# Exhibit C

Filing # 74406559 E-Filed 07/02/2018 05:03:24 PM

IN THE CIRCUIT COURT, SECOND JUDICIAL CIRCUIT IN AND FOR LEON COUNTY, FLORIDA

COREY and CHARISSE FULLER,

      Plaintiffs,

vs.                                 CASE NO.:  2018 CA 001464

P. TIMOTHY HOWARD;
HOWARD AND ASSOCIATES, PA;
CAMBRIDGE CAPITAL GROUP, LLC;
CAMBRIDGE CAPITAL ADVISORS LLC;
CAMBRIDGE CAPITAL PARTNERS, LP;
CAMBRIDGE CAPITAL GROUP EQUITY OPTION OPPORTUNITIES, LP;
CAMBRIDGE CAPITAL HOLDINGS;
CAMBRIDGE CAPITAL FUNDING, INC.;
YOUR CASE, LLC;
CAMBRIDGE CAPITAL WEALTH ADVISORS, LLC;
CAMBRIDGE CAPITAL GROUP ADVISORS, LLC;
ADDYS WALKER; and
GAIL MILON

      Defendants,

_____/

## **COMPLAINT**

COME NOW Plaintiffs COREY FULLER and CHARISSE FULLER, who bring this Complaint against Defendants on the following grounds:

1.     This is an action to recover damages in excess of $15,000, brought on behalf of the Plaintiffs against the Defendants.

2.     The Plaintiffs are husband and wife, who reside in Leon County, Florida.

3.     Plaintiff Corey Fuller formerly played professional football for several seasons with the National Football League (NFL).

4.     P. TIMOTHY HOWARD is a lawyer licensed in Florida, operating as HOWARD & ASSOCIATES, P.A.  Howard, individually, and Howard & Associates, P.A, his law firm, will be collectively referred to herein as "Howard."

5.     In early 2015, Howard established Cambridge Capital Group, LLC, as a private investment fund, with Cambridge Capitol Advisors, LLC, serving as the general partner of such fund. Mr. Howard served as the titular president of Cambridge Capital Group, LLC. The remaining defendants are related entities to these Cambridge entities, and will be referred to collectively in this Complaint as the "Cambridge Entities." Howard has described the investment fund as having the purpose to "empower and elevate leaders in underserved communities across the globe."  Howard engaged Don Reinhard, a convicted felon, to manage the assets of the fund.

6.     Howard has provided legal representation to numerous individuals, including Plaintiff Corey Fuller, in litigation brought by a class of former NFL players to recover damages for concussion injuries and related issues (the "NFL Concussion Litigation"). That case is in multi-district litigation in the United States Court for the Eastern District of Pennsylvania, Case No. 2:12-md-02323-AB, MDL No. 2323, the Honorable Anita B. Brody presiding.

7.     At or around the time that Plaintiff Corey Fuller agreed to retain the legal services of Howard for purposes of the NFL concussion case, Howard requested that Plaintiffs transfer their savings in their personal retirement accounts to the investment fund promoted by Howard, the Cambridge Capital Partners, LLC.

8.     To induce investment in this fund by Plaintiffs and others, Howard provided a "Private Offering Memorandum," dated March 1, 2015. See Attachment A. The Private Offering Memorandum stated that the investments were complex and exclusively for sophisticated investors.

9.     The Private Offering Memorandum stated that materials related to the operations of the fund or other matters relating to the Private Offering Memorandum were "available at the

administrative offices of the General Partner and the Fund located at 2120 Killarney Way, Suite 125, Tallahassee, FL 32309, Attention: Tim Howard, J.D., PhD."

10.     The Private Offering Memorandum also stated that the objective of the fund was to generate capital gains and interest from mortgage backed securities and similar investments.

11.     The General Partner "retained the Investment Manager to manage the Fund's investment portfolio."  The Cambridge fund and its General Partner granted wide latitude to the Investment Manager to invest such funds. The Private Offering Memorandum also allowed for the General Partner to enjoy 20% of the profits of the Fund and to pay 2% of the asset value in management fees.

12.     The Private Offering Memorandum identified the Investment Manager as Don Reinhard. The Private Offering Memorandum, however, did not disclose that Mr. Reinhard was a convicted federal felon who had been sentenced to prison for bankruptcy fraud and bank fraud in 2009, well prior to the representations in the Private Offering Memorandum. See United States District Court for the Northern District of Florida, Case No. 4:08cr49-01. Attachment B.

13.     The Private Offering Memorandum also failed to disclose that Mr. Reinhard was barred by the Securities and Exchange Commission from associating with any investment advisor as of 2011 and that a civil injunction to that effect had been issued in 2008. Attachment C.

14.     On information and belief, at various times, Plaintiffs' funds were invested in funds controlled by the CAMBRIDGE CAPITAL GROUP, LLC; CAMBRIDGE CAPITAL ADVISORS LLC; CAMBRIDGE CAPITAL PARTNERS, LP; CAMBRIDGE CAPITAL GROUP EQUITY OPTION OPPORTUNITIES, LP; CAMBRIDGE CAPITAL HOLDINGS;

CAMBRIDGE CAPITAL FUNDING, INC.; YOUR CASE, LLC; and possibly unknown related entities (referred to herein as the "Cambridge Entities").

15.     Collectively, Plaintiffs deposited approximately $700,000 in retirement funds with Defendants for investment in the fund managed by Defendants.

16.     In the beginning of 2018, Plaintiffs demanded the return of their investments, but Defendants have not complied with this demand nor have Defendants supplied Plaintiffs with up-to-date statements of their accounts. Instead, Defendant Howard has stated that he conveyed control of the Fund to others, including Defendants Walker and Milon.

17.     Defendant Howard stated that he conveyed the assets to others because the Florida Bar advised him that his conduct in encouraging clients to invest in the fund created by Howard was in violation of the Florida Bar rules. In 2017, Defendant Howard removed his name as President of the Cambridge Entities, and substituted the name of his mother-in-law, Ms. Lois Koons as the new President. New Cambridge entities were also created during this timeframe in Nevada with officers Lois Koons, Defendant Addys Walker and Defendant Gail Milon. Based on these name changes and new officers, Defendant Howard now claims that he has divested himself of any responsibility for the Plaintiffs' savings.

18.     Class Counsel in the Eastern District of Pennsylvania has alleged that the funds are being used by the Defendants for purposes other than those expressed in the placement memorandum. On information and belief, the Defendants are using such funds of their clients to further their own financial purposes in the NFL Concussion Litigation. The Defendants have admitted that Reinhard invested these funds in "advances" as an "investment class." In other words, the Defendants have used retirement funds invested in a fund to allow the Howard Defendants to pay advances to other potential plaintiffs to encourage them to become clients in

-4-

the concussion litigation. Class Counsel brought this matter to the attention of Judge Brody, who issued an Order on February 20, 2018, directing that all such Cambridge Entities' funds be frozen.

19.     The Howard Defendants encouraged the investment of their clients' retirement funds in a risky investment in which Howard had a financial interest.

20.     The Howard Defendants did not disclose that the funds were being managed by a person convicted of fraud. The Defendants also misled the Plaintiffs as to the true nature of the invested funds, which was not only deceptive but also could have jeopardized the tax status of the Plaintiffs' retirement funds.

## COUNT I – FRAUD

21.     Plaintiffs re-allege and incorporate herein by reference the allegations in Paragraphs 1 through 20.

22.     Plaintiffs have performed all conditions precedent to the filing of this action.

23.     Defendants and their agents intentionally made false statements or omitted material facts regarding the investment of Plaintiffs' funds in the Cambridge Entities.

24.     Defendants and their agents knowingly made fraudulent misrepresentations regarding the use of such funds and the capabilities of the Cambridge Entities and Mr. Reinhard in the Private Offering Memorandum and otherwise.

25.     Defendants and their agents knew or should have known these representations were false.  At the time Defendants and their agents made these misrepresentations, the intended purpose was to use such assets for undisclosed and improper purposes.

26.     These misrepresentations and omissions were material and fraudulently caused Plaintiffs to invest their funds in these entities. Plaintiffs reasonably relied on all of these false representations and omissions to their detriment.

27.     As a result of Defendants' false statements, material omissions and fraudulent conduct, Plaintiffs suffered financial damages through the loss of their life savings.

WHEREFORE, the Plaintiffs demand a jury trial and pray that this Court:

(a)     find that Defendants' actions constituted fraud;

(b)     enter a judgment in favor of Plaintiffs against Defendants;

(c)     award Plaintiffs compensatory, punitive and other damages in an amount to be proven at trial; and

(d)     grant such other relief as is just and equitable, including costs, as authorized by law.

## COUNT II - CONVERSION

28.     Plaintiffs re-allege and incorporate herein by reference the allegations in Paragraphs 1 through 20.

29.     Plaintiffs have performed all conditions precedent to the filing of this action.

30.     Defendants have appropriated the assets of Plaintiffs for their own benefit without lawful authority and refuse to account for such funds or return them, as demanded.

31.     In assuming exercise and control over these assets of Plaintiffs without lawful authorization, Defendants have unlawfully converted Plaintiffs' assets to their own use.

32.     As a direct result of such acts, Plaintiffs have suffered damages by the loss of assets.

WHEREFORE, Plaintiffs demand a jury trial and prays that this Court:

(a)     find that Defendants' actions constituted an unlawful conversion;

(b)     enter a judgment in favor of Plaintiffs against Defendants;

(c)     award Plaintiffs compensatory, punitive and other damages in an amount to be proven at trial; and

(d)     grant such other relief as is just and equitable, including costs, as authorized by law.

## COUNT III - BREACH OF FIDUCIARY DUTY

33.     Plaintiffs re-allege and incorporate herein by reference the allegations in Paragraphs 1 through 20.

34.     Plaintiffs have performed all conditions precedent to the filing of this action.

35.     Defendants owed a fiduciary duty to Plaintiffs by virtue of their handling and investment of Plaintiffs' life savings. Plaintiff Corey Fuller, at the time of the relevant events, was also suffering from brain injuries suffered as the result of his playing career, and Defendants were well aware of his condition.

36.     Defendants violated this fiduciary duty to Plaintiffs by failing to protect the Plaintiffs' savings, by taking advantage of the attorney-client relationship, and by taking advantage of Plaintiffs' condition to support the Defendants' own financial purposes.

37.     As a proximate cause of such acts, the Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand a jury trial and pray that this Court:

(a)     find that Defendants' actions violated fiduciary duties owed to Plaintiffs;

(b)     enter a judgment in favor of Plaintiffs against Defendants;

(c)     award Plaintiffs compensatory, punitive and other damages in an amount to be proven at trial; and

(d)     grant such other relief as is just and equitable, including costs, as authorized by law.

**COUNT IV – UNJUST ENRICHMENT**

38.     Plaintiffs re-allege and incorporate herein by reference the allegations in Paragraphs 1 through 20.

39.     Plaintiffs have performed all conditions precedent to the filing of this action.

40.     Defendants have been unjustly enriched by the transactions described above.

41.     The transfer of Plaintiffs' property for the benefit of Defendants unjustly enriched Defendants and the proceeds of such transactions should be placed in trust for Plaintiffs.

42.     Defendants' retention of Plaintiffs' funds and refusal to return such funds confers a benefit upon Defendants. The Defendants' acceptance and retention of the benefits under these circumstances make it inequitable for Defendants to retain such benefits without paying the value thereof.

43.     As a proximate cause of such acts, Defendants have been unjustly enriched, causing Plaintiffs to suffer damages.

WHEREFORE, Plaintiffs demand a jury trial and pray that this Court:

(a)     find that Defendants' actions resulted in unjust enrichment;

(b)     enter a judgment in favor of Plaintiffs against Defendants;

(c)     award Plaintiffs compensatory, punitive and other damages in an amount to be proven at trial; and

(d)     grant such other relief as is just and equitable, including costs, as authorized by law.

## COUNT V - CONSTRUCTIVE TRUST

44.     Plaintiffs re-allege and incorporate herein by reference the allegations in Paragraphs 1 through 20.

45.     Plaintiffs have performed all conditions precedent to the filing of this action.

46.     Defendants received property of Plaintiffs and utilized such funds for their own benefit. Defendants have unlawfully claimed a right to Plaintiffs' savings to invest in undisclosed ventures.

47.     Such actions by Defendants have deprived Plaintiffs of valuable property rights.

48.     As a result of the Defendants' unauthorized receipt and conveyance of Plaintiffs' savings, and the failure to return such savings, Plaintiffs will continue to be damaged by the ongoing use of such funds, unless Defendants' funds and the funds of any related entity possessing such funds are impressed with a constructive or resulting trust.

49.     Absent the imposition of a constructive or resulting trust on such sums, Defendants will continue to enjoy the beneficial interest of Plaintiffs' savings to the exclusion of the equitable rights of Plaintiffs.

WHEREFORE, Plaintiffs demand a jury trial and pray that this Court:

(a)     impose a constructive trust upon the relevant property rights;

(b)     enter a judgment in favor of Plaintiffs against Defendants;

(c)     award Plaintiffs compensatory, punitive and other damages in an amount to be proven at trial;

(d)     grant such other relief as is just and equitable, including costs, as authorized by law.

**COUNT VI – INJUNCTIVE RELIEF**

50.     Plaintiffs re-allege and incorporate herein by reference the allegations in Paragraphs 1 through 20.

51.     In addition to converting Plaintiffs' property, Defendants continue to receive the benefits of Plaintiffs' savings on an ongoing basis.

52.     Plaintiffs seek preliminary injunctive relief, including the imposition of the constructive trust, and an order (a) requiring all distributions from the transactions described above to be directed to the benefit of such constructive trust; (b) barring Defendants from receiving any further distributions from such transactions; and (c) requiring that such funds be placed in the registry of the court at the expense of Defendants pending a resolution of this case.

WHEREFORE, Plaintiffs demand a jury trial and pray that this Court:

(a)     Impose a constructive trust to collect and disburse receipts for the benefit of Plaintiffs;

(b)     restrain and enjoin Defendants from further collections in connection with the transactions described above;

(c)      enter a judgment in favor of Plaintiffs against Defendants;

(d)     award Plaintiffs compensatory, punitive and other damages in an amount to be proven at trial; and

(e)     grant such other relief as is just and equitable, including costs, as authorized by law.

## COUNT VII – PROFESSIONAL LIABILITY (Howard Defendants only)

53.     Plaintiffs re-allege and incorporate herein by reference the allegations in Paragraphs 1 through 20.

54.     Plaintiffs have performed all conditions precedent to the filing of this action.

55.     The Howard Defendants owed a professional obligation to Plaintiffs by virtue of their attorney-client relationship.

56.     Defendants violated these obligations and betrayed their legal duty to Plaintiffs by using the attorney-client relationship to persuade Plaintiffs to invest their life savings in a risky commercial investment for the benefit of counsel without properly advising Plaintiffs of the use of their funds and the risks involved. The breach of such professional obligations included, but is not limited to, the direction of Plaintiffs' life savings into the hands of an investment counselor who was a known felon and a person barred from giving investment advice.

57.     As a result of the advice of HOWARD and his firm, Plaintiffs have been damaged. Defendants breached their obligation to their clients by negligently or intentionally supplying false information regarding Plaintiffs' investment of their life savings.

58.     The Defendant knew that Plaintiffs would reasonably rely upon such information, and Plaintiffs did, in fact, reasonably rely on the information supplied by Defendants.

59.     As a direct and proximate result of the foregoing, Plaintiffs have suffered damages, including pecuniary losses.

WHEREFORE, Plaintiffs demand a jury trial and prays that this Court:

(a)     find that Defendants' actions constituted legal malpractice and violated their professional duties owed to Plaintiffs;

(b)     enter a judgment in favor of Plaintiffs against Defendants;

-11-

(c)     award Plaintiffs compensatory, punitive and other damages in an amount to be

proven at trial; and

(d)     grant such other relief as is just and equitable, including costs, as authorized by

law.

Respectfully submitted this 2nd day of July, 2018.

/s/ Thomas M. Findley
THOMAS M. FINDLEY
Florida Bar No. 0797855
Primary E-Mail: tfindley@bakerdonelson.com
Secondary E-Mail: jwarmack@bakerdonelson.com
BAKER, DONELSON, BEARMAN,
 CALDWELL & BERKOWITZ, PC
Monroe-Park Tower
101 North Monroe Street, Suite 925
Tallahassee, Florida  32301
Telephone:  (850) 425-7500

*Counsel for Plaintiffs, Corey and Charisse Fuller*

# Attachment A



# CAMBRIDGE
## CAPITAL GROUP

### INVESTMENT

Cambridge Capital Group can provide investors
with core-building blocks for portfolios, access
to hard-to-reach market segments, or highly
targeted investment opportunities.

CAMB-2_000618



# CAMBRIDGE CAPITAL PARTNERS L.P.

An Alternative Investment Fund with an Investment Focus on Mortgage Backed Securities, Asset Backed Securities, Private Debt Securities, and Litigation Settlements.

CAMB-2_000619

## GENERAL PARTNER and INVESTMENT MANAGER

Cambridge Capital Advisors, LLC

One Broadway, 14th Floor
Cambridge, MA 02142

340 Royal Poinciana Way, Suite 317/362
Palm Beach, FL 33480

2120 Killarney Way, Suite 125
Tallahassee, FL 32309

CAMB-2_000620

Offeree Name_____                                          Copy Number_____

### CAMBRIDGE CAPITAL PARTNERS L.P.

#### PRIVATE OFFERING MEMORANDUM
#### FOR
#### OFFERING OF LIMITED PARTNERSHIP INTERESTS

Required Minimum Investment – $100,000

THIS MEMORANDUM IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN THE LIMITED PARTNERSHIP INTERESTS OF CAMBRIDGE CAPITAL PARTNERS L.P., A MASSACHUSETTS LIMITED PARTNERSHIP ORGANIZED ON FEBRUARY 20, 2015. DUE TO THE CONFIDENTIAL NATURE OF THIS MEMORANDUM, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL CONSEQUENCES. AS A RESULT, THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART OR DELIVERED TO ANY PERSON WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

THE INVESTMENT APPROACH AND TRADING TECHNIQUES USED BY THE FUND INVOLVE A HIGHER DEGREE OF RISK THAN THAT ASSOCIATED WITH LESS AGGRESSIVE INVESTMENT ALTERNATIVES. AN INVESTMENT IN THE FUND IS THEREFORE NOT AN APPROPRIATE INVESTMENT FOR ANYONE UNABLE TO BEAR SUBSTANTIAL RISK OR REQUIRING LIQUIDITY AND SHOULD NOT BE VIEWED AS A COMPLETE DIVERSIFIED INVESTMENT PROGRAM. *SEE* "CERTAIN RISKS".

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THIS OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE FUND INTERESTS HAVE NOT BEEN APPROVED OR RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE FUND INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND ARE OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND SUCH LAWS, AS AMENDED. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.

The date of this Private Offering Memorandum is March 1, 2015.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO THE REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THERE ARE ALSO FURTHER SUBSTANTIAL RESTRICTIONS ON THE TRANSFERABILITY OF THE FUND INTERESTS.

CAMB-2_000621

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX CONSEQUENCES FROM AN INVESTMENT IN THE FUND. NO ASSURANCE CAN BE GIVEN THAT THE EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS OWN COUNSEL AND ACCOUNTANT FOR ADVICE CONCERNING THE VARIOUS LEGAL, TAX, AND ECONOMIC CONSIDERATIONS RELATING TO THEIR INVESTMENT. EACH INVESTOR IS RESPONSIBLE FOR THE FEES OF THEIR PERSONAL COUNSEL, ACCOUNTANT, AND OTHER ADVISORS.

NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM OTHER THAN THIS MEMORANDUM AND THE AGREEMENTS REFERRED TO HEREIN SHALL BE CONSIDERED TO CONSTITUTE AN OFFERING OF FUND INTERESTS. NO PERSON OTHER THAN THE GENERAL PARTNER AND ITS EXECUTIVE OFFICERS AND PLACEMENT AGENTS HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THE FUND INTERESTS, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR OTHERWISE SUPPLIED BY THE GENERAL PARTNER, ITS EXECUTIVE OFFICERS OR PLACEMENT AGENTS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE FUND OR ANY OF ITS PARTNERS.

THE FUND WILL MAKE AVAILABLE TO EACH INVESTOR OR HIS AGENT, PRIOR TO THE SALE OF ANY INTEREST TO SUCH INVESTOR, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE FROM REPRESENTATIVES OF THE GENERAL PARTNER CONCERNING ANY ASPECT OF THE FUND AND ITS PROPOSED BUSINESS AND TO OBTAIN ANY ADDITIONAL RELATED INFORMATION TO THE EXTENT THAT THE FUND POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

A PROSPECTIVE INVESTOR SHOULD NOT SUBSCRIBE FOR LIMITED PARTNERSHIP INTERESTS UNLESS SATISFIED THAT THEY OR THEIR INVESTMENT REPRESENTATIVE HAVE ASKED FOR AND RECEIVED ALL INFORMATION WHICH WOULD ENABLE THEM TO EVALUATE THE MERITS AND RISKS OF THE PROPOSED INVESTMENT.

## TO FLORIDA RESIDENTS:

PURSUANT TO THE PROVISIONS OF THE FLORIDA SECURITIES ACT, IF YOU ARE A FLORIDA RESIDENT, YOU HAVE THE RIGHT TO RESCIND YOUR SUBSCRIPTION AND TO RECEIVE A FULL REFUND OF YOUR SUBSCRIPTION PAYMENT BY GIVING CAMBRIDGE CAPITAL ADVISORS, LLC, AT 2120 KILLARNEY WAY, SUITE 125, TALLAHASSEE, FL 32309, (850) 298-4455 (o), (850) 216-2537 (f), info@cambridgecapitalgroup.holdings, NOTICE OF SUCH RECISSION BY TELEPHONE, LETTER, FACSIMILE, OR EMAIL WITHIN THREE BUSINESS DAYS OF ENTERING INTO YOUR SUBSCRIPTION AGREEMENT. IF YOUR NOTICE IS NOT TRANSMITTED BY SUCH TIME, YOUR RIGHT OF RESCISSION SHALL BE NULL AND VOID.

CAMB-2_000622

## TABLE OF CONTENTS

Page

1.  Summary .................................................................................................. 1

2.  Investment Objectives and Approach............................................................ 2

3.  Certain Risks............................................................................................ 5

4.  Prospective Investors................................................................................ 11

5.  Investment Management............................................................................ 11

6.  Management Fees and Allocation................................................................. 13

7.  Other Provisions of the Partnership Agreement............................................. 15

8.  Brokerage and Custody.............................................................................. 20

9.  Reports to Partners................................................................................... 21

10. Plan of Distribution................................................................................... 21

11. Federal Income Taxation............................................................................ 21

12. Other Taxes............................................................................................. 23

13. Fiscal Years and Interim Periods................................................................. 23

14. Procedure for Becoming a Limited Partner.................................................... 23

15. Available Materials.................................................................................... 23

APPENDIX A: Agreement of Limited Partnership............................................... A-1

APPENDIX B: Accredited Investor Definition Per Section 501(a) of Regulation D,...... B-1

APPENDIX C: Qualified Client Definition.......................................................... C-1

6

CAMB-2_000623

## 1. SUMMARY

THE FUND -- Cambridge Capital Partners L.P. (the "Fund") is a Massachusetts limited partnership investment fund organized in February 2015. The General Partner of the Fund (the "General Partner") is Cambridge Capital Advisors, LLC, a Florida limited liability corporation organized in February 2015. The Investment Manager of the Fund (the "Investment Manager") is Cambridge Capital Advisors, LLC, a Florida limited liability corporation organized in February 2015.

INVESTMENT OBJECTIVE AND APPROACH -- The objective of the Fund will be to generate capital gains and interest income primarily from investment and trading in mortgage backed securities ("MBS") and derivatives, asset backed securities ("ABS") and derivatives, US and International private and public debt securities ("USP") and derivatives, and litigation settlement claims ("LS"). The Fund may also invest in and trade in other securities, derivatives and financial contracts, both for hedging and for speculative purposes. The Investment may also allocate up to 25% of the Fund's net assets (determined at the time of investment) to other investment managers, including investment managers which may be affiliated with the Investment Manager.

INVESTMENT MANAGER -- The General Partner has, subject to delegation, sole responsibility for management of the Fund's business and investments. The General Partner who is also the Investment Manager will manage the Fund's investment portfolio on a discretionary basis. The Investment Manager is registered as an exempt investment advisor with the Securities and Exchange Commission under the Advisors Act Section 203(m), as amended, *See* "Management".

THE OFFERING -- The Fund is currently offering limited partnership interests with a current minimum investment by each subscriber of $100,000 (subject to waiver in the discretion of the General Partner). No minimum amount of interests must be subscribed prior to a sale of limited partnership interests.

RISKS AND SUITABILITY -- Purchase of a limited partnership interest in the Fund should be deemed to be an aggressive growth investment and is not intended as a complete investment program. *An investment in the Fund is designed only for investors who have adequate means of providing for their needs and contingencies without relying on distributions or withdraws from their Fund accounts, who are financially able to maintain their investment and who can afford the loss of their investment. There can be no assurance that the Fund will achieve its investment objectives. See "Certain Risks".* Investment in the Fund is available exclusively to sophisticated persons and entities that have a net worth in excess of $2,000,000.00, qualify as "accredited investors" as defined in Rule 501 of Regulation D under the Act and that meet the "qualified client" test of Rule 205-3, as amended, promulgated under the Investment Advisors Act (*see* Appendices B and C of this Memorandum). All investors must also have adequate means of providing for their needs and contingencies without relying on distributions or withdraws from the Fund, must be financially able to maintain their investment for an extended period and must be able to afford the loss of their investment. ADMISSION AS A LIMITED PARTNER IN THE FUND IS NOT OPEN TO THE GENERAL PUBLIC.

AVAILABLE INFORMATION -- This Memorandum sets forth the investment objectives, method of operation and certain other pertinent information relating to the Fund; however, this Memorandum does not set forth all the provisions and distinctions of the Amended and Restated Agreement of Limited Partnership of the Fund (the "Partnership Agreement") that may be

7

CAMB-2_000624

significant to a particular prospective limited partner. A copy of the Partnership Agreement is attached as Appendix A to this Memorandum.

Each prospective limited partner should examine the Memorandum, the Partnership Agreement and the Subscription Agreement contained the Subscription Package delivered with or after delivery of this Memorandum in order to assure himself that the terms of the Partnership Agreement and the Fund's investment objective and method of operation are satisfactory to them. Prospective limited partners are invited to review any materials that the General Partner has available that relate to the Fund, the operations of the Fund and any other matters relating to this Memorandum. All such materials are made available at the administrative offices of the General Partner and the Fund located at 2120 Killarney Way, Suite 125, Tallahassee, FL 32309, Attention: Tim Howard, J.D., Ph.D. The General Partner will afford prospective limited partners the opportunity to ask questions of and receive answers from its officers and the officers of the Investment Manager concerning the terms and conditions of the offering and the Fund's investment objective and strategies, and to obtain any additional information to the extent that the General Partner or the Fund possesses such information or can acquire it without unreasonable effort or expense.

## 2. INVESTMENT OBJECTIVE AND APPROACH

**OBJECTIVE AND GENERAL APPROACH** - The objective of the Fund will be to generate capital gains and interest income primarily from investment and trading in mortgage backed securities ("MBS") and derivatives, asset backed securities ("ABS") and derivatives, US and international private and public debt securities ("USI") and derivatives, and litigation settlement claims ("LS"). The Fund may also invest in and trade in other securities, derivatives and financial contracts, both for hedging and for speculative purposes. The investment may also allocate up to 25% of the Fund's net assets (determined at the time of investment) to other investment managers, including investment managers which may be affiliated with the Investment Manager.

**MORTGAGE-BACKED SECURITIES** -- Mortgage-backed securities ("MBS") can take a number of forms, including collateralized mortgage obligations ("CMOs") with tranches that include interest only securities ("IO"), principle only securities ("POs"), Inverse Floaters (securities whose coupon rates move in the opposite direction from an index such as LIBOR) and Inverse IOs (IOs whose coupon rates move in the opposite direction from an index). The values of these instruments depend, to differing degrees, on prevailing interest rates (long and short term) and mortgage prepayment rates which are largely a function of long term interest rates.

The Fund's strategy will be to focus on MBS that are issued and guaranteed by Government Sponsored Enterprises ("GSEs") such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") or issued and guaranteed by Government National Mortgage Association ("Ginnie Mae"). While this will significantly reduce default risk, the Fund may also periodically invest in private-label mortgage CMOs.

**ASSET-BACKED SECURITIES** -  Asset-backed securities ("ABS") are bonds or notes that are backed by financial assets such as credit card loans, auto loans, manufactured housing loans, legal claims and home equity loans. The values of these instruments depend, to a differing degree, on prevailing interest rates (long and short term) and asset durations, ie. period of time from investment to repayment, which are a function of many outside influences.

**INVESTMENT AUTHORITY AND RESTRICTIONS** -- The Fund has broad authority under the Partnership Agreement to acquire, purchase, invest in, hold for investment, own, exchange, assign,

8

CAMB-2_000625

sell or otherwise dispose of, trade in, on margin or otherwise, sell short, lend, lease, mortgage, pledge or otherwise deal in "Securities" (as defined below). The Fund may employ an aggressive investment policy and utilize sophisticated trading techniques such as (but not limited to) selling short, borrowing money for the purchase of securities and currency contracts and purchasing and selling put and call options (or combinations thereof), and may also make more conservative investments, including, but not limited to, investment in cash, deposit accounts and cash equivalents, as and when determined appropriate by the General Partner and the Investment Manager. The Fund may invest in Securities that are "restricted" as defined in Rule 144 promulgated under the Securities Act of 1933, as amended, and other Securities for which there is no established trading market. Unless properly registered, the Fund will not invest directly in commodities, commodity futures contracts or financial futures contracts. In addition, the Fund may sell any, all or substantially all of the assets of the Fund and collect and administer proceeds of any such sale and engage in such other activities related to the foregoing as the General Partner deems necessary, advisable or convenient to the promotion or conduct of the business of the Fund.

The term "Securities" includes foreign or domestic stocks, partnership interests, bond, warrants, debentures, puts, calls, notes, CMOs, REMICs and other synthetic, asset-backed and derivative securities, currencies or combinations thereof, mortgages or other obligations, any certificates, receipts, forward or spot contracts, repurchase agreements or other agreements or instruments representing rights to receive, purchase, subscribe for or sell any of the foregoing, or representing any other rights or interests therein or in any property or assets created or issued by any foreign or domestic persons, firms, associations, corporations or governments, agencies or subdivisions thereof, and futures and options of all types, including without limitation futures and options regarding Securities, commodities and financial market indices, except that the Fund will not invest in any instrument, future, option, commitment or other contract, investment or commodity interest that would, if the Fund were to invest, trade or deal in it, cause the General Partner or Investment Manager to be considered a commodity pool operator, unless and until the effectiveness of appropriate registration as a commodity pool operator or otherwise upon compliance with applicable regulations of the Commodity Futures Trading Commission.

The Fund may invest from time to time in securities of an issuer that would constitute more than 10% of a class of the outstanding stock of that company, if the General Partner or Investment Manager determines in its discretion that such an investment is appropriate.

GENERAL INVESTMENT APPROACH — Although the General Partner and the Investment Manager have extremely broad authority to invest and reinvest Fund assets in a wide range of investment situations at any time and may do so as they deem appropriate, the Investment Manager currently intends to emphasize the purchase of CMOs, ABS, and opportunistic loan / debt securities that will generate significant current cash flow as well as capital gains. These securities are often more volatile and less liquid than traditional corporate and US government debt securities. Although the Fund expects to generate attractive returns with a leveraged portfolio, there may be active trading and turnover in response to market conditions. The Investment Manager will also have the authority to use substantial borrowing at times to acquire portfolio positions with market values equal to up to ten times the Fund's net asset value in order to increase the Fund's potential returns. While leverage of this degree would be rare and only for short periods, the Investment Manager does intend to use borrowing to acquire portfolio positions with market values ranging from 2 to 10 times the Fund's net asset value. However, the Investment Manager may also determine to position the Fund entirely in cash equivalents or to take a substantial net short position in the portfolio if its perception of the market's trend is negative. These investment approaches may entail both the possibility of increased potential investment returns and the potential for greater losses.

9

CAMB-2_000626

The Investment Manager will also generally attempt to limit Fund market losses by establishing long or short positions in any number of different securities or instruments, as well as through other hedging strategies that it deems appropriate. These strategies may include, but not limited to, the purchase or sale of mortgage-backed derivatives, US Government securities, mortgage-backed collateral, interest rate caps and floors, and exchange-traded or over-the-counter traded equity and index options. However, the Investment Manager does not currently expect that the Fund will normally be in a fully hedged or market neutral position. *See also* "Potential Changes" below.

INVESTMENT SELECTION PROCESS – The Investment Manager maintains numerous contacts within a network of dealers in the fixed income markets. Through these contacts, the Investment Manager is presented with global investment opportunities. The Investment Manager evaluates these investment opportunities based upon its assumptions as to global interest rate directions and volatility, mortgage prepayment and prepayment trends, consumer debt trends, central bank policies and actions, and general market conditions. Based upon this analysis, the Investment Manager evaluates the risk/reward potential of the securities under consideration and makes an appropriate bid or offer.

As discussed above, a guiding principle for the Investment Manager is to generate a high level of current cash flow in relation to the size of the invested capital as well as capital gains. The Investment Manager will use its experience in the fixed income and mortgage derivatives markets as well as its knowledge of the global economy to establish positions that it believes will best meet these goals and provide a high level of return to the Fund.

CASH POSITIONS – The Fund's assets (other than those required for immediate operating expenses) may be invested fully in securities and other investment instruments, may be held fully in cash or cash equivalents, may be partially invested and partially held in cash, or may be fully or partly committed to short position securities and similar positions in other investment instruments, as the General Partner or Investment Manager believe the circumstances warrant.

DIVERSIFICATION AND CONCENTRATION – The General Partner and Investment Manager do not expect diversification of the Fund's investments among a large number of issuers at all times, and the Fund's investments may be concentrated in securities which can be adversely affected by changes in the interest rate environment as well as general market conditions.

INHERENT RISKS – An investment in the Fund should be viewed as an aggressive growth investment with above average risk. It is not intended as a complete investment program and is designed only for investors who have adequate means of providing for their needs and contingencies without relying on distributions or withdraws from their Fund accounts, who are financially able to maintain their investment and who can afford the loss of their investment. There can be no assurance that the Fund will achieve its investment objectives. All potential investors in the Fund should understand the investment approaches and techniques that the Investment Manager expects to use in the management of the Fund and the particular risks associated with those approaches and techniques. *See* "Certain Risks" below.

POTENTIAL CHANGES – *The General Partner reserves the right to alter any Fund investment policy or strategy as deemed appropriate from time to time in its discretion without requiring limited partner approval and without prior notice.*

10

CAMB-2_000627

### 3. CERTAIN RISKS

OPERATING HISTORY -- While the Fund does not have any operating history, members of the Fund's Investment Management Committee have vast global experience and involvement in business management, marketing, technology, economic analysis, fixed income analysis, MBS and CMO research, risk and return modeling, and stress investment analysis.

RESTRICTED WITHDRAWS AND TRANSFERABILITY -- Limited partner withdraws may not be made until the conclusion of the fourth full calendar quarter after investment and thereafter may be made only as of the first day of a calendar quarter after a 30 day written notice. The amount of a withdraw, which must generally be paid out within 30 days after the effective date of the respective withdraw, may also be further delayed under certain circumstances. In addition, the transferability of limited partnership interests will be restricted by provisions of federal and state laws, and transfers are prohibited except with the prior approval of the General Partner. There is no public market for the Fund's limited partnership interests, and none will develop.

Because of the limitation on withdrawal rights and the fact that limited partnership interests are not tradable, an investment in the Fund is a relatively illiquid investment. A subscription for limited partnership interests should be considered only by investors who have adequate means of providing for their needs and contingencies without expecting distributions or making withdrawals from the Fund, who are financially able to maintain their investment and who can afford a loss of a substantial part of such investment.

SPECULATIVE NATURE OF THE FUND'S INVESTMENT PROGRAM -- Prospective investors should be aware that the Fund's investment program can be speculative and involve a substantial degree of risk. Prices of mortgage-related securities, asset backed securities and distressed debt and their associated derivatives can be highly volatile. Price movements of such securities are influenced by, among other things, changing supply and demand relationships; government, trade, fiscal and economic events; and changes in interest rates. The investment characteristics of mortgage-related securities and asset-backed securities differ from traditional debt securities. The major differences include more frequent interest and principle payments (usually monthly), and the possibility that the underlying mortgages or financial assets may be prepaid at any time. Prepayment rates are influenced by changes in interest rates and a variety of other factors. In general, changes in the rate of prepayments will change the current and future cash flows and the yield to maturity (or total return) of the security. As a result, these differences can result in significantly greater price and yield volatility than in the case with traditional debt securities.

Despite the risk management techniques which may be utilized by the Fund, there is no assurance that the Fund will not be exposed to risks of significant losses. The prices of other derivatives and options used for hedging purposes may not correlate with price movements of the underlying securities being hedged. Except as described herein, there are no material limitations or restrictions on the particular securities or derivatives or the magnitude of the Fund's investments, or on the trading and investment strategies and techniques to be utilized by the Investment Manager, which may differ from time to time from those which are summarized herein.

LACK OF LIQUIDITY OF MORTGAGE-RELATED, ASSET-BACKED AND PRIVATE DEBT SECURITIES -- Mortgage-related securities, asset-backed securities, private debt securities,

11

CAMB-2_000628

litigation settlement claims and their associated derivatives are generally traded among broker-dealers and other institutional investors in over-the-counter markets or in private placement transactions. The Fund's portfolio may include securities which are not actively and widely traded or which are not registered under U.S. federal and state securities laws and therefore subject to restrictions on resale. Consequently, it may be relatively difficult for the Fund to dispose of investments rapidly and at favorable prices in connection with redemption requests, adverse market developments or other factors. There is no assurance that a liquid secondary market will exist for the securities held by the Fund or that the Fund will be able to dispose of such securities. The spread between the bid price and the asked price for mortgage- related securities, asset-backed securities and private debt securities and their associated derivatives can be very high in adverse market conditions. During these market periods, it is not unusual for the spread to be as high as 10% or more.

LEVERAGE - The Fund expects to finance portfolio positions by entering into repurchase agreements pursuant to which positions are sold to financial institutions subject to an unconditional obligation of the Fund to repurchase the position in the future at a fixed price (typically representing the sales price plus an interest charge) without regard to changes in the market value of the position after the sale to the financial institution. The Fund may also engage in other forms of borrowing in the course of its investments operations. Thus, the Fund may be in a highly leveraged position. The use of borrowed funds is intended to permit the Fund to purchase a portfolio whose value may be several times greater than the Fund's capital, which could result in a greater return on invested capital than is otherwise obtainable, however, if the Fund's investments suffer losses, the Fund's assets could decline in value to a greater extent than would have been the case had no funds been borrowed. Additionally, the Fund's investments and trading program may also involve other forms of leverage.

HEDGING (SHORT SALES; OPTIONS) - The Fund will engage in short sales, option trading and other strategies from time to time. A short sale will result in a gain if the price of the securities sold short declines between the date of the short sale and the date on which securities are purchase to replace those borrowed. A short sale will result in a loss if the price of the securities sold short increases. Any gain is decreased, and any loss is increased by the amount of any payment dividend or interest that the Fund may be required to pay with respect to the borrowed securities, offset (wholly or partly) by short interested credits. In a generally rising market, the Fund's "short" positions may be more likely to result in losses while the Fund's "long" positions increase in value. Conversely, in a generally falling market, the Fund's "short" positions may be more likely to result in gains while the Fund's "long" positions decrease in value. A vast majority of any of the short sales that the Fund will transact will be intended as part of the Fund's hedging strategies which in general are usually intended to limit or reduce investment risk, however, they can also be expected to limit or reduce the potential for profit.

Trading option contracts may be used either as a hedge for the portfolio or as a means of speculation. The prices of most, if not all, option contracts are highly volatile; price movements may fluctuate rapidly and over wide ranges during a short period of time. An option contract is a right, purchased for a certain price, either to buy or sell a particular security during a certain period of time for a pre-established price.

Although successful options trading requires many of the same skills as successful securities trading, the risks are somewhat different. As with short sales, a vast majority of any option purchases or sales will usually be intended as part of the Fund's hedging strategies.

12

CAMB-2_000629

### RELIANCE ON THE GENERAL PARTNER AND INVESTMENT MANAGER

The General Partner has retained the Investment Manager to manage the Fund's investment portfolio on a discretionary basis. The Investment Manager, which will act through its officers, employees and agents from time to time, has substantial discretionary authority to identify structure, execute, administer, monitor and liquidate Fund investments, consistent with the Fund's investment objective, authority and approach as described in this Memorandum and as the same may be altered by the General Partner from time to time. In exercising its authority, the Investment Manager has no responsibility to consult with any limited partner or any other person. Substantially all other decisions with respect to the management of the Fund's affairs are made exclusively by the General Partner (although it may also delegate administrative responsibilities from time to time). Limited partners have no right or power to take part in the management of the Fund. Accordingly, no person should purchase a limited partnership interest unless such person is willing to entrust all aspects of the management and all investment decisions of the Fund to the General Partner, the Investment Manager and their officers, employees and agents from time to time.

For the foreseeable future, it is expected that the Investment Manager will be the only investment manager retained by the General Partner to act on behalf of the General Partner with respect to management of the Fund's investments. The Investment Manager will rely on its investment management team in performing its duties as the investment manager of the Fund. As a result, the Fund's potential for success is expected to depend in particular on the team's ability to manage the Fund's investment. Since the investment management team will be globally diversified with vast talent and experience from many disciplines, the Fund's investments should not be adversely affected in the event the Fund lost the services of any one member.

### NEGOTIATION OF THE PARTNERSHIP AND INVESTMENT MANAGEMENT AGREEMENTS

The General Partner has generally determined the terms of the Partnership Agreement and the General Partner and the Investment Manager have determined the terms of the Investment Management Agreement among the Fund, the General Partner and the Investment Manager, which were not negotiated on an arms-length basis. In addition, legal counsel for the General Partner and the Investment Manager has not acted as counsel for or represented the interests of the limited partners. Potential investors should consult with their own legal counsel with respect to the Fund.

### NO ASSURANCE OF PROFIT OR CASH DISTRIBUTION

There is no assurance that future Fund investments will be profitable or that any future distribution will be made to the limited partners, and any prior successful investment management, recommendations or analysis by the Investment Manager or its investment committee and any future successful Fund performance cannot be relied upon as assuring further successful performance. Any future return on investment to the limited partners will depend upon successful investments made by the Fund at the direction of the Investment Manager and its investment committee. The value of any such investments will depend upon many factors beyond their control

13

CAMB-2_000630

and the control of the Fund, the General Partner and the Investment Manager. The expenses of the Fund may also exceed its income.

## PERFORMANCE-BASED PROFIT ALLOCATIONS

The fees paid by the Fund to the General Partner include quarterly performance-based allocations of profits in an amount equal to 20% of the net profits (including net unrealized profits), if any, subject to limited loss carry-forward provisions, generated in the accounts of limited partners. These quarterly allocations of net profits ("Performance Profit Allocations") will only be allocated after achieving a "soft" hurdle rate of 4% per annum, calculated quarterly, and may create an incentive for the General Partner and Investment Manager to make Fund investments that are riskier or more speculative than would be the case in the absence of such performance-based profit allocation arrangements in order to generate net profits subject to the Performance Profit Allocations. The performance-based allocations will be based on ALL realized and unrealized profits including the 4% hurdle rate after such rate is achieved.

## MANAGEMENT FEES

The Fund also pays quarterly management fees in an amount equal to .5% (2% per annum) of the Net Asset Value ("NAV") to the General Partner which is in addition to the performance-based profit allocation. The initial annual management fee is paid upon deposit in lieu of a one year "lock up" provision. Additionally, each Limited Partner agrees to pay a 6% one time special set up fee to the General Partner subject to waiver by the General Partner. The General Partner may also receive commission income or broker fees as well as loan broker fees from time to time with respect to Fund portfolio transactions.

## HIGH TURNOVER

Due to the nature of the Fund's investments and frequent return of principle capital, the Fund may also trade very actively, with resulting higher portfolio turnover and transaction costs, if the Investment Manager anticipates market conditions where active trading will produce the best overall investment returns. *See* "Conflicts of Interest" and "Brokerage and Custody" below.

## EFFECT OF WITHDRAW

Withdrawals by limited partners could require the Fund to liquidate or close out positions more rapidly than would otherwise be desirable, which could reduce the value of Fund assets and cause a resulting reduction in the value of limited partnership interests, or require the Fund to distribute securities in response to withdrawal requests.

## REPAYMENT OF DISTRIBUTIONS

Limited partners are not personally liable for any debts or losses of the Fund beyond the amount of their capital contribution and profits attributable thereto (if any) if the Fund is otherwise unable to meet its obligations. However, limited partners might be required to repay with interest Fund cash or in-kind distributions (including distributions on partial or complete redemption of limited partnership interests and distributions deemed a return of capital) received by them to the extent of overpayments, if the Fund is insolvent at the time of the payments or if such distributions render the Fund insolvent.

## CONFLICTS OF INTEREST

14

CAMB-2_000631

Certain inherent conflicts of interest are likely to arise as a result of the General Partner, the Investment Manager and affiliated persons carrying on similar investment activities both for themselves and for clients other than the Fund. As such, the General Partner and such persons will not be required to refrain from any other activity or to disgorge any profits from any such activity in the future. See "*Other* Provisions of the Partnership Agreement" below.

The Fund, other partnerships in which the General Partner, the Investment Manager and their affiliates may participate as a partner or serve as a manager and other investment management and consulting clients that the General Partner and such other persons or their affiliates may have from time to time may share administrative offices and utilize common services, facilities, investment research and management. The General Partner and such other persons may also determine from time to time that some investment opportunities are appropriate for certain investment management clients and not others, including the Fund, due to differing objectives, time horizons, liquidity needs or availability, tax consequences and assessments of general market conditions and of individual securities. It may also occasionally be necessary to allocate limited investment opportunities among the Fund and others on a basis deemed appropriate by the General Partner or the Investment Manager, which may mean that the General Partner, the Investment Manager, or other accounts managed by them, achieve profits that the Fund does not or avoid losses that the Fund suffers.

The General Partner and the Investment Manager also have complete discretion regarding the selection of those registered securities brokers, including associates of the General Partner or the Investment Manager, who execute and clear transactions on behalf of the Fund and the commissions and fees payable to such brokers. It is also expected that the General Partner and Investment Manager will allocate brokerage business generally on the basis of best available execution, but they may also allocate Fund brokerage business based in part on the provision of or payment for other products or services (including but not limited to investment research) to the Fund, the General Partner or affiliated persons. Such products or services may not be used for the direct or exclusive benefit of the Fund and may reduce the overhead and administrative expenses otherwise payable by the General Partner under the terms of the Partnership Agreement. The General Partner and Investment Manager also expect to allocate brokerage business to brokers who refer investors to the Fund and other investment funds and accounts managed by the General Partner, the Investment Manager or other affiliated persons. The General Partner or any of such persons may also determine in the future to establish or become affiliated with a securities broker-dealer and to execute transactions for the Fund through such affiliated broker-dealer. *See also* "Brokerage and Custody" and "Plan of Distribution" below.

### TAX RISKS

Limited partners will be subject to income taxation on their distributive shares of Fund net taxable income. In this regard, there are several risk factors of which potential investors should be aware. In addition, the Fund has not received, and does not propose to seek, an opinion of counsel or ruling from the Internal Revenue Service ("Service") on any matter set forth herein. *Investors are expected to seek and rely upon the advice of their own tax advisors.*

It is probable that a partner's share of the Fund's taxable income, and attendant income tax liabilities, will exceed cash distributions from the Fund (since distributions are not currently contemplated). Accordingly, a limited partner should not rely on or anticipate distributions of cash from the Fund to cover income tax liabilities associated with his investment in the Fund. Limited partners will not be permitted to withdraw funds from their capital accounts until the conclusion of the fourth full calendar quarter after investment, and thereafter may be made only as of the first day of a calendar quarter after *30* days prior written notice, even if they have income tax liability

15

CAMB-2_000632

associated with an investment in the Fund during that period. It is also possible that Fund net taxable income may occur in a year when the net asset value of the Fund is falling. Further, to the extent that the General Partner is unable to satisfy requests for withdrawals through distributions of securities in kind, the Fund may be required to sell appreciated securities, causing accelerated recognition of gains allocable to both the withdrawing and non-withdrawing Partners.

The Fund also anticipates, based upon the Code and Treasury Regulations ("Regulations") as currently in effect, that the Fund is more likely than not to be characterized for federal income tax purposes as a partnership rather than an association taxable as a corporation. No opinion of counsel has been obtained and no tax ruling will be sought from the Service as to the status of the Fund as a partnership. However, this opinion of the Fund may be challenged and, while the Fund would expect to prevail in any such dispute, there can be no certainty of that result.

Potential investors should also be aware that the Fund is not a so-called "tax shelter" investment intended to generate net losses that could be used to offset income from other sources. Temporary Treasury Regulations also provide that the activity of trading personal property (such as securities) for the account of owners of interests in the activity is not considered a passive activity that generates "passive" income, without regard to whether such activity is a non-passive trade or business activity. It is therefore not expected that the net income generated from the Fund's activities will be classified by the Service as "passive" income, notwithstanding the general rule that income derived by a limited partner is passive in nature. As a result, it is expected that a limited partner will not be able to use passive losses from other sources to offset Fund net income.

Under Temporary Treasury Regulations, it is also likely that Fund income derived by a limited partner that would otherwise be considered passive income will be deemed to be "portfolio" income. If the income generated by the Fund is characterized as portfolio income, then certain expenses incurred by the Fund could be characterized by the Service as investment advisory fees or other expenses incurred in connection with the production of income. In such event, each non-corporate partner's pro rata share of expenses so characterized would be deductible to such partner only to the extent such amount, when added to the partner's other miscellaneous itemized deductions, exceeded 2% of such partner's adjusted gross income for the year in question.

If the Fund's activities are deemed to constitute trading activity, it will then be deemed to generate "non- passive" income, 'which would allow non-corporate partners to deduct expenses incurred in connection with the Fund's trading without regard to the 2% threshold described above. However, no assurances can be given that the activities of the Fund will be interpreted by the Service to be non-passive in nature or that the Temporary Treasury Regulations will not be modified or withdrawn in the future.

The Fund may also take a more aggressive tax position than a partner might. Should the Service disallow any such position, partners could be audited and required to pay back taxes, interest and perhaps penalties. Under the Internal Revenue Code of 1986, as amended (the "Code"), neither interest nor any penalties incurred in such circumstances would be deductible. Further, the Code provides for centralized resolution of tax disputes where partnerships are involved. As a result, the resolution of tax disputes *affecting* partners' returns may ultimately be controlled by the General Partner. Any audit activity at the Fund level could also result in the audit of individual partners' returns with respect to items unrelated to the Fund's activities.

Any tax-exempt entities that invest in the Fund should also consider that the Fund will likely generate "unrelated Business taxable income." As a result entities may become subject to taxation of such income.

16

CAMB-2_000633

Federal and state tax laws are changing continuously as a result of new legislation, new regulations, and new administrative and judicial pronouncements. These changes may affect the Fund and its partners. All tax matters affecting the Fund and, through it, its partners, are and will be subject to such change. *Potential investors should discuss the particular tax implications for them of an investment in the Fund with their tax advisors. See* "Federal Income Taxation" and "Other Taxes" below.

#### QUALIFIED PLAN INVESTORS

Fiduciaries of qualified plans, in consultation with their tax and legal advisers, should carefully consider whether an investment in interests is consistent with their fiduciary responsibilities, particularly the responsibilities outlined in Part 4 of Title 1 of ERISA, the effect of the possible treatment of assets of the Fund as "plan assets", and certain tax risks such as, but not limited to, the probability of a portion of the Fund's net taxable income being taxed to them as "unrelated business taxable income."

#### INVESTMENT COMPANY ACT OF 1940

The Fund intends to avoid becoming subject to the Federal Investment Company Act of 1940, as amended. However, it cannot absolutely assure investors that under certain conditions, changing circumstances or changes in the law, it may become subject to the Investment Company Act of 1940 in the future. Becoming subject to that Act could have a material adverse effect on the Fund if it is determined that registration would be cost prohibited. If this were the case, the Fund would be liquidated and the proceeds distributed to the limited partners.

#### 4.  PROSPECTIVE INVESTORS

The Fund is currently offering limited partnership interests to up to 99 investors. The minimum investment for a subscriber, subject to waiver by the General Partner, is currently $100,000. No minimum amount of interests must be subscribed before additional interests will be sold.

Admission as a limited partner in the Fund is not open to the general public and is limited to persons and entities with a net worth of at least $2,000,000.00, excluding the value of their primary residence, or an initial investment of at least $1,000,000.00 that qualify as "accredited investors" as defined in Rule 501 of Regulation D under the Act and that meet the "qualified client" test of Rule 205-3 promulgated under the Investment Advisers Act (see Appendices B and C to this Memorandum). If an investor is a private investment company (that is, a company that would be defined as an investment company under the Investment Company Act of 1940 but for the exception from that definition provided by section 3(c)(1) of that Act), a qualified purchaser pool as defined in section 3(c)(7) of that Act, an investment company registered under that Act or a business development company (as defined in section 202(a)(22) of the Investment Advisers Act of 1940), then each equity owner of that investor must have a net worth of at least $2,000,000.00 excluding the value of their primary residence.

The Fund is not intended as a complete investment program and is designed only for persons and entities that have adequate means to provide for their needs and contingencies without relying on distributions or withdrawals from the Fund, that are able to bear the economic risk and afford the loss of the investment, and that either are sophisticated regarding financial and business matters or are represented by such a person in connection with their investment in the Fund.

Prospective investors should read carefully this entire Memorandum, the Partnership Agreement attached to this Memorandum as Appendix A and the Subscription Agreement included in the

17

CAMB-2_000634

Subscription Package delivered with or after delivery of this Memorandum. The Partnership
Agreement sets forth the specific provisions relating to the operations of the Fund.

## 5. INVESTMENT MANAGEMENT

CAMBRIDGE CAPITAL ADVISORS LLC -- The Fund is managed exclusively by the General
Partner, Cambridge Capital Advisors LLC ("CCA"), and such persons as the General Partner
retains from time to time, as described below and elsewhere in this Memorandum. CCA is also the
Investment Manager.

Cambridge Capital Advisors LLC, is a Florida Limited Liability Corporation organized on
February 27, 2015. Dr. Tim Howard, J.D., Ph.D., and Mark Hallim are the sole shareholders,
executive officers and directors with Dr. Howard holding the office of President. CCA is also
advised by Don Reinhard in its capacity as investment manager of the Fund.

Mr. Reinhard graduated from Florida State University in 1979 with a major degree in Finance and
a minor in Accounting. He also received his Masters degree in Finance from FSU in 1991.

Mr. Reinhard began an extremely successful investment management and analysis career in 1985
and eventually founded and owned his own SEC Registered Investment Advisory Firm and Hedge
Fund business in 1997. From inception to 6/2003 his Hedge Fund clients and parallel separately
managed portfolios received an average annual investment return of 25.39% while the S&P 500
returned 0.66% per annum. However, in July 2003, the custodian of his accounts, Bear Stearns,
through a computer error, failed to provide accurate market prices. This impacted the margin
calculations on 14 of 300 clients, and Mr. Reinhard's personal account as well. This Bear Stearns
error caused the liquidation of approximately $7 million in accounts and though Bear Stearns
readily admitted its error, it callously required Mr. Reinhard and his clients to sue Bear Stearns for
repayment. This cavalier approach to liability was a key reason that Bear Stearns ceased to exist in
March of 2008.

Despite the responsibility of Bear Stearns in causing the liquidation, the Securities and Exchange
Commission sanctioned Mr. Reinhard before he could prosecute Bear Stearns for its admitted
error. Taking full responsibility to protect his clients' interests, Mr. Reinhard organized the
damaged clients to pursue a case against Bear Stearns and personally provided over $1 million in
litigation fees. Despite 4 clients that wielded substantial political and media influence taking a
different and unsuccessful approach by targeting Mr. Reinhard, Bear Stearns was found liable for
the errors in a May 2011 arbitration that returned full compensation to the remaining clients.

In addition to Mr. Reinhard's direct investment management experience, he was extensively
involved with the former NYSE Assistant Chief of Margin Regulations, Mr. Steven Levine, on
various projects related to exempt fixed income securities and the NYSE financing requirements.

Dr. TIM HOWARD, J.D., Ph.D. -- Dr. Howard, who graduated with a B.A. degree Cum Laude in
Government, with Minors in History, Law and Society in 1983, a J.D. degree in 1986 from Florida
State University, and a Ph.D. degree in Law, Policy and Society in 2005 from Northeastern
University, began his professional career in with Florida Governor Bob Graham, the Florida
Legislature, and the Florida Attorney General's Office in the 1980s, including work as Special
Assistant Attorney General, and Assistant Attorney General. During 1993-1995 he held the
position as Senior Attorney for the Florida Governor's Agency for Health Care Administration,
and in 1995 he founded Howard & Associates, P.A. specializing in Government policy and
litigation, health care, securities and consumer litigation, trial practice, personal injury, and

18

CAMB-2_000635

product liability. His firm acted as the coordinator of Florida's Historic Tobacco Liability Litigation, which resulted in a $27 billion recovery for the State of Florida.

Dr. Howard also created the world's first Law & Policy Executive Doctoral Program at Northeastern University and served as its Director and Professor from 2007–2011. In 2012, Dr. Howard founded Cambridge Graduate University International, the world's first global campus graduate university with a focus to prepare global leaders to not only possess the knowledge to impact the world today but give them the necessary skills and tools to implement and execute solutions for business, technology, sustainable economic growth, health care, fina█████████, public and private leadership, and social sciences. Dr. Howard ████████████ni████████c world as a leader in the applied praxis model of education and the Investment Manager intends to leverage the global relationships developed by Dr. Howard and others associated with Cambridge Graduate University International. *See also* "Investment Advisory Team" insert provided with this Memorandum.

OTHER ACTIVITIES -- The General Partner and the Investment Manager intend to devote a significant portion of their business time to Fund activities. However, the Partnership Agreement recognizes that each of them and their affiliates and other officers, directors and employees may conduct any other business including any business with respect to securities. Without limiting the generality of the forgoing, each of such persons may serve as an officer, director or consultant to any company, including companies in which the Fund invests, may act as an investment manager for others, may manage funds or capital for others, may have, make and maintain investments in their own names or throu███████er entities, and may serve as an officer, director, consultant, partner or stockholder of one or more investment funds, partnerships, securities firms or advisory firms. The Partnership Agreement also recognizes that it may not always be possible or consistent with the investment objectives of the various persons described above and of the Fund for the same investment positions to be taken or liquidated at the same time or at the same price.

### INVESTMENT MANAGEMENT FEE AGREEMENT AND INVESTMENT MANAGER INDEMNIFICATION

The General Partner and Fund currently retain the Investment Manager to manage the Fund's investments on a discretionary basis pursuant to an investment Agreement dated as of February 27, 2015 (the "Management Agreement"). Under the terms of the Management Agreement, the Investment Manager has complete discretion to direct the investment of the Fund's assets subject to the investment authority, objectives and strategies outlined in the Partnership Agreement and in this memorandum. The Management Agreement expires on December 31, 2025 but will renew automatically for one-year terms absent prior notice. As compensation for its services, the General Partner has assigned the Management Fee to the Investment manager. In addition, the Fund and General Partner have agreed to indemnify the Investment Manager and its associates with respect to any claims relating to actions performed or omitted to be performed by or on behalf of the Investment Manager in managing the assets of the Fund, except to the extent that such a claim result from bad faith, intentional misconduct, malfeasance or knowing violation of law. However, no party to the Management Agreement has waived any of the party's rights with respect to compliance by the other parties with any provision of the Investment Advisers Act of 1940, as amended, under state law or with any rule, regulation or order thereunder.

### · 6. ·MANAGEMENT FEES AND ALLOCATION OF NET PROFITS AND LOSSES

The following is a brief description of the fees payable to the General Partner, the Investment Manager and their assignees for management and services provided to the Fund, and of the method by which the profits and losses resulting from operation of the Fund will be allocated among the

19

CAMB-2_000636

partners. The following description is qualified by reference to the full text of the Partnership Agreement attached as Appendix A.

MANAGEMENT FEE - The Partnership Agreement provides for the payment by the Fund to the General Partner and Investment manager of a quarterly fee (the "Management Fee") in an amount equal to 0.5% of the balance of limited partner accounts as of the first day of each calendar quarter. Management Fees are calculated after all allocations of net profits or losses of the Fund (including any Performance Profit Allocations) for the prior quarter, and after giving effect to all capital contributions and withdrawals. Any amounts contributed to a limited partner's capital account on a special opening date during a calendar quarter are also assessed the Management Fee pro rata with respect to that portion of the calendar quarter after the special opening date. The Management Fee is generally payable in cash within thirty days. No part of previously paid Management Fees is refundable with regards to any withdrawals made during a calendar quarter.

The management Fee is generally paid in lieu of reimbursement for administrative and overhead expenses (other than those operating expenses included in calculations of Fund profits and losses) incurred by the General Partner on behalf of the Fund, including "fund services", rent, the cost of computer equipment, telephone service, financial manuals, news services and periodical subscriptions, employee salaries, secretarial services and office supplies and equipment. Such administrative and overhead expenses, other expenses of the Fund, the General Partner and the Investment Manager and the Management fees themselves may also, in the discretion of the General Partner or Investment Manager, be paid through "soft dollar" arrangements with brokerage firms selected by the General Partner or Investment Manager and used by the Fund in executing and clearing Fund securities transactions. *See* "Brokerage and Custody" below. In no event shall the General Partner or Investment Manager be obligated to pay or cause to be paid pursuant to soft dollar arrangements any part of the Management Fees or other Fund expenses prior to causing all expenses otherwise to be borne by the General Partner or Investment Manager to be so paid. The amount of the Management Fee paid may be less or more than the total amount of such cost and expenses actually borne by the General Partner. The Management Fee has been assigned to the Investment Manager pursuant to the Management Agreement.

In lieu of the Fund having an initial one year "lock up" period in which limited partners cannot withdraw their funds, each limited partner will pay the full first year management fees of 2.0% upon their initial deposit into the fund. Subsequent deposits into the fund during the first full calendar year will pay a pro rata amount of the first year management upon the subsequent deposit. After the anniversary date of the initial deposit, future management fees will be paid as defined above.

The General Partner may also from time to time negotiate to participate in fees paid by the borrower to brokers of private placement debt and advances on legal settlement claims. However, the General Partner's negotiated share of broker's fees would always be paid from the borrower's proceeds at normal "market" fees and not in excess to the broker's normal "market" fees.

Additionally, each Limited Partner agrees to pay a 6% one time special set up fee to the General Partner subject to waiver by the General Partner.

DETERMINATION AND ALLOCATION OF PROFIT AND LOSS GENERALLY

The net profits or net losses of the Fund as of the end of each fiscal period are generally allocated to each partner in the proportion that his capital account bore to the aggregate of all the capital accounts as of the beginning of such fiscal period (generally, each calendar quarter). Net profits and net losses of the Fund are determined on the accrual basis of accounting in accordance with

20

CAMB-2_000637

generally accepted accounting principles consistently applied and are deemed to include net unrealized profits or losses on securities positions as of the end of each fiscal period. See also "Other Provisions of the Partnership Agreement – Determination of Net Asset Value", "Fund Asset valuation" and "Capital Accounts" below.

PERFORMANCE PROFIT ALLOCATIONS – An amount equal to 20% of the excess, if any, of each limited partner's share of net profits during each calendar quarter over the Loss Carryforward Account (as described below) balance, if any, for that limited partner is allocated to the capital accounts of the General Partner and any Special Partners (such as the Investment Manager) designated by the General Partner from the capital accounts of the limited partners. Performance Profit Allocations may also be made at any time for an individual limited partner who makes a substantial withdrawal in the discretion of the General Partner. Performance Profit Allocations do not apply to Related Partners and Special Partners except as directed by the General Partner. The Partnership Agreement will be interpreted as required to comply with Rule 205-3 promulgated under the Investment Advisers Act of 1940.

Performance profit allocations will not be allocated until the Fund reaches a "soft" hurdle rate of 4% per annum calculated quarterly. In other words, the "soft" hurdle rate for the second quarter will be 2% and will increase to 3% at the end of the third quarter. At such time, ALL realized and unrealized profits will be subject to the performance profit allocation.

A memorandum account ("Loss Carryforward Account") is maintained for each limited partner to determine any cumulative net losses over the eight calendar quarters prior to the period for which a performance Profit Allocation is to be made and that may reduce the amount of the Performance Profit Allocation from the limited partner's capital account. Loss Carryforward Account balances are reduced pro rata upon a withdrawal from a limited partner's capital account.

*The performance Profit Allocations may create an incentive for the General Partner and Investment Manager to make investments that are riskier or more speculative than would be the case in the absence Performance Profit Allocations. Including unrealized appreciation when calculating Performance Profit Allocations may increase the amount of such allocations to the General Partner and Investment Manager as opposed to just including realized appreciation.*

### 7. OTHER PROVISIONS OF THE PARTNERSHIP AGREEMENT

The following is a brief description of certain provisions of the Fund and is qualified by reference to the full text of the Partnership Agreement attached as Appendix A.

TERM OF THE FUND – The fund will continue until December 31, 2065, unless earlier dissolved as provided in the Partnership Agreement.

WITHDRAWALS OF CAPITAL AND RETIREMENT OF PARTNERS – Upon giving 30 days written notice, a limited partner may withdraw up to 90% of his capital account balance as of the first day of a calendar quarter. Such notice must state the amount to be withdrawn or the basis on which such amount is to be determined, with a minimum withdrawal of $25,000 unless otherwise permitted by the General Partner. However, the amount of a limited partner's withdrawals in excess of 25% of their capital account may be limited on a *pro rata* basis to the extent that aggregate withdrawals by all limited partners as of any date exceed 50% of the Fund's net asset value. Amounts not subject to withdrawal due to this limitation will be treated as though no withdrawal notice had been given with respect to that amount. Withdrawals may also be delayed during a state of emergency, if securities markets have been closed or under other extraordinary circumstances as

21

CAMB-2_000638

determined in good faith by the General Partner. A partner who properly elects to withdraw all of his capital account will be deemed to have retired as of the elective date of such withdrawal. The General Partner may withdraw all or any portion of its capital account at any time.

The General Partner may also, in its discretion, retain from amounts otherwise distributable to a limited partner a reserve in such amount as it deems proper with respect to that limited partner's pro rata share of any contingency, charge, expense or other unliquidated liability or asset accrued or anticipated to be applicable to any period prior to the effective date of the withdrawal and not previously included in calculating the net asset value of the Fund. That amount, so far as such liability is unliquidated or the value of the asset is unrealized, is fixed by the General Partner in its discretion (the "Reserve Amount"). Prior to the liquidation of the amount of the liability or realization of the value of the asset with respect to which the Reserve Amount was established and the inclusion of such amount in determining the net asset value of the Fund (if applicable), the Reserve Amount may be invested by the General Partner together with other Fund assets or segregated from other Fund assets, as determined by the General Partner. A withdrawing limited partner is not entitled to receive any share of net profits of the Fund with respect to the Reserve Amount for the period during which the Reserve Amount is invested or any other profits generated, but is entitled to payment of the Reserve Amount (plus or minus his or her pro rata share of the realized amount of the asset or the liquidated amount of the liability with respect to which the Reserve Amount was established). Reserve Amounts shall be distributed and paid promptly upon liquidation of the liability or realization of the asset to which they relate.

In its sole discretion, and without any advance notice, the General Partner may require any limited partner to retire from the Fund at any time. The General Partner also has the authority in its discretion to make disproportionate tax allocations of gain or loss as it determines appropriate in the event of a withdrawal during a period when the Fund has substantial unrealized gains or losses for tax purposes.

Amounts withdrawn and payable to a limited partner as of any date will be paid within 30 days after that withdrawal or payment.

PAYMENT ON RETIREMENT OR SUBSTANTIAL WITHDRAWAL - A partner retiring in accordance with the Partnership Agreement will be entitled to receive an amount equal to the value of his capital account as of the date of his retirement Subject to any Reserve Amount established by the General Partner, 90% of the estimate of such amount will be paid within 30 days after the date of such partner's retirement, and the remainder (the "Retained Amount") will be paid promptly after the Fund's independent public accountants have completed their audit of the Fund's year-end financial statements. If the audit indicates that the 90% payment exceeded the value of the retiring partner's account, the partner will be obligated to repay to the Fund the amount of the excess. Any limited partner seeking a withdrawal of more than 90% but less than his entire capital account balance will also be subject to such procedures. The Retained Amount may be invested by the General Partner together with other Fund assets or segregated from other Fund assets, as determined by the General Partner. A withdrawing limited partner is not entitled to receive any share of net profits of the Fund with respect to be Returned Amount, but is entitled to payment for the Retained Amount as adjusted pursuant to the audit.

Any overpayment upon a withdrawal will bear interest at a rate equal to the Prime rate as reported by the *Wall Street Journal* as of the date of such proper notice of the overpayment, plus two percent (2.0%), if the overpayment has not been repaid within 30 days after notice to the withdrawing partner.

22

CAMB-2_000639

DISTRIBUTIONS IN CASH OR IN KIND - Withdrawals of capital and the payment of the value of a partner's capital account to him on retirement will be made in cash or, as determined by the General Partner, in securities selected by the General Partner, or partly in cash and partly in securities selected by the General Partner. The General Partner would then normally sell the assets so distributed for the account of the withdrawing partner and distribute the cash proceeds to that partner in the same manner as though the Fund had sold the assets and distributed cash, but could distribute the assets themselves if the partner so prefers or if the General Partner has determined to distribute securities that are privately or thinly traded and for which a purchaser at an acceptable price has not been identified. While these alternative means of effecting a withdrawal may or may not change the total amount of gain or loss recognized by the withdrawing partner, the choice of method may affect the character of the gain and loss or the tax year in which recognition occurs. The General Partner is not obligated to use one method or the other in effecting withdrawals, but may make distributions that produce favorable tax results for partners not making withdrawals in its discretion. Any partner who receives a distribution in kind will bear the market risk of a decline in the value of the distributed securities. However, the General Partner will make all efforts to make withdrawals of capital and payments of the value of a partner's capital account upon retirement in cash.

DETERMINATION OF NET ASSET VALUE - The net asset value of the Fund is determined as of the close of business on the last day of each calendar quarter and the day prior to each other date that the Fund accepts capital contributions or that a withdrawal or distribution is made ("Valuation Dates"). All amounts are stated in United States Dollars, with assets and liabilities denominated in currencies other than United States Dollars on a valuation Date converted to United States Dollars at published exchange rates in effect on that Valuation Date. The net asset value of the Fund is determined as of each Valuation Date by:

(a) Adding (i) the aggregate value of the investments of the Fund (determined as described below in "Fund Asset valuation"), (ii) the invested cash balances of the Fund (as adjusted), (iii) such assets as would generally be considered pre-payments of expenses to be amortized over future periods, and (iv) such other assets of the Fund as should be considered assets in accordance with generally accepted accounting principles applied in a consistent manner (provided that the value of the name and goodwill of the Fund are not included in calculating the net asset value of the Fund); and

(b) Deducting from that total sum any liabilities as determined in accordance with generally accepted accounting principles applied in a consistent manner.

The net amount remaining is deemed to be the net asset value of the Fund on that Valuation Date. The net profit or net loss of any period is the difference between the net asset value of the Fund at the beginning of the period and the net asset value of the Fund at the close of the same period, such net asset value in each case determined before giving effect to capital contributions and withdrawals. Any increase in net asset value over the period (other than as a result of capital contributions) is then treated as a net profit and any decrease in net asset value (other than as a result of distributions or withdrawals) is treated as a net loss. Capital contributions, distributions and withdrawals are then made, with the net resulting amount constituting the opening net asset value of the Fund for the subsequent fiscal period.

FUND ASSET VALUATION - The Fund's assets are valued in the following manner:

(1) Securities for which market quotations are available are valued at their closing sale price on the Valuation Date (or, if on such date securities markets were closed, then the last

23

CAMB-2_000640

preceding business day on which they were open) on the composite tape or the primary exchange on which the security is traded;

(2) Securities traded in the over-the-counter market for which no sales quotations are generally available shall be valued at the closing bid price if held long and the closing ask price if sold short on the Valuation Date (or last preceding business day if securities markets were closed);

(3) Securities generally traded in an established securities market but for which there is no recorded sales information or quotations of bid and asked prices on the Valuation Date (or, if applicable, the last preceding business day) shall be valued by the General Partner in good faith with reference to (i) the most recently reported sales or bid and ask prices, (ii) bid and ask price information as of the Valuation Date not generally reported but secured from a reputable and independent broker, investment backer or other expert, and (iii) such other information as the General Partner believes in good faith is relevant;

(4) Puts, calls, futures and other contracts and derivative securities shall be valued in a manner comparable to the method for valuing other securities, except that listed options are valued at the closing bid price if held long and the closing ask price if sold short; and

(5) Securities not listed or traded on any exchange or in the over-the-counter market are considered as having no ascertainable market value and shall be valued at fair value based on information available to the General Partner regarding the value or worthlessness of such securities.

For valuation purposes, sales and bid and asked prices reported in newspapers of general circulation published in New York City, or in standard financial periodicals or in the records of securities exchanges or other markets, any one or more of which may be selected by the General Partner, are accepted as evidence of the price of a security. An investment purchased, and awaiting payment against delivery is included for valuation purposes as an asset held, and the cash account shall be adjusted by the deduction of the purchase price, including broker's commissions or other expenses of the purchase. An investment sold but not delivered pending receipt of proceeds is valued at the net sales price. For the purpose of valuation of an investment, except an investment sold but not delivered, no deduction is made from the value determined above for broker's commissions or other expenses that would be incurred upon a sale thereof.

CAPITAL ACCOUNTS - An individual capital account is maintained for each limited partner to which is added (a) the limited partner's initial capital contribution, (b) any additional capital contribution by the limited partner, and (c) any net profits allocable to the limited partner, and from which is deducted (w) any distribution made to the limited partner (whether or not at his request), (x) any net loss allocable to the limited partner, (y) any management fee then payable from the limited partner's capital account, and (z) any Performance Profit Allocation from the limited partner's capital account that is to be allocated to the General Partner and its assignees. *See also* "Management Fees and Allocation of Net Profits and Losses - Determination and Allocation of Profit and Loss Generally" and "Performance Profit Allocations" above.

OTHER GENERAL PARTNER AND MANAGEMENT ACTIVITIES - The Partnership Agreement recognizes that the General Partner, the Investment Manager and their affiliates and associates invest for their own account, may be associated with other investment entities, engage in investment management for others and engage in other business enterprises. The General Partner and such other persons are not limited or restricted from engaging in or devoting time and

24

CAMB-2_000641

attention to the management of any other business, whether of a similar or dissimilar nature, taking advantage of investment and business opportunities without offering the Fund an opportunity to participate, or rendering Services of any kind to any other corporation, partner, firm, individual or association. In no event may the General Partner or any of such other persons be required to account to the Fund or a limited partner for the profits generated by any such business, opportunity or service or through their own investments. The General Partner, such other persons and clients hold positions in securities from time to time both that the Fund owns and that it does not own.

ADMISSION OF PARTNERS AND ADDITIONAL CAPITAL CONTRIBUTIONS – The General Partner may admit additional limited partners to the Fund, or accept additional capital contributions from existing limited partners, on any date or dates selected by the General Partner. A person or entity may be added as an additional general partner with the approval of the existing General Partner and without requiring the consent of any limited partner. Capital contributions must be made in cash or, as permitted by the General Partner, readily marketable securities.

LIABILITY OF PARTNERS AND INDEMNIFICATION OF THE GENERAL PARTNER AND OTHERS – The General Partner is liable to creditors for the debts of the Fund. The General Partner will not be liable for honest mistakes in judgment or for losses due to such mistakes or for the negligence of employees, brokers or other agents of the Fund. The General Partner and its affiliates and associates will also not be liable to the Fund or any limited partner and will not be required to account for any profits or benefits generated from outside business activities, transactions with the Fund or the allocation of Fund brokerage business other than for the exclusive benefit of the Fund. *See* in particular section 3.1 of the Partnership Agreement attached as appendix A

The Fund will, to the fullest extent legally permissible under the laws of the State of Florida or Massachusetts, as defined in this agreement, indemnify the General Partner, the Investment Manager, any persons designated to wind up the affairs of the Fund pursuant to the Partnership Agreement and any of the Fund's sponsors and their affiliates against any loss, liability or expense reasonably incurred or suffered in connection with the performance by the General Partner or other persons of their responsibilities to the Fund. The Fund is also obligated to advance, subject to reimbursement under certain circumstances, the expenses of any such person incurred in connection with defending an action with respect to which they may be entitled to indemnification.

A limited partner will not be personally liable for any debt or obligation of the Fund. However, limited partners might be required to repay with interest Fund cash or in kind distributions (including distributions on partial or complete redemption of limited partnership interests and distributions deemed a return of capital) received by them to the extent of overpayments, if the Fund is insolvent at the time of the payments or if such distributions render the Fund insolvent.

EXPENSES – The General Partner is authorized to incur all operating expenses on behalf of the Fund, which expenses we borne by the Fund. The General Partner and Investment Manager generally bear their own overhead and administrative expenses incurred by them in managing the Fund, although those and other expenses may be paid pursuant to soft dollar arrangements as determined in the discretion of the General Partner or Investment Manager. *See* "Management Fees and Allocation of Net Profits and Losses – Management Fee" and "Brokerage and Custody". Expenses of operating the business borne by the Fund include but are not limited to fees of attorney, accountants, brokers, transfer agents, custodians, registrars and disbursing agents; other costs of effecting portfolio investments and portfolio transactions; taxes; insurance premiums; and interest. The Fund will reimburse Dr. Howard for an aggregate of $7,500.00 of Fund and General Partner organizational and offering expenses advanced by him once the Fund has received

25

CAMB-2_000642

$100,000.00 of capital contributions, which expenses will be capitalized and amortized over five years. The Fund will also bear the ongoing expenses of its offering of limited partnership interests.

AMENDMENT OF THE PARTNERSHIP AGREEMENT – The Partnership Agreement may be amended by the General Partner acting alone in any manner that does not adversely affect any limited partner and under certain other circumstances. The Partnership Agreement may also be amended by action of the General Partner and limited partners owning a majority in interest in the capital accounts of all the limited partners as to other designated matters. *See* Article 13 of the Partnership Agreement attached as Appendix A.

DISSOLUTION OF THE FUND – The Partnership Agreement provides that the Fund may be dissolved at any time by the General Partner without requiring the approval of any limited partner, whereupon its affairs shall be wound up by the General Partner.

The dissolution, death, retirement, bankruptcy, permanent disability or another event of withdrawal of the sole remaining General Partner would dissolve the Fund, and the business of the Fund would thereupon terminate and be wound up unless the limited partner's act unanimously to continue business of the Fund and appoint a new General Partner. If the Fund is dissolved, the General Partner, its designee or another person or entity designated by a majority in interest of the limited partners could take all steps necessary or appropriate to wind up the affairs of the Fund.

Neither the admission of partners nor the withdrawal, retirement, bankruptcy, death or insanity of any limited partner will dissolve the Fund.

ASSIGNABILITY OF LIMITED PARTNERSHIP INTEREST – Neither the interest of any limited partner in the Fund nor any beneficial interest therein is assignable, in whole or in part, without the consent of the General Partner.

POWER OF ATTORNEY – The General Partner is authorized to sign Fund documents on behalf of each limited partner so long as no personal liability is imposed by any such document on any limited partner.

### 8. BROKERAGE AND CUSTODY

The Fund pays brokerage commissions and fees to registered securities broker-dealers for executing and clearing transactions on behalf of the Fund on an agency and net basis. The General Partner and Investment Manager have complete discretion regarding the selection of such securities broker-dealers and the amount of brokerage commissions and fees paid to them, many or all of whom may refer prospective limited partners for investment in the Fund. *See* "Plan of Distribution" below. The General Partner or such other persons may also establish or acquire an interest in a securities brokerage firm in the future and execute Fund securities transactions through that firm.

Brokerage fees paid by the Fund vary and may be greater than those typical for investment funds similar to the Fund if the General Partner has determined that the research, execution and other services, including limited partner referrals and services rendered or items paid for pursuant to soft dollar arrangements (see below) of a particular broker merit greater than typical fees. Fund portfolio transactions may or may not also be made on an aggregate basis in conjunction with transactions on behalf of the General Partner, the Investment Manager, their affiliates or associates and other accounts managed by them. In those cases, the Fund may bear a *pro rata* share of brokerage commission expense similar to the commission expense that the Fund would have incurred if it had traded independently.

26

CAMB-2_000643

The Fund may also invest capital in private debt transactions whereby the borrower pays the General Partner or an associated company of the General Partner a "broker fee".

The Fund may also enter into so-called "soft dollar" arrangements with securities broker-dealer firms from time to time. Under these arrangements, the securities broker-dealer firms would provide or pay the costs of certain services, equipment or other items for the benefit of the Fund, the General Partner, the Investment Manager or one or more of their affiliates, in consideration of the allocation to the firm of Fund portfolio transactions (with resulting commission income or profit) made on behalf of the Fund on both an agency and net basis. The services, equipment and other items provided or for which payment is otherwise made using such soft dollar arrangements may include, without limitation, prime brokerage services, research services and products, proxy voting services, computers and other office equipment and services, investment research consulting fees, fees and charges for news wire, local and long distance telephone (land line, cellular and other), data processing, internet service provider, data access line and other service; Fund, General Partner and Investment Manager attorneys and accountants fees and expenses, Fund offering and marketing expenses (including without limitation fees and expenses of placement agents, finders, attorneys and accountants, filing fees, printing and mailing costs, and related travel and entertainment expenses), client and investor referrals, travel expenses related to Fund and other client investment research, office rent and utilities, quotation services, periodical subscription fees, and custody, record keeping and similar charges. The General Partner or Investment Manager may, in their discretion, arrange for the payment of the Management Fees through soft dollar arrangements with securities broker-dealer firms, which soft dollar payments would not reduce the amount of the Management Fees payable to the General Partner or Investment manager. In no event will the General Partner or Investment Manager be obligated to pay or cause to be paid pursuant to soft dollar arrangements any part of the Management Fees or other Fund expenses prior to causing all expenses otherwise to be borne by the General Partner or Investment Manager to be so paid. Any of those soft dollar arrangements may benefit the Fund by reducing its expenses or benefit the General Partner, the Investment Manager or one or more of their affiliates without any direct benefit to the Fund. The General Partner believes, however, that allocations of Fund portfolio transaction business and soft dollar arrangements would generally enhance the Fund's ability to obtain research and optimal execution, as well as other benefits to the Fund.

Custody of the Fund's investments will be maintained at one or more financial institutions or brokerage firms selected by the General Partner for publicly traded assets. Private debt assets will be maintained at the offices of the General Partner.

The Fund and General Partner will obtain verification by an independent representative prior to any payment or disbursement from the Fund to the General Partner, the Investment Manager or their affiliates intending to assure that the General Partner and Investment Manager will not be deemed to have custody of Fund assets for purposes of the federal Investment Advisers Act of 1940. However, such arrangements do not assure that Fund assets will be secure against any fraudulent activities of General Partner or Investment Manager personnel.

### 9.   REPORTS TO PARTNERS

The partners will be advised as of the end of each fiscal quarter as to the operation of the Fund. The books and records of the Fund will be audited as of the end of each fiscal year by a firm of independent certified public accountants selected by the General Partner, and the partners will be furnished with audited year-end f███cial statements, including a statement of profit or loss for such fiscal year. In addition, limited partners will receive a report reflecting the status of the charges in their capital account.

27

CAMB-2_000644

## 10. PLAN OF DISTRIBUTION

Interests are being offered and sold on behalf of the Fund by the General Partner. No person is currently entitled to any compensation from the Fund in connection with the offering and selling interests. However, the General Partner may direct or allocate Fund brokerage business to brokers who refer prospective investors to the Fund or otherwise assist the Fund in raising capital. *See* "Brokerage and Custody" above. The General Partner may also determine in the future to pay cash referral fees or to allow participation in Management Fees or Performance Profit Allocations for limited partner referrals, subject to compliance with applicable laws, regulations and disclosure of such compensation arrangements to the particular prospective limited partners.

The Fund intends to reimburse Dr. Howard for approximately $10,000.00 of Fund and General Partner organizational and offering expenses advanced by him once the Fund receives $1,000,000 of capital contributions, which expenses have been capitalized and are being amortized over five years. The Fund will also bear the ongoing expenses of its offering of limited partnership interests.

## 11. FEDERAL INCOME TAXATION

Except as described below, none of this Memorandum, the Fund the General Partner or counsel to the Fund makes or has made any representations to any potential purchaser of the partnership interests as to the federal or state income tax consequences of participating in the Fund or the operation of the Fund itself. The Fund has not requested, and accordingly will not receive, an opinion of counsel regarding any tax matter, nor has any Service ruling been sought with respect to any tax matter. *Federal and state tax laws are subject to constant change and the Fund cannot project how such changes would affect this investment.*

The Fund also anticipates, based upon the Code and Regulations thereunder as currently in effect, that the Fund is more likely than not to be characterized for federal income tax purposes as a partnership rather than an association taxable as a corporation. No opinion of counsel has been obtained and tax ruling will be sought from the Service as to the status of the Fund as a partnership. However, this position of the Fund may be challenged and, while the Fund would expect to prevail in any such dispute, there can be no certainty of that result.

Based on its assumption that the Fund is properly characterized as a partnership for federal income tax purposes, the Fed will file annually a partnership income tax information return, but will not be subject, as an entity, to federal income taxes. Each partner will be required to report on their own personal Federal income tax return his distributive share of the Fund's income, gains, losses, deductions and credits for the taxable year, whether or not actual distributions of cash or other property are made to him. Each partner's distributive share of such items is determined pursuant to the Partnership Agreement or otherwise in accordance with the partner's respective interests in the Fund, although the General Partner has the authority in its discretion to make disproportionate allocations as it determines appropriate in the event of a withdrawal during a period when the Fund has substantial unrealized gains or losses.

Potential investors should also be aware that the Fund is not a so-called "tax shelter" investment intended to generate net losses that could be used to offset income from other sources. Further, it is likely the Service will take the position, based on applicable Regulations, that the Fund will generate income against which losses from "passive investments" may not be offset, even though the Fund anticipates that it will operate such that its net income will not be considered "portfolio" income under the Regulations. In some instances, losses generated by the Fund may not be fully deductible to non-corporate partners. See "Certain Risks – Tax Risks". No assurances can be given in this regard, and investors are expected to seek and rely upon the advice of their own tax

CAMB-2_000645

advisors as to the characterization to investors of any net income derived from the Fund's activities and as to any limitations on the deductibility of certain fund expenses.

The Fund will provide annually to each partner a report of its operations and his share of the Fund's taxable income for use in the preparation of such partner's personal income tax return. The filing of such personal returns will be the responsibility of each partner. The Fund is not required to supply, and does not anticipate supplying, tax or accounting information to assignees of limited partners who do not become substituted limited partners.

Any tax-exempt entities that invest in the Fund should also consider that the Fund will likely generate "unrelated business taxable income". As a result, such entities may become subject to taxation of such income.

Partners should be aware that at any particular point in time the tax consequences of an investment in the Fund may vary significantly, and even inversely, from the performance of the Fund as reflected in a Partner's capital account. For example, while the overall performance of the Fund may reflect losses, sales may be primarily of securities, which have appreciated, therefore generating tax liabilities. In addition, dividends and interest can accrue and be taxable to partners in periods when the net asset value of the Fund is falling (though such income will in part be offset by Fund operating expenses). Partners may also have tax liability during a period when they are not permitted to make withdrawals from their Fund accounts.

*It will be the responsibility of each prospective limited partner to satisfy himself as to, among other things, the consequences of any federal taxes, including income and estate taxes, to which they are or they or their estate mink be subject due to his participation in the fund by obtaining advice from his own tax counsel or advisor. The General Partner will give each prospective limited partner and his counsel or advisor, upon request full access to all materials available to the General Partner relating to the projected operations of the Fund.*

### 12. OTHER TAXES

A limited partner's participation in the Fund will probably also affect his income tax liability in the jurisdiction in which he is a resident.

### 13. FISCAL YEARS AND INTERIM PERIODS

The Fund has adopted a fiscal year ending on December 31. Since limited partners may be admitted or required to retire, and additional capital contributions may be made, during the course of a fiscal year, the Partnership Agreement provides for interior fiscal periods that are portions of a fiscal year for the purpose of allocating net profits and net losses due to changes occurring in capital accounts at such times.

### 14. PROCEDURE FOR BECOMING A LIMITED PARTNER

In order to become a limited partner, a prospective investor should follow the instructions set forth in the Subscription Package delivered with or subsequent to delivery of this Memorandum.

### 15. AVAILABLE MATERIALS

In addition to the other materials referred to in this memorandum, prospective investors are invited to review prior to investing copies of the following materials at the administrative offices of the General Partner and Investment Manager located at 2120 Killarney Way, Suite 125, Tallahassee, FL 32309 Attention: Dr. Tim Howard (850) 298-4455 or at some other mutually convenient location, at any reasonable hour after reasonable prior notice:

CAMB-2_000646

1. The Fund's Certificate of Limited Partnership, as filed with the Secretary of state of Massachusetts.

2. The Investment Management Agreement among the Fund, the General Partner and the Investment Manager.

3. The Instructions to the Fund's brokers with respect to disbursement of Fund cash and assets.

4. The Fund's audited financial statements.

5. The Investment Managers ADV filing with the SEC

30

CAMB-2_000647

# Attachment B

*FLND Form 245B (rev 12/2003) Judgment in a Criminal Case*                           *Page 1 of 10*
*4:08cr49-01 - DON WARNER REINHARD*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

### UNITED STATES OF AMERICA

-vs-                                            Case # 4:08cr49-01

**DON WARNER REINHARD**

USM # 12268-017

**Defendant's Attorney:**
**Clyde M. Taylor, Jr. (Retained)**
**119 E. Park Avenue**
**Tallahassee, Florida 32301**

---

### JUDGMENT IN A CRIMINAL CASE

The defendant pled guilty to Counts 1, 9, 12, 17, 19, 21 and 23 of the Indictment on May 13, 2009. Accordingly, **IT IS ORDERED** that the defendant is adjudged guilty of such counts which involve the following offenses:

| TITLE/SECTION NUMBER | NATURE OF OFFENSE | DATE OFFENSE CONCLUDED | COUNT |
|---|---|---|---|
| 18 U.S.C. § 1014 | Making False Statements on Loan Application | November 19, 2003 | 1 |
| 18 U.S.C. §§ 152(3) and 2 | Making False Statements to Bankruptcy Trustee, Aiding and Abetting | November 15, 2006 | 9 |
| 18 U.S.C. §§ 1001 and 2 | Making False Statements, Aiding and Abetting | July 24, 2007 | 12 |
| 18 U.S.C. §§ 152(7) | Transferring and Concealing Assets from the Bankruptcy Trustee | January 7, 2008 | 17 |
| 18 U.S.C. §§ 152(7) | Transferring and Concealing Assets from the Bankruptcy Trustee | June 19, 2007 | 19 |

*FLND Form 245B (rev 12/2003) Judgment in a Criminal Case*                                              *Page 2 of 10*
*4:08cr49-01 - DON WARNER REINHARD*

| 26 U.S.C. § 7206(1) | Making False Statements on Income Tax Return | April 5, 2003 | 21 |
| 26 U.S.C. § 7206(2) | Procuring False Statements on Income Tax Return | January 22, 2007 | 23 |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984, including amendments effective subsequent to 1984, and the Sentencing Guidelines promulgated by the U.S. Sentencing Commission.

Counts 2, 3, 4, 5, 6, 7, 8, 10, 11, 13, 14, 15, 16, 18, 20 and 22 are dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.

Date of Imposition of Sentence:
October 1, 2009


s/Robert L. Hinkle
United States District Judge
October 5, 2009

*FLND Form 245B (rev 12/2003) Judgment in a Criminal Case*
*4:08cr49-01 - DON WARNER REINHARD*

*Page 3 of 10*

### IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **51 months on Counts 1, 9, 12, 17 and 19, and 36 months on Counts 21 and 23, all counts to run concurrently.**

The Court recommends to the Bureau of Prisons **in order of priority:**

1.    **That the Defendant participate in a Residential Drug Abuse Treatment Program while in the custody of the Bureau of Prisons.**

2.    **That the Defendant be designated to a facility as near as possible to Atlanta, Georgia.**

The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons   **by 2:00 P.M. on December 1, 2009.**

### RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.


_____
UNITED STATES MARSHAL


By:_____
Deputy U.S. Marshal

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **5 years in Count 1, 3 years in Counts 9, 12, 17 and 19, and one year in Counts 21 and 23, all counts to run concurrently.**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime and shall not possess a firearm, destructive device, or any other dangerous weapon.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

The defendant shall cooperate in the collection of DNA as directed by the probation officer.

## STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the following standard conditions that have been adopted by this court.

1. the defendant shall not leave the judicial district without the permission of the court or probation officer;

2. the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4. the defendant shall support his or her dependents and meet other family responsibilities;

5. the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6. the defendant shall notify the probation officer at least 10 days prior to any change in residence or

employment;

7. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9. the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11. the defendant shall notify the probation officer within **72 hours** of being arrested or questioned by a law enforcement officer;

12. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

14. if this judgment imposes a fine or a restitution obligation, it shall be a condition of supervision that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

*FLND Form 245B (rev 12/2003) Judgment in a Criminal Case*
*4:08cr49-01 - DON WARNER REINHARD*

## ADDITIONAL CONDITIONS OF SUPERVISED RELEASE

The defendant shall also comply with the following additional conditions of supervised release:

1. The defendant must report in person to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

2. The defendant must not own or possess a firearm, dangerous weapon, or destructive device.

3. The defendant must submit to testing to determine whether he is using drugs or alcohol.

4. The defendant must participate in a program of substance abuse treatment.

5. The defendant must provide the probation officer all requested financial information, business or personal.

6. The defendant must cooperate with the probation department in the collection of DNA samples as required by 42 U.S.C. § 14135a.

7. The defendant must make payments toward any unpaid restitution balance in the amount of at least **$500.00** per month (or any adjusted amount set by further court order based on the defendant's ability to pay from time to time) commencing within 60 days following defendant's release from custody.

Upon a finding of a violation of probation or supervised release, I understand the Court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

_____        _____

Defendant                                                  Date


_____        _____

U.S. Probation Officer/Designated Witness        Date

*FLND Form 245B (rev 12/2003) Judgment in a Criminal Case*
*4:08cr49-01 - DON WARNER REINHARD*

## CRIMINAL MONETARY PENALTIES

All criminal monetary penalty payments, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program, are to be made to the Clerk, U.S. District Court, unless otherwise directed by the Court. Payments shall be made payable to the Clerk, U.S. District Court, and mailed to 111 N. Adams St., Suite 322, Tallahassee, FL 32301-7717. Payments can be made in the form of cash if paid in person.

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth in the Schedule of Payments. The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options in the Schedule of Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

### SUMMARY

| Special Monetary Assessment | Fine | Restitution |
|---|---|---|
| $700.00 | -0- | $667,890.28 |

### SPECIAL MONETARY ASSESSMENT

A special monetary assessment of **$700.00** is imposed.

No fine imposed.

### RESTITUTION

Restitution in the amount of **$667,890.28** is imposed.

The defendant shall make restitution to the following victims in the amounts listed below.

*FLND Form 245B (rev 12/2003) Judgment in a Criminal Case*
*4:08cr49-01 - DON WARNER REINHARD*

*Page 9 of 10*

| Name of Payee | Total Amount of Loss | Amount of Restitution Ordered |
|---|---|---|
| **Wachovia Bank** c/o U.S. District Clerk attn: Financial Section 111 N. Adams Street Tallahassee, Florida 32301 | **$171,280.28** | **$171,280.28** |
| **Internal Revenue Service** c/o U.S. District Clerk attn: Financial Section 111 N. Adams Street Tallahassee, Florida 32301 | **$496,610.00** | **$496,610.00** |

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise. If nominal payments are made by the defendant the court authorizes those payments to be made to the victims on a rotating basis.

The amount of loss and the amount of restitution ordered will be the same unless, pursuant to 18 U.S.C. § 3664(f)(3)(B), the court orders nominal payments and this is reflected in the Statement of Reasons page.

*FLND Form 245B (rev 12/2003) Judgment in a Criminal Case*                                                    *Page 10 of 10*
*4:08cr49-01 - DON WARNER REINHARD*

## SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) special monetary assessment; (2) non-federal victim restitution; (3) federal victim restitution; (4) fine principal; (5) costs; (6) interest; (7) penalties

Payment of the total fine and other criminal monetary penalties shall be due as follows:

in full immediately

The defendant must notify the court of any material changes in the defendant's economic circumstances, in accordance with 18 U.S.C. §§ 3572(d), 3664(k) and 3664(n). Upon notice of a change in the defendant's economic condition, the Court may adjust the installment payment schedule as the interests of justice require.

Special instructions regarding the payment of criminal monetary penalties pursuant to 18 U.S.C. § 3664(f)(3)(A):

Unless the court has expressly ordered otherwise above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. In the event the entire amount of monetary penalties imposed is not paid prior to the commencement of supervision, the U.S. probation officer shall pursue collection of the amount due. The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

# Attachment C

SECURITIES AND EXCHANGE COMMISSION
Washington D.C.

SECURITIES EXCHANGE ACT OF 1934
Rel. No. 63720 / January 14, 2011

INVESTMENT ADVISERS ACT OF 1940
Rel. No. 3139 / January 14, 2011

Admin. Proc. File No. 3-13280

---

In the Matter of

DON WARNER REINHARD

---

OPINION OF THE COMMISSION

BROKER-DEALER PROCEEDING

INVESTMENT ADVISER PROCEEDING

**Grounds for Remedial Action**

**Civil Injunction**

Former associated person of registered broker-dealer and investment adviser was enjoined from violating the antifraud provisions of the federal securities laws. *Held*, it is in the public interest to bar Respondent from association with any broker, dealer, or investment adviser.

APPEARANCES:

*Don Warner Reinhard, pro se.*

*Edward D. McCutcheon* and *Robert K. Levenson* for the Division of Enforcement.

Appeal filed: July 20, 2010
Last brief received: November 2, 2010

2

I.

Don Warner Reinhard, formerly the sole owner and president of Magnolia Capital Advisors, Inc. ("Magnolia"), a registered investment adviser, and formerly associated with Paragon Financial Group, Inc. ("Paragon"), a registered broker-dealer, appeals from the decision of an administrative law judge barring him from association with any broker, dealer, or investment adviser based on his having been enjoined by default, in 2008, from violating the antifraud provisions of the securities laws.[1]  We base our findings on an independent review of the record, except with respect to those findings not challenged on appeal.

II.

A.    Civil Injunction

In October 2008, Reinhard was permanently enjoined from future violations of antifraud and other provisions of the federal securities laws, namely Section 17(a) of the Securities Act of 1933; Section 10(b) of the Securities Exchange Act of 1934 and Exchange Act Rule 10b-5;[2] Sections 206(1), (2)[3] and 207[4] of the Investment Advisers Act of 1940; and aiding and abetting violations of Advisers Act Section 204 and Advisers Act Rule 204-2(a)(7).[5]  The permanent injunction was entered against Reinhard following the entry of a default judgment against him.[6]

---

[1]     *Don Warner Reinhard,* Supplemental Initial Decision Rel. No. 396 (Jun. 1, 2010), 98 SEC Docket 28878.

[2]     Securities Act Section 17(a), 15 U.S.C. § 77q(a), Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibit fraudulent conduct in connection with securities transactions.

[3]     Advisers Act Sections 206(1) and (2), 15 U.S.C. §§ 80b-6(1) and (2), make it unlawful to defraud a client or a prospective client.

[4]     Advisers Act Section 207, 15 U.S.C. § 80b-7, prohibits the willful making of any untrue statement of material fact, or omission of any material fact, in a report or application required to be filed under Advisers Act Sections 203 or 204.

[5]     Advisers Act Section 204, 15 U.S.C. § 80b-4, and Advisers Act Rule 204-2(a)(7) thereunder, 17 C.F.R. § 275.204-2(a)(7), requires investment advisers to maintain books and records, including written communications relating to their securities recommendations and orders, and to provide copies of these records as directed by the Commission.

[6]     *SEC v. Reinhard,* No. 4:07-CV-529-RH/WCS (N.D. Fla. Oct. 3, 2008), *aff'd,* No. 09-10213-CC (11th Cir. Oct. 28, 2009).

3

In the injunctive proceeding, Reinhard, acting *pro se*, challenged the sufficiency of service and made other procedural objections but did not answer the Commission's complaint. In his Order for Entry of Judgment, the district court judge found that a process server had delivered the complaint and summons to Reinhard on February 13, 2008 but "Reinhard answered the door [and] then slammed it," whereupon the process server left the complaint and summons on Reinhard's front porch. In March 2008, Reinhard moved for an extension of the time to respond to the complaint and the judge granted the motion, directing Reinhard to respond by April 18, 2008.[7] Reinhard did not respond by April 18 but, rather, moved on May 6, 2008 for a further sixty-day extension. On the same day, the judge denied Reinhard's motion for another extension.

The Commission applied for a default judgment on June 9, 2008, which the clerk entered on June 12, 2008. On June 24, 2008, Reinhard objected to the Commission's application for a default judgment. On July 8, 2008, the Commission moved for entry of a default judgment. On July 13, 2008, the judge rejected Reinhard's opposition and granted the Commission's motion for entry of a default judgment.

The court relied on the Commission's complaint in entering judgment. The complaint alleged that, from at least January 2002 through August 2003, Reinhard had, through Magnolia Capital Advisers, "made false and misleading statements and omissions of material fact to his approximately 138 clients in connection with the offer and sale of collateralized mortgage obligations ('CMO's)." These false and misleading statements included "misrepresent[ing] the safety of the highly-leveraged CMO's he purchased for his clients' accounts and the account of . . . a hedge fund he controlled as its general partner." The complaint also alleged that Reinhard "lulled his hedge fund clients into keeping their investments with the hedge fund by providing them with false quarterly account statements showing materially inflated account valuations," and that "[t]hrough all this activity, Reinhard's clients and hedge fund investors lost $6 million." In addition, the complaint asserted that, during a period when the market value of the CMO investments had declined, Reinhard "engaged in a fraudulent scheme to artificially increase the equity in certain brokerage accounts and to avoid margin calls . . . by temporarily 'parking' the CMO investments in the accounts of third parties, while falsely reporting the nature of the transactions to his broker-dealer and clearing firm."

Following a telephonic hearing in which Reinhard participated, the judge entered a permanent injunction against Reinhard on October 3, 2008. In that order, the court held that "Mr. Reinhard in effect admitted the fraud alleged in the complaint." The judge held an evidentiary hearing on December 8, 2008 to rule on various motions filed by Reinhard[8] and to determine the

---

[7]     In his order granting Reinhard's motion, the judge stated that "[n]o further extensions will be granted."

[8]     On October 16, 2008, Reinhard filed a motion to quash the service of process. He
(continued...)

4

appropriate amount of disgorgement, prejudgment interest, and civil penalty to be paid by
Reinhard. Reinhard participated in this hearing and cross-examined the Commission's witness.

The judge found that "[t]he complaint identified the period of the fraud as beginning at
least January 2002 and continuing through August 2003," and that the government's proof at trial
established that Reinhard received commissions of approximately $5.9 million from the
transactions at issue. The judge ordered Reinhard to disgorge this amount, as well as to pay an
award of interest of approximately $2.26 million on the disgorgement amount and a civil penalty
of $120,000 -- for a total judgment of approximately $8.2 million. On October 28, 2009, the
Eleventh Circuit affirmed the district court decision.[9]

## B.    Criminal Conviction

On May 13, 2009, Reinhard entered into a plea agreement with the U.S. Attorney for the
Northern District of Florida (the "Plea Agreement") regarding various counts of criminal
misconduct (the "2009 Conviction").[10]  In the Plea Agreement, Reinhard stated that he was
pleading guilty to these counts because "he is in fact guilty of the charges contained" in these
counts and he acknowledged that, "were the case to go to trial, the government could present
evidence to support these charges beyond a reasonable doubt." Reinhard further agreed that he
was entering into the Plea Agreement "knowingly, voluntarily and upon the advice of counsel."
The parties also executed a supporting agreement, signed by Reinhard and his attorney, in which
they set out the factual basis for Reinhard's guilty plea (the "Factual Basis for Plea
Agreement").[11]

The Factual Basis for Plea Agreement identifies various misconduct as the basis for
Reinhard's guilty plea, including:

●      In 2003, Reinhard had applied to a bank for a loan of approximately
$250,000 to finance his purchase of a boat. As part of his loan application, he had
submitted his purported 2001 federal income tax return. This purported tax return

---

[8]       (...continued)

filed additional evidentiary and procedural motions in November 2008, including requesting a
hearing on his motion to quash service. On November 26, 2008, the judge denied one of
Reinhard's procedural motions and, on December 8, 2008, denied the remainder.

[9]       *SEC v. Reinhard*, No. 09-10213, 2009 U.S. App. LEXIS 23744 (11th Cir. Oct. 28,
2009) (*per curiam*).

[10]      Reinhard's then-counsel also signed the Plea Agreement.

[11]      The Factual Basis for Plea Agreement was also signed by Reinhard and his then-
counsel.

5

was not, however, a copy of the actual return he filed for 2001, and it falsely listed
his adjusted gross income as $944,322 and his total tax as $253,996, while his
actual return listed his adjusted gross income as $389,700 and his total tax as
$37,498.

● Reinhard filed a bankruptcy petition in 2006 but failed to disclose
"numerous significant assets," although he had represented to the bankruptcy
trustee that he had reported all the assets he owned. The omitted assets included
the boat mentioned above, artwork he had purchased for approximately $40,000,
and certain investment accounts. Reinhard also failed to disclose certain of his
liabilities, lease obligations and gifts (including gifts valued at approximately
$40,000 to his girlfriend).

● Reinhard transferred two unreported assets following the filing of his
bankruptcy petition, including artwork that he sold for $24,000, of which
approximately $20,000 was deposited to Reinhard's girlfriend's bank account -- an
account that was not disclosed to the bankruptcy court.

● Reinhard under-reported Schedule E income on his 2001 federal income
tax return by reporting a fraudulent expense of $554,622, the expense purportedly
being incurred to reimburse investors for losses they had incurred in one of
Reinhard's ventures when, in fact, the evidence reveals that no such payment was
made to the investors. As a result of this false statement, Reinhard underpaid his
taxes by $216,498.

● On his 2005 federal income tax return, Reinhard falsely stated that his cost
basis in investment properties that he sold in that year was $3.2 million, when it
was actually $1.14 million. Reinhard later benefitted from the incorrect basis
information when he used his overstated losses from the 2005 return to offset his
reported taxable income on his 2002 tax return, which he was required to file by
the bankruptcy court. As a result of his use of the false information from the 2005
return, Reinhard reported a taxable loss of approximately $1.17 million for 2002,
instead of correctly reporting taxable income of approximately $729,000. Also,
by submitting this false 2002 tax return to the bankruptcy court, Reinhard
concealed from the court the fact that he had generated substantial capital gains.

Pursuant to the Plea Agreement and the Factual Basis for Plea Agreement, Reinhard pled
guilty on May 13, 2009 to seven counts of the criminal indictment against him, including:
(i) making false statements on a loan application in violation of 18 U.S.C. § 1014;[12] (ii) making

---

[12]    18 U.S.C. § 1014 prohibits "knowingly mak[ing] any false statement or report . . .
for the purpose of influencing in any way the action of" a banking institution "upon any
(continued...)

6

false statements to the bankruptcy trustee and aiding and abetting the making of such statements in violation of 18 U.S.C. §§ 152(3) and 2;[13] (iii) transferring assets and concealing them from the bankruptcy trustee in violation of 18 U.S.C. § 152(7);[14] and (iv) making false statements on an income tax return in violation of 26 U.S.C. § 7206(1) and (2).[15] Reinhard was sentenced to 51 months' imprisonment for five of the counts and 36 months' imprisonment for the other two counts, the sentences to run concurrently. In addition, he was ordered to pay restitution of $667,890.28 and a special assessment of $700. He is currently incarcerated in the Beaumont, Texas Federal Correctional Complex.

## C. Administrative Proceedings

### 1. Initial Decision and Remand Order

On October 27, 2008, proceedings were instituted based on the default injunction. On February 12, 2009, the law judge issued an Initial Decision barring Reinhard from associating with any broker, dealer or investment adviser.[16] Reinhard appealed. In February 2010, we issued an order (the "Remand Order") holding that, while the statutory basis for the imposition of sanctions was satisfied in that Reinhard was enjoined from violating the antifraud and other provisions of the federal securities laws while in an associated capacity, we were concerned about whether the record was "sufficient to address, in a meaningful manner, the public interest"

---

[12]     (...continued)
application, . . . loan . . . agreement or . . . any change or extension of any of the same . . . ."

[13]     18 U.S.C. § 152(3) prohibits a person from "knowingly and fraudulently mak[ing] a false declaration, certificate, verification, or statement under penalty of perjury" in a bankruptcy matter. 18 U.S.C. § 2 declares that a person who aids or abets another in the commission of a crime against the United States, or willfully causes an act to be done which, if directly performed by him or another, would be an offense against the United States, will be punishable as a principal. Reinhard also pled guilty to aiding and abetting the concealment of a material fact in violation of 18 U.S.C. § 1001.

[14]     18 U.S.C. § 152(7) prohibits a person from "knowingly and fraudulently transfer[ring] or conceal[ing] any of his property . . . in contemplation of a case under" the bankruptcy laws or "with intent to defeat the provisions" of the bankruptcy laws.

[15]     26 U.S.C. § 7206(1), as relevant here, prohibits the submission of an income tax statement which the filer "does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(2) makes it unlawful to "[w]illfully" assist in the preparation of an income tax return "which is fraudulent or is false as to any material matter. . . ."

[16]     *Don Warner Reinhard,* Initial Decision Rel. No. 370 (Feb. 12, 2009), 95 SEC Docket 14218.

7

because the injunction was entered by default with no litigated or agreed upon findings of fact.[17] The Remand Order noted that the Supreme Court has held that "[i]n the case of a judgment entered by . . . default, none of the issues is actually litigated [and that] [t]herefore [issue preclusion or collateral estoppel] does not apply with respect to any issue in a subsequent action."[18] The Remand Order further stated that "[i]n determining the need for assessment of sanctions in the public interest, we, like the law judge, are guided by the factors identified in *Steadman v. SEC*."[19] The parties were directed, on remand, to introduce additional evidence regarding these factors.

2.    Supplemental Initial Decision and Appeal to Commission

The law judge then considered the case again pursuant to the Remand Order. On March 22, 2010, the law judge held a prehearing conference in which she requested that Reinhard state, by May 6, 2010, why his 2009 conviction should not be considered in evaluating whether sanctions should be imposed in the public interest in light of the *Steadman* factors. At the prehearing conference, Reinhard contended that the conviction was not relevant to the administrative proceeding, but did not file any additional pleadings with the law judge. On June 1, 2010, the law judge issued a Supplemental Initial Decision, again barring Reinhard from associating with any broker, dealer, or investment adviser based on the default permanent injunction entered against him.[20] In her Supplemental Initial Decision, the law judge took official notice of Reinhard's 2009 criminal conviction in assessing the public interest. The law judge held that, "[e]ven disregarding the injunction . . . his criminal conduct shows a lack of honesty

---

[17]    *Don Warner Reinhard*, Securities Exchange Act Rel. No. 61,506 (Feb. 4, 2010), 97 SEC Docket 25269, 25273.

[18]    *Arizona v. California*, 530 U.S. 392, 414 (2000) (quoting *Restatement (Second) of Judgments*, § 27 cmt. e, p. 257 (1982)); *but see Harold F. Harris*, Exchange Act Rel. No. 53122A (Jan. 13, 2006), 87 SEC Docket 362, 369 (preclusive effect given to default injunction where district court's accompanying findings took account of "substantive defenses argued by Respondents" in late-filed answer); *Thomas J. Donovan*, 58 S.E.C. 1032, 1035 (2005) (imposing sanctions based on default injunction, where law judge conducted hearing accepting testimony and other evidence related to underlying misconduct and the public interest); *Lamb Bros., Inc.*, 46 S.E.C. 1053, 1058-59 (1977) (sanctions imposed based on default injunction but "allegations made in the injunctive suit [were] remade" in administrative proceeding and "an evidentiary record with respect to those matters was developed").

[19]    97 SEC Docket at 25273 (citing to *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979). The relevant public interest factors are identified and discussed in Section III a. below.

[20]    *Don Warner Reinhard*, Initial Decision Rel. No. 396 (June 1, 2010), 98 SEC Docket 28878.

8

and indicates that he is unsuited to function in the securities industry." On July 28, 2010, we issued an order granting Reinhard's request for review. In this order, we asked the parties to address in their briefs "whether the order instituting proceedings ["OIP"] should be amended to reflect Reinhard's criminal conviction and the relevance of that conviction to the Commission's consideration of the public interest." In response, both parties argued that the OIP should not be amended to reflect the 2009 Conviction. Reinhard contended that amendment is not appropriate because, in his view, the 2009 Conviction is not relevant to the public interest. The Division of Enforcement, on the other hand, maintained that the "OIP does not need to be amended [because] [t]he default permanent injunction entered against Reinhard provides a statutory basis for these proceedings, and the OIP does not need to include a criminal conviction for a Law Judge to consider [the conviction] in determining whether it is in the public interest to order a bar." Under the circumstances, we have determined that there is no need to amend the OIP.[21]  On October 8, 2010, we issued a second order in which we gave the parties "express notice that the Commission may consider the 2009 Conviction in assessing the public interest." We further advised the parties that they would be given "a further opportunity to discuss any mitigating circumstances and any other issues related to that conviction," through the opportunity to file additional briefs on the matter.

## III.

Under Exchange Act Sections 15(b)(4) and (6)[22] and Advisers Act Sections 203(e) and (f),[23] we may impose remedial sanctions on a person associated with a broker, dealer, or investment adviser consistent with the public interest if, among other things, the associated person has been permanently enjoined from engaging in any conduct or practice in connection with the purchase or sale of securities. We find, and Reinhard does not dispute, that Reinhard was an associated person and that he was permanently enjoined from engaging in conduct in connection with the purchase or sale of securities. Accordingly, the statutory requirements for the imposition of sanctions were satisfied here.

a.     The Exchange Act and the Advisers Act authorize us to censure, place limitations on, suspend, or bar an associated person based on these findings if we find that such sanction is in the public interest.[24]  In analyzing the public interest we consider, among other things: the egregiousness of the respondent's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the respondent's assurances against future violations,

---

[21]     See *Robert Bruce Lohmann,* 56 S.E.C. 573, 583 n.20 (2003) (finding that matters "not charged in the OIP" may nevertheless be considered "in assessing sanctions").

[22]     15 U.S.C. §§ 78o(b)(4) and (6).

[23]     15 U.S.C. §§ 80b-3(e) and (f).

[24]     15 U.S.C. § 78o(b)(6)(A); 15 U.S.C. § 80b-3(f).

9

the respondent's recognition of the wrongful nature of his or her conduct, and the likelihood that the respondent's occupation will present opportunities for future violations.[25] Our "inquiry into . . . the public interest is a flexible one, and no one factor is dispositive."[26] Based on our consideration of these factors, we believe that the bar imposed by the law judge was amply warranted.

According to the Factual Basis for Plea Agreement, Reinhard made repeated false statements on a loan application, to a bankruptcy court, and on his tax returns. Moreover, the false statements were not mere minor or ministerial errors, as Reinhard maintains, but significant in amount and scope. For example, Reinhard included a bogus tax return in a loan application that falsely listed his adjusted gross income as $944,322 and his total tax as $253,996 when, in fact, his actual return listed his adjusted gross income as $389,700 and his total tax as $37,498. He also reported a fraudulent expense of $554,622 on his 2001 tax return, which allowed him to underpay his taxes by $216,498, and on his 2002 income tax return falsely claimed a net operating loss of $4,126,540 that was used to offset his reported income of $3.2 million. These are, as Enforcement correctly states, "crimes of dishonesty." His criminal misconduct included making false statements to the government and others concerning financial matters and involved concealing assets and lying about their existence and disposition. This misconduct is highly relevant in our inquiry where we are required to consider the public interest and determine whether an individual is fit to work in an industry where honesty and rectitude concerning financial matters is critical.[27]

---

[25]    *James C. Dawson*, Investment Advisers Act Rel. No. 3057 (July 23, 2010), 98 SEC Docket 30697, 30699-700, *Scott B. Gann*, Exchange Act Rel. No. 59729 (Apr. 8, 2009), 95 SEC Docket 15818, 15823 (citing *SEC v. Steadman*, 603 F.2d 1126, 1140 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981)), *aff'd*, No. 09-60435 (5th Cir. 2010) (per curiam)).

[26]    *David G. Ghysels*, Exchange Act Rel. No. 62937 (Sept. 20, 2010), 99 SEC Docket 32610, 32614, *appeal filed*, No. 10-4634 (2d Cir. Nov. 12, 2010); *Dawson, supra*.

[27]    The fact that Reinhard's criminal misconduct did not involve violations of the federal securities laws is not determinative for our analysis. Exchange Act Section 15(b)(4)(B) and Advisers Act Section 203(e)(2)(A) authorize Commission action if the respondent has been convicted of "any felony" involving "the taking of a false oath, the making of a false report, . . . [or] perjury." As we recently stated:

'The securities industry presents a great many opportunities for abuse and overreaching, and depends very heavily on the integrity of its participants.' Indeed, the importance of honesty for a securities professional is so paramount that we have barred individuals even when the conviction was based on dishonest conduct unrelated to securities transactions or securities business.

(continued...)

10

Also significant to our inquiry is the fact that Reinhard's misconduct occurred over an extensive period of time and involved a high degree of scienter. As the Factual Basis for Plea Agreement shows, Reinhard's criminal activity occurred between 2003 through 2007 and involved numerous false filings and statements. Moreover, all of the crimes to which Reinhard pled guilty required that he have acted intentionally or knowingly.[28] Finally, while Reinhard expressed his "remorse" for his actions, he also challenges the facts underlying his conviction, as discussed in section b. below, suggesting an unwillingness to appreciate the wrongfulness of what he did.

b.      Reinhard appears to concede that some sanction is warranted -- he proposes in his pleadings that, in settlement of this proceeding, he be suspended "for a period of 60 months beginning on the date of the SEC default judgement on October 3, 2008" -- but objects to a permanent bar as excessive.[29] According to Reinhard, a 60-month suspension is "more than sufficient given a default judgement and a plea agreement based on unintentional errors & mistakes." In particular, he objects to the consideration of his 2008 guilty plea in evaluating the public interest, arguing that the facts underlying his criminal conviction "do not lead to concern of the public interest" [emphasis in original].

---

[27]      (...continued)

*Gary M. Kornman*, Exchange Act Rel. No. 59403 (Feb. 13, 2009), 95 SEC Docket 14246, 14255-56, *petition denied*, 592 F.3d 173 (D.C. Cir. 2010) (quoting *Bruce Paul*, 48 S.E.C. 126, 128 (1985)). *See also Ahmed Mohamed Soliman*, 52 S.E.C. 227, 231 (1995) (holding that criminal conviction for tax law violations involving "fraud and deceit" is a "serious" offense which "shows a lack of honesty and judgement and indicates that [respondent was] unsuited to function in the securities industry"); *Benjamin Levy Sec., Inc.*, 46 S.E.C. 1145, 1147 (1978) (holding that respondent's conduct in "play[ing] a key role in a deliberate fraud practiced on the [Small Business Administration] and [a] bank" constituted "serious misconduct" and supported the law judge's decision to bar respondent from association with any broker-dealer or investment adviser).

[28]      *See supra* notes 12-15 and accompanying text.

[29]      Reinhard does not explain his reasons for suggesting a 60 month suspension. Alternatively, Reinhard seeks a stay of this proceeding pending his release from prison. We deny Reinhard's stay request. *Cf. David G. Ghysels, Order Denying Motions to Correct Manifest Errors of Fact and Denying Motions to Stay and for a Fact-Finding Hearing*, Admin. Proc. Rel. No. 648 (Jan. 10, 2010), 97 SEC Docket 25011, 25014 (holding that "pending appeal [of conviction] is not a valid reason for delaying the resolution" of follow-on administrative proceeding); *Charles Trento*, 57 S.E.C. 346-47 (2004) (denying request of incarcerated respondent to set aside law judge's decision pending appeal of his conviction). *See also Jose P. Zollino*, Exchange Act Rel. No. 55107 (Jan. 16, 2007), 89 SEC Docket 2598 (administrative proceeding adjudicated and decided while respondent was incarcerated).

11

Reinhard further argues that "[t]he actual counts that I pled guilty to are not the identical counts as outlined in the Factual Basis of the Plea Agreement." He claims that the discrepancies between the two "are substantiated in the language used when presenting the plea to the judge . . . and in the objections and changes made in the sentence hearing," and would be evident if the transcripts of these events were to be reviewed.[30] He further asserts that the factual record from the plea hearing and the sentencing hearing "proves . . . that [his] plea was based upon unintentional errors and mistakes by [Reinhard] and [his] legal counsel" that "solely dealt with the filing and appropriate ammending [sic] of documents."[31]

As we have repeatedly held, Reinhard is collaterally estopped from attacking the facts underlying his conviction.[32] Moreover, Reinhard cannot now dispute the accuracy of the findings

---

[30]    For example, with respect to the assertion in the Factual Basis for Plea Agreement that he had submitted a false tax return to a bank overstating his adjusted gross income in support of his loan application, Reinhard claims that "the issue on the [2001] tax return is one of a deduction and there was *not* a new loan or a loan application of any kind involved," rather "[i]t was simply an administrative function of a 'change of terms' agreement because of new collateral and [he] even paid the principle [sic] down by approximately $95,000 [emphasis in original]." Also, as to the statement in the Factual Basis for Plea Agreement that he had filed a false tax return in 2001 by reporting a fraudulent expense of $554,622, Reinhard states that the distributions to his limited partners "were actually made in 2002 and 2003 and therefore could be deducted in 2002 and 2003 instead of 2001."

[31]    Among other things, he challenges the facts set forth in the Factual Basis for Plea Agreement by arguing that: (i) the omissions in the various schedules and statements he filed with the bankruptcy court "should have been ammended [sic] by [his] bankruptcy attorney;" (ii) the purportedly false cost basis in his 2005 tax return for which he had pled guilty was, in fact, "accurate" but he "[did] not have the supporting documentation to prove the cost basis used;" and (iii) the distributions made to his limited partners, while not made in 2001 as his tax return for that year indicated, were, in fact, paid in 2002 and 2003 as shown in additional supporting materials provided to the Internal Revenue Service since the Plea Agreement was signed and the sentencing hearing held. Reinhard further claims that the government "acknowledged at the sentence hearing that there was *not* a fraud involving a loan application," and that the government agrees "that an incorrect tax return was supplied to the bank for administrative purposes during a change in collateral of an existing loan [emphasis in original]." Reinhard similarly seeks to minimize the significance of his tax return violations.

[32]    *See, e.g., Kornman,* 95 SEC Docket at 14257 (finding criminal conviction based on guilty plea has collateral estoppel effect precluding relitigation of issues in Commission proceedings); *Phillip J. Milligan,* Exchange Act Rel. No. 61790 (Mar. 26, 2010), 98 SEC Docket 26791, 26796-97 (holding that a respondent in a follow-on proceeding may not challenge the findings made in an underlying criminal or injunctive proceeding). *See also Robert Blakeney*
(continued...)

12

set out in the Factual Basis for Plea Agreement. He and his then-attorney signed this agreement as well as the Plea Agreement. These agreements were entered into as part of a settlement where the U.S. Attorney agreed to dismiss the remaining sixteen counts of the indictment and not to file any further criminal charges against Reinhard arising out of the same transactions and occurrences to which he pled guilty. As noted, Reinhard acknowledged in the Plea Agreement that "were the case to go to trial, the government could present evidence to support these charges [*i.e.*, the ones to which he pled guilty] beyond a reasonable doubt." Moreover, by signing the Plea Agreement and Factual Basis for Plea Agreement, Reinhard waived any objections he may have had to the facts set out in the latter agreement and became bound by the facts recited therein.[33]

c.      Reinhard asks that we "show mercy on [him] and [his] future as [his] current 51 month prison sentence is more than sufficient punishment." However, as we previously noted, "[t]he specified administrative and criminal remedies are designed to serve different purposes, one to determine whether respondent[] should be barred or suspended from association . . . or censured, and the other to determine whether [respondent] should be fined or imprisoned."[34] Thus, we do not view his criminal sentence as mitigative of the appropriate sanction to be imposed in the public interest in this administrative proceeding.

---

[32]      (...continued)

*Stevenson*, 48 S.E.C. 89, 90 n.4 (noting that it is "well-settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case [and that] [f]or purposes of applying that principle, this Commission and the United States have been regarded as one and the same." [citations omitted]).

Reinhard also challenges the validity of the civil injunction order, asserting that "the Commission did not prove that [he] broke or violated any securities laws in obtaining this default judgement." He attributes his civil injunction and the $8.2 million judgment against him to "egregious errors" of Bear Stearns that caused him to be a "victim as well as [his] clients," and argues that imposing a bar on him in this administrative proceeding would be "in effect punishing [him] for the errors of Bear Stearns." If Reinhard wished to challenge these allegations, he should have done so before the court.

[33]      *See United States v. Lomeli-Mences*, 567 F.3d 501, 507 (9th Cir. 2009) (holding that, having admitted to certain facts in "both his written plea agreement and oral change of plea proceedings," defendant could not challenge these facts on appeal); *United States v. Newman*, 148 F.3d 871, 876 (holding that defendant was deemed to have admitted facts in signed plea agreement and waived any subsequent challenge to them).

[34]      *Richard N. Cea*, 44 S.E.C. 8, 25 (1969).

13

The "securities industry presents continual opportunities for dishonesty and abuse, and depends heavily on the integrity of its participants and on investors' confidence."[35] Here, by his repeated acts of false filings and dishonest conduct over several years and his refusal to appreciate the wrongfulness of his misconduct, Reinhard has demonstrated his unfitness for employment in the industry. The imposition of a bar reflects the importance of "deterrence, both specific and general, as a component in analyzing the remedial efficacy of sanctions."[36] By barring Reinhard from associating with broker-dealers and investment advisers, these sanctions address the risks of allowing Reinhard to remain in the securities industry, serving as a "legitimate prophylactic remedy consistent with [our] statutory obligations"[37] to "protect[] investors and the integrity of the markets by preventing those convicted of crimes from acting in the capacity of a securities professional."[38]

Accordingly, we hold that it is in the public interest to bar Reinhard from association with any broker, dealer, or investment adviser. An appropriate order will issue.[39]

By the Commission (Chairman SCHAPIRO and Commissioners CASEY, WALTER, AGUILAR, and PAREDES).

Elizabeth M. Murphy
Secretary

---

[35]     *Conrad P. Seghers,* Advisers Act Rel. No. 2656 (Sept. 26, 2007), 91 SEC Docket 2293, 2304; *see also Charles Phillip Elliott,* 50 S.E.C. 1273, 1276 (1992) (stating that the securities industry is "a business that presents many opportunities for abuse and overreaching"), *aff'd,* 36 F.3d 86 (11th Cir. 1994) (per curiam).

[36]     *Ghysels,* 99 SEC Docket at 32621 (quoting *McCarthy v. SEC,* 406 F.3d 179, 189 (2d Cir. 2005)).

[37]     *Kornman,* 592 F.3d at 189.

[38]     *Ghysels,* 99 SEC Docket at 32621 (quoting *William F. Lincoln,* 53 S.E.C. 452, 461 (1998)); *see also SEC v. Palmisano,* 135 F.3d 860, 866 (2d Cir. 1998) (finding that "deterrence of securities fraud serves other important nonpunitive goals, such as encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry").

[39]     We have considered all of the parties' contentions. We have rejected or sustained them to the extent that they are inconsistent or are in accord with the views expressed in this opinion.

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Rel. No. 63720 / January 14, 2010

INVESTMENT ADVISERS ACT OF 1940
Rel. No. 3139 / January 14, 2010

Admin. Proc. File No. 3-13280

---

In the Matter of

DON WARNER REINHARD

---

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued this day, it is

ORDERED that Don Warner Reinhard be barred from association with any broker, dealer or investment adviser.

By the Commission.

Elizabeth M. Murphy
Secretary