UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE | ) | 12-MDL-2323-AB |
| PLAYERS' CONCUSSION INJURY | ) | |
| LITIGATION | ) | |
| | ) | |
| ———————————————————————— | ) | |
| | ) | |
| Kevin Turner and Shawn Wooden, | ) | Philadelphia, PA |
| on behalf of themselves and | ) | August 14, 2018 |
| others similarly situated, | ) | 10:39 a.m. |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| National Football League and | ) | |
| NFL Properties, LLC, | ) | |
| successor-in-interest to | ) | |
| NFL Properties, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————————— | ) | |


TRANSCRIPT OF FUNDER'S CONFERENCE
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT JUDGE


APPEARANCES:

| | |
|---|---|
| For Kevin Turner,<br>et al.: | TERRIANNE BENEDETTO, ESQUIRE<br>SEEGER WEISS, LLP<br>6th Floor<br>55 Challenger Road<br>Ridgefield, NJ  07660 |
| For Plaintiffs Ron<br>Solt, et al.: | GENE LOCKS, ESQUIRE<br>LOCKS LAW FIRM<br>37th Floor<br>747 Third Avenue<br>New York, NY  10017 |
| For National<br>Football League: | SEAN P. FAHEY, ESQUIRE<br>PEPPER HAMILTON, LLP<br>3000 Two Logan Square<br>18th and Arch Streets<br>Philadelphia, PA  19103 |

APPEARANCES: Continued


Special Master:          JO-ANN M. VERRIER, ESQUIRE
                         UNIVERSITY OF PENNSYLVANIA LAW
                         SCHOOL
                         3501 Sansom Street
                         Philadelphia, PA  19104

Claims Administrator:    ANDREW OXENREITER, ESQUIRE
                         BROWNGREER, PLC
                         250 Rocketts Way
                         Richmond, VA  23231




Audio Operator:          JAMES F.G. SCHEIDT


Transcribed by:          DIANA DOMAN TRANSCRIBING, LLC
                         P.O. Box 129
                         Gibbsboro, New Jersey  08026
                         Office:  (856) 435-7172
                         Fax:     (856) 435-7124
                         Email:   dianadoman@comcast.net



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                              I N D E X

2    PROPOSAL/PRESENTATION:                              PAGE

3       By Mr. Locks                                      4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   (The following was heard at 10:39 a.m.)

2                   THE COURT:  I've designated this as a funder's

3    conference and I will introduce some of the principals who are

4    here that will be presenting.  Gene Locks, who's class

5    counsel; Jo-Ann Verrier, who is my Special Master; Andrew

6    Oxenreiter, who is from BrownGreer who's representing the

7    Administrator; and Terri Benedetto, who's co-class counsel.

8                   All right, Mr. Locks, why don't you tell us where

9    you -- how far you've gotten and tell me -- give me some

10   background.

11                  MR. LOCKS:  Okay.  Your Honor, of course for the

12   record, my name is Gene Locks.  I am one of the class counsel

13   and I was asked to do some research on behalf of the Court as

14   to the nature and extent of funding transactions among the

15   class.

16                  As a background, I have been able to ascertain there

17   are somewhere slightly more than 20, maybe as many as 25 or

18   funders who have made some type of financial transactions with

19   players.  I have talked to almost every one.  There are one or

20   two names that I've just recently learned.

21                  What I've learned so far among the group that I've

22   spoken to which exceeds 20 -- 22 funders, there are

23   approximately 500 or plus funding transactions with players.

24   There's a certain amount of difficulty in computing that

25   because in some situations, one funder and another funder

1   participate, but at least -- at least more than 500 players

2   have some type of funding transaction.

3          Approximately 150 of those transactions are not

4   assignment transactions as defined in the -- by the Court and

5   the settlement agreement, but they are loans that are not

6   technically assignments.

7          Most of these occurred after final approval of the

8   settlement and that's common, not unusual in mass torts in

9   anticipation of the distribution of funds to players.  Most of

10  the funders -- and I know of none in this room -- that are not

11  reputable business people in what they do.

12         There are some funders that I don't know who have at

13  different times in collaboration with some attorneys

14  occasionally who have made certain types of transactions which

15  I'm not able to track, but the folks here have made, in their

16  minds, legitimate financial transactions.

17         However, most of the funders were pretty misinformed

18  about the procedure and the process in how the settlement was

19  going to distribute funds.  They were not well informed as to

20  who may or may not get a monetary award.

21         They were misled by some less than candid attorneys

22  on behalf of attempting to market and there were a number of

23  transactions by certain attorneys suggesting to certain

24  funders that A, B and C might happen or how they would get

25  marketing for the funder, as well as for themselves, to get

1   clients.

2          THE COURT:  Have they taken any -- as far as you

3   know, have they taken any action against lawyers whom they

4   believe have misled them?  Do you -- are you aware of that?

5          MR. LOCKS:  At the present moment I am not aware of

6   any of the funders in this room actually taking any action

7   against any -- shall I say incomplete or perhaps -- well, let

8   me just use the word "incomplete" information from the source.

9          THE COURT:  Okay.

10          MR. LOCKS:  I believe, and interestingly, many of

11  these funders have less than complete records as to whether or

12  not the people they've written checks to have lawyers or which

13  lawyers because there have been a number of players who moved

14  from one lawyer to another lawyer to another lawyer.

15          Most of these funders do not even know how in the

16  process of monetary awards that they would get notice or to be

17  aware that they had the possibility of collecting from the

18  player because they didn't -- sometimes the player wouldn't

19  inform them and sometimes --

20          THE COURT:  Well, lots of the lawyers signed.

21          MR. LOCKS:  I know, and lots of the times that

22  lawyer who signed no longer represents that player and that

23  player doesn't know who he got the funding from and there were

24  occasions where literally the funder had no idea that a player

25  got an award and couldn't find the lawyer, and there are

1  examples that I've learned from each of the different funders

2  that -- a little bit of a sad commentary on some of the

3  behavior of some people in the system.  But in any event, they

4  were not deliberately misled all the time, but they were

5  occasionally.

6        And because some of those attorneys used funding for

7  marketing purposes, again, they would come to a player and say

8  I can get you some funding, you should come to me as the

9  attorney, and then the funder would know the history or maybe

10 not know the history, but there's clear -- in many instances

11 there were people who were not forthright to the funder or the

12 player.

13        Now, at some times, lawyers who -- well, I'll call a

14 little more candid and a little more informed -- had to

15 respond to pressures from the players who had been solicited

16 by funders -- not funders, by other lawyers that you come to

17 me and I'll get you money and so on.

18        I want to make it clear though that in many

19 instances, the need of the player and the advancement of funds

20 provided liquidity and benefits to the player because he might

21 have had an IRS claim to pay, he might have had in some

22 instances a -- support liens to pay, he might have had

23 mortgage payments to pay and there were legitimate reasons for

24 many of these transactions because of the need of the players.

25 And I can probably give a lot more examples than what I just

1    told you, but those are common.

2            Now in the actual experience so far, approximately

3    30 or so -- it's a little less, a little more -- changes every

4    month.  Monetary awards have been issued to players who have

5    funding arrangements and they have been precessed by

6    BrownGreer and many of the transactions have been repaid, some

7    with recision, some with being loans and not prohibited

8    transactions.

9            But, there have been some problems and there will

10   continue to be some problems without some of the

11   recommendations that I think I am going to make today

12   concerning how it should be processed and handled in the

13   future.

14           Now, I want to make it clear, I represent players

15   and as class counsel my first duty and responsibility I

16   believe is to the players.  And the proposals that I'm making

17   I believe are to the benefit of the players.

18           I believe it in the sense that whatever the

19   financial transaction, they will get some type of discount or

20   substantial compromise of whatever papers they've signed under

21   the proposal that I'm going -- I'm going to recommend.

22           They avoid -- the player will avoid the litigation

23   risk.  Under the present system the risk of a funder to go

24   after the player legally in some form or fashion is a risk for

25   dispute resolution, and the player will have an opportunity if

1   he doesn't like this proposal to object at the end of the day,

2   and at least that's kind of better than it is right now.

3           As to the funders, I believe this is very helpful.

4   Number one, the suggestion is that they will get notice, which

5   they don't always get right now.  They have a method

6   internally for dispute resolution without having to chase or

7   go around in the proposal that we're making.

8           They have an ability -- not they have an ability --

9   there is built in a distribution protection wherein if there's

10  a dispute, the money is not paid to the player but the money

11  is retained by BrownGreer until there's a resolution of the

12  dispute.

13          There's no more problem which has occurred at the

14  moment in the recision transaction or two where money was paid

15  to the player because there was no recision and never got paid

16  to the funder.  Your Honor has certainly seen at least one of

17  those in front of her and hopefully under this --

18          THE COURT:  I believe that was retained by

19  BrownGreer.

20          MR. LOCKS:  At that time.  But there's another one

21  where it was not retained by BrownGreer and the player -- the

22  player received the money and the funder had to chase the

23  player.  And the proposal that I'm making and the declaration

24  and the protocol that will be handled by BrownGreer will

25  hopefully prevent the need for any of that and any involvement

1   with the Court having to decide the disputes.

2          Now, I'll go through that in a -- in a minute or two

3   when I talk about the actual proposal.  From the

4   administration point of view, it's going to be much simpler.

5   They won't have to do some of the things they're trying --

6   they're doing now to ascertain how and what to be involved in

7   the funding.

8          It will be presented in a way where they don't have

9   to read 40 different funding agreements to try to see what the

10  language is to try to see whether it's a prohibited assignment

11  or the terms and circumstances.

12         They will already know under the proposal that so-

13  and-so has a transaction, player with a funder and they don't

14  have  to re-read documents.  They won't have any essentially

15  involvement in the interpretation of the documents because

16  they will either have been approved or not with the proposal

17  that we're making.

18         As far as any issue from the administration point of

19  view that doesn't get resolved, the procedure (inaudible) the

20  ball to the Special Master and the Special Master will resolve

21  the dispute.

22         And in my view, 99 percent of the dispute between

23  the player and the funder under my proposal is simply going to

24  be calculation of how much interest it is -- saying it's 30

25  months or 22 months or something in a mechanical thing.  It's

1    not going to have to go into the legal issues.

2         Now lastly, from the Court's point of view, you

3    should have no litigation with funders and players anymore.

4         THE COURT:  Well, I'll always have the ones that

5    didn't --

6         MR. LOCKS:  You always have the ones that may arise

7    to a certain level, but generally almost you're not going to

8    have to be involved except in very unusual circumstances.

9         THE COURT:  Well, the one thing that you haven't

10   said which I'm sure that you'll understand and I think

11   everybody in this courtroom understands is that I may have to

12   impose a settlement if people are not taking a settlement and

13   not -- and I --

14        MR. LOCKS:  Yes.

15        THE COURT:  -- that's something that I've very

16   seriously considered and I think I've tipped my hand on that.

17        MR. LOCKS:  Yeah, well --

18        THE COURT:  So that's down the pike.

19        MR. LOCKS:  Hopefully it won't have to be utilized

20   very often.

21        THE COURT:  Okay, good.

22        MR. LOCKS:  Now, essentially there are certain

23   documents that have been submitted to all the funder here

24   except one or two that I overlooked.  There's a document --

25   the most important one, which is a Declaration of Consent to

1    Substitution.

2              THE COURT:  And would you like to make this part of

3    the record or would you rather not?

4              MR. LOCKS:  Your Honor, these --

5              THE COURT:  I'll bow to your --

6              MR. LOCKS:  -- these are hopefully 98 percent

7    drafts --

8              THE COURT:  Okay.

9              MR. LOCKS:  -- and there will be a little more

10   editing.  They are official documents that will be filed with

11   BrownGreer, the claims administrator.

12             THE COURT:  Okay, good.

13             MR. LOCKS:  But in effect, a funder who signs this

14   declaration is in effect converting their assignment

15   transactions voluntarily to 10 percent loans.

16             Under the agreement, under this draft, they will

17   submit to BrownGreer a list of all of the players who they

18   have advanced monies to and the amounts and the dates, and

19   BrownGreer will be able to put that into their system so that

20   when and if some of those players are lucky enough to get a

21   monetary award, that funder will get notice.

22             And therefore at that point, he will have the

23   opportunity to have this 10 percent loan transaction, which is

24   the substitution of the assignments that have been prohibited,

25   paid and taken care of.

 1          He will -- they will of course get a release.  Their

 2   release will also be the equivalent of a termination statement

 3   of all prior documents and they'll get a release from the

 4   player and the player of course will get a release from them

 5   and all of the prior documents are going to be history because

 6   of that release, which will be filed with BrownGreer who will

 7   then pay what's called the resolution amount, which is the

 8   money advance plus 10 percent from the date of the

 9   transaction.

10          The resolution amount will obviously change over the

11   course of time as the 10 percent grows -- you know, if it's a

12   year from now or six months or whatever.

13          From the BrownGreer point of view, there is a

14   proposal which is internal which is called a Third-party

15   Funding Resolution Protocol, and that essentially will tell

16   how BrownGreer will implement the substitution agreements and

17   this has been gone over with BrownGreer and the Special

18   Master.

19          We have attempted to make it a convenient and

20   streamlined document.  It may very well become a rule and

21   regulation under the manner in which dissemination of

22   information goes out from the Trust, or it may just be an

23   internal method of working, and that's subject to their

24   recommendation when it's done.  But it clearly allows the

25   third-party funder who participates in the resolution protocol

1     to get notice when and if one of their borrowers gets money.

2                THE COURT:  I assume that this has been given to Ms.

3     Benedetto?

4                MR. LOCKS:  Yes.

5                THE COURT:  Okay.

6                MR. LOCKS:  And -- and of course the Special Master

7     and Mr. Oxenreiter and everybody else there.  We've gone over

8     it, it is something that they believe and I believe makes

9     their life simpler, that it will be not something that will be

10    adversarial, except it does provide for what happens if in

11    fact there is a dispute with the player over the actual

12    quantity of the amount that should be paid.

13               The protocol will label each player with the name of

14    the funder, so when the player gets his award the funder's

15    name will be there and BrownGreer will have that and notify

16    them.

17               Now, if in fact -- and this is a rather significant

18    one -- well I'm not there yet -- the payments made to the

19    funder as I pointed out before, will have to have a

20    termination and release so that the player and the funder are

21    ending any possible involvement going forward.

22               But, it's possible that they don't come to an

23    agreement on what the resolution amount might be between the

24    funder and the player, or the biggest concern of funders and a

25    justifiable concern is that suppose the player says I don't

1     care what you've done, I don't -- I don't want to participate.

2           Well, under those circumstances all I can say,

3     Judge, is if the player is silly enough or his lawyer's silly

4     enough not to recommend this compromise on the substitution

5     agreement of the prohibited assignments, I don't think much of

6     the lawyer or the player's ability but they're entitled to do

7     that.

8           And then the funder unfortunately is exactly where

9     he is today, he's got somebody who doesn't pay him and he has

10    to do whatever he thinks he has to do.  I do not think that

11    will happen very often, if at all.

12          I've had discussions among members of the plaintiff

13    bar of what they would recommend to their players if these

14    declaration of substitution and 10 percent interest is paid as

15    a loan, what they would recommend to their players.

16          And I have gotten unanimous consent from everyone

17    I've talked to, at least half fo them who filed reports to the

18    Court when you asked for them -- Alex, I'm looking at you, I

19    can't remember when they were asked for but we had to give

20    them to the Court.  But most of them are in support and will

21    recommend to their players that they go along.

22          THE COURT:  Did you speak with -- did you speak with

23    Ms. Benedetto about this?

24          MR. LOCKS:  Oh, absolutely.

25          THE COURT:  Okay.

1          MR. LOCKS:  Now, if there's not an agreement on the

2    resolution amount that's been offered, then it will go to the

3    Special Master and they'll calculate what the agreement says.

4    I think it as good a solution as can be made.

5          I think it will work in everyone's self-interest --

6    in everyone's interest, even including if you have a self-

7    interest that you think is different than somebody else's.  I

8    believe of the 22 funders that I've spoken to, 19 or 18

9    depending on interpretation, have presently prohibited

10   assignments under Your Honor's ruling.

11         At least six or eight of those funders have agreed

12   with this proposal and signed or are willing to sign the draft

13   protocol.  Even though it's 99 percent complete, there's a

14   couple wrinkles.  I believe six or so more of those funders,

15   after they sort through this a little more, will probably

16   sign.

17         Preliminary conversations seemed to be that way.

18   Apparently there are three or four funders who have appealed

19   the award and I can't speak for them, their lawyer's here, I

20   don't talk to their funders, but I don't know what they're

21   going to do.

22         Of the other three or four, they have loan

23   transactions, not assignments.  But, if their loan

24   transactions are not acceptable, they have the option if they

25   want to join this protocol with their loan and accept 10

1    percent.

2            THE COURT:  Okay.

3            MR. LOCKS:  If they don't, they can -- whatever.

4            THE COURT:  Well, of course you know there is an

5    industry -- and I'll say this in open court -- I -- it would

6    seem to me and I certainly can't speak for the loan -- the

7    lenders, but there seems to be -- it seems to me that there is

8    a real industry interest in seeing that this is resolved

9    amicably and that this would be helpful to the industry

10   because the alternative is certainly my imposing upon it --

11   upon everyone.

12           And I think that that is a less valuable and a less

13   helpful resolution for the industry -- I'm talking about the

14   funder industry.  I mean, you don't have to comment on that,

15   please.

16           MR. LOCKS:  Well, I endorse that.  I completely

17   agree.

18           THE COURT:  I --

19           MR. LOCKS:  I think that it's totally appropriate

20   for compromises to be made and I believe the recommendations

21   I've made are fair and reasonable.  And if one funder doesn't

22   think that my recommendation of 10 percent is not fair, God

23   bless, he can do what --

24           THE COURT:  Well, and that might be --

25           MR. LOCKS:  -- he thinks he can do.

1                  THE COURT:  -- and that also might be a signal to me

2        by a certain number of funders being willing to compromise on

3        this that this is in fact a reasonable resolution if I find

4        that it's important for me to -- to impose such a --

5                  MR. LOCKS:  Your Honor --

6                  THE COURT:  -- such a --

7                  MR. LOCKS:  -- I recommend, because it's up til now

8        not been an opportunity for this Court to see, but I recommend

9        the opportunity to allow some of the funders or any -- all of

10       the funders to sit in and -- and you meet them --

11                 THE COURT:  I'm going to do just that.

12                 MR. LOCKS:  -- and you can hear their concerns.  If

13       they have more concerns than --

14                 THE COURT:  That will not be on the record.

15                 MR. LOCKS:  No, no --

16                 THE COURT:  I will do that --

17                 MR. LOCKS:  -- that's fine.

18                 THE COURT:  -- I will do that in chambers.  Yes,

19       that's --

20                 MR. LOCKS:  Anyway --

21                 THE COURT:  -- but I certainly -- yes, I appreciate

22       that, I appreciate your looking into this, Mr. Locks, and I

23       appreciate your presentation.

24                 MR. LOCKS:  Thank you.

25                 THE COURT:  Okay.  All right, would you like to say

1     whom you think I might -- I'd like you to tell me whom you

2     think it would be most helpful for me to meet with privately

3     in my chambers at this time.  Would you like to tell me which

4     funders you think would be helpful?

5                 MR. LOCKS:  Sure.  I would like to suggest anybody

6     who'd like to, make sure they go back.  I would -- since I've

7     talked to some of you a little more extensively than others, I

8     would -- I would recommend --

9                 THE COURT:  Okay, I have a sheet of everybody who's

10    here.

11                MR. LOCKS:  Yeah.

12                THE COURT:  I appreciate that.

13                MR. LOCKS:  I would recommend Mark, Jeff, Sean,

14    William Bray.  I don't know the faces, I know the names of the

15    companies that some of the -- that we've had --

16                MR. PACCIONE:  Cowen & Company, Anthony

17    Paccione --

18                MR. LOCKS:  Yeah --

19                MR. PACCIONE:  -- accountant.

20                MR. LOCKS:  -- okay.  And then --

21                THE COURT:  I'm going to in the back --

22                MR. LOCKS:  Well, I think that the first --

23                THE COURT:  Gene --

24                MR. LOCKS:  Yes.

25                THE COURT:  -- I'm going to go into the back.

1          MR. LOCKS:  Yes.

2          THE COURT:  You can do this out of my hearing --

3          MR. LOCKS:  Yes, okay.

4          THE COURT:  -- so that might be helpful.  Okay?  And

5    same with -- well, you're coming back, Terri.

6          MS. BENEDETTO:  Yes, Your Honor.

7          THE COURT:  Okay, good.

8          COURTROOM DEPUTY:  All rise.

9       (Off the record)

10         THE COURT:  What I'm back here on is that I did find

11   out -- and I thought I would announce it to everyone so you

12   knew that the best estimate as to the total amount that's been

13   involved in this is between 90 million and 100 million that --

14   in loans.

15         That's my understanding and I was authorized -- Mr.

16   Lock said -- said that he's trying to announce that and I -- I

17   -- oh, and the people who were in with me saw no objection so

18   I just want you to know that.  The people who were in with me

19   are excused and we'll get -- we'll be back to everybody

20   eventually.

21              (Matter concluded, 11:32 a.m.)

22                       * * *

23

24

25

1

2

3                    **C E R T I F I C A T I O N**

4

5              I, Diane Gallagher, court approved transcriber,

6    certify that the foregoing is a correct transcript from the

7    official electronic sound recording of the proceedings in the

8    above-entitled matter.

9

10   _____        _____

11   DIANE GALLAGHER                          DATE

12   DIANA DOMAN TRANSCRIBING, LLC

13

14

15