# EXHIBIT 8

## The New York Times

# Judge Approves Deal in N.F.L. Concussion Suit

**By Ken Belson**

April 22, 2015

A federal district court judge on Wednesday gave her final approval to the settlement of a lawsuit brought by more than 5,000 former players who accused the N.F.L. of hiding from them the dangers of concussions, a major step toward ending one of the most contentious legal battles in league history.

The settlement provides payments of up to $5 million to players who have one of a handful of severe neurological disorders, medical monitoring for all players to determine if they qualify for a payment and $10 million for education about concussions.

The landmark deal, which many players criticized, was originally reached in August 2013, but Judge Anita B. Brody twice asked the two sides to revise their agreement, first to uncap the total amount of damages that could be paid for the conditions covered, and then to remove the limit on how much could be spent on medical monitoring.

As part of the deal, the N.F.L. insisted that all retired players — not just the 5,000 or so who sued the league — be covered by the settlement as a way to fend off lawsuits in the future. But about 200 players, including Junior Seau, who committed suicide and was later found to have a degenerative brain disease, opted out of the settlement to preserve their right to continue fighting the league.

Critics of the settlement said that even after the revisions, the number and variety of diseases covered by the deal were too small and that many players would receive only a small fraction of the multimillion-dollar payouts promised by the league after their age and years in the N.F.L. were considered. Critics also contended that the settlement needed to acknowledge more classes of plaintiffs, not only those with diagnosable diseases and those without them.



Kevin Turner, a former N.F.L. player who has A.L.S., is the co-lead plaintiff in the suit.
Josh Ritchie for The New York Times

In her 132-page ruling, Brody called the settlement "fair, reasonable and adequate." She also addressed the criticisms of the deal filed with the court, something appellate judges are likely to scrutinize if the case reaches a higher court, which is widely expected.

No payments will be made to players until all appeals are exhausted. That could create tension between the players who are eager for some restitution and others who continue to push for a better deal. Appeals must be filed within 30 days.

Christopher Seeger, one of the two lead counsels for the plaintiffs, said he had a "modest concern" that the case could be appealed. While he said that Brody had addressed and dismissed many of the concerns about the settlement, he said new issues could be raised. If the settlement is appealed, it could take six to nine months for the judges to hear the case, he said. If it is not appealed, retired players could start filing claims within 90 to 120 days.

"What matters now is time, and many retired players do not have much left," said Kevin Turner, a retired running back who has amyotrophic lateral sclerosis, commonly known as Lou Gehrig's disease. "I hope this settlement is implemented without delay so that we can finally start helping those in need."

Still, some players contended that the settlement should be broader and include more generic conditions, like memory loss, irritability, sleep deprivation and other problems they claim were a result of playing football. Other plaintiffs claimed that the settlement should include a provision

that allowed for future scientific discoveries, like a test to diagnose chronic traumatic encephalopathy, a brain disorder associated with repeated blows to the head, in living patients. The disease can now only be diagnosed posthumously.

Some critics contended that the N.F.L. could have spent more to settle the case. When the deal was announced in August 2013, the league agreed to pay up to $675 million to players with diagnosable diseases. Under pressure from the judge, that limit was removed. But given the narrow number of diseases covered, critics claimed that the N.F.L. would pay out only a small fraction of what it promised.

Scott Rosner, a lawyer who teaches sports business at the University of Pennsylvania, said it would be hard for the players who appeal the settlement to win any substantive changes because the judge twice asked the N.F.L. and the plaintiffs to revise their deal and because she addressed the various criticisms of the deal.

"My sense is that the appellate court in this instance will give some pretty significant deference to Judge Brody," he said. "This is a bit of a long shot."

If an appeals court overturns part or all of the settlement, the case is likely to revert to Brody, who is also expected to have jurisdiction over the cases involving the plaintiffs who opted out of the settlement.

The players who opted out of the deal could settle their differences with the N.F.L. individually.

"The Seau family rejected the settlement because they want the truth to come out about the N.F.L.'s decades-long deception to hide the dangers of concussive brain injuries from the players," said Steven Strauss, a lawyer for the Seau family.

The concussion settlement was originally reached in August 2013, but Judge Anita B. Brody twice asked the two sides to revise their agreement.
U.S. District Court in Philadelphia, via Associated Press

Jeff Pash, the N.F.L.'s general counsel, said in a statement that the agreement would disburse money to players in need and avoid a lengthy trial.

"As a result of the settlement, retirees and their families will be eligible for prompt and substantial benefits and will avoid years of costly litigation that — as Judge Brody's comprehensive opinion makes clear — would have an uncertain prospect of success," Pash said.

Lawyers for the players have argued that the settlement is favorable because it would have been difficult to beat the N.F.L. in a trial. They noted that Brody never ruled on the N.F.L.'s argument that the case should be dismissed because the collective bargaining agreement between the players and the owners governed this dispute. Other judges have sided with the league on this point, and the plaintiffs' lawyers said Brody could have followed suit, had she ruled on the issue.

In a trial, the players would have also had to prove that the concussions they received in the N.F.L. led to their current conditions, a major hurdle given the lack of documentation. Under the current deal, players will not have to document that they had any concussions to be eligible for a payment, the lawyers said.

The lawyers for the plaintiffs encouraged the players to agree to the settlement because, they said, it is better to get some money to players who are sick now and coverage for those who may be sick in the future.

When the case is fully settled, Brody will have to rule on how much the lawyers representing the players will be paid. They have asked for, and the N.F.L. has agreed to pay, $112 million in fees.

The N.F.L. has also spent millions of dollars to defend itself. From April 2013 to March 2014, the league paid $7.4 million to Paul, Weiss, Rifkind, Wharton & Garrison, the firm most involved in representing the league.

A version of this article appears in print on April 23, 2015, on Page B11 of the New York edition with the headline: Judge Approves Deal in Concussion Suit

READ 30 COMMENTS