# EXHIBIT 2



# NFL
# COLLECTIVE
# BARGAINING
# AGREEMENT
## 2006-2012

COLLECTIVE BARGAINING AGREEMENT
BETWEEN
THE NFL MANAGEMENT COUNCIL
AND
THE NFL PLAYERS ASSOCIATION
March 8, 2006



**NFL PLAYERS**
ASSOCIATION

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

PREAMBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

ARTICLE I  DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
   Section 1.  General Definitions . . . . . . . . . . . . . . . . . . . . . .4
   Section 2.  Free Agency Definitions . . . . . . . . . . . . . . . . . . .5
   Section 3.  Salary Cap Definitions . . . . . . . . . . . . . . . . . . . .6
   Section 4.  Further Definitions . . . . . . . . . . . . . . . . . . . . . .7

ARTICLE II  GOVERNING AGREEMENT . . . . . . . . . . . . . . . . . .8
   Section 1.  Conflicts . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
   Section 2.  Implementation . . . . . . . . . . . . . . . . . . . . . . . .8
   Section 3.  Management Rights . . . . . . . . . . . . . . . . . . . . . .8
   Section 4.  Rounding . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

ARTICLE III  SCOPE OF AGREEMENT . . . . . . . . . . . . . . . . . . .9
   Section 1.  Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
   Section 2.  Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . .9

ARTICLE IV  NO STRIKE/LOCKOUT/SUIT . . . . . . . . . . . . . . . .10
   Section 1.  No Strike/Lockout . . . . . . . . . . . . . . . . . . . . . .10
   Section 2.  No Suit . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
   Section 3.  Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

ARTICLE V  UNION SECURITY . . . . . . . . . . . . . . . . . . . . . . . .12
   Section 1.  Union Security . . . . . . . . . . . . . . . . . . . . . . . .12
   Section 2.  Check-off . . . . . . . . . . . . . . . . . . . . . . . . . . .12
   Section 3.  NFLPA Meetings . . . . . . . . . . . . . . . . . . . . . . .12
   Section 4.  NFLPA Player Group Licensing Program . . . . . . . . .12
   Section 5.  Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
   Section 6.  Procedure for Enforcement . . . . . . . . . . . . . . . . .13
   Section 7.  NFLPA Responsibility . . . . . . . . . . . . . . . . . . . .14
   Section 8.  Orientations . . . . . . . . . . . . . . . . . . . . . . . . . .14
   Section 9.  Rookie Symposium . . . . . . . . . . . . . . . . . . . . . .14

ARTICLE VI  NFLPA AGENT CERTIFICATION . . . . . . . . . . . . . .16
   Section 1.  Exclusive Representation . . . . . . . . . . . . . . . . . .16
   Section 2.  Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . .16
   Section 3.  Penalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

**ARTICLE VII  PLAYER SECURITY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**18**
    Section 1.  No Discrimination  . . . . . . . . . . . . . . . . . . . . . .18
    Section 2.  Personal Appearance  . . . . . . . . . . . . . . . . . . . . . .18

**ARTICLE VIII  CLUB DISCIPLINE**  . . . . . . . . . . . . . . . . . . . . . . .**19**
    Section 1.  Maximum Discipline . . . . . . . . . . . . . . . . . . . . . . .19
    Section 2.  Published Lists  . . . . . . . . . . . . . . . . . . . . . . . .20
    Section 3.  Uniformity  . . . . . . . . . . . . . . . . . . . . . . . . . .20
    Section 4.  Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . .20
    Section 5.  Deduction  . . . . . . . . . . . . . . . . . . . . . . . . . .20
    Section 6.  NFL Drug and Steroid Policies  . . . . . . . . . . . . . . .21
    Section 7.  Cumulative Fines  . . . . . . . . . . . . . . . . . . . . . .21
    Section 8.  Offset of Pre-Season Fine Amounts  . . . . . . . . . . . . .21
    Section 9.  Effective Date  . . . . . . . . . . . . . . . . . . . . . . .22

**ARTICLE IX  NON-INJURY GRIEVANCE** . . . . . . . . . . . . . . . . . . . .**23**
    Section 1.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . .23
    Section 2.  Initiation  . . . . . . . . . . . . . . . . . . . . . . . . . .23
    Section 3.  Filing  . . . . . . . . . . . . . . . . . . . . . . . . . . . .23
    Section 4.  Ordinary and Expedited Appeal  . . . . . . . . . . . . . . .23
    Section 5.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . .24
    Section 6.  Arbitration Panel . . . . . . . . . . . . . . . . . . . . . . .24
    Section 7.  Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
    Section 8.  Arbitrator's Decision and Award  . . . . . . . . . . . . . .26
    Section 9.  Time Limits . . . . . . . . . . . . . . . . . . . . . . . . . .26
    Section 10.  Representation  . . . . . . . . . . . . . . . . . . . . . . .26
    Section 11.  Costs  . . . . . . . . . . . . . . . . . . . . . . . . . . . .26
    Section 12.  Payment  . . . . . . . . . . . . . . . . . . . . . . . . . . .27
    Section 13.  Grievance Settlement Committee  . . . . . . . . . . . . . .27

**ARTICLE X  INJURY GRIEVANCE** . . . . . . . . . . . . . . . . . . . . . . . .**28**
    Section 1.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . .28
    Section 2.  Filing  . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
    Section 3.  Answer  . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
    Section 4.  Neutral Physician  . . . . . . . . . . . . . . . . . . . . . .29
    Section 5.  Neutral Physician List  . . . . . . . . . . . . . . . . . . .29
    Section 6.  Appeal  . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
    Section 7.  Arbitration Panel . . . . . . . . . . . . . . . . . . . . . . .30
    Section 8.  Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . .30
    Section 9.  Miscellaneous  . . . . . . . . . . . . . . . . . . . . . . . .31
    Section 10.  Expenses  . . . . . . . . . . . . . . . . . . . . . . . . . .32
    Section 11.  Pension Credit  . . . . . . . . . . . . . . . . . . . . . . .32
    Section 12.  Payment  . . . . . . . . . . . . . . . . . . . . . . . . . . .32
    Section 13.  Presumption of Fitness  . . . . . . . . . . . . . . . . . . .32
    Section 14.  Playoff Money . . . . . . . . . . . . . . . . . . . . . . . .33

ii

Section 15.  Information Exchange . . . . . . . . . . . . . . . . . . . . . . .33
Section 16.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

**ARTICLE XI  COMMISSIONER DISCIPLINE** . . . . . . . . . . . . . . . **34**
Section 1.  League Discipline  . . . . . . . . . . . . . . . . . . . . . . .34
Section 2.  Time Limits  . . . . . . . . . . . . . . . . . . . . . . . . . .34
Section 3.  Representation  . . . . . . . . . . . . . . . . . . . . . . . . .34
Section 4.  Costs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
Section 5.  One Penalty  . . . . . . . . . . . . . . . . . . . . . . . . . .35
Section 6.  Fine Money . . . . . . . . . . . . . . . . . . . . . . . . . . .35

**ARTICLE XII  INJURY PROTECTION** . . . . . . . . . . . . . . . . . . **36**
Section 1.  Qualification  . . . . . . . . . . . . . . . . . . . . . . . . .36
Section 2.  Benefit  . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
Section 3.  Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

**ARTICLE XIII  COMMITTEES** . . . . . . . . . . . . . . . . . . . . . . **38**
Section 1.  Joint Committee . . . . . . . . . . . . . . . . . . . . . . . . .38
Section 2.  Competition Committee . . . . . . . . . . . . . . . . . . . . . .39
Section 3.  Player/Club Operations Committee . . . . . . . . . . . . . . . .39

**ARTICLE XIV  NFL PLAYER CONTRACT** . . . . . . . . . . . . . . . . . **40**
Section 1.  Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
Section 2.  Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
Section 3.  Changes  . . . . . . . . . . . . . . . . . . . . . . . . . . . .40
Section 4.  Conformity . . . . . . . . . . . . . . . . . . . . . . . . . . .40
Section 5.  General, Notices, Prohibitions, etc. . . . . . . . . . . . . . .40
Section 6.  Commissioner Disapproval . . . . . . . . . . . . . . . . . . . .42
Section 7.  NFLPA Group Licensing Program  . . . . . . . . . . . . . . . . .42
Section 8.  Good Faith Negotiation . . . . . . . . . . . . . . . . . . . . .43
Section 9.  Limitations on Salary Forfeitures  . . . . . . . . . . . . . . .43

**ARTICLE XV  OPTION CLAUSE** . . . . . . . . . . . . . . . . . . . . . **45**
Section 1.  Prohibition . . . . . . . . . . . . . . . . . . . . . . . . . . .45

**ARTICLE XVI  COLLEGE DRAFT** . . . . . . . . . . . . . . . . . . . . . **46**
Section 1.  Time of Draft  . . . . . . . . . . . . . . . . . . . . . . . . .46
Section 2.  Number of Choices and Eligibility  . . . . . . . . . . . . . . .46
Section 3.  Required Tender  . . . . . . . . . . . . . . . . . . . . . . . .46
Section 4.  Signing of Drafted Rookies  . . . . . . . . . . . . . . . . . . .46
Section 5.  Other Professional Teams  . . . . . . . . . . . . . . . . . . . .47
Section 6.  Return to College  . . . . . . . . . . . . . . . . . . . . . . .48
Section 7.  Assignment of Draft Rights  . . . . . . . . . . . . . . . . . . .49
Section 8.  Subsequent Draft  . . . . . . . . . . . . . . . . . . . . . . . .49
Section 9.  No Subsequent Draft  . . . . . . . . . . . . . . . . . . . . . .49

Section 10.  Compensatory Draft Selections . . . . . . . . . . . . . . . .49
Section 11.  Undrafted Rookies . . . . . . . . . . . . . . . . . . . . . . . . .49
Section 12.  Notice of Signing  . . . . . . . . . . . . . . . . . . . . . . . . .50

**ARTICLE XVII  ENTERING PLAYER POOL** . . . . . . . . . . . . . . . . . .**51**
Section 1.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51
Section 2.  Covered League Years  . . . . . . . . . . . . . . . . . . . . . .51
Section 3.  Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .51
Section 4.  Operation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53
Section 5.  Rookie Player Contract Length  . . . . . . . . . . . . . . . .55

**ARTICLE XVIII  VETERANS WITH LESS THAN**
**THREE ACCRUED SEASONS** . . . . . . . . . . . . . . . . . . . . . . . . .**56**
Section 1.  Accrued Seasons Calculation  . . . . . . . . . . . . . . . . .56
Section 2.  Negotiating Rights of Players With Less
Than Three Accrued Seasons  . . . . . . . . . . . . . . . . . . . . . .56

**ARTICLE XIX  VETERAN FREE AGENCY** . . . . . . . . . . . . . . . . . .**57**
Section 1.  Unrestricted Free Agents . . . . . . . . . . . . . . . . . . . .57
Section 2.  Restricted Free Agents . . . . . . . . . . . . . . . . . . . . . .58
Section 3.  Offer Sheet and First Refusal Procedures  . . . . . . . . .63
Section 4.  Expedited Arbitration  . . . . . . . . . . . . . . . . . . . . . .65
Section 5.  Individually Negotiated Limitations
on Player Movement  . . . . . . . . . . . . . . . . . . . . . . . . . . .66
Section 6.  Notices, Etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . .66

**ARTICLE XX  FRANCHISE AND TRANSITION PLAYERS** . . . . . . . .**68**
Section 1.  Franchise Player Designations . . . . . . . . . . . . . . . . .68
Section 2.  Required Tender for Franchise Players . . . . . . . . . . . .68
Section 3.  Transition Player Designations . . . . . . . . . . . . . . . . .71
Section 4.  Required Tender for Transition Players . . . . . . . . . . . .71
Section 5.  Right of First Refusal for Transition Players . . . . . . . . .72
Section 6.  Lists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72
Section 7.  Salary Information . . . . . . . . . . . . . . . . . . . . . . . . .72
Section 8.  No Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . .73
Section 9.  Duration of Designation [*no longer applicable*] . . . . . . .73
Section 10.  Franchise Player Designation Period . . . . . . . . . . . . .73
Section 11.  Transition Player Designation Period  . . . . . . . . . . . .74
Section 12.  Prospective Designation [*no longer applicable*]  . . . . . .74
Section 13.  Right to Decline [*no longer applicable*] . . . . . . . . . . .74
Section 14.  Other Terms  . . . . . . . . . . . . . . . . . . . . . . . . . . . .74
Section 15.  Compensatory Draft Selection . . . . . . . . . . . . . . . . .75
Section 16.  Signing Period for Transition Players  . . . . . . . . . . . .75
Section 17.  Signing Period for Franchise Players  . . . . . . . . . . . .75

iv

**ARTICLE XXI  FINAL EIGHT PLAN** . . . . . . . . . . . . . . . . . . . . . . .**77**
    Section 1.  Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77
    Section 2.  Top Four Teams . . . . . . . . . . . . . . . . . . . . . . . . . . .77
    Section 3.  Next Four Teams . . . . . . . . . . . . . . . . . . . . . . . . . . .77
    Section 4.  Replacement of Free Agents Signed by Other Club  . . .77
    Section 5.  Increases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .78
    Section 6.  Salary Definition . . . . . . . . . . . . . . . . . . . . . . . . . . .78
    Section 7.  Trade Limitation . . . . . . . . . . . . . . . . . . . . . . . . . . .78
    Section 8.  Transition and Franchise Players . . . . . . . . . . . . . . . .78
    Section 9.  Player Tenders . . . . . . . . . . . . . . . . . . . . . . . . . . . .78

**ARTICLE XXII  WAIVER SYSTEM** . . . . . . . . . . . . . . . . . . . . . . . .**79**
    Section 1.  Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .79
    Section 2.  Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .79
    Section 3.  Ineligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .79
    Section 4.  Notice of Termination . . . . . . . . . . . . . . . . . . . . . . . .79
    Section 5.  NFLPA's Right to Personnel Information  . . . . . . . . . .80
    Section 6.  Rosters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .80
    Section 7.  Procedural Recall Waivers . . . . . . . . . . . . . . . . . . . . .80

**ARTICLE XXIII  TERMINATION PAY** . . . . . . . . . . . . . . . . . . . . .**81**
    Section 1.  Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .81
    Section 2.  Regular Season Signings . . . . . . . . . . . . . . . . . . . . . .81
    Section 3.  Ineligibility for Termination Pay . . . . . . . . . . . . . . . .81

**ARTICLE XXIV  GUARANTEED LEAGUE-WIDE SALARY,**
    **SALARY CAP, & MINIMUM TEAM SALARY** . . . . . . . . . . . . .**82**
    Section 1.  Definitions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .82
    Section 2.  Trigger For Guaranteed League-wide Salary,
       Salary Cap, and Minimum Team Salary  . . . . . . . . . . . . . . .95
    Section 3.  Guaranteed League-wide Salary . . . . . . . . . . . . . . . . .95
    Section 4.  Salary Cap Amounts . . . . . . . . . . . . . . . . . . . . . . . . .96
    Section 5.  Minimum Team Salary . . . . . . . . . . . . . . . . . . . . . . .102
    Section 6.  Computation of Team Salary . . . . . . . . . . . . . . . . . . .102
    Section 7.  Valuation of Player Contracts . . . . . . . . . . . . . . . . . .104
    Section 8.  30% Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .133
    Section 9.  Renegotiations and Extensions  . . . . . . . . . . . . . . . . .134
    Section 10. Accounting Procedures  . . . . . . . . . . . . . . . . . . . . . .135
    Section 11. Revenue Sharing  . . . . . . . . . . . . . . . . . . . . . . . . . .143

**ARTICLE XXV  ENFORCEMENT OF THE SALARY**
    **CAP AND ENTERING PLAYER POOL** . . . . . . . . . . . . . . . .**145**
    Section 1.  Undisclosed Terms . . . . . . . . . . . . . . . . . . . . . . . . . .145
    Section 2.  Circumvention . . . . . . . . . . . . . . . . . . . . . . . . . . . .145
    Section 3.  Special Master Action . . . . . . . . . . . . . . . . . . . . . . .145

Section 4.  Commissioner Disapproval . . . . . . . . . . . . . . . . . .145
Section 5.  Special Master Review . . . . . . . . . . . . . . . . . . . .146
Section 6.  Sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . .146
Section 7.  Revenue Circumvention . . . . . . . . . . . . . . . . . . . .147
Section 8.  Management Council Audit Rights . . . . . . . . . . . . .148
Section 9.  Prior Consultation . . . . . . . . . . . . . . . . . . . . . .148

**ARTICLE XXVI  SPECIAL MASTER** . . . . . . . . . . . . . . . . . . . .**149**
Section 1.  Appointment . . . . . . . . . . . . . . . . . . . . . . . . . .149
Section 2.  Scope of Authority . . . . . . . . . . . . . . . . . . . . . .149
Section 3.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . .150
Section 4.  Compensation . . . . . . . . . . . . . . . . . . . . . . . . .150
Section 5.  Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . .150
Section 6.  Selection of Special Master . . . . . . . . . . . . . . . . .151
Section 7.  Penalties . . . . . . . . . . . . . . . . . . . . . . . . . . . .151

**ARTICLE XXVII  IMPARTIAL ARBITRATOR** . . . . . . . . . . . . . . .**152**
Section 1.  Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . .152
Section 2.  Scope of Authority . . . . . . . . . . . . . . . . . . . . . .152
Section 3.  Effect of Rulings . . . . . . . . . . . . . . . . . . . . . . .152
Section 4.  Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . .152
Section 5.  Compensation of Impartial Arbitrator . . . . . . . . . . .152
Section 6.  Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . .152
Section 7.  Selection of Impartial Arbitrator . . . . . . . . . . . . . .153

**ARTICLE XXVIII  ANTI-COLLUSION** . . . . . . . . . . . . . . . . . . .**154**
Section 1.  Prohibited Conduct . . . . . . . . . . . . . . . . . . . . . .154
Section 1a.  Commissioner Approvals . . . . . . . . . . . . . . . . . .154
Section 2.  Other Club Conduct . . . . . . . . . . . . . . . . . . . . . .154
Section 3.  Club Discretion . . . . . . . . . . . . . . . . . . . . . . . .154
Section 4.  League Disclosures . . . . . . . . . . . . . . . . . . . . . .155
Section 5.  Enforcement of Anti-Collusion Provisions . . . . . . . . .155
Section 6.  Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . .155
Section 7.  Summary Judgment . . . . . . . . . . . . . . . . . . . . . .156
Section 8.  Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . .156
Section 9.  Computation of Damages . . . . . . . . . . . . . . . . . .157
Section 10.  Player Election . . . . . . . . . . . . . . . . . . . . . . . .157
Section 11.  Payment of Damages . . . . . . . . . . . . . . . . . . . .158
Section 12.  Effect on Cap Computations . . . . . . . . . . . . . . . .158
Section 13.  Effect of Salary Cap . . . . . . . . . . . . . . . . . . . . .158
Section 14.  No Reimbursement . . . . . . . . . . . . . . . . . . . . . .158
Section 15.  Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .158
Section 16.  Termination . . . . . . . . . . . . . . . . . . . . . . . . . .158
Section 17.  Time Limits . . . . . . . . . . . . . . . . . . . . . . . . . .159
Section 18.  Prior Conference . . . . . . . . . . . . . . . . . . . . . . .159

vi

**ARTICLE XXIX  CERTIFICATIONS** . . . . . . . . . . . . . . . . . . . . . . . **160**
 Section 1.  Contract Certification . . . . . . . . . . . . . . . . . . . . . . .160
 Section 2.  End of League Year Certification . . . . . . . . . . . . . . .160
 Section 3.  False Certification . . . . . . . . . . . . . . . . . . . . . . . . .161

**ARTICLE XXX  CONSULTATION AND INFORMATION SHARING** . **163**
 Section 1.  Consultation and Communications . . . . . . . . . . . .163
 Section 2.  Salary Summaries . . . . . . . . . . . . . . . . . . . . . . . . .163
 Section 3.  Notice of Invalid Contract . . . . . . . . . . . . . . . . . .163
 Section 4.  Neutral Verifier . . . . . . . . . . . . . . . . . . . . . . . . . .163
 Section 5.  Copies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .164
 Section 6.  Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .164

**ARTICLE XXXI  EXPANSION** . . . . . . . . . . . . . . . . . . . . . . . . . **165**
 Section 1.  Veteran Allocation . . . . . . . . . . . . . . . . . . . . . . . .165
 Section 2.  Additional Compensatory Picks . . . . . . . . . . . . . . .165
 Section 3.  Entering Player Pool Adjustment . . . . . . . . . . . . . .165
 Section 4.  Relocation Bonus . . . . . . . . . . . . . . . . . . . . . . . . .165

**ARTICLE XXXII  OTHER PROVISIONS** . . . . . . . . . . . . . . . . . . **166**
 Section 1.  CFL Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .166
 Section 2.  Physically Unable to Perform . . . . . . . . . . . . . . . .166
 Section 3.  Non-Football Injury . . . . . . . . . . . . . . . . . . . . . . .166
 Section 4.  Roster Exemption . . . . . . . . . . . . . . . . . . . . . . . .166
 Section 5.  Arena Football Players . . . . . . . . . . . . . . . . . . . . .167

**ARTICLE XXXIII  SQUAD SIZE** . . . . . . . . . . . . . . . . . . . . . . . . **169**
 Section 1.  Active List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .169
 Section 2.  Pre-Season . . . . . . . . . . . . . . . . . . . . . . . . . . . . .169
 Section 3.  Inactive List . . . . . . . . . . . . . . . . . . . . . . . . . . . . .169
 Section 4.  Active and Inactive List Limit . . . . . . . . . . . . . . . .169

**ARTICLE XXXIV  PRACTICE SQUADS** . . . . . . . . . . . . . . . . . . **170**
 Section 1.  Practice Squads . . . . . . . . . . . . . . . . . . . . . . . . . .170
 Section 2.  Signing With Other Clubs . . . . . . . . . . . . . . . . . . .170
 Section 3.  Salary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .171
 Section 4.  Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .171
 Section 5.  Active List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .171

**ARTICLE XXXV  OFF-SEASON WORKOUTS** . . . . . . . . . . . . . . **172**
 Section 1.  Voluntary Workouts . . . . . . . . . . . . . . . . . . . . . . .172
 Section 2.  Time Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . .172
 Section 3.  Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .172
 Section 4.  Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .173
 Section 5.  Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . .173

Section 6.  Pre-Training Camp Period . . . . . . . . . . . . . . . . . . . . . .173
Section 7.  Rookie Premiere . . . . . . . . . . . . . . . . . . . . . . . . . . . .174
Section 8.  Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .174

**ARTICLE XXXVI  MINICAMPS** . . . . . . . . . . . . . . . . . . . . . . . .**176**
Section 1.  Number . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .176
Section 2.  Length . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .176
Section 3.  Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .176
Section 4.  Contact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .176
Section 5.  Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .176

**ARTICLE XXXVII  PRE-SEASON TRAINING CAMPS** . . . . . . . . . .**177**
Section 1.  Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .177
Section 2.  Room and Board . . . . . . . . . . . . . . . . . . . . . . . . . . . .177
Section 3.  Rookie Per Diem . . . . . . . . . . . . . . . . . . . . . . . . . . . .177
Section 4.  Veteran Per Diem . . . . . . . . . . . . . . . . . . . . . . . . . . .177
Section 5.  Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .177
Section 6.  Number of Pre-Season Games . . . . . . . . . . . . . . . . . . .177
Section 7.  Telephones . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .178
Section 8.  Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .178

**ARTICLE XXXVIII  SALARIES** . . . . . . . . . . . . . . . . . . . . . . . . .**179**
Sections 1-5.  [*no longer applicable*] . . . . . . . . . . . . . . . . . . . . .179
Section 6.  Minimum Salaries . . . . . . . . . . . . . . . . . . . . . . . . . . .179
Section 7.  Credited Season . . . . . . . . . . . . . . . . . . . . . . . . . . . .180
Section 8.  Other Compensation . . . . . . . . . . . . . . . . . . . . . . . . .180
Section 9.  Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .180
Section 10.  Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .180
Section 11.  Deferred Paragraph 5 . . . . . . . . . . . . . . . . . . . . . . . .180
Section 12.  Number of Regular Season Games . . . . . . . . . . . . . . .181
Section 13.  Copies of Contracts . . . . . . . . . . . . . . . . . . . . . . . . .181
Section 14.  Split Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . .181
Section 15.  Funding of Deferred and Guaranteed Contracts . . . .181

**ARTICLE XXXVIII-A  MINIMUM SALARY BENEFIT** . . . . . . . . . . .**183**
Section 1.  Qualifying Players . . . . . . . . . . . . . . . . . . . . . . . . . . .183
Section 2.  Qualifying Contracts . . . . . . . . . . . . . . . . . . . . . . . . .183
Section 3.  Additional Compensation Rules . . . . . . . . . . . . . . . .183
Section 4.  Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .184
Section 5.  Reduced Salary Cap Count . . . . . . . . . . . . . . . . . . . . .184
Section 6.  Minimum Salary Benefit Calculation . . . . . . . . . . . . .185
Section 7.  Extensions of Qualified Contracts . . . . . . . . . . . . . . .185
Section 8.  [*no longer applicable*] . . . . . . . . . . . . . . . . . . . . . . .185
Section 9.  Terminated Qualifying Players . . . . . . . . . . . . . . . . . .185

viii

Section 10.  Players Moving to New Club . . . . . . . . . . . . . . . . . 185
Section 11.  Player Returning to Old Club  . . . . . . . . . . . . . . . . 185
Section 12.  Players with Expired Contract . . . . . . . . . . . . . . . . 186
Section 13.  Guarantees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186
Section 14.  Termination Pay  . . . . . . . . . . . . . . . . . . . . . . . . . 186
Section 15.  No Benefit for Non-Qualifying Contracts . . . . . . . . 187

**ARTICLE XXXVIII-B  PERFORMANCE-BASED POOL** . . . . . . . . **188**
Section 1.  Creation of Fund . . . . . . . . . . . . . . . . . . . . . . . . . 188
Section 2.  Amount of Fund . . . . . . . . . . . . . . . . . . . . . . . . . 188
Section 3.  Mandatory Distribution Each Year . . . . . . . . . . . . 188
Section 4.  Qualifying Players . . . . . . . . . . . . . . . . . . . . . . . . 188
Section 5.  Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188
Section 6.  Corrections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

**ARTICLE XXXIX  MEAL ALLOWANCE** . . . . . . . . . . . . . . . . . **190**
Section 1.  Reimbursement . . . . . . . . . . . . . . . . . . . . . . . . . . 190
Section 2.  Travel Day . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

**ARTICLE XL  DAYS OFF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **191**
Section 1.  Rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
Section 2.  Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

**ARTICLE XLI  MOVING AND TRAVEL EXPENSES** . . . . . . . . . . **192**
Section 1.  Qualification . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
Section 2.  Moving Expenses . . . . . . . . . . . . . . . . . . . . . . . . . 192
Section 3.  Travel Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . 192
Section 4.  Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

**ARTICLE XLII  POST-SEASON PAY** . . . . . . . . . . . . . . . . . . . . **194**
Section 1.  System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194
Section 2.  Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . 194
Section 3.  Wild Card Game; Division Play-off Game . . . . . . . . 194
Section 4.  Conference Championship; Super Bowl Game . . . . . 194
Section 5.  Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

**ARTICLE XLIII  PRO BOWL GAME** . . . . . . . . . . . . . . . . . . . . **196**
Section 1.  Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . 196
Section 2.  Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196
Section 3.  Wives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196
Section 4.  Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196
Section 5.  Payment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

ix

**ARTICLE XLIV  PLAYERS' RIGHTS TO MEDICAL**
    **CARE AND TREATMENT** . . . . . . . . . . . . . . . . . . .**197**
    Section 1.  Club Physician  . . . . . . . . . . . . . . . . . . . . . . . . .197
    Section 2.  Club Trainers  . . . . . . . . . . . . . . . . . . . . . . . . . .197
    Section 3.  Players' Right to a Second Medical Opinion . . . . . . .197
    Section 4.  Players' Right to a Surgeon of His Choice  . . . . . . . .197
    Section 5.  Standard Minimum Pre-Season Physical  . . . . . . . . .197
    Section 6.  Substance Abuse . . . . . . . . . . . . . . . . . . . . . . . . .198

**ARTICLE XLV  ACCESS TO PERSONNEL AND**
    **MEDICAL RECORDS** . . . . . . . . . . . . . . . . . . . . . . . .**199**
    Section 1.  Personnel Records . . . . . . . . . . . . . . . . . . . . . . . .199
    Section 2.  Medical Records  . . . . . . . . . . . . . . . . . . . . . . . . .199

**ARTICLE XLVI  PLAYER BENEFIT COSTS** . . . . . . . . . . . . . . . . . .**200**
    Section 1.  General Right of Reduction  . . . . . . . . . . . . . . . . . .200
    Section 2.  Right of Restoration . . . . . . . . . . . . . . . . . . . . . . .200
    Section 3.  Definition  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .200
    Section 4.  Resolution of Disputes  . . . . . . . . . . . . . . . . . . . . .200
    Section 5.  [no longer applicable]  . . . . . . . . . . . . . . . . . . . . .201
    Section 6.  Limitations on Contributions  . . . . . . . . . . . . . . . .201
    Section 7.  Application of a Salary Cap to Plan Years  . . . . . . . . .202
    Section 8.  Timing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .202

**ARTICLE XLVII  RETIREMENT PLAN** . . . . . . . . . . . . . . . . . . . . .**203**
    Section 1.  Maintenance and Definitions . . . . . . . . . . . . . . . . .203
    Section 2.  [no longer applicable] . . . . . . . . . . . . . . . . . . . . . .203
    Section 3.  Contributions  . . . . . . . . . . . . . . . . . . . . . . . . . . .203
    Section 4.  Benefit Credits . . . . . . . . . . . . . . . . . . . . . . . . . . .203
    Section 5.  Disability Benefits  . . . . . . . . . . . . . . . . . . . . . . . .204
    Section 6.  Joint and Survivor Reset  . . . . . . . . . . . . . . . . . . . .205
    Section 7.  Death Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . .205

**ARTICLE XLVIII  SECOND CAREER SAVINGS PLAN**  . . . . . . . . .**206**
    Section 1.  Maintenance  . . . . . . . . . . . . . . . . . . . . . . . . . . . .206
    Section 2.  Contributions  . . . . . . . . . . . . . . . . . . . . . . . . . . .206

**ARTICLE XLVIII-A  PLAYER ANNUITY PROGRAM**  . . . . . . . . . .**208**
    Section 1.  Establishment  . . . . . . . . . . . . . . . . . . . . . . . . . . .208
    Section 2.  Contributions  . . . . . . . . . . . . . . . . . . . . . . . . . . .208
    Section 3.  Timing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .208
    Section 4.  Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .209
    Section 5.  New Tax-Qualified Portion  . . . . . . . . . . . . . . . . . .209
    Section 6.  NFL Player Annuity & Insurance
        Company Net Worth . . . . . . . . . . . . . . . . . . . . . . . .209

x

**ARTICLE XLVIII-B  TUITION ASSISTANCE PLAN** . . . . . . . . . . . . .**210**
    Section 1.  Establishment . . . . . . . . . . . . . . . . . . . . . . . . .210
    Section 2.  Eligibility  . . . . . . . . . . . . . . . . . . . . . . . . . . .210
    Section 3.  Reimbursement . . . . . . . . . . . . . . . . . . . . . . . .211

**ARTICLE XLVIII-C  NFL PLAYERS HEALTH**
    **REIMBURSEMENT ACCOUNT** . . . . . . . . . . . . . . . . . .**212**
    Section 1.  Establishment . . . . . . . . . . . . . . . . . . . . . . . . .212
    Section 2.  Contributions . . . . . . . . . . . . . . . . . . . . . . . . .212
    Section 3.  Eligibility . . . . . . . . . . . . . . . . . . . . . . . . . . .212
    Section 4.  Health Reimbursement Accounts  . . . . . . . . . . . . .213
    Section 5.  Payments from Health Reimbursement Accounts . . . .213
    Section 6.  Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . .214
    Section 7.  Plan Operation in Uncapped Years  . . . . . . . . . . . .214

**ARTICLE XLVIII-D  88 BENEFIT** . . . . . . . . . . . . . . . . . . . .**215**
    Section 1.  Establishment  . . . . . . . . . . . . . . . . . . . . . . . .215
    Section 2.  Benefits  . . . . . . . . . . . . . . . . . . . . . . . . . . . .215
    Section 3.  Funding  . . . . . . . . . . . . . . . . . . . . . . . . . . . .216
    Section 4.  Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .216

**ARTICLE XLVIII-E  NFL PLAYERS BENEFITS COMMITTEE** . . . .**217**
    Section 1.  Establishment . . . . . . . . . . . . . . . . . . . . . . . . .217
    Section 2.  Function  . . . . . . . . . . . . . . . . . . . . . . . . . . . .217
    Section 3.  Expenses  . . . . . . . . . . . . . . . . . . . . . . . . . . .217
    Section 4.  Uncapped Years  . . . . . . . . . . . . . . . . . . . . . . .217

**ARTICLE XLIX  GROUP INSURANCE** . . . . . . . . . . . . . . . . . .**218**
    Section 1.  Group Benefits  . . . . . . . . . . . . . . . . . . . . . . . .218
    Section 2.  Extended Post-Career Medical and Dental Benefits  . .219
    Section 3.  Limitations and Rules For Extended Insurance  . . . . .219
    Section 4.  *[no longer applicable]* . . . . . . . . . . . . . . . . . . .220
    Section 5.  Administration  . . . . . . . . . . . . . . . . . . . . . . . .220

**ARTICLE L  SEVERANCE PAY** . . . . . . . . . . . . . . . . . . . . . . .**221**
    Section 1.  Eligibility  . . . . . . . . . . . . . . . . . . . . . . . . . . .221
    Section 2.  Amount  . . . . . . . . . . . . . . . . . . . . . . . . . . . .221
    Section 3.  Application  . . . . . . . . . . . . . . . . . . . . . . . . . .221
    Section 4.  Payment  . . . . . . . . . . . . . . . . . . . . . . . . . . . .221
    Section 5.  Failure to Apply  . . . . . . . . . . . . . . . . . . . . . . .222
    Section 6.  Only One Payment  . . . . . . . . . . . . . . . . . . . . .222
    Section 7.  Payable to Survivor  . . . . . . . . . . . . . . . . . . . . .222
    Section 8.  Prior Severance Pay  . . . . . . . . . . . . . . . . . . . . .222
    Section 9.  Nonassignability  . . . . . . . . . . . . . . . . . . . . . . .222

**xi**

**ARTICLE LI  DISABILITY PLAN** . . . . . . . . . . . . . . . . . . . . . . . . . .**223**
    Section 1.  Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .223
    Section 2.  Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .223
    Section 3.  Extension . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .223

**ARTICLE LII  BENEFIT ARBITRATOR** . . . . . . . . . . . . . . . . . . . .**224**
    Section 1.  Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .224
    Section 2.  Compensation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .224
    Section 3.  Role  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .224

**ARTICLE LIII  RETENTION OF BENEFITS** . . . . . . . . . . . . . . . . .**226**

**ARTICLE LIV  WORKERS' COMPENSATION** . . . . . . . . . . . . . . .**227**
    Section 1.  Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .227
    Section 2.  Rejection of Coverage  . . . . . . . . . . . . . . . . . . . . . . . .227
    Section 3.  Arbitration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .227
    Section 4.  Worker's Compensation Offset Provisions  . . . . . . . .227
    Section 5.  Preservation of Rights . . . . . . . . . . . . . . . . . . . . . . . .231

**ARTICLE LV  MISCELLANEOUS** . . . . . . . . . . . . . . . . . . . . . . . . . .**233**
    Section 1.  Endorsements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .233
    Section 2.  Game Day Attire  . . . . . . . . . . . . . . . . . . . . . . . . . . . .233
    Section 3.  Appearances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .233
    Section 4.  Promotion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .233
    Section 5.  Deduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .233
    Section 6.  Public Statements . . . . . . . . . . . . . . . . . . . . . . . . . . .234
    Section 7.  Address . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .234
    Section 8.  NFLPA Tickets . . . . . . . . . . . . . . . . . . . . . . . . . . . . .234
    Section 9.  Player Tickets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .234
    Section 10.  Tests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .234
    Section 11.  League Security . . . . . . . . . . . . . . . . . . . . . . . . . . . .234
    Section 12.  Career Planning Program . . . . . . . . . . . . . . . . . . . .235
    Section 13.  Delivery of Documents . . . . . . . . . . . . . . . . . . . . . .235
    Section 14.  Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . .235
    Section 15.  Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . .235
    Section 16.  Headings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .235
    Section 17.  Time Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .235
    Section 18.  Exhibits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .235
    Section 19.  Parol Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . .235
    Section 20.  Prior Side Letters . . . . . . . . . . . . . . . . . . . . . . . . . .235

**xii**

**ARTICLE LVI  FINAL LEAGUE YEAR** . . . . . . . . . . . . . . . . . . . .237
    Section 1.  No Salary Cap . . . . . . . . . . . . . . . . . . . . . . . .237
    Section 2.  Free Agency if Salary Cap in League
        Year Prior to Final League Year . . . . . . . . . . . . . . . .237
    Section 3.  Free Agency if No Salary Cap in League
        Year Prior to Final League Year . . . . . . . . . . . . . . . .237
    Section 4.  Franchise and Transition Players  . . . . . . . . . . . . . .237

**ARTICLE LVII  MUTUAL RESERVATION OF RIGHTS:**
**LABOR EXEMPTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .238
    Section 1.  Rights Under Law . . . . . . . . . . . . . . . . . . . . . .238
    Section 2.  Labor Exemption  . . . . . . . . . . . . . . . . . . . . . .238
    Section 3.  CBA Expiration . . . . . . . . . . . . . . . . . . . . . . .238

**ARTICLE LVIII  DURATION OF AGREEMENT**  . . . . . . . . . . . . .240
    Section 1.  *[no longer applicable]*  . . . . . . . . . . . . . . . . . . .240
    Section 2.  Effective Date/Expiration Date  . . . . . . . . . . . . . .240
    Section 3.  Termination Prior to Expiration Date  . . . . . . . . . . .240
    Section 4.  Effect of Early Termination on Player Contracts  . . . . .241
    Section 5.  Ratification . . . . . . . . . . . . . . . . . . . . . . . . .241

**ARTICLE LIX  GOVERNING LAW** . . . . . . . . . . . . . . . . . . . . .243

**ARTICLE LX  NOTICES** . . . . . . . . . . . . . . . . . . . . . . . . . . .244

**APPENDIX A—CHECK-OFF AUTHORIZATION FOR**
    **NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION**
    **DEDUCTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .245

**APPENDIX B—INJURY PROTECTION/EARLY WAIVER**  . . . . . . .247

**APPENDIX C—NFL PLAYER CONTRACT**  . . . . . . . . . . . . . . . .248

**APPENDIX D—FIRST REFUSAL OFFER SHEET**  . . . . . . . . . . . .257

**APPENDIX E—FIRST REFUSAL EXERCISE NOTICE** . . . . . . . . . .258

**APPENDIX F—WAIVER OF FREE AGENT RIGHTS** . . . . . . . . . . .259

**APPENDIX G—NOTICE OF TERMINATION** . . . . . . . . . . . . . . .260

**APPENDIX H—ACCOUNTANTS' REVIEW PROCEDURES** . . . . . .261

xiii

APPENDIX H.1—ACCOUNTANTS' AGREED-UPON
    PROCEDURES REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .267

APPENDIX H.2—LOCAL ACCOUNTANTS' AGREED-UPON
    PROCEDURES REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .268

APPENDIX H.3—REVENUE ACCOUNTING RULES . . . . . . . . . .269

APPENDIX I—STANDARD MINIMUM PRE-SEASON
    PHYSICAL EXAMINATION  . . . . . . . . . . . . . . . . . . . . . . . . . .279

APPENDIX J—ACTUARIAL ASSUMPTIONS AND
    ACTUARIAL COST METHOD  . . . . . . . . . . . . . . . . . . . . . . . .282

APPENDIX J.1—HEALTH REIMBURSEMENT PLAN
    ACTUARIAL ASSUMPTIONS AND FUNDING  . . . . . . . . . . .285

APPENDIX K—EXTENSION CHART  . . . . . . . . . . . . . . . . . . . . . .287

APPENDIX L—OFF-SEASON WORKOUT RULES  . . . . . . . . . . . .288

APPENDIX M—PSL EXAMPLES  . . . . . . . . . . . . . . . . . . . . . . . . .289

APPENDIX N—WRITTEN WARNING GOOD FAITH EFFORT . . .296

APPENDIX O—SALARY CAP CALCULATION EXAMPLE  . . . . . .297

APPENDIX P—ADJUSTMENT MECHANISM EXAMPLES  . . . . . .298

INDEX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .302

xiv

## INTRODUCTION

This booklet contains the text of the Collective Bargaining Agreement between the National Football League Management Council and the National Football League Players Association effective March 8, 2006. To the extent that any differences exist between this booklet and the original signed Agreement maintained by the parties, the original shall control.

1

## PREAMBLE

This Agreement, which is the product of bona fide, arm's length collective bargaining, is made and entered into as of the 8th day of March, 2006, in accordance with the provisions of the National Labor Relations Act, as amended, by and between the National Football League Management Council ("Management Council" or "NFLMC"), which is recognized as the sole and exclusive bargaining representative of present and future employer member Clubs of the National Football League ("NFL" or "League"), and the National Football League Players Association ("NFLPA"), which is recognized as the sole and exclusive bargaining representative of present and future employee players in the NFL in a bargaining unit described as follows:

1.    All professional football players employed by a member club of the National Football League;

2.    All professional football players who have been previously employed by a member club of the National Football League who are seeking employment with an NFL Club;

3.    All rookie players once they are selected in the current year's NFL College Draft; and

4.    All undrafted rookie players once they commence negotiation with an NFL Club concerning employment as a player.

3

# ARTICLE I
# DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

*Section 1.* **General Definitions:**

(a)    "Agreement" means this Collective Bargaining Agreement.

(b)    "Class Counsel" means the law firm of Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153, the law firm of Dewey Ballantine, LLP, 1301 Avenue of the Americas, New York, New York 10019, and the law firm of Lindquist & Vennum, 4200 IDS Center, Minneapolis, Minnesota 55402.

(c)    "Club" or "Team" or "Member," used interchangeably herein, means any entity that is a member of the NFL or operates a franchise in the NFL at any time during the term of this Agreement.

(d)    "Club Affiliate" or "Team Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a Club or any owner of a Club.

(e)    "Commissioner" means the Commissioner of the NFL.

(f)    "Impartial Arbitrator" means the person authorized by this Agreement and the Settlement Agreement to hear and resolve specified disputes as provided in this Agreement and the Settlement Agreement.

(g)    "League Year" means the period from March 1 of one year through and including the last day of February of the following year, or such other one year period to which the NFL and the NFLPA may agree.

(h)    "NFL Player Contract" means the form of Player Contract utilized in the NFL.

(i)    "NFL Rules" means the Constitution and Bylaws, rules, and regulations of the NFL and/or the Management Council.

(j)    "Player Affiliate" means any entity or person owned by (wholly or partly), controlled by, affiliated with, or related to a player.

(k)    "Salary" means any compensation of money, property, investments, loans, or anything else of value that a Club pays to, or is obligated to pay to, a player or Player Affiliate, or is paid to a third party at the request of and for the benefit of a player or Player Affiliate, during a League Year, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(l)    "Settlement Agreement" means the Stipulation and Settlement Agreement, dated February 26, 1993, as amended.

(m)    "Special Master" means the special master appointed and authorized by this Agreement and the Settlement Agreement to hear and resolve specified disputes as provided in this Agreement and the Settlement Agreement.

4

Article 1, Definitions

*Section 2.* **Free Agency Definitions:**

(n)     "Accrued Season" means any playing season for which a player received credit with respect to his qualifications for Unrestricted Free Agency or Restricted Free Agency, as described in Article XIX (Veteran Free Agency).

(o)     "Compensatory Draft Selection" means an additional Draft choice awarded to a Club as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players).

(p)     "Draft" or "College Draft" means the NFL's annual draft of Rookie football players as described in Article XVI (College Draft).

(q)     "Draft Choice Compensation" means the right of any Club, as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players), to receive draft pick(s) from any other Club.

(r)     "Drafted Rookie" means a person who is selected in the current League Year's Draft or whose Draft rights are held, or continue to be held, consistent with this Agreement, by an NFL Club that selected the Rookie in a prior Draft.

(s)     "Final Eight Plan" means the rules whereby signings of Unrestricted Free Agents are limited in Uncapped Years for the final eight playoff Clubs, under the limited circumstances described in Article XXI (Final Eight Plan).

(t)     "Free Agent" means a player who is not under contract and is free to negotiate and sign a Player Contract with any NFL Club, without Draft Choice Compensation or any Right of First Refusal.

(u)     "Minimum Salary" means the minimum annual Paragraph 5 Salary which shall be paid to an NFL player not on any Active list, and not on the Inactive list, pursuant to this Agreement.

(v)     "Minimum Active/Inactive List Salary" means the minimum annual Paragraph 5 Salary which shall be paid to an NFL player on any Active list, or on the Inactive list, pursuant to this Agreement.

(w)     "Negotiate" means, with respect to a player or his representatives on the one hand, and an NFL Club or its representatives on the other hand, to engage in any written or oral communication relating to efforts to reach agreement on employment and/or terms of employment between such player and such Club.

(x)     "New Club" means any Club except the Prior Club (as defined below).

(y)     "Player Contract" means a written agreement or series of such agreements executed at or about the same time between a person and an NFL Club pursuant to which such person is employed by such Club as a professional football player.

(z)     "Prior Club" means the Club that contracted with or otherwise held the NFL playing rights for the player for the previous NFL League Year.

(aa)     "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, pro-rata portion of signing bonus, and other

5

payments to a player in compensation for the playing of professional football for the last League Year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Prior Year Salary shall also include any unpaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate.

(ab)    "Renegotiate" means any change in Salary or the terms under which such Salary is earned or paid, or any change regarding the Club's right to trade the player, during the term of a Player Contract.

(ac)    "Required Tender" means a Player Contract tender that a Club is required to make to a player pursuant to this Agreement, either as a matter of right with respect to the player, or to receive Rights of First Refusal, Draft Choice Compensation and/or other rights with respect to the player, as specified in this Agreement.

(ad)    "Restricted Free Agent" means a Veteran who has three or more Accrued Seasons and who completes performance of his Player Contract, but who is still subject to a Right of First Refusal and/or Draft Choice Compensation in favor of his Prior Club.

(ae)    "Right of First Refusal" means the right of an NFL Club, as described in Article XIX (Veteran Free Agency) and Article XX (Franchise and Transition Players) to retain the services of certain Veteran players by matching offers made to those players.

(af)    "Rookie" means a person who has never signed a Player Contract with an NFL Club.

(ag)    "Undrafted Rookie" means a Rookie who was eligible for but not selected in a College Draft.

(ah)    "Unrestricted Free Agent" means a Veteran who completes performance of his Player Contract, and who is no longer subject to any exclusive negotiating rights, Right of First Refusal, or Draft Choice Compensation in favor of his Prior Club.

(ai)    "Veteran" means a player who has signed at least one Player Contract with an NFL Club.

**Section 3. Salary Cap Definitions:**

(aj)    "Benefits" or "Player Benefit Costs" means the specific benefits paid to players set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(ak)    "Capped Year" means any League Year for which a Salary Cap is in effect.

(al)    "Total Revenues" or "TR" means all of the League and Team revenues that are included within the definition of Total Revenues, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(am)    "Guaranteed League-wide Salary" means the minimum amount that the Teams in the NFL must pay in Player Costs during a League Year, if

6

applicable, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(an) "Minimum Team Salary" means the minimum amount that each Team must pay in Salaries during a League Year, if applicable, as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 5.

(ao) "Paragraph 5 Salary" means the compensation set forth in paragraph 5 of the NFL Player Contract, or in any amendments thereto.

(ap) "Player Costs" means the total Salaries and Benefits attributable to a League Year for all NFL Teams under all of the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), but not including loans, loan guarantees, unpaid grievances attributions, and unearned incentives.

(aq) "Projected Benefits" means the amount of Benefits projected in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(ar) "Projected Total Revenues" means the amount of Total Revenues projected in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(as) "Room" means the extent to which a Team's then current Team Salary is less than either the Salary Cap or Entering Player Pool, as applicable.

(at) "Salary Cap" means the absolute maximum amount of Salary that each Club may pay or be obligated to pay or provide to players or Player Affiliates, or may pay or be obligated to pay to third parties at the request of and for the benefit of Players or Player Affiliates, at any time during a particular League Year, in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), if applicable.

(au) "Team Salary" means the Team's aggregate Salary for Salary Cap purposes, as calculated in accordance with the rules set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

(av) "Uncapped Year" means any League Year for which a Salary Cap is not in effect.

## Section 4. Further Definitions:

(aw) "Final League Year" means the League Year which is scheduled prior to its commencement to be the final League Year of this Agreement. As of the date hereof, the Final League Year is the 2012 League Year. The Final League Year shall always be an Uncapped Year.

(ax) "Final Capped Year" means the League Year immediately prior to the Final League Year. The Final Capped Year shall be Capped unless the Salary Cap is removed pursuant to Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 2(b).

7

## ARTICLE II
## GOVERNING AGREEMENT

***Section 1.* Conflicts:** The provisions of this Agreement supersede any conflicting provisions in the NFL Player Contract, the NFL Constitution and Bylaws, or any other document affecting terms and conditions of employment of NFL players, and all players, Clubs, the NFLPA, the NFL, and the Management Council will be bound hereby. The provisions of the Stipulation and Settlement Agreement, as *amended*, in White v. NFL, No. 4-92-906 (D. Minn.) ("Settlement Agreement"), shall supersede any conflicting provisions of this Agreement.

***Section 2.* Implementation:** The NFLPA and the Management Council will use their best efforts to faithfully carry out the terms and conditions of this Agreement and to see that the terms and conditions of this Agreement are carried out in full by players and Clubs. The NFLPA will use its best efforts to see that the terms and conditions of all NFL Player Contracts are carried out in full by players.

***Section 3.* Management Rights:** The NFL Clubs maintain and reserve the right to manage and direct their operations in any manner whatsoever, except as specifically limited by the provisions of this Agreement and the Settlement Agreement.

***Section 4.* Rounding:** For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, Total Revenue ("TR"), Benefits, Player Costs, Projected TR, Projected Benefits, or Salary, such amounts shall be rounded to the nearest $1,000.

# ARTICLE III
# SCOPE OF AGREEMENT

***Section 1. Scope:*** This Agreement represents the complete understanding of the parties on all subjects covered herein, and there will be no change in the terms and conditions of this Agreement without mutual consent. Except as otherwise provided in Article V (Union Security), Section 6, on Union Security, the NFLPA and the Management Council waive all rights to bargain with one another concerning any subject covered or not covered in this Agreement for the duration of this Agreement, including the provisions of the NFL Constitution and Bylaws; provided, however, that if any proposed change in the NFL Constitution and Bylaws during the term of this Agreement could significantly affect the terms and conditions of employment of NFL players, then the Management Council will give the NFLPA notice of and negotiate the proposed change in good faith.

***Section 2. Arbitration:*** The question of whether the parties engaged in good faith negotiations, or whether any proposed change in the NFL Constitution and Bylaws would violate or render meaningless any provision of this Agreement, may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance), which shall be the exclusive method for resolving disputes arising out of this Section 2. If the arbitrator finds that either party did not engage in good faith negotiations, or that the proposed change would violate or render meaningless any provision of this Agreement, he may enter an appropriate order, including to cease and desist from implementing or continuing the practice or proposal in question; provided, however, that the arbitrator may not compel either party to this Agreement to agree to anything or require the making of a concession by either party in negotiations.

# ARTICLE IV
# NO STRIKE/LOCKOUT/SUIT

**Section 1. No Strike/Lockout:** Except as otherwise provided in Article V (Union Security), Section 6, neither the NFLPA nor any of its members will engage in any strike, work stoppage, or other concerted action interfering with the operations of the NFL or any Club for the duration of this Agreement, and no Clubs, either individually or in concert with other Clubs, will engage in any lockout for the duration of this Agreement. Any claim by the Management Council that the NFLPA has violated this Section 1 will not be subject to the grievance procedure or the arbitration provisions of this Agreement and the Management Council will have the right to submit such claim directly to the courts.

**Section 2. No Suit:** The NFLPA agrees that neither it nor any of its members, nor agents acting on its behalf, nor any member of its bargaining unit, will sue, or support financially or administratively, or voluntarily provide testimony or affidavit in, any suit against, the NFL or any Club with respect to any claim relating to any conduct permitted by this Agreement, the Settlement Agreement, or any term of this Agreement or the Settlement Agreement, including, without limitation, the Articles concerning the College Draft, the Compensatory Draft, the Option Clause, the Entering Player Pool, Veterans With Less Than Three Accrued Seasons, Veteran Free Agency, Franchise and Transition Players, the Final Eight Plan, Guaranteed League-wide Salary, Salary Cap and Minimum Team Salary, and the Waiver System, and provisions applicable to the trading of players; provided, however, that nothing contained in this Section 2 will prevent the NFLPA or any player from asserting that any Club, acting individually or in concert with other Clubs, or the Management Council, has: (1) breached the terms of this Agreement, the NFL Player Contract, the revised NFL Player Contract, or the NFL Constitution and Bylaws, and from processing such asserted breach as a non-injury grievance under Article IX (Non-Injury Grievance) or asserting any claim before the Special Master or the Impartial Arbitrator as provided in this Agreement; or (2) breached the terms of the Settlement Agreement and from asserting such a claim before the Special Master, Impartial Arbitrator, or the Federal District Court, as provided for in the Settlement Agreement. In addition, neither the NFLPA nor any of its members, agents acting on its behalf, nor any members of its bargaining unit will sue, or support financially or administratively any suit against, the NFL or any Club relating to the provisions of the Constitution and Bylaws of the NFL, which are appended to the Side Letter dated July 24, 2006 from Harold Henderson to Eugene Upshaw, as they were operative and administered at the beginning date of the 2006 League Year (except any provisions relating to the 1982 CBA, which have been superseded by this Agreement); provided, however, that nothing herein shall prevent the NFLPA, its members,

10

agents or bargaining unit members from asserting any rights they may have under the federal labor laws or under this Agreement or the Settlement Agreement.

***Section 3. Releases:*** The releases and covenants not to sue contained in Article XIX (Releases and Covenants Not to Sue) of the Settlement Agreement are hereby incorporated by reference.

11

## ARTICLE V
## UNION SECURITY

***Section 1. Union Security:*** Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the execution of this Agreement and for the duration of this Agreement and wherever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA must, on the 30th day following the beginning of his employment or the execution of this Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA, an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.

***Section 2. Check-off:*** Commencing with the execution of this Agreement, each Club will check-off the initiation fee and annual dues or service charge, as the case may be, in equal weekly or biweekly installments from each pre-season and regular season paycheck, beginning with the first paycheck after the date of the first pre-season squad cutdown, for each player for whom a current check-off authorization (copy attached hereto as Appendix A and made a part of this Agreement) has been provided to the Club. The Club will forward the check-off monies to the NFLPA within seven days of the check-off.

***Section 3. NFLPA Meetings:*** The NFLPA will have the right to conduct three meetings on Club property each year, including one at the time of a Club's minicamp, provided that the player representative or NFLPA office has given the Club reasonable notice of its desire to hold such a meeting by the close of business on Friday of the week before the week in which the meeting is to take place, or by the close of business Thursday if the meeting is scheduled for the following Monday. No meeting will be held at a time which would disrupt a coach's team schedule.

***Section 4. NFLPA Player Group Licensing Program:*** The NFL recognizes that players have authorized the NFLPA to act as their agent in a Group Player Licensing program (defined below) for their benefit. The NFL hereby agrees that neither it, any Club, nor any affiliate of the NFL and/or any Club shall acquire, seek to acquire, induce others to acquire, or assist others in acquiring Group Player Licensing rights, or interfere in any manner with any player's conveyance of such rights pursuant to the NFLPA Group Player Licensing program, except as otherwise explicitly agreed to between the NFLPA and the NFL. Any disputes that arise regarding the NFL's conduct in this regard shall be submitted for expedited arbitration pursuant to

12

Article IX (Non-Injury Grievance). The first such grievance in any calendar year shall be treated on an expedited basis without counting against the number of grievances the NFLPA may expedite pursuant to Article IX, Section 4; all subsequent such grievances in that calendar year shall count against the number of grievances the NFLPA may expedite pursuant to Article IX, Section 4. For the purposes of this Section 4, Group Player Licensing shall be defined as the use of a total of six or more NFL players' names, signatures facsimiles, voices, pictures, photographs, likenesses and/or biographical information on or in conjunction with products (including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.): (a) in any one product category, as defined by industry standards; or (b) in different categories if a total of six or more players are used and (i) the products all use similar or derivative design or artwork or (ii) one such player product is used to promote another player product. For the purposes of this Section 4, Group Player Licensing includes, without limitation, products sold at retail and products that are used as promotional or premium items.

**Section 5.** Disputes: Any dispute over compliance with, or the interpretation, application or administration of this Article will be processed pursuant to Article IX (Non-Injury Grievance). Any decision of an arbitrator pursuant thereto will constitute full, final and complete disposition of the dispute, and will be binding on the player(s) and Club(s) involved and the parties to this Agreement.

**Section 6. Procedure for Enforcement:**

    (a)    Upon written notification to the Management Council by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Section 1 of this Article V (Union Security), the Management Council will within seven days consider the matter. If there is no resolution of the matter within seven days, then the Club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the Club in writing that the suspended player has satisfied his obligation as contained in Section 1 of this Article V (Union Security). The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause. The player's contract will be tolled during the period of any such suspension. A copy of all notices required by this "Procedure for the Enforcement of the Union Security Agreement Between the NFL Management Council and the NFLPA" will be simultaneously mailed to the player involved and the Management Council.

    (b)    It is further agreed that the term "member in good standing" as used in this Article V (Union Security) applies only to payment of dues or

13

initiation fee and not any other factors involved in union discipline.

(c)   It is further agreed that notwithstanding Article III (Scope of Agreement), Article IV (No Strike/Lockout/Suit), and Article LVIII (Duration of Agreement), that if at any time in the term of the Agreement, any court or agency shall wholly or partially invalidate the provisions of Article V (Union Security) relating to Union Security, then the NFLPA may reopen this Agreement upon the giving of 10 days' written notice, with reference solely to the issue of Union Security, and both parties will have an obligation to resume negotiations limited to the issue of Union Security, and both parties will be free to engage in whatever concerted or other action may be permitted by law in support of their positions.

**Section 7. NFLPA Responsibility:** It is agreed that neither the NFL nor any Club shall be liable for any salary, bonus, or other monetary claims of any player suspended pursuant to the terms of Section 6 above. Collection of initiation fees, annual dues, service charges or other check-off amounts missed because of inadvertent errors shall be the responsibility of the NFLPA. The NFLPA shall be solely responsible for refunds to players in the case of any sums deducted not in conformity with the provisions of the NFLPA Constitution and Bylaws or applicable law.

**Section 8. Orientations:** During the annual Timing and Testing Sessions of the Scouting Combines, the NFL will use best efforts to ensure that the NFLPA will be permitted to present one-hour orientations for all of the college players attending the session. The orientation will include only information on the Career Planning Program, the Chemical Dependency Program, the NFLPA Agent Certification System, and other information contained in this Agreement and will encourage the players to participate fully in all activities of the Scouting Combine. The NFLPA will also have the right to space in the public area of the players' hotel, staffed by NFLPA employees, to provide information requested by players during their free time at the Combine. The NFLPA and the NFL will also sponsor an orientation with an agreed-upon agenda for all rookies on a Club-by-Club basis during the first half of the NFL regular season, which meetings may take place on the players' day off if no other mutually acceptable day is agreed upon.

**Section 9. Rookie Symposium:** Attendance at the annual Rookie Symposium shall be mandatory for all Rookies invited to the Symposium. A material failure to attend the entire Symposium (e.g., missing more than one presentation) that is unexcused by the NFLMC will result in a maximum fine of $50,000 for the 2006-09 League Years and $75,000 for the 2010-12 League Years. The NFLPA and the NFLMC shall each use its best efforts to encourage players to participate fully in all symposium activities and to abide by all symposium rules (e.g., dress code, curfew, etc.). Being late for or missing curfew will result in a fine at the then applicable amount under

14

Article VIII of the CBA. Other lateness for meetings or similar Article VIII violations will be disciplined at the applicable fine amounts. Discipline shall be imposed, if appropriate, by the NFLMC, not by any Club.

# ARTICLE VI
## NFLPA AGENT CERTIFICATION

*Section 1.* **Exclusive Representation:** The NFLMC and the Clubs recognize that, pursuant to federal labor law, the NFLPA regulates the conduct of agents who represent players in individual contract negotiations with Clubs. The NFLMC and the Clubs agree that the Clubs are prohibited from engaging in individual contract negotiations with any agent who is not listed by the NFLPA as being duly certified by the NFLPA in accordance with its role as exclusive bargaining agent for NFL players. The NFLPA shall provide and publish a list of agents who are currently certified in accordance with its agent regulation system, and shall notify the NFLMC and the Clubs of any deletions or additions to the list pursuant to its procedures. The NFLPA agrees that it shall not delete any agent from its list until that agent has exhausted the opportunity to appeal the deletion pursuant to the NFLPA's agent regulation system, except: (i) where an agent has failed to pass a written examination given to agents by the NFLPA or (ii) in extraordinary circumstances where the NFLPA's investigation discloses that the agent's conduct is of such a serious nature as to justify immediately invalidating the agent's certification. The NFLPA shall have sole and exclusive authority to determine the number of agents to be certified, and the grounds for withdrawing or denying certification of an agent. The NFLPA agrees that it will not discipline, dismiss or decertify agents based upon the results they achieve or do not achieve in negotiating terms or conditions of employment with NFL Clubs. This section shall not limit the NFLPA's ability to discipline agents for malfeasance.

*Section 2.* **Enforcement:** Under procedures to be established by agreement between the NFL and the NFLPA, the Commissioner shall disapprove any NFL Player Contract(s) between a player and a Club unless such player: (a) is represented in the negotiations with respect to such NFL Player Contract(s) by an agent or representative duly certified by the NFLPA in accordance with the NFLPA agent regulation system and authorized to represent him; or (b) acts on his own behalf in negotiating such NFL Player Contract(s).

*Section 3.* **Penalty:** Under procedures to be established by agreement between the NFL and the NFLPA, the NFL shall impose a fine of $15,000 upon any Club that negotiates any NFL Player Contract(s) with an agent or representative not certified by the NFLPA in accordance with the NFLPA agent regulation system if, at the time of such negotiations, such Club either (a) knows that such agent or representative has not been so certified or (b) fails to make reasonable inquiry of the NFLPA as to whether such agent or representative has been so certified. Such fine shall not apply, however, if the negotiation in question is the first violation of this Article by the

16

Club during the term of this Agreement. It shall not be a violation of this Article for a Club to negotiate with any person named on (or not deleted from) the most recently published list of agents certified by the NFLPA to represent players.

# ARTICLE VII
# PLAYER SECURITY

***Section 1.* No Discrimination:** There will be no discrimination in any form against any player by the Management Council, any Club or by the NFLPA because of race, religion, national origin or activity or lack of activity on behalf of the NFLPA.

***Section 2.* Personal Appearance:** Clubs may make and enforce reasonable rules governing players' appearance on the field and in public places while representing the Clubs; provided, however, that no player will be disciplined because of hair length or facial hair.

18

# ARTICLE VIII
# CLUB DISCIPLINE

*Section 1.* **Maximum Discipline:**

(a)      For the 2006 League Year, the following maximum discipline schedule will be applicable:

Overweight—maximum fine of $400 per lb., which fine may be assessed no more than twice per week, with each week beginning on Monday and ending on Sunday, and with each fine at least three days apart (e.g., Monday-Thursday, Tuesday-Friday, etc.).

Unexcused late reporting for mandatory off-season minicamp, team meeting, practice, transportation, curfew, scheduled appointment with Club physician or trainer, or scheduled promotional activity—maximum fine of $1,500.

Failure to promptly report injury to Club physician or trainer—maximum fine of $1,500.

Losing, damaging or altering Club-provided equipment—maximum fine of $1,500 and replacement cost, if any.

Throwing football into stands—maximum fine of $1,500.

Unexcused late reporting for or absence from pre-season training camp by a player under contract except those signed as an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency)—maximum fine of $14,000 per day.

Unexcused late reporting for or absence from pre-season training camp by a player under contract signed as an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency)—maximum fine of $14,000 per day, plus one week's regular season salary for each pre-season game missed.

Unexcused missed mandatory off-season minicamp, team meeting, practice, curfew, bed check, scheduled appointment with Club physician or trainer, material failure to follow Club rehabilitation directions, or scheduled promotional activity—maximum fine of $8,000.

Material failure to follow rehabilitation program prescribed by Club physician or trainer—maximum fine of $8,000.

Unexcused missed team transportation—maximum fine of $8,000 and transportation expense, if any.

Loss of all or part of playbook, scouting report or game plan—maximum fine of $8,000.

Ejection from game—maximum fine of $14,000.

Conduct detrimental to Club—maximum fine of an amount equal to one week's salary and/or suspension without pay for a period not to exceed four (4) weeks. This maximum applies without limitation to any deactivation of a player in response to player conduct (other than a deactivation in response to a player's on-field playing ability), and any such deactivation, even with pay, shall be considered discipline subject to the limits set forth in this section. The Non-Injury Grievance Arbitrator's decision in *Terrell*

19

*Owens* (Nov. 23, 2005) is thus expressly overruled as to any Club decision to deactivate a player in response to the player's conduct.

The Club will promptly notify the player of any discipline; notice of any Club fine in a category subject to a maximum of $14,000 or above and of any "conduct detrimental" fine or suspension will be sent to the NFLPA.

(b)     The amounts set forth in Section 1(a) above and Section 7 below shall be increased for the 2007 League Year, and each League Year thereafter during the term of this Agreement, at the rate of annual TR growth, up to a maximum annual growth of 10% per year.

**Section 2. Published Lists:** All Clubs must publish and make available to all players at the commencement of pre-season training camp a complete list of the discipline which can be imposed for designated offenses within the limits set by the maximum schedule referred to in Section 1 above.

**Section 3. Uniformity:** Discipline will be imposed uniformly within a Club on all players for the same offense; however, if the Club's published list of discipline imposes fines for designated offenses that are less than the limits set by the maximum schedule set forth in Section 1 above, the Club may specify the events which create an escalation of the discipline, not to exceed such maximum limits, provided the formula for escalation is uniform in its application. Nothing in this Section 3 shall preclude any Club from imposing a fine and/or a suspension without pay for conduct detrimental to the Club, as set forth in Section 1(a) above, in any case in which the same player has committed repeated offenses in the same League Year, whether or not the fines imposed for the player's prior offenses were escalated as described in the immediately preceding sentence of this Section; provided, however, that the NFLPA expressly reserves the right to challenge the imposition of such discipline for conduct detrimental to the Club based upon the absence of just cause and/or any other allowable bases for opposing discipline. Any disciplinary action imposed upon a player by the Commissioner pursuant to Article XI (Commissioner Discipline) will preclude or supersede disciplinary action by the Club for the same act or conduct.

**Section 4. Disputes:** Any dispute involved in Club discipline may be made the subject of a non-injury grievance under Article IX (Non-Injury Grievance).

**Section 5. Deduction:** Any Club fine will be deducted at the rate of no more than $1,000 from each pay period, if sufficient pay periods remain; or, if less than sufficient pay periods remain, the fine will be deducted in equal installments over the number of remaining pay periods. This will not apply to a suspension.

**Section 6. NFL Drug and Steroid Policies:** No Club may impose any dis-

cipline against a player, including but not limited to terminating the player's Player Contract, as a result of that Player's violation of the Policy on Anabolic Steroids and Related Substances or the NFL Policy and Program for Substances of Abuse, or for failing any drug test, provided, however, that the fact that a player has violated the Policy on Anabolic Steroids and Related Substances or the NFL Policy and Program for Substances of Abuse, or has failed a drug test will not preclude the termination of his Player Contract if such termination is otherwise expressly permissible under this Agreement or the player's Player Contract.

**Section 7. Cumulative Fines:** Any player who commits multiple offenses on the same day (e.g., missed mandatory team meeting, late for practice and missed scheduled appointment with trainer) shall be subject to a separate fine for each such offense, within the limits set by the maximum schedule set forth in Section 1 above; provided, however, that the cumulative amount for all such fines on a given day during pre-season training camp shall not exceed $14,000, and that the cumulative amount for all such fines on a given day during the regular season or post-season shall not exceed $20,000. The cumulative fine limits set forth in this Section shall not apply to any violation as to which a player may be fined one week's regular season salary or to conduct detrimental to the Club. Nothing in this Section shall preclude the Club from denying payment of the Player's weekly salary or from seeking reimbursement from the Player under any forfeiture provision in the Player's Contract if such denial of payment or forfeiture is otherwise permissible under both the Player's Contract and this Agreement. Nor shall anything in this Section preclude a Club from imposing a fine and/or suspension without pay for conduct detrimental to the Club, as set forth in Section 1(a) above, in any case in which the same player has committed repeated offenses in the same League Year, as described in Section 3 above; provided, however, that the NFLPA expressly reserves the right to challenge the imposition of such discipline for conduct detrimental to the Club based upon the absence of just cause and/or any other allowable bases for opposing discipline.

**Section 8. Offset of Pre-Season Fine Amounts:** In the event that a player under contract is fined in the maximum category of $14,000 per day for unexcused late reporting for or absence from pre-season training camp and, as the result of such late reporting or absence, the Club also witholds payment, or claims reimbursement, under any forfeiture provision in a Player Contract executed prior to March 8, 2006, then there shall be an offset of the cumulative amount of such daily fines against the amount claimed by the Club under the forfeiture provision, or vice versa. In the 2006 League Year, the offset shall be $8,000 per day for each day the player has been fined, representing the difference between the CBA's prior maximum fine for this category of offense ($6,000 per day) and the new maximum fine for

21

this category of offense ($14,000 per day) effective on March 8, 2006. The amount of such offset shall be increased for the 2007 League Year and each League Year thereafter during the term of this Agreement, at the rate of annual TR growth, up to a maximum of 10% per year. Other than as specifically set forth in this Section, there shall be no offset of fines imposed under this Agreement against claims made by a Club under any forfeiture provision in a Player Contract.

**Section 9. Effective Date:** The maximum discipline rules set forth above apply to all discipline imposed on or after March 8, 2006.

22

# ARTICLE IX
# NON-INJURY GRIEVANCE

***Section 1.* Definition:** Any dispute (hereinafter referred to as a "grievance") arising after the execution of this Agreement and involving the interpretation of, application of, or compliance with, any provision of this Agreement, the NFL Player Contract, or any applicable provision of the NFL Constitution and Bylaws pertaining to terms and conditions of employment of NFL players, will be resolved exclusively in accordance with the procedure set forth in this Article, except wherever another method of dispute resolution is set forth elsewhere in this Agreement, and except wherever the Settlement Agreement provides that the Special Master, Impartial Arbitrator, the Federal District Court or the Accountants shall resolve a dispute.

***Section 2.* Initiation:** A grievance may be initiated by a player, a Club, the Management Council, or the NFLPA. A grievance must be initiated within forty-five (45) days from the date of the occurrence or non-occurrence upon which the grievance is based, or within forty-five (45) days from the date on which the facts of the matter became known or reasonably should have been known to the party initiating the grievance, whichever is later. A player need not be under contract to a Club at the time a grievance relating to him arises or at the time such grievance is initiated or processed.

***Section 3.* Filing:** Subject to the provisions of Section 2 above, a player or the NFLPA may initiate a grievance by filing a written notice by certified mail or fax with the Management Council and furnishing a copy of such notice to the Club(s) involved; a Club or the Management Council may initiate a grievance by filing written notice by certified mail or fax with the NFLPA and furnishing a copy of such notice to the player(s) involved. The notice will set forth the specifics of the alleged action or inaction giving rise to the grievance. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA. The party to whom a non-injury grievance has been presented will answer in writing by certified mail or fax within seven (7) days of receipt of the grievance. The answer will set forth admissions or denials as to the facts alleged in the grievance. If the answer denies the grievance, the specific grounds for denial will be set forth. The answering party will provide a copy of the answer to the player(s) or Club(s) involved and the NFLPA or the Management Council as may be applicable.

***Section 4.* Ordinary and Expedited Appeal:** If a grievance is not resolved after it has been filed and answered, either the player(s) or Club(s) involved, or the NFLPA, or the Management Council may appeal such grievance by filing a written notice of appeal with the Notice Arbitrator and mailing copies thereof to the party or parties against whom such appeal is taken,

23

and either the NFLPA or the Management Council as may be appropriate. If the grievance involves a suspension of a player by a Club, the player or NFLPA will have the option to appeal it immediately upon filing to the Notice Arbitrator and a hearing will be held by an arbitrator designated by the Notice Arbitrator within seven (7) days of the filing of the grievance. In addition, the NFLPA and the Management Council will each have the right of immediate appeal and hearing within seven (7) days with respect to four (4) grievances of their respective choice each calendar year. The arbitrator(s) designated to hear such grievances will issue their decision(s) within five (5) days of the completion of the hearing. Prehearing briefs may be filed by either party and, if filed, will be exchanged prior to hearing.

*Section 5.* **Discovery:** No later than ten (10) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the dispute. Failure to submit such documents, reports and records no later than ten (10) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing will be admissible provided that the proffering party and the custodian(s) of the documents made a good faith effort to obtain (or discover the existence of) said documents or that the document's relevance was not discovered until the hearing date. In the case of an expedited grievance pursuant to Section 4, such documentary evidence shall be exchanged on or before two (2) days prior to the hearing unless the arbitrator indicates otherwise.

*Section 6.* **Arbitration Panel:** There will be a panel of four (4) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties will designate the Notice Arbitrator within ten (10) days of the execution of this Agreement. In the event of a vacancy in the position of Notice Arbitrator, the senior arbitrator in terms of affiliation with this Agreement will succeed to the position of Notice Arbitrator, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement between December 1 and 10 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. If the parties are unable to agree on a new arbitrator within thirty (30) days of any vacancy, the Notice Arbitrator shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. With-

24

in fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

*Section 7.* **Hearing:** Each arbitrator will designate a minimum of twelve (12) hearing dates per year, exclusive of the period July 15 through September 10 for non-expedited cases, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Notice Arbitrator, provide to the NFLPA and the Management Council specified hearing dates for such ensuing period, which process will be repeated on an annual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his next reserved date in the Club city unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator determines that the postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Notice Arbitrator to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, and subject to Section 5, any evidence relevant to the grievance. All hearings will be transcribed.

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call. If either party requests post-

25

hearing briefs, the parties shall prepare and simultaneously submit briefs except in grievances involving non-suspension Club discipline where less than $25,000 is at issue, in which cases briefs will not be submitted. Briefs must be submitted to the arbitrator postmarked no later than sixty (60) days after receipt of the last transcript.

**Section 8. Arbitrator's Decision and Award:** The arbitrator will issue a written decision within thirty (30) days of the submission of briefs, but in no event shall he consider briefs filed by either party more than sixty (60) days after receipt of the last transcript, unless the parties agree otherwise. The decision of the arbitrator will constitute full, final and complete disposition of the grievance, and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement; provided, however, that the arbitrator will not have the jurisdiction or authority: (a) to add to, subtract from, or alter in any way the provisions of this Agreement or any other applicable document; or (b) to grant any remedy other than a money award, an order of reinstatement, suspension without pay, a stay of suspension pending decision, a cease and desist order, a credit or benefit award under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, or an order of compliance, with a specific term of this Agreement or any other applicable document, or an advisory opinion pursuant to Article XIII (Committees), Section 1(c). In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of the grievance. The interest shall be calculated at the one-year Treasury Note rate published in *The Wall Street Journal* as of February 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve (12) month period.

**Section 9. Time Limits:** Each of the time limits set forth in this Article may be extended by mutual written agreement of the parties involved. If any grievance is not processed or resolved in accordance with the prescribed time limits within any step, unless an extension of time has been mutually agreed upon in writing, either the player, the NFLPA, the Club or the Management Council, as the case may be, after notifying the other party of its intent in writing, may proceed to the next step.

**Section 10. Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice and/or a representative of the NFLPA. In any such hearing, a Club representative may be accompanied by counsel of his choice and/or a representative of the Management Council.

**Section 11. Costs:** All costs of arbitration, including the fees and expenses of the arbitrator and the transcript costs, will be borne equally between the

26

parties. Notwithstanding the above, if the hearing occurs in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city and one night's lodging.

**Section 12. Payment:** If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury Note rate published in *The Wall Street Journal* as of February 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each subsequent twelve (12) month period in lieu of continuation of any pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

**Section 13. Grievance Settlement Committee:** A grievance settlement committee consisting of the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL shall have the authority to resolve any grievance filed under this Article. This committee shall meet periodically to discuss and consider pending grievances. No evidence will be taken at such meetings, except parties involved in the grievance may be contacted to obtain information about their dispute. If the committee resolves any grievance by mutual agreement of the two members, such resolution will be made in writing and will constitute full, final and complete disposition of the grievance and will be binding upon the player(s) and the Club(s) involved and the parties to this Agreement. Consideration of any grievance by this committee shall not in any way delay its processing through the non-injury grievance procedure described in this Article, and no grievance may be resolved pursuant to this Section once an arbitration hearing has been convened pursuant to Section 7 hereof.

27

# ARTICLE X
# INJURY GRIEVANCE

**Section 1. Definition:** An "injury grievance" is a claim or complaint that, at the time a player's NFL Player Contract was terminated by a Club, the player was physically unable to perform the services required of him by that contract because of an injury incurred in the performance of his services under that contract. All time limitations in this Article may be extended by mutual agreement of the parties.

**Section 2. Filing:** Any player and/or the NFLPA must present an injury grievance in writing to a Club, with a copy to the Management Council, within twenty-five (25) days from the date it became known or should have become known to the player that his contract had been terminated. The grievance will set forth the approximate date of the alleged injury and its general nature. If a grievance is filed by a player without the involvement of the NFLPA, the Management Council will promptly send copies of the grievance and the answer to the NFLPA.

**Section 3. Answer:** The Club to which an injury grievance has been presented will answer in writing within seven (7) days. If the answer contains a denial of the claim, the general grounds for such denial will be set forth. The answer may raise any special defense, including but not limited to the following:

(a)    That the player did not pass the physical examination administered by the Club physician at the beginning of the pre-season training camp for the year in question. This defense will not be available if the player participated in any team drills following his physical examination or in any pre-season or regular season game; provided, however, that the Club physician may require the player to undergo certain exercises or activities, not team drills, to determine whether the player will pass the physical examination;

(b)    That the player failed to make full and complete disclosure of his known physical or mental condition when questioned during the physical examination;

(c)    That the player's injury occurred prior to the physical examination and the player knowingly executed a waiver or release prior to the physical examination or his commencement of practice for the season in question which specifically pertained to such prior injury;

(d)    That the player's injury arose solely from a non-football-related cause subsequent to the physical examination;

(e)    That subsequent to the physical examination the player suffered no new football-related injury;

(f)    That subsequent to the physical examination the player suffered no football-related aggravation of a prior injury reducing his physical ca-

28

pacity below the level existing at the time of his physical examination as contemporaneously recorded by the Club physician.

**Section 4. Neutral Physician:** The player must present himself for examination by a neutral physician in the Club city or the Club city closest to the player's residence within twenty (20) days from the date of the grievance. This time period may be extended by mutual consent if the neutral physician is not available. Neither Club nor player may submit any medical records to the neutral physician, nor may the Club physician or player's physician communicate with the neutral physician. The player will notify the Club of the identity of the neutral physician by whom he is to be examined as soon as possible subsequent to a selection by the player. The neutral physician will not become the treating physician nor will the neutral physician examination involve more than one office visit without the prior approval of both the NFLPA and Management Council. The neutral physician may review any objective medical tests which all parties mutually agree to provide. The neutral physician is further authorized to perform any necessary diagnostic tests after consultation with the parties. The neutral physician is required to submit to the parties a detailed typewritten medical report of his examination. In order to facilitate settlement of grievances, the parties periodically will consult with neutral physicians by telephone conference call to obtain preliminary opinions as to the length of time, if any, after their examinations before players would be physically able to perform contract services. The NFLPA will use its best efforts to make the neutral physicians in each Club city equally available to the players who file injury grievances.

**Section 5. Neutral Physician List:** The NFLPA and the Management Council will maintain a jointly approved list of neutral physicians, including at least two orthopedic physicians in each city in which a Club is located. This list will be subject to review and modification between February 1 and April 15 of each year, at which time either party may eliminate any two neutral physicians from the list by written notice to the other party. When vacancies occur, the NFLPA and the Management Council will each submit a list of three (3) orthopedic physicians to the other party within thirty (30) days for each NFL city where a vacancy exists. If the parties are unable to agree on a replacement, within ten (10) days they will select a neutral physician for each city by alternately striking names. The party to strike a name first will be determined by a flip of a coin. If either party fails to cooperate in the striking process the other party may select one of the nominees on its list, and the other party will be bound by such selection. The next vacancy occurring will be filled in similar fashion with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement.

29

*Section 6.* **Appeal:** A grievance may be appealed to an arbitrator by filing of written notice of appeal with the chairman of the arbitration panel within thirty (30) days from the date of receipt of the neutral physician's written report.

*Section 7.* **Arbitration Panel:** There will be a panel of five (5) arbitrators, whose appointment must be accepted in writing by the NFLPA and the Management Council. The parties shall designate the Chairman of the panel. In the event of a vacancy in the position of the Chairman of the panel, the senior arbitrator in terms of affiliation with this Agreement will succeed to the position of Chairman of the panel, and the resultant vacancy on the panel will be filled according to the procedures of this Section. Either party to this Agreement may discharge a member of the arbitration panel by serving written notice upon the arbitrator and the other party to this Agreement between December 1 and 10 of each year, but at no time shall such discharges result in no arbitrators remaining on the panel. If either party discharges an arbitrator, the other party shall have two (2) business days to discharge any other arbitrator. Any vacancies occurring on the arbitration panel will be filled as follows: If the parties are unable to agree to a new arbitrator within thirty (30) days of the occurrence of the vacancy, the Chairman of the panel shall submit a list of ten (10) qualified and experienced arbitrators to the NFLPA and the Management Council. Within fourteen (14) days of the receipt of the list, the NFLPA and the Management Council shall select one arbitrator from the list by alternately striking names until only one remains, with a coin flip determining the first strike. The next vacancy occurring will be filled in similar fashion, with the party who initially struck first then striking second. The parties will alternate striking first for future vacancies occurring thereafter during the term of this Agreement. If either party fails to cooperate in the striking process, the other party may select one of the nominees on the list and the other party will be bound by such selection.

*Section 8.* **Hearing:** Each arbitrator shall designate a minimum of twelve (12) hearing dates per year, exclusive of the period July 15 through September 10, for use by the parties to this Agreement. Upon being appointed, each arbitrator will, after consultation with the Chairman, provide to the NFLPA and the Management Council specified hearing dates for each of the ensuing six months, which process will be repeated on a semiannual basis thereafter. The parties will notify each arbitrator thirty (30) days in advance of which dates the following month are going to be used by the parties. The designated arbitrator will set the hearing on his or her next reserved date in the Club city, unless the parties agree otherwise. If a grievance is set for hearing and the hearing date is then postponed by a party within thirty (30) days of the hearing date, the postponement fee of the arbitrator will be borne by the postponing party unless the arbitrator deter-

30

mines that the postponement was for good cause. Should good cause be found, the parties will share any postponement costs equally. If the arbitrator in question cannot reschedule the hearing within thirty (30) days of the postponed date, the case may be reassigned by the Chairman to another panel member who has a hearing date available within the thirty (30) day period. At the hearing, the parties to the grievance and the NFLPA and Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the grievance. The NFLPA and the Management Council have the right to attend all grievance hearings. All hearings shall be transcribed.

If a witness is unable to attend the hearing, the party offering the testimony shall inform the other party of the identity and unavailability of the witness to attend the hearing. At the hearing or within fourteen (14) days thereafter, the party offering the testimony of the unavailable witness must offer the other party two possible dates within the next forty-five (45) days to take the witness' testimony. The other party shall have the opportunity to choose the date. The record should be closed sixty (60) days after the hearing date unless mutually extended notwithstanding any party's failure to present post-hearing testimony within the above-mentioned time period. If a witness is unavailable to come to the hearing, the witness' testimony may be taken by telephone conference call if the parties agree. In cases where the amount claimed is less than $25,000, the parties may agree to hold the hearing by telephone conference call.

Post-hearing briefs must be submitted to the arbitrator postmarked no later than sixty-five (65) days after receipt of the last transcript. The arbitrator will issue a written decision within thirty (30) days of the submission of briefs but shall not consider briefs filed by either party more than sixty-five (65) days after receipt of the last transcript, unless the parties agree otherwise. The arbitrator's decision will be final and binding; provided, however, that no arbitrator will have the authority to add to, subtract from, or alter in any way any provision of this Agreement or any other applicable document. In the event the arbitrator finds liability on the part of the Club, he shall award interest beginning one year from the date of the last regular season game of the season of injury. The interest shall be calculated at the one-year Treasury Note rate published in *The Wall Street Journal* as of February 1 (or the next date published) of each year, and such rate shall apply to any interest awarded during each such subsequent twelve (12) month period.

*Section 9.* **Miscellaneous:** The arbitrator will consider the neutral physician's findings conclusive with regard to the physical condition of the player and the extent of an injury at the time of his examination by the neutral physician. The arbitrator will decide the dispute in light of this finding and such other issues or defenses which may have been properly submitted to him. The Club or the Management Council must advise the grievant and

31

the NFLPA in writing no later than seven (7) days before the hearing of any special defense to be raised at the hearing. The arbitrator may award the player payments for medical expenses incurred or which will be incurred in connection with an injury.

*Section 10.* **Expenses:** Expenses charged by a neutral physician will be shared equally by the Club and the player. All travel expenses incurred by the player in connection with his examination by a neutral physician of his choice will be borne by the player. The parties will share equally in the expenses of any arbitration engaged in pursuant to this Article; provided, however, the respective parties will bear the expenses of attendance of their own witnesses. Notwithstanding the above, if the hearing is held in the Club city and if the arbitrator finds liability on the part of the Club, the arbitrator shall award the player reasonable expenses incurred in traveling to and from his residence to the Club city and one night's lodging.

*Section 11.* **Pension Credit:** Any player who receives payment for three or more regular season games during any year as a result of filing an injury grievance or settlement of a potential injury grievance will be credited with one year of Credited Service for the year in which injured under the Bert Bell/Pete Rozelle NFL Player Retirement Plan as determined by the Retirement Board.

*Section 12.* **Payment:** If an award is made by the arbitrator, payment will be made within thirty (30) days of the receipt of the award to the player or jointly to the player and the NFLPA, provided the player has given written authorization for such joint payment. The time limit for payment may be extended by mutual consent of the parties or by a finding of good cause for the extension by the arbitrator. Where payment is unduly delayed beyond thirty (30) days, interest will be assessed against the Club from the date of the decision. Interest shall be calculated at double the one-year Treasury Note rate published in The Wall Street Journal as of February 1 (or next date published) of each year, and such rate shall apply to the interest awarded during each such subsequent twelve (12) month period in lieu of continuation of pre-award interest. The arbitrator shall retain jurisdiction of the case for the purpose of awarding post-hearing interest pursuant to this Section.

*Section 13.* **Presumption of Fitness:** If the player passes the physical examination of the Club prior to the pre-season training camp for the year in question, having made full and complete disclosure of his known physical and mental condition when questioned by the Club physician during the physical examination, it will be presumed that such player was physically fit to play football on the date of such examination.

32

*Section 14.* **Playoff Money:** If the arbitrator finds that an injured player remained physically unable to perform the services required of him by his contract during the NFL postseason playoffs and if the Club in question participated in the playoffs that season, the player will be entitled to and the arbitrator shall award, such playoff money as though he had been on the Injured Reserve list at the time of the playoff games in question, should he otherwise qualify for such pay pursuant to Article XLII (Postseason Pay).

*Section 15.* **Information Exchange:** The NFLPA and the Management Council must confer on a regular basis concerning the status of pending injury grievances and the attribution of any injury grievance exposure to Team Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). Any communications pursuant to this Section are inadmissible in any grievance hearing.

*Section 16.* **Discovery:** No later than ten (10) days prior to the hearing, each party will submit to the other copies of all documents, reports and records relevant to the injury grievance hearing. Failure to submit such documents, reports and records no later than ten (10) days prior to the hearing will preclude the non-complying party from submitting such documents, reports and records into evidence at the hearing, but the other party will have the opportunity to examine such documents, reports and records at the hearing and to introduce those it so desires into evidence, except that relevant documents submitted to the opposing party less than ten (10) days before the hearing shall be admissible provided the offering party and the custodian(s) of the documents made good faith effort to obtain (or discover the existence of) such documents or that the documents' relevance was not discovered until the hearing.

33

# ARTICLE XI
# COMMISSIONER DISCIPLINE

***Section 1.* League Discipline:** Notwithstanding anything stated in Article IX (Non-Injury Grievance):

(a)     All disputes involving a fine or suspension imposed upon a player for conduct on the playing field other than as described in Subsection (b) below, or involving action taken against a player by the Commissioner for conduct detrimental to the integrity of, or public confidence in, the game of professional football, will be processed exclusively as follows: the Commissioner will promptly send written notice of his action to the player, with a copy to the NFLPA. Within twenty (20) days following such written notification, the player affected thereby, or the NFLPA with the player's approval, may appeal in writing to the Commissioner.

(b)     Fines or suspensions imposed upon players for unnecessary roughness or unsportsmanlike conduct on the playing field with respect to an opposing player or players shall be determined initially by a person appointed by the Commissioner after consultation concerning the person being appointed with the Executive Director of the NFLPA, as promptly as possible after the event(s) in question. Such person will send written notice of his action to the player, with a copy to the NFLPA. Within ten (10) days following such notification, the player, or the NFLPA with his approval, may appeal in writing to the Commissioner.

(c)     On receipt of a notice of appeal under subsection (a) or (b) above, the Commissioner will designate a time and place for a hearing to be commenced within ten (10) days thereafter, at which he or his designee (other than the person appointed in (b) above) will preside. The Commissioner will consult with the Executive Director of the NFLPA concerning the person to serve each season as the Commissioner's designee.

The hearing may be by telephone conference call, if the player so requests. As soon as practicable following the conclusion of such hearing, the Commissioner will render a written decision which will constitute full, final and complete disposition of the dispute and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement with respect to that dispute. Any discipline imposed pursuant to subparagraph (b) above may only be affirmed, reduced, or vacated by the Commissioner in such decision, and may not be increased.

***Section 2.* Time Limits:** Each of the time limits set forth in this Article may be extended by mutual agreement of the Commissioner and the player(s) and the Club(s) involved.

***Section 3.* Representation:** In any hearing provided for in this Article, a player may be accompanied by counsel of his choice. A representative of

34

the NFLPA may also participate in such hearing and represent the player. In any such hearing, a Club representative may be accompanied by counsel of his choice. A representative of the Management Council may also participate in such hearing and represent the Club. The NFLPA and Management Council have the right to attend all hearings provided for in this Article. At the hearing, the player, the NFLPA and the Management Council will have the right to present, by testimony or otherwise, any evidence relevant to the hearing. All hearings shall be transcribed.

**Section 4. Costs:** Unless the Commissioner determines otherwise, each party will bear the cost of its own witnesses, counsel and the like.

**Section 5. One Penalty:** The Commissioner and a Club will not discipline a player for the same act or conduct. The Commissioner's disciplinary action will preclude or supersede disciplinary action by any Club for the same act or conduct.

**Section 6. Fine Money:** Any fine money collected pursuant to this Article will be contributed to the Brian Piccolo Cancer Fund, the Vincent T. Lombardi Cancer Research Center, ALS Neuromuscular Research Foundation, and the NFLPA Players Assistance Trust ("P.A.T.") or will be used for such other purpose as the Parties may agree. In the absence of any such agreement, any such fine money shall be allocated equally among the four (4) organizations mentioned in the preceding sentence.

35

# ARTICLE XII
# INJURY PROTECTION

*Section 1.* **Qualification**: A player qualifying under the following criteria will receive an injury protection benefit in accordance with Section 2 below:

(a)　　The player must have been physically unable, because of a severe football injury in an NFL game or practice, to participate in all or part of his Club's last game of the season of injury, as certified by the Club physician following a physical examination after the last game; or the player must have undergone Club-authorized surgery in the off-season following the season of injury; and

(b)　　The player must have undergone whatever reasonable and customary rehabilitation treatment his Club required of him during the off-season following the season of injury; and

(c)　　The player must have failed the pre-season physical examination given by the Club physician for the season following the season of injury because of such injury and as a result his Club must have terminated his contract for the season following the season of injury. This pre-season physical may be given by the Club physician prior to the beginning of pre-season camp, so long as such fact is clearly communicated to the player at the time of the physical exam. The past understanding of the parties concerning a Club releasing a player who otherwise qualifies under (a) and (b) above prior to the pre-season physical examination will apply during the term of this Agreement (see Appendix B).

*Section 2.* **Benefit**: A player qualifying under Section 1 above will receive an amount equal to 50% of his contract salary for the season following the season of injury, up to a maximum payment of $275,000, if he is released pursuant to Section 1(c) above in the 2006-08 League Years unless he has individually negotiated more injury protection or a larger guaranteed salary into his contract. This amount shall be increased to $300,000 in the 2009 League Year and, if they are Uncapped Years, in the 2010-11 League Years; to $325,000 in the 2010-11 League Years, if they are Capped Years; and to $350,000 in the 2012 League Year. A player will receive no amount of any contract covering any season subsequent to the season following the season of injury, except if he has individually negotiated injury protection into that contract. The benefit will be paid to the player in equal weekly installments commencing no later than the date of the first regular season game, which benefit payments will cease if the player signs a contract for that season with another Club. A player will not be entitled to such benefit more than once during his playing career in the NFL, and such benefit shall be reduced by any salary guaranteed to the player for the season following the season of injury.

36

*Section 3.* **Disputes:** Any dispute under this Article will be processed under Article IX (Non-Injury Grievance). In any grievance in which the NFLPA or a player is claiming an injury protection benefit, the NFLPA or the player may contend that the player should not have passed the pre-season physical examination given by a Club following the season of a player's injury. In any such grievance, the NFLPA or the player may introduce evidence from a physician selected by and paid for by the player regarding the player's physical condition at the time of the Club's pre-season physical exam, provided that such physician conducted his examination of the player within fourteen (14) days of the player's contract termination, but no later than the date of the first pre-season cutdown. Any such evidence will be considered with the evidence from the Club physician, and the arbitrator shall give no special deference to the evidence presented by either physician. If the NFLPA prevails in such a grievance, then the requirements of Section 1(c) above shall be deemed to have been satisfied.

# ARTICLE XIII
# COMMITTEES

***Section 1.*** **Joint Committee:**

(a)     A Joint Committee on Player Safety and Welfare (hereinafter the "Joint Committee") will be established for the purpose of discussing the player safety and welfare aspects of playing equipment, playing surfaces, stadium facilities, playing rules, player-coach relationships, and any other relevant subjects. The Joint Committee will consist of six members: three Club representatives (plus advisors) and three NFLPA representatives (plus advisors). The Joint Committee will hold two regular meetings each year on dates and at sites selected by the Committee. Special meetings may be held at any time and place mutually agreeable to the Committee. The Joint Committee will not have the power to commit or bind either the NFLPA or the Management Council on any issue. The Joint Committee may discuss and examine any subject related to player safety and welfare it desires, and any member of the Committee may present for discussion any such subject. Any Committee recommendation will be made only to the NFLPA, the Management Council, the Commissioner, or any appropriate committee of the NFL; such recommendation will be given serious and thorough consideration.

(b)     The Joint Committee may employ consultants to assist it in the performance of its functions; the compensation and expenses of any such consultants will be paid in such manner as the Committee decides. The respective members of the Joint Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original appointees on the Committee will be selected within thirty (30) days following the execution of this Agreement. The NFLPA and the Management Council agree that a task for the Joint Committee to undertake promptly upon the execution of this Agreement is a review of all current materials on the player safety aspects of player equipment, playing surfaces, including artificial turf and other safety matters.

(c)     Immediately following the NFL annual meeting, the NFLPA will be given notice of all proposed playing rule changes, either tentatively adopted by the Clubs or put over for further consideration at a later league meeting. If the NFLPA believes that the adoption of a playing rule change would adversely affect player safety, then within seven (7) days of receiving such notice the NFLPA may call a meeting of the Joint Committee to be held within one (1) week to discuss such proposed rule change. Within five (5) days after such meeting, if the NFLPA continues to believe that the adoption of a playing rule change would adversely affect player safety, the NFLPA may request an advisory decision by one of the arbitrators designated in Article IX (Non-Injury Grievance). A hearing before such arbitrator must be held within seven (7) days of the Joint Committee meeting and

38

the arbitrator must render his decision within one (1) week of the hearing. No such playing rule change will be made by the Clubs until after the arbitrator's advisory decision unless the arbitrator has not rendered his decision within one (1) week of the hearing. The arbitrator's decision will be advisory only, not final and binding. Except as so limited, nothing in this section will impair or limit in any way the right of the Clubs to make any playing rule change whatsoever.

(d)     The NFLPA shall have the right to commence an investigation before the Joint Committee if the NFLPA believes that the medical care of a team is not adequately taking care of player safety. Within 60 days of the initiation of an investigation, two or more neutral physicians will be selected to investigate and report to the Joint Committee on the situation. The neutral physicians shall issue a written report within 60 days of their selection, and their recommendations as to what steps shall be taken to address and correct any issues shall be acted upon by the Joint Committee.

**Section 2. Competition Committee:** The NFLPA will have the right to appoint two persons to attend those portions of the annual meeting of the NFL Competition Committee dealing with playing rules to represent the players' viewpoint on rules. One of the appointees shall have a vote on all matters considered at the meeting which relate to playing rules. The NFLPA appointees will receive in advance copies of all agenda and other written materials relating to playing rules provided to other Committee members.

**Section 3. Player/Club Operations Committee:**

(a)     A Player/Club Operations Committee (hereinafter the "Operations Committee") shall be established for the purpose of examining issues arising with respect to the implementation of this Agreement. The Operations Committee may discuss and examine, and jointly decide, any such issues; provided, however, that any consideration by the Operations Committee shall not delay any grievance or other procedure under this Agreement, unless the Committee jointly decides otherwise.

(b)     The Operations Committee will consist of up to six (6) members: the Executive Vice President for Labor Relations of the NFL and a maximum of two (2) Club representatives (plus advisors), and the Executive Director of the NFLPA and a maximum of two (2) NFLPA representatives (plus advisors). The respective additional members of the Operations Committee will be selected and the length of their terms fixed under such rules as the NFLPA and the Management Council separately establish; the original additional members on the Operations Committee will be selected within thirty (30) days following the execution of this Agreement. An equal number on each side shall sit on all matters, and the Committee shall jointly decide whether the Committee shall sit with two (2), four (4) or six (6) members on any given matter. The Operations Committee will hold meetings on dates and at sites mutually agreeable to the Committee members.

39

## ARTICLE XIV
## NFL PLAYER CONTRACT

**Section 1. Form:** The NFL Player Contract form attached hereto as Appendix C will be used for all player signings. This form cannot be amended without the approval of the Management Council and the NFLPA.

**Section 2. Term:** The NFL Player Contract shall expire on the last day of the last League Year subject to such Contract.

**Section 3. Changes:**

(a)      Notwithstanding Section 1 above, changes may be agreed to between a Club and a player in a player's contract or contracts consistent with the provisions of this Agreement and the Settlement Agreement.

(b)      The NFL Player Contract shall provide that, other than any rights the player may have as a member of the class in White v. NFL, No. 4-92-906 (D. Minn.) to object to the Settlement Agreement during its review by the District Court, the player waives and releases any claims: (i) arising out of, related to, or asserted in that action; and (ii) for conduct engaged in pursuant to the Settlement Agreement during the express term of the Settlement Agreement.

**Section 4. Conformity:** All Player Contracts signed prior to the execution of this Agreement and in effect during the term of this Agreement shall be deemed amended in such a manner to require the parties to comply with the mandatory terms of this Agreement and the Settlement Agreement.

**Section 5. General, Notices, Prohibitions, etc.:**

(a)(i) Any agreement between any player and any Club concerning terms and conditions of employment shall be set forth in writing in a Player Contract as soon as practicable. Each Club shall provide to the NFLMC a copy of each such Player Contract within two days of the execution of such contract by the player and the Club. The NFLMC shall provide to the NFLPA a copy of each executed Player Contract it receives from a Club within two business days of its receipt of such Player Contract. It is anticipated that each Club will send a copy of each such Player Contract to the NFLMC by overnight mail the day it is so executed, and the NFLMC will send a copy of such copy to the NFLPA by overnight mail the day it is so received. The NFLMC shall provide to the NFLPA any salary information received from a Club which is relevant to whether such Player Contract complies with Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), within two business days following the NFL's receipt of such information. Promptly upon but no later than two business days after the signing of any Veteran with less than three Accrued Seasons to a Player Contract, the signing

40

Article XIV, NFL Player Contract

Club shall notify the NFLMC, which shall notify the NFLPA of such signing.

(ii) In the event that an Unrestricted Free Agent signs a Player Contract with a Club other than his prior Club between July 5 and July 15, the Player or his Agent shall promptly notify the Players Association, which will promptly notify the NFLMC in writing, and the New Club shall promptly notify the NFLMC, in writing, of such signing. If neither the NFLMC nor the Players Association has received any such written notice prior to midnight on July 15, such Player Contract shall be deemed not to have been signed within the signing period prescribed by Article XIX, Section 1(b)(i).

(b)      Any agreement between any player or Player Affiliate and any Club or Club Affiliate providing for the player to be compensated by the Club or Club Affiliate for non-football-related services shall be set forth in writing and disclosed and provided to the NFLMC within five business days of the execution or making of the agreement. The NFLMC shall provide such information to the NFLPA within two business days of the receipt of such information.

(c)      No Club shall pay or be obligated to pay any player or Player Affiliate (not including retired players) other than pursuant to the terms of a signed NFL Player Contract or a contract for non-football related services as described in Section 5(b) above. Nothing contained in the immediately preceding sentence shall interfere with a Club's obligation to pay a player deferred compensation earned under a prior Player Contract.

(d)      During the period any Salary Cap is in effect, in addition to any rights a Club may presently have under the NFL Player Contract, any Player Contract may be terminated if, in the Club's opinion, the player being terminated is anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempt to sign, or another player or players who is or are already on the roster of such Club, and for whom the Club needs Room. This Subsection shall not affect any Club or Club Affiliate's obligation to pay a player any guaranteed consideration.

(e)      No Player Contract may contain any individually negotiated provision transferring any player intellectual property rights to any Club or Club Affiliate or any Club sponsor.

(f)      No Club or player may agree upon any Player Contract provision concerning the termination of the contract that is inconsistent with the terms of this Agreement (including but not limited to the NFL Player Contract, Appendix C hereto), or the provisions of the NFL Constitution and Bylaws which are appended to the Side Letter dated July 24, 2006 from Harold Henderson to Eugene Upshaw, as they were operative and administered at the beginning date of the 2006 League Year (except any provisions relating to the 1982 CBA, which have been superseded by this Agreement). The parties disagree and reserve their rights with respect to whether a Player Contract may contain a commitment by the Club not to send a Qualify-

41

ing Offer to an eligible player or not to designate a player as a Franchise or Transition player.

### Section 6. Commissioner Disapproval:

(a)   If the Commissioner disapproves a Player Contract for any reason, he must inform the NFLPA in writing of the reasons therefore by noon on the date following such disapproval.

(b)   In the event the Commissioner disapproves any Player Contract as being in violation of the Salary Cap or Entering Player Pool, or any other provision of the Settlement Agreement or corresponding provision of this Agreement, the filing of an appeal of such disapproval pursuant to Article XV, Paragraph 5 or Article XXII, Paragraph 1 of the Settlement Agreement, or Article XXV, Section 5 or Article XXVI, Section 1 of this Agreement, shall automatically stay the Commissioner's disapproval, and the player shall continue to be free to practice and play for the Club, until the Special Master (or the District Court acting in lieu of the Special Master) issues its ruling. Provided, however, that in the event such Special Master appeal is filed within one week of or after the first scheduled regular season game of the Club: (i) the appeal shall be conducted in an expedited manner and shall be concluded within five (5) days of the filing date of such appeal; and (ii) the Special Master shall issue his ruling by the end of such five (5) day period. Provided, further, that, in the event the appeal is filed after the Club's first pre-season game, but before the date one week before the Club's first scheduled regular season game: (i) the appeal shall be conducted in an expedited manner and shall be concluded within ten (10) days of the filing date of such appeal; and (ii) the Special Master shall issue his ruling by the end of such ten (10) day period. If there is no ruling by the end of the periods prescribed in the preceding two sentences, or, for earlier filed appeals, by the day following the Club's third pre-season game, the automatic stay shall be dissolved. If the Commissioner disapproves a Player Contract for any of the reasons stated above on a second occasion for the same player during a given League Year, and determines that such player should not be able to play, there shall be no stay of such disapproval pursuant to this agreement, unless it is determined that the Commissioner's second disapproval is arbitrary or capricious. This agreement shall not prejudice or affect in any way, or constitute a waiver with respect to, any rights of class members to seek a stay or injunctive relief before the District Court, pursuant to the Federal Rules of Civil Procedure; nor shall it prejudice or affect in any way the rights of the NFL to oppose, or the arguments of the NFL in opposition, to such a stay.

### Section 7. NFLPA Group Licensing Program:

The NFL Player Contract shall include, solely for the administrative convenience and benefit of the player and the NFLPA, the provision set forth in Paragraph 4(b) of the NFL Player Contract (Appendix C hereto), regarding the NFLPA Group Licens-

ing Program. Neither the League nor any Club is a party to, or a beneficiary of, the terms of that provision. No Club may enter into any agreement with a Player or a Player Affiliate that is inconsistent with any rights granted to the NFLPA pursuant to Paragraph 4(b) of the NFL Player Contract; provided that this sentence is not intended and shall not be construed to override or restrict the rights granted to the Club and the League pursuant to Paragraph 4(a) of the NFL Player Contract.

### Section 8. Good Faith Negotiation:

(a)     In addition to complying with specific provisions in this Agreement, any Club or player engaged in negotiations for a Player Contract (including any Club extending, and any player receiving, a Required Tender) is under an obligation to negotiate in good faith.

(b)     A Club extending a Required Tender must, for so long as that Tender is extended, have a good faith intention to employ the player receiving the Tender at the Tender compensation level during the upcoming season. It shall be deemed to be a violation of this provision if, while the tender is outstanding, a Club insists that such a player agree to a Player Contract at a compensation level during the upcoming season below that of the Required Tender amount. The foregoing shall not affect any rights that a Club may have under the Player Contract, under this Agreement, or under the Settlement Agreement, including but not limited to the right to terminate the contract, renegotiate the contract, or to trade the player if such termination, renegotiation, or trade is otherwise permitted by the Player Contract, this Agreement, or the Settlement Agreement.

### Section 9. Limitations on Salary Forfeitures:

(a)     No forfeitures of signing bonuses shall be permitted, except that players and Clubs may agree: (i) to proportionate forfeitures of a signing bonus if a player voluntarily retires or willfully withholds his services from one or more regular season games; and/or (ii) that if a player willfully takes action that has the effect of substantially undermining his ability to fully participate and contribute in either pre-season training camp or the regular season (including by willfully withholding his services in either pre-season training camp or during the regular season or willfully missing one or more games), the player may forfeit the greater of: (a) 25% of the prorated portion of his signing bonus for the applicable League Year for the first time such conduct occurs after the beginning of training camp until the end of the season for his Club, and the remaining 75% prorated portion of his signing bonus for the applicable year for the second time such conduct occurs during that period that year; or (b) the proportionate amount of his signing bonus allocation for each week missed (1/17th for each regular season week or game missed).

(b)     If a player with a signing bonus forfeiture clause voluntarily retires and misses the remainder of the season, and the player then reports

43

back to the Club in the subsequent season, then the Club must either (i) take the player back under his existing contract with no forfeiture of the remaining proportionate signing bonus allocation, or (ii) release the player and seek repayment of any remaining proportion of the signing bonus allocated to future League Years.

(c)     No forfeitures permitted (current and future contracts) for signing bonus allocations for years already performed, or for other salary escalators or performance bonuses already earned.

(d)     A player's right to receive and/or retain a signing bonus may not be conditioned on the player's participation in voluntary off-season programs or voluntary minicamps, or for adverse public statements, provided that the Club may have non-proratable participation bonuses for its off-season workout program.

(e)     Player Contracts may not contain individually negotiated provisions for forfeiture relating to violations of the Policy on Anabolic Steroids and Related Substances or the NFL Policy and Program for Substances of Abuse (which policies will address this issue), or for failing any drug test.

(f)     Except as provided above, existing contract forfeiture provisions entered into before the end of the 2005 regular season will be in full force and effect for the duration of the current contract, and any extensions resulting solely from effectuation of existing contract provision (e.g., option years). If a Player Contract with a forfeiture provision entered into before the end of the 2005 regular season is otherwise extended or renegotiated, the amount of Salary agreed to in the contract prior to its extension or renegotiation shall be subject to forfeiture to the same extent as provided prior to such extension or renegotiation.

(g)     For purposes of this Section 9, the terms "proportionate forfeitures" and "proportionate amount" mean 1/17th of that year's signing bonus allocation for each regular season week or game missed.

44

## ARTICLE XV
## OPTION CLAUSE

*Section 1.* **Prohibition**: Any option clause must be negotiated as a separate addendum to the NFL Player Contract form. Any negotiated option clause must state the dollar amount(s) of Salary to be paid to the player during the option year.

45

# ARTICLE XVI
# COLLEGE DRAFT

**Section 1. Time of Draft:** There shall be an Annual Selection Meeting (the "College Draft" or "Draft") each League Year during the term of this Agreement and in the League Year immediately following the expiration or termination of this Agreement, with respect to which the following rules shall apply:

**Section 2. Number of Choices and Eligibility:**

(a)    The Draft shall consist of seven (7) rounds, with each round consisting of the same number of selection choices as there will be Clubs in the NFL the following League Year, plus a maximum number of additional Compensatory Draft Selections equal to the number of Clubs then in the League, with such Compensatory Draft Selections reserved for Clubs losing certain Unrestricted Free Agents. Each Draft shall be held between February 14 and May 2, on a date which shall be determined by the Commissioner.

(b)    No player shall be permitted to apply for special eligibility for selection in the Draft, or otherwise be eligible for the Draft, until three NFL regular seasons have begun and ended following either his graduation from high school or graduation of the class with which he entered high school, whichever is earlier. For example, if a player graduated from high school in December 2006, he would not be permitted to apply for special eligibility, and would not otherwise be eligible for selection, until the 2010 Draft.

(c)    If a player who was not eligible for the Draft in any League Year becomes eligible after the date of the Draft, he will be eligible to be selected in a supplemental Draft, if the League elects to conduct such a Draft, on or before the seventh calendar day prior to the opening of the first training camp that League Year. No player may elect to bypass a Draft for which he is eligible to apply for selection in a supplemental Draft. Any Club that selects a player in a supplemental Draft must forfeit a choice in the same round in the next succeeding principal Draft.

(d)    No player shall be eligible to be employed by an NFL Club until he has been eligible for selection in an NFL Draft.

**Section 3. Required Tender:** A Club that drafts a player shall be deemed to have automatically tendered the player a one year NFL Player Contract for the Minimum Active/Inactive List Salary then applicable to the player pursuant to the terms of this Agreement. The NFL or the Club shall provide the player with notice of such Required Tender before or immediately following the Draft.

**Section 4. Signing of Drafted Rookies:**

(a)    A drafted player may accept the Required Tender at any time up

46

to and including the Tuesday following the tenth week of the regular season immediately following the Draft, at 4:00 p.m. New York time. In the event the exclusive negotiating rights to the drafted player are assigned to another Club through the NFL waiver system, the acquiring Club must immediately extend the Required Tender following assignment. If released through waivers, the player shall be treated as an Undrafted Rookie Free Agent, with the right to sign an NFL Player Contract with any Club. If the Club that drafted the player signs the player after he is waived and becomes a Rookie Free Agent, the player's entire salary shall be counted against the Entering Player Pool, in the manner described in Article XVII (Entering Player Pool).

(b)       If a Drafted Rookie has not signed a Player Contract during the period from the date of such Draft to the thirtieth day prior to the first Sunday of the regular season: (i) the Club that drafted the player may not thereafter trade to another Club either its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year; and (ii) the Club that drafted the player is the only Club with which the player may sign a Player Contract until the day of the Draft in the subsequent League Year, at which time such player is eligible to be drafted in the subsequent League Year's Draft by any Club except the Club that drafted him in the initial Draft. (After the Tuesday following the tenth week of the regular season, the player and the Club may only sign a Player Contract for future League Year(s)).

(c)       If a Drafted Rookie has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

**Section 5.** **Other Professional Teams:**

(a)       Notwithstanding Section 4(b) above, if a player is drafted by a Club and, during the period between the Draft and the next annual Draft, signs a contract with, plays for or is employed by a professional football team not in the NFL during all or any part of the 12 month period following the initial Draft, then the drafting Club (or any assignee Club) shall retain the exclusive NFL rights to negotiate for and sign a contract with the player until the day of the Draft three (3) League Years after the initial Draft, and shall thereafter have a Right of First Refusal as described herein, and the player may receive offers from any Club at any time thereafter. The player shall notify the NFLPA and the NFL of his desire to sign a contract with an NFL Club, and of the date on which the player will be free of his other

47

contractual obligations of employment, if any. Within thirty (30) days of receipt of such notice by the NFL or the date of the availability of such player, whichever is later, the NFL Club that drafted the player must tender a one year written Player Contract to the player in order to retain its rights to that player, as detailed below.

(b)    For a player to whom the drafting Club retains the exclusive NFL rights to negotiate pursuant to Section 4(a) above, the Club must tender a one year Player Contract with salary of at least the Minimum Active/Inactive List Salary for players with less than one credited season, as defined in Article XXXVIII (Salaries), within the thirty (30) day period specified in Subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall be subject to the Entering Player Pool, as set forth in Article XVII (Entering Player Pool). If the player is released through waivers, the player immediately becomes a Free Agent, with the right to sign an NFL Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c)    For players with respect to whom the drafting Club retains a Right of First Refusal pursuant to this Section 5, during each League Year the player shall be treated as if he were a Restricted Free Agent not subject to Draft Choice Compensation, as described in Article XIX (Veteran Free Agency), Section 2, except as otherwise set forth in this Section 5. For such players subject to a Right of First Refusal, the Club must tender a one year Player Contract with at least the Minimum Active/Inactive List Salary for players with two (2) or more Credited Seasons, as defined in Article XXXVIII (Salaries), within the thirty (30) day period specified in Subsection (a) above. The amount of such tender and/or any Player Contract entered into with the player shall not be subject to the Entering Player Pool. If the Club does not make or withdraws the Required Tender, the player immediately becomes a Rookie Free Agent, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 6. Return to College:** If any college football player who becomes eligible for the Draft prior to exhausting his college football eligibility through participation is drafted by an NFL Club, and returns to college, the drafting Club's exclusive right to negotiate and sign a Player Contract with such player shall continue through the date of the Draft that follows the last season in which the player was eligible to participate in college football, and thereafter the player shall be treated and the Club shall have such exclusive rights as if he were drafted in such Draft by such Club (or assignee Club).

48

*Section 7.* **Assignment of Draft Rights:** In the event that the exclusive right to negotiate for a Drafted Rookie under Sections 4, 5 or 6 above is assigned from one Club to another Club, the Club to which such right has been assigned shall have the same, but no greater, right to such player, including the Right of First Refusal described in Section 5, as would the Club assigning such right, and such player shall have the same, but no greater, obligation to the NFL Club to which such right has been assigned as he had to the Club assigning such right.

*Section 8.* **Subsequent Draft:** A Club that, in a subsequent Draft, drafts a player who (a) was selected in an initial Draft, and (b) did not sign a contract with the NFL Club that drafted him or with any assignee Club during the signing period set forth in Sections 4 through 6 above, shall, during the period from the date of the subsequent Draft to the date of the Draft held the subsequent League Year, be the only NFL Club that may negotiate with or sign a Player Contract with such player. If such player has not signed a Player Contract within the period beginning on the date of the subsequent Draft and ending on the thirtieth day prior to the beginning of the regular season, the Club loses all rights to trade its exclusive negotiating rights to such player or any Player Contract that it signs with such player for the player's initial League Year. After the Tuesday following the tenth week of the regular season, the player and the Club may only sign a Player Contract for future League Year(s), except as provided in Section 4(c) above. If the player has not signed a Player Contract by the day of the next annual College Draft following the subsequent Draft, the player immediately becomes a Rookie Free Agent, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

*Section 9.* **No Subsequent Draft:** If a player is drafted by a Club in an initial Draft and (a) does not sign a contract with a Club during the signing period set forth in Sections 4 through 6 above, and (b) is not drafted by any Club in the subsequent Draft, the player immediately becomes an Undrafted Rookie, with the right to negotiate and sign a Player Contract with any Club, and any Club is then free to negotiate for and sign a Player Contract with such player, without any Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

*Section 10.* **Compensatory Draft Selections:** The rules and procedures regarding Compensatory Draft Selections set forth in Section 2 above shall be as agreed upon by the NFL and the NFLPA.

*Section 11.* **Undrafted Rookies:** Any person who has not been selected by a Club in a College Draft shall be free, after the completion of a College

49

Draft for which he is eligible, to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such person after such date, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind.

*Section 12.* **Notice of Signing:** Promptly following but no later than two (2) business days after receipt of notice of the signing of any Drafted or Undrafted Rookie, the NFL shall notify the NFLPA of such signing.

50

# ARTICLE XVII
# ENTERING PLAYER POOL

**Section 1. Definition:** For purposes of this Article XVII of this Agreement, the following terms shall have the meanings set forth below:

(a)  "Entering Player Pool" means the League-wide limit on the total amount of Salary to which all of the NFL Clubs may contract for in signing Drafted Rookies (and certain amounts contracted to be paid to Undrafted Rookies as described below) during each League Year of this Agreement, as set forth below.

(b)  Salary shall be defined and calculated in the same manner as set forth in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). In the event a Rookie who is subject to the Entering Player Pool signs a Player Contract after the commencement of the regular season, the Club must have Room under its Rookie Allocation for the entire Paragraph 5 amount of the contract.

**Section 2. Covered League Years:** The Entering Player Pool will be in effect in all League Years, except as set forth below. The NFL may remove the Entering Player Pool at its option in any Uncapped Year, by notice to the NFLPA at least 60 days prior to the scheduled date of the Draft that League Year. Further, in any Capped Year, the NFL may remove the Pool, by notice to the NFLPA at least 60 days prior to the scheduled date of the Draft that League Year, but to the extent that any Club spends more than its Rookie Allocation in that League Year, the Club will pay an equivalent number of dollars to its Veteran players pursuant to reasonable allocation instructions by the NFLPA.

**Section 3. Calculation:**

(a)  The Entering Player Pool shall consist on a League-wide basis of the amount of the Entering Player Pool for the immediately preceding League Year (excluding any formula allotments attributable to any Compensatory Draft Selections), increased by the same percentage as the increase in Projected TR for that League Year over the prior year's TR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)), up to a maximum of five percent (5%) per season, but shall not in any event decrease in actual amount from League Year to League Year. Notwithstanding the foregoing, to the extent there are Compensatory Draft Selections as a result of Article XVI (College Draft), Section 2 and/or Article XX (Franchise and Transition Players), Section 15, the Entering Player Pool shall be increased in accordance with Subsection (c) below and as otherwise agreed upon by the NFL and the NFLPA.

(b)  For each League Year of this Agreement, each Club shall have a Rookie Allocation, which shall be its proportional share of the Entering Player Pool, calculated based on the number, round, and position of the

51

Club's selection choices in the Draft. The Rookie Allocation formula shall be agreed upon by the NFL and the NFLPA and shall remain in effect for the duration of the Agreement, unless the NFL and the NFLPA otherwise agree.

(c)     If, pursuant to Article XVI (College Draft), Section 2 and/or Article XX (Franchise and Transition Players), Section 15, a Club has one or more Compensatory Draft Selections, an amount shall be added to that Club's Rookie Allocation, and to the Entering Player Pool (notwithstanding Subsection (b) above), based upon the amount allotted to selection choices of that round and position in calculating the Rookie Allocation (the "Formula Allotment"). In the event that a Club signs a Player Contract with a Drafted Rookie who was drafted in a prior League Year, an additional amount shall be added to that Club's Rookie Allocation, and to the Entering Player Pool (notwithstanding Subsection (b) above), equal to the lower of the Club's original Formula Allotment for such draft choice or the amount of unused Room under the Club's Rookie Allocation during the League Year in which the player was originally drafted.

(d)     Notwithstanding the above, nothing shall prevent the Club from signing a player for an amount in excess of the player's Formula Allotment, if the Club has Room available under its Rookie Allocation.

(e)     In the event that the NFL holds a supplemental draft in addition to its annual Draft in advance of the next League Year's Draft, adjustments shall be made to the Entering Player Pool and Rookie Allocation in a manner to be agreed upon by the NFL and the NFLPA.

(f)     In any League Year in which one or more expansion Teams enter the League, the amount of the Entering Player Pool shall be increased to account for the draft selections of any such expansion Teams.

(g)     In the event the NFL holds a supplemental draft in addition to its annual College Draft in advance of the following League Year's College Draft, there shall be added to each selecting Club's Rookie Allocation, and (cumulatively, if more than one selecting Club) to the Entering Player Pool for that League Year, an amount equal to the Formula Allotment for the corresponding choice(s) in that League Year's College Draft. In the subsequent League Year, after Formula Allotments have been established for each selection position in the College Draft, the amount of the Formula Allotment(s) for the selections used in the prior year's supplemental draft shall be deducted from the Club's Rookie Allocation. *See* Section 3(e) above. For example: If Team A selects a player in a supplemental draft with the first choice in the third round, Team A's Rookie Allocation for that League Year shall be increased by an amount equal to the Formula Allotment for the first choice in the third round of that year's College Draft. An amount equal to the Formula Allotment for the first choice in the third round of the prior League Year's Draft shall be eliminated from the subsequent League Year's Entering Player Pool, in that Club's Rookie Allocation, but all other Rookie Allocations remain the same.

52

*Section 4.* **Operation:**

(a)      No Club may enter into Player Contracts with Drafted Rookies that, standing alone or in the aggregate, provide for Salaries in the first League Year of such Player contracts that would exceed the Club's Rookie Allocation for that year.

(b)      For the purposes of this Article XVII, the Salary of any Undrafted Rookie shall count toward the Club's Rookie Allocation only to the extent that it exceeds the then applicable Minimum Active/Inactive List Salary for that player.

(c)      In the event that a Draft selection is assigned to another Club prior to completion of the Draft, the amount of the Formula Allotment for such selection shall be assigned to the Club receiving the selection under the assignment. A Club may not assign the exclusive negotiating rights to a Drafted Player to another Club if such New Club does not have Room under its Rookie Allocation equal to at least the original Formula Allotment for the player, unless the player consents to such assignment.

(d)(i)   If a Drafted Player is placed on waivers, the player's Formula Allotment remains with the Club that requested waivers on him, and the assignee Club must have Room or make Room under its Rookie Allocation to make the Required Tender to the player.

(ii)      If a Club requests waivers on a Drafted Rookie and that player is released via waivers, the requesting Club can sign that player to a Player Contract during that League Year only if the Club has Room under its Rookie Allocation equal to the full Salary contracted for in that League Year.

(e)      No Player Contract signed by a Rookie may provide for an annual increase in Salary of more than twenty-five percent (25%) of the contract's first League Year Salary, unless such Player Contract provides for Salary which is equal to the then applicable Minimum Salary for each League Year of the contract. For the purposes of the calculation in this section only, any amount of a signing bonus attributed to the player's Salary shall not be counted.

(f)      If a Rookie contracts with a Club for the minimum workout payments set forth in Article XXXV, for his second or subsequent season, such payments shall not be included for purposes of the 25% Rule for Rookies set forth above. If a Rookie contracts with a Club for a workout payment in excess of the minimum, such excess amount shall be included for the purposes of the 25% Rule for Rookies set forth above. In all cases, a workout payment shall count toward Team Salary and a Team's Rookie Allocation.

(g)      Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one or more contract years shall be treated as a signing bonus at the time the buyout is exercised by the Club, and prorated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buyout is based upon one or more incentives that are not "likely to be earned."

53

Such a buyout amount shall not be included in any calculation for purposes of the 25% Rule for Rookies set forth above. (The parties acknowledge that they disagree as to the treatment of allocated signing bonus and buyout payments when a player's right to terminate one or more contract years and/or the Club's right to buyout is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this Subsection (g), the terms of this Subsection may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all their rights with respect to the subject of this parenthetical.).

(h)     Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, prorated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 25% Rule for Rookies set forth above, prorated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii) if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

(i)     The Player Contract of a Rookie may not be renegotiated until after his Club's final game of the second NFL season following the signing of such Player Contract.

(j)     Nothing in this Agreement is intended to or shall be construed to mean that any Rookie's Salary is predetermined by any Allocation or Formula Allotment.

(k)     The list of each Formula Allotment attributed to each draft selection shall be agreed to by the NFL and the NFLPA, and shall not be disclosed to Clubs, Players, Player Agents or the public.

(l)     For purposes of the Entering Player Pool and a Team's Rookie Allocation, amounts contracted to be paid to Drafted Rookies, and amounts in excess of the applicable Minimum Active/Inactive List Salary contracted to be paid to Undrafted Rookies pursuant to Subsection 4(b) above shall be counted against the Entering Player Pool and a Team's Rookie Allocation, whether or not the amounts are actually paid, in the manner otherwise specified in the CBA.

(m)     In League Years for which no Salary Cap is in effect, 85% of any amount contracted by a Team to be paid from the Team's Rookie Allocation to a Rookie, but not actually paid by the Team to that player, either as a

54

rookie, or as a re-signed first year player or practice squad player, which amount was not paid because that player was released, will be distributed to all rookies on such Team promptly after the end of the season on a pro rata basis based upon the number of downs played.

(n)    If a Club has a Rookie Orientation Program apart from its allow-able minicamp(s) and prior to its training camp, the following categories of per player reimbursements or payments will not be counted against the Entering Player Pool: (1) One Round Trip Airline Ticket or its cash equivalent from the player's place of residence to the Club city and back, not to exceed $1,250 for the 2006-09 League Years and $1,500 for the 2010-12 League Years; (2) Room and Board or its equivalent of up to $110 per day for the 2006 League Year, $120 per day for the 2007-08 League Years, $130 per day for the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year, and $145 per day for the 2011 League Year if it is a Capped Year and the 2012 League Year, up to a maximum of sixty (60) days; and (3) ground transportation to and from the player's place of residence in the Club's city to the Club's facility. Any amounts in excess of the above reim-bursements or payments will count against the Entering Player Pool. Costs associated with the Rookie Orientation Programs will be evaluated by the parties each year to determine if adjustment, with respect to the Entering Player Pool, is appropriate.

**Section 5. Rookie Player Contract Length:** The initial Player Contract of a Rookie, including any Club option, may not exceed four (4) years in length, except that the initial Player Contract of a Rookie drafted with a selection in the first half of the first round (e.g., the first sixteen (16) of thirty-two (32) selections in the 2006 Draft), including any Club option, may not exceed six (6) years in length, and the initial Player Contract of a Rookie drafted with a selection in the second half of the first round, including any Club option, may not exceed five (5) years in length.

# ARTICLE XVIII
# VETERANS WITH LESS THAN THREE
# ACCRUED SEASONS

**Section 1.** Accrued Seasons Calculation:

(a)     For the purposes of calculating Accrued Seasons under this Agreement, a player shall receive one Accrued Season for each season during which he was on, or should have been on, full pay status for a total of six (6) or more regular season games, but which, irrespective of the player's pay status, shall not include games for which the player was on: (i) the Exempt Commissioner Permission List, (ii) the Reserve PUP List as a result of a nonfootball injury, or (iii) a Club's Practice or Development Squad.

(b)     For the purposes of calculating Accrued Seasons under this Agreement, for any League Year beginning with the 1993 League Year, a player shall not receive an Accrued Season for any League Year in which the player is under contract to a Club and in which he failed to report to such Club at least thirty (30) days prior to the first regular season game of that season, or in which the player thereafter failed to perform his contract services for the Club for a material period of time, unless he demonstrates to the Impartial Arbitrator extreme personal hardship causing such failure to report or perform, such as severe illness or death in the family. The determination of the Impartial Arbitrator shall be made within thirty (30) days of the application by the player, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

**Section 2.** Negotiating Rights of Players with Less Than Three Accrued Seasons: Any Veteran with less than three (3) Accrued Seasons whose contract has expired may negotiate or sign a Player Contract only with his Prior Club, if on or before March 1 his Prior Club tenders the player a one year Player Contract with a Paragraph 5 Salary of at least the Minimum Active/Inactive List Salary applicable to that player. If the Prior Club has not by that date made the Required Tender or later withdraws such tender, the player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

56

## ARTICLE XIX
## VETERAN FREE AGENCY

*Section 1.* **Unrestricted Free Agents:**

(a)      Subject to the provisions of Article XX (Franchise and Transition Players), any player with five (5) or more Accrued Seasons, or with four (4) or more Accrued Seasons in any Capped Year, shall, at the expiration of his Player Contract, become an Unrestricted Free Agent. Such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, subject to the signing period set forth below.

(b)      **Signing Period.**

(i)      In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by July 22 or the first scheduled day of the first NFL training camp, whichever is later, in the League Year following the expiration of his last Player Contract, he may negotiate or sign a Player Contract from July 22 until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, only with his Prior Club, provided that the Prior Club by June 1 has tendered to the player a one year Player Contract of at least 110% of either (a) his Prior Year Salary (if his expiring Player Contract is not a Player Contract he entered into as a Rookie), or (b) his Paragraph 5 Salary (if his expiring Player Contract is a Player Contract he entered into as a Rookie, without renegotiation), in each case with all other terms of his contract identical to his prior year's contract. For the purposes of this Subsection, "Prior Year Salary" means the total of the Paragraph 5 Salary, roster and reporting bonuses, pro-rata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the last year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Prior Year Salary shall also include any unpaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate.

(ii)      If an Unrestricted Free Agent described in Subsection 1(b)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(iii)      If an Unrestricted Free Agent does not play in the NFL for the

57

remainder of a League Year pursuant to Subsection 1(b)(ii) above, commencing the first day of the following League Year, the player shall be free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(c)     In the event that an Unrestricted Free Agent has not signed a Player Contract with a Club by June 1 of the League Year following the expiration of his last Player Contract, and if his Prior Club has not by that date tendered to the player a one year Player Contract in accordance with the requirements of Subsection 1(b)(i) above, or has withdrawn the tender, the player shall continue to be an Unrestricted Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(d)     An Unrestricted Free Agent shall not be subject to any limitations on the period of time before which he may qualify as an Unrestricted Free Agent again, or to any limitations on the number of times he may be an Unrestricted Free Agent.

(e)     Promptly upon but no later than two (2) business days after the signing of any Unrestricted Free Agent to a Player Contract, the signing Club shall notify the NFL, which shall notify the NFLPA of such signing.

### Section 2. Restricted Free Agents:

(a)     Any Veteran player with three (3) or more Accrued Seasons, but less than five (5) Accrued Seasons (or less than four (4) Accrued Seasons in any Capped Year), shall, at the expiration of his last Player Contract during such period, become a Restricted Free Agent. Any such player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, subject to the restrictions set forth in this Article.

(b)     In order to receive the following specified Rights of First Refusal and/or Draft Choice Compensation with respect to a Restricted Free Agent, the Prior Club of a Restricted Free Agent must tender the player a Qualifying Offer on or before the first date of the Restricted Free Agent Signing Period, as follows:

(i)     For Restricted Free Agents with three (3) Accrued Seasons:

(1)     Right of First Refusal: one year Player Contract with Paragraph 5 Salary of at least $721,600 for the 2006 League Year, $850,000 for the 2007 League Year, $927,000 for the 2008 League Year, $1,010,000 for the 2009 League Year, $1,101,000 for the 2010 League Year, $1,200,000 for the 2011 League Year, or $1,308,000 for the 2012 League Year, as applicable;

58

(2)    <u>Right of First Refusal and Draft Selection at Player's Original Draft Round</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) the amount set forth in Subsection (b)(i)(1) above, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this Subsection is subject to the rules of Subsection (c) below);

(3)    <u>Right of First Refusal, One Second Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $1,300,000 in the 2007 League Year, $1,417,000 in the 2008 League Year, $1,545,000 in the 2009 League Year, $1,684,000 in the 2010 League Year, $1,835,000 in the 2011 League Year, or $2,000,000 in the 2012 League Year, as applicable, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged;

(4)    <u>Right of First Refusal and One First Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $1,573,000 for the 2006 League Year, $1,850,000 for the 2007 League Year, $2,017,000 for the 2008 League Year, $2,198,000 for the 2009 League Year, $2,396,000 for the 2010 League Year, $2,611,000 for the 2011 League Year, or $2,846,000 for the 2012 League Year, as applicable, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged; and

(5)    <u>Right of First Refusal, One First Round Draft Selection, and One Third Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $2,096,600 for the 2006 League Year, $2,350,000 for the 2007 League Year, $2,562,000 for the 2008 League Year, $2,792,000 for the 2009 League Year, $3,043,000 for the 2010 League Year, $3,317,000 for the 2011 League Year, or $3,616,000 for the 2012 League Year, as applicable, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged.

(ii)    For Restricted Free Agents with four (4) Accrued Seasons (in Uncapped Years):

(1)    <u>Right of First Refusal</u>: one year Player Contract with Paragraph 5 Salary of at least $771,600 for the 2006 League Year, $925,000 for the 2007 League Year, $1,002,000 for the 2008 League Year, $1,085,000 for the 2009 League Year, $1,176,000 for the 2010 League Year, $1,275,000 for the 2011 League Year, or $1,383,000 for the 2012 League Year, as applicable;

(2)    <u>Right of First Refusal and Draft Selection at Player's Original Draft Round</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) the amount set forth in Subsection (b)(ii)(1) above; or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if

59

option (b) applies, all other terms of the player's prior year contract are carried forward unchanged (this Subsection is subject to the rules of Subsection (c) below);

    (3)  <u>Right of First Refusal and One Second Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $1,375,000 in the 2007 League Year, $1,492,000 in the 2008 League Year, $1,620,000 in the 2009 League Year, $1,759,000 in the 2010 League Year, $1,910,000 in the 2011 League Year, or $2,075,000 in the 2012 League Year, as applicable, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged;

    (4)  <u>Right of First Refusal and One First Round Draft Selection</u>: one year Player Contract with a Paragraph 5 Salary of at least (a) $1,673,000 for the 2006 League Year, $1,975,000 for the 2007 League Year, $2,142,000 for the 2008 League Year, $2,323,000 for the 2009 League Year, $2,521,000 for the 2010 League Year, $2,736,000 for the 2011 League Year, or $2,971,000 for the 2012 League Year, as applicable, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged; and

    (5)  <u>Right of First Refusal, One First Round Draft Selection, and One Third Round Draft Selection</u>: one year Player Contract with Paragraph 5 Salary of at least (a) $2,196,600 for the 2006 League Year, $2,475,000 for the 2007 League Year, $2,687,000 for the 2008 League Year, $2,917,000 for the 2009 League Year, $3,168,000 for the 2010 League Year, $3,442,000 for the 2011 League Year, or $3,741,000 for the 2012 League Year, as applicable, or (b) 110% of the player's prior year's Paragraph 5 Salary, whichever is greater; in addition, if option (b) applies, all other terms of the player's prior year contract are carried forward unchanged.

(c)(i) Notwithstanding Subsections 2(b)(i) and 2(b)(ii) above, in the event that a Prior Club tenders any of its Restricted Free Agents originally selected in a draft round lower than the first round a Qualifying Offer that requires Draft Choice Compensation of one first round selection (the "(c)(i) Upgraded Tender"), the Prior Club shall only be eligible to receive Draft Choice Compensation of one second round selection for any of its Restricted Free Agents originally selected in the first round of the Draft, unless such Restricted Free Agents have each received a Qualifying Offer of at least the amount of the (c)(i) Upgraded Tender.

    (ii) Notwithstanding Subsections 2(b)(i) and 2(b)(ii) above, in the event that a Prior Club tenders any of its Restricted Free Agents originally selected in a draft round lower than the second round a Qualifying Offer that requires Draft Choice Compensation of one second round selection (the "(c)(ii) Upgraded Tender"), the Prior Club shall only be eligible to receive Draft Choice Compensation of one third round selection for any of its Restricted Free Agents originally selected in the second round of the Draft,

60

unless such Restricted Free Agents have each received a Qualifying Offer of at least the amount of the (c)(ii) Upgraded Tender.

(d)     [*Omitted*]

(e)     [*Omitted*]

(f)     A Restricted Free Agent shall have the option of accepting a one-year NFL Player Contract for 110% of his Prior Year Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) in lieu of a Player Contract for the applicable alternative amount specified in this paragraph, if he so wishes, regardless of which Player Contract is for a greater amount.

(g)     In the event a Prior Club withdraws its Qualifying Offer, the Restricted Free Agent shall immediately become an Unrestricted Free Agent and shall be completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without being subject to First Refusal, Draft Choice Compensation, Signing Period, or any other limitation of any kind.

(h)     **Signing Period.** The dates of the period in which Restricted Free Agents shall be free to negotiate and sign a Player Contract with any Club (the "Signing Period") shall be agreed upon by the NFL and the NFLPA by the previous September 1, but in no event may such Signing Period be less than a period of forty-five (45) days, unless the parties agree otherwise.

(i)(i)     In the event that a Restricted Free Agent has not signed a Player Contract with a Club within the Signing Period in the League Year following the expiration of his last Player Contract, and if the Prior Club by June 1 tenders to the Restricted Free Agent a one year Player Contract of at least 110% of his Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) or extends the player's Qualifying Offer, whichever is greater (the "June 1 Tender"), the Prior Club shall be the only Club with which the player may negotiate or sign a Player Contract during the period from June 1 until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time. If the player's Qualifying Offer is greater than 110% of the player's Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged), the Club may withdraw the Qualifying Offer on June 15 and retain its rights under the preceding sentence, so long as the Club immediately tenders the player a one year Player Contract of at least 110% of his Paragraph 5 Salary (with all other terms of his prior year contract carried forward unchanged) (the "June 15 Tender").

(ii)     If a Restricted Free Agent described in Subsection 2(i)(i) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall not play football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five (5)

61

Article XIX, Veteran Free Agency

days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(iii)     If a Restricted Free Agent does not play in the NFL in a League Year, his Prior Team shall have the right to tender such player any Qualifying Offer consistent with Section 2(b) prior to the next League Year's Restricted Free Agent Signing Period. In the event such a Qualifying Offer is tendered, the Prior Team shall have the applicable rights regarding such player according to such tender, and such player shall have the same rights regarding negotiations with other Clubs as he had the previous League Year.

(j)     In the event that a Restricted Free Agent has not signed a Player Contract with a Club by June 1 in the League Year following the expiration of his last Player Contract, and if his Prior Club has not by that date made the applicable June 1 Tender to such player, or withdraws the tender, or in the event the Club has withdrawn the applicable June 15 Tender, the player shall be completely free to negotiate and sign a Player Contract with any Club, and any Club may negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(k)     Promptly upon but no later than two (2) business days after the signing of any Restricted Free Agent to a Player Contract, or the extending to any Restricted Free Agent of a Qualifying Offer, the signing or extending Club shall notify the NFL, which shall notify the NFLPA of such signing or offer.

(l)     Draft Choice Compensation under this Article shall be due in that League Year's Draft unless the Offer Sheet is received by the Prior Club later than two days before that League Year's Draft, in which case Draft Choice Compensation shall be due in the following League Year's Draft.

(m)     Notwithstanding the foregoing, in the event that the Prior Club of a Restricted Free Agent has tendered the player a Qualifying Offer pursuant to this Article XIX, Section 2(m) in an amount at least $500,000 greater than that specified by Subsections 2(b)(i)(5) or 2(b)(ii)(5) above, as applicable depending upon whether the League Year is a Capped Year or an Uncapped Year, or by Article LVI, Section 2(b), if applicable, then the Club shall have a Right of First Refusal and Draft Choice Compensation of only one first round selection, but any provision in an Offer Sheet to such player waiving or limiting the New Club's ability to designate the player as a Franchise Player or Transition Player in the future shall not be a Principal Term, and therefore need not be included in a contract formed with the Prior Club as a result of matching such an Offer Sheet (but shall be included in a contract formed with the New Club as a result of the Prior Club not matching such an Offer Sheet).

62

*Section 3.* **Offer Sheet and First Refusal Procedures:**

(a)     Offer Sheets. When a Restricted Free Agent receives an offer to sign a Player Contract from any Club (the "New Club") other than the Prior Club, which offer the player desires to accept, he shall give to the Prior Club a completed certificate substantially in the form of Appendix D, attached hereto (the "Offer Sheet"), signed by the Restricted Free Agent and the New Club, which shall contain the "Principal Terms" (as defined below) of the New Club's offer. The New Club and the player must specifically identify in the Offer Sheet those provisions they believe are Principal Terms. The Prior Club, within seven (7) days from the date it receives the Offer Sheet, may exercise or not exercise its Right of First Refusal, which shall have the legal consequences set forth below.

(b)     First Refusal Exercise Notice. If the Prior Club gives the Restricted Free Agent a "First Refusal Exercise Notice" substantially in the form of Appendix E, attached hereto, within seven (7) days from the date the Prior Club receives an Offer Sheet, but not later than four (4) days before the Draft, such Restricted Free Agent and the Prior Club shall be deemed to have entered into a binding agreement, which they shall promptly formalize in a Player Contract, containing (i) all the Principal Terms (subject to Subsection (e) below); (ii) those terms of the NFL Player Contract not modified by the Principal Terms; and (iii) such additional terms, not less favorable to the player than those contained in the Offer Sheet, as may be agreed upon between the Restricted Free Agent and the Prior Club.

(c)     No First Refusal Exercise Notice. If the Prior Club does not give the Restricted Free Agent the First Refusal Exercise Notice within the applicable period, the player and the New Club shall be deemed to have entered into a binding agreement, which they shall promptly formalize in a Player Contract, containing (i) all the Principal Terms; (ii) those terms of the NFL Player Contract not modified by the Principal Terms; and (iii) such additional terms, not less favorable to the Restricted Free Agent than those contained in the Offer Sheet, as may be agreed upon between the Restricted Free Agent and the New Club (subject to Section 5 below), and the Restricted Free Agent's Prior Club shall receive from the New Club the Draft Choice Compensation, if any, specified in Section 2 above of this Article. Any Club that does not have available, in the upcoming Draft, the selection choice or choices (its own or better choices in the applicable rounds) needed to provide Draft Choice Compensation in the event of a timely First Refusal Exercise Notice may not sign an Offer Sheet in such circumstances. The player and the New Club may not renegotiate such Player Contract to reduce the Salary in such contract until the date after the trading deadline in that League Year. Neither the Player nor the New Club may exercise an option in such Player Contract that reduces Salary in the first League Year of such contract until the date after the trading deadline in that League Year.

(d)     One Offer Sheet. There may be only one Offer Sheet signed by a Restricted Free Agent outstanding at any one time, provided that the Offer

63

Article XIX, Veteran Free Agency

Sheet has also been signed by a Club. An Offer Sheet, before or after it is given to the Prior Club, may be revoked or withdrawn only by the Clubs upon the written consent of the Restricted Free Agent. In either of such events, the Restricted Free Agent shall again be free to negotiate and sign a Player Contract with any Club, and any Club shall again be free to negotiate and sign a Player Contract with such Restricted Free Agent, subject to the Prior Club's continued Right of First Refusal and/or Draft Choice Compensation as described in this section.

(e)   Principal Terms. For the purposes of this Section, the Principal Terms of an Offer Sheet are only:

(i)   Salary, which shall consist only of: (a) the fixed and specified dollar amounts the New Club will pay, guarantee or lend to the Restricted Free Agent and/or his designees (currently and/or as deferred compensation in specified installments on specified dates) in consideration for his services as a football player under the Player Contract (i.e., signing bonus, Paragraph 5 Salary, and reporting and roster bonuses); and (b) Salary that is variable and/or is subject to calculation only upon the following bases: (i) based upon performance of the Club extending the Offer Sheet (only those incentives which are "likely to be earned" by the player if he enters into a Player Contract with the New Club, pursuant to Subsection (c) above, must be matched by the Prior Club for the purpose of exercising a Right of First Refusal, and such incentives may not exceed fifteen percent (15%) of the Salary in the Offer Sheet); and (ii) generally recognized league honors to be agreed upon by the parties; and

(ii)   Any modifications of and additions to the terms contained in the NFL Player Contract requested by the Restricted Free Agent and acceptable to the New Club, that relate to non-compensation terms (including guarantees, no-cut, and no-trade provisions) of the Restricted Free Agent's employment as a football player (which shall be evidenced either by a copy of the NFL Player Contract, marked to show changes, or by a brief written summary contained in or attached to the Offer Sheet).

(f)   No Property or Investments. A Club may not offer any item of property or investments other than Salary as part of the Principal Terms contained in an Offer Sheet.

(g)   Incentives. For those incentives which are based on Club performance, only those incentives which are "likely to be earned" by the player if he enters into a Player Contract with the New Club, pursuant to Subsection (c) above, must be matched by the Old Club for the purpose of exercising a Right of First Refusal.

(h)   No Consideration Between Clubs. There may be no consideration of any kind given by one Club to another Club in exchange for a Club's decision to exercise or not to exercise its Right of First Refusal, or in exchange for a Club's decision to submit or not to submit an Offer Sheet to a Restricted Free Agent or to make or not to make an offer to enter into a Player Contract with a Restricted Free Agent. If a Club exercises its Right of

64

First Refusal and matches an Offer Sheet, that Club may not trade that player to the Club that submitted the Offer Sheet for at least one calendar year, unless the player consents to such trade.

(i)     NFL Only. No Right of First Refusal rule, practice, policy, regulation, or agreement, including any Right of First Refusal applicable to any Restricted Free Agent or Transition Player pursuant to Article XX (Franchise and Transition Players) below, may apply to the signing of a Player Contract with, or the playing with, any club in any professional football league other than the NFL by any Restricted Free Agent (except as agreed by the player in the circumstances set forth in Section 5 below). This prohibition applies to any Right of First Refusal described in this Agreement (except as described in Section 5 below).

(j)     No Assignment. No Right of First Refusal may be assigned to any other Club (except as provided in Article XVI (College Draft), Section 7 or as agreed by the player in the circumstances set forth in Section 5 below). This prohibition applies to any Right of First Refusal described in this Agreement (except as described in Section 5 below), including any Right of First Refusal with respect to Restricted Free Agents, Transition Players, or Drafted Rookies described in Article XVI (College Draft), Section 5.

(k)     Copies. Promptly upon but no later than two (2) business days after the giving of an Offer Sheet to the Prior Club, the Restricted Free Agent shall cause a copy thereof to be given to the NFL, which shall notify the NFLPA. Promptly upon but no later than two (2) business days after the giving of a First Refusal Exercise Notice to the Restricted Free Agent, the Prior Club shall cause a copy thereof to be given to the NFL, which shall notify the NFLPA. At any time after the giving of an Offer Sheet to a Prior Club, the NFL may require the New Club to cause a copy thereof to be given to the NFL and the NFLPA by telecopy.

**Section 4. Expedited Arbitration:** An expedited arbitration before the Impartial Arbitrator, whose decision shall be final and binding upon all parties, shall be the exclusive method for resolving the disputes set forth in this Section. If a dispute arises between the player and either the Prior Club or the New Club, as the case may be, relating to their respective obligations to formalize their binding agreements created under Subsections 3(b) or (c) above, or as to whether the binding agreement is between the Restricted Free Agent and the New Club or the Restricted Free Agent and the Prior Club, such dispute shall immediately be submitted to the Impartial Arbitrator, who shall resolve such dispute within ten (10) days but in no event later than two (2) days before the Draft. The Impartial Arbitrator shall not have the power to terminate any such binding agreement; he shall have the power only to direct the parties to formalize such binding agreement into a Player Contract in accordance with the Principal Terms of the applicable Offer Sheet, as interpreted by the Impartial Arbitrator.

65

**Section 5. Individually Negotiated Limitations on Player Movement:**

(a)    All individually negotiated limitations on player movement are prohibited, except as specifically provided as follows:

(i)    If a Restricted Free Agent has been tendered a Qualifying Offer of (a) Paragraph 5 Salary of at least the applicable amount stated in Section 2(b)(i)(1) above for a player with three (3) Accrued Seasons, or (b) at least the applicable amount stated in Section 2(b)(ii)(1) above for a player with four (4) Accrued Seasons, or (c) at least 110% of his prior year's Paragraph 5 Salary, whichever is greater (in each case with all other terms of his prior year contract carried forward), and the Qualifying Offer is fully guaranteed for skill and injury, the Restricted Free Agent and his Prior Club may negotiate and contract for an individual Right of First Refusal with respect to the services of such player.

(ii)    Any Unrestricted Free Agent shall be permitted to negotiate and contract for an individual Right of First Refusal with any Club with respect to the services of such player so long as the player is not a Franchise Player or Transition Player at the time of such negotiation and contract.

(b)    Any player (other than a Free Agent) with less than three (3) Accrued Seasons is prohibited from negotiating any individual limitations on his movement in his Player Contract or otherwise, and all Clubs are prohibited from negotiating any such limitations with such players.

(c)    Any individual Right of First Refusal that is negotiated and contracted for pursuant to Subsection (a) or (b) above shall be void and unenforceable unless it is specified in a separate document signed by such player in the form annexed hereto as Appendix F, acknowledging such player's waiver of the express right that Unrestricted Free Agents have under this Agreement to be free of any Right of First Refusal restriction on their freedom of movement.

(d)    [*Omitted*]

(e)    [*Omitted*]

(f)    Rights of First Refusal negotiated pursuant to this Section 5 may be traded or assigned as part of a player's contract.

**Section 6. Notices, Etc.:**

(a)    Any Offer Sheet, First Refusal Exercise Notice, or other writing required or permitted to be given under this Article XIX (Veteran Free Agency), shall be sent either by personal delivery or by overnight mail, or by telecopy (in each case a confirmation copy shall also be sent by first class mail), addressed as follows:

(i)    To any NFL Club: addressed to that Club at the principal address of such Club as then listed on the records of the NFL or at the Club's principal office, to the attention of the Club's president or general manager;

(ii)    To the NFL, 280 Park Avenue, New York, New York 10017, to the attention of Executive Vice President-Labor Relations;

(iii)    To a Restricted Free Agent: to his address listed on the Offer

66

Sheet and, if the Restricted Free Agent designates a representative on the Offer Sheet and lists such representative's address thereon, a copy shall be sent to such representative at such address; and

(iv)    To the NFLPA, 2021 L Street, N.W., Suite 600, Washington, D.C. 20036.

(b)    An Offer Sheet shall be deemed given only when received by the Prior Club. A First Refusal Exercise Notice, a Qualifying Offer and any other writing required or permitted under Article XIX (Veteran Free Agency) shall be deemed given when sent by the Prior Club.

(c)    Subject to Article XXVIII (Anti-Collusion), Section 1 below, the NFL shall have the right to prepare and circulate to all Clubs two (2) lists containing, respectively, no more than the name, address, Social Security number, telephone number, college, position, Team, Right of First Refusal and/or any Draft Choice Compensation of each and every player who shall or has become (i) an Unrestricted Free Agent; or (ii) a Restricted Free Agent, as of March 1, or as of the first date of the Signing Period, respectively ("Free Agent Lists"), and no other list relating to free agents. Information shall not be selectively withheld for some players but not others. If one or more Free Agent Lists are so circulated, copies thereof shall be sent to the NFLPA.

67

# ARTICLE XX
# FRANCHISE AND TRANSITION PLAYERS

*Section 1.* **Franchise Player Designations:** Except as set forth in Section 10 below, each Club shall be permitted to designate one of its players who would otherwise be an Unrestricted Free Agent as a Franchise Player each season during the term of this Agreement. The player so designated may be one who would otherwise be a Restricted Free Agent. Except as set forth in Section 2(a)(i) below, any Club that designates a Franchise Player shall be the only Club with which such Franchise Player may negotiate or sign a Player Contract, during the period the player is so designated, notwithstanding the number of his Accrued Seasons. The period for Clubs to designate Franchise Players will begin on the twenty-second day preceding the first day of the new League Year and will end at 4:00 p.m. New York time on the eighth day preceding the first day of the new League Year.

*Section 2.* **Required Tender for Franchise Players:**

(a)      Except as provided in Subsection (b) below, any Club that designates a Franchise Player shall on the date the designation is made notify the player and the NFLPA which one of the following two (2) potential required tenders the Club has selected:

(i)      A one year NFL Player Contract for the average of the five (5) largest Prior Year Salaries for players at the position (within the categories set forth in Section 7(a) below) at which the Franchise Player played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater; if the Club extends the tender pursuant to this Subsection (a)(i), the player shall be permitted to negotiate a Player Contract with any Club as if he were a player subject to Section 5 below, except that Draft Choice Compensation of two (2) first round draft selections shall be made with respect to such player in the event he signs with the New Club, and the Signing Period for such player shall be determined under Section 17 below; or

(ii)      A one year NFL Player Contract for (1) the average of the five (5) largest Salaries in Player Contracts for that League Year as of the end of the Restricted Free Agent Signing Period that League Year, as set forth in Article XIX (Veteran Free Agency), Section 2(h), for players at the position (within the categories set forth in Section 7(a) below) at which he played the most games during the prior League Year, or (2) the amount of the required tender under Subsection (a)(i) above, whichever is greater.

(b)      Any Club that designates a player as a Franchise Player for the third time shall, on the date the third such designation is made, be deemed to have tendered the player a one-year NFL Player Contract for the greater of: (1) the average of the five (5) largest Prior Year Salaries for players at the position (within the categories set forth in Section 7(a) below) with the highest such average; (2) 120% of the average of the five (5) largest Prior

68

Year Salaries for players at the position (within the categories set forth in Section 7(a) below) at which the player played the most games during the prior League Year; or (3) 144% of his Prior Year Salary. By way of example, a kicker designated as a Franchise Player for the third time in the 2007 League Year would have a Required Tender equal to the greater of: (i) the average of the five (5) largest 2006 Salaries for quarterbacks; (ii) 120% of the average of the five (5) largest 2006 Salaries for kickers; or (iii) 144% of the player's own 2006 Salary. If the Club designates the player as a Franchise Player for the third time, the designating Club shall be the only Club with which the player may negotiate or sign a Player Contract. In lieu of designating such a player as a Franchise Player for the third time, any Club may designate such player as a Transition Player pursuant to Section 3 below.

(c)      If a player subject to a Franchise Player designation accepts the Required Tender, the resulting Player Contract shall be fully guaranteed if the player's contract is terminated because of lack of comparative skill; as a result of an injury sustained in the performance of his services under his Player Contract; and/or due to a Club's determination to create Room for Salary Cap purposes. For purposes of this Subsection only, any contract termination due to the failure of the player to establish or maintain his excellent physical condition will be subject to review of a neutral physician appointed by the parties under Article X (Injury Grievance), whose physical findings will be conclusive in any arbitration proceeding relating to the physical condition of the player at the time of the exam, providing such exam takes place within twenty (20) days of the contract termination.

(d)      Any of the required tenders set forth in this Section 2 may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with any such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(e)      For the purpose of this Article, "Salary" means the total of the Paragraph 5 Salary (reduced proportionately if the contract is entered into after the first regular season game), roster and reporting bonuses, pro-rata portion of signing bonus, and other payments to players in compensation for the playing of professional football for the applicable year of the player's most recently negotiated Player Contract, except for performance bonuses other than roster and reporting bonuses. Salary shall also include any unrepaid loans made, guaranteed or collateralized by a Team or its Team Affiliate to a player or Player Affiliate.

(f)      The calculation of any five (5) largest Prior Year Salaries shall include any Player Contract resulting from acceptance of a tender for the Prior Year pursuant to Section 2(a)(i) or (a)(ii) above, provided that the player

69

played during the Prior League Year pursuant to the tender, but shall not include the amount of any term of a Player Contract renegotiated after the Monday of the tenth week of the regular season of the Prior League Year that provides for an unearned incentive to be treated as a signing bonus.

(g)     The calculation of any five (5) largest Salaries for the current League Year as of the end of the Restricted Free Agent signing period pursuant to Section 2(a)(ii) above shall include any Player Contract resulting from acceptance of any tender for the Prior League Year pursuant to Section 2(a)(i) or (a)(ii) above, provided that the player played during the Prior League Year pursuant to the tender, but shall not include (i) any Player Contract amount resulting from a renegotiation of an existing Player Contract between the time of the designation and any applicable later date or (ii) the amount of any term of a Player Contract renegotiated after the Monday of the tenth week of the regular season of the Prior League Year that provides for an unearned incentive to be treated as a signing bonus.

(h)     If a Franchise Player receives a required tender pursuant to Section 2(a)(i) above, any provision in an Offer Sheet to such player waiving or limiting the New Club's ability to designate the player as a Franchise Player or Transition Player in the future shall not be a Principal Term, and therefore need not be included in a contract formed with the Prior Club as a result of matching such an Offer Sheet (but shall be included in a contract formed with the New Club as a result of the Prior Club not matching such an Offer Sheet). This Subsection (h) shall not apply to a player who was designated as a Transition Player in lieu of being designated as a Franchise Player, pursuant to Section 3(a) below, or to any other Transition Player.

(i)     The definition of a "Signing Bonus" for purposes of the top five and top 10 minimum tenders is the same as that under the Salary Cap. The pro-rata portion of such Signing Bonuses includes prorated amounts from prior Player Contracts, and the Salary Cap acceleration rules for unamortized Signing Bonus amounts do not apply to the calculation of the top five and top 10 minimum tenders.

(j)     For purposes of calculating the minimum tenders to Franchise and Transition players under this Article, if the present value of any deferred Paragraph 5 amount (as defined in Article XXIV, Section 7(a)(ii)) is at least $100,000 less than the initial Paragraph 5 amount (before being present valued), then the present value amount shall be used.

(k)     Any Club designating a Franchise Player shall have until 4:00 p.m., New York time, on July 15 of the League Year (or, if July 15 falls on a Saturday or Sunday, the first Monday thereafter) for which the designation takes effect to sign the player to a multi-year contract or extension. After that date, the player may sign only a one-year Player Contract with his Prior Club for that season, and such Player Contract may not be extended until after the Club's last regular season game.

### Section 3. Transition Player Designations:

(a)      Each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player in the Final League Year. In addition, in each League Year during the term of this Agreement, each Club shall be permitted to designate one *Unrestricted Free Agent or Restricted Free Agent* as a Transition Player in lieu of designating a Franchise Player, if such Franchise Player designation is available to such Club, in addition to the Transition Player designation permitted by the immediately preceding sentence, during the same designation period as the Franchise Player designation period. The period for Clubs to designate Transition Players will begin on the twenty-second day preceding the first day of the new League Year and will end at 4:00 p.m. New York time on the eighth day preceding the first day of the new League Year.

(b)      Any Club that designates a Transition Player shall receive the Rights of First Refusal specified in this Article notwithstanding the number of his Accrued Seasons. Any Transition Player shall be completely free to negotiate and sign a Player Contract with any Club during the period from the first day of the League Year following the expiration of his last player contract to July 22, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs of any kind, subject only to the Prior Club's Right of First Refusal described in this Article.

### Section 4. Required Tender for Transition Players:

(a)      Any Club that designates a Transition Player shall be deemed on the first day of the League Year following the expiration of the player's last contract to have automatically tendered the player a one year NFL Player Contract for the average of the ten (10) largest Prior Year Salaries for players at the position at which he played the most games during the prior League Year, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and thereafter is completely free to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without any penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

(b)      [*Omitted*]

(c)      The calculation of any ten (10) largest Prior Year Salaries pursuant to Section 4(a) above shall include any Player Contract amount resulting from acceptance of a tender for the Prior Year pursuant to Section 2(a)(i), 2(a)(ii) or 4(a) above, provided that the player played the Prior League Year pursuant to such tender, but shall not include the amount of any Player Contract renegotiated after the Monday of the tenth week of the

71

regular season of the Prior Year that provides for an unearned incentive treated as a signing bonus.

(d)     If a player subject to a Transition Player designation accepts the Required Tender, the resulting Player Contract shall be fully guaranteed if the player's contract is terminated because of lack of comparative skill; as a result of an injury sustained in the performance of his services under his Player Contract; and/or due to a Club's determination to create Room for Salary Cap purposes. For purposes of this Subsection only, any contract termination due to the failure of the player to establish or maintain his excellent physical condition will be subject to review of a neutral physician appointed by the parties under Article X (Injury Grievance), whose physical findings will be conclusive in any arbitration proceeding relating to the physical condition of the player at the time of the exam, providing such exam takes place within twenty (20) days of the contract termination.

**Section 5. Right of First Refusal for Transition Players:** Any player designated as a Transition Player shall, at the expiration of his prior year Player Contract, be permitted to negotiate a Player Contract with any Club. When the Transition Player negotiates such an offer with a New Club, which the player desires to accept, he shall give to the Prior Club a completed Offer Sheet, signed by the player and the New Club, which shall contain the Principal Terms (as defined in Article XIX (Veteran Free Agency)) of the New Club's offer. The Prior Club, within seven (7) days from the date it receives the Offer Sheet, may exercise or not exercise its Right of First Refusal, which shall have the legal consequences set forth in Sections 3(b)-(h), 4 and 6 of Article XIX (Veteran Free Agency) above, except that no Draft Choice Compensation shall be made with respect to such player, and, for the purposes of those provisions, the player and each Club shall otherwise have the same rights and obligations as for a Restricted Free Agent set forth in those provisions, notwithstanding the number of his Accrued Seasons.

**Section 6. Lists:** On each date following the dates set forth in Sections 1 and 3 above, the NFL shall provide to the NFLPA a list of each Unrestricted Free Agent designated as a Franchise Player or a Transition Player.

**Section 7. Salary Information:**

(a)     No later than February 1 of each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the ten (10) largest Prior Year Salaries for players at the following positions which shall be utilized for calculating the average Prior Year Salaries of players at the positions of Franchise Players and Transition Players: Quarterback, Running Back, Wide Receiver, Tight End, Offensive Line, Defensive End, Interior Defensive Line, Linebacker, Cornerback, Safety, and Kicker/Punter.

(b)     No later than ten (10) days after the last day of the Restricted

72

Free Agent Signing Period in each League Year during the term of this Agreement, the NFL shall compile and disclose to the NFLPA a list of each of the ten (10) and five (5) largest Salaries for players at the positions set forth in subparagraph (a) above which shall be utilized for calculating the applicable average Salaries of players at such positions as of the last day of the Restricted Free Agent Signing Period (including the amount of Salary in any executed Offer Sheets).

(c)     Any dispute concerning the identity and Salaries of players included within each player position category, or any other matter regarding these figures, shall be submitted to and resolved by the Impartial Arbitrator during the period from February 1 to February 15, or within twenty five (25) days after the last day of the Restricted Free Agent Signing Period, respectively. The Impartial Arbitrator shall make an independent determination in writing. In arriving at his determination, the Impartial Arbitrator shall consider any relevant information furnished to him, and shall be provided access to all relevant Player Contracts. The Impartial Arbitrator's determination shall be final and binding upon all parties.

**Section 8. No Assignment:** No Club may assign or otherwise transfer to any other Club the exclusive negotiating rights or any Right of First Refusal it may have for any Franchise Player, nor any Right of First Refusal it may have for any Transition Player, nor any designation rights it may have.

**Section 9.** [*Omitted*]

**Section 10. Franchise Player Designation Period:** A Club may designate a Franchise Player only during the periods and in the numbers specified in Section 1 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Franchise Player with respect to any first future League Year during the term of this Agreement for which such player is anticipated to be an Unrestricted Free Agent. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the five (5) largest Prior Year Salaries for players at the position category at which he played the most games during the prior League Year, or 120% of the player's Prior-Year Salary, whichever is greater, except as provided in Section 2(b) above. If a Club designates a player pursuant to this Section 10, the Club shall be deemed to have used the Franchise Player designation in Section 1 above for the year in which the designation takes effect; provided, however, that if a player designated to become the Franchise Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (oth-

73

er than through the waiver system) before such designation is exercised, the Club shall be entitled to designate a new Franchise Player for that League Year. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

**Section 11. Transition Player Designation Period:** A Club may designate a Transition Player (or players) only during the periods and in the numbers specified in Section 3 above; otherwise, the Club's right to such designation expires. However, a Club may designate a player to whom the Club has rights as a Transition Player with respect to any first future League Year during the term of this Agreement for which such player becomes an Unrestricted Free Agent; any such future designation exhausts the Club's designation right (and does not move to any other Club) even if the player moves to another Club, as a Restricted Free Agent or via waivers, before he would have become an Unrestricted Free Agent with the designated Club. For any such players, the Club shall be deemed on the first day of the first future League Year in which the designation takes effect to have automatically tendered the player a one year NFL Player Contract for the applicable average of the ten (10) largest Prior Year Salaries for players at the position that he played the most games during the prior League Year, or 120% of the player's Prior Year Salary, whichever is greater. If a player designated to become a Transition Player in the future retires, suffers a career-ending injury (or an injury that prevents the player from participating in 32 consecutive regular season games), is unavailable for the season due to non-injury circumstances beyond the control of the Club, or is assigned to another Club (other than through the waiver system) before such designation is exercised, the Prior Club shall be entitled to designate a new Transition Player for that League Year. If a Prior Club becomes entitled to designate a new Transition Player pursuant to this Section 11, the prior Club may designate the new Transition Player for that League Year during the period prescribed by Section 3(a) above, in the League Year prior to the League Year in which the player initially designated would have become a Transition Player. Any dispute as to whether an injury is career-ending or prevents or will prevent a player from playing in 32 consecutive games shall be decided by the Impartial Arbitrator.

**Sections 12-13.** [*Omitted*]

**Section 14. Other Terms:** For the purposes of this Article, the Required Tenders of a one year Player Contract for at least 120% (or 144%, if the player is eligible to receive such a tender) of the Franchise Player's or 120% of the Transition Player's Prior Year Salaries shall in addition to the 120% or 144% Salary also include all other terms of the player's Prior Year contract, including any guarantees and any provisions providing for incentives or

74

performance bonuses. In addition, a player who is designated as a Franchise Player or a Transition Player shall have the option of accepting a one year NFL Player Contract for 120% (or 144%, if the player is eligible to receive such a tender) of the player's Prior Year Salary in lieu of a Player Contract for the average of the five (5) (or ten (10), as applicable) largest applicable Salaries for players at his position, if he so wishes, regardless of which Player Contract is for a greater amount.

**Section 15. Compensatory Draft Selection:** The procedures for awarding Compensatory Draft Selections shall be determined as agreed by the NFL and the NFLPA.

**Section 16. Signing Period for Transition Players:**

(a)      In the event that a player who is designated and tendered as a Transition Player has not signed a Player Contract with a Club by July 22 in the League Year following the expiration of his last Player Contract, the Prior Club shall be be only Club with which the player may negotiate or sign a Player Contract during the period from such date until the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time.

(b)      If a Transition Player described in Subsection (a) above has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five (5) days of the application, and shall be based upon all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(c)      If a Transition Player does not play in the NFL in a League Year, he shall continue to be treated as a Transition Player the following League Year and the Team shall be deemed on the first day of the following League Year to have automatically tendered the player a one year NFL Player Contract for the average of the ten (10) largest Salaries for the prior League Year for players at the player's specified position, or 120% of his Prior Year Salary, whichever is greater. The tender may be withdrawn at any time, but if such tender is withdrawn, the player immediately becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

**Section 17. Signing Period for Franchise Players:**

(a)      If a Franchise Player has not signed a Player Contract by the Tuesday following the tenth week of the regular season, at 4:00 p.m. New York

75

time, the player shall be prohibited from playing football in the NFL for the remainder of that League Year, absent a showing to the Impartial Arbitrator of extreme Club or extreme personal hardship. The determination of the Impartial Arbitrator shall be made within five days of the application, and shall consider all information relating to such hardship submitted by such date. The determination of the Impartial Arbitrator shall be final and binding upon all parties.

(b)     If a Franchise Player does not play in the NFL in a League Year, his Prior Team shall have the right to designate such player as a Franchise Player or a Transition Player the following League Year, if such designation is otherwise available to the Team, except that the applicable tender must be made and any 120% tender shall be measured from the Player's prior year salary. If such a player is redesignated as a Franchise Player for the League Year following the League Year in which he does not play, the player may be designated only under Section 2(a)(i) above, except that Draft Choice Compensation of only one first round draft selection and one third round draft selection shall be made with respect to such player in the event he signs with the New Club. If such a player is designated as a Franchise Player for a third time, the terms of Section 2(b) above, shall apply. If a Franchise Player who has sufficient Accrued Seasons to become an Unrestricted Free Agent is not designated as a Franchise Player or Transition Player for any League Year immediately following a League Year in which he does not play, then on the first day of that League Year, the player becomes an Unrestricted Free Agent and is completely free to negotiate and sign a Player Contract with any Club, and any Club is completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period.

76

## ARTICLE XXI
## FINAL EIGHT PLAN

*Section 1.* **Application:** The provisions of this Article shall apply only in any League Year during the term of this Agreement in which no Salary Cap is in effect.

*Section 2.* **Top Four Teams:** Each of the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player Contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player Contract; and (c) any Unrestricted Free Agent signed pursuant to Section 4 below.

*Section 3.* **Next Four Teams:** Each of the four playoff Clubs that lost in the immediately preceding playoff games to the four Clubs that participated in the NFC and AFC Championship games the Prior League Year shall not be permitted to negotiate and sign any Unrestricted Free Agent to a Player contract, except: (a) any Unrestricted Free Agent who acquired that status as a result of the NFL waiver system; (b) any Unrestricted Free Agent who was under contract to such Club on the last date of the last League Year of the player's most recent Player contract; (c) any Unrestricted Free Agent signed pursuant to Section 4 below; and (d) any Unrestricted Free Agent as follows:

 (i) One such player for a Player Contract that has a first year Salary of $4,925,000 or more; and

 (ii) Any number of such players for a Player Contract that has a first year Salary of no more than $3,275,000 and an annual increase in any future contract years of no more than 30% of the first contract year Salary, not including any amount attributed to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this Subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

*Section 4.* **Replacement of Free Agents Signed by Other Club:** Each of the eight Clubs subject to the provisions of this Article shall be permitted to negotiate and sign one Unrestricted Free Agent to a Player Contract ("New Player") for each Unrestricted Free Agent who was under contract to such Club on the last date of the prior League Year, who has signed with another Club ("Previous Player"), so long as the Player Contract for the New Player shall have a first year Salary of no more than the first year Salary of the Player Contract signed by the Previous Player with the New Club,

77

and an annual increase in any future contract years of no more than 30% of the first contract year Salary, excluding any amounts attributable to any signing bonus. In addition, each such Club and each such player entering into a Player Contract pursuant to this Subsection may not renegotiate to increase the amount of Salary to be paid during the term of the Player Contract for a period of one year after the signing date of such contract.

**Section 5. Increases:** The amounts specified in this Article ($4,925,000 and $3,275,000) shall increase each League Year following the 2006 League Year by the same percentage as the increase in Projected TR over the prior League Year's TR (as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary)). Notwithstanding the foregoing, in no event shall the amounts specified in this Article increase if the Projected TR for the League Year in question is not greater than the highest TR of any previous League Year.

**Section 6. Salary Definition:** For purposes of this Article, "Salary" means Paragraph 5 Salary, roster and reporting bonuses, pro-rata portions of signing bonuses, likely to be earned incentive bonuses, and other payments in compensation for the playing of professional football, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) below.

**Section 7. Trade Limitation:** No Club subject to the provisions of this Article may, for one League Year, trade for a player it otherwise would not be permitted to sign as an Unrestricted Free Agent as a result of the provisions in this Article.

**Section 8. Transition and Franchise Players:** Clubs subject to the Final Eight Plan are permitted to negotiate with and sign Transition Players and Franchise Players who otherwise are permitted to negotiate and sign with other Clubs.

**Section 9. Player Tenders:** Each of the eight teams subject to the Final Eight Plan may, after the later of July 15 or the first scheduled day of the first NFL training camp, in any League Year in which the Final Eight Plan is in effect, sign any Unrestricted Free Agent whose team did not make the June 1 Tender or whose team subsequently withdrew that Tender.

78

# ARTICLE XXII
# WAIVER SYSTEM

*Section 1.* **Release:**

(a)      Whenever a player who has finished the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers between February 1 and the trading deadline, his contract will be considered terminated and the player will be completely free at any time thereafter to negotiate and sign a Player Contract with any Club, and any Club shall be completely free to negotiate and sign a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period. If the waivers occur after that time, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club. However, if such player is claimed and awarded, he shall have the option to declare himself an Unrestricted Free Agent at the end of the League Year in question if he has a no-trade clause in his Player Contract. If such player does not have a no-trade clause and the Player Contract being awarded through waivers covers more than one additional season, the player shall have the right to declare himself an Unrestricted Free Agent as set forth above at the end of the League Year following the League Year in which he is waived and awarded.

(b)      Whenever a player who has finished less than the season in which his fourth year of credited service has been earned under the Bert Bell/Pete Rozelle Plan is placed on waivers, the player's Player Contract will be subject to the waiver system and may be awarded to a claiming Club.

*Section 2.* **Contact:** Coaches or any other persons connected with another NFL Club are prohibited from contacting any player placed on waivers until such time as the player is released by the waiving Club.

*Section 3.* **Ineligibility:** Any NFL player who is declared ineligible to compete in a pre-season, regular season or postseason game because of a breach by any NFL Club by whom he is employed of waiver procedures and regulations, or any other provision of the NFL Constitution and Bylaws, will be paid the salary or other compensation which he would have received if he had not been declared ineligible, which, in any event, will be a minimum of one week's salary and, when applicable, expense payments.

*Section 4.* **Notice of Termination:** The Notice of Termination form attached hereto as Appendix G will be used by all Clubs. If possible, the Notice of Termination will be personally delivered to the player prior to his departure from the team. If the Notice of Termination has not been personally delivered to the player prior to his departure from the team, the Notice

79

of Termination will be sent to him by certified mail at his last address on file with the Club.

***Section 5. NFLPA's Right to Personnel Information:*** The NFL shall inform the NFLPA of player personnel transactions communicated in the Personnel Notice between the NFL and its member Clubs concerning the termination or trading of players including awards on waivers, termination through waivers, confirmation of trades or any change in the status of players (e.g., placed on Reserve Injured, etc.). The NFL will make best efforts to communicate the information referred to in this Article to the NFLPA on the same day, but in no event later than noon on the next day. A player who is terminated shall, upon request at or around the time of termination, be informed by the terminating Club of any claims made upon him by NFL Clubs during that League Year. The same information will be provided to the NFLPA if requested.

***Section 6. Rosters:*** The NFLMC shall supply the NFLPA with an opening day and final roster for each Club. Rosters shall consist of the following categories of players: Active; Inactive; Reserve Injured; Reserve Physically Unable to Perform; Exempt Commissioner Permission; Non Football Illness/Injury; Practice Squad.

***Section 7. Procedural Recall Waivers:*** A player with four (4) or more Credited Seasons who is subject to procedural recall waivers from the Reserved/Retired or Reserve/Military status, and who opts for Free Agency in lieu of assignment, cannot, during the same season, re-sign or return to the Club that originally requested such waivers.

80

# ARTICLE XXIII
# TERMINATION PAY

**Section 1. Eligibility:** Any player who has completed the season in which his fourth year or more of credited service under the Bert Bell/Pete Rozelle Retirement Plan has been earned shall be eligible for termination pay under this Article if:

    (1)    He is released after his Club's first regular season game; and

    (2)    He has made the Inactive or Active List of his Club on or after the date of his Club's first regular season game.

Subject to Section 3 below, the amount of termination pay payable to such player shall be the unpaid balance of his Paragraph 5 Salary for that League Year. Termination pay under this Article shall be claimed and payable no sooner than one day after the end of the regular season schedule, and no later than February 1. A player will not be entitled to termination pay more than once during his playing career in the NFL.

**Section 2. Regular Season Signings:** The termination pay under this Article of any player who is terminated from a contract which was signed after the beginning of the regular season in which he is terminated shall be limited to an amount equal to the greater of: (i) the unpaid balance of the initial 25% of such player's Paragraph 5 Salary, or (ii) one week's salary up to a maximum of the Active/Inactive List Paragraph 5 Salary of a player with ten (10) or more Credited Seasons as specified in Article XXXVIII, Section 6, notwithstanding the actual number of Credited Seasons the player has earned. For purposes of this 25% calculation only, the term "Paragraph 5 Salary" shall be defined as the proportionate remaining balance to be paid at the time such player is signed by the Club. (For example and without limitation, if a player is signed after the second week of the 2006 regular season to a Contract with a Paragraph 5 Salary of $850,000, his Paragraph 5 Salary for purposes of the 25% calculation shall be $750,000 or 15/17ths of $850,000.)

**Section 3. Ineligibility For Termination Pay:**

    (a)    An otherwise qualified player will not be entitled to termination pay under this Article if the Club can demonstrate that, after receipt of a written warning from his Club in the form attached hereto as Appendix N, the player failed to exhibit the level of good faith effort which can be reasonably expected from NFL players on that Club.

    (b)    A player shall not be eligible for Termination Pay if, without missing a game check at the Paragraph 5 rate stated in his terminated contract, he signs a Player Contract with the same Club that terminated his contract, which new contract provides for Paragraph 5 salary at a rate equal to or greater than that of his terminated contract. If the player's new contract is subsequently terminated, however, he shall be eligible for Termination Pay for such subsequent termination.

81

# ARTICLE XXIV
# GUARANTEED LEAGUE-WIDE SALARY,
# SALARY CAP, & MINIMUM TEAM SALARY

*Section 1.* **Definitions:** For purposes of this Article, and anywhere else specifically stated in this Agreement, the following terms shall have the meanings set forth below:

(a)    **Total Revenues.**

(i)    "Total Revenues" ("TR") means the aggregate revenues received or to be received on an accrual basis, for or with respect to a League Year during the term of this Agreement, by the NFL and all NFL Teams (and their designees), from all sources, whether known or unknown, derived from, relating to or arising out of the performance of players in NFL football games, with only the specific exceptions set forth below. The NFL and each NFL Team shall in good faith act and use their best efforts, consistent with sound business judgment, so as to maximize Total Revenues for each playing season during the term of this Agreement. Total Revenues shall include, without limitation:

(1)    Regular season, pre-season, and postseason gate receipts (net of (A) admission taxes, (B) taxes on tickets regularly paid to governmental authorities by Clubs or Club Affiliates, provided such taxes are deducted for purposes of calculating gate receipts subject to revenue sharing and (C) surcharges paid to stadium or municipal authorities which are deducted for purposes of calculating gate receipts subject to revenue sharing), including ticket revenue from "luxury boxes," suites, and premium seating subject to gate receipt sharing among NFL Teams (except as otherwise expressly agreed to by the parties, the aggregate amount of ticket revenue allocated to luxury boxes, suites and premium seating to be included in TR is the face value of the ticket, or any additional amounts which are subject to gate receipt sharing among NFL Clubs);

(2)    Proceeds including Copyright Royalty Tribunal and extended market payments from the sale, license or other conveyance of the right to broadcast or exhibit NFL pre-season, regular season and playoff games on radio and television including, without limitation, network, local, cable, pay television, satellite encryption, international broadcasts, delayed broadcasts (which shall not include any broadcast of an NFL pre-season, regular season or playoff game occurring more than 72 hours after the live exhibition of the game, unless the broadcast is the first broadcast in the market), and all other means of distribution, net of any reasonable and customary NFL (or Club, as the case may be) expenses related to the project;

(3)    Revenues derived from concessions, parking, local advertising and promotion, signage, magazine advertising, local sponsorship agreements, stadium clubs, luxury box income other than that described in Section 1(a)(i)(1) above (with "Super suites" (i.e., suites substantially larger in size than the largest suite regularly available for sale in the stadium) to have

82

no additional value imputed in respect of them by virtue of such status), Internet operations (including merchandise sales) other than those conducted by NFL Ventures, L.P. or its subsidiaries (which are separately addressed below), and sales of programs and novelties (in each of the foregoing cases, all revenues for these subcategories will be calculated using gross figures without any expenses deducted other than only those set forth in or expressly referenced in Section 1(a)(xiv)(1) below);

(4) The net consolidated revenue generated by NFL Ventures L.P. (including but not limited to those categories of revenue currently or formerly generated by NFL Ventures' subsidiaries, NFL Properties LLC, NFL Enterprises LLC, and NFL Productions LLC d/b/a NFL Films, but excluding from NFL Ventures' revenue any revenues otherwise included in TR pursuant to Subsections (a)(i)(1)-(3) above or Subsection (a)(i)(5) below), with only those expenses set forth in or expressly referenced in Section 1(a)(xiv)(1) below deducted in calculating such net consolidated revenue for purposes of calculating TR. Notwithstanding the foregoing or anything else in this Agreement, any revenues of NFL Ventures or any of its subsidiaries that are distributed directly or indirectly to any Club or Club Affiliate, or are held by NFL Ventures or any of its subsidiaries other than for their own legitimate investment purposes (including reasonable working capital, etc.) and available for distribution to any such Club or Club Affiliate, shall be included in TR (but shall be so included in TR only once, as revenue of either NFL Ventures or of such Clubs/Club Affiliates, in such League Years as are consistent with the Parties' practices for the 1993-2005 League Years). To the extent that revenues of the NFL, NFL Properties, NFL Films, NFL Enterprises, any other NFL affiliate (other than NFL Attractions, as defined below), any Club, or any Club Affiliate result from any licenses to or other provision of intellectual property or other products or services to NFL Attractions, such revenues will be included in TR at no less than fair market value (e.g., to the extent that film, video, NFL logos or other intellectual properties or other products or services of such NFL and/or Club entities are utilized by NFL Attractions without the payment of any licensing fees, the fair market value amount shall be imputed). Any dispute over the fair market value shall be resolved in the first instance by the Accountants after consulting and meeting with representatives of both parties. In the event such dispute involves a disputed amount of $10 million or more, each party shall have a right to appeal such resolution to the Special Master, who shall review the dispute de novo, and whose decision shall be subject to appeal pursuant to Article XXVI (Special Master), Section 2;

(5) Barter income, which shall be valued at 90% of the fair market value of the goods or services received;

(6) The value of equity instruments unconditionally received from third parties by the NFL or member Clubs (i.e., not equity instruments in business entities formed and owned exclusively by the NFL, NFL Ventures L.P. or any of its subsidiaries, or the member Clubs) derived from, relating

83

to or arising out of the performance of players in NFL football games, net of the exercise price, if any, paid (whether in cash or by a reduction in the quantity of equity instruments to be received by the NFL or member Clubs) for acquiring such equity instruments. Reasonable determinations as to valuation, TR inclusion dates, and expense deductions (other than any exercise price) in respect of specific equity instruments shall be agreed upon in good faith between the NFL and NFLPA in connection with each specific equity instrument so included, or, if such an agreement cannot be reached, shall be determined by the Accountants, whose decision shall be subject to appeal to the Special Master pursuant to Article XXVI;

(7)     Revenues received by a Club or Club Affiliate pursuant to a stadium lease or directly related stadium-use agreement with an unaffiliated third party, where the amount of such revenues is determined based upon activities that are unrelated to NFL football, in circumstances where the involved Club or Club Affiliate is not required to make a non-de minimis investment of capital or cash to receive such revenue (provided that the provisions of this Subsection (1)(a)(i)(7) shall not be retroactively applied to include in TR revenues generated from non-football business opportunities arising out of leases or other stadium use agreements entered into prior to January 1, 1993, the financial terms of which have not been amended since such date; and further provided that the foregoing does not affect, and the parties have not reached agreement and reserve their respective positions on, the treatment of revenue arising from the acquisition by a Club or Club Affiliate of a right to develop real estate in proximity to a stadium, pursuant to a stadium lease or directly related stadium use agreement with an unaffiliated third party);

(8)     Recoveries under business interruption insurance policies that are received by any League- or Club-related entity, to the extent that such recoveries compensate such entity for lost revenues that would have been included in TR. The amount of such recoveries shall be included in TR net of (1) premiums paid for the policy/policies recovered under in the League Year(s) that include the events and the recoveries; and (2) deductible and unreimbursed expenses arising out of or related to the events giving rise to the insurance claim/recovery. Any lump sum payments will be allocated under the method separately agreed to by the parties;

(9)     Any expense reimbursements received by a Club or Club Affiliate from a governmental entity in connection with a stadium lease or a directly related stadium-use agreement, except as provided in Section 1(a)(ii)(F) below; and

(10)    Proceeds from the sale or conveyance of any right to receive any of the revenues described above.

(ii)    The following is a nonexclusive list of examples of revenues received by the NFL and/or NFL Teams which are not derived from, and do not relate to or arise out of the performance of players in NFL football games (and are therefore not "TR"):

84

(A)      Proceeds from the assignment, sale or trade of Player Contracts, proceeds from the sale of any existing NFL franchise (or any interest therein) or the grant of NFL expansion franchises, dues or capital contributions received by the NFL (provided, however, that to the extent that there is put into place an incremental system for the NFL to recapture or to be repaid upon sale of a Club or Club Affiliate NFL contributions to stadium construction, as contemplated by Section 4(e)(v)(2) below, the incremental NFL recapture and/or receipts under such system shall not constitute TR, but shall give rise to incremental NFLPA recapture or repayment of Project Credits as contemplated by Section 4(e)(v)(2)), fines, "revenue sharing" among NFL Teams, interest income, insurance recoveries (other than those net business interruption insurance recoveries that are described in Section 1(a)(i)(8) above), sales of interests in real estate and other property, and Club cheerleader revenues (provided that, if such cheerleader revenue is provided by an entity with which the Club has another commercial relationship, the Accountants will review the transactions and determine the appropriateness of any revenue allocations);

(B)      Revenues generated from stadium events unrelated to NFL football (e.g., concerts, soccer games) in which the Club or a Club Affiliate makes a non de minimis investment of capital or cash, and the value of, and revenues generated from, stadium-related businesses and/or opportunities unrelated to NFL football in which the Club or an affiliate must invest a non-de minimis amount of capital, cash, or effort to generate revenue (other than real estate development opportunities, which are subject to the reservation in Subsection 1(a)(i)(7) above);

(C)      The value of promotional spots (e.g., television or radio spots) that are received from time to time by the NFL under national media contracts solely for its own use (either to promote the NFL's own football related businesses (and not the businesses of any other party), or for charitable purposes) and not for resale;

(D)      Revenues derived from NFL Attractions (a joint venture that formerly included the NFL and St. Joe Corporation) from the operation of indoor NFL entertainment facilities, with entry rights separate from the stadium, which facilities do not permit the users thereof to view the live performance of players in NFL football games except by media available outside the stadium (except to the extent that revenues derived from NFL Attractions are addressed in the second sentence of Section 1(a)(i)(4) above). This exclusion shall apply so long as the business of NFL Attractions is conducted with a non-NFL third party that holds a non-de minimus interest and participates in the business of NFL Attractions. Each of the parties hereto reserves any positions it may have regarding whether any similar revenues derived from other sources are TR or non-TR;

(E)      The value of complimentary or other no-charge tickets distributed by a Club, up to (but not in excess of) the following levels: (1) 1,700 tickets for each home regular season and pre-season game, or (2)

85

1,250 tickets for each home regular season game and 3,500 tickets for each home pre-season game;

(F)       Specifically designated day-of-game expense reimbursements received by a Club or Club Affiliate from a governmental entity, where such reimbursements are for legitimate expenses that the Club or Club Affiliate has incurred that the governmental entity previously incurred (including in connection with the Club's occupancy of a prior stadium, if the reimbursements arise out of the construction of a new stadium). This exclusion shall not apply to expense reimbursements received in connection with concession sales, operation of parking facilities, signage or advertising sales, or any other revenue generating activity at the stadium other than the conduct of the game itself (e.g., expense reimbursements for game-day security previously provided by the police, and post-game stadium clean-up previously provided by a municipality, are not treated as TR, if such reimbursement otherwise qualifies). All claims for this exclusion shall be supported by appropriate documentation evidencing the extent to which the Club or Club Affiliate incurred the designated day-of-game expense and the extent to which the governmental entity previously incurred the expense. The Parties have agreed that the day-of-game reimbursements received by the Buffalo Bills, Indianapolis Colts, Green Bay Packers, and Philadelphia Eagles shall be excluded as those arrangements existed as of March 8, 2006;

(G)       Investments in or contributions toward the purchase of concession equipment by concessionaires on behalf of a Club or a Club's Stadium, and the value of provided elements related to the operation and maintenance of the soft drink equipment in the Club's Stadium (i.e., dispensing/vending equipment, service), subject to disclosure and NFLPA review and approval of such arrangements; and

(H)       The value of luxury boxes that are (1) used by a Club owner for personal purposes or to promote the Club or the owner's other business interests; or (2) provided to stadium authorities, municipalities, and/or governmental officials, or (3) used or made available for use by the owner(s) of the visiting Club, or (4) provided for the use of a Club head coach; in each case where no revenue is actually received by the Club or a Club Affiliate, except that the value of such luxury boxes will be imputed as TR unless at least one luxury box in the stadium is available and unsold; provided that, in no event shall revenue be imputed for one luxury box that is used by the owner(s) of the Club, and one luxury box that is used or made available for use by the owner(s) of the Visiting Club. Without limiting the foregoing, the value of any luxury box that is provided to a former Club owner in connection with the sale of a Club shall be imputed into TR unless the prior owner is obliged to pay the club periodic consideration (i.e., annual rent) in connection with such use, in which case such consideration will be included as revenue in TR.

(iii)     Notwithstanding any other provision of this Agreement, the

86

NFLPA and NFLMC may agree, on a case-by-case basis, with no limitation on their exercise of discretion, not to include in TR network television revenue to the extent that such revenue is used to fund the construction or renovation of a stadium that results in an increase in TR.

(iv)    [*Omitted*]

(v)    [*Omitted*]

(vi)    It is acknowledged by the parties hereto that for purposes of determining Total Revenues:

(1)    NFL Teams may, during the term of this Agreement, be owned and controlled by persons or entities that will receive revenues for a grant of rights encompassing both (a) rights from the NFL Team so owned or controlled (the revenue from which is includable in Total Revenues) and (b) other rights owned or controlled by such persons or entities (the revenue from such other rights not being includable in Total Revenues), and that, in such circumstances, allocations would therefore have to be made among the rights and revenues described in this Section 1(a); and

(2)    NFL Teams may, during the term of this Agreement, receive revenue for the grant of rights to third parties which are owned or controlled by the persons or entities owning or controlling such NFL Teams (hereinafter "Related Entities"); and

(3)    The reasonableness and includability in TR of such allocations and transactions between Related Entities shall be determined by the nationally recognized accounting firm jointly retained by the parties, in accordance with the procedures described in Section 10 below.

(vii)    [*Omitted*]

(viii)    For the purposes of any amounts to be calculated or used pursuant to this Agreement with respect to TR, Benefits, Player Costs, Projected TR, Projected Benefits, Required Tenders, Qualifying Offers, Minimum Salaries, Minimum Active/Inactive List Salaries, Team Salary, or Salary, such amounts shall be rounded to the nearest $1,000.

(ix)    [*Omitted*]

(x)(1)    Without limiting the foregoing, except as specified in Subsections (x)(2) through (x)(7) below, TR shall include all revenues from Personal Seat Licenses ("PSLs") received by, or received by a third party and used, directly or indirectly, for the benefit of the NFL or any Team or Team Affiliate, without any deduction for taxes or other expenses (but subject to the provisions of Appendix H-3, Section C, with respect to PSL refunds). Such revenues shall be allocated in equal portions, commencing in the League Year in which they are received, over the remaining life of the PSL, subject to a maximum allocation period of fifteen (15) years; provided, however, that interest from the League Year the revenues are received until the League Years the revenues are allocated into TR shall be imputed and included in TR, in equal portions over such periods, calculated on an annual compounded basis using the one-year Treasury Note rate published in *The Wall Street Journal* of February 1 during the League Year in which the

87

revenues are received. Each equal portion of PSL revenues allocated into TR, plus an equal portion of the imputed interest specified above, shall be referred to as the "Maximum Annual Allocation Amount."

(x)(2)  To the extent that PSL revenues are used to pay for the construction of a new stadium or for stadium renovation(s) that increase TR (regardless of whether the stadium is owned by a public authority or a private entity (including, but not limited to, the NFL, any Team or any Team Affiliate)), and if such PSL revenues have received a waiver of any applicable League requirement of sharing of "gross receipts," then such PSL revenues will not be included in a particular League Year in TR. Notwithstanding the foregoing, except where, subsequent to the 2005 League Year, the NFLPA has approved the exclusion of PSL revenues from TR in circumstances where the stadium is also supported by a Stadium Credit described in Section 4(e) below, the maximum exclusion of PSL revenues each League Year from TR shall be equal to any increase in TR that directly results from such stadium construction or renovation as calculated in Subsections (x)(3) through (x)(7) below.

(x)(3)  Until the first full League Year the new stadium or the renovated facilities are put into service, the amount of PSL revenues excluded each League Year shall be equal to the Maximum Annual Allocation Amount. If the actual increase in TR directly resulting from such stadium construction or renovations during the first full League Year in which such stadium and/or renovations are put into service (the "First Year PSL Increases") is less than any Maximum Annual Allocation Amount for that League Year or any prior League Year (the "PSL Difference"), then the aggregate PSL Difference for every such League Year (assuming for purposes of calculating such PSL Difference, that the First Year PSL Increase had been received in each such League Year) shall be credited to TR in the immediately following League Year.

(x)(4)  Commencing with the first full League Year the new stadium or the renovated facilities are put into service, the jointly retained Accountants (set forth in Article XXIV, Section 10(a) below) shall determine the increase in TR that directly results each League Year from a stadium construction or renovation funded, in whole or in part, by PSL revenues. In the case of a new stadium, such calculation shall be made by comparing the TR directly generated by the old stadium during the last full League Year in which the old stadium was in service with the TR directly generated by the new stadium during the League Year in question. In the case of stadium renovations, such calculation shall be made by comparing the TR directly generated by those specific stadium facilities which are renovated, with the TR directly generated by those facilities prior to their renovation (where new facilities, such as completely new luxury suites or premium seats, are constructed, the TR directly generated by the facilities prior to their renovation would equal either zero, or the amount of TR directly generated by any facilities that were replaced by the renovation). If the NFL and the NFLPA

88

agree that a renovation is substantial enough to increase revenues throughout the stadium (e.g., significant renovations throughout the stadium which enable the Club to attract more fans and/or increase ticket prices) then the Accountants shall consider any increase in TR throughout the stadium (e.g., increased concession, parking or novelty revenues) as being directly generated by the renovation.

(x)(5)  If the calculations set forth in (x)(4) above result in an exclusion of PSL revenues from TR that is less than the Maximum Annual Allocation Amount, the Accountants shall report the amount not excluded from TR as a "Carryover PSL Credit." Such Carryover PSL Credits, if any, shall be deducted from a Team's TR in the first future League Year in which the amount of TR directly generated by the new stadium or the renovated facilities exceeds the Maximum Annual Allocation Amount (the "PSL Excess"), but only up to the amount of the PSL Excess. Each dollar of Carryover PSL Credit may be deducted from a Team's TR only once, and only to the extent of any PSL Excess existing at the time of such deduction.

(x)(6)  Any applicable deduction from TR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by PSL revenues excluded from TR pursuant to Subsection (x)(2) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total PSL revenues described in the first sentence of Subsection (x)(2), and the denominator of which is (2) the total costs for construction of the new stadium or renovations.

(x)(7)  For purposes of this paragraph, the term "PSL" shall include any and all instruments of any nature, whether of temporary or permanent duration, that give the purchaser the right to acquire or retain tickets to NFL games and shall include, without limitation, seat options; seat bonds; and suite bonds or long-term conveyances of suite occupancy rights where proceeds are segregated and unequivocally dedicated to stadium construction (e.g., Founders' Suite Programs) that directly or indirectly give purchasers the right to acquire NFL tickets, provided that the NFLPA shall have the unconditional right to review and determine whether any specific instruments relating to suites qualify as PSLs. PSL revenues shall also include revenues from any other device (e.g., periodic payments such as surcharges, loge maintenance fees, etc.) that the NFL and the NFLPA agree constitutes a PSL.

(x) (8)  Notwithstanding the above or anything else in this Agreement, any exclusions of PSL revenue from TR in respect of PSLs first sold after the 2005 League Year shall be subject to approval by the NFLPA on a case-by-case basis.

(xi)(1)  Notwithstanding Section 1(a)(i)-(iv) above, premium seat rev-

89

enues that otherwise would be included in TR shall not be so included in a particular League Year to the extent that such revenues are used to pay for, or to pay financing costs for, the construction of a new stadium or for stadium renovation(s) that increase TR (regardless of whether the stadium is owned by a public authority or a private entity (including, but not limited to, the NFL, any Team or any Team Affiliate)), and if such revenues have received a waiver of any League requirement of sharing of "gross receipts." The maximum exclusion of premium seat revenue from TR each League Year shall be equal to any increase in TR that directly results from such stadium construction or renovation as calculated in Subsections (xi)(2) through (xi)(6) below.

(xi)(2) Until the first full League Year the new stadium or the renovated facilities are put into service, the amount of premium seat revenues excluded each League Year shall be equal to the amount that receives a waiver of any League requirement of sharing of gross receipts (the "Non-Shared Amount"). If the actual increase in TR during the first full League Year in which the new stadium or the renovated facilities are put into service (the "First Year Premium Seat Increase") is less than any Non-Shared Amount for that League Year or any prior League Year (the "Premium Seat Difference"), then the aggregate Premium Seat Difference for every such League Year (assuming for purposes of calculating such Premium Seat Difference that the First Year Premium Seat Increase had been received in each such League Year) shall be credited to TR in the immediately following League Year.

(xi)(3) Commencing with the first full League Year the new stadium or the renovated facilities are put into service, the jointly retained Accountants (set forth in Article XXIV, Section 10(a) below) shall determine the increase in TR that directly results each League Year from the stadium construction or renovation funded, in whole or in part, with premium seat revenues. In the case of a new stadium, such calculation shall be made by comparing the TR directly generated by the old stadium during the last full League Year in which the old stadium was in service with the TR directly generated by the new stadium during the League Year in question. In the case of stadium renovations, such calculation shall be made by comparing the TR directly generated by those specific stadium facilities which are renovated, with the TR directly generated by those facilities prior to their renovation (where new facilities, such as completely new luxury suites or premium seats, are constructed, the TR directly generated by the facilities prior to their renovation would equal either zero, or the amount of TR directly generated by any facilities that were replaced by the renovation). If the NFL and the NFLPA agree that a renovation is substantial enough to increase revenues throughout the stadium (e.g., significant renovations throughout the stadium which enable the Club to attract more fans and/or increase ticket prices) then the Accountants shall consider any increase in TR throughout the stadium (e.g., increased concession, parking or novelty revenues) as be-

90

ing directly generated by the renovation.

(xi)(4) If the calculations set forth in (x)(3) above result in an exclusion of premium seat revenues from TR that is less than the Non-Shared Amount, the Accountants shall report the amount not excluded from TR as a "Carryover Premium Seat Credit." Such Carryover Premium Seat Credits, if any, shall be deducted from a Team's TR in the first future League Year in which the amount of TR directly generated by the new stadium or the renovated facilities exceeds the Non-Shared Amount (the "Premium Seat Excess"), but only up to the amount of the Premium Seat Excess. Each Carryover Premium Seat Credit may be deducted from a Team's TR only once, and only to the extent of any Premium Seat Excess existing at the time of such deduction.

(xi)(5) Any applicable deduction from TR for any expenses (i.e., interest, rent, taxes or depreciation) that are attributable to premium seats or luxury suites included in any new stadium or stadium renovation project funded, in whole or in part, by premium seat revenues excluded from TR pursuant to Subsection (x)(1) above shall be reduced, in any League Year, by an amount equal to the result obtained by multiplying (a) the gross deduction for such expenses that would otherwise be available under this Agreement in respect of such League Year, by (b) a fraction, the numerator of which is (1) the total premium seat Non-Shared Amount dedicated to funding the project during the allocation period, and (2) the denominator of which is the total costs for construction of the new stadium or renovations.

(xi)(6) For purposes of this paragraph, the term "Premium Seat Revenue" shall include revenue from any periodic charge in excess of the ticket price that is required to be paid to acquire or retain any ticket to NFL games (other than PSL revenues and charges for purchase or rental of luxury suites), including charges in respect of any amenities required to be purchased in connection with any ticket.

(xi)(7) Notwithstanding the above or anything else in this Agreement, any exclusions of Premium Seat Revenue from TR in respect of premium seat products first sold after the 2005 League Year shall be subject to approval by the NFLPA on a case-by-case basis.

(xi-a) Exclusions from TR of Premium Seat Revenue, and of PSL revenue as described in Subsection (x) above, in respect of funding for stadium projects approved after the 2005 League Year will terminate upon sale of the recipient franchise.

(xii)   The parties may agree to allocate TR received or to be received on an accrual basis in a particular League Year over one or more other League Years.

(xiii)   If, one or more weeks of any NFL season are cancelled or TR for any League Year substantially decreases, in either case due to a terrorist or military action, natural disaster, or similar event, the parties shall engage in good faith negotiations to adjust the provisions of this Agreement with re-

91

spect to the projection of TR and the Salary Cap for the following League Year so that TR for the following League Year is projected in a fair manner consistent with the changed revenue projection caused by such action. In such circumstances, the parties agree to discuss in good faith the possibility of suspending the application of Article XXIV, Section 4(c).

(xiv) Expense Deductions

(1)   The only expense deductions permitted to be taken in calculating Total Revenue are:

(A) a set deduction of five percent (5%) of TR (which set deduction is already reflected in the amounts defining and percentages prescribing the Salary Cap in Section 4(a) below) which includes Youth Football, NFL Europe, Players Inc. payments, NFL Charities, all team operating and day-of-game expenses, and any other category of expenses not previously netted against specific revenues). Set 5% percentage for TR Cost Deduction (i.e., both ceiling and floor);

(B) the set deduction of one and eight-tenths percent (1.8%) of TR described in Section 4(e) below (which set deduction is already reflected in the amounts defining and percentages prescribing the Salary Cap in Section 4(a) below, and is intended to account for private contributions to stadium construction qualifying for support under the G-3 program or any similar successor program, as well as for stadium security expenses), the amount of which set deduction may be increased with the express approval of the NFLPA to up to two and three-tenths percent (2.3%) of TR if private contributions to stadium construction that are approved by the NFLPA shall so justify (i.e., up to an additional one-half of one percent (.5%) of TR may be deducted from the amounts defining and percentages prescribing the Salary Cap in Section 4(a) below, if approved by the NFLPA, as provided in Section 4(e) below);

(C) expense deductions allowed to be netted against related revenues before inclusion of such revenues in TR, as follows:

(i) with respect to Club revenue items set forth in Section 1(a)(i)(3) above, the deduction of only those direct expenses allowed by the NFLPA to be netted against specific revenues of the foregoing types prior to the 2006 League Year (see Appendix H-3 for a non-exclusive list of such deductions, and Section F of Appendix H-3 for the list of deductions applicable to Club Internet operations (including merchandise sales)) and any other deductions specifically approved by the NFLPA after the date hereof; and

(ii) with respect to NFL Ventures and/or its subsidiaries, only those expenses of NFL Ventures and/or its subsidiaries previously allowed by the NFLPA to be netted against specific revenue items of such entities prior to the 2006 League Year (see Appendix H-3 for a non-exclusive list of such deductions and Section F of Appendix H-3 for the list of deductions applicable to NFL Ventures Internet operations (including merchandise sales)), and any other deductions specifically approved by the NFLPA after

92

the date hereof;

(D) expense deductions not referenced in Section 1(a)(xiv)(1)(C) above that were allowed by the NFLPA to be netted against related revenues before inclusion of such revenues in DGR or EDGR prior to the 2006 League Year, including but not limited to such deductions and exclusions relating to PSLs and premium seats as described in Subsections 1(a)(x)-(xi) above, for qualifying projects prior to the 2006 League Year (see Appendix M for examples as to the treatment of such PSLs), and such deductions as are set forth in Appendix H-3 (which provides a non-exclusive list and descriptions of other deductions allowed by the NFLPA prior to the 2006 League Year);

(E) deductions for expenses on additional "new nets" subject to NFLPA approval; and

(F) any other deductions specifically approved by the NFLPA after the 2005 League Year

(2)    Otherwise allowable expenses may only be deducted against the revenues to which they directly relate, and only up to the amount of such directly related revenues. If the result of expense netting with respect to a particular revenue item is a negative number, the TR count for such revenue item shall be zero and such negative number may not be used for any purpose.

(b)    **Benefits.** "Benefits" and "Player Benefit Costs" mean the aggregate for a League Year of all sums paid (or to be paid on a proper accrual basis for a League Year) by the NFL and all NFL Teams for, to, or on behalf of present or former NFL players, but only for:

(i)    Pension funding, including the Bert Bell/Pete Rozelle NFL Player Retirement Plan (as described in Article XLVII) and the Second Career Savings Plan (as described in Article XLVIII);

(ii)    Group insurance programs, including, life, medical, and dental coverage (as described in Article XLIX or as required by law), and the Supplemental Disability Plan (as described in Article LI);

(iii)    Injury protection (as described in Article XII);

(iv)    Workers' compensation, payroll, unemployment compensation, social security taxes, and contributions to the fund described in Article LIV, Section 4 below;

(v)    Pre-season per diem amounts (as described in Sections 3 and 4 of Article XXXVII) and regular season meal allowances (as described in Article XXXIX);

(vi)    Expenses for travel, board and lodging for a player participating in an off-season workout program in accordance with Section 7(e)(iv)(3) below;

(vii)    Payments or reimbursements made to players participating in a Club's Rookie Orientation Program (as described in Section 4(n) of Article XVII);

(viii)    Moving and travel expenses (as described in Sections 2, 3, and 4

93

of Article XLI, and Section 8 of Article XXXVII);

(ix)   Postseason pay (as described in Article XLII and Article XLIII); and salary paid to practice squad players pursuant to a practice squad contract during the postseason, unless the practice squad player contract is executed or renegotiated after December 1 for more than the minimum practice squad salary, in which case all salary paid to such a practice squad player during the postseason will be counted as Salary.

(x)   Player medical costs (i.e., fees to doctors, hospitals, and other health care providers, and the drugs and other medical cost of supplies, for the treatment of player injuries), but not including salaries of trainers or other Team personnel, or the cost of Team medical or training equipment (in addition, the amount of player medical costs included in Benefits may not increase by more than ten percent (10%) each League Year). Subject to the foregoing, Player medical costs shall include one-third of each Club's expenses for tape used on players and one-third of each Club's player physical examination costs for signed players (player physical examination costs relating to the Combine or for Free Agents whom the Club does not sign are not included in Player Benefit Costs);

(xi)   Severance pay (as described in Article L);

(xii)   The Player Annuity Program (as described in Article XLVIII-A);

(xiii)   The Minimum Salary Benefit (as described in Article XXXVIII-A);

(xiv)   The Performance Based Pool (as described in Article XXXVIII-B);

(xv)   The Tuition Assistance Plan (as described in Article XLVIII-B);

(xvi)   The NFL Players Health Reimbursement Account (as described in Article XLVIII-C);

(xvii)   The "88 Benefit" for former players suffering from dementia (as described in Article XLVIII-D); and

(xviii)   The NFL Player Benefits Committee (as described in Article XLVIII-E).

Without limitation on any other provision of this Agreement, Benefits will not include (1) salary reduction contributions elected by a player to the Second Career Savings Plan described in Article XLVIII; (2) any tax imposed on the NFL or NFL Clubs pursuant to section 4972 of the Internal Revenue Code for the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and (3) attorneys' fees, costs, or other legal expenses incurred by Clubs in connection with workers' compensation claims of players. Benefits for a League Year will be determined by adding together all payments made and amounts properly accrued by or on behalf of the NFL and all NFL Clubs for the above purposes during that League Year, except that Benefits for pension funding and the Second Career Savings Plan will be deemed to be made in a League Year for purposes of this Article if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

(c)   **Salary.**

(i)   "Salary" means the compensation in money, property, investments, loans or anything else of value to which an NFL player (including

94

Rookie and Veteran players and players whose contracts have been terminated) or his Player Affiliate is entitled in accordance with a Player Contract, but not including Benefits. Salary with respect to any period shall include all Salary actually payable with respect to such period under the terms of a Player Contract and all Salary attributable to such period under the terms of this Agreement.

(ii)     A player's Salary shall also include any and all consideration received by the player or his Player Affiliate, even if such consideration is ostensibly paid to the player for services other than football playing services, if the NFL can demonstrate before the Impartial Arbitrator that the consideration paid to the player or Player Affiliate for such nonfootball services does not represent a reasonable approximation of the fair market value of such services as performed by such player. The Impartial Arbitrator's determination may take into account, among other things: (1) any actual dollar amounts the player or Player Affiliate received for similar nonfootball playing services from an independent third party; and (2) the percentage of total compensation for nonfootball services received from third parties versus the Team or Team Affiliate.

(iii)     For purposes of this Article, Salary shall be computed pursuant to the additional rules below.

**Section 2.** **Trigger for Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary:**

(a)     If in any League Year the total Player Costs for all NFL Teams equals or exceeds 56.074% of actual Total Revenues, there shall be a Guaranteed League-wide Salary, Salary Cap, and Minimum Team Salary in the amounts set forth below for the next League Year and all subsequent League Years, unless the Salary Cap is removed pursuant to Section 2(b) below. Notwithstanding the immediately preceding sentence, there will be no Guaranteed League-wide Salary, Salary Cap, or Minimum Team Salary in the Final League Year.

(b)     If the total Player Costs of the NFL Teams during any League Year in which the Salary Cap is in effect falls below 46.868% of actual Total Revenues (before taking into account, and exclusive of, any Guaranteed League-wide Salary makeup payments pursuant to Section 3 below), then there shall be no Salary Cap for the next League Year or any succeeding League Year unless and until the Salary Cap again becomes effective in accordance with Section 2(a) above.

**Section 3.** **Guaranteed League-wide Salary:** In any League Year in which a Salary Cap is in effect, there shall be a Guaranteed League-wide Salary of 50% of Total Revenues. In the event that the Player Costs for all NFL Teams during any League Year in which a Salary Cap is in effect are less than 50% of actual TR for such season, then, on or before April 15 of the next League Year, the NFL shall pay an amount equal to such deficiency directly to play-

95

ers who played on NFL Teams during such season pursuant to the reasonable allocation instructions of the NFLPA.

*Section 4.* **Salary Cap Amounts:**

(a)    Subject to the adjustments and credits set forth below, the amount of the Salary Cap for each NFL Team in years that it is in effect shall be (1) in the 2006 League Year, $102 million; (2) in the 2007 League Year, $109 million; (3) in the 2008 League Year, 57.5% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (4) in the 2009 League Year, 57.5% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; (5) in the 2010 League Year, 58% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year; and (6) in the 2011 League Year, 58% of Projected Total Revenues, less League-wide Projected Benefits, divided by the number of Teams playing in the NFL during such year. Notwithstanding the preceding sentence or anything else in this Agreement, there shall be no Salary Cap in the Final League Year.

(b)(i)   In the event that the Salary Cap amount for the 2006 League Year or the 2007 League Year differs from 57% of Total Revenues, less League-wide Benefits, divided by the number of Teams playing in the NFL during such year, the difference for the 2006 League Year shall be credited or adjusted, as the case may be, in the calculation of the Salary Cap for the 2008 League Year, and the difference for the 2007 League Year shall be credited or adjusted, as the case may be, in the calculation of the Salary Cap for the 2009 League Year.

(ii)    Upon receipt of the information set forth in Section 10(a)(i)(B) below, at the end of the League Year, the parties shall agree upon the amount of the Salary Cap, subject to the adjustments and credits set forth below, for each NFL Team for the Capped League Year, if any, following the next League Year. For example, the parties shall agree at the end of the 2006 League Year on the Salary Cap for the 2008 League Year.

(iii)    Wherever the parties have agreed that a difference in the Salary Cap is to be carried over into a future League Year (e.g., Article XXIV, Section 10(a)(ii)), if the number of Clubs in the NFL changes from the League Year in which the Salary Cap difference originated to the League Year in which it will be applied, the amount of the difference will be adjusted to reflect the different number of Clubs in the NFL.

(c)    The actual dollar amount of the Salary Cap shall not be less than the actual dollar amount of any Salary Cap in effect during the preceding League Year, provided, however, that at no time shall the Projected Benefits, plus the amount of the Salary Cap multiplied by the number of Teams in the NFL, exceed 61.68% of Projected TR. See Appendix O.

96

(d)　**Adjustment Mechanism**

(i)　An Adjustment ("Adjustment") will be triggered if, during any Capped League Year, League-wide Cash Player Costs exceed or fall below the TR Trigger Percentage for that League Year multiplied by Total Revenues for that League Year (the "Trigger"). The differences shall be defined as the "League Excess" and "League Shortfall," respectively.

(ii)　At the end of each League Year, a determination shall be made as to whether an Adjustment with respect to that League Year has been triggered, and if so, its amount and allocation into future League Years.

(iii)　The "TR Trigger Percentage" shall be 59% in the 2006 and 2007 League Years, 59.5% in the 2008 and 2009 League Years, and 60% in the 2010 and 2011 League Years.

(iv)　"Cash Player Costs" for purposes of this Subsection is the sum of Cash Salary (as defined by Section 4(d)(ix) below), Performance Based Pay, Minimum Salary Benefit, and all costs committed to be spent in that League Year for other Player Benefits.

(v)　"Club Excess" is the amount by which a Club's Cash Player Costs exceed the TR Trigger Percentage multiplied by TR divided by the number of Clubs in the League during the year in which such excess occurs.

(vi)　"Accrued League Excess" is the total of all League Excesses from prior League Years that have not been offset by a League Shortfall.

(vii)　If an Adjustment is triggered by a League Shortfall in any League Year, such amount shall first be reduced by any remaining Accrued League Excess and any remaining balance shall result in a pro rata deduction from each Club's Team Salary, allocated equally among the remaining League Years that may be Capped Years under this Agreement.

(viii)　If an Adjustment is triggered by a League Excess in any League Year, a pro rata share of the League Excess for that League Year shall first be applied to each Club to offset any remaining Team Salary "deductions" that previously arose from any League Shortfall (with such deductions applied first to earlier Capped Years if the amount of Excess to be applied is less than the remaining "deductions" from prior League Years); if after all such Club offsets have been deducted from the League Excess, there remains a positive number in the League Excess on a League-wide basis, such number shall become the Accrued League Excess for that League Year. The League Excess (not the Accrued League Excess) shall also be a "charge" to the Team Salary of the Clubs with a Club Excess for that League Year. Each such Club will bear its proportionate share of the League Excess, the proportion to be determined by reference to each Club's share of the sum of the Club Excesses of the affected Clubs, with such proportionate share allocated equally among the remaining League Years that may be Capped Years under this Agreement; such charge to Clubs with such a Club Excess for that League Year shall be in addition to, and not in lieu of, the League-wide Shortfall adjustment.

97

(ix)     "Cash Salary" for purposes of this subparagraph is the sum of to-tal Paragraph 5 amounts earned by players (applying the valuation rules which apply to deferred salary specified in Section 7(a)(ii)), signing bonus amounts paid or committed (including amounts treated as signing bonus pursuant to this Agreement) (applying to signing bonuses the valuation rules that apply to deferred salary specified in Section 7(a)(ii) below), in-centives that have been earned and paid, or earned and committed to be paid to players (applying the valuation rules which apply to deferred salary specified in Section 7(a)(ii)), grievances settled, termination pay for which a player is eligible, injury settlements, Salary advances that were not in-cluded in Paragraph 5, and anything else paid or provided to players dur-ing that League Year that would be valued under the Salary Cap (e.g., the fair market value of automobiles gifted to players).

(x)      An illustration of the operation of the Adjustment Mechanism described in this Section 4(d) is set forth in Appendix P.

(xi)     If this Agreement is terminated early, there shall be no accelera-tion of outstanding credits or charges.

(e)      **Stadium Credit**

(i)      A Stadium Credit of 1.8% of TR is already reflected in the amounts defining and percentages prescribing the Salary Cap in Section 4(a) above (i.e., $102 million in the 2006 League Year, $109 million in the 2007 League Year, 57.5% of TR in the 2008 and 2009 League Years, and 58% of TR in the 2010 and 2011 League Years). If a Stadium Credit greater than 1.8% of TR in a League Year results from the sum of (a) Project Cred-its in respect of new G-3 stadium projects and amounts approved by the NFLPA after the 2005 League Year, (b) combined Project Credits in respect of previously approved G-3 stadium projects, (c) any banked credits that may be applied in that League Year as provided below, and (d) the Security Credit, then the excess over 1.8% of TR, up to a maximum of an addition-al one-half of one percent (0.5%) of TR (i.e., up to a maximum of 2.3% of TR), will be deducted from the calculation of the Salary Cap.

(ii)     For purposes of calculating the Stadium Credit:

(a)      the Annual League-wide security cost credit (the "Security Cred-it") shall be the greater of (1) $8 million increased at the rate of five percent (5%) each League Year subsequent to the 2006 League Year provided that, if as a result of the increase, the Stadium Credit exceeds 1.8% of TR, the Se-curity Credit for that League Year shall be reduced to equal the difference between the sum of 1.8% of TR plus the "bank" then-existing, if any, mi-nus the Project Credits for that League Year, or (2) any larger amount specif-ically approved by the NFLPA;

(b)      the term "G-3" shall mean any League stadium construction support program involving League loans or cash contributions to, or in-vestments in, stadium construction projects (including but not limited to the program established by 1999 NFL Resolution G-3 and extended by 2003 NFL Resolution JC-1), but shall not include any League stadium con-

98

struction support program involving temporary exemptions from NFL sharing rules of particular revenue streams;

(c)    the Salary Cap credit counted towards the Stadium Credit in respect of G-3 projects approved and first funded after the 2005 League Year shall be 50% of the Annual Amortization Amount in respect of such stadium, with no cap on the amount of such Salary Cap credit as long as the amounts have been expressly approved by the NFLPA;

(d)    the Salary Cap credit counted towards the Stadium Credit in respect of G-3 projects approved and first funded in or before the 2005 League Year shall be 50% of the Annual Amortization Amount in respect of up to $300 million (present value) in qualifying private contribution to the construction of such stadium (the credits defined in Subsections (c) and (d) are hereinafter referred to as the "Project Credits");

(e)    the "Annual Amortization Amount" for each G-3 stadium shall be the amortization charge for that year in respect of all qualifying private contributions to construction of such G-3 stadium project, calculated (1) over a 15-year period (or less if a shorter amortization period is used) (the "G-3 Amortization Period"), and (2) with interest at an agreed-upon rate based on the NFL's long-term borrowing cost to fund stadium construction support provided in the first year in which such support was provided to such project.

(iii)    If in any Capped Year prior to the Final Capped Year, the sum of that year's Project Credits and Security Credit (the "Actual Annual Credit") is less than the full base amount of the Stadium Credit (i.e., 1.8%), the difference between such base Stadium Credit and such Actual Annual Credit ("banked credits") will be "banked" and available for use (and shall be the first credits used, before any incremental Stadium Credits in excess of 1.8% that may be granted by the NFLPA are used) to offset future years' Actual Annual Credits to the extent such Actual Annual Credits exceed the 1.8% set deduction in any League Year; provided that such banked credits will not be available without the NFLPA's express approval to offset Actual Annual Credits in excess of 2.3% of TR in any such League Year. To the extent that the "bank" is not fully eliminated by application to subsequent Actual Annual Credits, each Club shall receive a deduction from its Team Salary in the Last Capped Year equal to its pro rata share of the unused portion of the "bank" (which deduction from Team Salary shall create additional Room for each Club).

(iv)    If a franchise that received G-3 funding approval is sold during its G-3 Amortization Period, the Project Credit in respect of that franchise will cease (provided that Project Credits in respect of the year the franchise sale is closed will be pro-rated and will cease only as of the closing date of the sale) and the Actual Annual Credit will accordingly be reduced.

(v)(1) The termination of future Project Credits will be the only mechanism by which the NFLPA's support for G-3 projects is adjusted in the event of Club sales for so long as the NFL's only repayment requirement/re-

99

capture mechanism in respect of sales of G-3 recipient Clubs is payment to the NFL of the "unamortized balance" of such franchise's G-3 support (calculating such unamortized balance over 15 years on a straight-line basis) plus (a) interest adjustments (if any), (b) any deficiencies in respect of Club guarantees of revenues that are dedicated to and applied to repay League-level borrowings to fund the G-3 support given to the Club, and (c) compensation to other Clubs for stadium credits against the Salary Cap and/or PSL exclusions from TR lost to the League as a result of the sale.

(2)     If the NFL imposes any incremental repayment requirement or recapture mechanism in respect of G-3, PSL, or premium seat support that is applicable when recipient franchises are sold, the NFLMC and the NFLPA will negotiate in good faith an equitable adjustment mechanism in respect of payments made to the NFL in connection with the sale of such recipient franchises, with the objective of providing to the NFLPA recapture or repayment of Project Credits on a basis comparable in nature, as well as proportionate in amount, to the NFL's incremental recapture or receipt of repayment in respect of G-3, PSL, and/or premium seat support. If the parties are unable to agree, the Special Master shall determine the amount or mechanism to be used for an equitable adjustment for the NFLPA.

(vi)     Project Credits in respect of G-3 funding first advanced after the 2005 League Year will begin to count towards the Stadium Credit in the League Year prior to the scheduled opening of the new stadium.

(vii)     There will be no limit on the Project Credit for any individual project approved and first funded after the 2005 League Year, but the qualifying private contributions to the Project Credit, and the resulting Annual Amortization Amount, in respect of each project will be subject to NFLPA approval prior to the initial NFL support funding for such project. Also, in furtherance (and not in limitation) of Section 1(a)(x)(8) above, any proposal for exclusion of PSL or premium seat revenue from TR in respect of PSLs or premium seats to be sold in connection with any stadium receiving G-3 support (and seeking Project Credits in respect of such support) shall be subject to approval by the NFLPA on a case-by-case basis, and all such PSL or premium seat revenue shall be included in TR in the absence of express NFLPA approval.

(viii)     The definition of stadium construction costs used by the NFL as of the end of the 2005 League Year (which has been provided to the NFLPA) to determine the amount of G-3 funds to be advanced to Clubs will be used to calculate the Stadium Credit, except that the capitalized value of rent paid to a third-party (i.e., unaffiliated) landlord in excess of a $2 million annual deductible that is deemed under such NFL definition to be a capital investment will be considered a capital investment for Stadium Credit purposes and will give rise to a Stadium Credit only if (1) a Club commits to pay such excess rent pursuant to documents entered into in connection with, but in advance of commencement of construction on, a stadium construction project; (2) the landlord will be providing bond fund-

100

ing for stadium construction pursuant to such documents; (3) the landlord's bond funding is used for costs that are "qualifying project costs" under the G-3 program; and (4) the bond funding is greater than the amount of the rent deducted. The NFLPA has the right to review stadium project spending independently to verify that the G-3 stadium construction cost definition has been properly applied, with any disputes subject to review by the Special Master pursuant to Article XXVI.

(ix)     Total TR must increase as a result of each G-3 project, after all TR deductions resulting from the project are counted.

(x)     Notwithstanding anything else in this Agreement, if a Club and/or Club owner owns a stadium constructed with G-3 funding, then revenues derived from non-football events/operations at the stadium are first deemed to be applied to cover non-football operating costs, then to cover general stadium overhead and operating costs (excluding NFL event game day costs). The amount of any excess non-football event revenues remaining after such subtractions will be applied to reduce the outstanding "private contribution" towards the stadium project, thus producing a corresponding 50% reduction in the Salary Cap deduction in respect of the G-3 Project. (Example: Team-owned stadium has $10 million in gross concert income, direct concert costs of $2 million, and stadium overhead of $4 million. $4 million in net concert income is applied to reduce the outstanding "private contribution" in respect of the stadium project, which will result in a lower Salary Cap deduction amount.) If the amount of the "private contribution" has been fully amortized, revenues from non-football events/operations for such stadium will not constitute Total Revenues.

(xi)     PSL/premium seat deductions from TR are not available for any G-3 stadium project approved and first funded before the 2006 League Year. As to any G-3 stadium project (including projects approved and first funded before the 2006 League Year), (a) no deductions from TR are available for naming rights revenues (to the extent received by or on behalf of a Club or Club Affiliate) that are used for the construction or renovation of such stadiums, but such revenues (if so used) shall constitute private contributions to the project for purposes of calculating the private contribution thereto (which will give rise to Project Credits to the extent such credits are approved by the NFLPA); and (b) there shall be no deduction in any League Year through the 2008 League Year for depreciation as to luxury boxes in any stadium for which a Stadium Credit is given (the parties reserve their respective rights and positions with respect to depreciation for luxury boxes thereafter). As to any G-3 stadium project approved and first funded after the 2006 League Year, all deductions from Total Revenues or otherwise in the calculation of the Salary Cap with respect to such stadium will be subject to approval by the NFLPA, in order for the project to qualify under this Subsection (e).

101

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

*Section 5.* **Minimum Team Salary:**

(a)      For the 2006 League Year, there shall be a guaranteed Minimum Team Salary of 84% of the Salary Cap. For each subsequent Capped Year, the percentage set forth in the prior sentence shall increase 1.2%, but in no event shall the percentage be greater than 90%. For example, in the 2008 League Year, there shall be a guaranteed Minimum Team Salary of 86.4% of the Salary Cap. Each Team shall be required to have a Team Salary of at least the Minimum Team Salary at the end of each Capped Year. There shall be no Minimum Team Salary in the Final League Year.

(b)      Nothing contained herein shall preclude a Team from having a Team Salary in excess of the Minimum Team Salary, provided it does not exceed the Salary Cap.

(c)      Any shortfall in the Minimum Team Salary at the end of a League Year shall be paid, on or before April 15 of the next League Year, by the Teams having such shortfall, directly to the players who were on such Teams' roster at any time during the season, pursuant to reasonable allocation instructions of the NFLPA.

(d)      If the NFL agrees, or a judgment or award is entered by the Special Master, that a Team has failed by the end of the then current League Year to make the payments required to satisfy a Team's obligations to pay the Minimum Team Salary required by this Agreement, then, in the event the Team fails promptly to comply with such agreement, judgment or award, the NFL shall make such payment on behalf of that Team (such funds to be paid as salary directly to the players on such Team at the direction of and pursuant to the reasonable allocation instructions of the NFLPA).

*Section 6.* **Computation of Team Salary:** During any League Year in which the Salary Cap is in effect, all of the following amounts shall be included every day in determining a Team's Team Salary:

(a)      **Player Contracts.** Subject to the rules below in Section 7 of this Article, all amounts the Team has paid or is obligated to pay as set forth in all Player Contracts of current and former players covering a particular League Year, including exercised, options, shall be included in Team Salary.

(b)      **Tenders.**

(i)      Drafted Rookies' Salaries shall be tendered automatically at the Rookie Minimum Active List Salary as of the day of the Draft and shall be included in Team Salary until (1) the player is signed, (2) the Team's rights are relinquished through waivers, or (3) the Tuesday following the tenth week of the regular season (if the player is unsigned).

(ii)      For players with less than three (3) Accrued Seasons whose contracts have expired, the Minimum Active List Salary will be included in Team Salary when tendered until the player is signed, or the Team's rights are relinquished.

(iii)      For players who are Restricted Free Agents, the Qualifying Offer will be included in Team Salary when tendered until the player is signed,

102

the Qualifying Offer is withdrawn, or a "June 1 tender" (which may be made on or before June 1) is made. If the player is unsigned and the Team makes a June 1 tender or June 15 tender, such tender will be included until the player is signed, the Team's rights are relinquished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(iv)     For players who are Unrestricted Free Agents, the June 1 tender, if made, will be included in Team Salary as of July 15 and thereafter until the player is signed, the tender is withdrawn, the Team's rights are relinquished or extinguished, or the Tuesday following the tenth week of the regular season (if the player is unsigned).

(v)     For Transition Players and Franchise Players, the tender will be included in Team Salary when made until the player is signed, the tender is withdrawn, the Team's rights are relinquished, or the Tuesday following the tenth game of the regular season (if the player is unsigned).

(vi)     All Offer Sheets will be included in Team Salary when tendered until the player is signed to a Player Contract by any NFL Team, or the Offer Sheet is withdrawn.

(c)     **Practice Squad Contracts.** Any Practice Squad contract Salaries shall be included in Team Salary except to the extent otherwise provided in Article XXXIV, Section 5.

(d)     **Termination Pay.** Any type of Termination Pay liability will be included in Team Salary at the time the player is released, except to the extent the Team is relieved of any such liability.

(e)     **Grievances.** When a player salary grievance is filed against a Team, 50% of the amount claimed (or, for a player whose contract qualifies under Article XXXVIII-A, 50% of the player's Salary Cap count, prorated to reflect the number of weeks remaining in the regular season) will be counted in Team Salary until the grievance is resolved or until the end of the League Year, whichever comes first; at the end of the League Year, if any grievances have been settled or awards have been made, if the net total grievance amounts paid by the Team are more than the original 50% attributions and put the Team over the Salary Cap, the excess will be deducted from the Team's Salary Cap in the following League Year; if the net total grievance amounts paid are less than the original 50% attributions and the Team finishes the season at the Salary Cap or below the Salary Cap by less than the amount of the unawarded attributions, the difference will be added to the Team's Salary Cap for the following League Year. If an award or settlement is made for a grievance in a League Year after the grievance was filed, and the grievance amount paid is more than the original 50% attribution, the excess shall be included in Team Salary when paid; if the grievance amount is less than the original 50% attribution, the difference shall be deducted from Team Salary when the award is made.

(f)     **Expansion Bonuses.** Except as set forth in Article XXXI (Expansion), any expansion bonuses paid to players shall be included in Team Salary.

103

(g)     **Other Amounts.** Any other Salary not listed above paid to players shall be included in Team Salary.

*Section 7.* **Valuation of Player Contracts:** Notwithstanding any provision in a Player Contract to the contrary or when such payments are actually made, the following rules shall apply in determining the amount of a player's Salary that is to be included in Team Salary in a particular League Year for purposes of the Salary Cap:

(a)     **Paragraph 5.**

(i)     The highest applicable Salary set forth in Paragraph 5 of the NFL Player Contract shall be included in Team Salary in the year earned, except that, between March 1 and the first day of the regular playing season, only the following amounts from Paragraph 5 shall be included for players whose Player Contracts are not among the Team's 51 highest valued Player Contracts, tenders and Offer Sheets (as determined under this Section 7):

(1)     Any amount that exceeds the Minimum Active/Inactive List Salary for Undrafted Rookie Free Agents; and

(2)     Any amount that exceeds twice the applicable Minimum Active/Inactive List Salary for all other players.

(ii)     **Deferred Salary.** Any Paragraph 5 Salary to be earned in a particular year but not to be paid until after the next League Year shall be considered "Deferred Salary" and will be included in Team Salary during the League Year earned at its present value based on the one-year Treasury Note rate published in *The Wall Street Journal* on February 1 in the year earned. Salary to be paid any time before the end of the League Year after it is earned shall not be considered Deferred Salary and will be included fully in the Team's Salary during the year earned.

(b)     **Signing Bonuses.**

(i)     **Proration.** The total amount of any signing bonus shall be prorated over the term of the Player Contract (on a straight-line basis, unless subject to acceleration or some other treatment as provided in this Agreement), with a maximum proration of six years, in determining Team and Player Salary, except that:

(1)     Maximum proration shall be five (5) years (a) for contracts entered into during the period after the last regular season game of the 2005 League Year through the last regular season game of the 2006 League Year and (b) for contracts entered into during the period after the last regular season game of the League Year preceding the Final Capped Year through the end of the Final Capped Year. For purposes of this Subsection 7(b)(i)(1) only, a renegotiation or extension of a Player Contract shall be treated as a new Player Contract.

(2)     Any contract year in which the player has the right to terminate based upon events within his sole control shall not be counted as a contract year for purposes of proration. In the event the NFL and the NFLPA cannot agree upon whether an option is within the player's sole control,

104

such issue shall be resolved by the Impartial Arbitrator.

(3)     With respect to the proration of signing bonuses for Player Contracts entered into by Rookie players in which the player has the right to terminate based solely upon reporting, making the roster and/or playtime, such conduct shall automatically be deemed "within his sole control" unless the exercise of the right to terminate is also conditioned upon the following playtime requirements: (1) for players drafted in the first round, at least 35% of the plays if the triggering condition occurs in the first year of the Player Contract, and at least 45% of the plays if in any subsequent year; (2) for all other Rookie players, at least 15% of the plays if the condition occurs in the first year of the Player Contract, and at least 30% of the plays if in any subsequent year. The playtime requirements set forth above do not affect the signing bonus allocation for any contract entered into by players other than Rookies.

(4)     For any multiyear Player Contract entered into in a Capped Year prior to the last Capped Year that extends into any Uncapped Year, if (i) the sum of the player's Paragraph 5 Salary, roster bonuses that are based upon the player making any of the Club's roster categories without limitation, and reporting bonuses during all Capped Years of the Contract (but, if there are fewer than three (3) remaining Capped Years, during the first three (3) years of the Contract) is in the aggregate less than (ii) the portion of the Contract's signing bonus that would be allocated to those League Years if the signing bonus were prorated equally over the term of the Contract, then: the difference between the amounts calculated pursuant to (ii) and (i) of this sentence, up to 50% of the portion of the signing bonus that would otherwise be allocated to the Uncapped Years (the "Difference"), shall be deducted in equal portions from those Uncapped Years and reallocated in equal portions over the Capped Years of the Contract (or, if there are fewer than three (3) Capped Years within the term of the Contract, over the first three (3) years of the Contract). For purposes of this Subsection only, a renegotiation shall be treated as if it is an entirely new Player Contract.

(5)     [Omitted]

(6)     [Omitted]

(7)     If a Player Contract provides for an increase in Salary upon the assignment of such contract to another NFL Team, such increase shall be included in the player's Salary upon such assignment and be attributable to the Team paying the bonus.

(8)     Any signing bonus given in connection with a contract extension entered into before the expiration of the player's existing contract will be prorated over the remaining years of the unexpired contract together with its extension. The player shall receive such a signing bonus at the time that the extension is executed, unless the player expressly agrees in the contract to defer payment of the extension bonus, in which case only the present value of the deferred payment, calculated in accordance with the method set forth in Article X of the Stipulation and Settlement Agreement and Arti-

105

cle XXIV, Section 7(a)(ii) of the Collective Bargaining Agreement, shall be prorated (unless the extension is executed within one year of the execution of the contract being extended, in which case the gross amount of the extension bonus shall be prorated).

(ii)   **Acceleration.**

(1)   For any player removed from the Team's roster, or whose Contract is assigned to another Club via waivers or trade, on or before June 1 in any League Year prior to the Final Capped Year, or at any time during the Final Capped Year, any unamortized signing bonus amounts will be included in Team Salary for such League Year, except that for each League Year preceding the Final Capped Year, each Club may designate up to two (2) Player Contracts that, if terminated on or prior to June 1 and if not renegotiated after the last regular season game of the prior League Year, shall be treated (except to the extent prescribed by Section 7(d)(iii) below) as if terminated on June 2, i.e., the Salary Cap charge for each such contract will remain in the Club's Team Salary until June 2, at which time its Paragraph 5 Salary and any unearned LTBE incentives will no longer be counted and any unamortized signing bonus will be treated as set forth in Subsection (2) below. If acceleration puts a Team over the Salary Cap, the Team will have seven (7) days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(2)   For any player removed from the Team's roster or whose Contract is assigned via waivers or trade after June 1, except in the Final Capped Year, any unamortized signing bonus amounts for future years will be included fully in Team Salary at the start of the next League Year.

(3)   In the event that a player who has had a signing bonus allocated over the years of his Player Contract is traded, or whose Contract is assigned to another team pursuant to the NFL's waiver procedure, the Team Salary of the player's new team will not include any portion of the signing bonus.

(4)   Any contract year that the player has the right to terminate based upon a contingency shall count as a contract year for purposes of proration until the contingency is fulfilled, at which time any amounts attributed to such year shall be accelerated and included immediately in Team Salary (notwithstanding the foregoing, if the player has one or more rights to terminate based upon one or more not "likely to be earned" incentives and the player also being on the roster at a subsequent time, no acceleration shall occur until both the incentive(s) and the roster precondition(s) have been satisfied). To the extent that such acceleration puts the Team over its Salary Cap in a League Year prior to the Final Capped Year, the difference shall be deducted from its Salary Cap for the following year; to the extent that such acceleration puts the Team over the Salary Cap in the Final Capped Year, the Team will have seven (7) days to conform with the Salary Cap, but may not sign any players until there is Room to do so under the Salary Cap.

(5)    The unamortized portion of any signing bonus contained in an NFL Player Contract that is renegotiated to reduce the number of years of such Player Contract shall be included, to the extent attributable to such reduced year or years, in Team Salary at the time of the renegotiation.

(iii)    [*Omitted*]

(iv)    **Amounts Treated as Signing Bonuses.** For purposes of determining Team Salary under the foregoing, the term "signing bonus" shall include:

(1)    Any amount specifically described in a Player Contract as a signing bonus;

(2)    Any guaranteed reporting bonus;

(3)    Any consideration, when paid, or guaranteed, for option years, contract extensions, contract modifications, or individually negotiated rights of first refusal;

(4)    Any option buyout amount, when paid or guaranteed;

(5)    The difference between the Salary in the second contract year and the first contract year when Salary in the second contract year is less than half the Salary called for in the first year of such Contract;

(6)    Any reporting bonus in the season of signing when a contract is signed after the start of training camp;

(7)    Any roster bonus in the season of signing when a contract is signed after the last pre-season game;

(8)    Any salary advance paid on a guaranteed basis;

(9)    Any guaranteed bonus tied to workouts;

(10)    Any salary advance which a player is not obligated to repay;

(11)    In a Player Contract executed after September 28, 2005, any amount of a Salary advance, off-season workout bonus, off-season roster bonus, or off-season reporting bonus that is guaranteed for skill, injury and Salary Cap terminations, on a non-contingent basis for all of the guarantees. (Notwithstanding Subsections (8)-(9) above, a Salary advance, off-season workout bonus, off-season roster bonus, or off-season reporting bonus that is guaranteed for skill, injury and Salary Cap terminations, but on a contingent basis for any of the potential guarantees, shall be included in Team Salary only in the League Year in which the bonus is earned by the player; e.g., in the case of an off-season roster bonus, in the League Year in which the player is required to be on the roster to earn the bonus. The rules set forth in this Subsection (11) shall not affect Salary Cap accounting for any other purpose.);

(12)    In a Player Contract, or any renegotiation or extension of a Player Contract, that is executed in the Final Capped Year, each of the following, if it is to be earned or paid to the player in the Final League Year (which is an Uncapped Year): (a) any Salary advance which the player is not and cannot be obligated to repay; (b) any off-season workout bonus that is contingent upon the player's participation in less than 32 days of the Club's off-season workout program; (c) any off-season roster bonus; and (d) any

107

off-season reporting bonus;

(13)   In a Player Contract executed on or before September 28, 2005, any Paragraph 5 Salary which was guaranteed for 2006 or earlier and treated as a signing bonus on or before September 28, 2005;

(14)   In a Player Contract executed on or before September 28, 2005, any Paragraph 5 Salary which was guaranteed for 2007 or later and treated as a signing bonus on or before September 28, 2005, in which case any allocation to 2005 or earlier shall remain as is, and any allocation to 2006 or later shall be reallocated to occur entirely in the year(s) of the guarantee(s);

(15)   In a Player Contract executed on or before September 28, 2005, any roster bonus or Paragraph 5 Salary that the Club had the right to guarantee for skill, when the Club subsequently exercises the right to guarantee such bonus or Paragraph 5 Salary for skill;

(16)   Any bonus to be paid to a player solely for fulfilling his obligations to play under his Player Contract without seeking to renegotiate and/or "holding out" (i.e., a "completion bonus"), and which bonus is otherwise guaranteed for skill and injury, <u>except</u> that the amount of any such completion bonus shall be calculated at its present value, computed at the one-year Treasury Note rate published in *The Wall Street Journal* on February 1 of the League Year in which the Player Contract is executed. Further, if any event occurs which extinguishes the player's right to receive such completion bonus, any amount of the bonus that has previously been included in Team Salary shall be immediately added to the Team's Salary Cap for the current League Year, if such event occurs prior to June 1, or for the next League Year, if such event occurs after such date, with the remainder of the bonus that has been allocated to Team Salary for future League Years immediately extinguished.

(17)   Any relocation bonus which is individually negotiated between a player and a Club; and

(18)   Any increase in a player's Salary for the current League Year that occurs as a result of the renegotiation or extension of the player's Contract in that League Year, if the NFL Management Council does not receive notice of the salary terms of such an executed extended or renegotiated contract prior to 4:00 p.m. (New York Time) on the Monday of the tenth week of the regular season. The then-existing provisions of the CBA will govern the Salary Cap valuation of such a renegotiation or extension in the Final Capped Year. The parties have reserved their respective positions regarding the CBA's requirements for any such renegotiation or extension in the Final Capped Year.

Notwithstanding the above provisions or anything else in this Agreement, but subject to Section 7(d) below, any guaranteed Paragraph 5 Salary in a Player Contract executed after September 28, 2005, including but not limited to renegotiations or extensions of pre-existing Player Contracts, will not be treated as a signing bonus solely on the basis of the guarantee.

(v)     **Credit for Signing Bonuses Refunded.** In the event that a Team

108

receives a refund from the player of any previously paid portion of a signing bonus, or the Team fails to pay any previously allocated portion of a signing bonus, such amount as has previously been included in Team Salary shall be added to the Team's Salary Cap for the next League Year. For purposes of this Subsection, to the extent that they constitute reimbursement for previously paid signing bonus, insurance proceeds received by a Team as beneficiary to cover the player's inability to perform services required by his Player Contract shall be deemed a "refund from the player" if (a) the Club or the player purchased the policy (b) the amounts covered by the policy are so specified in the Player Contract; and (c) the policy is made available for inspection upon request by the Management Council or the NFLPA.

(c)      **Incentives.**

(i)      Any and all incentive amounts, including but not limited to performance bonuses, shall be included in Team Salary if they are "likely to be earned" during such League Year based upon the player's and/or Team's performance during the prior year. In the case of a Rookie, or a Veteran who did not play during the prior season, in the event that the NFL and the NFLPA cannot agree as to whether such performance bonus is "likely to be earned," such disputes shall be referred to the Impartial Arbitrator. Any incentive within the sole control of the player (e.g., non-guaranteed reporting bonuses, off-season workout and weight bonuses) shall be deemed "likely to be earned."

(ii)      At the end of a season, if performance bonuses actually earned resulted in a Team's paying Salary in excess of the Salary Cap, then the amount by which the Team exceeded the Salary Cap as a result of such actually paid performance bonuses shall be subtracted from the Team's Salary Cap for the next League Year.

(iii)      At the end of a season, if performance bonuses previously included in a Team's Team Salary but not actually earned exceed performance bonuses actually earned but not previously included in Team Salary, an amount shall be added to the Team's Salary Cap for the next League Year equaling the amount, if any, by which such overage exceeds the Team's Room under the Salary Cap at the end of a season.

(iv)      Any team performance will be automatically deemed to be "likely to be earned" if the Team met or exceeded the specified performance during the prior League Year, and will be automatically deemed to be "not likely to be earned" if the Team did not meet the specified performance during the prior League Year.

(v)      Any incentive bonus that depends on team performance in any category not identified in Exhibit A hereto automatically will be deemed "likely to be earned."

(vi)      Any incentive bonus that depends on a player's individual performance in any category not identified in Exhibit B hereto automatically will be deemed "likely to be earned." Any incentive bonus that depends on

109

a player's individual performance in categories other than those used to assess performance at the player's primary position automatically will be deemed "likely to be earned."

(vii)   Any incentives "likely to be earned" by Rookies shall be valued at the percentages set forth in Exhibit C hereto.

(viii)   Any incentives based on a player receiving Honors or Media Recognition not listed on Exhibit D hereto shall automatically be deemed "likely to be earned."

110

(EXHIBIT A)
## TEAM INCENTIVES

| OFFENSE | DEFENSE | SPECIAL TEAMS |
|---|---|---|
| Points scored by offense | Points allowed by defense | Own punt return average |
| Touchdowns scored by offense | Touchdowns allowed by defense | Own kickoff return average |
| Total offense (net yards) | Total defense (net yards) | Opposition punt return average |
| | | Opposition kickoff return average |
| Average net yards gained per rushing play | Average net yards given up per rushing play | |
| Average net yards gained per passing play | Average net yards given up per passing play | |
| Sacks allowed | Sacks | |
| Passing % completed | Interceptions | |

| ALL |
|---|
| Wins |
| Playoffs |
| Conference Championship |
| Super Bowl |
| Touchdowns on returns and recoveries |
| Net difference takeaways/giveaways |

111

(EXHIBIT B)
## INDIVIDUAL INCENTIVES

**RUSHING**

Total yards

Average yards
(100 attempts)

Touchdowns

**PASSING**

Passer rating
(224 attempts)

Completion percentage
(224 attempts)

Interception percent
(224 attempts)

Total yards

Yards per pass
(224 attempts)

Touchdown passes

**RECEIVING**

Total receptions

Total yards

Average yards
(32 receptions)

Touchdowns

**DEFENSE**

Interceptions

Interception return yards

Touchdowns on interception
returns

Opponent fumble recoveries

Opponent fumble return yards

Touchdowns on opponent
fumble returns

Sacks

**PUNT RETURNS**

Total yards

Average (20 returns)

Touchdowns

112

(EXHIBIT B)
## INDIVIDUAL INCENTIVES

### KICKOFF RETURNS

Total yards

Average (20 returns)

Touchdowns

### PUNTING

Gross average (40 punts)

Net average (40 punts)

Inside 20-yard line

### PLACEKICKING

Total points

Field goals

Field goal percentage
(16 attempts)

Field goal percentage
0-19 yards (4 attempts)

Field goal percentage
20-29 yards (4 attempts)

Field goal percentage
30-39 yards (4 attempts)

Field goal percentage
40-49 yards (4 attempts)

Field goal percentage
50 yards or longer (3 attempts)

### OTHERS

Roster bonuses

Reporting bonuses

Playtime bonuses
(excluding special teams)

Special teams playtime

113

(EXHIBIT C)
### ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| CATEGORY | | PERCENT COUNTED |
|---|---|---|
| ROSTER BONUSES (regular season) | | |
| All Drafted | | 100% |
| Undrafted | | 30% |
| ROSTER BONUSES (pre-season) | | |
| All Players | | 100% |
| PLAYING TIME | ROUNDS 1-3 | |
| | Up to 33% | 100% |
| | 34% - 75% | 75% |
| | 76% - 90% | 50% |
| | 91% - 100% | 25% |
| | ROUNDS 4-8 | |
| | Up to 25% | 100% |
| | 26% - 33% | 75% |
| | 34% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | UNDRAFTED | |
| | Up to 15% | 100% |
| | 16% - 25% | 75% |
| | 26% - 50% | 50% |
| | 51% - 75% | 25% |
| | 76% - 100% | 10% |
| | All percentages will round to the nearest whole percentage (e.g., .05 is rounded to 1.0) | |
| SPECIAL TEAMS PARTICIPATION | ROUNDS 1 - 3 | 100% |
| | ROUNDS 4 - 8 | 66% |
| | UNDRAFTED | 50% |
| HONORS (First or Second Team) | ROUNDS 1 - 2 | |
| | All-Rookie | 100% |
| | All NFL, Pro Bowl | 5% |
| | All Conference | 10% |
| | ALL OTHERS | |
| | All-Rookie | 15% |
| | All Conference | 5% |
| | ALL | |
| | Rookie of Year ("ROY") | 0% |
| | NFL or Conf. ROY | 0% |
| | ROY - Offense - NFL | 0% |
| | ROY - Defense - NFL | 0% |

**114**

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
ROOKIE "LIKELY TO BE EARNED" INCENTIVES

**RUSHING**

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | |
| Rushing | Up to 150 yards | 100% |
| | 151 - 350 yards | 75% |
| | 351 - 500 yards | 66% |
| | 501 - 700 yards | 33% |
| | 701 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 100 yards | 100% |
| | 101 - 350 yards | 66% |
| | 351 - 650 yards | 25% |
| | 651 yards or more | 0% |
| Average Yards | ROUNDS 1 - 3 | |
| (100 attempts) | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 66% |
| | 4.01 - 4.49 | 33% |
| | 4.5 or more | 0% |
| | ALL OTHERS | |
| | Up to 3.74 | 100% |
| | 3.75 - 4.0 | 50% |
| | 4.01 - 4.49 | 25% |
| | 4.5 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | |
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

115

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

### PASSING

| | | |
|---|---|---|
| Passer Rating | ROUNDS 1 - 3 | |
| (224 attempts) | 50 rating or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 50% |
| | 90.00 - 100.00 | 33% |
| | 100.01 or more | 0% |
| | ALL OTHERS | |
| | 50.00 or less | 100% |
| | 51.00 - 75.00 | 66% |
| | 76.00 - 90.00 | 25% |
| | 90.01 or more | 0% |
| Completion Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | Up to 52% | 100% |
| | 52.1 - 56% | 66% |
| | 56.1 - 59% | 33% |
| | 59.01% or more | 0% |
| | ALL OTHERS | |
| | Up to 52% | 100% |
| | 52.1 - 56% | 50% |
| | 56.1 - 59% | 25% |
| | 59.01% or more | 0% |
| Interception Percentage | ROUNDS 1 - 3 | |
| (224 attempts) | 3.0% or more | 100% |
| | 2.7 - 2.9% | 66% |
| | 2.1 - 2.6% | 33% |
| | 2.0% or less | 0% |
| | ALL OTHERS | |
| | 3.0% or more | 100% |
| | 2.7 - 2.9% | 50% |
| | 2.1 - 2.6% | 25% |
| | 2.0% or less | 0% |

116

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| | | |
|---|---|---|
| Total Yards Passing | ROUNDS 1 - 3 | |
| | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 25% |
| | 1,201 yards or more | 0% |
| Yards Per Pass (224 attempts) | ROUNDS 1 - 3 | |
| | Under 6 | 100% |
| | 6.0 - 7 | 66% |
| | 7.1 - 8 | 33% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| | ALL OTHERS | |
| | Under 6 | 100% |
| | 6.0 - 7 | 50% |
| | 7.1 - 8 | 25% |
| | 8.1 - 9 | 10% |
| | 9.1 or more | 0% |
| Touchdown Passes | ROUNDS 1 - 3 | |
| | Under 11 | 100% |
| | 12 - 16 | 66% |
| | 17 - 23 | 33% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |
| | ALL OTHERS | |
| | Under 11 | 100% |
| | 12 - 16 | 50% |
| | 17 - 23 | 25% |
| | 24 - 29 | 10% |
| | 30 or more | 0% |

117

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

**RECEIVING**

| Total Receptions | ROUNDS 1 - 3 | |
|---|---|---|
| | Up to 20 catches | 100% |
| | 21 - 30 catches | 75% |
| | 31 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |
| | ALL OTHERS | |
| | Up to 10 catches | 100% |
| | 11 - 35 catches | 50% |
| | 36 - 40 catches | 25% |
| | 41 catches or more | 0% |
| Total Yards Receiving | ROUNDS 1 - 3 | |
| | Up to 200 yards | 100% |
| | 201 - 300 yards | 75% |
| | 301 - 400 yards | 50% |
| | 401 - 800 yards | 25% |
| | 801 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 150 yards | 100% |
| | 151 - 250 yards | 75% |
| | 251 - 350 yards | 50% |
| | 351 - 700 yards | 25% |
| | 701 yards or more | 0% |
| Average Yards (32 receptions) | ROUNDS 1 - 3 | |
| | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 75% |
| | 14.6 - 16.5 | 50% |
| | 16.6 - 18.5 | 25% |
| | 18.6 or more | 0% |
| | ALL OTHERS | |
| | Up to 11.5 | 100% |
| | 11.6 - 14.5 | 66% |
| | 14.6 - 16.5 | 33% |
| | 16.6 - 18.5 | 10% |
| | 18.6 or more | 0% |

118

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| | | |
|---|---|---|
| Receiving Touchdowns | ROUNDS 1 - 3 | |
| | Up to 4 | 100% |
| | 5 - 7 | 66% |
| | 8 - 11 | 33% |
| | 12 or more | 0% |
| | ALL OTHERS | |
| | Up to 4 | 100% |
| | 5 - 7 | 50% |
| | 8 - 11 | 25% |
| | 12 or more | 0% |

**TOTAL OFFENSE**

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | |
| | Up to 500 yards | 100% |
| | 501 - 700 yards | 75% |
| | 701 - 900 yards | 50% |
| | 901 - 1,600 yards | 25% |
| | 1,601 yards or more | 0% |
| | ALL OTHERS | |
| | Up to 400 yards | 100% |
| | 401 - 600 yards | 75% |
| | 601 - 800 yards | 50% |
| | 801 - 1,200 yards | 10% |
| | 1,201 yards or more | 0% |
| Scoring | ROUNDS 1 - 3 | |
| | 2 - 28 points | 100% |
| | 29 - 65 points | 50% |
| | 66 - 75 points | 25% |
| | 76 points or more | 0% |
| | ALL OTHERS | |
| | 2 - 28 points | 100% |
| | 29 - 55 points | 50% |
| | 56 - 75 points | 10% |
| | 76 points or more | 0% |

119

(EXHIBIT C)
**ROOKIE "LIKELY TO BE EARNED" INCENTIVES**

### DEFENSE

| | | |
|---|---|---|
| Interceptions | ROUNDS 1 - 3 | |
| | 1 - 5 | 100% |
| | 6 - 10 | 50% |
| | 11 or more | 0% |
| | ALL OTHERS | |
| | 1 - 3 | 100% |
| | 4 - 6 | 33% |
| | 7 or more | 0% |
| Interception Return Yards | ROUNDS 1 - 3 | |
| | 0 - 85 | 100% |
| | 86 - 150 | 66% |
| | 151 - 190 | 33% |
| | 191 or more | 0% |
| | ALL OTHERS | |
| | 0 - 65 | 100% |
| | 66 - 85 | 50% |
| | 86 - 110 | 25% |
| | 111 or more | 0% |
| Touchdowns on Interception Returns | ALL | |
| | 1 | 100% |
| | 2 | 50% |
| | 3 or more | 0% |
| Opponent Fumble Recoveries | ALL | |
| | 1 - 2 | 100% |
| | 3 - 4 | 50% |
| | 5 or more | 0% |
| Opponent Fumble Return Yards | ROUNDS 1 - 3 | |
| | 0 - 40 | 100% |
| | 41 - 65 | 66% |
| | 66 - 80 | 33% |
| | 81 or more | 0% |
| | ALL OTHERS | |
| | 0 - 30 | 100% |
| | 31 - 55 | 50% |
| | 56 - 75 | 25% |
| | 76 or more | 0% |

120

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| | | |
|---|---|---|
| Touchdowns On | ALL | |
| Opponent Fumble | 1 | 100% |
| Returns | 2 | 50% |
| | 3 or more | 0% |
| Sacks | ROUNDS 1 - 3 | |
| | .5 - 4 sacks | 100% |
| | 4.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |
| | ALL OTHERS | |
| | .5 - 3 sacks | 100% |
| | 3.5 - 6 sacks | 50% |
| | 6.5 - 8 sacks | 25% |
| | 8.5 sacks or more | 0% |

**PUNT RETURNS**

| | | |
|---|---|---|
| Total Yards | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 224 | 100% |
| | 225 - 349 | 33% |
| | 350 or more | 0% |
| Average (20 returns) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 7.9 | 100% |
| | 8.0 - 10.9 | 33% |
| | 11.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

### KICKOFF RETURNS

| Total Yards | ROUNDS 1 - 3 | 100% |
|---|---|---|
| | ALL OTHERS | |
| | 0 - 599 | 100% |
| | 600 - 649 | 33% |
| | 650 or more | 0% |
| Average (20 returns) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19.9 | 100% |
| | 20.0 - 21.9 | 33% |
| | 22.0 or more | 0% |
| Touchdowns | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 1 | 33% |
| | 2 or more | 0% |

### PUNTING

| Gross Average (40 punts) | ROUNDS 1 - 3 | 100% |
|---|---|---|
| | ALL OTHERS | |
| | 0 - 42.4 | 100% |
| | 42.5 - 43.9 | 33% |
| | 44.0 or more | 0% |
| Net Average (40 punts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 35.9 | 100% |
| | 36.0 - 37.9 | 33% |
| | 38.0 or more | 0% |
| Inside 20-yard line | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 23 | 33% |
| | 24 or more | 0% |

122

Article XXIV, Guaranteed League-Wide Salary, Salary Cap, & Minimum Team Salary

(EXHIBIT C)
### ROOKIE "LIKELY TO BE EARNED" INCENTIVES

## PLACEKICKING

| | | |
|---|---|---|
| Total Points | ROUNDS 1 - 3 | 100% |
| | Up to 86 points | 100% |
| | 87 - 95 points | 75% |
| | 96 - 104 points | 50% |
| | 105 - 113 points | 10% |
| | 114 points or more | 0% |
| | ALL OTHERS | |
| | Up to 75 points | 100% |
| | 76 - 90 points | 66% |
| | 91 - 99 points | 33% |
| | 100 - 109 points | 10% |
| | 110 points or more | 0% |
| Field Goals | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 19 | 100% |
| | 20 - 26 | 33% |
| | 27 or more | 0% |
| Field Goal Percentage (16 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 75% | 100% |
| | 75.1 - 80% | 33% |
| | 80.1 - 100% | 0% |
| Field Goal Percentage 0-19 yards (4 attempts) | ALL | 100% |
| Field Goal Percentage 20 - 29 yards (4 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 85% | 100% |
| | 85.1 - 95% | 33% |
| | 95.1 - 100% | 0% |
| Field Goal Percentage 30 - 39 yards (4 attempts) | ROUNDS 1 - 3 | 100% |
| | ALL OTHERS | |
| | 0 - 70% | 100% |
| | 70.1 - 90% | 33% |
| | 90.1 - 100% | 0% |

123

(EXHIBIT C)
## ROOKIE "LIKELY TO BE EARNED" INCENTIVES

| | | |
|---|---|---|
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| 40 - 49 yards | ALL OTHER | |
| (4 attempts) | 0 - 55% | 100% |
| | 55.1 - 70% | 33% |
| | 70.1 - 100% | 0% |
| Field Goal Percentage | ROUNDS 1 - 3 | 100% |
| 50 yards or longer | ALL OTHERS | |
| (3 attempts) | 0 - 45% | 100% |
| | 45.1 - 60% | 33% |
| | 60.1 - 100% | 0% |

124

(EXHIBIT D)
## HONORS AND RECOGNIZED MEDIA

**VETERAN HONORS**
PRO BOWL
1ST & 2ND ALL NFL
1ST & 2ND ALL CONFERENCE
SUPER BOWL MVP (ROZELLE TROPHY)
MVP — NFL
OFFENSIVE PLAYER OF YEAR — NFL OR CONF
DEFENSIVE PLAYER OF YEAR — NFL OR CONF
PLAYER OF YEAR — NFL OR CONF

**VETERAN MEDIA**
ASSOCIATED PRESS
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS
FOOTBALL NEWS
FOOTBALL DIGEST
USA TODAY
COLLEGE & PRO FOOTBALL WEEKLY

**ROOKIE HONORS (FIRST OR SECOND TEAM)\***
**ROUNDS 1-2**
ALL ROOKIE
ALL NFL, PRO BOWL
ALL CONFERENCE
**ALL OTHERS**
ALL-ROOKIE
ALL CONFERENCE
**ALL**
ROOKIE OF YEAR — NFL OR CONF
ROOKIE OF YEAR — OFFENSE — NFL
ROOKIE OF YEAR — DEFENSE — NFL

**ROOKIE MEDIA**
ASSOCIATED PRESS
PRO FOOTBALL WEEKLY
PRO FOOTBALL WRITERS OF AMERICA
SPORTING NEWS

\* *See* Exhibit C for Rookie Honors percentages

125

(ix)    The following is a non-exclusive list of rules that apply to incentives for Rookies:

(1) If the incentive is written for leading the Club in any official League statistical category (assuming it is on Exhibit A or B), it shall be valued at 0%;

(2) Rookie incentives shall be valued at 100%, for:

(A)    Any incentive written for any ranking other than first on the Club in any official League statistical category;

(B)    Any team statistic or team unit statistic, if the statistic was achieved in the prior season (based on prior season's performance);

(C)    Any incentives within the sole control of the player (e.g., non-guaranteed reporting bonuses, workouts, weight clauses, etc.);

(D)    Any relocation or completion bonus;

(E)    Any incentive not measured by official NFL statistics (i.e., hurries, tackles and assists) or incentives based on subjective standards;

(F)    Any guaranteed salary or bonus;

(G)    Any pre-season or off-season statistics;

(H)    Any incentive based upon another player's performance; and

(I)    Any incentives based on leading the team in punting/kicking.

(3) If the incentive is written for leading the team in kick returns or punt returns, and the player qualifies under the minimum standard established by the League for those statistical categories, then the following percentages shall be counted:

| ROUNDS 1 - 3 | 100% |
| ROUNDS 4 - 5 | 33% |
| ROUNDS 6 - 8 | 10% |
| ALL OTHERS | 0% |

(4) If a Rookie has an incentive bonus for touchdowns, the rushing and receiving touchdowns likely to be earned levels will apply to value the incentive;

(5) If a Rookie non-kicker has a Total Points incentive, the total points likely to be earned levels for a rookie kicker will apply to value the incentive.

(6) For Rookies, each component of non-cumulative incentives is calculated individually, and only the highest component amount is counted. For example, an incentive clause for a first-round running back that provides for $10,000 for up to 150 yards or $20,000 for 151-350 yards is counted as $15,000. (This amount is arrived at by taking the greater of 100% of $10,000 or 75% of $20,000, which equals $15,000. Only the higher component amount of $15,000 is counted).

(x)    [*Omitted*]

(xi)    Any team performance-related incentive will be revalued under

126

the "likely to be earned" rules if the contract is assigned to a new Team through trade or waiver.

(xii)   Any renegotiated contract will be revalued at the time of the renegotiation. Thus, if at the time of the renegotiation, the conditions for an incentive bonus have already been satisfied, that bonus will be deemed "likely to be earned." Any new or altered incentive bonuses renegotiated in a preexisting contract after the start of the regular season in which they may be earned automatically will be deemed "likely to be earned" during that season.

(xiii)   Other than as set forth in Subsection (xiv) below, any incentive bonus to an offensive player that is based upon the defensive team's or special team's performance automatically will be deemed "likely to be earned." Conversely, any incentive bonus to a defensive player that is based upon the offensive team's or special team's performance automatically will be deemed "likely to be earned." Any incentive bonus based upon another player's performance automatically will be deemed "likely to be earned."

(xiv)   Any incentive bonus in a contract signed by a Rookie that is based upon special team performance automatically will be deemed "likely to be earned," except for an incentive bonus to a Rookie kicker or Rookie punter that is based upon improvement in the performance of the kicking or punting team. Any incentive bonus to a player who is not a Rookie that is based upon special team performance automatically will be deemed "likely to be earned" unless the player played in at least 50% of his team's special team plays in the previous season.

(xv)   Any incentive bonus based on the team's performance automatically will be deemed "likely to be earned" if it sets a minimum level of statistical performance that is equal to or lower than that achieved by the team finishing fifth from the bottom in the League in the applicable category during the previous season. For example, an incentive bonus based on a team winning at least a specified number of games will be evaluated by determining whether this number of wins was equal to or lower than that achieved by the team that was fifth from the bottom of the League in wins during the previous season. Conversely, any incentive bonus based on the team's performance automatically will be deemed "not likely to be earned" if it sets a minimum level of statistical performance that is equal to or higher than that achieved by the team finishing fifth from the top of the League in the applicable category during the previous season.

(xvi)   Any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "likely to be earned" if it sets a ranking level equal to or lower than fifth from the bottom of the League or third from the bottom of the Conference, respectively. For example, an incentive bonus that is based on a team finishing 28th in the League in total offense will be deemed "likely to be earned" in a League consisting of 32 teams; similarly, an incentive bonus based on

127

a team finishing 14th in its Conference will be deemed "likely to be earned" in a Conference consisting of 16 teams. Conversely, any incentive bonus that is based upon the team achieving a particular ranking in its performance relative either to other teams in the League, or to other teams in its Conference, automatically will be deemed "not likely to be earned" if it sets a ranking level equal to or higher than fifth from the top of the League or third from the top of the Conference, respectively.

(xvii)   Any incentive bonus based on the team's ranking in its Division automatically will be deemed "likely to be earned."

(xviii)  In any Player Contract signed by a Rookie, if more than three (3) different team performance categories are included as incentives, all but the three (3) incentives with the lowest dollar value automatically will be deemed "likely to be earned." For Player Contracts signed by Rookies selected in rounds one and two of the NFL draft, any team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 35% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 45% of the plays for any team incentives that apply in any subsequent year of such a contract. For Player Contracts signed by all other Rookies, a team performance bonus automatically will be deemed "likely to be earned" unless coupled with a playtime requirement of at least 15% of the plays for any team incentives that apply in the first year of any Rookie contract, and at least 30% of the plays for any team incentives that apply in any subsequent year of such a contract. The provisions of this paragraph supplement and do not override Subsection (ix)(2)(B) above. The calculation of these playtime requirements shall exclude special teams plays.

(xix)   In any Player Contract signed by a player other than a Rookie, if more than three (3) different team performance categories are included as incentives, covering the Final Capped Year or thereafter, all but the three (3) incentives with the lowest dollar value automatically will be deemed "likely to be earned." In addition, any team performance bonus for a player other than a Rookie covering the Final Capped Year or thereafter automatically will be deemed "likely to be earned" unless coupled with a playtime requirement equal to or greater than the player's actual playtime during the year prior to the execution of the new Player Contract. If the latter requirement is satisfied, a determination of whether the incentive is "likely to be earned" will be made pursuant to Article XXIV, Section 7(c)(i). The calculation of these playtime requirements shall exclude special teams plays.

(xx)    Any incentive bonus that is stated in terms of a per play or per game occurrence automatically will be deemed "likely to be earned" to the extent the specified performance was achieved by the player (if an individual incentive) or by the team (if a team incentive) in the previous year. For Rookies, it will be based on 75% of the team leader on the Rookie's team in the specified performance category in the previous year. If not initially counted as "likely to be earned," such incentives shall be counted imme-

128

diately towards the Salary Cap and Entering Player Pool when they are earned.

(xxi)   Any incentive bonus to a kicker or punter for leading his team in any kicking or punting category automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie quarterback who was drafted in the first round, any incentive bonus for leading his team in any quarterback category in his third NFL season or thereafter automatically will be deemed "likely to be earned." In a Player Contract signed by a Rookie running back who was drafted in the first round, any incentive bonus for leading his team in any running back category automatically will be deemed "likely to be earned." The provisions of this paragraph shall apply notwithstanding Subsections (ix)(1) and (ix)(2)(A) above.

(xxii)   Any portion of an incentive bonus that is earned, but which had not been deemed likely to be earned at 100 percent of its value, will be deemed earned at the end of the season and not immediately upon attainment of the required performance level, except: (1) as provided in Subsection (xx) above in regards to per play or per game occurrences; (2) if the incentive bonus is actually paid before the end of the season, in which case it will count when paid; (3) if a player leaves the team's roster prior to the end of the season and the conditions of the incentive clause are satisfied prior to leaving, in which case the entire value of the earned bonus will count immediately; or (4) if the contract is renegotiated and the incentive has been earned prior to such renegotiation.

(xxiii)   Any incentive bonus which a player and a Club agree to that: (i) depends upon performance in any category not identified in Exhibit A or Exhibit B; and (ii) is stated in terms of per play, per event or per game, or for leading or any ranking on the Club in any such category; shall be prohibited.

(xxiv)   Any roster bonus which is deemed not "likely to be earned" based upon the player's performance during the prior year shall immediately be included in Team Salary when earned. Pre-season roster bonuses are automatically deemed "likely to be earned."

(xxv)   Any incentive bonus (or portion thereof) that is earned during the Final Capped Year, but which had not been deemed likely to be earned at 100 percent of its value during that League Year, will be deemed earned and counted against the Salary Cap immediately upon attainment of the required performance level. Conversely, any incentive bonus (or portion thereof) that had been deemed likely to be earned during the Final Capped Year will be immediately credited toward the Salary Cap if the required performance level should, during the course of the Final Capped Year, become impossible for the player to attain.

(xxvi)   To determine the value of an incentive clause for Salary Cap purposes, under either Subsection (xxii) or (xxv) above, such incentive clauses will be valued using the Club's performance in the prior season in lieu of the Club's current season performance. Thus, for example, if a Club had

129

1,000 offensive plays "last season," and an incentive clause were tied to a player's participating in 50 percent of the Club's offensive plays "this season," the incentive would be deemed earned, for Salary Cap purposes only, as of the time the player participated in 500 offensive plays. Similarly, such an incentive would be deemed not earned, for Salary Cap purposes only, as of the time the player had not participated in a sufficient number of offensive plays so that the player could not achieve the incentive based on last year's performance (e.g., had participated in only one of the Club's 502 offensive plays). Nothing herein, however, shall affect the player's contractual right to receive or not receive the specified incentive, based upon the performance level actually achieved during that year.

(xxvii)  If more than eight (8) different team performance categories are included in a Player Contract signed by a Veteran as incentives, all but the eight (8) incentives with the lowest dollar value automatically will be deemed "likely to be earned." For purposes of this paragraph, each conjunctive combination of performance categories shall be counted as one performance category (e.g., an incentive clause reading, "if A and B and C, then player will receive $X," shall be counted as one performance category), and each disjunctive combination of performance categories shall be counted by the number of disjunctive performance categories in the combination (e.g., an incentive clause reading, "if A or B or C, then player will receive $X", shall be counted as three (3) performance categories). In addition, any of the disjunctive performance categories may itself be a conjunctive combination of performance categories (e.g., the "A" in the immediately preceding example may be a conjunctive combination of numerous performance categories, and would be counted as being one category because of its conjunctive nature).

(xxviii) Subsection (xxvii) above, does not supersede the terms of any other provisions or other agreements between the parties that automatically deem certain performance incentives to be "likely to be earned" or "not likely to be earned" depending upon whether the incentive fulfills other specified criteria.

(xxix) Subsections (xxvii) and (xxviii) above, do not apply and the parties reserve their rights with respect to multiyear contracts containing team performance incentives in more than one year.

(d)     **Guaranteed Contracts.** Any portion of Salary for which a Team fully guarantees payment for skill or injury shall be included in Team Salary during the year earned, except that:

(i)      In a Player Contract entered into in a Capped Year, Salary fully guaranteed for League Years after the Final Capped Year will be included in Team Salary for the preceding League Years in which the Salary Cap is in effect, in any manner the Team chooses, if payment of the player's entire Salary for the Final Capped Year is not fully guaranteed. For example, without limitation on any other applicable example, and if the Salary Cap is in effect during the 2010 and 2011 League Years, and the player enters into a

130

four-year contract which is not fully guaranteed for the 2011 League Year, which is the Final Capped Year, but is fully guaranteed for the 2012 and 2013 League Years, which are Uncapped Years, then the full amount of the guaranteed Salary for the 2012 and 2013 League Years will be included in Salary and Team Salary for the 2010 and 2011 League Years in a proportion determined by the Team.

(ii)     In a Player Contract entered into in a Capped Year, 50% of the Salary fully guaranteed for any League Year beyond three (3) years after the Final Capped Year will be included in Salary and Team Salary during the League Year or Years of the Contract in which the Salary Cap is in effect in a proportion to be determined by the Team.

(iii)    Any portion of Salary fully guaranteed for any period after a player is released shall be immediately included in Team Salary at the time of his release at the present value rate determined in accordance with the one-year Treasury Note rate published in *The Wall Street Journal* of February 1 of the League Year of the player's release. In such event, the player shall have the option of being paid such guaranteed amount immediately at the present value rate or under the original schedule provided in the contract. To the extent that such payment puts the Team over its Salary Cap, the rule set forth in Subsection 7(b)(ii)(1) above, shall apply.

(iv)    If any Player Contract entered into in a Capped Year provides for yearly Salary in a sequence that, in the Final Capped Year or later, is fully guaranteed, unguaranteed, and then fully guaranteed, the amount fully guaranteed after the first such unguaranteed year will be allocated over the Capped Years in any manner the Team desires.

(v)     For purposes of valuing the Salary of a player under the Salary Cap, any portion of such Salary for which a Team guarantees payment shall immediately be included in Team Salary during the year earned, subject only to the exceptions contained in Subsections 7(d)(i)-(iv) above.

(e)     **Other Amounts.**

(i)     **Loans.** The principal amount of any loan made, guaranteed, or collateralized by a Team or its Team Affiliate to a player shall be included in Team Salary. However, when a player pays back any portion of the principal amount of any such loan, such amount will be added to the Team's Salary Cap to the extent previously included in Team Salary.

(ii)    A fraudulent agreement pursuant to which the player and the Club claim that the player has received a "loan" from the Club, when in fact there is no bona fide loan and the player is merely holding the money for the Club so that he can purport to "repay" the Club during a subsequent Capped Year (and thereby transfer a credit to the Club's Salary Cap for that year), constitutes an improper circumvention of the Salary Cap and/or Entering Player Pool, in violation of Subsection 7(e)(i) above.

(iii)   **Salary Advances.** Except as provided in Subsection 7(b)(iv) above, the full amount of any Salary advance paid to a player will be included immediately in Salary and Team Salary.

131

(iv)    **Non-Cash Provisions.**

(1)    The fair market value of all non-cash provisions (e.g., automobiles, houses, insurance policies) shall be included in Team Salary during the year in which such provision is made. If the parties cannot agree on the fair market value of such provisions, such dispute will be submitted to the Impartial Arbitrator.

(2)    Any tangible item of value provided to unsigned players (or their affiliates) recruited by Clubs will be included in Team Salary. Reasonable travel cost, lodging and entertainment, incurred in connection with recruiting an unsigned player (or his affiliate) at a Club facility or Club geographic area will not be included in Team Salary or Benefits. Miscellaneous costs associated with recruiting unsigned players but not paid to players (or their affiliates) are not included as part of Salary or Benefits, except as set forth above.

(3)    Expenses for travel, board and lodging for a player participating in an off-season workout program or classroom instruction shall not be included in Salary or Team Salary, so long as such expenses are reasonable and customary and generally offered to all players by that club. *See* Section 1(b)(vi) above (including such expenses in Player Costs as Benefits). Any such expenses in excess of reasonable and customary levels, or not generally offered to all players by that Club, shall immediately be included in Salary and Team Salary.

(4)    The voluntary provision to all players on a Club of meals, team apparel, or one team trip for celebrations in each League Year (plus any trips to the White House for the Super Bowl Champions) will not be included in Team Salary or Player Costs. This Subsection does not affect the treatment of consideration paid to a player for services other than football playing services, as provided in Section 1(c)(ii) above.

(5)    Except as provided in Subsections 7(e)(iv)(2)-(4) above, and Article XVII, Section 4(n) (concerning Rookie Orientation Programs), if any money or tangible item of value is provided by any Club to any player (or his affiliate) not pursuant to the CBA or a Player Contract, the value of the money or item shall immediately be included in Salary and the Team Salary of the Club making such provision. This paragraph does not apply to consideration paid to a player (or his affiliate) for nonfootball playing services, which are subject to Section 1(c)(ii) above.

(6)    Compensation to players for participation in the off-season workout programs or classroom instruction sessions of a Club at the minimum amount set forth in Article XXXV shall be included in Team Salary on the first day of such program, calculated by multiplying: (i) the minimum amount set forth in Article XXXV, Section 3; (ii) the number of players scheduled to participate in such program at said minimum amount; (iii) the number of days per week scheduled for such program; and (iv) the number of weeks scheduled for such program. For example, without limitation upon any other example, a Club having a fourteen-week workout

132

program in the 2006 League Year for 60 players to be paid at the minimum amount will include $369,600 in its Team Salary on the first day of such program ($110 per day x four workout days per week x fourteen weeks x sixty players). At the conclusion of a club's off-season workout program, any such minimum amounts which are unearned and unpaid shall be subtracted from Salary and Team Salary.

(7)  If a Club provides one or more gifts to a player during the term of the player's Player Contract to commemorate the player's retirement, and the player has been under contract with the Club in three (3) or more seasons, the fair market value of such gifts up to $15,000 shall not be counted as Salary, and any excess fair market value above $15,000 shall be counted as Salary. Notwithstanding the previous sentence, if the player has been under contract with the Club in less than three (3) seasons, the entire fair market value of any such gifts shall be counted as Salary.

(v)  **Annuities.** The cost to the Team of any annuity provided to any player (but not including any annuity provided pursuant to the player annuity program described in Article XLVIII-A), computed at the one-year Treasury Note rate on February 1 of the applicable League Year, shall be included immediately in Team Salary.

(f)  **Traded Contracts.**

(i)  In the event that a Player Contract is assigned to another NFL Team, either by trade or pursuant to the NFL's waiver procedure, the assignee Team will count as part of its Team Salary only that portion of the player's Salary which remains unpaid and for which the Team may be obligated. The assignor Team will continue to count as part of its Team Salary only that portion of the player's Salary which has already been paid by the Team and/or any Salary for which the Team remains obligated.

(ii)  A Club is not required to have Room to execute a Player Contract with a player to whom the Club has exclusive negotiating rights if the player is assigned to another Club via a trade on the same business day as the execution of the contract, and the assignee Club has or makes Room for such Player Contract.

(g)  **Mid-Season Contracts.** In the event that a player enters into a Player Contract after the first scheduled game of the regular season, a Team will only count as part of Team Salary that portion of the player's Salary which it might actually pay or might be obligated to pay that season.

*Section 8.* **30% Rules:**

(a)  No NFL Player Contract entered into in an Uncapped Year prior to the Final League Year may provide for an annual decrease in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary of the first League Year of the contract per year. This rule shall not apply in any Capped Year to any Player Contract that was signed in the 1993 League Year or earlier.

(b)  No NFL Player Contract entered into in a Capped Year and ex-

133

tending into the Final League Year or beyond may provide for an annual increase in Salary, excluding any amount attributable to a signing bonus as defined in Section 7(b)(iv) above, of more than 30% of the Salary provided for in the Final Capped Year, per year, either in the Final League Year or in any subsequent League Year covered by the Player Contract. For example, without limitation on any other applicable example, a four-year Player Contract signed in the 2011 League Year, assuming that it is Capped, may not provide for an annual increase of more than 30% of the 2011 League Year Salary, excluding amounts treated as a signing bonus, in any of the three (3) additional League Years covered by the Contract.

(c)      Any amount which a Club may pay to a player to buy out a right the player has or may have to terminate one or more contract years shall be treated as signing bonus at the time the buyout is exercised by the Club, and prorated at that time over the remaining term of the contract, including the current League Year, if the right to terminate and/or the right to buy-out is based upon one or more incentives that are not "likely to be earned." Such a buyout amount shall not be included in any calculation for purposes of the 30% Rule, set forth above. (The parties acknowledge a disagreement as to the treatment of allocated signing bonus and buyout payments when a player's right to terminate one or more contract years and/or the Club's right to buyout is based upon one or more incentives that are "likely to be earned," and not upon any incentives that are not "likely to be earned." These issues are expressly left open. Except to enforce the terms of this Subsection (c), the terms of this Subsection may not be referred to or used by any of the parties in any proceeding, or otherwise, and the parties otherwise reserve all their rights with respect to the subject of this parenthetical.).

(d)      Any amount specified to be paid for the exercise of an option by a Club to extend the term of a Player Contract shall be treated as signing bonus, prorated over the remaining term of the contract commencing in the League Year in which it is exercised or the last League Year in which the option may be exercised, whichever comes first. Such an option amount shall, immediately upon execution of the contract, renegotiation or extension, be included in any calculation for purposes of the 30% Rule, set forth above, prorated over the remaining term of the contract commencing in the last League Year in which the option may be exercised. Notwithstanding the foregoing: (i) if a Club renounces its right to exercise the option, the option amount shall not be included in Team Salary as of the date of such renunciation; and (ii) if the club does not renounce, but nonetheless does not exercise the option, the full amount of the option amount previously counted against Team Salary shall be credited to the Club's Salary Cap in the next League Year.

*Section 9.* **Renegotiations and Extensions:**

(a)      Provided that all Salary Cap requirements are met, Player Con-

134

tracts for current and future years may be renegotiated and/or extended except as follows:

(i)        The contract of a Veteran Player may not be renegotiated to increase the Salary to be paid to the player during the original terms of the contract for a period of twelve (12) months after the player's most recent contract renegotiation. The first renegotiation of a Veteran Player Contract, however, may take place at any time.

(ii)        No Team and player may agree to renegotiate any term of a previously signed Player Contract for a prior League Year.

(iii)        No contract renegotiations may be done for a current season after the last regular season game of that season.

(iv)        A Player Contract signed by a Rookie may not be renegotiated except as provided in Article XVII (Entering Player Pool), Section 4(i).

(v)        As provided in Article XXI (Final Eight Plan), Sections 3 and 4.

(b)        No Player Contract, and no contract renegotiation or extension, may be agreed to between a Player and a Club for any term that expires prior to the last day of a League Year. All rights by a player to terminate a Player Contract must be exercised prior to the first day of any League Year to be terminated.

(c)        Any agreement to compensate a player at the minimum amount set forth in Article XXXV for participation in an off-season workout program or classroom instruction shall not be treated as a renegotiation of a Player Contract. Any agreement to compensate a player for such participation above such amount shall be treated as a renegotiation. All such agreements shall be set forth in writing and promptly filed with the League Office.

(d)        Any salary deferral agreed to by club and player which does not affect the player's Salary for purpose of the Salary Cap and Entering Player Pool shall not be treated as a renegotiation.

(e)        An amendment to a Player Contract that changes the terms under which Signing Bonus is paid is a renegotiation.

**Section 10. Accounting Procedures:**

(a)        **Special Purpose Letters and TR Reporting.**

(i)(A)        As provided below, each League Year the parties will be provided with one or more "Special Purpose Letters" by an independent accounting firm (hereinafter "the Accountants") which report the Total Revenues, Team Salary, Cash Player Costs, Player Costs and Benefits of each Club and the NFL for that League Year, utilizing information reported by independent Club and League accounting firms, and information obtained by the Accountants through its review procedures. The Accountants shall be a nationally recognized accounting firm jointly appointed by the NFL and the NFLPA. The parties agree to share equally the cost of the Accountants. The Reporting Package to be used by the Clubs and the League in providing information to the Accountants ("Revenue Reports") in each of the NFL playing seasons covered by this Agreement shall be agreed to by the parties. The

135

basic review procedures to be performed by the Accountants are set forth in Appendix H hereto, and may be modified and/or supplemented by mutual agreement of the parties. The engagement of the Accountants shall be deemed to be renewed annually unless the Accountants are discharged by either party during the period from May 1 to July 1 of that year. Each Special Purpose Letter shall be based upon the best available information at the time of its issuance, and shall include a report of adjustments and new information obtained with respect to amounts previously reported for prior League Years.

(B)     The amount of any Salary Cap and Minimum Team Salary that may apply in a League Year shall be determined at the times and utilizing the Special Purpose Letters and other information described in Section 10(e) below, subject to adjustments at the times and in the manners described in Subsections (ii) and (iii) of this Section 10(a).

(ii)     Subject to Subsection 10(a)(iii) below, in the event than any error is found in (1) DGR, EDGR, or Player Costs in respect of the 2005 League Year or any earlier League Year; or (2) in Total Revenues or Player Costs in respect of any League Year subsequent to the 2005 League Year, which, if it had not occurred, would have resulted in any increase or decrease in any Salary Cap in one or more prior League Years, the total amount of any such Salary Cap shortfall or overage, as the case may be, shall be added or subtracted, as the case may be, the next time the Salary Cap is calculated. An inaccuracy in an estimate that was made in a prior League Year shall not be considered an error for purposes of this Subsection, and such estimates shall be reconciled by the Accountants each League Year. In the event that an inaccuracy in an estimate is not reconciled, the failure to do so shall be considered an error for purposes of this Subsection. Any individual errors proposed for correction pursuant to this Subsection that are greater than $25,000 must be substantiated by evidence and be reviewed with the Management Council, the NFLPA, and the Accountants prior to the correction being made. Any dispute regarding such corrections shall be subject to the procedures that apply under Subsections 10(a)(ix)-(x) below.

(iii)     To the extent that the amounts and information set forth in a Special Purpose Letter indicate that the amount of any Salary Cap and/or Minimum Team Salary in any prior League Year should have been different from the amount actually utilized, any such difference in the Salary Cap and/or Minimum Team Salary shall be credited or deducted, as the case may be, to the next Salary Cap and/or Minimum Team Salary to be set, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of each applicable League Year) (but subject in any case to Section 4(b)(i) above), or may be utilized for the Player Annuity Program described in Article XLVIII-A (Player Annuity Program), if specified by the NFLPA. In the case of any updated Special Purpose Letter issued in the Final Capped Year, such adjustment shall be immediate.

(iv)     The Accountants shall review the reasonableness of any esti-

136

mates of revenues or expenses included in any Club's Revenue Reports in the League Years covered by this Agreement and may make such adjustments in such estimates as they deem appropriate. To the extent that the actual amounts of revenues received or expenses incurred differ from such estimates, adjustments shall be made as provided in Section 10(a)(ii) above.

(v)     With respect to expenses deducted by the NFL or the Clubs from television, cable and radio broadcast revenues or any other revenues, the NFL and the Clubs shall report in the Revenue Reports only those expenses that are reasonable and customary in accordance with the provisions of Section 1(a)(i) above. All categories of expenses deducted from such revenues by the NFL or a Club in a Revenue Report completed by the NFL or that Club shall be reviewed by the Accountants, who shall determine whether they are reasonable and customary.

(vi)     The Accountants shall receive, in connection with their duties: (1) access to and copies of the local accountant workpapers with respect to the Schedule described in Appendix H; and (2) access to the financial audit workpapers of the local accountants or League Office (to the extent necessary), provided that any information derived from the access described in this clause (2) will be held in confidence and will not be part of any file subject to NFLPA review.

(vii)     The NFL will use its best efforts to ensure that any contract between the League, any Club, or any Club Affiliate, and any third party in connection with the sale or marketing of any source of TR shall include terms that provide to the Accountants and the NFLPA access to any and all financial and contractual information and documents in the possession, custody, or control of such third party to which the Club, Club Affiliate, or any other entity controlled by the owner of the Club has any right to any access, relating to such revenue source or any other financial or contractual relationship or transaction between such third party and the League, the Club involved in the sale or marketing of such revenue source, any Affiliate of that Club, or any of that Club's owners. In each case such access shall be subject to and limited by the rules set forth in this Agreement or otherwise agreed to by the parties regarding the dissemination of information provided to the Accountants and the NFLPA pursuant to the audit process. If the NFL, despite its best efforts, cannot ensure such access, the NFLPA shall have the right to obtain an order against the Club or Club Affiliate from a court or the Special Master requiring that such access be allowed.

(viii)     Reasonably prior to the issuance of a Special Purpose Letter, the Accountants shall, as set forth in Appendix H attached hereto, notify designated representatives of the NFL and the NFLPA: (1) if the Accountants have any questions concerning the amounts of revenues or expenses reported by the Clubs or any other information contained in the Revenue Reports submitted by the Clubs; and (2) if the Accountants propose that any adjustments be made to any revenue or expense item or any other infor-

137

mation contained in the Revenue Reports submitted by the Clubs.

(ix)      In the event of any dispute concerning the amounts (as opposed to includability or the interpretation, validity or application of this Agreement) of any revenues, expenses, or Player Costs to be included in the Revenue Reports, including any dispute concerning any findings or determinations concerning expenses made by the Accountants pursuant to the provisions of Subsection (iv) or Subsection (v), that cannot be resolved among the parties (hereinafter referred to as "Disputed Adjustments"), such dispute shall be resolved by the Accountants after consulting and meeting with representatives of both parties.

(x)      Notwithstanding the foregoing, either party shall have the right to contest, by commencing a Special Master Proceeding pursuant to this Agreement, any Disputed Adjustments made by the Accountants, whenever such Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more in any League Year covered by this Agreement. If the Disputed Adjustments for all Clubs are adverse to the party commencing the proceeding in an aggregate amount of $5 million or more but less than $10 million, the parties agree that: (1) the hearing will take place on an expedited basis and will not last longer than one full day, provided, however, that if, despite the reasonable efforts of the parties, the hearing cannot be completed in one day, the hearing shall continue, unless the parties otherwise agree, day-to-day until concluded; and (2) if the party that brings the proceeding does not substantially prevail after the hearing, then that party shall pay the reasonable costs and expenses, including attorneys' fees, of the other party for its defense of the proceeding. The immediately preceding sentence shall have no application to Special Master Proceedings in which the Disputed Adjustments for all Clubs adverse to the party bringing the proceeding equal or exceed $10 million. All other disputes among the parties as to the interpretation, validity, or application of this Agreement, or with respect to any Salary or Benefits amount included in a Revenue Report, shall be resolved by the Special Master appointed by the Court pursuant to this Agreement, as set forth in Article XXVI (Special Master).

(xi)      After receiving a Special Purpose Letter, the NFLPA shall have the right, upon reasonable notice and at its own expense, to conduct an audit of the League and any of its Clubs to further verify the accuracy of the information in such Special Purpose Letter. Bennett Hutt & Co. or another auditing firm replacing Bennett Hutt & Co. (subject to notification to and approval by the NFLMC, not to be unreasonably withheld, of such replacement for Bennett Hutt & Co.) (Bennett Hutt & Co. or such replacement firm hereinafter being referred to as the "NFLPA Auditor") may copy documents it reviews in the course of its audits and maintain copies of documents reviewed in its office. Other than as set forth in this Subsection, the NFLPA Auditor may not show any such copies to anyone other than its partners, employees, and agents. The documentation made available and

138

the information contained therein shall be held in strict confidence and may be discussed only with individuals authorized in this Subsection, or as jointly authorized by the NFL Management Council and the NFLPA. The NFLPA Auditor may prepare one or more written or oral reports for the use of the NFLPA in connection with this Agreement, which may refer to and discuss the contents of documents reviewed, but which may not include copies of any such documents. Any such report shall not be referred to or distributed to anyone outside of the NFLPA or the NFLPA Auditor for any other purpose. If the NFLPA determines in the exercise of its judgment that matters discussed in the NFLPA Auditor's report may indicate a violation of this Agreement, then the NFLPA Auditor may show a copy of such documents that it considers in the exercise of its judgment to be relevant to such potential violation to counsel for the NFLPA (who as of the date hereof are also serving as Class Counsel), the Executive Director and General Counsel of the NFLPA, up to three (3) NFLPA staff personnel (whose authority to receive such information shall be disclosed in advance to the NFLMC) and up to three (3) members of the NFLPA Executive Committee (whose authority to receive such information shall be disclosed in advance to the NFL Management Council). In addition, a copy of such documents may be presented to the Special Master and/or a court in any proceeding to enforce this Agreement. At least four (4) business days prior to commencing any such proceeding based upon such documents, the NFLPA will advise the NFL Management Council of the alleged violation upon which the proceeding would be based; the parties shall stipulate to reasonable protective order terms and conditions to protect the confidentiality of such information. Except in connection with a proceeding as described in the preceding sentence, the NFLPA, its representatives and agents shall not refer to or distribute such copies to anyone outside of their organizations for any other purpose.

(b)     **Projected Total Revenues**

(i)     For purposes of computing the Salary Cap and Minimum Team Salary to be applied in an upcoming League Year in accordance with Sections 4-5, and 10(a) above and Section 10(e) below, and for any other purpose specifically stated in this Agreement, Total Revenues for the applicable League Year(s) shall be projected ("Projected Total Revenues") utilizing one or more agreed-upon methods for the projection process so that the anticipated growth of Projected TR (based upon factors such as anticipated new stadiums, expansion Clubs, and revenue provisions in the NFL's television and other contracts) over the course of League Years which are anticipated to be Capped Years shall be as accurate as practicable, subject to any agreement between the parties to allocate TR over particular League Years pursuant to Section 1(a)(xii) above. Notwithstanding the foregoing, any difference between Projected TR and TR for a prior League Year shall be credited or deducted, as the case may be, in the calculation of the next Salary Cap and/or Minimum Team Salary to be set using the method set forth in Sec-

139

tions 10(b)(ii) and (iii) below, subject in any case to Section 4(b)(i) above. In the Final Capped Year, all such differences and other adjustments from prior League Years shall be made first in the initial calculation of the Salary Cap and Minimum Team Salary, and then shall be updated, with any other differences and adjustments discovered or agreed to subsequent to the initial calculation of the Salary Cap and Minimum Team Salary (a) on or before the third day prior to the beginning of the Final Capped Year, if and only if the Final Capped Year is determined on the basis of an election by either the NFL Management Council or the NFLPA to terminate one or more Capped Years hereunder, and (b) in all cases, on or before May 1 in such Final Capped Year. Moreover, if one or more League-wide television or local television and radio contracts are in effect for the League Year in respect of which the Salary Cap and Minimum Team Salary are being calculated, the actual revenues expected from such source under such contract shall be used in the determination of Projected TR, unless another allocation has been or is agreed to by the parties. Notwithstanding the foregoing or anything else in this Agreement, if, after the initial calculation of the Salary Cap, Minimum Team Salary, and Projected TR for a League Year, a new League-wide television contract is entered into for that League Year, such amounts shall be substituted for the amount for League-wide television revenues previously included in Projected TR, and the Salary Cap and Minimum Team Salary calculated for that League Year shall immediately be adjusted accordingly. In addition, if one or more new Clubs are scheduled to be added to the NFL during the next League Year as one or more expansion Clubs, Projected TR will include an additional projection of TR determined in a manner agreed to by the parties. In addition, if, after the initial calculation of Projected TR for a League Year, the number of scheduled regular season games per Club is increased above the standard of sixteen (16), Projected TR will include an additional projection of TR to account for such additional games as agreed upon by the NFLPA and the Management Council.

(ii)     In the event that actual Total Revenues for any League Year are less than Projected TR (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the difference shall be deducted from Projected Total Revenues for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made).

(iii)     In the event that actual Total Revenues for any League Year exceeded Projected TR (as calculated in accordance with Section 10(b)(i) above) for that League Year, then the amount of such deficiency shall be added to Projected Total Revenues for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made), ex-

140

cept that if, in respect of the 2008 League Year or any subsequent Capped Year, on the basis of the final Reporting Packages for the most recently completed League Year it is determined by the May 1 subsequent to the setting of the Salary Cap and Minimum Team Salary for the subsequent League Year (e.g., by May 1, 2007, in respect of the 2008 League Year, the Salary Cap and Minimum Team Salary for which were set three (3) days prior to the beginning of the 2007 League Year) that actual Total Revenues for the most recently completed League Year exceeded Projected TR for such League Year, the amount of such deficiency shall be set forth in an updated Special Purpose Letter to be issued on such May 1 and shall be taken into account in calculating the Projected Total Revenues for such subsequent League Year, and the Salary Cap and Minimum Team Salary for such subsequent League Year shall be appropriately increased to reflect such addition.

(iv)     Any adjustments pursuant to Section 10(a)(iv) above will be subtracted from or added to Projected TR as appropriate.

(c)     **Timetable and Procedures**

(i)     On or before the date of the Super Bowl in each League Year prior to the Final Capped Year, the parties will meet for the purposes of agreeing upon projections to be used in the calculation for the next Salary Cap and Minimum Team Salary to be set, including:

(A) incremental stadium-related revenues from the opening of any new stadium, any major renovation of an existing stadium, or any known major modification of an existing stadium lease;

(B) percentage increases to be used in the projections of the following categories of revenue (except to the extent addressed by Subsection (c)(i)(A) above): (1) gate receipts; (2) all other Club TR; and (3) all other League TR.

(ii)     In the absence of agreement within ten (10) business days after such meeting, such increases shall be projected on the basis of:

(A) for stadium-related revenues pursuant to Subsection (c)(i)(A) above, (1) the most recent projections used to secure financing of the stadium construction or renovation costs or to secure the lease modifications or, (2) in the absence of such projections, a determination by the Accountants, after consultation with both parties, subject to review by the Special Master pursuant to Article XXVI.

(B) for other projections described in Subsection (c)(i)(B) above, assuming a percentage increase at the annual percentage increase for that category of revenues over the prior four (4) League Years (on a per-Club basis for Club revenues and on a League-wide basis for revenues of the League, NFL Ventures, and other League affiliates). In the event of any dispute over such average annual percentage increases, the percentages shall be determined by the Accountants, after consultation with both parties, subject to review by the Special Master pursuant to Article XXVI.

(iii)     Notwithstanding Subsections 10(c)(i)-(ii) above, in the event that the NFL expands in the future by the addition of one or more Teams,

141

the parties will meet on or before October 15 of the League Year prior to the first League Year in which the expansion Club will play NFL games to agree upon a methodology for revenue projections for the following League Year attributable to the expansion Team. In the absence of agreement prior to December 15, such revenues shall be projected on the basis prescribed by Section 10(b)(i) above and Paragraph 10 of the settlement agreement of the parties on this subject dated June 6, 1996.

(d)     **Projected Benefits.**

(i)     For purposes of computing the Salary Cap and Minimum Team Salary to be applied in a League Year in accordance with Sections 4-5 above and Section 10(e) below, and for any other purpose specifically stated in this Agreement, Benefits shall be projected ("Projected Benefits") to be any Benefits to be paid (or properly accrued) in the applicable League Year pursuant to this Agreement. If the amounts to be paid for any Benefit during the next League Year are not reasonably calculable, then, for the purposes of calculating Projected Benefits, the projected amount to be paid for the Benefit shall be the amounts expended by NFL Teams for the same Benefit in the prior League Year.

(ii)     In the event that actual Benefits for any League Year are less than Projected Benefits (as calculated in accordance with Section 10(d)(i) above) for that League Year, then the difference shall be deducted from Projected Benefits for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made).

(iii)     In the event that actual Benefits for any League Year exceed Projected Benefits (as calculated in accordance with Section 10(d)(i) above) for that League Year, then the difference shall be added to Projected Benefits for the next League Year as to which the Salary Cap and Minimum Team Salary are being calculated, with interest (using the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of the year in which such calculation is being made).

(iv)     In the event the NFLPA exercises any right to reduce or freeze or increase certain Benefits pursuant to Article XLVI (Player Benefit Costs), Projected Benefits shall be adjusted immediately to reflect such changes.

(v)     In the event the amount of Projected Benefits is adjusted pursuant to (1) Subsection (d)(iv) above; (2) the dispute resolution procedures of Article XLVI (Player Benefit Costs), Section 4; (3) agreement of the parties; or (4) as otherwise permitted by this Agreement, then the Salary Cap amounts, Minimum Team Salary amounts, and any other amounts calculated using Projected Benefits, shall be immediately recalculated to reflect the adjustment in Projected Benefits.

(e)     **Setting the Salary Cap.**

(i)     **2008 and Subsequent Capped Years.** The Salary Cap and Minimum Team Salary for the 2008 League Year and each subsequent Capped

142

Year shall be set at least three (3) days before the beginning of the League Year immediately preceding the relevant Capped Year, based upon Projected Total Revenues and Projected Benefits for the relevant Capped Year, as provided in Subsections 10(b)-(c) above, utilizing the information contained in a Special Purpose Letter which the Accountants shall issue on or before the date on which such Salary Cap and Minimum Team Salary are to be set, and shall be subject to adjustment upwards, but not downwards, on the May 1 immediately following the setting of such Salary Cap and Minimum Team Salary in accordance with Section 10(b)(iii) above, based on an updated Special Purpose Letter to be issued on or before such date (if issuance of such an updated Special Purpose Letter is appropriate in light of the Total Revenues reflected in the final Reporting Packages for the then-most recently completed League Year).

(ii)    **2011 League Year.** If neither of the parties terminates either of the final two Capped Years of this Agreement pursuant to Article LVIII, Section 3(a), the Salary Cap and Minimum Team Salary for the 2011 League Year (the Final Capped Year) shall be initially set at the time specified in Subsection 10(e)(i) above, and shall be finally determined within five (5) business days after May 1, 2011, utilizing information contained in a final Special Purpose Letter issued by the Accountants on or before May 1, 2011.

(iii)    **Early Termination Provisions.** If either of the parties terminates one or both of the final two Capped Years of this Agreement pursuant to Article LVIII, Section 3(a), with the result that a League Year earlier than the 2011 League Year becomes the Final Capped Year, then the Salary Cap and Minimum Team Salary for the League Year that has become the Final Capped Year as the result of such termination (a) shall be updated on or before the third day prior to the beginning of such Final Capped Year, utilizing information contained in a Special Purpose Letter which the Accountants shall issue on or before such date, and (b) shall be finally determined within five (5) business days after May 1 in such Final Capped Year, utilizing information contained in a final Special Purpose Letter issued by the Accountants on or before May 1 in such Final Capped Year.

(iv)    **Adjustments in Final Capped Year.** In setting the Salary Cap and Minimum Team Salary for the Final Capped Year, all differences and other adjustments shall be implemented in an updated Salary Cap and Minimum Team Salary, within five (5) business days of the issuance of the May 1 final Special Purpose Letter.

*Section 11.* **Revenue Sharing:** For each season during the term of this Agreement, there shall be a program of revenue or cost sharing among the NFL Clubs which shall (a) be based on the Resolution adopted by the NFLMC on March 9, 2006 (2006 Resolution MC-1), approving this Agreement (including "qualifiers" established under Paragraph 5 of that Resolution), (b) provide for incremental revenue sharing as compared to the

arrangements created by 1995 Resolution G-6, and (c) be reasonably satisfactory to the NFLPA. The revenue sharing program described to the NFLPA by memorandum dated March 10, 2006, has been determined by the NFLPA to be satisfactory. Any material modification to that program must also be reasonably satisfactory to the NFLPA.

144

# ARTICLE XXV
# ENFORCEMENT OF THE SALARY CAP
# AND ENTERING PLAYER POOL

**Section 1. Undisclosed Terms:** A Club (or a Club Affiliate) and a player (or a Player Affiliate or player agent) may not, at any time, enter into undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract; and/or (b) concerning the terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.

**Section 2. Circumvention:** Neither the parties hereto, nor any Club or player shall enter into any agreement, Player Contract, Offer Sheet or other transaction which includes any terms that are designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by (a) the provisions of this Agreement with respect to Total Revenues, Salary Cap, Entering Player Pool, and Minimum Team Salary, and (b) any other term and provision of this Agreement. However, any conduct permitted by this Agreement shall not be considered to be a violation of this provision.

**Section 3. Special Master Action:** Any individual player or the NFLPA acting on that player's or any number of players' behalf, the NFL, and any Club may bring an action before the Special Master alleging a violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement. Issues of relief and liability shall be determined in the same proceeding. The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that the challenged conduct was in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary).

**Section 4. Commissioner Disapproval:** In the event the Commissioner disapproves any Player Contract as being in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), he shall at the time of such disapproval notify the NFLPA, all affected Clubs, and all affected players of such disapproval in writing and the reasons therefor. Except as required by the terms of this Agreement, nothing in this Agreement is intended to affect (i) any authority of the Commissioner to approve or disapprove Player Con-

145

tracts and (ii) the effect of the Commissioner's approval or disapproval on the validity of such Player Contracts.

**Section 5. Special Master Review:** In the event that the Commissioner disapproves a Player Contract pursuant to Section 4 above, the NFLPA, any affected Club, and any affected player shall have the right within thirty (30) days of such person's notice of such disapproval to initiate a proceeding before the Special Master to determine whether such contract is in violation of Article XVII (Entering Player Pool) and/or Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary). The Special Master shall review the dispute de novo, and shall have the authority to approve such Player Contracts in lieu of the Commissioner's approval, or confirm the Commissioner's disapproval. In the event the Commissioner's disapproval is upheld, the player and the Club shall have ten (10) days to attempt to renegotiate such Player Contract notwithstanding any other time period set forth in this Agreement. The Special Master does not have the authority to impose any revisions to such Player Contract on the player or the Club.

**Section 6. Sanctions:**

(a)     **Players and Agents.** In the event that the Special Master finds a violation of Subsection 1(a) or 1(b) of this Article, for each such violation: (i) (1) the Special Master may impose a fine of up to $375,000 on any player or player agent found to have committed such violation, and (2) shall, unless the parties to this Agreement otherwise agree, order the player to disgorge any undisclosed compensation found to have been paid in violation of Section 1 of this Article unless the player establishes by a preponderance of the evidence that he was unaware of the violation; and (ii) the Commissioner shall be authorized to void any Player Contract(s) that was (or were) the direct cause of such violation.

(b)     **Clubs.** In the event that the Special Master finds a violation of Section 1(a) of this Article, for each such violation, the Commissioner shall be authorized to: (i) impose a fine of up to $5,250,000, payable to the NFL, upon any Club found to have committed such violation; (ii) order the forfeiture of up to a maximum of two (2) draft choices (without limitation as to round) by the Club found to have committed such violation; (iii) impose a fine of up to $375,000 on any Club executive or other Club personnel found to have committed such violation; and/or (iv) suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In the event that the Special Master finds a violation of Subsection 1(b) of this Article, for each such violation, the Special Master may: (i) impose a fine of up to $5,250,000, payable to the NFL, upon any Club found to have committed such violation; and (ii) impose a fine of up to $375,000 on any Club executive or other Club personnel found to have committed such violation. In addition, in the event that the Special

146

Master finds a violation of Subsection 1(b) of this Article, for each such violation, the Commissioner (i) shall be authorized to order the forfeiture of up to a maximum of two (2) draft choices (without limitation as to round) by the Club found to have committed such violation; and (ii) shall, unless the parties agree otherwise, suspend for up to one year any Club executive or other Club personnel found to have committed such violation. In imposing sanctions pursuant to the immediately preceding sentence, the Commissioner shall apply the same standards that he would apply in the event of a violation of Subsection 1(a), taking into account the sanctions, if any, imposed by the Special Master. In amending the prior version of this Section in December 2000 and incorporating those amendments into this Section, the parties have not waived or affected their respective positions as to whether the Commissioner does or does not have authority to impose discipline for such violations against any Club, Club executive, or other Club personnel greater than the sanctions set forth in this Article, and those amendments shall not be considered in any resolution of that issue. For purposes of this Subsection 6(b), the term "Club personnel" shall not include players.

(c)     Subject to the parties' mutual reservation of their respective positions in the next to last sentence of Subsection 6(b) above, the sanctions set forth in Subsections 6(a) and 6(b) above shall be the sole penalties under this Agreement for conduct in violation of Section 1 of this Article or Sections 1-3 of Article XXIX (Certifications), and each of the sanctions set forth in Subsections 6(a) or 6(b) above may not be imposed more than once on the same person or Club for the same conduct, even if such conduct constitutes a violation of both Paragraph 1 of this Article and Paragraphs 1-3 of Article XXIX (Certifications). All fines collected from players and agents, and all disgorged compensation collected from players pursuant to this Section 6, shall be contributed and allocated as prescribed in Article XI (Commissioner Discipline), Section 6. For each League Year after the 2006 League Year, each of the maximum fines set forth in this Paragraph 6 shall increase by the same percentage as the increase in Projected TR for that League Year over the prior League Year's TR (up to a maximum of ten percent (10%) per League Year). The sanctions set forth in Sections 6(a) and 6(b) above shall not be implemented until the conclusion of any appeals thereof.

**Section 7. Revenue Circumvention:** In the event that a Club or anyone acting on its behalf fails to materially report or materially misreports Total Revenue ("TR") or non-TR in a manner designed to serve the purpose of defeating or circumventing the intention of the parties as reflected by the provisions of this Agreement with respect to such revenues, the NFLPA and/or the Management Council shall have the right to initiate a proceeding before the Special Master to determine whether such conduct is in violation of this Section 7 of this Article. In the event that the Special Master finds a viola-

147

tion of this Section 7, the Special Master may impose a fine upon the Club of up to $3 million, which shall be donated as additional contributions to the youth football programs fund referenced in Article XXIV (Guaranteed League-wide Salary, Salary Cap, & Minimum Team Salary), Section 1(a)(xiv)(1)(A) above. For each League Year after the 2006 League Year, the maximum fine set forth in this Paragraph 7 shall increase by the same percentage as the increase in Projected TR for that League Year over the prior League Year's TR (up to a maximum of ten percent (10%) per League Year).

*Section 8.* **Management Council Audit Rights.** The Management Council shall have the right to audit records of Clubs and Club Affiliates to investigate allegations of violations of Section 1 of this Article. In agreeing to this Section, the parties have not waived or affected their respective positions as to whether the Management Council may conduct any Club-related audits beyond those set forth in the preceding sentence, and such amendment shall not be considered in any resolution of that issue.

*Section 9.* **Prior Consultation.** Reasonably prior to the initiation of a proceeding alleging a violation of Section 1(a) or 1(b) above, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute, and the charging party shall disclose to the other party (either the NFLPA or the Management Council, as the case may be) all evidence (whether exculpatory or inculpatory) concerning such alleged violation (and provide a copy of all such evidence in documentary form), including but not limited to any such evidence that is the product of any investigation by or on behalf of the charging party. All such evidence subsequently acquired by the charging party shall be subject to disclosure to the other party in any resulting proceeding. This section shall not require the disclosure of any attorney-client communication, or any work product created by or at the request of an attorney. In addition, any attempt by the League, the Management Council, or any Club to have discipline imposed on any person (including but not limited to a Club) for conduct in violation of Section 1(a) or 1(b) above shall be immediately disclosed to the NFLPA.

148

# ARTICLE XXVI
# SPECIAL MASTER

*Section 1.* **Appointment:** The parties agree that the Special Master appointed by the Court pursuant to the Final Consent Judgment in <u>White</u> v. <u>NFL</u> shall have exclusive jurisdiction to enforce the terms of Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, XXXVIII-B, and LVI-LVIII of this Agreement that specifically provide for resolution by the Special Master (except as provided in those Articles with respect to disputes determined by the Impartial Arbitrator), and shall hold hearings on alleged violations thereof, subject to review by the Court in the manner set forth below.

*Section 2.* **Scope of Authority:** The powers of the Court and the Special Master and the rights of the parties in any enforcement proceeding shall be as set forth in Rules 53(a), (c), (d) and (e) of the Federal Rules of Civil Procedure; provided, however, that:

(a)    The Special Master shall make findings of fact and recommendations of relief including, without limitation, damages (including damages referred to in Article XXVIII (Anti-Collusion), Section 9), contempt and specific performance;

(b)    The Court shall accept the Special Master's findings of fact unless clearly erroneous and the Special Master's recommendations of relief unless based upon clearly erroneous findings of fact, incorrect application of the law, or abuse of discretion; except that, as to any finding concerning Article XXVIII (Anti-Collusion), any imposition of a fine of $1 million or more, or any finding that would permit termination of this Agreement, review shall be de novo;

(c)    Subject to Subsections (a) and (b) above, the Court shall determine all points of law and finally make the award of all relief including, without limitation, contract damages, contempt and specific performance;

(d)    Except for any matters for which the Court has de novo review of the Special Master's determinations (e.g., collusion, termination, or fines of $1 million or more), and except for fines for false certifications (as provided in Article XXIX (Certifications), Section 3), rulings of the Special Master shall upon their issuance be binding upon and followed by the parties unless stayed, reversed, or modified by the Court or by an appellate court. In such other matters, the determination of the Special Master shall not take effect until reviewed and acted upon by the Court. In entertaining a request for a stay of a ruling of the Special Master, the Court shall apply the standard that an appellate court would apply to a request for a stay of a ruling of the Court. If and when a recommendation of the Special Master is reversed or modified by the Court or by an appellate court, and is no longer subject to further appeal, the effect of such reversal or modification shall be deemed by the parties to be retroactive to the time of issuance of the recommendation of the Special Master. The parties may seek appropriate relief

149

to effectuate and enforce this provision.

(e)     The Special Master's authority shall be limited to those items specifically set forth in Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, XXXVIII-B, and LVI-LVIII of this Agreement for Special Master review.

**Section 3. Discovery:** In any of the disputes described in this Agreement over which the Special Master has authority, the Special Master shall grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so. Such discovery may include the production of documents and the taking of depositions. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement regarding any TR issue, the Special Master shall have the authority, upon good cause shown, to direct any Club to produce any tax materials disclosing any income figures for such Club or Club Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. Subject to rules to be agreed to by the parties, in any proceeding to review any alleged violation of Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) and/or Article XVII (Entering Player Pool) of this Agreement regarding any Salary paid to any player(s), the Special Master shall have the authority, upon good cause shown, to direct any such player(s) to produce any tax materials disclosing any income figures for any such player or Player Affiliate (non-income figures may be redacted) which in his or her judgment relates to any such alleged violation, including but not limited to portions of any tax returns or other documents submitted to the Internal Revenue Service. In each case the Special Master shall not release such tax materials to the general public, and any such tax materials shall be treated as strictly confidential under an appropriate protective order.

**Section 4. Compensation:** The compensation and costs of retaining the Special Master shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such enforcement proceeding by any other party, except as set forth in Article XXVIII (Anti-Collusion).

**Section 5. Procedures:** All matters in enforcement proceedings before the Special Master shall be heard and determined in an expedited manner. An enforcement proceeding may be commenced upon 72 hours written notice (or upon shorter notice if ordered by the Special Master) served upon the party against whom the enforcement proceeding is brought and filed with the Special Master. All such notices and all orders and notices issued and directed by the Special Master shall be served upon the NFL and the

150

NFLPA, in addition to any counsel appearing for individual NFL players or individual NFL Clubs. The NFL and the NFLPA shall have the right to participate in all such enforcement proceedings, and the NFLPA may appear in any enforcement proceedings on behalf of any NFL player who has given authority for such appearance.

**Section 6. Selection of Special Master:** In the event that the NFL and NFLPA cannot agree on the identity of a Special Master to be appointed by the Court, the parties agree to submit the issue to the President of the American Bar Association ("ABA") who shall submit to the parties a list of eleven (11) attorneys (none of whom shall have nor whose firm shall have represented within the past five (5) years players, player representatives, clubs or owners in any professional sport). If the parties cannot within thirty (30) days of receipt of such list agree to the identity of the Special Master from among the names on such list, they shall alternately strike names from said list, until only one name remains, and that person shall be the Special Master. The first strike shall be determined by a coin flip. Upon approval by the Court, the Special Master shall serve for an initial two-year term commencing on the date of entry of the order of appointment. Thereafter, the Special Master shall continue to serve for successive three-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party, the Court and the Special Master within the ninety (90) days preceding the end of any term, but no later than thirty (30) days prior to the end of such term. Following the giving of such notice, a new Special Master shall be selected in accordance with the procedures set forth in this Section 6. The NFL and the NFLPA may dismiss the Special Master at any time and for any reason upon their mutual consent.

**Section 7. Penalties:** Any monetary penalty assessed by the Special Master may be assessed only against a Club or Clubs or the League, as applicable, found to have violated this Agreement. In no event may the Special Master order relief, or assess any monetary penalty, against an individual Club owner, officer, or non-player employee.

151

# ARTICLE XXVII
## IMPARTIAL ARBITRATOR

*Section 1.* **Selection:** The parties shall select one of the Non-Injury Grievance Arbitrators who shall concurrently serve as the Impartial Arbitrator, who shall have exclusive jurisdiction to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement.

*Section 2.* **Scope of Authority:** The powers of the Impartial Arbitrator and the rights of the parties in any proceeding before him or her shall be solely to determine disputes that are specifically referred to the Impartial Arbitrator pursuant to the express terms of this Agreement. In no event shall the Impartial Arbitrator have any authority to add to, subtract from, or alter in any way the provisions of this Agreement.

*Section 3.* **Effect of Rulings:** Rulings of the Impartial Arbitrator shall upon their issuance be final and binding upon all parties, except as expressly specified under this Agreement or as expressly agreed to among all parties.

*Section 4.* **Discovery:** In any of the disputes described in this Agreement over which the Impartial Arbitrator has authority, the Impartial Arbitrator shall, for good cause shown, grant reasonable and expedited discovery upon the application of any party where, and to the extent, he determines it is reasonable to do so and it is possible to do so within the time period provided for his determination. Such discovery may include the production of documents and the taking of depositions.

*Section 5.* **Compensation of Impartial Arbitrator:** The compensation to and costs of the Impartial Arbitrator in any proceeding brought pursuant to this Agreement shall be equally borne by the NFL and the NFLPA. In no event shall any party be liable for the attorneys' fees incurred in any such proceeding by any other party.

*Section 6.* **Procedures:** All matters in proceedings before the Impartial Arbitrator shall be heard and determined in an expedited manner. A proceeding may be commenced upon 48 hours written notice served upon the party against whom the proceeding is brought and the Impartial Arbitrator, and the arbitration, shall be deemed to have been commenced on the second business day after such notice was given. All such notices and all orders and notices issued and directed by the Impartial Arbitrator shall be served upon the NFL and the NFLPA, in addition to any counsel appearing for individual NFL players or individual Clubs. The NFL and the NFLPA shall have the right to participate in all such proceedings, and the NFLPA may appear in any proceedings on behalf of any NFL player who

152

has given authority for such appearance.

*Section 7.* **Selection of Impartial Arbitrator:** In the event that the NFL and the NFLPA cannot agree on the identity of an Impartial Arbitrator, the parties agree that the Impartial Arbitrator shall be randomly selected from the then-currently serving Non-Injury Grievance Arbitrators. The Impartial Arbitrator shall serve for a two-year term commencing on the date of entry of the order of appointment, unless the parties agree otherwise. The Impartial Arbitrator shall continue to serve for successive two-year terms unless notice to the contrary is given either by the NFL or the NFLPA. Such notice shall be given to the other party and the Impartial Arbitrator within the ninety (90) days preceding the end of any term, but no later than thirty (30) days prior to the end of such term. If necessary, a new Impartial Arbitrator shall be selected in accordance with the procedures of this Section. The NFL and NFLPA may dismiss the Impartial Arbitrator at any time and for any reason upon their mutual consent.

153

# ARTICLE XXVIII
## ANTI-COLLUSION

*Section 1.* **Prohibited Conduct:** No Club, its employees or agents, shall enter into any agreement, express or implied, with the NFL or any other Club, its employees or agents, to restrict or limit individual Club decision-making as follows:

    (a)     whether to negotiate or not to negotiate with any player;

    (b)     whether to submit or not to submit an Offer Sheet to any Restricted Free Agent;

    (c)     whether to offer or not to offer a Player Contract to any Unrestricted Free Agent or Undrafted Rookie;

    (d)     whether to exercise or not to exercise a Right of First Refusal; or

    (e)     concerning the terms or conditions of employment offered to any player for inclusion, or included, in a Player Contract.

*Section 1a.* **Commissioner Approvals:** Any approval or disapproval of a player's contract by the Commissioner, or any communication thereof, timely notice of which is provided to the NFLPA cannot be the basis of any claim of collusion. The NFLPA or the affected Player shall have the right to appeal the Commissioner's disapproval of such player contract to the Special Master, pursuant to Article XXVI (Special Master) and Article XXV (Enforcement of the Salary Cap and Entering Player Pool) of the Collective Bargaining Agreement.

*Section 2.* **Other Club Conduct:** No Club may have a policy not to negotiate with, or enter into a Player Contract with, any player who is free to negotiate and sign a Player Contract with any Club, on any of the following grounds, if such policy is inconsistent with Section 1 above:

    (a)     that the player has previously been subject to the exclusive negotiating rights obtained by another Club in a College Draft, by virtue of a Required Tender to a player with less than three (3) Accrued Seasons, or a Franchise Player designation; or

    (b)     that the player has refused or failed to enter into a Player Contract for a Prior Season containing a Right of First Refusal or an Option Clause (i.e., any clause that authorizes an extension or renewal by a Club of a Player Contract beyond its stated term); or

    (c)     that the player has become a Restricted Free Agent or an Unrestricted Free Agent; or

    (d)     that the player is or has been subject to any Right of First Refusal.

*Section 3.* **Club Discretion:** Section 2 above does not diminish any Club's right not to negotiate or contract with any particular player on any policy ground not specified above. In conjunction with other evidence of an alleged violation(s) of Section 1, a Club's adherence to a policy identified in

Section 2 above may be offered as evidence of an alleged violation of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 4. League Disclosures:** Neither the NFL nor the NFL Management Council shall knowingly communicate or disclose, directly or indirectly, to any NFL Club that another NFL Club has negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet for such Restricted Free Agent has been given to the Prior Club, or with any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, if such communication or disclosure is inconsistent with Section 1 above. It shall not be a violation of this Article for the NFL to respond to an inquiry from a Club about whether and under what circumstances proposed transactions would be permissible under this Agreement or NFL Rules consistent with the Settlement Agreement or this Agreement. In conjunction with other evidence of an alleged violation of Section 1 above, a Club's communication or disclosure of the kind identified in the first sentence of this paragraph may be offered as evidence of an alleged violation(s) of Section 1 above, but may not be the basis of any separate proceeding seeking any penalty or other relief against any Club or the NFL.

**Section 5. Enforcement of Anti-Collusion Provisions:** Except as provided in Section 16(d) below, any player or the NFLPA, acting on that player's or any number of players' behalf, may bring an action before the Special Master alleging a violation of Section 1 of this Article. In any such proceeding, the Federal Rules of Evidence shall apply. Issues of relief and liability shall be determined in the same proceeding (including the amount of damages, pursuant to Section 8 below, if any). The complaining party shall bear the burden of demonstrating by a clear preponderance of the evidence that (1) the challenged conduct was or is in violation of Section 1 of this Article and (2) caused any economic injury to such player(s).

**Section 6. Burden of Proof:** The failure by a Club or Clubs to negotiate, to submit Offer Sheets, or to sign contracts with Restricted Free Agents or Transition Players, or to negotiate, make offers, or sign contracts for the playing services of such players or Unrestricted Free Agents, shall not, by itself or in combination only with evidence about the playing skills of the player(s) not receiving any such offer or contract, satisfy the burden of proof set forth in Section 1 above. However, any of the types of evidence described in the preceding sentence may support a finding of a violation of Section 1 of this Article, but only in combination with other evidence which, by itself or in combination with such evidence, indicates that the challenged conduct was in violation of Section 1 of this Article. Nothing in this Agreement shall preclude the NFL or its Clubs from arguing that any

155

evidence is insufficient to satisfy the burden of proof set forth in Section 5 above. Nothing in this Agreement shall preclude the NFLPA or any player from arguing that any evidence is sufficient to satisfy the burden of proof set forth in Section 5 above, except as set forth above.

*Section 7.* **Summary Judgment:** The Special Master may, at any time following the conclusion of the permitted discovery, determine whether or not the complainant's evidence is sufficient to raise a genuine issue of material fact capable of satisfying the standards imposed by Sections 5 and/or 6 above. If the Special Master determines that complainant's evidence is not so sufficient, he shall dismiss the action.

*Section 8.* **Remedies:** In the event that an individual player or players or the NFLPA acting on his, or their, behalf, successfully proves a violation of Section 1 of this Article, the player or players injured shall have the right:

(a)      To terminate his (or their) existing Player Contract(s) at his (or their) option, or void any Club's Draft rights or other rights with respect to such player(s) at his (or their) option; any Player Contract terminated during the course of a playing season shall be terminated as of the end of that season. Such rights shall not arise until the recommendation of the Special Master finding a violation is no longer subject to further appeal and must be exercised by the player within thirty (30) days therefrom. If, at the time the Player Contract is terminated, such player would have been a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become a Restricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been an Unrestricted Free Agent pursuant to Article XIX (Veteran Free Agency), such player shall immediately become an Unrestricted Free Agent, upon such termination. If, at the time the Player Contract is terminated, such player would have been subject to a Club's exclusive negotiating rights, such player shall remain subject to such rights upon such termination. In either case described in the preceding three (3) sentences, the player shall not be subject to any signing period. In the case of a Drafted Rookie who does not sign a Player Contract and who is given the option of voiding a Club's Draft rights pursuant to this Subsection (a), such player shall then be treated as either: (i) a Drafted Rookie subject to the NFL waiver system as described in Article XVI, Section 4, if the termination takes place during the player's first League Year; or (ii) a Drafted Rookie subject to the rules of Article XVI (College Draft), Section 9, if the termination takes place during the player's second League Year; or (iii) a Free Agent, if the termination takes place during the player's third League Year or thereafter; and

(b)      To recover all of his damages, as described in Section 9 below, for any alleged injuries suffered as a result of the violation.

*Section 9.* **Computation of Damages:** Upon any finding of a violation of

Article XXVIII, Anti-Collusion

Section 1 of this Article, compensatory damages (i.e., the amount by which any player has been injured as a result of such violation) and non-compensatory damages (i.e., the amount exceeding compensatory damages) shall be awarded as follows:

(a)     Two times the amount of compensatory damages, in the event that all of the Clubs found to have violated Section 1 of this Article, have committed such a violation for the first time. Any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages.

(b)     Three times the amount of compensatory damages, in the event that any of the Clubs found to have violated Section 1 of the Article, have committed such a violation for the second time. In the event that damages are awarded pursuant to this Subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; and (ii) any Club found to have committed such a violation for the second time shall be jointly and severally liable for three times the amount of compensatory damages.

(c)     Three times the amount of compensatory damages, plus, for each Club found to have violated Section 1 of this Article for at least the third time, a fine of $3,000,000 in the event that any of the Clubs found to have violated Section 1 of this Article have committed such violation for at least the third time. In the event that damages are awarded pursuant to this Subsection: (i) any Club found to have committed such a violation for the first time shall be jointly and severally liable for two times the amount of compensatory damages; (ii) any Club found to have committed such a violation for at least the second time shall be jointly and severally liable for three times the amount of compensatory damages; and (iii) any Club found to have committed such a violation for at least the third time shall, in addition, pay a fine of $3,000,000. For each League Year after the 2006 League Year, each of the enumerated fines set forth in this Subsection 9(c) shall increase by the same percentage as the increase in Projected TR for that League Year over the prior League Year's TR (up to a maximum of ten percent (10%) per League Year).

**Section 10. Player Election:** A proceeding prosecuting an alleged violation of Section 1 of this Article shall initially be limited to the issues of liability and damages sustained to the date of the Special Master's determination. In the event the Special Master finds a violation, the player shall make a determination within thirty (30) days of the date the Special Master's determination is final, or within thirty (30) days after the last game of the season for such player (including any playoff games) if the finding is made during the course of the season, whether the player intends to void the applicable Player Contract or Draft right. If the player voids the applicable Player Contract or Draft right, the player may commence a supplemental proceeding before the Special Master, for the purpose of determining his future dam-

157

ages, if any, only after the player has signed a new Player Contract or after the first scheduled game of the next regular season, whichever is earlier. If the player elects not to void the applicable Player Contract or Draft right, he may immediately commence a supplemental proceeding before the Special Master for the purpose of determining his future damages, if any.

*Section 11.* **Payment of Damages:** In the event damages are awarded pursuant to Section 9 above, the amount of compensatory damages shall be paid to the injured player or players. The amount of non-compensatory damages, including any fines, shall be paid directly to any NFL player pension fund, any other NFL player benefit fund, or any charitable fund for the benefit of present or former NFL players, as selected by the NFLPA, subject to the reasonable approval of the NFL.

*Section 12.* **Effect on Cap Computations:** In the event that damages are awarded pursuant to Section 9 above, the amount of non-compensatory damages, including any fines, will not be included in any of the computations described in Article XXIV above. The amount of compensatory damages awarded will be included in such computations.

*Section 13.* **Effect of Salary Cap:** In awarding any amount of damages, the Special Master shall take into account that, in any League Year in which a Salary Cap is in effect, no Club would have been authorized to pay out any Salary in excess of that permitted under the Salary Cap.

*Section 14.* **No Reimbursement:** Any damages awarded pursuant to Section 9 above must be paid by the individual Clubs found liable and those Clubs may not be reimbursed or indemnified by any other Club or the NFL.

*Section 15.* **Costs:** In any action brought for an alleged violation of Section 1 of this Article, the Special Master shall order the payment of reasonable attorneys' fees and costs by any party found to have brought such an action or to have asserted a defense to such an action without any reasonable basis for asserting such a claim or defense. Otherwise, each party shall pay his or its own attorneys' fees and costs.

*Section 16.* **Termination:** The NFLPA shall have the right to terminate this Agreement, under the following circumstances:

(a)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any one NFL season which, either individually or in total, involved five (5) or more Clubs and caused injury to 20 or more players; or

(b)     Where there has been a finding or findings of one or more instances of a violation of Section 1 of this Article with respect to any two (2)

158

consecutive NFL seasons which, either individually or in total, involved seven (7) or more Clubs and caused injury to 28 or more players. For purposes of this Section 16(b), a player found to have been injured by a violation of Section 1 of this Article in each of two (2) consecutive seasons shall be counted as an additional player injured by such a violation for each such NFL season; or

(c)     Where, in a proceeding brought by the NFLPA, it is shown by clear and convincing evidence that 14 or more Clubs have engaged in a violation or violations of Section 1 of this Article causing injury to one or more NFL players.

(d)     In order to terminate this Agreement:

(i)     The proceeding must be brought by the NFLPA;

(ii)     The NFL and the Special Master must be informed at the outset of any such proceeding that the NFLPA is proceeding under this Section for the purpose of establishing its entitlement to terminate this Agreement; and

(iii)     The Special Master must find that the Clubs engaged in willful collusion with the intent of restraining competition among teams for players.

**Section 17. Time Limits:** Any action under Section 1 of this Article must be brought within ninety (90) days of the time when the player knows or reasonably should have known with the exercise of due diligence that he had a claim, or within ninety (90) days of the first scheduled regular season game in the season in which a violation of Section 1 of this Article is claimed, whichever is later. In the absence of a Special Master, the complaining party shall file such claim with the Court. Any party alleged to have violated Section 1 of this Article shall have the right, prior to any proceedings on the merits, to make an initial motion to dismiss any complaint that does not comply with the timeliness requirements of this section.

**Section 18. Prior Conference:** Prior to the initiation of any proceeding under this Article by the NFLPA, the parties shall confer in person or by telephone to attempt to negotiate a resolution of the dispute.

159

# ARTICLE XXIX
# CERTIFICATIONS

*Section 1.* **Contract Certification:**

(a)      Every Player Contract, or any renegotiation, extension or amendment of a Player Contract, entered into during the term of this Agreement shall contain a certification, executed separately by: (i) the person who executed the Player Contract on behalf of the Club, (ii) the player, and (iii) any player representative who negotiated the contract on behalf of the player confirming that the Player Contract, renegotiation, extension or amendment sets forth all components of the player's remuneration, for his playing of professional football, from the Club or Club Affiliate and that there are no undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind: (a) involving consideration of any kind to be paid, furnished or made available or guaranteed to the player, or Player Affiliate, by the Club or Club Affiliate either prior to, during, or after the term of the Player Contract; or (b) concerning terms of any renegotiation and/or extension of any Player Contract by a player subject to a Franchise Player or Transition Player designation.

(b)      In the same certification, the Club, player, and player representative will either confirm that, to the best of their knowledge, no conduct violative of Article XXVIII (Anti-Collusion) took place with respect to the contract, renegotiation, extension or amendment in question, or describe such conduct of which they are aware.

(c)      In the same certification, the Club will confirm that any information regarding the negotiation of such contract provided to the Neutral Verifier pursuant to Article XXX (Consultation and Information Sharing), Section 4 was, at the time the information was provided, true and correct in all material respects.

(d)      No contract will be approved by the Commissioner unless accompanied by the certifications required by Subsections (a), (b), and (c) above.

(e)      Any failure to execute and submit a certification as required under Section 1(a) above may be deemed evidence of a violation of Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 1 of this Agreement. Any failure to execute and submit a certification as required under Section 1(b) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion) of this Agreement. Any failure to execute and submit a certification as required under Section 1(c) above may be deemed evidence of a violation of that provision.

*Section 2.* **End of League Year Certification:**

(a)      At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the

160

Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, as described in Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 1. Upon receipt of such certification, the Management Council shall forward a copy of the certification to the NFLPA.

(b)     At the conclusion of each League Year, each player agent representing a player who was under contract to an NFL Club during that League Year shall submit to the NFLPA a certification confirming, after reasonable inquiry of all personnel in his or her agency with authority to negotiate Player Contracts, that neither he or she nor they has entered into any undisclosed agreements of any kind, express or implied, oral or written, or promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind, as described in Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 1. Upon receipt of such certification, the NFLPA shall forward a copy of the certification to the Management Council.

(c)     Any failure to execute and submit a certification as required under Section 2(a) or 2(b) above, may be deemed evidence of a violation of Article XXV, Section 1 of this Agreement.

(d)     At the conclusion of each League Year, the executive primarily responsible for football operations on behalf of each Club shall submit to the Management Council a certification confirming that the Club has not, to the extent of his knowledge after reasonable inquiry of all owners and all employees with authority to negotiate Player Contracts, violated the terms of Article XXVIII (Anti-Collusion), Section 1, nor received from the NFL or the NFL Management Council any communication disclosing that an NFL Club had negotiated with or is negotiating with any Restricted Free Agent, unless and until an Offer Sheet has been given to the Prior Club, or any Unrestricted Free Agent, prior to the execution of a Player Contract with that Unrestricted Free Agent, where such communication or disclosure is inconsistent with Article XXVIII (Anti-Collusion), Section 1. Upon receipt of each such certification, the NFL shall forward a copy of the certification to the NFLPA.

(e)     Any failure to execute a certification as required under Section 2(d) above may be deemed evidence of a violation of Article XXVIII (Anti-Collusion), Section 1 of this Agreement.

**Section 3. False Certification:** Any person or Club who knowingly executes or files a false certification required by Sections 1(a), 1(b), 2(a), or 2(b) of this Article shall be subject to a fine of up to $375,000, upon a finding of such violation by the Special Master. Authority to impose such a fine

161

shall rest with the Special Master or the Commissioner, consistent with the allocation of authority in Article XXV (Enforcement of the Salary Cap and Entering Player Pool), Section 6(b). Notwithstanding the foregoing, in no circumstances shall a fine under this section be imposed upon any person or Club if such person or Club is also being sanctioned for the same conduct under Article XXV, Section 6 above.

162

# ARTICLE XXX
# CONSULTATION AND INFORMATION SHARING

*Section 1.* **Consultation and Communications:**

(a)    In any Capped Year, during the period from March 1 through July 15, or the scheduled date of the first day of the first NFL training camp that season, whichever is later, of each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet in person or by telephone conference once a week with the General Counsel of the NFLPA (or his designee) for the purpose of reviewing each Club's Club Salary summary and advice regarding the interpretation of the Salary Cap rendered since the last such meeting, or as otherwise agreed to by the parties.

(b)    Subject to any claim of attorney-client and/or work product privilege, any communications under this Section may be referred to or used by the NFL or the NFLPA in any proceeding. By agreeing to this Section, neither the NFL nor the NFLPA intends to waive or shall be deemed to have waived any attorney-client or other privilege with respect to any communications.

*Section 2.* **Salary Summaries:** During the period between March 1 and the first day of the regular season during any Capped Year, the NFL shall provide the NFLPA with Salary and Team Salary summaries for each Team on a weekly basis. Upon the first date of the regular season and during the remainder of any Capped Year, such information shall be provided as often as it is prepared for use by the NFL (but no less often than once each month). Prior to the first day of the regular season during any Uncapped Year, the NFL shall provide the NFLPA with an estimate of Projected TR, and a revised estimate on the first day of each month thereafter in any such year.

*Section 3.* **Notice of Invalid Contract:** If the NFL informs a Club that a proposed player transaction would be inconsistent with or in violation of the terms of the Settlement Agreement or this Agreement as interpreted by the NFL, the NFL shall promptly notify the NFLPA that such an interpretation has been communicated and the basis for such interpretation. The NFL shall provide such notice as soon as possible, but in no event later than five (5) business days following the communication of such interpretation to the Club.

*Section 4.* **Neutral Verifier:** The NFLPA shall designate, subject to the reasonable approval of the NFL, a third party to serve as the neutral verifier of Player Contract offers (the "Neutral Verifier"). A Club that wishes to verify a Player Contract offer may contact the Neutral Verifier and request him or her to contact the Club that is asserted to have extended the offer, to verify the terms and conditions of the offer. The Neutral Verifier shall prompt-

163

Article XXX, Consultation and Information Sharing

ly contact the offering Club to ascertain such terms and conditions, and shall promptly advise the inquiring Club of such information, and shall promptly advise the affected player of the inquiry and the information communicated. Communications pursuant to this paragraph shall be by telephone or telecopy, and the costs of the Neutral Verifier shall be equally borne by the NFL on the one hand, and the NFLPA on the other hand.

**Section 5. Copies:** Within two (2) business days of their receipt by the NFL, the NFL shall provide to the NFLPA, at no expense, a copy of any and all Player Contracts and Offer Sheets that are entered into or extended during the term of this Agreement.

**Section 6. Meetings:** During each League Year covered by this Agreement, the Executive Vice President for Labor Relations of the NFL (or his designee) shall meet once a month with the Executive Director of the NFLPA (or his designee), for the purpose of reviewing the implementation of this Agreement.

164

# ARTICLE XXXI
# EXPANSION

*Section 1.* **Veteran Allocation:** The Clubs may determine during the term of this Agreement to expand the number of Clubs and to have existing Clubs make available for assignment to the expansion Clubs the contracts of a certain number of veteran players, up to an average of three (3) per Club, excluding any player who has a no trade clause in his Player Contract.

*Section 2.* **Additional Compensatory Picks:** The Clubs may decide the selection position for expansion teams in the college draft, and may allocate to each expansion Club additional special draft selections in the drafts held prior to each of the first three (3) seasons in which the expansion Clubs will participate in regular league play, up to a maximum of one additional such special draft selection for each expansion Club in each round of the draft in each such year.

*Section 3.* **Entering Player Pool Adjustment:** The Entering Player Pool, and the Rookie Allocation for each expansion team, will be adjusted to account for draft selections awarded to expansion teams pursuant to Section 2.

*Section 4.* **Relocation Bonus:** Any Veteran player selected in any expansion allocation during the term of this Agreement will receive a bonus of $30,000 upon reporting to the expansion Club for pre-season training camp, and an additional bonus of $40,000 upon being placed on the Active or Inactive List, or remaining on the Injured Reserved List, after the beginning of the first regular season game played by the expansion Club. The total amounts paid to players pursuant to this Section shall not be included as Player Costs, Benefits, or Salary under Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary) of this Agreement.

165

# ARTICLE XXXII
## OTHER PROVISIONS

*Section 1.* **CFL Rule:** No Club may sign any player who in the same year has been under contract to a Canadian Football League ("CFL") club at the end of that CFL club's season (regular season or postseason, whichever is applicable).

*Section 2.* **Physically Unable to Perform:** Any player placed on a Physically Unable to Perform list ("PUP") will be paid his full salary while on such list. His contract will not be tolled for the period he is on PUP, except in the last year of his contract, when the player's contract will be tolled if he is still physically unable to perform his football services as of the sixth regular season game.

*Section 3.* **Non-Football Injury:** A player who is placed on a Non-Football Injury or Illness list ("N-F/I") will not be entitled to any compensation under his contract while on such list but, except as provided below, his contract will continue to run while in such status.

A player on N-F/I who is in the final year of his contract (including an option year) will have his contract tolled. However, if the player is physically able to perform his football services on or before the sixth regular season game, the club must pay the player his negotiated salary (pro rata) for the balance of the season in order to toll such player's contract. If such player is taken off N-F/I during the period when such action is allowed by League rules, his contract will not be tolled.

*Section 4.* **Roster Exemption:**

(a)    Certain Players Not Under Contract. After the final roster reduction a Club must agree in writing with an unsigned player who is either an Unrestricted Free Agent, Transition Player, or Franchise Player, prior to signing a Player Contract with such player, on what compensation, if any, the player will be paid if he is placed in a roster exempt status.

(b)    Players Under Contract. If a Club obtains a roster exemption for a player under contract who does not report to his Club until after the first roster reduction, the player will not be entitled to pre-season or regular season compensation until such exemption is removed, provided the player is given written notice of such fact upon reporting to the Club. If such notice is not given to the player, the player must be paid his salary during his exemption.

(c)    Restricted Players. Any player whose contract has expired and who either (i) has two (2) but less than three (3) Accrued Seasons or (ii) is a Restricted Free Agent pursuant to Article XIX (Veteran Free Agency), Section 2, and who has been given the required tender pursuant to Article XVIII (Veterans With Less Than Three (3) Accrued Seasons), Section 2, or

166

Article XIX (Veteran Free Agency), Sections 2(b)(i) or (ii), and who has not signed a contract and has not reported to his Club's pre-season training camp, may be placed on the roster exempt list of his Club under the following conditions:

(i)     If the player has not reported at least the day before the Club's second pre-season game, he may be placed on roster exempt until the day following the Club's first regular season game.

(ii)    If the player has not reported at least the day before the Club's third pre-season game, he may be placed on roster exempt until the day following the Club's second regular season game.

(iii)   If the player has not reported at least the day before the Club's fourth pre-season game, he may be placed on roster exempt until the day following the third regular season game scheduled after the date he actually reports.

(iv)    Any player who is placed on the roster exempt list of his Club, pursuant to Article XXXII, Section 4(c) shall be entitled to full compensation from his Club for any week in which his Club has a "bye" after the date he reports, but while he is still on the roster exempt list. Thus, any such player may not lose more than three (3) weeks of salary as a result of being placed on the roster exempt list. This agreement shall not affect the number of regular season games for which the player can be placed on the roster exempt list, and thus for which the player may not play for his Club, in accordance with Subsections (i)-(iii) above. Nothing herein shall affect any right or obligation the player or Club otherwise may have concerning compensation to the player.

(v)     No player may be placed on roster exempt under this Subsection unless the Club has provided written notice to the player and the NFLPA of its intent to place the player on roster exempt at least five (5) days prior to the Club's second pre-season game. Once such written notice is provided, the Club must place the player on roster exempt in accordance with Subsections (i)-(iii) above. For purposes of this Article, extra pre-season games such as the Canton Hall of Fame Game and the American Bowl shall not count. When placed on roster exempt pursuant to this Subsection, the player shall not be entitled to compensation.

(d)     Except as provided in Subsection (c) above, for purposes of this Section, roster exemptions shall be for no more than two (2) weeks of the regular season.

**Section 5. Arena Football Players:**

(a)     Players under an NFL Player Contract may not be allocated to a club in the Arena League, whether or not that Arena League club is commonly owned with an NFL Club.

(b)     Otherwise eligible Arena League players who would be Rookies in the NFL may be drafted by any NFL Club pursuant to current draft procedures, even if under contract to an Arena League Club.

167

(c)     Before a player under contract in the Arena League may be signed to an NFL Player Contract, he must be released by the Arena League club from any pre-existing contract obligations in the Arena League, including any residual contract rights relating to negotiation, first refusal, etc., and except for players to whom an NFL Club has draft rights, will be considered an Unrestricted Free Agent. This provision refers solely to contractual rights between a player and a team in the Arena Football League and does not refer to the terms of any collective bargaining agreement in the Arena League.

(d)     A player whose most recent contract to play professional football was with an AFL team ("Related AFL Team") that shares common ownership with an NFL Club ("Related NFL Club") may not sign a Player Contract with that Related NFL Club until after a period of 72 hours following the termination or expiration of the player's contract with the Related AFL Team. During that 72-hour period, the player shall be completely free to negotiate and sign a Player Contract with any other Club. The terms of this Subsection (d) are subject to any rights that any Club may have under Article XVI (College Draft), and any Club that has drafted such a player consistent with the terms of this Agreement may sign such a player at any time permitted by this Agreement.

(e)     NFL clubs and Arena League clubs may have common practice facilities, but may not participate in common classroom work, film study, drills, scrimmages, or other on- or off-field work.

(f)     Any NFL player suspended for one year or less in the NFL by the Commissioner or his Club may not play for an Arena League team that is commonly-owned with his NFL Club during any term of his suspension that overlaps with the period of time the player is under contract to his NFL Club.

(g)     If an Arena League club that is commonly-owned with an NFL Club engages in conduct that would violate NFL Rules, including but not limited to the NFL's anti-tampering policy, the violation shall be attributed to the NFL Club, so long as any sanctions are imposed consistent with the terms of this Agreement and the NFL Constitution and Bylaws.

168

# ARTICLE XXXIII
## SQUAD SIZE

*Section 1.* **Active List:** For each regular season, the Active List limit will be 45 players per Club. This limit may not be reduced by the Clubs for the duration of this Agreement; provided, however, that individual Clubs may carry less than 45 players on their Active Lists during the regular season, but at no time less than 42.

*Section 2.* **Pre-Season:** The pre-season cutdown dates and active player limits on such dates will be as determined by the Clubs. In the event the Clubs make a determination during the term of this Agreement that they wish to institute a "down-and-up" once during the pre-season, they may do so, provided that the active player limit may not be reduced below 40 at any time during the pre-season and the Active List limit must return to 45 by the start of the regular season.

*Section 3.* **Inactive List:** Inactive List players will receive the same benefits and protections as Active List players.

*Section 4.* **Active and Inactive List Limit:** In any League Year, a Club's Active and Inactive Lists shall not exceed 53 players.

169

# ARTICLE XXXIV
## PRACTICE SQUADS

**Section 1. Practice Squads:**

(a)      The League may elect in any League Year in accordance with this Article to establish practice squads not to exceed eight (8) players per Club. The League's election in any one season shall not determine or affect its election in any subsequent season.

(b)      The League may elect to allow some or all Clubs to add to their practice squads one additional player, who shall not count against the limit above, whose citizenship and principal place of residence are outside the United States and its Territories ("International Player"). The League's election in any one season shall not determine or affect its election in any subsequent season. Such International Players shall be subject to the same terms and conditions of employment that apply to other practice players except that they (1) may not, during the term of their practice player contract, negotiate or sign an NFL Player Contract with any Club; and (2) may not practice with any Club following the last Conference Championship Game unless both Conference Championship teams have such a player. In addition, notwithstanding the provisions of Section 4 below, such International Player shall be eligible to serve on a Practice Squad for three (3) additional seasons after the completion of the player's year(s) as an International Player. As set forth in Article XXXIV, Section 3, the weekly salary for such international players shall not be included in the employing Club's Team Salary and shall be deducted from the calculation of the Salary Cap in the same manner as any Player Benefit.

**Section 2. Signing With Other Clubs:**

(a)      Any player under contract to a Club as a practice squad player shall be completely free to negotiate and sign a Player Contract with any Club at any time during the League Year, to serve as a player on any Club's Active or Inactive List, and any Club is completely free to negotiate and sign such a Player Contract with such player, without penalty or restriction, including, but not limited to, Draft Choice Compensation between Clubs or First Refusal Rights of any kind, or any signing period, except that such player shall not be permitted to sign a Player Contract with another Club to serve as a practice squad player while under contract as a practice squad player.

(b)      Notwithstanding Subsection (a) above, a practice squad player may not sign an NFL Player Contract with his Club's next opponent later than 4:00 p.m., New York time, on the sixth day preceding the game (except in bye weeks, when the prohibition commences on the tenth day preceding the game).

**Section 3. Salary:** Minimum salary for a practice squad player shall be

170

$4,700 per week for the 2006-07 League Years, $5,200 per week for the 2008-10 League Years and the 2011 League Year if it is an Uncapped Year, and $5,700 per week for the 2011 League Year if it is a Capped Year and the 2012 League Year, including postseason weeks in which his Club is in the playoffs.

*Section 4.* **Eligibility:**

(a)      The practice squad shall consist of the following players, provided that they have not served more than two (2) previous seasons on a Practice Squad: (i) players who do not have an Accrued Season of NFL experience; and (ii) free agent players who were on the Active List for fewer than nine (9) regular season games during their only Accrued Season(s). An otherwise eligible player may be a practice squad player for a third season only if the Club by which he is employed that season has at least 53 players on its Active/Inactive List during the entire period of his employment.

(b)      A player shall be deemed to have served on a Practice Squad in a season if he has passed the club's physical and been a member of the club's Practice Squad for at least three (3) regular season or postseason games during his first two (2) Practice Squad seasons, and for at least one regular season or postseason game during his third Practice Squad season. (A bye week counts as a game provided that the player is not terminated until after the regular season or postseason weekend in question.)

*Section 5.* **Active List:** If a player on the Practice Squad of one club (Club A) signs an NFL Player Contract with another club (Club B), (1) the player shall receive three (3) weeks salary of his NFL Player Contract at the 53-player Active/Inactive List minimum even if he is terminated by Club B prior to earning that amount, and (2) Club B is required to count the player on its 53-player Active/Inactive List for three (3) games (a bye week counts as a game) even if he is terminated or assigned via waivers to another club or is signed as a free agent to another club's 53-player roster or another club's Practice Squad prior to that time. If the player is terminated from Club B's 53-player roster and signed to Club B's Practice Squad, he shall continue to count on the club's 53-player Active/Inactive List but shall not count against the eight-player Practice Squad limit until the three-game requirement has been fulfilled. If a player is terminated prior to the completion of the three-game period and is signed to Club B's Practice Squad or is signed or assigned to another club's 53-player roster or Practice Squad, any salary (as that term is defined in Article XXIV, Section 1(c)) that he receives from any NFL club applicable to the three-game period shall be an offset against the three (3) weeks salary that he is entitled to receive from Club B.

171

# ARTICLE XXXV
# OFF-SEASON WORKOUTS

**Section 1. Voluntary Workouts:** No player shall be required to attend or participate in any off-season workout program or classroom instruction of a Club other than as provided in Article XXXVI (Minicamps). Any other Club off-season workout programs and classroom instruction sessions shall be strictly voluntary and take place in the manner and time period set forth in this Article.

**Section 2. Time Periods:**

(a)      Subject to the limitations in Subsection (b) below, from the end of the previous NFL season until the opening of training camp, Clubs may schedule or conduct off-season workout programs for no more than fourteen (14) total weeks, and no more than four (4) workouts per week, for any individual player. Such workout programs shall not be permitted on weekends. During such workout programs, there may be no more than fourteen (14) days of organized team practice activity, to be defined by the Player/Club Operations Committee. Nothing herein shall prevent a Club from permitting an individual player to work-out on his own on weekends using Club facilities if he wishes to do so.

(b)      Each year off-season workout programs may not begin, and players may not be asked to voluntarily attend any such program, earlier than a date to be agreed upon by the Management Council and the NFLPA, and announced before the conclusion of the prior regular season. Each year on a date to be agreed upon by the parties, each Club shall provide the Management Council and the NFLPA with the Club's schedule for its off-season workout program that year, and shall advise the Management Council and the NFLPA in writing in advance of any changes to that schedule; if the Management Council provides such information to the NFLPA, the Club's obligation under this sentence shall be deemed satisfied. Notwithstanding the foregoing, any player who (1) is under contract or tender to an NFL Club; and (2) has been officially allocated by that Club to the NFL Europe League may commence voluntary off-season workouts with his NFL Club on the day following the NFL Europe League's prescribed yearly deadline for allocation of NFL players.

**Section 3. Payment:** Each player shall receive at least the following amounts per day for any workouts or classroom instruction in which he participates pursuant to a Club's voluntary off-season workout program, provided the player fulfills the Club's reasonable off-season workout requirements: $110 for the 2006 League Year; $120 for the 2007-08 League Years; $130 for the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year; and $145 for the 2011 League Year if it is a Capped Year and the 2012 League Year. Players who (1) are under contract or tender to

172

an NFL Club; and (2) have been officially allocated by that Club to the NFL Europe League who participate in a Club's off-season workout program may also receive expenses for travel, board, and lodging subject to the terms and conditions set forth in Article XXIV, Section 7(e)(iv)(3).

**Section 4. Injuries:** Any player injured during off-season workouts will be protected in the same manner as if injured during the Club's pre-season training camp, provided he is working out at the Club's facility under the direction of a Club official.

**Section 5. Miscellaneous:**

(a)     No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) is expressly prohibited in all off-season workouts. All Clubs, coaches and other Club officials shall follow all of the rules regarding off-season workouts set forth in Appendix L hereto.

(b)     During the off season program period, except for the fourteen (14) days of organized team practice activity and mini-camps, players may be (1) at the Club facility no more than four (4) hours per day, no more than four (4) days per week, and not during weekends; and (2) on the field no more than ninety (90) minutes per day. In addition, the Club may not specify to any player more than two (2) specific hours a day during which it suggests that the player be at club facilities. Any player participating in an off-season workout program may select the other two (2) hours in which he wishes to attend to conduct his weight training, etc., as long as he does so during the hours of operations of the Club's weight room.

**Section 6. Pre-Training Camp Period:** During the ten (10) consecutive days immediately prior to the mandatory veteran reporting date for each Club's pre-season training camp (as specified in Article XXXVII, Section 5), no veteran player (other than (i) quarterbacks and (ii) other players who (1) were on the Injured Reserve, Physically Unable to Perform or Non-Football Injury or Illness list at the end of the previous season; or (2) failed a physical examination given by a team physician at any time after the last game of the previous season; or (3) sustained a football-related or non-football-related injury or illness during the off-season; or (4) had surgery during the off-season regarding a football or non-football-related condition regardless of when such condition arose) shall be permitted to participate in any organized workouts or other organized football activity of any kind, or any football activity with any coach, on either a voluntary or involuntary basis, in connection with or on behalf of the Club or Club Affiliate. This prohibition shall apply notwithstanding any other provision of this Agreement, or

173

any provision in any Player Contract. Notwithstanding the above, nothing in this Section shall prevent any player from using any Club facility, subject to League rules and the Club's permission, to work out on his own at any time on a voluntary basis without the participation of any coach, trainer or other Club personnel. Nothing in this Section shall prohibit organized player activity in personal appearances or promotional activities on behalf of the Club or the League which have been agreed to by the player.

*Section 7. Rookie Premiere:* Invited Rookies will be permitted by their respective Clubs to attend the NFL Players Rookie Premiere provided that: (i) such event is scheduled during the month of May; (ii) such event encompasses a maximum of four (4) consecutive days, including both a Saturday and a Sunday; and (iii) the NFLPA provides the Management Council with the dates for the next Rookie Premiere not later than February 1 of each year.

*Section 8.* **Enforcement:**

(a)        The head coach, who is responsible for any conduct in violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), shall be subject to a fine to be determined by the Commissioner, which fine(s) shall not be reimbursable by the Club or any other person. The NFLPA and any player involved in any such violation shall each have the right to enforce Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), through an expedited non-injury grievance arbitration proceeding conducted pursuant to Article IX (Non-Injury Grievance) without charge to the four (4) grievances referenced in the third and fourth sentences of Section 4 of that Article. As soon as practicable after the commencement of any such proceeding, the NFLPA shall be provided with all tape, film, or other recorded evidence of any workout that is the subject of the proceeding. In the event that the Arbitrator finds any violation of Sections 5 or 6 of this Article (including but not limited to the rules in Appendix L), the Commissioner shall promptly impose the fine upon the head coach, and the League shall promptly provide the NFLPA with written evidence that the fine has been paid and donated to a qualified charitable organization. Any head coach who is the subject of a proceeding under this section shall have the right to participate in the proceeding and defend himself. It shall be an absolute defense if the head coach proves that the team's actions were based on a good faith interpretation of Sections 5 and 6 of this Article, and the rules set forth in Appendix L.

(b)(i)   The Management Council and the NFLPA shall each designate one or more representatives to investigate claims of violations of the rules set forth above or any other rules relating to off-season workouts set forth in this Agreement. At the request of either party, these representatives will inspect appropriate areas of Club facilities without notice to the Club and, upon request from any representative, shall be provided, as quickly as reasonably possible, with copies of film or other documentation any repre-

174

sentative deems relevant to any possible violation.

(ii)     Within forty-eight (48) hours of the commencement of a complaint by the NFLPA to the Management Council, or sooner if practical, the Executive Director of the NFLPA and the Executive Vice President-Labor Relations of the NFL shall be advised of the status of the complaint and these persons shall attempt to determine if a violation occurred. If they are unable to agree upon the outcome, the matter will be immediately referred to a non-injury grievance arbitrator who will render a decision within forty-eight (48) hours of the submission of the dispute. If the arbitrator determines that a violation has occurred, or if the Executive Director of the NFLPA and the Executive Vice President-Labor Relations of the NFL agree that a violation has occurred, the next scheduled week of the Club's off-season program shall be cancelled, excluding mini-camps, and no player may work out at any team facility during the cancelled week. However, in such event, players participating in the Club's off-season program shall be deemed to have participated in the required number of days for the cancelled week in order to qualify for off-season workout pay. If the arbitrator finds two (2) separate violations of these rules in the same League Year, the Commissioner shall cause the Club to forfeit a fourth-round draft selection in the next draft in which the Club has such a selection. No conduct occurring prior to the date upon which any non-injury grievance is filed under these rules may serve as the basis for a finding of a second violation by a Club; a second violation by a Club in the same League Year must be predicated upon facts arising after the grievance alleging the first violation has been filed.

(iii)     Except as provided in the fourth preceding sentence, these limitations on off-season workouts shall not preclude any player from working out on his own at any time, including weekends. By agreeing to the sanctions in this Subsection (b), the parties have not waived or affected their respective positions as to the issue of the Commissioner's authority to impose discipline, including the forfeiture of draft choices, for conduct within the scope of his authority under the Constitution and Bylaws.

175

# ARTICLE XXXVI
# MINICAMPS

***Section 1.* Number:** Each League Year each Club may hold a maximum of one mandatory minicamp for veteran players. If a Club hires a new head coach after the end of the regular season, that Club may hold two (2) additional voluntary minicamps for veteran players. There is no limitation on the number of minicamps a Club may hold for rookie players.

***Section 2.* Length:** No minicamp may exceed three (3) days in length, plus one day for physical examinations. If possible, minicamps should be scheduled for weekends and not in conflict with previously scheduled meetings of the NFLPA Board of Reps or the annual NFLPA convention.

***Section 3.* Expenses:**
(a)     Any veteran player who attends a minicamp will receive meal allowances in accordance with Article XXXIX (Meal Allowance), Section 1 of this Agreement, plus all travel expenses to and from the camp, plus "per diem" payments at the rate provided in Article XXXVII (Salaries), Section 4 of this Agreement. In addition, the Club will provide housing at minicamps for players coming from out-of-town.

(b)     If a rookie player (defined as in Article XXXVIII, Section 1) signed a Player Contract with any Club for the prior League Year, he shall receive, for each day that he attends minicamp, the following compensation, but no other compensation: (i) the prorated portion of the weekly per diem specified for the current League Year (as set forth in Article XXXVII, Section 3); (ii) the meal allowance specified for the current League Year (as set forth in Article XXXIX, Section 1); and (iii) all travel expenses to and from the camp, plus housing (for players coming from out-of-town).

***Section 4.* Contact:** There will be no contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run) or use of pads (helmets permitted) at minicamps.

***Section 5.* Injuries:** Any player injured in a Club's minicamp will be protected in the same manner as if injured during the Club's pre-season training camp.

176

# ARTICLE XXXVII
## PRE-SEASON TRAINING CAMPS

**Section 1. Definition:** For purposes of this Article, a "rookie player" is defined as any player who has not completed one season in which a year of Credited Service under the Bert Bell/Pete Rozelle Plan has been earned, and a "veteran player" is defined as any player who has completed one or more seasons in which a year of Credited Service has been earned under such Plan(s).

**Section 2. Room and Board:** All players will receive room and board during the pre-season training camp, and housing between training camp and the Tuesday prior to their Club's first regular season game for those players who have not as yet established residence in the Team city.

**Section 3. Rookie Per Diem:** A rookie player will receive "per diem" payments at the rate of $775 per week in the 2006 League Year, $800 per week in the 2007-08 League Years, $825 per week in the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year, and $850 per week in the 2011 League Year if it is a Capped Year and the 2012 League Year, commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game.

**Section 4. Veteran Per Diem:** A veteran player will receive "per diem" payments at the rate of $1,100 per week in the 2006-07 League Years, $1,225 per week in the 2008-10 League Years and the 2011 League Year if it is an Uncapped Year, and $1,375 per week in the 2011 League Year if it is a Capped Year and the 2012 League Year, commencing with the first day of pre-season training camp and ending one week prior to the Club's first regular season game, and an additional $200 per week during the pre-season, commencing with the Club's first pre-season game (exclusive of the Canton Hall of Fame Game and any International Game) and ending one week prior to the Club's first regular season game.

**Section 5. Reporting:** No veteran player other than quarterbacks and injured players, will be required to report to a Club's official pre-season training camp earlier than fifteen (15) days (including one day for physical examinations) prior to its first scheduled pre-season game or July 15, whichever is later. The July 15 date will not apply to Clubs participating in the Canton Hall of Fame Game or any American Bowl game scheduled around the Canton Hall of Fame Game date.

**Section 6. Number of Pre-Season Games:** The NFL will use its best efforts to hold no more than four pre-season games.

177

***Section 7. Telephones:*** Whenever possible, a player will be permitted to have a telephone in his room at pre-season training camp at his own expense.

***Section 8. Expenses:*** Clubs will reimburse all players under contract for reasonable traveling expenses incurred in reaching training camp from the players' residences, upon submission of vouchers. There will be no deductions by the Clubs for these payments. Players who are released by a Club will be reimbursed for their return trips to their residences, upon submission of vouchers.

178

# ARTICLE XXXVIII
# SALARIES

***Sections 1-5.*** [*Omitted*]

***Section 6.*** **Minimum Salaries:**

(a)      Beginning in the 2006 League Year, the Paragraph 5 Salary of any player on a Club's Active/Inactive List at any time during the regular season will be not less than the following:

| League Year | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Zero Credited Seasons | 275 | 285 | 295 | 310 | 325 | 340 | 355 |
| One Credited Season | 350 | 360 | 370 | 385 | 400 | 415 | 430 |
| Two Credited Seasons | 425 | 435 | 445 | 460 | 475 | 490 | 505 |
| Three Credited Seasons | 500 | 510 | 520 | 535 | 550 | 565 | 580 |
| Four-Six Credited Seasons | 585 | 595 | 605 | 620 | 635 | 650 | 665 |
| Seven-Nine Credited Seasons | 710 | 720 | 730 | 745 | 760 | 775 | 790 |
| Ten or more Credited Seasons | 810 | 820 | 830 | 845 | 860 | 875 | 890 |

(all amounts in thousands of dollars)

provided, however, that if any League Year other than the 2012 League Year is an Uncapped Year, then the minimum Paragraph 5 Salary for each such Uncapped Year shall only increase $10,000 from the prior League Year (*e.g.*, if the 2010 League Year is Uncapped, then the minimum Paragraph 5 Salary for a player with zero Credited Seasons for 2010 shall be $320,000 instead of $325,000).

(b)      Beginning in the 2006 League Year, the Minimum Salary of any player not on a Club's Active/Inactive List (excluding practice squad) shall be as follows:

| League Year | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|
| Zero Credited Seasons | 180 | 190 | 200 | 215 | 230 | 245 | 260 |
| One Credited Season | 195 | 205 | 215 | 230 | 245 | 260 | 275 |
| Two Credited Seasons | 210 | 220 | 230 | 245 | 260 | 275 | 290 |
| Three Credited Seasons | 250 | 260 | 270 | 285 | 300 | 315 | 330 |
| Four-Six Credited Seasons | 275 | 285 | 295 | 310 | 325 | 340 | 355 |
| Seven-Nine Credited Seasons | 300 | 310 | 320 | 335 | 350 | 365 | 380 |
| Ten or more Credited Seasons | 325 | 335 | 345 | 360 | 375 | 390 | 405 |

(all amounts in thousands of dollars)

provided, however, that if any League Year other than the 2012 League Year is an Uncapped Year, then the minimum Paragraph 5 Salary for each such Uncapped Year shall only increase $10,000 from the prior League Year (e.g., if the 2010 League Year is Uncapped, then the minimum Paragraph 5 Salary

179

for a player with zero Credited Seasons for 2010 shall be $225,000 instead of $230,000).

**Section 7. Credited Season:** For purposes of calculating Credited Seasons under this Article only, a player shall earn one Credited Season for each season during which he was on, or should have been on, full pay status for a total of three (3) or more regular season games, but which, irrespective of the player's pay status, shall not include games for which this player was on: (i) the Exempt Commissioner Permission List; (ii) the Reserve PUP List as a result of a non-football injury; (iii) a Club's Practice or Developmental Squad; or (iv) a Club's Injured Reserve List.

**Section 8. Other Compensation:** A player will be entitled to receive a signing or reporting bonus, additional salary payments, incentive bonuses and such other provisions as may be negotiated between his Club (with the assistance of the Management Council) and the player or his NFLPA-certified agent. The Club and the player or his NFLPA-certified agent will negotiate in good faith over such other compensation; provided, however, that a Club will not be required to deal with the player or his NFLPA-certified agent on a collective or tandem basis for two (2) or more players on that Club. Nothing in this Section will be affected by Article III (Scope of Agreement), Section 2.

**Section 9. Arbitration:** The question of whether or not the Club, the Management Council, the player or his NFLPA-certified agent has engaged in good faith negotiations over such other compensation may be the subject of a non-injury grievance under Article IX (Non-Injury Grievance). If the arbitrator finds that any party did not engage in good faith negotiations, he may enter a cease and desist order; provided, however, that the arbitrator may not compel any party to agree to anything or require the making of a concession by any party in negotiations.

**Section 10. Payment:** Unless agreed upon otherwise between the Club and the player, each player will be paid at the rate of 100% of his salary in equal weekly or bi-weekly installments over the course of the regular season commencing with the first regular season game. Nothing in this Article invalidates or otherwise affects any deferred compensation arrangement or any other method of payment which may have been entered into between a Club and a player or which after the execution of this Agreement may be negotiated between a Club and the player or his NFLPA-certified agent.

**Section 11. Deferred Paragraph 5:** A Player Contract may provide for deferral of no more than 50% of the player's Salary up to and including a total of the first $1 million, and may provide for deferral of no more than 75% of the player's Salary in excess of $1 million.

180

*Section 12.* **Number of Regular Season Games:** The League and/or Clubs cannot at any time during this Agreement increase the number of regular season games per team from the standard of sixteen (16) without providing ninety (90) days notice in writing to the NFLPA and thereafter negotiating with the NFLPA with regard to additional compensation to be paid to players for additional regular season games. If the parties are unable to agree on additional compensation within thirty (30) days after notice has been given, the issue of additional compensation may be submitted by either party to the Impartial Arbitrator under Article XXVII (Impartial Arbitrator) for an expedited hearing and a final and binding decision. The Impartial Arbitrator will have the full authority to decide the amount of additional compensation to which the players will be entitled. In no event will the regular season be extended during this Agreement to include more than eighteen (18) games per team.

*Section 13.* **Copies of Contracts:** In connection with the NFLPA's exclusive right to represent all players in its bargaining unit in negotiations with NFL Clubs, it is agreed and understood that: (a) copies of all contracts signed by Rookie and Veteran players after the date of execution of this Agreement will be provided to the NFLPA within two (2) days of their receipt by the Management Council; and (b) all information in such contracts will be made available to all Clubs by the Management Council. Any dispute regarding compliance of (a) above shall be resolved by the Impartial Arbitrator. The determination of the Impartial Arbitrator shall be made within ten (10) days of the application, and shall consider all information relating to such dispute submitted by such date. The determination of the Impartial Arbitrator shall be final and Clubs are prohibited from negotiating for or insisting upon any confidentiality clauses in Player Contracts.

*Section 14.* **Split Contracts:**
    (a)      [*Omitted*]
    (b)      After the point in the regular season at which a player with four (4) or more Accrued Seasons who signed his Player Contract when he was a Restricted Free Agent has been placed on the Active List of his Club, he must for the balance of that regular season be paid his Active List salary if he is thereafter placed on the Inactive List, whether or not his Player Contract calls for a lower salary if he is placed on the Inactive List.

*Section 15.* **Funding of Deferred and Guaranteed Contracts:** The NFL may require that by a prescribed date certain, each Club must deposit into a segregated account the present value, calculated using as a discount rate the one-year Treasury Note rate as published in *The Wall Street Journal* on February 1 of each year, of the gross amount, less $1,000,000, of deferred and guaranteed compensation owed by that Club with respect to Club

181

funding of Player Contracts involving deferred or guaranteed compensation; provided, however, that with respect to guaranteed contracts, the amount of unpaid compensation for past or future services to be included in the funding calculation shall not exceed seventy-five (75%) percent of the total amount of the contract compensation. The present value of any future years' salary payable to a player pursuant to an injury guarantee provision in his NFL Player Contract(s), shall not be considered owed by a Club under this Section until after the Club has acknowledged that the player's injury qualifies him to receive the future payments.

182

# ARTICLE XXXVIII-A
# MINIMUM SALARY BENEFIT

*Section 1.* **Qualifying Players:** For purposes of this Article, a "Qualifying Player" shall be defined as a player with four (4) or more Credited Seasons, whose contract has expired or been terminated, who signs a Qualifying Contract.

*Section 2.* **Qualifying Contracts:** For purposes of this section, a "Qualifying Contract" shall be defined as a Player Contract signed by a Qualifying Player that (a) covers only a single League Year and (b) contains no terms that affect compensation in any way other than (1) the applicable minimum Paragraph 5 Salary, (2) up to $40,000 in additional compensation for the 2006-08 League Years, or up to $50,000 in additional compensation for the 2009-11 League Years (e.g., signing bonus allocation, roster, report, or any incentive (LTBE or not)), and/or (3) a guarantee for salary and/or Salary advance of up to the Minimum Salary for a player with two (2) Credited Seasons (e.g., $425,000 in the 2006 League Year). Thus, for example, a contract that includes an option year is not a Qualifying Contract. Similarly, a Qualifying Contract may not be extended or renegotiated in any manner. Split contracts, if they otherwise qualify, may be Qualifying Contracts. If the player's prior contract was terminated, he is eligible to sign a Qualifying Contract if he does not earn more than $40,000 (2006-08 League Years) or $50,000 (for the 2009-2011 League Years) in additional compensation less the amount of any additional compensation and/or guaranteed Salary earned during that League Year under the terminated years of his prior contract(s), but his combined compensation from the terminated contract(s) earned for that League Year and the Qualifying Contract cannot exceed the applicable minimum for that League Year plus $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years) in additional compensation.

*Section 3.* **Additional Compensation Rules:**

(a) Per-day off-season workout payments shall not be considered in determining "additional compensation" under Section 2 above, if such payments do not exceed the minimum level prescribed by Article XXXV (e.g., $110 per day for fourteen (14) four-day weeks ($6,160) during the 2006 League Year).

(b) If, however, the Player Contract provides for off-season workout payments above the minimum level, (e.g., $111 per day for fourteen (14) four-day weeks during the 2006 League Year), then the total of those payments (e.g., $6,216 in the prior example) shall be included in determining "additional compensation."

(c) If the Player Contract provides for off-season workout bonus payments on a basis other than a per-day payment, such amounts shall count as "additional compensation" but will not affect the treatment of any off-

183

season workout payments that do not exceed the minimum prescribed level. For example, without limitation on any other example, a player with a 2006 Player Contract that provides for a $40,000 bonus payable to the player for participating in at least ten (10) days of off-season workouts, in addition to the per-day minimum of $110 and no other "additional compensation," has "additional compensation" of $40,000.

(d)    If a player receives from a single Club, under a series of contracts, off-season workout payments specified on a per-day basis that average more than the minimum level prescribed by Article XXXV (e.g., more than $110 per day during the 2006 League Year), then all of the off-season workout payments paid on a per-day basis shall count as "additional compensation."

(e)    If a player is eligible to sign a Qualifying Contract with a New Club in accordance with Section 9 below, the full amount of any signing bonus payable to the player under any Player Contract that was executed in the same League Year as the proposed Qualifying Contract shall count against the "additional compensation" that can be earned by such player in accordance with Section 2 above. No other signing bonus amounts from contracts other than the Qualifying Contract shall count as "additional compensation" for such player.

(f)    If a player is eligible to sign a Qualifying Contract with his Old Club in accordance with Section 11 below, the circumstances in which signing bonus from a contract other than the Qualifying Contract may count against the $40,000 (or $50,000 during the 2009-2011 League Years) in additional compensation that can be earned by the player in accordance with Section 2 above, shall be determined exclusively under Section 11 below, the terms of which are not affected by Subsection 3(e) above.

**Section 4. Payments:** Players with Qualifying Contracts shall be paid 1/17th of the specified minimum salary on a weekly basis (e.g., 1/17 of $810,000 per week in the 2006 League Year for a player with ten (10) or more Credited Seasons).

**Section 5. Reduced Salary Cap Count:** Notwithstanding any other provision of this Agreement, the Salary Cap count for a Qualifying Contract shall be the same as the minimum salary for a player with two (2) Credited Seasons. For split "Qualifying Contracts," the Salary Cap count will equal either the difference between the player's minimum salary and the full minimum salary for players with two (2) Credited Seasons (if the player is on an Active/Inactive List) or the difference between the player's split minimum salary and the split minimum for players with two (2) Credited Seasons (if the player is not on an Active/Inactive List).

**Section 6. Minimum Salary Benefit Calculation:** The difference between

184

the Salary Cap count for a Qualifying Contract and the stated minimum for the Qualifying Player's years of service shall be counted as a Player Benefit ("the Minimum Salary Benefit"). For example, in the 2006 League Year, a Qualifying Player with five (5) Credited Seasons shall receive a Minimum Salary of $585,000; however, only $425,000 shall count against his Club's Team Salary. The difference of $160,000 shall be counted as a Player Benefit. Similarly, for example, in the 2006 League Year, a Qualifying Player with 12 Credited Seasons shall receive a Minimum Salary of $810,000; however, only $425,000 shall count against his Club's Team Salary. The difference of $385,000 shall be counted as a Player Benefit.

**Section 7. Extensions of Qualified Contracts:** After the Club's last game of a season and prior to the expiration of the Qualifying Contract, the current Club and Player may agree to extend for one year a Qualifying Contract, provided that the terms of the extension comply with Section 2 above.

**Section 8.** [*Omitted*]

**Section 9. Terminated Qualifying Players:** If his contract is terminated, a Qualifying Player may sign a Qualifying Contract with any "New Club" (defined as any Club that did not hold contractual rights to the player's services on the final day of the prior regular season or last postseason game).

**Section 10. Players Moving to New Club:** In the event that a player signs a Qualifying Contract with a "New Club," the player cannot be traded back to the "Old Club" during that League Year unless the player's prior contract(s) with the Old Club meets the requirements of Section 11 below. In the event that the player signs a Qualifying Contract with a New Club and the Qualifying Contract is terminated by the New Club, the player may sign a Qualifying Contract with his Old Club. Nothing in the foregoing shall prevent a player from signing a contract with his Old Club if the Old Club does not seek to have the contract treated as a Qualifying Contract.

**Section 11. Player Returning to Old Club:** A player whose prior contract was terminated may sign a Qualifying Contract with his "Old Club" (defined as the Club that held contractual rights to the player's services on the final day of the prior regular season or last postseason game), provided that the Old Club did not, on or after January 1 in the calendar year that preceded the calendar year in which his contract was terminated, (a) renegotiate and/or extend his prior contract to increase or guarantee compensation or to convert non-guaranteed compensation to a signing bonus allocation, for more than $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years) in any League Year of the contract for which the player has received or will receive compensation, or (b) sign the player to a new multi-

185

year contract for more than the applicable Minimum Salary in any League Year of the contract plus $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years) in additional compensation in any League Year of the contract for which the player has received or will receive compensation, and further provided that (c) the sum of any acceleration from signing bonus that was agreed to in a contract executed on or after January 1 in the calendar year in which the contract was terminated and any other additional compensation that the player has received or will receive from that terminated contract does not exceed $40,000 (2006-08 League Years) or $50,000 (2009-2011 League Years). For purposes of the immediately preceding clause (c) only, any acceleration of signing bonus will be counted in the League Year of the contract's termination regardless of whether the contract was terminated before or after June 1, and signing bonus proration for the final League Year of a contract terminated after June 1 in the contract's next to last League Year will be considered to be accelerated. For example, if on January 1, 2006 a player signs a two-year contract for the minimum Paragraph 5 salary in both years and a $80,000 signing bonus, and his contract is terminated on June 2, 2006, the player is not eligible to sign a 2006 Qualifying Contract with his Old Club because the sum of the acceleration of the 2006 prorated portion of the signing bonus ($40,000) that was agreed to in the year of his contract termination and the 2006 prorated portion of signing bonus from that terminated contract ($40,000) resulted in "additional compensation" of more than $40,000 in 2006. However, if the contract was signed on December 1, 2005, and the contract is terminated on June 2, 2006, the player is eligible to sign a Qualifying Contract with his Old Club if that contract includes no other additional compensation.

**Section 12. Players with Expired Contract:** Upon the expiration of a Player Contract, the player may sign a Qualifying Contract with any Club.

**Section 13. Guarantees:** If a Qualifying Contract with guarantees is terminated, the player shall continue to receive the guaranteed portion of the contract and that money shall continue to count against the Team's Salary Cap, but the benefit portion of the player's compensation (including the subsidy) shall cease. For example, if a player with a $710,000 Qualifying Contract, which includes a $425,000 Paragraph 5 guarantee, is terminated after the eighth week of the regular season, he receives $425,000 of the $710,000 Minimum Salary. If the player signs multiple guaranteed Qualifying Contracts covering the same League Year at the applicable Minimum Salary, the maximum guaranteed salary he can earn under all such Qualifying Contracts is $425,000.

**Section 14. Termination Pay:** If a Qualifying Player is eligible for termination pay when he is released and subsequently files a claim, he shall receive the charged amount (e.g., $425,000) plus the full benefit amount (e.g.,

186

$285,000 for a player with a Paragraph 5 Minimum Salary of $710,000). The player does not receive the benefit amount twice (i.e., $995,000).

*Section 15.* **No Benefit for Non-Qualifying Contracts:** Contracts for players with four (4) or more Credited Seasons who sign at the applicable minimum for that year plus more than $40,000 in additional compensation (e.g., prorated signing bonus, etc.) in any of the 2006-08 League Years, or more than $50,000 in additional compensation in any of the 2009-11 League Years, or who otherwise do not qualify for the benefit, are not Qualifying Contracts. The Salary Cap count for such contracts will be in accordance with existing Salary Cap rules. There will be no Minimum Salary Benefit or reduced Salary Cap count for such contracts.

187

## ARTICLE XXXVIII-B
## PERFORMANCE-BASED POOL

**Section 1. Creation of Fund:** In each Capped Year, the NFL shall create a fund known as the Performance Based Pool that will be deducted from the calculation of the Salary Cap in the same manner as any other player benefit.

**Section 2. Amount of Fund:** For the 2006 League Year, the fund shall be $3 million per Club ($96 million League-wide). The fund will increase in each subsequent Capped Year by 5% unless otherwise agreed by the parties; provided, however, that the NFLPA has the unilateral right to reduce or freeze the amount of the fund pursuant to Article XLVI, Section 1.

**Section 3. Mandatory Distribution Each Year:** There shall be mandatory distribution to players of the entire fund each year.

**Section 4. Qualifying Players:** A player shall be eligible for participation in the Performance Based Pool for a League Year if he plays for at least one down in any regular season game. A player may receive multiple distributions if he qualifies for more than one Club in a single League Year.

**Section 5. Methodology:**
(a)      Each player's "Playtime Percentage" shall be calculated by (i) adding the player's total plays on offense or defense, as appropriate, plus special teams and (ii) dividing that number by the team's total plays on offense or defense, as appropriate, plus special teams;
(b)      Each player's "PBP Compensation" shall be calculated by adding his full regular season Paragraph 5 Salary, prorated signing bonus for the current League Year (plus any signing bonus acceleration (without regard to the June 1 rule) due to his having been released during the applicable League Year, unless the player is re-signed by his old Club without having missed a week of the regular season), earned incentives, and other compensation for the current League Year, subject to the following provisions:
(i)      For all players other than those who receive the Minimum Salary Benefit, the full regular season Paragraph 5 Salary shall be used;
(ii)      For players who were released and later resigned by the same Club during the regular season, the Paragraph 5 Salary from the player's initial contract shall be used for the period ending with the player's release, and the Paragraph 5 Salary from the player's subsequent contract shall be used for the period from release through the term of the subsequent contract;
(iii)      For players who receive the Minimum Salary Benefit, the Paragraph 5 Minimum Salary amount for a player with two (2) Credited Seasons, rather than the stated Paragraph 5 Salary, shall be used to calculate

188

Article XXXVIII-B, Performance-Based Pool

the player's PBP Compensation;

(iv)     If a Player Contract is renegotiated after the Monday of the tenth week of the regular season to include an unearned incentive for the current League Year that is treated as signing bonus, such incentive shall not be counted in the calculation of PBP Compensation; and

(v)     If a portion of the Player's Paragraph 5 Salary is treated as a signing bonus, the full Paragraph 5 Salary (rather than the current year's proration) will be counted; all other amounts treated as signing bonus will be included on a prorated basis except for unearned incentives, as described in Subsection (iv) above.

(c)     Each player's "PBP Index" shall be calculated by dividing the player's Playtime Percentage by his PBP Compensation;

(d)     Each player shall receive an allocation from the fund determined by (i) dividing his PBP Index by the sum of the PBP Indices for each player on the Club and then (ii) multiplying that percentage by the Club's total PBP allocation.

**Section 6. Corrections:** If, after the fund has been distributed to players for any given League Year, a player demonstrates that his payment was miscalculated and should have been greater, he shall promptly be paid the additional Performance-Based Pay to which he is entitled, and said amount shall be deducted from the Club's actual PBP allocation for the following League Year.

189

# ARTICLE XXXIX
# MEAL ALLOWANCE

**Section 1. Reimbursement:** A player will be reimbursed for meals not furnished by his Club on travel days during the pre-season, regular season and postseason as follows: 2006-07 League Years—Breakfast $17.00, Lunch $25.00, Dinner $43.00; 2008-10 League Years and the 2011 League Year if it is an Uncapped Year— Breakfast $18.00, Lunch $27.00, Dinner $45.00; and 2011 League Year if it is a Capped Year and 2012 League Year—Breakfast $19.00, Lunch $29.00, Dinner $47.00. For purposes of this Article, commercial airline meals or the equivalent shall not be considered as furnished by the Club.

**Section 2. Travel Day:** Each travel day will commence at the time a Team leaves its home city and will terminate at the time the Team arrives back at its home city. If a Team is traveling for a day game and leaves its home city after 2:00 p.m. on the day prior to the game, players will receive dinner money if the Team does not eat dinner together. When the pre-game meal on a travel day is after 9:00 a.m., players will receive breakfast money.

190

Article XL, Days Off

## ARTICLE XL
## DAYS OFF

*Section 1.* **Rate**: All players will be permitted days off at least at the rate of four (4) days per month as determined by the Clubs, commencing with the first pre-season game and continuing until the last regular season or post-season game played by the respective Clubs.

*Section 2.* **Requirements:** During the 24-hour period constituting a day-off, any injured player may be required to undergo medical treatment and quarterbacks may be required to attend coaches meetings.

# ARTICLE XLI
# MOVING AND TRAVEL EXPENSES

**Section 1. Qualification:** A player qualifying under either of the following categories will receive reimbursement for moving expenses, upon presentation of vouchers, in accordance with Section 2 of this Article:

(a)      Any veteran player who is traded, claimed, assigned in an expansion allocation or a member of a Club which relocates to a different home city, and before the first regular season game of the subsequent League Year, takes up permanent residence in the city of the Club to which he is traded or assigned, by which he is claimed or which relocates to a different home city; or

(b)      Any rookie player who is traded or claimed after the start of the regular season, subsequently makes the Active List of the Club to which he is traded or by which he is claimed, and takes up permanent residence in the city of the Club to which he is traded or by which he is claimed before the first regular season game of the subsequent season.

**Section 2. Moving Expenses:** As a condition of the responsibility of the Club for the costs of moving expenses for a player who qualifies for reimbursement pursuant to Section 1 above, the player must (a) consult with the appropriate Club official in advance concerning his move; and (b) allow the Club to designate the moving company that will accomplish the move. In the event that the player demonstrates reasonable dissatisfaction with the moving company designated by the Club, the player may, at his option, proffer two additional estimates from established moving companies, from which the Club will select a substitute for the moving company initially designated. (In no event shall the Club be liable for any property damage or loss resulting from use of another moving company. This shall not be construed to mean that the Club is responsible for any property damage or loss resulting from using the Club's moving company.) Thereafter, such player will receive reimbursement of his actual, ordinary and reasonable moving expenses, including travel expenses for player and his immediate family.

**Section 3. Travel Expenses:** Any veteran player who is traded or claimed at any time during a League Year, or any rookie player who is traded or claimed after the start of the regular season and subsequently makes the Active List of the Club to which he is traded or by which he is claimed, will receive, upon presentation of vouchers: (a) first class round trip air fare for his wife or the equivalent in cash if she makes the trip by another mode of transportation; (b) a sum not to exceed two months' rent on living quarters in the home city from which the player is traded or by which he is waived, provided, however, that such payment shall be made only if and to the extent that the player is legally obligated to such rent and each such payment shall

192

not exceed $5,500 during the 2006 League Year, $5,750 during the 2007-08 League Years; $6,100 during the 2009-10 League Years and the 2011 League Year if it is an Uncapped Year; and $6,350 during the 2011 League Year if it is a Capped Year and the 2012 League Year; and (c) the room cost of seven (7) days' stay at a hotel of the Club's choice in the new team city for the player.

*Section 4.* **Transportation:** Each player who is traded or claimed during the pre-season or regular season will by the fastest available means of transportation report to the Club to which he is traded or by which he is claimed. Any veteran player who is traded or claimed during the pre-season or regular season or any rookie player who is traded or claimed after the start of the regular season will receive first class air fare. All other players will be furnished coach air fare.

193

# ARTICLE XLII
## POST-SEASON PAY

*Section 1.* **System:** A four-tiered ("wild card" game, division playoff game, conference championship and Super Bowl game) play-off system will be used and continued throughout the term of this Agreement.

*Section 2.* **Compensation:** A player who qualifies will receive the following amount for each post-season game played:

| (in $000's) | 06 | 07 | 08 | 09 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|
| **Wild Card Game** | | | | | | | |
| (Division Winner) | 19 | 20 | 20 | 21 | 21 | 22 | 22 |
| (Other) | 17 | 18 | 18 | 19 | 19 | 20 | 20 |
| **Division Playoff Game** | 19 | 20 | 20 | 21 | 21 | 22 | 22 |
| **Conf. Championship Game** | 37 | 37.5 | 37.5 | 38 | 38 | 40 | 40 |
| **Super Bowl Game** | | | | | | | |
| (Winning Team) | 73 | 78 | 78 | 83 | 83 | 88 | 88 |
| (Losing Team) | 38 | 40 | 40 | 42 | 42 | 44 | 44 |

*Section 3.* **Wild Card Game; Division Play-off Game:** A player who is on the Active List, Inactive List, or Injured Reserve List of a Club at the time of the game in question will be paid the full amount designated in Section 2 above for that game.

*Section 4.* **Conference Championship; Super Bowl Game:**

(a)    A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for at least three (3) previous games (i.e., regular or postseason) will receive the full amount designated in Section 2 for such game.

(b)    A player who at the time of the game in question is and has been on the Active List or Inactive List of a Club participating in the game for less than three (3) previous games (i.e., regular or postseason) will receive one-half the amount designated in Section 2 for such game.

(c)    A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game but was on the Active or Inactive List for eight (8) or more games (i.e., regular or post-season) will receive the full amount designated in Section 2 for such game provided he is not under contract to another Club in the same Conference at the time of the game in question.

(d)    A player who at the time of the game in question is not on the Active List or Inactive List of a Club participating in the game, but who was on the Club's Active List or Inactive List for at least three (3) and not more than seven (7) games (i.e., regular and postseason) will receive one-half the

194

amount designated in Section 2 for such game, provided he is not under contract to another Club in the same Conference at the time of the game in question.

(e)    A veteran player injured during the regular season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(f)    A veteran player who has completed the season in which his fourth year or more of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive the full amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

(g)    A veteran player who has not completed the season in which his fourth year of Credited Service under the Bert Bell/Pete Rozelle NFL Player Retirement Plan has been earned, who was injured during the pre-season and removed from the Active List or Inactive List of a Club participating in the game in question for reason of injury will receive one half the amount designated in Section 2 for such game provided he is still under contract to the Club at the time of the game.

**Section 5.** **Payment:** Players will be paid under this Article within fifteen (15) days after the game in question has been played.

195

## ARTICLE XLIII
## PRO BOWL GAME

**Section 1. Compensation:** For the 2006 and 2007 seasons, each player on the winning Team in the AFC- NFC Pro Bowl game will receive $40,000 and each player on the losing Team will receive $20,000. These amounts shall be increased to $45,000 and $22,500 respectively for the Pro Bowls following the 2008 through 2010 seasons, and to $50,000 and $25,000 respectively for the Pro Bowls following the 2011 and 2012 seasons.

**Section 2. Selection:** Pro Bowl game players will be chosen on the basis of ballots cast by fans, players and coaches, with the total votes cast by each such group weighted equally at 33.33 percent (33.33%). Fan ballot results will be based on total votes received. Players' and coaches' ballots will be in accordance with the procedures currently in effect. The player rep will conduct the balloting of the players on each team in accordance with the same procedure used by the NFL for the coaches. The NFLPA will actively cooperate with the NFL to ensure participation in the game and prompt reporting by players selected. Any Pro Bowl incentive clauses in Player Contracts signed prior to the effective date of this Agreement shall be earned and paid in accordance with this selection process.

**Section 3. Wives:** Airplane, hotel and meal allowances will be provided for players' wives who attend the Pro Bowl games.

**Section 4. Injury:** In the event a player is injured in a Pro Bowl game and as a direct result is unable to perform in any regular season game the immediately following season, the player will be paid by his Club the weekly installments of his salary covering the games missed.

**Section 5. Payment:** Players will be paid for the Pro Bowl game within fifteen (15) days after the game is played.

# ARTICLE XLIV
# PLAYERS' RIGHT TO MEDICAL CARE AND TREATMENT

**Section 1. Club Physician:** Each Club will have a board-certified orthopedic surgeon as one of its Club physicians. The cost of medical services rendered by Club physicians will be the responsibility of the respective Clubs. If a Club physician advises a coach or other Club representative of a player's physical condition which adversely affects the player's performance or health, the physician will also advise the player. If such condition could be significantly aggravated by continued performance, the physician will advise the player of such fact in writing before the player is again allowed to perform on-field activity.

**Section 2. Club Trainers:** All full-time head trainers and assistant trainers hired after the date of execution of this Agreement will be certified by the National Athletic Trainers Association. All part-time trainers must work under the direct supervision of a certified trainer.

**Section 3. Players' Right to a Second Medical Opinion:** A player will have the opportunity to obtain a second medical opinion. As a condition of the responsibility of the Club for the costs of medical services rendered by the physician furnishing the second opinion, the player must (a) consult with the Club physician in advance concerning the other physician; and (b) the Club physician must be furnished promptly with a report concerning the diagnosis, examination and course of treatment recommended by the other physician.

**Section 4. Players' Right to a Surgeon of His Choice:** A player will have the right to choose the surgeon who will perform surgery provided that: (a) the player will consult unless impossible (e.g., emergency surgery) with the Club physician as to his recommendation as to the need for, the timing of and who should perform the surgery; and (b) the player will give due consideration to the Club physician's recommendations. Any such surgery will be at Club expense; provided, however, that the Club, the Club physician, trainers and any other representative of the Club will not be responsible for or incur any liability (other than the cost of the surgery) for or relating to the adequacy or competency of such surgery or other related medical services rendered in connection with such surgery.

**Section 5. Standard Minimum Pre-Season Physical:** Each player will undergo a standardized minimum pre-season physical examination, outlined in Appendix I attached hereto, which will be conducted by the Club physician, provided that no Club may conduct its own individual testing for anabolic steroids and related substances or drugs of abuse or alcohol. In addition, the League may conduct mandatory urinalysis testing of all players

197

at the beginning of the pre-season in the same manner as past seasons. The League may also conduct random testing for steroids and related substances as in the past seasons, but with limits on the number of times any given player can be tested to be negotiated between the Commissioner and the NFLPA.

*Section 6.* **Substance Abuse**:

(a)　　**General Policy.** The parties agree that substance abuse and the use of anabolic steroids are unacceptable within the NFL, and that it is the responsibility of the parties to deter and detect substance abuse and steroid use and to offer programs of intervention, rehabilitation, and support to players who have substance abuse problems.

(b)　　**Anabolic Steroids and Related Substances.** The Policy on Anabolic Steroids and Related Substances in effect as of March 8, 2006, shall remain in effect, except as modified by the parties due to scientific advances with respect to testing techniques or other matters, or as otherwise agreed by the parties. There shall be a joint Advisory Committee, consisting of the League's Advisor for Anabolic Steroids and Related Substances and an equal number of members appointed by the NFLPA and by the Management Council, to study pertinent scientific and medical issues and to advise the parties on such matters.

(c)　　**Drugs of Abuse and Alcohol.** The NFL Policy and Program for Substances of Abuse in effect as of March 8, 2006, shall apply with respect to drugs of abuse and alcohol, including annual pre-season testing of all players, except as otherwise amended by the parties.

198

# ARTICLE XLV
# ACCESS TO PERSONNEL AND MEDICAL RECORDS

*Section 1.* **Personnel Records:** Each Club will within seven (7) days after a written request of any player, permit the player to inspect and copy his individual personnel file and any other document which objectively relates to his performance and which in turn relates to any grievance. Each Club may, at its discretion, exclude from an individual player's personnel file subjective coaching and scouting reports, attorney-client privileged material or any other subjective material.

*Section 2.* **Medical Records:** Player may examine his medical and trainers' records in the possession of the Club or Club physician two (2) times each year, once during the pre-season and again after the regular season. Any player or former player may obtain a copy of his medical or trainer's records upon request during the off-season. Player's personal physician may, upon presentation to the Club physician of an authorization signed by the player, inspect the player's medical and trainers' records in consultation with the Club physician or have copies of such medical and trainers' records forwarded to him for his exclusive and confidential use in rendering a medical opinion, which records will not be released by the player's personal physician to any other person.

199

## ARTICLE XLVI
## PLAYER BENEFIT COSTS

**Section 1. (a) General Right of Reduction:** The NFLPA will have the unilateral right to reduce or freeze each separate and individual Player Benefit Cost and the applicable benefit, with the exception of (1) benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan"), (2) benefits under the NFL Player Supplemental Disability Plan (the "Disability Plan"), and (3) postseason pay (although the NFLPA will have the unilateral right to direct that postseason pay will not be increased), in a League Year, if such right is exercised on or before April 15 of such League Year. However, such action cannot reduce total Player Benefit Costs below 6% of Projected Total Revenues, as defined in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), and Player Benefit Costs required by law cannot be reduced.

(b)    **1998 Amendment Benefits:** [*No longer applicable*]

(c)    **NFLPA Right To Increase Certain Benefits:** In 2006 and each League Year thereafter for which a Salary Cap applies, the NFLPA will have the unilateral right to increase benefits under the NFL Player Second Career Savings Plan (as described in Article XLVIII) ("Second Career Savings Plan"), the NFL Player Annuity Program (as described in Article XLVIII-A) ("Player Annuity Program"), and the NFL Players Health Reimbursement Account (as described in Article XLVIII-C) ("Health Reimbursement Plan"), but only if such right is exercised on or before April 15 of such League Year, and only to the extent that the cost of such benefit increases is offset by reductions in other benefits pursuant to Section 1(a) of this Article. For 2010 and each League Year thereafter, the parties will jointly negotiate increases, if any, under the Second Career Savings Plan, the Player Annuity Program, the Health Reimbursement Plan, and/or the Severance Plan, but only if such League Year is a Capped Year. Any increase pursuant to this section shall be for one year only and shall not create a continuing obligation of the Clubs.

**Section 2. Right of Restoration:** Each separate and individual benefit reduced or frozen pursuant to Section 1 above may be unilaterally restored by the NFLPA in whole or in part for a League Year, if such right is exercised on or before April 15 of such League Year. Each benefit may be restored up to but not in excess of its prescribed level for that League Year in this Agreement.

**Section 3. Definition:** For purposes of this Agreement, the term "Player Benefit Costs" shall be the same as defined in Article XXIV, Section 1(b).

**Section 4. Resolution of Disputes:** In the event the NFLPA and the Management Council are unable to agree by March 7 as to Projected Benefits

200

for the League Year beginning at approximately the previous March 1, the parties will proceed immediately to mediation and binding arbitration on an expedited schedule so that all such differences are resolved by March 31. For purposes of this Article, the parties and the Benefit Arbitrator will use Projected Total Revenues. Such mediation and binding arbitration will be presided over by the Benefit Arbitrator pursuant to the following procedure:

(a)     The parties will submit in writing to the Benefit Arbitrator their respective calculations of Projected Benefits for the forthcoming year. Such submissions to the Benefit Arbitrator will be made by each party by March 15.

(b)     Thereafter, the Benefit Arbitrator, upon receipt of such submissions by each party, will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three (3) days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties.

(c)     As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing brief so requested must be submitted within one (1) week, with no extension. The parties intend that post-hearing briefs will be requested only in unusual circumstances. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than March 31.

**Section 5.** 1998 Amendment Benefits: [*No longer applicable*]

**Section 6.** Limitations on Contributions:

(a)     No NFL club shall have any obligation, directly or indirectly, to contribute to the Second Career Savings Plan, the Player Annuity Program, the Severance Pay Plan, the NFL Player Supplemental Disability Plan, the Health Reimbursement Account, the NFL Player Benefits Committee, the Workers' Compensation Time Offset Fund, the Performance Based Pool, or the Tuition Assistance Plan (individually, a "Player Benefit Arrangement") with respect to an Uncapped Year except to the extent required by the Internal Revenue Code. Each Player Benefit Arrangement shall be amended to prevent any employer provided benefit from accruing or being otherwise credited or earned thereunder with respect to an Uncapped Year, and to provide that no expense incurred in maintaining the Player Benefit Arrangement in an Uncapped Year shall be paid, directly or indirectly, by an NFL Club except to the extent required by law.

(b)     The parties will amend all benefit plans qualified under Section 401(a) of the Internal Revenue Code to ensure that an NFL Club will be re-

quired to make contributions to any qualified benefit plan only to the extent that such contributions are deductible when made under the limits of Section 404(a) of the Internal Revenue Code.

(c)     The parties will amend all Player Benefit Arrangements and the Retirement Plan to the extent necessary to permit any expenses related thereto to be paid by NFL Player Benefits Administration, if established, pursuant to Article XLVIII-E, except for expenses that cannot by law be paid by NFL Player Benefits Administration, or that are not currently deductible under Section 162 of the Internal Revenue Code, notwithstanding any other provision of the plan or this Agreement.

**Section 7. Application of Salary Cap to Plan Years:** For purposes of Articles XLVI through LI, a Salary Cap applies to a Plan Year if a Salary Cap is in effect on the first day of that Plan Year.

**Section 8. Timing:** Player Benefit Costs for pension funding, the Second Career Savings Plan, the NFL Player Supplemental Disability Plan, the Player Annuity Program, the Tuition Assistance Plan, the Health Reimbursement Account, and the 88 Benefit will be deemed to be made in a League Year for purposes of this Agreement if made in the Plan Year beginning in the same calendar year as the beginning of such League Year.

202

# ARTICLE XLVII
# RETIREMENT PLAN

**Section 1. Maintenance and Definitions:** The Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan") will be continued and maintained in full force and effect during the term of this Agreement. The Retirement Plan, and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

**Section 2. Additional Credited Seasons:** [*No longer applicable*]

**Section 3. Contributions:** For the 1993 Plan Year and continuing for each Plan Year thereafter that begins prior to the expiration of the Final League Year, a contribution will be made to the Retirement Plan on behalf of each NFL Club as actuarially determined to be necessary to fund the benefits provided in this Article, based on the actuarial assumptions and methods contained in Appendix J. No provision of this Agreement will eliminate or reduce the obligation to provide the benefits described in this Article, or eliminate or reduce the obligations of the NFL Clubs to fund retirement benefits. Contributions will be used exclusively to provide retirement benefits and to pay expenses. Contributions for a Plan Year will be made on or before the end of each Plan Year. Benefit Credits for future seasons and benefits subject to Retirement Board approval, if any, and contributions, if any, for Plan Years beginning on and after the expiration of the Final League Year will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the Retirement Board of the Retirement Plan to pursue all available legal remedies in an effort to assure timely payment of all contributions due under this Agreement.

**Section 4. Benefit Credits:** Effective for payments on and after June 1, 2006, the parties will amend Section 4.1 of the Retirement Plan to provide the following Benefit Credits for the indicated Credited Seasons:

| Credited Season in Plan Year | Benefit Credit |
| --- | --- |
| Before 1982 | $250 |
| 1982 through 1992 | $255 |
| 1993 and 1994 | $265 |
| 1995 and 1996 | $315 |
| 1997 | $365 |
| 1998 through the Plan Year that begins prior to the expiration of the Final League Year | $470 |

203

Benefits for affected players in pay status shall be proportionately increased based on the new and prior Benefit Credits, except that the minimum increase for any affected Player will be $50 per month.

**Section 5. Disability Benefits:** The following changes shall be made to the Plan's disability benefits:

(a)    Effective for applications for total and permanent disability benefits received on and after April 1, 2007, the parties will delete the Dependent Children's benefit described in Retirement Plan Section 5.1(e).

(b)    Effective for applications for total and permanent disability benefits received on and after April 1, 2007, the parties will increase the minimum Inactive total and permanent disability benefit from $1,500 to $1,750.

(c)    Effective April 1, 2007, the parties will amend the rules contained in Section 5.3 of the Retirement Plan to read substantially as follows:

> Any person receiving total and permanent disability benefits may be required to submit to periodic physical examinations for the purpose of re-examining his condition. The examinations will occur not more often than once every three (3) years, except that upon request of three (3) or more voting members of the Retirement Board, examinations may occur as frequently as once every six (6) months. For each calendar year in which a person receives total and permanent disability benefits, he must submit a complete copy, with all schedules and attachments, of his annual federal income tax return by July 1 of the following calendar year. A person who has not filed his annual federal income tax return by July 1 must either (1) submit a signed statement that he does not intend to file such tax return, and state the amount of total income from all sources for that year, or (2) submit an accounting of his total income from all sources for that year, and provide such federal income tax return promptly after it is filed. If the Retirement Board or the Disability Initial Claims Committee determines that such person is no longer totally and permanently disabled, the total and permanent disability benefits will terminate. The total and permanent disability benefits of any person refusing to submit to a required physical examination or to submit an annual federal income tax return (or equivalent) will be suspended until such refusal is resolved to the satisfaction of the Retirement Board. If such refusal is not resolved to the satisfaction of the Retirement Board within one year after such person is no-

204

tified of the consequences of his refusal, his total and permanent disability benefits will be terminated. In that event, such person must submit a new application to be eligible to receive any further total and permanent disability benefits, but the classification rules of Plan Section 5.6(a) and 5.6(b) will not apply.

**Section 6. Joint and Survivor Reset:** Effective for payments on and after April 1, 2006, the parties will amend the Retirement Plan to provide that the monthly benefit of a player who has elected either (1) a qualified joint and survivor annuity pursuant to Plan Section 4.4(c)(2) or (2) a life and contingent annuitant pension pursuant to Plan Section 4.4(c)(4) with his wife as the beneficiary, and who survives or has survived his wife, will increase to the amount that would have been paid if the player had elected a Life Only Pension as of his Annuity Starting Date (including subsequent benefit increases). The increase in benefit under the previous sentence will be paid beginning as of the later of (i) the first day of the month following the date of the wife's death, and (ii) April 1, 2006, and will continue for the life of the Player. However, no increase will be paid for any month that begins more than 42 months before the date upon which the player first notifies the Retirement Plan of his wife's death. The parties will also amend the Retirement Plan to provide a new table in Appendix B of the Retirement Plan to be used for a player with an Annuity Starting Date after March 31, 2007, which will provide the factors used to determine the actuarial equivalent of the benefit when the player's wife is his beneficiary.

**Section 7. Death Benefits:** Effective for payments on and after April 1, 2006, the parties will amend Section 7.2 of the Retirement Plan to insert "$3,600" in place of "$1,200"; "$6,000" in place of "2,000"; and "$9,000" in place of "$3,000."

# ARTICLE XLVIII
# SECOND CAREER SAVINGS PLAN

*Section 1.* **Maintenance:** The NFL Player Second Career Savings Plan ("Savings Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:**

(a)   **Prior to 2006:** [*No longer applicable*]

(b)   **2006 and Later Years:** For each of the Plan Years 2006 and thereafter in which the Salary Cap applies, a contribution will be made to the Savings Plan on behalf of each NFL Club as follows:

(i)   **Matching Contributions.** The NFL Clubs in the aggregate will contribute a matching amount for each player who earns a Credited Season during such Plan Year, who would qualify for a Minimum Contribution under (ii) below if Matching Contributions were not made on his behalf, and who makes a salary reduction contribution to the Savings Plan ("Matching Contribution"). The amount of such Matching Contribution shall be two dollars (up to a maximum of $20,000 for each of the Plan Years 2006 through 2008, $22,000 for the 2009 Plan Year, $24,000 for the 2010 Plan Year, and $26,000 for the 2011 Plan Year) for each dollar contributed by the player. Any salary reduction contribution made by a player to the Savings Plan during a calendar year will be eligible to be matched in the Plan Year that begins during such calendar year. The NFL Clubs will be required to contribute the Matching Contribution:

(a)   by December 1 of such Plan Year for those players who (i) earn a Credited Season by and through the sixth week of the regular season and (ii) make a salary reduction contribution of $10,000 or more to the Savings Plan for that calendar year by the end of the first full week in November of such Plan Year; and

(b)   by the last day of such Plan Year (March 31 of the following calendar year) for all other eligible players.

(ii)   **Minimum Contribution.** The NFL Clubs in the aggregate will contribute to the Savings Plan, for each Plan Year in which a Salary Cap applies, a contribution of at least $3,600 for each player who earns a Credited Season during such Plan Year and has three (3) or more Credited Seasons, and $7,200 for each player who earns a Credited Season during such Plan Year and has exactly two (2) Credited Seasons ("Minimum Contribution"). Any Matching Contribution made on behalf of a player will reduce

206

his Minimum Contribution on a dollar-for-dollar basis (but not below ze-ro). Any and all Minimum Contributions that are not Matching Contributions described in Subsection (b)(i) above shall be made by and as of the last day of the Plan Year.

(iii)    **Expenses.** The NFL Clubs will make advance contributions to the Savings Plan in an amount sufficient to pay all administrative expenses approved by the Savings Board which are not paid by NFL Player Benefits Administration under Article XLVIII-E.

(c)    **Future Contributions and Collection:** Contributions, if any, for subsequent years will be determined pursuant to future collective bar-gaining agreements, if any. It will be the duty of the fiduciaries of the Sav-ings Plan to pursue all available legal remedies in an effort to assure pay-ment of all contributions due under this Agreement.

(d)    **Automatic Enrollment:** Effective beginning with the 2007 Plan Year, the Plan will be amended to automatically enroll each eligible player who does not otherwise elect to make, or not to make, salary reduction contributions such that his contribution will be 10% of his eligible com-pensation each pay period up to the maximum permitted under Section 402(g) of the Internal Revenue Code for the calendar year. Effective begin-ning with the 2008 Plan Year, the Plan will be further amended to allow per-missible withdrawals to the full extent permitted under Section 414(w) of the Internal Revenue Code.

207

# ARTICLE XLVIII-A
# PLAYER ANNUITY PROGRAM

*Section 1.* **Establishment:** The NFL Player Annuity Program ("Annuity Program") will be continued and maintained in full force and effect during the term of this Agreement, except that the structure of the Program will be amended to include both a taxable portion ("Taxable Portion") and a tax-qualified portion ("Qualified Portion"). The Annuity Program, and all future amendments thereto as adopted in accordance with the terms of that Program, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Program and the definitions of such terms are applicable only to such Program, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms.

*Section 2.* **Contributions:** For each of the Annuity Years 2006 and thereafter in which a Salary Cap applies, a contribution will be made to the Annuity Program on behalf of the NFL Clubs as follows (unless changed by the NFLPA pursuant to Article XLVI of this Agreement):

(1)     **Expenses:** The NFL Clubs will make advance contributions to the Annuity Program in an amount sufficient to pay all administrative expenses approved by the Annuity Board which are not paid by NFL Player Benefits Administration under Article XLVIII-E. For purposes of this provision the term "administrative expenses" does not include reserve or similar capital requirements.

(2)     **Current Allocations:** An Allocation of $65,000 will be made for each eligible Player who earns a Credited Season (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan) in an Annuity Year and who has a total of four (4) or more Credited Seasons as of the end of such Annuity Year.

(3)     **Retroactive Allocations:** Retroactive Allocations will be made as provided in Section 3.4 of the Annuity Program.

Contributions, if any, for subsequent years will be determined pursuant to future collective bargaining agreements, if any. It will be the duty of the fiduciaries of the Player Annuity Program to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement.

*Section 3.* **Timing:** Effective April 1, 2006, an eligible player who earns a Credited Season through the sixth week of the regular season of an Annuity Year will receive an allocation on December 1 of such Annuity Year. All other players who are entitled to an allocation in an Annuity Year will receive an allocation on March 31 of such Annuity Year.

*Section 4.* **Structure:** The Annuity Program will hold assets for the sole

208

benefit of players and their beneficiaries and to pay all expenses of the Annuity Program approved by the Annuity Board. The Annuity Program is currently intended to be a program of deferred compensation that is not tax-qualified within the meaning of Section 401(a) of the Internal Revenue Code. Accordingly, it is intended that individual allocations will be subject to current taxation, and that taxes will be withheld in accordance with the requirements of applicable federal, state, and local law. The parties intend that the amount of each individual allocation remaining after withholding taxes will be used to purchase an annuity.

*Section 5.* **New Tax-Qualified Portion:** The parties agree to amend the Annuity Program so that a portion of the Allocations will be contributed to the Qualified Portion. The remaining portion of the Allocations will continue to be credited to the Taxable Portion. The portion of the Allocations to be contributed to the Qualified Portion will be the largest multiple of $1,000 that does not exceed (1) the amount that is currently deductible by the NFL Clubs under Section 404 of the Internal Revenue Code, or (2) the maximum amount permitted by Section 415 of the Internal Revenue Code.

The parties agree that, beginning with the 2006 Plan Year, a player who earns his second or third Credited Season will receive an allocation of $5,000 for that year in the new Qualified Portion, subject to a vesting schedule. Forfeitures will be used to reduce employer contributions. Allocations in later years for a player will be reduced to the extent such player receives an allocation for his second or third Credited Season.

*Section 6.* **NFL Player Annuity & Insurance Company Net Worth:** Unless unusual circumstances exist that warrant a greater Net Worth, the estimated Net Worth of the NFL Player Annuity & Insurance Company ("Company") at the end of each calendar year beginning with 2006 shall not exceed the greater of (1) one percent (1%) of the total Segregated Accounts, or (2) $3.5 million. For purposes of this calculation, Net Worth is defined as the net worth of the Company as shown in the pro forma financial statements. At its last meeting in each calendar year, the Company's Board of Directors shall determine:

(a)     Whether or not unusual circumstances exist that warrant a greater estimated Net Worth;

(b)     The amount of any payment to the player Segregated Accounts from the Company General Account for the current year, such that the estimated Net Worth for the current year does not exceed the above limits; and

(c)     The amount, if any, by which the Company charge to the player Segregated Accounts for the upcoming calendar year should be reduced, such that the estimated Net Worth at the end of the following calendar year is not expected to exceed the above limits.

## ARTICLE XLVIII-B
## TUITION ASSISTANCE PLAN

*Section 1.* **Establishment:** The NFL Player Tuition Assistance Plan will provide up to $15,000 per League Year for which a Salary Cap applies as reimbursement for tuition, fees, and books to any player who earns an average of "C" or better per semester at an eligible educational institution within the meaning of Section 529(e)(5) of the Internal Revenue Code. The NFL Player Tuition Assistance Plan is a written plan that is intended to qualify as an educational assistance program under Section 127 of the Internal Revenue Code that provides benefits to a player in any calendar year up to the maximum exclusion amount of Section 127 of the Internal Revenue Code, to minimize the tax burden on players. Benefits in excess of the maximum exclusion of Section 127 of the Internal Revenue Code in any calendar year will be subject to wage withholdings. To be eligible for reimbursement, fees must be associated with the course or courses taken, and no more than $400 in fees will be reimbursed for any semester. The Plan Year for the Tuition Assistance Plan begins on April 1.

*Section 2.* **Eligibility:**

(a)    To be eligible for reimbursement in any League Year, the player must have earned at least one Credited Season prior to the beginning of an academic year and (i) be on the Active, Inactive, or Reserve/Injured roster for the first game of the NFL regular season for reimbursement for the Fall semester during that NFL season, or (ii) be on the Active, Inactive, or Reserve/Injured roster for the last game of the NFL regular season for reimbursement for any other semester during that academic year.

(b)    Effective April 1, 2006, a player, who (i) is not eligible for benefits under 2(a) above, (ii) has at least one Credited Season after the 2005 Season, and (iii) has at least five (5) Credited Seasons under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, shall be eligible to be reimbursed for up to $45,000 of his expenses incurred for qualifying tuition, fees and books, provided such expenses are incurred within 36 months of the first day of the League Year immediately following the player's last regular or post season game and otherwise satisfy the conditions of the plan.

(c)    A player who has just completed his first Credited Season will be eligible to be reimbursed for a course that begins after his Club's final game of that season and prior to the next following season provided that:

(i)    if, on the day the course begins, the player is under contract with a Club; and

(ii)    if any portion of the course is taught after the start of his Club's off-season workout program, that the player does not have to travel more than 100 miles from that Club's main practice facility to take the course, provided that

(iii)    the Parties may waive the 100 mile limitation in any individual

210

case, based upon a showing of unreasonable hardship.

*Section 3.* **Reimbursement:** An eligible player will be reimbursed no more than seventy five (75) days after the player submits a certified transcript from the eligible educational institution for that semester, and receipts demonstrating payment for tuition, fees, or books.

211

## ARTICLE XLVIII-C
## NFL PLAYERS HEALTH REIMBURSEMENT ACCOUNT

*Section 1.* **Establishment:** The parties will jointly establish a new benefit, to be called the NFL Players Health Reimbursement Account Plan (hereinafter referred to as "Health Reimbursement Plan" or "Plan"). The Health Reimbursement Plan will be jointly administered pursuant to the requirements of the Taft-Hartley Act in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The Plan Year begins on April 1. The Health Reimbursement Plan, and any and all future amendments thereto as adopted in accordance with the terms of that Plan, will be incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Such Plan will be continued and maintained in full force and effect during the term of this Agreement.

*Section 2.* **Contributions:** For each of the Plan Years 2006 and thereafter in which a Salary Cap applies, a contribution will be made to the Health Reimbursement Plan on behalf of the NFL Clubs based on the actuarial assumptions and methods contained in Appendix J-1. If either party terminates the CBA such that the last League Year subject to a Salary Cap is before 2011, the unfunded present value of accrued nominal accounts shall be funded at a time or times selected by the NFL Management Council in an amount sufficient to pay reimbursements when they become due. All such contributions will be held for the exclusive benefit of Participants and their beneficiaries, and under no circumstances will any assets of the Plan ever revert to, or be used by, an Employer, the League, or the NFLPA. Notwithstanding the above, any contribution made by or on behalf of an Employer to the Plan due to a mistake of fact or law will be returned to such Employer within six (6) months of the determination that such contribution was in error. The return of contributions is limited to that portion of the contribution as to which there was a mistake of fact or law. A returned contribution will not include any earnings attributable to the contribution, but will be reduced by any losses attributable to the contribution. It will be the duty of the fiduciaries of the Health Reimbursement Plan to pursue all available legal remedies in an effort to assure payment of all contributions due under this Agreement. No participant or beneficiary is required or permitted to contribute, except as may be required by law. The present value of accrued nominal accounts will be determined based on the actuarial assumptions and methods contained in Appendix J-1.

*Section 3.* **Eligibility:** A Player participates in this Plan if (a) he earns a Credited Season under the Bert Bell/Pete Rozelle NFL Player Retirement

212

Plan ("Retirement Plan") for 2006 or for any later Plan Year for which a Salary Cap applies and has a total of three (3) or more Credited Seasons as of the end of such Plan Year, or (b) his last Credited Season under the Retirement Plan is either 2004 or 2005 and he had a total of eight (8) or more Credited Seasons as of the end of the such Plan Year.

**Section 4. Health Reimbursement Accounts:** A nominal account will be established to account for the interest of each eligible player. No interest, other investment earnings, or losses will be credited to any nominal account, except as described under Section 7(b) below. Reimbursement payments from the Plan to eligible players, their spouses, and dependents will reduce the health reimbursement accounts dollar-for-dollar. Credits to the nominal accounts of eligible Players are determined as of March 31 of each Plan Year during which a Salary Cap applies as follows:

(a)     On March 31, 2007, the nominal account of each eligible player will be credited with $25,000 for each of his Credited Seasons.

(b)     On March 31, 2008 and at the end of each Plan Year thereafter for which a Salary Cap applies:

(i)     The nominal account of an eligible Player who earned a Credited Season in that Plan Year will be credited with $25,000; and

(ii)     The nominal account of a Player who first becomes eligible in that Plan Year because it is his third Credited Season will be credited with an additional $50,000 for that year only.

(c)     The determination by the Retirement Board of the Bert Bell/Pete Rozelle NFL Player Retirement Plan of a Player's Credited Seasons will be binding on the Plan. A player who is awarded Credited Seasons by the Retirement Board and who thereby (1) becomes eligible to participate in the Plan or (2) becomes eligible for additional credits, will receive retroactive credits to his nominal account as of the end of the Plan Year in which the Retirement Board's Credited Season determination is made. The amount of the retroactive allocation will be $25,000 times the number of Credited Seasons not already counted under the Plan.

Total credits to an eligible player's nominal account shall not exceed $300,000.

**Section 5. Payments from Health Reimbursement Accounts:** The Plan will reimburse medical care expenses (within the meaning of Internal Revenue Code section 213(d), and including, without limitation, direct medical expenses, medical insurance premiums, and medical insurance copays and deductibles to the extent provided in such Internal Revenue Code section) incurred by eligible players and their spouses and dependents without regard to Section 152(b)(1), (b)(2) and (d)(1)(B)). The Plan will be established and administered to use the broadest allowable definition of "dependent" permitted by law. Payments will be made only to the extent that the player or the player's spouse or dependents have not been reimbursed

213

for the expense from any other plan. No player will have the right to receive cash or any taxable or nontaxable benefit other than the reimbursement of medical care expenses incurred by the player and his spouse and dependents. No reimbursement will be made to the extent that it would reduce the Player's Health Reimbursement Account below zero. A player's rights under this Health Reimbursement Plan may not be transferred, assigned, or alienated, except pursuant to a qualified medical child support order as defined in Section 609(a)(2) of ERISA.

Upon the death of a player, any remaining account balance may be used only to reimburse the medical care expenses of his surviving spouse and dependents. Upon the death of such surviving spouse and last dependent, or upon the death of the player if there is no surviving spouse or dependents, any unused remaining balance is cancelled.

A player may receive a reimbursement from this Plan only for expenses incurred during a period of time during which he is not covered by (a) the Group Insurance provided in Section 1 of Article XLIX and (b) the Extended Post-Career Medical and Dental Insurance described in Section 2 of Article XLIX; except that a player who is covered by the Extended Post-Career Medical and Dental Insurance described in Section 2 of Article XLIX by reason of COBRA may receive a reimbursement from this Plan.

*Section 6.* **Structure:** The Health Reimbursement Plan will hold assets for the exclusive benefit of players and their beneficiaries. The parties agree that the Plan will be administered by a Health Board, and that prior to the first meeting of the Health Board the advisors to the Health Reimbursement Plan will be the same as the advisors to the Savings Plan. The Health Reimbursement Plan is intended to be a health care reimbursement arrangement as described in IRS Notice 2002-45, 2002-28 IRB 93; Rev. Rul. 2002-41, 2002-28 IRB 75; and Situation 1 of IRS Revenue Ruling 2005-24.

*Section 7.* **Plan Operation in Uncapped Years:** The Plan will operate as follows in years for which no Salary Cap applies:

(a)     The Plan will continue in existence until all nominal accounts have been paid out or forfeited; and

(b)     The nominal accounts will not be credited with any earnings or interest except to the extent that, in the sole discretion of the Health Board, accumulated Plan earnings exceed current expenses and an appropriate reserve.

214

# ARTICLE XLVIII-D
# 88 BENEFIT

***Section 1:*** **Establishment:** The parties agree to design and establish a new plan, effective February 1, 2007, to be called the "88 Plan," to provide medical benefits to former Players who are (1) vested due to their Credited Seasons or their total and permanent disability under the Bert Bell/Pete Rozelle NFL Player Retirement Plan, and (2) determined by the governing Board of the 88 Plan (the "88 Board") to have "dementia," as defined by the parties. The 88 Plan will be jointly administered, pursuant to the requirements of the Taft-Hartley Act, in a manner similar to the NFL Player Second Career Savings Plan ("Savings Plan"). The 88 Plan, and any and all future amendments thereto, will be incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan, and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. Prior to the first meeting of the 88 Board, the advisors to the 88 Plan will be the same as the advisors to the Savings Plan. The Plan Year begins on April 1.

***Section 2:*** **Benefits:** The Plan will reimburse, or pay for, certain costs related to dementia. In no event will the total payments to or on behalf of an eligible player exceed $88,000 in any year, and in no event will benefits be paid for any month or other period of time that precedes the later of (1) February 1, 2007, or (2) the date the 88 Board first receives a written application or similar letter requesting the benefit, provided that such written application or similar letter begins the administrative process that results in the award of the benefit, except that an application received on or before May 15, 2007, will be deemed to have been received on February 1, 2007. The costs to be paid for an eligible player include:

(a)      For any month in which an eligible player was admitted as an in-patient at an eligible institution for all or part of the month, institutional custodial care, institutional charges, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medication, up to 1/12 of $88,000; and

(b)      For any month in which an eligible player was not admitted as an in-patient at an eligible institution for all or part of the month, home custodial care provided by an unrelated third party, physician services, durable medical equipment, and prescription medication, up to 1/12 of $50,000.

The maximum benefit payable for any month shall be reduced, but not below zero, by the amount of any total and permanent disability benefits paid by the Bert Bell/Pete Rozelle NFL Player Retirement Plan and the NFL Player Supplemental Disability Plan. However, the maximum benefit payable for any month shall not be reduced by those total and permanent disability benefits paid to players who are receiving the Inactive total

215

and permanent disability benefit described in Section 5.1(d) of the Bert Bell/Pete Rozelle NFL Player Retirement Plan. In the case of a player who has reached his normal retirement date under the Bert Bell/Pete Rozelle Plan and who is receiving total and disability benefits under Section 5.1(a), 5.1(b), or 5.1(c) of the Bert Bell/Pete Rozelle Plan (including a player who has converted to retirement benefits under Section 5.4 of that Plan), the maximum benefit payable for any month shall be reduced, but not below zero, by the excess of (1) the monthly benefit the player would receive from both the Bert Bell/Pete Rozelle Plan and the Supplemental Disability Plan if he elected a Life Only form beginning on his normal retirement date, over (2) the monthly benefit the player would have received from the Bert Bell/Pete Rozelle Plan in a Life Only form beginning on his normal retirement date based solely on his Credited Seasons, as if he were not disabled. The parties will structure the benefits payable for or to eligible Players to reduce or eliminate taxes on such benefits, to the extent deemed possible. At the discretion of the 88 Board, payments for durable medical equipment and prescription medication may be made directly to the player.

**Section 3: Funding:** Effective February 1, 2007, and continuing for the term of this Agreement, the NFL Clubs will make advance contributions to the 88 Plan in an amount sufficient to pay benefits and all administrative expenses approved by the 88 Board which are not paid by the NFL Player Benefits Committee under Article XLVIII-E.

**Section 4: Term:** This Plan will continue to provide benefits as above after the Final League Year and after the expiration of this Agreement, but only to a former player who qualified during a Plan Year for which a Salary Cap was in effect and who remains qualified.

216

# ARTICLE XLVIII-E
# NFL PLAYER BENEFITS COMMITTEE

*Section 1.* **Establishment:** The parties agree to consider and, if feasible, jointly establish, as soon as administratively feasible, a labor-management committee as described in the Labor-Management Cooperation Act of 1978 that is exempt from Section 302 of the LMRA pursuant to Section 302(c)(9) of the LMRA. If established, the labor-management committee will be known as "NFL Player Benefits." The NFLPA and the Management Council will have the right to appoint an equal number of voting members of NFL Player Benefits. Prior to the first meeting of NFL Player Benefits, the advisors to NFL Player Benefits will be the same as the advisors to the NFL Player Second Career Savings Plan.

*Section 2.* **Function:** NFL Player Benefits, through an entity to be called NFL Player Benefits Administration, if established, will provide the services now provided by the Plan Office in Baltimore and such other services as the parties may direct it to perform. NFL Player Benefits Administration, if established, will also pay directly the expenses of the Bert Bell/Pete Rozelle NFL Player Retirement Plan, the NFL Player Second Career Savings Plan, the NFL Player Supplemental Disability Plan, the NFL Player Annuity Program, the 88 Plan, and the Health Reimbursement Plan, including investment, legal, actuarial, consulting, audit, and other expenses, except expenses that cannot be so paid by law, to the extent deemed appropriate by NFL Player Benefits.

*Section 3.* **Expenses:** The NFL Clubs will pay in advance amounts sufficient to fund each budget or expense of NFL Player Benefits Administration, if established, to the extent such budget or expense is approved by NFL Player Benefits. Such amounts will be a Player Benefit Cost for purposes of this Agreement.

*Section 4.* **Uncapped Years:** During League Years in which no Salary Cap applies, NFL Player Benefits Administration, if established, will be funded by the Bert Bell/Pete Rozelle NFL Player Retirement Plan, the NFL Player Supplemental Disability Plan, the NFL Player Second Career Savings Plan, the NFL Player Annuity Program, the 88 Plan, and the Health Reimbursement Plan proportionately in accordance with the services provided to each such plan, or otherwise to the extent the parties agree.

## ARTICLE XLIX
## GROUP INSURANCE

*Section 1.* **Group Benefits:** Players will receive group insurance benefits, consisting of life insurance, medical, and dental benefits, as follows:

(a)    **Life Insurance:** Effective September 6, 2006, a rookie player will be entitled to $300,000 in coverage, and a veteran player's coverage will be increased by $100,000 for each Credited Season (as defined by the Bert Bell/Pete Rozelle Plan NFL Player Retirement Plan ("Retirement Plan")) up to a maximum of $800,000 in coverage.

(b)    **Medical:** Each player is required to pay an annual deductible of $400 per individual per plan year and $800 per family per plan year, with maximum out-of-pocket expenses of $1600 (including the deductible) for each covered individual. In addition:

(1)    the co-insurance paid by a covered individual for services rendered by out-of-network providers will be 30% of covered charges; and

(2)    the amount paid by a covered individual for non-compliance with pre-certification and emergency admission procedures will be $500 and the reimbursement paid to the covered individual for such services shall be reduced by 50%; and

(3)    a prescription drug card will be provided to covered individuals requiring a $5 co-pay for generic drugs and a $10 co-pay for brand name drugs if the generic or brand name drugs are obtained from participating pharmacies. The availability of participating pharmacies will not be significantly reduced below the level initially provided by CIGNA.

(4)    The maximum lifetime benefits paid on behalf of a covered individual will be $2.5 million.

(c)    **Dental:** Usual, customary and reasonable ("UCR") dental expenses for all players and their eligible dependents will be reimbursed to players pursuant to the following schedule:

(1)    Preventive care paid at 100% of UCR;

(2)    General services paid at 85% of UCR; and

(3)    Major services paid at 50% of UCR.

Each player is required to pay an annual deductible of $50 per individual per plan year and $100 per family per plan year. The maximum benefit payable is $2,000 per covered individual per plan year.

(d)    **Period of Benefits:** Subject to the extension provided in Section 2, players will continue to receive the benefits provided in this article through the end of the Plan Year in which they are released or otherwise sever employment. Effective September 7, 2005, players vested under the Retirement Plan who are released or otherwise sever employment after May 1 in a calendar year will continue to receive the benefits provided under this section until the first regular season game of the season that begins in the following calendar year. Group benefits are guaranteed during the term of

218

this Agreement unless reduced by the NFLPA pursuant to Article XLVI (Player Benefit Costs), Section 1, or required to be modified by law.

(e) **Family Medical and Dental Coverage for Deceased Players:** A player's enrolled dependents (including a child born to the player's wife within ten (10) months after the player's death) shall be entitled to continuing family medical and dental coverage effective August 1, 2001, as follows:

(1) for the dependents of a player on the Active, Inactive, Reserve/Injured, Reserve/PUP, or Practice Squad roster at the time of the player's death, coverage will continue for the length of time the player would have been covered had his contract been terminated on the date of his death for any reason other than death;

(2) for dependents of a player who was receiving coverage under this Article at the time of his death, coverage will continue for the remaining length of time that the player would have been eligible under such Section had his death not occurred.

**Section 2. Extended Post-Career Medical and Dental Benefits:** The medical and dental benefits described in Section 1 of this Article XLIX are continued, subject to limitations described in Section 3 below, as follows:

(a)-(c) [*no longer applicable*]

(d) Players vested under the Retirement Plan who are released or otherwise sever employment at any time after the first regular season game in the 2002 season, and before the first regular season game in the 2005 season will continue to receive the benefits described in Subsections 1(b) and 1(c) above for forty-eight (48) months beyond the date the benefits described in Subsections 1(b) and 1(c) above terminate in accordance with Subsection 1(d) of this Article.

(e) Players vested under the Retirement Plan who are released or otherwise sever employment at any time on or after the first regular season game in the 2005 season, and prior to the expiration or termination of this Agreement, will continue to receive the benefits described in Subsections 1(b) and 1(c) above through the end of the Plan Year in which such release or severance occurs and for the following sixty (60) month period.

(f) All rights under federal law of the players and their spouses and dependents to elect COBRA continuation coverage will commence upon the expiration or termination of the period in which the benefits described above are provided, as if such additional benefits had not been provided.

**Section 3. Limitations and Rules for Extended Insurance:** Certain limitations and rules for the benefits described in Section 2 above will apply as follows:

(a) The benefits described in Subsections 2(d) and 2(e) above will terminate immediately upon the expiration or termination of this Agreement, for individuals eligible for benefits under this Section, including,

219

without limitation, those who have already been released or otherwise severed employment at the time of such expiration or termination.

(b)      Players eligible for coverage under Section 2 above are not obligated to enroll in any other health plan or program for health services offered by an employer

(c)      The obligation in the aggregate of the Clubs to provide the benefits described in Section 2 above is limited to, in the 2006 and each subsequent League Year, the costs for such benefits up to $500,000 multiplied by the number of Clubs in the League that League Year.

**Section 4.** [*No longer applicable*]

**Section 5. Administration:** The Management Council will assume administrative responsibility for group insurance benefits. The NFLPA will be entitled to appoint one of the Trustees of the NFL Players Insurance Plan. The NFLPA will have the right to veto for cause any insurance company or other entity selected by the NFL or the Management Council to provide benefits under this Article. Reasons justifying such a veto for cause include, but are not limited to, excessive cost, poor service, or insufficient financial reserves. The parties agree to review and consider the most cost efficient manner to provide the coverage described in this Article. Upon request by the NFLPA, the Management Council will promptly provide the NFLPA with any document or other information relating to group insurance, including materials relating to experience and costs.

220

# ARTICLE L
## SEVERANCE PAY

***Section 1.* Eligibility:** Only players with two (2) or more Credited Seasons (as that term is defined in the Bert Bell/Pete Rozelle NFL Player Retirement Plan), at least one of which is for a season occurring in 1993 through 2011, will be eligible for severance pay under this Article. Except as provided in Section 8, this Article will not extinguish or affect any other rights that a player may have to any other severance pay. Determinations of the Retirement Board with respect to Credited Seasons will be final and binding for purposes of determining severance pay.

***Section 2.* Amount:** Each eligible player will receive severance pay in the amounts determined as follows: (a) $5,000 per Credited Season for each of the seasons 1989 through 1992; (b) $10,000 per Credited Season for each of the seasons 1993 through 1999; (c) $12,500 per Credited Season for each of the seasons 2000 through 2008; and (d) $15,000 per Credited Season for each of the seasons 2009 through 2011; for which a Salary Cap is in effect at the beginning of that Credited Season.

***Section 3.* Application:** To apply for severance pay under this Article, a player must submit a request in writing to the NFL Club that he was under contract with when he earned his last Credited Season, with copies to the Executive Director of the NFLPA and the Executive Vice President for Labor Relations of the NFL. His request must indicate his intention to permanently sever employment with all NFL Clubs as an Active Player.

***Section 4.* Payment:** Severance pay under this Article will be paid in a single lump sum payment by the NFL Club with which the player last earned a Credited Season according to the following schedule:

| LAST LEAGUE PLAYING ACTIVITY (AS DETERMINED BY ROSTER) | IF APPLY NO LATER THAN | PAYMENT DATE |
| --- | --- | --- |
| The date of the first regular season game of that player's Club through League Week 8, or earlier | March 1 | March 31 |
| League Week 9 through the end of the League Year, or earlier | June 1 | June 30 |
| The beginning of the League Year through May 31, or earlier | September 1 | September 30 |
| June 1 through the date immediately preceding the date of the first regular season game of that player's Club, or earlier | December 1 | December 31 |

221

Article L, Severance Pay

**Section 5. Failure to Apply:** A player who has not applied for severance pay under this Article within twenty (20) months of his last participation in NFL football playing activities will be deemed to have applied under this Article as of the expiration date of such twenty (20) month period.

**Section 6. Only One Payment:** Any player who returns to NFL football after receiving a severance payment under this Article will not be entitled to any further severance pay.

**Section 7. Payable to Survivor:** In the event a player eligible to receive severance pay under this Article dies before receiving such pay, the player's designated beneficiary (or his estate in the absence of a designated beneficiary) will be entitled to receive such pay on the later of (a) the next payment date following the date of the player's death, or (b) thirty (30) days after written notification of the player's death.

**Section 8. Prior Severance Pay:** Any player entitled to severance pay solely under the 1982 Collective Bargaining Agreement will receive his severance on March 31 or September 30 (instead of April 15 or the day after the third game of the NFL regular season), provided that such player complies with the procedure of the Settlement Agreement dated October 26, 1983.

**Section 9. Nonassignability:** The right to receive payment hereunder shall not be assignable, transferable or delegable, whether by pledge, creation of a security interest or otherwise, and in the event of any attempted assignment, transfer or delegation, the Clubs will have no liability to pay any amount so attempted to be assigned, transferred or delegated. Neither the NFL nor any NFL Clubs will have any obligation to verify other than to the NFLPA upon request the amount of severance pay a player may be entitled to receive, unless and until an application for pay is properly submitted by such player.

222

# ARTICLE LI
# DISABILITY PLAN

**Section 1. Maintenance:** The NFL Player Supplemental Disability Plan ("Supplemental Disability Plan"), and all past and future amendments thereto as adopted in accordance with the terms of that Plan, are incorporated by reference and made a part of this Agreement; provided, however, that the terms used in such Plan and the definitions of such terms are applicable only to such Plan and shall have no applicability to this Agreement unless the context of this Agreement specifically mandates the use of such terms. The Supplemental Disability Plan will be continued and maintained in full force and effect during the term of this Agreement.

**Section 2. Contributions:** For each Plan Year in which the Salary Cap applies, contributions will be made to the Supplemental Disability Plan at least quarterly in an amount sufficient to pay estimated benefits and all administrative expenses approved by the Disability Board which are not paid by the NFL Player Benefits Administration under Article XLVIII-E. It will be the duty of the fiduciaries of the Disability Plan to pursue all available legal remedies in an effort to ensure payment of all contributions due under this Agreement.

**Section 3. Extension:** For each Plan Year in which the Salary Cap applies, a player receiving benefits under Section 5.1(a) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $14,670 per month for such Plan Year only; a player receiving benefits under Section 5.1(b) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $7,167 per month for such Plan Year only; and a player receiving benefits under Section 5.1(c) of the Bert Bell/Pete Rozelle Plan will receive a benefit of $5,167 per month for such Plan Year only.

223

## ARTICLE LII
## BENEFIT ARBITRATOR

*Section 1.* **Selection**: The Management Council and the NFLPA will submit five (5) candidates for Benefit Arbitrator to each other within two (2) weeks of the ratification of this Agreement. If the parties are unable to agree on a Benefit Arbitrator from among the ten (10) candidates submitted, a flip of the coin, no later than three (3) weeks after ratification of the Agreement, will determine which party first strikes a name from the other party's list of candidates, and the parties will alternately strike names beginning within 24 hours of the coin flip and continuing for no more than a total of 24 hours until the parties are able to agree on the selection of the Benefit Arbitrator, or until only one candidate's name remains, which candidate will become the Benefit Arbitrator. If for any reason this procedure does not result in the selection of the Benefit Arbitrator within one month of the ratification of this Agreement, the Notice Arbitrator provided for in Article IX (Non-Injury Grievance), will appoint the Benefit Arbitrator of his or her choice within one week of written request by either party.

In the event of a subsequent vacancy in the position of Benefit Arbitrator, the procedure in this Section will be followed to fill the vacancy, substituting only the date of such vacancy for the date of ratification of this Agreement, and permitting the party who lost the prior coin flip to strike the first name from the other party's list of candidates. Either party may dismiss the Benefit Arbitrator between May 1 and June 1 of each calendar year of this Agreement by written notice to the Benefit Arbitrator and the other party.

*Section 2.* **Compensation**: To the extent that the fees and expenses of the Benefit Arbitrator are not properly charged to and paid by one of the employee benefit plans described or created by this Agreement, such fees and expenses will be divided equally between the parties.

*Section 3.* **Role**: The Benefit Arbitrator will resolve any and all disagreements relating to Articles XLVI through LI of this Agreement. However, disagreements relating to eligibility for pension, disability, or other benefits under the Bert Bell/Pete Rozelle Plan and disagreements relating to eligibility for disability benefits under the Supplemental Disability Plan will be resolved in accordance with the procedures that have previously been adopted by the Members of the Retirement Board of the Bert Bell/Pete Rozelle Plan for the resolution of such issues under that Plan, or such other procedures as may be jointly agreed upon by the parties. Also, prior to the merger of the Bert Bell Plan and the Pete Rozelle Plan, disagreements relating to eligibility for benefits under the Pete Rozelle Plan will be resolved in accordance with the procedures established under that Plan. The parties may jointly agree to enlarge or restrict the role of the Benefit Arbitrator. Either party may refer a matter to the Benefit Arbitrator by so notifying the Bene-

224

Article LII, Benefit Arbitrator

fit Arbitrator and the other party. If no other provision in this Agreement governs the procedures for resolution of the dispute, the following procedures will apply. The parties will have two (2) weeks to submit briefs or other documents to the Benefit Arbitrator. Thereafter, upon the request of either party, the Benefit Arbitrator will immediately convene an expedited hearing at the site of his or her selection. Such hearing will proceed for no more than three (3) days, the first day of which will include whatever mediation efforts the Benefit Arbitrator deems appropriate; provided, however, that such mediation will not be binding on the parties. As soon as possible following the closing of such expedited hearing, the Benefit Arbitrator will render his or her decision, which will be final and binding on the parties. Post-hearing briefs following the close of such hearing will be permitted only if requested by the Benefit Arbitrator, and any post-hearing briefs so requested by the Benefit Arbitrator must be submitted within one week of the close of the hearing, with no extensions. The parties intend that post-hearing briefs will be requested only in unusual situations. In no event will the Benefit Arbitrator's decision be rendered and delivered to the parties any later than 60 days after a hearing is requested.

225

## ARTICLE LIII
## RETENTION OF BENEFITS

No financial benefit granted by any Club to its players (e.g., free shoes) in all of the 1990, 1991 and 1992 League Years may be reduced or eliminated during the term of this Agreement, unless compelling business reasons make continuation of the benefit financially impracticable.

# ARTICLE LIV
## WORKERS' COMPENSATION

**Section 1. Benefits:** In any state where workers' compensation coverage is not compulsory or where a Club is excluded from a state's workers' compensation coverage, a Club will either voluntarily obtain coverage under the compensation laws of that state or otherwise guarantee equivalent benefits to its Players. In the event that a Player qualifies for benefits under this section, such benefits will be equivalent to those benefits paid under the compensation law of the state in which his Club is located.

**Section 2. Rejection of Coverage:** Nothing in this Article is to be interpreted as preventing a Club that has the legal right to do so from rejecting coverage under the workers' compensation law of its state. However, if a Club elects to reject coverage under the compensation law of its state, it must nevertheless guarantee benefits to its Players in the manner provided in Section 1 above. Moreover, any Club may be excluded from those laws if it elects to do so, but any such Club will be obligated to guarantee benefits to its Players in the same manner provided in Section 1 above.

**Section 3. Arbitration:** In any state where a Club (e.g., Miami Dolphins/ Florida) has legally elected not to be covered by the workers' compensation laws of that state, the equivalent benefit, if any, to which a Player may be entitled under this Article will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 4. Workers' Compensation Offset Provisions:** The parties agree that the following provisions shall exclusively govern any and all rights Clubs have with respect to workers' compensation credits or offsets during the remaining Capped Years of this Agreement.

(i)     **"Dollar-for-Dollar" Credits or Offsets.** No Club shall be entitled to claim or receive any dollar-for-dollar credit or offset for salary, benefits, or other compensation paid or payable to a Player against any award or settlement of workers' compensation benefits, either pursuant to Paragraph 10 of the NFL Player Contract or any provision of state law.

(ii)    **"Time" Credits or Offsets.** All Clubs are instead entitled only to a "time" credit or offset under Paragraph 10 of the NFL Player Contract or state law, as set forth more specifically in Subsections (A)-(F) below. This "time" credit or offset shall in all cases be expressed or granted as a reduction in the number of weeks of a Player's workers' compensation award or settlement that is attributable to the same period of weeks in which the Player is deemed entitled to salary payments or CBA benefits as described in this Section. The credit or offset shall be at the weekly rate specified under the state workers' compensation law in question. Because the period from the beginning of the regular season to the end of the League Year (25

227

weeks) is approximately 1.5 times longer than the seventeen (17) week period over which Players receive salary and/or Injury Protection payments, the parties agree that, in calculating the "time" credit or offset as set forth more particularly herein, the Club is entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week during the regular season for which a Player is awarded or executes a settlement agreement for workers' compensation benefits and for the same period of weeks is paid his full Paragraph 5 salary or Injury Protection payments.

(A)    In the case of salary payments pursuant to Paragraph 5 or 9 of the NFL Player Contract, the Club shall be entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week during the regular season in which the Player is physically unable to perform his services under his contract due to an injury he suffers while performing services during that contract year, to a maximum of 25 weeks, provided that the Player receives his full salary as set forth in Paragraph 5 of his contract for the period in question. For example, if a Player receives three (3) weeks of Paragraph 5 salary subsequent to an injury that rendered him unable to perform for three (3) games (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 4.5 (= 3 x 1.5) weeks of the Player's workers' compensation award or settlement. As another example, if a Player receives seventeen (17) weeks of Paragraph 5 salary subsequent to an injury that rendered him unable to perform all 16 games of the regular season (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 25 (= 17 x 1.5) weeks of the Player's workers' compensation award or settlement.

(B)    In the case of Injury Protection payments, a Club shall be entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week from the beginning of regular season to the end of the League Year that the Player receives full Injury Protection payments, to a maximum of 25 weeks. For example, if a Player receives the Injury Protection payments for 17 weeks (regardless of whether the payments were made on a weekly or bi-weekly basis), the Club will be entitled to a reduction of 25 weeks of the Player's workers' compensation award or settlement. As another example, if a Player receives Injury Protection payments for three (3) weeks but then signs a contract for that season with another Club such that benefits payments cease, the Club will be entitled to a reduction of 4.5 weeks of the workers' compensation award or settlement. In the event that a Club pays a Player full Injury Protection payments prior to the first regular season game of the League Year, the Club will be entitled to a reduction of 1.5 weeks of the Player's workers' compensation award or settlement for each week during the regular season to the end of the League Year for which the Player's Injury Protection payments are made.

(C)    Nothing in this Section 4 shall be interpreted to preclude a Club from receiving the "time" credit or offset set forth in this Section for both

228

salary payments and Injury Protection payments when both payments are made.

(D)    In the event that an Injury Grievance, Injury Protection, injury guarantee, or other arbitrable claim where workers' compensation offsets or credits is at issue and within the jurisdiction of the arbitrator, is settled between the Player and the Club, or in the event that a Club and Player execute an injury-related settlement agreement, the Club shall be entitled to a reduction of 1.5 weeks of a Player's workers' compensation award or settlement for each week that the Player is deemed entitled to receive his full Paragraph 5 salary or Injury Protection payments pursuant to the settlement, to a maximum of 25 weeks. The Club and Player shall be required to specify in the written settlement agreement the number of weeks for which the Player is receiving his full Paragraph 5 salary or Injury Protection payments under the settlement so that the appropriate number of weeks of the Player's workers' compensation award or settlement can be reduced. For example, if a Player and a Club settle an Injury Grievance, Injury Protection or injury guarantee claim for a specified period of three (3) weeks, the Club will be entitled to a reduction of 4.5 (= 3 x 1.5) weeks of the Player's workers' compensation award or settlement.

(E)    In the event that an Arbitrator awards Paragraph 5 salary or Injury Protection payments in an Injury Grievance, Injury Protection, injury guarantee, or other arbitrable claim where workers' compensation offsets or credits is at issue and within the jurisdiction of the arbitrator, for the same period of weeks for which a Player has already been awarded workers' compensation benefits or received a workers compensation settlement, the Club shall be entitled to a reduction of 1.5 weeks of the Player's workers' compensation award or settlement for each week the Player is deemed entitled to receive his full Paragraph 5 salary or Injury Protection payments pursuant to the Arbitrator's award. For example, if an Arbitrator awards a Player three (3) weeks of Paragraph 5 salary pursuant to an Injury Grievance award and the Player has already been awarded workers' compensation benefits or received a workers' compensation settlement for that same period, the Arbitrator shall reduce the award by an amount equal to 4.5 (= 3 x 1.5) weeks of workers' compensation benefits.

(F)    Clubs are not entitled to any credit or offset under this Article against any workers' compensation benefits attributable to the period of time after the last League Year for which the Player is entitled to receive salary payments (or, in cases where the Player receives Injury Protection payments, after such period) from the Club, even if the Player's entitlement to such payments is not determined until after the League Year in question. No payment of any of the following may be used by a Club as a basis for claiming any workers' compensation credit or offset under this Article:

(1) Signing bonus;

229

(2) Option bonus;

(3) Roster bonus;

(4) Incentive bonus;

(5) Performance-based pay earned prior to the date of injury (unless, for any period of time in which a Club would otherwise be entitled to a credit or offset pursuant to this Section, the Player's weekly salary would be less than the amount of weekly workers' compensation benefits payable under state law, in which case the performance-based pay could be added by the Club to the Player's Paragraph 5 salary for those weeks in which the Club would be entitled to a credit or offset under this Section);

(6) Deferred compensation (except where the deferred compensation is salary attributable to the weeks for which the Player has been awarded or has executed a settlement agreement for workers' compensation benefits as described in this Section in which case the Club is permitted a credit or offset in the same manner as if the salary was not deferred and instead was paid during the League Year in which the Player was physically unable to perform his services under his NFL Player Contract due to an injury he suffered while performing services during that contract year);

(7) Severance pay; or

(8) Any other form of compensation other than Paragraph 5 salary under the NFL Player Contract or Injury Protection payments under the CBA.

(G) Total and Permanent, Line of Duty and Degenerative Disability Benefits paid pursuant to the Bert Bell/Pete Rozelle NFL Player Retirement Plans and/or related documents are not subject to any credit or offset for workers' compensation benefits, whether or not those benefits are payable during the same period in which the disability payments are payable. Clubs are not entitled to any credit or offset under this Article for any workers' compensation benefits payable to any Player against any payments made to any Player under the Bert Bell/Pete Rozelle NFL Player Retirement Plans and/or related documents; provided, however, that the receipt of such disability payments by the Player shall not affect the Club's right to claim or

230

receive any offsets or credits set forth elsewhere in this Article.

(iii)    **Pending cases.** The parties agree to settle those Players' workers' compensation claims and related cases that were pending or in any stage of appeal as of March 8, 2006, and thereafter in which a Player or former Player has claimed entitlement to workers' compensation benefits on account of an injury or injuries suffered while performing services under a NFL Player Contract and in which a Club is claiming any entitlement to a credit or offset greater than the credit or offset provided herein; all such settlements shall limit credits or offsets as set forth in this Article, regardless of any awards or decisions already entered in any particular case. Clubs specifically reserve the right to maintain any defenses they may have in such pending cases that are unrelated to the offset issue.

(iv)    **Remedies.** If, after March 8, 2006, despite the terms of this Article and the Clubs' obligation to comply with Subsection (iii) and all other provisions of this Article, a state court or other competent authority nevertheless renders a decision or other determination with an outcome inconsistent with the terms of this Section 4, then the Player shall have a right to immediate payment from the Club for the amount of any difference between such outcome and the outcome specified in Subsections (i)-(ii) above. A Player may initiate a claim under this Section by filing a written notice by certified mail or fax with the Management Council and furnishing a copy to the Club involved. The claim shall set forth the name of the matter and jurisdiction in which the improper award was made, the amount of payment requested and the basis for the calculation. The claim must be initiated within 45 days of either the date of execution of this Agreement or the date of any adverse order (whichever is later); provided, however, that in the event the Player files an appeal of any adverse order, the time for the Player to notify the Club will begin to run from the date the appeal is decided.

(v)    **Time-Offset Fund.** The NFL shall establish a fund which shall bear the cost of additional benefits or associated insurance and related costs (exclusive of professional fees, administrative overhead, penalties or similar costs) incurred by any Club as a direct result of the adoption of this Section 4. The parties shall use their best efforts to ensure that all parties involved including the Clubs and their insurance carriers will implement this Subsection (v) in such a manner as to minimize the costs and expenses associated with this fund.

(vi)    **Disputes.** Any dispute concerning the operation of Section 4 and/or any payments to a Player under Subsection (iv) will be determined under the grievance procedure of Article IX (Non-Injury Grievance).

**Section 5.** **Preservation of Rights:** Beginning as of the Final League Year, the NFLPA and the Clubs preserve their prior positions (i.e., prior to March 8, 2006) with regard to the applicability and legality of workers' compensation offset provisions under state law, and nothing in this Article shall be-

231

ginning in the Final League Year prevent any Player from claiming that an offset provision is not legally binding upon him or prevent any Club from asserting that an offset provision (including, but not limited to, a state statute providing a Club with a dollar-for-dollar credit) is legally binding upon a Player.

232

# ARTICLE LV
# MISCELLANEOUS

*Section 1.* **Endorsements:** No Club may unreasonably refuse to permit a player to endorse a product. Notwithstanding the foregoing, and without affecting interpretation of the preceding sentence, no player will be permitted to be a party to any endorsement arrangement of any kind with a company whose brand name is prominently associated with the production, manufacture, or distribution of a substance that has been banned by the Policy and Procedure with respect to Anabolic Steroids and Related Substances. The Management Council and the NFLPA will agree each year on a list of such companies.

*Section 2.* **Game Day Attire:**

(a)    Neither the NFL nor any of the Clubs may have any rule prohibiting or limiting the type of footwear or gloves which may be worn by players on the field, except to the extent such rules or limitations are agreed to by the NFLPA.

(b)    On game days, prior to the game and continuing until 90 minutes after the whistle ending each game (pre-season or regular season), players will be prohibited from wearing, displaying, or orally promoting equipment, apparel, or other items that carry commercial names or logos of companies in any televised interview on Club premises, unless such commercial identification has been approved in advance by the League office.

(c)    Notwithstanding Subsection (b) above, players will be permitted to wear apparel bearing the logo "Players Inc" and/or the logo "NFLPA" during televised interviews in the locker room following pre-season and regular season games, provided that such apparel does not display the names, logos, or other identifying marks of any other entity or product that is licensed by or associated with Players Inc or the NFLPA, including, but not limited to, the manufacturer of the apparel or any sponsor or licensee of Players Inc, the NFLPA, or any individual player.

(d)    The provisions in Subsection (b)-(c) above, shall not be used or referred to in any dispute between the parties over prohibition by the League and/or any Club of the wearing of unapproved commercial items in circumstances other than as expressly addressed in Subsections (b)-(c).

*Section 3.* **Appearances:** No Club may unreasonably require a player to appear on radio or television.

*Section 4.* **Promotion:** The NFLPA will use its best efforts to ensure that the players cooperate with the Clubs and the news media in reasonable promotional activities on behalf of the Clubs and the NFL.

*Section 5.* **Deduction:** The involuntary deduction of amounts from any

233

compensation due to a player for the purpose of compensating any Club personnel is prohibited.

**Section 6. Public Statements:** The NFLPA and the Management Council agree that each will use its best efforts to curtail public comments by Club personnel or players which express criticism of any club, its coach, or its operation and policy, or which tend to cast discredit upon a Club, a player, or any other person involved in the operation of a Club, the NFL, the Management Council, or the NFLPA.

**Section 7. Address:** The Management Council will furnish upon request to the NFLPA whatever address and telephone lists that Clubs have covering all players who are under contract to the Clubs as of October 1 for in-season information, and under contract to the Club as of January 1 for off-season information. The Management Council will not divulge player telephone numbers to the media or the public. As of the first pre-season cutdown date, the Management Council will provide to the NFLPA employment dates for all players who are then under contract to the Clubs.

**Section 8. NFLPA Tickets:** Two (2) complimentary tickets will be made available to the NFLPA to permit attendance at each regularly scheduled League game by authorized NFLPA representatives. All Clubs will make their best efforts to make available two (2) additional tickets to the NFLPA for purchase. The NFLPA will provide a list of authorized persons to the Management Council. The NFLPA must notify the home Club of its desire to attend such a game at least three (3) days prior to the date of the game. NFLPA representatives must possess appropriate identification.

**Section 9. Player Tickets:** Two (2) complimentary tickets will be made available to each player for each home game of his Club. Each player will be afforded the opportunity to purchase two (2) tickets for each away game of his Club from the best tickets available for public sale immediately prior to the public sale for each game. Each Club will provide players with the opportunity to purchase two (2) tickets to the Super Bowl game each year, subject to reasonable safeguards to avoid scalping of the tickets.

**Section 10. Tests:** No psychological or personality tests will be given to any player after he signs his first contract with an NFL Club. An Unrestricted Free Agent may agree to take a psychological or personality test if so requested by a Club interested in his services. A player is entitled to review the results of his psychological or personality tests upon request.

**Section 11. League Security:** A player will have the right, if he so requests, to have an NFLPA representative present during an interview by any representative of NFL Security if the player has a reasonable basis for believing

234

that Commissioner discipline might result from the interview.

**Section 12. Career Planning Program:** The parties will use best efforts to establish an in-depth, comprehensive Career Planning Program. The purpose of the program will be to help players enhance their career in the NFL and make a smooth transition to a second career. The program will also provide information to players on handling their personal finances, it being understood that players shall be solely responsible for their personal finances.

**Section 13. Delivery of Documents:** The NFL, its Clubs, the Management Council, and the NFLPA shall, upon request therefore by any party hereto, execute and deliver such further documents and instruments and take such further steps as are reasonably necessary and appropriate to implement and effectuate the purposes of this Agreement.

**Section 14. Binding Effect:** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their heirs, executors, administrators, representatives, agents, successors and assigns and any corporation into or with which any corporate party hereto may merge or consolidate.

**Section 15. Authorization:** The Management Council represents that it has been duly authorized to enter into and to execute this Agreement on behalf of itself and its members. The NFLPA hereby represents that it has been duly authorized to execute this Agreement on behalf of its members.

**Section 16. Headings:** The headings in this Agreement are solely for the convenience of the attorneys for the parties, and shall not be deemed part of, or considered in construing or interpreting this Agreement.

**Section 17. Time Periods:** The specification of any time period in this Agreement shall include any non-business days within such period, except that any deadline falling on a Saturday, Sunday, or Federal Holiday shall be deemed to fall on the following business day.

**Section 18. Exhibits:** All of the Exhibits hereto are an integral part of this Agreement and of the agreement of the parties thereto.

**Section 19. Parol Evidence:** The parties shall not, in any proceeding or otherwise, use or refer to any parol evidence with regard to the interpretation or meaning of Articles I, XIV, XVI-XXI, XXIV-XXX, XXXVIII-A, XXXVIII-B, and LVI-LVIII of this Agreement. None of the Articles of this Agreement may be changed, altered or amended other than by a written agreement.

**Section 20. Prior Side Letters:** Except to the extent inconsistent with this

235

Agreement or superseded by a new side letter executed by the Parties after the date of this Agreement, all interpretative side letters executed prior to the date of this Agreement shall remain in full force and effect.

236

# ARTICLE LVI
# FINAL LEAGUE YEAR

All of the provisions of this Agreement shall be the same in the Final League Year of this Agreement, except that the following rules shall apply only in that League Year:

**Section 1. No Salary Cap:** No Salary Cap shall be in effect during the Final League Year.

**Section 2. Free Agency If Salary Cap In League Year Prior To Final League Year:** In the event that a Salary Cap is in effect in the League Year prior to the Final League Year: (a) the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be six (6) or more Accrued Seasons; and (b) the provisions of Article XIX (Veteran Free Agency), Sections 2-4, shall apply to any player with five (5) Accrued Seasons in the Final League Year, as if such player had four (4) Accrued Seasons, except that the Qualifying Offer amounts specified in Article XIX (Veteran Free Agency), Section 2(b)(ii)(1)-(3) shall be $50,000 greater, and the Qualifying Offer amounts specified in Article XIX Section 2(b)(ii)(4)-(5) shall be $100,000 greater.

**Section 3. Free Agency If No Salary Cap In League Year Prior To Final League Year:** In the event that a Salary Cap is not in effect in the League Year prior to the Final League Year, the number of Accrued Seasons required to be an Unrestricted Free Agent during the Final League Year shall be five (5) Accrued Seasons.

**Section 4. Franchise and Transition Players:** As set forth in Article XX (Franchise and Transition Players), Section 3, each Club shall be permitted to designate one Unrestricted Free Agent as a Transition Player between February 1 and February 15, in the Final League Year, notwithstanding that Transition Players may not be designated in the League Years after the 1994 League Year (except as provided in Article XX (Franchise and Transition Players), Sections 3(a) and 11).

# ARTICLE LVII
# MUTUAL RESERVATION OF RIGHTS:
## LABOR EXEMPTION

*Section 1.* **Rights Under Law:** Subject to the provisions of this Article, upon the expiration (or termination of this Agreement, no Party (as defined in Article XVIII (Mutual Reservation of Rights; Labor Exemption), paragraph 1, of the Settlement Agreement) nor any member of the collective bargaining unit shall be deemed to have waived, by reason of the Settlement Agreement or this Agreement or the settlement and dismissal of other actions, or the entry into or effectuation of this Agreement or any Player Contract, or any of the terms of any of them, or by reason of any practice or course of dealing between or among any of the Parties, their respective rights under law with respect to the issues of whether any provision or practice authorized by this Agreement is or is not then a violation of the antitrust laws. Subject to the provisions of this Article, upon the expiration or termination of this Agreement or the Settlement Agreement, the Parties shall be free to make any available argument that any provision or practice authorized by this Agreement or the Settlement Agreement is or is not then a violation of the antitrust laws, or is or is not then entitled to any labor exemption.

*Section 2.* **Labor Exemption:** In effectuation of this Agreement, the Parties agree that the labor exemption from the antitrust laws applies during the express term of this Agreement and to any conduct of the NFL and the NFLPA taken in accordance with the terms of this Agreement during its express term.

*Section 3.* **CBA Expiration:**

(a)      Following the expiration of the express term of this Agreement, then, if the NFLPA is in existence as a union, the Parties agree that none of the Class Members (as defined in the Settlement Agreement) nor any player represented by the NFLPA shall be able to commence an action, or assert a claim, under the antitrust laws for conduct occurring, until either: (i) the Management Council and NFLPA have bargained to impasse; or (ii) six (6) months after such expiration, whichever is later; at that time, the Parties reserve any arguments they may make regarding the application of the labor exemption.

(b)      The Parties agree that, after the expiration of the express term of this Agreement, in the event that at that time or any time thereafter a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL and its Clubs and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is

238

Article LVII, Mutual Reservation of Rights: Labor Exemption

or would be a sham, pretext, ineffective, requires additional steps, or has
not in fact occurred.

239

# ARTICLE LVIII
# DURATION OF AGREEMENT

**Section 1.** [*Omitted*]

**Section 2. Effective Date/Expiration Date:** Except as provided in Section 3 below, this Agreement shall be effective from March 8, 2006 until the last day of the 2012 League Year, except for the provisions relating to the Draft, Article XVI (College Draft), which shall expire in the League Year immediately following the expiration or termination of this Agreement.

**Section 3. Termination Prior to Expiration Date:**

(a)      Either the NFLPA or the Management Council may terminate both of the final two Capped Years (2010 and 2011) by giving written notice to the other on or before November 8, 2008. In that event, the 2010 League Year would be the Final League Year, and the Agreement would continue in full force and effect until the last day of that League Year, except for the provisions related to the Draft, which would expire as prescribed in Article XVI, Section 1.

(b)      Either the NFLPA or the Management Council may terminate the final Capped Year of this Agreement (2011) by giving written notice to the other on or before November 8, 2009. In that event, the 2011 League Year would be the Final League Year, and the Agreement would continue in full force and effect until the last day of that League Year, except for the provisions related to the Draft, which would expire as prescribed in Article XVI, Section 1.

(c)      **Provision Invalidated:** If at any time after Court Approval during the term of this Agreement, any provision of this Agreement is enjoined, declared null and void, rendered unenforceable or otherwise invalidated by a court of competent jurisdiction, and such court's order having become final and all appeals through the Court of Appeals having been exhausted, the provision in question shall be severed from the Agreement, and the remainder of the Agreement shall remain in full force and effect. Notwithstanding anything in this Subsection (c), either the NFL or the NFLPA shall have the right to terminate this Agreement if one or more of the following provisions is rendered invalid, null and void, or unenforceable: Articles XVI (College Draft), XIX (Veteran Free Agency), XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), LVI (Final League Year), XXVIII (Anti-Collusion), and LVII (Mutual Reservation of Rights; Labor Exemption). If either the NFL or the NFLPA wishes to exercise its option to terminate, it may do so by serving upon the other parties written notice of termination within 30 days of the date of such determination and any appeals relating thereto.

(d)      **Termination Due To Collusion:** If at any time the conditions of Article XXVIII (Anti-Collusion), Section 16(a), (b) or (c) are satisfied, the

240

NFLPA shall have the right to terminate this Agreement. To execute such a termination, the NFLPA shall serve upon the NFL written notice of termination within thirty (30) days after the Special Master's report finding the requisite conditions becomes final and any appeals therefrom to the District Court have been exhausted. The Parties agree, however, that such termination shall be stayed if any Party appeals such finding to the Court of Appeals. All Parties agree to seek and accept expedited review in any appeal of a collusion determination, with all the procedural limitations thereof. Thirty (30) days after any expedited review by the Court of Appeals, and in the absence of a stay by the U.S. Supreme Court within ten (10) days thereof, the termination shall be effective, unless the Parties agree otherwise. The Parties shall confer in person or by telephone during the thirty-day period to attempt to resolve the dispute.

(e) **No Waiver:** Any failure of the NFL or the NFLPA to exercise its right to terminate this Agreement with respect to any League Year in accordance with this Article shall not be deemed a waiver of or in any way impair or prejudice any right of any such party, if any, to terminate this Agreement in accordance with this Article with respect to any succeeding League Year.

### Section 4. Effect of Early Termination on Player Contracts:

(a) If otherwise in compliance with this Agreement upon execution prior to notice of early termination, a Player Contract may not be found to violate this Agreement solely by reason of a subsequent early termination of this Agreement. For example, a Player Contract that, upon execution, complies with the 30% Rule set forth in Article XXIV, Section 8(b), may not be found to violate the 30% Rule solely by reason of a subsequent early termination, although neither the Player nor the Club may, after notice of early termination of this Agreement, exercise any options, or otherwise exercise rights or take actions that would, upon exercise or implementation, cause the Player Contract to violate the 30% Rule.

(b) Except as otherwise provided in Article XXIV, the Salary Cap accounting treatment accorded to Player Contracts executed, or any options or other rights exercised, prior to any notice of early termination of this Agreement will not change, and such contracts will not be re-valued, solely by reason of such early termination.

(c) Contracts executed or renegotiated after any notice of early termination of this Agreement, as well as the exercise after such notice of any pre-existing option or contract rights shall be governed by the then-existing Salary Cap rules, taking into account the consequences of any such early termination (e.g., the conversion of 2009 to the Final Capped Year and the conversion of 2010 to an Uncapped Year).

### Section 5. Ratification: This Agreement is subject to ratification by the NFLPA and the Management Council in accordance with their internal pro-

241

Article LVIII, Duration of Agreement

cedures before it becomes effective. In the event of failure of ratifications by either party, then this Agreement will not become effective and neither party, nor any of its members, will possess or assert any claim whatsoever against the other party because of the failure of ratification of this Agreement.

242

## ARTICLE LIX
## GOVERNING LAW

To the extent that federal law does not govern the implementation of this Agreement, this Agreement shall be construed and interpreted under, and shall be governed by, the laws applicable to contracts made and performed in the State of New York.

# ARTICLE LX
## NOTICES

Any notice to be given under the terms of this Agreement whose method is not otherwise specified herein shall be given in writing by hand-delivery and first-class prepaid mail addressed as follows:

(a)   To the National Football League Management Council:
      The National Football League
      Management Council
      280 Park Avenue
      New York, New York 10017
      Attention: Executive Vice President—Labor Relations

(b)   To an NFL Club:
      At the principal address of such Club as then
      listed on the records of the NFL or at that Club's
      principal office.
      Attention: President

(c)   To the NFLPA:
      National Football League Players Association
      2021 L Street, N.W.
      Washington, D.C. 20036
      Attention: General Counsel

or to such other persons or addresses as the parties hereto may designate in writing.

NATIONAL FOOTBALL LEAGUE          NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION               MANAGEMENT COUNCIL


BY: _____       BY: _____

244

# APPENDIX A
## CHECK-OFF AUTHORIZATION FOR
## NATIONAL FOOTBALL LEAGUE PLAYERS
## ASSOCIATION DEDUCTIONS

I hereby authorize and direct my present club, or any other National Football League club by which I may be employed as a player in the future to deduct from my salary and to pay the National Football League Players Association any initiation fees, annual membership dues, or the required service fee, in the amounts from time to time certified by the National Football League Players Association to the club as properly authorized for each year of the operation of this authorization.

I direct that the initiation fee and the annual dues be deducted beginning on the 30th day following the beginning of my employment as a player in the National Football League.

I direct that the annual service fee in the same amount as any initiation fee and the annual dues required of members of the National Football League Players Association be deducted on the 30th day following the beginning of my employment as a player in the National Football League.

The foregoing authorized deductions are to be checked-off in equal weekly or biweekly installments from each pre-season and regular season pay check, beginning with the first pay check after the date of the first pre-season squad cutdown. The club will forward such deductions within seven (7) days of each check-off to the National Football League Players Association, 2021 L Street, N.W., Washington, D.C. 20036.

This check-off authorization is irrevocable for a period of one year or until the expiration date of the currently effective collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever date occurs first, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between the National Football League Players Association, the National Football League Management Council and the Member Clubs of the National Football League, whichever shall be shorter, unless written notice is given by me to the National Football League Players Association and the club not more than twenty (20) and not less than ten (10) days prior to the expiration of each period of one year or of each collective bargaining agreement between the National Football League Players Association, the National Football League Management

245

Council and the Member Clubs of the National Football League, whichever occurs sooner.

Date:

_____
Signature

_____
Player's Name—Type or Print

246

## APPENDIX B
## INJURY PROTECTION/EARLY WAIVER

With regard to the last sentence of Section 1, Article X, of the March 1, 1977 Collective Bargaining Agreement, it was agreed that a player who qualifies for "Injury Protection" under Subsections (a) and (b) may be waived prior to being given a pre-season physical examination, but the waiving Club would retain "Injury Protection" liability unless and until the player signed a contract with and passed the physical examination of another NFL Club. In other words, a Club cannot evade "Injury Protection" liability by early waiving.

# APPENDIX C
# NFL PLAYER CONTRACT

THIS CONTRACT is between _____,
hereinafter "Player," and_____,
a _____ corporation
(limited partnership) (partnership), hereinafter "Club," operating under
the name of the
as a member of the National Football League, hereinafter "League." In con-
sideration of the promises made by each to the other, Player and Club agree
as follows:

    1.    TERM. This contract covers _____ football season(s), and
will begin on the date of execution or March 1, _____, whichever is
later, and end on February 28 or 29, _____, unless extended, termi-
nated, or renewed as specified elsewhere in this contract.

    2.    EMPLOYMENT AND SERVICES. Club employs Player as a
skilled football player. Player accepts such employment. He agrees to give
his best efforts and loyalty to the Club, and to conduct himself on and off
the field with appropriate recognition of the fact that the success of profes-
sional football depends largely on public respect for and approval of those
associated with the game. Player will report promptly for and participate
fully in Club's official mandatory minicamp(s), official pre-season training
camp, all Club meetings and practice sessions, and all pre-season, regular
season and postseason football games scheduled for or by Club. If invited,
Player will practice for and play in any all-star football game sponsored by
the League. Player will not participate in any football game not sponsored
by the League unless the game is first approved by the League.

    3.    OTHER ACTIVITIES. Without prior written consent of the
Club, Player will not play football or engage in activities related to football
otherwise than for Club or engage in any activity other than football which
may involve a significant risk of personal injury. Player represents that he
has special, exceptional and unique knowledge, skill, ability, and experi-
ence as a football player, the loss of which cannot be estimated with any cer-
tainty and cannot be fairly or adequately compensated by damages. Player
therefore agrees that Club will have the right, in addition to any other right
which Club may possess, to enjoin Player by appropriate proceedings from
playing football or engaging in football-related activities other than for Club
or from engaging in any activity other than football which may involve a sig-
nificant risk of personal injury.

    4.    PUBLICITY AND NFLPA GROUP LICENSING PROGRAM.
(a)    Player grants to Club and the League, separately and together,

**248**

the authority to use his name and picture for publicity and the promotion of NFL Football, the League or any of its member clubs in newspapers, magazines, motion pictures, game programs and roster manuals, broadcasts and telecasts, and all other publicity and advertising media, provided such publicity and promotion does not constitute an endorsement by Player of a commercial product. Player will cooperate with the news media, and will participate upon request in reasonable activities to promote the Club and the League. Player and National Football League Players Association, hereinafter "NFLPA," will not contest the rights of the League and its member clubs to telecast, broadcast, or otherwise transmit NFL Football or the right of NFL Films to produce, sell, market, or distribute football game film footage, except insofar as such broadcast, telecast, or transmission of footage is used in any commercially marketable game or interactive use. The League and its member clubs, and Player and the NFLPA, reserve their respective rights as to the use of such broadcasts, telecasts or transmissions of footage in such games or interactive uses, which shall be unaffected by this subparagraph.

(b)       Player hereby assigns to the NFLPA and its licensing affiliates, if any, the exclusive right to use and to grant to persons, firms, or corporations (collectively "licensees") the right to use his name, signature facsimile, voice, picture, photograph, likeness, and/or biographical information (collectively "image") in group licensing programs. Group licensing programs are defined as those licensing programs in which a licensee utilizes a total of six (6) or more NFL player images on or in conjunction with products (including, but not limited to, trading cards, clothing, videogames, computer games, collectibles, internet sites, fantasy games, etc.) that are sold at retail or used as promotional or premium items. Player retains the right to grant permission to a licensee to utilize his image if that licensee is not concurrently utilizing the images of five (5) or more other NFL players on products that are sold at retail or are used as promotional or premium items. If Player's inclusion in a particular NFLPA program is precluded by an individual exclusive endorsement agreement, and Player provides the NFLPA with timely written notice of that preclusion, the NFLPA will exclude Player from that particular program. In consideration for this assignment of rights, the NFLPA will use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA. The NFLPA will use its best efforts to promote the use of NFL player images in group licensing programs, to provide group licensing opportunities to all NFL players, and to ensure that no entity utilizes the group licensing rights granted to the NFLPA without first obtaining a license from the NFLPA. This paragraph shall be construed under New York law without reference to conflicts of law principles. The assignment in this paragraph shall expire on December 31 of the later of (a) the third year following the execution of this contract, or (b) the year in which this contract ex-

249

pires. Neither Club nor the League is a party to the terms of this paragraph, which is included herein solely for the administrative convenience and benefit of Player and the NFLPA. The terms of this subparagraph apply unless, at the time of execution of this contract, Player indicates by striking out this subparagraph (b) and marking his initials adjacent to the stricken language his intention to not participate in the NFLPA Group Licensing Program. Nothing in this subparagraph shall be construed to supersede or any way broaden, expand, detract from, or otherwise alter in any way whatsoever, the rights of NFL Properties, Inc. as permitted under Article V (Union Security), Section 4 of the 1993 Collective Bargaining Agreement ("CBA").

5.    COMPENSATION. For performance of Player's services and all other promises of Player, Club will pay Player a yearly salary as follows:

$_____for the 20____season;

$_____for the 20____season;

$_____for the 20____season;

$_____for the 20____season;

$_____for the 20____season.

In addition, Club will pay Player such earned performance bonuses as may be called for in this contract; Player's necessary traveling expenses from his residence to training camp; Player's reasonable board and lodging expenses during pre-season training and in connection with playing pre-season, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to and from pre-season, regular season, and postseason football games outside Club's home city; Player's necessary traveling expenses to his residence if this contract is terminated by Club; and such additional compensation, benefits and reimbursement of expenses as may be called for in any collective bargaining agreement in existence during the term of this contract. (For purposes of this contract, a collective bargaining agreement will be deemed to be "in existence" during its stated term or during any period for which the parties to that agreement agree to extend it.)

6.    PAYMENT. Unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise, Player will be paid 100% of his yearly salary under this contract in equal weekly or biweekly installments over the course of the applicable regular season period, commencing with the first regular season game played by Club in each season. Unless this contract specifically provides otherwise, if this contract is executed or Player is activated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or biweekly por-

tions of his yearly salary becoming due and payable after he is activated. Unless this contract specifically provides otherwise, if this contract is terminated after the beginning of the regular season, the yearly salary payable to Player will be reduced proportionately and Player will be paid the weekly or bi weekly portions of his yearly salary having become due and payable up to the time of termination.

7.   DEDUCTIONS. Any advance made to Player will be repaid to Club, and any properly levied Club fine or Commissioner fine against Player will be paid, in cash on demand or by means of deductions from payments coming due to the Player under this contract, the amount of such deductions to be determined by Club unless this contract or any collective bargaining agreement in existence during the term of this contract specifically provides otherwise.

8.   PHYSICAL CONDITION. Player represents to Club that he is and will maintain himself in excellent physical condition. Player will undergo a complete physical examination by the Club physician upon Club request, during which physical examination Player agrees to make full and complete disclosure of any physical or mental condition known to him which might impair his performance under this contract and to respond fully and in good faith when questioned by the Club physician about such condition. If Player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith responses to the Club physician, then Club may terminate this contract.

9.   INJURY. Unless this contract specifically provides otherwise, if Player is injured in the performance of his services under this contract and promptly reports such injury to the Club physician or trainer, then Player will receive such medical and hospital care during the term of this contract as the Club physician may deem necessary, and will continue to receive his yearly salary for so long, during the season of injury only and for no subsequent period covered by this contract, as Player is physically unable to perform the services required of him by this contract because of such injury. If Player's injury in the performance of his services under this contract results in his death, the unpaid balance of his yearly salary for the season of injury will be paid to his stated beneficiary, or in the absence of a stated beneficiary, to his estate.

10.   WORKERS' COMPENSATION. Any compensation paid to Player under this contract or under any collective bargaining agreement in existence during the term of this contract for a period during which he is entitled to workers' compensation benefits by reason of temporary total, permanent total, temporary partial, or permanent partial disability will be

251

deemed an advance payment of workers' compensation benefits due Player, and Club will be entitled to be reimbursed the amount of such payment out of any award of workers' compensation.

11.    SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract. In addition, during the period any salary cap is legally in effect, this contract may be terminated if, in Club's opinion, Player is anticipated to make less of a contribution to Club's ability to compete on the playing field than another player or players whom Club intends to sign or attempts to sign, or another player or players who is or are already on Club's roster, and for whom Club needs room.

12.    TERMINATION. The rights of termination set forth in this contract will be in addition to any other rights of termination allowed either party by law. Termination will be effective upon the giving of written notice, except that Player's death, other than as a result of injury incurred in the performance of his services under this contract, will automatically terminate this contract. If this contract is terminated by Club and either Player or Club so requests, Player will promptly undergo a complete physical examination by the Club physician.

13.    INJURY GRIEVANCE. Unless a collective bargaining agreement in existence at the time of termination of this contract by Club provides otherwise, the following injury grievance procedure will apply: If Player believes that at the time of termination of this contract by Club he was physically unable to perform the services required of him by this contract because of an injury incurred in the performance of his services under this contract, Player may, within 60 days after examination by the Club physician, submit at his own expense to examination by a physician of his choice. If the opinion of Player's physician with respect to his physical ability to perform the services required of him by this contract is contrary to that of the Club's physician, the dispute will be submitted within a reasonable time to final and binding arbitration by an arbitrator selected by Club and Player or, if they are unable to agree, one selected in accordance with the procedures of the American Arbitration Association on application by either party.

14.    RULES. Player will comply with and be bound by all reasonable Club rules and regulations in effect during the term of this contract which

252

are not inconsistent with the provisions of this contract or of any collective bargaining agreement in existence during the term of this contract. Player's attention is also called to the fact that the League functions with certain rules and procedures expressive of its operation as a joint venture among its member clubs and that these rules and practices may affect Player's relationship to the League and its member clubs independently of the provisions of this contract.

15.    INTEGRITY OF GAME. Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; knowingly associates with gamblers or gambling activity; uses or provides other players with stimulants or other drugs for the purpose of attempting to enhance on-field performance; or is guilty of any other form of conduct reasonably judged by the League Commissioner to be detrimental to the League or professional football, the Commissioner will have the right, but only after giving Player the opportunity for a hearing at which he may be represented by counsel of his choice, to fine Player in a reasonable amount; to suspend Player for a period certain or indefinitely; and/or to terminate this contract.

16.    EXTENSION. Unless this contract specifically provides otherwise, if Player becomes a member of the Armed Forces of the United States or any other country, or retires from professional football as an active player, or otherwise fails or refuses to perform his services under this contract, then this contract will be tolled between the date of Player's induction into the Armed Forces, or his retirement, or his failure or refusal to perform, and the later date of his return to professional football. During the period this contract is tolled, Player will not be entitled to any compensation or benefits. On Player's return to professional football, the term of this contract will be extended for a period of time equal to the number of seasons (to the nearest multiple of one) remaining at the time the contract was tolled. The right of renewal, if any, contained in this contract will remain in effect until the end of any such extended term.

17.    ASSIGNMENT. Unless this contract specifically provides otherwise, Club may assign this contract and Player's services under this contract to any successor to Club's franchise or to any other Club in the League. Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract. The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

253

18. FILING. This contract will be valid and binding upon Player and Club immediately upon execution. A copy of this contract, including any attachment to it, will be filed by Club with the League Commissioner within 10 days after execution. The Commissioner will have the right to disapprove this contract on reasonable grounds, including but not limited to an attempt by the parties to abridge or impair the rights of any other club, uncertainty or incompleteness in expression of the parties' respective rights and obligations, or conflict between the terms of this contract and any collective bargaining agreement then in existence. Approval will be automatic unless, within 10 days after receipt of this contract in his office, the Commissioner notifies the parties either of disapproval or of extension of this 10-day period for purposes of investigation or clarification pending his decision. On the receipt of notice of disapproval and termination, both parties will be relieved of their respective rights and obligations under this contract.

19. DISPUTES. During the term of any collective bargaining agreement, any dispute between Player and Club involving the interpretation or application of any provision of this contract will be submitted to final and binding arbitration in accordance with the procedure called for in any collective bargaining agreement in existence at the time the event giving rise to any such dispute occurs.

20. NOTICE. Any notice, request, approval or consent under this contract will be sufficiently given if in writing and delivered in person or mailed (certified or first class) by one party to the other at the address set forth in this contract or to such other address as the recipient may subsequently have furnished in writing to the sender.

21. OTHER AGREEMENTS. This contract, including any attachment to it, sets forth the entire agreement between Player and Club and cannot be modified or supplemented orally. Player and Club represent that no other agreement, oral or written, except as attached to or specifically incorporated in this contract, exists between them. The provisions of this contract will govern the relationship between Player and Club unless there are conflicting provisions in any collective bargaining agreement in existence during the term of this contract, in which case the provisions of the collective bargaining agreement will take precedence over conflicting provisions of this contract relating to the rights or obligations of either party.

22. LAW. This contract is made under and shall be governed by the laws of the State of _____.

Appendix C

23.    WAIVER AND RELEASE. Player waives and releases any claims that he may have arising out of, related to, or asserted in the lawsuit entitled White v. National Football League, including, but not limited to, any such claim regarding past NFL Rules, the College Draft, Plan B, the first refusal/compensation system, the NFL Player Contract, pre-season compensation, or any other term or condition of employment, except any claims asserted in Brown v. Pro Football, Inc. This waiver and release also extends to any conduct engaged in pursuant to the Stipulation and Settlement Agreement in White ("Settlement Agreement") during the express term of that Settlement Agreement or any portion thereof. This waiver and release shall not limit any rights Player may have to performance by the Club under this Contract or Player's rights as a member of the White class to object to the Settlement Agreement during its review by the court in Minnesota. This waiver and release is subject to Article XIV (NFL Player Contract), Section 3(c) of the CBA.

24.    OTHER PROVISIONS.

(a)    Each of the undersigned hereby confirms that (i) this contract, renegotiation, extension or amendment sets forth all components of the player's remuneration for playing professional football (whether such compensation is being furnished directly by the Club or by a related or affiliated entity); and (ii) there are not undisclosed agreements of any kind, whether express or implied, oral or written, and there are no promises, undertakings, representations, commitments, inducements, assurances of intent, or understandings of any kind that have not been disclosed to the NFL involving consideration of any kind to be paid, furnished or made available to Player or any entity or person owned or controlled by, affiliated with, or related to Player, either during the term of this contract or thereafter.

(b)    Each of the undersigned further confirms that, except insofar as any of the undersigned may describe in an addendum to this contract, to the best of their knowledge, no conduct in violation of the Anti-Collusion rules of the Settlement Agreement took place with respect to this contract. Each of the undersigned further confirms that nothing in this contract is designed or intended to defeat or circumvent any provisions of the Settlement Agreement, including but not limited to the Rookie Pool and Salary Cap provisions; however, any conduct permitted by the CBA and/or the Settlement Agreement shall not be considered a violation of this confirmation.

(c)    The Club further confirms that any information regarding the negotiation of this contract that it provided to the Neutral Verifier was, at the time the information was provided, true and correct in all material respects.

255

25.   SPECIAL PROVISIONS.

THIS CONTRACT is executed in six (6) copies. Player acknowledges that
before signing this contract he was given the opportunity to seek advice
from or be represented by persons of his own selection.

_____   _____
PLAYER                              CLUB
_____   _____
Home Address                        By
_____   _____
Telephone Number                    Club Address
_____   _____
Date                                Date
_____
PLAYER'S CERTIFIED AGENT
_____
Address
_____
Telephone Number
_____
Date

Copy Distribution:   White-League Office      Yellow-Player
                     Green-Member Club        Blue-Management Council
                     Gold-NFLPA               Pink-Player Agent

256

# APPENDIX D
# FIRST REFUSAL OFFER SHEET

Name of Player:                        Date:

Address of Player:                     Name of New Team:

Name and Address of                    Name of Prior Team:
Player's Representative
Authorized to Act for Player:

                                       Address of Prior Team:

Principal Terms of NFL Player Contract With New Team:

    [Supply Information on this Sheet or on Attachment]

    1.    Salary to be paid, guaranteed or loaned (i.e., Paragraph 5 Salary; signing, reporting and roster bonuses; deferred compensation (including the specified installments and the specified dates); amount and terms of loans, if any; and description of variation and method of calculation, if any, for Salary in Principal Terms that may be variable and/or calculable (i.e., only likely to be earned team incentives for New Team [not to exceed 15% of Salary] and generally recognized League-wide honors): [Please identify every component of such payment (e.g., signing bonus, salary, etc.) and indicate if any component or portion thereof is guaranteed or based upon specific incentives].

    2.    Modifications and additions to NFL Player Contract(s): [or attach marked-up copy of NFL Player Contract(s)]

    3.    Other terms (that need not be matched):

Player:                                New Club:

By: _____            By: _____
                                       Chief Operating Officer

257

## APPENDIX E
## FIRST REFUSAL EXERCISE NOTICE

Name of Player:                     Date:


Address of Player:                  Name of New Team:


Name and Address of                 Name of Prior Team:
Player's Representative
Authorized to Act for Player:


                                    Address of Prior Team:


    The undersigned member of the NFL hereby exercises its Right of First Refusal so as to create a binding Agreement with the player named above containing the Principal Terms set forth in the First Refusal Offer Sheet (a copy of which is attached hereto), and those terms of the NFL Player Contract not modified by such Principal Terms.


                                    Prior Team

                                    By: _____
                                    Chief Operating Officer

258

## APPENDIX F
## WAIVER OF FREE AGENT RIGHTS

I, the undersigned, hereby state that I have agreed to a Right of First Refusal at the end of my NFL Player Contract, as set forth in the documents attached to this waiver. I understand that, in so doing, I am giving up rights I have to be completely free to sign with other teams at the end of my contract. I also understand that no NFL team is permitted to force me to renounce these rights, which are rights that I have under the NFLPA/NFL collective bargaining agreement and the settlement of the Reggie White class action suit against the NFL. In exchange for renouncing these rights, I understand that I will receive the following additional compensation, if any, from my team:

By: _____

WITNESSED BY:

_____

259

**APPENDIX G**
**NOTICE OF TERMINATION**

TO:

You are hereby notified that effective immediately your NFL Player Contract(s) with the Club covering the _____ football season(s) has (have) been terminated for the reason(s) checked below:

• You have failed to establish or maintain your excellent physical condition to the satisfaction of the Club physician.

• You have failed to make full and complete disclosure of your physical or mental condition during a physical examination.

• In the judgment of the Club, your skill or performance has been unsatisfactory as compared with that of other players competing for positions on the Club's roster.

• You have engaged in personal conduct which, in the reasonable judgment of the Club, adversely affects or reflects on the Club.

The following reason can be checked only in a year in which a Salary Cap is in effect:

• In the Club's opinion, you are anticipated to make less of a contribution to the Club's ability to compete on the playing field than another player or players whom the Club intends to sign or attempts to sign, or already on the roster of the Club, and for whom the Club needs Room.

260

# APPENDIX H
## ACCOUNTANTS' REVIEW PROCEDURES

The information included in the Schedule of Team Salaries, Benefits, Player Costs, Cash Player Costs, and Total Revenues ("TR") of the NFL and its member clubs (the "Schedule"), which is not intended to be a presentation in accordance with generally accepted accounting principles, is to be prepared in accordance with the provisions of the CBA. The information on the Schedule is to be the responsibility of the management of the Clubs and the NFL.

The Management Council and the NFLPA are to retain a national accounting firm (the "Accountants") which will have the responsibility to perform certain procedures on the Schedule and report on the results of these procedures. The Accountants are to conduct procedures as agreed upon by the parties (the "Procedures"). The Procedures shall include examining, on a test basis, evidence supporting the amounts and disclosures in the Schedule. The Procedures shall also include an assessment of the significant estimates made by management, as well as an evaluation of the overall Schedule presentation.

A committee is to be established, the Settlement Agreement Salary Cap Review Committee (the "Committee"), consisting of six (6) members with three (3) representatives designated by each of the Management Council and the NFLPA. The Committee is to meet with the Accountants at least twice during the year, once prior to December 31st to review the scope of the Procedures described in the preceding paragraph and again to review the results of the Procedures reasonably before issuance of any Special Purpose Letter for that playing season.

The procedures detailed below and/or as otherwise agreed by the parties are and shall be designed to determine whether the Schedule represents, in all material respects, the Team Salaries, Benefits, Player Costs, Cash Player Costs and Total Revenues of the NFL and its Clubs for such League Year in accordance with the provisions of the CBA. The Accountants will perform the Procedures with respect to the Schedule for each League Year.

The Accountants may rely on the procedures performed by each member club's local accounting firm ("Local Accountants"), as agreed upon by the parties, or may test the procedures on a scope basis so as to permit the Accountants to obtain a reasonable basis to report upon the Procedures as referred above.

261

The Accountants will have access to and receive copies of the Local Accountants' workpapers of the Schedule (the "Workpapers"). If the Accountants need to review the financial audit workpapers or the corresponding financial statement of any Club or the League Office, this information will be held in confidence and not be part of the file subject to review by the Committee.

## Procedures provided by the Management Council and the NFLPA to be performed by the Accountants

### General

- The CBA and all relevant side letters should be reviewed and understood.

- See Exhibit H.1 for the form of the Accountants' Report.

- Examine the National Television and Cable contracts at the League Office and agree to amounts reported.

- Schedules of international broadcast should be obtained from the League Office. Schedules should be verified by agreeing to general ledgers and testing supporting documentation where applicable.

- All loans, advances, bonuses, etc. received by the League Office should be noted in the report and included in TR where appropriate.

- The Player Compensation and Revenues Reporting Package and instructions for the playing season should be reviewed and understood.

- All workpapers of the Accountants relative to its report on the Schedule shall be made available for review by representatives of the Management Council and the NFLPA prior to issuance of the report.

- A summary of all findings (including any unusual or non-recurring transactions) and proposed adjustments must be jointly reviewed with representatives of the Management Council and the NFLPA prior to issuance of the report.

- Any problems or questions raised should be resolved by the Committee.

- Estimates should be reviewed in accordance with the CBA. Estimates are to be reviewed based upon the previous year's actual results and current year activity. Estimates should be reconfirmed with third parties when possible.

262

- Revenue and expense amounts that have been estimated should be re-confirmed with the Controller or other team representatives prior to the issuance of the report.

- Where possible, team and League Office revenues and expenses should be reconciled to audited financial statements. This information is to be held in confidence.

- The Accountants should be aware of revenues excluded from TR. All revenues excluded by the teams or League Office should be reviewed to determine proper exclusion. The Accountants should perform a review for revenues improperly excluded from, or included in, TR.

## Procedures provided by the Management Council and the NFLPA to be performed by the Local Accountants

### General
- The local accountants shall conduct procedures as agreed upon by the parties.

- The CBA and all side letters should be reviewed and understood by all Local Accountants.

- See Exhibit H.2 for the form of the Local Accountants' Report.

- Special rules for Salary Cap counting such as annuities, loans, guarantees, deferrals, signing bonuses and the like should be reviewed and understood.

### Team Salaries - Schedule 1
- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Examine the applicable player contracts for all players listed, noting agreement of all salary amounts for each player, in accordance with the definition of salary in the CBA.

- Compare player names with all player lists for the season in question.

- Determine method used to value non-cash compensation is in compliance with methods outlined in the CBA.

263

- Examine trade arrangements to verify that each team has properly recorded its pro rata portion of the players' entire salary based upon roster days.

- Inquire of Controller or other representative of each team if any additional compensation was paid to players and not included on the schedule.

- Review "Miscellaneous Bonuses" to determine whether such bonuses were actually earned for such season.

- Review signing bonuses to determine if they have been allocated over the years of the Contract in accordance with the CBA.

- Review contracts to insure that any guaranteed amounts for future years are allocated, if applicable, over previous years in accordance with the provisions of this CBA.

- Compare the balances of player loans from the end of the prior period to the end of the current period and reconcile to the respective payment schedule in effect at the end of the prior period.

## Benefits - Schedule 2

- Trace amounts to the team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Investigate variations in amounts from prior year through discussion with the Controller or other representative of the team.

- Review each team's insurance expenses for premium credits (refunds) received from carriers.

- Review supporting documentation as to the following expenses:

| | |
|---|---|
| Players Pension | Workers Compensation |
| Severance Costs | FICA Social Security/Medicare |
| Disability Insurance | Unemployment Insurance |
| Medical/Dental/Life Ins. | Other Allowable Benefits |

## Player Costs - Schedule 3

- Perform procedures provided in Schedules 1 and 2 above and deduct amounts not includable in the definition of "Player Costs" in the CBA.

264

**Cash Player Costs - Schedule 3A**
- Perform procedures provided in Schedules 1 and 2 above and calculate Club's "Cash Salary" and amounts committed to be spent by Club in the year under review for Player Benefits, to determine the Club's contribution to Cash Player Costs (as defined in Article XXIV, Section 4(d)(iv) for such year.

**Revenues - Schedule 4**
- Trace amounts to team's general ledger or other supporting documentation for agreement.

- Foot all schedules and perform other clerical tests.

- Trace gate receipts to general ledger and test supporting documentation where appropriate.

- Gate receipts should be reviewed and reconciled to League Office gate receipts summary.

- Luxury box revenues should be included in TR in a manner consistent with the CBA. Amounts included in TR, and deductions against such revenues should be verified to supporting documentation.

- Examine local television, local cable and local radio contracts. Verify to amounts reported by teams.

- When local broadcast revenues are not verifiable by reviewing a contract, detailed supporting documentation should be obtained and tested.

- All loans, advances, bonuses, etc. received by the team should be noted in the report and included in TR where appropriate.

- All amounts of other revenues should be reviewed for proper inclusion/exclusion in TR. Test appropriateness of balances where appropriate.

**Questions**
- Review with Controller or other representatives of the team the answers to all questions on this schedule.

- Review that appropriate details are provided where requested.

- Prepare a summary of all changes.

265

Appendix H

**Revenue Reporting Procedures and List of Related Entities**

- Review with Controller or other representatives of the team all information included on both schedules.

- Prepare a summary of any changes, corrections or additions to either schedule.

266

Exhibit H.1

## EXHIBIT H.1
## ACCOUNTANTS' AGREED-UPON PROCEDURES REPORT

We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (collectively, the "Parties") with respect to the National Football League Office Reporting Package and the Reporting Packages of the Member Clubs of the National Football League, for the [insert] League Year, solely to assist the Parties in evaluating whether the Reporting Packages were prepared in accordance with the provisions and definitions contained in the Instructions to the Reporting Package. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule 1 either for the purpose for which this report has been requested or for any other purpose.

Our findings are set forth in the accompanying Schedule B.

We were not engaged to, and will not perform an audit or examination, the objective of which would be the expression of an opinion on the Reporting Packages. Accordingly, we will not express such an opinion. If we were to perform additional procedures or if we were to perform an audit or examination of the Reporting Packages, other matters might have come to our attention that would have been reported to the Parties.

This report is intended solely for the use of the National Football League Management Council, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

267

## EXHIBIT H.2
## LOCAL ACCOUNTANTS' AGREED-UPON
## PROCEDURES REPORT

We have performed the procedures as described in the accompanying Schedule A, which were agreed to by the National Football League Management Council, the National Football League Players Association and Class Counsel (the "Parties") with respect to the Reporting Package of the [Member Club Name], a Member Club of the National Football League, for [insert] League Year, to assist the Parties in evaluating whether the Reporting Package was prepared in accordance with the provisions and definitions contained in the Instructions to the Reporting Package dated [insert]. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of management of the Parties. Consequently, we make no representation regarding the sufficiency of the procedures described in Schedule A either for the purpose for which this report has been requested or for any other purpose.

Our findings are set forth in the accompanying Schedule B.

We were not engaged to, and did not, perform an audit, the objective of which would be the expression of an opinion on the Reporting Package. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to the Parties.

This report is intended solely for the use of the [Member Club Name], the National Football League Management Council, the National Football League Players Association and Class Counsel and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes.

# APPENDIX H-3
# REVENUE ACCOUNTING RULES

The following is a non-exclusive list of revenue accounting rules that were agreed to by the Parties prior to the 2006 League Year that continue in effect under this Agreement, as stated in Article XXIV, Section 1(a). These rules apply to TR as of the 2006 League Year, and to DGR or Excluded DGR, as appropriate, prior to then. These rules apply only to the extent expressly stated below and shall not be used to support or impose an interpretation of any provision of the Settlement Agreement or any other provision of this Agreement. The Parties hereby confirm that, absent an express provision of the Agreement or this Appendix to the contrary, all revenue accounting rules applied prior to the 2006 League Year continue in effect, regardless of whether or not they are set forth or referenced in this Appendix or the text of the Agreement.

## A. Cost of Goods Sold

In the event that a Club or Club Affiliate is regularly engaged in selling goods (e.g., concessions or merchandise) directly to the public, and incurs an actual out-of-pocket, direct cost for purchasing such goods (i.e., the purchase price paid to an unrelated third party including shipping costs and sales taxes paid, net of all discounts), and such goods are not sold to any individual or entity related in any manner to any Club owner or previous owner, then such "cost of goods sold" may be deducted from the calculation of the TR revenues for that Club. Allowable costs of goods deductions shall not include, without limitation: costs that are imputed or allocated in any manner; insurance; depreciation; amortization; costs incurred by any person other than the Club or Club Affiliate, including but not limited to such costs that are reimbursed by the Club or Club Affiliate; maintenance expenses; expenses that have in any manner been shifted from another revenue source that was previously included in TR on a gross basis; marketing; advertising or promotional expenses; and interest or financing costs.

In the event that a Club or Club Affiliate is regularly engaged in selling directly to the public printed materials promoting the Club, NFL players, or NFL football, and the Club or Club Affiliate incurs an actual, out-of-pocket, direct cost in the production of such printed materials, and such goods are not sold to any individual or entity related in any manner to any Club or previous owner, then thirty-three percent (33%) of such costs may be deducted from the printed material revenue included in the calculation of the TR revenues for that Club. This paragraph is intended to supplement without modifying the immediately preceding paragraph pertaining to costs of goods sold.

269

## B. Sponsorship Revenues

In the event that a Club provides tickets to any individual or entity having a sponsorship relationship with the Club (including tickets provided pursuant to any sponsorship contract), the face value of such tickets may be excluded from TR only if the tickets are excluded from TR under Article XXIV, Section 1(a)(ii)(E). In any case, all sponsorship revenue from sponsors (whether cash or barter) less only the face value of any tickets provided by the Club which are otherwise included in TR shall be included in TR (i.e., a revenue amount that a Club receives from a sponsor in connection with the sponsor receiving tickets shall not be counted more than once).

In the event that a Club provides tickets to any individual or entity not having a sponsorship relationship with the Club, and the Club receives anything of value from such individual or entity, then the fair market value of the consideration received by the Club (whether cash or barter), less only the face value of any tickets provided by the Club which would otherwise be included in TR, shall be included in TR.

## C. PSL Refunds

PSL revenues shall be reported net of actual refunds made in the year for which such revenues are reported. If an amount has been refunded, then the refunded amount shall be deducted from PSL revenues used in the calculation of TR. If there is a non-contingent contractual commitment to refund, but the refund is to be made at a later date, then the only amount included is the interest (i.e., deferred compensation interest rate) on the refund. Otherwise, all amounts are included regardless of any refund contingencies. If a refund contingency occurs and money previously included as PSL revenue is refunded, the NFL shall receive a credit against TR (i.e., League-wide TR shall be reduced) in the amount of the refund the next Salary Cap year.

## D. Luxury Boxes, Suites and Premium Seating

Non-shared revenues relating to luxury boxes, suites and premium seating that are included in TR that are not included in Article XXIV, Section 1(a)(i)(1) above will be included in the calculation only after the deduction of direct expenses for depreciation (subject to Article XXIV, Section 4(e)(xi)), rent, interest and taxes. Where a deduction for direct expenses for depreciation for such revenues is available, such direct expenses will be calculated using a reasonable period of depreciation, and will not include acquisition expenses not directly related to the construction or improvement of the luxury box, suite or premium seating.

270

There is no change in the depreciation methods for all stadiums existing as of the 1997 League Year. In addition, if a new stadium replaces the stadiums in place as of January 26, 1999 for any of the following Clubs: Arizona Cardinals, Chicago Bears, Cincinnati Bengals, Denver Broncos, Detroit Lions, Minnesota Vikings, Philadelphia Eagles, Pittsburgh Steelers, San Diego Chargers, San Francisco 49ers, Seattle Seahawks, or Tennessee Titans, then the un-depreciated costs of the luxury boxes at the old stadium will be accelerated into the final League Year of the old stadium and deducted in full as depreciation expense against luxury box revenues. For Jack Kent Cooke Stadium (which went into service in the 1997 League Year), and any other new stadium put into service in the 1998 League Year or thereafter, the depreciable lives for luxury boxes shall be as follows: (i) depreciation on the physical structure of the box (e.g., the concrete, steel, etc. used in the construction of the box) shall be 30 years (however, if the stadium lease term is less than 30 years, the parties agree to revisit the depreciation period for the specific stadium); (ii) depreciation on fixtures for the box (e.g., wiring costs, internal fixtures, etc.) shall be 12 years; and (iii) depreciation on newly purchased furniture and movable fixtures shall be five (5) years.

Any revenues derived from or to be derived from any sale or conveyance of any right to revenue from luxury boxes, suites or premium seating that the NFL and NFLPA do not agree to treat as a PSL pursuant to Article XXIV, Section 1(a)(x)(7) will be included in TR on a straight line amortized basis over the period of time covered by the sale or conveyance of such rights, up to the maximum useful life of the luxury boxes, suites or premium seating, consistent with the first paragraph of this Section D. Any revenues derived from or to be derived from the multi-year lease or sale of luxury boxes, suites or premium seating, as a prepayment or otherwise, will be included in TR on a straight line amortized basis over the period of time covered by the multi-year lease or sale of such seating. If the Club or Club owner is required as part of the transaction to provide to the other party to the transaction with tickets to non-football events, the face value or fair market value of such tickets, whichever is lower, will not be included in the allocation.

## E.  Advertising

Advertising expenses in connection with broadcasts or cablecasts of games or other NFL-related programs are not allowable expenses, except that allowable reasonable and customary expenses for Clubs that produce the broadcast or cablecast themselves shall include payments to unrelated third parties for print, broadcast or cablecast advertising (including "spots") that promote the broadcast or cablecast itself (e.g., ads promoting the team alone are not an allowable expense, but ads promoting the broadcast or cablecast are an allowable expense).

271

### F.  Special Internet-Related Provisions

Revenues from the NFL Internet Network received by entities that are owned by substantially all of the NFL member Clubs and that are involved in Internet businesses related to the NFL (the "Network Entities"), or by any member Club of the NFL (including, without limitation, revenues from auctions to the extent the net revenues therefrom are no longer used for charitable purposes) will constitute revenue of the recipient entity to be included as part of such entity's contribution to TR, in accordance with Article XXIV, Section 1(a)(i)(3) or 1(a)(i)(4), as the case may be, subject to netting by each entity of the reasonable and customary expenses incurred to generate, and directly related to the generation of, such revenues by the recipient entity, as agreed upon by the parties, or in the absence of such agreement, as determined consistently with the principles applicable to NFL.com as of January 26, 2001, by the jointly-retained Accountant; provided, that no negative number may result from such netting for any member Club (and/or its respective Club Affiliate(s)); and further provided that the aggregate result of netting for the Network Entities collectively may not be a negative number. Payments made to Players Inc pursuant to the Internet Agreement, dated January 26, 2001, and as subsequently extended and modified by the parties ("Internet Agreement") shall then be netted against the Internet revenues of the entities identified above (and allocated among such entities in accordance with their respective net revenues from Internet activities as determined in accordance with this Section) in the League Year in which such sums are paid to Players Inc; provided that the aggregate result of such netting may not be a negative number. The payments made to Players Inc pursuant to the Internet Agreement shall not themselves be separately deducted from aggregate League-wide revenue in the calculation of TR. This paragraph does not apply to any non-Internet related revenues or expenses of any member Club, Club Affiliate, or Network Entity, which are governed by other provisions. The treatment of any negative numbers in connection with this paragraph shall be in accordance with the practice used as of the 2005 League Year.

If at any time, the Network Entities no longer dedicate auction proceeds to charity, then all proceeds from the auction site received by the Network Entities or any other NFL-related entity or the Clubs or any Club Affiliate will be included in calculating the NFL Ventures revenue included in TR in accordance with Article XXIV, Section 1(a)(i)(4), net of the recipient entity's reasonable and customary (1) cost of goods sold, (2) fulfillment costs, (3) payments to players (through Players Inc, in the case of players represented on a group basis by Players Inc as exclusive agent under the Group Licensing Program) for services or items, (4) commissions and listing fees paid to the auction provider, (5) authentication costs, and (6) third-party site development and maintenance costs, in each case provided that such

272

costs are incurred to generate, and are directly related to the generation of, such proceeds.

## G. NFL Ventures/Non-Internet Expense Deductions

In calculating the net consolidated revenue of NFL Ventures to be included in TR pursuant to Article XXIV, Section 1(a)(i)(4).

Expenses for NFL.com and Satellite TV that are both directly related to the project, and reasonable and customary, may be deducted from such revenues, with the amounts to be determined by the Accountants. Allocations of expenses are permitted if sufficient evidence is provided to support their qualification for deductibility, and are subject to review and adjustment by the Accountants. However, no allocations may be made for salaries and benefits of employees of the NFL or any NFL-related entity, unless the person is documented to and in fact works at least 75% of the time on NFL.com and/or Satellite TV.

Deductible advertising expenses for NFL.com and Satellite TV shall include payments to unrelated third parties for print and broadcast advertising (including "spots") that promote NFL.com and/or Satellite TV, but only if no other NFL product or service (or other product or service) is advertised.

## H. [*Omitted*]

## I.  Naming Rights/Pouring Rights

1.      If a Club or a Club Affiliate receives revenue in cash or barter for or in respect to pouring rights, such revenues shall be included in TR except to the extent set forth below.

2.      If a Club or Club Affiliate receives revenues in cash or barter for or in respect to pouring rights at a stadium that serves as a venue for both the Club and Major League Baseball, the proportion of such revenues to be included in TR shall be limited to: (i) for a Club or Club Affiliate that does not own or operate the stadium, any such revenues received by the Club or Club Affiliate from an unrelated third party, net of any revenues transferred to, or received by the Club or Club Affiliate from, the MLB tenant in connection with such pouring rights revenues (for example, if, in connection with a pouring rights transaction, the Club receives $500,000 from an unrelated third party which owns and operates the stadium, transfers $300,000 in revenue to the MLB tenant, and receives real estate to be used as a parking lot with a value of $150,000 from the MLB tenant, $350,000 shall be included in TR); and (ii) for a Club or Club Affiliate that owns or operates the stadium, any such revenues received by the Club or Club Affiliate multiplied by a fraction, the numerator of which shall be the total at-

273

tendance for all NFL games in the facility during the League Year in question (the "NFL Attendance") and the denominator of which shall be the sum of the NFL Attendance in the League Year in question plus the total attendance at all MLB games, if any, in the facility during the League Year in question. In no case shall there be any double-counting of revenue.

3.      If a Club or a Club Affiliate receives revenue in cash or barter for or in respect to naming rights, such revenues shall be included in TR except to the extent set forth below.

4.      Subject to Article XXIV, Section 4(e)(xi) above, such revenues shall not be included in TR to the extent that they are used to pay for construction of a new stadium or for stadium renovations that increase TR; such exclusions from TR shall be governed by the same rules used to determine the extent to which PSL revenues are excluded from TR, except that any allocation of naming rights lump sum payments among League Years shall be in accordance with Appendix H-3, Section J below.

5.      If a Club or Club Affiliate receives revenues in cash or barter for or in respect to naming rights at a stadium that serves as a venue for both the Club and Major League Baseball, the proportion of such revenues otherwise eligible for inclusion in TR (see Paragraph 4 of this Section I above) (the "eligible revenues") shall be limited to: (i)  for a Club or Club Affiliate that does not own or operate the stadium, any eligible revenues received from an unrelated third party, net of any revenues transferred to, or received by the Club or Club Affiliate from, the MLB tenant in connection with such naming rights revenues (see the example in Paragraph 2 of this Section I above); and (ii)  for a Club or Club Affiliate that owns or operates the stadium, sixty percent of eligible revenues received by the Club or Club Affiliate. In no case shall there be any double-counting of revenue.

6.      The parties agree that to "operate" a stadium for purposes of this Section I means that the Club or Club Affiliate has the right to receive all naming and pouring rights revenues.

J.    **Lump Sum Payments, etc.**

In the event that a Club or Club Affiliate receives or has received a lump sum payment for sponsorship or other rights for or with respect to multiple years, which revenues would otherwise constitute TR, such revenues shall be allocated among such years according to one of the following methods which the NFL Management Council may elect prior to the initial allocation of each respective lump sum payment:

(i)      in equal annual portions over a period of five (5) years or the duration of the rights, whichever is shorter; or

(ii)      in equal annual portions over a period of ten (10) years or the duration of rights, whichever is shorter; provided that interest from the League Year the revenues are received until the League Years the revenues

274

are allocated into TR shall be imputed and included in TR in equal portions over such periods, calculated on an annual compounded basis using the one-year Treasury Bill rate published in *The Wall Street Journal* of February 1 during the League Year in which the revenues are received.

If a Club enters into a multi-year contract pursuant to which revenues are to be received in different League Years, the contract's attribution of revenues to specific years shall not control the allocation of revenues among League Years for TR purposes if the allocation is inconsistent with the schedule for receipt of such revenues. In that case, and subject to the last two sentences in this paragraph, such revenues shall be allocated to the League Years they are received. If the amount received in any League Year is grossly disproportionate to the pro rata portion of the total amount to be paid, the Accountants shall bring such amount to the attention of the parties, which shall review the relevant facts and consider whether some other attribution is appropriate. For example, without limitation on any other example, if a three-year, $15 million sponsorship contract states that $4 million of the total amount to be paid to the Club is attributable to the first year, $5 million is attributable to the second year, and $6 million is attributable to the third year, but the Club in fact is paid $5 million in the 2006 League Year, and is scheduled to be paid $6 million in the 2007 League Year and $4 million in the 2008 League Year, then $5 million shall be allocated to TR in the 2006 League Year, and, if the other amounts are paid as scheduled, $6 million will be allocated to TR in the 2007 League Year, and $4 million will be allocated to TR in the 2008 League Year. This rule does not apply to the treatment of an initial or other payment received by a Club or Club Affiliate that the Club or Club Affiliate asserts is attributable to the entire term or more than one year of a multiyear broadcast, sponsorship, concession, signage, or other contract (for example, without limitation on any other example, a lump-sum, up-front payment for a multi-year sponsorship contract). This issue is expressly left open.

## K. Revenue Sharing

The gross receipts described in clause (1) of NFL 1995 Resolution G-6 that are paid into the revenue sharing pool established by such resolution and/or to any successor revenue sharing pool established pursuant to or in connection with the revenue sharing plan referenced in Article XXIV, Section 11, shall, for TR accounting purposes, be considered revenue subject to gate receipt sharing among NFL Clubs, and thus be included in TR, subject to any applicable allocation or exclusion pursuant to Article XXIV, Section 1(a)(x)-(xi). Such revenue shall be included only once (i.e., for the Club whose home games generate such gross receipts but not for any Club receiving revenue sharing distributions from such pool).

275

## L.  Multi-Use Stadiums

When a Club plays its home games in a multi-use stadium (e.g., the stadium is used for both NFL games and Major League Baseball or Major League Soccer games) that is owned, operated, or leased by the Club or Club Affiliate, signage revenues which are received by the Club or a Club Affiliate in consideration for the right to display such signage during both NFL games and Major League Baseball games shall be allocated based on the total attendance in the stadium during the baseball and NFL seasons beginning in the same year (e.g., the 2005 baseball season and the 2005-06 NFL season). If a multi-use stadium is not used for Major League Baseball games or the revenues are received from an unrelated third party which owns, operates or leases the stadium, no allocation shall be made between the various sports and the entire amount of signage revenues received by the Club and/or Club Affiliate shall be included in the appropriate year(s).

Clubs may receive luxury box revenues in excess of ticket revenues subject to gate receipt sharing among NFL Clubs, when such revenue might also be attributable in part to the purchaser's right to use the luxury box to attend non-football events, such as baseball, if such right is included in the purchase of the box from the Club. When a Club receives revenues in excess of ticket revenue subject to gate receipt sharing among NFL Clubs from the sale of luxury box rights which also permit the purchaser to attend Major League Baseball games, a weighted allocation shall be made of such revenue between TR and baseball-related revenue, pursuant to the allocation method the parties agreed upon on October 20, 1994, based upon the respective ticket prices of the football and baseball tickets. No allocation shall be made, and the full amount of the revenues will be included in TR, to the extent that the purchaser also has the right to use the box to attend non-football events other than Major League Baseball. The allocation method agreed to by the parties will not affect the inclusion in TR of the ticket revenue subject to gate receipt sharing among NFL Clubs.

## M. Advertising/Barter Transactions

The value assigned to revenue from barter transactions associated with advertising is to be based on the rate cards, and all other non-ticket barter transactions are to be valued at the fair market value of the goods or services received. However:

(i)      For local radio and television promotions that are non-guaranteed (i.e., the station has the unilateral discretion to extinguish the Club's right to the promotion), the value assigned to revenues associated with such promotions will be zero, unless (a) such promotions have a stated value in the contract, in which case the assigned value will be twenty-five per-

276

cent (25%) of the stated value, or (b) the lack of a stated value is grossly disproportionate to the actual value. Any promotion that a Club may sell or otherwise transfer to a third party is agreed to be guaranteed, notwithstanding any other terms of the contract.

(ii)    For local radio and television promotions that are guaranteed, the value assigned to revenue associated with such promotions will be one hundred percent (100%) of rate card, or the stated amount in the contract where the contract specifies a stated dollar amount of advertising which the Club may draw against.

(iii)    Where the total revenue value provided by a Club in a barter transaction associated with advertising is greater, using rate card valuation, than the revenue value received by the Club, and where the Club is transferring to an unrelated party its rights to advertising, and where the goods and services received by the Club in the barter transaction have been valued at fair market value, the assigned value for the advertising provided by the Club may be reduced by the Accountants from the rate card valuation on a pro rata basis, where such reduction is needed to make the value of the goods and services provided by the Club equal to the value of the goods and services it received.

## N. Off-Site Pre-season Games

Clubs at times receive a flat amount for playing in off-site pre-season games (non-American Bowl), and also may be reimbursed for expenses. In such circumstances, only the flat amount received from the off-site game will be included in TR. Reimbursed expenses and unreimbursed expenses will not be included in TR.

## O. Club Related Entities

Any entity which has the same ownership as a Club, or is controlled by the same persons or entities which own or control a Club, and is engaged in transactions with the Club will be treated as the same entity for the purposes of the TR Reporting Package and any audit with respect thereto. Any entity which does not fit the rule set forth in the first sentence of this paragraph, but which has partial common ownership with a Club, which is engaged in transactions with the Club, will have its transactions reviewed by the local accountants and the Accountants to confirm that any revenues and expenses in such transaction are reasonable.

## P. Miscellaneous Revenues and Expenses

Revenue from premium charges on ticket sales in excess of the face value of the ticket (e.g., rebates from ticketing sources); revenue from scrimmages and training camps; and broadcast revenue from a Coach's show or pre-

277

game and post-game show received by a Club will be included in TR. However, revenue from scrimmages or training camps that are donated to charities will not be included in TR. Credit card charges related to ticket sales are not considered a deductible "surcharge" and will not be offset against gate receipts. If a Club charges a service fee on the tickets it sells in excess of the face value of the ticket, on a ticket account basis and not on a per-ticket basis (which fee is limited by the League to a $4 per ticket account), such service fee will not be TR.

Charitable contributions made by sponsors or other entities that have a commercial relationship with a Club, to charitable entities affiliated with or designated by a Club (e.g., charitable foundations), pursuant to a contract with the Club, are Club revenues, and shall be classified as TR or non-TR, as appropriate, except if the commercial relationship is a relationship between a Club and a player.

If a player fine is a deduction from a player's salary which is never paid (and thus not included in a W-2), it is not included in Salary or TR. If a fine is paid by the player, either as a deduction from gross salary or in a separate payment, it is counted as Salary. If the Club gives a fine to charity, it is not included in TR. If the Club spends a fine on behalf of all players for specific purposes that it (or any other Club) had previously earmarked as being paid by fine money for the benefit of all players (such as player parties), and the players were (and are) expressly notified of such specific earmarking, the fine is not included in TR. If the Club keeps a fine, it is included in TR. Any fine assessed by and paid to the League is not included in TR.

The value of in kind provisions to the League office under contracts made by NFL Ventures or its subsidiaries (e.g., airline tickets) will not be included in TR. The value of in kind provisions distributed or provided to Clubs under such contracts will be included in TR; the value of such provisions will be based upon actual usage or consumption by each Club (the Clubs will be responsible for tracking such usage or consumption).

Salary or other compensation paid to a Club owner relating to a pre-game or other broadcast program may not be deducted from TR as an expense item pursuant to Article XXIV, Section 1(a)(i)(2). Such salary or other compensation paid to coaches may be deducted as such an expense item, up to a maximum of $125,000 each League Year per Club per coach, if such expense is actually incurred.

### APPENDIX I
### STANDARD MINIMUM PRE-SEASON
### PHYSICAL EXAMINATION

Should there be the need for additional examination or testing in any specific area, such will be permitted.

**General Medical Examination**
1. History
  - player
  - family
  - thorough review of all team physicians and trainer reports for preceding seasons

2. Examination
  - head
  - face
  - scalp
  - ears
    - external & drums
  - sinus
  - throat
  - eyes
    - pupils
    - reaction to movement & light
  - lungs
    - palpation
  - chest
  - heart
  - visceral
  - hernia
  - rectal
    - hemorrhoid
    - fistula
    - prostate
  - gastric
  - any unusual body marks, i.e. scars, birthmarks
  - height
  - weight
  - temperature
  - blood pressure
  - pulse
  - heart rate

279

**Orthopedic Examination**
Examination visually, including stress testing and range of motion for all of the following:
- neck and spine
- shoulder
- elbow
- wrist
- fingers
- hips
- knees; also knee jerk
- ankle; check Achilles tendon for abnormalities and by jerk test
- toes

**Flexibility**
Testing of hamstrings and neck

**EKG**
Heart Abnormalities

**Stress Testing** (at physician's discretion) (Treadmill or bicycle) for cardiovascular

**Blood Testing**
Standard grid. Testing for (including but not limited to):
- Chemistry
- Calcium
- Phosphorus
- Glucose
- Uric Acid
- Cholesterol
- Iron
- Triglyceride
- Lipids
- Sodium
- Chlorides
- White Blood Count
- Red Blood Count
- Mono-Screen*
- Tay Sachs*
- Sickle Cell*
- VD*

*Where applicable. If found, individual counseling necessary.

280

Appendix 1

**Urinalysis**
Check for (including but not limited to):
- Protein
- Glucose
- PH Factor
- Diabetes
- Renal Failure
- Gout

**Vision Testing**
- peripheral vision
- standard eye test

**Hearing Test**

**Dental Examination**

**Chest X-Ray** (at appropriate intervals)
(Only as recommended by AMA standard)
Check for:          Tumor
                    T.B.
                    Lesions

**X-Ray all previously injured areas** (at physician's discretion)

281

# APPENDIX J
## ACTUARIAL ASSUMPTIONS AND
## ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Group Annuity Mortality Table for 1983 without margins (Effective April 1, 2007: RP-2000 Table projected to 2006) |
| Disability mortality before age 65: | 1965 Railroad Retirement Board select and ultimate table (Effective April 1, 2007: RP-2000 Table, disabled mortality) |

Nonfootball related disability rates before retirement:

| Age | Rate |
|---|---|
| 22 | .04 |
| 27 | .04 |
| 32 | .04 |
| 37 | .05 |
| 42 | .09 |
| 47 | .18 |
| 52 | .41 |

(Effective April 1, 2007, the above rates are increased by 33⅓%.)

| | |
|---|---|
| Football related disability rates: | .08% per year for active players and .06% per year for inactive players until age 45, after which it becomes zero. Active players are assumed to become inactive after one year or age 30, whichever comes later. (Effective April 1, 2007, the .08% and .06% above are changed to .10% and .08%, respectively.) |

Withdrawal rates:

For Players

| With Service of | Rate |
|---|---|
| 1 year | 29.1% |
| 2 years | 19.7% |
| 3 years | 17.0% |

| | |
|---|---|
| Election of early payment benefit: | 35% of all players out of football less than two (2) years will elect the benefit two (2) years after leaving football. Active players are assumed to leave football after one season or age 30, whichever is later. No assumption for players with no Credited Seasons before 1993. |

282

Appendix J

| | |
|---|---|
| Retirement age: | 47, except 55 for players with no Credited Seasons before 1993 |
| Percent married: | Social Security awards in 1972 |
| Age of Player's wife: | Three (3) years younger than player |
| Remarriage and mortality rates for widow's benefit: | 1971 Railroad Retirement Board rates (Effective April 1, 2007: 1980 Railroad Retirement Board rates) |
| Net investment return: | 7.25% |
| Administration expenses: | Actual for prior year |
| Valuation date: | First day of Plan Year |
| Actuarial value of assets: | Write up of assets to market value and restart a new asset smoothing method as of April 1, 2007. |
| Funding method: | Unit credit cost method, except retrospective term cost based on actual experience during the prior year for line-of-duty disability benefits. |
| Amortization period: | The Plan's unfunded actuarial accrued liability as of April 1, 2006 will be amortized in level amounts over seven (7) years, beginning with the contribution for the 2006 Plan Year. In each Plan Year after the 2006 Plan Year, a new level seven-year amortization period will be established for the net change in the Plan's unfunded liability during the preceding Plan Year, other than for the unfunded liability attributable to the benefit increases to which the parties agreed in the 2006 Amendment to the CBA ("2006 Benefit Increase"). The unfunded liability of the 2006 Benefit Increase will be amortized over six (6) years, beginning with the contribution for the 2006 Plan Year, except that if the CBA is terminated by either party such that the last League Year subject to a Salary Cap is before 2011, the unamortized amount for the 2006 Benefit Increase may, at the Management |

283

Council's discretion, be amortized on a pro rata basis over the remaining League Year or League Years subject to a Salary Cap, unless otherwise agreed to by the parties. In no event shall the contribution for a year exceed an amount which is expected to produce a negative unfunded actuarial liability at the end of the plan year; nor shall the contribution be less than the minimum required under section 412 of the Internal Revenue Code.

## APPENDIX J-1
## HEALTH REIMBURSEMENT PLAN ACTUARIAL ASSUMPTIONS AND FUNDING

| | |
|---|---|
| **Valuation Date:** | April 1 |
| **Value of Assets:** | Market value |
| **Mortality Assumptions:** | None |
| **Players Included in Valuation:** | Players for whom a nominal balance has been established |
| **Player's Last Season:** | Each active player is assumed to have three (3) future Credited Seasons |
| **Date When Benefits Will Begin to be Paid:** | Each player with a nominal balance is assumed to begin distributions five (5) years after his expected last Credited Season |
| **Annual Distributions:** | Annual distributions will equal the estimated cost of a year's coverage for an active player under the Player Group Insurance Plan for the years in which a reimbursement is expected to be made |
| **Discount Rate:** | 60 basis points greater than the average yield of money market funds as published in *The Wall Street Journal* on each April 1 nearest the Valuation Date |
| **Expenses:** | $500,000 for the year beginning April 1, 2007, and, for each subsequent year, the actual expenses for the prior year |
| **Contributions and Amortization Period:** | As of April 1, 2006, a valuation is prepared based on the expected nominal balances for seasons prior to 2006 ("past service liability"), and the sum of the expected value of the balances to be earned during the |

285

2006 Season and the estimated expenses for the year ("normal cost"). A contribution will be made by March 31, 2007, of at least the sum of (1) the normal cost, (2) an amortization of the past service liability over five (5) years, and (3) the assumed expenses.

A valuation will be performed each subsequent year. Each year a new base will be established equal to the Plan's unfunded liability less the unamortized amount of the bases for the past service liability and each of the bases established for 2006. Each year, a contribution will be made equal to the sum of (1) the normal cost for the year, (2) the amount for each amortization base amortized over five (5) years (until each base is fully amortized), and (3) interest to the end of the year. The contribution, however, will be reduced, but will not be less than zero, to the extent the assets exceed the Plan's liability.

# APPENDIX K
## EXTENSION CHART

Salary Cap as Percentage of TR

|     | 06 | 07 | 08   | 09   | 10 | 11 | 12 | 13 |
|-----|----|----|------|------|----|----|----|----|
|     | 57 | 57 | 57.5 | 57.5 | 58 | 58 | U  | D  |
| (1) | 57 | 57 | 57.5 | 57.5 | U  | D  | -  |    |
| (2) | 57 | 57 | 57.5 | 57.5 | 58 | U  | D  |    |

U = Uncapped
D = College Draft

(1)  If either party terminates final two Capped Years (2010 and 2011) by 11/8/08.

(2)  If either party terminates final Capped Year (2011) by 11/8/09.

287

# APPENDIX L
## OFF-SEASON WORKOUT RULES

The Collective Bargaining Agreement with the NFLPA provides that, except for certain specified mini-camps, any off-season workout programs or classroom instruction shall be strictly voluntary. No Club official shall indicate to a player that the Club's off-season workout program or classroom instruction is not voluntary (or that a player's failure to participate in a workout program or classroom instruction will result in the player's failure to make the Club). Off-season programs may take place for fourteen (14) weeks between the end of the previous season and ten (10) days prior to the start of veteran training camp. The CBA limits such workouts to four (4) days per week; such workout programs are not permitted on weekends. Included in the fourteen (14) weeks may be no more than fourteen (14) days of organized team practice activity. This does not preclude any player from working out on his own on other days, including weekends. Contact work (e.g., "live" blocking, tackling, pass rushing, bump-and-run), is expressly prohibited in all off-season workouts.

Voluntary off-season workout programs are intended to provide training, teaching and physical conditioning for players. The intensity and tempo of drills should be at a level conducive to learning, with player safety as the highest priority, and not at a level where one player is in a physical contest with another player.

Teams are to provide their players and the Management Council the schedule for the program, including designation of any days on which organized team practice activity will take place, pursuant to the rules set forth in Article XXXV of the CBA, and any changes to the schedule for the program.

The following rules shall also apply to the fourteen (14) days of organized team practice activity:
- No pads except protective knee or elbow pads. Helmets are permitted.
- No live contact; no live contact drills between offensive and defensive linemen.
- 7-on-7, 9-on-7 and 11-on-11 drills will be permitted, providing no live contact takes place.
- The NFL will monitor all Clubs during the off-season to ensure player safety and adherence to live contact guidelines.
- Maximum six (6) hours per day, with a maximum two (2) hours on field, for any player.

## APPENDIX M
## PSL EXAMPLES

Without limitation on any other example, the following are examples of the operation of the rules in Article XXIV (Guaranteed League-wide Salary, Salary Cap & Minimum Team Salary), Section 1(a), concerning Personal Seat Licenses (PSLs), based on the assumption that the NFLPA has approved the PSL deduction:

**1. Subsection (x)(1) — Maximum Annual Allocation Amount**

**Year 1 (2006)**   PSL revenues received = $ 45 million
Remaining life of PSL = 16 years
WSJ Treasury Note rate at 2/1/06 - 8%
Factor-Future Value of 8% annuity 15 years (maximum)
= 27.152 (annual compounding)
Future Value of $3 million/year for 15 years
= $3 million x 27.152 = $81.456 million
Interest Amount      = $81.456 million $45 million
                     = $36.456 million

Year 1 Annual Interest Allocation
= $36.456 million/15 years = $2.43 million/year

Year 1 PSL Allocation Amount
= PSL Amount = $45 million/15 years  = $3.00 million
+ Allocated Interest                 = $2.43 million
Total Year 1 Allocation              = $5.43 million

2006 PSL Maximum Annual Allocation Amount        = $5.43 million

**Year 2 (2007)** PSL revenues received = $ 30 million
Remaining life of PSL = 15 years
WSJ Treasury Note rate at 2/1/07 7%
Factor-Future Value of 7% annuity 15 years = 25.129
(annual compounding)
Future Value of $2 million/year for 15 years
= $2m x 25.129     = $50.258 million
Interest Amount        = $50.258 million $30 million
= $20.258 million

Year 2 Annual Interest Allocation
= $20.258 million/15 years = $1.35 million/year

Year 2 PSL Allocation Amount
= PSL Amount = $30 million/15 years        = $2.00 million
+ Allocation Interest                                   = $1.35 million
Total Year 2 Allocation                              = $3.35 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount               = $5.43 million
Year 2 PSL Allocation Amount               = $3.35 million

2007 PSL Maximum Annual Allocation Amount      = $8.78 million

290

**Year 3 (2008)** PSL revenues received = $ 7 million
Remaining life of PSL = 14 years
WSJ Treasury Note rate at 2/1/08 7.5%
Factor-Future Value of 7.5% annuity 14 years = 23.366
Future Value of $ 5 million/year for 14 years
= $.5m x 23.366 = $11.683 million
Interest Amount = $11.683 million $7 million
= $ 4.683 million

Year 3 Annual Interest Allocation
= $4.683 million/14 years = $.335 million/year

Year 3 PSL Allocation Amount
= PSL Amount = $7 million/14 years = $ .500 million
+ Allocated Interest = $ .335 million
Total Year 3 Allocation = $ .835 million

PSL Maximum Annual Allocation Amount
Year 1 PSL Allocation Amount = $5.430 million
Year 2 PSL Allocation Amount = $3.350 million
Year 3 PSL Allocation Amount = $ .835 million

2008 PSL Maximum Annual Allocation Amount = $9.615 million

## 2. Subsection (x)(2) — PSL Revenues Used For Stadium Construction Or Renovation

Assume the Team sells PSLs on the following terms:
• Gross PSL revenues received in 2006 = $45 million
• Income taxes paid on PSL revenues in 2006 = $12 million
• Legal and marketing costs incurred relating to PSL revenues = $6 million
• Stadium renovation costs = $56 million

The PSL revenues included in TR, subject to the rules in Subsections (x)(3) through (x)(7), would be $45 million.

Assume that only the net PSL revenues of $27 million were used in the renovation project ($45m ($12m + 6m)) and the total stadium renovation costs were $30 million.

The PSL revenues excluded from TR in this example would be limited to $27 million, subject to the rules in Subsections (x)(3) through (x)(7). The PSL Maximum Annual Allocation Amount, however, would be calculated based upon the gross revenues of $45 million.

291

**3.** [*Omitted*]

**4. Subsection (x)(3) — PSL Difference Credited To TR**

a. Assume that the new stadium is placed in service in June 2008.

2008 increase in TR directly related to new stadium:

| | |
|---|---|
| Increase in gate receipts | $6 million |
| Increase in Other TR | $2 million |
| Total TR increase | $8 million |

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year TR Increase | PSL Difference |
|---|---|---|---|
| 2006 | $5.430 million | $8 million (assumed) | $ 0 |
| 2007 | $8.780 million | $8 million (assumed) | $.780 million |
| 2008 | $9.615 million | $8 million | $1.615 million |
| Cumulative PSL Difference | | | $2.395 million |

For purposes of computing the PSL Difference, we assume that the increase in TR was the same for 2006 and 2007 (years prior to the first full year the new stadium was placed into service) as it is in the first full year in the new stadium was placed into service ($8 million). $2.395 million would be credited into TR in the 2009 League Year.

b. Assume that the new stadium is placed in service in June 2008.

2008 increase in TR directly related to new stadium:

| | |
|---|---|
| Increase in gate receipts | $ 9 million |
| Increase in other TR | $16 million |
| Total TR increase | $25 million |

Cumulative PSL Difference:

| Year | PSL Maximum Annual Allocation Amount | First Year TR Increase | PSL Difference |
|---|---|---|---|
| 2006 | $5.430 million | $25 million (assumed) | 0 |
| 2007 | $8.780 million | $25 million (assumed) | 0 |
| 2008 | $9.615 million | $25 million | 0 |
| Cumulative PSL Difference | | | 0 |

292

Since the increase in TR in the first full year is greater than the PSL Maximum Annual Allocation Amount for each prior year in which such Allocation Amount was used, then there is no PSL Difference in any prior year. No amount would be credited into TR in the 2009 League Year.

### 5. Subsection (x)(5) Carryover PSL Credit

Assume the following:

New Stadium is placed in service in June 2008.
2009 2002 Maximum Annual Allocation Amount is $9.615 million.
Increases in TR directly related to New Stadium are as follows:

| | |
|---|---|
| 2009 | $ 8 million |
| 2010 | $ 9 million |
| 2011 | $14 million |

The Carryover PSL credits are calculated as follows:

| | |
|---|---|
| 2009 | $9.615m $8m = $1.615m |
| 2010 | $9.615m $9m = $ .615m |
| 2011 | (No carryover PSL credits) |

Under this scenario, year 2011 has a PSL Excess of $4.385 million ($14m-$9.615m). The Carryover PSL credits of $2.230 million from 2009 and 2010 ($1.615m + $.615m) can be deducted in full from TR in League Year 2011. There would be no remaining Carryover PSL credits to deduct from TR in future League years.

### 6. Subsection (x)(6) Reduction In Premium Seat And Luxury Box Expenses

Assume that $80 million in PSL revenues are used to fund the New Stadium which has a total construction cost of $200 million. If the annual expenses relating to luxury boxes and premium seats are $5 million, the reduction in such expenses would be $2 million, computed as follows: $5 million x ($80 million/$200 million) = $2 million.

### 7. PSL Revenues Not Benefiting The Team Or Any Team Affiliate Except Through A New Or Improved Stadium

In any case where:

(i) PSLs are sold by a Team or by a third party (such as a stadium corporation, a nonprofit private sector entity, or a governmental entity) pursuant to Team authorization; and

(ii) all net proceeds of such PSL sale are used to build a new stadium or con-

293

struct improvements to an existing stadium in which the Team will play upon completion, or is then playing and will continue to play (net proceeds are all gross proceeds net of (a) taxes and (b) expenses (e.g., legal costs, marketing expenses, or securities registration fees) if such taxes and expenses are directly incurred as the result of the PSL sale, and do not benefit the Team or any of its affiliates, either directly or indirectly, other than through the stadium construction or improvements paid by the PSL revenues); and

(iii) such new or improved stadium is owned by a party not affiliated with the Team, such as a governmental entity or a private sector for-profit or non-profit entity; and

(iv) the Team (and all Team affiliates) have only a leasehold interest, and no reversionary interest in the stadium (that is, if the Team or any Team affiliate wishes to acquire any title to the stadium, it must do so in a separately negotiated arms'-length transaction); and

(v) neither the Team nor any of its affiliates receives any payments, long-term loans, forgiveness of indebtedness, or other consideration from the Stadium landlord or any of its affiliates, other than payments that are due to the Team pursuant to its lease as consideration for its performance of its obligations under the lease, or are reimbursements for expenses incurred by the Team solely in performing its obligations under the lease; then, because the Team and its affiliates do not receive any net benefit arising out of the sale of PSLs other than through the stadium construction or improvements paid by the PSL revenues (all PSL revenues being spent on third-party costs and charges directly incurred as a result of the PSL sale, or on stadium construction or improvements), none of the proceeds received from the sale of the PSLs would be included in TR. Each of Example Nos. 1 through 6 above assumes that, for one or more reasons, the example does not qualify for the foregoing treatment.

Nothing in the foregoing shall provide any basis to argue that any amounts other than the PSL proceeds, including but not limited to any expense payments, may be treated as TR or non-TR under this Agreement. Moreover, the Special Master or the Court would have the authority to examine any transaction involving the Club or any of its affiliates and the Stadium landlord or any of its affiliates, to determine if such transaction transfers, in whole or in part, some or all of the economic benefit of any PSL revenues to the Club or any of its affiliates, and any such transferred economic benefits shall be treated as TR.

NOTE: Premium seat revenues (non-shared amounts) discussed in Subsections (xi)(1) through (xi)(6) call for calculations quite similar to those

294

discussed in Example Nos. 1 through 6 above in calculating "Premium Seat Differences," "Carryover Premium Seat Credits," "Premium Seat Excesses," and "Reductions in Expenses Related to Premium Seats and Luxury Boxes."

**APPENDIX N**
**WRITTEN WARNING GOOD FAITH EFFORT**

[date]

Dear [player]:

The Club hereby provides you with written notice that you are failing to exhibit the level of good faith effort which can be reasonably expected from players on this Club. If you do not demonstrate the good faith effort which can be reasonably expected from players on this Club, you will not be entitled to Termination Pay under Article XXIII of the Collective Bargaining Agreement if you are terminated before the end of this season.

[Club Official]
[Club name]

296

Appendix O

# APPENDIX O
## SALARY CAP CALCULATION EXAMPLE

If 2007 Salary Cap:        $109 million

If 2008 Projected TR equals $205 million per Club:

        57.5% = $117.875 million
        61.68% = $126.44 million

less assumed Projected Benefits/salary cap deductions of $20 million per Club:

        57.5% cap = $97.875 million
        61.68% max = $106.44 million

then, pursuant to Article XXIV, Section 4(c), the Salary Cap for 2008 is $106.44 million

297

# APPENDIX P
## ADJUSTMENT MECHANISM EXAMPLES

**Example #1: League Excess at the end of Year 1**

**Assumptions:**
5-Team League
At Year End League-wide Cash Player Costs exceed Trigger by $5M
Dollar amounts in millions

| Club | '06 Trigger | '06 Cash PC | Pro Rata Share | Adjustment to Team Salary Over Remaining Capped Years | | | | |
|------|------|------|------|------|------|------|------|------|
| | | | | '07 | '08 | '09 | '10 | '11 |
| A | 102.0 | 101.5 | | | | | | |
| B | 102.0 | 99.0 | | | | | | |
| C | 102.0 | 100.5 | | | | | | |
| D | 102.0 | 109.5 | 75% | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| E | 102.0 | 104.5 | 25% | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 |
| League-wide | 510.0 | 515.0 | 100% | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Excess/(Shortfall) | | 5.0 | | | | | | |

298

Appendix P

**Example #2: League Shortfall at the end of Year 1**

**Assumptions:**
5-Team League
At Year End League-wide Cash Player Costs fall below Trigger by $9M
Dollar amounts in millions

| Club | '06 Trigger | '06 Cash PC | Pro Rata Share | Adjustment to Team Salary Over Remaining Capped Years | | | | |
|------|-------------|-------------|----------------|-------|-------|-------|-------|-------|
| | | | | '07 | '08 | '09 | '10 | '11 |
| A | 102.0 | 100.0 | **20%** | (.36) | (.36) | (.36) | (.36) | (.36) |
| B | 102.0 | 102.0 | **20%** | (.36) | (.36) | (.36) | (.36) | (.36) |
| C | 102.0 | 99.0 | **20%** | (.36) | (.36) | (.36) | (.36) | (.36) |
| D | **102.0** | **106.0** | **20%** | **(.36)** | **(.36)** | **(.36)** | **(.36)** | **(.36)** |
| E | 102.0 | 94.0 | **20%** | (.36) | (.36) | (.36) | (.36) | (.36) |
| League-wide | 510.0 | 501.0 | 100% | (1.8) | (1.8) | (1.8) | (1.8) | (1.8) |
| Excess/(Shortfall) | | (9.0) | | | | | | |

299

Appendix P

**Example #3: League Excess in Year 1 and League Shortfall in Year 2**

**Assumptions:**
5-Team League
League Excess of $5M at the end of Year 1 (Clubs D & E exceeded Trigger)
League Shortfall of $9M at the end of Year 2
Dollar amounts in millions

| Club | | '06 Excess | '07 Shortfall | '07 | '08 | '09 | '10 | '11 |
|---|---|---|---|---|---|---|---|---|
| League-wide | | 5.0 | (9.0) | | | | | |
| A | Year 1 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| B | Year 1 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| C | Year 1 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| D | **Year 1** | | | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| E | **Year 1** | | | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 |
| | Year 2 | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| League-wide | | | | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 |

The column header "Adjustment to Team Salary Over Remaining Capped Years" spans columns '07 through '11.

| League Year | Excess/ (Shortfall) | |
|---|---|---|
| 2006 | 5.0 | Allocate charge proportionately among Clubs that exceeded Trigger (D&E) |
| 2007 | (9.0) | Shortfall (to be offset by Prior Years' League Excess, then allocated equally among all Clubs) |
| | (4.0) | Pro rata deduction to be allocated to each Club's Team Salary |

300

Appendix P

**Example #4**: League Excess in Year 1, League Shortfall in Year 2 and League Excess in Year 3

**Assumptions:**
5-Team League
League Excess of $5M at the end of Year 1 (Clubs D & E exceeded Trigger)
League Shortfall of $9M at the end of Year 2
League Excess of $6M at the end of Year 3 (Clubs A & E exceeded Trigger equally)
Dollar amounts in millions

| Club | | '06 Excess | '07 Shortfall | '08 Excess | Adjustment to Team Salary Over Remaining Capped Years | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | '07 | '08 | '09 | '10 | '11 |
| League-wide | | 5.0 | (9.0) | 6.0 | | | | | |
| A | Year 1 | | | | | | | | |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | **Year 3** | | | | | | 1.0 | 1.0 | 1.0 |
| B | Year 1 | | | | | | | | |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 3 | | | | | | | | |
| C | Year 1 | | | | | | | | |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 3 | | | | | | | | |
| D | **Year 1** | | | | 0.75 | 0.75 | 0.75 | 0.75 | 0.75 |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | Year 3 | | | | | | | | |
| E | **Year 1** | | | | 0.25 | 0.25 | 0.25 | 0.25 | 0.25 |
| | Year 2 | | | | | (0.2) | (0.2) | (0.2) | (0.2) |
| | **Year 3** | | | | | | 1.0 | 1.0 | 1.0 |
| League-wide | | | | | 1.0 | 0.0 | 3.0 | 3.0 | 3.0 |

| League Year | Excess/ (Shortfall) | |
|---|---|---|
| 2006 | 5.0 | Allocate charge proportionately among Clubs that exceeded Trigger (D&E) |
| 2007 | (9.0) | Shortfall (to be offset by Prior Years' League Excess, then allocated equally among all Clubs) |
| | (4.0) | Pro rata deduction to be allocated to each Clubs Team Salary |
| 2008 | 6.0 | Excess will offset "deductions" from any remaining League Shortfall in Prior Years ($6M-$3M), then allocate total League Excess charge ($6M) proportionately among Clubs that exceeded Trigger (A&E) |

301