## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : No. 2:12-md-02323-AB<br>: MDL No. 2323<br>:<br>: Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | :<br>: JURY TRIAL DEMANDED<br>: ORAL ARGUMENT<br>: REQUESTED |
| 2:12-md-02323-AB (as applicable)<br>18-cv-0464 (*A.H. v. NFL et al*) | :<br>:<br>: |

### MEMORANDUM OF LAW OF PLAINTIFF A.H. IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINTS FILED BY SETTLEMENT CLASS MEMBERS

### PRELIMINARY STATEMENT

Doesn't a court need jurisdiction to dismiss a case on substantive grounds? Defendants sing quite the siren's song by suggesting otherwise. If their Motion (D.E. 10228) is to be believed, the Court can (a) leap-frog subject-matter jurisdiction; (b) consider extrinsic information on a 12(b)(6); and then (c) construe it against a non-movant. But this improper, backward approach leads smack into reversible error. It is particularly problematic for several reasons with regard to A.H., whose class membership status remains undetermined. First, A.H.'s pending Motion to Remand (D.E. 10149) precedes and forestalls 12(b)(6) argument. Second, her father was not a class member. Third, Defendants do not even contend A.H. to have been a class-member at the time of the opt-out deadline; nor do they demonstrate how she released her non-derivative, post-settlement lawsuit through the class settlement (that she is a stranger to.) Both of these latter issues implicate fact-questions that cannot be resolved without affording her the benefit of discovery. As supported fully below, the Court should deny Defendants' Motion because remand moots it, because it is premature, and because it fails substantively.

BACKGROUND[1]

## I. PROPERLY FRAMING THE ARGUMENT ON DEFENDANTS' 12(B)(6) MOTION.

Although Defendants' Motion invokes no express procedural rule, it can only travel under Rule 12(b)(6). Defendants previously raised this defense amidst their opt-out-related 12(b)(6) motion and again seek pre-answer dismissal, making 12(b) the only vehicle for relief. Arguments concerning "class membership" constitute either defenses of *res judicata*, or *release*, or both. *See* F.R.C.P. 8(c).[2] That is, these constitute substantive (affirmative) defenses; neither independently confer jurisdiction, such that vaulting past remand[3] (and onto them) could be justified; particularly so, prior to factual development on the decedent and A.H.'s class-member status.

Under 12(b)(6), the Court considers only those matters apparent on the face of the complaint[4] and any integral document (here, the Complaint and Settlement Agreement), while resolving all reasonable inferences in favor of the non-movant. Defendants attempt to circumvent

---

[1] For organizational purposes, this opposition focuses narrowly on A.H.'s purported "class membership." That is, we have separately opposed the Defendants' attempt to incorporate by reference argument from distinct, opt-out-related, Rule-12 briefing. *See Defs' Mot.* at 19, n.11. The Court partitioned A.H.'s action from the sluice of opt-out briefing on March 6, 2018, recognizing that it implicated "unique issues." *See* D.E. 9758, at 2. Particularly if one accepts this Motion's premise—that A.H. became a class member in October, 2017—it is hard to see how "opt-out briefing" would still, also apply (and retroactively); as it is also difficult to understand how a court might superimpose opt-out master-complaint briefing onto A.H.'s state complaint. We address these issues in full, in a separate opposition.

[2] Plainly, "*res judicata* is an affirmative defense and not a doctrine which would defeat the subject matter jurisdiction of this court." *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (1997).

[3] "[I]t is improper to resolve contested questions of law when [] jurisdiction is in doubt." *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 360-61 (3rd Cir. 2015) (*citing Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 93-94 (rejecting the propriety of "hypothetical jurisdiction" in order to reach a merits issue.)

[4] Although we have proven (*supra*) that this can be no such motion, jurisdictional challenges made under Rule 12(b)(1) take two forms: facial and factual challenges. *Oddo v. Bimbo Bakeries USA, Inc.*, No. 16-cv-04267, 2017 WL 2172440, at *2–4 (D.N.J. May 17, 2017). On facial challenges, a Court "assumes that the allegations in the complaint are true, and may dismiss the complaint only if it nevertheless appears that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction." Factual attacks, "permit … evidence extrinsic to the pleadings" but there, "the court must permit the plaintiff to respond with rebuttal evidence … and the court then decides the jurisdictional issue by weighing the evidence. If there is a dispute of a material fact, the court must conduct a plenary hearing …" *see id.* (*internal citations omitted*.)  In other words, even under the unsupported premise that Defendants' defenses are somehow jurisdictional, Plaintiff would still need opportunity to develop a rebuttal, *see* Fed. R. Civ. P. 12(d) and would therefore need some discovery. She is not a class-member.

this principle by seeking the judicial notice of certain documents for the truth of matters asserted.[5] The information they point to, subject to a multitude of interpretations, appears designed to invite the Court to resolve disputed inferences in Defendants' favor regarding the decedent's retirement. Although we have contravened this information below, regardless, it is simply not proper to resolve these in Defendants' favor, against A.H. the non-movant, and absent a record.

Here, the face of the Complaint does not address whether the decedent sought a return to football. This is a collateral issue to the pleading, and one defendants would need to develop later in the litigation. Therefore, a Court could not reach the question of whether the decedent was "retired" on a 12(b)(6) motion. Only after discovery, could a court with jurisdiction apply the terms "Derivative Claimants" and "Retired NFL Football Players", as respectively defined in Sections 2.1(ee) and 2.1(ffff) of the Settlement Agreement to a factual record.

## II.    INFORMATION PERTINENT TO THE DISPOSITION OF DEFENDANTS' MOTION.

### A.    THE PLAINTIFF A.H. AND HER FATHER, THE DECEDENT.

Real-party-in-interest A.H. is indeed the toddler daughter of former New England Patriots star Aaron Hernandez. Hernandez, a generational talent at his position, entered the NFL in 2010, even though (and amidst everyone's full knowledge that) he had been investigated for ties to a brutal 2007 shooting. The NFL paid no mind to this and let him play. As is often the case (*see* II(D), *infra*), he became a star, notwithstanding startling off-field turmoil that culminated in a serious criminal investigation and his high-profile contractual release from the Patriots in 2013. A.H., a child, committed no crime nor asked to be born into such tragic circumstances.

---

[5] *Southern Cross Overseas Agencies, Inc. v. Wah Kwo*, 181 F.3d 410, 426-27 (3rd Cir. 1999). Judicial notice of certain public records may be appropriate in some instances, and to notice the "existence" of certain facts on a 12(b)(6). Although we do not contest the *existence* of the cited media reports, the Court cannot rely on the substance of them is impermissible. Plaintiff has also supplied similar publicly available information to contravene any desired inference that Defendants' seek to draw out from their cited public information.

B.   AT ANY POINT THE NFL COULD'VE BANNED THE DECEDENT; YET IT DIDN'T.

Following his release from the Patriots, the NFL recognized that a strong likelihood of the

decedent being signed by another team. It went so far as to issue a public statement regarding the

decedent's signing of a new NFL contract amidst murder allegations, saying that:

> NFL clubs were advised [Thursday] that if Aaron Hernandez enters into a player
> contract prior to the resolution of the charges pending against him, [approval will
> be subject to] Commissioner Roger Goodell hold[ing] a hearing. The purpose of
> the hearing would be to determine whether Hernandez should be suspended or face
> other action prior to the charges being resolved.

*See* John Breech, *https://www.cbssports.com/nfl/news/nfl-no-team-can-sign-hernandez-without-*

*goodells-approval/* (Jun. 27, 2013) (observing that "even though he's technically in jail, he's free

to sign with any team he wants.") In other words, the NFL never precluded decedent's full return.

C.   PUBLIC RECORDS REVEAL DECEDENT'S STATED INTENT TO RETURN TO THE NFL.

Subsequently, of course, a jury acquitted the decedent of a double-murder, mere days

before he erratically took his own life, and thereupon also had a 2015 felony conviction vacated.

After the fact, he was found to have one of the most advanced presentations of CTE ever observed,

and a stunning deposition of tau for someone just age 26. Throughout the course of the turmoil,

and indeed right up until his death, as is plainly detailed within the Massachusetts State Department

of Corrections' records, Hernandez verbalized an intent to return to NFL football:

> A source who claimed to be one of HERNANDEZ's closest friends stated "Just spoke with him
> yesterday and he was in a great place." "He was a very spiritual guy who was always quoting the
> bible." "Since Friday's verdict he had been talking about the NFL and going back to play even if
> it wasn't with the Pats." " He talked about his daughter and spending time with her." "There was
> absolutely no indication that he would do anything like that."

D.   THE NFL'S RICH HISTORY OF COLORFUL "SECOND CHANCES" BELIES ITS POSITION
THAT DECEDENT'S RETURN TO THE NFL IS "IMPLAUSIBLE."

Had he lived, decedent's return to football could hardly have been well-characterized as

unprecedented or even unusual; certainly, this would not have been *implausible*, as Defendants

nakedly conclude. NFL clubs have a celebrated history of employing violent criminals. Some of the game's biggest stars—champions from hall-of-famer Ray Lewis, to Michael Vick, to Plaxico Burress, to Donte Stallworth—have been adjudged guilty of murder-related obstruction-of-justice, racketeering, weapons felonies, and manslaughter, respectively. Rather than end those star-players' careers, this startling list of offenses cost each player no more than two and in some cases zero seasons'-worth of total lost time. Hall-of-famer Ray Lewis, one notable example, is one the game's most heralded ambassadors, notwithstanding concerns that he stabbed two people death and entered a guilty plea to obstruction. Moreover, since USA Today began its "NFL Player Arrests Database" in 2000, it has recorded close to 900 arrests (or worse) among *active* NFL players. As one reporter observed when musing specifically on Hernandez's return to the football field following murder charges, "[b]e thankful O.J. is too old to play."[6] If anything, a full return has to be viewed as the null hypothesis. It is hardly "implausible." *See* Defs' Mot., p. 11.

On July 7, 2014, Hernandez was indeed incarcerated and not under contract when the Court conditionally certified the settlement classes. But he had hardly abandoned his intent to keep playing NFL football. Certainly, he never "retired" from the NFL, any more than did hundreds of other players, not on NFL rosters but still seeking gainful NFL employment as of the Preliminary Approval Date, and eventually again on NFL rosters. Defendants do not even claim as much. Tellingly, their lurid foray into collateral (at best) news articles in no way reveals or suggests that he had submitted retirement paperwork, nor received, nor even applied for his severance pay, a benefit taken by retiring players. Nor do Defendants suggest or point to evidence (where they can easily point to this in the instances of Plaintiffs Scroggins and Stabler) that Hernandez or his heirs

---

[6] Ostler, Scott. "How Hernandez Might Return to NFL," San Francisco Chronicle, Sept. 9, 2013. Available at: https://www.sfgate.com/sports/ostler/article/How-Aaron-Hernandez-might-return-to-NFL-4800104.php (last visited Jul. 30, 2018).

sought to register or did register for the NFL Concussion Settlement. And that is because the decedent vigorously and successfully disputed his charges, his contractual release, and had actively voiced an intent to return to the NFL. Nothing suggests he believed he was "retired." Nor that he had ceased "seeking" active employment with an NFL club.

     E.     A.H. SUES DEFENDANTS "BY REASON" OF HER OWN INJURY IN 2017.

In October of 2017, A.H. sued the Defendants through the subject lawsuit, a one-count complaint, alleging loss of parental consortium. This claim seeks redress for A.H.'s own injuries caused by third-party negligence. A.H., is of course the decedent's non-custodial daughter, born to and living with a mother he never married (and who therefore never would have received notice of this settlement, even if one were sent to *him*.) This complaint cannot not be accurately characterized as bringing a "Derivative" claim. Nor does nothing indicate that A.H.'s guardian— not married to the decedent—had anticipated anything other the decedent's eventually returning to his NFL career; in other words, she also did not believe the decedent to have been "retired", for the purposes of Defendants' later-asserted, retroactive-class-membership affirmative defense. Nor would she have even been contemplated as a party for which the reasonableness of the class notice was calculated to reach.[7]

Defendants never claim that A.H. was a "Derivative Claimant" *before* July 7, 2014. Rather, they take things a step further: They propose to expand the Settlement Agreement's release such that it would retroactively bind this non-party toddler. She became a class member, Defendants charge, several years later, and at the time she "… filed this action … making her a Derivative Claimant."

---

[7] Plaintiff further reserves all rights to seek amended final judgment under FRCP 60(b), and further, to seek collateral review of this settlement under United States Supreme Court precedent (*e.g.*, *Stephenson v. Dow Chem. Co.*, 539 U.S. 111 (2003)) and in light of due process considerations, should the court find her to be a retroactive class member.

<u>ARGUMENT</u>

I.   THE COURT CANNOT REACH DEFENDANTS' 12(B) ARGUMENTS BEFORE REMAND.

Before reaching 12(b)(6) motions practice, the Court must first find that it has jurisdiction.
*See* Background at I (*citing Steel Co.*, *Volvo*).  Indeed, as we have demonstrated elsewhere, the
Court does not have jurisdiction over A.H.'s Massachusetts consortium claim. *See generally* D.E.
3 (Plf's Mot. to Remand); Plaintiff's Opposition to Defendants Purportedly Incorporated Motion
to Dismiss on Preemption Grounds (forthcoming). Jurisdiction has become even more doubtful in
light of the Ninth Circuit's recent holding in *Dent v. National Football League*, No. 15-15143 (9th
Cir. Sept. 6, 2018) (reversing and denying the NFL's 12(b)(6) motion to dismiss on preemption.)
Federal subject-matter jurisdiction would require a determination that this claim—which neither
belongs to the decedent nor derives from the rights of anyone ever governed by a CBA—somehow
arose from or depended upon resolution of terms within the NFL's CBA. Barring a ruling that
distinguishes *Kline*, the 9th Circuit's *Dent* opinion, the NHL MDL Court's preemption order, and
essentially every court[8] to have ever addressed 301/LMRA preemption of personal injury claims
under the NFL's CBA, this state claim will be remanded and the Court will be without jurisdiction.

---

[8] Defendants usually highlight a handful of outlier cases but skip over this mountain of authority: *Ryans v. Houston NFL Holdings, L.P.*, No. 16-cv-3554, 2017 WL 1650202 (S.D. Tex. May 2, 2017) (no preemption – premises liability vs. club); *Oliver v. Riddell, Inc.*, No. 16-cv-4760, 2016 WL 7336412 at *3 (N.D. Ill. Jul. 16, 2016) (no preemption - near-identical allegations, drafted by the undersigned); *Bush v. St. Louis Reg. Conv. Ctr.*, No. 250, 2016 WL 3125869 at *3 (E.D. Mo. Jun. 3, 2016) (no preemption – premises liability vs. club); *Tynes v. Buccaneers Ltd. P'ship*, 134 F. Supp. 3d 1351 (M.D. Fla. 2015) (no preemption - medically-related negligence vs. club); *Green v. Pro Football, Inc.*, 31 F. Supp. 3d 714 (D. Md. 2014) (no preemption - civil conspiracy vs. club); *Green v. Arizona Cardinals Football Club*, 21 F. Supp. 3d 1020, 1030 (E.D. Mo. 2014) (no preemption – head trauma vs. club); *Bentley v. Cleveland Browns Football Co., LLC*, 958 N.E.2d 585 (Ohio App.3d 2011) (no preemption – negligent misrepresentation vs. club); *Jurevicius v. Cleveland Browns Football Co., LLC*, No. 09-cv-1803, 2010 WL 8461220 at *12-14 (N.D. Ohio Mar. 31, 2010) (no preemption – medical malpractice and medically related negligence); *Stringer v. Nat'l Football League*, 474, F. Supp. 2d 894, 905-06 (S.D. Ohio 2007) (no preemption - negligent licensing claim); *McPherson v. Tennessee Football, Inc.*, No. 0002-D.E. 16-1, 2007 WL 5445124 at *5 (M.D. Tenn. 2007) (no preemption – on-field injury to player vs. club); *Brown v. Nat'l Football League*, 219 F.Supp. 2d 372 (S.D.N.Y. 2002) (no preemption – negligent hiring by NFL); *Meggett v. New England Patriots*, No. 00-cv-12535, D.E. 14 (D. Mass. Feb. 28, 2001) (no preemption - medical malpractice claims against club and team doctor); *Hendy v. Losse and San Diego Chargers Football Co.*, 925 F.2d 1470, 1991 WL 17230 at *2 (9th Cir. 1991) (unpub) (same).

The separate affirmative defenses giving rise to this Motion do not give rise to or bear on jurisdiction, *see Rycoline*, 109 F.3d at 885. They are simply garden-variety affirmative defenses; they are no different than "assumption of risk." And so they must proceed in that order. Furthermore, this would not prejudice Defendants. Following remand and upon sufficient discovery, Defendants would still remain free to seek to enjoin the state action, as a roadmap they have cited even suggests. *See In re Imprelis Herbicide Marketing Sales Practices and Products Liability Litigation*, No. 11-md-2284, 2014 WL 6901120 at *3-4 (E.D. Pa. Dec. 5, 2014). In that instance, the Court first remanded and only later granted an injunction. Defendants stray from this orderly path. They push for this result ahead of any factual finding, fearing discovery of any kind. Their Motion presumes their having prevailed on a contested issue: the statuses of A.H. and her father. But this issue does not create jurisdiction such that the Court could address it before remand.

## II.    THE DECEDENT IS A NON-PARTY, NOT A SETTLEMENT-CLASS MEMBER.

To prevail on their Motion, Defendants must demonstrate that the face of the Complaint and Settlement Agreement permit the legal conclusion that A.H.'s father was a class-member. The present procedural posture prevents this, as would principles of contractual interpretation.

### A.    DECEDENT'S CLASS-MEMBERSHIP STATUS RAISES FACTUAL ISSUES IMPROPERLY DECIDED ON A RULE 12(B)(6) MOTION.

Nothing within A.H.'s Complaint nor the Settlement Agreement permits a finding that her father, the decedent, a non-party, was a settlement-class member. Indeed, nothing within these documents suggests or even addresses the status of the non-party decedent as "retired", with regard to the application of the Settlement Agreement's definitions. Although Defendants' Motion claims he was, it provides no support for this conclusion from within these documents (all they are limited to) nor elsewhere. Defendants try spinning the decedent's ongoing criminal proceedings into evidence that his return after July 7, 2014 would have been implausible—but this is insufficient;

not to mention, not the standard. The question is simply whether a player ceased seeking NFL employment. And Plaintiff points to other matters which could be construed to support her proposed, opposite conclusion. Rule 12(b) does not resolve these sorts of disputes. Presently, there is simply no record upon which to evaluate facts probative of whether prior to July 7, 2014, the decedent had permanently ceased "seeking active employment" (not whether his being rehired was plausible.) Indeed, this would appear likely to remain a jury question.

Plaintiff believes she can establish that the decedent was not even considered retired by the NFL at the time of his death. Although she has alluded to why she believes as much, discovery will be needed to support or refute her claims with evidence. She further believes evidence can be adduced to prove the decedent could have, and sought to return to the NFL. Indeed, the decedent would have followed the example set by long line of felons, were he to have done as his own words suggest he wanted to do and gotten back on the field; he fully intended to return, which would have been more than plausible, notwithstanding Defendants' bare conclusion that it would have been *implausible*. Each parties' supported positions are in direct conflict, requiring record development. One simply cannot render a conclusion—particularly one adverse to A.H.—based only on the face of the Complaint and on the face of the Settlement Agreement, and regarding her father at this early stage in litigation.

B.   DEFENDANTS' PROPOSED READING OF THE SETTLEMENT AGREEMENT WOULD BE INCONSISTENT WITH PRINCIPLES OF CONTRACTUAL INTERPRETATION.

Defendants' proposed interpretation of the release also defies basic principles of contract law. Their proposed interpretation would render provisions of the class definition illusory or meaningless. Section 2.1(ffff) of the Settlement Agreement clearly excluded from its definition of "Retired NFL Football Players" those players not "under contract" as of July 7, 2014, but who nonetheless were "seeking" to be on NFL rosters again. Defendants now seek to equate all players

simply "not under contract" as of July 7, 2014 with those "seeking" future NFL employment. Presuming the decedent's return to be "implausible" simply by virtue of his not being under contract, due to legal circumstances that other returning players had also faced—aside from the fact that it is beside the point—would render the latter term meaningless. That is, if all players not under contract were class members, then the latter "seeking" term would amount to surplusage. *See, e.g.*, *In re G-I Holdings, Inc.*, 755 F.3d 195, 202 (3rd Cir. 2014) (holding "[a] court should interpret the contract in such a way as not to render any of its provisions illusory or meaningless.") Indeed, this language could have read "all players no longer under contract"; but it does not. And this is not merely a problem limited to the decedent. Finding the decedent to have been class member would inure to the detriment hundreds of other similarly-situated players, not yet retired but simply not on rosters during 2014. All such players—likely with good reason to disbelieve they were members at the time or not investigate this issue—would be deemed to have forever waived all of their rights. For nothing.

## III.   A SETTLEMENT-CLASS-MEMBERSHIP DEFENSE DOES NOT DEFEAT A.H.'S CLAIM.

For Defendants' to prevail on their settlement-class-membership defense as to A.H., they must first establish that A.H.'s father was a settlement-class-member. Defendants have not established the decedent's class-membership, which ought to collapse their entire house of cards. Nevertheless, assuming Defendants could do so (and they cannot), they would also need to establish that A.H. herself was a class member; and that her legal claim derived from the decedent. They would have to accomplish this in the face of Massachusetts law holding consortium claims to constitute free-standing, independent rights. They have not and cannot do so.

First, and notably, Defendants do not argue that A.H. was a class-member at the time of the settlement's agreement (which of course they cannot); she was simply a non-party altogether.

Defendants instead argue A.H.'s 2017 lawsuit to have transmogrified her into a class member after the fact. As they put it, she "she filed this action … ***making*** her a derivative claimant …" *Defs' Mot.* at p.11 (*emphasis added*). But of course, we never learn how one gets alchemized from stranger to class member long after approval, opt-out dates, appeals, and even registration. Nor do we learn any legal principle that could support imputing such a detriment onto a non-party.

Although her familial relationship confers her standing, her substantive rights cannot derive from her relationship to a Retired NFL Football Player under Massachusetts law. Other states, to be sure, characterize consortium claims differently, and might view such a claim as one brought by reason of her father's injury. Not Massachusetts. Settled Massachusetts law reveals that A.H.'s claim arising by reason of her own injuries is legally separate from her father. The leading case on this point, *Eyssi v. City of Lawrence*, 416 Mass. 194 (1993), holds that a "claim for loss of consortium is independent" from the claim of the injury to the spouse. Tellingly, even where workers' compensation exclusivity operated to release a claim belonging to a dead police officer, the Court found that same officer's "spouse or child [was] free to assert a loss of consortium claim …"); *accord Bliss v. Sanguinet*, No. 12-cv- 10123, 2013 WL 3334728 at *9 (D. Mass. Jun. 24, 2013). In other words, even if the Court were to determine that the decedent was a class member, this is not enough, or even relevant to the issue of A.H.'s claim. She owns a free-standing claim that only she has the power to release.

Along these lines, it also appears clear that Massachusetts likely allows the repudiation of any such release by A.H. Applicable law strongly suggests she would retain a right to repudiate a constructive parental contract that endeavored to bind her. *See Sharon v. City of Newton*, 769 N.E.2d 738, 748 (Mass. 2002). The *Sharon* Court permitted parental judgment to indemnify third parties from liability specifically in light of the parents' decision to exchange a liability-release for

something of value easily understood as benefitting the child and within the parent's sound discretion. Indeed, it recognized that "under Massachusetts law, the contract of a minor is generally voidable" and non-derivative claims generally are not subject to conditions agreed upon by non-party decedents." *Id.* Here, the opposite is true. A.H. finds herself ensnared within a game of legal "gotcha" where she stands to receive absolutely nothing, and on account of some sort of *constructive* parental choice to give up everything without any benefit to her. What the Defendants characterize as a release given for "valuable consideration" is the ultimate legal fiction with respect to A.H. *See GGNSC Chestnut Hill, LLC v. Schrader*, 2018 WL 1582555, at *6 (*citing Oahn Nguyen Chung v. StudentCity.com, Inc.*, CIV.A. 10-10943-RWZ, 2013 WL 504757, at *1 (D. Mass. Feb. 12, 2013) (denying a stay of wrongful death claims in favor of arbitration found to be "not derivative", where parental contract had consented to arbitrate certain claims on a minor child's behalf) (*internal citations omitted*).

IV.    **AS A NON-PARTY, A.H. DID NOT RECEIVE NOTICE AND OPPORTUNITY TO OPT OUT.**

Although the Defendants correctly state that settlement class members were found by the Court to have received due-process-compliant notice and opportunity to both object or opt out, they fail to demonstrate how the toddler-plaintiff here—whom they never claim was a class member in 2014—also enjoyed these same safeguards. She cannot be treated as a class member unless she received the protections that class-members received. *C.f. Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 179-80 (3rd Cir. 1994) (binding effect of quasi-class-action settlement, for preclusion purposes onto a non-party, would have required due process). Simply: how could A.H. have had notice and opportunity in 2014, when her custodial parent was uncontemplated by the notice plan, and when her rights were not at issue in 2014, a time possibly pre-dating the accrual of her claim?

Defendants are left to argue exactly this: that A.H.'s unknowing but prospective waiver traps her on account of due-process-by-proxy.  In other words, best we can tell, Defendants seem to push for some sort of spillover effect onto her from those others—who *were in fact class-members*—having received due process. No case law supports this absurd proposition, which is fundamentally different than arguing A.H. was an absent class member who received due-process-sufficient notice and opportunity. At the least, A.H. deserves the right "to make arguments that merit a Rule 60(b) motion or a collateral attack on the validity of settlement as to certain class members," requiring that "a record must be fully developed in the district court …" *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liab. Litig.*, 385 F.3d 386, 396 (3d Cir. 2004). One struggles to see how three years later, she—as a non-class member—gets shoe-horned into the 2014 due-process rights of others.

## CONCLUSION

This case does not relitigate debates over line-drawing nor the fairness of this historic settlement; it opposes an attempt by Defendants to get extra-credit for settling separate cases. Defendants want to apply their credit for their separate agreement—to resolve a large *but distinct* swath of cases *with others*—here, to A.H. And they want to do it in jump-the-gun fashion to ensure there will be absolutely no chance of discovery. But that simply is not how the law operates. Defendants indeed get a certain amount of credit for their choices: anyone bound by the settlement has foregone the right to sue these Defendants elsewhere, and based on nearly anything related. That group may well include the other subjects of Defendants' motion; but it does not include A.H. Certainly, it cannot yet include A.H., ahead of a determination of jurisdiction. Had Defendants agreed to include A.H. within its set of compensated cases, or evinced a position that her father, mother, and she were putative class members (such that they had notice of the class settlement and

opportunity to object), then she would likely would not be here. Her action exists because Defendants want to snuff out her rights *and* not pay her a dime. This ought to be viewed as a problem. We ask that the Court remand her case and allow the Superior Court of Norfolk County, Massachusetts to adjudicate all later-in-time defenses as appropriate.

WHEREFORE Plaintiff asks that the Court deny Defendants' Motion, or alternatively, defer ruling on this Motion, subject to discovery.

Respectfully submitted,

Dated: October 16, 2018

*/s/ Bradford Rothwell Sohn*
Admitted *Pro Hac Vice*
The Brad Sohn Law Firm, PLLC
2600 S. Douglas Road, Suite 1007
Coral Gables, FL 33134
786.708.9750 Office
305.397.0650 Facsimile

THE BAEZ LAW FIRM
23 South Osceola Ave.
Orlando, FL 32801
407-705-2626
jose@baezlawfirm.com
*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY this 16th day of October, 2018 that true and accurate copies of the foregoing Notice was served via ECF and electronic mail to all counsel of record.


                                   _____/s/ Bradford R. Sohn_____
                                   Bradford R. Sohn, Esq.