**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| | : : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : : | |
| ALL ACTIONS | : : | |

**CLAIMS ADMINISTRATOR STATUS REPORT NO. 3**

## I.    INTRODUCTION

1.    ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 3 to apprise the Court and the public on the implementation of its duties as the Claims Administrator and developments since Status Report No. 2 filed on July 24, 2018 (Document 10163).  To see the progress of the Settlement Program until that time, we invite all readers to review our earlier Status Reports, which are posted to the Settlement Website (under "Information," click "Documents" and then "Status Reports and Court Notices").  We do not repeat here the information from these earlier Status Reports.  All information in this Status Report No. 3 is as of October 15, 2018.  We will cover developments since then in future reports.

## II.    PROGRAM REPORTS

2.    ***Changes to Posted NFL Settlement Program Summary Report.***  In Status Report No. 2 we described Section 6 of the Summary Report we post to the Settlement

Website, which is a bar chart of the notices we have sent out after processing of Monetary Award claims, based on the latest notice as payable, denied, denied after Audit or incomplete.  We have since added "Withdrawn" as a fifth category to that bar chart.  A Settlement Class Member may withdraw a claim at any time by notifying us of that intention. As of October 15, 2018, 106 Settlement Class Members had withdrawn their claims.

3.     ***Past Summary Reports.***  We refresh the Summary Report every Monday (or Tuesday, if Monday is a holiday) with the current numbers.  Beginning on September 6, 2018, the Settlement Website provides all the past Summary Reports, as well as the current one.  Click the "View Reports" Quick Link button on the Home page and then choose "History."  To see the progress made in the Program since we started posting the Summary Report on July 16, 2018, compare the data in those past weekly reports.

### III.     REGISTRATION

4.     ***Registration Submissions.***

(a) Section 1 of the Summary Report on the Settlement Website covers Registration. Table 1 here shows changes in the number of timely Registration submissions since our Status Report No. 2:

| Table 1 | TIMELY REGISTRATION SUBMISSIONS | | | |
|---|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 7/16/18** | **AS OF 10/15/18** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,965 | 15,958 | -7 |
| 2. | Representative Claimants | 1,253 | 1,262 | +9 |
| 3. | Derivative Claimants | 3,286 | 3,294 | +8 |
| 4. | **Totals** | **20,504** | **20,514** | **+10** |

The number of Retired NFL Football Players (Row 1) went down by seven from Status Report No. 2 because we received two new registrations, eight were replaced by Representative Claimants and one was removed as a duplicate after we determined the player

had already registered under a different Settlement Program ID.  Through our research efforts with the NFL Parties to help registrants who do not give us enough proof of their NFL employment histories with their initial Registration materials, we had, as of October 15, 2018, confirmed that 731 registrants were in fact Retired NFL Football Players and that 366 Retired NFL Football Players were eligible for the BAP.  Of the 20,514 persons who sent us timely Registration materials, we were able to confirm that 19,354 of them are Settlement Class Members under the Settlement Agreement, of whom 12,818 are Retired NFL Football Players eligible to participate in the BAP.  The other 1,160 persons are not Settlement Class Members under the Settlement Agreement because of one or more of these reasons:  (1) they were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not provide us with the information or support required by the Settlement Agreement to register, after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a Derivative Claimant but did not have a relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether Registrations submitted after August 7, 2017, that do not meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement can otherwise be accepted under the Rules Governing Registration Determinations and Appeals.  As of October 15, 2018, we had received 224 such late Registrations and found that 99 (44%) of them presented good reasons to be allowed to register late.  Table 2 shows the change in these numbers since Status Report No. 2:

| Table 2 | LATE REGISTRATIONS | | | |
|---|---|---|---|---|
| | STATUS | AS OF 7/16/18 | AS OF 10/15/18 | CHANGE |
| 1. | Accepted as Timely | 95 | 99 | +4 |
| 2. | Not Accepted as Timely | 119 | 125 | +6 |
| 3. | Totals | 214 | 224 | +10 |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge. The NFL Parties also may challenge our timeliness decisions. As of October 15, 2018, we had received 352 challenges, which is 20 more than we reported in Status Report No. 2. Table 3 explains these challenges and what happened to them:

| Table 3 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | |
|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 45 | Settlement Class Member | 23 | 22 |
| 2. | Not Eligible for the BAP | 235 | Settlement Class Member | 67 | 168 |
| 3. | Not Properly Registered | 51 | Settlement Class Member | 41 | 10 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 10 | Settlement Class Member | 4 | 6 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | Totals | 352 | | 136 | 216 |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters. Table 4 shows the appeals thus far and the Special Masters' rulings on them:

| Table 4 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO APPEALED | DECISION UPHELD | DECISION OVERTURNED |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 25 | Settlement Class Member | 23 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Totals | 29 | | 27 | 2[1] |

**5.**    ***Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.***  As of October 15, 2018, the Special Masters had approved 376 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player, which is seven new approvals since Status Report No. 2.  We set May 31, 2018, as the deadline for persons with incomplete petitions to submit the required Centralized Process documents and notified all affected Settlement Class Members (or their lawyers) about that deadline.  On June 1, 2018, we sent adverse Notices of Registration Determination to 64 proposed Representatives who did not submit by the May 31, 2018, deadline all documents required for approval using the Centralized Process.  We closed the registrations for 60 of these persons after the July 31, 2018, challenge/appeal deadline on their Notices of Registration Determination expired without any action.  The Special Masters approved the petitions for the four other proposed Representatives in this group.  A proposed Representative whose registration was closed may submit a new registration within 180 days after he or she is ordered by a local court or other official to be the authorized representative of a Retired NFL Football Player.  Since Status Report No. 2, and as of October 15, 2018, we had not received any new petitions from

---

[1] These two were the result of the 53-Man Roster decision issued on December 5, 2017 (Document 9513).

proposed Derivative Claimant Representatives.  The Special Masters have approved the only three such petitions we received for Derivative Claimants who are minors.

<div align="center">

### IV.   <u>COMMUNICATIONS CENTER FOR THE PROGRAM</u>

</div>

**6.** *Our Contact Activity.*  Since our contact center opened on February 6, 2017, we have handled 59,212 total communications (as of October 15, 2018), including 37,510 calls made or received and 19,118 emails to us at our Claims Administrator email box.  Between July 16, 2018, and October 15, 2018, we handled 3,641 such total communications.

**7.** *Law Firm Contacts.*  Our Law Firm Contacts are assigned to 501 different law firms or lawyers representing Settlement Class Members in the Program (as of October 15, 2018).  This is nine more law firms or lawyers than we reported in Status Report No. 2.  The calls and emails done by the Law Firm Contacts are part of the total contact activity described in Paragraph 6 above.

**8.** *Newsletters.*  Since Status Report No. 2, and as of October 15, 2018, we had issued three more monthly editions of our "Insights" newsletter (July, August and September).  We work with Garretson Resolution Group ("GRG"), which serves as the BAP Administrator and the Lien Resolution Administrator, to include material about the BAP and Medical Liens in the newsletters.  We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail.  We also post them to the Settlement Website (under "Information" click "Documents" and then "Newsletters").  We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters.

**9.** *Settlement Program Website.*  We regularly update the Settlement Website to reflect progress and changes to the Program.  We have made these changes since Status Report No. 2 (as of October 15, 2018):

(1) Added five new Court Orders under the Documents section at https://www.nflconcussionsettlement.com/Documents.aspx.  These five were:  (1) Order Approving Joint Application for Appointment of Two Additional AAP Members (Document 10248, filed September 5, 2018); (2) Order Granting NFL Parties' Motion for Appointment of a Special Investigator (Document 10255, filed September 12, 2018); (3) Order Adopting Amended Rules Governing Attorneys' Liens (Document 10283, filed October 3, 2018); (4) Order Adopting Amended Rules Governing Petitions for Deviation from the Fee Cap (Document 10294, filed October 10, 2018); and (5) Order Amending in Part the Amended Rules Governing Attorneys' Liens (Document 10304, filed October 15, 2018).

(2) Posted two new Alerts (https://www.nflconcussionsettlement.com/Alerts.aspx).  The first, dated August 22, 2018, describes a new portal feature.[2]  The second, dated October 9, 2018, explains when the Special Masters will make decisions on Statute of Limitations proceedings, an issue we discuss more fully in Paragraph 22 of this Status Report.

(3) Replaced two existing forms with new versions and added a new form to the Forms page at https://www.nflconcussionsettlement.com/Forms.aspx.[3]

We are developing a new version of the Settlement Website to give it a fresh look and will make it live soon.  When we do, we will post an Alert explaining what has changed from the old site and include a message on the Home page saying the site has been redesigned.  Since Status Report No. 2, the Program's Home page has had 15,274 more unique visits, giving us 355,975 total unique visits as of October 15, 2018, coming from 187 countries and all 50 of the United States.

---

[2] We discuss the document sort feature more fully in Paragraph 34 of this Status Report.
[3] We replaced with new versions the Sworn Statement: Status of Assignment of Monetary Claim (SWS-5) (under "Payment Documents") and the Withdrawal of Attorney's Lien Dispute Form (under "Other Documents").  We added the Declaration of Consent to Substitution (under "Payment Documents"), a form we describe more fully in Paragraph 26(d) of this Status Report.

## V.     QUALIFIED MAF PHYSICIANS

**10.     *Establishing and Maintaining the MAF Network.***

(a) We continue to identify and contact providers, collect Provider Applications, verify credentials, submit applicants to the Parties for approval and contract with approved Qualified MAF Physicians, in conjunction with the BAP Administrator.[4]  We add Qualified MAF Physicians to the posted list as these steps are completed.  As of October 15, 2018, the posted list included 131 of the total 167 approved Qualified MAF Physicians.  We will add the remaining 36 potential Qualified MAF Physicians as we are able to get signed contracts back from them.  We have final contracts with Qualified MAF Physicians in or near 41 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside and are in the contracting stages with additional approved Qualified MAF Physicians to increase the geographical coverage to 51 of the 53 target cities.  Table 5 shows the changes in these numbers since Status Report No. 2:

| Table 5 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | DATA POINT | AS OF 7/16/18 | AS OF 10/15/18 | CHANGE |
| 1. | Total Approved Physicians | 181 | 167 | -14 |
| 2. | Approved – On Posted List | 145 | 131 | -14 |
| 3. | Approved – Not Yet Posted | 36 | 36 | 0 |
| 4. | Target Cities Represented | 40 | 41 | +1 |

Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website.  We explain in sub-paragraphs (b) and (c) below why the total number of approved physicians went down by 14 (Row 1 of Table 5).

---

[4] The "Parties" are the parties to the Settlement Agreement, Co-Lead Class Counsel and the NFL Parties.  Our contacts with Co-Lead Class Counsel are at Seeger Weiss LLP.  We work with counsel for the NFL Parties at Paul, Weiss, Rifkind, Wharton & Garrison LLP.

(b) After the Special Masters adopted the Rules Governing Qualified MAF Physicians on June 4, 2018, we focused on finalizing the published Qualified MAF Physician list, especially those approved candidates who had not yet signed a contract with us. Pursuant to Rule 4, we asked all the approved Qualified MAF Physicians to sign contracts with us within 60 days. We secured signed contracts from three Qualified MAF Physicians and are training them for the role. However, 12 withdrew from consideration; four because they were fully occupied serving as Qualified BAP Providers, while six declined to participate because of a change in circumstances, such as their practice is longer taking new patients, or they had left that practice and not yet set up a new practice in which to continue work as a Qualified MAF Physician. Additionally, two Qualified MAF Physicians were appointed to serve as members of the Appeals Advisory Panel ("AAP").

(c) The other two physicians accounting for the decline in Row 1 of Table 5 were terminated from the Program. Pursuant to our authority under Rule 14 of the Rules Governing Qualified MAF Physicians, we monitor the Qualifying Diagnoses submitted to us by Qualified MAF Physicians. We provide claim-specific follow-up and general refresher trainings to the Qualified MAF Physicians, as appropriate, based on our monitoring activity. If we determine a Qualified MAF Physician is not performing at the appropriate level or has engaged in questionable conduct, we have discretion to suspend or terminate him or her under Rules 15 and 16 of the Rules Governing Qualified MAF Physicians. As of October 15, 2018, we had terminated five Qualified MAF Physicians, which is two more than we reported in Status Report No. 2.

## VI.   <u>SPECIAL MASTERS</u>

**11.     *Our Work with the Special Masters.*** Since Status Report No. 2, we have had six

more regularly-scheduled calls to discuss policy and operational issues and as of October 15,

2018, had held 57 such calls with the Special Masters.  We have many other calls and exchange

countless emails with them to address issues as they arise.  The Special Masters have the final

say in how the Settlement is implemented, subject only to the Court's oversight.

**12.     *Program Rules.*** Since Status Report No. 2, the Special Masters approved these

changes to Rules previously adopted in the Program (as of October 15, 2018):

> (a) Revised Rules 30 and 31 in the Rules Governing Statute of Limitations Proceedings
>     to permit objections to all Special Master determinations.[5]

> (b) Amended the Rules Governing the Audit of Claims to eliminate an unforeseen and
>     unintended gap that prevented Settlement Class Members from reviewing and
>     responding to all new information provided by the NFL Parties and/or Co-Lead
>     Class Counsel.  We:  (1) added "Subject of Investigation" as a new definition in
>     Rule 3; (2) changed Rules 17, 19 and 21; and (3) updated language throughout the
>     Rules for consistency and to accommodate "Subject of Investigation" as a new
>     defined term.[6]

All nine sets of Rules are available on the Settlement Website by clicking the "Settlement

Program Rules" Quick Link icon on the <u>Home</u> page and on the online portals of law firms,

lawyers and *pro se* Settlement Class Members.

**13.     *Decisions.*** Since Status Report No. 2, and as of October 15, 2018, the Special

Masters issued four new decisions and designated them to be published.  We post these rulings to

the Settlement Website (under "Information," click "Documents" and then "Published Appeal

---

[5] We posted the Rules Governing Statute of Limitations Proceedings with these changes on August 1, 2018.
[6] We posted the Rules Governing the Audit of Claims with these changes on October 2, 2018.

Decisions"). Two of these four new rulings were Monetary Award appeals and two were from Audit Proceedings.[7]

## VII.   PROCEDURES AND FREQUENTLY ASKED QUESTIONS

14.   ***Coordination with the Parties.*** We have conducted 12 more weekly policy and operational issues calls with the Parties after Status Report No. 2, and, as of October 15, 2018, had done 112 such calls in this Program since April 19, 2016. We also have other calls, meetings and emails with the Parties on particular interpretation or operational issues that arise. Where we do not have consensus among the Parties on an issue, we consult the Special Masters to determine the best practices approach to address it, while still honoring the terms of the Settlement Agreement.

15.   ***Frequently Asked Questions.*** Since Status Report No. 2, we added eight new FAQs to address Orders entered by the Court (as of October 15, 2018):[8]

    (a) FAQ 309 (What is the fee cap?);

    (b) FAQ 310 (What happens to those lawyers' fees and expenses that the Claims Administrator has withheld from Award payments?);

    (c) FAQ 311 (What are claims service providers and are they covered by the fee cap?);

    (d) FAQ 312 (Do lawyers have to send a statement of contingency fees and expenses to the Claims Administrator?);

    (e) FAQ 313 (What does the Claims Administrator do with the 5% Common Benefit Fund Holdback?);

---

[7] We discuss the two Audit decisions in Paragraph 31 of this Status Report. The information in this Status Report is as of October 15, 2018. Since that date, the Special Masters designated four more decisions for publication, so as of the filing of this Status Report the posted set of Special Master decisions includes four Monetary Award appeals decisions and five Audit decisions. We will cover those and other developments after October 15 in more detail in our next Status Report.

[8] These include the: (1) Order Regarding Payment of Attorneys' Fees and Expenses (Document 10103, filed June 27, 2018); (2) Order Regarding Withholdings for the Common Benefit Fund (Document 10104, filed June 27, 2018); (3) Order Adopting Amended Rules Governing Attorneys' Liens (Document 10283, filed October 3, 2018); and (4) Order Adopting Amended Rules Governing Petitions for Deviation from the Fee Cap (Document 10294, filed October 10, 2018).

(f)  FAQ 186 (How will a Petition for Deviation be resolved if there is also an Attorney's Lien asserted against the Settlement Class Member?);

(g)  FAQ 254 (What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision on the Withdrawals?); and

(h)  FAQ 294 (What information will the Magistrate Judge consider in making the Report and Recommendation or the final decision on the Withdrawals?).

We also made substantive revisions to these FAQs already on the Settlement Website:

(a)  FAQ 177 (What are Common Benefit Fees and how will Class Counsel be paid?), to clarify earlier Court filings and address the Court's June 27, 2018, Order Regarding Withholdings for the Common Benefit Fund (Document 10104);

(b)  FAQ 182 (Will the attorney's fees be reduced to pay for common benefit attorneys?), to make it clearer and refer specifically to the Attorneys' Fees Qualified Settlement Fund;

(c)  FAQ 302 (I received a Notice of Monetary Award Claim Determination or Notice of Derivative Claimant Award Determination.  Do I need to do anything else to receive payment of the award?), where we removed the Statement of Attorney Fees and Expenses requirement, based on the Court's June 27, 2018, Order Regarding Payment of Attorneys' Fees and Expenses (Document 10103);

(d)  FAQ 327 (I received a Bankruptcy Trustee Notice.  What does this mean?), where we changed the 120-day response period for a Notice of Bankruptcy Question Delaying Payment to 30 days and shortened from 90 to 30 days the time for the Bankruptcy Trustee to respond to a Notice to the Bankruptcy Trustee;

(e)  FAQ 66 (What happens after a BAP exam?), where we now address medical records we get directly from the BAP Administrator;

(f)  FAQ 67 (What should I do if my BAP exam results in a diagnosis?), where we now address medical records we get directly from the BAP Administrator;

(g)  FAQ 90 (What should I do if I already have a Qualifying Diagnosis?), where we now address medical records we get directly from the BAP Administrator;

(h)  FAQ 111 (What if I cannot get medical records or a Diagnosing Physician Certification Form from the diagnosing physician?), where we now address medical records we get directly from the BAP Administrator;

(i) FAQ 122 (I received a Qualifying Diagnosis through the BAP.  Do I have to do anything else to receive a Monetary Award?), where we now address medical records we get directly from the BAP Administrator;

(j) FAQ 26 (If I receive benefits under the 88 Plan or any other disability plan, do I automatically qualify for a Monetary Award in the Settlement Program?), where we include new information about records from NFL disability plans; and

(k) FAQs throughout the Petitions for Deviation from Fee Cap, Liens – Information for Settlement Class Members and Liens – Information for Lienholders sections, where we addressed the Court's adoption of amended sets of the Rules Governing Attorneys' Liens and Rules Governing Petitions for Deviation from the Fee Cap.[9]

There now are 341 FAQs in 15 categories.  The FAQs are available under the Information tab on the Settlement Website and also can be accessed by clicking the "Frequently Asked Questions" Quick Link icon on the Home page.  These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program.  The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs.

## VIII.    MONETARY AWARD CLAIMS

16.    ***Medical Records from the BAP Administrator***.  The BAP Administrator now uploads directly through a secure online portal with us all the medical records related to Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made in the BAP.  We put this function in place on August 9, 2018.  Even though we have records, Settlement Class Members still must submit a claim to us before we may review them.  GRG does not send us BAP exam records if there is no Qualifying Diagnosis or there is a diagnosis of Level 1 Neurocognitive Impairment.

---

[9] We address the amended sets of Rules more fully in Paragraphs 27 and 28 of this Status Report.

17.     ***Total Claims Received.***  Section 3 of the Summary Report on the Settlement Website shows the total Monetary Award claims we have received.  Since Status Report No. 2, we have 132 new Monetary Award claims, giving us 2,050 Monetary Award Claim Packages from Retired NFL Football Players and Representative Claimants (as of October 15, 2018), which means we have claims from 11.9% of registered Players (or their Representative Claimants).  We now get about 10 new Monetary Award claims each week.  Of the 132 claims submitted since July 16, 2018, 46% (61) were based on pre-Effective Date diagnoses, while 51% (67) were for post-Effective Date diagnoses.[10]  That is a higher percentage of post-Effective Date diagnoses than we reported in Status Report No. 2, when 37% of claims were for post-Effective Date diagnoses.  We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the Summary Report on the Settlement Website.  We also show the current status of all Monetary Award claims based on the last notice or action taken in Section 8 of the Summary Report on the Settlement Website.  We review and make a determination on each new claim within 48 business hours after we receive it and issue a notice as soon as possible after any additional verification steps are complete.

18.     ***Incomplete Claim Packages***.  There are 114 items that can make a claim incomplete, of which 48 are mandatory (meaning we cannot go forward to review the claim without the item and are compelled to deny the claim as incomplete if we do not receive it within the 120 days that the Settlement Agreement allows for Settlement Class Members to send in missing elements of a Claim Package) and 66 are optional (meaning they do not have to be cured for the claim to move forward and do not lead to denial if not submitted).[11]  We

---

[10] These numbers do not add up to 100% because we do not know the diagnosis asserted for four of the claims.

[11] The mandatory items relate to fundamental elements of a complete Claim Package, like the Claim Form, HIPAA Form, Diagnosing Physician Certification Form and medical records reflecting the Qualifying Diagnosis.  Optional

want our notices to be clear and immediately understood.  We prepared simpler explanations for 69 of these 114 deficiency items and on September 14, 2018, started using the new language on our notices to explain what is missing and how to address it.

**19.**   ***Monetary Award Claims Reviewed by the AAP.***

(a) On September 5, 2018, the Court approved the appointment of two additional neurologists to the AAP (Document 10248), bringing the total members on the panel to eight. As of October 15, 2018, there were 58 claims in or still requiring AAP review, which is 147 fewer than the 205 we reported in Status Report No. 2.  The AAP is nearly caught up on the claims requiring their evaluation and, as of October 15, 2018, had reviewed 608 pre-Effective Date diagnosis Monetary Award claims and approved 59% of those claims.[12] Under FAQ 138 (Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?), adopted on February 5, 2018, AAP members may, where they find that a claimed Qualifying Diagnosis is not supported by the records, approve a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid if supported by the medical records on the claim.  As of October 15, 2018, the AAP members had approved a lower level diagnosis on 23 claims (an increase of three since Status Report No. 2).

(b) The AAP members may ask for input from the Appeals Advisory Panel Consultants ("AAPC") about Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing that supports an Alzheimer's Disease diagnosis.

---

items, such as what type of doctor made the diagnosis and certain types of medical records documenting the Qualifying Diagnosis (*e.g.*, raw scores), make the claim stronger but are not fundamental elements of a complete Claim Package.

[12] Broken down by Qualifying Diagnosis, the AAP members had approved 98% of Death with CTE claims, 95% of ALS claims, 86% of Alzheimer's claims, 98% of Parkinson's claims, 33% of Level 2 claims and 27% of Level 1 claims.

As of October 15, 2018, we had assigned 336 claims (an increase of 70 since Status Report No. 2) to the AAPC based on requests by AAP members for their input.

20.   ***Notices for Missing Materials.***   As of October 15, 2018, we had sent one or more notices requesting additional documents or information on 1,328 of the 2,050 Monetary Award claims, which is 30 more claims than we reported in Status Report No. 2.[13]   More of the Level 1.5 and Level 2 claims are missing materials than claims for the other Qualifying Diagnoses, as shown in Table 6:

| Table 6 | | NOTICES FOR MISSING MATERIALS | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN [14] | TOTAL |
| 1. | Total Submitted | 85 | 43 | 359 | 121 | 553 | 773 | 116 | 2,050 |
| 2. | Notice Issued | 19 | 21 | 213 | 62 | 358 | 546 | 109 | 1,328 |
| 3. | % Missing Materials | 22% | 49% | 59% | 51% | 65% | 71% | 94% | 65% |

So far, 63% of these Settlement Class Members who received a notice requesting additional documents have responded to the notice.  Settlement Class Members take an average of about 60 days to respond.  We get about 10 to 15 responses to these notices each week.  We review each reply to see if it cures the problem.  Missing raw scores, problems with the medical records (*e.g.*, whether they are from the diagnosing doctor, issues related to functional impairment and neuropsychological testing, missing pages, etc.) and defects in the Diagnosing Physician Certification Forms have been the most common problems.  Section 6

---

[13] Depending on the type of review that led to it, the notice is called a Notice of Preliminary Review or a Notice of Request for Additional Documents.

[14] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.  We can process and pay a person for only one Qualifying Diagnosis.  All of these claims by nature are incomplete because we need to know what Qualifying Diagnosis should be used.  We soon will issue notices on the seven claims that had not yet received one as of October 15, 2018.

of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

21.     ***Eligible Seasons.***  As of October 15, 2018, we had confirmed during claims review additional Eligible Seasons for 29 Settlement Class Members (an increase of three since Status Report No. 2), who will receive larger Monetary Awards because of this research.

22.     ***Statute of Limitations Matters.***  The Rules Governing Statute of Limitations Proceedings explain how the Special Masters make determinations as to whether claims submitted by Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006, are barred by the statute of limitations, as specified in Section 6.2(b) of the Settlement Agreement.  As of October 15, 2018, we had received 367 registrations from Representative Claimants that may require the statute of limitations analysis, 71 of whom had submitted a Claim Package.  Statute of Limitations Rule 7 requires that a Claim Package be complete before a statute of limitations proceeding may begin.  Of the 71 Claim Packages we have:  (a) 33 are complete and assert a potentially compensable Qualifying Diagnosis if the claim is not time-barred under Section 6.2(b); (b) three are incomplete but still within their deadlines to submit missing items; and (c) 35 have been denied for failing to cure deficiencies or for not asserting a compensable diagnosis.  Table 7 summarizes the changes to these numbers since Status Report No. 2:

| Table 7 | STATUS OF CLAIMS REQUIRING STATUTE OF LIMITATIONS ANALYSIS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % | | |
| | | AS OF 7/16/18 | AS OF 10/15/18 | CHANGE | AS OF 7/16/18 | AS OF 10/15/18 | CHANGE |
| 1. | Complete - Potentially Compensable Qualifying Diagnosis | 25 | 33 | +8 | 37% | 46% | +9% |
| 2. | Incomplete – Within Deadline to Submit Missing Items | 15 | 3 | -12 | 22% | 4% | -18% |
| 3. | Denied – Deficient or No Compensable Qualifying Diagnosis | 27 | 35 | +8 | 40% | 49% | +9% |
| 4. | Totals | 67 | 71 | +4 | 100% | | |

We have issued a Notice of Commencement of Statute of Limitations Proceeding under Statute of Limitations Rule 16 to the 33 Representative Claimants with a complete Claim Package to start the briefing process under the Statute of Limitations Rules. The Special Masters have determined they will not issue a decision on whether any of these claims are barred by a statute of limitations until after February 6, 2019, which is the deadline set by Section 8.3(a)(i) of the Settlement Agreement for Retired NFL Football Players with a pre-Effective Date Qualifying Diagnosis to submit a Monetary Award claim, and after all proceedings on such claims are fully briefed. This will permit all affected representatives to be heard before any ruling and allow for the consideration of all such claims in a uniform and efficient manner.

23.    *Monetary Awards and Payments.*

(a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website. As of October 15, 2018, we had issued Notices of

Monetary Award for 649 claims totaling $569,314,153 in awards.[15]  We request funding from the NFL Parties by the 10th of every month for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline passed with no appeal) and there is no other reason to delay paying the claim (*e.g.*, Audit, unresolved bankruptcy issues, deceased claimants, etc.).  Of the 649 claims with Notices of Monetary Award, 510 had reached the point where we had requested funding from the NFL Parties.  As of October 15, 2018, the NFL Parties had deposited into the Settlement Fund $424,340,221 for 464 claims and not yet funded 46 claims because they were still within the period for the Parties to object to the October Funding Request.  Of the 464 Monetary Award claims for which the NFL had deposited funds, the Program had, as of October 15, 2018, paid 419 a total of $348,307,380.  The remaining 45 claims the NFL has funded were not yet ready for payment (*e.g.*, some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount, etc.).  For the 419 Retired NFL Football Players and Representative Claimants who had been paid as of October 15, 2018, the Trustee sent $19,050,849, which is 5% of those Monetary Award payments, to the Attorneys' Fees Qualified Settlement Fund, in accordance with the Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104).  Finally, we are required to withhold money for unresolved Liens and for third-party funders that may accept rescission of prohibited assignments (as described further in Paragraph 26).  Table 8 shows where the $348,307,380 paid by the Settlement Program went and compares those totals to what we reported in Status Report No. 2:

---

[15] The amount of these 649 Notices of Monetary Award includes the 1% of Awards allocated to eligible Derivative Claimants.  See Paragraph 25 of this Status Report.

| Table 8 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | **PAID TO** | **AS OF 7/16/18** | **AS OF 10/15/18** | **CHANGE** |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $278,925,304 | $344,361,427 | +$65,436,123 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $1,477,496 | $2,542,909 | +$1,065,413 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $101,100 | $540,239 | +$439,139 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to Third-Party Funders who have accepted rescission of prohibited assignments that they had entered into with Settlement Class Members) | $375,071 | $862,805 | +$487,734 |
| **5.** | **Total** | **$280,878,970** | **$348,307,380** | **+$67,428,410** |

(b) Table 9 shows the changes in figures for payments and claims with Notices of Monetary Award since Status Report No. 2:

| Table 9 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 2 | | | | | |
|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **AMOUNT** | | |
| | | **AS OF 7/16/18** | **AS OF 10/15/18** | **CHANGE** | **AS OF 7/16/18** | **AS OF 10/15/18** | **CHANGE** |
| 1. | Notice of Monetary Award Issued | 499 | 649 | +150 | $485,634,235 | $569,314,153 | +$83,679,918 |
| 2. | Paid | 324 | 419 | +95 | $280,878,970 | $348,307,380 | +$67,428,410 |

Of the 649 claims with Notices of Monetary Award, 118 (18%) have been appealed (100 by the NFL Parties and 18 by the Settlement Class Member).  This is 26 more appeals (20 by the NFL Parties and six by Settlement Class Members) than we described in Status Report No. 2.

We show the status of appealed Monetary Award claims in Section 9 of the Summary Report on the Settlement Website.

24. **_Monetary Award Denials_.** As of October 15, 2018, we had 505 denials on Monetary Award claims (130 more since Status Report No. 2), 141 of which were appealed by the Settlement Class Member, as shown in Table 10:

| Table 10 | | MONETARY AWARD DENIALS | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTAL |
| 1. | Total Submitted | 85 | 43 | 359 | 121 | 553 | 773 | 116 | 2,050 |
| 2. | Denied | 9 | 1 | 53 | 8 | 114 | 228 | 92 | 505 |
| 3. | % Denied | 11% | 2% | 15% | 7% | 21% | 29% | 79% | 25% |

Section 10 of the Summary Report on the Settlement Website shows the reasons for these denials. Overall, the AAP found 312 (62%) of these claims not medically eligible. Others were denied because a fundamental requirement in the Settlement Agreement was not satisfied (_e.g._, date of death for a Death with CTE claim) or, most often, because Settlement Class Members did not provide the mandatory information and/or documents we requested in our notices and outreach efforts. When an AAP member denies a claim, we include in the notice comments from that AAP member explaining why. When we deny a claim on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents. Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam.

25.    *Derivative Claimants.*  As of October 15, 2018, we had received 523

Derivative Claim Packages, which is an increase of 21 since Status Report No. 2.  Table 11

shows the status of these claims:

| Table 11 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | HOW MANY | % |
| 1. | Paid ($547,151) | 79 | 15% |
| 2. | Award Notice Issued but Not Paid ($223,063) | 68 | 13% |
| 3. | In Line for Notice of Derivative Claimant Award Determination | 1 | <1% |
| 4. | Final Denial – Deceased Derivative Claimant | 4 | <1% |
| 5. | Final Denial – Untimely Derivative Claim Package | 1 | <1% |
| 6. | Successful Player Challenge – Not Eligible for Award | 6 | 1% |
| 7. | Derivative Claimant Challenge – Pending Final Determination | 7 | 1% |
| 8. | Withdrawn | 8 | 2% |
| 9. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Player has not yet submitted a claim, or his claim status was not final) | 349 | 67% |
| 10. | Totals | 523 | 100% |

Since Status Report No. 2, 23 more Derivative Claimants were paid, we issued 35 more

Notices of Derivative Claimant Award and we denied one Derivative Claimant.

26.    *Handling of Attempted Assignments of Claims.*

(a) As of October 15, 2018, we had received 546 signed SWS-5s (Sworn Statement:

Status of Assignment of Monetary Claim) from eligible Settlement Class Members telling us

whether they had attempted to assign a claim in exchange for money from a third-party

funder, as shown in Table 12:

| Table 12 | | SIGNED SWS-5 ASSIGNMENT RESPONSES | | | | | |
|---|---|---|---|---|---|---|---|
| | RESPONSE | HOW MANY | | | % | | |
| | | AS OF 7/16/18 | AS OF 10/15/18 | CHANGE | AS OF 7/16/18 | AS OF 10/15/18 | CHANGE |
| 1. | No Assignment or Attempt to Assign | 365 | 504 | +139 | 93% | 92% | -1% |
| 2. | Assigned or Attempted to Assign | 26 | 42 | +16 | 7% | 8% | +1% |
| 3. | Totals | 391 | 546 | +155 | 100% | | |

(b) If a Settlement Class Member has attempted to assign any settlement benefits from his or her monetary claim to a third-party funder or borrowed any funds against his or her monetary claim as collateral, he or she also must provide to us all documents relating to that transaction (a "Third-Party Funder Transaction").  We review each Third-Party Funder Transaction with the Special Masters to determine whether it is an assignment prohibited by Section 30.1 of the Settlement Agreement and the Court's December 8, 2017 Explanation and Order (Document 9517) (a "Prohibited Assignment") and notify the affected Settlement Class Member of that decision in a Notice of Assignment Review Determination.  As of October 15, 2018, we had reviewed 36 Third-Party Funder Transactions (an increase of 10 since Status Report No. 2), 23 of which are Prohibited Assignments (an increase of seven since Status Report No. 2).

(c) On any Prohibited Assignment that has not been terminated by agreement between the Settlement Class Member and the funder, we issue a Waiver Relinquishing Rights Under Attempted Assignment contemplated in the Explanation and Order ("Waiver Form") for the third-party funder to sign and return within 30 days to:  (a) indicate the amount advanced to the Settlement Class Member that has not been repaid to the third-party funder; and (b) rescind the Prohibited Assignment and relinquish all claims relating to it.  We send this Waiver Form to the lawyer for a represented Settlement Class Member and directly to the

third-party funder if the Settlement Class Member is not represented by a lawyer.  The Waiver Form includes an attachment for the Settlement Class Member to sign and return to us showing agreement with the information the third-party funder provided in the Waiver Form.  As of October 15, 2018, we had issued 19 Waiver Forms (an increase of eight since Status Report No. 2) and received 10 completed, signed Wavier Forms from third-party funders (an increase of six since Status Report No. 2).

(d) Additionally, at the direction of the Court and Special Masters, we assisted Class Counsel Gene Locks in implementing the terms of a Third-Party Funding Resolution Protocol effective on September 20, 2018.  We provide this Protocol to third-party funders and affected Settlement Class Members as we learn of awards subject to an attempted assignment.  A funder may elect to participate in it by submitting a Declaration of Consent to Substitution, a template of which is available on the Settlement Website.  By completing all necessary forms, the third-party funder and Settlement Class Member agree that the Prohibited Assignment and any rights held under it are terminated.

**27.    *Petitions for Deviation from the Fee Cap.***  As of October 15, 2018, we had received seven Petitions for Deviation, one of which has been withdrawn.[16]  The Court resolved one of these; the other five are pending final resolution.  On October 10, 2018, the Court adopted Amended Rules Governing Petitions for Deviation from the Fee Cap (Document 10294).  The amendments:  (1) explain the presumptive fee cap imposed by the Court's April 5, 2018 Order and Memorandum (Documents 9863 and 9862, respectively); (2) reinforce that personal information about a Settlement Class Member must not be included in Petitions for Deviation filed with the Court; and (3) establish provisions on how to request

---

[16] The Petitions for Deviation from Fee Cap section of FAQs on the Settlement Website explains what Petitions for Deviation are and the process by which they get resolved.

the admission of live testimony and additional documents at a hearing on a Petition for Deviation.

   28.   ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

   (a) The Settlement Agreement, as well as federal and state law, require us to hold back portions of Monetary Awards to satisfy Liens before paying Settlement Class Members. We review each non-medical Lien assertion and advise the lienholder if it needs to submit additional documentation about the Lien.  If we do not receive the required documents, we will not hold back any funds from the Monetary Award to pay the purported lienholder.  We issue a Notice of Lien to the Settlement Class Member and the lienholder after:  (1) we have complete documentation in support of the Lien from the lienholder; and (2) the Settlement Class Member submits a Claim Package.  The Settlement Class Member has an opportunity to object to each non-medical Lien.  Table 13 summarizes non-medical Lien assertions, notices and disputes by Lien type as of October 15, 2018, and changes to those numbers since Status Report No. 2:

| Table 13 | | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | **AS OF 7/16/18** | **AS OF 10/15/18** | **CHANGE** | **AS OF 7/16/18** | **AS OF 10/15/18** | **CHANGE** | **AS OF 7/16/18** | **AS OF 10/15/18** | **CHANGE** |
| 1. | Attorneys' Lien | 876 | 901 | +25 | 301 | 319 | +18 | 288 | 279 | -9 |
| 2. | Child Support | 326 | 330 | +4 | 38 | 40 | +2 | 35 | 28 | -7 |
| 3. | Judgment | 52 | 55 | +3 | 11 | 11 | 0 | 9 | 9 | 0 |
| 4. | Tax | 47 | 48 | +1 | 1 | 1 | 0 | 0 | 0 | 0 |
| **5.** | **Totals** | **1,301** | **1,334** | **+33** | **351** | **371** | **+20** | **332** | **316** | **-16** |

   (b) If a Settlement Class Member consents to a non-medical Lien or resolves a dispute with the lienholder by agreement or through the Attorneys' Liens dispute process, we deduct

the non-medical Lien amount after the Settlement Class Member becomes eligible for payment.  We hold back funds from a Monetary Award for a pending Lien where the Lien is disputed and the Lien amount is not final.  The holdback amount is preliminary and is based on the Lien assertion.  For an Attorney's Lien, we hold back 22% of a Monetary Award, plus reasonable costs, pursuant to the Court's April 5, 2018, Order and Memorandum.  However, if the terms of the contract with the attorney lienholder are for a lower rate, we only withhold the amount provided in the contract.  If the attorney lienholder files a Petition for Deviation requesting more than 22% in fees, we hold back the amount asserted in the Petition for Deviation until the Court rules on the amount of fees the attorney lienholder can receive.  If there is holdback money left over after paying the non-medical Lien, we pay that money to the Settlement Class Member.  For Child Support Liens, Tax Liens and Judgment Liens, we hold back the amount asserted by the lienholder.  As of October 15, 2018, the parties to five Attorneys' Liens Disputes reached agreements resolving the Disputes, and the Magistrate Judge approved the terms of the agreements.  We paid $390,154.19 for four of those Attorneys' Liens (we will pay another $351,028.94 for the fifth Attorney's Lien with the October Disbursement Report) and paid $150,084.43 for two resolved Child Support Liens. Table 14 summarizes the non-medical Lien payments by Lien type relative to the Monetary Award amount:

| Table 14 | | NON-MEDICAL LIEN PAYMENTS | | | | |
|---|---|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARD PAYMENTS AFFECTED | MONETARY AWARD AMOUNTS | ORIGINAL LIEN HOLDBACKS | LIEN PAYMENT DEDUCTIONS | RESIDUAL OF HOLDBACKS PAID TO SETTLEMENT CLASS MEMBERS |
| 1. | Attorney's | 4 | $6,917,917.33 | $1,212,936.35 | $390,154.19 | $822,782.29 |
| 2. | Child Support | 2 | $2,011,050 | $304,311.80 | $150,084.43 | $154,227.37 |
| 3. | Judgment | 0 | $0 | $0 | $0 | $0 |
| 4. | Tax | 0 | $0 | $0 | $0 | $0 |
| 5. | **Totals** | **6** | **$8,928,967.33** | **$1,517,248.15** | **$540,238.62** | **$977,009.66** |

We are holding $4,333,932.83 for 14 disputed Attorneys' Liens and $162,335.81 for four disputed Child Support Liens.

(c) On October 3, 2018, the Court adopted Amended Rules Governing Attorneys' Liens (Document 10283).  The amendments:  (1) explain the presumptive fee cap imposed by the Court's April 5, 2018 Order and Memorandum (Documents 9863 and 9862, respectively); (2) clarify the cost information the Claims Administrator sends to Settlement Class Members and lienholders; (3) describe Lien notices the Claims Administrator sends to Settlement Class Members and lienholders; (4) elaborate on the information the Magistrate Judge requires before consideration of Withdrawals of Attorney's Lien Dispute; (5) establish provisions on how to request the admission of live testimony and additional documents at a hearing on an Attorney's Lien Dispute; and (6) provide the Magistrate Judge will resolve a Petition for Deviation filed by a party to an Attorney's Lien Dispute in the Attorney's Lien dispute process.

## IX.   AUDIT

29.   ***No Finding of Misrepresentation, Omission, or Concealment.***  As of October 15, 2018, we had determined there was no misrepresentation, omission, or concealment in

165 claims after full Audit and then closed the Audit and returned the claims to the normal review process.  Settlement Class Members also withdrew 53 claims during our investigation, which concluded their Audits.  We therefore concluded the Audit of 45 claims since Status Report No. 2.

30.   ***Reports of Adverse Finding in Audit.***   Since Status Report No. 2, we have issued to the Parties two additional Reports of Adverse Finding in Audit.  As of October 15, 2018, we had issued to the Parties 12 such Audit Reports affecting 506 Monetary Award claims, all of which were then referred to the Special Masters.  These 12 Audit Reports concerned three neurologists, 12 neuropsychologists, two law firms and two individual Settlement Class Members.  As of October 15, 2018, the Special Masters accepted our referrals on eight of the 12 Audit Reports, which concern 11 neuropsychologists, three neurologists and one law firm, rejected our referral on one Audit Report concerning a neuropsychologist and were still considering whether to accept three, which concern one law firm and two individual Settlement Class Members.

31.   ***Special Master Decisions.***   Since Status Report No. 2, and as of October 15, 2018, the Special Masters had issued findings in two additional Audit Proceedings.  On August 29, 2018, they disqualified Dr. August Dolan-Henderson, a neuropsychologist, from participating in the Program.  On September 11, 2018, they ruled on the Audit Report regarding seven neuropsychologists using a common medical record template.  The Special Masters did not disqualify these seven neuropsychologists but directed us to ensure special processing of the claims through a single AAP member and a single AAP Consultant.  Copies of the Special Masters' decisions are published on the Settlement Website (under

"Information," click "Documents" and then "Appeal Decisions by Special Master" in the "Published Appeal Decisions" section).[17]

32.    ***On-Going Audit Investigations.***   We have other Audit investigations underway that we are pushing to conclude as soon as possible.   As of October 15, 2018, we were still investigating 276 claims, of which 244 are part of one of nine group investigations of claims with similar characteristics and 32 are individual claims.   There are 138 claims in the group investigations on hold according to the Special Masters' July 13, 2018 Order on Audit investigations (Document 10136) because one or more parties in the Audit have refused to provide information we need to do the Audit.

33.    ***Order on Special Investigator.***   On September 11, 2018, the Special Masters requested that the Court appoint a Special Investigator so they could faithfully implement the Settlement Agreement and move toward the prompt payment of all valid claims (Document 10253).   The Court granted this request on September 12, 2018 (Document 10255).[18]   The Special Investigator, when appointed, will serve under the direction of the Special Masters.

## X.    OTHER FUNCTIONS

34.    ***Online Portals***.   On August 22, 2018, we added a new portal feature to make it easier for users to find and access documents.   This feature allows users to sort documents by 17 different subjects.   There is an Alert on the Settlement Website with more details about this.   We also will soon be adding links to surveys within all portals for users to give us feedback about their experiences.   We invite and encourage all Settlement Class Members

---

[17]The posted set now includes a total of five Audit decisions because after October 15, 2018, the Special Masters issued two more decisions they designated for publication, concerning diagnoses made by Drs. Robert Martinez, Robert C. Martinez and Ena Andrews.   The Special Masters disqualified Dr. Ena Andrews from participation in the Program.

[18] The NFL Parties filed a Motion on April 13, 2018, requesting that the Court appoint a Special Investigator (Document 9880), but the Court on July 18, 2018, issued a notice that it would not make such an appointment unless the Claims Administrator or Special Masters advise that one is needed (Document 10144).

and lawyers who use a portal to complete the surveys, give us their honest opinions and offer suggestions for improvement.

## XI.   CONCLUSION

**35.   *General Status.*** The number of payable Monetary Award claims exceeded $500 million as of July 30, 2018, just 16 months after we started accepting claims on March 23, 2017, and much sooner than projected.  As of October 15, 2018, we had 162,855 documents (12,517 gigabytes, or 12.22 terabytes of data, roughly equivalent to 5,280,000,000 single-spaced typewritten pages), including notices we have issued, stored on Settlement Class Members, which is 7,494 more than when we filed Status Report No. 2.  As of October 15, 2018, we had issued 34,161 notices (910 more since Status Report No. 2) of various kinds (Registration, claims, appeals, Audit, etc.) to 20,910 different persons since March 23, 2017, and developed and programmed over 70 different types of notices and forms that are used in the Program.

<div style="margin-left:40%">

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By:   __/s/ Orran L. Brown, Sr._____
        Orran L. Brown, Sr.
        Virginia State Bar No.:  25832
        BrownGreer PLC
        250 Rocketts Way
        Richmond, Virginia  23231
        Telephone:  (804) 521-7201
        Facsimile:  (804) 521-7299
        Email:  obrown@browngreer.com

</div>

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Claims Administrator Status Report No. 3 was filed electronically on this 1st day of November, 2018, and was served electronically upon Class Counsel, Counsel for the NFL Parties and all counsel of record by the United States District Court for the Eastern District of Pennsylvania's electronic filing system.

/s/ Orran L. Brown, Sr.
Orran L. Brown, Sr.
Virginia State Bar No.: 25832
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
Telephone: (804) 521-7201
Facsimile: (804) 521-7299
Email: obrown@browngreer.com