UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB MDL No. 2323 Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : : : | JURY TRIAL DEMANDED ORAL ARGUMENT REQUESTED |
| 2:12-md-02323-AB (as applicable) 18-cv-0464 (*A.H. v. NFL et al*) | : : : | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFF A.H.'S MOTION TO REMAND**

Plaintiff respectfully submits this reply in support of her Motion to Remand (D.E. 5):

**PRELIMINARY STATEMENT**

Our moving papers demonstrated that the sole cause of action is not 301-preempted. This Plaintiff is a member of the general public, alleging her own, direct, non-derivative injury. Thus her claim presents no occasion to even justify a 301 analysis. Nor do allegations of the decedent's injury either arise from nor depend upon the CBA. Indeed, Defendants' Opposition concedes that these do not expressly concern medical care. Against this unfavorable backdrop, Defendants had to hurdle *Kline* and *Trans Penn Wax* and *Stellar* and *NHL* and *Berda* and key First Circuit cases and *Caterpillar*, to prove that *this Complaint*—not others that alleged NFL duties to NFL players, but *this claim*—required that the Court construe the NFL's CBA, *with all doubts resolved in favor of remand*; they failed. Then came *Dent's* exclamation point, rejecting the NFL's core argument that its duties could not be considered absent considering club responsibilities under the CBA. Particularly in *Dent's* wake, Defendants cannot prove how *this Complaint's* sole claim requires the Court to construe the CBA. Accordingly, Plaintiff respectfully submits that the Court should issue an Order granting Plaintiff's Motion to Remand.

# ARGUMENT

I. **DEFENDANTS HAVE FAILED TO MEET THEIR JURISDICTIONAL BURDEN.**

   A. **THE PLAINTIFF'S LACK OF CBA RIGHTS VITIATES A 301 DEFENSE.**

Defendants' Opposition Brief all but ignored the fact that the sole claim at issue "belong[s] independently" to the Plaintiff, a young child (*see* Mot. at 7, 11.) This fact ought to vitiate a 301 defense, and the absence of a meaningful rebuttal should sound the skepticism alarm bells. Whereas typically, Defendants have asserted this jurisdictional argument against former NFL players who had rights under the CBA, this Plaintiff never had these contractual rights. In this instance, if the Court denies remand, it deprives this child of the only rights she has. The law and due process do not operate this way.

Defendants respond to this point with subterfuge, muddling this critical issue in with the separate straw-man of 301's application to non-signatories. *Opp. Br.*, at 15, n.7; 21, n.8. But these are quite distinct issues. Were A.H. asserting derivative claims, Defendants could at least make a colorable argument. But here that is not the case. And Defendants notably have *not* (and cannot) offered a straight-faced argument that the Plaintiff—rather obviously, never a unionized employee—could have arbitrated her rights under the NFL's CBA, so as to animate the policy-aims of 301.[1] Applying 301 to an indisputably non-arbitrable claim would constitute the ultimate caricature: the Plaintiff would be stripped of the only rights she has in the name of uniformly interpreting arbitral rights that she has never had; she would be categorically denied access to courts. 301 makes no sense here.

---

[1] Defendants recognize (Opp. Br. (D.E. 14), at 1-2) that Congress enacted Section 301 to ensure that labor disputes be resolved through uniform federal law. As the United States Supreme Court described, 301 exists to prevent "parties evad[ing] requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract." *Allis-Chalmers Corp. v. Lueck*, 105 S. Ct. 1904, 1911 (1985). Exactly the point here: A.H. has no contract claim.

Important legal authority that Defendants sprint away from reflects as much. Although this incarnation of Defendants' opposition ignores *Kline* and Third Circuit precedent, seemingly in favor of the First, Defendants still ignore the key First Circuit case: *Pruell v. Caritas Christi*, 645 F.3d 81, 83-84 (1st Cir. 2011). As *Pruell* notably holds, in LMRA-preemption analysis the

> threshold issue … **must start with a plaintiff covered by a CBA for it is that fact that establishes subject matter jurisdiction in the federal district court … non-union workers unaffected by any CBA, [render] section 301 and its case law glosses [] irrelevant, [and] state law would apply with full force** …

*Id.* Exactly the point here. A.H. of course is not a union-worker. Moreover, applicable Massachusetts law recognizes that her consortium claim constitutes a direct-injury claim; it has been interpreted as *not deriving* from the underlying claims in the way that other state laws might view a similarly-named claim. *See Mot.*, at pp. 11, 17-18. Defendants citations claiming otherwise badly miss the mark.[2] Our cases—the leading authorities addressing the independence of consortium in Massachusetts, clarify this tort's independent nature (*see Mot.*, Sec. II(B)(1))—taken with *Pruell* demonstrate how nothing justifies a 301 analysis here. The policy animating this statute has no relationship to the case at hand. And the Defendants[3] have simply ignored the First Circuit's instruction that this defense is "irrelevant."

Their pseudo-response mischaracterizes our argument as one concerning contractual privity, which it is not. *See Opp. Br.*, at 26-27. We have never disputed that the Plaintiff will need to prove tortious injury to her father, the decedent. But as we pointed out (*see Mot.*, at 15, 19), proving the underlying injury does not implicate preemption. Those underlying claims are not

---

[2] *Sena* (*see id.*, at 26) (standing only for the proposition that consortium claims require an underlying tort; it has nothing to do with 301 preemption whatsoever); *Guthrie* (*id.*) (same); *Cullen* (*id.*) (underlying 301 claim that was not a tort at all; *Laskowski* (*id.*) (arising from Pennsylvania law, which views consortium as a derivative claim.)

[3] Furthermore, not only do *none* of the removing Defendants have a contractual relationship with the Plaintiff (Plf's Mot. at 24), two of these three removing Defendants—NFL, NFLP, and NFLC—are complete strangers to the CBA.

actually being asserted here. In citing to *Eyssi* (*Mot.*, 19-20), we illustrate that consortium claims are independent, even where underlying claims are subsumed by statute. In *Eyssi*, Massachusetts' Supreme Court permitted a consortium claim to proceed where a spouse's underlying claim had been swallowed up by the workers' compensation bar.[4] Although the Opposition attempts to distinguish *Eyssi* by noting it to have concerned workers' compensation exclusivity and not "*preemption*" (*Opp. Br.*, 27, n.11), it is difficult to envision how preemption would have compelled a different result.

      **B.**    **VAULTING PAST PLAINTIFF ONTO DECEDENT DOES NOT SAVE DEFENDANTS.**

So the Defendants try vaulting past the Plaintiff and onto the decedent. This does not save them. In brazen violation of *Pruell*, they have ignored the central question to this analysis—the Plaintiff's union-member status—and shifted focus onto the decedent's injuries. Even if this approach squared with 301's policy-aims (and it does not), the dormant torts proving tortious injury concern only obligations undertaken and breached to the general public.[5] That is, none concern medical care at all (as Defendants concede), much less NFL-player medical care or NFL-player-specific-safety, or rules of play. One sees as much when reviewing them:

> CIVIL CONSPIRACY: Defendants, agreed with others to intentionally conceal information from the general public, which, if known, would have led to different decisions on starting to

---

[4] Further, our support for estoppel makes clear that *no one*—not even NFL football players—has the right (not remedy; but *right*) to arbitrate state tort claims under the CBA. See *Opp. Br.*, at 31, n.16. *Henderson* concerned a CBA arbitration between the NFLMC—the NFL's collective-bargaining agent—and a player, in which the player alleged that team conduct (through the doctor but not the doctor individually) was "so egregious as to constitute negligence under Florida law." The arbitrator held that his claim was not "a question appropriate addressed in this forum." In *Sampson*, decided shortly thereafter, a player attempted to grieve "gross[] negligence" as to the *team* (not the doctor) to which the arbitrator, citing *Sampson*, identically held that "misdiagnosis or malpractice … is not properly addressed in this forum." These decisions involved the Defendants' privies and were full and final; they create an estoppel, or at least amount to allegations that *could* lead to one. Defendants have essentially responded through the non-legal arguments that the authorities are old and that no one else has found such a thing, citing to one Court that decided a separate issue altogether.

[5] Plaintiffs believe in good-faith that evidence supports such a claim. Defendants' opposing position seems to rest on the idea that the only legal relationship they could have to football players exists through the CBA. But this is a "12(b)(6) argument"; it is not an argument that supports complete (forum) preemption.

| |
|---|
| play football, continuing to play football, and managing head-health issues from football. The decedent's CTE constitutes a foreseeable detriment incurred because of this civil conspiracy. Armed with the concealed knowledge (e.g., that two decades of football exposures starting at age five might kill or seriously injure him), he would have acted differently. |
| INTENTIONAL CONCEALMENT: Defendants intentionally concealed material information from the general public regarding football exposure. The decedent's CTE constitutes a foreseeable detriment incurred because of the Defendants' having concealed information. Armed with the concealed knowledge (e.g., that two decades of football exposures starting at age five might kill or seriously injure him), decedent would have acted differently. |
| NEGLIGENT PERFORMANCE OF VOLUNTARILY UNDERTAKING: Defendants' MTBI Committee undertook to publish on football-exposures in *all* football players, *e.g.*, non-NFL players also, while the decedent was only a member of the general public (i.e., in the time spanning from his fifth birthday to his senior year of college) and not when he was an NFL player; they negligently told the general public (including decedent's family) that **children could safely receive multiple MTBIs**. This was unreasonable, foreseeably and actually injurious, and occurred because of specific conduct directed to a broader universe than NFL players. |
| NEGLIGENT LICENSING: From her dad's first childhood football season through his penultimate football season, Defendants licensed or agreed to license Riddell helmets as the "official helmet of the NFL," knowing no helmet could mitigate against CTE. Her dad wore only Riddell helmets and developed CTE. |
| NEGLIGENT HIRING / RETENTION / SUPERVISION: Pursuant to the 1989 Riddell-NFLP licensing agreement, a business-deal between these companies and their affiliates, e.g., in no way implicating the league's relationship to either the NFLPA or to the decedent, the Defendants' retained, hired, and supervised MTBI Committee co-chair and career-defense-only-expert-witness David Viano, whom they presented as a professor (when he was not); who opined on football exposure (extending his opinions to children's football) during her dad's childhood; and who published and presented industry-supported "research" as good-faith science. Her dad developed CTE as a consequence. |
| FAILURE TO WARN: Riddell's warnings, omitted CTE. Her dad developed CTE. |

Could a high-school football player not bring each of these claims? How would any claim from this list either stem from the CBA or intertwine with it, such that the Court would need to *construe* a CBA term in analyzing the Defendants' conduct before decedent ever played under a CBA?

      **C.**     **DEFENDANTS AVOID AND SPIN THE PLAINTIFF'S COMPLAINT.**

Defendants' scattershot flagging of CBA topics purported to overlap with the facts in Plaintiff's Complaint does not satisfy their weighty jurisdictional burden. As we clarified, *Mot.* at 30, Third and First Circuit law requires that Defendants prove—doubtlessly—that this state

claim's meaning would change, depending on how a court construed specific CBA language.[6] But that's not what Defendants ever argue. Absent this showing, "… remand is mandatory,"[7] even though Defendants might still raise an affirmative LMRA defense in state court.

Instead of pointing to the complaint and CBA language altering its meaning, the Defendants have invoked the Court's subject-matter jurisdiction by abstractly tossing out contractual (CBA) terms that they claim to *shape* state duties of care for each of the *four*[8] Defendants. But they never demonstrate a relationship between these sections and what the Plaintiff actually herself plead. *See Mot.*, at 24-29. As other courts have articulated in rejecting such tactics:

> even though the Defendants may have available a [] "preemption defense" to plaintiffs' allegations on remand to state court, "[s]uch preemption … is not the type of complete preemption that would provide [a defendant] with a basis for federal question jurisdiction.[9]

Identically here, Defendants' shape-the-scope argument constitutes a conceivable, if unavailing *defense* (*see Dent v. NFL*, 902. F.3d 1109, 1118 (9th Cir. 2018) (rejecting the shape-the-scope argument because the complaint alleged the NFL directly, not its teams, had certain obligations)

---

[6] Third Circuit law: *Kline v. Security Guards, Inc.*, 386 F.3d 246, 256 (3rd Cir. 2004) (301-preemption requires dependence on a specific CBA provision's interpretation); *see also Stellar v. Allied Signal, Inc.*, 98 F.Supp. 3d 790, 802 (E.D. Pa. 2015) (claim only preempted where "clauses in the CBA [must be interpreted] required to establish the scope of the duty."); *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 (3d Cir.1992) ("… all doubts should be resolved in favor of remand.")) First Circuit law: *Brawn v. Coleman*, 167 F.Supp. 2d 145,148 (D. Mass. 2001); *Sweeney v. Westavco Co.*, 926 F.2d 29, 42 (1st Cir. 1991); *Sirois v. Business Exp., Inc.*, 906 F. Supp. 722, 725 (D.N.H. 1995).

[7] *Allen v. GlaxoSmithKline PLC*, No. 07-cv-5045, 2008 WL 2247067 at *2 (E.D.Pa. May, 30, 2008).

[8] It is important to remember that NFLP and NFLF—notwithstanding the common three letters in these acronyms—are equivalent to Riddell in the context of jurisdictional LMRA preemption. In other words, they are strangers to the collective bargaining process, without obligations or benefits.

[9] *Gulick v. Ferreira Const. Co., Inc.*, No. CIV A 06-4069 MLC, 2007 WL 602440, at *2 (D.N.J. Feb. 22, 2007) (citing *Kline*, at 262-63.

(*discussion infra*.) But merely "relat[ing] to a subject … contemplated by a CBA" does not confer jurisdiction. *Kline*, at 256.

In response, Defendants' nakedly conclude that these are no defenses because the Plaintiff "will need to establish *as part of her affirmative case* the existence and scope of the alleged duties," a feat they claim to be impossible without accounting for parties the Complaint never mentions. (Opp. Br. at 11, n.5.) Sounds great; not true. Not only did *Dent* (*infra*) more recently reject this contention, but it has long been the law that the "Plaintiff is entitled to limit the scope of [her] own Complaint."[10] A.H. elected not to sue entities obligated under the CBA and instead alleged only that the Defendants are liable, as was her right. The hypothetical liability of non-parties does not alter her affirmative case.[11]

In possible recognition of this, Defendants have mischaracterized the Complaint as an attempt to *re-brand* (*see* Opp. at 12, n.6; 30) a medical-care case as a research/sham-messaging case. Their Opposition uses the correct buzz-word, but uses it quite differently than the Supreme Court did in *Rawson*. In finding state claims to have been *re-branded*, the *Rawson* Court determined that specific CBA language had been avoided, such that the state claims constituted ones for "tortious breach[es] of contract [under the LMRA]," *e.g. id*, at 369, "to evade

---

[10] *M3 Midstream LLC v. South Jersey Port Corp.*, 1 F.Supp. 3d 289, 296-99 (D.N.J. 2014) (distinguishing "complete preemption" from "substantive preemption" in observing the foregoing.) Furthermore, as alleged in the Complaint, an estoppel altogether prevents the Defendants from advancing this defense. *See* n.4.

[11] "In an action for injury alleged to result from a neglect of duty by the defendant, it is no defense that a similar duty rested upon another person." 57A Am. Jur. 2d Negligence § 80. As then-Judge Breyer explained, a party who fails to take reasonable precautions cannot escape liability "simply because two (or three, or thirty) colleagues also failed to take proper care." *Lyon v. Ranger III*, 858 F.2d 22, 25 (1st Cir. 1988). Were it otherwise, "individual responsibility" would "diminish ... in direct proportion to" the number of actors involved "thereby encouraging individual negligence." *Id*., at 25-26. *See also Union Stock Yards Co. of Omaha v. Chicago, B. & Q.R.R. Co.*, 196 U.S. 217, 227-28 (1905) (holding train terminal solely liable for negligent inspection, even though "railroad company" was "guilty of a like neglect of duty in failing to properly inspect the car"); *Dougherty v. Hooker Chem. Corp.*, 540 F.2d 174, 178 (3d Cir. 1976) (duty to warn requires "reasonable assurance that the information will reach those whose safety depends" on it, regardless of whether "third person" also has similar duty) (internal quotations omitted).

[preemption.]" A helpful way to think about this might be a court's evaluating whether the present Complaint could be described as stating a claim for breach of the CBA. Clearly if one changed its allegations altogether (as the Opposition effectively seeks to do), this might be true; certainly the CBA does preempt some tort claims. But the question is whether it preempts *this* tort claim; it does not.

Defendants have pointed out portions of their CBA that are "alien to Plaintiffs' claim" altogether. (Mot. at 26). Not once do they identify specific CBA language underpinning "the gravamen of the action."[12] Indeed, the CBA never speaks to sham-messaging, or intentional misconduct directed at anyone playing football. The response of "you could've sued the team for negligently credentialing its medical staff" amounts to Defendants' "self-serving spin" (*see* Mot. at 12), and a focus on matters Plaintiff "could have plead but did not." As Kline instructs, Defendants cannot frame a Court's "look at the CBA in order to determine that it is silent" as its "hav[ing] 'interpreted'" it. *Kline*, at 256.

### D. DEFENDANTS DO NOT PERSUASIVELY DISTINGUISH *DENT V. NFL*.

Defendants do little to persuasively distinguish *Dent* (Opp. Br. at 29), which we advised in September (Pl's Notice of Supplemental Authority (D.E. 12)), to be on all fours with this case. Although they would lead the Court to believe that *Dent* rejects only the LMRA preemption of state-statutory duties of care, that is simply not what the case says:

> The NFL has not identified any CBA provisions that must be interpreted in order to resolve the players' fraud claims. As with the negligent misrepresentation claim, the NFL argues that assessing whether the NFL had a duty to make disclosures, and whether the players reasonably relied on the NFL's representations, would require interpreting CBA provisions requiring team doctors to make certain disclosures. But as explained above, because the players' claims are about the NFL's conduct,

---

[12] (D.E. 6 (Defs' Opp.), p. 16; D.E. 3 (Plfs' Mot. Remand), p.14 (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 397 (1987)).

>resolving these claims does not require interpreting CBA provisions regarding *team* doctors' disclosure obligations.

*Id.* at 1125 (*emphasis in original*). This addresses and rejects the Defendants' central preemption argument: that one cannot assess their conduct without considering the CBA-delegated responsibilities to the clubs and doctors. As the Ninth Circuit observed during colloquy, this is a "12(b)(6)" argument (that Plaintiff named the wrong party); it is not jurisdictional. *Id.*[13] The Opposition points almost exclusively to club duties. (Opp. Br. at 12-13 (club medical provisions); 13 (club duties to provide ambulances and medical care); 13 (club responsibilities to certify medical/training staff).) The lone exception comes through the oft-rejected (for LMRA purposes) Joint Accountability and Care Committee. This very Court, as far back as oral argument in 2013, correctly voiced doubt as to whether this committee, which the CBA expressly disavowed as creating any obligation on *any* CBA signatory's part. And many Courts have concluded this already.[14] But *Dent* makes this position exceedingly untenable. The 301 case law cited in our moving papers (pp. 9-13) is clear: the Court assesses the Defendants' duty of care (and that of the other two removing Defendants) by analyzing the Complaint's actual allegations against any CBA language.[15]

---

[13] The same is true in the analogous context of general-contractor on-the-job-injury liability. Even if one accepts the Defendants' premise (that A.H. has vaulted the liable party for a related third-party), the analysis would be no different; a subcontractor-employee construction-worker could bring a negligence suit against a general contractor. That is, a general contractor might be able to seek *indemnity* from its sub-contractor, but its own foreseeable acts creating a *tort-duty* would not disappear on account of a contractual arrangement with a sub-contractor employer. *See Kostrzewa v. Suffolk Constr. Co.*, 73 Mass. App. Ct. 377 (2008); *rev. denied* 453 Mass. 1103 (2009).

[14] *Bush v. St. Louis Reg. Convention and St. Louis Rams, LLC*, No. 16-cv-250, 2016 WL 3125869 at *3 (E.D. Mo. Jun. 3, 2016) (remanding personal injury claims because the NFL club citing Articles 50 and 39, among others "[did] not show how this is essential to their case") (*citing Williams v. NFL*, 528 F.3d 863, 876 (8th Cir. 2009). This provision plainly does not give rise to any binding duties, *Stringer v. Nat'l Football League*, 474, F.Supp. 2d 894, 905-06 (S.D. Ohio 2007) (denying preemption of identical claim as asserted here in part because Article 50 carried no preemptive weight). Numerous other courts have found the same way and none have preempted a claim in light of this section.

[15] There is of course no mention whatsoever of NFLP and NFLC in the CBA. They are strangers to the CBA. And here again, the Defendants respond with a "12(b)(6)" argument, incorrectly claiming the Plaintiff has not

E.   **DECEDENT'S NFL PLAY IS LEGALLY INCONSEQUENTIAL TO HIS CLAIMS.**

Defendants also argue (Opp. Br., at 23) that A.H. cannot avoid the fact that her father played in the NFL and under a CBA- something she makes no attempt to do. They identify purported problems with fraud[16] and negligence claims, but it is they themselves who have created these pseudo-problems, by egregiously mischaracterizing A.H.'s allegations.

1.   THE SPECIFIC ALLEGATIONS CONCERNING THE MTBI COMMITTEE.

Regarding the NFL's MTBI Committee (*see id.*), A.H. alleges that through this group, Defendants *undertook* to disseminate false science. Pointing to the Committee-members' published words (*see* Compl. pp. 8-11), the Plaintiff has alleged that Defendants, through their MTBI Committee which disbanded before decedent entered the NFL, extended suspect industry-backed research to amateur football players, *during the precise time-period of decedent's amateur football career, not during his pro career*. The analogy would be a smoker, addicted before tobacco companies placed warning labels on their packs, incurring a detriment. That is, the NFL (and NFLP, and NFLC) are not liable to the decedent because of a duty created through decedent's NFL-player relationship with them; they are allegedly liable for an undertaking that pre-dated his arrival into the NFL. Once the decedent made it to the NFL, he received the same injurious exposures that he did previously. But the breach began when he first started playing. Defendants ignore this realty, never explaining how the CBA-created relationship between the NFL and its NFL players changes anything. Nor do they ever link him to NFLP, NFLC, or Riddell. Defendants' liability to the decedent for the entirety of his football-exposures stems from their voluntary undertaking of conduct expressly directed at amateurs including the decedent.

---

[16] Intentional torts cannot possibly be LMRA-preempted. *See Mot.*, at 20 (*citing Purvis v. Hamwi*, 828 F.Supp. 1479, 1483 (D. Colo. 1993) ("*intentional torts require no traditional finding of duty … [t]he duty, if so named, is obviously to refrain from intentional harm to others.*")

Defendants respond by accusing A.H. of "try[ing] to downplay" her father's NFL career. They point to language in *Duerson*, a District Court's Order that addresses a complaint with overlapping but importantly distinct, if not opposite allegations. In *Duerson*, the Court evaluated legal claims concerning the NFL's express duties to NFL players, including—for example—allegedly NFL-driven obligations regarding return-to-play standards, rules of place, and medical care. It rejected the *Duerson* Plaintiffs' attempt to segment the NFL's CBA-gap-year (tort) liability from the NFL's potentially contractual, CBA-driven liability during CBA-periods. The Court observed that drawing these artificial lines would be "exceedingly implausible." *See id.*, p. 24. But that is not at all the point here.

A.H. makes the polar opposite claim from the *Duerson* and *Maxwell* plaintiffs. A.H. makes no attempt to parse out gap-year liability to save a claim that the NFL owed medical-care duties to the decedent. Her Complaint alleges that these Defendants intended and undertook to influence a (then) child's decision-making on *starting to play* football, on *continuing to play* football. This could *only* be an obligation owed (and breached) to the general public, *e.g. Rawson* (Opp. Br., at 20) because the decedent was (at the time) *only* a member of the general public. It flips Judge Holderman's concerns on their head.[17] While decedent eventually also played NFL football and suffered further exposures in the NFL, this mere factual overlap and not an interpretive dispute, *e.g. Livadas v. Bradshaw*, 512 U.S. 107, 124-26 (1994). That is, it does not alter the duties the Plaintiff alleges to have been undertaken back in 1994 through his death.

2.  THE ACTUAL ALLEGATIONS REGARDING MEDICAL CARE.

More broadly, A.H.'s Complaint simply never treads into the subject of decedent's medical care at all. The Defendants have no choice but to concede this vital point. (*See Mot.* pp. 18-29)

---

[17] No. 12-c-2513, 2012 WL 1658353 at *1-2 (N.D. Ill. May 11, 2012).

(acknowledging that A.H. "omit[s] explicit reference to medical care …" (*Opp. Br.* at 30; *see also* p. 12, n.6)). Rather, she alleges that "football itself … caused" (*see Mot*. at 22) the decedent's death, through Defendants' fraudulent and negligent promotion of their game and related products, and attempts to negate concerns about its long-term impacts through junk biomechanics and junk science. Such a claim is not medical. Indeed, A.H. has sued no one responsible for the decedent's medical care. Nor were the alleged actors (on behalf of the Defendants) necessarily providing medical opinions. Indeed, not all of them were even medical professionals.[18] The Opposition, in this way, never explains how its crown-jewel LMRA defense—Article 39 of the CBA concerning a Players' Right to Medical Care—could ever relate to these allegations.

    A.H. has chosen not to pursue these claims altogether. She is no different than the thousands of medical-device-plaintiffs choosing to pursue product-maker and not medical-malpractice claims. Defendants point to a purported, "nonsensical line" that they claim A.H. draws artificially between acute-medical-care-related liability and messaging-related liability from non-doctors who never had a role in treating her father. *See id.* But she has drawn no such *line* at all; the concepts differ altogether and she has this choice.[19] Her Complaint alleges that conduct having nothing to do with medical care, unchanged throughout decedent's lifetime of football exposures, led to the decedent's brain damage.[20] Thus, the Court need not construe the CBA.

---

[18] Defendants are alleged to have conducted the MTBI Committee's operations in a negligent and fraudulent fashion. This committee not only disclaimed its power to influence team-medical-staff decision-making, its personnel included many who were not even medical professionals- notably an NFL referee, and a biomechanics-of-injury expert who did not even graduate from college.

[19] *See Mot.* at 22 (*citing Tynes*; *Jurevicius*.) In *Tynes*, which concerned an alleged outbreak of MRSA at a club facility, we opted against bringing medical negligence claims against the club or its physicians. The plaintiff instead sued the club for alleged negligence in failing to keep the medical treatment area sufficiently clean, and for allegedly negligently misrepresenting the infection hazard. Moreover, leaving aside that the alleged breaches are not inherently medical in the first place, *Dent* instructs that nothing in the CBA obligates these *named Defendants* to provide medical care (to either the Plaintiff or to the decedent.) Those CBA obligations belong to the individual clubs.

[20] D.E. 1-A, at 8-9 (briefly summarizing the conduct directed at the "world-wide football community" in a number of ways expressly alleged to have taken place outside of 29 U.S.C. § 185(a).)

F.  **DEFENDANTS DO NOT SUPPORT THEIR CONTENTIONS THAT PLAINTIFF MISSTATES THE LEGAL STANDARD FOR PREEMPTION.**

In a puzzling section of their Opposition, Defendants claim that the Plaintiff misstates the legal standard for LMRA preemption, which they characterize as *arising from* or *being inextricably intertwined with* the CBA, such that the Court would need to construe the CBA. *Opp. Br.*, at 28. We believe we also stated this. Exactly. *See Mot.* at 15-18. Curiously, this constitutes Defendants' reply in opposition to our statement (which they otherwise do not contest) that "[none of the CBA provisions cited by Defendants' Notice of Removal] suggest the existence of legal duties raised by *the Complaint* and within the CBA, or raised *by the Complaint* and implied by the CBA." *Opp. Br.* at 28 (citing Mot. at 25). We fail to understand a distinction between the above standard (arising from or being intertwined with) and our point that, as applied here, this requires a Court to compare those specific CBA portions to our Complaint. A Complaint without such a nexus would seem to be one neither arising from nor inextricably intertwined with a CBA.

G.  **DEFENDANTS DO NOT DISTINGUISH *GREEN V. ARIZONA CARDINALS* NOR *OLIVER V. RIDDELL*.**

Along these same lines, Defendants make confusing statements regarding the *Green* and *Oliver* cases that we have cited. We cited *Green v. Arizona Cardinals Football Club* in seeking remand (at 22) to provide an NFL-specific example of the principle that Defendants' shape-the-scope argument confuses principles of indemnity with immunity; it illustrates the point that contractual delegation between third parties (e.g., the NFL and its clubs through the CBA), while possibly allowing *indemnity*, does not abrogate tort-*liability*. 21 F.Supp. 3d 1020, 1030 (E.D. Mo. 2014). *Dent* (*discussion supra*) of course makes a related point regarding the allegations.

As for *Oliver*, we submit that after *Dent*, this may be the single-most relevant legal authority to guide the Court. Indeed, undersigned counsel drafted that complaint, hence its nearly

identical allegations to this one; it alleges the "NFL Concussion case" against Riddell, as alleged civil co-conspirators with the NFL, NFLP, and NFLC. Defendants correctly point out that Riddell had been sued alone in *Oliver* and point to language affirming this non-controversial point. *Opp. Br.* at 28 (citing *Oliver*, at *3). But they incorrectly claim that here "the precise question" is the one they claim the *Oliver* court avoided, i.e., whether "the NFL lived up to its standard of care under its CBAs" (*id.*) This is incorrect. As in *Oliver*, Plaintiff has alleged a conspiracy and concealment-fraud by Defendants. In evaluating this very issue, Judge Guzman held that one "would not even need to glance at the CBAs" to determine the scope of an identically alleged fraud, alleged as to civil co-conspirators (who would stand in each other's shoes anyway, for the purposes of such a claim.) (*Mot.*, at 20).

## II.     THE COURT CANNOT RELY ON THE LATER-ADDED EXTRINSIC EVIDENCE.

Defendants made the strategic choice not to include their CBA within the removal record and must live with that choice. They speciously (*Opp.*, p. 5-6, n. 2) point out that Courts permit post-removal affidavits and allow removing parties time to correct for removal-notice defects. *But Plaintiff does not argue that the Defendants removed in procedurally deficient fashion*. Instead, Plaintiff argues that the Defendants have *substantively* failed. Without recapitulating the entirety of Defendants' burden here (*Mot.*, pp. 13-17), it is clear that the Court considers the record at the time of removal, but not thereafter. The Defendants might desire to supplement the record for other purposes, but the Court does not consider later-added information. And at the time of removal, Defendants did not attach their CBA. They made a choice to rely solely on attorney-argument.

## III.    ONLY FEDERAL SUBJECT-MATTER JURISDICTION PERMITS REMOVAL.

Defendants (including Riddell, which did not remove but purported to "join") tellingly plead for the Court to retain this case under any means possible, arguing that "as long as at least

one federal claim is present, this Court has supplemental jurisdiction." *Opp. Br.*, at 9 (relying on non-binding authority.) But here only one claim exists. If the Court found some of this one claim's factual support (e.g. any dormant tort) implicated the CBA, it could indicate as much while still remanding the remainder of the case. *See, e.g. Jurevicius v. Cleveland Browns Football Co., LLC*, No. 09-cv-1803, 2010 WL 8461220 at *12-14 (N.D. Ohio Mar. 31, 2010). But it would not retain jurisdiction unless it preempted the consortium claim itself.

Along these lines, Defendants also cannot create jurisdiction through their conclusion— one they have not supported factually at all—that A.H. is a class-member. This could constitute an affirmative defense, but it is not a jurisdictional argument for the purpose of removal. *See* D.E. 10307 (Opposition to Defendants' Motion to Dismiss Complaints Filed By Class Members) at 1-4 (filed 10/16/18). Whichever court has jurisdiction will need to develop and adjudicate any defenses at the proper stage in this litigation. One cannot dispatch with the law on account of pragmatism, as Defendants' recently filed reply begs the Court to do. *See* D.E. 10331 (Defendants' Reply in Support of Motion to Dismiss Complaints Filed By Class Members) at 6-7. And particularly before a proper factual record has been developed.

### IV. DEFENDANTS DO NOT DESERVE COSTS; PLAINTIFF DOES DESERVE COSTS AND FEES.

Defendants NFLP and NFLC have removed jointly with Defendant NFL, as opposed to simply consenting to Defendant NFL's removal. But these two Defendants had zero objectively reasonable basis to do so. There was no record (*see* Arg. Sec. II, *supra*) evidence whatsoever giving rise to jurisdiction. The Plaintiff incurred a massive delay and severe prejudice to her case each day as a result of the vexatious removal; witnesses continue to age; and evidence continues to spoil. It is in light of this fact that we make this respectful request, and believe the authorities we

cited support as much. Section 301 is not a talisman that can be brandished simply for the purposes of delay. And that has been its only function in this litigation; it provides no defense.

The Defendants also point in rebuttal to Rule 41(d) of the Federal Rules of Civil Procedure, through which they claim their own entitlement to *costs* (but not fees) relating only to the previously filed action. That action was dismissed within three weeks' of its filing, before Defendants had to do anything whatsoever. It does not warrant cost-shifting, which the Court is permitted to do under the rules, but not required to do. To the extent the Court were inclined to consider this, we respectfully ask that it defer, pending a hearing on the subject.

## **CONCLUSION**

WHEREFORE based on the foregoing and those reasons set forth in Plaintiff's moving papers, Plaintiff respectfully submits that the Court should remand, and grant any other relief deemed just or necessary.

Respectfully submitted,

Dated: November 15, 2018

*/s/ Bradford Rothwell Sohn*
Admitted *Pro Hac Vice*
The Brad Sohn Law Firm, PLLC
2600 S. Douglas Road, Suite 1007
Coral Gables, FL 33134
786.708.9750 Office
305.397.0650 Facsimile

THE BAEZ LAW FIRM
23 South Osceola Ave.
Orlando, FL 32801
407-705-2626
jose@baezlawfirm.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 15th day of November, 2018 that true and accurate copies of the foregoing Notice was served via ECF and electronic mail to all counsel of record.

    /s/ Bradford R. Sohn
Bradford R. Sohn, Esq.