## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | **Hon. Anita B. Brody** |

### NOTICE

On Thursday, January 10, 2019 at 10:15 a.m., the Court is holding oral argument regarding the NFL Parties' Appeal of the Special Master's Ruling Regarding the Interpretation of the "Generally Consistent" Standard. (See attached.) The Court will hear argument from counsel for the NFL Parties and Co-Lead Class Counsel Christopher Seeger.

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to:

O:\ABB 2018\L-Z\NFL Oral Argument Notice_generally consistent appeal.docx

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION : | No. 2:12-md-02323-AB |
| : | MDL No. 2323 |
| : | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: NFL PARTIES' OBJECTIONS TO DIAGNOSES MADE OUTSIDE THE BASELINE ASSESSMENT PROGRAM : | |

### INTRODUCTION

This matter requires the Special Master to determine whether the NFL Parties may object to the Special Master's determination that Qualifying Diagnoses made outside the Baseline Assessment Program ("BAP") were supported by medical evidence "generally consistent" with the criteria set forth in the Settlement Agreement. For the reasons stated below, the Special Master holds that the rulings on these appeals were not predicated on conclusions of law, and thus the NFL Parties may not object.

### STANDARD OF REVIEW

The Special Masters must decide an appeal of a Monetary Award based on a showing by the appellant of clear and convincing evidence that the determination of the Claims Administrator was incorrect. ("Order Appointing Special Masters," filed July 13, 2017, at 5.) "Clear and convincing evidence" is a recognized intermediate standard of proof—more demanding than preponderance of the evidence, but less demanding than proof beyond a reasonable doubt. *In re Fosamax Alendronate Sodium Prods Liab. Litig.*, 852 F.3d 268, 285-86 (3d Cir. 2017) ("Black's Law Dictionary defines clear and convincing evidence as 'evidence indicating that the thing to be proved is highly probable or reasonably certain.'").

The NFL Parties object to denial of its appeals of six Monetary Awards based on the sufficiency of the medical evidence supporting the claimants' Qualifying Diagnoses, all of which were made outside of the BAP. Diagnoses made outside of the BAP must be based on evidence "generally consistent" with the diagnostic criteria set forth for Qualifying Diagnoses made within the BAP (Settlement Agreement at Ex. A, "Injury Definitions".) The NFL Parties argue that these six claims were not supported by evidence generally consistent with the diagnostic criteria, and thus the Monetary Awards should have been denied.

## DISCUSSION

The parties to the settlement agreed and the Court directed that the "factual determinations of the Master(s) on…appeal will be final and binding." ("Order Appointing Special Masters," at 5.) Pursuant to Fed. R. Civ. P. 53(f)(4), the Court must review *de novo* any objection to the Special Master's conclusions of law. (*Id.*) The parties also agreed that the "Special Masters will identify in each decision any issue the Special Master determines to be a conclusion of law to which a party to the appeal may object and have it reviewed by the court." ("Rules Governing Appeals of Claim Determinations," Rule 31.) The NFL Parties did not object to this Rule.

In all six of the appeals at issue, the Special Master did not identify a conclusion of law. Each of the Special Master's determinations clarified that the Special Master's decision is a factual determination and is final and binding. The Special Master found that each of these appeals involved conclusions of fact, because the appeals required the Special Master to apply the undisputed factual circumstances of each case to a legal standard – a "generally consistent" – that was clearly established by the parties to the Settlement Agreement.[1] According to FAQ 95 on the Settlement Website, a Qualifying Diagnosis is supported by evidence that is "generally consistent" with the relevant diagnostic criteria if the evidence "ha[s] more elements or characteristics in common" with the diagnostic criteria than "elements or characteristics that differ" from the criteria.[2]

Based on this definition, when an appeal of a Monetary Award turns on the sufficiency of the medical support for the Claimant's Qualifying Diagnosis, the appellant must prove clearly and convincingly that there are more differences than commonalities between the medical evidence supporting the Qualifying Diagnosis and the Settlement Agreement's diagnostic criteria. The Special Master denied the six appeals at issue because the NFL Parties failed to meet this standard of proof in light of the factual circumstances on the record in each case.

---

[1] *See* Randall H. Warner, *All Mixed Up about Mixed Questions*, 7 J. APP. PRAC. & PROCESS 101, 113-14 (2005) ("Cases often equate law interpretation with the application of fact to law, and therefore conclude that law application is a question of law. This is sometimes true, but not always…[L]aw application may just involve taking an established, undisputed legal standard and deciding whether the undisputed facts of this case fall within the standard. This…exercise does not involve law interpretation.") Warner notes that clarifying the meaning of a legal standard involves a question of law, while applying the standard to the facts of a case is for the trier of fact. *See id.* at 133 (quoting *Harris v. Parker College of Chiropractic*, 286 F.3d 790, 794 (5th Cir. 2002) ("Challenges to a district court's finding of hostile work environment and constructive discharge are typically treated as factual questions.").

[2] *See Settlement Website FAQs*, "FAQ 95: What does 'generally consistent' mean?" (available at https://www.nflconcussionsettlement.com/FAQ.aspx). FAQ 95 also states that "[t]he common elements or characteristics [between the medical evidence and the diagnostic criteria] must predominate over the uncommon ones." The primary dictionary definition of "predominate" is "to hold advantage in numbers or quantity." *Predominate*, Merriam-WEBSTER.COM (2018), available at https://www.merriam-webster.com/dictionary/predominate. FAQ 95 thus makes explicit that the "generally consistent" standard requires that the commonalities between the diagnostic criteria and the evidence supporting the Qualifying Diagnosis outnumber the differences.

Under Fed. R. Civ. P. 53(f)(4), the Special Master must defer to the Court's interpretation of the "generally consistent" standard. However, based on the definition of "generally consistent" set forth in FAQ 95, the Special Master concludes that the six appeals at issue fail to establish by clear and convincing evidence that there are more differences than commonalities between the medical support for the Qualifying Diagnoses and the relevant diagnostic criteria.

Therefore, based on the Special Master's conclusion that the definition of "generally consistent" in FAQ 95 is the correct standard, the Special Master holds that the rulings on the six appeals by the NFL Parties did not involve conclusions of law, but evaluations of fact against a legal standard that was clearly defined by the parties. The NFL Parties have thus exhausted the review process afforded by the Settlement Agreement with respect to these claims.

## CONCLUSION

For the reasons stated above, the NFL Parties may not object to the determinations of the Special Master.

Date: October 18, 2018

Wendell E. Pritchett, Special Master

### Appeal of the NFL Parties of the Special Master's Ruling
### Regarding the Interpretation of the "Generally Consistent" Standard

The National Football League and NFL Properties LLC (the "NFL Parties") respectfully appeal the Special Master's October 18, 2018 decision (the "Special Master Generally Consistent Ruling") denying the NFL Parties' objections to certain Special Master appeal determinations that turned on an interpretation of the Settlement Agreement's requirement that Qualifying Diagnoses of Level 1.5 and 2 Neurocognitive Impairment made outside the Baseline Assessment Program (the "BAP") be based on evaluation and evidence "generally consistent" with the diagnostic criteria set forth in the Agreement for diagnoses rendered in the BAP.

Specifically, the NFL Parties submit that the Special Master wrongly denied the NFL Parties' appeals of seven claims based on an incorrect interpretation and application of the "generally consistent" standard. Under the Special Master's construction, a retired player who takes the *identical* neuropsychological testing battery outlined in the BAP, and whose scores incontestably would *not* permit a Qualifying Diagnosis in the BAP, may nonetheless receive a Qualifying Diagnosis pursuant to relaxed diagnostic criteria if the player *pays* to see a Qualified MAF Physician as opposed to seeing the exact same physician for *free* in the BAP. The idea that a retired player can *buy* relaxed diagnostic criteria for the exact same neuropsychological testing—indeed, from the exact same physician—is wholly inequitable and anathema to the design of the Settlement Program. The "generally consistent" standard cannot reasonably be construed to permit such a result. Accordingly, the NFL Parties respectfully request that the Court overturn the

Special Master's decisions and deny the claims at issue.[1]  In addition, and pursuant to this Court's continuing jurisdiction to oversee the implementation of the Settlement Agreement, the NFL Parties respectfully request that the Court construe the "generally consistent" standard for Level 1.5 and 2 Neurocognitive Impairment diagnosed outside of the BAP to preclude a Qualifying Diagnosis where the BAP test battery is applied and the results fail to satisfy the BAP diagnostic criteria.

## PRELIMINARY STATEMENT

The bedrock principle of the Settlement Agreement is to pay all claims that meet the diagnostic impairment criteria set forth in its heavily negotiated Injury Definitions, while denying those claims that do not meet these thresholds as of the date of diagnosis. Under the express design of the Settlement Program, not all levels of cognitive and functional impairment—such as mild cognitive impairment—entitle a retired player to monetary compensation.   Instead, the Settlement provides a 65-year term for retired players to file (and re-file) claims should their cognitive condition further decline and satisfy the impairment criteria set forth in the Injury Definitions.  The Settlement is not a "now or never" exercise with respect to diagnosis and compensation.[2]

The Injury Definitions for Level 1.5 and 2 Neurocognitive Impairment were negotiated at length by the Parties in consultation with leading medical experts.  These Injury Definitions prescribe specific neuropsychological testing (the "BAP testing

---

[1]  Specifically, the NFL Parties appeal with respect to the claims of SPIDs 100000070, 100004758, 100005741, 100007941, 100009422, 100013190 and 950000215.

[2]  Indeed, not only can retired players who do not meet the impairment criteria for any Injury Definition re-file their claims should their condition further decline, but retired players who satisfy the impairment criteria for a particular Injury Definition (and who are paid Monetary Awards consistent with that diagnosis) can also re-file claims if their condition declines further and satisfies the impairment criteria of a more severe Injury Definition that would provide additional compensation as of that date.

battery") and provide impairment criteria, including precise T-score cutoffs as well as distribution requirements across five cognitive domains. These criteria—and the precise T-score cutoffs and distribution requirements—were central issues in the Court's approval of the Settlement Agreement. In response to objectors' arguments that this line-drawing established an "unreasonably high bar" for a Qualifying Diagnosis, Co-Lead Class Counsel responded that these specific criteria provided a reliable, objective testing regime that was both reasonable and supported by relevant medical science.[3] This Court agreed in approving the Settlement, holding that the criteria were fair, reasonable and adequate, and emphasizing that players with lesser impairment—who do not satisfy the particular cutoffs and distribution requirements for compensation—may experience further decline over time such that their condition later becomes compensable under the terms of the Settlement Agreement.[4]

The NFL Parties' consent to an uncapped Monetary Award Fund was predicated on the fundamental principle that the Parties had bargained for a clear demarcation of the boundary between compensable and non-compensable levels of impairment, as set forth in the Settlement Agreement's BAP impairment criteria, including by means of the

---

[3] *See* Mem. of Law in Supp. of Class Pls.' Mot. for an Order Granting Final Approval of the Settlement and Certification of Class and Subclasses 85–86, ECF. No. 6423-1 (arguing that the cutoffs were "based on well-established methods and reasonable criteria," touting the reliability of the "objective" test results, citing to expert testimony that the criteria are "reasonable and scientifically well-founded" and stating "when the BAP test battery (and related thresholds) for neurocognitive impairments has been applied in testing with retired players, it performs as intended. . . . a patient who will satisfy Level 1.5 Injury Definitions by testing is most likely to be in the early stages of dementia" (internal quotation marks omitted)).

[4] *See In re Nat'l Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 403–04, 412 (E.D. Pa. 2015), *amended* No. 2:12-MD-02323-AB, 2015 WL 12827803 (May 8, 2015), *and aff'd* 821 F.3d 410 (3d Cir. 2016), *as amended* (May 2, 2016) (ruling that objectors were "misguided" because "[b]oth the cognitive and functional cutoffs are drawn directly from well-established sources," and concluding that "[n]umerous empirical studies show that these [BAP] tests are effective at identifying impairment, especially in persons who have sustained brain injury" and that "[it] would be very difficult for any significant neurological abnormalities to escape an examination of this breadth").

3

cutoffs and distribution requirements identified with respect to neuropsychological testing. Not a single objector nor Co-Lead Class Counsel argued that the criteria for the BAP testing battery could be evaded—and more relaxed criteria substituted—if the retired player simply paid for a diagnosis by a Qualified MAF Physician rather than obtaining a free diagnosis in the BAP. Co-Lead Class Counsel, however, have now changed their tune in argument to the Special Masters.

The Special Master's interpretation of the "generally consistent" standard upends the bargained-for and judicially-approved neuropsychological testing regime. Specifically, the Special Master's interpretation permits Qualified MAF Physicians to render Qualifying Diagnoses of Level 1.5 and 2 Neurocognitive Impairment to claimants on the basis of neuropsychological tests *identical* to those in the BAP testing battery even where, as with each of the claims here, the testing results are *facially insufficient* to satisfy the BAP diagnostic criteria. The Injury Definition's "generally consistent" standard cannot reasonably be construed to support such blatant inconsistency. Indeed, the purpose of requiring that Qualifying Diagnoses rendered outside the BAP be "based on evaluation and evidence generally consistent with the diagnostic criteria set forth in" the BAP is to ensure that Settlement Class Members—both inside and outside the BAP, and both before and after the Effective Date—are placed on equal footing when evaluating their medical conditions for possible compensation. Permitting claimants who pay for a diagnosis to receive compensation they plainly would be denied if the exact same testing was performed for free by the exact same doctor in the BAP threatens the integrity of the Settlement Program and gives players examined outside the BAP an unfair and arbitrary advantage over those who participate in the BAP.

Surprisingly, the Special Master Generally Consistent Ruling does not discuss, or even mention, the inequitable results identified above, even though the NFL Parties made the very same arguments both in the appeals at issue and in the objections to the Special Master's determinations concerning those appeals. In particular, the Special Master does not address the NFL Parties' argument that his construction of the "generally consistent" standard violates the language and intent of the Settlement Agreement, as well as basic principles of fairness by privileging retired players who pay for a diagnosis over those that participate in the free BAP. Instead, the Special Master ruled on purely formalistic, erroneous legal grounds that the NFL Parties are precluded from objecting to the Special Master's appeal determinations because, in his view, those determinations turned on factual findings and not on conclusions of law.

Contrary to the Special Master's contention, however, the NFL Parties are entitled to object to the Special Master's construction of the "generally consistent" standard, and this Court has the unquestionable authority to rule on the issue. For the reasons set forth below, the Special Master's interpretation is manifestly incorrect—testing results that are *patently inconsistent* with an Injury Definition under the BAP cannot be "generally consistent" with that Injury Definition for purposes of a diagnosis paid for outside of the BAP. Such a result distorts the essential bargain the Parties agreed to in the Settlement Agreement and would create perverse incentives for retired players, lawyers and Qualified MAF Physicians, while severely prejudicing those retired players that participate in the BAP. Accordingly, the NFL Parties request that the Court deny the seven claims at issue, and clarify that the "generally consistent" standard does not permit

5

Qualifying Diagnoses of Level 1.5 or 2 Neurocognitive Impairment based on testing scores that preclude a Qualifying Diagnosis under the BAP.

## BACKGROUND

### A.   The Seven Claims on Appeal

Each of the seven claims at issue involves a diagnosis by a neurologist who is both a Qualified MAF Physician ("MAF Physician") and a Qualified BAP Provider ("BAP Provider"). In each case, the retired player paid to see the physician in his MAF capacity, rather than seeing the same physician for free in the BAP. In each case, the retired player was administered the precise BAP neuropsychological testing battery. Based on that testing, there is no dispute that none of the retired players would be entitled to the Qualified Diagnosis he received from the MAF Physician had he been evaluated by that same physician in the BAP. However, in each case, the MAF Physician overlooked the claimant's failure to meet the necessary T-score cutoffs in the required cognitive domains and gave a Qualifying Diagnosis of either Level 1.5 or 2 Neurocognitive Impairment that incontrovertibly could not have been obtained in the BAP. Because a MAF Physician provided the Qualifying Diagnosis, the Claims Administrator did not consult with an Appeals Advisory Panel Member or Consultant ("AAP" or "AAPC") or otherwise assess either the medical accuracy of the diagnosis or its conformity with the Injury Definition requirements of the Settlement Agreement before issuing a claim determination based on the purported Qualifying Diagnosis.[5]

---

[5]   As explained in the separate appeal filed by the NFL Parties on October 29, 2018 regarding the Special Master's use of the AAP on claim appeals (the "Use of AAP Appeal"), we understand that, given the ongoing concerns about the diagnostic work of numerous MAF Physicians, the Special Masters and Claims Administrator are discussing ways that the Claims Administrator, with the assistance of the AAPs and AAPCs, might provide more quality control and oversight of the diagnostic work of the MAF Physicians and better educate them on the Settlement Agreement's Injury Definitions.

The NFL Parties appealed each of these claim determinations on the ground that the neuropsychological test scores received on the BAP testing battery were patently insufficient for the Qualifying Diagnosis under the Settlement Agreement (among other grounds for appeal, which differed by claimant). The Special Master denied each appeal (without consultation with the AAP/AAPC), finding in each case that that the NFL Parties had failed to show, by clear and convincing evidence, that the Qualifying Diagnosis was not "generally consistent" with the diagnostic criteria for Level 1.5 or 2 Neurocognitive Impairment (as applicable) under the Settlement Agreement. The Special Master characterized each of these appeal decisions as a "factual determination" and therefore "final and binding."

The NFL Parties filed timely objections to these appeal determinations. In those objections (initially intended for this Court), the NFL Parties argued that the Special Master's interpretation of "generally consistent"—whereby retired players who saw the *same* neurologist, took the *same* BAP testing battery and obtained the *same* scores, could nonetheless achieve diametrically opposite results, with BAP participants receiving no compensation while retired players who paid to see the doctor in his MAF capacity received compensation—violated principles of fundamental fairness, created perverse incentives, and impermissibly diluted the bargained-for criteria for Qualifying Diagnoses. The NFL Parties argued that the Special Master's appeal decisions reflected legal determinations construing the "generally consistent" standard and thus were subject to review by this Court. The NFL Parties also argued that this Court unquestionably had the right to hear these objections and determine the meaning of "generally consistent" because the Court had expressly retained "continuing and exclusive jurisdiction to

7

interpret, implement, administer and enforce the Settlement Agreement" in accordance with its terms. (Am. Final Order and J. § 17, ECF No. 6534; *see also* Settlement Agreement § 20.1(n).)

The Special Masters (in consultation with the Court) determined that the NFL Parties' objections would first be ruled on by the Special Master, who would render a written opinion addressing the "generally consistent" question. Claimants and Co-Lead Class Counsel filed responsive briefs with respect to these objections and the Special Master issued the Special Master Generally Consisting Ruling on October 18, 2018.

### B.   The Special Master Generally Consistent Ruling

The Special Master Generally Consistent Ruling is based solely on interpretation of applicable procedure while avoiding entirely any discussion of the substance of these claim appeals and the egregiously unfair results they produced. The Ruling holds that "the NFL Parties may not object" to the Special Master's appeal decisions on the "generally consistent" question because those determinations purportedly "were not predicated on conclusions of law." (Ruling at 1.) In so ruling, the Special Master emphasizes that the Rules Governing Appeals of Claim Determinations instruct the Special Master to "identify in each decision any issue the Special Master determines to be a conclusion of law to which a party to the appeal may object and have it reviewed by the court" (*id.* at 2 (quoting Rule 31)), and noted that his decisions on these appeals "did not identify a conclusion of law" (*id.*). The Special Master contended that the appeals "involved conclusions of fact" because the appeals required him to apply a legal standard—the "generally consistent" standard—to "the undisputed factual circumstances of each case." (*Id.*) While the Special Master acknowledged that he "must defer to the

8

Court's interpretation of the 'generally consistent' standard," he based his decision on the purported "definition of 'generally consistent' in FAQ 95" posted on the Settlement Website at the Special Masters' direction and found that his rulings on the appeals at issue "did not involve conclusions of law, but evaluations of fact against a legal standard that was clearly defined by the parties." (*Id.* at 2–3.)

The Special Master Generally Consistent Ruling does not discuss, or address in any way, the NFL Parties' concerns with fundamental fairness, perverse incentives and the widespread dilution of the bargained-for criteria for Qualifying Diagnoses, if the Special Master's interpretation of "generally consistent" is accepted.

## ARGUMENT

### I.    This Court Incontestably Has the Power to Interpret the "Generally Consistent" Standard and Provide Needed Guidance with Respect to Its Application

The Special Master Generally Consistent Ruling not only sidesteps all of the substantive issues raised in the NFL Parties' objections to the Special Master's erroneous interpretation of the "generally consistent" standard, it also purports to insulate the Special Master's interpretation from *any* review by this Court.   Indeed, the ruling attempts to create a remarkable Catch-22:  while acknowledging that the Special Master must defer to this Court's interpretation of the "generally consistent" standard, the Special Master holds that his interpretation and application of the standard to any particular set of facts constitutes a factual determination unreviewable by this Court.

In fact, there is no Catch-22 and this Court can rule on the appropriate interpretation and application of the "generally consistent" standard both because the question is, in truth, one of law, and because this Court retains plenary and exclusive

jurisdiction with respect to the interpretation and implementation of the Settlement Agreement.

### A.   The Special Master's Characterization of His Conclusions as Factual Findings Does Not Determine Their True Character

When a Court's review of a Special Master's determinations differs depending on whether they involve findings of fact or law, the label a Special Master applies is not determinative.   A party is entitled to challenge the Special Master's characterization of the findings, and the Court must determine their true character.   *See Minnesota Mining and Mfg. Co.* v. *Johnson & Johnson Orthopaedics, Inc.*, No. 4-86-359, 1991 WL 340579, at *1–2 (D. Minn. July 26, 1991) ("It is not the label [the special master] may have used which is conclusive as to which standard of review to apply, but the character of the finding"); *see also Mentor Ins. Co. (U.K.)* v. *Brannkasse*, 996 F.2d 506, 513 (2d Cir. 1993) (although special master's findings were "framed as 'Conclusions of Law,' such determinations are findings of fact which may not be set aside unless clearly erroneous"); *Poyner* v. *Lear Siegler, Inc.*, 542 F.2d 955, 959 (6th Cir. 1976) ("[T]he fact that a trial court labels determinations as 'findings' does not make them so if they are in reality conclusions of law."); *Tri-Tron Int'l* v. *Velto*, 525 F.2d 432, 435 (9th Cir. 1975) ("We look at a finding or conclusion in its true light, regardless of the label that the district court may have placed on it."); 9 Moore's Federal Practice - Civil § 52.32[6] (2018) ("If a court concludes that the trial court mislabeled a conclusion of law as a finding of fact, it may disregard the label and review the issue de novo.").   Accordingly, it is for this Court—not the Special Master—to review the NFL Parties' objection to these appeal decisions and determine whether they present legal or factual issues.

While the Special Master notes that the Rules Governing Appeals of Claim Determinations provide that the Special Master "will identify in each decision any issue the Special Master determines to be a conclusion of law to which a party to the appeal may object" (Ruling at 2 (citing Rule 31)), any suggestion that this provision reflects the NFL Parties' agreement to accept the Special Master's characterization as final and binding is unsupportable. Nowhere in the Rules do the Parties agree to be bound by such characterization or to abandon any right to review by this Court where a Party believes the Special Master has mischaracterized an appealable legal conclusion as a factual finding. The Parties' agreement that the Special Master would state his view concerning which of his findings constituted conclusions of law (and were thus appealable) was simply a matter of convenience to the Parties and consistent with the typical practice in reports and decisions issued by a Special Master. As the authorities cited above show, Special Masters do not have the final say in characterizing the nature of their findings and thereby securing more deferential review or—as here—insulating their decisions from any review at all.

**B.      The Interpretation of the Settlement Agreement's "Generally Consistent" Standard Is a Question of Law**

The Settlement Agreement is a contract subject to general principles of contract interpretation. *See*, *e.g.*, *Greco* v. *Dep't of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988) ("It is axiomatic that a settlement agreement is a contract."). Under those principles, the interpretation of an unambiguous term in a settlement agreement is a conclusion of law. *See In re Johns-Manville Corp.*, 759 F.3d 206, 214 (2d Cir. 2014) ("The interpretation of unambiguous settlement-agreement terms is a question of law subject to *de novo* review."). Indeed, the Special Master agrees that he "must defer to the Court's

11

interpretation of the 'generally consistent' standard" (Ruling at 3), thus acknowledging that the interpretation of the standard is a legal issue for the Court to decide.

The Special Master nonetheless attempts to insulate his "generally consistent" determinations from review by this Court, claiming they are wholly factual "because the appeals required the Special Master to apply the undisputed factual circumstances of each case to a legal standard – 'generally consistent' – that was clearly established by the parties to the Settlement Agreement." (*Id.* at 2.)  But the Special Master's logic conflicts with established Third Circuit law.  As a general matter, the Third Circuit adopts a mixed standard of review in such circumstances, bifurcating the issue into "distinct factual and legal elements," and accepting findings of "historical or narrative facts unless they are clearly erroneous," while exercising plenary review of legal standards and the "application of those precepts to the historical facts." *Universal Minerals, Inc.* v. *C.A. Hughes & Co.*, 669 F.2d 98, 103 (3d Cir. 1981).  As the authority cited by the Special Master makes clear, "clarifying the meaning of a legal standard involves a question of law." (Ruling at 2, n.1 (citing Randall H. Warner, *All Mixed Up about Mixed Questions*, 7 J. APP. PRAC. & PROCESS 101, 133 (2005)).  Indeed, this authority goes on to explain— in material omitted by the Special Master—that "[w]hen there are undisputed historical facts and the question is whether a statute applies on those facts, the question may well involve interpreting a term in the statute or deciding as a matter of law whether the statute applies to certain recurring circumstances." (*Id.* at 113.)  That is precisely what the NFL Parties seek here:  the NFL Parties ask the Court to "clarify[] the meaning of a legal standard" and, specifically, for the Court to determine, "as a matter of law," how the "generally consistent" standard applies to "certain recurring circumstances"—namely,

12

where a retired player is administered the exact BAP testing battery and incontestably would not be entitled to a Qualifying Diagnosis if seen in the BAP, but receives a purported Qualifying Diagnosis by a MAF Physician (for a fee) pursuant to relaxed criteria that manifestly conflict with the judicially approved impairment criteria for that testing battery. The Special Master's determination that the "generally consistent" standard permits such inequitable results is a conclusion of law plainly reviewable by this Court.

### C.     The Court Has Unquestionable Authority To Interpret the Settlement Agreement's "Generally Consistent" Standard

Even if the Special Master's appeal decisions were purely factual determinations (and they are not), this Court still would have unquestionable authority to consider and determine the proper interpretation and application of the "generally consistent" standard for Level 1.5 and 2 Neurocognitive Impairment claims. This Court expressly retained "continuing and exclusive jurisdiction to interpret, implement, administer and enforce the Settlement" in accordance with its terms. (Am. Final Order and J. § 17, ECF No. 6534; *see also* Settlement Agreement § 20.1(n).) Clarification of the "generally consistent" standard in the recurring circumstances at issue here is essential to the proper functioning and integrity of the Settlement Program.

### D.     The Special Master's Reliance on FAQ 95 Is Misplaced

The Special Master Generally Consistent Ruling improperly treats FAQ 95 as a binding "definition" of "generally consistent," and, in any event, completely misinterprets the implications of FAQ 95 for the circumstances at issue here. (*See* Ruling at 3.) As an initial matter, the NFL Parties do not agree that FAQ 95 is final or binding authority with respect to the meaning of the "generally consistent" standard in the

13

Settlement Agreement.   Indeed, the NFL Parties explicitly objected to the characterization of the FAQs as "rules of the road."[6]   Instead, FAQs are helpful guideposts that can neither change the terms of the Settlement Agreement nor serve as final authority on the meaning of its terms.   Ultimately, the interpretation of the "generally consistent" standard in the Settlement Agreement is for the Court to decide, as the Special Master concedes.  (*See* Ruling at 2.)

In addition, the Special Master Generally Consistent Ruling misinterprets FAQ 95, which, when read in full, strongly suggests that the circumstances at issue here cannot possibly satisfy the "generally consistent" standard.  The Special Master focuses only on the first paragraph of FAQ 95, which states that:

> Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other.   The common elements or characteristics must predominate over the uncommon ones.[7]

Based on his reading of this portion of FAQ 95, the Special Master concludes that, to be "generally consistent" with the Injury Definitions for Level 1.5 or 2 Neurocognitive Impairment, a diagnosis outside the BAP must simply be supported by evidence that has "more elements or characteristics in common" with the diagnostic criteria established in the Settlement Agreement than "elements or characteristics that differ."   But this simplistic test cannot be squared with a sensible, contextual definition of "predominate"

---

[6]   *See* Feb. 3, 2018 Email from Counsel for the NFL Parties to BrownGreer, Ex. 1 ("[T]he NFL Parties object to the language stating that the FAQs are the 'rules of the road' for the Settlement Program.  We think this issue can be remedied either by simply deleting the sentence containing this language, or, alternatively, adding to the sentence the phrase 'subject to the terms of the Settlement Agreement . . . .'").

[7]   *See FAQ 95 What does 'generally consistent' mean?*, Settlement Website FAQs, https://www.nflconcussionsettlement.com/Un-Secure/FAQDetails.aspx?q=246#246; *see also* Ruling at 2.

in the above quoted section; nor can it be squared with the portion of the FAQ that actually addresses neuropsychological testing, which the Special Master improperly ignores.

First, to support his interpretation, the Special Master adopts a narrow definition of "predominate" that effectively renders the second sentence of the above-quoted portion of the FAQ entirely redundant of the first. Specifically, the Special Master interprets "predominate"—based on a Merriam-Webster dictionary definition—as meaning "to hold advantage in numbers or quantity" (Ruling at 2 n.2), but notably fails to consider Merriam-Webster's second definition: "to exert controlling power or influence"[8] This second definition, which looks to qualitative influence rather than numerical superiority, would give the second sentence of FAQ 95 distinct meaning. Clearly this second definition also makes good sense in this context: to be "generally consistent" is not solely a mathematical exercise of counting commonalities and differences as the Special Master's analysis suggests. The importance of each commonality and difference is critical as well.

Second, the Special Master entirely ignores the portion of FAQ 95 that actually addresses the question of neuropsychological testing. That portion of the FAQ provides, in relevant part, that a claim "is most solid" when the "Claim Package contains . . . proof of neuropsychological testing that serve[s] the majority of purposes of those specified in [the Injury Definitions] for the diagnosis and that *do not conflict in any manner with*

---

[8]   *Predominate*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/predominate (last visited Nov. 7, 2018); *see also Predominate*, American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=predominate (last visited Nov. 7, 2018) ("predominate" means "to have or gain *controlling power or influence*" or "to be of or have greater quantity *or importance*" (emphasis added)).

*those criteria and requirements.*[9]  While the section of FAQ 95 that the Special Master relies on refers to commonalities and differences, it does not address the possibility of conflicts, as this section does.  *Conflict* is obviously distinct from a mere *difference*. Neuropsychological testing administered by MAF Physicians could very well have "elements" that "differ" from the BAP testing battery outlined in the Injury Definitions without "conflict[ing] in any manner with the [BAP] criteria and requirements."  The question raised on these appeals is not about differences in the testing battery or whether the different testing nonetheless "serve[s] the majority of purposes of those specified" in the Injury Definitions—because the testing battery in these cases was *identical*.  Rather, the question raised on these appeals concerns the direct and irreconcilable *conflicts* between the BAP diagnostic criteria and the watered-down diagnostic criteria that the MAF Physician applied (for a fee) to this identical testing regime, resulting in the retired player receiving a Qualifying Diagnosis that he incontestably could not have received in the BAP.  We submit that the guideposts provided in FAQ 95 make clear that such an outcome—demonstrating clear and fundamental *conflicts* with the BAP criteria and requirements—cannot possibly be "generally consistent."[10]

---

[9]  *See FAQ 95 What does 'generally consistent' mean?*, Settlement Website FAQs, https://www.nflconcussionsettlement.com/Un-Secure/FAQDetails.aspx?q=246#246 (emphasis added).

[10]  As stated in the Use of AAP Appeal, where a MAF Physician does not apply the BAP neuropsychological tests but asserts that different, substituted testing and accompanying diagnostic criteria are "generally consistent," the NFL Parties respectfully submit the Special Master lacks the expertise to evaluate that highly qualitative assertion without expert neutral AAP and AAPC assistance.  (*See* NFL AAP Appeal at 19–20.)

Where, as here, the testing is identical to the BAP battery, the NFL Parties submit that conflicting diagnostic criteria to those established in the Settlement for this precise testing battery cannot be "generally consistent."  But, if the Court were to disagree and rule that conflicting diagnostic criteria (with respect to identical tests) are permitted to some extent and in certain circumstances under the "generally consistent" standard, the NFL Parties respectfully submit that the Special Master concededly lacks the medical expertise to evaluate the qualitative question of their degree of conflict without expert AAPC assistance.  As such, to the extent that the Court does not rule that the Special

In all events, the meaning of "generally consistent" as applied to this recurring circumstance is for the Court to determine.

## II.    The Special Master's Interpretation of the "Generally Consistent" Standard Is Wrong Because It Treats Identically-Situated Claimants Differently

The Special Master incorrectly interpreted the Settlement Agreement's "generally consistent" standard to permit precisely the type of disparity it was intended to prevent: treating identically situated retired players differently depending on whether they were evaluated inside or outside of the BAP.  The seven claimants at issue here took the full BAP neuropsychological test battery and failed to meet the Settlement Agreement's objective diagnostic criteria for that test battery to qualify for a diagnosis in the BAP. Yet because these players were paying to see a neurologist in his capacity as a MAF Physician, rather than seeing the same physician for free as a BAP Provider, the Special Master concluded that the MAF Physician could provide Qualifying Diagnoses pursuant to relaxed criteria that nonetheless somehow satisfied the "generally consistent" standard.

The "generally consistent" provision cannot reasonably be interpreted to permit that type of patent inconsistency and, in fact, was specifically intended to avoid it by ensuring that all retired players are placed on equal footing whether evaluated inside or outside of the BAP, and before or after the Effective Date.  For that reason, the "generally consistent" standard does not, and cannot, mean that when the administered testing regime is the same as that set forth in the BAP, a MAF Physician can unilaterally change the corresponding, bargained-for and judicially approved impairment and diagnostic criteria for that testing battery in order to give a Qualifying Diagnosis that the player

Master's interpretation of the "generally consistent" standard is in error, the NFL Parties conditionally request that the Court order the Special Master's re-review of the seven claim appeals identified herein in consultation with the AAP and AAPC.

17

incontestably could not have received had he taken the exact same testing in the BAP. The Special Master's interpretation of "generally consistent" in this context subverts its intended purpose and prejudices retired players who participate in the free BAP by subjecting them to a more restrictive diagnostic standard on the same set of tests than retired players who pay for their own examinations. Not only is that position contrary to fundamental fairness, but it also harms the integrity of the Settlement Program and denies the NFL Parties the benefit of their bargain on uncapped exposure.

To date, only forty percent of eligible retired players have sought to schedule BAP examinations, while claim submission reports show that retired players—including the claimants at issue here—are paying to see neurologists acting in their MAF Physician roles despite being eligible to receive the same examinations from the same providers for free in the BAP. In fact, over 70% of payable claim determinations for post-Effective Date Qualifying Diagnoses of Level 1.5 and 2 Neurocognitive Impairment came from MAF Physicians as opposed to BAP Providers.

The diagnoses at issue in these appeals clearly illustrate why retired players are paying to get evaluations outside the BAP. For example, a MAF Physician repeatedly diagnosed one claimant (SPID 950000215) with mild cognitive impairment based on neurological examination and MRI imaging (without neuropsychological testing) between March and August 2017—a diagnosis that is not compensable under the Settlement Agreement and even falls short of Level 1 Neurocognitive Impairment (where Supplemental Benefits are available).[11] In October 2017, the claimant took the precise

---

[11]   *See* Doc. No. 148032, Ex. A at 1, 2, 3, 7 (documented as having "Mild cognitive impairment" on the basis of March 2, 2017 clinical evaluation); Doc. No. 148032, Ex. C at 1 (documented as having "Mild cognitive impairment" on the basis of MRI performed on March 24, 2017); Doc. No 148032, Ex. A at

18

BAP testing battery and, as a result, received an amended diagnosis of Level 1.5 Neurocognitive Impairment from the MAF Physician. To receive a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment in the BAP, a retired player must have T scores below the cutoff in two or more of the five cognitive domains, with at least one of those domains being Executive Function, Learning and Memory, or Complex Attention. (*See* Settlement Agreement Ex. A-1 at 2, § 1(a)(ii).) Here, the claimant had T scores below the cutoff in only one—not two—domains, and that domain was Language. Indeed, the claimant's T scores in three domains exhibited no impairment whatsoever (with 0 of 13 tests meeting the impairment criteria), while the T score in the other domain only met the BAP criteria for Level 1. (Doc. No. 148032, Ex. B. at 5.) There can be no dispute that this claimant, who took the precise BAP testing battery, would *not* have qualified for a Level 1.5 diagnosis in the BAP. The conclusion that the MAF Physician's Level 1.5 diagnosis is "generally consistent"—when it manifestly conflicts—with the requirements of the Settlement Agreement reflects clear and convincing error reversible on appeal.

Similarly, another claimant (SPID 100007941) was administered the full BAP testing battery. Because his only corroboration of functional decline was a third-party affidavit from a girlfriend, the Level 1.5 Neurocognitive Impairment Injury Definition for the BAP would require him to have T scores below the cutoff in two domains, with at least one of those domains being either Executive Function or Learning and Memory to receive a Qualifying Diagnosis. (Settlement Agreement Ex. A-1 at 2, § 1(a)(iii).) The claimant's neuropsychological test results unambiguously failed to meet the Settlement Agreement's T-score thresholds in those domains. (*See* Doc. 148877 at 4-5 (claimant's

---

11–13 (documented as having "Mild cognitive impairment" by diagnosing physician on August 22, 2017 after review of MRI interpretation).

"[l]evel of impairment in [the Executive Function and Learning and Memory domains] is classified as *None*" (emphasis added).)   Moreover, the claimant's neuropsychological testing reflected performance validity issues, including a "suboptimal" validity score on the Test of Memory Malingering, and a mental health assessment found "not interpretable due to a pattern of excessive content-inconsistent false reporting." (*Id.* at 3, 5.) Nevertheless, Dr. Randolph Evans, acting as a paid MAF Physician rather a free BAP Provider (he was later terminated from the Settlement Program), diagnosed this claimant with Level 1.5 Neurocognitive Impairment. The conclusion that this diagnosis is "generally consistent"—when it manifestly conflicts—with the requirements of the Settlement Agreement reflects clear and convincing error reversible on appeal.

As this Court recognized in the approval process, the Settlement's design allows retired players to be examined periodically over its term so they may receive diagnoses if their cognitive health declines to a level compensable under the Settlement. The above examples reflect retired players whose condition, over time, might decline to a level compensable under the Settlement Agreement. But there can be no dispute that they do not satisfy those Injury Definitions today.

## CONCLUSION

For the reasons set forth herein, the NFL Parties respectfully request that the Court reverse the Special Master Generally Consistent Ruling, deny the Monetary Claim Awards at issue, and clarify that the Settlement Agreement's "generally consistent" language does not permit a Qualifying Diagnosis of Level 1.5 or 2 Neurocognitive Impairment based on scores on the BAP testing battery that incontestably conflict with the diagnostic criteria set forth in the Settlement Agreement.

## REQUEST FOR ORAL ARGUMENT

The NFL Parties respectfully request oral argument on their appeal of the Special

Master Generally Consistent Ruling.

Dated:  November 7, 2018

Respectfully submitted,

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP

*/s/ Brad S. Karp*
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
Richard C. Tarlowe
Douglas M. Burns
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*

EXHIBIT  1

| From: | Burns, Douglas |
|---|---|
| Sent: | Saturday, February 3, 2018 3:19 PM |
| To: | 'Erin Maruskin' |
| Cc: | Orran Brown; Morgan Meador; jaw@garretsongroup.com; jbruemmer@garretsongroup.com; jpaschal@garretsongroup.com; mlg@garretsongroup.com; mfrancis@garretsongroup.com; Sydney Gustafson; Emily Engle; Anastasia Danias; Annie Pell; Birenboim, Bruce; cseeger@seegerweiss.com; dbuchanan@seegerweiss.com; Bayard, Lynn B; mrosenberg@seegerweiss.com; Istel, Sarah; sgeorge@seegerweiss com; Tarlowe, Richard |
| Subject: | RE: Announcing the FAQs |
| Attachments: | Alert on FAQs.docx |

Erin,

For the reason stated in Bruce Birenboim's email yesterday to Orran, the NFL Parties object to the language stating that the FAQs are the "rules of the road" for the Settlement Program. We think this issue can be remedied either by simply deleting the sentence containing this language, or, alternatively, adding to the sentence the phrase "subject to the terms of the Settlement Agreement . . . ."

The NFL Parties otherwise approve of the draft Alert content.

**Douglas Burns** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
+1 212 373 3403 (Direct Phone) | +1 212 492 0403 (Direct Fax)
dburns@paulweiss.com | www paulweiss.com

---

**From:** Erin Maruskin [mailto:emaruskin@browngreer.com]
**Sent:** Friday, February 02, 2018 2:21 PM
**To:** Anastasia Danias <Anastasia.Danias@nfl.com>; Annie Pell <annie.pell@nfl.com>; Birenboim, Bruce <bbirenboim@paulweiss.com>; cseeger@seegerweiss.com; dbuchanan@seegerweiss.com; Burns, Douglas <dburns@paulweiss.com>; Bayard, Lynn B <lbayard@paulweiss.com>; mrosenberg@seegerweiss.com; Istel, Sarah <sistel@paulweiss.com>; sgeorge@seegerweiss.com; Tarlowe, Richard <rtarlowe@paulweiss.com>
**Cc:** Orran Brown <OBrown@browngreer.com>; Morgan Meador <mmeador@browngreer.com>; jaw@garretsongroup.com; jbruemmer@garretsongroup.com; jpaschal@garretsongroup.com; mlg@garretsongroup.com; mfrancis@garretsongroup.com; Sydney Gustafson <sgustafson@browngreer.com>; Emily Engle <eengle@browngreer.com>
**Subject:** Announcing the FAQs

When we post the approved FAQs to the Settlement Website on Monday, we would like to announce them with the attached draft Alert, which the Special Masters have already reviewed and approved. We seek your permission to post this on the Alerts page of the website after the FAQs are up and add a banner at the top of the Home page with this language from the Alert to draw more attention to it and the new FAQs:

The Claims Administrator posted a full new set of Frequently Asked Questions (FAQs) to the Settlement Website. These new FAQs reflect an ongoing commitment to transparency in the claims

1

administration process and are the "rules of the road" in the Settlement Program.  Click here to read them.

Please let us know if you have any edits to the Alert or banner text and whether we can proceed as planned.

Thank you,
Erin

**Erin E. Maruskin**
**BROWNGREER PLC**
250 Rocketts Way
Richmond, Virginia  23231
Telephone:  (804) 782-4556
Facsimile:   (804) 521-7299
www.browngreer.com

*This electronic mail is intended to be received and read only by certain individuals  It may contain information that is privileged or protected from disclosure by law  If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply  These restrictions apply to any attachment to this email*

### Co-Lead Class Counsel's Response to the NFL's Appeal of the Special Masters' Ruling Regarding the "Generally Consistent" Standard

### PRELIMINARY STATEMENT

Under the terms of the Settlement Agreement, the Court's July 13, 2016 Order appointing the Special Masters, and the Rule Governing Appeals of Claim Determinations, the NFL does not have the right to appeal the Special Masters' October 18, 2018 decision denying its Objection. The Special Masters clearly stated that their decision was a final and binding factual determination, as opposed to an appealable conclusion of law. Accordingly, the NFL's appeal is improper and should not be entertained.

With respect to the substance of the NFL's appeal, Co-Lead Class Counsel agrees with the NFL that the Settlement Agreement was heavily negotiated and that both sides must live up to its negotiated terms. However, the NFL now requests this Court "to construe the 'generally consistent' standard for Level 1.5 and Level 2 Neurocognitive Impairment diagnosed outside of the BAP to preclude a Qualifying Diagnosis where the BAP test battery is applied and the results fail to satisfy the BAP diagnostic criteria." Brief at 2. That is, the NFL argues for a "specifically identical" standard that appears nowhere in the Settlement Agreement. Indeed, it is clear that the NFL does not want to live up to the negotiated terms of the Settlement Agreement and is unwilling to accept one of the most fundamental and important agreed-upon provisions of the Settlement Agreement. Specifically, the NFL asks the Court to re-write the Settlement Agreement so that the negotiated and judicially-approved "generally consistent" standard would not apply to those Retired Players who exercised one of the fundamental rights afforded by the Settlement Agreement and obtained their Qualifying Diagnosis from a Qualified MAF Physician.

While the NFL discusses the importance of the negotiated BAP diagnostic criteria ("precise T-score cutoffs as well as disability requirements across five cognitive domains" – Brief at 3), the

NFL never once acknowledges that the Parties specifically agreed that all Qualifying Diagnoses obtained **outside of the BAP** are to be evaluated differently than Qualifying Diagnoses obtained **in the BAP**. Therefore, while Qualifying Diagnoses obtained in the BAP must, by definition, satisfy the strict BAP diagnostic criteria found in the Settlement Agreement, Qualifying Diagnoses obtained outside of the BAP need only be "generally consistent" with the BAP diagnostic criteria. This difference in diagnostic criteria for evaluating Qualifying Diagnoses is a cornerstone of the Settlement Agreement and cannot be disturbed.

## ARGUMENT

### I.   The NFL's Current "Appeal" is Improper

#### A.  The Decision of the Special Master Was "Final and Binding"

Under the terms of the Settlement Agreement and the Court's July 13, 2016 Order appointing the Special Masters, the NFL does not have the right to seek Court review of the Special Masters' October 18, 2018 decision.[1]   As agreed to by the Parties, objections to the Special Masters' determinations are only permitted as to "conclusions of law," designated as such by the Special Masters. The relevant portion of the July 13th Order states:

> If an appeal is referred to the Master(s), the parties agree, pursuant to Fed.
> R. Civ. P. 53(f)(3), that the **factual determinations of the Master(s) will**

---

[1]      The NFL frames its challenge to the decision of the Special Masters as an "appeal." However, none of the parties to the Settlement have any right to appeal the Special Masters' determination of a Notice of a Monetary Award appeal. Rather, the parties only enjoy the right to "object" in clearly limited circumstances to the findings of the Special Masters.  Under the Settlement Agreement and July 13, 2016 Order, the term "appeal" specifically refers to a Party's challenge of the Claims Administrator's Notice of Monetary Award Claim Determination, whereas an "objection" refers to a Party's challenge of a Special Masters' conclusion of law in a determination on appeal.  Therefore, the NFL's current "appeal" is really an "objection" to the Special Masters' determination on appeal. While the Parties have the right to appeal from a Notice of Claim Determination, no Party has the right to "appeal" a Special Masters' determination. The distinction is important here because the Settlement Agreement and Order appointing the Special Masters make it clear that the right to file an "objection" to the Special Masters' determinations on appeal is limited and does not permit the instant objections by the NFL.

> **be final and binding. Pursuant to Fed. R. Civ. P. 53(f)(4), the court**
> **will review de novo any objection to the Master(s) conclusions of law.**

(See July 13, 2016 Order at 5) (emphasis added). Similarly, the Rules Governing Appeals of Claim

Determinations, promulgated by the Special Masters, state that the Special Masters' decisions on

appeal are **not** generally subject to appeal, but ". . . **the Court will review** *de novo* **(that is, anew)**

**any objection to the Special Master's conclusions of law.** (See Rule 31) (emphasis added).

Rule 31 of the Rules Governing Appeals of Claim Determinations further establishes that,

for the purposes of the appeals process, the Special Masters are the ones who determine whether

there is a conclusion of law properly subject to review by the Court. Rule 31 makes clear that only

conclusions of law, as determined by the Special Masters, may be objected to:

> **Rule 31.   Finality of the Special Master's Decision.** *The Special Master's*
> *decision on an Appeal is final and binding* on the Settlement Class Member(s), the
> Parties to the Appeal and the Claims Administrator *and is not subject to appeal or*
> *review by the Court, except* that pursuant to Fed. R. Civ. P. 53(f)(4) and the Court's
> July 13, 2016 Order appointing the Special Masters, *the Court will review de novo*
> *(that is, anew) any objection to the Special Master's conclusions of law.* <u>The Special</u>
> <u>Master will identify in each decision any issue the Special Master determines to be</u>
> <u>a conclusion of law to which a Party to the Appeal may object and have reviewed</u>
> <u>by the Court.</u>

(emphases in italics and underlines added).

Though the NFL provided comments and proposed revisions to other provisions of the

Rules Governing Appeals Claim Determinations, they did not raise any concerns with the quoted

language from Rule 31. Accordingly, as agreed among the parties, "the factual determinations of

the Master(s) will be final and binding" and the Special Masters' determinations are only

reviewable by the Court if the Special Masters identify a conclusion of law.

The Special Masters did not identify any conclusions of law in this instance and, therefore,

the NFL's initial objection was improper. In a Settlement where application of each of the

thoroughly negotiated definitions for Qualifying Diagnoses will inevitably turn on facts, it is clear

3

why the NFL would want finality of factual findings made by the Special Masters – denials of claims would reach conclusion with a decision by the Special Masters.   The same must hold true for the NFL's appeals of approved claims.  With each of the claims subject to the NFL's appeal and objection efforts, the Special Masters stated in the "Explanation of Claim Determination" section of the Post-Appeal Notices of Monetary Award Determination that "(t)he Special Master's decision is a factual determination and is final and binding." More importantly, the Special Masters stated clearly that their October 18, 2018 is a final factual finding, not an appealable legal conclusion:  "For the reasons stated above, the NFL Parties may not object [to the Court] to the determinations of the Special Master."

### B.  The NFL Cannot Concoct a Basis for Court Review

Notwithstanding the foregoing directive from the Special Masters, the NFL is undeterred. The NFL now seeks to clear a path to object to the decision by arguing that the Special Masters may not decide whether their decision turned on factual findings or whether there is a conclusion of law that may be brought to the Court for review.  At issue on this appeal are the definitions for Qualifying Diagnoses of dementia made outside of the BAP, and "generally consistent" with those BAP definitions for dementia.  At bottom, the NFL argues that any decision by the Special Masters regarding a dementia diagnosis made outside of the BAP is inevitably subject to Court review, even when it is otherwise final and binding.

To avoid the simple fact that it lost its initial appeals and objection on factual grounds, the NFL makes two arguments. First, it argues against the plain language of the Order Appointing Special Masters and the governing Rules contending that it did not or could not consent to the finality of factual findings.  Second, it argues that diagnosis of players under the "generally consistent" standard is not rooted in the medical facts of each case, but instead is a legal question.

Both arguments are ill-founded.  The NFL's efforts to now force Court review of a "final and binding" decision by the Special Masters should not be rewarded.

### 1.  The NFL Agreed that the Special Masters' Findings of Fact Were to Be "Final and Binding" and Not Subject to Court Review

There is no further appeal available once the Special Masters deem their decision to be a factual determination rather than a conclusion of law.  Parties may consent to the referral of any and all matters to a Special Master for determination, and such consent can exclude all rights to object to the decision of a Special Master so long as the findings were within the scope of consent.  *See Baker Indus., Inc. v. Cerberus, Ltd.*, 570 F. Supp. 1237, 1242 (D.N.J. 1983), *aff'd*, 764 F.2d 204 (3d Cir. 1985) ("the Court then noted that Federal Rules of Civil Procedure do not prohibit such a stipulation, that it could see no difficulty with the parties' waiver of whatever statutory rights of appeal that they might have, that the master's findings would not be final to the extent that he exceeded the scope of his reference, that the master would have full power to decide the issue of breach and remedy, and that the master's decision would not be reviewable by this Court or any other Court.")  The NFL agreed to a regimen for appeals of Notices of Denial of Monetary Awards and Notices of Monetary Awards that end with the Special Masters when the Special Masters determine that there are no appealable conclusions of law. The NFL would clearly cry foul if any player sought Court review of findings of fact or a determination that there were no appealable questions of law in a decision affirming denial of a dementia claim.

### 2.  The Special Masters' Determination that There Is No Reviewable Conclusion of Law Is Correct

The NFL's argument that the definitions of Qualifying Diagnoses made outside of the BAP are a legal question or, at least, a mixed question of fact and law, should not be entertained.  The NFL argues simply that because the Settlement Agreement is unambiguous as to the definition for

diagnoses obtained outside of the BAP, the matter is a question of law. However, each of the definitions of Qualifying Diagnoses underlie almost every one of the appeals taken - whether by a player who believes that he was properly diagnosed in the first instance and wrongly denied a Monetary Award, or by the NFL who believes that the facts of the Claim Package do not support the Qualifying Diagnosis. If taken seriously, the NFL's argument would render meaningless the "final and binding" nature of Special Masters' decisions in this Settlement, particularly as to whether or not a Qualifying Diagnosis is or is not supported by the facts of each player's claim. Under the NFL's view, each decision by the Special Masters regarding a claim would be transformed into an appealable question of law ("is this what the definition was meant to mean?") or a mixed question of facts and law ("do these facts really fit this definition?").

The Supreme Court has made clear that there is no such bright-line rule in determining whether a matter is factual or legal for the purposes of appellate review: "the appropriate methodology for distinguishing questions of fact from questions of law has been, to say the least, elusive. . . . Perhaps much of the difficulty in this area stems from the practical truth that the decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of allocation as it is of analysis." *Miller v. Fenton*, 474 U.S. 104, 113–14 (1985)[2]; *see also Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) ("The Court has previously noted the vexing nature of the distinction between questions of fact and questions of law.").

---

[2]     The Supreme Court went on to discuss a practical solution to the problem which further supports the wisdom in according deference to the Special Masters determination of the factual or legal nature of the issues under decision: "[when] the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Id.* at 114.

The Special Masters recognized this challenge and properly determined that review of the appeals being taken by the NFL was a review of the facts presented in each of the individual claims. October 18, 2018 Decision, p. 2, n. 1. Given the essentially fact-specific nature of the "generally consistent" standard at the heart of diagnoses made outside of the BAP, the kind of case by case, factual approach taken by the Special Masters is particularly apt. *See Pierce v. Underwood*, 487 U.S. 552, 562 (1988) ("whether the Government's litigating position has been 'substantially justified' is precisely such a multifarious and novel question, little susceptible ... [to] useful generalization, and likely to profit from the experience that an abuse-of-discretion rule [to findings of fact] will permit to develop.")

Accordingly, the NFL's appeal of the Special Masters' October 18, 2018 decision denying the NFL's Objection is improper and should not be reviewed by the Court.

## II.   Qualifying Diagnoses Made Outside the BAP Are to Be "Generally Consistent" With, Not Identical to, the Diagnostic Criteria for Qualifying Diagnoses Made Within the BAP

The Settlement Agreement is clear that the diagnostic criteria for Qualifying Diagnoses made outside the BAP, which includes diagnoses rendered by Qualified MAF Physicians and pre-Effective Date diagnoses rendered by board-certified neurologists, need not be identical to the diagnostic criteria for diagnoses made in the BAP. Six of the seven Retired Players subject to the NFL's appeal were diagnosed with Level 1.5 Neurocognitive Impairment.[3] The specific BAP diagnostic criteria for Level 1.5 Neurocognitive Impairment can be found in subsection 1(a)(i)-(iv) of Exhibit A-1 to the Settlement Agreement. Subsection 1(b) of Exhibit A-1 then makes clear which "diagnostic criteria" are subject to the "generally consistent" standard. Subsection 1(b) states in relevant part:

---

[3]      The remaining Retired Player was diagnosed with Level 2 Neurocognitive Impairment.

> For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, **based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv) above,** . . . made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

(emphasis added).

Despite the clear language setting forth the application of the "generally consistent" standard to all dementia diagnoses made outside of the BAP, it is the very specific diagnostic criteria set forth in subsection 1(a)(i)-(iv) of Exhibit A-1, that the NFL seeks to enforce on Qualifying Diagnoses rendered outside of the BAP. The NFL's position is contrary to the plain language of the Settlement Agreement.

To begin, it must be noted that the "generally consistent" standard, as well as which Qualifying Diagnoses are subject to it, is a product of the parties' negotiations, which, by design, specifically does not require the identical diagnostic criteria for Qualifying Diagnoses made outside of the BAP. Rather, it empowers Qualified MAF Physicians, who have been approved by both parties and have received extensive training in the various Qualifying Diagnoses recognized by the Settlement Agreement, as well as board-certified neurologists who rendered pre-Effective Date diagnoses, to use their experience and medical judgment to make appropriate diagnoses after personal examination of the Retired Player **outside of the BAP** without belated second-guessing. In addition, it guides the Claims Administrator to affirm MAF Qualifying Diagnoses even though different testing and evaluation criteria may have been utilized by the Qualified MAF Physician, so long as such testing and evaluation is "generally consistent" with the diagnostic criteria for the particular Qualifying Diagnosis as defined in the Settlement Agreement.

8

The NFL's position, as expressed repeatedly throughout its appeals and objections, is that Qualifying Diagnoses made outside of the BAP must meet the same exact diagnostic criteria as those Qualifying Diagnoses made in the BAP, effectively ignoring the "generally consistent" language found in Section 1(b) of Exhibit A-1 of the Settlement Agreement. The NFL's initial appeals, Objections, and current appeal demonstrate that the NFL wants "generally consistent" to be deleted from the Settlement Agreement with respect to Qualifying Diagnoses made outside of the BAP. The parties, in drafting the Settlement Agreement, recognized the importance of the "generally consistent" standard and foresaw the possibility of the NFL's current argument with respect to the application (or non-application) of "generally consistent" to Qualifying Diagnoses made outside of the BAP. That is why the parties added the following language to the Settlement Agreement: "For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) **does not require identical diagnostic criteria, including without limitation, the same testing protocols or documentation requirements**." (Settlement Agreement §6.4(b)) (emphasis added).

The NFL's current attempt to delete "generally consistent" from the Settlement Agreement through the Objection and Appeal process is improper, taken in bad faith, and must be rejected. Aside from the Settlement Agreement's clear language on this issue, the Special Masters have weighed in on this very issue. FAQ 95 (entitled "What does 'generally consistent' mean?") states in relevant part:

> Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones.

9

> The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

Despite the language of FAQ 95, the NFL repeatedly argues that these players' test results are insufficient to support a monetary award based on a non-BAP diagnosis of Level 1.5 Neurocognitive Impairment, even though the Qualified MAF Physicians (who personally examined the players) concurred with the board-certified neuropsychologists (who also personally examined the players) and found those test results to be "generally consistent" with the BAP's diagnostic criteria for Level 1.5. Crucially, these Qualified MAF Physicians have received training on the diagnostic criteria in the Settlement, including the BAP criteria as well as the "generally consistent" standard that guides diagnoses outside the BAP. The NFL argues that test results that fall short of the strict BAP diagnostic criteria cannot, by definition, support a Qualifying Diagnosis made outside of the BAP, even though the NFL is fully aware that the "generally consistent" standard applies to these Retired Players' claims since they were all diagnosed outside the BAP.

In denying the NFL's Objection, the Special Masters concluded that:

> ". . . based on the definition of "generally consistent" set forth in FAQ 95, . . . the six appeals as issue fail to establish by clear and convincing evidence that there are more differences than commonalities between the medical support for the Qualifying Diagnosis and the relevant diagnostic criteria."

(Special Master 10/18/18 Decision at 3). The NFL argues that the "Special Master's interpretation of the "generally consistent" standard upends the bargained-for and judicially-approved neuropsychological testing regime." (Brief at 4). The NFL's argument is ironic considering that what the NFL is requesting this Court to do -- apply the same diagnostic criteria to Qualifying Diagnoses obtained in the BAP as those obtained outside the BAP -- is specifically contrary to the

"bargained-for and judicially-approved" terms of the Settlement Agreement. The Special Masters' ruling not only does not "upend" the terms of the Settlement Agreement, it upholds one of the most important and fundamental provisions of the Settlement Agreement. That is, Qualifying Diagnoses obtained outside of the BAP do not have to satisfy the same diagnostic criteria as those Qualifying Diagnoses obtained in the BAP.

The specific facts of these players' claims illustrate the extent to which the NFL's argument, if accepted, would result in unjust and bizarre results. Co-Lead Class Counsel will defer to the individually retained counsel with respect to the presentation and argument of case-specific issues. Please note, however, that Co-Lead Class Counsel did submit statements with respect to the NFL's initial appeals of four of the Retired Players subject to the current Appeal (SPID 100000070, 100009422 100013190, and 100005741), which addressed certain case-specific facts. Those redacted statements are attached hereto as Exhibits 1, 2, 3 and 4.

### III.    Retired Players Who Obtain a Qualifying Diagnosis From a Qualified MAF Physician Rather Than Through the BAP Are Acting In Accordance With the Terms of the Settlement Agreement

The NFL's appeal focuses on those Retired Players who had a choice between obtaining a Qualifying Diagnosis either through the BAP process or from a Qualified MAF Physician. In so doing, the NFL improperly invites speculation as to the reason that any Retired Player chose to see a Qualified MAF Physician as opposed to a BAP Provider. The express terms of the Settlement Agreement provide two separate paths for obtaining a Qualifying Diagnosis for those Retired Players who do not have a pre-Effective Date Qualifying Diagnoses. Retired Players have the

right to pursue either path, for whatever reason they wish.[4]  Though Retired Players' reasons are irrelevant to the analysis, the NFL ignores the many valid factors that may influence the decision. These reasons include:

- At the time the Retired Players subject to this Appeal were deciding whether to see a Qualified MAF Physician or a BAP Provider, there were substantial wait times for BAP appointments in some cities,[5] which was a particular concern for Retired Players who were facing an approaching birthday and additional offsets for age.  Qualified MAF Physicians were sometimes more flexible with respect to scheduling.

- Many Players want to control the scheduling of their own appointments as opposed to coordinating through the BAP Administrator, who schedules all BAP appointments.

- A Retired Player may already be under the care of a neurologist or other medical professional and, therefore, their "baseline" has already been established.  For those Players, the BAP examination is not as useful as it is for those Retired Players whose "baseline" has not yet been established.

---

[4]    The NFL improperly assumes that all Retired Players have the choice to obtain their Qualifying Diagnoses either from a Qualified MAF Physician or from a BAP Provider.  Many Retired Players do not, or will not, have that choice.  For example, Retired Players who did not earn at least half an Eligible Season are not BAP-eligible, but they are eligible to submit Monetary Award Claims. Accordingly, their only option is to obtain a Qualifying Diagnosis from a Qualified MAF Physician. Likewise, there are Retired Players who already went through the BAP process and were not symptomatic and, accordingly, did not receive a Qualifying Diagnosis.  Since the Settlement Agreement only allows each BAP-eligible Retired Player one BAP examination, if a Retired Player's condition worsens over time (which is likely to happen in many cases), he may only obtain a Qualifying Diagnosis from a Qualified MAF Physician.  Lastly, since the BAP program is only in existence for 10 years, all Retired Players who become symptomatic after 10 years will not have the option to see a BAP provider.  Rather, their only option will be to see a Qualified MAF Physician.

[5]    Under the on-going efforts of the BAP Administrator, the network of BAP Providers has constantly increased and the concern with wait times has been substantially addressed.

- BAP Providers can only diagnose Retired Players with dementia (Levels 1, 1.5, and 2 Neurocognitive Impairment), whereas MAF Physicians can diagnose a Retired Player with any Qualifying Diagnosis (except Death with CTE). Therefore, any Retired Player who thinks he may be suffering from Alzheimer's disease, for example, would be better served going to a Qualified MAF Physician, who is permitted by the Settlement Agreement to render an Alzheimer's diagnosis, rather than a BAP Provider who cannot.

There may be as many valid reasons as there are appointments with Qualified MAF Physicians. In any event, those Retired Players are simply exercising a right provided to them by the Settlement Agreement. In fact, all of the Retired Players subject to the NFL's current appeal followed the rules set forth in the Settlement Agreement. That is, since they did not have a Qualifying Diagnosis from a qualified physician prior to the Effective Date, they were required to select a doctor from a prescribed list of MAF/BAP physicians, all of whom have been vetted and approved by the NFL. The Retired Players were examined by a Qualified MAF Physician and received a Qualifying Diagnosis. They then submitted the required Claim Form, and the medical records and signed Diagnosing Physician Certification form from their Qualified MAF Physician. All of these Retired Players followed the rules, their claims were approved by the Claims Administrator, and they received a Notice of Monetary Award Claim Determination.

The Settlement Agreement requires that all Retired Players who obtain a post-Effective Date diagnosis outside of the BAP be treated the same, regardless of their reason for obtaining their Qualifying Diagnosis through the MAF. The Settlement Agreement does not provide a different diagnostic standard of review based on the Retired Player's reason for obtaining their Qualifying Diagnoses from a Qualified MAF Physician (i.e. they were not BAP-eligible, they diagnosed after expiration of 10-year BAP program, they already went through the BAP process

without obtaining a diagnosis, etc.). In short, the claims of all Retired Players who obtained their Qualifying Diagnoses outside of the BAP must be treated the same and their diagnoses must be reviewed under the same diagnostic standard ("generally consistent"), which specifically does not require the identical diagnostic criteria as Qualifying Diagnoses obtained in the BAP process.

For the NFL now to accuse these Retired Players of trying to undermine the settlement program by trying to "buy" a relaxed diagnostic standard (a standard which the Settlement Agreement requires to be applied to all Qualifying Diagnoses obtained outside of the BAP process) is outrageous.

IV.    **The NFL's Request, If Granted, Would Re-Write the Settlement Agreement With Respect to the Application of the "Generally Consistent" Standard**

The Settlement Agreement, as agreed to by the parties and approved by the Court, identifies two categories of Qualifying Diagnoses: 1) those obtained in the BAP; and 2) those obtained outside of the BAP. All Qualifying Diagnoses, by definition, fit into one of those two categories. Despite this clear language, the NFL seeks to re-write the Settlement Agreement to add a third category of diagnoses in order to avoid the application of the "generally consistent" standard. The NFL wants to treat certain Qualifying Diagnoses obtained "outside of the BAP" differently than other Qualifying Diagnoses obtained "outside the BAP" based on how the diagnosis was made. To be precise, the NFL does not want the "generally consistent" standard to apply to those Retired Players diagnosed outside of the BAP by a Qualified MAF Physician who utilized the same test battery required by the BAP.[6]

---

[6]    There is no reason to believe that the NFL's efforts to twist the "generally consistent" standard will stop at instances where the test battery is identical to that used in the BAP. Rather, if a "specifically identical" standard like the NFL is seeking here is recognized, the NFL will next seek to usurp (as a question of law) the clinical judgment of a Qualified MAF Physician who relies on a test battery that, while not identical, contains many of the same tests.

There is absolutely no support in the judicially-approved Settlement Agreement for the NFL's position. In fact, the NFL's position is directly contrary to the negotiated the terms of the Settlement Agreement. The Parties explicitly agreed that the same diagnostic standards would be applied to all Retired Players diagnosed outside of the BAP (i.e. "based on evaluation and evidence generally consistent with the diagnostic criteria required for BAP diagnosis"). There was no discussion, let alone any agreement, that certain Qualifying Diagnoses obtained outside of the BAP would be evaluated under a different diagnostic standard depending on the type of neuropsychological testing utilized by the Diagnosing Physician. That request, if granted, would fundamentally re-write the Settlement Agreement, thereby depriving Retired Players of a fundamental provision of the Settlement Agreement. To re-write the Settlement Agreement at this late date - - after Retired Players no longer have the ability to opt out of the Settlement - - would be unjust. Accordingly, the NFL's request must not be permitted.

## CONCLUSION

The Special Masters' October 18, 2018 decision denying the NFL's objection was a final and binding factual determination and, therefore, was not appealable. Accordingly, the Court should deny the NFL's current appeal.

Even if the NFL has a right to appeal the Special Masters' decision, its appeal should be denied because the NFL seeks a governing standard that violates the "generally consistent" standard it agreed to in the Settlement Agreement and stands at odds with the rights of Retired Players.

For the foregoing reasons, the NFL's appeal must be denied.

Respectfully submitted,

SEEGER WEISS LLP
*/s/* Christopher A. Seeger
Christopher A. Seeger
David R. Buchanan
Michael L. Rosenberg
TerriAnne Benedetto
Scott A. George
CO-LEAD CLASS COUNSEL

November 27, 2018

# EXHIBIT 1

## CO-LEAD CLASS COUNSEL'S

## REDACTED STATEMENT (SPID 100000070)

### Co-Lead Class Counsel's Statement in Support of Retired NFL Player
### ▉▉▉▉▉ Response to the NFL Parties' Appeal of Claim Determination

The NFL Parties appealed Mr. ▉▉▉▉ Notice of Monetary Award Claim Determination arguing that test scores from Mr. ▉▉▉▉ neuropsychological testing did not meet the "specific criteria" set forth in the Settlement Agreement for Level 1.5 Neurocognitive Impairment (NFL Brief at 1). The NFL's argument is contrary to the plain language and intent of the Settlement Agreement, as well as to the Special Master's interpretation of the "generally consistent" standard, as expressed in FAQ 95 ("What does generally consistent mean?"). Specifically, the NFL fails to acknowledge that the diagnostic criteria for diagnoses made outside of the Baseline Assessment Program (BAP), such as Mr. ▉▉▉▉ diagnosis which was rendered by an MAF neurologist, need not be identical to the diagnostic criteria for diagnoses made in the BAP. Such diagnoses need only be "generally consistent" with the definitions set forth in the Settlement Agreement for the BAP. The NFL's argument not only runs counter to the Settlement Agreement, it unjustly impacts those Retired NFL Football Players who have been, and will be, diagnosed by MAF neurologists over the 65 years of the settlement program. For the reasons set forth below, the NFL has not established by clear and convincing evidence that the Claims Administrator's acceptance of the MAF diagnosis was wrong and, therefore, the NFL's appeal must be denied.

Furthermore, the NFL's blatant disregard for the "generally consistent" standard establishes that its appeal of Mr. ▉▉▉▉ monetary award was not taken in good faith, in violation of Section 9.6(b) of the Settlement Agreement. It should be noted that since the filing of this appeal, the NFL has filed at least 20 additional appeals similarly arguing for the application of the BAP diagnostic criteria to players who were diagnosed by MAF neurologists **outside of the BAP.** Accordingly, pursuant to Section 9.6(b), Co-Lead Class Counsel requests a determination that the NFL's appeal was taken in bad faith and for an order prohibiting the NFL from appealing awards

where the Qualifying Diagnosis was made outside of the BAP based on the argument that the diagnostic criteria of the BAP apply strictly outside of the BAP. The NFL's frivolous, bad faith appeals have real life consequences. Not only do they cause Co-Lead Class Counsel to extend substantial resources to fight against such appeals, more importantly, they needlessly delay payments to injured players, who have waited long enough to receive compensation for their injuries.

**I.    Background**

Mr. ████ was not diagnosed with a Qualifying Diagnosis prior to the Effective Date of the settlement (1/7/17).   Accordingly, under the terms of the Settlement Agreement, in order to submit a claim for monetary award, Mr. ████ would have to be diagnosed by an MAF-approved neurologist or through the BAP after examination by two BAP Providers. Mr. ████ followed the required procedure and was examined by Dr. ██████████, an MAF-approved neurologist, and underwent neuropsychological testing performed by Dr. ██████████, a BAP-approved, board-certified neuropsychologist. Based on his examination of Mr. ████, along with the results of Dr. ████████ neuropsychological evaluation, Dr. ████ diagnosed Mr. ████ with Level 1.5 Neurocognitive Impairment as of 8/24/17 and submitted a properly completed MAF Diagnosing Physician Certification Form that same day. Mr. ████ followed all of the rules as laid out in the Settlement Agreement and established as part of the MAF.

Co-Lead Class Counsel believes that providing the Special Masters with the background of Mr. ████ diagnosis is necessary because the NFL Parties omitted much of this important information from its appeal. Specifically, the NFL remarkably fails to mention in its appeal that Mr. ████ was diagnosed **outside of the BAP** and after the Effective Date by Dr. ████, a qualified MAF neurologist, whom the NFL approved after reviewing his application and following whatever

investigation the NFL undertook before its decision to approve him as a Qualified MAF Physician.[1] The NFL also fails to mention that Dr. ▇▇▇ is a BAP-approved, board-certified neuropsychologist, who is qualified under the terms of the settlement to assist Dr. ▇▇▇ with his diagnosis of Mr. ▇▇▇ (See Section 6.3(b)(i) of the Settlement Agreement).

The NFL's appeal does not raise any issues with the qualifications of these doctors and/or their ability to render Mr. ▇▇▇ diagnosis. Rather, the NFL is only arguing that the diagnosis did not satisfy what it argues is the governing standard – those spelled out for diagnoses through the BAP. However, because Mr. ▇▇▇ was diagnosed outside the BAP and by a qualified MAF neurologist, under the plain terms of the Settlement Agreement, the diagnosing physician did **not** have to apply the same objective diagnostic criteria to Mr. ▇▇▇ as to those diagnoses made in the BAP. Rather, diagnoses made by MAF neurologists need only be "generally consistent" with the BAP diagnostic criteria.

The NFL's failure to advise the Special Masters that Mr. ▇▇▇ diagnosis was made by an MAF neurologist **outside of the BAP** must be seen for what it is – an intentional attempt to mislead the Special Masters into applying the BAP diagnostic criteria to a non-BAP claim. Of note, in all of the appeals taken by the NFL from awards based on diagnoses rendered by MAF neurologists, the NFL has failed to acknowledge that the diagnoses at issue were made **outside of the BAP**. Lastly, the Special Master has denied every appeal taken by the NFL in claims where the award was based on a diagnosis rendered by an MAF neurologist outside of the BAP.

---

[1] All MAF providers must be approved by both the NFL and Co-Lead Class Counsel. Both sides are afforded the opportunity to vet all MAF candidates and both sides have the right to veto a providers' candidacy. The NFL approved Dr. ▇▇▇ as an MAF provider (and also as a BAP provider). As an approved MAF provider, Dr. ▇▇▇ received training on the terms of the Settlement Agreement, including being provided with the Qualified MAF Physician Manual, as well as regular updates from the Claims Administrator.

**II.    Qualifying Diagnoses Made by MAF Neurologists Are to Be "Generally Consistent" with, Not Identical to, the Diagnostic Criteria for Qualifying Diagnoses Made in the BAP**

The Settlement Agreement is clear that the diagnostic criteria for diagnoses made outside the BAP, which includes diagnoses rendered by MAF neurologists such as ███████, need not be identical to the diagnostic criteria for diagnoses made in the BAP.  With respect to Mr. ███████ claim, the specific diagnostic criteria for Level 1.5 Neurocognitive Impairment in the BAP can be found in subsection 1(a)(i)-(iv) of Exhibit A-1 to the Settlement Agreement.  Subsection 1(b) of Exhibit A-1 then makes it clear which "diagnostic criteria" are subject to the "generally consistent" standard.  Subsection 1(b) states in relevant part:

> For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, **based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv) above,** . . . made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement (emphasis added).

Despite the clear language setting forth the application of the "generally consistent" standard to diagnoses made outside of the BAP, it is the very specific diagnostic criteria set forth in subsection 1(a)(i)-(iv) of Exhibit A-1, such as the need for Mr. ███████ to establish "a certain level of moderate to severe decline in *two or more* cognitive domains" that the NFL is now claiming Mr. ███████ was required, but failed, to satisfy, even though Mr. ███████ was diagnosed outside the BAP (NFL Brief at 1)(emphasis in original).  The NFL's position is contrary to the Settlement Agreement and the Special Master's interpretation of "generally consistent."

To begin, it must be noted that the "generally consistent" standard is a product of the parties' negotiations, which, by design, specifically does not require the identical diagnostic

criteria for Qualifying Diagnoses made outside of the BAP as it does for Qualifying Diagnoses made in the BAP.  Rather, it empowers MAF physicians, who have been approved by both parties and have received extensive training in the various Qualifying Diagnoses recognized by the Settlement Agreement, to make appropriate diagnoses after examination of the Retired Player **outside of the BAP** without belated second-guessing.  In addition, it provides discretion to the Claims Administrator to affirm MAF Qualifying Diagnoses even though different testing and evaluation may have been utilized by the MAF Physician, so long as such testing and evaluation is "generally consistent" with the diagnostic criteria for the particular Qualifying Diagnosis as defined in the Settlement Agreement.

The NFL's position, as expressed repeatedly throughout its brief, is that Qualifying Diagnoses made outside of the BAP must meet the same exact diagnostic criteria as those Qualifying Diagnoses made in the BAP, effectively ignoring the "generally consistent" language found in Section 1(b) of Exhibit A-1 of the Settlement Agreement.  For example, the NFL repeatedly argues:

- "Mr. ███ indisputably *failed to satisfy this requirement*.  In particular, while the *Settlement Agreement unambiguously requires* a certain level of moderate to severe decline in **two or more** domains, Mr. ███ test results reflect the necessary impairment in **any** domain." (NFL Brief at 1) (bolding in original) (italics added).

- "To determine a Level 1.5 impairment . . . his tested impairment **must meet the following T scores**: . . ." (NFL Brief at 1) (bolding added).

- "Mr. ███ test results plainly *do not meet the required T scores* in **any** domain." (NFL Brief at 2) (bolding in original) (italics added)

- "With regard to the Executive Function domain, the *Settlement Agreement requires* that three or more scores be **"below** a T score of 35" or two or more scores be **"below** a T score of 35" with "1 score **below** a T score of 30."" (NFL Brief at 2) (bolding in original; italics added).

- "With regard to the Learning and Memory domain . . . *[t]he Settlement Agreement requires* that four or more scores be "**below** a T score of 35" with "1 score "**below** a T score of 30.""(NFL Brief at 3) (bolding in original; italics added).

All of the above statements from the NFL's brief demonstrate that the NFL wants "generally consistent" to be deleted from the Settlement Agreement with respect to Qualifying Diagnoses made outside of the BAP, which constitutes bad faith. The parties, in drafting the Settlement Agreement, recognized the importance of the "generally consistent" standard and foresaw the possibility of the NFL's current argument with respect to the application (or non-application) of "generally consistent" to Qualifying Diagnoses made outside of the BAP. That is why the parties added the following language to the Settlement Agreement: "For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) does not require identical diagnostic criteria, including without limitation, the same testing protocols or documentation requirements." (Section 6.4(b) of the Settlement Agreement).

The NFL's current attempt to delete "generally consistent" from the Settlement Agreement through the appeal process is improper, taken in bad faith and must be rejected. Aside from the Settlement Agreement's clear language on this issue, the Special Masters have weighed in on this very issue. FAQ 95, entitled "What does 'generally consistent' mean?" states in relevant part:

> Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones.
>
> The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

Prior to the Special Masters promulgating FAQ 95, Co-Lead Class Counsel and the NFL provided the Special Masters with their respective views on the meaning of "generally consistent" and how it should be applied to diagnoses made outside of the BAP. The Special Masters considered the opposing views and ultimately stated their view in FAQ 95, which rejects the NFL's suggested view. So, for the NFL to now argue for the elimination of the "generally consistent" standard for diagnoses made outside of the BAP is improper, frivolous and evinces bad faith.

Despite the language of FAQ 95, the NFL repeatedly argues that Mr. ███ test results are insufficient to support a monetary award based on a non-BAP diagnosis of Level 1.5 Neurological Impairment, even though Dr. ███, an MAF neurologist, and Dr. ███, a BAP-approved neuropsychologist, found those test results to be "generally consistent" with the strict BAP criteria. The NFL argues that the strict BAP diagnostic criteria must be satisfied in every respect, even though the NFL is fully aware that the "generally consistent" standard applies to Mr. ███ claim since his diagnosis was rendered outside the BAP. In fact, the NFL actually bolds the words "below" and "two or more" in their appeal presumably to reinforce their argument that Mr. ███ test results fall short of the strict BAP diagnostic criteria.

The NFL's argument is made all the more remarkable considering the Settlement Agreement's warning against trying to hold Qualifying Diagnoses made outside the BAP to those diagnostic criteria reserved solely for Qualifying Diagnoses made in the BAP (see the "For the avoidance of any doubt, . . ." language in Section 6.4(b)), and the Special Master's interpretation of the meaning of "generally consistent" found in FAQ 95. As noted earlier, FAQ 95 simply states that "[s]omething is 'generally consistent with' something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics

7

that differ from each other. The common elements or characteristics must predominate over the uncommon ones."

The specific facts of Mr. ▇▇▇ claim illustrate the extent to which the NFL's argument, if accepted, would result in an unjust and bizarre result. Under the BAP diagnostic criteria, which the Settlement Agreement and Special Masters tell us do not strictly apply to Qualifying Diagnoses made outside of the BAP, in order to establish Level 1.5 Neurocognitive Impairment, there must be evidence of severe cognitive decline in two or more cognitive domains, provided that one of those cognitive domains is executive function, learning and memory, or complex attention. Dr. ▇▇▇ and Dr. ▇▇▇ based their diagnosis on Mr. ▇▇▇ decline in two domains, Executive Function and Learning and Memory.

The NFL's position is that the test results do not support a Level 1.5 impairment finding in any domain. Specifically, the NFL argues that Mr. ▇▇▇ test results do not support a moderate to severe cognitive decline in Executive Function because they do not satisfy the exact BAP diagnostic criteria, which require 3 or more scores below a T score of 35, or 2 or more scores below a T score of 35 with 1 T score below 30. Mr. ▇▇▇ T scores were 25, 35, 36 and 41. So, Mr. ▇▇▇ had one score below 35 which was also below 30 (25), and one score of exactly 35. Accordingly, Mr. ▇▇▇ scores barely missed satisfying the second prong of the strict BAP criteria. Specifically, if Mr. ▇▇▇ scores had been 25 and 34 rather than 25 and 35, he would have satisfied the second prong of the BAP criteria. The only way that Mr. ▇▇▇ scores are not "generally consistent" with the BAP diagnostic criteria for moderate to severe cognitive decline in Executive Function (two scores below 35 with one below 30) is if you simply ignore not only the "generally consistent" language found in the Settlement Agreement, but also the Settlement Agreement's admonition to remember that language ("For the avoidance of any doubt . . ."), as

8

well as the Special Master's language found in FAQ 95. It is impossible to reconcile any reasonable application of "generally consistent" with the NFL's position that scores of 25 and 35 are not "generally consistent" with two scores below 35, with one below 30.

The same analysis is true with respect to the Learning and Memory domain. For that domain, the strict BAP criteria require 4 or more T scores below 35, or 3 or more scores below 35, with one below 30. Mr. ███ T scores were 29, 35, 35, 37, 41 and 56. Again, Mr. ███ scores barley missed satisfying the strict BAP criteria. If Mr. ███ scores of 35 had been 34, he would have satisfied the second prong of the BAP criteria (i.e. 3 or more scores below 35 with one below 30). It is impossible to reconcile any reasonable application of "generally consistent" with the NFL's position that scores of 29, 35 and 35 are not "generally consistent" with three scores below 35, with one below 30.


### III.    Conclusion

The "generally consistent" standard applicable to Qualifying Diagnosis made outside of the BAP does not require Retired Players to satisfy the BAP diagnostic criteria. Any argument to the contrary violates the language and spirit of the Settlement Agreement, as well as the guidance from the Special Masters. Most importantly, that argument, if accepted, would unjustly impact all Retired Players, such as Mr. ███, who have been, and will be, diagnosed outside of the BAP over the 65 year life of this settlement program. Accordingly, the NFL's appeal must be denied.

In addition, Co-Lead Class Counsel's request for a determination that the NFL's appeal was taken in bad faith should be granted and the NFL should be prohibited from arguing that Qualifying Diagnoses made outside of the BAP must meet the identical diagnostic criteria as those

Qualifying Diagnoses made in the BAP.  Any appeal based on that argument should be deemed to

be frivolous and taken in bad faith.


Respectfully submitted,

SEEGER WEISS LLP
/s/ Christopher A. Seeger
Christopher A. Seeger
David R. Buchanan
Michael L. Rosenberg
TerriAnne Benedetto
Scott A. George
Dated: June 5, 2018                         CO-LEAD CLASS COUNSEL

# EXHIBIT 2

## CO-LEAD CLASS COUNSEL'S

## REDACTED STATEMENT (SPID 100009422)

**Co-Lead Class Counsel's Statement in Support of Retired NFL Player
███████████'s Response to the NFL Parties' Appeal of Claim Determination**

The NFL Parties appealed Mr. ████'s Notice of Monetary Award Claim Determination arguing that test scores from Mr. ████'s neuropsychological testing did not meet the "specific criteria" set forth in the Settlement Agreement for Level 1.5 Neurocognitive Impairment (NFL Brief at 1). The NFL's argument is contrary to the plain language and intent of the Settlement Agreement, as well as to the Special Master's interpretation of the "generally consistent" standard, as expressed in FAQ 95 ("What does generally consistent mean?"). Specifically, the NFL fails to acknowledge that the diagnostic criteria for diagnoses made outside of the Baseline Assessment Program (BAP), such as Mr. ████'s diagnosis which was rendered by an MAF neurologist, need not be identical to the diagnostic criteria for diagnoses made in the BAP. Such diagnoses need only be "generally consistent" with the definitions set forth in the Settlement Agreement for the BAP. The NFL's argument not only runs counter to the Settlement Agreement, it unjustly impacts those Retired NFL Football Players who have been, and will be, diagnosed by MAF neurologists over the 65 years of the settlement program. For the reasons set forth below, the NFL has not established by clear and convincing evidence that the Claims Administrator's acceptance of the MAF diagnosis was wrong and, therefore, the NFL's appeal must be denied.

Furthermore, the NFL's blatant disregard for the "generally consistent" standard establishes that its appeal of Mr. ████'s monetary award was not taken in good faith, in violation of Section 9.6(b) of the Settlement Agreement. It should be noted that since the filing of this appeal, the NFL has filed at least 20 additional appeals similarly arguing for the application of the BAP diagnostic criteria to players who were diagnosed by MAF neurologists **outside of the BAP.** Accordingly, pursuant to Section 9.6(b), Co-Lead Class Counsel requests a determination that the NFL's appeal was taken in bad faith and for an order prohibiting the NFL from appealing awards

where the Qualifying Diagnosis was made outside of the BAP based on the argument that the diagnostic criteria of the BAP apply strictly outside of the BAP. The NFL's frivolous, bad faith appeals have real life consequences.  Not only do they cause Co-Lead Class Counsel to extend substantial resources to fight against such appeals, more importantly, they needlessly delay payments to injured players, who have waited long enough to receive compensation for their injuries.

## I.    **Background**

Mr. ████ was not diagnosed with a Qualifying Diagnosis prior to the Effective Date of the settlement (1/7/17).   Accordingly, under the terms of the Settlement Agreement, in order to submit a claim for monetary award, Mr. ████ would have to be diagnosed by an MAF-approved neurologist or through the BAP after examination by two BAP Providers.  Mr. ████ followed the required procedure and was examined by Dr. ████████, an MAF-approved neurologist, and he underwent neuropsychological testing by Dr. ███████, a BAP-approved, board-certified neuropsychologist, on 1/11/18. Based on his examination of Mr. ████, along with the results of Dr. ████ neuropsychological evaluation, Dr. ████ diagnosed Mr. ████ with Level 1.5 Neurocognitive Impairment as of 1/11/18 and submitted a properly completed MAF Diagnosing Physician Certification Form dated 2/1/18.  Mr. ████ followed all of the rules as laid out in the Settlement Agreement and established as part of the MAF.

Co-Lead Class Counsel believes that providing the Special Masters with the background of Mr. ████'s diagnosis is necessary because the NFL Parties omitted much of this important information from its appeal. Specifically, the NFL remarkably fails to mention in its appeal that Mr. ████ was diagnosed **outside of the BAP** and after the Effective Date by Dr. ████, a qualified MAF neurologist, whom the NFL approved after reviewing his application and following

whatever investigation the NFL undertook before its decision to approve him as a Qualified MAF Physician.[1] The NFL also fails to mention that Dr. ▮▮▮▮ is a BAP-approved, board-certified neuropsychologist, who is qualified under the terms of the settlement to assist Dr. Evans with his diagnosis of Mr. ▮▮▮▮. (See Section 6.3(b)(i) of the Settlement Agreement).

The NFL's appeal does not raise any issues with the qualifications of these doctors and/or their ability to render Mr. ▮▮▮▮'s diagnosis. Rather, the NFL is only arguing that the diagnosis did not satisfy what it argues is the governing standard – those spelled out for diagnoses through the BAP. However, because Mr. ▮▮▮▮ was diagnosed outside the BAP and by a qualified MAF neurologist, under the plain terms of the Settlement Agreement, the diagnosing physician did **not** have to apply the same objective diagnostic criteria to Mr. ▮▮▮▮ as to those diagnoses made in the BAP. Rather, diagnoses made by MAF neurologists need only be "generally consistent" with the BAP diagnostic criteria.

The NFL's failure to advise the Special Masters that Mr. ▮▮▮▮'s diagnosis was made by an MAF neurologist **outside of the BAP** must be seen for what it is – an intentional attempt to mislead the Special Masters into applying the BAP diagnostic criteria to a non-BAP claim. Of note, in all of the appeals taken by the NFL from awards based on diagnoses rendered by MAF neurologists, the NFL has failed to acknowledge that the diagnoses at issue were made **outside of the BAP.** Lastly, the Special Master has denied every appeal taken by the NFL in claims where the award was based on a diagnosis rendered by an MAF neurologist outside of the BAP.

---

[1] All MAF providers must be approved by both the NFL and Co-Lead Class Counsel. Both sides are afforded the opportunity to vet all MAF candidates and both sides have the right to veto a providers' candidacy. The NFL approved Dr. ▮▮▮ as an MAF provider (and also as a BAP provider). As an approved MAF provider, Dr. ▮▮▮ received training on the terms of the Settlement Agreement, including being provided with the Qualified MAF Physician Manual, as well as regular updates from the Claims Administrator.

## II.    Qualifying Diagnoses Made by MAF Neurologists Are to Be "Generally Consistent" with, Not Identical to, the Diagnostic Criteria for Qualifying Diagnoses Made in the BAP

The Settlement Agreement is clear that the diagnostic criteria for diagnoses made outside the BAP, which includes diagnoses rendered by MAF neurologists such as Dr. ███, need not be identical to the diagnostic criteria for diagnoses made in the BAP.  With respect to Mr. ███'s claim, the specific diagnostic criteria for Level 1.5 Neurocognitive Impairment in the BAP can be found in subsection 1(a)(i)-(iv) of Exhibit A-1 to the Settlement Agreement.  Subsection 1(b) of Exhibit A-1 then makes it clear which "diagnostic criteria" are subject to the "generally consistent" standard.  Subsection 1(b) states in relevant part:

> For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, **based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv) above**, . . . made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement (emphasis added).

Despite the clear language setting forth the application of the "generally consistent" standard to diagnoses made outside of the BAP, it is the very specific diagnostic criteria set forth in subsection 1(a)(i)-(iv) of Exhibit A-1, such as the need for Mr. ███ to "establish sufficient decline in two or more cognitive domains" that the NFL is now claiming Mr. ███ was required, but failed, to satisfy, even though Mr. ███ was diagnosed outside the BAP (NFL Brief at 1).  The NFL's position is contrary to the Settlement Agreement and the Special Master's interpretation of "generally consistent."

To begin, it must be noted that the "generally consistent" standard is a product of the parties' negotiations, which, by design, specifically does <u>not</u> require the identical diagnostic

4

criteria for Qualifying Diagnoses made outside of the BAP as it does for Qualifying Diagnoses made in the BAP. Rather, it empowers MAF physicians, who have been approved by both parties and have received extensive training in the various Qualifying Diagnoses recognized by the Settlement Agreement, to make appropriate diagnoses after examination of the Retired Player **outside of the BAP** without belated second-guessing. In addition, it provides discretion to the Claims Administrator to affirm MAF Qualifying Diagnoses even though different testing and evaluation may have been utilized by the MAF Physician, so long as such testing and evaluation is "generally consistent" with the diagnostic criteria for the particular Qualifying Diagnosis as defined in the Settlement Agreement.

The NFL's position, as expressed repeatedly throughout its brief, is that Qualifying Diagnoses made outside of the BAP must meet the same exact diagnostic criteria as those Qualifying Diagnoses made in the BAP, effectively ignoring the "generally consistent" language found in Section 2(b) of Exhibit A-1 of the Settlement Agreement. For example, the NFL repeatedly argues:

- "Mr. ▇▇▇▇ indisputably *failed to satisfy this requirement*. In particular, while the *Settlement Agreement unambiguously requires* a certain level of moderate to severe decline in **two or more** cognitive domains, Mr. ▇▇▇▇'s neuropsychological test results reflect such impairment in only **one** domain." (NFL Brief at 1) (bolding in original; italics added).

- "To determine a Level 1.5 impairment . . . his tested impairment **must meet the following T scores**: . . ." (NFL Brief at 1) (emphasis added).

- "Mr. ▇▇▇▇'s test results plainly **do not meet the required T scores** in any domain except for the Complex Attention domain." (NFL Brief at 2) (emphasis added)

- "The Settlement Agreement, however, contains **specific, objective thresholds, and does not permit a Qualifying Diagnosis to be based on results that "approximate" – but fall short of -- those thresholds.** (NFL Brief at 2) (emphasis added)

- Instead, the *Settlement Agreement requires* that either four scores be **"below** a T score of 35" or three scores be **"below** a T score of 35" with one score below a T score of 30." (NFL Brief at 2) (bolding in original; italics added).

All of the above statements from the NFL's brief demonstrate that the NFL wants "generally consistent" to be deleted from the Settlement Agreement with respect to Qualifying Diagnoses made outside of the BAP, which constitutes bad faith. The parties, in drafting the Settlement Agreement, recognized the importance of the "generally consistent" standard and foresaw the possibility of the NFL's current argument with respect to the application (or non-application) of "generally consistent" to Qualifying Diagnoses made outside of the BAP. That is why the parties added the following language to the Settlement Agreement: "For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) does not require identical diagnostic criteria, including without limitation, the same testing protocols or documentation requirements." (Section 6.4(b) of the Settlement Agreement).

The NFL's current attempt to delete "generally consistent" from the Settlement Agreement through the appeal process is improper, taken in bad faith and must be rejected. Aside from the Settlement Agreement's clear language on this issue, the Special Masters have weighed in on this very issue. FAQ 95, entitled "What does 'generally consistent' mean?" states in relevant part:

> Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones.
>
> The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

6

Prior to the Special Masters promulgating FAQ 95, Co-Lead Class Counsel and the NFL provided the Special Masters with their respective views on the meaning of "generally consistent" and how it should be applied to diagnoses made outside of the BAP. The Special Masters considered the opposing views and ultimately stated their view in FAQ 95, which rejects the NFL's suggested view. So, for the NFL to now argue for the elimination of the "generally consistent" standard for diagnoses made outside the BAP is improper, frivolous and evinces bad faith.

Despite the language of FAQ 95, the NFL repeatedly argues that Mr. ▮▮▮'s test results are insufficient to support a monetary award based on a non-BAP diagnosis of Level 1.5 Neurological Impairment, even though Dr. ▮▮▮, a BAP approved neuropsychologist, found those test results to "closely approximate" the BAP's diagnostic criteria for Level 1.5. The NFL argues that "approximate" and "closely approximate", by definition, cannot satisfy the BAP diagnostic criteria, even though the NFL is fully aware that the "generally consistent" standard applies to Mr. ▮▮▮'s claim since his diagnosis was rendered outside the BAP. In fact, the NFL actually bolds the phrase "closely approximates" in their appeal presumably to reinforce their argument that such language falls short of the requirement that the BAP diagnostic criteria be satisfied in every respect.

The NFL's argument that test results that "closely approximate" the BAP diagnostic criteria cannot, by definition, satisfy the "generally consistent" standard is all the more remarkable considering the Settlement Agreement's warning against trying to hold Qualifying Diagnoses made outside the BAP to those diagnostic criteria reserved solely for Qualifying Diagnoses made in the BAP (see the "For the avoidance of any doubt, . . ." language in Section 6.4(b)), and the Special Master's interpretation of the meaning of "generally consistent" found in FAQ 95. As noted earlier, FAQ 95 simply states that "[s]omething is 'generally consistent with' something else if the two things have more elements or characteristics in common with each other than they have

7

elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones." In fact, "closely approximates" is probably a higher standard than the one found in FAQ 95.

The specific facts of Mr. ████'s claim illustrate the extent to which the NFL's argument, if accepted, would result in an unjust and bizarre result. Under the BAP diagnostic criteria, which the Settlement Agreement and Special Masters tell us do not strictly apply to Qualifying Diagnoses made outside of the BAP, in order to establish Level 1.5 Neurocognitive Impairment, there must be evidence of moderate to severe cognitive decline in two or more cognitive domains, provided that one of those cognitive domains is Executive Function, Learning and Memory, or Complex Attention. Since the NFL does not dispute that the neuropsychological test results indicate that Mr. ████ showed Level 1.5 impairment in the Complex Attention domain, Mr. ████ would only have to show moderate to severe cognitive decline in any other domain to qualify for monetary award.

The NFL's position is that the test results do not support a Level 1.5 impairment finding in any domain other than Complex Attention. Specifically, the NFL argues that Mr. ████'s test results do not support a moderate to severe cognitive decline in Learning and Memory because they do not satisfy the exact BAP diagnostic criteria for that domain. Those strict BAP diagnostic criteria require either 4 or more scores below a T score of 35, or 3 or more scores below a T score of 35, with one score below 30. Mr. ████'s T scores in the Learning and Memory domain were 30, 33, 35, 35, 47 and 47. The only way that Mr. ████'s scores are not "generally consistent" with either prong of the BAP diagnostic criteria for moderate to severe cognitive decline in Learning and Memory is if you simply ignore not only the "generally consistent" language found in the Settlement Agreement, but also the Settlement Agreement's admonition to remember that

language ("For the avoidance of any doubt . . ."), as well as the Special Master's language found in FAQ 95. With respect to the first prong (4 or more scores below 35), Mr. ▮▮▮▮ had two scores below 35 (30 and 33) and two scores of exactly 35. If the scores of 35 had been only one point lower (34), he would have satisfied the strict BAP criteria. Similarly, with respect to the second prong (3 or more scores below 35 with one score below 30), if either of the 35s had been just one point lower (34), and if the score of 30 had been one point lower (29), he would have satisfied the strict BAP criteria for the second prong. It is impossible to reconcile any reasonable application of "generally consistent" with the NFL's position that Mr. XXXX's scores of 30, 33, 35, and 35 are not "generally consistent" with scores of either 30, 33, 34 and 34, or 29, 33 and 34.

## III.    Conclusion

The "generally consistent" standard applicable to Qualifying Diagnosis made outside of the BAP does not require Retired Players to satisfy the BAP diagnostic criteria. Any argument to the contrary violates the language and spirit of the Settlement Agreement, as well as the guidance from the Special Masters. Most importantly, that argument, if accepted, would unjustly impact all Retired Players, such as Mr. ▮▮▮▮, who have been, and will be, diagnosed outside of the BAP over the 65 year life of this settlement program. Accordingly, the NFL's appeal must be denied.

In addition, Co-Lead Class Counsel's request for a determination that the NFL's appeal was taken in bad faith should be granted and the NFL should be prohibited from arguing that Qualifying Diagnoses made outside of the BAP must meet the identical diagnostic criteria as those Qualifying Diagnoses made in the BAP. Any appeal based on that argument should be deemed to be frivolous and taken in bad faith.

Respectfully submitted,

SEEGER WEISS LLP
/s/ Christopher A. Seeger
Christopher A. Seeger
David R. Buchanan
Michael L. Rosenberg
TerriAnne Benedetto
Scott A. George

Dated: June 11, 2018                                   CO-LEAD CLASS COUNSEL

# EXHIBIT 3

CO-LEAD CLASS COUNSEL'S

REDACTED STATEMENT (SPID 100013190)

**Co-Lead Class Counsel's Statement in Support of Retired NFL Player
███████'s Response to the NFL Parties' Appeal of Claim Determination**

The NFL Parties appealed Mr. ██████'s Notice of Monetary Award Claim Determination arguing that test scores from Mr. ██████'s neuropsychological testing did not meet the "specific criteria" set forth in the Settlement Agreement for Level 2 Neurocognitive Impairment (NFL Brief at 1). The NFL's argument is contrary to the plain language and intent of the Settlement Agreement, as well as to the Special Master's interpretation of the "generally consistent" standard, as expressed in FAQ 95 ("What does generally consistent mean?"). Specifically, the NFL fails to acknowledge that the diagnostic criteria for diagnoses made outside of the Baseline Assessment Program (BAP), such as Mr. ██████'s diagnosis which was rendered by an MAF neurologist, need not be identical to the diagnostic criteria for diagnoses made in the BAP. Such diagnoses need only be "generally consistent" with the definitions set forth in the Settlement Agreement for the BAP. The NFL's argument not only runs counter to the Settlement Agreement, it unjustly impacts those Retired NFL Football Players who have been, and will be, diagnosed by MAF neurologists over the 65 years of the settlement program. For the reasons set forth below, the NFL has not established by clear and convincing evidence that the Claims Administrator's acceptance of the MAF diagnosis was wrong and, therefore, the NFL's appeal must be denied.

Furthermore, the NFL's blatant disregard for the "generally consistent" standard establishes that its appeal of Mr. ██████'s monetary award was not taken in good faith, in violation of Section 9.6(b) of the Settlement Agreement. It should be noted that since the filing of this appeal, the NFL has filed additional appeals similarly arguing for the application of the BAP diagnostic criteria to players who were diagnosed by MAF neurologists **outside of the BAP.** Accordingly, pursuant to Section 9.6(b), Co-Lead Class Counsel requests a determination that the NFL's appeal was taken in bad faith and for an order prohibiting the NFL from appealing awards

where the Qualifying Diagnosis was made outside of the BAP based on the argument that the diagnostic criteria of the BAP apply strictly outside of the BAP. The NFL's frivolous, bad faith appeals have real life consequences. Not only do they cause Co-Lead Class Counsel to extend substantial resources to fight against such appeals, more importantly, they needlessly delay payments to injured players, who have waited long enough to receive compensation for their injuries.

## I.   **Background**

Mr. ███████ was not diagnosed with a Qualifying Diagnosis prior to the Effective Date of the settlement (1/7/17).   Accordingly, under the terms of the Settlement Agreement, in order to submit a claim for monetary award, Mr. ███████ would have to be diagnosed by an MAF-approved neurologist or through the BAP after examination by two BAP Providers. Mr. ███████ followed the required procedure and was examined by Dr. ███████, an MAF-approved neurologist, and underwent neuropsychological testing by Dr. ███████, a BAP-approved, board-certified neuropsychologist, on 7/26/17. Based on his examination of Mr. ███████, along with the results of Dr. ███████' neuropsychological evaluation, Dr. ███ diagnosed Mr. ███████ with Level 2 Neurocognitive Impairment as of 10/9/17 and submitted a properly completed MAF Diagnosing Physician Certification Form dated 10/13/18. Mr. ███████ followed all of the rules as laid out in the Settlement Agreement and established as part of the MAF.

Co-Lead Class Counsel believes that providing the Special Masters with the background of Mr. ███████'s diagnosis is necessary because the NFL Parties omitted much of this important information from its appeal. Specifically, the NFL remarkably fails to mention in its appeal that Mr. ███████ was diagnosed **outside of the BAP** and after the Effective Date by Dr. ███, a qualified MAF neurologist, whom the NFL approved after reviewing his application and following

2

whatever investigation the NFL undertook before its decision to approve him as a Qualified MAF Physician.[1] The NFL also fails to mention that Dr. Brooks is a BAP-approved, board-certified neuropsychologist, who is qualified under the terms of the settlement to assist Dr. ▮▮ with his diagnosis of Mr. ▮▮▮▮. (See Section 6.3(b)(i) of the Settlement Agreement).

The NFL's appeal does not raise any issues with the qualifications of these doctors and/or their ability to render Mr. ▮▮▮▮'s diagnosis. Rather, the NFL is only arguing that the diagnosis did not satisfy what it argues is the governing standard – those spelled out for diagnoses through the BAP. However, because Mr. ▮▮▮▮ was diagnosed outside the BAP and by a qualified MAF neurologist, under the plain terms of the Settlement Agreement, the diagnosing physician did **not** have to apply the same objective diagnostic criteria to Mr. ▮▮▮▮ as to those diagnoses made in the BAP. Rather, diagnoses made by MAF neurologists need only be "generally consistent" with the BAP diagnostic criteria.

The NFL's failure to advise the Special Masters that Mr. ▮▮▮▮'s diagnosis was made by an MAF neurologist **outside of the BAP** must be seen for what it is – an intentional attempt to mislead the Special Masters into applying the BAP diagnostic criteria to a non-BAP claim. Of note, in all of the appeals taken by the NFL from awards based on diagnoses rendered by MAF neurologists, the NFL has failed to acknowledge that the diagnoses at issue were made **outside of the BAP**. Lastly, the Special Master has denied every appeal taken by the NFL in claims where the award was based on a diagnosis rendered by an MAF neurologist outside of the BAP.

---

[1] All MAF providers must be approved by both the NFL and Co-Lead Class Counsel. Both sides are afforded the opportunity to vet all MAF candidates and both sides have the right to veto a providers' candidacy. The NFL approved Dr. ▮▮ as an MAF provider (and also as a BAP provider). As an approved MAF provider, Dr. ▮▮ received training on the terms of the Settlement Agreement, including being provided with the Qualified MAF Physician Manual, as well as regular updates from the Claims Administrator.

**II.     Qualifying Diagnoses Made by MAF Neurologists Are to Be "Generally Consistent" with, Not Identical to, the Diagnostic Criteria for Qualifying Diagnoses Made in the BAP**

The Settlement Agreement is clear that the diagnostic criteria for diagnoses made outside the BAP, which includes diagnoses rendered by MAF neurologists such as Dr. ███, need not be identical to the diagnostic criteria for diagnoses made in the BAP.  With respect to Mr. ███'s claim, the specific diagnostic criteria for Level 2 Neurocognitive Impairment in the BAP can be found in subsection 2(a)(i)-(iv) of Exhibit A-1 to the Settlement Agreement.  Subsection 2(b) of Exhibit A-1 then makes it clear which "diagnostic criteria" are subject to the "generally consistent" standard.  Subsection 2(b) states in relevant part:

> For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 2 Neurocognitive Impairment, *i.e.*, moderate dementia, **based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv) above,** . . . made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement (emphasis added).

Despite the clear language setting forth the application of the "generally consistent" standard to diagnoses made outside of the BAP, it is the very specific diagnostic criteria set forth in subsection 2(a)(i)-(iv) of Exhibit A-1, such as the need for Mr. ███ to establish "a certain level of moderate to severe decline in two or more cognitive domains" that the NFL is now claiming Mr. ███ was required, but failed, to satisfy, even though Mr. ███ was diagnosed outside the BAP (NFL Brief at 1).  The NFL's position is contrary to the Settlement Agreement and the Special Master's interpretation of "generally consistent."

To begin, it must be noted that the "generally consistent" standard is a product of the parties' negotiations, which, by design, specifically does <u>not</u> require the identical diagnostic

criteria for Qualifying Diagnoses made outside of the BAP as it does for Qualifying Diagnoses made in the BAP. Rather, it empowers MAF physicians, who have been approved by both parties and have received extensive training in the various Qualifying Diagnoses recognized by the Settlement Agreement, to make appropriate diagnoses after examination of the Retired Player **outside of the BAP** without belated second-guessing. In addition, it provides discretion to the Claims Administrator to affirm MAF Qualifying Diagnoses even though different testing and evaluation may have been utilized by the MAF Physician, so long as such testing and evaluation is "generally consistent" with the diagnostic criteria for the particular Qualifying Diagnosis as defined in the Settlement Agreement.

The NFL's position, as expressed repeatedly throughout its brief, is that Qualifying Diagnoses made outside of the BAP must meet the same exact diagnostic criteria as those Qualifying Diagnoses made in the BAP, effectively ignoring the "generally consistent" language found in Section 2(b) of Exhibit A-1 of the Settlement Agreement. For example, the NFL repeatedly argues:

- "Mr. ███████ indisputably **failed to satisfy this requirement** because his neuropsychological testing did not establish sufficient decline in two or more cognitive domains. In particular, while the **Settlement Agreement unambiguously requires** a specific level of decline in two or more cognitive domains, Mr. ███████'s test results reflect such impairment in only one domain. (NFL Brief at 1) (emphasis added).

- "To determine a Level 2 impairment . . . his tested impairment **must meet the following T scores in two or more domains: . . .**" (NFL Brief at 1) (emphasis added).

- "Mr. ███████'s test results plainly **do not meet the required T scores** in any domain other that the Language domain." (NFL Brief at 2) (emphasis added)

- "The Settlement Agreement, however, contains **specific, objective thresholds, and does not permit a Qualifying Diagnosis to be based on results that fall short of those thresholds.** (NFL Brief at 2) (emphasis added)

5

All of the above statements from the NFL's brief demonstrate that the NFL wants "generally consistent" to be deleted from the Settlement Agreement with respect to Qualifying Diagnoses made outside of the BAP, which constitutes bad faith. The parties, in drafting the Settlement Agreement, recognized the importance of the "generally consistent" standard and foresaw the possibility of the NFL's current argument with respect to the application (or non-application) of "generally consistent" to Qualifying Diagnoses made outside of the BAP. That is why the parties added the following language to the Settlement Agreement: "For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) does not require identical diagnostic criteria, including without limitation, the same testing protocols or documentation requirements." (Section 6.4(b) of the Settlement Agreement).

The NFL's current attempt to delete "generally consistent" from the Settlement Agreement through the appeal process is improper, taken in bad faith and must be rejected. Aside from the Settlement Agreement's clear language on this issue, the Special Masters have weighed in on this very issue. FAQ 95, entitled "What does 'generally consistent' mean?" states in relevant part:

> Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones.

> The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

Prior to the Special Masters promulgating FAQ 95, Co-Lead Class Counsel and the NFL provided the Special Masters with their respective views on the meaning of "generally consistent"

6

and how it should be applied to diagnoses made outside of the BAP. The Special Masters considered the opposing views and ultimately stated their view in FAQ 95, which rejects the NFL's suggested view. So, for the NFL to now argue for the elimination of the "generally consistent" standard for diagnoses made outside of the BAP is improper, frivolous and evinces bad faith.

Despite the language of FAQ 95, the NFL repeatedly argues that Mr. ███████'s test results are insufficient to support a monetary award based on a non-BAP diagnosis of Level 2 Neurological Impairment, even though Dr. █████, an MAF neurologist, concurred with Dr. Brooks, a BAP neuropsychologist, who found those test results to be "generally consistent" with the BAP's diagnostic criteria for Level 2  The NFL argues that test results that "fall short" of the strict BAP diagnostic criteria cannot, by definition, support a Qualifying Diagnosis made outside of the BAP, even though the NFL is fully aware that the "generally consistent" standard applies to Mr. ███████'s claim since his diagnosis was rendered outside the BAP.

The NFL's argument that test results that "fall short" of the strict the BAP diagnostic criteria cannot, by definition, satisfy the "generally consistent" standard is all the more remarkable considering the Settlement Agreement's warning against trying to hold Qualifying Diagnoses made outside the BAP to those diagnostic criteria reserved solely for Qualifying Diagnoses made in the BAP (see the "For the avoidance of any doubt, . . ." language in Section 6.4(b)), and the Special Master's interpretation of the meaning of "generally consistent" found in FAQ 95. As noted earlier, FAQ 95 simply states that "[s]omething is 'generally consistent with' something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones."

The specific facts of Mr. ████'s claim illustrate the extent to which the NFL's argument, if accepted, would result in an unjust and bizarre result.  Under the BAP diagnostic criteria, which the Settlement Agreement and Special Masters tell us do not strictly apply to Qualifying Diagnoses made outside of the BAP, in order to establish Level 2 Neurocognitive Impairment, there must be evidence of severe cognitive decline in two or more cognitive domains, provided that one of those cognitive domains is Executive Function, Learning and Memory, or Complex Attention.  Since the NFL does not dispute that the neuropsychological test results indicate that Mr. ████ showed Level 2 impairment in the Language domain, Mr. ████ would only have to show severe cognitive decline in any of the following domains in order to qualify for monetary award:  Executive Function, Learning and Memory, or Complex Attention.

The NFL's position is that Mr. ████'s test results do not support a Level 2 impairment finding in any domain other than Language.  Specifically, the NFL argues that his test results do not support a severe cognitive decline in Learning and Memory because they do not satisfy the exact BAP diagnostic criteria for that domain.  The strict BAP diagnostic criteria for Learning and Memory require two or more scores below a T score of 30.  Mr. ████'s scores in Learning and Memory were 26, 32, 32, 37, 56 and 58.  So Mr. ████ had one score below 30 (26), with two scores just over 30 (32).  As Dr. ████ points out, Mr. ████ "barely missed" satisfying the strict BAP criteria for Level 2 Neurocognitivce Impairment in the Learning and Memory domain. In fact, if Mr. ████ had made just one less correct answer on the Logical Memory II test, his T-score for the Learning and Memory domain would have been below 30.  Accordingly, the only way Mr. ████'s scores are not "generally consistent" with the BAP diagnostic criteria for severe cognitive decline in Learning and Memory is if you simply ignore not only the "generally consistent" language found in the Settlement Agreement, but also the Settlement Agreement's

8

admonition to remember that language ("For the avoidance of any doubt . . ."), as well as the Special Master's language found in FAQ 95.

### III.   Conclusion

The "generally consistent" standard applicable to Qualifying Diagnosis made outside of the BAP does not require Retired Players to satisfy the BAP diagnostic criteria. Any argument to the contrary violates the language and spirit of the Settlement Agreement, as well as the guidance from the Special Masters. Most importantly, that argument, if accepted, would unjustly impact all Retired Players, such as Mr. ████, who have been, and will be, diagnosed outside of the BAP over the 65 year life of this settlement program. Accordingly, the NFL's appeal must be denied.

In addition, Co-Lead Class Counsel's request for a determination that the NFL's appeal was taken in bad faith should be granted and the NFL should be prohibited from arguing that Qualifying Diagnoses made outside of the BAP must meet the identical diagnostic criteria as those Qualifying Diagnoses made in the BAP. Any appeal based on that argument should be deemed to be frivolous and taken in bad faith.

<div style="margin-left:40%">

Respectfully submitted,

SEEGER WEISS LLP
/s/ Christopher A. Seeger
Christopher A. Seeger
David R. Buchanan
Michael L. Rosenberg
TerriAnne Benedetto
Scott A. George
CO-LEAD CLASS COUNSEL

</div>

Dated: July 16, 2018

# EXHIBIT 4

CO-LEAD CLASS COUNSEL'S

REDACTED STATEMENT (SPID 100005741)

**Co-Lead Class Counsel's Statement in Support of Retired NFL Player
██████████'s Response to the NFL Parties' Appeal of Claim Determination**

The NFL Parties appealed Mr. ██████'s Notice of Monetary Award Claim Determination

arguing that test scores from Mr. ██████'s neuropsychological testing did not meet the "specific

criteria" set forth in the Settlement Agreement for Level 1.5 Neurocognitive Impairment (NFL

Brief at 1).  The NFL's argument is contrary to the plain language and intent of the Settlement

Agreement, as well as to the Special Master's interpretation of the "generally consistent" standard,

as expressed in FAQ 95 ("What does generally consistent mean?").  Specifically, the NFL fails to

acknowledge that the diagnostic criteria for diagnoses made outside of the Baseline Assessment

Program (BAP), such as Mr. ██████'s diagnosis which was rendered by an MAF neurologist, need

not be identical to the diagnostic criteria for diagnoses made in the BAP.  Such diagnoses need

only be "generally consistent" with the definitions set forth in the Settlement Agreement for the

BAP. The NFL's argument not only runs counter to the Settlement Agreement, it unjustly impacts

those Retired NFL Football Players who have been, and will be, diagnosed by MAF neurologists

over the 65 years of the settlement program.  For the reasons set forth below, the NFL has not

established by clear and convincing evidence that the Claims Administrator's acceptance of the

MAF diagnosis was wrong and, therefore, the NFL's appeal must be denied.

Furthermore, the NFL's blatant disregard for the "generally consistent" standard

establishes that its appeal of Mr. ██████'s monetary award was not taken in good faith, in violation

of Section 9.6(b) of the Settlement Agreement.  It should be noted that since the filing of this

appeal, the NFL has filed additional appeals similarly arguing for the application of the BAP

diagnostic criteria to players who were diagnosed by MAF neurologists **outside of the BAP.**

Accordingly, pursuant to Section 9.6(b), Co-Lead Class Counsel requests a determination that the

NFL's appeal was taken in bad faith and for an order prohibiting the NFL from appealing awards

where the Qualifying Diagnosis was made outside of the BAP based on the argument that the diagnostic criteria of the BAP apply strictly outside of the BAP. The NFL's frivolous, bad faith appeals have real life consequences.  Not only do they cause Co-Lead Class Counsel to extend substantial resources to fight against such appeals, more importantly, they needlessly delay payments to injured players, who have waited long enough to receive compensation for their injuries.

### I.   Background

Mr. ▮▮▮ was not diagnosed with a Qualifying Diagnosis prior to the Effective Date of the settlement (1/7/17).   Accordingly, under the terms of the Settlement Agreement, in order to submit a claim for monetary award, Mr. ▮▮▮ would have to be diagnosed by an MAF-approved neurologist or through the BAP after examination by two BAP Providers.  Mr. ▮▮▮ followed the required procedure and was examined by Dr. ▮▮▮▮▮▮, an MAF-approved neurologist, and underwent neuropsychological testing by Dr. ▮▮▮▮▮▮, a board-certified neuropsychologist, on 3/12/18. Based on her examination of Mr. ▮▮▮, along with the results of Dr. ▮▮▮'s neuropsychological evaluation, Dr. ▮▮▮ diagnosed Mr. ▮▮▮ with Level 1.5 Neurocognitive Impairment as of 4/24/18 and submitted a properly completed MAF Diagnosing Physician Certification Form dated 6/7/18. Mr. ▮▮▮ followed all of the rules as laid out in the Settlement Agreement and established as part of the MAF.

Co-Lead Class Counsel believes that providing the Special Masters with the background of Mr. ▮▮▮'s diagnosis is necessary because the NFL Parties omitted much of this important information from its appeal. Specifically, the NFL remarkably fails to mention in its appeal that Mr. ▮▮▮ was diagnosed **outside of the BAP** and after the Effective Date by Dr. ▮▮▮, a qualified MAF neurologist, whom the NFL approved after reviewing her application and following

whatever investigation the NFL undertook before its decision to approve her as a Qualified MAF Physician.[1] The NFL also fails to mention that Dr. Dickson is a board-certified neuropsychologist, who is qualified under the terms of the settlement to assist Dr. ███ with her diagnosis of Mr. ███. (See Section 6.3(b)(i) of the Settlement Agreement).

The NFL's appeal does not raise any issues with the qualifications of these doctors and/or their ability to render Mr. ███'s diagnosis. Rather, the NFL is only arguing that the diagnosis did not satisfy what it argues is the governing standard – those spelled out for diagnoses through the BAP. However, because Mr. ███ was diagnosed outside the BAP and by a qualified MAF neurologist, under the plain terms of the Settlement Agreement, the diagnosing physician did **not** have to apply the same objective diagnostic criteria to Mr. ███ as to those diagnoses made in the BAP. Rather, diagnoses made by MAF neurologists need only be "generally consistent" with the BAP diagnostic criteria.

The NFL's failure to advise the Special Masters that Mr. ███'s diagnosis was made by an MAF neurologist **outside of the BAP** must be seen for what it is – an intentional attempt to mislead the Special Masters into applying the BAP diagnostic criteria to a non-BAP claim. Of note, in all of the appeals taken by the NFL from awards based on diagnoses rendered by MAF neurologists, the NFL has failed to acknowledge that the diagnoses at issue were made **outside of the BAP**. Lastly, the Special Master has denied every appeal taken by the NFL in claims where the award was based on a diagnosis rendered by an MAF neurologist outside of the BAP.

---

[1] All MAF providers must be approved by both the NFL and Co-Lead Class Counsel. Both sides are afforded the opportunity to vet all MAF candidates and both sides have the right to veto a providers' candidacy. The NFL approved Dr. ███ as an MAF provider (and also as a BAP provider). As an approved MAF provider, Dr. ███ received training on the terms of the Settlement Agreement, including being provided with the Qualified MAF Physician Manual, as well as regular updates from the Claims Administrator.

**II.**     **Qualifying Diagnoses Made by MAF Neurologists Are to Be "Generally Consistent" with, Not Identical to, the Diagnostic Criteria for Qualifying Diagnoses Made in the BAP**

The Settlement Agreement is clear that the diagnostic criteria for diagnoses made outside

the BAP, which includes diagnoses rendered by MAF neurologists such as Dr. ████, need not

be identical to the diagnostic criteria for diagnoses made in the BAP.  With respect to Mr. ████'s

claim, the specific diagnostic criteria for Level 1.5 Neurocognitive Impairment in the BAP can be

found in subsection 1(a)(i)-(iv) of Exhibit A-1 to the Settlement Agreement.  Subsection 1(b) of

Exhibit A-1 then makes it clear which "diagnostic criteria" are subject to the "generally consistent"

standard.  Subsection 1(b) states in relevant part:

> For living Retired NFL Football Players diagnosed outside of the BAP, a
> diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early
> dementia, **based on evaluation and evidence generally consistent with the
> diagnostic criteria set forth in subsection 1(a)(i)-(iv) above,** . . . made by
> a Qualified MAF Physician or a board-certified or otherwise qualified
> neurologist, neurosurgeon, or other neuro-specialist physician, as set forth
> and provided in Sections 6.3(b)-(d) of the Settlement Agreement (emphasis
> added).

Despite the clear language setting forth the application of the "generally consistent" standard to

diagnoses made outside of the BAP, it is the very specific diagnostic criteria set forth in subsection

1(a)(i)-(iv) of Exhibit A-1, such as the need for Mr. ████ to establish "a certain level of moderate

to severe decline in two or more cognitive domains" that the NFL is now claiming Mr. ████ was

required, but failed, to satisfy, even though Mr. ████ was diagnosed outside the BAP (NFL Brief

at 1).  The NFL's position is contrary to the Settlement Agreement and the Special Master's

interpretation of "generally consistent."

     To begin, it must be noted that the "generally consistent" standard is a product of the

parties' negotiations, which, by design, specifically does <u>not</u> require the identical diagnostic

criteria for Qualifying Diagnoses made outside of the BAP as it does for Qualifying Diagnoses made in the BAP. Rather, it empowers MAF physicians, who have been approved by both parties and have received extensive training in the various Qualifying Diagnoses recognized by the Settlement Agreement, to make appropriate diagnoses after examination of the Retired Player **outside of the BAP** without belated second-guessing. In addition, it provides discretion to the Claims Administrator to affirm MAF Qualifying Diagnoses even though different testing and evaluation may have been utilized by the MAF Physician, so long as such testing and evaluation is "generally consistent" with the diagnostic criteria for the particular Qualifying Diagnosis as defined in the Settlement Agreement.

The NFL's position, as expressed repeatedly throughout its brief, is that Qualifying Diagnoses made outside of the BAP must meet the same exact diagnostic criteria as those Qualifying Diagnoses made in the BAP, effectively ignoring the "generally consistent" language found in Section 1(b) of Exhibit A-1 of the Settlement Agreement. For example, the NFL repeatedly argues:

- "Exhibit 2, in turn, specifies that a claimant of average estimates intellectual functioning, such as Mr. ▮▮▮▮, **must meet the following T scores:** . . ." (NFL Brief at 1) (emphasis added).

- "Mr. ▮▮▮▮'s neuropsychological test results clearly **do not meet the threshold T scores** in two or more domains." (NFL Brief at 2) (emphasis added)

- "Nor can claimants, such as Mr. ▮▮▮▮, attempt to change or ignore the **requisite criteria** for establishing Qualifying Diagnoses. (NFL Brief at 4) (emphasis added)

All of the above statements from the NFL's brief demonstrate that the NFL wants "generally consistent" to be deleted from the Settlement Agreement with respect to Qualifying Diagnoses made outside of the BAP, which constitutes bad faith. The parties, in drafting the Settlement Agreement, recognized the importance of the "generally consistent" standard and

5

foresaw the possibility of the NFL's current argument with respect to the application (or non-application) of "generally consistent" to Qualifying Diagnoses made outside of the BAP. That is why the parties added the following language to the Settlement Agreement: "For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) does not require identical diagnostic criteria, including without limitation, the same testing protocols or documentation requirements." (Section 6.4(b) of the Settlement Agreement).

The NFL's current attempt to delete "generally consistent" from the Settlement Agreement through the appeal process is improper, taken in bad faith and must be rejected. Aside from the Settlement Agreement's clear language on this issue, the Special Masters have weighed in on this very issue. FAQ 95, entitled "What does 'generally consistent' mean?" states in relevant part:

> Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones.
>
> The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

Prior to the Special Masters promulgating FAQ 95, Co-Lead Class Counsel and the NFL provided the Special Masters with their respective views on the meaning of "generally consistent" and how it should be applied to diagnoses made outside of the BAP. The Special Masters considered the opposing views and ultimately stated their view in FAQ 95, which rejects the NFL's suggested view. So, for the NFL to now argue for the elimination of the "generally consistent" standard for diagnoses made outside of the BAP is improper, frivolous and evinces bad faith.

Despite the language of FAQ 95, the NFL repeatedly argues that Mr. ████'s test results are insufficient to support a monetary award based on a non-BAP diagnosis of Level 1.5 Neurological Impairment, even though Dr. ████, an MAF neurologist, concurred with Dr. Dickson who found those test results to be "generally consistent" with the BAP's diagnostic criteria for Level 1.5  The NFL argues that test results that do not satisfy the strict BAP diagnostic criteria cannot, by definition, support a Qualifying Diagnosis made outside of the BAP, even though the NFL is fully aware that the "generally consistent" standard applies to Mr. ████'s claim since his diagnosis was rendered outside the BAP.

The NFL's argument that test results that do not satisfy of the strict the BAP diagnostic criteria cannot, by definition, satisfy the "generally consistent" standard is all the more remarkable considering the Settlement Agreement's warning against trying to hold Qualifying Diagnoses made outside the BAP to those diagnostic criteria reserved solely for Qualifying Diagnoses made in the BAP (see the "For the avoidance of any doubt, . . ." language in Section 6.4(b)), and the Special Master's interpretation of the meaning of "generally consistent" found in FAQ 95.  As noted earlier, FAQ 95 simply states that "[s]omething is 'generally consistent with' something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other.  The common elements or characteristics must predominate over the uncommon ones."

The specific facts of Mr. ████'s claim illustrate the extent to which the NFL's argument, if accepted, would result in an unjust and bizarre result.  Under the BAP diagnostic criteria, which the Settlement Agreement and Special Masters tell us do not strictly apply to Qualifying Diagnoses made outside of the BAP, in order to establish Level 1.5 Neurocognitive Impairment, there must be evidence of moderate to severe cognitive decline in two or more cognitive domains, provided

that one of those cognitive domains is Executive Function, Learning and Memory, or Complex Attention.  Since the NFL does not dispute that the neuropsychological test results indicate that Mr. ▮▮▮▮ showed Level 1.5 impairment in the Learning and Memory domain, Mr. ▮▮▮▮ would only have to show moderate to severe cognitive decline in any of the remaining domains in order to qualify for monetary award.

The NFL's position is that Mr. ▮▮▮▮'s test results do not support a Level 1.5 impairment finding in any domain other than Learning and Memory.  Specifically, the NFL argues that his test results do not support a moderate to severe cognitive decline in Executive Function because they do not satisfy the exact BAP diagnostic criteria for that domain.  The strict BAP diagnostic criteria for Executive Function require three or more scores below a T score of 35, or two or more scores below 35 with one score below 30.  Mr. ▮▮▮▮'s scores in Executive Function were 29, 36, 37 and 48. So Mr. ▮▮▮▮ had one score below 35 (29), which was also below 30, and one score just over 35 (36), which barely missed satisfying the strict BAP criteria.  If Mr. ▮▮▮▮'s 36 had been a 34, he would have satisfied the second prong of the strict BAP criteria. Accordingly, the only way Mr. ▮▮▮▮'s scores are not "generally consistent" with the BAP diagnostic criteria for moderate to severe cognitive decline in Executive Function is if you simply ignore not only the "generally consistent" language found in the Settlement Agreement, but also the Settlement Agreement's admonition to remember that language ("For the avoidance of any doubt . . ."), as well as the Special Master's language found in FAQ 95.

8

## III.    Conclusion

The "generally consistent" standard applicable to Qualifying Diagnosis made outside of the BAP does not require Retired Players to satisfy the BAP diagnostic criteria. Any argument to the contrary violates the language and spirit of the Settlement Agreement, as well as the guidance from the Special Masters. Most importantly, that argument, if accepted, would unjustly impact all Retired Players, such as Mr. ▓▓▓, who have been, and will be, diagnosed outside of the BAP over the 65 year life of this settlement program. Accordingly, the NFL's appeal must be denied.

In addition, Co-Lead Class Counsel's request for a determination that the NFL's appeal was taken in bad faith should be granted and the NFL should be prohibited from arguing that Qualifying Diagnoses made outside of the BAP must meet the identical diagnostic criteria as those Qualifying Diagnoses made in the BAP. Any appeal based on that argument should be deemed to be frivolous and taken in bad faith.

.

                                          Respectfully submitted,

                                          SEEGER WEISS LLP
                                          /s/ Christopher A. Seeger
                                          Christopher A. Seeger
                                          David R. Buchanan
                                          Michael L. Rosenberg
                                          TerriAnne Benedetto
                                          Scott A. George
                                          CO-LEAD CLASS COUNSEL

Dated: September 4, 2018