# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                       Plaintiffs,<br>     v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>                       Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Locks Law Firm v. Owens<br>Attorney's Lien Dispute<br>(Doc. No. 8399) | |

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                                     January 18, 2019

### I.    INTRODUCTION

The District Court referred to us all "all petitions for individual attorneys' liens." (Doc. No. 7446). On January 7, 2019, we issued a Report and Recommendation pertaining to three separate cases. (Doc. No. 10368). These were the first where we set out the legal principles that would guide our analysis in these cases. We do the same here.

Before this Court is a Lien filed by Locks Law Firm ("Locks") seeking attorneys' fees and costs from the Award granted to Burtaniel Owens ("Owens") as a Representative Claimant authorized to pursue the claim of her deceased husband, Joseph Owens, in the litigation which became this class action, *In re: National Football League Players' Concussion Injury Litigation*,

No. 12-md-2323 (E.D. Pa.).[1] Owens and Locks (the "Parties") were advised of their right to consent to have a Magistrate Judge issue a final Order to resolve this Dispute. They both consented. (Doc. No. 10260). Accordingly, this Explanation and Order will serve as the final decision of the Court. *See* Fed. R. Civ. P. 73.

Locks seeks payment of attorneys' fees of 22% of the Award issued to Owens, their former client.[2] Lienholder's Response at 4. Owens, now acting *pro se*, challenges the Lien. Initially she contended that the fee "for [Locks'] short services" should be limited to $20,000, given that the firm "did not take [her] full interest to the table." SCM Statement of Dispute (dated July 30, 2018) at 1. Subsequently, she has asserted that Locks "misrepresented facts pertinent to obtaining the best possible award for [her]" and that the firm "concealed … and misrepresented" facts relating to their services for Owens during this Lien Litigation and therefore should not be entitled to any fee. SCM Response to Locks Response Memo. at 1.

As we set out in our January 7th Report and Recommendation, our evaluation of these positions involves a consideration of the contingency fee agreement ("CFA") between the Parties and an assessment of the reasonableness of the requested fee in light of the five factors enumerated by the Third Circuit in *McKenzie*. *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")). This will require us to scrutinize the

---

[1] Under the terms of the Settlement Agreement, a Representative Claimant is an authorized representative of a deceased, legally incapacitated or incompetent Retired NFL Football Player. Settlement Agreement, Article II, Section 2.1(eeee).

[2] As we describe below, on April 5, 2018, the District Court determined that presumptively no Individually Retained Plaintiff's Attorneys ("IRPAs") should receive more than 22% of a Monetary Award in fees. ("Fee Cap"). (Doc. No. 9863). *See* Doc. No. 10368 at 10-11 (discussing the District Court's decision relating to the presumptive Fee Cap). Locks' request in this case reflects that development.

2

reasonableness of the CFA at the time of the contact's signing and then determine if the circumstances compel a different evaluation of the CFA at the time of its enforcement. We will then examine the results obtained, the quality of the representation provided by Locks, and whether the efforts of Locks substantially contributed to the result. *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.

## II. FACTS AND PROCEDURAL HISTORY

Locks entered into a CFA with Owens and her husband on March 7, 2012. Lienholder's Response, Exhibit C. Under the terms of the agreement, Mr. and Mrs. Owens agreed to pay 33.33% of any monetary recovery. Payment was contingent upon the success of the litigation. On March 9, 2012, the firm filed a complaint against the NFL that included Joseph Owens as a named plaintiff. *Hopkins, et al. v. NFL, et al.*, No. 12-cv-1239 (E.D. Pa. Mar. 9, 2012).[3] Joseph Owens died on June 13, 2013. After his death, Locks continued to represent his interests, pursuing the litigation on behalf of Mrs. Owens.

Sometime in 2016,[4] after the approval of the Settlement Agreement, Locks advised all of its clients, including Owens, that they were revising their fee agreements by lowering the fee sought to 20% of the total Award. N.T. 11/9/2018 at 59. *See also* Lienholder's Response, Exhibit C (attaching the modified retainer agreement). Registration in the class opened on February 6,

---

[3] Locks had previously filed a class action complaint against the NFL. *Solt, et al. v. NFL, et al.*, No. 12-cv-262 (E.D. Pa. Jan. 18, 2012). Owens was not named in the original complaint, but as a retired professional football player he would have been a part of the class proposed by the Locks complaint. *Id.*, Doc. 1 at 17. Specifically, Owens would have been a proposed member of the "Symptomatic Subclass," which included individuals with a variety of diagnoses including Alzheimer's Disease. *Id.* at 18.

[4] The Parties have not provided us with a precise date that the agreement was modified. However, Locks has indicated that it was in 2016, and Owens has not disputed this.

2017, and on May 16, 2017, Locks submitted the claim for a monetary award for Owens. By July 14, 2017, Owens had received conditional approval of the Award. On August 18, 2017, the Claims Administrator issued a Notice of Monetary Award.

Before the Award was issued, however, Owens decided that she no longer wanted the services of Locks.[5] On or about September 19, 2017, the Claims Administrator received from Owens written notification that Locks had been "terminated." Lienholder's Response, Exhibit K. The Claims Administrator promptly advised Locks that it had received notice of this development.

On September 22, 2017, Locks filed a Notice of Lien in this Court. (Doc. No. 8399). The firm attached the *original* fee agreement with Owens reflecting a 33.33% fee, not the revised CFA containing the adjustment to a 20% fee. On October 2, 2017, the Claims Administrator issued a Notice of Lien to Owens and Locks, which indicated that the Lien amount was 33.33% of any Monetary Award. Owens responded and advised the Claims Administrator that she intended to dispute the Lien.[6]

Before any action was taken on the liens filed in this litigation, we promulgated "Rules Governing Attorney Liens." These Rules were approved and adopted by the District Court on March 6, 2018, with amendments approved and adopted on October 3, 2018. ("Lien Rules" at Doc. No. 9760, as amended at Doc. No. 10283). The Lien Rules provide the specific briefing

---

[5] Owens stated at the hearing that she terminated Locks before the Award "was submitted." There is no support for that timing in the record, and she later acknowledged that she did not terminate the agreement until September of 2017. N.T. 11/9/2018 at 63. Moreover, Locks has provided copies of e-mails between the firm and Owens through the middle of August 2017. Lienholder's Response, Exhibit I. We accept those e-mails as evidence of an ongoing attorney-client relationship at that point. We thus find that the CFA was terminated after both the Claim had been submitted and the Notice of Award was issued.

[6] The Notice of Lien issued by the Claims Administrator was consistent with Lien Rule 8(d), and the response of Owens satisfied Lien Rule 10.

4

requirements for this litigation. The Parties were provided Notice of these Rules through multiple sources, as they were filed on the MDL Docket and are accessible through the NFL Concussion Settlement website, www.nflconcussionsettlement.com.

On June 18, 2018, the Claims Administrator issued a Schedule of Document Submissions to the Parties. Each were advised that, pursuant to Lien Rule 16, they were obligated to submit a Statement of Dispute by July 18, 2018. The Schedule of Document Submissions specifically copied the requirements of the Statement of Dispute that are contained in the Lien Rules:

> (a) Each attorney lienholder and the current attorney, if the [Settlement Class Member ("SCM")] is represented, must serve the Claims Administrator with a Statement of Dispute including:
>
> (1) A statement of all issues in dispute;
>
> (2) A chronology of the tasks performed by the attorney, the date each task was performed, and the time spent on each task;
>
> (3) A list of costs with a brief explanation of the purpose of incurring these costs and the date the costs were incurred;
>
> (4) The relief sought;
>
> (5) A summary of the attempts to reach an agreement with the opposing Party;
>
> (6) Any exhibits; and
>
> (7) A statement signed by the submitting Party declaring under penalty of perjury pursuant to 28 U.S.C. § 1746 that the information submitted in the Statement of Dispute is true and accurate to the best of that Party's knowledge and that the submitting Party understands that false statements made in connection with this process may result in fines, sanctions, and/or any other remedy available by law. The statement may be signed by a current attorney on behalf of the SCM. The signature may be an original wet ink signature, a PDF or other electronic image of an actual signature, or an electronic signature.

Schedule of Document Submissions at 1.

Neither Owens nor Locks filed a Statement of Dispute. On July 25, 2018, the Claims Administrator advised the Parties of their omission and notified them that we had granted a *sua sponte* extension of time to Owens, in recognition of her *pro se* status and the somewhat unique nature of this litigation. This notice included a link to the Lien Rules for the Parties' reference.

5

Locks did not respond to this correspondence nor request any extension of time on their own behalf with respect to the past-due Statement of Dispute.

On August 6, 2018, Owens submitted a brief Statement of Dispute. ("SCM Statement of Dispute"). On August 13, 2018, having received no statement from Locks, the Claims Administrator served the firm with Owens' Statement. On August 28, 2018, Locks submitted a Response to Owens' Statement of Dispute. ("Lienholder's Response"). The Claims Administrator served Owens with the Lienholder's Response on August 30, 2018. Pursuant to Lien Rule 17, the Record of Dispute was transferred to this Court.

Upon review, we granted Owens' request for a hearing. On October 3, 2018, we held an evidentiary hearing, allowing the admission of evidence and argument for both sides. Locks was represented by David Langfitt, Esq. ("Langfitt"), who appeared in person. Owens and her son appeared via telephone.[7] During the evidentiary hearing, Owens advised us that she did not receive Locks' Response to her Statement of Dispute. Following the hearing, the Claims Administrator re-sent Locks' Response to Owens. On November 26, 2018, the Claims Administrator received Owens' Response to that response. ("SCM Response"). We granted Locks' request to file a Reply, which they did on December 5, 2018. ("Lienholder Reply").[8]

---

[7] The Court made arrangements for Owens to appear via video conference. Due to an administrative error between our court and the court at the location where the video was set to originate, however, the video connection was not available. We offered to reschedule the hearing, but Owens wished to proceed and appeared via telephone. We agreed.

[8] Despite the actions of the Court and the Claims Administrator to ensure that the Parties were given notice of these rules, Langfitt advised us during the evidentiary hearing that he had been unaware of them. N.T. 11/8/2018 at 31 (indicating that he "felt that [the firm's] response [to Owens' Statement of Dispute] was what [they] were required to do"). We recognize that Locks, like many law firms, have many Liens filed in this Court. We therefore wish to be clear. The Lien Rules are designed to provide a format for attorney lienholders and other current attorneys to present us with evidence to support their claim that they have a valid contingency agreement and that the fee they are seeking is reasonable under the *McKenzie* standards. The mere submission of

## III. THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in no way relieved attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees – whether those fee requests are submitted through a Lien or otherwise – are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*. (Doc. No. 9862 at 8-9) (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Where as here we are presented with a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

The *McKenzie* five-part reasonableness analysis obligates us to evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1.

---

a Lien that attaches a fee agreement is not sufficient to meet that standard.

Locks was notified of this by the Claims Administrator and they were expressly advised of the deadlines for filing a statement of dispute and the contents required in such a statement. The law firm was actually advised a second time of these obligations in the notice that extended the deadline for the Owens. Yet no Statement of Dispute was ever filed.

Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the contract's enforcement. We will then review (1) the result in the case, (2) the quality of the work performed by Locks, and (3) the substantiality of that contribution to the overall result.

As is discussed in greater detail below, circumstances here at the time of contracting and the time of execution changed significantly, leaving us to consider whether, under the facts presented here, the presumptive fee cap should apply or whether a further adjustment – as Owens argues – would be appropriate. In evaluating the remaining three prongs, we are satisfied that Locks provided quality representation and made substantial contributions to the ultimate Award received in this case. Considering the substantiality of Locks' contribution as an IRPA, as reduced to account for the contributions of Class Counsel, we conclude that Locks should receive a fee of 20%, which will be reduced by the amount of the 5% holdback that the District Court deems necessary.

### A. The CFA at the time of contracting

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.

Locks entered into the fee agreement on March 7, 2012, after the collective individual cases filed against the NFL had been consolidated into this MDL. This is what Professor Rubenstein[9]

---

[9] The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court. After considering the recommendations of

characterized as "Phase 2" of the litigation. Once the individual cases were consolidated into an MDL, the risk related to the *volume* of work to be undertaken by the law firm changed dramatically. Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly." (Doc. No. 9526 at 26). The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case. *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from IRPAs to Plaintiffs' Committees, which would be compensated through a common benefit fund).[10] The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial. This case remained a "high-risk, long-odds litigation." (Doc. No. 9860 at 10). *See also* N.T. 11/9/2018 at 16-18 (discussing the legal risks in the case prior to the approval of the Settlement Agreement).

As of the March 7, 2012 date of contracting, Locks had attracted many clients. At the hearing, Langfitt stated that prior to that date, the firm "had probably filed 500 cases individually against the NFL, as well as a class action for medical monitoring in this Court and in other courts." N.T. 11/9/2018 at 8.[11] It is clear to us that Locks had the benefit of economies of scale and would

---

Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2).

[10] We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation. *See* Doc. No. 10368 at 13-18.

[11] Locks has represented to the District Court elsewhere that they had been "retained by or consulted by 1,591 players or their representatives" and "registered 1,127 players for the Fund." (No. 18-md-2323 (E.D. Pa.), Doc. No. 20 at 5). In another filing, Locks stated that the firm

9

be able to use the knowledge gained through their representation of such a high volume of class members, and the anticipated role as class counsel, to provide a more efficiently produced work-product for their Individual Clients. At the same time, Owens benefited from the high-volume practice of Locks in that the firm's extensive work in this litigation ensured that they would be knowledgeable about developments as the MDL progressed. Their clients benefited from that expertise.

### B. The CFA at time of enforcement – impact of changed circumstances

Locks and Owens remained in a contractual relationship for five and a half years, between March 7, 2012 and September 19, 2017. Between contract signing and the issuance of the award, a Class Action Settlement Agreement was reached that relieved individual class members of their obligations relating to causation and resolved other significant legal obstacles – such as limitation periods and preemption – that had existed at the outset. Further, the work in these areas that was anticipated at the time of contracting was ultimately accomplished through the efforts of Class Counsel, including Locks, rather than Locks working as an IRPA in Owens' individual case.

Locks effectively acknowledged the significant change in circumstance in 2016 when it unilaterally reduced its contractual fee percentage to 20% after the settlement was reached and the Settlement Agreement approved. After Owens terminated Locks' representation in September 2017, however, the firm reverted to seeking its original fee of 33.33%. Following the District Court decision setting the presumptive IRPA fee cap of 22%, Locks revised its demand downward and now asks for a percentage award at the 22% rate.

---

represented "approximately 200 retired players" by January 2012 and that "[t]hat number expanded through the time-period of 2012 to approximately 1400 players." (No. 12-md-2323 (E.D. Pa.), Doc. No. 7151-7 at ¶ 3).

### C. The results obtained

On August 18, 2017, Owens was notified that she would receive a Monetary Award of $752,000, based upon the claim package Locks submitted on May 16, 2017, which substantiated the award given where Joseph Owens fit on the grid with his Alzheimer's diagnosis and age (65). While Owens has arguably questioned whether this was the appropriate sum by asserting that Locks "misrepresented facts pertinent to obtaining the best possible award for [her]," (SCM Response at 2), Locks has rebutted this assertion for the reasons we set out below. We ultimately accept that it was the appropriate award and that the litigation was successful.

### D. The quality of the work performed

Owens contends that the individual work provided by Locks during the representation was minimal, as she asserts that it was she and her husband who obtained the significant diagnosis. She also contends that Locks failed to communicate with her about the possibility of a CTE diagnosis and about the impact of the worker's compensation claim.

The record before us belies these contentions. We credit the testimony of Langfitt, as corroborated by the exhibits as we describe below, that in the course of this representation, Locks obtained and reviewed the pertinent medical history, advised Owens on the potential implications of a possible CTE diagnosis after Joseph Owens' death, drafted and submitted Owens' claim for Award under the terms of the Settlement Agreement, and aided Owens in seeking a loan against a future Award while the matter remained pending. These actions fall within the various categories of service that we have recognized generally as IRPA work as opposed to Common Benefit fund work. *See, e.g.,* Doc. No. 10368 at 44-51.

We start with Locks's marshaling of the significant medical evidence. At the time the complaint was filed on March 9, 2012, Joseph Owens had not yet been diagnosed with

Alzheimer's. The nature of his impairments was stated in only general terms in the complaint, without any specific reference to the number or nature of head traumas he suffered. (No. 12-cv-1239 (E.D. Pa.), Doc. No. 1 at 8). Locks subsequently became aware of records indicating an Alzheimer's diagnosis and, after registration opened for the class in February 2017, obtained necessary certifications and documentation to enable them to submit the claims on Owens' behalf on May 16, 2017.

Owens complains that Locks did not perform any work aiding her or her husband in obtaining the Alzheimer's diagnosis that provided the gravamen of this claim. N.T. 11/9/2018 at 36-37. Owens notes that the diagnosis was obtained when her husband visited with his personal doctor, Dr. Burgess. She contends that it was at the prompting of Dr. Burgess, without any intervention from Locks, that she and Joseph set up an appointment with Dr. Helveston, the neurologist who ultimately documented the Alzheimer's diagnosis in July, 2012.

The manner in which this diagnosis was made does not mean that Locks did no meaningful work in relation to development of these important medical issues. To the contrary, as Locks explained, they obtained the medical records from Dr. Helveston that provided the actual diagnosis of Alzheimer's. The firm worked with Dr. Helveston to ensure that he completed the relevant paperwork for submission to the Claims Administrator to substantiate Owens' claim. As Locks explained in its Response to Owens' Statement of Dispute, the submission of a claim with a Pre-Effective Date Diagnosis requires the diagnosing physician to submit a certification form to support the claim.[12] Lienholder's Response at 3. The firm's work therefore entailed obtaining the

---

[12] Locks explained that it has been difficult at times for IRPAs to obtain these physician certification forms from doctors. As a result, Locks has engaged closely with the doctors in the litigation to ensure that their client obtains the most complete records for submission to the Claims Administrator. N.T. 11/9/2018 at 38.

form and ensuring that Dr. Helveston's credentials were sufficient to withstand scrutiny. N.T. 11/9/2018 at 39-40. In interviewing Dr. Helveston, the firm also ensured that his diagnosis was premised on the same diagnostic standards that were adopted in the Settlement Agreement. *Id*. at 41. Prudent counsel would do as Locks did here. The lawyers needed to understand what was in the medical records and speak to the diagnosing doctors to better understand the issues connected with the onset and progression of the disease condition. It is not simply a matter of providing a letter stating a diagnosis.

Locks' review of the medical records did not stop at that point. Because the age at diagnosis is an important factor in the calculation of the Monetary Award, Locks inquired of Owens whether there could be any earlier diagnosis date available. Owens directed Locks to Dr. Burgess, who had seen Owens before his diagnosis by Dr. Helveston. Langfitt interviewed both doctors and ultimately found that while Dr. Burgess suspected impairment, he was not in a position to make a diagnosis of Alzheimer's because that was not within his specialty. N.T. 11/9/2018 at 35. Locks also evaluated the timing of these two doctor visits and determined that even if they could obtain a diagnosis from Dr. Burgess, the date of diagnosis would not have changed Owens' placement on the Monetary Award grid. *Id.* In making the final evaluation, Locks reports that they spoke directly with both doctors and reviewed all of the medical records provided by each. N.T. 11/9/2018 at 39. These communications with the medical personnel who examined Owens were taken to ensure the viability and success of Owens' individual award under the Settlement Agreement.

Locks and the Owens family also found themselves in an unusual position at the time Joseph Owens died in June 2013. Owens was interred without an evaluation of his remains for CTE. This was significant because Death with CTE is a Pre-Effective Date Diagnosis that could

have yielded a greater Award under the Monetary Award Grid. Locks provided Owens via conference call and e-mail with an estimate of the difference in Monetary Award under each diagnosis, less costs for exhumation and autopsy fees, in an effort to provide the Owens family with the relevant information to make a decision about what actions to take. Ultimately, the family decided to pursue a claim under the Alzheimer's diagnosis only. Owens acknowledged at the hearing that Locks advised her son about what might benefit the family if her husband's remains had been exhumed and tested. She confirmed her determination that, given the circumstances, she did not want to pursue a CTE claim. N.T. 11/9/2018 at 55-56. This consultation and decision-making process is also documented in a follow-up e-mail message in the record. Lienholder's Response, Ex. D (e-mail of Oct. 30, 2013). This record adequately rebuts Owens' representation that Locks "never discussed death with CTE claim with respect to an autopsy, exhumation or the settlement grid." (SCM Response at 1).

Locks also makes reference to having kept Owens apprised of all developments in the case, including the result of a worker's compensation claim for her husband. Langfitt testified at the hearing that he discussed the issue with Owens during two or three phone calls. Locks also points to an e-mail memorializing a communication to Owens about the workers' compensation award. Lienholder's Response, Exhibit D (e-mail dated Dec. 9, 2014). Owens correctly observes that her husband was represented by a different attorney in that matter. Locks reports, however, that the firm reviewed some of the records in that case in order to provide Owens with information relating to how, if at all, the progress of the workers' compensation claim could affect the concussion litigation.[13] *See also id.,* Exhibit D (e-mail dated Oct. 30, 2013 reflecting interest in older records

---

[13] Since Locks did not provide us with a Statement of Dispute, they also did not provide any itemization of their time. It is therefore difficult to ascertain the scope of this work. However, we accept Langfitt's assertion at the hearing that he discussed the issue with Owens during two or

14

to explore possibility of earlier diagnosis for purposes of this litigation). Again, this was an individualized service provided by Locks to Owens in its role as an IRPA.

Finally, Locks shepherded Owens through the claims process and kept her informed as matters progressed. On May 16, 2017, Locks advised Owens that they had submitted the claim for Monetary Award, a copy of which was provided. Lienholder's Response, Exhibit I. On July 14, 2017, Locks advised Owens of the conditional approval of the claim and soon thereafter sought additional information from Owens to ensure the prompt disbursement of the Award to her as the Representative Claimant. *Id.* Locks also supported her as she sought to borrow against her Award while it remained pending. On August 11, 2017, at Owens' request, Locks put Owens in touch with a lender and provided supporting documentation concerning her anticipated Award. *Id.* As was made clear at the hearing, this loan process became the subject of some difficulty between Owens and Locks. N.T. 11/9/2018 at 64-66, 68-69. Ultimately, however, it was a service that was provided by Locks in their role as an IRPA and pursuant to Owens' request.

On August 21, 2017, Locks advised Owens that the Claims Administrator had issued a Notice of Monetary Award. The next correspondence that Locks received was Owens' undated indication, sent through the Claims Administrator, that she had terminated the services of the law firm. She communicated this by returning a Claims Administrator's notice from July 13, 2017 that identified Locks as her representative and on which she had placed a handwritten "X" and added the word "Terminated." Lienholder's Response, Exhibit K. At the hearing, Owens agreed that the termination was sent in September of 2017, N.T. 11/9/2018 at 63, and the date documented

---

three telephone calls in addition to the e-mail communication that is documented, despite the subsequent written assertion of Owens that no such communications were made. SCM Response at 1 ("David Langfitt never participated or discussed results of my husband['s] workers compensation claim").

15

by the Claims Administrator is September 19, 2017. The timeline thus demonstrates that in August 2017 Locks continued to assist Owens with collateral matters such as the loan and that they were keeping her abreast of claims processing developments. It was only after her claim culminated in her Award that she discharged Locks.

We acknowledge that the Owens family is unhappy with Locks' representation. It may well be that Locks, with many individual clients, did not give them attention at a level they may have wanted. We are nonetheless satisfied from the record before us that Locks provided quality representation. The complaints that Owens raised here do not pass muster when considered against the documentary evidence supported by the testimony of Langfitt.

### E. The substantiality of the work

We are compelled to find that the substantiality of Locks' work as an IRPA in securing the Monetary Award is necessarily reduced given that the work of Class Counsel clearly "reduced the amount of work required of IRPAs." (Doc. No. 9862 at 4). In its establishment of a 22% presumptive fee cap, the District Court has already taken actions to reduce IRPA fees, accounting for the substantial benefit provided by Class Counsel. This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials.

The representation that Locks provided to Owens as an IRPA, however, certainly was not *in*substantial. Owens was approved for a Monetary Award within just a few months of the opening of the claims registration period. As we discussed above, Locks filed the lawsuit for Owens that

provided entry to the early stages of the MDL. This followed the initial tasks of doing the necessary review to ensure that the client satisfied the requirement of admission into the class. This was accomplished exclusively by Locks as an IRPA for Owens. Locks then reviewed medical records and worked with physicians to insure diagnoses were provided based on earliest possible dates. Locks advised Owens of the MDL litigation as matters progressed, advised regarding opt-out risks, shepherded Owens through the claims process, and aided Owens in the process of obtaining a loan. In sum, Locks addressed whatever issues arose that could implicate Owens' Award, including a brief review of a worker's compensation matter and advising Owens on the difficult decision relating to a possible CTE diagnosis.[14]

As we consider substantiality, we also consider the early work of Owens acting alone in bringing about the Award achieved here. We recognize that Owens achieved the qualifying diagnosis by visiting doctors obtained through the Owens family's efforts and without any direction or intervention by Locks. There is no evidence before us, however, that Owens did anything that impacted the Award. To be sure, the Award was already secured and finalized when she terminated Locks. Moreover, although she was left by her own choice to proceed *pro se* as she challenged this Lien, Owens was not required to take any further actions on her own in order to receive her Monetary Award, as that work had already been performed by Locks. Therefore, unlike in cases where significant steps were taken by successor counsel or the SCM acting *pro se*,

---

[14] We add a comment about Locks' role as Class Counsel. It is inevitable, and appropriate, that consideration be given to this role in light of the amount of fees that class counsel has been paid. We see a potential for overlap where certain class counsel roles may have provided particularized benefit for a particular SCM. For this reason, we reviewed Locks' submission to the District Court setting forth the work they performed for the benefit of the class. Those submissions and the representations made here regarding the individual work performed for Owens, however, do not suggest any significant overlap.

there is no basis for such a reduction here in the fee sought by Locks as prior counsel.

Finally, we accept that the economies of scale do come into play as we seek to find the proper balance between the interests of the parties. But, as we assess that balance here, we take into account that Locks had already reduced their fee to the 20% rate even before the Court imposed the presumptive fee cap. Under these circumstances, we conclude that the 20% rate is reasonable and we will not downgrade the percentage any further.[15]

## IV. CONCLUSION

We conclude that Locks' IRPA contribution to the Award is sufficient to support its lien to the extent of 20% of the Monetary Award. The fee we authorize here, however, must be reduced by the 5% holdback currently applicable to all attorney fee Awards. Therefore, Locks will receive 15% of the overall Award at this time. Whatever portion of the 5% holdback is ultimately released by the District Court will be provided to Locks at that time. The remaining funds must be distributed to Owens in accordance with the provisions of the Settlement Agreement and all Court Orders regarding implementation.

---

[15] At the same time, we are not permitted to approve any larger award up to the 22% they seek, in light of the District Court's clear statement that in cases where a fee contract is for less than the 22% cap, the contract amount, not the fee cap, will provide the relevant fee percentage.

Locks' request for a 22% fee, instead of the 20% fee to which they agreed in 2016 and as reflected in the CFA, is thus surprising. Locks argues that they are not restricted to the 20% agree-upon term because Owens fired the firm and put them to the task of seeking enforcement of the CFA through this Lien. We flatly reject this notion, which Locks has not supported with any citation to the record or any legal authority. Indeed, the notion that they are entitled to something greater than their contingency fee just because Owens decided to terminate their contract appears to be belied by the firm's own contract, which states: "[Owens] and [Locks] agree that [Owens'] responsibility for the payment of fees to [Locks] is limited to the contingent fee provided in paragraph four (4)…." Lienholder's Response, Exhibit C. The paragraph four referenced states that Owens shall pay Locks a contingent fee "in an amount equal to 20% (twenty) of the gross proceeds of recovery by [Owens], whether by settlement, judgment or otherwise." *Id.* The contract does not address the question of any penalty or cost associated with collection of the fee. We will not impose one.

An appropriate order follows.

BY THE COURT:

/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE