# EXHIBIT 9

## Appeal of the Denial of his Monetary Award Claim

**Introduction:** Appellant _____ respectfully submits his appeal (the "Appeal") of the denial of his claim for a Monetary Award[1] (the "Claim") under the Settlement Agreement. The June 5, 2018 Notice of Denial of Monetary Award Claim (the "Denial") alleges that _____ "does not have the Qualifying Diagnosis indicated on the Diagnosing Physician Certification Form." *See* Explanation of Claim Determination, p.1, §II of the Denial. The Denial by the Appeals Advisory Panel (the "AAP") further contains an explanation (the "Explanation") by the AAP for the Denial. *See id.* Simply put, the Explanation is the sole basis for the Denial and lacks any evidentiary support.

On the other hand, this Appeal is based upon the evidence in the record on appeal (the "Record"), a copy of which is attached as **Exhibit A**. Specifically, undisputed Record evidence provides that two Board Certified Neurologists determined that _____ is a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, which makes _____ eligible for a Monetary Award under the Settlement Agreement. Moreover, the Settlement Agreement is clear that the ***physician making the Qualifying Diagnosis shall determine the sufficiency of the documentary evidence*** corroborating the Retired NFL Football Player's functional impairment.

The Record evidence provides that: (a) Board-Certified Neurologist Dr. Morariu is the physician who examined _____ and made his Qualifying Diagnosis [Record, _____ 000047-51, 89-90]; (b) Dr. Morariu determined the sufficiency of the documentary evidence corroborating Mr. _____ Qualifying Diagnosis [*See id.*]; (c) Dr. Suite, a Board-Certified Neurologist and Qualified MAF Physician selected and approved by the NFL and Co-Lead Class Counsel to make Qualifying Diagnoses in the Claims process, evaluated and affirmed Dr. Morariu's Qualifying Diagnosis of Mr. _____ [Record, _____ 000052-69].

In comparison, the seven sentence Explanation provides partial information, inaccurate information and information that is irrelevant or inapplicable to the Qualifying Diagnosis. The Explanation further ignores and misconstrues Record evidence and, despite its affirmation to the contrary, fails to consider generally consistent criteria. The Denial forces _____ to bear the burden of proving by clear and convincing evidence that the Denial was made in error.[2] The Settlement Agreement follows New York law, which provides that "the evidence must satisfy the factfinder that it is highly probable that what is claimed actually happened." *See Blair v. Inside Ed. Productions*, 7 F.Supp. 3d, USDC, S. D. New York (2014).

**1.     The Denial incorrectly applies the BAP Standard.** _____ was diagnosed Pre-Effective Date (between the date of the Preliminary Approval and Class Certification Order and the Effective Date of the Settlement Agreement - January 7, 2017) by Board-Certified Neurologist Dr. M. Albin Morariu, Sr., *outside of the BAP* as provided for under Section 6.3(c) of the Settlement Agreement. As such, the applicable standard for a Qualifying Diagnosis is Section 1(b) of Exhibit A-1 to the Settlement Agreement, not the inapplicable BAP Standard provided in § 1(a) of Exhibit A-1. The Denial references the wrong Qualifying Diagnosis standard and would lead the Special Master to analyze this Appeal under the BAP standard provided in § 1(a) of Exhibit A-1 to the Settlement Agreement, *which does not apply to* _____

Moreover, the Settlement Agreement does not require that neuropsychological testing be performed when a Board-Certified Neurologist makes a Pre-Effective Date Qualifying Diagnosis of Level 1.5. Rather, the plain language of § 1(b) governs:

> For living Retired NFL Football Players **diagnosed outside of the BAP**, a diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, ***based on evaluation***

---

[1] The definitions provided for in the Settlement Agreement are incorporated into this Appeal by Reference.
[2] Section 9.8 of the Settlement Agreement provides in relevant part: "Review and Decision. The Court will make a determination based upon a showing by the appellant of clear and convincing evidence."

*and evidence generally consistent with* the diagnostic criteria set forth in subsection 1(a)(i)-(iv) above, made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement. [Emphasis Added]. *See* Settlement Agreement, Ex. 1 at 2, § 1(b).

Under the Settlement Agreement, _____ Pre-Effective Date Qualifying Diagnosis may be "generally consistent" with the BAP Standard. The Record is replete with clear and convincing evidence that the Qualifying Diagnosis is generally consistent with the BAP Standard. Board-Certified Neurologist Dr. Morariu certified under penalty of perjury that he diagnosed _____ with Level 1.5 Neurocognitive Impairment, and that the Qualifying Diagnosis was made with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) scale, category 1.0 (Mild). *See* Record, _____ 000047-51, 89-90.

2. **The Denial misstates the requirements under the BAP Standard**. The Explanation provides that "[i]t is not clear from the documentation that a severe decline in cognition is present." *See id.* The Settlement Agreement language related to "severe decline" is found under the Baseline Assessment Program (the "BAP") standard provided in Exhibit A-1 to the Settlement Agreement, *which does not apply to*

> (a) For Retired NFL Football Players diagnosed through the BAP, a diagnosis of Level 1.5 Neurocognitive Impairment must meet the criteria set forth in subsections (i)-(iv) below: (i) Concern of the Retired NFL Player, a knowledgeable informant, or the Qualified BAP Provider that there has been a severe decline in cognitive function. *See* Settlement Agreement, Exhibit A-1, p. 2, §1(a)(i).

The Settlement Agreement requires "concern" of severe decline[3] in cognitive function by the Retired Player, which is provided in the Record, but the Explanation asserts a different standard that is not provided for under the Settlement Agreement.

The Denial also asserts that "[t]here is no documentation or input from a knowledgeable informant, which is required for general consistency with published methods for CDR scoring." The Denial is wrong because it cites the BAP Standard §1(a), not the Outside the BAP Standard found in §1(b). *See* Settlement Agreement, Exhibit A-1, p. 2, §1(a)(iii). In addition, Dr. Morariu indicated that he considered all criteria under the CDR in making his diagnosis. *See* Record, _____ : 000089-90. Last, §1(a)(iii) of the BAP provides that the sufficiency of corroborating documentary evidence of functional impairment under the CDR shall be determined by the physician making the qualifying diagnosis. *See* Exhibit A-1, p. 2, §1(a)(iii).

3. **The Denial misstates the Record, ignores clear and convincing evidence and fails to consider evidence that is Generally Consistent with the BAP:** Section 6.4(b) of the Settlement Agreement specifically provides that "generally consistent" shall not be read to mean "identical to" the BAP or the Post Effective Date diagnosis criteria:

> For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1 (Injury Definitions) **does not require identical diagnosis criteria including without limitation, the same testing protocols or documentation requirements.** [Emphasis Added]. *See* Settlement Agreement, p. 33-4.

---

[3] Section 2(a)(ii) of Exhibit A-1 – Level 2 Neurocognitive Impairment also references "severe cognitive decline" but is inapplicable to _____ vho has a Qualifying Diagnosis of Level 1.5. Section 1(a)(ii) references a scale of "moderate to severe cognitive decline ..." but not simply "severe cognitive decline."

The Denial purports to have reviewed the Qualifying Diagnosis based on principles "generally consistent" with the BAP Standard, but actually ignores clear and convincing Record evidence that is "generally consistent" with §1(a)(i) BAP Standard regarding concern of "severe decline."          Medical Chart provides clear and convincing evidence of his concerns, and Dr. Morariu's, that there has been a severe decline in neurological function:

> CHIEF COMPLAINT: This is the initial office visit of this 28-year-old African American male, right handed, single without children who complains of left hemicranial headaches occurring daily and lasting approximately one hour at a time. The patient does not have any accompanying symptoms with his headaches. He also has lack of interest in activities, such as hobbies. He feels better if he avoid crowds and has significant memory problems consisting in forgetfulness, confusion and inability to acquire new information or to retain what he has read or what happened 24 to 48 hours previously. The patient also difficulties in sleeping at night and has a restless sleep. He is irritable and has a short fuse.
>
> HISTORY OF THE PRESENT ILLNESS: The patient started playing football at the age of 10 and he played high school, college and then professionally in the NFL. He played from ~~~ as a "safety" and he was used primarily in the "special teams". The patient played for the T          and          ns. He has several head injuries from his career, but none of them with loss of consciousness. He developed headaches and dizziness, as well as memory deficits. The memory deficits manifest themselves by lack of interest in social activities and memory deficits developed in 2013 and they have been progressive. He feels better when he is not in crowds and he is isolating himself from friends and society, but feels okay with his family. He also has difficulties in acquiring new information.

*See* Record,          000048.          expressed concerns regarding his "significant memory problems consisting in forgetfulness, confusion and the inability to acquire new information … ," all of which amounts to a description of severe cognitive decline. Furthermore,          medical chart documents Board Certified Neurologist Dr. Morariu's concerns regarding          's cognitive decline. *See* Record,          000048, 89-90. To the extent the Record evidence does not meet the BAP Standard, it is at least generally consistent. *See* Exhibit A-1, p. 2, §1(a)(i). However, the Denial fails to consider "generally consistent" criteria and claims that there is no documentation.

The Explanation alleges that the "chief complaint addressed by the diagnosing physician was headache; Dr. Morariu's clinical diagnosis was 'mild cognitive impairment.'" *See* Denial. Dr. Morariu's Clinical Note contains the heading "Chief Complaint" and it is accurate that Dr. Morariu addressed headaches under that heading. *See* Record,          000048. However,          did not simply present with headaches as suggested in the Explanation, which ignores neurological reports of dizziness, memory loss and other issues. *See id.*

The Explanation is further misleading where it provides that Dr. Morariu's "diagnosis" was "mild cognitive impairment." *See* Denial. Dr. Morariu did not make a single diagnosis as alleged in the Denial, he made diagnoses:

> **Diagnoses**
> Postconcussional syndrome          F07.81
> Postconcussion syndrome-40425004
> Mild cognitive impairment, so stated          G31.84
> Minimal cognitive impairment-110352000

*See* Record,          000049. Despite clear and convincing record evidence to the contrary, the Explanation identifies a single diagnosis, failing to mention postconcussional syndrome. *See* Denial. The Denial fails to recognize numerous other sections of          . 000049 containing clear and convincing evidence in support of the Qualifying Diagnosis:

> 1. Mild cognitive impairment due to repeated head injuries (cumulative post-traumatic encephalopathy.
> 2. Muscle contraction headaches (post-traumatic).

The Denial fails to consider          medical chart and the diagnoses of the Board-Certified Neurologist, which is clear and convincing Record evidence, and fails to apply a "generally consistent" standard to          Pre-Effective Date Claim.

4.     **The Denial misstates test results contained in ___'s chart:** The Denial asserts that ___ obtained a "normal score" on the MMSE because he missed only 1 of 30 items and implies that additional tests are required to corroborate the MMSE. A score of 29 can be indicative of mild cognitive impairment. However, Dr. Morariu further performed a clock drawing test ("CDT"), which is used to detect deficiencies in executive functioning that are overlooked by other tests (such as the MMSE) to clarify ___'s dysfunction. The Denial goes on to incorrectly assert that ___ scored two out of three on the CDT based on MoCA clock scoring. *See* Denial. The Montreal Cognitive Assessment Administration and Scoring Instruction provided as follows:

> Administration: Indicate the right third of the space and give the following instructions: *"Draw a clock. Put in all the numbers and set the time to 10 past 11"*.
>
> Scoring: One point is allocated for each of the following three criteria:
> • Contour (1 pt.): the clock face must be a circle with only minor distortion acceptable (e.g., slight imperfection on closing the circle);
> • Numbers (1 pt.): all clock numbers must be present with no additional numbers; numbers must be in the correct order and placed in the approximate quadrants on the clock face; Roman numerals are acceptable; numbers can be placed outside the circle contour;
> • Hands (1 pt.): there must be two hands jointly indicating the correct time; the hour hand must be clearly shorter than the minute hand; hands must be centred within the clock face with their junction close to the clock centre.
>
> A point is not assigned for a given element if any of the above-criteria are not met.

Mr. ___ drew the following clock:



*See* Record, ___: 000072. Mr. ___ failed to include all numbers and failed to identify the correct time, which means he scored only one point for the contour. Again, the AAP misstated clear and convincing evidence in the Record.

5.     **The Denial misstates the requirements under the CDR Scoring Table.** The Denial misstates the National Alzheimer's Coordinating Center's Clinical Dementia Rating (CDR) Scoring Table and focuses on one component of one element in isolation. The Denial provides that "[t]he player reported current employment as a driver for a delivery company. This contradicts the inability to function normally in community Affairs as would be required to assign a CDR score of 1 in that domain." *See* Denial. However, the CDR Table does not say inability to function *normally* as alleged in the Denial. The CDR Scoring Table Impairment Level 1 Mild for Community Affairs provides "[u]nable to function *independently* at these activities *although may still be engaged in some*; appears normal to casual observer." *See* CDR Table.

As a delivery driver Mr. ___ need not function independently. For example, he can follow directions from a navigation system that tells him exactly where to go, when to turn and when he has arrived at the location. He can use other technology to accept direction to assist him through his day and never to

function independently. The Denial assumes that ____ functions "normally" but provides no supporting evidence. In addition, the ability to perform one subset of a domain does not rule out cognitive impairment. One example is Glenn Campbell, who performed concerts with Alzheimer's. *See* https://www.youtube.com/watch?v=nqRXOPJzgdY specifically at 2:11 to 4:00.

Furthermore, the CDR has six categories, not three, which also include Memory, Orientation and Judgment & Problem Solving. *See* CDR Table. The CDR scale is not meant to be used with only three of the six categories and cannot be scored[4] based solely on three categories without the other three categories.

6. **The Denial misstates the purpose of certain testing and cites disclaimed authority**: The Denial asserts that electrophysiologic (testing electrical activity and pathways of the heart) and vascular tests are not consistent with the methods for dementia diagnosis under the Academy of Neurology. However, those tests were used to rule out vascular dementia, which they accomplished. Also, the Knopman *et al.*, 2001 paper cited in the Denial provides a disclaimer indicating that it is not intended to include all proper methods of care and patient care decisions are the prerogative of the patient and physician based on the circumstances.

7. **The Record contains clear and convincing evidence that ____ has a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment**: The Record provides clear and convincing evidence that: (a) Board Certified Neurologist Dr. Mircea Morariu, Sr. made a Qualifying Diagnosis of ____ and verified that the corroborating documentation was sufficient [Record, ____: 000047-51, 89-90]; (b) Board Certified Neurologist Dr. Nicholas Suite, who is also a Qualified MAF Physician selected and approved by the NFL and Co-Lead Class Counsel to make Qualifying Diagnoses in the Claims process, performed a review of ____ medical chart and verified Dr. Morariu's Qualifying Diagnosis of ____ [Record, E.Cook 000052-69]; and (c) the medical chart, clock test and clinical diagnosis support Dr. Morariu's Qualifying Diagnosis of Level 1.5 [Record 00001-90].

**Conclusion:** The Denial applies the wrong standard for determination of Pre-Effective Date Claims, asserts medical concepts in support of its conclusion that do not apply under the circumstances, ignores critical findings identified in ____ medical chart (which is part of the Record), and misstates test results and other Record evidence. Ultimately, the Denial leads the Special Master to error and lacks any evidentiary basis. The Denial further lacks transparency by allowing the AAP Member to remain anonymous, and prevents class members from knowing which AAP member is repeatedly applying the wrong standard, making baseless denials and misstating or ignoring record evidence. Denials lacking substance unfairly shift the burden to the claimant, exposing claims to an attack by the NFL who will have the last word, instead of the reverse. There is no reason ____ should have to re-prove his Qualifying Diagnosis supported by two Board-Certified Neurologists in the face of this anonymous and largely inaccurate Denial. The Denial fails to provide supporting evidence and or warrant ignoring the Board-Certified Neurologists. Moreover, the record contains clear and convincing evidence of ____ s entitlement to an award. As such, ____ respectfully requests that the Special Master reverse the denial based upon the Record evidence and direct the Claims Administrator to issue ____ a Notice of Monetary Award.

Dated: July 5, 2018

s/ Patrick J. Tighe
Patrick J. Tighe, Esq.
Pat@X1LAW.com
Florida Bar No. 568155

s/ Michael St. Jacques
Michael G. St. Jacques, II
mstjacques@lorenkeanlaw.com
Florida Bar No. 0783471

---

[4] The CDR includes two scoring methods, one of which is an algorithm that weighs Memory as the primary category, and the second which weighs all categories equally.