# EXHIBIT 10

## NFL Parties' Opposition to
## Appeal of His Claim Denial

Claimant ⸺ received a pre-Effective Date Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment (*i.e.*, early dementia) on January 3, 2017, at the age of 28, from neurologist Dr. Mircea A. Morariu. On June 5, 2018, the Claims Administrator denied Mr. ⸺'s claim, explaining that a member of the Appeals Advisory Panel (the "AAP") had determined that Mr. ⸺ claim was not based on evaluation and evidence generally consistent with the Settlement Agreement's criteria for a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment in the Baseline Assessment Program ("BAP") because, among other reasons, Mr. ⸺ did not undergo (and Dr. Morariu did not review) any neuropsychological testing and did not demonstrate the requisite level of functional impairment. (Notice of Denial of Monetary Award Claim dated June 5, 2018 ("Notice of Denial") at 1.)

On July 5, 2018, Mr. ⸺ appealed that denial, arguing that he was properly diagnosed and that the AAP member incorrectly applied the BAP standard to Dr. Morariu's neurological evaluation. (*See* ⸺ Statement on Appeal.)

The NFL Parties respectfully oppose Mr. ⸺'s appeal because Mr. ⸺ has presented no evidence—let alone clear and convincing evidence—demonstrating that he met the criteria required for his alleged diagnosis. To the contrary, the medical records in Mr. ⸺'s Claim Package support the AAP member's findings. Specifically, the claim was properly denied because Mr. ⸺ did not undergo neuropsychological testing and failed to establish or corroborate the requisite level of functional impairment to establish a Level 1.5 diagnosis. As such, Mr. ⸺'s claim was denied because his diagnosis was not "generally consistent" with the Settlement Agreement's criteria.

For these reasons, and those set forth below, the NFL Parties respectfully submit that the claim determination should be upheld and Mr. ⸺'s appeal should be denied.

**Background**

Dr. Morariu evaluated Mr. ⸺ on January 3, 2017. Although Mr. ⸺ complained of headaches and memory loss, Dr. Morariu documented normal neurological findings in his report, including a score of 29 out of 30 on the Mini-Mental State Examination ("MMSE"), which is squarely within the normal range and, according to the test itself, reflects *no* cognitive impairment. (Morariu Report at 2-3; Notice of Denial at 1.) Nevertheless, based exclusively on his neurological evaluation, and without any neuropsychological testing or sufficient evidence of functional impairment, Dr. Morariu concluded that Mr. ⸺ met the criteria for a Qualifying Diagnosis of "[L]evel 1.5 [N]eurocognitive [I]mpairment." (Morariu Report at 3.)

I. **Mr. ⸺: Does Not Present Clear and Convincing Evidence that His Diagnosis was "Generally Consistent" with the BAP Criteria for a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment**

The NFL Parties respectfully submit that the AAP member who reviewed Mr. ⸺'s claim correctly concluded that he did not meet the criteria for a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, and Mr. ⸺ has offered no evidence, let alone clear and convincing evidence, to the contrary.

The Settlement Agreement states that "[f]or living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 1.5 Neurocognitive Impairment, *i.e.*, early dementia, [must be] based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv)" of the Injury Definitions. (Settlement Agreement, Ex. 1 at 2, § 1(b).) Under those Injury Definitions, a diagnosis of Level 1.5 Neurocognitive Impairment requires "evidence of a moderate to severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol annexed in Exhibit 2 to the Settlement Agreement, in *two or more cognitive domains* (complex attention, executive function, learning and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) executive function, (b) learning and memory, or (c) complex attention." (*Id.* § 1(a)(ii) (emphasis added).)

The AAP member correctly determined that Mr.        's diagnosis was not based on evaluation and evidence generally consistent with those criteria. In particular, while the Settlement Agreement criteria for the BAP requires evidence of moderate to severe decline in two or more cognitive domains, Mr.        did not undergo *any* neuropsychological testing. (*Id.* § 1(a)(ii), (b) (requiring evidence of moderate to severe decline to be "determined by and in accordance with the [BAP] standardized neuropsychological testing protocol").) In fact, the "only documentation regarding cognition is an MMSE [score]," on which Mr.         received a score of 29 out of 30, and the results of a clock-drawing test ("CDT"). (*See* Notice of Denial at 1.) A score of 29 out of 30 on the MMSE is not only within the normal range, it reflects *no* cognitive impairment.[1] Mr.        's argument on appeal that the inclusion of the CDT was sufficient to confirm Mr.        s diagnosis is unfounded, since the CDT is not a test specific to dementia[2] and, in any event, the results of that test were available to the AAP member who determined that Mr.        's Level 1.5 diagnosis was not generally consistent with the Settlement Criteria. (*See* Notice of Denial at 1.) The absence of any neuropsychological testing, particularly in light of Mr.        's performance on the MMSE, is plainly not consistent (generally or otherwise) with the Settlement Agreement criteria for a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment.[3]

---

[1] Mini-Mental State Examination (MMSE) (score between 24 and 30 reflects "No cognitive impairment"), *available at* https://www.uml.edu/docs/Mini%20Mental%20State%20Exam_tcm18-169319.pdf; *see also* Robert Perneczky et al., *Mapping Scores Onto Stages: Mini-Mental State Examination and Clinical Dementia Rating*, 14(2) Am. J. Geriatric Psychiatry 139 (2006) (finding that MMSE scores between 26 and 29 align with CDR Category 0.5, not Category 1).

[2] Because the CDT was designed as a screening test, the scoring systems have higher sensitivity scores than specificity scores. Strauss, E. Sherman, E. M. S. Spreen, O. (2006) *A compendium of Neuropsychological Tests: Administration, norms, and commentary* (3rd ed.), NY: Oxford. In other words, the CDT is not specific to dementia, and other conditions, such as depression, can cause poor performance. *See id.* Additionally, false positive rates are often as high as 74%, and therefore a positive result on the CDT "simply signals the need for further inquiry." *See id.* at 980.

[3] In some instances, the Settlement Agreement allows a diagnosing physician to conclude that neuropsychological testing is medically unnecessary where a player's dementia is so severe. (*See* Settlement Agreement, Ex. 1 at 3, § 2(b).) Here, Mr.        clearly did not exhibit that degree of impairment, as reflected by, among other things, his nearly perfect score on the MMSE. In any event, the Settlement Agreement only allows this exception to neuropsychological testing for Level 2 diagnoses, not Level 1.5 diagnoses. (*Compare id. with id.* at 2, § 1(b).) Therefore, even if Dr. Morariu determined that neuropsychological

2

In addition, as the AAP member also found, Mr. _____ failed to establish or corroborate the functional impairment required for a Level 1.5 diagnosis. Under the Settlement Agreement, a diagnosis of Level 1.5 Neurocognitive Impairment in the BAP requires "functional impairment generally consistent with the criteria set forth in the [CDR] scale Category 1.0 (Mild) in the areas of Community Affairs, Home & Hobbies, and Personal Care." (Settlement Agreement, Ex. 1 at 2, § 1(a)(iii).)

Under the CDR, a score of 1—or mild impairment—in the area of Community Affairs requires that a person be "unable to function independently" in "job, shopping, volunteer and social groups"; a score of 1 in the area of Home & Hobbies requires "[m]ild but definite impairment of function at home," "more difficult chores abandoned," and "more complicated hobbies and interests abandoned"; and a score of 1 in the area of Personal Care requires that a person "needs prompting" with respect to self-care. (*See* Ex. 1, CDR Worksheet.)

As the AAP member correctly determined, Mr. Cook failed to meet these requirements. Indeed, with regard to Community Affairs, Mr. Cook acknowledged that he is employed as a driver for FedEx—employment that is plainly at odds with the characteristics of a CDR score of 1. (Morariu Report at 1-2.) Mr. _____'s argument on appeal that "[a]s a delivery driver [he] need not function independently," because, for example, "he can follow directions from a navigation system," is unpersuasive. (*See* Cook Statement on Appeal at 4.) Whether or not he relies on navigation, his work as a delivery driver undoubtedly requires him to function independently.

Mr. _____ provided no evidence of functional impairment in the categories of Home & Hobbies and Personal Care. His conclusory, self-reported statements to Dr. Morariu that he "has a lack of interest in activities," "feels better if he avoids crowds," and "is isolating himself from friends and society" do not suffice, and, in any event, Mr. _____ provided no documentary evidence or third-party affidavit corroborating his purported functional impairment. That is inconsistent with the Settlement Agreement criteria, which provide that reports of "functional impairment shall be corroborated by documentary evidence" or "by a third-party sworn affidavit from a person familiar" with the player. (Settlement Agreement, Ex. 1 at 2, § 1(a)(iii).)

Moreover, publicly-available information indicates that Mr. _____ does not exhibit a degree of functional impairment consistent with Level 1.5 Neurocognitive Impairment. For example, Mr. _____'s public social media accounts reflect that he is the CEO of _____ ic

---

testing was medically unnecessary because Mr. _____'s dementia was so severe, such a determination would not be generally consistent with—and in fact, is *inconsistent* with—the terms of the Settlement Agreement.

3

Group,[4] travels,[5] cooks,[6] fishes,[7] and generally attends social events.[8] These activities are at odds with a CDR score of 1 and further support the AAP member's finding that Mr. 's diagnosis was not based on evaluation and evidence generally consistent with the BAP criteria for a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment. (Morariu Addendum at 1-2.)

In sum, the AAP member correctly concluded that Mr.  failed to meet the criteria for a Level 1.5 diagnosis, and Mr.  has not demonstrated otherwise. Mr.  did not undergo neuropsychological testing, and his neurological evaluation documented normal findings. Moreover, Mr. 's social media presence reflects activities inconsistent with his claims of functional impairment, for which he provided no documentary evidence and no third-party affidavit. Thus, there is no basis to overturn the denial of Mr. 's claim based on the finding that his diagnosis was not generally consistent with the BAP criteria for a diagnosis of Level 1.5 Neurocognitive Impairment. (*See* Notice of Denial at 1.)

**Conclusion**

For the reasons set forth herein, the AAP member correctly determined that Mr.  did not meet the requirements for a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment because his diagnosis was not based on evaluation and evidence generally consistent with the BAP diagnostic criteria, and, accordingly, his appeal should be denied. If Mr.  believes that he is entitled to a Qualifying Diagnosis, he should participate in the complimentary Baseline Assessment Program for evaluation and potential diagnosis. Denial here will not preclude Mr.  from receiving a Qualifying Diagnosis in the future.

---

[4] *See generally* https://www.instagram.com  (calling himself "CEO of  !" in Description section) (last visited August 8, 2018).

[5] *See e.g.*, Ex. 2, https://www.instagram.c  (J  8) (traveling in New Orleans).

[6] *See e.g.*, Ex. 3, https://www.instagram.cc  |Ffo/  (Fe  18) (grilling).

[7] *See e.g.*, Ex. 4, https://www.instagram.com/p  (N  17) (detailing number of fish caught during fishing trip).

[8] *See e.g.*, Ex. 5, https://www.instagram.com'  attending party in New Orleans).

4

Dated: August 8, 2018

Respectfully submitted,

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

/s/ *Brad S. Karp*

Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
Richard C. Tarlowe
Douglas M. Burns
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*