# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : | No. 2:12-md-02323-AB |
| | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

## AMENDED RESPONSE BY THE CLAIMS ADMINISTRATOR TO MOTION BY X1LAW, PA, TO STOP AUDIT INVESTIGATIONS OF ITS CLAIMS

# ATTACHMENT 1

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................ 1

II. FACTUAL BACKGROUND ...................................................................................... 1

  A. Submissions in the Settlement Program by X1Law. .............................................. 1

  B. The Audit Investigation of Doctor 2. ..................................................................... 4

    1. Commencement of the Audit Investigation of Doctor 2. ................................... 4

    2. Conversations with Doctor 2 and the AAP's Opinion. ..................................... 5

    3. Conclusion of the Audit Investigation of Doctor 2. .......................................... 6

  C. The Audit Investigation of Doctor 1. ..................................................................... 6

    1. Commencement of the Audit Investigation of Doctor 1. ................................... 6

    2. X1Law's Earlier Efforts to Place Doctor 1 as a Qualified MAF Physician. ............. 8

    3. Serious Issues with Doctor 1. ............................................................................ 9

      (a) Cognitive Testing. ...................................................................................... 9

      (b) Clinical History and Tests. ........................................................................ 11

      (c) Reported Public Activity and Discrepancies With the Claimed Impairment..... 11

      (d) Inconsistent Diagnoses. ............................................................................ 13

    4. Suspect High Rate (100%) of Diagnoses for Evaluated Players. ...................... 14

    5. Current Status of the Audit of Doctor 1. .......................................................... 15

III. ARGUMENT AND AUTHORITIES ....................................................................... 16

  A. The Audit Process Under the Settlement Agreement. ........................................... 16

    1. Relevant Provisions of the Settlement Agreement. .......................................... 16

    2. The Audit Rules. .............................................................................................. 16

    3. How an Audit Investigation Starts. .................................................................. 17

    4. The Goal of an Audit Investigation. ................................................................. 18

    5. The Authority to Investigate in an Audit. ......................................................... 19

    6. The Special Masters Have Ruled that the Claims Administrator May Audit
      Claims and Place Holds on Claims During Audit. ............................................. 21

  B. The X1Law Motion. .............................................................................................. 21

    1. A Player or Claim Can be Audited More than Once. ........................................ 21

    2. Audit Investigations are Not Restricted to the Mandatory Audits. ................... 22

    3. X1Law's Motion Seeks to Circumvent Established Processes. ........................ 23

IV. CONCLUSION .......................................................................................................... 25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : | No. 2:12-md-02323-AB |
| | : | MDL No. 2323 |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : : | |
| ALL ACTIONS | : : | |

**AMENDED RESPONSE BY THE CLAIMS ADMINISTRATOR TO MOTION BY**
**X1LAW, PA, TO STOP AUDIT INVESTIGATIONS OF ITS CLAIMS**

## I.  INTRODUCTION

BrownGreer PLC, the Court-appointed Claims Administrator of the Class Action

Settlement Agreement of this litigation, submits this amended Response to the "Motion for

Court Intervention to Stop Multiple Audits of Settlement Class Members that Violate the

Settlement Agreement" filed on February 24, 2019 (Document No. 10434) by X1Law, PA

("X1Law").

## II. FACTUAL BACKGROUND

### A. Submissions in the Settlement Program by X1Law.

X1Law, a personal injury law firm in Palm Beach, Florida, represents 69 registered

Retired NFL Football Players in the Program.  While 68 of those 69 registered players are

eligible for the Baseline Assistance Program ("BAP"), X1Law has set up a BAP baseline

assessment for only one player, who scheduled both neuropsychology and neurology

1

appointments. The player cancelled the neuropsychology appointment and did not show up

for the neurology one. X1Law has told the BAP Administrator it will not reschedule those

appointments.

X1Law has submitted 57 Monetary Award Claim Packages:[1]

| Table 1 | | MONETARY AWARD CLAIMS FROM X1LAW | |
|---|---|---|---|
| | **Qualifying Diagnosis Asserted** | | **Claims (% of X1Law Claims)** |
| 1. | Level 1.5 Neurocognitive Impairment | | 19 (33%) |
| 2. | Level 2 Neurocognitive Impairment | | 34 (60%) |
| 3. | Alzheimer's Disease | | 4 (7%) |
| 4. | **Total** | | **57** |

These claims came in from June 27, 2017, to February 22, 2019. The firm has not filed any

claims for ALS, Parkinson's Disease, or Death with CTE.

Though—as explained below—the factual sequence on its claims is somewhat

tortured, the net result is that X1Law uses two neurologists to sign the Diagnosing Physician

Forms ("DPCs") for its 57 claims, as shown in Table 2:

| Table 2 | | DIAGNOSING PHYSICIANS USED BY X1LAW | | |
|---|---|---|---|---|
| | **Physician** | **Diagnosis Type** | **Location** | **Claims** |
| 1. | Doctor 1[2] | Pre-Effective Date | Delray Beach, FL | 51 |
| 2. | Doctor 2 | Former Qualified MAF Physician | Davie, FL | 6 |
| 3. | | **Total** | | **57** |

---

[1] We treat a law firm's client information as confidential to that firm and its clients, except as we are permitted to share it with the Court, the Special Masters, the Parties, the Trustee and the Lien Resolution Administrator. We do not make public statements about how many clients a particular firm has or what has happened to their claims. Our audit proceedings are conducted in private among the Special Masters, the Parties and the Settlement Class Members affected by an audit, along with their lawyers if they are represented. Normally, we would not discuss claims or audit investigations in this public forum. Here, however, we need to explain these facts in this Response to be able to respond to the accusations by X1Law in its Motion.

[2] Doctor 1 practices with his son, Doctor 1A, who also is a neurologist. Doctor 1A did Brain MRIs ordered by Doctor 1 on X1Law clients.

Delray Beach is about 20 miles from the X1Law offices in Palm Beach in southern

Florida, while Davie lies 55 miles away. The X1Law clients these two physicians diagnosed

live in 16 states, with 17 in Florida:

| Table 3 | STATES OF RESIDENCE OF X1LAW CLIENTS | |
|---|---|---|
| **Player Lives In** | | **Number of Players** |
| 1. | Alabama | 1 |
| 2. | Arizona | 1 |
| 3. | California | 2 |
| 4. | Florida | 17 |
| 5. | Georgia | 8 |
| 6. | Illinois | 2 |
| 7. | Minnesota | 1 |
| 8. | Mississippi | 1 |
| 9. | North Carolina | 9 |
| 10. | Nevada | 2 |
| 11. | Ohio | 1 |
| 12. | Oklahoma | 1 |
| 13. | Pennsylvania | 1 |
| 14. | South Carolina | 2 |
| 15. | Texas | 6 |
| 16. | Virginia | 2 |
| 17. | **Total** | **57** |

Section 6.4(a) of the Settlement Agreement requires that claims based on Pre-

Effective Date diagnoses be reviewed by a Court-appointed neurologist on the Appeals

Advisory Panel ("AAP"), while a claim resting on a diagnosis from a Qualified BAP

Provider or Qualified MAF Physician is handled by the Claims Administrator without

mandatory review by the AAP or by the neuropsychologists on the Appeals Advisory Panel

Consultants. The AAP has assessed 34 Pre-Effective Date claims from X1Law and found 33

of them not medically eligible. The AAP approved one Alzheimer's Disease Pre-Effective

Date claim from X1Law, which the Program has paid. The other 17 X1Law Pre-Effective

3

claims have been in audit investigations. On the six claims done by Doctor 2 while he was a Qualified MAF Physician, four have been denied, one was found payable but is on appeal, and we are reviewing the claim filed on February 22, 2019.

## B. The Audit Investigation of Doctor 2.

### 1. Commencement of the Audit Investigation of Doctor 2.

X1Law originally sent us 34 DPCs signed by Doctor 1, a neurologist who is neither a Qualified MAF Physician nor Qualified BAP Provider. But on June 7, 2017, a paralegal at X1Law emailed her contact at BrownGreer saying "I uploaded the physicians [*sic*] certification for our clients prematurely and my boss wants them taken off immediately." Following that direction, we removed the Doctor 1 DPCs from the claim files of all 34 players. About two weeks later, X1Law began submitting Claim Packages for 30 of those 34 players, this time with DPCs signed by Doctor 2, who had been approved as a Qualified MAF Physician by the Parties on May 15, 2017, and had signed all these DPCs in that capacity.[3] As originally submitted with Doctor 1 DPCs, the claims would have been assessed by an AAP neurologist, while a DPC from a Qualified MAF Physician is not subject to mandatory AAP review.

None of those 30 Claim Packages, however, included medical records from Doctor 2 himself. Instead, without examining the players in person, Doctor 2 had relied on reports from the earlier evaluations done by Doctor 1. Under the Settlement Agreement and the implementing rules and materials:

(a) The diagnosing physician cannot base a Qualifying Diagnosis solely on a review of test results or the medical records of another physician; and

(b) The diagnosing physician must have met with the player in person, rather than communicating with him by email, texts, letters, or on the phone.

---

[3] X1Law did not submit claims using DPCs from Doctor 2 for the other four clients who started out with Doctor 1 DPCs. Instead, the firm later resubmitted the retracted Doctor 1 DPCs for these four without an intervening Doctor 2 DPC.

4

The Qualified MAF Physician Manual we furnish to all appointed Qualified MAF Physicians clearly instructs them they must see the player to make a diagnosis. A Claim Package must include records from the diagnosing physician who examined the player in person and rendered the Qualifying Diagnosis and that diagnosing physician must sign the DPC.

On September 22, 2017, we began an audit investigation into Doctor 2's actions and diagnoses and over time sent X1Law Notices of Audit on those claims. On November 17, 2017, X1Law emailed asking us to identify the specific basis for the audit. We responded on November 20, 2017, that the claims were in audit under Sections 10.3 and 10.4 of the Settlement Agreement because Doctor 2 had not personally examined players yet had signed DPCs for them. Starting on December 20, 2017, X1Law re-submitted the 34 DPCs signed by Doctor 1 to replace those from Doctor 2. All but one of those DPCs were exactly the same as those X1Law had submitted originally but retracted back on June 12, 2017.

## 2. **Conversations with Doctor 2 and the AAP's Opinion.**

We talked with Doctor 2 several times during his audit investigation. He confirmed he had not personally evaluated any of the players for whom X1Law had submitted a substitute DPC signed by him. Instead, in late April or early May 2017, after X1Law had delivered to him records from Doctor 1 on the players, he had simply looked at them and then entered his Qualifying Diagnoses on all of them. We explained to him that he had breached his Qualified MAF Physician Agreement by making diagnoses without personally examining the players. Doctor 2 told us he had misunderstood his MAF Physician Manual and did not realize that he could not diagnose a player without seeing him.

As part of the audit investigation, we sought input from the AAP on the medical aspects of Doctor 2's claims. An AAP member told us on March 8, 2018, that Doctor 2 had provided

5

some diagnoses without any neuropsychological testing and that the Clinical Dementia Rating

("CDR") scores he assigned did not always match the player's reported functional abilities,

which is an essential element of a Level 1.5 or Level 2 diagnosis under Ex. 2 to the Settlement

Agreement.

### 3. Conclusion of the Audit Investigation of Doctor 2.

At that point, it appeared to us that the flaws in Doctor 2's diagnoses were ones of

clinical judgment and compliance with medical and Settlement Agreement diagnostic criteria.

The absence of a DPC from a physician who had examined the player made the X1Law claims

seriously incomplete, but by this time X1Law had abandoned Doctor 2 to return to relying on

Doctor 1 instead.  While his medical judgment was quite questionable, we did not have a

reasonable basis to conclude that Doctor 2 had misrepresented, omitted or concealed material

facts on these claims.  As a result, we closed our audit investigation of Doctor 2 and on March

23, 2018 sent Notices of Concluded Audit to X1Law on each of their clients involved in the

Doctor 2 investigation.  For various reasons related to his performance, on September 7, 2018,

we notified Doctor 2 that his role as a Qualified MAF Physician was terminated.

### C. The Audit Investigation of Doctor 1.

### 1. Commencement of the Audit Investigation of Doctor 1.

We processed the X1Law claims now with the Doctor 1 DPCs which, because they were

Pre-Effective Date diagnoses, had to be reviewed by the AAP.  On August 20 and 21, 2018, an

AAP member expressed to us serious concerns about Doctor 1.  The AAP member had assessed

ten diagnoses by Doctor 1, finding reasons to suspect the veracity of many, if not all, of his

results because of a "systematic pattern of incomplete and contradictory documentation

suggestive of misrepresentation by the diagnosing physician."  The AAP member elaborated:

6

(1) The clinical histories were remarkably similar in all 10 cases.

(2) The players had scored in the normal range on cognitive testing. No neuropsychological testing was included in the reports, even though there is no indication that impairments are sufficient to preclude such testing.

(3) Doctor 1 had ordered, conducted, and interpreted physiologic testing that was irrelevant to the evaluation.

(4) There was no assessment by Doctor 1 of daily function generally consistent with the CDR scoring of daily function in Home & Hobbies, Community Affairs, or Personal Care.

(5) There was little or no consideration of employment history in the diagnostic assignments and documentation of functional decline was limited or absent.

(6) Doctor 1 assigned clinical diagnoses of "mild cognitive impairment" and "minimal cognitive impairment," in direct contradiction with the requirement of moderate to severe or severe decline from a previous level of performance required by Ex. 1 to the Settlement Agreement for Level 1.5 or Level 2 Qualifying Diagnoses.

The AAP member felt Doctor 1 showed significant bias in favor of making payable Qualifying Diagnoses with no documentation to support the claims and a complete lack of medical judgment to address reported inconsistencies. He also noted that the documentation submitted in support of the diagnoses had an "appearance of thoroughness" that might suggest to someone without medical training that all of it was medically valid.

We have received 54 Pre-Effective Date MAF Claims based on diagnoses from Doctor 1, 51 of which came from X1Law.[4] The concerns expressed by the AAP member appeared in all these claims:

---

[4] Although three players with diagnoses from Doctor 1 are not currently represented by X1Law, evidence from our audit of Doctor 1 and records submitted to the Program indicate that each player at one time had been represented by X1Law and the evaluation was done at direction of that firm.

7

| Table 4 | | DOCTOR 1 CLAIMS | | |
|---|---|---|---|---|
| **Diagnosis** | | **X1Law** | **Another Firm or Pro Se** | **Claims** |
| 1. | Level 1.5 | 19 | 0 | **19** |
| 2. | Level 2 | 30 | 3 | **33** |
| 3. | Alzheimer's Disease | 2 | 0 | **2** |
| 4. | **Totals** | **51** | **3** | **54** |

The serious issues about Doctor 1 caused us to begin an audit investigation of his claims on August 21, 2018. We sent Notices of Audit to X1Law on August 29, 2018, to alert them to this new investigation and subsequently explained by email that Doctor 1's diagnostic methodologies had raised red flags and caused claims relying on his diagnoses to go into audit. This investigation is in its last stages and will finish soon. The X1Law Motion requires us to preview here much of what our report from that investigation will say.

### 2. **X1Law's Earlier Efforts to Place Doctor 1 as a Qualified MAF Physician.**

There was considerable history with X1Law and Doctor 1. On December 30, 2016, Patrick Tighe of X1Law had emailed us recommending Doctor 1 to serve as a Qualified MAF Physician. He also contacted us on later occasions to promote him. Doctor 1 submitted his Qualified MAF Physician application to us on January 9, 2017.

As we do with all such applicants, we researched Doctor 1's background. We found two Florida Board of Medicine actions against him that were concerning. In 1988, Doctor 1 was found to have failed to keep written medical records justifying the course of a treatment of a patient and assessed a $500 fine. In 1992, the Board of Medicine investigated a case where Doctor 1 prescribed a patient a certain drug at much higher levels than a "prudent similar physician." When the patient became pregnant, another doctor took her off that drug.

8

Nonetheless, Doctor 1 had prescribed the drug again to this patient, who suffered "spontaneous rupture of the membranes with delivery of twins, neither of whom survived" and died from "adult respiratory distress." The Florida Board of Medicine found that Doctor 1 was guilty of "prescribing, dispensing, administering, mixing, or otherwise preparing a legend drug, including any controlled substance, inappropriately or in excessive or inappropriate quantities . . . thirty (30) times over the recommended dosage." It assessed Doctor 1 a $3,000 fine, issued a Letter of Concern and required him to complete an additional 30 training hours in neurology, 10 hours in risk management and 10 hours in prescribing neurologic drugs. In addition, Doctor 1 was ordered to appear before the Board of Medicine to "demonstrate to the Board's satisfaction the events which resulted in the allegations on this case and shall further demonstrate what he has changed in his practice in order to prevent future similar occurrences."

We also found multiple negative online reviews on Doctor 1. In light of all the foregoing, we did not feel Doctor 1 was a proper candidate to be Qualified MAF Physician and did not present his application to the Parties to consider.

### 3. **Serious Issues with Doctor 1.**

#### (a) **Cognitive Testing.**

The AAP was concerned about Doctor 1's reliance on and misinterpretation of cognitive testing, specifically the MMSE (Mini-Mental Status Exam). While the MMSE is not part of the extensive neuropsychological testing battery in Exhibit A-2 of the Settlement Agreement, it is a commonly used screening test to help assess whether there is an increased or decreased chance of dementia or cognitive impairment in a patient and its possible severity.[5] Doctor 1 did not refer any player he examined to a neuropsychologist for neurocognitive testing. Instead, he personally

---

[5] https://knightadrc.wustl.edu/cdr/PDFs/CDR_OverviewTranscript-Revised.pdf

administered the MMSE to the players and relied on his findings to support his diagnoses, even though the players' scores, in most cases, did not actually support the Qualifying Diagnoses he later entered for them.

During the MMSE, a health professional gives the patient a three-page questionnaire posing a limited set of questions and tasks designed to test a range of everyday mental skills. The maximum MMSE score is 30 points. A score of 20 to 24 suggests possible mild dementia, 13 to 20 suggests possible moderate dementia, and less than 12 suggests possible severe dementia. A score above 24 suggests possible normal function.[6]

Based on the MMSE scores reported in their medical records, out of 51 players represented by X1Law at the time of their diagnoses from Doctor 1, 35 were in the normal function range on the MMSE, yet Doctor 1 assigned a Qualifying Diagnosis to all 35 of them (19 Level 1.5, 15 Level 2 and one Alzheimer's Disease). Another 15 players received scores indicating only mild dementia, but Doctor 1 entered 14 Level 2 diagnoses and one Alzheimer's diagnosis for them. The medical records for the remaining player do not provide an MMSE score for him; this player received a Level 2 diagnosis.[7]

Doctor 1 did not attempt to explain how the scores could be compatible with his diagnoses. Also, because Doctor 1 did not refer players for testing by a licensed neuropsychologist, there is no other objective criteria by which the Program could measure the reasonableness of Doctor 1's diagnoses. The AAP member noted there is no indication that any player's supposed impairments were sufficient to preclude such testing.

---

[6] https://www.alz.org/alzheimers-dementia/diagnosis/medical_tests
[7] Two of these players are no longer represented by X1Law, though they were at the time of the diagnoses. One player who scored in the normal range on the MMSE is now represented by a different law firm, and one who scored in the range indicating possible mild dementia is now proceeding *pro se*.

10

### (b) Clinical History and Tests.

The AAP member was puzzled that Doctor 1 had done the same analysis and tests for almost all players that he examined. Doctor 1 ordered a set of the same five tests during his evaluation for almost all players, regardless of age or other unique history of the player. One of the tests, a Brain MRI, is within the recommendations for assessment of dementia with imaging tests under the Academy of Neurology Guidelines dating to 2001. The other four tests are "irrelevant physiological testing," according to the AAP member.

Despite those tests having no apparent role in the diagnosis of dementia or cognitive impairment, Doctor 1 repeatedly used them to conclude that each of the players has some level of dementia or cognitive impairment. In fact, Doctor 1 submitted a Physician Addendum & Attestation for 33 players in which he certified that he relied on one or more of these irrelevant physiological tests to reach his diagnosis.

### (c) Reported Public Activity and Discrepancies With the Claimed Impairment.

Exhibit 1 to the Settlement Agreement defines the compensable Qualifying Diagnoses. For both Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment, Exhibit 1 requires that the player exhibit functional impairment generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's CDR scale in the areas (or "subscales") of Community Affairs, Home & Hobbies and Personal Care.[8] For a Level 2 diagnosis, the functional impairment must be generally consistent with the CDR scale criteria for Category 2 (Moderate Impairment) in those three areas.[9] When assigning a CDR score in each area, the diagnosing physician must use all reliable information available, including the player's history

---

[8] For more information on the CDR, see https://knightadrc.wustl.edu/CDR/CDR.htm.

[9] The scoring choices are None (0), Questionable (0.5), Mild (1), Moderate (2) and Severe (3). For Personal Care, the 0 and 0.5 scores are combined into one if the physician determines the patient is "[f]ully capable of self-care."

11

and physical and the physician's interviews with the player and a reliable informant.

Doctor 1 assigned a Level 2 diagnosis to 30 X1Law players. All but seven of them were still working. Doctor 1 gave Level 2 diagnoses to 23 of them despite their telling him they were still employed in some capacity at the time. He recorded a CDR score of 2 in Community Affairs for 12 of these 23 Level 2 players; nine players did not receive specific scores for each CDR level but got an overall score of 2 from Doctor 1; the other two were given scores of 1 for each CDR level.

According to the CDR scale, a score of 2 for Community Affairs indicates "no pretense of independent function outside home."[10] Any activity or employment that would require even the pretense of independent function has a direct bearing on the CDR score for Community Affairs and the resulting diagnosis. Such information must be considered and addressed by the practitioner making the diagnosis. Someone with a CDR score of 2 in Community Affairs would not be expected to hold either part-time or full-time employment or be able to participate in any meaningful way in other activities such as public speaking where at least a "pretense of independent function outside home" is required.

An especially striking example of Doctor 1's CDR assignments being inconsistent with a player's actual activities is his assignment of a Level 2 diagnosis to a player who continues to work as a corporate spokesman and as a host for special events related to athletics, regularly makes public appearances and has an active social media presence documenting his frequent golf outings and his foreign travel. Despite all this, Doctor 1 diagnosed the player with Level 2 Neurocognitive Impairment in late 2016 and assigned a score of 2 for each CDR area, including Community Affairs.

---

[10] https://knightadrc.wustl.edu/CDR/CDR.htm.

**(d)** <u>Inconsistent Diagnoses</u>.

The AAP member concluded that Doctor 1's Qualifying Diagnoses for the X1Law clients were inconsistent with the findings for those players in Doctor 1's own records. Under the Settlement Agreement's Injury Definitions (Exhibit 1), to qualify for a Qualifying Diagnosis of Level 1.5, the player's medical records must show (1) there is a concern that there has been a severe decline in cognitive function and (2) there is evidence of a moderate to severe cognitive decline from a previous level of performance. For Level 2, the player's medical records must show (1) there is a concern that there has been a severe decline in cognitive function and (2) there is evidence of a severe cognitive decline from a previous level of performance.

The medical records for 29 Doctor 1 players were internally inconsistent regarding his findings for the player. Doctor 1 provided two different diagnoses in two sections of his written reports on those players. In the "Diagnoses" section, Doctor 1 wrote that the player had "Postconcussional Syndrome, Mild Cognitive Impairment, and Minimal Cognitive Impairment." However, in his later Assessment section, Doctor 1 said the same player had "Moderate cognitive impairment due to repeated head injuries."

Those two sections of Doctor 1's records conflict for all 29 of those players. Even worse, both diagnoses are also inconsistent with the Qualifying Diagnoses that Doctor 1 ultimately entered on the DPCs, as he entered 27 Qualifying Diagnoses of Level 2 impairment, which requires a showing of severe cognitive decline under the Settlement Agreement, and two Qualifying Diagnoses of Alzheimer's Disease.

We also identified several instances where Doctor 1's medical records did not have that internal conflict but did not match the Qualifying Diagnosis that he ultimately gave the player in the DPC he signed under penalty of perjury. For 17 players, both the Diagnoses and Assessment

13

sections of Doctor 1's report said the players had only "mild cognitive impairment" and/or "minimal cognitive impairment," which is not dementia, yet Doctor 1 gave 16 of these players Level 1.5 diagnoses and one player a Level 2 diagnosis.

### 4. **Suspect High Rate (100%) of Diagnoses for Evaluated Players.**

We sent Audit Questions and follow-up Audit Questions to both Doctor 1 and X1Law. These went to Doctor 1 on September 4, 2018; we received his responses on September 13, 2018. We sent follow-up questions to him on September 27, 2018, which he answered on October 19, 2018. We had a call with him on October 25, 2018, and then sent more written questions to him on February 11, 2019.

Similarly, we sent questions to Mr. Tighe on October 9, 2018, with his answers on November 5, 2018. We emailed some follow-up questions to Mr. Tighe on November 28, 2018, which he answered by email on December 11, 2018.

We asked Doctor 1 how many players he had evaluated and how many of them received Qualifying Diagnoses. He responded that he had evaluated "60-70" players, and that "a high percentage of retired NFL Players had cognitive and functional impairment resulting in dementia."

Mr. Tighe told us that "all of the Retired NFL Football Players currently clients of the Firm who are under audit by the Claims Administrator: (a) have been examined by a Board Certified Neurologist; and (b) have been found to have a Qualifying Diagnosis." We asked X1Law to be more specific. He then told us that of the 53 of his clients he had sent to Doctor 1, Doctor 1 had found all 53 of them to have a Qualifying Diagnosis. This 100% diagnosis rate elevated our suspicions about the legitimacy of Doctor 1's diagnoses.

14

### 5.  Current Status of the Audit of Doctor 1.

We have tried to give Doctor 1 every chance to clear up the above issues, lastly in the

written questions we sent him on February 11, 2019, asking him to explain:

1.  His approach in accounting for MMSE scores when making a Qualifying Diagnosis
    in the Program and in general in his practice when diagnosing patients with
    dementia.

2.  Why he did not seek or obtain any neuropsychological testing on any player.

3.  His basis and rationale for using four tests that the AAP Member described as being
    "irrelevant physiological testing" in making a Qualifying Diagnosis in the Program,
    and, in general, in his practice when diagnosing patients with dementia.

4.  His assessment of CDR score of 2 in Community Affairs for players who were still
    working at the time of evaluation.

5.  His approach and basis for overall functional impairment when making a Qualifying
    Diagnosis in the Program, and, in general, in his practice when diagnosing patients
    with dementia.

6.  The apparent internal contradictions in the diagnoses for 29 players where his medical
    records assign clinical diagnoses of "mild cognitive impairment" and "minimal
    cognitive impairment" but later note that the player has "Moderate cognitive
    impairment due to repeated head injuries."

7.  Why he assigned diagnoses of Level 1.5 or Level 2 to 17 players when his medical
    records indicate that the players had only "mild cognitive impairment" and/or
    "minimal cognitive impairment."

8.  Contradictions between his statements during the MAF Physician application process
    and his answers to our Audit Questions about the number of players he evaluated and
    the source of referrals of those players.

9.  How it was possible for him to have found a Qualifying Diagnosis in 100% of the
    players he saw.

We called Doctor 1's office about the status of them on February 25, 2019, and spoke

with one of the employees at his practice, who said Doctor 1 had not yet seen the questions.  We

emailed the questions to Doctor 1 again on February 25, 2019, and we followed up by email on

February 26, 2019.  Doctor 1 finally replied that day saying he had not received the questions

when we sent them on February 11, 2019, and he would send us answers. On February 24, 2019,

X1Law filed its present Motion asking that we be prohibited from auditing Doctor 1. We

received answers from Doctor 1 on March 5, 2019, and we are going over them with an AAP

member.

## III.   ARGUMENT AND AUTHORITIES

### A. The Audit Process Under the Settlement Agreement.

#### 1. Relevant Provisions of the Settlement Agreement.

Sections 10.3(c) and 10.3(d) of the Settlement Agreement require us to audit:

(1) 10% of the total Claim Packages or Derivative Claim Packages we have found
   to qualify for Monetary Awards or Derivative Claimant Awards during the
   preceding month. We select these Claim Packages at random and are required
   to audit at least one Claim Package, if any qualify, per month.

(2) Claims seeking a Monetary Award for a given Qualifying Diagnosis when the
   Retired NFL Football Player took part in the BAP within the prior 365 days
   and was not diagnosed with that Qualifying Diagnosis during the BAP
   baseline assessment examination.

(3) Claims for a Monetary Award for a given Qualifying Diagnosis when the
   Retired NFL Football Player submitted a different Claim Package within the
   prior 365 days based upon a diagnosis of that same Qualifying Diagnosis by a
   different physician and that Claim Package was found not to qualify for a
   Monetary Award.

(4) Claims reflecting a Qualifying Diagnosis made through a medical examination
   conducted at a location other than a standard treatment or diagnosis setting.

Those required audits are not our only audit duties. Sections 10.3(b) and 10.4 of the

Settlement Agreement mandate that we, in consultation with the Parties, establish and

implement procedures and system-wide processes to detect and prevent fraud.

#### 2. The Audit Rules.

We have implemented Sections 10.3(b) and 10.4 of the Settlement Agreement with

system-wide processes to identify suspect claims and avoid paying them. We developed the

Rules Governing the Audit of Claims ("Audit Rules"), which the Special Masters adopted as effective on January 26, 2018. The Audit Rules are posted on the Settlement Website to detail how the audit process works.

We look at various "red flags" to detect potential fraud, based on Section 10.4 of the Settlement Agreement: (1) alteration of documents; (2) questionable signatures; (3) duplicative documents submitted on claims; (4) the number of claims from similar addresses or supported by the same physician or office of physicians; and (5) data metrics indicating patterns of fraudulent submissions. We continue to refine and add to the matters that arouse suspicion about the legitimacy of a claim or group of claims, but have not posted these publicly, for doing so would provide a road map to persons on how to avoid triggering them and the scrutiny that would result.

We also receive tips about potential fraud, which often are the best leads on claims that are of doubtful veracity. The Settlement Website allows anyone to report potential fraud to us (https://www.nflconcussionsettlement.com/ReportFraud.aspx). We research information from each tip to determine its credibility and decide whether we have reason to place claims in audit while we investigate it further.

### 3.  **How an Audit Investigation Starts.**

If we put a claim in audit, we notify the Settlement Class Member (through his lawyers, if represented) and the Parties under Audit Rule 9. Under Audit Rule 8, we suspend all claims processing and appeal deadlines during the pendency of an audit investigation. If the claim ends up being closed because of what we find in the audit, this spares the Settlement Class Member, the Parties, the Special Masters and the administrators of wasted effort on the claim.

17

### 4. The Goal of an Audit Investigation.

Sections 10.3(g) and 10.3(j) of the Settlement Agreement and Audit Rule 12 require us to determine whether there is a reasonable basis to support a finding that there has been a misrepresentation, omission, or concealment of a material fact made in connection with a claim. Audit Rule 12 sets this out in detail:

**Rule 12. Standard of Proof Applied by the Claims Administrator.**

(a) Standard of Proof: If the Claims Administrator determines there is a reasonable basis to support a finding that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim by the Settlement Class Member, the Claims Administrator will report the Claim to the Parties and then refer it to the Special Masters as permitted by these Rules. This standard applies to all Audits by the Claims Administrator, including those under Section 10.3(j) of the Settlement Agreement concerning possible fraud in connection with a Claim.

(b) Fraudulent Intent Not Required: This standard of proof does not require the Claims Administrator to determine whether the misrepresentation, omission or concealment was intentional.

(c) Materiality: A fact is material if it did affect or has any potential to affect whether the Settlement Class Member qualifies for a Monetary Award, Supplemental Monetary Award or Derivative Claimant Award and/or the amount of such award in favor of the Settlement Class Member under the provisions of the Settlement Agreement.

If we do not have a reasonable basis for a finding of misrepresentation, omission, or concealment, we remove the claim from audit and pursuant to Audit Rule 14 issue a notice to the Settlement Class Member advising him or her that we will continue processing the claim. If, however, we conclude there is a reasonable basis for a finding of misrepresentation, omission, or concealment, under Audit Rule 15 we issue to the Parties a Report of Adverse Finding in Audit, explaining what we found and the remedies we feel are appropriate. Audit Rule 16 gives Co-Lead Class Counsel and the NFL Parties 15 days from the Report to decide whether they agree with us that it should be referred to the Special Masters for review. If either Party consents to the referral, we send the Report to the Special Masters, after which each Party has 20 days under

18

Audit Rule 17 to submit their statements of position to the Special Masters regarding referral. After all this process, if the Special Masters decide to accept the referral, we follow Audit Rule 19 and send the affected Settlement Class Members (or their lawyers) a notice of the referral and a copy of the Audit Report. Then the affected Settlement Class Members and their lawyers have 30 days under Audit Rule 20 to submit a memorandum to the Special Masters in response to the Audit Report, along with exhibits and additional evidence in support of their positions. Rule 24 gives the Special Masters discretion to require or permit oral argument on a referred Report.

The Special Masters then determine whether the Settlement Class Members or other parties subject to the Audit Report have established that there is no reasonable basis to support a finding that there has been a misrepresentation, omission, or concealment of a material fact made in connection with a claim by the Settlement Class Member and may find such misrepresentation, omission, or concealment was intentional (Audit Rule 28). The Special Masters may remand claims to us under Audit Rule 29; dismiss the proceeding under Audit Rule 30; or under Audit Rule 31 deny the claims, require additional audits, refer the matter to the appropriate disciplinary boards or federal authorities, direct re-examination of a living Retired NFL Football Player or review of the medical records of a deceased Retired NFL Football Player by a Qualified BAP Provider or by a Qualified MAF Physician, disqualify the lawyer, law firm, claims service, or healthcare provider, and/or Settlement Class Member(s) from the Program, and/or order other relief that the Special Masters may deem appropriate. Claims are not closed after an audit unless the Special Masters agree with our findings and direct us to do so.

### 5. **The Authority to Investigate in an Audit.**

Section 10.3(e) of the Settlement Agreement grants us the authority to require Settlement Class Members to submit additional records and information to us, including a list

19

of all the player's healthcare providers for the past five years and NFL employment records, as well as allowing us to obtain medical records from all the player's doctors. Audit Rule 10 sets out this investigative authority, which is essential to any effective process for investigating suspicious claims and sources of claims in a settlement program, and bestows upon our requests for records or information in connection with an audit the force and effect of a subpoena under Fed. R. Civ. P. 45:

> **Rule 10. Required Information and Records.** The Claims Administrator may require a Settlement Class Member, within 90 days or such other time as necessary and reasonable under the circumstances, to submit to the Claims Administrator such records and information as may be necessary and appropriate to audit the Claim of the Settlement Class Member, including the records and information described in Sections 10.3(e) and 10.3(f) of the Settlement Agreement. The Claims Administrator also may require persons and entities other than the Settlement Class Member to submit such records and information within 90 days or such other time as necessary and reasonable under the circumstances. Any request by the Claims Administrator for records or information in connection with an Audit will have the force and effect of a subpoena under Fed. R. Civ. P. 45 and may be served by any means that will cause the recipient to receive it. The Claims Administrator has the authority to take testimony, issue follow-up requests for information and records, and/or obtain additional materials and information pursuant to Fed. R. Civ. P. 45 as it deems reasonably necessary to complete the Audit.

Section 10.3(e) of the Settlement Agreement allows audited Settlement Class Members 90 days, or such other time we determine necessary and reasonable, to respond to a request for information in an audit. If a Settlement Class Member refuses to cooperate with an audit, including by unreasonably failing or refusing to obtain and provide us with all the records and information sought within the time we specified, Section 10.3(b)(ii) of the Settlement Agreement and Audit Rule 11 gives us the authority to deny the claim, without right to appeal.

### 6. **The Special Masters Have Ruled that the Claims Administrator May Audit Claims and Place Holds on Claims During Audit.**

On July 13, 2018, the Special Masters entered an Order (Document 10136) denying a motion (Document 9815) by another law firm, Neurocognitive Football Lawyers, LLC, that challenged the authority of the Claims Administrator to conduct audit investigations of Monetary Award Claim Packages and to place claims on hold and not pay them until the investigation can be completed. The Special Masters held that "the Claims Administrator is fully empowered—indeed is required—to investigate all facts that bear on the integrity and reliability of the materials and assertions submitted in a Monetary Award Claim Package." Order at p. 4.

### B. **The X1Law Motion.**

#### 1. **A Player or Claim Can be Audited More than Once.**

In Paragraph 23 of its Motion, X1Law asks the Court to rule that "[w]hen the Claims Administrator concludes an audit of a claim without making a determination of fraud, the audit process ... is over" and "[t]he process of issuing a Monetary Award is not subject to a second audit of the claim, or a re-audit of the same records and information . . .." The firm would like to exempt a once-audited claim from any further scrutiny, even if the claim changes after the first audit, as its claims did, and even if we learn new information completely unrelated to the first audit.

The X1Law claims now in audit because of the firm's use of Doctor 1 are different claims than those we investigated because of issues with Doctor 2. The claims are not in audit for the same reasons as when they were in audit before. The firm changed the records and information supporting its claims. It submitted records from Doctor 1, withdrew them and switched to Doctor 2, withdrew the Doctor 2 DPCs after we told the firm those claims were

21

fatally flawed because Doctor 2 had never seen the players, and then resubmitted DPCs from Doctor 1. After we finished our audit of Doctor 2 and issued Notices of Concluded Audit on that investigation, we learned new information from the AAP about Doctor 1 calling his Qualifying Diagnoses into question and mandating an investigation of the integrity of his results.

We must be able to stop ineligible payments whenever we find them, even if we may have audited a claim before, especially when the previous audit focused on a separate issue, as is the case here. The Settlement Agreement and the Audit Rules adopted by the Special Masters allow us to audit claims at any time in the claims process, even after they are paid. New and different information and documents can be submitted at any time in the claims process. To protect the integrity of the Program and pay only those Settlement Class Members who properly qualify for a Monetary Award, we need to be able to reevaluate a player and his claim in the audit process whenever we become aware of questions about the legitimacy of a player's claimed diagnosis. That is especially true when a law firm changes key elements of its claims to avoid the issues raised in an audit investigation. No claim should be immune from audit scrutiny at any time.

### 2. **Audit Investigations are Not Restricted to the Mandatory Audits.**

X1Law states in Paragraph 20 of their Motion that "Section 10.3(d) of the Settlement Agreement provides the terms of the deal with respect to Audits of Claims Packages by the Claims Administrator." Paragraph 21 repeats the erroneous argument that Section 10.3(d) identifies the "three circumstances under which the Claims Administrator may audit Claims Packages."

X1Law completely ignores the rest of Section 10.3, including the directive in Section 10.3(b) that we "establish and implement procedures to detect and prevent fraudulent

22

submissions to, and payments of fraudulent claims from, the Monetary Award Fund," as well as Section 10.4 and the Audit Rules adopted by the Special Masters. This Program surely would suffer raiding by unscrupulous persons if we could investigate only the three fact-pattern scenarios identified in Section 10.3(d).

X1Law's position is similar to that proffered by the Yerrid Law Firm and Neurocognitive Football Lawyers, PLLC, in their March 30, 2018 Partial Joinder of the Motion Brought by the Locks Law Firm for Appointment of Administrative Counsel, Motion to Review Deprivation of Appeal Rights and Requesting Oral Argument (Document 9843), where those firms contended that the "only basis for an Audit of a Monetary Award is under Paragraph 10.3(c)" of the Settlement Agreement. While the Court did not directly address this argument in denying the Locks Motion and the Joinders in it, in their July 13, 2018 Order (Document 10136) on those motions, the Special Masters rejected that argument entirely.

### 3. **X1Law's Motion Seeks to Circumvent Established Processes.**

This is not the first time X1Law has tried to bypass procedures established by the Settlement Agreement and approved by the Court and/or the Special Masters. On August 15, 2017, X1Law filed a "Motion to Determine Proper Administration of Claims Under the Settlement Agreement" (Document 8267). There, the firm said we had no authority to send deficiency notices to them asking for the documentary evidence required by Exhibit 1 to the Settlement Agreement to corroborate a player's functional impairment, contending that the Settlement Agreement did not mean such corroborating evidence actually existed before the date of the Qualifying Diagnosis. In its November 2, 2017 Order (Document 8882), the Court denied X1Law's motion, ruling that X1Law "must proceed through the Claims Administration process, and if the claims are denied, ... must follow the proper appeals

process." The Court noted that the firm's attempt to circumvent Claims Administration processes "by directly petitioning the Court is improper."

The Audit Rules adopted by the Special Masters set out the steps for an audit investigation and afford the players affected ample due process, as described above. Now that Doctor 1 has replied to our questions, we can finish our investigation of his claims. If we conclude that there is no reasonable basis for a finding of misrepresentation, omission or concealment, we will remove those claims from audit and resume claims review. If, however, we determine pursuant to Audit Rules 12 and 15 that there is a reasonable basis for a finding of misrepresentation, omission or concealment, we will issue to the Parties a Report of Adverse Finding in Audit, and the Parties will respond to us with their positions on whether the Report should be referred to the Special Masters for decision. If either or both of Co-Lead Class Counsel and the NFL Parties support such referral, we will send the Audit Report to the Special Masters.

Co-Lead Class Counsel and the NFL Parties then may submit Statements of Position under Rule 17 on whether the Special Masters should accept the referral. Under Audit Rule 18, the Special Masters may accept the referral of the Audit Report for further proceedings, reject the referral and direct that we remove the claims from audit, or order other relief. If the Special Masters accept the referral of the report, we will send Notices of Referral to X1Law for each of its clients involved in the Audit Proceeding, along with the Audit Report and the Parties' Statements of Position. Audit Rule 20 allows all affected Settlement Class Members to submit a memorandum addressing the matters in the Report, along with exhibits and any additional evidence they want the Special Masters to review. Co-Lead Class Counsel and the NFL Parties may then submit their Reply Memoranda. The Special Masters

24

then will consider the complete record of the Audit Proceeding (including the Audit Report, Claim Packages of the Settlement Class Members involved, Parties' and Settlement Class Members Statements and Memoranda and all other documents related to the proceeding that are named in Audit Rule 25), and issue their written decision.

That process affords X1Law's clients full notice and chance to be heard. The firm has to follow that process. Its Motion seeks to circumvent that process by asking the Court to intervene before it occurs.

## IV.  CONCLUSION

For the foregoing reasons, the Claims Administrator submits that X1Law's Motion should be denied. To preserve the integrity of the Program and ensure that only valid claims based on reliable diagnoses are paid out of the Monetary Award Fund, we ask that we be permitted to follow the audit procedures in the Settlement Agreement and Audit Rules adopted by the Special Masters.

Respectfully submitted,

BROWNGREER PLC

By:     /s/ Orran L. Brown, Sr.
        Orran L. Brown, Sr.
        Virginia State Bar No. 25832
        BrownGreer PLC
        250 Rocketts Way
        Richmond, Virginia 23231
        Telephone: (804) 521-7201
        Facsimile: (804) 521-7299
        Email: obrown@browngreer.com