**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |

| |
|---|
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, |
| Plaintiffs, |
| v. |
| National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., |
| Defendants. |

| |
|---|
| THIS DOCUMENT RELATES TO: |
| Pope McGlamry v. Leeland McElroy<br>Attorney Lien Dispute<br>(Doc. No. 6522) |

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                      March  28, 2019

## I.      INTRODUCTION

Presently before the Court in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Pope, McGlamry, Kilpatrick, Morrison & Norwood, P.C. ("Pope"), where the firm seeks attorneys' fees and costs from the Award granted to Settlement Class Member ("SCM") Leeland McElroy ("McElroy") in the litigation that became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).

Pope seeks payment of attorneys' fees of 20% of the Award issued to McElroy, its former

client.[1]  Lienholder's Statement of Dispute at 2.  McElroy, now represented by Steckler Gresham Cochran PLLC ("Steckler"), challenges the Lien.  Steckler contends that Pope is not entitled to any portion of McElroy's award because "the work performed by [Pope] on Mr. McElroy's claim was done for common benefit of the settlement and not for Mr. McElroy's individual monetary award claim."  SCM Statement of Dispute at 1.

As we set out in a Report and Recommendation filed on January 7, 2019,[2] our evaluation of these positions involves a consideration of the contingency fee agreement ("CFA") between McElroy and his former counsel and an assessment of the reasonableness of the requested fee in light of the five factors enumerated by the Third Circuit in *McKenzie*.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This will require us to scrutinize the reasonableness of the CFA at the time of the contact's signing and then determine if the circumstances compel a different evaluation of the CFA at the time of its enforcement.  We will then examine the results obtained, the quality of the representation provided by Pope, and whether the efforts of Pope substantially contributed to the result.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.

---

[1]  As we describe below, on April 5, 2018, the District Court determined that presumptively no Individually Retained Plaintiff's Attorneys ("IRPAs") should receive more than 22% of a Monetary Award in fees.  ("Fee Cap").  (Doc. No. 9863).  *See* Doc. No. 10368 at 10-11 (discussing the District Court's decision relating to the presumptive Fee Cap).

[2]  The District Court referred to us all "all petitions for individual attorneys' liens."  (Doc. No. 7446).  On January 7, 2019, we issued a Report and Recommendation pertaining to three separate cases.  (Doc. No. 10368).  These were the first where we set out the legal principles that would guide our analysis in these cases.

## II.    FACTS AND PROCEDURAL HISTORY

Pope entered into a CFA with McElroy on September 22, 2012.  Lienholder's Statement of Dispute, Exhibit A.  Under the terms of the agreement, if Pope "obtains a settlement or judgment for Client, Client will pay to [Pope] thirty (30%) of the net recovery" as the legal fee.  *Id.*, Ex. A, ¶ 3.  McElroy would not owe a legal fee or expense if the firm made no recovery, by settlement or trial, on his behalf.  *Id.*  The agreement also specifically provided that in case of termination before resolution, "[i]f an offer has been negotiated, [Pope] will have a lien upon any subsequent recovery equal to 40% of the offer or an amount to compensate for time and expenses whoever is greater."  *Id.*, Ex. A, ¶ 5.[3]

Pope included McElroy in a multi-player complaint filed in the Northern District of Georgia on September 28, 2012, *Buck, et al. v. NFL*, that was transferred to this district on November 15, 2012.  *See* E.D. Pa. No. 12-cv-6449.  Pope also filed a Short Form Complaint against the NFL on behalf of McElroy on December 12, 2012.  *Id.*, Doc. No. 7; E.D. Pa. No. 12-md-2323, Doc. No. 4244.

On March 24, 2015, McElroy notified Pope that he "was terminating [Pope's] representation of him."  SCM Statement of Dispute at 1.  Pope filed a Notice of Lien in this Court on April 24, 2015 with its petition to establish an attorney's lien.  (Doc. No. 6522).

On August 23, 2016, after some 17 months without counsel, McElroy retained Steckler and entered into a contingent fee agreement pursuant to which he would pay Steckler 5% of his recovery "for registering, any additional testing, and the submitting of claims," but that if

---

[3]  Pope subsequently advised all of its clients on March 10, 2016 that it was revising its fee agreements by reducing the fees sought to 20% of the total Award.  It also confirmed in this litigation that it would, accordingly, seek a fee of only 20% of McElroy's award.  *See* Lienholder's Statement of Dispute at 2, 13 n.2.

McElroy's "claim is challenged," the fee would be 12% of his recovery. SCM Statement of Dispute at Ex. F. In the spring of 2017, Steckler filed McElroy's claim form with the Settlement Claims Administrator. Thereafter the firm addressed a deficiency notice and re-submitted the claim; prepared an appeal when his claim was denied in the fall of 2017; and provided documentation of McElroy's eligibility based on seasons played. SCM Statement of Dispute at 8-13. His award of $918,630 was ultimately finalized on April 16, 2018.[4]

On March 12, 2018, the Claims Administrator issued a Notice of Lien to McElroy and Pope, which noted Pope's lien claim of 20% of any Monetary Award. Steckler, on McElroy's behalf, responded and advised the Claims Administrator that it intended to dispute the Lien.[5] Steckler also filed on the MDL docket on April 6, 2018 a Petition for Attorney's Fees "to protect [the firm's] attorney's fees and costs related to the preparation and filing of Plaintiff's claim." (Doc. No. 9867.)

In light of Pope's notice of lien, Steckler's petition, and the contingency fee agreements of both Pope and Steckler, the Claims Administrator withheld funds for payment of attorneys fees in an amount equal to 22% of McElroy's Award, which reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2018 Opinion and Order. (Doc. Nos. 9862, 9863.) Of that withholding, a portion reflecting 5% of McElroy's Award was subsequently deposited into the Attorneys' Fees Qualified Settlement Fund pursuant to the Court's June 27, 2018 Order Regarding Withholdings for Common Benefit Fund. (Doc. No. 10104.) Those funds may be distributed at a

---

[4]  This amount reflects the grid award amount revised in light of an offset based on the number of seasons played and an increase due to inflation. This amount is then subject to withholding for attorney fees and costs, and then by any other liens of record.

[5]  The Notice of Lien issued by the Claims Administrator was consistent with Lien Rule 8(d), and the response of McElroy satisfied Lien Rule 10.

later date upon further order(s) of Judge Brody. This leaves the Court to determine the appropriate distribution for attorneys fees currently available for disbursement (representing 17% of McElroy's Award) and the distribution of those funds that are currently held in the Attorneys' Fees Qualified Settlement Fund (representing 5% of McElroy's Award), if those funds, or a portion thereof, are refunded by the Court at a future date.

Pursuant to a briefing schedule issued by the Court and in accordance with the Lien Rules, both McElroy and Pope submitted Statements of Dispute concerning Pope's attorney lien on November 13, 2018. ("SCM Statement of Dispute" and "Lienholder Statement of Dispute"). On November 29, 2018, McElroy and Pope submitted Responses to each other's Statement of Dispute. ("SCM Response" and "Lienholder Response"). Pursuant to Lien Rule 17, the Record of Dispute was then transferred to the Court. The parties consented on January 17, 2019 to having this Magistrate Judge exercise final judgment authority over this matter. (Doc. No. 10381.) The Court held a hearing on February 21, 2019 at which an attorney from each firm was heard. (Doc. No. 10507.)

## III.    THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in this class action settlement in no way relieved attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees – whether those fee requests are submitted through a Lien or otherwise – are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*.

*See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.[6]

## IV.    DISCUSSION

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the contract's enforcement. We will then review: (1) the result in the case, (2) the quality of the work performed by Pope, and (3) the substantiality of that contribution to the overall result.

As we outline below, circumstances here changed significantly from the time of contracting to the time Pope sought to enforce its contract, leaving us to consider whether, under the facts presented here, we should approve its 20% fee sought or whether a downward adjustment or a

---

[6]  The fee that each firm seeks, when considered in isolation, is within the presumptive fee cap. If both Pope and Steckler were awarded the full fee each seeks, however, then 32% of McElroy's award would go to pay IRPA fees. We see no basis to make such an upward deviation from the presumptive 22% IRPA fee cap.

disapproval of its fees – as Steckler argues – would be appropriate. Based upon our evaluation of the remaining three prongs of the *McKenzie* test, we are satisfied that Pope provided quality representation and made contributions to the ultimate Award received in this case. Considering Steckler's contributions and the substantiality of its work relative to Pope's, however, we will approve Steckler's requested fee of 12% of McElroy's Award and approve a fee to Pope of 6% of McElroy's Award.[7] These fees will be payable as we set forth in the Conclusion section of this Memorandum Opinion.[8]

### A.      The CFA at the time of contracting

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.

Pope entered into the fee agreement with McElroy on September 22, 2012, after the collective individual cases filed against the NFL had been consolidated into this MDL. This is what Professor Rubenstein[9] characterized as "Phase 2" of the litigation. Once the individual cases

---

[7]  In awarding Steckler a 12% fee, we are approving the fee it sought. Our discussion going forward therefore focuses upon the appropriate fee for Pope, which was terminated but has still sought a fee of 20% of McElroy's Award.

[8]  As alluded to above, these IRPA fees are subject to the holdback for the Attorneys Fees' Common Benefit Fund. Pursuant to the Court's June 27, 2018 Order Regarding Withholdings for Common Benefit Fund (ECF No. 10104), the Claims Administrator has deposited 5% of McElroy's award into the Attorneys' Fees Qualified Settlement Fund. These funds may be distributed at a later date to the IRPA attorneys upon further order(s) of Judge Brody and as we set forth below.

[9]  The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court. After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs.

were consolidated into an MDL, the risk related to the *volume* of work to be undertaken by a law firm representing a retired player changed dramatically. Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly." (Doc. No. 9526 at 26). The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case. *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from IRPAs to Plaintiffs' Committees, which would be compensated through a common benefit fund).[10] The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial. This case remained a "high-risk, long-odds litigation." (Doc. No. 9860 at 10).

As of the September 22, 2012 date of contracting, Pope had already attracted over 200 retired NFL player clients, a number that would eventually grow to over 400 retired players. (Hr'g Tr. at 8-9; Lienholder's Statement of Dispute at 3.) Even at the time of contracting, then, Pope knew that it would have the benefit of economies of scale and would be able to use the knowledge gained through its representation of several hundred class members, and the anticipated role of providing service for the common benefit to what became the class,[11] to provide a more efficiently

---

(Doc. No. 9862 at 2).

[10] We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation. *See* Doc. No. 10368 at 13-18.

[11] Attorneys working for the common benefit of all plaintiffs in the MDL could not formally be considered class counsel until the Settlement Agreement, which established a class action for purposes of Settlement, was approved. In prior opinions, we used the phrase "Class Counsel" to

produced work-product for the firm's Individual Clients. We also recognize that McElroy also benefited from the high-volume practice of Pope in that the firm's extensive work in this litigation ensured that the lawyers would be knowledgeable about developments as the MDL progressed. The class as a whole and individual clients both benefited from the firm's high profile and expertise.

B. **The CFA at time of enforcement – impact of changed circumstances**

Pope and McElroy remained in a contractual relationship between September 22, 2012 and March 24, 2015. During this time substantial progress had been made in moving the cases forward. The NFL's motions to dismiss and to sever were argued in April 2013. The significant issues of preemption, causation, and limitation periods were fully in play. In July 2013, without yet ruling on these motions, Judge Brody ordered the parties to mediation, and by the end of August 2013 a term sheet had been signed. This led to class counsel's motion for preliminary approval filed on January 6, 2014. Judge Brody denied the motion and sent the matter back for further discussion, making it clear that she was not happy about the inclusion of an overall cap. In June 2014 an amended agreement that eliminated the cap was presented for preliminary approval. It was approved on July 7, 2014. In November 2014 the fairness hearing was held. This led to additional changes in the settlement agreement, which was finally presented to the Court on February 13, 2015. It was approved on April 22, 2015.

So while the settlement agreement had not been finally approved by the District Court as of March 24, 2015 when Pope was terminated, it was certainly clear to those involved in the work

_____

refer to any firm that was paid by the District Court for work performed for the common benefit of the collective group of plaintiffs in the MDL that ultimately became a class action. Pope was one such firm. Going forward, however, we will reserve the term "Class Counsel" for the six attorneys designated by the Court for the particular role of representing the entire class.

on behalf of the class, as Pope was, that the major risks confronting counsel in September 2012 had been alleviated, albeit not completely, as there was a long wait for the appeal process to run and for the claims administration process to be rolled out. The effort that brought the parties to this point was ultimately accomplished through the further efforts of Class Counsel and those other lawyers who served on various MDL committees and performed work for the common benefit – including Pope.[12]

### C.      The results obtained

Having determined that we are dealing with marked difference in circumstances from the time of the creation of the contract to the time of enforcement – hastened by McElroy's decision to terminate Pope – we next look to the results obtained, the quality of the work performed and the substantiality of Pope's efforts. In doing so, we recognize that we must also consider the work done by Steckler and the extent that effort meets the substantiality test. We observe that on April 26, 2018, McElroy qualified for a Monetary Award grid amount of $1.5 million, based on his Level 1.5 Neurocognitive Impairment diagnosis at the age of 42. (McElroy, Notice of Monetary Award Claim Determination). After offsets based on the number of his eligible seasons, other credits, and Section 6.7 of the Settlement Agreement, his revised monetary award grid amount, from which the attorneys fees are calculated, was $918,630.

### D.      The quality of the work performed

Steckler contends that the individual work performed by Pope during its representation was

_____

[12] Pope effectively acknowledged the significant change in circumstance after the settlement was reached and the Settlement Agreement approved when it unilaterally reduced its standard contractual fee percentage to 20% in 2016.

minimal as that work purportedly done "on Mr. McElroy's NFL concussion settlement claim was done for the common benefit of the settlement and not for Mr. McElroy's individual monetary award claim." SCM Statement of Dispute at 1. Steckler further contends that "[Pope] had absolutely no part in furtherance of McElroy's <u>individual</u> claim, and all work, legal advice and guidance as to his individual monetary award claim under the Settlement Agreement has been done by [Steckler] and not any other firm." SCM Statement of Dispute at 3 (emphasis in original).

As is discussed in detail below, we disagree and conclude that Pope, as an IRPA, undertook many necessary tasks in this litigation. We accept the representations of both firms that they maintained a quality relationship with McElroy and provided competent advice and necessary individual support in navigating the issues presented during that phase of the litigation and claims process that the firms were involved in while representing McElroy individually. We suggest, however, that the question of "the quality of the work" does not, by itself, assist our analysis. The more important question here is to look at the substantiality of the work – that is to sa,y what work Pope did that had a substantial effect on achieving the result obtained. Steckler characterizes Pope's efforts – not as counsel working for the common benefit but as an IRPA – as *de minimus*, claiming that it did not have a substantial effect on the ultimate outcome, regardless of its quality. We therefore lay out the efforts undertaken by both firms to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.

### E.      The substantiality of the work performed

We turn first to the work performed by Pope, which provided the necessary support to McElroy early in this litigation. That firm has presented evidence that it: (a) performed extensive legal research in advance of the litigation; (b) filed the lawsuit against the NFL; (c) assembled and reviewed McElroy's medical records; (d) arranged for a neurological examination when it

determined that existing records would not be sufficient; and (e) supported and updated McElroy in his understanding of the negotiations and the Settlement Agreement.

### (a) Filing the lawsuit

Pope included McElroy in the consolidated complaint, *Buck, et al. v. NFL*, that it filed in the Northern District of Georgia on September 2012, shortly after it was retained. It then filed a Short Form Complaint in this Court in December 2012 bringing McElroy into the MDL. This work was clearly undertaken for McElroy's benefit and to protect his rights, such that it is appropriate to consider it as IRPA work. The time spent in developing its form pleadings, however, was for the benefit of some 200-plus Pope clients. We need to take this circumstance into account when we consider this work that in part applied to McElroy individually.[13]

### (b) Medical records

Pope obtained and reviewed McElroy's medical records. Although there was some indication of a cognitive impairment that would be expected to warrant a meritorious claim, an initial review of the medical records did not reveal a clear diagnosis. (Lienholder Statement of Dispute at 4; Hr'g Tr. at 10-11, 19-21). Due to the uncertainty over the extent of McElroy's cognitive impairment, Pope made certain to review, understand, and obtain further information with respect to these medical records. As the settlement agreement was announced in January 2014 and players' counsel became aware of what the agreement would offer players, Pope recognized that McElroy's records and dementia diagnosis might not be adequate to support a compensable diagnosis. Pope then arranged in September 2014, and recommended to McElroy,

---

[13]  Steckler contends that the filing of these suits was no benefit to McElroy because these suits were dismissed on April 22, 2015 as part of Judge Brody's order and judgment that implemented the settlement. *See* SCM Statement of Dispute at 4. We do not agree that the fact that the suits did not directly reward the class members with a monetary award means that Pope's lawsuit was "unrelated" to the Monetary Award subsequently obtained.

that he see a specialized neurologist in Texas, who apparently had substantial qualification such as to provide a comfort level that McElroy would qualify for the highest level of impairment supported by his condition. (Hr'g Tr. at 19-20). Pope has produced documentation of arrangements it made on September 16, 2014 for McElroy to be evaluated by this physician, as well as the details needed to confirm the appointment. (Lienholder Statement of Dispute at 6). This evidence was not contradicted, and we accept Pope's representation that these telephone conversations and arrangements were about McElroy's individual case and the medical documentation necessary to support his future claim. Pope performed quality work in considering the information that was available as the proposed settlement came to be announced and attempting to shore up the medical evidence that would prove necessary for a meritorious claim.[14]

Steckler argues that Pope's work with respect to obtaining, reviewing, and analyzing medical records was *de minimus* because "the records themselves would not meet the requirements under the criteria" and that subsequent to Pope's termination, "[Steckler] worked with McElroy to schedule and receive the additional testing, this time done following the criteria of the settlement program." (SCM Statement of Dispute at 6). We agree that Steckler's work in arranging additional testing and in curing deficiencies in McElroy's claim were significant. While Pope's work on behalf of McElroy individually is compensable, it did not play a significant role in his qualification for an award based on the diagnosis and date of diagnosis that was found. Steckler's work with respect to gathering and presenting medical records was more significant.

---

[14] McElroy ultimately did not attend the appointment and no opinion was rendered by this doctor. While Pope's efforts in this regard were appropriate and undertaken as far as counsel could take it, we acknowledge they did not have any effect on his qualification for an award (pertaining to "substantiality").

### (c) Advice and communications to McElroy throughout the litigation

We next address Pope's argument that its interactions with McElroy relating to his particular claim were extensive and should be considered as support for the IRPA claim.[15]  As is discussed above, due to Pope's interaction with McElroy in the context of mass communications with its large client list, we conclude that Pope's IRPA obligations relating to advising and communicating with McElroy must be reduced.  It is not for McElroy or any other individually retained client of Pope to bear more than his share of the compensation Pope seeks here.  Yet how to allocate this effort is challenging, as it does not allow for precise mathematical calculation.  Rather, we look at this effort as it supports McElroy and others and reflects our judgment with the reductions imposed on the extent of Pope's lien.  We will, however, fully credit Pope for the time it spent in individual conversations with McElroy – often generated by the mass communications – to address his individual questions and concerns.  We accept Attorney Blakely's testimony and documentation (Exhibit 25) that he spent 1.4 hours on a telephone conference in January 2014 regarding predicted diagnoses and settlement terms.  We also accept that the counseling provided by Pope to McElroy concerning his decision to remain in the class or to opt-out reflects important work.  As counsel pointed out at the hearing, like many players, McElroy felt a degree of frustration in the process that led to the final settlement.  Had he acted on that frustration and opted out of the class, he would not have been in the position to claim the benefits he ultimately received from this settlement.  (Hr'g Tr. at 66-69; Lienholder Ex. 26.)

---

[15] Specifically, Pope submitted 26.5 hours of time drafting and disseminating litigation bulletins, 15.7 hours of time preparing and answering questions during client telephone conferences, and 22 hours of time organizing the "Emory neurological event."  M.J. Blakely, Jr. testified that these entries, while submitted on behalf of all clients, generated individual telephone calls and correspondence from McElroy that are partially unaccounted for.

**(d) Remaining work**

Pope argues that the nearly three year representation and its counseling of McElroy to convince him to remain in the class justifies the 20% fee that it seeks. (Lienholder Statement of Dispute at 13-14.) This argument ignores, however, the important work that remained before McElroy could qualify for a monetary award with a Level 1.5 diagnosis.

Following Pope's termination, McElroy was unrepresented for some sixteen (16) months. Ultimately, however, on August 23, 2016 he retained Steckler to provide legal assistance as he worked through the administrative process leading to the Monetary Award. Steckler provided us with a detailed accounting of its work completed after Pope's representation was terminated. This includes: (1) registering McElroy with the Claims Administrator; (2) finalizing and submitting the claim package; (3) reviewing a deficiency notice on McElroy's claim package and coordinating with Dr. Nosnik, McElroy's treating physician, to cure the claim package deficiencies; (4) finalizing, assembling, and correcting McElroy's claim package; (5) reviewing the denial notice issued to McElroy's claim package and scheduling additional testing with Dr. Nosnik in anticipation of an appeal; (6) finalizing and submitting an appeal; (7) successfully litigating McElroy's appeal with the NFL; (8) reviewing McElroy's notice of monetary award and advising him about associated fees, liens, and inflation adjustments; and (9) working with the Claims Administrator and Garretson Resolution Group regarding McElroy's position on medical lien reductions. (SCM Statement of Dispute at 7-14). These were not "mundane legal chores," but rather quality work performed that advanced McElroy's individual interest. *See McKenzie II,* 823 F.2d at 47.

### F.    Factors considered

As we assess how to apportion fees for the quality representation provided to McElroy, we are cognizant that three groups of attorneys contributed to the work necessary to obtain the Monetary Award in this case: Pope acting for McElroy individually; Class Counsel and lawyers including Pope, acting for the common benefit; and Steckler. We first find that the substantiality of Pope's work as an IRPA in securing the Monetary Award is necessarily reduced given that the work of Class Counsel, and the attorneys working with them for the common benefit, clearly "reduced the amount of work required of IRPAs." (Doc. No. 9862 at 4). In its establishment of a 22% presumptive fee cap, the District Court has already taken actions to reduce IRPA fees, accounting for the substantial benefit provided by Class Counsel. This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials. Particularly when we account for Steckler's meaningful work from its engagement in August 2016, we are convinced that Pope's role in McElroy's litigation does not warrant the 20% fee it is seeking.

As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions to taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients in ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this

litigation would not be negatively impacted;

(4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,

(5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,

(6) support of clients who were seeking loans and were exposed to predatory lending practices; and

(7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories. We will, however, use these categories as checkpoints as we consider the substantiality of the IRPA's efforts and the role they may have played in the maximizing the player's award.

Looking at Pope's work, it is clear that firm provided high quality services in this litigation, and that there were substantial risks at the time that it was engaged as counsel. Of the seven factors, Pope argues that it provided services as an IRPA relating to two of them. Steckler challenges this assertion in two ways. It argues that: (1) Pope's IRPA-services relating to the medical records were insubstantial (factor 1); and (2) Pope's support of McElroy in his understanding of negotiations that led to the Settlement Agreement was exclusively common benefit work, not IRPA work (factor 4). Moreover, Steckler suggests that Pope's fee should be rejected in its entirety because it was Steckler's submitting, curing, and appealing McElroy's claim package (factor 5) that resulted in the Award. We address these points in order.

**(a) Factor 1: Review of Medical Records**

Steckler first argues that we should ignore the work performed by Pope because its collection and review of medical records was insufficient with respect to meeting the requirements under the Settlement Agreement criteria. While we accept Steckler's assertion – that the medical

records collected by Pope were insufficient for submitting a claim package – we cannot ignore the fact that it was Pope's initial review of McElroy's medical records, and determination regarding those records, that resulted in Pope filing a lawsuit on McElroy's behalf and consequently his entry into the early stages of the MDL.

Further, we also consider the neurology appointment made by Pope on behalf of McElroy in September, 2014 prior to its termination. We accept Pope's position that this appointment was made in furtherance of obtaining a clear diagnosis for which McElroy would benefit later in the litigation. The fact that McElroy decided not attend the appointment, but rather waited sixteen months until Steckler set up additional testing with Dr. Nosnik, does not affect our determination that Pope provided quality work. The fifth McKenzie factor, however, analyzes the extent to which the work done by the IRPA contributed to the Award obtained. While we are sympathetic to Pope's position that McElroy unilaterally chose not to attend the neurology appointment, we cannot credit Pope with identifying a clear diagnosis. That work, the additional testing and collection of medical records in compliance with the Settlement Agreement criteria, was completed through the efforts of Steckler as IRPA alone. Taking these circumstances as a whole, we determine that a significant reduction in Pope's IRPA fee is proper.

### (b) Factor 4: Support for Individual clients for Their Understanding of the Process and the Available Options

McElroy was advised extensively about the scope and nature of the settlement negotiations and the terms of the agreement. Pope submitted 26.5 hours of time drafting and disseminating litigation bulletins, 15.7 hours of time preparing and answering questions during global client telephone conferences, and 22 hours of time organizing the "Emory neurological event." Steckler argues, and points to Pope's own time entries for support, *see* Lienholder Statement of Dispute at Ex. B, that these tasks were taken for the benefit of *all* Pope clients – not McElroy individually.

Mr. Blakely of Pope testified, however, that while these entries were undertaken on behalf of all clients, they generated a significant number of individual telephone calls and correspondence from McElroy that received individual responses.

We accept Mr. Blakely's position that the firm's global correspondence generated some individual calls and letters between Pope and McElroy. Specifically, we acknowledge the individual work done by Pope in discussing the proposed settlement with McElroy and ultimately convincing him, on September 16, 2014, to remain a class member amid significant skepticism. (Hr'g Tr.)

We recognize that Pope performed some services that were substantial; however, we conclude that the majority of this work was performed for the common benefit of the class and that Pope was already paid as such.[16]

### (c) Factor 5: Shepherding the Client through the Claims Process

Finally, we address Steckler's argument that it was solely responsible for McElroy's Award through its work in putting together, submitting, curing, and appealing his claim package. We do not agree.

Certainly, a large part of McElroy's award can be attributed to the work performed by Steckler during the claims process. We consider the fact that Steckler performed the claims package work alone. Second, we accept, as did Pope during the evidentiary hearing, that Steckler faced significant adversity and substantially contributed to the Award by overcoming deficiencies and the initial denial of McElroy's claim package. We are reluctant, however, to disallow payment for the services performed by Pope prior to its termination. While Steckler correctly points out

---

[16] Pope was awarded $829,030 in fees for 1,274.90 hours from the class benefit fund. (Doc. 10019 at 19; SCM Statement of Dispute at Ex. J.)

that it – not Pope – was responsible for the claim package, Pope accurately states that McElroy would not have been eligible to submit a claim package but for Pope's advice to remain a class member. (Lienholder Response at 10).

Taking these facts under consideration, a significant deduction in Pope's fee is proper as it had no part in the actual claim process. We acknowledge the substantial nature of the work performed by Steckler with respect to shepherding McElroy through that process, but we cannot accept its position that it was solely responsible for the Award when Pope substantially contributed to McElroy's Settlement Class Member status.

### G.    Costs

Steckler seeks reimbursement of the $3,138.00 it incurred in costs. Its CFA with McElroy provided for reimbursement of costs from his award. These costs were reasonably incurred. We authorize this reimbursement to Steckler.

Pope likewise seeks reimbursement for costs in accordance with its CFA. We do *not* authorize payment to Pope for any costs.[17] These expenses were not identified in its Notice of Lien and Petition to Establish Attorney's Lien filed on April 24, 2015 at ECF No. 6522. Rather, they were asserted for the first time in its Statement of Dispute. Pope thus failed to comply with Attorney Lien Rule 8, which sets forth the proofs the lienholder must provide of the lien it seeks, including, "before the Claims Administrator begins processing the Award," to identify "[t]he

---

[17]  Among the costs it identifies is an "NFL Administrative Expense" that was assessed on November 12, 2018, which was more than 3 years after McElroy terminated the firm's representation. (Lienholder Statement of Dispute, Ex. C.) Pope did not explain the basis for this expense in its Statement of Dispute, when it first asserted costs for which it sought reimbursement. In attempting to assert this vague cost, Pope failed to comply with Attorney Lien Rule 17(a)(3), which required that the Statement of Dispute include "a brief explanation of the purpose of incurring these costs[.]"

dollar amount of the attorney's costs if the attorney is seeking reimbursement of costs in addition to fees." Attorney Lien Rules 8(a)(5), 8(b). As the Rules advised: "Failure to comply with Rule 8(a)(5) before the Claims Administrator begins processing the Award will result in the waiver of the Attorney Lienholder's right to seek reimbursement of any costs incurred during representation of the SCM." *Id.*, ¶ 8(b). By this failure, Pope has forfeited its right to seek reimbursement for costs.

## V. CONCLUSION

We conclude that Pope's IRPA contribution to McElroy's Award here is insufficient to support an attorney fee of 20% as it seeks. The relative contribution of Class Counsel compared to that of Pope was substantial in this individual litigation due to the termination of Pope in March 2015, when the revised proposed settlement was still pending approval in the District Court. The work performed by Steckler during the claims and appeal process also provided a more significant contribution in bringing the litigation to a successful close for McElroy. We conclude that a fair resolution of this dispute is to award 18% of the Monetary Award for attorneys' fees to be apportioned between Pope and Steckler as follows: 6% to Pope and 12% to Steckler. These amounts must be reduced by the Common Benefit Fee deduction currently applicable to all Awards. Accordingly, Pope will receive at this time 4.33% of the Monetary Award, and Steckler will receive 8.67% of the Monetary Award.[18] We allocate whatever portion of the 5% holdback that is later released by the District Court for payment to IRPA attorneys by the same 1:2 ratio as we used to apportion the currently-payable fee, *i.e.,* Pope will receive 1/3 of it and Steckler will

---

[18] Thus, the total approved IRPA fee is 18% of McElroy's Monetary Award. As 22% of the Award was withheld for counsel fee (IRPA and the heldback funds), the 4% of the Award that is not designated for counsel fee is available to be distributed to McElroy.

receive 2/3 of it. We also approve payment to Steckler of $3,138.00 in costs. The remaining portion of withheld funds that are not designated for attorneys' fees --- which amounts to 4% of the Monetary Award --- shall be paid to McElroy forthwith.

An appropriate order follows.

BY THE COURT:


 /s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE