# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |

Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,

                                   Plaintiffs,

        v.

National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,

                                   Defendants.

THIS DOCUMENT RELATES TO:

Podhurst Orseck, P.A. v. Turner
Attorneys' Lien Dispute
(Doc. No. 7071)

Podhurst Orseck, P.A. v. Smith
Attorneys' Lien Dispute
(Doc. No. 7064)

Cummings, McClorey,
    Davis & Acho, PLC v. Johnson
Attorneys' Lien Dispute
(Doc. No. 7449)

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                    January 7, 2019

The Honorable Anita B. Brody, presiding judge responsible for the NFL Concussion

Litigation referred to us "all petitions for individual attorneys' liens." (Doc. No. 7446). Pursuant

to that Order of Reference we published rules governing the handling of these Liens. These Rules

were approved and adopted by the District Court on March 6, 2018, with amendments approved

and adopted on October 3, 2018. ("Lien Rules" at Doc. No. 9760, as amended at Doc. No. 10283). On April 5, 2018, the District Court determined that "fees paid to [Individually Retained Plaintiff's Attorneys ("IRPAs")] will be presumptively capped at 22%." ("Fee Cap"). (Doc. No. 9862 at 6). On that same day, the District Court referred any Petitions seeking a deviation from that 22% cap to us as well. *Id* at 8-9. Pursuant to that Order, we published rules governing Petitions for Deviation. These Rules were approved and adopted by the District Court on May 3, 2018, with amendments approved and adopted on October 10, 2018. ("Deviation Rules" at Doc. No. 9956, as amended at Doc. No. 10294).

As of this writing, 723 petitions for Attorney Liens have been filed by IRPAs who formally represented Settlement Class Members ("SCMs"). These matters become ripe upon the issuance of a Monetary Award. The prospective volume of this litigation, as well as the expected delay between the filing of the Lien and the issuance of an Award, has made the Lien and Deviation Rules that we have issued necessary to provide what we hope is clarity to counsel and SCMs on how these matters will be resolved. Interested counsel will note that our Rules require the Parties to file their pleadings with the Claims Administrator as we anticipate that in many cases counsel will have been involved in a medical review and we may also have a need to review some of those medical records. It would be inappropriate to have these records published on ECF. The Claims Administrator has already set up processes that allow for the secure submission of such records.

Presently before us for Report and Recommendation are three Attorney Lien ("Lien") claims being asserted against SCM Awards. They are:

(1) A Lien filed by Podhurst Orseck, P.A. ("Podhurst") seeking fees and costs

against the Award granted to Paul Turner, as a Representative Claimant,[1] authorized to represent Kevin Turner ("Turner" or the "Estate"). Podhurst is seeking payment of attorneys' fees up to the presumed maximum allowed under the Fee Cap imposed by the District Court. The Estate, through current counsel Polsinelli, P.C. ("Polsinelli"), disputes the Lien, claiming that Podhurst is not entitled to collect any fees against this Award, given the significant fee it received as Class Counsel and the *de minimus* work done for Turner individually;

(2) A Lien filed by Podhurst seeking fees and costs against the Award granted to Chie Smith, as a Representative Claimant, authorized to represent her husband Steven Smith ("Smith" or "the Smiths"). Podhurst is seeking payment of attorneys' fees up to the maximum allowed under the Fee Cap imposed by the District Court. Smith, through her current counsel Catherina Watters, Esq. and Tucker Law Group, LLC ("Watters"), disputes the Lien, claiming that Podhurst is not entitled to collect any fees against this Award, given the significant fee received as Class Counsel and the *de minimus* work done for Smith individually;

(3) A Lien filed by Cummings, McClorey, Davis & Acho, PLC ("CMDA"), seeking fees and costs against the Award granted to Levi Johnson ("Johnson"). Cummings is seeking payment of attorneys' fees of 20% of the Monetary

---

[1]  Under the terms of the Settlement Agreement, a Representative Claimant is an authorized representative of a deceased, legally incapacitated or incompetent Retired NFL Football Player. Settlement Agreement, Article II, Section 2.1(eeee).

Award paid to Johnson, as well as the reimbursement of $2,617.20 in costs associated with their representation. Johnson disputes the Lien generally, but has failed to submit pleadings to this Court setting out the specifics of his objection.

As we consider these three Liens individually, we acknowledge that there are differences in the particular circumstances presented. But we also acknowledge that there are important similarities. This leads us to the decision to address these matters in a single opinion, so we may set out the legal constructs that apply generally to this lien litigation that has been referred to us. Before doing so, we provide the relevant procedural and factual background of the NFL Concussion Litigation, so that we may discuss the work of these IRPAs against the backdrop of the obligations of counsel generally. In this recitation we take care to distinguish the work performed by IRPAs from the work performed by attorneys for the benefit of the class as a whole ("Class Counsel").[2] We also provide the procedural background as related to the District Court's Attorney Fee decisions that have issued to date.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Procedural History of the Class Action Settlement

This case began as an aggregation of lawsuits brought by former Players against the NFL Parties for head injuries sustained while playing NFL football. On July 19, 2011, *Maxwell, et al.*

---

[2]  The attorneys working for the common benefit of all plaintiffs in the Multi-District Litigation ("MDL") were not formally considered Class Counsel until the Settlement Agreement, which established a class action for purposes of Settlement, was approved. We, however, use the phrase to mean any lawyer who was paid by the District Court for work performed for the common benefit of the collective group of plaintiffs in this MDL, which ultimately became a class action.

*v. NFL, et al.* was filed in the Superior Court of the State of California, Los Angeles County.[3] Soon thereafter, *Pear, et al. v. NFL, et al.* (August 3, 2011)[4] and *Barnes et al. v. NFL, et al.* (August 26, 2011)[5] were filed in the same court. On October 11, 2011, all three matters were removed to federal court by the NFL Defendants, (ECF No. 11-cv-8394 (C.D. Cal.); ECF No. 11-cv-8395 (C.D. Cal.); ECF No. 11-cv-8396 (C.D. Cal.)), who argued preemption under section 301 of the Labor Management Relations Act, "because plaintiffs' claims arise from or are substantially dependent upon the terms of the collective bargaining agreements . . . pursuant to which the vast majority of players played in the NFL." (MDL No. 2323, Doc. No. 1-1 at 2). On December 8, 2011, the motion for remand was denied on the basis that a least one state law claim was preempted by federal law. Upon concluding that one claim was preempted, the Court determined that its review of the preemption issue on the remaining claims was best left to the motion to dismiss stage of the proceedings. (ECF No. 11-cv-8394 (C.D. Cal.), Doc. No. 58 at 3).

On August 17, 2011, while these matters were being joined in state court, the first putative class action in what became this MDL, *Easterling, et al. v. NFL*, 11-cv-5209 (E.D. Pa), was filed by Anapol Weiss in this Court. On November 9, 2011, the NFL filed a Motion to Dismiss the amended complaint, raising preemption, as well as other defenses. (ECF No. 11-cv-5209, Doc. No. 19).

On November 15, 2011, the NFL Parties then filed a motion in the United States Judicial Panel on Multidistrict Litigation ("JPML") (MDL No. 2323), seeking to transfer all four matters

---

[3] *Maxwell* was filed by Girardi Keese and Goldberg, Persky and White, P.C.

[4] *Pear* was filed by Girardi Keese and Goldberg, Persky and White, P.C.

[5] *Barnes* was filed by Rose, Klein and Marias LLP.

for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.  On December 6 and 7, 2011, the plaintiffs in these proceedings filed memoranda in support of the NFL's Motion for Transfer.[6] On December 21, 2011, the Panel on Multidistrict Litigation ordered a hearing for January 26, 2012.  By the end of December seven similar proceedings were filed in courts throughout the country.  (MDL No. 2323, Doc. No. 31).

On January 31, 2012, the Panel granted the motion and issued an order that the matter be transferred to the Eastern District of Pennsylvania and assigned to Judge Brody for "coordinated and consolidated pretrial proceedings."  The MDL was formed.  (MDL No. 2323, Doc. No. 61). On March 6, 2012, the District Court issued the first Case Management Order in the MDL, which governed the 32 cases that had been consolidated as of that date.  By the Order, counsel for plaintiffs were directed to meet and confer and file a Proposed Case Management Order by April 5, 2012, in anticipation of the Initial Organization Conference that would be held on April 25, 2012.  (Doc. No. 4).  The attorneys who had appeared in the Transferor Courts were admitted to the Eastern District of Pennsylvania *pro hac vice* in this litigation and were advised that they were obligated to comport themselves "in accordance with the Pennsylvania Rules of Professional Conduct and the Rules of this Court."  (*Id.* at 5).

On April 3, 2012, the plaintiffs provided the Court with a proposed Organizational Structure, which included the creation of a Plaintiffs' Executive Committee ("PEC") and a Plaintiffs' Steering Committee ("PSC").  (Doc. No. 54).  On April 26, 2012, the Court appointed Christopher Seeger, Esq. as Co-Lead Counsel and ordered the plaintiffs to select an attorney from

---

[6]  Only the Riddell defendants, which had not been sued in the class action, but had been sued in the three other cases, opposed the motion.

the Philadelphia-based lawyers to be Co-Lead Counsel.  (Doc. No. 64).  In the same order, the

Court made the appointments to the Plaintiff's Committees as had been proposed in the April 3rd

request.  The NFL's Motion to Dismiss on preemption grounds was designated to be heard on an

expedited basis, and a briefing schedule was issued pertaining to this issue.  (*Id.*)

Class Counsel then filed a Master Administrative Long-Form Complaint and a Master

Administrative Class Action Complaint for Medical Monitoring.  Thereafter, IRPAs submitted

individual short-form complaints for their individual clients.  Class Counsel filed a series of

responses to the Motions to Dismiss and Motion to Sever that were filed by the NFL and Riddell.

(Doc. Nos. 4130-4134, 4136-4137, 4589, 4591).  Argument on the contested motions was held on

April 9, 2013.

On July 8, 2013, while the contested motions were pending, the District Court Ordered the

Parties to mediation before retired U.S. District Court Judge Layn Phillips.  (Doc. No. 5128).

Intense negotiations followed, ultimately leading to the Settlement Agreement that was approved

by the District Court on April 22, 2015.

As it is relevant to our resolution of these Lien claims, we set out chronologically key dates

of activities taking place throughout these negotiations:

- August 29, 2013:  The Parties signed a Term Sheet (Doc. No. 5235);
- January 6, 2014:  Class Counsel moved for entry of a preliminary order approving the proposed settlement and conditionally granting class certification (Doc. No. 5634);
- January 14, 2014:  The motion was denied without prejudice due primarily to the Court's concerns about the cap on the Monetary Award Fund (Doc. No. 5658);
- June 25, 2014:  An Amended Settlement Agreement was submitted to the Court (Doc. No. 6073);
- July 7, 2014:  The District Court issued an Opinion and Order granting preliminary approval (Doc. Nos. 6083 and 6084);

- November 19, 2014:  The Fairness Hearing was held;
- February 2, 2015:  The District Court proposed additional changes to the Settlement Agreement (Doc. No. 6479);
- February 13, 2015:  The Parties submitted a new Settlement Agreement (Doc. No. 6481);
- April 22, 2015:  The District Court approved the Settlement Agreement (Doc. No. 6508 and 6509).

On May 13, 2015, the first of 11 appeals challenging the Settlement Agreement was filed (Doc. No. 6539).  On April 18, 2016, the Court of Appeals for the Third Circuit affirmed the District Court's approval of the Settlement Agreement.  Petitions for certiorari were denied by the United States Supreme Court on December 12, 2016.

On January 7, 2017, the Effective Date of the Settlement, the Class was able to move ahead with the implementation of the Settlement Agreement.  On February 6, 2017, the six-month period to register as a class member opened.  On April 7, 2017, the Claims Administrator began accepting claim submissions for an Award from the Monetary Award Fund.

### B.  Procedural History of the Attorneys' Fees Litigation

This Settlement Agreement came about as a result of "hard-fought" negotiation between Class Counsel and the NFL.  (Doc. No. 6509 at 8).  For the plaintiffs, the efforts of these attorneys led to a claims process that eliminated significant legal risks in this litigation, including the NFL's preemption defense and the complexities surrounding causation for the individual claimants.  *See* (Doc. No. 6073-4 at 6-8 (Declaration of Mediator, Retired District Court Judge Layn Phillips, discussing the litigation risks for the class and the NFL)).  As the District Court summarized, "[t]he Settlement allows Class Members to choose certainty in light of the risks of litigation."  (Doc. No. 6509 at 74).  Under the Terms of the Settlement Agreement, Class Counsel is paid through the Attorneys' Fees Qualified Settlement Fund (the "AFQSF").  The District Court has reserved for

itself the decisions that relate to the funding of the AFQSF and the allocation of payment to Class Counsel.  (Doc. No. 7446).  It is not part of our remit.

As is seen in the three cases that are before us today, there are disputes that arise out of contingent fee agreements ("CFAs") between a SCM and an IRPA where the IRPA also worked as Class Counsel and has benefited from the payments authorized by the District Court's May 24, 2018 Order.  (Doc. No. 10019).  We have found in addressing these claims, setting out the distinctions between work done for the common benefit from the work done for an individual client is challenging.  We consider the parties' submissions and, in many instances, will look to Class Counsel's statements to the District Court about the work performed for the class benefit, as well as the District Court's opinions, to distinguish between class benefit work and work completed for the individual claimant.  It is our hope and expectation that this opinion shall provide guidance to counsel as to how to distinguish this work on an ongoing basis.

### 1.  **The Common Benefit Fund**

The Settlement Agreement allowed for funding of the AFQSF through two sources:  a payment of up to $112.5 million by the NFL Parties and up to a 5% deduction from all Awards (the "5% Holdback Request").  On April 5, 2018, the District Court granted Class Counsel's request, approving the $112.5 million dollars to be paid by the NFL Parties for work done by Class Counsel in securing the settlement and implementing the Settlement Agreement.  (Doc. No. 9860).  Understanding that there is further work to be done to implement the Settlement Agreement, the District Court reserved decision on the 5% Holdback Request until such time as the Court believes it can accept an assessment of the extent of the funds to be needed.  (*Id.* at 17-18).

### 2.  **Allocation of the AFQSF**

Due to the nature of the settlement, which will require work from Class Counsel over the

65-year term, the AFQSF has been used to pay Class Counsel for their work in securing the Settlement Agreement but also will be used to pay Class Counsel for their work in implementing the Settlement Agreement over its full term.

On May 24, 2018, a portion of the AFQSF was allocated to Class Counsel for their work in implementing the Agreement.  At the request of the District Court, Co-Lead Class Counsel submitted a proposed allocation of common benefit attorneys' fees.  Any other attorneys seeking payment or objecting to the proposal submitted by Co-Lead Class Counsel were granted leave to file a counter-declaration with the Court.  (Doc. No. 8448).  Ultimately, the District Court approved Class Counsel's request for costs incurred in securing the Settlement (Doc. No. 9860 at 5) and allocated the funds to be paid to 26 separate law firms for work performed for the benefit of the class in securing the Settlement.  (Doc. No. 10019 at 25-26).

Upon payment of those fees for securing the Settlement, approximately $23 million remained in the AFQSF to pay counsel who work for the benefit of the Class through the implementation of the Settlement over its 65-year term. (Doc. No. 10019 at 25).  The question of what percentage, if any, of each Monetary Award that will be needed to pay for the implementation of the Settlement remains undetermined.  When there is sufficient information, the District Court will address this point, through its ruling on the 5% Holdback Request.

### 3. **The Fee Cap**

The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court.  *See* (Doc. No. 8376 (Order Appointing Professor Rubenstein); (Doc. No. 9526 ("Rubenstein's Report")); (Doc. No. 9571 ("Rubenstein's Reply")).  After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and capped

IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2). This conclusion was based on a two-part analysis. First, the Court adopted Professor Rubenstein's conclusion that "a one-third contingent fee best approximate[s] the risk and work that the two sets of attorneys (Class Counsel and IRPAs) undertook in this case." (Doc. No. 9862 at 6, *quoting* Doc. No. 9571 at 3). Having already concluded that the payment of $112.5 million by the NFL into the AFQSF constituted 11% of the estimated overall class recovery, the Court determined that presumptively no IRPA could or should receive more than 22% in fees from a Monetary Award. As the District Court explained, the Fee Cap was necessary "to prevent a 'free-rider problem'—enabling IRPAs to financially benefit from the work of Class Counsel even though they did not bear the costs." (Doc. No. 9862 at 4-5).[7]

## II.   THE APPLICABLE LEGAL PRINCIPLES

While none of the Parties before us have specifically challenged our authority to review the fee agreements, we confirm that proposition and discuss the ample authority supporting it. As the District Court explained, "Third Circuit law unequivocally supports the proposition that this Court possesses the inherent authority to regulate the contingent fees of lawyers appearing before it and any lawyer representing a class member in this Settlement is clearly subject to this authority." (Doc No. 9862 at 3-4 (relying on Rubenstein's Report 19; *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*"); *Dunn v. H. K. Porter Co.*, 602 F.2d 1105, 1110 (3d Cir. 1979)).

---

[7]   As was discussed above, the District Court has reserved judgement on whether an additional amount (not to exceed 5%) must be heldback from all Awards to ensure there are sufficient funds to pay Class Counsel for future work. Whatever percentage is ultimately selected, the District Court has indicated that it must be taken from the IRPA Award for the same reasons that the 11% reduction is necessary. (Doc. No. 9860 at 18 n.12; Doc. No. 9862 at 8 n.5).

Contingency fee agreements ("CFAs") are a "special concern" for Courts and "are not to be enforced on the same basis as ordinary commercial contracts." *McKenzie I*, 758 F.2d at 101. Under Third Circuit precedent, we are obligated to review CFAs to determine if the fee sought is reasonable in light of the five factors enumerated by the Third Circuit in *McKenzie*.

It is also well established that District Courts have the power to monitor CFAs based upon the court's "supervisory power over the members of its bar." *Dunn*, 602 F.2d at 1109. This review is "part and parcel of the process a federal court follows both in supervising members of its bar and in meeting the obligations imposed on it by Fed.R.Civ.P. 23(e)." *Id.* at 1110 n.8. From the outset, counsel were advised that they were obligated to comport themselves "in accordance with the Pennsylvania Rules of Professional Conduct and the Rules of this Court." (Doc. No. 4 at 5).

## A. The *McKenzie* "reasonableness" analysis

The *McKenzie* five-part reasonableness analysis obligates us to evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. We must first assess both (1) the circumstances existing at the time the Parties entered into the agreement and (2) whether subsequent events have rendered an agreement—however fair it may have been at the time of contracting—unfair at the time of enforcement. We then turn to our consideration of the attorney's performance, where we examine: (3) the results obtained; (4) the quality of the work performed; and (5) whether the attorney's efforts substantially contributed to the result. *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*"); s*ee also* Doc. No. 9862 at 7 (District Court's discussion of the *McKenzie* factors).

We accept, as other Courts have recognized, that "the reasonableness standard, when employed in an attorney-client fee dispute is, by its very nature, difficult to define, much less

apply." *McKenzie I*, 758 F.2d at 102. But where the reasonableness of the CFA is presented to us, either through a Lien Dispute or a Petition for Deviation, we must assess the *McKenzie* factors and apply them to the specific circumstances of each case. In so doing, we discern that there are markers within the history of this litigation from which we will be better able to evaluate the case-by-case specifics of the IRPA representation.

Our Lien Rules and Deviation Rules were drafted with the *McKenzie* factors and the related burden of proof in mind. Lien Rule 17 and Deviation Rule 14 require a recitation of "[a] chronology of the tasks performed by the attorney, the date each task was performed, and the time spent on each task." (Doc. No. 9760 at 9). The implementation of these rules provides us a vehicle for attorneys to present evidence as we and they work through the *McKenzie* factors.

### 1. The CFA at time of contracting

As we see it, there are two primary factors that we must examine when we review the reasonableness of the contract at signing: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation. It is clear that the risk for attorneys as to both of these factors changed significantly over the years that this litigation has progressed.

The presence of risk in the attorney-client relationship is the critical factor with any CFA. *See generally Restatement (Third) of The Law Governing Lawyers* § 35 cmt c. (2000) (noting that it is reasonable for a contingency fee to exceed an hourly rate for similar representation because "[a] contingent-fee lawyer bears the risk of receiving no pay if the client loses and is entitled to compensation for bearing that risk."). "[T]he obvious but critical characteristic of a contingent fee arrangement [is] the presence of risk." *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 290 F. Supp. 2d 840, 850 (N.D. Ohio 2003).

13

Here it is accepted that there were significant risks at the outset of this litigation.  *See generally* (Doc. No. 6073-4 at 6-7 (discussing the litigation risks for the class and the NFL)).  The plaintiffs faced "stiff challenges surmounting the issues of preemption and causation."  (Doc. No. 6509 at 67-68 (cataloguing the issues as they related to preemption and the prior law)).  Causation would have been similarly challenging, since the claims involved "complex scientific and medical issues not yet comprehensively studied."  (*Id.* at 60, 69-71 (discussing the evolving science at length)).  In describing the complexity of the case absent a settlement, the District Court noted:

> Absent settlement, Class Members would have to conclusively establish what and when the NFL Parties knew about the risks of head injuries. This would require voluminous production from the NFL Parties, and time to sort through decades of records. Non-party discovery would be inevitable; Class Members would seek documents from individual NFL Member Clubs. To fully investigate scientific causation, the Parties would have to continue to retain costly expert witnesses…. In turn, the NFL Parties would seek discovery about the medical history of 20,000 Retired Players.

(*Id.* at 61) (citation omitted).

Further, Class Members also faced issues relating to specific causation.  As the District Court explained:

> Class Members argue that the cumulative effect of repeated concussive blows Retired Players experienced while playing NFL Football led to permanent neurological impairment. Yet the overwhelming majority of Retired Players likely experienced similar hits in high school or college football before reaching the NFL…. Isolating the effect of hits in NFL Football from hits earlier in a Retired Player's career would be a formidable task.

(*Id.* at 71).

The Settlement Agreement neutralized these risks.  By way of stark example, the reasonableness of a contingent fee agreement at the time of contracting must be evaluated based on the timing of the contract signing in reference to the presence or absence of the Settlement Agreement.

Risk as it related to overall workload also varied over time in this litigation.  When law

firms undertake large-scale litigation, they are obligated to decline to take on other litigation. *See Dunn*, 602 F.2d at 1111. The cost to law firms in deciding to participate and thus forego alternative matters must be recognized. Professor Rubenstein noted the significant disparity of obligations for law firms undertaking the representation of claimants in each of three major phases in this litigation. These landmark moments in the litigation provide clear guideposts for us as we evaluate the reasonableness of the contracts when they were entered:

- Phase 1: Individual Litigation;

- Phase 2: Litigation with the MDL;

- Phase 3: Litigation within the Class Action Settlement.

(Doc. No. 9526 at 25-26). In each phase the risks for the law firm entering into the fee agreement varied greatly.

In the first phase of the litigation, the law firms undertaking representation of players individually, without the benefit of the efficiencies contained within an MDL, faced monumental challenges. Those lawyers risked having to "pursuing the entire case themselves, perhaps even through trial, and fee arrangements reflecting those large contingencies would have been expected and appropriate." (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL, the risk, as it related to the volume of work to be undertaken by the law firm, changed dramatically.[8] Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and

---

[8] We recognize that at this phase in the litigation, the risks as to the legal challenges faced by the plaintiffs remained largely the same. This case remained a "high-risk, long-odds litigation." (Doc. No. 9860 at 10).

the likelihood that any case would be remanded for trial declined significantly." (Doc. No. 9526 at 26 (*relying on In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 405 (D. Mass. 2008) ("Multi-district litigation is like the old Roach Motel ad: 'Roaches [the transferred cases] check in—but they don't check out.'") (quoting Professor Samuel Issacharoff)).

The formation of an MDL resulted in the formation of the PEC, PSC and committees that took over the primary work in the case, as would have been expected. Case Management Order Number 5 provides a detailed list of the type of work that was shifted from the IRPAs to the Plaintiffs' Committees, work that was to be compensated not through IRPA fee contracts, but through a common benefit fund:

- investigation and research;
- conducting discovery (e.g., reviewing, indexing and coding documents);
- drafting and filing pleadings, motions, briefs and orders;
- preparation and attendance at non-case specific depositions;
- preparation for and attendance at state and federal Court hearings;
- attendance at PEC- or PSC-sponsored meetings and addressing lawyers on the status of the litigation;
- other PEC or PSC activities, including committee work;
- work with expert witnesses; trial preparation and trial;
- performance of administrative matters; and
- performance of conventional administrative, scheduling, coordination and related liaison tasks performed by Plaintiffs' Liaison Counsel.

(Doc. No. 3710 at 3).[9]

As Professor Rubenstein recognized, there is no clear demarcation line between Phase 1

---

[9] The efficiencies inherent in an MDL, and the benefits to the IRPA, are well known. The stated role of the transferee court is to "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). *See generally In re Vioxx Prod. Liab. Litig.,* 650 F. Supp. 2d at 562-63 (discussing the benefit to IRPAs of not having to "pursue individual discovery, nor . . . to file individual motions, engage in individual settlement negotiations, or prepare individual trial plans").

and Phase 2 of this litigation. The NFL filed its motion to consolidate the first four cases into an MDL on November 15, 2011, but the motion to consolidate was not granted until January 31, 2012. On the date the cases were transferred, the MDL Panel indicated it had already been notified of sixteen additional actions. (MDL 2323, Doc. No. 28). As with all of our reasonableness evaluations, we recognize the evaluation of contracts in this time period will require a sliding scale analysis. The risk was clearly at its highest before the motion; it clearly dropped after the motion was granted; how much the risk was reduced in the time between the two requires the exercise of informed discretionary judgment.

Finally, in Phase 3, attorneys entered into fee contracts with the knowledge that the cases in this phase had the benefit of the negotiated Settlement Agreement and "it became apparent that IRPAs would be primarily responsible only for processing their clients' claims through the claims facility." (Doc. No. 9526 at 26). At this point in the litigation, it became clear that there was no risk that the case would be dismissed based on the significant legal challenges set out above. For most players with Pre-Effective Date Diagnoses, the claims process would be a straightforward application of the matrices from the Settlement Agreement. For some individuals, this means that the claim submission process will be more streamlined and efficient; for others the process still presents complexity as the Settlement Agreement contains various terms, factors and circumstances that have been subject in some cases to significant post-settlement litigation. The evaluation of the reasonableness of a fee contract signed even after the adoption of the Settlement Agreement will still require an evaluation of the specific facts and circumstances of each case.

As with the start date of Phase 2, Phase 3 has no clear start date, but rather a period of time where the risks began to be reduced. With each new event, it became more likely that all individual cases would be resolved as a part of a class action settlement agreement. *See* (Doc. No. 10019 at

5, 13-14 (discussing the complexity of the litigation on appeal, and implicitly, the risk that remained in the case)).  On August 29, 2013, the Parties signed a Term Sheet.  On July 7, 2014, the District Court granted preliminary approval.  On April 22, 2015, the District Court approved the final Settlement Agreement.  On April 18, 2016, the Third Circuit affirmed the District Court's decision.  And on December 12, 2016, the petitions for writ of certiorari were denied.  We consider the risk in this time-period as Phase 2 ended and Phase 3 began as a sliding scale as well.

Separate and apart from the foregoing, we must recognize the "economies of scale" that are present in this litigation.  As Professor Rubenstein noted, law firms who represented hundreds of clients "should be able to provide IRPA services at reduced contingent fee rates given the economies of scale." (Doc. No. 9526 at 33).  The Third Circuit has recognized the difficulties with contingent fee contracts in cases where a law firm's collection of a high volume of clients "escalat[es] the attorneys' fees without a proportionate increase in the effort and expense of litigation." *Dunn,* 602 F.2d at 1113, n.12.  In cases like this, the Circuit Court has stated that "[a] fair and equitable contingent fee agreement generally provides for a sliding scale in which fees based on a percentage of the total recovery decrease as the amount of the recovery increases." *Id.*

## 2.  The CFA at time of execution – impact of changed circumstances

Even where the CFA may be considered reasonable at the time of signing, we are obligated to consider whether events arose in the litigation that rendered an otherwise reasonable contract unreasonable.  "It should… be the unusual circumstance that a court refuses to enforce a contractual contingent attorney's fee arrangement because of events arising after the contract's negotiation." *McKenzie II*, 823 F.2d at 45.  Nonetheless, the risks here varied significantly from the outset of the original litigation to the circumstances when the fee awards were ultimately issued.  We must give consideration to those circumstances, sometimes present here, "where the

18

lawyer's retention of [the originally negotiated fee] would be unjustified and would expose him to the reproach of oppression and overreaching." *McKenzie I*, 758 F.2d at 102.

The District Court has already concluded that the change of circumstances here are such that contingent fee contracts must be reduced through the imposition of a Fee Cap. We conclude that further evaluation of the impact of these changed circumstances is best accounted for on a case-by-case basis, through an assessment of the remaining three factors in the *McKenzie* analysis, understanding that no contingent fee agreement can be in excess of 22% in the absence of exceptional and unique circumstances.

In conducting this case-by-case analysis, however, we cannot use a strict lodestar analysis to evaluate a CFA. *McKenzie II*, 823 F.2d at 47, n.3 (stating that lodestar analysis is inapplicable to contingency fee contracts); s*ee also Dunn*, 602 F.2d at 1111 (rejecting the argument that it was inappropriate to assess the reasonableness of an IRPA fee agreement by comparing it to the fee paid by unrepresented class members (calculated under a *Lindy* analysis)). These are CFAs, so it is not proper to use the rates that could have been obtained based under an hourly fee agreement to evaluate their reasonableness.

Nonetheless, in our Lien Rules, we indicated that IRPAs should provide written evidence of "the time spent on each task." We seek this information only to the extent that the amount of time spent on a project can be an indicator of the substantiality of the effort required by the IRPA to perform the task.[10] This does not mean that we are assessing contingent fee contracts based on

---

[10] For example, review of a loan agreement might be a matter of course for counsel and could be undertaken quite easily with minimal time for review, or in some cases the review might require extensive negotiations with the lender that consume a much greater effort. We appreciate that some IRPAs may not have prepared contemporaneous billing records given the terms of the CFA, but estimates of time dedicated to a task will be an aid in assessing the nature of the work performed.

billable hours submitted or that we intend to "disallow" work that is not evidenced by contemporaneous time entries. As is explained below, an assessment of the substantiality of the contribution provided by the IRPA will ultimately be the most important factor in the *McKenzie* analysis as it applies to this case.

### 3. The results obtained

The final three *McKenzie* factors work together, but we look at them individually to provide clarity in our analysis. Ultimately, we must evaluate "[3] the results obtained, [4] the quality of the work, and [5] whether the attorney's efforts substantially contributed to the result." *McKenzie I,* 758 F.2d at 101. The first part of this analysis is straightforward.

Both the District Court and the Third Circuit have already endorsed the result obtained through the Settlement Agreement. As a general matter, this Settlement was widely endorsed by the Class, with only 1% of class members opted out of the litigation. *In re Nat'l Football League Players Concussion Injury Litig.,* 821 F.3d 410, 438 (3d Cir. 2016), *as amended* (May 2, 2016). That overall result was obtained through the solid work of Class Counsel, but it intertwines with our evaluation of an IRPA's work in obtaining the individual result for their particular clients.

As to the result for each individual SCM, we are provided with the Notice of Monetary Award, which is presented to the SCM at the time an Award is issued. This Notice provides us with evidence of the nature of the class member's diagnosis, as well as the extent of the Award for that SCM. We will evaluate each on a case-by-case basis.

### 4. The quality of the work performed

Before we can evaluate the degree that an attorney's overall performance contributed to the SCM's Award, we must consider the quality of the work performed by each IRPA. It is also helpful as a general matter to evaluate the quality and necessity of the work performed for the

SCM individually by other attorneys, or by the SCM him or herself, that contributed to the Award obtained.  The record before us does not lend itself to discussing the "quality" of the attorney's work in any real sense.[11]  Rather, we look to whether the work was necessary, or justified based upon the circumstances at the time.  This evaluation naturally morphs into an assessment of whether and to what degree that effort contributed to the result.  Ultimately, our assessment of the "quality" of the work performed will always be influenced by the degree to which that work contributed to the result obtained.

We recognize that under this Settlement Agreement there are circumstances where the SCM's Award is based on a pre-existing diagnosis and obtaining an Award might not be particularly difficult, and subject to only the completion of the forms processed by the Claims Administrator.[12]  However, the District Court has already included the tasks of "shepherding of their clients through the claims process" as a factor in its conclusion that IRPAs provided a sufficiently substantial contribution to the Awards as to justify a reasonable fee not to exceed the 22% Fee Cap.  (Doc. No. 9862 at 7).  As Co-Lead Class Counsel has explained, the claims process in this case is not "routine or mechanical. . . .  [T]he claims process here requires the involvement of designated medical experts in personally examining Retired NFL Football Players, and . . . in

---

[11]  We assess "quality" not so much as in the context of how a particular task was undertaken, but rather by assessing the degree to which the work was undertaken as part of the effort to garner the highest award, in light of the circumstances at the time the task was undertaken.  For example, the careful examination of medical records to ensure the highest Award is obtained, or facilitating a fair lending arrangement to maintain the client's quality of life as the claims process is unfolding.

[12]  Because of the factors discussed here, we do not expect that the many IRPAs will have provided only perfunctory service to their clients.  However, we note that where the nature of a lawyer's work is "basically administrative in nature" we would expect that the fee agreement would account for that fact.  *See, e.g.*, *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.,* 290 F. Supp. 2d at 853–54 (greatly restricting fee contracts where the lawyer merely "monitor[ed] the case" and "timely and properly fill[ed] out claims forms.").

many instances has been and will continue to be adversarial, especially given the uncapped nature of the [Monetary Award Fund]."  (Doc. No. 9552 at 8-9, n.15).  Implementation of the Settlement Agreement has not been without challenge.  We are aware of the administrative appeals that have been necessary to clarify terms in the Settlement Agreement, which have necessitated sometimes extensive work to be performed by IRPAs.

Furthermore, IRPAs must be credited for work performed for their client that was reasonably deemed necessary at the time, even where the work ultimately became unnecessary under the Settlement Agreement.  For example, in the early stages of this litigation, there was a realistic possibility that IRPAs might have to pursue these claims through individual cases.  That meant that the attorneys were obligated to file lawsuits against the NFL Parties to ensure the IRPA's client would be a party within the consolidated MDL case.  Similarly, we anticipate that law firms might have taken actions on behalf of their client to preserve testimony or evidence that could be used if the individual case eventually went to trial.  Such actions, not duplicative of work done by Class Counsel, were actions taken for the advancement of the individual player.  The fact that such evidence was not ultimately used does not mean it cannot be considered in our evaluation of the overall work performed by each IRPA.  While these activities might be defensive in nature, we will properly acknowledge them as worthy of compensation.

We also recognize that there are instances where work that is performed by an attorney is best considered both as work done as an IRPA and work done for the common benefit.  In these cases, where the service is for a mixed purpose, we must again exercise our discretion to allocate the value of that work between the two roles.

Additionally, we expect that in some instances IRPAs will have performed work for their individual clients on matters that were collateral to the NFL Concussion Litigation and on other

personal matters. Where those matters are related to this litigation and the services were performed based on the expectation that payment would be covered by the CFA, these services will be considered.

Recognizing that the burden of demonstrating that the fees requested are reasonable rests with the attorney, we rely on the attorneys seeking fees to present evidence through their Lien Dispute Submissions that would demonstrate to us the quality, or rather the value or necessity, of the work performed on behalf on the individual client.

## 5. **The substantiality of the work**

Ultimately, we must evaluate the degree to which the attorney's efforts substantially contributed to the result obtained. As with any case where multiple attorneys represented a client, we review the work performed by each attorney and allocate the total fees on a proportionate basis. This litigation is somewhat complicated by the fact that one set of responsible attorneys are Class Counsel, who were already paid for their services and are not a Party to this Attorney Lien Litigation. Further, in some instances, the final claims process was performed by an attorney working *pro bono* or by a class member acting *pro se*. Ultimately, however, the evaluation is the same. We will exercise our best judgment to determine the substantiality of the contribution by each attorney.

The District Court has stressed the importance of "compartmentaliz[ing] the fees sought by Class Counsel for the work done to advance the interests of the Class and the work done by IRPAs to advance the interests of their individual clients." (Doc. No. 9860 at 13). We have the benefit of the District Court's opinions as they related to the Common Benefit Award and Allocation (Doc. No. 9860; Doc. No. 10019), as well as the fee requests submitted by each law firm who sought payment from the AFQSF, which provide us some details of the work performed

by IRPAs when working as Class Counsel. We must ensure these attorneys who are both IRPA and Class Counsel are not paid "twice for the same work." (Doc. 9862 at 5). As we evaluate the contribution of the IRPA to the Award, we will take care to consider only IRPA work and not include common benefit work that was already paid through the AFQSF.

In its establishment of a Fee Cap, the District Court has already taken action to reduce IRPA fees, accounting for the general benefit provided by Class Counsel. This cap takes into account (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials. We strongly consider the willingness of the IRPA to accept varying degrees of risk depending upon the timing of the representation. Such is particularly the case when the earliest cases were filed, before the MDL was established. Additionally, we have identified seven ways that IRPAs have supported their individual clients:

(1) review of medical records and necessary actions to taken to ensure medical conditions were identified and diagnosed at the earliest possible date;

(2) support of their individual clients in ensure their lawsuit would have evidentiary support should the matter proceed to trial;

(3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;

(4) support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,

(5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,

(6) support of clients who were seeking loans and were exposed to predatory lending practices; and

(7) providing necessary support in other personal matters collaterally related to this litigation.

This is not an exhaustive list of factors. We recognize that there will likely be other examples, which we will consider as each is presented. With this as a starting point, however, we will be able to incorporate our findings that relate to the quality and value of the work performed by the IRPA and determine whether or to what degree that work substantially contributed to the Award issued.

## B. The impact of the 22% Fee Cap on the reasonableness analysis

The District Court's Fee Cap does not relieve us of the obligation to review the *McKenzie* factors. Just as a CFA provides a starting point in a fee dispute, the District Court's presumptive Fee Cap provides a starting point in our litigation. However, the Court's ruling on this general point does not, and cannot, shift from the attorney the burden of proof to establish that the amount sought in the fee agreement is reasonable.

It has long been acknowledged that the nature of the relationship between attorney and client obligates attorneys to carry the burden of proof to demonstrate that the fee awarded "is reasonable under the circumstances." *Dunn,* 602 F.2d at 1111-13 (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in no way relieved attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees – whether those fee requests are submitted through a Lien or otherwise – are obligated to ensure their fees are "reasonable" under the standards articulated in *McKenzie*. (Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence)). Where we are presented with a valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it

25

offends a court's sense of fundamental fairness and equity." *McKenzie I*, 758 2d at 101.

In two of the cases before us a Party in the Lien litigation also filed a Petition for Deviation downward from the presumptive Fee Cap. In each of these cases, we concluded that the filing of this petition was unnecessary, as the arguments were duplicative of the arguments contained in the Lien litigation that was already before us. As a general matter, we believe that a downward deviation petition will typically be unnecessary where there is already a pending Lien Dispute. As is detailed below, the question before us in this context is simply this: Is the fee sought by the contracting attorney reasonable under the analysis set forth in *McKenzie*; understanding that presumptively the fee cannot be more than 22%? A petition for downward deviation sets forth the same analysis, and the arguments will therefore be subsumed in that larger Lien analysis.[13]

With these standards in mind, we turn to the individual cases before us.

## III. DISCUSSION OF PODHURST v. TURNER

Podhurst seeks 22% of the Award issued to Turner, through his father, Paul Raymond Turner, the Representative Claimant for the Estate. The Estate challenges the Lien, arguing that Podhurst did not perform any individual work here and is therefore not entitled to any fee as an IRPA. Podhurst argues that they performed all of the work necessary to obtain the Award and are therefore entitled to the full 22% available under the Fee Cap. We reject both positions. Rather, we hold that we must assess the reasonableness of the fee in light of the five factors enumerated by the Third Circuit in *McKenzie*.

We begin with a consideration of "the reasonableness of the contingent fee arrangement"

---

[13] In an instance where the attorney is seeking a deviation upward from the presumptive Fee Cap, we believe that a petition for deviation will be necessary. However, no such petition is before us for our evaluation today.

at the time of the contact's signing. *McKenzie II,* 823 F. 2d at 45, n.1 and then determine whether the circumstances compel a different evaluation of the CFA at the time of its execution. We then look to the third, fourth and fifth *McKenzie* factors: "the results obtained, the quality of the work, and whether the attorneys' efforts substantially contributed to the result." *McKenzie I*, 750 F.2d at 101.

Within our evaluation of the attorney's overall performance, we are aware of our obligation to distinguish work performed for Turner as an individual SCM from work performed for the class as a whole. To the extent the work performed by Podhurst was already compensated, in whole or in part, we cannot consider it as a part of our reasonableness evaluation of the IRPA fee sought by Podhurst.

### A. Facts and Procedural History

Turner first met with Podhurst about possible representation on September 26, 2011. Lienholder's Statement of Dispute at 2. He did not sign a CFA with the firm however, until January 18, 2012. (Doc. No. 7071-2). Under the terms of the agreement, Turner agreed to pay 40% of any monetary award recovery, plus an additional 5% for any appellate proceeding. Payment was contingent on Turner's success in the litigation. At that point, Podhurst had already filed a lawsuit against the NFL on behalf of 21 retired players. *Jones, et al. v. NFL*, 11-cv-24594 (S.D. Fla. filed on December 22, 2011). Turner was added to that lawsuit through an amended complaint on January 20, 2012. *Id.* at Doc. No. 14. As of January 2012, Turner had already been diagnosed with Amyotrophic Lateral Sclerosis ("ALS").[14]

Turner was the representative of the symptomatic subclass, Subclass 2, which contained

---

[14] Turner was diagnosed in June of 2010.

27

the group of retired NFL players who had received a Qualifying Diagnosis prior to the date of preliminary approval. He began working with Class Counsel in this role in July of 2013, during the negotiations that led to the submission of the first term sheet. (Doc. No. 6423-7 at 4 (Turner's affidavit submitted to the District Court explaining the nature of his role as Subclass Representative and indicating his endorsement of the Settlement Agreement)). As Turner explained, he was extensively advised by Class Counsel about the settlement negotiations and the terms of the Settlement Agreement. (*Id.* at 3). He was formally appointed to be the Subclass Representative on June 25, 2014, upon the submission of the operative Settlement Agreement.

Over the course of this representation, a dispute arose between Podhurst and Turner about attorneys' fees. On June 2, 2015, Polsinelli agreed to represent Turner *pro bono* to advise him about the fee agreement with Podhurst. Although Turner sent inquiries about his fee agreement concerns to Podhurst, he did not advise the firm that he had engaged separate counsel. On March 24, 2016, Turner died after his long battle with ALS.

After Turner's death, his father, Raymond Turner, became the personal representative of the Estate. N.T. 10/3/2018 at 4.[15] Podhurst sought a new fee agreement with the Estate, but those attempts failed. On April 15, 2016, the Estate terminated Podhurst's representation. N.T. 10/3/2018 at 51. Polsinelli then took over Turner's representation in the claim process. They are representing the Estate *pro bono* in this fee dispute as well.

On December 14, 2016, Polsinelli filed a Motion to Resolve Attorney Fee Dispute, asking the District Court to preclude Podhurst from collecting any fees as an IRPA, given that they were also receiving fees as Class Counsel. (Doc No. 7029). Podhurst filed a Response on January 11,

---

[15] As citations referencing "N.T." throughout this Report and Recommendation are citations to the Notes of Testimony to hearings held before us in the course of these attorney lien hearings.

2017 (Doc. No. 7071), and the Estate submitted a Reply on January 30, 2017 (Doc. No. 7114).  On May 14, 2018, following the District Court's Opinion relating to the Fee Cap, the District Court dismissed the Motion without prejudice to the Estate's right to file a Petition for Deviation raising the same issues, which they have now done.  (Doc. No. 9984).  On May 29, 2018, Turner filed the Petition seeking a downward departure from the 22% presumptive Fee Cap to 0%, arguing that Podhurst had already been compensated for any work performed for Turner by the common benefit fee they received.  (Doc. No. 10025).

On June 9, 2017, while those matters were pending in District Court, the Claims Administrator issued a Notice that the Lien had been filed and provided the Estate twenty days to consent to or dispute the Lien.  On June 17, 2017, the Estate advised the Claims Administrator of its intention to dispute the Lien.  On June 22, 2017, the Claims Administrator issued a Notice of Monetary Award Claim Determination to Turner.

On June 11, 2018, upon conclusion of the common benefit fee litigation, the issuance of the District Court's Fee Cap Opinion, and the issuance of the Attorney Lien and Deviation Rules, the Claims Administrator issued a Schedule of Document Submissions setting the deadlines for the pleadings that needed to be submitted to resolve the Lien Dispute.  On July 11, 2018, pursuant to Lien Rule 14 (Doc. No. 9760 at 9),[16] the Parties submitted their Statements of Dispute to the Claims Administrator ("Lienholder Statement of Dispute" and "SCM Statement of Dispute").  On August 6, 2018, pursuant to Lien Rule 15 (Doc. No. 9760 at 10), they submitted their Response Memoranda ("Lienholder Response" and "SCM Response").   Both Parties then requested a hearing, which we granted.  On July 24, 2018, with the consent of the Parties, having concluded

---

[16]  The pleadings were filed under our original Lien Rules, not the Lien Rules as later amended.

that the arguments in the Petition for Deviation were already before us in the pleadings filed in the Attorney Lien litigation, we denied the Petition for Deviation as moot. (Doc. No. 10161). Pursuant to Lien Rule 17, the Record of Dispute was transferred to this Court. On October 3, 2018, we held an evidentiary hearing, allowing the admission of evidence and argument for both sides.

### B.  The Turner CFA

It is undisputed that on January 18, 2012, Turner signed a CFA with Podhurst for the firm to represent him in his claim for damages against the NFL. (Doc. No. 7071-2). The Parties agree that the original contract was an agreement to pay 40% recovery of any monetary award, plus an additional 5% for any appellate proceeding. It is further agreed that Podhurst later reduced its contingency fee percentage to 25% but that following the District Court's presumptive Fee Cap Order, Podhurst's maximum fee cannot exceed 22%, absent the submission of Petition for Deviation demonstrating unique and extraordinary circumstances. (Doc. No. 7071 at 2).

The Estate has not argued that the CFA is invalid. They argue, rather, that the 22% fee requested is "unreasonable" because Podhurst performed only *de minimus* work on behalf of Turner. Polsinelli Statement of Dispute at 9-10. We discuss the "reasonableness" of the total fee in detail below.

Podhurst argues that they "should be awarded its full contractual fee because the contingency occurred." Lienholder Statement of Dispute at 5. As we discuss within we are unwilling to give credence to this concept, as it is only a small part of the more expansive *McKenzie* reasonableness test.[17] Whether the contract was fully completed or not, Podhurst is obliged to

---

[17]  In any event, we reject Podhurst's argument that the contingency was met in this case. As is discussed in detail below, there was still work to be done when Podhurst's representation was terminated. To consider otherwise would be contrary to the conclusions in the District Court's Fee Cap Opinion, which specifically included "shepherding of their clients through the claims

demonstrate that the contingent fee they were seeking was "reasonable" under the standards articulated by the Third Circuit in *McKenzie*.

Podhurst also challenges the applicability of Third Circuit law in this context, arguing that we are bound by state law, not federal law, in our evaluation of the reasonableness of the fee agreement here.  Podhurst relies on dicta in *Novinger v. E.I. DuPont de Nemours & Co.,* 809 F.2d 212, 217 (3d Cir. 1987). This reliance is misplaced.  This dicta from *Novinger* stated only that as a general matter state law applies to review of attorney fee contracts.  In *Mitzel v. Westinghouse*, 72 F.3d 414 (3d Cir. 1995), the Circuit Court addressed the issue with greater particularity, explaining that while "generally" state law applies to the review of attorney fee contracts, contingent fee contracts are "treated differently." *Id.* at 417.

Third Circuit has made clear however that in evaluating IRPA contracts that exist in a class action, that we must apply federal law and review these fee contracts for reasonableness.  *Dunn*, 602 F.2d at 1110, n.8.  "Rules regulating contingency fees pertain to conduct of members of the bar, not to substantive law which determines the existence or parameters of a cause of action." *Mitzel,* 72 F.3d at 417 (*quoting Elder v. Metropolitan Freight Carriers, Inc.*, 543 F.2d 513, 519 (3d Cir. 1976)).  Since "federal courts have the power to prescribe requirements for admissions before them and to discipline attorneys who have been admitted to practice before them . . . 'such

---

process" as a factor in its conclusion that IRPAs provided a sufficiently substantial contribution to the Awards as to justify the conclusion that, as a general matter, a fee up to 22% could be reasonable. (Doc. No. 9862 at 7); *see also* (Doc. No. 9552 at 8-9, n.15 (Class Counsel's discussion of the complexities of the claims process)).

Podhurst provides this Court with a series of cases setting forth the unremarkable proposition that if all the work is done in case, but the Award has not yet been issued, a client cannot fire his attorney and then claim that the contingency was not met. Lienholder Statement of Dispute at 7-8.  The issue here is whether the work was completed or so closely completed that the contingency was met.  The answer, considering the facts of this case, is no.

rules are of deep concern to the court which promulgated them.'"  *Id*.  This is why "contingency fee agreements in diversity cases are to be treated as matters of procedure governed by federal law."  *Id*.

In *Dunn*, the Third Circuit was presented with a similar circumstance to the one presented here.  602 F.2d at 1109.  Many of the members of a class had individual fee contracts with private attorneys.  The Circuit concluded that the District Court had the authority to set aside private CFAs between attorneys and class members.  As the Court explained, the District Court had the power to monitor CFAs generally based on the court's "supervisory power over the members of its bar." *Dunn*, 602 F.2d at 1109.  Federal law applies as our review is "part and parcel of the process a federal court follows both in supervising members of its bar and in meeting the obligations imposed on it by Fed.R.Civ.P. 23(e)."  *Id*. at 1110, n.8.  Additionally, the Court explained that when a fee is to be paid through a settlement fund approved by the court, Rule 23 imposes an even greater responsibility on the Court to review the fee contracts.  *Id*.

The fact that this is an MDL does not change the analysis.  As the District Court noted in the *Vioxx* litigation, "the MDL statute's mandate of fairness requires a uniform, consistent result for all attorneys and their clients.  Any other result would be impractical from the standpoint of judicial economy. Conducting fifty independent analyses of reasonableness would drain judicial resources and would eliminate the efficiency that the MDL was designed to create."  *In re Vioxx Prod. Liab. Litig.*, 650 F. Supp. 2d 549, 563 (E.D. La. 2009).[18]

Ultimately, we observe that the Third Circuit's rule requiring that contingent fees be

---

[18]  As is discussed in the discussion of the CFA between Smith and Podhurst, where the Parties are disputing the validity of the contract or disputing the interpretation of a clause in the contract, state law may provide the relevant precedent to evaluate the claim.

"reasonable" is not unique. In the context of mass tort litigation, "a court that exercised inherent power to prevent a violation of the lawyers' professional responsibility to charge only reasonable rates would be acting within the parameters of inherent authority as described by the Supreme Court." *Contingent Fees in Mass Tort Litigation,* 42 Tort Trial & Ins. Prac. L.J. 105, 127 (2006). "Any analysis of a fee agreement between an attorney and his client begins with the general rule that an attorney may not charge 'in excess of a reasonable fee.'" *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.,* 290 F. Supp. 2d at 850. "Courts that have considered the issue have nearly unanimously concluded that the power to consider the reasonableness of contingent fees is inherent in a federal court." *In re Vioxx Prod. Liab. Litig.,* 650 F. Supp. 2d at 559. Indeed, *Dunn* itself relied on the Canons of Professional Ethics as promulgated by the American Bar Association for the Court's conclusion that contingent fee agreements are permissible "subject to the 'supervision of the courts, as to their reasonableness.'" *Dunn*, 602 F.2d at 1108 (*quoting Fitzgerald v. Freeman*, 409 F.2d 427 (7th Cir. 1969)).

In any event, Florida law, which Podhurst claims is applicable, does not appear to require a different result, even if it did apply. Podhurst points to a multi-factor analysis in *Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Poletz,* 652 So. 2d 366, 369, n.4 (Fla. 1995) which the Florida Court describes as a "good starting point." We have reviewed this seven-factor reasonableness test and consider these factors as a part of the totality of circumstances of the particular case. *Id*. We observe that even if we were to consider this test, which we do not, we expect that the result would not likely be different than the result we come to here using the *McKenzie* factors.[19]

---

[19] The Florida Court pointed to Rule Regulating the Florida Bar 4-1.5, which lists the following factors:

33

Finally, Podhurst has asserted that Turner's termination of the CFA was for "an avowed purpose to avoid the contractual fee." Lienholder Statement of Dispute at 10. While this assertion has little effect upon our analysis, we reject the implication. We see this as a misunderstanding by the estate over what the impact of the substantial common benefit fees coming to Podhurst would have upon their IRPA fees. *See* (Doc. No. 7029-11, Exhibits C through J (correspondence between the Parties detailing the dispute)).

### C. Applying *McKenzie* "reasonableness"

Having established that there is a valid CFA in place and that we are obligated to review the fee under the *McKenzie* factors, we turn to the *McKenzie* analysis. Our inquiry begins "by

---

(1) the time and labor required, the novelty, complexity, and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee, or rate of fee, customarily charged in the locality for the legal services of a comparable or similar nature;

(4) the significance of, or amount involved in, the subject matter of the representation, the responsibility involved in the representation, and the results obtained;

(5) the time limitations imposed by the client or by the circumstances and, as between attorney and client, any additional or special time demands or requests of the attorney by the client;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, diligence, and ability of the lawyer or lawyers performing the service and the skill, expertise, or efficiency of effort reflected in the actual providing of such services; and

(8) whether the fee is fixed or contingent, and, if fixed as to amount or rate, then whether the client's ability to pay rested to any significant degree on the outcome of the representation.

*Id.*

34

scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of execution. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the contract's execution. We will then review (1) the result in the case, (2) the quality of the work performed by the attorneys, and (3) the substantiality of that contribution on the overall result.

As is discussed in greater detail below, circumstances here, at the time of contracting and the time of execution, changed significantly, necessitating an adjustment to the fee beyond that contemplated within the District Court's presumptive Fee Cap. In evaluating the remaining three prongs, we are satisfied that both Podhurst and Polsinelli provided quality work and made substantial contributions to the ultimate Award received in this case. Considering the substantiality of Podhurst's contribution as an IRPA, as reduced to account for the contributions of Class Counsel and Watters, we recommend that Podhurst receive a fee of 15½ %, which will be reduced by the amount of the 5% holdback that the District Court deems necessary.

### 1. The CFA at time of contracting

Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing. *McKenzie II*, 823 F.2d at 45 n.1. Here, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation. Podhurst signed a fee agreement with Turner very early in this litigation, when consolidation as an MDL was likely, but not certain. The legal challenges to the litigation remained substantial, but there was a strong likelihood that much of the

35

considerable time-intensive work that counsel were facing would be streamlined by the creation of the benefits of the MDL.

### (a) Filing before MDL consolidation

Podhurst's initial meeting with Turner occurred on September 26, 2011, but he did not sign his fee agreement until January 18, 2012. This was arguably at the very end of what Professor Rubenstein described as Phase 1, but effectively in the earliest stages of Phase 2. (Doc. No. 9526 at 25-26).

The initial meeting with Turner occurred before the NFL filed its motion to consolidate, but after the first four cases in this MDL had been filed.[20] On December 16, 2011, about a month after the NFL filed the motion to consolidate the cases as an MDL, Podhurst spoke again with Turner about representation. Although Turner did not sign with Podhurst at that time, Podhurst filed the initial complaint seeking damages against the NFL on behalf of 21 other retired players on December 22, 2011. At that point, it was nearly certain that Podhurst's lawsuit was going to proceed within the MDL, as the NFL and all plaintiffs in the first four suits had sought consolidation. (MDL No. 2323, Doc. Nos. 17, 18, and 19 (all filed Dec. 7, 2011)).[21]

By January 18, 2012, when the CFA was signed, the fact that the case was almost certain to proceed jointly through an MDL necessarily changed the dynamic when assessing fees. The formation of the MDL committees allowed a central group to perform the work for the class, and

---

[20] *Maxwell, et al. v. NFL, et al.* was filed on July 19, 2011; *Pear, et al. v. NFL, et al.* was filed on August 3, 2011; and *Barnes et al. v. NFL, et al.* was filed on August 26, 2011. The three cases were removed to federal court on October 11, 2011. On August 17, 2011, *Easterling, et al. v. NFL*, was filed in the District Court for the Eastern District of Pennsylvania.

[21] The only opposition to the MDL formation came from the Riddell defendants. But Podhurst's complaint was solely against the NFL.

relieved IRPAs from having to complete the work independently.  Podhurst was aware of the benefits of consolidation.  As they explained in their Class Benefit Fee request, the firm hosted an organizational meeting prior to the JPML hearing.  "The purpose and result of the meeting was to facilitate tentative agreements on coordination and leadership among the majority of counsel representing former players."  (Doc. No. 7151-8 at 4).

Consolidation, however, did not eliminate risk.  Despite the opportunity to spread out the workload, there were still substantial risks for Turner, including challenges relating to causation, preemption, and statute of limitations, to name a few.  *See* (Doc. No. 9860 at 10 (describing this as a "a high-risk, long-odds litigation.")).

Additionally, Podhurst's work in drafting and filing a lawsuit against the NFL and including Turner as a plaintiff was a necessary part of this litigation when Turner retained the law firm.  To participate in the MDL, Turner needed to be a party in a lawsuit, which could be transferred into the soon-to-be-created MDL.  Podhurst took on these risks when they filed the necessary pleadings.

### (b) Pre-MDL work as IRPA work

Podhurst lawyers, like other firms who were involved in the early filings in this litigation, spent months prior to the filing of their initial lawsuit researching the legal issues that would be faced in the litigation.  N.T. 10/3/2018 at 28.  Since this voluminous upfront work creates a collateral loss of opportunity, which is an appropriate and necessary consideration for lawyers when negotiating the terms of the CFA.  When Podhurst entered into the CFA with Turner, the fee could reasonably be considered to compensate the firm for this upfront work, as well as future work.  We consider this work as a factor in evaluating the reasonableness of the contract at its drafting, but recognize that, as discussed below, circumstances changed over time.

### (c) The clarity of Turner's Diagnosis

Turner was diagnosed with ALS in June of 2010, before this litigation began. To some degree the presence of that diagnosis reduced the complexity of the litigation for Podhurst at the time of contract signing. As a result, Podhurst's obligations regarding Turner's medical diagnosis were reduced. Podhurst was not obligated to secure additional neuropsychological or other evaluations for Turner, who was already under the care of well-respected doctors due to his prior diagnosis. (Doc. No. 10134 at 47 (explaining that Turner was being treated by Dr. Cantu prior to the initiation of the lawsuit)). Further, the early onset for Turner's diagnosis relieved Podhurst of the obligation of reviewing medical records for earlier symptom presentation. As Podhurst explained in argument, Turner's case was "an out of the ordinary case because there's less to do. He had a clear qualifying diagnosis." N.T. 10/3/2018 at 65.

Ultimately, under the Settlement Agreement, the ALS diagnosis and the number of years that Turner played in the NFL were the only facts necessary to obtain an Award. But at the time of contract signing, the proof required for an Award was not known. We recognize that in these early stages Podhurst undertook responsibility to review Turner's extensive medical history and obtained a full history relating to Turner's playing career and history of concussions.

### (d) Conclusion

Polsinelli does not challenge the reasonableness of the contract at the time of signing, nor do we. The complexity of the litigation at this early stage is apparent as are the risks. The articulation of the factors known at the time of contracting that demonstrate the significant change of circumstances by the time of execution of the contract.

## 2. The CFA at time of execution – impact of changed circumstances

The fee contract between Podhurst and Turner remained in place for more than four years,

between January 18, 2012 and April 15, 2016.  Between contract signing and the issuance of the

fee award, the individual cases filed were consolidated into an MDL, and the litigation, broadly

speaking, was resolved through a Class Action Settlement Agreement that relieved plaintiffs of

their obligations relating to causation and resolved other significant legal obstacles that had existed

at the outset.  Further, this work anticipated in the CFA was accomplished by Class Counsel

(including Podhurst), rather than Podhurst, working as an IRPA.  Finally, Podhurst's services were

terminated before the completion of the contract, relieving the firm of the obligation of performing

the tasks required to submit a claim through the administrative process set out in the Settlement

Agreement.

### (a) Payment for pre-MDL work

Podhurst lawyers, like other firms who were involved in the early filings, spent months

prior to filing researching the legal issues that would be faced in the litigation.  N.T. 10/3/2018 at

28.  Since this voluminous upfront work and collateral loss of opportunity is a consideration for

lawyers when CFAs are drafted, we believe it is a necessary consideration for us as we evaluate

the reasonableness of the contract at its signing.  When Podhurst entered into the CFA with Turner,

the fee could reasonably be considered to compensate the firm for this upfront work, as well as

future work.  We consider this work as a factor in evaluating the reasonableness of the contract at

its drafting, but recognize that, as discussed within, circumstances changed over time.

At the time the CFA was signed, Podhurst reasonably anticipated that it would need to rely

on its individually retained clients to obtain compensation for the extensive work it performed in

advance of filing the complaints against the NFL.  However, over the term of the contract, two

things became clear: (1) that Podhurst and other law firms would be able to seek payment from

what became the AFQSF to compensate them for this pre-MDL work and (2) Podhurst's stable of

individual clients grew, allowing them to benefit from economies of scale.

Podhurst included this pre-MDL work as part of the firm's request for common benefit fees, stating that the "firm began investigating the possibility of a suit against the NFL in the Summer of 2011, after receiving inquiries on behalf of several former players. After investigating the history of the NFL's handling of the problem and researching the law applicable to potential claims and likely defenses, our firm make the commitment to devote the considerable resources of personnel, time, and funds that would be necessary to take on the goliath of the NFL on an issue of vital importance to its business." (Doc. No. 7151-8 at 3). This time was not included in the firm's lodestar, as Class Counsel did not to include pre-MDL time in that calculation.[22] However, we accept, as the District Court did when it allocated common benefit fees (*see* Doc. No. 10019), Podhurst's own assertion that this was, at least in part, common benefit work, and we recognize that Podhurst received a 2.25 multiplier for the common benefit work they performed.

This does not mean that at least some of this work did not also benefit Podhurst's individual clients. We recognize that Turner benefited from his inclusion in this MDL prior to the establishment of the class. This individual work, however, was not performed exclusively for Turner, or any single client, but rather for all Podhurst's clients. Recognizing the benefit of this expertise generated by the firm's undertaking of this work, requires us to also consider economies of scale.

At one point in this litigation, Podhurst represented 569 clients. (ECF No. 18-md-2323 (E.D. Pa.), Doc. No. 28 at 4). Although that number has reduced as the litigation has progressed, the fact of the matter is that Podhurst has benefited greatly from the economies of scale. Podhurst's

---

[22] The MDL was established by the panel on January 31, 2012.

initial complaint, filed in late December of 2011, was filed on behalf of 21 plaintiffs.  (ECF No.
11-cv-24594 (S.D. Fla.), Doc. No. 1).  On January 20, 2012, the complaint was amended to add
Turner as well as others, increasing the number of plaintiffs to 98.  (ECF No. 11-cv-24594 (S.D.
Fla.), Doc. No. 14).  It was amended one final time on February 3, 2012, increasing the number of
plaintiffs to 135.  (ECF No. 11-cv-24594 (S.D. Fla.), Doc. No. 14).  The work researching, drafting
and filing this lawsuit benefited all of these clients and must be distributed between them.  Only a
portion of the weight of this work is fairly attributable to our reasonableness analysis of the fee
agreement with Turner.

### (b) *Change due to Class Counsel's work*

Through the Fee Cap, the District Court has already adjusted attorney fee contracts to
account for the changes in circumstances that are attributable to Class Counsel's contribution
generally.  Podhurst benefited from those changes of circumstance, as did other firms.  But, in
addition, the common benefit work altered Podhurst's role in Turner's case even more
significantly.

Because of Turner's role as Subclass Representative,[23] work that would have ordinarily
been the responsibility of the IRPA was instead performed by attorneys working for the common
benefit.  Class Counsel supported Turner by advising him of the details of the settlement, helping
him to present an effective media message, and by reviewing his medical records in depth.  In
some instances, it was Podhurst, acting as Class Counsel, who was performing these tasks.  We
know from Podhurst's common benefit fee request that the firm deemed this work to be common

---

[23] The Settlement Agreement addresses two Subclasses.  Subclass 2 contained the group of retired
NFL players who had received a Qualifying Diagnosis prior to the date of preliminary approval.

benefit work, not IRPA work. Since Podhurst's work performed for the common benefit subsumed work that would have otherwise been IRPA work, the changed circumstance must be considered in the evaluation of the reasonableness of the agreement at the time of its execution.

Conveying information about the negotiations and providing detailed information about the terms of the Settlement Agreement is an important obligation of the IRPA from the formation of the MDL through the start of the claims process. Here, however, as Turner was a Subclass Representative, it was Podhurst as Class Counsel, not an IRPA, who advised Turner about the intricacies of the negotiations and about the terms of the settlement. Podhurst recognized this when they submitted their work supporting Turner as a part of their common benefit claim. (N.T. 10/3/2018 7/13/2018 at 51; Doc. No. 7151-8 at 9).

Further, as Podhurst explained, Turner "wanted to make sure there was public awareness of this problem." (Doc. No. 7151-8 at 5). Ordinarily, the advice provided by counsel to a client about public appearances in light of pending litigation is best characterized as IRPA work, as the time was submitted for the benefit of the individual, not the common benefit. However, Podhurst submitted this work as a part of their common benefit declaration due to the nature of their role of Class Counsel. Podhurst partner Steven Marks ("Marks") was Co-Chair of the Communications and Ethics Committee, which "developed a communications and media plan" for the class. In that role, Marks "worked along with an outside consultant which the PEC/PSC engaged on messaging, talking points, media strategies and OpEds to reinforce the significance of this litigation and the risks involved at all levels." (Doc. No. 7151-8 at 5).

Marks' representations about this common benefit work specifically note his work with Turner to help advance this strategy for the benefit of the Class. Further, as Marks explained, his work with Turner as one of the "two main spokespersons" for the class:

> I traveled to New York and Philadelphia on multiple occasions with Kevin Turner and Shawn Wooden and assisted with the preparation of talking points and primed them for questioning. Along with the two class representatives, I also did this with many other players, and their loved ones, including Herb Orvis, Chie Smith, and others. I also spearheaded identifying suitable players and in the preparation of the "Day in the Life" video that was prepared for potential use at the Final Fairness hearing. That professionally prepared video showed firsthand the devastating effects of multiple head trauma in the daily lives of these former players. My partners also assisted with some of these tasks, which formed part of the coordinated communications and media plan.

(Doc. No. 7151-8 at 6).

Turner's selection as Subclass Representative and the co-extensive responsibilities taken on by Podhurst in its work for the common benefit were significant changes in circumstance that impact the reasonableness of the overall fee agreement. The impact of these changes will be addressed below in our discussion of the substantiality of the contribution by Podhurst as an IRPA.

### (c) Termination of the CFA

Podhurst's expected role was further reduced when their contract was terminated before the litigation was completed. Podhurst urges us to conclude that all essential work was done before their fee agreement was terminated. We disagree. For the reasons set forth below, in our discussion of the work performed by Polsinelli, we conclude that the fact that Podhurst did not represent Turner during the claim submission process resulted in a reduction in their obligation to their client.

### (d) Conclusion

Collectively, these are all significant changes of circumstance that we need to consider in our evaluation of the fee requested. These circumstances impact upon Turner's individual representation more than the circumstances anticipated by the District Court in its Fee Cap opinion. We therefore need to make adjustments beyond those implemented through the cap itself.

### 3. **The results obtained**

Having determined that we are dealing with a marked difference in circumstance from the time of the creation of the contract to the time of the execution – hastened by Podhurst's termination – we look to the result obtained, the quality of the work performed and the substantiality of the efforts of Podhurst as IRPA. We first observe that on June 22, 2017, Turner's Estate was Awarded a Monetary Award grid amount of $5 million, based on Turner's ALS diagnosis at the age of 42. This is the highest amount payable under the Settlement Agreement.

### 4. **The quality of the work performed**

The Parties both urge us to conclude that opposing counsel did not provide quality work for Turner: Polsinelli argues Podhurst's IRPA work was merely *de minimus*; and Podhurst argues that "the contingency was met," as there was no work left to perform after their termination. As is discussed in detail below, Podhurst provided quality work for Turner, performing many necessary tasks in this litigation. Polsinelli provided quality work as well. We accept the representations of both law firms that they maintained a quality relationship with Turner and the Estate, providing necessary individual support in navigating the legal complexities of the litigation. We suggest however that the question of "the quality of the work" does not standing alone assist our analysis. We accept that Podhurst performed at the highest level. The more important question here is to look at the substantiality of the work – that is to say what work did Podhurst do that had a substantial effect on achieving the result obtained. Polsinelli characterizes their efforts – not as Class Counsel but as an IRPA – as *de minimus,* not that it was lower quality, but that it did not make much difference in the ultimate outcome. We agree with Polsinelli that this is the right approach, but we disagree with their characterization of how substantial the work was. We

therefore lay out the quality work performed by both attorneys, to aid in our evaluation of the final factor in the *McKenzie* analysis.

We turn to the work performed by Podhurst, which provided the necessary support to Turner early in this litigation. Podhurst represented Turner for more than four years – from before the MDL was formed through much of the appellate process. Podhurst has presented evidence that they: (a) performed extensive legal research in advance of the litigation; (b) filed the lawsuit against the NFL; (c) assembled and reviewed his medical records; (d) created a Day in the Life video for use in future litigation, (e) advised Turner on collateral litigation that might impact this case and attempted to obtain an *in extremis* deposition to preserve Turner's testimony for future litigation; (f) supported Turner in his understanding of the negotiations and the Settlement Agreement; (g) assisted the family in obtaining a loan while they awaited payment of the Award; and (h) other personal matters. Although some work for Turner was co-extensive of work performed by Podhurst as Class Counsel, we reject Turner's argument that all the work performed in that time was exclusively common benefit work for which Podhurst has already been paid. As detailed here, these were services that benefited Turner individually.

### (a) Legal research pre-MDL

Podhurst has asserted that the pre-MDL work performed to research the legal bases necessary to file a successful lawsuit against the NFL should be compensated. We recognize the skill and quality of the legal work performed by Podhurst in this capacity. Indeed, that skill was the reason that Podhurst partner Stephen Rosenthal was a Co-Chair of the Legal and Briefing Committee. (Doc. No. 7151-8 at 4). While we accept that Turner benefited from this expertise, we recognize that the work was performed for all Podhurst's clients and for the class at large. We consider this individual work, but we must prorate the value among these other Podhurst clients.

### (b) *Filing the lawsuit*

Podhurst was involved in this litigation early in the process when they filed a lawsuit in the Southern District of Florida on December 22, 2011. The firm then filed an amended complaint on January 20, 2012 that included Turner. This work was clearly undertaken for Turner's benefit. Even considering that we need to divide the value among Podhurst's clients, we consider this work in part applied to Turner individually.

### (c) *Medical Records*

Podhurst obtained and reviewed Turner's medical records. Although the medical records review in this case was less labor intensive than it might have been in other cases due to the clarity of the diagnosis, Podhurst was not entirely relieved of obligations to Turner. Prudent counsel would make certain to review and understand what is in the medical records as they could have some bearing upon the onset and progression of the disease process. The firm reports a meeting with several individuals including Dr. Cantu.[24] We accept Podhurst's representation that this meeting was about Turner's individual case.

Ultimately, it is clear that this work was performed for Turner's individual benefit exclusively. We acknowledge that early in the litigation, it was unclear what details in the medical history would prove necessary for the litigation. We expect, as was done here, that prudent counsel would diligently pursue and review of these records as a part of Podhurst's obligations to Turner in his individual capacity. Recognizing that the prior diagnosis reduced Podhurst's obligations,

---

[24] The Estate argues that this must be common benefit time as Dr. Cantu and the others at the meeting provided guidance on other global common benefit issues. We do not accept that to be that case. In his testimony before the District Court at the allocation hearing, Podhurst's representative noted that Dr. Cantu treated Turner. SCM Response at 11-12.

we conclude that this was significant work performed on his behalf.

### (d) *The Day in the Life Video*

Podhurst also created a Day in the Life video documenting Turner's condition. Podhurst detailed the preparation of Day in the Life videos in their common benefit petition, submitting that this work was done for the class "for potential use at the Final Fairness hearing. . . . [as a] part of the coordinated communications and media plan." (Doc. No. 7151-8 at 6). We recognize that these videos benefited the class. But this work also would have benefited Turner had this case proceeded independently from the class action. Recognizing the realities of Turner's ALS diagnosis, prudent counsel would have wanted to preserve a demonstrative aid to show the jury a day in the life of the Turner's family, so they could understand the day-to-day difficulties of his condition. The video served a dual purpose and we credit it as such.

### (e) *The workers' compensation litigation and in extremis deposition*

Similarly, Podhurst has urged us to include work they performed relating to the workers' compensation case that Turner had pending during this litigation. As Podhurst explained at the evidentiary hearing, during the course of the firm's representation of Turner, Podhurst advised Turner about pending workers' compensation litigation that was occurring in another jurisdiction, specifically as it related to the pending claims against the NFL. N.T. 10/3/2018 at 59. This was important work. At the time there was no way to know that this litigation would resolve through settlement. It was important for Podhurst to ensure the testimony would not undercut legal positions in this litigation. This was clearly work for Turner's individual benefit.

In the workers compensation litigation, there was a pending deposition. Podhurst attempted to get an agreement with the NFL to use the already scheduled matter as an *in extremis* deposition to be used in this litigation. N.T. 10/3/2018 at 59. When those efforts failed, Podhurst

still participated in the deposition via telephone to assist Turner in participating in such a way as to assist the workers compensation claim, but not harm his position in the NFL litigation. N.T. 10/3/2018 at 61-62. We accept that this time is properly construed as an effort to support Turner's case against the NFL.

### (f) Advice to Turner throughout the litigation

We next address Podhurst's argument that their interactions with Turner were extensively relating to this litigation in an individual capacity and should be considered as support for the IRPA claim.[25] As is discussed above, due to Podhurst's interaction with Turner in its role as Class Counsel given to the firm's leadership position on various plaintiffs committees and the support that Turner received in his role of Subclass Representative, we conclude that Podhurst's IRPA obligations relating to supporting Turner while negotiations and appeals were pending must be reduced. Where an attorney – be it Podhurst or another attorney acting for the common benefit – has already been paid for the work performed supporting Turner, we may not consider a duplication of that time or work on our review of an IRPA fee for reasonableness.

### (g) Loan agreement negotiation

Podhurst also argues that they helped Turner when he was seeking a loan to advance funds for his family while he awaited the receipt of his Monetary Award. The issues with predatory lending practices are well-documented through this litigation and need not be discussed here. As was discussed at the hearing, however, Podhurst's representation in this matter was not pro forma,

---

[25] Specifically, Podhurst submitted 2.0 hours of time for a January 25, 2012 conference with Turner, a telephone conference for an unspecified time on May 5, 2012, telephone calls and emails for an unspecified time on June 9, 2013, 2.0 hours of time for a meeting with Turner on August 15, 2013, and a telephone call for an unspecified time on August 23, 2013. Marks testified that these time entries are only a small sample, stating that "there are hundreds of hours… not accounted for." N.T. 10/18 at 107.

but rather they worked intensively in negotiating a fair lending agreement for Turner. N.T. 10/3/2018 at 50.

We recognize, however, that Polsinelli also argues that they played an active role in negotiating the loan, arguing that Podhurst only "made the introduction" and Polsinelli handled the remaining negotiations. We have reviewed the time submitted by each law firm and the exhibits admitted at the hearing on this point. It is clear to us that both law firms assisted Turner in this process and the work cannot be solely credited to Podhurst or Polsinelli. We divide the work equally between the two firms.

### (h) Support in personal matters

Podhurst reports services that relate to several personal matters that are properly characterized as IRPA work. Specially, Podhurst notes that they advised Turner with respect to matters relating to his ex-wife and regarding the NFL's "Plan '88" and a disability application. As to the communications about Turner's ex-wife, the Estate argues that the time was for services provided to Turner's ex-wife, as opposed to Turner himself. We disagree. Podhurst stated that the time submitted related to their efforts in advising Turner about his ex-wife's requests. As to the completion of the disability form, the Estate is critical of the work because it is "administrative." We disagree. Much like the workers' compensation claim, the statements submitted on the form could have impacted Turner's recovery in this litigation. Prudent counsel would have taken an interest in order to protect Turner's individual award. See N.T. 10/3/2018 at 62. That said, we observe that very little time is reported to have been spent on these tasks. Other matters discussed here are more significant indicators of the nature and quality of the work performed by Podhurst.

Podhurst has also presented us with evidence of several initial client meetings, which

occurred before the CFA was signed and other time relating to a dispute between Podhurst and another firm relating to Turner's decision to sign on as a Podhurst client, instead of the other firm. We place little weight on these submissions. Work performed in persuading a client to sign with a law firm is not includable in our evaluation of quality work performed for the client's benefit. Similarly, work related to a dispute between firms about representation is not work performed for the client's benefit, but rather for the law firm's benefit.[26]

### (i) *Remaining work*

Recognizing the quality work performed by Podhurst, we turn to the firm's argument that all of the work that needed to be done had been done by the time that their contract was terminated. We disagree and conclude that Polsinelli provided quality legal representation to Turner, which was necessary in support of his claims.

Polsinelli provided legal assistance to the Estate as they worked through the administrative process leading to the Award. The firm has provided us with a detailed accounting of their work completed after Podhurst's representation was terminated. This includes: (1) registering Turner as a member of the class, (2) submitting the claim package to demonstrate entitlement for an Award, (3) working with Esquire Bank to ensure the loan was appropriately repaid, (4) working with Garretson Resolution Group on matters relating to the Medicare reimbursement, and (5) working with the Claims Administrator to obtain the payment of the Award to Turner for acting as Subclass Representative. These were not "mundane legal chores," but rather quality work

---

[26] Polsinelli urges us to disallow the time as it was performed before the fee agreement was signed. We reject the argument. If a law firm worked closely with a client in its first meeting – prior to the signing of an agreement – to obtain medical records, work history or other relevant information necessary to firm before they can file a lawsuit, that work should be includable even if the fee agreement was signed after the work was performed.

performed that advanced Turner's individual interest.  *See McKenzie II,* 823 F.2d at 47.

### (j)  Conclusion

Recognizing that both firms provided quality work that contributed to Turner obtaining his Monetary Award, we must evaluate on balance the degree to which the attorney's efforts substantially contributed to the result obtained.

### 5.  The substantiality of the work

Three groups of attorneys contributed to the work necessary to obtain the Monetary Award in this case – Podhurst acting for Turner individually, Class Counsel (of which Podhurst was a significant actor), and Polsinelli.  In reviewing the degree to which each substantially contributed to the result, we recognize that the District Court has already reduced the IRPA payments to account for Class Counsel's substantial contribution through the application of the Fee Cap. However, there are several factors specific to this case that compel us to conclude that Class Counsel's contribution or rather work done by Podhurst in its Class Counsel role, to this result was more substantial here given Turner's role as Class Representative and including his willingness to put himself forward with Podhurst's substantial support as the "face of the case."  N.T. 7/13/2018 at 51.  Podhurst's role in this regard together with Polsinelli's meaningful work gives us comfort that Podhurst as IRPA is not entitled to the 22% cap as they have urged.

As is discussed above, we generally expect there to be seven major categories of work for IRPAs who have supported their clients in this litigation.  In no way is it expected that as IRPAs work will cover each of these categories.  Rather, as we consider the substantiality of the IRPA efforts, we use them as check points, which may or may not have played a role in the SCM's effort to maximize his award.  So, we use it as a checklist of factors to consider and weigh on balance, the substantiality of the contribution of the IRPA to the Award obtained.

Looking at Podhurst's work, it is clear they provided high quality services in this litigation, and that there were substantial risks at the time that Podhurst was engaged as counsel. Of our seven factors (*see infra* p. 24), Podhurst argues that they provided as an IRPA services relating to six of them. Polsinelli challenges this assertion in four ways. They argue that: (1) Podhurst's IRPA-services relating to the medical records was insubstantial (factor 1); and (2) Podhurst's support of Turner in his understanding of the negotiations that led to the Settlement Agreement was exclusively common benefit work, not IRPA work (factor 4); (3) Polsinelli's work submitting the claim and processing the award was substantial (factor 5); (4) Polsinelli also provided necessary services in helping Turner obtain a loan (factor 6). We address these points in order.

### (a) Factor 1: Review of Medical Records

Polsinelli first argues that the Turner's early and clear diagnosis simplified the important medical issues here and we should discount Podhurst's fee accordingly. We acknowledge that the diagnosis simplified the review of Turner's medical records, as there was no requirement that Podhurst pursue other medical evidence, and ultimately the paperwork needed to submit the final claim was straightforward. But Podhurst argued that if the Settlement Agreement had not been reached and Turner's case had to go to trial, they would have needed to document Turner's condition, as his ability to testify was seriously compromised by the deterioration of his condition. As a result, the firm, acting reasonably, was obligated to take actions to preserve testimony and evidence – in the form of the Day in the Life video and the attempts to secure a deposition. Taking these circumstances as a whole, we consider only a modest reduction in Podhurst's IRPA fee on this basis.

*(b) Factor 4: support for individual clients for their understanding of the process and the available options*

Podhurst worked extensively with Turner and others as spokespeople for players but it did so primarily as Class Counsel – not as an IRPA, in this litigation. Without the support of Class Counsel, advice to Turner regarding public appearances and the potential impact on the litigation these tasks would have fallen upon the IRPA. Turner was advised extensively about the scope and nature of the settlement negotiations and the terms of the agreement in his role as Subclass Representative. If Turner had not been in that role, the obligation to provide that support would have fallen upon the IRPA. In that way, Class Counsel reduced the work that would have ordinarily been performed by Podhurst.

We recognize that Podhurst performed some services that fall in this category. However, we conclude that this work was substantially performed as Class Counsel and Podhurst was already paid as such.

*(c) Factor 5: Shepherding the client through the claims process*

We next address Podhurst's argument that Polsinelli's work was insignificant, due to the existence of the Monetary Award Grid. First, we have discussed the quality work performed by Polsinelli, which went beyond the mere submission of paperwork. The law firm provided other substantial legal support to Turner in the final stages of this claim process. Secondly, we are reluctant to disallow payment for services in the Claims process merely because the SCM's condition was previously known. Either way, the simplicity of this process does not result in the conclusion that Podhurst's work was insubstantial, but it was Class Counsel, and not Podhurst as IRPA, who was responsible for the grid. (Doc. No. 6481-1 at 122). We accept that the work done

53

by Polsinelli contributed to the successful resolution of the claim process. We take this into account.

### (d) Factor 6: Support for clients seeking a loan

Both Podhurst and Polsinelli have argued that they provided the necessary support to Turner in his efforts to obtain a loan while he awaited the issuance of his Monetary Award. As is addressed above, based on the arguments of counsel and the documents provided, we conclude that both law firms provided substantial support in this process. We therefore divide the credit for these services equally between the law firms.

### D. Conclusion

Overall, we conclude that Podhurst's IRPA contribution to the Award is insufficient to support its lien to the full 22%. The contribution of Class Counsel was more substantial in this individual litigation due to Turner's status. The work performed by Polsinelli also provided a significant contribution in bringing the litigation to a close. Accordingly, we recommend that Podhurst receive 15½ % of the Monetary Award as its fee. The 15½ % fee must still be reduced by the 5% holdback currently applicable to all attorney fee Awards. Therefore, it is our recommendation that Podhurst receive 10½ % of the overall Award at this time. Whatever portion of the 5% holdback is ultimately released by the District Court, will be provided to Podhurst at that time. We recommend that the remaining funds be distributed to Turner promptly.

## IV. DISCUSSION OF PODHURST v. SMITH

Podhurst seeks 22% of the Award issued to Smith. Smith challenges the Lien arguing (1) that a second fee contract signed by Chie Smith superseded the original contract signed by Steven Smith and precludes Podhurst from any IRPA fee, and (2) even if this argument fails, Podhurst did not perform any individual work here and is therefore not entitled to any fee as IRPA. Podhurst

argues that the original contract signed by Steven Smith is the binding contract, which remains unaltered, and the firm performed all of the work necessary to obtain the Award and are therefore entitled to the full 22% available under the Fee Cap.

Before we can proceed with the *McKenzie* analysis, we consider the issues raised by the parties over which the CFA applies. We have reviewed the relevant fee agreements under the applicable law and conclude that the original fee contract was not superseded by the contract later signed by Chie Smith. We do nonetheless reject the Podhurst argument that the strict terms of the CFA control. Rather, we hold that we must assess the reasonableness of the fee in light of the five factors enumerated by the Third Circuit in *McKenzie.*

We begin with a consideration of "the reasonableness of the contingent fee arrangement" at the time of the contact's signing. *McKenzie II,* 823 F. 2d at 45, n. 1 and then determine whether the circumstances compel a different evaluation of the CFA at the time of its execution. We then look to the third, fourth and fifth *McKenzie* factors: "the results obtained, the quality of the work, and whether the attorneys efforts substantially contributed to the result." *McKenzie I*, 750 F.2d at 101.

Within our evaluation of the attorney's overall performance we are aware of our obligation to distinguish work performed for Smith as an individual SCM from work performed for the class as a whole. To the extent the work performed by Podhurst was already compensated, in whole or in part, we cannot consider it as a part of our reasonableness evaluation of the IRPA fee sought by Podhurst.

### A. Facts and Procedural History

Steven Smith signed a CFA with Podhurst on January 25, 2012. Under the terms of the agreement, he agreed to pay 40% of any recovery, plus an additional 5% for any appellate

proceeding.  Payment was contingent on success in the litigation.  At the time that Steven Smith

signed his agreement with Podhurst he had already been diagnosed with ALS.[27]

On approximately February 3, 2012,[28] Chie Smith signed a second CFA with Podhurst.

The two agreements had the same financial terms, but the second CFA added the following:

> Some of the claims may be presented as a class action.  If any claims are certified
> as a class action and successfully resolved through a settlement or final judgment,
> the attorneys' fees and costs for those claims will be awarded by the Court or other
> tribunal.  Such Court-awarded attorneys' fees and costs shall override the terms of
> this contract concerning attorneys' fees and costs with respect to those claims, and
> the client will not be responsible for the above-referenced 40% fee or additional
> 5% fee for any recovery on those claims.  The client shall still be responsible for
> all attorney's fees and costs applicable to any gross recovery for claims which are
> not certified as class action claims.

(Doc. No. 7365-6 at 2).

Smith asserts that these agreements should be treated as the operative agreement and it

limits Podhurst's fee to its common benefit award.  Podhurst contends that this is not the case, and

that this second agreement pertains only to Chie Smith's consortium claim.

As of the signing of these agreements, Podhurst had already filed a lawsuit against the NFL

on behalf of 21 retired players.  *Jones, et al. v. NFL*, 11-cv-24594 (S.D. Fla. filed on December

22, 2011).  On January 31, 2012, the NFL's motion for consolidation of the MDL was granted.

(MDL No. 2323; Doc. No. 61).  On February 3, 2012, the *Jones* complaint was amended to add

both Steven Smith and Chie Smith (for loss of consortium), to 135 individuals as plaintiffs in that

lawsuit.  (ECF No. 11-24594 (S.D. Fla.); Doc. No. 24).  *Jones* was among eleven additional cases

---

[27]  Smith was diagnosed in July 2002.

[28]  This second CFA is not dated.  However, the document has a stamp at the top of the page that
indicates that it was faxed on February 3, 2012.  (Doc. No. 7365-6).  We assume, as the Parties
have, that it was signed on or about the February 3, 2012 date.

transferred on the MDL February 6, 2012.  (MDL No. 2323, Doc. No. 63).

In April of 2016,[29] Chie Smith signed a third retainer agreement, on behalf of Steven Smith, with NastLaw, LLC ("Nast"), relating to work that Smith agreed to perform as Subclass Representative.[30]  Under that agreement, Nast agreed to represent Steven Smith jointly with Podhurst in his role as Subclass Representative, and Nast would be paid exclusively through the common benefit fee award.

On July 19, 2016, three months after the Third Circuit had approved the Settlement Agreement, the Smiths, with Chie Smith acting on Steven Smith's behalf through a Power of Attorney, terminated the fee agreements with Podhurst.  She also stated that Steven no longer wished to serve as Subclass Representative.

After the termination, the litigation of Smith's claim under the Settlement Agreement continued.  Catherina Watters, Esq. ("Watters") agreed to assist them in registering and moving through the claim process *pro bono*.[31]  Watters is representing the Smiths in this fee dispute as well.  On March 27, 2017, Watters entered her appearance for the Smiths.

On the same date, Watters filed a notice of joinder in Turner's Motion to Resolve Attorney Fee Dispute which (*see infra* pp. 28-29) asked the District Court to preclude Podhurst from

---

[29]  The CFA was undated, but the Parties agreed that it was signed contemporaneously with Smith's affidavit regarding his potential class representative status.  That affidavit was signed on April 15, 2016.  N.T. 11/16/2018 at 77.

[30]  Smith was never formally appointed as Subclass Representative.  The paperwork was completed to ensure an individual was available to replace Kevin Turner, who had died while the matter remained pending on appeal, should a new Subclass Representative be needed.  N.T. 10/24/2018 at 182.

[31]  The time entries provided by Watters reveal that she began working on the case on August 8, 2016.  An engagement letter with local counsel, the Tucker Law Group, dated March 24, 2017 has been provided.  SCM Statement of Dispute at Exhibit 5.

collecting any fees as an IRPA, given that they were also receiving fees as Class Counsel. (Doc. Nos. 7363 and 7365). Podhurst filed a Response to the Joinder on April 10, 2017 (Doc. No. 7465). On April 20, 2017, Smith filed a Reply. (Doc. No. 7524). On May 14, 2018, following the District Court's Opinion relating to the Fee Cap, the District Court dismissed the Motion without prejudice to Smith's right to file a Petition for Deviation raising the same issues, which they have now done. (Doc. No. 9984). On June 1, 2018, Smith filed the Petition seeking a downward departure from the 22% presumptive Fee Cap to 0%, arguing that Podhurst had already been compensated for any work performed for Smith by the common benefit fee they received. (Doc. No. 10037).

On October 3, 2017, while those matters were pending in District Court, the Claims Administrator issued a Notice that the Lien that had been filed and provided Smith twenty days to consent to or dispute the Lien. On the same day, Watters advised the Claims Administrator of the Smith's intention to dispute the Lien. On October 4, 2017, the Claims Administrator issued a Notice of Monetary Award Claim Determination to Smith.

On June 11, 2018, upon conclusion of the common benefit fee litigation, the issuance of the District Court's Fee Cap Opinion, and the issuance of the Attorney Lien and Deviation Rules, the Claims Administrator issued a Schedule of Document Submissions setting the deadlines for the pleadings that needed to be submitted to resolve the Lien Dispute. On July 11, 2018, pursuant to Lien Rule 14 (Doc. No. 9760 at 9),[32] the Parties submitted their Statements of Dispute to the Claims Administrator. On August 7, 2018, pursuant to Lien Rule 15 (Doc. No. 9760 at 10), the Parties submitted their Response Memoranda. Both Parties then requested a hearing, which we granted. On July 24, 2018, with the consent of both Parties, having concluded that the arguments

---

[32] The pleadings were filed under our original Lien Rules, not the Lien Rules as later amended.

in the Petition for Deviation were already before us in the pleadings filed in the Attorney Lien Litigation, we denied the Petition for Deviation as moot.  (Doc. No. 10161).  Pursuant to Lien Rule 17, the Record of Dispute was transferred to this Court.  On October 24, 2018 and November 16, 2018, we held a bifurcated evidentiary hearing, allowing the admission of evidence and argument for both sides.

### B.  Which CFA Applies

The Smiths argue that the binding language in this case comes from the contract signed by Chie Smith on February 3, 2012, which clearly provides that Podhurst will not be entitled to a contingency fee if the case is resolved as a class action.  They argue that it was always Chie Smith's understanding that this language was contained in both agreements, and therefore, they would not now be responsible for any fee.  Podhurst disputes this assertion, arguing that the two agreements were always distinct – one between the firm and Steven Smith and a second between the firm and Chie Smith for her consortium claim – and therefore the contract signed by Chie should have no bearing at all on this Court's analysis of this Lien Claim based on the firm's contract with Steven Smith.  Further, Podhurst argues that the Smiths always understood these to be separate contracts, and that there was no confusion on the point.

As we must interpret the language of contracts to determine to resolve this dispute we are urged by the parties to look to Florida law.  Ultimately, however, we do not get to a choice of law question as we are dealing with a factual dispute, which we resolve in favor of Podhurst based upon the evidence presented at the hearing.

In the first fee contract, the "undersigned client" referenced is Steven Smith.[33]  (Doc. No.

---

[33]  Chie Smith signed this agreement on Steven Smith's behalf under her power of attorney.  (Doc. No. 7365 at 4).

7365-1 at 2). In second fee contract, the "undersigned client" referenced is Chie Smith. Podhurst has argued that this is consistent with its position that the second fee contract was an agreement to pursue a loss of consortium claim for Chie Smith.

Smith notes that the contract does not state that it is exclusively for the pursuit of a consortium claim and the language of the contract itself is not entirely clear. We acknowledge that the contract itself does not state that it is narrowly for the pursuit of a consortium claim. Rather it says that it is an agreement for representation in a lawsuit against the NFL for "injuries sustained while a player in the NFL." (Doc. No. 7365-6 at 2). Of course, it was Steven, not Chie Smith, who incurred those injuries while a player.

Podhurst has not provided an explanation for this discrepancy or the absence of specific language in the contract. Steven Marks, the Podhurst lawyer responsible for this litigation, did testify, however, that the firm did not automatically pursue consortium claims for most of their clients who were asymptomatic. However, in some instances, the claims were pursued. The first amended complaint in *Jones*, filed on behalf of symptomatic clients but before Podhurst signed a fee agreement with the Smiths, included consortium claims on behalf of some fifteen spouses. The second amended complaint added only Chie Smith to the list of spouses pursuing this claim.

Smith argues that the two contracts were sufficiently unclear that she was confused about the language and that we should consider the ambiguities in our evaluation of the contracts. We are sympathetic to this argument, but conclude that the reference to Chie Smith as the signatory and the "undersigned client" makes it sufficiently clear that the sole purpose of the contract was for the pursuit of a derivative claim for Ms. Smith only. The timing of the contract's signing and the firm's pursuit of the consortium claim on Chie Smith's behalf reinforce this conclusion. Further, the record demonstrates that Ms. Smith understood that these were distinct contracts. In

a July 16, 2016 email to Podhurst, Chie Smith wrote: "I also signed a separate document from Ricardo [Martinez-Cid].  This document is for "Spouse" vs the NFL as the derivative claimant." (Doc. No. 7365-5 at 1).  In the Joinder submitted in the District Court, the Smiths again indicated that the agreement signed on January 25, 2012, was signed for Steven Smith and the agreement with the February 3, 2012 was signed by Chie Smith "on her own behalf."  (Doc. No. 7365 at 4).

Finally, Watters argues on behalf of Smith that Ms. Smith believed that the terms in the second contract were the same as the terms in the first and therefore superseded the first.  This, Smith argues, was a fair assumption because the fee agreement signed by Steven Smith was difficult to read.  We have reviewed copies of both contacts and acknowledge that the agreement signed by Steven Smith is somewhat difficult to read, but if examined carefully it can be read. (Doc. No. 7365-1 at 2).  Further, a comparison of the agreements makes it clear that the relevant paragraph is an additional paragraph in the second contract only.  We do not believe that any difficulty in reading the first contract could provide a sufficient basis to imply conditions in the second agreement should be read into the first.

We reject this claim and conclude that the first fee agreement, signed by Steven Smith in January 2012, is the relevant fee contract for purposes of this litigation.  The agreement signed by Chie Smith in February of 2012 controls any claim that Ms. Smith may have had as a Derivative Claimant.[34]

## C.  The Impact of the CFA

Having determined that the first CFA signed by Steven Smith on January 25, 2012 is the

---

[34]  At the hearing, Podhurst stated that they were not pursuing any separate claim for fees against Ms. Smith's 1% Derivative Claimant Award.  N.T. 10/24/2018 at 8.  (*See* Doc. No. 6481-1 at 42-43(Article VII of the Settlement Agreement detailing Derivative Claimant Awards)).

proper agreement for us to consider, we review its particular terms. The Parties agree that the original contract was an agreement to pay 40% recovery of any monetary award, plus an additional 5% for any appellate proceeding. It is further agreed that Podhurst later reduced its contingency fee percentage to 25%, but that following the District Court's presumptive Fee Cap Order, the firm accepts that the fee cannot exceed 22%. Lienholder's Statement of Dispute at 14.

Subject only to their argument that the second CFA applies, Smith argues that the 22% fee requested is "unreasonable," because "time [Podhurst] spent on individual legal representation, if any, could only be *de minimus*, thus no separate individual additional fee should be awarded." SCM's Statement of Dispute at 3. We discuss the "reasonableness" of the total fee in detail below.

Podhurst argues that they "should be awarded its full contractual fee because the contingency occurred." Lienholder Statement of Dispute at 5. For the reasons set out in our discussion of CFA between Podhurst and Turner, we are unwilling to give credence to this concept. (*See infra* pp. 30-34). Whether the contract was fully completed or not, Podhurst is obliged to demonstrate that the fee they were seeking was "reasonable" under the standards articulated by the Third Circuit in *McKenzie*. We now turn to *McKenzie*.

### D. Applying *McKenzie* "reasonableness"

Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of execution. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this case, we must determine if there were other factors specific to this individual litigation that should be considered in our assessment of the reasonableness of the fee at the time of the contract's execution. We will then review (1) the result in the case, (2) the quality of the

work performed by the attorneys, and (3) the substantiality of that contribution on the overall result.

As is discussed in greater detail below, circumstances here, at the time of contracting and the time of execution, changed significantly, necessitating an adjustment to the fee beyond that contemplated within the District Court's presumptive Fee Cap. In evaluating the remaining three prongs, we are satisfied that both Podhurst and Watters provided quality work and made substantial contributions to the ultimate Award received in this case. Considering the substantiality of Podhurst's contribution as an IRPA, as reduced to account for the contributions of Class Counsel and Watters, we recommend that Podhurst receive a fee of 17%, which will be reduced by the amount of the 5% holdback that the District Court deems necessary.

### 1. **The CFA at time of contracting**

Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing. *McKenzie II*, 823 F.2d at 45 n.1. Here, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation. Podhurst signed a fee agreement with Smith very early in this litigation, when consolidation as an MDL was likely, but not certain. The legal challenges to the litigation remained substantial, but there was a strong likelihood that much of the considerable time-intensive work that counsel were facing would be streamlined by the creation of the benefits of the MDL.

#### (a) *Filing before MDL consolidation*

Podhurst signed a CFA with Smith on January 25, 2012. This was arguably at the very end of what Professor Rubenstein described as Phase 1, but effectively in the earliest stages of Phase 2. On December 22, 2011, prior to signing the CFA with Smith, Podhurst filed their initial

complaint seeking damages against the NFL on behalf of 21 retired players. Although Smith was not signed as a client at this phase, it was this lawsuit that he eventually joined. Ultimately, however, the difference between the two dates has little impact. On both dates, consolidation into the MDL was virtually certain, considering the agreement of all relevant parties as to the joinder and the volume of cases that had been filed by that point.

Podhurst urges us to conclude that the risks remained unchanged after the formation of the MDL, as the legal obstacles remained the same. As the firm argued, "we were looking at tremendous difficulty with respect to individual causation . . . for each individual player with their own history and medical history . . . plus . . . science of proving the concussions led to these [impairments]." N.T. 10/24/2018 at 38. We agree. But that is only part of the story.

As is discussed in detail above (*see infra* pp. 36-37), the formation of the MDL committees allowed a central group to perform the work for the class, and relieved IRPAs from having to complete the work independently. This certainly benefited IRPAs. Podhurst has acknowledged as much. N.T. 10/24/2018 at 17. The amount of work necessary to carry the litigation to resolution must be a factor in assessing a fee agreement. No matter the odds of success, a case that will require more hours is necessarily riskier than a case that will be resolved with few hours consumed. The consolidation of these cases into an MDL necessarily spread out the volume of necessary work. This impacts the extent of the risk for the law firm.[35]

Despite the reduction of overall workload built into an MDL, we agree with Podhurst that before the Settlement Agreement was reached, the legal risks in this litigation were substantial.

---

[35] Podhurst also provided services in its role on various Plaintiffs Committees for the MDL. But the firm has already been paid for that time and for the risk incurred in performing the work on a contingent basis. It is not properly considered as a risk attributable to their representation of Smith.

64

Consolidation, however, did not eliminate risk. Despite the opportunity to spread out the workload, there were still substantial risks for Smith. *See* (Doc. No. 9860 at 10 (describing this as a "a high-risk, long-odds litigation.")).

Furthermore, Podhurst's work in drafting and filing a lawsuit against the NFL was a necessary part of this litigation when Smith retained the law firm. To participate in the MDL, Smith needed to be a party in a lawsuit, which could be transferred into the soon-to-be-created MDL. Podhurst took on that risk when they filed the necessary pleadings.

### (b) Pre-MDL work as IRPA work

Podhurst lawyers, like other firms who were involved in the early filings in this litigation, spent months prior to the filing of their initial lawsuit researching the legal issues that would be faced in the litigation. N.T. 10/24/2012 at 42. This voluminous upfront work creates a collateral loss of opportunity, which is an appropriate and necessary consideration for lawyers when negotiating the terms of CFAs. When Podhurst entered into the CFA with Smith, the fee could reasonably be considered to compensate the firm for this upfront work, as well as future work. We consider this work as a factor in evaluating the reasonableness of the contract at its drafting, but recognize that, as discussed below, circumstances changed over time.

### (c) The clarity of Smith's Diagnosis

Smith was diagnosed with ALS in July of 2002, before this litigation began. To some degree the presence of that diagnosis reduced the complexity of the litigation for Podhurst at the time of contract signing. As a result, Podhurst's obligations regarding Smith's medical diagnosis were reduced. Podhurst was not obligated to secure additional neuropsychological or other evaluations for Smith, who was already under the care of doctors due to his prior diagnosis.

Ultimately, under the Settlement Agreement, the ALS diagnosis and the number of years

that Smith played in the NFL were the only facts necessary to obtain an Award. But at the time of contract signing, the proof required for an Award was not known. In preparation of potential individual litigation, Podhurst obtained and reviewed approximately 150 pages of medical records obtained from Smith's doctors. Podhurst Hearing Exhibits, Exhibit F. Additionally, the firm obtained a full history relating to Smith's playing career and history of concussions. Podhurst Hearing Exhibits, Exhibit E.

### (d) Conclusion

We do not challenge the reasonableness of the contract at the time of signing. The complexity of the litigation at this early stage is apparent as are the risks. The articulation of the factors known at the time of contracting demonstrate the significant change of circumstances during the term of the contract.

### 2. The CFA at time of execution – impact of changed circumstances

The fee contract between Podhurst and Smith remained in place for more than four years, between January 25, 2012 and July 19, 2016. Between contract signing and the issuance of the fee award, the individual cases filed were consolidated into an MDL, and the litigation, broadly speaking, was resolved through a Class Action Settlement Agreement that relieved plaintiffs of their obligations relating to causation and resolved other significant legal obstacles that had existed at the outset. Further, this work anticipated in the CFA was accomplished by Class Counsel (including Podhurst), rather than Podhurst, working as an IRPA. Finally, Podhurst's services were terminated before the completion of the contract, relieving the firm of the obligation of performing the tasks required to submit a claim through the administrative process set out in the Settlement

Agreement.

### (a) Payment for pre-MDL work

Podhurst lawyers, like other firms who were involved in the early filings, spent months prior to filing researching the legal issues that would be faced in the litigation.  N.T. 10/3/2018 at 28.  Since this voluminous upfront work and collateral loss of opportunity is a consideration for lawyers when CFAs are drafted, we believe it is a necessary consideration for us as we evaluate the reasonableness of the contract at its signing.  When Podhurst entered into the CFA with Smith, the fee could reasonably be considered to compensate the firm for this upfront work, as well as future work.  We consider this work as a factor in evaluating the reasonableness of the contract at its drafting, but recognize that, as discussed within, circumstances changed over time.

As with their representation of Turner, Podhurst reasonably anticipated that it would need to rely on its individually retained clients to obtain compensation for the extensive work it performed in advance of filing the complaints against the NFL.  However, over the term of the contract, two things became clear: (1) that Podhurst and other law firms would be able to seek payment from what became the AFQSF to compensate them for this pre-MDL work and (2) Podhurst's stable of individual clients grew, allowing them to benefit from economies of scale.

Podhurst included this pre-MDL work as part of the firm's request for common benefit fees, stating that the "firm began investigating the possibility of a suit against the NFL in the Summer of 2011, after receiving inquiries on behalf of several former players.  After investigating the history of the NFL's handling of the problem and researching the law applicable to potential claims and likely defenses, our firm make the commitment to devote the considerable resources of personnel, time, and funds that would be necessary to take on the goliath of the NFL on an issue of vital importance to its business."  (Doc. No. 7151-8 at 3).  This time was not included in the

firm's lodestar, as Class Counsel did not to include pre-MDL time in that calculation.[36]  However, we accept, as the District Court did when it allocated common benefit fees (*see* Doc. No. 10019), Podhurst's own assertion that this was, at least in part, common benefit work, and we recognize that Podhurst received a 2.25 multiplier for the common benefit work they performed.

This does not mean that at least some of this work did not also benefit Podhurst's individual clients.  We recognize that Smith benefited from his inclusion in this MDL prior to the establishment of the class.  This individual work, however, was not performed exclusively for Smith, or any single client, but rather for all Podhurst's clients.  Recognizing the benefit of this expertise generated by the firm's undertaking of this work, requires us to also consider economies of scale.

At one point in this litigation, Podhurst represented 569 clients.  (ECF No. 18-md-2323 (E.D.Pa.), Doc. No. 28 at 4).  Although that number has reduced as the litigation has progressed, the fact of the matter is that Podhurst has benefited greatly from the economies of scale.  Podhurst's initial complaint, filed in late December 2011, was filed on behalf of 21 plaintiffs.  (ECF No. 11-cv-24594 (S.D.Fla.), Doc. No. 1).  On February 3, 2012, the complaint was amended for a second time, adding both Steven Smith and Chie Smith, as well as others, increasing the number of plaintiffs to 135.  (ECF No. 11-cv-24594 (S.D.Fla.), Doc. No. 14).  The work researching, drafting and filing this lawsuit benefitted all of these clients and must be distributed between them.  Only a portion of the weight of this work is fairly attributable to our reasonableness analysis of the fee agreement with Smith.

---

[36] The MDL was established by the panel on January 31, 2012.

*(b) Change due to Class Counsel's work*

Through the Fee Cap, the District Court has already established that there was a significant change in circumstances largely attributable to Class Counsel's contribution. Podhurst benefited from those changes of circumstance, as other firms did. But, in addition, the common benefit work altered Podhurst's role in Smith's case even with greater significance.

We consider this as we examine whether a portion of Podhurst's work performed for the common benefit is duplicative of work that would normally have been done by the IRPA. The nature of Podhurst's role in working for the common benefit therefore results in a changed circumstance that must be considered in the evaluation of the reasonableness of the agreement at the time of its execution.

Podhurst partner Steven Marks was Co-Chair of the Communications and Ethics Committee, which "developed a communications and media plan" for the class. In that role, Marks "worked along with an outside consultant which the PEC/PSC engaged on messaging, talking points, media strategies and OpEds to reinforce the significance of this litigation and the risks involved at all levels." (Doc. No. 7151-8 at 5). In effectuating this strategy, Marks specifically noted the public work done by Chie Smith to help advance this strategy for the benefit of the Class. In the same Common Benefit Declaration, Marks identifies how the preparation of a Day in the Life video in several of the Podhurst cases provided advantage to the Class during the Fairness hearing. (Doc. No. 7151-8 at 6). Marks stated: "I also spearheaded identifying suitable players and in the preparation of the Day in the Life video that was prepared for potential use at the Final Fairness hearing. That professionally prepared video showed firsthand the devastating effects of multiple head trauma in the daily lives of these former players. My partners also assisted with some of these tasks, which formed part of the coordinated communications and media plan." (Doc.

69

No. 7151-8 at 6).

Undoubtedly, this work would have benefited Smith had this case proceeded independently from the class action.  We accept Marks' testimony that the Day in the Life video was shot in part because they were concerned that something could happen to Smith that would have rendered him unavailable and they wanted to preserve a demonstrative aid to show a day in the life of the Smith family to a jury so that they could understand the "pain and suffering" that was endured.  N.T. 10/28/2018 at 89-96, 186.  But as Marks himself explained, the video was also procured to benefit the class, and would be available for that purpose as well.  (Doc. No. 7151-8 at 6).

Smith notes that Podhurst's common benefit time included work in "vetting the background and medical records of hundreds of former players to identify suitable class representatives. This task entailed investigating their backgrounds, interviewing family and friends, and conducting detailed research into their playing histories to make sure that they were adequate and proper class representatives." (Doc. No. 7151-8 at 9).  Smith argues that this work must have included a review of Smith's records, as Smith was chosen as the alternate Subclass 2 representative after Turner's death.  Podhurst, however, disputes this point, explaining that Smith's records were not thoroughly reviewed for this purpose as his condition was considered too advanced at the time the initial selection of Subclass Representative was made.  N.T. 0/24/208 at 179-183.  We accept Podhurst's assertion that it did not perform a thorough review of Smith's medical records in this vetting process, and therefore the time as was spent should not be divided between IRPA and Class Benefit work but should rather be considered IRPA work.

### (c) *Termination of the CFA*

Podhurst's expected role was further reduced when their contract was terminated before the litigation was completed.  Podhurst urges us to conclude that all essential work was done before

70

their fee agreement was terminated.  We disagree.  For the reasons set forth below, in our discussion of the work performed by Watters, we conclude that the fact that Podhurst did not represent Smith during the claim submission process resulted in a reduction in their obligation to their client.

### *(d) Conclusion*

Collectively, these are all significant changes of circumstance that we need to consider in our evaluation of the fee requested.  These circumstances impact upon Smith's individual representation more than the circumstances anticipated by the District Court in its Fee Cap opinion. We, therefore, need to make adjustments beyond those implemented through the cap itself.

### 3.  **The results obtained**

Having determined that we are dealing with a marked difference in circumstance from the time of the creation of the contract to the time of the execution – hastened by Podhurst's termination – we look to the result obtained, the quality of the work performed and the substantiality of the efforts of Podhurst as IRPA.  We first observe that on October 4, 2017, Smith received notice that he would be Awarded $5 million, based on Smith's ALS diagnosis at the age of 37.  This represents the highest amount payable under the Settlement Agreement.

### 4.  **The quality of the work performed**

The Parties both urge us to conclude that opposing counsel did not provide quality work for Smith:  Watters argues Podhurst's IRPA work was merely *de minimus*; and Podhurst argues that "the contingency was met," as there was no work left to perform after their termination.  As is discussed in detail below, Podhurst provided a high level of service to Smith, performing many

necessary tasks in this litigation.  However, after Podhurst was terminated, significant work remained, which was competently undertaken by Watters.

In evaluating the quality of work performed, we recognize the high level of service that Podhurst provided both to the class and to Smith individually.  We suggest however that the question of "the quality of the work" does not standing alone assist our analysis.  We accept that Podhurst performed at the highest level.  The more important question here is to look at the substantiality of the work – that is to say what work did Podhurst do that had the most substantial effect on achieving the result obtained.  Watters characterizes their efforts – not as Class Counsel but as an IRPA – as *de minimus*, not that it was lower quality, but that it did not make much difference in the ultimate outcome.  We disagree.  We therefore layout the quality work performed by both attorneys, to aid in our evaluation of the final factor in the *McKenzie* analysis.

We turn to the work performed by Podhurst, which provided the necessary support to Smith early in this litigation.  Podhurst represented Smith for more than four years – from before the MDL was formed through much of the appellate process.  Podhurst has presented evidence that they: (a) performed extensive legal research in advance of the litigation; (b) filed the lawsuit against the NFL; (c) assembled and reviewed his medical records; (d) created a Day in the Life video for use in future litigation and attempted to obtain an *in extremis* deposition to preserve Smith's testimony for future litigation, (e) advised Smith on collateral litigation that might impact this case; (f) supported Smith in his understanding of the negotiations and the Settlement Agreement; (g) assisted the family in obtaining a loan while they awaited payment of the Award; and (h) resolved other personal matters.  Although some work for Smith was co-extensive of work performed by Podhurst as Class Counsel, we reject Smith's argument that all the work performed was exclusively common benefit work for which Podhurst has already been paid.  As detailed here,

these were services that benefited Smith individually.

### (a) Legal research pre-MDL

Podhurst has asserted that the pre-MDL work performed to research the legal bases necessary to file a successful lawsuit against the NFL should be compensated. We recognize the skill and quality of the legal work performed by Podhurst in this capacity. Indeed, that skill was the reason that Podhurst partner Stephen Rosenthal was a Co-Chair of the Legal and Briefing Committee. (Doc. No. 7151-8 at 4). While we accept that Smith benefited from this expertise, we recognize that the work was performed for all Podhurst's clients and for the class at large. We consider this individual work, but we must prorate the value among these other Podhurst clients.

### (b) Filing the lawsuit

Podhurst was involved in this litigation early in the process when they filed a lawsuit in the Southern District of Florida on December 22, 2011. The firm then filed an amended complaint on February 8, 2012 that included Smith. Although this case was resolved as a Class Action and these initial filings were not ultimately required for the litigation, this work was performed for Smith's benefit. Recognizing the need to divide the value among Podhurst's clients, we consider this work applied to Smith individually.

### (c) Medical Records

Podhurst obtained and reviewed Smith's medical records.[37] Although the medical records review in this case were less labor intensive than in other cases, due to the clarity of the diagnosis, Podhurst was not entirely relieved of obligations to Smith. As Marks explained, the medical

---

[37] Smith argued that Podhurst had not obtained these records based on an affidavit from his doctor. However, Podhurst has provided these documents as an exhibit, so it is clear that the firm did obtain the records.

records obtained were voluminous due to Smith's treatment history.  N.T. 10/24/2018 at 117.  We acknowledge that early in the litigation, it was unclear what details in the medical history would prove necessary for the litigation.  We expect, as was done here, that prudent counsel would diligently pursue and review of these records as a part of Podhurst's obligations to Smith in his individual capacity.

### (d) The Day in the Life Video and the in extremis deposition

Podhurst also created a Day in the Life video documenting Smith's condition.  Podhurst explained that they obtained a Day in the Life video to preserve evidence of Smith's condition to present to a jury if the opportunity later arose.  N.T. 10/24/2018 at 91.  As is discussed above, this work was also a part of the common benefit work that Podhurst presented to the District Court.  (Doc. No. 7151-8 at 6).  We recognize that these videos benefited the class.  But recognizing the realities of Smith's ALS diagnosis, prudent counsel would have wanted to preserve a demonstrative aid to show the jury a day in the life of the Smith family, so they could understand the day-to-day difficulties of his condition.  The video served a dual purpose and we credit it as such.

Similarly, Podhurst also attempted to obtain an in *extremis* deposition to ensure Smith's testimony could be preserved.  Ultimately, these efforts were unsuccessful, but we recognize it as an attempt to advance the interests of their individual client, should the matter proceed as an individual case at a future date.  Again, this is the type of quality work that we would expect from prudent counsel in this litigation.  We credit this as work performed for Smith's individual case.

### (e) Other litigation

During its representation of Smith, Podhurst was asked to review the *Dryer* litigation to assess if there was any possible collateral impact on this litigation.  *Dryer v. NFL* was a class action

74

relating to publicity rights. Smith was a potential class member who needed to assess if he wished to participate or opt out of the litigation. *See generally* Podhurst Hearing Exhibits, Exhibit D (documenting the materials reviewed). Although Podhurst did not represent Smith in that matter, the firm reviewed the litigation to ensure Smith's decisions in that matter did not jeopardize his claims in this litigation against the NFL. N.T. 10/24/2018 at 122. We characterize this, partially at least, as IRPA work.

### (f) *Advice to Smith throughout the litigation*

Podhurst advised Smith about the status of the negotiations and appeals throughout this litigation. Unlike Turner, who was extensively advised due to his status as Subclass Representative, which spanned much of the litigation, Smith was primarily advised of the status of the proceeding in the ordinary course, as were other individuals who ultimately became the Class Members in this litigation.

We recognize that Smith did agree to become a Subclass Representative, when Turner was no longer able to perform the role. Smith took on that responsibility in April of 2016, and although he was never formally appointed Subclass Representative, he was advised as such at that point in the litigation. Where an attorney – be it Podhurst or another attorney acting for the common benefit – has already been paid for the work performed supporting Smith, we may not consider a duplication of that time or work on our review of an IRPA fee for reasonableness. Ultimately, however, this support provided by Class Counsel was less extensive than we discussed with Turner. By April of 2016, the Settlement Agreement had already been signed and the appeals had been briefed and argued. Indeed, the Third Circuit's opinion affirming the District Court's approval of the Settlement was decided in April 2016, which made it almost certain that Smith would not need to step in as Subclass Representative. We, therefore, recognize that almost all of

the support Smith received in understanding the litigation was provided by Podhurst, in their role as IRPA, not Class Counsel.

### (g) Loan agreement negotiation

Podhurst also argues that they helped Smith when he was seeking a loan to advance funds for his family while he awaited the receipt of his Monetary Award. The issues with predatory lending practices are well documented through this litigation and need not be discussed here. Smith argues that all of the work negotiating the loan was performed by Co-Lead Class Counsel, and not Podhurst. We disagree. While co-lead Class Counsel may have had a role, Podhurst's representation in this matter was not pro forma. They have demonstrated that they worked intensively in negotiating a fair lending agreement for Smith. *See generally* Podhurst Hearing Exhibits, Exhibit B (documenting the work done in negotiating the loan); N.T. 10/24/2018 at 98-99.

### (h) Support in personal matters

Finally, Podhurst reports services that relate to several personal matters for Smith that were not directly related to this litigation – advice relating to copyright on a book and referral for a Trust Attorney. We conclude that there may be some challenges as to whether this is proper IRPA work, and that these efforts were not substantial as conceded by Podhurst at the hearing.

### (i) Remaining work

Recognizing the quality work performed by Podhurst, we turn to the firm's argument that all of the work that needed to be done, had been completed by the time that their contract was terminated. We disagree and conclude that Watters provided quality legal representation to Smith, which was necessary in support of his claims.

Watters provided legal assistance to Smith as he worked through the administrative process

leading to the Award. Watters provided us with a detailed accounting of the work completed after Podhurst's representation was terminated. This includes: (1) registering Smith as a member of the class, (2) submitting the claim package to demonstrate entitlement for an Award, (3) preparing Chie Smith, acting on behalf of Steven Smith, for certain interviews with news agencies, (4) assisting the Smiths in the resolution of an issue relating to a Power of Attorney; (5) ensuring that loans against the Award were properly repaid,[38] (6) ensuring that various liens were resolved, and (7) managing the distribution of the Monetary Award. These were not "mundane legal chores," but rather quality work performed that advanced Smith's individual interest. *See McKenzie II,* 823 F.2d at 47.

In defining the role of the IRPA, the District Court noted the need for IRPAs to assist their individual clients through this claim process. Although the medical diagnosis in this case was straightforward, issues relating to the liens and transfers of funds were not. These supports are clearly quality work that advanced Smith's individual interest and aided him in receiving the Award.

### (j) *Conclusion*

Recognizing that both Podhurst and Watters provided quality work that contributed to Smith obtaining his Monetary Award, we must evaluate on balance the degree to which the attorney's efforts substantially contributed to the result obtained.

### 5. <u>The substantiality of the work</u>

Three groups of attorneys contributed to the work necessary to obtain the Monetary Award

---

[38] Watters worked with Esquire Bank to resolve issues relating to the loan negotiated by Podhurst. Specifically, the original loan contained a prohibited assignment, and a renegotiation was necessary to obtain the funds and resolve the lien. N.T. 11/6/2018 at 45.

in this case – Podhurst acting for Smith individually, Class Counsel (of which Podhurst was a significant actor), and Watters. In reviewing the degree to which each substantially contributed to the result, we recognize that the District Court has already reduced the IRPA payments to account for Class Counsel's substantial contribution through the application of the Fee Cap. However, there are several factors specific to this case that compel us to conclude that Class Counsel's contribution or rather work done by Podhurst in its Class Counsel role to this result was somewhat more substantial here. Further, substantial work was performed by *pro bono* counsel, which must to be factored into our analysis of the fee to be distributed to Podhurst.

As is discussed above, we generally expect there to be seven major categories of work for IRPAs who have supported their clients in this litigation. In no way is it expected that as IRPAs work will cover each of these categories. Rather, as we consider the substantiality of the IRPA's efforts, we use them as check points, which may or may not have played a role in the SCM's effort to maximize his award. So, we use it as a checklist of factors to consider and weigh on balance, the substantiality of the contribution of the IRPA to the Award obtained.

Looking at Podhurst's work, it is clear that they provided substantial, high quality services in this litigation, and that there were substantial risks at the time that Podhurst was engaged as counsel. Of our seven factors (*see infra* p. 24), Podhurst argues that they provided as an IRPA services relating to six of them. Smith challenges this assertion in four ways. He argues: (1) Podhurst's IRPA-services relating to the medical records were insubstantial (factor 1); and (2) Podhurst's support of Turner in his understanding of the negotiations that led to the Settlement Agreement was exclusively common benefit work, not IRPA work (factor 4); (3) Watters' work submitting the claim and processing the award was substantial (factor 5); and (4) Class Counsel, not Podhurst, negotiated the loan (factor 6). We address these points in order.

### (a) Factor 1: Review of Medical Records

Watters first argues that the Smith's early and clear diagnosis simplified the important medical issues here and that we should discount Podhurst's fee accordingly. We acknowledge that the diagnosis simplified the review of Smith's medical records, as there was no requirement that Podhurst pursue other medical evidence, and ultimately the paperwork needed to submit the final claim was straightforward. But Podhurst argued that if the Settlement Agreement had not been reached and Smith's case had to go to trial, they would have needed to document Smith's condition, as his ability to testify was seriously compromised by the deterioration of his condition. As a result, the firm, acting reasonably, was obligated to take actions to preserve testimony and evidence – in the form of the Day in the Life video and the attempts to secure a deposition. Taking these circumstances as a whole, we consider only a modest reduction in Podhurst's IRPA fee on this basis.

### (b) Factor 4: support for individual clients for their understanding of the process and the available options

Watters argues that the "only conversations with Podhurst involved Steven Smith's involvement in the common benefit case." SCM's Statement of Dispute at 5. We disagree.

Smith acknowledges that he received emails throughout the negotiations and appellate process about the status of the case. *Id.* We acknowledge that many of these emails were distributed among the firm's many clients and that some discount for the apparent economies of scale is necessary. At the same time, we are also aware that Smith did with some regularity receive advice as to the status of his individual case.

We recognize that for a brief period of time, Smith was being advised by Class Counsel about the status of the proceedings, due to his role as Subclass Representative. In that time period,

Class Counsel reduced the work that would have ordinarily been performed by Podhurst. Therefore, a small reduction to account for this support by Class Counsel is necessary.

### (c) Factor 5: Shepherding the client through the claims process

We next address Podhurst's argument that Watters' work was insignificant, due to the existence of the Monetary Award Grid. First, we have discussed the quality work performed by Watters, which went beyond the mere submission of paperwork. Watters provided substantial legal support to Smith in the final stages of this claim process. Second, we are reluctant to disallow payment for services in the Claims process merely because the SCM's condition was previously known. Either way, the simplicity of this process does not result in the conclusion that Podhurst's work was insubstantial, but it was Class Counsel, and not Podhurst as IRPA, who was responsible for the grid. (Doc. No. 6481-1 at 122). We accept that the work done by Watters contributed to the successful resolution of the claim process. We take this into account.

### (d) Factor 6: Support for clients seeking a loan

Smith argues that Podhurst did not assist him in obtaining a loan, but rather the loan was secured by Class Counsel. Podhurst has argued that the firm "negotiated with lenders over the course of several months to obtain a substantial loan for the Smiths." Lienholder's Response at 7. Podhurst has provided evidence documenting these negotiations. Lienholder Response Memorandum, Exhibit A. We conclude that these materials demonstrate that Podhurst's work in negotiating the loan provided a substantial benefit to Smith.

We recognize, however, Watters' argument – unchallenged by Podhurst – that she was obligated to work with Esquire Bank to renegotiate the loan agreement, because the agreement contained language which provided that Smith was assigning his interest in the Award to the lender, which was prohibited under the Settlement Agreement. SCM's Statement of Dispute at

125. As such, the terms of the loan had to be renegotiated before it could be paid out. We therefore must recognize the work provided by both Podhurst and Watters relating to this factor.

### E. Conclusion

Overall, we conclude that Podhurst's IRPA contribution to the Award is insufficient to support its lien to the full 22%. This was primarily because of the work that was performed by Watters supporting Smith in the claim submission process. We note, however, that the contribution of Class Counsel was slightly more substantial in this individual litigation. Accordingly, we recommend that Podhurst receive 17% of the Monetary Award as its fee. The 17% fee must still be reduced by the 5% holdback currently applicable to all attorney fee Awards. Therefore, it is our recommendation that Podhurst receive 12% of the overall Award at this time. Whatever portion of the 5% holdback is ultimately released by the District Court, will be provided to Podhurst at that time. We recommend that the remaining funds be distributed to Smith promptly.

## V.    DISCUSSION OF CMDA v. JOHNSON

CMDA has filed a Lien seeking 20% of the Award issued to Johnson, plus $2,617.20 in costs. Johnson has not filed formal pleadings in response. However, he challenges the Lien and has states that he believes CMDA is not entitled to any fees for the services performed. Lienholder's Statement of Dispute, Exhibit F.

Johnson's decision not to provide us with pleadings or any other informed statement to support his position (*see* Lien Rule 15) has hampered on our resolution of this dispute. We do have submissions from CMDA as is appropriate, particularly whereas it is their burden to prove the fees requested are reasonable. We have determined that the record before us is sufficiently clear to allow us to resolve the Dispute.

As is discussed below, the costs asserted by CMDA are untimely asserted and are therefore

rejected. As to the attorneys' fees, we begin with a consideration of "the reasonableness of the contingent fee arrangement" at the time of the contact's signing. *McKenzie II,* 823 F. 2d at 45, n.1 and then determine whether the circumstances compel a different evaluation of the CFA at the time of its execution. We then look to the third, fourth and fifth *McKenzie* factors: "the results obtained, the quality of the work, and whether the attorneys efforts substantially contributed to the result." *McKenzie I*, 750 F.2d at 101.

### A. Facts and Procedural History

Johnson signed a CFA with CMDA on September 21, 2015. Johnson retained CMDA for the narrow purpose of pursuing a claim through the NFL concussion class action settlement. Under the terms of the agreement, Johnson agreed to pay CMDA 20% of the amount recovered, contingent on the recovery of an Award from the settlement.

As is clear from the language of the fee agreement, as of the time of contract signing, the final approval of the Settlement Agreement had been granted by the District Court, but the Third Circuit appeals were still pending. Unlike the CFAs in Turner and Smith, the contract here was specifically limited to be for services in pursuit of a claim under the agreement, as opposed to pursuit of a separate lawsuit against the NFL.

In pursuing an award under the Settlement Agreement, CMDA assisted Johnson with identifying and retaining the services of two doctors: Dr. Charles Seigerman, a neuropsychologist/psychologist and Dr. Steven Schechter, a neurologist. Dr. Schechter provided the Alzheimer's diagnosis that provided the basis for the Monetary Award in this case. The firm also reviewed Johnson's medical records and consulted with these doctors.

According to billing records provided by CMDA as a part of our Lien process, the firm prepared the claims package for the Claims Administrator while the appeals of the District Court's

approval of the Settlement Agreement were pending.  That claim package included the necessary medical records, a Qualifying Diagnosis Physician Certification from Dr. Schechter, and a HIPAA authorization.

On February 6, 2017, after the appeals were concluded and the Settlement Agreement became final, the six-month period to register as a class member opened.  Two days later, on February 8, 2017, Johnson notified CMDA of his decision to terminate their representation.  He requested that the firm forward his complete case file.  On February 16, 2017, CMDA did so and advised Johnson that his claim had not yet been filed with the Claims Administrator.

On April 10, 2017, Johnson, acting *pro se* filed his own claim package with the Claims Administrator.  On December 1, 2017, the Claims Administrator issued a Monetary Award Notice.  On January 2, 2018, the NFL appealed the determination to the Special Master.  Johnson did not submit any additional pleadings in relation to the appeal.  On April 2, 2018, however, the Claims Administrator issued a Post-Appeal Notice of Monetary Award, reaffirming the Award.

CMDA filed a Lien against Johnson's Award on April 5, 2017.  (Doc. No. 7450).  In the Petition for Lien, CMDA provided a copy of the fee agreement and noted the relevant terms but did not indicate what, if any, of costs that they were seeking.  On November 7, 2017, pursuant to Lien Rule 8(d), the Claims Administrator issued a Notice of Lien to Johnson and CMDA, which indicated that the Lien amount was 20% of any Monetary Award.  There was no reference to costs in the Notice of Lien, as no costs had been asserted in the original Lien filing.

Pursuant to Lien Rule 10, when Johnson failed to respond to the Notice of Lien, the Claims Administrator withheld full amount of the Lien, 20% of the Monetary Award, and issued a Notice of Duty to Resolve the Lien to the Parties and referred the matter to us.  Pursuant to Lien Rule 16 on July 2, 2018, the Claims Administrator issued a Schedule of Document Submissions to the

Parties. CMDA and Johnson were advised that each were obligated to submit a Statement of Dispute by August 1, 2018.

CMDA's Statement of Dispute was timely submitted. Johnson, however, did not meet the deadline. Because of his *pro se* status, we granted him a two-week extension of this deadline and directed the Claims Administrator to contact him to ensure he understood the nature of the process and his rights to file a Statement of Dispute, presenting the facts and circumstances of this matter as he understood them. Johnson advised the Claims Administrator that he did not wish to submit materials.

After the record was transferred to this Court, we initiated a telephone conference with the Parties to advise them of the availability of a Magistrate Judge for a Settlement Conference, if the Parties believed such a conference would be an aid. On the call, Johnson made it clear that he did not want to participate in this litigation, but he still disputes the fee asserted by CMDA.

### B. CMDA's untimely request for costs

In its Statement of Dispute, CMDA indicates that they are seeking a 20% contingency fee, as well as costs in the amount of $2,617.20 for work performed on behalf of Johnson. We deny CMDA's request for costs, as the firm failed to provide prompt notice of these costs as associated with their Lien.

To present a valid Lien for costs in this litigation, counsel are required to provide the Claims Administrator with "[t]he dollar amount of the attorney's costs if the attorney is seeking reimbursement of costs in addition to fees." Lien Rule 8(a)(5). The precise dollar amount, as well as the other requirements in Lien Rule 8(a) must be submitted to the Claims Administrator "before it begins processing the Award." Lien Rule 8(c).

This requirement of notice to the Claims Administrator serves an important purpose. Once

a SCM is issued an Award, the Claims Administrator is obligated to "withhold an appropriate amount sufficient to pay the Attorney's Lien." Lien Rule 10. Strict enforcement of these rules is necessary to ensure the Claims Administrator can promptly distribute Monetary Awards to SCMs. If the dollar amount of a Lienholder's costs has not been presented to the Claims Administrator, the amount of the costs will be released to the SCM prematurely. We would be loath to require a SCM to return a portion of their Award to pay a Lienholder's costs when that Lienholder had notice and opportunity, indeed an obligation, to inform the Court of the costs incurred prior to the payment to the SCM.

We acknowledge that the Lien Rules were not adopted by the Court until March 6, 2018, which was after the initial Lien was filed in this case. But notice of these Lien Rules was provided to the Parties, both through their filing on the ECF Docket and through information contained on the NFL Concussion Website. Our Lien Rule requiring timely assertion of costs has already been the subject of two Orders to Show Cause, which were also filed on the docket. (Doc. Nos. 10151 and 10156).

Despite this, CMDA's requested costs are stated for the first time in CMDA's Statement of Dispute filed on July 27, 2018. The assertion is made without any reference to the timeliness of their submission and without any explanation provided for the delay. Given the CMDA's failure to provide timely notice of costs and failure to explain the significant omission, we conclude that the asserted costs must be disallowed.

## C. Applying *McKenzie* "reasonableness"

Having established that there is a valid CFA in place and that we are obligated to review the fee under the *McKenzie* factors, we turn to this analysis. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and

comparing it to the circumstances at the time of execution. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred generally over the course of this litigation, we must determine if there were other factors specific to this individual litigation that should be considered in our assessment of the reasonableness of the fee at the time of the contract's execution. We will then review (1) the result in the case, (2) the quality of the work performed by the attorneys, and (3) the substantiality of that contribution on the overall result.

As is discussed in greater detail below, considering the substantiality of CMDA's contribution, we recommend that CMDA receive a fee of 7½ %, which will be reduced by the amount of the 5% holdback that the District Court deems necessary.

### 1. The CFA at time of contracting

Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of contracting. *McKenzie II*, 823 F.2d at 45 n.1. Here, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.

CMDA and Johnson entered into the fee agreement on September 21, 2015, five months after the District Court approved the Settlement Agreement. This was what Professor Rubenstein characterized as "Phase 3" of the litigation. It was clear at this stage that IRPAs would be primarily responsible for "processing clients' claims through the claims facility." (Doc. No. 9526 at 26). CMDA bore the risk that Johnson's claim might not have yielded a Monetary Award. But the fee agreement is not an engagement to file a lawsuit against the NFL, but rather exclusively to submit a claim through the already established NFL Class Action Settlement.

As to the legal challenges like causation and preemption, CMDA did not carry any of that

risk. Those issues had already been resolved through the Settlement Agreement. Although the District Court's approval of the Settlement was still being reviewed on appeal, CMDA did not undertake any obligation of the litigation of matters beyond pursuit of a claim through the Settlement.

There did, however, remain some risk in this litigation. Johnson was not diagnosed with Alzheimer's when he engaged CMDA. CMDA undertook the responsibility to get Johnson to appropriate medical professionals and to shepherd Johnson through the process of diagnosis, as well as claim submission. This process required evaluation by two different doctors and the obtaining of sufficient documentation to support a claim to be submitted under the Settlement Agreement. We accept that this work was performed with an eye toward the submission of the paperwork necessary to submit a claim and litigate any necessary appeals. But the firm's services were terminated before the second part of the work was needed.

### 2. **The CFA at time of execution – impact of changed circumstances**

The fee contract between CMDA and Johnson remained in place for only 18 months, between September 21, 2015 and February 8, 2017. At the time of initial contract signing, there was still a chance that the District Court's approval of the Settlement Agreement would be rejected on appeal. The risks related to that possibility dropped on April 18, 2016, when the Third Circuit affirmed the District Court's decision.[39]

CMDA's expected role was reduced when their contract was terminated before the claim

---

[39] As we explained above, CMDA's risk relating to this was contained somewhat by the fact that they had not taken on the obligation of pursuing a lawsuit, but rather were only obligated to pursue a claim under the agreement. If there was no agreement, they would have lost the opportunity to pursue an Award, but they were not also obligated under the fee agreement to spend significantly increased time in pursuing a claim through other means.

submission process began. The fact that Johnson performed these tasks on his own reduced the work that was required of CMDA as had been contemplated by the original CFA.

### 3. The results obtained

Having determined that there was a difference in circumstance between the time of the creation of the contract to the time of its execution – hastened by CMDA's termination – we look to the result obtained, the quality of the work performed and the substantiality of the efforts of CMDA as IRPA. We first observe that on April 2, 2018, Johnson was Awarded a Monetary Award Grid Amount of $752,000, based on Johnson's Alzheimer's diagnosis at the age of 65.

### 4. The quality of the work performed

In evaluating the quality of work performed, we recognize the nature of the work performed by CMDA in pursuit of Johnson's award. The District Court has concluded that the process of "shepherding . . . clients through the claims process" is a factor in our reasonableness evaluation.

CMDA guided Johnson through a portion of the claims process, in helping him to identify the appropriate doctors to see that the proper paperwork was completed to ensure the documentation of the diagnosis. However, CMDA, itself noted the limited scope of the work when they expressed to Johnson to limited scope of the law firm's case file, which consisted only of emails and letters between attorney and client and the reports from Doctors Schechter and Seigeman. Ultimately, we recognize that this was important work performed to advance Johnson's claim. Johnson did not have a pre-existing diagnosis when he retained CMDA. Rather the firm guided Johnson through the significant process of obtaining the necessary diagnosis.

That was the full scope of the work performed by CMDA. Because the attorney-client relationship was terminated, CMDA was not obligated to create the claims package for submission to the Claims Administrator and it was not obligated to support Johnson in his defense against the

NFL on the administrative appeal that was submitted. These were also important steps in the process that were handled by Johnson acting *pro se*.

### 5. The substantiality of the work

Three groups contributed to the work necessary to obtain the Monetary Award in this case – Class Counsel, CMDA and Johnson, himself. In reviewing the degree to which each substantially contributed to the result, we recognize that the District Court has already reduced the IRPA payments to account for Class Counsel's substantial contribution through the application of the Fee Cap. Indeed, CMDA's own decision to provide the firm's services for a 20% contingency fee, is reflective of their understanding of the reduction of the risk for them. However, CMDA's services were terminated while there was still work to be done to ensure the claim was fully processed, and there are factors specific to this case that compel us to conclude that Class Counsel's contribution to this result was more substantial here than in other cases.

As is discussed above, we generally expect there to be as many as seven major categories of work for IRPAs who have supported their clients in this litigation (*see infra* p. 24). In no way is it expected that as IRPAs work will cover each of these categories. Rather as we consider substantiality of the IRPA efforts we use them as check points which may or may not have played a role in the success, or not, in the SCM's effort to maximize his award. So, we use it as a checklist of factors to consider and weigh on balance, the substantiality of the contribution of the IRPA to the Award obtained.

Because CMDA was not engaged until after the settlement was already approved, many of the obligations that are generally placed on IRPAs are not present here. CMDA undertook minimal risk due to the scope of the representation. In reviewing our seven factors, CMDA has provided

89

evidence exclusively related to (1) review of medical records and support in obtaining Johnson's diagnosis (factor 1) and (2) shepherding Johnson through the claims process (factor 6).

### (a) CMDA did not provide any services in support of factors 2, 3, 6 or 7

The CFA between Johnson and CMDA was for a narrow set of circumstances – pursuing a claim through the NFL concussion class action settlement.  As is noted above, this type of contract carried limited risk.  CMDA undertook no obligation as related to evidentiary support for any potential lawsuit (factor 2).  In reviewing the billing entries provided by CMDA, we can discern no indication that the firm was obligated the review any collateral litigation on Johnson's behalf to ensure his claims would not be negatively impacted (factor 3).  Indeed, the Settlement Agreement was carefully constructed to avoid those types of pitfalls.  Since CMDA did not represent Johnson before the approval of the agreement, these were not likely concerns for the firm.  Similarly, CMDA has not argued that they had to provide Johnson with any support on personal matters, including loan agreements (factors 6 and 7).

The nature and scope of these types of services are well represented in the discussions of Turner and Smith in this case.  It is significant that CMDA was not required to take on any of these obligations.  We do, however, give CDMA credit for assistance in Factor 1 and 4, and nominally in Factor 5.

### (b) Factor 1:  Review of medical records and support in obtaining medical evaluations

CMDA has not presented any evidence that they searched through pre-existing medical records.  Instead, the firm was, however, fully engaged with the process of obtaining a prompt and complete evaluation that would provide a sufficient basis to support a claim when the claims submission process opened.  This was an important service, but on the record before us, it was the primary work performed by the law firm.

90

### (c) **Factor 4: Advising Johnson as to the terms of the Settlement Agreement**

CMDA needed to be familiar with the Settlement Agreement in order to shepherd their clients through the claims process. However, due to the timing of the contract, they had no obligation to advise Johnson over the course of years relating to the evolution of negotiations. Further, CMDA did not need to advise Johnson about his opt-out rights. The deadline to opt-out of the Settlement Agreement was October 14, 2014, almost a year before Johnson retained the firm. Although CMDA did need to advise Johnson of the terms of Settlement Agreement in regard to the process of claims processing, their obligation on this point was quite minimal. When the claims process opened, the final steps were performed by Johnson, acting *pro se*. Johnson completed and submitted the claims package and handled the matter on his own behalf from that point forward.

### (d) **Factor 5: Shepherding the client through the claims process**

When CMDA and Johnson signed the CFA, the parties understood that the firm would take on the obligation of shepherding Johnson through the claims process. However, Johnson, not CMDA, completed and submitted the paperwork necessary to establish his claim.

While we recognize the assistance provided by CMDA in shepherding Johnson through the process of obtaining the relevant diagnosis, we consider the claims submission process as a separate matter. This work was not performed by CMDA.

### D. **Conclusion**

Overall, we conclude that CMDA's contribution to the Award obtained was less substantial than that which was expected by the District Court when it established the Fee Cap. We acknowledge the important role provided by CMDA when they supported Johnson in obtaining the necessary medical diagnoses here. However, we also acknowledge the substantial role of Class

91

Counsel in establishing and defending the Settlement Agreement that provided the framework for CMDA's litigation here. And we must acknowledge that Johnson completed the claims process himself.

We recommend that CMDA receive 7½ % of the Monetary Award as its fee. The 7½ % fee must still be reduced by the 5% holdback currently applicable to all attorney fee Awards. Therefore, it is our recommendation that CMDA receive 2½ % of the overall Award at this time. Whatever portion of the 5% holdback is ultimately released by the District Court, will be provided to CMDA at that time. We recommend that the remaining funds be disbursed to Johnson promptly.

## VI.    CONCLUSION

Upon review of the foregoing, we conclude that an attorney asserting a Lien seeking attorneys' fees from a Monetary Award must be able to demonstrate not only a valid CFA, but also that the fees sought are reasonable under the paradigm set forth in *McKenzie*.  This requires an evaluation of the CFA's reasonableness both at the time when the contract is signed and upon its execution.  Our ultimate resolution of a Liens has been, and will continue to be, an exercise of informed discretion in consideration of "the results obtained, the quality of the work, and whether the attorney's efforts substantially contributed to the result," *McKenzie I,* 758 F.2d at 101, with a focus on the substantially of the contribution to the Award obtained.

BY THE COURT:

/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1/7/2019

RE:    IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
        CA No. 12-MD-2323

# NOTICE

Enclosed herewith please find a copy of the Report and Recommendation filed by United States Magistrate Judge Strawbridge, on this date in the above captioned matter.  You are hereby notified that within fourteen (14) days from the date of service of this Notice of the filing of the Report and Recommendation of the United States Magistrate Judge, any party may file (in duplicate) with the clerk and serve upon all other parties written objections thereto (See Local Civil Rule 72.1 IV (b)).  **Failure of a party to file timely objections to the Report & Recommendation shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court Judge**.

In accordance with 28 U.S.C. §636(b)(1)(B), the judge to whom the case is assigned will make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  The judge may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge, receive further evidence or recommit the matter to the magistrate judge with instructions.

Where the magistrate judge has been appointed as special master under F.R.Civ.P 53, the procedure under that rule shall be followed.

**KATE BARKMAN**
Clerk of Court


By:s/Kristen Pepin_____
    Kristen Pepin, Deputy Clerk

cc:    Counsel of Record



Courtroom Deputy to Judge Brody

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                            Plaintiffs,<br><br>      v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>                            Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Podhurst Orseck, P.A. v. Turner<br>Attorneys' Lien Dispute<br>(Doc. No. 7071)<br><br>Podhurst Orseck, P.A. v. Smith<br>Attorneys' Lien Dispute<br>(Doc. No. 7064)<br><br>Cummings, McClorey,<br>    Davis & Acho, PLC v. Johnson<br>Attorneys' Lien Dispute<br>(Doc. No. 7449) | |

## <u>ORDER</u>

**AND NOW**, this      day of           , 2019, upon careful and independent consideration of the Report and Recommendation of United States Magistrate Judge David R. Strawbridge, it is **ORDERED** that the Report and Recommendation is **APPROVED** and **ADOPTED**. Accordingly:

1.      **As to the Lien filed by Podhurst against Turner (Doc. No. 7071):**

(a) Podhurst shall receive 15½ % of the Monetary Award as its fee, subject to this Court's ruling on the 5% Holdback Request;

(b) The remaining funds shall be distributed to Turner.

2.      **As to the Lien filed by Podhurst against Smith (Doc. No. 7064):**

(a) Podhurst shall receive 17 % of the Monetary Award as its fee, subject to this Court's ruling on the 5% Holdback Request;

(b) The remaining funds shall be distributed to Smith.

3.      **As to the Lien filed by CMDA against Johnson (Doc. No. 7449):**

(a) CMDA shall receive 7½ % of the Monetary Award as its fee, subject to this Court's ruling on the 5% Holdback Request;

(b) The remaining funds shall be distributed to Johnson.

The Claims Administrator is **ORDERED** to disburse the withheld funds in accordance with this decision, the provisions of the Settlement Agreement, and all Court Orders regarding implementation.

BY THE COURT:

_____

ANITA B. BRODY, J.

2