IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br>Plaintiffs,<br>v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>McCorvey Law, LLC v. Dexter Carter<br>Attorney Lien Dispute<br>(Doc. No. 7213) | |

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    April 16, 2019

**I.     INTRODUCTION**

Presently before the Court in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by McCorvey Law, LLC ("McCorvey")[1], where the firm seeks attorney's fees and costs from the Award granted to Settlement Class Member ("SCM")

---

[1] When we say McCorvey, we are referring to both Derriel McCorvey individually and McCorvey Law, LLC.

1

Dexter Carter ("Carter") in the litigation that became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).

McCorvey seeks payment of attorney's fees of 22% of the Award issued to Carter, his former client. SCM Statement of Dispute at 1 n.1. As we describe below, on April 5, 2018 the District Court determined that presumptively no Individually Retained Plaintiff's Attorneys ("IRPAs") should receive more than 22% of a Monetary Award in fees. ("Fee Cap"). (Doc. No. 9863). *See* Doc. No. 10368 at 10-11 (discussing the District Court's decision relating to the presumptive Fee Cap). Carter, now represented by The Lorentz Law Firm, P.A. ("Lorentz")[2], challenges the Lien. Carter contends that McCorvey is not entitled to any portion of Carter's award, instead asserting that McCorvey "should receive Quantum Meruit for [his] early efforts…" SCM Statement of Dispute at 1.

As we set out in our Report and Recommendation of January 7, 2019,[3] our evaluation of these positions involves a consideration of the contingency fee agreement ("CFA") between Carter and his former counsel and an assessment of the reasonableness of the requested fee in light of the five factors enumerated by the Third Circuit in *McKenzie*. See Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")). The *McKenzie* formulation requires us to scrutinize the reasonableness of the CFA at the time of the contract's

---

[2] When we say Lorentz, we are referring to both John Lorentz individually and the Lorentz Law Firm, P.A.

[3] The District Court referred to us all "all petitions for individual attorneys' liens." (Doc. No. 7446). On January 7, 2019, we issued a Report and Recommendation pertaining to three separate cases. (Doc. No. 10368). These were the first where we set out the legal principles that would guide our analysis in these cases.

signing and then determine if the circumstances compel a different evaluation of the CFA at the time of its enforcement. We must then examine the results obtained, the "quality" of the representation provided by McCorvey, and whether the McCorvey efforts substantially contributed to the results. *See McKenzie I*, 750 F.2d at 45 n.1.

## II.    FACTS AND PROCEDURAL HISTORY

McCorvey entered into a CFA with Carter on June 25, 2012. SCM Statement of dispute, Exhibit B. Under the terms of the agreement, Carter agreed "to pay The Law Office of Darriel C. McCorvey, LLC 33 1/3% of any sum recovered" as the legal fee. *Id.*, Ex. B, ¶ 3. Carter would not however, owe a legal fee or reimbursement of costs if the firm made no recovery on his behalf. *Id.* at ¶ 2. The agreement, however, did not address the question of the fees and costs in the event of termination before resolution. *Id.*

McCorvey included Carter in a multi-player class action complaint, *Simpson, et al. v. National Football League, et al.*, filed on July 12, 2012 in the Eastern District of Louisiana. That suit was transferred to this district on August 8, 2012. *See* E.D. Pa. No. 12-cv-4379. McCorvey also filed a Short Form Complaint against the NFL on behalf of Carter on August 8, 2012. E.D. Pa. No. 12-cv-4379, Doc. No.5; E.D. Pa. No. 12-md-2323, Doc No. 3040.

Around mid-January 2016, and without notifying McCorvey, Carter retained attorney Timothy Howard of Howard & Associates Attorney at Law, P.A. ("Howard")[4] to handle this claim. Hr'g Tr. at 12-13; SCM Statement of Dispute at 1. Carter entered into a CFA with Howard on January 19, 2016. SCM Statement of Dispute, Exhibit A. Under the terms of the contingency, Carter agreed "to pay the Attorney 20% of all gross monies recovered on the Client's behalf in

---

[4] When we say Howard, we are referring to both Howard individually and Howard & Associates Attorney at Law, P.A.

3

relation to the IN RE NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION Final Settlement Agreement." SCM Statement of Dispute Ex. A at 2. McCorvey was never informed by Carter that he had retained other counsel and only learned of Howard's representation from the Claims Administrator ("CA") when attempting to register Carter in the Settlement Program on or around February 15, 2017. McCorvey Response at 1. Shortly after learning of Carter's new representation, McCorvey withdrew his appearance and on February 27, 2017 filed a Notice of Lien in this Court with his petition to establish an attorney's lien. Doc. No. 7213-1.

On August 7, 2017, while still represented by Howard, who had registered him in the claims portal, Carter contacted Lorentz seeking his representation. According to Lorentz, Carter sought out the firm because of his current representation of him in various other matters including his NFL Bert Bell/ Pete Rozelle disability claim and a claim for Social Security disability benefits. SCM Statement of Dispute at 1. Carter retained Lorentz as to his NFL concussion claim on August 23, 2017 and entered into a CFA for the third time.[5] Under the terms of that agreement, Lorentz was to be compensated with "[f]ifteen percent (15%) from any settlement grid award." Lorentz Concussion Settlement Retainer Agreement. In early February 2018, Lorentz filed Carter's claim form with the CA. SCM Statement of Dispute, Exhibit D at 6. One month later, Carter received

---

[5] At some point, Howard learned that he was no longer Carter's counsel in the concussion litigation. He did not, however, file a Notice of Lien and thereby failed to comply with the Amended Rules for seeking attorney fees and costs. Instead, he sent a letter to Lorentz on August 24, 2018 with the subject line "Re: Dexter Carter NFL Concussion Claim Representation – Costs Lien Recovery; details on Amounts." SCM Statement of Dispute, Ex. A. To date, no further action has been taken by Howard to file a Notice of Lien in accordance with the Amended Rules.

4

notice of a monetary award claim determination in the amount of $810,000. *See* Notice of Monetary Award Claim Determination.

On February 13, 2018, the CA issued a Notice of Lien to Carter and McCorvey, which noted McCorvey's lien claim of 33 1/3% of any Monetary Award. *See* Notice of Lien. Lorentz, on Carter's behalf, responded and advised the CA that he intended to dispute the Lien consistent with Lien Rules 8(d) and submitted a response to McCorvey which satisfied Lien Rule 10. Lorentz also filed on the MDL docket on May 17, 2018 a Statement of Attorney Fees and Expenses.

In light of McCorvey's notice of lien, Lorentz's statement, and the contingency fee agreements of both McCorvey and Lorentz, the CA withheld funds for payment of attorney's fees in an amount equal to 22% of Carter's Award, which reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2016 Opinion and Order. Doc. Nos. 9862, 9863. Of that withholding, a portion reflecting 5% of Carter's Award was subsequently deposited into the Attorney's Fees Qualified Settlement Fund ("AFQSF") pursuant to the Court's June 27, 2018 Order Regarding Withholding for Common Benefit Fund. Doc. No. 10104. Those funds may be distributed at a later date upon further order(s) of Judge Brody. This leaves the Court to determine the appropriate distribution for attorney's fees currently available for disbursement (representing 17% of Carter's Award) and the distribution of those funds that are currently held in the AFQSF (representing 5% of Carter's Award), if those funds, or a portion thereof, are refunded by the Court at a future date.

Pursuant to a briefing schedule issued by the Court and in accordance with the Lien Rules, both McCorvey and Lorentz submitted Statements of Dispute concerning McCorvey's lien on December 13, 2018 and December 17, 2018 respectively. ("Lienholder Statement of Dispute" and "SCM Statement of Dispute"). On January 10, 2019, McCorvey and Lorentz both submitted

responses to each other's Statements of Dispute. ("Lienholder Response" and "SCM Response"). Pursuant to Lien Rule 17, the Record of Dispute was then transferred to the Court. The parties consented on January 10, 2019 to having this Magistrate Judge exercise final judgement authority over this matter. (Doc. No. 10377 (docketed Jan. 14, 2019).) The Court held a hearing on February 28, 2019 at which an attorney from each firm was heard, as well as Lorentz's attorney, Mr. Ron Cohen. (Doc. No. 10508 (N.T. 2/28/19).)

## III. THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.*, 602 F.2d 1105, 1111-112 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in this class action settlement did not relieve attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees – whether those fee requests are submitted through a Lien or otherwise –are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*. *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I*, 758 F.2d at 101.[6]

---

[6] The fee that each firm seeks, when considered in isolation, is within the presumptive fee cap. If both McCorvey and Lorentz were awarded the full fee each seeks, however, then 37% of Carter's award would go to pay IRPA fees. We see no basis to make such an upward deviation from the presumptive 22% IRPA fee cap.

6

## IV. DISCUSSION

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie* II, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the contract's enforcement. We will then review the result in the case and then the quality of the work performed by McCorvey. We suggest, however, that the question of "the quality of the work" does not, by itself, assist our analysis. The more important question here is to look at the substantiality of the work – that is to say, what work McCorvey did that had a substantial effect on achieving the results obtained. Lorentz characterizes McCorvey's efforts – not as counsel working for the common benefit, but as an IRPA – as *de minimus*, claiming that he did not have a substantial effect on the ultimate outcome, regardless of its quality. Lastly, we will review the substantiality of that contribution to the overall result.

As we outline below, circumstances here changed significantly from the time of contracting to the time McCorvey sought to enforce his contract, leaving us to consider whether, under the facts presented here, we should approve his 22% fee sought or whether a downward adjustment of his fees – as Lorentz argues – would be appropriate. Based upon our evaluation of the remaining three prongs of the *McKenzie* test, we are satisfied that McCorvey provided quality representation and made contributions to the ultimate Award received in this case. Considering Lorentz's

contributions and the substantiality of his work relative to McCorvey's, however, we will approve Lorentz's requested fee of 15% of Carter's Award and approve a fee to McCorvey of 7% of Carter's Award.[7] These fees will be payable as we set forth in the Conclusion section of this Memorandum Opinion.[8]

### A. The CFA at the time of contracting

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.

McCorvey entered into the fee agreement with Carter on June 25, 2012, after the collective individual cases filed against the NFL had been consolidated into this MDL. This is what Professor Rubenstein[9] characterized as "Phase 2" of the litigation. Once the individual cases were consolidated into an MDL, the risk related to the volume of work to be undertaken by a law firm representing a retired player changed dramatically. Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced:

---

[7] In awarding Lorentz a 15% fee, we are approving the fee it sought. Our discussion going forward therefore focuses upon the appropriate fee for McCorvey, who was terminated but has still sought a fee of 22% of Carter's Award.

[8] As alluded to above, these IRPA fees are subject to the holdback for the Attorneys Fees' Common Benefit Fund. Pursuant to the Court's June 27, 2018 Order Regarding Withholdings for Common Benefit Fund (ECF No. 10104), the CA has deposited 5% of Carter's award into the AFQSF. These funds may be distributed at a later date to the IRPA attorney upon further order(s) of Judge Brody as we set forth below.

[9] The District court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court. After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2).

pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly." (Doc. No. 9526 at 26). The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case. See Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from IRPAs to Plaintiffs' Committees, which would be compensated through a common benefit fund).[10] The risks to the legal challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial. This case remained a "high-risk, long-odds litigation." (Doc. No. 9860 at 10).

As of the June 25, 2012 date of contracting, McCorvey was already attracting retired NFL player clients, and the number eventually grew to 120 retired players. (Hr'g Tr. at 11). McCorvey knew that he would have the benefit of economies of scale and would be able to use the knowledge gained through his representation of many class members, and the anticipated role of providing service for the common benefit to what became the class,[11] to provide a more efficiently produced work-product for the firm's Individual clients. We also recognize that Carter benefited from the high-volume practice of McCorvey in that the firm's extensive work in this litigation ensured that it would be knowledgeable about developments as the MDL progressed. The class as a whole and

---

[10] We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation. See Doc. No. 10368 at 13-18.

[11] Attorneys working for common benefit of all plaintiffs in the MDL could not formally be considered Class Counsel until the Settlement Agreement, which established a class action for purposes of Settlement, was approved. In prior opinions, we used the phrase "Class Counsel" to refer to any firm that was paid by the District court for work performed for the common benefit of the collective group of plaintiffs in the MDL that ultimately became a class action. McCorvey was one such firm. Going forward, however, we will reserve the term "Class Counsel" for the six attorneys designated by the Court for the particular role of representation the entire class.

9

the individual clients both benefited from the firm's high profile and expertise. We must note as it pertained to the common benefit work however that McCorvey has been awarded $198,780 in fees for the 331.30 hours of common benefit work. (Doc. 10019 at 16).

**B. The CFA at the time of enforcement – impact of changed circumstances**

McCorvey and Carter remained in a contractual relationship effectively between June 25, 2012 and February 15, 2017. On January 19, 2016, Carter retained Howard without notifying McCorvey of his termination. Hr'g Tr. at 25. It was not until McCorvey attempted to register Carter in February 2017 that Howard's representation of Carter became known through the CA. For this reason, we determine the timeframe during which McCorvey represented Carter and we rely on what McCorvey knew with respect to the status of his representation of Carter at that time. We conclude that the CA's communication with McCorvey on February 15, 2017 was the first time McCorvey knew or reasonably could have known Carter had terminated him. During this time, substantial progress, albeit by Class Counsel, had been made in moving the cases forward. The NFL's motions to dismiss and sever were argued in April 2013. The significant issues of preemption, causation, and limitation periods were fully in play. In July 2013, without yet ruling on these motions, Judge Brody ordered the parties to mediation, and by the end of August 2013 a term sheet had been signed. This led to Class Counsel's motion for preliminary approval filed on January 6, 2014. Judge Brody denied the motion and sent the matter back for further discussion, making clear that she was not happy about the inclusion of an overall cap. In June 2014, an amended agreement that eliminated the cap was presented for preliminary approval. It was so approved on July 7, 2014. In November 2014, the fairness hearing was held. This led to additional changes in the settlement agreement, which was finally presented to the Court on February 13, 2015. It was approved on April 22, 2015. On April 18, 2016, the Court of Appeals for the Third Circuit affirmed the District Court's approval of the settlement agreement.

When McCorvey learned of his termination in February 15, 2017, it was certainly clear that the major risks confronting counsel in June 2012 had been eliminated and his representation going forward would have been to register his clients, complete claim packages, cure deficient claim submissions, and see the client through potential Award appeals. The efforts that brought the parties to this point in February 2017 was ultimately accomplished through the efforts of Class Counsel and those other lawyers who served on various MDL committees and performed work for the common benefit and less so any IRPA acting only in his or her capacity as an IRPA.

C. **The results obtained**

Having determined that we are dealing with marked differences in circumstances from the time of the creation of the contract to the time of enforcement, we next look to the results obtained, the quality of the work performed and the substantiality of McCorvey's efforts.[12] We observe that on March 12, 2018, Carter qualified for a Monetary Award grid amount of $810,000, based on his Level 1.5 Neurocognitive Impairment diagnosis at the age of 49. (Carter, Notice of Monetary Award Claim Determination).

D. **The "quality" of the work performed**

Lorentz contends that the individual work performed by McCorvey during his representation was minimal, concluding "[a]t best, the only concession the SCM can make based on the evidence is that a standardized Short Form Complaint was filed." SCM Response at 2.

---

[12] In doing so, we recognize that we must also consider the work done by Lorentz and the extent that effort meets the substantiality test. As stated earlier, this court does not credit Howard for any work allegedly performed on Carter's behalf because he failed to file a timely Notice of Lien in accordance with the Amended Rules. Further, we question the value of that work. Lorentz claims that when he received Carter's file from Howard, the medical testing and accompanying reports obtained through Howard's representation "were not reliable for the submission of claims," resulting in Lorentz getting Carter "retest[ed] under the protocol physicians under the MAF program." Hr'g Tr. at 36.

Lorentz further contends that "all substantial legal work occurred after… [McCorvey's] termination" and that "substantially all of the IRPA work [that] still need[ed] to be done" was completed by Lorentz alone. SCM Response at 1.

As discussed in detail below, we disagree and conclude that McCorvey, as an IRPA, undertook necessary tasks in this litigation. We accept that both McCorvey and Lorentz maintained a quality relationship with Carter and provided competent advice and necessary individual support in navigating the issues presented during that phase of the litigation and claims process that the firms were involved in while representing Carter individually. We suggest, however, that the question of "the quality of the work" does not, by itself, assist our analysis. The more important question here is to look at the substantiality of the work – that is to say, what work did McCorvey do that had a substantial effect on achieving the results obtained. Lorentz characterizes McCorvey's efforts – not as counsel working for the common benefit, but as an IRPA – as *de minimus*, claiming that he did not have a substantial effect on the ultimate outcome. We move to a consideration of that question, as required by the *McKenzie* analysis.

### E. The substantiality of the work performed

We turn first to the work performed by McCorvey, which provided the necessary support to Carter early in this litigation. That firm has presented evidence that it: (a) filed both a full and short from complaint against the NFL; and (b) supported and updated Carter in his understanding of the negotiations and the Settlement Agreement.

#### (a) Filing the lawsuit

McCorvey filed a complaint on July 12, 2012 in the Eastern District of Louisiana that included Carter and a short form complaint on August 8, 2012 that brought Carter into the MDL in the Eastern District of Pennsylvania. This work was clearly undertaken for Carter's benefit and to protect his rights, and it clearly qualifies as IRPA work.

**(b) Advice and communication to Carter throughout the litigation**

We next address McCorvey's argument that his interactions with Carter relating to his particular claim were extensive and should be considered as support for the IRPA claim. As is discussed above, due to McCorvey's interaction with Carter in the context of mass communications with his large client list, we conclude that McCorvey's IRPA obligations relating to advising and communicating with Carter must be reduced. It is not for Carter or any other individually retained client of McCorvey to bear more than his share of the compensation McCorvey seeks here. Yet, how to allocate this effort is challenging, as it does not allow for precise mathematical calculation. Rather, we look at this effort as it supports Carter and others and reflects our judgment with the reductions imposed on the extent of McCorvey's lien. We will, however, accept and fully credit McCorvey for the time he spent in individual communications with Carter.[13] We also accept that the counseling provided by McCorvey to Carter concerning his decision to remain in the class or to opt-out reflects important work. McCorvey testified that he "remember[s] a telephonic conversation of selling the deal (the Settlement Agreement) to him (Carter) when asked should he opt out." Hr'g Tr. at 25. Had McCorvey not advised Carter of the consequences of opting out, Carter may very well not have been in the position to claim the benefits he ultimately received from this settlement.

**(c) Remaining work**

McCorvey argues that his multiyear representation and counseling of Carter, the filing of complaints, and generally the severe risk at the time of the CFA signing justifies the 22% fee that

---

[13] Derriel McCorvey testified that in addition to mass email communications and client wide telephone conferences, he also communicated with Carter directly "through email communication, as well as phone conversations that Mr. Carter and myself had…" Hr'g Tr. at 24-25.

he seeks. LH Response; Hr'g Tr. at 11, 25. This argument ignores, however, the important work that remained before Carter could qualify for a monetary award with a Level 1.5 diagnosis.

On January 19, 2017 and without providing notice, Carter signed a CFA with Howard.[14] It is undisputed that Howard was responsible for registering Carter in the Settlement Program and had Carter undergo certain Neuropsychological testing and evaluation. SCM Statement of Dispute, Exhibit A.[15] After ten months, on August 23, 2017 Carter retained Lorentz to provide legal assistance as Carter worked through the administrative process leading to the Monetary Award. Lorentz has asserted that the testing done through Howard was not sufficient to establish an award. Lorentz provided us with a detailed accounting of his work completed after Howard's representation was terminated. This includes: (1) scheduling testing under the MAP program; (2) finalizing and submitting the claim package; (3) reviewing Carter's notice of monetary award and advising him about associated fees, liens, and inflation adjustments; (4) working with BrownGreer regarding Carter's pre-settlement loans; (5) litigating Carter's son's derivative claim which was ultimately "denied in its entirety" and (6) handling Carter's Social Security disability claim, for which he also received a favorable outcome. Hr'g Tr. at 36-39. These were not "mundane legal chores," but rather substantial work performed that advanced Carter's individual interest. *See McKenzie II*, 823 F.2d at 47.

F.   **Factors considered**

---

[14] Again, while we give no financial weight to the work performed by Howard in this matter, its representation and the tasks performed provide chronological context.

[15] In its August 24, 2018 letter to Lorentz, Howard lists its costs associated with its representation of Carter. Howard includes entries for: (1) Neurological Report by Dr. Kobera; (2) Neuropsychological Testing and Report by Dr. Ford-Johnson; (3) Neuropsychological Testing and Report by Dr. Hopper; (4) a CDR Review and Report from Nurse Barker; and (5) an MRI. The costs alleged by Howard for this medical work totaled $7,100. SCM Statement of Dispute, Ex. A.

As we assess how to apportion fees for the quality of representation provided to Carter, we are cognizant that four groups of attorneys contributed to the work necessary to obtain the Monetary Award in this case: McCorvey acting for Carter individually; Class Counsel and lawyers including McCorvey, acting for the common benefit; Howard acting for Carter individually; and Lorentz. We first find that the substantiality of McCorvey's work as an IRPA in securing the Monetary Award is necessarily reduced given that the work of Class Counsel, and the attorneys working with them for the common benefit, clearly "reduced the amount of work required of IRPAs." (Doc. No. 9862 at 4). In its establishment of a 22% presumptive fee cap, the District Court has already taken actions to reduce IRPA fees, accounting for the substantial benefit provided by Class Counsel. This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials. Particularly when we account for Lorentz's meaningful work from his engagement in August 2017, we are convinced that McCorvey's role in Carter's litigation does not warrant the 22% fee he is seeking.

As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;

(4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and ultimately making the determination of whether to opt out of the class;

(5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award;

(6) support of clients who were seeking loans and were exposed to predatory lending practices; and

(7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories. We will, however, use these categories as checkpoints as we consider the substantiality of the IRPA's efforts and the role they may have played in the maximizing of the player's award.

Looking at McCorvey's work, it is clear he provided high quality services in this litigation, and that there were substantial risks at the time that he was engaged as counsel. Of the seven factors, however, McCorvey argues that he provided services as an IRPA relating to only Factor 4, supporting his client in understanding the process and ensuring that he accepted the Settlement Agreement. Lorentz challenges this assertion. He argues that McCorvey's support of Carter in his understanding of negotiations that led to the Settlement Agreement was exclusively common benefit work undertaken in McCorvey's capacity as part of the PSC.[16] Moreover, Lorentz suggests that McCorvey's fee of 22% should be rejected in its entirety because it was Lorentz's submission of Carter's claim package (Factor 5) that resulted in the Award. We address these points in order.

**(a) Factor 4: Support for Individual Clients for Their Understanding of the Process and Available Options**

---

[16] At the hearing, McCorvey testified that "part of my role was to go around the country, have these meet-and-greets and sell the settlement." Further, McCorvey states that these meet-and-greets, which purported to support clients in their understanding of negotiations, were "something I did on behalf of the PSC." Hr'g Tr. at 10.

Carter was advised about the scope and nature of the settlement negotiations and the terms of the agreement. McCorvey asserts that he accomplished this task through "electronic communication, conference calls, and general information updates" to all of his clients including Carter. Lienholder Response at 1. Lorentz argues that these tasks were taken for the benefit of all McCorvey clients – not Carter individually. Mr. McCorvey testified, however, that while these task were undertaken on behalf of all clients, he "distinctly remember[s] a telephonic conversation of selling the deal to [Carter] when asked should he opt out." Hr'g Tr. at 25.

We accept McCorvey's position that the firm's global correspondence was supplemented by individual calls to clients and emails between McCorvey and Carter. Specifically, we acknowledge the individual work done by McCorvey in discussing the proposed settlement with Carter and ultimately convincing him to remain a class member amid significant skepticism.

We recognize that McCorvey performed some services that were substantial; however, we conclude that the majority of this work was performed in McCorvey's PSC's role for the common benefit of the class and that he was already paid for most of that work.

**(b) Factor 5: Shepherding the Client through the Claims Process**

We next address Lorentz's argument that he was solely responsible for Carter's Award through his work in putting together and submitting the claim package. We do not agree.

Certainly, a large part of Carter's award can be attributed to the work performed by Lorentz during the claims process. We consider the fact that Lorentz performed the claims package work alone. Second, we acknowledge that Lorentz scheduled medical examinations under the MAF protocol which provided the necessary evidentiary basis for Carter's claim submission. SCM Response at 1; Hr'g Tr. at 36. While Lorentz correctly points out that it was he – not McCorvey – who was responsible for the claim package, McCorvey accurately states that Carter would not have

been eligible to submit a claim package but for McCorvey's advice and push for him to remain a class member. Hr'g Tr. at 25.

Taking these facts under consideration, a significant deduction in McCorvey's fee is proper as he had no part in the actual claims process. We acknowledge the substantial nature of the work performed by Lorentz with respect to re-testing Carter and shepherding him through the claims process, but we cannot accept his position that he was solely responsible for the Award when McCorvey substantially contributed to Carter's Settlement Class Member status.

### G. Costs

Lorentz seeks reimbursement of the $6,250.00 he incurred in costs. SCM Statement of Dispute, Exhibit E. His CFA with Carter provided for reimbursement of the "actual expenses incurred… deducted from the gross amount of money recovered." Lorentz Concussion Settlement Retainer Agreement at ¶ 2. These costs were reasonably incurred. We authorize this reimbursement to Lorentz.

McCorvey likewise seeks reimbursement of the $350.00 filing fee he incurred for the July 12, 2012 complaint. This cost was also reasonably incurred, and even Lorentz agrees that McCorvey should be reimbursed for this amount. SCM Statement of Dispute at 3; SCM Response at 3. We authorize this reimbursement to McCorvey.

### V. CONCLUSION

We conclude that McCorvey's IRPA contribution to Carter's Award here is insufficient to support an attorney fee of 22% as he seeks. The relative contribution of Class Counsel compared to that of McCorvey was substantial in this individual litigation, where McCorvey was terminated before the CA began accepting claim submissions. The work performed by Lorentz in preparing and submitting the claim also provided a more significant contribution in bringing the litigation to a successful close for Carter. We conclude that a fair resolution of this dispute is to award 22% of

the Monetary Award for attorneys' fees to be allocated such that McCorvey gets 7% and Lorentz gets 15%. These amounts must be reduced by the Common Benefit fee deduction currently applicable to all Awards. Accordingly, McCorvey will receive at this time 5.4% of the Monetary Award, and Lorentz will receive 11.6% of the Monetary Award.[17] We allocate whatever portion of the 5% holdback that is later released by the District court for payment to IRPA attorneys by the same ratio as we used to apportion the currently-payable fee, *i.e.*, McCorvey would receive 32% of the holdback funds and Lorentz would receive 68% of it. We also approve payment to Lorentz of $6,250.00 in costs and $350.00 to McCorvey.

    An appropriate order follows.

BY THE COURT:

/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

---

[17] Thus, the total approved IRPA fee is 22% of Carter's Monetary Award.