IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | NO. 2:18-md-02323-AB<br><br>MDL NO.2323 |
| Kevin Turner and Shawn Wooden, on behalf Of themselves and others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>Defendants | No. 2:12-md-02323-AB<br><br>MDL NO. 2323 |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Hon. Anita B. Brody |

MOTION OF CLASS COUNSEL FOR RECONSIDERATION
OF THE COURT'S APRIL 11 ORDER

Undersigned Class Counsel respectfully request via this Motion that the Court reconsider its Order of April 11, 2019 (MDL ECF No. 10527). The grounds for this Motion, which are more fully set forth in the accompanying Memorandum are:

1.     The April 11 Order imposes substantial amendments to the Settlement Agreement that are adverse to the class and benefit the NFL.

2.     They were developed and approved without notice to or the consent of Class Counsel, a requirement under section 30.6 of the Settlement Agreement and paragraph 18 of the Court's Final Approval Order (MDL ECF No. 6534).

3.      They were also developed and approved without notice to the class as required by Fed. R. Civ. P. 23.

They are, therefore, impermissible under the Agreement and this Court's jurisprudence.

WHEREFORE, Class Counsel respectfully requests that the Court hold the April 11 Order in abeyance and set a hearing date when Class Counsel can be heard on the April 11 Order and the accompanying Rules Governing Qualified MAF Physicians.

Dated: April 25, 2019                          Respectfully submitted,


/s/ Gene Locks
Gene Locks, Esq.
David D. Langfitt, Esq.
LOCKS LAW FIRM
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: 215-893-3423
Fax: (215) 893-3444
glocks@lockslaw.com
dlangfitt@lockslaw.com

**Class Counsel**

/s/ Sol Weiss
Sol Weiss, Esquire
Larry Coben, Esquire
Anapol Weiss
One Logan Square
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
PH: (215) 735-1130
sweiss@anapolweiss.com
lcoben@anapolweiss.com

**Co-Lead Class Counsel**

/s/ Steven C. Marks

Steven C. Marks, Esquire
Ricardo M. Martinez-Cid, Esquire
Stephen F. Rosenthal, Esquire
Podhurst Orseck PA
25 West Flagler Street
Suite 800
Miami FL 33130
Ph:305.358.2800
smarks@podhurst.com
rmcid@podhurst.com
srosenthal@podhurst.com

**Class Counsel**

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing Motion and Memorandum of Class Counsel for Reconsideration, including a Proposed Order and Exhibits, were filed and consequently served via the Electronic Filing System on all counsel of record in Case No. 2:12-md-02323-AB, MDL No. 2323, and 2:18-md-2323-AB.

DATE: April 25, 2019

/s/ David D. Langfitt
David D. Langfitt

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | NO. 2:18-md-02323-AB<br><br>MDL NO.2323 |
| Kevin Turner and Shawn Wooden, on behalf Of themselves and others similarly situated,<br><br>          Plaintiffs,<br>    v. | No. 2:12-md-02323-AB<br><br>MDL NO. 2323 |
| National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>          Defendants | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Hon. Anita B. Brody |

**MEMORANDUM**
**IN SUPPORT OF MOTION OF CLASS COUNSEL**
**FOR RECONSIDERATION OF THE COURT'S APRIL 11 ORDER**

Undersigned Class Counsel, the Locks Law Firm, Anapol Weiss, and Podhurst Orseck, respectfully submit this Memorandum in support of their Motion for Reconsideration pursuant to Federal Rules of Civil Procedure 59 and 60. The movants have standing to bring this Motion on behalf of the Class since they have been appointed Class Counsel and represent many Class members.

**Preliminary Statement**

The April 11 Order imposes substantial amendments to the Settlement Agreement ("Agreement") that are adverse to the Class and benefit the NFL. They were developed and approved without notice to or the consent of Class Counsel, a requirement under section 30.6 of

-1-

the Agreement and paragraph 18 of the Court's Final Approval Order (ECF No. 6534). They were also developed and approved without notice to the Class as required by Fed. R. Civ. P. 23. They are, therefore, impermissible under the Agreement.

Among other things, the new rules[1] prevent Class members from selecting pre-screened and qualified MAF neurologists and neuropsychologists of their choice and add a new layer of scrutiny. The restrictions compromise a fundamental benefit the class bargained for and received in 2013: the right to choose without restriction an MAF neurologist and neuropsychologist. If the amendments go into effect, that benefit will be gone. During the settlement negotiations, the NFL proposed restrictions on the right of players to choose MAF physicians, presumably so that the Agreement would mimic the NFL's disability benefit plans.[2] The Class rejected the NFL's proposal. In the end, a player's right to select an MAF physician and neuropsychologist became an integral part of the bargain. Had the right to choose a qualified MAF neurologist and

---

[1] Specifically, Rule 9 restricts players from seeing any MAF physician for the next 63 years of the program whose office is not within a 150 mile radius of the player's home. Rule 10(b) restricts players from seeing any approved neuropsychologist who is not within a 50 mile radius of the MAF physician's office. Rule 13(k) precludes an MAF neurologist from evaluating a player represented by any counsel for whom the neurologist currently provides services as a consulting or testifying expert witness in any litigation of any kind, a restriction that is inconsistent with the express terms of the Settlement. Rule 20 appears to limit substantially the negotiated "generally consistent" standard in that an MAF neurologist may not under Rule 20 apply his or her clinical judgment and FAQs 99 and 100 to a diagnosis of dementia without specifically describing in detail every single issue and fact as to how the neuropsychological test results and CDR evaluation might deviate from the exacting BAP test protocol and criteria for a dementia diagnosis under the Settlement. This is an onerous burden on MAF physicians and designed to allow the NFL to litigate every MAF-diagnosed dementia claim based on any deviation from the BAP protocol and scoring system. Rule 23 adds a new layer of review by selected AAP members who have never evaluated the claimant/player. This is a substantial alteration of the Agreement to add another layer of scrutiny and opportunity for the player's claim to be denied.

[2] Under the NFL's disability benefit plans, including the 88 Plan, the NFL has the right to choose its own doctors to examine players. The NFL has paid for players to travel hundreds of miles to see NFL-designated medical and neuropsychological specialists paid by the benefits plans.

neuropsychologist not been part of the bargain in 2013, the calculus for the players as to whether to opt-out in 2014-2015 would have been very different.[3]

New Rule 23 imposes a new layer of review by members of the Appeals Advisory Panel ("AAP") at the initial claim-submission stage, although at the discretion of the Claim Administrator. New Rule 23 is inconsistent with the express terms of the Settlement. After extensive negotiations, the parties struck a bargain that limited the AAP's involvement at the claims-submission stage to the review of a subset of claims presenting Pre-Effective Date diagnoses. *See* Settlement Agreement, § 6.4. As its name suggests, the AAP's role otherwise is to assist the Court, at the Court's discretion, during the appellate stage of the claim process. *See* Settlement, § 9.8. New Rule 23, however, creates a brand new body—the AAP Leadership Council—that is not authorized by the Settlement, and permits the Claims Administrator to request that this new body review claims at the initial determination stage, contrary to the limited role the Settlement establishes for the AAP.

The April 11 Order, therefore, has materially altered the bargain, and it has done so without the consent of Class Counsel, a requirement of the Agreement and the Court's Final Approval Order. For these reasons and those explained below, Class Counsel respectfully request that the Court amend the April 11 Order to hold it in abeyance and set a hearing date when Class Counsel can be heard on the issues.

---

[3] Had the right to choose an MAF physician not been part of the bargain, the deal would have more closely resembled the NFL benefits plans, which are perceived in the retired player community as often unfair. That is why Class Counsel rejected the NFL's proposal in 2013. Presumably, it is also why the NFL continually lobbies the Claims Administrator and the Court to restrict players from freely choosing MAF specialists; that is, the NFL wants the MAF program to resemble its benefits plans.

## Argument

Under Agreement section 30.6, changes to the Agreement may be accomplished <u>only</u> with

the direct participation and consent of Class Counsel.  Section 30.6 states:

> This Settlement Agreement will not be subject to any change,
> modification, amendment, or addition <u>without the express written</u>
> <u>consent of Class Counsel</u> and Counsel for the NFL Parties, on behalf
> of all Parties to this Settlement Agreement, and upon Court approval.

*See* Exhibit 1 (emphasis added).  In the Final Approval Order, the Court made plain the exact same

requirement.  At paragraph 18, the Order states:

> Without further approval from the Court, and without the express
> written consent of Class Counsel and Counsel for the NFL Parties,
> the Settlement Agreement is not subject to any change, modification,
> amendment, or addition.

*See* MDL ECF No. 6534, p. 8, attached as Exhibit 2.

That requirement was not satisfied.  The Amendments—in the form of the new rules for

MAF physicians—were created without the consent of undersigned Class Counsel and without the

agreement of co-lead Counsel Seeger Weiss.  The Amendments are, therefore, contrary to section

30.6 of the Agreement, the Court's Final Approval Order, and Federal Rule of Civil Procedure 23,

because they (a) create a material amendment to the Agreement without notice to Class Counsel

and the Class and (b) create disparate treatment among Class members.

The primary problems involve MAF Rule 9, Rule 10, Rule 13, Rule 20, and Rule 23,

which, among other things, (a) restrict the players' right to choose qualified MAF physicians and

neuropsychologists to evaluate them for the next 63 years (the remaining life of the Agreement)

and (b) impose a new layer of review for filed MAF claims.  The new rules turn the MAF

Physician Program (the primary diagnostic program within the Settlement and a program for which

the players must pay) into a system that compromises the players' right to choose qualified

-4-

specialists and adds new scrutiny of MAF diagnosed claims that is not within the Agreement and not part of the bargain.

The right of the players to choose MAF physicians is fundamental to the Agreement. Under the new rules, Class members now may only see an MAF neurologist if the neurologist practices primarily within 150-miles of the player's home and a neuropsychologist only if the neuropsychologist practices within 50 miles of MAF neurologist. And even if the geographical conditions are satisfied, Class Members still will not be permitted to choose an MAF physician if that physician serves as an expert witness for the Class Members' attorneys in a completely unrelated case and capacity. None of these restrictions are found anywhere in the Settlement.[4] Going forward, a highly skilled and qualified MAF neurologist in Houston cannot treat and evaluate a Class member in Corpus Christi. A highly qualified and skilled MAF neurologist in Miami cannot treat and evaluate a Class member in Atlanta or Orlando. Further, the Class member cannot see a qualified neuropsychologist unless the MAF neurologist designates that neuropsychologist, and the neuropsychologist has a primary office within 50 miles of the MAF neurologist.

Different MAF neurologists have different areas of expertise, and each individual claimant has his own circumstances. Neurologists with expertise in cognitive and behavioral neurology (and mild traumatic brain injury) are substantially different from general neurologists in that their clinical expertise is designed for the evaluation of the neurodegenerative diseases that afflict this unique population. The players should not be restricted from identifying and choosing those

---

[4] In fact, the restriction on serving as an expert witness in an unrelated case is in conflict with the express terms of the Agreement, which limit the restriction on serving as an expert for a Class Member's attorney to "litigation relating to the subject matter of the Class Action Complaint." *See* Settlement, § 6.5(b). The new rules cannot override this limitation without consent of the parties.

neurologists from the list of pre-screened and approved MAF physicians. The same is true of neuropsychologists. For that reason, each claimant should continue to be free to select the MAF neurologist and neuropsychologist of his choice, regardless of location.

Moreover, and by way of example only, a Class member who is suspected of having a differential diagnosis of Parkinson's Disease should be permitted to select an MAF neurologist who has expertise and experience in evaluating Parkinson's Disease specifically or movement disorders generally, regardless of location.

Before April 11, all Class members had the freedom to choose, and they did. The new rules have changed that right in a material way. The new rules will also create unequal and unfair treatment to the Class members in violation of Fed. R. Civ. P. 23, which requires similar treatment for all Class members. Class members who were examined and diagnosed before April 11 had the unfettered right to choose a qualified MAF Physician and neuropsychologist to evaluate them. Under the restrictive amendments, no Class member will have that unfettered right, a change that uniquely affects Class members who have not received a Qualifying Diagnosis yet.

The MAF Physician program was negotiated and agreed upon in 2013 to allow Class members the freedom to choose from a qualified list of MAF neurologists and neuropsychologists over the life of the Agreement. It is a fundamental part of the bargain, because (1) the MAF Physician program is the primary medical evaluation mechanism for the vast majority of the remaining 63-year life of the Settlement, and (2) during that time period, it is the primary mechanism with which Class members can access benefits. The BAP program, free to Class

members, will terminate for many in June of this year and for younger players in June 2027.[5] The results of the BAP program show that most of the participants will rely upon the MAF Physician evaluations for ongoing neurological evaluations for the life of the Agreement. Class members must pay handsomely. Every complete MAF evaluation will cost a Class member or his/her counsel between $6,500 and $8,500, depending on the specialist and the specialist's location.[6] The NFL has no obligation to pay these costs. As a result, the new rules will force Class members to pay thousands of dollars for an MAF neurologist and neuropsychologist the Class member cannot chose, even though the NFL Counsel and Co-Lead Counsel have vetted MAF neurologists before they are accepted to the program.

These changes to the Agreement impose substantial prejudice on the Class. The population of former players seeking compensation for their injuries are a group of men for whom physical strength, the ability to endure pain, and a refusal to show weakness were job requirements: qualities that the NFL screened for, cultivated and exploited in making professional football a profitable bonanza. Now that former players are suffering severe cognitive and physical harm, those players must overcome a lifetime of training in order to ask for help. They must show physical weakness, reveal cognitive decline, admit that they are unable to hold a job or care for their own daily needs. They must expose vulnerability in exactly the way that they were taught never to do, often depending on the assistance of a wife or girlfriend because even seeking care is beyond their ability.

---

[5] For registered players born before June 6, 1974, the deadline for BAP participation is June 7, 2019. For registered players born after June 6, 1974, the deadline is June 7, 2027 or before they turn 45, whichever comes first.

[6] It is also possible that the only MAF physician within 150 miles of player's home will not accept the player's health insurance, making payment much more onerous or impossible.

When players seek to identify a qualified neurologist and neuropsychologist with whom to work, they are not just seeking a skilled diagnostician. They are also looking for a professional with whom they can establish a relationship of trust — a professional with whom they feel comfortable exposing their weakness and vulnerability so that they can secure an accurate diagnosis that captures the full measure of their impairment. For some players, that means relying on recommendations from fellow players or spouses who can vouch for a doctor as competent, sensitive and humane. For some players, working with a doctor close to home may be a plus, but for others it may be a strong disincentive to seeking care because of the risk of shame if the extent of their impairment becomes known in the local community.

And for all the players, working with a doctor who possesses expertise in the sub-specialties that map onto their particular impairment is a priority. Not all MAF doctors are equally qualified to evaluate and treat all players, and some players will not know what sub-specialization they will need until they begin accessing care. There is, for example, no rational reason under the Agreement to restrict a player in Louisiana who may have Parkinson's Disease from seeing a pre-screened and qualified MAF movement disorder specialist in Atlanta if the player is willing to travel and pay for the evaluation from a credentialed physician in that sub-specialty. There is no rational reason for a player in Chicago with deep memory impairments from seeing a pre-screened qualified MAF neurologist in Philadelphia with expertise in Alzheimer's Disease.

For all of these reasons, the ability to seek care from any qualified MAF physician is a material term of this Agreement and is of great importance to the players. It gives them confidence that they can seek a diagnosis on their own terms, navigating the physical pain, cognitive decline and emotional difficulty of accessing care in whatever way would best serve their individual needs. The ability to choose their own qualified MAF physician is an assurance to

players that they will receive accurate diagnoses unhindered by the danger that a lack of trust or other obstacles to the doctor-patient relationship will impair the validity or reliability of their results, along with a promise that they will be able to exercise some agency in their own medical decisions while the impact of traumatic brain injury takes their agency away in other aspects of their lives.

The NFL, for its part, sought to minimize the risk that player choice in the selection of qualified MAF physicians could result in fraud or overly generous diagnoses. To do so, the NFL successfully negotiated robust anti-fraud provisions: audits by the Claims Administrator, appeals of individual claims by the NFL, reviews by the Special Master, and the ability to move for disqualification of MAF physicians they deem suspect. These protections have been effective. Recently, the Court enhanced the enforcement of these existing protections further with its Order providing the Special Master with a Special Investigator, adding another layer of scrutiny within the existing framework. That is the bargain that the players struck to balance their vital interest in selecting MAF physicians of their choice against the NFL's concerns about the possibility of fraud. That balance is working.

It is no surprise that the NFL would prefer to impose severe restrictions against player choice in the MAF Program. It made a similar request during settlement negotiations in 2013, when the NFL sought to craft a program that more closely resembled the NFL player disability benefit plans under which the NFL has the unilateral right to choose NFL-friendly doctors the NFL designates and pays. Class Counsel rejected the NFL proposal in 2013, in part, to protect the players against a system that mimics the disability plans.[7] This was the bargain the players struck,

---

[7] The NFL's disability benefit plans have never been acceptable to the players. Even when players are diagnosed as qualifying under the plans, the NFL at times rejects their applications and litigates against the players, using layers of review by the Plan's Board to reject the claims.

and the NFL agreed to it.  It was a critical part of the Agreement.  The amendments seek to compromise this negotiated balance for the next 63 years.

New Rule 20 is also problematic.  As it does not specify the level of detail that will be required of MAF physicians in providing the requisite explanations, the rule creates a risk of imposing upon MAF physicians an onerous, unworkable burden to support their judgment that a dementia diagnosis is generally consistent with the BAP neuropsychological protocols, scoring system and CDR assessment criteria.  This burden, in turn, risks alienating MAF physicians by making their judgments subject to attack and second-guessing by the NFL over a myriad of nuances.  It lays the foundation for the NFL to litigate against the MAF physicians the minutiae of dementia claims until FAQ 100—where the "generally consistent" standard is defined—is effectively rolled back or eliminated.

The creation of the AAP Leadership Council in Rule 23 likewise adversely affects the rights of Class members.  The new rule permits two members of this new body, who have not

---

The NFL showed its *modus operandi* in the case of Mike Webster, reported in an opinion by the Court of Appeals for the Fourth Circuit.  The opinion is attached and highlighted as Exhibit 3. The Fourth Circuit recounted how Mike Webster died while litigating his clear entitlement to disability for complete cognitive impairment.  In Webster's case, the NFL used multiple layers of scrutiny and concocted almost any argument to minimize Webster's functional impairment for the purpose of limiting its obligation to pay.  The Plan's Board denied Webster substantial benefits and, in doing so, rejected the opinion of its own "neutral" neurologist.  The Plan's Board argued that Webster was not functionally impaired (and was able "...to engage in any occupation... for remuneration or profit") for many years after 1991, even though all of the examining physicians said otherwise.  The NFL cited Webster's two week stint as a broadcaster, various failed ventures, and a job as a strength and conditioning coach for the Kansas City Chiefs.  *See* Exhibit 3 at 17.  Copious evidence showed the so-called work was nothing of the kind, but the Board rejected Webster's claim anyway.  Webster died during the process.  *Id.*  The district court in Baltimore reversed the Board's decision and awarded Webster's Estate full benefits and attorney's fees.  The district court found (and the Fourth Circuit affirmed) that the Board's "...decision indicates culpable conduct, if not bad faith..." *Id.* at 34, n. 11.  The Webster case is one of many that motivated the Class to reject the NFL's request to restrict the players' right to select MAF specialists.

examined the players, to question the medical judgment of pre-screened and approved MAF physicians at the initial claim determination stage.  The Settlement, however, cabins the involvement of the AAP at the initial claim determination stage to a subset of claims presenting Pre-Effective Date diagnoses.  *See* Settlement § 6.4, attached as Exhibit 4.  All other claims submitted with certifications by qualified MAF physicians are reviewed by the Claims Administrator, without any involvement of the AAP.  *See* Exhibit 4, Settlement §§ 8-9.  The Settlement calls for the AAP to become involved later in the process.  As its name suggests, the AAP's role is primarily limited to advising the Court on appeals of claim determinations.  *See* Exhibit 4, Settlement § 9.8.  Importing the AAP into the initial claim determination process materially upsets the balance struck by the parties and accepted by the Class.  Now, under the new rules, players must effectively receive a Qualifying Diagnosis from two separate physicians, one of whom has never examined the player, before receiving an initial, favorable claim determination.

Raising this threshold requirement for a player to receive an initial favorable claim determination is particularly problematic, because of the burden of proof that applies to appeals. Under the Settlement, the AAP's involvement (for all claims other than the subset of Pre-Effective Date claims identified in the Settlement) is limited to appeals, where a "clear and convincing evidence" burden is placed on the appellant.  *See* Exhibit 4, Settlement § 9.8.  Thus, under the Settlement, if an AAP member is consulted on an appeal and advises that she or he merely questions the judgment of the diagnosing MAF physician, it is likely that the appeal will fail and the initial claim determination will be upheld.  This is precisely the balance that the parties struck and the Class accepted—placing a significant amount of weight on the opinions of MAF physicians who actually examine the players and whom the players are free to select.  The new rules and the AAP Leadership Council, however, substantially limit the authority, discretion, and

-11-

weight of qualified MAF physicians. They permit AAP members to question the judgment of MAF physicians at the initial claim determination stage, without the limitation of the "clear and convincing evidence" burden. This is a significant, unauthorized alteration of the Settlement that adversely affects the players, benefits the NFL, and upsets the balance struck during negotiations. It moves the entire Agreement closer to what the NFL always wanted, but the Class rejected: something akin to the benefits plans, with a multi-layered set of reviews and a process that provides multiple opportunities to reject a player's claim.[8]

The recent statements from the Claims Administrator show that the Court's April 11 Order and new MAF Rules are not retroactive. The April 11 Order itself, however, does not say that. Class Counsel, therefore, also respectfully requests that the Court amend or modify the April 11 Order to state that the new rules are not retroactive, so that over the next 63 years there is no ambiguity on that issue.

The single, apparent purpose of the problematic new rules—including the 150-mile rule (Rule 9), 50-mile rule (10(b)) the limited consultation rule (13(k)), Rule 20, and the AAP Leadership Council—is to prevent fraud in the filing of claims. But given the fraud protections already included in the Settlement and further enhanced by the Court, the new rules are excessive and unnecessary. The anti-fraud provisions in the Settlement permit audits by the Claims Administrator, appeals by the NFL, and reviews by the Special Master, all of which have been effective. Recently, these provisions were enhanced by the Court's Order that provided the Special Master with a Special Investigator that adds another layer of protection. The restrictions in

---

[8] Significantly, the benefits plans provide the players a significant counter-balance to the NFL's right to choose and pay examining physicians and reject otherwise meritorious claims. Players have the right to sue the plans *de novo* in federal district court in Baltimore. The Settlement does not include the right to a *de novo* trial.

the new rules are, therefore, not needed.  Adequate anti-fraud protection already exists, and it works.

The jurisprudence of the Third Circuit confirms that the consent requirements of Agreement Section 30.6 and the Court's Final Approval Order are essential and cannot be overridden.  *See In re Diet Drugs, Sales Practices & Prods. Liab. Litig*. MDL 1203, 226 F.R.D. 498, 516-18 (E.D. Pa. March 15, 2005) (holding that Seventh Amendment to Settlement, which was a material change to the Settlement, required notice to Class and Class Counsel and fairness hearing under FRCP 23(c)(2) and 23(e) where any objecting Class member could participate).  In *Diet Drugs*, an amendment to the Settlement made a material change to financial benefits and opt-out rights under the Settlement.  The district court required extensive notice to the Class and a fairness hearing, the right to object, the right to be heard, and the right to opt-out.  *Id.* at 518. At all times, Class counsel was directly involved with negotiating and drafting the seventh amendment and the notice.  *Id.*

As in *Diet Drugs*, Rule 23(c)(2) and 23(e) apply to the April 11 Order, because the Order materially changes the rights of the vast majority of Class members and would treat Class members differently.  The BAP Administrator's recent report filed with this Court suggests that greater than 90% of the Class will be relying upon the MAF program to potentially obtain a Qualifying Diagnosis and Settlement benefits.  Those who seek a diagnosis after April 11 will be treated differently from those who sought a diagnosis before that date.  As such, Rule 23 requires that the Court notify Class Counsel and the Class of the proposed changes to the Agreement and provide a right to be heard.

## Conclusion

For all the foregoing reasons, the undersigned respectfully request that the Court enter the proposed Order that accompanies Class Counsel's Motion and Memorandum, hold the April 11 Order in abeyance, and set a hearing date that provides Class Counsel an opportunity to be heard.


Dated: April 25, 2019                          Respectfully submitted,


/s/ Gene Locks
Gene Locks, Esq.
David D. Langfitt, Esq.

LOCKS LAW FIRM
The Curtis Center
Suite 720 East
601 Walnut Street
Philadelphia, PA 19106
Phone: 215-893-3423
Fax: (215) 893-3444
glocks@lockslaw.com
dlangfitt@lockslaw.com

**Class Counsel**

/s/ Sol Weiss
Sol Weiss, Esquire
Larry Coben, Esquire
Anapol Weiss
One Logan Square
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
PH: (215) 735-1130
sweiss@anapolweiss.com
lcoben@anapolweiss.com

**Co-Lead Class Counsel**

/s/ Steven C. Marks
Steven C. Marks, Esquire
Ricardo M. Martinez-Cid, Esquire
Stephen F. Rosenthal, Esquire

-14-

Podhurst Orseck PA
25 West Flagler Street
Suite 800
Miami FL 33130
Ph:305.358.2800
smarks@podhurst.com
rmcid@podhurst.com
srosenthal@podhurst.com

**Class Counsel**