**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| This document relates to: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

## RESPONSE BY THE CLAIMS ADMINISTRATOR TO
## MOTION FOR RECONSIDERATION

## <u>TABLE OF CONTENTS</u>

**Page No.**

I.      INTRODUCTION ................................................................................ 1

II.     DISCUSSION ..................................................................................... 1

   A.   The Impetus for the Revised Rules Governing Qualified MAF Physicians. ............ 1

   B.   The Network of Qualified MAF Physicians. ............................................... 2

   C.   The Goal of the Revised Rules Governing Qualified MAF Physicians. .................... 4

   D.   The Authority for the Rules Governing Qualified MAF Physicians. ....................... 7

   E.   The Revised Rules Questioned in the Motion to Reconsider. .................................. 8

    1.   The Mileage Concepts in Rule 9 and Rule 10(b). ....................................... 9

    2.   Rule 13(k):  A Qualified MAF Physician May Not Examine or Diagnose Settlement Class Members Represented by Lawyers for Whom the Physician Works as an Expert. ............................................................................... 14

    3.   Rule 20:  Implementation of the Court's January 9, 2019 Order on the "Generally Consistent" Standard. ............................................................ 15

    4.   Rule 23:  The AAP Leadership Council. ................................................ 18

III.    CONCLUSION ................................................................................. 20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

## RESPONSE BY THE CLAIMS ADMINISTRATOR TO
## MOTION FOR RECONSIDERATION

## I.   INTRODUCTION

BrownGreer PLC, the Court-appointed Claims Administrator of the Class Action

Settlement Agreement of this litigation, submits this Response to the Motion of Class

Counsel for Reconsideration of the Court's April 11 Order, filed on April 25, 2019

(Document No. 10582).  We are a neutral claims administrator.  We submit this Response not

in "opposition" to the Motion for Reconsideration but to offer the rationale for the five Rules

it questions.  We will do our part to implement successfully any directives from the Court.

## II. DISCUSSION

### A.   The Impetus for the Revised Rules Governing Qualified MAF Physicians.

On January 9, 2019, the Court entered an Order (Document 10370) noting that the NFL

Parties had withdrawn their appeal of seven Monetary Awards found payable on Level 1.5 or

Level 2 Qualifying Diagnoses made by Qualified MAF Physicians.  The NFL Parties felt those

diagnoses departed from the criteria under Ex. 1 and Ex. 2 to the Settlement Agreement for

diagnoses made in the BAP and presented the issue whether the physician's conclusions were "generally consistent" with those BAP criteria.  The Order continued:

> The Court directs the Claims Administrator to develop for review and approval by the Court a clarification of the existing Rules Governing Qualified MAF Physicians. The clarification should require that Qualified MAF Physicians who make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment by deviating from the BAP testing protocols or diagnostic criteria provide a written description in their reports as to why, in such doctor's medical judgment, the evaluation and evidence is "generally consistent" with the BAP diagnostic criteria.

We immediately set about working with the Special Masters to carry out that directive. Analysis of our experience thus far with Monetary Award claims in this Program and of areas where greater clarity could be provided to all participants led to the Rules Governing Qualified MAF Physicians adopted by the Court in its Order on April 11, 2019 (Document 10527).

**B.  <u>The Network of Qualified MAF Physicians.</u>**

The Qualified MAF Physicians across the country are highly credentialed board-certified neurologists, neurosurgeons or other neuro-specialist physicians.  They perform a crucial role in carrying out the Settlement Program in examining Retired NFL Football Players to determine if they have any of the five Qualifying Diagnoses that are eligible under the Settlement Agreement for Monetary Awards to living Retired NFL Football Players (Level 1.5 Neurocognitive Impairment, Level 2 Neurocognitive Impairment, Alzheimer's Disease, Parkinson's Disease and Amyotrophic Lateral Sclerosis).  Following Section 6.5(a) of the Settlement Agreement, all have been appointed by the agreement of Co-Lead Class Counsel and the NFL Parties.  If either Co-Lead Class Counsel or the NFL Parties do not to agree to a candidate's appointment, he or she does not become a Qualified MAF Physician.  We have 121 Qualified MAF Physicians serving in 40 major cities and metropolitan areas.  We have nominated 52 candidates who were not

appointed, as Co-Lead Class Counsel did not approve nine of them, the NFL Parties did not agree to 36 and both Co-Lead Class Counsel and the NFL Parties have disapproved of seven.

We want more Qualified MAF Physicians in the network.  We had 64 on board who have withdrawn from the Program for various reasons, including lack of any appointments and repeated requests by lawyers for Retired Players to change their results.  We lost nine who moved from the practice that joined the Program.  We had 22 in the works who decided to serve in the BAP only.  Another seven are still looking at the contract, with their legal advisors.  We constantly search for ways to remove obstacles to participation, drum up enthusiasm in the medical community for serving and cultivate long-lasting relationships with highly skilled and trained physicians.  Section 6.5 of the Settlement Agreement prescribes many prerequisites to service that must be met to be appointed.  Some physicians have told us they do not have time in their busy practices to work in this Program, have strict rules against getting involved in anything sounding like litigation, or were put off by the contract they need to sign to participate.  Despite those challenges, the existing Qualified MAF Physician network covers the country, as 91% of the 15,126 Retired NFL Football Players and 131 Representative Claimants for living Retired Players registered in this Program live within 150 miles of one or more Qualified MAF Physicians.

Qualified MAF Physicians act as neutral referees who are trained in the specifics of the Settlement Agreement and are to draw upon their medical expertise to render accurate diagnoses of the Retired Players they examine.  Their duties are defined by the Settlement Agreement, the contract they sign with us to begin service and any orders from the Court.  To promote certainty and uniformity in their performance, we worked with the Special Masters to develop a set of Rules Governing Qualified MAF Physicians, first adopted and posted to the Qualified MAF

Physicians and publicly on June 7, 2018, consisting of 16 Rules covering various aspects of physician enrollment and training, submission of appointment and diagnosis information, ethical requirements and suspension and termination.[1]

### C.  The Goal of the Revised Rules Governing Qualified MAF Physicians.

Implementing the Court's January 9 Order and efforts to promote the successful operation of the network of Qualified MAF Physicians led to the revised set of Rules Governing Qualified MAF Physicians approved by the Court in its April 11 Order.  This expanded the number of Rules from 16 to 27 and added sections to some existing Rules.  The Appendix attached to this Response summarizes each of the Rules and explains which ones are new or have been revised.

The goal in all changes to the Rules is to help this Program deliver benefits quickly and correctly to Settlement Class Members who deserve them by:

1.  **Providing Clear Guidance to Qualified MAF Physicians:**  It is important that the Qualified MAF Physicians know exactly how they are to do their work and what the Settlement Agreement requires.  Clear guidance leads to uniformity and accuracy in their diagnoses.

2.  **Reducing Processing Delays:**  Correct work and accurate diagnoses by Qualified MAF Physicians reduce the number of incomplete claims and appeals, both of which cause delays in processing and payment.

3.  **Helping the Program Run Efficiently:**  With fewer incomplete claims and appeals and fewer questions about how conditions are to be or were diagnosed, the Program can deliver benefits more quickly and accurately to those who deserve them.

4.  **Furthering the Fairness of the Program:**  When all Qualified MAF Physicians follow the same rules and procedures and are held to the same standards, Settlement Class Members are treated similarly no matter where or when they get an MAF exam, who their lawyer is, or whether they have a lawyer.  Each Retired Player has the same

---

[1] The Rules Governing Qualified MAF Physicians are one of nine sets of Rules adopted for use in this Program. The other Rules cover statute of limitations proceedings, appeals from claim determinations, challenges to Derivative Claimants, Audit investigations, Registration determinations and appeals, assignment of claims by Settlement Class Members and the handling of attorneys' liens.  All these Rules are available on the public website of the Settlement Program.

right and opportunity to learn the state of his health.  Each Retired Player has the same right and opportunity to receive a Monetary Award.

5. **Getting the Medicine Right:**  Retired Players deserve to be told whether they have any of the medical conditions defined by the Settlement Agreement as Qualifying Diagnoses.  They need to know their health conditions and deserve to be paid if they qualify for a Monetary Award.

Since we began receiving Monetary Award Claim Packages on March 23, 2017, we have processed 1,774 Monetary Award claims based on Pre-Effective Date Diagnoses (made before the Settlement Agreement became effective on January 7, 2017), 121 claims resting on diagnoses in the BAP and 445 claims diagnosed by Qualified MAF Physicians, for a total of 2,340 claims processed.  We received another 256 claims from persons who did not submit any diagnosis, making us unable to tell whether they were Pre-Effective Date or later conditions.  We eventually have to deny such claims as incomplete if the claimant does not give us a Diagnosing Physician Certification Form after request from us.  In addition, 196 claims (194 Pre-Effective Date and two MAF) have been denied after Audit investigations.

As a result, we now have considerable experience with the medical questions presented in Monetary Award claims, the types of materials frequently missing from the claims but required by the Settlement Agreement for a complete Claim Package, and aspects of the claims casting doubt on the legitimacy and reliability of the diagnosis on which the claim is based.  If claims come in to us with any of those issues, we can and do address the problems presented, but that delays reaching an outcome on the claim.  Section 8.5 of the Settlement Agreement mandates that Settlement Class Members be given no less than 120 days—four months—to send us missing materials.  Features of claims raising questions about misrepresentations or omissions of material fact, such as clients of a law firm traveling thousands of miles to see the same physician rather than those available to them in their hometowns and excessively high numbers and rates of

5

payable diagnoses from those doctors led to Audit investigations under Section 10.3 of the Settlement Agreement.  Those require considerable time, especially when lawyers refuse to give us information we need to answer questions presented by the claims.  These extensive efforts required of us, as well as of Settlement Class Members, lawyers for Settlement Class Members and the physicians involved in the diagnoses, to clear up all these issues after a claim is submitted postpone our ability to alert the Settlement Class Member to an outcome on the claim or have an Award paid, all of which has been the brunt of considerable criticism of the Program from certain lawyers, Settlement Class Members and media outlets.

In this, as in any settlement program, it would be far better for Settlement Class Members to clean up these issues on the front end of a claim, rather than on the back end.  Claim Packages that are complete, follow the Settlement Agreement requirements and are free of any of the indicia of suspicion that require an Audit investigation can glide through the claims process without delay.  Today such a complete Claim Package based on an MAF examination will receive an Award Notice from us within 20 days after it is submitted and, if not appealed to the Special Masters by the Settlement Class Member, Co-Lead Class Counsel, or the NFL Parties, can be paid by the Trustee as early as the following month, depending on the date of the Award Notice and the availability of funds in the Monetary Award Fund.[2]  We want every claim to move along quickly in that fashion.  The revised Rules Governing Qualified MAF Physicians will help make that happen.

---

[2] We do not issue the payments on Monetary Awards.  The Trustee of the Settlement Fund, Citibank, makes the payments, relying on instructions from us. The Trustee pays Awards once a month.  Section 23.3(b) of the Settlement Agreement prescribes several steps in the payment process, beginning with our sending the Parties a Funding Request on the 10th of each month listing Awards to be paid.  The Parties have 10 days to object to the Funding Request.  The NFL Parties have 30 days to deposit the funds.  After the Special Masters approve the payments on a Request, we issue instructions to the Trustee, which then has 10 days to send out payments.  When an Award gets paid depends on what point in this two-month cycle it becomes final and ready for payment.

### D.  **The Authority for the Rules Governing Qualified MAF Physicians.**

We did not see any of the provisions in the Rules Governing Qualified MAF Physicians as changing anything in the Settlement Agreement or as adverse to the Settlement Class in any respect.[3]  The Rules should benefit the Settlement Class by promoting accuracy in diagnoses and removing questions that impede the progress of claims and can lead to denials or appeals.  In many settlements, such operational rules are adopted by a claims administrator based on its experience without any review or approval by a special master or the supervisory court.  Here, the revised Rules are a product of a collaborative effort with the Special Masters to refine certain aspects of the Qualified MAF Physician network to enhance its performance and that of the claims process, with the Court's approval.  Nothing in the Rules contravenes any express provision of the Settlement Agreement.

We are working within the terms of the Settlement Agreement to implement it, rather than amending it.  We have both the duty and the authority to develop and adopt processes to implement the Settlement Agreement fairly and correctly, subject to the oversight of the Special Masters and the Court, as these sections of the Settlement Agreement say:

1. **Section 9.1:**  The Claims Administrator must determine whether a Class Member qualifies for an award "[b]ased upon its review of the Claim Package, and the results of any investigations of the Settlement Class Member's claim."

2. **Section 8.4:**  The Claims Administrator must determine the sufficiency and completeness of a Claims Package.

3. **Section 8.6(b):**  The Claims Administrator has the "discretion to undertake or cause to be undertaken further verification and investigation, including into the

---

[3] This Response provides facts and does not argue law.  We do know an amendment when we see one.  Working with Mr. Locks and the other Class Counsel in that program, we helped write, secure approval of and then implement the Seventh Amendment to the Nationwide Diet Drugs Class Action Settlement Agreement cited by Class Counsel, *In re Diet Drugs*, MDL 1202, 226 F.R.D 498 (E.D. Pa. 2005).  Memorandum in Support at p. 13.  Unlike the Rules Governing Qualified MAF Physicians, that Seventh Amendment eliminated two severity payment levels on which class members could be paid awards and altered other eligibility criteria.  Everyone involved in it, including the defendant, agreed it was an amendment to the Settlement Agreement, labeled it as such and provided class notice and a fresh opt out opportunity to the class.

nature and sufficiency of any Claim Package or Derivative Claim Package documentation."

4. **Section 10.2(a)(ii):**  The "Claims Administrator will perform its responsibilities and take all steps necessary to faithfully implement and administer the Settlement Agreement."

5. **Section 10.2(b)(i)(6):**  The Claims Administrator will "[d]etermine whether Settlement Class Members who submit Claim Packages and Derivative Claim Packages are entitled to Monetary Awards or Derivative Claimant Awards, as set forth in ARTICLE VI and ARTICLE VII."

6. **Section 10.3(b)**:  In addition to audits by Co-Lead Class Counsel and the NFL Parties, "Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator will establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund."

7. **Section 10.4:**  "The Claims Administrator, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties, will also establish system-wide processes to detect and prevent fraud, including, without limitation, claims processing quality training and review and data analytics to spot 'red flags' of fraud, including, without limitation, alteration of documents, questionable signatures, duplicative documents submitted on claims, the number of claims from similar addresses or supported by the same physician or office of physicians, data metrics indicating patterns of fraudulent submissions, and such other attributes of claim submissions that create a reasonable suspicion of fraud."

8. **Section 10.2(a)(iv):**  "The Special Master, for the duration of his or her term, will oversee the Claims Administrator."  This oversight duty is also specified in Section 10.1(b)(4).

Section 27.1 of the Settlement Agreement and Paragraph 17 of the Court's May 8, 2015 Amended Final Order and Judgment (Document 6534) approving the Settlement Agreement give the Court continuing and exclusive jurisdiction over the interpretation, implementation, administration, and enforcement of the Settlement Agreement.

### E.  **The Revised Rules Questioned in the Motion to Reconsider.**

Class Counsel's Motion to Reconsider objects to five of the 27 Rules Governing Qualified MAF Physicians approved by the Court.  Co-Lead Class Counsel's April 25, 2019 Memorandum in Support (Document 10583) joins in the objection to two of the Rules—the 150-

Mile concept in Rule 9 for Qualified MAF Physicians and the 50-Mile radius Rule 10(b) for neuropsychologists.  We explain here the basis for each of the five challenged Rules.  Because they rest on similar premises the mileage aspects of Rules 9 and 10(b) are considered together.

### 1.   <u>The Mileage Concepts in Rule 9 and Rule 10(b).</u>

Rule 9 sets the general rule that a Qualified MAF Physician is to perform an MAF exam in his or her regular office located within 150 miles of the Retired Player's primary residence.  If the Qualified MAF Physician determines that neuropsychological testing is needed to assess the Retired Player's cognitive abilities, Rule 10(b) says that testing will occur in the neuropsychologist's regular office within 50 miles of the Qualified MAF Physician's office. Neither Rule is absolute.  Both allow us to grant exceptions to the mileage limit if there is no physician available, the wait time for one is over 100 days, the Retired Player already has a doctor-patient relationship with a physician outside those limits, or "[s]uch other circumstances that, in the Claims Administrator's discretion, warrant an exception" to the mileage limit.

In an Alert we posted to the Settlement Class and publicly on April 19, 2019, we made it clear that these mileage Rules apply only prospectively to MAF appointments made after April 11, 2019.  They do not require any Settlement Class Member to reschedule appointments already made or to undo any examinations already performed.

The two mileage concepts are prudent administrative steps because:

(a) There are 15,257 Retired Players who may wish to be examined by a Qualified MAF Physician (15,126 registered Retired Players and 131 registered Representative Claimants of incapacitated Retired Players).  Of them, 91% live within 150 miles of the office of one or more Qualified MAF Physicians.

(b) Those who do not have a Qualified MAF Physician within 150 miles of their primary residence will get an automatic exception to this requirement.  It is correct, as Co-Lead Class Counsel say, that 1,734 registered, living Retired Players live within 150 miles of one Qualified MAF Physician.  If they cannot get in to see that physician or want to see someone else, they should tell us and take

advantage of the exception option.

(c) Anyone who needs an exception may ask us and explain why.  This request can be made using a simple form filled out online with us on screen, using the form posted on the public Settlement Website, or just by emailing us.  We will respond to each request within 24 business hours.  This will not delay getting an appointment or an exam.  We put an online MAF Physician Locator Tool on the Settlement Website where the Retired Player or his lawyer or family member enters the city, state or zip code of his primary address.  The Tool generates a list of the five MAF Physicians closest to that location and displays the number of miles from the Retired Player's address for each physician.  The instructions tell the Retired Player (or his lawyer, if the lawyer is doing the scheduling) to pick one of the Qualified MAF Physicians within 150 miles or ask us for an exception to use one more than 150 miles away and explain why that physician is preferred.  The miles are measured geographically, not by driving distance, which works in the Retired Player's favor.  The entire Qualified MAF Physician list is posted on the public Settlement Website, organized by city.  If a Retired Player wants to use a Qualified MAF Physician from that list who is more than 150 miles from his home, he just has to give us a reasonable explanation why.  Also, if there are no Qualified MAF Physicians within 150 miles of the Retired Player's home, we will help the Retired Player figure out where to go.

(d) We want to provide Qualified MAF Physician choices close to where Retired NFL Football Players live.  One of the selection criteria for Qualified MAF Physicians set by Section 6.5(b) of the Settlement Agreement is "geographic proximity to Retired NFL Football Players."  Defining proximity as 150 miles fits with that criterion.  Retired Players should not have to travel hundreds or thousands of miles to see a physician and incur the resulting burden and travel and lodging expenses.

(e) Traveling great distances to see a particular physician has raised concerns in this Program over the bona fides of the resulting diagnosis, as it does in every settlement program where the claimant's award depends on an accurate medical diagnosis.  Some examples from this Program:

   (1) After an Audit investigation, the Special Masters disqualified a neuropsychologist in California from participating in the Program because her diagnoses were not reliable.  She had found 137 Retired Players eligible for an award.  Retired Players traveled from all over the country to see her, going an average of 1,055 miles, with some Retired Players journeying over 2,400 miles to her office.

   (2) Two law firms have been in Audit investigation and currently are under scrutiny by the Court's Special Investigator.  One firm sent its 46 clients to see particular neurologists an average of 1,226 miles away (some going over 2,200 miles) and neuropsychologists an average of 1,201 miles away (one as

far as 2,301 miles away). The other firm sent 155 Retired Players to neurologists an average of 410 miles away (as much as 2,513 miles) and neuropsychologists an average of 433 miles distant (one Retired Player traveled 2,513 miles).

(3) We had to terminate four Qualified MAF Physicians from the network because of irregularities in their exams and diagnoses. Retired Players who got Qualifying Diagnoses from these doctors had traveled an average of 1,020 miles (high of 2,442 miles), 866 miles (high of 2,522 miles), 749 miles (high of 1,671 miles) or 565 miles (high of 1,873 miles) to be examined by them. One of these physicians turned in 101 Qualifying Diagnoses (of which 56 were Level 1.5 and 37 Level 2). The four had a total of 196 Qualifying Diagnoses (43% of all the Qualifying Diagnoses we have received from Qualified MAF Physicians were from these four), of which 98 were Level 1.5 and 86 Level 2 (50% of all the Level 1.5 and Level 2 Qualifying Diagnoses we have from Qualified MAF Physicians).

In those instances, there was no credible reason for the Retired Players to travel such great distances to see these neurologists or neuropsychologists, when there were physicians available much closer to them. As the trend emerged in the claims, it appeared the travel to a particular office was in the hope that a payable diagnosis was more easily and likely to be obtained there, which required us to investigate the circumstances in greater depth, held up the claims, and uncovered exams and results that were not medically correct.

(f) Neuropsychological testing generally is necessary only for Level 1.5 and Level 2 diagnoses, though some neurologists will refer a patient to such testing to help assess the possibility of a diagnosis of Alzheimer's Disease. Unlike in the BAP, where the neuropsychologists are Qualified BAP Providers under contract with the BAP Administrator, with appointments set by the BAP Administrator, in MAF exams the neuropsychologists are chosen by the Qualified MAF Physician. We have no contract with or communications with those neuropsychologists, no opportunity to train them on the diagnostic criteria adopted by the Settlement Agreement or talk with them to get explanations about their findings, and no chance to provide feedback to them on whether they are following the Settlement Agreement. The substitute for those quality controls is the requirement that the Qualified MAF Physician refer the Retired Player to a neuropsychologist who is either a Qualified BAP Provider, which means he or she has been trained to work in this Program, or is a neuropsychologist on a list of providers we have approved for use in this Program based on our experience to date.[4]

---

[4] We have heard reports that lawyers for Retired Players prefer to pick the neuropsychologist to examine a client, get those results first and then decide whether to have the player go see a Qualified MAF Physician, carrying the neuropsychological testing with him. That is not the way this is supposed to work. Neuropsychologists are not physicians. The system rests on the better medical model that the Qualified MAF Physician decides whether neuropsychological testing is needed and, if it is, then refers the Retired Player out to a credentialed neuropsychologist.

(g) The 50-Mile radius from the Qualified MAF Physician's practice for neuropsychological testing rests on the same goals of sparing the Retired Player from the burden and expense of travel, as well as eliminating unexplained travel of great distances to see a neuropsychologist chosen by the Retired Player's lawyer or the Retired Player that force us to look further into the reasons for that choice and the legitimacy of the resulting diagnosis.  Because the Qualified MAF Physician is to select the neuropsychologist to use, we did not see how the Qualified MAF Physician could quickly or easily measure distances from the Retired Player's home to the neuropsychologist's office.  Thus Rule 10(b) sets the mileage limit as a 50-mile radius from the Qualified MAF Physician's office.  Because normally the Qualified MAF Physician will be within 150 miles of the Retired Player's home, the neuropsychologist also will be within that range, but will not be more than 200 miles from the Retired Player's home.  Our online portals with the Qualified MAF Physicians will display to them the BAP Providers and other approved neuropsychologists within 50 miles from their offices.  If the Retired Player or the Qualified MAF Physician wishes to use someone else, they will ask us and tell us why.

The two mileage limits are not hard and fast.  Exceptions will be granted where there is a plausible, non-pretextual explanation free from fraud suspicion for a departure from the Rule.  The Rules do not make the mileage targets merely aspirational—the idea that the exams "should generally" occur within the 150-mile or 50-mile zones as suggested by Co-Lead Class Counsel—because removing the requirement of an exception before the exam would eliminate our ability to clear up this issue on the front end of a claim and instead leave us attempting to sort this out after the exams are done and we have a Claim Package, thereby delaying the progress of the claim and running the risk to the Retired Player that the exam may have to be re-done.  Here, getting approval before acting is better than acting and then hoping to get approval later, especially when the Retired Player is paying for the exam.

The concerns of Class Counsel about the possible desire of a Retired Player to see a Qualified MAF Physician with a particular area of expertise in cognitive or behavioral neurology rather than "general neurologists," or someone with whom the Retired Player has or feels he can build a relationship of trust, or someone who accepts the Retired Player's health insurance, will be handled easily through the exception process.  All Qualified MAF Physicians are board-

certified and must possess extensive education, training, licensing and insurance coverages.  If their areas of practice did not seem sufficient, Co-Lead Class Counsel had the absolute right to prevent their appointment.  Yet if a Retired NFL Football Player wishes to see a particular Qualified MAF Physician because of his or her particular expertise, all he has to do is tell us accurately why and ask for an exemption from the mileage limit.

That gets us to Class Counsel's argument that the "right of the players to choose MAF physicians is fundamental to the Agreement."  *See* Memorandum in Support at 5; *see also* Memorandum in Support at 2, 3, 4, 6, 7, 8, 9 and 12.  We were not privy to the negotiations between Class Counsel and the NFL Parties that led to the Settlement Agreement.  No language in the 96-page Settlement Agreement guarantees a Settlement Class Member an absolute right to pick a Qualified MAF Physician anywhere in the country or prohibits the Court, the Special Masters or the Claims Administrator from establishing administrative processes for the operation of the Qualified MAF Physician network affecting that choice in some manner.  For example, Section 6.3(a) of the Settlement Agreement tells us that after the January 7, 2017 Effective Date, the five Qualifying Diagnoses possible in living Retired Players "shall be made only by Qualified MAF Physicians."  It does not say "by the Qualified MAF Physician chosen by the Settlement Class Member."[5]

Nonetheless, the goal is not to take away any rights from the Settlement Class or to place obstacles in the way of a Retired Player's choice of a Qualified MAF Physician.  The NFL Parties do not pick the Qualified MAF Physician who sees any Retired Player.  They did not select any Qualified MAF Physician on the approved list.  The advance clearance of traveling a

---

[5] This is reminiscent of the Court's statement in its April 12, 2019 Order, when finding that use by the Special Masters of the AAP or AAPC on Monetary Award appeals is discretionary and not compulsory, that "If the parties wished for compulsory AAP or AAPC review of certain claim appeals, they could have put this in writing."  Order at p. 2.

long distance to see a physician, rather than equally trained and credentialed ones closer by, is designed to curb improper choices fueled by a desire to forum shop across the country in the hope of finding the doctor most likely to provide a ticket to payment.  The Retired Players sent to see the four terminated MAF Physicians who had become known for high positive diagnosis rates received inaccurate findings on their health.  Most saw their claims delayed or denied by questions over the legitimacy of the diagnoses.  Most of them have to be re-tested to learn their true conditions.  While we were able to catch the bulk of these unreliable results, some made it through to payment before the trend became evident. If we had been alerted to the destination diagnoses before the travel and the exams occurred, we could have addressed the problem much sooner.

> **2.  <u>Rule 13(k):  A Qualified MAF Physician May Not Examine or Diagnose Settlement Class Members Represented by Lawyers for Whom the Physician Works as an Expert</u>.**

Rule 13 identifies 11 questionable things a Qualified MAF Physician must avoid.  The last one in Rule 13(k) prohibits a Qualified MAF Physician from examining or rendering diagnoses in this Program for Retired Players who are represented by a lawyer or law firm for whom or for which the physician is at the same time working as a consulting or testifying expert witness.

The integrity of this Program must be beyond reproach.  There is a potential conflict of interest inherent in a financial connection between a Qualified MAF Physician, who must be independent and neutral, and a lawyer or law firm representing Retired Players when that lawyer or firm is paying that physician for services on other matters.  We cannot run the risk that the physician's independent judgment could be influenced, whether overtly or subtly, by such a

connection.  A Retired Player would not feel comfortable being seen by a Qualified MAF Physician who is at the same time on the payroll of the NFL Parties.

As Class Counsel point out, Section 6.5(b) of the Settlement Agreement expressly prohibits a Qualified MAF Physician from working as a litigation expert for an Opt Out.  The Settlement Agreement does not say that is the only ethical rule the Qualified MAF Physicians are to follow.  The Settlement Agreement cannot be read as giving a lawyer or his or her client the absolute right to be examined for benefits by a physician who views that lawyer as a source of income on other matters.[6]

### 3.  Rule 20:  Implementation of the Court's January 9, 2019 Order on the "Generally Consistent" Standard.

In its January 9, 2019 Order, the Court directed us to develop for review and approval by the Court a clarification of the existing Rules Governing Qualified MAF Physicians to "require that Qualified MAF Physicians who make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment by deviating from the BAP testing protocols or diagnostic criteria provide a written description in their reports as to why, in such doctor's medical judgment, the evaluation and evidence is 'generally consistent' with the BAP diagnostic criteria."  That is what Rule 20 does.

Implementing the Court's January 9 Order requires the Qualified MAF Physicians to be able to identify when, in making a Level 1.5 or Level 2 diagnosis, they are "deviating from the BAP testing protocols or diagnostic criteria."  When they do they are to explain to us how they

---

[6] This has come up only once in the Program, as far as we know.  We learned that a Qualified MAF Physician was working as a consultant for a law firm in an unrelated matter.  We presented to the Parties the question whether that engagement prevented the physician from evaluating the Retired Players in the Qualified MAF role for that firm.  The Parties agreed that the current engagement as an expert presented potential conflict but could not agree how broadly the rule would apply retroactively.  We told the physician that a Qualified MAF Physician could work for a law firm but could not examine that firm's clients in this Program.  The physician agreed to transfer the Players from that firm to other Qualified MAF Physicians for evaluation.

reached a Qualifying Diagnosis despite the deviation.  Subparts (a)-(e) of Rule 20 describe when

a deviation from the BAP criteria occurs, as when the full Ex. 2 BAP test battery is used but the

resulting scores would not lead to a Level 1.5 or Level 2 Qualifying Diagnosis under the Ex. 2

criteria, or not all the Ex. 2 neuropsychological testing battery was used, tests were used that do

not appear in that test battery and are not used in the BAP, or the Retired Player's scoring on the

performance validity tests in the BAP protocol, which are designed to detect lack of effort or

false effort during the testing, would not support a Qualifying Diagnosis in the BAP.  Rule 20(e)

also allows us to ask the Qualified MAF Physician to explain to us other situations that appear to

depart from the BAP criteria.  We will train the Qualified MAF Physicians that they are

permitted to deviate from the BAP criteria if they remain "generally consistent" with it and on

how to recognize when the "deviation" is occurring.

When the Parties could not agree on any articulation of what "generally consistent"

means, we and the Special Masters wrote FAQ 99, FAQ 100 and FAQ 125 to explain to the

Settlement Class and to the Qualified MAF Physicians that Level 1.5 and Level 2 diagnoses

outside the BAP may be "generally consistent" with the BAP criteria and what that means.  We

posted these FAQs on the public Settlement Website on February 5, 2018, as part of the "rules of

the road" for this Program.  The key guidance on what "generally consistent" means is in FAQ

100:

### 100. What does "generally consistent" mean?

Something is "generally consistent with" something else if the two things have more
elements or characteristics in common with each other than they have elements or
characteristics that differ from each other. The common elements or characteristics must
predominate over the uncommon ones.

The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made
outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made
in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make

the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

With this said, the closer a set of diagnostic criteria match those specified in Exhibit 1, the more "consistent" it will be with Exhibit 1.

A claim based on a Qualifying Diagnosis is most solid when its elements match closely those required in Exhibit 1. For example, where Exhibit 1 requires documentary evidence or a third-party sworn affidavit corroborating functional impairment, or neuropsychological testing, the claim of a Qualifying Diagnosis is most solid when its Claim Package contains documentary evidence or a third-party sworn affidavit corroborating functional impairment and proof of neuropsychological testing that serve the majority of purposes of those specified in Exhibit 1 for the diagnosis and that do not conflict in any manner with those criteria and requirements.

Special Master Pritchett adopted this definition of generally consistent in his October 18, 2018 decision that led to the appeal by the NFL Parties and ultimately the Court's January 9, 2019 Order. Rule 20 does not change FAQ 100 or that Special Master ruling. We will continue to apply it as the meaning of "generally consistent."

As mandated in the Court's January 9 Order, a Qualified MAF Physician who has made a Level 1.5 or Level 2 diagnosis she or he sees as "generally consistent" with the BAP criteria must explain to us how. Rule 20 requires the physician to provide a "complete explanation" to our satisfaction. Because that explanation will vary depending upon the unique circumstances of each Retired Player, we could not prescribe in the Rule what content each explanation must have. This will be neither "onerous" nor "unworkable," as Class Counsel fear. *See* Memorandum in Support at p. 10. Many Qualified MAF Physicians already have been providing us their rationale for finding a Qualifying Diagnosis despite departing from the strict BAP criteria. When they have not done so on Pre-Effective Date diagnoses reviewed by the AAP, which also can be "generally consistent" with BAP criteria because made outside the BAP, the AAP has asked us to go back to the diagnosing physician for an explanation. If we cannot get one at all or cannot get one that makes medical sense, the AAP has denied the claims. This is

another matter we prefer to clear up on a claim from the outset, rather than deal with it downstream and cause delay, denials and appeals.

Qualified MAF Physicians will enter this explanation online in their portals with us.  We will train them how to do that.  The explanation must be more than merely conclusory.  It need not be lengthy or exhaustive.  It has to provide enough rationale to show a medical basis for the conclusion that the Retired Player has the Qualifying Diagnosis found.  The complaints by Class Counsel about needing this explanation really are not about Rule 20, but about the Court's January 9 Order that requires us to have Rule 20.  No one asked the Court to reconsider that January 9 Order.

### 4.   Rule 23:  The AAP Leadership Council.

Rule 23 allows us to rely on two of the eight members of the AAP as our "Leadership Council" to give us advice and assistance on medical issues arising in the Qualified MAF Physician network and to review claims or groups of claims as we need help on them.  This does not mean these two AAP members will review every Claim Package resting on a Qualifying Diagnosis from a Qualified MAF Physician.  Far from it.

The Settlement Agreement assigns several duties to the AAP.  Section 6.4(a) mandates that a member of the AAP review every Qualifying Diagnosis made between July 1, 2011, and the January 7, 2017 Effective Date by board-certified neurologists and neuro-specialists, and by other non-board-certified physicians before the Effective Date.  In appeals from our determinations on Monetary Award claims, Section 9.8 provides that the "Court may be assisted, in its discretion, by any member of the Appeals Advisory Panel and/or an Appeals Advisory Panel Consultant."  The Court has referred all such appeals to its Special Masters.  In its Order

on April 12, 2019 (Document 10528), the Court ruled that this use of the AAP or AAPC on appeals is discretionary, not mandatory.

The Settlement Agreement does not state that the AAP can do nothing more than review Pre-Effective Date claims and help on appeals.  If the Parties had intended to cabin the AAP solely to those two functions, they could have said so.  Instead, Section 2.1(g) of the Settlement Agreement specifies that "any one" of the AAP members "is eligible to advise the Court or the Special Master with respect to the medical aspects of the Class Action Settlement."  The Special Masters have allowed us to tap into that medical advice to help us administer the Settlement Agreement correctly.  Thus far, we have called upon the AAP to review 32 Monetary Award claims from four Qualified MAF Physicians we terminated from the Program because of unreliable medical techniques and conclusions, and 30 other claims initially with fraud suspicions that became misdiagnosis questions rather than misrepresentation ones, exercising our "discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package or Derivative Claim Package documentation" under Section 8.6(b) of the Settlement Agreement.  Because the issues in the claims were medical ones, we felt it best to have the advice of the AAP on them.

The Settlement Program is better served when we can turn to the exceptionally qualified AAP experts for medical advice.  To promote efficiency and avoid burdening all eight AAP members with helping us, we narrowed the support down to two AAP members on the "Leadership Council."  This will not require Retired Players to "receive a Qualifying Diagnosis from two separate physicians" on every claim.  *See* Memorandum in Support at p. 11.  It will not happen on every claim.  If not part of a fraud investigation, the AAP will be involved only on claims presenting medical issues we have not previously encountered and for which we have no

19

precedent or established guidance, such as when we need help determining whether an explanation for deviating from the BAP criteria on a Level 1.5 or Level 2 diagnosis makes medical sense.  As Rule 23 makes clear, all of this will be "overseen by the Special Masters."

### III.   CONCLUSION

The Rules Governing Qualified MAF Physicians are designed to help, not to delay things, change any eligibility requirements in the Settlement Agreement or make it more difficult to obtain Monetary Awards.  Our fundamental objective is to pay Settlement awards to those who deserve them under the terms of the Settlement Agreement, but we cannot pay them to those who do not qualify. We treat all Settlement Class Members equally, applying the same requirements to all.  We believe the Rules will serve those goals.

Respectfully submitted,

BROWNGREER PLC

By:    /s/ Orran L. Brown, Sr.
Orran L. Brown, Sr.
Virginia State Bar No. 25832
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
Telephone: (804) 521-7201
Facsimile: (804) 521-7299
Email:  obrown@browngreer.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on all counsel of record through the Court's ECF system on May 3, 2019.

   /s/ Orran L. Brown, Sr.   
Orran L. Brown, Sr.
Virginia State Bar No. 25832
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
Telephone: (804) 521-7201
Facsimile: (804) 521-7299
Email:  obrown@browngreer.com
