**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB MDL No. 2323 |

Kevin Turner and Shawn Wooden, on behalf
of themselves and others similarly situated,

                                        Plaintiffs,

          v.

National Football League and NFL Properties, LLC,
successor-in-interest to NFL Properties, Inc.,

                                        Defendants.

THIS DOCUMENT RELATES TO:

Goldberg, Persky & White, P.C. v. Lorenzo Hampton
Attorney Lien Dispute
(Doc. No. 7775)

AND

Smith & Stallworth, P.A. v. Lorenzo Hampton
Attorney Lien Dispute
(Doc. No. 7447)

<u>**REPORT AND RECOMMENDATION**</u>

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                    May    13  , 2019

## I.    INTRODUCTION

Presently before the Court for a Report and Recommendation in the National Football

League Player's Concussion Injury Litigation is the assertion of Attorney Liens by Goldberg,

Persky & White, P.C. ("Goldberg") and Smith & Stallworth, P.A. ("Smith") against the Award

granted to their former client, Settlement Class Member ("SCM") Lorenzo Hampton ("Hampton"),

in the litigation that became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).  Each firm seeks reimbursement of its costs and payment of attorneys' fees of 22%[1] of the Award issued to Hampton pursuant to the contingency fee agreements ("CFA") that he entered into with them in the earlier phases of this case.  Hampton, now represented by Mitnick Law Office LLC ("Mitnick"), challenges the Liens.  He contends that neither Goldberg nor Smith is entitled to any attorneys' fees because he discharged the firms "for cause," citing to a perceived lack of communication by the firm and alleged incompetence.  SCM Statement at 2.  Mitnick seeks a fee of 15% of its client's award pursuant to its CFA, which Hampton does not challenge.  It asks that the balance of withheld funds be returned to Hampton, less reimbursement to prior counsel for their actual expenses incurred.

As we set out in a Report and Recommendation filed on January 7, 2019,[2] our evaluation of these positions involves a consideration of the CFAs between Hampton and these former counsel and an assessment of the reasonableness of the requested fees of all of these parties in light of the five factors enumerated by the Third Circuit in *McKenzie.  See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I"*) and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach will require us to scrutinize the reasonableness of the CFAs at the time of the signing of the contracts and then determine if the circumstances compel a different evaluation of the CFA at

---

[1]  As we describe below, on April 5, 2018, the District Court determined that presumptively no Individually Retained Plaintiff's Attorneys ("IRPAs") should receive more than 22% of a Monetary Award in fees.  ("Fee Cap").  (Doc. No. 9863).  *See* Doc. No. 10368 at 10-11 (discussing the District Court's decision relating to the presumptive Fee Cap).

[2]  The District Court referred to us "all petitions for individual attorneys' liens."  (Doc. No. 7446). On January 7, 2019, we issued a Report and Recommendation pertaining to three separate cases. (Doc. No. 10368).  These were the first where we set out the legal principles that would guide our analysis in these cases.

the time each lienholder seeks to enforce it.  We will then examine the results Hampton obtained, the quality of the representation provided by Goldberg and by Smith, and whether the efforts of those firms substantially contributed to the result.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II*, 823 F. 2d at 45 n.1.  As part of that analysis, we necessarily consider the role of current counsel, Mitnick.  Ultimately, we conclude that Hampton's fee agreements with all three firms should be honored in part and that Hampton cannot escape his obligation to pay both Goldberg and Smith attorney's fees and reimburse costs for their work on his behalf.

## II.      FACTS AND PROCEDURAL HISTORY

Hampton entered into a CFA with Goldberg on August 3, 2011.  Goldberg Lienholder Statement, at 1.  Under the terms of the agreement, if recovery were made by way of lawsuit or settlement, Hampton would pay 40% of the net recovery as the legal fee.  *Id.* at Ex. C, p. 1. Hampton would not owe a legal fee or expense if the firm made no recovery on his behalf by settlement or trial.  *Id.*, at Ex. C, pp. 1-2.  The fee agreement was later amended by Goldberg to reduce the fee to 25%.  *Id.* at 1.  *See also*  Pet. to Est. Attorney's Lien, ¶ 3 (Doc. 7775-1) (indicating firm notified clients on September 17, 2014 that fees were unilaterally reduced).

Goldberg promptly included Hampton in a multi-player complaint it filed in the Superior Court of California on August 3, 2011, *Pear, et al. v. NFL*, that was transferred to this district on February 28, 2012.  *See* E.D. Pa. No. 12-cv-1025.  Goldberg also filed a Short Form Complaint against the NFL on behalf of Hampton on July 11, 2012.  Goldberg formally withdrew from the case on March 4, 2016, after Hampton discharged the firm on July 15, 2015.  (Doc. No. 6758.) The firm filed a Notice of Lien in this Court on June 6, 2017 with its Petition to Establish Attorney's Lien.  (Doc. No. 7775.)

On July 14, 2015, as he terminated his relationship with Goldberg, Hampton entered into

a new CFA with Smith.  Under the terms of that CFA, Hampton agreed he would pay 25% of any recovery as the legal fee.  Smith CFA, appended to Notice of Lien (Dispute Rec. Doc. 2).  As with the Goldberg agreement, Hampton would not owe a legal fee or expense if the firm made no recovery, by settlement or trial, on his behalf.  The agreement also specifically provided that if Hampton discharged Smith "without cause," he would pay Smith 25% of any outstanding offer and that he would agree that Smith earned its full 25% fee if the firm obtain medical opinions that qualified him for an award.  Smith Lienholder Statement at Ex. A.

On March 27, 2017, Hampton notified Smith that he was terminating Smith's representation of him.  Smith Notice of Lien ¶ 6.  A short time later, on March 29, 2017, Hampton entered into a CFA with Mitnick, the third and final law firm to represent him in this litigation. (Dispute Rec. Doc. 5.)  The Mitnick CFA reflects that the firm was retained to represent Hampton "in the preparation and submission of his NFL Concussion claim arising out of the Settlement" and that Hampton would pay Mitnick on a contingency fee basis and in the amount of 10% of the gross proceeds of the financial award recovered by Hampton.  (*Id.,* ¶ 3.)  The CFA also made reference to the "5% holdback fee," with conflicting provisions about Mitnick's claim on those funds.[3]  On April 4, 2017, Smith filed a Notice of Lien with its Petition to Establish Attorney's Lien in this Court.  (Doc. No. 7447.)

In April of 2017, Mitnick submitted Hampton's claim with the Settlement Claims Administrator and thereafter provided additional supporting documentation.  SCM Statement at 3.

---

[3]     In paragraph 3 of the CFA, Hampton manually struck out typed language indicating that the fee he would owe Mitnick was 10% "plus an additional five percent (5%) constituting 'holdback' as ordered by the Court." (Dispute Rec. Doc. 5, ¶ 3.)  Paragraph 6 of the CFA, however, was not altered and provided that Hampton agreed that his responsibility for the payment of the contingency fee was "limited to the 10% fee and 5% holdback fee provided in paragraph three (3) and that those sums shall be derived from the CLIENT's recovery of an award."  (*Id.*, ¶ 6.)

Hampton was ultimately approved for an award of $1,173,805 on September 25, 2018.

During the pendency of Hampton's claim processing, the Claims Administrator issued Notices of Lien on March 20 and March 28, 2018 concerning the liens asserted on Hampton's award by Goldberg and Smith.  Each notice instructed Hampton to respond within 20 days to indicate if he consented to or disputed the lien.  He filed no response to either notice.

In light of the two unresolved liens and the contingency fee agreements of all three firms, the Claims Administrator withheld from Hampton's award funds for payment of attorneys fees in an amount equal to 22% of Hampton's Award, which reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2018 Opinion and Order.  The Claims Administrator also withheld the amount of costs incurred by Goldberg and Smith as asserted in their Notices of Lien. (Doc. Nos. 9862, 9863.)  Of that attorney fee withholding, a portion reflecting 5% of Hampton's Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund ("AFQSF") pursuant to the Court's June 27, 2018 Order Regarding Withholdings for Common Benefit Fund. (Doc. No. 10104.)  Those funds may be distributed at a later date upon further order(s) of Judge Brody.  This leaves the Court to determine the appropriate distribution for the attorneys fees currently available for disbursement (representing 17% of Hampton's Award) and the allocation of those funds that are currently held in the AFQSF (representing 5% of Hampton's Award), if those funds, or a portion thereof, are distributed by the Court at a future date.

Pursuant to a briefing schedule issued by the Court and in accordance with the Lien Rules, all three law firms submitted simultaneous Statements of Dispute concerning their entitlement to a fee in light of the other CFAs and/or attorney liens.  (Goldberg Lienholder Statement, Jan. 28, 2019, Dispute Rec. Doc. 10; Smith Lienholder Statement, Feb. 6, 2019, Dispute Rec. Doc. 9; SCM Statement, Feb. 4, 2019, Dispute Rec. Doc. 8.)  The two lienholder firms each submitted Responses

5

to the other lienholder's Statement of Dispute and to the SCM Statement of Dispute offered by Mitnick.  (Goldberg Response, Dispute Rec. Doc. 13; Smith Response, Dispute Rec. Doc. 12.) Although Mitnick was granted an extension of time in order to submit Hampton's response to the lienholders' statements, no response was submitted and the record is now closed.[4]  Pursuant to Lien Rule 17, the Record of Dispute was then transferred to the Court.

## III.   THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances."  *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts).  The District Court's prior opinions in this class action settlement did not relieve attorneys of this obligation.  Indeed, the Court explained that all attorneys seeking fees, whether through a Lien or otherwise, are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*.  *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity."  *McKenzie I,* 758 F.2d at 101.[5]

---

[4]  The circumstances of Mitnick's request for an extension are outlined in Doc. 16 of the Dispute Record.

[5]  The fee that each firm seeks, when considered in isolation, is within the presumptive fee cap.  If all three firms were awarded the full fee each seeks, however, then 59% of Hampton's award would go to pay IRPA fees.  We see no basis to make such an upward deviation from the presumptive 22% IRPA fee cap.

IV.   **DISCUSSION**

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101.  Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based.  We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

As we outline below, circumstances in some cases changed significantly from the time of Hampton's initial contracting with each firm to the time the two lienholders sought to enforce their contract.  Based upon our evaluation of the remaining three prongs of the *McKenzie* test, we are satisfied that both Goldberg and Smith provided quality representation and made contributions to the ultimate Award received in this case, notwithstanding Hampton's contention that both firms were terminated "for cause" and should not receive any fee.   Considering also Mitnick's contributions and the substantiality of its work with respect to the claims submission and effectuation of the award, we will recommend that the Court approve each firm's fee request in part such that Goldberg's total fee is 9% of Hampton's monetary award, Smith's fee is 8%, and Mitnick's fee is 5%, before accounting for the holdback.

A.     **The CFAs at the time of contracting and enforcement – impact of changed circumstances**

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing by Hampton and the firms, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.   We then compare the landscape at the time of contracting with the circumstances at the time the Goldberg and Smith attorney-client relationships terminated.

1.   *Goldberg*

Goldberg agreed to represent Hampton on August 3, 2011, shortly after the first lawsuit was brought by former players against the NFL in California state court but before individual cases had been consolidated for pretrial purposes into this MDL.  This is what Professor Rubenstein[6] characterized as "Phase 1" of the litigation.  As has been noted in prior opinions in this case, at that time the plaintiffs faced stiff challenges surmounting the issues of preemption.  Establishing causation also would have been similarly challenging, as the claims involved complex scientific and medical issues that had not yet been studied comprehensively.

Risk as it related to overall workload also varied over time in this litigation.  When law firms undertake large-scale litigation, they are obligated to decline to take on other litigation.  The cost to law firms in deciding to participate and thus forego alternative matters must be recognized. In this first phase of the litigation, the law firms that undertook representation of players individually, without the benefit of the efficiencies contained within an MDL, faced monumental

---

[6]  The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court.  After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2).

challenges and risked having to pursue the entire case themselves, perhaps even through trial.  Fee arrangements reflecting those large contingencies "would have been expected and appropriate." (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL in January 2012, the risk related to the *volume* of work to be undertaken by a law firm changed dramatically.  Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case.  *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from individually-retained player attorneys to Plaintiffs' Committees, which would be compensated through a common benefit fund).[7]  The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

Hampton remained in a contractual relationship with Goldberg from the signing date of August 3, 2011 until July 15, 2015 when he discharged the firm.  During this time substantial progress had been made in moving the cases forward.  The NFL's motions to dismiss and to sever were argued in April 2013, but in July 2013, without yet ruling on these motions, Judge Brody ordered the parties to mediation, and by the end of August 2013 a term sheet had been signed. This led to class counsel's motion for preliminary approval filed on January 6, 2014.  Judge Brody

---

[7]  We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

denied the motion and sent the matter back for further discussion, making it clear that she was not happy about the inclusion of an overall cap.  In June 2014 an amended agreement that eliminated the cap was presented for preliminary approval.  It was approved on July 7, 2014.  In November 2014 the fairness hearing was held.   This led to additional changes in the settlement agreement, which was finally presented to the Court on February 13, 2015.  It was approved on April 22, 2015, although appeals were filed as early as May 13, 2015.  It was in this posture, prior to the April 18, 2016 decision of the Third Circuit Court of Appeals affirming the District Court's approval of the Settlement Agreement, that Goldberg's representation of Hampton was terminated.

Thus, during the period in which Goldberg represented Hampton, the risk inherent in the litigation decreased significantly.  This reduction in risk was ultimately accomplished through the efforts of Class Counsel and those other lawyers who served on various MDL committees and performed work for the common benefit.  This does not alter the fact, however, that Goldberg undertook the representation at a time of great risk.

### 2. Smith

At the time Smith agreed to represent Hampton on the July 16, 2015 date of contracting, the Settlement Agreement had met with the approval of the District Court but implementation was on hold pending appeals.  Smith agreed to undertake representation of Hampton as a "NFL Concussion Class Action Settlement Claimant," "specifically in relation to the NFL Concussion Class Action Settlement Relative to the case known as *In re: National Football League Players' Concussion Injury Litigation*, No. 2:12-MD-02323," in this Court.  (Smith Lienholder Statement at Ex. A.)  At the time of contracting, then, Smith anticipated that the representation would involve making a claim under a settlement agreement, as opposed to advancing novel litigation.  In that posture, the major risks confronting prior counsel in terms of liability and the defenses the NFL

10

could assert had been alleviated, although some risks and several more months of waiting remained until the appeal process resolved and for the claims administration process to be rolled out.

### 3.   *Mitnick*

At the time Mitnick contracted with Hampton in March 2017, the risks and benefits of the representation were largely known.   Hampton was already registered with the Claims Administrator, his eligible seasons had been documented, and he had been examined by a doctor who could document a qualifying diagnosis as of September 3, 2015.   The Claims Administrator was to begin accepting claims submissions in the coming months.

In addition, the parties knew at the time of contracting that the Court had accepted a recommendation to presumptively cap IRPA fees at 22% of the Monetary Awards.   Mitnick contracted for a 10% fee, although the contract contains inconsistent provisions concerning the firm's entitlement to attorneys fees "held back" by the Claims Administrator.   Mitnick also knew of the involvement of prior counsel that could affect the fees available from Hampton's award, and he committed in the CFA to "advocate on behalf of client in having any such lien reduced or eliminated." (Dispute Rec. Doc. 5.)   There were no changes in the circumstances during the time between when Mitnick agreed to represent Hampton and when it sought to enforce the contract upon the approval of Hampton's award.

### B.   <u>The results obtained</u>

We next look to the results obtained, the quality of the work performed and the substantiality of the attorneys' efforts in bringing about the result.   We observe that on September 25, 2018, Hampton qualified for a Monetary Award grid amount of $1,173,805, based on his Level 2.0 Neurocognitive Impairment diagnosis at the age of 53. (Hampton, Notice of Monetary Award

Claim Determination).[8]  After deduction for potential derivative claimant awards, the monetary

award amount from which attorneys' fees are calculated and deducted is $1,162,067.

### C.     The quality of the work performed

Each of the firms contends that the work performed by the others was minimal and

overstated.  Both Goldberg and Smith vigorously contest the characterization by Hampton through

Mitnick that he terminated both firms "for cause" and due to poor communications.  As is

demonstrated in our discussion below, we find each firm to have provided quality work on behalf

of Hampton and in accordance with the demands of that stage of the litigation and settlement

administration.  We also make clear that the question of "the quality of the work" does not, by

itself, assist our analysis.

### D.     The substantiality of the work performed

The more important question to consider in this multi-party lien dispute is how the different

attorneys contributed to the work necessary to obtain the Monetary Award that Hampton received

in this case.  Each contributed in some way, although Goldberg's contribution is reflected primarily

in the fact that Hampton was a part of the litigation from the outset and did not opt out of the

settlement once a global resolution was proposed.  Smith for example, characterizes Goldberg's

efforts as an IRPA as *de minimus*, regardless of the value it added in advancing legal theories and

working at the vanguard of this litigation and for the common benefit, in that the work it performed

individually for Hampton did not have a substantial effect on the ultimate outcome of Hampton's

award.  Mitnick, in turn, characterizes Smith's efforts as ineffectual.  Both lienholders assert that

---

[8]  The Claims Administrator's records reflect that Mitnick submitted the claim form on August 28,
2017.

subsequent counsel poached the client after they had prepared his claim and improperly interfered with their right to their fee.  We therefore lay out the efforts undertaken by the three firms in the various aspects of their representation to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.

As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;

> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;

> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;

> (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,

> (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,

> (6) support of clients who were seeking loans and were exposed to predatory lending practices; and

> (7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories, and there may be other categories of tasks undertaken or services provided by IRPAs that would be relevant to this analysis.  In the absence of any suggestion of other relevant criteria, we will use these categories as checkpoints as we consider the substantiality of the IRPA's efforts and the role each may have played in maximizing the player's award.

### (1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date

Goldberg contends that it worked with Hampton to schedule medical evaluations shortly after the final NFL standards were preliminarily approved.  Hampton went to those evaluations on October 3, 2014 "and received a qualifying diagnosis per the NFL settlement criteria."  (Goldberg Response at 2.)  This work is also reflected in the costs Goldberg incurred for which it requests reimbursement, $5,878.67 of which was spent on expert evaluations, airfare, and hotel expenses in November and December 2014.  (Goldberg Statement, Ex. B; Goldberg Response at 4.)  Goldberg has represented that it also provided a consultant, Charles Berry, to assist Hampton with these medical evaluations and with communications about his case.  (*Id.*)

The evidence of Goldberg's work on behalf of Hampton in gathering medical records was not contradicted in the response of Smith,[9] and we accept Goldberg's representation that these communications and arrangements were about Hampton's individual case and the medical documentation necessary to support his future claim.  Goldberg performed quality work in considering the information that was available as the proposed settlement came to be announced and attempting to shore up the medical evidence that would prove necessary for a meritorious claim.

Smith notes, however, that the reports of Drs. Getz and Dappert obtained through Goldberg were not ultimately used to obtain the qualifying diagnosis.  (Smith Resp. ¶ 5.)  To be sure, Goldberg's submissions do not identify what the diagnosis was that it helped Hampton obtain, and the Notice of Award in the record before us reflects that the diagnosis for which Hampton received

---

[9]  Mitnick did not file a response to Goldberg's Statement of Dispute.

an award was made on September 3, 2015. That post-dates Goldberg's representation. Therefore, the medical evaluations arranged for by Goldberg would not seem to have played a substantial role in the benefit received.

We accept Smith's assertion that it performed significant work with respect to reviewing and collecting medical reports and scheduling appointments for neuropsychological testing with Dr. Afield and Board Certified Neurologist Dr. Andrews. A representative from the firm even attended the examination conducted by Dr. Afield and communicated with him about the BAP criteria. In addition, Smith reviewed and collected Hampton's NFL player history data and player contracts dating back to 1985, which would pertain to the number of eligible seasons Hampton could establish and directly impacted the size of his Monetary Award. In the course of this work, Smith advanced $1,650.46 in costs in February 2016 for testing and evaluations by Drs. Afield and Andrews.[10]

Mitnick gathered additional medical data in April 2017 from the Neuropsychiatric Institute where Dr. Afield was employed to supplement the reports that Smith had obtained the prior year. It also obtained a sworn third-party statement in July 2017 regarding Hampton's functional limitations. Mitnick did not incur any costs for which it seeks reimbursement.

### (2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial

Smith collected Hampton's NFL player history file, which would be necessary to document the number of seasons played by Hampton. This was ultimately an important factor in the grid

---

[10] One dispute between Smith and Hampton on this subject appears to have led to the rift and Hampton's decision to terminate the firm. According to Smith, Hampton did not want to submit the claim before first seeing if a worker's compensation physician who evaluated him years earlier might be able to provide an earlier diagnosis date. Smith was satisfied from a review of that physician's records that no earlier date would be established. *See* Smith Resp. at 6-7.

utilized for the players' monetary awards under the settlement.  By the time Smith was representing Hampton, however, it was clear that the matter was one for preparation of a claim in a settlement, not of trial preparation.

### (3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted

While not other litigation *per se*, two of the firms were aware that various liens against Hampton's award would reduce his eventual recovery.  Goldberg did some work in this area in late 2014 and early 2015.  (Goldberg Statement at Ex. A.)  Smith does not appear to have touched on this area in its short representation, when it was focused on preparing a successful claim for Hampton.  Mitnick appears to have spent a bit more time in this area and claims to have done so successfully.  We accept that these were not "mundane legal chores" but rather necessary work that advanced Hampton's individual interest.  *See McKenzie II,* 823 F.2d at 47.  We suspect that the communications with Garretson Resolution Group concerning these liens would not, however, have involved "an exorbitant amount of time" as Mitnick suggests.  *See* SCM Statement at 3.

### (4) Support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class

This factor would relate to Goldberg's period of representation.  Goldberg obviously counseled Hampton to join the multi-plaintiff lawsuit that was being filed in California in 2011.  Goldberg has represented that it had periodic communications with Hampton concerning the status of settlement discussions and the future of the litigation.  He also designated a consultant to respond to Hampton's inquiries and concerns.  While Hampton contends that Goldberg did not communicate well with him, we are unaware of what individual communications would have been necessary during this period that were not provided.  Goldberg did as much for Hampton as the

16

circumstances of the case would allow.[11]

By the time Smith was engaged, the settlement was pending approval in the Court of Appeals. Smith's engagement letter reflected that it would represent Hampton as to a claim being submitted through the MDL claims administration process. Smith was not required to counsel Hampton as to whether he should remain in the class.

### (5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award

Both Smith and Mitnick shared a role in this aspect. Smith registered Hampton and provided him access to the Claims Administration Portal. It also drafted the claim form that Mitnick ultimately submitted and further updated. Smith offered advice to Hampton about whether any worker's compensation documentation would lead to any earlier diagnosis and thus a larger award (though it ultimately did not). For the most part, however, Mitnick was at the helm as Hampton navigated the claims process through receipt of a Monetary Award. To the extent that this claims processing was more protracted, with the necessity of responding to deficiency notices, Smith suggests that these problems could have arisen from carelessness on Mitnick's part. The record also supports, however, that Mitnick was required to obtain additional underlying data from one of the diagnosing doctors selected by Smith, Dr. Afield, which would not reflect on any deficiencies created by Mitnick.

We note here Goldberg's contention that, after its representation ceased, all that remained

---

[11]   We note that Hampton also complained of Smith's unresponsiveness and lack of communication, suggesting a common theme of dissatisfaction with counsel. Smith's records show multiple communications with Hampton. Moreover, one example that Hampton cited as a particularly egregious example of the lack of responsiveness of Smith instead paints *Hampton* as having unreasonable expectations of the relationship and of misconstruing information about the availability of Smith personnel. *See, e.g.,* Smith Resp. at 4-5 (describing client assumption that Smith was "out fishing" when he was not in the office at the time of an unannounced visit but where he was instead participating in a mediation in another case).

was the processing of Hampton's claim and that Mitnick's work in that regard was "purely ministerial." (Goldberg Resp. at 4.)  We accept that the representation at that point did not involve assuming the risk of no recovery, nor did Mitnick need to develop novel legal theories as was necessary during the earlier phases of litigation.   The work beginning in 2017 did, however, involve responding to the requests for further information from the Claims Administrator, including obtaining additional information from the medical specialists.   Mitnick also spent "substantial" time working with Garretson Resolution Group for the successful negotiation of medical liens on Hampton's award.  All of this post-claim work was not *de minimis* and it was certainly a necessary step for Hampton to receive the award that he did.

> **(6) Support of clients who were seeking loans and were exposed to predatory lending practices; and**

This factor does not appear to apply to Hampton's situation.

> **(7) Providing necessary support in other personal matters collaterally related to this litigation**

This factor also does not appear to apply to Hampton's relationship with any of the three law firms.

### E.   <u>Apportionment</u>

As we synthesize this information to assess how to apportion fees for the quality representation provided to Hampton that yielded the positive outcome of a Monetary Award, we are cognizant that four groups of attorneys contributed to the work necessary to obtain that Award: Goldberg acting for Hampton individually; Class Counsel and law firms such as Goldberg that acted for the common benefit in negotiating and defending the Settlement Agreement; and Smith and Mitnick, both of which agreed to represent Hampton when it was clear that his case would be resolved according to the terms of the class action settlement.

18

We first find that the substantiality of Goldberg's work as an IRPA in Hampton securing the Monetary Award that he received is necessarily reduced given that the work of Class Counsel, and the attorneys working with them for the common benefit during that same period, clearly "reduced the amount of work required of IRPAs." (Doc. No. 9862 at 4). In its establishment of a 22% presumptive fee cap, the District Court has already taken actions to reduce IRPA fees, accounting for the substantial benefit provided by Class Counsel.  This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials.  Particularly when we account for the meaningful work of Smith from its engagement in 2015, we are convinced that Goldberg's hand in bringing about the award Hampton received does not warrant the 22% fee it is seeking.  At the same time, we reject the argument advanced by Mitnick that Hampton was justified in terminating Goldberg due to the firm's alleged incompetence.

Consistent with its simplistic view, Mitnick suggests that it single-handedly brought about the award.  It added limited value beyond the preparations done by Smith.  Therefore, Mitnick's share in the 22% fee will be apportioned accordingly.

Smith, the only party that indicated a willingness to have its fee fairly apportioned, ultimately guided Hampton through the most active phase of the case as protocols were finalized and qualifying diagnoses could be secured.

When we consider the contributions of each firm to the five categories of tasks described above, and valuing each task category based on its significance to this case (e.g., minimizing the

19

impact of work done to reduce medical liens but valuing the work done to obtain medical records and the qualifying diagnosis), we find that the efforts of Goldberg and Smith were more substantial to the result in this case than that of Mitnick.  As between Goldberg and Smith, we value the risk that Goldberg willingly shouldered when it agreed in 2011 to represent Hampton in his uphill battle.  Accordingly, we settle upon what we consider to be fair resolution, apportioning 9% of the Monetary Award to Goldberg, 8% to Smith, and the remaining 5% to Mitnick.  In light of the District Court's prior order that a portion of these IRPA fees be set aside in the Attorneys' Fees Qualified Settlement Fund, we recommend that the 5% "holdback funds" be apportioned among counsel in the same proportion in which they share the 17% portion that is currently available for distribution to counsel.

###    F.    <u>Costs</u>

Goldberg seeks reimbursement of the $5,878.67 it incurred in costs.[12]  Its CFA with Hampton provided for reimbursement of costs from his award.  These costs were reasonably incurred and should be awarded to Goldberg.

Smith likewise seeks reimbursement of the $1,650.46 it incurred in costs.  Its CFA with Hampton also provided for reimbursement of costs from his award.  We find that these costs were also reasonably incurred and should be awarded to Smith.

---

[12]  As reflected in the Notice of Lien (Dispute Rec. Doc. 3), Goldberg initially asserted a larger amount for costs.  As a result, the Claims Administrator withheld $6,663.26 for this purpose.  The lesser amount that Goldberg now seeks for costs reflects its decision not to pursue reimbursement for $799.20 for Hampton's "pro rata share of general costs incurred" and instead to request only the costs it could itemize for postage and photocopying relative to Hampton's.  This was a prudent decision by Goldberg.

V.      **CONCLUSION**

We conclude that Goldberg's IRPA contribution to Hampton's Award here is insufficient to support an attorney fee of 22% as it seeks.  The relative contribution of Class Counsel compared to that of Goldberg was substantial in this individual litigation due to the termination of Goldberg in July 2015, when the revised proposed settlement was still pending approval in the District Court. The work performed by Smith during the claim development stage provided a significant contribution in ensuring that Hampton would qualify for the best possible award.  The work of Mitnick in seeing Hampton through this final phase clearly bears the most obvious indicia of success, yet Mitnick's success came on the shoulders of prior counsel.  We conclude that a fair resolution of this dispute is to award 22% of the Monetary Award for attorneys' fees to be apportioned between Goldberg, Smith, and Mitnick as follows: 9% to Goldberg, 8% to Smith, and 5% to Mitnick.  These amounts must be reduced by the Common Benefit Fee deduction currently applicable to all Awards.  Accordingly, we recommend that the Claims Administrator be directed to release the funds currently withheld for counsel fee, which reflects 17% of Hampton's Monetary Award, in the following manner:  Goldberg will receive 9/22 (41%) of it, Smith with receive 8/22 (36%) of it, and Mitnick will receive 5/22 (23%) of it.  We recommend that the Court allocate whatever portion of the 5% holdback that is later released for payment to IRPA attorneys by the same ratios as we used to apportion the currently-payable fee.  We also recommend that the Court approve payment to Goldberg of the $5,878.67 it incurred in costs and to Smith of the $1,650.46 it incurred in costs.  The balance of withheld funds (for excess attorney costs withheld by the Claims Administrator) would be payable to Hampton.

BY THE COURT:


 /s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE