UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | ) ) ) ) ) | 12-MDL-2323-AB |
| ──────────────────────────── | ) ) | |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, | ) ) ) ) | Philadelphia, PA May 7, 2019 10:39 a.m. |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., | ) ) ) ) ) | |
| Defendants. | ) ) | |
| ──────────────────────────── | ) | |

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

Claims Administrator:        ORRAN BROWN, ESQUIRE
                             ROMA PETKAUSKAS, ESQUIRE
                             BROWNGREER, PLC
                             250 Rocketts Way
                             Richmond, VA  23231

For the Plaintiffs:          GENE LOCKS, ESQUIRE
                             DAVID D. LANGFITT, ESQUIRE
                             The Curtis Center
                             601 Walnut Street
                             Suite 720 East
                             Philadelphia, PA  19106

For Kevin Turner,            DAVID R. BUCHANAN, ESQUIRE
et al.:                      MICHAEL L. ROSENBERG, ESQUIRE
                             SCOTT A. GEORGE, ESQUIRE
                             SEEGER WEISS, LLP
                             6th Floor
                             55 Challenger Road
                             Ridgefield, NJ  07660

APPEARANCES: Continued

For National Football        BRUCE BIRENBOIM, ESQUIRE
League:                       CLAUDIA HAMMERMAN, ESQUIRE
                              BRAD S. KARP, ESQUIRE
                              PAUL, WEISS, RIFKIND, WHARTON
                              & GARRISON, LLP
                              1285 Avenue of the Americas
                              New York, NY  10019

Audio Operator:               JAMES F.G. SCHEIDT


Transcribed by:               DIANA DOMAN TRANSCRIBING, LLC
                              P.O. Box 129
                              Gibbsboro, New Jersey  08026
                              Office:  (856) 435-7172
                              Fax:     (856) 435-7124
                              Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                           I N D E X

2    INTRODUCTORY STATEMENT:                              PAGE

3       By Mr. Locks                                    5, 40

4       By Mr. Langfitt                                      7

5       By Mr. Buchanan                                13, 43

6       By Mr. Brown                                   17, 44

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (The following was heard at 10:32 a.m.)

2            THE COURT:  -- Players' Concussion Injury Litigation

3     at Docket Number 2012-2323, and we're here -- I want to

4     recognize Orran -- Mr. Brown --

5            MR. BROWN:  Yes, good morning, Your Honor.

6            THE COURT:  -- and with you?

7            MR. BROWN:  Is Roma Petkauskas from our firm, Your

8     Honor.

9            THE COURT:  Okay, thank you.  And for the NFL?

10           MR. BIRENBOIM:  Bruce Birenboim from Paul, Weiss.

11    I'm here with Claudia Hammerman, and Brad Karp is on a train

12    that's delayed, but he'll be here any minute.

13           THE COURT:  Okay.

14           MR. BIRENBOIM:  He apologizes.

15           THE COURT:  Do you want me to wait?

16           MR. BIRENBOIM:  No, we can proceed.

17           THE COURT:  Okay.  All right.  And the people who

18    are here for the plaintiffs are Gene Locks, David Langfitt, is

19    that right?  Who's going to be speaking?

20           MR. LOCKS:  We -- both.  I'm going to have an

21    introductory statement and then he's going to carry the ball.

22           THE COURT:  Okay.  And Mr. Buckman (sic), hi.

23           MR. BUCHANAN:  Good morning, Your Honor.

24           THE COURT:  And, Mr. Rosenberg --

25           MR. ROSENBERG:  Yes, Your Honor, good morning.

1          THE COURT:  And Scott George, is that correct?

2          MR. GEORGE:  Good morning, Your Honor.

3          THE COURT:  Okay.  All right, let's begin with your

4     introductory statement, Mr. Locks.

5          MR. LOCKS:  Your Honor, our efforts at the moment

6     are to be constructive and not destructive.  My motive is to

7     make this work and make it work better, and that's what we're

8     trying to do.  It's very personal to me because I did play

9     college football and I have a close friend who's an

10    end-stage --

11         THE COURT:  Are you a plaintiff?  No?  You're not a

12    member of the class?

13         MR. LOCKS:  No, I didn't make it into the pros, Your

14    Honor.

15         THE COURT:  I'm only kidding.

16         MR. LOCKS:  I only went -- I only played at

17    Princeton, but in those days they played pretty good football.

18    And one of my closest friends, a lineman, is an end-stage

19    Alzheimer's as we speak, a former lawyer at Dechert in this --

20    didn't work here, he worked overseas -- from the kind of

21    treatment we got maybe playing football.

22         Another close friend that we played against and we

23    beat from Yale, he is a former player who died with

24    Alzheimer's and CTE and was a plaintiff and recovered.  So

25    really, really this was a great idea, it's a great program,

1    it's a great settlement and it's within the benefit that we

2    support.

3            However, part of the program and part of the support

4    of the players was always to have the freedom of choice to

5    decide who they could go to for medical treatment and have the

6    freedom to make those decisions.

7            They had bad experiences with the NFL benefit

8    programs, both during their playing time and after their

9    playing time, when they felt that they were used and abused

10   and were not going to the doctors that they wanted to.

11           When we went to get support for this case -- and at

12   the time we originally had 1,300 players under agreements,

13   1,100 were registered -- when we went around to get the

14   support of the players, the most important issue to them was

15   can we go to whatever doctor we wish, and that was a main,

16   main concern and it was important.

17           Now, very quickly, the 150-mile rule plus,

18   unequivocally was only put in place for fraud.  There was no

19   other reason valid expressed and it was told specifically to

20   me that was the reason it was put in.

21           And frankly, as David will explain and as we talk

22   about the balance of the changes that have been made by Mr. --

23   the Claims Administrator, that rule is not needed.  It's

24   particularly not needed if it's mandatory and it should only

25   be a factor in evaluating the merits of a medical report or

1    case.  By the way, it's not workable.  There are not enough

2    doctors in the program as we speak today.

3            They're limited in their specialties, many of them.

4    I learned there are 30 different specialties of neurology and

5    only three -- four or maybe five apply to this kind of medical

6    evaluations.  The doctors have not all got the experience of

7    dealing with players with this type of injury.

8            Because the sole reason for the 150-mile rule is

9    fraud, Mr. Greer has been very successful in finding the bad

10   guys, the bad doctors, the bad lawyers who have committed the

11   frauds, but having said that, with the new programs in place,

12   there does not need to be an added fraud provision like the

13   150-mile rule.

14           And frankly, all the players should not be punished

15   for the violations of a few.  Mr. Langfitt has a lot to say

16   about the rest of the substance.  I leave it up to him.

17           THE COURT:  Okay.  And, Mr. Buchanan, are you going

18   to be speaking also?

19           MR. BUCHANAN:  I will, Your Honor.

20           THE COURT:  Okay.

21           MR. BUCHANAN:  Thank you.

22           MR. LANGFITT:  Thank you, Your Honor.  May it please

23   the Court, my name is David Langfitt for the moving parties.

24           THE COURT:  Okay.

25           MR. LANGFITT:  Picking up where Mr. Locks left off,

1    by way of background, the MAF program and the generally

2    consistent standard were not in the agreement this Court

3    rejected in January of 2014.  They only came after that

4    agreement.

5              They came in the agreement that Mr. Buchanan

6    negotiated and that MAF program and the generally consistent

7    standard were really essential bargaining benefits that Mr.

8    Buchanan and Mr. Seeger primarily obtained from the NFL.

9              The NFL for its part got its anti-fraud provisions

10   and when the Court looks at the numbers that are being posted

11   on the website and seeing that there are 2,700 claims

12   submitted and 843 awards, I think overall, those robust fraud

13   provisions are working.

14             But this was a bargain that Mr. Buchanan and Mr.

15   Seeger struck with the support of other class counsel and part

16   of that is the choice of an MAF physician.  And what I would

17   submit to the Court is that the 150-mile rule as Mr. Locks

18   stated is one to restrict that choice and it's one based on an

19   anti-fraud sentiment.

20             We support the anti-fraud provisions.  We think that

21   they're working well.  We see that.  We think to turn a

22   privilege, a right bargained for within that six-month period

23   between January and June or July of 2014 into a restriction,

24   we think is unfounded and we don't think it would work.

25             Now, if you move on -- and the same would be true of

1    Provision 10 in the new MAF rules about restricting the choice

2    of a neuropsychologist for an MAF evaluation, we think that

3    there's -- and we applaud Mr. Brown by the way and Ms.

4    Petkauskas for developing the program, we want the best

5    physicians in there.

6              And I think that they would agree that when they see

7    what we do in terms of choosing physicians, we choose them

8    based on quality.  We want as many cognitive and behavioral

9    neurologists in that program as possible, and we think that

10   the developments of an advisory council to the Court of ten or

11   more MAF physicians to develop that network is just a great

12   idea.

13             So we thoroughly applaud it, but we think the

14   restriction is unnecessary and we think actually it does

15   materially change the bargain that was struck between January

16   and July of 2014.

17             Now, with respect to Rule 13K, that -- that's a

18   knotty rule and we do see within the agreement that the

19   restriction does exist, but it restricts MAF physicians from

20   serving for opt-outs in related litigation in the settlement

21   agreement itself.

22             So what we would propose to Your Honor -- and we

23   have a complete compare right of the rules that Mr. Brown

24   prepared and we can certainly submit that, we want to be

25   productive and helpful, we think that if the Court allowed us

1   to sit down with the stakeholders here including BrownGreer

2   and the Special Masters, we think that we could come up with

3   rules that they all -- we all could agree to and that the

4   Court could approve, and it wouldn't in any way resemble an

5   amendment.  It would balance the bargain that was struck.

6              THE COURT:  Well, what's your -- articulate it.

7   This is your chance.

8              MR. LANGFITT:  In 13K, in Paragraph 13K what we

9   would suggest --

10             THE COURT:  And tell me what -- 13K is 150?

11             MR. LANGFITT:  No, it is not.

12             THE COURT:  Well tell me what it is.

13             MR. LANGFITT:  13K is the provision that prevents an

14  MAF physician from serving as a consulting or litigation

15  expert --

16             THE COURT:  Oh.

17             MR. LANGFITT:  -- in related litigation.  I

18  understand, Your Honor, I just think that BrownGreer should

19  have the discretion to approve or disapprove that, and I would

20  leave that to BrownGreer.  I think that they can approve it or

21  disapprove it depending on a case-by-case basis, I think that

22  would be fair.

23             As to the 150-mile rule, I would suggest that that

24  be re-written as non-mandatory but urged upon the player by

25  the Court and by BrownGreer for one simple reason.  This whole

1    program is about the health of the players.  The NFL decided

2    they were going to do something that was very beneficial to

3    the players, and they are.  And the plaintiffs' lawyers want

4    the same thing.

5         And so by having -- by urging players to focus on

6    doctors who are near them, we all know that this is an ongoing

7    problem, one -- it's not a one-and-done thing.  If someone

8    goes to a doctor, they don't necessarily get a qualifying

9    diagnosis.  In the BAP, I think maybe six percent get

10   qualifying diagnostics.

11        But they have those baselines and so if they go and

12   they are urged and encouraged by the Court to go to doctors

13   nearby that they can repeatedly go to using their insurance in

14   the future, that means the goal of monitoring players is

15   achieved.

16        They get monitored by qualified MAFs that the Claims

17   Administrator is recruiting and developing with the Court's

18   assistance.  Once they get these -- these people in place,

19   this will fulfill the ultimate goal of the program because the

20   players go back to those doctors.  They trust those doctors.

21   They know they're not too far away.

22        So they can go -- a player who goes in and gets a

23   negative baseline test -- well first of all, that's great news

24   for anybody, but if two, three, four years down the line

25   something goes wrong, the spouse starts to notice things, the

1    player goes back to the MAF using insurance and sees what

2    happens maybe in a 45 minute visit.  That's a real benefit.

3         But making it mandatory is changing the bargain that

4    Mr. Buchanan and Mr. Seeger struck long ago and I think that

5    if it's encouraged, you're going -- we -- we collectively are

6    going to succeed in the goal that we set a long time ago.

7         And I don't mean just Mr. Buchanan and me, I mean

8    Mr. Birenboim, I mean BrownGreer, we can all succeed in this.

9    And when we come in here, Your Honor, first of all, we're very

10   grateful that you granted this hearing.  We really want to be

11   productive and we think that based on the fact that we

12   represent so many players, we've had so many evaluations done,

13   not just BAP but also MAF, we feel that we have a lot to bring

14   to the table --

15             THE COURT:  Thank you.

16             MR. LANGFITT:  -- okay?

17             THE COURT:  Okay, thank you.

18             MR. LANGFITT:  Now, is -- there's one other thing

19   and I really want to get to the --

20             THE COURT:  Well let's --

21             MR. LANGFITT:  -- the AAP issue.  For example, we

22   think that BrownGreer deserves --

23             THE COURT:  Is this in your papers?

24             MR. LANGFITT:  Forgive me?

25             THE COURT:  Is this in your papers?

1           MR. LANGFITT:  It is -- the -- it is not in the

2    papers, but it's one of the things that Mr. Brown touched upon

3    in his rules and it's the --

4           THE COURT:  I'm not -- you asked me to consider

5    certain things today and you wrote them out.  I took them in,

6    I let you have a hearing.  That's what the hearing is on.  If

7    you have some other complaints, if you don't mind, any -- not

8    -- this has nothing to do with the Steering Committee, this is

9    -- you are a lawyer representing private clients and you will

10   have that right to do.

11          MR. LANGFITT:  Very good.  Thank you.

12          THE COURT:  Thank you.

13          Mr. Buchanan.

14          MR. BUCHANAN:  Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MR. BUCHANAN:  I am going to address one issue.

17   It's the restriction on the 150-mile radius in the rule as

18   adopted by the Court.

19          THE COURT:  Well that's what -- that's what your

20   colleague has --

21          MR. BUCHANAN:  Indeed, and I think in looking at the

22   data -- and we read Mr. Brown's response -- as I understand

23   Mr. Brown's response, the hope is that to address something up

24   front to minimize if you will addressing this on the back end,

25   and we accept certainly what he says, that exceptions will be

1    liberally granted, but we have some concerns.

2             One, we think the necessity -- and this is where we

3    agree with the Locks Firm and their position on this -- the

4    necessity for this we think is greatly overstated, and I would

5    like to go through some of the data with Your Honor.

6             If you turn -- just for the record -- page ten of

7    Mr. Brown's submission highlights three factual bases for this

8    need.  The first point, Your Honor, concerns pre-effective

9    date diagnoses associated with Dr. Hoover.

10            As you recall, a large number of neuropsychologists

11   who reviewed a number of players, players traveled great

12   distances to go to see her, maybe with or without the guidance

13   of counsel, and a number of claims were denied and permitted

14   to be resubmitted with different reviews by other doctors.

15            That's point one, all pre-effective date diagnoses

16   all tied to one doctor.  Again, a physician who had not been

17   screened by BrownGreer and signed off on by co-lead counsel

18   for the plaintiffs or for the NFL.

19            Two, pre-effective diagnoses of -- I think submitted

20   by two law firms that are currently the subject of an

21   audit/special investigator review.  Those claims obviously

22   denied, pre-effective date, reviewed by physicians not

23   approved by BrownGreer.

24            There's the example now of reviews conducted by four

25   physicians who were MAF doctors who have since not been

1   renewed and they're no longer seeing players.  They're now out

2   of the program.  But what we see actually when we look at the

3   data and in response to Mr. Brown's submission, this is not in

4   our papers -- our argument obviously as to why it's not

5   necessary is in the papers, but responding to what Mr. Brown

6   wrote on Friday, we looked at the data for the statement --

7   for the appeals that have been taken by the NFL, perhaps the

8   greatest indication that there's an issue with the medical

9   diagnosis in the claim.

10          And what we see actually is the NFL is appealing 30

11  percent of approved claims of MAF doctors that are local --

12  appealing 30 percent that are local, they're appealing 27

13  percent that are not local outside 150 miles, and that

14  includes the claims of the four doctors that are no longer

15  going to be seeing patients under the program.

16          When we take them out and we look at what's the

17  practice then with regard to concerning diagnoses, we see that

18  the NFL has been appealing 17 percent of local doctor

19  diagnoses and 13 percent of non-local doctor diagnoses.

20  Essentially there's no difference.

21          And so where we are and as our papers did reflect,

22  this should be determined on the quality of the diagnoses,

23  this should be determined on the basis of, you know, the

24  diagnosis that is rendered by the MAF doctor, the information

25  is provided to the Claims Administrator, provide the right of

1   the claimant or if they're guided by counsel to select

2   physicians for the very reasons that Mr. Langfitt said, and we

3   endorse.

4          If somebody wants to travel to Columbia to see a

5   world-renowned physician, to see their associated world-

6   renowned neuropsychologist knowing that that may be the best

7   place for care, they should have that right.

8          It's their expense, it was negotiated for, we think

9   that's an appropriate selection, but I think the data really

10  unpacks it all because we don't have an issue.  Yes, people

11  have traveled great distances and there's -- there are

12  instances unfortunately where the very few have I think with

13  good intentions suggested that this would be a good idea.

14         But it doesn't manifest in the data.  The NFL is

15  appealing frankly equally local and non-local diagnoses,

16  actually they're appealing slightly more of the local

17  diagnoses.  So we think that rule should be revisited.

18         A suggestion from the Claims Administrator -- you

19  should generally go within this room, certainly it's going to

20  eliminate any concern that you've done it for an improper

21  motive, and we think -- and maybe that raises a potential red

22  flag, the data doesn't bear it out, Your Honor.

23         Finally, there is a concern on our part that by

24  addressing something up front by the Claims Administrator, we

25  do give rise to yet another potential objection by the NFL.

1    So if the claimant calls in and as Mr. Brown, as he said

2    granted the extension for a reason that he perceived to be a

3    proper medical basis for a legitimate non-pretextual reason

4    and then that claim gets approved and then the NFL looks at

5    it, it would be brief point one in the appeal, but it may be

6    brief point two or brief point three that there were other

7    appropriate physicians who could have seen this person within

8    150 miles -- you know, the Claims Administrator abused his

9    discretion granting the exception to the 150-mile rule.

10          We think guidance that hey, you should look first in

11   your region, see if you can satisfy yourself, there should

12   generally, as what we had proposed, would be a more prudent

13   course because the data ultimately doesn't support a greater

14   weight of problems outside 150 miles versus inside with regard

15   to the NFL's challenges to diagnoses.

16          THE COURT:  Okay, thank you.

17          MR. BUCHANAN:  Thank you, Your Honor.

18          THE COURT:  Okay.  Mr. Brown.

19          MR. BROWN:  Good morning, Your Honor --

20          THE COURT:  Good morning.

21          MR. BROWN:  May it please the Court, I'm Orran Brown

22   from BrownGreer.  We are the Claims Administrator and with me

23   today as I said earlier is Roma Petkauskas of our firm, and if

24   it's -- if it's all right, Your Honor, I have some slides with

25   some information to sort of set the stage --

1               THE COURT:  That's fine.

2               MR. BROWN:  -- for this discussion --

3               THE COURT:  That's fine.

4               MR. BROWN:  -- and that will require me to approach

5       the be at that bench over there --

6               THE COURT:  Over here?

7               MR. BROWN:  -- so I can use the monitor?

8               THE COURT:  Sure.

9               MR. BROWN:  But I think I can speak loudly enough

10      and there's a mic there.

11              THE COURT:  Is there?

12              MR. BROWN:  Thank you.

13              THE COURT:  Will it be on the big screen?

14              MR. BROWN:  Yes.

15              THE COURT:  Oh, it will.  Oh sure, no problem.

16              MR. BROWN:  If that's all right with Your Honor.

17              THE COURT:  Yes, there's a -- there's a microphone

18      there.

19              MR. BROWN:  Good.  So and the point, Your Honor, is

20      there's a lot of information here, and please stop me if you

21      don't need to hear this or if you don't think it's helpful to

22      all of us gathered together today, because our -- our goal in

23      this as we've said in our papers is that we don't -- we're not

24      really in opposition to class counsel or the NFL, we are -- we

25      are a neutral fiduciary.

1          We collaborate instead of litigate.  We want to make

2     this work correctly and that's what we're trying to do.  We --

3          THE COURT:  I appreciate that.

4          MR. BROWN:  We know that there's no system that just

5     works, there's no process that just works by itself.  We have

6     to have systems, and we create systems that are workable and

7     we continually fine-tune them, react to experience as things

8     evolve -- evolve in the program, and then adjust, and that's

9     what this is.

10         These are kind of mid-course adjustments to react to

11    circumstances we're seeing, and that's what we hope is

12    effective.  So just to set the stage, Your Honor -- and these

13    numbers appear in the papers and so we're just reminding

14    ourselves that we have over 20,000 people who timely

15    registered for this program.

16         Some of those are players, some of those are

17    representatives of players, some of those are representatives

18    of deceased players.  And we've been through them all, and we

19    have after all of this, a little over 15,000 players or

20    representatives of incapacitated players who might be looking

21    for and have the opportunity to go to this qualified MAF

22    physician for a diagnosis.

23         Most of these, as you can see, are BAP-eligible

24    players, so they can go to the BAP system for a free diagnosis

25    for level 1.5 and 2 neurocognitive impairment, but for the

1    other diagnoses and for those two, you can go to a qualified

2    MAF physician.  And so we're starting out with that audience

3    and so far since we opened the claims process in February of

4    2017, we've gotten 27,074 monetary award claims and that's --

5    this shows what qualifying diagnoses were asserted.

6            There are always some that are -- they don't give us

7    a diagnosing certification so we don't know what the claim is,

8    they eventually are either made complete or we have to deny

9    them because they don't have a diagnosis at all.  But the bulk

10   of the activity that we've had are at the level 2 and 1.5

11   claims.

12           That's where most of our claim activity has been and

13   that's -- that's what we've been processing.  We have been

14   through those claims and issued monetary awards of payable

15   conditions of over $659 million, and over $558 million has

16   been funded by the NFL where they put in the money for us to

17   pay them and then it goes though a process that's in the

18   settlement agreement to get paid.

19           We've paid over $485 million and these other

20   payments here, it's about 150 million that are in the

21   pipeline, will be paid soon.  It's a two -- almost a two-month

22   cycle to get approvals funding-to-pay, but this program has

23   sent out approaching three-quarters of a billion dollars, and

24   we'll soon hit that mark so it is working.

25           As our colleague said, the process is working and

1   the question is, is it working the best way it can.  We're

2   still getting claims.  This shows -- the top lines are claims

3   that are diagnosed by MAF physicians.

4          The bottom line is the ones that come from BAP

5   providers, we're getting about 45 to 42 new claims a month,

6   and about 20 of them or about five a week are coming from

7   diagnoses by MAF physicians and about three or four a week --

8   12 or so a month are coming from BAP providers, and we're

9   receiving claims regularly and of course they go into our

10  review system immediately.

11         And this slide is just a snapshot of all the claims

12  we've ever gotten and where they are.  There are 704 for

13  example that are still in review somewhere along the pipeline

14  with us or through the process of the AP reviewing pre-

15  effective date claims.  That system is working.  We have 27

16  claims currently on appeal.

17         We've had 35 percent of the claims that either had

18  been withdrawn or got denied in some way, and we have this

19  number of claims sitting in Audit right now.  That number used

20  to be a lot larger.  We've worked through the audit process

21  with the Special Masters, and here's the 740 claims that we

22  paid.

23         And we keep track of all of this on a regular basis

24  and it's posted publically so that people can see how the

25  process is working.  These three charts here so whether it's

1    pre-effective date claims or MAF diagnoses or BAP diagnoses,

2    what's happened to them -- it's a little bit hard to match up

3    the pie slices with the colors -- and so that's really what's

4    happened to our claims by source of diagnosis -- either pre-

5    effective date or MAF physicians or the BAP physicians.

6            We have been through these claims or are going

7    through them now and the program is moving obviously to where

8    the claims we're getting now are from MAF or BAP physicians

9    mostly.  The pre-effective claims had to be filed with us by

10   February the 6th of this year.

11           And so now we're moving into the mature stage of

12   this program where the MAF physicians and the BAP providers

13   are really seeing the players to find out if they have these

14   conditions, and if so, tell us about them, and if they

15   qualify, they will get paid if their diagnosis is correct.

16           And so we're now moving into that phase, and as we

17   should be, and these MAF physicians are really the lynchpin of

18   this program for the next 63 years, as our colleague said in

19   their papers, that this is a key component of this program --

20           THE COURT:  You mean after 63 years I can escape.

21           MR. BROWN:  Yes, you can.

22           THE COURT:  Okay.

23           MR. BROWN:  So can I.  But it's -- it's here for

24   these physicians to be able to see these players and do two

25   things -- give them an accurate picture of their conditions so

1    that they know what's going on and if they need care and

2    treatment, and then if they qualify and meet the criteria in

3    the settlement agreement, they will get paid.  So there's two

4    things going on here, conditions and compensation.

5           Now, this network of physicians that we -- the

6    settlement calls for that we set up on time and we nominate

7    candidates and then the parties -- the co-lead class counsel

8    and the NFL parties can -- they either agree or don't agree.

9           If either one objects, that doctor does not get

10   appointed in the network, and we have been trying to cultivate

11   this group now more vigorously just in the last -- once we

12   realized we -- it doesn't -- it just doesn't sell itself.

13          We have to push this to get these physicians

14   interested and committed and enthusiastic and realize the

15   significance of what they're doing, not only get them on board

16   and train them, but keep them engaged and make them see that

17   their work in this program is important and meaningful.

18          We developed this logo for the network that we're

19   now trying to have some more identity for the program among

20   these physicians and peer-to-peer discussions, but we have, as

21   Mr. Locks and Mr. Langfitt said, we have 121 physicians now

22   serving in 40 major cities or metropolitan areas.

23          Now, we've had others that we found -- 52 of them

24   that we put up, and they didn't get appointed because either

25   one of both sides didn't agree to their credentials or their

1    appointment.  We had -- this is one issue that has concerned

2    us, and while we're being more aggressive now about finding

3    these folks, is that we had 64 people who made it through the

4    approval process and signed their contracts with us, but then

5    withdrew and told us they don't want to do it anymore either

6    because they weren't seeing anybody or they feel like it's

7    taking up too much time, or they don't want to deal with legal

8    things.

9         They have been -- they don't like the back-and-

10   forth.  They've had lawyers or players come back to them and

11   ask them to change their findings or change their diagnosis

12   and they don't want to be in that position.

13        They feel uncomfortable with it and we've had people

14   quit the program because they don't want to be involved in

15   that with the back-and-forth.  They want to make their

16   diagnosis, turn it in and make sure it's right.  That's what

17   we're seeing among these physicians.

18        There are these -- these kind of companion networks

19   of BAP providers in that -- in the baseline assessment program

20   and our MAF physicians and there's a lot of overlap, but

21   they're not all the same.

22        As it says here, we've got about two-thirds of the

23   doctors are in both camps but we have segments that are one

24   and not the other, as these members show us, and some doctors

25   want to do just one and not the other for whatever reason.

1          But we have been engaging much more aggressively in

2    the last few months with the approval and advice of the

3    Special Masters to cultivate this group of MAF physicians more

4    aggressively than we have been.  It's like a garden, it has to

5    be tended to and curated for it to produce and actually be as

6    productive as you want it to.

7          So we, for example, looking at the -- this is sort

8    of a heat map of the whole country, this shows us where the

9    players are and where the doctors are and it's little tough to

10   make out particularly if you're color blind like I am, but

11   these -- these circles down here represent concentrations of

12   players.

13         With the dark green it's like zero to 300 and the

14   light green is up to 600 and yellow is up to 900 and red is up

15   to 1,500.  The orange is up to 1,200 and then the little

16   symbols -- the medical symbol, that's where we have physicians

17   -- MAF physicians.

18         And this, as our papers say, we have 91 percent of

19   the living players had a physician in this network within 150

20   miles of them, at least one.  There's about 1,700 of them who

21   have only one.  These little blue dots here, the smaller dots,

22   that's where there's players -- a player living and some of

23   those are not within 150 of a physician.  91 percent of them

24   are.

25         But we think that in the situations where they don't

1    have a person close, then that's what the exception process is

2    for.  We're going to help them get through the process to go

3    see a physician.  But we're still working to find more doctors

4    to fill up all of these holes because we've been trying to

5    find them, we have found them, but we're being much more

6    aggressive about that.

7            For example, this week starting Saturday in

8    Philadelphia, this American Academy of Neurology which is a

9    huge organization, had been having its annual meeting here in

10   Philadelphia.

11           So we went there and working with the Special

12   Masters' approval and ideas we set up a booth there, that's

13   what it looks like, where these physicians can go through and

14   we have people there staffing it since Saturday talking to

15   them about the program.  A lot of them hadn't been in touch

16   with us before.

17           This is the banner behind the table.  We're trying

18   to be visible and show where we have people, where we would

19   like to have people, because we want more physicians in the

20   network.  We have --

21           THE COURT:  Let me ask you something.  You mentioned

22   about players and lawyers on the plaintiffs' side contacting

23   -- I think that's something that shouldn't happen after the

24   examination and if you would like to suggest to me, I might

25   consider making that such an abuse.  That's just not

1    appropriate.  This is -- this is similar to an independent

2    medical examination if you will --

3               MR. BROWN:  Yes.

4               THE COURT:  -- and you can't go back to the doctor

5    and argue with them.  I mean, that just can't be done and I

6    would -- you and I can talk about that --

7               MR. BROWN:  Yes, Your Honor.

8               THE COURT:  -- after, but this is not something that

9    I would seriously consider.

10              MR. BROWN:  Yes, Your Honor, we've been trying to

11   discourage that and trying -- and telling the doctors that --

12              THE COURT:  Or their lawyers.

13              MR. BROWN:  -- and but we don't want the back-and-

14   forth trying to --

15              THE COURT:  Oh, absolutely.

16              MR. BROWN:  -- change the --

17              THE COURT:  Absolutely not.  They --

18              MR. BROWN:  So yes.

19              THE COURT:  And if I were a neurologist, I would be

20   very concerned about somebody coming back and trying to argue

21   with me about what kind of diagnosis I made.

22              MR. BROWN:  And, got it, Your Honor, and that's

23   -- that's on their agenda and we will -- we'll be more

24   aggressive about that --

25              THE COURT:  Okay.

1            MR. BROWN:   -- because --

2            THE COURT:   Okay.

3            MR. BROWN:   -- it is important and sometimes there's

4    a mistake or something and we can see that and if they want to

5    correct a mistake, maybe.   But the problem that we've had

6    is --

7            THE COURT:   Let them write them --

8            MR. BROWN:   -- changing the outcome.

9            THE COURT:   -- and send you a copy.

10           MR. BROWN:   Yes.   So this is for example, Your

11   Honor, we developed a pamphlet -- there's a picture of it here

12   -- that we hand out at this conference talking about this

13   program and the significance of their role and quoting the

14   Court's comment about how important these physicians are to

15   it, and we're getting some interest.

16           Like in the last few days here in Philadelphia, we

17   have iPads there with this sign up, and we have about 40

18   doctors who are new to us who have signed up to get more

19   information to be considered.

20           THE COURT:   Good.

21           MR. BROWN:   So we're trying to continue to beat the

22   bushes to plug any of the gaps in their network that we saw on

23   the map.   And this, now getting into the substance of the

24   motion and we've heard a lot about it and we do have good

25   papers I think -- I hope that lay it all out, so I don't want

1    to repeat any of that, but the rules that we're looking at

2    stem from the Court's order on January 9th about the whole

3    generally consistent explanation issue.

4           And Mr. Buchanan's numbers about the appeals from

5    the NFL, a lot of the appeals that we're seeing are unrelated

6    to the suspicion about distance but there have been appeals of

7    claims where there is a disparity between the BAP criteria and

8    the diagnosis or test outcomes where the NFL feels it's not

9    generally consistent and it has to be explained, which was the

10   point of this -- this January 9 order.

11          So that's where we're getting a number of -- most of

12   the appeals that aren't like over location issues, but they're

13   on the substance of this generally consistent, which these

14   rules are also generally designed to resolve or deal with.

15          And this, Your Honor, it's in every program we work

16   on.  We have a basic settlement agreement and sometimes a

17   quite lengthy one and very well thought out by the parties and

18   the Court, and it has the skeleton or the basics of how the

19   program is going to work and sometimes a lot of detail like

20   this, but it's very common for any administrator including

21   when we do our do our job in these, to sort of fill in the

22   gaps, to fill in --

23          THE COURT:  Does this happen --

24          MR. BROWN:  -- the how --

25          THE COURT:  Does this happen in other settlements

1    also that --

2              MR. BROWN:  It happens in every settlement.

3              THE COURT:  Every settlement, okay.

4              MR. BROWN:  There are adjustments, there are

5    procedures that have to be made that put details on top of the

6    basic framework that the parties worked out, and this one has

7    a lot of detail.  But in terms of making it work and adjusting

8    the situation, this is very common and we cannot do anything

9    that contradicts a term in the settlement agreement, an

10   amendment.

11             But we did not see these as amending anything.

12   There's nothing in the settlement agreement that says

13   expressly that you have an unfettered right to choose and the

14   AP cannot do anything but two things, so we didn't see

15   anything that prevented this.

16             And so working with the Special Masters, we came up

17   with ideas that we thought would address some of the

18   phenomenon or circumstances we've seen, and we laid out the

19   authority to do that that is in the settlement agreement about

20   investigating claims, see if they qualify, working with the

21   Special Masters.

22             And obviously the Court has the ultimate authority

23   over this under your retained jurisdiction to make sure these

24   things are appropriate and the Court exercised that authority

25   and approved these rules.  Now, there are 27 rules.  The

1    motion to reconsider deals with five of them.  We've heard a

2    little bit about all these today.

3          This question about the rule that Mr. Langfitt

4    mentioned about the relationship between a physician in the

5    network and a law firm, that's just based on sort of a

6    conflict of interest thing that we don't want a doctor who's

7    on the payroll of a law firm diagnosing that law firm's client

8    in this program.

9          Whether it's either conscious or unconscious,

10   there's a -- just some sort of an appearance that there's an

11   influence there that people might not trust.  And so we just

12   rule it out and it's -- it's something that only has come up

13   once but it's just an ethical rule that we think they have to

14   abide by.

15         I don't -- I really can't imagine a situation where

16   we would approve that where we have a doctor working for a law

17   firm and also diagnosing that firm's players, and one of the

18   reasons, Your Honor, is that we don't want the class to feel

19   like there's some lawyers who have an advantage because

20   they've got their person in the program who's on their payroll

21   too or that you have to have -- go to that firm to be

22   successful, and also the pro se players don't have access to

23   that, the unrepresented players.  So that's probably all we

24   need to say about that rule.

25         The others I can address pretty quickly because

1   we've heard a lot about the mileage rule and the percentages

2   and --

3             THE COURT:   That's what this -- as I understood it,

4   that was what this hearing was focused on.

5             MR. BROWN:   Yes, and we think it will work the way

6   it's designed again because of the coverage opportunity and

7   the neuropsychologists, we've got even more of the class that

8   have somebody within 50 miles of the MAF physician.

9             If you add it all together it's 200 miles maximum,

10  150 plus 50 to get to the neuropsych, so we've got pretty good

11  coverage and where we don't, we've got this exception ability

12  and as class counsel pointed out, there are 1,700 players who

13  only have access to one today.

14            Until we get more fruitful about our cultivation

15  exercises, there's one.  But if that doctor is unavailable,

16  that's what this exception process is for.  If they have a

17  relationship with a doctor or there's a speciality they want

18  or they can't get in soon enough or they have some -- they

19  can't find anybody close enough, email us, call us.

20            There's an on-screen form for it that you can --

21  this is what it looks like.  If you go on our website or on

22  the -- there's this -- you can fill it out here.  You look at

23  finding doctors and it will -- if you plug in your address,

24  the player's address, either the player does it or the lawyer

25  does it, and you get these results that show your choices and

1    it will show you the miles and the instructions will tell them

2    use these miles, not the driving distance, this is as the crow

3    flies miles, and pick one within 150 miles and if you don't

4    want one or can't get in there, let us know, contact us and we

5    will -- we will help you.

6              And how they do that, they can do it right there on

7    the screen with this exception request form that they can fill

8    out right on the screen.  They can send -- download this form

9    and send it to us or they can just email us and people are

10   already doing that.

11             And it's built upon the premise that the settlement

12   agreement says that geographic proximity is one the criteria

13   for selecting these doctors in the first place so they're --

14   they're obviously in the settlement agreement with some

15   concern.  People shouldn't have to travel.

16             And although it sounds a little patronizing to say

17   it, there is some -- some concern about players traveling -- a

18   player who is diagnosed as having difficulty with any activity

19   outside the home and getting on a plane and flying 2,400 miles

20   to see a doctor, and so this would avoid that burden and

21   expense.

22             But it also, as Mr. Langfitt and Mr. Locks said, the

23   real goal here is to control the forum shopping for doctors

24   that are perceived rightly or wrongly as providing a golden

25   ticket to payment, and we did see that happen.  We see it

1    happen in a lot of programs where people -- either word gets

2    out that that's the go-to person or lawyers think it is or

3    they have some structure set up to where they have an assembly

4    line going on where they do generate these claims in volume.

5           We have seen it in this program with the audits that

6    Mr. Buchanan mentioned where people traveled up to 2,400 miles

7    and averages over 1,000 miles to go see a particular physician

8    for some reason.  And then the four physicians that we had to

9    terminate as MAF physicians had high-mileage, high-volume

10   traffic and once we realized that was going on, we could react

11   to it.

12          The goal here is to be able to react to it or

13   prevent it sooner because we would like to keep the weeds out

14   of the garden before they seed, and so the idea is here let's

15   know about it in advance, which is why we said let's make it

16   mandatory with a big exception hole to it rather than

17   aspirational or as a suggestion because -- and we understand

18   that.

19          I do think, Your Honor, that if we make it just a

20   recommendation, it will be kind of like a speed limit on a

21   highway which is there for safety for everybody involved.

22   It's mandatory.  It's not just a suggestion, though I guess we

23   see people treat it like it is.

24          But it's -- we have guardrails on the highway to

25   keep us out of the ditches, we have the speed limit for

1    safety.  That's a rule.  If you break it, there are

2    consequences.  Here, we want this -- if you didn't make the

3    speed limit mandatory, almost nobody would abide by it because

4    there's this group psychology of why should I do it if other

5    people had an advantage and they're not following it.

6            Plus, it's just there's no consequences if you

7    don't.  So here, we want to clear it up on the front end.  We

8    want the claim -- we just want to know about it.  We want to

9    know -- if we had known about it in the four terminated

10   physicians sooner, we could have caught that sooner.

11           We want to just say let us know, we're going to look

12   at it in 24 hours.  If there's a question, we're going to talk

13   to you about why you want this doctor and a lot of times we'll

14   know the doctor.  Is it a doctor who's got -- who's performing

15   great and we don't have any questions about it?  Fine.

16           If it's somebody that's got some questions or the

17   distance doesn't make sense, we all know that no profession or

18   industry is immune from either corruption or mistake or

19   temptation or influence.

20           We see it in doctors like Medicare fraud or opioid

21   prescription abuse.  We see it in lawyers.  Michael Cohen

22   reported a person yesterday.  We see it in college admission

23   officers or coaches.  I mean, those are the type of things

24   that happen if you don't have adequate controls and so we

25   would like to have this control here to deal with it on the

1    front end because what --

2              THE COURT:  I don't know how many you had, Mr.

3    Brown, but I -- a few were brought to my attention where we

4    had a lawyer from say -- a lawyer from Pennsylvania and a

5    player from Florida going to a doctor in Texas --

6              MR. BROWN:  Right.

7              THE COURT:  -- and that was a red flag.  I mean, and

8    I don't know how many you have, I didn't go through that, but

9    as my recollection was, it was not unsubstantial --

10             MR. BROWN:  It --

11             THE COURT:  -- and that was my concern and my

12   concern about this kind of -- this kind of restriction.

13             MR. BROWN:  That was our concern as we watched that

14   emerging, Your Honor, and that's what -- these are the four

15   physicians we had to terminate as MAF physicians who accounted

16   for over about half of all the 1.5 and 2 diagnoses that we had

17   from MAF physicians came from these four, and that's what was

18   happening.

19             There was this big geographic triangle about it and

20   it didn't make a lot of sense but we didn't notice it until

21   the claims starting coming in and then we were looking at them

22   and they didn't make a lot of sense and we were getting help

23   from the AAP about them, and but this $46 million went out the

24   door on these claims before we could catch it.

25             And some of those were valid, some of them, and

1      that's the goal of having AAP review who have even terminated

2      things.  So let's find the ones that are medically correct and

3      pay them.  But if we had known or had this provision in place

4      sooner, we would have caught those sooner and that's the goal

5      here, you just set up those guardrails with exceptions.

6              And then the rest of this, Your Honor, that the

7      motion deals with, the generally consistent issue, we're just

8      implementing the Court's order on the generally consistent

9      point.  This is something that we want to help the doctors

10     understand, that when they're -- and it only applies to 1.5

11     and 2 claims, but when they're diagnosing in the MAF, they can

12     make a diagnosis that's generally consistent with the BAP

13     criteria.

14             If you break down the BAP criteria or the settlement

15     agreement requirements for a level 1.5 and 2, it's really four

16     things.  It's this concern issue, it's the cognitive decline

17     which is the 14 tests in the Exhibit 2, and then there's this

18     functional impairment under the clinical dementia rating --

19     CDR methodology, and then the doctor also has to say it's not

20     from delirium or substance abuse or your own medicine that's

21     causing your impairment.

22             This one right here is really the only one where the

23     generally consistent thing comes into play because on this

24     one, the settlement agreement says the BAP doctors and the MAF

25     doctors act generally consistent with the CDR.  So your order

1    on January 9th that requires these MAF physicians to explain

2    themselves, it's really explaining what they and the

3    neuropsychologist have done on this cognitive decline issue

4    and so we are -- we want to make sure the doctors understand

5    that and train them in it.

6           We're still using the definition that the Special

7    Master adopted with us and in an opinion about what generally

8    consistent means, the common elements that predominate over

9    the uncommon elements.  We're trying to put some clarity in

10   that.

11          Plus what the doctor tells us doesn't have to be

12   lengthy, it doesn't have to be page and pages, it just has to

13   be more than just a conclusion that I find it generally

14   consistent.  It has to be medically sensible and we kind of

15   know that when we see it and if we don't, we'll ask the AAP

16   for help on whether it makes sense.

17          But we want to make sure everybody understands how

18   this is going to work and get that cleared up on the front end

19   of the claim so that they'll go through without the appeals

20   because people are worried about whether it's adequately

21   explained or whether it's generally consistent or not.

22          We think this rule will help us do that, and then we

23   want to be able to turn to these two members of the AAP to

24   help us as we have up until now.  They are not going to review

25   every claim.  This is not a double review of every claim.

1          This is not what we had to do in diatribe with Judge

2     Bartle.  Mr. Locks and I worked on that together where we had

3     to move to 100 percent medical review of every claim because

4     we were to stop the assembly line process.

5          In this process, we are just using the AP to review

6     claims in isolated instances where we've terminated an MAF

7     physician or just where we need help, and the settlement

8     agreement clearly allows them to advise on medical issues.

9     They are the Appeals Advisory Panel.

10          If they were just supposed to do appeals, I guess it

11     would just have been called the Appeals Panel.  But it's --

12     it's there to help the Court and the Special Masters to allow

13     us to tap into that on medical issues.

14          And that's very common in these programs too, to

15     have somebody who's a doctor, who's a neurologist and these

16     are really highly trained credentialed doctors, the eight

17     doctors who are on the AAP, and the two of them that have been

18     helping us are enthusiastic about it.

19          They have the time, they are responsive to us and we

20     just need them there to help us make sure the medicine is done

21     correctly, and that's the overall goal for all of us.

22          But the end result is, Your Honor, if anybody has

23     questions about these rules, if anybody has -- needs an

24     exception, if anybody has a question about how we're handling

25     a claim, all they have to do is ask us.  They could call us,

1  they could go to the website, there's a lot of information

2  there.  They could email us and we deal and respond with these

3  things every day.

4           THE COURT:  Thank you very much.

5           MR. BROWN:  Thank you, Your Honor.

6           THE COURT:  Very helpful.

7           MR. BROWN:  Thank you.

8           THE COURT:  Okay.

9           MR. LOCKS:  Your Honor --

10          THE COURT:  I have -- you have --

11          MR. LOCKS:  Your Honor, may I make a statement?

12          THE COURT:  Yes, for only -- yes, but a short one,

13  Mr. Locks.

14          MR. LOCKS:  Can I cross-examine him on some of his

15  statistics?  These things are being brought up now

16  specifically without our having any knowledge about them

17  having been class counsel, having been part of the

18  negotiations and having a certain -- certain negative impact.

19  His motivation is terrific.  He is a terrific Claims

20  Administrator.  But there are certain flaws in some of the

21  logic --

22          THE COURT:  I'm --

23          MR. LOCKS:  -- and we don't have an opportunity to

24  express them because we don't know all of those statistics and

25  we try to talk about them informally --

1          THE COURT:  What kind of statistics?  What --

2     explain exactly what you mean, Mr. Locks.  Precisely, what do

3     you want to know?

4          MR. LOCKS:  Tell me how many of the 61 of 121

5     doctors who are MAF doctors have filed a claim for a monetary

6     award claimant.  No more than 50 percent is my view.

7          THE COURT:  So?

8          MR. LOCKS:  And how many of the remaining 50 percent

9     have examined a qualified monetary award claimant for more

10    than one or two people?  Now, you don't have 121 qualified

11    doctors out there on the street, you have a couple of clusters

12    of them as he has pointed -- as he knows, and don't have the

13    availability of going to a doctor locally who has the

14    specialty or the knowledge that you need.

15         And by the way, you're paying for it.  You're a

16    player going out and not having the right to choose this

17    doctor.  Now, I know they're trying to get more doctors, but

18    they don't have them and the statistics that they're referring

19    to about some of the abuses are historical.

20         It's not going to happen again.  The BAP program is

21    over in constant.  From now on it's an MAF program for 63

22    years because after two more weeks if you're not registered

23    for it, you don't get it anymore.

24         THE COURT:  You mean BAP?

25         MR. LOCKS:  The BAP so you're --

1          THE COURT:  Well, but for the people that's plenty

2     of notice.

3          MR. LOCKS:  Well oh, I absolutely agree.  I --

4     notice on top of notice on top of notice, I understand.  But

5     the problems from the original quantity of claims is not going

6     to be addressed by restricting the player's right to go to his

7     own doctor if he wants to, wherever that may be, pay for it

8     and submit a claim.

9          It's either valid or not, no matter whether he's 200

10    miles away or he's 2,000 miles away, and that's what this is

11    doing now and it's changing the fundamental agreement --

12         THE COURT:  I --

13         MR. LOCKS:  -- that we went out on the street --

14         THE COURT:  I did --

15         MR. LOCKS:  -- I went and talked to hundreds of -- I

16    didn't talk to hundreds personally -- of the players and said

17    the best part of this program is you've got an opportunity for

18    a free exam at blah, blah, blah, blah, blah, but you can

19    always go to the doctor you want --

20         THE COURT:  Okay.

21         MR. LOCKS:  -- and that's what they're not

22    preventing beyond.  The rest of the program, the rest of the

23    adjustments, they're all in good faith --

24         THE COURT:  Well this one --

25         MR. LOCKS:  -- and they are intended to be good.

1          THE COURT:  -- is in good faith too.

2          MR. LOCKS:  I'm sorry?

3          THE COURT:  This one is in good faith.  You may not

4     like it, but it's certainly in good faith.

5          MR. LOCKS:  Well --

6          THE COURT:  I was the one who was behind it so I

7     take exception to that.

8          MR. LOCKS:  Well, sometimes you and I might

9     disagree.

10          THE COURT:  I agree with that.  Okay.

11          All right, Mr. Buchanan, did you --

12          MR. BUCHANAN:  Briefly, Your Honor --

13          THE COURT:  It's not a question of good faith, it's

14     a question of whether or not it's the right thing to do --

15          MR. BUCHANAN:  Two quick --

16          THE COURT:  -- and I certainly will rule on that.

17          MR. BUCHANAN:  Two quick points, Your Honor, just in

18     response to Mr. Brown's points.  As I think Your Honor knows,

19     we did take a look at every claim that gets approved and

20     monitor to see whether there's a statement that should be

21     supported if it's going to an appeal, if there's a further

22     statement that needs to be submitted if there's an objection,

23     so we -- we have some knowledge and familiarity with the

24     concerns and the process that underlies this.

25          Just two footnotes I wanted to highlight, the first

1  with regard to the AAP consultation by the Claims

2  Administrator.  As we understand what Mr. Brown is outlining,

3  this is where the Claims Administrator essentially needs a

4  consult on a medical question, and we think Your Honor has

5  discretion in the agreement obviously to consult the AAP for

6  medical advise and you could obviously provide that discretion

7  to the Special Masters and further down in the process.

8          We would be concerned and we're going to take --

9  obviously be vigilant in looking for this.  If it turns into

10  an AAP review of every level 2 claim, every level 1.5 claim or

11  every generally consistent claim, if Mr. Brown and his team

12  needs medical insight that he doesn't have within his walls so

13  that he can properly do his function, that certainly is one

14  thing.

15          To the extent it turns into a broader appellate

16  level review in the claims administration process, we would

17  have that concern, but we understand we have the right and

18  opportunity obviously to evaluate how this plays out and be

19  heard again at a later point in time before the Special

20  Masters.

21          THE COURT:  Thank you.

22          Would you like to be heard again?

23          MR. BROWN:  Your Honor, I can address briefly Mr.

24  Locks' questions and I -- I see he's concerned and obviously

25  we've talked a lot about numbers and data and we have so much

1    data and I'm happy to share that and I did not mean to use

2    anything that he wasn't aware of.  He's correct that we have

3    121 doctors who are up-trained, under contract, open for

4    business in the MAF.

5         About 68 of them have actually done diagnoses for

6    which we've seen claims.  We don't know how many players

7    they've seen and examined and it didn't find a qualifying

8    diagnosis and so we didn't get a claim because we don't make

9    the appointments.

10        One of the rules the Court approved directs them,

11   tell us about your appointments and your outcomes up or down.

12   We want to monitor whether somebody is never finding anybody

13   qualified.  That's a concern in the other direction.  We want

14   to monitor that too, and we will if we get that information

15   from them.

16        I think we don't know why some of these doctors

17   haven't had people come to see them.  Some of them have quit

18   because they never got anybody.

19        We think part of it was that lawyers were sending

20   them across county to somebody else and so they -- they had

21   players within 150 miles of them and nobody ever came to see

22   them.  But we want to make sure everybody understands that and

23   we want everybody active and we want to know what their

24   appointments are.

25        THE COURT:  Okay, thank you very much.

1          MR. BROWN:  Thank you, Your Honor.

2          THE COURT:  Okay, I'm going -- Court is adjourned, I

3     am going to ask two things.  I'm going to ask representatives

4     of counsel to come --

5          (Matter concluded, 11:29 a.m.)

6                              *  *  *

7

8

9

10                **C E R T I F I C A T I O N**

11

12          I, Diane Gallagher, court approved transcriber,

13     certify that the foregoing is a correct transcript from the

14     official electronic sound recording of the proceedings in the

15     above-entitled matter.

16

17     _____        _____

18     DIANE GALLAGHER                         DATE

19     DIANA DOMAN TRANSCRIBING, LLC

20

21

22

23

24

25