**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

## CLAIMS ADMINISTRATOR STATUS REPORT NO. 5

## I.    INTRODUCTION

1.    ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 5 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 4 filed on February 15, 2019 (Document 10429).  Our earlier Status Reports are posted to the Settlement Website (under "Documents," click "Status Reports").  We do not repeat here what we covered in them.  All numbers and other information in this Status Report No. 5 are as of May 13, 2019.  We will cover developments after that date in future reports.

## II.    MONETARY AWARD CLAIMS

2.    ***Total Claims Received.***

(a) Section 3 of the Summary Report on the Settlement Website shows the total Monetary Award claims submitted.  We have received 143 new Monetary Award claims since Status

Report No. 4, bringing the total to 2,787 Monetary Award Claim Packages from Retired NFL

Football Players and Representative Claimants (17.3% of the 16,132 Players and Representative

Claimants who received favorable registration determinations and are eligible to submit claims).[1]

Two other claims were untimely because they were based on pre-Effective Date diagnoses and

submitted after the February 6, 2019 Claim Package submission deadline for such diagnoses; we

do not count these two untimely claims in the 2,787.  We have received about 11 new claims a

week since Status Report No. 4.  Of all 2,787 Monetary Award claims we received, 1,935 (69%)

rest on pre-Effective Date diagnoses, while 600 (22%) are for post-Effective Date diagnoses, of

which 131 (22% of the 600) were made in the Baseline Assessment Program ("BAP") and 469

(78% of the 600) were made by Qualified MAF Physicians.[2]  The other 252 claims did not tell us

what diagnosis date they assert.  Table 1 compares this breakdown to what we reported in Status

Report No. 4:

| Table 1 | QUALIFYING DIAGNOSIS DATES | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **%** | | |
| | | AS OF 2/11/19 | AS OF 5/13/19 | CHANGE | AS OF 2/11/19 | AS OF 5/13/19 | CHANGE |
| 1. | Pre-Effective Date | 1,890 | 1,935 | +45 | 71% | 69% | -2% |
| 2. | Post-Effective Date | 472 | 600 | +128 | 18% | 22% | +4% |
| | *(a) BAP* | *88* | *131* | *+43* | *3%* | *5%* | *+2%* |
| | *(b) MAF Physician* | *384* | *469* | *+85* | *15%* | *17%* | *+2%* |
| 3. | No Date Asserted | 282 | 252 | -30 | 11% | 9% | -2% |
| **4.** | **Totals** | **2,644** | **2,787** | **+143** | **100%** | | |

---

[1] Of these Monetary Award claims, 527 (19%) have at least one associated Derivative Claimant who has registered and 2,260 (81%) have no registered Derivative Claimants.  The total number of Players and Representative Claimants with favorable registration determinations is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible).

[2] In our March 2019 newsletter article titled "BAP Appointments & Diagnoses," we explained that there are more confirmed Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made in the BAP than claims we have based on such BAP diagnoses.  Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award.  The BAP Administrator's status reports explain more about BAP diagnoses.

Table 2 shows by diagnosis date how many claims we have for each type of Qualifying Diagnosis:

| Table 2 | CLAIMS BY QUALIFYING DIAGNOSIS TYPE AND DATE | | |
|---|---|---|---|
| | DIAGNOSIS | PRE-EFFECTIVE DATE | POST-EFFECTIVE DATE | |
| | | | MAF | BAP |
| 1. | CTE | 122 | N/A | N/A |
| 2. | ALS | 50 | 5 | |
| 3. | Alzheimer's Disease | 405 | 59 | |
| 4. | Parkinson's Disease | 137 | 25 | |
| 5. | Level 2 | 505 | 162 | 44 |
| 6. | Level 1.5 | 716 | 217 | 83 |

We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the Summary Report on the Settlement Website.  We also show the current status of all Monetary Award claims based on the last notice or action taken in Section 8 of the Summary Report on the Settlement Website.  There are 38 claims (1% of 2,787) in our review process after an initial Claim Package submission or a response to a notice requesting additional information and/or documents.

(b) We launched the process for submitting Supplemental Monetary Awards on January 24, 2019.  A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis; the new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid.  We have not yet received any claims from Retired NFL Football Players or Representative Claimants seeking Supplemental Monetary Awards.

   3.      *Monetary Awards and Payments.*

   (a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website.  We have issued Notices of Monetary Award for 852 claims totaling $663,705,780.[3]  We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit.  Of the 852 claims with Notices of Monetary Award, 761 reached the point at which we can request funding from the NFL Parties, which have deposited $550,040,643 into the Monetary Award Fund for 736 claims and not yet funded 25 claims because they are within the funding deadline for the May Funding Request.[4]  Of the 736 Monetary Award claims for which the NFL Parties had deposited funds, the Program paid 713 claims for a total of $499,396,136.  The remaining 23 funded claims were not yet ready for payment when we submitted the most recent Disbursement Request; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount.  For the 713 Retired NFL Football Players and Representative Claimants who have been paid, the Trustee sent $26,958,375.64 (5% of those Monetary Awards), to the Attorneys' Fees Qualified Settlement Fund, in accordance with the Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104).  Finally, we are required to withhold money for unresolved Liens and for third-party funders that may accept rescission

---

[3] The amount of these 852 Notices of Monetary Award includes the 1% of Awards allocated to eligible Derivative Claimants.  See Paragraph 16 of this Status Report.
[4] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.

of prohibited assignments (as described further in Paragraph 18).  Table 3 shows the

distribution of the $499,396,136 paid by the Settlement Program and compares the totals to

those reported in Status Report No. 4:

| Table 3 | | MONETARY AWARD PAYMENTS | | |
|---|---|---|---|---|
| | **PAID TO** | **AS OF 2/11/19** | **AS OF 5/13/19** | **CHANGE** |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $416,958,080 | $487,914,086 | +$70,956,006 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $2,771,502 | $2,843,170 | +$71,668 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $3,301,972 | $4,693,098 | +$1,391,126 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to Third-Party Funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $2,189,876 | $3,945,783 | +$1,755,907 |
| 5. | **Totals** | **$425,221,431** | **$499,396,136** | **+$74,174,705** |

(b) Table 4 shows the changes in figures for payments and claims with Notices of

Monetary Award since Status Report No. 4:

| Table 4 | | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 4 | | | | | |
|---|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **AMOUNT** | | |
| | | **AS OF 2/11/19** | **AS OF 5/13/19** | **CHANGE** | **AS OF 2/11/19** | **AS OF 5/13/19** | **CHANGE** |
| 1. | Notice of Monetary Award Issued | 779 | 852 | +73 | $618,768,460 | $663,705,780 | +$44,937,320 |
| 2. | Paid | 569 | 713 | +144 | $425,221,431 | $499,396,136 | +$74,174,705 |

(c) Table 5 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:

| Table 5 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS | | | | | |
|---|---|---|---|---|---|---|
| | DIAGNOSIS | CLAIMS SUBMITTED | NOTICE OF MONETARY AWARD | | PAID | |
| | | | HOW MANY | % | HOW MANY | % |
| 1. | CTE | 122 | 75 | 61% | 73 | 60% |
| 2. | ALS | 55 | 36 | 65% | 36 | 65% |
| 3. | Alzheimer's Disease | 464 | 273 | 59% | 244 | 53% |
| 4. | Parkinson's Disease | 162 | 122 | 75% | 111 | 69% |
| 5. | Level 2 | 711 | 136 | 19% | 89 | 13% |
| 6. | Level 1.5 | 1,016 | 210 | 21% | 160 | 16% |

Of the 852 claims with Notices of Monetary Award, 151 (18%) have been appealed (114 by the NFL Parties and 37 by the Settlement Class Member). This is eight more appeals (two by the NFL Parties and six by Settlement Class Members) than we described in Status Report No. 4. We show the status of appealed Monetary Award claims in Section 9 of the Summary Report on the Settlement Website.

**4.** *Monetary Award Claims Reviewed by the AAP.*

(a) There are 70 claims in or still requiring Appeals Advisory Panel ("AAP") review, which is 27 more than the 43 we reported in Status Report No. 4. The AAP has reviewed 719 pre-Effective Date diagnosis Monetary Award claims, approving 435 (61%) of those claims.[5] Under FAQ 145 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 50 claims (an increase of 10 since Status Report No. 4).

---

[5] Broken down by Qualifying Diagnosis, the AAP members approved 98% of Death with CTE claims, 95% of ALS claims, 87% of Alzheimer's claims, 99% of Parkinson's claims, 34% of Level 2 claims and 36% of Level 1.5 claims.

Under Rule 27 of the Rules Governing Qualified MAF Physicians, the AAP has reviewed 16 Monetary Award claims for diagnoses made by terminated Qualified MAF Physicians, approving six (38%) of those claims.[6]

(b) We have assigned 423 claims (an increase of 26 since Status Report No. 4) to the Appeals Advisory Panel Consultants ("AAPC") based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing supporting an Alzheimer's Disease diagnosis.  The AAPC has completed 402 reviews (95%) and provided their assessments to the AAP.  An AAPC member is reviewing the other pending claims.

(c) Two AAP members serve as our AAP Leadership Council to provide advice and assistance on any medical issues arising in the oversight work of Qualified MAF Physicians.[7] This includes review of specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued to Qualified MAF Physicians, and whether the Claim Package reflects and supports the Qualifying Diagnosis stated in the Diagnosing Physician Certification form on a claim.  The AAP Leadership Council is selected by and works at our direction, as overseen by the Special Masters.

5.    ***Notices for Missing Materials***.  We have sent one or more notices requesting additional documents or information on 1,887 Monetary Award claims, which is 405 more

---

[6] This figure excludes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award.  At our request, the AAP has reviewed 29 claims to verify the sufficiency of the claimed Qualifying Diagnosis.
[7] See Rule 23 of the Rules Governing Qualified MAF Physicians.

claims than we reported in Status Report No. 4.  More of the Level 1.5 and Level 2 claims are missing materials than claims for the other Qualifying Diagnoses, as shown in Table 6:

| Table 6 | NOTICES FOR MISSING MATERIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CLAIMS | CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[8] | TOTAL |
| 1. Total Submitted | 122 | 55 | 464 | 162 | 711 | 1,016 | 257 | 2,787 |
| 2. Notice Issued | 47 | 27 | 269 | 87 | 488 | 736 | 233 | 1,887 |
| 3. % Missing Materials | 39% | 49% | 58% | 54% | 69% | 72% | 91% | 68% |

So far, 80% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice.  Settlement Class Members take an average of about 55 days to respond.  We receive approximately 10 to 15 responses to these notices each week and review each reply to determine if it cures the problem.  Of those that responded, 41% cured the problem.  Section 6 of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

6. *Statute of Limitations Matters.*  The Rules Governing Statute of Limitations Proceedings explain how the Special Masters make determinations as to whether claims submitted by Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006, are barred by statutes of limitations, as specified in Section 6.2(b) of the Settlement Agreement.  We have received 370 Registration Forms from Representative Claimants that may require a statute of limitations analysis, but 134 individuals did not properly register because of uncured incompleteness reasons or the player was not a

---

[8] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.  We process and pay a person for only one Qualifying Diagnosis per claim submission.  All these claims by definition are incomplete because we need to know which Qualifying Diagnosis should be used.  We soon will issue notices on the 24 claims that had not yet received one as of May 13, 2019.

Settlement Class Member because he did not play NFL Football as required by the Settlement Agreement. Of the 236 Settlement Class Members who are registered, 134 submitted Claim Packages, 58 of those since January 1, 2019. Rule 7 of the Rules Governing Statute of Limitations Proceedings requires that a Claim Package be complete before a statute of limitations proceeding may begin. Of the 134 Claim Packages we received: (a) 57 are complete and assert a potentially compensable Qualifying Diagnosis if the claim is not time-barred under Settlement Agreement Section 6.2(b); (b) 32 are incomplete but still within the Settlement Class Members' deadlines to submit missing items; and (c) 45 have been denied for failing to cure deficiencies or for not asserting a compensable Qualifying Diagnosis. Table 7 summarizes the changes to these numbers since Status Report No. 4:

| Table 7 | STATUS OF CLAIMS REQUIRING STATUTE OF LIMITATIONS ANALYSIS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % | | |
| | | AS OF 2/11/19 | AS OF 5/13/19 | CHANGE | AS OF 2/11/19 | AS OF 5/13/19 | CHANGE |
| 1. | Complete - Potentially Compensable Qualifying Diagnosis | 42 | 57 | +15 | 34% | 43% | +9% |
| 2. | Incomplete – Within Deadline to Submit Missing Items | 11 | 32 | +21 | 9% | 24% | +15% |
| 3. | Denied – Deficient or No Compensable Qualifying Diagnosis | 36 | 45 | +9 | 30% | 34% | +4% |
| 4. | Under Review | 33 | 0 | -33 | 27% | 0% | -27% |
| 5. | Totals | 122 | 134 | +12 | 100% | | |

We have issued a Notice of Commencement of Statute of Limitations Proceeding under Statute of Limitations Rule 16 to the 57 Representative Claimants with complete Claim Packages to start the briefing process under the Rules. The Special Masters will not rule on these until all claims presenting this issue have been fully briefed, to permit all affected

Representative Claimants to be heard before any ruling and allow for the consideration of all arguments in a uniform and efficient manner.

7.   ***Monetary Award Denials***.  There have been 640 denials of Monetary Award claims for reasons other than an Audit (60 more since Status Report No. 4), as shown in Table 8:[9]

| Table 8 | | MONETARY AWARD DENIALS | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | UNTIMELY |
| 1. | Total Submitted | 122 | 55 | 464 | 162 | 711 | 1,016 | 257 | 2 |
| 2. | Denied | 16 | 2 | 62 | 9 | 148 | 280 | 121 | 2 |
| 3. | % Denied | 13% | 4% | 13% | 6% | 21% | 28% | 47% | 100% |

Sections 6 and 10 of the Summary Report on the Settlement Website show these denials and the reasons for them.  Of the 2,787 timely claims, we denied 638 (23%).  Overall, the AAP found 349 (55%) of these claims did not reflect a valid Qualifying Diagnosis.  Other claims were denied because a fundamental requirement in the Settlement Agreement was not satisfied (*e.g.*, date of death for a Death with CTE claim) or because Settlement Class Members did not provide the mandatory information and/or documents we requested in our notices and outreach efforts.  When an AAP member denies a claim, we include in the notice comments from that AAP member explaining why.  When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents.  Our denial notices explain all appeal

---

[9] We discuss Audit denials in Paragraph 12 of this Status Report.

rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam.  Settlement Class Members have appealed 195 (30%) of the 640 denials.

### III.     QUALIFIED MAF PHYSICIANS

**8.     *Establishing and Maintaining the MAF Network.***

(a) We continue to identify and contact providers, collect applications, verify credentials, submit applicants to the Parties for approval and contract with approved Qualified MAF Physicians, in conjunction with the BAP Administrator.  We recently attended the American Academy of Neurology ("AAN") Annual Meeting in Philadelphia to recruit additional candidates for the Qualified MAF Physician Network.  We set up a booth in the exhibit hall where 66 persons expressed interest in the Network and gave us their contact information.  We are communicating with them to confirm whether they meet the Settlement Agreement criteria to serve as a Qualified MAF Physician and, if so, to encourage them to apply.  The Honorable Anita B. Brody hosted a breakfast for the Qualified MAF Physicians in her courtroom in Philadelphia in conjunction with the AAN conference.  We received an overwhelmingly positive response to this invitation, though many of the Qualified MAF Physicians said they would not be in town for the conference.  We had 13 Qualified MAF Physicians, one practice manager and one practice lawyer in chambers for this session.

(b) The posted list of Qualified MAF Physicians includes 117 of the total 130 approved Qualified MAF Physicians.  We will add the remaining 13 potential Qualified MAF Physicians when we receive signed contracts back from them.  We have final contracts with Qualified MAF Physicians in or near 40 of the 53 target cities closest to where the majority of living Retired

NFL Football Players reside.  Table 9 shows the changes in these numbers since Status Report

No. 4:

| Table 9 | QUALIFIED MAF PHYSICIANS | | |
|---|---|---|---|
| | DATA POINT | AS OF 2/11/19 | AS OF 5/13/19 | CHANGE |
| 1. | Total Approved Physicians | 153 | 130 | -23 |
| 2. | Approved – On Posted List | 127 | 117 | -10 |
| 3. | Approved – Not Yet Posted | 26 | 13 | -13 |
| 4. | Target Cities Represented | 41 | 40 | -1 |

Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF

Physician Locator Tool on the Settlement Website.  We explain in sub-paragraph (c) below why

the total number of approved physicians went down by 23 (Row 1 of Table 9).

(c) There are 25 providers from 19 facilities who are no longer with the Program.  One

physician was terminated, nine never signed a contract with us and were unresponsive to our

attempted contacts and 15 withdrew.  Of the five who gave us reasons for withdrawing, two cited

busy schedules, two stated they did not like dealing with lawyers and one had left the practice.

The Parties approved two new Qualified MAF Physicians since Status Report No. 4.  We

secured their signed contracts and added them to the posted list of Qualified MAF Physicians.

**9.**      *Assistance in the Operation of the Network.*  On April 11, 2019, the Court

entered an Order adopting a revised set of the Rules Governing Qualified MAF Physicians.

(Document 10527).[10]  Title VII of these Rules covers how we help with the operations of the

network by assessing diagnoses made by Qualified MAF Physicians to see if they comply

with the Settlement Agreement and Rules and analyzing other aspects of the doctors' overall

performance in the Program.

---

[10] An earlier set of these Rules was approved by the Special Masters and posted to the Settlement Website on June 7,
2018.  The guide at the beginning of the current set of Rules posted on the public website explains which Rules are
new and which ones changed from the earlier set.

IV.   **AUDIT**

**10.**   *Closed Audits.*   We have concluded the Audit investigations of 523 Settlement Class Members with Monetary Award claims.   Table 10 summarizes the reasons for these closures and changes in the numbers since Status Report No. 4:

| Table 10 | CLOSED AUDITS | | |
|---|---|---|---|
| | REASON FOR CLOSURE | AS OF 2/11/19 | AS OF 5/13/19 | CHANGE |
| 1. | No Finding of Misrepresentation, Omission, or Concealment; or Special Masters Directed Result | 261 | 410 | +149 |
| 2. | Claim Withdrawn by Settlement Class Member | 108 | 113 | +5 |
| 3. | Totals | 369 | 523 | +154 |

**11.**   *Reports of Adverse Finding in Audit.*   We have issued to the Parties 16 Reports of Adverse Finding in Audit affecting 511 Monetary Award claims.   All 16 Audit Reports were then referred to the Special Masters.   These 16 Audit Reports concern three neurologists, 12 neuropsychologists, two law firms, five individual Settlement Class Members and one claims preparation company.   The Special Masters accepted our referrals on eight of the 16 Audit Reports, which concern 11 neuropsychologists, three neurologists and one law firm; rejected our referral on six Audit Reports covering one neuropsychologist and five individual Settlement Class Members; and are considering whether to accept two referrals, which concern one law firm and one claims preparation company.

**12.**   *Published Special Master Decisions.*   Since Status Report No. 4, the Special Masters have issued findings in two additional Audit Proceedings, both dated March 12, 2019.   In one, they disqualified Dr. Darren Fuerst, a neuropsychologist, from participating in the Program, which means no claims may be submitted in reliance on his neuropsychological testing and evaluation.   In the other, they ruled on the Audit Report regarding Dr. Larry

Pollock, a neuropsychologist. The Special Masters did not find any misrepresentation, omission, or concealment of material fact in the claims relying on neuropsychological testing by Dr. Pollock and allowed those claims to move forward in the review process, but the Special Masters directed us to deny one claim based on the unique circumstances of a Retired NFL Football Player's medical examinations. Copies of the Special Masters' decisions are published on the Settlement Website (under "Documents" click "Special Master" below "Published Decisions"). We have denied 196 claims after Audit based on decisions by the Special Masters disqualifying certain neurologists and neuropsychologists from participating in the Program.[11] Sections 6 and 8 of the Summary Report on the Settlement Website show these denials. A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors.

13. ***Ongoing Audit Investigations.*** We have other Audit investigations underway affecting 68 Monetary Award claims (102 fewer than the 170 we reported in Status Report No. 4), of which 52 are subject to two group investigations of claims with similar characteristics and 16 are individual claims.

14. ***Claims Audited Multiple Times.*** Sometimes, claims on which we have concluded an Audit undergo another Audit if we later learn information that requires further investigation. We notify Settlement Class Members when this happens. We have audited 76 Monetary Award claims more than one time; the most times a Monetary Award claim has been audited is two.

---

[11] Of the 196 denials, 195 are associated with disqualified providers: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims). The remaining denial is the one Dr. Pollock claim that the Special Masters directed us to deny based on the unique circumstances of a Retired NFL Football Player's medical examinations.

15.    *Activities of the Special Investigator.*  The Special Masters or the Court have referred five investigations to the Special Investigator; the five investigations involve three law firms, one litigation funding company and one individual Settlement Class Member.  The investigations affect 178 Monetary Award claims that are currently in Audit.  We show these claims in Section 8 (Row 11) of the Summary Report on the Settlement Website.  The Special Investigator has retained HML Group to provide supportive investigative services.[12]

## V.    DERIVATIVE CLAIMANTS

16.    *Derivative Claims.*  We have received 567 Derivative Claim Packages, which is an increase of nine since Status Report No. 4.  Table 11 shows the status of these claims:

| Table 11 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | HOW MANY | % |
| 1. | Paid ($736,492) | 159 | 28% |
| 2. | Award Notice Issued but Not Paid ($123,236) | 30 | 5% |
| 3. | Denied – Deceased Derivative Claimant | 4 | <1% |
| 4. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 5. | Successful Player Challenge – Not Eligible for Award | 14 | 2% |
| 6. | Derivative Claimant Challenge – Pending Final Determination | 3 | <1% |
| 7. | Withdrawn | 8 | 1% |
| 8. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Player has not yet submitted a claim, or his claim status was not final) | 336 | 59% |
| 9. | **Totals** | **567** | **100%** |

Since Status Report No. 4, 21 more Derivative Claimants were paid, we issued 16 more Notices of Derivative Claimant Award and we denied one Derivative Claimant.  We have so far paid 84% of the 189 Derivative Claimants who received Notices of Derivative Claimant Award; of the 30 eligible Derivative Claimants who have not yet been paid, 17 are in the

---

[12] Read our March 2019 "Insights" newsletter (https://www.nflconcussionsettlement.com/Newsletters.aspx) for more about HML Group.

payment process.  We have not received an objection from any of the 147 Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

17.    ***Additional Derivative Claimant Details.***  We have received challenges from 28 Retired NFL Football Players (or their Representative Claimants) to 40 Derivative Claimants; 18 (45%) of those 40 challenged Derivative Claimants never submitted a timely Derivative Claim Package, making them ineligible for a Derivative Claimant Award.  We issued a Notice of Derivative Claim Package Submission Deadline to 380 registered Derivative Claimants, of whom 140 (37%) submitted a timely claim, 233 (61%) did not submit a timely claim and seven (2%) are still within their 30-day deadline to submit a timely claim.[13]

## VI.    <u>OTHER CLAIM PROCESSES</u>

18.    ***Handling of Attempted Assignments of Claims.***

(a) We have received 882 signed SWS-5s (Sworn Statement:  Status of Assignment of Monetary Claim) from eligible Settlement Class Members telling us whether they had attempted to assign a claim in exchange for money from a third-party funder, as shown in Table 12:

---

[13] To potentially share 1% of a Retired NFL Football Player's Monetary Award, a Derivative Claimant must submit a Derivative Claim Package within 30 days of when we notify the Retired NFL Football Player that he is eligible for a Monetary Award.  We inform Derivative Claimants of this deadline if they have not submitted a Derivative Claim Package at the time we issue the associated Retired NFL Football Player his Notice of Monetary Award.

| Table 12 | | SIGNED SWS-5 ASSIGNMENT RESPONSES | | | | | |
|---|---|---|---|---|---|---|---|
| | **RESPONSE** | **HOW MANY** | | | **%** | | |
| | | **AS OF 2/11/19** | **AS OF 5/13/19** | **CHANGE** | **AS OF 2/11/19** | **AS OF 5/13/19** | **CHANGE** |
| 1. | No Assignment or Attempt to Assign | 727 | 806 | 79 | 91% | 91% | 0% |
| 2. | Assigned or Attempted to Assign | 69 | 76 | 7 | 9% | 9% | 0% |
| **3.** | **Totals** | **796** | **882** | **+86** | **100%** | | |

(b) If a Settlement Class Member has attempted to assign any settlement benefits from his or her Monetary Award claim to a third-party funder, or borrowed any funds against his or her claim as collateral, he or she also must provide to us all documents relating to that transaction (a "Third-Party Funder Transaction"), unless the third-party funder has submitted a Declaration of Consent to Substitution to participate in the Third-Party Funding Resolution Protocol, as described in Paragraph 18(d) below.  We review each Third-Party Funder Transaction that is not subject to the Third-Party Funding Resolution Protocol with the Special Masters to determine whether it is an assignment prohibited by Section 30.1 of the Settlement Agreement and the Court's December 8, 2017 Explanation and Order (Document 9517) (a "Prohibited Assignment") and notify the affected Settlement Class Member of that decision in a Notice of Assignment Review Determination.  We have reviewed 57 Third-Party Funder Transactions (an increase of seven since Status Report No. 4), 41 of which are Prohibited Assignments (an increase of six since Status Report No. 4).  Another 20 Third-Party Funder Transactions did not require our review because the third-party funder submitted a Declaration of Consent to Substitution to participate in the Third-Party Funding Resolution Protocol.

(c) On any Prohibited Assignment that has not been terminated by agreement between the Settlement Class Member and the funder, and that is not subject to the Third-Party

Funding Resolution Protocol described in Paragraph 18(d) below, we issue a Waiver Relinquishing Rights Under Attempted Assignment contemplated in the Explanation and Order ("Waiver Form") for the third-party funder to sign and return within 30 days to:  (a) indicate the amount advanced to the Settlement Class Member that has not been repaid to the third-party funder; and (b) rescind the Prohibited Assignment and relinquish all claims relating to it.  We send this Waiver Form to the lawyer for a represented Settlement Class Member and directly to the third-party funder if the Settlement Class Member is not represented by a lawyer.  The Waiver Form includes an attachment for the Settlement Class Member to sign and return to us showing agreement with the information the third-party funder provided in the Waiver Form.  We have issued 35 Waiver Forms (an increase of five since Status Report No. 4) and received 25 completed, signed Waiver Forms from third-party funders (an increase of eight since Status Report No. 4).

(d) In addition, we provide a Third-Party Funding Resolution Protocol to third-party funders and affected Settlement Class Members as we learn of Monetary Awards subject to an attempted assignment.  A funder may elect to participate in it by submitting a Declaration of Consent to Substitution, a template of which is available on the Settlement Website.  By completing all necessary forms, the third-party funder and Settlement Class Member agree that the Prohibited Assignment and any rights held under it are terminated.  We have implemented the terms of the Protocol to successfully terminate 12 transactions between third-party funders and Settlement Class Members (an increase of six since Status Report No. 4).

19.     *Petitions for Deviation from the Fee Cap.*  We have received seven Petitions

for Deviation, one of which was withdrawn.  The Court resolved two of the remaining six

Petitions for Deviation; the other four are pending final resolution.

20.     *Non-Medical Liens Process and Attorneys' Lien Disputes.*

(a) Table 13 summarizes Non-Medical Lien assertions, notices and disputes by Lien

type and reflects changes to those numbers since Status Report No. 4:

| Table 13 | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | AS OF 2/11/19 | AS OF 5/13/19 | CHANGE | AS OF 2/11/19 | AS OF 5/13/19 | CHANGE | AS OF 2/11/19 | AS OF 5/13/19 | CHANGE |
| 1. | Attorneys' | 930 | 984[14] | +54 | 331 | 365 | +34 | 278 | 275 | -3 |
| 2. | Child Support | 339 | 343 | +4 | 40 | 43 | +3 | 23 | 22 | -1 |
| 3. | Judgment | 58 | 60 | +2 | 13 | 13 | 0 | 11 | 11 | 0 |
| 4. | Tax | 48 | 48 | 0 | 1 | 1 | 0 | 0 | 0 | 0 |
| 5. | **Totals** | **1,375** | **1,435** | **+60** | **385** | **422** | **+37** | **312** | **308** | **-4** |

(b) Table 14 summarizes the status of Liens in the Attorneys' Liens dispute resolution

process:

| Table 14 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[15] | | | |
|---|---|---|---|---|
| | **PENDING** | **RESOLVED** | | **TOTAL** |
| | | **BY AGREED WITHDRAWAL** | **BY COURT DETERMINATION** | |
| | 20 | 23 | 3 | 46 |

(c) Table 15 summarizes the Non-Medical Lien holdbacks by Lien type:

---

[14] These 984 Attorneys' Liens were asserted by 47 law firms.

[15] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.

| Table 15 | NON-MEDICAL LIEN HOLDBACKS | | | |
|---|---|---|---|---|
| | **LIEN TYPE** | **MONETARY AWARDS AFFECTED** | **MONETARY AWARD AMOUNTS** | **LIEN HOLDBACKS** |
| 1. | Attorneys' | 17 | $21,254,960.50 | $3,648,676.84 |
| 2. | Child Support | 1 | $624,056 | $21,150.25 |
| 3. | Judgment | 2 | $1,104,579.49 | $791,986.86 |
| 4. | Tax | 0 | N/A | N/A |
| **5.** | **Totals** | **20** | **$22,983,595.99** | **$4,461,813.95** |

(d) Table 16 summarizes the Non-Medical Lien payments by Lien type:

| Table 16 | NON-MEDICAL LIEN PAYMENTS | | | |
|---|---|---|---|---|
| | **LIEN TYPE** | **MONETARY AWARDS AFFECTED** | **MONETARY AWARD AMOUNTS** | **LIEN PAYMENTS** |
| 1. | Attorneys' | 26 | $38,971,542.77 | $2,751,326.02 |
| 2. | Child Support | 9 | $9,789,967.40 | $353,205.51 |
| 3. | Judgment | 1 | $3,222,009 | $1,588,566.32 |
| 4. | Tax | 0 | N/A | N/A |
| **5.** | **Totals** | **36** | **$51,983,519.17** | **$4,693,097.85** |

## VII.   COMMUNICATIONS CENTER FOR THE PROGRAM

21.   *Our Contact Activity*.  Since our contact center opened on February 6, 2017, we have handled 68,824 total communications, including 43,899 calls made or received and 21,650 emails to us at our Claims Administrator email box.  Since Status Report No. 4, we handled 3,929 such total communications.

22.   *Law Firm Contacts*.  Our Law Firm Contacts are assigned to 524 different law firms or lawyers representing Settlement Class Members in the Program.  This is 11 more law firms or lawyers than we reported in Status Report No. 4.  The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 21 above.

23.     *Newsletters.*  Since Status Report No. 4, we issued two more editions of our "Insights" newsletter (February and March 2019).[16]  We work with the BAP Administrator and the Lien Resolution Administrator to include material about the BAP and Medical Liens in the newsletters.  We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail.  We also post them to the Settlement Website (under "Documents" click "Newsletters").  We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters.

24.     *Settlement Program Website.*  We regularly update the Settlement Website to reflect progress and changes to the Program.  We have made these changes since Status Report No. 4:

(1)  Posted three new decisions the Court or Special Masters designated should be published.

(2)  Replaced the existing How to Calculate Eligible Seasons Guide on the Reference Guides page at https://www.nflconcussionsettlement.com/Reference_Guides.aspx.  It now covers the change on calculating half an Eligible Season we discussed in Paragraph 28 of our last Status Report.

(3)  Added one new Court Order (Order in Aid of Implementation of the Settlement Agreement: Rules Governing Qualified MAF Physicians, Document 10527, filed April 11, 2019) to the Court Orders and Opinions page at https://www.nflconcussionsettlement.com/Court_Orders_Opinions.aspx.

(4)  Added a new "Status Reports" page for Program status reports filed with the Court at https://www.nflconcussionsettlement.com/Status_Reports.aspx (under "Documents," select "Status Reports" below "Court Filings").[17]

---

[16] The newsletters are a service to Settlement Class Members and their lawyers, so we want to make sure they cover timely and useful information.  Although we typically issue a new edition of "Insights" by the end of each month, we delayed the April/May 2019 issue because we want to discuss new rules about MAF exams and had to wait until the Court issued a decision on the April 25, 2019 Motion of Class Counsel for Reconsideration of the Court's April 11 Order (Document 10582), which challenged some of the Rules Governing Qualified MAF Physicians adopted by the Court on April 11, 2019 (Document 10527).  We thought the Class would be best served by waiting to issue the newsletter until we knew what the final version of the Rules would be.  The Court denied Class Counsel's Motion for Reconsideration on May 16, 2019 (Document 10612), leaving the Rules adopted on April 11, 2019, intact.

[17] The documents on this new page used to appear on the "Other Court Filings" page, but we thought creating a separate page for them would make them easier to find.

(5) Put the BAP Administrator's 1st Quarter 2019 Status Report (Document 10470, filed February 28, 2019) on the Status Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.

(6) Posted one new Alert (https://www.nflconcussionsettlement.com/Alerts.aspx) titled Rules Governing the National Network of Qualified MAF Physicians (April 19, 2019).  This Alert announces changes to the Rules after the Court's April 11, 2019 Order (Document 10527).

(7) Added two new forms (150-Mile Rule Waiver Request Form; Employment History and Social and Community Activity Form for Retired NFL Football Players) and replaced one existing form (SWS-3 (Third Party Sworn Statement: Functional Impairment)) in the Monetary Awards and Supplemental Monetary Awards sections on the Claims Forms page at https://www.nflconcussionsettlement.com/Claims.aspx.

(8) Put on the Home and Login pages a message linking to the Alerts page, where we post important information about the Program.

(9) Added new language to the MAF Physician Locator Tool at https://www.nflconcussionsettlement.com/PhysicianSearch.aspx regarding the distance Retired NFL Football Players may travel to see a Qualified MAF Physician.

Since Status Report No. 4, the Program's Home page has had 26,281 more unique visits, giving us 397,354 total unique visits, coming from 190 countries and all 50 of the United States.

## VIII.   SPECIAL MASTERS

25.     ***Our Work with the Special Masters***.  Since Status Report No. 4, we had six more regularly scheduled calls to discuss policy and operational issues, and have held 70 such calls with the Special Masters to date.  We have many other calls and exchange countless emails with them to address issues as they arise.  The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

26.     ***Program Rules.***  Since Status Report No. 4, only one set of Rules has changed. The Rules Governing Qualified MAF Physicians as originally posted on June 7, 2018, included 16 rules; now there are 27 rules.  We posted the new set of Rules Governing Qualified MAF Physicians after the Court's April 11, 2019 Order adopting them (Document 10527); this posted set includes a Quick Reference Guide explaining rules that are new or

have changed.[18]  All nine sets of Rules are available on the Settlement Website (under

"Documents," click "Governing Rules") and on the online portals of law firms, lawyers and *pro

se* Settlement Class Members.

27.    ***Published Decisions.***  Since Status Report No. 4, the Special Masters issued two

new decisions and designated them to be published.  We post these rulings to the Settlement

Website (under "Documents," click "Special Master" below "Published Decisions").  Both of

these rulings were from Audit Proceedings.[19]  The Special Masters have so far issued five

published Monetary Award appeal decisions and seven Audit decisions.

## IX.    PROCEDURES AND FREQUENTLY ASKED QUESTIONS

28.    ***Coordination with the Parties.***  We conducted five more weekly policy and

operational issue calls with the Parties after Status Report No. 4 and have held 128 such calls in

this Program since April 19, 2016.  We also have other calls, meetings and emails with the

Parties on particular interpretation or operational issues that arise.  Where we do not have

consensus among the Parties on an issue, we consult the Special Masters to determine the best

practices approach, while still honoring the terms of the Settlement Agreement.

29.    ***Frequently Asked Questions***.  Since Status Report No. 4, we added nine new

FAQs:

> (a) FAQ 86 ("Who helps with the operation and implementation of the network of
>     Qualified MAF Physicians?");
>
> (b) FAQ 87 ("What is the MAF Steering Committee?");
>
> (c) FAQ 89 ("Is there any limit on which Qualified MAF Physician I may choose
>     to examine me?");

---

[18] On April 25, 2019, Class Counsel Gene Locks filed a Motion for Reconsideration of the Court's April 11 Order (Document 10582) adopting these Rules.  The Court held a hearing to address that Motion on May 7, 2019, and has since denied the Motion (Document 10612, filed May 16, 2019).  There is a separate appeal of the Court's April 11 Order to the 3rd Circuit.  Because the Court has not issued a stay, we are implementing the Rules as posted.
[19] We discuss the two Audit decisions in Paragraph 12 of this Status Report.

(d) FAQ 92 ("Do I need to tell the Qualified MAF Physician about my work and other activities?");

(e) FAQ 93 ("Is there any limit on which neuropsychologist the Qualified MAF Physician may refer me to for neuropsychological testing?");

(f) FAQ 108 ("Are Qualified MAF Physicians required to follow the strict BAP criteria when making a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment?");

(g) FAQ 127 ("What is the AAP Leadership Council?");

(h) FAQ 326 ("Who is the Special Investigator?"); and

(i) FAQ 327 ("Why did I receive a Notice of Referral to Special Investigator?").

We also made substantive revisions to these 19 FAQs already on the Settlement Website:

(a) FAQ 41 ("How does the Claims Administrator calculate a Retired NFL Football Player's Eligible Seasons?"), to account for a change to how we calculate half an Eligible Season;[20]

(b) FAQ 83 ("Should I get a BAP exam or see a Qualified MAF Physician?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(c) FAQ 85 ("Who is a Qualified MAF Physician?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(d) FAQ 88 ("How do I get evaluated for a Qualifying Diagnosis if I do not already have one?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(e) FAQ 91 ("Does the physician who makes the Qualifying Diagnosis of a Retired NFL Football Player have to see and examine that Player in person?"), to account for passage of the February 6, 2019 Claim Package submission deadline for pre-Effective Date diagnoses;

(f) FAQ 94 ("Can the representative of a deceased Retired NFL Football Player submit a claim now?"), to account for passage of the February 6, 2019 Claim Package submission deadline for pre-Effective Date diagnoses;

(g) FAQ 95 ("What should I do if I already have a Qualifying Diagnosis?"), to account for passage of the February 6, 2019 Claim Package submission deadline for pre-Effective Date diagnoses;

---

[20] See Paragraph 28 of Status Report No. 4 for more on this.

(h) FAQ 99 ("Which diagnostic criteria must a physician use when making my Qualifying Diagnosis?  When and to what diagnoses does the "generally consistent" criteria apply?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(i) FAQ 101 ("What makes a Claim Package complete?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(j) FAQ 107 ("What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made outside the BAP for living Retired NFL Football Players?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(k) FAQ 109 ("What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses for Retired NFL Football Players who *died before January 7, 2017* (the Effective Date) and cannot participate in the BAP or be diagnosed by a Qualified MAF Physician?"), to account for passage of the February 6, 2019 Claim Package submission deadline for pre-Effective Date diagnoses;

(l) FAQ 115 ("What must the medical records show for Death with CTE?"), to account for passage of the February 6, 2019 Claim Package submission deadline for pre-Effective Date diagnoses;

(m) FAQ 125 ("How is my diagnosis reviewed?  When and to what does the "generally consistent" standard apply?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(n) FAQ 126 ("What is the AAP and what does it do?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(o) FAQ 128 ("What is the AAPC and what does it do?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(p) FAQ 131 ("If I received a Qualifying Diagnosis from a Qualified MAF Physician, what types of records will the physician send to the Claims Administrator?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(q) FAQ 139 ("Does the Claims Administrator question the medical judgment of the physician who made the Qualifying Diagnosis?"), to cover changes to the Rules Governing Qualified MAF Physicians;

(r) FAQ 148 ("Can the Claims Administrator change the outcome of my claim after I receive a notice?"), to cover changes to the Rules Governing Qualified MAF Physicians; and

(s) FAQ 149 ("Can I submit a new claim for a Monetary Award if the Claims Administrator has denied my claim?"), to account for passage of the February 6, 2019 Claim Package submission deadline for pre-Effective Date diagnoses.

There now are 350 FAQs in 15 categories.  "FAQs" is one of the options in the green menu bar on the Settlement Website.  These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program.  The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs.  Note that when we add new FAQs, we place them within the existing set where it makes the most sense.  This means that the numbering of FAQs within the set may change from time to time.

## X.    REGISTRATION

**30.    *Registration Submissions.***

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover Registration.  Table 17 here shows changes in the number of timely Registration submissions since our Status Report No. 4:

| Table 17 | TIMELY REGISTRATION SUBMISSIONS | | | |
|---|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 2/11/19** | **AS OF 5/13/19** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,938 | 15,925 | -13 |
| 2. | Representative Claimants | 1,294 | 1,312 | +18 |
| 3. | Derivative Claimants | 3,295 | 3,300 | +5 |
| 4. | **Totals** | **20,527** | **20,537** | **+10** |

The number of Retired NFL Football Players (Row 1) went down by 13 from Status Report No. 4 because they were replaced by Representative Claimants.  Of the 20,537 who we

issued Registration notices to, we were able to confirm that 19,379 of them are Settlement Class Members under the Settlement Agreement, of whom 12,830 are Retired NFL Football Players eligible to participate in the BAP.  The other 1,158 persons are not Settlement Class Members under the Settlement Agreement because of one or more of these reasons:  (1) they were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not provide us with the information or support required by the Settlement Agreement to register, after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a Derivative Claimant but did not have a relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, that do not meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement can otherwise be accepted under the Rules Governing Registration Determinations and Appeals.  We have made determinations on 265 such late Registrations and found that 143 (54%) of them presented good reasons to be allowed to register late. Table 18 shows the change in these numbers since Status Report No. 4:

| Table 18 | LATE REGISTRATIONS | | | |
|---|---|---|---|---|
| | STATUS | AS OF 2/11/19 | AS OF 5/13/19 | CHANGE |
| 1. | Accepted as Timely | 133 | 143 | +10 |
| 2. | Not Accepted as Timely | 114 | 122 | +8 |
| 3. | Totals | 247 | 265 | +18 |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge.  The NFL Parties also may challenge our timeliness decisions.  We have received 373 challenges, which is three more than we reported in Status Report No. 4.  Table 19 explains these challenges and what happened to them:

| Table 19 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 243 | Settlement Class Member | 75 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 20 | Settlement Class Member | 5 | 15 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | Totals | 373 | | 148 | 225 |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters. Table 20 shows the appeals thus far and the Special Masters' rulings on them:

| Table 20 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO APPEALED | DECISION UPHELD | DECISION OVERTURNED |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2[21] |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 4 | Settlement Class Member | 3 | 1 |
| 5. | Totals | 34 | | 31 | 3 |

---

[21] These two were the result of the 53-Man Roster decision issued on December 5, 2017 (Document 9513).

31.     *Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.*  The Special Masters have approved 397 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants.  This is 12 new Representative Claimant approvals since Status Report No. 4.  There have been no new Derivative Claimant Representatives since Status Report No. 4.

## XI.     OTHER FUNCTIONS

32.     *Reporting*.  On March 18, 2019, we added to Section 8 of the Summary Report a new row (Row 11) to show the number of claims referred to the Special Investigator by the Special Masters.  The Summary Report is posted to the Reports and Statistics page on the Settlement Website (https://www.nflconcussionsettlement.com/Reports_Statistics.aspx).

33.     *Online Portals*.  On April 22, 2019, we posted a message on the Home page of Pro Se and Law Firm portals with a link to the Alerts page, where we publish important information about the Program.

## XII.     CONCLUSION

34.     *General Status.*  We have 179,314 documents (15,103 gigabytes, or 15 terabytes of data), including notices we have issued, stored on Settlement Class Members, which is 5,764 more than when we filed Status Report No. 4.  We have issued 36,022 notices (893 more since Status Report No. 4) of various kinds (Registration, claims, appeals, Audit, etc.) to 20,948 different persons since March 23, 2017, and developed over 100 different types of notices and forms for use in the Program.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By:   /s/ Orran L. Brown, Sr.
      Orran L. Brown, Sr.
      Virginia State Bar No.:  25832
      BrownGreer PLC
      250 Rocketts Way
      Richmond, Virginia  23231
      Telephone:  (804) 521-7201
      Facsimile:  (804) 521-7299
      Email:  obrown@browngreer.com