UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>        Plaintiffs,<br><br>      v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br>        Defendants. | Civ. Action No.: 14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>Settlement Class Member ▇▇▇<br>(SPID 100002282) | Hon. Anita B. Brody |

**THE NFL PARTIES' APPEAL OF THE
SPECIAL MASTER'S DECISION NOT TO CONSULT AN AAPC WHEN
DECIDING THE APPEAL OF CLAIM DETERMINATION FOR** ▇▇▇

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................................... i

PRELIMINARY STATEMENT ....................................................................................................... 1

BACKGROUND ............................................................................................................................... 2

      A.      The Role of AAPCs in Appeals ....................................................................................... 2

      B.      Performance Validity Testing Under the Settlement Agreement ............................ 3

      C.      Mr. ▮▮▮'s Neuropsychological Testing Results and Claim History ...................... 4

ARGUMENT ..................................................................................................................................... 7

CONCLUSION ................................................................................................................................ 10

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully appeal the Special Master's March 19, 2019 Post-Appeal Notice of Monetary Award Claim Determination, which denied the NFL Parties' appeal of ▆▆▆▆ ("Claimant's") Monetary Award Determination (the "▆▆ Appeal"). The NFL Parties submit that the Special Master's failure to consult with an Appeals Advisory Panel Consultant ("AAPC") in deciding the ▆▆ Appeal, which exclusively concerned the highly technical issue of egregious performance validity failures on neuropsychological testing, constitutes an abuse of discretion. The NFL Parties respectfully seek reconsideration of the ▆▆ Appeal with the assistance of an AAPC.

## PRELIMINARY STATEMENT

Claimant ▆▆▆▆ submitted a claim based on evaluations he received through the Baseline Assessment Program ("BAP") by neurologist Dr. ▆▆▆▆ and neuropsychologist Dr. ▆▆▆▆. Although Dr. ▆▆ (the neurologist) diagnosed Claimant with Level 1.5 Neurocognitive Impairment, Dr. ▆▆ (the neuropsychologist) determined that Claimant did not satisfy the criteria for *any* Qualifying Diagnosis because the neuropsychological test results "[were] not considered an accurate reflection of [his] optimal cognitive abilities," as the Settlement Agreement requires, because Claimant *failed all seven administered performance validity tests*—including *performing substantially below chance on all six* measures of forced choice recognition. In other words, the testing results reflected intentional malingering. As Dr. ▆▆▆▆ summarized, Claimant "would have performed better if he had randomly guessed."

Because the Qualified BAP Providers disagreed on whether the evaluations merited a Qualifying Diagnosis of Level 1.5 (per the neurologist) or no diagnosis (per the neuropsychologist), the BAP Administrator asked a neurologist on the Appeals Advisory Panel ("AAP") to review the medical records. Upon information and belief, the AAP neurologist reviewed the material without consulting an AAPC neuropsychologist. The AAP then *upgraded*

the claim to a diagnosis of Level 2 Neurocognitive Impairment despite the fact that *neither* Dr. ███ *nor* Dr. ███ supported that more severe diagnosis.

The NFL Parties appealed the claim determination based on the extreme performance validity failures, and specifically requested that the Special Master exercise his discretion to consult with an AAPC given the clear need for neuropsychological expertise to evaluate Dr. ███ conclusion that the testing was unreliable. The Special Master, however, denied the NFL's appeal without consulting his neutral AAPC resource. The Special Master's failure to consult an AAPC—where the entire appeal turned on the highly technical issue of extreme performance validity failures in neuropsychological testing and the *only* neuropsychologist to review that testing had determined that Claimant's severe performance validity failures rendered the testing unreliable and precluded a Qualifying Diagnosis—was a clear abuse of discretion. The integrity of the Settlement Program requires consultation with an AAPC in the face of such flagrant intentional malingering.

For these reasons, the Court should remand the ███ Appeal to the Special Master for reconsideration, in consultation with an AAPC, to determine whether Mr. ███'s neuropsychological test results are reliable or, instead, reflect intentional malingering.

## BACKGROUND

### A.   The Role of AAPCs in Appeals

The Settlement Agreement provides that, in deciding appeals of claim determinations, the Court "may be assisted, in its discretion, by . . . an Appeals Advisory Panel Consultant." (Settlement Agreement, § 9.8.) While the decision to seek such assistance is discretionary, the Parties to the Settlement Agreement made the AAPCs a central part of the claim appeal process because they recognized that the Court or its designees (here, the Special Masters) would not be

2

experts in neuropsychology or have the training necessary to evaluate neuropsychological testing records and the meaning and significance of performance validity failures.

The three AAPCs available for consultation on appeals are board-certified neuropsychologists "agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court." (*Id.*, § 2.1(g).) The Parties selected these AAPCs based on their unquestionable expertise and stature in the field of neuropsychology, and after conducting a stringent vetting process. The AAPCs are incontestably qualified to evaluate performance validity failures in neuropsychological test results. The AAPCs are true neutrals, with no ongoing contact with lawyers for claimants, Co-Lead Class Counsel or the NFL Parties.

**B.     Performance Validity Testing Under the Settlement Agreement**

The definitions of Qualifying Diagnoses were key and heavily negotiated components of the Settlement Agreement. For a Qualifying Diagnosis of Level 2 Neurocognitive Impairment made through the BAP, the Settlement Agreement requires "[e]vidence of a severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neuropsychological testing protocol" provided in the Settlement Agreement. (*Id.*, Ex. 1 § 2(a)(ii).) That neuropsychological testing protocol requires that "[f]reestanding, embedded and regression based performance validity metrics [are] administered to each Retired NFL Football Player during baseline and, if relevant, subsequent neuropsychological examinations," and that the neuropsychologist complete the *Slick* Checklist of validity criteria "in order to determine whether the Retired NFL Player's test data is a valid reflection of his optimal level of neurocognitive functioning." (*Id.*, Ex. 2 at 2.) Moreover, "a Retired NFL Player's failure on two or more effort tests may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing." (*Id.*)

3

**C.     Mr. ▆▆▆ Neuropsychological Testing Results and Claim History**

Claimant was evaluated in the BAP by neurologist Dr. ▆▆▆ and neuropsychologist Dr. ▆▆▆. Dr. ▆▆▆ found that Mr. ▆▆▆'s evaluation was "generally consistent with" the BAP criteria for a diagnosis of Level 1.5 Neurocognitive Impairment and rendered that diagnosis, even though the "generally consistent" standard plainly does not apply to diagnoses made within the BAP. Dr. ▆▆▆, on the other hand, determined that Mr. ▆▆▆ did not satisfy the criteria for *any* Qualifying Diagnosis, explaining that because Mr. ▆▆▆ failed all seven performance validity tests, Mr. ▆▆▆'s test results "[were] not considered an accurate reflection of [his] optimal cognitive abilities," as the Settlement Agreement requires. (Ex. 1, ▆▆▆ Report at 2–3; Ex. 2, ▆▆▆ Addendum at 1.)

A neurologist on the AAP reviewed these conflicting determinations pursuant to the Settlement Agreement and upgraded Claimant's diagnosis to Level 2 Neurocognitive Impairment, despite the fact that neither Qualified BAP Provider agreed to that Qualifying Diagnosis. (*See* Ex. 3, Nov. 5, 2018 Letter.) Claimant then submitted a claim based on that upgraded Level 2 diagnosis, and his claim was approved by the Claims Administrator. The NFL Parties appealed that claim determination based on Claimant's egregious performance validity test failures, as documented by Dr. ▆▆▆, who performed the neuropsychological examination.

Specifically, the NFL Parties argued that Claimant failed to satisfy the requirements for Level 1.5 or 2 Neurocognitive Impairment because the neuropsychological testing used to support his alleged diagnosis clearly evidenced malingering and was therefore invalid. As Dr. ▆▆▆ found, Claimant *failed all seven* performance validity measures, and performed "*substantially below levels of chance on all 6 measures of forced-choice recognition*" (the TOMM, VSVT, and 4 other ACS measures). (Ex. 1, ▆▆▆ Report at 2–3 (emphasis added).) That is, Claimant "would have performed better if he had randomly guessed." (*Id.*) Although an individual with

4

severe dementia may have suboptimal scores on performance validity tests as a result of guessing or severe limitations, that individual would be expected to perform near chance levels (*i.e.*, the level expected when randomly guessing). Here, where Claimant performed "substantially below levels of chance" on *all six* measures of forced choice recognition, the results indicate intentional malingering. Put another way, to perform so far below chance on so many measures, Claimant must have recognized the correct answer (*e.g.*, answer "A"), and then *intentionally* picked an incorrect response instead (*e.g.*, answer "B").

Indeed, it is well established that such results demonstrate malingering. Extensive neuropsychological research, as well as the TOMM's and VSVT's own test manuals, confirm that performing below-chance levels, especially substantially and repeatedly as here, goes beyond other performance validity test failures and is a telltale sign of intentional malingering.[1]

Because of this substantial evidence of malingering, Dr. ▇ reviewed the *Slick Criteria Checklist*, as the Settlement Agreement requires, and determined that "review of the *Slick Criteria* suggest that there was a pattern of neuropsychological test performance that *is markedly discrepant from currently accepted models of normal and abnormal central nervous system function*," and that Claimant's "[p]erformance was extremely poor on tests designed to measure the degree of effort applied to testing." (Ex. 1, ▇ Report at 3 (emphasis added).) In addition, as part of the *Slick* Criteria Checklist, Dr. ▇ specifically determined that Mr. ▇'s performance on these validity tests was "markedly discrepant" and "below" that seen "in

---

[1] *See, e.g.*, Ex. 4, Larrabee, G.J., *Aggregation Across Multiple Indicators Improves the Detection of Malingering* (2008); Ex. 5, Green, P. & Iverson, G.L., *Validation of the Computerized Assessment of Response Bias in Litigating Patients With Head Injuries* (2001); Ex. 6, Clark, et al., *Yes/No Versus Forced-Choice Recognition Memory in Mild Cognitive Impairment and Alzheimer's Disease* at 1212–13 (2012); Ex. 7, Dean, et al., *Dementia and Effort Test Performance* at 148 (2009); Tombaugh, T. N. (1996). Test of Memory Malingering (TOMM), New York: Multi-Health Systems, Inc.; Slick, D., et al., Victoria Symptom Validity Test (VSVT) Professional Manual.

5

patients with [traumatic brain injury] and moderate levels of dementia." (*Id.*) Dr. ▇ concluded:

> According to guidelines from the Neuropsychologist Handbook provided by the BAP, Mr. ▇ test results *cannot be considered valid due to his failure of multiple [performance validity tests]*. As such, *I cannot rely on these findings as an accurate representation of his cognitive abilities.* Therefore, it is *not possible to conclude that Mr.* ▇ *meets criteria for Neurocognitive Impairment at Level 1, 1.5 or 2* at the present time.

(*Id.* at 5 (emphases added).)[2]

On appeal, the NFL Parties argued that Dr. ▇'s conclusions were correct and that Claimant's performance on his neuropsychological examination provided clear and convincing evidence that he was intentionally malingering and, therefore, his neuropsychological test results did not represent his optimal neurocognitive performance and could not satisfy the Settlement Agreement's criteria for Level 2 (or Level 1.5) Neurocognitive Impairment. Because the appeal dealt exclusively with highly technical issues of failures on neuropsychological performance validity tests, the NFL Parties explicitly requested that the Special Master consult with an AAPC in deciding the appeal. (*See* Ex. 8, NFL Parties' Appeal at 4.)

Claimant opposed the NFL Parties' appeal, arguing that there was no evidence he was malingering and that deference should be given to the AAP neurologist who reviewed the Qualified BAP Providers' disagreement and upgraded the diagnosis to Level 2. Claimant also

---

[2] Although Claimant's performance on the seven performance validity tests, standing alone, invalidates his neuropsychological testing, Dr. ▇ found additional indications that Claimant was malingering during the evaluations. For example, Claimant's validity results on the MMPI-2-RF (a mental health assessment test included in the BAP) likewise "raise[d] concerns about inconsistent reporting." (Ex. 1, ▇n Report at 4.) In particular, there were "concerns about over-reporting [because] he generated a much larger than average number of infrequent responses . . . and provided a very unusual combination of responses that is strongly associated with non-credible memory complaints." (*Id.*) Claimant's "report of cognitive symptoms was much higher than that typically seen in individuals with known cognitive impairments," indeed it "was *nearly 6 standard deviations above the mean.*" (*Id.* (emphasis added).) Yet, Claimant also "presented himself in an extremely positive light by denying minor faults and shortcomings that most people acknowledge." (*Id.*)

argued that the NFL Parties' appeal disregarded his functional impairment, and that the request that the "Special Master . . . confer with an AAP member on . . . appeal shows why [the] appeal should be denied." (*See* Ex. 9, Claimant's Opp'n.) In fact, the NFL Parties requested that the Special Master consult with an *AAPC*, rather than an *AAP member*—a critical difference, as described herein. (*See* Ex. 8, NFL Parties' Appeal at 4.)

The Special Master denied the NFL Parties' appeal on March 19, 2019. Despite the NFL Parties' explicit request that the Special Master consult with an AAPC given the performance validity issues involved, the Post-Appeal Notice provides no indication that the Special Master exercised his discretion to consult an AAPC.

## ARGUMENT

The Special Master's apparent failure to consult with an AAPC constituted a clear abuse of discretion given the appeal's singular focus on the highly technical issue of performance validity failures in Claimant's neuropsychological testing.[3] Only neuropsychologists are properly trained in the validated science to review such results. Indeed, the only neuropsychologist to review Claimant's testing, Dr. ▇▇▇▇, unequivocally determined that Claimant's testing could not support a Qualifying Diagnosis under the terms of the Settlement Agreement. (*See* Ex. 1, ▇▇▇▇ Report; Settlement Agreement, Exs. 1–2.)

In reviewing for abuse of discretion, the Court must determine, based on the totality of the circumstances, whether the Special Master's decision not to consult an AAPC was unreasonable.[4]

---

[3] *See* Fed. R. Civ. P. 53(f)(5) ("Unless the appointing order establishes a different standard of review, the court may set aside a master's ruling on a procedural matter only for an abuse of discretion.").

[4] *See Loinaz* v. *EG & G, Inc.*, 910 F.2d 1, 7 (1st Cir. 1990) ("There is no neat, standardized test for judging abuse of discretion; each case must be judged on its own facts and circumstances."); *Zervos* v. *Verizon N.Y., Inc.*, 252 F.3d 163, 169 n.6 (2d Cir. 2001) ("Discretion is said to be 'abused' ('exceeded' would be both a more felicitous and correct term) when the decision reached is not within the range of decision-making authority a reviewing court determines is acceptable for a given set of facts.") (internal quotation omitted)); *U.S.* v. *Cunningham*, 694 F.3d 372, 383 (3d Cir. 2012) (district court's rulings are an abuse of discretion if "clearly unreasonable");

7

The Special Master's decision is entitled to less deference than an appellate court would give to a trial court's determination.[5] Moreover, this Court expressly retains "continuing and exclusive jurisdiction to interpret, implement, administer and enforce the Settlement Agreement,"[6] and thus has unfettered authority to opine on the proper implementation of the Settlement Agreement's provisions governing AAPC use in this context.

The goal in making AAPCs available to the Court (and, by extension, the Special Master) in connection with claim appeals was to provide a safeguard that the ultimate determinations would be correct—or at least not clearly wrong—as a matter of clinical neuropsychology. Here, there can be no pretense that it was reasonable for the Special Master not to consult an AAPC in deciding this appeal. The NFL Parties' appeal focused solely on extreme performance validity failures, which only a neuropsychologist has the proper training and expertise to properly and fully interpret. As noted above, the NFL Parties' appeal detailed Claimant's severe performance validity failures—including that Claimant failed *all seven* validity measures and was *substantially below chance* on *all six* forced-choice validity measures—and explained that Dr. ▮▮▮▮, the only neuropsychologist who has reviewed Claimant's testing results, unequivocally concluded that Claimant's "test results cannot be considered valid due to his failure of multiple [performance validity tests]" and cannot be "rel[ied] on . . . as an accurate representation of his cognitive abilities." (Ex. 1, ▮▮▮▮ Report at 3, 5.) For that reason, the NFL Parties explicitly requested that the Special Master consult with an AAPC, eminently qualified neuropsychologists hand-picked by the Court and Parties for the express purpose of helping the Court and Special Masters

---

*Ferguson v. Eakle*, 492 F.2d 26, 29 (3d Cir. 1974) (considering "totality of [] circumstances" in determining that district court abused its discretion).

[5] *See* Fed. R. Civ. P. 53, Special Committee Notes, 2003 Amendment Subdivision (g) ("The subordinate role of the master means that the trial court's review for abuse of discretion may be more searching than the review that an appellate court makes of a trial court.").

[6] Am. Final Order and J. § 17, ECF No. 6534; *see also* Settlement Agreement § 20.1(n).

8

correctly decide precisely this type of appeal. (*See* Ex. 8, NFL Parties' Appeal at 4.)

While the AAP member who reviewed Claimant's BAP medical records prior to appeal is, of course, eminently qualified in his or her field, that field is *neurology* rather than *neuropsychology*, and the NFL Parties' appeal (and Dr. ▮▮▮▮'s refusal to render a Qualifying Diagnosis) solely involved issues of *neuropsychological* testing. The Parties understood that AAP members, despite their impressive qualifications in the field of neurology, would need assistance interpreting neuropsychological testing. That is why the Parties ensured that highly-qualified neuropsychologist AAPCs would be available to the Court to assist with technical neuropsychological issues, such as the severe performance validity failures that are the subject of the NFL Parties' appeal.

The NFL Parties' appeal presented a highly technical issue as to which the Special Master's failure to consult with an AAPC is particularly misguided and unreasonable. The performance validity metrics in the neuropsychological testing battery are a critical feature to safeguard the integrity of the Settlement Program and weed out intentional malingering and misrepresentation of cognitive abilities by retired players. Those performance validity metrics, however, are also highly technical and require the specific expertise of the AAPC. Unassisted review by the Special Master, a layperson with no expertise in this highly technical area, simply provides no safeguard on appeal. The severe performance validity failures at issue on this appeal should presumptively have the benefit of AAPC expertise. Indeed, the Settlement Agreement specifically provides that "a Retired NFL Player's failure on two or more effort tests may result in the retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing." (Settlement Agreement, Ex. 2 at 2.) Here, Claimant failed not just *two* effort tests, but *all seven* of the performance validity measures, including six below chance level. Simply put, this

9

claim involves textbook intentional malingering, and the payment of this claim without AAPC review would undermine the integrity of the Settlement Program.

## CONCLUSION

For the reasons set forth herein, the NFL Parties respectfully request that the Court remand the ███ Appeal and direct the Special Master to consult with an AAPC on the appeal.

Dated: April 8, 2019    Respectfully submitted,

/s/ Brad S. Karp
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Richard C. Tarlowe
Douglas M. Burns
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
bkarp@paulweiss.com

*Attorneys for Defendants the National Football League and NFL Properties LLC*

10