## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |

Kevin Turner and Shawn Wooden, on behalf
of themselves and others similarly situated,

Plaintiffs,

v.

National Football League and NFL Properties, LLC,
successor-in-interest to NFL Properties, Inc.,

Defendants.

THIS DOCUMENT RELATES TO:

Podhurst Orseck P.A. v. Tim McKyer
Attorney Lien Dispute
(Doc. No. 10327)

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                    June  20 , 2019

## I.    INTRODUCTION

Presently before the Court for a Report and Recommendation in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Podhurst Orseck P.A. ("Podhurst") against the Award granted to their former client, Settlement Class Member ("SCM") Tim McKyer ("McKyer"), in the litigation that became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).  The firm seeks payment of attorneys' fees of 22%[1] of the Award issued to McKyer pursuant to the

---

[1]  As we describe below, on April 5, 2018, the District Court determined that presumptively no

contingency fee agreement ("CFA") that he entered into with them on January 12, 2012.  McKyer, now proceeding *pro se*, challenges the lien.  He contends that "it was not [his] understanding" that he had retained Podhurst to represent him individually, "nor was it ever [his] intent" that the firm "be [his] personal lawyer against the NFL."  SCM Statement at 1.  He contends that the fact that he made arrangements for appointments with doctors demonstrates that he never intended to hire Podhurst to act on his behalf.  *Id.*  He asks that the funds withheld for counsel fees to Podhurst be released to him.

As we set out in a Report and Recommendation ("R&R") filed on January 7, 2019,[2] our evaluation of these positions involves a consideration of the CFA between McKyer and his former counsel and an assessment of the reasonableness of the requested fees in light of the five factors enumerated by the Third Circuit in *McKenzie*.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach will require us to scrutinize the reasonableness of the CFA at the time of the signing of the contracts and then determine if the circumstances compel a different evaluation of the CFA at the time Podhurst, as lienholder, seeks to enforce it.  We will then examine the results obtained, the quality of the representation provided by Podhurst, and whether the efforts of Podhurst substantially contributed to the result.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.  We conclude

---

Individually Retained Plaintiff's Attorneys ("IRPAs") should receive more than 22% of a Monetary Award in fees.  ("Fee Cap").  (Doc. No. 9863).  *See* Doc. No. 10368 at 10-11 (discussing the District Court's decision relating to the presumptive Fee Cap).

[2] The District Court referred to us all "all petitions for individual attorneys' liens."  (Doc. No. 7446).  On January 7, 2019, we issued an R&R pertaining to three separate cases.  (Doc. No. 10368).  In that R&R we set out the legal principles that would guide our analysis in these cases.  We have since issued opinions resolving similar disputes in which the parties consented for the magistrate judge to resolve the lien dispute.  *See* Doc. Nos. 10383 (Owens) & 10514 (McElroy).

that McKyer's fee agreement with Podhurst must be honored.  We ultimately value Podhurst's reasonable fee for the firm's work on behalf of McKyer at 20% of the monetary award.

## II.   FACTS AND PROCEDURAL HISTORY

On January 12, 2012, McKyer signed a document entitled "Authority to Represent," which reflected that he "retain[ed] and employ[ed] the firm of PODHURST ORSECK, P.A. and THE LEVINE LAW FIRM, P.C., as [his] attorneys to represent [him] in [his] claim for damages" against the NFL or any other entity liable for the injuries he sustained while playing in the NFL. (Lienholder Stmt., Ex. A at 1.)[3]  Under the terms of the agreement, if recovery were made, McKyer would pay 40% of the net recovery as the legal fee, with an additional 5% fee due if the recovery was made only after institution of an appeal or if post-judgment relief or action was required for recovery on the judgment.[4]  *Id.*  McKyer also signed an appended "Statement of Client's Rights" document that advised him of his rights as a prospective client entering into a contingent fee relationship.  *Id.* at 3-4.  McKyer's signature on the "Authority to Represent" document indicated in typed language that it was "[d]ated at Miami, Florida," with the handwritten date of January 12, 2012.  Both documents were signed by attorneys Stephen F. Rosenthal of Podhurst and David I. Levine of the Levine Firm, with Attorney Rosenthal dating his signatures January 13, 2012.[5]

---

[3]  The document provided for the division of responsibilities, as well as fees, between the two firms.  The Levine firm was to "be responsible and available to the client for consultation, will participate and assist in preparation of the case, and will bear full responsibility to the client, for its processing, up to final conclusion," together with Podhurst, which was described as "the lead trial and appellate counsel."  (Lienholder Stmt., Ex. A, at 1.)  The Levine firm is not a party to this lien dispute.

[4]  On January 5, 2017, Podhurst advised its clients via e-mail that it would not seek an individual contingency fee of more than 25%.  (Lienholder Resp. at Ex. 1.)

[5]  Podhurst has represented that McKyer sent his signed agreement to the Podhurst office in Miami, where Attorney Rosenthal then signed it.  (Lienholder Stmt. of Disp. at 1.)

At the time of the execution of this contract, Podhurst already had filed a complaint against the NFL on behalf of retired players asserting concussion injuries. When the firm amended its complaint on January 20, 2012, it included McKyer as a plaintiff, and it filed an individual short form complaint on McKyer's behalf after the MDL was formed. (Lienholder Stmt., Exs. D, E.) After the class action settlement was reached, approved by the District Court, and upheld on appeal, Podhurst registered McKyer in the claims portal on February 12, 2017. It obtained documentation of a qualifying diagnosis for McKyer on June 24, 2018 and within a matter of days submitted McKyer's claim. The Claims Administrator gave Notice on August 13, 2018 of McKyer's Monetary Award Claim Determination. This determination was based upon the qualifying diagnosis of a Level 1.5 Neurocognitive Impairment as of June 24, 2018. (Dispute Rec. Doc. 1.)

The Notice of Award also reflected the Claims Administrator's understanding that McKyer was represented by Podhurst. On October 22, 2018, after the appeal period had passed as to the monetary award, Podhurst provided to McKyer via e-mail a "Closing Statement" to reflect the disbursements it would make from his Monetary Award for attorney's fees, direct costs, and medical liens paid. (Lienholder Stmt., Ex. C.) At that point, McKyer expressed an objection to Podhurst about paying any fee from his award. The parties attempted to resolve this dispute in several telephone calls but were unsuccessful, prompting McKyer to advise the Claims Administrator that Podhurst was no longer his representative. Podhurst filed a Notice of Lien on the MDL docket on November 9, 2018. (ECF No. 10327.)

The Claims Administrator gave McKyer notice of Podhurst's lien on November 12, 2018. (Dispute Rec. Doc. 2.) McKyer filed his timely dispute of the lien by e-mail on November 13, 2018. In light of the unresolved lien based upon the contingency fee agreement, the Claims

Administrator withheld from McKyer's award funds for payment of attorneys fees in an amount equal to 22% of his Award, which reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2018 Opinion and Order (Doc. Nos. 9862, 9863), plus costs – $4,450 – allegedly incurred by Podhurst as asserted in their Notice of Lien.   Of that attorney fee withholding, a portion reflecting 5% of McKyer's Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund pursuant to the Court's June 27, 2018 Order Regarding Withholdings for Common Benefit Fund counsel.  (Doc. No. 10104.)  Those funds may be distributed at a later date upon further order(s) of Judge Brody.  This leaves the Court to determine the appropriate distribution for the attorneys fees currently available for disbursement (representing 17% of McKyer's Award) and the allocation of those funds that are currently held in the Attorneys' Fees Qualified Settlement Fund (representing 5% of McKyer's Award), if those funds, or a portion thereof, are distributed by the Court at a future date.

Pursuant to a briefing schedule issued by the Court and in accordance with the Lien Rules, the parties submitted simultaneous Statements of Dispute concerning Podhurst's entitlement to a fee.  (Dispute Rec. Doc. Nos. 7 & 8.) Each also submitted a Response to the other's Statement of Dispute.  (Dispute Rec. Docs. 9 & 10.)  Neither party requested that the Court hold an evidentiary hearing.  Pursuant to Lien Rule 17, the Record of Dispute was then transferred to the Court.  After convening a telephone conference with the parties, I determined that it was not necessary to hold an evidentiary hearing before evaluating this dispute and making a recommendation for its disposition.[6]  The matter is ripe for review.

---

[6]  During a preliminary telephone conference, Podhurst recommended that I assist the parties by overseeing settlement discussions.  McKyer joined in this request.  Accordingly, I spoke with each side individually in an initial effort to reach a resolution.  I then enlisted the assistance of my colleague, the Honorable Timothy R. Rice, United States Magistrate Judge.  Unfortunately, those efforts were unsuccessful.

### III.     THE VALIDITY OF THE CONTRACT

To begin, we address the implicit challenge raised by McKyer about the enforceability of

the CFA.  That document, entitled "**AUTHORITY TO REPRESENT**," provides:

> I, the undersigned client, do hereby retain and employ the firm of PODHURST ORSECK, P.A. and THE LEVINE LAW FIRM, P.C., as my attorneys to represent me in my claim for damages against THE NATIONAL FOOTBALL LEAGUE, or any other person, firm or corporation liable, resulting from injuries sustained while a player in the NFL.
>
> I hereby agree to pay from any recovered amount, the cost of investigation including reasonable charges for in-house charges for services and, should it be necessary to institute suit, the court costs including the actual amount charged by third party providers of services to the attorney.  As compensation for their services, I agree to pay my said attorneys, from the proceeds of any gross recovery, including any awarded attorneys' fees, the following fees:
>
> a.    40% of any recovery; plus
>
> b.    An additional 5% of any recovery after institution of any appellate proceeding is filed or post-judgment relief or action is required for recovery on the judgment.

(Lienholder Stmt. of Dispute, Ex. A) (Dispute Rec. Doc. 7).

In response to the Claims Administrator's notification that funds were being deducted from

his Monetary Award for Podhurst's fee (albeit capped at 22% of his award), McKyer asserted that

he "NEVER thought [he] 'hired' them as [his] personal attorney in the case."  (SCM Resp. to

Notice of Lien, Nov. 13, 2018) (Dispute Rec. Doc. 3).  He contended that the firm lawyers "grossly

misrepresented themselves by leading [him] to believe they [were] the main attorneys in the case

against the NFL and the league was going to pay them."  (*Id.*)  He contends that he "do[es] not

recall ever being told that [he] hired them at 40%" and that he would not have agreed to such a

term.  (*Id.*)  He re-asserted this contention in his Statement of Dispute as this lien dispute reached

the briefing stage, explaining that it was never his "intent to hire Steven Marks or Podhurst Orseck

PA" to be his "personal lawyer against the NFL," adding that according to Marks, "they were already 'Hired'" and McKyer "was adding [his] name as a litigant," which he believes he "did not have to do as [he is] a protected class member." (SCM Stmt. of Dispute, Jan. 15, 2019) (Dispute Rec. Doc. 7). He contends that he "honestly [does not] remember actually signing this 'contact' with Mr. Marks," whom he says he never met and spoke with on only a few occasions. (*Id.*)

McKyer contends that the fact that he and his friend who assisted him throughout coordinated appointments with doctors and paid for the flights and accommodations reflects that he was "acting on the understanding that [he] was not represented by Podhurst Orseck or Steven Marks." (SCM Resp. to Stmt. of Dispute) (Dispute Rec. Doc. 9). *See also id.* (arguing that his actions "prove we were not on the 'same page' about the extent of the relationship").

We find that the records before us of the communications between McKyer and Podhurst belie his contentions. McKyer provided, or caused to be provided, to Podhurst several hundreds of pages of medical and other records from his NFL career. *See* Lienholder Stmt. of Disp., Ex. F. These records would have been important had the individual lawsuit against the NFL proceeded with discovery and in the absence of the large-scale resolution of the class-wide settlement. In addition, when the proposed revised settlement agreement was pending approval in the district court in early 2015, Podhurst personnel made inquiries on McKyer's behalf for an advance on his future recovery. *See id.*, Ex. G (March 4, 2015 email from Roy K. Altman, Esquire of Podhurst to McKyer, copied to paralegal Gina Palacio). These communications, particularly about an advance or loan, were clearly made in the context of an individual attorney-client relationship.

Podhurst has also represented that McKyer was included in "all client" e-mail alerts and bulletins, including one sent on January 5, 2017, as the class-wide settlement approached its effective date, that clarified the difference between common benefit fees for class counsel and

individual contingency fees.  *See* Lienholder Resp. to SCM Stmt. of Dispute, Ex. 1.  *See also id.* (describing the work for which individual contingency fees are paid).  The firm explained that it would "not seek an individual contingency fee under your contract of more than 25%."  *Id.*  There is no record of any response by McKyer to this e-mail communication that would dispute the notion that he entered into a contract with Podhurst for individual representation, which at that point, as the e-mail message explained, would include "gathering medical records, preparing updates, registration for settlement benefits, scheduling baseline examinations (if needed), compiling, preparing, submitting, and following up with the claims package and representing individual clients through any appeals within the claims process, should that be necessary."  (*Id.*)

Finally, the dispute record demonstrates that Podhurst personnel, usually paralegal Gina C. Palacio,[7] did help with many of the tasks of individual representation described in the firm-wide e-mail, such as scheduling (and re-scheduling) McKyer's evaluation by Dr. Brooks.  *Id.*, Ex. J (e-mails of Feb. 2018).  Ms. Palacio also demonstrated in her e-mail communications with McKyer that she obtained from Dr. Books his neuropsychological report, which she shared with him, and that she "provided it to Dr. Nieto's office so he can finalize his MAF Report and Certification."  *Id.* (e-mail of Mar. 27, 2018).  She also explained to McKyer that Dr. Nieto required that a close family member fill out a particular questionnaire, which she attached to her message and which she asked to be returned to her for transmission to Dr. Nieto.  (*Id.*)  McKyer's friend complied with Ms. Palacio's request, as the record shows that Ms. Palacio had the completed questionnaire on hand less than two weeks later and forwarded it to Dr. Nieto's office staff to facilitate his MAF Report and MAF Certification.  *Id.* (e-mail of April 9, 2018).

---

[7]  Ms. Palacio's e-mail signature identifies her as "Sr. Paralegal to Steven C. Marks, Esq." at Podhurst Orseck, P.A.  *See* Lienholder Stmt. of Dispute, Ex. J.

The record thus demonstrates that Podhurst personnel conducted themselves in a manner we accept as consistent with the obligations they undertook in the contingency fee agreement and that McKyer engaged with them in those efforts, even if there were other arrangements that he made on his own.  *See, e.g.,* Report of Lisa Cicetti, Psy. D., Dec. 16, 2016 (reflecting McKyer's self-referral).  (Lienholder Stmt. of Dispute, Ex. H.)  McKyer did not produce any evidence that he made any objection to the efforts of Ms. Palacio or any other Podhurst personnel that are described here and which reflect activity on his behalf over a span of several years.  Moreover, his alternative account – that Attorney Steven Marks told him that he was merely adding his name to a lawsuit but that he did not have to do so because he was "a protected class member" – reflects a garbled understanding or recollection of events, as no class had been certified when McKyer signed the CFA on January 12, 2012.  To be sure, the MDL had not even been formed.[8]  As neither Steven Marks nor the Podhurst firm was yet designated as class counsel or members of plaintiffs' steering committees, it is difficult for us to accept that Attorney Marks would have assured McKyer on or before January 12, 2012 that, notwithstanding the clear language of the CFA, he "would be paid by the NFL."  *See* SCM Stmt. of Dispute at 1.  (Dispute Rec. Doc. 7.)

We conclude that the only reasonable interpretation of the record is that McKyer entered into this contract because he agreed to and intended to be bound by all of the terms set forth in the contract.  We proceed to consider the validity of Podhurst's attorney lien on that basis.

---

[8]  The NFL parties filed a motion with the United States Judicial Panel on Multidistrict Litigation on November 15, 2011 requesting consolidated pretrial proceedings.  Although we could assume that Podhurst expected that an MDL would be created and that its attorneys would play a significant role in the litigation, the motion was not granted until January 31, 2012, after Podhurst and McKyer entered into this CFA.

## IV.    DISCUSSION

Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts).   The District Court's prior opinions in this class action settlement in no way relieved attorneys of this obligation.   Indeed, the Court explained that all attorneys seeking fees – whether those fee requests are submitted through a Lien or otherwise – are obligated to ensure that their fees are "reasonable" under the standards set out in *McKenzie*. *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence).   Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101.  Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract

10

upon which a lien is based.  We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

As we outline below, circumstances changed significantly from the time of McKyer's initial contracting with Podhurst to the time that Podhurst sought to enforce its contract.  Based upon our evaluation of the remaining three prongs of the *McKenzie* test, however, we are satisfied that Podhurst provided quality representation and made substantial contributions to the ultimate Award received in this case, notwithstanding McKyer's contention that he himself is solely responsible for the award he secured such that Podhurst should not receive any fee.  We will therefore recommend that the Court approve Podhurst's fee request.

A. **The CFAs at the time of contracting and enforcement – impact of changed circumstances**

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing by McKyer and Podhurst, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.  We then compare the landscape at the time of contracting with the circumstances at the time the attorney-client relationship terminated.

Podhurst agreed to represent McKyer in his dispute with the NFL on January 13, 2012, after the first lawsuits were brought by former players against the NFL in a California state court but before individual cases had been consolidated for pretrial purposes into this MDL.  The NFL's motion for consolidated pretrial proceedings, however, was pending at this time, and was granted soon after, on January 31, 2012.  This is what Professor Rubenstein[9] characterized as "Phase 1" of

---

[9]  The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court.  After considering the recommendations of

the litigation.  As has been noted in prior opinions in this MDL, at that time the plaintiffs faced

stiff challenges surmounting the issue of preemption.  Establishing causation also would have been

similarly challenging, since the claims involved complex scientific and medical issues that had not

yet been studied comprehensively and where the settlement class members would certainly also

have suffered trauma in their college and high school careers.

Risk as it related to overall workload also varied over time in this litigation.  When law

firms undertake large-scale litigation, they are obligated to decline to take on other litigation.  The

cost to law firms in deciding to participate and thus forego alternative matters must be recognized.

In this first phase of the litigation, the law firms that undertook representation of players

individually, without the benefit of the efficiencies contained within an MDL, faced monumental

challenges and risked having to pursue the entire case themselves, perhaps even through trial.  Fee

arrangements reflecting those large contingencies "would have been expected and appropriate."

(Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL at the end of January 2012, the

risk related to the *volume* of work to be undertaken by a law firm representing a retired player

changed dramatically.  Once an MDL was formed, "lawyers contracting to represent clients were

well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now

be consolidated and undertaken once and the likelihood that any case would be remanded for trial

declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the

formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee

Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor
Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs.
(Doc. No. 9862 at 2).

("PSC"), and other committees that took over the primary work in the case.  *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from IRPAs to Plaintiffs' Committees, which would be compensated through a common benefit fund).[10]  The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

McKyer remained in a contractual relationship with Podhurst from January 13, 2012 until after he received his award on August 13, 2018.  During this time, of course, substantial progress had been made in moving the cases forward, collectively and individually.  The NFL's motions to dismiss and to sever were argued in April 2013, but in July 2013, without yet ruling on these motions, Judge Brody ordered the parties to mediation, and by the end of August 2013 a term sheet had been signed.   This led to class counsel's motion for preliminary approval filed on January 6, 2014, which was further amended  and finally approved on April 22, 2015.  On April 18, 2016, the Third Circuit Court of Appeals affirmed the District Court's approval of the Settlement Agreement, and the United States Supreme Court later denied *certiorari*.  The risk inherent in the litigation was then decreased significantly, thanks to the efforts of Class Counsel and those other lawyers who served on various MDL committees and performed work for the common benefit.  This does not alter the fact, however, that Podhurst undertook the representation at a time of great risk.

McKyer and Podhurst remained in a contractual relationship through the period in which the claims administration opened.  Podhurst registered McKyer with the Claims Administrator on February 12, 2017 and assisted in obtaining the necessary diagnosis and documentation from

---

[10]   We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

appropriate providers and followed up as necessary.  Podhurst submitted McKyer's claim on June 28, 2018 and it was approved on August 13, 2018.

There were thus several key changes in the circumstances during the time between when Podhurst agreed to represent McKyer and when it sought to enforce the contract upon the approval of McKyer's monetary award by the settlement Claims Administrator.  While the evidence-gathering tasks and case development relating to damages were much the same, Podhurst had only to adhere to an administrative process in order to secure the award and did not have to defend against legal challenges from the NFL Parties.

**B.**      **The results obtained**

We next look to the results obtained, the quality of the work performed and the substantiality of the firm's efforts in bringing about the result.  We observe that on August 13, 2018, McKyer qualified for the full Monetary Award grid amount based on his number of eligible seasons played and his Level 1.5 Neurocognitive Impairment diagnosis at the age of 54.  (McKyer, Notice of Monetary Award Claim Determination).

**C.**      **The quality of the work performed**

Podhurst contends that it provided quality work to assist McKyer in securing this award. It lays out this work at pages 7-10 of its Statement of Dispute.  McKyer responds that Podhurst "did NOTHING" for him.  (SCM Stmt. of Dispute at 1.)  (Dispute Rec. Doc. 3.)  He contends that he found doctors and made appointments himself, and that he made his own travel arrangements. This is acknowledged by Podhurst and confirmed by the dispute record, where a medical report from 2016 is addressed to McKyer and indicates that he was a "self-referral."  Nonetheless, it does not appear that this arose from Podhurst failing to represent him adequately.  To be sure, when

McKyer needed to be evaluated by a different (board-certified) psychologist, Podhurst helped to shepherd him through the process with Dr. Brooks and ensured that the neuropsychologist received all of the necessary information from Dr. Brooks and others to render a diagnosis consistent with the MAF protocols.  Podhurst's involvement in this important work is also reflected in the costs it incurred.  *See* Lienholder Stmt. of Dispute, Ex. C (reflecting expenses advance in 2017 and 2018 for reports and supplemental reports of Drs. Nieto and Brooks).[11]

As is demonstrated in our discussion below, we find that Podhurst provided quality work on behalf of McKyer and in accordance with the demands of the litigation and settlement administration.

### D.        The substantiality of the work performed

Perhaps the more important question is to consider Podhurst's contribution to the work necessary to obtain the Monetary Award that McKyer received in this case.  In cases where more than one firm represented a settlement class member leading up to the receipt of the Notice of Award, we have looked to the contributions of each firm, comparing the value each added in advancing legal theories and in the work it performed individually for the client, with the effect on the ultimate outcome of the client's award.  We typically lay out the efforts undertaken by the firms in the various aspects of their representation to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.

Here, only one firm has represented McKyer – Podhurst – and that firm was still of record

---

[11]  We observe here that this is not the first case in which we have been faced with a settlement class member or representative who claims that counsel's fee request should be rejected or reduced because he or she made appointments with doctors independent of the law firm.  *See* ECF No. 10383 (*Locks Law Firm v. Burtaniel Owens*), Mem. Opin., Jan. 18, 2019.  There we concluded that the lienholder was entitled to the 20% fee percentage set forth in the parties' CFA as amended.

when the award was made, at which point there was no more to be done.  There is no other attorney competing for the funds available for counsel fees.  Rather, McKyer contends that no IRPA fee is payable to Podhurst at all because he never intended to oblige himself to an individual contract representation.  He also contends that "they did NOTHING for me," as he did not require advances and he and his friend did all of the "leg work."  (SCM Resp. at 3.)

Although the construct is somewhat different here, we will evaluate Podhurst's (and McKyer's) contributions here in accordance with Circuit case law and our prior decisions.  As we have described there, we look to as many as seven non-exclusive categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;
>
> (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class;
>
> (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award;
>
> (6) support of clients who were seeking loans and were exposed to predatory lending practices; and
>
> (7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories.  We will, however, use these categories as checkpoints as we consider the substantiality of Podhurst's efforts as an IRPA and the role Podhurst played in the maximizing McKyer's award.

16

### (1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date

Podhurst contends that it worked with McKyer to schedule a medical evaluation with a qualified MAF physician because a psychologist with whom McKyer previously consulted on his own in 2016 did not ultimately meet the criteria set for the MAF program. Podhurst facilitated the transmission of a third-party report to the neuropsychologist to review for his qualifying diagnosis. It is uncontested, however, that McKyer himself also arranged and paid for medical appointments and obtained recommendations and referrals for evaluators for this litigation. *See* Lienholder Stmt. of Dispute at 9-10.

### (2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial

We accept Podhurst's assertion that it performed significant work with respect to reviewing and collecting medical reports and scheduling appointments for neuropsychological testing with Dr. Brooks and follow up diagnoses with board certified neurologist Dr. Nieto. The firm gathered NFL player history file materials (largely obtained by McKyer) that would pertain to the number of McKyer's eligible seasons, which would directly impact the size of his Monetary Award. These materials may also have been necessary had Podhurst been required to litigate the case individually and face causation challenges. In the course of the work it did after the settlement was reached and the MAF criteria established, Podhurst advanced $4,450 in costs in 2017 and 2018 for testing and reports by Drs. Brooks and Nieto.

### (3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted

This factor is not applicable to this dispute.

### (4) Support of their individual clients in understanding the on-

**going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class**

Podhurst obviously counseled McKyer to join the multi-plaintiff lawsuit that was being filed in the Southern District of Florida on January 20, 2012. Podhurst has represented that it had periodic communications with McKyer concerning the status of settlement discussions and the future of the litigation. *See, e.g.,* Lienholder Resp., Ex. 1 (e-mail from Steven C. Marks dated Jan. 5, 2017 re: implementation of settlement). Podhurst appears to have done as much for McKyer as the circumstances of the case would allow while the agreement was negotiated, pending approval, and on appeal.

**(5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award**

Podhurst exclusively performed this work for McKyer. It registered him on February 12, 2017 and submitted the claim form on June 28, 2018. This work was certainly a necessary step for McKyer to receive the award that he did.

**(6) Support of clients who were seeking loans and were exposed to predatory lending practices**

Podhurst worked with McKyer when he wanted to obtain a loan, although the loan application was ultimately not approved. *See* Lienholder Stmt., Ex. G (e-mail dated Mar. 4, 2015 from Roy K. Altman, Esq. of Podhurst to McKyer, copied to Gina Palacio of Podhurst).

**(7) Providing necessary support in other personal matters collaterally related to this litigation**

This factor does not appear to apply to McKyer's relationship with Podhurst.

\*       \*       \*

In this attorney lien process, we are called upon to synthesize this information to apportion fees for the quality representation provided to the retired player that yielded the positive outcome

of a Monetary Award.  We are cognizant that, here, three entities contributed to the work necessary to obtain that Award: Podhurst acting for McKyer individually; Class Counsel and law firms such as Podhurst that acted for the common benefit in negotiating and defending the Settlement Agreement; and McKyer himself, who sought out treatment providers and obtained evaluations at his own expense.

The substantiality of Podhurst's work as an IRPA in securing McKyer's Monetary Award is necessarily reduced by the work of Class Counsel and the attorneys working with them for the common benefit for much of the same time period in which Podhurst represented him.  The Court has already observed that class counsel's efforts clearly "reduced the amount of work required of IRPAs." (Doc. No. 9862 at 4.)  Its establishment of a 22% presumptive fee cap for IRPAs reflects this, taking into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials.  Podhurst was at McKyer's side prior to the formation of the MDL, during the period in which the settlement was negotiated, while protocols were finalized and qualifying diagnoses could be secured, and for claim submission and award receipt.  It was only after the claim culminated in the Award that McKyer discharged Podhurst.

Our task is to determine the reasonableness of the fee sought by Podhurst.  We conclude that Podhurst's work warrants a reasonable fee.  We acknowledge McKyer's expression of confusion about the nature of the agreement that was signed in January 2012.  *See* SCM Stmt. of Dispute ("I honest[ly] do no[t] remember actually signing that 'contract' with Mr. Marks").  While

he argues that his course of conduct in setting up his own appointments reflected his understanding about his responsibility to manage his own case, there is no evidence that McKyer ever communicated to Podhurst that he desired any change to their CFA.  Nor is there any evidence that he questioned or objected to the individualized assistance, reflected in the record, from Attorney Altman (concerning a possible advance) and paralegal Gina Palacio (concerning the advance as well as compilation of the medical record and claim submission), nor the firm's interactions with the Claims Administrator regarding registration and claim form submissions.  The record contains no evidence of any complaints by McKyer that Podhurst was not providing the services described in the CFA.  Rather, Podhurst was available to him and assisted as necessary throughout.  We cannot accept the proposition he advances that the award was solely the result of his own effort, albeit with some sort of "free" assistance of Ms. Palacio, the paralegal to Podhurst partner Mr. Marks.

At the same time, McKyer did have direct involvement in obtaining his player records and in securing and making many of the arrangements to see the doctors who would ultimately provide the necessary testing and qualified diagnosis.  He thus relieved Podhurst of some of the tasks ordinarily undertaken by IRPAs.  We also note that there did not appear to have been any difficulty in the processing or approval of McKyer's claim that required any additional or unanticipated work by Podhurst.  In these circumstances, we are hard pressed to conclude that the firm's efforts support the presumptive maximum fee of 22% for its IRPA work on McKyer's behalf.  We are comfortable, however, in approving a fee of 20%.

###### E.    Costs

Podhurst has declared that it does not seek reimbursement of the $4,450.00 incurred in costs arising from its representation of McKyer.  (Lienholder Stmt. of Dispute at 13.)  Therefore, these withheld funds will be available for release to McKyer.

## V.    CONCLUSION

The evidence recounted here should result in an approval of a fee to Podhurst equal to 20% of McKyer's monetary award.  We are convinced that McKyer's assertions, predicated upon his own "understanding" of the relationship he had with Podhurst and its personnel, does not invalidate the clear terms of the CFA signed in January 2012.  We find that Podhurst's IRPA contribution to McKyer's Award is sufficient to support a fee of 20%, although this amount must be reduced by the Common Benefit Fee deduction currently applicable to all Awards.   Accordingly, we recommend that the Claims Administrator be ordered to:

1) Disburse from the currently withheld funds, representing 17% of McKyer's monetary award and $4,450.00 withheld for reimbursement of costs:

    a. To Podhurst: an amount equal to 15% of McKyer's monetary award; and

    b. To McKyer: an amount equal to 2% of the monetary award, plus $4,450.00;

2)  At such time as the Court rules upon the 5% holdback request, disburse from those currently set aside funds:

    a. To Podhurst: 91% (20/22nds) of the funds released for payment to IRPAs; and

    b. To McKyer: 9% (2/22nds) of the funds released.

BY THE COURT:

 /s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE