## RESPONSE OF CLAIMANT ███
## IN OPPOSITION TO THE OBJECTION OF THE NFL

███ received a monetary award from the Claims Administrator and post-appeal monetary award from the Special Master based on the Special Master's determination that the NFL failed to marshall clear and convincing evidence that the award, diagnosis, or date of diagnosis was incorrect. This was a final factual determination. *See* Post Appeal Notice of Monetary Award, attached as Exhibit 1. For that reason, the Special Master's determination is final and binding, and Mr. ███ award should be paid. *See* section 9.8 of the Settlement Agreement, attached as Exhibit 2.

Co-Lead Class Counsel addressed the NFL's appeal of Dr. ███ proper application of FAQ 93(c)(5) to Mr. ███ claim. Mr. ███ incorporates and adopts in his own Opposition to the NFL's Objection the entire submission of Co-Lead Counsel as if fully set forth herein.

Contrary to the NFL argument, this diagnosis has nothing to do with section 8.2 of the Settlement Agreement. That section addresses circumstances where a qualifying diagnosis was rendered by a neurologist who is deceased or otherwise unavailable and cannot sign a DPC. Dr. ███ is a qualified MAF neurologist who is among the leading cognitive and behavioural neurologists in the United States. He fully and independently examined Mr. ███ gave a diagnosis based, in part, on the contemporaneous neuropsychological report of ███ and assessed the date of onset as provided by FAQ 93(c)(5). He is entitled to do that under the MAF program based on his own examination, the evaluation provided by Dr. ███ collateral information available to him, and past medical records, including neurological records from 2012. Under these circumstances, Dr. ███ was able to determine a likely clinical date-of-onset of Alzheimer's Disease using standard medical practice and his sound judgment. Notwithstanding the NFL's argument, it is medically obvious that Mr. ███ advanced Alzheimer's Disease did not appear overnight. It developed over many years and likely began as a clinical manifestation of simple dementia diagnosed in 2012. The specialists who diagnosed Mr. ███ with dementia in 2012 did not have the benefit of the course of the disease Dr. ███ assessed. Over six years, the advance of the memory disorder was so dramatic that Dr. ███ (and Dr. ███) diagnosed the symptoms as an advanced case of Alzheimer's Disease that began long ago. Dr. ███ was conservative in placing the date of onset as the date (2012) when a neurosurgeon first formally diagnosed Mr. ███ with dementia.

### Settlement Section 8.2 Does Not Apply

Settlement section 8.2 is irrelevant. It addresses an anticipated problem when a diagnosing physician becomes deceased or unavailable after rendering a qualifying diagnosis but before signing a DPC. It provides a remedy anticipated by the Settlement in the completion of the DPC, but it does not address the present case where a qualifying physician examines a patient and, using all available information, diagnoses an illness and its start date.

Case law cited by the NFL is equally irrelevant. Those cases involve written contracts

-1-

that impose an explicit condition to a finite outcome. *See Sony Corp. v. Fujifilm Holdings Corp.*, No. 16 CIV. 5988 (PGG), 2017 WL 4342126 (S.D.N.Y. Sept. 28, 2017) and *Realtime Data, LLC v. Malone*, 961 N.Y.S.2d 275 (N.Y. App. Div. 2013) (an express condition implies a mandatory precedent). *See also Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 306 (2d Cir. 2016) (any condition precedent must be specific within the contract and any condition not explicitly stated cannot be a required precedent). The cases do not pertain to the present facts, because section 8.2 does not impose a fixed requirement or preclude the agreement of the Parties and Order of the Court set forth in FAQ 93(c)(5). If the parties had intended that the diagnosis date of a player's disease must always match the MAF examination date, the Settlement would say so. Instead, the Settlement provides one anticipated hypothetical (section 8.2) that authorizes a diagnosing neurologist to determine an earlier date of onset of a diagnosed disease. FAQ 93 adds other examples, but it is not an exhaustive list. *See* FAQ 93(c)(4) and FAQ 93(c)(5). Instead, FAQ 93 acknowledges that the circumstances of Mr. ▆▆▆▆ claim were not addressed by the Settlement, and the existence of FAQ 93(c)(5) is proof that when implemented the Settlement had to account for unanticipated fact patterns.

Standard medical practice requires a physician to make a diagnosis based on current evaluation and past medical history. The verified symptoms and impairments of a patient are revealed by contemporary evaluations, prior medical records, patient history, and reliable informants. These elements combine to permit the diagnosing neurologist to determine what the likely disease is and whether or not the disease is sufficiently advanced and observed in the past to have a date of onset before the date of encounter. This is standard practice in neurological offices every day. It is illogical and contrary to ethical standards to curtail the obligations of the physician and limit the treatment available to the player who has paid for the medical examination. FAQ 93 expressly requires that a physician will determine not only the diagnosis, but also the start date of the disease: "The diagnosing physician uses his or her professional medical judgment in deciding when the Player had the conditions amounting to a Qualifying Diagnosis." *See* FAQ 93(c)(5). This general rule was specifically endorsed by the NFL when the FAQs were first circulated.[1]

---

[1] The NFL objected to other language within FAQ 93 (in particular at FAQ 93(c)(3)), but specifically endorsed the language of FAQ 93(c)(5). *See* Feb. 2, 2018 Email from B. Birenboim to O. Brown: "There is nothing in the Settlement Agreement that permits the Special Masters or the Court to depart from the "general rule" articulated in FAQ 93 (the date of diagnosis is "when the diagnosing physician has enough information and materials, including test results, to be able to render a medically sound and reliable judgment about the Player's condition, the way a physician normally does in his or her clinical practice")." This general rule applies to the diagnosis of Mr. ▆▆▆▆ because Dr. ▆▆▆▆ used medically sound and reliable judgment just as he would in his normal clinical practice. Further, the NFL failed to file any formal objection with the Court seeking an adjudication of the issue. More than a year has passed since that time, and the NFL has waived its right to object now.

-2-

## The 2012 Diagnosis Date is Correct

Alzheimer's Disease by definition has an insidious and often unrecognized start date. The gradual decline in memory means that many cases are preliminarily misdiagnosed and mistreated. Dennis ▮▮▮ was 66 in 2012 when he actively sought treatment for memory loss. At that time Mr. ▮▮▮'s symptoms had been ongoing for at least six years.[2] Dr. ▮▮▮ evaluations of Mr. ▮▮▮ – three in all – progressed in a manner consistent with the common problems of a making an Alzheimer's diagnosis. Dr. ▮▮▮ first treated Mr. ▮▮▮ for general dementia and later (after several months) for Alzheimer's in particular. However, Dr. ▮▮▮ never had the breadth of patient history and reports possessed by Dr. ▮▮▮ who received six more years of the patient's progressive decline in memory, extensive interviews with Mr. ▮▮▮'s wife ▮▮▮ and son ▮▮▮ (a ▮▮▮, and the neuropsychological test results by ▮▮▮ that established that Mr. ▮▮▮ memory was nearly non-existent. Mr. ▮▮▮ T-scores in 2018 for the cognitive domain of learning and memory were 16, 24, 25, 31, 34, and 39, which show impairment on every single test and a severe level of impairment that signals Alzheimer's. *See* ▮▮▮ Report, attached as Exhibit 3. This is the ultimate red flag for Alzheimer's, yet this information and none of the other foregoing information was available to Dr. ▮▮▮ (or Dr. ▮▮▮. It was available to Dr. ▮▮▮ and he was able to use the data, including the reports Dr. ▮▮▮ and Dr. ▮▮▮ provided, to view the patient in a broader context. Both prior evaluations misdiagnosed Mr. ▮▮▮ with CTE, a diagnosis popular in 2012, but neither had the full picture provided by six more years that showed the course of the disease.[3]

The NFL, in its argument, uses emotion rather than facts. It vaguely mischaracterizes Dr. ▮▮▮ as "sympathetic" in the diagnosis. Whatever the NFL may mean, it is a baseless statement and designed to question an exemplary professional carefully selected to participate in the MAF program. In his evaluation, Dr. ▮▮▮ was, in fact, conservative. He stated that Mr. ▮▮▮ may have met the criteria for dementia as early as 2002, when his impairment forced him into early retirement. *See* Medical Addendum of ▮▮▮, MD, attached as Exhibit 4, at 1. The assessed start date of 2012 was, however, ten years later and only after qualified physicians had formally diagnosed serious neurocognitive impairment, including significant memory loss. This is the assessment of a thoughtful and conservative diagnostican who based

---

[2] Both neurologists, plus the neurosurgeon and the neuropsychologist, corroborate memory impairment dating back to 2006 or earlier.

[3] The NFL's argument against Alzheimer's Disease makes no sense. On the one hand, it agrees that Mr. ▮▮▮ does, in fact, have Alzheimer's Disease in 2018. On the other hand, it seeks to convince the Special Masters and Court that this gradual and insidious disease did not exist in 2012 and the impairment diagnosed must have been something else, perhaps CTE, and only later turned into Alzheimer's. This reflects a complete misunderstanding of the medical course of Alzheimer's and the diagnostic process. It is why the Special Masters, Court, and both parties must rely on the sound clinical judgment of outstanding neurologists in accordance with the provisions of FAQ 93.

his assessment on a large volume of medical evidence he and others developed over many years.[4]

The NFL implies that Mr. ▇ should not have sought an MAF evaluation from Dr. ▇. First, as the NFL points out, Dr. ▇ (as a member of the AAP) is precluded from signing a pre-effective date DPC for Mr. ▇ so Dr. ▇ was ▇. Further, the advancement of Mr. ▇ disease is such that it would be unreasonable (and possibly legal malpractice) for undersigned counsel to rely on the limited evaluation in 2012 of a neurosurgeon who is not a neurologist and not nearly as well-versed in the clinical assessment of Alzheimer's as a cognitive and behavioral neurologist whose day to day clinical specialty is the evaluation and treatment Alzheimer's Disease. Furthermore, any Class member who is willing to travel and pay for a medical examination from a qualified MAF neurologist has the right under the Agrement to do that. It is disingenuous for the NFL to claim anything untoward against a player for exercising that right. The NFL in its disability benefit plans recognizes that long-distance travel for medical treatment is common. It oftens sends players 800 to 1500 miles for medical examinations from physicians, including neurologists and neuropscyhologists, the NFL unilaterally selects and pays.



Dr. ▇ stated both in his Report, attached as Exhibit 5, and in his Medical Addendum (Exhibit 4), that Mr. ▇ showed a level of moderate dementia in 2018 that progressed over many years and had a date-of-onset of at least 2012 when Mr. ▇ received his first diagnosis of dementia. In his addendum, Dr. ▇ ably deflates the NFL's argument that something else must have existed in 2012 (general dementia and/or CTE), because of the distinguishing features of Mr. ▇ ase, in particular the early memory loss. *See* Exhibit 4. The MRI results also support Alzheimer's. *See* Exhibit 5 at 6.

### There Was No Abuse of Discretion

The NFL filed its objection in this case on March 20, 2019, before the Court's Order of April 12, 2019, attached as Exhibit 6. In its Order, the Court addressed the NFL's abuse-of-discretion allegation against the Special Master for declining to consult the AAP when reviewing claims that allegedly turned on technical and medical grounds. The Court confirmed that Settlement section 9.8 provides the Special Master complete discretion whether or not to consult the AAP. The Court determined that the language of section 9.8 is unambiguous and that if the parties had wanted compulsory review by the AAP in any particular situation, they would have said so in writing. Also, the Court directly referred to the standard the NFL must meet to prove its allegation that the Special abused his discretion. That standard requires that the NFL establish that the Special Master issued a decision that is "arbitrary, fanciful, or clearly unreasonable." That is, one that "no reasonable person would adopt." *See United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (quoting *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009). *See also*

---

[4] If Mr. ▇ disease started in 2002, then his Monetary Award would be $576,212 more than what he was awarded for a 2012 diagnosis date.

*U.S. v. Cunningham*, 694 F.3d 372, 383 (3d Cir. 2012) (the abuse must be "clearly and substantially" unreasonable).

In this case, the Special Master had complete discretion to refer (or not refer) the case to the AAP. The NFL has not even attempted to prove that the Special Master's decision not to refer the case was "arbitrary, fanciful, or clearly unreasonable" or one that "no reasonable person would adopt." Based on the plain facts, the Special Master was reasonable to rely on Dr. ▮ evaluation over any other, in part, because it is more thorough and based on a more complete set of facts than the reports provided in 2012. Also, the NFL's diagnostic argument is fanciful. It makes no sense that the NFL agrees that Mr. ▮ had Alzheimer's Disease in 2018, yet claims that his dementia in 2012 was some other disease and anything but Alzheimer's. That argument is unreasonable, and Dr. ▮ explains that the dementia witnessed in 2018 was a progression of the illness that existetd in 2012. *See* Exhibit 4.

The Settlement is also unambiguous with respect to "strict scrutiny." The Agreement grants to the Claims Administrator discretion to seek additional information in the strict scrutiny process: "Any such diagnosis [under FAQ 93] will be strictly scrutinized in the claims review process. The Claims Administrator <u>may</u> request additional information and/or documents to support the claimed diagnosis date and prevent misrepresentations of material fact in connection with the claim." *See* Settlement Agreement FAQ 93, attached as Exhibit 7. (Emphasis added). The anticipated review, therefore, is <u>within the Claims Administrator's discretion during the claims review process</u>, and it does not require an extra procedure, either by seeking review by the AAP or requesting additional documentation, if the Claims Adminstrator does not think that is necessary. There should be no doubt, therefore, that the Claims Administrator and Special Master acted within their discretion in reviewing and approving Mr. ▮ laim, because their respective decisions are clearly reasonable, not fanciful, and not arbitrary. They reasonably relied on Dr. ▮ iagnosis, because it is medically sound and better-supported than the arguments offered by the NFL.

<u>Conclusion</u>

For all of the foregoing reasons, Mr. ▮ espectfully requests that the Court and Special Master overrule the NFL's Objection and direct the Claims Administrator to pay Mr. ▮.

Respectfully submitted,

/s/ David D. Langfitt
David D. Langfitt
LOCKS LAW FIRM
601 Walnut Street
Philadelphia, PA 19106
Email: dlangfitt@lockslaw.com
Phone: (215) 893-3423
**Counsel for** ▮