# EXHIBIT 10

### Appeal of Claim Determination for ▓▓▓▓

Claimant ▓▓▓▓ received a purported pre-Effective Date Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment (*i.e.*, early dementia) on June 3, 2015 from neurologist Dr. Michael A. Lobatz. The NFL Parties respectively appeal the Monetary Award Claim supported by that Qualifying Diagnosis because there is clear and convincing evidence that Mr. ▓▓▓▓ did not exhibit the level of impairment necessary for the diagnosis alleged.

The Settlement Agreement permits a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment outside of the BAP, but only if that diagnosis is "based on evaluation and evidence generally consistent with the diagnostic criteria set forth in" the Settlement Agreement's Injury Definitions. The purpose of that requirement is to ensure that Settlement Class Members—both inside and outside the BAP, and both before and after the Effective Date—are placed on equal footing when evaluating their medical conditions for possible compensation. Thus, while the battery of tests administered to a claimant outside of the BAP need not be identical to the battery of tests required under the BAP, the level of impairment necessary for a diagnosis of Level 1.5 Neurocognitive Impairment must be the same regardless.

In this case, Mr. ▓▓▓▓ results on the <u>same</u> <u>tests</u> called for under the BAP (as well as other tests) plainly failed to satisfy the criteria necessary for a diagnosis of Level 1.5 Neurocognitive Impairment in <u>any</u> cognitive domain.

Curiously, despite Dr. Lobatz's stated familiarity with the Settlement Agreement's criteria, Dr. Lobatz reported Mr. ▓▓▓▓ neuropsychological scores as scaled scores, rather than T scores (as called for under the Settlement Agreement). Even so, Dr. Lobatz failed to explain how Mr. ▓▓▓▓ scores—whether presented as scaled scores or otherwise—satisfied the required level of impairment. When Mr. ▓▓▓▓ scores are converted to T scores, they plainly do not meet, and are not generally consistent with, the required impairment criteria in <u>any</u> cognitive domain. Indeed, Mr. ▓▓▓▓ actually scored <u>above</u> <u>average</u> in subtests in at least four of the five cognitive domains in which he completed testing, and within the average range in nearly every other subtest administered.

For these reasons, and those set forth herein, the claim determination should be reversed.

### Background

Mr. ▓▓▓▓ Claim Package was supported by a neurological evaluation and report by Dr. Lobatz ("Lobatz Report"), a neuropsychological evaluation and report by Dr. Hopper ("Hopper Report"), and three MRI scans and an MMPI-2-RF Report submitted by Dr. Robert Knol.

Dr. Hopper conducted her neuropsychological evaluations of Mr. ▓▓▓▓ on December 24, 29 and 30, 2014. Dr. Hopper determined that Mr. ▓▓▓▓ presented with a "Superior" range premorbid IQ—*i.e.*, "above average" in Settlement program parlance—and concluded that, at the time of his examination, Mr. ▓▓▓▓ "general intellectual ability, as measured by the WAIS-IV, [wa]s similar to others his age" and still "f[e]ll within the average range" at the time of his evaluation. (Hopper Report at 3, 8, 10.)

Based on Mr. ▮▮▮▮ neuropsychological test results, Dr. Hopper concluded that while he "performed better than his peers" or "similar to others his age" in many areas, including verbal comprehension, visual scanning, number sequencing, letter sequencing, cognitive flexibility and attention, his difficulty in "both auditory and visual memory" suggested "deficits in both speed of processing and memory." (*See id.* at 10-11.) Dr. Hopper also indicated that the results of these tests and Mr. ▮▮▮▮ history of head injury "suggest[ed] possible damage to Mr. ▮▮▮▮ brain," but that a "SPECT scan is recommended to identify impacted areas in order to effectively develop a treatment plan." (*See id.* at 11.)

Approximately six months later, on June 3, 2015, Dr. Lobatz conducted his clinical evaluation of Mr. ▮▮▮▮. Based on that evaluation and the neuropsychological test results provided by Dr. Hopper, Dr. Lobatz diagnosed Mr. ▮▮▮▮ with Level 1.5 Neurocognitive Impairment, based on "test scores in the domains of learning/memory and executive functioning (processing)." (Lobatz Report at 34-35.)

### I.  Mr. ▮▮▮▮ Neuropsychological Test Scores Are Insufficient to Establish the Requisite Neurological Impairment in Any Cognitive Domain

As stated above, the Settlement Agreement requires that a claimant meet specific impairment criteria based on his premorbid intellectual functioning in at least <u>two</u> of <u>five</u> cognitive domains to support a Level 1.5 Neurocognitive Impairment diagnosis, which is intended to be the equivalent of early dementia. In this case, Dr. Hopper diagnosed Mr. ▮▮▮▮ with a "Superior"—*i.e.*, "above average"—premorbid IQ. (*See* Hopper Report at 9.) The threshold T scores for each of the five cognitive domains required to support a Level 1.5 Neurocognitive Impairment diagnosis with above average premorbid IQ are included below. (*See* Appendix.)

In his report, Dr. Lobatz concluded that Mr. ▮▮▮▮ scores met the criteria for "Level 1.5 based on test scores in the domains of learning/memory and executive functioning (processing)." (Lobatz Report at 34-35.) That is not so. In fact, Mr. ▮▮▮▮ test scores plainly <u>did</u> <u>not</u> meet the requisite impairment cutoffs for Level 1.5 Neurocognitive Impairment in either of these (or any other) domain.

Although Dr. Lobatz relied only on Mr. ▮▮▮▮ test scores in the two domains of Learning and Memory and Executive Function, for completeness, the NFL Parties explain why Mr. ▮▮▮▮ test scores failed to satisfy the requisite criteria under all five domains.[1]

1. <u>Learning and Memory</u>

Turning first to the domain of Learning and Memory, the Settlement Agreement specifies six tests to be administered in the BAP. (*See* Appendix.) Retired NFL Football Players with Mr. ▮▮▮▮ premorbid IQ must score below a T score of 37 in at least

---

[1] As stated, Dr. Hopper scored all of Mr. ▮▮▮▮ tests with a scaled score, as opposed to a T score. For ease of reference and comparison to the required criteria, Mr. ▮▮▮▮ scaled scores are converted in this appeal to T scores. The scores were converted by the following method: A scaled score is a mean of 10 and a standard deviation of 3, while a T score is a mean of 50 and a standard deviation of 10. *See* Exhibit 1.

2

three of these six tests with at least two of the three scores below a T score of 35. (*See id*.)

Mr. ▮ took all six contemplated tests—Logical Memory I, Logical Memory II, Visual Reproduction I, Visual Reproduction II, Verbal Paired Associates I and II. He did not generate a T score below 37 on any of the six tests. Specifically, Mr. ▮ generated scaled scores of 9, 7, 12, 10, 7 and 8, respectively. (*See* Hopper Report at 7-8.) These scores translate to T scores of approximately 46.6, 40, 56.3, 50, 40 and 43.6—all of which fall into the above average range. Accordingly, Mr. ▮ did not meet the criteria for any level of Neurocognitive Impairment in the Learning and Memory domain.

2. Executive Function

Dr. Lobatz also relied on Mr. ▮ neuropsychological test scores in the Executive Function domain to support his diagnosis. The Settlement Agreement specifies four tests to be administered in the Executive Function domain for the BAP: Similarities, Verbal Fluency (FAS), Trails B and the Booklet Category Test. (*See* Appendix.) Retired NFL Football Players with Mr. ▮ premorbid IQ must score below a T score of 37 in at least three of these four tests, or, alternatively, score below a T score of 37 in at least two of these four tests with at least one score below a T score of 30. (*See id*.)

Dr. Hopper administered three of the four contemplated Executive Function tests or tests generally consistent therewith: Similarities, Letter Fluency (in place of Verbal Fluency), and Trails B. (*See* Hopper Report at 7-8.) Mr. ▮ did not receive a T score below 37 on any of these three tests. Specifically, Dr. Hopper reported that Mr. ▮ generated scaled scores of 11 and 19 in the Similarities and Letter Fluency tests, respectively, which convert approximately to T scores of 53.3 and 80. Dr. Hopper confirmed that Mr. ▮ Letter Fluency score fell within the "Superior range." (*See id.* at 8.) While Dr. Hopper did not provide a numerical score of Mr. ▮ administered test generally consistent with Trails B, she stated that "Mr. ▮ performance on the Trail Making Test was similar [sic] to others his age on all conditions he was presented [with]." (*See id*.)

Dr. Hopper did not administer any test generally consistent with the fourth Executive Functioning test—the Booklet Category Test—but that is of no consequence; the criteria requires at least two scores below a T score of 37, and Mr. ▮ did not achieve such a score on any of the three generally consistent tests administered in the Executive Function domain. Thus, Mr. ▮—regardless of any fourth test—cannot satisfy the required impairment criteria in the Executive Function domain for the diagnosis alleged.

3. Complex Attention

The Settlement Agreement specifies six tests to be administered in the domain of Complex Attention for the BAP. (*See* Appendix.) Retired NFL Football Players with Mr. ▮ premorbid IQ must score below a T score of 37 in at least three of these six tests with at least two of the three scores below a T score of 35. (*See id*.)

Mr. ▮ took all six tests—Digit Span, Arithmetic, Letter Number Sequencing, Coding, Symbol Search and Cancellation. (*See* Hopper Report at 8.) He

3

generated scaled scores of 10, 12, 14, 8, 3 and 11, respectively, which convert approximately to T scores of 50, 56.3, 62, 43.6, 28.6 and 53. Accordingly, only <u>one</u> of Mr. ▮▮▮▮▮ T-scores fell below 37, and he therefore cannot meet the criteria for Level 1.5 Neurocognitive Impairment in the Complex Attention domain.

    4. <u>Visual Perception</u>

The Settlement Agreement specifies three tests to be administered in the domain of Visual Perception for the BAP. (*See* Appendix.) Retired NFL Football Players with Mr. ▮▮▮▮▮ premorbid IQ must score below a T score of 40 in all <u>three</u> tests or, alternatively, score below a T score of 40 in <u>two</u> of the three tests with at least <u>one</u> score below 37.

Dr. Hopper administered all three Visual Perception tests on Mr. ▮▮▮▮▮—Block Design, Visual Puzzles and Matrix Reasoning. (*See* Hopper Report at 8.) Mr. ▮▮▮▮▮ generated scaled scores of 11, 9 and 8, respectively, which translate approximately to T scores of 53, 46.6 and 43.6. Accordingly, none of his T scores were below a T score of 40 and he therefore did not meet the criteria for Level 1.5 Neurocognitive Impairment in the Visual Perception domain; to the contrary, his scores once again were in the <u>above</u> average range.

    5. <u>Language</u>

Finally, in the Language domain, the Settlement Agreement specifies three tests to be administered in the BAP: the Boston Naming Test, BDAE Complex Ideational Material and Category Fluency (Animal Naming). (*See* Appendix.) Players with Mr. ▮▮▮▮▮ premorbid IQ must score below a T score of 40 in all <u>three</u> tests or, alternatively, below a T score of 40 in <u>two</u> of the three tests with at least <u>one</u> score below a T score of 37. (*See id.*)

Dr. Hopper administered only two Language tests or tests that even arguably could be considered generally consistent—Boston Naming and DKEFS Category Fluency. (*See* Hopper Report at 9.) Mr. ▮▮▮▮▮ generated a scaled score of 16, which converts approximately to a T score of 70, on the Category Fluency Test. Dr. Hopper confirmed that this score is "within the Above Average Range." (*See id.* at 8.) Although Dr. Hopper did not provide a numerical score for the Boston Naming Test, she stated in her report that "Mr. ▮▮▮▮▮ was administered the Boston Naming Test, [and] . . . [h]is performance on this measure was similar to others his age, indicating that he does not have any difficulty with word retrieval." (*See id.* at 9.) Dr. Hopper did not administer any test generally consistent with the third Language test specified in the Settlement Agreement—the BDAE Complex Ideational Test—but, as with in the Executive Function domain, it is of no consequence because Mr. ▮▮▮▮▮ already cannot meet the diagnostic criteria for this domain based on his lack of any T-scores below 40 in the two administered tests. Accordingly—and consistent with his scores in the other four domains—Mr. ▮▮▮▮▮ did not meet the criteria for Level 1.5 Neurocognitive Impairment in the Language domain.

In sum, Mr. ▮▮▮▮▮ test scores failed to satisfy the required criteria for Level 1.5 Neurocognitive Impairment in any of the five cognitive domains based on the tests required for the BAP. Put differently, if Mr. ▮▮▮▮▮ participated in the BAP and

4

achieved these same results, he indisputably would not qualify for a Level 1.5 Neurocognitive Impairment diagnosis. To allow Mr. ███ claim to proceed would thus greatly diminish the integrity of the Settlement program by giving players outside the BAP an unfair and arbitrary advantage over those who participate in the BAP.[2]

**Conclusion**

For the reasons set forth herein, the Monetary Award determination for the claim submitted by Mr. ███ should be reversed. If Mr. ███ believes that he is entitled to a Qualifying Diagnosis, he should participate in the complimentary Baseline Assessment Program for evaluation and potential diagnosis. Denial will not result in any prejudice to Mr. ███ to the extent that he is entitled to a Qualifying Diagnosis today or in the future. In fact, Mr. ███ will remain eligible to recover the same Monetary Award he applied for in this Claim Package for another <u>ten</u> years given that he is only 35 years old and the Monetary Award deductions by age do not begin until age 45.

Dated: January 3, 2018

Respectfully submitted,

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Lynn B. Bayard
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: bkarp@paulweiss.com

*ATTORNEYS FOR THE
NATIONAL FOOTBALL LEAGUE
AND NFL PROPERTIES LLC*

---

[2] Dr. Hopper and Dr. Lobatz's conclusions of impairment are curious given Mr. ███ clear failure to establish the requisite levels of impairment. For example, Dr. Hopper concluded that Mr. ███ was impaired in domains where his test scores plainly fell within (or even above) normal limits, or where only a single outlier score fell below normal limits. Specifically, Dr. Hopper determined that Mr. ███ had deficits in Processing Speed based on a <u>single</u> outlier score. (*See* Hopper Report at 10.) But Mr. ███ scored average or above average on all Processing Speed subtests with the exception of only one test, Symbol Search. (*See id.* at 5.) One outlier subtest score does not reasonably support Dr. Hopper's conclusion that Mr. ███ is impaired in this domain. Similarly, Dr. Hopper concluded that Mr. ███ was impaired in the Learning and Memory domain tests, despite the fact that <u>all</u> of his scores on these tests fell within or above the normal limits. (*See id.* at 6-7.)

5

# APPENDIX

## Neuropsychological Test Score Criteria by Domain of Cognitive Functioning

| Domain/Test | Ability |
|---|---|
| **Complex Attention/Speed of Processing (6 Scores)** | |
| Digit Span | Attention & Working Memory |
| Arithmetic | Mental Arithmetic |
| Letter Number Sequencing | Attention & Working Memory |
| Coding | Visual-Processing & Clerical Speed |
| Symbol Search | Visual-Scanning & Processing Speed |
| Cancellation | Visual-Scanning Speed |
| **Executive Functioning (4 scores)** | |
| Similarities | Verbal Reasoning |
| Verbal Fluency (FAS) | Phonemic Verbal Fluency |
| Trails B | Complex Sequencing |
| Booklet Category Test | Conceptual Reasoning |
| **Learning and Memory (6 scores)** | |
| Logical Memory I | Immediate Memory for Stories |
| Logical Memory II | Delayed Memory for Stories |
| Verbal Paired Associates I | Learning Word Pairs |
| Verbal Paired Associates II | Delayed Memory for Word Pairs |
| Visual Reproduction I | Immediate Memory for Designs |
| Visual Reproduction II | Delayed Memory for Designs |
| **Language** | |
| Boston Naming Test | Confrontation Naming |
| BDAE Complex Ideational Material | Language Comprehension |
| Category Fluency | Category (Semantic) Fluency |
| **Visual-Perceptual** | |
| Block Design | Spatial Skills & Problem Solving |
| Visual Puzzles | Visual Perceptual Reasoning |
| Matrix Reasoning | Visual Perceptual Reasoning |

**Impairment Criteria:** *Above Average* **Estimated Intellectual Functioning (A3 – E3)**

| |
|---|
| **A3. Complex Attention (6 test scores)** |
| 1. Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37 |
| 3. Level 2 Impairment: 3 or more scores below a T score of 35 |
| **B3. Executive Function (4 test scores)** |
| 1. Level 1 Impairment: 2 or more scores below a T score of 37 |
| 2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 30 |
| 3. Level 2 Impairment: 2 or more scores below a T score of 30 |
| **C3. Learning and Memory (6 test scores)** |
| 1. Level 1 Impairment: 2 or more scores below a T score of 35 |
| 2. Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 37 |
| 3. Level 2 Impairment: 3 or more scores below a T score of 35 |
| **D3. Language (3 test scores)** |
| 1. Level 1 Impairment: 2 or more scores below a T score of 40 |
| 2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37 |
| 3. Level 2 Impairment: 2 or more scores below a T score of 37 |
| **E3. Visual-Perceptual (3 test scores)** |
| 1. Level 1 Impairment: 2 or more scores below a T score of 40 |
| 2. Level 1.5 Impairment: 3 scores below at T score of 40; or meet for Level 1 and 1 score below a T score of 37 |
| 3. Level 2 Impairment: 2 or more scores below a T score of 37 |