**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

**CLAIMS ADMINISTRATOR STATUS REPORT NO. 6**

## I.     INTRODUCTION

1.     ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 6 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 5 filed on May 31, 2019 (Document 10652).  Our earlier Status Reports are posted to the Settlement Website (under "Documents," click "Status Reports").  We do not repeat here what we covered in them.  All numbers and other information in this Status Report No. 6 are as of August 19, 2019.  We will cover developments after that date in future reports.

## II.     MONETARY AWARD CLAIMS

2.     ***Total Claims Received.***  Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted.  We have received 77 new Monetary Award claims since Status Report No. 5, bringing the total to 2,864 Monetary Award

Claim Packages from Retired NFL Football Players and Representative Claimants (17.8% of the 16,134 Retired NFL Football Players and Representative Claimants who received favorable registration determinations and are eligible to submit claims).[1]  Four of these 2,864 claims were denied as untimely.[2]  We have received about six new claims a week since Status Report No. 5 in May 2019.  Of the 2,864 Monetary Award claims submitted, 1,965 (69%) rest on pre-Effective Date diagnoses, while 657 (23%) are for post-Effective Date diagnoses, of which 152 (23% of the 657) were made in the Baseline Assessment Program ("BAP") and 505 (77% of the 657) were made by Qualified MAF Physicians.[3]  The other 242 claims did not tell us what diagnosis date they assert.  Table 1 compares these numbers to those in Status Report No. 5:

| Table 1 | QUALIFYING DIAGNOSIS DATES | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **%** | | |
| | | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** |
| 1. | Pre-Effective Date | 1,935 | 1,965 | +30[4] | 69% | 69% | 0% |
| 2. | Post-Effective Date | 600 | 657 | +57 | 22% | 23% | +1% |
| | *(a) BAP* | *131* | *152* | *+21* | *5%* | *5%* | *0%* |
| | *(b) MAF Physician* | *469* | *505* | *+36* | *17%* | *18%* | *+1%* |
| 3. | No Date Asserted | 252 | 242 | -10 | 9% | 8% | -1% |
| **4.** | **Totals** | **2,787** | **2,864** | **+77** | **100%** | | |

Table 2 shows by diagnosis date how many claims we have for each type of Qualifying

Diagnosis:

---

[1] Of these Monetary Award claims, 545 (19%) have at least one associated Derivative Claimant who has registered and 2,319 (81%) have no registered Derivative Claimants.  The total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible).

[2] Another 13 claims were reviewed for potential untimeliness but were found to be timely submissions.

[3] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award.  The BAP Administrator's status reports explain more about BAP diagnoses.

[4] These 30 claims were part of the "No Date Asserted" group (Row 3 of Table 1) in Status Report No. 5 because we did not yet know the date of diagnosis being claimed.  As of May 13, 2019, four of the claims were in our review process, two were ready to receive a notice from us and 24 last received a notice of incomplete Claim Package and were within their deadlines to respond.  After receiving responses to our notices and additional review, we were able to determine that the 30 claims were for pre-Effective Date diagnoses.

| Table 2 | CLAIMS BY QUALIFYING DIAGNOSIS TYPE AND DATE | | |
|---|---|---|---|
| | **DIAGNOSIS** | **PRE-EFFECTIVE DATE** | **POST-EFFECTIVE DATE** | |
| | | | **MAF** | **BAP** |
| 1. | Death with CTE | 126 | N/A | |
| 2. | ALS | 50 | 5 | N/A |
| 3. | Alzheimer's Disease | 414 | 63 | |
| 4. | Parkinson's Disease | 138 | 27 | |
| 5. | Level 2 | 506 | 166 | 51 |
| 6. | Level 1.5 | 731 | 243 | 95 |

We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the Summary Report on the Settlement Website.  We also show the current status of all Monetary Award claims based on the last notice or action taken in Section 8 of the Summary Report on the Settlement Website.  There are 27 claims (1% of 2,864) in our review process after an initial Claim Package submission or a response to a notice requesting additional information and/or documents (see Row 1 in Section 8 of the Summary Report).

**3.**     *Monetary Awards and Payments.*

(a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website.  We have issued Notices of Monetary Award for 956 claims totaling $690,235,675.[5]  We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit.  Of the 956 claims with Notices of Monetary Award, 865 reached the point at which we can request funding from the NFL Parties, which have deposited $594,719,177 into the Monetary Award Fund for 828

---

[5] The amount of these 956 Notices of Monetary Award includes the 1% of Awards allocated to eligible Derivative Claimants.  See Paragraph 22 of this Status Report.

claims and not yet funded 37 claims because they are within the funding deadline for the August Funding Request.[6]  Of the 828 Monetary Award claims for which the NFL Parties had deposited funds, the Program paid 771 claims for a total of $534,270,814.  Of the remaining 57 funded claims, 41 were included on the most recent Disbursement Report that we submitted to the Special Masters on August 13, 2019, but that had not yet been paid as of August 19, 2019.  The remaining 16 funded claims were not yet ready for payment when we submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount.  For the 771 Retired NFL Football Players and Representative Claimants who have been paid, the Trustee sent $28,626,199 (5% of those Monetary Awards), to the Attorneys' Fees Qualified Settlement Fund, in accordance with the Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104). Finally, we are required to withhold money for unresolved Liens and for third-party funders that may accept rescission of prohibited assignments (as described further in Paragraph 25). Table 3 shows the distribution of the $534,270,814 paid by the Settlement Program and compares the totals to those reported in Status Report No. 5:

---

[6] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.

| Table 3 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | **PAID TO** | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $487,914,086 | $520,222,917 | +$32,308,831 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $2,843,170 | $2,908,987 | +$65,817 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $4,693,098 | $5,980,569 | +$1,287,471 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to Third-Party Funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $3,945,783 | $5,158,341 | +$1,212,558 |
| 5. | **Totals** | **$499,396,136** | **$534,270,814** | **+$34,874,678** |

(b) Table 4 shows the changes in figures for payments and claims with Notices of Monetary Award since Status Report No. 5:

| Table 4 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 5 | | | | | |
|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **AMOUNT** | | |
| | | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** |
| 1. | Notice of Monetary Award Issued | 852 | 956 | +104 | $663,705,780 | $690,235,675 | +$26,529,895 |
| 2. | Paid | 713 | 771 | +58 | $499,396,136 | $534,270,814 | +$34,874,678 |

(c) Table 5 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:

| Table 5 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS | | | | | |
|---|---|---|---|---|---|---|
| | DIAGNOSIS | CLAIMS SUBMITTED | NOTICE OF MONETARY AWARD | | PAID | |
| | | | HOW MANY | % | HOW MANY | % |
| 1. | Death with CTE | 126 | 78 | 62% | 74 | 59% |
| 2. | ALS | 55 | 37 | 67% | 36 | 65% |
| 3. | Alzheimer's Disease | 477 | 295 | 62% | 260 | 55% |
| 4. | Parkinson's Disease | 165 | 132 | 80% | 115 | 70% |
| 5. | Level 2 | 723 | 145 | 20% | 105 | 15% |
| 6. | Level 1.5 | 1,069 | 269 | 25% | 181 | 17% |

Of the 956 claims with Notices of Monetary Award, 164 (17%) have been appealed (121 by the NFL Parties and 43 by the Settlement Class Member).  This is 13 more appeals (seven by the NFL Parties and six by Settlement Class Members) than we described in Status Report No. 5.  We show the status of appealed Monetary Award claims in Section 9 of the Summary Report on the Settlement Website.

**4.** *Monetary Award Claims Reviewed by the AAP.*

(a) There are 116 claims in or still requiring Appeals Advisory Panel ("AAP") review, which is 46 more than the 70 we reported in Status Report No. 5.  This increase is largely due to the number of claims with closed Audits, as reported in Paragraph 15 of this Status Report.  Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel Consultants ("AAPC"), as highlighted in sub-paragraph (b) below. The AAP has reviewed 836 pre-Effective Date diagnosis Monetary Award claims, approving 475 (57%) of those claims.[7]  Under FAQ 146 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a

---

[7] Broken down by Qualifying Diagnosis, the AAP members approved 98% of Death with CTE claims, 95% of ALS claims, 88% of Alzheimer's claims, 95% of Parkinson's claims, 30% of Level 2 claims and 34% of Level 1.5 claims.

lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 62 claims (an increase of 12 since Status Report No. 5).  Under Rule 27 of the Rules Governing Qualified MAF Physicians, the AAP has reviewed 61 Monetary Award claims for diagnoses made by terminated Qualified MAF Physicians, approving 24 (39%) of those claims.[8]

(b) We have assigned 589 claims (an increase of 166 since Status Report No. 5) to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing supporting an Alzheimer's Disease diagnosis.  The AAPC has completed 558 reviews (95%) and provided their assessments to the AAP.  An AAPC member is reviewing the other pending claims.

(c) Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network.[9]  We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses.

**5.**     ***Notices for Missing Materials.***  We have sent one or more notices requesting additional documents or information on 1,920 Monetary Award claims, which is 33 more

---

[8] This figure excludes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award.  At our request, the AAP has reviewed 54 claims to verify the sufficiency of the claimed Qualifying Diagnosis.

[9] See Rule 23 of the Rules Governing Qualified MAF Physicians.

claims than we reported in Status Report No. 5.  More of the Level 1.5 and Level 2 claims are missing materials than claims for the other Qualifying Diagnoses, as shown in Table 6:

| Table 6 | | NOTICES FOR MISSING MATERIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[10] | TOTAL |
| 1. | Total Submitted | 126 | 55 | 477 | 165 | 723 | 1,069 | 249 | 2,864 |
| 2. | Notice Issued | 50 | 27 | 279 | 89 | 492 | 762 | 221 | 1,920 |
| 3. | % Missing Materials | 40% | 49% | 58% | 54% | 68% | 71% | 89% | 67% |

So far, 92% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice.  Settlement Class Members take an average of about 61 days to respond.  We receive approximately eight to 12 responses to these notices each week and review each reply to determine if it cures the problem.  Of those who responded, 38% cured the problem.  Section 6 of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

6.     *Statute of Limitations Matters*.  The Rules Governing Statute of Limitations Proceedings explain how the Special Masters make determinations as to whether claims submitted by Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006, are barred by statutes of limitations, as specified in Section 6.2(b) of the Settlement Agreement.  We have received 370 Registration Forms from Representative

---

[10] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.  We process and pay a person for only one Qualifying Diagnosis per claim submission.  All these claims by definition are incomplete because we need to know which Qualifying Diagnosis should be used.  We soon will issue notices on the 28 claims that had not yet received one as of August 19, 2019.

Claimants that may require a statute of limitations analysis, but 134 individuals did not properly register because of uncured incompleteness reasons or the player was not a Settlement Class Member because he did not play NFL Football as required by the Settlement Agreement.  Of the 236 Settlement Class Members who are registered, 135 (57%) submitted Claim Packages.  Rule 7 of the Rules Governing Statute of Limitations Proceedings requires that a Claim Package be complete before a statute of limitations proceeding may begin.  Of the 135 Claim Packages we received:  (a) 72 are complete and assert a potentially compensable Qualifying Diagnosis if the claim is not time-barred under Settlement Agreement Section 6.2(b); and (b) 63 have been denied for failing to cure deficiencies or for not asserting a compensable Qualifying Diagnosis.[11]  Table 7 summarizes the changes to these numbers since Status Report No. 5:

| Table 7 | STATUS OF CLAIMS REQUIRING STATUTE OF LIMITATIONS ANALYSIS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % | | |
| | | AS OF 5/13/19 | AS OF 8/19/19 | CHANGE | AS OF 5/13/19 | AS OF 8/19/19 | CHANGE |
| 1. | Complete - Potentially Compensable Qualifying Diagnosis | 57 | 72 | +15 | 43% | 53% | +11% |
| 2. | Incomplete – Within Deadline to Submit Missing Items | 32 | 0 | -32 | 24% | 0% | -24% |
| 3. | Denied – Deficient or No Compensable Qualifying Diagnosis | 45 | 63 | +18 | 34% | 47% | +13% |
| 4. | Totals | 134 | 135 | +1 | 100% | | |

We have issued a Notice of Commencement of Statute of Limitations Proceeding under Statute of Limitations Rule 16 to the 72 Representative Claimants with complete Claim Packages to start the briefing process under the Rules.  The Special Masters will not rule on

---

[11] The value of the 72 complete and potentially compensable claims is $62,852,869.

these until all claims presenting this issue have been fully briefed, to permit all affected

Representative Claimants to be heard before any ruling and allow for the consideration of all

arguments in a uniform and efficient manner.  Barring any deadline extensions, the date for

the conclusion of the last brief under Rules 16 through 21 will expire on November 22, 2019.

     7.    ***Monetary Award Denials*.**  There have been 811 denials of Monetary Award

claims for reasons other than an Audit (171 more since Status Report No. 5), as shown in

Table 8:[12]

| Table 8 | MONETARY AWARD DENIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTALS |
| 1. | Total Submitted | 126 | 55 | 477 | 165 | 723 | 1,069 | 249 | 2,864 |
| 2. | Denied | 40 | 3 | 68 | 12 | 160 | 323 | 205 | 811 |
| 3. | % Denied | 32% | 5% | 14% | 7% | 22% | 30% | 82% | 28% |

Sections 6 and 10 of the Summary Report on the Settlement Website show these denials and

the reasons for them.  Overall, the AAP found 368 (45%) of these claims did not reflect a

valid Qualifying Diagnosis.  Other claims were denied because they were untimely, a

fundamental requirement in the Settlement Agreement was not satisfied, or because

Settlement Class Members did not provide the mandatory information and/or documents we

requested in our notices and outreach efforts.  When an AAP member denies a claim, we

include in the notice comments from that AAP member explaining why.  When a claim is

denied on other grounds, we typically call or email the Settlement Class Member (or his or

her lawyer, if represented) to explain why the claim is being denied and discuss options for

resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can

---

[12] We discuss Audit denials in Paragraph 17 of this Status Report.

obtain the missing mandatory information and/or documents.  Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam. Settlement Class Members have appealed 232 (29%) of the 811 denials.

### III.   SUPPLEMENTAL MONETARY AWARD CLAIMS

**8.**   ***Total Supplemental Monetary Award Claims Received.***  A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis.  The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid.  We have received claims from three Retired NFL Football Players seeking Supplemental Monetary Awards for Qualifying Diagnoses of Alzheimer's Disease.

**9.**   ***Supplemental Monetary Awards and Payments.***  A Supplemental Monetary Award is the difference between the Monetary Award Grid value of the new Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis.  We issued two Notices of Supplemental Monetary Award.[13]  The combined Monetary Award Grid value of these two Supplemental Monetary Awards was $900,721, but after subtracting the prior Monetary Award values, totaled $551,642, as detailed below in Table 9:

---

[13] The third claim for a Supplemental Monetary Award was submitted on August 16, 2019, and is still under review.

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD |
| | QUALIFYING DIAGNOSIS | HOW MUCH | QUALIFYING DIAGNOSIS | HOW MUCH | |
| 1. | Alzheimer's Disease | $187,217 | Level 1.5 | $93,904 | $93,313 |
| 2. | Alzheimer's Disease | $713,504 | Level 1.5 | 255,175 | $458,329 |
| 3. | Totals | $900,721 | | $349,079 | $551,642 |

## IV.   QUALIFIED MAF PHYSICIANS

**10.**   *Establishing and Maintaining the MAF Network.*

(a) We continue to identify and contact providers, collect applications, verify credentials, submit applicants to the Parties for approval and contract with approved Qualified MAF Physicians, in conjunction with the BAP Administrator.[14]   We are following up with the 66 persons who expressed interest in the Network and gave us their contact information at the May 2019 American Academy of Neurology ("AAN") Annual Meeting in Philadelphia, which we attended to recruit additional candidates.  From those 66 persons, we have received three applications, two of which are under review by the Parties for potential approval, and one which we will send to the Parties after the physician provides us with additional documentation.  We are pushing hard to get as many applications as we can from this group.  We also created a new page on the public Settlement Website with links to the Network Overview and Network Provider application (https://www.nflconcussionsettlement.com/Join_the_Network.aspx) to make information about the Program more accessible to potential candidates.

(b) The posted list of Qualified MAF Physicians includes 115 of the total 130 approved Qualified MAF Physicians.  We will add the remaining 15 potential Qualified MAF Physicians as we confirm their participation and/or contract with them.  We have final contracts with

---

[14] The "Parties" are the parties to the Settlement Agreement, Class Counsel and the NFL Parties.  Our contacts with Class Counsel are at Seeger Weiss LLP.  We work with counsel for the NFL Parties at Paul, Weiss, Rifkind, Wharton & Garrison LLP.

Qualified MAF Physicians in or near 37 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside.  Table 10 shows the changes in these numbers since Status Report No. 5:

| Table 10 | QUALIFIED MAF PHYSICIANS | | |
|---|---|---|---|
| | **DATA POINT** | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** |
| 1. | Total Approved Physicians | 130 | 130 | 0 |
| 2. | Approved – On Posted List | 117 | 115 | -2 |
| 3. | Approved – Not Yet Posted | 13 | 15 | +2 |
| 4. | Target Cities Represented | 40 | 37 | -3 |

Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website.  We explain in sub-paragraph (c) below why the total number of approved physicians in Row 1 of Table 10 has not changed even though new physicians have been added to the Network.

(c) There are seven providers from four facilities who are no longer with the Program. One physician has retired, four never signed a contract with us and have decided not to participate and two withdrew because they are no longer available to participate.  The Parties approved seven new Qualified MAF Physicians since Status Report No. 5.  We secured signed contracts for two of them and added them to the posted list of Qualified MAF Physicians, and we are working with the other five to get signed contracts in place so we can add them to the posted list.

**11.** *Assistance in the Operation of the Network*.  On April 11, 2019, the Court entered an Order adopting a revised set of the Rules Governing Qualified MAF Physicians (Document 10527).[15]  After that Order, we worked closely with the Special Masters on

---

[15] An earlier set of these Rules was approved by the Special Masters and posted to the Settlement Website on June 7, 2018.  The guide at the beginning of the current set of Rules posted on the public website explains which Rules are new and which ones changed from the earlier set.

updates to the Qualified MAF Physician Manual and related materials and to create new reference guides and other resources to help the Qualified MAF Physicians.  We continue to identify new ways to educate Qualified MAF Physicians on all the requirements and enhance their overall experience in the Program.

12.  *150-Mile Rule.*  Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired NFL Football Player be examined by a Qualified MAF Physician whose office is within 150 miles of his primary residence.[16]  If a Retired NFL Football Player wants to use a Qualified MAF Physician more than 150 miles away, we can make exceptions to the 150-Mile Rule but must do so before the appointment.  This is a flexible rule with broad exceptions.  We have received 14 requests for waivers to this 150-Mile Rule, of which we granted 11 (79%) and denied three (21%).  For two of the denied requests, a waiver was deemed unnecessary after we helped set up appointments with Qualified MAF Physicians within 150 miles; a third request was denied because the Retired NFL Football Player had more than 10 Qualified MAF Physicians within 150 miles and did not provide a reasonable explanation for wanting to see a Qualified MAF Physician further away.

13.  *50-Mile Rule.*  Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office.  Like the 150-Mile Rule, we have discretion to grant exceptions.  We have received five requests for waivers to the 50-Mile Rule and granted all five.

---

[16] This requirement applies only to appointments made after April 11, 2019.  Appointments made before April 11, 2019, do not need to be rescheduled with a different Qualified MAF Physician.

**14.**   *Deviation Explanations for Level 1.5 and Level 2 Diagnoses.*   Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a Qualified MAF Physician and/or neuropsychologist whenever the strict BAP criteria are not followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we determine more information is needed.[17]  We cannot process claims further until we receive the requested explanation.  We report on claims held in review for this reason in Section 8 (Row 2) of the Summary Report on the Settlement Website.  We expect the number of claims in this group will go down over time as the Qualified MAF Physicians become more familiar with this requirement and include the necessary explanation in their initial submissions to us.

## V.   AUDIT

**15.**   *Closed Audits.*   We have concluded the Audit investigations of 613 Settlement Class Members with Monetary Award claims.  Table 11 summarizes the reasons for these closures and changes in the numbers since Status Report No. 5:

| Table 11 | CLOSED AUDITS | | | |
|---|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** |
| 1. | No Finding of Misrepresentation, Omission, or Concealment; or Special Masters Directed Result | 410 | 447 | +37 |
| 2. | Claim Withdrawn by Settlement Class Member | 113 | 166 | +53 |
| **3.** | **Totals** | **523** | **613** | **+90** |

**16.**   *Reports of Adverse Finding in Audit.*   We have issued to the Parties 18 Reports of Adverse Finding in Audit (two more than we reported in Status Report No. 5)

---

[17] We explained this in our May 2019 Settlement Class Member (https://www.nflconcussionsettlement.com/Docs/SCM_may_2019.pdf) and lawyer (https://www.nflconcussionsettlement.com/Docs/lawyer_may_2019.pdf) newsletters, which can be accessed in the Past Newsletters section on the Newsletters page of the Settlement Website (https://www.nflconcussionsettlement.com/Newsletters.aspx).

affecting 565 Monetary Award claims.  All 18 Audit Reports were then referred to the

Special Masters.  These 18 Audit Reports concern four neurologists, 12 neuropsychologists,

two law firms, six individual Settlement Class Members and one claims preparation

company.  The Special Masters accepted our referrals on 10 of the 18 Audit Reports, which

concern 11 neuropsychologists, four neurologists, one law firm and one claims preparation

company; rejected our referral on six Audit Reports covering one neuropsychologist and five

individual Settlement Class Members; and are considering whether to accept two referrals,

which concern one law firm and one individual Settlement Class Member.[18]

17. ***Published Special Master Decisions.***  Since Status Report No. 5, the Special

Masters have not issued findings on any Audit Proceeding that they designated for

publication under Audit Rule 35.  Copies of the Special Masters' past decisions are published

on the Settlement Website (under "Documents" click "Special Master" below "Published

Decisions").  We have denied 196 claims after Audit based on decisions by the Special

Masters disqualifying certain neurologists and neuropsychologists from participating in the

Program.[19]  Sections 6 and 8 (Row 16) of the Summary Report on the Settlement Website

show these denials.  A Settlement Class Member whose claim is denied after Audit may

submit a new claim if based on a Qualifying Diagnosis that does not rely on records or

opinions from disqualified doctors.

---

[18] Pursuant to Rule 34 of the Rules Governing the Audit of Claims, on May 15, 2019, the NFL Parties submitted an objection to the Special Masters' decisions on the five Audit Reports concerning individual Settlement Class Members.  On August 19, 2019, the Court issued a decision on that objection, finding that: (1) four Claim Packages contained material misrepresentations and/or omissions and must be denied; and (2) one Claim Package did not include a material misrepresentation or omission and will be paid.

[19] Of the 196 denials, 195 are associated with disqualified providers: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims).  The remaining denial is the one Dr. Pollock claim that the Special Masters directed us to deny based on the unique circumstances of a Retired NFL Football Player's medical examinations.

18.     ***Ongoing Audit Investigations.***  We have other Audit investigations underway affecting 25 individual Monetary Award claims (43 fewer than the 68 we reported in Status Report No. 5).

19.     ***Claims Investigated More than Once.***  Sometimes, claims on which we have concluded an Audit undergo another Audit if we later learn information that requires further investigation.[20]  We notify Settlement Class Members when this happens.  We have audited 80 Monetary Award claims more than one time (four more than the 76 we reported in Status Report No. 5); the most times a Monetary Award claim has been audited is two.

20.     ***Activities of the Special Investigator.***  The Special Masters have referred five investigations to the Special Investigator, concerning three law firms, one litigation funding company and one individual Settlement Class Member.  The Special Investigator has finished his work on the one Settlement Class Member, finding clear evidence of a false affidavit in the Claim Package.  The other investigations by the Special Investigator involve 177 Monetary Award claims in Audit.  We show those claims in Section 8 (Row 12) of the Summary Report on the Settlement Website.  HML Group provides supportive investigative services to the Special Investigator.

21.     ***Appointment of Special Master Lin.***  On July 15, 2019, the Court appointed Susan Lin as Special Master to advise the Court regarding the protection of participants' rights in the investigative process (Document 10739).

## VI.   <u>DERIVATIVE CLAIMANTS</u>

22.     ***Derivative Claims.***  We have received 580 Derivative Claim Packages, which is an increase of 13 since Status Report No. 5.  Table 12 shows the status of these claims:

---

[20] On August 20, 2019, the Court issued an Explanation and Order denying a motion which sought to stop multiple audits of claimants (Document 10811).

| Table 12 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | HOW MANY | % |
| 1. | Paid Derivative Claimant Award ($785,185) | 176 | 30% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($50,200) | 15 | 3% |
| 3. | Denied – Deceased Derivative Claimant | 4 | <1% |
| 4. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 5. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 6. | Successful Challenge to Derivative Claimant - Not Eligible | 14 | 2% |
| 7. | Challenge to Derivative Claimant – Pending Final Determination | 2 | <1% |
| 8. | Withdrawn | 8 | 1% |
| 9. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 347 | 60% |
| 10. | Totals | 580 | 100% |

Since Status Report No. 5, 17 more Derivative Claimants were paid, we issued two more Notices of Derivative Claimant Award and we denied one Derivative Claimant. We have so far paid 92% of the 191 Derivative Claimants who received Notices of Derivative Claimant Award; of the 15 eligible Derivative Claimants who have not yet been paid, 10 are in the payment process. We have not received an objection from any of the 146 Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

23. *Additional Derivative Claimant Details*. We have received challenges from 28 Retired NFL Football Players (or their Representative Claimants) to 40 Derivative Claimants (no change since Status Report No. 5); 18 (45%) of those 40 challenged Derivative Claimants never submitted a timely Derivative Claim Package, making them ineligible for a Derivative Claimant Award. We issued a Notice of Derivative Claim Package Submission Deadline to 408 registered Derivative Claimants. Table 13 summarizes their claim submission statuses and the changes since Status Report No. 5:

| Table 13 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % | | |
| | | AS OF 5/13/19 | AS OF 8/19/19 | CHANGE | AS OF 5/13/19 | AS OF 8/19/19 | CHANGE |
| 1. | Claim Submitted | 140 | 148 | +8 | 37% | 36% | -1% |
| 2. | No Claim Submitted | 233 | 252 | +19 | 61% | 62% | +1% |
| 3. | Within 30-Day Deadline | 7 | 8 | +1 | 2% | 2% | 0% |
| 4. | Totals | 380 | 408 | +28 | 100% | | |

24.    *Supplemental Derivative Claimant Awards*.  Section G of the Overview of Derivative Claimant Process on the Settlement Website (https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf) explains how Supplemental Derivative Claimant Awards are handled.  As discussed in Paragraph 9 of this Status Report, we issued Notices of Supplemental Monetary Award to two Retired NFL Football Players.  Neither of those Supplemental Monetary Award Notices had a 1% offset for potential Derivative Claimant Awards.  One Retired NFL Football Player had no registered Derivative Claimants associated with him, and the other Retired NFL Football Player had one registered Derivative Claimant, but she did not submit a Derivative Claim Package to share 1% of the Retired NFL Football Player's earlier Monetary Award and was not eligible for any portion of his Supplemental Monetary Award.  We have not yet issued any Notices of Supplemental Derivative Claimant Award.

## VII.    OTHER CLAIM PROCESSES

25.    *Handling of Attempted Assignments of Claims*.

(a) We have received 1,018 signed SWS-5s (Sworn Statement:  Status of Assignment of Monetary Claim) from eligible Settlement Class Members telling us whether they had attempted to assign a claim in exchange for money from a third-party funder, as shown in Table 14:

19

| Table 14 | SIGNED SWS-5 ASSIGNMENT RESPONSES | | | | | |
|----------|-----------------|---|---|---|---|---|
| | **RESPONSE** | **HOW MANY** | | | **%** | | |
| | | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** |
| 1. | No Assignment or Attempt to Assign | 806 | 928 | +122 | 91% | 91% | 0% |
| 2. | Assigned or Attempted to Assign | 76 | 90 | +14 | 9% | 9% | 0% |
| 3. | **Totals** | **882** | **1,018** | **+136** | **100%** | | |

(b) If a Settlement Class Member has attempted to assign any settlement benefits from his or her Monetary Award claim to a third-party funder, or borrowed any funds against his or her claim as collateral, he or she also must provide to us all documents relating to that transaction (a "Third-Party Funder Transaction"), unless the third-party funder has submitted a Declaration of Consent to Substitution to participate in the Third-Party Funding Resolution Protocol, as described in Paragraph 25(d) below.  We review each Third-Party Funder Transaction that is not subject to the Third-Party Funding Resolution Protocol with the Special Masters for language in the documents indicating that the Settlement Class Member has attempted to make an assignment of his or her interest prohibited by Section 30.1 of the Settlement Agreement and the Court's December 8, 2017 Explanation and Order (Document 9517), as clarified by the Court of Appeals for the Third Circuit's April 26, 2019 Opinion (Document 003113222504) (a "Prohibited Assignment"), and notify the affected Settlement Class Member of that decision in a Notice of Assignment Review Determination.[21]  We have reviewed 61 Third-Party Funder Transactions (an increase of four since Status Report No. 5),

---

[21] The Court of Appeals' Opinion reversed the District Court's December 8, 2017 Explanation and Order "to the extent the District Court purported to void the cash advance agreements in their entirety and void contractual provisions that went only to a lender's right to receive funds after the player acquired them."  We are not unilaterally voiding cash advance agreements or telling Settlement Class Members or their lawyers that they are not bound to honor such agreements.  Third-party funders have the option to pursue outside of the claims administration process whatever rights they may continue to have under their cash advance agreements with Settlement Class Members and applicable state and federal law.

44 of which are Prohibited Assignments (an increase of three since Status Report No. 5).

Another 31 Third-Party Funder Transactions did not require our review because the third-

party funder submitted a Declaration of Consent to Substitution to participate in the Third-

Party Funding Resolution Protocol.

 (c) On any Prohibited Assignment that has not been terminated by agreement between

the Settlement Class Member and the funder, and that is not subject to the Third-Party

Funding Resolution Protocol described in Paragraph 25(d) below, we issue a Waiver

Relinquishing Rights Under Attempted Assignment contemplated in the Explanation and

Order ("Waiver Form") for the third-party funder to sign and return within 30 days to:  (a)

indicate the amount advanced to the Settlement Class Member that has not been repaid to the

third-party funder; and (b) rescind the Prohibited Assignment and relinquish all claims

relating to it.  We send this Waiver Form to the lawyer for a represented Settlement Class

Member and directly to the third-party funder if the Settlement Class Member is not

represented by a lawyer.  The Waiver Form includes an attachment for the Settlement Class

Member to sign and return to us showing agreement with the information the third-party

funder provided in the Waiver Form.  We have issued 36 Waiver Forms (an increase of one

since Status Report No. 5) and received 26 completed, signed Waiver Forms from third-party

funders (an increase of one since Status Report No. 5).

 (d) In addition, we provide a [Third-Party Funding Resolution Protocol](#) to third-party

funders and affected Settlement Class Members as we learn of Monetary Awards subject to

an attempted assignment.  A funder may elect to participate in it by submitting a Declaration

of Consent to Substitution, a template of which is available on the Payment Forms page of

the Settlement Website.  By completing all necessary forms, the third-party funder and

Settlement Class Member agree that the Prohibited Assignment and any rights held under it are terminated.  We have implemented the terms of the Protocol to successfully terminate 14 transactions between third-party funders and Settlement Class Members (an increase of two since Status Report No. 5).

26.     ***Petitions for Deviation from the Fee Cap.***  We have received seven Petitions for Deviation, one of which was withdrawn.  The Court resolved two of the remaining six Petitions for Deviation in conjunction with the Attorneys' Lien Dispute Process; the other four are pending final resolution.

27.     ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a) Table 15 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 5:

| Table 15 | | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** |
| 1. | Attorneys' | 984[22] | 1,088[23] | +104 | 365 | 421 | +56 | 275 | 289 | +14 |
| 2. | Child Support | 343 | 344 | +1 | 43 | 47 | +4 | 22 | 21 | -1 |
| 3. | Judgment | 60 | 60 | 0 | 13 | 14 | +1 | 11 | 10 | -1 |
| 4. | Tax | 48 | 51 | +3 | 1 | 3 | +2 | 0 | 0 | 0 |
| **5.** | **Totals** | **1,435** | **1,543** | **+108** | **422** | **485** | **+63** | **308** | **320** | **+12** |

(b) Table 16 summarizes the status of Liens in the Attorneys' Liens dispute resolution process:

---

[22] These 984 Attorneys' Liens were asserted by 47 law firms.
[23] These 1,088 Attorneys' Liens were asserted by 50 law firms.

| Table 16 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[24] | | |
|---|---|---|---|
| | PENDING | RESOLVED | | TOTAL |
| | | BY AGREED WITHDRAWAL | BY COURT DETERMINATION | |
| | 15 | 35 | 9 | 59 |

(c) Table 17 summarizes the Non-Medical Lien holdbacks by Lien type:

| Table 17 | NON-MEDICAL LIEN HOLDBACKS | | |
|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN HOLDBACKS |
| 1. | Attorneys' | 14 | $21,374,141.80 | $3,743,727.41 |
| 2. | Child Support | 3 | $2,132,191 | $157,268.71 |
| 3. | Judgment | 2 | $1,611,618 | $1,195,044.24 |
| 4. | Tax | 1 | $33,282.80 | $6,378.33 |
| 5. | Totals | 20 | $25,151,233.60 | $5,102,418.69 |

(d) Table 18 summarizes the Non-Medical Lien payments by Lien type:

| Table 18 | NON-MEDICAL LIEN PAYMENTS | | |
|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN PAYMENTS |
| 1. | Attorneys' | 41 | $53,442,417 | $3,356,418.40 |
| 2. | Child Support | 9 | $9,845,609 | $353,205.51 |
| 3. | Judgment | 2 | $4,108,168.49 | $2,270,945.48 |
| 4. | Tax | 0 | N/A | N/A |
| 5. | Totals | 52 | $67,396,194.49 | $5,980,569.39 |

## VIII.   COMMUNICATIONS CENTER FOR THE PROGRAM

**28.**   *Our Contact Activity*.  Since our contact center opened on February 6, 2017, we

have handled 72,725 total communications, including 46,698 calls made or received and 22,432

emails to us at our Claims Administrator email box.  Since Status Report No. 5, we handled

3,901 such total communications.  The most common topics of these communications have been

---

[24] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.

general Settlement Program information, the BAP, payments, representation changes and Claim Package status questions.

29.    ***Law Firm Contacts.***  Our Law Firm Contacts are assigned to 535 different law firms or lawyers representing Settlement Class Members in the Program.  This is 11 more law firms or lawyers than we reported in Status Report No. 5.  The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 28 above.

30.    ***Newsletters.***  Since Status Report No. 5, we issued three more editions of our "Insights" newsletter (May, June and August 2019).[25]  We work with the BAP Administrator and the Lien Resolution Administrator to include material about the BAP and Medical Liens in the newsletters.  We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail.  We also post them to the Settlement Website (under "Documents" click "Newsletters").  We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters.

31.    ***Settlement Program Website.***  We regularly update the Settlement Website to reflect progress and changes to the Program.  We have made these changes since Status Report No. 5:

> (1) Added two new Court Orders (Order Denying Motion for Reconsideration of the Court's April 11, 2019 Order in Aid of Implementation of the Settlement Agreement, Document 10612, filed May 16, 2019; and Order Terminating Class Counsel, Co-Lead Class Counsel and Subclass Counsel Appointments and Reappointing Christopher A. Seeger as Class Counsel, Document 10624, filed May 24, 2019) and the Third Circuit Opinion Clarifying the Court's December 8, 2017 Explanation and Order Regarding Assignment of Monetary Claims to Third Parties (Document

---

[25] The newsletters are a service to Settlement Class Members and their lawyers, so we want to make sure they cover timely and useful information.  Although we typically issue a new edition of "Insights" by the end of each month, we delayed the July/August 2019 issue because we wanted to discuss some new materials on the website and changes made pursuant to the Rules Governing Qualified MAF Physicians.  We thought the Class would be best served by issuing the newsletter in August immediately after the changes took effect.  See the "Stroke or Traumatic Brain Injury Explanation Form," "New Reference Guide," "Updates to Employment and Activities Form" and "SWS-3 vs. Employment and Activities Forms" articles in our August 2019 issue.

003113222504, filed April 26, 2019) to the Court Orders and Opinions page at https://www.nflconcussionsettlement.com/Court_Orders_Opinions.aspx.

(2) Posted a Report of the Special Masters (Document 10651, filed May 31, 2019), Claims Administrator Status Report No. 5 (Document 10652, filed May 31, 2019) and BAP Administrator Status Report 2nd Quarter 2019 (Document 10653, filed May 31, 2019) to the Status Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.

(3) Added two new forms (Employment History and Social and Community Activity of Retired NFL Football Player (Form for Use by Knowledgeable Informant); Stroke or Traumatic Brain Injury Form), replaced two existing forms with new versions (Employment History and Social and Community Activity of Retired NFL Football Player (Form for Use by Retired Player); MAF Diagnosing Physician Certification Form) and replaced the Claim Package and Supplemental Claim Package Kits (to include the updated MAF Diagnosing Physician Certification Form) in the Monetary Awards and Supplemental Monetary Awards sections on the Claims Forms page at https://www.nflconcussionsettlement.com/Claims.aspx.[26]

(4) Replaced the existing Waiver Relinquishing Rights Under Attempted Assignment form with a new version on the Payment Forms page at https://www.nflconcussionsettlement.com/Payment.aspx.

(5) Added a new button on the MAF Physician Locator Tool at https://www.nflconcussionsettlement.com/PhysicianSearch.aspx for doctors interested in joining the Qualified MAF Physician Network to go for more information.  The button opens a new page with its own URL (https://www.nflconcussionsettlement.com/Join_the_Network.aspx) that has links to a Network Overview and the Network Provider Application.

(6) Updated how past newsletters are displayed on the Newsletters page at https://www.nflconcussionsettlement.com/Newsletters.aspx.  Users can select a year and month from the dropdowns to find and view past newsletters.

(7) Posted a new Neuropsychological Test Score Criteria guide on the Reference Guides page at https://nflconcussionsettlement.com/Reference_Guides.aspx.

Since Status Report No. 5, the Program's Home page has had 27,443 more unique visits, giving

us 424,797 total unique visits, coming from 190 countries and all 50 of the United States.

---

[26] The MAF Diagnosing Physician Certification Form was updated to include space for a Qualified MAF Physician to explain deviations from the BAP criteria on Level 1.5 and Level 2 Neurocognitive Impairment diagnoses, pursuant to Rule 20 of the Rules Governing Qualified MAF Physicians.  The Employment History and Social and Community Activity of Retired NFL Football Player forms are available to help Retired NFL Football Players and their informants provide information required under Rules 15 and 16 of the Rules Governing Qualified MAF Physicians.

## IX.   SPECIAL MASTERS

32.   ***Our Work with the Special Masters.***   Since Status Report No. 5, we had seven more regularly scheduled calls to discuss policy and operational issues, and have held 77 such calls with the Special Masters to date.   We have many other calls and exchange countless emails with them to address issues as they arise.   The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

33.   ***Program Rules.***   On May 31, 2019, we updated seven sets of Rules to change "Co-Lead Class Counsel" references to "Class Counsel" pursuant to the Court's May 24, 2019 Order terminating its previous Class Counsel, Co-Lead Class Counsel and Subclass Counsel appointments and reappointing Christopher A. Seeger as Class Counsel (Document 10624).[27] On August 8, 2019, we also posted a revised set of the Rules Governing Qualified MAF Physicians, which clarified in Rule 10(c) that prior neuropsychological testing by Qualified BAP Providers must have been performed in the BAP.   All nine sets of Rules are available on the Settlement Website (under "Documents," click "Governing Rules") and on the online portals of law firms, lawyers and *pro se* Settlement Class Members.

34.   ***Published Decisions.***   Since Status Report No. 5, the Special Masters did not issue any new decisions they designated for publication.   We post all such rulings to the Settlement Website (under "Documents," click "Special Master" below "Published Decisions"). The Special Masters have so far issued five published Monetary Award appeal decisions and seven Audit decisions.

---

[27] These include the (1) Rules Governing Statute of Limitations Proceedings, (2) Rules Governing Appeals of Claim Determinations, (3) Rules Governing Appeals of Player Challenges to Derivative Claimants, (4) Rules Governing the Audit of Claims, (5) Rules Governing Assignment of Claims, (6) Rules Governing Qualified MAF Physicians and (7) Rules Governing Registration Determinations and Appeals.

### X.   PROCEDURES AND FREQUENTLY ASKED QUESTIONS

35.   ***Coordination with the Parties.***   We conducted seven more weekly policy and operational issue calls with the Parties after Status Report No. 5 and have held 135 such calls in this Program since April 19, 2016.  We also have other calls, meetings and emails with the Parties on particular interpretation or operational issues that arise.  Where we do not have consensus among the Parties on an issue, we consult the Special Masters to determine the best practices approach, while still honoring the terms of the Settlement Agreement.

36.   ***Frequently Asked Questions.***   Since Status Report No. 5, we added FAQ 93 ("What kinds of communications may I have with the Qualified MAF Physician?").  We also revised these six FAQs already on the Settlement Website, mostly to clarify existing content:

   (a) FAQ 26 ("If I receive benefits under an NFL disability plan (such as the 88 Plan), Social Security, or any other disability plan, do I automatically qualify for a Monetary Award in the Settlement Program?"), to make it clearer that receipt of disability benefits does not automatically lead to eligibility for a Monetary Award;

   (b) FAQ 92 ("Do I need to tell the Qualified MAF Physician about my work and other activities?"), to refer to a new Employment History and Social and Community Activity of Retired NFL Football Player form for use by knowledgeable informants;

   (c) FAQ 94 ("Is there any limit on which neuropsychologist the Qualified MAF Physician may refer me to for neuropsychological testing?"), to clarify which neuropsychologists may perform the testing;

   (d) FAQ 108 ("What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made outside the BAP for living Retired NFL Football Players?"), to clarify which neuropsychologists may perform the testing and what past neuropsychological testing may be used to measure impairment;

   (e) FAQ 182 ("Who is Class Counsel?"), based on the Court's May 24, 2019 Order terminating its earlier Class Counsel, Co-Lead Class Counsel and Subclass Counsel appointments and reappointing Christopher A. Seeger as Class Counsel (Document 10624);[28] and

---

[28] We also updated "Co-Lead Class Counsel" references to "Class Counsel" throughout other FAQs, as appropriate.

(f) [FAQ 316](#) ("Can a Settlement Class Member assign rights to receive his or her Monetary Award or Derivative Claimant Award, or a portion of the Award, to a third party?"), to address the Third Circuit's April 26, 2019 Opinion concerning assignments (Document 003113222504).

There now are 351 FAQs in 15 categories.  "FAQs" is one of the options in the green menu bar on the Settlement Website.  These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program.  The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs.  Note that when we add new FAQs, we place them within the existing set where it makes the most sense.  This means that the numbering of FAQs within the set may change from time to time.

## XI.   **REGISTRATION**

37.   *Registration Submissions.*

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover Registration.  Table 19 here shows changes in the number of timely Registration submissions since our Status Report No. 5:

| Table 19 | TIMELY REGISTRATION SUBMISSIONS | | | |
|---|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 5/13/19** | **AS OF 8/19/19** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,925 | 15,921 | -4 |
| 2. | Representative Claimants | 1,312 | 1,318 | +6 |
| 3. | Derivative Claimants | 3,300 | 3,304 | +4 |
| 4. | **Totals** | **20,537** | **20,543** | **+6** |

The number of Retired NFL Football Players (Row 1) went down by four from Status Report No. 5 because they were replaced by Representative Claimants.  Of the 20,543 who we issued Registration notices to, we were able to confirm that 19,385 of them are Settlement Class Members under the Settlement Agreement, of whom 12,833 are Retired NFL Football

Players eligible to participate in the BAP.  The other 1,158 persons are not Settlement Class

Members under the Settlement Agreement because of one or more of these reasons:  (1) they

were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined

in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not

provide us with the information or support required by the Settlement Agreement to register,

after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a

Derivative Claimant but did not have a relationship with the Retired NFL Football Player by

which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August

7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the

Settlement Agreement or can otherwise be accepted under the Rules Governing Registration

Determinations and Appeals.  We have made determinations on 276 such Registrations and

found that 148 (54%) of them presented good reasons to be allowed to register after August

7, 2017.  Table 20 shows the change in these numbers since Status Report No. 5:

| Table 20 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | STATUS | AS OF 5/13/19 | AS OF 8/19/19 | CHANGE |
| 1. | Accepted as Timely | 143 | 148 | +5[29] |
| 2. | Not Accepted as Timely | 122 | 128 | +6 |
| 3. | Totals | 265 | 276 | +11 |

(c) Settlement Class Members who disagree with our Registration determinations may

object to them by sending us a challenge.  The NFL Parties also may challenge our timeliness

---

[29] Of these five, one was a Retired NFL Football Player whose request to revoke his Opt Out was approved by the
Parties and Court, and four were Derivative Claimants who qualified for a good cause exception under Section
4.2(c)(i) because the subject Retired NFL Football Player timely registered and the Derivative Claimants sought to
register within 30 days of that Retired NFL Football Player's submission of a Claim Package.

decisions.  We have received 375 challenges, which is two more than we reported in Status

Report No. 5.  Table 21 explains these challenges and what happened to them:

| Table 21 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 244 | Settlement Class Member | 76 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 21 | Settlement Class Member | 5 | 16 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | Totals | 375 | | 149 | 226 |

Those who are not successful in challenging Registration determinations to us may appeal

our decision to the Special Masters.  Table 22 shows the appeals thus far and the Special

Masters' rulings on them:

| Table 22 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO APPEALED | DECISION UPHELD | DECISION OVERTURNED |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | $2^{30}$ |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 5 | Settlement Class Member | 4 | 1 |
| 5. | Totals | 35 | | 32 | 3 |

38.     ***Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.***  The Special Masters have approved 404 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants.  This is seven new Representative Claimant approvals since Status Report No. 5.  There have been no new Derivative Claimant Representatives since Status Report No. 5.

## XII.   OTHER FUNCTIONS

39.     ***Reporting.***  On August 12, 2019, we added to Section 8 of the Summary Report a new row (Row 2) to show the number of claims on hold because the Qualified MAF Physician needs to provide a deviation explanation pursuant to Rule 20 of the Rules Governing Qualified MAF Physicians.  The Summary Report is posted to the Reports and Statistics page on the Settlement Website

---

[30] These two were the result of the 53-Man Roster decision issued on December 5, 2017 (Document 9513).

(https://www.nflconcussionsettlement.com/Reports_Statistics.aspx), which contains a Guide to Summary Report that we also updated to reflect the change to Section 8.

## XIII.   CONCLUSION

**40.**     *General Status.*   We have 184,931 documents (16,007 gigabytes, or 16 terabytes of data), including notices we have issued, stored on Settlement Class Members, which is 5,617 more than when we filed Status Report No. 5.  We have issued 36,352 notices (330 more since Status Report No. 5) of various kinds (Registration, claims, appeals, Audit, etc.) to 20,960 different persons since March 23, 2017, and developed over 100 different types of notices and forms for use in the Program.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By:    /s/ Orran L. Brown, Sr.
        Orran L. Brown, Sr.
        Virginia State Bar No.:  25832
        BrownGreer PLC
        250 Rocketts Way
        Richmond, Virginia  23231
        Telephone:  (804) 521-7201
        Facsimile:  (804) 521-7299
        Email:  obrown@browngreer.com