**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

**CLAIMS ADMINISTRATOR STATUS REPORT NO. 7**

## I.      INTRODUCTION

1.      ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 7 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 6 filed on August 30, 2019 (Document 10826).  Our earlier Status Reports are posted to the Settlement Website (under "Documents," click "Status Reports").  We do not repeat here what we covered in them.  All numbers and other information in this Status Report No. 7 are as of December 2, 2019.  We will cover developments after that date in future reports.

## II.      MONETARY AWARD CLAIMS

2.      ***Total Claims Received.***  Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted.  We have received 69 new Monetary Award claims since Status Report No. 6, bringing the total to 2,933 Monetary Award

Claim Packages from Retired NFL Football Players and Representative Claimants (16.3% of the 16,138 Retired NFL Football Players and Representative Claimants who received favorable registration determinations and are eligible to submit claims).[1]  Four of these 2,933 claims were denied as untimely.[2]  We have received about five new claims a week since Status Report No. 6 in August 2019.  Of the 2,933 Monetary Award claims submitted, 1,972 (67%) rest on pre-Effective Date diagnoses, while 718 (25%) are for post-Effective Date diagnoses, of which 179 (25% of the 718) were made in the Baseline Assessment Program ("BAP") and 539 (75% of the 718) were made by Qualified MAF Physicians.[3]  The other 243 claims did not tell us what diagnosis date they assert.  Table 1 compares these numbers to those in Status Report No. 6:

| Table 1 | QUALIFYING DIAGNOSIS DATES | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **%** | | |
| | | AS OF 8/19/19 | AS OF 12/2/19 | CHANGE | AS OF 8/19/19 | AS OF 12/2/19 | CHANGE |
| 1. | Pre-Effective Date | 1,965 | 1,972 | +7[4] | 69% | 67% | -2% |
| 2. | Post-Effective Date | 657 | 718 | +61 | 23% | 25% | +2% |
| | *(a) BAP* | *152* | *179* | *+27* | *5%* | *6%* | *+1%* |
| | *(b) MAF Physician* | *505* | *539* | *+34* | *18%* | *19%* | *+1%* |
| 3. | No Date Asserted | 242 | 243 | +1 | 8% | 8% | 0% |
| **4.** | **Totals** | **2,864** | **2,933** | **+69** | **100%** | | |

[1] Of these Monetary Award claims, 554 (19%) have at least one associated Derivative Claimant who has registered and 2,379 (81%) have no registered Derivative Claimants.  Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible); 2,633 of these Settlement Class Members submitted the 2,933 claims.  Additionally, 51 Claim Packages are from Settlement Class Members credited with Eligible Seasons from the World League of American Football ("WLAF") or NFL Europe, of which 34 are in our review process (*i.e.*, they have not been denied or withdrawn and are not in Audit) with Qualifying Diagnoses that allow us to estimate a total potential claim value of $7,269,569.74 attributable to Eligible Seasons from the WLAF or NFL Europe.

[2] We reviewed another 14 claims for potential untimeliness, of which we accepted 12 as timely and two because they showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

[3] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award.  The BAP Administrator's status reports explain more about BAP diagnoses.

[4] Two of these seven claims were submitted after the February 6, 2019 Claim Package submission deadline but were accepted under the substantial hardship exception set forth in Section 8.3(a)(i) of the Settlement Agreement.  The other five claims were part of the "No Date Asserted" group (Row 3 of Table 1) in Status Report No. 6 because we did not yet know the date of diagnosis being claimed.  After receiving responses to our notices and additional review, we were able to determine that the five claims were for pre-Effective Date diagnoses.

Table 2 shows by diagnosis date how many claims we have for each type of Qualifying Diagnosis:

| Table 2 | CLAIMS BY QUALIFYING DIAGNOSIS TYPE AND DATE | | |
|---|---|---|---|
| | DIAGNOSIS | PRE-EFFECTIVE DATE | POST-EFFECTIVE DATE | |
| | | | MAF | BAP |
| 1. | Death with CTE | 124 | N/A | N/A |
| 2. | ALS | 51 | 5 | |
| 3. | Alzheimer's Disease | 421 | 69 | |
| 4. | Parkinson's Disease | 138 | 29 | |
| 5. | Level 2 | 507 | 177 | 65 |
| 6. | Level 1.5 | 731 | 258 | 109 |

We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the Summary Report on the Settlement Website.  We also show the current status of all Monetary Award claims based on the last notice or action taken in Section 8 of the Summary Report on the Settlement Website.  There are 17 claims (<1% of 2,933) in our review process after an initial Claim Package submission or a response to a notice requesting additional information and/or documents (see Row 1 in Section 8 of the Summary Report).

      3.     *Monetary Awards and Payments.*

     (a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website.  We have issued Notices of Monetary Award for 1,025 claims totaling $714,132,721.[5]  We surpassed 1,000 such Notices as of October 28, 2019.  We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has

---

[5] The amount of these 1,025 Notices of Monetary Award includes the 1% of Awards allocated to eligible Derivative Claimants.  See Paragraph 21 of this Status Report.  Seven of these Notices of Monetary Award included Eligible Seasons credit for WLAF or NFL Europe, totaling $1,066,534.58 in additional Monetary Award value.

passed with no appeal) and that are not in Audit.  Of the 1,025 claims with Notices of

Monetary Award, 968 reached the point at which we can request funding from the NFL

Parties, which have deposited $650,813,157 into the Monetary Award Fund for 937 claims

and not yet funded 31 claims because they are within the funding deadline for the November

Funding Request.[6]  Of the 937 Monetary Award claims for which the NFL Parties had

deposited funds, the Program paid 921 claims for a total of $611,945,878.[7]  The remaining 16

funded claims were not yet ready for payment when we submitted the most recent

Disbursement Report; some have holds preventing payment, some do not have a submitted

Payment Election Form or SWS-5, and some have holdbacks for potential Liens which,

together with the 5% deduction for the Common Benefit Fund, exceeded the gross award

amount.  For the 921 Retired NFL Football Players and Representative Claimants who have

been paid, the Trustee sent $32,673,496 (5% of those Monetary Awards), to the Attorneys'

Fees Qualified Settlement Fund, in accordance with the Court's June 27, 2018 Order

Regarding the Common Benefit Fund (Document 10104).  Finally, we are required to

withhold money for unresolved Liens and for third-party funders that may accept rescission

of prohibited assignments.  Table 3 shows the distribution of the $611,945,878 paid by the

Settlement Program and compares the totals to those reported in Status Report No. 6:

---

[6] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.
[7] Six of these paid claims included Eligible Seasons credit for WLAF or NFL Europe, totaling $1,003,348.88 in additional payments.

| Table 3 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | **PAID TO** | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $520,222,917 | $593,236,610 | +$73,013,693 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $2,908,987 | $3,209,839 | +$300,852 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $5,980,569 | $8,067,554 | +$2,086,985 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $5,158,341 | $7,431,876 | +$2,273,535 |
| 5. | **Totals** | **$534,270,814** | **$611,945,878** | **+$77,675,064** |

(b) Table 4 shows the changes in figures for payments and claims with Notices of Monetary Award since Status Report No. 6:

| Table 4 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 6 | | | | | |
|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **AMOUNT** | | |
| | | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** |
| 1. | Notice of Monetary Award Issued | 956 | 1,025 | +69 | $690,235,675 | $714,132,721 | +$23,897,046 |
| 2. | Paid | 771 | 921 | +150 | $534,270,814 | $611,945,878 | +$77,675,064 |

(c) Table 5 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:[8]

---

[8] Section 8 of the Summary Report on the Settlement Website shows where claims that have not received a Notice of Monetary Award or been paid stand in the process.

| Table 5 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS | | | | |
|---|---|---|---|---|---|
| | DIAGNOSIS | CLAIMS SUBMITTED | NOTICE OF MONETARY AWARD | | PAID | |
| | | | HOW MANY | % | HOW MANY | % |
| 1. | Death with CTE | 124 | 80 | 65% | 79 | 64% |
| 2. | ALS | 56 | 39 | 70% | 38 | 68% |
| 3. | Alzheimer's Disease | 490 | 315 | 64% | 293 | 60% |
| 4. | Parkinson's Disease | 167 | 137 | 82% | 128 | 77% |
| 5. | Level 2 | 749 | 160 | 21% | 130 | 17% |
| 6. | Level 1.5 | 1,098 | 294 | 27% | 253 | 23% |

Of the 1,025 claims with Notices of Monetary Award, 186 (18%) have been appealed (131 by the NFL Parties and 55 by the Settlement Class Member).  This is 22 more appeals (10 by the NFL Parties and 12 by Settlement Class Members) than we described in Status Report No. 6.  We show the status of appealed Monetary Award claims in Section 9 of the Summary Report on the Settlement Website.

**4.**     ***Monetary Award Claims Reviewed by the AAP.***

(a) There are 38 claims in or still requiring Appeals Advisory Panel ("AAP") review, which is 78 fewer claims than the 116 we reported in Status Report No. 6.  Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel Consultants ("AAPC"), as highlighted in sub-paragraph (b) below.  The AAP has completed reviews on 856 pre-Effective Date diagnosis Monetary Award claims, approving 484 (57%) of those claims.[9]  Under FAQ 147 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe

---

[9] Broken down by Qualifying Diagnosis, the AAP members approved 98% of Death with CTE claims, 95% of ALS claims, 88% of Alzheimer's claims, 97% of Parkinson's claims, 29% of Level 2 claims and 34% of Level 1.5 claims.

medically or with a lower Award amount under the Monetary Award Grid) on 87 claims (an increase of 25 since Status Report No. 6).  Under Rule 27 of the Rules Governing Qualified MAF Physicians, the AAP has reviewed 81 Monetary Award claims for diagnoses made by terminated Qualified MAF Physicians, approving 25 (31%) of those claims.[10]

(b) We have assigned 608 claims (an increase of 19 since Status Report No. 6) to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing supporting an Alzheimer's Disease diagnosis.  The AAPC has completed 606 reviews (99.7%) and provided their assessments to the AAP.  An AAPC member is reviewing the other pending claims.

**5.**     *Notices for Missing Materials.*  We have sent one or more notices requesting additional documents or information on 1,964 Monetary Award claims (44 more since Status Report No. 6), as shown in Table 6:

| Table 6 | NOTICES FOR MISSING MATERIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[11] | TOTAL |
| 1. | Total Submitted | 124 | 56 | 490 | 167 | 749 | 1,098 | 249 | 2,933 |
| 2. | Notice Issued | 48 | 28 | 288 | 91 | 509 | 777 | 223 | 1,964 |
| 3. | % Missing Materials | 39% | 50% | 59% | 54% | 68% | 71% | 90% | 67% |

---

[10] This figure excludes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award.  At our request, the AAP has reviewed 54 claims to verify the sufficiency of the claimed Qualifying Diagnosis.

[11] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.  We process and pay a person for only one Qualifying Diagnosis per claim submission.  All these claims by definition are incomplete because we need to know which Qualifying Diagnosis should be used.  We soon will issue notices on the 26 claims that had not yet received one as of December 2, 2019.

So far, 85% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice.  Settlement Class Members take an average of about 60 days to respond.  We generally receive up to five responses to these notices each week and review each reply to determine if it cures the problem.  Of those who responded, 35% cured the problem.  Section 6 of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

   **6.**      ***Statute of Limitations Matters.***  We received 135 Claim Packages from Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006.[12]  The Rules Governing Statute of Limitations Proceedings explain how the Special Masters make determinations as to whether such claims are barred by statutes of limitations, as specified in Section 6.2(b) of the Settlement Agreement.  Statute of Limitations Rule 7 requires that a Claim Package be complete before a statute of limitations proceeding may begin.  Of the 135 claims we received:  (a) 71 are complete and assert a potentially compensable Qualifying Diagnosis if the claim is not time-barred under Settlement Agreement Section 6.2(b); (b) one was withdrawn; and (c) 63 have been denied for failing to cure deficiencies or for not asserting a compensable Qualifying Diagnosis.[13]  Table 7 summarizes the changes to these numbers since Status Report No. 6:

---

[12] We received Registration Forms from 370 Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006, but 134 of them did not properly register because of uncured incompleteness reasons or the player was not a Settlement Class Member because he did not play NFL Football as required by the Settlement Agreement.  Of the 236 Representative Claimants who successfully registered, 101 (43%) did not submit a Claim Package.

[13] The value of the 71 complete and potentially compensable claims is $63,570,292.

| Table 7 | STATUS OF CLAIMS REQUIRING STATUTE OF LIMITATIONS ANALYSIS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % | | |
| | | AS OF 8/19/19 | AS OF 12/2/19 | CHANGE | AS OF 8/19/19 | AS OF 12/2/19 | CHANGE |
| 1. | Complete - Potentially Compensable Qualifying Diagnosis | 72 | 71 | -1[14] | 53% | 53% | 0% |
| 2. | Claim Package Withdrawn | 0 | 1 | +1 | 0% | <1% | 0% |
| 3. | Denied – Deficient or No Compensable Qualifying Diagnosis | 63 | 63 | 0 | 47% | 47% | 0% |
| 4. | Totals | 135 | 135 | 0 | 100% | | |

The Special Masters will not rule on these until all claims presenting this issue have been fully briefed, to permit all affected Representative Claimants to be heard before any ruling and allow for the consideration of all arguments in a uniform and efficient manner.  The last Opening Brief previously was due on October 15, 2019, but the Special Masters extended that deadline to December 6, 2019, because counsel for the Representative Claimant was evacuated for the wildfires in California.  Barring any further deadline extensions, the date for the conclusion of the briefing process under Statute of Limitations Rules 16 through 21 will be January 25, 2020.

     **7.** *Monetary Award Denials*.  There have been 915 denials of Monetary Award claims for reasons other than an Audit (104 more since Status Report No. 6), as shown in Table 8:[15]

---

[14] The number of complete claims went down because one was withdrawn, as noted in Row 2.
[15] We discuss Audit denials in Paragraph 17 of this Status Report.

| Table 8 | | MONETARY AWARD DENIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTALS |
| 1. | Total Submitted | 124 | 56 | 490 | 167 | 749 | 1,098 | 249 | 2,933 |
| 2. | Denied | 41 | 3 | 72 | 11 | 194 | 382 | 212 | 915 |
| 3. | % Denied | 33% | 5% | 15% | 7% | 26% | 35% | 85% | 31% |

Sections 6 and 10 of the Summary Report on the Settlement Website show these denials and the reasons for them.  Overall, the AAP found 359 (39%) of these claims did not reflect a valid Qualifying Diagnosis.  When an AAP member denies a claim, we include in the notice comments from that AAP member explaining why.  When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents.  Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam.  Settlement Class Members have appealed 277 (30%) of the 915 denials.

### III.    SUPPLEMENTAL MONETARY AWARD CLAIMS

**8.    *Total Supplemental Monetary Award Claims Received*.**  A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis.  The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid.  We have received claims from four Retired NFL Football Players and one Representative Claimant seeking

Supplemental Monetary Awards, four for Qualifying Diagnoses of Alzheimer's Disease and one for a Level 2 Neurocognitive Impairment diagnosis.

        **9.**    ***Supplemental Monetary Awards and Payments.***  A Supplemental Monetary Award is the difference between the Monetary Award Grid value of the new Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis.  We issued four Notices of Supplemental Monetary Award to eligible Retired NFL Football Players.[16]  The combined Monetary Award Grid value of these four Supplemental Monetary Awards was $1,432,832, but after subtracting the prior Monetary Award values, totaled $831,028, as detailed below in Table 9:

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | **SUPPLEMENTAL CLAIM** | | **PREVIOUSLY PAID CLAIM** | | **SUPPLEMENTAL MONETARY AWARD** |
| | **QUALIFYING DIAGNOSIS** | **HOW MUCH** | **QUALIFYING DIAGNOSIS** | **HOW MUCH** | |
| 1. | Alzheimer's Disease | $187,217 | Level 1.5 | $93,904 | $93,313 |
| 2. | Alzheimer's Disease | $713,504 | Level 1.5 | $255,175 | $458,329 |
| 3. | Level 2 | $215,923 | Level 1.5 | $153,105 | $62,818 |
| 4. | Alzheimer's Disease | $316,188 | Level 1.5 | $99,620 | $216,568 |
| **5.** | **Totals** | **$1,432,832** | | **$601,804** | **$831,028** |

The Program has paid one Retired NFL Football Player $320,830 for his Supplemental Monetary Award.

### IV.    QUALIFIED MAF PHYSICIANS

        **10.**    ***Maintaining the MAF Network.***

    (a) Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website.  There are 109 Qualified MAF Physicians on the website now, representing 36 of the 53 target cities closest to where the

---

[16] The fifth claim for a Supplemental Monetary Award was submitted by a Representative Claimant on November 26, 2019, and is still under review.

majority of living Retired NFL Football Players reside.  We hope to add another 22 approved Qualified MAF Physicians as we confirm their participation and/or contract with them.  Table 10 shows the changes in these numbers since Status Report No. 6:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | DATA POINT | AS OF 8/19/19 | AS OF 12/2/19 | CHANGE |
| 1. | Approved Physician – On Posted List | 115 | 109 | -6 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 37 | 36 | -1 |
| 3. | Approved Physician – Not Yet Posted | 15 | 22 | +7 |

The Parties approved 11 new Qualified MAF Physicians since Status Report No. 6.[17]  From those 11, we secured a signed contract from one and added him to the posted list, and we are working with the other 10 to get signed contracts in place so we can add them too.  Although we added two Qualified MAF Physicians since Status Report No. 6, the total number of approved physicians on the posted list (Row 1 of Table 10) went down by six because we removed eight physicians.  Of the eight physicians we removed, three retired, three were temporarily removed because they changed practices, one was terminated and one withdrew from the MAF Network.[18]

(b) We continue to identify and contact potential new providers, collect applications, verify credentials and submit applicants to the Parties for approval, in conjunction with the BAP Administrator.  From the 66 persons who expressed interest in the Network and gave us their contact information at the May 2019 American Academy of Neurology ("AAN") Annual Meeting in Philadelphia, we have received four applications, two which the Parties approved, one which is under review by the Parties for potential approval, and one which the Parties did not

---

[17] The "Parties" are the parties to the Settlement Agreement, Class Counsel and the NFL Parties.  Our contacts with Class Counsel are at Seeger Weiss LLP.  We work with counsel for the NFL Parties at Paul, Weiss, Rifkind, Wharton & Garrison LLP.
[18] We hope to add the three who were temporarily removed back to the posted list after they are situated in their new practices and we have the necessary contracts in place.  They are counted in Row 3 of Table 10.

approve.  Of all these AAN leads, we are still actively pursuing three physicians and in approximately six months will revisit 24 physicians who told us they were not yet ready to join the Network.[19]  We have another 294 physicians on our radar, 21 whom the Parties are considering whether to approve as Qualified MAF Physicians, three for whom we are preparing credentials for submission to the Parties, 113 with whom we are engaged in initial and follow-up communications to determine interest and 157 who we have identified as possibly having appropriate qualifications but who we need to research more fully before contacting.  Although overall coverage has not been a problem, we constantly push hard to add new physicians to the MAF Network and to keep the ones we have.

   **11.**   *150-Mile Rule.*

   (a) Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired NFL Football Player be examined by a Qualified MAF Physician whose office is within 150 miles of his primary residence.[20]  We can make exceptions to this 150-Mile Rule if the exception is requested prior to the appointment.  We have received 32 requests for exceptions to the 150-Mile Rule, of which we granted 21 (66%) and denied 11 (34%).  Table 11 shows the changes since Status Report No. 6:

| Table 11 | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **%** | | |
| | | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** |
| 1. | Granted | 11 | 21 | +10 | 79% | 66% | -13% |
| 2. | Denied | 3 | 11 | +8 | 21% | 34% | +13% |
| 3. | **Totals** | **14** | **32** | **+18** | **100%** | | |

---

[19] We have stopped contacting the others because they said they were not interested in participating.
[20] This requirement applies only to appointments made after April 11, 2019.  Appointments made before April 11, 2019, do not need to be rescheduled with a different Qualified MAF Physician.

For each denied request, the Retired NFL Football Player had at least one Qualified MAF Physician within 150 miles and did not provide a reasonable explanation for wanting to see a Qualified MAF Physician further away.

(b) The 150-Mile Rule is a flexible rule with broad exceptions.  Of the living Retired NFL Football Players registered in the Program, 91% have a Qualified MAF Physician within 150 miles of their primary residence.  We work with those who do not to help them schedule appointments with physicians further away, when they tell us they are ready to be examined.

12. **50-Mile Rule.**  Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office. Like the 150-Mile Rule, we have discretion to grant exceptions.  Table 12 shows how many exception requests we have received and our decisions on those requests:

| Table 12 | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **%** | | |
| | | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** |
| 1. | Granted | 5 | 6 | +1 | 100% | 100% | 0% |
| 2. | Denied | 0 | 0 | 0 | 0% | 0% | 0% |
| 3. | **Totals** | **5** | **6** | **+1** | **100%** | | |

We have not denied any of these requests yet.  Of the 109 Qualified MAF Physicians who are actively scheduling appointments, 104 (95%) have an approved neuropsychologist within 50 miles of their office, and we will grant exceptions for the five who do not.

13. **Deviation Explanations for Level 1.5 and Level 2 Diagnoses.**  Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a

Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we determine more information is needed.  We delay processing these claims further until we receive the requested explanation.  We report on claims held in review for this reason in Section 8 (Row 2) of the Summary Report on the Settlement Website.  Since first reporting on this claim status in August 2019, we are at the lowest number of affected claims to date (32).  We expect the number of claims in this group will continue to go down over time as the Qualified MAF Physicians become more familiar with this requirement and include the necessary explanation in their initial submissions to us.

14.  *AAP Leadership Council.*  Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network.  We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses.  The AAP Leadership Council also assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the Settlement Agreement criteria.  Overall, our collaboration with the AAP Leadership Council has been successful, and the Qualified MAF Physicians have responded positively to receiving feedback from AAP members.

## V.   AUDIT

**15.**     *Closed Audits.*  We have concluded the Audit investigations of 634 Settlement

Class Members with Monetary Award claims.  Table 13 summarizes the reasons for these

closures and changes in the numbers since Status Report No. 6:

| Table 13 | | CLOSED AUDITS | | |
|---|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** |
| 1. | No Finding of Misrepresentation, Omission, or Concealment; or Special Masters Directed Result | 447 | 462 | +15 |
| 2. | Claim Withdrawn by Settlement Class Member | 166 | 172 | +6 |
| 3. | **Totals** | **613** | **634** | **+21** |

**16.**     *Reports of Adverse Finding in Audit.*  We have issued to the Parties 19

Reports of Adverse Finding in Audit (one more than we reported in Status Report No. 6)

affecting 566 Monetary Award claims, 18 of which were then referred to the Special

Masters.  The Parties are reviewing the one Audit Report not yet referred to the Special

Masters, which covers one Settlement Class Member.  The 18 Audit Reports referred to the

Special Masters concern four neurologists, 12 neuropsychologists, two law firms, six

individual Settlement Class Members and one claims preparation company.  The Special

Masters accepted our referrals on 11 of the 18 Audit Reports, which concern 11

neuropsychologists, four neurologists, one law firm, one claims preparation company and

one Settlement Class Member; rejected our referral on six Audit Reports covering one

neuropsychologist and five individual Settlement Class Members;[21] and are considering

whether to accept one referral, which concerns one law firm.

---

[21] Pursuant to Rule 34 of the Rules Governing the Audit of Claims, on May 15, 2019, the NFL Parties submitted an objection to the Special Masters' decisions on the five Audit Reports concerning individual Settlement Class

17.     *Audit Proceeding Decisions.*   Since Status Report No. 6, the Special Masters have issued findings in two additional Audit Proceedings that they designated for publication under Audit Rule 35.  In one, dated October 4, 2019, they directed that all claims from clients of a particular claims preparation company be placed in Audit as a matter of course (the company has objected to this decision under Audit Rule 34).[22]  In the other, dated October 28, 2019, they disqualified Dr. Mircea Morariu, Sr., a neurologist, from participating in the Program, which means no claims may be submitted in reliance on his diagnoses.[23] Copies of the Special Masters' past decisions are published on the Settlement Website (under "Documents" click "Special Master" below "Published Decisions").  We have denied 200 claims after Audit based on decisions by the Court or Special Masters.[24]  Sections 6 and 8 (Row 17) of the Summary Report on the Settlement Website show these denials.  A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors.

18.     *Ongoing Audit Investigations.*   We have other Audit investigations underway affecting 33 individual Monetary Award claims (eight more than the 25 we reported in Status Report No. 6).

---

Members.  On August 19, 2019, the Court issued a decision on that objection, finding that: (1) four Claim Packages contained material misrepresentations and/or omissions and must be denied; and (2) one Claim Package did not include a material misrepresentation or omission.

[22] We discussed this more fully in our October 2019 Settlement Class Member (https://www.nflconcussionsettlement.com/Docs/SCM_oct_2019.pdf) and lawyer (https://www.nflconcussionsettlement.com/Docs/lawyer_oct_2019.pdf) newsletters, which can be accessed in the Past Newsletters section on the Newsletters page of the Settlement Website.

[23] We discussed the Morariu decision in our November 2019 newsletters, which are posted on the Newsletters page of the Settlement Website (https://www.nflconcussionsettlement.com/Newsletters.aspx).

[24] Of the 200 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims).  Four claims were denied by the Court (see Footnote 21 of this Status Report).  The remaining denial is the one Dr. Pollock claim that the Special Masters directed us to deny based on the unique circumstances of a Retired NFL Football Player's medical examinations.

19.    ***Claims Investigated More than Once.***  Sometimes, claims on which we have concluded an Audit undergo another Audit if we later learn information that requires further investigation.  We notify Settlement Class Members when this happens.  We have audited 86 Monetary Award claims more than one time (six more than the 80 we reported in Status Report No. 6); the most times a Monetary Award claim has been audited to date is twice.

20.    ***Activities of the Special Investigator.***  The Special Masters have referred five investigations to the Special Investigator, concerning three law firms, one litigation funding company and one individual Settlement Class Member.  The Special Investigator has finished his work on the one Settlement Class Member, finding clear evidence of misstatements in an affidavit submitted as part of the Claim Package.  The other investigations by the Special Investigator involve 170 Monetary Award claims in Audit.  We show those claims in Section 8 (Row 13) of the Summary Report on the Settlement Website. HML Group provides supportive investigative services to the Special Investigator.

## VI.    <u>DERIVATIVE CLAIMANTS</u>

21.    ***Derivative Claims.***  We have received 583 Derivative Claim Packages, which is an increase of three since Status Report No. 6.  Table 14 shows the status of these claims:

| Table 14 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | **STATUS** | **HOW MANY** | **%** |
| 1. | Paid Derivative Claimant Award ($837,712) | 192 | 33% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($61,924) | 16 | 3% |
| 3. | Denied – Deceased Derivative Claimant | 4 | <1% |
| 4. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 5. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 6. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 3% |
| 7. | Challenge to Derivative Claimant – Pending Final Determination | 1 | <1% |
| 8. | Withdrawn | 8 | 1% |
| 9. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 333 | 57% |
| 10. | **Totals** | **583** | **100%** |

Since Status Report No. 6, 16 more Derivative Claimants were paid, and we issued 17 more Notices of Derivative Claimant Award.  We have so far paid 92% of the 208 Derivative Claimants who received Notices of Derivative Claimant Award; of the 16 eligible Derivative Claimants who have not yet been paid, 12 are in the payment process.  We have not received an objection from any of the 158 Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

22.    *Additional Derivative Claimant Details*.  We have received challenges from 28 Retired NFL Football Players (or their Representative Claimants) to 40 Derivative Claimants (no change since Status Report No. 6); 18 (45%) of those 40 challenged Derivative Claimants never submitted a timely Derivative Claim Package, making them ineligible for a Derivative Claimant Award.  We issued a Notice of Derivative Claim Package Submission Deadline to 433 registered Derivative Claimants.  Table 15 summarizes their claim submission statuses and the changes since Status Report No. 6:

| Table 15 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % | | |
| | | AS OF 8/19/19 | AS OF 12/2/19 | CHANGE | AS OF 8/19/19 | AS OF 12/2/19 | CHANGE |
| 1. | Claim Submitted | 148 | 150 | +2 | 36% | 35% | -1% |
| 2. | No Claim Submitted | 252 | 276 | +24 | 62% | 64% | +2% |
| 3. | Within 30-Day Deadline | 8 | 7 | -1 | 2% | 1% | -1% |
| 4. | **Totals** | **408** | **433** | **+25** | **100%** | | |

23.    *Supplemental Derivative Claimant Awards*.  Section G of the Overview of Derivative Claimant Process on the Settlement Website (https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf) explains how Supplemental Derivative Claimant Awards are handled.  As discussed in Paragraph 9 of this Status Report, we issued Notices of Supplemental Monetary Award to four Retired NFL Football Players.  None of those Supplemental Monetary Award Notices had a 1% offset for potential Derivative Claimant Awards.  Three Retired NFL Football Players had no registered Derivative Claimants associated with them, and the fourth Retired NFL Football Player had one registered Derivative Claimant, but she did not submit a Derivative Claim Package to share 1% of the Retired NFL Football Player's earlier Monetary Award and was not eligible for any portion of his Supplemental Monetary Award.  We have not yet issued any Notices of Supplemental Derivative Claimant Award.

## VII.    OTHER CLAIM PROCESSES

24.    *Handling of Attempted Assignments of Claims*.  On September 27, 2019, the Court issued a Notice (Document 10858) directing us to streamline the process regarding attempted assignments by Settlement Class Members of claims to third-party lenders.  Since then, we have suspended the process for handling such assignment questions under the Rules

Governing Assignment of Claims and have been working with the Court and the Special Masters on how these Rules will be modified.

25.     ***Petitions for Deviation from the Attorneys' Fee Cap.***  We have received seven Petitions for Deviation, one of which was withdrawn.  The Court resolved two of the remaining six Petitions for Deviation in conjunction with the Attorneys' Lien Dispute Process; the other four are pending final resolution.  This is unchanged from Status Report No. 6.

26.     ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a) Table 16 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 6:

| Table 16 | | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** |
| 1. | Attorneys' | 1,088[25] | 1,123[26] | +35 | 421 | 431 | +10 | 289 | 289 | 0 |
| 2. | Child Support | 344 | 344 | 0 | 47 | 48 | +1 | 21 | 21 | 0 |
| 3. | Judgment | 60 | 63 | +3 | 14 | 15 | +1 | 10 | 9 | -1 |
| 4. | Tax | 51 | 51 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| 5. | **Totals** | **1,543** | **1,581** | **+38** | **485** | **497** | **+12** | **320** | **319** | **-1** |

(b) Table 17 shows the status of Liens in the Attorneys' Liens dispute resolution process:

---

[25] These 1,088 Attorneys' Liens were asserted by 50 law firms.
[26] These 1,123 Attorneys' Liens were asserted by 50 law firms.

| Table 17 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[27] | | |
|---|---|---|---|
| PENDING | RESOLVED | | TOTAL |
| | BY AGREED WITHDRAWAL | BY COURT DETERMINATION | |
| 20 | 44 | 8 | 72 |

(c) Table 18 breaks down the Non-Medical Lien holdbacks by Lien type:

| Table 18 | NON-MEDICAL LIEN HOLDBACKS | | |
|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN HOLDBACKS |
| 1. | Attorneys' | 12 | $16,979,962 | $2,864,689.73 |
| 2. | Child Support | 1 | $1,456.20 | $1,409.68 |
| 3. | Judgment | 0 | $0 | $0 |
| 4. | Tax | 0 | $0 | $0 |
| 5. | Totals | 13 | $16,981,418.20 | $2,866,099.41 |

(d) Table 19 summarizes the Non-Medical Lien payments by Lien type:

| Table 19 | NON-MEDICAL LIEN PAYMENTS | | |
|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN PAYMENTS |
| 1. | Attorneys' | 50 | $66,677,929.18 | $4,714,536.17 |
| 2. | Child Support | 11 | $11,353,744 | $485,971.64 |
| 3. | Judgment | 4 | $5,719,786 | $2,860,553.18 |
| 4. | Tax | 1 | $33,282.80 | $6,492.65 |
| 5. | Totals | 66 | $83,784,741.98 | $8,067,553.64 |

## VIII.   COMMUNICATIONS CENTER FOR THE PROGRAM

**27.**   *Our Contact Activity.*  Since our contact center opened on February 6, 2017, we

have handled 75,220 total communications, including 48,308 calls made or received and 23,137

emails to us at our Claims Administrator email box.  Since Status Report No. 6, we handled

2,495 such total communications.  The most common topics of these communications have been

---

[27] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.

general Settlement Program information, the BAP, payments, representation changes and Claim Package status questions.

28.    *Law Firm Contacts.*  Our Law Firm Contacts are assigned to 543 different law firms or lawyers representing Settlement Class Members in the Program.  This is eight more law firms or lawyers than we reported in Status Report No. 6.  The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 27 above.

29.    *Newsletters.*  Since Status Report No. 6, we issued three more editions of our "Insights" newsletter (September, October and November 2019).  We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail.  We also post them to the Settlement Website (under "Documents" click "Newsletters").  We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters.

30.    *Settlement Program Website.*  We regularly update the Settlement Website to reflect progress and changes to the Program.  We have made these changes since Status Report No. 6:

(1) Added one new Court Order (Explanation and Order Regarding Multiple Audits, Document 10811, filed August 20, 2019) to the Court Orders and Opinions page at https://www.nflconcussionsettlement.com/Court_Orders_Opinions.aspx.

(2) Posted three new decisions the Court or Special Masters designated should be published.  The Court decision, dated August 20, 2019, relates to Qualifying Diagnosis dates and finds generally that a date of diagnosis could occur at some point before the date of the examination by the diagnosing physician, based on a diagnosing physician's sound clinical judgment and review of medical records and other information.[28]

(3) Posted a Report of the Special Masters (Document 10827, filed August 30, 2019), Claims Administrator Status Report No. 6 (Document 10826, filed August 30, 2019) and BAP Administrator Status Report 3rd Quarter 2019 (Document 10825, filed August 30, 2019) to the Status Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.

---

[28] The Special Master decisions are covered separately in Paragraphs 17 and 33 of this Status Report.

(4) Replaced three existing forms with new versions (Employment History and Social and Community Activity of Retired NFL Football Player (Form for Use by Retired Player); Employment History and Social and Community Activity of Retired NFL Football Player (Form for Use by Knowledgeable Informant); SWS-3 (Third Party Sworn Statement: Functional Impairment)) in the Monetary Awards and Supplemental Monetary Awards sections on the Claims Forms page at https://www.nflconcussionsettlement.com/Claims.aspx.[29]

(5) Updated the Summary Report on the Reports & Statistics page (https://www.nflconcussionsettlement.com/Reports_Statistics.aspx) to include a new row in Section 8 to show how many claims are under our review after being remanded by the Special Master on appeal (Row 3).[30]  The Guide to Summary Report includes a description of this new row.

(6) Posted a new Alert dated November 26, 2019, warning of a scam against Settlement Class Members (https://www.nflconcussionsettlement.com/Alerts.aspx).

Since Status Report No. 6, the Program's Home page has had 22,167 more unique visits, giving us 446,964 total unique visits, coming from 190 countries and all 50 of the United States.  The two most frequently downloaded documents since Status Report No. 6 in August 2019 were the Settlement Agreement (932 clicks) and Monetary Award Grid (457 clicks).

## IX.    SPECIAL MASTERS

**31.    *Our Work with the Special Masters*.**  Since Status Report No. 6, we had six more regularly scheduled calls to discuss policy and operational issues, and have held 83 such calls with the Special Masters to date.  We have many other calls and exchange countless emails with them to address issues as they arise.  The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

---

[29] The updates to these forms are intended to encourage the truthfulness and reliability of information provided by lawyers, Settlement Class Members and third parties to the Qualified BAP Providers and MAF Physicians evaluating and diagnosing Retired NFL Football Players.  We included articles about these changes in our November 2019 Settlement Class Member (https://www.nflconcussionsettlement.com/Docs/SCM_nov_2019.pdf) and lawyer (https://www.nflconcussionsettlement.com/Docs/lawyer_nov_2019.pdf) newsletters, which can be accessed on the Newsletters page of the Settlement Website.

[30] Rules 23 and 24 of the Rules Governing Appeals of Claim Determinations cover remands by the Special Master.

32.     ***Program Rules.***  Since Status Report No. 6, there were no changes to Rules

previously adopted in the Program.[31]  All nine sets of Rules are available on the Settlement

Website (under "Documents," click "Governing Rules") and on the online portals of law firms,

lawyers and *pro se* Settlement Class Members.

33.     ***Published Decisions.***  Since Status Report No. 6, the Special Masters issued two

new decisions they designated for publication.  We post all such rulings to the Settlement

Website (under "Documents," click "Special Master" below "Published Decisions").  Both of

these rulings were from Audit Proceedings.[32]  The Special Masters have so far issued five

published Monetary Award appeal decisions and nine Audit decisions (14 total such decisions).

## X.     <u>PROCEDURES AND FREQUENTLY ASKED QUESTIONS</u>

34.     ***Coordination with the Parties.***  We conducted four scheduled policy and

operational issue calls with the Parties after Status Report No. 6 and have held 139 such calls in

this Program since April 19, 2016.  We also have other calls, meetings and emails with the

Parties on particular interpretation or operational issues that arise.  Where we do not have

consensus among the Parties on an issue, we consult the Special Masters to determine the best

practices approach, while still honoring the terms of the Settlement Agreement.

35.     ***Frequently Asked Questions***.  Since Status Report No. 6, we added FAQ 113

("How is the SWS-3 (Third-Party Sworn Statement: Functional Impairment) different from

the Employment History and Social and Community Activity of Retired NFL Football Player

Forms?").  We also revised these four FAQs already on the Settlement Website:

---

[31] On December 3, 2019, we reposted the existing Rules Governing Assignment of Claims with a note explaining that the process described in the Rules is suspended while we work to design new streamlined rules, under the supervision of the District Court, in accordance with the District Court's Notice entered September 27, 2019 (Document 10858).
[32] We discuss the two Audit decisions in Paragraph 17 of this Status Report.

(a) FAQ 92 ("Do I need to tell the Qualified MAF Physician about my work and other activities?"), to include a reminder that reported employment and activities may be verified through interviews with employers and to explain that any person, including anyone working in a law office or in a claims preparation office, who helps a Retired NFL Football Player or Knowledgeable Informant complete a section in one of the Employment History and Social and Community Activity of Retired NFL Football Player forms about the Retired Player's employment, business, income sources, social, community, recreational or other activities outside the home must sign the form attesting that he or she accurately conveyed the statements of the Retired Player or Knowledgeable Informant;

(b) FAQ 93 ("What kinds of communications may I have with the Qualified MAF Physician?), to remind Retired NFL Football Players that Qualified MAF Physicians may send them for testing by a neuropsychologist and emphasize the importance of talking openly and honestly with the neuropsychologists and putting forth their best effort in the completion of neuropsychological testing;

(c) FAQ 94 ("Is there any limit on which neuropsychologist the Qualified MAF Physician may refer me to for neuropsychological testing?"), to note that it is very important that Retired NFL Football Players put forth their best effort in the completion of any neuropsychological tests; and

(d) FAQ 112 ("What must be included in a sworn statement corroborating a Retired NFL Football Player's functional impairment for a Level 1.5 or Level 2 claim?"), to clarify our rules for accepting homemade versions of the SWS-3 and to explain that any person, including anyone working in a law office or in a claims preparation office, who helps a Third Party complete Section III of the SWS-3 must sign the SWS-3 under penalty of perjury attesting that he or she accurately conveyed the statements of the Third Party.

There now are 352 FAQs in 15 categories. "FAQs" is one of the options in the green menu bar on the Settlement Website. These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program. The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs. Note that when we add new FAQs, we place them within the existing set where it makes the most sense. This means that the numbering of FAQs within the set may change from time to time.

## XI.   REGISTRATION

**36.   *Registration Submissions.***

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover

Registration.  Table 20 here shows changes in the number of timely Registration submissions

since our Status Report No. 6:

| Table 20 | TIMELY REGISTRATION SUBMISSIONS | | |
|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 8/19/19** | **AS OF 12/2/19** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,921 | 15,915 | -6 |
| 2. | Representative Claimants | 1,318 | 1,328 | +10 |
| 3. | Derivative Claimants | 3,304 | 3,305 | +1 |
| 4. | **Totals** | **20,543** | **20,548** | **+5** |

The number of Retired NFL Football Players (Row 1) went down by six from Status Report

No. 6 because they were replaced by Representative Claimants.  Of the 20,548 who we

issued Registration notices to, we were able to confirm that 19,388 of them are Settlement

Class Members under the Settlement Agreement, of whom 12,836 are Retired NFL Football

Players eligible to participate in the BAP.[33]  The other 1,160 persons have incomplete

registrations or are not Settlement Class Members under the Settlement Agreement because

of one or more of these reasons:  (1) they were on an Active Roster as of July 7, 2014; (2)

they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out

of the Settlement Program; (4) they did not provide us with the information or support

required by the Settlement Agreement to register, after several notices from us and up to 150

days to turn it in; or (5) they tried to register as a Derivative Claimant but did not have a

---

[33] Of all Retired NFL Football Players who registered themselves or through a Representative Claimant, 766 have at least a half-Eligible Season from WLAF or NFL Europe credit, equaling 435.5 total additional Eligible Seasons.  Of those 766, 670 were eligible for the BAP only because of their time in the WLAF or NFL Europe.

relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals.  We have made determinations on 281 such Registrations and found that 150 (53%) of them presented good reasons to be allowed to register after August 7, 2017.  Table 21 shows the change in these numbers since Status Report No. 6:

| Table 21 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | STATUS | AS OF 8/19/19 | AS OF 12/2/19 | CHANGE |
| 1. | Accepted | 148 | 150 | +2[34] |
| 2. | Not Accepted | 128 | 131 | +3 |
| 3. | Totals | 276 | 281 | +5 |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge.  The NFL Parties also may challenge our good cause exception decisions.  We have received 376 challenges, which is one more than we reported in Status Report No. 6.  Table 22 explains these challenges and what happened to them:

---

[34] Both of these were Derivative Claimants who qualified for a good cause exception under Section 4.2(c)(i) because the subject Retired NFL Football Player timely registered and the Derivative Claimants sought to register within 30 days of that Retired NFL Football Player's submission of a Claim Package.

| Table 22 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 244 | Settlement Class Member | 76 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 22 | Settlement Class Member | 5 | 17 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | Totals | 376 | | 149 | 227 |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters.  Table 23 shows the appeals thus far and the Special Masters' rulings on them:

| Table 23 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO APPEALED | DECISION UPHELD | DECISION OVERTURNED |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2[35] |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 6 | Settlement Class Member | 5 | 1 |
| 5. | Totals | 36 | | 33 | 3 |

---

[35] These two were the result of the 53-Man Roster decision issued on December 5, 2017 (Document 9513).

37.     ***Eligible Seasons from Europe***.  Retired NFL Football Players may receive credit for Half of an Eligible Season based on time spent in the WLAF, NFL Europe, and/or NFL Europa.  The "How to Calculate Eligible Seasons" work aid posted on the Reference Guides page of the Settlement Website shows how this works.  We have included footnotes, as applicable, in Paragraphs 2, 3 and 36 above to highlight how credit for Eligible Seasons from Europe has benefited Settlement Class Members.

38.     ***Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.***  The Special Masters have approved 410 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants.  This is six new Representative Claimant approvals since Status Report No. 6.  There have been no new Derivative Claimant Representatives since Status Report No. 6.

## XII.   CONCLUSION

39.     ***General Status.***  We have 189,307 documents (17,434 gigabytes, or 17.4 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 4,376 more than when we filed Status Report No. 6. We have issued 36,831 notices (479 more since Status Report No. 6) of various kinds (Registration, claims, appeals, Audit, etc.) to 20,967 different persons since March 23, 2017, and developed over 100 different types of notices and forms for use in the Program.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By:   /s/ Orran L. Brown, Sr.
     Orran L. Brown, Sr.
     Virginia State Bar No.:  25832
     BrownGreer PLC
     250 Rocketts Way
     Richmond, Virginia  23231
     Telephone:  (804) 521-7201
     Facsimile:  (804) 521-7299
     Email:  obrown@browngreer.com