UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323<br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>          Plaintiffs,<br><br>                    v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>          Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**CLASS COUNSEL'S MOTION FOR THE APPROVAL OF
EDUCATION FUND PROGRAMS AND MEMORANDUM IN SUPPORT**

Pursuant to Article XII of the Amended Settlement Agreement, Class Counsel respectfully submits its Motion for Approval of Education Fund Programs and memorandum in support thereof. The NFL Parties consent to the filing of this motion and memorandum.

**PRELIMINARY STATEMENT**

As the Court is aware, the Amended Settlement Agreement approved by the Court included three core benefits for eligible Retired Players: (i) a Monetary Award Fund to compensate all Retired NFL Football Players ("Retired Players") who develop Qualifying Diagnoses over the 65-year life of the Settlement Program (Amended Settlement Agreement, Section 6.10); (ii) a Baseline Assessment Program ("BAP") Fund to provide all BAP-eligible Retired Players with examinations to assess their cognitive deficits and impairments and provide certain treatment benefits to qualifying Retired Players (Amended Settlement Agreement, Article V); and (iii) an Education Fund to support medical research and education programs promoting safety and injury prevention with respect to football players, and programs to educate Retired Players regarding the NFL CBA Medical and Disability Benefits (Amended Settlement Agreement, Section 3.1(c)).

Together with the Monetary Award and Baseline Assessment Program Funds, a $10 million Education Fund was funded by the NFL Parties upon the Effective Date of the Settlement in accordance with Article XXIII of the Amended Settlement Agreement. Article XII provides additional information about the purposes of that fund:

> Section 12.1 - An Education Fund will be established to fund programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football, the education of Retired NFL Football Players regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players. The Court shall approve these education programs, with input from Co-Lead Class Counsel, Counsel for the NFL Parties and medical experts, as further set forth below. Co-Lead Class Counsel and Counsel for the NFL Parties will agree to a protocol through which Retired NFL Football Players will actively participate in such initiatives.
>
> Section 12.2 - Co-Lead Class Counsel, with input from Counsel for the NFL Parties, and with Court approval, will take all necessary steps to establish the Education Fund and establish procedures and controls to manage and account

for the disbursement of funds to the education projects and all other costs associated with the Education Fund. The costs and expenses to administer the Education Fund will be paid out of the Education Fund Amount.

Relatedly, consistent with Article XII's mandate that the Education Fund be used to fund programs ". . . promoting safety and injury prevention with respect to football players . . .", the Amended Settlement Agreement expressly contemplates that the medical information generated through Retired Players' BAP examinations will be made available for ". . . medical research into cognitive impairment and safety and injury prevention with respect to football players." (*See* Amended Settlement Agreement, Section 5.10(a).)

Class Counsel, Counsel for the NFL, and the Special Masters have spent considerable time and effort to identify appropriate programs that would best serve the purposes of the Education Fund. Class Counsel is pleased to advise the Court that, to date, the Parties have identified three such programs, as described in greater detail below.

Accordingly, Class Counsel moves the Court, pursuant to Article XII of the Amended Settlement Agreement, for an Order approving the Education Fund programs as proposed herein.

### I. The Korey Stringer Institute

#### A. Background

The Korey Stringer Institute ("KSI") is a non-profit organization dedicated to continuing the legacy of Korey Stringer, a Minnesota Vikings player who died from heat stroke during training camp in 2001. Founded in 2010 and located at the University of Connecticut, KSI has been recognized as an expert in the field of sports health and safety, and has significant experience managing large-scale safety-related programs, such as the one proposed in this motion.

B.     The innovATe Project

After researching KSI's background and programs, the Parties discussed KSI's Athletic Trainer program (also known as The innovATe Project) ("Project").  Over a five-year period, the Project, as proposed, will provide funding to 10 – 14 school districts currently without athletic trainers to hire and retain much-needed athletic trainers, a critical step in promoting safety and injury prevention for thousands of student athletes playing all sports, including football.  Notably, a recent study conducted by KSI examined all high school sport-related deaths from 2000-2013 and found that for 70% of the deaths, an athletic trainer was not onsite to triage the injured student-athletes. Not only will the Project help the selected school districts fill their dire need for athletic trainers, the Project will also require the athletic trainers to provide education, including on concussions and emergency preparedness, to the high school population to promote concussion awareness and concussion-management best practices.  Attached as Exhibit A is KSI's detailed description of the Project.  The Parties believe that The Project aligns with the Education Fund's mission ". . . to fund programs promoting safety and injury prevention with respect to football players, including safety-related initiatives in youth football . . ." (*See* Amended Settlement Agreement, Section 12.1.)

KSI anticipates that, with the proposed funds allocated to the Project, KSI will be able to provide athletic trainers to 10 – 14 school districts, serving between approximately 60,000 and 100,000 high school students (attending approximately 50 high schools).  These athletic trainers will work with student athletes across all sports, including football, to service the high schools' teams. KSI was involved in a similar athletic trainer program that, in its second year, led to the employment of athletic trainers at 75 high schools in Arizona, Oregon, Oklahoma, and Illinois.

As described in further detail in Exhibit A, the Project will include three critical features that will take advantage of KSI's experience in previous partnerships and are intended to encourage the subject school districts to build successful, self-sustaining athletic training programs at the selected schools:

  i. <u>Sports Medicine Partnerships</u> – KSI will work with the selected school districts to develop relationships/partnerships with local sports medicine clinics/hospitals/practices so that each grant application includes a financial commitment from one or more of those entities.  This will be a requirement for every successful applicant.  The goal is to coincide the phasing out of the limited grant money with the ramping up of committed funds from partner sources, thereby increasing the likelihood that the athletic trainer program will become self-sustaining in the district for years to come.

  ii. <u>Settlement Class Member Ambassadors</u> – Consistent with the Parties' and Court's desire that Retired Players be active participants in the initiatives funded by the Education Fund, and as contemplated by Section 12.1 of the Amended Settlement Agreement, each school district will identify a Retired Player who would be willing to serve as an ambassador to assist with promoting the necessity of proper athletic health care for secondary school athletes during the grant application process and the three-year life of the grant program.  In addition, KSI will create an advisory group for each selected school district, which will include at least one Retired Player. KSI believes that the involvement and visibility of Retired Players will be a substantial benefit in promoting the Project and procuring long-term funding for this important initiative.

  iii. <u>Athletic Training Education</u> – The athletic trainers hired by the selected school districts will be required to provide education and advocacy above and beyond normal job responsibilities, including concussion education and a KSI-led Continuing Education Unit course of preventing sudden death in sports.

<u>Approximate Costs/Parameters of Project</u>

As proposed, the total approximate cost of the Project will be $3 million, inclusive of the Program grants and management/administrative expenses.  The following is a breakdown of that total amount:

  i. <u>Program Grants</u>

Each selected school district will receive a total of $165,000 - $195,000 over a three-year period, broken down as follows:

   Year 1 $80,000 - $90,000;
   Year 2 $55,000 - $65,000: and
   Year 3 $30,000 - $40,000.

Assuming an average funding amount of $180,000 per school district, 12 school districts could be funded by the program for a total grant allotment of $2.16 million.

  ii. <u>Management and Administrative Expenses</u>

KSI will lead the administration of the Project to bring athletic trainers to under-resourced school districts.  Among other duties, KSI will undertake grant criteria development and procurement, program promotion, on-site collaboration to assist potential applicants to nurture local medical partnerships, grant review, grant distribution and ongoing engagement with the selected schools.  Exhibit A provides greater detail regarding KSI's role in the Project.

KSI's Project Management Fee will average approximately $110,000/year for five years starting at the inception of the Project, for a total of approximately $550,000. Administrative expenses to the University of Connecticut, which houses KSI, are 10% of the total project costs ($2.71 million) or $217,000.

Accordingly, Class Counsel, based on consultation with the Special Masters, the NFL Parties and KSI, seeks approval and authorization to proceed with The innovATe Project, as outlined in Exhibit A, in an amount not to exceed $3 million.

    C.    <u>Additional Funding in the Future</u>

If the Court approves the initial distribution of money from the Education Fund for the Project, Class Counsel, in consultation with the Special Masters and the NFL Parties, will monitor the performance of the Project during the initial five-year period and determine whether to recommend, and seek Court approval for, Education Fund funding for additional school districts in further support of the Project.

**II.**    **Establishment of Medical Information Research Database**

The Amended Settlement Agreement contemplates that the medical information generated through the Baseline Assessment Program (BAP) will be made available for medical research, subject to the consent of each Retired Player and consistent with HIPAA. Specifically, Section 5.10(a) states:

> All Retired NFL Football Players who participate in the BAP will be encouraged to provide their confidential medical records for use in medical research into cognitive impairment and safety and injury prevention with respect to football players. The provision of such medical records shall be subject to the reasonable informed consent of the Retired NFL Football Players, and in compliance with applicable law, including a HIPAA-compliant authorization form. Medical records and information used in medical research will be kept confidential.

To facilitate the availability and use of BAP information for medical research, the Claims Administrator, in consultation with Class Counsel and Counsel for the NFL Parties, developed a HIPAA-compliant authorization for BAP-eligible Retired Players to sign as part of the BAP process. That authorization includes a section titled "CONSENT TO PARTICIPATE IN RESEARCH," which provides a box for Retired Players to indicate their consent to have their medical information used for medical research. Attached as Exhibit B is the HIPAA-compliant authorization. To date, 66% of the Retired Players (approximately 5,000 out of 7,500) who have returned signed HIPAA authorizations have consented to the use of their medical information for research.

Class Counsel and Counsel for the NFL Parties have confirmed through consultation with their respective experts that the medical information gathered through the BAP presents significant opportunity for future medical research into cognitive impairment and safety and injury prevention with respect to football players. As the medical information generated through BAP examinations includes both symptomatic and healthy Retired Players (eligibility to participate in the BAP is only driven by the requirement that the Retired Player earned at least half an Eligible Season), Class Counsel is advised that such information would be of great interest to the scientific research community.

Through discussions with the BAP Administrator and the Claims Administrator, Class Counsel has assessed the nature and scope of available information, the format in which the information is available, and the structure or systems in which the medical records and related information are currently maintained. While demographic data (*e.g.*, age, seasons played, years of play) was generated and/or is maintained in an electronic form by the Claims Administrator for each Retired Player, much of the underlying medical information (*i.e.*, the neurology reports and

8

neuropsychology testing and reports) maintained by the BAP Administrator is organized by Retired Player, and is in PDF format—thus lacking clear uniformity in presentation and structure from player to player. Accordingly, the preparation of a research-ready medical information research database requires the assistance of others with expertise in such matters.

A. <u>Columbia University</u>

To facilitate the assembly of the available medical information in its varying forms into a research database, Class Counsel has consulted with members of the Department of Biostatistics of the Mailman School of Public Health at Columbia University. The Columbia University group at issue serves as a data coordinating center for clinical and observational studies in analogous settings. Discussions with the Columbia University group have centered on the extraction, normalization, and standardization of the data and information generated in the BAP that could be made accessible to qualified scientific researchers, upon application, with appropriate restrictions.[1]

As guided by the Columbia University biostatistics team, the creation and utilization of such a medical information research database will involve the following:

  i. The inventory and analysis of existing information, creation of abstraction forms, and the creation of a new secure database framework to store the data;

  ii. Abstraction of data for consenting BAP-examined Retired Players, and entry into the new database;

---

[1] Attached as Exhibit C is a proposal from the Data Management Unit in the Department of Biostatistics in Columbia University's School of Public Health providing a description and an estimate to complete the tasks necessary to establish a Medical Database containing the data generation through the BAP, and to make that data available for medical research.

9

      iii.    Creation of a tool, available publicly to researchers, that will provide information of the nature and extent of the data stored in the database, while maintaining the confidentiality of the data itself;

      iv.    Creation and implementation of a process for requesting data from the database, reviewing and ruling on requests, and creation and distribution of data sets to approved requesters; and

      v.    Creation of a schedule for abstraction and entry of data collected in the future.

  B.    <u>Approximate Costs to Establish and Maintain Medical Information Research Database for Years 1 - 5</u>

    1.  <u>Approximate Costs for Year 1</u>

Establishing and implementing the research database requires both technical and professional resources. Based on the following parameters, the total budget for the first year is estimated to be $230,000 - $240,000. The following is a breakdown of that total amount:

    a.    <u>Technical Services</u>

The Columbia Biostatistics group is experienced in the creation, management and utilization of medical information research databases, and has provided cost estimates for the creation and hosting of the subject database. There are necessarily some unknowns (the largest being the time required to abstract and enter the information from 5,000 Retired Players' BAP records) that may affect the technical costs. As of now, the estimated cost associated with Columbia's technical services as enumerated above, would be approximately $180,000 for the initial year. Going forward, there would be certain continuing technical fees associated with hosting the database, inputting new BAP data (as the number of Retired Players examined in the BAP exceeds 5,000), and the generation of datasets upon research requests, etc.

10

b.      Professional Services

Beyond the technical components of the project, the research database will require the services of medical professionals, particularly during set-up.  Primarily, the project may warrant a Principal Investigator, ideally someone at Columbia, who will serve as the administrative (and perhaps scientific) head of the project overseeing such matters, as well as the creation and operation of a Data Use and Research Committee to regulate the dissemination of data for approved research.  While members of the Data Use and Research Committee will receive fees for their work, we do not anticipate any fees for them in the first year.

Through conversations with Class Counsel's scientific consultant familiar with similar research endeavors, we estimate the cost for the Principal Investigator to be approximately $25,000 - $30,000 annually, starting in year one.  We also anticipate the need for a neuropsychologist and a neurologist consultant to structure and extract the neuropsychology and neurology data.  We estimate the cost for those medical professionals to be $25,000 – 30,000.  This is likely only a year-one cost.  Accordingly, we anticipate a total of $50,000-60,000 in professional fees in the first year, with $25,000-30,000 required each year thereafter for the Principal Investigator.

This estimated budget is necessarily preliminary, and will require adjustment as we gather additional data for use as part of the research database. Once funding is available, it is estimated that the process outlined above will require at least six months to a year before the Medical Information Research Database could be made available.

Class Counsel believes that the medical information captured in the program from consenting Retired Players will be of significant value to the scientific community on issues of cognitive impairment, and will be useful in promoting safety and injury prevention with respect to football players, and that the costs to make that data available to researchers are reasonable.

2. <u>Approximate Costs for Years 2 – 5</u>

The establishment of a Medical Information Research Database is the necessary first step to ensure that approved entities seeking to conduct research have access to the medical information generated through the BAP in the proper format. There will be future costs for technical services associated with the database, as well as compensation for the Principal Investigator and the Data Use and Research Committee, as detailed below:

a. <u>Technical Services for Years 2 – 5</u>

There will be certain continuing technical fees associated with hosting the database, inputting new BAP data (as more Retired Players are examined through the BAP and additional BAP data becomes available), and the generation and distribution of datasets to approved requestors, among other items. We are awaiting the BAP Administrator's estimate of the expected number of additional Retired Players (in excess of the current 5,000) who will ultimately be examined by the BAP and consent to their data being used for research purposes. For planning purposes, assuming that an additional 3,000 Retired Players consent to allow their BAP data to be included in the database in Years 2 - 5, the technical cost of inputting and maintaining the new data (assuming the same cost per player's data as in Year 1) will be approximately $90,000. There will also be technical costs related to the generation and distribution of datasets to approved requestors, for which Columbia will be compensated at a reasonable hourly rate.

In addition to the cost for Columbia's technical work described above, Columbia charges an annual "hosting" fee of $2,200.

Based on the above parameters, the cost for technical services for Years 2 – 5 is estimated to be approximately $100,000.

b.      Principal Investigator for Years 2 – 5

As noted above, we estimate that the compensation of the Principal Investigator will be $25,000-30,000 annually. Accordingly, the cost for the Principal Investigator in Years 2 – 5 is estimated to be $100,000 - $120,000.

c.      Data Use and Research Committee for Years 2 – 5

The Data Use and Research Committee will serve two primary functions:

1. Review and evaluate all requests from entities seeking access to the data in the Medical Information and Research Database to ensure the requests meet any necessary requirements; and

2. Review and evaluate all grant requests from entities seeking financial support for their research in connection with the data in the Medical Information and Research Database.

Class Counsel anticipates that the Data Use and Research Committee will consist of at least two medical professionals, each with a different specialty (neurology and neuropsychology being the most obvious specialties). There may be the need for other professional expertise, such as sports medicine, epidemiology, or public health. Those medical professionals will have responsibility for the Committee's two functions noted above. In addition to the medical professionals, and consistent with Section 12.1 of the Amended Settlement Agreement, a Retired Player should serve as a member of the Committee, and Class Counsel should also be represented on the Committee, for the purpose of ensuring the protection of the Retired Players' confidential medical data and to facilitate communications with the Special Masters of the Settlement Program, to whom the Committee will be obligated to report. A representative of the Columbia University's Biostatistics team will also be a member of the Committee. Lastly, the NFL Parties may provide input to Class

Counsel and the Special Masters with respect to the Date Use and Research Committee, as contemplated by Section 12.2 of the Amended Settlement Agreement.

Through consultation with experts in this field, Class Counsel believes that, to ensure retention of skilled medical professionals on the Data Use and Research Committee, reasonable consulting rates will need to be allocated for Data Use and Research Committee member services. The amount of time needed from members of the Committee will be largely tied to the volume of requests. At this point, it is difficult to estimate what the volume of requests will be.

For planning and approval purposes, however, following consultation with its consultants and the Columbia University group, Class Counsel believes it is appropriate to budget $350,000 for the Data Use and Research Committee members' consulting and oversight services following the establishment of the Medical Information Research Database ($150,000 for Year 2, $100,000 for Year 3, and $50,000 each for Years 4 and 5). As noted earlier, based on the responsibilities of the Data Use and Research Committee, Class Counsel does not anticipate any cost associated with the Data Use and Research Committee in Year 1.

Class Counsel proposes to compensate the designated Retired Player with an annual honoraria in the amount of $10,000 (subject to appropriate adjustment depending on the time demands on the Retired Player). In addition, the representative from the Columbia University Biostatistics team serving on the Committee will be compensated at a reasonable hourly rate.

Based on the above, the cost of the Data Use and Research Committee for Years 2 – 5 is estimated to be $390,000.

C.    Future Research Grant Funding/Resources

In addition to providing access to the medical information generated through the BAP, Class Counsel believes that the Education Fund should be available to financially support scientific research using the Medical Information Research Database via the awarding of research grants. As previously noted, one of the responsibilities of the Data Use and Research Committee will be to evaluate grant requests. In determining whether to approve funding to any research entity, the Data Use and Research Committee will consider the extent to which the proposed research is relevant to safety and injury prevention with respect to football players, and/or the broader education of Retired NFL Football Players. In the event that the Data Use and Research Committee approves a research grant request, Class Counsel will file a motion with the Court seeking the Court's authorization to release the requested funds from the Education Fund.

Therefore, in addition to the previously described estimated costs for Years 1 - 5 for the establishment and maintenance of the Medical Information Research Database and to compensate the Data Use and Research Committee members for their services in connection therewith, Class Counsel requests that an additional $1.5 million of the Education Fund be authorized and reserved to provide research grants to those approved entities interested in conducting research utilizing the information in the Medical Information Research Database.

If the Court approves Class Counsel's request to reserve $1.5 million from the Education Fund to provide research grants, Class Counsel, in consultation with the Special Masters and the NFL Parties, will monitor the research grant approval process and will determine whether to recommend that further Education Funds be reserved for additional funding of approved research utilizing the data in the Medical Information Research Database. In that event, Class Counsel will

15

formally seek Court approval for the financial support necessary to fund such additional research activities.

### III. Program to Educate Retired Players Regarding Available NFL Benefits

As previously noted, Section 12.1 of the Amended Settlement Agreement states that one of the purposes of the Education Fund is to fund programs promoting ". . . the education of Retired Players regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players." At Class Counsel's request, Counsel for the NFL Parties provided Class Counsel with illustrative documents showing its current methods of educating Retired Players as to the various benefits available to them.

Upon review of the provided materials, Class Counsel believes that supplemental communications may improve awareness in Retired Players of the benefits that may be available to them.

By way of background, if a Retired Player accesses the NFL benefits website (www.nflplayerbenefits.com), he is provided access to those retirement and disability benefits he is eligible to receive now or in the future, as well as information on how to enroll for those benefits. For example, a Retired Player whose CBA and credited seasons would entitle him to 88 Plan benefits is provided with information regarding the 88 Plan, even if his current medical condition makes him ineligible to receive those benefits at this time. The same is true for Long Term Care and Medicare Supplemental benefits, even though Retired Players must reach ages 50 and 65, respectfully, to apply for those programs. Class Counsel believes it is important for Retired Players to be made aware of all possible benefits and that a communication sent in the Settlement Program that reminds players of the benefits website and how to access their benefits information would serve and further that goal.

In addition, Class Counsel believes that the Settlement Program communication should advise Retired Players that any award that they may receive in the Settlement Program (monetary or Supplemental BAP benefits) in no way affects their ability to receive benefits under one of the NFL's disability plans. That is, a Retired Player currently receiving benefits under an NFL disability plan will not lose those benefits if they receive a Monetary Award in the settlement program. This is an important component of the Settlement Program and one that should be emphasized. No Retired Player who believes he is suffering from a condition that would qualify him to receive a Monetary Award under the settlement should forego filing a claim for that condition under the mistaken belief that he will lose an existing NFL disability benefit.

For these reasons, to better educate Retired Players "regarding the NFL CBA Medical and Disability Benefits programs and other educational initiatives benefitting Retired NFL Football Players," we propose a direct mailing to Retired Players in the Settlement Program advising them of the information available at the benefits website and reminding them that any award received through the settlement program has no effect on their receipt of other NFL benefits to which they are entitled. Although the Claims Administrator could post the educational materials on the Settlement Website and on each Class Member's portal (for those Class Members with a portal), that may not be the most effective way to reach all Class Members because Class Members represented by individual counsel do not have direct access to their portal (only their counsel have access). Accordingly, Class Counsel believes that, in the first instance, a direct mailing would be the most effective method to disseminate educational materials to all Class Members. Class Counsel and Counsel for the NFL Parties will jointly agree on the contents of the mailing. In addition to the direct mailing, Class Counsel believes that the Claims Administrator should also post the educational materials on the Settlement Website.

In addition to providing written materials to better educate Retired Players as to the various medical and disability benefits available to them, Section 12.1 of the Amended Settlement Agreement states that the Education Fund should also be used to fund "other educational initiatives benefitting Retired NFL Football Players." Accordingly, Class Counsel and the NFL Parties are reviewing other existing benefit programs available to Retired NFL Football Players, including programs on educational opportunities, financial stability, and career transition, to determine how best to educate Retired Players about these programs and to consider whether these programs could be enhanced to further benefit Retired Players. Following that review, Class Counsel will make a supplemental application to the Court identifying those other existing benefit programs for Retired Players and making a proposal as to how best to educate Retired Players as to the existence of these programs and how the Education Fund can best be used to enhance the existing programs, if necessary.

      A.     Approximate Costs

The cost of distributing written educational materials, via direct mailing, to Retired Players is estimated to be $20,000. Accordingly, Class Counsel requests that $20,000 of the Education Fund be authorized to cover the cost of distributing written materials, via regular mail, to better educate Retired Players regarding the NFL's benefits and education programs. The funding for any additional proposals as discussed above and agreed to by Class Counsel and the NFL Parties will be the subject of subsequent applications to the Court.

      **IV.**     **Identification of Additional Potential Recipients**

In addition to the three uses discussed above, the Parties continue to investigate additional programs that would best serve the purposes of the Education Fund, as set forth in the Amended

Settlement Agreement.  Any such further programs will be the subject of subsequent application to the Court.

## CONCLUSION

For the foregoing reasons, Class Counsel respectfully requests that the Court approve the Education Fund programs and uses described above.

Dated:  January 23, 2020

                                          Respectfully submitted,

*/s/ Christopher A. Seeger*
Christopher A. Seeger
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
cseeger@seegerweiss.com
Telephone:  (212) 584-0700
***CLASS COUNSEL***