# EXHIBIT A

# UNITED STATES DIRECT COURT

# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>SPID No. 260006736 | **Hon. Anita B. Brody** |

## PLAINTIFF'S MOTION TO CORRECT A MISTAKE IN APPLICATION OF THE SETTLEMENT AGREEMENT TO PLAINTIFF'S CLAIM PURSUANT TO RULE 60 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Plaintiff A.G. respectfully moves this Court pursuant to Rule 60(b)(1),(2) and (6) for an Order overruling the Special Master's denial of A.G.'s clam under the Class Action Amended Settlement Agreement in the Order of July 2, 2019 [Dkt. 10712], Ex. 1. for the reasons set forth in the accompanying memorandum of law.

Dated:  August 22, 2019

Respectfully submitted,

By: /s/ Wendy R. Fleishman
Wendy R. Fleishman

Lieff Cabraser Heimann & Bernstein, LLP
Wendy R. Fleishman
Rachel Geman
250 Hudson Street, 8th Floor
New York, New York 10013
Telephone: (212) 355-9000
Facsimile:  (212) 355-9592
wfleishman@lchb.com
rgeman@lchb.com

1829385.1

Lieff Cabraser Heimann & Bernstein, LLP
Kenneth S. Byrd
Andrew R. Kaufman
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219
Telephone: (615) 313-9000
Facsimile: (615) 313-9965
kbyrd@lchb.com
akaufman@lchb.com

-3-

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2019, I filed the foregoing through the Court's CM/ECF system, which will provide electronic notice to all counsel of record and constitutes service on all counsel of record.

>           */s/ Wendy R. Fleishman*
>               Wendy R. Fleishman

1829385.1

UNITED STATES DIRECT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>SPID No. 260006736 | Hon. Anita B. Brody |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## F.R.C.P. RULE 60 MOTION

Plaintiff A.G. ("Plaintiff" or "A.G.") respectfully moves this Court pursuant to Rule 60(b)(1),(2) and (6) in order for A.G., a retired football player and Class Member whose diagnosis of mild-to-moderate dementia and subsequent claim for relief was initially approved twice by the Claims Administrator, to recover under the Court-approved Settlement Agreement. A.G.'s claim was rejected for a reason *outside of*, and in fact *prohibited by*, the terms of the Settlement Agreement and contrary to this Court's own determination as to the definition of "generally consistent," FAQ 101; Order of the Hon. Anita B. Brody, 1/9/19 [Dkt. 10370]. Thus, he makes this timely motion due to mistake, newly discovered evidence and because allowing the determination to stand would bring about a manifest injustice. The relief Plaintiff seeks does not challenge the Settlement Agreement or attempt to alter its terms in any way, but instead— and to the contrary—asks only that the Settlement be applied as written to A.G.'s claim.

1829384.1

I. **Plaintiff has standing to bring this motion in lieu of a direct appeal.**

This Court's order entered July 2, 2019, denying an objection to a finding by the Special Master that A.G. was not entitled to a claim award, is the subject of this Rule 60 Motion. There is no question that the district court has jurisdiction to review the determination of the Special Master, *Pittsburgh Metro Area Postal Workers Union, A.F.L.-C.I.O. v. U.S. Postal Service*, 938 F. Supp. 2d 555 (W.D. Pa. 2013). There was a flawed record before this Court and Plaintiff respectfully requests that this Court strictly apply the Settlement Agreement, over which the Court has retained full authority and jurisdiction pursuant to the Amended Settlement Agreement (Dkt. 6481-1).

II. **The claims process and the procedural history of A.G.'s claim.**

By way of background, there is or should be no dispute that: (a) A.G. suffered significant concussion-related injuries, (b) he was diagnosed by qualified medical personnel who offered multiple bases for their opinions, (c) his claims were approved both by the Claims Administrator *and* the Appeals Advisory Panel (AAP), and (d) the diagnostic criteria used by his physicians (and confirmed by the AAP) were generally consistent with the criteria set forth in the subsequently created Baseline Assessment Program (BAP)[1].

Under the Settlement Agreement, a retired professional football player must have registered for the Settlement and must qualify to bring a claim for defined damages under the Settlement for a Qualifying Diagnosis. The Qualifying Diagnoses include Level 1.5 Neurocognitive Impairment (mild-moderate dementia) as described in the Settlement at Section

---

[1] "Generally consistent" is not a defined term in the Amended Settlement Agreement, however in the context of analyzing an Objection by the NFL to six class members' awards based on generally consistent findings, the District Court's Order of January 9, 2019, directed "the Claims Administrator to develop for review and approval by the Court a clarification of the existing Rules Governing MAF Physicians. The clarification should require that Qualified MAF Physicians who make a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment . . . by deviating from the BAP testing protocols or diagnostic criteria provide a written description in their reports as to why, in such doctor's medical judgment, the valuation and evidence is 'generally consistent' with the BAP diagnosis." The January 9, 2019 Order is attached as Ex. 2.

6.3(a)-(f). The Settlement Agreement certified two categories of players: those diagnosed before the Effective Date of the Settlement and those diagnosed after the Effective Date of the Settlement. And, further, Qualifying Diagnoses must be made by either board-certified neurologists or neuro-psychiatrists if made before the effective date of the Settlement, January 7, 2017, or by a MAF approved board-certified neurologist or neuro-specialist physician after the Effective Date or by a BAP appointed neurologist.

The BAP was created pursuant to the Settlement Agreement and thus implemented only after its Effective Date. Notably, the Settlement Agreement did not require re-testing of all still-living Class Members whose injuries and diagnoses pre-dated the execution of the Settlement. Instead, and logically, only general consistency—as in, general consistency of the criteria used in the BAP and outside of the BAP—was required to further principles of equity and efficiency in the Settlement; the Settlement Agreement was based on a recognition that the BAP was not the only way a player could or would recover. To the contrary, the express (and logical) term in the Settlement Agreement is that the Class Members must be diagnosed under criteria that are "generally consistent with," not identical to, the BAP criteria.

"Generally consistent with" is not a defined term in the Settlement Agreement, however, it is defined by the Court and the parties in the Frequently Asked Questions:

> F.A.Q. 101. What does "generally consistent" mean?
>
> Something is "generally consistent with" something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones.
>
> The Settlement Agreement states specifically that diagnostic criteria for a diagnosis made outside the BAP do not have to be identical to the diagnostic criteria for a diagnosis made in the BAP. The diagnostic criteria, or the medical rules the doctor must follow to make the diagnosis, outside the BAP do not have to be 100% the same as the Exhibit 1 criteria.

1829384.1

> With this said, the closer a set of diagnostic criteria match those specified in Exhibit 1, the more "consistent" it will be with Exhibit 1.
>
> A claim based on a Qualifying Diagnosis is most solid when its elements match closely those required in Exhibit 1. For example, where Exhibit 1 requires documentary evidence or a third-party sworn affidavit corroborating functional impairment, or neuropsychological testing, the claim of a Qualifying Diagnosis is most solid when its Claim Package contains documentary evidence or a third-party sworn affidavit corroborating functional impairment and proof of neuropsychological testing that serve the majority of purposes of those specified in Exhibit 1 for the diagnosis and that do not conflict in any manner with those criteria and requirements. (Ex. 15, Settlement Program FAQ 101.)

The crux of the issue is that A.G.'s claim did not match one of the specific BAP requirements for a Qualifying Diagnosis of Level 1.5. However, A.G.'s test scores and all other findings were generally consistent with the BAP's requirements, more of them matched precisely than not. And, the Special Master ignored or entirely overlooked the CDR score assigned to A.G.'s diagnosis by the board-certified neurologist. That CDR rating, flatly ignored by the Special Master, exceeded one of the four criteria for recovery.

However, this finding was *not* because the BAP medical personnel believed or could argue they were more qualified than A.G.'s original doctors to render a diagnosis and, crucially, *not* because the NFL challenges the sad fact that, like all patients with dementia, A.G. has in fact suffered a precipitous decline in neuro-functioning. Nothing in the express or implied terms of the Settlement Agreement provides that a retired player suffering from dementia who chose to participate in the Settlement is out of luck simply because, apparently, his cognitive functioning started at a higher level than perhaps the average (of course, someone has to be above the average just as others have to be below).

A.G. graduated from Stanford University, played nine seasons with the NFL and, like he was encouraged to do, he played hard. He suffered multiple concussive injuries. Dementia is a horrible disease to strike any person, but A.G. is only 37 years old. He was first diagnosed with

-4-

dementia at age 33. He chose to participate in the Settlement because it is a fair and good agreement as written. Because his claim (which had already been accepted) was subsequently rejected for a reason not permitted by the Settlement Agreement, Plaintiff respectfully submits that even though the relief he seeks would not alter the Settlement Agreement, the correction of this relatively discrete but important mistake would serve the additional purpose of helping the Court to ensure appropriate implementation of the Settlement Agreement going forward to the extent this is an issue that may recur.

### A.    A.G. received a qualifying diagnosis by a world-renowned neurologist.

A.G. is a 37-year-old man who played for the NFL for nine seasons between 2004 and 2012 as a defensive lineman. On April 11, 2017, Class Member A.G. submitted a Pre-Effective Date claim, supported by a 30 page neurological report and opinion that he suffered from qualifying 1.5 deficit (mild-moderate dementia) as a result of the repetitive head trauma suffered as a professional football player. The July 10, 2015 report was authored by Michael A. Lobatz, M.D., a world renowned expert in concussions and a board-certified neurologist. (Ex. 3, Lobatz Report.) In addition, A.G. submitted a neuropsychological report by Dr. Laura Hopper, using an accepted set of measurements that also independently demonstrated that he suffered a 1.5 deficit (mild-moderate dementia). (Ex. 4, Hopper Report.) And, although Dr. Hopper did not perform all of the suggested tests in the battery of tests, she performed most of them.

The claim first was analyzed and approved by the Claims Administrator and then by the Appeals Advisory Panel, because the Pre-Effective Date Claimants are so reviewed pursuant to Section 6.4(a)(1).

Plaintiff was diagnosed with a Qualifying Diagnosis prior to the Effective Date of the settlement (January 7, 2017) by a board-certified neurologist (as permitted by the Settlement Agreement) and that board-certified neurologist submitted a Diagnosing Physician Certification

Form as required by the Settlement Agreement. (Ex. 5, Pre-Effective Date Diagnosing Physician Certification Form.) Plaintiff complied with all of the applicable requirements for the submission of his claim. Because his was a Pre-Effective Date claim, A.G.'s entire record was reviewed by members of the Appeals Advisory Panel ("AAP"), who are board-certified neurologists. The AAP members concurred with Dr. Lobatz, as well as with the Plaintiff's neuropsychologist Dr. Hopper, that A.G.'s Qualifying Diagnosis met the criteria for Level 1.5 Neurocognitive Impairment. Subsequent to the approval of his claim, Plaintiff timely followed all of the rules as laid out in the Settlement Agreement for the submission of a monetary award claim. Based upon the final and binding determination of the Appeals Advisory Panel, the Claims Administrator agreed that A.G. suffered a Level 1.5 deficit and issued a Notice of Monetary Award to A.G. on July 20, 2017, finding that he was entitled to a monetary award under the settlement and that he qualified for a Level 1.5 recovery. (Ex. 6, Notice of Monetary Award, 7/20/17.)

    **B.**    **The Claims Administrator audited the entire record and accepted the opinion of the board-certified neurologist.**

On day 32 after the monetary award was initially granted, A.G. was advised that his Claim was the subject of a random 10% audit by the Claims Administrator[2]. (Ex. 7, Notice of Audit, 8/21/17). As part of the audit, on September 7, 2017, A.G. produced 5 years of medical records and 5 years of employment records. (Ex. 8, Response to Notice of Audit, 9/7/17.)

The Claims Administrator interviewed Dr. Lobatz. During the interview, Dr. Lobatz made clear to the Claims Administrator that he based his opinion on the radiographic evidence of significant brain bleeds caused by trauma to the head as well as his long history as A.G.'s doctor of four years to formulate his opinion that A.G. suffered from a Level 1.5 Qualifying Diagnosis.

---

[2] The audit was done pursuant to Section 10.3 of the Settlement Agreement. (*Id.*)

-6-

Dr. Lobatz explained to the Claims Administrator's representatives that his opinion was independent of Dr. Hopper's testing, however, helpful.

In his written opinion, Dr. Lobatz refers to multiple bases for his diagnosis including, Dr. Hopper's 2015 neuropsychological examination taken over three days, an EEG, radiological imaging of A.G.'s brain, psychiatric evaluation by the Crosby Center, and an evaluation by Dr. Ezekiel Fink, an independent medical examiner/neurologist. (Ex. 3, Lobatz Report at 26-35.) In Dr. Lobatz's report, he describes the supportive findings at length.  He describes a moderate decline in cognitive functioning, as well as the Amen Clinic, Dr. Fink and the Crosby Center's "document evidence of functional impairments, depression and anxiety that are generally consistent with the criteria set forth in the National Alzheimer's Coordination Center's Clinical Dementia Rating Scale (CDR) 1.5 (Neurocognitive impairment) in the areas of Community Affairs, Home and Hobbies and personal care." (*Id.* at 35.)  He found that A.G. had a progressive history of cognitive impairment, images of brain trauma demonstrating hemorrhagic events caused by trauma, evidence of trauma on the EEG findings, as well as the determination by Dr. Fink that he had significant cognitive impairment and the Crosby Center   records supported his CDR rating of 1.5. (*Id.*)

   **C.** **The NFL's objection confuses and conflates the Generally Consistent Standard with "Identical."**

The NFL's initial appeal to the Special Master did not raise any issues with the qualifications of the doctors and/or their ability to render the Plaintiff's diagnosis. The Diagnosing Physician's diagnosis was confirmed as generally consistent by a member of the AAP, who reviewed the findings for the Claims Administrator during the two audits. Rather, the NFL argued below only that the diagnosis did not satisfy what it argues is the governing standard – those spelled out for diagnoses through the Baseline Assessment Program (the "BAP").

1829384.1

However, because Plaintiff was diagnosed outside the BAP, and, indeed before the BAP was even conceived, under the plain terms of the Settlement Agreement, the diagnosing physicians did not have to apply the same objective diagnostic criteria to this player as to those diagnoses made by BAP neurologists after 2017.  Diagnoses made by board-certified neurologists Pre-Effective Date, need only be "generally consistent" with the diagnostic criteria set forth under the Settlement Agreement.

This Court has made it clear that generally consistent is not identical. (Ex. 1, Order of Hon. Anita B. Brody, 1/9/2019 [Dkt. 10370].)  With respect to this player's claims, the specific diagnostic criteria for Level 1.5 Neurocognitive Impairment in the BAP can be found in subsection 1(a)(i)-(iv) of Exhibit A-1 to the Settlement Agreement[3].

### D.     The standard for "Generally Consistent."

The NFL has repeatedly insisted to the Special Master and to the Court that significant deviations downward alone are not sufficient to meet the "generally consistent" criteria set in the Settlement Agreement.  This is without basis in science and these assertions were made long after the fact when class members had to opt in and agree to the terms of the Agreement.  The NFL insisted that A.G.'s significant downward deviations in most of his neuropsychological testing "could not" meet that standard, when in fact, there is no such "standard."  The neuropsychologist report from 2015 *two years* before the Settlement, demonstrates A.G. had significant downward deviations in complex attention and processing speed. (Ex. 4, Hopper Report at 3-10.) His T scores were respectively at 26 for complex attention/processing speed, far

---

[3] Subsection 1(b) of Exhibit A-1 then makes it clear which "diagnostic criteria" are subject to the "generally consistent" standard. Subsection 1(b) states in relevant part:
For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 1.5 Neurocognitive Impairment, i.e., early dementia, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 1(a)(i)-(iv) above, . . . made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement.

-8-

below the T score of 35, and at 40 for the auditory memory and visual memory testing. (*Id.*) There is no question that A.G. scored in the 80 percentile range in the vocabulary testing but that is consistent with his premorbid IQ of 122. (*Id.*) The complex attention/ processing speed and visual and auditory memory tests demonstrated substantial and multiple deviations downward from his premorbid IQ of 122, with scores of 26, 40, 40, 40 and 41, and 44. (*Id.*) The testing was valid and the doctor found that these findings were indeed consistent with brain damage demonstrated by the imaging and the EEG testing. (Ex. 3, Lobatz Report at 27-28, 34-35.) As a result, both neurologists who examined A.G., Dr. Lobatz and Dr. Fink, found that he had a significant neurocognitive decline. (*Id.; see also* Ex. 9, Fink Report at 12.)

Instead of acknowledging and accepting the validity of the testing, the validity of the board-certified neurologist's extensive report and the validity of the AAP members' initial approval and assent, and the validity of the CDR rating of 1.5, the NFL insisted that the testing results need be identical to the BAP results. Nonetheless, the NFL insisted upon disregarding the board-certified neurologist's diagnosis, completely ignoring or downplaying what Dr. Lobatz knew of his patient of four years, the neuropsychologist finding of a premorbid high IQ of 122 and the testing demonstrating a three to four time deviation downward in critical domains of complex attention/processing speed and visual and auditory memory. The NFL similarly sought to ignore and downplay severe symptoms consistent with dementia that several other treaters had described. Had the NFL not continuously argued that "generally consistent with" is equivalent to "identical" then, the Court would never have been presented with such a flawed record. This Court has prided itself throughout this long and difficult process with requiring the most accurate data to be sure the player class members are best served by the Settlement. That was not

-9-

1829384.1

presented to the Court here and this Court should request to be presented with these facts once again in order to make a fair determination applying the Settlement Agreement as stated.

The NFL appealed to the Special Master, Wendell Pritchett. (Ex. 10, NFL Appeal, 1/3/18.) Presumably based on the report of a new or different AAP Consultant[4], who was a neuropsychologist not a neurologist, the Special Master denied Plaintiff's claim. (Ex. 11, Post-Appeal Notices of Denial; *see also* Ex. 12, Special Master Decision, 10/10/18.)  Plaintiff appealed to Judge Brody who upheld the denial based on improper flawed information placed before the Court. (Ex. 13, Objection to Special Master Decision, 10/26/18; *see also* Ex. 1, Settlement Implementation Determination, 7/2/19 [Dkt. 10712].) There is no clear explanation why the claim was denied.  However, speculation suggests that the Special Master denied the claim because A.G.'s T scores in the complex attention/processing speed domain fell below 35, as required under the BAP, while the learning and auditory and visual memory tests reflected scores of 40, 40, 44, 47, 57, and 50. (*See* Ex. 14, AAPC Review, 8/12/17.) And, the Special Master held Section 1(a)(iii) was not satisfied without explanation, despite the findings that there was documentary evidence and evaluations demonstrating functional impairments, depression and anxiety that are generally consistent with the criteria set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating Scale (CDR) 1.5 (Neurocognitive impairment) in the area of Community Affairs, Home and Hobbies and personal care. (Ex. 12, Special Master Decision at 3.)

---

[4] Settlement Agreement (Dkt. 6481-1), Section 2.1 (h): "Appeals Advisory Panel Consultants" means three (3) neuropsychologists certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN), a member board of the American Board of Professional Psychology, in the specialty of Clinical Neuropsychology, agreed to and jointly recommended by Co-Lead Class Counsel and Counsel for the NFL Parties, and appointed by the Court, any one of whom is eligible to advise a member of the Appeals Advisory Panel, the Court, or the Special Master on the neuropsychological testing referenced in Exhibits 1 and 2 to the Settlement Agreement, as pertaining to the Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment and Amended Settlement Agreement,  Level 2 Neurocognitive Impairment, and Level 1 Neurocognitive Impairment if subject to review as set forth in Section 5.13.Appeals Advisory Panel Consultants do not meet the definition of Appeals Advisory Panel members and shall not serve as members of the Appeals Advisory Panel.

1829384.1

The NFL argued below only that the diagnoses did not satisfy what it argues is the governing standard – those spelled out for diagnoses through the BAP because of the deviation in the scores. With respect to this player's claims, the specific diagnostic criteria for Level 1.5 Neurocognitive Impairment in the BAP can be found in subsection 1(a)(i)-(iv) of Exhibit A-1 to the Settlement Agreement. There is no question that A.G. satisfied all four prongs of Section 1(a)(i)-(iv):

1. A.G. presented a well-documented decline in his cognitive functioning.  He can no longer attend school, work outside of his home, adequately care for his personal care, or participate in the family without being oftentimes disruptive;

2. The neuropsychological testing demonstrates a severe decline in performance in connection with complex attention, processing speed, visual and auditory memory.  His T scores of 26, 40, 40, 40 in processing speed/complex attention, and auditory memory are consistent with the required T scores in the BAP testing.  This is especially true where, here, the decline from premorbid functioning and IQ was so significant;

3. A.G.'s CDR score was found to be a 1.5 ( Functional Impairment) in the areas of Community Affairs, Home and Hobbies and personal care by Dr. Lobatz, greater than the rating of 1 required under subsection iii; and,

4. Dr. Lobatz stated that the cognitive deficits documented in this case have clearly not occurred in the context of a delirium, acute substance abuse or as a result of medication side effects. (Ex. 3, Lobatz Report; *see also* Ex. 4 Hopper Report.)

These findings meet the definition of generally consistent with.  The findings demonstrate that most of them match precisely while one is similar to the BAP standard, even though not identical.

-11-

### III. **Rule(60)(B) provides that the Court may correct a mistake that has caused a manifest injustice as occurred here.**

Rule 60(b) of the Federal Rules of Civil Procedure provides that:

On motion and upon such terms as are just, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

The motion must be made within a reasonable time and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken. *Gonzalez v. Crosby*, 545 U.S. 524, 528 n. 2, 125 S. Ct. 2641, 2646 n. 2, 162 L.Ed.2d 480 (2005); FED.R.CIV.P. 60(c)(1). This motion is indeed timely as it was made within 30 days following the entry of the Settlement Implementation Order dated July 2, 2019, that the Court wrote was final and binding. (*See* Ex. 1, Settlement Implementation Determination, 7/2/19 [Dkt. 10712].)

Here, the district court would be empowered to grant relief under several parts of Rule 60(b), including but limited to Rule 60(b)(1), mistake and surprise; Rule 60(b)(2), newly discovered evidence; and Rule 60(b)(6), any other reason justifying relief from the operation of the judgment. *See Satterfield v. D.A. Philadelphia*, 872 F.3d 152 (3rd Cir. 2017). Here, the hardship to A.G. is extreme. Having to wait to go through another years-long process to make a claim under the Settlement Agreement will undoubtedly delay his award and even potentially reduce his award drastically as the awards are reduced based on age of the claimant. A.G. will be under extreme hardship if he fails to reinstate the claims he was duly awarded more than two years ago.

-12-

1829384.1

In addition, apparently, there is some unknown action that took place by the NFL, the Claims Administrator or the AAP , that led to the district court being provided incorrect information: "The Court is troubled by the events leading to this objection and has looked into the matter. The Special Master and the Claims Administrator have assured the Court that the events leading to this objection will not be repeated." (*See* Ex. 1, Settlement Implementation Determination, 7/2/19 [Dkt. 10712].) There is simply no further explanation in the Order to put A.G. or his counsel on notice of what misleading information may have worked its way into the process that resulted in A.G.'s claim being strangely rejected contrary to the clear language of the Settlement Agreement. It can only mean the Settlement Agreement was not followed and that behind-the-scenes efforts may have trampled A.G.'s Due Process rights to notice of the actions and implementation of the Settlement Agreement.

Under well-established principles, Rule 60(b) is not a substitute for an appeal. *See Martinez-McBean v. Government of the Virgin Islands*, 562 F.2d 908, 911 (3d Cir. 1977). However, other courts have held that legal error may be characterized as a "mistake" within the meaning of Rule 60(b)(1), but only where the motion is made, as here, within the time allowed for appeal. *See, e.g.*, *Barrier v. Beaver*, 712 F.2d 231 (6th Cir. 1983); *International Controls Corp. v. Vesco*, 556 F.2d 665 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978). *See generally*, Note, Relief from Final Judgment Under Rule 60(b)(1) Due to Judicial Errors of Law, 83 Mich. L. Rev. 1571 (1985). This Court has yet to decide this issue.

When the Sixth Circuit considered this question in the *Barrier* case, it found that a mistake of law falls within the "mistakes" considered under Rule 60(b)(1)[5].

---

[5] There is authority for the view that the word "mistake" as used in Rule 60(b)(1) encompasses any type of mistake or error on the part of the court, including judicial mistake as to applicable law. *See, Oliver v. Home Indem. Co.*, 470

-13-

Here, this Court is faced with a question of mistake in the application of the precise terms of the Settlement Agreement to A.G.'s claim. This Court specifically described that: "[s]omething is 'generally consistent with' something else if the two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones." (Ex. 15, Settlement Program FAQ 101.)

A.G. demonstrated a significant decline in cognitive function as documented by testing data, films and a board-certified neurologist's report meeting all the criteria under Sections 1(a)((i)-(iv). The T scores are not identical but they certainly replicate the same pattern as predicted for someone with a lower IQ. The fact that he had a higher premorbid IQ skews the numbers slight upward but not significantly as to demonstrate that he was not injured by the multiple concussive strikes to his head. There is no question that all of A.G.'s findings, taken together, are more than consistent with a Level 1.5 Qualifying Diagnosis, and that these findings are generally consistent with the criteria called for under the Settlement.

### IV. Conclusion

Plaintiff A.G. respectfully moves this Court to review this matter, apply the precise language of the Settlement Agreement as this Court has interpreted and applied it and reinstate A.G.'s monetary award with interest.

---

F.2d 329 (5th Cir. 1972); *Stewart Security Corp. v. Guaranty Trust, Co.*, 71 F.R.D. 32 (W.D.Okla.1976); *Crane v. Kerr*, 53 F.R.D. 311 (N.D. Ga. 1971). *See also D.C. Federation of Civic Associations v. Volpe*, 520 F.2d 451 (D.C. Cir. 1975*); Meadows v. Cohen*, 409 F.2d 750 (5th Cir. 1969); and *Schildhaus v. Moe*, 335 F.2d 529 (2d Cir. 1964) (failure to apply intervening appellate decisions contrary to district court interpretation of the law is a "mistake*"). Contra, Silk v. Sandoval*, 435 F.2d 1266, 1267–68 (1st Cir. 1971), *cert. denied*, 402 U.S. 1012 [91 S.Ct. 2189, 29 L.Ed.2d 435] (1971); *Morgan Guaranty Trust Co. of N.Y. v. Third National Bank of Hampden Cty.,* 545 F.2d 758 (1st Cir.1976); *Scola v. Boat Frances, R., Inc.*, 6181 [618] F.2d 147 (1st Cir.1980). *See also Swam v. United States*, 327 F.2d 431 (7th Cir. 1964) [*cert. denied*, 379 U.S. 852 [85 S.Ct. 98, 13 L.Ed.2d 55] (1964) ]. This Court is persuaded that the better view is to allow reconsideration of a point of law under Rule 60(b)(1) when relief from judgment is sought within the normal time for taking an appeal. *International Controls*, 556 F.2d 665 , *cert. denied*, 434 U.S. 1014 [98 S.Ct. 730, 54 L.Ed.2d 758] (1978 ). This view serves the best interest of the judicial system by avoiding unnecessary appeals and allowing correction of legal error if and when made and the trial court has been satisfied that an error was committed.

1829384.1

Dated: August 22, 2019

Respectfully submitted,

By: /s/ Wendy R. Fleishman
     Wendy R. Fleishman

Lieff Cabraser Heimann & Bernstein, LLP
Wendy R. Fleishman
Rachel Geman
250 Hudson Street, 8th Floor
New York, New York 10013
Telephone: (212) 355-9000
Facsimile: (212) 355-9592
wfleishman@lchb.com
rgeman@lchb.com

Lieff Cabraser Heimann & Bernstein, LLP
Kenneth S. Byrd
Andrew R. Kaufman
150 Fourth Avenue, North, Suite 1650
Nashville, TN 37219
Telephone: (615) 313-9000
Facsimile: (615) 313-9965
kbyrd@lchb.com
akaufman@lchb.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2019, I filed the foregoing through the Court's CM/ECF system, which will provide electronic notice to all counsel of record and constitutes service on all counsel of record.

*/s/ Wendy R. Fleishman*
Wendy R. Fleishman
