**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                                        Plaintiffs,<br><br>          v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>                                        Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Provost Umphrey Law Firm, LLP v. Scott Kellar<br>Attorney Lien Dispute<br>(Doc. No. 7466) | |

**REPORT AND RECOMMENDATION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                               April 3 , 2020

## I.    INTRODUCTION

Presently before the Court for a Report and Recommendation in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Provost Umphrey Law Firm, LLP ("Provost") against the Award granted to its former client, Settlement Class Member ("SCM") Scott Kellar, in the litigation that became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).  The firm represented Mr. Kellar from May 17, 2012 until November 23, 2016, when it was discharged.  Provost seeks from the award issued to Mr. Kellar recovery of the funds it advanced for litigation

costs pursuant to the contingency fee agreement ("CFA") they executed in May 2012.  (Dispute Rec. Doc. 2 at appended exhibits).  Mr. Kellar is currently represented by the Mokaram Law Firm ("Mokaram"), which filed the claim for a Monetary Award on his behalf on June 12, 2018.  The Settlement Claims Administrator ("CA") transmitted the Dispute Record on December 19, 2019 and subsequently forwarded at our request additional information submitted to it by Mokaram on January 21, 2020.  For the reasons we set forth below, we recommend that Provost be awarded the revised amount sought and that the balance of funds withheld for counsel fee be released to Mr. Kellar directly.  We are unable to recommend disbursement of a fee to Mokaram in this case.

## II.    FACTS AND PROCEDURAL HISTORY

On May 17, 2012, Mr. Kellar retained Provost to represent him in "a certain claim against The National Football League and any other appropriate entities."  (Dispute Rec. Doc. 2.)  Under the terms of the "Contract to Hire Attorney" that he signed, Mr. Kellar agreed that he would pay 33.3% of the net of any recovery to Provost as its fee for legal services.  He also agreed that "all costs, out of pocket expenses, computer-assisted legal research expenses, financing expenses and/or interest incurred in borrowing the money necessary to finance the expenses on the case … will be paid by the Client by deduction from Client's share of the recovery after calculation of attorney's contingent fee."  (*Id.*)

Provost filed a Long-Form Complaint on Mr. Kellar's behalf on June 15, 2012.  (Dispute Rec. Doc. 2 at Pet. ¶ 4.)  The firm contends that during the course of its representation, it: "actively and diligently" investigated and prepared to pursue Mr. Kellar's claims; filed two complaints; corresponded and communicated with Mr. Kellar; reviewed his NFL Questionnaire; ordered and reviewed his medical records; researched his condition; held teleconferences; and participated in meetings in Pennsylvania and New York concerning the litigation.  (*Id.* at Pet. ¶ 5.)  The firm

ended its representation on November 20, 2016 upon receiving notice from Mr. Kellar that he was terminating the attorney-client relationship.  (*Id.* at Pet. ¶¶ 5-6.)  Provost filed its lien on the docket on April 11, 2017.

It is not apparent from the record before us when Mr. Kellar next obtained counsel.  He was, however, registered in the settlement portal on February 6, 2017 by The Jones Law Firm ("Jones").   A document signed by Mr. Kellar indicates that he had previously "executed an Attorney's Employment Agreement / Contingency Fee Agreement" retaining Jones to represent him and that on October 12, 2017 he was giving his consent to Jones to associate with Mokaram for purposes of this representation.  The "Consent to Associate Agreement" represented that the firms would share joint responsibility for his case and would divide between themselves the total attorneys' fees.  (Consent to Assoc. Agr't, *appended to* Mokaram Stmt. of Atty's Fees & Costs.) Mr. Kellar also signed a designation form to notify the CA of his "desire to continue forward in the settlement process with Mokaram Law Firm as [his] firm of choice for representation" and to "authorize Mokaram Law Firm to handle on his behalf all further matters related to [his] claim in the settlement process, including all communications by and between the Claims Administrator and Mokaram Law Firm regarding information related to [his] case."  (Stmt. of Registr. Det'n., *appended to* Mokaram Stmt. of Atty's Fees & Costs.)[1]

Mr. Kellar's claim was submitted to the CA on June 2, 2018 by Mokaram.  As a result of this claim submission, the CA provided to Mokaram notice of Provost's lien on any monetary award secured by Mr. Kellar.  (Dispute Rec. Doc. 2.)  The June 26, 2018 Notice advised Mokaram:

[1] These documents regarding the relationship between Mr. Kellar and Mokaram were appended to Mokaram's January 21, 2020 submission to the CA of a Statement of Attorney's Fees and Costs. Mokaram submitted these materials after the Dispute Record was compiled by the CA and provided to me.  For this reason, these documents do not bear a "Dispute Rec." reference.)

"**You must notify us whether you consent to or dispute this Lien by the deadline at the top of this Notice.**" (*Id.* at 1 (emphasis in original).)  It also explained that the CA would refer the matter to the Court if Mokaram either disputed the lien or failed to consent to it.  (*Id.* at 2.)  The Notice again advised Mokaram that it "must respond to this Notice by the deadline above" – July 16, 2018 – "with a short statement advising us whether you consent to or dispute the Lien." (*Id.*)  Mokaram, however, did not submit a response.

Mr. Kellar's claim for a monetary award proceeded.  On September 6, 2019, the CA issued the Notice of Monetary Award Claim Determination, which reflects that the qualifying diagnosis in his case was established on May 23, 2018.  (Dispute Rec. Doc. 1.)  As reflected in the notice, the CA withheld from Mr. Kellar's disbursement the amount for Provost attorney's lien, which constituted 17% of Mr. Kellar's award.[2] (*Id.* at 8.)

The appeal period concerning the monetary award expired on October 7, 2019.  A week later, on October 17, 2019, the CA posted to Mr. Kellar's "portal" a "Notice of Duty to Resolve Lien Dispute" and provided a Withdrawal Form that the parties could use in the circumstance that they resolved the lien dispute.[3]  The Court's MDL Clerk also notified the parties by e-mail on October 17, 2019 of the availability of the option to consent to Magistrate Judge jurisdiction of the lien dispute and provided a blank form in which they could indicate their consent.  That communication was sent to four different individuals at Mokaram: Ali Jahanian

---

[2] The CA also set aside and withheld separately an amount equal to 5% of Mr. Kellar's award for counsel fee, the distribution of which will be determined at a later date by the Court.

[3] It is our understanding of the CA's normal operations that an e-mail notification is automatically generated to counsel for the SCM upon the addition of any document to the client's portal and that, where the document added to the portal concerns a lien, a hardcopy of the notice is also mailed to the lienholder.

4

(aj@mokaramlawfirm.com);  Ali  Mokaram  (ali@mokaramlawfirm.com);  Amanda  Hernandez
(amanda@mokaramlawfirm.com);  and  to  maya@mokaramlawfirm.com.    The  next  day,  on
October 18, 2019, the CA also sent to Mokaram a Statement of Attorney's Fees and Costs form,
which the firm was to complete and return by October 28, 2019.  The communication was again
directed  to  multiple  individuals  at  the  firm:    Ali  Jahanian,  Amanda  Hernandez,  and
maya@mokaramlawfirm.com.[4]

Having received no response from counsel, on October 23, 2019 the CA issued to both
Provost and Mokaram a Schedule of Document Submissions from me regarding the lien dispute.
(Dispute Rec. Doc. 6A.)[5]  The schedule described the parties' obligations under Rule 19 of the
Amended Rules Governing Attorneys' Liens (the "Rules") and provided that "each Party must
comply" with the schedule.  The schedule required submission of a Statement of Dispute by
November 22, 2019, which was to describe the issues in dispute and a summary of that party's
attempts to reach an agreement with the opposing party.  (*Id.*)

As was indicated by the Schedule[6] and consistent with the earlier Notice of the parties'
responsibilities regarding the dispute, Provost attempted to reach an agreement with Mokaram
concerning its lien.  On November 14, 2019, Jacqueline Ryall, Esquire of Provost sent a letter by

---

[4]  The CA sent a reminder email on November 6, 2019 to these three addressees, alerting them to
the fact that this form had not been received by the deadline.  As we describe below, however, Ali
Mokaram ultimately completed this form on January 8, 2020 and a colleague at the firm, Attorney
Jante Langan, transmitted it to the CA via email on January 21, 2020.

[5]  Pursuant to its ordinary operations, the CA issued the notice via e-mail from the address
ClaimsAdministrator@NFLConcussionSettlement.com.  It was sent to four individuals from
Mokaram: Ali Jahanian, Ali Mokaram, Amanda Hernandez, and maya@mokaramlawfirm.com.

[6]  The Schedule of Document Submissions requires that each party's Statement of Dispute include
"a summary of the attempts to reach an agreement with the opposing Party[.]". (Dispute Rec. Docs.
6, 6A, para. 1(a)(6).)

e-mail to Ali Mokaram, Esquire, which she copied to Amanda Hernandez.  The letter referenced the Notice of Duty to Resolve Lien Dispute and communicated that Provost sought only $3,022.86, rather than the full value of its lien.  She asked for a response as to whether the proposal was "acceptable."  (Dispute Rec. Doc. 13B.)  She never received a response from Mokaram accepting or rejecting the proposal.

With the November 22, 2019 deadline looming for submission to the CA of the parties' statements of dispute, Attorney Ryall submitted a letter to the CA on November 21, 2019 to advise that Provost had "attempted, on several occasions by phone and email correspondence, to contact the Mokaram Law Firm" in an effort to resolve the lien dispute.  (Dispute Rec. Doc. 13B.)  She continued:

> To this date [November 21, 2019], the only response has been an email from Ali Mokaram advising us that he is out of the country, however, someone from his office will contact us.  As of this letter, no one from the Mokaram firm has contacted us, nor do they respond to our attempts to contact them.

(*Id.*)  Attorney Ryall reiterated that the firm only sought to recoup the amount of its expenses rather than a full contingent fee or portion thereof.  (*Id.*)

In light of the efforts by Provost to resolve this matter and the prospect that, perhaps with Attorney Mokaram's return to the country, the firm would respond to Provost's overtures, we issued through the CA a Revised Schedule of Document Submissions on December 5, 2019.  (Dispute Rec. Doc. 6B.)  Pursuant to the revised schedule, the deadline for submission of the parties' Statements of Dispute was extended to December 19, 2019.  (*Id.*)  The transmittal e-mail from the CA to the firm contacts of record advised the parties that "[a]fter the submission deadlines in the Revised Schedule have run, and if both Parties have not submitted complete, identical Withdrawals of Attorney's Lien [the form for which was attached], Judge Strawbridge will

proceed to make his recommendation to Judge Brody about the disbursement of the funds currently withheld for attorneys' fees." (Dispute Rec. Doc. 13A.)[7] The December 19, 2019 deadline came and went with no further communications from either party. The CA then transmitted the Dispute Record to the Court.

In light of the failure of Mokaram to participate in the lien dispute resolution process, particularly where a settlement proposal was timely made by Provost, we issued on January 3, 2020 an Order for Mokaram to show cause by January 22, 2020 "why the undersigned should not recommend that the Court order that Provost be awarded the amount sought in its November 14, 2019 proposal and that the remainder of the funds withheld from Mr. Kellar's award for counsel fee, including any portion of the 5% holdback that may be released in the future, be disbursed to Mr. Kellar." (ECF Doc. 10934.)[8]

On January 22, 2020, Attorney Jeffrey Stern[9] docketed Mokaram's "Response to Motion for Order to Show Cause." (ECF Doc. 10969.) The response acknowledged receipt on January 3rd of the notice of the filing of our Order to Show Cause (ECF Doc. 10934), which it understood to seek a response as to why we should not recommend (a) that Provost be awarded what it sought "in its 11/14/2019 *proposed Lien Withdrawal*" and (b) the award for counsel fee otherwise "be

---

[7] The Mokaram addressees on this notification were Ali Jahanian, Amanda Hernandez, and maya@mokaramlawfirm.com.

[8] Mokaram Law Firm has been designated to receive notices of filings on the MDL 2323 docket since December 29, 2017, and Ali Mokaram has filed documents on the MDL docket. *See, e.g.,* ECF 10121 (filed 7/2/2018).

[9] Stern is registered in our district's ECF system as affiliated with the Stern Law Group in Bellaire, Texas. Stern Law Group was party to a "Consent to Associate Agreement" dated October 12, 2017 and appears to have worked with Mokaram in joint representations in this litigation. The response document itself, however, is signed by Attorney Jante Langan of Mokaram. (Doc. 10969 at 2.)

disbursed to Mr. Kellar." (*Id.* at 1 (emphasis added).).  The firm responded that it "respectfully asserts that the full counsel's fee should not be awarded to Mr. Kellar because the appropriate documents have now been submitted according to the rules" and because Mokaram allegedly "did not receive proper notice of the filing deadlines for the attorney lien submission process." (*Id.* at 1.)10  The firm further asserted that Mr. Kellar would be unjustly enriched if "the entirety of the remaining counsel fee's [*sic*]" were awarded to him, in that "the firm has advanced all of the necessary expenses for medical evaluations and expended attorney time that has ultimately generated a significant recovery for Mr. Kellar." (*Id.* at 1-2.)

Attached to the Response, although not otherwise referred to in it, was an Affidavit, notarized on January 20, 2020 before Amanda M. Hernandez (presumably the staffer at Mokaram associated with email address "amanda@mokaramlawfirm.com"), stating:

> My name is Peyman Momeni, I am over 18 years old and fully competent to make this affidavit.  I have knowledge of the facts and opinions stated in my affidavit.
>
> Recently, our law firm Mokaram Law Firm has switched IT providers.  This has created problems with our email notification system.  Due to these errors I did not receive the Schedules of Document Submissions issued by the Claims Administrator giving deadlines of October 23, 2019, December 5, 2019 and November 14, 2019 for various responses.  The failure to answer timely was neither intentional nor the result of conscious indifference.

(Doc. 10960-1.)

---

10  Mokaram attributed its lack of receipt of the notices regarding the lien dispute deadlines to "the fact that a new IT provider created problems with the Firm's email system, resulting in numerous emails not being accessible for a period of time[.]"  (Doc. 10969 at 1-2.)  Mokaram asserted that "[u]pon receiving notice" of the deadlines it failed to meet due to emails it allegedly could not "access," "the Firm diligently compiled the necessary responses and submitted them to the Claims Administrator."  (*Id.* at 2.)  We do not know what "necessary responses" Mokaram believes it submitted.  It never submitted a Statement of Dispute.  It submitted an incomplete Statement of Attorneys Fees and Costs four months after it was due.  It never responded to Provost's settlement offer.

The firm also submitted to the Claims Administrator on January 21, 2020 a completed form Statement of Attorney's fees and Costs in this case.[11]  It was dated as having been completed by Ali Mokaram on January 7, 2020 and provided responses on the two topics for which a response was sought: the contingency fee percentage to which the parties allegedly agreed (33.3%) and the amount of costs allegedly incurred by the firm ($6,100.00).[12]  Although the form instructed Mokaram to append its CFA if it had not previously provided it to the CA, Mokaram appended only Mr. Kellar's written consent to Jones to associate with Mokaram.  No terms of any CFA entered into by Mr. Kellar with either Jones or Mokaram were provided.

Neither firm submitted to the CA a Statement of Dispute.  They have not submitted to the CA a Withdrawal of Lien Dispute form, nor have they otherwise communicated with the CA in any way to suggest that they have resolved their dispute.  Accordingly, we treat the record before us as a Dispute Record in which two firms assert a right to payment from Mr. Kellar's monetary award for providing legal representation to him in this litigation and settlement.

## III.   LEGAL STANDARD

As we set out in an earlier Report and Recommendation ("R&R") filed on January 7, 2019 concerning attorney liens on other SCM awards, our evaluation of a contested lien involves a consideration of the CFA between the SCM and his counsel and an assessment of the reasonableness of the requested fees in light of the five factors enumerated by the Third Circuit in

---

[11]  This document bore the CA's request date of October 18, 2019 and deadline of October 28, 2019.

[12] As to costs, the form explained that if counsel does not provide the amount of costs on the Statement, which was to be submitted prior to the payment of the SCM's award, the CA "will not withhold any funds to reimburse you for those costs, and you waive the right to seek reimbursement of those costs from the Settlement Class Member," citing to the Court orders and Rules applicable to attorney liens.

*McKenzie.  See* ECF 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach requires us to scrutinize the reasonableness of CFAs at the time of the signing of the contracts and then determine if the circumstances compel a different evaluation of the CFA at the time Provost, as lienholder, seeks to enforce it.  We will then examine the results obtained, the quality of the representation provided by Provost, and whether the efforts of Provost substantially contributed to the result.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.

For the reasons we set forth below, we conclude that Mr. Kellar's fee agreement with Provost should be enforced and that Provost should recoup from Mr. Kellar's monetary award an amount equal to the costs it advanced on behalf of Mr. Kellar during its period of representation. We also conclude, however, that there is no basis in this record to approve any contingent fee or cost reimbursement to Mokaram and that it should be deemed to have waived its right to any such fee or costs in light of its blatant failure to comply with its obligation to seek to resolve this dispute.

## IV.    DISCUSSION

The Court's prior opinions in this class action settlement have proceeded with the understanding that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances."  *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts).  We have required all attorneys seeking contested fees – whether those fee requests are submitted through a Lien or otherwise – to justify their fees as "reasonable" under the standards set out in *McKenzie*.  *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing

reasonableness by a preponderance of the evidence).

Pursuant to the *McKenzie* five-part reasonableness analysis, we typically evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney," *McKenzie I*, 758 F.2d at 101, "scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. We also assess whether there are other factors specific to the individual case that should be considered in the assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based. We then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

In this case, our analysis of these factors is hampered by the fact that neither firm submitted a Statement of Dispute to the CA. We are thus left with limited information about the details of each firm's representation of Mr. Kellar as would pertain to an evaluation of the reasonableness of the fee requested. What we are left with are only reasonable inferences based upon the materials that have been provided and our understanding of the scope of the work required at different points in time by counsel representing individual plaintiffs.

Two other propositions guide our analysis. The first is that the degree of the parties' participation in the lien dispute resolution process, or their lack thereof, will affect their recovery for fees in these circumstances. The second is that the lack of diligence of a firm to protect its own interest should inure to the benefit of the client, here the SCM, Mr. Kellar.

**A.      Provost is entitled to a fee.**

Circumstances in the representation of individual retired players changed significantly from the time of Mr. Kellar's initial contracting with Provost in 2012 to the time that Provost sought to enforce its contract in 2017 through the filing of its lien.  Based upon our evaluation of the remaining three prongs of the *McKenzie* test, however, we are satisfied that Provost provided sufficiently quality representation and made contributions to the ultimate Award received here, notwithstanding the subsequent roles that appear to have been played by Jones and Mokaram in registering Mr. Kellar in the settlement and submitting his claim.  We will therefore recommend that the Court approve Provost's modest fee request.

**1.      The CFA at the time of contracting and enforcement – impact of changed circumstances**

We first analyze the two primary factors that bear upon the reasonableness of the fee and cost arrangement at the time of the contract's signing by Mr. Kellar and Provost: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.  We then compare the landscape at the time of contracting with the circumstances at the time the attorney-client relationship terminated.

Provost agreed to represent Mr. Kellar in his dispute with the NFL on May 17, 2012, a few months after the Court's January 31, 2012 order granting the NFL's motion for consolidated pretrial proceedings.  As we have explained in prior opinions, by this time the Court had issued a Case Management Order, plaintiffs had proposed the key committees that would manage the litigation, and the Court appointed co-lead counsel.  The risk related to the *volume* of work to be undertaken by a law firm representing a retired player was greatly limited, as the various plaintiffs' committees took over the primary work in the case.  The risks as to the *legal* challenges facing the

plaintiffs at this phase in the litigation, however, remained substantial, and the case remained a "high-risk, long-odds litigation."  *See* ECF 9860 at 10 (Judge Brody opinion addressing common benefit fees).

Mr. Kellar remained in a contractual relationship with Provost until November 23, 2016. Our prior opinions have described the substantial progress made during that time in moving the cases forward, collectively and individually, leading to the decision of the Third Circuit on April 18, 2016 affirming the District Court's approval of the Settlement Agreement.

Mr. Kellar appears to have entered into a contractual relationship with Jones by the time the claims administration opened.  Jones registered Mr. Kellar with the Claims Administrator on February 6, 2017 and then Mokaram, in association with Mr. Kellar, submitted Mr. Kellar's claim on June 2, 2018.  It was approved on September 6, 2019.  The risk inherent in agreeing to represent Mr. Kellar beginning in late 2016 had decreased in many ways compared to the risk that was present when Provost undertook its representation and through much of the period of its representation.

## 2.     The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the firm's efforts in bringing about the result.  Even with the limited record before us, we observe that, due to Provost's representation, Mr. Kellar filed a complaint and became a plaintiff in this litigation and that he did not opt out of the settlement.   Later, due to the representation by Jones and Mokaram, he formally registered in the settlement program and, fifteen months after that, was approved for a Monetary Award grid amount that was based on his number of eligible seasons played, his level of impairment, and his age at diagnosis.  (Dispute Rec. Doc. 1.)  Both phases of representation would have been important in obtaining these results.

### 3.     The quality of the work performed

With the limited record before us, we cannot reach any firm conclusions about the quality of the work performed by the individually-retained firms on behalf of Mr. Kellar here.  Provost has provided a list of expenses it advanced for Mr. Kellar's case for medical records it obtained from seven different medical providers between 2013 and 2016, for earnings records it obtained from the Social Security Administration in 2016, and miscellaneous expenses incurred between 2013 and 2016 for research, filing fees, "allocated travel expenses," mileage, postage, copies, and telephone charges.  (Dispute Rec. Doc. 13B.)  We accept that by incurring these expenses, Provost was engaging in the work that appeared necessary at that time for a zealous and responsible representation of its client in this litigation and ultimate settlement.

Mokaram suggests that it, too, advanced costs on behalf of Mr. Kellar.  It asserted in response to our Show Cause Order that it would be unfair to deny it a fee where "the Firm has advanced all of the necessary expenses for medical evaluations and expended attorney time that has ultimately generated a significant recovery for Mr. Kellar."  (ECF 10969 at 2.)  Its untimely submission to the CA of its Statement of Attorney's Fees and Costs provides the figure of $6,100.00 as the amount of costs incurred.  Despite the clear directive of the attorney lien resolution dispute process, it failed to provide any itemization of its costs or even a brief explanation of the purpose of incurring those costs and the dates they were incurred.[13]  In failing to engage with Provost in its fee dispute resolution efforts and in failing to provide in any format documentation of its work on behalf of Mr. Kellar, we cannot assess the quality of work performed by Mokaram and the extent to which its work assisted Mr. Kellar in securing his award.

---

[13]  This information was required in the Statement of Dispute that Mokaram did not file.  *See* Dispute Rec. Doc. 6A at ¶ 1(a)(3) (Schedule of Document Submissions requiring this information to be provided in current attorney's statement of dispute).

### 4.     The substantiality of the work performed

What we generally consider the more important question in this analysis is the relative contributions of the firms to the work necessary to obtain the Monetary Award that the player received.  Our prior decisions have identified non-exclusive categories of work undertaken by individual counsel who have supported their clients in this litigation, including: (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date; (2) support of the individual client to ensure his lawsuit would have evidentiary support should the matter proceed to trial; (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted; (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class; (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award; (6) support of clients who were seeking loans and were exposed to predatory lending practices; and (7) providing necessary support in other personal matters collaterally related to this litigation.

Provost's correspondence with Mokaram about the scope of relief it sought via its lien reflects that it obtained and reviewed medical records for treatment Mr. Kellar received for the period 2013 to 2016.  While Mr. Kellar's qualifying diagnosis was not obtained until 2018, Provost clearly made efforts to document any potentially qualifying diagnosis that might be available.  It also gathered Mr. Kellar's earnings records.  Mokaram's response to the Show Cause Order states that it, too, obtained and reviewed medical records, but no other information is provided.

The only other topic upon which we can draw any inferences about the involvement and performance of the respective firms relates to shepherding the individual client through the claims process.  Here, Mr. Kellar had discharged Provost before the registration process opened.  Records

from the CA indicate that Jones registered Mr. Kellar in 2017 and that Mokaram submitted his claim in 2018.  Obviously, that work was a necessary step for Mr. Kellar to receive an award in 2019.  We have no information, however, about what tasks were required of Mokaram (or Jones, as its associated firm), the diligence with which it attended to those tasks, nor the ultimate effectiveness of its representation of Mr. Kellar.

Taking into account the information available to us, and recognizing that our task is to determine the reasonableness of the fees sought by the firms in this presumptively contested lien dispute, we conclude that Provost's work warrants a reasonable fee.  The modest amount it sought from Mokaram represents 1.3% of the monetary award authorized for Mr. Kellar.[14]  With as much as 22% of a player's monetary award presumed to be a reasonable contingent fee, we have no trouble accepting that Provost is entitled to this amount as a reasonable fee for its representation.

## B.    Consequence of non-compliance by Mokaram

At the same time, Mokaram seeks a fee for its work on behalf of Mr. Kellar.  On January 21, 2020, apparently alerted to this matter by our Order to Show Cause, Mokaram turned in to the CA a form that was due months earlier and represented that it (or perhaps the counsel with whom it associated) contracted with Mr. Kellar for as much as a 33.3% fee and reimbursement of what totaled $6,100.00 in unspecified costs.  If the Court agrees to award Provost the amount it seeks, some $36,771.30 in funds withheld would still be available to cover these alleged costs and provide

---

[14] We recognize that Provost did not pursue a "fee" of a mere 1.3% of Mr. Kellar's award.  Rather, it sought in its settlement proposal to Mokaram the amount of out-of-pocket expenses that it incurred as a result of its representation.  In terms of the requirements of the lien dispute resolution process, however, Provost had not asserted its entitlement to reimbursement of costs through the proper channels: in a Statement of Dispute.  Inasmuch as Provost's pending lien put Mr. Kellar and Mokaram on notice of Provost's claim to as much as 17% (or 22%) of his Monetary Award and led to the CA setting aside this amount of funds, we consider it appropriate under these circumstances to direct payment to Provost in this amount.

a fee equal to 13.4% of Mr. Kellar's award, in addition to whatever portion of the 5% holdback that becomes available.

Unlike the case with Provost, however, the record provides little support for a fee to Mokaram in this amount – and many valid reasons to deny a fee altogether.  First, there is no CFA on file between Mokaram and Mr. Kellar, nor is there one between Mr. Kellar and any of the firms that he apparently permitted to associate with Mokaram.  Second, Mokaram has not provided any sort of chronology of tasks performed on behalf of Mr. Kellar.  While Provost's submission to the CA regarding its offer to compromise its claim provided at least a basic chronology of its expenditures, and thus reflected tasks it undertook apart from its docketed filings, Mokaram has provided no such information.  We take notice from the Dispute Record (including Mokaram's untimely submission on January 21, 2020), that Jones registered Mr. Kellar on February 6, 2017; that the firms agreed to associate and that Mr. Kellar consented on October 12, 2017; that a diagnosis was rendered on May 23, 2018; and that Mokaram submitted his claim on June 12, 2018. The Dispute Record does not otherwise indicate, however, what tasks Mokaram or its associated counsel performed on behalf of Mr. Kellar to help him secure this award as to claim any contingent fee from Mr. Kellar's award in the face of the competing claim of Provost.

When specifically directed by the Court in a docketed Order to show cause why the remaining funds withheld for counsel fee should not be refunded to Mr. Kellar, Mokaram finally addressed, in some respect, its deficiencies regarding this attorney lien resolution process.  Its excuse:  its email system was not working properly and "numerous emails" were not "accessible for a period of time."  (ECF 10969.)  The period of time was not specified.  An affiant, Peyman Momeni, swore that *he* did not receive from the CA the documents that set deadlines in this matter for October 23, November 14, and December 5, 2019.  (ECF 10969-1.)

17

We do not find Mokaram's explanation to excuse its persistent non-compliance with the attorney lien dispute resolution process involving this client. Presumably long before Mokaram experienced this alleged disruption to its email system, the firm was put on notice of the need to respond to Provost's lien. On **June 26, 2018** the CA posted to the portal for Mr. Kellar a Notice of Lien that set a response deadline of July 16, 2018. The addition of this document to Mr. Kellar's portal generated an e-mail notification to the Mokaram personnel of record at that time. The firm, however, failed to respond to that notice.

The alleged deficiencies in its email system also does not excuse Mokaram's non-compliance with its responsibilities as to this lien dispute because it was made aware of at least some of its obligations and should have been aware of all of its obligations. The record reflects Provost made a variety of efforts to contact Mokaram in the fall of 2019 – *and made contact.* Provost attorney Ryall emailed both Attorney Ali Mokaram and Ms. Hernandez, and she reached out by telephone.[15] Although Attorney Ryall also found the firm to be largely non-responsive, at least one of her attempts obviously proved successful. Attorney Ryall represented to the CA that Attorney Mokaram *did* acknowledge receipt of a communication from her and advised that someone from his office would contact her, as he was at that time traveling abroad. (Dispute Rec. Doc. 13B.) In the face of this evidence that the lien dispute and proposed resolution was brought to Attorney Mokaram's attention, we cannot accept the firm's excuse for its non-compliance with the schedules for document submissions that were issued by the CA on behalf of the Court.[16]

---

[15] Mokaram has not suggested that the alleged IT server issues impacted its telephone system.

[16] Each of the Schedules of Document Submissions stated that "each Party must comply" with the schedule that followed. While not captioned as orders *per se* and not docketed on the MDL 2323 docket, the Schedules indicated at the end: "/s/ Magistrate Judge David R. Strawbridge." (Dispute Rec. Docs. 6A & 6B.)

Moreover, we find Mokaram's response to the Show Cause Order disingenuous, where the affiant who attested that *he* "did not receive the Schedules of Document Submissions issued by the Claims Administrator" *was never one of the personnel identified by Mokaram to receive email communications from the CA as to this client.*

      To award Mokaram a fee of any sort from Mr. Kellar's recovery does not sit well with us. As indicated above, while it appears that Mr. Kellar contracted with Jones to represent him on a contingent fee basis, there is no evidence before us of the terms of that agreement. This deficiency also precludes us from approving Mokaram's belated request for reimbursement of $6,100.00 in costs, as we do not know what Mr. Kellar agreed to as to costs and thus cannot know whether these costs are reimbursable. Finally, Mokaram has failed to meet its obligations as counsel for the SCM as to this attorney lien against his award *since June 26, 2018,* when it was given notice of the lien. *It failed to meet its obligation regarding the attorney lien **at every step of the way.*** It would undermine the authority of the Court and respect for the processes that the Court and CA labored to establish if Mokaram were awarded a counsel fee or costs here.

## V.    CONCLUSION

      The evidence recounted here should result in an approval of a fee to Provost in the amount of $3,022.86, with the remainder of the funds withheld for counsel fee and the lien to be released to Mr. Kellar. Our recommendation follows.

## RECOMMENDATION

**AND NOW**, this       3rd      day of April, 2020, it is respectfully **RECOMMENDED** that

the Claims Administrator be ordered to (1) disburse from the currently withheld funds representing

17% of Mr. Kellar's monetary award, and in accordance with the provisions of the Settlement

Agreement and all Court Orders regarding implementation, $3,022.86 to Provost and the balance

to Mr. Kellar; and (2) at such time as the Court rules upon the 5% holdback request, disburse any

available funds to Mr. Kellar.

The Parties may file objections to this Report and Recommendation.  *See* Rule 25(d).


BY THE COURT:


/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                                                    Plaintiffs,<br><br>        v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>                                                    Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Provost Umphrey Law Firm, LLP v. Scott Kellar<br>Attorney Lien Dispute<br>(Doc. No. 7466) | |

**ORDER**

**AND NOW**, this         day of                          , 2020, upon consideration of the

Report and Recommendation of United States Magistrate Judge David R. Strawbridge (ECF No.

_____), and no objection having been docketed, it is **ORDERED** that:

1.        The Report and Recommendation is **ADOPTED**;

2.        The Claims Administrator is **ORDERED** to disburse the withheld funds for

attorneys' fees and costs in accordance with the provisions of the Settlement Agreement, all Court

Orders regarding implementation, and in the following manner:

        a.  From the currently withheld funds representing 17% of Mr. Kellar's monetary

award: $3,022.86 to Provost and the balance to Mr. Kellar; and

        b.  At such time as the Court rules upon the 5% holdback request: any available

funds to Mr. Kellar.

BY THE COURT:

_____

ANITA B. BRODY, J.