**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., <br><br> Defendants. | |
| THIS DOCUMENT RELATES TO: <br><br> McCorvey Law LLC v. Errict Rhett <br> Attorney Lien Dispute <br> (Doc. No. 8048) <br><br> AND <br><br> Locks Law Firm v. Errict Rhett <br> Attorney Lien Dispute <br> (Doc. No. 10769) | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    June 4, 2020

## I.      INTRODUCTION

Presently before the Court in the National Football League Player's Concussion Injury

Litigation is the assertion of Attorney Liens by McCorvey Law, LLC ("McCorvey Law") and

Locks Law Firm ("Locks Law") against the Award granted to their former client, Settlement Class

Member ("SCM") Errict Rhett, in the litigation that became part of this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.). The firms seek reimbursement of their costs and payment of attorneys' fees of up to as much as 22%[1] of the Award that has been authorized for Mr. Rhett. McCorvey Law seeks payment pursuant to a contingency fee agreement ("CFA") that it entered into with Mr. Rhett in an earlier phase of this litigation. While Mr. Rhett originally agreed that McCorvey Law could receive a contingent fee of 23% of his ultimate Monetary Award, the firm now seeks only 8.25% of his monetary award as its fee. Locks Law seeks payment under similar contingent fee principles but cannot produce a signed agreement with Mr. Rhett setting forth the terms of an agreement and how it would be paid. By his current counsel, Langfitt Garner PLLC ("Langfitt Garner"), Mr. Rhett challenges the Liens to the extent that the two firms would seek the maximum allowable fees (22%) and given that Langfitt Garner also seeks a contingent fee for its work in representing him. That work, which Mr. Rhett agreed would be compensated with a contingent fee of 15% of any monetary award he received, ultimately involved Langfitt Garner's rigorous defense of an administrative appeal initiated by the by the NFL which, if it had succeeded, would have left Mr. Rhett with no award and the three firms with no fees. The parties consented to my resolution of this lien dispute. (Doc. No. 10978.)

  As we set out in a Report and Recommendation filed on January 7, 2019,[2] our evaluation

---

[1] As we describe below, on April 5, 2018, the District Court determined that presumptively no Individually Retained Plaintiff's Attorneys ("IRPAs") should receive more than 22% of a Monetary Award in fees (the "Fee Cap") given the benefits received by the SCMs from the work of counsel engaged for the common benefit of all SCMs. (Doc. No. 9863.) *See* Doc. No. 10368 at 10-11 (discussing the District Court's decision relating to the presumptive Fee Cap).

[2] The District Court referred to us "all petitions for individual attorneys' liens." (Doc. No. 7446.) On January 7, 2019, we issued a Report and Recommendation pertaining to three separate cases.

of these positions involves a consideration of the CFAs between Mr. Rhett and his two former counsel and an assessment of the reasonableness of the requested fees of all of all three law firms in light of the analysis set out by the Third Circuit's *McKenzie* decision.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach obligates us to scrutinize the reasonableness of the CFAs at the time of the signing of the contracts and then determine whether the circumstances compel a different evaluation of the agreement at the time each lienholder seeks enforcement.  We will also have to determine the validity of the Locks Law lien in the absence of a signed agreement.  We will then examine the results Mr. Rhett obtained, the quality of the representation provided by McCorvey Law and Locks Law, and most importantly the extent to which the efforts of those firms substantially contributed to the result.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.  As part of that analysis, we necessarily consider the role of current counsel, Langfitt Garner.  Ultimately, we conclude that each firm is entitled to recoup attorney's fees and costs but only such that their fees, when aggregated, do not exceed 22% of Mr. Rhett's total award, and with Locks Law and Langfitt Garner sharing the bulk of the fee.

## II.     FACTS AND PROCEDURAL HISTORY

Mr. Rhett entered into a CFA with McCorvey Law on May 16, 2012 for litigation against the NFL for what he claimed were cognitive deficiencies resulting from injuries sustained while playing in the NFL.  Under the terms of the fee agreement, if recovery were made by way of

(Doc. No. 10368.)  These were the first where we set out the legal principles that would guide our analysis in these cases.

lawsuit or settlement, Mr. Rhett would pay 23% of the net recovery as the legal fee.3  He would

not owe a legal fee or expense if the firm made no recovery on his behalf by settlement or trial.

Shortly thereafter, on June 1, 2012, McCorvey Law filed a complaint on behalf of Rhett and 20

other clients in the United States District Court for the Eastern District of Louisiana.  On July 9,

2012, after that suit was transferred to this district, McCorvey Law filed a short form complaint on

behalf of that group of clients.  *See* E.D. Pa. Civ. A. No. 12-cv-3537.  The suit was then

consolidated here with the MDL, No. 12-md-2323.  McCorvey Law represents that, for the next

several years, it monitored the MDL docket and individual e-filings; reviewed motions, orders,

and notices; trained to work with claims and lien administrators to develop an expertise in

settlement administration; and included Mr. Rhett in communications to update its client base

concerning developments in the litigation and eventual settlement.  (McCorvey Stmt. of Disp. at

1-2 & Ex.)4

    Unbeknownst to McCorvey Law, however, Mr. Rhett in 2016 was in communication with

Attorney David Langfitt, then of the Locks Law firm.5  (Langfitt Stmt. of Disp. at 1.)  He and

Attorney Langfitt agree that this overture was prompted by Mr. Rhett's desire for an early

---

3 This percentage, inserted in script initialed by Mr. Rhett, reflected a modification of the typed provision in the contract for a fee of 33%.

4 For its work for the common benefit of the class, McCorvey Law was allocated a portion of the over $106 million in attorneys fees authorized by the Court in May 2018.  Its award of $198,780.00 was based on McCorvey's petition for compensation for 331.3 hours, at $600 per hour, for his work on both the Plaintiffs' Steering Committee and on the Communications Committee, which involved attending PSC meetings, participating in speaking engagements, reviewing drafts of pleadings and approving the settlement agreement, and preparing players for media interviews. *See* Doc. No. 10019 at 16; Doc. No. 7151-21.

5 The circumstances of Mr. Rhett's engagement of another firm for his representation in this litigation are disputed, although not all of the circumstances are material.  *See, e.g.,* McCorvey Stmt. of Disp. at 1 (referring to "this case" as having been "illegally poached").

evaluation of his neurological condition, which he did not perceive McCorvey Law to be in a position to obtain for him at that time. Attorney Langfitt promptly arranged for examinations and expert reviews of Mr. Rhett's condition in August 2016 by a neurologist and a neuropsychologist, for which Locks Law assumed financial responsibility.

Locks Law undertook these tasks to support Mr. Rhett's claim even though the parties had not reached a formal agreement as to the terms of the firm's representation in what it anticipated to be a settlement claims process going forward. The record reflects that in August and September 2016, as Attorney Langfitt was updating Mr. Rhett and seeking feedback on the medical evaluations, he also forwarded a Locks Law Retainer Agreement, the terms of which are not in the record, and advised Mr. Rhett that he needed to sign and return it. Mr. Rhett and Attorney Langfitt recall that Mr. Rhett wanted to negotiate a lower contingent fee rate,[6] that firm managing partner Gene Locks did not agree to a reduced rate, and that they simply proceeded with the work to be done, hoping that they could resolve the percentage fee at a later date. For his part, Attorney Locks reports that the firm opened a file for Mr. Rhett with the expectation, based upon Attorney Langfitt's representation "that the signed retainer agreement was on the way." (Locks Aff., Feb. 12, 2020, para. 4.) While aspects of this are unclear, it is undisputed that Locks Law undertook tasks for the benefit of Mr. Rhett's individual claim with the expectation that it was his retained counsel. This included coordinating examinations and expert reviews in August 2016 and

---

[6] The record before us does not reflect what contingent fee rate was proposed in the fee agreement presented to Mr. Rhett in August and September 2016. Locks Law reports that when it initially agreed to represent retired players in litigation against the NFL in 2011, its retainer fee was 33%. It subsequently reduced its fee to 22% and, "in some cases," further reduced it to 20%. (Locks Aff. at para. 4.) Other documentation in the record suggests that a reduction to 20% was made to *all* clients and was referenced in subsequent communications to the client base, such as an e-mail message sent on March 16, 2017. (Langfitt Resp. at 1 & Ex. 3.)

registering him in the settlement claims portal on February 14, 2017.

On April 5, 2017, after receiving two separate registrations, one by each firm, the Claims Administrator advised McCorvey and Locks that there was overlapping representation of Mr. Rhett.  Prompted by this news, the managing partners of the two firms, Attorney Derriel C. McCorvey and Attorney Locks, worked out an arrangement that they would split any attorney fee awarded to Locks Law for Mr. Rhett's claim. (McCorvey Stmt. of Disp. at 1; Locks Aff., Feb. 12, 2020, at para. 8.)[7]  McCorvey Law filed its attorney's lien on the MDL docket on July 22, 2017 and Locks Law continued with its representation of Mr. Rhett.  On December 14, 2017, Mr. Rhett verified with the Claims Administrator that his attorney was Locks Law.  (Locks Resp. at Ex. 5.)

Locks Law filed a pre-effective date claim on behalf of Mr. Rhett in December 2017 based upon the diagnosis obtained in 2016 by the doctors to whom it had sent Mr. Rhett for testing.  An Appeals Advisory Panel neurologist, however, contested the validity of the results of the diagnosing neurologist, and his claim was denied.  Mr. Rhett elected not to appeal but rather opted to pursue new testing with different providers.  Locks Law filed a new claim on Mr. Rhett's behalf on February 27, 2019.  The claim was approved on July 1, 2019.  (Langfitt Stmt. of Disp. at 2-3.)

On June 7, 2019, shortly before the Claims Administrator issued notice of the approval of Mr. Rhett's monetary award, David Langfitt left Locks Law and set up a new firm, Langfitt Garner. (Locks Stmt. of Disp. at 3.)  Attorney Langfitt advised Mr. Rhett of this development on June 18, 2019 and gave him the option to choose to remain with Locks Law or move to Langfitt Garner.  He chose to switch to Langfitt Garner.  (Langfitt Stmt. of Disp. at 3.)  Mr. Rhett and Langfitt Garner then entered into a CFA that provided for a 15% attorney's fee.  (*Id.*, at Ex. 7.)  Although

---

[7] We do not consider the terms of this agreement to be pertinent to our analysis, which is guided by the *McKenzie* principles we describe below.

the agreement does not reflect the date of signature of either party, Mr. Rhett dates it to "early July." (*Id.*, Dispute Rec. Doc. 7 at Ex. 1.)  Mr. Rhett advised the Claims Administrator of this change of representation on July 26, 2019. (*Id.* at Ex. 8.)  In light of its termination, Locks Law promptly filed a Notice of Lien on July 27, 2019 seeking "reasonable attorney's fees, plus expenses and costs," for its work on behalf of Mr. Rhett. (Doc. No. 10769.)

Mr. Rhett's award did not, however, immediately proceed to processing, as the NFL filed an appeal on July 31, 2019, which if successful would have resulted in a denial of the claim. Langfitt Garner, however, succeeded in its opposition to the appeal.  On October 18, 2019, the Claims Administrator issued a Post Appeal Notice of Monetary Award, to which the NFL did not further object. (Langfitt Stmt. of Disp. at 4.)

In light of the two attorney liens and the contingency fee agreements of record, the Claims Administrator withheld from Mr. Rhett's award funds for payment of attorneys fees in an amount equal to 22% of his Award, which reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2018 Opinion and Order. (Doc. No. 9863.) Of the attorney fee withholding, a portion reflecting 5% of the Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund ("AFQSF") pursuant to the Court's June 27, 2018 Order Regarding Withholdings for the Common Benefit Fund. (Doc. No. 10104.)  Those funds may be distributed at a later date upon further order(s) of Judge Brody.  This leaves us to determine the appropriate distribution for the attorney fees currently available for disbursement (representing 17% of Mr. Rhett's Award) and the allocation of those funds that are currently held in the AFQSF (representing 5% of Mr. Rhett's Award), if those funds, or a portion thereof, are distributed by the Court at a future date. The Claims Administrator also withheld the amount of costs asserted by Locks Law in its Notice of Lien and by Langfitt Garner in its November 26, 2019 Statement of Attorneys Fees and Costs.

(Doc. No. 10769; Dispute Rec. Doc. 5.)   We must also determine whether these costs, as well as others that were subsequently sought by McCorvey Law and further by Langfitt Garner, are reimbursable from Mr. Rhett's award.

Pursuant to a briefing schedule we issued through the Claims Administrator, and in accordance with the Lien Rules, all three law firms submitted simultaneous Statements of Dispute on January 23, 2020 concerning their entitlement to a fee in light of the other CFAs and/or attorney liens.  (McCorvey Stmt. of Disp., Dispute Rec. Doc. 8B; Locks Stmt. of Disp., Dispute Rec. Doc. 8A; Langfitt Stmt. of Disp., Dispute Rec. Doc. 7.)  Locks Law and Langfitt Garner each submitted Responses to the other parties' filings on February 12, 2020.  (Langfitt Resp., Dispute Rec. Doc. 9; Locks Resp., Dispute Rec. Doc. 10A.)  McCorvey Law did not file a response.  Pursuant to Lien Rule 17, the Record of Dispute was then referred to us for resolution.  Additional documentation that Locks Law had provided to the Claims Administrator on November 12, 2019[8] was subsequently added to the Dispute Record (Dispute Rec. Doc. 13A), as was a Sur-Reply brief that we permitted Langfitt Garner to file on February 14, 2020 (Dispute Rec. Doc. 13B).

## III.    THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances."  *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their

---

[8]  The Claims Administrator requested a statement summarizing the work performed by Locks Law on behalf of Mr. Rhett to substantiate its lien given the absence of a retainer agreement.  Locks Law provided a general chronology of the tasks it performed on behalf of Mr. Rhett.  The firm sought a full contingency fee of 20%, plus reimbursement of costs, and suggested that the remaining 2% of funds available for counsel fee be awarded to McCorvey.  (Dispute Rec. Doc. 13-A.)

contracts).   The District Court's prior opinions in this class action settlement did not relieve attorneys of this obligation.   Indeed, the Court explained that all attorneys seeking fees, whether through a Lien or otherwise, are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*.   *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity."   *McKenzie I,* 758 F.2d at 101.

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney."   *McKenzie I*, 758 F.2d at 101.   Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement.   *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based.   We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

## IV.   DISCUSSION

As we outline within, circumstances in some cases changed significantly from the time of Mr. Rhett's initial engagement of the two lienholder firms to the time they sought to enforce their contract and recover a fee from his monetary award.   Based upon our evaluation of the remaining

three prongs of the *McKenzie* test, we are satisfied that Langfitt Garner's significant work with respect to the defense of the award when challenged on appeal by the NFL warrants a substantial fee notwithstanding the short duration of its representation.  Locks Law, however, also provided quality representation and made longer-term substantial contributions to the ultimate Award received in this case, given that it developed the claim that was successful, while McCorvey Law provided only minimal individual support beyond what it performed for the common benefit of the class.  Accordingly, we will approve each firm's fee request in part.

A.      **Mr. Rhett's agreement with Locks Law**

Before embarking on the *McKenzie* analysis, we first address the question of how to consider Locks Law's claim to a contingent fee, where Mr. Rhett and the firm did not enter into a written fee agreement.  Here, too, we will be guided by "the circumstances surrounding the engagement of the attorney."  *McKenzie I*, 758 F.2d at 101.

As we recounted briefly above, the record before us indicates that Mr. Rhett sought new counsel in 2016 because he believed McCorvey Law "was not able to comply with his desire to receive neurological testing early and as soon as possible," and Mr. Rhett believed that it was important he be tested at his then current age.  (Langfitt Stmt. of Disp. at 1.)  He spoke directly with David Langfitt about representation at Locks Law.  Email communications within the firm indicate that Michael Leh, another attorney at Locks Law, conditionally approved opening an investigative file for Mr. Rhett.  (Locks Resp. at Ex. 1.)  Attorney Langfitt arranged for Mr. Rhett to undergo an MRI study.  During August 2016 Mr. Rhett also underwent examinations by a neurologist and neuropsychologist supporting a Level 1.5 Neurocognitive Impairment diagnosis.  Attorney Langfitt personally advanced the funds for these studies, for which he sought reimbursement from Locks Law on September 1, 2016 and for which he did receive

10

reimbursement.   At this point in time, however, Mr. Rhett and Locks Law had not entered into a fee agreement.

Attorney Langfitt's request for reimbursement from Locks Law for his expenditures on behalf of Mr. Rhett led to a string of communications within Locks Law in September 2016 on the subject of the lack of what Locks Law referred to as a Retainer Agreement.   Firm records also reflect that on August 30, 2016, Attorney Langfitt sent an e-mail to Mr. Rhett that he "need[ed] that signed retainer, so we can move forward with [testing at the University of Florida at] [G]ainesville."   He asked that he "please print it out, sign it, and send back.   Everything else we can discuss.   Hotel, location, schedule, etc."   (Locks Resp. at Ex. 4.) Attorney Langfitt followed up on September 8, 2016 with another e-mail message asking how the evaluations in Gainesville went and again reminding him that the firm needed "a signed copy of the retention agreement," as well as a HIPAA authorization form, "so we can move forward."   (*Id.*)   Attorney Langfitt represents that "Mr. Rhett refused to sign the retainer." (Langfitt Surreply at 2.)   Attorney Langfitt further represents that at that time he "notified Mr. Locks," *id.*, although Locks Law denies that anyone at the firm other than Attorney Langfitt "[had] an understanding with Mr. Rhett that the fee and execution of the retainer would be worked out later."  (Locks Resp. at 1.)

The Dispute Record contains no other documentation of further discussion concerning the Locks Law retainer agreement or the terms of the firm's representation of Rhett after the e-mails from Attorney Langfitt to Mr. Rhett on August 30 and September 8, 2016.   While the communications from those dates indicate that a Retainer Agreement was attached, the attachments have not been provided.   An affidavit from Gene Locks reflects that the firm's "original retainer fee was 33%" for its clients with NFL cases and that it subsequently reduced its fees to 22%, and "[i]n some cases, [the firm] further reduced those fees to 20%[.]"  (Locks Resp.

11

at Ex. 2, para. 4.)   The reduction to a 20% fee is supported by documentation of an email communication from Attorney Locks to unidentified clients on March 16, 2017.  (Langfitt Resp. at Ex. 3.)  Attorney Langfitt represents that the e-mail went to all Locks Law clients.  (Langfitt Surreply at 1.)  Nine months later, when the Claims Administrator asked Mr. Rhett to confirm who represented him in the claim process, he responded that Locks Law represented him.  (Locks Resp. at Ex. 5.)

We appreciate that Locks Law seeks a contingent fee without presenting a writing signed by Mr. Rhett, nor any other affirmative evidence of his acceptance of particular terms of representation.  We do not condone Locks Law's failure to ensure that attorney and client had a meeting of the minds as to *all* of the pertinent terms of the representation.[9]  Whether Locks Law personnel – particularly Attorney Langfitt, who performed the work on Mr. Rhett's behalf – satisfied the state rules of professional conduct, however, our concern is whether the fee sought through the Locks Law lien can be considered "reasonable" in light of all of the circumstances.  In this regard, we note that both parties continued to operate under the assumption that there was an agreement that Locks Law would represent Mr. Rhett concerning his claim and would advance all funds for necessary testing.  Locks Law never sought to bill Mr. Rhett for its time put into the case

---

[9]  Pennsylvania's Rules of Professional Conduct require that "the basis or rate of the fee shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation."  Pa. R. Prof. Conduct 1.5(b).  Locks Law did so but did not obtain Mr. Rhett's consent to the rate of the fee at the time of the communications.  The Rules further state that as to a fee contingent on the outcome of the matter for which the service is rendered – as here – the "contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated."  *Id.*, R. 1.5(c).  The record shows that Locks Law provided Mr. Rhett with such a writing and that the only objection that he raised in his subsequent conversations with Locks Law personnel was as to the percentage of the contingent fee.

nor to recoup, during the pendency of the claim, any of the outlays that it made to ensure the timely examinations he desired.

In the absence of any further discussions between Locks Law personnel and Mr. Rhett concerning the terms of the fee he would owe to Locks Law if he received a monetary award, we find that he effectively agreed to a continue to receive services from Locks for a fee that would not exceed 20%. Our finding is based on the fact that Mr. Rhett clearly desired representation by Locks Law. He believed he needed a firm to act quickly in arranging medical examinations in 2016 before he advanced to a new age category, and Locks Law did just that. Attorney Langfitt represents that while Mr. Rhett had not signed the retainer because he "would not agree to the rate," Attorney Langfitt "had faith in our work and that we would receive a signed agreement from Mr. Rhett in the future." (Dispute Rec. Doc. 13B at 2.) Mr. Rhett echoed this sentiment in his own declaration prepared for this dispute. (Dispute Rec. Doc. 7 at Ex. 1.) He agreed that he would pay Locks Law some fee contingent on his recovery of a monetary award and that it would be calculated as a percentage of his award.

When the firm reiterated its standard fee rate of 20% in a mass client communication in March 2017, which we presume Mr. Rhett to have received, he did not renew with the firm any discussions about his contingency fee rate or the terms of his engagement of the firm. Rather, he continued to utilize Locks Law, affirmed to the Claims Administrator on December 14, 2017 that the firm represented him, and went forward with a second claim that involved Locks Law again fronting the costs of a set of medical evaluations in 2018. We accept that Mr. Rhett agreed to engage Locks Law to represent him; that he understood that it would seek a fee from his Monetary Award if he received one; that he accepted that its fee could be as much as 20% of his Award, although a 5% portion would be held back; and that the firm would seek reimbursement for its

expenditures on his behalf.  We thus proceed to determine what fee, if any, is reasonable for the three firms with which Mr. Rhett had an attorney-client relationship with a contingent fee agreement.

> ### B.    The CFAs at the time of contracting and enforcement – impact of changed circumstances

As we assess the reasonableness of the contingent fee arrangements at the time Mr. Rhett entered into them with the three firms, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.  We then compare the landscape at the time of contracting with the circumstances at the time the respective McCorvey Law and Locks Law attorney-client relationships terminated.

> #### 1.    *McCorvey Law*

McCorvey Law agreed to represent Mr. Rhett on May 16, 2012, during the early part of what has been described as "Phase 2"[10] of this litigation: after the MDL had been created but while there remained substantial risks, as the plaintiffs faced stiff challenges including surmounting the issues of preemption and establishing causation.

Risk as it related to overall workload also varied over time in this litigation.  When law firms undertake large-scale litigation, they are obligated to decline to take on other litigation.  The cost to law firms in deciding to participate and thus forego alternative matters must be recognized.  As we have noted in previous opinions, in the first phase of the litigation, the law firms that

---

[10]  The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court.  After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2).

undertook representation of players individually, without the benefit of the efficiencies contained within an MDL, faced monumental challenges and risked having to pursue the entire case themselves, perhaps even through trial.  Fee arrangements reflecting those large contingencies "would have been expected and appropriate."  (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL in January 2012, however, the risk related to the *volume* of work to be undertaken by any law firm changed dramatically.  Once an MDL was formed, firms such as McCorvey Law contracting to represent individual clients "were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case.  *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from individually-retained player attorneys to Plaintiffs' Committees, which would be compensated through a common benefit fund).[11]   To be sure, Attorney McCorvey served on the PSC and assisted with communications committee work, for which he was awarded his lodestar from the common benefit fund.  *See* Doc. Nos. 7151-21 & 10019.   The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

Mr. Rhett remained in a contractual relationship with McCorvey Law from the signing date of May 16, 2012 until April 5, 2017 when the firm learned of the overlapping representation and

---

[11]   We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

withdrew from the representation shortly thereafter.  During this time substantial progress had been made in moving the cases forward.  The motion of various defendants (such as helmet manufacturers) to sever their cases from those against the NFL, as well as the motions to dismiss filed by those parties and the NFL, were argued in April 2013.  In July 2013, without yet ruling on the motions, Judge Brody ordered the plaintiffs and the NFL to mediation, and by the end of August 2013 a term sheet had been signed.   Class counsel moved for preliminary approval on January 6, 2014.  On April 16, 2014, Judge Brody sent the matter back for further discussion given her dissatisfaction with the Monetary Award cap, but an amended agreement that eliminated the cap was presented in June 2014.  The Court gave preliminary approval on July 7, 2014 and held a fairness hearing in November 2014.  After additional changes were made to the settlement agreement, it was again presented to the Court on February 13, 2015 and given final approval on April 22, 2015.  Appeals followed, but the Third Circuit Court of Appeals affirmed the District Court's approval of the Settlement Agreement on April 18, 2016, and the Supreme Court denied certiorari on December 12, 2016.  Registration in the settlement program opened in February 2017.

Thus, during the period in which McCorvey Law represented Mr. Rhett, the risk inherent in the litigation decreased significantly.  This reduction in risk was ultimately accomplished through the efforts of Class Counsel and those other firms, including McCorvey Law and Locks Law, whose attorneys served on various MDL committees and performed work for the common benefit of the class, for which many firms including theirs were awarded compensation.  *See* Doc. No. 10019 (the Court's May 24, 2018 Explanation and Order distributing the common benefit fees among petitioning firms).  This does not alter the fact, however, that McCorvey Law undertook the representation at a time of significant risk.

### 2. *Locks Law*

At the time Locks Law agreed to represent Mr. Rhett in August 2016, the Settlement Agreement had met with the approval of the District Court but implementation was on hold pending appeals.  Locks Law could anticipate that the representation would most likely involve making a claim under a settlement agreement, as opposed to advancing novel litigation.  In that posture, the major risks confronting prior counsel in terms of liability and the defenses the NFL could assert had been alleviated, although some risks and several more months of waiting remained until the appeal process resolved and for the claims administration process to be rolled out.  As this case itself bore out, however, the claims administration process was not without risk.  Claims may be denied, and even approved claims are subject to appeal by the NFL.  The claims administration process requires an outlay of expenses and time that can only be recouped if the claim is approved and able to withstand an appeal.  Locks Law undertook the representation in that posture of case-specific risk.

### 3.  *Langfitt Garner*

At the time Langfitt Garner assumed representation of Mr. Rhett in July 2019, he had just been approved for a Monetary Award after having been unsuccessful on his previous claim.  The appeal period, however, had not yet run.  Therefore, there was potential for much work to need to be done to fend off an NFL appeal.[12]  Langfitt Garner contracted for a 15% fee, but it well knew of the involvement of prior counsel who would have a significant claim to any attorney fee to be approved, likely up to the presumptive cap of 22% of any Monetary Award.  The fact that it may have had to engage in significant efforts to enable Mr. Rhett to hold on to his Award was a clear and present risk.  In short, there were no changes in the circumstances as to risk factors during the

---

[12]  The record before us does not provide any specific evidence as to whether an appeal was anticipated by either Locks Law or Langfitt Garner after Mr. Rhett received his award.

time between when Langfitt Garner agreed to represent Mr. Rhett and when it sought to enforce the contract upon the post-appeal approval of his award.

### C.   The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the attorneys' efforts in bringing about the result. On October 18, 2019, Mr. Rhett qualified for a Monetary Award based upon a qualifying diagnosis of Level 1.5 Neurocognitive Impairment at the age of 48. (Post-Appeal Notice of Monetary Award Claim Determination.) That award is subject to deduction for potential derivative claimant awards and finalized liens, as well as a holdback for pending liens with unresolved final amounts.

### D.   The quality of the work performed

Both Locks Law and Langfitt Garner contend that the work performed by McCorvey Law was minimal and had no effect on the result Mr. Rhett obtained. (Locks Resp. at 3; Langiftt Resp. at 2.) Neither firm challenges that McCorvey Law competently filed a placeholder complaint and included Mr. Rhett in communications about the litigation status. The one deficiency suggested as to McCorvey Law's representation concerned what Mr. Rhett suggests was his desire to receive neurological testing early, before he reached a new age category, and what he alleges was McCorvey Law's inability to assist him by advancing funds for such testing or referrals to appropriate providers. (Langfitt Stmt. of Disp. at 1; *Id.*, Ex. Rhett Declar. at para. 2-3.)

As is demonstrated in our discussion below, we find that each firm played a positive role and provided adequate if not quality work on behalf of Mr. Rhett and in accordance with the demands of the respective stage of the litigation, settlement administration, and appeal, although McCorvey Law could perhaps have done more to document Mr. Rhett's condition prior to the

effective date of the settlement.  However, the question of "the quality of the work" does not, by itself, complete our analysis.

### E.     The substantiality of the work performed

The more important question to consider in this multi-party lien dispute is how the different attorneys contributed to the work necessary to obtain the Monetary Award that Mr. Rhett received and defended in this case.  Each contributed in some way, although McCorvey Law's contribution is reflected primarily in the fact that Mr. Rhett was a part of the litigation from the outset and did not opt out of the settlement once a global resolution was proposed.  As noted above, Locks Law and Langfitt Garner characterize McCorvey Law's efforts as *de minimis*, in that the firm invested only a few hours on Mr. Rhett's individual behalf (by its own count) and the work it performed did not have a substantial effect on the ultimate outcome of his award apart from filing a placeholder complaint during the MDL litigation phase.  Langfitt Garner, in turn, characterizes Locks Law's contribution as less significant than its own in defending the award from the NFL's appeal.  Locks Law points to the substantial efforts undertaken by its personnel to file two claims on Mr. Rhett's behalf, the second of which was approved.  We therefore lay out the efforts undertaken by the three firms in the various aspects of their representation to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.

As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;

(3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;

(4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,

(5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,

(6) support of clients who were seeking loans and were exposed to predatory lending practices; and

(7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories, and there may be other categories of tasks undertaken or services provided by IRPAs that would be relevant to this analysis.   In the absence of any suggestion of other relevant criteria, we will use these categories as checkpoints as we consider the substantiality of the IRPA's efforts and the role each may have played in maximizing Mr. Rhett's award.

### (1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date

There is little question that any tasks in this category were undertaken by Locks Law.  None of the entries in the time log provided by McCorvey Law describe any personnel of that firm performing these tasks.  The dispute record makes clear, however, that Locks Law arranged for Mr. Rhett's medical conditions to be identified and diagnosed from the earliest days of its representation in August 2016.  Langfitt Garner's representation did not begin until after Mr. Rhett had obtained a qualifying diagnosis and his claim had been approved, albeit subject to an NFL appeal.

### (2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to

20

**trial**

The materials submitted by McCorvey Law show that the firm had not yet begun to gather evidence for use at a future trial before Mr. Rhett terminated the relationship. By the time Locks Law was engaged by Mr. Rhett in the summer of 2016, the settlement had been reached and approved in the District Court. As of April 18, 2016, it had withstood an appeal to the Third Circuit. Although certiorari in the United States Supreme Court was pending, it was not expected to be granted. Thus, at the time Locks Law undertook representation of Mr. Rhett, it was not expected that his case would proceed to trial. Rather, Locks Law undertook testing to ensure that Mr. Rhett was evaluated at a time as to maximize his chance for recovery under the terms of the proposed settlement agreement based on his age category and the criteria applied to pre-effective date evaluations.

### (3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted

The time log prepared by McCorvey Law shows that in 2014 it monitored a subrogation claim that would reduce Mr. Rhett's eventual recovery. For the most part, however, this factor does not appear to pertain to the work of any of the firms involved.

### (4) Support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class

This factor would relate to McCorvey Law's period of representation. The firm obviously counseled Mr. Rhett to join the multi-plaintiff lawsuit that it filed in the Eastern District of Louisiana in 2012. McCorvey Law has represented that it had periodic communications with Mr. Rhett concerning the status of settlement discussions and the future of the litigation. The firm stressed the importance of not opting out of the class. (McCorvey Stmt. of Disp. at 1.)

By the time Locks Law was engaged in the summer of 2016, the settlement had been

approved in the district court and the Court of Appeals, with only the question of whether certiorari would be granted.  Mr. Rhett did not require convincing to remain in the class.

### (5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award

All three firms shared a role in this aspect.  McCorvey Law, which did not know that it had been replaced, registered Mr. Rhett in the Claims Administration Portal on February 13, 2017. After April 2017, when the matter of overlapping representation was worked out, Locks Law managed communications on Mr. Rhett's behalf regarding the claims process.  McCorvey had no role in the filing of that claim and had neither obtained any medical records nor referred Mr. Rhett for any testing.

The work of Locks Law, however, certainly involved much work outside of registration (which it, too, effectuated on February 14, 2017).  Even before the effective date of the settlement, the firm arranged for Mr. Rhett to be evaluated in August and September 2016 by a neurologist and neuropsychologist.  The firm filed Mr. Rhett's claim and provided relevant medical records on December 18, 2017.  After that claim was denied in May 2018, Locks Law arranged for another set of testing to be performed by a different neurologist and neuropsychologist through the MAF program in January 2019.  It then submitted the new claim in February 2019.  The claim was approved on July 1, 2019.

In many cases, the work of counsel may have ended there.  In Mr. Rhett's case, however, he faced an appeal brought by the NFL.  That required counsel, which at that point was Langfitt Garner, to engage quite actively in advocacy on his behalf.  This work was less "shepherding" than it was skilled legal advocacy.  This work was not *de minimis* and it was certainly a necessary step for Mr. Rhett to receive the award that he did.

### (6) Support of clients who were seeking loans and were exposed

**to predatory lending practices; and**

This factor does not appear to apply to Mr. Rhett.

> **(7) Providing necessary support in other personal matters collaterally related to this litigation**

Langfitt Garner represents that it was provided counsel to Mr. Rhett on the various NFL disability plan programs created through negotiations between the NFL and the NFL Players Association, worker's compensation claims, social security disability programs, and the possibility of future qualifying diagnoses under the Settlement.  (Langfitt Stmt. of Disp. at 4.)

### F.   Apportionment

As we synthesize this information to assess how to apportion fees for the representation provided to Mr. Rhett that yielded the positive outcome of a Monetary Award, we are cognizant that four groups of attorneys contributed to the work necessary to obtain that Award: McCorvey Law acting for Mr. Rhett individually; Class Counsel and the other firms that acted for the common benefit in negotiating and defending the Settlement Agreement, as well as keeping players informed; and Locks Law and Langfitt Garner, both of which agreed to represent Mr. Rhett when it was clear that his case would be resolved according to the terms of the class action settlement.

We first find that the substantiality of McCorvey Law's work as an IRPA in Mr. Rhett's case securing the Monetary Award that he received is necessarily reduced given that the work of class and common benefit counsel clearly "reduced the amount of work required of IRPAs." (Doc. No. 9862 at 4). In its establishment of a 22% presumptive fee cap, the District Court has already taken actions to reduce IRPA fees, accounting for the substantial benefit provided by Class Counsel.  This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team

in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials.  Particularly when we account for the meaningful work of Locks Law from its engagement in 2016 and from Langfitt Garner in 2019, we are convinced that McCorvey Law's hand in bringing about the award Mr. Rhett received clearly does not warrant the 22% fee sought in its lien or even the reduced demand of 8.25% that it requested in its Statement of Dispute.  While the firm contends that this fee is warranted because "settlement was reached when [Mr.] Rhett terminated McCorvey Law[']s representation," (McCorvey Stmt. of Disp. at 3), this argument is not helpful.  This circumstance neither pertains to the substantiality of the work performed to achieve the end result for Mr. Rhett in 2019 nor does it implicate any of the *McKenzie* concerns that we apply here.  In fact, it does appear, at least from Locks' perspective, that McCorvey Law missed an opportunity to best posture Mr. Rhett's future claim by not referring him for pre-effective date evaluations.

Locks Law notes that the claim was filed and approved under its stewardship and that it represented Mr. Rhett actively for three years.  It asserts that it should receive "the vast majority of the fees" or, in the alternative, "a quantum meruit recovery on the relative contributions … based on the number of hours worked multiplied by a fair fee [sic]," (Locks Resp. at 4), although it never made a fulsome presentation supporting a recovery on this basis.  We accept that work performed at Locks Law – even if by personnel who later became affiliated with Langfitt Garner – should be recoverable by Locks Law.[13] We accept that Mr. Rhett effectively acquiesced to the

---

[13] We agree with Locks Law that Langfitt Garner cannot take from it credit for the success of the 2019 claim that "began under the umbrella" of Locks Law but "was developed and advanced exclusively by personnel that later transitioned to Langfitt Garner," as Langfitt Garner argues. (Langfitt Stmt. of Disp. at 5.) *See also id.* at 5 ("It was, therefore, Langfitt Garner personnel and

representation of Locks Law on a contingent fee basis and that the fee would not exceed 20% of any future recovery.  Locks Law took on significant expenses as it assisted Mr. Rhett not once, but twice, in formulating and submitting a claim.

While Langfitt Garner represented Mr. Rhett for the shortest period of time among the three firms, it argues persuasively that it played a very significant role in defending against the NFL's appeal.  This required the firm to front costs (ultimately totaling $4,731.77) and, on a very tight schedule, perform a number of tasks that involved 57.5 hours in attorney time.  (Langfitt Stmt. of Disp. at 4.)  While the span of 86 days between retention and receipt of the post-appeal monetary award reflected only 8% of the claim's "lifespan," as Locks Law calculated (Locks Resp. at 3), a robust opposition to this appeal was critical.  The appeal required Mr. Rhett to defend himself from the NFL's contention that he may have submitted a false claim warranting investigation and that surveillance footage suggested he was not as functionally impaired as he or his witnesses indicated to his neurologist.  As Langfitt Garner described in its Statement of Dispute, and as supported by its exhibits, as part of its preparation of the opposition brief, the firm compiled documentation to undermine the notion that Mr. Rhett had deceived anyone; provided an analysis of NFL surveillance footage to explain Mr. Rhett's impairment; used Mr. Rhett's driving record as affirmative evidence of his impairment; and obtained a further opinion from the diagnosing physician concerning the impact of the surveillance video footage on her diagnostic assessment.  (Langfitt Stmt. of Disp. at 3-4 & Ex. 10.)

When we consider the contributions of each firm to the five categories of tasks described

their expertise and diligence that achieved the 2019 award for Mr. Rhett.").  As Locks Law put it in its response, the work performed between 2016 and 2019 that led to the issuance of a monetary award on July 1, 2019 "was exclusively carried out by [Locks Law] employees and thus on behalf of [Locks Law]. … The only significance of who implemented work within this timeframe is that it was performed at [Locks Law] on behalf of [Locks Law]."  (Locks Resp. at 3.)

above, and valuing each task category based on its significance to this case, we find that the efforts of Locks Law and Langfitt Garner were far more substantial to the result in this case than that of McCorvey Law.  As between Locks Law and Langfitt Garner, we give substantial value to the risk that Locks Law shouldered when it agreed in 2016 to represent Mr. Rhett by fronting costs for two sets of evaluations not knowing whether he would be approved for a monetary award that would provide reimbursement.  At the same time we are impressed by the efforts of Langfitt Garner in defending against the NFL appeal.  But it undertook representation of Mr. Rhett accepting the risk that an appeal was possible.  It was willing to take the chance that continued representation, and any hope of a fee, would require defending against an NFL appeal.

The other question that remains is how much of Mr. Rhett's award is available for distribution to counsel here.  In 2012, when an MDL had been formed but no settlement yet reached, Mr. Rhett agreed that McCorvey Law could collect up to 23% of his award, which was a discount of the firm's standard contract terms at the time.  When he engaged Locks Law in 2016, the firm may still have been charging 33%, but he sought a lower rate.  He was clearly a fee-sensitive client.  Nonetheless, as he switched firms multiple times he had to know that his prior counsel would seek compensation for their work.  He cannot reasonably expect to have had his total counsel fee capped at the 15% rate he negotiated with Langfitt Garner in 2019, when his award was already approved, particularly knowing that the district court had presumptively approved IRPA fees totaling 22% of settlement class members' monetary awards.  Given the quantity of work expended on Mr. Rhett's behalf to achieve the post-appeal monetary award, we find that a total fee of 22% of his award is appropriate.

We will apportion the counsel fee as follows:  2% of the Monetary Award to McCorvey Law, 11% to Locks Law, and 9% to Langfitt Garner.  In light of the District Court's prior order

that a portion of these IRPA fees be set aside in the Attorneys' Fees Qualified Settlement Fund, 5% "holdback funds" will be apportioned among counsel in the same proportion in which they share the 17% portion that is currently available for distribution to counsel.

### G.    Costs

McCorvey Law seeks $350.00 in costs as reimbursement for the filing fee associated with the "Complaint filed on June 1, 2012." (McCorvey Stmt. of Disp. at 3.)  Its CFA with Mr. Rhett provided for reimbursement of such expenditures.  That complaint, however, was filed on behalf of 20 other clients as well.  Therefore, we will only authorize recovery for Mr. Rhett's approximate share of that expense: $70.00.

Locks Law seeks reimbursement of the $16,067.07 it incurred in costs.  The reimbursement of costs, a standard provision in CFAs, was not a subject that was holding up the formalization of Mr. Rhett's agreement with Locks Law.  In accepting Locks Law's efforts to have him evaluated and making those arrangements, Mr. Rhett implicitly agreed to reimburse the firm from any award that he received.  The costs for which Locks Law seeks reimbursement were reasonably incurred and must be awarded to Locks Law.

Langfitt Garner likewise seeks reimbursement of the $4,731.77 it incurred in costs.  Its CFA with Mr. Rhett also provided for reimbursement of costs from his award.  We find that these costs were also reasonably incurred and must be awarded to Langfitt Garner.

## V.    CONCLUSION

We conclude that McCorvey's IRPA contribution to Mr. Rhett's Award here is insufficient to support even a reduced attorney fee of 8.25% of the Award, in light of the subsequent contributions of IRPA counsel.  The work performed by Locks Law during the claim development

and filing stages provided the most significant contribution in ensuring that Mr. Rhett would qualify for the best possible award.  The work of Langfitt Garner in seeing Mr. Rhett through the appeal phase preserved the success achieved by Locks Law and required active advocacy.  We conclude that a fair resolution of this dispute is to award 22% of the Monetary Award for IRPA fees to be apportioned between McCorvey Law, Locks Law, and Langfitt Garner as follows: 2% to McCorvey Law, 11% to Locks Law, and 9% to Langfitt Garner.  These amounts must be reduced by the Common Benefit Fee deduction currently applicable to all Awards.  The firms are entitled to the costs asserted, with the modification described above for the filing fee incurred for a multi-party complaint.  The balance of withheld funds for excess attorney costs withheld by the Claims Administrator would be payable to Mr. Rhett in accordance with all other applicable liens and the terms of the Settlement Agreement.

An appropriate Order follows.

BY THE COURT:

/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE