**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

## CLAIMS ADMINISTRATOR STATUS REPORT NO. 9

## I.     INTRODUCTION

1.     ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 9 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 8 filed on March 27, 2020 (Document 11035).  Our earlier Status Reports are posted to the Settlement Website (under "Documents," click "Status Reports").  We do not repeat here what we covered in them.  All numbers and other information in this Status Report No. 9 are as of June 15, 2020.[1]  We will cover developments after that date in future reports.

---

[1] All dates formatted as 6/15/20 in this Status Report mean June 15, 2020.

## II.   COVID-19 PANDEMIC

**2.**   ***Alert on the Effect of the Covid-19 Pandemic.***  Since the World Health Organization declared COVID-19 a pandemic on March 11, 2020, we have not had a noticeable interruption in the operations of the Claims Administrator, and most of the Settlement Program.  On March 19, 2020, we posted on the Settlement website an Alert regarding the effect of the COVID-19 Pandemic on the Settlement Program.  During this difficult time, the Program has continued to schedule BAP appointments, get the results of examinations by Qualified BAP Providers and Qualified MAF Physicians, receive and process Monetary Award Claims, issue notices and payments, resolve Liens, and perform the many other actions that take place in this Program.  Although the spread of the virus disrupted normal processes in all types of medical practices and facilities across the country, many providers have now resumed non-COVID-19 health care.

## III.   MONETARY AWARD CLAIMS

**3.**   ***Total Claims Received.***  Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted.  We have received 45 new Monetary Award claims since Status Report No. 8, bringing the total to 3,034 Monetary Award Claim Packages from Retired NFL Football Players and Representative Claimants[2] (18.8% of the 16,138 Retired NFL Football Players and Representative Claimants who received favorable registration determinations and are to submit claims).[3]  We have reviewed all 3,034 claims and

---

[2] Section 3 of the Summary Report indicates that 3,044 Monetary Award Claim Packages have been submitted, which includes ten Supplemental Monetary Award claims that we do not include in our numbers in this section of the Status Report. See paragraphs 9 and 10 of the Status Report for details on the Supplemental Monetary Award claims.

[3] Of these Monetary Award claims, 567 (19%) have at least one associated Derivative Claimant who has registered and 2,467 (81%) have no registered Derivative Claimants.  Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible); 2,722 of these Settlement Class Members

have no claims awaiting review.  Five of the 3,034 claims were denied as untimely.[4]  We have received about three new claims a week since Status Report No. 8 in March 2020.  Of the 3,034 Monetary Award claims submitted, 1,973 (65%) rest on pre-Effective Date diagnoses, while 821 (27%) are for post-Effective Date diagnoses, of which 228 (28% of the 821) were made in the Baseline Assessment Program ("BAP")[5]  and 593 (72% of the 821) were made by Qualified MAF Physicians.[6]  The other 240 claims did not tell us what diagnosis date they assert.  Table 1 compares these numbers to those in Status Report No. 8:

| Table 1 | QUALIFYING DIAGNOSIS DATES IN MONETARY AWARD CLAIMS | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE |
| 1. | Pre-Effective Date | 1,972 | 1,973 | +1 | 66% | 65% | -1% |
| 2. | Post-Effective Date | 778 | 821 | +43 | 26% | 27% | +1% |
| | *(a) BAP* | *208* | *228* | *+20* | *7%* | *8%* | *+1%* |
| | *(b) MAF* | *570* | *593* | *+23* | *19%* | *20%* | *+1%* |
| 3. | No Date Asserted | 239 | 240 | +1 | 8% | 8% | 0% |
| **4.** | **Totals** | **2,989** | **3,034** | **+45** | | | |

Table 2 shows by diagnosis date how many claims we have for each type of Qualifying Diagnosis:

---

submitted the 3,034 claims.

[4] We reviewed 19 claims for potential untimeliness and denied five as untimely.  We accepted 14 as timely, which includes two claims that showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

[5] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award.  The BAP Administrator's status reports explain more about BAP diagnoses.

[6] This includes two claims where the Settlement Class Members submitted claims after the Effective Date, but the diagnoses were not rendered by MAF Physicians.  Given unique circumstances, the Parties allowed an AAP member or AAP Consultant to review the medical records to determine if there was a Qualifying Diagnosis.

| Table 2 | QUALIFYING DIAGNOSES PRESENTED IN MONETARY AWARD CLAIMS | | |
|---|---|---|---|
| | DIAGNOSIS | PRE-EFFECTIVE DATE | POST-EFFECTIVE DATE | |
| | | | MAF | BAP |
| 1. | Death with CTE | 124 | N/A | N/A |
| 2. | ALS | 51 | 5 | |
| 3. | Alzheimer's Disease | 424 | 82 | |
| 4. | Parkinson's Disease | 137 | 37 | |
| 5. | Level 2 | 505 | 183 | 83 |
| 6. | Level 1.5 | 732 | 284 | 137 |

We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the Summary Report on the Settlement Website. We also show the current status of all Monetary Award claims based on the last notice or action taken in Section 8 of the Summary Report on the Settlement Website. There are 10 claims (<1% of 3,034) in our review process after an initial Claim Package submission or a response to a notice requesting additional information and/or documents (see Row 1 in Section 8 of the Summary Report).

   **4.**    ***Monetary Awards and Payments.***

   (a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website. We have issued Notices of Monetary Award for 1,157 claims totaling $788,259,592.[7] We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit. Of the 1,157 claims with Notices of Monetary Award, 1,126 reached the point at which we can request funding from the NFL Parties, which have deposited $752,803,551.76 into the Monetary Award Fund

---

[7] The amount of these 1,157 Notices of Monetary Award includes the 1% Derivative Claimant Award deductions allocated to eligible Derivative Claimants. See Paragraph 23 of this Status Report.

for 1,105 claims and 21 not yet funded claims because they are within the funding deadline for the June Funding Request.[8]  Of the 1,105 Monetary Award claims for which the NFL Parties had deposited funds, the Program paid 1,069 claims for a total of $692,353,579.  The remaining 36 funded claims were not yet ready for payment when we submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount.  For the 1,069 Retired NFL Football Players and Representative Claimants who have been paid, the Trustee sent $36,905,716 (5% of those Monetary Awards) to the Attorneys' Fees Qualified Settlement Fund, in accordance with the Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104).  Finally, we are required to withhold money for unresolved Liens and for third-party funders.  Table 3 shows the distribution of the $692,353,579 paid by the Settlement Program and compares the totals to those reported in Status Report No. 8:

---

[8] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.

| Table 3 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | **PAID TO** | **AS OF 3/16/20** | **AS OF 6/15/20** | **CHANGE** |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $640,130,388 | $670,185,583 | +$30,055,195 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $3,341,034 | $3,518,610 | +$177,576 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $8,676,073 | $8,923,847 | +$247,774 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $8,019,000 | $9,725,539 | +$1,706,539 |
| 5. | **Totals** | **$660,166,495** | **$692,353,579** | **+$32,187,084** |

(b) Table 4 shows the changes in figures for payments and claims with Notices of Monetary Award since Status Report No. 8:

| Table 4 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 8 | | | | | |
|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **AMOUNT** | | |
| | | **AS OF 3/16/20** | **AS OF 6/15/20** | **CHANGE** | **AS OF 3/16/20** | **AS OF 6/15/20** | **CHANGE** |
| 1. | Notice of Monetary Award Issued | 1,102 | 1,157 | +55 | $758,001,149 | $788,259,592 | +$30,258,443 |
| 2. | Paid | 1,009 | 1,069 | +54 | $660,166,495 | $692,353,579 | +$32,187,084 |

(c) Table 5 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:[9]

---

[9] Section 8 of the Summary Report on the Settlement Website identifies where claims that have not received a Notice of Monetary Award or been paid stand in the process.

| Table 5 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS | | | | | |
|---|---|---|---|---|---|---|
| | DIAGNOSIS | CLAIMS SUBMITTED | NOTICE OF MONETARY AWARD | | PAID | |
| | | | HOW MANY | %[10] | HOW MANY | %[11] |
| 1. | Death with CTE | 124 | 80 | 65% | 80 | 65% |
| 2. | ALS | 56 | 39 | 70% | 39 | 70% |
| 3. | Alzheimer's Disease | 514 | 347 | 68% | 329 | 64% |
| 4. | Parkinson's Disease | 174 | 143 | 82% | 136 | 78% |
| 5. | Level 2 | 773 | 192 | 25% | 166 | 21% |
| 6. | Level 1.5 | 1,153 | 356 | 31% | 319 | 28% |

5.    *Monetary Award Claims Reviewed by the AAP.*

(a) There are 41 claims in or still requiring Appeals Advisory Panel ("AAP") review, which is the same number we reported in Status Report No. 8.  Although this number has not changed since the last Status Report, the claims that make up that number are not all the same.  Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel Consultants ("AAPC"), as highlighted in sub-paragraph (b) below. The AAP has completed reviews on 858[12] pre-Effective Date diagnosis Monetary Award claims, approving 478 (56%) of those claims.[13]  Under FAQ 147 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 97 claims (an

[10] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that received a Notice of Monetary Award.
[11] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that were paid.
[12] This total number of reviews by the AAP is lower than what was reported in Status Report No. 8. This is because a number of Pre-Effective Date Claims that had been reviewed by the AAP previously were recently denied after Audit and are no longer reported as AAP reviews.
[13] Broken down by Qualifying Diagnosis, the AAP members approved 98% of Death with CTE claims, 95% of ALS claims, 88% of Alzheimer's claims, 97% of Parkinson's claims, 28% of Level 2 claims and 31% of Level 1.5 claims.

increase of six since Status Report No. 8).  Under Rule 27 of the Rules Governing Qualified

MAF Physicians, the AAP has reviewed 152 Monetary Award claims for diagnoses made by

terminated Qualified MAF Physicians, approving 46 (30%) of those claims.[14]

(b) We have assigned 662 claims (an increase of 27 since Status Report No. 8) to the

AAPC based on requests by AAP members for their input on Level 1.5 and Level 2

Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing

supporting an Alzheimer's Disease diagnosis.  The AAPC has completed 653 reviews (98.6%

of those assigned to it) and provided their assessments to the AAP.  An AAPC is reviewing

the other pending claims.

6.    *Notices for Missing Materials*.  We have sent one or more notices requesting

additional documents or information on 2,056 Monetary Award claims (43 more since Status

Report No. 8), as shown in Table 6:

| Table 6 | NOTICES FOR MISSING MATERIALS | | | | | | | |
|---------|-------------------------------|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[15] | TOTAL |
| 1. | Total Reviewed | 124 | 56 | 506 | 174 | 771 | 1,153 | 250 | 3,034 |
| 2. | Notice Issued | 48 | 28 | 301 | 95 | 540 | 821 | 223 | 2,056 |
| 3. | % Missing Materials | 39% | 50% | 59% | 55% | 70% | 71% | 89% | 68% |

So far, 87% of the Settlement Class Members who received a notice requesting additional

documents have responded to the notice.  Settlement Class Members take an average of

---

[14] This figure excludes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award.  At our request, the AAP has reviewed 59 claims to verify the sufficiency of the claimed Qualifying Diagnosis.

[15] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.  We process and pay a person for only one Qualifying Diagnosis per claim submission.

about 60 days to respond.  We generally receive up to four responses to these notices each week and review each reply to determine if it cures the problem.  Of those who responded, 41% cured the problem.  Section 6 of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

7. ***Statute of Limitations Matters***.  We received 136 Claim Packages from Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006.[16]  The Rules Governing Statute of Limitations Proceedings explain how the Special Masters make determinations as to whether such claims are barred by statutes of limitations, as specified in Section 6.2(b) of the Settlement Agreement.  Statute of Limitations Rule 7 requires that a Claim Package be complete before a statute of limitations proceeding may begin.  Of the 136 claims we received:  (a) 73 are complete and assert a potentially compensable Qualifying Diagnosis if the claim is not time-barred under Settlement Agreement Section 6.2(b); (b) one was withdrawn; and (c) 62 have been denied for failing to cure deficiencies or for not asserting a compensable Qualifying Diagnosis.[17]  Table 7 summarizes the status of claims requiring a statute of limitation analysis:

---

[16] We received Registration Forms from 370 Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006, but 134 of them did not properly register because of uncured incompleteness reasons or the player was not a Settlement Class Member because he did not play NFL Football as required by the Settlement Agreement.  Of the 236 Representative Claimants who successfully registered, 100 (42%) did not submit a Claim Package.
[17] The 2020 Grid Value of the 73 complete and potentially compensable claims is $65,607,948.

| Table 7 | STATUS OF CLAIMS REQUIRING STATUTE OF LIMITATIONS ANALYSIS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE |
| 1. | Complete - Potentially Compensable Qualifying Diagnosis | 73 | 73 | 0 | 53% | 53% | 0% |
| 2. | Claim Package Withdrawn | 1 | 1 | 0 | < 1% | < 1% | 0% |
| 3. | Denied – Deficient or No Compensable Qualifying Diagnosis | 62 | 62 | 0 | 46% | 46% | 0% |
| 4. | Totals | 136 | 136 | 0 | | | |

The Special Masters originally stayed a decision on all claims presenting this issue until all were fully briefed, to permit all affected Representative Claimants to be heard before any ruling and allow for the consideration of all arguments in a uniform and efficient manner. Then, on December 11, 2019, the Court appointed United States Magistrate Judge Diane M. Welsh as the Mediator to seek to resolve all claims implicated by Section 6.2(b) of the Settlement Agreement.  The Claims Administrator and Special Masters await the results of Judge Welsh's efforts before adjudicating the 73 claims presenting the statute of limitations issue.

        **8.**     ***Monetary Award Denials***.  There have been 1,027 denials of Monetary Award claims for reasons other than an Audit (14 more since Status Report No. 8), as shown in Table 8.[18]

---

[18] We discuss Audit denials in Paragraph 18 of this Status Report.

| Table 8 | MONETARY AWARD DENIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTALS |
| 1. | Total Reviewed | 124 | 56 | 506 | 174 | 771 | 1,153 | 250 | 3,034 |
| 2. | Denied | 41 | 3 | 74 | 10 | 241 | 433 | 225 | 1,027 |
| 3. | % Denied | 33% | 5% | 15% | 6% | 31% | 38% | 90% | 34% |

Sections 6 and 10 of the Summary Report on the Settlement Website show these denials and the reasons for them.  Overall, the AAP found 562 (55%) of these claims did not reflect a valid Qualifying Diagnosis.  When an AAP member denies a claim, we include in the notice comments from that AAP member explaining why.  When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents.  Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam.  Settlement Class Members have appealed 340 (33%) of the 1,027 denials.

### IV.   SUPPLEMENTAL MONETARY AWARD CLAIMS

**9.**   *Supplemental Monetary Award Claims Received.*  A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis.  The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid.  We have received claims from nine Retired NFL Football Players and one Representative Claimant seeking

Supplemental Monetary Awards, eight for Qualifying Diagnoses of Alzheimer's Disease and two

for a Level 2 Neurocognitive Impairment diagnosis.  This is four more claims than we reported

in Status Report No. 8.

      **10.**    ***Supplemental Monetary Award Reviews and Payments.***  A Supplemental

Monetary Award is the difference between the Monetary Award Grid value of the new

Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis.

We have issued eight Notices of Supplemental Monetary Award to eligible Retired NFL Football

Players and denied one claim for a Supplemental Monetary Award.[19]  The combined Monetary

Award Grid value of these eight Supplemental Monetary Awards was $2,237,054, but after

subtracting the prior Monetary Award payments, totaled $1,212,764, as set out below in Table 9:

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | |
|---|---|---|---|---|
| | **SUPPLEMENTAL CLAIM** | | **PREVIOUSLY PAID CLAIM** | | **SUPPLEMENTAL MONETARY AWARD AMOUNT** |
| | **QUALIFYING DIAGNOSIS** | **AMOUNT** | **QUALIFYING DIAGNOSIS** | **AMOUNT** | |
| 1. | Alzheimer's Disease | $187,217 | Level 1.5 | $93,904 | $93,313 |
| 2. | Alzheimer's Disease | $713,504 | Level 1.5 | $255,175 | $458,329 |
| 3. | Level 2 | $215,923 | Level 1.5 | $153,105 | $62,818 |
| 4. | Alzheimer's Disease | $316,188 | Level 1.5 | $99,620 | $216,568 |
| 5. | Alzheimer's Disease | $118,571 | Level 1.5 | $41,604 | $76,967 |
| 6. | Alzheimer's Disease | $404,326 | Level 2 | $253,783 | $150,543 |
| 7. | Level 2 | $78,737 | Level 1.5 | $55,125 | $23,612 |
| 8. | Alzheimer's Disease | $202,588 | Level 1.5 | $71,974 | $130,614 |
| **9.** | **Totals** | **$2,237,054** | | **$1,024,290** | **$1,212,764** |

The Program has paid six Retired NFL Football Players $751,200 for their Supplemental

Monetary Awards and the remaining two are set to be paid in the next disbursement.

---

[19] The tenth claim for a Supplemental Monetary Award was submitted by a Representative Claimant on November 26, 2019, and is still under review.

## V.     <u>QUALIFIED MAF PHYSICIANS</u>

**11.     *Rules Governing Qualified MAF Physicians.*** On April 11, 2019, the District Court adopted by Order the revised Rules Governing Qualified MAF Physicians. The District Court denied a motion seeking reconsideration of the Order on May 16, 2019 (you can read our response to the request for reconsideration here).  A group of Settlement Class Members appealed Rules 9, 10(b), 13(k) and 23 to the United States Court of Appeals for the Third Circuit. and asked that they be invalidated.  On June 12, 2020, the Third Circuit issued an Opinion and Judgment affirming the District Court's April 11, 2019, and May 16, 2019 Orders.  We have been implementing the Rules as adopted by the District Court and will continue to do so.

**12.     *Maintaining the MAF Network.***

(a) Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website.  There are 107 Qualified MAF Physicians on the website now, representing 35 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside.  We hope to add another 23 approved Qualified MAF Physicians as we confirm their participation and/or contract with them.  Table 10 shows the changes in these numbers since Status Report No. 8:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | ASPECT | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE |
| 1. | Approved Physician – On Posted List | 108 | 107 | -1 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 35 | 35 | 0 |
| 3. | Approved Physician – Not Yet Posted | 20 | 23 | +3 |

Although we added two new physicians to the website, the total in Row 1 of Table 10 went down by one because three physicians withdrew, one because of COVID-19-related issues, and two because of negative interactions they had with a Retired NFL Football Player and his wife about

the Player's diagnosis date.  The Parties approved nine new Qualified MAF Physicians since

Status Report No. 8.[20]  We are working with the approved physicians to get signed contracts in

place so we can add them to the posted list.

(b) We have 370 physicians on our radar, 18 of whom Class Counsel and/or the NFL are

considering whether to approve as Qualified MAF Physicians, one for whom we are preparing

credentials for submission to the Parties, 161 with whom we are engaged in initial and follow-up

communications to determine interest and 190 who we have identified as possibly having

appropriate qualifications but who we need to research more fully before contacting.

**13.**   *150-Mile Rule.*

(a) Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired

NFL Football Player be examined by a Qualified MAF Physician whose office is within 150

miles of his primary residence.[21]  We can make exceptions to this 150-Mile Rule if the

exception is requested prior to the appointment.  We have received 64 requests for

exceptions to the 150-Mile Rule, of which we granted 47 (73%) and denied 17 (27%).  Table

11 shows the changes since Status Report No. 8:

| Table 11 | | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | |
|---|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 3/16/20** | **AS OF 6/15/20** | **CHANGE** | **AS OF 3/16/20** | **AS OF 6/15/20** | **CHANGE** |
| 1. | Granted | 33 | 47 | +14 | 70% | 73% | +3% |
| 2. | Denied | 14 | 17 | +3 | 30% | 27% | -3% |
| **3.** | **Totals** | **47** | **64** | **+17** | | | |

---

[20] The "Parties" are the parties to the Settlement Agreement, Class Counsel and the NFL Parties.  Our contacts with Class Counsel are at Seeger Weiss LLP.  We work with counsel for the NFL Parties at Paul, Weiss, Rifkind, Wharton & Garrison LLP.

[21] This requirement applies only to appointments made after April 11, 2019.  Appointments made on or before April 11, 2019, do not need to be rescheduled with a different Qualified MAF Physician.

For each denied request, the Retired NFL Football Player had at least one Qualified MAF Physician within 150 miles and did not provide a reasonable explanation for wanting to see a Qualified MAF Physician further away.

(b) The 150-Mile Rule is a flexible rule with broad exceptions.  Of the living Retired NFL Football Players registered in the Program, 89.9% have a Qualified MAF Physician within 150 miles of their primary residence.  We work with those who do not to help them schedule appointments with physicians further away, when they tell us they are ready to be examined.

**14.** *50-Mile Rule.*  Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office.  Like the 150-Mile Rule, we have discretion to grant exceptions.  We have received 14 requests for exceptions to the 50-Mile Rule, of which we granted 13 (93%) and denied one 7%).  Table 12 shows how many exception requests we have received and our decisions on those requests:

| Table 12 | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 3/16/20** | **AS OF 6/15/20** | **CHANGE** | **AS OF 3/16/20** | **AS OF 6/15/20** | **CHANGE** |
| 1. | Granted | 8 | 13 | +5 | 100% | 93% | -7% |
| 2. | Denied | 0 | 1 | +1 | 0% | 7% | +7% |
| 3. | **Totals** | **8** | **14** | **+6** | | | |

We denied one request since Status Court Report No. 8 because the Retired NFL Player did not provide a sufficient explanation to grant the exception to see a neuropsychologist outside of the 50-Mile Rule after he saw a neuropsychologist within 50 miles of his Qualified MAF

Physician's office.  Of the 107 Qualified MAF Physicians who are actively scheduling appointments, 101 (94.4%) have an approved neuropsychologist within 50 miles of their office, and we will grant exceptions on a case by case basis for the six Qualified MAF Physicians who do not.

15.    ***Deviation Explanations for Level 1.5 and Level 2 Diagnoses.***  Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we determine more information is needed.  We cannot process these claims further until we receive the required explanation.  We report on these claims in Section 8 (Row 2) of the Summary Report on the Settlement Website.  Since first reporting on this claim status in August 2019, we continue to see the number of affected claims decrease.  We expect the number of claims in this group will continue to go down over time as the Qualified MAF Physicians become more familiar with this requirement and include the necessary explanation in their initial submissions to us.

16.    ***AAP Leadership Council.***  Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network.  We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses.  The AAP Leadership Council also assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the

Settlement Agreement criteria.  Overall, our collaboration with the AAP Leadership Council

has been successful, and the Qualified MAF Physicians have responded positively to

receiving feedback from AAP members.

## VI.   AUDIT

17.   *Closed Audits.*  We have concluded the Audit investigations of 853 Settlement

Class Members with Monetary Award claims by denying a claim through Audit, by making

no adverse finding and removing a claim from Audit, or because the Settlement Class

Member withdrew his or her claim during our Audit.  Table 13 summarizes the reasons for

these closures and changes in the numbers since Status Report No. 8:

| Table 13 | CLOSED AUDITS | | | |
|---|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 3/16/20** | **AS OF 6/15/20** | **CHANGE** |
| 1. | No Finding of Misrepresentation, Omission, or Concealment; or Special Masters Directed Result[22] | 513 | 684 | +171 |
| 2. | Claim Withdrawn by Settlement Class Member | 174 | 169 | -5 |
| 3. | **Totals** | **687** | **853** | **+166** |

18.   *Reports of Adverse Finding in Audit.* We have issued to the Parties 19

Reports of Adverse Finding in Audit (the same number that we reported in Status Report No.

8) affecting 566 Monetary Award claims, all 19 of which were then referred to the Special

Masters.  The 19 Audit Reports concern four neurologists, 12 neuropsychologists, two law

firms, seven individual Settlement Class Members and one claims preparation company.  The

Special Masters accepted our referrals on 12 of the 19 Audit Reports, which concern four

neurologists, 11 neuropsychologists, one law firm, two Settlement Class Members and one

---

[22] Special Masters Directed Result includes claims denied in Audit or released from Audit.

claims preparation company; they rejected our referral on six Audit Reports covering one neuropsychologist and five individual Settlement Class Members.[23]  They referred the remaining Audit Report, concerning one law firm, to the Special Investigator for additional investigation and then issued findings following the Special Investigator's conclusion of his investigation, which is discussed in paragraph 22 of this Status Report.

19.  ***Audit Proceeding Decisions.*** Since Status Report No. 8, the Special Masters issued findings on one Audit Proceeding that they did not designate for publication under Audit Rule 35. Copies of the Special Masters' past decisions that were designated for publication are published on the Settlement Website (under "Documents" click "Special Master" below "Published Decisions").  We have denied 372 claims after Audit based on decisions by the Court or Special Masters.[24]  Sections 6 and 8 (Row 17) of the Summary Report on the Settlement Website show these denials.  A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors.

20.  ***Ongoing Audit Investigations.***  We have other Audit investigations underway affecting 45 individual Monetary Award claims (15 more than the 30 we reported in Status Report No. 8).

---

[23] Pursuant to Rule 34 of the Rules Governing the Audit of Claims, on May 15, 2019, the NFL Parties submitted an objection to the Special Masters' decisions on the five Audit Reports concerning individual Settlement Class Members.  On August 19, 2019, the Court issued a decision on that objection, finding that: (1) four Claim Packages contained material misrepresentations and/or omissions and must be denied; and (2) one Claim Package did not include any material misrepresentations or omissions.

[24] Of the 372 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims).  The Special Masters denied one Retired NFL Football Player's claim.  The Court denied four claims (see Footnote 19 of this Status Report).  One denial is the Dr. Pollock claim that the Special Masters directed us to deny based on the unique circumstances of a Retired NFL Football Player's medical examinations.  The Special Masters directed us to deny 170 claims based on their findings related to the Special Investigator's investigation of a law firm.  We denied the remaining claim for failing to cooperate with our requests for information during an Audit.

21.     ***Claims Investigated More than Once.***  Claims on which we have concluded an Audit may be the subject of another Audit if we later learn of information that requires further investigation.  We notify Settlement Class Members when this happens.  We have audited 91 Monetary Award claims more than one time (one more than the 90 we reported in Status Report No. 8); the most times a Monetary Award claim has been audited is twice.

22.     ***Activities of the Special Investigator.***  The Special Masters referred five investigations to the Special Investigator, concerning three law firms, one litigation funding company and one individual Settlement Class Member.  The Special Investigator has finished his work on each of these investigations. Since Status Report No. 8, the Special Investigator completed his work concerning two law firms.  The Special Masters referred one firm to the Special Investigator because the firm refused to cooperate with our Audit; the Special Investigator concluded that the firm did not appear to have inappropriately attempted to influence the outcomes of Players' Settlement claims.  The Special Masters referred the second firm to the Special Investigator after receiving our Audit Report concerning the firm's activities.  Based on the Special Investigator's findings, the Special Masters concluded that the firm's practices impugned the integrity and fair administration of the Settlement Agreement as a whole.

## VII.   <u>DERIVATIVE CLAIMANTS</u>

23.     ***Derivative Claims.***  We have received 593 Derivative Claim Packages, which is an increase of two since Status Report No. 8.  Table 14 shows the status of these claims:

| Table 14 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | HOW MANY | % OF TOTAL |
| 1. | Paid Derivative Claimant Award ($934,287) | 208 | 35% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($10,515) | 6 | 1% |
| 3. | Denied – Associated Retired NFL Football Player's Claim Denied | 46 | 8% |
| 4. | Denied – No Timely Claim for Associated Retired NFL Football Player | 42 | 7% |
| 5. | Denied – No Timely or Proper Registration for Associated Retired NFL Football Player | 34 | 6% |
| 6. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 7. | Denied – Deceased Derivative Claimant | 4 | 1% |
| 8. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 9. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 3% |
| 10. | Withdrawn | 9 | 2% |
| 11. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 215 | 36% |
| 12. | Total | 593 | |

Since Status Report No. 8, six more Derivative Claimants were paid, and we issued three more Notices of Derivative Claimant Award. We have paid 97% of the 214 Derivative Claimants who received Notices of Derivative Claimant Award; all six of the eligible Derivative Claimants who have not yet been paid are in the payment process. We have not received an objection from any of the 158 Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

24.     ***Additional Derivative Claimant Details.*** We have received challenges from 29 Retired NFL Football Players (or their Representative Claimants) to 41 Derivative Claimants (no change since Status Report No. 8); 19 (46%) of those 41 challenged Derivative Claimants never submitted a timely Derivative Claim Package, making them ineligible for a Derivative Claimant Award. We issued a Notice of Derivative Claim

Package Submission Deadline to 447 registered Derivative Claimants.  Table 15 summarizes their claim submission statuses and the changes since Status Report No. 8:

| Table 15 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | |
|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE |
| 1. | Claim Submitted | 152 | 152 | 0 | 34% | 34% | 0% |
| 2. | No Claim Submitted | 287 | 294 | +7 | 65% | 66% | +1% |
| 3. | Within 30-Day Deadline | 3 | 1 | -2 | 1% | <1% | -1% |
| 4. | Totals | 442 | 447 | +5 | | | |

25.    ***Supplemental Derivative Claimant Awards.***  Section G of the Overview of Derivative Claimant Process on the Settlement Website (https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf) explains how Supplemental Derivative Claimant Awards are handled.  As discussed in Paragraph 10 of this Status Report, we issued Notices of Supplemental Monetary Award to eight Retired NFL Football Players.  None of those Supplemental Monetary Award Notices had a 1% offset for potential Derivative Claimant Awards.  Six Retired NFL Football Players had no registered Derivative Claimants associated with them, and two Retired NFL Football Players each had one registered Derivative Claimant, but neither Derivative Claimant submitted a Derivative Claim Package to share 1% of the Retired NFL Football Player's earlier Monetary Award and was not eligible for any portion of that Player's Supplemental Monetary Award.  We have not yet issued any Notices of Supplemental Derivative Claimant Award.

## VIII.   OTHER CLAIM PROCESSES

26.      ***Handling of Attempted Assignments of Claims***.  On September 27, 2019, the

Court issued a Notice (Document 10858) directing us to streamline the process regarding

attempted assignments by Settlement Class Members of claims to third-party lenders.  At that

time, we suspended the process for handling such assignment questions under the Rules

Governing Assignment of Claims and worked with the Court and the Special Master to

modify these Rules.  On March 19, 2020, the Special Masters adopted the Rules Governing

Payment of Claims Involving Third-Party Funders and the Rules Governing Third-Party

Funding Resolution Protocol, which superseded the previous Rules.  Under the new Rules

Governing Payment of Claims Involving Third-Party Funders, all Settlement Class Members

must complete and submit a Sworn Statement regarding the Status of Assignment of

Monetary Claim ("SWS-5") to receive payment. There are two versions of the SWS-5, one

for those identified as a borrower by a Third-Party Funder that is participating in the Rules

Governing Third-Party Funding Resolution Protocol ("Resolution Protocol") (the SWS-5(A))

and another for those not so identified (the SWS-5(B)).

27.      ***Petitions for Deviation from the Attorneys' Fee Cap.***[25]  We have received

seven Petitions for Deviation, one of which was withdrawn.  The Court resolved two of the

remaining six Petitions for Deviation in conjunction with the Attorneys' Lien Dispute

Process; the other four are pending final resolution.  This is unchanged from Status Report

No. 8.

---

[25] Judge Brody entered a Memorandum and Order in April of 2018 limiting attorneys' fees in the Program to 22% of each SCM's Monetary Award, plus reasonable costs (ECF Nos. 9862 and 9863).  In the Memorandum, the Judge decided that attorneys should have the opportunity to petition the Court to go above and beyond the cap in exceptional circumstances, which is what the Petitions for Deviation process is meant to cover.

28.    *Non-Medical Liens Process and Attorneys' Lien Disputes.*

(a) Table 16 summarizes Non-Medical Lien assertions, notices and disputes by Lien

type and reflects changes to those numbers since Status Report No. 8:

| Table 16 | | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE |
| 1. | Attorneys' | 1,165[26] | 1,205[27] | +40 | 450 | 464 | +14 | 290 | 290 | 0 |
| 2. | Child Support | 345 | 346 | +1 | 49 | 50 | +1 | 19 | 20 | +1 |
| 3. | Judgment | 64 | 64 | 0 | 15 | 15 | 0 | 9 | 6 | -3 |
| 4. | Tax | 54 | 55 | +1 | 3 | 3 | 0 | 0 | 0 | 0 |
| **5.** | **Totals** | **1,628** | **1,670** | **+42** | **517** | **532** | **+15** | **318** | **316** | **-2** |

(b) Table 17 shows the status of Liens in the Attorneys' Liens dispute resolution

process:

| Table 17 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[28] | | |
|---|---|---|---|
| **PENDING** | **RESOLVED** | | **TOTAL** |
| | **BY AGREED WITHDRAWAL** | **BY COURT DETERMINATION** | |
| **32** | **62** | **9** | **103** |

(c) Table 18 breaks down the Non-Medical Lien holdbacks[29] by Lien type:

---

[26] These 1,165 Attorneys' Liens were asserted by 52 law firms.

[27] These 1,205 Attorneys' Liens were asserted by 52 law firms.

[28] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.

[29] The holdbacks are the amount of funds we are withholding pending resolution of a Dispute. As of 6/15/2020, there are 19 disputed Attorneys' Liens currently pending resolution by Judge Strawbridge where the Settlement Class Member has received payment of the rest of his Monetary Award.  After the Court enters a final order (whether by Judge Strawbridge or Judge Brody's approval of his Report and Recommendation) resolving the Disputes and any appeal period passes, we disburse the held back funds on the next available monthly Disbursement.

| Table 18 | | NON-MEDICAL LIEN HOLDBACKS | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN HOLDBACKS |
| 1. | Attorneys' | 19 | $19,071,634.77 | $3,220,188.64 |
| 2. | Child Support | 0 | N/A | N/A |
| 3. | Judgment | 0 | N/A | N/A |
| 4. | Tax | 0 | N/A | N/A |
| 5. | **Totals** | **19** | **$19,071,634.77** | **$3,220,188.64** |

(d) Table 19 summarizes the Non-Medical Lien payments by Lien type:

| Table 19 | | NON-MEDICAL LIEN PAYMENTS | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN PAYMENTS |
| 1. | Attorneys' | 65 | $82,278,288.28 | $5,562,975.60 |
| 2. | Child Support | 12 | $11,437,991.60 | $486,492.42 |
| 3. | Judgment | 4 | $5,719,786 | $2,860,553.18 |
| 4. | Tax | 1 | $33,282.80 | $6,492.65 |
| 5. | **Totals** | **82** | **$99,469,348.68** | **$8,916,513.85** |

## IX.  COMMUNICATIONS CENTER FOR THE PROGRAM

**29.**  *Our Contact Activity*.  Since our contact center opened on February 6, 2017, we have handled 79,567 total communications, including 50,491 calls made or received and 25,122 emails to us at our Claims Administrator email box.  Since Status Report No. 8, we handled 1,361 such total communications.  The most common topics of these communications have been Payment, General Settlement Information, Liens – Non-Medical, Baseline Assessment Program (BAP), and MAF Physicians.

**30.**  *Law Firm Contacts.*  Our Law Firm Contacts are assigned to 545 different law firms or lawyers representing Settlement Class Members in the Program.  This is one more law

firm or lawyer than we reported in Status Report No. 8.  The calls and emails handled by the

Law Firm Contacts are part of the total contact activity described in Paragraph 29 above.

      **31.**    ***Newsletters.*** Since Status Report No. 8, we issued three more editions of our

"Insights" newsletter (March 2020, April 2020 and May 2020).  We send the newsletters to

unrepresented Settlement Class Members and lawyers by email or mail.  We also post them to

the Settlement Website (under "Documents" click "Newsletters").  We invite all lawyers and

Settlement Class Members to send us suggested topics for our newsletters.

      **32.**    ***Settlement Program Website.*** We regularly update the Settlement Website to

reflect progress and changes to the Program.  We have made these changes since Status Report

No. 8:

(1) Added four new Court orders/opinions to the Court Orders and Opinions page at https://www.nflconcussionsettlement.com/Court_Orders_Opinions.aspx.  These include: (a) Order and Explanation for Approval of Education Fund Programs (Document 11033, filed March 23, 2020); (b) Order Extending Special Investigator's Appointment (Document 11037, filed March 30, 2020); and (c) Third Circuit Opinion and Judgment Affirming District Court's April 11, 2019 Order in Aid of Implementation of the Settlement Agreement: Rules Governing Qualified MAF Physicians, and May 16, 2019 Order Denying Motion for Reconsideration (Documents 76 and 77-1, filed June 12, 2020).

(2) Posted a Report of the Special Masters (Document 11036, filed March 27, 2020), Claims Administrator Status Report No. 8 (Document 11035, filed March 27, 2020) and BAP Administrator Status Report 1st Quarter 2020 (Document 11034, filed March 27, 2020) to the Status Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.

(3) Posted two new Alerts dated March 19, 2020, discussing the effect of the COVID-19 pandemic on the Settlement Program and new rules regarding payment of claims and Third-Party Funders (https://www.nflconcussionsettlement.com/Alerts.aspx).

(4) Removed four forms from Payment Forms page, including the Law Firm Payment Election Form, Unrepresented Settlement Class Member Payment Election Form, Waiver Relinquishing Rights Under Attempted Assignment, and SWS-5 (Sworn Statement: Status of Assignment of Claim).

(5) Added two forms to the Payment Forms page: the SWS-5(B) (Sworn Statement: Status of Assignment of Monetary Claim Not Involving Resolution Protocol) and the

SWS-5(A) (Sworn Statement: Status of Assignment of Monetary Claim Involving Resolution Protocol).

(6) Replaced the Petition for Appointment of Representative Claimant and Petition for Appointment of Derivative Claimant Representative on the Centralized Process for Representative Appointment Forms page to include a line for Special Master Hoffman's signature.

Since Status Report No. 8, the Program's Home page has had 12,385 more unique visits, giving us 476,965 total unique visits, coming from 190 countries and all 50 of the United States. The top five downloaded documents since Status Report No. 8 in March 2020 were the Settlement Agreement (470 clicks), Monetary Award Grid (97 clicks), Diagnosis and Review Table (47 clicks), Payment Process Timeline (36 clicks) and Exhibit 1 Injury Definitions (34 clicks). The three most frequently visited pages (after the Home page) were Physician Search (813 unique views), Alerts (811 unique views) and Reports and Statistics (791 views).

## X.  SPECIAL MASTERS

**33.  *Our Work with the Special Masters*.** Since Status Report No. 8, we had five more regularly scheduled calls to discuss policy and operational issues, and have held 94 such calls with the Special Masters to date. We have many other calls and exchange countless emails with them to address issues as they arise. The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

**34.  *Program Rules*.** Since Status Report No. 8, we replaced the Rules Governing Third-Party Funder Voluntary Compromise Process with the Rules Governing Payment of Claims Involving Third-Party Funders and added the Rules Governing Third-Party Funding Resolution Protocol, in accordance with the District Court's Notice entered September 27, 2019 (Document 10858). We also posted new sets of the Rules Governing Appeals of Claim

Determination and Rules Governing the Audit of Claims.[30]  All 10 sets of Rules are available on the Settlement Website (under "Documents," click "Governing Rules") and on the online portals of law firms, lawyers and *pro se* Settlement Class Members.

35.      ***Published Decisions.***  Since Status Report No. 8, the Special Masters have issued six new decisions they designated for publication.  These decisions dated May 1, 2020, May 27, 2020, June 2, 2020, and June 8, 2020, all relate to issues that affect how we analyze claims for Monetary Awards.  We post all such rulings to the Settlement Website (under "Documents," click "Special Master" below "Published Decisions").  The Special Masters have so far issued 11 published Monetary Award appeal decisions and nine Audit decisions (20 total such decisions).

## XI.      PROCEDURES AND FREQUENTLY ASKED QUESTIONS

36.      ***Coordination with the Parties.***  We have held 147 policy and operational issue calls with the Parties since we began doing them on April 19, 2016.  We also have other calls, meetings and emails with the Parties on particular interpretation or operational issues that arise.  Where we do not have consensus among the Parties on an issue, we consult the Special Masters to determine the best practices approach, while still honoring the terms of the Settlement Agreement.

37.      ***Frequently Asked Questions***.  Since Status Report No. 8, we added a new category of FAQs named "Special Master Appeal Decisions."  This new section explains

---

[30] In the Rules Governing Appeals of Claim Determinations, Rule 6(c) on extensions of time now includes a new sub-section (1) that says: "Any party seeking an extension of time from the Special Master must make the extension request before the deadline for any appeal expires. However, requests made after the deadline may be considered for extenuating circumstances that may merit *post-facto* extensions at the discretion of the Claims Administrator, and the Parties will have an opportunity to provide their positions on whether the specific factual circumstances merit such an extension."  In the Rules Governing the Audit of Claims, Rule 3(d) changed the definition of "Claim" to include Claim Packages that may be submitted to the Claims Administrator ("any Claim Package (or portion of a Claim Package) submitted *or that may be submitted* to the Claims Administrator seeking or relating to a Monetary Award or Supplemental Monetary Award, or a Derivative Claim Package (or any portion of a Derivative Claim Package) submitted *or that may be submitte*d to the Claims Administrator seeking a Derivative Claimant Award").  (Emphasis added.)

rules established by the Special Master in those decisions designated to be published, or posted publicly on the Settlement Website.  There is one FAQ in this new section ("Who determines the appropriate model for predicting premorbid functioning?").  We also revised these five Payment FAQs for consistency with the Rules Governing Payment of Claims Involving Third-Party Funders and Rules Governing Third-Party Funding Resolution Protocol:

(a) FAQ 311 ("I received a Notice of Monetary Award Claim Determination or Notice of Derivative Claimant Award Determination. Do I need to do anything else to receive payment of the award?");

(b) FAQ 312 ("When will I receive payment for my Monetary Award or Derivative Claimant Award?");

(c) FAQ 314 ("How will the funds be issued by Citibank?");

(d) FAQ 317 ("Can a Settlement Class Member assign rights to receive his or her Monetary Award or Derivative Claimant Award, or a portion of the Award, to a third party?"); and

(e) FAQ 321 ("Do lawyers have to send a statement of contingency fees and expenses to the Claims Administrator?").

There now are 353 FAQs in 16 categories.  "FAQs" is one of the options in the green menu bar on the Settlement Website.  These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program.  The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs.  Note that when we add new FAQs, we place them within the existing set where it makes the most sense.  This means that the numbering of FAQs within the set may change from time to time.

## XII.   REGISTRATION

**38.   *Registration Submissions.***

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover

Registration.  Table 20 here shows changes in the number of timely Registration submissions

since our Status Report No. 8:

| Table 20 | TIMELY REGISTRATION SUBMISSIONS | | |
|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 3/16/20** | **AS OF 6/15/20** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,909 | 15,903 | -6 |
| 2. | Representative Claimants | 1,334 | 1,340 | +6 |
| 3. | Derivative Claimants | 3,310 | 3,311 | +1 |
| **4.** | **Totals** | 20,553 | **20,554** | **+1** |

The number of Retired NFL Football Players (Row 1) went down by six from Status Report

No. 8 because they were replaced by Representative Claimants.  Of the 20,554 to whom we

issued Registration notices, we were able to confirm that 19,393 of them are Settlement Class

Members under the Settlement Agreement, of whom 12,837 are Retired NFL Football

Players eligible to participate in the BAP.  The other 1,161 persons have incomplete

registrations or are not Settlement Class Members under the Settlement Agreement because

of one or more of these reasons:  (1) they were on an Active Roster as of July 7, 2014; (2)

they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out

of the Settlement Program; (4) they did not provide us with the information or support

required by the Settlement Agreement to register, after several notices from us and up to 150

days to turn it in; or (5) they tried to register as a Derivative Claimant but did not have a

relationship with the Retired NFL Football Player by which they had a right under applicable

state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals.  We have made determinations on 288 such Registrations and found that 156 (54%) of them presented good reasons to be allowed to register after August 7, 2017.  Table 21 shows the change in these numbers since Status Report No. 8:

| Table 21 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | STATUS | AS OF 3/16/20 | AS OF 6/15/20 | CHANGE |
| 1. | Accepted | 155 | 156 | +1 |
| 2. | Not Accepted | 131 | 132 | +1 |
| 3. | Totals | 286 | 288 | +2 |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge.  The NFL Parties also may challenge our good cause exception decisions.  We have received 377 challenges, which is the same as what we reported in Status Report No. 8.  Table 22 explains these challenges and what happened to them:

| Table 22 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 245 | Settlement Class Member | 77 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 22 | Settlement Class Member | 5 | 17 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | Totals | 377 | | 150 | 227 |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters.  Table 23 shows the appeals thus far and the Special Masters' rulings on them:

| Table 23 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO APPEALED | DECISION UPHELD | DECISION OVERTURNED |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 6 | Settlement Class Member | 5 | 1 |
| 5. | Totals | 36 | | 33 | 3 |

**39.**     ***Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.***  The Special Masters have approved 418 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants.  These are four new Representative Claimant approvals since Status Report No. 8.  There have been no new Derivative Claimant Representatives since Status Report No. 8.

## XIII.   OTHER DEVELOPMENTS

**40.**     ***Education Fund.***  One of the benefits of the Settlement Agreement is the establishment of a $10 million Education Fund to support programs promoting safety and injury prevention in the sport of football.  On March 23, 2020, the Court entered an Order approving the Education Fund programs presented by Class Counsel in its January 23, 2020 Motion. The Court approved these three initiatives:

   (a) Financial support for The innovATe Project, which will be managed by the Korey Stringer Institute.
   (b) Funding for, and creation of, a Medical Information Research Database, utilizing medical information generated through the BAP.
   (c) Distribution of additional educational materials to Retired Players about the NFL's benefits and education programs.

The Court's Order and Class Counsel's Motion contain more information about these Education Fund programs and are posted on the Settlement Website.

## XIV.   CONCLUSION

**41.**     ***General Status.***  We have 196,598 documents (20,195 gigabytes, or 20.2 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 3,792 more than when we filed Status Report No. 8. We have issued 37,888 notices (460 more since Status Report No. 8) of various kinds

(Registration, claims, appeals, Audit, etc.) to 20,977 different persons since March 23, 2017,

and developed over 100 different types of notices and forms for use in the Program.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By: _____
       Orran L. Brown, Sr.
       Virginia State Bar No.:  25832
       BrownGreer PLC
       250 Rocketts Way
       Richmond, Virginia  23231
       Telephone:  (804) 521-7201
       Facsimile:  (804) 521-7299
       Email:  obrown@browngreer.com