# **Exhibit A**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                    Plaintiffs,<br><br>                         v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>                    Defendants. | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody**<br><br><br>CIVIL ACTION NO: 2:14-cv-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

### SUPPLEMENTAL DECLARATION OF CHRISTOPHER A. SEEGER IN SUPPORT OF PETITION FOR ADOPTION OF A SET-ASIDE FROM EACH <u>MONETARY AWARD AND DERIVATIVE CLAIMANT AWARD</u>

CHRISTOPHER A. SEEGER declares, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, information and belief, the following:

1.      I am fully familiar with the matters set forth herein, including the procedural history of this litigation, the work that has been undertaken since the final approval of the Class Action Settlement Agreement dated June 25, 2014, as amended February 13, 2015 (ECF No. 6481-1) ("Settlement Agreement" or "Settlement"), and the ongoing work necessary to deliver the promised benefits of the Settlement Agreement to the Retired NFL Football Players and their families.

2.      I submit this Supplemental Declaration in further support of the Petition for an Award of Attorneys' Fees, Reimbursement of Clasts and Expenses, Adoption of a Set-Aside of Each Monetary Award and Derivative Claimant Award, and Case Contribution Awards for Class Representatives ("Common Benefit Petition"), which I filed with the Court on February 13, 2017. ECF No. 7151. Specifically, this Supplemental Declaration is in further support of the Common Benefit Petition's concurrent request for a five-percent holdback or set-aside from Monetary Awards[1] for the purpose of compensating implementation-phase common benefit work. ECF Nos. 7151 at 2, 7151-1 at 70-75, 7151-2 at 31-35 (¶¶ 101-19) ("set-aside request" or "holdback request").

3.      Based on the experience of Class Counsel (by which I mean my own experience as well as that of the attorneys in my firm, Seeger Weiss LLP ("Seeger Weiss")  who have been involved in Settlement implementation matters) since the launch of the Settlement Program, and with the conclusion of the appeals taken by a number of objectors to the Court's 2018 and 2019 fee-related decisions (including its aggregate fee award, its allocation of that award, its capping of individually retained private attorney ("IRPA") fees at a presumptive 22%, and its first implementation-phase common benefit fee award),[2] I am now able to provide the Court with additional facts pertinent to the holdback request, as to which the Court deferred a decision pending

---

[1] References to Monetary Awards encompass both Monetary Awards and Derivative Claimant Awards under articles VI and VII, respectively, of the Settlement Agreement inasmuch as the set-aside request pertains to both types of awards. *See* Settlement Agreement § 21.1, ECF No. 6481-1 at 82; *see generally id.*, arts. VI-VII, ECF No. 6481-1 at 35-43 (providing for both types of awards).

[2] Those decisions included the Court's aggregate common benefit fee award, its allocation of that award, its capping of individually retained private attorney ("IRPA") fees at a presumptive 22%, and its first implementation-phase common benefit fee award. *See In re Nat'l Football League Players' Concussion Injury Litig.*, ___ F. App'x ___, No. 18-2012, 2020 WL 2214131 (3d Cir. May 7, 2020), a*ff'g*, ECF Nos. 9860-9863, 10378, *and aff'g in part and remanding in part*, ECF No. 10019.

further evidentiary development.  ECF No. 9860 at 2 & n 1, 8-9, 17-20; ECF No. 10019 at 4 n.2. Given the facts that I set forth below concerning the developments relating to the Settlement's effectuation over the past three and one-half years, I respectfully submit that the matter of the holdback request is now ripe for the Court's formal adjudication.

### *Overview*

4.      On April 25, 2012, the Court appointed me in this multidistrict litigation to serve as Plaintiffs' Co-Lead Counsel, and as a member of the Plaintiffs' Executive Committee ("PEC"). ECF No. 64.  In its Amended Final Order and Judgment approving the Settlement Agreement, the Court confirmed its July 7, 2014 appointment of me as Co-Lead Class Counsel.  ECF Nos. 6534 at 3 (¶ 6), 6034 at 4 (¶ 3.b).   On May 24, 2019, the Court terminated all other leadership appointments and appointed me to serve as sole Class Counsel.  ECF No. 10624.

5.      The Court granted final approval to the Settlement on April 22, 2015.  ECF Nos. 6509, 6510.  The Third Circuit affirmed this Court's final approval of the Settlement on April 18, 2016.  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016), *aff'g*, 307 F.R.D. 351 (E.D. Pa. 2015).  On December 12, 2016, following years of hard-fought litigation, negotiation, and numerous challenges on appeal, the United States Supreme Court denied review of the Third Circuit's decision.  *Armstrong v. NFL*, 137 S. Ct. 607 (2016); *Gilchrist v. NFL*, 137 S. Ct. 591 (2016).  By its terms, therefore, the Settlement became effective on January 7, 2017, the day after the expiration of the time to seek rehearing of the denials of the two petitions for writ of *certiorari*.  *See* Settlement Agreement § 2.1(j), ECF No. 6481-1 at 12-13 ().

6.      The Settlement provides that "[a]fter the Effective Date, Co-Lead Class Counsel may petition the Court to set aside up to five percent of each Monetary Award and Derivative

Claimant Award to facilitate the Settlement program and related efforts of Class Counsel. These set-aside monies shall be held in a separate fund overseen by the Court." Settlement Agreement § 21.1, ECF No. 6481-1 at 82.

7.      In accordance with the Settlement, for a Class Member represented by an IRPA, any set-aside from a Monetary Award will reduce the attorney's fee payable to that counsel by the amount of the set-aside. *Id.*

8.      The purpose of the set-aside is to compensate counsel for work performed and expenses incurred for the common benefit of the Settlement Class during the Settlement's implementation phase, so as to ensure the successful operation of the Settlement over the course of its 65-year life. This is distinct from the $112.5 million in attorneys' fees and reimbursement of costs and expenses paid by the NFL,[3] which fees were designed to compensate Class Counsel for all common benefit work and costs incurred prior to the Settlement's implementation.

9.      On February 13, 2017, while still serving as Co-Lead Class Counsel, I filed the Common Benefit Petition. ECF No. 7151. As is relevant here, the Common Benefit Petition included the set-aside request. *See* ECF Nos. 7151 at 2, 7151-1 at 70-75, 7151-2 at 31-35 (¶¶ 101-19).

10.      On September 14, 2017, the Court appointed Professor William B. Rubenstein to render an expert opinion concerning the holdback request and the potential capping of fees earned by IRPAs pursuant to their retainers with Settlement Class Members. ECF No. 8376. Professor Rubenstein issued an Expert Report on December 11, 2017 ("Rubenstein Report"), opining that no holdback was warranted, based on a series of assumptions regarding the Settlement Agreement

---

[3]   For the sake of brevity and clarity, NFL throughout is used as a shorthand reference to both of the NFL Parties.

and the nature of the common benefit work needed to implement the Settlement.  Professor Rubenstein recommended, *inter alia*, that the NFL could pay more in attorney's fees or that $22.5 million of the $112.5 million in class fees paid by the NFL could be placed in an interest-bearing account that would generate about $1 million a year, which he believed should be sufficient to compensate implementation-phase work.  ECF No. 9526 at 35-45.

11.     Class Counsel (among others) responded to Professor Rubenstein's Report on January 3, 2018, pointing out that he had incorrectly calculated what class attorneys' fees represented as a share of the Settlement's value; and that he had incorrectly assumed that the fees paid by the NFL would also be sufficient to compensate all implementation-phase common benefit work by underestimating the wide-ranging efforts that had gone into securing and defending the Settlement and would be necessary for its long-term effectuation in the first place.  In particular, Class Counsel noted the increased and unexpected burdens that were being faced in the effectuation phase, including from third-party funders and claims services providers aggressively targeting Class Members.   ECF No. 9552 at 2-11.

12.     Professor Rubenstein then filed a reply to the various responses to his report,  in which he opined that if the funds in the Attorneys' Fees Qualified Settlement Fund ("AFQSF") prove inadequate to compensate effectuation-phase common benefit work, either the NFL could pay additional attorneys' fees (which the NFL subsequently advised the Court that it categorically rejected and would oppose, ECF No. 9581) or, as a last resort, the Court adopt a 2% rather than a 5% set-aside.  ECF No. 9571 at 4-8.

13.     On April 5, 2018, the Court issued a decision, granting the Common Benefit Petition.  The Court rendered an aggregate common benefit fee award and approved the requested

Case Contribution Awards for the class representatives, but reserved decision on the matter of the

holdback request.  ECF No. 9860 ("Common Benefit Order").

14.     On the matter of the holdback, the Court explained that it was concerned that

Professor Rubenstein's initial analysis did not fully appreciate the demands of the Settlement

Program:

> The Court is troubled that the $1 million per year suggested by Professor
> Rubenstein may be insufficient to pay the costs and fees associated with future
> implementation of the Settlement.  The past year of implementation alone has
> required Class Counsel to bill well over $5 million in costs and fees.  *See* Decl.
> Chris Seeger 19, ECF No. 8447 (summarizing implementation costs and fees
> through September 2017).  While the Court assumes that Class Counsel's
> implementation work will decrease as the Settlement progresses, no party or expert
> has provided the Court with an adequate estimate for the amount of work that will
> be required in the future.
>
> Because of this current ambiguity and in an abundance of caution, the Court reserves
> decision on the 5% holdback request.

*Id.* at 17-18.

15.     Thus, evidently believing that some set-aside would be necessary, but

recognizing that the Settlement Program was still in its relative infancy, the Court reserved

decision on the question of the holdback request and directed that the Claims Administrator should,

in the meantime, continue provisional withholding of 5% of Monetary Awards and Derivative

Claimant Awards[4];

> The Court plans to adopt Professor Rubenstein's recommendation to set aside some
> portion of the $112.5 million for future implementation work, but the Court simply
> needs more time to evaluate the situation before making a final determination
> regarding the amount of a set aside from the $112.5 award and the amount, if any,
> of a percentage holdback of Monetary Awards.  Reserving decision will allow for
> the accumulation of more data that can be used to more accurately assess future

---

[4]     In addition, the Court made clear that the provisional holdback would, like any
permanent set-aside, be deducted from the  attorneys' fees portion of Monetary Awards in the case
of those class members who are represented by IRPAs.  *See id.*

costs and fees. The issue will be revisited at a future point once a clearer picture
has emerged. . . .

The Court recognizes the hardship that holding back funds may place on
unrepresented Class Members and IRPAs, but the hardship is necessary to ensure
the integrity and longevity of the Settlement.  The Court hopes and anticipates that
the combination of a set aside and a precautionary 5% holdback will provide more
than enough money for implementation.

ECF No. 9860 at 17-18; *see also id.* at 2 n.1.

16.     Shortly after entry of the Common Benefit Order, on May 4, 2018, the Court
allocated the aggregate common benefit fee award between the various firms or counsel that had
performed common benefit work or had otherwise conferred a common benefit on the Settlement
Class before the Settlement's Effective Date.  ECF No. 10019 ("Allocation Order").  The Court
allocated a total of $85,619,466.79, leaving at that time $22,823,253.33 in the AFQSF available to
compensate implementation-phase common benefit work.  *Id.* at 25.  Additionally, the Court
directed Class Counsel to begin filing semi-annual post-Effective Date fee petitions, using
prescribed blended rates that the Court had used in calculating firms' lodestars for the purpose of
apportioning the aggregate common benefit award.  *Id.* at 7 n.4, 25.

17.     On July 10, 2018, I filed the First Verified Petition of Co-Lead Class Counsel
Christopher A. Seeger for an Award of Post-Effective Date Common Benefit Attorneys' Fees and
Costs ("First Post-Effective Date Fee Petition").  ECF No. 10128.  That fee petition covered the
work completed between the Effective Date of the Settlement and May 24, 2018.  The First Post-
Effective Date Fee Petition requested compensation for 13,553.5 hours of professional and para-
professional work from eight different firms or lawyers, or a total of $8,559,179.97 in fees using
the blended rates set by the Court, and reimbursement of $926,244 in expenses.  *Id.*

18.     On January 16, 2019, the Court granted the First Post-Effective Date Fee Petition,
reducing slightly some of the claimed time (to 13,354.1 hours) that did not comport with Case

Management Order No. 5 (ECF No. 3710), and awarding $8,455,717.02 in fees and $926,244,04 in reimbursement of expenses, for a total award of $9,381.961.06.  ECF No. 10378.[5]  In its ruling, the Court acknowledged that implementation of the Settlement was demanding:  "As was expected, implementation efforts have been time-intensive. Class Counsel's Petition provides an excellent summary of the work that has been essential for the success of this Settlement Agreement, and it will not be restated in full here."  *Id.* at 2.

19.        Various appeals followed the entry of the Common Benefit Award, the Allocation Award, and the grant of the First Post-Effective Date Fee Petition (collectively, the "Fee Appeals").  *E.g.*, ECF Nos. 9960, 10026, 10043, 10044, 10075, 10079, 10095, 10097, 10099, 10101, 10102, 10428.  During the pendency of the Fee Appeals, I continued to file the semi-annual implementation-phase fee petitions.  Following the same practice used for each of the prior fee-related petitions, I reviewed all time for the relevant period to ensure that the tasks and expenses were genuinely in furtherance of the Settlement Class's common benefit.  Each subsequent petition marked a decrease in hours and expenses as the Settlement Program gradually became established.

20.        On January 10, 2019, I filed the Second Verified Petition of Co-Lead Class Counsel Christopher A. Seeger for an Award of Post-Effective Date Common Benefit Attorneys' Fees and Costs ("Second Post-Effective Date Fee Petition").  ECF No. 10374.  The Second Post-Effective Date Fee Petition covered the period from May 25, 2018 to November 30, 2018, and was on behalf of five firms or lawyers that had performed common benefit work, requesting

---

[5]  Regarding the holdback request, the Court also noted that it was still not ripe for decision: "The Settlement Agreement allowed for a reduction of individual Awards by up to 5% to pay implementation fees to Class Counsel.  In my April 5, 2018 opinion, I indicated that I believed a determination of the need for additional funds was premature at this time.  In an abundance of caution, I have instructed the Claims Administrator to hold 5% of all Awards in reserve.  I will revisit Class Counsel's request for additional funds to be paid from that holdback at a later date."  *Id.* at 1 n.1.

$2,895,044.17 in fees (reflecting 4,378 hours using the prescribed blended rates[6]) and $300,590.26 in reimbursement of expenses, for a total request of $3,195,634.43.  *Id.* at 16-17.

21.     I filed the Third Verified Petition of Class Counsel Christopher A. Seeger for an Award of Post-Effective Date Common Benefit Attorneys' Fees and Costs ("Third Post-Effective Date Fee Petition"), covering the period from December 1, 2018 to May 31, 2019, on July 25, 2019.  EC No. 10767.  The Third Post-Effective Date Fee Petition requested compensation for 2,180.1 hours of work (undertaken by Seeger Weiss and Professor Samuel Issacharoff), amounting to $1,445,488.66 in fees (again using the prescribed blended rates) and $243,788.10 in reimbursement of expenses, for a total request of $1,689,276.76.  *Id.* at 2, 14-15.

22.     I filed the Fourth Verified Petition of Class Counsel Christopher A. Seeger for an Award of Post-Effective Date Common Benefit Attorneys' Fees and Costs ("Fourth Post-Effective Date Fee Petition"), covering the period from June 1, 2019 to November 30, 2019.  ECF No. 10986.  The Fourth Post-Effective Date Fee Petition was filed on February 5, 2020, and requested compensation for 1,814.4 hours of work (as was the case with the Third Post-Effective Date Fee Petition, that common benefit work was performed only by Seeger Weiss and Professor Issacharoff), for $1,146,470.19 in fees (once again, using the prescribed blended rates) and $91,159.62 in reimbursement of expenses, for a total request of $1,237,629.81.  *Id.* at 2, 12-13.

23.     On this date, I have filed the Fifth Verified Petition of Class Counsel Christopher A. Seeger for an Award of Post-Effective Date Common Benefit Attorneys' Fees and Costs ("Fifth Post-Effective Date Fee Petition"), covering the period from December 1, 2019 to May 31, 2020. ECF No. 11126. The Fifth Post-Effective Date Fee Petition requests compensation for 1,444.2

---

[6]   Of that claimed time, my firm had performed 3728.4 hours of work.

hours of work, or $998,512.99 in fees (once again, using the prescribed blended rates) and $155,031.53 in reimbursement of expenses, for a total request of $1,153,544.52. *Id.* at 13.

24.     Thus, as of the date of this Supplemental Declaration, the Court has awarded $95,001,427.85 in common benefit fees and reimbursement of expenses from the AFQSF, and the four pending post-Effective Date petitions are requesting further awards of $7,276,085.52 in common benefit fees and reimbursement of expenses.  In addition, the work of Court-appointed counsel for certain *pro se* Settlement Class Members, has been paid from the AFQSF fund.  *See* ECF No. 9561.  To date, the fees and expenses for *pro se* counsel have totaled $923,136.64.[7] Consequently, as of the date of this Supplemental Declaration, the balance of the AFQSF, not including those amounts provisionally withheld from Monetary Awards (which have been placed in a subaccount in the AFQSF), is $13,307,494.96.

25.     The extensive work underpinning each of the aforementioned implementation-phase common benefit fee petitions was outlined in the post-Effective Date petitions and is also set forth in further detail below.  This work has resulted in benefits to the Settlement Class that exceeded initial projections.  As of the most recent Status Reports from the Claims Administrator and the Baseline Assessment Program ("BAP") Administrator:  over 20,000 Settlement Class Members have successfully registered to participate in the Settlement, including over 17,200 Retired NFL Football Players and Representative Claimants; over 3,000 Monetary Award Claims Packages have been submitted, with approved claims reaching over $788 million and over $692 million in awards paid; and over 12,800 Retired NFL Football Players are eligible for the BAP, nearly 7,500 of whom have sought to schedule or completed their BAP examinations, 5,349 of

---

[7]     Additionally, taxes and fees related to the maintenance of the AFQSF are paid from the balance of that fund.

whom have reports from both examinations completed, resulting in 154 diagnoses of Level 1.5 Neurocognitive Impairment, 103 diagnoses of Level 2 Neurocognitive Impairment, and 172 diagnoses of Level 1 Neurocognitive Impairment with eligibility for Supplemental BAP Benefits. *See* ECF Nos. 11115 at 10 (BAP Administrator Status Report – 2nd Quarter 2020), 11116 at 2-6 (Claims Administrator Status Report No. 9).

26.     On May 7, 2020, the Third Circuit affirmed the Common Benefit Award (and related orders) and the First Post-Effective Date Fee Petition, and affirmed the Allocation Order, save a limited remand for further consideration of the fee petition of the so-called Faneca Objectors, which is not pertinent here.  *In re Nat'l Football League Players' Concussion Injury Litig.*, 2020 WL 2214131 at *3-6; *see* ECF No. 11075 (Third Circuit's Mandate).  As relates to the matter of the holdback request, the Court of Appeals upheld this Court's discretion to approve a set-aside:  "The District Court approved the settlement term that provided for up to a 5% holdback from each Monetary Award to pay for costs and fees associated with implementing the settlement.  The Court acted within its discretion to overrule the more than twenty objections to this term, as it provides funds for work on behalf of eligible players seeking benefits in the future." *In re Nat'l Football League Players' Concussion Injury Litig.*, 2020 WL 2214131, at *2 n.2.  Based on the foregoing, and as discussed at greater length below, I request that the Court adopt the full 5% holdback contemplated by section 21.1 of the Settlement Agreement.

### *Post-Effective Date Work Dedicated to Establishing the Settlement Program*

27.     The work implementing the Settlement built, from the ground up, a Settlement Program that will continue to deliver benefits over its 65-year term.  Every form and notice needed for claims and the BAP process needed to be prepared; policies and procedures covering all aspects

of the Monetary Award Fund ("MAF") and BAP programs needed to be drafted and, as the Settlement Program proceeded, revised; and the two physician networks supporting the MAF and BAP needed to be staffed. Moreover, although the Settlement Agreement provided an extensive framework, implementation has demanded negotiation between the Settling Parties[8] and, when negotiations failed, briefing on issues in dispute between Class Counsel and the NFL. Throughout, Class Counsel not only advocated for the players and their families, but provided personal, hands-on support for them and, for those who are individually represented, their IRPAs.

28.     In the sections that follow, I summarize the nature and scope of the work that Class Counsel has undertaken on behalf of the Settlement Class, much of which will continue to be demanded by the Settlement Program in the coming years.

*Ensuring Inclusive, Class Member-Friendly Registration and Claims Processes*

29.     With the launch of the Settlement, Class Counsel dedicated hundreds of hours to the negotiation and development of the registration forms and procedures, in order to ensure that the process was efficient and accessible so that no eligible Class Member would be denied entry into the Settlement Program. Seeger Weiss undertook substantial efforts to drive registration. These included my appearances at many NFL Alumni and annual NFL events across the country; my hosting live webinar sessions and countless interviews by local and national media outlets; and responding, along with other Seeger Weiss attorneys and paralegals, to hundreds of calls from Retired NFL Football Players and their families. These efforts inured to the Class' benefit. As mentioned above, the number of Retired NFL Football Players and family members who registered far exceeded all projections:  over 20,500 Settlement Class Members timely registered, including over 17,200 Retired NFL Football Players and Representative Claimants.

---

[8] "Settling Parties" collectively refers to Class Plaintiffs and the NFL Parties.

30.     Seeger Weiss worked with the Claims Administrator to continually update the Settlement's dedicated website, https://www.nflconcussionsettlement.com ("Settlement Website"), including its "Frequently Asked Questions" ("FAQs") section, so as to ensure that Class Members have easy access to the most up-to-date information and clear guidance on the Settlement Program.  Late in 2017, at the direction of the Court, Seeger Weiss worked for weeks with the Special Masters, the Claims Administrator, the BAP Administrator, the Lien Resolution Administrator, and the NFL to create an entirely revised and expansive set of FAQs that, in February 2018, became the "rules of the road" for the Settlement, ensuring the Settlement Program remains accessible and transparent.  ECF Nos. 8930, 9137.  Class Counsel also submitted comments on the FAQs.  Such revisions continued to take place as new issues emerged or were identified.

31.     Seeger Weiss also worked on revisions to the Settlement Website as new phases began, and additional forms, procedures, and other documents were prepared for Class Members, such as those relating to the BAP Program and the appeals process.   These efforts included a complete redesign of the Settlement Website late in 2018 to ensure that the increased volume of information concerning the Settlement Program in general, and the Claims Process in particular, remain easily accessible.  As the Settlement Program matured, Class Counsel also reviewed and proposed revisions to the monthly "Insights" newsletter circulated by the Claims Administrator and the BAP Administrator, each issue highlighting news from and best practices for the Settlement Program, including new FAQs as they were rolled out.

32.     Relatedly, Seeger Weiss worked with counsel for the NFL, the Administrators, and the Special Masters to ensure that all forms needed to submit a claim were prepared, and that they were all-inclusive and easily understood.  Additionally, Seeger Weiss worked with the Claims

Administrator, the NFL, and the Special Masters to launch the on-line claims portal, which guides Class Members through the claims submission process. To make sure that Class Members received all the support they deserve and need, Seeger Weiss responded to hundreds of calls each month from Retired NFL Football Players and their families, as well as from IRPAs, about the Settlement and its claims process.

33. Also, Seeger Weiss constantly monitored the progress of the Settlement Program's claims process in order to introduce improvements where possible to guarantee that all eligible claims are paid and every Settlement Class Member and lawyer representing Class Members receives any needed guidance. For the initial years of the Settlement Program, a regular, weekly call between Class Counsel, the Claims Administrator, the BAP and Lien Administrators, and the NFL and its counsel served as the guiding forum for discussions about issues as they arose, and successes as they were noted. By April 1, 2020, the 146th of these regularly scheduled conference calls had taken place. Although it was decided that a regularly scheduled conference call was no longer needed, the ever-present *ad hoc* calls have continued. This engagement by Class Counsel to ensure a smooth and efficient claims process continues and will necessarily continue throughout the life of the Settlement Program.

### *Selection of Appeals Advisory Panel Members and Appeals Advisory Panel Consultants*

34. As the Court is aware, Appeals Advisory Panel ("AAP") members and AAP Consultants serve several functions in the Settlement Program, including review of many pre- and post-Effective Date diagnoses, re-review of claims that were subject to appeal but remanded by the Special Masters for further consideration in light of new documentation submitted on appeal, resolution (in some instances) of disputes between BAP Providers as to the existence (or not) of a

Qualifying Diagnosis, and consultation with the Special Masters and Claims Administrator as issues relating to medicine arise in the course of their duties. *See* Settlement Agreement §§ 5.13, 6.4, 9.9(a), ECF No. 6481-1 at 34, 37-38, 52-53.

35.     Under the Settlement Agreement, the Settling Parties had until April 7, 2017 to recommend the five neurologists and three neuropsychologists to serve as AAP members and AAP Consultants. Seeger Weiss worked diligently to ensure that leading candidates were identified and presented to the Court. That process included identifying and interviewing many potential candidates, and working with counsel for the NFL until the Settling Parties agreed on the recommendations to be made to the Court for appointment to those bodies. On May 5, 2017, the Court approved the recommended AAP and AAP Consultant candidates. ECF No. 7603.

36.     Toward the end of 2017, it became apparent that the volume of claims, like registrations, exceeded projections, and one member of the AAP was not able to dedicate sufficient time to his responsibilities. Accordingly, the decision was made to remove that one member of the AAP and add two new members, so as to bring the AAP to six members. The same process as with the initial selection of members was followed, leading to the appointment of two new AAP members (and the removal of the one AAP Member) on March 6, 2018. ECF No. 9757.

37.     Later in 2018, it became apparent that the volume of claims and the related need for AAP claims review and consultation by the Special Masters and the Claims Administrator continued to exceed projections. Accordingly, the decision was made to add two additional members to the AAP. As with each of the prior candidates, the Settling Parties identified and interviewed potential candidates until the Settling Parties agreed on the recommendations to be made to the Court for appointment to the AAP. On September 5, 2018, the Court approved the appointment of two new AAP members. ECF No. 10248.

38.     Working with the Claims Administrator and the NFL, Seeger Weiss undertook ongoing efforts to ensure that these Court-appointed medical professionals had a complete understanding of their responsibilities in the Settlement Program, including, most importantly, their appreciation of the definitions of each of the Qualifying Diagnoses recognized under the Settlement Agreement and the standards guiding their review of claim packages.  These efforts included the creation of an Orientation Guide, subsequent guidance documents as issues were encountered and identified in the Settlement, and oversight of AAP/AAP Consultant Roundtables, where the AAP members and AAP Consultants participated in an open discussion, moderated by the Claims Administrator, of medical issues that these Court-appointed experts were seeing and being asked to address.

39.     Over the course of time, CAAP member and AAP Consultants will inevitably retire or otherwise seek to be relieved of their duties to the Court and responsibilities to the Settlement.  At that time, Class Counsel will again need to undertake the important and equally time consuming search for appropriate candidates to consider along with the NFL.

### *Selection and Orientation of Hundreds of Individuals to Serve as Qualified BAP Providers and Qualified MAF Physicians and Maintenance of These Physician Networks*

40.     The Settlement Agreement provides that Claims for Qualifying Diagnoses after the Effective Date need to be made through one of the two networks of medical professionals, either through the MAF or, for Retired NFL Football Players with at least one-half of an Eligible Season (as that term is defined), the BAP network.  Settlement Agreement §§ 2.1(kk), 5.1, 6.3(b), ECF No. 6481-1 at 13, 24, 36.  The time-consuming vetting process associated with the selection of Qualified BAP Providers and Qualified MAF Physicians included a detailed review of each provider's curriculum vitae and application, as well as in-depth internet searches to ensure the

qualifications of each candidate.  Seeger Weiss was engaged in this effort on virtually a daily basis during the set-up phase of these networks and continued to dedicate substantial time over the first years of the Settlement Program to "round out" both networks.  These were daunting tasks, but they were successfully accomplished prior to the initial launch of the MAF Physician network and preliminary establishment of the BAP Provider network in June 2017.

41.     Working with the BAP Administrator, the Claims Administrator, the NFL, and its own experts, Seeger Weiss developed the services agreement that each physician and provider will need to sign to serve in the networks.  Moreover, as with the Court-appointed medical experts, training on the relevant terms of the Settlement Agreement, most notably the definitions for each of the Qualifying Diagnoses, was necessary.  The Settling Parties prepared the manuals that are being used by each of the Settlement Program's Administrators to train the physicians and providers on the medical aspects of the Settlement, including the testing regimen at the heart of the BAP Program and what constitutes a Qualifying Diagnosis for purposes of qualifying for a Monetary Award.   Also, the Settling Parties participated in the drafting of occasional communications to the Qualifying MAF Physicians and Qualified BAP Providers, which sought to address developments in and clarifications of the Settlement Program.  Relatedly, Class Counsel advocated on behalf of the Settlement Class when the Claims Administrator developed and the Court promulgated a new set of Rules Governing Qualified MAF Physicians to address a number of developments in the Settlement Program over the preceding three years, which advocacy included negotiation and briefing before the Court when negotiations failed to produce an amicable resolution.  *See* ECF Nos. 10527, 10612.

42.     Class Counsel continually monitors and reviews these networks to make certain that Retired NFL Football Players are receiving the care and services that they deserve under the

Settlement.  Although this aspect of Class Counsel's oversight has demanded less of his firm's time as the physician networks were established, maintaining an adequate network to ensure that Retired NFL Football Players across the nation can easily find a qualified, network physician will require ongoing attention throughout the life of the Settlement.

*Oversight of the Claim Process and Monetary Award Determinations*

43.     Over the initial three and one-half years of the Settlement's implementation, which saw over two thousand Notices on Monetary Award Determinations on over 3000 Claim Packages, Seeger Weiss dedicated hundreds of hours in actively monitoring and supporting the Claims Process to ensure that Class Members are receiving the benefits that were negotiated on their behalf.  This oversight included ongoing reporting and requests for information from the Claims Administrator and reviewing every determination by a member of the AAP, opinion by an AAP Consultant, and decision by the Claims Administrator to ensure that each was correctly following the terms of the Settlement Agreement.  This type of "hands on" support was particularly demanded in the lead-up to, and immediately following, the February 6, 2019 deadline for the filing of pre-Effective Date claims, and the June 6, 2019 BAP deadline for those BAP-eligible players born on or before June 6, 1974.

44.     Since the launch of the Settlement Program, unanticipated issues arose regarding the terms of the Settlement Agreement, the implementation of the Settlement Program, and the "best practices" to be adopted.  In coordination with the Claims Administrator and negotiation with the NFL, Class Counsel endeavored to resolve many of these "open issues" regarding the implementation of the MAF claims process.  These "open issues" covered a range of topics, some of which were also the subject of appeals of Monetary Award Determinations (discussed below), where Class Counsel supported the interests of the Settlement Class Members and opposed the

NFL's interpretations and positions.  As with the administrative appeals, Class Counsel sought to ensure that the procedures and guidance developed and adopted by the Claims Administrator lead to payment of all eligible Claims.

45.       Key among recent "open issues" were: limiting the use of neurocognitive screening tests to challenge Qualifying Diagnoses; the relevance of continued driving and employment to Monetary Award claims; protecting the clinical judgment of the Qualified MAF Physicians and BAP Providers in matters such as the estimation of a player's premorbid IQ and determination whether neuropsychological testing is required when a player has a Qualifying Diagnosis of Level 2 Neurocognitive Impairment; and limitation on the use of any validity measures of neuropsychological testing beyond those expressly negotiated as part of the Settlement Agreement, and requiring a full *Slick* analysis[9] if such validity measures are the basis for the denial of a claim.  In addition, Class Counsel provided input to the Claims Administrator as it developed guidance for the Qualified MAF Physicians, the AAP, and the AAP Consultants regarding some of these open issues.

46.       Seeger Weiss also supported the petitions of Representative Claimants for Retired NFL Players who were diagnosed with a Qualifying Diagnosis, but died before January 1, 2006. *See* Settlement Agreement § 6.2(b), ECF No. 6481-1 at 35.  Representative Claimant Award claims require a determination as to whether they are timely under applicable state law.  *Id.*  Seeger Weiss has submitted Statements in support of Representative Claimant submissions and otherwise

---

[9] *Slick* is medical parlance for standards for detecting exaggeration or fabrication of cognitive dysfunction, named after the lead author of a ground-breaking 1999 study.  *See* D.J. Slick *et. al.*, *Diagnostic criteria for malingered neurocognitive dysfunction:  proposed standards for clinical practice and research*, 13(4) Clinical Neuropsychology 545-61 (Nov. 1999).

supported efforts to resolve these claims to the benefit of the Representative Claimants. Similarly, Class Counsel provided requested support to the IRPAs representing these Representative Claimants in mediation efforts before retired United States Magistrate Judge Diane M. Welsh, whom the Court has appointed as a mediator. *See* ECF No. 10914.

47.     Additionally, as with any program of this magnitude and duration, a sophisticated audit program was negotiated and implemented. Seeger Weiss negotiated protections for the interests of Class Members in the rules and procedures governing the audit process, so as to make certain that meritorious claims are not unduly caught up with claims that are properly the subject of further examination by the Claims Administrator and, if warranted, the Special Masters. As part of these rules and procedures, Seeger Weiss monitors the progress of audit investigations and provides formal input as to each juncture in the process, including submissions to the Special Masters for those claims that are referred for decision.

48.     Just as it had negotiated protections for the interests of Class Members in the rules and procedures governing the audit process, Seeger Weiss has remained engaged with ongoing audits, including through the submission of Statements regarding referrals to the Special Masters and replies in those proceedings taken up by the Special Masters, to make certain that meritorious claims are not unduly caught up in that referral process and to ensure that the focus of any inquiry be only on those parties (e.g., medical or legal professionals) suspected of possible misconduct in the Settlement program. Similarly, Class Counsel monitored the status of the investigations undertaken by the Court-Appointed Special Investigator, who completed his pending investigations prior to the end of his term of appointment on May 30, 2020.[10]

---

[10]   The Special Investigator was initially appointed to a one-year term on December 10, 2018 (ECF No. 10355), which was extended on January 6, 2020 to March 30, 2020 (ECF No.

49.     Although I understood that a sophisticated audit process would be put in place in this Settlement, in its efforts to identify potentially fraudulent claims, the NFL undertook an unexpectedly aggressive posture in the claims process in general.  Consequently, I had to dedicate more professional resources to this aspect of the Settlement Program than I had originally contemplated.  Ultimately, however, these engagements bore fruit.  During the first half of 2020, all of the longer-standing audits of law firms, medical providers, and others that had been referred to the Special Masters were concluded with decision by the Special Masters.

50.     My firm and I will continue to oversee the claims process and confront emerging or "open" issues as they continue to arise.  Any future successor as Class Counsel (given the Settlement's 65-year term) will need to do likewise.  Future responsibilities also include the requirement under the Settlement Agreement that the Settling Parties revisit the science every ten years to discuss in good faith the possible prospective modifications to the definitions of the Qualifying Diagnoses or the protocols for making Qualifying Diagnoses (or both), in light of generally accepted advances in medical science.  Settlement Agreement § 6.6, ECF No. 6481-1 at 35. Necessarily, this will require Class Counsel to independently consult with medical and scientific experts to keep abreast of developments in these areas over time.

### Appeals of Claims Determinations

51.     As mentioned above, Seeger Weiss monitors all Monetary Award determinations, including to assess whether Class Counsel should file a Statement regarding an appeal (be it in support of an appeal taken by a disappointed Class Member or in support of the Class Member's

---

10937) and further extended on March 30, 3030 for two additional months, to end on May 30, 2020 (ECF No. 11037).

opposition to an appeal taken by the NFL). Through this active engagement, Seeger Weiss' goal is to make sure that Class Members' entitlement to benefits is not restricted or foreclosed outright by parsimonious interpretations of the Settlement Agreement or by meritless appeals taken by the NFL. Whether through submitting Statements in support of a Class Member on appeal or through direct support of unrepresented Class Members and IRPAs representing Class Members, Seeger Weiss has pursued, among other things: a properly inclusive interpretation of the "generally consistent" standard underpinning diagnoses made outside of the BAP; appropriate deference to diagnosing physicians, particularly those in the BAP and MAF physician networks; assurance that appeals by the are not taken in bad faith, causing improper delay; making sure that evidence offered by the NFL on appeal, such as social media postings offered by the NFL, is subjected to the scrutiny appropriate to unauthenticated hearsay; the appropriate use of neuropsychological screening tests when reviewing the merits of a claim; the application of the proper diagnostic standards in cases where the Retired NFL Football Player is deceased, which may differ from the diagnostic standards for living Retired NFL Football Players; a determination, based on the NFL's Collective Bargaining Agreement, that players on the practice squad should earn credit toward half an Eligible Season for "bye" weeks; arguing against the denial of claims for Level 1.5 and Level 2 Neurocognitive Impairment based on validity thresholds that were not negotiated as part of the Settlement Agreement; arguing against the denial of claims for Level 1.5 and Level 2 Neurocognitive Impairment because the Retired NFL Football Player failed to satisfy "criteria" that are not included in the BAP criteria (e.g., comparison of pre-morbid IQ with current full-scale IQ); and arguing against the denial of claims where such denials are based upon suboptimal performance validity test results from earlier neuropsychological testing where the Retired NFL

Football Player passed the performance validity tests during the current testing relied upon by the diagnosing physician.

52.     On a number of issues where it did not prevail in the claims process, the NFL filed Objections with the Court to the Special Masters' decisions, and my firm continued its advocacy on behalf of Retired NFL Football Players and their families.  *See* ECF Nos. 9754, 10528, 10810.  These efforts led to important rulings affecting entitlement to Monetary Awards or the amount of awards, including:  the ability of Diagnosing Physicians to date the onset of a Qualifying Diagnosis to a time prior to examination of a Retired NFL Football Player; the discretion of the Special Masters to decide whether or not to consult with a member of the AAP or an AAP Consultant in the course of deciding issues on appeal, including medical issues; the consideration of "bye" weeks in calculating Eligible Seasons; and the scope of the "generally consistent" standard outside of the BAP particularly as concerns the nature of the neuropsychological testing and testing results that may support a claimed neurocognitive impairment.

53.     Also, many appeals in which Seeger Weiss submitted a statement in support of a Retired NFL Football Player's position and other submissions to the Special Masters concerning Settlement implementation disputes ultimately led to the issuance of FAQs providing greater clarity to Class Members and their counsel.  *E.g.*, ECF No. 9137.

54.     Given the complexity and dynamism of the medical issues underpinning the Settlement Program and interpretive challenges posed by the implementation of the Settlement Agreement, and the continuing appeals taken either by the NFL or Settlement Class Members, including regular objections to the decisions of the Special Masters, Class Counsel anticipates that

involvement in administrative appeals will continue to demand a substantial amount of resources, including medical expert consultations.

### *BAP Examinations and Supplemental Benefits*

55.     Development of the BAP network of medical professionals (discussed above) was only the first step in implementing the BAP benefits for eligible Retired NFL Football Players. As with the MAF program, Class Counsel worked on negotiating procedures, rules, forms, and notices to guide and be used in the BAP.  Key among these documents was the BAP Clinicians' Guide, which was the "go-to" source for BAP Providers, particularly with respect to the neuropsychological testing, best practices, and the BAP rules, and was the subject of months of negotiations with the NFL and consultations with our expert.  Thereafter, Class Counsel undertook the ongoing monitoring of the BAP's implementation so that examinations were promptly scheduled and all appropriate medical standards followed.  After the initial two years of the BAP Program, Class Counsel worked with the BAP Administrator to more efficiently schedule examinations, including by allowing BAP Providers situated in one metropolitan area to be used in regions having greater demand for examinations.

56.     This monitoring was particularly demanding as the June 9, 2019 deadline for the BAP examinations of older Retired NFL Players (those born before June 6, 1974) approached. Not only were the scheduling procedures put to the test, but several aspects about the Settlement needed to be addressed to ensure that the benefits of the BAP were made available to those older players.  For example, in coordination with the BAP Administrator, Class Counsel negotiated a compromise with the NFL that offered the players subject to the then-looming deadline an extension so long as they have requested an appointment by the deadline (as opposed to having completed the examinations).

57.     Similarly, with the passage of the initial deadline for BAP examinations, Class Counsel sought additional protections for players.   First, although not mandated by the Settlement Agreement, Class Counsel worked to guarantee that players whose initial MAF claims were denied, but whose deadline for undergoing a BAP examination had passed while their claim was pending, could still participate in the BAP and receive their free neurological and neuropsychological examinations (and thus not face a possible 10% reduction of any future Monetary Award; *see* Settlement Agreement § 6.7(b)(iv), ECF No. 6481-1 at 40.   This was particularly beneficial to those players who are already suffering from neurocognitive decline but whose condition has not yet reached the level of a Qualifying Diagnosis entitling them to a Monetary Award.

58.     As noted in the preceding paragraph, the Settlement Agreement provides for a 10% offset for eligible players who "chose not to participate" in the BAP before their deadline. *See* Settlement Agreement §§ 5.4, 6.7(b)(iv), ECF No. 6481-1 at 35, 40.   Class Counsel ensured that those players whose deadlines had passed, but who had not yet actually scheduled or attended a second BAP appointment, be given ample opportunity to do so.   Class Counsel notified all unrepresented Retired NFL Football Players who had initially contacted the BAP Administrator but had not yet scheduled or attended their second BAP appointment that they were still eligible to participate in the BAP program but that they needed to take action in order to maintain that eligibility.   Class Counsel also worked with the BAP Administrator to ensure that IRPAs also were provided similar guidance as to preserving their clients' BAP eligibility.

59.     On a more individual level, Class Counsel has worked with the BAP Administrator to ensure that Retired NFL Football Players receive reasonable accommodations for testing where required.   For example, several visually impaired Retired NFL Football Players

sought to participate in the BAP.  Because many of the tests that make up the BAP test battery require that the test subject be able to see, Class Counsel, with the support and assistance of its expert, undertook to negotiate an amended battery of neuropsychological tests that would accommodate visually impaired Retired NFL Football Players.

60.     Finally, the implementation of BAP Supplemental Benefits for those Retired NFL Football Players who are diagnosed with Level 1 Neurocognitive Impairment through their BAP examinations demanded the continual attention of Class Counsel.  As of June 15, 2020, 172 players have received Level 1 diagnoses and either were in the process of selecting their BAP Provider who will be overseeing their treatment and benefits or were already receiving their Supplemental Benefits.  These benefits include a range of therapeutics, pharmaceuticals, and diagnostic and imaging services, and require additional contracting with BAP Providers as well as with those entities outside of the BAP Provide network, who will provide many of the services.

61.     Working with the BAP Administrator, the Claims Administrator, the NFL, and its own experts, Seeger Weiss developed the services agreement that each physician and supplemental provider will need to sign to serve as a Supplemental Provider. Class Counsel monitored these retention efforts by the BAP Administrator and the wider roll-out of the Supplemental Benefits.  Class Counsel also worked with the BAP Administrator to introduce Cognitive Rehabilitation Therapy ("CRT") as an additional benefit available to Retired NFL Football Players who receive Supplemental Benefits.  CRT is a collection of treatment strategies designed to address problems with memory, attention, perception, learning, planning, and judgment brought about by brain injury, neurological disorders, and other illnesses.

62.     Although the BAP Program will begin to wind down in just under seven years, I anticipate that it will continue to demand hundreds of hours each year during that time to ensure that this key benefit of the Settlement is delivered to eligible Retired NFL Football Players.

*Fielding Calls and Emails, and Supporting Class Members and Lawyers Representing Class Members*

63.     Besides the foregoing, my firm has responded to hundreds of telephone calls and emails each month from Class Members or IRPAs representing Class Members.  Of note, in the weeks leading up to the August 7, 2017 registration deadline, Seeger Weiss was deluged with telephone calls and emails from Class Members (and even non-Class Members) and IRPAs having questions concerning the registration process.  Seeger Weiss handled every call and email and was able to assist numerous Class Members in successfully registering under the Settlement.  My firm provided the same level of support for Class Members through the Claims Process and any other aspect of the Settlement Program in which Class Members may be involved, and was similarly providing "all hands on deck" support as the deadline for the filing of pre-Effective Date Claims came and went.

64.     In addition, given the scope and duration of the Settlement, there are several other junctures, aside from Settlement Program deadlines, when additional outreach efforts were needed. For example, Seeger Weiss also fielded calls and emails from Class Members and their family members concerning misleading third-party solicitations and deceptive practices in the wake of the issuance of the Notice designed to clear up confusion, which was disseminated in accordance with the Court's June 12, 2017 Order (ECF No. 7814), and the Court's Notice and Order of July 19, 2017 (ECF No. 8037), setting a September 19, 2017 hearing (ECF Nos. 8392-93, 8410) to address deceptive practices.  (Those practices are discussed in detail below.)  Class Counsel also

reached out to all unrepresented Retired NFL Football Players whose deadline for BAP exams had passed, but who had not yet started the scheduling process, and to all IRPAs who represented Retired NFL Football Players in the same position, to remind them of the approaching deadline. Similarly, Class Counsel sent emails and letters reminding all unrepresented Retired NFL Football Players and IRPAs who had not yet filed a claim for Monetary Award of the February 6, 2019 deadline for the submission of claims based on pre-Effective Date diagnoses.

65.     Although their volume has decreased over time, calls involve virtually every conceivable facet and issue concerning the Settlement, including the Claims Process, matters relating to post-Effective Date examinations through the BAP and MAF, liens, and appeals. Seeger Weiss has handled every call and has assisted numerous Class Members in successfully navigating the Claims Process and, when appropriate, assisted unrepresented Class Members in gathering necessary documents, including medical records, and completing their claims packages so that their claims can be promptly reviewed and, where meritorious, approved.  Seeger Weiss continues to be similarly engaged with IRPAs, answering questions they have about the Claims Process, the Settlement Website's FAQs (which guide the Claims Process), and otherwise offering support to ensure that meritorious claims are properly submitted and paid.

66.     I fully expect that fielding numerous calls and emails from Class Members and IRPAs will continue to be one of my firm's leading responsibilities in helping Class Members navigate the Settlement Program and seek benefits to which they are entitled under the Settlement.

### *Extensive Efforts to Protect Class Members from Third-Party Profiteers*

67.     As the Court is well aware, one of the major issues that both it and Class Counsel have had to confront in the course of the Settlement's implementation – perhaps unexpectedly, or at the very least to a level that was unanticipated – was the aggressive targeting of Class Members

by two categories of what can reasonably be called profiteers.  Those were (i) third-party claims services providers (such as Legacy Pro Sports and Case Strategies Group f/k/a NFL Case Consulting, LLC)  that promised to steer Class Members through the MAF claims process for a substantial percentage (10% or 15%) of their Monetary Awards; and (ii) third-party lenders ("funders"), who offered Class Members advances against their anticipated Monetary Awards, which were packaged as assignments of those awards (at discounts of often 50% or more), designed to mask the usurious rates of interest being charged.

68.     Seeger Weiss began its investigation into these misleading, aggressive, and predatory solicitations in early 2017.  As Class Counsel, Seeger Weiss was particularly concerned that Class Members were more susceptible to deceptive lures, and thus easy prey for these profiteers, by reason of neurocognitive impairments, other ailments, age, financial distress, or some combination of these factors.

69.     Pursuant to the Court's July 19, 2017 Order, Seeger Weiss directed discovery at over three dozen separate groups of funders, claims services providers, certain Retired NFL Football Players, and even law firms.  Seeger Weiss propounded written discovery requests, met and conferred with the respondents' counsel, received and reviewed documents and information, conducted depositions, and filed motions to compel against those persons and entities refusing to comply with the discovery requests.  Most of these entities mounted spirited defenses against my firm's efforts.  Seeger Weiss presented its findings to the Court at the hearing held on September 19, 2017.  ECF Nos. 8392, 8410.  Additionally, Seeger Weiss created and provided to the Court a spreadsheet identifying all of the Class Members purportedly owing portions of their potential future Monetary Awards to one or more of these entities.  ECF No. 8410 at 10, 13-14.

70.     Following the September 19, 2017 hearing, Seeger Weiss continued to seek discovery from additional entities whose identities became known, and continued to pursue motion practice against the profiteers, including successfully opposing an attempted interlocutory appeal (ECF No. 8461; *see* ECF No. 8433) and moving for an order directing the Claims Administrator to withhold portions of future monetary awards allegedly owed to third parties until their entitlement to same could be determined (ECF Nos. 8470, 9113), which was vigorously opposed by numerous third parties (ECF Nos. 8825, 8910, 8932, 8933, 8939, 8940, 8941, 8942, 8943).

71.     In particular, Seeger Weiss sought to challenge funders' advances to Class Members against their anticipated Monetary Awards that seek to circumvent state usury laws by cleverly packaging the loans as assignments or partial assignments of the anticipated award (or portion thereof).  Seeger Weiss sought to participate as *amicus curiae* in an action in the Southern District of New York when it learned that putative assignments agreements between several Class Members and one of the third-party funders (RD Legal Funding, LLC and its affiliates) were the subject of a suit brought by the federal Consumer Financial Protection Bureau and the New York State Attorney General, and that the Settlement Agreement's prohibition against assignments of claims (Settlement Agreement § 30.1,  ECF No. 6481-1 at 96) might be interpreted by that court. *See Consumer Fin. Protection Bureau v. RD Legal Funding, LLC*, No. 1:17-cv-00890 (LAP) (S.D.N.Y.).  Alternatively, Seeger Weiss proposed that the district court presiding over that action refer the question of the putative assignments' validity to this Court for resolution, which that court did.  ECF No. 8197-1; Order, *Consumer Fin. Protection Bureau v. RD Legal Funding, LLC*, No. 1:17-cv-00890 (LAP) (S.D.N.Y. Sept. 8, 2017) (ECF No. 59).

72.     After the issue of these putative assignments was referred to this Court, the issue was extensively briefed in accordance with this Court's order.  ECF Nos. 8409, 8434, 8435, 8438,

8457, 8458, 8459, 8913.  Seeger Weiss argued that the putative assignments violate Section 30.1 of the Settlement Agreement.  ECF Nos. 8434, 8457.  In Orders entered on December 8, 2017 (ECF No. 9517) and February 20, 2018 (ECF No. 9749), the Court agreed with Seeger Weiss' position, declaring the putative assignment agreements void, as prohibited by the Settlement Agreement and directing the manner in which the Claims Administrator was to handle the voiding of these assignment contracts.  Those Orders, and a subsequent Order denying Class Counsel's motion to have the Claims Administrator withhold monies purportedly owed to funders as moot (ECF No. 10124; see ECF No. 8470) resulted in multiple third-party funders' appeals to the Third Circuit (ECF Nos. 9558, 9755, 9794, 10141, 10174); motions to stay in this Court (ECF No. 9761) and in the Third Circuit; and a motion for a temporary restraining order and for a permanent injunction to prevent one funder (Thrivest Specialty Funding, LLC ("Thrivest")) from employing arbitration against the affected Class Member as an end-run around the Court's rulings, which resulted in the Court entering an Order enjoining the arbitration (ECF No. 10011), an Order that was also appealed to the Third Circuit (ECF No. 10027).

73.     Class Counsel continued its fight before the Third Circuit, opposing the appeals taken by several third-party funders who challenged the Court's determination that their putative assignment agreements were void.  *See* ECF Nos. 9558, 9755, 9794, 10027, 10141, 10174 (notices of appeal filed by various funders).  Related to these appeals was Class Counsel's successful briefing of sundry district court and Third Circuit motions (for stay pending appeal, imposition of bond, or expedition of appeal) that the funders filed.  *E.g.*, ECF No. 9812 (denying RD Legal entities' motion for stay pending appeal; also denied by the Third Circuit on April 10, 2018), ECF No. 10232 (denying Thrivest's motion for imposition of bond; also denied by the Third Circuit on Nov. 6, 2018).  In a victory for the Class, the Third Circuit fully upheld this Court's authority to

protect Class Members and void cash advance agreements packaged as assignments, although the Court of Appeals held that the agreements have to be considered on a case-by-case basis to determine whether they are, in fact, prohibited assignments.  *See Nat'l Football League Players' Concussion Injury Litig.* 923 F.3d 96, 107-10 (3d Cir. 2019).

74.     While the initial appeals were pending, on May 7, 2018, a global resolution with funders that entered into assignments with Class Members was negotiated as a potential alternative to the rescission remedy that the Court had afforded Class Members in its December 8, 2017 Explanation and Order (ECF No. 9517).  *See*, *e.g.*, ECF Nos. 10212, 10233.  The negotiated protocol allowed many Retired NFL Football Players to avoid the usurious terms of the funding arrangements for several years, with the vast majority of funders agreeing to the protocol rather than engage in further litigation.

75.     In September 2019, Thrivest launched a further challenge to the Court's authority respecting putative assignments, this time attacking the Rules Governing Assignment of Claims (now crafted as Rules Governing Third-Party Funder Voluntary Compromise Process).  Those rules govern the consensual program established by the Court to allow funders who may have entered into a prohibited assignment of proceeds from a Monetary Award to resolve any further dispute, and accept rescission of the agreement in exchange for a compromise repayment by the player based on a commercially reasonable interest rate.  After the Court denied Thrivest's request for a conference concerning the program (ECF Nos. 10736, 10807), Thrivest filed a petition for writ of mandamus with the Third Circuit (ECF No. 10843).  In particular, Thrivest argued that those rules were in contravention of the Third Circuit's decision respecting putative assignments of Monetary Awards.  Working in coordination with the Claims Administrator, Class Counsel opposed Thrivest's petition, which the Third Circuit denied after the Court entered a notice

clarifying the legal status of third-party funder agreements (ECF No. 10858).  *In re Thrivest Specialty Funding, LLC*, No. 19-3149 (3d Cir. Oct. 31, 2019).

76.     On a separate track, Class Counsel sought injunctive relief, other relief, and sanctions – the former for violating the Court's December 8, 2017 Explanation and Order, and the latter for violating its February 20, 2018 Order requiring production of an accounting and return of monies to Class Members (ECF No. 9750) – against one notorious funder in particular, the so-called Cambridge Entities ("Cambridge") and one of their principals, attorney Tim Howard (also known as Phillip Timothy Howard) ("Howard").  ECF No. 9578, 9974.  Cambridge and Howard had encouraged Class Members to "invest" their retirement monies in that funder's investment portfolio.  Seeger Weiss obtained an accounting showing that, in a classic Ponzi scheme, the monies had indeed been used to pay cash advances to other Class Members entering into void assignment agreements with Cambridge.  *See* ECF Nos. 10186, 10210.[11]

77.     Yet other fronts on which I and my firm had to combat misinformation and deceptive outreach to Class Members were those involving (i) the law firm X1Law P.A., which

---

[11] The Securities and Exchange Commission later filed a civil suit against the Cambridge Entities and Howard, charging them with defrauding Class Members.  *SEC v. Cambridge Capital Group Advisors, LLC*, No. 4:19-cv-00420-RH-MJF (N.D. Fla. filed Aug. 29, 2019) (ECF No. 1).  Discovery in that action is scheduled to conclude by August 4, 2020, with dispositive motions due by August 25, 2020.  *Id.* (Order Amending Schedule, ECF No. 87).  Howard is also the subject of a multicount Florida bar complaint charging him with, among other things, misappropriating client funds.  *See* Raychel Lean, "Florida Bar Accuses Lawyer of False Accounting, Misappropriation of Paraplegic Clients' Funds" (Apr. 4, 2019), https://www.law.com/dailybusinessreview/2019/04/04/florida-bar-accuses-lawyer-of-false-accounting-misappropriation-of-paraplegic-clients-funds/?slreturn=20200525145920 (last visited July 14, 2020).  He is also the subject of other civil litigation stemming from the scheme he perpetrated against Class Members.  *See* Raychel Lean, "Embattled Florida Attorney Took Ex-FSU Professor's Life Savings, Lawsuit Claims" (Nov. 14, 2019), https://www.law.com/dailybusinessreview/2019/11/14/embattled-florida-attorney-took-ex-fsu-professors-life-savings-lawsuit-claims/ (last visited July 14, 2020).

had created a website having a URL deceptively similar to that of the official Settlement Website, including a "registration" page, thereby falsely conveying the impression that the site had Court endorsement or was otherwise official in nature; and (ii) Class Member Fred Willis, who, while not a third-party profiteer, nonetheless   sowed much confusion among Class Members by repeatedly spreading false information about the Settlement, the Settlement Program's progress, and the Claims Administrator. *See*, *e.g.*, ECF Nos. 7175, 7206, 7245, 7396, 7347, 7811-2. The judicial intervention that we sought concerning Mr. Willis' activities resulted in a hearing (ECF No. 7417, 7440, 7470) and eventually a negotiated resolution (ECF No. 7489).

78.     The sundry forms of targeting of Class Members and oftentimes insidious conduct that we had to confront – often against spirited resistance (such as that mounted by the RD Legal Funding entities, who were represented by a well-known, high-caliber law firm) – underscore both that one cannot predict what kinds of dubious conduct may arise in the course of the Settlement's implementation, and that substantial resources often must be mustered to address or combat it in order to protect Class Members.

### *Education Fund and Medical Research Information Database*

79.     A third pillar of the benefits provided under the Settlement is the $10 million Education Fund intended to support safety and injury protection in football.   Settlement Agreement, art. XII, ECF No. 6481-1 at 68.  In 2018, for purposes implementing that component of the settlement, Class Counsel and the NFL began to explore organizations that support safety and injury protection in football and may be appropriate recipients of Education Fund proceeds. These efforts lead to discussions with the Korey Stringer Institute ("KSI") to set up the innovATe program through the University of Connecticut.  The innovATe project will provide funding to selected public high school districts currently without athletic trainers to enable them to hire and

retain athletic trainers, which is a critical step in promoting safety and injury prevention in youth football.   The innovATe project will utilize Retired NFL Football Players to serve as "Ambassadors" in the communities where the selected high school districts are located.  Class Counsel will actively monitor the progress of KSI's innovATe project and will provide bi-annual reports to the Court as to the status of the project.

80.     Similarly, the Settlement Agreement contemplated that the medical records and information that would be generated through the free BAP examinations provided to consenting and eligible Retired NFL Football Players would be made available for medical research. Settlement Agreement § 5.10(a), ECF No. 6481-1 at 33.  During the late summer of 2018, Seeger Weiss commenced efforts with Columbia University, the BAP Administrator, the Claims Administrator, its own expert, and the NFL to establish a Medical Information Research Database that will gather, systematically organize, and maintain the medical information that the BAP Administrator is collecting from the BAP Examinations.

81.     Additionally, the Settlement Agreement provides that a portion of the Education Fund be used for "educational initiatives benefitting Retired NFL Football Players."  Settlement Agreement, § 12.1, ECF No. 6481-1 at 68.  Class Counsel worked with the NFL to identify the scope and nature of such educational initiatives.

82.     On January 23, 2019, Class Counsel filed a formal motion for Court approval of the projects and the organizations that will be engaged, and for authorization of an initial release of a portion of the Education Fund to commence both programs and the initiative to educate players about the range of benefits available to them.  ECF No. 10970.  On February 12, 2020, the Court held a hearing on the Education Fund Motion (ECF No. 11030), which it subsequently granted on March 23, 2020.  ECF No. 11033.

83.     Since approval of the Education Fund Motion, Class Counsel has been actively engaged in formalizing the relationship with each institution and implementing both programs. Meanwhile, Class Counsel is overseeing the initial transfer of the medical records from the BAP Administrator to Columbia University for the creation of the Medical Information Research Database, and identifying the principal investigator and other experts who will assist Columbia University in the near-term.  Once the Medical Information Research Database is operational, Class Counsel will eventually serve on the Data Use Committee that will oversee and approve the medical research that is undertaken with the use of the Medical Information Research Database. All of this work respecting the Education Fund and Medical Information Research Database will command some prospective investment of time.

*The Work Summarized Above Is Ongoing*

84.     Aside from the initial set-up work (e.g., notices, forms, initial policies, and procedures), the kind of work outlined above will continue throughout the life of the Settlement. Claims will continue to be filed, appeals taken, and "open issues" arise.  Calls and emails will be received from players and IRPAs, often requiring the kind of hand-on engagement that Class Counsel has consistently provided.

85.     Indeed, we are only a few years into the Settlement and only a fraction of the payable claims expected to be filed in the Settlement have been filed.  As originally projected, 3,596 payable claims were expected to be filed during the life of the Settlement Program.  *See* ECF No. 6167 at 20, 34.  Due largely to the extensive efforts of Class Counsel to ensure that Retired NFL Football Players and their families registered in the Settlement, however, the participation rate (measured by registrations) was approximately 80% – exceeding original projections by 59% (while the value of the claims actually paid exceeded original projections by 68%).  *See* ECF Nos.

9552-1, 10145 at 2.  Therefore, Class Counsel expects that well over 5,500 payable claims will be filed over the course of the Settlement Program, whereas only 1,157 claims have been paid to date. That is, we are only one-quarter of the way through the volume of claims expected to be paid over the life of the 65-year Settlement.  Even taking the original projections, we are still less than one-third of the way through the daily work to support these as-yet-unpaid claims.

***Keystone Accomplishments***

86.    Besides the foregoing, there are several key accomplishments that illustrate how the ongoing efforts to effectuate the Settlement have not only yielded valuable benefits to the Settlement Class, but also that they have been necessary and have entailed substantially greater investment of time and resources than the simple oversight that Professor Rubenstein had envisaged for the Settlement Program's implementation phase.  Below, I touch upon some of these keystone accomplishments.

87.    <u>Earlier Date for a Qualifying Diagnosis</u>.  The question of determining the date of a Qualifying Diagnosis had been an issue from the beginning of the claims process.  The issue is significant because, under the Settlement's compensation matrix, once a player reaches the age of 45, his potential Monetary Award steadily decreases for every five-year age "bracket" (i.e., ages 45-49, 50-54, 55-59, etc., until the "80+" bracket is reached).  *See* Settlement Agreement, Ex. A-3, ECF No. 6481-1 at 122.  Therefore, a difference of even one year in the date of the Qualifying Diagnosis can push a Class Member into a less favorable age "bracket," translating into a substantial decrease in the amount of a Monetary Award.[12]  The NFL's position had been that the

---

[12] Thus, for example, putting aside possible offsets, the maximum Monetary Award for a Class Member who receives a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment at age 44 is $1.5 million.  At age 45, the maximum award for that Qualifying Diagnosis drops to

earliest that the date of a Qualifying Diagnosis can be is the date that the diagnosing physician first personally examined the player. It was Seeger Weiss' position, however, that diagnosing physicians, based on their personal examination of the player, as well as a review of that player's existing medical records, may properly determine that the player began suffering from a Qualifying Diagnosis beginning on a date earlier than the initial personal examination by the diagnosing physician, and if so, that the use that earlier date as the date of the Qualifying Diagnosis is appropriate. The Special Masters accepted Seeger Weiss' position in the FAQs that they promulgated in early February 2018. Specifically, FAQ 99 allows physicians to use their "sound clinical medical judgment" to determine whether the player's diagnosed conditions "existed at a date earlier than the date of personal examination of the Player by the physician making the diagnosis and signing the DPC [Diagnosing Physician Certification, i.e., medical certification)] form." Notwithstanding, the NFL continued to press its position concerning the so-called "deemed onset" issue through appeals of Monetary Awards, which Class Counsel continued to oppose. Class Counsel ultimately briefed the matter before the Court, which affirmed the Special Masters' ruling on August 20, 2019. ECF No. 10810.

88.     <u>MAF Physicians' Ability to Rely on Historic Neuropsychological Records</u>.  The NFL and Class Counsel had sharply differing views as to whether Qualified MAF Physicians could rely on historic neuropsychological testing when making dementia diagnoses (Level 1.5 and Level 2), or whether they were required to send the player for new neuropsychological testing. This testing included earlier neuropsychological testing for one of the NFL benefit plans, such as the 88 Plan. The NFL's position was that a Qualified MAF Physician could rely only on

---

$950,000, and at age 50 to $600,000. *See id.* (As the Court is aware, the closer the proximity of age to the time that the Class Member played in the NFL serves as a proxy for a causal relationship between exposure to repetitive head trauma and the Qualifying Diagnosis.)

neuropsychological testing that was conducted at the direction of the Qualified MAF Physician. Seeger Weiss advocated through submissions before the Special Master for recognition of and respect for the medical judgment of the Qualified MAF Physicians and allowing them to rely on historic neuropsychological testing if they found it to be reliable, particularly when the testing was conducted in connection with one of the NFL's own benefits plans.  The Special Masters accepted this position, with the result that FAQ 108 gives the Claims Administrator the discretion "to decide whether to accept neuropsychological testing from other sources based on the unique facts and circumstances of a particular claim," so long as it is less than 12 months old.  Similarly, FAQs 99 and 108 permit the use of earlier neuropsychological testing, including under the 88 Plan or another NFL benefit plan.

89.     Accommodating the "Unavailability" of Diagnosing Physician or Medical Records.  Under the Settlement Agreement, one of the few express exceptions to the requirement that the player submit a DPC from the Diagnosing Physician is if the diagnosing physician died, or was declared incompetent or legally incapacitated, before the Settlement's Effective Date.  Similarly, the only exception to the requirement that the player submit medical records reflecting the claimed diagnosis was if the records were destroyed or lost by reason of a *force majeure* type event.  *See* Settlement Agreement § 8.2(a)(i)-(iii), ECF No 6481-1 at 43-44.  For every claim that fits easily into these exceptions, there were some where the Diagnosing Physician is still alive and competent but unavailable as a practical matter, or where medical records are no longer available due to a variety of reasons, including routine destruction of older records.  These claims were susceptible to denial under the terms of the Settlement Agreement.  Seeger Weiss was initially able to secure the NFL's consent to look at such circumstances on a case-by-case basis rather than having claims affected by such circumstances categorically rejected, and it dedicated many hours

to reviewing each Claim Package and negotiating with the NFL.  In some cases, Seeger Weiss had disputes with the NFL that were irreconcilable – either because of the burden placed on the Class Member by the only accommodation that the NFL was willing to offer, or because of the NFL's refusal to offer an accommodation.  The Special Masters ultimately took up this issue and, in FAQ 124, gave the Claims Administrator the discretion to decide whether the DPC and medical records requirements should be excused in particular cases.

90.     <u>Providing for the Downgrading of Qualifying Diagnoses to Speed Awards</u>.  Early in the claims process, Seeger Weiss realized that there would be situations in which a player's claim may be denied with respect to the asserted Qualifying Diagnosis, but that there was sufficient evidence in the Claim Package to support a different Qualifying Diagnosis.  For example, a player submits a claim based on asserted Level 2 Neurocognitive Impairment (moderate dementia) but the evidence supports only a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment (early dementia).  Under the Settlement Agreement, that claim would be subject to denial and the player would either need to file an appeal (which, under those circumstances, is likely to fail), or a *de novo* claim for a Monetary Award based on an lower-level Qualifying Diagnosis.  In an effort to streamline the process and avoid needless appeals and re-applications, Class Counsel proposed that the AAP should have the ability to approve a claim for a lesser Qualifying Diagnosis or for the asserted Qualifying Diagnosis but with a later diagnosis date.  After much negotiation, the NFL agreed, in part, to "downgrading," but only in very limited circumstances.  As a result, Seeger Weiss raised the issue with the Special Masters, who agreed and promulgated FAQ 147, giving the AAP the discretion to "downgrade" claims without restriction.

91.     <u>The Definition of "Eligible Season" and the Full 53-Man Active List</u>.  At the heart of eligibility for the Settlement's benefits is the "Eligible Season," which stands as a proxy for

exposure to concussive and sub-concussive hits. The number of Eligible Seasons is thus a key driver in the amount of a Monetary Award[13] and drives a Retired NFL Football Player's eligibility for participation in the BAP.[14] A full Eligible Season is earned for each year that a Retired NFL Football Player was on the Active List for at least three games. Settlement Agreement § 2.1(kk), ECF No 6481-1 at 13 (defining Eligible Season). The NFL, however, took the rigid position that uninjured players who were listed as "inactive" on game day would earn no time toward an Eligible Season, even though they were shoulder-to-shoulder in practice with the Active List players during the week preceding the game. After Seeger Weiss prevailed on behalf of the Class Members before the Special Master (ECF No. 9713), the NFL filed objections to the Special Master's ruling in this Court (ECF No. 9754-1). The Court overruled that objection, making the final and binding determination that the more reasonable (and expansive) definition of "Active List" should apply (ECF No. 9754). This victory meant tangible benefits for players, and has already resulted in a substantial increase in at least one Monetary Award and has increased the number of players eligible for the BAP. The player whose appeal raised this issue had his Monetary Award increased by approximately $150,000, while 37 other players were credited with an additional one-half of an Eligible Season, with the result that eight of those players became newly eligible for the BAP.

92.     <u>Special Masters' Use of AAP on Appeals</u>. In response to a number of Special Masters' denials of its appeals of Monetary Awards in claims involving diagnoses rendered by MAF Physicians and BAP Providers, the NFL submitted a letter-brief to the Special Masters,

---

[13] *See* Settlement Agreement § 6.7(b)(i), ECF No. 6481-1 at 40 (schedule of Monetary Award offsets where Class Members have fewer than 5 Eligible Seasons).

[14] *See* Settlement Agreement §§ 4.3(a) & 5.1, ECF No. 6481-1 at 23-24 (Retired NFL Players must have at least one-half of an Eligible Season to be eligible to participate in BAP).

asserting that they should overturn the denials of its appeals because they had not consulted with the AAP in reaching their decisions. The NFL took the position that the Special Masters are required to consult with the AAP in all appeals involving medical issues. Class Counsel submitted an opposing letter-brief, pointing out that although the Settlement Agreement *permits* the Special Masters to consult with the AAP on appeals at their discretion and does not mandate such consultation. The Special Masters rejected the NFL's position, and the NFL lodged an objection to the Court, which affirmed the Special Master's discretion. ECF No. 10528. Recently, the NFL again mounted a challenge to the discretion of the Special Masters to decide if and when to consult with the Court-appointed medical experts, and Class Counsel joined the Settlement Class Members in opposing these efforts both before the Special Master and by Objection to the Court.

93. <u>The NFL's "Generally Consistent" Appeal</u>. The NFL initially appealed a number of Monetary Awards in which the diagnoses were rendered by MAF Physicians, contending that the players' test results did not satisfy BAP diagnostic criteria. Class Counsel filed statements in support of a number of the players who were the subject of the NFL's appeals, arguing that the Settlement Agreement's "generally consistent" standard, applicable to all diagnoses rendered outside of the BAP, expressly does not require the player to satisfy the BAP diagnostic criteria. The Special Masters denied all of the NFL's appeals, and the NFL then filed objections with the Court to the Special Masters' decisions. Class Counsel filed a brief in opposition to the NFL's objections, which the Court remanded to the Special Masters. The Special Masters again overruled the NFL's objections. The NFL then appealed the Special Masters' second ruling to this Court and Class Counsel filed additional briefing in opposition to the NFL's appeal. *See* ECF No. 10361 (notice of Jan. 10, 2019 hearing, appending parties' submissions). The Court had scheduled oral

argument on that matter for January 10, 2019, ECF No 10361, but cancelled the hearing following the NFL's withdrawal of its appeal.  ECF No. 10370.

### *A Five Percent Set-Aside Is Appropriate*

94.     Given what must be demonstrated by Class Members to qualify for its benefits, the implementation of this Settlement is unlike the ministerial effectuation of most class settlements.  This Settlement is without precedent in its complexity, duration, and scope.  Some 20,500 individuals have registered under the Settlement Program, and Class Counsel has been engaged (often individually) on their behalf at varying levels depending on the issue affecting them.  The complexity of the medical issues at play in many diagnoses in particular and the Settlement Program in general mean that, even three and one-half years after the launch of the Settlement, there continue to be unanticipated issues and disputes between the Settling Parties that demand the resources of Class Counsel above and beyond the routine oversight and support of the Settlement Program.

95.     Moreover, given the 65-year length of this Settlement, at some point Class Counsel may need to transition the responsibilities for representing the Class and overseeing the implementation of the Settlement to other law firms.  Indeed, with over six decades still remaining in the life of this Settlement, it is likely that this need will rise more than once.  Thus, the set-aside would create a sufficient pool of funds that are available to compensate work performed for the common benefit of the Class so as to ensure that prospective incoming firms have the financial incentive to undertake these responsibilities, get up to speed, and take up the mantle.

96.     Importantly, given the Third Circuit's recent pronouncement, *see In re Nat'l Football League Players' Concussion Injury Litig.*, 2020 WL 2214131, at *2 n.2, there should no

longer be any question as to whether the Court *may* impose a holdback, but simply how much of a holdback is appropriate.

97.     At the root of Professor Rubenstein's opinions respecting the set-aside request were two assumptions regarding the nature of implementation-phase work and the funds that would be available absent a holdback.  First, Professor Rubenstein maintained that "there should not be a high level of work" down the road "if the parties establish a sound claims administration program." Rubenstein Report at 43, ECF No. 9526 at 44.  That belief, however, reflected an assumption that the claims process would be routine or mechanical, as is the case with the administration of most class settlements (such as in consumer, securities, or ERISA cases).  That was faulty from the outset given the very nature of this Settlement but, in any event, it has now been proven incorrect given everything that has transpired during the three and one-half years of the Settlement's effectuation, as I have recounted in the foregoing paragraphs and has also been recounted in the various implementation-phase common benefit fee petitions.  The claims process, for example, often has been and will often continue to be adversarial, especially given the uncapped nature of the MAF.  Furthermore, as noted above, to the extent that Settlement Agreement interpretation is at issue in individual claims, Class Counsel necessarily will be involved in addition to or an IRPA or in lieu of one where players are unrepresented.

98.     Second, Professor Rubenstein's position that interest earned on a reserve of $22.5 million is no longer tenable.  After the award of the pre-Effective Date common benefit fees and expenses, the Court noted that just over $22.8 million remained in the AFQSF.  ECF No. 10019 at 25.  The award of $9,381.961.06 related to the First Post Effective Date Fee Petition reduced the

AFQSF to just around $13.5 million.[15]  With the various other payments of fees to Court-appointed counsel for *pro* se Class Members, taxes, and account-related costs, the AFQSF balance is currently just over $13 million.  The pending fee petitions (including that filed this date) request just over $7.2 million (which, if granted, would leave about $5.8 million in the AFQSF) and appointed counsel for *pro se* Class Members is expected to submit further requests for reimbursement for his continuing work on behalf of Representative Players in the Statute of Limitations Proceedings including, most recently, the efforts to mediate resolution of those pending claims.

99.     With substantial sums either having been paid out or standing to be paid out, it is no longer conceivable that there are sufficient funds in the AFQSF that could be invested in order to yield $1 million or anything close to that amount annually.  But even if, for the sake of argument, a yield of $1 million each year could be generated from investment of AFQSF funds, compensation of common benefit work and reimbursement of common benefit expenses will well exceed $1 million annually. Although the time and expenses reflected in the semi-annual fee petitions have been declining,[16] I continue to dedicate between $2 million and $2.5 million annually each year in my firm's professional and paraprofessional resources and outlays of expenses to the Settlement

---

[15]   In addition to what remains in the "original" AFSQF following payment of fee awards, approximately $37 million has been collected pursuant to the provisional 5% holdback directed by the Court.  Those funds are being maintained in a separate QSF account.

[16]   As was mentioned above, the Court awarded $9,381,961.06 on the First Post-Effective Date Fee Petition.  Currently pending with the Court are the Second Post-Effective Date Fee Petition, which requests an award of $3,195,634.43; the Third Post-Effective Date Fee Petition, which requests an award of $1,689,276.76; the Fourth Post-Effective Date Fee Petition, which requests an award of $1,237,629.81; and the Fifth Post-Effective Date Fee Petition, which requests an award of $1,153,544.52.

Program.[17]   While I expect that there will be a gradual reduction over the coming years, this provides a good measure of what the Settlement Program will continue to demand over the next several years.

100.    Based on the established record of work completed to date, an assessment of the continuing and anticipated work required by the Settlement, and the remaining funds in the AFQSF, I respectfully request that the Court adopt a permanent set-aside of 5% from all Monetary Awards.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of July, 2020.

*s/ Christopher A. Seeger*
CHRISTOPHER A. SEEGER
*Class Counsel*

---

[17]  That amount reflects the Court's prescribed billing rates rather than my firm's normal rates, which are substantially higher.