IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL | § | |
| LEAGUE PLAYERS' CONCUSSION | § | |
| LITIGATION | § | |
| _____ | § | No. 2:12-md-2323 (AB) |
| | § | |
| | § | MDL No. 2323 |
| THIS DOCUMENT RELATES TO: | § | |
| ALL ACTIONS | § | |

SUPPLEMENTAL OPPOSITION OF LUBEL VOYLES LLP AND
CERTAIN CLASS MEMBERS TO CLASS COUNSEL'S MOTION TO
SUPPLEMENT PETITION FOR ADOPTION OF A SET-ASIDE

Lubel Voyles LLP, counsel for various Class Members eligible for benefits

under the NFL Concussion Settlement Agreement, and certain Class Members[1]

respectfully submit this Supplemental Opposition to the Motion of Class Counsel

Seeger Weiss to Supplement Petition for Adoption of a Set-Aside (ECF 11127).[2]

---

[1] Class Members, represented by Lubel Voyles LLP, include: Melvin Aldridge, Patrise Alexander, Charlie Anderson, Charles E. Arbuckle, Cassandra Bailey Individually and as the Representative of the Estate of Johnny Bailey, Rod Bernstine, Reatha Brown Individually and as the Representative of the Estate of Aaron Brown, Jr., Curtis Ceasar, Jr., Larry Centers, Trevor Cobb, Darrell Colbert, Elbert Crawford III, Christopher Crooms, Gary Cutsinger, Jerry W. Davis, Tim Denton, Leland C. Douglas, Jr., Michael Dumas, Corris Ervin, Robert Evans, Doak Field, James Francis, Baldwin Malcom Frank, Murray Garrett, Clyde P. Glosson, Anthony Guillory, Roderick W. Harris, Wilmer K. Hicks, Jr., Patrick Jackson, Fulton Johnson, Richard Johnson, Gary Jones, Eric Kelly, Patsy Lewis Individually and as the Representative of the Estate of Mark Lewis, Ryan McCoy, Emanuel McNeil, Gerald McNeil, Jerry James Moses, Jr., Anthony E. Newsom, Winslow Oliver, John Owens, Robert Pollard, Derrick Pope, Jimmy Robinson, Thomas Sanders, Todd Scott, Nilo Silvan, Matthew Sinclair, Dwight A. Scales, Richard A. Siler, Frankie Smith, Eric J. Swann, Anthony Toney, Herbert E. Williams, James Williams, Jr., Butch Woolfolk, Keith Woodside, Milton Wynn, and James A. Young, Sr.

[2] An objection to Class Counsel's proposed holdback/set-aside was timely filed on March 27, 2017. *See* ECF 7354; ECF 7355, at 66-67.

## SUMMARY OF ARGUMENT

Class Counsel's Motion should be denied. <u>First</u>, the Motion and accompanying Supplemental Declaration of Christopher A. Seeger (collectively, the "Motion") fail to satisfy the Court's April 5, 2018, directive to provide an "adequate estimate … of work that will be required *in the future*." The overwhelming majority of the Motion describes completed work for which Class Counsel has been paid or has applied to be paid. <u>Second</u>, the 5% holdback request directly conflicts with the advice, recommendation, and opinion of the Court's own expert, Professor Rubenstein, who counselled against any holdback when originally consulted in 2017. Professor Rubenstein should be re-engaged to consider any new facts and to provide any supplemental opinions on the proposed holdback. <u>Third</u>, the Motion seeks a permanent holdback for ongoing "oversight;" however, the Settlement already compensates Special Masters to oversee the Settlement. <u>Fourth</u>, Class Counsel has failed to utilize willing IRPAs in connection with common benefit work. Such work could be performed at significantly reduced rates and would reduce the burden on the AFQSF. <u>Fifth</u>, there are substantial negative consequences were the Court to award the entire 5% holdback. Through its various fee petitions, Class Counsel is on the verge of exhausting the $112.5 million funded by the NFL. Now, it is seeking to take from *pro se* claimant awards and the fees of the lawyers who represent other Class

Members.  This, of course, reduces the awards to *pro se* claimants, who are already victims of the NFL, and deprives fees from IRPAs who do far more work on these claims than either the Court or Class Counsel ever anticipated.  Sixth, the Motion's demand to receive indefinite payments of $2-2.5 million annually from the 5% holdback is unjustified and disproportionate to the need.  At most, the potential need for a holdback is less than 1% of the monetary awards.

For all these reasons, the Motion should be denied, and the Court should decline to order any permanent holdback.  Alternatively, if the Court concludes some measure of a permanent holdback is appropriate, it should be no more than one 1%.

ARGUMENT

Apparently, $112.5 million is not enough.  $112.5 million—paid by the NFL and awarded to Class Counsel for "past, present, and future work"[3]—is simply not enough, says Class Counsel.  Now, Class Counsel says it needs to tap into another $40+/- million (via the 5% Holdback).[4]  Not $40 million from the NFL; $40 million from the victims of the NFL, *i.e.*, the *pro se* Class Members, as well as the IRPAs that represent Class Members as they navigate the claims process.  This is

---

[3] *See* ECF 10378, at 1; *see also* ECF 9860, at 2; ECF 9571, at 5.

[4] $37MM has reportedly already been held back from payments made under the Settlement.  *See* ECF 11127-1, at 46, n. 15.  Professor Rubenstein pegged the 5% number over the course of the Settlement at about $47.5 million.  ECF 9526, at 34-35.  The Court estimated the 5% holdback at about $40 million over the term of the Settlement. *See* ECF 9860, at 17 n. 10.

true despite the fact that Class Counsel sold the Settlement with repeated representations that the NFL was—independent of its injury-related compensatory obligations—separately paying Class Counsel for its fees and expenses.[5]

There is no merit Class Counsel's Motion. Its request that the Court impose a permanent 5% holdback should be rejected.

## A.   THE MOTION FAILS TO PROVIDE AN "ADEQUATE ESTIMATE FOR THE AMOUNT OF WORK THAT WILL BE REQUIRED IN THE FUTURE."

When considering Class Counsel's original fee petition, and particularly its request for the 5% holdback, the Court expressed concern that "no party or expert has provided the Court with an adequate estimate for the amount of work that will be required in the future."[6] The Motion does not solve that problem. Indeed, the vast majority of the Motion addresses completed, post-effective date work dedicated to establishing, implementing/administering, and "overseeing" the

---

[5] *See, e.g.,* ECF 6073-5, at 13, 24, 41; ECF 5634-5, at 26 (citing "the value in the defendant agreeing to bear all administrative costs and counsel fees" is a selling point; representing "the uncapped fund, in combination with the NFL Parties' agreement to pay for Class Notice, certain administrative costs and class attorneys' fees and reasonable costs, should quell any concerns the Court has about the fairness…;" claiming "the NFL Parties remain responsible to provide all of the funding for … class attorneys' fees;" noting "[u]nlike traditional common fund cases where attorneys' fees are obtained directly from the common fund, the Settlement Class is further benefitted by the separate payment of Class attorneys' fees by the NFL Parties;" and stating "[h]aving the NFL Parties pay Class attorneys' fees and reasonable incurred costs separate from the $760 million is another very significant benefit to Settlement Class Members").

[6] ECF 9860, at 17. Section 21.1 of the Settlement similarly requires any petition for a set-aside to "describe: (i) the proposed amount; (ii) how the money will be used; and (iii) any other relevant information …."

Settlement.[7]  But Class Counsel has been paid for that work or has submitted applications for payment from the remaining AFQSF.[8]  And, even if all of its outstanding petitions are granted, the AFQSF—funded by the NFL, not the former players—will still have a balance of approximately $6 million.[9]

What is lacking from the Motion is any substantive discussion of efforts to reduce these fees or expenses or any reasonable estimate of the nature or extent of future work or the foundation as to why Class Counsel will be required to expend thousands of hours each year on claims that are now at a trickle (approx. 3/week).[10] The reports from the Claims Administrator and BAP Administrator confirm claims are declining significantly and will continue to do so.[11]  The reduction in the number of claims together with the maturity of the claims process point toward significantly less efforts required in the future. Even using Class Counsel's billing and cost numbers for the past 6 months, which are opaque and not subject to

---

[7] *See, e.g.*, ECF 11127-1, at 12-14 (describing work re registration and claims processes); 14-16 (describing work re AAP members and consultants); 16-18 (describing work re BAP and MAF providers and physicians); 18-20 (describing oversight of claims process and award determinations); 21-24 (describing oversight of appeals); 28-34 (describing efforts fighting third-party lenders/profiteers); *etc*. It is largely a rehash of the five fee petitions filed by Class Counsel.

[8] *See* 11127-1, at 8-10, ¶¶ 19-23.  Class Counsel has, through his five (5) post-effective date fee petitions, requested the Court distribute about $16.8 million of the $22.8+ million AFQSF.  *See, e.g.,* ECF 10128 ($9.485MM) (paid); ECF 10374 2 ($3.195MM) (pending); ECF 10767 ($1.689MM) (pending); ECF 10986 ($1.237MM) (pending); ECF 11126 ($1.15MM) (pending).

[9] *See id.*; *see also* 11127-1, at 10.

[10] *See* ECF 11116, at 3.

[11] *See generally* ECF 11115 and 11116.

scrutiny,[12] Class Counsel cannot justify $2-2.5 million per year in fees and expenses on a going-forward basis.

On this point, Class Counsel's estimate that "over 5,500 payable claims will be filed"[13] is pure speculation, belied by the actual data.[14] For example, out of nearly 5,400 former players with completed BAP examinations and reports, only 257, or approximately five percent (5%), qualified for a monetary award.[15] Assuming this trend continues over the remaining life of the BAP, at most 500 or so additional eligible Class Members will receive a qualifying monetary award for Level 1.5 or Level 2 neurocognitive disorder.[16] This data does not support Class Counsel's estimate that 5,500 payable claims will be filed, or that it will be required to engage in future costly and labor-intensive work.

---

[12] Class Counsel's post-petition fee applications have never been supported by documentation or other data supporting the requested fees or the alleged expenses, rendering it is impossible to for anyone to conduct the required review. For example, Class Counsel's most recent petition, the Fifth, claims 1,444 hours of attorney time (mostly billed at excessive partner rates) and $155,000 in expenses for the 6 month period. *See* ECF 11126. Class Counsel provides no—zero— information on the claimed expenses and summary details on the hours/rates. There is no disclosure of the actual billing rates, the dates or a range of dates for the hours allegedly worked, the identity of the individuals alleged to have performed the service(s), or how the work was divided between partners, "counsel," associates, or paralegals. *See id*. The other pending petitions—the Second, Third, and Fourth—are likewise devoid of any meaningful documentation or data. *See* ECF 10374; ECF 10767; and ECF 10986.

[13] ECF 11127-1, at 37-38, ¶ 85.

[14] As of June 15, 2020, there were 1,157 payable claims. ECF 1116, at 4.

[15] *See* ECF 11115, at 10 ("154 diagnoses of Level 1.5 …, and 103 diagnoses of Level 2…); *see also* ECF 11116, at 2-6; ECF 11127-1, at 11-12, ¶ 25.

[16] 12,837 retired NFL players are eligible to participate in the BAP. ECF 11115, at 3, ¶ 7.

B.    THE MOTION'S REQUEST FOR THE FULL 5% HOLDBACK
CONFLICTS WITH THE ADVICE, OPINIONS, AND
RECOMMENDATIONS OF THE COURT'S OWN RETAINED EXPERT

Not only is it unsupported, the Motion's request for a permanent 5%
holdback conflicts with the opinions offered by the Court's own expert, Professor
Rubenstein, who was retained to opine on this very issue.  He, of course, counseled
against *any* holdback, advising the Court that the $112.5 million fee fund
established by the NFL is sufficient to cover all Class Counsel fees, past, present
and future.[17]  And, he opined that if, for some reason, the $112.5 million turned out
to be insufficient to cover implementation/administration, Class Counsel was in the
best position to secure more funding from the NFL.[18]

Even after Class Counsel submitted additional information for Professor
Rubenstein to consider—certain "unforeseeable, additional work"—he stood by
"[his] conclusion that the NFL's $112.5 million fee and expense payment should
be sufficient to fund past, present, and future work…."[19]  And, he again suggested
that if it turned out to be insufficient, Class Counsel turn to the NFL.[20]  Ultimately,

---

[17] *See* ECF 9526, at 2, 35. Part of his six-part rational was that the Settlement did not fix $112.5
million as the fee solely for negotiating a settlement agreement; the $112.5 million included
implementation. *See id*. at 37-40 (confirming nothing in the Settlement says Class Counsel must
be paid extra to implement it).  Professor Rubenstein also opined that, with proper management,
the $112.5 million would be enough for the entire term of the Settlement.  *See id*. at 43-44.

[18] *Id*. at 41.

[19] ECF 9571, at 5.

[20] *Id*. at 6.

however, he offered "as a last resort" a holdback of up to 2%.  He proposed this only as a "final backstop"[21] and, even then, never suggested 5%.

Despite Professor Rubenstein's opinions, the Court expressed concern that the substantial sum of money set aside for implementation/administration ($22.8 million) may run out.[22]  So, the Court ordered a precautionary 5% holdback.[23]  But as it is now configured (and what Class Counsel is asking the Court to make permanent), the 5% holdback basically ensures an uncapped, unchecked incentive for Class Counsel to work on its maintenance and oversight services with no plan in sight, no estimate of future work, and no foundation for what the fees for that unidentified work might be.  This is particularly troubling at this time as the claims process has matured and the claims are dwindling.  "[I]t implies … Class Counsel [seeks] to significantly enhance [its] own fees without significantly enhancing [its] own work…."[24]

In any event, because the Court appointed Professor Rubenstein to address this issue initially, and he came to a conclusion wholly different from Class

---

[21] *Id*. at 7-8.

[22] *See* ECF 9860, at 17.

[23] *Id*. at 18.  True, as Class Counsel notes, the Third Circuit confirmed this Court's discretion to order a Holdback.  *See* ECF 11127-1, at 43-47, citing *In re Nat'l Football League Players' Concussion Injury Litig*., 18-2012, 2020 WL 2214131, at *2 (3d Cir. May 7, 2020).  At the same time, however, the Third Circuit did not say this Court had to so, or, if it does, in what amount.

[24] ECF 9526, at 37, ¶45.

Counsel, prudence requires that he be given an opportunity to consider Class Counsel's Motion in light of the current state of the Settlement and Settlement-related activities for the benefit of the Court, the *pro se* claimants, and those opposing the Motion.

C.    THE MOTION SEEKS TO MAKE THE 5% HOLDBACK PERMANENT TO COVER FEES FOR SERVICES ALREADY PROVIDED BY OTHERS UNDER THE SETTLEMENT

Much of what is described in the Motion—both past and future—is oversight; oversight of awards, oversights of appeals, oversight of the BAP, *etc.* But the Settlement already compensates the Special Masters for overseeing administration and implementation of the Settlement, including oversight of the Claims Administrator and the BAP Administrator.[25]  In fact, everyone involved in the administration and implementation of the Settlement (save Class Counsel) is paid out of the Monetary Award Fund that is ultimately funded by the NFL,[26] not the Class.  No Class Member suffers any award deduction for the effort or expense of the Claims Administrator, BAP administrator, Special Masters, Special Investigator or the Court.  Of course, Class Counsel, already paid the majority of the $112.5 million, is treated differently. Nevertheless, the settlement implementation phase has been overseen by two Special Masters appointed by the

---

[25] *See, e.g.*, ECF 6073-2, at 53-54 (Article X, Class Action Settlement Administration) and § 10.1(a)-(c).

[26] *See id.* at § 10.01(c).

Court.  Accordingly, there is no rational basis, given the structure of the Settlement and the defined roles of the various entities and people involved, for Class Counsel to seek more than ten (10) times what each Special Master is paid.

D.    CLASS COUNSEL HAS FAILED TO USE OTHER RESOURCES THAT COULD/COULD HAVE PRESERVE(D) THE AFQSF

Class Counsel has previously said the 5% holdback is vital "to create an incentive for the multiple groups of lawyers who will be entrusted with shepherding the Settlement in the future to ensure that benefits continue to be provided to Class Members."[27]  But Class Counsel has largely failed to use other lawyers/law firms in connection with past implementation/administrative work and, based on the tone of the Motion, appears unwilling to do so in the future, especially if it is able to tap into an additional $40+ million via the 5% holdback.[28]

True, there may be larger, global projects requiring Class Counsel's attention, given his knowledge of the Settlement and its intricacies.  But, based on Class Counsel's last few fee petitions, it appears daily oversight and maintenance tasks comprise the majority of time incurred (and to be incurred in the future, given the maturity of the Settlement and dwindling claims).[29]  Yet those tasks appear to

---

[27] ECF 7464, at 31.

[28] *See* ECF 11127-1, at 45-46.

[29] We are, of course, speculating based on the available filings, because they do not include any supporting documents or data detailing who did what or when.

have been performed in large part by partners or "counsel"/"of counsel" at hourly rates close to or exceeding $700/hour, instead of associates and/or paralegals at substantially lower rates.[30]

Respectfully, we submit that administrative counsel could accomplish the goals of the Settlement for a fraction of what the Motion demands. Market rates for competent counsel in Philadelphia, plus the required workflow at this juncture in the Settlement process should require no more than two lawyers per year at $200,000 per year. The more rational and market-based approach would set an estimate of $500,000 per year for the administrative activities for the class of plaintiffs. Again, each Special Master is paid $200,000 per year to oversee the entire Settlement process, so there is no justification at this juncture, when the workflow has ebbed, to set aside $37+ million for the benefit of Class Counsel, who has been richly rewarded already, at the expense of both the lawyers who actually represent claimants in the case and the claimants themselves.

Simply put, there are numerous qualified lawyers and paralegals outside of Seeger Weiss who (i) represent former players, (ii) are deeply invested in those players and this litigation, (iii) are intimately familiar with and involved in the settlement and the claims process, and (iv) could provide the services referenced

---

[30] *See, e.g.*, ECF 10986, at 12 (claiming the vast majority of time as "partners" time billed at $758/hour); ECF 11126, at 13 (same).

by Class Counsel at substantially reduced rates.  Our firm and many others who actually represent Class Members stand ready, willing, and able assist Class Counsel in the oversight and maintenance of the settlement at rates substantially below those being requested in Class Counsel's outstanding fee petitions.  But there appears to be no interest by Class Counsel to reach out to other lawyers/law firms involved in the litigation to provide the necessary "implementation" services at reduced rates.[31]

## E.   PUBLIC POLICY CAUTIONS AGAINST ANY HOLDBACK

As a matter of public policy, there are substantial negative consequences were the Court to award Class Counsel the requested 5% holdback.  With a few more fee petitions, Class counsel will exhaust the $112.5 million funded by the NFL for common benefit fees and expenses.  When that happens, Class Counsel wants to charge its exorbitant fees and expenses against each *pro se* Class Member's award or the fees of lawyers who represent other Class Members.  This, of course, reduces the awards to *pro se* claimants, who are already victims of the NFL, and deprives fees from individual counsel who do far more work on these

---

[31] Just by way of comparison, the settlement agreement dictates that the *"[a]nnual* compensation of the Special Master will not exceed … $200,000.00" for all of the responsibilities assumed under the settlement.  *See* ECF 6481-1, at 51.  That is equivalent to one (1) month of Class Counsel's burn rate.

claims than the Court ever anticipated.[32] Class counsel may do little or no work at all on any individual claim, but still be accorded nearly 25% of the attorney's fees or 5% of the award the victim should otherwise receive.  This harms claimants, but it also reduces the incentives for privately retained counsel and supports the NFL's desire to drive away counsel for claimants and claimants themselves from the claims process.

## F.     THERE IS NO FACTUAL BASIS FOR A 5% HOLDBACK

No Holdback is warranted on these facts.  If the Court disagrees, any Holdback should be 1% or less, and then the Court can decide in a year or two whether or not even less is required. The Motion fails to bear the burden of proof on whether Class Counsel has a reasonable basis to demand $2-2.5 million annually for 61.5 years.  Nine Status Reports from the Claims Administrator show that only three claims per week are now being filed, and only one in three Claims are successful.  Therefore, Class Counsel's projection of 4,374 additional monetary awards has no basis in statistical reality.  The work won't be there.  For these

---

[32] The Court capped IRPA fees at 22%, in part, based on a misconception advanced by Class Counsel that this would be an easy settlement where individual counsel was not even required. This turned out to be wildly inaccurate. By its own admission, Class Counsel now states that this is the most complex settlement program ever conceived.  *See* 11127-1, at 43. The diagnostic standards and requirements of the Settlement are not even known within the neurological profession.  These are standards and requirements Class Counsel negotiated on its own.  As a result, the Settlement is a thicket in which two out of three claims are denied based on audits, investigations, appeals, surveillance, second-guessing diagnostic assessments and claims, and a pitched battel with the NFL over language, terms, and what the Parties intended.

reasons, we respectfully requests that the Court deny the Motion, return the 5%

Holdback to the *pro se* players and IRPAs.  But, if the Court concludes a Holdback

is warranted, it should be no more than 1%.  On this point, we support and adopt

the Response of Langfitt Garner PLLC, which addresses the numerical reality of

the current claims process.[33]

## CONCLUSION

For the reasons stated, the Court should reject Class Counsel's request to

make the 5% holdback permanent. Alternatively, if the Court is inclined to

establish some measure of a permanent Holdback, it should be less than 1%.

Dated: July 28, 2020                    Respectfully submitted,

                                        */s/ Lance H. Lubel*
                                        Lance H. Lubel, Esq.
                                        Texas Bar No. 12651125
                                        Adam Q. Voyles
                                        Texas Bar No. 24003121
                                        LUBEL VOYLES LLP
                                        675 Bering Drive, Suite 850
                                        Houston, Texas 77057
                                        Telephone: (713) 284-5200
                                        Facsimile: (713) 284-5250
                                        Email: lance@lubelvoyles.com
                                        Email: adam@lubelvoyles.com

---

[33] We dispute the necessity of any holdback.  But, if the Court is inclined to impose some measure of a permanent holdback, there should be a plan or protocol in place to address the potential of a positive balance in the AFQSF at the end of the Settlement term.  If money is held back now, but paid out in 60+ years, there will likely be a significant subset of former players who might ultimately be entitled to a refund but will die before ever seeing it.  One way to avoid this would be to establish some form of holdback/refund grid that returns money to the first-settled/withheld players but continues to fund the AFQSF with newer settlements.

*Attorneys for the Identified Class Members*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2020, I filed the foregoing through the Court's CM/ECF system, which will provide electronic notice to all counsel of record and constitutes service on all counsel of record.

*/s/   Lance  H. Lubel*
Lance H. Lubel