**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><div align="right">Plaintiffs,</div><br>v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><div align="right">Defendants.</div> | |
| THIS DOCUMENT RELATES TO:<br><br>Locks Law Firm v. Tamra Alexander<br>Attorney Lien Dispute<br>(Doc. No. 10684) | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    July  31, 2020

## I.      INTRODUCTION

Presently before the Court in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Locks Law Firm ("Locks Law") against the Award granted to Representative Claimant Tamra Alexander, on behalf of her husband, Settlement Class Member ("SCM") Kermit Alexander, in the litigation that became part of this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).  Locks Law seeks payment of attorneys' fees of up to as much as 10% of the Award that has been authorized for Mr. Alexander, its former client, pursuant to a contingency fee agreement

("CFA") that it entered into in an earlier phase of this litigation.  By their current counsel, Langfitt Garner PLLC ("Langfitt Garner"), the Alexanders challenge the Lien.  Langfitt Garner also seeks approval of a 15% contingent fee for its work, which included securing a referral of Mr. Alexander to a different provider who certified a diagnosis of a more serious condition at an earlier date, leading to a larger monetary award than was initially contemplated when the case was handled by Locks Law.  The parties consented to my resolution of this lien dispute.  (Doc. No. 11055).

As we set out in a Report and Recommendation filed on January 7, 2019,[1] our evaluation of these positions involves a consideration of the CFA between the Alexanders and former counsel and an assessment of the reasonableness of the requested fees of both law firms in light of the analysis set out by the Third Circuit's *McKenzie* decision.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach obligates us to scrutinize the reasonableness of the CFAs at the time of the signing of the contracts and then determine whether the circumstances compel a different evaluation of the agreement at the time each lienholder seeks enforcement.  We will then examine the results Mr. Alexander obtained, the quality of the representation provided by Locks Law, and most importantly the extent to which the efforts of Locks Law substantially contributed to the result.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.  As part of that analysis, we necessarily consider the role of current counsel, Langfitt Garner.  Ultimately, we conclude that both firms are entitled to recoup attorney's fees and costs but only such that their fees, when aggregated, do not exceed 15% of Mr.

---

[1] The District Court referred to us "all petitions for individual attorneys' liens."  (Doc. No. 7446.) On January 7, 2019, we issued a Report and Recommendation pertaining to three separate cases. (Doc. No. 10368.)  These were the first where we set out the legal principles that would guide our analysis in these cases.

Alexander's total award, and with Locks Law and Langfitt Garner sharing the fee on a 40%-60% ratio.

## II.    FACTS AND PROCEDURAL HISTORY

Mr. Alexander entered into a CFA with Locks Law on May 5, 2016 for litigation against the NFL for cognitive deficiencies resulting from injuries sustained while playing in the NFL. Under the terms of the fee agreement, if recovery were made by way of lawsuit or settlement, the Alexanders would pay 10% of the net recovery as the legal fee.  The Alexanders would not owe a legal fee or expense if the firm made no recovery on his behalf by settlement or trial.

Mr. Alexander had already been diagnosed with "dementia" when he engaged Locks Law. As records obtained by Locks show, he sought evaluation and treatment for his memory problems and other symptoms at the Kaiser Riverside Medical Office when he was in his early 70s.  A geriatrician and family medicine specialist who saw him for a consultation at Kaiser's Memory Clinic on January 7, 2015, Palak Dave, M.D., was the first to diagnose dementia.  Accordingly, after registering Mr. Alexander in the settlement claims portal on February 8, 2017 and facing a deadline of February 6, 2019 to file a pre-effective date claim, Locks Law wrote to Dr. Dave on January 29, 2019 and asked her to complete a certification form required by the Settlement Claims Administrator.  Unfortunately, she declined to do so.  The attorney principally responsible for the representation at Locks Law, David Langfitt, advised the Alexanders of this development on February 4, 2019.  He explained to them his strategy to submit what he knew would be an incomplete claim and then seek a MAF examination and record review with the hope of obtaining an even earlier diagnosis date.

Without a certification form signed by Dr. Dave, Locks Law was left with no choice but to file a claim on behalf of Mr. Alexander on February 5, 2019 without the requisite supporting

materials.  The claim sought an award for a Level 2.0 Neurocognitive Impairment diagnosis as of

October 24, 2018.  As expected, the Claims Administrator notified Locks Law of deficiencies in

the claim on April 29, 2019 and requested additional documentation.  In the meantime, Locks Law

had been working to obtain the necessary evaluations.  In March 2019, it made arrangements for

Mr. Alexander to be examined by neuropsychologist Melissa Bunner, Ph.D. in Austin, Texas.  She

conducted her evaluation April 16, 2019 and produced a report dated April 24, 2019 opining that

Mr. Alexander met the criteria for a Level 2.0 Neurocognitive Impairment as defined in the

Settlement Agreement.

Locks had wanted to have Mr. Alexander examined shortly thereafter by neurologist John

Bertelson, M.D., who was also based in the Austin area, in order to complete the additional *medical*

certification necessary to support a Level 2.0 diagnosis.  That appointment had not been finalized,

however, when a new settlement administration rule was issued that applied to appointments with

Qualified MAF Physicians that were being made after April 11, 2019.  Such appointments were

subject to a new "150-Mile Rule" that largely restricted claimants to examinations by qualified

evaluators who practice within a 150-mile radius of the claimant's home.  Locks Law sought to be

excused  from  this  requirement  in  e-mail  communications  with  the  Claims  Administrator

throughout April and May 2019.  It was ultimately unsuccessful, however, in obtaining a waiver

to permit Mr. Alexander to be examined by Dr. Bertelson.

In the midst of these efforts to obtain a neurologist's assessment, on June 7, 2019, Attorney

Langfitt left Locks Law and set up a new firm, Langfitt Garner.  The Alexanders were notified of

this development and chose to follow him to Langfitt Garner.  They entered into a CFA on June

20, 2019 that provided for a 15% contingency fee.  In light of its termination, Locks Law promptly

filed a Notice of Lien on June 22, 2019 seeking "reasonable attorney's fees, plus expenses and

costs," for its work on behalf of Mr. Alexander.  (Doc. No. 10684.)

Given the requirements of the 150-Mile Rule, Langfitt Garner sought out a Qualified MAF Physician in California to examine Mr. Alexander, interview Mrs. Alexander, and review earlier medical records.  William Chow, M.D., evaluated Mr. Alexander on September 25, 2019 and prepared his report on September 27, 2019.  He diagnosed Alzheimer's Disease and, based on his examination and review of Mr. Alexander's medical records, could date the onset of the condition to December 9, 2014.  Langfitt Garner submitted Dr. Chow's materials and certification form to the Claims Administrator as part of a new claim on October 23, 2019.[2]  On January 13, 2020, the Claims Administrator issued a Notice of Monetary Award, reflecting that Mr. Alexander qualified for an award based upon a diagnosis of Alzheimer's Disease and an onset consistent with the certification of Dr. Chow.  The NFL did not appeal the decision.

In light of the attorney liens and the contingency fee agreements of record, the Claims Administrator withheld from Mr. Alexander's award funds for payment of attorneys fees in an amount equal to 22% of his Award, which reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2018 Opinion and Order.  (Doc. No. 9863.)[3]  Of the attorney fee withholding, a portion reflecting 5% of the Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund ("AFQSF") pursuant to the Court's June 27, 2018 Order

[2]  In light of this condition and Dr. Chow's qualifications as an approved neurologist, his certification alone was sufficient for submission of the claim seeking an award for Alzheimer's Disease.  It was not necessary to provide Dr. Bunner's evaluation.

[3]  The District Court determined that presumptively no Individually Retained Plaintiff's Attorneys ("IRPAs") should receive more than 22% of a Monetary Award in fees (the "Fee Cap") given the benefits received by the SCMs from the work of counsel engaged for the common benefit of all SCMs.  *See* Doc. No. 10368 at 10-11 (discussing the District Court's decision relating to the presumptive Fee Cap).

5

Regarding Withholdings for the Common Benefit Fund. (Doc. No. 10104.) Those funds may be distributed at a later date upon further order(s) of Judge Brody. We must determine the appropriate distribution for the attorney fees currently available for disbursement (representing 17% of Mr. Alexander's Award) and the allocation of those funds that are currently held in the AFQSF (representing 5% of his Award), if those funds, or a portion thereof, are distributed by the Court at a future date. The Claims Administrator also withheld the amount of costs asserted by Langfitt Garner in its April 27, 2020 Statement of Attorneys Fees and Costs.[4]

Pursuant to a briefing schedule we issued through the Claims Administrator, and in accordance with the Lien Rules, both firms submitted simultaneous Statements of Dispute on April 27, 2020 concerning their entitlement to a fee in light of the other firm's claim to fees. They submitted Responses to the other's filings on May 12 and 15, 2020. Pursuant to Lien Rule 17, the Record of Dispute was then referred to us for resolution.

## III.    THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in this class action settlement did not relieve attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees, whether through a Lien or otherwise, are obligated to ensure that their fees are "reasonable" under the

---

[4] No funds were withheld for the purpose of reimbursement to Locks Law for any costs, as no amount of costs was asserted in its lien. However, in its Statement of Dispute, Locks attaches an exhibit showing its expenditure of $3,620.35 in costs on behalf of Mr. Alexander. The reasonableness of those costs has not been challenged.

standards articulated in *McKenzie*. *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based. We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

## IV.    DISCUSSION

Mr. Alexander received an award under the Agreement that certainly can be considered favorable for someone of his advanced age. This was a meaningful development in the case, which was primarily handled by the same personnel that originated at Locks Law and moved to Langfitt Garner. It is apparent, however, that little was done on Mr. Alexander's matter for a period of time at Locks Law such that receipt of his award was unnecessarily delayed. Given this question of the quality of work in the earlier phase of representation, and the significance of the later opinion of

7

Dr. Chow to the favorable award that Langfitt Garner secured for Mr. Alexander from its claim submission of October 23, 2019, we will approve each firm's fee request in part but allocate the larger share to Langfitt Garner.

      A.    **The CFAs at the time of contracting and enforcement – impact of changed circumstances**

As we assess the reasonableness of the contingent fee arrangements at the time the Alexanders entered into them, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation. We then compare the landscape at the time of contracting with the circumstances at the conclusion of the attorney-client relationship. Here, the conclusion of the relationship with Locks Law coincided with the entry of Langfitt Garner.

      *1.   Locks Law*

As our prior opinions have chronicled, litigation of individual cases in this MDL involved degrees of risk that varied over time. In the first phase of the litigation, the law firms that undertook representation of players individually, without the benefit of the efficiencies contained within an MDL, faced monumental challenges and risked having to pursue the entire case themselves, perhaps even through trial. Fee arrangements reflecting those large contingencies "would have been expected and appropriate." (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL in January 2012, however, the risk related to the *volume* of work to be undertaken by any law firm changed dramatically, as the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees took over the primary work in the case. *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from individually-retained player attorneys to

Plaintiffs' Committees, which would be compensated through a common benefit fund).[5]  The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial, as the NFL filed a robust motion to dismiss.  Without yet ruling on pending motions, Judge Brody ordered the plaintiffs and the NFL to mediation, and by the end of August 2013 a term sheet had been signed.   The Court ultimately gave final approval to a settlement agreement on April 22, 2015.  The Third Circuit Court of Appeals affirmed the District Court's approval of the Settlement Agreement on April 18, 2016.  The Supreme Court's denial of certiorari would follow on December 12, 2016.

The Alexanders engaged Locks Law on May 5, 2016, after the Third Circuit had affirmed the approval of the Settlement Agreement.  Implementation was still on hold, however, pending the Supreme Court's consideration of an expected certiorari petition.  With the Third Circuit's ruling, however, Locks Law could anticipate that the representation would most likely involve making a claim under the settlement agreement, as opposed to advancing novel litigation.  In that posture, the major risks confronting prior counsel in terms of liability and the defenses the NFL could assert had been alleviated, although some risks and several more months of waiting remained until the appeal process resolved and for the claims administration process to be rolled out.  The claims administration process would not be without risk, as claims may be denied, and even approved claims are subject to appeal by the NFL.  The claims administration process often requires an outlay of expenses and time that can only be recouped if the claim is approved and able to withstand an appeal.  Locks Law undertook the representation of the Alexanders in May 2016 in that posture of case-specific risk.

---

[5]  We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

### 2. *Langfitt Garner*

At the time Langfitt Garner assumed representation of the Alexanders on June 20, 2019, Mr. Alexander had already been examined by Dr. Bunner and had the testing results to support a qualifying diagnosis of Level 2.0 Neurocognitive Impairment.  He was yet to be examined by a neurologist, however, and the neurologist with whom he had hoped to work in Texas, Dr. Bertelson, appeared to have become unavailable in light of the new 150-Mile Rule.  Langfitt Garner contracted for a 15% fee knowing there was work to be done to shore up the pending Level 2.0 claim with the necessary medical certification, although the potential change in clinicians also created an opportunity to seek a larger monetary recovery based upon a diagnosis of an earlier and/or more serious condition.  At the time of contracting, Langfitt Garner of course also knew of the prior involvement of Locks Law and that firm's claim to an attorney fee on any potential recovery up to its 10% contracted contingency fee.  The circumstances as to risk factors from the time when Langfitt Garner agreed to represent the Alexanders and when it sought to enforce the contract upon the approval of his award were essentially the same.

### B.     The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the attorneys' efforts in bringing about the result.  On January 13, 2020, Mr. Alexander qualified for a Monetary Award based upon a qualifying diagnosis of Alzheimer's Disease as of December 9, 2014, when he was 73 years old.  (Notice of Monetary Award Claim Determination.)

### C.     The quality of the work performed

As is demonstrated in our discussion below, we find that each firm played a role on behalf

of the Alexanders in accordance with the demands of the respective stage of the litigation and settlement administration.  The question of "the quality of the work" would not resolve the question of which firm should receive a fee in this case.  We do note, however, that even though Mr. Alexander already had received a dementia diagnosis by a geriatric specialist when he retained Locks in May 2016, the firm does not appear to have undertaken any efforts to obtain a proper certification of that diagnosis until January 2019, shortly before the deadline in which to file a claim based upon a pre-effective date diagnosis such as his.  Because of this delay in filing his claim, Mr. Alexander's appointments with the second of two examiners in Austin, Texas had not been completed before the new 150-mile rule was enacted.  The implementation of this rule required counsel to forgo plans to utilize Dr. Bertelson following the neuropsychological testing by Dr. Bunner and to abandon her evaluation, for which it had incurred $3,500.00 in expenses. This also resulted in the further delay of seeking out a new neurologist within Mr. Alexander's local community.  The parties have not justified this delay in Locks Law's work on behalf of Mr. Alexander's claim, other than to suggest that the firm had a heavy caseload.

### D.  The substantiality of the work performed

The other and perhaps more important question to consider in this lien dispute is how the two firms contributed to the work necessary to obtain the Monetary Award that the Alexanders received.  Locks Law asserts that by filing Mr. Alexander's claim and obtaining medical records that ultimately substantiated the Alzheimer's Disease diagnosis dating to 2014 it made the more significant impact.  Langfitt Garner, however, asserts that as of the time Locks Law last handled Mr. Alexander's case, he possessed evidence supporting a qualifying diagnosis only for Level 2.0 Neurocognitive Impairment as of 2019, which was of significantly less value under the Monetary Award Fund rules than the Alzheimer's diagnosis at the younger age that was ultimately certified.

11

Langfitt Garner contends that it maximized the recovery for the Alexanders and, by extension, for both counsel sharing in a contingency fee.  We therefore lay out the efforts undertaken by the two firms in the various aspects of their representation to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.

As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;
>
> (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,
>
> (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,
>
> (6) support of clients who were seeking loans and were exposed to predatory lending practices; and
>
> (7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories, and there may be other categories of tasks undertaken or services provided by IRPAs that would be relevant to this analysis.  In the absence of any suggestion of other relevant criteria, we will use these categories as checkpoints as we consider the substantiality of the IRPA's efforts and the role each may have played in maximizing Mr. Alexander's award.

**(1) The review of medical records and necessary actions taken**

12

**to ensure medical conditions were identified and diagnosed at the earliest possible date**

Both firms reviewed medical records and worked to establish a pre-effective date diagnosis that would qualify Mr. Alexander for a Monetary Award.  Locks Law, however, did not take action at the earliest opportunity.  Mr. Alexander's medical records reflected a "dementia" diagnosis documented on January 7, 2015.  But it was not until late January 2019 that Locks Law sent a letter to Dr. Dave, the diagnosing physician, seeking a physician certification from her that could have established the basis for a successful claim to be made in advance of the February 6, 2019 claim filing deadline.  By the same token, and as reflected in email communications between Locks Law personnel and Mrs. Alexander from that time, the approach that Attorney Langfitt developed while still at Locks Law gave them the opportunity to seek certification of a qualifying diagnosis as of an earlier date, which had the potential for a larger award.  Locks Law personnel began to effectuate that plan as they arranged for the examination by Dr. Bunner in Texas and then sought permission from the Claims Administrator for Mr. Alexander to be examined by Dr. Bertelson, who was also located in Texas.  Unfortunately the 150-mile rule required counsel to seek another physician to support this claim.  Langfitt Garner assumed representation on June 20, 2019 and ultimately arranged for Mr. Alexander to be examined in California.  While the diagnosis came later, the earlier onset date that Dr. Chow identified and his diagnosis of Alzheimer's Disease reflected a significant benefit to the Alexanders.

**(2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial**

This factor does not apply in large part.  By the time Locks Law was engaged by the Alexanders in May of 2016, the settlement had been reached and approved in the District Court and had withstood an appeal to the Third Circuit.  Although a petition for certiorari in the United

States Supreme Court was anticipated, it was not expected to be granted. Thus, at the time Locks Law undertook representation of Mr. Alexander, it was not expected that his case would proceed to trial.

### (3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted

This factor does not appear to pertain to the work of either of the firms.

### (4) Support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class

Again, given that the Alexanders retained Locks Law in May 2016, when the parties awaited only the denial of certiorari in order for the settlement agreement to become effective, Locks Law was not required to provide this type of support for more than a few months until certiorari was denied. Moreover, having just retained Locks Law following the Third Circuit approval of the settlement, the Alexanders would not have required much convincing to remain in the class.

### (5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award

Both firms shared a role in this aspect. The Alexanders came to Locks Law prior to the effective date of the Settlement Agreement. Locks Law registered Mr. Alexander on February 8, 2017 and filed his claim for a pre-effective date condition on February 5, 2019. It arranged for him to be seen by Dr. Bunner and, following the announcement of the 150-Mile Rule, sought permission from the Claims Administrator for an exception to that rule to enable him to be seen by Dr. Bertelson.

Langfitt Garner picked up where Locks Law left off, arranging for an examination by a Qualified MAF Physician located within the 150 mile radius. It provided that physician, Dr. Chow,

with the prior medical records that Locks Law had also gathered to support a diagnosis pre-dating the evaluation date. With Dr. Chow's certification on September 27, 2019 of a diagnosis of Alzheimer's Disease as of December 9, 2014, Langfitt Garner was in a position to submit the strong claim it did on October 23, 2019. During this time, Langfitt Garner also arranged to have Tamra Alexander designated as the Representative Claimant. Langfitt Garner further monitored the progress of the claim, making inquiry of the Claims Administrator in January 2020 when no decision had been issued within 60 days. The Award was then authorized on January 13, 2020.

> **(6) Support of clients who were seeking loans and were exposed to predatory lending practices; and**

This factor does not appear to apply to Mr. Alexander.

> **(7) Providing necessary support in other personal matters collaterally related to this litigation**

This factor does not appear to apply here.

### E.    Apportionment

As we synthesize this information to assess how to apportion fees for the representation provided to Mr. Alexander that yielded the positive outcome of the Monetary Award he received, we are cognizant that three sets of attorneys contributed to the work necessary to obtain that Award: Class Counsel and the other firms that acted for the common benefit in negotiating and defending the Settlement Agreement, as well as keeping players informed; and Locks Law and Langfitt Garner, both of which agreed to represent Mr. Alexander when it was clear that his case would be resolved according to the terms of the class action settlement.

The substantiality of the work of either firm in securing the Monetary Award authorized for Mr. Alexander is necessarily reduced given that the work of class and common benefit counsel clearly "reduced the amount of work required of IRPAs." (Doc. No. 9862 at 4). In its establishment

15

of a 22% presumptive fee cap, the District Court has already taken actions to reduce IRPA fees, accounting for the substantial benefit provided by Class Counsel.  This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials.

Rather, both of these firms were principally engaged with the filing and support of Mr. Alexander's claim once registration in the claims process opened.  Locks Law notes that the claim was filed in February 2019 by the filing deadline under its stewardship; that it gathered the historical medical records upon which the certification of Alzheimer's Disease dating to December 2014 was ultimately based; and that the strategy developed in the wake of Dr. Dave's failure to certify a qualifying diagnosis of Level 2.0 Neurocognitive Impairment was crafted while Mr. Alexander was represented by Locks Law, albeit with Attorney Langfitt as the principal handler. It asserts that it should receive 80% of the fees awarded plus reimbursement of its costs.  (Dispute Rec. Doc. 10 at 4.)

Langfitt Garner, which represented the Alexanders for a shorter period of time, seeks 75% of the total authorized fee.  Such a division of fees would align to some extent with the fact that when the Alexanders followed Attorney Langfitt to Langfitt Garner, they agreed to a larger fee percentage.  Langfitt Garner's work involved arranging for an evaluation by a MAF physician that would satisfy the 150-Mile Rule; providing that physician, Dr. Chow, with historical medical records and third-party statements; filing a new claim in October 2019 seeking an award based upon Alzheimer's Disease; guiding the Alexanders through the process of having Mrs. Alexander

16

designated a Representative Claimant; and following up with the Claims Administrator when no decision had been rendered in the expected timeframe. It notes that had the initial claim filed at Locks Law, which was submitted in February 2019 and was going to be supported by Dr. Bunner's neuropsychological testing conducted in April 2019 and anticipating a confirming neurologist's report, sought an award based only on a Level 2.0 Neurocognitive Impairment diagnosis that would have yielded a recovery of $78,700. The claim that Langfitt Garner ultimately filed in October 2019 based on Dr. Chow's certification of Alzheimer's Disease beginning at age 73 led to an award of $343,231. It argues that Locks Law, which would have received a 10% fee of $7,870 under its CFA had the claim continued on its trajectory there after Attorney Langfitt left, should not benefit from the higher fee percentage – 15% – that was negotiated by Langfitt Garner.

When we consider the contributions of each firm to the five categories of tasks described above, and valuing each task category based on its significance to this case, we find that the efforts of Langfitt Garner were at least equal to, if not more substantial than, the efforts of Locks Law. Apart from the administrative functions of registering Mr. Alexander in the settlement in February 2017 and filing a placeholder claim on the eve of the filing deadline in February 2019, Locks Law gathered materials but did not obtain the necessary medical certifications to substantiate any award at that time. It quickly scrambled to remedy that deficiency, but that process was still not complete several months later. Langfitt Garner certainly benefitted from the strategy Langfitt himself developed at Locks Law and the historical medical records the firm had obtained from Mr. Alexander's various medical providers. But the effectuation of that strategy, the construction of the claim based upon an Alzheimer's Disease diagnosis dating to 2014, and the oversight of the remaining administrative matters before the Claims Administrator was executed by Langfitt Garner. Given the substantiality of this work and the overall quality of the representation offered

17

by the two firms, we conclude that the fees should be apportioned so as to favor Langfitt Garner.

The other question that remains is how much of Mr. Alexander's award is available for distribution to counsel here.  When he engaged Locks Law in 2016, the firm agreed to accept a contingent fee of 10%.  When he switched to Langfitt Garner in 2019, he agreed that that firm could be paid 15% of his award.  We do not know what Mr. Alexander's expectations were as to whether his total counsel fee would be capped at the 15% rate he negotiated with Langfitt Garner in 2019, particularly knowing that the district court had presumptively approved IRPA fees totaling as much as 22% of settlement class members' monetary awards.  Given the two-year period from claim registration to claim submission in which counsel was largely inactive, we find that the quantity of work expended on Mr. Alexander's behalf justifies a total fee of no more than the 15% of the Monetary Award.

We will apportion that counsel fee as follows: 40% (of the 15% fee) to Locks Law and 60% (of the 15% fee) to Langfitt Garner.  In light of the District Court's prior order that a portion of these IRPA fees be set aside in the Attorneys' Fees Qualified Settlement Fund, the 5% "holdback funds" will be apportioned among counsel in the same proportion in which they share the portion that is currently available for distribution to counsel.

**F.    Costs**

Langfitt Garner seeks reimbursement of $739.42 it incurred in costs.  Its CFA with the Alexanders provided for reimbursement of costs from his award.  We find that these costs were reasonably incurred and must be awarded to Langfitt Garner.

Locks Law did not identify in its lien the amount of costs it sought, although it identified costs as something sought by its lien.  Because the amount of its costs had not been provided to the Claims Administrator, funds were not withheld for this purpose from Mr. Alexander's award.

Its Statement of Dispute, however, outlined the costs it incurred for Dr. Bunner's examination and UPS charges, and sought reimbursement totaling $3,620.35.  Langfitt Garner does not address Locks Law's untimely request for costs in its response memorandum, but the expenses appear legitimate and would ordinarily be recoverable.

We have not approved reimbursement for costs that were not timely submitted and where the reimbursement would require funds already released to the SCM to be payable to counsel.  In this case, however, the Claims Administrator has withheld funds to satisfy as much as a 22% counsel fee, which leaves sufficient funds from the award available to reimburse Locks Law.  We will direct the Claims Administrator to reimburse Locks Law for these expenses from the withheld funds.

## V.    CONCLUSION

Both Locks Law and Langfitt Garner agreed to represent Mr. Alexander for less than the maximum fee authorized to IRPA counsel in this litigation.  After Locks was retained with a 10% contingency fee, its personnel did little over a period of about two years to advance his claim. When Mr. Alexander followed Attorney Langfitt from Locks Law to Langfitt Garner in 2019, he obligated himself to pay a 15% fee.  We find that number to fairly reflect what should be the total fee divided between the two firms in this case.

We conclude that a fair resolution of this dispute is to divide the fee between Locks Law and Langfitt Garner, such that they receive 40% and 60% respectively, of the total fee (15% of the monetary award).  These amounts must be reduced by the Common Benefit Fee deduction currently applicable to all Awards.  Both firms are also entitled to the costs asserted.  The balance of funds withheld by the Claims Administrator for counsel fees shall be payable to the Alexanders in accordance with all other applicable liens and the terms of the Settlement Agreement.  An

appropriate Order follows.


BY THE COURT:


 /s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE