# EXHIBIT "A"

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| | : | |
| Kevin Turner and Shawn Wooden, On behalf of themselves and Others similarly situated, | : : | Hon. Anita B. Brody |
| Plaintiffs, | : | |
| v. | : | Civ. Action No. 14-00029-AB |
| National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc., | : : | |
| Defendants. | : | |

THIS DOCUMENT RELATES TO:
ALL ACTIONS

## DECLARATION OF GENE LOCKS, CLASS COUNSEL, IN RESPONSE TO THE DECLARATION OF CHRISTOPHER A. SEEGER IN SUPPORT OF PROPOSED ALLOCATION OF COMMON BENEFIT ATTORNEYS' FEES, PAYMENT OF COMMON BENEFIT EXPENSES, AND PAYMENT OF CASE CONTRIBUTION AWARDS TO CLASS REPRESENTATIVES

I, GENE LOCKS, declare under oath, based upon my personal knowledge, information and belief as follows:

1. I have been a practicing attorney for fifty-five years and have been a pioneer and in the forefront of personal injury mass tort litigation for the past forty years.

# INTRODUCTION

2.  With this Declaration, the Locks Law Firm ("LLF") objects to the purported allocation of Christopher A. Seeger ("Seeger") in his Declaration (hereinafter the "Seeger Declaration") for the following reasons:

A.  Seeger's method and procedure are a self-serving violation of the jurisprudence set forth in numerous cases by the Court of Appeals for the Third Circuit. Those cases command that the leadership collectively (not individually), or an independent auditor, must sort through, deliberate about, and come to an agreement about (i) the criteria used for the allocation of common benefit fees; (ii) the proper application of the criteria and (iii) the allocation itself. This "herculean" task should be shouldered by all the leadership, not just by one person, before they submit a recommendation to the Court. Here, Seeger did none of that, and the result is a self-serving purported allocation that ignores many contributions other than his own and that of his co-counsel, Arnold Levin.

B.  Rather, the Court should order the leadership (all class counsel and possibly the entire Plaintiffs Steering Committee) to shoulder the difficult work of coming up with an allocation that properly recognizes contributions, applies reasonable criteria for doing so, arrives at loadstar figures for each applicant, and applies multipliers that are reasonable (though possibly subject to dispute). This way, the Court will receive an allocation that the leadership at least attempted to construct in a deliberative and fair process, perhaps subject to further review by an independent Auditor or Court designee. Seeger did not even make an attempt to do that here.

C.  Further, awarding common benefit fees at this juncture in the case is premature. Seeger proposes to pay himself and Levin $82 million before there is any real data about the

success or failure of the claims processing in this Settlement. Jurisprudence nationwide in similar mega-cases shows that courts cannot know whether a settlement has actually conveyed common benefit to the class until there is sufficient data to prove it. Courts do not allow common benefit fees before reliable data is accumulated and known to the court and parties. Seeger has been involved in many of these cases, including the *Vioxx* matter, so he knows the cases and knows the process. But here, Seeger appears eager to evade the data-gathering that would support or undercut his common benefit fee application and in order to receive enormous sums for himself and Levin, before any but a small amount of players receive monetary awards. This is contrary to the careful way courts and attorneys assess the value of a mega-case settlement and a subsequent award of common benefit fees

D.      The Seeger allocation negatively affected virtually every law firm other than Seeger's and it its co-counsel, Levin. Specifically, it negatively affected LLF in numerous ways more fulsomely described later in this Declaration. By way of example only, Seeger ignored virtually everything LLF did in the case, including its pre-MDL efforts, its negotiation efforts, its construction of the player injury database for negotiation purposes, and the fact that it represents and has always represented more retired players than any other firm.[1] A telling fact is that although LLF has been on the Court-appointed PEC from the beginning of this case and also has been class counsel from 2013 onward, Seeger has given LLF a multiplier equivalent to firms that were late to the case or barely participated at all. For the reasons set forth in this Declaration, without the claim filings by LLF, there likely would have been no Settlement. Seeger appears to have no recollection of this.

---

[1] LLF represented 1400 retired players during negotiations in 2013, whereas Seeger and Levin together represented no more than a dozen.

3

E.    Beyond his and Levin's $80 million plus request, Seeger also seeks additional common benefit fees in the form of 5% of every monetary award granted to retired players. He seeks the additional fees to finance what he claims to be the cost of administering the Settlement Agreement. He has allocated that task to lawyers in his firm alone who, along with NFL counsel, are currently micro-managing every nuance of the Settlement, racking up hours and costs, and preventing the expert Claims Administrator BrownGreer from doing its job. On that level, this is another exhorbitant self-serving request, particularly in light of the fact that Seeger has excluded Class counsel from almost every aspect of the administration process and made the process opaque.

F.    Moreover, the requested 5% holdback is unnecessary. LLF urges the Court not to grant the request but, rather, (1) to allocate from the $112.5 million fund a reserve for whatever is needed for administration; (2) audit Seeger's and the NFL's micromanagement of the Settlement process with the help of class counsel, BrownGreer, and a special master, if necessary, and (3) wait and see whether additional funds are ever needed for the administration of the Settlement which are not presently available. If additional funds are needed, the NFL should pay them, not the claimants.

## SEEGER'S ALLOCATION DECLARATION UTILIZES A METHODOLOGY NOT CONSISTENT WITH THIRD CIRCUIT JURISPRUDENCE

3.    Pursuant to the Court's directive, co-lead Counsel, Christopher A. Seeger, filed the the Seeger Declaration on October 10, 2017 and recommended an allocation of the common benefit fees. Using a traditional "lodestar methodology" to perform the proffered allocation, he recommended that his law firm receive 65.36 percent of the requested $107,735,097.00 aggregate fee award even though his firm only claimed to have performed (allegedly) 45.74

4

percent of the lodestar value of the work and even though a significant percentage of that work was performed by attorneys who were paid a small fraction of the hourly rate claimed for their services. For the reasons that follow, we respectfully submit, the Court cannot rely on Seeger's recommendation in allocating whatever award it determines is appropriate herein.

4. First, allocation based on the recommendation of lead counsel ignores the prevailing methodology for distributing an award of class action attorneys' fees. Unlike the aggregate award of attorneys' fees from a class settlement fund itself, the allocation of such an award among those attorneys entitled to share therein is properly viewed as a "private matter" that does not require independent determination by the Court. As our Court of Appeals stated in *Warfarin*:

> Appellant ... also contests the District Court's fee award on the grounds that it exacerbated the intraclass conflict between consumers and T[hird] P[arty] P[ayor]s. The District Court set aside 22.5% of the total $44 million settlement fund to cover attorneys fees to be divided according to the discretion of the co-chairs of the Executive Committee. **The District Court dismissed objections lodged against the award as unpersuasive, explaining that the distribution of an attorney fee award among counsel is and should be a "private matter" for the attorneys to resolve amongst themselves.** [Appellant] renews his arguments here, essentially asserting that consumer counsel would have had an incentive to win a larger settlement for their clients if their share of the fees were directly linked to their clients' recovery. Because we find that the class was properly certified, and the Executive Committee structure adequately represented the interests of all class members in the settlement negotiations, **we see no reason to** treat TPP and consumer counsel as antagonistic constituencies within the settlement class and **deviate from the accepted practice of allowing counsel to apportion fees amongst themselves**.

*Warfarin*, 391 F.3d at 533 n.15 (citations omitted and emphasis supplied). *Accord, e.g., Bowling v. Pfizer, Inc.*, 102 F.3d 777, 781 (6th Cir. 1996) ("How ... class counsel ultimately divide that [court- awarded] fee" is up to them); *Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir. 1992) ("The district court acted well within its discretion in awarding an aggregate sum to the ... Attorneys that was based on their collective efforts, leaving apportionment of that sum up to the ... Attorneys themselves."); *In re Domestic Air Transportation*, 148 F.R.D. 297, 357 (N.D. Ga.

2013) ("Ideally, allocation is a private matter to be handled among class counsel."); *In re Copley Pharmaceutical, Inc., Albuterol Products Liability Litigation*, 50 F. Supp. 2d 1141,1148 (D. Wyo. 1999) (court prefers that class counsel handle allocation as a "private matter").

5. The prospect of multiple applicants trying to reach agreement on the percentage allocation of a potential nine-figure award may seem daunting, but this process has succeeded in cases involving four times as many applicants for aggregate awards that were six times as much as the fee requested here. *See, e.g., In re Diet Drugs*, 553 F.Supp.2d 442, 460-61 (E.D.Pa. 2008). And the effort is well worth making because, if successful, it saves the Court the "difficult", "unenviable", "herculean" task of undertaking an allocation on its own. *See, e.g., Diet Drugs*, 401 F.3d at 167 (Ambro, J. concurring) ("The District Court described the task of allocating $160 million in counsel fees as 'herculean.' ... This description was apt."); *Prudential*, 148 F.3d at 329 n.96 (describing "the difficult task of assessing counsels' relative contributions"); *Copley*, 50 F. Supp. 2d at 1148 ("Attorney fee allocation is an unenviable task for any court. It is a difficult matter that ... even the trial court is often not in the best position to decide."); Curtis, D. & Resnick, J., *"Contingency Fees in Mass Torts: Access, Risk, and The Provision of Legal Services When Layers of Lawyers Work For Individuals and Collectives of Clients*," 47 DEPAUL L. Rev. 425, 448-49 (Winter 1998) (noting the difficulty of "assessing the value of contributions of a multitude of attorneys to a particular outcome").

6. Here, the Court did not request and Seeger did not even attempt to negotiate the allocation of a hoped-for fee that reaches into the nine-figure range. The failure to do is certain to result in acrimonious allocation litigation and appeals that could be avoided by following the well-accepted practice of good faith, arms-length negotiation among those who collectively labored to produce the Settlement that created the opportunity for the fee award. Respectfully,

the Court should overrule the allocation recommendation contained in the Seeger Declaration and direct Seeger and all the other fee applicants to engage in negotiations.

7. Second, while there are older, scattered cases that suggest it is appropriate for a district court to substantially rely on allocation recommendations of counsel occupying a leadership role in MDL class litigation, that line of cases was strongly rejected by Judge Ambro in a concurring opinion in the *Diet Drugs* litigation where he offered much needed appellate "guidance on how fees should be allocated among counsel in MDL class actions." *See In re Diet Drugs*, 401 F.2d 143, 167 (3rd Cir. 2005). In that opinion Judge Ambro emphasized that when a district court asks MDL leadership to "suggest[]…how to proceed on matters near and dear – dividing a limited fund among themselves and other firms" it creates a "direct conflict of interest" akin to asking a "fox [to] recommend[] how to divvy up the chickens." *Id.* at 173. "Such a direct conflict of interest" Judge Ambro observed, "strongly suggests that affording substantial deference [to the allocation recommendation of such lead counsel] is inappropriate."

8. Far and away Seeger's firm has the largest claimed lodestar in the present litigation. He obviously has an enormous direct financial interest in how any fee award made by the Court is to be allocated among the twenty-six attorneys who are entitled to participate in the aggregate common benefit fee award. Given this open and obvious conflict,[2] it is apparent that the Court may not substantially rely on his recommended allocation as a matter of law and should opt, instead, for neutral allocation procedure such as allocation by agreement or, if necessary,

---

[2] As an example of this obvious conflict for allocation purposes, Seeger afforded the time devoted to Settlement, an activity that he was involved in, substantially greater weight than the time devoted to developing the class claims at the outset of the litigation, an activity that he was not involved in, even though it is obvious that there would have been no settlement if class claims were not conceived of, filed and aggressively maintained in the first instance.

allocation by a neutral judicial officer such as a magistrate judge, special master or an Article III

judge using appropriate legal standards and based on a full evidentiary record.

9. Third, the allocation methodology proposed in the Seeger Declaration was not

properly applied as a matter of law. While the fee application here properly abjures reliance on

the lodestar method for awarding an aggregate fee in favor of the percentage-of-the-fund

methodology,[3] the Seeger Declaration nonetheless assumes that the Court will award the

requested aggregate amount and utilizes the lodestar method for allocation, multiplying self-

reported lodestar values for each fee applicant times differential multiples ranging from a low of

0.75 to a high of 3.885 for Seeger's firm. *See* Seeger Declaration at ¶ 17. For the Court to

follow this methodology would be plain error.

10. In the lodestar method, "the court multiplies the number of hours that … counsel

reasonably worked by the reasonable hourly rate for that work to determine the counsel's

lodestar," which may be multiplied by a factor "that attempts to account for the contingent nature

or risk involved in a particular case and the quality of the attorneys' work." *In re Cendant Corp.

Sec. Litig.* ("*Cendant II*"), 404 F.3d 173, 188 (3rd Cir. 2005). *In re Rite Aid Securities Litig.*, 396

---

[3] Attorneys' fees are typically assessed through the percentage-of-recovery method or through
the lodestar method. In the lodestar method, "the court multiplies the number of hours that lead
counsel reasonably worked by the reasonable hourly rate for that work to determine the counsel's
lodestar, which may be multiplied by a factor intended to compensate the attorneys for the risks
they faced and any other special circumstances." *In re Cendant Corp. Sec. Litig.* ("*Cendant II*"),
404 F.3d 173, 188 (3rd Cir. 2005). The percentage-of-recovery method, on the other hand,
"resembles a contingent fee in that it awards counsel a variable percentage of the amount
recovered for the class." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3rd Cir.), cert.
denied, 534 U.S. 889 (2001). Applicable Third Circuit precedent "'recommend[s]' that district
courts compare the results at which they arrive via the percentage-of-recovery method with an
abbreviated calculation of the lodestar amount." *Cendant I*, 264 F.3d at 285. "The goal of this
practice is to ensure that the proposed fee award does not result in counsel being paid a rate
vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall'
to lead counsel." *Cendant I*, 264 F.3d at 285. Thus, "when the multiplier is too great, the court
should reconsider its calculation under the percentage-of-recovery method, with an eye toward
reducing the award." *Rite Aid*, 396 F.3d at 306.

F.3d 294, 305-06 (3rd Cir. 2005). In terms of the "hours worked" and reasonable hourly rate components of lodestar evaluation, it has been clear since this methodology was first announced in the Third Circuit's *Lindy* cases that the number of hours reasonably worked for the benefit of the class may not be based on the self-serving assertions of the fee petitioners but, rather, must be determined independently by the district court based on an appropriate and reasonably specific evidentiary record, a process sometimes characterized as "cumbersome, enervating and often surrealistic." *See, e.g., Lindy Bros., Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* ("*Lindy I*"), 487 F.2d 161, 167 (3rd Cir. 1973); *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 48-49 (2nd Cir. 2000); 1985 TASK FORCE REPORT, 108 F.R.D. at 246 & 258; *Cendant I,* 264 F.3d at 256.

11.   Indeed, even though the percentage-of-the-fund with an abbreviated lodestar cross-check method for common fund fee adjudication was adopted in part to relieve the district courts of this herculean task, most courts supervising large MDL/Class cases and using this methodology still require an independent audit of the reasonableness of the time and hourly rates claimed by petitioning counsel to assure that their fee adjudication is predicated on an accurate understanding of the hours actually and reasonably devoted to the case by those who seek participation in large fee awards. *See, e.g., Diet Drugs,* 553 F.Supp.2d at 458; *In re Vioxx Prods. Liab. Litig.,* 760 F. Supp. 2d 640, 643 (E.D.La. 2010), *In re Oil Spill by the Deepwater Horizon,* MDL 2179, 2016 WL 6215974 at *14 (E.D. La. Oct. 25, 2016).

12.   As noted earlier, the lodestar methodology requires that the court-determined lodestar of the petitioning attorneys be increased or decreased by a "multiplier" to account for the "contingent nature of success" and the "quality of an attorney's work." *Lindy I,* 487 F.2d at 168. *See also, e.g., Cendant II,* 404 F.3d at 188. In this regard *Lindy* long ago cautioned that a:

court must recognize that a consideration of "quality" inheres in the "lodestar" award: counsel who possess or who are reputed to possess more experience, knowledge and legal talent generally command hourly rates superior to those who are less endowed. Thus, the quality of an attorney's work in general is a component of the reasonably hourly rate; this aspect of "quality" is reflected in the "lodestar" and should not be utilized to augment or diminish the basic award under the rubric of "the quality of an attorney's work". *** Rather, the increase or decrease reflects exceptional services only; it may be considered in the nature of a bonus or penalty. The heavy burden of proving entitlement to such an adjustment is on the moving party.

*Lindy Bros. Builders Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,*

("*Lindy II*"), 540 F.2d 102, 118 (3rd Cir. 1976).

13. A quality multiplier is justified only by reference to (a) "an evaluation of the professional methods utilized in processing the case, rewarding the use of efficient methods to expedite the case" and, more importantly, (b) the "benefit monetary or non-monetary conferred on the class". *Id.*; *see also Lindy I*, 487 F.2d at 168 ("the amount of recovery obtained ... may be the only means by which the quality of an attorneys' performance can be judged where a suit is not settled before any significant in-court proceedings"). Writing as the reporter for the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, Seeger's appellate counsel, Professor Samuel Issacharoff, expressly recognized that for purposes of any common benefit fee award, the benefit conferred on the class has to be calibrated based on the direct monetary amounts *actually delivered* to the class, not some hypothetical, abstract or hoped for benefit stream. Prof. Issacharoff stated "[a]ttorney's fees in class actions, whether by litigated judgment or by settlement, should be based on ... the actual value of the judgment or settlement to the class.... *** For case judgments or settlements, *the actual value is the value actually paid to class members*." American Law Institute, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION at 3.13(a) & Comment a (2010) (emphasis supplied).

14. Unlike securities and antitrust class actions, where an irrevocable fund is created for the benefit of the class to be divided *pro rata* by claiming class members based on their purchases, mass tort class actions and "quasi-class actions" are typically constructed on a pay-as-you go model that requires the defendant to fund claims only as they are determined payable and, in any event, generate complex questions that require substantial litigation beyond ministerial settlement administration.

15. Because the amount of the benefits actually paid (or to be paid with certainty) to class members or claimants in such mass tort cases is literally impossible to determine until substantially all claims have been adjudicated, courts universally defer making an award of fees until that critical endpoint. *See Diet Drugs*, 401 F.3d at 150-51("Because questions regarding the value of the settlement and the benefits conferred on Class Members remain unsettled, the District Court found that it could not undertake a *Gunter* analysis and make a full fee award"); *Deepwater Horizon*, 2016 WL 6215974 at \*6 - \*8 (fee adjudication only after payment of over $10 billion in benefits); *Vioxx*, 760 F.Supp.2d at 646 (fee adjudication only after full processing and payment of all claims from settlement fund of approximately $5 billion); *Diet Drugs*, 553 F.Supp.2d at 459, 460-463 (final fee adjudication only after substantial payment of settlement benefits totaling in excess of $6 billion).

16. Indeed, given the public policy considerations implicated by a judicial award of attorney's fees, one is hard pressed to argue that the attorneys for class members should be paid substantially before the class members themselves have received actual payment of the settlement benefits that justify such an award in the first instance. *See, e.g., In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 730 (3rd Cir.), *cert. denied*, 534 U.S. 889 (2001) (thorough judicial

11

review of fee applications in all class action settlements is required to protect against "potential public misunderstandings.").

17. Even cursory examination of these fundamental principles reveals that Seeger's methodology for allocating any aggregate fee award herein is hopelessly flawed.

18. To begin with, in this case there has been no independent review of the lodestar amounts claimed by each of the fee petitioners to determine whether the amount of time claimed by each firm was for services that were actually performed, reasonable, necessary and non-duplicative and whether the hourly rates claimed for those who performed such services are reasonable in light of the training, skill and experience of those attorneys and paraprofessionals. Without such an independent review it is impossible to see how those lodestar values can fairly or lawfully be utilized to make individual awards to each of the fee petitioners herein.

19. In terms of assigning a differential multiplier to the self-reported lodestar amounts claimed by the fee applicants herein, as we have seen, there are three legal factors that govern such an assignment: (1) the risk of non-compensation, (2) the use of efficient methods to expedite the case, and (3) the actual value of monetary benefits paid to class members. None of these factors warrants the vastly differing multipliers Seeger assigned to the lodestar amounts he determined he would allow for each of the fee applicants here.

20. The first factor was not considered by Seeger at all. *See* Declaration of Brian T. Fitzpatrick. This, despite the fact that the risks of the various fee applicants ranged from minimal (Prof. Issacharoff, who invested no money in the litigation and represented no player) to extremely substantial, (LLF, who by virtue of being on the PEC and having filed the most cases has by far the greatest risk).

21. With regard to the second factor, it is difficult to see how the services performed by Seeger and those whom he would reward with higher than average multipliers can justify such a grotesque a word based on purported litigation efficiencies that they allegedly generated.

22. Indeed, it actually appears that Seeger was responsible for inefficiencies that delayed compensation to Class Members. For example, his error in agreeing to cap the NFL's financial exposure without hard data regarding the likely attack rate of each disease required the Court to take the unusual step of denying preliminary approval to the Settlement sending the parties back to the bargaining table with a resulting six-month delay in Class Members recovering compensation. *In re Nat'l Football League Concussion Injury Litig.,* 961 F.Supp.2d 768 (E.D.Pa. 2014).

23. Another mistake by Seeger – allowing claims processing to be deferred until after final judicial approval of the Settlement – meant that claims were not adjudicated and ready for payment as soon as this Court's approval of the Settlement was affirmed on appeal.

24. A third error topped them all. Seeger agreed to the release all amateur leagues and teams from liability for zero compensation, a decision the Court corrected and that begs the question whether Seeger fully understood the Agreement.

25. If anything, consideration of efficient or inefficient methods of litigation might warrant a negative multiple for Seeger, rather than the uniquely high multiple he claims for himself at the expense of his partners in this litigation.

26. Finally, with respect to the benefit-conferred-on-the-class prong of the multiplier analysis, it is simply too early to evaluate that factor. Claims in the present litigation have just started to be paid. The vast bulk of claims have not been determined. Even if, under certain

circumstances, it were legally appropriate to project future claim payouts based on the limited

number of claims adjudicated to date, there is no reliable basis to do so here.

27. Virtually all of the paid claims to date are those involving diseases diagnosed based

on hard objective data, like Amyotrophic Lateral Sclerosis or death with CTE. However, the

vast majority of claims in this case are based on subjectively measured neurocognitive deficits.

In the real world, such deficits are diagnosed based on subjective criteria and the skill and

judgment of the treating physician or neuropsychologist and the treating specialist.

28. The Settlement Agreement, however, attempts to objectify the qualifying diagnostic

criteria for neurocognitive disease and provide multiple safeguards against payment of phony

neurocognitive deficit claims. It remains to be seen how the objectification criteria and fraud

prevention measures will actually work in reality and, therefore, how many class members who

were alive at the time of the Settlement will actually receive benefits for diagnosed

neurocognitive deficits.

29. The Seeger Declaration itself recognizes that there is much work to be done on

behalf of claiming class members before these claims are finally adjudicated. Hence, at this point

it is impossible to determine how much the Settlement actually benefitted Class Members and,

for this reason, construction of a "benefit multiplier" for each fee applicant is impossible.

30. Indeed, given the emphasis of contemporary fee jurisprudence on the actual benefits

conferred on class members, it is hard to see why the Court should even award an aggregate fee

at this point. *See e.g., Prudential*, 148 F.3d at 337 n.116, *quoting Institutionalized Juveniles v.*

*Secretary of Pub. Welfare*, 758 F.2d 897, 910 (3rd Cir. 1985) ("[T]he relevant inquiry to

determine eligibility for [common benefit] fees (whether plaintiffs prevailed and whether the

[class] litigation was causally linked to the relief obtained) 'focuses a court's attention on the

benefits actually received and caused by [class counsel], [and] will determine not only the often evident threshold question of eligibility for fees, but it will also be critical in determining the amount of a reasonable fee award, in that the final award must depend on a full assessment of the extent of the benefits received by plaintiffs.'"); *In re Rite Aid Securities Litig.*, 396 F.3d 294, 300 (3rd Cir. 2005) (common fund award should "reward[] counsel for success and penalize[] it for failure.").[4]

31. Rather, the Court should follow the standard practice of waiting until substantially all class members with pending claims have been processed as in the *Diet Drugs*, *Vioxx* and *Deepwater Horizon* cases referenced above. Given the relatively small number of claiming Class Members here, if the Settlement is as good as Seeger contends, that point should be reached in the relatively near future. There is no need jump the gun and place the Court in the unsavory position of paying the lawyers before their injured clients receive a penny.

## SEEGER'S METHOD AND ALLOCATION NEGATIVELY IMPACTED LOCKS LAW FIRM AND SUBSTANTIALLY REDUCED ITS LODESTAR FOR ALLOCATION PURPOSES

32. Seeger's faulty methodology gives comparatively little to LLF, although our firm is one of four class counsel and represents many more retired players than any other firm and

---

[4] Computation of the actual benefit conferred on class members is necessary to determine the value of the settlement fund for purposes of making an award of fees as a percentage of that fund and is essential in order to determine one of the key "*Gunter*" factors" that a district court in the Third Circuit must consider in order to make and appropriate award. *E.g.*, *Cendant I*, 264 F.3d at 256 (the court "calculates the percentage of the total recovery that the proposal would allocate to attorneys fees by dividing the amount of the requested fee by *the total amount paid out by the defendant*; it then inquires whether that percentage is appropriate based on the circumstances of the case") (emphasis supplied); *Rite Aid*, 396 F.3d at 301 ("A district court should consider seven factors when analyzing a fee award in a common fund case [including] the size of the fund created and the number of persons benefitted")

exponentially more than Seeger. Seeger's omissions and mistakes regarding LLF are enormous, and they are set forth below.

33. First, Seeger's stated method of how he assessed any firm's contribution is set forth on page six of his Declaration in bullet points:

- Roles in leadership, including Court-appointed Leadership Positions, such as Co-Lead Counsel, Co-Lead Class Counsel, Class Counsel, Subclass Counsel, membership on PEC and PSC, and Liaison Positions;
- The point at which a firm's claimed common benefit contributions were made (i.e., were they involved in the earliest stages of a project, or were they brought in mid-way to help on particularized issues); and
- Contributions to the Settlement, including, most importantly, early settlement discussions, formal settlement negotiations and mediations, approvals of the Settlement Agreement, and defense of the Settlement through the attempted appeal to the Supreme Court.

34. Notwithstanding LLF's substantial contributions at every phase of the process, Seeger mischaracterizes our contribution as relatively menial (*see* Seeger Declaration at 10), although LLF did, among other things, the following:

a. From the inception of this litigation, LLF filed more cases and represented more clients than any other firm. This includes the pre-MDL phase of this case forward, when, from the beginning LLF, led the litigation by both its actions and by the numbers of retired players it represents.

b. In January 2012, the undersigned argued before the JPML for the MDL to be assigned to this Court and demanded a settlement as the only feasible option for the NFL.

c. Two partners of LLF (the undersigned and David Langfitt) became Court-appointed members of the PEC and PSC in April 2012;

d. LLF drafted the Master Complaint based largely from its own original complaints, but also on the complaints of Podhurst Orseck, Goldberg Persky, Hausfeld, and Anapol Weiss.

e. Prior to January/February, 2013 negotiations, LLF filed hundreds of individual cases and class cases in federal and state court nationwide to put pressure on the NFL (1 National Class, 3 state wide classes, 25 individual actions and 27 multiple plaintiff's complaints – 8 to 127 plaintiffs). (*See* Lists attached as Exhibit A;

f. LLF was the only firm to obtain preservation depositions (six) by Distric Court orders in New York (SDNY) that showed to NFL counsel and preserved for the record the extraordinary brain damage icons of professional football had sustained, brain damage the NFL in earlier months and years had willfully and vociferously denied.

g. To the NFL's consternation and anger, the undersigned was featured and interviewed for a *Businessweek* publication in Nov – Dec, 2012 which was published a few months after settlement negotiations began. That interview infuriated the NFL and spurred it to negotiate earnestly since it was plain to the NFL that the risk of not settling the matter was very high. This was, from the beginning, a very dangerous public-relations case for the NFL. It still is. When LLF and others exposed the NFL for denying the existence of insidious brain injury in football, the NFL risked losing its fan-base and revenue. It still does, and it has never faced an existential crisis of this magnitude. When

17

*Businessweek* made clear to the public that the seriousness of this matter could well run into an uncapped liability to the NFL of multiple billions of dollars, the leverage of that publicity at the same time the Court ordered the parties to negotiate and work out a deal was substantial. The result was an uncapped settlement created in large measure by this Court, not Seeger, which proved that the statements in *Businessweek* were true. The result of the claims process, still not yet certain, may also prove these statements to be true.

h. The anger expressed by the NFL in the aftermath of the interview was tempered by the fact that the NFL ultimately sought a settlement similar to what LLF had pleaded in his lawsuits from the start; i.e., a settlement that included diagnostic monitoring and monetary awards.

i. LLF created the retired player/injured player database (the majority of which was based on LLF clients) that became the foundation of the settlement negotiations.

j. LLF was involved in every phase of the negotiations with the NFL, even though not always in person, and when the Settlement was achieved, LLF kept its very large number of class members apprised of the value of the Settlement to them personally and to the class as a whole.

k. Without LLF's work, the Settlement may not have happened when it did and would not have been as successful.

l. Once achieved, LLF made certain that its clients understood the Settlement and did not seek routes that would attempt to upend the Settlement. This

involved constant communications with attorneys and leaders of the plaintiff class.

35.     For reasons unknown, Seeger's recitation at page 10 of his Declaration neither recalls nor acknowledges LLF's participation and contribution.

36.     The result is that Seeger adversely discounted the firm's loadstar by unilaterally deleting more than $1.5 million of the firm's time and hours without explanation. Never did Seeger invite a deliberative process where LLF as class counsel might agree on the elements of a proper allocation. Seeger unilaterally carved up the time records of LLF and other firms, yet never entered a deliberative process whereby his own records may be subject to scrutiny by class counsel.

37.     In particular, Seeger unilaterally disregarded and disallowed all of the LLF pre-MDL and pre-negotiation work, all of which were vital to the success of the case. This is significant time and amounts to many hours in fees disallowed, substantially reducing LLF's loadstar. During the pre-MDL period, LLF aggressively filed more claims and represented more clients than any other firm. LLF filed a vast number of individual claims and class cases in state and federal courts for the purposes of putting maximum pressure on the NFL. *See* attached docket compilation at Exhibit B.[5] The fact that the undersigned was co-lead counsel for *In re Diet Drug Litigation* also meant that the demands for settlement at the inception of this case did not ring hollow to the NFL.

38.     Seeger's unilateral decision not to include pre-MDL time is contrary to the position he took before Judge Fallon in the *Vioxx* matter. Firms that take the risk to originate

---

[5] The attachment is a profile of the pre-MDL work LLF did and the leverage LLF exerted on the NFL at that time.

significant successful litigation like that which arose in this matter should be compensated for their actions out of a Common Benefit Fund. *See In re Vioxx Products Liability Litigation*, 802 F.Supp. 2d 740, 780 (E.D.La. 2011) (noting in awarding common benefit fund fees that a firm had "been at the forefront of the Vioxx litigation since its inception in 2001", four years before the beginning of that MDL, having filed the second Vioxx case that year). *See also In re Cendant Corp. Securities Litigation*, 404 F.3d 173, 195 (3d Cir. 2005) (stating in relation to a securities class action that "[w]e therefore conclude that the court's involvement in the fee decision will be at its height when the fee request is for work performed before the appointment of the lead plaintiff, if an attorney creates a substantial benefit for the class in this period.")

39.     Seeger also deleted all of the LLF firm's paralegal time, yet allowed paralegal time for his own firm and his co-counsel, Levin's firm. LLF demanded an explanation, but received only the nostrum that no paralegal time would be included. Obviously, this could not be true, because Seeger and Levin included paralegal time for their firms. When subjected to the extreme multiplier Seeger granted for both firms, Seeger and Levin stand to be paid over $900 to $1,000 per hour for paralegal work they normally charge at $215 per hour. Yet LLF is to receive nothing at all.

40.     Seeger has decided that the multiplier for LLF is *de minimis* and not commensurate with the actions taken by the firm. Seeger assigned LLF a 1.25 multiplier, but recommended a multiplier more than twice that for other PEC member firms.

41.     Seeger partially based his multiplier decisions on recommendations of Brian T. Fitzpatrick, Professor of Law at Vanderbilt University. In his Declaration, Professor Fitzpatrick explains the methodology by which Seeger allegedly "adjusted each firm's lodestar", i.e.,

decided which multiplier to use. In paragraph 8 and 9 of his Declaration, Professor Fitzpatrick

lists three, and only three, reasons certain firm's lodestars were adjusted upward. For each of the

three, he included a footnote listing those firms who were "included most notably." LLF is

included in footnote 1, which lists those firms who served as co-lead counsel, class counsel or

sub-class counsel. Of course, Seeger could not omit LLF from the list, but recommended a low

and inappropriate multiplier any way.

42.     The other two factors listed in Professor Fitzpatrick's Declaration related to (a)

firms that made contributions from the outset of the litigation all the way to its end, and, (b)

firms that worked directly on settlement negotiations or supported the settlement on appeal or

otherwise once it was consummated. Seeger fails to include LLF on either, even though LLF

was among the first law firms to file Complaints in this litigation, has been involved in the

litigation every step of the way, represents more players than any other firm by an overwhelming

margin, and continues to be directly involved. Seeger even admits that LLF "made contributions

toward the negotiations of the settlement," but gives LLF a meager multiplier. Based on the

number of LLF clients alone, no other firm was more involved in supporting the settlement once

it was consummated. There is no possible way to justify a multiplier of 1.25 for LLF. Contrast

that with the multiplier of 3.55 applied by Seeger to Professor Issacharoff, who was not involved

at the start of the litigation, risked nothing, represents no player,and is not currently contributing

to the Settlement in any way.

43.     A fundamental factor in the calculation of any allocation is the significance of

the risk of non-compensation a law firm took on and managed by representing injured parties in

high-stakes litigation. See ¶ 19 of this Declaration. This involves full-time work, substantial

debt, and litigation in multiple courts nationwide to create clarity and understanding for the

21

parties and counsel and leverage for potential settlement. LLF took on immense risk by representing and managing effectively 1400 retired players at the outset of this case. This required full time work by multiple lawyers and administrators with no guarantee of success. LLF succeeded in creating the case and litigating it in a way that forced the NFL to bargain. Then, LLF helped settle the case via Court intervention and supervision. To date, LLF has registered more than 1100 retired players within the claims process and has submitted more than 75 claims.

44.　　Seeger does not acknowledge this risk at all, probably because he never incurred much risk himself. He represented very few retired players on the date of his appointment and fewer today. As a result, Seeger appears to give no weight to the risks firms incurred generally and the specific risk to LLF, which represented and still represents a vast number of retired players, far more than any other firm in the case.

45.　　Needless to say, LLF objects to Seeger's Allocation and are prepared to document our position to the Court or her designee, at the appropriate time.


## LLF's OBJECTIONS TO THE UNNECESSARY, NOT NEEDED, EXHORBITANT AND ILL ADVISED REQUEST FOR A 5% SET ASIDE

46.　　I have devoted my practice to mass torts for the past forty years. Together with a Duke law professor, I coined the term "mass torts" in the mid '80s. During my career, I have negotiated and participated in the establishment of and implementation of multiple mass tort personal injury claims trust processing facilities.

47.    I negotiated their creation, participated in their implementation, and still am an advisor to many Trusts or Funds established to pay claimants in mass tort personal injury settlement claims processing entities[6].

48.    In each of the funds, I became a trustee advisor to the entity performing the distribution of the funds to claimants. My work included monitoring and overview of the implementation and procedures of their various distribution functions.

49.    As a trustee advisor to the various trusts that were created, I, and other plaintiffs' counsel, have served without payment and in some of the trusts received per diem amounts and travel expenses. As the creator of the Trust and attorney for many of the individual beneficiaries, it was my duty and responsibility to continue to advise without hourly payment or lodestar.

50.    I also participated as co-negotiator of the Diet Drug litigation funds before Honorable Harvey Bartle, EDPA and consulted the trust that the Court created to implement and

---

[6] By way of example, I was primary negotiator of the Agent Orange Class Settlement before the Honorable Jack Weinstein, USDC-NY. It was formed in 1983, a fund of initially 225 million dollars was created. I was co-lead negotiator of the Manville Personal Injury Trust which was formed in 1988. As of January 1, 2017, it has paid 5 billion dollars in benefits to 900,000 plaintiffs. I was sole negotiator of the UNR Claims Trust which was formed in 1989 and has paid slightly less than 400 million dollars in benefits to 450,000 plaintiffs. I was primary negotiator of the Eagle Pitcher Industries personal injury trust which was formed in 1996 and has paid more than 700 million dollars in benefits to 650,000 plaintiffs as of January, 2017. I was primary negotiator of the Celotex Personal Injury Trust which was formed in 1997 and has paid approximately 1.2 billion dollars in benefits to 475,000 plaintiffs as of January 2016. I was co-lead negotiator of Raytech  personal injury trust which was formed in 2006  with approximately 55 million dollars and has processed claims for 135,000 plaintiffs. I was sole negotiator of Amatex personal injury trust which was formed with approximately 75 million dollars and paid several thousand plaintiffs. I was sole negotiator of Pacor personal injury trust which was formed in 1997 with approximately 30 million dollars and has processed in excess of 10,000 plaintiffs' claims.

distribute awards to approved claimants. I continued in that role for the short time needed to assist the claims administrators in their responsibilities.

51.     I was the co-creator of the Claims Resolution Facility (CPR), which was founded in 1989. CPR has been overseeing asbestos trust funds in the payment and distribution to the beneficiaries of the funds. It continues to administer ten entities in the distribution of personal injury claims, mostly, but not all, asbestos trusts. I am an unpaid advisor to CPR.

52.     As a result, I have expertise in the creation, management and supervision of a mass tort personal injury trust fund distribution processing facility.

53.     I am also class counsel in this case before this Court. Based on the number of retired players LLF represents, LLF is more familiar with the claims process than any other firm, save possibly Goldberg, Persky. Since LLF represents in excess of 1100 registered former players, and LLF has filed more than 75 claims, of which more than 30 have proceeded to conclusion and/or distribution, LLF has direct experience in the claims process. LLF is, therefore, uniquely qualified to comment on Seeger's request for a 5% set aside for future administration expenses to this Trust.

54.     For the following reasons, the request for a 5% set aside is unnecessary, not needed, exhorbitant and ill-advised at the present time. Any services Seeger purports to have done (or purports to do in the future) can and should be paid out of a reserve of a portion of the $112.5 million common benefit fund unopposed by the NFL.

55.     If, for some unforeseeable circumstance, there is not enough money in that existing fund, any additional money for services for post-effective date administration should be paid by the NFL in a supplemental payment.

56.     If there is compensable post-effective date administration work that the existing fund does not pay, the separate existing BAP and MAF funds are available to pay for the those services.  Administrative services applicable to the BAP, for example, may be paid by the 75 million dollar BAP fund.  Services for claims processing, which deserve to be paid, may be paid by the MAF fund already established.  Any services involving the BAP or the MAF claims processing should be paid, if at all, after the effective dates of those programs (March 23, 2017 for MAF or May 7, 2017 for BAP) and should be *de minimus* based on the analysis set forth below.

57.     In Seeger's February 13, 2017 Declaration and October 10, 2017 Declaration, a line by line analysis shows that any fair estimate of future expenses is *de minimus* and no set aside is necessary.

58.     In the February 17 Declaration, Seeger makes the bold statement at paragraph 104 that $112.5 million in attorneys' fees should only be paid for past common benefit work and expenses prior to the effective date.  There is no justification why the time line of the effective date of the settlement should be the dividing line for common benefit work.  This is especially relevant since the calculation of the $112.5 million dollars was negotiated when there was an unsuccessful capped fund and before the Court ordered that the settlement include an uncapped fund.  Therefore, there is no reason why additional money, if needed, for appropriate implementation and processing, should not be paid by the NFL.

59.     In describing the work he believes should be paid out of the 5% set aside, Seeger states in paragraphs 107 and 108 of his February Declaration that the registration process and the development of the network of doctors was all common benefit work.  Most of it, however, was

25

done before the effective date, and it was done by Garretson and BrownGreer, not Seeger. The BAP and MAF Funds have money to pay for these services.

60.     The work on the registration process referred to paragraph 109 were part of the duties and responsibilities of BrownGreer. Monies were set aside in a fund for that. The bulk of the BAP services were not the responsibility of class counsel but part of Garretson's BAP program duties, and a special BAP fund is available to pay for those services if the NFL does not pay. The launching of the BAP process to which Seeger refers in Paragraph 110, again, was predominately Garretson's responsibility, to which Seeger and the BAP fund is available to pay for those services.

61.     The duties to which Seeger refers in paragraph 111, − to Coordinate with Claims Administrator, BAP Administrator and lien resolution Administrator and Settlement Trustee going forward − should be part and parcel of a single meeting on a quarterly basis to handle all of these matters.

62.     Moreover, the preferred way to execute the process would be a committee of class counsel who actually represent claimants, as opposed to counsel hired by Seeger Weiss, who has filed no claims and has no first-hand experience with retired players, even though the Seeger lawyers are well intentioned, diligent and hard working.

63.     Seeger's Declaration alleges multiple meetings with NFL and BrownGreer for which Seeger's attorneys seek payment. These were unnecessary, redundant and counter-productive, since BrownGreer are professional claims administrators with exponentially more experienced in the claims process than Seeger or NFL.

64.     The alleged work to which Seeger refers in Paragraph 112 (to appeal Awards of Settlement for decision and/or provide assistance to claimants) is a responsibility, if any, or at

minimum on a case by case basis in the future and should not be part of any special funding request. Also the number of appeals is minimal, probably less than 1% of claims filed and, mostly, the appeals come from the NFL.

65.     The duties to which Seeger refers in Paragraph 113 concern maintaining the Appeals Advisory Panel (AAP). This has been done and is the primary responsibility of BrownGreer, not others. It is payable from the MAF Fund.

66.     With respect to Paragraph 114, which refers to plaintiffs' counsel keeping up with the science, this is certainly not compensable work, and there is no evidence to date that Seeger or his lawyers understand the medical science sufficiently to understand the symptoms suffered by former players, or that they have the inclination to bring disputes with the NFL on claims processing to the Court's attention for rapid resolution.

67.     With respect to Paragraphs 115 and 116, which refer to monitoring and reviewing the BAP and MAF programs, this should be done at regular meetings of class counsel and the NFL to insure that the NFL adheres to its responsibilities. Both items must include class counsel, and they should not involve an exhorbitant amount of time if BrownGreer is allowed to do it's work. This appears to be an example of micro-management by Seeger and NFL, and there is no evidence to date that these efforts have helped claimants at all. In light of recent allegations that NFL and Seeger have unilaterally amended the agreement to the detriment of retired players, the efforts may have hurt claimants, not helped them.

68.     Thus, none of the alleged services in Seeger's February, 2017 Declaration justify a 5% set aside.

69.     As to the October 10, 2017 Declaration, nothing proffered justifies a 5% set aside going forward.

70.    In paragraph 20(a), Seeger seeks compensation for registering players, updating the website, and helping prepare claim forms. Such services should be paid by the MAF fund, since these duties were the responsibility of BrownGreer.

71.    In paragraph 20(b), Seeger seeks compensation for the selection of the AAP panel members and consultants. This work was largely the duty and responsibility of BrownGreer, not Seeger, whose attorneys, albeit with good intentions, frequently duplicated BrownGreer's work.

72.    In paragraph 20(c), Seeger seeks compensation for obtaining the BAP providers and qualified physicians. This work was done primarily by Garretson, sometimes guided and advised by LLF. Garretson did its job successfully, albeit not always timely. The role of monitoring both the BAP and MAF network can be and should be done at regular meetings with BrownGreer and Garretson and Class Counsel who actually represent retired players should be involved, but currently they are not.

73.    In paragraph 20(d), Seeger wants to be paid for monitoring and oversight of every AAP decision. This is duplicative and counter-productive. It should be done at regular meetings, if necessary, with BrownGreer, who is uniquely qualified to do it. Again, if this is so important, then class counsel should be involved, yet Seeger has repeatedly refused class counsel's demands to be involved in implementation.

74.    In paragraph 20(e), Seeger seeks payment for monitoring appeals and claim determinations. BrownGreer can do this better, and if plaintiff's counsel should be involved, Class Counsel should be directly involved, not just Seeger.

75.    In paragraph 20 (f), Seeger wants to be paid for monitoring BAP examinations, which is a Garretson function. This is duplicative, counter-productive and not necessary. If it is

28

required, class counsel should be involved, because Class Counsel has far greater knowledge of the nuances of neurological examinations and the difficulties faced by injured players.

76.     In paragraph 20 (g), Seeger seeks payment for fielding calls from class members. It is not reimbursable. It is part of the duties and responsibilities of co-lead counsel.

77.     Finally, Seeger wants payment for organizing and challenging misleading solicitations. This may be the only reimbursable expense that is ongoing and may continue, since these issues concern the integrity of the settlement. The NFL should pay for these efforts, and it should come from the existing $112.5 million dollar fund.

78.     The analysis above shows that a substantial amount of time and payment requested by Seeger reflects two things: an attempt  by the NFL and Seeger to micro-manage the claims administration and an attempt by Seeger to allocate to itself alone the task of management without the involvement or consent of class counsel.

79.     In the first nine months of the claims process, Seeger attorneys have been involved in 70 plus committee meetings, phone calls, and discussions regarding claims administrative processes, decisions and disputes. It is difficult to discern whether any of this process is successful, but it appears to have hindered, not helped, BrownGreer to administer the Settlement.   Class Counsel has never been involved in this process.   It should not be rewarded.

80.     It should be the Claims Administrator's job to administer the claims and interpret the agreement.  It is neither efficient nor sensible to have Seeger and NFL hamper the Administrator's job or disallow the involvement of Class Counsel.  It certainly should not be reimbursable via the proposed set aside from paid claims.

81.     If, as has been represented by Seeger, the ultimate fund paid to the players will be one billion dollars, adding the proposed 5% set aside to the 112.5 million dollars already

29

available would make the compensable fees in excess of 16% of the projected fund, a fraction of

which has been paid to claimants. This projected award is substantially above any other mega

fund award (*see* Opinion of Hon. Harvey Bartle in *In re Diet Drug*, 553 F.Supp.2d at 479-480

EDPA April 9, 2008). This is the only mega fund case in which there was no paper discovery,

no depositions, no motion practice, no litigation, no trials, no trial activity as in all previous mega

funds in which settlement occurred after litigation work was accomplished.

82.     It is obvious that Seeger's request is excessive, exorbitant and without precedent.

It should be denied and no 5% set aside award granted. No other fair conclusion can be made.

83.     If there is a need for some future set aside, which is unlikely, the maximum

amount should be 0.5% not 5%. On the incorrect assumption that the value of the claim fund

will be approximately one billion dollars, as has been suggested by various prognosticators, it is

outrageous to assess 5%, which is 50 million dollars for the future potential services, especially

since so few plaintiffs have been paid.

Respectfully submitted,

LOCKS LAW FIRM

BY: _____

Gene Locks, Esquire
Atty. I.D. #12969
601 Walnut Street, Suite 720East
Philadelphia, Pa. 19106
215-893-3434

# EXHIBIT A

# Locks Law Firm
# Individual Case Filings – (Chron.)

1. 5/7/2012     Charles Hannah v. NFL, USDC, EDPA, No. 12-cv-2489
LPA2012185             Individual

2. 4/2/2012     Greg Landry, et a. v. NFL, USDC, EDPA, No. 12-cv-1643
LPA2012463             Individual

3. 4/7/2012     Thomas McDonald, et al. v. NFL, PCCP, No. 1204-1887
LPA2012500             Individual

4. 6/19/2012     Scott M. Ross v. NFL, USDC, EDPA, No. 12-cv-3479
LPA2012356             Individual

5. 6/19/2012     Jason Short, et al. v. NFL, USDC, EDPA, No. 12-cv-3478
LPA2012452             Individual

6. 7/12/2012     Michael Pyle, et al. v. NFL, NY Supreme Ct, NY County, No. 154506/2012
LPA20121005             Individual

7. 7/10/2012     Fred Willis, et al. v. NFL, USDC, District of Massachusetts, No. 12-cv-11248
LPA2012398             Individual

8. 7/20/2012     Scott Ross v. NFL, NY Supreme Ct, NY County, No. 154751/2012
LPA2012356             Individual

9. 9/4/2012     Glenn Amerson, et al. v. NFL, PCCP, No. 1209-0326
LPA20121148             Individual

10. 9/14/2012     *Curtis McClinton v. NFL, USDC, WDMO, No. 4:12-cv-01275-JTM
LPA2012396             Individual

11. 10/5/2012     Patrick Fischer, et al. v. NFL, USDC, Dist. Maryland, No. 8:12-cv-2963-JFM
LPA20121401             Individual

12. 10/5/2012     Elmer Wingate, Jr. v. NFL, Cir. Ct. Baltimore MD, No. No. 03-C-12-010322-OT
LPA20121404             Individual

13. 10/16/2012     William Mathis v. NFL, NY Supreme Ct, NY County, No. 157269/2012
LPA20121303             Individual

14. 10/30/2012     *Kenney/Baugh v. NFL, 16th Cir. Court, Jackson, MO, No. 1216-cv-28199
LPA20121127/LPA20121140             Individual

15. 11/14/2012     Daniel Brabham, Dec'd, v. NFL, NY Supreme Ct, NY County, No. 158011/2012
LPA2012989             Individual

16. 11/14/2012     Raymond Abruzzese, Dec'd v. NFL, NY Supreme Ct, NY Cty, No. 158012/2012
LPA2012478             Individual

Updated: 7/18/2013

17. 12/20/2012  Archie Matsos v. NFL, NY Supreme Ct, NY County, No. 159062/2012
                LPA20121352            Individual

18. 12/20/2012  Fletcher (Joe) Perry, Dec'd v. NFL, NY Supreme Ct, NY County, No. 159094/2012
                LPA20121473            Individual

19. 12/20/2012  Larry Bowie v. NFL, NY Supreme Ct, NY County, No. 159069/2012
                LPA20121266            Individual

20. 12/21/2012  Ross Hawkins v. NFL, NY Supreme Ct, NY County, No. 159057/2012
                LPA20121475            Individual

21. 12/26/2012  Scott "Cookie" Gilchrist v. NFL, NY Supreme Ct, NY County, No. 159129/2012
                LPA20121218            Individual

22. 01/02/2013  Otis Taylor, et al. v. NFL, 16th Cir. Court, Jackson, MO, No. 1216-cv-34713
                LPA20121544            Individual

23. 01/04/2013  Tom Bettis, et al. v. NFL, NY Supreme Ct, NY County, No. 150091/2013
                LPA20121474            Individual

24. 01/17/2013  Steven Schmitz, et al. v. NFL, NY Supreme Ct, NY County, No. 150481/2013
                LPA2013510            Individual

25. 01/22/2013  Bill Quinlan, et al. v. NFL, NY Supreme Ct, NY County, No. 150620/2013
                LPA2013509            Individual

26. 03/25/2013  Robert Watkins, et al. v. NFL, Superior Ct, Bristol, MA, No. BRCV2013-00258-C
                LPA20121477            Individual

27. 04/15/2013  William (Don) Gillis v. NFL, NY Supreme Ct, NY County, No. 153414/2013
                LPA20121424            Individual

28. 05/01/2013  Don Paul v. NFL, NY Supreme Ct, NY County, No. 153978/2013
                LPA20121435            Individual

29. 06/06/2013  Estate of Lewis Carpenter v. NFL, USDC, EDPA, No. 13-cv-03894
                LPA2013559            Individual

## CLASS AND MULTIPLE PLAINTIFF FILINGS

1. 1/18/2012   Ron Solt, et al. v. NFL, No. USDC, EDPA, No. 12-cv-00262
    Class – 7 Plaintiffs   LPA201224

2. 1/20/2012   Rob Johnson, et al. v. NFL, USDC, EDPA, No. No. 12-cv-00324
    13 Plaintiffs     LPA201210

3. 2/3/2012   Ashley Lelie, et al. v. NFL, USDC, EDPA, No. No. 12-cv-00600
    8 Plaintiffs     LPA201232

4. 2/3/2012   Britt Hager, et al. v. NFL, No. USDC, EDPA, No. 12-cv-00601
    42 Plaintiffs (41)    LPA201241

5. 2/10/2012   Steve Everitt, et al. v. NFL, USDC, EDPA, No. No. 12-cv-00731
    58 Plaintiffs     LPA2012100

6. 2/17/2012   John Brodie, et al. v. NFL, USDC, EDPA, No. No. 12-cv-00861
    45 Plaintiffs (43)    LPA2012200

7. 2/24/2012   Carl Hairston, et al. v. NFL, USDC, EDPA, No. No. 12-cv-00989
    52 Plaintiffs (50)    LPA2012249

8. 3/5/2012   Jethro Pugh, et al. v. NFL, USDC, EDPA, No. No. 12-cv-01165
    63 Plaintiffs     LPA2012303

9. 3/9/2012   Wes Hopkins, et al. v. NFL, USDC, EDPA, No. No.12-cv-01239
    25 Plaintiffs     LPA2012372

10. 3/12/2012   Eric Allen, et a. v.NFL, USDC, EDPA, No. No. 12-cv-1281
    45 Plaintiffs (43)    LPA2012400

11. 3/21/2012   Michael Haddix, et al. v. NFL, NJ Superior, No. CAM-L-1363-12
    NJ Class – 3 Plaintiffs     LPA2012498

12. 3/23/2012   Mark Rypien, et al. v. NFL, USDC, EDPA, No. 12-cv-1496
    127 Plaintiffs (124)   LPA2012600

13. 4/2/2012   Frank Lemaster, et al. v. NFL, PCCP, 1204-0108
    PA Class – 3 Plaintiffs     LPA2012497

14. 4/2/2012   John "Golden" Richards, et al. v. NFL,  USDC, EDPA, No.12-cv-1623
    71 Plaintiffs     LPA2012731

15. 4/12/2012   Alex Karras, et al. v. NFL, USDC, EDPA, No. 12-cv-1916
    70 Plaintiffs (69)    LPA2012809

16. 4/19/2012   Mark Chmura, et al. v. NFL, USDC, EDPA, No. 12-cv-2108
    28 Plaintiffs     LPA20121098

17. 4/23/2012   Jeff Hostetler, et al. v. NFL, USDC, EDPA, No. 12-cv-2199
    78 Plaintiffs (75)    LPA2012893

| 18. | 5/7/2012 | Brad Culpepper, et al. v. NFL, USDC, EDPA, No. 12-cv-2490 |
| | | 26 Plaintiffs (25)     LPA2012972 |

19.  5/16/2012   Bryon Evans, et al. v. NFL, USDC, EDPA, No. 12-cv-2682
              41 Plaintiffs     LPA2012978

20.  6/13/2012   Jeff Nixon, et al. v. NFL, USDC, EDPA, No. 12-cv-3352
              49 Plaintiffs     LPA20121072

21.  6/14/2012   John Hannah, et al. v. NFL, USDC, EDPA, No. 12-cv-3379
              23 Plaintiffs     LPA20121082

22.  7/02/2012   Dave Robinson, et al. v. NFL, USDC, EDPA, No. 12-cv-3731
              43 Plaintiffs     LPA20121139

23.  7/20/2012   Richard J. Watters, et al. v. NFL, USDC, EDPA, No. 12-cv-4159
              46 Plaintiffs     LPA20121206

24.  7/20/2012   Chuck Foreman, et al. v. NFL, USDC, EDPA, No. 12-cv-4160
              95 Plaintiffs     LPA20121257

25.  7/23/2012   Stephen Wisniewski, et al. v. NFL, USDC, EDPA, No. 12-cv-4187
              20 Plaintiffs     LPA20121265

26.  9/4/2012    George Andrie, et al. v. NFL, USDC, EDPA, No. 12-cv-5059
              59 Plaintiffs     LPA20121351

27   10/2/2012   Wesley Chandler, et al. v. NFL, USDC, EDPA, No. 12-cv-5624
              37 Plaintiffs     LPA20121402

28.  10/5/2012   Jody Schulz, et al. v. NFL, Cir. Ct. Queen Anne's MD, No. 17-C-12-017392
              MD Class – 3 Plaintiffs     LPA2012

29.  10/29/2012  Louis Breeden, et al. v. NFL, USDC, EDPA, No. 12-cv-06080
              21 Plaintiffs     LPA20121405

30.  11/9/2012   Hugh (Pat) Richter, et al. v. NFL, USDC, EDPA, No. 12-cv-06369
              55 Plaintiffs     LPA20121472

31.  01/2/2013   Jim Kaniciki, et al. v. NFL, USDC, EDPA, No. 13-cv-00019
              32 Plaintiffs     LPA20121543

32.  03/1/2013   Dave Butz, et al. v. NFL, USDC, EDPA, No. 13-cv-01109
              24 Plaintiffs     LPA2013523

33.  03/19/2013  John M. Babinecz, et al. v. NFL, USDC, EDPA, No. 13-cv-01444
              19 Plaintiffs     LPA2013528

34.  06/06/2013  Barney Chavous, et al v. NFL, USDC, EDPA, No. 13-cv-03126
              15 Plaintiffs     LPA2013562

35.  06/06/2013  Johnnie Walton, et al v. NFL, USDC, EDPA, No. 13-cv-03125
              15 Plaintiffs     LPA2013563