**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, <br><br>                 Plaintiffs <br><br>     v. <br><br> National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., <br><br>                 Defendants. | No. 2:12-md-02323-AB <br> MDL No. 2323 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**BRIEF IN SUPPORT OF MOTION FOR**
**RELIEF UNDER ARTICLE XXVII OF THE SETTLMENT**
**AGREEMENT OR FOR RELIEF FROM JUDGMENT**

The settlement agreement in this case (the "Settlement Agreement" or "SA") resolved a large and important dispute, making millions of dollars available to former football players with certain qualifying diagnoses. But as administered, the Settlement Agreement is marred by an unacceptable flaw: the NFL[1] has been paying head-injury claims under that Agreement based on a formula that explicitly and deliberately discriminates on the basis of race. When being evaluated for neurocognitive impairment, Black former players have been automatically assumed, through a statistical manipulation called "race-norming," to have started with worse cognitive functioning

---

[1] Defendants the National Football League and NFL Properties, LLC are referred to collectively as "the NFL."

than White former players.  As a result, if a Black former player and a White former player receive the exact same scores on a battery of tests designed to measure their current cognitive functioning, the Black player is automatically assumed to have suffered less impairment, and he is therefore less likely to qualify for compensation.  The effects of race-norming "can be extremely consequential, and the adjustments may often make the difference in a clinician's determination of cognitive impairment . . . for Retired NFL Players seeking benefits under the Agreement." Decision of Special Masters Regarding Najeh Davenport at 7 (Aug. 20, 2020) ("SM Decision").

This Motion is filed by Kevin Henry and Najeh Davenport (the "Movants"), who are Black members of the MDL's Settlement Class and to whom the NFL has avoided (or is currently seeking to avoid) paying compensation based on a discriminatory testing regime.  This Motion is aimed at ending the NFL's discriminatory practice of making it harder for Black former players to be compensated under the Settlement Agreement than it is for White former players, and providing a remedy for Black Class members who have already experienced racial discrimination under the Settlement Agreement.  They seek relief for all Black Class members to prevent future discrimination against them in the administration of the Settlement Agreement, and to undo the effects of past discrimination on Black former players who were denied benefits under a discriminatory standard.  As explained below, Class Counsel has declined to pursue these issues on behalf of Black Class members.  And they face insurmountable obstacles in representing those Class members' interests here, because of their role in creating the claims administration documents which direct race-norming.  SM Decision at 9.

Pursuant to Article XXVII of the Settlement Agreement, Movants seek an Order (1) declaring that the Settlement Agreement approved by this Court does not require or presume

"race-normed" determination of Neurocognitive Impairment,[2] and enjoining this type of racial discrimination to the detriment of Black former players for any claims currently being processed and all future claims; and (2) permitting any member of the MDL class who has previously been subjected to unfavorable race-based standards when being evaluated for a Qualifying Diagnosis to be given the option to have his test scores reprocessed under a race-neutral standard and to submit a claim based on the results.

The use of a deliberate, explicit, racial classification – with Black and White former players *automatically* subjected to different standards – is a blatant violation of the law. Such race discrimination violates the equal protection principles of the U.S. Constitution if it is imposed by government action, and is also contrary to federal law entitling Blacks to the same treatment under contracts and in litigations as Whites. *E.g.*, 42 U.S.C. § 1981.[3]

The most natural interpretation of the Settlement Agreement is that it does *not* mandate the racially discriminatory double standard that the NFL has advanced and that the Claims Administrator has typically imposed against Black former players. And even if the Settlement Agreement were ambiguous, it should be interpreted not to require or recommend race-normed testing so as to avoid substantial doubts regarding whether it is void as against public policy. However, if this Court disagrees and concludes that the Settlement Agreement unambiguously requires discrimination on the basis of race, then that Agreement itself is an unlawful violation of class members' civil rights, and the Court should modify the Settlement Agreement under Federal Rule of Civil Procedure 60(b) or its general equitable powers.

---

[2] Where capitalized, words and phrases have the meaning assigned in the Settlement Agreement.
[3] In addition to this Motion, Mr. Henry and Mr. Davenport, as representatives of a class of all Black members of the MDL class subjected to race-norming, have today filed a separate class action complaint, as a related case to this one, raising claims under § 1981.

The relief requested here is warranted for the reasons set forth below.  But if the Court believes that a more complete record is needed to examine the discriminatory enforcement of the Settlement Agreement, the Court should order limited discovery for that purpose.

## BACKGROUND

### A. Monetary Awards for Neurocognitive Decline Under the Settlement Agreement

To receive a monetary payment under the Settlement Agreement, a former player must receive a "Qualifying Diagnosis," SA § 6.2(a), which means one of several listed diagnoses:

(a) Level 1.5 Neurocognitive Impairment (i.e., early or mild dementia)
(b) Level 2 Neurocognitive Impairment (i.e., moderate dementia)
(c) Alzheimer's Disease
(d) Parkinson's Disease
(e) Death with Chronic Traumatic Encephalopathy ("CTE")
(f) Amyotrophic Lateral Sclerosis ("ALS")

SA § 6.3(a).

Diagnoses of "Level 1.5" or "Level 2" impairment reflect an estimate of a former player's decline from his prior level of neurocognitive functioning.  To qualify for a diagnosis of Level 1.5 or Level 2 impairment, a former player must meet several criteria, including "[e]vidence of a moderate to severe cognitive decline from a previous level of performance" for Level 1.5, SA Ex. A-1 § 1(a)(ii), or "a severe cognitive decline" for Level 2.  Ex. A-1 § 2(a)(ii).  For former players receiving their diagnosis under the Settlement Agreement's Baseline Assessment Program ("BAP"), the cognitive decline must be "determined by and in accordance with the standard neuropsychological testing protocol" set forth in Exhibit A-2 to the Agreement.  *Id.* §§ 1(a)(ii), 2(a)(ii).  For former players diagnosed outside the BAP, the cognitive decline must be diagnosed "based on evaluation and evidence generally consistent with the diagnostic criteria" set forth in the BAP.  *Id.* §§ 1(b), 1(c), 2(b), 2(c).

Under the Settlement Agreement, cognitive decline is measured in two steps. First, a retired player undergoes an assessment used to classify his premorbid (pre-injury) intellectual ability as "above average," "average," or "below average." That classification determines which of three tables is used to determine eligibility for benefits, based on neurocognitive tests of the former player's current level of functioning. The classification of the former player's previous intellectual ability can be based on a neurocognitive test of word recognition known as the Test of Premorbid Functioning ("TOPF"), on demographic information (including race) alone, or on the TOPF in combination with demographic information. SA Ex. A-2 § 3.

Second, a retired player's *current* neurocognitive functioning is determined by a battery of tests in five different "domains": (1) complex attention/speed of processing; (2) executive functioning; (3) learning and memory; (4) language; and (5) visual-perceptual. Obtaining a result for each of these tests requires taking a raw score and "norming" it against a reference population to generate a "T-Score," which is the ultimate metric of whether the player has demonstrated impairment on a particular test. T-Scores reflect distance from the population's mean: a player with a T-Score of 50 is at the mean; a player with a T-Score of 40 is one standard deviation below the mean; a player with a T-Score of 30 is two standard deviations below the mean; and so on.

T-Scores must fall below specific numerical cutoffs in order to reflect impairment. SA Ex. A-2 § 4. In introducing the cutoffs, the Settlement Agreement explains that "[t]he basic principle for defining impairment on testing is that there must be a pattern of performance that is approximately . . . 1.7–1.8 standard deviations (for Level 1.5 Impairment) or 2 standard deviations (for Level 2 Impairment) below the person's expected level of premorbid functioning," as measured by the applicable reference population. *Id.* To qualify for Level 1.5 or Level 2 Impairment, a retired player must exhibit the requisite degree of decline "in two or more domains"

(out of five total), at least one of which must be complex attention, executive function, or learning and memory. SA Ex. A-1 §§ 1(a)(ii), 2(a)(ii).

These two steps interact to determine a former player's ultimate diagnosis. The lower the group to which the former player is assigned based on the assessment of pre-injury functioning (from among the three categories of estimated prior ability -- below average, average and above average), the lower his scores must be on the tests of his *current* neurocognitive functioning in order for him to demonstrate impairment in any particular cognitive domain. *See* SA Ex. A-2 § 4 at 6–8.

If a former player receives a Qualifying Diagnosis, he is eligible for a monetary award, the amount of which depends on the diagnosis, the age when he received the diagnosis, the number of years he played in the NFL, whether he participated in the NFL's Baseline Assessment Program, and other factors. SA Ex. A-3. If a former player receives a diagnosis of Level 1 Impairment, he is not eligible for a monetary award, but is entitled to further monitoring and treatment.

**B. The NFL Has Successfully Urged that the Results of Neurocognitive Tests Be Manipulated on the Basis of Race**

The Settlement Agreement notes that each of the neurocognitive tests that it lists can be scored differently for Black and White former players, but the Agreement does not require that test scores *must* be adjusted for a player's race, or that a clinician must justify any decision not to make racial adjustments in a particular case. *See* SA Ex. A-2 § 4 (noting "the *availability* of demographically-adjusted normative data for Caucasians and African Americans" on each test (emphasis added)). Each of the neurocognitive tests specified in the Settlement Agreement can also be scored in a race-neutral fashion.

On information and belief, the language in the Agreement regarding "the availability" of race-based test scoring was supplied by the NFL during settlement negotiations, but when the

former players voted to accept the Settlement Agreement, they were unaware that this language would be used to justify discrimination against Black former players.

Nonetheless, the NFL has frequently and successfully insisted that tests results be "normed" or "corrected" based on a player's race, to the disadvantage of Black former players. The NFL has even opposed awards to Black former players that used race-neutral testing by arguing that the Settlement Agreement *requires* the use of "race-normed" analysis. And the NFL has advocated for race-norming both in setting claims administration policy and in litigating individual claims before the Special Masters.

First, in 2017, two years after the Settlement Agreement went into effect, the NFL and Class Counsel developed a Clinician's Interpretation Guide for the BAP ("the BAP Guide") that expressly urges clinicians to "correct" test scores based on a retired player's race. SM Decision at 9. Specifically, the manual requires clinicians to "Convert test scores to demographically-corrected T-scores via ACS software (*use of the full demographic correction is recommended*) or Revised Comprehensive Norms for an Extended Halstead-Reitan Battery." *Id.* (emphasis added by Special Masters). In the ACS testing software, "full demographic correction" includes adjusting scores based on a player's race. And the mention of "Revised Comprehensive Norms" is a reference to the "Heaton norms," the principal source for race-based reference population data for neuropsychological tests. *See* Robert K. Heaton, *et al.*, *Revised comprehensive norms for an expanded Halstead-Reitan Battery: Demographically adjusted neuropsychological norms for African American and Caucasian adults*. Professional Manual (2004) ("Heaton 2004"). The BAP Guide was developed confidentially by the NFL and Class Counsel, without input from class members or their individual counsel. The BAP Guide remains confidential.

The BAP Guide is given to all Monetary Award Fund ("MAF") Physicians, who are required to provide it to any neuropsychologist who assists in diagnosing a retired player. On information and belief, most of the clinicians making diagnoses as part of the Claims Administration process have followed the NFL's directions to "race-norm" the results of each neurocognitive test. As an Appeal Advisory Panel Consultant stated in an October 2018 report: "The NFL settlement guidelines are very specific in requiring the use of the Heaton norms for several tests."

Second, the NFL has advocated for race-based manipulation of scores when litigating individual claims before the Special Masters. The NFL has actively opposed testing that did *not* employ race-norming, arguing that a retired player may only qualify for a monetary award on the basis of a particular combination of scores on neuropsychological tests, and that the scores should be adjusted for the retired player's race. For example, on August 3, 2020, the NFL argued that a Black retired player should not qualify for compensation, even though he had received qualifying test scores for Level 2 Impairment, in part because the evaluating clinician "corrected only for age (without providing any rationale for his decision not to use full demographic corrections)." The NFL then proceeded to correct the player's scores "for age, education, *and ethnicity*" (emphasis added), which the NFL characterized as "the appropriate norms" for adjusting players' test scores.

In multiple filings, the NFL has invoked the "Heaton norms" referenced in the BAP Guide. The NFL has repeatedly touted these race-based norms as "industry-standard" and has represented that BAP neuropsychologists "most commonly use" them. Citing the BAP Guide, the NFL has gone so far as to state that these norms "are mandated in the BAP," even though the Settlement Agreement does not say so.

The NFL has even *appealed* Qualifying Diagnoses for Black former players that *didn't* use race-norming, expressly arguing that the Special Masters should reverse the Qualifying Diagnosis because it was determined without a race-based adjustment specific to Black former players. Conversely, in instances where Black retired players have appealed the denial of compensation after having been scored using race-normed data, the NFL has stood by the use of race-norming as a basis for subjecting Black retired players to more stringent standards, calling that practice "industry standard." In at least one, more recent case, the NFL has opposed an award to a Black ex-player by arguing that even if race-norming is not required under the Settlement Agreement, clinicians must specifically explain any decision *not* to engage in race-norming and must give a "clinically reasonable explanation" for not doing so. This position affirmatively advocates the use of an explicit, unlawful racial classification in the claims administration process.

Although the NFL has been the active proponent of race-norming through its litigation of individual claims, Class Counsel cooperated with the NFL in developing the BAP Guide in 2017, which encourages race-norming. SM Decision at 9. The Special Masters construed this 2017 agreement as "result[ing] from a collaborative and iterative process." SM Decision at 9. Under the Special Masters' Decision, continued discrimination in the implementation of the Settlement Agreement is thus based on actions by Class Counsel as well as the NFL, which dictates separate counsel on behalf of Black members of the Class to address this issue.

Moreover, the discriminatory nature of race-norming has been brought to Class Counsel's attention as far back as August 2019 in the context of at least one appeal to the Appeals Advisory Panel, and informally as well. However, the flaw in the Settlement Agreement's administration remains unaddressed, and the NFL continues to insist on testing that makes it harder for Black players to qualify for benefits. And although the Special Masters' Decision endorses the use of

race norming subject to rebuttal rather than requiring it to be used in all cases, it does not eliminate the use of dual standards for Black and White former players. Nor does that Decision address the thousands of Black Class members who have already suffered from the NFL's actions in completed testing and claims administration. This Court's intervention is now required.

**C. Because of "Race-Norming," it is Harder for Black Former Players to Qualify for Compensation than for White Former Players.**

"Race-norming" makes it *substantially more difficult for Black players to qualify for compensation than it is for White players*. In effect, the Settlement, as it has been administered, has a White door and a Black door. Although the neurocognitive tests behind each door are the same, the raw scores for Black and White former players are interpreted differently when they are converted to scaled T-Scores for purposes of determining eligibility for compensation. Thus, the same raw performance results on the tests can lead to very different outcomes for Black players and White players. The impact of this racial discrimination is exacerbated because the practice of race-norming may be employed *twice* during the process of determining results on neurological testing.

First, clinicians have been scoring the assessment for premorbid (pre-injury) intellectual ability using statistical techniques that explicitly account for a retired player's race. As a consequence, if a Black retired player and a White retired player receive the *exact same raw scores* on the TOPF, the Black player can still be placed in a lower estimated category of premorbid intellectual ability. As noted above, the lower a player's category of premorbid intellectual ability, the lower his cognitive functioning will need to be on those tests to receive a Qualifying Diagnosis.

Second, the "Heaton norms," which the NFL has directed clinicians to use, provide different reference populations for Black and White former players when clinicians score the battery of tests that measure *current* cognitive functioning in each of the five "domains." Under

the Heaton norms, the reference population used for Black test subjects scores lower than the reference population used for White test subjects, sometimes by a substantial amount. *See* SM Decision at 4. As a result, if a Black player and a White player receive the same raw score on one of the tests, the Black player's scaled T-score (which reflects the raw score relative to the "norm" of the reference population) will be higher than the White player's, and the Black player will be less likely to fall below the T-Score ceiling for showing impairment.

For purposes of the Qualifying Diagnoses of Level 1.5 or Level 2 Impairment as defined in the Settlement Agreement, lower scores on the tests measuring current cognitive functioning are better. A White player may qualify for benefits, but a Black player with an identical set of raw scores may not -- because the T-Scores which actually determine eligibility are different. Put differently, a Black player will need to exhibit even worse cognitive functioning to be deemed to have suffered the same amount of cognitive decline as a White player. And this effect is exacerbated by the use of race-norming in *also* categorizing players' pre-morbid intellectual ability as above average, average, or below average.

Because of these two issues – individually and in combination -- a Black player must suffer from significantly worse cognitive functioning than a similarly-situated White player in order to be diagnosed with Level 1.5 or Level 2 Impairment and to qualify for compensation under the Settlement Agreement.

As the Special Masters recently observed, the effect of the race-based scoring urged by the NFL "can be extremely consequential, and the adjustments may often make the difference in a clinician's determination of cognitive impairment . . . for Retired NFL Players seeking benefits under the Agreement." SM Decision at 7. For example, in the case of Mr. Davenport, one of the Movants here, the Special Masters observed that using the race-based adjustment advocated by the

NFL would have affected Mr. Davenport's score on one test "by almost a full standard deviation." *Id.* at 7.

The scientific case for using race-based norms in this context is weak at best. "The use of race/ethnicity in normative data ignores the underlying cultural, health, and educational factors that result in disparities in test performance; subsequently, adjustments are made based on group membership, which may not fully represent the experiences and characteristics of a specific individual." SM Decision at 8 (citing N.C.S. Pearson, *Advanced Clinical Solutions for WAIS-IV and WMS-IV: Clinical and Interpretive Manual* (2009)). Clinicians sometimes use race-normed data in a diagnostic context with respect to an individual patient, where performance on neurocognitive tests is considered along with other information about the patient's individual circumstances. *See id.* at 4–5. In contrast, race-norming has been recognized as more problematic in contexts like this one where benefits or services are contingent on rigid score cutoffs. In this context, "using 'race-based' normative data may result in minority examinees not receiving needed services (e.g., increasing their scores above cutoffs)." *Id.* at 8 (citing Pearson, *supra*). "As using African American-specific norms increases the rate of false negatives, there is a risk that some may be denied access to necessary benefits or compensation solely on the basis of race." *Id.*

### D. Movants' Test Scores Have Been Subjected to Race-Norming, to Their Prejudice.

Both Kevin Henry and Najeh Davenport have received neurocognitive test scores that demonstrated the necessary cognitive decline had they been White. But because Mr. Henry and Mr. Davenport are Black, their claims have been rejected, or the NFL is currently urging that they be rejected, at least in part on the basis of race-norming.

Mr. Henry played in the NFL for eight years between 1993 and 2000, all for the Pittsburgh Steelers, retiring at the age of 33. During his playing career, Mr. Henry suffered multiple concussions, at least one of which was severe enough to cause him to miss playing time. Since

retirement, Mr. Henry has suffered from persistent headaches, depression, emotional volatility and memory loss and impaired cognitive ability.  These symptoms have left Mr. Henry unable to hold a job for the past eight years, and increasingly unable to perform the activities of daily living.

Pursuant to the Settlement Agreement, on August 2, 2017, Mr. Henry received a neurological examination by a MAF Physician.  The MAF Physician concluded that Mr. Henry's test scores qualified him for Level 1.5 Impairment in one domain (executive functioning), and for Level 2 Impairment in two domains (learning and memory, and language).  Nonetheless, Mr. Henry's claim for benefits was denied.  The denial decision explained: "Incorrect normative scores were provided by [the evaluating clinician] and when the correct Heaton norms were used, there were significant difference on [several tests]."

On December 5, 2019, Mr. Henry received a second neurological evaluation under the Settlement Agreement.  This time, the evaluating clinician adjusted Mr. Henry's raw scores using a "Full Demographic Model . . . which includes age, education, race/ethnicity, and gender."  The clinician determined that Mr. Henry's test scores did not qualify him for Level 1.5 or Level 2 Impairment in any category.  Based on his raw test scores in two different cognitive domains, if Mr. Henry's scaled T-Scores had been a single point lower on a single test (and they would have been much lower if Mr. Henry had been White), his scores would have qualified him for Level 1.5 Impairment in each of the two domains.  In explaining the discrepancy with the prior round of testing, the clinician wrote: "different normative comparison groups were used at the previous evaluation, which also may account for some discrepancies in the standard scores and meeting impairment criteria."

Mr. Davenport played in the NFL for seven years between 2002 and 2008 for the Green Bay Packers, Pittsburgh Steelers, and Indianapolis Colts, retiring at the age of 29.  During his

playing career, Mr. Davenport suffered over 10 concussions, one of which was associated with an orbital fracture and loss of consciousness. After multiple episodes of head impact, Mr. Davenport experienced ringing in his ears, double vision, headaches, and photophobia. Since retirement, Mr. Davenport has suffered from memory loss, progressive cognitive decline, and depression, and is unable to perform basic household chores.

Pursuant to the Settlement Agreement, Mr. Davenport received a neurological evaluation by a MAF Physician on November 5, 2019. Declining to use the special scale for Blacks, the MAF Physician concluded that Mr. Davenport's test scores qualified him for Level 1.5 Impairment in one domain (executive functioning), and for Level 2 Impairment in one domain (language). Mr. Davenport received a Notice of Monetary Award from the Claims Administrator indicating that he would receive compensation.

But the NFL appealed Mr. Davenport's claim determination, arguing in part that, "based on the NFL Parties' independent re-calculation of Mr. Davenport's T-scores using the raw scores provided by [the MAF Physician] and applying the industry standard Heaton norms, Mr. Davenport did not demonstrate the requisite cognitive impairment in *any* domain." (Emphasis in original). As the NFL put it, the use of racial norms would have "materially and critically affected the outcome of Mr. Davenport's claim."

On August 20, 2020, the Special Master issued a decision in the NFL's appeal of Mr. Davenport's monetary award. The decision recognized significant problems with race-norming, observing that the use of "African American-specific norms increases the rate of false negatives," and as a result, some Black retirees "may be denied access to necessary benefits or compensation solely on the basis of race." SM Decision at 8. The decision, however, did not address Mr. Davenport's argument that race-norming is unlawful, and left in place a presumption in favor of

race-norming, as advocated by the NFL. The Special Master remanded Mr. Davenport's case to the Claims Administrator to allow the neuropsychologist who tested Mr. Davenport to justify the decision not to use Black norms. SM Decision at 11-12.

The illegal use of race-based "norms" by the NFL and clinicians is not confined to Mr. Henry and Mr. Davenport. The vast majority of Black members of the Settlement Class who have been subjected to neurocognitive testing have had their test results distorted by these means. This is an important and recurring legal question which should be resolved by this Court under Article XXVII of the Settlement Agreement, in a way that affords relief to all Settlement Class members, and there is no reason for delay.

**ARGUMENT**

**I.     This Court Should Declare that the Settlement Agreement Does Not Require or Presume the Use of Race Norming.**

Under Article XXVII of the Settlement Agreement, this Court retains continuing jurisdiction over all participants in the claims administration process and may entertain motions relating to the interpretation of that Agreement. Pursuant to its Article XXVII authority, the Court should clarify that the Settlement Agreement does not require or presume that retired players who seek compensation be subjected to a racially discriminatory cognitive testing regime.

**A.     The Settlement Agreement does not require clinicians to use or presumptively use race-norming.**

The plain language of the Settlement Agreement does not require that race norms be used – or that they presumptively be used absent a specific reason not to use them – when estimating a retired player's cognitive decline. Interpretation of a settlement agreement, like any contract, must begin with the language of the agreement itself. *See, e.g.*, *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017). And under the plain language of the Settlement Agreement, clinicians are not absolutely required or presumptively required to use race norms at either stage of the process for

measuring a retired player's prior cognitive decline – either the TOPF stage or the neurocognitive test battery stage.

First, race-norming is not required at the TOPF stage, during which a former player is classified or tested for prior "intellectual ability." *See* SA Ex. A-2 § 3. As the Settlement Agreement recognizes, the TOPF test offers several different "models for predicting premorbid functioning," and some of the models "us[e] demographic data," including "race/ethnicity." *Id.* But crucially, the Settlement does not require or even recommend that a diagnosing clinician select a model that incorporates race-norming. Rather, the Settlement Agreement provides: "The clinician should select a model based on the patient's background and his or her current level of reading or language impairment." *Id.* There is no basis under the Settlement Agreement for requiring clinicians to select (or presumptively select) race-normed data when estimating a former player's prior intellectual ability.

Second, race-norming is neither absolutely nor presumptively required at the neurocognitive test battery stage, during which a former player is tested for current cognitive functioning in five different domains. The Settlement Agreement identifies specific tests to be used in each of the cognitive domains, SA Ex. A-2 § 1, and it explains that "[t]est selection in the domains was based on the availability of demographically-adjusted normative data for Caucasians and African Americans." SA Ex. A-2 § 4. This language explains that each test *allows* for a patient's raw scores to be normed against a reference population based on race. But it says nothing about whether a clinician *must* presume the use of race-normed data in every case, and it certainly does not require a clinician to offer special justification for declining to use that race-normed data. As discussed below, the Special Masters' determination that such a justification is required is based not on the language of the Settlement Agreement itself, but on the 2017 BAP Guide. But a 2017

document, even one that the Special Masters conclude "represents the Parties' [meaning Class Counsel and the NFL] joint understanding of the Agreement" (SM Decision at 9) cannot alter the Settlement Agreement without notice to the Class and approval by this Court.

Moreover, evaluation of claims outside the BAP process need only be "generally consistent" with the BAP criteria. SA Ex. A-1 § 1(b), 2(b). The phrase "generally consistent" "does not require identical diagnostic criteria, including without limitation, the same protocols or documentation requirements." SA § 6.4(b). Accordingly, even if the testing protocols specifically set forth for the BAP in the Settlement Agreement did require or presumptively require race-norming (and they do not), diagnoses outside the BAP do not.

Finally, if the Court finds that the language of the Settlement Agreement is ambiguous on these points, it should construe the Settlement Agreement so as not to require that clinicians presume the use of race-normed data, in order to avoid the Settlement Agreement being unconstitutional or void as against public policy. Court enforcement of a contract term that perpetuates racial discrimination would violate the equal protection guarantee of the U.S. Constitution. *See Shelley v. Kraemer*, 334 U.S. 1, 20–21 (1948). In addition, the public policy doctrine "may also void a contract term if that term offends the laws prohibiting racial discrimination." *Pryor v. NCAA*, 288 F.3d 548, 570 (3d Cir. 2002). This Court is empowered to construe ambiguous contract provisions so as to avoid these results. *Cf. Bartlett v. Strickland*, 556 U.S. 1, 21 (2009) (resolving doubt as to meaning of statutory provision so as to "avoid[] serious constitutional concerns under the Equal Protection Clause").

**B.    To the extent that the confidential BAP Guide requires clinicians to presume the use of race norms, it is an unauthorized amendment to the Settlement Agreement.**

According to the recent decision of the Special Masters with respect to Movant Davenport, the BAP Guide "generally recommend[s]" the use of race norms, and as such, "it is reasonable to

require that the clinician explain why" he or she chose *not* to use race norms in any particular case. SM Decision at 11. According to the Special Masters, this rule "is consistent with the Settlement, which explicitly states that tests were selected based on their susceptibility to norming using samples with sufficient African American participants." *Id.* at 9–10. But the Settlement Agreement merely observes that race-based demographic data is available; the Agreement does not urge clinicians to engage in race-norming or require that they expressly justify any decision not to do so in a particular case.

If the BAP Guide requires clinicians to presume the use of race norms, it is an *amendment* to the Settlement Agreement. But amendments are permissible only "upon Court approval." SA § 30.6. Submission of a proposed amendment for Court approval would have offered Class members a chance to be heard. The BAP Guide, in contrast, was developed confidentially by the NFL and Class Counsel in "a collaborative and iterated process," SM Decision at 9, with *no* opportunity for Class members to be heard. To the extent that the BAP Guide requires clinicians to presumptively adjust players' raw test scores using race-based data, or to explain any decision not to do so in a particular case, it is an amendment to the Settlement Agreement that did not receive Court approval, and the Court should now reject it.

\*     \*     \*

In reaching the Settlement Agreement, retired players never agreed to be subjected to racial discrimination when they submit claims for compensation. This Court should clarify that the Settlement Agreement neither requires nor presumes that result.

**II.    This Court should declare that it is unlawful to use race-based norms to the detriment of Black Former Players.**

The Court should declare that it is unlawful to make it *harder* to qualify for compensation under the Settlement Agreement by using Black-specific race-based adjustments.

The Settlement Agreement is subject to the supervision of this Court, and as such, its administration must comply with the guarantees of equal protection on the basis of race in the U.S. Constitution. *See Democratic Nat'l Cmtee. v. Republican Nat'l Cmtee.*, 673 F.3d 192, 204 (3d Cir. 2012) (noting that "a court's enforcement of a settlement decree can constitute state action under *Shelley* [*v. Kraemer*, 334 U.S. 1 (1948)]"). Racially discriminatory administration of the Settlement Agreement also violates the rights of Black former players under federal law to obtain the equal benefit of contracts and to participate in legal proceedings on an equal footing with White former players. *See* 42 U.S.C. § 1981.

The use of race-norming to the detriment of Black former players represents an explicit, deliberate, race-based classification that cannot survive strict scrutiny. The application of racial classifications is subject to "stringent examination" and can be justified only if the practice is narrowly tailored to serve a compelling interest. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 291 (1978). The discriminatory use of race norms to the detriment of Black former players cannot survive these standards, and the Court should therefore declare that it is unlawful.

**III.    In the Alternative, if the Court Concludes that the Settlement Agreement Requires Clinicians to Use or Presumptively Use Race-Norming, then the Settlement Agreement Should Be Vacated in Part Under Federal Rule of Civil Procedure 60(b), or the Court's Equitable Powers.**

As set forth above, the Settlement Agreement does not require clinicians to use or presumptively use "race-norming," and even if ambiguous, must not be interpreted in that fashion. But if the Settlement Agreement does require clinicians to presume race-norming, making it substantially harder for Black retired players to qualify for compensation than White ones, then

Movants seek amendment of that aspect of the Settlement Agreement pursuant to Federal Rule of Civil Procedure 60(b), or the Court's equitable powers.

A district court "has the general equitable power to modify the terms of a class action settlement," especially when necessary in the exercise of the court's "special responsibility to see to the administration of justice . . . for the protection of class members." *In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 194 (3d Cir. 2000). "[W]hen parties avail themselves of the District Court to implement [a class action] settlement, the District Court may use its traditional powers" to advance the administration of justice, including both "its power in equity" and its powers under "the Federal Rules of Civil Procedure." *Id.* at 195; *see also In re Diet Drugs Prod. Liability Litig.*, 706 F.3d 217, 227 (3d Cir. 2013) (describing court's "general equitable power to modify the terms of a class action settlement" and referencing the standard for modifying a judgment under Rule 60(b)).[4]

First, any provisions of the Settlement Agreement that the Court construes to require race-norming should be vacated under Rule 60(b)(5) on the ground that "applying [those provisions] prospectively is no longer equitable." Under this clause of Rule 60(b)(5), it is appropriate to modify or vacate a judgment with prospective application where: (1) there has been "a significant change in factual circumstances" or (2) "a significant change in law"; (3) "a decree proves to be unworkable because of unforeseen obstacles"; or (4) "enforcement of the decree without modification would be detrimental to the public interest." *Democratic Nat'l Cmtee.*, 673 F.3d at

---

[4] In opposing one class member's Rule 60(b) motion on a different issue, the NFL Parties previously argued that "alter[ing] the negotiated-for and agreed-to terms of a settlement agreement" is "outside the scope of permitted relief" available via the Court's equitable powers. ECF 9592 at 8–9. That is wrong. In the principal case that the NFL cited, the Third Circuit explained that when deciding whether to extend a settlement agreement deadline for excusable neglect under Rule 6(b), the fact that the extension would change the parties' bargained-for terms is relevant to the "prejudice prong" of the Rule 6(b) standard. *In re Cendant Corp.*, 233 F.3d at 196. But the Court of Appeals never suggested that changing the parties' bargained-for terms is "outside the scope of permitted relief," as the NFL Parties earlier argued, ECF 9592 at 9; to the contrary, the court stated that district courts have "general equitable power *to modify the terms* of a class action settlement." *In re Cendant Corp.*, 233 F.3d at 194 (emphasis added).

202; *see also White v. NFL*, 585 F.3d 1129, 1136 (8th Cir. 2018) (applying this standard to a motion to modify a class action settlement agreement between the NFL and players). Given that the Class Notice in this case said absolutely nothing about the fact that claims would be adjudicated using racially discriminatory testing protocols, *see* ECF 6084-1, the use of race-norming is both a changed factual circumstance and an "unforeseen obstacle." *See Pigford v. Veneman*, 292 F.3d 918, 926 (D.C. Cir. 2002) (holding that modification to consent decree might be appropriate under Rule 60(b)(5) and noting that class members can overcome background presumption that they are accountable for class counsel's actions). Moreover, enforcement of a settlement that requires racial discrimination would clearly be "detrimental to the public interest."

Second, even if none of the specific grounds for relief in Rule 60(b)(1)–(5) applied, the use of racially discriminatory cognitive testing is an "other reason that justifies relief" under Rule 60(b)(6). Rule 60(b)(6) is an admittedly narrow avenue, but it provides relief when a movant shows "extraordinary circumstances that justify reopening the judgment." *Budget Blinds, Inc. v. White*, 536 F.3d 244, 255 (3d Cir. 2008) (internal quotation marks and citation omitted). The circumstances here are indeed extraordinary: they constitute overt race discrimination in the administration of justice. *See Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (noting that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice," and "[s]uch concerns are precisely among those we have identified as supporting relief under Rule 60(b)(6)"). The presence of race discrimination warrants an exercise of this Court's "equitable power to modify the terms of a class action settlement," so as "to see to the administration of justice." *In re Cendant Corp. Prides Litig.*, 233 F.3d at 194.

If the Court concludes that the Settlement Agreement requires clinicians to presume that test scores be race-normed to the detriment of Black former players, then relief from judgment

under Rule 60(b)(6) or the Court's equitable power is necessary to avoid this Court becoming an instrument of racial discrimination through enforcement of the Settlement Agreement.

## IV.    Relief

The use of race-norming is a blatant instance of race discrimination in the administration of justice. Movants seek the Court's help in remedying the injustice through the following relief:

1. Declaring, for purposes of all future claims for compensation and all future appeals to the Special Masters, that the Settlement Agreement does not require clinicians to use or presume the use of race-norming when measuring a retired player's cognitive status or decline, and that the use of race-norming to the detriment of Black former players is unlawful;

2. Ordering and enjoining the Claims Administrator to issue guidance documents to all clinicians who make diagnoses for purposes of the Settlement Agreement stating that: (a) the Settlement Agreement does not require or recommend the use of race-norming; and (b) all of the neurocognitive tests identified in the Settlement Agreement must be scored in such a way that does not use race-normed data or race-based statistical techniques to the detriment of Black former players;

3. Enjoining the required or presumed use of any such race-normed data or race-based statistical techniques to the detriment of Black former players in the claims administration process;

4. Ordering that any retired player who has previously undergone neurocognitive testing for the purpose of seeking compensation under the Settlement Agreement, and who has been subjected to unfavorable race-based scoring, may choose to have his test scores re-calculated using his existing raw scores, without unfavorable race-norming, and may

submit a claim for compensation using the new scores, which will be treated as though it had been submitted at the time of his prior testing;

5.  Ordering any further relief necessary to place such retired players in the same position that they would have been in, if no such race-norming had been used;

6.  In the alternative, ordering limited discovery[5] into the use of race-normed data in the Settlement Agreement and the claims administration process and its disparate effects on Black and White retired players; and

7.  Appointing Movants' counsel as special class counsel to oversee the above-referenced relief and any associated changes to the Settlement Agreement, and authorizing an appropriate award of attorney's fees and expenses, whether from the Monetary Award Fund or otherwise.

## CONCLUSION

The Settlement Agreement accomplished much for retired players. But the use of racially discriminatory testing rules places a blot on that record. This Court should intervene to end the practice of race-norming to the detriment of Black former players, to ensure that all players have an equal opportunity to avail themselves of the claims administration process, without discrimination on the basis of race.

Respectfully submitted,

Dated: ___August 25, 2020___      _____/s/ Cyril V. Smith_____
                                  Cyril V. Smith*
                                  Zuckerman Spaeder LLP
                                  100 E. Pratt Street, Suite 2440

---

[5] *See Pearson*, 893 F.3d at 987 (reversing denial of Rule 60(b)(6) motion challenging side-payments to objecting class members and stating that, "[o]n remand, the parties and the court can tailor evidentiary proceedings to resolve any factual disputes before confronting the propriety of any remedy"); *Pearson v. First NH Mortg. Corp*., 200 F.3d 30, 35 (1st Cir. 1999) (holding, under bankruptcy equivalent to Rule 60(b), that court has discretion to order discovery once movant makes a "colorable" claim for relief).

Baltimore, MD 21202
(410) 332-0444
csmith@zuckerman.com


_____/s/ *Steven N. Herman*_____
Aitan D. Goelman*
Steven N. Herman (Bar No. 205832)
David A. Reiser*
Ezra B. Marcus*
Megan S. McKoy*
Zuckerman Spaeder LLP
1800 M Street, 10th Floor
Washington, DC 20036
(202) 778-1800
agoelman@zuckerman.com
sherman@zuckerman.com
dreiser@zuckerman.com
emarcus@zuckerman.com
mmckoy@zuckerman.com


_____/s/ *Edward S. Stone*_____
Edward S. Stone
Edward Stone Law P.C.
300 Park Avenue, 12th Floor
New York, NY 10022
(203) 504-8425
eddie@edwardstonelaw.com


_____/s/ *J.R. Wyatt*_____
J.R. Wyatt
JR Wyatt Law
49 West 37th Street, 7th Floor
New York, New York 10018
(215) 557-2776
justin@jrwyattlaw.com


Attorneys for Movants

---

* *Pro hac vice* applications forthcoming.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the foregoing was filed electronically with the Clerk of the Court on the 25th day of August 2020, to be served by operation of the Court's electronic filing system which sent notification of such filing via electronic mail to all counsel of record.


Dated: _____August 25, 2020_____          _____/s/ *Steven N. Herman*_____