**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB MDL No. 2323 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | : : : : : | Hon. Anita B. Brody |

<u>**CLAIMS ADMINISTRATOR STATUS REPORT NO. 10**</u>

## I.        <u>INTRODUCTION</u>

1.        ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 10 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 9 filed on July 6, 2020 (Document 11116).  Our earlier Status Reports are posted to the Settlement Website (under "Documents," click "Status Reports").  We do not repeat here what we covered in them.  All numbers and other information in this Status Report No. 10 are as of September 14, 2020.[1]  We will cover developments after that date in future reports.

---

[1] All dates formatted as 9/14/20 in this Status Report mean September 14, 2020.

## II.   <u>MONETARY AWARD CLAIMS</u>

**2.**   ***Total Claims Received.***  Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted.  We have received 36 new Monetary Award claims since Status Report No. 9, and have finished the review of all but one claim.  As of September 14, 2020, the total Monetary Award Claim Packages received from Retired NFL Football Players and Representative Claimants is 3,070[2] (19.0% of the 16,138 Retired NFL Football Players and Representative Claimants who received favorable registration determinations).[3]  Five of the 3,070 claims were denied as untimely.[4]  We have received about three new claims a week since Status Report No. 9 in June 2020.  Of the 3,070 Monetary Award claims submitted, 1,977 (64%) rest on pre-Effective Date diagnoses, while 852 (28%) are for post-Effective Date diagnoses, of which 243 (29% of the 852) were made in the Baseline Assessment Program ("BAP")[5] and 609 (71% of the 852) were made by Qualified MAF Physicians.[6]  The other 241 claims did not tell us what diagnosis date they assert.  Table 1 compares these numbers to those in Status Report No. 9:

---

[2] Section 3 of the Summary Report indicates that 3,080 Monetary Award Claim Packages have been submitted, which includes ten Supplemental Monetary Award claims that we do not include in the rest of our numbers in this section of the Status Report. See section III of the Status Report for details on the Supplemental Monetary Award claims.

[3] Of these Monetary Award claims, 572 (19%) have at least one associated Derivative Claimant who has registered and 2,498 (81%) have no registered Derivative Claimants.  Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible); of these 2,741 Settlement Class Members submitted the 3,070 claims.

[4] We reviewed 19 claims for potential untimeliness and denied five as untimely.  We accepted 14 as timely, which includes two claims that showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

[5] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award.  The BAP Administrator's status reports explain more about BAP diagnoses.

[6] This includes two claims where the Settlement Class Members submitted claims after the Effective Date, but the diagnoses were not rendered by MAF Physicians.  Given unique circumstances, the Parties allowed an AAP member or AAP Consultant to review the medical records to determine if there was a Qualifying Diagnosis.

| Table 1 | QUALIFYING DIAGNOSIS DATES IN MONETARY AWARD CLAIMS | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 6/15/20** | **AS OF 9/14/20** | **CHANGE** | **AS OF 6/15/20** | **AS OF 9/14/20** | **CHANGE** |
| 1. | Pre-Effective Date | 1,973 | 1,977 | 4 | 65% | 64% | -1% |
| 2. | Post-Effective Date | 821 | 852 | 31 | 27% | 28% | +1% |
| | *(a) BAP* | *228* | *243* | *15* | *8%* | *8%* | *0%* |
| | *(b) MAF* | *593* | *609* | *16* | *20%* | *20%* | *0%* |
| 3. | No Date Asserted | 240 | 241 | 1 | 8% | 8% | 0% |
| **4.** | **Totals** | **3,034** | **3,070** | **36** | | | |

Table 2 shows by diagnosis date how many claims we have for each type of Qualifying

Diagnosis:

| Table 2 | QUALIFYING DIAGNOSES PRESENTED IN MONETARY AWARD CLAIMS | | |
|---|---|---|---|
| | **DIAGNOSIS** | **PRE-EFFECTIVE DATE** | **POST-EFFECTIVE DATE** | |
| | | | **MAF** | **BAP** |
| 1. | Death with CTE | 124 | 0 | N/A |
| 2. | ALS | 51 | 5 | |
| 3. | Alzheimer's Disease | 425 | 87 | |
| 4. | Parkinson's Disease | 137 | 39 | |
| 5. | Level 2 | 505 | 186 | 88 |
| 6. | Level 1.5 | 735 | 291 | 146 |

We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the

Summary Report on the Settlement Website.  We also show the current status of all Monetary

Award claims based on the last notice or action taken in Section 8 of the Summary Report on the

Settlement Website.  There are seven claims (<1% of 3,070) in our review process after an initial

Claim Package submission or a response to a notice requesting additional information and/or

documents (see Row 1 in Section 8 of the Summary Report).

### 3.   *Monetary Awards and Payments.*

(a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website.  We have issued Notices of Monetary Award for 1,170 claims totaling $ 796,625,374.[7]  We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit.  Of the 1,170 claims with Notices of Monetary Award, we requested $791,179,980 from the NFL Parties for the 1,156 claims that have reached the point at which we can request funding.  The NFL Parties have deposited funds for 1,146 claims and not yet funded 10 claims because they are within the funding deadline for the September Funding Request.[8]  Of the 1,146 Monetary Award claims for which the NFL Parties had deposited funds, the Program paid 1,111 claims for a total of $719,114,600.  The remaining 35 funded claims were not yet ready for payment when we submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount.  For the 1,111 Retired NFL Football Players and Representative Claimants who have been paid, the Trustee sent $38,282,988 (5% of those Monetary Awards) to the Attorneys' Fees Qualified Settlement Fund, in accordance with the Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104).

---

[7] The amount of these Notices of Monetary Award includes the 1% Derivative Claimant Award deductions allocated to eligible Derivative Claimants (see Paragraph 20 of this Status Report).  Section 7 of the Summary Report indicates that we have issued Notices of Monetary Award for 1,179 claims totaling $797,966,647, which includes nine Supplemental Monetary Award claims.  We do not cover Supplemental Monetary Award claims in our numbers in this section of the Status Report.  See section III of this Status Report for details on Supplemental Monetary Award claims.

[8] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.

Finally, we are required to withhold money for unresolved Liens and for third-party funders.

Table 3 shows the distribution of the $719,114,600 paid by the Settlement Program and

compares the totals to those reported in Status Report No. 9:

| Table 3 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | PAID TO | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $670,185,583 | $695,441,722 | $25,256,139 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $3,518,610 | $3,553,651 | $35,041 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $8,923,847 | $9,594,623 | $670,776 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $9,725,539 | $10,524,604 | $799,065 |
| 5. | **Totals** | **$692,353,579** | **$719,114,600** | **$26,761,021** |

(b) Table 4 shows the changes in figures for payments and claims with Notices of

Monetary Award since Status Report No. 9:

| Table 4 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 9 | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | AMOUNT | | |
| | | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE |
| 1. | Notice of Monetary Award Issued | 1,157 | 1,170 | 13 | $788,259,592 | $796,625,374 | $8,365,782 |
| 2. | Paid | 1,069 | 1,111 | 42 | $692,353,579 | $719,114,600 | $26,761,021 |

(c) Table 5 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:[9]

| Table 5 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS[10] | | | | | |
|---|---|---|---|---|---|---|
| | DIAGNOSIS | CLAIMS SUBMITTED | NOTICE OF MONETARY AWARD | | PAID | |
| | | | HOW MANY | %[11] | HOW MANY | %[12] |
| 1. | Death with CTE | 124 | 80 | 65% | 80 | 65% |
| 2. | ALS | 56 | 39 | 70% | 39 | 70% |
| 3. | Alzheimer's Disease | 512 | 344 | 67% | 334 | 64% |
| 4. | Parkinson's Disease | 176 | 146 | 83% | 141 | 80% |
| 5. | Level 2 | 779 | 194 | 25% | 180 | 23% |
| 6. | Level 1.5 | 1172 | 367 | 31% | 337 | 29% |

### 4.    *Monetary Award Claims Reviewed by the AAP.*

(a) There are 22 claims in or still requiring Appeals Advisory Panel ("AAP") review, which are 19 fewer claims than we reported in Status Report No. 9.  Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel Consultants ("AAPC"), as highlighted in sub-paragraph (b) below.  The AAP has completed reviews on 863 pre-Effective Date diagnosis Monetary Award claims, approving 480 (56%) of those claims.[13]  Under FAQ 149 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level

---

[9] Section 8 of the Summary Report on the Settlement Website identifies where claims that have not received a Notice of Monetary Award or been paid stand in the process.

[10] These do not include claims submitted where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.

[11] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that received a Notice of Monetary Award.

[12] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that were paid.

[13] Broken down by Qualifying Diagnosis, the AAP members approved 98% of Death with CTE claims, 95% of ALS claims, 88% of Alzheimer's claims, 97% of Parkinson's claims, 29% of Level 2 claims and 31% of Level 1.5 claims.

diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 100 claims (an increase of three since Status Report No. 9).  Under Rule 27 of the Rules Governing Qualified MAF Physicians, the AAP has reviewed 159 Monetary Award claims for diagnoses made by terminated Qualified MAF Physicians, approving 48 (30%) of those claims.[14]

(b) We have assigned 693 claims (an increase of 31 since Status Report No. 9) to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing supporting an Alzheimer's Disease diagnosis.  The AAPC has completed 685 reviews (98.8% of those assigned to it) and provided their assessments to the AAP.  An AAPC is reviewing the other pending claims.

**5.**    *Notices for Missing Materials.*  We have sent one or more notices requesting additional documents or information on 2,080 Monetary Award claims (24 more since Status Report No. 9), as shown in Table 6:

| Table 6 | | NOTICES FOR MISSING MATERIALS | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[15] | TOTAL |
| 1. | Total Reviewed | 124 | 56 | 512 | 176 | 778 | 1,172 | 251 | 3,069 |
| 2. | Notice Issued | 48 | 28 | 304 | 96 | 547 | 833 | 224 | 2,080 |
| 3. | % Missing Materials | 39% | 50% | 59% | 55% | 70% | 71% | 89% | 68% |

---

[14] This figure excludes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award.  At our request, the AAP has reviewed 60 claims to verify the sufficiency of the claimed Qualifying Diagnosis.
[15] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.  We process and pay a person for only one Qualifying Diagnosis per claim submission.

So far, 87% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice.  Settlement Class Members take an average of about 60 days to respond.  We generally receive up to three responses to these notices each week and review each reply to determine if it cures the problem.  Of those who responded, 41% cured the problem.  Section 6 of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

      **6.**     ***Statute of Limitations Matters***.  We received 136 Claim Packages from Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006.[16]  The Rules Governing Statute of Limitations Proceedings explain how the Special Masters make determinations as to whether such claims are barred by statutes of limitations, as specified in Section 6.2(b) of the Settlement Agreement.  Statute of Limitations Rule 7 requires that a Claim Package be complete before a statute of limitations proceeding may begin.  Of the 136 claims we received:  (a) 73 are complete and assert a potentially compensable Qualifying Diagnosis if the claim is not time-barred under Settlement Agreement Section 6.2(b); (b) one was withdrawn; and (c) 62 have been denied for failing to cure deficiencies or for not asserting a compensable Qualifying Diagnosis.[17]  Table 7 summarizes the status of claims requiring a statute of limitation analysis:

---

[16] We received Registration Forms from 370 Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006, but 134 of them did not properly register because of uncured incompleteness reasons or the player was not a Settlement Class Member because he did not play NFL Football as required by the Settlement Agreement.  Of the 236 Representative Claimants who successfully registered, 100 (42%) did not submit a Claim Package.

[17] The 2020 Grid Value of the 73 complete and potentially compensable claims is $65,607,948.

| Table 7 | STATUS OF CLAIMS REQUIRING STATUTE OF LIMITATIONS ANALYSIS | | | | | |
|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE |
| 1. | Complete - Potentially Compensable Qualifying Diagnosis | 73 | 37 | -36 | 53% | 27% | -26% |
| 2. | Claim Package Withdrawn | 1 | 37 | +36 | < 1% | 27% | +26% |
| 3. | Denied – Deficient or No Compensable Qualifying Diagnosis | 62 | 62 | 0 | 46% | 46% | 0% |
| 4. | Totals | 136 | 136 | 0 | | | |

The Special Masters originally stayed a decision on all claims presenting this issue until all were fully briefed, to permit all affected Representative Claimants to be heard before any ruling and allow for the consideration of all arguments in a uniform and efficient manner. On December 11, 2019, the Court appointed United States Magistrate Judge Diane M. Welsh as the Mediator to seek to resolve all claims implicated by Section 6.2(b) of the Settlement Agreement. On September 14, 2020, the Claims Administrator and Special Masters received notice that 36 claimants were withdrawing their submitted Monetary Award claim, which simultaneously concludes the pending claim and the Statute of Limitations briefing under Rule 29 of the Rules Governing Statute of Limitations Proceedings.

7.    ***Monetary Award Denials.***  There have been 1,047 denials of Monetary Award claims for reasons other than an Audit (20 more since Status Report No. 9), as shown in Table 8.[18]

---

[18] We discuss Audit denials in Paragraph 16 of this Status Report.

| Table 8 | MONETARY AWARD DENIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTALS |
| 1. | Total Reviewed | 124 | 56 | 512 | 176 | 778 | 1172 | 251 | 3,069 |
| 2. | Denied | 41 | 3 | 74 | 10 | 250 | 443 | 226 | 1,047 |
| 3. | % Denied | 33% | 5% | 14% | 6% | 32% | 38% | 90% | 34% |

Sections 6 and 10 of the Summary Report on the Settlement Website show these denials and the reasons for them.  Overall, the AAP found 577 (55%) of these claims did not reflect a valid Qualifying Diagnosis.  When an AAP member denies a claim, we include in the notice comments from that AAP member explaining why.  When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents.  Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam.  Settlement Class Members have appealed 350 (33%) of the 1,047 denials.

### III.    SUPPLEMENTAL MONETARY AWARD CLAIMS

**8.**    *Supplemental Monetary Award Claims Received.*  A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis.  The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid.  We have received claims from nine Retired NFL Football Players and one Representative Claimant seeking

Supplemental Monetary Awards, eight for Qualifying Diagnoses of Alzheimer's Disease and two

for a Level 2 Neurocognitive Impairment diagnosis.  This is the same number of Supplemental

claims that we reported in Status Report No. 9.

> **9.**    ***Supplemental Monetary Award Reviews and Payments.***  A Supplemental

Monetary Award is the difference between the Monetary Award Grid value of the new

Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis.

We have issued nine Notices of Supplemental Monetary Award to eligible Retired NFL Football

Players and denied one claim for a Supplemental Monetary Award.  The combined Monetary

Award Grid value of these nine Supplemental Monetary Awards was $2,408,432, but after

subtracting the prior Monetary Award payments, totaled $1,341,273, as set out below in Table 9:

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| 1. | Alzheimer's Disease | $187,217 | Level 1.5 | $93,904 | $93,313 |
| 2. | Alzheimer's Disease | $713,504 | Level 1.5 | $255,175 | $458,329 |
| 3. | Level 2 | $268,132 | Level 1.5 | $153,105 | $115,027 |
| 4. | Alzheimer's Disease | $316,188 | Level 1.5 | $99,620 | $216,568 |
| 5. | Alzheimer's Disease | $118,571 | Level 1.5 | $41,604 | $76,967 |
| 6. | Alzheimer's Disease | $404,326 | Level 2 | $253,783 | $150,543 |
| 7. | Level 2 | $78,737 | Level 1.5 | $55,125 | $23,612 |
| 8. | Alzheimer's Disease | $202,588 | Level 1.5 | $71,974 | $130,614 |
| 9 | Alzheimer's Disease | $119,170 | Level 1.5 | $42,870 | $76,300 |
| 10. | Totals | $2,408,432 | | $1,067,160 | $1,341,273 |

The Program has paid seven Retired NFL Football Players and one Representative Claimant a

total of $843,192 for their Supplemental Monetary Awards and the remaining claim is set to be

paid in the next disbursement.

## IV.    QUALIFIED MAF PHYSICIANS

**10.**    *Maintaining the MAF Network.*

(a) Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website.  There are 100 Qualified MAF Physicians on the website now, representing 34 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside.  We hope to add another 25 approved Qualified MAF Physicians as we confirm their participation and/or contract with them.  Table 10 shows the changes in these numbers since Status Report No. 9:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | ASPECT | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE |
| 1. | Approved Physician – On Posted List | 107 | 100 | -7 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 35 | 34 | -1 |
| 3. | Approved Physician – Not Yet Posted | 23 | 25 | 2 |

We removed two physicians from the website, one physician withdrew because of retirement and one was no longer interested in participating but gave no specific reason for her lack of interest. The Parties approved two new Qualified MAF Physicians since Status Report No. 9.[19]  We are working with the approved physicians to get signed contracts in place so we can add them to the posted list.

(b) We have 303 physicians on our radar, nine of whom Class Counsel and/or the NFL are considering whether to approve as Qualified MAF Physicians, 86 with whom we are engaged in initial and follow-up communications to determine interest and 208 who we have identified as

[19] The "Parties" are the parties to the Settlement Agreement, Class Counsel and the NFL Parties.  Our contacts with Class Counsel are at Seeger Weiss LLP.  We work with counsel for the NFL Parties at Paul, Weiss, Rifkind, Wharton & Garrison LLP.

possibly having appropriate qualifications but who we need to research more fully before
contacting.

      11.    *150-Mile Rule.*

     (a) Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired
NFL Football Player be examined by a Qualified MAF Physician whose office is within 150
miles of his primary residence.[20]  We can make exceptions to this 150-Mile Rule if the
exception is requested prior to the appointment.  We have received 72 requests for
exceptions to the 150-Mile Rule, of which we granted 53 (74%) and denied 17 (24%).  We
have not issued determinations on two 150-Mile exception requests because we are awaiting
additional information.  Table 11 shows the changes since Status Report No. 9:

| Table 11 | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE |
| 1. | Granted | 47 | 53 | 6 | 73.4% | 73.6% | +0.2% |
| 2. | Denied | 17 | 17 | 0 | 26.6% | 23.6% | -3.0% |
| 3. | Pending | 0 | 2 | 2 | 0% | 2.8% | +2.8% |
| 4. | **Totals** | **64** | **72** | **8** | | | |

For each denied request, the Retired NFL Football Player had at least one Qualified MAF
Physician within 150 miles and did not provide a reasonable explanation for wanting to see a
Qualified MAF Physician further away.

     (b) The 150-Mile Rule is a flexible rule with broad exceptions.  Of the living Retired
NFL Football Players registered in the Program, 89% have a Qualified MAF Physician
within 150 miles of their primary residence.  We work with those who do not to help them

---

[20] This requirement applies only to appointments made after April 11, 2019.  Appointments made on or before April
11, 2019, did not need to be rescheduled with a different Qualified MAF Physician.

schedule appointments with physicians further away, when they tell us they are ready to be examined.

12.    *50-Mile Rule.*  Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office. Like the 150-Mile Rule, we have discretion to grant exceptions.  We have received 16 requests for exceptions to the 50-Mile Rule, of which we granted 14 (87.5%) and denied two (12.5%).  Table 12 shows how many exception requests we have received and our decisions on those requests:

| Table 12 | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | DECISION | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE |
| 1. | Granted | 13 | 14 | +1 | 92.9% | 87.5% | -5.4% |
| 2. | Denied | 1 | 2 | +1 | 7.1% | 12.5% | +5.4% |
| 3. | Totals | 14 | 16 | 2 | | | |

We denied one request since Status Court Report No. 9 because the Retired NFL Football Player received neuropsychological testing before his exam with a Qualified MAF Physician, the testing was not generally consistent with the Settlement Agreement, and the neuropsychologist who performed the testing was not located within 50 miles of the Qualified MAF Physician's office.  Of the 100 Qualified MAF Physicians who are actively scheduling appointments, 94 (94%) have an approved neuropsychologist within 50 miles of their office, and we will grant exceptions on a case by case basis for the six Qualified MAF Physicians who do not.

13.     *Deviation Explanations for Level 1.5 and Level 2 Diagnoses.*  Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we determine more information is needed.  We cannot process these claims further until we receive the required explanation.  We report on these claims in Section 8 (Row 2) of the Summary Report on the Settlement Website.  Since first reporting on this claim status in August 2019, we continue to see the number of affected claims decrease.  We expect the number of claims in this group will continue to go down over time as the Qualified MAF Physicians become more familiar with this requirement and include the necessary explanation in their initial submissions to us.

14.     *AAP Leadership Council.*  Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network.  We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses.  The AAP Leadership Council also assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the Settlement Agreement criteria.  Overall, our collaboration with the AAP Leadership Council has been successful, and the Qualified MAF Physicians have responded positively to receiving feedback from AAP members.

## V.   AUDIT

**15.**   ***Closed Audits.***  We have concluded the Audit investigations of 997 Settlement

Class Members with Monetary Award claims by denying a claim through Audit, by making

no adverse finding and removing a claim from Audit, or because the Settlement Class

Member withdrew his or her claim during our Audit.  Table 13 summarizes the reasons for

these closures and changes in the numbers since Status Report No. 9:

| Table 13 | CLOSED AUDITS | | | |
|---|---|---|---|---|
| | REASON FOR CLOSURE | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE |
| 1. | No Finding of Misrepresentation, Omission, or Concealment; or Special Masters Directed Result[21] | 684 | 830 | +146 |
| 2. | Claim Withdrawn by Settlement Class Member | 169 | 167 | -2 |
| 3. | Totals | 853 | 997 | +144 |

**16.**   ***Reports of Adverse Finding in Audit.***  We have issued to the Parties 19

Reports of Adverse Finding in Audit (the same number that we reported in Status Report No.

9) affecting 566 Monetary Award claims, all 19 of which were then referred to the Special

Masters.  The 19 Audit Reports concern four neurologists, 12 neuropsychologists, two law

firms, seven individual Settlement Class Members and one claims preparation company.

Table 14 summarizes the Special Masters' and Court's decisions on these Audit reports:

---

[21] Special Masters Directed Result includes claims denied in Audit or released from Audit.

| Table 14 | DECISIONS ON AUDIT REPORTS | |
|---|---|---|
| | **DECISION** | **AUDIT REPORTS** |
| 1. | Claims Denied in Audit | 12 |
| 2. | Claims Removed from Audit and Subjected to Specialized Review | 2 |
| 3. | Claims Removed from Audit and Returned to Normal Review | 3 |
| 4. | All Claims Withdrawn before Decision | 1 |
| 5. | No Final Decision issued Yet | 1 |
| **6.** | **Total** | **19** |

17.    *Audit Proceeding Decisions.* We have denied 372 claims after Audit based on decisions by the Court or Special Masters.[22]  Sections 6 and 8 (Row 17) of the Summary Report on the Settlement Website show these denials.  A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors.  We have received 75 new claims submitted by Settlement Class Members following an Audit Denial, of which 13 have been paid or are in the payment process.

18.    *Ongoing Audit Investigations.*  We have other Audit investigations underway affecting 45 Monetary Award claims (the same number we reported in Status Report No. 9). Of these, 15 are subject to three group investigations of claims with similar characteristics and 30 are individual claims.

19.    *Claims Investigated More than Once.*  Claims on which we have concluded an Audit may be the subject of another Audit if we later learn of information that requires further investigation.  We notify Settlement Class Members when this happens.  We have

---

[22] Of the 372 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims).  Six individual Retired NFL Football Players' claims have been denied.  The Special Masters directed us to deny 170 claims based on their findings related to the Special Investigator's investigation of a law firm.  We denied the remaining claim for failing to cooperate with our requests for information during an Audit.

audited 91 Monetary Award claims more than one time (the same number we reported in

Status Report No. 9); the most times a Monetary Award claim has been audited is twice.

## VI.   DERIVATIVE CLAIMANTS

20.   *Derivative Claims.*  We have received 593 Derivative Claim Packages (no

increase since Status Report No. 9).  Table 15 shows the status of these claims:

| Table 15 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | HOW MANY | % OF TOTAL |
| 1. | Paid Derivative Claimant Award ($938,795) | 211 | 36% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($6,274.60[23]) | 4 | 1% |
| 3. | Denied – Associated Retired NFL Football Player's Claim Denied | 46 | 8% |
| 4. | Denied – No Timely Claim for Associated Retired NFL Football Player | 42 | 7% |
| 5. | Denied – No Timely or Proper Registration for Associated Retired NFL Football Player | 34 | 6% |
| 6. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 7. | Denied – Deceased Derivative Claimant | 4 | 1% |
| 8. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 9. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 3% |
| 10. | Withdrawn | 8 | 1% |
| 11. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 215 | 36% |
| 12. | **Total** | **593** | |

Since Status Report No. 9, three more Derivative Claimants were paid, and we issued a

Notice of Derivative Claimant Award to one new Derivative Claimant.  We have paid 98%

of the 215 Derivative Claimants who received Notices of Derivative Claimant Award; three

of the four eligible Derivative Claimants who have not yet been paid are in the payment

process.  We have not received an objection from any of the 158 Derivative Claimants who

---

[23] This includes $763.00 for a Supplemental Derivative Claimant Award issued to a Derivative Claimant who was previously paid an initial Derivative Claimant Award.

equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

21.   ***Additional Derivative Claimant Details.***  We have received challenges from 29 Retired NFL Football Players (or their Representative Claimants) to 41 Derivative Claimants (no change since Status Report No. 9); 19 (46%) of those 41 challenged Derivative Claimants never submitted a timely Derivative Claim Package, making them ineligible for a Derivative Claimant Award.  We issued a Notice of Derivative Claim Package Submission Deadline to 451 registered Derivative Claimants.  Table 16 summarizes their claim submission statuses and the changes since Status Report No. 9:

| Table 16 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE |
| 1. | Claim Submitted | 152 | 152 | 0 | 34% | 34% | 0% |
| 2. | No Claim Submitted | 294 | 298 | +4 | 66% | 66% | 0% |
| 3. | Within 30-Day Deadline | 1 | 1 | 0 | <1% | <1% | 0% |
| 4. | **Totals** | **447** | **451** | **+4** | | | |

22.   ***Supplemental Derivative Claimant Awards.***  Section G of the Overview of Derivative Claimant Process on the Settlement Website (https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf) explains how Supplemental Derivative Claimant Awards are handled.  As discussed in Paragraph 9 of this Status Report, we issued Notices of Supplemental Monetary Award to nine Retired NFL Football Players.  Six Retired NFL Football Players had no registered Derivative Claimants associated with them, and two Retired NFL Football Players each had one registered Derivative Claimant, but neither Derivative Claimant submitted a Derivative

Claim Package to share 1% of the Retired NFL Football Player's earlier Monetary Award and was not eligible for any portion of that Player's Supplemental Monetary Award.  The ninth Player's Supplemental Monetary Award Notice had a 1% offset for potential Derivative Claimant Awards, which we assigned in our first Notice of Supplemental Derivative Claimant Award issued on August 11, 2020.

## VII.   OTHER CLAIM PROCESSES

23.   ***Handling of Attempted Assignments of Claims.***  On September 27, 2019, the Court issued a Notice (Document 10858) directing us to streamline the process regarding attempted assignments by Settlement Class Members of claims to third-party lenders.  At that time, we suspended the process for handling such assignment questions under the Rules Governing Assignment of Claims and worked with the Court and the Special Master to modify these Rules.  On March 19, 2020, the Special Masters adopted the Rules Governing Payment of Claims Involving Third-Party Funders and the Rules Governing Third-Party Funding Resolution Protocol, which superseded the previous Rules (collectively, the "New Payment Rules").  Under the New Payment Rules Governing Payment of Claims Involving Third-Party Funders, all Settlement Class Members must complete and submit a Sworn Statement regarding the Status of Assignment of Monetary Claim ("SWS-5") to receive payment. There are two versions of the SWS-5, one for those identified as a borrower by a Third-Party Funder that is participating in the Rules Governing Third-Party Funding Resolution Protocol ("Resolution Protocol") (the SWS-5(A)) and another for those not so identified (the SWS-5(B)).  As of September 14, 2020, 20 Third-Party Funder entities are participating in the Resolution Protocol.  We have worked with those participating funders to

resolve cash advances for 10 Settlement Class Members since the adoption of the New Payment Rules.

24.     ***Petitions for Deviation from the Attorneys' Fee Cap.***[24]  We have received seven Petitions for Deviation, one of which was withdrawn.  The Court resolved two of the remaining six Petitions for Deviation in conjunction with the Attorneys' Liens Dispute Process; one Court decision on a Petition in the Attorneys' Liens Dispute Process was appealed and recently upheld by the Third Circuit.  The other three Petitions are pending final resolution.

25.     ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a) Table 17 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 9:

| Table 17 | | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | **AS OF 6/15/20** | **AS OF 9/14/20** | **CHANGE** | **AS OF 6/15/20** | **AS OF 9/14/20** | **CHANGE** | **AS OF 6/15/20** | **AS OF 9/14/20** | **CHANGE** |
| 1. | Attorneys' | 1,205[25] | 1,224[26] | +19 | 464 | 466 | +2 | 290 | 280 | -10 |
| 2. | Child Support | 346 | 347 | +1 | 50 | 50 | 0 | 20 | 20 | 0 |
| 3. | Judgment | 64 | 64 | 0 | 15 | 15 | 0 | 6 | 8 | +2 |
| 4. | Tax | 55 | 55 | 0 | 3 | 3 | 0 | 0 | 0 | |
| **5.** | **Totals** | **1,670** | **1,690** | **+20** | **532** | **534** | **+2** | **316** | **308** | **-8** |

---

[24] Judge Brody entered a Memorandum and Order in April of 2018 limiting attorneys' fees in the Program to 22% of each SCM's Monetary Award, plus reasonable costs (ECF Nos. 9862 and 9863).  In the Memorandum, the Judge decided that attorneys should have the opportunity to petition the Court to go above and beyond the cap in exceptional circumstances, which is what the Petitions for Deviation process is meant to cover.
[25] These 1,205 Attorneys' Liens were asserted by 52 law firms.
[26] These 1,224 Attorneys' Liens were asserted by 53 law firms.

(b) Table 18 shows the status of Liens in the Attorneys' Liens dispute resolution

process:

| Table 18 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[27] | | |
|---|---|---|---|
| PENDING | RESOLVED | | TOTAL |
| | BY AGREED WITHDRAWAL | BY COURT DETERMINATION | |
| 23 | 77 | 9 | 109 |

(c) Table 19 breaks down the Non-Medical Lien holdbacks[28] by Lien type:

| Table 19 | | NON-MEDICAL LIEN HOLDBACKS | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN HOLDBACKS |
| 1. | Attorneys' | 13 | $12,476,892 | $2,048,797.33 |
| 2. | Child Support | 3 | $1,083,315.38 | $13,593.78 |
| 3. | Judgment | 1 | $3,192,046 | $229,733.96 |
| 4. | Tax | 0 | N/A | N/A |
| 5. | Totals | 17 | $16,752,253.38 | $2,292,125.07 |

(d) Table 20 summarizes the Non-Medical Lien payments by Lien type:

| Table 20 | | NON-MEDICAL LIEN PAYMENTS | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN PAYMENTS |
| 1. | Attorneys' | 81 | $94,415,555.63 | $6,233,751.66 |
| 2. | Child Support | 12 | $11,437,991.60 | $486,492.42 |
| 3. | Judgment | 5 | $5,802,161.20 | $2,867,886.18 |
| 4. | Tax | 1 | $33,282.80 | $6,492.65 |
| 5. | Totals | 99 | $111,688,991.23 | $9,594,622.91 |

---

[27] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.

[28] The holdbacks are the amount of funds we are withholding pending resolution of a Dispute. As of 9/14/20, there are 23 disputed Attorneys' Liens currently pending resolution by Judge Strawbridge where the Settlement Class Member has received payment of the rest of his Monetary Award. After the Court enters a final order (whether by Judge Strawbridge or Judge Brody's approval of his Report and Recommendation) resolving the Disputes and any appeal period passes, we disburse the held back funds on the next available monthly Disbursement.

## VIII.   COMMUNICATIONS CENTER FOR THE PROGRAM

26.      *Our Contact Activity.*  Since our contact center opened on February 6, 2017, we have handled 75,220 total communications, including 51,387 calls made or received and 25,562 emails to us at our Claims Administrator email box.  Since Status Report No. 9, we handled 1,364 such total communications.  The most common topics of these communications have been General Settlement Information, Payment, Change in Lawyers, Audit, and Baseline Assessment Program (BAP).

27.      *Law Firm Contacts.*  Our Law Firm Contacts are assigned to 551 different law firms or lawyers representing Settlement Class Members in the Program.  This is six more law firms or lawyers than we reported in Status Report No. 9.  The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 26 above.

28.      *Newsletters.* Since Status Report No. 9, we issued three more editions of our "Insights" newsletter (June 2020, July 2020 and August 2020).  We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail.  We also post them to the Settlement Website (under "Documents" click "Newsletters").  We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters.

29.      *Settlement Program Website.* We regularly update the Settlement Website to reflect progress and changes to the Program.  We have made these changes since Status Report No. 9:

    (1) Posted a Notice Regarding Special Investigations (Document 11110, filed July 1, 2020) on the Other Court Filings page at https://www.nflconcussionsettlement.com/Other_Court_Filings.aspx.

    (2) Posted a Report of the Special Masters (Document 11117, filed July 6, 2020), Claims Administrator Status Report No. 9 (Document 11116, filed July 6, 2020) and BAP Administrator Status Report 2nd Quarter 2020 (Document 11115, filed July 6, 2020) to the Status Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.

Since Status Report No. 9, the Program's Home page has had 25,499 more unique visits, giving us 502,464 total unique visits, coming from 190 countries and all 50 of the United States.  The top five downloaded documents since Status Report No. 9 in June 2020 were the Settlement Agreement (447 clicks), Monetary Award Grid (112 clicks), Diagnosis and Review Table (75 clicks), Exhibit 1 Injury Definitions (38 clicks) and Rules Governing Appeals of Claim Determinations (36 clicks).  The three most frequently visited pages were Physician Search (1,137 unique views), Published Special Master Decisions – Monetary Award Claims (925 unique views) and Reports and Statistics (825 views).

## IX.    SPECIAL MASTERS

30.    ***Our Work with the Special Masters.***  Since Status Report No. 9, we continue to have regularly scheduled calls to discuss policy and operational issues, and have held 96 such calls with the Special Masters to date.  We have many other calls and exchange countless emails with them to address issues as they arise.  The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

31.    ***Program Rules.***  Since Status Report No. 9, we have not posted any new or revised sets of Rules.  There are 10 sets of Rules available on the Settlement Website (under "Documents," click "Governing Rules") and on the online portals of law firms, lawyers and *pro se* Settlement Class Members.

32.    ***Published Decisions.***  Since Status Report No. 9, the Special Masters have issued 10 new decisions they designated for publication.  These decisions dated June 24, 2020, through September 5, 2020, all relate to issues that affect how we analyze claims for Monetary Awards.  We post all such rulings to the Settlement Website (under "Documents," click "Special Master"

below "Published Decisions").  The Special Masters have so far issued 21 published Monetary

Award appeal decisions and nine Audit decisions (30 total such decisions).

## X.    PROCEDURES AND FREQUENTLY ASKED QUESTIONS

**33.    *Frequently Asked Questions*.**  Since Status Report No. 9, we added a new

category of FAQs named "External Evidence," which includes these five FAQs:

> (a) FAQ 355 ("What is External Evidence?");
>
> (b) FAQ 356 ("Why does the Claims Administrator receive External Evidence?");
>
> (c) FAQ 357 ("What happens after the Claims Administrator receives or finds External Evidence?");
>
> (d) FAQ 358 ("Is the External Evidence available to Class Counsel and the NFL Parties?"); and
>
> (e) FAQ 359 ("I received a Notice of External Evidence.  What should I do?").

We also added these new FAQs to other existing categories:

> (a) FAQ 92 ("If a Retired NFL Football Player shares past medical records with a Qualified MAF Physician, is that physician permitted to ask the Player to submit additional records?");
>
> (b) FAQ 93 ("May Qualified MAF Physicians rely on records from providers who were disqualified or terminated because their medical practices and/or reasoning did not comply with the Settlement Program's specific requirements and criteria?");
>
> (c) FAQ 361 ("How much deference does the Claims Administrator give to the Diagnosing Physician's determination that neuropsychological testing is medically unnecessary?"); and
>
> (d) FAQ 362 ("How should a Qualified MAF Physician apply the Generally Consistent standard when making a Qualifying Diagnosis?").

There now are 362 FAQs in 17 categories.  "FAQs" is one of the options in the green menu

bar on the Settlement Website.  These FAQs contain links to other tools and resource guides

posted on the Settlement Website to help Settlement Class Members and their lawyers

navigate the Program.  The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs.  Note that when we add new FAQs, we place them within the existing set where it makes the most sense.  This means that the numbering of FAQs within the set may change from time to time.

## XI.   REGISTRATION

**34.   *Registration Submissions.***

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover Registration.  Table 21 here shows changes in the number of timely Registration submissions since our Status Report No. 9:

| Table 21 | TIMELY REGISTRATION SUBMISSIONS | | |
|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 6/15/20** | **AS OF 9/14/20** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,903 | 15,897 | -6 |
| 2. | Representative Claimants | 1,340 | 1,346 | +6 |
| 3. | Derivative Claimants | 3,311 | 3,313 | +2 |
| 4. | **Totals** | **20,554** | **20,556** | **+2** |

The number of Retired NFL Football Players (Row 1) went down by six from Status Report No. 9 because they were replaced by Representative Claimants.  Of the 20,556 to whom we issued Registration notices, we were able to confirm that 19,395 of them are Settlement Class Members under the Settlement Agreement, 12,837 of whom are Retired NFL Football Players eligible to participate in the BAP.  The other 1,161 persons are not Settlement Class Members under the Settlement Agreement because of one or more of these reasons:  (1) they were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not provide us with the information or support required by the Settlement Agreement to register, after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a

Derivative Claimant but did not have a relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals.  We have made determinations on 292 such Registrations and found that 158 (54%) of them presented good reasons to be allowed to register after August 7, 2017.  Table 22 shows the change in these numbers since Status Report No. 9:

| Table 22 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | STATUS | AS OF 6/15/20 | AS OF 9/14/20 | CHANGE |
| 1. | Accepted | 156 | 158 | +2 |
| 2. | Not Accepted | 132 | 134 | +2 |
| 3. | Totals | 288 | 292 | +4 |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge.  The NFL Parties also may challenge our good cause exception decisions.  We have received 378 challenges, which is one more than what we reported in Status Report No. 9.  Table 23 explains these challenges and what happened to them:

| Table 23 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | |
|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 245 | Settlement Class Member | 77 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |

| Table 23 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 23 | Settlement Class Member | 5 | 18 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | Totals | 378 | | 150 | 228 |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters.  Table 24 shows the appeals thus far and the Special Masters' rulings on them (no changes since Status Report No.9):

| Table 24 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO APPEALED | DECISION UPHELD | DECISION OVERTURNED |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 6 | Settlement Class Member | 5 | 1 |
| 5. | Totals | 36 | | 33 | 3 |

35.     *Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.*  The Special Masters have approved 423 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants.  There have been five new

Representative Claimant approvals and no new Derivative Claimant Representatives since Status Report No. 9.

## XII.   CONCLUSION

36.   ***General Status.***  We have 198,969 documents (20,955 gigabytes, or 20.5 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 2,371 more than when we filed Status Report No. 9. We have issued 38,079 notices (991 more since Status Report No. 9) of various kinds (Registration, claims, appeals, Audit, etc.) to 20,982 different persons since March 23, 2017, and developed over 100 different types of notices and forms for use in the Program.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By: _____

Orran L. Brown, Sr.
Virginia State Bar No.:  25832
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia  23231
Telephone:  (804) 521-7201
Facsimile:  (804) 521-7299
Email:  obrown@browngreer.com