# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>           Plaintiffs,<br><br>    v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.<br>           Defendants. | Civ. Action No.: 14-cv-00029-AB<br><br>**Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

# NFL PARTIES' OPPOSITION TO KEVIN HENRY'S AND NAJEH DAVENPORT'S MOTION FOR RELIEF

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................... 6

    A.    The Settlement Program Provides Diagnostic Services and Monetary
Awards ................................................................................................................. 6

    B.    The Diagnostic Process ...................................................................................... 8

    C.    Demographic Considerations and Normative Adjustments in the
Settlement Program's Neuropsychological Testing ........................................ 9

            (a)    Determining Premorbid Intellectual Functioning ............................. 9

            (b)    Tests of Current Cognitive Ability .................................................... 11

    D.    The Clinician's Interpretation Guide Recommendation .................................. 20

    E.    Claimants Henry and Davenport's Claims ...................................................... 23

ARGUMENT ......................................................................................................................... 24

I.    Claimants Have No Basis to Invoke Rule 60(b) ............................................................ 25

II.    The Clinician's Interpretation Guide Recommendation and Special Masters'
Decision Are Sound and Do Not Amend the Settlement Agreement ............................. 28

III.    Claimants' Purported Section 1981 Claim is Meritless ................................................. 31

    A.    Claimants Do Not Meet the Requirements for a Section 1981 Claim ............. 31

            (a)    Strict Scrutiny Does Not Apply to This Court's Review .................. 33

            (b)    Demographic Normative Adjustments Easily Pass Strict Scrutiny ... 35

CONCLUSION ...................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bakkali* v. *Walmart, Inc.*,
No. 20-CV-3440, 2020 WL 5517350 (E.D. Pa. Sept. 14, 2020) ...........................................31

*Bartlett* v. *Strickland*,
556 U.S. 1 (2009) .................................................................................................................35

*Blum* v. *Yaretsky*,
457 U.S. 991 (1982) ........................................................................................................33–34

*Brown* v. *Philip Morris Inc.*,
250 F.3d 789 (3d Cir. 2001) .........................................................................................25, 31

*Buck* v. *Davis*,
137 S. Ct. 759 (2017) ............................................................................................................28

*Budget Blinds, Inc.* v. *White*,
536 F.3d 244 (3d Cir. 2008) .................................................................................................28

*In re Cendant Corp. Prides Litig.*,
233 F.3d 188 (3d Cir. 2000) .................................................................................................27

*Comcast Corp.* v. *Nat'l Ass'n of African Am.-Owned Media*,
140 S. Ct. 1009 (2020) .................................................................................................25, 31–32

*Democratic Nat'l Comm.* v. *Republican Nat'l Comm.*,
673 F.3d 192 (3d Cir. 2012) .........................................................................................26–28, 34

*In re Diet Drugs.*,
706 F.3d 217 (3d Cir. 2013) .................................................................................................27

*Doe* v. *Kamehameha Sch./Bernice Pauahi Bishop Estate*,
470 F.3d 827 (9th Cir. 2006) ...............................................................................................33

*Doe* v. *Lower Merion Sch. Dist.*,
665 F.3d 524 (3d Cir. 2011) ...........................................................................................32–34

*Ehrheart* v. *Verizon Wireless*,
609 F.3d 590 (3d Cir. 2010) ...........................................................................................27–28

*Flores* v. *Barr*,
934 F.3d 910 (9th Cir. 2019) .........................................................................................21, 29

*Gen. Bldg. Contractors Ass'n, Inc.* v. *Pennsylvania*,
458 U.S. 375 (1982) .............................................................................................................32

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Gonzalez* v. *Crosby*,
  545 U.S. 524 (2005) .......................................................................................26

*Hibbard* v. *Penn-Trafford Sch. Dist.*,
  621 Fed. Appx. 718 (3d Cir. 2015) ................................................................26

*Juarez* v. *Nw. Mut. Life Ins. Co.*,
  69 F. Supp. 3d 364 (S.D.N.Y. 2014) ..............................................................32

*Martinez-McBean* v. *Gov't of V.I.*,
  562 F.2d 908 (3d Cir. 1977) .......................................................................25–26

*In re: Nat'l Football League Players' Concussion Inj. Litig.*,
  821 F.3d 410 (3d Cir. 2016) ...........................................................................20

*In re: Nat'l Football League Players' Concussion Inj. Litig.*,
  962 F.3d 94 (3d Cir. 2020) ........................................................................21, 29

*In re: Nat'l Football League Players' Concussion Inj. Litig.*,
  307 F.R.D. 351 (E.D. Pa. 2015) .............................................................. passim

*Nunez* v. *Temple Prof'l Assocs.*,
  245 Fed. Appx. 144 (3d Cir. 2007) ............................................................24, 26

*Pigford* v. *Veneman*,
  292 F.3d 918 (D.C. Cir. 2002) ........................................................................28

*Pollard* v. *Wawa Food Mkt.*,
  366 F. Supp. 2d 247 (E.D. Pa. 2005) .............................................................32

*Pryor* v. *NCAA*,
  288 F.3d 548 (3d Cir. 2002) ...........................................................................35

*Regents of Univ. of California* v. *Bakke*,
  438 U.S. 265 (1978) .......................................................................................35

*Seese* v. *Volkswagenwerk, A.G.*,
  679 F.2d 336 (3d Cir. 1982) ...........................................................................26

*Shelley* v. *Kraemer*,
  334 U.S. 1 (1948) ...........................................................................................34

*White* v. *NFL*,
  585 F.3d 1129 (8th Cir. 2009) ........................................................................28

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

**STATUTES**

42 U.S.C. § 1981 ................................................................................................. passim

**OTHER AUTHORITIES**

Adam M. Brickman et al., *Ethical Issues in Cross-Cultural Neuropsychology*,
   13(2) APPLIED NEUROPSYCHOLOGY 91 (2006) ................................................12, 15

David Freedman & Jennifer J. Manly, *Assessment of Cognition in African
   American Older Adults*, *in* APA HANDBOOK OF DEMENTIA 107 (2018) ....................13–15, 19

Desiree A. Byrd et al., *Early Environmental Factors, Ethnicity, and Adult
   Cognitive Test Performance*, 20 THE CLINICAL NEUROPSYCHOLOGIST 243
   (2006) ...........................................................................................................13–14, 16

Heather R. Romero et al., *Challenges in the Neuropsychological Assessment of
   Ethnic Minorities: Summit Proceedings*, 23 THE CLINICAL
   NEUROPSYCHOLOGIST 761 (2009) ...............................................................16, 18–19

James A. Holdnack & Larry G. Weiss, *Demographic Adjustments to WAIS-
   IV/WMS-IV Norms*, *in* WAIS-IV, WMS-IV, and ACS: Advanced Clinical
   Interpretation 171 (James A. Holdnack et al. eds. 2013) ................................ passim

James A. Holdnack & Larry G. Weiss, *Predicting Premorbid Ability for WAIS-IV,
   WMS-IV, and WASI-II*, *in* WAIS-IV, WMS-IV, and ACS: Advanced Clinical
   Interpretation 217 (James A. Holdnack et al. eds., 2013) ........................................10

Jason Brandt, *2005 INS Presidential Address: Neuropsychological Crimes and
   Misdemeanors*, 21 THE CLINICAL NEUROPSYCHOLOGIST 553 (2006) .............................17–18

Jennifer J. Manly & Ruben J. Echemendia, *Race-Specific Norms: Using the
   Model of Hypertension to Understand Issues of Race, Culture, and Education
   in Neuropsychology*, 22 CLINICAL NEUROPSYCHOLOGY 319 (2007).......................17

Jennifer J. Manly, *Advantages and Disadvantages of Separate Norms for African
   Americans*, 19 THE CLINICAL NEUROPSYCHOLOGIST 270 (2005) ......................17–18

Jennifer J. Manly, *Deconstructing Race and Ethnicity*, 44(11) MEDICAL CARE S10
   (Supp. 3 2006)...........................................................................................................15–16

John A. Lucas et al., *Mayo's Older African Americans Normative Studies:
   Normative Data for Commonly Used Clinical Neuropsychological Measures*,
   19 THE CLINICAL NEUROPSYCHOLOGIST 162 (2005).......................................14–15

iv

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

Joshua W. Kirton et al., *Comparison of Models of Premorbid IQ Estimation Using the TOPF, OPIE-3, and Barona Equation, With Corrections for the Flynn Effect*, 34(1) AM. PSYCH. ASS'N: NEUROPSYCHOLOGY 43 (2020) ................................10

Julie Akiko Gladsjo et al., *Norms for Letter and Category Fluency: Demographic Corrections for Age, Education, and Ethnicity*, 62(2) PSYCH. ASSESSMENT 147 (1999) ................................................................................................................17

Marc. A. Norman et al., *Demographically Corrected Norms for African Americans and Caucasians on the Hopkins Verbal Learning Test-Revised, Brief Visuospatial Memory Test-Revised, Stroop Color and Word Test, and Wisconsin Card Sorting Test 64-Card Version*, 33(7) J. CLINICAL AND EXPERIMENTAL NEUROPSYCHOLOGY 793 (2011) ............................................14–16

Maura Mitrushina et al., *Handbook of Normative Data for Neuropsychological Assessment* 33 (2nd Ed. 2005) ........................................................................11–12

Milushka M. Elbulok-Charcape et al., *Trends in the Neuropsychological Assessment of Ethnic/Racial Minorities: A Survey of Clinical Neuropsychologists in the United States and Canada*, 20(3) CULTURAL DIVERSITY AND ETHNIC MINORITY PSYCH. 353 (2014) ........................................19

Monica Rivera Mindt et al., *Increasing Culturally Competent Neuropsychological Services for Ethnic Minority Populations: A Call to Action*, 24 THE CLINICAL NEUROPSYCHOLOGIST 429 (2010) ..............................................................14, 19

Order, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, No. 2:10-md-02179-CJB-JCW (E.D. La. Oct. 23, 2017), ECF No. 23570 ............................21

Order, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, No. 2:10-md-02179-CJB-SS (E.D. La. Jul. 26, 2013), ECF No. 10877 ................................21

Patrick F. McKay et al., *The Effects of Demographic Variables and Stereotype Threat on Black/White Differences in Cognitive Ability Test Performance*, 18(1) J. OF BUS. AND PSYCH. 1 (2003) ...............................................................15

Philip G. Gasquoine, *Race-Norming of Neuropsychological Tests*, 19 NEUROPSYCHOLOGY REV. 250 (2009) ..............................................................18

Robert K. Heaton et al., *Demographic Influences and Use of Demographically Corrected Norms in Neuropsychological Assessment of Neuropsychiatric Disorders* 127 (2009) ........................................................................................16

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

Robert K. Heaton et al., *Revised Comprehensive Norms for an Expanded*
  *Halstead Reitan Battery: Demographically Adjusted Neuropsychological*
  *Norms for African American and Caucasian Adults* (2004)....................................................13

RULES

Rule 23(c), *Rules Governing Appeals of Claim Determinations*, NFL Concussion
  Settlement Website (Jan. 7, 2019) ........................................................................................30

Fed. R. Civ. P. 60(b) ................................................................................................... passim

TREATISES

4 Newberg on Class Actions § 12:25 (5th ed.) ....................................................................21

Ann. Manual Complex Lit. § 21.66 (4th ed.)........................................................................21

22 N.Y. Jur. 2d Contracts § 201............................................................................................28

22 N.Y. Jur. 2d Contracts § 261............................................................................................28

8 Williston on Contracts § 19:70 (4th ed.)............................................................................28

The National Football League and NFL Properties LLC (collectively, the "NFL Parties") respectfully submit this memorandum of law in opposition to Settlement Class Members Kevin Henry's and Najeh Davenport's (together, "Claimants") motion for relief under Article XXVII of the Settlement Agreement or relief from Judgment, ECF No. 11169 (the "Motion").

## PRELIMINARY STATEMENT[1]

Claimants' Motion—at bottom accusing the NFL Concussion Settlement Program of race discrimination arising out of independent neuropsychologists' widely-accepted practice of using demographic normative adjustments to accurately score diagnostic testing—has no basis in law or fact and should be summarily denied.

As this Court is well aware, the Concussion Settlement was the result of detailed, arms-length negotiations between the NFL Parties and Class Counsel, was developed with assistance from top medical experts, was modified to address concerns articulated by the Court, and was finally approved by this Court and the Third Circuit more than four years ago, after a searching review of its terms and full evidentiary consideration of all objections mounted against it. Pursuant to the Settlement Agreement, the NFL Parties and Class Counsel agreed to a long-term Settlement Program operated by both a neutral Court-appointed Claims Administrator and a neutral administrator for the Settlement's Baseline Assessment Program (the "BAP Administrator") and guided at every turn by leading neurologists and neuropsychologists. The Program provides baseline examinations for Retired Players and a process for Retired Players with qualifying diagnoses of neurocognitive impairment ("Qualifying Diagnoses") to submit claims for Monetary Awards. To date, in the four years that the Settlement Program has been in operation,

---

[1]    Capitalized terms not otherwise defined have the meaning assigned to them in the Settlement Agreement. Citations to "Ex." are to exhibits to the Declaration of Dr. Scott Richard Millis ("Millis Decl.").

the NFL Parties have funded more than $750 million in Monetary Awards to Retired Players with Qualifying Diagnoses and have committed to pay all qualifying claims through the life of the Settlement Program.

In the Program, *independent* medical clinicians examine the Retired Players and are authorized to render Qualifying Diagnoses consistent with negotiated and expert-driven criteria underlying each Diagnosis. For certain Diagnoses—specifically, Level 1.5 and Level 2 Neurocognitive Impairment—the Settlement Program prescribes neuropsychological testing as part of the evaluation process. In negotiating the Settlement Agreement, the Parties relied on leading experts to identify a battery of established and validated neuropsychological tests in order to facilitate the most accurate diagnoses. Any such Diagnosis is made solely by the clinician administering the tests, and is subject to review and approval by the neutral Claims Administrator. To be clear, neither the NFL Parties nor Class Counsel participates in the clinical diagnoses.

The neuropsychological test battery consists entirely of well-established and well-validated tests commonly used in the neuropsychological community. These tests were not developed for the Settlement Program; to the contrary, their use long predates implementation of this Settlement Program and they remain widely used today. So, too, are the demographic normative adjustments (or "norms") used in connection with the scoring of these tests, which norms account for numerous characteristics such as age, gender, years of education, and race or ethnic background. Those norms seek to achieve more accurate results by allowing an individual's raw testing scores to be converted to scaled scores and compared with the "average" scores of individuals with similar demographic characteristics in order to determine if there is any score deviation such that the individual should be considered impaired. This practice of closely matching an individual's comparison group to the individual's demographics seeks to ensure that

2

any score deviation is due to legitimate impairment rather than non-cognitive factors (*e.g.*, test bias, quality of education, and "stereotype threat"—fear that one might confirm negative stereotypes about their group).  Critically, *nothing in the Settlement Agreement mandates the use of any specific normative adjustments in connection with a diagnostic evaluation*.  Rather, a provision in a clinician's guide—expressly contemplated by the Settlement Agreement to assist in application of the Settlement's diagnostic criteria (the "Clinician's Interpretation Guide" or "Guide")—"recommends," but does not require, application of full demographic (including race-based) norms in scoring the tests.  The inclusion of this recommendation was not suggested by the NFL Parties.  Rather, the neutral BAP Administrator suggested its inclusion based on advice from its own experts.  Consistent with this approach, and as the Special Masters' recent decision highlights, race-based normative adjustments are not required and no claim will be denied solely because a clinician did not use them.

Moreover, as extensive expert literature confirms, the purpose of demographic adjustments, including for race or ethnicity, in connection with neuropsychological testing is not to discriminate against Black test-takers.  To the contrary, race-based demographic adjustments were developed to correct *errors* in neuropsychological testing which, without adjustment, misdiagnosed Black test-takers—incorrectly characterizing healthy individuals as cognitively impaired—at up to *three times* the rate as White test-takers.

Notwithstanding that the NFL Parties play *no* role in the rendering of Qualifying Diagnoses, that the challenged "recommendation" in the Clinician's Interpretation Guide derived from the neutral BAP Administrator and expert medical practice in order to avoid and not perpetuate bias, and that the Special Masters' decision confirms that there is no requirement that racial norms be used, Claimants purport to bring this motion pursuant to Article XXVII of the

Settlement Agreement, Federal Rule of Civil Procedure 60(b) ("Rule 60(b)"), and 42 U.S.C. 1981

("Section 1981"), claiming that the Settlement Program somehow perpetrates race discrimination

by imposing unlawful racial classifications as part of the neuropsychological testing program.

Claimants' motion has no merit, for several reasons.

As an initial but dispositive matter, Rule 60(b) provides no sound basis for

Claimants' request to be relieved from the final judgment here.  It is long settled that a Rule 60(b)

motion must rest on an "extraordinary" or "changed" circumstance.  This case presents no such

circumstances.  To the contrary, the availability of race-based norms and adjustments, and the fact

that clinicians may use them in connection with Settlement Program evaluations of *all* Retired

Players, was disclosed and evident to Retired Players from the outset.  To that end, the Settlement

Agreement explicitly states that (1) in order to estimate pre-injury cognitive ability, clinicians

would be able to choose among three tests, two of which account for demographic factors,

including specifically **"race/ethnicity"**, and (2) all of the neuropsychological tests for determining

current cognitive functioning had been selected **"based on the availability of demographically-

adjusted normative data for [both] Caucasians and African Americans."**  (Settlement Agmt.

Ex. 2 § 4 (emphasis added).)  All Settlement Class Members received notice of the Settlement

Agreement and had ample time to review and assert objections to these terms.  And while this

Court heard more than 80 written objections to the design of the Settlement Program and the

neuropsychological testing regime in particular, no objection was ever raised to challenge the

potential use of demographic adjustments—including race-based adjustments—in administering

the neuropsychological testing.  Simply put, all potential class members, including Claimants,

could have raised, but did not, their instant arguments in the proper forum:  as an objection or as

the basis for an appeal in connection with the approval of the Settlement Agreement.  Thus,

Claimants' motion is an impermissible *ex post* attack on the Settlement Agreement that cannot now be brought under Rule 60(b).

Second, there is no merit to Claimants' argument that independent clinicians' use of norms in the Settlement Program, as recommended by the Clinician's Interpretation Guide and consistent with clinical practice, constitutes an amendment to the Settlement Agreement or that the Special Masters' ruling is in any way improper. As noted, the potential use of such norms in the clinicians' discretion was clearly disclosed in the Settlement Agreement. And because these norms are widely used to achieve diagnostic accuracy—indeed the neutral BAP Administrator suggested they be recommended in this Program where diagnostic accuracy is paramount—the Special Masters were correct to permit their use and to allow the Claims Administrator to inquire into a clinician's rationale in choosing not to use them, to ensure that decision was consistent with the clinician's ordinary clinical practice (rather than a one-time, results-oriented decision) or otherwise appropriate in the context of the individual being evaluated. Because neither the Settlement Agreement nor the Special Masters' decision mandates or "presumes" the use of norms, but instead reserves such use to the reasoned discretion of individual clinicians, there is no basis and no need for this Court to overrule the thoughtful decision of the Special Masters.

Third, the Settlement Agreement's and Clinician's Interpretation Guide's provision for commonly-accepted normative adjustments, including race-based adjustments, to further diagnostic accuracy does not remotely constitute intentional racial discrimination in violation of Section 1981. To state a claim under Section 1981, Claimants must, among other elements, establish that race discrimination was the "but for" cause of their injury, and that the Parties to the Settlement Agreement had the requisite purposeful intent to treat Black Retired Players differently from White Retired Players. Claimants cannot come close to meeting these hurdles. Here, the

Settlement Agreement indisputably provided for the use of demographic adjustments—including for race—for the sole purpose of achieving diagnostic accuracy for all Retired Players.  And the Special Masters' decision puts to rest any concern that race-based demographic normative adjustments are required, or that a clinicians' failure to use them will ever be the "but for" cause of any injury:  the Special Masters' decision expressly notes that clinicians may choose not to use race norms, and that such a determination cannot serve as the sole basis for a claim's denial.

Moreover, in the two particular claims at issue in this Motion, there is no question that the norms were not the cause of any injury to Claimants.  Claimant Henry's claim was denied on the independent ground that he failed multiple validity tests indicating that his neuropsychological testing was unreliable.  Notably, Claimant Henry never appealed this denial, which forecloses this application as a procedural matter.  By contrast, Claimant Davenport's claim has not been finally determined yet.  While it was appealed on several independent grounds, including a failure to satisfy the functional impairment requirement for the Diagnosis, the claim has been remanded by the Special Masters to the Claims Administrator to inquire of the relevant clinician how his choice of norms relates to his normal practice.  Thus, Claimant Davenport's motion is procedurally foreclosed as well.

For these reasons, and those set forth herein, the NFL Parties respectfully submit that Claimants' Motion should be denied.

## **BACKGROUND**

### A.      **The Settlement Program Provides Diagnostic Services and Monetary Awards**

The Settlement Program was designed to accomplish two goals:  (1) provide accurate baseline clinical assessments to Retired Players to understand their current condition; and (2) provide Monetary Awards to Retired Players diagnosed with Qualifying Diagnoses.

Three diagnoses rely on neurocognitive testing:  (1) Level 1 Neurocognitive

Impairment (moderate cognitive impairment); (2) Level 1.5 Neurocognitive Impairment (early dementia); and (3) Level 2 Neurocognitive Impairment (moderate dementia).  (Settlement Agmt. at § 6.3(a), Ex. 1.)  Level 1.5 and Level 2 are Qualifying Diagnoses for which a Retired Player may receive a Monetary Award.  (*Id.* at § 6.3(a).)  A diagnosis of Level 1 Neurocognitive Impairment is not eligible for a Monetary Award; instead the Retired Player is entitled to receive reimbursement for treatment of the condition (*e.g.*, pharmaceuticals, counseling, examination by Program providers) up to a certain monetary threshold.  (*Id.* at § 5.11.)

Examinations for these diagnoses are available to Retired Players in two ways. Eligible Retired Players may receive free baseline cognitive examinations through the BAP to screen for and potentially diagnose Level 1, Level 1.5, or Level 2 Neurocognitive Impairment, or Retired Players may pay for an examination through a network of Qualified MAF Physicians qualified to render the full array of Qualifying Diagnoses, including Level 1.5 and Level 2 Neurocognitive Impairment.  (Settlement Agmt. §§ 5, 6.5.)[2]  Through both avenues, Retired Players are examined by independent neurologists and neuropsychologists selected by the neutral Claims Administrator and approved by the Parties.  (*Id.*)  Evaluations are conducted and diagnoses are rendered in the independent clinicians' discretion, with no involvement from the Parties.

Because certain Qualifying Diagnoses are progressive in nature, Retired Players may seek additional examinations over the Settlement Program's 65-year term.  Thus, Retired Players who were previously evaluated and did not receive a Qualifying Diagnosis may qualify for one in the future should their condition deteriorate.  Likewise, Retired Players who receive a Qualifying Diagnosis for a less severe cognitive impairment (*e.g.*, Level 1.5) may be reevaluated

---

[2]    In addition, MAF Physicians can render Qualifying Diagnoses of Alzheimer's Disease, Parkinson's Disease, and ALS.  (*Id.*)

at a later date to qualify for a more severe Qualifying Diagnosis (*e.g.*, Level 2) and potentially a Supplemental Monetary Award.  (*Id.* at § 6.8.)

### B.    The Diagnostic Process

BAP evaluations consist of two examinations:  (1) a specified cognitive test battery administered by an approved BAP neuropsychologist, and (2) a basic neurological evaluation completed by a board-certified BAP neurologist.  (*Id.* at §§ 5.1–5.14.)  Diagnoses of Level 1, 1.5, and 2 Neurocognitive Impairment made through the BAP must be made in accordance with the Settlement Agreement's specific criteria for those Diagnoses.  (*Id.* at Ex. 1.)  These criteria require, among other things, that the Retired Players' cognitive test scores meet certain specified thresholds in two of five cognitive domains, and that the Retired Players demonstrate a specific level of functional impairment caused by cognitive deficits.  (*Id*.)  Qualifying Diagnoses of Level 1.5 and 2 Neurocognitive Impairment rendered by a MAF Physician (as opposed to in the BAP) must be made in a manner "generally consistent" with these BAP criteria, although the Claims Administrator is permitted to request a reasonable explanation of the MAF Physician for any Qualifying Diagnosis that diverges from the specific criteria outlined in the BAP.  (*Id.*)

The Settlement Agreement's test battery includes 22 individual tests to diagnose Levels 1, 1.5, and 2 Neurocognitive Impairment.  As this Court concluded in its Final Order Approving the Settlement (the "Final Order"), these tests were carefully selected by the Parties, based on the advice of leading experts in the field, as well-validated, widely-utilized tests that would be familiar to the neuropsychology community and result in accurate diagnoses.  (*Id.* at Ex. 2); *In re: Nat'l Football League Players' Concussion Inj. Litig.*, 307 F.R.D. 351, 412 (E.D. Pa. 2015), *amended*, No. 12-md-02323, 2015 WL 12827803 (E.D. Pa. May 8, 2015) [hereinafter *Final Order*] ("The Parties and their experts did not construct any test from scratch; each individual exam in the Test Battery is a well-established and validated tool for diagnosing neurocognitive

impairment in any age group and is supported by extensive empirical testing to ensure its validity.").

### C.     Demographic Considerations and Normative Adjustments in the Settlement Program's Neuropsychological Testing

As part of its diagnostic testing, the Settlement Agreement contemplates the use of demographic considerations and adjustments in two ways, consistent with standard practice in the neuropsychological community to further diagnostic accuracy:  (1) in the estimation of the Retired Player's level of intellectual functioning prior to any suspected cognitive decline ("premorbid intellectual functioning"), and (2) in scoring the results of a Retired Player's cognitive testing.

#### (a)     Determining Premorbid Intellectual Functioning

In order to determine whether a Retired Player has experienced a decline from a previous level of intellectual functioning, and to assess the extent of any such decline, a clinician must first determine the Retired Player's premorbid intellectual functioning.  (Settlement Agmt. Ex. 2 § 3.)  Under the Settlement Agreement, a clinician must estimate whether the Player had "Below Average," "Average," or "Above Average" premorbid intellectual functioning.  (*Id.*)

A Retired Player's estimated level of premorbid intellectual functioning dictates the thresholds he must meet on tests of current cognitive functioning in order to demonstrate the requisite impairment for each Qualifying Diagnosis.  For example, if a Retired Player had Above Average premorbid intellectual functioning, he does not have to demonstrate as poor performance on the cognitive testing to qualify for any particular Diagnosis as does an individual estimated to have had "Average" premorbid intellectual functioning.  That is because the diagnoses depend on decline from a prior level of functioning (that is, from premorbid intellectual functioning).  (*Id.*); *Final Order* at 404 ("Simply put, Retired Players with lower estimated pre-injury IQs must do comparatively worse on the same test to qualify for compensation than Retired Players with higher

pre-injury ability.").  As the Final Order makes clear, this design is "based on preexisting empirical research" and reflects the "'well-known [fact] . . . that premorbid ability has a profound effect on the expression of deficits following brain injury or disease."[3]

In standard clinical practice, and in the Settlement Program, premorbid intellectual functioning is estimated using one of three methods, selected in the examining practitioner's discretion:  (1) a reading test (the "Test of Premorbid Functioning" or "TOPF"), (2) estimation based purely on the individual's demographics, or (3) a combined method that relies both on the reading test and the individual's demographics.  (Settlement Agmt. Ex. 2 § 3.)  The Settlement Agreement provides that, as in clinical practice, where demographics were considered, this would include "race/ethnicity."  (*Id*. ("For each model using demographic data, a simple and complex prediction equation can be selected.  In the simple model, only sex, ***race/ethnicity***, and education are used in predicting premorbid ability.  In the complex model, developmental, personal, and more specific demographic data is incorporated into the equations.  The clinician should select a model based on the patient's background and his or her current level of reading or language impairment." (emphasis added)).)[4]  The Parties adopted this framework because it was—and remains—the long-standing standard approach in clinical practice to achieve an accurate estimate

---

[3]   *Id.* at 404 (quoting Decl. of Dr. John Keilp ¶ 33, ECF No. 6423-20); (*see also* Millis Decl. ¶ 18; Ex. 2 at 44 (Joshua W. Kirton et al., *Comparison of Models of Premorbid IQ Estimation Using the TOPF, OPIE-3, and Barona Equation, With Corrections for the Flynn Effect*, 34(1) AM. PSYCH. ASS'N: NEUROPSYCHOLOGY 43 (2020)) ("A critical component of psychological and neuropsychological evaluation involves comparison of test performance with estimates of overall intellectual ability (*e.g.*, IQ) to determine whether assessment results reflect a change from premorbid IQ.")).

[4]   (*See also* Millis Decl. ¶¶ 17, 19–20; Ex. 3 at 217–18, 220 (James A. Holdnack & Larry G. Weiss, *Predicting Premorbid Ability for WAIS-IV, WMS-IV, and WASI-II, in WAIS-IV, WMS-IV, and ACS: Advanced Clinical Interpretation* 217 (James A. Holdnack et al. eds., 2013)) (noting that "[i]n neuropsychological assessment, the estimation of a premorbid intelligence is generally used as a comparison standard" and that "[t]ypically" the estimate is derived from "demographic data only, current performance data only, or a combination of demographic and current performance data"); *id.* at 236 ("The TOPF provides clinicians with three models for predicting premorbid functioning:  (a) demographics only, (b) TOPF only, (c) combined demographics and TOPF prediction equations. . . .  The clinician should select a model based on the patient's background and his or her current level of reading or language impairment.").)

of premorbid intellectual functioning.  (*Id.*)  The evaluating clinician may choose in his or her expert discretion to use any of these three options for estimating premorbid intellectual functioning, regardless of the Retired Player's race or ethnicity.  The Parties play no role whatsoever in the clinician's decision as to which of these well-established tests are used in the evaluation of premorbid intellectual functioning.

During the Court's consideration of the Settlement Agreement, no Class Member objected to the potential use of demographic factors, including race/ethnicity, in determining premorbid intellectual functioning.  Instead, one objection challenged the one method that did *not* incorporate demographic factors:  "Some Objectors argue[d] that the TOPF disadvantages those with accents because one component [the reading test] asks participants to read a list of words and pronounce them exactly."  *Final Order* at 412 n.81; (*see also* Millis Decl. ¶ 19).  The Court dismissed that objection, noting that the TOPF "also includes demographic formulas" as an alternative means of assessing premorbid intellectual functioning that can take such individual characteristics into account.  *Id.*  The Final Order approving the Settlement expressly determined that "using the [TOPF] together with a complex demographics statistical model . . . is a fair and reasonable manner to account for individual variability."  *Final Order* at 404 (quoting Decl. of Dr. Richard Hamilton ¶ 15, ECF No. 6423-25).

### (b)  Tests of Current Cognitive Ability

The Settlement Agreement's 22 tests of current cognitive ability and processing result in a set of raw scores.  Consistent with clinical practice, the Settlement Agreement requires that those raw scores be converted to common scale scores (*e.g.*, "T scores") for assessment. (Settlement Agmt. Ex. 2 at 6–8; Ex. 4 (Maura Mitrushina et al., *Handbook of Normative Data for Neuropsychological Assessment* 33–56 (2nd Ed. 2005) ("*Handbook of Normative Data*")).)

To obtain a Retired Player's T score, the neuropsychologist compares the Player's

unique raw scores to the raw scores obtained from a sample of unimpaired individuals with comparable characteristics.  (Aug. 20, 2020 Special Masters' Determination ("Special Masters' Determination") at 3; Millis Decl. ¶¶ 21–23; Ex. 4 (*Handbook of Normative Data*).)  "The accuracy of diagnosis is best when the patient is demographically similar to those individuals included in the normative data set[.]"  (Ex. 5 at 94 (Adam M. Brickman et al., *Ethical Issues in Cross-Cultural Neuropsychology*, 13(2) APPLIED NEUROPSYCHOLOGY 91 (2006) ("*Cross-Cultural Neuropsychology*")); *see also id.* ("[C]omparison of a patient to individuals matched on demographic features, including race, is appropriate."); Millis Decl. ¶ 24.)  A bell curve is created such that the *average* score obtained by the unimpaired comparable sample population is represented by a T score of 50.  (Ex. 4 (*Handbook of Normative Data*); Millis Decl. ¶ 23.)  The Retired Player's raw scores are then converted to T scores that reflect how far (if at all) the Retired Player deviates from his comparable group's mean unimpaired score (50).  (*Id.*)  This allows a clinician to determine, with accuracy, whether, and to what extent, the individual is impaired.

Thus, a crucial step in accurately scoring an individual's current cognitive ability is the clinician's selection of the unimpaired comparable sample population against which the individual's raw score can be "scaled," or, put another way, "normed."  In standard clinical practices—both at the time of the Settlement and continuing today—full demographic normative adjustments accounting for a wide range of characteristics, including age, education, gender, and race, have typically been used to norm an individual's raw scores in an effort to achieve diagnostic accuracy.  (Millis Decl. ¶ 24; Ex. 6 at 173 (James A. Holdnack & Larry G. Weiss, *Demographic Adjustments to WAIS-IV/WMS-IV Norms*, *in WAIS-IV, WMS-IV, and ACS: Advanced Clinical Interpretation* 171 (James A. Holdnack et al. eds. 2013) ("*Holdnack on Demographic Adjustments*")) ("The ACS demographic adjusted norms incorporate three demographic variables

that have been used in research and clinical practice for decades:  sex, education, and race/ethnicity.").)[5]

The goal of using race-based norms in this context is to correct for racial bias, not to perpetuate it, and to achieve accurate diagnoses.  Race-based demographic adjustments were designed by neuropsychologists to correct for the fact that certain racial groups were consistently obtaining disproportionately low scores on cognitive testing and were being *incorrectly* classified as cognitively impaired.  (Millis Decl. ¶ 26.)  Indeed, research showed that, when unadjusted for race, testing "typically results in a substantial (sometimes up to three-fold) increase in the probability of misclassifying normal African Americans as having brain disorders, as compared to misclassification rates for Caucasians."  Robert K. Heaton et al., *Revised Comprehensive Norms for an Expanded Halstead Reitan Battery: Demographically Adjusted Neuropsychological Norms for African American and Caucasian Adults* 4 (2004);[6] (Millis Decl. ¶ 26).  For example, researchers had identified unacceptable rates of misdiagnosis of Black and Hispanic test-takers as compared to White test-takers when race was not accounted for in scoring widely-used tests included in the Settlement Program's battery.  (Ex. 6 at 189 (*Holdnack on Demographic*

---

[5]  (*See also* Ex. 7 at 255–56 (Desiree A. Byrd et al., *Early Environmental Factors, Ethnicity, and Adult Cognitive Test Performance*, 20 THE CLINICAL NEUROPSYCHOLOGIST 243 (2006) ("*Early Environmental Factors and Cognitive Test Performance*")) (recommending clinicians "use ethnicity-specific normative data when evaluating African American clients.  In the absence of such data, neuropsychologists should exercise considerable caution when using Caucasian-based (or Caucasian-dominated) normative standards to interpret African American test scores . . . ."); *see also* Ex. 11 at 109, 114 (David Freedman & Jennifer J. Manly, *Assessment of Cognition in African American Older Adults*, *in* APA HANDBOOK OF DEMENTIA 107 (2018) ("*Assessment of Cognition*")) ("Because [prior cognitive test data representing the test-taker's unimpaired scores] rarely exist, as a best estimate neuropsychologists use comparison groups of similarly situated people who are currently performing everyday tasks without limitations, problems, or disability.  Traditionally, similarity has been operationalized as age, sex, and years of education," but "additional consideration of the examinee's race/ethnicity . . . dramatically improve[s] specificity of the test when used among ethnic minorities" and "[u]se of separate norms for African Americans is appropriate" when the goal is diagnostic accuracy).)

[6]  This document is not attached as an exhibit as we understand the neuropsychological community considers it highly confidential and is concerned the integrity of certain confidential data therein could be compromised if broadly shared.  The NFL Parties note that neuropsychologists, including AAPC neuropsychologists available to the Court, have access to this document.

*Adjustments*) (When race is not accounted for, "15 to 20% of healthy Hispanics and up to 35% of healthy African-Americans may be misidentified as having general cognitive or memory dysfunction compared to 10–14% of Whites"); *see also* Millis Decl. ¶ 26.)[7]  These unacceptable rates of misdiagnosis continue to this day.  (*See* Millis Decl. ¶ 34; Ex. 11 at 107–10 (*Assessment of Cognition*) ("Most previous studies of ethnic group differences in performance on neuropsychological tests have shown that discrepancies between scores of different ethnic groups persist, despite equating groups on other demographic covariates such as age, education, gender, socioeconomic background, and medical history . . . .  These discrepancies cause . . . cognitively normal ethnic minorities [to be] more likely to be misdiagnosed as impaired than are Whites.").)

Misdiagnoses have serious public health implications as well as social and healthcare consequences for the patients and their families.  (*See, e.g.*, Millis Decl. ¶ 27; Ex. 10 at 794 (Marc. A. Norman et al., *Demographically Corrected Norms for African Americans and Caucasians on the Hopkins Verbal Learning Test-Revised, Brief Visuospatial Memory Test-Revised, Stroop Color and Word Test, and Wisconsin Card Sorting Test 64-Card Version*, 33(7) J. CLINICAL AND EXPERIMENTAL NEUROPSYCHOLOGY 793 (2011) ("*Demographically Corrected*

---

[7]  (*See also* Ex. 6 at 190 (*Holdnack on Demographic Adjustments*) ("Next to education level, race/ethnicity has the most impact on observed test performance.  Studies indicate that Hispanics and African Americans are at a higher risk for misidentification of cognitive impairment in the absence of a disease process."); Ex. 8 at 433 (Monica Rivera Mindt et al., *Increasing Culturally Competent Neuropsychological Services for Ethnic Minority Populations: A Call to Action*, 24 THE CLINICAL NEUROPSYCHOLOGIST 429 (2010) ("*A Call to Action*")) ("Numerous studies report the disproportionate rate of false-positive errors for neuropsychological disorders in African American and Latino communities."); Ex. 9 at 163 (John A. Lucas et al., *Mayo's Older African Americans Normative Studies: Normative Data for Commonly Used Clinical Neuropsychological Measures*, 19 THE CLINICAL NEUROPSYCHOLOGIST 162 (2005) ("*MOAANS*")) ("Studies of cognitive functioning in African Americans, however, have consistently documented an unacceptably high level of misclassification of normal individuals as impaired . . . [and] [a]ttempts to account for these misclassifications by controlling common demographic variables, such as age or years of education, have been largely unsuccessful."); Ex. 7 at 243 (*Early Environmental Factors and Cognitive Test Performance*) ("Disparities in neurocognitive test performance in people with different cultural backgrounds continue to perplex neuropsychologists and place ethnic minorities at greater risk for misdiagnoses when these tests are used for clinical purposes."); *id.* at 244 ("[N]eurologically normal African Americans tend to earn lower scores than Caucasians on tests of cognitive functioning . . . [t]he differences persist across age, gender, and educational levels.").)

*Norms*")) ("The overestimation of impairment with existing normative data can lead to misclassification and/or misdiagnosis of African American individuals and can have serious negative consequences for the patients and their families.").)  For example, a misdiagnosed individual could alter his career and retirement planning under the misunderstanding that his condition would progressively decline, or could undergo "unnecessary or inappropriate treatments."  (Ex. 9 at 163 (*MOAANS*).)

The reason for this racially discriminatory impact in cognitive testing remains the subject of much debate and study, but is widely understood to be the product of some combination of biased test content, socioeconomic factors, stereotype threat (*i.e.*, the test-taker's concern about potentially confirming negative stereotypes about his or her group), and other non-cognitive factors.  (Millis Decl. ¶ 28; Ex. 11 at 110–14 (*Assessment of Cognition*) (cognitive test performance is impacted by factors other than true cognitive impairment, including "experiences of discrimination and racism, as well as knowledge of historical cultural and institutional racism," "acculturation level," "stereotype threat" and "[s]ignificant gaps in quantity and quality of education [that] are found between ethnic minorities and Whites").)[8]  However, there were and are no validated normative adjustments available to correct for these particular factors, in part because

---

[8]     (*See also* Ex. 10 at 793–804 (*Demographically Corrected Norms*) ("Factors potentially contributing to raw [neuropsychological testing] score differences between African American and Caucasian groups may include academic exposure, education quality, academic resources, acculturation, socioeconomic status, social exposure, 'test wiseness,' societal discrimination."); Ex. 12 at 2 (Patrick F. McKay et al., *The Effects of Demographic Variables and Stereotype Threat on Black/White Differences in Cognitive Ability Test Performance*, 18(1) J. OF BUS. AND PSYCH. 1 (2003)) (discussing that *non-cognitive* factors, including stereotype threat and parental education level, contribute to the fact that "[o]n average, African Americans score approximately 1 standard deviation lower than Whites on cognitive ability tests"); Ex. 5 at 92–93 (*Cross-Cultural Neuropsychology*) ("[D]ifferences among groups do in fact exist, but they can be explained by a number of factors, some of which have been defined and some of which remain to be operationalized.  These factors include quality of education . . ., acculturation . . ., literacy . . ., and racial socialization."); *id.* at 93 ("Most neuropsychological tests that are used in clinical practice have been developed and validated with primarily non-Hispanic White normative cohorts.  Therefore, there may be an inherent bias in the tests themselves."); Ex. 13 at S10 (Jennifer J. Manly, *Deconstructing Race and Ethnicity*, 44(11) MEDICAL CARE S10 (Supp. 3 2006) ("*Deconstructing Race*")) (discussing that cognitive test performance is impacted by cultural experience, years and quality of education, socioeconomic status, and stereotype threat).)

"research so far suggests that they are difficult to assess and quantify retrospectively in adults." (Ex. 14 at 149 (Robert K. Heaton et al., *Demographic Influences and Use of Demographically Corrected Norms in Neuropsychological Assessment of Neuropsychiatric Disorders* 127 (2009) ("*Use of Demographically Corrected Norms*")); *see also* Millis Decl. ¶ 29.)  As a result, normative adjustments for race, which *are* available for many widely-used test measures (including all of the tests of cognitive performance in the Settlement Program), are used as a proxy for these factors in order to correct for the unacceptable rate of misdiagnosis in Black test-takers and in an effort to achieve diagnostic accuracy.  (*See id.*; *see also* Ex. 14 at 149 (*Use of Demographically Corrected Norms*) ("In the absence of currently available methods for quantifying such [nuanced] factors retrospectively and for using them to predict cognitive test performance in individual cases, one can at least avoid excessive false-positive error rates by using norms that are based upon data from normal people who are demographically (including ethnically) similar to the patient.").)[9]

At the time that the Settlement Program was developed, numerous studies confirmed that the use of race as a demographic adjustment substantially eliminated the unacceptable disparity in misdiagnosing healthy Black individuals as cognitively impaired.  (*See, e.g.*, Millis Decl. ¶ 29; Ex. 14 at 133–45 (*Use of Demographically Corrected Norms*) (noting

---

[9]   (*See also* Ex. 10 at 793 (*Demographically Corrected Norms*) ("It is considered unlikely that race has a direct causal effect on differences in adult cognition, so race/ethnicity is viewed as a proxy for other factors, much like has been discussed about education."); Ex. 15 at 765, 771–79 (Heather R. Romero et al., *Challenges in the Neuropsychological Assessment of Ethnic Minorities: Summit Proceedings*, 23 THE CLINICAL NEUROPSYCHOLOGIST 761 (2009) ("*2008 Summit Proceedings*")) ("The value of the construct of race is that it serves as an easily assessed proxy for more meaningful but complex variables."); Ex. 13 at S10 (*Deconstructing Race*) ("[R]ace/ethnicity serves as a proxy for" other outcome-determinative "variables such as quality of education, wealth, and perceived racism" which cannot yet be "explicit[ly] measure[d]" or normed against); Ex. 7 at 255 (*Early Environmental Factors and Cognitive Test Performance*) ("Results from this study further demonstrate that neuropsychologists cannot ignore ethnicity when evaluating clients in clinical or research settings . . . .  Until the sources of [racial] differences [in cognitive testing] are better understood, the best and most feasible remedy is for neuropsychologists to use ethnicity-specific normative data when evaluating African American clients."); Ex. 6 at 186–87 (*Holdnack on Demographic Adjustments*) ("[R]ace, ethnicity, and educational level, are proxy variables for a host of interacting and potentially additive environmental factors that more directly influence the development, maintenance, and decline of cognitive abilities across the life span.").)

various studies have "demonstrated that use of ethnicity corrections for the test norms eliminated the previously observed discrepancies in false-positive error rates between Caucasians and African Americans"); *id.* at 149 (the use of demographic norms including race/ethnicity "provide much more *equal* probability of the patient's being correctly classified as normal or abnormal, regardless of whether he/she is young or old, a high school dropout or college graduate, male or female, or White, Black, or Hispanic.   For diagnostic questions, this is the major purpose of norms." (emphasis in original)).)[10]

To be clear, the use of race-based norms in this manner is not without controversy. Some in the neuropsychological community have taken "positions that run contrary to the current *Zeitgeist*" and have cited various concerns in arguing that race normative adjustments should not be used, including that such adjustments: (1) could "norm[] away clinically important phenomena" if it is ultimately discovered that "conditions that cause cognitive impairment" are "more prevalent among African-Americans" (Ex. 19 at 554–55 (Jason Brandt, *2005 INS Presidential Address: Neuropsychological Crimes and Misdemeanors*, 21 THE CLINICAL NEUROPSYCHOLOGIST 553 (2006) ("*Presidential Address*"))),[11] or (2) are imprecise as they cannot practicably account for

---

[10]   (*See also id.* at 144–45 (noting a study in which "ethnicity corrections for the test norms eliminated" the observed "false-positive error rates for the African American cohort, [that] were clearly excessive for all six factors [studied]:   Verbal Comprehension (36% versus 11% Whites), Perceptual Organization (37% versus 12%), Processing Speed (38% versus 12%), Working Memory (37% versus 11%), Auditory Memory (30% versus 13%), and Visual Memory (25% versus 14%)"); Ex. 16 at 271 (Jennifer J. Manly, *Advantages and Disadvantages of Separate Norms for African Americans*, 19 THE CLINICAL NEUROPSYCHOLOGIST 270 (2005) ("*Advantages and Disadvantages of Separate Norms*")) ("[T]he primary advantage of normative studies of neuropsychological test performance among African Americans is that the accuracy of diagnoses will improve when the norms are applied to individuals who are demographically similar to the normative sample.   Increased specificity of cognitive measures is an unmistakable benefit of proper use of normative information."); Ex. 17 at 156 (Julie Akiko Gladsjo et al., *Norms for Letter and Category Fluency: Demographic Corrections for Age, Education, and Ethnicity*, 62(2) PSYCH. ASSESSMENT 147 (1999)) (study showed that "[c]orrecting for ethnicity decreased the false positive error rate to acceptable levels" in tests contained in the Settlement Agreement's test battery).)

[11]   (*See also* Ex. 20 at 323 (Jennifer J. Manly & Ruben J. Echemendia, *Race-Specific Norms: Using the Model of Hypertension to Understand Issues of Race, Culture, and Education in Neuropsychology*, 22 CLINICAL NEUROPSYCHOLOGY 319 (2007)) (noting risk that norms could "'wip[e] out' clinically significant differences")).)

17

"[t]he sheer number of different race/ethnic groupings in America" (Ex. 21 at 257 (Philip G. Gasquoine, *Race-Norming of Neuropsychological Tests*, 19 NEUROPSYCHOLOGY REV. 250 (2009) ("*Race-Norming of Neuropsychological Tests*"))), and are based on "historically defined categories [of race] that have limited scientific meaning" (Ex. 16 at 274 (*Advantages and Disadvantages of Separate Norms*)).   But none of these papers dispute that studies show a disproportionate (up to *three times* higher) rate of harmful misdiagnoses for Black test-takers when testing results are not adjusted for race.   (Millis Decl. ¶ 31.)   Nor do they proffer any viable alternative to such norms for facilitating accurate diagnoses.   Instead, they promote unvalidated and highly flexible methodologies, such as:  (1) a holistic analysis that critically studies each of the underlying test's cultural biases and reaches a determination on impairment unbound by strict cognitive score thresholds (Ex. 19 at 553–55 (*Presidential Address*)), and (2) an "individual comparison standard" that "has received little attention in the neuropsychological research literature," has "no uniformly agreed upon method of making the" estimate of impairment, and has "little research comparing the accuracy of [the method] with minority participants via published norms and individual comparison standards" (Ex. 21 at 257 (*Race-Norming of Neuropsychological Tests*); *see also* Millis Decl. ¶ 31).   These methods would be unworkable in the context of a Settlement Program employing formulaic score thresholds and diagnostic criteria.

The impact of normative adjustments in cognitive testing is such a significant issue that the neuropsychological community convened a summit in 2008, enlisting the field's top minds and "key perspectives" to discuss the question and issue recommendations.  (*See* Ex. 15 at 762, 771–79 (*2008 Summit Proceedings*); Millis Decl. ¶ 30.)   The resulting guidance was clear:  demographic normative adjustments (including for race) are useful when diagnosing acquired cognitive impairment—the precise goal of the Settlement Program.  (*Id.*; *see also* Ex. 15 at 770

(*2008 Summit Proceedings*) (such norms "*are* useful when they are used to identify and characterize acquired neurocognitive impairment." (emphasis in original)).)

This recommendation has not changed. "[D]emographic norms for African Americans [remain] an important tool when the question is diagnostic, and when the normative cohort includes a sufficient number of people with the same background (including birth year) as the examinee, because their use improves the specificity of detection of subtle cognitive impairment." (Ex. 11 at 110 (*Assessment of Cognition*); *see also* Millis Decl. ¶ 34.) Indeed, a study showed that a majority of clinicians use race normative adjustments "when interpreting cognitive scores of ethnic/racial minorities." (Ex. 18 at 355–56 (Milushka M. Elbulok-Charcape et al., *Trends in the Neuropsychological Assessment of Ethnic/Racial Minorities:  A Survey of Clinical Neuropsychologists in the United States and Canada*, 20(3) CULTURAL DIVERSITY AND ETHNIC MINORITY PSYCH. 353 (2014)); *see also* Millis Decl. ¶ 30.)

In fact, neuropsychologists have pointed to an inherent danger in Claimants' argument that race-based normative adjustments should be outlawed.  That position has been criticized as accepting the view that cognitive performance is unaffected by cultural and environmental factors and thus does not need to be adjusted for differences in this regard (a "universalist" view), which can lead to adverse outcomes for racial minorities, including "(1) inaccurate and harmful racial/ethnic generalizations, (2) inadequate science (not examining construct validity), and (3) inappropriate use of tests in the assessment of racial/ethnic minority." (Ex. 8 at 430–31 (*A Call to Action*); *see also* Millis Decl. ¶ 32.)  Indeed, some researchers worry that this view "can lead directly to nativism, because when ethnic groups differ on neuropsychological test performances, those differences can be attributed to genetic endowment rather than culture and environment." (Ex. 8 at 431 (*A Call to Action*).)

The Settlement Agreement, which all potential class members received notice of, made clear that the tests of current neurocognitive functioning were selected "based on the availability of demographically-adjusted normative data for Caucasians and African Americans." (Settlement Agmt. Ex. 2 § 4.)  As the Special Masters' Determination remanding Mr. Davenport's claim correctly concluded, "[t]his language suggests that the Agreement's drafters believed that demographically adjusting normative data was an important technique in accurately identifying whether the Claimant demonstrated" cognitive impairment.  (Special Masters' Determination at 9.)  Because the Settlement affords the individual clinician discretion to choose not to apply race norms if he or she believes the risk of a false negative exists, the risk that automatic application will lead to a false negative diagnosis where an individual has not been affected by the factors underlying race normative adjustments is accounted for and avoided.  (*See* Millis Decl. ¶ 35.)

While the Settlement clearly contemplated the potential use of race-based demographic norms, no objections were made on this score.  The Settlement Agreement was subject to 83 written objections filed by 205 objectors, lengthy submissions by the Parties, and hearings conducted both by this Court and the Third Circuit.  *Final Order* at 269.[12]  No one challenged the use of race-based demographic considerations and normative adjustments.

### D.    The Clinician's Interpretation Guide Recommendation

Beyond expressly disclosing to potential Settlement Class Members and their counsel the contemplated use of demographic (including race-based) norms, the Agreement also expressly stated that a more detailed "user manual" would be developed and "provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical and normative data to support the impairment criteria."

---

[12]    *See also In re: Nat'l Football League Players' Concussion Inj. Litig.*, 821 F.3d 410 (3d Cir. 2016).

(Settlement Agmt. Ex. 2 § 4.)  This practice—leaving certain details of the Settlement Agreement's implementation to the Parties and Court post-approval—is standard in settlements of this nature.[13]

Consistent with this mandate, the Parties (including Class Counsel, at that time appointed to represent the Settlement Class) collaborated on the Clinician's Interpretation Guide, advised by their respective expert neuropsychologists.  (*See* Special Masters' Determination at 9; Millis Decl. ¶¶ 12, 33.)  The Guide "recommend[s]," *but does not require*, the use of "full demographic correction"—which includes race—in converting a test-taker's raw scores on neuropsychological tests to scale scores.  (*Id.* at 9.)  Critically, this language was *not* requested by the NFL Parties (or by Class Counsel).  Instead, this language was suggested by the neutral BAP Administrator at the time based on the advice of its own experts.  (Millis Decl. ¶ 33.)  The suggestion was accepted by the NFL Parties and Class Counsel in furtherance of both Parties' commitment to achieving *accurate* diagnoses for *all* Retired Players, and in line with the current guidance in the neurocognitive literature.  As discussed in detail above, this literature clearly recommends the use of full demographic corrections in diagnostic settings, but also provides that practitioners should consider the "examinee's own conceptualization of their race/identity" and

---

[13]   *See In re: Nat'l Football League Players' Concussion Inj. Litig.*, 962 F.3d 94, 101–02 (3d Cir. 2020) (promulgation of post-settlement "clarifications created for the Settlement Agreement's proper and successful administration" constituted Settlement "interpretation" and "not [an] amendment[]"); *see also* Settlement Administration, Ann. Manual Complex Lit. § 21.66 (4th ed.) ("Class settlements are rarely self-executing and various problems may arise in their administration."); Judicial Oversight of Claim Process, 4 Newberg on Class Actions § 12:25 (5th ed.) ("Occasionally, in the course of administering a class action settlement, issues may arise that are not covered in the parties' settlement agreement . . . . With rare exceptions, the court's equitable powers will empower it to address such concerns.")); Order at 1, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, No. 2:10-md-02179-CJB-JCW (E.D. La. Oct. 23, 2017), ECF No. 23570 (court implemented, pursuant to its continuing and exclusive jurisdiction, rules and procedures governing certain claims processes); Order at 1, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, No. 2:10-md-02179-CJB-SS (E.D. La. Jul. 26, 2013), ECF No. 10877 (same); Order at 1, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, No. 2:10-md-02179-CJB-SS (E.D. La. Sep. 24, 2012), ECF No. 7462 (same); *Flores* v. *Barr*, 934 F.3d 910, 911–12 (9th Cir. 2019) (district court merely interpreted, and did not modify, a settlement agreement when it held that a provision requiring the government to provide "safe and sanitary" conditions to detained minors should, in practice, require the provision of a list of specific hygiene items (*e.g.*, deodorant) and adequate sleeping accommodations).

"determine if the individual's background is representative of the factors that can result in cognitive differences between groups" prior to applying race adjustments.  (Ex. 6 at 199–200 (*Holdnack on Demographic Adjustments*).)  Thus, as the Special Masters' ruling expressly states, the Guide does not require neuropsychologists to apply full normative adjustments.  (Special Masters' Determination at 10.)  Rather, the question of which demographic adjustments should be applied is left to the practitioner's expert judgment.  (*Id.*)

The Special Masters' decision also incorporates the sound legal principle that discretion is not unbridled and must be exercised in a reasonable way.  Because practitioner discretion in the application of normative adjustments leaves open the possibility that a clinician may improperly "decide[] to adjust [for race], or not, as a way of achieving a financial result for a particular player"—*i.e.*, a neuropsychologist may manipulate the demographic corrections to inappropriately classify an individual as cognitively impaired when he is not, in order to qualify him for a Monetary Award—the Special Masters determined the Claims Administrator "may require clinicians to show that [any] decision to avoid" applying standard race-based demographic adjustment was either:  (1) "consistent with their ordinary practice" (to "assuage any worry that the adjustment was a one-time-only technique to achieve a particular result") or (2) based on the practitioner's reasonable belief that such normative adjustments would lead to the *incorrect* result based on the "individualized characteristics of the Claimant."  (Special Masters' Determination at 11.)[14]  The Claims Administrator may not substitute its judgment for the reasoned judgment of the expert clinician; as the Special Masters held, claims will not be denied "solely because the clinician

---

[14]   This framework makes sense in the context of a compensatory scheme, where it is necessary to ensure that clinicians' choices are reasoned.  The Claims Administrator has plenary authority to investigate the accuracy of claims and diagnoses and routinely asks clinicians, among other things, to provide a reasoned explanation when they depart from the BAP battery's tests or prescribed score cutoffs in connection with MAF diagnoses, or where they determine that neuropsychological testing is unnecessary because a patient's dementia is so severe.

chose to reject the . . . recommendation to use African American normative samples in interpreting raw scores." (*Id.* at 10.) And, based upon the NFL Parties' review, no claim has *ever* been denied by the Claims Administrator or on appeal by the Special Masters solely on the basis of a failure to apply full demographic norms—including Claimants' claims.[15]

### E.    Claimants Henry and Davenport's Claims

Claimant Kevin Henry submitted a claim for Level 1.5 Neurocognitive Impairment made through the MAF Program. (Doc. No. 194178 at 1 (Notice of Denial of Monetary Award Claim).) A member of the AAP—the neutral panel of leading neurologists in the field of cognitive impairment, jointly selected by the Parties and approved by the Court—reviewed and denied Mr. Henry's claim for multiple reasons. (*Id.*) In addition to the question of the use of full demographic norms, Mr. Henry's claim was denied on the independent ground that he failed multiple performance validity measures (clinically standard tests required by the Settlement Agreement that are designed to determine whether the test-taker is feigning impairment). (*Id.*) Notably, Claimant Henry did not appeal this determination denying his claim.

Claimant Najeh Davenport filed a claim for Level 1.5 Neurocognitive Impairment made through the MAF Program and supported by testing conducted by a neuropsychologist who is no longer approved to support MAF diagnoses. (Doc. No. 218314.) The Claims Administrator approved Mr. Davenport's claim without AAP or AAPC assistance. (*Id.*) The NFL Parties, however, discovered that Mr. Davenport's claim, like Mr. Henry's, had numerous issues, including that it was unclear which norms, if any, the neuropsychologist employed, and when full adjustments were applied, Mr. Davenport showed no impairment in any cognitive domain. While the NFL Parties' appeal of Mr. Davenport's claim raised this normative adjustment issue, it

---

[15]    To the extent it would be useful to the Court, the NFL Parties respectfully suggest that the Court direct the neutral Claims Administrator to conduct an independent review to confirm the NFL Parties' finding.

primarily argued that Mr. Davenport's claim should be denied on other grounds:  he failed a validity measure and could not satisfy the requirement that his functional impairment be caused by cognitive loss (as non-cognitive issues better explained any functional impairment he was experiencing).  (Doc. No. 219431.)  Mr. Davenport's claim has not been finally determined. Instead, the Special Masters, in consultation with AAPCs, remanded Mr. Davenport's claim to allow the Claims Administrator to "seek more clarity from [the neuropsychologist] as to exactly what he did, and how it relates to his normal practice" with respect to the use of norms, with guidance that the claim should not be denied solely on the basis of a failure to use a racial normative adjustment.  (Special Masters' Determination at 12.)

In sum, the recommended but discretionary use of demographic normative adjustments is consistent with prevailing practices in the neuropsychological community—both at the time of the Settlement and continuing today—and was expressly contemplated by the Settlement Agreement.  For the reasons set forth below and herein, the Motion should be denied.

## **ARGUMENT**

Claimants' Motion is both factually misguided and legally flawed.

*First*, Claimants cannot invoke Rule 60(b) to seek relief they "could have reasonably sought" through an objection or appeal to the Settlement Agreement's implementation. *Nunez* v. *Temple Prof'l Assocs.*, 245 Fed. Appx. 144, 148 (3d Cir. 2007).  The potential use of demographic normative corrections—a clinically standard practice designed by the neuropsychological community to achieve accurate diagnoses and expressly contemplated by and fully disclosed in the Settlement Agreement—does *not*, as Claimants argue, constitute a "changed factual circumstance," a practice that is "detrimental to the public interest," or "overt race discrimination" constituting an "extraordinary circumstance[] that justif[ies] reopening the judgment" under Rule 60(b).  (Motion at 20–21.)

*Second*, both the Clinician's Interpretation Guide and the Special Masters' reasoned Determination approving the discretionary use of demographic normative adjustments are consistent with the Settlement Agreement's clear terms and standard neuropsychological clinical practice and do not constitute impermissible amendments to the Settlement Agreement.

*Finally*, Claimants' argument that the recommended use of full demographic normative corrections is barred by Section 1981 fails because, among other reasons, racial normative adjustments were not the "but for" cause of any injury to Claimants, *Comcast Corp.* v. *Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020), and because there can be no serious argument that anyone, let alone the NFL Parties, purposely "inten[ded] to discriminate on the basis of race" in the face of an indisputable record that the goal of the *discretionary* use of norms, which were generally recommended at the suggestion of the neutral BAP Administrator's experts (*not* the NFL Parties), was for diagnostic accuracy and to *avoid* racial bias in the subject tests, *Brown* v. *Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001).

## I.   Claimants Have No Basis to Invoke Rule 60(b)

Claimants improperly request that this Court use its equitable powers under Rule 60(b) to "relieve" them "from [the] final . . . order" implementing the Settlement Agreement or modify the Settlement Agreement's terms to prohibit the use of a race normative adjustment. But Claimants can articulate no credible basis to invoke Rule 60(b).

As discussed, demographic normative adjustments were always expressly contemplated by and fully disclosed in the Settlement Agreement and their potential application reflects well-accepted clinical practice. (*See supra* pp. 6–23.) Claimants had ample notice and a full opportunity to object to the Settlement Program's potential use of race-based norms but failed to do so. Claimants cannot now bring a 60(b) motion requesting the Court to modify or reject terms that they could have, but chose not to, object to or appeal. *See Martinez-McBean* v. *Gov't*

*of V.I.*, 562 F.2d 908, 911 (3d Cir. 1977) ("[C]ourts must be guided by 'the well established principle that a motion under Rule 60(b) may not be used as a substitute for appeal.' . . . [I]t is improper to grant relief under Rule 60(b)(6) if the aggrieved party could have reasonably sought the same relief by means of appeal." (internal citations omitted)).[16]

Claimants have articulated no reason they could not have brought the present objection *five years* ago when the Settlement was being carefully scrutinized and reviewed for final approval by this Court and the Third Circuit.  If Claimants "wanted to contest the propriety of" the use of demographic adjustments, they "should have done so by [objection or] appeal after a final order in the case was entered. . . .  [The Court] cannot grant relief under 60(b) if," as here, Claimants "could have reasonably sought the same relief by means of an appeal." *Nunez*, 245 Fed. Appx. at 148.  The Parties are entitled to finality on claims settled more than five years ago.

Rule 60(b) "does not confer upon the district courts a standardless residual discretionary power to set aside judgments." *Martinez-McBean*, 562 F.2d at 911.  Indeed, Claimants "admit[]" that Rule 60(b) provides a "narrow avenue" to relief and requires either: (1) a "'significant change in factual circumstance,'" "unforeseen obstacle," or practice that is "'detrimental to the public interest'" for relief under Rule 60(b)(5); or (2) "extraordinary circumstances that justify reopening the judgment," such as "overt race discrimination," for relief under Rule 60(b)(6).[17]  (Motion at 20–21 (quoting *Democratic Nat'l Comm.* v. *Republican Nat'l*

---

[16]  *See also Seese* v. *Volkswagenwerk, A.G.*, 679 F.2d 336, 337 (3d Cir. 1982) ("The district court is without jurisdiction to alter [a court's] mandate . . . on the basis of matters included or includable in the defendant's prior appeal."); *Hibbard* v. *Penn-Trafford Sch. Dist.*, 621 Fed. Appx. 718, 723 (3d Cir. 2015) ("Here, the conclusion is inescapable that [plaintiff] made a considered decision not to appeal the [court's] order . . . . There was thus no proper basis for the District Court to reopen the judgment under Rule 60(b)(6).").

[17]  Claimants reference—but do not engage with—Rule 60(b)(1)–(4). (Motion at 21.)  There is a "specific 1-year deadline for asserting" Rule 60(b)(1)–(3) motions, which has long since passed, and Claimants make no attempt to—and cannot—assert that the judgment is in any way "void" under Rule 60(b)(4).  *Gonzalez* v. *Crosby*, 545 U.S. 524, 535 (2005).  In all events, the potential use of demographic adjustments was clear from the face of the Settlement Agreement and thus does not constitute a "surprise" or "mistake," is certainly not the product of "fraud

*Comm.*, 673 F.3d 192 (3d Cir. 2012)).)  Claimants cannot remotely meet this high burden.

As discussed, far from being a "change," the discretionary use of demographic normative adjustments was expressly contemplated by the Settlement Agreement.  This practice also does not constitute an "extraordinary circumstance" or "overt race discrimination."  (*Id.*)  To the contrary, normative adjustments are well-accepted in clinical practice (then and today), and were made available—but not required—in the Settlement Program solely to avoid racial bias and to achieve diagnostic accuracy.   In sum, nothing has changed, and no "extraordinary circumstances" exist that would justify revisiting the Final Order.  The use of demographic norms remains non-discriminatory, proper, and consistent with commonly-accepted practices in the neuropsychological community for correcting errors in neuropsychological testing.[18]

Further, the purported Rule 60(b) relief Claimants request is patently improper.  While the Court has a "general equitable power to modify the terms of a class action settlement . . . for the protection of class members," this authority is generally limited, as Claimants' own case makes clear, to terms "deliberately left . . . to the Court's discretion" (*e.g.*, court-mandated deadlines)—***not*** substantive "bargained-for terms."  *In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 194–95, 197 (3d Cir. 2000) (affirming district court's "conclusion that it could, ***without upsetting the bargained-for terms*** of the Stipulation, modify" court-mandated deadlines (emphasis added)); *see also Ehrheart* v. *Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010) ("A

---

[or] misrepresentation," and is not called into question by *any* new "evidence."  Rule 60(b)(1)–(4).

[18]   Claimants cite *In re Diet Drugs.*, 706 F.3d 217, 227 n.8 (3d Cir. 2013), for that court's statement—in dicta—that a court may modify settlements "when the plaintiff demonstrates that there has been a 'significant change either in factual conditions or in the law.'"  (Motion at 20.)  But, as discussed, that is not the case here, nor was it the case in *In re Diet Drugs.*  Indeed, Claimants' citation to that case is ironic, given that the settlement class member there was challenging a medical requirement where "normative values used to calculate a patient's percentage of lung capacity predicted at rest 'are based upon averages for persons of similar height, weight, age, ***ethnicity***, etc.'"  *Id*. at 221–22 (emphasis added).  No claim of discrimination was raised to the incidental use of ethnicity as one factor in norming medical data; instead, the settlement class member unsuccessfully sought reformation of the medical requirement based on the allegation that new diagnostic capabilities rendered it obsolete.  *Id*. at 223.

district court is not a party to the settlement, nor may it modify the terms of a voluntary settlement agreement between parties.").[19]

Claimants thus offer no "justif[ication]" for this Court to invoke Rule 60(b) and "relieve" them "from [the] final . . . order" implementing the Settlement Agreement, and certainly provide no basis for the Court to *modify* the Agreement.  (Motion at 19.)[20]

## II.     The Clinician's Interpretation Guide Recommendation and Special Masters' Decision Are Sound and Do Not Amend the Settlement Agreement

Claimants similarly offer no basis for this Court to find that either the Clinician's Interpretation Guide recommendation or the Special Masters' reasoned Determination amends the Settlement Agreement or is in any way improper.

As discussed, the Settlement Agreement *expressly* provides that demographic norms may be used by independent clinicians in two ways, consistent with standard clinical practice:  (1) the estimation of premorbid ability (Settlement Agmt. Ex. 2 § 3); and (2) the norming of cognitive testing scores (*id.* at § 4).  Indeed, the Settlement Agreement explains that cognitive tests were selected "based on the availability of demographically-adjusted normative data for

---

[19]   Indeed, if a court chooses to modify or invalidate a material bargained-for term as illegal or against public policy, the entire agreement may have to be voided where, as here, the provisions are interdependent and not divisible. *See, e.g.*, 8 Williston on Contracts § 19:70 (4th ed.); 22 N.Y. Jur. 2d Contracts §§ 201, 261.

[20]   None of Claimants' cited cases support the invocation of Rule 60(b), as they all either *confirm* Rule 60(b)'s inapplicability or are readily distinguishable.  *See Democratic Nat'l Comm.*, 673 F.3d at 202 (Rule 60(b) relief was ***not justified*** because the movant knowingly entered into the consent decree, and did not demonstrate "a significant change in factual conditions [or] law;" that the decree was "'unworkable because of unforeseen obstacles;'" or that the decree's enforcement was "'detrimental to the public interest'" (internal citation omitted)); *White* v. *NFL*, 585 F.3d 1129, 1136–37 (8th Cir. 2009) (modification of consent decree was ***not warranted*** where the alleged "changed circumstance" had actually occurred "contemporaneously with the execution of the original agreement"); *Pigford* v. *Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002) (D.C. Circuit applied Rule 60(b) to reset settlement deadlines due to the "unforeseen obstacle" of class counsel's egregious failure to meet critical claims deadlines for class members constituting "virtual malpractice"; *Budget Blinds, Inc.* v. *White*, 536 F.3d 244, 258 (3d Cir. 2008) (default judgment could ***not be set aside*** under Rule 60(b)(6) because there were no "extraordinary circumstance[s]" justifying relief and defendants' "decision not to contest the . . . [default] judgment was the result of a deliberate choice"); *Buck* v. *Davis*, 137 S. Ct. 759, 759 (2017) (relief justified under Rule 60(b) where prisoner was sentenced to death based in part on psychologist's determination that he was "statistically more likely to act violently [in the future] because he is black").

Caucasians and African Americans," and expressly states that the parties would create a more detailed "user manual" that, among other things, would set out the "normative data to support the impairment criteria."   (*Id.*)   It is thus hardly surprising, much less a departure from or an amendment to the Settlement Agreement, that full demographic, including race-based, norms would be "recommended" by the Clinician's Interpretation Guide—again, at the request of the independent BAP Administrator—in converting raw scores to scaled scores.  (Special Masters' Determination at 9.)[21]   Indeed, as the Special Masters' well-reasoned Determination makes clear, the Guide "leaves significant room for clinical discretion" in the choice of norms, as it "only *recommends*"—but does not mandate—the use of race-based norms.  (*Id.* at 10 (emphasis in original).)  Because neither the Guide nor Determination "requires clinicians to presume the use of race norms" (Motion at 17), they do not amend the Settlement Agreement.

In sum, both the Guide and the Special Masters' Decision reflect standard clinical practice in the field of neuropsychology, are entirely consistent with the Settlement Agreement, and neither "alter[s] [the] bargained-for terms" of the Settlement such that an impermissible amendment to the Settlement Agreement has occurred.  *In re: Nat'l Football League Players' Concussion Inj. Litig.*, 962 F.3d at 101–02 (promulgation of post-settlement "clarifications created for the Settlement Agreement's proper and successful administration" constituted Settlement "interpretation" and "not [an] amendment[]").[22]  Claimants' request that this Court overrule the

---

[21]   Claimants also argue that, if the Court finds the Settlement terms regarding normative corrections are "ambiguous," it should "construe the Settlement Agreement so as not to require that clinicians presume the[ir] use" to "avoid the Settlement Agreement being unconstitutional or void as against public policy." (Motion at 17.) The Settlement Agreement is not ambiguous—normative corrections are clearly contemplated (though not required). (Special Masters' Determination at 11.)  And, as discussed below, the Settlement's terms do not run afoul of the Equal Protection clause, Section 1981, or public policy.  (*See infra* pp. 31–35.)

[22]   *See also Flores*, 934 F.3d at 911–12 (district court merely interpreted, and did not modify, a settlement agreement when it held that a term requiring the provision of "safe and sanitary" conditions to detained minors in practice required the provision of specific hygiene items (*e.g.*, deodorant) and adequate sleeping accommodations, despite those items not being specifically listed in the agreement).

Special Masters' determination and treat the Guide's recommended (but not mandated) use of demographic normative adjustments as an impermissible amendment to the Settlement Agreement is therefore meritless.

Indeed, Claimants' Motion amounts to an improper end-run around the Settlement Agreement's clear procedures.  Claimants attempt to take "the extraordinary action of modifying the Settlement Agreement," Oct. 26, 2017 Order, ECF No. 8557, despite the fact that: (1) Mr.  Henry received notice of his claim's denial—and his right to appeal that determination within 30 days—but declined to file any appeal or request any extension of time for his appeal; (2) Mr. Davenport's claim has not yet been determined, because the Special Masters' decision to remand Mr. Davenport's claim had the effect of "terminat[ing]" the appeal and claim determination, placing the claim back into "processing;"[23] and (3) Mr. Davenport's Objection to the Special Masters' Determination remains pending.  Claimants should not be permitted to circumvent the Settlement Agreement's clear processes by filing the present Motion.  *See* Oct. 26, 2017 Order, ECF No. 8557 (denying a motion to modify the Settlement in part because plaintiff failed to "go through the [Settlement Agreement's] appeals process and raise any issues as to why she [was] entitled to relief—including, but not limited to, the . . . issue raised in her motion to modify"); Nov. 2, 2017 Order, ECF No. 8882 ("Movants must proceed through the Claims Administration process, and if the claims are denied, movants must follow the proper appeals process.  Movants' attempt to circumvent those processes by directly petitioning the Court is improper.").

---

[23]   Rule 23(c), *Rules Governing Appeals of Claim Determinations*, NFL Concussion Settlement Website (Jan. 7, 2019), https://www.nflconcussionsettlement.com/Docs/rules_governing_appeals_of_claim_determinations.pdf.

## III.    Claimants' Purported Section 1981 Claim is Meritless

Finally, the Settlement Program's provisions allowing neuropsychologists to use racial adjustments in estimating premorbid intellectual function and norming cognitive test scores—consistent with standard clinical practice—in no way violates Section 1981.  Claimants' Section 1981 claim fails at the outset because racial discrimination is not the "but for" cause of their "injury" (if any), and there is no argument that any actor here had any discriminatory intent.

### A.    Claimants Do Not Meet the Requirements for a Section 1981 Claim

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  To state a Section 1981 claim, Claimants must "initially plead and ultimately prove that, *but for* race," they would not have suffered their injury, if any.  *Comcast*, 140 S. Ct. at 1019 (emphasis added); *see also Bakkali* v. *Walmart, Inc.*, No. 20-CV-3440, 2020 WL 5517350, at *3 (E.D. Pa. Sept. 14, 2020) ("[T]o prevail, a plaintiff must initially plead and ultimately prove that, *but for* race, he would not have suffered the loss of a legally protected right." (emphasis added)).  Claimants also must allege facts supporting "the following elements:  (1) [they are] a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts."  *Brown*, 250 F.3d at 797.  Claimants cannot come close to meeting this burden.

*First*, as discussed, only Mr. Henry's claim has been denied and it was denied on independent grounds unrelated to normative adjustments; Mr. Davenport's claim has not been denied (it has been remanded) and it was appealed on *several* grounds unrelated to normative adjustments.  (*See supra* pp. 23–24.)  Moreover, as the Special Masters made clear, a clinician's

mere failure to use a race adjustment will never be the sole basis for a claim's denial. (Special Masters' Determination at 11.) Indeed, based upon the NFL Parties' review, no claim has *ever* been denied solely because a practitioner failed to apply a race-based normative adjustment. Claimants' appeal to Section 1981 thus fails at its premise, as they have not alleged, and cannot allege, that race or racial demographic normative adjustments were the "but for" cause of their injury, as required. *Comcast*, 140 S. Ct. at 1019.

       *Second*, Claimants do not—and cannot—remotely allege that anyone involved in the Settlement's design or implementation had the requisite discriminatory intent where, as here, the provisions reflect standard clinical practice and were designed to achieve diagnostic accuracy. Section 1981 can "be violated only by *purposeful discrimination*," *Gen. Bldg. Contractors Ass'n, Inc.* v. *Pennsylvania*, 458 U.S. 375, 391 (1982) (emphasis added), which requires more than "intent as volition or intent as awareness of consequences," *Juarez* v. *Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 368 (S.D.N.Y. 2014) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 677 (2009) (describing the motion to dismiss standard)). Instead, discrimination is intentional only if the defendant "selected or reaffirmed a particular course of action 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pollard* v. *Wawa Food Mkt.*, 366 F. Supp. 2d 247, 252 (E.D. Pa. 2005) (internal citation omitted); *id.* (disparate impact claims "are not actionable under section 1981" as "discriminatory ***motive***" is required (emphasis added)); *Doe* v. *Lower Merion Sch. Dist.*, 665 F.3d 524, 548 (3d Cir. 2011) ("Racially discriminatory purpose means that the decisionmaker adopted the challenged action . . . ***because*** the action would benefit or burden an identifiable group." (emphasis added)).

       Here, as discussed, demographic normative adjustments were recommended (but not mandated) not at the request of the NFL Parties but at the behest of the neutral BAP

Administrator, and provided for (at the discretion of clinicians) in the Settlement Program not "because" they would result in different treatment between Black and White Retired Players, but because they are customary in clinical practice, are designed to eliminate the disproportionate misdiagnosis of healthy Black individuals as cognitively impaired, are supported by substantial published research, and thus specifically promote a paramount goal of the Settlement—diagnostic accuracy. (*See supra* pp. 6–23.) Claimants' appeal to Section 1981 thus fails because they cannot satisfy the threshold requirement of identifying any party that had *any*—let alone *purposeful*—intent to "benefit or burden an identifiable group." *Doe*, 665 F.3d at 548.[24]

### (a)   <u>Strict Scrutiny Does Not Apply to This Court's Review</u>

Recognizing that they cannot possibly prove intent to discriminate given the indisputable facts here, Claimants summarily claim they are entitled to "strict scrutiny" of the potential use of race adjustments in the Settlement Program (a form of judicial review that would eliminate the need to show intent). (Motion at 19.) But "[t]he Supreme Court has never applied strict scrutiny to the actions of a purely private entity." *Doe* v. *Kamehameha Sch./Bernice Pauahi Bishop Estate*, 470 F.3d 827, 839 (9th Cir. 2006). Rather, absent an initial showing of intent, strict scrutiny is applied only when, unlike here: (1) *state action* is challenged under the Equal Protection clause, *and* (2) the enforced terms are not facially neutral.

The Equal Protection clause governs only state action, and thus is inapplicable here. *See Blum* v. *Yaretsky*, 457 U.S. 991, 1004–05 (1982) ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for

---

[24] Moreover, and critically, the limited way in which independent clinicians could use racial considerations in the Settlement Program was evident on the face of the proposed Settlement Agreement. By not objecting or appealing on the basis of this feature, Claimants tacitly agreed to it. Thus, under the third-prong of the Section 1981 analysis, there is no violation of the "right . . . to **make and enforce contracts**"—this is the agreement Claimants voluntarily signed onto and thus there has been no interference whatsoever with their right to "***the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.***" 42 U.S.C. § 1981 (emphasis added).

those initiatives under the terms of the Fourteenth Amendment."). Indeed, Claimants' own cited case notes that "[s]tate approval of or acquiescence to a private choice does not convert that choice into state action" where it does not "make the state privy to [its] discriminatory purpose," *e.g.*, if it does not require the Court to inquire into, accept, and effectuate a discriminatory purpose with no sound non-discriminatory aim. *Democratic Nat'l Comm.*, 673 F.3d at 192 (internal quotations and citations omitted). The Court is not being made "privy" to any discriminatory purpose—it is merely enforcing a Settlement Agreement that made well-accepted demographic adjustments (developed and employed *solely* to facilitate diagnostic accuracy), available (and, in the Clinician's Interpretation Guide, recommended) for the use of independent clinicians consistent with their normal clinical practice; indeed, as the Special Masters' ruling made clear, no claim will be denied solely on the basis of a clinician's failure to employ race-based adjustments.[25]

Moreover, even if such enforcement could possibly bring this claim under the purview of the Equal Protection clause (and it cannot), strict scrutiny still would not apply as the terms at issue are facially neutral (*i.e.*, they do not employ an explicit race classification or facially treat people differently on the basis of race). *Doe*, 665 F.3d 524 at 548 ("When there is no racial classification in the plan, strict scrutiny is only applied if plaintiffs show discriminatory intent."). Full normative adjustments are recommended (but not required) for *all* Retired Players, regardless of race. Indeed, neither the Settlement Agreement nor any of its claim forms require that a Retired

---

[25]   Claimants cite to *Shelley* v. *Kraemer* to imply this Court is a state actor and the Equal Protection clause applies. (Motion at 19.) In fact, *Shelley* largely has been limited to its facts over time by cases like *Blum*, 457 U.S. at 1004, and, in any event, is wholly inapposite. The *Shelley* Court dealt with an overt racial covenant restricting a Black family from owning property it had purchased; enforcement of the covenant would have required the Court to adopt the racial restriction *and* coercively evict the family. 334 U.S. 1, 6 (1948). Here, as the Special Masters' decision makes clear, the use of a race normative adjustment is not mandatory in the Settlement Program, but may be used by independent clinicians to achieve diagnostic accuracy consistent with the clinician's standard clinical practice; moreover, a clinician's failure to apply such norms cannot be the sole basis for a claim's denial.

Player even *disclose* his race, much less that he be treated differently on the basis of it.

Claimants' argument that strict scrutiny applies is thus simply incorrect.

**(b)   Demographic Normative Adjustments Easily Pass Strict Scrutiny**

In all events, even if the Equal Protection clause and strict scrutiny both applied (and they do not), the permissive use of normative adjustments, including for race, by independent clinicians in accordance with their typical clinical practice would pass muster, as the neuropsychological community regards the use of such adjustments in certain circumstances as the *only* available and viable mechanism of effectuating the compelling interest of achieving diagnostic accuracy—an overriding goal of the Settlement Program.  (*See supra* pp. 6–23.)

The Settlement Agreement's permissive use of well-accepted and widely-used normative adjustments in furtherance of diagnostic accuracy—a Settlement term that Claimants had an opportunity to, but did not, object to in the course of its final approval—does not violate Section 1981.[26]

**CONCLUSION**

For the foregoing reasons, the NFL Parties respectfully request that the Court deny Claimants' Motion.

---

[26]   The cases Claimants cite do not support their argument that the discretionary use of demographic normative corrections by independent clinicians, consistent with their clinical practice, and in service of diagnostic accuracy is unlawful.  *See Pryor* v. *NCAA*, 288 F.3d 548, 570 (3d Cir. 2002) (policies established *for the express purpose* of treating individuals differently based on race may be "purposefully" discriminatory under Section 1981); *Bartlett* v. *Strickland*, 556 U.S. 1, 21 (2009) (redistricting plan violated the Equal Protection clause where race motivated the legislature's decision); *Regents of Univ. of California* v. *Bakke*, 438 U.S. 265, 279 (1978) (policy rejecting applicants to a state program in favor of other applicants because they were a different race was improper under the Equal Protection clause where it "was not the least intrusive means of achieving" diversity).

Dated: October 8, 2020

Respectfully submitted,

/s/ Brad S. Karp
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Main: 212.373.3000
Fax: 212.757.3990
bkarp@paulweiss.com
bbirenboim@paulweiss.com
chammerman@paulweiss.com
lbayard@paulweiss.com

*Attorneys for the National Football League
and NFL Properties LLC*

## CERTIFICATE OF SERVICE

It is hereby certified that a true copy of the foregoing document was served

electronically via the Court's electronic filing system on the 8th day of October, 2020, upon all

counsel of record.


Dated:  October 8, 2020                     */s/ Brad S. Karp*
                                             Brad S. Karp