## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Hon. Anita B. Brody |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.<br><br>Defendants. | Civ. Action No.: 14-cv-00029-AB<br><br>**Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **DECLARATION OF SCOTT RICHARD MILLIS, PhD** |

I, SCOTT RICHARD MILLIS, PhD, hereby declare as follows:

1. I submit this declaration in support of the NFL Parties' Opposition to Kevin Henry's and Najeh Davenport's Motion for Relief, and specifically to address the Settlement Agreement's terms providing clinicians with the option of considering demographic factors, including race/ethnicity, both in assessing premorbid intellectual functioning and in applying normative adjustments to the raw scores retired players obtain on the Test Battery set forth in Exhibit 2 to the Settlement Agreement (the "Test Battery").

2. The opinions I express in this Declaration are based upon the personal knowledge, experience, and expertise that I have developed over 35 years of studying, researching, and practicing in the field of clinical neuropsychology.

**I.     Qualifications**

3.     I am board-certified in three psychological specialties by the American Board of Professional Psychology: Clinical Neuropsychology, Clinical Psychology, and Rehabilitation Psychology. Neuropsychology is a particular specialty of psychology that focuses on understanding how the structure and function of the brain influences our specific psychological processes, including cognitive functioning and behavior. I am also a licensed psychologist in the state of Michigan. My complete *curriculum vitae* ("CV") is attached as Exhibit 1.

4.     I obtained a Bachelor of Arts degree in Psychology from Oberlin College in 1978, and a Master of Arts degree in Clinical Psychology from the University of Cincinnati in 1982. I was awarded the Doctor of Philosophy degree in Clinical Psychology at the University of Cincinnati in 1984. I obtained a Master of Education degree in Educational Evaluation and Research from Wayne State University in 2003.

5.     Currently, I am a tenured Professor in the Department of Physical Medicine and Rehabilitation at Wayne State University School of Medicine. I have been on the faculty at Wayne State University since 2005.

6.     I am also a Chartered Statistician (CStat) with the British Royal Statistical Society and a Professional Statistician (PStat) accredited by the American Statistical Association. I am a Fellow in the American Psychological Association in Division 5 – Quantitative and Qualitative Methods.

7.     I previously served over a ten-year period as the statistician for the Traumatic Brain Injury National Data Center ("TBINDC"), a central resource for researchers and data collectors within the Traumatic Brain Injury Model Systems ("TBIMS") program. I am the former Project Co-Director of the TBINDC. I also previously served as the Chief of Neuropsychology at the DMC Rehabilitation Institute of Michigan from 1993 to 1999.

8. I have authored over 170 peer-reviewed publications in neurobehavioral outcome in central nervous system disorders and psychometrics relating to neuropsychology.

9. I serve and have served as a member of various editorial boards of peer-reviewed journals, as detailed in my CV. I currently am a member of the editorial boards of the Journal of Head Trauma Rehabilitation and The Clinical Neuropsychologist.

10. Over my career, I have maintained an active program of research in traumatic brain injury ("TBI"). My research has been supported by the United States Department of Defense, National Institutes of Health, and the United States Department of Education – National Institute on Disability and Rehabilitation Research. Some of my completed grants include: (i) Treatment for Social Competence in Military Veterans, Service Members and Civilians with Traumatic Brain Injury; (ii) Prevention of Blast-Related Injuries; and (iii) Prevention of Long-term Consequences of Mild Traumatic Brain Injury.

11. In my role as a consulting expert for the NFL Parties in connection with the Settlement Program, I am being compensated for my time at my standard hourly rate.

**II.     Assignment**

12. I was part of the group of neuropsychologists who, together with Class Counsel and Counsel for the NFL Parties, designed the Neuropsychological Test Battery and defined the Specific Impairment Criteria agreed to by the parties as part of the Settlement. I was also part of the group of neuropsychologists who, together with Class Counsel and Counsel for the NFL Parties, developed the Baseline Assessment Program's Clinician's Interpretation Guide in accordance with the Settlement Agreement's terms (the "Clinician's Interpretation Guide"). I assisted the NFL Parties during their negotiations of each of the aforementioned documents. I therefore am familiar with those documents, and the Test Battery, Specific Impairment Criteria, and Clinician's Interpretation Guide,

specifically. I previously submitted a declaration in support of the NFL Parties' Memorandum of Law in Support of Final Approval of the Class Action Settlement Agreement and in Response to Objections. Decl. of Dr. Scott Richard Millis, ECF No. 6422-34 ("2014 Declaration").

13. I have been asked to opine as to whether, at the time the Settlement Agreement was developed and approved, it was a widely-used and commonly-accepted clinical practice in the neuropsychological community to consider demographic factors, including race, when assessing premorbid intellectual functioning, and in choosing normative adjustments to scale an individual's raw scores on cognitive tests. I have also been asked to opine as to whether such demographic considerations and adjustments, including for race, remain widely used and commonly accepted in clinical neuropsychological practice to this day.

14. As I explain in further detail below, in my opinion, both at the time of the Settlement Agreement's development and continuing to this day, it was and is widely-used and commonly-accepted neuropsychological clinical practice to consider demographic factors, including race, when assessing premorbid intellectual functioning, and in choosing normative adjustments to scale an individual's raw scores on cognitive tests.

### III. Opinions

#### A. The Potential Use of Demographic Factors in Assessing Premorbid Intellectual Functioning Was—and Remains—Consistent with Commonly Accepted Clinical Methods and Was Adopted in the Settlement Program to Facilitate Accurate Diagnoses

15. As noted above, I was one of the neuropsychological experts who assisted the parties with their negotiations of the Test Battery and Specific Impairment Criteria, attached as Exhibit 2 to the Settlement Agreement.

16. The Test Battery is a battery of neuropsychological tests designed to provide retired NFL football players with a baseline assessment of their cognitive

functions and to evaluate whether retired NFL football players are currently suffering from moderate cognitive impairment (Level 1 Neurocognitive Impairment), mild dementia (Level 1.5 Neurocognitive Impairment), or moderate dementia (Level 2 Neurocognitive Impairment).

17. Estimating a retired player's premorbid—that is, pre-injury or baseline—intellectual functioning is essential to assessing whether there has been a decline in that individual's functioning such that he is properly classified as suffering from a specified degree of cognitive impairment or dementia. (Ex. 2 at 44 (Joshua W. Kirton et al., *Comparison of Models of Premorbid IQ Estimation Using the TOPF, OPIE-3, and Barona Equation, With Corrections for the Flynn Effect*, 34(1) AM. PSYCH. ASS'N: NEUROPSYCHOLOGY 43 (2020) ("*Models of Premorbid IQ Estimation*").) The Settlement Program adopted a widely-accepted clinical approach for estimating premorbid intellectual functioning, which permits the practitioner, in her discretion, to choose one of three commonly-used assessment methodologies: (1) a reading test (the "Advanced Clinical Solutions Test of Premorbid Functioning" or "TOPF"), which is a well-accepted test in the scientific and neuropsychological communities; (2) estimation based purely on the individual's demographics; and (3) a combined method, using both the reading test and the individual's demographics. (*See* Ex. 3 at 217–18, 220 (James A. Holdnack & Larry G. Weiss, *Predicting Premorbid Ability for WAIS-IV, WMS-IV, and WASI-II*, in *WAIS-IV, WMS-IV, and ACS: Advanced Clinical Interpretation* 217 (James A. Holdnack et al. eds., 2013).)[1]

18. In the Settlement Agreement, the thresholds a retired player's scores must meet on cognitive testing to meet the diagnostic criteria change depending on the individual's estimated premorbid functioning. For example, retired players with "Average" estimated premorbid functioning must have more low test scores than players

---

[1] Exhibits 3, 4, 6, and 14 are book chapters that have been excerpted from the books they appear in for purposes of this Declaration.

with "Above Average" estimated premorbid functioning. As I noted in my 2014 Declaration, and as the Court cited in providing final approval of the Settlement, "[t]his methodology and the thresholds were based on empirical data and research that has been accepted within the scientific and medical communities." 2014 Declaration ¶ 21; *In re: Nat'l Football League Players' Concussion Inj. Litig.*, 307 F.R.D. 351, 404 (2015), amended, No. 12-md-02323, 2015 WL 12827803 (E.D.Pa. May 8, 2015).

19.     In my 2014 Declaration, I addressed certain objections brought against the Settlement Agreement's Test Battery and Specific Impairment Criteria. In particular, I addressed declarations filed by Drs. Brent Masel and Gregory O'Shanick which, among other things, criticized the use of the TOPF reading test option—but not the demographics models—and claimed that the TOPF was unreliable in assessing premorbid (or baseline) functioning. *See* 2014 Declaration ¶ 37. Drs. Masel and O'Shanick were concerned that the reading test would disadvantage retired players with accents or those who did not speak English as a first language, because it asks participants to read a list of words and pronounce them accurately. *See* Brain Injury Association of America, Decl. of Drs. Brent Masel & Gregory O'Shanick ¶ 14, ECF No. 6180-2. As I noted then, Drs. Masel's and O'Shanick's concerns were misplaced. While the TOPF reading test for predicting premorbid intellectual functioning is sound ("reading skills are less susceptible to decline following brain injury and have been found to be predictive of intellectual functioning"), accurate, and widely accepted, it is not the only option provided in the Settlement Agreement. 2014 Declaration ¶ 37. Rather, the Settlement Agreement—and the TOPF framework as applied in clinical practice—"combines the best of both worlds" by providing for the optional use of demographics instead of or in addition to the reading test. *Id*. As discussed in my 2014 Declaration, the use of demographics—including race—in estimating premorbid intellectual functioning was also sound and widely accepted at the time because "combinations of different demographic variables ha[d] been found to correlate with IQ and are not affected by brain injury." *Id.*

20. My opinion on the propriety of using the TOPF reading test and demographics framework as set forth in the Settlement Agreement remains unchanged, as that framework continues to be widely accepted and commonly used in clinical practice to this day. In fact, a recent study concluded that considering full demographic factors—including race—increases the accuracy of a clinician's premorbid intellectual functioning estimate. (*See* Ex. 2 at 47–48 (*Models of Premorbid IQ Estimation*).) It is thus my opinion that allowing practitioners to choose between options that include the ability to consider demographic factors, including race, in their assessment of premorbid intellectual functioning is proper and continues to reflect widely-accepted clinical practice to this day.

> **B. The Potential Use of Demographic Normative Adjustments in Scaling Raw Scores on Neuropsychological Tests Was—and Remains—Consistent with Widely-Accepted and Commonly-Used Clinical Methods and Was Adopted in the Settlement Program to Facilitate Accurate Diagnoses**

21. The Test Battery includes 22 individual tests that assess an individual's current level of functioning in five cognitive domains. The Parties did not create any unique test for the Program—each test in the Battery "is well accepted and scientifically validated in the scientific and medical communities" for diagnosing moderate cognitive impairment or dementia. 2014 Declaration ¶ 18. These tests result in a set of raw scores for each retired player.

22. The Settlement Agreement requires that the raw scores resulting from the cognitive tests be converted to common scale scores (*e.g.*, "T scores") for assessment. This practice was, and remains, commonly used and widely accepted in neuropsychological clinical practice. (*See, e.g.*, Ex. 4 (Maura Mitrushina et al., *Handbook of Normative Data for Neuropsychological Assessment* 33–56 (2nd Ed. 2005) ("*Handbook of Normative Data*")).

23. In the Settlement Program, and in widely-accepted clinical practice, neuropsychologists derive an individual's T scores by comparing his unique raw score to

the raw scores obtained from a sample of unimpaired individuals with comparable characteristics. (*Id.*) A bell curve is created such that the average score obtained by the normative data set is represented by a T score of 50. (*Id.*) The raw scores are then converted to T scores that reflect how far (if at all) the individual deviates from the mean unimpaired score (50) of his comparable group. (*Id.*) This allows a clinician to determine whether, and to what degree, the individual is impaired.

24. Generally, the more similar an individual is demographically to the individuals included in the unimpaired sample used for comparison, the more accurate the resulting diagnosis will be. (*See* Ex. 5 at 94 (Adam M. Brickman et al., *Ethical Issues in Cross-Cultural Neuropsychology*, 13(2) APPLIED NEUROPSYCHOLOGY 91 (2006) ("*Cross-Cultural Neuropsychology*").) Thus, at the time of the Settlement Agreement's design and approval, neuropsychologists commonly used the widest range of available demographic normative adjustments (or "norms") typically accounting for a wide range of characteristics—including age, education, gender, and race—when scaling (or "norming") scores, in order to achieve diagnostic accuracy. (*See, e.g.*, Ex. 6 at 173 (James A. Holdnack & Larry G. Weiss, *Demographic Adjustments to WAIS-IV/WMS-IV Norms*, in *WAIS-IV, WMS-IV, and ACS: Advanced Clinical Interpretation* 171 (James A. Holdnack et al. eds. 2013) ("*Holdnack on Demographic Adjustments*")); Ex. 7 at 255 (Desiree A. Byrd et al., *Early Environmental Factors, Ethnicity, and Adult Cognitive Test Performance*, 20 THE CLINICAL NEUROPSYCHOLOGIST 243 (2006) ("*Early Environmental Factors and Cognitive Test Performance*")).

25. As I noted in my 2014 Declaration, "all of the tests in the Test Battery allow neuropsychologists to compare a patient's scores against his expected scores given his age, race, education, and other relevant factors." ¶ 24. This alleviates any concern that an individual will be misclassified as cognitively impaired simply because their scores are being compared against a normative sample with differing demographics.

26. Race demographic normative adjustments, in particular, were designed and intended by the neuropsychological community to correct for the fact that certain racial groups were consistently obtaining disproportionately low scores on cognitive testing and thus were being *incorrectly* classified as cognitively impaired. Specifically, research showed that, when their testing was unadjusted for race, Black test-takers were *misdiagnosed* with brain disorders at an up to *three times* higher rate than White test-takers. Robert K. Heaton et al., *Revised Comprehensive Norms for an Expanded Halstead Reitan Battery: Demographically Adjusted Neuropsychological Norms for African American and Caucasian Adults* at 4 (2004);[2] (Ex. 6 at 173, 190 (*Holdnack on Demographic Adjustments*); Ex. 8 at 433 (Monica Rivera Mindt et al., *Increasing Culturally Competent Neuropsychological Services for Ethnic Minority Populations: A Call to Action*, 24 THE CLINICAL NEUROPSYCHOLOGIST 429 (2010) ("*A Call to Action*")); Ex. 9 at 163 (John A. Lucas et al., *Mayo's Older African Americans Normative Studies: Normative Data for Commonly Used Clinical Neuropsychological Measures*, 19 THE CLINICAL NEUROPSYCHOLOGIST 162 (2005) ("*MOAANS*")); Ex. 7 at 243–44 (*Early Environmental Factors and Cognitive Test Performance*).)

27. Misdiagnoses of cognitive impairments, such as those diagnosed through the Settlement Program, can be very harmful. A misdiagnosed retired player could undergo unnecessary treatment, or plan his future based on a misunderstanding of his current abilities and likely progressive decline. (*See, e.g.*, Ex. 10 at 794 (Marc. A. Norman et al., *Demographically Corrected Norms for African Americans and Caucasians on the Hopkins Verbal Learning Test-Revised, Brief Visuospatial Memory Test-Revised, Stroop Color and Word Test, and Wisconsin Card Sorting Test 64-Card Version*, 33(7) J.

---

[2] This document is not attached as an exhibit as it contains highly confidential data, the integrity of which could be compromised if broadly shared. I note, however, that neuropsychologists, including Appeals Advisory Panel Consultant neuropsychologists, have access to this document.

CLINICAL AND EXPERIMENTAL NEUROPSYCHOLOGY 793 (2011) ("*Demographically Corrected Norms*")); Ex. 9 at 163 (*MOAANS*).)

28. The reason for the racial disparity in the accuracy of cognitive testing is the subject of much research and study, but is widely understood to be the product of factors other than race (which, in all events, is generally understood to be a socially constructed concept)—for example, socioeconomic status, quality of education, biased test content, stereotype threat (concern that one might confirm negative stereotypes about his or her group) and other non-biological factors. (*See* Ex. 11 at 110–14 (David Freedman & Jennifer J. Manly, *Assessment of Cognition in African American Older Adults*, in APA HANDBOOK OF DEMENTIA 107 (2018) ("*2018 Assessment of Cognition*")); Ex. 10 at 793–804 (*Demographically Corrected Norms*); Ex. 12 at 2 (Patrick F. McKay et al., *The Effects of Demographic Variables and Stereotype Threat on Black/White Differences in Cognitive Ability Test Performance*, 18(1) J. OF BUS. AND PSYCH. 1 (2003)); Ex. 5 at 92–93 (*Cross-Cultural Neuropsychology*); Ex. 13 at S10 (Jennifer J. Manly, *Deconstructing Race and Ethnicity*, 44(11) MEDICAL CARE S10 (Supp. 3 2006) ("*Deconstructing Race*")).)

29. At the time of the Settlement Agreement, however, there were no validated normative adjustments available to correct for these particular factors, including because they are difficult to quantify and assess. (*See* Ex. 14 at 149 (Robert K. Heaton et al., *Demographic Influences and Use of Demographically Corrected Norms in Neuropsychological Assessment*, in Neuropsychological Assessment of Neuropsychiatric Disorders 127 (2009) ("*Use of Demographically Corrected Norms*")).) Thus, race norms—which *were* available for many widely-used test measures (including all of the tests of cognitive performance in the Settlement Program)—were commonly used as a proxy for these factors in order to correct the heightened rate of misdiagnosis in Black test-takers and achieve diagnostic accuracy. (*See id.*; *see also* Ex. 10 at 793 (*Demographically Corrected Norms*); Ex. 15 at 771–79 (Heather R. Romero et al., *Challenges in the Neuropsychological Assessment of Ethnic Minorities: Summit Proceedings*, 23 THE

CLINICAL NEUROPSYCHOLOGIST 761 (2009) ("*2008 Summit Proceedings*")); Ex. 13 at S10 (*Deconstructing Race*); Ex. 7 at 255 (*Early Environmental Factors and Cognitive Test Performance*); Ex. 6 at 187 (*Holdnack on Demographic Adjustments*).)  Indeed, the use of race norms has been shown to substantially eliminate the disparity in misdiagnosis of healthy Black test-takers as cognitively impaired.  (*See, e.g.*, Ex. 14 at 133–45, 149 (*Use of Demographically Corrected Norms*); Ex. 16 at 271 (Jennifer J. Manly, *Advantages and Disadvantages of Separate Norms for African Americans*, 19 THE CLINICAL NEUROPSYCHOLOGIST 270 (2005) ("*Advantages and Disadvantages of Separate Norms*")); Ex. 17 at 156 (Julie Akiko Gladsjo et al., *Norms for Letter and Category Fluency: Demographic Corrections for Age, Education, and Ethnicity*, 6(2) PSYCH. ASSESSMENT 147 (1999)).)

        30. In my experience, full demographic normative adjustments, including for race, were widely accepted at the time of the Settlement Agreement as an appropriate means of facilitating accurate diagnoses in clinical practice.  Indeed, the racially disparate rate of misdiagnosis in cognitive testing led to a summit in 2008, where key leaders in the neuropsychological community discussed the issue and how best to correct for it.  (*See* Ex. 15 at 762, 771–79 (*2008 Summit Proceedings*).)  At that summit, it was determined that demographic adjustments—including for race—are useful when attempting to accurately diagnose acquired neurocognitive impairment, which is the Settlement Program's goal.  (*See id.* at 770.)  Research from the time of the Settlement shows that the vast majority of clinicians took a "special approach" to account for race when evaluating individuals from a minority group (68%), and an overwhelming majority of those clinicians (at least 82.4%) employed normative adjustments as their "special approach."  (Ex. 18 at 355–56 (Milushka M. Elbulok-Charcape et al., *Trends in the Neuropsychological Assessment of Ethnic/Racial Minorities:  A Survey of Clinical Neuropsychologists in the United States and Canada*, 20(3) CULTURAL DIVERSITY AND ETHNIC MINORITY PSYCH. 353 (2014)).)

31.     Yet, some members in the neuropsychological community objected to the use of race demographic normative adjustments for a variety of reasons, including (i) the concern that the practice might "norm" away critically important information if, in fact, factors causing cognitive impairment are more prevalent in Black individuals, (ii) the concern that race norms cannot practically account for the vast number of different race and ethnic groupings, or (iii) the concern that race norms are based on historically defined race categories that have limited scientific meaning. (*See, e.g.*, Ex. 19 at 554–55 (Jason Brandt, *2005 INS Presidential Address: Neuropsychological Crimes and Misdemeanors*, 21 THE CLINICAL NEUROPSYCHOLOGIST 553 (2006)); Ex. 20 at 323 (Jennifer J. Manly & Ruben J. Echemendia, *Race-Specific Norms: Using the Model of Hypertension to Understand Issues of Race, Culture, and Education in Neuropsychology*, 22 CLINICAL NEUROPSYCHOLOGY 319 (2007)); Ex. 16 at 274 (*Advantages and Disadvantages of Separate Norms*); Ex. 21 at 257 (Phillip G. Gasquoine, *Race-Norming of Neuropsychological Tests*, 19 NEUROPSYCHOLOGY REV. 250 (2009)).) From my perspective, this view ran counter to the prevailing sentiment of leading experts in the neuropsychological community. Additionally, to my knowledge, none of the critics of normative adjustment disputed the studies showing a wide racial disparity in the accuracy of neuropsychological testing, and, based on my review, none suggested alternative approaches to reduce these inaccuracies that have been subject to rigorous validation, could readily be translated into reliable and objective diagnostic criteria, or would be familiar to the independent clinicians hired into the Settlement Program. (*See id.*)

32.     Moreover, as others in the neuropsychological community have articulated, rejecting the concept of race normative adjustments raises inherent dangers; that position would appear to adopt a "universalist" view of cognitive testing—*i.e.*, the view that cognitive performance is not affected by cultural and environmental factors and thus does not need to be adjusted for differences in this regard. (Ex. 8 at 430–31 (*A Call to Action*).) That view may lead to inaccurate and harmful racial generalizations,

misdiagnoses, and even "nativism, because when ethnic groups differ on neuropsychological test performance, those differences can be [inaccurately] attributed to genetic endowment rather than culture and environment." (*Id.*)

33. As I noted above and in my 2014 Declaration, all of the cognitive tests in the Settlement's battery "allow neuropsychologists to compare a patient's scores against his expected scores given his age, race, education, and other relevant factors." ¶ 24. The Settlement Agreement also mandated the development of a Clinician's Interpretation Guide that would provide more detail on the application of normative data. I helped the Parties develop, and assisted the NFL Parties in their negotiation of, this Guide. The Clinician's Interpretation Guide recommends, but does not require, that clinicians use full demographic normative adjustments (including race) in evaluating testing. This recommendation—which was suggested by the BAP Administrator at the time—was consistent with the prevailing recommendation in the neuropsychological community at the time of the Settlement Program's creation and implementation.

34. Indeed, the Settlement Program's framework remains consistent with widely-accepted and commonly-used clinical practice. To this day, Black test-takers continue to be misdiagnosed with brain disorders at a much higher rate than White test-takers when their testing is unadjusted for race. (*See, e.g.*, Ex. 11 at 107–10 (*2018 Assessment of Cognition*).) The neuropsychological community still has not developed validated normative adjustments for the factors believed to cause this racial disparity in cognitive test accuracy, as they remain difficult to quantify and assess. Thus, the current prevailing recommendation and clinical practice for attaining diagnostic accuracy remains unchanged—neuropsychologists should use race demographic normative adjustments. (*See id.*)

35. The Settlement Agreement's recommendation—but not automatic mandate—to use race normative adjustments is appropriate because it permits the clinician the discretion to use his or her ordinary course practice in assessing retired players. This

means that Settlement Program clinicians retain the discretion *not* to use a race normative adjustment (or even to use a White normative adjustment for a Black individual) if, for example, the clinician feels that the non-cognitive factors for which the race norms have been shown to operate as proxy corrections may not be consistent with the individual's life experience. This discretion alleviates any concern that a race norm may result in a false *negative* diagnosis. In summary, at the time the Settlement Agreement was approved and continuing to this day, it was and is medically sound and consistent with widely-accepted clinical neuropsychological practice to recommend, but not mandate, that clinicians use race normative adjustments in scaling raw scores from neuropsychological testing.

    36.  I understand that, in connection with the Special Masters' decision to remand Najeh Davenport's claim, the Special Masters determined that, where a practitioner chooses not to use race normative adjustments, the Claims Administrator may inquire to determine whether that choice is consistent with the practitioner's general, non-Settlement-related clinical practice. In the context of a Settlement Program that provides monetary awards for diagnoses, this strikes me as a reasonable safeguard against the possibility that certain neuropsychologists may conduct results-oriented assessments. It would never be medically sound for a clinician to choose or reject a normative adjustment simply because the clinician believes it would result in a Qualifying Diagnosis and compensation under the Settlement Agreement, rather than because he or she believes it is the most accurate diagnostic approach.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Detroit, Michigan
October 07, 2020

_____
Scott Richard Millis, PhD