# EXHIBIT 19

*The Clinical Neuropsychologist*, 21: 553–568, 2007
http://www.psypress.com/tcn
ISSN: 1385-4046 print/1744-4144 online
DOI: 10.1080/13854040600770800



# 🆑 2005 INS PRESIDENTIAL ADDRESS: NEUROPSYCHOLOGICAL CRIMES AND MISDEMEANORS

**Jason Brandt**

*The Johns Hopkins University School of Medicine, Baltimore, MD, USA*

*This address to the International Neuropsychological Society membership challenges the wisdom of several common practices in contemporary neuropsychology. It is argued that, in spite of their popularity, the development of race-specific test norms, the indiscriminate use of Bonferroni's correction for multiple comparisons, and the conduct of "quality of life" research are all conceptually problematic. These practices may have untoward sociopolitical effects as well, and neuropsychologists are urged to exercise caution before embracing them.*

Many of you will recognize the title of this address as borrowed from the 1989 film written by, directed by, and starring Woody Allen. *Crimes and Misdemeanors* is a masterpiece of comedy and drama about the meaning of art, love, work, and morality. Its all-star cast includes Allen as a struggling documentary film-maker, Alan Alda as his brother-in-law (a slimy TV producer), and Martin Landau as a philanthropic ophthalmologist-turned-murderer. Woody Allen's work as a comedian, movie actor, and director is well known, but I'll bet you never thought he would inspire an International Neuropsychological Society Presidential Address!

Today, I will be discussing what I consider to be some crimes and misdemeanors in neuropsychological research and clinical work. These transgressions are well-intentioned deeds that I maintain are nevertheless extremely problematic and deserve careful reconsideration. I'll discuss three of them: (1) race- and ethnicity-specific test norming, (2) so-called "corrections" for multiple statistical comparisons, and (3) quality-of-life research. In challenging these sacred cows, I realize that I am taking unpopular positions that run contrary to the current *Zeitgeist*. But self-examination is healthy for any discipline, and I hope to convince at least some of you that these three activities should be pursued only after thoughtful consideration and with full awareness of their implications.

Address correspondence to: Jason Brandt, Ph.D., Department of Psychiatry and Behavioral Sciences, The Johns Hopkins Hospital, 600 N. Wolfe Street, Meyer 218, Baltimore, MD 21287-7218, USA. E-mail: jbrandt@jhmi.edu

Accepted for publication: April 21, 2006. First published online: November 10, 2006.

© 2006 Psychology Press, an imprint of the Taylor & Francis group, an Informa business

554                                    JASON BRANDT

## RACE- AND ETHNICITY-SPECIFIC TEST NORMING

Over the past 10 years or so, we have seen a spate of publications reporting neuropsychological tests norms for specific racial and ethic groups, mostly for African-Americans. Thus, we now have African-Americans norms for the CERAD neuropsychological test battery (Unverzagt, Hall, Torke, Rediger, Mercado, Gureje et al., 1996), the Paced Auditory Serial Addition Test (Diehr, Heaton, Miller, Grant, & HNRC, 1998), letter and category fluency (Fillenbaum, Heyman, Huber, Ganguli, & Unverzagt, 2001; Gladsjo, Schuman, Evans, Peavy, Miller, & Heaton, 1999), the California Verbal Learning Test (Norman, Evans, Miller, & Heaton, 2000), my beloved Hopkins Verbal Learning Test (Friedman, Schinka, Mortimer, & Graves, 2002), and the RBANS (Patton, Duff, Schoenberg, Mold, Scott, & Adams, 2003). Most recently, such norms have been published for perhaps the most widely used and most influential of assessment instruments, the expanded Halstead-Reitan Neuropsychological Test Battery (Heaton, Miller, Taylor, & Grant, 2004).

Many reasons have been provided for the need to develop race/ethnicity-specific test norms. The most fundamental of these is that ethnicity accounts for a significant proportion of the variance in cognitive test performance (Evans, Miller, Byrd, & Heaton, 2000; Heaton, Taylor, & Manly, 2003), resulting in lower mean scores for specific subpopulations. This is assumed to reflect racial or ethnic bias in our test instruments that places members of some minority groups at a distinct disadvantage. A second argument is that, because of its social and cultural demands, the assessment process itself is experienced differently by different cultural groups (e.g., Steele & Aronson, 1995). It has been argued, for example, that basic attitudes toward testing, such as the importance of working quickly and even the desire to give correct answers when requested to do so, reflect culture-specific values (Helms, 1992). As a result, the argument goes, using cut-off scores for impaired performance derived from standardization samples that are largely Caucasian results in unacceptably high numbers of false-positive diagnoses of neurologic dysfunction among minorities, particularly African-Americans (Adams, Boake, & Crain, 1982; Campbell, Ocampo, Rorie, Lewis, Combs, Ford-Booker et al., 2002; Heaton et al., 2004; Manly, Miller, Heaton, Byrd, Reilly, Velasquez et al., 1998).

So, what's wrong with race-specific test norms? The primary problem, as I see it, is that they confound (and therefore confuse) measurement with interpretation. A low score on a neurocognitive test, or even poor performances generally, should not be equated with the presence of frank brain damage. Achieving a score below some prespecified cut-off score or percentile rank *sometimes* means that the test-taker has a neurological disorder, but not always. The era of using cutting scores blindly for deciding that someone has "brain damage," or even a specific neurological disorder, is long past. Instead, we should strive to *understand the sources of lower than average performance*.

Not all racial or ethnic group differences in neuropsychological measurements are due to test bias. There are lots of potential reasons why one segment of the population—however defined—performs more poorly than another. If differences exist on even our best, most culturally fair tests, we need to learn *why*, so we can do something about them if possible. Using subgroup-specific norms to artificially eliminate the differences is not the answer. "Norming away" ethnic or racial group differences obviates the possibility of discovering clinically important phenomena.



**Figure 1** Age-adjusted prevalence of hypertension in Americans, ages 20–74, by sex and race/ethnicity. Data for 1999–2000 from the National Health and Nutrition Examination Survey, National Center for Health Statistics, US Centers for Disease Control and Prevention.

Consider the following example from another domain of biomedical science: On the average, African-Americans have higher blood-pressure measurements than European-Americans. Many more African-Americans have higher than 140 mm systolic and 90 mm diastolic pressure and therefore meet criteria for hypertension (Burt, Whelton, Roccella, Brown, Cutler, Higgins et al., 1995). As a result, there are racial group differences in the United States in the prevalence of hypertension and stroke, particularly among women (see Figure 1). Would anyone advocate that we use different blood pressure norms for African-Americans so that we don't over-diagnosis hypertension? I doubt it. Rather, we acknowledge that there is a real difference in blood pressure among subgroups of Americans and we seek to discover its source. When this phenomenon is studied carefully, we learn that environmental and behavioral factors, including differences in diet and exercise, are largely responsible for differences in the prevalence of hypertension between people of African and European origin (Cooper, Wolf-Maier, Luke, Adeyemo, Banegas, Forrester et al., 2005; Sacco, Boden-Albala, Abel, Lin, Elkind, Hauser et al., 2001). Thus, it appears that race is largely a proxy for potentially modifiable lifestyle variables when it comes to risk for hypertension and stroke.

In a similar vein, if conditions that cause cognitive impairment, such as Alzheimer's disease, cerebrovascular disease, or other conditions, or are associated with neurodevelopmental deficits, such as poor prenatal nutrition, lead ingestion, etc., are more prevalent among African-Americans or any other segment of the population (probably mediated, in large part, by socioeconomic factors), wouldn't we want to know about it? Don't we do a disservice to our patients if we "normalize" lower than average cognitive performance by using subgroup-specific test norms? I maintain that we do. I believe that the noble intentions of race-specific norming must ultimately backfire and we will end up depriving minority group members of much needed medical care and social services.

One really can't make much progress in this debate without addressing what we mean by, and how we operationalize, the subgrouping variable—race. Most neuropsychological studies have relied upon participants' self-identified race or

ethnic group; in making racial attributions of others, most of us depend on physical characteristics. But such identities and characteristics are known to be notoriously unreliable. Do we mean by race a shared culture? A shared ethnicity? A shared ancestral geography? Shared DNA?

The US government defines race as follows: "The concept of race as used by the Census Bureau reflects self-identification by people according to the race or races with which they most closely identify. These categories are sociopolitical in nature. Furthermore, the race categories include both racial and national-origin groups." It is undeniable that race is a potent sociopolitical reality and influences how we treat one another. But it is increasingly recognized that the concept of race, as applied to humans, has little biological meaning (American Anthropological Association, 1998; Cooper & Kaufman, 1998; Schwartz, 2001; Witzig, 1996). Therefore, its use for parsing humankind into distinct groups for neuropsychological research or practice is extremely problematic.

The traditional, historical meaning of race is a large group of individuals within a species that constitutes a breeding population. Over time, that definition has been elaborated as a large group of individuals who have a significant proportion of their genes in common and can therefore be distinguished from other races by their common gene pool. However, the application of new scientific methods reveals that the four most commonly defined racial groups—African, European, Asian, and Pacific—are not genetically distinct. In fact, recent population genetic studies reveal that humans actually have only a small fraction of the biological diversity of other primate species. Approximately 99.9% of the human genome is identical among humans. That is, only 1 out of 1,000 base-pairs on the DNA molecule, on average, differs between any two individuals. In part because *Homo sapiens* is a relatively young species, it has only one-tenth the genetic diversity of the chimpanzee (Jorde & Wooding, 2004).

Figure 2 displays the genetic relatedness of 31 different Old-World human populations (Jorde & Wooding, 2004; Watkins et al., 2003). Genetic similarity, represented in the figure by proximity, is based on the frequencies of 100 *Alu* polymorphisms. These polymorphisms are pieces of DNA that, for unknown reasons, replicate and splice themselves into the DNA molecule at apparently haphazard locations in a person's genome. Once they are inserted, they remain forever, and get passed along from generation to generation. Thus, if two people share the same *Alu* sequence at the same location in the genome, they must have descended from a common ancestor. This method has been shown to be highly reliable in determining the genetic similarity of human groups (Watkins et al., 2001). What is evident in Figure 2 is that the neighbor-joining network diagram is dominated by groups from sub-Saharan Africa. This reflects the much greater genetic variability *among* African peoples than *between* Africans and others. That the genetic differences within traditionally defined races are much greater than the differences between races is an often replicated and robust finding (Lewontin, Rose, & Kamin, 1984; Yu, Chen, Ota, Jorde, Pamilo, Patthy et al., 2002). The take-home message is that DNA differences between traditional racial groups are extremely modest.

As mentioned earlier, part of the definition of race is that it is a group of individuals in reproductive isolation, typically due to geographical isolation. But this is hardly the case for modern humans (American Anthropological Association, 1998). In the US and many other nations, there is significant and ever-increasing genetic admixture among traditional racial groups. The contribution of genes originating



**Figure 2** Genetic similarities among 31 populations expressed as distances in a neighbor-joining network. Similarities based on the frequencies of 100 *Alu* polymorphisms. Reproduced from Watkins et al. (2003) with permission of the publisher.

in West Africa to the genome of individual African-Americans ranges from around 20% to 100%. In other words, people who call themselves African-American (not mixed-race or multi-racial) can have as little as 20% African-derived DNA. Approximately 30% of "white" Americans have <90% European ancestry. Evidently, self-reported race is not a strong predictor of genetic composition for a large number of Americans. In 2000, 2.4% of the US population self-defined as being of two or more races, and that number appears to be increasing (US Census Bureau, 2001). Multi-racialism is particularly prevalent among the young; 42% of multi-racial Americans are under age 18. So much for "a group in reproductive isolation."

In neuropsychological research and practice, race is largely a surrogate for sociocultural and economic variables. It is therefore important to recognize that the prevalence of CNS disorders is inversely correlated with socioeconomic status

(Birch & Gussow, 1970). Race is a proxy for rates of poverty, with its accompanying suboptimal nutrition, exposure to toxins, trauma, and other conditions known to influence brain development and hence cognitive functioning. As well, race is a proxy for access to quality education, healthcare, and career opportunities, as well as aspects of the home environment that foster cognitive development. Differences between blacks and whites in neuropsychological test performance are dramatically reduced when we covary for these socioeconomic factors (Duncan, Brooks-Gunn, & Klebanov, 1994; Nichols & Anderson, 1973).

It is difficult to identify all of the relevant sociocultural and economic factors relevant to neuropsychological performance. The one that has been studied the most is education. Adjusting test scores for years of education or covarying for educational differences markedly attenuates black–white differences in neuropsychological performance (Manly et al., 2002; Welsh, Fillenbaum, Wilkinson, Heyman, Mohs, Stern et al., 1995). In some studies, such differences are eliminated entirely (Carlson, Brandt, Carson, & Kawas, 1998; Fillenbaum et al., 2001; Murden, McRae, Kanes, & Bucknam, 1991).

Education is probably the most potent of the sociocultural factors affecting neuropsychological performance, but it is itself not without conceptual and measurement problems. First, is lower education a cause of poor cognitive performance or a consequence of poor cognitive performance? The assumption is that the stimulating experience of a quality education alters cognitive schemata and builds cognitive reserve, perhaps by increasing the number, density, or efficiency of synapses. However, the relationship is probably, at least in part, bi-directional. Those with healthy, efficient brains are able to profit from educational experiences and therefore go further and perform better in school. Thus, even education-adjusted or stratified test norms are potentially problematic.

Next, how do we measure the amount and quality of a person's educational experience? Traditionally, studies have used number of years of schooling, clearly an inadequate measure of educational quality. Success in school is an important variable, but how do we measure that? By the highest credential or level graduated? By grade point average? By measures of literacy? These appear to be getting closer to what we mean by education and the influence of education on cognitive performance. But what about other variables, such as teacher credentials, the school's expenditure per pupil, or the success of its graduates? All of these need to be considered in order to determine how best to measure a construct as critical to neuropsychology as education.

Let me offer a few more arguments against racial or ethnic subgroup norming. There are many variables that are clearly more highly correlated with brain structure and function than are race and ethnicity. We know that handedness is related to brain morphology and organization, as well as vulnerability to specific cognitive impairments after unilateral lesions. Yet, for the vast majority of neuropsychological tests, we don't employ separate norms for right-handers and left-handers. In both children and adults, height is positively correlated with cognitive test performance. The effect size for this phenomenon is not insignificant; product moment correlations between height and cognitive test performance are typically in the neighborhood of .2 to .4 (Humphreys, Davey, & Park, 1985; Richards, Hardy, Kuh, & Wadsworth, 2002; Teasdale, Owen, & Sorensen, 1991). Should we develop ''height-corrected'' test norms so that we don't overdiagnose mental retardation or

dementia among short people? Of course not. We would like to be able to examine the influence of height—and more particularly the interacting genetic and environmental variables that determine it—on test performance, rather than essentially erase it with subgroup-specific norms.

In America, some ethnic/cultural minorities, such as those of East Asian descent and Ashkenazic Jews, often perform better than average on many tests of cognitive ability and achievement (Cochran, Hardy, & Harpending, 2006; Geary, Bow-Thomas, Fan, & Siegler, 1993; Geary, Salthouse, Chen, & Fan, 1996; Schneider & Lee, 1990; Stevenson, Stigler, Lee, Lucker, Kitamura, & Hsu, 1985). What should we do about those situations in which ethnic minorities perform *better* than average? Should we develop test norms that eliminate this ''bias'' as well? Or should we say instead that certain sociocultural and economic factors have conspired to favor more efficient cognitive functioning and better performance in some groups than in others?

So, what is the solution to this dilemma? I'm afraid the answer is not simple or straightforward. At the most basic level, however, neuropsychologists must acknowledge a host of person and context variables when engaging in the assessment process. The influence on test performance of age, sex, socioeconomic level, race/ethnicity/cultural identity, degree of acculturation, primary language and level of sophistication in the language of the test, educational experience and educational quality, and ''test-wiseness''—as well as the degree of examiner–examinee mismatch on these variables—must all be considered. However, with the exception of age, sex, and education (and even these under only certain circumstances), it is neither scientifically nor clinically justifiable to develop separate norms for subgroups defined by these variables. The solution involves knowing the tests, knowing the clinical phenomena, and knowing the patient. Determine whether the tests were standardized in populations that are reasonably representative (in terms of the variables that really matter) of the patients with whom you will be using them. Ask yourself whether the tests are obviously culturally or subculturally biased, or whether they are relatively culture fair. Study how performance is influenced by the myriad developmental, health, environmental, and cultural variables discussed above. And don't indiscriminately use cut-off scores to ''diagnose'' brain damage. A Mini-Mental State Exam score of 20 is always low, and no amount of subgroup-specific norming should convince you otherwise, but it is not always a sign of dementia. Know the clinical phenomena. Is there a biomedical explanation for the poor performance? Do the test findings make neurological sense? If you are evaluating somebody for a possible toxic or metabolic encephalopathy and you find that he or she has selective deficits in verbal crystalized intelligence, that just doesn't make neuropsychological sense. Understand the clinical phenomena and the nature of the brain mechanisms that would be expected to be impaired. Finally, know the patient. Thoroughly explore aspects of the life story that might influence test performance. Don't get so carried away with test norms and percentile rankings that you ignore the patient's experience as a source of insights into the causes of poor performance.

## ''CORRECTION'' FOR MULTIPLE COMPARISONS

If one believes grant reviewers or journal editors, the man in Figure 3 is almost a deity. Every day, clinical researchers of many disciplines, not just neuropsychology,

Case 2:12-md-02323-AB   Document 11204-21   Filed 10/08/20   Page 9 of 17

pay homage to him in the "statistical analysis" sections of their manuscripts. He is, of course, Carlo Emilio Bonferroni, who was Professor and Chair of Financial Mathematics in Florence, Italy from 1933 until his death in 1960. Bonferroni proposed an adjustment for statistical decision making that will be familiar to most of you. The logic of Bonferroni's adjustment is as follows: Suppose you conduct a research study in which the null hypothesis is actually true; that is, the variables of interest are unrelated, or the independent variable is unrelated to the dependent variable. The probability that a significant relationship will be observed by chance alone is represented by $\alpha$, a parameter that is pre-determined by the researcher. We typically set $\alpha$ at .05, meaning that we will observe a significant relationship, by chance alone, one time in 20. If we then perform $n$ independent tests, the chance of at least one of those tests being significant is $1 - (1 - \alpha)^n$. For example, if we perform 20 tests, the probability that we will observe at least one significant relationship will be 64 times out of 100 ($p = .64$). The basic logic of the Bonferroni correction is that we should divide $\alpha$ by the number of tests performed so that the "study-wide" error rate remains at $\alpha$. In the example given, we would divide .05 by 20, yielding an adjusted $\alpha$ of .0025.

So, what is wrong with the Bonferroni correction? Contrary to what most of us have been taught, and what many of us believe, this adjustment does not automatically result in more sensible statistical analysis and interpretation of data. Blind application of the Bonferroni correction mechanizes data analysis, trivializes data interpretation, and reduces the usefulness of large, complex, information-rich data sets (Perneger, 1998; Rothman, 1990). In fact, wholesale use of the Bonferroni adjustment is based on a faulty premise. The "study-wide" error rate applies only



**Figure 3**  Carlo Emilio Bonferroni (1892–1960).

to a test of what is called the "universal" null hypothesis; i.e., the hypothesis that *all* associations in the data set are due solely to random variation, *all* the groups are identical on *all* the variables, *all* correlations are actually zero, etc. However, we are almost never interested in testing this extreme straw-man hypothesis. We want to assess specific relationships among particular variables, typically variables taken two at a time.

It could be argued convincingly that the universal null hypothesis is a fundamentally untenable one, as it flies in the face of a basic presumption of science. Empirical scientists believe that there is order in the universe, and that the variability that we observe in our data sets is due to lawful relationships. What does it mean that a research finding is "due to chance"? If you stop to think about it, this is a very peculiar notion. Yet, we have all come to accept the idea that a correlation observed between two variables, or a statistically large difference between two or more groups on some measured variable, is actually a "chance finding." The researcher who asserts this typically means that the finding was unanticipated and will likely not be replicable (Rothman, 1990). But what does it mean to say that it was "due to chance?" I believe that statement means only that the finding is due to factors that are currently unknown. But while the ultimate causes may be too intricate, too difficult to study, and currently unknown, they are potentially knowable. They obey observable, natural laws. Whether a coin that is flipped lands on heads or tails is typically described as due to chance, but the movement of that coin will obey all the laws of physics. If we understood completely all the forces involved, we could calculate whether the coin would land on its head or its tail. What we mean by chance, then, is that the answer is too difficult to know, but that is a far cry from its being unknowable. A chance finding is simply an unanticipated finding, but it may actually be very important and warrant further investigation. In fact, it might lead to a revolutionary development in our understanding of the phenomenon being studied. Simply because something is unpredicted does not make it any less real (Rothman, 1990).

There is also a peculiar logic to the Bonferroni correction. Why should interpretation of a given statistical comparison differ depending on how many other comparisons are also performed? If you go to your physician for a series of blood tests, you want to know whether *any* of them differ from normal. Would you want your doctor to apply a more stringent criterion to your serum glucose test simply because it was part of a comprehensive metabolic panel?! The same logic applies to statistical analysis. Is performing several comparisons in the same study inherently more problematic than performing those same comparisons in separate studies? Should the investigator be able to avoid the wrath of journals' statistical reviewers by dividing his/her multiple comparisons into separate "studies," each one published separately?

Perhaps the most obvious problem with the Bonferroni correction is that decreasing the type-I error rate increases the probability of a type-II error; that is, of not rejecting the null hypothesis when you should, or failing to detect a significant relationship when one exists. Type-II errors are inherently no less problematic or egregious than type-I errors (Perneger, 1998). Sometimes they're worse, such as failing to detect the higher morbidity associated with an experimental treatment over a placebo control treatment.

**562**  JASON BRANDT

So, what is the solution? Here, it is simple: Let each statistical test speak for itself. Except in very specific circumstances (such as when one really is interested in the universal null hypothesis of no difference on any variable), adjusting α for multiple comparisons is unnecessary. The researcher should simply describe what was done and why, and critically evaluate each association found. Is it biologically or otherwise mechanistically plausible? The researcher and the reader can then decide if the association is worthy of further exploration (Perneger, 1998).

## QUALITY OF LIFE RESEARCH

Like researchers in other clinical and social science disciplines, neuropsychologists have become enamored with the concept of quality of life and preoccupied with its measurement. During the 1970s, the number of scientific articles published with "quality of life" in their titles was fewer than 10 per year. Currently, that number is well over 1,700 per year (see Figure 4). Apparently, quality of life has become something of an obsession—or, perhaps more appropriately, an overvalued idea—for clinical investigators.

On the face of it, quality of life research in neuropsychology seems like a noble undertaking. After all, it represents a shift in focus from patients' narrowly defined cognitive deficits to a broader range of skills and functional competencies and, broader still, to the full range of subjective and objective well-being. Measuring quality of life, it could be argued, demonstrates the neuropsychologist's respect for the experiences of the person; a focus not on the lesions, not on the deficits, but on the phenomenal world of the patient, in its richest and fullest form.



**Figure 4** Number of publications since 1970 with "quality of life" in their titles. Results of PubMed search on January 10, 2005.

Case 2:12-md-02323-AB   Document 11204-21   Filed 10/08/20   Page 12 of 17

The World Health Organization defines "quality of life" (QOL) as "individuals' perceptions of their position in life, in the context of the cultural and value systems in which they live and in relation to their goals, expectations, standards and concerns" (Bonomi, Patrick, Bushnell, & Martin, 2000, pp. 1–2). Almost universally, researchers recognize the subjective and highly personal nature of QOL judgments, and attempt to elicit patients' self-reports of well-being, life satisfaction, or self-actualization (Hörnquist, 1989). Most researchers make some basic assumptions about QOL: (1) that it is a multidimensional concept, (2) that it is measurable, and (3) that, in many cases, it can be summarized by a single number (Schwartz, Richardson, & Glasziou, 1993).

So, what's wrong with quality of life research? First and foremost, the assessment of QOL requires intact self-awareness, metacognitive judgment, and communication skills, but so many of our patients are impaired in precisely these capacities. By their very nature, neurologic disorders compromise patients' abilities to reflect on their situations, to recognize, weigh, and judge often-abstract concepts, and to convey their synthesized assessments to others. How many of our neuropsychological patients have full capacity to introspect meaningfully and reliably judge and convey their experiences? What does it even mean to introspect meaningfully?!

To circumvent this obstacle, researchers have often relied on proxy reports of QOL for patients with severe language disorders, anosagnosia, dementia, and related conditions. We ask a person who knows the patient well to describe, or make educated guesses about, the patient's well-being. But can another person quantify the patient's experiences in a legitimate, meaningful way? Many research studies have shown that we can achieve good reliability between proxy raters. But I don't know how we establish validity. We might *presume* that a patient who smiles a lot and interacts with others in an animated, upbeat way is enjoying life more than a patient who looks and acts miserable. But it is just that, a presumption. We might empathize, but we can never truly know the patient's experience. And is personal happiness and enjoyment all we mean by quality of life? What about self-sacrifice, capacity to fulfill duties and obligations, ability to leave the world a better place, and other highly personal goals that make our patients' lives meaningful and fulfilling to them? Judging the quality of life of another person is a conceptual and philosophical chasm that I suspect we will never be able to cross.

In most cases, QOL research takes a snapshot of the patient at one point in time and does not distinguish "trait" from "state." Are we assessing the quality of life of a person in the midst of an illness, such as an episode of major depression? Is what we're seeing the result of specific life events? Are we observing the patient under conditions that might change over time, or are these enduring dispositions, personality traits, characteristics of the person?

A major impetus for the original QOL studies in the 1970s and 1980s was the perception of some in government and business (especially in the healthcare and insurance industries) that medical care was a scarce commodity and needed to be rationed. In fact, many of the earliest studies were performed and/or funded by health insurance companies. It is important to recognize that the concept of quality of life derives from an econometric service delivery model, not from humanistic concern for the well-being of others. The primary concern of these

models is the value of health and welfare services for the money. QOL ratings are used for deciding whether medical interventions and life-extending treatments are "worth it." The computation of "quality-adjusted life years" (QALYs) is used for the assessment of utility of medical care (Schwartz et al., 1993). QALYs have been described as "utility scores (that) reflect preferences for the health states and allow morbidity and mortality improvements to be combined into a single weighted measure" (Revicki & Kaplan, 1993, p. 477). The US government's Health Economics Resource Center (www.herc.research.med.va.gov/resources/faq_a06.asp) explains that:

> QALYs (quality-adjusted life years) are estimated by multiplying each life year gained with an intervention by a quality-weighting factor that reflects the individual's quality of life in the health state for that year. Utilities, measured on a scale from zero (death or the worst health imaginable) to one (perfect health), can be used as quality-weighting factors. There are different ways to find quality weights; the easiest is to use published reports. Besides Medline, a great resource for this is the *Harvard Center for Risk Analysis*.

Fundamentally, quality of life research institutionalizes the most personal and subjective aspects of the human condition. Even if the patient is the one who provides the quality of life ratings (i.e., we rely on patient self-report), who determines the relevant domains to study? Who determines what dimensions go into that multi-dimensional assessment? Who decides the weights to assign to various factors? And who determines how that single number will be used? Typically, it is the researcher, not the patient, and not his/her doctor.

You can find QOL weights just by getting on the Internet. You can then apply those weights to decide if an intervention is going to meet the quality threshold for the service to be provided. Whether a patient with early Alzheimer's disease is eligible for a heart transplant, or whether a hemiplegic, cognitively handicapped child with Rasmusson's syndrome and intractable seizures should get a hemispherectomy, is determined by the projected change in quality-adjusted life years. I believe we all know instances in which formal or informal quality of life assessment has been used to ration healthcare.

Quality of life research is part of a general trend toward the consumerization of healthcare. There are many examples of this movement. We now call doctors, nurses, and other clinicians "providers" and patients are now "consumers." We've witnessed the tyranny of "managed care organizations" (as if care was something to be managed or rationed rather than be provided). Prescription drug and other health care marketing directly to patients is also part of the consumer movement in health care, as are living wills, other advance directives, and ultimately physician-assisted suicide. All of these examples of the consumerization of health care turn what has historically been a clinical relationship—one based on a moral obligation to provide care and comfort to the sick—into a strictly pragmatic, business arrangement. You can get treatment if you can pay for it. If you're lucky enough to have health insurance, a third party will pay for your treatment if it's in your contract, your doctor is an "approved provider," and the gate-keepers (often themselves non-clinicians) deem the treatment "medically necessary." And that's where QOL measurement fits

in the machine: deciding what's medically necessary and appropriate treatment for a given patient.

Finally, let's not forget the most extreme and horrific misuse of quality of life assessment, that performed by the Nazi Third Reich (Lifton, 1986, p. 21):

> Prior to Auschwitz and other death camps, the Nazis established a policy of direct medical killing (physician-assisted suicide): that is, killing arranged within medical channels, by means of medical decisions, and carried out by doctors and their assistants. The Nazis called this program 'euthanasia'.... The Nazis based their justification for direct medical killing on the simple concept of 'life unworthy of life' (*lebensunwertes Leben*). While the Nazis did not originate this concept, they carried it to its ultimate biological, racial, and therapeutic extreme.

I certainly don't mean to suggest that the vast majority of those who conduct quality of life research have anything but the most caring, appropriate motives for doing so. I myself have participated in several studies of quality of life in dementia (Albert et al., 1996, 2001; González-Salvador et al., 2000), though each time it has been with a great deal of ambivalence and trepidation. I simply would like to sound a loud clarion call, and urge all of us to carefully consider the potential social and political ramifications of this research enterprise.

## CONCLUSIONS

I have described today three crimes and misdemeanors that are prevalent in contemporary neuropsychology: race- and ethnicity-specific test norming, corrections for multiple statistical comparisons, and quality of life research. All three of these transgressions are well-intentioned efforts by members of our profession to correct a perceived scientific or clinical wrong or a social injustice. But these remedies, I maintain, are each conceptually wrong-minded, clinically/scientifically problematic, and/or sociopolitically perilous. Please be careful.

## POST-SCRIPT

Since delivering this address, I've received many thoughtful comments from wonderful colleagues, some supportive of the positions I've taken and some critical. To remain true to my oral presentation, I have chosen not to incorporate their critiques, nor to respond to them, in this article. I do hope, however, that this work prompts further discussion of these important professional issues.

## REFERENCES

Adams, R., Boake, C., & Crain, C. (1982). Bias in neuropsychological test classification related to education, age, and ethnicity. *Journal of Consulting and Clinical Psychology*, *50*, 143–145.

Albert, S. M., Castillo-Casteneda, C. D., Sano, M., Jacobs, D. M., Marder, K., Bell, K. et al. (1996). Quality of life in patients with Alzheimer's disease as reported by patient proxies. *Journal of the American Geriatrics Society*, *44*, 1342–1347.

Albert, S. M., Jacobs, D. M., Sano, M., Marder, K., Bell, K., Devanand, D. et al. (2001). Longitudinal study of quality of life in people with advanced Alzheimer's disease. *American Journal of Geriatric Psychiatry*, *9*, 160–168.

American Anthropological Association (1998). Statement on race. *American Anthropologist*, *100*, 712–713.

Birch, H. G., & Gussow, J. D. (1970). *Disadvantaged children: Health, nutrition, and school failure*. New York: Harcourt, Brace & World.

Bonomi, A. E., Patrick, D. L., Bushnell, M., & Martin, M. (2000). Validation of the United States' version of the World Health Organization Quality of Life (WHOQOL) instrument. *Journal of Clinical Epidemiology*, *53*, 1–12.

Burt, V. L., Whelton, P., Roccella, E. J., Brown, C., Cutler, J. A., Higgins, M. et al. (1995). Prevalence of hypertension in the U.S. adult population. *Hypertension*, *25*, 305–313.

Campbell, A. L., Ocampo, C., Rorie, K. D., Lewis, S., Combs, S., Ford-Booker, P. et al. (2002). Caveats in the neuropsychological assessment of African Americans. *Journal of the National Medical Association*, *94*, 591–601.

Carlson, M. C., Brandt, J., Carson, K. A., & Kawas, C. H. (1998). Lack of relation between race and cognitive test performance in Alzheimer's disease. *Neurology*, *50*, 1499–1501.

Cochran, G., Hardy, J., & Harpending, H. (2005). Natural history of Ashkenazi intelligence. *Journal of Biosocial Science*, *38*, 659–693.

Cooper, R. S., & Kaufman, J. S. (1998). Race and hypertension: Science and nescience. *Hypertension*, *32*, 813–816.

Cooper, R. S., Wolf-Maier, K., Luke, A., Adeyemo, A., Banegas, J. R., Forrester, T. et al. (2005). An international comparative study of blood pressure in populations of European vs. African descent. *BMC Medicine*, *3*, 2.

Diehr, M. C., Heaton, R. K., Miller, W., Grant, I., & the HIV Neurobehavioral Research Center. (1998). The Paced Auditory Serial Addition Task (PASAT): Norms for age, education, and ethnicity. *Assessment*, *5*, 375–387.

Duncan, G. J., Brooks-Gunn, J., & Klebanov, P. K. (1994). Economic deprivation and early childhood development. *Child Development*, *65*, 296–318.

Evans, J. D., Miller, S. W., Byrd, D. A., & Heaton, R. K. (2000). Cross cultural applications of the Halstead-Reitan batteries. In E. Fletcher-Janzen, T. L. Strickland, & C. R. Reynolds (Eds.), *The handbook of cultural neuropsychology* (pp. 287–303). New York: Plenum Press.

Fillenbaum, G. G., Heyman, A., Huber, M. C., Ganguli, M., & Unverzagt, F. W. (2001). Performance of elderly African American and White community residents with the CERAD Neuropsychological Battery. *Journal of the International Neuropsychological Society*, *7*, 502–509.

Friedman, M. A., Schinka, J. A., Mortimer, J. A., & Graves, A. B. (2002). Hopkins Verbal Learning Test – Revised: Norms for elderly African Americans. *The Clinical Neuropsychologist*, *16*, 356–372.

Geary, D. C., Bow-Thomas, C. C., Fan, L., & Siegler, R. S. (1993). Even before formal instruction, Chinese children outperform American children in mental addition. *Cognitive Development*, *8*, 517–529.

Geary, D. C., Salthouse, T. A., Chen, G-P., & Fan, L. (1996). Are East Asian versus American differences in arithmetical ability a recent phenomenon? *Developmental Psychology*, *32*, 254–262.

Gladsjo, J. A., Schuman, C. C., Evans, J. D., Peavy, G. M., Miller, S. W., & Heaton, R. K. (1999). Norms for letter and category fluency: Demographic corrections for age, education, and ethnicity. *Assessment*, *6*, 147–178.

González-Salvador, M. T., Lyketsos, C. G., Baker, A., Hovanec, L., Roques, C., Brandt, J. et al. (2000). Quality of life in dementia patients in long-term care. *International Journal of Geriatric Psychiatry*, *15*, 181–189.

Albert, S. M., Jacobs, D. M., Sano, M., Marder, K., Bell, K., Devanand, D. et al. (2001). Longitudinal study of quality of life in people with advanced Alzheimer's disease. *American Journal of Geriatric Psychiatry*, *9*, 160–168.

American Anthropological Association (1998). Statement on race. *American Anthropologist*, *100*, 712–713.

Birch, H. G., & Gussow, J. D. (1970). *Disadvantaged children: Health, nutrition, and school failure*. New York: Harcourt, Brace & World.

Bonomi, A. E., Patrick, D. L., Bushnell, M., & Martin, M. (2000). Validation of the United States' version of the World Health Organization Quality of Life (WHOQOL) instrument. *Journal of Clinical Epidemiology*, *53*, 1–12.

Burt, V. L., Whelton, P., Roccella, E. J., Brown, C., Cutler, J. A., Higgins, M. et al. (1995). Prevalence of hypertension in the U.S. adult population. *Hypertension*, *25*, 305–313.

Campbell, A. L., Ocampo, C., Rorie, K. D., Lewis, S., Combs, S., Ford-Booker, P. et al. (2002). Caveats in the neuropsychological assessment of African Americans. *Journal of the National Medical Association*, *94*, 591–601.

Carlson, M. C., Brandt, J., Carson, K. A., & Kawas, C. H. (1998). Lack of relation between race and cognitive test performance in Alzheimer's disease. *Neurology*, *50*, 1499–1501.

Cochran, G., Hardy, J., & Harpending, H. (2005). Natural history of Ashkenazi intelligence. *Journal of Biosocial Science*, *38*, 659–693.

Cooper, R. S., & Kaufman, J. S. (1998). Race and hypertension: Science and nescience. *Hypertension*, *32*, 813–816.

Cooper, R. S., Wolf-Maier, K., Luke, A., Adeyemo, A., Banegas, J. R., Forrester, T. et al. (2005). An international comparative study of blood pressure in populations of European vs. African descent. *BMC Medicine*, *3*, 2.

Diehr, M. C., Heaton, R. K., Miller, W., Grant, I., & the HIV Neurobehavioral Research Center. (1998). The Paced Auditory Serial Addition Task (PASAT): Norms for age, education, and ethnicity. *Assessment*, *5*, 375–387.

Duncan, G. J., Brooks-Gunn, J., & Klebanov, P. K. (1994). Economic deprivation and early childhood development. *Child Development*, *65*, 296–318.

Evans, J. D., Miller, S. W., Byrd, D. A., & Heaton, R. K. (2000). Cross cultural applications of the Halstead-Reitan batteries. In E. Fletcher-Janzen, T. L. Strickland, & C. R. Reynolds (Eds.), *The handbook of cultural neuropsychology* (pp. 287–303). New York: Plenum Press.

Fillenbaum, G. G., Heyman, A., Huber, M. C., Ganguli, M., & Unverzagt, F. W. (2001). Performance of elderly African American and White community residents with the CERAD Neuropsychological Battery. *Journal of the International Neuropsychological Society*, *7*, 502–509.

Friedman, M. A., Schinka, J. A., Mortimer, J. A., & Graves, A. B. (2002). Hopkins Verbal Learning Test – Revised: Norms for elderly African Americans. *The Clinical Neuropsychologist*, *16*, 356–372.

Geary, D. C., Bow-Thomas, C. C., Fan, L., & Siegler, R. S. (1993). Even before formal instruction, Chinese children outperform American children in mental addition. *Cognitive Development*, *8*, 517–529.

Geary, D. C., Salthouse, T. A., Chen, G-P., & Fan, L. (1996). Are East Asian versus American differences in arithmetical ability a recent phenomenon? *Developmental Psychology*, *32*, 254–262.

Gladsjo, J. A., Schuman, C. C., Evans, J. D., Peavy, G. M., Miller, S. W., & Heaton, R. K. (1999). Norms for letter and category fluency: Demographic corrections for age, education, and ethnicity. *Assessment*, *6*, 147–178.

González-Salvador, M. T., Lyketsos, C. G., Baker, A., Hovanec, L., Roques, C., Brandt, J. et al. (2000). Quality of life in dementia patients in long-term care. *International Journal of Geriatric Psychiatry*, *15*, 181–189.

Heaton, R. K., Miller, S. W., Taylor, M. J., & Grant, I. (2004). *Revised comprehensive norms for an expanded Halstead-Reitan Battery: Demographically adjusted neuropsychological norms for African American and Caucasian adults*. Lutz, FL: Psychological Assessment Resources.

Heaton, R. K., Taylor, M. J., & Manly, J. (2003). Demographic effects and use of demographically corrected norms with the WAIS-III and WMS-III. In D. Tulsky, D. Sakolefske, R. K. Heaton, G. Chelune, R. Ivnik, R. A. Bornstein, et al. (Eds.), *Clinical interpretation of the WAIS-III and WMS-III*. San Diego, CA: Academic Press.

Helms, J. E. (1992). Why is there no study of cultural equivalence in standardized cognitive ability testing? *American Psychologist*, 47, 1083–1101.

Hörnquist, J. O. (1989). Quality of life: Concept and assessment. *Scandinavian Journal of Social Medicine*, 18, 69–79.

Humphreys, L. G., Davey, T. C., & Park, R. K. (1985). Longitudinal correlation analysis of standing height and intelligence. *Child Development*, 56, 1465–1478.

Jorde, L. B., & Wooding, S. P. (2004). Genetic variation, classification and "race." *Nature Genetics*, 36, S28–S33.

Lewontin, R. C., Rose, S., & Kamin, L. J. (1984). *Not in our genes: Biology, ideology and human nature*. New York: Random House.

Lifton, R. J. (1986). *The Nazi doctors*. New York: Basic Books.

Manly, J. J., Jacobs, D. M., Touradji, P., Small, S. A., & Stern, Y. (2002). Reading level attenuates differences in neuropsychological test performance between African American and White elders. *Journal of the International Neuropsychological Society*, 8, 341–348.

Manly, J. J., Miller, S. W., Heaton, R. K., Byrd, D., Reilly, J., Velasquez, R. J. et al. (1998). The effect of African-American acculturation on neuropsychological test performance in normal and HIV-positive individuals. *Journal of the International Neuropsychological Society*, 4, 291–302.

Murden, R. A., McRae, T. D., Kanes, S., & Bucknam, M. E. (1991). Mini-Mental State Exam scores vary with education in Blacks and Whites. *Journal of the American Geriatrics Society*, 39, 149–155.

Nichols, P. L., & Anderson, V. E. (1973). Intellectual performance, race, and socioeconomic status. *Social Biology*, 20, 367–374.

Norman, M. A., Evans, J. D., Miller, S. W., & Heaton, R. K. (2000). Demographically corrected norms for the California Verbal Learning Test. *Journal of Clinical and Experimental Psychology*, 22, 80–94.

Patton, D. E., Duff, K., Schoenberg, M. R., Mold, J., Scott, J. G., & Adams, R. L. (2003). Performance of cognitively normal African Americans on the RBANS in community dwelling older adults. *The Clinical Neuropsychologist*, 17, 515–530.

Perneger, T. V. (1998). What's wrong with Bonferroni adjustments? *British Medical Journal*, 316, 1236–1239.

Revicki, D. A., & Kaplan, R. M. (1993). Relationship between psychometric and utility-based approaches to the measurement of health-related quality of life. *Quality of Life Research*, 2, 477–487.

Richards, M., Hardy, R., Kuh, D., & Wadsworth, M. E. J. (2002). Birthweight, postnatal growth and cognitive function in a national UK birth cohort. *International Journal of Epidemiology*, 31, 342–348.

Rothman, K. J. (1990). No adjustments are needed for multiple comparisons. *Epidemiology*, 1, 43–46.

Sacco, R. L., Boden-Albala, B., Abel, G., Lin, I-F., Elkind, M., Hauser, W. A. et al. (2001). Race-ethnic disparities in the impact of stroke risk factors: The North Manhattan study. *Stroke*, 32, 1725–1731.

Schneider, B., & Lee, Y. (1990). A model for academic success: The school and home environment of East Asian students. *Anthropology and Education Quarterly*, *21*, 358–377.

Schwartz, R. S. (2001). Racial profiling in medical research. *New England Journal of Medicine*, *344*, 1392–1393.

Schwartz, S., Richardson, J., & Glasziou, P. P. (1993). Quality-adjusted life years: Origins, measurements, applications, and objections. *Australian Journal of Public Health*, *17*, 272–278.

Steele, C., & Aronson, J. (1995). Stereotype threat and the intellectual performance of African Americans. *Journal of Personality and Social Psychology*, *69*, 797–811.

Stevenson, H. W., Stigler, J. W., Lee, S-Y., Lucker, G. W., Kitamura, S., & Hsu, C-C. (1985). Cognitive performance and academic achievement of Japanese, Chinese, and American children. *Child Development*, *1985*, 718–734.

Teasdale, T. W., Owen, D. R., & Sorensen, T. I. (1991). Intelligence and educational level in adult males at the extremes of stature. *Human Biology*, *63*, 19–30.

Unverzagt, F. W., Hall, K. S., Torke, A. M., Rediger, J. D., Mercado, N., Gureje, O. et al. (1996). Effects of age, education, and gender on CERAD neuropsychological test performance in an African American sample. *The Clinical Neuropsychologist*, *10*, 180–190.

U.S. Census Bureau (2001). *Two or more races*. Report available at http://www.census.gov/prod/2001pubs/c2kbr01-6.pdf.

Watkins, W. S., Ricker, C. E., Bamshad, M. J., Carroll, M. L., Nguyen, S. V., Batzer, M. A. et al. (2001). Patterns of ancestral human diversity: An analysis of *Alu*-insertion and restriction-site polymorphisms. *American Journal of Human Genetics*, *68*, 738–752.

Watkins, W. S., Rogers, A. R., Ostler, C. T., Wooding, S., Bamshad, M. J., Brassington, A-M. E. et al. (2003). Genetic variation among world populations: Inferences from 100 *Alu* polymorphisms. *Genome Research*, *13*, 1607–1618.

Welsh, K. A., Fillenbaum, G., Wilkinson, W., Heyman, A., Mohs, R. C., Stern, Y. et al. (2005). Neuropsychological test performance in African-American and white patients with Alzheimer's disease. *Neurology*, *45*, 2207–2211.

Witzig, H. (1996). The medicalization of race: Scientific legitimization of a flawed social construct. *Annals of Internal Medicine*, *125*, 675–679.

Yu, N., Chen, F-C., Ota, S., Jorde, L. B., Pamilo, P., Patthy, L. et al. (2002). Larger genetic differences within Africans than between Africans and Eurasians. *Genetics*, *161*, 269–274.