**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION

No. 2:12-md-02323-AB

MDL No. 2323

**Hon. Anita B. Brody**

Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,

Plaintiffs,

v.

National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,

Defendants.

Civ. Action No. 14-00029-AB

THIS DOCUMENT RELATES TO: ALL ACTIONS

**CLASS COUNSEL'S MEMORANDUM IN RESPONSE TO MOTION FOR RELIEF UNDER ARTICLE XXVII OF THE SETTLEMENT AGREEMENT OR FOR RELIEF FROM JUDGMENT**

Class Counsel respectfully submits this memorandum in response to the Motion for Relief under Article XXVII of the Settlement Agreement or for Relief from Judgment (ECF No. 11169), which seeks, among things, to prohibit neuropsychologists from using demographic normative adjustments that incorporate, *inter alia*, race, in their assessment of Players'[1] cognitive

[1] For the sake of brevity and simplicity, Class Counsel uses "Player(s)" as a shorthand reference to class members who are Retired NFL Football Players as defined under section 2.1(ffff) of the Settlement Agreement, ECF No. 6481-1 at 18.

impairment. As discussed below, Movants' contention that the Settlement Program is employing "a formula that explicitly and deliberately discriminates on the basis of race," Movants' Mem. (ECF No. 11169-1) at 1, is without merit. The Court should accordingly deny the motion.

## ARGUMENT

### I. The Baseline Assessment Program Was Modeled to Track Regular Clinical Practice by Making Demographic Norms, Including for Race, Available to Neuropsychologists for Use Based on Their Professional Judgment

In establishing the BAP program, the Settling Parties[2] sought to create a framework through which Players could be clinically evaluated for neurocognitive impairment, and a baseline established for them, by medical professionals (neurologists and neuropsychologists) consistent with general clinical practice. In doing so, the Parties recognized that neuropsychologists must have the same tools available to them -- and must be allowed to exercise clinical judgment and discretion -- similar to that which they use when assessing patients in their clinical practice. That is, neuropsychologists should examine Players like clinical patients. Accordingly, neuropsychologists who are seeing Players in the course of the Settlement Program are to use the demographic norms they believe best fit the Player before them, just as they would do when assessing clinical patients. Declaration of John Keilp, Ph.D. ("Keilp Decl." or "Keilp Declaration") ¶¶ 12-13, 16-17.[3] For some, the selected norms will be "education only" norms, where the person's age, sex, and level of education best describe the population against whose testing results their current neurocognitive health should best be measured. *Id.* ¶ 15. For others, the use of demographic adjustments, including the patient's race or ethnicity ("full demographic

---

[2] For the sake of brevity and simplicity, Class Counsel uses "Settling Parties" to refer collectively to Class Plaintiffs and the NFL Parties.

[3] The Keilp Declaration accompanies this memorandum.

correction") may be the most appropriate. In this way, the true picture of the Player's current neurocognitive health can be assessed in accordance with the neuropsychologist's best clinical judgment.[4] *Id.* ¶ 17.

The Settlement Agreement states that the individual tests that compose the test battery were selected, in part, because of the *availability* of demographically-adjusted normative date for Caucasians and African Americans. Exhibit A-2 states, in relevant part:

> **Section 4. Neuropsychological Test Score Criteria by Domain of Cognitive Functioning**
>
> There are 5 domains of cognitive functioning. In each domain, there are several tests that contribute 3, 4, or 6 demographically-adjusted test scores for consideration. Test selection in the domains was based on the *availability* of demographically-adjusted normative data for Caucasians and African Americans. These domains and scores are set out below. (emphasis added).

ECF No. 6481-1 at 116 (emphasis added).

Although full demographically adjusted normative data are available to be used by neuropsychologists in the Settlement Program, just as they are in clinical practice, their use is *not* mandated by the Settlement Agreement or the BAP Manual. Rather, the decision as to whether to use full demographic corrections is left to the clinical judgment of the examining

[4] "Of course, clinical interpretation of neuropsychological data should not strictly rely upon use of norms, but also consider the appropriateness of available norms in relation to each person's background, including social, educational and medical history, and other factors (i.e., psychiatric, substance use, etc.)." Norman et al., *Demographically Corrected Norms for African Americans and Caucasians on the Hopkins Verbal Learning Test-Revised, Brief Visuospatial Memory Test-Revised, Stroop Color and Word Test, and Wisconsin Card Sorting Test 64-Card Version*. [hereafter "Norman"] J Clin Exp Neuropsychol. 2011 Aug;33(7):793-804.

neuropsychologist, who is in the best position to make that decision, which is similar to clinical practice. Keilp Decl. ¶¶ 12-13, 16-17.

Exhibit A-2 to the Settlement Agreement does, in fact, mandate that neuropsychologists follow certain procedures (e.g., specified test battery, required cut-off scores to support a dementia diagnosis, etc.) when examining players, but the Settling Parties did not use any such language with respect to which demographic norms must be used. The Settling Parties clearly left that decision to the clinical judgment of the individual neuropsychologist. Full demographic corrections are simply one of the tools available to neuropsychologists**,** which may be used at their discretion.

Based on the aforementioned language of the Settlement Agreement, neuropsychologists are plainly afforded the *discretion* to use (or not use) full demographic corrections. The fact that some neuropsychologists decided to apply full demographic corrections is not surprising considering that the Settlement Agreement explicitly states they are available, and also considering that they were commonly used by clinical neuropsychologists at the time of the settlement was negotiated. *Id*. ¶ 11.

**II. <u>The Use and Application of Demographic Norms</u>**

The Settlement Program, as established by the Settling Parties and approved by the Court, acknowledges that in order to properly assess a Player's neuropsychological test results, neuropsychologists need to compare Players' current test results with normal expectations for other people of similar demographic characteristics. *Id.* ¶ 7. That means that the neuropsychologist must estimate how the patient would have performed on the tests if he had not suffered an injury or disease involving the brain. This is accomplished by using the appropriate demographic norms when converting a Player's raw neuropsychological test scores to T-scores.

*Id.* ¶ 6. This is the *same* process used by neuropsychologists in their daily clinical practice, which is encouraged under the Settlement Program.

The use of demographic norms when converting raw scores to T-scores is standard practice by neuropsychologists in the clinical setting. Demographically adjusted normative reference values for many neuropsychological tests have been available for clinical use, and used, for many years. *Id.* ¶ 11. Clinical training programs provide neuropsychology students with training and instruction regarding the appropriate use of demographic corrections, and these corrections are commonly used in day-to-day clinical practice. *Id.*

Numerous published studies have established that neuropsychological test scores in the general population vary in association with demographic characteristics, including age, gender, race, ethnicity, and level of education. *Id.* ¶ 8. For most neuropsychological tests, older adults perform more poorly than younger adults. People with more education, on average, perform better on many tests than people with less education, while African Americans, on average, perform more poorly on many neuropsychological tests than do Caucasians. *Id.* ¶¶ 8-9. Consequently, the most common demographic corrections account for age, sex, education, and race. *Id.* ¶ 10.

The purpose of using demographically corrected norms in assessing for possible dementia is to ensure a uniform likelihood of patients being correctly classified as normal or "abnormal/impaired," irrespective of whether they are old or young, well-educated or not, male or female, or Black or White. *Id*. Both types of misclassification in this situation could be problematic—either diagnosing an impaired person as normal, or the other way around. Demographically corrected norms are used in clinical practice to try to both minimize and balance the two types of potential misdiagnosis as much as possible for all people, irrespective of their demographic characteristics. With respect to the use of full demographic corrections, published

studies recommend their use in order to improve diagnostic accuracy and reduce the likelihood that African Americans will be *misdiagnosed* as having cognitive impairment when they do not. *Id.*[5]

For these reasons, full demographically adjusted normative reference values are available for the tests used in the BAP, including the Wechsler Adult Intelligence Scale-Fourth Edition, Wechsler Memory Scale-Fourth Edition, Trail Making Test, Boston Naming Test, Boston Diagnostic Aphasia Exam Complex Ideational Material subtest, Controlled Oral Word Association Test (F-A-S and Animal Naming tasks), and the Booklet Category Test. Keilp Decl. ¶¶ 13-14. Thus, a clinician evaluating an African-American player's test results could adjust these results with reference to a more specific normative sample (e.g., African-American men in their 60s with

[5] "A substantial number of normal African-Americans patients might be incorrectly classified as neuropsychologically impaired, and misdiagnosed."; "Instead, the use of the more general race/ethnicity proxy (with all its shortcomings) in normative corrections should at least enhance consistency/reliability and may greatly reduce the probability of incorrectly attributing cognitive and possibly central nervous system abnormalities to normal African Americans." Norman, 2011 Aug;33(7):793-804.

"These racial comparisons have generally shown that despite equivalence on demographic variables such as years of education and socioeconomic status, African Americans obtain lower scores on both verbal and nonverbal cognitive tasks. These discrepancies cause attenuated specificity, such that cognitively normal African Americans are more likely to be mis-diagnosed as impaired as compared to Whites (Ford-Booker et al., 1993; Klusman et al., 1991; Manly et al., 1998a, 1998b, 1998c; Stern et al., 1992; Welsh et al., 1995)" (Manly et al. 2002, *Reading level attenuates differences in neuropsychological test performance between African American and White elders*. J Int Neuropsychol Soc. 2002 Mar;8(3):341-8.

"Some authors have suggested that the unavailability of demographically appropriate norms could have detrimental implications in terms of diagnostic accuracy (e.g., Friedman et al., 2002), as research has suggested that cognitively normal African Americans are more likely to be misdiagnosed as impaired compared to Caucasians due to lower scores on standard neuropsychological tests (e.g., Manly, Jacobs, Touradji, Small, & Stern, 2002). Patton DE, Duff K, Schoenberg MR, Mold J, Scott JG, Adams RL. *Performance of cognitively normal African Americans on the RBANS in community dwelling older adults*. Clin Neuropsychol. 2003 Nov;17(4):515-30.

a college degree) or to a broader and more heterogeneous sample (e.g., all men and women, of all levels of education, in their 60s).

Although full demographically adjusted normative data are *available* to neuropsychologists in the settlement program, neuropsychologists are not *required* to use them. The decision as to which demographic norms are appropriate for any particular Player is left to the clinical judgment of the examining neuropsychologist, who is in the best position to make that clinical decision. *Id.* ¶¶ 12-13, 16-17. Based on individual circumstances, a neuropsychologist may conclude that the use of full demographic corrections when calculating T-scores is appropriate for one African American player but not for another African American player with different individual circumstances. That decision is ultimately left to the clinical judgment of the neuropsychologist, just as it would be if the Player was examined in a clinical setting outside of the settlement program. *Id.* ¶¶ 16-17.

## III. The BAP Manual Neither Mandates the Use of Full Demographic Norms Nor Creates a Presumption in Favor of Their Use

The BAP Manual, approved by the NFL and Class Counsel, currently instructs neuropsychologists to "Convert test scores to demographically-corrected T-scores via ACS software (use of the full demographic correction is *recommended*) or Revised Comprehensive Norms for an Extended Halstead-Reitan Battery." BAP Manual at 13 (emphasis added). The parenthetical recommending the use of full demographic correction was added at the recommendation of the BAP Administrator based on input that it received from the clinical neuropsychologist on its medical panel. The parenthetical neither requires the use of full demographic corrections, nor creates a presumption in favor of their use. Consequently, the parenthetical does not "amend" the Settlement Agreement.

There are numerous instances in the BAP Manual, as in the Settlement Agreement, where the Settling Parties clearly showed their intention to mandate certain actions by the neuropsychologists with respect to neuropsychological testing in the BAP. For example, among other things, the BAP Manual clearly requires that neuropsychologists:

a. Use a specific test battery;

b. Determine how many tests within each cognitive domain fall below the negotiated cut-offs;

c. Determine test validity;

d. Administer Trail Making Test A before Trail Making Test B; and

e. Determine Pre-Morbid function.

When neuropsychologists diagnose a Player with a Qualifying Diagnosis of Level 1.5 or 2 Neurocognitive Impairment outside of the BAP program, but do not strictly adhere to the above requirements, they are required to provide a "deviation explanation"—explaining why their diagnosis is "generally consistent" with the Settlement Agreement's injury definition for that particular Qualifying Diagnosis. For example, neuropsychologists may use a "generally consistent," but non-identical, test battery to diagnose a Player but they must then provide a "deviation explanation," which the Claims Administrator may or may not deem sufficient.

If the Settling Parties had intended to *require* the use of full demographic corrections, they would have used the necessary language, just like they did with respect to the above examples, which would have resulted in the need for a "deviation explanation" from the neuropsychologist in the event they made a diagnosis without full demographic corrections. Rather, the Settling Parties accepted the language proposed by the BAP Administrator, which simply *recommends*, but does not require, the use of full demographic corrections.

The parenthetical "recommending" the use of full demographic norms does not create a presumption in favor of their use or suggest any sort of deviation from either clinical practice or the requirements of the Settlement Program. Notably, there are other examples in the BAP Manual where the Settling Parties "recommend" or "suggest" that the neuropsychologist take a certain course of action, but in none of those instances is a presumption created based on the "recommendation" or "suggestion." Specifically, the BAP Manual "suggests" the specific order in which the neuropsychologist should administer the tests. BAP Manual at 11. Neuropsychologists who do not follow that sequence, however, need not provide a deviation explanation as to why they employed a different order.

Similarly, the BAP Manual "recommends" a specific narrative report template to be used by neuropsychologists and "recommends" that the Player be given a break during the testing. *Id.* at 11, 18. Despite those "recommendations", no presumption is created if the neuropsychologist does not follow either of those recommendations and, therefore, there is no need for the neuropsychologist to provide a deviation explanation as to why they did not follow either of those recommendations. Importantly, the parenthetical proposed by the BAP Administrator's clinical neuropsychologist and accepted by the Settling Parties uses the exact language (*i.e.*, "recommends") as employed in the BAP Manual for the situations detailed above. No presumption was created in those situations and no presumption is warranted with respect to the "recommendation" to use full demographic corrections. That approach is consistent with the goal of encouraging neuropsychologists to examine Players in a manner similar to that which they would use in their own clinical practice. Neuropsychologists' clinical judgement should be afforded deference.

Although Class Counsel believes that the BAP Manual is clear in leaving the decision as to the use of demographic norms to the professional judgment of neuropsychologists, out of an abundance of caution, Class Counsel would support a statement by the Court that the use of full demographic corrections is not required, and that neuropsychologists examining Players should use their professional judgment to select the appropriate demographic adjustments to apply to the player's test results. A corresponding amendment to the BAP Manual reflecting the same is set forth below:

> Convert test scores to demographically-corrected T-scores via ACS software or Revised Comprehensive Norms for an Extended Halstead-Reitan Battery. The selection of the appropriate demographic normative data to apply to the player's results for such testing is reserved to the clinician's professional judgment.

## IV. No Player Has Been Denied a Monetary Award Based Solely on a Neuropsychologist's Use of Demographic Norms

Putting aside that, as the foregoing demonstrates, the use of full demographic corrections is not required by the Settlement Agreement or the BAP Manual and there is no presumption in favor of the use of such norms, the bottom-line question presented by Movants' motion is whether any Player has had a Monetary Award claim denied on account of the norms that a neuropsychologist decided to use in adjusting his test results. Based on review of the available claims information, Class Counsel has not identified any claim that was denied solely because of the normative adjustments the neuropsychologist applied when converting raw neuropsychological test scores to T-scores.

Neuropsychological testing, as a measure of decline in cognitive ability, is only one criteria necessary to support a Qualifying Diagnosis for dementia (Level 1.5 or Level 2 Neurocognitive Impairment). Other criteria must also be satisfied, including the Players' current functional abilities -- that is the ability to deal with the various tasks of daily living. Functional impairment

is assessed through three subscales of the Clinical Dementia Rating ("CDR"), Community Affairs, Home & Hobby, and Personal Care. For those denied claims where the use of demographic adjustments was mentioned in the Notice of Denial, the Claims Administrator indicated in the Notice that there were other independent bases for the denials. In the vast majority of those claims, the Player's CDR scores were deemed incompatible with the dementia diagnosis claimed by the Player. Further, many of the claims were denied based on the invalidity of the neuropsychological testing due to sufficiently low scores on performance validity tests and other validity measures.

Lastly, it is important to note that, despite the clear language of the Settlement Agreement, no objection was made during the settlement approval process regarding the availability or possible use of full demographic corrections. In fact, one Objector filed a declaration from his expert neuropsychologist, who not only failed to object to the possible use of full demographic corrections but actually discussed the utility and purpose behind neuropsychologists' use of demographic corrections. *See* ECF No. 6201-16 (Stern Decl, ¶ 48). Thus, any such objection to the possible use of full demographic corrections is not only at odds with clinical practice, it is at this stage long since waived.

## V. <u>Movants' Claim of Unlawful Race Discrimination Is Meritless</u>

Lastly, Movants make a two-paragraph argument that the challenged conduct violates the constitutional guarantee of equal protection. Movants Br. (ECF No. 11169-1) at 19. Setting aside that, as the above discussion demonstrates, there has been no untoward conduct in the administration of the Settlement, Movants' contention is unavailing. Their reliance on *Democratic National Committee v. Republican National Committee*, 673 F.3d 192, 204 (3d Cir. 2012), is misplaced because all that case stands for is that court enforcement of a consent decree can amount to state action if it calls for state *coercion*. There is plainly no state (or federal) coercion in the

administration of this Settlement between private parties. *See Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982) ("[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment.") (internal citations omitted); *see also Switlik v. Hardwicke Co.*, 651 F.2d 852, 860 (3d Cir. 1981) (Hunter, J., concurring) ("There is no cause of action under the Civil Rights Act if a case is private litigation in which the state does no more than furnish the forum and has no interest in the outcome.") (citation and internal quotation marks omitted).

Nor does the fact that a federal court oversees the effectuation of this Settlement suffice to constitute state or governmental action for purposes of the Fourteenth Amendment or the civil rights laws. *See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 954 F.2d 801, 806-07 (2d Cir. 1992) (Government oversight of consent decree in RICO action against union and court's enforcement of court-appointed independent administrator's decision not state action triggering due process rights); *Duffy v. Int'l Union of Operating Engineers Local 14-14B*, 795 F. Supp. 2d 246, 253 (E.D.N.Y. 2011) ("[T]the actions of an officer appointed by a federal district court to oversee the implementation of a union consent decree do not constitute 'state action' for constitutional purposes.") (citation and internal quotation mares omitted).

In short, Movants' makeweight constitutional claim fails.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion.

Date: October 8, 2020

Respectfully submitted,

*/s/ Christopher A. Seeger*
Christopher A. Seeger
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
cseeger@seegerweiss.com
Telephone: (212) 584-0700

***CLASS COUNSEL***