# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                                        Plaintiffs,<br><br>          v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>                                        Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Howard and Associates, P.A. v. Jessie Small<br>Attorney Lien Dispute<br>(Doc. No. 10920) | |

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                    September 28, 2020

## I.     INTRODUCTION

Presently before the Court for a Report and Recommendation in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Howard and Associates, P.A. ("Howard") against the Award granted to its former client, Settlement Class Member ("SCM") Jessie Small, in the litigation that became part of this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.). The firm represented Mr. Small beginning on December 6, 2016. With Mr. Small's consent, Howard

**Exhibit**

**1**

brought in another firm, Shenaq PC ("Shenaq"), in the spring of 2018 as associated counsel.[1]   On

September 20, 2019, Mr. Small discharged Howard and instead retained Shenaq alone.  Howard

seeks from the award that was ultimately issued to Mr. Small reimbursement of costs incurred plus

a fee equal to 20% of the award, pursuant to the contingency fee agreement ("CFA") they executed

in December 2016.  (Dispute Rec. Doc. 2.)  On behalf of Mr. Small, Shenaq opposes Howard's

lien.  It seeks its own counsel fee in the amount of 20% of Mr. Small's monetary award, pursuant

to the CFA they entered into on September 20, 2019.

The Settlement Claims Administrator transmitted the Dispute Record to us on March 12,

2020.  Following a hearing on July 7, 2020, and for the reasons we set forth below, we recommend

that Howard be awarded a portion of the fee it seeks.  We also recommend that Howard be awarded

certain of its costs, in accordance with the funds set aside from Mr. Small's award by the Claims

Administrator for this purpose.


## II.        FACTS AND PROCEDURAL HISTORY

On December 6, 2016, Mr. Small retained Howard to represent him in any "claims and/or

lawsuits" in relation to the "Final Settlement Agreement" arising from this litigation.  (Dispute

Rec. Doc. 2, Ex. A, p. 1.)  Under the terms of the Retainer Agreement, Mr. Small agreed that he

would pay an attorney fee of 20% of all gross monies recovered if payment was obtained from the

filing of a claims packet pursuant to the Settlement Agreement.  (*Id.* at p. 2.)  He also agreed that

he would make reimbursement for a portion of the Howard firm's "common costs" and would

---

[1]  We are using the names of the law firms as the defined terms "Howard" and "Shenaq."  Mr. Small had contact at each firm with the named partner, Timothy Howard and Amir Shenaq.  Those attorneys also participated in the evidentiary hearing that we convened.  When we mean to refer to the individual attorney, as opposed to the firm entity, we identify them as "Attorney Howard" and "Attorney Shenaq."

reimburse the firm for the "particularized costs" associated with his representation. (*Id.* at pp. 1-2.)

Howard registered Mr. Small in the concussion settlement program on February 22, 2017. The firm also gathered from Mr. Small's wife an affidavit concerning his condition and compiled for medical review other materials provided by Mr. Small. It engaged a nurse as early as January 4, 2017 for what Howard described as a "CDR."[2] It also arranged for Mr. Small to undergo an MRI and for an evaluation by a Dr. Koberda in March 2017. Six months later, it referred him to Dr. Sadek, a neurologist at the Orlando Epilepsy Center, who in turn put him in touch with neuropsychologists in Orlando, Drs. Lloyd and Morgan. These providers prepared reports in October 2017. Howard advanced costs to these providers on September 20, 2017.

The firm's e-mail communications with Mr. Small in November and December 2017 reflect that its case coordinator worked with the providers to correct typographical errors in the reports. Mr. Small was also actively engaged in this time period obtaining from various sources, and providing to Howard, records of past injuries and treatments, including those from a worker's compensation claim. Howard provided this information to Dr. Sadek in January 2018.

In or about March 2018,[3] Howard associated itself in a number of its NFL cases with Shenaq. Howard has explained in its submissions to us that it brought Shenaq in to "nearly 300" of its cases for the "administrative assistance" that firm offered:

> At [Howard's] suggestion, Shenaq – a solo law firm located in Houston, Texas – was brought on board to assist in providing status

---

[2] Possibly "clinical dementia rating," although the parties never explained this expense.

[3] Howard's brief did not provide a date reference for this development. The Shenaq brief dated this to development to March 2018. (Dispute Rec. Doc. 7 at 4 ("In March 2018, Shenaq was associated into Mr. Small's claim pursuant to a consent to associate agreement signed by Mr. Small.").)

> updates and other ministerial acts, and referring to experts to
> confirm and update prior MAF certified neurology reports, e.g.,
> making requisite filing with the Administrator, as Small's claims
> finished its [sic] journey through the administrative process.

(Dispute Rec. Doc. 10 at 7.) This arrangement between counsel was memorialized in a "Co-Counsel Agreement" that Howard and Shenaq entered into on April 29, 2018 and an "Amended and Restated Co-Counsel Agreement" of April 15, 2019. (Post-Hr'g Exs.)

Prior to the formalization of the co-counsel agreement between Howard and Shenaq, Mr. Small consented to Shenaq's involvement in his case. On April 3, 2018, he signed a document entitled "Consent to Associate Counsel," confirming that he had retained Howard to prosecute his claim against the NFL but authorized Shenaq to act on his behalf "as additional counsel." Although the document was not signed by either firm, it reflected that "[t]he firms will assume joint responsibility for [his] representation" and would divide any fee that arose from his recovery, with 75% of the fee to Howard and 25% to Shenaq.[4] (Post-Hr'g Ex.) Mr. Small also signed a contemporaneous document entitled "Statement of Registration Determination," which was filed with the Claims Administrator and designated Shenaq as his representative in the settlement program and authorized recipient for all future communications from the Claims Administrator about his case. (Post-Hr'g Ex.)

After it was brought into the case, Shenaq proceeded to review Mr. Small's existing medical records in preparation for submission of a claim for compensation under the Settlement

---

[4] The subsequent Co-Counsel Agreement and Amended Agreement signed by Howard and Shenaq provided a more complex formula for splitting counsel fee between Howard and Shenaq for Howard's NFL client base, depending on, *inter alia*, whether any obligations were still owed to a lender with whom Howard had a funding agreement. The Co-Counsel and Amended Agreements also provided for Howard to reimburse Shenaq for any out of pocket expenses for medical testing, travel, lodging, obtaining client medical records, and other third-party experts that Shenaq incurred on behalf of the jointly represented clients.

Agreement. Rules that were then in place governing the implementation of the Settlement Agreement precluded any opinion made by Dr. Sadek, the neurologist Mr. Small saw in September 2017, from substantiating a claim, as his opinion relied upon neuropsychological testing performed by a neuropsychologist who evidently did not have the requisite credentials. Given this circumstance, Shenaq arranged for Mr. Small to undergo evaluations and testing in May 2018 with a new neuropsychologist and new neurologist with the necessary credentials. (Dispute Rec. Doc. 7 at 5.) Shenaq incurred those expenses and was then reimbursed for them by Howard, pursuant to their Co-Counsel Agreement. (Post-Hr'g Exs.)

As Mr. Small had designated Shenaq as the attorney authorized to interface with the Claims Administrator regarding his participation in the Settlement, it was Shenaq that submitted Mr. Small's initial claim form on June 21, 2018. The claim form sought an award based upon a diagnosis of a Level 2.0 impairment and accompanied by the reports obtained the previous month. Before a determination was made on the claim, however, it was flagged for an audit.

The record before us reveals little about the contours of or reasons for the audit.[5] Attorney Shenaq testified that he believed it arose from the evaluations in 2017 by the doctors to whom Howard referred Mr. Small. While reports of those doctors had not been used to support the claim filed on June 21, 2018, apparently the neurologist, Dr. Sadek, had uploaded information to the settlement claims portal directly. This action evidently made his work, and the work of the

---

[5] Attorney Shenaq marked as an exhibit at the hearing questions issued by the Claims Administrator to Mr. Small during a later audit in 2019. (Hr'g Ex. 5.) He also marked a set of audit questions that were promulgated to another client, which he testified were similar to the questions issued as part of Mr. Small's 2018 audit. (Hr'g Ex. 7.) These lengthy questions pertained to how the player came to be examined by a neurologist or neuropsychologist, whether he had been coached for his evaluation, whether any promises had been made to him about awards under the settlement program, and his activities of daily living.

neuropsychologist(s) upon whom he relied, available for review by the Claims Administrator.  Mr. Small's claim remained in audit status with the Claims Administrator, with no determination on his qualification for an award, for some seven months.

During this time, and upon further review of available medical records, Shenaq came to believe that the evidence supported a diagnosis of a more severe condition than the Level 2.0 neurocognitive impairment sought in the June 2018 submission.  It recommended to Mr. Small that he undergo another evaluation by yet a third neurologist, one who was approved to certify a diagnosis of Parkinson's Disease for the MAF program.  As was the case with the 2018 evaluations for which Shenaq made arrangements, the expert fee and travel expenses that Mr. Small incurred were paid for by Shenaq and then reimbursed by Howard.

The March 2, 2019 evaluation led to a diagnosis of Parkinson's Disease.  Shenaq withdrew the pending claim that was still in audit and submitted a new claim in March 2019 based upon the Parkinson's diagnosis.  (Dispute Rec. Doc. 7 at 6.)  The claim was preliminarily approved on May 30, 2019.  (Dispute Rec. Doc. 10 at Ex. C.) Once again, however, the claim was flagged for an audit.  In the course of this second audit, the Claims Administrator twice requested responses from Mr. Small, sent via e-mail to Attorney Shenaq in July and September 2019.  The auditor inquired into the question of who was present for and who actually performed evaluations that he underwent in 2017 with Drs. Lloyd, Morgan, Sadek, and a Dr. Ford-Johnson and whether Nurse Barker participated.  The audit questions also sought explanations for discrepancies in a set of those scoring reports.  (Hr'g Exs. 4-5.)  The audit ultimately concluded, and on October 28, 2019, the Claims Administrator issued a Notice of Monetary Award Claim Determination, finally approving Mr. Small for a claim based upon his Parkinson's Disease diagnosis dating to March 2, 2019.  (Dispute Rec. Doc. 1.)

In light of the questions being asked by the Claims Administrator, Mr. Small came to believe that the 2019 audit was attributable to the manner in which Howard had developed his claim prior to associating with Shenaq in 2018. He also allegedly learned during this time of "legal issues" involving Attorney Tim Howard. He elected to terminate Howard and proceed solely with Shenaq. He sent Howard an e-mail message announcing his decision on September 20, 2019. (Dispute Rec. Doc. 10 at Ex. D.) On that same date, he signed a contingent fee agreement with Shenaq. Howard filed its petition to establish its attorney's lien on December 13, 2019. (ECF Doc. No. 10920.) The Claims Administrator gave notice of this lien on December 16, 2019. Shenaq was directed to provide a response by January 6, 2020 but failed to do so. (Dispute Rec. Doc. No. 2.)[6]

On January 21, 2020, we issued through the Claims Administrator a Schedule of Document Submissions. (Dispute Rec. Doc. 6.)[7] The schedule described the parties' obligations regarding the lien dispute under Rule 19 of the Amended Rules Governing Attorneys' Liens (the "Rules"). The schedule required each party to submit, by February 20, 2020, a Statement of Dispute describing the issues in dispute and a summary of that party's attempts to reach an agreement with the opposing party. (*Id.*) Shenaq submitted its Statement of Dispute on February 20, 2020. Howard did not submit a statement but on March 11, 2020 filed a response memorandum to

---

[6] During this time, Mr. Small presumably would have received the payout of his award. The deadline to appeal the decision outlined in the October 28, 2019 Notice of Monetary Award Claim Determination was November 27, 2019. *See* Dispute Rec. Doc. 1.

[7] Pursuant to its ordinary operations, the Claims Administrator issued the notice via e-mail from the address ClaimsAdministrator@NFLConcussionSettlement.com. It was sent to the various registered portal users for Howard – "Addernike," "Cortney," "duante," "jose," "kyla," "nfl," and "erin" – all "@howardjustice.com".

Shenaq's statement. (Dispute Rec. Doc. 10.) Howards asserted that "[t]here is no dispute as to the relevant facts," but in the alternative requested that we hold a hearing. (*Id.* at 1-2, 11-12.) We did so on July 7, 2020, hearing testimony from Mrs. Renessa Small and Attorneys Howard and Shenaq. In advance of the hearing, Shenaq marked 13 exhibits. Additional exhibits were provided at the request of the Court following the hearing.

## III.    LEGAL STANDARD

As we set out in an earlier Report and Recommendation ("R&R") filed on January 7, 2019, our evaluation of a contested lien involves a consideration of the CFA between the SCM and his counsel and an assessment of the reasonableness of the requested fees in light of the five factors enumerated by the Third Circuit in *McKenzie*. *See* ECF 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")). This approach obligates us to scrutinize the reasonableness of CFAs at the time of the signing of the contracts and then determine if the circumstances compel a different evaluation of the CFA at the time Howard, as lienholder, seeks to enforce it. We will then examine the results obtained, the quality of the representation provided by Howard, and most importantly the extent to which the efforts of Howard substantially contributed to the result. *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1. We necessarily consider the role of current counsel, Shenaq, but we do so mindful that Shenaq did not represent Mr. Small apart from Howard until September 20, 2019.

## IV.    DISCUSSION

Mr. Small, through Shenaq, requests that the Court "discharge" Howard's attorney lien, award no fees to Howard, and authorize only the reimbursement of reasonable costs advanced by

8

Howard – which he asserts were none. (Dispute Rec. Doc. 7 at 2, 8.) While Shenaq has agreed to "waive" any costs it has incurred (which were in fact none), it presumably expects that it would be authorized a contingent fee of 20% of Mr. Small's award pursuant to its September 20, 2019 contingent fee agreement and in light of the work it performed prior to that date. Howard responds that the contingency triggering its entitlement took place in May 2019, while its CFA was still in place, and that it should receive its full 20% fee and repayment of all costs incurred. (Dispute Rec. Doc. 10 at 10.)

The Court's prior opinions in this class action settlement have proceeded with the understanding that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). We have required all attorneys seeking contested fees to justify their fees as "reasonable" under the standards set out in *McKenzie.* *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence).

**A.     The fee claimed by Howard is largely "reasonable."**

Pursuant to the *McKenzie* five-part reasonableness analysis, we typically evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney," *McKenzie I*, 758 F.2d at 101, "scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. We also assess whether there are other factors specific to the individual case that should be considered in the assessment of the reasonableness of the fee at the time of the enforcement of

each contract upon which a lien is based.  We then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.  As set forth below, our analysis of these factors brings us to the conclusion that Howard's claim on Mr. Small's award is essentially reasonable in the context of the parties' contingent fee agreement.

### 1. The CFA at the time of contracting and enforcement – impact of changed circumstances

We first analyze the two primary factors that bear upon the reasonableness of the fee and cost arrangement at the time of the contract's signing by Mr. Small and Howard: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.  We then compare the landscape at the time of contracting with the circumstances at the time the attorney-client relationship terminated.

Howard agreed to represent Mr. Small in his dispute with the NFL on December 6, 2016.  As we have described in our prior opinions, almost five years earlier, on January 31, 2012, the Court granted the NFL's motion for consolidated pretrial proceedings.  This greatly reduced the risk related to the volume of work to be undertaken by any law firm representing a retired player in concussion-related litigation, as the various plaintiffs' committees took over the primary work in the case.  The Court's appointment of co-lead counsel also paved the way for settlement discussions, which led to the Court's eventual approval of a proposed settlement agreement.  On April 18, 2016, the Third Circuit Court of Appeals affirmed the District Court's approval of the settlement.   With the near-certain resolution of the pending litigation through the proposed settlement, the risk of failure of any suit brought by Mr. Small due to the *legal* defenses initially constructed by the NFL were eliminated.  Therefore, at the time Howard took on the representation

10

of Mr. Small, the risks of its work primarily involved those inherent in the claims development process: potential outlays of expenses for medical examinations and gathering of medical records, and the expenditures of time by firm personnel to complete the claim form and follow up as necessary.

When Shenaq assumed sole representation of Mr. Small in September 2019, Mr. Small's claim seeking an award based on his Parkinson's Disease diagnosis had been approved as of May 2019 but was then held up in an audit that appears to have focused on the practices of the examiners to whom Howard referred Mr. Small in 2017. If the claim could clear the audit, Mr. Small stood to receive a significant award, but it would be one that might attract an NFL appeal, given that, in Attorney Shenaq's experience, a Parkinson's diagnosis at Mr. Small's age was uncommon. By the same token, when Shenaq assumed sole representation there did not appear to be any reason for it to expect to have to advance funds for Mr. Small to be examined by any more neurologists or neuropsychologists. Therefore, Shenaq could assume the representation knowing that there was likely to be little financial risk in doing so. Given that it had served as co-counsel for more than a year and was actively involved in work on behalf of Mr. Small, Shenaq also had greater knowledge of the case – with both its risks and rewards – than is typical of new counsel.

We next look to the results obtained, the quality of the work performed and the substantiality of the firm's efforts in bringing about the result.

### 2. The results obtained

Howard registered Mr. Small in the settlement program in the first month that registration opened, February 2017. The firm advanced the costs of various medical and psychological examinations and evaluations it believed necessary for the best understanding of Mr. Small's claim, although the early sets of medical examinations and evaluations were not ultimately used

11

to support the claim. It engaged associate counsel – Shenaq – which assisted with further claim development, leading to the submission of the claim filed in June 2018. With further investigation, Mr. Small's claim was re-filed for the Parkinson's condition in March 2019. The claim was initially approved on May 30, 2019 before it was placed into a second audit beginning in June 2019. (Dispute Rec. Doc. 10 at Ex. C.) Therefore, the claim submission and review process were complete when Howard was Mr. Small's counsel, but for the conclusion of the audit by the Claims Administrator and actual payout of the award based on Parkinson's Disease.

After Mr. Small discharged Howard on September 20, 2019 and proceeded solely with Shenaq, the Claims Administrator completed the second audit and re-issued the monetary award based on the Parkinson's Disease diagnosis on October 28, 2019. Shenaq asserts that it "worked to ensure that there was no delay" in this process, as it was sensitive to Mr. Small's "financial hardship." (Dispute Rec. Doc. 7 at 6.).

### 3. The quality of the work performed

The parties have sharply differing views on the quality of the work performed by Howard. Howard points out it advanced all costs on behalf of Mr. Small, "performed the legal and related services required on every front to advance SCM Small's claim," including "obtaining requisite medical reviews by three distinct MAF-approved neurologists and the neuropsychologist used by them," and maintained communication with Mr. Small throughout the claims process. (Dispute Rec. Doc. 10 at 3-4.) It also points to additional "unique services" it makes available to its client base, including "field visits" and "client education forums across the country," bi-monthly conference calls, outbound calling campaigns to discuss other benefit programs, and a weekly bible study call that "several players" join and for which they were appreciative. (*Id.* at n.2.). Howard points to e-mail communications from Mr. Small expressing his trust in him and his

12

appreciation for his work. (*Id.* at 6 (quoting emails from Dec. 21, 2017 and Mar. 31, 2018).)

Shenaq, however, paints Howard as an ineffective advocate, whose poor choices as to the sources of medical evaluations resulted in delays in the submission and approval of Mr. Small's claim, as well as in the size of the award. It contends that Howard retained a neurologist who relied upon testing "from a neuropsychologist who lacked the appropriate credentials to allow a Qualifying Diagnosis under the Settlement Agreement." (Dispute Rec. Doc. 7 at 3.) Shenaq contends that this "complication" could have been "easily remedied" if Mr. Small had been re-examined by an approved neuropsychologist and that, based upon medical records indicating that Mr. Small suffered from a Level 2.0 Impairment in 2017, "Mr. Small would have likely been able to submit a timely claim that may have qualified for compensation." (*Id.*) Shenaq asserts that, instead:

> As a result of the delay caused by Howard's inaction, Mr. Small's claim had to go through a complete re-evaluation and his claim was not submitted until a year later, resulting in a decline of possible recovery by at least $100,000 due to the increase in Mr. Small's age (a component of the compensation valuation in the Settlement Agreement).

(*Id.*)

The parties also dispute which of them is to blame for Mr. Small's claim having gone into audit. In its Statement of Dispute, Shenaq contends that the second audit that Mr. Small underwent, which spanned from June 2019 through October 2019, was "caused" by "Howard's use of improper doctors," who "had come under significant scrutiny." (Dispute Rec. Doc. 7 at 4.)[8] This audit required Mr. Small to respond to "audit questions relating to their diagnosis and underlying evaluations," causing him "additional stress" and delaying his claim. (*Id.*) Shenaq emphasizes

---

[8] At the hearing, counsel explained that Dr. Koberda had been MAF-certified but that he was later taken off the list of approved neurologists. (N.T. 7/7/2020 at 50.)

that this audit required Mr. Small "to answer additional audit questions primarily related to the

doctors Howard referred Mr. Small to in 2017, prior to Shenaq's involvement." (*Id.* at 6.) Howard

disagrees, responding that:

> Shenaq's communications with a MAF neurologist caused the audit
> of all of Shenaq's claims, including those claims partnered with
> [Howard]. This audit lasted over a year and caused the delay of
> SCM Small's claim for over a year. This year delay was not caused
> by [Howard].

(Dispute Rec. Doc. 10 at 5 n.5.)

While we have limited information about the nature of the 2018 audit, it is clear from the

Claims Administrator's inquiries during the 2019 audit that it was exploring the circumstances of

the 2017 examinations that Howard arranged for Small. There is no evidentiary support in the

record for Howard's contention that any audit of Mr. Small's claim was related to Shenaq's

contacts with a neurologist. Therefore, we find that the delays that Mr. Small experienced from

the two audits initiated by the Claims Administrator are attributable to Howard and diminish the

quality of the work performed by Howard in its representation of Mr. Small between 2016 and

2019.

Mr. Small also suggests that Howard was inept in certain respects, such as in allegedly

registering him in the settlement program with an incorrect name. (Dispute Rec. Doc. 7 at 7.) He

has also complained that his requests for communications with Attorney Tim Howard specifically

were not honored and that when other firm personnel provided responses or updates, they "rarely

had any pertinent information regarding the case" and the information provided was often

incorrect. (*Id.* at 3 & Ex. 2.) Neither of these instances appear to have interfered with the

progression of his claim or stood in the way of him receiving the award he ultimately received.

Nonetheless these circumstances might reflect less than exemplary service to Mr. Small. By

contrast, Mr. Small is very complimentary of Shenaq's responsiveness and accuracy in communications. The record reflects no deficiencies in the quality of Shenaq's work either at the time of his association with Howard or otherwise.

### 4. The substantiality of the work performed

What we generally consider the more important question in this analysis is the relative contributions of the firms to the work necessary to obtain the Monetary Award that the player received. Our prior decisions have identified non-exclusive categories of work undertaken by individual counsel who have supported their clients in this litigation, including: (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date; (2) support of the individual client to ensure his lawsuit would have evidentiary support should the matter proceed to trial; (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted; (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class; (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award; (6) support of clients who were seeking loans and were exposed to predatory lending practices; and (7) providing necessary support in other personal matters collaterally related to this litigation.

We must note here that Shenaq touts its work on behalf of the Smalls and they likewise tout the responsiveness and capabilities of that firm. But the reality is that for a significant portion of the time period at issue, Shenaq's work on behalf of Mr. Small was as co-counsel with Howard, which brought in the Shenaq firm for precisely the services it performed. Therefore, until September 20, 2019, when Mr. Small terminated Howard and entered into a CFA with Shenaq, work performed by Shenaq personnel was done in support of Howard's CFA with Mr. Small.

15

### (1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date

Howard arranged for evaluation and medical record gathering by Nurse Barker and Dr. Koberda within a few months of being retained by Mr. Small. Thereafter, the firm sent Mr. Small for evaluation by Drs. Lloyd and Morgan, as well as Dr. Sadek. These tasks were undertaken for early identification and documentation of Mr. Small's medical condition and in anticipation of filing a claim under the Settlement Agreement when that process opened.

When Shenaq became associated counsel in 2018, it also undertook a prompt review and referred Mr. Small for additional necessary evaluations. This work, however, was done under the auspices of Howard's representation. By the time Shenaq became sole counsel in September 2019, the medical records had been reviewed and medical conditions had been identified and diagnosed. Therefore, this work in the role of an individually-retained plaintiff's attorney ("IRPA") must be credited to Howard.

### (2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial

By the time Howard was engaged by Mr. Small on December 6, 2016, the settlement had been reached and approved in the District Court. As of April 18, 2016, it had withstood an appeal to the Third Circuit. Although certiorari in the United States Supreme Court was pending, it was not expected to be granted. Thus, at the time Howard undertook representation of Mr. Small, it was not expected that his case would proceed to trial. Rather, Howard undertook testing to ensure that Mr. Small was evaluated at a time as to maximize his chance for recovery under the terms of the proposed settlement agreement.

### (3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted

16

This factor does not appear to pertain to the work of either of the firms involved.

**(4) Support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class**

By the time Howard was engaged in December of 2016, the settlement had been approved in the district court and the Court of Appeals, with only the question of whether certiorari would be granted. Mr. Small did not require convincing to remain in the class.

**(5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award**

Both firms shared a role in this aspect, although Howard largely chose to remain in the background and use Shenaq as the liaison with the Claims Administrator. Howard registered Mr. Small in the Claims Administration Portal on February 22, 2017. After April 3, 2018, when Shenaq was brought in as associated counsel, Shenaq managed communications on Mr. Small's behalf regarding the claims process. Shenaq filed Mr. Small's claim and provided relevant medical records on June 21, 2018. After that claim went into audit, Shenaq arranged for another set of testing to be performed and submitted the new claim in March 2019. Shenaq helped Mr. Small address audit inquiries issued on July 15, 2019 and September 5, 2019. Again, however, this was done as associated counsel of Howard for the first seventeen (17) months of its involvement in Mr. Small's claim.

While proceeding as sole counsel after September 20, 2019, Shenaq saw the audit through to resolution, culminating in the re-issuance of the award on October 28, 2019. Shenaq also followed-up with the Claims Administrator to ensure payment as soon as possible.

**(6) Support of clients who were seeking loans and were exposed to predatory lending practices; and**

Howard appears to have served as a liaison for the Smalls when they utilized litigation

funders.  There is no evidence in the record that Howard *protected* them from predatory lending practices.  Rather, Howard may have risked *exposing* Mr. Small to predatory lending practices, inasmuch as Shenaq later saved Mr. Small "more than $90,000" when it assisted him in modifying the terms of loans that Howard allegedly recommended.  (Dispute Rec. Doc. 7 at 7.)

### (7) Providing necessary support in other personal matters collaterally related to this litigation

Howard represents that it provided assistance to Mr. Small with "social security disability, depression, health coverage for his family, suicide ideation, lack of employment, public benefits, family crises, public benefits [sic], and more."  (Dispute Rec. Doc. 10 at 4.)  The Smalls credibly refuted that attestation in large part.  *See* N.T. 7/7/2020 at 71-73 (Mrs. Small's testimony that Howard never helped with public assistance or depression, that her husband never had suicidal ideation, and that the family had health insurance).  The e-mail messages cited by Howard for support for this proposition do not show the firm assisted but rather that the Smalls shared with Howard personal developments and asked for some advice and referrals.  (Dispute Rec. Doc. 10 at 4 n.4 (requesting referral to Social Security lawyer for Mrs. Small).)  By the time that Shenaq was sole counsel, it does not appear that the Smalls required support in other personal matters.

### 5.    Apportionment[9]

Howard notes that the successful claim for an award based on Parkinson's Disease was

---

[9] As we synthesize this information to assess how to apportion fees for the representation provided to Mr. Small that yielded the positive outcome of a Monetary Award, we are cognizant that three groups of attorneys contributed to the work necessary to obtain that Award: Class Counsel and the other firms that acted for the common benefit; and Howard and Shenaq, both of which agreed to represent Mr. Small as IRPAs.  In its establishment of a 22% presumptive cap for IRPA fees, the District Court has already accounted for the substantial benefit provided by Class Counsel.  This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing

filed and initially approved in May 2019 under its stewardship and during the 2 ½ years it actively represented Mr. Small. It asserts that it should receive its full contingent fee of 20%, with a share to be distributed to Shenaq pursuant to their separate co-counsel agreement.

We accept that Howard brought Shenaq into the case and that the work of Shenaq through September 19, 2019 should be credited to Howard. Given that the two firms had a written association agreement, there can be no question that Shenaq understood that its work on behalf of Mr. Small up through September 19, 2019 was pursuant to its association agreement with Howard. To be sure, without fail Howard advanced payment for all of the medical evaluations and other expenses incurred in the development of Mr. Small's claims, even when arranged by Shenaq.

Shenaq performed important work to bring Mr. Small to the point that his claim for an award based upon a Parkinson's diagnosis was initially approved. He also assumed sole responsibility for Mr. Small's representation at the critical time when his award based on Parkinson's Disease was on hold pending the second audit. But the work *prior* to the date on which Mr. Small terminated Howard in September 2019 was pursuant to the CFA between Mr. Small and Howard, as supplemented by Howard's separate agreement accounting for Shenaq's work as associate counsel. Shenaq's submission attempts to blur the line between its work as associated counsel and its work as individually retained sole counsel. We cannot conflate the two time periods.

When we consider the contributions of each firm to the five categories of tasks described above, and valuing each task category based on its significance to this case, we find that the work

---

pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials.

performed during the period in which Howard was retained counsel was more substantial to the result in this case than were the tasks performed by Shenaq after the termination of Howard. As between Howard and Shenaq, we give substantial value to the risk that Howard shouldered when it agreed in December 2016 to represent Mr. Small by fronting costs for a set of evaluations in March 2017 not knowing whether he would be approved for a monetary award that would provide reimbursement to the firm. Howard fronted two other sets of evaluations in 2018 and 2019, again with risks attendant as to recovery of these costs. We are mindful that Shenaq worked diligently after its retention in September 2019 to bring the audit to a conclusion and restore the award initially issued in May 2019. But it undertook representation of Mr. Small knowing that the medical development had already been accomplished and that it might be able to obtain part of a contingency fee simply by completing the audit process and standing ready for any NFL appeal. Shenaq did not have to make an investment in the case as did Howard.

We set the balance between counsel as 88% of the fee to Howard and 12% to Shenaq.[10] A final question that remains is how much of Mr. Small's award is available for distribution to counsel here. As much as 22% of a class member's award may be authorized for counsel fee, less the 5% portion that is currently being held back for potential future disbursement to class counsel. When he engaged Howard in 2016, Mr. Small agreed to pay 20% of any future monetary award as counsel fee, in addition to costs reasonably advanced by Howard. When he discharged Howard and retained Shenaq to represent him as sole counsel, he similarly agreed that Shenaq could receive 20% of his award as its fee. We have considered whether Howard and Shenaq should share in a

---

[10] We express no view on Howard's obligation to distribute its fee in accordance with the co-counsel agreement or the amended agreement that were marked as exhibits post-hearing. That agreement is not within this Court's jurisdiction.

22% portion or a lesser portion of Mr. Small's award.  We conclude that these two firms, which initially agreed to share between themselves a 20% portion of Mr. Small's award for their joint representation, should not be rewarded with a larger portion.  We find that a total fee of 20% of his award is appropriate.

We will apportion the counsel fee as follows:  an amount equal to 15% of Mr. Small's Monetary Award would be distributed between Howard and Shenaq on an 88%-12% basis.  The remaining 2% of Mr. Small's Monetary Award that the Claims Administrator set aside for counsel fee would be refunded Mr. Small.  In light of the District Court's prior order that a portion of IRPA fees be set aside in the Attorneys' Fees Qualified Settlement Fund, 5% "holdback funds" will be apportioned among counsel and Mr. Small in the same proportion in which they share the funds that are currently available for distribution to counsel.

## B.      Howard is entitled to reimbursement of costs incurred in support of Mr. Small's claim.

As part of its lien, Howard seeks reimbursement of $16,750 it contends it incurred in costs associated with its representation of Mr. Small.  (Lien, ECF No. 10920.)    Howard's CFA with Mr. Small provided for reimbursement from his award of costs that were "reasonably advanced" on his behalf, including "medical evaluations, medical records, other medical expenses, … expert witness fees and expenses, and other expenses relating to a particular claim or case, including costs of investigation and litigation[.]"  (Howard CFA at pp. 1, 2.)  In the Statement of Dispute submitted by Shenaq, Mr. Small "respectfully requests that [we] only award those costs which are both reasonable and appropriate under the circumstances."  He contends such costs are *none*, "given that Howard engaged an inappropriate medical expert" – presumably an expert seen in 2017 – and

21

that "[t]he remainder of Howard's costs only created problems for Mr. Small." (Dispute Rec. Doc. 7 at 8.) Shenaq does not seek reimbursement of any costs for itself.[11]

We have been unable to determine how Howard calculated the sum sought in the lien. Following the evidentiary hearing, however, counsel jointly presented a more clear accounting of expenditures made in the case.[12] The list included costs advanced by Howard for examinations and travel arranged by Shenaq in May 2018 and March 2019 during the period of joint representation, which totaled $10,664.56 and for which Howard reimbursed Shenaq as part of its co-counsel arrangement.

The itemization also, however, catalogued the following additional costs incurred by Howard prior to Shenaq's association with the case:

| | | |
|---|---|---|
| 1/4/2017 | $900.00 | "Barker CDR" |
| 3/16/2017 | $1,125.00 | MRI American Health Imaging |
| 3/16/2017 | $7,000.00 | Koberda |
| 9/20/2017 | $4,000.00 | Sadek |
| 9/20/2017 | $4,000.00 | "Loyd Morgan" |
| | -------------------------------- | |
| Total: | $17,025.00 | |

(Post-Hr'g Ex.) Assuming that Howard should be reimbursed the $10,664.56 for the 2018 and 2019 evaluations for which Shenaq made arrangements, there remains only $6,085.66 in funds

---

[11] Shenaq reported in its Statement of Dispute that it "has agreed to waive any recovery of its costs." (Doc. 7 at 8.) In fact, however, there do not appear to have been any costs incurred during the time that Shenaq was sole counsel. Furthermore, when Shenaq operated as associated counsel, the costs it incurred on behalf of Mr. Small were reimbursed by Howard.

[12] The expenditures listed totaled $27,689.56. (Post-Hr'g Exs.)

22

withheld by the Claims Administrator from Mr. Small's award for reimbursement of Howard's additional costs.

Mr. Small has raised concerns about the propriety of those evaluations, particularly as Shenaq argues that it was his client's encounters with some of those providers that attracted the attention of the auditors. We are reluctant, however, to Monday-morning quarterback evaluations that may, in hindsight, seem off-base. Attorney Howard has represented that Drs. Koberda and Sadek were "MAF approved and certified" at the time of the evaluations. (N.T. 7/7/2020 at 7, 100.) The costs appear facially valid, and unless and until an audit process or other special investigation deems them otherwise, we cannot say that these evaluations were not unreasonably obtained such that Howard should be precluded from recovering those costs.

We conclude with a recommendation that the entirety of the $16,750 withheld by the Claims Administrator for Howard's costs – based on the figure identified by Howard in its 2019 lien – be released to Howard. This will not fully reimburse Howard for the costs he now alleges he incurred ($27,689.56). The consequences of Howard's failure to include in its lien the full value of the expenses it incurred on Mr. Small's behalf must fall on Howard. We do not believe that Mr. Small should be required to repay, from the Monetary Award already released to him, the additional $10,939.56 in costs that Howard would appear to seek.

## V. CONCLUSION

The evidence recounted here should result in approval of a 20% attorney fee to be shared by Howard and Shenaq on a 88%-12% basis. Howard should be permitted reimbursement of $16,750 towards its costs. The remainder of funds withheld for attorney fees should be allocated to Mr. Small. The 5% holdback should be borne by Howard, Shenaq, and Mr. Small in the proportion to which they are allocated the 17% portion of the award currently available for

23

distribution. Our recommendation follows.

## RECOMMENDATION

**AND NOW**, this 28th  day of September, 2020, it is respectfully **RECOMMENDED** that the Claims Administrator be ordered to designate the funds withheld for attorney's fee and costs as follows:

> **1.**  Howard may receive 13.2% of Mr. Small's Monetary Award as attorney's fees;
>
> **2.**  Shenaq may receive 1.8% of Mr. Small's Monetary Award as attorney's fees;
>
> **3.**  Mr. Small may receive a refund in the amount of 2% of his Monetary Award, representing funds withheld for attorney's fees but not approved for Howard and Shenaq;
>
> **4.**  The 5% holdback funds shall be attributed to Howard, Shenaq, and Mr. Small in accordance with the allocations indicated above and released in accordance with future orders of the Court;  and
>
> **5.**  Howard may receive the $16,750.00 withheld from Mr. Small's award for reimbursement of costs.

The Parties may file objections to this Report and Recommendation.  *See* Rule 25(d).

BY THE COURT:


/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

24

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                                          Plaintiffs,<br>       v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>                                        Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Howard and Associates, P.A. v. Jessie Small<br>Attorney Lien Dispute<br>(Doc. No. 10920) | |

**ORDER**

**AND NOW**, this _____ day of _____, 2020, upon consideration of the Report and Recommendation of United States Magistrate Judge David R. Strawbridge (ECF No. _____), and no objection having been docketed, it is **ORDERED** that:

1.     The Report and Recommendation is **ADOPTED**;

2.     The Claims Administrator is **ORDERED** to disburse the withheld funds for attorney's fees and costs in accordance with the provisions of the Settlement Agreement, all Court Orders regarding implementation, and in the following manner:

a.  Howard shall be paid from currently withheld funds for attorney's fees in an amount equal to 13.2% of Mr. Small's Monetary Award;

b.  Shenaq shall be paid from currently withheld funds for attorney's fees in an amount

equal to 1.8% of Mr. Small's Monetary Award;

      c.  The balance of funds currently withheld for attorney's fees, representing 2% of the Monetary Award, shall be refunded to Mr. Small;

      d.  The funds from Mr. Small's award that are currently in the 5% holdback funds shall be attributed to Howard, Shenaq, and Mr. Small in accordance with the allocations indicated above and released in accordance with future orders of the Court; and

      e.  Howard shall be paid the $16,750.00 withheld from Mr. Small's award for reimbursement of costs.

BY THE COURT:

_____

ANITA B. BRODY, J.

2