## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>SPID No. 950005876 | Hon. Anita B. Brody |

## OBJECTION TO THE SPECIAL MASTER'S
## MAY, 27, 2020 RULING

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES........................................................................................3

PRELIMINARY STATEMENT ................................................................................6

BACKGROUND ......................................................................................................8

STANDARD OF REVIEW.......................................................................................8

ARGUMENT............................................................................................................9

   A.   The Special Master changed the burden of proof under the Settlement by applying the "clearly erroneous" standard instead of using the settlement's burden of "clear and convincing." ...........................................................................................................9

   B.   The Special Masters decision fails to mention or analyze the Player's documentary evidence on Appeal ...........................................................................................................11

   C.   Dr. ██████████████ experience, exemplary career and medical judgment have been incorrectly discounted by the Claims Administrator................................................12

   D.   The MAF Physicians Medical Judgment was questioned and improperly categorized as incompetent by the Claims Administrator ..............................................................13

   E.   The Player's Claim Package was subject to an extensive and detailed investigation during the Audit which proved to have no adverse findings and confirmed his Qualifying Diagnosis15

   F.   The Special Master adopts new protocols for obtaining a Qualifying Diagnosis and expands the Injury Definition without Court approval.........................................17

      a.   The Injury Definitions contemplate a scenario where there is no documentary evidence that will be available, yet the Special Master believes unambiguous evidence of cognitive impairment was mandatory ...............................................................................18

   G.   The Special Master and the Parties Adopted Improper and Prejudicial Ex-Parte Communications that Violate the Player's Rights to Justify Denial of his Claim Package.......19

      b.   A Pattern of Improper Ex-Parte Communications is Evidenced by the February 5, 2020 Correspondence and as Relied Upon by the Special Master in his Decision........................20

H.    The Special Master's Interpretation of the Injury Definition Violates the Unambiguous Terms of the Settlement Agreement .........................................................................21

I.    The NFL Parties' Opposition Statement Introduced Inadmissible Evidence According to Rule 14, Rule 23 Governing Appeals, and the Federal Rules of Evidence ............................23

J.    Excluding a Review of the Player's Response to the NFL Parties', "new evidence" sets the Legal Grounds to Vacate and Overturn the Special Master's Decision ............................24

K.    The Reliance on The MMSE Score to Deny a "Qualifying Diagnosis" Violates the Unambiguous Terms of the Settlement Agreement ...............................................................27

L.    The Special Master claims that "Dr. ███ did not address why testing was unnecessary despite the MMSE results, making it harder to conclude that his Certification was reasonably determined." ........................................................................................................................28

        c.    The Special Master Concedes that "Denial of a Claim Merely Because an MMSE Screening Test Conflicted with the Scheduled Testing Battery Would Present a Serious Issue on Appeal." ...............................................................................................................30

CONCLUSION ...................................................................................................................32

## **TABLE OF AUTHORITIES**

**CASES**

*Bird Lakes Dev. Corp. v. Meruelo*, 582 So. 2d 119, 120 n.1 (Fla. Dist. Ct. App. 1991)........**16, 17**

Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993).................................................................**24**

*DeGeorge v. Bernier* 768 F.2d 1318 U.S.P.Q. (Fed. Cir. 1985) ....................................................6

*Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010)................................................14

*Falk v. Paluch*, 163 F.R.D. 8, 1995 U.S. Dist. (N.D. Ill. 1995) ..................................................20

*Goebel v. Benton*, 830 P.2d 995 (Colo. 1992)..........................................................................25

*Hughes v. Long*, 242 F.3d 121 (3d Cir. 2001)..........................................................................24

*Hutter Northern Trust v. Door County Chamber of Commerce*, 467 F.2d 1075, 1972 U.S. App.

 (7th Cir. 1972).)) ................................................................................................................22

*In re Caveney*, 761 F.2d 671, 674, 226 U.S.P.Q. 1, 3 (Fed. Cir. 1985).......................................6

*In re Diet Drugs Prods. Liability Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008) ...........................14

*In re Johns- Manville Corp.*, 759 F.3d 206, 214 (2d Cir. 2014) .................................................19

*Koon v. United States*, 518 U.S. 81 (1996) ................................................................................5

*Leisure v. Leisure*, 589 N.E.2d 1163 (Ind. Ct. App. 1992) .......................................................17

*Mathew Zaheri Corp. v. New Motor Vehicle Bd.*, 64 Cal. Rptr. 2d 705  (Cal. Ct. App. 1997) ....18

*Parts & Elec. Motors, Inc. v. Sterling Elec.*, Inc., 866 F.2d (7th Cir. 1988)..................................7

*Rose v. State*, 601 So. 2d 1181, 1183 (Fla. 1992).....................................................................16

See Torres v. SGE Management, L.L.C., 945 F.3d 347, 353 (5th Cir. 2019)..............................22

*Socony--Vacuum Oil Co. v. Oil City Refiners*, 136 F.2d 470, 58 U.S.P.Q. (BNA) 632 (6th Cir.),

 (1943).................................................................................................................................11

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 312 (3d Cir. 2011) ..........................................14

*Thompson v. Riverside Chemical Co.*, 416 F. Supp. 35, 1976 U.S. Dist.(N.D. Miss. 1976). .......23

*Tugwell v. A. F. Klaveness & Co.*, 320 F.2d 866, 1963 U.S. App. (5th Cir. 1963)....................24

*U.S. Bank Nat. Ass'n v. Village at Lakeridge, LLC*, 138 S.Ct. 960 (2018)...................................5

*Wallace v. Abell,* 318 F. App'x 96 (3d Cir. 2009).....................................................................25

**STATUTES**

USCS Fed Rules Evid R 103........................................................................................................7

**OTHER AUTHORITIES**

Final Order and J. § 17, *In re: Nat'l Footbal League Players' Concussion Injury Litigation*, ECF
   No. 6534...................................................................................................................................6

Folstein MF, Folstein SE, McHugh PR. Mini-mental state. A practical method for grading the
   cognitive state of patients for the clinician. J Psychiatr Res. 1975;12:189–98.........................27

Galasko D, Klauber MR, Hofstetter CR, Salmon DP, Lasker B, Thal LJ. The Mini-Mental State
   Examination in the early diagnosis of Alzheimer's disease. Arch Neurol. 1990;47:49-52.......28

George D. Marlow, From Black Robes to White Lab Coats: The Ethical Implications of a Judge's
   Sua Sponte, Ex Parte Acquisition of Social and Other Scientific Evidence During the
   Decision-Making Process, 72 St. John's L. Rev. 291, 324-28 & n.129 (1998) ........................18

Jonah S. Shiroky, BSc, Hyman. Schipper, MD, PHD, FRCPC, Howard Bergman, MD, and
   Howard Chertkow, MD FRCPC, Can You Have Dementia With an MMSE Score of 30?
   American Journal of Alzheimer's Disease & Other Dementia 2007 Volume 22 Number 5 406-
   415 .........................................................................................................................................26

Mitchell A.J. (2013) The Mini-Mental State Examination (MMSE): An Update on Its Diagnostic
   Validity for Cognitive Disorders. In: Larner A. (eds) Cognitive Screening Instruments.
   Springer, London...................................................................................................................27

Mr. Brown, BrownGreer PLC, Claims Administrator, Miami Dolphins Alumni NFL Concussion
   Settlement Town Hall. YouTube 00:31:37 - 00:31:53, NFL Concussion Settlement Web
   Portal, (August 2017) ............................................................................................................10

Notice, *In re: Nat'l Football League Players' Concussion Injury Litigation* (Regarding Special
   Investigations) ECF No. 11110...............................................................................................3

Order, *In re: Nat'l Footbal League Players' Concussion Injury Litigation* (Settlement
   Implementation Determination) ECF No. 10712.....................................................................3

Schultz-Larsen K, Kreiner S, Lomholt RK. Mini-Mental Status Examination: mixed Rasch
   model item analysis derived two different cognitive dimensions of the MMSE. J Clin
   Epidemiol. 2007;60:268–79.) ................................................................................................25

Shulman KI, Herrmann N, Brodaty H, et al. IPA survey of brief cognitive screening instruments. Int Psychogeriatr. 2006;18:281–94. .......................................................................................27

Simard M, van Reekum R: Memory assessment in studies of cognitive enhancing drugs for Alzheimer's disease. Drugs and Aging, in press.....................................................................28

Van Hout H, Vernooij-Dassen M, Hoefnagels W, Grol R. Use of mini-mental state examination by GPs to diagnose dementia may be unnecessary. BMJ. 1999;319:190 ................................28

## PRELIMINARY STATEMENT

A settlement is a cornerstone of the American judicial process. The compromise in entering into a settlement gives certainty and resolution. In reaching a settlement agreement, the terms and application of such substantive terms the parties have negotiated must be helped by and applied by the parties.  In adding new rules to the Settlement they have been agreed upon by the Parties and most important Court approved.

While there have been countless appeals and objections stemming from the claims process, the fundamental principles of due process and ethics must be strictly applied. Specifically, the procedures to which the Parties adhere to in the claim's determination process must be held to the highest standards.  The roller coaster ride that began for Mr. ███ on June 1, 2018, upon his Claims Package Submission, has now more than two years later come to the filing of this Objection.

The Court has expressed its reliance on the highly vetted MAF Physician's sound clinical judgment to produce correct diagnoses absent evidence to contradict his findings.  The Court has been troubled by events regarding denials, objections, and audits.  To the extent that this Court found disturbing, requiring the Special Masters and Claims Administrator to provide assurances that such events would not be repeated.  Order, *In re: Nat'l Footbal League Players' Concussion Injury Litigation* (Settlement Implementation Determination) ECF No. 10712

The Court did appoint a special investigator and as reported in the Notice Regarding Special Investigations, the Special Masters have taken the necessary and appropriate steps to remediate the wrongful conduct denying specific claims. Notice, *In re: Nat'l Footbal League Players' Concussion Injury Litigation* (Regarding Special Investigations) ECF No. 11110  The Claims Administrators Status Reports filed with the Court; do not mention one word of wrongful conduct regarding denial of claims.

Here the SM does not recognize the contradiction of Mr. ███ submission of additional evidence supporting his first Appeal, which proved he did not live alone and he did not drive; provided additional medical records that were not mandatory under the settlement terms as a good faith showing of transparency and additional medical evidence of his brain injury.

Additionally, the SM fails to acknowledge that the Claims Administrator (hereinafter, the "CA"), in its first denial, also claimed that "The statement the Player is too severely impaired to undergo neuropsychological testing contradicts the MMSE score of 25/30" has no probative value

in denying a claim because the MMSE is a screening tool used at Neurology practices and, most notably, the MMSE is not part of the required test neither in the BAP or MAF Physician's (hereinafter, the "MAF") diagnostic criteria or injury definitions. Logically, going back to denial one, it has been a frivolous and malicious determination by the CA citing to the MMSE, knowing it has no bearing on Settlement terms/injury definitions. Therefore, when the Player submitted his first Appeal with evidence that he does not live by himself, the SM Pritchett did not deny his appeal and instead remanded.

At first glance, it seemed like the usual NFL Parties creating red herrings and justifications outside of Settlement terms to pay injured players less money, but that is not the extent of it. In the NFL Parties opposition, they relied heavily on Mr. █████████ MMSE score and even uploaded a blank MMSE test as "new evidence." The MAF Physician's competency, was questioned by the CA. Subsequently, the MAF's termination was at-will and not conducted in an emergent manner nor due to suspicion of improper practices. The reality is that the CA questioned the MAF's competency and therefore tarnished his diagnosis reports/certifications submitted on behalf of players.

Here we argue that the SM established an entirely new and erroneous legal principle in addition to the application of the incorrect rule of law and Settlement terms. The decision at issue focuses on legal jargon in contrast to the only thing that should matter, the Player's brain trauma and the evidence presented supporting his "Qualifying Diagnosis". The SM makes no mention of the Player's Appeal's content including but not limited to the medical records on file, or any additional documentary evidence that contradicts the CA's allegations.

It is a mystery why Mr. ████████ claim was subject to SM Hoffman's decision after his third Appeal, considering the matter was appointed to SM Pritchett, who had already remanded the claim back to the CA twice and without a doubt familiar with the issues and his reasons for remands. As discussed below, the SM creates new legal principles, injury definitions, and additional protocol for Qualifying Diagnoses under the Settlement Agreement.

## BACKGROUND

The Player offers the Court in this objection, a series of events encompassing wrongful conduct in denying the Player's Qualifying Diagnosis.  On January 31, 2018, the Player received a Qualifying Diagnosis of Level 2.0 from the Qualified MAF Physician. The audit of the Player's claim resulted in no adverse finding, and as thoroughly explained in his three Appeals of the CA's denials, the GC diagnostic criteria were applied.

The AAP recommended that the Claims Administrator deny the claim, which it did on November 30, 2018.  The Player, subsequently supplemented his Claim Package with various medical records and new materials, but the Claims Administrator, following remand by SM Pritchett to review the additional materials, again denied the Player's diagnosis.  The Player appealed the denial of his diagnosis for the second time on September 19, 2019.  On October 1, 2019, Special Master Pritchett, for a second time, remanded the claim for "re-review for the issues raised in the appeal."  That third review culminated with another AAP recommendation to deny Mr. ███████ appeal, as well as another denial by the Claims Administrator.

## STANDARD OF REVIEW

The strictest standard of review is de novo review for legal error and when the trial tribunal establishes a new legal principle. The Appellate Court will not defer at all to the trial tribunal (i.e., in a case of the first impression).  In this case, the SM's(tribunal) decisions when performing essentially appellate functions regarding the Settlement Agreement shall be reviewed at the highest and strictest standards.

Abuse of discretion is when the trial judge committed a legal error in exercising her discretion. If the trial judge fails to consider the various options available, fails to consider relevant factors, or considers irrelevant factors, the Court of Appeals will reverse the decision. The failure to apply the law correctly in reaching a decision is always an abuse of discretion. The appellate Court shall also reverse if the record does not adequately establish the reasoning employed by the judge to reach a discretionary decision. *Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.")

The nature of the duties of the Settlement Entities in administering the Settlement Agreement are "functionally comparable to that of a judge" - in advising the court, "resolving disputes between the parties" and "adjudicating private rights".  The Supreme Court has determined that the "the standard of review" for mixed questions of law and fact is that if it entails

developing auxiliary legal principles of use in the instant case and other cases, de novo review shall be used. *U.S. Bank Nat. Ass'n v. Village at Lakeridge, LLC*, 138 S.Ct. 960, 967 (2018)

While the Special Master's decision purports to be a factual determination that is "final and binding," the decision turns on an interpretation of the Settlement Agreement's terms and thus reflects a conclusion that the Court may review de-novo. *See, e.g.*, In Re Johns-Manville Corp., 759 F.3d 206, 214 (2d Cir. 2014) ("The interpretation of unambiguous settlement agreement terms is a question of law subject to de-novo review.")  The interpretation of unambiguous settlement agreement terms is a question of law subject to *de novo* review. Moreover, this Court expressly retained "continuing and exclusive jurisdiction to implement, administer and enforce the Settlement Agreement" in accordance with its terms. Final Order and J. § 17, *In re: Nat'l Football League Players' Concussion Injury Litigation*, ECF No. 6534; *see also* Settlement Agreement § 20.1(n).)

## ARGUMENT

### A.  The Special Master changed the burden of proof under the Settlement by applying the "clearly erroneous" standard instead of using the settlement's burden of "clear and convincing."

The application of the wrong quantum (burden) of proof is an error of law subject to plenary review. *In re Caveney*, 761 F.2d 671, 674, 226 U.S.P.Q. 1, 3 (Fed. Cir. 1985). The quantum of evidence is the amount of evidence needed quality, and type of proof needed to prevail in litigation. For example, in *DeGeorge v. Bernier* 768 F.2d 1318, 226 U.S.P.Q. 758 (Fed. Cir. 1985) the Federal Circuit vacated a decision by the BPAI because it applied an erroneously high standard of proof (a standard above the correct clear and convincing standard that is closer to the beyond a reasonable doubt standard) to the party who copied claims to provoke an interference.

The quantum of proof is determined by law, statute, case law, or including but not limited to a settlement agreement (as is the case here). Therefore, altering the quantum of proof as to the Player's claim in any way amounts to legal error, abuse of discretion, and reversible.

Rule 33 is the Standard of Review and provides the Player the correct burden of proof: The Special Master will decide an issue on a Registration Appeal based upon a showing by the Appellant of clear and convincing evidence. Under this standard, the Appellant must convince the Special Master that there is a high degree of probability that the determination of the Claims

Administrator being appealed was wrong. The Player's burden of proof is "clear and convincing." Stated correctly, the Appellant (the Player) has the burden to prove by clear and convincing evidence that the CA was wrong in their determination as to whether his Qualifying Diagnosis was or was not generally consistent with the Settlement criteria.

The Player's burden of proof at the "determination by the CA of a monetary award stage" is "Generally Consistent" which FAQ 101 explains this to mean "...two things have more elements or characteristics in common with each other than they have elements or characteristics that differ from each other. The common elements or characteristics must predominate over the uncommon ones".

The SM's proposed that he was to decide **"whether the Claims Administrator's determination that the MAF Certification was insufficient was "clearly erroneous."** "Clearly erroneous." is a higher burden of proof than required under the settlement terms. "Clearly erroneous" is a higher standard than even beyond a reasonable doubt. For example, the Seventh Circuit informed one appellant that, for the trial court's decision to be overturned as clearly erroneous, the decision "must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.*" Parts & Elec. Motors, Inc. v. Sterling Elec*., Inc., 866 F.2d 228, 233 (7th Cir. 1988). The appellant must convince the appellate court that the findings lack any rational connection to the record or that the vast weight of the evidence renders a finding certainly wrong. Such circumstances are rare.

According to the SM's decision, the Player had to prove by "clear and convincing" evidence that "**that the Claim's Administrator's decision incorrectly discounted his clinician's judgment.**" If that standard of proof were to be found appropriate now it would substantially harm the Player, because it is impossible to prove that the CA is "clearly erroneous," due to the nature of subjective AAP recommendations and it unduly raises the burden of proof under the Settlement. For this reason alone, the SM has committed reversible error, abused his discretion, and his decision should be overturned.

**B. The Special Masters Decision Fails To Mention Or Analyze the Player's Documentary Evidence on Appeal**

We respectfully outline in this objection the SM's failure to adhere to the Court's Order.  Because and as further discussed, the SM excludes from his decision any mention and or discussion of the Player's record on Appeal.  According to USCS Fed Rules Evid R 103, The Player preserves his claim of error affecting his substantial right under the Settlement as to the SM excluding in his decision the following relevant evidence submitted in support of his Qualifying Diagnosis and Appeals:

1) Notice of Concluded Audit dated October 12, 2018, (Doc. 187783).

2) Kenneth L. Nudleman, M.D., F.R.C.P.(C) Diplomat American Board of Neurology & Psychiatry with added qualifications in Clinical Neurophysiology, Certified American Board of Electromyography & Electrodiagnostic, Certified American Board of EEG and Clinical Neurophysiology QME, AME, IME and a Clinical Professor of Neurology Qualified Medical Examination- Neurology **dated October 28, 2010** (Doc. 175143).

 3) Third-Party Sworn Statement (Doc ID. 196142).

4) Employment History Form (Doc ID. 177122).

5) Declaration of reliant informant ████████ (Doc ID. 196141).

6) Declaration of ████████ (Doc ID. 196140).

7) Declarations of MAF Physician Dr. ████. (Doc ID. 196137,196138).

8) MAF Physician Dr. ████████ Certification Letter of Diagnosis (Doc ID. 171337).

9) Kenneth L. Nudleman, M.D., Qualified Medical Examiner – Supplemental Medicolegal Report **dated September 19, 2011** (Doc ID. 196139),

10) Clinical Dementia Rating Worksheet completed by reliable informant ████████ (Doc ID. 221270),

11) Side by side comparison chart of the applicable diagnostic criteria and the MAF Phycians's application under the Generally Consistent principle (Doc ID. 221260),

12) Kenneth L. Nudleman, M.D., Qualified Medical Examiner – Supplemental Medicolegal Report **dated November 14, 2010** (Doc ID. 196139),

13) Health Care Provider History Form (Doc ID. 177123)

Here, the above listed documentary evidence was provided and or obtained independently by the MAF. He approved the records' sufficiency as addressed in his Diagnosing Physician Letter but, most importantly, accepted by the CA during its audit investigation, resulting in no adverse findings. As discussed in Mr. ████ second and third Appeal; the CA discounts the sufficiency

of the records in contradiction to the injury definitions delegating that authority to diagnosis physician who confirms the sufficiency of any documentary/medical evidence.  Foot(Not only did Mr. ███████ comply with the requirements of §2 (a)(iii); but in the spirit of transparency and integrity of the Settlement, he also volunteered and complied with §2 (a)(iii) **(b)**, which is triggered if **no documentary evidence** of functional impairment **exists or is available**.  §2 (a)(iii) **(b)** requires the Retired NFL Football Player's ("Players") functional impairment, ***must*** be corroborated by a third party sworn affidavit from a person familiar with the Players condition, **the *sufficiency* of which will be *determined* by the physician making the Qualifying Diagnosis**.)

It is disheartening in reviewing the SM's decision that not one mention of the above listed documentary evidence was made or analyzed. The Player addressed all the documentary evidence and the CA's incorrect and subjective interpretation of the records in his Appeals. The SM's failure to address and or acknowledge the record and evidence that should be considered on Appeal is a direct contradiction and failure to comply with Rule 23 governing appeals. [1]

**C. Dr. ███████ D.A ██████'s Experience, Exemplary Career and Medical Judgment have Been incorrectly Discounted by the Claims administrator**

While the denials are said to be supported by the anonymous AAP's recommendation and Orran L. Brown's court filing expressing Dr. █████s medical judgment is questionable, neither member of the AAP or Mr. Brown have a legal standing for such conclusion. Dr. █████ D.A. ████ M.D., obtained his medical degree in 1986 from the prestigious John Hopkins University School of Medicine. In 1991 he accomplished his residency as a Chief Residency in Neurology at the New York Hospital-Cornell University Medical Center with an additional year of residency. Dr. ████ is licensed to practice medicine in the State of New York, Michigan, and Florida. From 1991 to 2001, he was certified by the American Board of Internal medicine.

From 1994 to present, he is certified by the American Board of Psychiatry and Neurology, and from 2016 to present, he is a certified Expert Medical Advisor for the Florida Department of

---

[1] As eloquently stated by the Honorable Judge Brody in the executed Order dated April 11, 2019, "the neurologist selected to serve as Qualified MAF Physicians are approved because of their exemplary education, training, board certifications, experience and credentials in the medical community. That safeguarding the integrity of the claims process is crucial to implementing the Settlement with honor and each Qualified MAF Physician performs a crucial and indispensable role in the successful implementation of the Settlement Agreement, the provision of Settlement benefits to Retired NFL Football Players and their families and the correct application of the provisions of the Settlement Agreement."

Financial Services, Division of Workers' Compensation.  Dr. Suites' education and work history have withstood the scrutiny of years of diagnosing patients without error, providing court accepted expert opinion and a leader in the advancement of scientific research in Neurology.  His medical judgment has never been discounted or questioned. (Exhibit A)

### D.  The Maf Physicians Medical Judgment Was Questioned and Improperly Categorized as Incompetent by the Claims Administrator

Orran L. Brown made public in his court filing (ECF No. 10488) the CA's doubt and belief that Dr. ████ medical judgment was questionable.  The MAF's subsequent termination from the program has poisoned the decision-making process under the guise of anonymous AAP recommendations discounting his medical judgment.  The CA's office openly questioned MAF Physician Dr. ████ competence to diagnose dementia although he was vetted to participate in the MAF Program and his education and experienced in the medical field of Neurology are exceptional and extraordinary.  Although the MAF's medical judgment was in doubt and subject to multiple investigations and audits in several other claimants for an extended amount of time as evident by the court filing (ECF No. 10488) in March 2019, the CA failed to notice the Settlement Class Members.  By March 2018, the Player had already submitted to an evaluation by the MAF and had no reason to question his competency, and neither did the undersigned. The CA's failure to notify the Player that his MAF's medical judgment has been questioned and notify him that the MAF was terminated from the program has amounted to a fatal and prejudicial breach of the Settlement Agreement.

The point is not only procedural criticism, but on of substance. The CA's failure to provide adequate notice to the Player results in a breach of its duties to the players under Section 10.2 (b)(8), to perform such other tasks reasonably necessary to accomplish the goals contemplated by the Settlement Agreement. Openly, Mr. Brown communicated at the Miami 2017 town hall that obtaining a diagnosis from an MAF Physician would not raise any issues unless it was found that fraud, misrepresentation, or omissions of material facts were discovered. Mr. Brown enthusiastically stated:

> "If you get a diagnosis from a MAF doctor and the doctor fills out that form that certifies what it is, then there is no way we can deny it unless the records do not support it, which I do not think that is going to happen." 1 "But if that doctor makes a mistake and signs a form that says he has ALS, when the

records, in his records he said he does not have ALS, we would catch that." (id.)
"But if you have a qualified MAF physician, on the list of doctors that we have,
we have found, make that diagnosis, and they fill out the paperwork, and you
give us a claim form, then it is not going to be denied." (Mr. Brown,
BrownGreer PLC, Claims Administrator, Miami Dolphins Alumni NFL
Concussion Settlement Town Hall. YouTube 00:31:37 - 00:31:53, NFL
Concussion Settlement Web Portal, (August 2017).

As confirmed by the CA, Dr. ███ termination was at-will and not conducted in an
emergent manner nor due to suspicion of fraud, to which the CA also confirmed that he did not
commit fraud. (*See.* Response by the Claims Administrator to Motion by X1Law, PA to Stop Audit
Investigation of its Claims, ECF No. 10488). The truth of the matter is that Dr. ███ competency
was questioned in Mr. Brown's response filed with the Court and therefore tarnished as to any of
his diagnoses, reports, or certifications submitted on behalf of players. When Dr. ███ was
released from the program, the Players Qualifying Diagnosis was only four months old. Instead of
the CA notifying him of the MAF's termination and doubt as to his competency to diagnose
dementia, the Player received his first denial on November 30, 2018.   If the Player would have
been notified, the undersigned can absolutely assure the Court that he would have withdrawn the
Player's Claim Package.  It would be logical to conclude that the CA would not have approved his
Qualifying Diagnosis and the Player would have been scheduled to receive and evaluation from
an alternate MAF Physician.

Mr. Brown's court filing referenced above also confirmed no evidentiary finding of errors,
omissions of material facts, or fraud by the former MAF. Although such concession were made,
the MAF's medical judgment is still at issue here.  **The SM claims in his decision that "Dr. ███**
**did not consider or facilitate the administration of a neuropsychological testing protocol."**
(SM Decision at 2) Here, the SM makes an unacceptable assumption that is only prejudicial to the
Player with zero probative value as to his decision. There is no evidence on the record to support
SM's statement that Dr. ███ did not consider the administration of neuropsychological testing.[2]
*Socony--Vacuum Oil Co. v. Oil City Refiners*, 136 F.2d 470, 58 U.S.P.Q. (BNA) 632 (6th Cir.),
cert. denied, 320 U.S. 798, 64 S. Ct. 368, 88 L. Ed. 482, 59 U.S.P.Q. (BNA) 495 (1943) Assuming
facts, not in evidence is dangerous to all parties involved. It is especially dangerous when the
person assuming facts, not in evidence, has the power of "denial" as did the SM here.

---

[2] Rule 53 does not operate to relieve the appellate Court of the burden of reviewing inferences or conclusions drawn
by the master and the trial court.

The SM's unsupported conclusion that Dr. ███ did not consider the administration of neuropsychological testing should be of no surprise to the Court considering the SM's decision does not reference a scintilla of the volume of the Player's documentary medical evidence on record.

**E.  The Player's Claim Package Was Subject to an Extensive and Detailed Investigation During the Audit Which Proved to Have No Adverse Findings and Confirmed His Qualifying Diagnosis**

Settlement Agreement, Section 8.6(b) states, "The claims Administrator will have the discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any claim package … documentation, including without limitation, as set forth in Section 10.3."

Settlement Agreement, Section 10.3(h) says, "If, upon completion of an audit, the CA determines that there has not been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the process of issuing a Monetary Award ... subject to appeal, will proceed."  Naturally, deciding whether a diagnosis was generally consistent with the diagnostic criteria would entail some vetting by determining whether there were facts and or evidence that would contradict the doctor's diagnosis.  They use an anonymous AAP's recommendation to help determine an acceptable diagnosis, because logically, lawyers could never make that determination.

However, as the SM imposes the evidentiary burden of "clearly erroneous" to the Player; one has to argue that the **AAP's job is akin to only have the authority to provide guidance/recommendation based on accepted medical science in the field of Neurology**. <u>Without an adverse finding during Audit, we are left to a subjective interpretation of the record and denial</u>. (emphasis added)

The SM stated, "The parties have interpreted the agreement to mean that the claims administrator cannot disagree with the clinician's certification merely because it would have made a different choice." (SM Decision at 4) We concede that an MAF's Certification has to be reasonable under the accepted medical standards in Neurology. However, reasonable is subjective, and as discussed above, the CA cannot deny a claim simply because they disagree with the MAF's diagnosis (**as is here without any objective evidence**). To determine the reasonableness of the Certification without contradictory objective evidence, then the CA has only one way to invalidate

a diagnosis – upon a finding in Audit of fraud, omission of fact, and material misrepresentations in the Players Claim Package.

The Claims Administrator is empowered to do an Audit, which they did here and reported no adverse finding to contradict the Qualifying Diagnosis or the documentary evidence.  It is evident by the extensive medical history and documentary evidence the Player has (severe) Moderate Dementia, and if the Claims Administrator had any evidence to negate the MAF's Certification, they should, could, or would have established adverse findings during the Audit process.  Even if not in Audit, they are certainty held to an objective evidentiary standard to deny the Player's Qualifying Diagnosis.

The Player's number one contention of the issues raised in Appeal two and Appeal three; remained, that if the AAP's recommendation to deny was based on insufficient records and or incomplete MAF explanation/clarity, then why did the CA fail to ask for more? (Exhibit B Appeal Two) (Exhibit C Appeal Three).  Another way to put it; if the CA failed their mandate of due diligence by not obtaining additional clarification or doing anything to produce objective evidence then the Player rights have been violated in their three denials of his Qualifying Diagnosis.[3]

The Court has ordered a new procedure for Qualifying Diagnosis that deviate from the BAP diagnostic criteria and provides in part that, "A qualified MAF physician who does not follow the BAP criteria … on claims we already have and diagnoses already made, we will go back to the Qualified MAF and get the explanation where we feel it is necessary." (ECF No. 546114)  The revised rule is an excellent addition because it allows the Claims Administrator to determine precisely how the MAF reached the Player's Qualifying Diagnosis. Appeal two **encouraged** the CA to apply the new MAF rule and obtain the clarity and explanation necessary to correctly determine his Claim Package/Qualifying Diagnosis. The CA made no such inquiry.

The most glaring misrepresentation in the CA's first denial statement is that the Player drives, and therefore his diagnosis is not generally consistent under CDR 2.0. The CA's misrepresentation in the first denial, is notable because the Audit did not produce such findings or evidence supporting the Player drives. Moreover, as proven in his first Appeal, objective evidence was submitted that contradicted the CA's misrepresentation that he does drive. The fact was that he has not driven a vehicle for approximately the past five years.   The CA intentionally disparages,

---

[3] "Safeguarding the integrity of the claims process is crucial to implementing the Settlement with honor." (ECF No. 10527)

destroys, and discards the Player's source of evidence (MAF Physician medical judgment), which as the case here almost three years later, the Player's claim has been denied three times under the guise of (inconsistent or incomplete) clarification from the MAF that was terminated at will.

The SM's decision attempts to contradict the Player's proposal on Appeal; that if the CA believed the MAF's Certification required additional explanation, **they should have investigated further and obtained the necessary clarification**. Without such clarification and or evidence to support otherwise, contention with the Certification is subjective and reversible. The failure to obtain additional clarification from the MAF is a crucial component in the Player's Appeal and constitutes legal error under the Settlement. In good faith, the Player believed the CA made an incorrect determination because they provide no objective evidence to support the denial of his Qualifying Diagnosis.

### F. The Special Master Adopts New Protocols for Obtaining A Qualifying Diagnosis And Expands the Injury Definition Without Court Approval

The SM expressly confirms that, 'deference to MAF Physicians' Certification should be the rule, given those clinicians' eminence and training, as well as their personal evaluation of the player-claimant.' (SM Decision at 3) Immediately thereafter he circumvents the MAF's deference by creating a new legal principle and protocol not included in the Settlement and most importantly not approved by the Court. He does this by claiming that "The Claims Administrator does, however, <u>have an obligation to determine if the Certification was </u>"reasonably determined"—**a standard fashioned by the Parties, which I adopt in this Appeal."** (SM Decision at 3)

The SM's adoption of a new protocol and legal principle as "fashioned by the Parties" raises questions of impropriety and the incorrect conclusion of law. The SM's new adaptation is a standard that has magically appeared after three denials and three Appeals. That is because there is no such reasonably determined standard. Here, an amendment of the terms of the Settlement Agreement requires <u>written agreement of the Parties</u>. (*See*. Settlement Agreement § 30.6 ("This Settlement Agreement will not be subject to any change, modifications, amendment, or addition without express written consent of Class Counsel and Counsel for the NFL Parties, on behalf of all Parties to this Settlement Agreement and **upon Court approval**."))

Moreover, federal courts do not maintain the power to alter the terms of a Settlement Agreement, such as the definition of a Qualifying Diagnosis of Level 2 Neurocognitive Impairment. *See*, e.g., *Sullivan v. DB Investments, Inc*., 667 F.3d 273, 312 (3d Cir. 2011) (finding

that it is "well established" that settlement agreements are "creatures of private contract law" and a district court cannot modify their terms (internal citations omitted)); *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010) (**holding that a "district court is not a party to the settlement, nor may it modify the terms of a voluntary settlement agreement between parties" because Rule 23 "does not vest [in the district court the] broad powers to intrude upon the parties' bargain");** *In re Diet Drugs Prods. Liability Litig.*, 553 F. Supp. 2d 442, 490 (E.D. Pa. 2008) ("*The Supreme Court has stated: 'Rule 23(e) wisely requires court approval of the terms of any settlement of a class action*, but … does not authorize the court to require the parties to accept a settlement to which they have not agreed.'… We have no power to modify any terms and force acceptance on the parties to the agreement" (internal citations omitted)).

Here the Settlement's definition of "Level 2 Neurocognitive Impairment" was heavily negotiated, as this Court is well aware.  It withstood this Court's scrutiny and the Third Circuit Court of Appeals and should be enforced according to its terms, which the CA's denials and SM's decision contradict. Instead, we are faced with the "adoption" of a "reasonably determined" requirement by the SM **without court approval**.

### a. The Injury Definitions Contemplate a Scenario Where there is No Documentary Evidence that Will Be Available, yet the Special Master Believes Unambiguous Evidence Of Cognitive Impairment was Mandatory

SM makes yet another fatal and prejudicial mistake in claiming that there would be some evidence that shows the 'player's unambiguously severe cognitive impairment **precluded him from generating valid test results**.' (SM Decision at 2) The Settlement does not require unambiguous evidence to prove any part of the Player's Qualifying Diagnosis.  The SM creates the new legal principle and contrary to Judge Brody's Order and reliance on the medical judgment of the physicians who diagnose the player and the Generally Consistent diagnostic criteria.

A second fatal flaw and incorrect application of Injury definition Level 2 Neurocognitive Impairment is SM's assertion that in applying section 2(a)(i)-(iv), the severity of the player's cognitive impairment had **to "preclude him from generating valid test results**." This unapproved legal principal is another non-existent Settlement requirement applied by the SM. The words are clear in section 2(b), which provides "the diagnosing physician can certify in the Diagnosis Physician Certification that certain testing in 2(a)(i)-(iv) (here being neuropsychological testing) **is medically unnecessary because the Retired NFL Football Player's dementia is so**

**severe, made by a MAF Physician**." The rule **does not require** that the severity of the player's dementia **preclude him from generating valid test results**.

What are the <u>valid test results</u>**?** As applied here by the SM, "valid test results" were not obtained; sets the foundation for his incorrect conclusion of law.   The SM's decision deters the heart and integrity of the Settlement relying on MAF's medical judgment coupled with the requirement of "Generally Consistent" diagnosis.  The Player's Certification must be accepted in accordance with the **Court approved** Settlement and not the SM's alteration of it.

### G.  The Special Master and the Parties Adopted Improper and Prejudicial Ex-Parte Communications that Violate the Player's Rights to Justify Denial of his Claim Package

The SM confirms in his decision, "The Parties, **when prompted for their views** on the AAP's practice, <u>responded jointly</u> on January 31, 2020. (SM Decision at 2)  Prohibiting ex-parte communications between the master and the Parties also does enhance the role of a settlement master by assuring the parties that Settlement can be fostered and enforced without the doubt of corruption and or creation of bias to either party.

The Player is now faced with the creation of impropriety and prejudicial conduct in the administration of this Settlement program. Mr. ██████ attorney did not receive any notice as to the parties being prompted for their views of the AAP's practice. (*See. Bird Lakes Dev. Corp. v. Meruelo*, 582 So. 2d 119, 120 n.1 (Fla. Dist. Ct. App. 1991) (reprimanding a trial judge for an ex parte telephone call in which he gave oral instructions "to appellant's counsel as to what the order should contain")

It is unknown who prompted the parties for their views on January 31, 2020, and it is unknown what the "Parties" said and to whom.  Why would the parties need to be prompted on their views of an unambiguous term of the Settlement (<u>Level 2 Neurocognitive Impairment</u>), and precisely what practice is the SM referring to?  Regarding his reference to the AAP requiring "**unambiguous evidence** of severe cognitive impairment that would preclude valid test results," the prompting of the parties for their views does not make any sense or logic.   The Settlement terms govern and not the parties' views. It only sets the foundation of multiple improper and prejudicial ex-parte communications revealed during the Appeal's process.

The SM obtained improper ex-parte information about the Parties' views that he relied upon and found to be of the essence by making it part of his decision. Now the Player is faced with

additional protocols not included in the Settlement or approved by the Court.   Nothing is more dangerous and destructive than impartiality when there is a one-sided communication between a judge and a single litigant. Such contacts may subtly influence even the most vigilant and conscientious of judges. No matter how pure the intent of the party who engages in such contacts, without the benefit of a reply, a judge is placed in the position of possibly receiving inaccurate information or being unduly swayed by unrebutted remarks about the other side's case. The other party should not have to bear the risk of factual oversights or inadvertent negative impressions that might easily be corrected by chance to present counter-arguments. *Rose v. State*, 601 So. 2d 1181, 1183 (Fla. 1992) (stating that the judicial practice of contacting only one party to prepare an order for a judge to sign gives the appearance of impropriety))

**b.   A Pattern of Improper Ex-Parte Communications is Evidenced by the February 5, 2020 Correspondence and as Relied Upon by the Special Master in his Decision**

The SM's acceptance of the Parties non-approved "agreement" is detrimental to the Player because, in all three of the CA's denials, the "reasonableness" of the MAF's Certification is not a factor.   Additionally, in neither one of Mr. ▆▆▆▆▆ three Appeals is there an analysis of a reasonably determined standard of proof in application of <u>Injury Definition Section 2(a)(i)-(iv) or 2(b)</u>. Because neither the CA's denial statement and most importantly, the Settlement terms, mention or require the Player's burden to prove a "reasonably determined Certification" was made by the MAF. The Court is well aware of the correct GC requirement as to the diagnostic criteria. The SM further magnifies the impropriety of ex-parte correspondence as stated in his decision, **"However, as the Parties jointly agreed in correspondence to the Claims Administrator on February 5, 2020, cognitive screening tests can be used by BAP Providers and MAF Physicians."** (*See. Bird Lakes Dev. Corp. v. Meruelo*, 582 So. 2d 119, 120 n.1 (Fla. Dist. Ct. App. 1991) (reprimanding a trial judge for an ex parte telephone call in which he gave oral instructions "to appellant's counsel as to what the order should contain")

The alleged agreement, as presented by SM, not only violates the provision of no modifications to Settlement without court approval; but is a magnification of the impropriety of the ex-parte communications relied upon to deny the Appeal.   The prejudicial effect of the February 5, 2020 "agreement" without the Player's knowledge, created an impossible situation to accept the accept the SM's decision on his Appeals. At a minimum and supported by case law, the Player must have been promptly notified about the substance of the communication and given the

opportunity to respond. *Leisure v. Leisure*, 589 N.E.2d 1163, 1168-69 (Ind. Ct. App. 1992) (finding that no actual bias resulted from the ex parte communication because the content of the communication "went to an incidental issue" and was not related to appellate issues)

The improper communications are enlarged because, during the time, the 'Parties' were prompted for their "views"; the Player's attorney was not made aware of such prompting, and "views" is unconscionable and prejudicial.  During the time the Parties were "prompted", the Player had already received the CA's third denial of his claim, and the undersigned was working on his third Appeal.

If the undersigned had been made aware of the "prompting" and the parties' "views," the same would have been addressed in the Player's third Appeal or directly to the Court via motion practice.[4] *Mathew Zaheri Corp. v. New Motor Vehicle Bd.*, 64 Cal. Rptr. 2d 705, 712 (Cal. Ct. App. 1997) (stating the basic standard for improper ex parte communication and concluding that this standard generally prohibits any ex parte communication between counsel and the trier of fact)

The SM concedes to and the events leading to the submission of this objection, which only raised the unimaginable concern of dishonest conduct in the claims process. While disciplinary sanctions for ethical violations attributable to communications may vary with circumstances, the undersigned suggests the stakes are too high. The number of players that may have been violated similarly to Mr. ███ requires immediate Court intervention and relief based on law and equity.[5] The Special Master's Interpretation of the Injury Definition Violates the Unambiguous Terms of the Settlement Agreement

Injury Definition Level 2 Neurocognitive Impairment permits the application of the unless clause and contradicts SM's <u>newly adopted definition</u> that the "Settlement's **narrow** ("unless") exception to the testing requirement, i.e., that the impairment was "so severe" that testing is "medically unnecessary." (SM Decision at 3)

The SM's newly adopted standard "fashioned by the Parties" and his expansion and application of his "Reasonably Determined" Certification misses the point entirely. As is the CA,

---

[4] The definition of an ex parte communication supports this interpretation, for it includes any communication of information in which adversary counsel would be interested.  Because procedural rulings can end a case prior to its disposition on the merits, counsel is likely to be as concerned about procedural issues as he or she is to be about the substance of the contested claims.

[5] George D. Marlow, From Black Robes to White Lab Coats: The Ethical Implications of a Judge's Sua Sponte, Ex Parte Acquisition of Social and Other Scientific Evidence During the Decision-Making Process, 72 St. John's L. Rev. 291, 324-28 & n.129 (1998)

the SM must comply with the written terms of the Settlement Agreement as negotiated and judicially approved. The SM shall not have obtained communications and directions outside of the Court's approval to adopt a standard fashioned by the Parties subject to his incorrect conclusion of law.

The Settlement "unless" exception to the neuropsychological testing requirement under Injury Definitions §2(b) is not a **"narrow"** unless exception to the testing requirement and only another example of the SM's imposition of a newly created non-approved additional protocol, evidentiary burden, and or modification of the injury definitions in obtaining a Qualifying Diagnosis. The imposition of the highly negotiated and judicial approved Injury Definition does not include the word **"narrow"** or even require that in the application of §2(b) the MAF Certification was predicated on not **"generating valid test result"** if the Parties intend such burden or requirement the injury definition would require that. It does not. (*See*, e.g., *In re Johns-Manville Corp.*, 759 F.3d 206, 214 (2d Cir. 2014) ("The interpretation of unambiguous settlement agreement terms is a question of law subject to de novo review.")

Another way to put this is that adopting a new standard fashioned by the parties which modifies the definition of protocols for making Qualifying Diagnoses shall not be adopted by the Special Master absent approval from this Court. Consequently, the SM's unilateral modification and/or addition of the new "reasonably determined" protocol results in a prejudicial and dangerous imposition of non-court approved changes to the Settlement for the benefit of the NFL Parties and to the detriment of the injured Players. "Unless" is universally known as an exception. Here, the unless clause of Injury Definitions §2 (b) is a material provision, carefully crafted, and added to the Settlement Criteria to promote MAF Physician's highly qualified credentials and support of their medical judgment. Suppose the intention of the Parties was for the unless clause to be "narrow" the Settlement would say so.[6]

The CA has challenged the intent and plain meaning of §2(b) by stating as part of its denial that, "On the Diagnosing physician certification form, Dr. ███ reported: "The severity of Mr. ███ neurocognitive impairment was such that his CDR score of 2 obviated the need for

---

[6] Exhibit 1 Injury Definitions Level 2 Neurocognitive Impairment; §2(b) For living Retired NFL Football Players diagnosed outside of the BAP, a diagnosis while living of Level 2 Neurocognitive Impairment, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv), unless the diagnosing physician can certify in the Diagnosis Physician Certification that certain testing in §2(a)(i)-(iv) is medically unnecessary because the Retired NFL Football Player's dementia is so severe, under CDR 2.0 moderate dementia.)

neuropsychological testing in accordance with the MAF Provider Manual Guidelines." The available documentation does not support that contention." (SM Decision at 3) The CA's conclusion is only justified by the newly fashioned standard adopted by the SM **but notably remanded by SM Princhett for the exact same issues raised by the Player in his second Appeal**.[7]

The undersigned respectfully suggests that on the basis of the SM's non-approved modification to the injury definition Level 2 Neurocognitive Impairment and imposition of a new protocol in making the Qualifying Diagnoses under Level 2; the decision shall be overturned.

### H. The NFL Parties' Opposition Statement Introduced Inadmissible Evidence According to Rule 14, Rule 23 Governing Appeals, and the Federal Rules of Evidence

The Masters have the authority to take all appropriate measures to perform the assigned duties and, most importantly, to take all steps necessary to oversee the Settlement Agreement's implementation and administration faithfully. On or about April 8, 2020, the NFL Parties' filed an Opposition Statement to Appeal of Claim Denial by the Player".   Immediately and as expected, the NFL Parties' opposition attempts to create an impermissible proposition to support further their reliance, contention, and submission of a **blank MMSE as "new evidence."**

The introductory paragraph is an immediate attack and defamation of MAF Physician Dr. ███ profession, career, and exemplary education and experience. The Opposition Statement starts by highlighting that "MAF Physician Dr. ███ was terminated from the MAF Program by the Claims Administrator." The introduction is unethical and prejudicial to the substantive issues on Appeal.  The dark and malicious reason underlying the NFL Parties' reminder to the SM of Dr. Suites' "termination" is strategically placed in footnote one. Footnote one provides the following outright **false statement** subject to sanctions under the applicable rules of **ethics**: **"Dr. ███ was terminated from the MAF program in October 2018 for _improper practices_, including for assigning CDR scores that did not match the players' functional abilities"** (Doc Id. 223229, Portal) The NFL Parties intentionally misprerent the CA's purpose for terminating Dr. ███ from

---

[7] The "unless" clause of §2(b) enables the MAF physician to find that if the Player's dementia is so severe, standardized neurophysiological testing in accordance with §2(a)(iii) is not necessary. The rule does not impose a "narrow" requirement upon the MAF Physician who applied the use of §2(b) and certainly does not require that in applying §2(b) that "valid test results" would not be generated as "adopted" by the SM in this Appeal but not part of the injury definition. )

the MAF Program. (("we did not have a reasonable basis to conclude that Doctor 2 (Dr. ███ had misrepresented, omitted, or concealed material facts on these claims (ECF No. 10488 at 6))[8]

Upon reviewing the NFL Parties opposition statement, the undersigned immediately addressed the improper practices used in justifying the opposition.  On the correspondence dated April 15, 2020, and uploaded into the Player's online portal; the undersigned objects and highlights the violations and unethical tendencies of the NFL Parties with a reasonable request to the SM, premised in law to strike and or not consider the NFL Parties Opposition Statement.

The objection and relief requested in said correspondence emphasized the NFL Parties' citation of prior Special Master decisions, which were neither filed with the Court and nor published in the Players' online portal. The highly regarded counsel for the NFL Parties did not even provide the courtesy of notice and copies of the decisions they intend to rely on, which they knew the undersigned did not have access to in formulating the Player's Appeal.[9]

Remarkably, the NFL Parties opposition statement also included two exhibits categorized in the online portal as "new evidence," one being a blank MMSE, and the second a CDR chart. The submission of the blank MMSE "Exhibit" and as categorized in the portal as "new evidence" on its face should have zero probative value in opposing the Player's Qualifying Diagnosis.  While the Opposition Statement attempted to emphasize the Player's MMSE score as probative to support the CA's denial, the undersigned did not anticipate the SM would even entertain a screening test (MMSE) that was not part of the highly negotiated and judicially approved Settlement diagnostic criteria or <u>Injury Definitions</u>.

I.   **Excluding a Review of the Player's Response to the NFL Parties', "new evidence" sets the Legal Grounds to Vacate and Overturn the Special Master's Decision**

In providing fair procedure and promotion of substantive due process, the SM granted the Player an opportunity to respond to the NFL Parties "new evidence." Received via email notification from CA representative, the Player's response was to be submitted by May 29, 2020. The undersigned requested in his email response additional clarification to the granted option to file a response. It was a great opportunity to focus on the MMSE screening test that was not only

---

[8] Misconduct by attorney rises to the necessary level of impropriety for purposes of granting new trial if that conduct prejudices adverse party; misconduct prejudices party if it affects party's substantial rights, otherwise any wrongdoing is merely harmless error. Falk v. Paluch, 163 F.R.D. 8, 1995 U.S. Dist. LEXIS 11112 (N.D. Ill. 1995).

[9] After submission of the objection, the undersigned did receive an email from NFL Parties counsel with the decisions attached.

excluded from the Settlement but also to magnify the AAP's flawed medical judgment; in recommending that his MMSE score was indicative of justifying the denial of the Qualifying Diagnosis.

In all three of the Player's Appeals, the CA's three denial statements would passively suggest that his MMSE score did not allow for a "Generally Consistent" diagnosis of (severe) Moderate dementia. Notably, the CA's denial statements encompassed a plethora of misrepresentations of the documentary evidence and negative assumptions incorrectly "discounting" the MAF Physician's medical judgment and applicable injury definition.

Because the undersigned was well aware of the MMSE, although regularly used in the medical practice of neurology as a screening test, little to no analyses or scientific medical support was offered in the Appeals to address a "diagnostic" test excluded from the Settlement. On may 29, 2020, at the time the undersigned submitted to the portal, the Player's response to the "new evidence," it was shockingly discovered that the SM had already decided on the Appeal which he dated May 27, 2020, the same date it was submitted into the Player's portal. The undersigned became confused and could not comprehend how the Special Master had finalized and published his decision without first receiving the Player's response to NFL Parties "new evidence."[10]

On Saturday, May 30, 2020, the undersigned accessed the portal and discovered the SM's decision dated and submitted on May 27, 2020, was removed from the portal. It only created additional confusion and the unimaginable consequence the Player describes throughout this Objection. A few days later, on or about June 2, 2020, the Special Master's decision discovered on May 27, 2020, magically appeared in the portal.  Not only was the June 2, 2020 submission of the same dated (May 27, 2020) SM decision, but upon a careful review of it, the content of it was the same decision. (This lack of transparency deprives the Class of vital information material to judicial review of Class Counsel's repetitive Fee Petitions. (*See. Torres v. SGE Management, L.L.C.*, 945 F.3d 347, 353 (5th Cir. 2019)

The unimaginable and non-anticipated chain of events imposed on the Player has required a methodical and precise discussion in Objection. Where his rights to full and fair implementation

---

[10] It is a prejudicial error to exclude evidence which is attempted to be introduced in proper manner and which is essential to the case. Hutter Northern Trust v. Door County Chamber of Commerce, 467 F.2d 1075, 1972 U.S. App. (7th Cir. 1972).

of the Settlement has become grossly violated, not only on the basis that the Special Master published his decision without review of the Player's response to the NFL Parties' "new evidence" but most crushing and defeating the reliance and application of the MMSE by the Special Master in justifying his denial of the Appeal.

The only light of reason and courtesy to the undersigned by a Partner (not Orran Brown) of the firm/Claim Administrator's office. On or about June 8, 2020, the undersigned had the pleasure of a long and detailed discussion of the chain of events surrounding the Special Masters pre-mature decision and submission. As received by the undersigned and communicated by the Partner, transparency was the intention of the discussion. The undersigned received information necessary to have any logical way to explain to the Player the unanticipated violations of his rights under the Settlement.

The Partner explained the Special Master's mistake in finalizing his decision without affording the Player a review of his response to the NFL Parties' "new evidence." As expressly communicated during the phone call with the Partner, the SM's decision submitted to the portal on May 27, 2020, was subsequently removed once the CA realized the Player did file his response to the "new evidence" on May 29, 2020 (Friday).

The Partner assured the undersigned that the SM's decision was removed from the portal for him to review the Player's May 29, 2020 submission. Unfortunately, and with all due respect to the Partner's assurance, the undersigned did not accept the SM's alleged review of the Player's response to the NFL Parties' "new evidence" (blank MMSE). Furthermore, the Partner explained that the SM instructed that a phone call be made to the undersigned and communicate that he did, in fact, during the weekend, review and consider the response, and it **did not change his decision in any way**. That is not apparent, considering the re-submission of his pre-mature decision dated May 27, 2020 was entered into the portal the following Tuesday without any changes made. (If substantial rights of plaintiff have been adversely affected by erroneous instruction, court's duty is to grant new trial. *Thompson v. Riverside Chemical Co*., 416 F. Supp. 35, 1976 U.S. Dist. LEXIS 14488 (N.D. Miss. 1976).

The undersigned articulated that he cannot accept the SM's assurance of his review via a phone call with the Partner. Additionally a request was made to receive in writing the SM's

message for the purpose of supplementing and creating an evidentiary record of his flawed procedure and pre-mature decision.[11]

Following the phone call the CA submitted to the Player's portal a document titled "Memorandum" and dated June 8, 2020. (Exhibit D) While the courtesy afforded by the CA Partner is much appreciated, the "memorandum" falls short of the details and explanation provided during the above-referenced phone call.  It merely states, "As discussed in the call, the Claims Administrator verified that the Special Master evaluated the firm's response to the new evidence, and it did not change his opinion. The Special Master then directed the Claims Administrator to finalize his opinion and post it as drafted." (Id.)

As detailed in this Objection, the Special Master is tasked with judicial functions analogous to the district court judge. On that basis, the Special Master's failure to amend his decision and or supplement his decision with his explanation and acknowledgment that he did, in fact, review the Player's response did not change his decision.[12]

According to this Court's order detailing his mandate under the appointment, t**he SM fails to adhere to the appropriate law in this circuit** and most importantly fails to uphold the integrity and honor mandated by the Honorable Judge Brody in the implementation and assurance of a *correct and fair application* of the Settlement for the **benefit** of the injured Player.

### J.   The Reliance on The MMSE Score to Deny a "Qualifying Diagnosis" Violates the Unambiguous Terms of the Settlement Agreement

**"The MMSE is not a listed test in the Settlement Agreement."** as acknowledged by the SM**.**  The MMSE is not part of the testing battery due to its insignificance in identifying cognitive impairment (**screening test/intake form**). The importance of identifying and updating the MMSE's diagnostic validity, as described in *Mitchell A.J*, is that in clinical practice, a high score on the MMSE would lead to about a 10% false-negative rate. (Schultz-Larsen K, Kreiner S, Lomholt RK. Mini-Mental Status Examination: mixed Rasch model item analysis derived two

---

[11] Standard for judging whether rulings on evidence necessitate reversal is not simple one of making microscopic examinations to ascertain whether in one way or another rulings lacked perfection; reviewing court must determine whether, assuming action under review was erroneous, ruling was really harmful to complaining party. Tugwell v. A. F. Klaveness & Co., 320 F.2d 866, 1963 U.S. App. LEXIS 4730 (5th Cir. 1963), cert. denied, 376 U.S. 951, 84 S. Ct. 967, 11 L. Ed. 2d 970, (1964).

[12] Under the "functional approach," courts look to the nature of the function performed, not the identity of the act of who performed it " Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993); (See also Hughes v. Long, 242 F.3d 121 125 (3d Cir. 2001). ((Judicial functions are "functions of resolving disputes between parties, or of authoritatively adjudicating private right." Antoine v. Byers and Anderson, Inc., 508 U.S. 429, 435-36 (1993).

different cognitive dimensions of the MMSE. J Clin Epidemiol. 2007;60:268–79.) The MMSE is neither the most accurate nor more efficient tool to evaluate cognitive disorders, but it has provided a benchmark against which all newer tools can be measured. (emphasis added).

The record further reflects the information the SM accepted and inferred to "logically" mean the weight of an MMSE score may form a basis for denial was unavailable to the Player. (ex-parte communications/directions) The SM's acceptance of the MMSE score indicates that the Player's Qualifying Diagnosis has been denied under a legal principle and additional protocol without Court approval as to its validity or credibility.  The MMSE clinical utility is suitable as a screening test. More significant here is that it is not one of the several judicially approved tests that encompass the Settlement diagnostic criteria.

For numerous reasons discussed in this Objection, the ban on ex-parte investigations reinforces the principle that the SM must consider only the evidence presented that results from approved Settlement Terms, i.e., the highly negotiated testing battery.[13] a Special Master, "serving as a neutral adjudicator by appointment of Court of Federal Claims.") (When the judge communicates privately, either with a witness, with counsel for only one of the parties, or otherwise discusses the facts of the case without all counsel being present, a Code violation occurs regardless of who initiated the discussion. *Goebel v. Benton*, 830 P.2d 995, 999-1000 (Colo. 1992) (disqualifying a judge following his discussion with a dismissed party's executive director and counsel to discuss an issue of "critical importance" to the judge's ultimate ruling in case))

**K. The special master claims that "Dr. ▇ did not address why testing was unnecessary despite the MMSE results, making it harder to conclude that his certification was reasonably determined."**

While the proposition here that the Player's MMSE score, as reported by the MAF had any significance as to the factual determination stated in the "Certification". The Court must ignore such deduction and look at the plain letter language of the Certification and, most important, the fact that MMSE has no bearing on the application of the GC diagnosing criteria. It is merely a test that is not part of the Settlement Agreement and logically not approved to negate the actual medical records and MAF medical judgment.

---

[13] Wallace v. Abell, 318 F. App'x 96, 99 (3d Cir. 2009)

It is possible to achieve a score of 30/30 on the MMSE even if a subject is suffering from a dementing illness. (Jonah S. Shiroky, BSc, Hyman. Schipper, MD, PHD, FRCPC, Howard Bergman, MD, and Howard Chertkow, MD FRCPC, Can You Have Dementia With an MMSE Score of 30? American Journal of Alzheimer's Disease & Other Dementia 2007 Volume 22 Number 5 406-415) Many clinicians agree that they have seen patients meeting criteria for dementia, who nevertheless displayed an MMSE score of 29/30.

The Special Master claims that**,** "Here, the Claims Administrator did not accept Dr. ███ Certification. It first noted that the Player completed the cognitive screening and achieved an MMSE score of 25/30, **indicating a milder level of impairment than Dr. ███ subjective findings implied. "**

While SM creates a fanciful "logic" to accept the CA and NFL Parties contention with the Player's MMSE score, the truth of the matter is that he received improper ex-parte communication and advice on the reliance of the score from interested and adversarial parties. If the SM would have even considered the Player's response to the NFL Parties' "new evidence" the blank MMSE. He would have been informed of the MAF's evaluation "that the Player had some difficulty with the MMSE, that he was unable to recall three objects at 5 minutes, even with prompting, that his calculations were slowed, making frequent errors, that he was not able to complete the full series of subtractions due to mounting frustration, that he had great difficulty with multistep commands requiring repetition and reinforcement and that he did not sense the special orientation of pentagons very well." (Physician Dr. ███ Certification Letter of Diagnosis (Doc ID. 171337 at 5)  Such an explanation confirms that the MMSE is simply "screening tool". With the application of his medical judgment, experience, and qualifications, the MAF, upon his complete neurological examination, was able to certify under penalties of perjury that the Player's Dementia was severe under CDR 2 (Moderate Dementia) and did not require neuropsychological testing to determine his Qualifying Diagnosis.

**c.  The Special Master Concedes that "Denial of a Claim Merely Because an MMSE Screening Test Conflicted with the Scheduled Testing Battery Would Present a Serious Issue on Appeal."**

The SM is correct in his acceptance and understanding that relying on MMSE to deny claim creates a severe issue on Appeal because that is precisely what the Player's Appeals have extensively briefed. The MMSE is easy and quick to administer the test but has limitations for detecting mild cognitive impairment and early dementia and identifying the various types of dementias. If SM followed his proposition, then even mentioning the MMSE in his decision contradicts his logic. His correct understanding of the fatal flaw in accepting the denial of a Qualifying Diagnosis based in any part on an MMSE score is because the test has a ceiling effect meaning it cannot easily gauge severity in people with sever "moderate dementia".

Such confirmations as to the validity of the MMSE to assess executive functions are essential here; in that the Settlement Injury definition applicable to the Player's diagnosis provides in part that evidence of a severe cognitive decline from a previous level of performance in two or more cognitive domains (complex attention, executive function, learning, and memory, language, perceptual-spatial), provided one of the cognitive domains is (a) **executive function**, (b) learning and memory, or (c) complex attention. The MMSE was not a mandatory exam under the Settlement terms, and the medical research **since its inceptions over 20 years ago confirms why it should not be**. The Settlement calls for a change in executive functions, and it is medically accepted that the MMSE does not help identify change in executive functions.

The MMSE was published in 1975 by Folstein et al. (Folstein MF, Folstein SE, McHugh PR. Mini-mental state. A practical method for grading the cognitive state of patients for the clinician. J Psychiatr Res. 1975;12:189–98.) The exam may never have been intended as a diagnostic tool; it has become a practical method, and the most rapidly used rapid cognitive screening instrument. (Shulman KI, Herrmann N, Brodaty H, et al. IPA survey of brief cognitive screening instruments. Int Psychogeriatr. 2006;18:281–94.)

Data suggest that there is little basis for case-finding (confirmatory) role for the MMSE in early dementia, **and its accuracy is lower when compared with the diagnosis of moderate-severe dementia**. (Mitchell A.J. (2013) The Mini-Mental State Examination (MMSE): An Update on Its Diagnostic Validity for Cognitive Disorders. In: Larner A. (eds) Cognitive Screening Instruments. Springer, London.) **The MMSE lacks the detail to differentiate between**

**dementias**. (Shulman KI, Herrmann N, Brodaty H, et al. IPA survey of brief cognitive screening instruments. Int Psychogeriatr. 2006;18:281–94.)

The SM's claim that the AAP and or the AAPC are experts is questionable because their recommendation is based on a piece of MMSE score evidence that their medical judgment is flawed and unreliable. (Declarations of MAF Physician Dr. ███████ D.A. (Doc ID. 196137,196138, Portal) The MMSE cannot be expected to replace a complete clinical appraisal in reaching a final diagnosis of any individual patient. (Galasko D, Klauber MR, Hofstetter CR, Salmon DP, Lasker B, Thal LJ. The Mini-Mental State Examination in the early diagnosis of Alzheimer's disease. Arch Neurol. 1990;47:49-52.)

*Folstein,* the creator of the MMSE, concludes the screening test is reliable on a 24 hour or 28-day retest by single or multiple examiners. Regarding the implementation of the MMSE screening for dementia in a nonrandomized study of diagnostic practices of 64 general practitioners, it was found that they opted to use the MMSE in only 18 out of 93 cases, and use of the MMSE was not associated with better diagnostic accuracy. (Van Hout H, Vernooij-Dassen M, Hoefnagels W, Grol R. Use of mini-mental state examination by GPs to diagnose dementia may be unnecessary. BMJ. 1999;319:190.) **After 20 years of the utilization of the MMSE medical advancements have now confirmed that the memory is composed of different and, sometimes, overlapping systems**. (Simard M, van Reekum R: Memory assessment in studies of cognitive enhancing drugs for Alzheimer's disease. Drugs and Aging, in press.)

It has also been widely accepted in the medical community that MMSE's use was not associated with better diagnostic accuracy.  Nevertheless, as mentioned above, this is the reason why NFL Parties attorneys or Player's attorneys should not be sticking their legal jargon to muddy up the waters or create smoking mirrors to prove or disprove a Player's diagnosis. There is a medical and legal basis for why the MMSE was excluded from the Settlement testing battery and should have never been used to deny the Player's Qualifying Diagnosis three times.

This Court should not set a precedent of claims being determined on the reliance of MMSE score. The exclusion of the MMSE from the testing battery, as agreed by the Parties, survived scrutiny of this Court and Third Circuit Court of Appeals.  The Special Master's ruling should not be permitted to stand due to its reliance and acceptance that the Player's MMSE score supports the CA's **subjective discounting** of the MAF Physician's medical judgment, which directly contradicts the highly contended and negotiated court approved Settlement Agreement.

**CONCLUSION**

1. <u>As to Community Affairs, the CA omits</u>: The Player has been **unable to drive** for several years now; **not remembering invitations** from friends; he does not live by himself and lives with his domestic partner Rhonda Sellers; he has **not been employed** in the past ten years.

2. <u>As to Personal Care, the CA omits:</u> There was a **major decline in his appearance**; to the contrary, the CA assumes facts, not in evidence, and claims in the denial that his personal care "needs prompting," although the truth is that his domestic partner **must assist him with his personal care.**

3. <u>As to Homes and Hobbies, the CA omits</u>**:** The Player is unable to use the phone, and his friends have to call his domestic partner to get him on the phone for a chat; that he is no longer making his bed; and he has multiple episodes of disorientation and confusion while at home.

4. <u>As to Dr. Nuddleman's Neurological examination October 28, 2010, the CA omits the reported symptoms:</u> Constant ringing or buzzing in ears, fatigue, sleeping problems, depression, and difficulty with memory concentration and focus.

5. <u>The CA omits the following diagnosis reported by Dr. Nuddleman, *October 28, 2010*</u>: **Post Traumatic Head Syndrome; reduced attention, concentration, recall; post-traumatic headaches; cumulative trauma while playing football; neurological impairment; 100 % impairment/disability due to cumulative brain trauma while playing football and ▮▮▮ needs future medical care.**

6. <u>From MAF ▮▮▮▮ diagnosis report, the CA</u>**:** The Player recalls too many episodes of loss of memory and consciousness while playing football; describes poor memory; severe headaches; disorientation; lack of interest; and he can no longer do his profession of welding.

7. <u>From MAF ▮▮▮▮ Neurological Examination the CA omits:</u> The Player  has a bachelor's degree but was not able to do simple subtraction; does not remember three objects after five minutes; his calculations are slowed and makes frequent errors; **great difficulty with multi-step commands;** and has residual cognitive issues that are ongoing and still needs future medical care.  (Exhibit B Appeal Two) (Exhibit C Appeal Three)


The Player obtained a Qualifying Diagnosis under Injury Definition Level 2 Neurocognitive impairment by a qualified MAF Physician.  The MAF Physician determined that upon finalization of the Player's evaluation in determining the severe nature of the Player's Moderate Dementia and in accordance with the "Generally Consistent" diagnostic criteria; neuropsychological testing was not medically necessary.  For all the reasons above and as presented in the Appeals, the Special Master's ruling shall be reversed and the above objections sustained.  **The Player's Claim Package shall proceed to a Monetary Award.**

Respectfully Submitted,


By:/s/ Derrick C. Morales
    Derrick C. Morales
    Florida Bar No. 117161
    Attorney at Law
    13499 Biscayne Blvd. Suite 107
    North Miami, FL 33181
    Tel: (786) 440-9383
    Fax:17862883816
    E-Mail: dcm@dcmoraleslaw.com

By: /s/ Kevin Stantz
    Kevin F. Stantz Jr.,
    Florida Bar No. 1002013
    Attorney at Law
    13499 Biscayne Blvd. Suite 107
    North Miami, FL 33181
    Tel: (786) 440-9383
    Fax:17862883816
    E-Mail: stantzlaw@gmail.com