# "Exhibit B"

## INTRODUCTION

■■■■■■ (ID:950005876) has a good faith belief the Claims Administrator's denial of his Monetary Award claim is incorrect.

## ARGUMENT

1. **The Qualifying Diagnosis of Mr. ■■■■■ need not be identical to the Diagnostic Criteria**

    Section 6.4(b) of the Settlement Agreement requires, "For the avoidance of any doubt, the review of whether a Qualifying Diagnosis is based on principles generally consistent with the diagnostic criteria set forth in Exhibit 1(Injury Definitions) does not require identical diagnostic criteria". It is a fundamental principle that MAF Physicians have broad discretion in the manner they determine the Qualifying Diagnosis.

2. **Analyses of the contentions by the Claims Administrator in regard to the documentary evidence**

    A. **The Claims Administrator interpretation of the Third Party Sworn Affidavit disregards the evidence of Functional Impairment in Community Affairs, Home & Hobbies and Personal Care**

    Exhibit 1 §2 (a)(iii)(b) requires the Retired NFL Football Player's ("Players") functional impairment, must be corroborated by a third party sworn affidavit from a person familiar with the Players condition, **the sufficiency of which will be determined by the physician making the Qualifying Diagnosis**. Here, the Third Party Sworn Statement: executed by Luis Samperio provides substantial information that helped determine Mr. ■■■■■ diagnosis. The Statement provides in part as follows:

**Community affairs:**
- **Loss of interest in activities outside the home/Has stopped visiting with friends:** "■■■■ was not remembering my invites and I would remind him to check his text messages to see that I did text him and remind him that we spoke about the BBQ several days before." (Id. at 3)
- **Has stopped attending social functions:** "For no apparent reason ■■■■ stopped being active on the fantasy and has not attended our draft day gatherings for the past several seasons. ■■■■ loss of interest in our long friendship has shown me that something changed for him. Not only did ■■■■ stop attending our gatherings and participate in fantasy football but he did not attend and declined invitations to my daughter's past 3 birthdays." (Id.)
- **Loss of the ability to drive:** "After several conversations with ■■■■ about him not wanting to drive over he stated to me that he started feeling lost when behind the wheel of the car and became a bit scared." (Id.)

The first denial (Doc ID. 192077) was partly based on the incorrect assumption that he drives but gets lost and therefore capable of independent function outside of his home. (Doc ID. 196128) Mr. Samperio executed a Declaration in which he states, "When I provided the experience with ■■■■ of that one time, I let him drive my car, and he got lost; the point of reflecting on that day with ■■■■ was to show he is not able to drive because he

gets lost. I do not remember the last time I have seen ▇ behind the wheel of a car. It must be over five years ago." (Doc ID. 196141)

*Third Party Sworn Statement cont.:*
**Home & Hobbies:**
- **Loss of interest in hobbies:** "We considered fantasy football our hobby and we would talk about it all week. I have had to make several attempts to reach out to his significant other just to talk to him for a small chat on the phone and he has declined". (Doc ID. 196142)

**Personal Care:**
- **Decline in appearance/Lapses in grooming:** "I began to notice he was no longer well-groomed and his clothing was not the normal appearance I have known of him for the past 10 years. In the past 2 years I have seen the severity of ▇ mental change. I have asked him about his grooming and appearance and he never had a real answer for the drastic change. (Id.)

The MAF Physician accepted the sufficiency of the record and referred to it in his diagnosis certification letter. It is a distorted representation by the Claim Administrator in summarizing the Third Party Sworn Statement as a mere showing of "social withdrawal". (Doc ID. 211371) Here, the Claims Administrator has created doubt on the sufficiency of the record and must be directed by the Settlement Agreement §6.4 (b) The Third Party Sworn Statement has common elements that predominate over the uncommon ones in describing the functional impairments consistent with CDR scores of 2.0.

B. <u>The Claims Administrator's wrongful emphasis of ▇ sleep disorder</u>

Mr. ▇ has been unemployed for the last eight years, and no employment records were available as certified in the Employment History form. The Qualified MAF Physician referenced in his diagnosis report, Dr. Nuddleman's Qualified Medical Examination- Neurology Report, October 28, 2010 (Doc ID. 175143) which provides in part the following:

**Complaints of Mr. ▇ as noted by Dr. Nudleman (Id. at 2):**
- "He has constant tinnitus to the ears. He reports that he has a constant buzzing to both ears." (Id.)
- "He notes that during the course and scope of playing he received several concussions. He notes he was never actually physically taken off the field." (Id.)
- "He notes at the present time he has headaches. He describes them as being constantly present. He describes them in the frontal and temporal areas. On a scale of 0-10, it is 6-7. They occur daily. He notes they began within the first year after his professional football career. If anything, they have been more intense over time." (Id.)
- "He notes difficulties with his memory, concentration, and focusing. He says he will walk into a room and does not know why he went in there. He notes that if he has to do multiple things, he will often forget information." (Id. at 3)
- "As to his activities of daily living, he notes difficulties with concentration and at times feeling of depression." (Id.)

**Overall Assessment** (Id.)**:**

   **1. Post Traumatic head syndrome characterized by reduced attention concentration, and recall.**
   **2. Post Traumatic headaches daily, and in addition a disorder of sleep and arousal with body jerks and nonrestorative sleep.**" (Id. at 4)

- "…based on the information available 100% causation and 100% of impairment/disability is due to cumulative trauma while playing professional football."(Id.)
- "With respect to his post traumatic head syndrome…, he would be considered at CDR at 0.5% benign forgetfulness equivalent of 5% whole person impairment. Using the combined values charts… this would lead to 7% whole person impairment neurological evaluation."(Id.)

1. The Epworth Sleepiness and Fatigue severity scale are only sub-parts to Dr. Nudleman's Neurological Examination

     The Qualified Medical Examiner – Supplemental Medicolegal Report (Doc ID. 196139) was submitted as new evidence with the first appeal and the Claim was remanded.

**Supplemental Medicolegal Report November 14, 2010** (Doc ID. 196139):
- **"The study did not show any evidence of sleep apnea."** (Id. at 2)
- "it is my opinion that the sleep disturbance arises from a nonrestorative sleep condition. **This is related principally to his back pain."** (Id.)
- "he will be considered equivalent of 7% whole person impairment. This includes his excessive fatigue during the daytime and his nighttime arousals secondary to pain." (Id.)
- "… this would lead to a total neurological impairment of 14% based upon the best medical evidence." (Id.)

     The medical records are produced by a highly qualified doctor named Kenneth L. Nudleman M.D., Board of Neurology with added qualifications in Clinical Neurophysiology, and a Clinical Professor of Neurology among other credentials.

     The distinction between a medical examination to find disability on a workers' compensation claim or the one required by the Settlement Agreement are significant. The Claims Administrator seems to not take this distinction into consideration as evidenced by the denial. (Doc ID. 211371)

     The Claims Administrator cherry-picks to quote language that supports the incorrect denial and disregards the most important parts of the medical records which corroborate the diagnosis made. The above outline of the reports shows Mr. ▇▇▇▇'s neurological problems dating back to 2010. Instead, the Claims Administrator focuses on Mr. ▇▇▇▇s "fatigue".

     The Claims Administrator ignored the most reasonable interpretation of the medical reports. The findings of Dr. Nudleman that Mr. ▇▇▇▇ has posttraumatic head syndrome characterized by reduced attention concentration, recall, posttraumatic headaches daily and did not show any evidence of sleep apnea led to the conclusion of posttraumatic head syndrome. (Doc ID. 175143) The Claims Administrator only, referring to select

parts of the report amounts to a bad faith denial of the Claim. The Claims Administrator must be held to a high standard and expected to consider the medical records in their totality, and must acknowledge parts of the record that contradict their denial and refer to both.

The Claims Administrator's allegation that the records do not attribute the functional losses to cognitive losses, is to impose the diagnostic criteria of the Settlement Agreement upon a doctor who was focused on Mr. ▮▮▮▮ workers' compensation disability claim. It is not far-fetched to assume the above diagnosis of Mr. ▮▮▮▮ would result in worsened functional impairment, cognitive loss and severe mental decline for the following nine years without the means for medical care. Mr. ▮▮▮▮'s worst nightmare came true when he received confirmation that he has severely declined since the findings of Dr. Nudleman.

The Settlement Agreement was the answer for Mr. ▮▮▮▮ to receive his much-needed medical care with the help of a monetary award. The only viable inference considering the Claims Administrator's interpretation of the medical records provide a merciless and disturbing reality: The Claims Administrator has the power to deny life-saving medical treatment based on a flawed application of the Settlement Agreement and disregard for the medical conclusion of two neutral and detached highly qualified board-certified neurologists who personally examined Mr. ▮▮▮▮ in 2010 and 2018.

C. <u>Physician Letter Certification of Diagnosis by the MAF Physician</u>

MAF Physician, ▮▮▮▮ by way of his Physician Letter Certification of Diagnosis provides that "▮▮▮▮ has been diagnosed with a level 2 neurocognitive impairment on January 31, 2018. I certify under penalty of perjury that the information provided is true and correct and that the qualifying diagnosis is being made with the criteria set forth in the National Alzheimer's Coordinating Center's clinical dementia rating scale (CDR) category 2.0 in the areas of 1. Community Affairs, 2. Home and Hobbies, 3. Personal Care and the cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects." (Doc ID. 171337) The letter of diagnosis provides the following:

**History of present illness (**Id. at 2**):**
- "He reports that he had a number of significant traumas during his playing time. He states he had too many to recall in terms of professional league loss of memory episodes and loss of consciousness." (Id.)
- "In terms of his professional playing time, he felt dazed and confused too frequently to recall how many times. He is very frustrated and depressed most of the time."(Id.)
- "He has had multiple episodes of disorientation and confusion." (Id.)

Dr. ▇ continues this section regarding the Third-Party Affidavit in his showing of accepting the record as sufficient and substantial. to help him reach the correct diagnosis of Mr ▇. The diagnosis continues with the following:

**History of present illness, cont.:**
- "He describes poor memory, severe headaches, disorientation, and feelings of lack of interest in all of his daily activities." (Id.)
- "Mr. ▇ tells me the same thing today that he was originally trained to be able to do welding but cannot do so." (Id.)
- "He feels as though he is not a good father and cannot do very much with them. This tends to bring on an attitude of self-defeat and an unwillingness to confront the problem." (Id.)
- "He is not working. He is not making his own bed. He is doing quite poorly on his own." (Id)

**Neurological Examination (Id. at 5):**
- "He is able to register 3 objects immediately and is able to repeat. However, he is unable to recall 3 objects at 5 minutes, even with prompting." (Id.)
- "Calculations are slowed, and he makes frequent errors." (Id.)
- "He was not able to complete the full series of subtraction because of mounting frustration … he has great difficulty with multi step commands and requires repetition and reinforcement." (Id.)
- "He is able to copy intersecting pentagons but does not sense the special orientation of these pentagons very well." (Id.)

**Clinical Impression (Id. at 6):**
- "Mr. ▇ is a pleasant 45-year old man who has cognitive impairment as a result of repetitive traumatic brain injuries relating to his career in football, particularly his career as a professional." (Id.)
- "He has residual cognitive issues that are ongoing and still need to be monitored." (Id.)
- "As per my review of the sworn affidavit of Mr. Samperio as well as the outside records from Dr. Nudleman dating back to 2010, it does appear that Mr. ▇ has a clinical dementia rating score for community affairs, home and hobbies, and personal care of 2.0." (Id.)

The Settlement Agreement was negotiated and accepted to empower Qualified MAF Physicians, who have been approved, received extensive training, to use their experience and medical judgement to make appropriate diagnoses after personal examination of the Players without belated second-guessing. The Claims Administrator's denial implies that the MAF physician did not apply his training, experience and sound medical judgment in reaching the correct Qualifying Diagnosis.

The corroborating documentary evidence outlined above, coupled with a strict application of the rules, helped the MAF Physician provide the necessary standard of care upon his personal examination of Mr. ▇, he certified the proper diagnosis and CDR score of 2.0. The Claims Administrator's denial relies on attacking the medical judgment of the MAF Physician. Dr. ▇ executed a Declaration in which he states "As a Board-Certified Neurologist, I am familiar with and utilize the CDR scale in my practice and have for the entirety of my days practicing medicine." (Doc ID. 196138, ▇ Affidavit 1) "I do, in fact know how to assign ratings to my

clients". (Id.) "There is no error in my diagnosis nor my competency in using the CDR scale and/or assigning scores." (Id. at 2)

The Claims Administrator's denial has imposed a burden beyond the requirements in the Settlement Agreement. Dr. ▮ executed a Declaration in which he eloquently states, the AAP's unacceptable assessment or disregard of the medical records and MAF Physician diagnosis of Claimant. (Doc ID. 196138, ▮ Affidavit 2)

The Claim Administrator's decision to misinterpret the documentary evidence is a prevalent problem the Players are subject to. Dr. ▮ states "The American Academy of Neurology in June 2018 put out a volume entitled Behavioral Neurology and Psychiatry. In the first chapter entitled "Bedside approach to the mental status assessment," the authors, in this peer-reviewed article make the exhortation that a thorough oral history and mental status examination are necessary requirements for the evaluation of the patient with cognitive impairment. This indicates that the practice of the AAP of simply reviewing records without even examining the patient falls below the standard of care in the assessment of patients with memory loss and dementia." (Doc ID. 196138, ▮ Affidavit 2)

There is no evidence provided by the Claims Administrator to contradict the brain trauma reported by Dr. Nudleman in 2010 and the MAF Physician's Qualifying Diagnosis in 2018.

### 3. The MAF Physicians unless clause under Injury Definition Level 2. Neurocognitive Impairment

A. The unless clause of Injury Definitions §2(b)

"Unless" is universally known as an exception. Here, the unless clause of Injury Definitions §2(b) is a material provision, added to promote MAF Physicians medical judgment, based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv), unless the diagnosing physician can certify in the Diagnosis Physician Certification that certain testing in §2(a)(i)-(iv) is medically unnecessary because the Retired NFL Football Player's dementia is so severe, made by a Qualified MAF Physician. Here, this is not just an exception to a rule but one of the most important provisions of the Settlement Criteria for players like Mr. ▮ who have severe dementia.

Here, the Qualified MAF Physician certified that testing as provided for in §2(a)(i)-(iv) was medically unnecessary because Mr. ▮ dementia is so severe. (Doc ID. 171336) The Claims Administrator has

challenged the plain meaning of §2(b) by stating as part of the denial that, "The available documentation does not support that contention." (Doc ID. 211371) The Settlement Agreement covers in §2(b) the likely scenario in which no documentary evidence would be available. Section 2(a)(iii) declares "In the event that no documentary evidence of functional impairment exists or is available, then (a) there must be evidence of severe cognitive decline from a previous level of performance, as determined by and in accordance with the standardized neurophysiological testing protocol annexed in Exhibit 2 to the Settlement Agreement.".

The "unless" clause of §2(b) enables the MAF physician to find that if the player's dementia is so severe, standardized neurophysiological testing in accordance with §2(a)(iii) is not necessary. The rule does not impose any requirement upon the MAF Physician who applied the use of §2(b) to have documentation to support their certification. The plain letter intent is that no testing or examination documentation is necessary as required by §2(a)(i)-(iv) upon the medical conclusion by the MAF Physician that the player's dementia is severe. Here, the contention of the Claims Administrator that the MAF physician should have documentation to support his finding in the Diagnosing Physician Certification Form imposes an additional burden not in the Agreement.

In this case, with the corroborating documentary evidence and Third-Party sworn Statement, there is no good faith basis to deny Mr. ▮ diagnosis. The MAF Physician applied the generally consistent requirement in evaluating Mr. ▮ and confirming the sufficiency of the documentary evidence included in his Claim Package. The heart of the Settlement Agreement is centered on the vital role of the Qualified MAF Physicians, to apply their education, board certifications, medical judgment to make appropriate diagnoses after personal examination of the Player outside of the BAP.

The Claims Administrator is empowered to do an Audit, which they did here and reported no adverse finding to contradict the Qualifying Diagnosis or the documentary evidence. It is evident that Mr. ▮ has severe dementia, and if the Claims Administrator had any evidence to negate the Physician Certification, they should, could, or would have established adverse findings during the Audit process. Section 10.3 of the Settlement Agreement directs the Claims Administrator to conduct Audits of Monetary Award Claims to avoid payment of claims involving any misrepresentation, omission or concealment of material fact. The Claims Administrator must not ignore that no such finding was made during the Audit of Mr. ▮ Monetary Award

Claim. Mr. ▓▓▓ prays that the Special Master recognizes our efforts to promote transparency and give weight to the result of the Audit and approve his Monetary Award Claim.

**4.   In the Alternative - find that the player qualifies for monetary award under Level 1. 5 Neurocognitive Impairment**

Altogether, if there is a denial, it would be wrong, prejudicial, and unduly cruel. Whether the Claims Administrator may contend that Mr. ▓▓▓ should not be assigned a 2.0 CDR score, there is no argument against a 1.0 CDR score. There are several reasons why:

A.   There is enough corroborating evidence to support the application of a 2.0 CDR score

There is unrefuted, clear, and convincing evidence, as explained throughout this appeal, that Mr. ▓▓▓ is entitled to a Monetary Award under CDR Score of 2.0. Mr. ▓▓▓ Claim Package shows that his qualifying diagnosis of Level 2 Neurocognitive Impairment was reached by strictly complying with the "generally consistent" criteria. According to Exhibit 1, Injury Definitions, a level 1.5 Neurocognitive Impairment is the same as a CDR score of 1.0 set forth in the National Alzheimer's Coordinating Center's Clinical Dementia Rating CDR Scale. The CDR Score of 1.0 requires a diagnosis of considerably less functional impairment from cognitive loss, in comparison to the requirements under a 2.0 CDR Score.

It must be recognized that a diagnosis regarding dementia has no goal-line criteria for each score. It is a sliding scale with different variables that contribute to the score in either direction. "The lack of appreciation of fundamental medical practice and failure to even examine these injured patients, or be aware personally of the clinical findings in such patients hobble the ability of the AAP to make meaningful contributions to the assessment of this cohort of injured retired players." (Doc ID. 196138, ▓▓▓ Affidavit 2 at 3) Each player has their life specific facts, circumstances, and impairments, which could affect the score.

The denial at hand states in part that "Neither Dr. ▓▓▓ limited history (i.e., acquired independently from the records) nor the third party statement provide sufficient information to be considered generally consistent with CDR scores of 2 in the required domains or "moderate dementia". (Doc ID. 211371) Fittingly, the Claims Administrator with input from the AAP has, reached a Qualifying Diagnosis admitting that "The player's score of 25/30 on the MMSE indicates a level consistent with no more severe than "mild cognitive impairment" or "mild dementia.". (Doc ID. 211371)

It is imperative to consider, that if the Claims Administrator has admitted based on Mr. ▮ MMSE score that he has "mild dementia," the Qualified MAF Physician had much more information to support his diagnosis because he personally examined the Player. Technically the Claims Administrator's acceptance that Mr. ▮ has "mild dementia," must automatically qualify him for a Monetary Award under Level 1.5, which requires a CDR score of 1.0 "mild dementia.".

B. <u>The denial infers a CDR score of 1.0 "Mild Dementia" and the Settlement Agreement calls for using the higher of the two scores</u>

Under FAQ 111, a magnificent clarification is provided; "In cases where the available information is ambiguous and the diagnosing physician thinks the Player could be rated in either one of two adjacent scores, such as 1 (Mild) or 2 (Moderate), the CDR scale calls for the physician to select the score corresponding to greater impairment." Here, the Claims Administrator admitted that at the very least Mr. ▮ has "mild cognitive impairment" or "mild dementia".

The explanation under FAQ 111 is essential for two reasons. One being; the Claims Administrator has admitted that Mr. ▮ has "mild dementia" which correlates with a CDR score of 1.0 and the second being that FAQ 111 solidifies that Mr. ▮ was assigned the correct CDR score of 2.0. In the strict application of FAQ 111, the MAF Physician had no choice but to select the CDR score corresponding to greater impairment. Considering that if the MAF Physician concluded as the Claims Administrator did here, that Mr. ▮ has "mild dementia", and but for his personal examination and use of his medical judgment and expertise also believed that Mr. ▮ can be assigned a score of 2.0 CDR, then he is obligated to choose the greater impairment.

If the Court is inclined to find that Mr. ▮ should not have a CDR score of 2.0, then it must accept that he has a CDR score of 1.0 "mild dementia" as did the Claims Administrator. Combining Dr. ▮ Physician Certification, personal examination, Dr. Nudleman's Neurology reports and the corroborating documentary evidence with the Claims Administrator's admission that Mr. ▮ has "mild dementia"; then at the very minimum Mr. ▮ Claim Package must qualify for the Monetary Award under Level 1.5 Neurocognitive Impairment.

C. <u>The Court's commitment to delivering benefits to the Settlement Class quickly and correctly</u>

The Court's Order dated January 9, 2019 and April 11, 2019 are intended to reinforce that "Safeguarding the integrity of the claims process is crucial to implementing the Settlement with honor". The Court directs a new procedure for Qualifying Diagnosis which provides in part, "A qualified MAF physician who does not follow the BAP criteria when making a Level 1.5 or Level 2 Qualifying Diagnosis has to explain to us the difference and how he or she reached the qualifying diagnosis". Furthermore, "On claims we already have and diagnoses already made, we will go back to the Qualified MAF Physician and get the explanation where we feel it is necessary." (Doc. No. 546114)

The revised rule allows the Claims Administrator to find out how the MAF Physician reached the qualifying diagnosis. As to Mr. ████, there is nothing on the record that negates his Claim, for example; his work history, his decline of personal care or that he does not drive. There is only a conclusory complaint that the MAF Physician's medical judgment is wrong. Mr. ████'s brain trauma has been apparent since 2010. He should not be penalized for following the rules here. If the Court is to affirm the denial, Mr. ████ respectfully requests that his Claim is remanded to compel the Claims Administrator to inquire with the MAF Physician and get the explanation on the difference and how he reached the qualifying diagnosis.

**Conclusion**

The Players need to know their health conditions and deserve to be paid if they qualify for a Monetary Award. The glaring conclusion of the Claims Administrator's denial is that Mr. ████ does have "mild dementia." Whether the Court affirms the Claims Administrator's finding that Mr. ████ has "mild dementia," or the MAF Physician's diagnosis that qualifies him for a Monetary Award under Level 2 Neurocognitive Impairment, the Court must find that Mr. ████ qualifies for a Monetary Award.

Pursuant to Rule 21 of the Rules Governing Appeals of Claim Determinations, the undersigned respectfully requests the opportunity to provide an oral argument in support of Claimant's appeal.

Respectfully submitted,

By: *Derrick C. Morales*
**Derrick C. Morales, Esq.**
Admitted to Practice Law
in Florida and New York