"Exhibit C"

████████ (ID:950005876 or ████ has a good faith belief the Claims Administrator's third denial of his Monetary Award Claim is incorrect for the reasons stated below:

INTRODUCTION

*"…It's not going to be denied…"* Mr. Brown of BrownGreer PLC, Claims Administrator at the Miami NFL Concussion Settlement Town Hall (2017).
*"There is no requirement in this settlement that you prove causation."* Chris Seeger, Class Counsel for the NFL Players at the Miami NFL Concussion Settlement Town Hall (2017).

On June 29, 2017, the Miami Dolphins alumni group hosted the NFL Concussion Settlement Town Hall. Mr. Brown of BrownGreer PLC, also known as the Claims Administrator (**CA**), communicated to the former Players in the audience and those who would watch the recording of the event that "If you get a diagnosis from a MAF doctor and the doctor fills out that form that certifies what it is, then there is no way we can deny it unless the records don't support it, which I don't think that's gonna happen." [1] "But if that doctor makes a mistake and signs a form that says he has ALS, when the records, in his records he said he doesn't have ALS, we would catch that." (id.) "But if you have a qualified MAF physician, on the list of doctors that we have, we have found, make that diagnosis, and they fill out the paperwork, and you give us a claim form, there, its not going to be denied."(id.)

The hypothetical addressed by Mr. Brown, as referenced above, highlights the purpose under the Settlement to rely on the Neurologist, carefully picked to determine correct diagnoses for the Players. He acknowledged the Neurologists could make honest mistakes that could be fixed. Absent a mistake, the selected Neurologist would be found to have committed fraud, misrepresentation or omissions of material facts subject to a claim of medical malpractice and the penalties under the Settlement. As discussed below, any contention with a Qualifying Diagnosis submitted by a MAF Physician who did not commit fraud, misrepresentation or omissions of material facts, must be deemed improper and dismissed by the Court. Therefore, as confirmed by Mr. Brown during the town hall, ████ diagnosis is the perfect example of a Qualifying Diagnosis that must not be subject to denial.

ARGUMENT

1. **████ has complied with all the requirements of the Settlement agreement and must not be denied lifesaving medical treatment for the brain disease he acquired while playing for the NFL.**

MAF Physician Dr. ████████████ (**MAF** ████ declared under penalties of perjury that ████ brain disease consists of moderate dementia and certified a Qualifying Diagnosis of Level 2.0 Neurocognitive Impairment (**CDR 2.0**). Additionally, MAF ████ certified that "The severity of Mr. ████ neurocognitive impairment was such that his CDR score of 2.0 obviated the need for neuropsychological testing per the MAF Provided Manual Guidelines". Following ████ submission of his Monetary Award Package (**Claim**), a Notice of Audit of Claims was entered. ████ complied with all requests during the audit. Each request was met with immediate response, compliance, and transparency. The notice of concluded audit confirmed there

---

[1] Mr. Brown, BrownGreer PLC, Claims Administrator, *Miami Dolphins Alumni NFL Concussion Settlement Town Hall. YouTube* 00:31:37 - 00:31:53, NFL Concussion Settlement Web Portal, (August 2017).

were no adverse findings to report. On 11/30/18, the CA filed their first Notice of Denial of Monetary Award Claim.

▇▇▇ first Appeal provided clarity and additional evidence to address what seemed to be a misunderstanding of the record.  The First Appeal was filed with supporting affidavits by MAF ▇▇▇, The Third Party Sworn Statement (**TPS**) affiant Luis Samperio (**Luis**), and additional medical records dating back to 2010.  The Appeal addressed: MAF ▇▇▇'s certification that certain testing was unnecessary due to ▇▇▇s severe dementia under CDR 2.0 was correct; the AAP had overstepped the boundary between diagnosing a patient and imposing a diagnosis on a patient they have never met; the CA's conclusion that an MMSE Score of 25/30 contradicts MAF ▇▇▇s CDR 2.0 certification was incorrect; the past medical records relied upon by MAF ▇▇▇ to corroborate the diagnosis were sufficient, and it explained how MAF ▇▇▇ diagnostic process was "generally consistent" with the BAP diagnostic criteria.

Following the first Appeal, the Special Master remanded ▇▇▇'s claim.  After that, the CA denied ▇▇▇s claim for the second time.  The second Appeal was drafted to promote transparency and a fair application of the Settlement terms.  The CA's second denial did not introduce any new evidence to support the input of the AAP negating ▇▇▇s brain Disease.  The second denial brought into question the integrity of the implementation of the Settlement because it became apparent the AAP was counter-diagnosing the player.  His second Appeal confirms that: MAF ▇▇▇ Diagnosis did not have to be identical to the BAP diagnostic criteria; the CA and AAP's misrepresented the medical records; omitted material facts from the TPS; and that MAF ▇▇▇ rightfully applied the unless clause of Injury Definitions Section 2(b) certifying that certain medical testing was not necessary. Because the CA concluded that ▇▇▇ has mild dementia instead of moderate dementia, FAQ 111 was introduced to remind the court that when the available information is ambiguous to the MAF and the Player could be rated either one or two adjacent scores on the CDR scale; the correct certification would be the higher of the two scores.  Therefore, a complete denial of ▇▇▇ Claim would amount to a breach of the Settlement agreement.

▇▇▇ second Appeal was also remanded for re-review. During the remand period, there was no additional audit or any additional evidence obtained by the CA.  Appeal two encouraged the CA to apply the new MAF Physician Rules, individually to obtain clarification of the diagnosis, and the CA made no such inquiry.  With no clear and convincing evidence to support denial one and two, the CA again misapplied the Settlement terms and again mischaracterized ▇▇▇s brain disease to support the third denial. ▇▇▇ respectfully requests for the Special Master to consider his first and second Appeal when deciding on this third Appeal.

2. **The CA has wrongfully denied ▇▇▇'s Claim by assuming facts, not in evidence.**

Assuming facts, not in evidence, is dangerous to all parties involved. It is especially dangerous when the party assuming facts, not in evidence, has the power of "denial." The first, second, and third denials, are riddled with false assumptions of facts, not in evidence.  In every instance where there is an "ambiguity" created or a fact omitted by the CA in their denial, the CA assumes a fact not in evidence to negate the player's diagnosis and justify the denial.

The Settlement was reached, relying on the premise that Players have suffered a traumatic brain injury, which inevitably leads to brain disease. For that reason, when a player claim demonstrates potential ambiguity, the parties should look at the evidence in the light most favorable to the Player. FAQ 111, provides that "In cases where the available information is ambiguous, and the diagnosing physician thinks the Player could be rated in either one of two adjacent scores, such as CDR 1.0 (Mild) or 2.0 (Moderate), the physician is to select the score corresponding to greater impairment." FAQ 111 provides additional support for the proper implementation of the Settlement, which is for the benefit of the Players, and the diagnoses assigned to the Players must be reviewed in the light most favorable to them. FAQ 111 obligates the MAF Physician, to give the higher of two scores, even if his medical judgment was leaning towards the lower score. FAQ 111 solidifies when the CA or AAP are evaluating a Player's diagnosis, they must look at the record in the light most favorable to the Player absent a specific finding of fraud, misrepresentation, or omission of material fact.

If the MAF Physicians have to apply the FAQ 111 standard, then the CA and AAP must also be governed by the same standard. Listed below are examples of the most relevant misrepresentation and omissions of material facts the CA has created in the light most negative to ▮▮▮▮ Claim, followed by numbered explanations.

**Statement from CA denial:** The records indicate that the Player is capable of independent function outside the home – i.e., He drives but gets lost.
1. Here, the CA is alleging that ▮▮▮▮ drives but gets lost; therefore, it shows he is capable of independent function outside the home. The CA mispresents that he still drives and omits the relevant portion from the TPS that established ▮▮▮▮ has not driven in several years because he gets lost and is too scared drive.
**Statement from CA denial:** The third-party statement indicates that the Player has shown significant social withdrawal, but neither the statement nor Dr. Nuddleman's reiteration of it indicates functional losses generally consistent with CDR score of 2.
1. The CA's claim of significant social withdrawal is a misrepresentation of ▮▮▮▮'s symptoms that include depression, memory loss, confusion, and inability to function outside of his home.
2. The CA omits the material facts from the TPS that confirm: ▮▮▮▮ stopped attending weekly barbeques, stopped participating in football, did not remember invitations, and could not leave his home without somebody else helping him.
**Statement from CA denial:** Neither Dr. ▮▮▮▮ s limited history (i.e., acquired independently from the records) nor the third-party statement that constitutes a bulk of the reported functional history provide sufficient information to be considered generally consistent with the CDR scores of 2 in the required domains or "moderate dementia" as outlined in the injury definitions.
1. The CA makes up the theory that MAF ▮▮▮▮ had a "limited history" and that a "bulk" of the doctor's background on the Player came from the TPS. Assuming MAF ▮▮▮▮ reached ▮▮▮▮ diagnosis based only on limited history and the TPS, then he should have been subject to penalties of perjury and reported to disciplinary boards. The CA again decides to omit the most critical part that MAF ▮▮▮▮ personally evaluated the Player and failed to obtain a clarification from him during two separate remand periods. Instead of assuming the MAF received the most relevant information from his personal evaluation, the CA decides to interpret the record in the light most negative to ▮▮▮▮ and disregards the essential part of the diagnostic process that being the personal evaluation of the patient.

In contrast to the above list, below are examples of material facts the CA chose to overlook that were most relevant to support ▮▮▮▮ diagnosis:

1. **As to Community Affairs, the CA omits**: ▮▮▮▮ has been unable to drive for several years now; not remembering invitations from friends; he does not live by himself and lives with his domestic partner Rhonda Sellers; he has not been employed in the past ten years.
2. **As to Personal Care, the CA omits:** There was a major decline in his appearance; to the contrary, the CA assumes facts, not in evidence, and claims in the denial that his personal care "needs prompting," although the truth is that his domestic partner must assist him with his personal care.

3. **As to Homes and Hobbies, the CA omits:** ▇ is unable to use the phone, and his friends have to call his domestic partner to get him on the phone for a chat; that ▇ is no longer making his bed; and he has multiple episodes of disorientation and confusion while at home.

4. **As to Dr. Nuddleman's neurological examination, the CA omits the reported symptoms:** Constant ringing or buzzing in ears, fatigue, sleeping problems, depression, and difficulty with memory concentration and focus.

5. **The CA omits the following diagnosis reported by Dr. Nuddleman:** Post Traumatic Head Syndrome; reduced attention, concentration, recall; post-traumatic headaches; cumulative trauma while playing football; neurological impairment; 100 % impairment/disability due to cumulative brain trauma while playing football and ▇ needs future medical care.

6. **From MAF ▇ diagnosis report, the CA:** ▇ recalls too many episodes of loss of memory and consciousness while playing football; describes poor memory; severe headaches; disorientation; lack of interest; and he can no longer do his profession of welding.

7. **From MAF ▇'s Neurological Examination the CA omits:** ▇ has a bachelor's degree but was not able to do simple subtraction; does not remember three objects after five minutes; his calculations are slowed and makes frequent errors; great difficulty with multi-step commands; and has residual cognitive issues that are ongoing and still needs future medical care.

All the above facts were purposely omitted, ignored, or misrepresented by the CA. Rather than acknowledging or applying the relevant parts of the documentary evidence, the CA decides to use "ambiguity" in the record to generate false inferences and baseless conclusions and justify a bad faith denial.

**3. The AAP has overstepped the boundary between actually diagnosing a patient whom they have examined and imposed a diagnosis on a patient whom they have never met.**

The settlement does not allow the AAP's input to overshadow or undermine the MAF's expertise or medical judgment. As explained in ▇ second Appeal, Dr. Nuddleman corroborated and confirmed his brain disease ten years ago. MAF ▇ used the past medical records to help measure ▇ cognitive decline during the ten years. The Injury Definitions expressly state that medical records used to corroborate functional impairment will be determined to be sufficient by the MAF. The CA and or AAP do not conform with the rule and instead attempt to discredit and misrepresent the sufficiency of the 2010 Neurological Examination Report by Dr. Nuddleman for the sole purpose of discrediting MAF ▇'s diagnostic process.

As recent as 8/20/19, the NFL attempts to enlarge the powers of the AAP by way of appeal[2]. In that appeal, the NFL argued the Special Master must consult with an AAP member before the determination of a claim. The Court denied the NFL's position and confirmed the Court does not have to obtain AAP input to make a monetary award determination. The NFL has gone to the extent of arguing the Special Master cannot review medical records relied upon by a MAF Physician, which brings into question the reason why the NFL is so confident with AAP input and not the diagnosis of a well-vetted and carefully chosen MAF Physician. The denial by the Court discarding the NFL's position of mandatory AAP input, confirms that a MAF's certification approving the sufficiency of the medical records is enough for the Special Master to make a correct determination of the claim. The Court provides a positive reminder to the NFL and CA that a MAF Physician certification is not subject to AAP approval absent illegal conduct.

Here, the CA concludes by relying on AAP "input" that ▇ Brain Disease does not qualify under a CDR score of 1.5 or 2.0. That conclusion reveals the impropriety of AAP input, particularly where, as here,

---

[2] NFL Litigation No. 2:12-md-02323-AB, Order on Settlement Implementation Determination (August 20,2019)

without any evidence, no personal evaluation of the Player, and most important, denying two highly qualified neurologists who classified ▮ severe brain disease.  Primarily, the CA has promoted the AAP to make a counter diagnosis to support a denial.  The Settlement does not grant the CA such authority, nor does it allow the AAP to counter diagnose a Player.

The AAP does not examine the injured Player, so it hobbles their ability to make a meaningful contribution to the assessment of ▮ brain disease. The AAP's input does not consider the expected cognitive decline from ▮ diagnosis in 2010 up to his current state. Under Injury Definitions, the MAF may provide a certification that certain testing is medically unnecessary because the Player's dementia is so severe. The third Denial claims that "neuropsychological testing would be critical to understand whether ▮ s poor cognitive abilities reflect other factors such as fatigue or motivational issues rather than concussion-related injuries."[3] That is just an opinion because neither the AAP or the CA have the right under the Settlement to negate MAF ▮ s Certification without evidence of illegal conduct. If they did have such power, the Settlement would say so.

The denial fails to acknowledge that ▮ s brain disease had worsened over the past ten years when it was first identified in Dr. Nuddleman's diagnosis. The progression of ▮ brain disease is an essential factor because Dr. Nuddleman did not have the benefit, unlike MAF ▮ , to analyze the course of ▮ dementia over a period of ten years. Dr. Nuddleman's 2010 report, provides the perfect example of reliable information to help an MAF identify cognitive decline and come to a correct diagnosis for any Player under the Settlement. Dementia, whether mild, moderate, or severe, has a stealthy and often unrecognized start date.  The gradual decline in cognitive loss means that many cases are preliminary misdiagnosed and mistreated. The Settlement contemplates the anticipated hypothetical that a Player's dementia can be so severe under the qualifying CDR score 2.0, that certain medical testing is unnecessary.  That is confirmation the Parties acknowledge as part of the Settlement that such scenarios are supported by medical science and the neurological diagnostic criteria.  The CA, in all three denials, refuses to accept these anticipated scenarios and the proper medical standard that also applies to them.

▮ underwent a Neurological Examination before the concept of the NFL Concussion lawsuit became public.  Regretfully, the AAP does not accept Dr. Nudleman's 2010 report as sufficient to support MAF ▮ 's certification.  Paradoxically, Dr. Nudleman's 2010 report, was subject to medical and legal scrutiny before the California Workers' Compensation court. ▮ Disability, as reported by Dr. Nuddleman was accepted and approved by the California court.  The Settlement implementation produced a list of the most highly qualified neurologists to help the former Players obtain the correct diagnosis and finally know what is wrong with their brains. The qualifications and experience of the neurologist were vetted and approved by the Parties. It is impossible to allow the unknown AAP member to provide input negating the MAF's diagnosis without any clear and convincing documentary evidence. Which in this case, the AAP negated ▮ diagnosis, relying on an assumption, misrepresentations, omissions of material facts, and unsupported medical conclusions.

---

[3] Concussion Settlement Web Portal, (Doc ID 219022), Notice of Denial of Monetary Award Claim ( December 30, 2019).

4. **The Third Party Sworn Statement was not mandatory therefore the probative value shall not negate MAF ▮▮▮▮ diagnosis absent direct contradictory documentary evidence.**

The CA's insistence to misapply the TPS as a basis for the third Denial was discussed and analyzed in ▮▮▮s Second Appeal. Please refer to ▮▮▮ second Appeal section 2A[4]. The third Denial does not provide any additional evidence and instead repeats the same misrepresentations included in the second Denial. According to Injury Definitions 2(a)(iii), a Third Party Sworn Statement must be submitted when there is no documentary evidence of functional impairment. Here, the TPS was not required because there is prior documentary evidence of functional impairment.

Luis Samperio's TPS was submitted to promote transparency, and with the good faith belief that it would help the MAF Physician and the CA understand ▮▮▮'s deterioration in all parts of his life. The most reliable informant, ▮▮▮s domestic partner Rhonda Sellers, is not allowed under Settlement terms to submit a TPS. Considering how the CA in all three Denials has misrepresented and omitted material facts of the statement, it has proven to be a mistake to volunteer information that was not mandatory. ▮▮▮l does not object to the application of precedent, that if the TPS had offered contradictory evidence, such as ▮▮▮ is working, that it would rightfully support a denial of his claim, but that is not the example here. If the Parties intended for the observations of a layperson as described in the TPS to outweigh and or undermine the expertise and medical judgment of the MAF Physician, then such provision would be included in the Settlement.

5. **▮▮▮'s ten-year unemployment record, coupled with his inability to drive, proves that he has no pretense of independent function outside his home.**

Working is essential to the determination of a Player's CDR score in regards to community affairs. It has been affirmed by the CA and approved by Court order that working is detrimental to a Player's diagnosis of dementia. This creates an undesirable outcome under the Settlement considering that people have to work to survive under unconscionable circumstances, much worse than with mild or moderate dementia. Here, ▮▮▮ unemployment record speaks for itself.

A precedent to consider is the matter of the Martinez Doctors, who were certifying players with CDR scores of 2.0 although they were employed[5]. The AAP found it detrimental for the doctors not to consider the Players' employment as part of the evaluation in certifying a diagnosis, and the Court affirmed the same. (id.) The evidence of employment history is essential to the determination of a Player's functional impairment, which was solidified by Order of the Court[6]. In both cases, the Special Master agreed and found that evidence of working was not indicative of a CDR score of 2.0.

Since 2010, ▮▮▮ has been unemployed due to his brain disease and mental decline. According to the CA and the AAP, working is a massive piece of corroborating evidence of the Player's functional ability outside the

---

[4] Concussion Settlement Web Portal, (Doc ID 214361), The Claims Administrator interpretation of the Third Party Sworn Affidavit disregards the evidence of Functional Impairment in Community Affairs, Home & Hobbies and Personal Care.
[5] Findings and Remedies of The Special Masters Pursuant To Section 10.3(i) Regarding 84 Monetary Award Claims (October 25, 2018).
[6] Special's Master's Rule 27 Decision On Report Of Adverse Finding Regarding Dr. Mircea Morariu (October 28, 2019).

home. On the contrary here, the CA departs from that precedent approved by the Court by claiming, ▮ symptoms do not qualify under a CDR 2.0 although he has been unemployed for ten years.

In the NFL appeal affirmed by the court on October 28, 2019, the Special Master specifies that when a Third Party Sworn Statement provides that the Player has not declined in his personal care, this infers the Player "is functioning at a level much higher than would be expected" for someone with moderate dementia. (id.) The TPS provides detailed observation of ▮'s decline in appearance and grooming as "another major change."[7] The CA's denial omits the material fact that his decline in personal appearance and grooming was described as a "major change". Applying the precedent set by the Court to ▮ diagnosis, the CA's conclusion that the reported change in his personal appearance and grooming indicates a CDR 1.0 is not valid. (Doc ID 219022)

6. **The Claims Administrator and members of the Appeals Advisory Panel must be subject to accountability and do not have immunity from misrepresentations, omissions or concealment of a material fact**

The MAF Physicians and Players' attorneys involved in this matter are subject to harsh penalties and held accountable for the conduct of fraud, misrepresentation, and omissions of material facts. It is apparent by the fact that both licensed professionals have to sign and certify under penalty of perjury, pursuant to 28 U.S.C. 1746, that all information provided is true and correct. Additionally, the MAF Physician has to certify that he personally examined the Retired NFL Football Player (**emphasis added**). The CA and AAP must be held to the same accountability standard as the MAF Physicians and attorneys helping the injured players. At the onset of the Settlement, the NFL, with support of the CA, created a narrative of alleged fraud as a prevalent issue. A few bad apples were quickly and swiftly addressed by the Court, and the proper determinations were made. This is not the issue with ▮ claim. Common problems on all three Appeals, are the details of the CA and AAP demonstrating unregulated power not assigned by the Settlement.

There is no measure of accountability or exposure to penalties to deter the CA and AAP from disregarding all medical and ethical standards. This is obvious due to the fact the AAP and CA associates are able to remain anonymous and do not have to sign or certify under penalties of perjury the notice of denial. The first, second, and third denial are founded on conclusions and assumptions rather than facts or medical evidence to support a denial of ▮s brain disease. Here, the denial misrepresents the findings of two highly qualified Neurologists, one being the MAF Physician. The CA indicates that MAF ▮ "does not report several other of Dr. Nudleman's findings, including significant elevations on the Epworth sleepiness scale or the fatigue severity scale." Such a statement insinuates that the MAF ▮ did not report relevant medical records and creates a red herring.

MAF ▮ reported all the relevant findings as he is mandated to do under his professional license and ethical standard governed by HIPPA[8]. The CA gets to make false assertions and misrepresent the record without any concern of accountability. In the second and third denial, the CA proposes, the Epworth Sleepiness scale is relevant and negates MAF ▮ certification. The CA's conclusion must be backed by medical evidence. The

---

[7] Concussion Settlement Web Portal, (Doc 196142), Third Party Sworn Statement.
[8] 45 C.F.R. § 164.502, Uses and disclosures of protected health information: *Standard: Minimum necessary.*

Players must know which member of the AAP provided input in order to hold them accountable under the same standards as the MAF.

Because the CA is not subject to the same consequences outlined in Section 10.3(i)[9] or subject to penalties of perjury, the CA is emboldened to make assertions such as "Dr. ▅▅▅'s documentation makes no reference to the potential role of sleep disturbance or its consequences including severe fatigue as potential sources of the cognitive or functional losses" (Doc ID 219022)  That is a perfect example of the CA's misrepresentation and omission of material facts in creating a red herring. The CA's focus on the role of sleep disturbance is taken from the October 28, 2010 medical report by Neurologist Dr. Nuddleman.  A truthful reference of the medical records by the CA as to the "sleep disorder" reported by Dr. Nuddleman must include the complete diagnosis which states:

> ""Post Traumatic head syndrome characterized by reduced attention concentration, and recall,  Post Traumatic headaches daily, and in addition a disorder of sleep and arousal with body jerks and nonrestorative sleep, With respect to his post-traumatic head syndrome, I would consider this to be on a constant basis and intermittent and slight …His headaches are considered constant and slight, becoming occasionally slight to moderate. He does have an abnormal Epworth and fatigue scale… As to the need for future medical care, the patient should be monitored relative to his memory and short-term concentration problems…based on the information available 100% causation and 100% of impairment/disability is due to cumulative trauma while playing professional football…this would lead to a total neurological impairment of 14% based upon the best medical evidence[10]""  (Doc ID 196129)

What accountability is the CA governed by for the practice of nit-picking medical records to create a narrative that justifies a denial? There are none. The CA has taken the position of insinuating that MAF ▅▅▅ misrepresents the medical records in order to justify their denial and discredit his medical judgment.  The CA's defamatory accusation is designed to question MAF ▅▅▅'s expertise in his field of practice and tarnish his reputation. Such conduct by the CA must be subject to a report to disciplinary boards and or disqualification of the CA.

7. **There is no requirement in the Settlement that causation must be proven.**

The AAP and CA's departure from the heart, integrity, and intentions of the Settlement are audaciously demonstrated in the third denial. What is one of the most important bargained terms of the Settlement, is the fact "there is no requirement in the Settlement that you prove causation[11]".  With no actual evidence or medical science in support, the CA reverts to red herrings by stating "although Dr. Nuddleman identified back pain as an important contributor to the Player's problems, Dr. ▅▅▅ omits any mention of the potential for pain to limit his daily activities". (Doc ID 219022) Mr. Preston's back pain reported to Dr. Nuddleman in 2010 is wholly immaterial to the MAF Physician's role under the Settlement to identify associated symptoms of cognitive decline and not have

---

[9] Settlement Agreement 10.3(i) The Special Master's review and findings shall take into account whether the misrepresentation, omission or concealment was intentional, and may include the following relief, without limitation: (a) denial of the claim in the event of fraud; (b) additional audits of claims from the same law firm or physician (if applicable), including those already paid; (c) referral of the attorney or physician (if applicable) to the appropriate disciplinary boards; (d) referral to federal authorities; (e) disqualification of the attorney, physician and/or Settlement Class Member from further participation in the Class Action Settlement.

[10] Concussion Settlement Web Portal, (Doc ID 196129) <u>Qualified Medical Examination</u>, Kennet L. Nudleman, M.D. (October 28, 2020)

[11] Chris Seeger, Class Counsel for the NFL Players, Miami Dolphins Alumni NFL Concussion Settlement Town Hall. *YouTube* 00:13.24,, NFL Concussion Settlement Web Portal, (August 2017).

to address the causation of irrelevant symptoms such as back pain. More alarming is the CA's attempt to create an improper causation argument to decline the Player's brain disease. The CA or AAP must avail themselves and certify under penalties of perjury as to why back pain that limits activities negates ▮ CDR of 2.0.

The CA has attempted to create improper issues of causation since the second denial, although proving causation is not part of the Settlement terms. Again, the CA claims that "Support for the player's functional losses being the result of cognitive impairment and not other factors (especially fatigue and excessive daytime somnolence from non-restorative sleep) as required by the CDR is not established." (Doc ID 219022) The CA must know that causation is not an element that must be proven as part of the Player's diagnosis. The CA's emphasis in the second and third denial of ▮ sleeping problems and fatigue as an alternate theory to negate his brain disease must be rejected and admonished by the Court. It is a medical, scientific fact that symptoms of traumatic brain injury resulting from concussions include and are not limited to fatigue, insomnia, and or sleep disorders[12]. No section in the Settlement permits the CA relying on AAP input to depart from the ethical and medical standards of medicine.

8. **Fatigue, depression, social withdrawal, headaches, and sleep disorder are common symptoms of traumatic brain injury; post-concussion syndrome developed into dementia.**

On October 28, 2010, ▮ communicated to Dr. Nuddleman, his feelings of depression. On January 31, 2018, he also complained to MAF ▮ that he is "depressed most of the time[13]." The third denial misrepresents ▮s depression symptoms dating back to 2010. The CA simplifies his depression, which is known to be a significant symptom of moderate dementia, by claiming that based on the TPS, ▮ "has shown significant social withdrawal." Contrary to CA's claim of social withdrawal, the Oxford Medical Journal reports that "repeated head injuries are associated with cognitive symptoms of depression such as sadness, feelings of guilt, and critical self-evaluations[14]."

The symptoms of a patient are revealed by personal evaluation, prior medical records, patient history, and reliable informants. All who were part of the MAF ▮s practice during ▮s Diagnosis[15]. Those elements combine to permit a neurologist to determine a correct diagnosis. Additionally, the elements help identify the onset of dementia. It was an essential factor for MAF ▮ to identify ▮s symptoms and cognitive decline since first reported by Dr. Nuddleman in 2010. The CA is in possession of evidence that confirms ▮ has no record of working for the past ten years, no record of driving for the past five years, and as concluded in the audit no adverse findings to negate his Claim. MAF ▮s diagnosis report notes that "He feels as though he is not a good father and cannot do very much with them. This tends to bring on an attitude of self-defeat and an

---

[12] Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/symptoms-causes/syc-20353352 (last visited March 2, 2020).
[13] Concussion Settlement Web Portal, (Doc ID 171337) Physician Letter Certification of Diagnosis, MAF Physician Nicholas D.A. ▮ M.D. (January 31, 2018)
[14] Repeated head injuries are associated with "cognitive symptoms of depression such as sadness, feelings of guilt, and critical self-evaluations. Didehbani, N., Munro Cullum, C., Mansinghani, S., Conover, H., & Hart, J., Jr (2013). Depressive symptoms and concussions in aging retired NFL players. Archives of clinical neuropsychology : the official journal of the National Academy of Neuropsychologists, 28(5), 418–424. https://doi.org/10.1093/arclin/act028.
[15] Concussion Settlement Web Portal, Side by side comparison of the applicable diagnostic criteria and the MAF Physician's Dr. ▮ M.D. application of the Generally Consistent principle.

unwillingness to confront the problem." (Doc ID 196129) MAF ▮ once again, exhibits his expert ability to annotate relevant cognitive symptoms while examining ▮. The CA ignores established medical evidence and also ignores the correlation of ▮'s symptoms of depression, fatigue, sleep disorder, and headaches as symptoms of moderate dementia and instead creates the proposition that he may have "motivational issues" rather than dementia-related symptoms. That suggestion reflects both the AAP and CA's complete misunderstanding of the medical course of dementia, its related symptoms, and the diagnostic process.

**Conclusion**

The CA's third denial of ▮'s brain disease has tarnished the honor of the Settlement and has raised questions of credibility as to NFL, CA, and AAP. Not only has ▮ lost hope to obtain his much-needed medical care, but he also regrets that he accepted Class Counsel and the CA's encouragement to join the class Settlement. It makes no sense that in the second denial, the CA concludes he has mild dementia, and in the third denial that he does not have mild dementia. In the second Appeal, the Court was reminded that accepting the CA's conclusion that ▮ has mild dementia, then it must accept MAF ▮'s diagnosis of moderate dementia. This concept was introduced with the application of FAQ 111 and brought into question the CA's understanding of the Settlement terms.

The undersigned respectfully suggests for the Special Master to rely solely on MAF ▮ diagnosis over AAP input, in part because it is supported by prior medical records, and most importantly, his personal evaluation of ▮ Although, prior NFL appeals and CA denials attempt to create the requirement that a diagnosis made outside the BAP has to be confirmed by the AAP or the AAP has the power to provide a counter diagnosis. ▮ prays the Special Master will promote the integrity of the Settlement and affirm the MAF Physician's ability to make the requisite diagnostic judgments as promised to the Players when entering into the Settlement. We must not let the Settlement overshadow the reality that ▮ has not received any medical treatment for his brain disease since his retirement from the NFL in 1998. For a reason being, the NFL intentionally failed him; the league concealed players' concussions and the consequential traumatic brain injuries for the pursuit of money and reputation over their lives. Not until the NFL had blood on their hands, from the suicides of legendary players such as Junior Seau, Ray Easterling, David Duerson, Shane Dronett, Andre Waters and Terry long whose brains were discovered to contain CTE, did the NFL begin to do damage control. No matter what the NFL, CA, or AAP offer as their opinion of ▮'s mental state, the real-life implication is that his brain disease is not going to disappear because of a denial of his Claim.

The reality is that denying ▮ Qualifying Diagnosis does not erase his symptoms and continued struggles in life because of his brain disease. The CA's insistence on diminishing the MAF's diagnosis has no implication outside the Settlement. MAF ▮ is not going to inform ▮ that because the CA denied his Claim, he no longer stands by his diagnosis of ▮ severe dementia. What must happen next to ▮ or players similarly situated before the NFL makes belief they will do the right thing again to fix the problem they created.

Pursuant to Rule 21 of the Rules Governing Appeals of Claim Determinations, the undersigned respectfully requests the opportunity to provide an oral argument in support of ▮ Preston's Appeal.

/s/ Derrick C. Morales, Esq.