# "Exhibit G"

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO: APPEAL OF SETTLEMENT CLASS MEMBER ███████ REGARDING DENIAL OF MONETARY AWARD | : : : : : : | **Hon. Anita B. Brody** |

## INTRODUCTION

On June 1, 2018, ███████, a Retired NFL Player and Class member under the Amended Class Action Settlement Agreement, filed a claim for benefits under that Agreement. As he received a Qualifying Diagnosis outside of the Baseline Assessment Program, it was his burden to submit "evaluation and evidence generally consistent with the diagnostic criteria" specified in the Settlement.[1]

After an extended process, the Claims Administrator concluded that ███████ had failed to meet that burden. ███████ timely appealed. Because ███████ has not established by clear and convincing evidence that the Claims Administrator's decision incorrectly discounted his clinician's judgment,[2] the Appeal is denied.

---

[1] *See* Settlement Agreement, Exhibit 1(2)(b). The parties to the Settlement Agreement have defined "generally consistent" to mean that the evidence "has more elements or characteristics in common" with the diagnostic criteria than "elements or characteristics that differ" from the criteria. *See* Settlement Portal, *Frequently Asked Questions*, FAQ #101.

[2] *See* Settlement Agreement, Section 9.8. The Special Masters must decide an appeal of a Monetary Award based on a showing by the appellant of clear and convincing evidence that the determination of the Claims Administrator was incorrect. *See* Order Appointing Special Masters, at 5. "Clear and convincing evidence" is a recognized intermediate standard of proof—more demanding than preponderance of the evidence, but less demanding than proof beyond a reasonable doubt. *In re Fosamax Alendronate Sodium Prods. Liab. Litig.*, 852 F.3d 268, 285-86 (3d Cir. 2017) ("Black's Law Dictionary defines clear and convincing evidence as 'evidence indicating that the thing to be proved is highly probable or reasonably certain.'").

## FACTUAL AND PROCEDURAL BACKGROUND

▅▅▅▅▅▅ received a Qualifying Diagnosis of Level 2.0 Neurocognitive Impairment on January 31, 2018, from Dr. Nicholas Suite, a Qualified MAF Physician. Doc. 171336. Dr. Suite was not assisted by a licensed neuropsychologist. *Id.*

The claim was submitted for auditing pursuant to §10.3 of the Settlement Agreement and emerged without an adverse inference on October 12, 2018. Doc. 175802; Doc. 187783.

An AAP Reviewer recommended that the Claims Administrator deny the claim, which it did on November 30, 2018. Doc. 192077 ▅▅▅▅▅▅ subsequently supplemented his Claim Package with various medical records and new materials, but the Claims Administrator, following remand by Special Master Pritchett for review of the additional materials, again denied Mr. Preston's claim. Doc. 211371. ▅▅▅▅▅▅ appealed the denial of his claim for the second time on September 19, 2019. Doc. No. 214364. On October 1, 2019, Special Master Pritchett for a second time remanded the claim for "re-review for the issues raised in the appeal." Doc. 214826. That third review culminated with another AAP recommendation to deny ▅▅▅▅▅▅ appeal, as well as another denial by the Claims Administrator, and the issues are now ripe for review. Doc. 216079; Doc. 219022.

## DISCUSSION

▅▅▅▅▅▅ has the burden of coming forward with a "diagnosis . . . based on evaluation and evidence generally consistent with the diagnostic criteria set forth in subsection 2(a)(i)-(iv)" of Exhibit A-1 of the Settlement Agreement, made by a "Qualified MAF Physician or a board-certified or otherwise qualified neurologist . . . ."[3]

Dr. Suite was, at the time, a Qualified MAF Physician. Further, ▅▅▅▅▅▅ has met his burden under criterion (i), *i.e.*, there is concern for a "severe decline in cognitive function."

Dr. Suite did not consider or facilitate the administration of a neuropsychological testing protocol. This would render the Diagnosis inconsistent with the criteria unless, as the Settlement provides, "the diagnosing physician can certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) is medically unnecessary because the Retired NFL Football Player's dementia is so severe . . . ."[4]

In applying this clause, the AAP and AAPC, and through them the Claims Administrator, have required submission of evidence showing that the player's unambiguously severe cognitive impairment precluded him from generating valid test results. The Parties, when prompted for their views on the AAP's practice, responded jointly on January 31, 2020 that "MAF Physicians should not be required to refer players for neuropsychological testing in those cases where the MAF Physicians have reasonably determined that Claimant's dementia is so severe that neuropsychological testing is medically unnecessary."

---

[3] *See* Settlement Agreement, Exhibit 1(2)(b).
[4] *Id.*

Here, Dr. Suite made the required Certification twice. First, on January 31, 2018, Dr. Suite handwrote a Certification that, "the player's dementia is so severe that testing is medically unnecessary." Doc. 196135. Later, on May 10, 2018, a typewritten form Certification stated that "The severity of Mr. Preston's neurocognitive impairment was such that his CDR score of 2.0 obviated the need for neuropsychological testing in accordance with the MAF Provider Manual guidelines." Doc. 171336.

Dr. Suite's justification thus asserted: (i) ▇▇▇▇▇▇ neurocognitive impairment was severe; and (ii) given that severity, the CDR score of 2.0 "obviated" the need for testing according to the Provider Manual guidelines. This Certification facially satisfied the Settlement's requirement; nonetheless the Claims Administrator rejected it:

> "On the Diagnosing Physician Certification form, Dr. Suite reported '[T]he severity of ▇▇ ▇▇▇▇▇▇ neurocognitive impairment was such that his CDR score of 2.0 obviated the need for neuropsychological testing in accordance with the MAF Provider Manual guidelines.' However, the available documentation does not support that contention. The Player's score of 25/30 on the MMSE indicates a level consistent with a decline no more severe than 'mild cognitive impairment' or 'mild dementia.' This score indicates that except for memory lapses and "frustration," the Player was able to complete the cognitive screening. Neither Dr. Suite's limited history (i.e., acquired independently of the record review), nor the third-party statement that constitutes the bulk of the reported functional history, provide sufficient information to be considered generally consistent with CDR scores of 2.0 in the required areas or "moderate dementia" as outlined in the Settlement's Injury Definitions
> ...
> The asserted medical grounds for bypassing more detailed cognitive examination are not evident in the records. Support for the Player's functional losses being the result of cognitive impairment and not other factors (especially fatigue and excessive daytime somnolence from nonrestorative sleep), as required by the CDR, is not established. Neuropsychological testing, specifically the performance and symptom-reporting validity assessments in the Settlement criteria, would be critical to whether the reportedly poor cognitive abilities reflect constitutional factors (especially fatigue due to disordered sleep) or motivational issues, rather than or in addition to concussion-related injuries." Doc. 219022.

The question in this Appeal is whether the Claims Administrator's determination that Dr. Suite's Certification was insufficient was clearly erroneous.

Ordinarily, deference to MAF Physicians' certification should be the rule, given those clinicians' eminence and training, as well as their personal evaluation of the player-claimant. The Claims Administrator does, however, have the obligation to determine if the Certification was "reasonably determined"—a standard fashioned by the Parties which I adopt in this Appeal. "Reasonably determined" means that the clinician's choices are cognizable as an application of the Settlement's narrow ("unless") exception to the testing requirement, *i.e.,* that the impairment was "so severe" that testing is "medically unnecessary." Another way to put this is that it was reasonable to have concluded that the testing would not generate valid results.

Under the Settlement, particularly Section 8.6(b), the Claims Administrator has the authority to verify the sufficiency of both prongs of that reasonableness inquiry: How *severe* was the impairment; and, Why does the impairment's severity make the testing *unnecessary*? That is not the same as saying that the Claims Administrator's supervisory authority is plenary. The Parties have interpreted the agreement to mean that the Claims Administrator cannot disagree with the clinician's Certification merely because it would have made a different choice. The clinician's articulated reasons for certifying must be *unreasonable*. But the Claims Administrator possesses ample authority to require a complete explanation, and to ensure it is internally consistent.

Here, the Claims Administrator did not accept Dr. Suite's Certification. It first noted that ▇▇▇ completed the cognitive screening and achieved an MMSE score of 25/30, indicating a milder level of impairment than Dr. Suite's subjective findings implied. The MMSE is not a listed test in the Settlement Agreement. Denial of a claim merely because an MMSE screening test conflicted with the scheduled testing battery would present a serious issue on Appeal. However, as the Parties jointly agreed in correspondence to the Claims Administrator on February 5, 2020, cognitive screening tests can be used by BAP Providers and MAF Physicians. Logically, it cannot be outside of the Claims Administrator's authority to use such tests as an aspect of its duty to verify claims. Here, Program's expert panel, empowered to provide advice on medical aspects of the Settlement,[5] concluded that the MMSE scores were properly employed to suggest that testing could have generated valid results. It also suggested that such scores were inconsistent with ▇▇▇ asserted level of disease severity. Dr. Suite did not address why testing was unnecessary despite the MMSE results, making it harder to conclude that his Certification was reasonably determined.

Second, the Claims Administrator discounted the correctness of Dr. Suite's CDR scoring. Recall that Dr. Suite's Certification stated that the "severity of ▇▇▇ neurocognitive impairment was such that his CDR score of 2.0 obviated the need for neuropsychological testing." Though the Parties have extensively briefed the issues, the connection between the first and second halves of this explanation remains obscure. As the NFL Parties point out, a Qualifying Diagnosis of Level 2 Impairment generally requires functional impairment consistent with a CDR of 2.0 *as well as* evidence of cognitive decline, established through testing (Settlement Agreement, Exhibit 1. at § 2(a)(ii)), "unless the diagnosing physician can certify" that the neuropsychological testing "is medically unnecessary because the Retired NFL Football Player's dementia is so severe. *Id*. at 3, § 2(b). Because most diagnoses require both functional loss *and* testing/certification, a given functional score can't necessarily determine severity or medical necessity for the purposes of certification. The inquiries should be distinct.

The appropriate focus—what the Certification must reasonably determine—is whether the cognitive impairment was so severe as to make testing medically unnecessary. Functional impairment at the 2.0 level—designated as "moderate" in the CDR scoring sheet—may be probative of that standard's satisfaction. But there are links in the chain of argument from functional impairment to Certification that the Claims Administrator may seek to be made explicit. A CDR score of 2.0, standing alone, is neither preclusive, necessary nor sufficient. It is a piece of the puzzle.

---

[5] *See* Settlement Agreement, Section 9.8(a)(iii).

Even putting this aside, the Claims Administrator concluded that for each of the listed functional categories Dr. Suite relied on, the evidence did not support the conclusion that ▮▮▮▮▮ impairment was generally consistent with a CDR of 2.0, and was inconsistent with finding that his impairment was severe. As the Denial Notice stated:

"Dr. Suite provides a detailed recounting of the elements of the third-party statement dated 1/22/18, and of the prior evaluation by Dr. Nudleman in 2010. The third-party statement indicates that the Player has shown significant social withdrawal. This is potentially consistent with the CDR score of 1.0 for Community Affairs (i.e., 'unable to function independently at these activities although may still be engaged in some') but not the CDR score of 2.0, which indicates 'no pretense of independent function outside home.' The third-party statement also identifies a change in personal grooming consistent with the CDR score of 1.0 for Personal Care (needs prompting), but there are no statements that indicate the Player 'requires assistance' in those tasks, as indicated for a CDR score of 2.0 in that area. Similarly, there are no elements of the third-party statement that address Home and Hobbies activities apart from a loss of interest. A CDR score of 2.0 in Home and Hobbies would need to be associated with a loss of function in the home at a level where 'only simple chores preserved.' Dr. Suite does not document that he conducted his own assessment of daily function in a manner generally consistent with the methods of the CDR, nor that there was additional contemporaneous evidence about daily function beyond the third-party statement and the Player's own assertions." Doc. 2190022.

The Claims Administrator thus concluded that ▮▮▮▮▮ functional impairment was not generally consistent with a CDR score of 2.0, and I cannot say its well-reasoned analysis was clearly erroneous. That conclusion is strengthened when considering Denial Notice's statements about the validity of the previous results:

"Additionally, Dr. Suite identifies – via Dr. Nudleman's records — that the Player had previously obtained abnormal results on a polysomnogram. He does not report several other of Dr. Nudleman's findings, including significant elevations on the Epworth Sleepiness Scale (17) or the Fatigue Severity Scale (47). This is particularly notable because on the Fatigue Severity Scale administered by Dr. Nudleman, the Player reported strong agreement with several statements regarding the impact of fatigue, including that 'fatigue interferes with my physical functioning' and 'fatigue interferes with my work, family, or social life.' Despite this, Dr. Suite's documentation makes no reference to the potential role of sleep disturbance or its consequences (including severe fatigue) as potential sources of the cognitive or functional losses. Similarly, although Dr. Nudleman identified back pain as an important contributor to the Player's problems, Dr. Suite omits any mention of the potential for pain to limit his daily activities. The new evidence includes a 9/19/11 Supplemental Medicolegal Report by Dr. Nudleman, which summarizes a review of additional documents and the Player's deposition, from which he states, 'based on his symptoms and complaints, my opinions to a reasonable medical certainty are unchanged.' He asserts '0.5% benign forgetfulness' as the relevant cognitive deficit. Therefore, the additional report provides no further basis for establishing a diagnosis of Level 2 Neurocognitive Impairment or an indication that neuropsychological testing would not be required." Id.

The Claims Administrator's close reading of the file thus found inconsistencies which undermined a CDR 2.0 score, the conclusion that ▮▮▮▮▮ impairment was severe as the Settlement defines that term, and the conclusion that new testing would produce no useful data.

The Settlement Agreement requires testing unless a clinician can "certify in the Diagnosing Physician Certification that certain testing in 2(a)(i)-(iv) is medically unnecessary because the Retired NFL Football Player's dementia is so severe . . . ." If a clinician offers a coherent and reasonably complete explanation of why that standard is satisfied, the Claims Administrator should accept that Certification even if it would have made a different choice. In this case, Dr. Suite's explanation did not discuss aspects of the record which suggested the utility of testing, and rested on a CDR score that on its own terms was not generally consistent with severe impairment. Given these flaws, the Claims Administrator decided that the Certification was not reasonably determined. That exercise of its authority was not clearly erroneous.[6] And, without a valid Certification justifying the absence of neuropsychological testing, Mr. Preston has not offered evidence generally consistent with a Level 2.0 Neurocognitive Impairment.

## **CONCLUSION**

It was not clearly erroneous for the Claims Administrator to conclude that ▮▮▮▮▮ clinician offered a deficient Certification for why testing was medically unnecessary. For want of that Certification or valid testing, the Diagnosis was not generally consistent with the Settlement's requirements. This Appeal is consequently denied.

Date: May 27, 2020

_David A. Hoffman_
David Hoffman, Special Master

---

[6] It does not follow that Level 1.5 Neurocognitive Impairment must be granted if Level 2.0 Neurocognitive Impairment is not. Just as for Level 2.0, Mr. Preston's file lacks evidence of the required severity of cognitive deficit at the 1.5 Level using neuropsychological testing, and (unlike Level 2.0) there is no exception provided in the Agreement for Level 1.5 diagnoses to be made without this testing. Also, while functional loss may be consistent with CDR scores of 1 in Personal Care or Community Affairs, there is insufficient evidence to establish the same in the area of Home & Hobbies.