"Exhibit I"

# NDAS

NEUROLOGY, DIAGNOSIS, & APPLIED SOLUTIONS, INC.
**"The secret of caring for the patient is in *caring* for the patient"**
1108 Kane Concourse, Ste 300, Bay Harbor Islands, FL 33154
2525 Embassy Drive, Ste 7, Cooper City, FL 33026
11420 N Kendall Dr, Miami, FL 33176
Phone: 954-431-6884  Fax: 954-436-6936  e-Mail: Embassy2525@gmail.com
MEDICAL DIRECTOR: NICHOLAS D.A. SUITE M.D.
BOARD-CERTIFIED NEUROLOGIST

## PHYSICIAN LETTER CERTIFICATION OF DIAGNOSIS

RE: ▉▉▉▉▉▉▉
Evaluation Date: **January 31, 2018**

To Whom It May Concern:

This letter is to certify that ▉▉▉▉▉▉▉, date of birth ▉▉▉▉▉▉▉ has been diagnosed with a level 2 neurocognitive impairment on January 31, 2018.  I certify under penalty of perjury that the information provided is true and correct and that the qualifying diagnosis is being made with the criteria set forth in the National Alzheimer's Coordinating Center's clinical dementia rating scale (CDR) category 2.0 in the areas of 1. Community Affairs, 2. Home and Hobbies, 3. Personal Care and the cognitive deficits do not occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects.

Sincerely,

*I, Nicholas D. A. Suite, M.D., being a neurologist duly licensed to practice in the State of Florida, under the penalties of perjury, pursuant to CPLR 2106, do hereby affirm the contents of the foregoing.*

_____
Nicholas D.A. Suite M.D.
Board-certified Neurologist

RE: ▮▮▮▮▮▮▮▮▮▮                                                         Date:  January 31, 2018
Page 2

---

Type of visit:  Initial neurology evaluation
CPT code:  99205
Time spent face to face:  60 minutes
Location:  Cooper City office
Reason for Consultation: Concern of the retired NFL football player, a knowledgeable informant, or the qualified provider that there has been a severe decline in cognitive function.

HISTORY OF PRESENT ILLNESS:
▮▮▮▮▮▮▮▮▮▮, date of birth ▮▮▮▮▮▮▮▮▮▮, is a pleasant 45-year old man who is here today for neurological assessment on account of the above complaints.  He reports that he first began playing tackle football at the age of 13.  He played for a total of 3 years in high school as a wide receiver, punt returner, and kicker.  He then played for 4 years at the University of Mississippi in those same positions.  He was then drafted upon graduation in 1995 to the Atlanta Falcons.  He played for a total of 5 years in the National Football League.  He played at several clubs over that 5-year period but does not recall the exact duration of the stints at each club.  He does recall, however, that he played at the following clubs:  Atlanta, Tennessee, Green Bay, Dolphins, 49ers, and Red Skins.  He was selected in 1998 pro ball player.  He retired from the game after he felt that he could no longer take the physical abuse.  He was depressed.  He reports that he had a number of significant traumas during his playing time.  He states that he had too many to recall in terms of professional league loss of memory episodes and loss of consciousness.  He believes that he had 3 to 6 episodes of loss of memory in high school and in college.  In terms of his professional playing time, he felt dazed and confused too frequently to recall how many times.  He is very frustrated and depressed most of the time.  He has a poor attitude.  He has had the experience of walking towards the wrong huddle.  At one point he thought the play was over in one of his games and tried to walk off the field before being called back on.  He has had multiple episodes of disorientation and confusion.  He reports that he did play some US Football League games as well.  He played for the Chicago Enforcers.  He has had injuries while playing in that league as well and he did apply for disability on that basis under the Worker's Compensation Appeals Board State of California.

He has had other individuals who have assessed him.  He had a 3rd party sworn statement that was completed by a close friend who has known him for a long time.  His name is Luis Samperio.  Mr. Samperio has been a personal friend of Roell Preston for 12 years.  Mr. Samperio finished an affidavit that stated that he has witnessed the decline in ▮▮▮▮▮▮▮▮▮▮ mental state over the prior 10 years before the completion of this 3rd party sworn statement.  Mr. Samperio has noted a loss of interest on the part of ▮▮▮▮▮▮▮▮▮▮ in terms of all activities outside the home.  When he first met ▮▮▮▮▮▮▮▮▮▮, he would hang out with him and they would watch football together and BBQ in the back yard.  Now and over the past 10 years, ▮▮▮▮▮▮▮▮▮▮ has been very unwilling to come outside and enjoy a BBQ or even watch football with his friend.  Over the past 3 years, since 2015, Mr. Samperio noted that he was no longer seeing ▮▮▮▮▮▮▮▮▮▮.  ▮▮▮▮▮▮▮▮▮▮ would prefer to stay inside.  When Mr. Samperio asked him why he would not come over for a football game or parties, he was surprised to hear that ▮▮▮▮▮▮▮▮▮▮ would tell him that he felt as though he was not invited.  He has become increasingly antisocial.  Mr. Samperio has also observed ▮▮▮▮▮▮▮▮▮▮ being disoriented behind the wheel and becoming lost while driving.

RE: ████████                                    Date:  January 31, 2018
Page 3

HISTORY OF PRESENT ILLNESS, cont:
Mr. Samperio also observed a steady decline in ████████ overall appearance and grooming. He has gone from being a very clean cut and well-groomed man to somebody who is disheveled and unshaven. The other aspect of what Mr. Samperio has written indicates that there has been a great decline in his attitude towards his friends and his willingness to associate with others. He has been experiencing increasing difficulty not only with his close friends but with his family. He does have 3 children. He has one son in California who is 20 years old. He has another son in Georgia who is also about the same age, possibly 21. He has a daughter in Florida who is 17 years old. He sees them from time to time. He feels as though he is not a good father and that he cannot do very much with them. This tends to bring on an attitude of self-defeat and an unwillingness to confront the problem. This further feeds into his depressed state of mind. He is not working. He does live alone at the present time. He is not making his own bed. He has to make a list if he is going to go shopping and otherwise is doing quite poorly on his own.

The specific episodes that ████████ has experienced have been difficult to recall for him. He nevertheless maintains that he had multiple severe concussions throughout his playing career and that these have profoundly affected him. He describes poor memory, severe headaches, disorientation, and feelings of lack of interest in all of his daily activities. His headaches are almost continuous. He does not have very much interest in going out of his home.

I have had the opportunity of reviewing a neurological assessment performed by Dr. Kenneth Nudelman, a neurologist in Santa Ana, California, performed on October 28, 2010 in conjunction with a Worker's Compensation Claim. The history and examination at that time revealed that ████████ had been experiencing ringing in the ears continuously since playing football. He also had been experiencing headaches at that time in relation to his football playing. He had also been experiencing insomnia, which has been present since that time as well.

The records completed indicate that ████████ did undergo a polysomnogram and this study was demonstrated as abnormal. Dr. Nudelman felt that Mr. Preston had suffered a permanent injury as a result of his too minute of trauma while playing professional football and that he was 100% disabled. He felt that there was impairment of his neurological status including sleep. This was accepted by the California Board of Worker's Compensation. Additional records from Dr. Nudelman indicate that after reviewing more medical records, there was evidence to correlate his deposition testimony as to his disability with all of the medical problems that had been discerned during prior workups by other physicians.

He also noted that ████████ was trying to do iron work and welding but that he was having great difficulty with that.

████████ tells me the same thing today that he was originally trained to be able to do welding but cannot do so.

████████ is here today for a neurological assessment of all of the above complaints.

PAST MEDICAL AND SURGICAL HISTORY:
The patient's past medical history is negative for hypothyroidism, hyperlipidemia, heart disease, diabetes, hypertension, or cancer. There is no prior surgical history.

ALLERGIES:
The patient denies any allergies to medication at this time.

MEDICATIONS:
▆▆▆▆▆▆▆▆ is not taking any medications other than anti-inflammatory medication.

FAMILY HISTORY:
The family history is notable for heart disease in his mother. The family history is negative for diabetes, hypertension, stroke, heart attack, or any significant pattern of malignancy. There is no known history of heritable illness.

SOCIAL HISTORY:
The patient is a non-smoker and non-drinker.

REVIEW OF SYSTEMS:
The patient denies fever or weight change. There has been no change in vision. The patient denies hearing loss, vertigo, nosebleeds, or sore throat. There have been no problems with chest pain, fainting, shortness of breath, or wheezing. The patient denies dysphagia, dyspepsia, abdominal pain, jaundice, melena, rectal bleeding, or fecal incontinence. The patient denies any pain on urination, polyuria, hematuria, or urinary incontinence. The patient has had no changes in hair growth or nails. Any history of seizures, weakness, paralysis, or tremor is denied. Suicidal ideation is also denied but there is a history of anxiety and depression.

PHYSICAL EXAMINATION:
**General:**  The patient is pleasant, cooperative, and appears the stated age.

Blood pressure in the right arm seated is 130/74 and the heart rate is 74 per minute and regular. General appearance is consistent with age.

**Neck:**  The neck is supple. I do not appreciate any carotid bruits. The thyroid is midline and not enlarged. The trachea is midline. There are no masses.

**Lungs:**  The lungs are clear to auscultation and percussion. No wheezes, rales, or rhonchi are appreciated.

**Cardiovascular:**  The cardiac examination reveals a normal S1 and S2 without murmur.

**Back:**  There is no evidence for scoliosis or prior surgical intervention.

**Abdominal:**  The abdomen is normal in appearance. No masses are palpable. Bowel sounds are heard in all 4 quadrants.

**Extremities:**  The extremity examination fails to reveal any evidence for cyanosis, clubbing, or edema distally.

MUSCULOSKELETAL EXAMINATION:
**Cervical spine**:  Range of motion – Flexion is 40 degrees (normal 60 degrees), extension is 20 degrees (normal 50 degrees), and rotation to the right and left is 40 degrees (normal 80 degrees). There is cervical paraspinal tenderness and spasm.

MUSCULOSKELETAL EXAMINATION, cont:
**Lumbar spine**: Range of motion – Flexion is 90 degrees (normal 90 degrees), extension is 30 degrees (normal 30 degrees), bending to the right is 40 degrees (normal 40 degrees), and bending to the left is 40 degrees (normal 40 degrees).

All range of motion data was obtained objectively through the use of a handheld goniometer.

NEUROLOGICAL EXAMINATION:
Higher integrative function: ▮▮▮▮▮▮▮▮ has some difficulty with the mini mental status examination. He is able to register 3 objects immediately and is able to repeat. However, he is unable to recall 3 objects at 5 minutes, even with prompting. Calculations are slowed, and he makes frequent errors. He was not able to complete the full series of subtraction because of mounting frustration.

Speech is fluent. Comprehension appears to be intact. However, he has great difficulty with multistep commands and requires repetition and reinforcement. He is able to copy intersecting pentagons but does not sense the special orientation of these pentagons very well. He is able to name common objects.

The score on the mini mental status examination is 25/30.

CRANIAL NERVE EXAMINATION:
Cranial nerves I through XII are tested in detail. The sense of smell is preserved. Visual fields are full to confrontation. The extraocular movements are intact. Pupils are equal and reactive to light and accommodation bilaterally. The consensual response is symmetrical and present. Facial sensation is normal bilaterally. Facial movement is symmetrical. Hearing is intact. The lower cranial nerves are intact including swallowing and shoulder shrug. The tongue is midline. Neither fasciculation nor atrophy is seen.

MOTOR SYSTEM:
The patient has normal bulk and tone in all 4 extremities. The range of motion of the extremities is full. Strength is rated at 5/5 bilaterally in all muscle groups tested including deltoids, biceps, triceps, and intrinsic hand muscles, as well as 5/5 bilaterally in hip flexion, hip extension, knee flexion, knee extension, plantar flexion, and extensor hallucis longus.

SENSORY EXAMINATION:
There is preservation of light touch and pinprick perception throughout all dermatomes tested on the trunk as well as the extremities. Secondary modalities, specifically vibration and joint position sense, are intact.

MUSCLE STRETCH REFLEXES:
Deep tendon reflexes are graded at 2+ and symmetrical bilaterally in the biceps, triceps, and brachioradialis. Deep tendon reflexes are graded at 2+ and symmetrical bilaterally in the patellar and Achilles tendon reflexes. Plantar responses are downgoing. No pathologic reflexes are observed.

COORDINATION:
Coordination is normal with intact rapid alternating movements preserved bilaterally in the upper and lower extremities.

RE: ███████████                                                                  Date:  **January 31, 2018**
**Page 6**

CEREBELLAR TESTING:
Cerebellar testing reveals intact finger-to-nose and heel-to-shin testing bilaterally. Saccades are normal.

GAIT:
Gait is normal. The Romberg sign is absent. Tandem walking is preserved.

CLINICAL IMPRESSION:
███████████ is a pleasant 45-year old man who has cognitive impairment as a result of repetitive traumatic brain injuries relating to his career in football, particularly his career as a professional.  He has residual cognitive issues that are ongoing and still need to be monitored. He will likely benefit from medication for improvement of his memory.  We also spoke about hyperbaric oxycodone and this may help him to some extent.  I explained to him that the science behind it is still being developed but that it is a technique that has helped many people subjectively.  He will look into that himself.

As per my review of the sworn affidavit of Mr. Samperio as well as the outside records from Dr. Nudleman dating back to 2010, it does appear that ███████████ has a clinical dementia rating score for community affairs, home and hobbies, and personal care of 2.0.

I will be happy to see him again on an as-needed basis.  He is a local resident in this area and therefore if he needs any further assistance or care, I will be happy to help him with that.

This document serves as a letter of medical necessity for any diagnostic testing, physical therapy, followup evaluations and referrals recommended above.

*I, Nicholas D. A. Suite, M.D., being a neurologist duly licensed to practice in the State of Florida, under the penalties of perjury, pursuant to CPLR 2106, do hereby affirm the contents of the foregoing.*


_____
Nicholas D.A. Suite M.D.
Board-certified Neurologist

bb

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | Case No. 12-md-2323 (AB) <br><br> MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated,* <br><br> Plaintiffs, <br><br> National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc., <br><br> Defendants. | **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF NICHOLAS SUITE, MD

I, Nicholas Suite, MD, make the following statements upon my personal knowledge and belief:

1. My name is Nicholas Suite, MD. I am of legal age and sound mind, and I am competent to make this declaration.

2. I have been made aware of an error in the records of some, if not all of my NFL clients. The error, as I understand it, is an erroneous designation of 1.5 on the CDR rating scale.

3. As a Board Certified Neurologist, I am familiar with and utilize the CDR scale in my practice and have for the entirety of my days practicing medicine. I do, in fact, know how to assign ratings to my clients.

1

**Suite Affidavit 1**

4. The error which, has been brought to my attention as evidence of a "lack of competency' in CDR scoring, is merely an error in dictating my findings due to the fulfillment of the requirements of the NFL Class Action guidelines, the 1.5 & 2.0 designations and their correlation to the CDR scores created this error.

5. There is no error in my diagnosis nor my competency in using the CDR scale and/or assigning scores. This simple and excusable error is not grounds to disqualify the diagnoses I have assigned to the players whom, I have examined and diagnosed.

PURSUANT TO 28 U.S.C. § 1746(2), I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS IN THIS DECLARATION ARE TRUE AND CORRECT.

Executed on this 17th day of December, 2018.

NICHOLAS SUITE, MD

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | Case No. 12-md-2323 (AB)<br><br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## DECLARATION OF DR. NICHOLAS D. A. SUITE, M.D.

1. I, Nicholas D. A. Suite, M.D., make the following statements upon my personal knowledge. I am of legal age and sound mind, and I am competent to make this declaration.

2. It is well recognized that patients who have a score of 1.5, 2.0 or worse in the NFL concussion settlement system have a clinical dementia rating score of probably 2.0 or worse.

3. Standard textbooks of Neurology and Psychiatry as well as literature that is readily accessible indicate that there is no clear line of demarcation between the demented patient who is fit to drive and the demented patient who is unfit to drive. The AAP's sudden practice of arbitrarily establishing a figurative line in the sand by asserting that a patient who has

1

**Suite Affidavit 2**

a score of 1.5 or 2.0 in the NFL concussion settlement system cannot be allowed to drive is not grounded in medical science. I find it interesting how there seems to be legitimate sincere debate around the issue with everyone, except the AAP, who is adamant that driving or continued employment is a disqualification for a monetary award. Furthermore, perusal of peer reviewed literature as well as guidelines published by the American Academy of Neurology appear to contradict the position that the AAP is taking and is trying to present to the Special Master and to the Court as Neurology dogma. I believe that they are in conflict with current teachings and medical understanding[1] as they pertain to patients who are actually examined by their physicians. Yet, they are taking a position of authority and overstepping the boundary between actually diagnosing a patient whom they have examined and imposing a diagnosis on a patient whom they have never met. Such a practice is, in my opinion, not consistent with ethical medical conduct, and the AAP may well be aware of this too and are creating anonymous reviews as shield from later criticism or liability.

4.   An article by Redelmeier et al published in the New England Journal of Medicine September 27, 2012 367(13), p. 1228 to 1236, outlines the association between medical warnings and the risk of subsequent road crashes. The conclusion was that physicians' warnings to patients who are potentially unfit to drive may contribute to a decrease in subsequent trauma from road crashes yet they may also exacerbate mood disorders and compromise the doctor patient relationship. This study documents the dilemma of the physician who wishes to limit driving in a

---

[1] *See* April 20, 2010; 74 (16) SPECIAL ARTICLE - Practice Parameter update: Evaluation and Management of Driving Risk in Dementia, Report of the Quality Standards Subcommittee of the American Academy of Neurology, D.J. Iverson, G.S. Gronseth, M.A. Reger, S. Classen, R.M. Dubinsky, M. Rizzo, first published April 12, 2010, DOI, http://n.neurology.org/content/74/16/1316; and Dementia in the Workplace: How long should someone with dementia keep working?, *Neurology Now*, December/January 2011; Volume 7(6); P.30–33, http://tools.aan.com/elibrary/neurologynow/?event=home.showArticle&id=ovid.com:/bib/ovftdb/01222928-201107060-00009.

patient with dementia. At this time, there is no clear index for limiting driving in patients with dementia. Removal of driving privileges in individuals with mild to moderate dementia may exacerbate mood disorders and propel the patient into a greater depression.

5. The American Academy of Neurology in June 2018 put out as part of the Continuum series for continuing medical and neurological education, a volume entitled Behavioral Neurology and Psychiatry.

6. In the first chapter, entitled "Bedside approach to the mental status assessment", the authors, in this peer reviewed article, make the exhortation that a thorough oral history and mental status examination are necessary requirements for the evaluation of the patient with cognitive impairment. This indicates that the practice of the AAP of simply reviewing records without even examining the patient falls below the standard of care in the assessment of patients with memory loss and dementia.

7. This lack of appreciation of fundamental medical practice and failure to even examine these injured patients, or be aware personally of the clinical findings in such patients hobble the ability of the AAP to make meaningful contributions to the assessment of this cohort of injured retired players. The wanton actions of the AAP disregard the needs of these injured players and would inevitably preclude these injured players from receiving necessary medical care, and it is particularly disturbing that the AAP has not even bothered to examine any of these retired players whom they have denied, nor are they subject to review, as they hide behind a veil of anonymity.

8. This is below the standard of care in any field of medicine. To make a determination that the patient who needs medical care is not entitled to have any and then curtail future, necessary medical care means that a patient would more likely than not go ahead and

have an adverse outcome as a result of that neglectful determination and this is tantamount to medical malpractice.

9. The text book entitled Brain Injury Medicine, second edition, by Zasler et al, in Chapter 29 (entitled Mild Traumatic Brain Injury) page 455, has a discussion of chronic traumatic encephalopathy. This discussion indicates that some researchers have assumed that the neuropathological findings for example tauopathy, neurofibrillary tangles, neuropil threads, glial tangles, beta amyloid deposits, and TDP 43 proteinopathy were directly and exclusively caused by repetitive head trauma associated with playing sports. The second assumption was that the psychiatric problems in these former athletes were caused by the specific neuropathological findings. The author goes on to state that these assumptions regarding causation might ultimately be proven to be correct or partially correct but at present we do not know if patients with chronic mental problems such as drug abuse and alcohol abuse or steroid abuse or other health conditions may show some of these other neurological features. The authors conclude by calling for much more research to understand the neuropathology of repetitive head injury and dementia that relates to this process. Thus, with so much discussion and need for more research in evidence, the AAP position appears prejudicial and adverse to the cohort of brain injured patients that have definite needs for future care and treatment.

10. It is therefore disingenuous for the AAP to stand on ceremony and negate the findings of board-certified neurologists who have personally examined patients with repetitive head injury who exhibit a variety of neurological and psychiatric symptomatology.

11. Furthermore, I have had the benefit of carefully evaluating my own patients and I have reported on them in the standard manner that is taught in medical schools, residency programs, and postgraduate courses.

12. The methodology employed above including the generation of a differential diagnosis is generally accepted by all medical professionals throughout the United States who have attended accredited medical schools and as a practitioner who continues to be involved in teaching and mentoring of students of all ages, I am very familiar with this type of methodology. This methodology, which begins with reviewing medical records and taking a history directly from the patient and/or family members helps to allow the practicing clinician to formulate a set of reasonable diagnostic entities. These diagnostic entities are based upon a careful consideration of the patient's symptoms and physical exam findings when taken in the context of historical details and the pre-existing conditions. The physical examination is a crucial part of the scientific method in assessing a patient and it takes into consideration all of the physical complaints and physical findings, both objective and subjective all of which are generally recognized in the medical community throughout the United States and the world.

13. The third part of the scientific method in terms of evaluating a patient is to consider and review relevant diagnostic images which have been provided to me as per my brain injury workup. The patient records have been reviewed and entered into each document as well.

14. All of the above approaches and methods come together to assist the clinician in formulating a differential diagnosis. The differential diagnosis takes into consideration all of the records presented and all of the findings on physical examination taken together with any objective testing, subjective reports, third-party affidavits and observations in keeping with the requirements of the CDR protocol.

15. As part of my assessment of my patients, I did consider all possible alternative diagnoses and I have concluded that the closest diagnostic considerations that might be considered would include the following:

    (a) Idiopathic stroke;

    (b) Idiopathic dementia or idiopathic dementia of the Alzheimer variety;

    (c) Medication effect; and

    (d) Pre-existing medical illness.

16. I have excluded those elements as possible diagnostic entities that would come into play in each of my patients' specific cases. There is no basis to consider those beyond a cursory and comprehensive consideration of a differential diagnosis. None of them are borne out by any of the objective elements of the history that I have reviewed in each instance.

PURSUANT TO 28 U.S.C. § 1746(2), I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS IN THIS DECLARATION ARE TRUE AND CORRECT.

_____
NICHOLAS D. A. SUITE, M.D.

December 17, 2018

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: NATIONAL FOOTBALL
LEAGUE PLAYERS' CONCUSSION
INJURY LITIGATION

No. 2:12-md-02323-AB

MDL No. 2323

Hon. Anita B. Brody

THIS DOCUMENT RELATES TO:
▆▆▆▆▆▆▆▆▆▆▆▆ APPEAL OF DENIAL
OF MONETARY AWARD

## DECLARATION OF DR. NICHOLAS D.A. SUITE. M.D

1. I, Nicholas D. A. Suite, M.D., make the following statements upon my personal knowledge. I am of legal and sound mind, and I competent to make this declaration.

2. On January 31, 2018, I examined and diagnosed ▆▆▆▆▆▆▆▆

3. I have been made aware of several clerical errors made on my Physician Letter Certification of Diagnosis for ▆▆▆▆▆▆. Specifically, spelling mistakes and or missing words in a sentence.

4. On page three (3) paragraph one (1) of my Physician Letter Certification of Diagnosis for ▆▆▆▆▆▆ I state "He does live alone at the present time." The sentence contains a clerical error in the omission of the word "not." The corrected sentence shall state "He does not live alone at the present time."

5. During his examination, ▆▆▆▆▆▆ did communicate that he lives with a domestic partner ("his girlfriend").

6. Please accept this sworn declaration as my confirmation that the error and omission of the word "not" on the sentence mentioned above, shall be corrected to accurately state "He does not live alone at the present time."

7. On page three (3) paragraph four (4) of my Physician Letter Certification of Diagnosis for ▮▮▮▮▮▮▮ I state "Dr. Nudelman felt that Mr. Preston had suffered a permanent injury as a result of his too minute of trauma while playing football and that he was 100% disabled". The sentence contains a clerical error in the omission of the word "cumulative." The corrected sentence shall state "Dr. Nudelman felt that ▮▮▮▮▮▮▮ had suffered a permanent injury as a result of cumulative trauma while playing football and that he was 100% disabled".

8. Please accept this sworn declaration as my confirmation that the error and omission of the word "cumulative" on the sentence mentioned above, shall be corrected to accurately state "Dr. Nudelman felt that ▮▮▮▮▮▮▮ had suffered a permanent injury as a result of cumulative trauma while playing football and that he was 100% disabled".

9. There is no error in my diagnosis of ▮▮▮▮▮▮▮ The excusable and straightforward error corrected and clarified above is not grounds to disqualify the diagnoses I have assigned to ▮▮▮▮▮▮▮

PURSUANT TO 28 U.S.C. § 1746(2), I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS IN THIS DECLARATION ARE TRUE AND CORRECT.

Executed on this 14 day of January, 2019.

NICHOLAS SUITE, MD