**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                              Plaintiffs<br><br>              v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>                              Defendants. | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**REPLY IN SUPPORT OF MOTION FOR RELIEF UNDER ARTICLE XXVII**
**OF THE SETTLMENT AGREEMENT, OR FOR RELIEF FROM JUDGMENT**

Thousands of Black NFL retirees have been evaluated for concussion benefits based on a racially-stratified test protocol that means Black players will not qualify with the same scores that would qualify White players.  On the infrequent occasions that neuro-psychologists objected to use of this protocol, the NFL Parties attacked those clinicians, claiming that they were trying to "circumvent the *requirements*" of the Settlement Agreement by not using "recommended best practices."  Appeals Advisory Panel Consultants joined in the NFL Parties' assault, asserting that "The NFL guidelines are very specific in *requiring* the use" of the race-based "Heaton norms for several tests."  (Emphasis added in both cases.)

The NFL Parties' response to the world they created is to deny that world exists, and to say nothing – *nothing* – about the large numbers of Black Class Members who were tested using a

racially discriminatory system, and never qualified for Settlement benefits in the first place. This Court has a "continuing" obligation "to protect the class as a fiduciary" and to police the terms of the Settlement it has approved and over which it has exclusive jurisdiction. Brief of NFL Parties, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 19-2085, 2019 WL 4670928, at 30 (3d Cir., filed Sept. 23, 2019). Now is the time to declare that use of race-based "norms" to the detriment of Black Class Members is prohibited, and to fashion a remedy for the many Class Members whose rights have been violated so far. The Motion should be granted.[1]

*     *     *

The legal question presented by this Motion is straightforward: does the Settlement Agreement, properly construed, authorize the presumption currently in effect, under which clinicians are all but required to score Black players more harshly than White players? Neither the NFL Parties nor Class Counsel argues that the Settlement Agreement should be construed that way, nor do they dispute that the Court has authority to resolve issues of contract construction under Article XXVII.

Instead, the NFL Parties ignore reality, claiming that no presumption is in effect and insisting that clinicians actually exercise wide discretion regarding whether to use race norms in light of the particular background of each individual examinee. That depiction is a fairy tale: the BAP Guide installs a presumption in favor of race norming, and the NFL Parties have cemented

---

[1] This reply memorandum is supported by the Declarations of Dr. Jennifer Manly, Dr. Kirk Daffner, and Justin Wyatt. Exs. A–C. The Declarations of Dr. Manly and Dr. Daffner address assertions in the NFL Parties' Millis Declaration. Dr. Manly is a Professor of Neuropsychology at Columbia University and one of the nation's leading experts on the use of racial norms – her work is cited repeatedly in the NFL Parties' papers. Dr. Daffner is the J. David and Virginia Wimberly Professor of Neurology at Harvard Medical School and leads the Division of Cognitive and Behavioral Neurology at Brigham & Women's Hospital. Mr. Wyatt's Declaration summarizes available documents and evidence regarding practice under the Settlement Agreement.

that presumption by repeatedly demanding race-based scoring for Black players – without *any* reference to the player's individual background (other than that he is Black).  Unsurprisingly, clinicians in fact have overwhelmingly used race-normed scoring scales when evaluating former players, with many understandably believing that doing so is required by the Settlement Agreement.

As the Special Masters have explained, the effects of using Black scoring scales in any individual player's case "can be large," and the use of Black scales "may often make the difference" in whether a former player receives a qualifying diagnosis.  SM Decision at 6–7.  The NFL Parties spend most of their brief discussing the use of race norms in a clinical diagnostic context, *see* NFL Opp'n at 9–20, but that is not the context here.  The NFL Parties point to *no* support for blindly importing those norms into a benefits regime that depends on constructed legal categories ("Level 1.5" and "Level 2" Impairment) with rigid score cut-offs, as opposed to recognized medical diagnoses for which false positives can have harmful social and healthcare consequences.  Race norms are a blunt, error-prone tool that pose special harms in *this* context; the Special Masters have noted that race norms "may be most charitably seen as offering an imperfect proxy for socioeconomic status," and that "using African-American-specific norms increases the rate of false negatives," *i.e.*, players who are neuro-cognitively impaired but are found to be just fine. SM Decision at 4, 8; *see generally* Declaration of Jennifer J. Manly ("Manly Decl."), Ex. A, at ¶¶ 5, 10-11; Declaration of Kirk R. Daffner ("Daffner Decl."), Ex. B, at ¶¶ 8-15.

The use of race-specific norms in clinical practice is not a defense to the NFL's promotion of their use under the Settlement.  First, that practice has nothing to do with what the words of the Settlement meant to this Court and to the Class that had to decide whether to approve the Agreement.  Second, the most that can be said about the relevance of clinical practice to the

administration of the Settlement is that reducing false positives for Blacks, which in clinical practice avoids potential harms from needless treatment or stigmatizing classification, is good for the NFL.  But the NFL Parties' presentation has nothing to say about the other side of the accuracy coin: false negatives.  If changing test standards to make it harder to qualify reduces false positives, it also increases false negatives, meaning that Black retirees who should qualify for benefits do not.  Likewise, the NFL Parties simply assume that clinical practice is relevant to the use of racial norms in clinical practice, when it is not, for multiple reason.  Manly Decl. ¶¶ 4, 9; Daffner Decl. ¶¶ 5, 8, 14-15.

The NFL Parties claim they have clean hands, asserting that the use of separate racial scales "achieve[s] accurate diagnoses," and thus serves "to correct for racial bias, not to perpetrate it." NFL Opp'n at 13.  The Court can and should grant this Motion without engaging with the NFL's factual premise, because this is no defense:  the use of race norms is discriminatory on its face and is not required or presumed under the Settlement Agreement.  But if the Court concludes that the *effects* of race-norming are relevant, then it must require discovery about, among other things, the rate of qualifying diagnoses in the BAP (i.e., number of tests administered vs. number of each Qualifying Diagnosis), broken down by race.  A racial disparity in qualification rate could only be explained by the discriminatory use of race norms to the detriment of Black former players.

## ARGUMENT

### I.    An All-But-Irrebuttable Presumption in Favor of Race Norming Has Long Been in Effect.

The NFL Parties and Class Counsel repeatedly invoke the "expert discretion" that clinicians have supposedly exercised, in every individual retired NFL player's case, regarding whether to employ race-based scoring.  *E.g.*, NFL Opp'n at 11; *see also* Class Counsel Opp'n at 4.  According to the NFL Parties, "prior to applying race adjustments," each practitioner

"consider[s] the examinee's own conceptualization of their race/identity and determine[s] if the individual's background is representative of the factors that can result in cognitive differences between groups."  NFL Opp'n at 21–22 (internal quotation marks and citation omitted).[2]  If this were true, there would be no need for the Motion or the relief it seeks; this Court could simply declare what the NFL Parties seemingly agree should be the standard.

This narrative, however, bears zero resemblance what has actually happened.  In reality, clinicians evaluating retired players under the Settlement Agreement, almost without exception, have applied race-based scoring, without any determination of whether the individual examinee's background is demographically similar to the normative reference population (other than that he is Black).  *See* Decl. of Justin R. Wyatt, Esq. ("Wyatt Decl."), Ex. C, at ¶¶ 4–5.  Many clinicians understand the use of race norms to be required, or at least strongly encouraged.  *Id.* ¶ 4.  The result is that thousands of Black retired NFL players have been subjected to unfavorable cognitive test scoring on the basis of race – not because of an individualized determination by a doctor focused on diagnostic accuracy, but because of a blanket presumption applicable to all Black retired players.

This wholesale application of race-based scoring should come as no surprise given the language in the BAP Guide; its application by the Claims Administrator; and the NFL Parties' routine objections whenever a clinician evaluates a Black player without adjusting his scores unfavorably based on race.  Again, the BAP Guide states that use of race norms "is recommended."  And that Guide directs that certain tests be scored using "Heaton norms."  Those norms *require* a clinician to choose either a "White" or "Black" reference population for every test subject.  *See*

_____

[2] Even if this description were accurate, it would ask the wrong question.  The correct question is whether the reference population (the Heaton "norm") used for Black players is a good representative of the player's prior functioning.  For the reasons set forth below, it is not.

SM Decision at 6.  Thus, requiring use of the Heaton norms means that use of separate racial scales is also required.

Citing this language in the BAP Guide, the NFL Parties have written in one player's appeal that the use of Heaton norms – and thus the selection of either a "White" or "Black" reference population – is "*mandated* in the BAP."  Ex. 6 to Wyatt Decl. at 2 (Emphasis added).  The Appeal Advisory Panel Consultants have similarly written regarding a MAF evaluation that "[t]he NFL settlement guidelines are very specific in *requiring* the use of the Heaton norms for several tests."  Ex. 9 to Wyatt Decl. at 2 (Emphasis added).   The NFL Parties and Class Counsel offer no persuasive explanation of how these provisions in the BAP Guide do not install a presumption of race-norming.  *See* NFL Opp'n at 29; Class Counsel Opp'n at 7.

In the rare cases where a clinician does not employ race-based scoring adjustments, the Claims Administrator frequently cites that decision as a reason for rejecting the claim.  This is what happened in Movant Henry's case, and it has happened to others as well.[3]  In explaining its rejections of claims on this basis, the Claims Administrator regularly refers to non-race-adjusted T-scores as using "*incorrect* norms," and refers to race-adjusted T-scores as using the "*correct* (Heaton) demographically adjusted norms."  Ex. 1 to Wyatt Decl. at 1 (Emphasis added); *see also* Wyatt Decl. ¶ 7.

The NFL Parties made this world but now ignore it, arguing that any risk of "automatic application" of race-based scoring will be avoided through case-specific discretion by clinicians.  NFL Opp'n at 20.  In individual claim appeals, however, the NFL Parties have repeatedly touted

---

[3] The BAP Guide, which requires the use of separate racial scales, is a secret document that has been actively concealed from individually-retained counsel for Class Members.  The reason appeals and objections to denials based on race-norming have not happened more often is simple: until quite recently, attorneys for individual Settlement Class Members were generally unaware of the practice of race-norming and therefore unable to challenge it.

race-based scoring as "industry standard" and "appropriate" *without reference to the circumstances of the individual player*, other than that he is Black.  For example, in their appeal of Movant Davenport's claim determination, the NFL Parties argued – with no discussion of his particular background – that the clinician's decision not to apply a Black-specific scoring scale "*deviated from industry-standard methods* in a way that materially and critically affected the outcome of Mr. Davenport's claim."  Ex. 7 to Wyatt Decl. at 4 (Emphasis added).  In another recent brief in a Black player's claim appeal, the NFL Parties argued that norms including a Black reference population were "the appropriate norms," again without any discussion of the particular player's background.  Ex. 6 to Wyatt Decl. at 2 nn.4–5.  In a third Black player's appeal, after the clinician had written that she used "education-only adjusted norms" based on her judgment that using race norms would "increase[] the likelihood of under-diagnosis," the NFL Parties insisted that the scores be adjusted on the basis of race as well, stating that race-adjusted T-scores "are designed to reflect a Retired NFL Football Player's neurocognitive abilities."  Ex. 8 to Wyatt Decl. at 2.  Not *that specific* retired player – *any* Black retired player.  For good measure, the NFL Parties added that, by not adjusting for race, the clinician had "reject[ed] recommended best practices" by "attempt[ing] to circumvent th[e] requirements" of the Settlement Agreement.  *Id.*

The NFL Parties have also demanded that clinicians explain all decisions *not* to use race-norming.[4]  Such a one-way explanation requirement amounts to at least a presumption in favor of race-norming across the board.  For example, in one claim appeal, the NFL Parties wrote that "when a neuropsychologist decides against [using racial norms], the neuropsychologist must disclose the normative methods used, provide a clinically reasonable explanation for the decision,

---

[4] In each of undersigned counsel's cases where race norms were raised, the NFL Parties insisted on their use.  Wyatt Decl. ¶ 8.

and remain consistent in those choices."  Ex. 6 to Wyatt Decl. at 2 (Emphasis added).  In another appeal, the NFL Parties objected to a clinician's failure to adjust for race because the clinician "failed to provide any explanation for why the demographically-adjusted [i.e., race-adjusted] test scores would *not* be appropriate for [the player]."  Ex. 8 to Wyatt Decl. at 2.[5]  And in Mr. Davenport's case, the Appeals Advisory Panel Consultant expressly supported the NFL Parties' position, stating that "It has been . . . standard across settlement adjudications to provide such adjustments or a clear rationale for not doing so."  Ex. 10 to Wyatt Decl. at 1.  The AAPC then dismissed the fact of "ethnoracial . . . discrimination" as "not compelling."  *Id.*

Class Counsel point to an equivalent requirement that clinicians give a "deviation explanation" when they depart from certain elements of the Settlement Agreement's testing protocol, correctly noting that such a reason-giving requirement is indicative of a presumption being in effect.  *See* Class Counsel Opp'n at 8–9.  Although Class Counsel may have intended to use this example as a point of contrast, it is actually just the opposite: the NFL Parties have successfully urged just such a reason-giving requirement in the context of race-norming. Clinicians need not explain their decisions to subject Black players to unfavorable, Black-specific scoring scales, but according to the NFL Parties, they *must* explain any decision to do otherwise.[6] To state the obvious, this is a presumption.

The BAP Guide installs a presumption that all Black players' cognitive testing should be subject to an unfavorable adjustment on the basis of race.  The Claims Administrator has treated

---

[5] The NFL Parties characterize this burden of explanation as a requirement that *may* be imposed *by the Claims Administrator* in individual cases.  *See* NFL Opp'n at 22–23.  Not so. As the foregoing examples demonstrate, the NFL Parties have repeatedly demanded that *any* clinician who chooses not to use race-based scoring *must* explain that decision, regardless of whether the Claims Administrator has requested it.

[6] For reasons discussed more fully below, there is no basis in clinical practice for demanding such a justification.  See Daffner Decl. generally and ¶¶ 16-17.

the presumption as a requirement.  And the NFL Parties' litigation conduct in individual claim appeals has likewise cemented that presumption, treating it as a *de facto* requirement.  It should come as little surprise that, with few exceptions (to which the NFL Parties have strenuously objected), clinicians evaluating Black players under the Settlement Agreement have routinely adjusted their test scores unfavorably on the basis of race.

## II.     "Race Norming" is Discriminatory on its Face and Has Unacceptable Discriminatory Effects, Likely on a Large Scale.

Race-based scoring treats Black and White players differently on the basis of race.  As the NFL Parties and Class Counsel fail to acknowledge (but do not attempt to deny), a Black player can fall short of a qualifying diagnosis even though a White player with the exact same test scores would qualify.  Presumed or required race-based scoring means that Black and White players are *automatically* treated differently on the basis of race.  White former players walk into a clinical examination with a presumption that they will be measured against a favorable comparison population, broken down on racial lines.  Black former players walk into a clinical examination with the opposite presumption.  This is disparate treatment on the basis of race.

The NFL Parties argue that a presumption of race-based scoring does not "facially treat people differently on the basis of race" because "[f]ull normative adjustments are recommended . . . for *all* Retired Players, regardless of race."  NFL Opp'n at 34 (emphasis in original).  But this is simply the concept of "separate but equal" with a kinder, gentler face.  Sorting people by race and treating them differently – whether for classrooms, water fountains, or settlement benefits -- does not become non-discriminatory when people of all races are sorted.

The available evidence shows that the discriminatory effects of the presumption in favor of race-based scoring are substantial.  Although focused on false positives rather than false negatives, the NFL Parties have noted that race norming can have a *three-fold* effect on outcomes.

NFL Opp'n at 3, 13.  As the Special Masters note, there are no data about how many false negatives result from using racial norms, but there is no reason to think the magnitude would be smaller than the risk of false positives in the clinical setting, meaning there could easily be three times as many false negatives for Black players as for White players.  The Special Masters have pointed out that the effects of using Black scoring scales in any individual player's case "can be large" and "enormously consequential," so that the use of Black scales "may often make the difference" in whether a former player receives a qualifying diagnosis.  SM Decision at 6–7.  Mr. Davenport's case makes the point:  use of the White scale "decreased Mr. Davenport's estimated score by almost a full standard deviation" on one test – in a setting where a decline of just 1.7 standard deviations will qualify a player for the Settlement's financial benefits.  *Id.*

The NFL Parties' assertion that "no claim has *ever* been denied by the Claims Administrator or on appeal by the Special Masters solely on the basis of a *failure to* apply full demographic norms," NFL Opp'n at 23 (second emphasis added), is meaningless as a measure of the harmful consequences of the presumption.  The Motion seeks relief not only for retired players who presented claims on the basis of testing scored without race-specific norms, but also those who never submitted claims or qualified in the first place because of tests interpreted using race-specific norms.  Just as the NFL Parties have argued that Mr. Davenport should be denied benefits because when race-specific norms are applied his scores fall short, retired players who were tested under the BAP Guide or by MAF neuropsychologists who followed the "recommendation" would also fall short of the Settlement's numerical cut-offs.  Even just among the claims decisions available to undersigned counsel, several have been denied by the Claims Administrator at least in part on the basis of a failure to apply full demographic norms.  Wyatt Decl. ¶ 7.  And more important, large numbers of Black players likely have been unable to obtain qualifying diagnoses

at all because their evaluating clinicians *did* use racial norms.  *See* SM Decision at 6–7 (noting that use of Black scoring "may often make the difference" in whether a former player receives a qualifying diagnosis).  In those circumstances, without a certification from a diagnosing clinician, the retired player could not even submit a claim.[7]

A requirement or presumption of race-norming expressly discriminates among former NFL players on the basis of race, and likely has resulted in large numbers of Black former players not claiming, let alone obtaining, benefits when the same scores would have resulted in a qualifying diagnosis if obtained by White players.

### III.  The Settlement Agreement May Not Be Construed to Encourage Race-Norming, if Race Norming Can Be Allowed at All.

#### A.  The Settlement Agreement itself did not place Class Members on notice that Black retired players would routinely be subjected to unfavorable scoring scales.

In contrast to the NFL Parties' routine attacks whenever a clinician declines to use Black scoring scales for a Black player, in their response to this Motion the NFL Parties now acknowledge that the Settlement Agreement installs no presumption in favor of race-norming. NFL Opp'n at 5.  But then the question, which the NFL fails to squarely address, is whether the Special Masters were right in tying that presumption to the 2017 BAP Guide on the theory that the Guide reflected the agreement of Class Counsel and the NFL.  The Guide says "recommend," not "presume," but as shown above, this recommendation operates as a presumption or requirement. In any event, the Settlement Agreement presented to the Class and to the Court neither recommends nor presumes the use of race-specific norms.  In fact, the Settlement Agreement itself

---

[7] This fact disposes of Class Counsel's assertion, based on undisclosed data, that they have "not identified any *claim* that was denied *solely* because of" race norming.  Class Counsel Opp'n at 10 (emphasis added).  In addition, the carefully chosen word "solely" demonstrates that there are plenty of claims that could and would be appealed if it were known that the player's neurocognitive testing plainly qualified him for benefits.

says nothing about the use of racial norms, and Exhibit 2 says only that they are "availab[le]." Just as courts resist construing statutes to hide elephants in mouseholes, this Court should resist construing a glancing reference to the availability of race-specific norms as the source of a presumption that Black and White Class members will be treated differently when it comes to qualifying for benefits.  If there is no presumption in the Settlement Agreement itself (and there is none), how could the BAP Guide create such a presumption, except by an impermissible amendment to that Agreement?

The NFL Parties' observation that "while this Court heard more than 80 written objections to the design of the Settlement Program and the neuropsychological testing regime in particular, no objection was ever raised to challenge the potential use of demographic adjustments—including race-based adjustments—in administering the neuropsychological testing,"  NFL Opp'n at 4, is powerful evidence that the Settlement Agreement does not say – and never gave the Class notice -- that race would play a role in measuring cognitive impairment, all to the detriment of Black former players.

The Notice issued to all Class Members before the Court's approval of the Settlement Agreement likewise said nothing about a race-based testing regime.  *See* ECF 6084-1.  As a result, the Notice failed to "contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement" with respect to race norms.  *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013); *see also Vassalle v. Midland Funding LLC*, 708 F.3d 747, 759 (6th Cir. 2013) (observing that the class notice at issue did not satisfy due process requirements in failing to "'fairly apprise . . . prospective members of the class of the terms of the proposed settlement'" (citation omitted)).  Without notice of the fact that test scores would be manipulated as a matter of

course using racially discriminatory scoring protocols, Class Members had no opportunity to object on that basis. That is particularly true for the many unrepresented Class Members, a large number of whom had brain injuries caused by their NFL careers.

In fact, the application of race norms as a matter of course has resulted not from the public Settlement Agreement itself, but from the *confidential* BAP Guide and from the NFL Parties' non-public conduct in litigating individual claims. It is the confidential BAP Guide, not the Settlement Agreement, that dictates that "use of the full demographic correction is recommended" on tests scored using ACS software. It is the confidential BAP Guide, not the Settlement Agreement, that requires that certain tests be scored using "Heaton norms," which *require* a clinician to choose either a "White" or "Black" reference population for every test subject. *See* SM Decision at 6. And it is the confidential BAP Guide, not the Settlement Agreement, that the NFL Parties have cited in arguing that Heaton norms "are mandated in the BAP." The Special Masters, in approving a requirement that a clinician explain his decision not to use race norms, based that conclusion in the BAP Guide, not on the language of the Settlement Agreement itself. *See* SM Decision at 11.

The presumption in favor of race-norming currently in effect amounts to an amendment to the Settlement – not a mere interpretation or administrative implementation. The NFL cites a string of authorities for the notion that simply interpreting or administratively implementing a Settlement Agreement does not amount to an impermissible post-approval amendment. *See* NFL Opp'n at 21 n.13; *id.* at 29 & n.22. But the required or presumptive use of race-based scoring reflects more than just a "permissible clarification[]" to the Settlement Agreement designed to "facilitate its successful administration." *In re Nat'l Football League Players' Concussion Injury Litig.*, 962 F.3d 94, 102 (3d Cir. 2020). The NFL Parties have pointed to no "problems" that "arose in the[] administration" of the Settlement Agreement, necessitating that clinicians be instructed to

13

pick race-based normative scoring methods over others.  NFL Opp'n at 21 (quoting Ann. Manual
Complex Lit. § 21.66 (4th ed.)).

**B. The Settlement Agreement cannot be construed to encourage race-norming based on the practice's use by neuropsychologists in a clinical, diagnostic context.**

Even if the Settlement Agreement were ambiguous regarding the use of race norming as a
matter of course, the Court must not construe the Agreement to condone it.  The NFL Parties spend
much of their opposition brief pointing to the prevalence of race-norming in clinical practice.  *See*
NFL Opp'n at 9–20.  Without ever saying so, the NFL Parties appear to be suggesting that the
Court can take evidence about such practice into account when determining whether the Settlement
Agreement authorizes blanket race norming.  It cannot: unlike with a private contract, whose
ambiguous terms may sometimes be construed after the fact with reference to usage in common
trade,[8] all material terms of a class action settlement agreement must be available to the parties
and known to the Court at the time it approves the agreement, acting as a fiduciary for absent class
members.  *See. e.g.*, Fed. R. Civ. P. 23(e)(3) ("The parties seeking approval must file a statement
identifying any agreement made in connection with the proposal").

In short, the NFL Parties' lengthy defense of clinical use of racial norms, including the
Millis Declaration, is irrelevant to the task at hand.  But even if "clinical practice" were somehow
pertinent to either notice or construction of the Settlement Agreement, cognitive testing under that
Agreement is vastly different from a medical diagnosis in the normal course of a doctor's clinical

---

[8] Even in transactions governed by the Uniform Commercial Code, under New York law
applicable here (Settlement Agreement, Article XXVII (a)), such "trade usage" would be limited
to "parties involved in the particular commercial transaction in a given locality or in a given
vocation or trade."  107 N.Y. Jur. 2d Uniform Commercial Code § 48 (August 2020 update).  Class
members cannot possibly fit within this definition.  Nor could weight be placed on the BAP Guide,
a closely-guarded confidential "custom" of third parties who play a role in administering an
agreement, which did not even exist at the time of Settlement notice.

practice. The NFL Parties make no effort to account these differences. To start with, the NFL Parties identify no support in the literature for using race norms in the context of a mechanical testing regime with rigid score cutoffs. "Level 1.5" and "Level 2.0" Neurocognitive Impairment are not medical diagnoses, for which false positives (over-diagnosis) have social and healthcare consequences; they are legal constructs which have no meaning outside the Settlement Agreement. Manly Decl. ¶ 4.

Further, the Settlement's exclusive reliance on tests with hard cutoffs is not like a clinical setting where race-based reference population data would be used as just one source of information among many. Daffner Decl. ¶¶ 4-5; Manly Decl. ¶¶ 9, 11. Rather than use race-based norms, in this case there is a large amount of information regarding both the retired player population as a whole and many individual retired players. Incoming NFL players have undergone cognitive testing of one form or another upon their entry into the league since 1970. Daffner Decl. ¶ 5. NFL players have taken SATs or ACTs for college admission. *Id.* NFL players of all races are a highly specialized group with skills including the cognitive ability to master complex offensive and defensive schemes.[9]

And the use of a demographic "norm" is only as useful as the norm itself – the reference population chosen. Manly Decl. ¶ 5. Neither the NFL Parties, Class Counsel, nor their experts provide any scientific reason to assume, and there is substantial reason to doubt, that Black former NFL players, as a group, are sufficiently similar in their relevant characteristics to the "geographically limited sample of African Americans" who comprise the Black Heaton norm

---

[9] *See, e.g.*, Doug Farrar, *The Most Important Schemes and Concepts in the NFL Today*, BLEACHER REPORT (Feb. 12, 2018), https://bleacherreport.com/articles/2758286-the-most-important-schemes-concepts-in-the-nfl-today (accessed Nov. 2, 2020).

population.  SM Decision at 8[10]; *see also* Manly Decl. ¶¶ 4, 6, 7 (nothing multiple reasons that Heaton norm samples are not comparable to NFL players, and that Black NFL players may be more similar to White NFL players than to Heaton sample); Daffner Decl. ¶¶ 17–20 (similar).  The bottom line is that the Settlement bears "little resemblance" to a clinical setting, and race norms "lack the precision required" for exclusive use in this context.  Manly Decl. ¶ 9.

Finally, whatever ambiguity is left in the Settlement Agreement regarding the status of race norming must be viewed in light of the strong foundation in American law and public policy against overt discrimination on the basis of race.  As the Special Masters have noted, application of race norming in this context is likely to "increase[] the rate of false negatives" for Black test-takers, creating "a risk that some may be denied access to necessary benefits or compensation solely on the basis of race."  SM Decision at 8.[11]  That is exactly what has happened here.  Under the governing New York law, to the extent the Settlement Agreement is ambiguous, this Court must construe it to avoid that outcome.  *See, e.g.*, *Deutsche Bank Nat'l Tr. Co. v. Flagstar Capital Markets Corp.*, 32 N.Y.3d 139, 150 (2018) (avoiding issue of contract construction because, if one party's construction of a contract term was correct, the term would be void as against public policy).[12]

---

[10] The Special Masters also recognized (but did not resolve) the problem of using racial categories when those are social, not scientific constructs.  SM Decision at 8.  Drs. Manly and Daffner identify the same problem.  *See* Manly Decl. ¶ 6; Daffner Decl. ¶ 21.

[11] Dr. Daffner and Dr. Manly confirm this point about false negatives, while the NFL's declaration fails to address it.  Particularly because the prevalence of cognitive impairment is likely to be higher among NFL retirees, the risk of false negatives for Black players from using race norms is greatly increased.  Daffner Decl. ¶¶ 11-12; Manly Decl. ¶¶ 10-11. And because clinical practice would never confine itself to such limited information as the Settlement's test batteries, those risks are magnified still further.  Daffner Decl. ¶¶ 5, 13-15.

[12] The NFL contends that Mr. Henry and Mr. Davenport are not entitled to relief because they do not state a claim under 42 U.S.C. § 1981.  But the Motion does not rely on a § 1981 cause of action, and in granting this Motion, the Court need not decide the merits of that claim.  (Mr. Henry and Mr. Davenport have filed a separate class action complaint raising claims under § 1981.  *See Henry*

**IV.     The NFL Parties and Class Counsel Do Not Dispute That the Court Has Ongoing Authority to Construe the Settlement Agreement.**

The NFL Parties focus on Federal Rule of Civil Procedure 60(b), *see* NFL Opp'n at 24–28, claiming it is "dispositive." *Id.* at 4.  But the Court need not reach Rule 60(b) to construe the Settlement Agreement in a non-discriminatory way.[13]  There is no need to modify the judgment because the Settlement Agreement neither requires nor presumes the use of separate Black and White scoring scales.  As Movants explained in detail in their Motion, this Court has the authority, pursuant to Article XXVII of the Settlement Agreement, to resolve any disputes arising out of, or related to, the construction of that Agreement.  Using its Article XXVII authority, the Court should clarify that the Settlement Agreement does not require or presume that retired players who seek compensation be subjected to a racially discriminatory cognitive testing regime.  On this ground alone, the Court can and should grant the Motion and end the practice of race-norming in administration of the Settlement Agreement.

The NFL Parties assert that Mr. Henry and Mr. Davenport may seek relief only through the Settlement Agreement's administrative appeals process, pointing to two orders issued in response to motions seeking modification or enforcement of the Settlement Agreement for reasons

---

*v. National Football League*, No. 2:20-cv-4165.)  Here, Movants invoke § 1981 simply as evidence of a well-established, heretofore uncontroversial, public policy.  That policy requires the Court not to construe the Agreement as a racially discriminatory contract.  Even if the Court should determine that the Agreement's language is ambiguous, the Court can and should read the Agreement in such a way to steer clear of a violation of that public policy.

[13] Even assuming that invocation of Rule 60(b) is required, it is available here.  In particular, the NFL Parties are wrong to assert that subjecting Black and White players to different testing standards, in which Black players are automatically assumed to have started with worse cognitive functioning, is not "detrimental to the public interest" or that "overt race discrimination" will not justify Rule 60(b) relief because the practice is "well-accepted."  The explicit and deliberate use of race-based testing standards has almost certainly resulted in Black players qualifying for compensation at a substantially lower rate than their White counterparts.

unrelated to those presented here.  *See* Order of Oct. 26, 2017, ECF No. 8557; Order of Nov. 2, 2017, ECF No. 8882.  But neither of those motions sought relief pursuant to Article XXVII, which provides, in pertinent part, that "[a]ny disputes or controversies arising out of, or related to, the interpretation . . . of this Settlement Agreement will be made by motion to this Court."  This Motion presents exactly the sort of dispute for which Article XXVII creates a forum.

No further claim procedures are needed for Mr. Davenport and Mr. Henry to have a direct interest in the dispute raised in this Motion.  Nor will further claim procedures in Mr. Henry and Mr. Davenport's cases shed additional light on the core legal issue that this Motion presents: whether the Agreement should be construed so as not to authorize discrimination on the basis of race.

Moreover, the Court should use Article XXVII as a vehicle to resolve the dispute presented in this Motion because claimants rarely have an opportunity to appeal the use of race-based standards in the claims administration process.  If a player is tested using unfavorable race norms, as virtually all Black players are, and does not receive a qualifying diagnosis, the player has no claim to submit, and thus no avenue to appeal a denial on the basis of race.  Such cases will never be known, unless the players are re-scored pursuant to Court order.  (That is particularly true given the large number of unrepresented Class members, many of them laboring under a disability; relief is required for them, not just Movants Davenport and Henry.)  The legal issues presented by the use of race norms arise only in the rare cases in which the clinician refuses to use Black norms for a Black player, and that decision is appealed by the NFL Parties, or alternatively, the Claims Administrator, AAP, or AAPC reviews the doctor's decision and determines that the failure to score a player based on his race was improper.  As set forth above, those cases are quite rare.  *See* Wyatt Decl. ¶¶ 4–5.

V.      **A Remedy Is Required for Class Members Scaled Using Black Norms**

The Settlement Agreement has been administered for more than three years with a *de facto* requirement that race-norming be employed for Black Class Members.  Because the NFL Parties and Class Counsel now admit that such a requirement or presumption was erroneous (even while disputing its existence), a remedy is required for Class Members who were tested on that basis. Many such Class Members never even filed a claim, because they were unable to obtain a Qualifying Diagnosis for Neurocognitive Impairment, or a lower Qualifying Diagnosis than their raw scores would dictate.[14]  At the very least, this Court should order that every Class Member whose scores were subjected to unfavorable race-norming be permitted to have his tests re-scaled (at no expense to the Class Member) using any norms or adjustments that his clinician chooses, and for claims to be submitted or re-submitted effective as of their original date of testing. Similarly, all clinicians should be instructed that neither the Settlement Agreement nor any related guides, manuals or other materials impose any restrictions or recommendations on the use of normative data, and that no explanation or defense of the use of any particular norm is required.[15]

VI.     **Unless the Court Can Resolve the Motion on the Current Record, Discovery Is Required.**

The case for construing the Settlement Agreement as Movants argue is straightforward and is based solely on the language of that Agreement.  And the evidence that the Agreement has *not* been applied that way – that for all practical purposes, requirement of race-norming has been in

---

[14] For example, a Class Member might have received no Qualifying Diagnosis (or a 1.0 level with no right to financial benefits), but be entitled to a Level 1.5; or might have received a Level 1.5 and be entitled to a Level 2.0.

[15] In demanding an explanation whenever a clinician does not use race-norming, NFL Opp'n at 22, the NFL Parties give away the game.  That demand demonstrates their belief that any clinician who does not employ race norming has "use[d] diagnostic criteria that differ from those set forth in the Settlement Agreement."  MAF Rule 20.

effect – is overwhelming on the current record.  No additional evidence is required to rule in Movants' favor.

If, however, the Court believes that there are questions about how the Agreement has been construed or applied in practice, or that it is relevant to consider the NFL Parties' assertion that race norming actually serves "to correct for racial bias, not to perpetrate it," NFL Opp'n at 13, then discovery is required.[16]   At minimum, that discovery must determine the proportion of Black and White Class Members who received Qualifying Diagnoses of 1.0, 1.5 or 2.0 Neurocognitive Impairment.  If the NFL Parties are correct, then there should be no meaningful racial disparity in qualification rates.  If there *is* a racial disparity, that will be additional and conclusive evidence that Black former players have been wrongfully denied benefits under the Settlement Agreement, solely on the basis of race.  Indeed, Class Counsel describes this as "the bottom line question presented by Movants' motion."  Class Counsel Opp'n at 10.[17]

## CONCLUSION

The Motion should be granted, to declare the Settlement Agreement's meaning both retrospectively and prospectively, and to enjoin the required, recommended or presumed use of race norms adverse to Black Class Members.  To the extent the Motion cannot be granted on the

---

[16] The NFL Parties ask for discovery on these matters, though they describe it differently.  *See* NFL Opp'n at 23 (asking that the Court "direct the . . . Claims Administrator to conduct an independent review to confirm the NFL Parties'" assertion about the basis for claim denials).  Class Counsel simply asserts, based on undisclosed facts, that they have not "identified any claim that was denied solely because of the normative adjustments the neuropsychologist made" when scaling scores."  Class Counsel Opp'n at 10.

[17] Both the NFL Parties and Class Counsel have stonewalled the production of this information, presumably because of what it would reveal.  The NFL Parties have failed to respond to a letter from Members of Congress, written shortly after this Motion was filed, asking for information on qualification rates, broken down by race. Class Counsel have declined to help in obtaining similar information when asked by undersigned counsel.  Wyatt Decl. ¶ 10.

current record, the Court should direct discovery as set forth in the Motion, in the Wyatt Declaration, and above.

Dated: November 2, 2020                     Respectfully submitted,


                                            ___/s/  *Cyril V. Smith* _____
                                            Cyril V. Smith
                                            Zuckerman Spaeder LLP
                                            100 E. Pratt Street, Suite 2440
                                            Baltimore, MD  21202
                                            (410) 332-0444
                                            csmith@zuckerman.com

                                            Aitan D. Goelman
                                            Ezra B. Marcus
                                            Megan S. McKoy
                                            Zuckerman Spaeder LLP
                                            1800 M Street, 10th Floor
                                            Washington, DC 20036
                                            (202) 778-1800
                                            agoelman@zuckerman.com
                                            emarcus@zuckerman.com
                                            mmckoy@zuckerman.com


                                            ___/s/ *Edward S. Stone* _____
                                            Edward S. Stone
                                            Edward Stone Law P.C.
                                            300 Park Avenue, 12th Floor
                                            New York, NY  10022
                                            (203) 504-8425
                                            eddie@edwardstonelaw.com


                                            ___/s/ *J.R. Wyatt* _____
                                            J.R. Wyatt
                                            JR Wyatt Law PLLC
                                            49 West 37th Street, 7th Floor
                                            New York, New York 10018
                                            (215) 557-2776
                                            justin@jrwyattlaw.com

                                            Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was filed electronically with the Clerk of the Court on the 2nd day of November 2020, to be served by operation of the Court's electronic filing system which sent notification of such filing via electronic mail to all counsel of record.

Dated: November 2, 2020                 */s/ Cyril V. Smith_____*
                                        Cyril V. Smith