**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION** | |
| **Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, Plaintiffs v. National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., Defendants.** | **No. 2:12-md-02323-AB MDL No. 2323** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | |

**DECLARATION OF JENNIFER J. MANLY**

I, Jennifer J. Manly, Ph.D., declare:

1. I am a tenured Professor of Neuropsychology in Neurology at the Gertrude H. Sergievsky Center and the Taub Institute for Research on Alzheimer's Disease and the Aging Brain at Columbia University, where I have been on faculty since 1998. I completed my graduate training in clinical psychology, within the neuropsychology track, at the San Diego State University/University of California at San Diego Joint Doctoral Program in Clinical Psychology. After a clinical internship at Brown University, I completed a postdoctoral fellowship at Columbia University. I am a licensed psychologist in New York state. My research on social, medical, and genetic factors that increase risk or promote resilience to cognitive aging and Alzheimer's Disease among African Americans and Hispanics has been funded by the National Institute on Aging and the Alzheimer's Association. I have authored over 220 peer-reviewed publications and 10 chapters. I was awarded the Early Career Award from Division 40 of the American Psychological Association in 2002 and the Early Career Award from the National Academy of Neuropsychology in 2006, and in 2004 I was elected a Fellow of the APA. I served on the US Department of Health and Human Services Advisory Council on

Alzheimer's Research, Care and Services from 2011 to 2015, and was a member of the Alzheimer's Association Medical & Scientific Research Board from 2012 - 2019. I am currently serving on the National Advisory Council to the National Institute on Aging at NIH, and am a member of the National Academy of Sciences, Engineering, and Medicine Committee on Population. I held multiple roles on the Board of Governors of the International Neuropsychological Society, including Continuing Education Chair, Member-at-Large, and Publications Chair. I was an Associate Editor at the Journal of the International Neuropsychological Society from 2005 to 2014, and have served as consulting editor for many other journals including The Clinical Neuropsychologist, Neuropsychology, and Psychology and Aging. My credentials and publications are more fully set out in my curriculum vitae attached as Exhibit 1 to this Declaration.

2. Much of my professional work aims to improve the diagnostic accuracy of neuropsychological tests when used to detect mild cognitive impairment, dementia, and Alzheimer's Disease among African American and Hispanic older adults. This work clarifies the independent influences of early life socioeconomic factors, language use and bilingualism, acculturation, educational experiences, literacy, racism, and adult occupational opportunities on cognitive test performance, with the ultimate goal of understanding more about the pathways between racially patterned social factors, cognitive test performance, and brain health. I have been a leader in addressing the problem of misdiagnosis or misclassification of African Americans through examination of the role of lifecourse social factors that influence neuropsychological test performance in African Americans with and without cognitive impairment. The analysis of these social factors set a new standard in neuropsychology for accounting for quality of education, not just quantity of formal schooling.

3. I have been retained by Zuckerman Spaeder LLP at my standard rate for consulting to provide advice concerning the use of race-specific norms in neuropsychological tests performed to

determine eligibility for benefits under the Settlement Agreement entered in the NFL concussion litigation. The opinions in this Declaration are based on my training and experience.

4. I have reviewed Dr. Millis's Declaration. While I agree with Dr. Millis that demographically matched norms have a role to play in the diagnosis of neurological disease or injury, I do not agree that an adequate scientific foundation has been established for applying the available race-specific norms to interpret neuropsychological testing in the medico-legal context of the NFL Concussion Settlement. As I understand it, the neuropsychological tests administered under Exhibit A-2 of the Settlement Agreement are used to determine whether a retired NFL player has a "Qualifying Diagnosis" of Neurocognitive Impairment Level 1.5 or Level 2.0. "Qualifying Diagnosis" is a legal term defined in the Settlement Agreement, and is not medical diagnostic category. The results of the neurocognitive tests are not used to determine a retired player's medical treatment, nor would they be relied upon exclusively to ascertain a retired player's current abilities and likely progressive decline. Neuropsychological test norms are used in clinical or research settings to help determine if an individual's test scores are consistent with acquired cognitive impairment and the relative severity of the impairment. Demographic norms are used so that we can compare an individual's current cognitive test performance to our best estimate of the person's prior functioning. In the clinical setting, the results of cognitive tests are used in the context of other sources of data to determine a diagnosis. Dr. Millis states that use of race-specific norms is a commonly-accepted neuropsychological clinical practice; however, it is not commonly accepted practice to use norms that have not been validated and rigorously evaluated to be appropriate in the population in which they will be used. It is not commonly accepted practice to assume that normative data is adequate for the individual being tested, especially if the norms are 25 years outdated, are regionally specific, may include small numbers of Black men with college degrees. Given the context that neuropsychological tests are used under the NFL Settlement Agreement, the

normative standardization sample must be appropriate for use among NFL retirees, and there should be empirical evidence of the precision of the tests and norms for detection of impairment in this cohort. In my opinion, the use of race-specific norms in this context does not meet these necessary standards for scientific rigor.

5. I agree with Dr. Millis (¶ 28) that the racial disparity observed in neuropsychological testing "is widely understood to be the product of factors other than race." Much of my own professional work has involved identifying those factors[1]; in fact, Dr. Millis cites a number of articles concerning that body of research of which I am the lead or co-author in his Declaration. Because race has been used as a variable in neuropsychological test norms as a proxy for other factors, as Dr. Millis notes, applying race-specific norms to retired NFL players who are eligible to seek benefits under the NFL Concussion Settlement is only appropriate if the populations used to develop the race-specific norms are representative of the individual or the specific population. That is, a retired player's self-identified race is not the only variable to consider to determine if race-specific norms are appropriate. [2] Race-specific norms that did not include representatives of the population that and individual belongs to, may be no more accurate, or less accurate, than any other set of norms

[1] "Race and ethnicity are surrogates for other relevant variables whose effect on cognition and test performance are more direct. If we explicitly measure these behavioral, attitudinal, experiential, and psychological factors that underline racial classifications, we take advantage of this variability and improve our understanding of the role of race and culture on cognitive test performance. These variables, not race, account for the differences between African Americans and Whites on neuropsychological tests, and can inform us in future development of new measures that improve diagnostic accuracy and validity in multicultural populations." Jennifer J. Manly, Advantages and Disdavantages of Separate Norms for African Americans, 19 The Clinical Neuropsychologist 270, 273 (2005) (Manly 2005).

[2] "Whether race-based norms should be used for the assessment of an individual patient is contingent on a number of factors. The clinician must have a good understanding of the patient's educational and cultural background and experience. Do these experiences match with those of the normative group? Are there normative data sets that more similarly match the patient's background and experience, even if not including race or ethnicity? Regardless of the patient's race or ethnicity, clinicians should not consider neuropsychological test scores in isolation. That is, a test score, regardless of the normative group used to determine it, reflects one aspect of the patient's presentation and should be interpreted in the context of a detailed qualitative assessment (Ethical Standard 9.01, Bases for Assessments, subsection a). In this vein, it would not be inappropriate to report scores derived from multiple normative data sets and explore the possible implications of discrepancies in a clinical evaluation report." Adam M. Brickman, et al., Ethical Issues in Cross-Cultural Neuropsychology, 13 Applied Neuropsych. 91, 95 (2006)

that do not include race as a demographic variable. Even in a clinical setting, "[a]ny neuropsychologist who compares a patient's test performance to a normative data set should question whether the norms used are appropriate for the patient. Criteria for this determination might include consideration of the time in history the norms were created; whether an adequate number of subjects was included; and, most importantly, that the normative data are appropriately stratified in ways that best capture demographic factors that contribute to performance on the test." Adam Brickman, et al., Ethical Issues in Cross-Cultural Neuropsychology, 13 Applied Neuropsychology 91, 93-94 (2006).

6. As Holdnack and Weiss explain in their chapter on demographic adjustments to the WAIS-IV (including tests used under the Settlement Agreement), "racial/ethnic status cannot be determined by any scientific means and it may not be possible to accurately classify an individual client."[3] Dr. Millis agrees with this statement, and yet he argues that any available race-specific norms are the best choice for precisely measuring the presence or severity of impairment, regardless of consideration of whether the player's background is similar to the people who were included in the normative sample. Many researchers have discussed the danger of assuming that race-specific standards are appropriate in all cases, in part because these practices reify race as a biological construct (and not as the a social construct that it is[4]), they fail to recognize the racism and racial capitalism that have led to racial disparities in health, and because many race-corrections lack rigor, they may amplify health inequalities (Dorothy Roberts, Fatal invention: How science, politics, and big business re-create race in the twenty-first century; 2011). As the Special Masters' decision in the Davenport appeal notes, the Manual for the WAIS also warns that "[c]aution is warranted when using norms adjusted for racial/ethnic group differences, as scores may be misunderstood or

[3] James A. Holdnack & Larry G. Weiss, Demographic Adjustments to WAIS-IV/WMS-IV Norms, in WAIS IV, WMS-IV, and ACS, Advanced Clinical Interpretation 171, 199 (James A. Holdnack et al., eds. 2013).

[4] "[R]ace is a construct that lacks scientific basis." Manly (2005) at 272.

inappropriately interpreted. No scientific models exist for accurately identifying race and ethnicity (i.e., these are primarily social/political constructs)." SM Dec 8 (quoting N.C.S. Pearson, Advanced Clinical Solutions for WAIS-IV and WMS-IV: Clinical and Interpretive Manual (2009)). Although in the United States a person of mixed racial ancestry may identify as Black or African American, there is no scientific principle that would assign that individual to one race or another. "Proponents of the utilization of race-based norms need to explicitly highlight that the norms are not created as a claim of biological differences among groups; instead, race, like age or gender, is a strong correlate of other factors that impact performance but not an inherent cause of cognitive performance." Brickman, et al., at 94. The apparent or self-identified ancestry of an individual may or may not correlate with the differences in culture and educational opportunity that have been shown to account for racial differences. For that reason, it is important to apply considerable scrutiny of the norms and provide a clear, empirically-based justification before deciding on a normative standard for people who are traditionally underrepresented in neuropsychological research and testing. The WAIS Manual cautions, "the use of race/ethnicity in normative data ignores the underlying cultural, health and educational factors that result in disparities in test performance; subsequently, adjustments are made on group membership, which may not fully represent the experiences and characteristics of a specific individual." SM Dec 8 (quoting N.C.S. Pearson, Advanced Clinical Solutions for WAIS-IV and WMS-IV: Clinical and Interpretive Manual (2009)). In fact, White and Black retired NFL players may be more similar to each other than they are to the reference populations in the standardization samples used to develop Heaton or WAIS/WMS race-specific norms. Before norms are applied to any individual, empirical evidence must show that use of these norms improves diagnostic accuracy in the specific population of which that individual is a member. I am not aware of any published studies showing that diagnostic accuracy of cognitive impairment among Black and White retired NFL players is improved by applying different norms to interpret

neuropsychological test scores on the basis of a retired player's racial identification, and Dr. Millis does not present any such data.

7. Apart from whether there is a scientific basis to apply *different* interpretive standards to retired NFL players on the basis of race, there is the question whether people with backgrounds similar to Black retired NFL players are sufficiently well-represented within the populations used to generate the race-specific norms. Dr. Millis does not present any data about that question, and I am not aware of any published study addressing it. Taking the Heaton norms in particular, they were created by recruiting Black residents of San Diego in the 1990s (Robert K. Heaton, et al., Revised Comprehensive Norms for an Expanded Halstead-Reitan Battery: Demographically Adjusted Neuropsychological Norms for African American and Caucasian Adults Professional Manual 7, 2004) ("almost all of the African American participants were recruited specifically for this norming project, using a census- based survey method designed to provide a representative sample of neurologically normal participants from the San Diego area."). We are not provided enough information to know how representative this sample of San Diego residents is of Black Americans right now, or even at the time the norms were collected (approximately 25 years ago). While a representative sample of African Americans was the goal of the Heaton et al. project, use of these norms in the Settlement should require verification of whether census-matching was achieved, as well as a comprehensive understanding of how the methods employed to recruit enough people in to specific demographic classifications (e.g., middle aged Black men with college degrees), might have differed from the methods used to recruit other subgroups. Different recruitment methods may create ascertainment bias, which has been shown to have significant impact on cognitive test performance and racial differences in cognitive trajectory. (Carey E. Gleason, et al, Association between enrollment factors and incident cognitive impairment in Blacks and Whites: Data from the Alzheimer's Disease Center, 15 Alzheimer's & Dementia. 1533-45; 2019). Several factors call into

question whether the African American cohort who participated in the Heaton norms project is representative of retired NFL players being tested under the Settlement. One particularly important factor is that Black retired NFL players are likely to have had very different educational opportunities than Black San Diego residents who were recruited and tested approximately 25 years ago. A 50-year old San Diego resident tested in 1995 was more likely to have attended segregated schools for most or all of their education, and the quality of those schools are likely to have differed. In addition, there are known geographic variations in neuropsychological test performance among neurologically normal people, which suggest that African American San Diego residents may not be an appropriate normative standard for all Black Americans (Alfred Sellers, et al, Differences in Young Children's IQs on the Wechsler Preschool and Primary Scale of Intelligence-Revised as a Function of Stratification Variables, 9 Applied Neuropsychology 65-73, 2002; M. Maria Glymour & Jennifer J. Manly, Lifecourse Social Conditions and Racial and Ethnic Patterns of Cognitive Aging, 18 Neuropsychology Rev. 223-254b, 2008; Melissa Lamar, et al, Relationship of Early-Life Residence and Educational Experience to Level and Change in Cognitive Functioning: Results of the Minority Aging Research Study**,** 75 J. of Gerontology e81-e92, 2020). In addition, secular changes should be taken in to account when applying neuropsychological test norms in order to improve their accuracy (Rhoda Au, et al, New Norms for a New Generation: Cognitive Performance in the Framingham Offspring Cohort, Experimental Aging Research 333-358, 2010) ("continued surveillance of each generation is necessary to document the impact that unique social and economic variables have on cognitive function."). Dr. Millis does not present data that justifies the assumption that the participants in the Heaton norms are a good fit for the Black players being tested under the NFL Concussion Settlement, other than that they are Black.

9. Dr. Millis's central argument is that "it was and is widely-used and commonly-accepted neuropsychological clinical practice to consider demographic factors, including race, when assessing

premorbid intellectual functioning, and in choosing normative adjustments to scale an individual's raw scores on cognitive tests." I agree, but Dr. Millis fails to acknowledge that testing in the context of this settlement bears little resemblance to common neuropsychological practice, and due to the way that neuropsychological tests are being used in the Settlement, the highest degree of rigor and precision should be required of the neuropsychological tests. In a clinical setting, neuropsychological test results would be one component of a comprehensive clinical assessment that would also take into account other available information about the individual's prior function and experiences. A clinician attempting to determine if a patient had cognitive decline would consider the results of neurocognitive tests along with other information about the patient's level of neurocognitive functioning at an earlier period of time. In contrast, under the Settlement, a retired player can be ruled out as eligible if, independent of all other considerations, he does not meet the statistical criteria in the Table in Exhibit A-2, which establishes specific numerical cutoffs for each test using T-scores derived with demographically specific norms and requires that (at least) 2 or more tests within each domain are below these cutoffs. In my opinion, the currently available race-specific norms lack the precision that is required for them to be used in this manner. To my knowledge, the data used to develop race-specific norms for the measures approved for use in the Settlement, and the algorithm presented, has never been validated as an accurate way to detect cognitive impairment in Black men with similar backgrounds (all the complex and intersecting experiences that comprise this background) as the retired NFL players.

10. A related difference in how neurocognitive tests are used under the NFL Concussion Settlement, as I understand it, and how they are used in a clinical setting, is that the consequences of false positives and false negatives are different. Every kind of diagnostic test can produce errors, both false negatives and false positives. In clinical practice, it is important to be aware of the sensitivity (the ability to detect true positives, meaning avoiding false negatives) and specificity

(avoiding false positives). Tests in clinical practice are chosen, and cutoffs are adjusted, with an eye to the harmful consequences of each kind of error. For example, screening tests for covid-19 must consider the accuracy of the test in concert with the potential harms of a false positive result (e.g., the hassle and cost of having to take another test, unnecessary quarantine, and emotional distress) and the potential public health impact of a false negative result (e.g., the person may unwittingly expose others to the virus). For a different disease or context, even if the tests have the same sensitivity and specificity, the balance of harms would be different. This balance should not only take in to account the public health impact of false positives and false negatives, but should also consider the prevalence of the condition in the population. If cognitive decline is more frequent in the population of retired NFL players, as some studies suggest (Jeff Schaffert, Neuropsychological functioning in ageing retired NFL players: a critical review, 32 Int'l Rev. of Psychiatry, 71-88, 2019), even at the same level of sensitivity and specificity, the Negative Predictive Value (the probability that players who do not meet the cuts truly don't have cognitive impairment) will go down. In the clinical setting, neuropsychologists deal with high or low base rates and potential harms of over- or under-diagnosis by carefully considering which cutoff to use, deciding how wide the confidence interval around each score should be, and also deciding how to weigh the test scores in the context of other evidence of decline from prior levels of function.

11. The impetus for developing demographic norms for neurocognitive testing is to reduce the rate of false positive and false negative diagnoses of neurocognitive impairment for everyone, and demographic adjustments can be especially useful in improving diagnostic accuracy of tests when used among people with demographic backgrounds that are not in the majority within the general population. As Dr. Millis states, it is standard clinical practice to use norms that consider demographic background when determining presence and severity of cognitive impairment. However, in my opinion, we lack scientific evidence that the Heaton norms decrease false negative

results (improve sensitivity) in people with backgrounds similar to the NFL players. In other words, there is insufficient evidence that the Heaton norms possess the level of precision that would be needed to require their use in determination of eligibility for the Settlement. Neuropsychologists who are experienced with assessment of Black adults may be willing to accept this imprecision in their regular clinical practice, but only because they would never rely on the specific rules in Exhibit A-2 of the Settlement to determine if someone was impaired. For example, a clinician who is experienced using the Heaton norms within the last 5 to 10 years among Black men who are graduates of top colleges in the Midwest of the United States, may not rule out impairment within the memory domain if a player obtained a Heaton T-score of 36 on one memory measure and a T-score of 37 on another. In clinical practice, neuropsychologists use their clinical judgement, consider reports of significant decline in daily function and loss of independence, and use their knowledge of the precision of the norms along with the pattern of results on neuropsychological testing, to determine if impairment is present.

I declare under penalty of perjury that the foregoing is true and correct.

Digitally signed by Jennifer J. Manly
DN: cn=Jennifer J. Manly, o=Columbia University Medical Center, ou=Department of Neurology, email=jjm71@cumc.columbia.edu, c=US
Date: 2020.11.02 09:27:28 -05'00'

Date: 11/02/2020