**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                              Plaintiffs<br><br>                     v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>                             Defendants. | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

**DECLARATION OF KIRK R. DAFFNER**

I, Kirk R. Daffner, declare:

1. I am the J. David and Virginia Wimberly Professor of Neurology at Harvard Medical School. I also serve as the Stephen Muss Clinical Director of the Alzheimer Center, Director of the Center for Brain/Mind Medicine, and Chief of the Division of Cognitive and Behavioral Neurology at Brigham and Women's Hospital, a teaching hospital affiliated with Harvard Medical School. All of the groups I lead are multidisciplinary and consist of a large number of cognitive neurologists, neuropsychologists, social workers, and clinical researchers, working together to understand and care for patients with cognitive and behavioral disorders. I graduated from Harvard College *magna cum laude* and Phi Beta Kappa, and from Harvard Medical School. I am an elected Fellow of the American Neurologic Association and the American Academy of Neurology. I serve

on the editorial boards of the J*ournal of Alzheimer's Disease*, the *Journal of Cognitive Neuroscience* and the *Journal of Neuropsychiatry and Clinical Neurosciences*. I was President of the National Society of Behavioral and Cognitive Neurology from 2011 to 2013. My credentials, research and publications are more fully set out in the curriculum vitae attached as Exhibit 1 to this Declaration.

2. I am familiar through my research and clinical practice with the diagnosis and treatment of traumatic brain injury. I am also familiar with the use of neurocognitive testing in the identification of cognitive decline. I use the results of neurocognitive testing in my research work as well as my clinical practice. In addition, I have some familiarity with the NFL Concussion Settlement because I have been retained to review records of several former NFL players in connection with applications for benefits under the Settlement and I have examined former NFL players in connection with applications for pre-Effective Date benefits under the Settlement. The opinions set forth in this Declaration are based on my experience. I have been retained by Zuckerman Spaeder LLP at my standard hourly rate for consulting.

3. I have reviewed the Declaration of Scott R. Millis, Ph.D. and the August 20, 2020 decision of the Special Masters concerning the use of race-specific norms in the interpretation of neurocognitive testing under the NFL Concussion Settlement. Both the Millis Declaration and Special Masters' Decision presume that the use of race-specific norms in clinical practice means that race-specific norms should also be used in interpreting neurocognitive testing under the NFL Concussion Settlement. My purpose in this Declaration is to identify some of the differences in the purpose of neurocognitive testing and the way in which test scores are used under the NFL Concussion Settlement as compared to clinical practice, and how those differences bear on whether the use of race-specific norms in one setting means they should also be used in the other. I will

also address the kind of information that should be considered in making such a decision. More specifically, I will address whether evidence has been presented making it appropriate to require a neuropsychologist to offer particular reasons for declining to use race-specific norms in interpreting neurocognitive tests under the Settlement.

4. The first important point to consider about the relevance of clinical practice to the use of race-specific norms in neurocognitive testing for purposes of making Qualifying Diagnoses of Neurocognitive Impairment under the NFL Concussion Settlement is that, as I understand it, test results play a very different role in the ultimate decision under the Settlement than they would in making a diagnosis in clinical practice.

5. In clinical practice, neurocognitive test scores rarely stand alone as the basis for conclusions about a patient's prior level of cognitive functioning. A clinician would consider specific information about the patient, such as the patient's prior academic performance and job responsibilities, not just demographic norms, to assess the magnitude of the patient's decline in cognitive functioning. "In the absence of premorbid test data, psychologists have traditionally estimated premorbid cognitive ability from available historical data. These sources include: employment and education history, academic indicators such as grades and standardized test scores, family education and income level, and quality of educational experiences (Kareken & Williams, 1994)." James A. Holdnack, et al., Predicting Premorbid Ability for WAISIV, WMSIV and WASIII, in WAIS-IV, WMS-IV, and ACS: Advanced Clinical Interpretation, 217, 219 (James A. Holdnack, et al, eds. 2013). For example, it my understanding that the NFL has administered the Wonderlic intelligence test to aspiring NFL players since the 1970s, and since 2007 has administered a limited neurocognitive test battery. Alex Nieves, What is the Wonderlic Test and why does the NFL use it?, Sports Illustrated (Feb. 15, 2016) available at

https://www.si.com/nfl/2016/02/15/nfl-combine-wonderlic-test-explained (describing history of the use of Wonderlic test in NFL combine); Mark R. Lovell, Assessment of Mild Traumatic Brain Injury in the Professional Athlete, in Neuropsychological Assessment of Work-Related Injuries 68, 71 (Shane S. Bush & Grant L. Iverson, eds. 2012) (describing neurocognitive testing in NFL combine beginning in 2007). In addition, many if not all former NFL players have SAT or ACT scores and grades that would bear on their cognitive ability before they began their NFL careers. Under the NFL Concussion Settlement, as I understand it, neurocognitive test scores play a much bigger and more determinative role in assessing the precise magnitude of a former player's cognitive decline, by comparing current test scores to the mean performance of a theoretically appropriate sample. My understanding is that it is difficult, if not impossible, for a former player to qualify for benefits if his t-scores on neuropsychological tests do not match the tables in Exhibit 2 of the Settlement, even if other information about his prior functioning would show a significant loss of cognitive ability.

6. In fact, even in scientifically rigorous trials of medications to affect neurocognitive ability, such as drugs developed to treat Alzheimer's Disease, outcome measures do not usually rely solely on neuropsychological test scores, but also include a clinician's assessment of meaningful change. Scales such as the Clinical Global Impression of Change (CGIC) reflect an overall rating of patient functioning. As the Alzheimer Disease and Research Center notes, "Although CGIC ratings are less precise and consistent than psychometric measures, they may be more sensitive to clinically meaningful effects, and, therefore, can serve as useful measures of clinical utility." (http://adrc.usc.edu/cgic/)

7. In thinking about whether race-specific norms should be used to interpret neurocognitive tests as a matter of routine under the NFL Concussion Settlement, we have to

consider the difference in the context in which the tests are being administered and the way the test results are used. Typically, clinical decisions do not depend on measuring a person's cognitive decline (or seeming to do so) to determine if some numerical threshold has been crossed, as the NFL Concussion Settlement does in defining the Qualifying Diagnoses of Neurocognitive Impairment 1.5 and 2.0. Also, test results that drive decisions by themselves must be evaluated differently from test results that are considered along with a great deal of other data.

8. Consideration of a diagnostic test must take into account the likelihood of errors and the consequences of those errors. A perfect test would mean that all individuals with the disorder will test positive and all individuals who do not have the disorder will test negative. Invariably, tests are less than perfect. Errors in test results can be described as false positives (a positive test in individuals who do not have the disease (which we will label as Test +, Disease -)) or false negatives (a negative test in individuals who have the disease (which we will label as Test -, Disease +). The **sensitivity** of a test is defined as the probability that an individual with the disorder (Disease +) will test positive. Sensitivity is calculated as true positives / (true positives plus false negatives) x 100). In the Table below, sensitivity is represented as [A/(A + C)] x 100. A very sensitive test helps to "rule out" a disorder when the test is negative (because it has a low rate of false negatives). The **specificity** of a test is defined as the probability that an individual who does not have the disorder (Disease -) will test negative (True Negatives/ (True Negatives + False Positives) x 100). In the Table, specificity is represented as [D / (D + B)] x 100. A very specific test helps to "rule in" a disorder when the test is positive (because it has a low rate of false positives).

9. Knowing the probability that <u>someone with the disorder</u> will test positive (and someone without the disorder will test negative) is important in assessing the utility of a test. However,

5

clinicians are most interested in knowing the probability that <u>someone with a positive test</u> actually has the disorder (and similarly assessing the probability that someone with a negative test does not have the disorder). The **Positive Predictive Value** (PPV) of a test is defined as the probability that an individual who tests positive has the disorder (True Positive/ True Positives + False Positives). In the Table below, PPV is represented as [A/(A + B)] x 100.

|  | **Disease +** | **Disease -** | Total |
|---|---|---|---|
| **Test Results** |  |  |  |
| + Test | **A**<br><br>True Positive | **B**<br><br>False Positive | **Total # Test Positive** |
| - Test | **C**<br><br>False Negative | **D**<br><br>True Negative | **Total # Test Negative** |
| Total | **Total # with the Disease** | **Total # without Disease** |  |

The Negative Predictive **Value** (NPV) of a test is defined as the probability that an individual who tests negative does not have the disorder (True Negatives/ True Negatives + False Negatives). In the Table, PPV is represented as [D/(D + C)] x 100. The **prevalence** of a disease reflects the proportion of a specified population or sample that has the disease. For example, the prevalence of dementia in individuals who are in their 30s is exceedingly low. In contrast, the prevalence of dementia in individuals 85 years and older is well over 35%. Sensitivity and specificity are

6

characteristics of a test and do not change as a function of the prevalence of the disorder. In contrast, the PPV and NPV are directly linked to the prevalence of a disease. Of note, as the prevalence of a disorder goes up (e.g., dementia in 85-year-olds vs. 30-year-olds), the PPV increases because there will be fewer false positives for every true positive. In contrast, increases in prevalence are associated with decreases in the NPV because there will be fewer true negatives for every false negative. An example of how PPV and NPV for a test could vary as a function of disease prevalence is illustrated below.

| Prevalence | PPV | NPV |
|---|---|---|
| 10% | 46% | 97% |
| 30% | 76% | 89% |
| 50% | 88% | 67% |

10. As discussed, the Positive Predictive Value (PPV) and the Negative Predictive Value (NPV) of a test depends on the prevalence of a condition in the population being tested. If the population of former NFL players has a higher prevalence of neurocognitive decline and dementia than the general population, the NPV among NFL players will be lower, which means that a negative test is less likely to accurately signify that a player is not impaired (i.e., does not have the disorder). A higher prevalence rate would also lead to the PPV among former NFL players to be

higher, which means that a positive test is more likely to accurately signify that a player is impaired (i.e., has the disorder).

11. Although incomplete, available data suggest that former NFL players have substantially higher prevalence rates of cognitive decline and dementia than the general population. Jeff Schaffert, et al., Neuropsychological functioning in ageing retired NFL players: a critical review, 32 International Review of Psychiatry, 71-88 (2020); Everett J.. Lehman et al, Neurodegenerative causes of death among retired National Football League players, 79 Neurology 1970-74 (2012); John Hart, Jr., et al., Neuroimaging of Cognitive Dysfunction and Depression in Aging Retired NFL Players- A cross-sectional study. 70 JAMA Neurol. 326-35 (2013). Alan Schwarz, Dementia Risk Seen in Players in NFL Study, New York Times (Sept. 30, 2009);[1] David R. Weir, et al, National Football League Player Care Foundation: Study of Retired NFL Players (Sept.10, 2009).[2] As noted, higher prevalence rates among former NFL players means that the NPV will be lower for this group than the general population. As a result, a higher frequency of former NFL players who test negative will actually have the condition. Put in terms that are relevant to the use of neurocognitive testing under the NFL Settlement, that would mean a greater likelihood of the test results leading to a denial of benefits to a former NFL player who should get them.

12. Dr. Millis (¶ 26) presents information about rates of false positives when neurocognitive tests are administered without using race-specific norms. However, he does not present any information about the rate of false negatives that result from using race-specific norms. The Special Masters note that "[s]ince race-norming studies sample only neurologically intact

---

[1] https://www.nytimes.com/2009/09/30/sports/football/30dementia.html#:~:text=A%20study%20commissioned%20by%20the,men%20ages%2030%20through%2049
[2] http://ns.umich.edu/Releases/2009/Sep09/FinalReport.pdf

participants, the false negative rate of using the adjustments is unknown." Special Masters Decision at 8. Determining false negative rate would require large-scale studies of neurologically impaired Black individuals (as classified by methods other than the neuropsychological tests under discussion) that could assess the frequency in which race-specific norms failed to accurately identify them. In the absence of information about the rate of false negatives using race-specific norms, the relative benefit of reducing false positives towards increasing the overall accuracy of the testing protocol cannot be determined.

13. The consequences of false negative and false positive neuropsychological test results differ between those under clinical settings and those under the NFL Concussion Settlement. Diagnostic decisions in a clinical setting are not based on rigid cut-off values derived from neurocognitive testing. In clinical practice, a neurologist like myself will utilize all of the available data at his/her disposal to reach conclusions about a patient's current clinical status and to determine whether a player has declined from his baseline and crossed the threshold into a clinical dementia. Clinically, the issue is not simply to determine how an individual is performing compared to a normative mean, but to consider evidence about how a person is functioning relative to his baseline state. If there is compelling evidence for decline in functional status linked to cognitive deterioration, clinicians would view it appropriate to diagnose dementia, even if a person was not performing greater than 1.7-1.8 SD below a normative mean (as required for the Agreement's Level 1.5 impairment). Importantly, the D*iagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5) criteria for major neurocognitive disorder and the National Institute on Aging- Alzheimer's Association (NIA-AA) criteria for dementia do **not** include a specified level of cognitive impairment relative to published normative data. American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders. (5th ed. 2013); Guy M.

McKhann, et al., The diagnosis of dementia due to Alzheimer's disease: recommendations from the National Institute on Aging- Alzheimer's Association workgroups on diagnostic guidelines for Alzheimer's disease. 7 Alzheimer's & Dementia 263-69 (2011). (Note that "major neurocognitive disorder" and "dementia" are different terms for the same condition.) Diagnosis of these conditions is a reflection of clinical judgment, primarily based on whether there has been cognitive decline from previous levels of functioning that interfere with independent daily living activities. Similarly, the diagnosis of minor neurocognitive disorder under the DSM-5 and mild cognitive impairment (MCI) under the standards in Marilyn S. Albert et al., the diagnosis of mild cognitive impairment due to Alzheimer's disease- Recommendations from the National Institute on Aging- Alzheimer's Association workgroups on diagnostic guidelines for Alzheimer's disease, 7 Alzheimer's & Dementia, 270-79 (2011), is made on clinical grounds and not directly linked to a specified level of impairment derived from normative data. Certainly, if based on the patient's history, data from informants and other records, and thorough clinical evaluation there was evidence of substantial mental decline that has led to an erosion of instrumental activities of daily living (iADLS) such as managing finances or shopping for groceries, performance of 1.6 SD rather than 1.75 SD below a normative mean would not prevent a clinician from diagnosing a patient with dementia. Because test scores alone do not drive clinical decisions, false positive or false negative results on neurocognitive tests would likely only have serious ill consequences in the absence of other meaningful data about the individual's baseline and current state.

14. Take, for example, a former NFL player for whom there was evidence of a decline in function secondary to cognitive impairment, leading to an inability to manage his iADLs. If, using race-specific (Black) norms, he was determined to be performing 1.6 SD below mean (a "negative" test result for Level 1.5 impairment), but other available data suggested that he had declined

substantially (e.g., the theoretical equivalent of 1.8 SD from his own baseline performance), the neuropsychological test result would, in my opinion, be a false negative. This false negative test would result in the failure to provide compensation for this player, who has been struggling to manage on his own. That reflects a substantial negative consequence. As the Special Masters note, "[a]s using African American-specific norms increases the rate of false negatives, there is a risk that some may be denied access to necessary benefits or compensation solely on the basis of race." Special Masters Decision at 8.

15. Imagine another former NFL player for whom there also was evidence of cognitive decline. In this case, using non-race-specific norms, the player scored 1.8 SD below the mean, when in fact he had declined only the theoretical equivalent of 1.6 SD relative to his own baseline. This would yield a false positive result. However, if the decline is associated with functional impairment and there is evidence of a downward trajectory, the negative consequence of this "false positive" is that the individual would be awarded benefits sooner than the Agreement specified.

16. All of these differences between the clinical and Settlement context mean that even a clinician who sometimes or even typically considers race-specific norms in interpreting neurocognitive tests in a clinical setting might reasonably choose not to use them in testing under the NFL Concussion Settlement. Contrary to the Special Masters' view, a decision not to use race-specific norms in interpreting neurocognitive tests under the Settlement does not suggest "a one-time only technique to achieve a particular result," even if the neuropsychologist does consider race-specific norms in other contexts. Special Masters Decision at 11. Instead, a clinician might simply make the judgment that based on the available data, there is not enough evidence that using race-specific norms for Black former NFL players will improve the overall accuracy of assessing

an individual's cognitive status, and that without such evidence there is no reason to apply *different* standards to Black and White former NFL players.

17. Similarly, Dr, Millis does not present any evidence that would preclude a clinician from reasonably deciding not to use race-specific norms to interpret neurocognitive testing for any Black former NFL player because of the uncertainty about how similar the underlying characteristics of the reference population used to create the normative sample are to those of former NFL players in general. For example, one underlying characteristic that explains part of the observed racial difference in test scores is quality of education. A neuropsychologist could reasonably conclude that the educational experience of San Diego residents tested in the 1990s (upon which the Heaton race-specific norms are based), might not be fairly representative of the educational experience of age-matched former NFL players who were tested decades later. Robert K. Heaton, et al., Revised Comprehensive Norms for an Expanded Halstead-Reitan Battery: Demographically Adjusted Neuropsychological Norms for African American and Caucasian Adults Professional Manual 7 (2004) ("almost all of the African American participants were recruited specifically for this norming project, using a census-based survey method designed to provide a representative sample of neurologically normal participants from the San Diego area."). I know of no reason to question the judgment of a clinician who believes that it is too great an inferential leap to apply the 1990s San Diego norms to an individual being evaluated without evidence that the data collected then are adequately representative of the expected performance of a former NFL player educated many years later.

18. Of note, there are growing concerns in many areas of medicine about the potential ill-consequences of applying different standards to Black than White patients. A recent article in the *New England Journal of Medicine* (Vayas et al, 2020) reviewed the ways in which such an

approach may cause harm to the care of Black patients who suffer from cardiac, renal, obstetrical, and urologic conditions. The *Boston Globe* recently reported that "some medical institutions have stopped using race corrections in some tests. MGH [Massachusetts General Hospital] and Brigham and Women's Hospital, for example, no longer adjust the results of a popular test for kidney functions, called eGFR." Hiawatha Bray, 'Race is not a biologic category': The movement to remove race-based assessments in medicine, *Boston Globe*, October 23, 2020).[3] Concerns have been raised that "The use of race has the potential to worsen health care disparities by race." Given the uncertainty over the extent to which race-based norms and adjustments may be harmful to Black patients, a neuropsychologist's decision not to use such norms is reasonable and should not require further justification.

19. The data Dr. Millis presents do not overcome the reasons for caution before using race-specific norms in testing under the NFL Concussion Settlement, because they do not demonstrate that using race-specific norms will improve the accuracy of tests, taking into account the positive and negative predictive value of the tests, as applied to a population of former NFL players. Dr. Millis (¶ 24) cites an article by Adam M. Brickman, et al, Ethical Issues in Cross-Cultural Neuropsychology, 13 Applied Neuropsychology 91 (2006), which states at pages 93-94:

> Normative data sets provide the clinician with a reference to compare performance of an individual patient in the determination of cognitive ability. Good normative data maximize the diagnostic utility of neuropsychological tests. Any neuropsychologist who compares a patient's test performance to a normative data set should question whether the norms used are appropriate for the patient. Criteria for this determination might include consideration of the time in history the norms were created; whether an adequate number of subjects was included; and, most importantly, that the normative data are appropriately stratified in ways that best capture demographic factors that contribute to performance on the test. Traditionally, these factors include age, education, and sex.

---

[3] https://www.bostonglobe.com/2020/10/19/business/new-push-remove-race-based-assessments-medicine/

The value of using demographic norms to estimate a patient's prior level of functioning depends on how well the norms actually fit the individual patient and what other data are available to determine the patient's prior functioning. The more information there is about a patient's prior cognitive functioning, the less critical norms are likely to be in making a determination of the extent of the patent's cognitive decline.

20. Another important consideration in using race-specific norms, as compared to other demographic norms, is that, as Dr. Millis notes (¶ 28), observed racial differences in scores on neurocognitive tests are "widely understood to be the product of factors other than race." Whether race is a good predictor of prior cognitive functioning depends on how those "factors other than race" are distributed in the population. If a person is the same race as the people in a normative sample, but differs from them in characteristics that account for some of the observed racial differences in test scores, then the value of the race-specific norms in estimating prior cognitive functioning is likely to be limited and may produce serious errors. For example, I would not conclude without evidence that race-specific norms would be clinically appropriate to identify cognitive decline in a Black Harvard Medical School student. As Brickman, et al., note, "the clinician should consider the how similar the individual patient matches with the normative sample. For example, comparison of test scores from a highly educated African American man from New York City to an African American normative data set collected in the rural South might not be appropriate." 13 Applied Neuropsychology at 94. Even in clinical practice, we cannot simply assume that using race-specific norms will improve diagnostic accuracy just because the patient identifies as being of a particular race.

21. Also, as discussed in the recent *New England Journal of Medicine* article cited above, race is not a well-defined scientific or biological construct. In the United States, many people

identify themselves or are identified by others as Black notwithstanding a racially-mixed ancestry. Moreover, even if race were a more homogeneous category in terms of ancestry, there is considerable variability within every racial classification. As stated by Holdnack, et al.:

> The use of group membership variables such as race/ ethnicity and region of residence in prediction equations assumes that factors that impact minority groups (e.g., racism, lack of opportunity, low socioeconomic status, and linguistic and cultural differences), or people living in the same region (e.g., activity level, health status, education level), in general, accurately represent the experiences of the individual being assessed (see Chapter 4 for further discussion). Therefore, the clinician must consider whether the demographic variables to be used to predict premorbid functioning adequately generalize to a particular patient (i.e., does the demographic data accurately represents the patient's historical experiences).
>
> There is considerable variability in the degree to which an individual's life experiences are well represented by the experiences within a specific demographic group. For example, many African-Americans experience economic disadvantage and a lack of opportunities for a high quality education. However, there are also many African- Americans raised in wealthy families with access to high quality educational experiences. Subsequently, there is considerable variability in the cognitive functioning of individuals within a group; such that within-group differences are frequently larger than between-group differences.

James A. Holdnack, et al., Predicting Premorbid Ability for WAISIV, WMSIV and WASIII, in WAIS-IV, WMS-IV, and ACS: Advanced Clinical Interpretation, 217, 221 (James A. Holdnack, et al, eds. 2013).  As the Special Masters' decision notes, the Manual for the WAIS also warns that "[c]aution is warranted when using norms adjusted for racial/ethnic group differences, as scores may be misunderstood or inappropriately interpreted.  No scientific models exist for accurately identifying race and ethnicity (i.e., these are primarily social/political constructs)." Special Masters Decision  8 (quoting N.C.S. Pearson, Advanced Clinical Solutions for WAIS-IV and WMS-IV: Clinical and Interpretive Manual (2009)).  Consequently, we do not have strong presumptive evidence that a population sample is representative of a particular individual just

because the individual identifies as a member of the same race as the individuals comprising the reference sample.

I declare under penalty of perjury that the foregoing is true and correct.

*Kirk R. Daffner, M.D.*
Kirk R. Daffner, MD.

Date: 11-2-20