# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>    Plaintiffs<br><br>    v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>    Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS |  |

**SUPPORTING BLACK CLASS MEMBERS' [PROPOSED] MEMORANDUM OF LAW
IN SUPPORT OF THE MOTION FOR RELIEF UNDER
ARTICLE XXVII OF THE SETTLEMENT AGREEMENT**

Black Settlement Class members represented by the undersigned counsel, who

collectively number in the hundreds, respectfully offer this brief in support of the Motion for

Relief Under Article XXVII of the Settlement Agreement or Relief from Judgment by Kevin

Henry and Najeh Davenport (ECF No. 11169, hereinafter the "Davenport Motion").

**INTRODUCTION**

The Davenport Motion is not about what any particular player, counsel, or claims

administrator have said or done. Nor is it about the denial of benefits to Mr. Henry and Mr.

1

Davenport alone. Instead, it is about a facially discriminatory practice that has likely

disadvantaged, and will continue to disadvantage, *thousands of Black Class Members* who likely

make up the majority of the Class the Settlement was intended to benefit.

As the discussion regarding one of the Supporting Black Class Member's experience

below makes clear, race norming has *actually* harmed Black Class Members by preventing them

from obtaining Qualifying Diagnoses and monetary awards. With race norming, that Player did

not obtain a Qualifying Diagnosis. When White norms were applied and his test results rescored,

he qualifies for an award of more than $400,000. And Class Members who cannot now obtain a

Qualifying Diagnosis will continue to be harmed by race norming. The effect of discriminatory

race-norming will follow them throughout their lives as they continue to seek compensation as

their cognitive abilities decline. This is so whether race norming is characterized as

discretionary, presumed, or required. Regardless, any time it is applied in the context of this

Settlement, it subjects Black Class members to racial discrimination. The Davenport motion is

about a practice that must end. And this Court has the power to ensure it does.

The undersigned collectively represent hundreds of Black Settlement Class Members

who support the Davenport Motion ("Supporting Black Class Members"). Supporting Black

Class Members have either already participated in testing under the Baseline Assessment

Program ("BAP") or the Monetary Award Fund Program ("MAF") (or will do so in the future),

and have not received a Qualifying Diagnosis or compensation under the Settlement.

Most Supporting Black Class Members cannot know whether race norming was applied

to their test scores during their BAP or MAF assessments. The report of the neuropsychological

test results does not indicate whether racial adjustments were applied, although they have good

reason to believe that they were. The representations by the National Football League and an

2

Appeals Advisory Panel Consultant discussed in Davenport Movants' opening brief[1] (and the experience of one of the Supporting Black Class Members discussed below) make it clear that it is likely that the overwhelming majority of the Supporting Black Class Members were subjected to the race norming during scoring of their neuropsychological tests because BAP providers were required or encouraged to apply it. The Manly Declaration in support of Davenport Movants' Reply Brief underscores that the racial norms applied during BAP and MAF testing have never been evaluated to determine whether they are representative of Black Settlement Class members and likely are not given when and how some of these norms were derived. Manly Decl. at 2-3, 6-8 (ECF No. 11222-1). Dr. Manly indicates that there is a very substantial risk that the use of the race norming under the Settlement neuropsychological testing builds in an inaccurate presumption that Black players—*because they are Black*—have a lower baseline level of cognition than they actually have, without consideration of the actual circumstances of individual Black players or Black players as a group relative to the normative standardization sample used to derive the racial norms. *Id.* As discussed in the Davenport Movants' Reply Brief, this race norming results in an adjustment that is *unfavorable* to Black players by assuming that their baseline levels of cognition were lower than their White peers, making it more difficult to demonstrate cognitive impairment compared to that adjusted baseline.

In light of the information provided in the Davenport Movants' Reply Brief and the Manly Declaration, it is thus likely that many of Supporting Black Class Members who did not receive a Qualifying Diagnosis would or may have received one but for discriminatory race norming used to standardize their test scores and that they fared worse than their White peers, solely because they are Black. And those Supporting Black Class Members are at risk of being

---

[1] Mem. in Supp. of Mot. for Relief at 8 (ECF No. 11169).

denied compensation in the future as they suffer further cognitive decline and undergo additional

BAP or MAF testing that continues to apply discriminatory race norms.

The Supporting Black Class Members thus have a direct and personal stake in the relief

sought by the Davenport Movants. They stand a far greater chance of receiving Settlement

benefits if the Davenport Motion is granted and the discriminatory practices are terminated, and

a substantially diminished chance, now and in the future (as long as they live), if it is denied.

## ARGUMENT

If one were to accept what the NFL Parties assert, Class Members have always known

(and accepted) that race-based norms would be used in BAP and MAF neuropsychological

testing, the use of race-based norms has always been completely discretionary (never mandatory

or presumed), and race norming has never harmed Black Class Members. None of these claims

appear to be accurate. Race norming inherently discriminates against Black Class Members

because it assumes, solely on the basis of race, that *every* Black player has lower baseline

cognitive abilities compared to every one of their White peers, though evidence of the accuracy

of the race norms applied has not been established. *See* Manly Decl. at 6-8.

And, as Supporting Black Class Members demonstrate below, Black Class Members

*have* been denied Qualifying Diagnoses solely because of race norming. Whether it is useful in

determining certain individualized treatment in clinical settings, race norming has no place in

the administration of this Class Action Settlement. Race norming is discriminatory and

unlawful.

This Court should grant the relief sought by the Davenport Movants to find that the

Settlement Agreement neither requires nor presumes that race norming will be used, that race

norming should be enjoined, and Black Class Members who have undergone BAP or MAF

assessments may opt to have their scores recalculated without the use of Black racial norms and submit new claims.

1. **Supporting Black Class Members Did Not Receive Notice that Racially Discriminatory Norms Would Be Used to Devalue Their Settlement Benefits.**

Neuropsychological evaluations are the fundamental building blocks for the Settlement's diagnostic system. From the beginning, the NFL advertised and promoted the idea that the cognitive symptoms measured by neuropsychological testing are the symptoms for which the NFL would pay claims. For these reasons, the integrity and fairness of the neuropsychological evaluation process is central to the integrity and fairness of the Settlement. A testing protocol that disadvantages Black Class Members because of their race undermines the Settlement's integrity. It makes the Settlement more valuable to White players and less valuable to Black players, who form the substantial majority of the Settlement Class, and denies Black players the benefit of the bargain.

Despite the impact of race norming on Black Class Members' ability to recover, Black Class Members did not receive notice that race norming would be used in neuropsychological assessments in a manner that makes it more difficult for Black players to qualify for a monetary award solely because of their race. By the NFL Parties' admission, the only mention of the possibility of "demographic" adjustments appears on just two sentences on one page of the 162-page Settlement Agreement.[2] Importantly, this vague language does not disclose that use of racial norms would be, at a minimum, recommended (as Supporting Black Class Members now understand the BAP Manual instructs) or presumed (as the Special Master concluded and has been the practice), much less that use of race norming, whether voluntary, recommended,

---

[2] NFL Parties' Opp'n to Kevin Henry's and Najeh Davenport's Motion for Relief (ECF No. 11204) ("NFL Opp'n) at 2 (referencing Ex. 2 § 4's mention of "availability of demographically-adjusted normative data").

presumed, or required, may disqualify Black Settlement Class members with the same cognitive

disabilities of compensated White-players just because they are Black. Notably absent is any

reference by the NFL Parties to statements in the *Long- or Short-form Notices* regarding a

presumption or requirement that race norming would be used in BAP and MAF assessments,

much less their potential impact on compensation.

Yet the Long-form Notice informed Supporting Black Class Members that certain *other*

factors could decrease their recovery—their years of play, age, prior history of stroke, etc.—and

by how much,[3] but *not* that their race would disqualify them from receiving a monetary award

now and in the future. Because notice was not provided, Supporting Black Class Members did

not receive information reasonably necessary to evaluate whether to object to or opt-out of the

Settlement. *See, e.g., In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010). It is

therefore both unsurprising and understandable, then, that the Supporting Black Class Members

did not object to that purported term. The information necessary to form such an objection had

been withheld from them, if, indeed, presumptive use of race norming was even contemplated at

that time.

Moreover, while, as the NFL's Opposition to the Davenport Motion points out, this Court

was aware, at the time of the approval, that demographic adjustments were available,[4] it is far

less clear that, in the context of the objection the Court was considering, that the adjustments

would be used to assume *lower* pre-morbid intellectual functioning. Indeed, as the Millis

Declaration to the NFL's Opposition makes clear,[5] the objectors were concerned that players

---

[3] *See* Long Form Notice at 13-15 (ECF No. 6093-1).

[4] NFL Opp'n at 11.

[5] Millis Decl. (ECF No. 11204-1) ¶ 19.

who did not speak English as a first language or who had accents would be disadvantaged

relative to their English-speaking peers. The Court's conclusion that demographic statistical

models together with the Test of Premorbid Function would be "fair and reasonable" appears to

presume that any demographic adjustments would be *favorable* to the claimant (e.g., put them on

equal footing with English speakers), not discriminatory.

Black Settlement Class Members should receive the benefit of the bargain they struck.

And presumptive or required discriminatory race norming was not a part of it. The bargain

Supporting Black Class Members struck was to be treated fairly, without discrimination on the

basis of race.

### 2. BAP and MAF Providers Understand Race Norming is Mandatory and Routinely Apply Racial Adjustments.

Contrary to the NFL Parties' and Class Counsel's Opposition, the use of race norming

has been presumed, if not mandatory. The BAP Manual recommends race norming without any

directive to the neuropsychologist that anything other than full demographic norms may be used.

And while the NFL concedes that "[*n*]*othing in the Settlement mandates the use of any specific*

*normative adjustments in connection with a diagnostic evaluation*," it admits that the race-based

normative adjustments arise in a "clinician's guide" (the BAP Manual), which has never been

disclosed to Supporting Black Class Members or their counsel. That Manual recommends

examining specialists apply full demographic adjustments[6] without any written guidance that

doing so is purely "voluntary" and "discretionary" and, notably, without any warnings that the

accuracy of the norms has not been established with respect to Black players and their use may

result in false negatives with a disproportionate adverse impact on those Black players. It is,

---

[6] *See, e.g.,* NFL Opp'n at 3 ("NFL Opp'n"); Class Counsel's Mem. in Resp. to Mot. for Relief (ECF No. 11205) at 7 ("Class Counsel Resp.").

therefore, unlikely that any BAP provider would surmise that he or she had license to not use the race-based norms. And, as the Special Master noted in their decision on the Davenport Appeal, "it is unclear whether the clinician can exercise discretion in deciding whether to apply the White or African American norms." *See* August 20, 2020 SM Decision at 10. It is mere speculation (and no defense at all), given the language of the BAP Manual, that BAP and MAF providers might conceivably depart from the BAP Manual's recommendations. Without rescoring, supporting Black Class Members cannot know if they suffered discriminatory race norming; the BAP and MAF assessments ordinarily report only the T-scores, not the norms used to calculate them.

And although the NFL Parties and Class Counsel have argued that there is no presumption in favor of race norming,[7] this is unsupported and contrary to the BAP Manual itself. The Special Masters' August 20, 2020 decision regarding the Davenport Appeal shows such a presumption exists: it requires examining specialists to justify their decision *not to apply* race norming. *See* August 20, 2020 SM Decision at 11. If the use of racially discriminatory norms were truly discretionary, there would be no need for the neurologist and neuropsychologist to specifically justify their decision to disregard race norming.

The Special Masters' decision establishes this presumption despite their understanding of the dangers of race norming—namely that it increases the risk of false negatives, fails to account for factors that make those norms inappropriate, and may be "particularly inapt" when applied to this population. *See* August 20, 2020 SM Decision at 6-7, 10. The Manly Declaration in support of Movants only underscores how serious those risks are when used in the context of a Class Settlement with specific numerical cutoffs, above which no monetary award is available,

---

[7] NFL Opp'n at 5; Class Counsel Resp. at 9, 22.

compared with a treatment setting in which demographic factors are just one of many sources of information about a patient. Manly Decl. at 9.

The BAP Manual's recommendations and the Special Masters' establishment of a presumption in favor of race norming are perverse. They require neuropsychologists to justify why they are *not* applying racially discriminatory norms, the risks of which are acknowledged, rather than why they *are* applying them.

### 3. Black Settlement Class Members Have Been, and Will Be, Harmed by Race Norming.

Both the NFL and Class Counsel have asserted that they have not identified any claims in which a monetary award was denied due solely to the offending norms.[8] That confidence is misplaced and unsupported. They  wrongly assume that race norming results only in a denial of a monetary award when a player's claim is rejected by the Claims Administrator. But players whose BAP assessments did not result in a Qualifying Diagnosis would not have submitted claims. Neither Class Counsel nor the NFL can possibly know how many Black players failed to obtain a Qualifying Diagnosis because of race norming, unless and until the neuropsychological tests of the Black players are rescored. The Special Master's purported conclusion that no player *should* be denied a monetary award solely because of race norming[9] is cold comfort to those Black players whose BAP or MAF provider applied race norming with the result that no Qualifying Diagnosis was made.

Moreover, neither the NFL nor Class Counsel provide any data or statistical support for their assertion that Black Settlement Class Members have not been harmed by race norming. If such support exists, it has not been made available to Black Settlement Class Members (or,

---

[8] NFL Opp'n at 32; Class Counsel Resp. at 10-11.

[9] *See* NFL Opp'n at 3.

presumably, to the Court). If the Court finds it necessary to give weight to assertions of the NFL and Class Counsel that "based on review of available claims information"[10] no Class Member has been denied a monetary award due solely to the offending norms, at a minimum, the Court should order the NFL Parties, Class Counsel, and the Claims Administrator to substantiate that conclusion with data and the methodology used to reach it.

In fact, the experience of one Supporting Black Class Member (the "Player," designated by SPID number 100004770) demonstrates that race norming *does* have a serious adverse effect and why race norming must be rejected. His case demonstrates how race norming prevents players from obtaining a Qualifying Diagnosis in the first place. The Player is Black and was assessed under the BAP/MAF program using full demographic race norms. His medical and diagnostic records[11] show that he has been actually harmed by the use of neuropsychological race-based norms. Had his test results been scored using the norms used for White players, he would have received a Qualifying Diagnosis that should result in a monetary award.

The Player was first tested within the BAP in 2017 and again under the MAF Program in 2019. The validity of his neuro-psychological results has never been in doubt. Both test results showed deep impairment in Learning and Memory (three scores substantially less than a T-score of 30 and one T-score at 30). T-scores in other domains, however, did not qualify the Player for a diagnosis of Level 1.0, 1.5, or 2.0 Neurocognitive Impairment. Both sets of neuro-psychological tests were conducted and scored using the race-based norms for Black players "recommended" by the BAP Manual. Accordingly, the Player did not file a claim for a monetary award.

---

[10] Class Counsel Resp. at 10.

[11] The medical data have been uploaded to the Player's portal, and the data is available to the Court, the Claims Administrator, and the Parties.

But after the Davenport Motion was filed, the same neuropsychologist who previously evaluated the Player in 2019 under the MAF Program re-scored that evaluation using White norms. The re-scored results show the following:

1.  Use of the race-based norms for Blacks yielded a pre-injury IQ for the Player of 84 (which falls in the below average range for pre-injury IQ), whereas the norms for Whites yields a pre-injury IQ of 92 (which falls in the average range for pre-injury IQ). This is significant because it affects the calculations for impairments in the cognitive domains of Language and Executive Function for which the original 2019 evaluation showed no impairment.

2.  When calculating the 2019 test result for the cognitive domain of Language using Black norms, the Player had no impairment in the Language domain. When White norms were applied, he qualified for a Level 1.5 Neurocognitive Impairment.

3.  The change is even more significant in the cognitive domain of Executive Function. Using Black norms, the Player had no impairment in this domain in 2019. Using White norms, the Player received two scores below a T-score of 30, which qualifies Player 1 for Level 2.0 Neurocognitive Impairment (or moderate dementia). The Player's scores, as set forth in the re-scored tests, are:

    Executive Functioning:

    Similarities = 9; T=47
    F-A-S Letter Fluency = 10; (Heaton T-score=52/49)
    Trail Making Test-B = 4; (Heaton T-score=34/23)
    Booklet Category Test = 4; (Heaton T-score=36/29)

    The T-scores in Blue (T-52, T-34, and T-36) are based on Black norms. The T-scores in Red (T-49, T-23, and T-29) are based on White norms.

11

4.    Depending on which norms are used, the numerical differences and impact on the Player are dramatic. Using Black norms, the Player does not qualify at all. Using White norms, the Player qualifies for Level 2.0 Neurocognitive Impairment in Executive Function and Learning and Memory[12] and his overall neuropsychological test results are at Level 2.0 Neurocognitive Impairment.

5.    A White player who performed exactly the same as this Black player on raw scores would have received a Level 2.0 Neurocognitive Impairment on his neuropsychological testing, solely because he is White. But because the Player is Black, he received no qualifying diagnosis at all because of race-norming and thus did not file a claim. The difference in monetary compensation is equally dramatic. Based on new test scores derived using norms for White players, the Player would receive (and has filed a claim for) $401,000.

And this Player is but one example. There are many more Black Settlement Class Members whose neuropsychological scores should be investigated for the same disparate treatment and whose scores should be recalculated without race norming.[13]

Other Supporting Black Class Members have received neuropsychological testing under the BAP and/or MAF programs but have never received either a qualifying diagnosis or compensation. Because of the *recommended* (or required) use of Black norms in

---

[12] The Player's Learning and Memory T-Scores were at Level 2.0 using the Black norms and dropped even lower using the White norms.

[13] The undersigned counsel are aware that many players in the Settlement Class are unrepresented, including players who have been tested in the BAP and may be unaware of the Davenport Motion and related litigation. These *pro se* claimants are every bit as deserving of fair treatment as those represented by counsel likely do not know that race norming may have been applied to their raw test scores. Accordingly, the Court should order automatic rescoring for all Black players.

neuropsychological test scoring, those players are likely victims of race-based discrimination or they will be in the future.

Class Counsel asserts a "no-harm, no-foul" theory, arguing that when players are denied compensation because of the effect of race norming on their T-scores, there are often other independent bases for denying their claims. That is, race-based adjustments to raw scores do not matter. For example, it is argued (without data) that claims are denied, in part, because the players do not fulfill day to day disability requirements under the Clinical Dementia Rating ("CDR") scale, not solely because of their T-scores.[14] That ignores two important facts. First, race-norming in initial assessments deprives Black Settlement Class Members of properly scored evaluations they can use in the future. The BAP is supposed to provide a proper and accurate baseline, but race-based scores do not provide that. Second, players who do not initially obtain a Qualifying Diagnosis will seek reassessment (and a monetary award) as they age. It should be expected that the CDR scores of Black Settlement Class Members will decline as the players' cognitive functioning worsens, so the CDR scores will not be a barrier to a monetary award. At that moment, accurate (and non-racially biased) T-Scores are likely to become dispositive of a Qualifying Diagnosis. Those T-Scores should not be determined by racially biased norms.

It is, therefore, a mistake to conclude that racially discriminatory norms will never be the basis for a player's failure to obtain a Qualifying Diagnosis. Just as the Player described above, every Supporting Black Class Member is at risk for the future discriminatory impact of the race-based norms that the BAP Manual recommends (and the Special Masters have deemed are presumed to apply unless rebutted).

---

[14] Class Counsel Resp. at 10-11.

**6.  If the Court Does Not Grant the Davenport Motion Outright, It Should Order Disclosures to Aid its Assessment of the Discriminatory Effects of Race Norming.**

The Claims Administrator reported that as of November 2, 2020, there have are 20,556 registered Settlement Class Members who have attended 12,180 BAP appointments, resulting in 1,200 monetary awards, under which the NFL has paid or is obligated to pay some $811 million to Settlement Class Members. But neither those data nor any other data reported by the Claims Administrator address or permit one to assess racial disparities in administration of the Settlement. For example, if a greater percentage of the awards have been paid to White players as compared to Black players, who likely make up a majority of the Settlement Class, this would be evidence relevant to the question of whether the systematic use of race-based norms has disadvantaged Black players and adversely impacted their ability to obtain Qualifying Diagnoses and monetary awards. These data are essential (though not sufficient) to assess whether race norming has adversely impacted Black Settlement Class Members.

For these reasons, the Supporting Black Settlement Class Members respectfully request that the Court direct the Claims Administrator to collect and disclose on the Settlement website the following data, *by race*:

1. The number of players registered for the Settlement;

2. The number of players who have been tested under the BAP and MAF;

3. The number of players for whom White norms were applied to raw test scores under the BAP and MAF;

4. The number of players for whom Black norms were applied to raw test scores under the BAP and MAF;

5. The number of claims filed for Level 1.5 or Level 2.0 Impairment;

6. The number of notices of Monetary Awards received and Monetary Awards paid out for Level 1.5 or Level 2.0 Impairment;

7.      The number of denials and final denials of claims applications for an award for Level 1.5 or Level 2.0 Impairment;

8.      The number of appeals by Class Members for full or partial denial of claims for Level 1.5 or Level 2.0 Impairment;

9.      The number of appeals by the NFL Parties of awards for Level 1.5 or Level 2.0 Impairment claims;

10.      The number of successful and remanded appeals brought by Class Members for denial of claims for Level 1.5 or Level 2.0 Impairment;

11.      The number of successful and remanded appeals brought by the NFL Parties of awards for Level 1.5 or Level 2.0 Impairment claims;

In addition, the Black Settlement Class Members respectfully request that the Court order the Claims Administrator (a) to find out from each BAP and MAF neuropsychologists whether Black racial norms were applied to score the neuropsychological tests of Black Class Members, (b) to find out who those Black Class Members are, and (c) provide a confidential notification to each Black Class Member whose neuropsychological tests were scored using Black racial norms.

## CONCLUSION

For the foregoing reasons, Supporting Black Class Members urge the Court to grant the relief sought by the Davenport Motion as well as order the discovery suggested by this Memorandum.

Dated: November 9, 2020          Respectfully submitted,

         */s/ David D. Langfitt*
         David D. Langfitt
         **LANGFITT GARNER PLLC**
         P.O. Box 302
         Gladwyne, PA 9035
         Phone: (610) 787-1706
         david@langfittgarner.com

         Jeannine M. Kenney
         **HAUSFELD LLP**
         325 Chestnut Street, Suite 900

Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
jkenney@hausfeld.com

Richard S. Lewis
**HAUSFELD LLP**
888 16th Street, NW, Suite 300
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeld.com

Wendy R. Fleishman
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
Tel: 212.355.9500 ext. 6619
Fax: 212.355.9592
250 Hudson Street, 8th Floor
New York, NY 10013
wfleishman@lchb.com

Brian Gudmundson
**ZIMMERMAN REED**
1110 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel: 612-341-0400
Brian.gudmundson@zimmreed.com


*Counsel to Supporting Black Class Members*

16