IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                       Plaintiffs,<br>    v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>                       Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Langfitt Garner PLLC v. Michael Downs<br>Attorney's Lien Dispute<br>(Doc. No. 11101) | |

**REPORT AND RECOMMENDATION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                             November 13, 2020

**I.    INTRODUCTION**

Before the Court for Report and Recommendation is a Lien filed by Langfitt Garner PLLC ("Langfitt") seeking attorneys' fees and costs from the Award granted to its former client Michael Downs ("Mr. Downs") in the litigation which became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.). Langfitt seeks payment of attorneys' fees of 20% of the Award issued to Mr. Downs. Mr. Downs, now acting *pro se*, has not responded to Langfitt's assertion of the Lien.

As we set out in our January 7, 2019 Report and Recommendation assessing the first

grouping of attorney lien disputes, our evaluation of the validity of Langfitt's lien involves a consideration of the contingency fee agreement ("CFA") between the parties and an assessment of the reasonableness of the requested fee in light of the five factors enumerated by the Third Circuit in the *McKenzie* cases. *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")). This requires us to scrutinize the reasonableness of the CFA at the time of the contact's signing and then determine if the circumstances compel a different evaluation of the CFA at the time of its enforcement. We then examine the results obtained, the quality of the representation provided by Langfitt, and whether the efforts of Langfitt substantially contributed to the result. *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.

## II.     FACTS AND PROCEDURAL HISTORY[1]

Langfitt entered into a CFA with Downs on September 10, 2019. As of that date, two other firms had done work on behalf of Mr. Downs. Acosta and Associates, LLC registered him with the Claims Administrator on February 6, 2017 and submitted claim forms on April 10, 2017, April 26, 2018, and January 23, 2019. Meyers & Flowers, LLC also submitted a claim form on behalf of Mr. Downs on August 12, 2019.[2] Progress of his various claims, however, was hampered by

---

[1] We derive the factual background principally from the Statement of Dispute submitted by Langfitt. Mr. Downs has not responded to that Statement or challenged Langfitt's characterization of the facts. We accept Langfitt's uncontested narrative as true for purposes of this dispute. The Claims Administrator has also provided us with the dates of certain administrative filings that helped us to understand this chronology.

[2] Neither Acosta nor Meyers & Flowers has filed a lien concerning this award. The present record does not shed any light on how Meyers & Flowers came to be involved in Mr. Downs's claim, nor does the record reflect what work that firm may have undertaken on Mr. Downs's behalf apart from filing a claim in August 2019, just a month before Mr. Downs retained Langfitt.

audits.

When Mr. Downs retained Langfitt, he agreed to pay 20% of any monetary recovery as the attorney fee. Payment was contingent upon the success of the litigation. Langfitt reports that it "worked with BrownGreer to bring [Mr. Downs's claim] out of audit and add new information to his medical records that would help the AAP assess Mr. Downs' CDR [clinical dementia scale] scoring." (Stmt. of Dispute at 2.) Langfitt also arranged for a cerebro-spinal fluid test in late 2019 to see if additional support for an Alzheimer's Disease diagnosis might be available. At that time, and into early 2020, Langfitt also arranged and paid for consultations with Dr. Boyd Lyles about these results and Mr. Downs's diagnosis. (*Id.* & Ex. 6.)

On March 13, 2020, the Claims Administrator issued a Notice of Monetary Award, approving Mr. Downs's claim based upon a qualifying diagnosis dating to December 4, 2016.[3] Before the Award was paid, however, Mr. Downs determined that he no longer wanted the services of Langfitt and advised the Claims Administrator of his decision in early June 2020. The Claims Administrator advised Langfitt on June 16, 2020 that it had received notice of this development.

On June 22, 2020, Langfitt filed its Notice of Attorney's Lien on the docket in this Court. (Doc. No. 11101). On that same date, the Claims Administrator issued a Notice of Lien to Mr. Downs and Langfitt, advising Downs that the lien amount was 20% of his Monetary Award, plus a total of $590 in costs. The Notice advised Mr. Downs that the deadline to respond to the lien was July 13, 2020. Mr. Downs, however, made no response.

---

[3] The Notice of Monetary Award Claim Determination reflects that this qualifying diagnosis was made by Q. Mark Adams, M.D., and reflects that this "claim type" involved a "Qualified MAF Provider." Langfitt's time records do not describe any contact with Dr. Adams. This diagnosis and the arrangements for any examination that led to it would appear to reflect the work of prior counsel.

On July 20, 2020, the Claims Administrator issued a Schedule of Document Submissions to the parties as part of the attorneys' liens dispute resolution process. The parties were advised that, pursuant to Rule 19 of the Amended Rules Governing Attorney's Liens, they were obligated to submit a Statement of Dispute by August 19, 2020. The Schedule of Document Submissions laid out what elements were required to be included in a *counseled* Statement of Dispute. It further specified that, as to *pro se* litigants:

> (c) If the Settlement Class Member is not represented, he or she must serve the Claims Administrator with a Statement of Dispute that:
>
> (1) Explains his or her best understanding of the issues;
>
> (2) Provides a summary of the attempts to reach an agreement with the Attorney Lienholder;
>
> (3) Includes any information that he or she thinks would be useful to the Magistrate Judge about the work performed, any suggested resolution, and any documents or exhibits he or she wants the Magistrate Judge to consider; and
>
> (4) Includes a statement signed by the submitting Party declaring under penalty of perjury pursuant to 28 U.S.C. § 1746 that the information submitted in the Statement of Dispute is true and accurate to the best of that Party's knowledge and that the submitting Party understands that false statements made in connection with this process may result in fines, sanctions, and/or any other remedy available by law. The signature may be an original wet ink signature, a PDF or other electronic image of an actual signature, or an electronic signature.

(Sched. of Doc. Submissions at 1-2.)

Langfitt submitted its Statement of Dispute on August 19, 2020. Mr. Downs did not submit a Statement of Dispute. On or about August 20, 2020, the Claims Administrator advised the parties of Mr. Downs's omission and notified them that Mr. Downs had been granted a *sua sponte* extension of time, in recognition of his *pro se* status, permitting him another seven (7) days to submit a Statement of Dispute. He did not respond to this correspondence nor did he request any further extension of time with respect to the past-due Statement of Dispute.

After the extended deadline passed for Mr. Downs to submit his Statement of Dispute, the

4

Claims Administrator served him with Langfitt's Statement. Pursuant to the Schedule of Document Submissions, he had 15 days after being served with Langfitt's Statement of Dispute to file any Response. Again, he neither filed a Response nor requested an extension of time to do so. The Claims Administrator transferred the Record of Dispute to us on September 17, 2020. Neither party has requested that we hold a hearing.

### III.  THE APPLICABLE LEGAL PRINCIPLES

As we have explained in prior Reports regarding lien disputes involving other settlement class members in this litigation, Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to contingency fee contracts but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The Court has explained in its prior opinions that all attorneys seeking fees in this litigation – whether those fee requests are submitted through a Lien or otherwise – are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*. *See, e.g.,* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Where, as here, we are presented with a presumptively valid contingency fee contract, we assess whether the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

The *McKenzie* five-part reasonableness analysis obligates us to evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and

5

comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court previously adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the contract's enforcement. We will then review (1) the result in the case, (2) the quality of the work performed by Langfitt, and (3) the substantiality of that contribution to the overall result.

As is discussed in greater detail below, circumstances here at the time of contracting and the time of execution did not change significantly. In evaluating the remaining three prongs, we are satisfied that Langfitt provided quality representation and made substantial contributions to the ultimate Award received in this case. Considering the substantiality of Langfitt's contribution as an individually-retained plaintiff's attorney, we conclude that Langfitt should receive its fee of 20%, which will be reduced by the amount of the 5% holdback that the District Court deems necessary.

### A.      The CFA at the time of contracting

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.

Langfitt and Mr. Downs entered into the fee agreement on September 10, 2019. That was long after the collective individual cases filed against the NFL had been consolidated into this MDL, the settlement had been approved, and Mr. Downs had been registered with the Claims Administrator by prior counsel. Given the timing of the firm's entry into the case, Langfitt would not have been responsible for defeating procedural or legal defenses to the lawsuit from the NFL,

such as those relating to arbitration clauses or causation issues.  At the time that Langfitt assumed representation, however, the firm understood Mr. Downs's claim, filed by prior counsel, to have been mired in an audit that had lasted "for many years."  (Stmt. of Dispute at 2.)[4]

### B. The CFA at time of enforcement – impact of changed circumstances

Langfitt represented Mr. Downs from September 2019 until June 2020.  During that time, Langfitt worked with the Claims Administrator "to bring [Downs's claim] out of audit and add new information to his medical records that would help the [Appeals Advisory Panel] assess Mr. Downs' CDR scoring."  (Stmt. of Dispute at 2.)  The Appeals Advisory Panel granted Mr. Downs an award on March 13, 2020 based upon a qualifying diagnosis from a Qualified MAF Provider in December 2016 for Level 1.5 Neurocognitive Impairment.  The NFL did not appeal the award.  Following the passage of the appeal period, the award was scheduled for disbursement.  The Claims Administrator received notice that Mr. Downs was terminating Langfitt shortly before the scheduled disbursement.  Thus, when Langfitt filed its lien and sought enforcement of its CFA with Downs, it had achieved an objective of the representation inasmuch as it negotiated Mr. Downs's claim out of the audit process and put it on track for approval and payment of an award.

### C. The results obtained

On March 13, 2020, Mr. Downs was found qualified for a gross award of $505,408.00 based upon the date of the qualifying diagnosis, the nature of the diagnosis, and his age at diagnosis (57).  Earlier communications between Langfitt and Mr. Downs from November 15, 2019 explained to him their strategy to secure "as quickly as possible" an award based on the Level 1.5

---

[4] It is not clear what knowledge Langfitt had as to the existence or status of the claim filed by Meyers & Flowers just a few weeks earlier, on August 12, 2019.

impairment diagnosis, perhaps at age 59, and then pursue re-testing and see if there was "an enhanced diagnosis" that would qualify him for a supplemental award in the future. (Stmt. of Dispute at Ex. 5.) Thus, when an award was made in March 2020 based on a Level 1.5 diagnosis *at age 57*, Langfitt certainly achieved an important objective of the representation. Mr. Downs has not rebutted this conclusion in any way. We accept that it was the appropriate award based upon the evidence presented. The representation was successful.

### D.      The quality of the work performed

Mr. Downs has not explained if or why he believes that Langfitt did not provide quality work. Langfitt, for its part, has detailed the work that it performed during its period of representation. We credit the representation of Langfitt, as corroborated by the exhibits it submitted with its Statement of Dispute, that in the course of this representation it reviewed the pertinent medical history; obtained an updated spinal tap and expert review; advised Mr. Downs of the size of the award that would be available based on different possible diagnoses and at different ages; developed a strategy for securing the earliest award possible given existing medical evidence, leaving open the possibility of applying for a supplemental award as later evidence might warrant; worked with the Claims Administrator to bring Mr. Downs's claim out of audit and reviewed for an appropriate award; counseled him on exploring social security benefits and assisted with interactions with his mortgage company to ensure continuity in his living situation; kept Mr. Downs and his daughter apprised of developments and reviewed updates from the daughter about her father's condition; strategized about pursuit of other benefits available to settlement class members, such as the 88 Plan; and strategized for alternative paths should the pending claim be rejected, including making appointments (later canceled) for further evaluations. (Stmt. of Dispute at 2-3 & Ex. 6.) Even after Langfitt helped Mr. Downs to secure the award in

March 2020 based upon the Level 1.5 diagnosis, it continued its work in an effort to obtain a supplemental award for a more severe diagnosis. In April 2020 it provided a questionnaire to his daughter regarding his condition and began to pursue further testing options for him. (*Id.* at Ex. 6, p. 8.) These actions fall within the various categories of service that we have recognized generally as necessary work of individually-retained counsel. *See, e.g.,* Doc. No. 10368 at 44-51.

Mr. Downs has not expressed any complaints about the quality of the work performed by Langfitt. Langfitt has shared that Mr. Downs appeared confused over the value of his claim based on the Level 1.5 neurocognitive impairment. Firm personnel spoke with him in May 2020 about his mistaken belief that his claim was valued at $1.5 million. (*Id.* at 9.) As early as November 2019, the firm had advised Mr. Downs and his daughter what the expected range of his award would be; that the firm expected it to be approximately $409,301; and that he might qualify for a supplemental award for a more severe diagnosis, which could provide some $300,000 more. (Stmt. of Dispute, Ex. 5.) In the absence of any specific complaints from Mr. Downs about Langfitt's performance, it appears that his was dissatisfied because the award he received for his "1.5" diagnosis did not conform with a misguided expectation of a "1.5" million-dollar award. We concur with Langfitt's statement that this is an unfortunate misunderstanding, to which Mr. Downs's neurocognitive impairment likely contributes. Langfitt is not to blame for his misimpression of the value of his claim. To be sure, Langfitt endeavored to dispel this misunderstanding.

### E.     The substantiality of the work

The substantiality of Langfitt's work in securing the Monetary Award in the broadest sense is necessarily reduced given that the work of Class Counsel clearly "reduced the amount of work required of" individually-retained counsel to secure awards in this program. (Doc. No. 9862 at 4).

In its establishment of a 22% presumptive fee cap, the District Court has already taken actions to contain individual contingent fees, accounting for the substantial benefit provided by Class Counsel.  This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials.

The representation that Langfitt provided to Mr. Downs after all of that work of class counsel was performed, however, certainly was not *in*substantial.  As we outlined above, Mr. Downs's claim apparently had been mired in a long audit related to claims filed by his former counsel.  Langfitt succeeded in drawing the claim out of the audit process and securing a Monetary Award within six months.  We find the 20% contingent fee sought to be reasonable.

## IV.     CONCLUSION

The evidence recounted here should result in approval of a 20% attorney fee to Langfitt. In addition, Langfitt should be permitted reimbursement of $590.00 for the costs it incurred.  Our recommendation follows.

## RECOMMENDATION

**AND NOW**, this 13th day of November, 2020, it is respectfully **RECOMMENDED** that the Claims Administrator be ordered to designate the funds withheld for attorney's fee and costs as follows:[5]

    i. Langfitt Garner PLLC ("Langfitt") is authorized to deposit into its operating account the 15% portion of Mr. Downs's Monetary Award as attorney's fees;

    ii. Langfitt is authorized to deposit into its operating account the $590.00 in funds withheld from Mr. Downs's Monetary Award for reimbursement of costs; and

    iii. The 5% holdback funds shall be released by the Claims Administrator to Langfitt in accordance with future orders of the Court.

The Parties may file objections to this Report and Recommendation.  *See* Rule 25(d).

BY THE COURT:


/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

---

[5] The funds from Mr. Downs's award were already scheduled for disbursement before this lien dispute arose. The full allocation was disbursed to Langfitt on behalf of Mr. Downs, and the firm represents that it has distributed to Mr. Downs the portion that is not the subject of the lien. It has retained in escrow the funds representing 15% of the award for attorney's fees and the $590.00 for costs.

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                            Plaintiffs,<br>      v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>                            Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Langfitt Garner PLLC v. Michael Downs<br>Attorney's Lien Dispute<br>(Doc. No. 11101) | |

**ORDER**

**AND NOW**, this _____ day of _____, 2020, upon consideration of the Report and Recommendation of United States Magistrate Judge David R. Strawbridge (ECF No. _____), and no objection having been docketed, it is **ORDERED** that:

1. The Report and Recommendation is **ADOPTED**;

2. Langfitt Garner PLLC is **AUTHORIZED** to disburse from its escrow account the withheld funds for attorney's fees and costs from Mr. Downs's award, in accordance with the provisions of the Settlement Agreement and all Court Orders regarding implementation; and

3. The 5% portion from Mr. Downs's award that is currently in the 5% holdback fund shall be released in accordance with future orders of the Court.

BY THE COURT:

_____
ANITA B. BRODY, J.

2