UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : No. 2:12-md-02323-AB : : MDL No. 2323 : : **Hon. Anita B. Brody** |
| THIS DOCUMENT RELATES TO | : : |
| SPID Nos. 900000088; 900001323; 100001247; 100001280; 100001857; 100002848; 100004343; 100004799; 100005171; 100006463; 100006888; 900010961; 100008941; 100009267; 950001121; 100009733; 100010024; 950001124; 100013165; 100013279; 100013618; 100014206; 100014352; 100014842; 100014957; 100015113; 100016009; 950000158; 100016602; 110034435; 100016770; 100017069 | : : : : : : : : : : : : : |

## SETTLEMENT IMPLEMENTATION DETERMINATION

After a Special Investigation determined that neuropsychological evaluations conducted by the Neuropsychiatric Institute ("NPI") "may be unreliable," thirty-two Former Players whose claims relied on NPI testing objected to the Special Masters' denial of their claims without prejudice. Special Masters' Post-Investigation Statement of Finding Regarding Claims Relying on Testing by Neuropsychiatric Institute, Doc. No. 227279 ("Special Masters' Ruling"); Interim Report of the Special Investigator, Doc. No. 227268, ex. 8, at 1 ("Interim Report").

I. BACKGROUND

On May 24, 2018, the Claims Administrator issued an Audit Report raising concerns about claims filed by a consortium of law firms (unrelated to the law firm representing the Former Players bringing this objection). Interim Report, at 4. The consortium relied on NPI to

1

conduct the neuropsychological testing for the majority of its clients' claims. *Id.* NPI's results "raised red flags."[1] *Id.* The Audit Report was subsequently referred to the Special Masters. *Id.* The Special Masters directed the Special Investigator[2] to investigate the entities in the Audit Report, including NPI.

The Special Investigator discovered "irregularities" in NPI's testing procedures. *Id.* at 45. The NPI evaluations reviewed during the Special Investigation were signed by clinical psychologist Jennifer Barror-Levine and psychiatrist Walter Afield. *Id.* at 33. According to NPI's office manager, Dr. Barror-Levine was contractually responsible for overseeing the neuropsychological testing completed by NPI psychometrists to "ensure accuracy and to interpret testing results." *Id.* at 33, 35. Dr. Afield was responsible for in-person evaluations of players and calculations of their Clinical Dementia Rating scores. *Id.* at 2, 36. But when interviewed, Dr. Barror-Levine denied that she ever evaluated players, scored their tests, reviewed scoring completed by NPI psychometrists, or signed players' neuropsychological evaluations. *Id.* at 34-35. In fact, she stated that she was neither familiar with the neuropsychological testing required by the Settlement nor qualified to score or interpret the test results. *Id.* Dr. Afield passed away before he could be interviewed. *Id.* at 33. Based on this conflicting information, the Special Investigator concluded that "to the extent that BrownGreer

---

[1] NPI was previously audited in 2018 after AAPC review revealed, among other concerns, a series of miscalculated T-scores on evaluations. Claims Administrator's Audit Report: The Neuropsychiatric Institute, Doc. No. 227268, ex. 7, at 1-2. The Claims Administrator closed the audit because it concluded that the miscalculations were a "result of sloppiness" rather than "misrepresentation, concealment, or omission of material facts." *Id.* at 3. But the Claims Administrator began requiring that NPI submit raw scores with its evaluations so the AAPC could review for scoring errors. *Id.*

[2] On September 12, 2018, in response to the Special Masters' request, the Court appointed a Special Investigator to investigate "the role of attorneys or healthcare professionals involved in the submission of potentially fraudulent claims for which the Qualifying Diagnosis was rendered prior to the Effective Date." ECF No. 10255; ECF No. 10355, at 3. The Special Investigator served "under the authority of the Court, at the direction of the Special Masters." ECF No. 10355, at 3.

has thus far reasonably assumed that NPI psychometrists were under the supervision of a clinical psychologist based on the inclusion of Dr. Barror-Levine's signature on NPI reports, she has denied the same." *Id.* at 37. As such, "the testing completed by NPI . . . may be unreliable," though it was "less clear whether the irregularities uncovered at NPI with respect to the supervision of psychometrists had any impact on testing outcomes." *Id.* at 1, 45.

Based on this information, the Special Masters concluded that "[t]he Special Investigator's findings about the work of NPI have significant implications for the integrity and fair administration of the Settlement Agreement as a whole, requiring a re-evaluation of all Claims filed based on testing done by NPI." Special Masters' Ruling, at 2. Thus, the Special Masters denied without prejudice all claims based on NPI evaluations. *Id.* Affected players were free to submit new claims based on new evaluations conducted through the BAP or MAF programs. *Id.*

Thirty-two Former Players whose claims relied on NPI evaluations now bring this objection to the Special Masters' denial of their claims without prejudice.

## II.     DISCUSSION

The Former Players challenge the denial on three grounds.[3] First, they contend that they should have been allowed to participate in the Special Investigation and receive the full Interim Report. Second, they contend that the Special Masters did not properly weigh certain evidence relating to the Special Investigation. Third, they contend that the Special Masters erred in denying without prejudice all claims relying on NPI testing without allowing individualized review of the claims. None of these arguments are availing.

---

[3] The Former Players repeatedly refer to "violation[s] of due process" but do not make any constitutional arguments in their objection. Thus, the Court does not address any potential constitutional arguments.

*First*, the Former Players were not entitled to participate in the Special Investigation or receive the full Interim Report under the Settlement rules. The Former Players point to the Court's July 1, 2020 Notice Regarding Special Investigation, which stated: "While the Parties and the subjects of these investigations were aware of the investigations and given the opportunity to participate, all individual cases are confidential." ECF No. 11110, at 1. The Former Players claim that, contrary to the Notice, they were neither aware of nor given an opportunity to participate in the NPI investigation. But the Former Players are neither "Parties"[4] nor "subjects of these investigations"[5] within the meaning of the Notice. Furthermore, the Court specifically stated when appointing the Special Investigator that the Special Investigator would "perform his duties independent of the Parties and [would] report directly to, and take direction from, the Special Masters and the Court." ECF No. 10355, at 5. Thus, the Former Players had no right to participate in the investigation.

The Former Players further argue that they were entitled to a complete, unredacted copy of the Special Investigator's Interim Report. This is not so. In the March 23, 2017 Order Regarding Retention, Exchange, and Confidentiality of Claims Information in NFL Concussion Settlement Program, the Court made clear that Settlement Entities like the Special Masters and the Special Investigator are not "require[d] . . . to disclose to Settlement Class Members or their counsel any information disclosed to, obtained by, or generated by the Party, Settlement Entities or any other person in preparation for or in the course of an audit, investigation, or law

---

[4] The Notice differentiates between "Parties" and "former Players and/or Representative Claimants." ECF No. 11110, at 1.

[5] Under the Rules Governing the Audit of Claims, "Subject of Investigation" means "a lawyer, law firm, claims service provider, third party funder, or other person or entity that is the focus of an Audit, other than a Settlement Class Member or the healthcare providers involved in a Claim." Rules Governing the Audit of Claims r. 3(m).

enforcement activity." ECF No. 7324 ¶ 10. Nevertheless, in the interest of transparency, the Special Masters chose to provide the Former Players with a copy of the Interim Report with the pertinent sections unredacted. The Former Players are not entitled to the redacted information in the Interim Report that has no bearing on this objection or their claims.

*Second*, the Former Players may not challenge the weight the Special Masters gave to certain evidence relating to the Special Investigation because the Special Masters' factual findings are not reviewable. Under the Rules Governing the Audit of Claims,

> The decision of the Special Master[s] on a referred Audit Report is final and binding on the Parties to the Audit Proceeding[6] and the Claims Administrator and is not subject to appeal or review by the Court, except that pursuant to Fed. R. Civ. P. 53(f)(4) and the Court's July 13, 2016 Order appointing the Special Masters, the Court will review *de novo* (that is, anew) any objection to the Special Master[s'] conclusions of law.

Rules Governing the Audit of Claims r. 33. The Former Players argue that the Special Masters did not give sufficient weight to evidence that Dr. Barror-Levine signed affidavits attesting that she was involved in and qualified to oversee the neuropsychological testing as well as evidence that the previous audit of NPI did not reveal fraud. These are factual issues that are not reviewable by the Court.

*Third*, the Special Masters did not err in denying without prejudice all claims relying on NPI testing without allowing individualized review. The Rules Governing the Audit of Claims provide the Special Masters with authority to "direct such relief as deemed appropriate, including without limitation . . . [d]enial of the Claim(s) subject to the Audit Proceeding," "[r]e-examination of a living Retired NFL Football Player by a Qualified BAP Provider (if the Retired NFL Football Player is eligible for the BAP) or by a Qualified MAF Physician," and "[s]uch

---

[6] "Parties to the Audit Proceeding" includes "any Settlement Class Member(s) with a Claim identified in and/or related to the Audit Report." Rules Governing the Audit of Claims r. 3(f).

other and further relief as the Special Master[s] may deem appropriate." Rules Governing the Audit of Claims r. 31; *accord* Settlement Agreement § 10.3(i). The sole remedy for players with affected claims is to file an objection to the Special Masters' ruling.[7] Rules Governing the Audit of Claims r. 33, r. 34. The Former Players have done just this.

Unless otherwise provided in the order appointing the Special Masters, a Court may only set aside the Special Masters' ordered relief if the Special Masters abused their discretion. Fed. R. Civ. Pro. 53(f)(5). "An abuse of discretion occurs only where the [Special Masters'] decision is 'arbitrary, fanciful, or clearly unreasonable'—in short, where 'no reasonable person would adopt the [Special Masters'] view." *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (quoting *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009)).

The Former Players argue that the Special Masters abused their discretion because the Former Players' claims are not affected by the discrepancies that the Special Investigation revealed about Dr. Barror-Levine's role at NPI. They contend that only Dr. Afield's signature appears on their neuropsychological evaluations and that Dr. Afield was qualified to conduct the neuropsychological testing. Because Dr. Afield passed away before he could be interviewed, the Special Investigator was not able to confirm whether Dr. Afield was qualified to conduct neuropsychological testing. As the Special Investigator stated:

> It is clear that Dr. Afield had a critical role in evaluating players in connection with their Settlement claims and, according to [the office manager at NPI], he was able to assess neuropsychological testing results. It appears possible, then, that he was solely responsible for NPI's reports and that Dr. Barror-Levine truly had no role in

---

[7] The Former Players incorrectly claim that Settlement Agreement § 9 and the Rules Governing Appeals of Claim Determinations provide them with the right to individualized review and appeal of their claims. Section 9 and the Rules Governing Appeals of Claim Determinations only apply to determinations made by the Claims Administrator. Settlement Agreement §§ 9.5, 9.8; Rules Governing Appeals of Claim Determinations r. 7. The determinations at issue were made by the Special Masters post-audit, not by the Claims Administrator. Therefore, the Rules Governing Appeals of Claim Determinations do not apply. Instead, the Former Players are limited to the remedy provided by the Rules Governing the Audit of Claims: filing an objection to the Special Masters' ruling.

>supervising testing or interpreting results. If this is so, there must be some reason that her electronic signature was included on NPI's reports. One possibility, which the Special Investigator was unable to confirm, is that Dr. Afield was not qualified or licensed to review the scoring results and felt that the reports were stronger if endorsed by a clinical psychologist.

Interim Report, at 37. A review of Dr. Afield's credentials does not shed further light on this issue. His credentials involve *psychiatry* and do not reveal whether he was qualified to conduct—let alone oversee—*neuropsychological* testing.[8] Doc. No. 227265, ex. D. Thus, it is questionable whether the Former Players' evaluations were conducted or overseen by a qualified individual.

The Special Masters did not abuse their discretion in denying without prejudice all claims relying on NPI testing. Again, the Special Investigation revealed concerns about the reliability of the testing *procedures* employed by NPI: it is unclear whether neuropsychological evaluations were overseen by a qualified individual, whether that was clinical psychologist Dr. Barror-Levine or psychiatrist Dr. Afield. Interim Report, at 2, 37. Furthermore, it is unclear what effect these procedural irregularities had on testing outcomes. Interim Report, at 45. Irregularities in NPI's testing *procedures*—unlike irregularities in scoring—would be difficult, if not impossible, to detect and remedy through individualized review of claims—even by experts like the AAPC, as the Former Players suggest. Thus, it was reasonable for the Special Masters to deny without prejudice all claims relying on NPI testing without allowing individualized review. Affected players are free to submit new claims based on procedurally sound diagnoses from the MAF or BAP programs. As such, the Special Masters did not abuse their discretion.

---

[8] "Strictly speaking, neither [Dr. Barror-Levine nor Dr. Afield] . . . is (or was) a neuropsychologist." Interim Report, at 2 n.2.

Based on a review of the Special Masters' Ruling, a review of the Former Players' objection, and a review of the NFL Parties' opposition to the objection, the Court approves and adopts the conclusions in the Special Masters' Ruling.

**AND NOW**, on this 17th day of December, 2020, it is **ORDERED** that Settlement Class Members' Revised Objection to Special Masters' May 14, 2020 Post-Investigation Statement of Finding Regarding Claims Relying on Testing by the Neuropsychiatric Institute (Doc. No. 227265) is **DENIED**.

                                                        _____s/ ANITA B. BRODY_____
                                                        ANITA B. BRODY, J.