**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |

Kevin Turner and Shawn Wooden, on behalf
of themselves and others similarly situated,

                                   Plaintiffs,

       v.

National Football League and NFL Properties, LLC,
successor-in-interest to NFL Properties, Inc.,

                                Defendants.

THIS DOCUMENT RELATES TO:

Locks Law Firm v. Billy Ray Smith, Jr.
Attorney Lien Dispute
(Doc. No. 10704)

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                         January 14, 2021

## I.    INTRODUCTION

      Presently before the Court in the National Football League Player's Concussion Injury Litigation is the assertion of Attorney Lien by Locks Law Firm ("Locks Law") against the Award granted to their former client, Settlement Class Member ("SCM") Billy Ray Smith, Jr., in the litigation that became part of this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.). By its lien, Locks Law seeks

reimbursement of its costs and payment of attorneys' fees of up to as much as 22%[1] of the Award that has been authorized for Mr. Smith, although it has modified its demand in the course of this lien dispute process.  By his current counsel, Langfitt Garner PLLC ("Langfitt Garner"), Mr. Smith challenges the Lien given that Langfitt Garner also seeks a contingent fee for its work in representing him.  That work, which Mr. Smith agreed would be compensated with a contingent fee of 20% of any monetary award he received, ultimately involved Langfitt Garner's filing an appeal of a partially favorable monetary award such that Mr. Smith received a larger award after he terminated Locks Law and proceeded with former Locks Law personnel working at Langfitt Garner.  The parties consented to my resolution of this lien dispute.  (Doc. No. 11192.)

As we set out in past opinions, our evaluation of these positions involves a consideration of the CFAs between Mr. Smith and his counsel and an assessment of the reasonableness of the requested fees of both law firms in light of the analysis set out by the Third Circuit's *McKenzie* decision.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach obligates us to scrutinize the reasonableness of the CFA at the time of the signing and then determine whether the circumstances compel a different evaluation of the agreement at the time the lienholder seeks enforcement.  We will then examine the results Mr. Smith obtained, the quality of the representation provided by each firm, and most importantly the extent to which the efforts of the lienholder firm substantially contributed to the

---

[1]  The District Court has determined that an Individually Retained Plaintiff's Attorney ("IRPA") is presumptively due no more than 22% of a Monetary Award in fees (the "Fee Cap") given the benefits received by the SCMs from the work of counsel engaged for the common benefit of all SCMs.  (Doc. No. 9863.)  *See* Doc. No. 10368 at 10-11 (discussing the District Court's decision relating to the presumptive Fee Cap).  That presumptive cap has not been challenged in this case.

result obtained while the client was represented by current counsel.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.  Ultimately, we conclude that both firms are entitled to recoup attorney's fees, with the much larger portion allocated to Locks Law for its work securing the diagnosis of the qualifying condition and obtaining the evidence from which Langfitt Garner was later able to procure a more favorable date of diagnosis for that condition.

## II.    FACTS AND PROCEDURAL HISTORY

Mr. Smith entered into a CFA with Locks Law on June 26, 2012 for litigation against the NFL for alleged cognitive deficiencies resulting from injuries sustained while playing in the NFL. Under the terms of the fee agreement, and contingent upon Mr. Smith obtaining a recovery, Locks Law would charge a fee of 33.33% of the net recovery.  The firm filed a complaint in this district on behalf of Mr. Smith and others on July 23, 2012.  (No. 12-cv-04187.)  The suit was later consolidated with the MDL, No. 12-md-2323.  For the next several years, Locks Law was heavily involved in the MDL, in addition to monitoring the MDL docket and individual filings for its individual clients.  It regularly issued communications to update its client base concerning developments in the litigation and eventual settlement.

Prior to retaining Locks Law for litigation against the NFL, Mr. Smith had entered into a clinical research study at the Amen Clinic that was run by Daniel Amen, M.D., and neuroscientist Kristen Willeumier, Ph.D.  As part of that study, he underwent brain SPECT scans on July 15, 2009; October 18, 2011; and February 6, 2013.[2]  He and his wife also completed surveys about his activities and abilities.  In anticipation of a claim of football-related neurocognitive decline, the Smiths shared with Locks Law some of the records they possessed of these evaluations.

---

[2]  Years later, the Claims Administrator would approve a more favorable Monetary Award for Mr. Smith based on a diagnosis date as of the date of this third scan, February 6, 2013.

The NFL and counsel for the proposed class of retired NFL players ultimately reached a settlement, and following court approval and resolution of appeals, a claims process was established for those players who did not opt out of the settlement.  Locks Law advanced costs for Mr. Smith to undergo neuropsychological testing with Dr. Marc Norman in 2016 and for him to be examined on June 18, 2016 by Shauna H. Yuan, M.D., who was then affiliated with the Neurology Department at the University of California, San Diego.  She identified a condition that would qualify Mr. Smith under the Monetary Award Fund.  Registration in the claims program opened in February 2017, and Locks Law registered Mr. Smith on March 3, 2017.  On October 25, 2017 it filed a Pre-Effective Date Claim on Mr. Smith's behalf seeking an award for the condition that Dr. Yuan had diagnosed.  The claim form indicated, however, that Mr. Smith sought an award for that condition *as of July 15, 2009* and identifying the board-certified neurologist as *Dr. Amen*.  Locks Law attached a physician's certification form signed by Dr. Amen on July 26, 2017, accompanied by his clinic records; the SPECT scans he took from 2009, 2011, and 2013; a copy of Dr. Yuan's report; and a short report of Dr. Amen explaining that his clinic's SPECT scans provide evidence that the condition that was diagnosed by Dr. Yuan was present in Mr. Smith as early as 2009.  Locks Law also included in the claim submission a second, separate physician's certification form from Dr. Yuan that she completed on October 25, 2017, attesting to her diagnosis of a qualifying condition in Mr. Smith as of June 18, 2016, and accompanied by her extensive report of that date.  (LLF SOD Ex. B.)

Following the submission of the claim, the Claims Administrator on June 18, 2018 issued to Locks Law a Notice of Request for Additional Documents, seeking a copy of the 2016 neuropsychological testing of Dr. Norman to which Dr. Yuan referred in her report.  The following month, on July 18, 2018, the Claims Administrator issued a Notice of Audit of Claim, as it would

again in 2020.  As part of the inquiry begun in July 2018, the Claims Administrator sought a list of Mr. Smith's healthcare providers and information concerning his employment history, which included his various positions in the field of sports broadcasting.  In further support of Mr. Smith's claim, Locks Law obtained and submitted to the Claims Administrator in October 2018 a short letter from a provider with whom Mr. Smith had contact between 1999 and 2007 as well as a lengthy statement from Mrs. Smith describing the emergence of neurocognitive symptoms in her husband over time.

A short time after Locks Law submitted these materials, on October 31, 2018, the Claims Administrator issued a Notice of Monetary Award of $1,449,395 based upon Dr. Yuan's diagnosis of his condition as of June 18, 2016.  (Locks SOD Ex. A.) As evidenced by contemporaneous e-mail messages, Locks Law personnel believed that it might be possible to obtain a more favorable award based upon an earlier date for the inception of the condition, and the Smiths were interested in pursuing that goal further.  Locks Law personnel inquired of the Claims Administrator as to how they should proceed to seek a better award based on the same disease condition but as of a different date.  They were advised not to file a new claim, in that Mr. Smith had been recognized to have the condition sought, but to appeal the Monetary Award as to the date of qualifying diagnosis.  Locks Law preserved its ability to do so by obtaining extensions of time to file an appeal.  During this time, the firm remained in communication with Mrs. Smith about other possible sources of information about Mr. Smith's condition prior to 2016, including a family physician with whom Mrs. Smith had consulted about her husband.  The firm also explored obtaining another third-party statement from someone who managed some of the TV and radio stations and programs with which Mr. Smith was affiliated as a broadcaster during the time period prior to 2007 and who had stayed in contact with the Smiths thereafter.

During this time, the work on Mr. Smith's claims was handled at Locks Law principally by attorney David Langfitt and paralegal Jessica Brown.  On June 7, 2019, while the right to appeal the Monetary Award to Mr. Smith was preserved but not yet filed, David Langfitt left Locks Law and on June 10, 2019 joined a new firm he had set up, Langfitt Garner.  Ms. Brown joined him.  Mr. Smith was notified of this development and chose to switch to Langfitt Garner.  Mr. Smith and Langfitt Garner entered into a CFA on June 24, 2019 that provided for a 20% attorney's fee.  In light of its termination as counsel in a case in which it had not yet collected a fee, Locks Law promptly filed a Notice of Lien on June 28, 2019 seeking reasonable attorney's fees and costs for its work on behalf of Mr. Smith.  (Doc. No. 10704.)

Langfitt Garner was granted two additional extensions of time in June and July 2019 on behalf of Mr. Smith for the filing of any appeal of the Monetary Award.  The Claims Administrator advised Langfitt Garner that no further extensions were permitted and that August 26, 2019 would be the final deadline.  Following upon initial contacts made by Mr. Langfitt when he was still employed by Locks and when the subject of a possible appeal was first considered, Langfitt Garner proceeded to develop and finalize two sworn statements addressing Mr. Smith's daily functioning over time: an updated statement from Mrs. Smith and the anticipated statement from the former broadcasting manager for which the groundwork had been laid during the Locks Law representation.

In preparation for the appeal, Langfitt Garner also contacted two new experts to explore the viability of an earlier condition diagnosis date than the 2016 date that had been certified by Dr. Yuan.  The first was neuropsychologist Kristen Willeumier, who was the director of research at the Amen Clinic in California during the time of Mr. Smith's two follow-up visits in 2011 and

6

2013.[3]  The second expert consulted was neurologist Douglas Galasko, M.D., of the UCSD Neurology Department, under whom Dr. Yuan worked when she was affiliated with UCSD.

At some point, Langfitt Garner came to believe that an appeal would be more successful if it did not continue to pursue a diagnosis date of July 15, 2009, which was premised upon Mr. Smith's first evaluation at the Amen Clinic, but rather a diagnosis date of February 6, 2013, which was the date of the third and final SPECT scan and assessment at the Amen Clinic.  Dr. Willeumier provided Langfitt Garner a set of records of Mr. Smith's evaluations at the Amen Clinic that contained additional documentation beyond the records that the Smiths had previously provided to counsel.  At the firm's request, she also prepared a formal and lengthy report on August 23, 2019 that provided further context for the data from 2009-2013 and highlighted how the clinic records from that time documented cognitive decline.  Dr. Galasko, the UCSD neurologist, then examined Mr. Smith on August 24, 2019.  With the benefit of his own examination, the prior report of Dr. Yuan, the explanatory report of Dr. Willeumier, the Amen Clinic records, and the various third-party statements, Dr. Galasko prepared a report dating the onset of Mr. Smith's qualifying disease to February 6, 2013.

Langfitt Garner compiled these additional reports and statements and submitted Mr. Smith's appeal to the Claims Administrator on August 26, 2019, the extended appeal deadline. The Special Masters remanded the appeal to the AAP, and that body ultimately approved the recognition of the new diagnosis date of February 6, 2013.  It did so, however, on the condition that the original diagnosing neurologist, Dr. Yuan, agreed with Dr. Galasko that her diagnosis from 2016 could be supported in the record as of that earlier date.  After she was provided with the

---

[3]  Mr. Smith's initial examination at the Amen Clinic in 2009 was conducted by a different neuropsychologist.

7

entire appeal record, she signed a new Pre-Effective Date Diagnosing Physician Certification Form setting the date of diagnosis of Mr. Smith's disease as February 6, 2013.

For reasons not apparent from the record before us, the Special Master remanded the new information to the Claims Administrator for a review, which prompted another audit. The Claims Administrator requested additional documentation of Langfitt Garner, which led to a period of back-and-forth communications. Langfitt Garner made its final response to the audit and the Claims Administrator's Request for Additional Documentation on March 4, 2020, although a further Request for Additional Documentation followed on April 27, 2020, seeking a statement from Dr. Yuan documenting her agreement with Dr. Galasko's conclusions. Langfitt Garner secured that statement from her and submitted it on June 15, 2020. (LG Stmt. of Disp. at Ex. 9.)

The Claims Administrator issued a new Notice of Award to Mr. Smith on August 10, 2020, based upon the disease onset date of February 6, 2013. The diagnosing physician identified on the award notice is Dr. Yuan. The 2020 decision added approximately $400,000 to the value of the monetary award to Mr. Smith.

In light of the attorney lien and the contingency fee agreements of record, the Claims Administrator withheld from Mr. Smith's award funds for payment of attorney fees in an amount equal to 22% of the Monetary Award that was approved on August 10, 2020. This percentage reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2018 Opinion and Order. (Doc. No. 9863.) Of the attorney fee withholding, a portion reflecting 5% of the Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund ("AFQSF") pursuant to the Court's June 27, 2018 Order Regarding Withholdings for the Common Benefit Fund. (Doc. No. 10104.) Those funds may be distributed at a later date upon further order(s) of Judge Brody. This leaves us to determine the appropriate distribution for the attorney fees currently available for

disbursement (representing 17% of Mr. Smith's Award) and the allocation of those funds that are currently held in the AFQSF (representing 5% of Mr. Smith's Award), if those funds, or a portion thereof, are distributed by the Court at a future date. The Claims Administrator also withheld the amount of costs asserted by Locks Law in its Notice of Lien and by Langfitt Garner in its September 28, 2020 Statement of Attorneys Fees and Costs. (Doc. No. 10704; Dispute Rec. Doc. 5.) We must also determine whether these costs are reimbursable from Mr. Smith's award.

Pursuant to a briefing schedule that we issued through the Claims Administrator, and in accordance with the Lien Rules, both law firms submitted simultaneous Statements of Dispute on October 16, 2020 concerning their entitlement to a fee in light of the other firm's CFA or attorney lien. (Locks Stmt. of Disp., Dispute Rec. Doc. 8; Langfitt Stmt. of Disp., Dispute Rec. Doc. 7.) Each submitted a Response to the other's filing on November 4, 2020. (Langfitt Resp., Dispute Rec. Doc. 9; Locks Resp., Dispute Rec. Doc. 10.) Pursuant to Lien Rule 17, the Record of Dispute was then referred to us for resolution.

## III.    THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in this class action settlement did not relieve attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees, whether through a lien or otherwise, are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*. *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence).

9

Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I*, 758 F.2d at 101.

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based. We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

## IV.   DISCUSSION

We start with the premise, in accordance with the agreement of the parties, that Locks Law is entitled to all of the fee attributable to the initial award approved for Mr. Smith in 2018, which was based upon the diagnosis of his qualifying condition as of June 18, 2016. Our discussion thus focuses on the relative contribution of each firm to the enhanced award approved in 2020, which increased the gross award authorized for Mr. Smith by an additional $401,993 based upon the earlier diagnosis date of February 6, 2013 for that same condition.

As we outline within, we certainly recognize that Langfitt Garner performed essential tasks in submitting the appeal of the 2018 award, obtaining further expert opinions pointing to a more

favorable onset date, and shepherding the claim through another audit. That work, however, followed upon and perfected work undertaken when Locks Law managed Mr. Smith's case. We cannot agree with Langfitt Garner that it is entitled to all of the counsel fee attributable to the enhanced award approved in 2020.

A.    **The CFAs at the time of contracting and enforcement – impact of changed circumstances**

As we assess the reasonableness of the contingent fee arrangements at the time Mr. Smith entered into them with each firm, there are two primary factors that we must examine: (1) the legal challenges in his pursuit of a monetary award and (2) the time-intensive nature of the litigation. We then compare the landscape at the time of contracting with the circumstances at the time the Locks Law attorney-client relationship terminated.

1.    *Locks Law*

Locks Law agreed to represent Mr. Smith on June 26, 2012, during the early part of what has been described as "Phase 2"[4] of this litigation: after the MDL had been created but while there remained substantial risks, as the plaintiffs faced stiff challenges including surmounting the issues of preemption and establishing causation.

Risk as it related to overall workload also varied over time in this litigation. When law firms undertake large-scale litigation, they may be obligated to decline to take on other litigation. The cost to law firms in deciding to participate and thus forego alternative matters must be

---

[4] The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court. After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2).

recognized.  As we have noted in previous opinions, in the first phase of the litigation, the law firms that undertook representation of players individually, without the benefit of the efficiencies contained within an MDL, faced monumental challenges and risked having to pursue the entire case themselves, perhaps even through trial.  Fee arrangements reflecting those large contingencies "would have been expected and appropriate."  (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL in January 2012, however, the risk related to the *volume* of work to be undertaken by any law firm changed dramatically.  Once an MDL was formed, firms such as Locks Law contracting to represent individual clients "were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case.  *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from individually-retained player attorneys to Plaintiffs' Committees, which would be compensated through a common benefit fund).[5]  To be sure, Locks Law personnel served on important committees, for which the firm was awarded fees from the common benefit fund.  The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

Mr. Smith remained in a contractual relationship with Locks Law from the signing date of June 26, 2012 until June 24, 2019 when he moved to Langfitt Garner.  During this time substantial

---

[5]  We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

progress had been made in moving forward the many cases in the class, including Mr. Smith's individual claim. The motion of various defendants (such as helmet manufacturers) to sever their cases from those against the NFL, as well as the motions to dismiss filed by those parties and the NFL, were argued in April 2013. In July 2013, without yet ruling on the motions, Judge Brody ordered the plaintiffs and the NFL to mediation, and by the end of August 2013 a term sheet had been signed. Class counsel moved for preliminary approval on January 6, 2014. On April 16, 2014, Judge Brody sent the matter back for further discussion given her dissatisfaction with the Monetary Award cap, but an amended agreement that eliminated the cap was presented in June 2014. The Court gave preliminary approval on July 7, 2014 and held a fairness hearing in November 2014. After additional changes were made to the settlement agreement, it was again presented to the Court on February 13, 2015 and given final approval on April 22, 2015. Appeals followed, but the Third Circuit affirmed the District Court's approval of the Settlement Agreement on April 18, 2016, and the Supreme Court denied certiorari on December 12, 2016. Registration in the settlement program opened in February 2017.

Thus, during the period in which Locks Law represented Mr. Smith, the risk inherent in the litigation decreased significantly. This reduction in risk was ultimately accomplished through the efforts of Class Counsel and those other firms, including Locks Law, whose attorneys served on various MDL committees and performed work for the common benefit of the class, for which many firms including theirs were awarded compensation. *See* Doc. No. 10019 (the Court's May 24, 2018 Explanation and Order distributing the common benefit fees among petitioning firms). This does not alter the fact, however, that Locks Law undertook the representation at a time of significant risk.

### 2.  *Langfitt Garner*

13

At the time Langfitt Garner assumed representation of Mr. Smith in June 2019, the major risks confronting prior counsel in terms of liability and the defenses the NFL could assert had been alleviated.  A claims administration process had been rolled out and Locks Law had made the outlay of expenses and time necessary for initial claim approval.

Mr. Smith's claim, filed by Locks Law, had been partially successful in that he had been found to have a qualifying diagnosis but only as of 2016, not the 2009 onset date that had been sought in the alternative.  His opportunity to challenge that decision on appeal had been preserved by Locks Law, as they successfully obtained extensions of time to file the appeal.  What Mr. Smith had in hand, however, and what he could have chosen to accept, was a substantial monetary award that was obtained for him by Locks Law.

When Mr. Smith switched to Langfitt Garner in June 2019, it can reasonably be assumed that something more was expected to be done; otherwise, there would have been no reason to delay the finalization of his award and its payment.  Thus, when Langfitt Garner assumed representation of Mr. Smith, it could anticipate work to appeal as to the diagnosis date.  It would also have known that any enhanced award it might achieve could be subject to appeal by the NFL or to audit.  The fact that it would have had to engage in significant efforts and advance costs to achieve any additional award for Mr. Smith was a clear and present risk.  There were no changes in the circumstances as to risk factors during the time between when Langfitt Garner agreed to represent Mr. Smith and when it sought to enforce its contingent fee agreement upon the approval of his enhanced award.

## B.    The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the attorneys' efforts in bringing about the result.  While represented by Locks

Law, Mr. Smith qualified for a Monetary Award issued on October 31, 2018 based upon a qualifying diagnosis of a significant condition as of June 18, 2016. The parties agree that the result obtained at that point are attributable entirely to Locks Law. After Mr. Smith changed representation to Langfitt Garner, that firm filed an appeal of the partially favorable award and on August 10, 2020 secured for him a larger award based upon a qualifying diagnosis date of February 6, 2013. Locks Law contends that work for that appeal was begun during the period of its representation of Mr. Smith.

### C.      The quality of the work performed

The parties agree that all credit for the initial award secured for Mr. Smith in 2018 goes to Locks Law. The open question concerns whether Locks Law may also take some credit for the enhanced award that followed in 2020.

Langfitt Garner suggests that the claim that Locks Law filed on behalf of Mr. Smith in 2016, although successful in part, was not well-constructed to achieve an award based upon the 2009 diagnosis date that it sought. It notes that the disease diagnosis from Dr. Amen that Locks Law used as the basis for its claim on behalf of Mr. Smith "was not a formal diagnosis at all" and was limited to a 2009 SPECT scan result and an accompanying certification, made in retrospect, that the scan result was consistent with the condition later diagnosed by Dr. Yuan. (Langfitt Resp. at 2.) Langfitt Garner contends that the materials that Dr. Amen provided did not include the evidence required by the Settlement Agreement to substantiate a diagnosis for this disease condition. (*Id.*) Langfitt Garner also asserts that the direct experience Dr. Willeumier could share about Mr. Smith from her experience with him at the Amen Clinic, along with the other expert reports that it obtained in August 2019, was critical to understand Mr. Smith's decline between 2009 and 2013. It also contends that the clinic's records, which were given to counsel by the

15

Smiths, "are virtually impossible to understand without the guidance of Dr. Willeumier," which Locks Law had not sought.  (*Id.* at 3.)

Locks Law does not dispute that Langfitt Garner secured a valuable benefit for Mr. Smith with the appeal it filed accompanied by the additional expert reports and declarations.  It contends, however, that that the appeal strategy was developed, at least in part, during its period of representation, and that the appeal that Langfitt Garner ultimately filed was grounded in the work conducted when it represented the client.  There is much evidence to support this view.

It is undisputed that Attorney Langfitt filed "placeholder" appeal extension requests "to keep open the possibility of an appeal" while he worked at Locks Law.  (Langfitt Resp. at 3.)  He also took initial steps to obtain a statement from Mr. Smith's former broadcasting supervisor and a further statement from Mrs. Smith.  Although the record shows that Attorney Langfitt directed his paralegal at Locks Law via e-mail *on February 10, 2019* to begin to draft an affidavit based on questions and answers he developed with the former supervisor, Langfitt Garner postures that Attorney Langfitt did not proceed to develop or have either the supervisor or Mrs. Smith execute a statement "because, at that time, [he] was uncomfortable moving forward with an appeal of the 2009 Denial." (Langfitt Stmt. of Disp. at 4.)  We do not find this position completely plausible.[6]

As is demonstrated in our discussion below, we find that both firms played a positive role and provided quality work on behalf of Mr. Smith and in accordance with the demands of the respective stage of the litigation and claims process.

---

[6] We find it difficult to accept Attorney Langfitt's representation that he did not believe an appeal was "viable" unless and until new evidence "arose" (Langfitt Resp. at 3) and that he only made this "discovery" of new evidence in August 2019 at Langfitt Garner.  Attorney Langfitt could have sought this evidence months earlier when he was still at Locks Law.  He alone controlled the timing of this appeal.

**D.**   __The substantiality of the work performed__

The more important question to consider in this lien dispute is how the two firms contributed to the work necessary to obtain the enhanced award that Mr. Smith received in 2020. Langfitt Garner characterizes Locks Law's contribution as *de minimis* compared to its own in the development of the medical evidence and claims strategy to seek a diagnosis as of 2013. Locks Law points to the initial efforts undertaken by its personnel (including Attorney Langfitt) to preserve the appeal right and to inquire of potential witnesses who might be able to give additional statements relative to the onset of Mr. Smith's disease. It also argues that the earlier diagnosis recognized by the 2020 award originates from records obtained and produced by Locks Law. (Locks Resp. at 3.) We therefore lay out the efforts undertaken by both firms in the various aspects of their representation to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.

As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;
>
> (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,
>
> (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,
>
> (6) support of clients who were seeking loans and were exposed to

predatory lending practices; and

(7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories, and there may be other categories of tasks undertaken or services provided by IRPAs that would be relevant to this analysis.  In the absence of any suggestion of other relevant criteria, we will use these categories as checkpoints as we consider the substantiality of the IRPA's efforts and the role each may have played in maximizing Mr. Smith's award.

### (1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date

The work undertaken to seek an award based upon qualifying diagnosis dating to 2009 was performed by Locks Law and culminated in the claim submitted in 2017.  That claim provided physician certification forms attesting to the diagnosis by Dr. Yuan in 2016 and, with respect to Dr. Amen, applying that diagnosis retroactively to the inception of Mr. Smith's treatment with him in 2009.  Following receipt of the October 31, 2018 award that accepted the disease diagnosis only as of 2016, Locks Law personnel began to explore what appeal could be taken to achieve an earlier diagnosis date.  It could be expected that Locks Law personnel would have reviewed Dr. Willeumier's records and reduced to writing the declarations it was in the process of obtaining from Mrs. Smith and from Mr. Smith's former supervisor had Attorney Langfitt and colleagues not left Locks Law in June 2019 to form a competitor firm.

Once Attorney Langfitt was working on Mr. Smith's case at Langfitt Garner, and facing the final appeal deadline extension looming on August 26, 2019, he set to work to obtain additional medical opinions and other supporting materials.  Langfitt Garner finalized and obtained the two third-party sworn statements in July 2019.  It obtained additional information from medical sources

in August 2019. It characterizes the compilation of the appeal as work that "was done in a period of 5-10 days in August 2019 because it had not been done before – that is, it had not been done at Locks and, while at Locks, [Attorney Langfitt and his colleagues] had no expectation or strategy to complete this work." (Langfitt Garner Stmt. of Disp. at 4.) As discussed above, this representation strikes us as somewhat disingenuous.

That being said, it was during the period that Mr. Smith was represented at Langfitt Garner that counsel worked with Dr. Willeumier and then Dr. Galasko for their insights as to a 2013 diagnosis date. Langiftt Garner paid for their work, as well as the additional work of Dr. Yuan to amend her diagnosing physician certification form to adjust the diagnosis date to February 6, 2013. The work of obtaining well-supported and persuasive medical opinions to justify a 2013 onset date took place at Langfitt Garner.

### (2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial

This factor is not pertinent as to the attorney fee dispute arising from the enhanced award that resulted from the 2019 appeal. By the time this work was performed, Mr. Smith was participating in the claims process arising from the settlement of the litigation. He would not be taking his claim to trial.

### (3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted

This factor does not appear to pertain to the work of either of the firms in the relevant time period concerning the 2019 appeal and the 2020 enhanced award.

### (4) Support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class

This factor is not pertinent as to the attorney fee dispute arising from the enhanced award

that resulted from the 2019 appeal.   By the time this work was performed, Mr. Smith was participating in the claims process arising from the settlement of the litigation.   The time to opt out had passed.

### (5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award

Locks Law represented Mr. Smith and registered him in the settlement program at an early stage.   It filed the pre-effective date claim and requested an award based on a particular condition at one of two points in time.   It shepherded him through a round of requests for further information as well as through an audit.   It preserved his right to appeal the initial monetary award decision in an effort to obtain an earlier diagnosis date and began to take steps to obtain more specific third-party statements to focus attention on Mr. Smith's condition even before his 2016 diagnosis.

Langfitt Garner ended up shouldering perhaps a greater burden in the claims process than it expected.   It arranged for additional statements and evaluations to be undertaken in July and August 2019, which enabled it to file an appeal seeking a diagnosis date of 2013.   After this new claim was presented to the Special Masters, the AAP panel required Mr. Smith to obtain a further certification from Dr. Yuan, the neurologist who made the original diagnosis, to ensure that she agreed with Dr. Galasko's conclusions about the earlier onset date.   Langfitt Garner ensured that that was done.   The work of the appeal was not purely ministerial, inasmuch as it involved persuading the reviewing body that the onset of disease was in 2013 and marshaling the evidentiary support for that argument.   Langfitt Garner also shepherded Mr. Smith through another audit and responded on Mr. Smith's behalf to the Claims Administrator's two requests for additional documentation until the claim was finally approved on August 10, 2020.

### (6) Support of clients who were seeking loans and were exposed to predatory lending practices; and

This factor does not appear to apply to Mr. Smith for the time period at issue.

### (7) Providing necessary support in other personal matters collaterally related to this litigation

Locks Law counseled Mr. Smith concerning his suitability for benefits under the NFL's "88 Plan" and prepared and submitted an application on his behalf on August 10, 2018. (Locks SOD Ex. J.)  His application was approved on September 7, 2018. (Locks SOD at 2.)

### E.    Apportionment

Our analysis of the apportionment of fees in this case differs from our analysis of many of the other disputes in that the parties agree that Locks Law is entitled to all of the IRPA fees associated with the initial award granted to Mr. Smith in October 2018.  That award, approving a qualifying diagnosis as of 2016, reflected the culmination of six years of representation across the many phases of litigation, class formation, settlement, and claims administration.  Where the parties have a dispute is whether Langfitt Garner should be credited with 100% of the IRPA fees associated with the appeal and claims administration work that Langfitt Garner conducted that led to the enhanced award that Mr. Smith was given in 2020.

We will accept the parties' proposition that the IRPA fee associated with the portion of the monetary award that was authorized in 2018 should be allocated entirely to Locks Law.  Inasmuch as the CFA between Locks Law and Mr. Smith provided for a fee of 33.33%, we will limit the contingent fee percentage to 22%.  We will also adopt the proposal of Locks Law that the IRPA fee associated with the additional monetary award secured via the appeal be split evenly between Locks Law and Langfitt Garner.  Inasmuch as Mr. Smith contracted with Langfitt Garner for a 20% contingent fee at the time the appeal was anticipated, we will limit the fee attributable to the enhanced award to 20%.  These fee allocations are subject to the 5% holdback.

F.      **Costs**

Locks Law seeks reimbursement of the $12,475.75 it incurred in costs for the neuropsychological testing performed by Dr. Norman in 2016, the examination and report of Dr. Yuan in 2016, and postage and delivery costs between 2016 and 2019.  Mr. Smith's CFA with Locks Law provided that he would reimburse the firm for expenses of this nature from any award that he received.  The costs for which Locks Law seeks reimbursement were reasonably incurred and must be awarded to Locks Law.

Langfitt Garner likewise seeks reimbursement for costs, given that its CFA with Mr. Smith also provided for such reimbursement.  The contours of the cost request have altered significantly during this lien dispute process.  When counsel were exploring between each other whether this lien dispute could be resolved before embarking on briefing, Langfitt Garner represented in a writing to Locks Law personnel dated September 21, 2020 that it had not yet received invoices from Drs. Galasko, Willeumier, and Yuan for their work.[7]  It "estimated" those costs, however, as $8,000.  A week later, on the September 28, 2020 deadline to respond to the Claims Administrator with its Statement of Attorney's Fees and Costs, Langfitt Garner identified the sum of *$31,800* in costs for reimbursement, and that amount has been withheld by the Claims Administrator from the funds otherwise payable (and presumably now paid) to Mr. Smith.  The firm attached to its Statement form its internal expense log for the case.  The log identified a payment to Dr. Galasko dated September 28, 2020 in the amount of $7,500; a payment to Kristin Willeumier on September 23, 2020 in the amount of $18,000; and a payment to Dr. Yuan from September 22, 2020 in the

---

[7] It appears that the firm actually did not solicit bills from those professionals until later in September 2020, although their work in the case dated to August 2019 (Drs. Galasko and Willeumier) or spring 2020 (Dr. Yuan).

amount of $3,500.[8]  There was also an itemization for "payment to outside counsel regarding Audit of third party."  That expense, dated September 16, 2020, was in the amount of $2,800.

Through the Claims Administrator, we requested that Langfitt Garner provide further information about the payment to outside counsel and to explain the discrepancy between his estimate of the case expenses in his communication to Locks Law and his representation to the Claims Administrator a short time later.  As a result of that inquiry, we learned that the amounts listed in the itemization did not necessarily reflect costs that were paid to the medical experts.  The firm confirmed in a December 21, 2020 letter to me via the Claims Administrator that it paid $3,500 to Dr. Yuan on September 22, 2020, and it has provided an August 16, 2020 letter from her containing her invoice for work performed in May 2020.  As to Dr. Willeumier, the firm provides her invoice dated September 23, 2020 for work performed in August 2019 at the cost of $18,000. Langfitt Garner represents to us, however, that at the request of the client, it "negotiated that invoice down to $9,000" a few weeks prior to our inquiry and has paid that amount.  The firm also explained that it had estimated Dr. Galasko's expected charge because he had not provided to Langfitt Garner an invoice before the deadline for the Claims Administrator to withhold funds for cost reimbursement.  As documented in Langfitt Garner's letter to me, however, a month later, Dr. Galasko responded that he did not intend to send an invoice and instead asked only that a donation be made to a local food bank.  Therefore, the firm ultimately did not incur any costs for Dr. Galasko's report.  The total outlay for the neurological and neuropsychological evaluations and reports was only $12,500.  These costs were reasonably incurred and must be awarded to Langfitt Garner.

---

[8]  This presumably would have been for her spring 2020 record review and supplemental report. When she examined Mr. Smith in 2016 at UCSD, she charged $9,250.

Langfitt Garner also, however, included in its request for costs an expense in the amount of $2,800.00 for "payment to outside counsel regarding Audit of third party."  Upon our request for further information about this expense, Langfitt Garner explained that it engaged outside counsel for advice on how to handle inquiries and requests for information from the Claims Administrator's audit team, given that it perceived the audit process to have been protracted in Mr. Smith's case and where the Claims Administrator's audit team appeared to be focusing on third-party affiants in multiple claims in which Langfitt Garner was counsel.  From the total fees it paid to outside counsel, the firm calculated the portion attributable to the issues associated with the affiant in Mr. Smith's case to be $2,800.  Langfitt Garner represents that it obtained the client's consent to seek to recover this cost.

Notwithstanding the consent that has been elicited from the client after the firm made known its intention to recoup this expense, we will not give the Court's approval to recovery of such a cost.  Langfitt Garner entered into a retention agreement under which its fees for legal work performed on behalf of Mr. Smith would be paid as a percentage of his recovery.  Costs that could be reimbursed from a recovery pursuant to the agreement were described as "case-related and administrative-related expenses and costs, such as the costs of travel expenses, settlement administrative costs and fees, and filing fees."  (CFA para. 4.)  Consulting with outside counsel for back-up and assistance in communications with the Claims Administrator about processing of a client's claim, or concerns about the authenticity of an affidavit that the firm helped to prepare, could not have been contemplated by the parties as falling under this paragraph.  Legal work performed in support of Mr. Smith's claim is compensated in the contingent fee, not as an additional itemized cost.  We are unwilling to sanction a circumstance in which the Smiths would

be expected to pay both a contingent fee to Langfitt Garner and an additional "cost" for hourly work performed by other counsel.  We will not permit reimbursement of this expense.

## V.     CONCLUSION

The work performed by Locks Law during the claim development and filing stages played the most significant part in ensuring that Mr. Smith would qualify for an award that recognized his neurocognitive disorder.   Through its appeal, Langfitt Garner could present both further information from existing sources and information from a new expert.  This benefitted Mr. Smith in that, while it delayed receipt of his award by almost two years, it achieved for him an award that was 28% larger than the original award, based on the earlier diagnosis date.  We conclude that a fair resolution of this dispute is to award IRPA fees to be apportioned between Locks Law and Langfitt Garner such that all of the fees attributable to the initial 2018 award go to Locks Law and that the two firms equally share in the fees attributable to the additional incremental award secured in 2020.  The remaining funds withheld for counsel fee, based on the Claims Administrator having withheld counsel fee based upon the 22% presumptive cap, and which have not been authorized for either firm as set forth above, may be refunded to Mr. Smith.

The Claims Administrator shall reduce the disbursements in light of the 5% holdback and shall apportion the holdback funds between Locks Law, Langfitt Garner, and Mr. Smith in the proportions set forth above.

Finally, Locks Law may be reimbursed for the expenses it sought.  Langfitt Garner may be reimbursed $12,500 for costs.

An appropriate Order follows.

BY THE COURT:


 /s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE