**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : | No. 2:12-md-02323-AB |
| | : | MDL No. 2323 |
| THIS DOCUMENT RELATES TO: | : | Hon. Anita B. Brody |
| ALL ACTIONS | : | |

# CLAIMS ADMINISTRATOR STATUS REPORT NO. 11

## I. INTRODUCTION

**1.** ***The Purpose and Scope of this Status Report.*** BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 11 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 10 filed on October 1, 2020 (Document 11198). Our earlier Status Reports are posted to the Settlement Website (under "Documents," click "Status Reports"). We do not repeat here what we covered in them. All numbers and other information in this Status Report No. 11 are as of January 4, 2021.[1] We will cover developments after that date in future reports.

[1] All dates formatted as 1/4/21 in this Status Report mean January 4, 2021.

## II. MONETARY AWARD CLAIMS

**2.** ***Total Claims Received.*** Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted. We have received 55 new Monetary Award claims since Status Report No. 10 and have finished the review of all but 13 claims. As of January 4, 2021, the total Monetary Award Claim Packages received from Retired NFL Football Players and Representative Claimants is 3,125[2] (19.4% of the 16,138 Retired NFL Football Players and Representative Claimants who received favorable registration determinations).[3] Five of the 3,125 claims were denied as untimely.[4] We have received about four new claims a week since Status Report No. 10 in September 2020. Of the 3,125 Monetary Award claims submitted, 1,978 (63%) rest on pre-Effective Date diagnoses, while 898 (29%) are for post-Effective Date diagnoses, of which 258 (29% of the 898) were made in the Baseline Assessment Program ("BAP")[5] and 640 (71% of the 898) were made by Qualified MAF Physicians.[6] The other 249 claims did not tell us what diagnosis date they assert. Table 1 compares these numbers to those in Status Report No. 10:

[2] Section 3 of the Summary Report indicates that 3,142 Monetary Award Claim Packages have been submitted, which includes seventeen Supplemental Monetary Award claims that we do not include in the rest of our numbers in this section of the Status Report. See section III of the Status Report for details on the Supplemental Monetary Award claims.

[3] Of these Monetary Award claims, 580 (19%) have at least one associated Derivative Claimant who has registered and 2,545 (81%) have no registered Derivative Claimants. Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations (16,138) is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible); of these, 2,772 unique Settlement Class Members submitted the 3,125 claims.

[4] We reviewed 19 claims for potential untimeliness and denied five as untimely. We accepted 14 as timely, which includes two claims that showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

[5] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award. The BAP Administrator's status reports explain more about BAP diagnoses.

[6] This includes two claims where the Settlement Class Members submitted claims after the Effective Date, but the diagnoses were not rendered by MAF Physicians. Given unique circumstances, the Parties allowed an AAP member or AAP Consultant to review the medical records to determine if there was a Qualifying Diagnosis.

| Table 1 | QUALIFYING DIAGNOSIS DATES IN MONETARY AWARD CLAIMS | | | | | | |
|---|---|---|---|---|---|---|---|
| | DATE | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 9/14/20 | AS OF 1/4/21 | CHANGE | AS OF 9/14/20 | AS OF 1/4/2021 | CHANGE |
| 1. | Pre-Effective Date | 1,977 | 1978 | 1 | 64% | 63% | -1% |
| 2. | Post-Effective Date | 852 | 898 | 46 | 28% | 29% | 1% |
| | *(a) BAP* | *243* | *258* | *15* | *8%* | *8%* | 0% |
| | *(b) MAF* | *609* | *640* | *31* | *20%* | *20%* | 0% |
| 3. | No Date Asserted | 241 | 249 | 8 | 8% | 8% | 0% |
| **4.** | **Totals** | **3,070** | **3,125** | **55** | | | |

Table 2 shows by diagnosis date how many claims we have for each type of Qualifying Diagnosis:

| Table 2 | QUALIFYING DIAGNOSES PRESENTED IN MONETARY AWARD CLAIMS | | | |
|---|---|---|---|---|
| | DIAGNOSIS | PRE-EFFECTIVE DATE | POST-EFFECTIVE DATE | |
| | | | MAF | BAP |
| 1. | Death with CTE | 124 | 0 | N/A |
| 2. | ALS | 51 | 7 | |
| 3. | Alzheimer's Disease | 425 | 93 | |
| 4. | Parkinson's Disease | 137 | 46 | |
| 5. | Level 2 | 505 | 192 | 93 |
| 6. | Level 1.5 | 736 | 301 | 156 |

We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the Summary Report on the Settlement Website. We also show the current status of all Monetary Award claims based on the last notice or action taken in Section 8 of the Summary Report on the Settlement Website. There are nineteen claims (<1% of 3,125) in our review process after an initial Claim Package submission or a response to a notice requesting additional information and/or documents (see Row 1 in Section 8 of the Summary Report).

3. ***Monetary Awards and Payments.***

(a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website. We have issued Notices of Monetary Award for 1,203 claims totaling $819,371,459.[7] We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit. Of the 1,203 claims with Notices of Monetary Award, we requested $811,957,811 from the NFL Parties for all 1,189 claims that have reached the point at which we can request funding. The NFL Parties have deposited funds for all 1,189 of those claims.[8] Of the 1,189 Monetary Award claims for which the NFL Parties have deposited funds, the Program paid 1,172 claims for a total of $760,011,000.[9] The remaining 17 funded claims were not yet ready for payment when we submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount. For the 1,172 Retired NFL Football Players and Representative Claimants who have been paid, the Trustee sent $40,461,980 (5% of those Monetary Awards) to the Attorneys' Fees Qualified Settlement Fund, in accordance with the

---

[7] The amount of these Notices of Monetary Award includes the 1% Derivative Claimant Award deductions allocated to eligible Derivative Claimants (see Paragraph 20 of this Status Report). Section 7 of the Summary Report indicates that we have issued Notices of Monetary Award for 1,212 claims totaling $820,712,731, which includes nine Supplemental Monetary Award claims. We do not cover Supplemental Monetary Award claims in our numbers in this section of the Status Report. See section III of this Status Report for details on Supplemental Monetary Award claims.

[8] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.

[9] Section 7 of the Summary Report indicates that we have issued Payments to 1,181 Retired Players and Representative Claimants totaling $760,938,032, which includes Supplemental Monetary Award payments to nine claimants. We do not cover Supplemental Monetary Award claims in our numbers in this section of the Status Report. See section III of this Status Report for details on Supplemental Monetary Award claims.

Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104). Finally, we are required to withhold money for unresolved Liens and for third-party funders. Table 3 shows the distribution of the $760,011,000 paid by the Settlement Program and compares the totals to those reported in Status Report No. 10:

| Table 3 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | **PAID TO** | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $695,441,722 | $735,495,873 | $40,054,151 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $3,553,651 | $3,599,039 | $45,388 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $9,594,623 | $10,293,031 | $698,408 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $10,524,604 | $10,623,057 | $98,453 |
| **5.** | **Totals** | **$719,114,600** | **$760,011,000** | **$40,896,400** |

(b) Table 4 shows the changes in figures for payments and claims with Notices of Monetary Award since Status Report No. 10:

| Table 4 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 10 | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | AMOUNT | | |
| | | AS OF 9/14/20 | AS OF 1/4/21 | CHANGE | AS OF 9/14/20 | AS OF 1/4/21 | CHANGE |
| 1. | Notice of Monetary Award Issued | 1,170 | 1,203 | 33 | $796,625,374 | $819,371,459 | $22,746,085 |
| 2. | Paid | 1,111 | 1,172 | 61 | $719,114,600 | $760,011,000 | $40,896,400 |

(c) Table 5 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:[10]

| Table 5 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS[11] | | | | | |
|---|---|---|---|---|---|---|
| | DIAGNOSIS | CLAIMS SUBMITTED | NOTICE OF MONETARY AWARD | | PAID | |
| | | | HOW MANY | %[12] | HOW MANY | %[13] |
| 1. | Death with CTE | 124 | 80 | 65% | 80 | 65% |
| 2. | ALS | 58 | 41 | 71% | 41 | 71% |
| 3. | Alzheimer's Disease | 518 | 350 | 68% | 346 | 67% |
| 4. | Parkinson's Disease | 183 | 150 | 82% | 144 | 79% |
| 5. | Level 2 | 790 | 204 | 26% | 199 | 25% |
| 6. | Level 1.5 | 1,193 | 378 | 32% | 362 | 30% |

**4. *Monetary Award Claims Reviewed by the AAP.***

(a) There are 28 claims in or still requiring Appeals Advisory Panel ("AAP") review, which are six more claims than we reported in Status Report No. 10. Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel Consultants ("AAPC"), as highlighted in sub-paragraph (b) below. The AAP has completed

[10] Section 8 of the Summary Report on the Settlement Website identifies where claims that have not received a Notice of Monetary Award or been paid stand in the process.
[11] These do not include claims submitted where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.
[12] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that received a Notice of Monetary Award.
[13] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that were paid.

reviews on 867 pre-Effective Date diagnosis Monetary Award claims, approving 479 (55%) of those claims.[14] Under FAQ 151 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 97 claims. Under Rule 27 of the Rules Governing Qualified MAF Physicians, the AAP has reviewed 160 Monetary Award claims for diagnoses made by terminated Qualified MAF Physicians, approving 47 (29%) of those claims.[15]

(b) We have assigned 710 claims (an increase of 17 since Status Report No. 10) to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing supporting an Alzheimer's Disease diagnosis. The AAPC has completed 700 reviews (98.6% of those assigned to it) and provided their assessments to the AAP. An AAPC is reviewing the other pending claims.

**5.** ***Notices for Missing Materials.*** We have sent one or more notices requesting additional documents or information on 2,123 Monetary Award claims (43 more since Status Report No. 10), as shown in Table 6:

[14] Broken down by Qualifying Diagnosis, the AAP members approved 98% of Death with CTE claims, 95% of ALS claims, 86% of Alzheimer's claims, 97% of Parkinson's claims, 28% of Level 2 claims and 30% of Level 1.5 claims. The number of claims approved or denied by the AAP may fluctuate depending on multiple factors including ongoing audit investigations, remands of AAP decisions, and re-review of determinations that have not yet been finalized to ensure compliance with current Settlement Program rules and guidelines.

[15] This figure excludes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award. At our request, the AAP has reviewed 60 claims to verify the sufficiency of the claimed Qualifying Diagnosis and approved 24 of them.

| Table 6 | NOTICES FOR MISSING MATERIALS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[16] | TOTAL |
| 1. | Total Reviewed | 124 | 58 | 514 | 181 | 789 | 1,192 | 254 | 3,112 |
| 2. | Notice Issued | 48 | 29 | 306 | 101 | 555 | 858 | 226 | 2,123 |
| 3. | % Missing Materials | 39% | 50% | 60% | 56% | 70% | 72% | 89% | 68% |

So far, 87% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice. Settlement Class Members take an average of about 58 days to respond. We generally receive up to three responses to these notices each week and review each reply to determine if it cures the problem. Of those who responded, 42% cured the problem. Section 6 of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

**6.** ***Statute of Limitations Matters.*** We received 136 Claim Packages from Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006.[17] The Rules Governing Statute of Limitations Proceedings explain how the Special Masters make determinations as to whether such claims are barred by statutes of limitations, as specified in Section 6.2(b) of the Settlement Agreement. Statute of Limitations Rule 7 requires that a Claim Package be complete before a statute of limitations proceeding may begin. Of the 136 claims we received and processed: (a) 73 were complete

[16] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed. We process and pay a person for only one Qualifying Diagnosis per claim submission.

[17] We received Registration Forms from 370 Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006, but 134 of them did not properly register because of uncured incompleteness reasons or the player was not a Settlement Class Member because he did not play NFL Football as required by the Settlement Agreement. Of the 236 Representative Claimants who successfully registered, 100 (42%) did not submit a Claim Package.

and asserted a potentially compensable Qualifying Diagnosis if the claim is not time-barred under Settlement Agreement Section 6.2(b); (b) one was withdrawn; and (c) 62 were denied for failing to cure deficiencies or for not asserting a compensable Qualifying Diagnosis.

The Special Masters originally stayed a decision on all claims presenting this issue until all were fully briefed, to permit all affected Representative Claimants to be heard before any ruling and allow for the consideration of all arguments in a uniform and efficient manner. On December 11, 2019, the Court appointed United States Magistrate Judge Diane M. Welsh as the Mediator to seek to resolve all claims implicated by Section 6.2(b) of the Settlement Agreement.

Since September 14, 2020, the Claims Administrator and Special Masters received notice that 69 claimants were withdrawing their submitted Monetary Award claim, which simultaneously concludes the pending claim and the Statute of Limitations briefing under Rule 29 of the Rules Governing Statute of Limitations Proceedings. This leaves only four remaining pending Statute of Limitations claims that must be adjudicated by the Special Master under the applicable Rules.[18] Table 7 summarizes the current status of claims requiring a statute of limitation analysis after the appointment of the Mediator:

[18] The 2020 Grid Value for the four remaining Statute of Limitations claims is $713,954.

| Table 7 | STATUS OF CLAIMS REQUIRING STATUTE OF LIMITATIONS ANALYSIS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 9/14/20 | AS OF 1/4/21 | CHANGE | AS OF 9/14/20 | AS OF 1/4/21 | CHANGE |
| 1. | Complete - Potentially Compensable Qualifying Diagnosis | 37 | 4 | -33 | 27% | 3% | -24% |
| 2. | Claim Package Withdrawn | 37 | 70 | +33 | 27% | 51% | +24% |
| 3. | Denied – Deficient or No Compensable Qualifying Diagnosis | 62 | 62 | 0 | 46% | 46% | 0% |
| **4.** | **Totals** | **136** | **136** | **0** | | | |

**7.** ***Monetary Award Denials.*** There are 1,053 denials of Monetary Award claims for reasons other than an Audit (six more since Status Report No. 10), as shown in Table 8.[19]

| Table 8 | MONETARY AWARD DENIALS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTALS |
| 1. | Total Reviewed | 124 | 58 | 514 | 118 | 789 | 1,192 | 254 | 3,112 |
| 2. | Denied | 41 | 3 | 74 | 10 | 250 | 447 | 228 | 1,053 |
| 3. | % Denied | 33% | 5% | 14% | 6% | 32% | 38% | 90% | 34% |

Sections 6 and 10 of the Summary Report on the Settlement Website show these denials and the reasons for them. Overall, the AAP found 543 (52%) of these claims did not reflect a valid Qualifying Diagnosis. When an AAP member denies a claim, we include in the notice comments from that AAP member explaining why. When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the

[19] The 1,053 denials are the count of claims where the most recent determination notice is a denial notice. We discuss Audit denials in Paragraph 17 of this Status Report.

missing mandatory information and/or documents. Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam. Settlement Class Members have appealed a total of 371 denial notices; 21 of the currently active denial notices are under appeal.

## III. SUPPLEMENTAL MONETARY AWARD CLAIMS

**8.** ***Supplemental Monetary Award Claims Received.*** A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis. The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid. We have received claims from fifteen Retired NFL Football Players and two Representative Claimant seeking Supplemental Monetary Awards, fourteen for Qualifying Diagnoses of Alzheimer's Disease and three for a Level 2 Neurocognitive Impairment diagnosis. This is seven more Supplemental claims than we reported in Status Report No. 10.

**9.** ***Supplemental Monetary Award Reviews and Payments.*** A Supplemental Monetary Award is the difference between the Monetary Award Grid value of the new Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis. We have issued nine Notices of Supplemental Monetary Award to eligible Retired NFL Football Players and denied two claims for a Supplemental Monetary Award. The combined Monetary Award Grid value of these nine Supplemental Monetary Awards was $2,408,432, but after subtracting the prior Monetary Award payments, totaled $1,341,273, as set out below in Table 9:

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| 1. | Alzheimer's Disease | $187,217 | Level 1.5 | $93,904 | $93,313 |
| 2. | Alzheimer's Disease | $713,504 | Level 1.5 | $255,175 | $458,329 |
| 3. | Level 2 | $268,132 | Level 1.5 | $153,105 | $115,027 |
| 4. | Alzheimer's Disease | $316,188 | Level 1.5 | $99,620 | $216,568 |
| 5. | Alzheimer's Disease | $118,571 | Level 1.5 | $41,604 | $76,967 |
| 6. | Alzheimer's Disease | $404,326 | Level 2 | $253,783 | $150,543 |
| 7. | Level 2 | $78,737 | Level 1.5 | $55,125 | $23,612 |
| 8. | Alzheimer's Disease | $202,588 | Level 1.5 | $71,974 | $130,614 |
| 9 | Alzheimer's Disease | $119,170 | Level 1.5 | $42,870 | $76,300 |
| **10.** | **Totals** | **$2,408,432** | | **$1,067,160** | **$1,341,273** |

The Program has paid seven Retired NFL Football Players and two Representative Claimants a total of $927,032 for their Supplemental Monetary Awards.

## IV. QUALIFIED MAF PHYSICIANS

### 10. *Maintaining the MAF Network.*

(a) Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website. There are 98 Qualified MAF Physicians on the website now, representing 35 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside. We hope to add another 26 approved Qualified MAF Physicians as we confirm their participation and/or contract with them. Table 10 shows the changes in these numbers since Status Report No. 10:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | ASPECT | AS OF 9/14/20 | AS OF 1/4/21 | CHANGE |
| 1. | Approved Physician – On Posted List | 100 | 98 | -2 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 34 | 35 | +1 |
| 3. | Approved Physician – Not Yet Posted | 25 | 26 | +1 |

We removed three physicians from the website and added one. Two physicians withdrew because they changed practices and the other was no longer interested in participating but gave no specific reason for his lack of interest. One former Qualified MAF Physician requested to be reinstated into the Program, which increased the target city count by one. The Parties approved one new Qualified MAF Physician since Status Report No. 10 who has not yet been posted on the website.[20] We are working with the approved physicians to get signed contracts in place so we can add them to the posted list.

(b) We have 516 physicians on our radar, seven of whom Class Counsel and/or the NFL are considering whether to approve as Qualified MAF Physicians, 285 with whom we are engaged in initial and follow-up communications to determine interest and 224 who we have identified as possibly having appropriate qualifications but who we need to research more fully before contacting.

**11.** ***150-Mile Rule.***

(a) Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired NFL Football Player be examined by a Qualified MAF Physician whose office is within 150 miles of his primary residence.[21] We can make exceptions to this 150-Mile Rule if the

---

[20] The "Parties" are the parties to the Settlement Agreement, Class Counsel and the NFL Parties. Our contacts with Class Counsel are at Seeger Weiss LLP. We work with counsel for the NFL Parties at Paul, Weiss, Rifkind, Wharton & Garrison LLP.

[21] This requirement applies only to appointments made after April 11, 2019. Appointments made on or before April 11, 2019, did not need to be rescheduled with a different Qualified MAF Physician.

exception is requested prior to the appointment. We have received 85 requests for exceptions to the 150-Mile Rule, of which we granted 67 (79%) and denied 18 (21%). Table 11 shows the changes since Status Report No. 10:

| Table 11 | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | | |
|---|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** |
| 1. | Granted | 53 | 67 | +14 | 73.6% | 78.8% | +5.2% |
| 2. | Denied | 17 | 18 | +1 | 23.6% | 21.2% | -2.4% |
| 3. | Pending | 2 | 0 | -2 | 2.8% | 0% | -2.8% |
| **4.** | **Totals** | **72** | **85** | **+13** | | | |

For each denied request, the Retired NFL Football Player had at least one Qualified MAF Physician within 150 miles and did not provide a reasonable explanation for wanting to see a Qualified MAF Physician further away.

(b) The 150-Mile Rule is a flexible rule with broad exceptions. Of the living Retired NFL Football Players registered in the Program, 89% have a Qualified MAF Physician within 150 miles of their primary residence. We work with those who do not to help them schedule appointments with physicians further away, when they tell us they are ready to be examined.

**12.** ***50-Mile Rule.*** Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office. Like the 150-Mile Rule, we have discretion to grant exceptions. We have received 16 requests for exceptions to the 50-Mile Rule, of which we granted 14 (87.5%) and denied two

(12.5%). Table 12 shows how many exception requests we have received and our decisions on those requests (no change since Status Report No. 10):

| Table 12 | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | | |
|---|---|---|---|---|---|---|---|
| | DECISION | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 9/14/20 | AS OF 1/4/21 | CHANGE | AS OF 9/14/20 | AS OF 9/14/2020 | CHANGE |
| 1. | Granted | 14 | 14 | 0 | 87.5% | 87.5% | 0% |
| 2. | Denied | 2 | 2 | 0 | 12.5% | 12.5% | 0% |
| **3.** | **Totals** | **16** | **16** | **0** | | | |

Of the 99 Qualified MAF Physicians who are actively scheduling appointments, 93 (94%) have an approved neuropsychologist within 50 miles of their office, and we will grant exceptions on a case by case basis for the six Qualified MAF Physicians who do not.

**13.** ***Deviation Explanations for Level 1.5 and Level 2 Diagnoses.*** Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we determine more information is needed. We cannot process these claims further until we receive the required explanation. We report on these claims in Section 8 (Row 2) of the Summary Report on the Settlement Website. There are currently 24 claims that require additional explanation from a Qualified MAF Physician and/or neuropsychologist, representing less than 1% of all Claim Packages submitted to the Program, 15 claims (62.5%) based on a diagnosis of Level 1.5 Neurocognitive Impairment and 9 claims (37.5%) based on a diagnosis of Level 2 Neurocognitive Impairment. We expect the number of claims in this group will decrease over time as the Qualified MAF Physicians become more familiar with this requirement and include the necessary explanation in their initial

submissions to us. Table 13 shows how many claims require additional explanation from the Qualified MAF Physician before we can issue award or denial notices:

| Table 13 | CLAIMS REQUIRING ADDITIONAL EXPLANATION FROM QUALIFIED MAF PHYSICIANS | | | | | | |
|---|---|---|---|---|---|---|---|
| | DECISION | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 9/14/20 | AS OF 1/4/21 | CHANGE | AS OF 9/14/20 | AS OF 1/4/21 | CHANGE |
| 1. | Level 1.5 | 5 | 15 | +10 | 62.5% | 62.5% | 0% |
| 2. | Level 2 | 3 | 9 | +7 | 37.5% | 37.5% | 0% |
| **3.** | **Totals** | **8** | **24** | **+17** | | | |

**14.** ***MAF Physician Newsletters***. We issued our first newsletter to the Qualified MAF Physicians on December 8, 2020 to convey information on upcoming training, a reminder on communications with lawyers and guidance from the Special Master and Parties. We plan to send the Qualified MAF Physicians newsletters on a quarterly basis.

**15.** ***AAP Leadership Council.*** Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network. We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses. The AAP Leadership Council also assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the Settlement Agreement criteria. AAP Leadership Council also facilitates discussions and solicits guidance from the MAF Steering Committee, a group of six Qualified MAF Physicians, who render advice and assistance on providing peer-to-peer feedback to Qualified MAF Physicians and provide suggestions on how to improve the operations and

performance of the network of Qualified MAF Physicians. Overall, our collaboration with the AAP Leadership Council has been successful, and the Qualified MAF Physicians have responded positively to receiving feedback from AAP members.

**16.** ***MAF Steering Committee.*** We extended invitations to seven Qualified MAF Physicians, based on their experience and with input from the AAP Leadership Council, to join the MAF Steering Committee as authorized by Rule 24 of the Rules Governing Qualified MAF Physicians. Six of them agreed to serve in this role and have since participated in a roundtable discussion with the AAP Leadership Council, assisted in developing training for the Qualified MAF Physicians to address most common issues, and provided other suggestions for improvement of the Qualified MAF Physicians network. We plan to hold regular roundtables with the MAF Steering Committee and the AAP Leadership Council to maintain open communication regarding the operation and performance of the network of Qualified MAF Physicians.

## V. AUDIT

**17.** ***Closed Audits.*** We have concluded the Audit investigations of 1,150 Settlement Class Members with Monetary Award claims by denying a claim through Audit, by making no adverse finding and removing a claim from Audit, or because the Settlement Class Member withdrew his or her claim during our Audit. Table 14 summarizes the reasons for these closures and changes in the numbers since Status Report No. 10:

| Table 14 | CLOSED AUDITS[22] | | | |
|---|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** |
| 1. | Claim Denied in Audit | 372 | 372 | +0 |
| 2. | No Finding of Misrepresentation, Omission, or Concealment | 546 | 574 | +28 |
| 3. | Claim Withdrawn by Settlement Class Member | 202 | 204 | +2 |
| **4.** | **Totals** | **1,120** | **1,150** | **+30** |

**18.** ***Reports of Adverse Finding in Audit.*** We have issued to the Parties 20 Reports of Adverse Finding in Audit (one more than we reported in Status Report No. 10) affecting 566 Monetary Award claims, all 20 of which were then referred to the Special Masters. The 20 Audit Reports concern four neurologists, 12 neuropsychologists, three law firms, seven individual Settlement Class Members and one claims preparation company. Table 15 summarizes the Special Masters' and Court's decisions on these Audit reports:

| Table 15 | DECISIONS ON AUDIT REPORTS | |
|---|---|---|
| | **DECISION** | **AUDIT REPORTS** |
| **1.** | Claims Denied in Audit | 12[23] |
| **2.** | Claims Removed from Audit and Subjected to Specialized Review | 2 |
| **3.** | Claims Removed from Audit and Returned to Normal Review | 3 |
| **4.** | All Claims Withdrawn before Decision | 1 |
| **5.** | No Final Decision issued Yet | 2 |
| **6.** | **Total** | **20** |

[22] In previous Status Reports, we reported closed audits based on the number of Settlement Class Members who had been removed from Audit. We have updated Table 14 to instead report on the status of our Audits of individual claims, which increased the total number of closed audits from 997 to 1,120 as of 9/14/20.

[23] On 7/2/20, 32 Retired NFL Football Players whose claims had been denied in Audit objected to the Special Masters' decision and sought review by the Court. On 12/18/20, the Court approved the Special Masters' ruling and upheld the denial of these denials without prejudice (Document Number 11255).

**19.** ***Audit Proceeding Decisions.*** We have denied 372 claims after Audit based on decisions by the Court or Special Masters.[24] Sections 6 and 8 (Row 17) of the Summary Report on the Settlement Website show these denials. A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors. We have received 79 new claims submitted by Settlement Class Members following an Audit Denial, of which 15 have been paid or are in the payment process.

**20.** ***Ongoing Audit Investigations.*** We have other Audit investigations underway affecting 19 Monetary Award claims (26 less than the number we reported in Status Report No. 10). Of these, 11 are subject to two group investigations of claims with similar characteristics and eight are individual claims.

**21.** ***Claims Investigated More than Once.*** Claims on which we have concluded an Audit may be the subject of another Audit if we later learn of information that requires further investigation. We notify Settlement Class Members when this happens. We have audited 92 Monetary Award claims more than one time (one more than the number we reported in Status Report No. 10); the most times a Monetary Award claim has been audited is twice.

---

[24] Of the 372 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims). Six individual Retired NFL Football Players' claims have been denied. The Special Masters directed us to deny 170 claims based on their findings related to the Special Investigator's investigation of a law firm. We denied the remaining claim for failing to cooperate with our requests for information during an Audit.

## VI. DERIVATIVE CLAIMANTS

**22.** ***Derivative Claims.*** We have received 594 Derivative Claim Packages (an increase of one since Status Report No. 10). Table 16 shows the status of these claims:

| **Table 16** | **DERIVATIVE CLAIMS** | | |
|---|---|---|---|
| | **STATUS** | **HOW MANY** | **% OF TOTAL** |
| 1. | Paid Derivative Claimant Award ($944,128.85[25]) | 214 | 36% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($10,728.15) | 2 | <1% |
| 3. | Denied – Associated Retired NFL Football Player's Claim Denied | 46 | 8% |
| 4. | Denied – No Timely Claim for Associated Retired NFL Football Player | 42 | 7% |
| 5. | Denied – No Timely or Proper Registration for Associated Retired NFL Football Player | 34 | 6% |
| 6. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 7. | Denied – Deceased Derivative Claimant | 4 | 1% |
| 8. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 9. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 3% |
| 10. | Withdrawn | 8 | 1% |
| 11. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 215 | 36% |
| **12.** | **Total** | **594** | |

Since Status Report No. 10, three more Derivative Claimants were paid, and we issued a Notice of Derivative Claimant Award to one new Derivative Claimant. We have paid 99% of the 216 Derivative Claimants who received Notices of Derivative Claimant Award; one eligible Derivative Claimant who has not yet been paid is in the payment process. We did not receive a timely objection from any of the 158 Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

[25] This includes $724.85 for a Supplemental Derivative Claimant Award payment issued to a Derivative Claimant who was previously paid an initial Derivative Claimant Award.

**23.** ***Additional Derivative Claimant Details.*** We received challenges from 29 Retired NFL Football Players (or their Representative Claimants) to 41 Derivative Claimants (no change since Status Report No. 10); 19 (46%) of those 41 challenged Derivative Claimants are not eligible for a Derivative Claimant Award because they never submitted a timely Derivative Claim Package. We have issued a Notice of Derivative Claim Package Submission Deadline to 454 registered Derivative Claimants. Table 17 summarizes their claim submission statuses and the changes since Status Report No. 10:

| **Table 17** | **CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE** | | | | | | |
|---|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** |
| 1. | Claim Submitted | 152 | 153 | +1 | 34% | 34% | 0% |
| 2. | No Claim Submitted | 298 | 301 | +3 | 66% | 66% | 0% |
| 3. | Within 30-Day Deadline | 1 | 0 | -1 | <1% | 0% | -<1% |
| **4.** | **Totals** | **451** | **454** | **+3** | | | |

**24.** ***Supplemental Derivative Claimant Awards.*** Section G of the Overview of Derivative Claimant Process on the Settlement Website (https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf) explains how Supplemental Derivative Claimant Awards are handled. As discussed in Paragraph 9 of this Status Report, we issued Notices of Supplemental Monetary Award to nine Retired NFL Football Players. Six Retired NFL Football Players had no registered Derivative Claimants associated with them, and two Retired NFL Football Players each had one registered Derivative Claimant, but neither Derivative Claimant submitted a Derivative Claim Package to share 1% of the Retired NFL Football Player's earlier Monetary Award and was not eligible for any portion of that Player's Supplemental Monetary Award. The

ninth Player's Supplemental Monetary Award Notice had a 1% offset for potential Derivative Claimant Awards, which has been paid to an eligible Derivative Claimant.[26]

## VII. OTHER CLAIM PROCESSES

**25.** ***Handling of Attempted Assignments of Claims.*** On September 27, 2019, the Court issued a Notice (Document 10858) directing us to streamline the process regarding attempted assignments by Settlement Class Members of claims to third-party lenders. At that time, we suspended the process for handling such assignment questions under the Rules Governing Assignment of Claims and worked with the Court and the Special Master to modify these Rules. On March 19, 2020, the Special Masters adopted the Rules Governing Payment of Claims Involving Third-Party Funders and the Rules Governing Third-Party Funding Resolution Protocol, which superseded the previous Rules (collectively, the "New Payment Rules"). Under the New Payment Rules Governing Payment of Claims Involving Third-Party Funders, all Settlement Class Members must complete and submit a Sworn Statement regarding the Status of Assignment of Monetary Claim ("SWS-5") to receive payment. There are two versions of the SWS-5, one for those identified as a borrower by a Third-Party Funder that is participating in the Rules Governing Third-Party Funding Resolution Protocol ("Resolution Protocol") (the SWS-5(A)) and another for those not so identified (the SWS-5(B)). As of January 4, 2021, 21 Third-Party Funder entities are participating in the Resolution Protocol. We have worked with those participating funders to resolve cash advances for 14 Settlement Class Members since the adoption of the New Payment Rules.

[26] See Row 1 of Table 16 in this Status Report.

**26.** ***Petitions for Deviation from the Attorneys' Fee Cap.***[27] We have received seven Petitions for Deviation, one of which was withdrawn. The Court resolved two of the remaining six Petitions for Deviation in conjunction with the Attorneys' Liens Dispute Process; one Court decision on a Petition in the Attorneys' Liens Dispute Process was appealed and recently upheld by the Third Circuit. The other three Petitions are pending final resolution.

**27.** ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a) Table 18 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 10:

| **Table 18** | **NON-MEDICAL LIENS SUMMARY** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** |
| 1. | Attorneys' | 1,224[28] | 1,244[29] | +20 | 466 | 474 | +8 | 280 | 273 | -7 |
| 2. | Child Support | 347 | 348 | +1 | 50 | 51 | +1 | 20 | 21 | +1 |
| 3. | Judgment | 64 | 64 | 0 | 15 | 15 | 0 | 8 | 8 | 0 |
| 4. | Tax | 55 | 55 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| **5.** | **Totals** | **1,690** | **1,711** | **+21** | **534** | **543** | **+9** | **308** | **302** | **-6** |

[27] Judge Brody entered a Memorandum and Order in April of 2018 limiting attorneys' fees in the Program to 22% of each SCM's Monetary Award, plus reasonable costs (ECF Nos. 9862 and 9863). In the Memorandum, the Judge decided that attorneys should have the opportunity to petition the Court to go above and beyond the cap in exceptional circumstances, which is what the Petitions for Deviation process is meant to cover.

[28] These 1,224 Attorneys' Liens were asserted by 53 law firms.

[29] These 1,244 Attorneys' Liens were asserted by 53 law firms.

(b) Table 19 shows the status of Liens in the Attorneys' Liens dispute resolution process:

| Table 19 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[30] | | |
|---|---|---|---|
| PENDING | RESOLVED | | TOTAL |
| | BY AGREED WITHDRAWAL | BY COURT DETERMINATION | |
| 16 | 86 | 12 | 114 |

(c) Table 20 breaks down the Non-Medical Lien holdbacks[31] by Lien type:

| Table 20 | NON-MEDICAL LIEN HOLDBACKS | | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN HOLDBACKS |
| 1. | Attorneys' | 8 | $7,345,962.17 | $1,370,288.45 |
| 2. | Child Support | 3 | $1,374,043.23 | $232,976.90 |
| 3. | Judgment | 1 | $3,192,046 | $229,733.96 |
| 4. | Tax | 0 | N/A | N/A |
| **5.** | **Totals** | **12** | **$11,912,051.40** | **$1,832,999.31** |

(d) Table 21 summarizes the Non-Medical Lien payments by Lien type:

| Table 21 | NON-MEDICAL LIEN PAYMENTS | | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN PAYMENTS |
| 1. | Attorneys' | 88 | $102,309,211.94 | $6,925,224.74 |
| 2. | Child Support | 13 | $11,495,196.75 | $493,427.19 |
| 3. | Judgment | 5 | $5,802,161.20 | $2,867,886.18 |
| 4. | Tax | 1 | $33,282.80 | $6,492.65 |
| **5.** | **Totals** | 107 | $119,639,852.69 | $10,293,030.76 |

[30] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.
[31] The holdbacks are the amount of funds we are withholding pending resolution of a Dispute. As of 1/4/21, there are 16 disputed Attorneys' Liens currently pending resolution by Judge Strawbridge where the Settlement Class Member has received payment of the rest of his Monetary Award. After the Court enters a final order (whether by Judge Strawbridge or Judge Brody's approval of his Report and Recommendation) resolving the Disputes and any appeal period passes, we disburse the held back funds on the next available monthly Disbursement.

## VIII. COMMUNICATIONS CENTER FOR THE PROGRAM

**28.** ***Our Contact Activity.*** Since our contact center opened on February 6, 2017, we have handled 82,316 total communications, including 52,134 calls made or received and 26,126 emails to us at our Claims Administrator email box. Since Status Report No. 10, we handled 1,380 such total communications. The most common topics of these communications have been General Settlement Information, Audit, Payment, Baseline Assessment Program (BAP) and MAF Physicians.

**29.** ***Law Firm Contacts.*** Our Law Firm Contacts are assigned to 553 different law firms or lawyers representing Settlement Class Members in the Program. This is two more law firms or lawyers than we reported in Status Report No. 10. The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 28 above.

**30.** ***Insights Newsletters.*** Since Status Report No. 10, we issued three more editions of our "Insights" newsletter (October 2020, November 2020 and December 2020). Starting in the first quarter of 2021, we will issue the Insights newsletters on a quarterly basis. We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail. We also post them to the Settlement Website (under "Documents" click "Newsletters"). We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters.

**31.** ***Settlement Program Website.*** We regularly update the Settlement Website to reflect progress and changes to the Program. We have made these changes since Status Report No. 10:

(1) Posted a Report of the Special Masters (Document 11199, filed October 1, 2020), Claims Administrator Status Report No. 10 (Document 11198, filed October 1, 2020) and BAP Administrator Status Report 3rd Quarter 2020 (Document 11197, filed October 1, 2020) to the Status Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.

     (2) Added a new Audit category on the Published Court Decisions page to house decisions made by the Court addressing findings made by us and the Special Masters through the Audit process (under "Documents" select "Court" under "Published Decisions" and then click the Audit button). There is one decision posted to this new page, dated December 18, 2020.

Since Status Report No. 10, the Program's Home page has had 53,925 more unique visits, giving us 556,389 total unique visits, coming from 190 countries and all 50 of the United States. The top five downloaded documents since Status Report No. 10 in September 2020 were the Settlement Agreement (551clicks), Monetary Award Grid (145 clicks), Diagnosis and Review Table (79 clicks), Exhibit 1 Injury Definitions (54 clicks) and Payment Process Timeline (32 clicks). The three most frequently visited pages were Published Special Master Decisions – Monetary Award Claims (1,271 unique views), Physician Search (1,130 unique views), and Reports and Statistics (920 views).

## IX. SPECIAL MASTERS

**32.** ***Our Work with the Special Masters.*** Since Status Report No. 10, we continue to have regularly scheduled calls to discuss policy and operational issues, and have held 101 such calls with the Special Masters to date. We have many other calls and exchange countless emails with them to address issues as they arise. The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

**33.** ***Program Rules.*** Since Status Report No. 10, we have not posted any new or revised sets of Rules. There are 10 sets of Rules available on the Settlement Website (under "Documents," click "Governing Rules") and on the online portals of law firms, lawyers and *pro se* Settlement Class Members.

**34.** ***Published Decisions.*** Since Status Report No. 10, the Special Masters have issued eleven new decisions they designated for publication.[32] These decisions dated September 29, 2020, through December 15, 2020, all relate to issues that affect how we analyze claims for Monetary Awards. We post all such rulings to the Settlement Website (under "Documents" select "Special Master" under "Published Decisions" and then click the Monetary Award Claims button). The Special Masters have so far issued 27 published Monetary Award appeal decisions and nine Audit decisions (36 total such decisions).

## X. PROCEDURES AND FREQUENTLY ASKED QUESTIONS

**35.** ***Frequently Asked Questions.*** Since Status Report No. 10, we added these eight new FAQs (two under Monetary Award Claims and six under Special Master Appeal Decisions):

(a) FAQ 118 ("Is a biomarker test (such as an amyloid PET, spinal fluid test) enough to establish my Qualifying Diagnosis of Alzheimer's Disease?");

(b) FAQ 120 ("Are auxiliary tests, including biomarker tests, enough to establish my Qualifying Diagnosis of Parkinson's Disease?");

(c) FAQ 365 ("Can new evidence or records, not considered by my physician, that show behavior or activity occurring before my Qualifying Diagnosis result in a Denial of my Claim?");

(d) FAQ 366 ("Can new evidence or records, not considered by my physician, that show behavior or activity occurring after my Qualifying Diagnosis result in a Denial of my Claim?");

(e) FAQ 367 ("Does my evaluating physician have to address my medication side-effects or other conditions when deciding whether I have a Qualifying Diagnosis?");

(f) FAQ 368 ("If my performance on validity test measures is determined to invalidate my neuropsychological testing, can that testing support a Qualifying Diagnosis?");

---

[32] On October 28, 2020, the Special Master issued contextually similar decisions on deviation from BAP Criteria for six claimants, One of the six decisions appears on the Settlement Website.

(g) FAQ 369 ("When will the Claims Administrator apply the Stroke offset?"); and

(h) FAQ 370 ("Can one diagnosis be used as proof that a Player had a different Qualifying Diagnosis?").

We also made substantive revisions to these four existing FAQs in the Monetary Awards category:

(a) FAQ 117 ("What must the medical records show for Alzheimer's Disease?");

(b) FAQ 119 ("What must the medical records show for Parkinson's Disease?");

(c) FAQ 121 ("What must the medical records show for Death with CTE?"); and

(d) FAQ 139 ("Can I receive a Monetary Award for more than one Qualifying Diagnosis on the same claim?").

There now are 370 FAQs in 17 categories.  "FAQs" is one of the options in the green menu bar on the Settlement Website.  These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program.  The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs.  Note that when we add new FAQs, we place them within the existing set where it makes the most sense.  This means that the numbering of FAQs within the set may change from time to time.

## XI.     REGISTRATION

**36.     *Registration Submissions.***

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover Registration.  Table 22 here shows changes in the number of timely Registration submissions since our Status Report No. 10:

| Table 22 | TIMELY REGISTRATION SUBMISSIONS | | | |
|---|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,897 | 15,889 | +2 |
| 2. | Representative Claimants | 1,346 | 1,354 | -2 |
| 3. | Derivative Claimants | 3,313 | 3,313 | 0 |
| **4.** | **Totals** | **20,556** | **20,556** | **0** |

The number of Representative Claimants (Row 2) went down by two from Status Report No. 10 because they were replaced by Retired NFL Football Players. Of the 20,556 to whom we issued Registration notices, we were able to confirm that 19,395 of them are Settlement Class Members under the Settlement Agreement, 12,837 of whom are Retired NFL Football Players eligible to participate in the BAP. The other 1,161 persons are not Settlement Class Members under the Settlement Agreement because of one or more of these reasons: (1) they were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not provide us with the information or support required by the Settlement Agreement to register, after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a Derivative Claimant but did not have a relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals. We have made determinations on 293 such Registrations and found that 158 (54%) of them presented good reasons to be allowed to register after August 7, 2017. Table 23 shows the change in these numbers since Status Report No. 10:

| Table 23 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | **STATUS** | **AS OF 9/14/20** | **AS OF 1/4/21** | **CHANGE** |
| 1. | Accepted | 158 | 158 | 0 |
| 2. | Not Accepted | 134 | 135 | +1 |
| **3.** | **Totals** | **292** | **293** | **+1** |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge. The NFL Parties also may challenge our good cause exception decisions. We have received 378 challenges, which is the same number we reported in Status Report No. 10. Table 24 explains these challenges and what happened to them:

| Table 24 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | **ISSUE** | **HOW MANY** | **WHO CHALLENGED** | **CHALLENGE SUCCESSFUL** | **CHALLENGE NOT SUCCESSFUL** |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 245 | Settlement Class Member | 77 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 23 | Settlement Class Member | 5 | 18 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| **7.** | **Totals** | **378** | | **150** | **228** |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters. Table 25 shows the appeals thus far and the Special Masters' rulings on them (no changes since Status Report No. 10):

| Table 25 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | **ISSUE** | **HOW MANY** | **WHO APPEALED** | **DECISION UPHELD** | **DECISION OVERTURNED** |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 6 | Settlement Class Member | 5 | 1 |
| **5.** | **Totals** | **36** | | **33** | **3** |

**37.** ***Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.*** The Special Masters have approved 426 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants. There have been three new Representative Claimant approvals and no new Derivative Claimant Representatives since Status Report No. 10.

## XII. CONCLUSION

**38.** ***General Status.*** We have 202,289 document files (21,322 gigabytes, or 21.3 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 3,320 more than when we filed Status Report No. 10. We have issued 38,174 notices (95 more since Status Report No. 10) of various kinds (Registration, claims, appeals, Audit, etc.) to 20,983 different persons since March 23, 2017, and developed over 100 different types of notices and forms for use in the Program.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By: /s/ Roma Petkauskas
Roma Petkauskas
Virginia State Bar No.: 71357
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
Telephone: (804) 521-7218
Facsimile: (804) 521-7299
Email: rpetkauskas@browngreer.com