**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                                          Plaintiffs,<br>     v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>                                          Defendants.<br><br>THIS DOCUMENT RELATES TO:<br><br>Locks Law Firm v. SPID 100002295 (D.C.)<br>Attorney Lien Dispute Case No. 01541 | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                                      January 29, 2021

**I.    INTRODUCTION**

Presently before the Court in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Locks Law Firm ("Locks") against the Award granted to their former client, Settlement Class Member D.C. ("Player"), in the litigation that became part of this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.). By its lien, Locks Law seeks reimbursement of its costs and payment of attorneys' fees of 20% of the Award that has been authorized for Player. By his current counsel, Langfitt Garner PLLC ("Langfitt"), Player challenges the Lien given that Langfitt also seeks a contingent fee for its work in representing him. That work, which Player agreed would

be compensated also with a contingent fee of 20% of any monetary award he received, involved Langfitt responding to requests for additional information and an audit of the claim, ultimately resulting in approval of the sought-after monetary award.  The parties consented that my ruling on this matter should represent the final determination of the district court.

As we set out in past opinions, our evaluation of these positions involves a consideration of the contingent fee agreements ("CFAs") between Player and his counsel and an assessment of the reasonableness of the requested fees of both law firms in light of the analysis set out by the Third Circuit's *McKenzie* decision.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach obligates us to scrutinize the reasonableness of the CFA at the time of the signing and then determine whether the circumstances compel a different evaluation of the agreement at the time the lienholder seeks enforcement.  We will then examine the results Player obtained, the quality of the representation provided by each firm, and most importantly the extent to which the efforts of the lienholder firm substantially contributed to the result obtained while the client was represented by current counsel. *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.  Ultimately, we conclude that both firms are entitled to recoup attorney's fees, with the slightly larger portion allocated to Langfitt for its work curing deficiencies in the claim submitted by Locks and for guiding the client through a challenging claim and audit process.

II.     **FACTS AND PROCEDURAL HISTORY**

Player entered into a CFA with Locks in February 2018 for representation in the NFL

Concussion Settlement, for which he had been registered by prior counsel.[1]  Under the terms of the fee agreement, and contingent upon Player obtaining a recovery, Locks would charge a fee of 20% of the net recovery.

Locks promptly set to work to develop the claim.  It obtained a third-party statement from Player's fiancée concerning her observations of Player's level of functioning.  It also assumed the financial responsibility for Player to undergo BAP testing with neuropsychologist Joanne M. Hamilton, Ph.D.  Following her assessment conducted on July 12, 2018 and her review of historical medical records provided by counsel, Dr. Hamilton issued a report on July 31, 2018 supporting a diagnosis of Level 1.5 Neurocognitive Impairment.  (SCM Stmt. of Disp. Ex. 5.)  Player then saw neurologist Gilbert J. Ho, M.D., who evaluated him over two sessions on July 20, 2018 and September 15, 2018 and sent him for an MRI.  Dr. Ho assigned a diagnosis only of Level 1 Neurocognitive Impairment, which would not qualify Player under the settlement program.  Player returned on November 5, 2018 and Locks provided Dr. Ho additional materials concerning Player's history, but Dr. Ho did not issue a new diagnosis.  (LH Stmt. of Disp. Ex. G.)  Locks then arranged to have Player re-evaluated through the MAF program with neurologist Jonathan Mueller, M.D.  Locks provided him Dr. Hamilton's report and other materials pertinent to the claim. Following his February 5, 2019 neurological examination, which included an interview of Player's fiancée, and with the benefit of Dr. Hamilton's test results from the previous summer, Dr. Mueller produced a report on February 19, 2019 endorsing a diagnosis of a Level 1.5 Neurocognitive Impairment. On March 21, 2019, Dr. Mueller certified his diagnosis and uploaded to the Settlement Claims Portal his report and the pertinent materials provided by Locks, including

---

[1] Prior counsel has not filed a lien in this case or otherwise sought approval to collect a fee based on a contingent fee agreement with Player.  According to the parties, Player terminated his relationship with that firm in December 2017 and proceeded *pro se* until he retained Locks.

the fiancée's statement. Locks incurred costs for these evaluations by Dr. Hamilton and Dr. Mueller, as well as costs associated with Dr. Ho's study and review earlier.

On April 2, 2019, Locks filed the claim on Player's behalf seeking a monetary award based upon the qualifying diagnosis, Level 1.5 Neurocognitive Impairment that Dr. Mueller had identified. Very shortly thereafter, the Claims Administrator issued a Notice of Preliminary Review. The April 5, 2019 notice advised that the claim did not contain sufficient evidence of impairment in the particular cognitive domains set forth in the Settlement Agreement for an award as a Level 1.5 Neurocognitive Impairment. Player was required to respond by August 5, 2019.

During this time, the work on Player's claim was handled at Locks principally by attorney David Langfitt. On June 7, 2019, while the response to the Notice of Preliminary Review was still pending, David Langfitt left Locks and on June 10, 2019 joined a new firm he had set up, Langfitt Garner. His paralegal also joined him. Player was notified of this development and chose to switch to Langfitt. Player and Langfitt entered into a CFA on July 30, 2019 that provided for a 20% attorney's fee. In light of its termination as counsel in a case in which it had not yet collected a fee, Locks promptly filed a Notice of Lien on August 2, 2019 seeking reasonable attorney's fees and costs for its work on behalf of Player.

Langfitt was granted an extension of time on behalf of Player for the filing of a response to the Notice of Preliminary review. The firm provided additional medical records to the Claims Administrator on September 3, 2019 (SCM Stmt. of Disp. Exs. 8-13) but received another such Notice on October 4, 2019, again pointing to deficiencies in the documentation of a decline in particular cognitive domains. (*Id.* Ex. 14.) By this second notice, the Claims Administrator also asserted that the report that had been submitted from neurologist Dr. Mueller failed to include sufficient explanation for his diagnosis. The Claims Administrator independently contacted Dr.

Mueller and provided him the additional records submitted by Langfitt. It obtained from Dr. Mueller a three-page addendum dated October 10, 2019 that gave context to the additional records submitted by Langfitt and addressed the concerns about evidence of cognitive decline. (*Id.* Ex. 15.)

After the response to the second Notice of Preliminary Review had been filed, the Claims Administrator issued a Notice of Audit as to the claim on October 28, 2019. The audit required Player, through Langfitt, to provide answers to written questions concerning his cognitive condition, his activities of daily living, and the circumstances of his claim; to identify healthcare providers and execute HIPAA releases for their records; to complete an employment history form; and to authorize release of his records pertaining to an application for disability benefits. He accomplished those tasks in early November 2019, with the assistance of his fiancée. The following month, counsel also provided several years of his tax returns in order to address the question of his employment history. (*Id.*, Exs. 17-18.) Following the audit process, a Notice of Award was issued on February 14, 2020, approving a Monetary Award to Player based upon Dr. Mueller's diagnosis.

In light of the attorney lien and the contingency fee agreements of record, the Claims Administrator withheld from Player's award funds for payment of attorney fees in an amount equal to 22% of the Monetary Award that was approved on February 14, 2020. This percentage reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2018 Opinion and Order. (Doc. No. 9863.) Of the attorney fee withholding, a portion reflecting 5% of the Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund ("AFQSF") pursuant to the Court's June 27, 2018 Order Regarding Withholdings for the Common Benefit Fund. (Doc. No. 10104.) Those funds may be distributed at a later date upon further order(s) of Judge Brody.

The Claims Administrator also withheld the amount of costs asserted by Locks in its Notice of Lien.

Pursuant to a briefing schedule we issued through the Claims Administrator, and in accordance with the Lien Rules, both law firms submitted simultaneous Statements of Dispute on June 10, 2020 concerning their entitlement to a fee in light of the other firm's CFA or attorney lien. Each submitted a Response to the other's filing on June 26, 2020. Pursuant to Lien Rule 17, the Record of Dispute was then referred to us for a determination as to the appropriate distribution for the attorney fees currently available for disbursement (representing 17% of Player's Award) and the allocation of those funds that are currently held in the AFQSF (representing 5% of Player's Award), if those funds, or a portion thereof, are distributed by the Court at a future date.

### III.  THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in this class action settlement did not relieve attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees, whether through a lien or otherwise, are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*. *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

6

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based. We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

## IV. DISCUSSION

Langfitt contends that it should be paid "significantly more than Locks," in that Langfitt's "well-documented work enhanced and finalized the Claim, defended the Claim, and created the fund." (SCM Stmt. of Disp. at 5.) It notes that it did extensive work after the claim was filed and that Locks "did not spend nearly as any hours as Langfitt and did not face the scrutiny of an intensive audit" nor perform "the detailed analytical work Langfitt performed in the claims and audit process." (*Id.* at 5-6.) While we do not mean to diminish the work done by Locks, as we outline within, we ultimately conclude that the work performed by Langfitt warrants a larger share of the fee derived from Player's award.

### A. **The CFAs at the time of contracting and enforcement – impact of any changed circumstances**

When we assess the reasonableness of the contingent fee arrangements at the time Player

entered into them with each firm, we examine: (1) the legal challenges in his pursuit of a monetary award and (2) the time-intensive nature of the representation. We then compare the landscape at the time of contracting with the circumstances at the time the Locks attorney-client relationship terminated. These considerations also factor into our conclusion that the total fee to be divided between these two firms is 20% of Player's award and not the presumptive cap of 22%.

### 1. *Locks Law*

When Locks Law agreed to represent Player in February 2018 with a contingent fee of 20%, the settlement had already been finally approved, Player had already decided not to opt out, and he was registered in the program. At this stage, counsel faced none of legal challenges that were hallmarks of the litigation years earlier, such as the prospect of defenses including preemption and the need to establish causation. Risk as it related to overall workload had also decreased by this point. Thanks to the settlement, counsel no longer risked having to pursue the entire case themselves, perhaps even through trial. The primary risk undertaken by Locks was the expenditure of time and outlay of funds for the examinations of Player that would enable it to submit the claim in April 2019.

### 2. *Langfitt Garner*

When Langfitt took over the representation of Player on July 30, 2019, the posture was somewhat similar to when Locks agreed to represent Player, in that the major risks in terms of liability and the class-wide defenses the NFL could assert had been alleviated. Locks had made the outlay of expenses for the initial claim submission, although the claim was facing scrutiny by the Claims Administrator. As Langfitt personnel were aware from their personal involvement in Player's representation at Locks, additional documentation had been called for by the Claims Administrator on April 5, 2019 and this material was still outstanding. Thus, when Langfitt

8

assumed representation of Player, it could anticipate work to be done to shore up the pending claim application.  It would also have known that any award it might secure for Player could be subject to appeal by the NFL or that the claim may be subject to audit.  The fact that it would have had to engage in significant efforts and perhaps advance costs for any additional examinations that might be necessary to secure the award for Player was a clear and present risk.  There were no significant changes in the circumstances as to risk factors during the time between when Langfitt agreed to represent Player and when it sought to enforce its contingent fee agreement upon the approval of his award.

### B.  The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the attorneys' efforts in bringing about the result.  The claim that ultimately led to a Monetary Award on February 14, 2020 was filed on Player's behalf by Locks.  The qualifying diagnosis identified in the award notice was certified by Dr. Mueller on March 21, 2019 following his examination on referral from Locks.  Ultimately, Player was approved for an award consistent with the qualifying diagnosis sought by Locks and based upon the work of Locks over the prior 13 months to put Dr. Mueller in a position to render that diagnosis.  The award was not approved, however, until after Langfitt responded to the notices of preliminary review and shepherded Player through an audit.  It was only at the conclusion of that process that Player held an award, which the NFL did not challenge on appeal.

### C.  The quality of the work performed

The open question here concerns the extent to which Langfitt may share the credit for the award that was finally approved on February 14, 2020.  Langfitt suggests that the claim that Locks

9

filed on behalf of Player in 2019, although ultimately approved, was not well-constructed to achieve a prompt award based upon Dr. Mueller's March 2019 certification.  It notes that the Claims Administrator quickly identified deficiencies in Dr. Mueller's report and the requisite evidence for this diagnosis.  As a result, Langfitt negotiated the preliminary review and the somewhat precarious audit process that was required to secure an award under these circumstances.  For its part, Locks does not dispute that Langfitt performed necessary tasks for Player when it assisted him in responding to the notices seeking further information concerning the claim submission.  It characterizes those tasks, however, as more administrative than legal or strategic.  As is demonstrated in our discussion below, we find that both firms played a positive role and provided quality work on behalf of Player and in accordance with the demands of the claims process.

        D.       **<u>The substantiality of the work performed</u>**

Given the similar posture of each firm when they took on the representation and the fact that the award sought by Locks in the claim filed on April 2, 2019 was achieved during the representation of Langfitt, the resolution of this dispute largely turns on the question of how the two firms contributed to the work necessary to obtain the award.  Locks can point to the fact that the award was based upon examinations that it arranged for Player and from the claim that it submitted.  Langfitt, however, characterizes Locks Law's contribution as more administrative and formulaic, while it argues it performed work necessary to cure the deficiencies in Locks' work and to navigate potential setbacks in the claims process. We therefore lay out the efforts undertaken by both firms in the various aspects of their representation to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.

As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

(1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;

(2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;

(3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;

(4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,

(5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,

(6) support of clients who were seeking loans and were exposed to predatory lending practices; and

(7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories, and there may be other categories of tasks undertaken or services provided by IRPAs that would be relevant to this analysis. In the absence of any suggestion of other relevant criteria, we will use these categories as checkpoints as we consider the substantiality of the IRPA's efforts and the role each may have played in maximizing Player's award.

### (1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date

Any work associated with review of historical medical records would have been performed by Locks. Locks also undertook the arrangements for Player to be evaluated by appropriately-credentialed neuropsychologists and neurologists who could justify the diagnosis of a condition to

qualify him for a monetary award. Locks appears to have undertaken that work promptly, in that Player was examined by these providers within five months of when the firm was retained. Ultimately it took a second neurology examination, on February 5, 2019, before a Level 1.5 neurocognitive impairment condition could be attributed to Player in the MAF Diagnosing Physician Certification form that Dr. Mueller completed March 21, 2019. No party has suggested that Locks did not take necessary actions to ensure the identification of a qualifying impairment for Player at the earliest possible date.

Ultimately, the Claims Administrator identified a deficiency in the claim packet, advising Player that he may wish to provide additional information demonstrating the requisite cognitive decline in particular cognitive domains. While a response was not *required* for his claim to be evaluated, he was given the opportunity to gather the requested information or documents and submit them before his claim was considered. (LH Stmt. of Disp. at Ex. K.) Upon assuming responsibility for Player's representation, Langfitt obtained an extension of time to do this, obtained earlier medical records that would help to establish a decline, and on October 4, 2019 provided the records and an explanatory letter to demonstrate that Player met the criteria for this impairment. Langfitt also provided those records to the diagnosing neurologist, Dr. Mueller, so that he was in a position on October 10, 2019 to incorporate those records into a three-page letter describing Player's neurocognitive decline, with specificity. Langfitt provided this letter to the Claims Administrator on October 14, 2019. Player's claim received final approval in February 2020.

> **(2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial**

This factor is not pertinent as to this attorney fee dispute. By the time this work was performed, Player was participating in the claims process arising from the settlement of the litigation. He would not be taking his claim to trial.

> **(3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted**

This factor does not appear to pertain to the work of either of the firms.

> **(4) Support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class**

Again, this factor is not relevant as to the attorney fee dispute arising from the representation between 2018 and 2020, when Player was already registered in the settlement.

> **(5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award**

This responsibility was shared by both firms. Locks Law filed the claim and requested an award based upon the testing and evaluation of Drs. Hamilton and Mueller. It had not responded to the Claims Administrator's April 5, 2019 Notice of Preliminary Review before Player changed representation. Accordingly, it fell to Langfitt to "shepherd" Player through the decisionmaking as to how to respond to that notice. After providing further evidence, Langfitt then accompanied Player through an audit, which included Player's responses to a series of questions from the Claims Administrator, an interview of Player's fiancée, as well as the acquisition and submission of additional records concerning his employment history and other documentary support for his averments concerning his activities of daily living.

> **(6) Support of clients who were seeking loans and were exposed to predatory lending practices; and**

This factor does not appear to apply to Player for the time period at issue.

> **(7) Providing necessary support in other personal matters**

13

>  **collaterally related to this litigation**

Langfitt has been counseling Player concerning his suitability for benefits under the NFL's "88 Plan." (SCM Resp. at 5.)

### E.   Apportionment

We understand Locks' view about the primacy of its work in arranging for Player to be seen by the doctors who could conduct the proper testing and offer credible opinions concerning his impairment. That required the firm to engage in an outlay of time and expense. Some of that work had to be repeated, however, during the Langfitt representation in order to get through the claims process. Additional records had to be gathered, presented to the Claims Administrator, and reviewed by Dr. Mueller to meet the settlement program's evidentiary and diagnostic requirements for the Level 1.5 neurocognitive impairment. Dr. Mueller was required to compose an addendum to his earlier report. Player and his fiancée were subjected to testing of their statements thorough a searching audit process, with enough at stake that separate counsel was consulted. While Locks would not be in a position to measure the investment of time by Langfitt, nor the significance of Langfitt's work to the ultimate approval of the award, we can. We will apportion 55% of the attorney fee to Langfitt.

### F.   Costs

Locks Law seeks reimbursement of the $6,923.95 it incurred in costs for the neuropsychological testing performed by Dr. Hamilton in 2018, for evaluation at Dr. Ho's Pacific Center for Neurological Disease in 2018, the examination and report of Dr. Mueller in 2018, and postage and delivery costs in 2019. Player's CFA with Locks Law provided that he would reimburse the firm for expenses of this nature from any award that he received. The costs for

which Locks Law seeks reimbursement were reasonably incurred and must be awarded to Locks Law. Langfitt Garner does not seek reimbursement for costs.

## V. CONCLUSION

The work performed by Locks Law during the claim development and filing stages played an important role in preserving the possibility of a Level 1.5 Neurocognitive Impairment award. Further work was required to achieve that result, however, and that work was performed by Langfitt. Langfitt also weathered periods of uncertainty from the beginning of its stewardship of the claim in July 2019, with the claim facing detours following only a preliminary review, and then through an audit process. Langfitt did what was necessary to see this claim through to a successful conclusion. We conclude that a fair resolution of this dispute is to award IRPA fees to be apportioned between Locks Law and Langfitt Garner such that the two firms share a total fee of 20% of the client's award, with 45% of the fee allocated to Locks and 55% allocated to Langfitt. Locks is authorized to be reimbursed for its costs. The remaining funds withheld for counsel fee, based on the Claims Administrator having withheld counsel fee based upon the 22% presumptive cap, and which have not been authorized for either firm as set forth above, may be refunded to Player.

The Claims Administrator shall reduce the disbursements in light of the 5% holdback and shall apportion the holdback funds between Locks Law, Langfitt Garner, and Player in the proportion set forth above.

An appropriate Order follows.

BY THE COURT:


 /s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE