## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Locks Law Firm v. SPID 100016274 (E.W.)<br>Attorney Lien Dispute<br>(Lien Case No. 01596) | |

## <u>MEMORANDUM OPINION</u>

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                         February 19, 2021

## I.    INTRODUCTION

Presently before the Court in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Locks Law Firm ("Locks") against the Award granted to their former client, Settlement Class Member No. 100016274, E.W. ("Player"), in the litigation that became part of this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).   By its lien, Locks Law seeks reimbursement of its costs and payment of attorneys' fees of 22% of the Award that has been authorized for Player.   By his current counsel, Langfitt Garner PLLC ("Langfitt"), Player

challenges the Lien, given that Langfitt also seeks a contingent fee for its work in representing him.  That work, which Player agreed would be compensated with a contingent fee of 20% of any monetary award he received, involved the filing of a new claim that ultimately resulted in approval of the sought-after monetary award.  The parties consented that my ruling on this matter will constitute the final determination of the district court.

As we set out in past opinions, our evaluation of these positions involves a consideration of the contingent fee agreements ("CFAs") between Player and his counsel and an assessment of the reasonableness of the requested fees of both law firms in light of the analysis set out by the Third Circuit's *McKenzie* decision.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach obligates us to scrutinize the reasonableness of the CFA at the time of the signing and then determine whether the circumstances compel a different evaluation of the agreement at the time the lienholder seeks enforcement.  We will then examine the results Player obtained, the quality of the representation provided by each firm, and most importantly the extent to which the efforts of the lienholder firm substantially contributed to the result obtained while the client was represented by current counsel. *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.  Ultimately, we conclude that Locks's role in this litigation did not justify the percentage award it seeks but rather would entitle it, in our view, to only 15% of the total allocated fee.

## II.      FACTS AND PROCEDURAL HISTORY

Player entered into a CFA with Locks Law on March 14, 2012 for litigation against the NFL for alleged cognitive deficiencies resulting from injuries sustained while playing in the NFL. Under the terms of the fee agreement, and contingent upon Player obtaining a recovery, Locks

would charge a fee of 33.33% of the net recovery.  The firm filed a short form complaint in this district on his behalf in July 2012 pursuant to the Court's Case Management Order No. 2.

For the next several years, Locks was heavily involved in work on behalf of the class, in addition to monitoring the MDL docket and individual filings for its individual clients.  It regularly issued communications to update its client base concerning developments in the litigation and eventual settlement.  The NFL and counsel for the proposed class of retired NFL players ultimately reached a settlement, and following court approval and resolution of appeals, a claims process was established for those players who did not opt out of the settlement.

Leading up to the filing of a claim, Locks arranged for Player to undergo consultative examinations and neuropsychological evaluations in accordance with the requirements of the Settlement.  On November 20, 2015, Player was tested by David Hebda, Ph.D., and then examined by Jon D. Peters, M.D., of Neuroscience Consultants, PLC in Reston, Virginia.  Dr. Peters diagnosed Major Neurocognitive Disorder meeting or exceeding the criteria for a Level 1.5 rating, as well as Alzheimer's Disease.[1]  Locks also obtained a third-party statement from one of Player's friends that captured his observations of Player's diminishing level of functioning.

On April 26, 2017, Locks filed the pre-effective date claim on Player's behalf seeking a monetary award based upon the Alzheimer's Disease diagnosis that Dr. Peters had identified on November 20, 2015.  The evaluation of this claim did not go smoothly, and on February 13, 2018, the Claims Administrator issued a Notice of Audit of Claim.  Player was required to provide a

---

[1] The parties dispute whether the first such evaluation arranged by Locks was conducted on October 26, 2015 by William Hu, M.D., Ph.D., who was affiliated with the University of Pennsylvania and later Emory University Medical School.  Locks has a record of payment for an evaluation by Dr. Hu relative to Player, but no report from Dr. Hu appears in the record.  Langfitt believes the association of a charge by Dr. Hu to Player's file was a clerical error.  Ultimately, this discrepancy has little impact upon the chronology pertinent to this dispute.

history of his healthcare providers for the prior five years, a history of his employment for the prior five years, and HIPAA authorizations for additional records to be obtained and reviewed.

With the claim still pending in audit, Locks sought further expert opinions as to Player's condition and claim. In October 2018, it provided the reports of Drs. Hebda and Peters to neuropsychologist Allison Myers-Fabian and arranged for evaluations to be conducted by her and John Bertelson, M.D. Locks also made arrangements at that time for genetic testing of Player to evaluate his risk of Alzheimer's Disease. Before any additional reports were produced by these experts or otherwise submitted to the Claims Administrator, however, Player was notified on November 12, 2018 that his claim was denied. The denial notice explained that the Appeals Advisory Panel found that his Alzheimer's Disease diagnosis from Dr. Peters in 2015 was not made in a manner "generally consistent" with the Settlement criteria in that other etiologies identified in the report could have been contributing to Player's alleged poor cognitive functioning. The notice also ruled out an award for a Level 1.5 Neurocognitive Impairment in light of evidence of exaggeration during testing that undermined the validity of the results. In short, the medical observations and neuropsychological testing conducted in 2015 could not support a claim. Player had until December 12, 2018 to appeal the denial of the claim but did not do so.

On June 7, 2019, the attorney who principally handled Player's representation, David Langfitt, left Locks and on June 10, 2019 joined a new firm he had set up, Langfitt Garner. Player was notified of this development and on June 20, 2019 entered into a CFA with Langfitt that provided for a 20% attorney's fee for representation in this settlement claims process. In light of its termination as counsel in a case in which it had not yet collected a fee, Locks promptly filed a Notice of Lien seeking reasonable attorney's fees and costs for its work on behalf of Player. At the time of this change in representation, however, Player did not have a claim actively pending

with the Claims Administrator.

Very soon after this change in representation, Player sought treatment with a local neurologist, Mohammad Kukaswadia, M.D., in the Gwinnett (Georgia) Hospital System. Following an initial evaluation on June 26, 2019 for his complaints of headaches, memory loss, and dizziness, he was referred for various studies and physical therapy, which he underwent in June and July 2019.[2]  Player also apparently was seeing a Dr. Schwartz, a neuropsychologist, during this time.[3]  Langfitt consulted with a number of sources -- including Player's primary care physician, Dr. Kukaswadia, Dr. Schwartz, and Dr. Hu -- regarding the best approach for treatment and for identification of a diagnosis for Player that would qualify him for an award under the Settlement.  Langfitt ultimately decided to pursue an evaluation of Player by Julian A. Bragg, M.D., Ph.D., an MAF-qualified physician.  The firm provided some of Player's medical records to Dr. Bragg and arranged for an evaluation on November 11, 2019.  Dr. Bragg composed a progress note that expressed his view, based on his record review and evaluation, that Player had early onset Alzheimer's Disease.  The following day, he signed a form for purposes of the settlement claim administration certifying this diagnosis.

In light of Dr. Bragg's assessment, Langfitt completed a new claim form for Player and, in coordination with Player, submitted the new claim on November 15, 2019 seeking an award based upon Dr. Bragg's diagnosis of Alzheimer's Disease as of November 11, 2019.  On January 31,

---

[2] It is not clear from the record whether Player was referred to Dr. Kukaswadia by his primary care physician or by counsel.

[3] The dispute record does not shed light on how Player came to be seeing this specialist.  The historical fact of it was referenced in a progress note from November 11, 2019.  *See* Dr. Bragg record at 1 ("Has been seeing Kukaswadia (neurology), Schwartz (neuropsych).  Has been getting medications that seem to help with sleep, but not with memory.  Has tried many medications for headache, none have been helpful.").

2020, the Claims Administrator gave notice that the claim was approved and that Player earned a monetary award based upon the November 11, 2019 Alzheimer's Disease diagnosis of Dr. Bragg. The NFL did not file an appeal.

In light of the attorney lien and the contingency fee agreements of record, the Claims Administrator withheld from Player's award funds for payment of attorney fees in an amount equal to 22% of the Monetary Award. This percentage reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2018 Opinion and Order. (Doc. No. 9863.) Of the attorney fee withholding, a portion reflecting 5% of the Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund ("AFQSF") pursuant to the Court's June 27, 2018 Order Regarding Withholdings for the Common Benefit Fund. (Doc. No. 10104.) Those funds may be distributed at a later date upon further order(s) of Judge Brody. The Claims Administrator also withheld funds for reimbursement of attorney costs based upon assertions made by counsel up to that point.

Pursuant to a briefing schedule we issued through the Claims Administrator, and in accordance with the Lien Rules, both law firms submitted simultaneous Statements of Dispute on May 26, 2020 concerning their entitlement to a fee in light of the other firm's CFA or attorney lien. Each submitted a Response to the other's filing on June 10, 2020. Pursuant to Lien Rule 17, the Record of Dispute was then referred to us for a determination as to the appropriate distribution for the attorney fees currently available for disbursement (representing 17% of Player's Award) and the allocation of those funds that are currently held in the AFQSF (representing 5% of Player's Award), if those funds, or a portion thereof, are distributed by the Court at a future date. We also address the question of how the limited funds withheld for reimbursement of attorney costs may be allocated.

## III.     THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in this class action settlement did not relieve attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees, whether through a lien or otherwise, are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*. *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based. We will then review: (1) the result in the case, (2) the quality of the

work performed by counsel, and (3) the substantiality of that contribution to the overall result.

## IV.    DISCUSSION

Langfitt contends that it should be paid "all or nearly all of the attorney's fees," in that the award achieved by Player "was entirely attributable to Langfitt, not Locks."  (SCM Stmt. of Disp. at 1, 5.)  It notes that "[t]he Locks Claim failed, and [Player] started again, because he had to," and that "[n]one of the work performed at Locks … created [Player's] Award."  (*Id.* at 4.)  As we outline within, we agree with Langfitt in large part and conclude that the work performed by Locks warrants a much smaller share of the fee derived from Player's award.

### A.    The CFAs at the time of contracting and enforcement – impact of any changed circumstances

When we assess the reasonableness of the contingent fee arrangements at the time Player entered into them with each firm, we examine: (1) the legal challenges in his pursuit of a monetary award and (2) the time-intensive nature of the representation.  We then compare the landscape at the time of contracting with the circumstances at the time the Locks attorney-client relationship terminated.

#### 1.  *Locks Law*

Locks Law agreed to represent Player on March 14, 2012, during the early part of what has been described as "Phase 2" of this litigation: after the MDL had been created but while there remained substantial risks, as the plaintiffs faced stiff challenges including surmounting the issues of preemption and establishing causation.

Risk as it related to overall workload also varied over time in this litigation.  When law firms undertake large-scale litigation, they may be obligated to decline to take on other litigation.  The cost to law firms in deciding to participate and thus forego alternative matters must be

recognized.  As we have noted in previous opinions, in the first phase of the litigation, the law firms that undertook representation of players individually, without the benefit of the efficiencies contained within an MDL, faced monumental challenges and risked having to pursue the entire case themselves, perhaps even through trial.  Fee arrangements reflecting those large contingencies "would have been expected and appropriate."  (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL in January 2012, however, the risk related to the volume of work to be undertaken by any law firm changed dramatically.  Once an MDL was formed, firms such as Locks Law contracting to represent individual clients "were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case. See Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from individually-retained player attorneys to Plaintiffs' Committees, which would be compensated through a common benefit fund).   To be sure, Locks Law personnel served on important committees, for which the firm was awarded fees from the common benefit fund.  The risks as to the legal challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

Player remained in a contractual relationship with Locks Law from the signing date of March 14, 2012 until June 20, 2019 when he moved to Langfitt Garner.  During this time substantial progress had been made in moving forward the many cases in the class. The motion of various defendants (such as helmet manufacturers) to sever their cases from those against the NFL,

as well as the motions to dismiss filed by those parties and the NFL, were argued in April 2013. In July 2013, without yet ruling on the motions, Judge Brody ordered the plaintiffs and the NFL to mediation, and by the end of August 2013 a term sheet had been signed.   Class counsel moved for preliminary approval on January 6, 2014.   On April 16, 2014, Judge Brody sent the matter back for further discussion given her dissatisfaction with the Monetary Award cap, but an amended agreement that eliminated the cap was presented in June 2014.   The Court gave preliminary approval on July 7, 2014 and held a fairness hearing in November 2014.   After additional changes were made to the settlement agreement, it was again presented to the Court on February 13, 2015 and given final approval on April 22, 2015.   Appeals followed, but the Third Circuit affirmed the District Court's approval of the Settlement Agreement on April 18, 2016, and the Supreme Court denied certiorari on December 12, 2016.   Registration in the settlement program opened in February 2017.

Thus, during the period in which Locks represented Player, the risk inherent in the litigation decreased significantly.   This reduction in risk was ultimately accomplished through the efforts of Class Counsel and those other firms, including Locks, whose attorneys served on various MDL committees and performed work for the common benefit of the class, for which many firms including theirs were awarded compensation.   See Doc. No. 10019 (the Court's May 24, 2018 Explanation and Order distributing the common benefit fees among petitioning firms).   This does not alter the fact, however, that Locks undertook the representation at a time of significant risk.

### 2.   *Langfitt Garner*

When Langfitt Garner took over the representation of Player on June 20, 2019, the major risks confronting prior counsel in terms of liability and the defenses the NFL could assert had been eliminated.   A claims administration process had been rolled out and Player was already registered

in the program.  Player's initial claim, however, had been denied on November 12, 2018, and no appeal had been filed.  The medical opinions on which that claim relied had been discredited and Player had been suspected of exaggerating his symptoms.  The settlement program rules permitted a new claim package to be filed.  However, as the Denial Notice advised Player, several factors would be considered for any new claim for a Monetary Award, "including whether the new claim shows materially changed circumstances from the earlier claim."  (Denial Notice at p. 2.)  The Notice went on to explain that the "materially changed circumstances" could include a different type of qualifying diagnosis or, if the same diagnosis, a different diagnosis date supported by additional medical records.  (*Id.*)  Moreover, if a new claim asserted the same diagnosis but from a different physician and was submitted within 365 days of the original denial notice, the new claim would be subject to an audit process.

Thus, when Langfitt Garner assumed representation of Player, it could anticipate that it would need to obtain new medical evidence to establish a qualifying diagnosis to support a renewed claim on behalf of Player.  It also knew that, to avoid an automatic audit, it would have to wait to submit the new claim until November 2019 at the earliest if Player again sought an award based upon Alzheimer's Disease diagnosis.  It would also have known that any award it might achieve could be subject to appeal by the NFL, and that the risk might have been heightened here given the circumstances of the prior denial.  The fact that it would have had to engage in significant efforts and potentially advance costs to achieve any award for Player after the prior failed attempt was a clear and present risk.  There were no changes in the circumstances as to risk factors during the time between when Langfitt agreed to represent Player and when it sought to enforce its contingent fee agreement upon the approval of his award.

### B.     The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the attorneys' efforts in bringing about the result. The claim that ultimately led to a Monetary Award on January 31, 2020 was filed on Player's behalf by Langfitt. The qualifying diagnosis identified in the award notice was made by Dr. Bragg on November 11, 2019 following his examination on referral from Langfitt. While the Alzheimer's Disease diagnosis certified by Dr. Bragg was consistent with the qualifying diagnosis sought by Locks in the claim it filed in April 2017, that diagnosis was not accepted until the new claim was submitted with a new doctor's assessment. It was only after Player's treatment with neurologist Dr. Kukaswadia and evaluation by a new expert, chosen by Langfitt, that Player could establish a qualifying diagnosis of Alzheimer's Disease leading to a Monetary Award approval.

### C.     The quality of the work performed

Langfitt does not suggest that Locks was deficient in its representation of Player between 2012 and 2019, even though the results in the tests for which Locks referred him were found to be invalid. *See* SCM Resp. at 2 ("Sadly, nothing done at Locks yielded a positive result, a 'baseline,' or any medical records of any kind that substantially [or] primarily contributed to the result and monetary award Langfitt achieved."). The quality of the work performed by Langfitt is unchallenged, inasmuch as Player achieved a favorable award within a few months of Langfitt's submission of the new claim. We accept that each firm provided quality work on behalf of Player and in accordance with the demands of the respective stage of the litigation and claims process.

### D.     The substantiality of the work performed

The more important question to consider in this lien dispute is how the two firms

contributed to the work necessary to obtain the award that Player received in January 2020. Langfitt characterizes the contributions of Locks as essentially irrelevant to its work in 2019 to develop medical evidence based on valid testing supporting a claim for Alzheimer's Disease.  For its part, Locks points to the initial efforts undertaken by its personnel (including Attorney Langfitt) to document Player's condition and seek an award as early as possible in 2017.  It also argues that the November 2019 claim filed by Langfitt and its supporting diagnosis "had been coordinated" during the period of the Locks representation.  (Locks Resp. at 1.)  We therefore lay out the efforts undertaken by each firm in the various aspects of their representation to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.

As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;
>
> (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,
>
> (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award;
>
> (6) support of clients who were seeking loans and were exposed to predatory lending practices; and
>
> (7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories, and there may be other categories of tasks undertaken or services provided by IRPAs that would be relevant to this analysis.   In the absence of any suggestion of other relevant criteria, we will use these categories as checkpoints as we consider the substantiality of the IRPA's efforts and the role each may have played in achieving Player's award.

### (1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date

The parties disagree over whether Locks, in fact, sent Player for a diagnostic consultation with Dr. William Hu, M.D., Ph.D. at Emory University in or around October 2015.  The parties agree, however, that Locks sent him to Jon Peters, M.D. in Reston, Virginia in November 2015 and for neuropsychological testing at that same time with David Hebda, Ph.D.  Locks also arranged for a friend of Player to memorialize in an affidavit in July 2016 his observations of Player's memory problems and other symptoms of neurocognitive decline.  These preparations enabled Locks to file a claim in April 2017.  Although Dr. Peters rendered a diagnosis of Alzheimer's Disease, the claim was ultimately unsuccessful in that the neuropsychological testing on which it was based could not be considered valid and where the diagnosis was not made in a manner generally consistent with the settlement criteria for an Alzheimer's Disease diagnosis.  (LH Stmt. of Disp. at Ex. K.)

When Langfitt assumed representation in June 2019, it set to work promptly to prepare for the submission of a new claim that it anticipated it would file upon the expiration of 365 days from the initial denial that had been issued on November 12, 2018.  It encouraged Player to see his local neurologist, Dr. Kukaswadia at Gwinnett Medical Center, which he did at the end of June 2019 and thereafter.   Langfitt spoke with doctors familiar with Player about the benefit of being

examined by MAF physician Dr. Bragg.  The firm arranged for Dr. Bragg to be given all of the

necessary background records from Player's primary care physician, Dr. Kukaswadia, and the

Concussion Institute at Gwinnett Medical Center where Player underwent studies and therapy.

Thanks to the firm's arrangements, Player was examined by Dr. Bragg on November 11, 2019.

Thus, Langifft also undertook efforts to identify a qualifying impairment at the earliest possible

date following the commencement of its representation.

> **(2) Support of their individual clients to ensure their lawsuit
> would have evidentiary support should the matter proceed to
> trial**

Locks was available to Player during the time period prior to the settlement of litigation.

> **(3) Review of other litigation that was related to ensure claims
> in this litigation would not be negatively impacted**

This factor does not appear to pertain to the work of either of the firms.

> **(4) Support of their individual clients in understanding the on-
> going settlement negotiations and risks, and in ultimately
> making the determination of whether to opt out of the class**

Locks was available to Player during the time period in which he had to consider whether

to opt out of the class.

> **(5) Shepherding the individual client through a claims process
> from registration to receipt of a Monetary Award**

Locks registered Player in the settlement, filed a claim for him, and shepherded him

through an audit process.  Unfortunately, this claim was unsuccessful.  Langfitt then filed a new

claim and has continued to represent Player through receipt of a Monetary Award.

> **(6) Support of clients who were seeking loans and were exposed
> to predatory lending practices; and**

Locks advised Player and guided him as he entered into a litigation funding agreement in

February 2016.  During its period of representation, Langfitt worked on Player's behalf to ensure

that the lender would charge interest in accordance with an agreement with the Court.

### (7) Providing necessary support in other personal matters collaterally related to this litigation

Locks also counseled Player concerning child support obligations.

### E. Apportionment

Langfitt resists any of the attorney fee being apportioned to Locks, as it undertook its representation of Player when the prior pre-effective date claim had been denied and the testing deemed invalid by the AAP, leaving Langfitt to develop its own strategy and "start over" when Player retained the firm. Locks contends that the Alzheimer's Disease diagnosis, the strategy to re-file, and the timeframe for the strategy was "coordinated" when Attorney Langfitt was still employed by Locks and thus must be credited to Locks.

We cannot agree with Locks that it is so strongly tethered to the subsequent successful claim filed by Langfitt in this case. At the time Player discharged Locks, that firm had attempted to achieve a monetary award for him but failed. The claim it filed was denied. No appeal was viable. The underlying medical reports had been rejected as invalid and could not serve to support any second claim attempt. The denial notice suggested that even a claim for a Level 1.5 Neurocognitive Impairment could not be based upon the 2015 examinations. There was little that could be done following the claim denial except to begin the work of constructing a new claim and determining the optimal timing to submit such a claim. Locks has failed to come forward with evidence that those tasks were undertaken during the period of the Locks representation.

Locks argues that, while the evaluations it obtained could not be submitted as the basis for a future claim, they nonetheless had value in that they were shared with subsequent doctors. More specifically, Locks seeks to draw a connection to the successful claim through a chain of medical

reports dating to the Locks era that were reviewed by or known to the doctors who established the diagnosis that led to an award.  It notes that Dr. Kukaswadia's initial treatment report from June 26, 2019 includes in the "history of present illness" section a reference to Player having "undergone multiple evaluations that include a neuropsychology evaluation as well as neurology evaluation and [having] been diagnosed with dementia."  Locks also notes that Dr. Kukaswadia's report documents that Player "brought a record from 2015 as well as Apo screening, which was done in 2018" --- which were the products of work and counseling done by Locks.  (LH Resp. at 3, quoting SCM Stmt. of Disp. Ex. 4 at p. 81.)  Finally, Locks argues that, inasmuch as Dr. Kukaswadia's treatment of Player was noted by Dr. Bragg in his report, there is a line from the firm's work on behalf of Player to the source of the successful qualifying diagnosis he received in 2020.

We will recognize the value of Locks's guidance of Player from 2012 until 2019, including counseling him to remain in the settlement class and registering him so that he could pursue a claim when he had the appropriate supporting evidence.  There may have been some additional value to Player in his 2019 evaluations from having had a history of evaluations and testing, although we think Locks overstates this value, given the absence of any serious discussion of the prior evaluations in the analysis or assessments of either Dr. Kukaswadia or Dr. Bragg.[4]  We award Locks a 15% portion of the total attorney fee.

_____

[4]  We acknowledge the difficulty of assessing the impact, if any, of the early evaluations on the later evaluations, as Langfitt does not reveal what earlier Locks-era records were provided to the later doctors whom Player saw at its urging.  The doctors' reports themselves reveal little, with the exception of Dr. Kukaswadia's reference to the two items that Player himself brought to his initial appointment.

F.    **Costs**

Both firms seek to recover expenditures for relatively insignificant postage or delivery fees as well as for more substantial payments made to doctors for their evaluation of Player or their consultation with counsel concerning a proper diagnosis for him under the settlement program protocols.  Langfitt's opposition to the reimbursement request of Locks, however, puts before us a question about the propriety of reimbursing a firm for expenses incurred in an unsuccessful claim.

In its Statement of Dispute, Locks Law seeks reimbursement of the costs it incurred for evaluations by or consultations with the following medical or psychological experts: Dr. Hu ($2,000 paid on October 26, 2015); Dr. Peters ($5,000 paid on November 12, 2015); Dr. Hebda ($2,700 paid on January 12, 2016); and Dr. Myers-Fabian ($3,000 paid on October 29, 2018).  It also seeks a total of $133.81 in postage costs.  Player's CFA with Locks Law provided that he would reimburse the firm for expenses of this nature from any award that he received.  Similarly, Langfitt seeks reimbursement for a total of $2,022.40 in costs.  Only upon our request through the Claims Administrator for further information did it identify those costs as relating to postage/delivery ($22.40) and an outstanding bill from Dr. Bertelson for $2,000.00, which dated to the period of the Locks representation and which Langfitt apparently paid on March 19, 2020 because the invoice had not been paid previously.

Player, through Langfitt, has raised several objections to Locks's requests regarding expert fee reimbursement.  At the broadest level, Player objects to the reimbursement of any costs incurred by Locks.  He notes that he bargained for representation by Locks that would involve a contingent fee and expense reimbursement only if he achieved a monetary award.  Langfitt contends that Player did not secure a monetary award through Locks's work but rather through Langfitt's work exclusively.  As our discussion above makes clear, we do not view the roles of the

18

two firms quite so starkly.  Locks undertook these expenses in good faith, and while the reports of Drs. Hebda and Peters were ultimately found to be insufficient for an award in 2018, their evaluations of Player informed how counsel would proceed thereafter.  With the knowledge of the deficiencies of the assessments made by Drs. Hebda and Peters, for example, Langfitt knew that it would be necessary to construct a stronger claim through ongoing neurological treatment and evaluation by an MAF-certified physician.

We also note here that Player, through Langfitt, objects to reimbursing Locks for the cost of the Myers-Fabian evaluation on the ground that it did not result in the production of a report by that expert.  (SCM Resp. at 1, 5.)  If production of a report is the standard by which the value of an expert must be judged, then Langfitt itself cannot, in good faith, seek reimbursement of the expenditure for consultation with Dr. Bertelson.  *See* SCM Resp. at 5 (noting that "Myers-Fabian and Bertelson saw [Player], but neither generated a report, because of profound invalidity").  We will not exclude the reimbursement request on that basis.

Finally, Player challenges the specific assertion that Locks incurred expenses related to Dr. Hu on Player's behalf.  He and Attorney Langfitt, who was involved in his case at Locks in 2015, insist that he was not actually seen by Dr. Hu and that the inclusion of a cost on Player's ledger at the Locks Firm "is likely a clerical error."  (SCM Resp. at 1 n.3.  *See also id.* at 5 (suggesting a "book-keeping error").  *See also id.*, Ex. A (declaration of Player that he did not see Dr. Hu).).  Inasmuch as Locks has not sought to rebut that contention with any evidence, we will credit Player's objection and exclude the Dr. Hu expense.

While we will not exclude as a matter of law the expenses incurred by the experts consulted during the Locks representation, we find it appropriate to discount the recovery by Locks (and by Langfitt for the bill it paid to Dr. Bertelson for work apparently undertaken during the Locks

representation) for these expenses to the same extent that we discounted Locks's lien for its contingent fee.   We will permit recovery of 15% of the expert fees incurred prior to the development of the successful claim.  In short, the following reimbursements are approved:

*To Locks*:

   Postage: $133.81

   Dr. Hebda: 15% of $2,700 = $405.00

   Dr. Peters: 15% of $5,000 = $750.00

   Dr. Myers-Fabian: 15% of $3,000 = $450.00

Total: $1,738.81

*To Langfitt*:

   Postage: $22.40

   Dr. Bertelson:   15% of $2,000.00 = $300.00

Total: $322.40

As Langfitt did not incur any costs in arranging for Langfitt to be seen by Dr. Bragg or any other physician or psychologist, this represents the extent of the costs it incurred and for which it will be reimbursed.

## V.   CONCLUSION

The work performed by Locks Law during the claim development and filing stages did not yield a positive outcome for Player, and the contingency specified in the parties' fee agreement was not satisfied during the period of the Locks representation. That initial denial, however, carried with it certain lessons that could inform a future claim.  There remained the possibility that Player could obtain new documentation and file a new claim in the future.  Given Attorney Langfitt's familiarity with the unsuccessful claim, Langfitt Garner was primed to assist Player, and Player

20

chose to engage Langfitt.  Langfitt went on to perform what became the most important work associated with the claim, knowing what issues needed to be addressed based upon the AAP analysis of the claim filed by Locks.  The role of Locks in the development of the new medical records and successful claim was ultimately relatively minor.

Inasmuch as it was Langfitt's work that primarily created the fund and achieved the successful result for Player, we will set the total fee according to the CFA that Player entered into with Langfitt.  Thus, the total fee to be divided between counsel represents 20% of the Monetary Award, rather than the 22% fee sought by Locks.  As alluded to above, we have concluded that a fair resolution of this dispute is to divide the fee such that 15% of the fee is allocated to Locks and 85% is allocated to Langfitt.  The Claims Administrator shall reduce the disbursements in light of the 5% holdback and shall apportion the holdback funds between Locks Law, Langfitt Garner, and Player according to the proportion set forth above.  The Claims Administrator shall also disburse $1,738.81 to Locks for its costs and $322.40 to Langfitt for its costs.  Any remaining withheld funds may be disbursed to Player.

An appropriate Order follows.

BY THE COURT:


 /s/ David R. Strawbridge, USMJ____
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE