**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |

Kevin Turner and Shawn Wooden, on behalf
of themselves and others similarly situated,

Plaintiffs,

v.

National Football League and NFL Properties, LLC,
successor-in-interest to NFL Properties, Inc.,

Defendants.

THIS DOCUMENT RELATES TO:

Goldberg Persky & White, P.C.
v.
SPID 100002255 (B.B.)

Attorney Lien Dispute Case No. 00588

<u>**MEMORANDUM OPINION**</u>

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                        March 16, 2021

## I.    INTRODUCTION

Presently before the Court in the National Football League Player's Concussion Injury

Litigation is the assertion of an Attorney Lien by Goldberg Persky & White, P.C. ("GPW") against

the Award granted to their former client, Settlement Class Member B.B. ("Player"), in the

litigation that became part of this class action, *In re: National Football League Players'*

*Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).  By its lien, GPW seeks reimbursement

of its costs and payment of attorneys' fees of as much as 22% of the Award that has been authorized

for Player.  By his current counsel, Neurocognitive Football Lawyers, PLLC ("NCFL"), Player challenges the Lien given that NCFL also seeks a contingent fee for its work in representing him. That work, which Player agreed would be compensated with a contingent fee of 25% of any monetary award he received, involved NCFL eliciting expert reports documenting his impairment, which ultimately resulted in approval of the sought-after monetary award.  The parties consented that my ruling on this matter should represent the final determination of the district court. [1]

As we set out in past opinions, our evaluation of these positions involves a consideration of the contingent fee agreements ("CFAs") between Player and his counsel and an assessment of the reasonableness of the requested fees of both law firms in light of the analysis set out by the Third Circuit's *McKenzie* decision.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach obligates us to scrutinize the reasonableness of the CFA at the time of the signing and then determine whether the circumstances compel a different evaluation of the agreement at the time the lienholder seeks enforcement.  We will then examine the results Player obtained, the quality of the representation provided by each firm, and most importantly the extent to which the efforts of the lienholder firm substantially contributed to the result obtained while the client was represented by current counsel. *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.  Ultimately, we conclude that both firms are entitled to recoup attorney's fees, with the larger portion allocated to NCFL for its

---

[1]  This decision does not concern the propriety of the Monetary Award to Player, which has already been authorized.  Rather, it solely addresses the allocation of the portion of Player's Monetary Award that was set aside by the Claims Administrator for fees and costs of Player's individually-retained counsel.  It is Player's retention of more than one attorney to represent him in this matter, and the filing of an attorney's lien by prior counsel, that has created the need for this judicial determination of the appropriate fee.

active development of the medical record and presentation of the claim that led to the award.

## II.      FACTS AND PROCEDURAL HISTORY[2]

Player entered into a CFA with GPW in August 2011 for representation in connection with a potential personal injury claim for concussion-related brain injuries sustained during his NFL playing career.  The parties agreed that if Player made a recovery by way of lawsuit or settlement, he would pay 40% of the recovery as the legal fee.  He would not owe a legal fee or expense if the firm made no recovery on his behalf by settlement or trial.  The fee agreement was later amended by GPW to reduce the contingent fee to 25%.  (Pet. to Est. Attorney's Lien, ¶ 3 (indicating firm notified clients on September 17, 2014 that fees were unilaterally reduced).)

GPW included Player in a multi-player complaint it filed in this district in May 2012.  It also filed a Short Form Complaint against the NFL on his behalf in July 2012.  It was in contact with him in May 2013 to update his medical information.  It also included him in various communications regarding the status of the litigation against the NFL and Riddell, including the settlement with the NFL, and provided advice on third party loans and testing options.  (Lienholder ("LH") Stmt. of Disp. Ex. A.)

Meanwhile, unbeknownst to GPW, in 2016 Player entered into a CFA with a group of four law firms: The Yerrid Law Firm; Gibbs & Parnell, P.A.; Holliday Karatinos Law Firm, PLLC; and

---

[2]  This factual and procedural background section is derived from the Statements of Dispute and Responses filed by both the lienholder firm and current counsel; each firm's contingent fee agreement; and the itemization of costs that the lienholder provided with its lien and that current counsel provided with its Statement of Attorney's Fees and Costs.  The Claims Administrator has also provided us with the Notice of Monetary Award Claim Determination in this matter and identified the dates on which Player was registered in the settlement program and on which claims were submitted on his behalf.

Jeffrey D. Murphy, P.A.[3]   Player and a representative from each firm signed the CFA, which provided that the law firms would represent him for any claim for settlement benefits in the NFL Concussion Settlement and would charge a contingent fee of 25% of any recovery. Player signed the CFA on January 9, 2016 and Attorney James Holliday, who signed on behalf of the Holliday Karatinos Law Firm, dated his signature March 23, 2016.[4]   Player notified GPW in May 2016 that he was terminating their relationship, and GPW formally withdrew as Player's representative in the settlement litigation.  GPW filed a Notice of Lien in this Court in April 2017 with its Petition to Establish Attorney's Lien.

Shortly after Player changed representation, NCFL arranged for testing and examinations of Player.  The first was an MRI of the brain on January 7, 2016.[5]  With the assistance of NCFL, Player also underwent a forensic examination with a neurosurgeon that led to a report dated April 6, 2016; neuropsychological testing that led to a report dated April 11, 2016; a forensic examination with a specialist in brain injury medicine that led to a report dated April 28, 2016; and a forensic neurological examination that led to a report dated May 23, 2016.  NCFL then registered Player in the Settlement Program on February 6, 2017.

The record before us, which is narrow due to the limited nature of the lien dispute, reflects that NCFL first submitted a claim on Player's behalf on June 7, 2017.  This claim was based upon evaluations by providers who were not pre-approved by the settlement program.   NCFL's submissions to us reflect that the claim was not approved at that time and that it went through an audit.  This process appears to have been protracted.  NCFL has reported, for example, that it spent

---

[3] It appears that these firms or some portion of them are now the NCFL firm.

[4]  The other attorneys did not date their signatures.

[5]  NCFL appears to have arranged for that study even before Player signed the CFA.

time in or around April 2018 assisting Player with forms and additional information required as part of the audit, and it was not until early 2019 that we see evidence of work on Player's case resuming.

While we do not have information on any determination that was made as to the 2017 claim nor the results of the audit, the issues would appear to have been resolved, as neither NCFL nor Player has been excluded from participating in the settlement program.  In February of 2019, NCFL arranged for Player to undergo new testing using doctors who were pre-qualified by the settlement program.  Player was seen by an approved neuropsychologist, who provided a report dated March 15, 2019, and by an approved neurologist, who provided a report dated March 27, 2019.  These examinations were conducted by different, approved experts, unrelated to the providers consulted in 2016.  NCFL finalized and submitted a new claim package for Player on December 9, 2019, and on March 9, 2020, Player's award was authorized.  The Notice of Monetary Award Claim Determination reflects that the qualifying diagnosis of Level 1.5 Neurocognitive Impairment was made by the qualified MAF provider, Daniel Kantor, M.D., on March 27, 2019. The NFL did not appeal the award and there does not appear to be any further audit activity associated with Player's claim.[6]

In light of the attorney lien and the contingency fee agreements of record, the Claims Administrator withheld from Player's award funds for payment of attorney fees in an amount equal to 22% of the Monetary Award.  This percentage reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2018 Opinion and Order.  (Doc. No. 9863.)[7]  Of the attorney fee

---

[6]  We touch upon the audit activity within.

[7]  The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court.  After considering the recommendations of

withholding, a portion reflecting 5% of the Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund ("AFQSF") pursuant to the Court's June 27, 2018 Order Regarding Withholdings for the Common Benefit Fund.  (Doc. No. 10104.)  Those funds may be distributed at a later date upon further order(s) of Judge Brody.  The Claims Administrator also withheld the amount of costs asserted by GPW in its Notice of Lien.

Pursuant to a briefing schedule we issued through the Claims Administrator, and in accordance with the Lien Rules, both law firms submitted simultaneous Statements of Dispute on June 12, 2020 concerning their entitlement to a fee in light of the other firm's CFA or attorney lien.  NCFL submitted a Response to GPW's filing on June 24, 2020, and GPW submitted a Response to NCFL's filing on June 30, 2020.  Pursuant to Lien Rule 17, the Record of Dispute was then referred to us for a determination as to the appropriate distribution for the attorney fees currently available for disbursement (representing 17% of Player's Award) and the allocation of those funds that are currently held in the AFQSF (representing 5% of Player's Award), if those funds, or a portion thereof, are distributed by the Court at a future date.

## III.    THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances."  *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts).  The District Court's prior opinions in this class action settlement did not relieve

---

Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2).

attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees, whether through a lien or otherwise, are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*. *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based. We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

## IV. DISCUSSION

NCFL contends that only a small portion of the counsel fee should be allocated to GPW in that Player terminated GPW "before the Amended Settlement Agreement was approved and before the contingency on [Player's] individual claim arose[.]" (Settlement Class Member ("SCM") Stmt. of Disp. at 1.) While Player recognizes that GPW provided some support to him (along with

GPW's other clients) earlier in the litigation, he argues, through NCFL, that the work his current firm performed provided the far more significant contribution in bringing his claim to a successful conclusion.  (*Id.*)  While we do not diminish the work done by GPW, as we outline within, we agree that the work performed by NCFL warrants the larger share of the fee derived from Player's award.

A.    <u>The CFAs at the time of contracting and enforcement – impact of any changed circumstances</u>

When we assess the reasonableness of the contingent fee arrangements at the time Player entered into them with each firm, we examine: (1) the legal challenges in his pursuit of a monetary award and (2) the time-intensive nature of the representation.  We then compare the landscape at the time of contracting with the circumstances at the time the GPW attorney-client relationship terminated.

1.   *GPW*

When GPW agreed to represent Player in August 2011, the first lawsuit had been brought by former players against the NFL in California state court but individual cases had not yet been consolidated for pretrial purposes into this MDL.  This is what Professor Rubenstein characterized as "Phase 1" of the litigation.  As has been noted in prior opinions in this case, at that time the plaintiffs faced stiff challenges surmounting the issues of preemption.  Establishing causation also would have been similarly challenging, as the claims involved complex scientific and medical issues that had not yet been studied comprehensively.

Risk as it related to overall workload also varied over time in this litigation.  When law firms undertake large-scale litigation, they are obligated to decline to take on other litigation.  The cost to law firms in deciding to participate and thus forego alternative matters must be recognized.

In this first phase of the litigation, the law firms that undertook representation of players individually, without the benefit of the efficiencies contained within an MDL, faced monumental challenges and risked having to pursue the entire case themselves, perhaps even through trial.  Fee arrangements reflecting those large contingencies "would have been expected and appropriate." (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL in January 2012, the risk related to the *volume* of work to be undertaken by a law firm changed dramatically.  Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case.  *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from individually-retained player attorneys to Plaintiffs' Committees, which would be compensated through a common benefit fund).[8]  The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

Player remained in a contractual relationship with GPW from the signing date of August 10, 2011 until May 2, 2016 when he notified the firm that he was terminating the relationship. (LH Stmt. of Disp. at 1.)  During this time substantial progress had been made in moving the cases forward.  The NFL's motions to dismiss and to sever were argued in April 2013, but in July 2013,

---

[8]  We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

without yet ruling on these motions, Judge Brody ordered the parties to mediation, and by the end of August 2013 a term sheet had been signed.   This led to class counsel's motion for preliminary approval filed on January 6, 2014.   Judge Brody denied the motion and sent the matter back for further discussion, making it clear that she was not happy about the inclusion of an overall cap.   In June 2014 an amended agreement that eliminated the cap was presented for preliminary approval. It was approved on July 7, 2014.   In November 2014 the fairness hearing was held.   This led to additional changes in the settlement agreement, which was finally presented to the Court on February 13, 2015.   It was approved on April 22, 2015, although appeals were filed as early as May 13, 2015.

Thus, during the period in which GPW represented Player, the risk inherent in the litigation decreased significantly.   This reduction in risk was ultimately accomplished through the efforts of Class Counsel and those other lawyers who served on various MDL committees and performed work for the common benefit.   This does not alter the fact, however, that GPW undertook the representation at a time of great risk.

### 2.   NCFL

At the time that the lawyers now comprising NCFL agreed to represent Player in January 2016,[9] the Settlement Agreement had met with the approval of the District Court but implementation was on hold pending appeals.   It was not until April 18, 2016 that the Third Circuit Court of Appeals issued its decision affirming the District Court's approval of the Settlement Agreement.   However, anticipating that the settlement would be approved, NCFL agreed to

---

[9] The earliest date that any of the four attorneys dated their signature was March 23, 2016.   Only Player dated his signature to January 9, 2016.   However, inasmuch as NCFL began to make expenditures on behalf of Player for medical evaluations as early as January 6, 2016, we date the inception of the representation to that month.   *See* SCM Stmt. of Disp. at 4 (listing costs incurred by date).

undertake representation of Player "on his claim for any *settlement benefits* related to and/or arising from" this litigation.  (CFA (emphasis added), appended to SCM Stmt. of Disp. as Ex. 6.)  At the time of contracting, then, NCFL anticipated that the representation would involve making a claim under a settlement agreement, as opposed to advancing novel litigation.  In that posture, the major risks confronting prior counsel in terms of liability and the defenses the NFL could assert had been alleviated, although some risks and several more months of waiting remained until the appeal process resolved and for the claims administration process to be rolled out.

### B.  The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the attorneys' efforts in bringing about the result.  We observe that Player qualified for a Monetary Award based on his Level 1.5 Neurocognitive Impairment diagnosis rendered on March 27, 2019 at the age of 53.  This determination followed from the claims form submitted on December 9, 2019 by NCFL, which registered Player in the settlement program in February 2017.

### C.  The quality of the work performed

In its initial communication to the Claims Administrator in August 2017 concerning the GPW lien, NCFL noted that Player terminated his representation by GPW "because of a dispute in the manner in which his individual claim was being handled."  (Disp. Rec. Doc. 3.)  NCFL has not, otherwise, pointed to any manner in which the representation by GPW might be lacking in "quality."  *Cf.* SCM Stmt. of Disp. at 1 ("However, the efforts of Jason Luckasevic as an IRPA on [Player's] individual claim were de minimis.").

For its part, GPW asserts that NCFL should not be entitled to any fees.  It bases its position upon what it characterizes as "information gathered through multiple written audit reports and

11

investigations" concerning NCFL and/or one of its attorneys.  (LH Stmt. of Disp. at 1.)  GPW provides no specific information, however, that would be pertinent to the quality of the work provided by NCFL after Player engaged that firm.

NCFL has offered little information about the audit to which Player's 2017 claim was subjected.  Inasmuch as NCFL ultimately did not obtain for Player an award based upon the evaluations for which it made arrangements in 2016, we can glean that there may have been some concern by the Settlement Claims Administrator and/or a reviewing AAP doctor about the supportability of the diagnoses advanced in those reports.  This certainly led to a period of delay for Player.  Apart from the question of delay, however, NCFL objects to GPW's suggestion that the firm was somehow not qualified or authorized to work on behalf of clients such as Player. NCFL has responded that its clients have been "specifically permitted" by the Special Masters "to submit claims based on evaluations in the MAF program," which is what ultimately occurred here. (SCM Resp. at 1.)  It is our understanding that this is correct, that NCFL *is* permitted to submit claims for players if the claim is based upon an evaluation by an MAF-approved doctor.  We have no reason to believe that there is any *pending* audit or investigation concerning NCFL's conduct *with respect to the 2019 claim* that impacts upon our analysis.  To be sure, Player has received his award and the Claims Administrator has deemed it appropriate to advance this lien dispute record to us for adjudication of the disputed claim to counsel fee.

With the record before us, we are left largely to assume that GPW provided quality work on behalf of Player and in accordance with the demands of the stage of the litigation, and that NCFL did so as well during the settlement administration phase, at least from 2019 onward.

### D.    The substantiality of the work performed

A more important question to consider in this lien dispute is how the two firms contributed

12

to the work necessary to obtain the Monetary Award that Player received in this case. Each contributed in some way, although GPW's contribution is reflected primarily in the fact that Player was a part of the litigation from the outset and did not opt out of the settlement once a global resolution was proposed. NCFL characterizes GPW's efforts as an IRPA with respect to Player's individual claim as "de minimis." GPW, in turn, asserts that much of the individual work on behalf of Player for which NCFL seeks credit is largely administrative, that it duplicated work that had already been performed by GPW, or that it was related to collateral matters that were not material to Player's award in this MDL. (LH Resp. at 2.) GPW also suggests that because NCFL has been the subject of investigations, it should not be authorized to receive a fee.

As is demonstrated in our discussion below, we find that both firms played a positive role and provided quality work on behalf of Player and in accordance with the demands of the claims process. We lay out below the efforts undertaken by both firms in the various aspects of their representation to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.

As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;
>
> (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,
>
> (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,

(6) support of clients who were seeking loans and were exposed to predatory lending practices; and

(7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories, and there may be other categories of tasks undertaken or services provided by IRPAs that would be relevant to this analysis.   In the absence of any suggestion of other relevant criteria, we will use these categories as checkpoints as we consider the substantiality of the IRPA's efforts and the role each may have played in maximizing the player's award.

### (1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date

GPW's "chronology of client representation" exhibit includes entries in May and June of 2013 regarding communications with Player about his medical status and medical reports.  (LH Stmt. of Disp. at Ex. A.)  Over the entirety of the period of representation, GPW contends that it also advised him about potential testing options "contingent upon his cognitive and functional deficits," and that it "[e]xplored multiple testing facilities/doctors within the bounds of the Settlement criteria."  (*Id.*) Ultimately, however, it did not schedule any medical evaluations for Player before he terminated the representation.  GPW incurred no costs associated with medical testing or evaluations of Player.  To be sure, the qualifying diagnosis that led to Player receiving a monetary award dated to March 27, 2019, approximately three years after Player terminated GPW. Therefore, any early work by GPW concerning Player's medical history ultimately had no impact upon the medical finding that led to the award.

We accept NCFL's uncontradicted assertion that it promptly performed the tasks of scheduling appointments upon its retention in 2016 for neuropsychological testing; forensic

examinations with a brain injury specialist, neurologist, and neurosurgeon; and an MRI.  In the course of this work, NCFL advanced $9,526.84 in costs in 2016 alone.  Although these costs were for services that ultimately were not accepted for an award, they reflect active engagement by NCFL to document Player's condition.

### (2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial

GPW obtained from Player a questionnaire in 2011 to enable the firm to file its complaint on Player's behalf.  While GPW has not provided specifics, it appears to have requested medical documents and other data "necessary for litigation of his claim."  (LH Stmt. of Disp. at Ex. A.).

By the time that NCFL was representing Player, however, it was clear that the matter was one for preparation of a claim in a settlement, not of trial preparation.  As noted above, NCFL took prompt action to develop an evidentiary record for a claim submission.

### (3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted

This factor does not appear to relate to either firm's work on Player's behalf.

### (4) Support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class

This factor would largely relate to GPW's period of representation.  GPW clearly counseled Player leading up to the decision to join the multi-plaintiff lawsuit that was being filed in this district in May 2012.  GPW has represented that it had periodic communications with Player concerning the status of settlement discussions and the future of the litigation.

By the time NCFL was engaged, the settlement was pending approval in the Court of Appeals.  NCFL's engagement letter reflected that it would represent Player as to a claim being submitted through the MDL claims administration process.  NCFL was not required to counsel

Player as to whether he should remain in the class.

### (5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award

This work was performed exclusively by NCFL.  That firm registered Player in the Claims Administration Portal, drafted a claim that was initially submitted in June 2017 and then the claim in December 2019 that ultimately led to the award issued in March 2020.  It assisted Player with additional forms required by the Claims Administrator in 2018 when the 2017 claim submission went through an audit.

GPW attempts to diminish the value of this aspect of the work of NCFL, asserting that "if [NCFL's] argument is that they scheduled an appointment and filed a claim form, those functions are not unique to [NCFL], nor any attorneys involved in representing clients in the claim process." (LH Resp. at 1.)  GPW asserts that, by contrast, it "earned [its] fee" "by continually advising [Player] as to the litigation, the settlement criteria, and individually analyzing the threshold as it relates to [Player's] individualized physical and cognitive condition while applying all principles of integrity."  (*Id.* at 1-2.)  It further argues that inasmuch as GPW had analyzed Player's medical records, NCFL's performance of the same tasks was "nothing unique that added value to the representation," and that it was GPW that "obtained the client, instituted the litigation, took 100% risk, and provided their threshold review and analysis specific to [Player]."  (*Id.* at 2.)

We accept that the work undertaken by NCFL did not require it to develop novel legal theories as was necessary during the earlier phases of litigation.  The work beginning in 2016 did, however, involve responding to the requests for further information from the Claims Administrator regarding the 2017 claim, as well as obtaining another round of medical evaluations for submission of a new claim in 2019.

### (6) Support of clients who were seeking loans and were exposed

16

**to predatory lending practices;**

GPW represents that it counseled Player about third-party loans and the reasons it did not recommend them.

**(7) Providing necessary support in other personal matters collaterally related to this litigation**

NCFL represents that it provided to Player medical reports obtained for purposes of the Settlement that were relevant to a pending claim he had for Social Security disability benefits.  It also conferred with outside counsel about options for a special needs trust for Player.  (SCM Stmt. of Disp. at 4.)

**E.    Apportionment**

As we synthesize this information to assess how to apportion fees for the quality representation provided to Player that yielded the positive outcome of a Monetary Award, we are cognizant that three groups of attorneys contributed to the work necessary to obtain that Award: GPW acting for Player individually; Class Counsel and law firms such as GPW that acted for the common benefit in negotiating and defending the Settlement Agreement; and NCFL, which agreed to represent Player when it was almost certain that his case would be resolved according to the terms of the class action settlement.

We first find that the substantiality of GPW's work as an IRPA in Player securing the Monetary Award that he received is necessarily reduced given that the work of Class Counsel, and the attorneys working with them for the common benefit during that same period from 2011 to 2016, clearly "reduced the amount of work required of IRPAs."  (Doc. No. 9862 at 4). In its establishment of a 22% presumptive fee cap, the District Court has already taken actions to reduce IRPA fees, accounting for the substantial benefit provided by Class Counsel.  This cap takes into

account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials. Particularly when we account for the meaningful work of NCFL – which, from its engagement in 2016, ultimately guided Player through the most active phase of the case as protocols were finalized and qualifying diagnoses could be secured – we are convinced that GPW's role in bringing about the award Player received in 2020 does not warrant the 22% fee it is seeking.

When we consider the contributions of each firm to the five categories of tasks described above, and when we value each task category in the context of the particular needs of Player, we find that the work of NCFL was more substantial to the result in this case. While we value the risk that GPW willingly shouldered when it agreed in 2011 to represent Player in litigation against the NFL, we nonetheless cannot ignore that it was the NCFL firm that guided Player through the process that concluded with the approval of a monetary award in March 2020. Moreover, inasmuch as GPW had not incurred costs specific to its work on behalf of Player by the time he changed firms, it has not engaged in the same financial investment in Player's case.

Accordingly, we settle upon what we consider to be fair resolution, apportioning 8% of the Monetary Award to GPW and 14% to NCFL. In light of the District Court's prior order that a portion of these IRPA fees be set aside in the Attorneys' Fees Qualified Settlement Fund, we recommend that the 5% "holdback funds" be apportioned among counsel in the same proportion in which they share the portion that is currently available for distribution to counsel.

###### F.     Costs

When it first filed its lien, GPW sought to recoup $883.60 in costs, which it represented to be Player's *pro rata* share of administrative expenses incurred by the firm in relation to its work on behalf of its client base litigating against the NFL.  In its submissions as part of this lien dispute, however, it has waived these costs.  (LH Stmt. of Disp. at 1; LH Resp. at 1.)

NCFL initially sought reimbursement of a total of $14,676.84 in costs.  A large portion of those costs – which were for copies of medical records, travel expenses, various MRI studies, brain injury examinations, and neurological and neuropsychological examinations – were incurred in the first half of 2016 and not ultimately utilized in the successful claim.  NCFL has advised us, in fact, that they no longer seek reimbursement for those costs that were associated with the unsuccessful 2017 claim.  We consider that to be a prudent decision.  Instead, they seek only the $5,150.00 expended in February 2019 on the neurological exam and neuropsychological testing with the MAF-approved personnel that gave rise to the qualifying diagnosis.

Player's CFA with NCFL provided that he would reimburse the firm for expenses of this nature from any award that he received.  The $5,150.00 in costs for which the firm seeks reimbursement appear to have been reasonably incurred and therefore must be awarded to NCFL.

### V.     CONCLUSION

GPW's contribution as an IRPA from 2011-2016 to the success that Player achieved with his Monetary Award issued in 2020 is insufficient to support the attorney fee of 22% it seeks. Much of the benefit that inured to Player during that period flowed from the work of class counsel. Once approval of the settlement appeared more secure, the work required of counsel principally revolved around claim development and submission.  NCFL's representation at those stages provided the more significant contribution in ensuring that Player would qualify for the best

possible award.  We conclude that a fair resolution of this dispute is to award 22% of the Monetary Award for IRPA attorneys' fees to be apportioned between GPW and NCFL as follows: 8% to GPW and 14% to NCFL.  These amounts must be reduced by the Common Benefit Fee deduction currently applicable to all Awards.  The Claims Administrator shall apportion the holdback funds between GPW and NCFL in the proportion set forth above.

We also approve payment to NCFL of the $5,150.00 it incurred in costs.  The balance of withheld funds (for attorney costs initially asserted by GPW and NCFL but subsequently waived) are to be released to Player.

An appropriate Order follows.

BY THE COURT:


 /s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE