UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323<br>**Hon. Anita B. Brody** |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>    Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br><br>    Defendants. | Civ. Action No. 14-00029-AB |
| THIS DOCUMENT RELATES TO: ALL CASES | |

**CLASS COUNSEL'S OPPOSITION TO
MOTION TO INTERVENE AND TO STAY MEDIATION**

**INTRODUCTION**

Class Counsel respectfully submits this response to the "Motion to Intervene and to Stay Mediation" ("Motion") filed by the law firm of Zuckerman Spaeder LLP ("Zuckerman Spaeder" or "Movants' Counsel") on behalf of class members Kevin Henry ("Henry") and Najeh Davenport ("Davenport") (collectively, "Movants") (ECF No. 11306).

Zuckerman Spaeder insists on participating in any discussions that that Court has directed Class Counsel and the NFL to conduct before Magistrate Judge Strawbridge concerning

neuropsychologists' possible use of race adjustments when evaluating the test results from a player's neuropsychological examinations conducted in the Settlement.  *See* ECF No. 11302. Zuckerman Spaeder refers to that practice as "race norming."[1] Wrongly accusing Class Counsel of "having played a role in the introduction of race norming into the Settlement Program" (Motion at 7) and being unconcerned about the issue, Zuckerman Spaeder maintains that Class Counsel cannot adequately represent Movants' interests.  In addition, it asks that any proceedings before the Magistrate Judge be stayed until the Court rules on the Motion.

The Court should reject Zuckerman Spaeder's bid, which is based on a web of distortions, both about Class Counsel's conduct and about the disposition of certain Monetary Award claims. Contrary to Zuckerman Spaeder's assertions, Class Counsel has never wavered on this issue or failed to guard Class Members' interests. There is no reason to mandate Zuckerman Spaeder's involvement in any discussions before the Magistrate Judge – which, if they yield a proposed resolution, will be put before the Court for its consideration, and Class Members such as Henry and Davenport will have ample opportunity to weigh in.  Accordingly, the Court should deny the Motion.

**FACTUAL BACKGROUND**

On August 25, 2020, Henry and Davenport filed a motion (ECF No. 11169) for relief under Article XXVII of the Settlement Agreement (ECF No. 6481) or, in the alternative, for relief, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, from the Final Order and Judgment

---

[1] For purposes of this opposition, Class Counsel adopts Zuckerman Spaeder's use of the term "race norming."  Zuckerman Spaeder, however, does not seem to appreciate that, as part of their daily practice, neuropsychologists routinely use their clinical judgment and discretion when deciding which of the available normative adjustments are appropriate for their individual patients. The other common normative adjustments are based on age, sex, and education.  Zuckerman Spaeder also does not appreciate that "race norming" has no effect on three of the four settlement criteria for dementia diagnoses under the terms of the Settlement.

approving the Settlement, alleging that neuropsychological test results of Class Members seeking Monetary Awards were subject to "a formula that explicitly and deliberately discriminates on the basis of race." ECF No. 11169-1 at 1. Both Class Counsel and the NFL opposed the motion. ECF Nos. 11204-05; *see also* ECF No. 11222 (Henry and Davenport's reply).

The Court denied the motion without prejudice on November 20, 2020 because neither of the two had exhausted available administrative remedies before seeking judicial intervention. ECF No. 11237. Just four days later, Henry and Davenport filed a notice of appeal from that denial. ECF No. 11239.[2] Noting the apparent lack of appellate jurisdiction, the Third Circuit directed the parties to address that issue. *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 20-3401 (3d Cir. order filed Dec. 2, 2020) (ECF No. 3). The parties duly filed their submissions, and the issue of possible dismissal of Movant's appeal is currently *sub judice*. *See In re Nat'l Football League Players' Concussion Injury Litig.*, No. 20-3401 (3d Cir. parties' responses filed Dec. 16, 2020) (ECF Nos. 9, 13, 19).

Meanwhile, as the Court is aware, Movants had simultaneously commenced a separate action against the NFL regarding their allegations of race norming. *Henry v. Nat'l Football League*, No. 2:20-cv-04165 (E.D. Pa. Compl. filed Aug. 25, 2020) (ECF No. 1). The NFL moved to dismiss that action, arguing that the suit was an improper collateral attack on the Settlement and that, in any event, Henry and Davenport failed to state a claim under 42 U.S.C. § 1981. *Henry v.*

---

[2] Shortly afterwards, Davenport moved for reconsideration of this Court's November 20, 2020 order (issued on the Settlement Program's portal), denying, without prejudice, his objection to the Special Masters' August 20, 2020 decision on his Monetary Award claim. Declaration of Christopher A. Seeger, dated Mar. 22, 2021 ("Seeger Decl."), ¶ 4. That decision had remanded Davenport's claim to the Claims Administrator to obtain further information from the examining neuropsychologist. *Id.* & Ex. 1; *see infra* at 6-9 (discussing Movants' mischaracterization of the Special Masters' decision on Davenport's claim and both Movants' failure to exhaust administrative remedies). Class Counsel opposed that motion, which is fully briefed and currently *sub judice*. Seeger Decl., ¶ 4.

*Nat'l Football League*, No. 2:20-cv-04165 (E.D. Pa. mot. filed Nov. 2, 2020) (ECF Nos. 28, 28-1).

This Court agreed that the action commenced by Henry and Davenport amounted to an improper collateral attack on the Settlement, and it accordingly dismissed the suit on March 8, 2021, although it referred Class Counsel and the NFL to address the race norming issue before Magistrate Judge Strawbridge. *Henry v. Nat'l Football League*, No. 2:20-cv-04165 (E.D. Pa. order filed Mar. 8, 2021) (ECF No. 40); *see* ECF No. 11302 (concurrent order entered same date in the MDL concerning Court's reference of race norming issue to Magistrate Judge Strawbridge). Henry and Davenport filed an appeal of the Court's dismissal of their action the same day. *Henry v. Nat'l Football League*, No. 2:20-cv-04165 (E.D. Pa. filed Mar. 8, 2021) (ECF No. 41). The Third Circuit has consolidated that appeal with Henry and Davenport's earlier appeal for purposes of scheduling. *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 20-3401 (3d Cir. order filed Mar. 9, 2020) (ECF No. 20) (consolidating appeal with appeal No. 21-1434).

## ARGUMENT

### THE COURT SHOULD DENY BOTH INTERVENTION AND A STAY OF THE MEDIATION

**I. Standards for Intervention**

On timely motion, Rule 24(a) of the Federal Rules of Civil Procedure provides for intervention as of right where the movant "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2); *see Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987) ("[A] person is entitled to intervene if (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected

4

or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation.").[3]  Rule 24(b) allows for permissive intervention on timely motion if the movant "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).

Both intervention as of right and permissive intervention are matters ultimately committed to this Court's discretion.  *E.g.*, *Commonwealth of Pa. v. President United States of Am.*, 888 F.3d 52, 57 (3d Cir. 2018) ("We will overturn a district court's order denying a motion to intervene as of right only 'if the court has abused its discretion by applying an improper legal standard or [by] reaching a conclusion we are confident is incorrect.'") (quoting *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998)); *United States v. Territory of V.I.*, 748 F.3d 514, 519 (3d Cir. 2014) (noting "'the highly discretionary decision of whether to grant permissive intervention'") (quoting *Brody v. Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992)).

## II. Henry and Davenport Fail the Test for Intervention

### A. Movants Lack a Protected Interest

As an initial matter, it is doubtful whether Movants even have a protected interest here. Although they are Class Members and their counsel, Zuckerman Spaeder, has been vocal about allowing neuropsychologists to use race as one of the normative adjustments when evaluating a player's neurocognitive decline for settlement purposes,[4] the fact is that neither claim was deemed

---

[3] Rule 24(a) also allows for intervention as of right where a federal statute confers an unconditional right to intervene.  Fed. R. Civ. P. 24(a)(1).  That is inapplicable here.

[4] *See*, *e.g.*, Motion at 4 n.2; "Black N.F.L. Players Want New Advocate in Concussion Settlement,"  https://www.nytimes.com/2021/03/17/sports/football/nfl-concussion-settlement-race-bias.html?referringSource=articleShare (last visited Mar. 21, 2021).  Indeed, although the use of race norming is a serious issue that needs to be addressed as it relates to the administration of the Settlement Program – and is now being addressed by the Settling Parties – it is regrettable that Zuckerman Spaeder has made repeated inaccurate and misleading representations in the press,

deficient solely by virtue of each Player's performance on neurocognitive testing, and both failed to exhaust administrative remedies as to their Monetary Award claims.

Henry filed a Monetary Award claim that was denied on January 4, 2019. Under the Settlement, he had thirty days in which to lodge an administrative appeal – *i.e.*, until Monday, February 4, 2019. Seeger Decl., ¶ 3; *see* Settlement Agreement § 9.7(a) (ECF No. 6481-1 at 52). Henry, though, neither filed an appeal nor requested an extension of time to do so. Seeger Decl., ¶ 3.

Davenport's Monetary Award claim was initially approved on December 12, 2019, but the NFL administratively appealed the award on January 13, 2020. *Id.*, ¶ 4. The Special Masters remanded the claim to the Claims Administrator for further review on August 20, 2020 – which, as discussed below (*see infra* at 8-9), was not because of race norming – after which Davenport lodged with this Court (through the Settlement's claims portal) an objection to the Special Master's ruling on August 31, 2020. *Id.*, ¶ 4 & Ex. 1. On November 20, 2020, the Court issued an order on the Settlement Program's portal, denying Davenport's objection without prejudice because he had filed his objection before completion of proceedings on remand and thus in contravention of the Rules Governing Appeals of Claim Determinations promulgated by the Special Masters to implement the Settlement. *Id.*, ¶ 4 & Ex. 2. Proceedings on administrative remand with respect to his claim remain pending as of this date. *Id.* ¶ 4.

"[T]he polestar for evaluating a claim for intervention is always whether the proposed intervenor's interest is direct or remote." *Kleissler*, 157 F.3d at 972. Here, Movants' Counsel has

---

wrongly claiming that the Settlement discriminates against black players. They either do not genuinely understand the Settlement or perhaps they are savoring the media attention they have garnered from hurling groundless accusations.

failed to demonstrate Movants' interest is sufficiently concrete and direct to warrant their intrusion into the Settling Parties' discussions before the Magistrate Judge.

B. **Class Counsel Will Adequately Protect Movants' Interest**

Even assuming, however, that Movants have a protected interest, Zuckerman Spaeder's central attack that Class Counsel cannot adequately represent that interest (Motion at 4-5) is unavailing. Zuckerman Spaeder contends that Class Counsel cannot be "entrusted with eradicating a discriminatory practice that it has had a role in effectuating" (*id.* at 5), but that is based on untrue statements.

*First*, it is inaccurate that Class Counsel has "effectuat[ed]" or otherwise condoned any racially discriminatory practice in the administration of the Settlement Program. As he pointed out in his response to Henry and Davenport's August 2020 motion, the use of demographic norms when converting raw scores to T-scores is standard practice by neuropsychologists in the clinical setting. Demographic adjustments to neuropsychological test results have been used for decades, and they reduce the likelihood of misdiagnosing cognitive impairment in minority populations. ECF Nos. 11205 at 5, 11205-1 at 4-7 (Decl. of John G. Keilp, Ph.D., ¶¶ 8-12). Indeed, clinical training programs provide neuropsychology students with training and instruction regarding the appropriate use of demographic adjustments, and these adjustments are commonly used in day-to-day clinical practice. ECF No. 11205 at 5.

Neuropsychologists who examine Players[5] in the course of the Settlement Program are to use the demographic norms that they believe best fit a particular Player before them, just as they would do in assessing their own clinical patients. ECF No. 11205 at 2. The Settling Parties did

---

[5] For purposes of brevity and simplicity, "Players" refers to Retired NFL Football Players as defined in section 2.1(ffff) of the Settlement Agreement, ECF No. 6481-1 at 18.

*not* mandate which demographic norms must be used.  Rather, they left that decision to the clinical judgment of individual neuropsychologists.  Full demographic corrections are simply one of the tools available to neuropsychologists, which may be used at their discretion.  *Id.* at 4, 7.

Zuckerman Spaeder does not point to a single case in which a claim was denied solely as a result of race adjustments to neuropsychological test scores.  To justify its assertion that there is a widespread "presumption of race-norming" in the Settlement Program (Motion at 6), Zuckerman Spaeder begins by distorting the Special Masters' decision remanding Davenport's claim.  In that decision, the Special Masters discussed at length how demographic adjustments are employed and the scientific literature noting the advantages for neuropsychologists to convert raw test scores to demographically corrected scores, and they noted that "[t]hose who developed these adjustments believe them to be a key tool for avoiding misclassification of cognitive impairments."  Seeger Decl., Ex. 1 at 4-6.  Ultimately, "demographic adjustments in neuropsychological testing strive to make the raw score meaningful when controlling for factors that are not unique to the individual's cognition."  *Id.* at 3.

At the same time, however, the Special Masters thoughtfully acknowledged the concerns about such adjustments.  *Id.* at 7-8.  They noted, though, that the Settlement expressly recognizes the potential use of demographic adjustments in the clinical setting of a neuropsychological examination – although it "does not explicitly require adjustments based on *race* but, rather, a broader category of 'demographic' adjustment as defined by a user manual."  *Id.* at 9 (emphasis in original); *see* Settlement Agreement, Ex. 2, § 4 (ECF No. 6481-1 at 116).  Far from requiring any clinician to use racially discriminatory standards, the Special Masters declared that "it is inappropriate to deny a claim solely because the clinician chose to reject the [BAP Clinician's] Guide's recommendation to use African American normative samples in interpreting raw scores."

Seeger Decl., Ex. 1 at 10.  The Special Masters ordered a remand of Davenport's claim only because "significant questions remain[ed] as to what system of adjustments" the examining neuropsychologist had used in assessing Davenport, "and how reflective that approach is of his general practice."  *Id.* at 12.  Thus, the remand was not to mandate the use of any particular demographic adjustment.  Rather, the Special Masters' ultimate concern was to ensure that the "clinicians' judgments are not outcome oriented."  *Id.* at 11.  In short, the Special Masters remanded Davenport's claim for purposes of further evidentiary development, *not* for a racially discriminatory reason.

Zuckerman Spaeder's distortions about what has gone on in the Settlement Program do not end there.  The disingenuousness of its contention that "Class Counsel has resisted multiple opportunities to help rectify" the issue of race-norming is revealed by the facts surrounding the three cases it fleetingly cites in a footnote.  *See* Motion at 7 & n.6.  Zuckerman Spaeder's assertion that "Class Counsel had an opportunity to respond to each case but declined to address the race-norming issue" (*id.* at 7) is demonstrably untrue.

In two of the three cases (SPID 100010093 and 100016045), the Players – represented by Zuckerman Spaeder's co-counsel, J.R. Wyatt – appealed the respective denial of their Monetary Award claims, but the Special Master remanded those claims before the NFL had an opportunity to oppose the appeal – and thus before Class Counsel even had an opportunity to file a statement in support of the appeal.  Seeger Decl., ¶ 5.

In the case of the third Player (SPID 10005553) – also represented by Mr. Wyatt – Class Counsel did, in fact, submit a statement in support of the Player's appeal – which was ultimately granted, with the Player receiving a Monetary Award of $1.563 million.  Seeger Decl., ¶¶ 6, 10 & Ex. 7.  Notably, in that appeal, Mr. Watt stated that "[a]lthough the [race-norming] issue *need not*

9

*be reached on appeal*, out of an abundance of caution, the Firm [was] address[ing] the use of race-based norms and the ramifications thereof." *Id.*, Ex. 3 at 16 (emphasis added).  Thus, *Movants' own counsel* did not believe that race norming was an issue material to that Player's claim.

In opposing the Player's appeal, the NFL first addressed several reasons that had served as a basis for the denial – all *unrelated* to the race norming issue. *Id.*, Ex. 4 at 2-3.  The NFL then addressed the Player's arguments concerning race norming.  It acknowledged, correctly, that "the Settlement Agreement itself . . . does *not* require the use of race-based demographic norms." *Id.* at 5 (emphasis added and omitted).  The NFL further correctly stated that "the AAP member [had] never stated that concerns over [the neuropsychologist's] use of demographic corrections were related to his failure to use race-based demographic norms. Indeed, the NFL Parties' independent recalculation of [the Player's] test scores shows that the [neuropsychologist] failed to use *any* demographic corrections (*e.g.,* age, gender, education, etc.) in calculating [the Player's] test scores for the ACS battery of tests." *Id.* (emphasis in original).

Consistent with the NFL's acknowledgment that the Settlement does not require the use of demographic norms adjusted for race, and its further conclusion that the neuropsychologist had not used *any* demographic adjustments, Class Counsel had an expert neuropsychologist recalculate the Player's scores using demographic adjustments for age, sex, and education.  Seeger Decl. ¶ 8. Based on those calculations, Class Counsel determined that the Player's test scores did, in fact, satisfy the criteria for Level 2 (and Level 1.5) Neurocognitive Impairment. *Id.*  Class Counsel then submitted a statement in support of the Player's appeal, disputing the NFL's contention that the Player's test scores did not satisfy the relevant criteria and arguing, among other things, that when the demographic adjustments for age, sex, and education were applied, the Player satisfied the requirements for Level 2 (and Level 1.5). *Id.* & Ex. 5 at 2-3.  In his reply, the Player's individual

counsel (Mr. Wyatt) noted that, "[a]s established *by Class Counsel*, [the Player] qualified for Level 2 Impairment in Memory/Learning and Language using non-race based demographically adjusted norms. Neither the AAP nor the NFL challenged this result despite having the raw data." *Id.*, Ex. 6 at 1 (emphasis added). The Special Master granted the Player's appeal, finding that he had established by clear and convincing evidence that he satisfied the criteria for the Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment. *Id.*, ¶ 10 & Ex. 7. The Player accordingly received a Monetary Award of $1.563 million. *Id.*, ¶ 10.[6]

These facts concerning the three cases cited by Zuckerman Spaeder highlight the depths to which it has gone to mislead the Court and Retired Players in arguing that Class Counsel has declined to address race norming. Zuckerman Spaeder is well aware of these facts inasmuch as all three Players were represented by Mr. Wyatt, one of the two co-signatory counsel on the Motion.

*Third*, for Zuckerman Spaeder to point the finger at Class Counsel is remarkably galling. Zuckerman Spaeder fought the Settlement from Day One and sought to scuttle it, filing objections to it on behalf of sixteen Class Members in October 2014,[7] and subsequently taking an

---

[6] This is yet another example of the hypocrisy of Zuckerman Spaeder and Wyatt, and their practice of shamelessly speaking out of both sides of their mouths. In their effort to reverse the denial of one of their client's claims (SPID 10005553), Movant's counsel relied upon and cited to Class Counsel's specific work and statement in support of their challenge--all of which resulted in that retired player's claim denial being reversed and the player receiving a $1.563M award on appeal. Here, however--when not convenient to their argument--Zuckerman Spaeder and Wyatt disingenuously contend that Class Counsel is not protecting players. Mr. Wyatt's own client (SPID 100005553) is the perfect example of how effective Class Counsel has been in protecting Retired Players in the settlement and ensuring that all are treated fairly.

[7] ECF No. 6242 (objections of Class Members Aloyoius Chesley *et al.*, represented by Zuckerman Spaeder); *see* ECF No. 6509 at 37-42, 83-87 & n.34 (overruling objections of Chesley Objectors).

unsuccessful appeal of this Court's final approval of the Settlement to the Third Circuit. (ECF No. 6559).  At no time in their efforts to torpedo the Settlement, though, did Zuckerman Spaeder raise any concern about use of demographically adjusted normative data, even though the Settlement expressly contemplated it.  *See* Settlement Agreement, Ex. 2, § 4 (ECF No. 6481-1 at 116). Therefore, by their own logic, Zuckerman Spaeder should not be heard to insist on having a "seat at the table" concerning an issue as to which it sat on its hands until only recently.

Indeed, this was one of the most thoroughly vetted class settlements ever.  Approximately one-fourth of the 20,000 members of the Class were represented by individual counsel, who presumably went over the Settlement with a fine-tooth comb.  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 438 (3d Cir. 2016).  No one during the course of the robust final approval proceedings raised any objection to the Settlement's allowance for demographic adjustments to neuropsychological test results.  To the contrary, one of the experts for what were perhaps the most spirited and painstaking group of objectors to the Settlement noted that neuropsychological tests are typically standardized, using a large group of healthy individuals having no known neurological disorder or other possible cause of cognitive impairment, with reference groups created from "across different age and educational levels, as well as gender and sometimes ethnic, racial, and geographical groups." ECF No. 6201-6 at 13-14 (Decl. of Robert A. Stern, Ph.D., ¶ 48).[8]

---

[8] This is not to justify the permissive use of demographic normative adjustments based on race – whether in the Settlement or in the practice of neuropsychology.  Class Counsel believes that race should not be a determinant in a Class Member's entitlement to compensation in the Settlement.  Though demographic norms that account for race have been utilized by neuropsychologists for decades, based on their clinical judgment and discretion, Class Counsel has been clear from the outset in opposing their mandatory use in the Settlement.

Moreover, to the extent that Zuckerman Spaeder complains about being excluded from any discussions about demographic norms that adjust for race, that can only be laid at its feet. Far from having ignored Movants' counsel, Class Counsel tried to work with them constructively, and had several email exchanges and telephone conversations with them. Seeger Decl. ¶ 11. In those conversations, Class Counsel shared information concerning his investigation, as well as concepts from his proposal for a resolution. *Id.*, Class Counsel then organized a conference call with Movants' counsel and counsel for the NFL to discuss attempted mediation, during which Zuckerman Spaeder revealed the information that Class Counsel had shared with them to the NFL's counsel – violating confidences, and to Players' detriment. *Id.* When Class Counsel subsequently called them out on this, Zuckerman Spaeder did not deny having violated confidences or explain why they had shared that information with the NFL's counsel. *Id.* Class Counsel stands ready to work with anyone appointed by the Court to address the issues discussed herein. In light of the aforementioned events, however, Class Counsel strenuously objects to the direct involvement of Zuckerman Spaeder.[9] Rather, Zuckerman Spaeder will be afforded the opportunity to consider, endorse, and/or comment upon on any proposal submitted to the Court for its review. *See infra* at 15-16.

The cases that Movants' Counsel cite (Motion at 5, 9) in support of their request for intervention as of right are readily distinguishable. In *Buchet v. ITT Consumer Financial Corp.*, 845 F. Supp. 684 (D. Minn.), *amended on other grounds*, 858 F. Supp. 944 (1994), the district

---

[9] For this and other reasons stated throughout this memorandum, the Court should also deny Movants' alternative request for Rule 24(b) permissive intervention (Motion at 5 n.3), assuming that it is not waived for having been relegated to a footnote. *See, e.g., John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ('[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").

court had granted preliminary approval to a class action settlement. *Id.* at 687. The defendant's subsequent sale of its subsidiary's consumer loan portfolio (out of which the plaintiffs' claims had arisen), however, put into sharper focus the central issue of whether the proposed settlement – which provided for issuance of scrip – offered adequate value to members of the proposed settlement class, and the proposed intervenors opposed the settlement. *Id.* at 688-91. The district court allowed the class members to intervene for purposes of, *inter alia*, participating in further settlement negotiations in light of its denial of final approval to the settlement (based on its fairness concerns) and the need to rework the deal. *Id.* at 691-97.

Similarly, in *Benjamin ex rel. Yock v. Department of Public Welfare of Pennsylvania*, 701 F.3d 938, 958-59 (3d Cir. 2012), the Third Circuit reversed the denial of intervention upon vacating final approval of a Rule 23(b)(2) (*i.e.*, mandatory) class settlement, to which the proposed intervenors were opposed. The class plaintiffs and the proposed intervenors had starkly conflicting interests because the former were mentally disabled individuals complaining that the defendant state officials had failed to offer them community services whereas the proposed intervenors were intermediate care facility residents altogether opposed to community placement. *Id.* at 941.

Likewise, in *In re Community Bank of Northern Virginia*, 418 F.3d 277 (3d Cir. 2005), the proposed intervenors opposed the class settlement, whose approval the Third Circuit reversed. The Third Circuit held that the district court had failed to exercise independent judgment in evaluating the deal, pointing to questions concerning class counsel's adequacy of representation, and even the possibility of collusion, given his failure to pursue or seek compensation for certain claim and his negotiation of a large fee simultaneously with the terms of the settlement itself. *Id.* at 301, 303-08. It was because the district court had failed to conduct an independent inquiry into both the settlement's fairness and class counsel's adequacy that the Court of Appeals remanded

the district court's conclusory denial of intervention. *Id.* at 314-15. Notably, the Court of Appeals emphasized that, ordinarily, mere dissatisfaction with the terms of a proposed settlement is insufficient cause to justify absent class members' intervention. *Id.* at 315.

All three cases are plainly inapposite to the circumstances here. The Court is not faced with the fairness of a proposed settlement hotly contested by rival factions, or even with ongoing settlement negotiations. Rather, Zuckerman Spaeder seeks its compulsory inclusion in discussions before the Magistrate Judge on a *post*-judgment, settlement administration issue that the Court has referred the Settling Parties to address with him. But putting aside the questions concerning its trustworthiness noted above, Zuckerman Spaeder's involvement is unnecessary.

Contrary to Zuckerman Spaeder's incorrect contention that Class Counsel has been unconcerned about race norming and even sanctioned it, Class Counsel has worked assiduously to ensure that no Class Member has been, or will be, adversely affected by race norming. Seeger Decl., ¶ 12. Class Counsel's objectives are two-fold. The first goal is to eliminate the use of demographic norms that adjust for race, and put into place purely race-neutral demographic norms. *Id.* The second is to investigate whether any Class Member has been disadvantaged by race norming. *Id.* The process is not simple, and it will take time. Demographic norms that adjust for race, when clinically appropriate, have been used for decades and are generally accepted by experts in the field of neuropsychology. *Id.* But there is a societal importance in what Class Counsel has undertaken and seeks to accomplish – *i.e.,* removal of race as a factor in neurocognitive testing and use of solely race-neutral demographic norms. In effect, Class Counsel would be creating a model that is both new and accurate, and which may lead to significant changes in the way that people of all races are evaluated for neuropsychological problems. *Id.* This is a daunting task but

one of paramount importance. It is one that Class Counsel is confident can, and will, be accomplished. *Id.*

Any proposal for ensuring the elimination of race norming will be worked out before Magistrate Judge Strawbridge, and ultimately will be submitted to this Court for its consideration. *Id.* All Class Members and their counsel – including Movants and their counsel – likewise will have an opportunity to consider it. *Id.* Far from any suggestion that there might be clandestine discussions involving parties unconcerned about race norming or that anyone's interests might be compromised without an opportunity to be heard, Class Counsel intends for the process to be transparent. *Id.* Thus, Movants do not face a situation where "disposing of the action may as a practical matter impair or impede [their] ability to protect [their] interest." Fed. R. Civ. P. 24(a)(2).

## III. Discussions Before the Magistrate Judge Should Not Be Stayed

Finally, although Zuckerman Spaeder asks that the Court stay what it characterizes as a formal "mediation" before Magistrate Judge Strawbridge until the Court rules on the Motion, Zuckerman Spaeder does not address any standards for granting a stay. There is no reason for the Court to issue one. Zuckerman Spaeder has shown no likelihood of success on the Motion and certainly face no irreparable harm if the Settling Parties' discussions before the Magistrate Judge move forward.

This litigation was brought to obtain relief for Players suffering debilitating illness as a result of concussive and sub-concussive head injuries experienced in the course of their NFL careers, as well as relief for their families. The meritless appeals of this Court's final approval decision that were filed by Zuckerman Spaeder and others were the reason why the Settlement's effectuation was held up for twenty-one months, during which time Players and their families

16

suffered. Class Counsel should be allowed to move swiftly to remove any potential taint of the clinical practice of race norming, investigate scored claims to ensure that none were inappropriately denied for that reason, and continue to get help to Players and their families who need it. No stay of discussions before the Magistrate Judge that would impede these efforts and hold matters up should be entertained.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion.

Date:  March 22, 2021

                                                Respectfully submitted,

                                                */s/ Christopher A. Seeger*
                                                Christopher A. Seeger
                                                SEEGER WEISS LLP
                                                55 Challenger Road, 6th Floor
                                                Ridgefield Park, NJ  07660
                                                Telephone:  (212) 584-0700
                                                cseeger@seegerweiss.com

                                                ***CLASS COUNSEL***