# EXHIBIT 3

## INTRODUCTION

It is a fact that ████████ – an 11 veteran of the NFL – suffered brain damage.  After his death in a November 20, 2017 car accident, ████ brain was sent to Boston University for autopsy and he was diagnosed with Level 3 CTE ("CTE Report").  *Exh. A.*  This is the rare case in which the analysis starts with a known conclusion: Mr. ████ cognitive impairment was real, present and severe.

The CTE Report independently supports the diagnosis of Dr. ████ a MAF approved doctor, who certified Mr. ████ Level 2 Impairment.  This Firm also took the extra step of having Mr. ████ file reviewed by:

- ████████ MD, FAAN

  - ➤ **Harvard Medical School, J. David and Virginia Wimberly Professor of Neurology.**
  - ➤ Brigham and Women's Hospital, Chief, Division of Cognitive & Behavioral Neurology.

- ████████ PhD, ABPP

  - ➤ **Brigham and Women's Hospital, Chief of Psychology and Neuropschology.**
  - ➤ Harvard Medical School, Assistant Professor of Psychology (collectively, Drs. ████████ are the "Brigham Doctors" and their report is the "Brigham Report").  *Exh. B.*

The Brigham Doctors *confirmed* the findings of Dr. ████.

Mr. ████ passed 100% of the validity tests administered, did not work and died in a car accident.  His condition was attested to by 5 affiants.  *Exh. C.*  His claim was approved by a MAF Physician and Board Certified Neuropsychologist.  *Exhs. D & E.*  The denial of this claim, when the evidence is clear that Mr. ████ suffered from dementia and followed the Settlement's requirements is unjustifiable, especially as he can't be re-tested or assert a claim for CTE.

While Mr. ███ presents clear and convincing evidence in the support of his diagnosis,

the Denial is riddled with factual inaccuracy and medical mistakes:

- <u>MSVT</u>: The AAP challenges the validity of Mr. ███ testing because the raw scores of the MSVT are omitted, **but the raw scores are included.** The MSVT is a computerized test and the results are calculated/presented by the computer as percentages. In the NPEs provided to this Firm, only percentages are reported. *Exh. F.* For the MSVT, the percentages are the raw scores, and the AAP's failure to recognize this raises serious questions about its understanding of the how the testing in Concussion Battery is administered.

- <u>Travelling to Examination</u>: The AAP challenges the validity of Mr. ███ NPE because he travelled to his testing independently, **but this is simply wrong as he was accompanied throughout his testing by Ms ███** There is no indication in any record that Mr. ███ travelled alone. It is obviously not the place of the AAP to assume facts not in evidence, much less make up reasons for denying a claim.

  ➢ This attack on validity is disturbing as this basis for denying the claim had previously been withdrawn after the misrepresentation was addressed by Class Counsel. *Exh. G vs. Exh. H.* It is unclear how this misrepresentation has re-appeared, but it is clear error.

- <u>Driving</u>: The AAP challenges Mr. ███ functional impairment because he continued to drive, **but Mr. ███ died in a car accident while driving.** Beyond the grossness of using this as a basis of denial, the AAP ignored the record which is replete with facts indicating that Mr. ███ should not have been driving at the time of his death.

- <u>Intelligence</u>: Mr. ███ was classified with 'above average' intelligence as he scored in the 91% on the TOPF, substantially above the 75% cut-off. The AAP —despite never having met with the player— determined that the testing and MAF Physician are wrong.

  ➢ The AAP's attack on Mr. ███ pre-morbid function because he left college early and had "low grades" demonstrates a surprising lack of understanding of the population in the Settlement. Many players had to balance football, work/finances and school. The pressure to leave college early to earn a paycheck, especially for the 7th overall pick in the draft is obvious. Down-grading Mr. ███ intellect because he left college to earn millions of dollars twists reality to fit a preconceived expectation that is inappropriate under the circumstances, especially from a physician who never interviewed Mr. ███

  ➢ This Firm is also troubled by the AAP's contention that attention deficit (and possible undiagnosed ADHD (*Exh. E. at 4*)) is inconsistent with above-average IQ. This Firm is unsure of the basis for such a broad and discriminatory painting of a huge swath of the population: regardless, it is highly speculative to judge a person's intellect with whom you have never met based on a disability.[1]

---

[1]      The AAP uses the wording 'inconsistent with' fairly often.  This Firm is not sure what this means in many of the contexts in which it is used.  Moreover, the AAP appears to use the term in a manner contrary to the express language of the FAQs.  Many individual facts can be inconsistent with an ultimate conclusion, yet

> ➤ Mr. ███ underlying condition was confirmed by Boston University's
> Level 3 CTE diagnosis. While the autopsy result can't be used to assert
> a CTE claim, it can be used as independent verification that his testing
> results appear valid. *Exh. A.*

The foregoing is compelling evidence that Mr. ███ was not malingering and that his results are

an accurate representation of his cognitive ability.

On the other hand, the attacks on the validity of Mr. ███ testing are unsound.

The AAP's contention that MSVT raw scores were "selectively omitted" is baseless.[2]

The MSVT is a computerized test. Mr. ███ sat at a computer and took the test. Once

completed, the results were calculated by a computer program <u>as percentages</u>. The NPEs

provided to this Firm <u>only</u> contain the percentage for the MSVT.[3] *Exh. F.* The absurdity of the

AAP's attack on a computer's compilation of results is compounded by the fact that raw scores

are not even required in the Settlement. *FAQ 112.* Attacks such as this undermine the

creditability of the AAP (*i.e.*, it indicates a concerning and fundamental lack of understanding of

how the testing works) and is not a basis for denying a claim.[4]

The AAP's attack also grossly misses the point: Mr. ███ passed every MSVT test

administered to him. Mr. ███ obtained perfect scores on 4 out of 5 of the MSVT subtests and

90% on the final subtest. *Exh. E. This is not a close call.* The result of the MSVT demonstrates

that Mr. ███ was putting forth adequate effort.

---

[2] The use of the word 'selectively' implies that Dr. ███ intentionally misled the Claims Administrator for the benefit of Mr. ███ There is no proof of this; and accordingly, constitutes an inappropriate accusation with no legitimate place in the Denial.
[3] This Firm has attached 5 NPEs conducted by different Neuropsychologists conducted in the BAP for review. For convenience purposes and to avoid unwitting disclosure of private information, only the MSVT scores are included with the remainder of the NPEs being redacted.
[4] Compounding the problem is that this error was previously identified by this Firm with respect to this Claim and brought to the AAP's attention. *Exh. I.* This Firm recognizes that Neurologists are not necessarily experts in testing, but it is troubling that this late in the Settlement that this type of mistake continues to be the basis for denying claims, especially as the AAP member has the ability to consult with other AAPs, the MAF and the AAP-C.

The AAP's contention that Dr. ███████ failure to conduct a second TOMM trial invalidates the testing is also spurious. Mr. █████ score on the first TOMM trial was a perfect 50 out of 50. *Exh. E.* Where, as here, an examinee passes the first TOMM trial with a high score –much less a perfect score– studies have concluded that the remaining TOMM trials can be confidently discontinued.[5]   In one study, 100% of the test subjects that passed the first TOMM trial also passed the second trial.[6]   In another study, which used cut off scores well below 50 points, 99% of subjects that passed the first TOMM trial also passed the remaining trails.[7]   As with the MSVT, Mr. ██████ TOMM testing *supports* the conclusion that Mr. █████ut forth adequate effort and that his testing represents his actual level of cognitive functioning.   The futility of this attack is further elucidated by the fact that even if it was assumed that Mr. ██████ failed the TOMM, his overall testing results would still be considered valid as he passed the remaining six validity measures in the Concussion Battery.[8]

---

[5]      O'Bryant S. E., Gavett B. E., McCaffrey R. J., O'Jile J. R., Huerkamp J. K., Smitherman T. A., *et al.* Clinical utility of Trial 1 of the Test of Memory Malingering (TOMM), Applied.

[6]      Gavett B. E., O'Bryant S. E., Fisher J. M., McCaffrey R. J.. Hit rates of adequate performance based on the Test of Memory Malingering (TOMM) Trial 1, Applied Neuropsychology, 2005, vol. 12 (pg. 1-4).

[7]      Wisdom, N. M., Brown W. L., Chen D. K., Collins, R. L. The Use of All Three Test of Memory Malingering Trials in Establishing the Level of Effort, Archives of Clinical Neuropsychology, Volume 27, Issue 2, March 2012, Pages 208–212.

[8]      The Settlement requires the TOMM, but does not provide any specific method in which the TOMM should be administered.   Even in an environment as closely controlled as the Settlement, testing variation exists.  Given the substantial research that supports the conclusion that a single trial of the TOMM presents valid results, an experienced Board Certified Neuropsychologist's decision to not perform excess testing falls under the auspices of the 'generally consistent' language in the Settlement.

The Denial's attack on the validity of Mr. █████ cognitive testing because of "failed validity scores on the MMPI-2-RF" is simply wrong.   Mr. █████ did *not* fail validity tests on the MMPI-2-RF.   The following are Mr. █████ scores and the applicable validity level:

| Test | █████ T-Score | T-Score Validity Cut-off as per Dr. Ben-Porath, the co-author the MMPI-2-RF[9] |
|------|---------------|--------------------------------------------------------------------------------|
| VRIN-r | 48 | Invalid T score ≥ 80 |
| TRIN-r | 50 | Invalid T score ≥ 80 |
| F-r | 88 | Possibly invalid T score ≥ 100 |
| Fp-r | 77 | Invalid T score ≥ 100 |
| Fs | 58 | Invalid T score ≥ 100 |
| FBS-r | 70 | Possibly invalid T-score ≥ 100 |
| RBS | 84 | Possibly invalid T score ≥ 100 |
| L-r | 52 | Possibly invalid T-score ≥ 80. |
| K-r | 35 | Possibly invalid T-score ≥ 70. |

As is demonstrated from the above chart, Mr. █████ passed every validity test on the MMPI.[10]

Even assuming that Mr. █████ MMPI was invalid, the AAP's attack on his cognitive testing performance *via* the MMPI is misplaced.   As is stated by the Brigham Doctors, "[t]he MMPI-2-RF is a mental health measure; it is not a cognitive measure."[11]   The literature is clear

---

9    Ben-Porath, Y.S., Interpreting the MMP-2-RF(2012)(Co-author of the MMPI-2-RF).
10    The AAP appears to conflate validity on the MMPI with over-reporting.   They are not same thing either in the context of this Settlement or otherwise.   Regardless, Mr. █████ MMPI results present a valid profile and are not a legitimate basis for attacking the validity of his cognitive testing.
11    Attached as *Exhibit J,* is a report by the Brigham Doctors with respect to an appeal for another player that involves many similar issues.

that failed validity on mental health testing (*i.e.*, MMPI-2-RF) does not vitiate *passed* validity tests on cognitive measures, such as those prescribed in the Concussion Battery. *Exh. K.* Moreover, "the utility of the MMPI in an individual with significant cognitive impairment is questionable"; and accordingly, a suspect validity measure for Mr. █████ and other impaired players.[12] [13] *Exh. J.*

The AAP's attack on the validity of Mr. █████ cognitive impairment because he reported unusual memory problems is also flawed. The AAP claims that it is inconsistent for Mr. █████ to forget about what he is doing and be able to fly independently for his examination. The problem is: Mr. █████ did not fly independently. Nothing in the record says he flew independently and the fact is that he was accompanied throughout his testing. The AAP previously removed this misrepresentation from the Denial at the request of Class Counsel, only to have it now reappear. *Exh. G vs. Exh. H.* This error can't form a legitimate basis for a denial, and raises serious questions about the thoroughness of the AAP review of this Claim.

The Denial's repeated mistakes with respect to validity are surprising. The Denial's blatant ignoring of the fact that Mr. █████ passed every validity test administered to him is confusing. The Denial's decision to overlook the purpose of validity –*i.e.*, whether the test results present a fair depiction of Mr. █████ actual level of function– is disturbing. It is also puzzling that the Denial creates "alternative facts", such as flying independently to his

---

[12]     The MMPI requires testing subjects to accurately respond to the questions presented about their condition. As a testing subject's cognition declines, his ability to accurately respond to questions also deteriorates and his ability to accurately reflect his own condition may be skewed. As is stated on page 176 of *Interpreting the MMP-2-RF*, "some potential test takers with severe cognitive impairments may be unable to complete an interpretable MMPI-2-RF." Ben-Porath, Y.S., (2012). It is obviously unfair to attack a player's cognitive testing results with a mental health test that may be invalid due to the very cognitive disability that the Concussion Battery is intended to measure.
[13]     The MMPI is also not listed as one of the 7 validity/effort tests in the Concussion Battery. It is appropriately listed as a "Mental Health" examination, which is its primary purpose. The AAP's attempt to alter the Battery to add an additional validity test is not supported by the text of the Settlement.

examination, to challenge the validity of Mr. ███████testing, but ignored his CTE results that objectively and independently confirm his impairment.  The foregoing problems taint the Denial and raise serious questions about its efficacy, especially as the cost of error in this case is high (Mr. ████is dead and can't be re-tested).

## B.    The Facts Support The Independent MAF's CDR Determination

Mr. ██████ overall CDR score of 2 is certified by an Independent MAF Physician.[14] There is no legitimate basis to second guess the determination of a highly decorated and experienced doctor approved by the NFL.  This is especially true as Dr. ███████interviewed Mr. ███████and performed testing on him, whereas the AAP has not.  The value of an in-person examination can't be underestimated or replaced and is required for any Independent MAF to diagnose a Retired NFL Football Player in the Settlement.

While not necessary, this Firm took the extra step of having Mr. ███████complete file reviewed by one of the pre-eminent neurologists in the world.  This step was taken because Mr. ███████can't be re-tested and any negative result would have a massive effect on his family, and specifically, his six children. ***The Brigham Doctors confirmed Dr. ███████diagnosis.*** While many things in this Settlement remain unsettled, it is beyond cavil that a doctor such Dr. ████████ can be relied on to be provide a competent, fair and accurate determination and that his understanding of dementia and the CDR is consummate.  As a gold standard within his profession and Chief of Neurology at Brigham Women's Hospital, a professor with an endowed

---

[14]       Dr. ██████is not one of the 4 MAFs who have been criticized by Claims Administrator and is still an active MAF.  *NFL Concussion Settlement, Doc. # 10597.*  This Firm had several potential Level 2.0 cases downgraded to Level 1.5, and Level 1.5 cases downgraded to non-qualifiers based on Dr. ██████ CDR determinations.  While this Firm does not have access to the information available to the Parties or Claims Administrator, it would be surprising if the overall record with respect to Dr. ███████did not confirm that he is anything but fair and not particularly player friendly.

chair at Harvard Medical School, and Director of the Center for Brain/Mind Medicine, Dr. ███████ confirmation of the Independent MAF's findings in itself constitutes clear and convincing evidence.

Mr. ████ CDR rating is supported by the following facts:

- Mr. ████ had significant memory problems.
  - ➤ He forgot his kids' birthdates. *Exh. D, at 2*; *Exh. C.*
  - ➤ He forgot his wedding date. *Exh. D, at 2*
  - ➤ He had difficulty remembering names, numbers, events and recent conversations. *Exh. E, at 3; Exh. D, at 2; Exh. C.*

- Mr. ████ was frequently disorientated.
  - ➤ He would go to the store and forget he was there. *Exh. D, at p. 2.*
  - ➤ He would go into rooms and not be sure why he went to the room. *Exh. D, at p. 2.*
  - ➤ He would get lost in places that he knew well. *Exh. D, at p. 4.*
  - ➤ He would forget what he is supposed to be doing, where he is, or where he is going. *Exh. E, at p. 3.*

- Mr. ████ had difficulty with finances.
  - ➤ He would forget to pay bills. *Exh. D, at p. 2; Exh. C.*
  - ➤ He was unable to make change with small sums of money. *Exh. D, at p. 2.*
  - ➤ He could not balance a check book. *Exh. D, at 2.*
  - ➤ He lost money in investments he could not manage. *Exh. C.*
  - ➤ He would not pay the mortgage and utilities and they would get turned off. *Exh. C.*

- Mr. ████ has difficulty with speech.
  - ➤ He had difficulty finding the correct word during conversation. *Exh. D, at 2.*
  - ➤ He lost his place in conversations. *Exh. D, at 4.*
  - ➤ He would call his children by the wrong name. *Exh. E, at 3.*
  - ➤ His comprehension was compromised as instructions needed to be repeated at least twice. *Exh. E, at 6.*

- Mr. ████ had difficulty with problem solving / emergency situations.
  - ➤ He would not be able to handle a plumbing leak or a small fire. *Exh. D, at 3; Exh. C.*

- Mr. ████ did not sustain a job / school.
  - ➤ He could not maintain a job as a broadcaster because of memory problems. *Exh. D, at 2.*
  - ➤ He went back to finish college, but couldn't because of his memory problems. *Exh. D, at 3.*

- ➢ He could not finish broadcasting school. *Exh. D, at 2.*
- ➢ He did not work in the years before his death. *Exh. C.*
- ➢ He did not work at his foundation on a regular or irregular basis and did not go foundation events in the year before his death. *Exh. C.*

- Mr. ▆▆▆ did not engage in activities outside of the home.
  - ➢ He lost interest in hobbies. *Exh. D, at 3; Exh. C.*
  - ➢ ▆▆▆ did very little outside the home … he mostly watched TV. *Exh. C.*
  - ➢ He did not belong to any professional groups or organizations. *Exh. D, at 5.*
  - ➢ He stopped going to church. *Exh. C.*
  - ➢ He did not shop for himself; and would not without someone to accompany him. *Exh. C.*

- Mr. ▆▆▆ needed constant care.
  - ➢ He would not do well outside of the home without constant supervision of friends and family. *Exh. D, at 4.*
  - ➢ His condition declined so much that he could not maintain his property without assistance of outside help. *Exh. D, at 4.*

- Mr. ▆▆▆ had difficulty with friends and family.
  - ➢ He would refuse to engage with friends and family for long periods of time. *Exh. D, at 4.*
  - ➢ He stopped communicating with several family members, including his sister. *Exh. C.*

- Mr. ▆▆▆ was not capable of household chores.
  - ➢ He may have thought he was capable of performing simple chores, but that was not the reality. *Exh. C.*

- Mr. ▆▆▆ should not have been driving.
  - ➢ He died in a car accident and caused serious injury to his girlfriend, who was thrown from the vehicle.
  - ➢ He was involved in a hit and run accident with a bicyclist approximately 1 year before death. *Exh. P.*
  - ➢ He would get lost and not be able to find his way home *Exh. D, at 4.*
  - ➢ He ex-wife tried to stop him from driving because he was a danger himself and others, but he refused *Exh. C.*
  - ➢ He was pulled over by the police many times. *Exh. C.*

- Mr. ▆▆▆ had significant problems with personal care.
  - ➢ He did not shower. *Exh. D, at 4, 6; Exh. C.*
  - ➢ He was inappropriately dressed … mostly wore sweats. *Exh. D, at p. 4; Exh. C.*
  - ➢ He forgot to shave and would go to the barber. *Exh. D, at 6.*
  - ➢ He lost control of his bladder and would have accidents. *Exh. C.*
  - ➢ He did not eat on a regular basis. *Exh. C.*

- He had conflicts with strangers. *Exh. C.*

- Mr. ███ attention span was impaired. *Exh. D, at 8.*
  - He has difficulty concentrating for any significant length of time. *Exh. C, at 3, 6.*

- Mr. ███ was easily agitated and angered.
  - He has increased irritability and anger. *Exh. C.*
  - In the years before his death, he became increasingly violent. *Exh. C.*
  - His ex-wife and children were scared of him. *Exh. C.*

While the Independent MAF and Brigham Doctors rely on an overwhelming record of facts that justify a CDR of 2, the AAP *cherry picks* a handful statements and skews them to demonstrate a lower level of impairment than the general record reflects.

One basis for the Denial was that Mr. ███ traveled alone to his examination. This contention is false. This basis for the Denial, which is clear error, was originally withdrawn after the misstatement was addressed by Class Counsel. *Exhs. G vs H.* The AAP's findings and determinations must be beyond reproach and errors such as this being used to deny a claim and incorrectly attack approved physician's findings degrades the Settlement process, undermines the AAP's creditability and raises seriously questions about the validity of the Denial.

The AAP's conclusion that Mr. ███ should not qualify for the Settlement because he was able to drive is inexplicable. Mr. ███ *died in a car accident*. There is very little that is as clear as the fact that Mr. ███ should not have been driving. In support of this claim, the ███ Affidavit states:

> ███ should not have driven in the years before his death. He had very poor judgment. He was a danger to himself and others. There were times his driving was so impaired that he needed his 14 year old daughter to drive him home. While I tried to stop him from driving, he would not stop. He was pulled over by police many times before the motor-vehicle accident that resulted in his death."
> *Exh. C.*

A look at the entire record should have led a reasonable reviewer to the conclude that Mr. ████ should not have been driving.  By way of example, even putting aside his death, Mr. ████ repeatedly reported becoming disoriented to time and place, which is obviously incompatible with driving.  *Exh. D, at 2.*  The ████ Estate is also being sued for an earlier car accident in which ██ is alleged to have struck a bike and fled the accident scene.  *Exh. P.*  Although players' ability to drive is a touchstone in this Settlement, it is unquestionable that many people with dementia continue to drive for years after onset.[15]  The ability to drive in certain situations might be a legitimate basis for challenging a CDR rating; however, it is clear that is not the case with respect to Mr. ████  The AAP should have the discretion and *common sense* to be able distinguish Mr. ████ tragic inability to recognize the extent of his own impairment from other situations where a driver is more capable.

The Denial has also skewed the record with respect to Mr. ████ ability to work.  The record is clear that Mr. ████ had not worked since 2008.  *Exh. D, at 2.*  The record is also clear that he could not even make it through a broadcasting class.  *Id.*  A foundation in Mr. ████ name does exist; however, that foundation was managed and operated by a professional staff and not by Mr. ████.  While the foundation was undoubtedly thankful for the 'work' Mr. ████ provided, this is a long way from saying he could function in any way in a work environment.  As is stated in the ████ Affidavit:

> "In the years before his death, ████ did not work.  He could not keep a regular schedule ... In the years before his death, ████ was the figurehead for the foundation he started.  All the daily activities of the foundation were left to a professional staff.  While the foundation was an important legacy for him, he did not work at the foundation on a regular or irregular basis.  To the extent he was forced to make an appearance at an event, he needed assistance.  He would not go to places

---

[15]   *Gilley, et al.,* Cessation of Driving and Unsafe Motor Vehicle Operation by Dementia Patients, Arc Intern. Med. (1991); *see also Lloyd S, et al.,* Driving and Dementia:  A Review of the Literature, Can J. Occup. Ther. (2001) (30% of older adults with dementia continue to drive).

> alone.  He felt uncomfortable in large groups and speaking to people.  I can't remember any specific events he actually did attend in the year before his death."  *Exh. C.*

Moreover, the record is clear that Mr. ███ could not function inside or outside of the home without significant supervision.  It is unrealistic to expect someone to work who needs constant supervision.  Given the foregoing, the Denial's contention that Mr. ███ could work in any function is directly counter to statements in the record and his overall condition.

The Denial also attempts to paint Mr. ███ personal care as far more functional than the reality.  The ███ Affidavit addresses this issue as follows:

> ███ stopped maintaining himself the way he should and needed assistance with basic personal care matters.  He mostly wore sweats.  He did not always shave or cut his hair.  He had difficulty shaving and he went to the barber.  ███ did not eat regularly.  He did not eat real food, but mostly foods that were easy to eat like junk food.  Because he did not eat on a regular basis, his weight fluctuated.  There were times ███ lost control of his bladder; he would not be able to make to the bathroom and had accidents on the floor.  He might not have remembered these incidents, but I surely do."  *Exh. C.*

The foregoing demonstrates substantial disability with respect to personal care.  It appears as if in many places, the Denial assumes because an issue is not addressed that it means that Mr. ███ was capable of performing the task.  By way of example, the record is clear that Mr. ███ did not shave on a regular basis.  The Denial concludes from this that Mr. ███ was capable of shaving, but simply forgets to.  This type of implication without a factual basis is dangerous and can lead to incorrect conclusions.  Mr. ███ needed assistance with the act of shaving, which is why he would go to the barber. *Exh. C.*  It is not the place of the AAP to leap without evidence to disprove the diagnosis of Independent MAF.

The foregoing facts and the Special Master's rulings on the CDR and the generally consistent language all point to a CDR of 2.  The FAQs expressly require using the higher of two possible scores in a given category if there is a question as to what CDR rating should be given.

Moreover, "if a Player is given a mix of scores on the three areas, the diagnosing physician must make a sound medical judgment, assessing the qualitative results of the three areas as a whole to reach a diagnosis, and the final diagnosis rendered must be generally consistent with the scores assigned." FAQs at 104(1).   Given the inherent flexibility provided to Independent MAF to call balls and strikes within the CDR and the fact Dr. █████ actually interviewed Mr. █████ there is ample evidence to justify his determination.   Where, as here, an Independent MAF's diagnosis is confirmed by the Chief of Neurology at Brigham Women's Hospital, it can safely be said that clear and convincing evidence of a CDR score is established.

While Mr. █████ presents strong evidence in support of his CDR rating, the AAP's attempt to discredit the Independent MAF falls short.   The AAP has ignored the overall record to focus on a handful statements and then uses them out of context.   This runs directly counter to FAQ 104(1), which expressly requires a holistic examination of all facts.   It almost appears as if the AAP was searching for facts to support a pre-determined outcome.   By way of example, the AAP's contention that Mr. █████ ability to drive precludes a CDR of 2 is belied by his death and the unassailable truth that Mr. █████ should not have been behind the wheel.   The AAPs statement that Mr. █████ was capable of attending his examination alone is not only untrue, but also belied by numerous statements in the record that indicate that he was not capable of function outside the home without assistance.   The AAP's presumption that Mr. █████ was capable of shaving on a regular basis is without evidence in the record and untrue.   While AAP determinations should be given deference, this Denial is riddled with problems and inaccuracies that undermine its validity, and arguably even usability.

*C.  Mr. ███████ Has Above-Average Intelligence*

The AAP's challenge to Mr. ███████ classification of 'above average' intelligence is absurd. Mr. ███████ TOPF score is in 91%, which translates to an estimated IQ of 120 and is well above the required IQ score of 110. *Settlement, Exh. A-2, at 2.* Dr. ███████—who concurred with the rating—notes that Mr. █████ scored in the 91% of Matrix Reasoning subtest, which also indicates a high-level of pre-morbid function and provides a second high data point that is consistent with the TOPF score. *Exhs. B and E.* The NPE states "Mr. █████ is a highly intelligent man who likely has superior level of intellectual endowment." *Exh. E, at 12.* Many of the affiants also note that Mr. █████ was extremely intelligent. *Exh. C.*

In response, the AAP states that there are apparent "inconsistencies" with this rating. To be frank, these "inconsistencies" stretch reasonableness to a breaking-point: the AAP appears to be searching for reasons to justify denial.

The AAP's attack on Mr. ██████ pre-morbid function because he left college early and had "low grades" is bizarre. Mr. █████ was a walk-on at The Ohio University. Players, such as Mr. █████ are often forced into 3 full-time jobs while at school: working, playing football and academics. The burdens and pressures on these players are unimaginable to an average student. Moreover, the AAP's argument that Mr. █████ should be classified with a lowered IQ because he left school early to earn millions of dollars as the 7th overall pick in the draft is absurd. Most people, regardless of intelligence, when given a once in a lifetime opportunity to play in the NFL as a first round draft pick, would take it. This is the dream of millions of young boys and hardly a justification to downgrade Mr. █████ intelligence.

The AAP's contention that Mr. ████ attention deficit (and possible undiagnosed ADHD) is inconsistent with above-average intellectual function is equally absurd.  This Firm is unsure of the basis for such a broad and discriminatory statement: regardless, it is highly speculative to judge a person's intellect with whom you have never met based on a disability. The AAP's contention that Mr. ████ struggled in English is equally worthless.  As it has throughout the Denial, the AAP ignored the overall record, and takes a portion of a sentence out of context.  The actual sentence from the NPE reads as follows: "[h]e performed best in history and struggled most in English."  *Exh E, at p. 5.*   This sentence is a comparison of strengths and weakness, and similar statements exist in numerous reports by this Neuropsychologist.   It is intellectually dishonest to twist this sentence and conclude that Mr. ████ has a lower IQ than reported on his TOPF (and Matrix Reasoning) because he preferred History to English.   In fact, a close examination of Mr. ████ history, possible ADHD and preference of other subjects over English makes his very high TOPF score even more impressive.

### D. Race Based Norms: Race Should Never Be The Determinative Factor In Whether A Player Gets An Award

The AAP contends that incorrect normative data was used with respect to certain testing. While the AAP dances around the issue, this Firm thinks it understands what is being argued: Mr. ████ scores should be lower than stated because he is African American and *maybe* he should not qualify for the Settlement for this reason.   Although the issue need not be reached on appeal; out of an abundance of caution, this Firm addresses the use of race-based norms and the ramifications thereof.

1.  **Heaton Makes it Harder for African Americans to Qualify for the Settlement than Caucasians**

It is unclear when or how the Heaton norms were chosen for the Concussion Battery. The word Heaton does not appear in the Settlement or any public document related to the Settlement. This Firm has been informed that these norms appeared in Qualified Physician MAF Manuel sometime *after* Mr. ████ was tested.

Heaton and other race-based norms are problematic as they make it harder for African Americans to qualify for the Settlement than Caucasians. In many instances, African American players with the exact same raw scores as Caucasian players do not qualify for the Settlement. This is not a controversial statement: any AAP consultant will agree that the use of the Heaton norms results in African Americans with the exact same raw scores as Caucasians not qualifying for the Settlement.[16]

The reason why African Americans need lower raw scores than Caucasians is that when race is applied to individual tests *via* Heaton, African Americans are expected to score lower than Caucasians. Because African American players' starting point under Heaton is lower than Caucasians[17], in order to show impairment – a score that is 1.7/8 or 2 standard deviations away from their racially adjusted normal – a African American's raw scores must be lower than their Caucasian counterpart to qualify for the Settlement. **To be clear:** African American players whose raw scores would qualify them for the Settlement if compared against the general population (or Caucasians) become non-qualifiers because race is applied to change their T-scores.

---

[16]     To the extent necessary, this Firm expressly requests that this question be certified to the AAP-C. It should be noted that Heaton requires the use of race in its norming. Other norms can account for age, education and other factors, but exclude skewing results with the inclusion of race.

[17]     Effectively, the use of racial norming starts with the premise that African Americans are impaired *vis-à-vis* their Caucasian counterparts.

### 2.  *Heaton is not Required by the Settlement*

As a starting point, the AAP's requiring the use of Heaton is without foundation as the Settlement does not state that Heaton or any specific norm must be used.  Exhibit A-2, Section 4 of the Settlement does state that certain tests were selected because demographically-adjusted normative data was available.  This does not mean that any norm was required to be used for any given test, merely that certain types of norms were available for use by the MAF Physician and his/her selected Neuropsychologist.  Where a doctor believes that demographic norms are useful, the Settlement gives him or her the option to use them.  In fact, at the time Mr. ▮▮▮▮ was tested, there was no requirement by the AAP or in the Qualified Physician MAF Manual that any specific norm be used.  The AAP now requiring that Heaton, or any race-based norm be used, goes beyond the terms of the Settlement and should be rejected.  Even to the extent that at some point Heaton did become the applicable norm in a secret agreement not approved by the Court and made without notice, it should not be retroactively applied to a diagnosis made before the requirement was finalized.

### 3.  *The Use of Race-Based Norms Violates Equal Protection, including 42 U.S.C. §1981*

The use of Heaton's race-based norms in the context of this Settlement violates fundamental principles of equal protection, and more specifically 42 U.S.C. §1981.[18]  While discrimination is often difficult to evince, this is not such a case.  Heaton norms actually alter raw test scores when converted into T-scores *on racial lines*.  This conversion increases the

---

[18]  This brief is not intended fully canvas the entire spectrum of civil rights laws that might be applicable to this case.  By way of example, New York (*i.e.*, the law the governs the Settlement) has a large body of civil rights statutes that could apply to this action. There are also numerous other Federal Laws that might apply, including Title VII. This Firm identified Section 1981 because the use of race-based norms clearly violates the statute.

Obviously, if Mr. ▮▮▮▮ case is denied (in part or whole) on the use of discriminatory norms, this Firm will be required to file an independent suit in Federal Court and challenge the Settlement, as applied, on these grounds.

chance that African Americans will have higher T-scores, and thus, not qualify for the Settlement.   The NFL must be aware of this effect as approximately 70% of players in the NFL are African American, and racial norming will reduce their liability with respect to these players.[19]

Discrimination on the basis of race in private contracts and/or employment is expressly forbidden by 42 USC §1981.  Section 1981 states in relevant part:

> "(a) Statement of equal rights
>
> All persons within ... the United States shall have the **same** right ... to make and enforce contracts, to sue ... and to the full and equal benefit of all laws and proceedings ... as is enjoyed by white citizens.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, **and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship**.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." (emphasis added).

This statute has been construed to include all aspects employee-employer relationship.  In *Ford v. Long*, the 6th Circuit stated:

> "When an employer, public or private, places more stringent requirements on employees because of their race, Section 1981 is violated. The purpose for which the Section was enacted — to afford equal opportunities to secure the benefits of American life regardless of race — requires that a court adopt a broad outlook in enforcing Section 1981. Schemes of discrimination, whether blatant or subtle, are forbidden." 496 F.2d 500, 505 (6th Cir.1974).

Consistent with its purpose, Section 1981 has also been broadly applied in almost every situation where a contract exists or might exist.  *See, e.g., Runyon v. McCrary*, 427 U.S. 160

---

[19]     While 70% of NFL players are African American, 9% of managers in the league office, and 0% of league majority owners, CEOs, or Presidents are African American.  https://qz.com/1287915/the-nfls-racial-makeup-explains-much-of-its-national-anthem-problems/                                                                          : https://profootballtalk.nbcsports.com/2018/05/28/nfl-needs-more-minority-owners-but-franchise-values-make-that-difficult/

(1976)(Section 1981 found to be applicable with respect to applying to private schools as potential contract between the student and school was involved.); *Brown v. J. Kaz, Inc.*, 581 F. 3d 175, 182 (3rd Cir. 2009)(Section 1981 broadly construed to include potential employee-employer contracts for independent contractors.); *Perry v. Command Performance*, 913 F. 2d 99 (3rd Cir. 1990)(Section 1981 found to applicable with respect to beauty appointment as scheduling the appointment constituted a contract.).

In this case, Mr. ██████ injuries and claim arise out of his contracts and employment as a professional football player in the NFL. The section heading in the Notice of Concussion Settlement entitled *What is the litigation about* states that "Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries … [and] accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn or protect the players." *Exh. M, at p. 5; see also Settlement, at Recital B; Exh. L.* Moreover, in order to qualify for the Settlement, a player must have been "under contract to play for a Member Club." *Settlement, at 2.1(a), (kk) and 5.1.* To the extent that the NFL attempts to eschew its contractual/employment relationship with Mr. ██████ it can also be argued that the Settlement itself is a contract subject to Section 1981. *See, e.g., Singh v. State Farm Mut. Auto. Ins. Co.*, 860 P. 2d 1193 (Alaska 1993)(Settlement found to be a contract for purposes of Section 1981.).

In addition to prohibiting racial discrimination in contracting, Section 1981 also guarantees "[a]ll persons within … the United States … the same right … to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." *42 U.S.C. §1981; see Phillip v. University of Rochester*, 316 F.3d 291, 292 (2nd Cir. 2003). In this case, the right to recover an award for the

brain damage caused by playing in the NFL constitutes a property interest. *See, e.g., Phillip,* 316 F.3d at 293 (Claims of false arrest and imprisonment, battery and excessive use of force, assault, malicious prosecution, intentional and negligent infliction of emotional distress found to implicate Section 1981); *Hawk v. Perillo,* 642 F. Supp. 380 (N.D. Ill. 1985)(Claim for personal injuries found to come within score of Section 1981 property interest.). The Settlement arises out of the player's 'right to sue' and the litigation and claims process are 'proceedings' used to secure players' property interest. Mr. ████████nderlying claims alleged violations of State negligence and fraud laws. *Exh. M, at p. 5; Settlement, at Recital B; Exh. L.* As the application of Heaton's race-based norms denies African Americans players the **same** application of these laws and proceedings as Caucasian players, the use of these norms violate Section 1981.

Unlike many civil rights cases, the use of Heaton's race-based norms is discriminatory on its face. By definition, Heaton's race based norms have the effect of treating African Americans differently than Caucasians. Section 1981 expressly provides that races must be treated the **"same"**. In cases such as this one, where a stated policy treats racial groups differently, a violation of Section 1981 naturally follows. *See, e.g., Gratz v. Bollinger,* 539 U.S. 244 (2003)(University of Michigan policy of giving specific point advantage to minorities when evaluating student admissions violates white applicants right to Equal Protection and Section 1981.); *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate,* 416 F.3d 1025 (9th Cir.2005)(Ninth Circuit found that school policy concerning race was discriminatory on its face, and thus violated Section 1981.); *cf. Brown v. Board of Education,* 347 US 483 (1954)(Finding policy of separate but equal inherently unequal.).

*Gratz v. Bollinger* is particularly instructive. In *Gratz,* a Caucasian applicant for admission to the University of Michigan complained that the process for determining who was

admitted to the school was discriminatory and violated Section 1981.  As part of the University of Michigan Affirmative Action within the admissions process, all African Americans were given a specific point advantage over Caucasian applicants.  Despite the significant historical justification for Affirmative Action, the Supreme Court agreed with Gratz and found that a policy that gave a specific advantage to African American applicants was discriminatory and violated Section 1981.  Obviously, the instant case is far more compelling than Gratz as Section 1981 was originally intended to protect African Americans against discrimination.  To the extent that a process that gives African Americans an advantage violates Section 1981, the same must also be true for this claims process that gives Caucasians a specific advantage in obtaining monetary awards *via* the application of race-based norms.

It is well-settled that "claims brought pursuant to Section 1981 are analyzed under the same standards as Title VII claims."  *Ganthier v. N. Shore-Long Island Jewish Health Sys., Inc.*, 345 F. Supp. 2d 271, 282 (E.D.N.Y. 2004) (*citing Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2nd Cir. 2000)); *see Brown v. J. Kaz, Inc.*, 581 F. 3d 175, 182 (3rd Cir. 2009)("[W]e have previously held that the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII.").[20]   Congress has made clear within the Title VII context that the use of norms in employment is discriminatory.  Specifically, §106 of the 1991 Civil Rights Act, codified at 42 U.S.C. § 2000e-2(l) of Title VII states:

---

[20]    Title VII and section 1981 are 'parallel or overlapping remedies against discrimination.' Consequently, in fashioning a substantive body of law under section 1981 the courts should, in an effort to avoid undesirable substantive law conflicts, look to the principles of law created under Title VII for direction. *Waters v. Wisconsin Steel Works of Int. Harvester Co.*, 502 F.2d 1309 (7th Cir. 1974), *citing, Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

> "Prohibition of discriminatory use of test scores
>
> It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, *to adjust the scores of*, use different cutoff scores for, *or otherwise alter the results of*, employment related tests on the basis of race, color, religion, sex, or national origin. "

Given the significant interconnectedness of purpose between Section 1981 and Title VII, the Congressional determination that race-based norms are discriminatory should be given significant weight.

### 4. *Failure to Notice the Disparity Amongst Class Member And To Address Issue At Fairness Hearing*

While the Settlement contains no express requirement that African American players be treated differently than Caucasian players, the AAP appears to disagree. [21] The AAP's disparate treatment of class members creates significant problems with the Rule 23 Notice to Class Members and FRCP 23(e)(2)(D).

The Rule 23 Class Notice fails to state that African Americans would be treated differently than Caucasians. *Exh. M.* The Notice also makes no mention of the Heaton norms. Notice in a class action must be the "best practicable, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). "The notice should describe the action and the plaintiffs' rights in it." *Id.* Notice provides an opportunity for class members to participate in the litigation, to opt-out of the litigation, to monitor the performance of class representatives and class counsel, and to ensure that predictions of adequate representation are fulfilled. *Manual For Complex Litigation (Fourth)*

---

[21]     Upon information and belief, there are zero AAP or AAP-C members that are African Americans even though over 2/3 of the players being tested are African American. ***Upon information and belief, there are approximately 3 African Americans out of approximately 116 MAF Physicians or 2.6%.***

§ 21.13 (2004). Discrimination within the testing battery is a major issue that could have affected many players' decisions to opt-out of the Settlement and would have resulted in objections. If this issue had been noticed, it would have been rectified or we might well not have a Settlement.

Rule 23(e)(2)(D) requires that the Court hold a fairness hearing to determine whether "the proposal treats class members equitably relative to each other." It is hard to imagine that any Court would find that a Settlement that makes it more difficult for African Americans to recover an award than similarly situated Caucasians is equitable. Needless-to-say, this Court made no such finding, nor does it seem likely that this issue was even addressed as no such requirement is stated within the Settlement. Given the importance of this issue and the lack of a finding that such treatment is equitable, the AAPs decision to apply the rule without Court approval substantially overstepping of its authority.

### 5. *Does not Apply Well*

The use of demographically adjusted norms is also troubling because they ignore reality. In today's society, very few people fit into tightly boxed in norms. There is no 1 drop rule when it comes to norms, people or testing. Most people aren't 100% of anything even if they identify themselves as Caucasian, Hispanic or African American. Many people don't know their heritage or demographics particularly well. Each Board Certified Neuropsychologist appointed by the respect MAF Independent Neurologist should be given the opportunity to choose the type of norming specific to the individual being testing without being second-guessed, and certainly should not be required to use norms he or she finds inaccurate or not in keeping with internal beliefs or standards.

Mr. ███ history provides a good example of why norming is complicated and can't be rigidly set by AAP doctors who have had no interaction with the players.[22]   While Mr. ███ identified as African American, he never knew his father.  *Exh. N.*  He was raised in a series of foster homes after his mother was beaten to death.  *Id.*  He entered college without a scholarship, but left early to join the NFL.  Mr. ███ long standing problems from concussions (*Exh. O*) affected his attempt to return to college and graduate after playing in the NFL.  *Exh. D, at 3("After retirement from the NFL, he went back to college to finish his education.  He could not finish his education due to his thinking problems and memory difficulty.").*  Given the foregoing, the use of neutral norming is imminently justifiable.  While it might be convenient for the AAP to put every player in clearly identified normed boxes, this is just not possible in many cases, including Mr. ███

## CONCLUSION

Mr. ███ claim is surrounded by *indicia* of creditability.  He followed the precise requirements of the Settlement, having been examined by an NFL approved MAF Neurologist.  Dr. ███ after actually meeting with Mr. ███ and reviewing the complete record, certified him with Level 2 Impairment.  The MAF's diagnosis was confirmed by the two most reputable brain/mind doctors in the world; both of whom teach at Harvard Medical School and hold leadership roles at Brigham Women's Hospital.  The diagnosis was lent added creditability by an autopsy report from Boston University that found that Mr. ███ suffered from Level 3 CTE.  Mr. ███ failed no validity tests.  He played a long time in the NFL and suffered documented

---

[22]   Neuropsychologists do not blankly apply all potential adjustments; instead, they utilize clinical judgment based on extensive reserves, statistical analyses, and experience --J. Holdnack, *et al.*, WAIS-IV/WMS-IV and ACS, Chapter 4: Demographic Adjustments to WAIS-IV/WMS-IV Norms-- discussing "When to Use Demographic Adjustments."

concussions during career. *Exh. O.* His testing and diagnosis are supported by 5 statements of people close to him. The foregoing constitutes clear and convincing evidence of his diagnosis. [23]

While Mr. ████ claim is surrounded by validity that is repeatedly and independently verified, the Denial contains inaccuracies, unfounded medical conclusions and contentions that appear slanted against approval.[24] The work and findings of the AAP must be accurate *every time* and *in every respect*. The record must reviewed as a whole and not skewed to fit a predetermined result. This does not appear to have occurred in this Denial. It would be a tragedy, if mistakes and misjudgment resulted in a perfectly valid claim being denied, especially as Mr. ████ can't be retested.

For the reasons stated herein, this Firm respectfully requests that the Denial be overturned and that Mr. ████ estate be granted the Monetary Award that it is entitled to.

Dated:        New York, New York
              August 22, 2019

                                        JR WYATT LAW, PLLC

                                        Justin R. Wyatt
                                        *Attorneys for* ████
                                        ████

                                        49 West 37th Street, 7th Floor
                                        New York, NY 10018
                                        (212) 557-2776

---

[23]    If one were to use Mr. ████ actual base intelligence T-score of 63, then he would have scored 2 or more standard deviations from his base intelligence on 9 of 22 tests and 1.5 standard deviations from his baseline on 16 of 22 tests. The foregoing demonstrates a massive and consistent decline.

[24]    It should be noted that it does not appear that the AAP made any effort to: reach out to the MAF; apply the 'generally consistent' standard; or to determine if a lesser diagnosis (*i.e.*, Level 1.5 Impairment) would be appropriate.