# EXHIBIT 4

## NFL Parties' Opposition to the Appeal of
## Claim Denial Filed by Representative Claimant

Retired NFL Football Player ▇▇▇ received a Qualifying Diagnosis of Level 2 Neurocognitive Impairment (*i.e.*, moderate dementia) from Qualified MAF Physician Dr. ▇▇▇, as supported by neuropsychologist Dr. ▇▇▇, on September 14, 2017. (*See* Diagnosing Physician Certification at 3.) Unfortunately, Mr. ▇▇▇ passed away in an automobile accident on November 20, 2017, and ▇▇▇, the temporary administrator of Mr. ▇▇▇ estate, was substituted as Representative Claimant on April 23, 2018. (*See* Substitution of Representative Claimant Form at 1.)

On January 9, 2018, the Claims Administrator placed Mr. ▇▇▇ claim into audit due to its association with Dr. ▇▇▇, whom the Claims Administrator identified (along with six other neuropsychologists, referred to collectively as the "Template Doctors") as having potentially used template reports for multiple claimants evaluated as part of the Settlement Program. (*See* Jan. 9, 2018 Notice of Audit of Claim.) On February 28, 2018, the Claims Administrator referred an audit report (the "Template Doctors Audit Report") to the Special Masters, concluding that "there [was] a reasonable basis to conclude that the Template Doctors' evaluations contain misrepresentations of material facts in connection with . . . 62 claims," and recommending (1) disqualification of the Template Doctors and (2) denial of claims relying on neuropsychological testing by the Template Doctors. (*See* Template Doctors Audit Report at 2.) On September 17, 2018, the Special Master directed the Claims Administrator to refer all claims associated with the Template Doctors "to a single member of the [Appeals Advisory Panel ("AAP")], with consultation from a single [Appeals Advisory Panel Consultant ("AAPC")], for individualized assessment." (Sept. 17, 2018 Notice of Special Master Decision After Audit of Claim at 1.)

On November 21, 2018, the Claims Administrator denied Mr. ▇▇▇ claim based on a determination by an AAP member, with assistance from an AAPC, that (1) Mr. ▇▇▇ functional abilities were not generally consistent with the Settlement criteria for Level 2 Neurocognitive Impairment; (2) Mr. ▇▇▇ neuropsychological test scores were not generally consistent with the Settlement's BAP criteria for Level 2 Neurocognitive Impairment; and (3) Mr. ▇▇▇ SLUMS score of 18/30 was "more typical of an early dementia" than the moderate dementia contemplated by a Qualifying Diagnosis of Level 2 Neurocognitive Impairment. (*See* Nov. 21, 2018 Notice of Denial of Monetary Award Claim ("First Notice of Denial") at 1.)

On May 6, 2019, Mr. ▇▇▇ filed a 27-page appeal, more than 16 pages over the 10-page limit set by Rule 11(c) of the Rules Governing Appeals of Claim Determinations, and submitted new evidence in the form of (1) a September 17, 2018 neuropathology report by Dr. ▇▇▇; (2) May 2, 2018 letters from neurologist Dr. ▇▇▇ and neuropsychologist Dr. ▇▇▇, who reviewed Mr. ▇▇▇ medical records after his death; (3) a 2013 article from *The Clinical Neuropsychologist*, titled *Assessing Effort: Differentiating Performance and Symptom Validity*; (4) a 2016 article from *Archives of Clinical Neuropsychology*, titled *Relative Utility of Performance and Symptom Validity Tests*; (5) an April 26, 2019 supplemental letter from Dr. ▇▇▇ and Dr. ▇▇▇, discussing the AAP's reasons for recommending denial of the claim; and (6) an undated Third-Party Sworn Statement from Mr. ▇▇▇ former wife, ▇▇▇. (*See* May 6, 2019 Statement of Appeal ("First Appeal").) On July 26, 2019, following the

Special Master's remand of the claim for review of the new evidence, the Claims Administrator again denied the claim after the AAP member determined that the new evidence did not change the conclusions set forth in the First Notice of Denial. (*See* July 26, 2019 Notice of Denial of Monetary Award Claim ("Second Notice of Denial") at 2.)

On August 23, 2019, Mr. ▬▬▬ filed a second, 26-page appeal, again in violation of Rule 11(c) of the Rules Governing the Appeal of Claim Determinations, and did not submit any additional new evidence. (*See* Aug. 23, 2019 Statement of Appeal ("Second Appeal").)

The NFL Parties respectfully oppose this Second Appeal because Mr. ▬▬▬ has not identified clear and convincing evidence that the denial of his claim was in error. Specifically, the AAP member correctly determined that Mr. ▬▬▬ claim should be denied because Mr. ▬▬▬ reported functional impairment was not generally consistent with the Settlement criteria for a Qualifying Diagnosis of Level 2 Neurocognitive Impairment. Indeed, publicly available information provides further evidence that Mr. ▬▬▬ functional abilities far exceeded those required for a Qualifying Diagnosis of Level 2 Neurocognitive Impairment.

In addition, although tangential to resolution of this appeal, Mr. ▬▬▬ accusations that the AAP, Claims Administrator, and/or the Settlement Agreement itself somehow discriminate on the basis of race are wholly without merit.

For each of these reasons, and those set forth below, Mr. ▬▬▬ appeal should be denied.

### I. Mr. ▬▬▬ Reported Functional Impairment Was Not Generally Consistent with the Settlement Agreement Criteria

For a diagnosis of Level 2 Neurocognitive Impairment, the Settlement Agreement requires "functional impairment generally consistent with the criteria set forth in the [CDR] scale Category 2.0 (Moderate) in the areas of Community Affairs, Home & Hobbies, and Personal Care." (Settlement Agreement, Ex. A-1 at 3, § 2(a)(iii).) The purpose of this requirement is to ensure that the diagnosing physician, assessing each of the three areas independently, determines whether a claimant's functional abilities—assessing the qualitative results of the three areas as a whole—is generally consistent with the diagnosis rendered. Under the CDR, a score of 2.0 in the area of Community Affairs requires that a person have "no pretense of independent function outside home"; a score of 2.0 in the area of Home & Hobbies requires "only simple chores preserved" and "very restricted interests," which are "poorly maintained"; and a score of 2.0 in the area of Personal Care requires that a person "requires assistance in dressing, hygiene, [and] keeping of personal effects." (*See* Ex. 1, CDR Worksheet.)

In his evaluations with Dr. ▬▬▬ and Dr. ▬▬▬, Mr. ▬▬▬ reported that he experienced significant memory issues, difficulty finding words, difficulty handling his finances, and difficulty handling tasks around the home. (*See* ▬▬▬ Report at 2-3, ▬▬▬ Report at 3.) In three third-party affidavits and a letter provided at the time of Mr. ▬▬▬ purported diagnosis, Mr. ▬▬▬ girlfriend, friend, former instructor, and coworker reported that Mr. ▬▬▬ experienced memory issues, had trouble focusing, sometimes got lost while driving, withdrew socially, and sometimes failed to dress, shower, or shave

2

appropriately. (*See* ▓ Affidavit at 1-3; ▓ Affidavit at 1; ▓ Affidavit at 1-2; ▓ Letter.) Although these reports show that Mr. ▓ experienced *some* degree of functional impairment, they fail to show, as the AAP member correctly determined, that Mr. ▓ impairments met the criteria for a CDR score of 2.0, which requires that a person have "no pretense of independent function outside home."[1]

On appeal, Mr. ▓ argues that Mr. ▓ impairments were much more severe than reflected by the AAP member. Mr ▓ arguments, however, are based in large part on an unreliable third-party statement that was submitted *after* Mr. ▓ death and *after* the first denial of his claim, and that describes more severe impairments that conflict with the contemporaneous affidavits and statements provided at the time of Mr. ▓ examination by persons much closer to him; this *post hoc* statement, clearly at odds with the contemporaneous reports in Mr. ▓ Claim Package, cannot provide the clear and convincing evidence required to overturn the AAP's decision on appeal.

Specifically, in this Second Appeal, Mr. ▓ relies in large part on an unsigned, undated, and previously un-submitted third-party sworn statement completed *after* Mr. ▓ death by his ex-wife, ▓. (*See* First Appeal at 10-12, Ex. I; Second Appeal at 9-11, Ex. C.) Despite the fact that Ms. ▓ and Mr. ▓ divorced in 2014, and only spoke "on a weekly basis" until the time of his death (*see* ▓ Statement), Ms. ▓ statement purports to detail *significantly* more severe functional impairment than the affidavit provided by Ms. ▓, Mr. ▓ then-current girlfriend who completed her affidavit while Mr. ▓ was alive and who "spent most of [her] free time with [Mr. ▓]" (*see* ▓ Affidavit at 1). Ms. ▓ undated, unsigned, and unreliable *post hoc* statement cannot be accorded weight to the extent it exaggerates impairment beyond that described in the contemporaneous affidavits and letter, which were actually reviewed by Dr. ▓ prior to his diagnosis. (*See* ▓ Report at 3-4.)

Moreover, the reports of severe functional impairment discussed in Mr. ▓ appeal (many of which are taken from Ms. ▓ statement) are flatly contradicted by publicly available information. This publicly available information serves as additional evidence that the AAP member's conclusion was correct, and that Mr. ▓ has failed to provide clear and convincing evidence to the contrary on appeal.

First, Mr. ▓ argues that "[t]he AAP's conclusion that Mr. ▓ should not qualify for the Settlement because he was able to drive is inexplicable" because the fact that Mr. ▓ died in a car accident shows that "[t]here is very little that is as clear as the fact that Mr. ▓ should not have been driving." (Second Appeal at 11.) While Mr. ▓ thus suggests that Mr. ▓ car accident resulted from his functional impairment due to cognitive decline, publicly available information makes clear that the accident resulted from a wholly different sort of impairment. Specifically, Mr. ▓ autopsy report reveals that his blood alcohol level was more than twice the legal limit, and that he had marijuana in his system at the time of the accident,[2] facts wholly omitted from

---

[1]  This conclusion is further supported by the AAP's finding that Mr. ▓ SLUMS score of 18/30 was "more typical of an early dementia" than a Level 2 diagnosis. (First Notice of Denial at 1.)

[2]  *See* Naheed Rajwai & Brandon George, *Report:* ▓ *Had Marijuana, Alcohol in System at Time of Fatal Crash This Past November*, Dallas Morning News (Jan. 6, 2018),

3

the appeal. Mr. ▮▮▮ also points to a hit-and-run accident in ▮▮▮ in 2016, as further evidence of Mr. ▮▮▮ inability to drive due to cognitive impairment. (*See* Aug. 2019 Appeal at 12, Ex. P.) Again, however, Mr. ▮▮▮ neglects to mention that Mr. ▮▮▮ had been arrested *twice* for driving while intoxicated in ▮▮▮ in recent years, including just one month before his fatal accident.[3] Thus, Mr. ▮▮▮ argument that the AAP member should not have considered Mr. ▮▮▮ driving because it merely reflected "Mr. ▮▮▮ tragic inability to recognize the extent of his own [cognitive] impairment," misrepresents the facts. In fact, Mr. ▮▮▮ continued to drive, and the various issues with his driving clearly stem from his drinking and substance abuse; there is nothing to suggest that they are related to cognitive decline.

Second, contrary to Mr. ▮▮▮ arguments and Ms. ▮▮▮ statement, publicly available information shows that Mr. ▮▮▮ was very active in the community, on social media, and with his "▮▮▮ Foundation" in the time leading to his diagnosis and untimely death. For example, in photos posted to Mr. ▮▮▮ Facebook page in March, April, September, and October 2017, both before and *after* his purported Qualifying Diagnosis, Mr. ▮▮▮ can be seen socializing with attendees, posing for pictures, giving a speech, driving a golf cart, participating in a dunk tank game, signing autographs, shooting a basketball, and purchasing groceries during events for the ▮▮▮ Foundation.[4] In another set of photos posted to Mr. ▮▮▮ Facebook page in March 2017, Mr. ▮▮▮ can be seen using a laminator, scissors, a hole punch, and a large paper cutter to make credential lanyards for an ▮▮▮ Foundation event.[5] A different set of photos posted to Mr. ▮▮▮ Facebook page in March 2017 shows Mr. ▮▮▮ in a tuxedo at a black tie charity ball.[6] In another set of photos posted to Mr. ▮▮▮ Facebook page in February 2017, Mr. ▮▮▮ can be seen preparing food at a volunteer event for the Houston Food Bank.[7] Given this evidence, Mr. ▮▮▮ clearly did not have "no pretense of independent functioning outside home," without the ability to maintain chores and keep personal effects. This is not to say that Mr. ▮▮▮ did not experience any functional impairment. Instead, as the AAP correctly determined, it is evidence that Mr. ▮▮▮ s level of functional impairment was insufficient to satisfy the Settlement criteria for Level 2 Neurocognitive Impairment.

## II. Mr. ▮▮▮ Accusations That the AAP, the Claims Administrator, and the Settlement Agreement Discriminate on the Basis of Race Are Misguided and Without Merit

In the (superseded) First Notice of Denial, the reviewing AAP member noted that Dr. ▮▮▮ "use[d] . . . inadequate norms when calculating scores," that "there was a significant difference in the T-scores when the correct Heaton norms were applied," and that the "TOPF score" (used to calculate premorbid IQ) was "possibly incorrectly calculated." (First Notice of Denial at 1.) Based solely on these statements, Mr. ▮▮▮ argued in the First Appeal: "While the AAP dances around the issue, [Mr. ▮▮▮] thinks

---

  https://www.dallasnews.com/sports/cowboys/2018/01/06/report-▮▮▮-▮▮▮-had-marijuana-alcohol-in-system-at-time-of-fatal-crash-this-past-november/.
[3]  *See* Rajwai & George, *supra* n.2.
[4]  *See* Ex. 2, Facebook Photos.
[5]  *See* Ex. 3, Facebook Photos.
[6]  *See* Ex. 4, Facebook Photos.
[7]  *See* Ex. 5, Facebook Photos.

4

[he] understands what is being argued: Mr. ███ scores should be lower than stated because he is African American and *maybe* he should not qualify for the Settlement for this reason." (First Appeal at 16.) Mr. ███ argued that the AAP's insinuation that race-based Heaton norms were required was unsupported by the Settlement Agreement, and that any requirement to use race-based norms would constitute unconstitutional discrimination on the basis of race. (*See id.* at 18-22.) Indeed, Mr. ███ argued that the AAP member had created an "express requirement that black players be treated differently than white players," which, if true, "creates significant problems with the Rule 23 Notice to Class Members and FRCP 23(e)(2)(D)." (*Id.* at 22-24.)

Of course, neither the Settlement Agreement nor the AAP was mandating any sort of discrimination on the basis of race. Thus, in the Second Notice of Denial, the AAP member attempts to correct Mr. ███ misunderstanding regarding the issues that concerned the AAP with Dr. ███ neuropsychological evaluation, explaining that there were "problems with the use of incorrect normative data that resulted in incorrect T-scores for several tests including the Boston Naming Test, Category Fluency, BDAE Complex Id., and Verbal Fluency," and that "Dr. ███ identified a pre-morbid level of functioning that was above average despite apparent inconsistencies." (Second Notice of Denial at 2.) Notwithstanding these clarifications, Mr. ███ again accuses the AAP, the Claims Administrator, and the Settlement Agreement itself of racial discrimination.

Mr. ███ accusations are completely baseless. First, the Settlement Agreement itself, as Mr. ███ concedes, does not *require* the use of race-based demographic norms. Instead, it provides a test battery that was selected "based on the *availability* of demographically adjusted normative data for Caucasians and African Americans," and *explicitly* provides a range of demographic corrections that can be used in calculating premorbid intellectual ability. (*See* Settlement Agreement, Ex. A-2 at 4-5.) Second, the AAP member never stated that concerns over Dr. ███ use of demographic corrections were related to his failure to use race-based demographic norms. Indeed, the NFL Parties' independent recalculation of Mr. ███ test scores shows that Dr. ███ failed to use *any* demographic corrections (*e.g.*, age, gender, education, etc.) in calculating Mr. ███ test scores for the ACS battery of tests. Finally, the AAP member's statements about the change in T-scores with the use of the "correct Heaton norms," did not imply that the AAP or the Settlement Agreement mandated the use of race-based norms, but simply served as an example of the AAP member's inability to determine what norms Dr. ███ used to calculate T-scores for six tests from the Halstead-Reitan battery. (*See* First Notice of Denial at 1, Second Notice of Denial at 2.) Indeed, the NFL Parties' medical expert has attempted to recreate Mr. ███ T-scores using several different sets of norms for the Halstead-Reitan battery tests, but could not ascertain the norms used by Dr. ███.

For these reasons, it is clear that the AAP's denial recommendations were based on legitimate concerns regarding Dr. ███ neuropsychological evaluation. Any suggestion that the AAP, the Claims Administrator, or the Settlement Agreement itself attempt to discriminate on the basis of race is misguided and without merit.

### Conclusion

For the reasons set forth herein, this claim did not meet the criteria for a Qualifying Diagnosis of Level 2 Neurocognitive Impairment, and the appeal should be denied.

Dated:  September 26, 2019

Respectfully submitted,

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

*/s/ Brad S. Karp*_____
Brad S. Karp
Bruce Birenboim
Claudia Hammerman
Lynn B. Bayard
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email:  bkarp@paulweiss.com

*ATTORNEYS FOR THE*
*NATIONAL FOOTBALL LEAGUE*
*AND NFL PROPERTIES LLC*