# EXHIBIT 5

**Class Counsel's Statement in Support of the
Appeal Filed by Representative Claimant** █████

█████ died shortly after he filed a post-Effective Date Claim Package based on a Qualifying Diagnosis of Level 2 Neurocognitive Impairment rendered by Qualified MAF Physician, Dr. Meratee. An Appeals Advisory Panel ("AAP") member initially denied the claim. Representative Claimant █████ appealed the denial and submitted additional evidence with the appeal. The Special Master remanded the claim and it was re-reviewed by the AAP. The AAP denied the claim based on the reasons stated in the Notice of Denial issued on July 26, 2019 and █████ timely appealed. Class Counsel believes that █████ current appeal presents clear and convincing evidence that the denial of the claim was in error.

Class Counsel is submitting this statement in support of Representative Claimant █████ appeal specifically to address two of the reasons cited in the Notice of Denial. Those two reasons are: i) the alleged "use of incorrect normative data that resulted in incorrect T-scores"; and ii) the determination by the Qualified MAF Physician and the examining neuropsychologist that Mr. █████ estimated pre-morbid level of functioning is "above average." With respect to both of the cited reasons, the AAP member inappropriately second-guessed the medical judgment of the Qualified MAF Physician and the examining neuropsychologist who personally examined Mr. █████ shortly before his untimely death. More importantly, even if the AAP member is correct in their analysis on those two issues (which they are not), the results of Mr. █████ neuropsychological testing still support a Qualifying Diagnosis. Accordingly, pursuant to FAQ 146, if the current appeal is denied, █████ should receive an award for the lesser Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment.

I. **Alleged Use of Incorrect Normative Data**

The Notice of Denial states that "(t)here were also problems with the use of incorrect normative data that resulted in incorrect T-scores for several tests including the Boston Naming Test, Category Fluency, BDAE Complex Id., and Verbal Fluency." However, the AAP member does not explain in what way the normative data was "incorrect" and/or how the use of that normative data affected the calculation of the T-scores. Most importantly, the AAP member provides no information as to what the correct T-scores would be if they had been calculated using what they believe to be the correct normative data, nor do they indicate whether those T-scores are "generally consistent" with the claimed Qualifying Diagnosis of Level 2 Neurocognitive Impairment (or the lesser Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment), which is the AAP member's ultimate responsibility.

The NFL states in its opposition that it recalculated Mr. ▬▬▬ test scores, which allegedly showed "that Dr. ▬▬▬ failed to use *any* demographic corrections (*e.g.*, age, gender, education, etc.) in calculating Mr. ▬▬▬ test scores for the ACS battery of tests." However, similar to the AAP member, the NFL fails to provide Mr. ▬▬▬ recalculated scores, and it does not indicate whether those scores are "generally consistent" with the claimed Qualifying Diagnosis of Level 2 Neurocognitive Impairment (or Level 1.5 for that matter). One would think that if Mr. ▬▬▬ recalculated test scores were not "generally consistent" with any Qualifying Diagnosis, the NFL would have emphatically pointed that out.

Class Counsel also recalculated Mr. ▬▬▬ test scores using the demographic corrections referenced by the NFL (*i.e.* age, gender and education). The test results are attached as Exhibit A. As the attached chart shows, Mr. ▬▬▬ T-scores are not only "generally consistent" with the BAP criteria for Level 2 Neurocognitive Impairment, they actually meet the BAP criteria for that

Qualifying Diagnosis (as well as Level 1.5).[1] Perhaps that is the reason the NFL chose not to provide the results of its recalculation. Specifically as shown on Exhibit A, Mr. ▇ has two T-scores below 37 in the Language domain, and three T-scores below 35 in the Learning and Memory domain. Therefore, even when the "correct" normative data is used, Mr. ▇ neuropsychological test scores support the claimed Qualifying Diagnosis of Level 2 Neurocognitive Impairment. Accordingly, any use of "incorrect normative data" was immaterial in that it did not result in a misdiagnosis.

While it may be appropriate for the AAP to identify mistakes they believe were made by the Qualified MAF Physician and/or the examining neuropsychologist in reaching their diagnosis of a Retired Player, those mistakes are only material if they affect the validity of the Qualifying Diagnosis. That is, unless those "mistakes" resulted in a misdiagnosis, the AAP cannot rely on them to deny a claim. That is what the AAP did in this claim with respect to the alleged use of incorrect normative data. As stated earlier, the AAP's ultimate responsibility in this claim is to determine whether the evidence submitted on behalf of Mr. ▇ is "generally consistent" with the BAP criteria for the claimed Qualifying Diagnosis Level 2 Neurocognitive Impairment (or the lesser Qualifying Diagnosis. Level 1.5).

In this case, there is clear and convincing evidence that Mr. ▇ neuropsychological test scores, when calculated using the appropriate normative data, are "generally consistent" with the BAP criteria for Level 2 (and Level 1.5) Neurocognitive Impairment.

---

[1] Based on Mr. ▇ pre-morbid intellectual functioning being "above average." However, even if his pre-morbid intellectual functioning is considered to be "average", his T-scores are still "generally consistent" with Level 2 Neurocognitive Impairment, and his T-scores are "generally consistent" with, and actually meet, the BAP criteria for Level 1.5 Neurocognitive Impairment.

3

II.  **Determination of Mr. ▮ Estimated Premorbid Intellectual Ability**

Dr. ▮ determined Mr. ▮ estimated premorbid intellectual ability to be "above average", which the settlement defines as "estimated IQ above 110", in accordance with one of the models prescribed in the Amended Settlement Agreement. Specifically, the Amended Settlement Agreement states that "(t)he Test of Premorbid Functioning (TOPF) provides three models for predicting premorbid functioning: (a) demographics only, (b) TOPF only, and (c) combined demographics and TOPF." *See* Amended Settlement Agreement, Ex. 2, Sec. 3. The selection of which model to utilize for any particular Retired Player is left to the medical judgment of the neuropsychologist and must be afforded significant deference.

In Mr. ▮ case, Dr. ▮ stated in his report that he determined Mr. ▮ estimated premorbid intellectual ability "based on the patient's demographic and TOPF of 120." The AAP does not dispute Mr. ▮ TOPF score of 120. Rather, in the Notice of Denial, the AAP member is critical of Dr. ▮ determination that Mr. ▮ estimated premorbid intellectual ability fell within the "above average" range because of "inconsistencies", such as problems with attention in school and not completing college. However, there is no evidence that Dr. ▮ failed to take into account any of those "inconsistencies" in his calculation of Mr. ▮ estimated premorbid IQ. In addition, even if Dr. ▮ did not take those "inconsistencies" into consideration (of which there is no evidence), the AAP fails to explain how consideration of these so-called "inconsistencies" would cause Mr. ▮ estimated premorbid intellectual ability to be less than "above average", considering that his performance on the TOPF revealed an estimated premorbid IQ of 120. It highly unlikely that any demographic adjustment to a TOPF score of 120 would cause Mr. ▮ estimated premorbid IQ to fall below 110, especially considering that Mr. ▮ had 15 years of education.

4

It must also be noted that Dr. ▮ could have simply made his determination that Mr. ▮ estimated premorbid intellectual ability was "above average" based solely on the "TOPF only" model, which is specifically permitted by the Amended Settlement Agreement.[2] Since Mr. ▮ indisputably scored a 120 on the TOPF, Mr. ▮ premorbid IQ falls in the "above average" range.

### III. Mr. ▮ Qualifies for an Award for Level 1.5 Neurocognitive Impairment

Based on a review of the Notice of Denial, it does not appear that the AAP member who reviewed this claim ever considered whether the evidence in the Claim Package was "generally consistent" with the BAP criteria for Level 1.5 Neurocognitive Impairment, Accordingly, in the event it is determined that appellant has not established by clear and convincing evidence that an error was made in the denial of her claim for Level 2 Neurocognitive Impairment, this entire claim should be reviewed, in accordance with FAQ 146, to determine whether the claimant should receive a "downgraded" award based on the Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment.

As stated in footnote 1, even if it is determined that Mr. ▮ estimated premorbid IQ is "average" rather than "above average", Mr. ▮ test scores are not only "generally consistent with the BAP criteria for Level 1.5, they actually meet those criteria. Accordingly, Mr. ▮ at

---

[2] In fact, in another claim reviewed by the AAP (SPID 100015394), the Retired Player scored an 84 on the TOPF and the neuropsychologist utilized the "combined demographics and TOPF" model to determine that the Retired Player's estimated premorbid IQ was 91 and, therefore, fell within the "average" range (90-109) rather than the "below average" range (below 90). In that case, the AAP member was critical of the neuropsychologist's use of the "combined demographics and TOPF" model and argued that the neuropsychologist should have used the "TOPF only" model, which would have resulted in the player's estimated premorbid IQ being classified as "below average." Yet, in this case, the AAP is taking the position that a player who scored 120 on the TOPF should not be considered "above average." The common thread in both cases is that the AAP member urged the use of the model that would least benefit the Retired Player. This inconsistency from the AAP is troubling.

the very least, should receive an award based on Level 1.5. The importance of considering a lesser Qualifying Diagnosis is heightened in this case since Mr. ▇ is deceased and, therefore, does not have the ability to obtain a future Qualifying Diagnosis from another Qualified MAF Physician.

## CONCLUSION

For the reasons stated above, as well as the reasons stated in ▇ appeal, ▇ ▇ appeal should be granted. In the event it is not, ▇ should receive an award based on the lesser Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment.

Respectfully submitted,

SEEGER WEISS LLP
/s/ Christopher A. Seeger
Christopher A. Seeger
David R. Buchanan
Michael L. Rosenberg
Scott A. George
CLASS COUNSEL

October 22, 2019

# EXHIBIT A

| | |
|---|---|
| ▮ | |
| 42 Years Old | |
| 15 Years Education | |

| | Raw Scores | Demographically adjusted (Age, Sex, Education) |
|---|---|---|
| **Complex Attention** | | |
| Digit Span | 23 | 39 |
| Arithmetic | 10 | 39 |
| Letter-Number | 19 | 45 |
| Coding | 47 | 35 |
| Symbol Search | 26 | 42 |
| Cancellation | 24 | 31 |
| | | |
| **Language (2 scores < 37)** | | |
| Boston Naming | 52 | 36 |
| BDAE Complex Ideational | 11 | 44 |
| Category Fluency | 14 | 32 |
| | | |
| **Executive** | | |
| Letter Fluency | 43 | 50 |
| Trails B | 51 | 54 |
| Booklet Category Test | 46 | 44 |
| Similarities | 25 | 49 |
| | | |
| **Visual Spatial** | | |
| Block Design | 10 | 50 |
| Visual Puzzles | 9 | 47 |
| Matrix Reasoning | 14 | 63 |
| | | |
| **Memory (3 scores < 35)** | | |
| Logical Memory I | 11 | 25 |
| Logical Memory II | 10 | 33 |
| Paired Associates I | 26 | 43 |
| Paired Associates II | 4 | 31 |
| Visual Reproduction I | 35 | 46 |
| Visual Reproduction II | 29 | 50 |