# EXHIBIT 6

## INTRODUCTION

███████████was an 11-year veteran of the NFL.  During his career, ████played in 137 games and caught 593 passes for 8,823 yards.   As a small receiver, Mr. ████was exposed to violence and put his body and brain on the line for his teams, the fans and the NFL as he crashed into larger defenders at high speeds.

As a result of his contributions to the NFL, Mr. ████was left a mental wreck.  ████ was unable to work, manage his finances, sustain relationships, or function in the modern world.  On November 20, 2017, Mr. ████made the horrible decision to drive while impaired and died in a car accident.  He left behind 6 children, including an infant, and a bankrupt estate.

It is the NFL's position that despite the harm inflicted on Mr. ████, his Estate is not entitled to a recovery from the Concussion Settlement.  This position is untenable as ████was qualified for the Settlement by a NFL approved MAF Physician and satisfies the express criteria for an award, especially as████can't be retested and denial bars his family's recovery forever.

## THE TESTING

Mr. ████testing demonstrates Level 2 Impairment.  The NFL admits that race-neutral norming is allowed under the terms of the Settlement.  As established by Class Counsel, ████ qualified for Level 2 Impairment in Memory/Learning and Language using non-race based demographically adjusted norms.  Neither the AAP nor the NFL challenged this result despite having the raw data.  Mr.████passed all administered validity measures; and accordingly, the testing is an accurate reflection of his cognitive ability.  There is no legitimate basis to deny the Estate's claim based on████neuropsychological testing.

## FUNCTIONAL IMPAIRMENT – CDR

Mr. ████CDR was established by a NFL approved MAF Physician that remains active in the Settlement.   Because of the devastating effect that potential denial could have on ████ family, this Firm took the extraordinary step of having the complete record reviewed by Harvard Medical School Professors and practicing doctors at Brigham and Women's Health,  Dr. ████████ and Dr. ████████ (the "Harvard/Brigham Doctors").   The Harvard/Brigham Doctors  determined  that  the  diagnosis  of  Level  2  Impairment  was  justified.    The Harvard/Brigham Doctors are experts in their fields and their opinion on Mr.████ CDR is compelling.   Neither  the  AAP  nor  the  NFL  bothers  to  address,  much  less  attack  the Harvard/Brigham Doctors' findings.

While  the  NFL  approved  MAF  Physician's  CDR  determination  is  surrounded  by creditability, the AAP attack on Mr.████CDR is founded on factual errors.  The Denial

---

[1]     Chaired Professor of Neurology at Harvard Medical School, Chief of Neurology at Brigham and Women's Health and Director of the Center for Brain/Mind Medicine.

[2]     Professor of Psychology at Harvard Medical School and Chief of Psychology and Neuropsychology at Brigham and Women's Hospital.

claims that Mr. █████traveled alone to his examination, worked, and only needed prompting for certain personal care activities, such as shaving. The foregoing is false and contrary to the record. The NFL does not even attempt to defend the AAP's use of egregious factual errors. The AAP's continued use of unsupported 'alternate facts' as the basis for challenging Mr. █████CDR is inexcusable, clear error and can't form a legitimate basis to deny the Estate's claim.

*1. ████████████████ Statement*

The NFL's complaint that ███████████████ Statement indicates that Mr. ██████ was more impaired than earlier evidence is a red-herring and untrue.[3] Dr. ██████ an NFL approved MAF Physician **and** the Harvard/Brigham Doctors determined that Mr. █████ CDR was consistent with Level 2 Impairment *before* ██████ Statement. ████████ Statement was introduced to address the factual mistakes by the AAP, and to foreclose additional errors on remand. The Statement is made under oath, was admitted by Your Honors as part of the record, and attacking the creditability of a hard working mother of 4 who has no criminal history is unjustified. It is telling that the NFL does not attack the substance of █████████Statement – only her creditability – indicating that even the NFL recognizes that information contained therein justifies a CDR of 2. Moreover,████████Statement is consistent[4] with the complete record, which demonstrates devastating impairment and includes statements such as:

"As the months have gone by, ████required my assistance with almost every task he had to perform ...

We would be in a conversation and████would completely forget what we were talking about ...

Unless████spends the entire day there with me, he could not function in the world and would have to seek help and guidance elsewhere. Without question, I am the friend who keeps him going day to day. ...

I believe that without the support and guidance from me, ████cannot and should not travel outside of his home. ...

████is unpredictably short-tempered. He has episodes of anger and frustration that neither he nor anyone else understands. I feel as though I am walking on eggshell.. ...

████condition has declined so noticeably that without assistance of outside help, he could not maintain the property". *LeGrand Affidavit, Exh. C to the Appeal.*

"I have first-hand experience with memory problems, confusion and personal frustration associated with caring for my grandfather and grandmother. One had Dementia and the other Dementia that evolved into Alzheimer's disease. I can confidently attest based upon the behavior traits and confusion of my grandparents that ████suffers from a similar condition, especially with respect to forgetfulness.

---

[3]    Attached hereto as Exhibit A, please find a copy of ████████████tatement, which is verified, dated and signed, and Ms████████tatement for comparison.
[4]    The NFL states that the██████Statement is inconsistent with the earlier affidavits, but does not support this conclusion with examples.



argumentative posturing, and confusion. The foregoing is all substantially different from who ▮▮▮ was. It is sad and deeply concerning." ▮▮▮▮ *Affidavit, Exh. C to the Estate's Appeal.*

"We could be having a conversation and he would completely forget what we were talking about. ...

He stated that he has to rely on others to drive him places and that he would forget to ask these people to help him with enough advance time. ...

▮▮▮ was unable to stay focused on any task. I do not think ▮▮▮ could function in any way that he could get his day to day tasks done in this Profession. ...

I have found all of this alarming. I would understand how this might happen to an elderly person, but not someone as young as ▮▮▮ I am concerned for him and his future." ▮▮▮ *Affidavit, Exh. C to the Estate's Appeal.*

## 2. *Driving*

It is unclear if the NFL believes that having persons such as Mr. ▮▮▮ behind the wheel is a good idea, or is merely posturing.  Mr. ▮▮▮ exercise of poor judgment in driving while impaired ultimately lead to his death, but the record is not limited to this incident. As is stated in the Appeal on page 12, "even putting aside his death, Mr. ▮▮▮ repeatedly reported becoming disoriented to time and place, which is obviously incompatible with driving. *Exh. D, at 2.*" **The ▮▮▮ Estate is being sued for an earlier car accident in which ▮▮▮ is alleged to have struck a bike and fled the accident scene without reporting the incident to police.**  Ms. ▮▮▮ states that ▮▮▮ was pulled over by the police many times, was forced to have his *minor* daughter drive him places when he found himself unable to do so, and that his driving was a danger to himself and others. *Exh. A.*  Regardless of the accident that resulted in his death, it is clear that Mr. ▮▮▮ should not have been driving, and using this as a basis to deny his claim is unjustifiable.  In fact, Mr. ▮▮▮ inability to drive and understand the consequences of his actions is evidence that supports his Clinical Dementia Rating, not the reverse.

## 3.       *Extrinsic Evidence: Instagram vs. Boston University's Brain Autopsy*

As has become commonplace in this litigation, the NFL scoured the internet for photographs and requests that medical conclusions be drawn from social media.  While flashy, photographs have little value as no context is provided.  We don't know when the photographs were taken or by whom.  We don't know whether Mr. ▮▮▮ was actually performing the activities in the photographs or they are merely 'photo ops'.  By way of example, the NFL concludes that Mr. ▮▮▮ was shopping because there is a photograph with him and a bunch of kids in front of a shopping cart.  There is no evidence that he actually did shop for the goods in the basket. The only real conclusion that can be drawn from the photo is that Mr. ▮▮▮ was capable of smiling in front of a camera.   Using static photos to draw conclusions about functionality is tenuous under any circumstances, *but is especially egregious herein as Mr. ▮▮▮ is deceased and can't provide the appropriate context.*

Moreover, nothing in the photographs would bar a finding of a CDR of 2. The NFL would have us believe that any task and all activity outside of the home is inconsistent with a CDR of 2, but this is simply untrue. The standard for a CDR of 2 in Community Affairs is that the player has no pretense of *independent* function outside of the home; not that the that the player is comatose or never goes out. The photos show Mr █████ leaving his home on around 4 or 5 occasions over the course of year, but there is no evidence that Mr. █████ attended any of these charity events alone or without assistance. In fact, the opposite is true. Ms. █████ states:

> "I believe that without the support and guidance from me █████ cannot and should not travel outside of his home … I believe that without the care and supervision of his family and friends, meaning me, █████ would not do well outside of his home." *Exh. A.*

Ms. █████ states:

> "In the years before his death, █████ was the figurehead for the foundation that he started. … To the extent he was forced to make an appearance at an event, he needed assistance. He would not go places alone." *Exh. A.*

The standard for a CDR of 2 in Home and Hobbies is that only simple chores are maintained; not that the player is a paraplegic or incapable of any activity. The use of scissors or a hole-punch, posing for pictures or sitting in a golf cart are not complex activities. The foregoing are similar to tooth brushing, are governed by the procedural memory system and such activities "often remain preserved well into the course of a progressive neurodegenerative process." *Exh J to the Appeal.* Accordingly, the pictures provided are consistent with a CDR of 2 in Home and Hobbies and do not serve to undermine the correct determination of the NFL approved MAF Physician and Harvard/Brigham Doctors.

While making dubious conclusions from evidence without context or foundation against a deceased individual who can't provide the real background, the NFL ignores the incontrovertible evidence in this case: **Boston University autopsied Mr. █████ brain and found him to have Level 3 CTE.** This autopsy/brain study is scientific fact-based medicine from which assumptions do not have to be made. It is a fact that the NFL approved MAF Physician and the Harvard/Brigham Doctors are correct and that Mr. █████ suffered severe impairment. This case is not fraudulent or misrepresented. █████ was brain damaged and everyone involved knows it.

## THE AAP's MISTAKES

The number and breadth of mistakes by the AAP fundamentally undermines the Denial. Many of the mistakes are not questions of judgment, but involve unjustifiable use of false facts, and clear medical error. These errors inexcusably remained in the Denial after remand. The NFL does not even attempt to defend these mistakes. The AAP is charged with getting the medicine and facts right every time and in every instance. Where, as here, a Denial is riddled with error, it can't form the legitimate basis to reject a Claim. Moreover, the lack of creditability of the Denial stands in stark contrast to the finding of the NFL approved MAF Physician, the

Harvard/Brigham Doctors, 5 sworn statements and the autopsy of Mr. ███████ brain by doctors at Boston University, all of which evince Level 2 Impairment.

## LEVEL 1.5 vs 2.0 CLAIM

The Estate steadfastly believes that the evidence justifies a Level 2 Award. The legitimate evidence supporting the Claim massively outweighs the *chimera* of arguments submitted in opposition. That being said, to the extent that Yours Honors do not see fit to approve a Level 2 Award, the Estate respectfully requests that the Claim be approved with a Level 1.5 Award. As both the MAF Physician and the Harvard/Brigham Doctors found Mr. ███████ to have Level 2 Impairment, at a minimum, the lesser included diagnosis of 1.5 Impairment is justified. This is especially true as (a) under virtually under any analysis (as demonstrated by Class Counsel), Mr. ███████ testing qualifies him with Level 1.5 Impairment, and (b) neither the NFL nor the AAP challenges that the record justifies Mr. ███████ being diagnosed with an overall CDR of 1.

## CONCLUSION

For the reasons stated herein and in the Appeal, the Estate of ███████ respectfully requests that the AAP's Denial be overturned as clearly erroneous. The denial of this claim be unjust as Mr. ███████ can't be retested, but also because his impairment is incontrovertible, and he satisfied the express criteria of the Settlement after having been diagnosed by an NFL approved MAF Physician.

Dated:      New York, New York
            November 6, 2019

                              **JR WYATT LAW, PLLC**

                              Justin R. Wyatt
                              *Attorneys for* ███████
                              ███████
                              49 West 37th Street, 7th Floor
                              New York, NY 10018
                              (212) 557-2776

**Exhibit "A"**

# NFL CONCUSSION SETTLEMENT

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. Pa.)

| SWS-3 | THIRD-PARTY SWORN STATEMENT: FUNCTIONAL IMPAIRMENT |
|---|---|

This document is to be used by Settlement Class Members seeking to corroborate the Retired NFL Football Player's functional impairment when no documentary evidence (for example, medical records or employment records) exists or is available.

In that situation, the Settlement Agreement allows that a Retired NFL Football Player's functional impairment may be supported by a sworn statement from someone who personally knows the Retired NFL Football Player, is familiar with his condition, and can describe his functional impairment in the areas of Community Affairs, Home & Hobbies, and Personal Care (see next page for detailed instructions), but who is not the Retired NFL Football Player's family member. The Player's "family members" are his: (1) spouse and his or her parents; (2) sons and daughters and their spouses; (3) parents and their spouses; (4) brothers and sisters and their spouses; (5) grandparents, grandchildren and their spouses; and (6) domestic partner and his or her parents, and the domestic partners of any of these family members. **Do not complete this form if you are a family member (as defined above) of the Retired NFL Football Player.**

## I.   RETIRED NFL FOOTBALL PLAYER INFORMATION

| | |
|---|---|
| **Settlement Program ID** | 1 0 0 0 0 5 5 5 3 |
| **Retired NFL Football Player Name** | First ▮▮▮  M I  T  Last ▮▮▮ |
| **Retired NFL Football Player Date of Birth** | ▮▮▮ (Month/Day/Year) |

## II.   THIRD-PARTY INFORMATION

| | |
|---|---|
| **Name** | F ▮▮▮  M I  La ▮▮▮ |
| **Mailing Address** | Street/P.O. Box ▮▮▮   City Grapevine   State TX   Zip 76051 |
| **Telephone** | |
| **E-Mail Address** | ▮▮▮ |
| **Relation to the Retired NFL Football Player** | Former Wife |

| SWS-3 | THIRD-PARTY SWORN STATEMENT: FUNCTIONAL IMPAIRMENT |
|---|---|

| **III.   DESCRIPTION OF RETIRED NFL FOOTBALL PLAYER'S FUNCTIONAL IMPAIRMENT** |
|---|

In your own words, describe any behavior of the Retired NFL Football Player listed on the first page of this form that you believe demonstrates difficulties he has in his everyday functioning.  We would like you to comment on each of the following areas:

- **Community Affairs  (how he functions in the community, outside the home)**
- **Home & Hobbies  (how he functions at home)**
- **Personal Care  (how he takes care of himself)**

Also explain how you are aware of the above-described difficulties, if any.

Examples of the types of activities in each of these categories are listed here, and range in severity.  These include:

- **Community Affairs**
  - Loss of interest in activities outside the home
  - Inability to perform occupational activities (employment)
  - Loss of the ability to drive
  - Failure to shop for himself
  - Has stopped visiting with friends and family
  - Has stopped attending church, social functions, political activities, every day appointments, or educational programs
  - Has repeated conflicts with strangers.

- **Home & Hobbies**
  - Difficulties getting along with family members
  - Inability to perform household chores, such as cooking, laundry, vacuuming, cleaning, making the bed, taking out the garbage, yard work, and basic home repair
  - Loss of interest in hobbies, such as painting, reading, entertaining, photography, gardening, woodworking, or participation in sports.

- **Personal Care**
  - Decline in appearance
  - Loss of the ability to dress himself
  - Lapses in washing and grooming
  - Decline in eating habits (for example, no longer eats regular meals, or in more severe cases has trouble with using utensils and has to be fed)
  - Poor toileting habits or loss of bladder control (for example, soils himself or wets the bed).

Use the space below to describe the player's function in each of these areas.  If you need more space, attach additional pages.

| SWS-3 | THIRD-PARTY SWORN STATEMENT: FUNCTIONAL IMPAIRMENT |
|---|---|

- I knew ▮▮▮▮▮ for 18 years and was married to him from 2006 until 2014 when we were divorced. I am also the mother of 4 of his children.
- I spoke with ▮▮▮ on a weekly basis until the time of his death.
- In the years before his death, ▮▮▮ became increasingly erratic, difficult and withdrawn. This could be seen in all aspects of his life.
- ▮▮▮ had difficulty remembering things and dates. It became so bad that he even forgot his childrens' birthdays. He would forget appointments, including his kids' appointments.
- In the years before his death ▮▮▮ did not work. He could not keep a regular schedule. He lived on ▮▮▮▮▮ He got confused easily. He would get lost in conversations. He had difficulty expressing himself. He could not remember things and would constantly have to be retold things. ▮▮▮ was short tempered and would get angry for little reason.
- In the years before his death, ▮▮▮ was the figurehead for the foundation that he started. All the daily activities of the foundation were left to a professional staff. While the foundation was an important legacy for him, he did not work at the foundation on a regular or even irregular basis. To the extent he was forced to make an appearance at an event, he needed assistance. He would not go to places alone. He felt uncomfortable in large groups and speaking to people. I can't remember any specific events he actually did attend in the year before his death.
- In the years before his death, ▮▮▮ had problems with finances. He would forget to pay bills. The mortgage would not get paid and utilities were turned off. I believe he lost significant money in investments that he could not manage.
- ▮▮▮ had very poor judgment while driving. He was a danger to himself and others. There were times his driving was so impaired that he needed his 14 year old daughter to drive him home. While I tried to stop his irresponsible behavior behind the wheel, he would not stop. He was pulled over by police many times before the motor-vehicle accident that resulted in his death.
- In the years before his death, ▮▮▮ did very little inside the home. He mostly watched TV. ▮▮▮ really did not perform any household activities on a regular basis. He may have thought he was capable of doing basic household chores, such as cleaning, laundry or yard work, but the reality is that these projects would never be completed or completed with significant problems. Often things he worked on caused more damage than good.
- In the period before his death, ▮▮▮ would do very little outside the home. I don't remember him shopping for himself, but if he did, he would always be with another person. I don't think he was comfortable navigating by himself. He stopped going to church. Generally, if it did not have to do with his children, he would not do it.
- Even with respect to our children, I was not comfortable leaving him with them. I know he loved them, but he was erratic and I was always concerned that something might happen. I would often have to call the police to his home in order to avoid bad or dangerous situations from escalating.
- In the years before his death ▮▮▮ would not have been capable of handling an emergency. If there were a plumbing flood or a problem that needed to be addressed with the children, he could not handle it. Even something relatively simple was beyond him. I remember my son had an infection on his scalp. ▮▮▮ was not capable of helping him and the infection spread and put my son at real risk.
- In the years before his death ▮▮▮ became increasingly violent. I was scared of him and the children were scared as well. I felt like I was always walking on egg shells. He also had conflicts with people he did not know well and for no real reason.
- In the years before his death ▮▮▮ stopped communicating with several of the family members, including his sister, and friends that he knew best and who loved him most. ▮▮▮ sister was his only real contact with his childhood, yet this relationship faded away by his choice. We never really understood why.
- ▮▮▮ stopped maintaining himself the way he should. He mostly wore sweats. He did not always shave or cut his hair. He had difficulty shaving and he went to the barber. ▮▮▮ did not eat regularly. He did not eat real food, but mostly foods that were easy to eat like junk food. Because he did not eat on a regular basis, his weight fluctuated. There were times that ▮▮▮ lost control of his bladder, he would not be able to make to the bathroom and had accidents on the floor. He might not have remembered these incidents, but I surely do.
- ▮▮▮ was smart and proud, but embarrassed by many of his challenges. He would at times make excuses for things. He did not want people to know how impaired he was, even those he was close to. He was clever and could fool people for a short time, but this quickly faded. I don't believe even he admitted to himself many of his own challenges. Especially toward the end, he thought he was far more capable then he actually was.



| SWS-3 | THIRD-PARTY SWORN STATEMENT: FUNCTIONAL IMPAIRMENT |
|---|---|

### IV. SIGNATURE

This Sworn Statement is an official document submitted in connection with the Class Action Settlement in *In re: National Football League Players' Concussion Injury Litigation, MDL No. 2323.* **By signing below, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that all information provided in this Sworn Statement is true and correct to the best of my knowledge, information and belief.**

| Third-Party Signature | ███████████████ | Date | 03/12/2019 (Month/Day/Year) |
|---|---|---|---|
| Printed name | ███████████████ MI | ████████████████ | |

### V. WHAT TO DO WITH THIS FORM

Complete this Sworn Statement fully, sign it and return it to the person who asked you to complete it.

STATE OF TEXAS           :
                                        : SS

COUNTY OF DALLAS      :

## AFFIDAVIT

I, █████████████ being duly sworn according to the law, do hereby depose and say the following:

1.     I have known ████████████ or a couple of years, and I am currently his girlfriend.

2.     I have no blood relationship with ████ of any kind.

3.     I currently spent most of my free time with ████ I know his habits and tendencies and have been able to observe and interact with him for extended periods of time.

4.     I noticed that ████ has very substantial memory problems even when I first met him.

5.     I assist ████ in making a list of things he has to accomplish during the day. He asks me to help him get things done.

6.     At first, he would give me only the complicated things on the list he was confused with. As the months have gone by, ████ required my assistance with almost every task he had to perform. Without my help and guidance, there is no chance ████ could accomplish any of those tasks.

7.     ██████ recall is clearly growing worse. He could never remember an appointment without a written calendar. Even when he has an appointment on his calendar, he sometimes forgets to look at his calendar. I must remind him of his appointments and important birthdays of his family members.

15.    Given that has gotten lost a lot, I believe that without the support and guidance from me ██████ cannot and should not travel outside of his home. I would be very worried about him traveling without the aid of someone or at least a GPS

16.    I believe that without the care and supervision of his family and friends, meaning me, ██████ would not do well outside of his home.

17.    He want to dress well, but often needs help and can be inappropriately mannered and dressed and not know it. He sometimes does not shower or shave when he should.

18.    ██████ is unable to stay focused on any task. For example, I will ask him to throw clothes in the washer and then help me in the kitchen. He completes the first task, but then is found sitting down on couch, forgetting he was to come in kitchen. When he comes to the kitchen he will forget what he was supposed to do. He has also left on appliances, which is dangerous.

19.    ██████ is unpredictably short-tempered. He has episodes of anger and frustration that neither he nor anyone else understands. I feel as though I am walking on eggshells.

20.    The most recent occasion when I saw this was when he became frustrated when I did not agree with him. He can't take criticism and even suggestions to help with his frustration.

21.   ███████ condition has declined so noticeably that without assistance of outside help, he could not maintain the property himself. He must pay people to keep the house together and the property. Without me to get the people to appear and get paid, things would not be good around our house.

I declare under penalty of perjury pursuant to the laws of the State of Dallas and the United States of America that the foregoing is true and correct.

Dated: 8|14|17

Sworn and signed before me this
14th day of August, 2017.

Notary

ALFREDO VIGILANTE
Notary Public
STATE OF TEXAS
My Comm. Exp. 01.28.20
Notary ID # 124805755-0

4

PhotoScan by Google Photos