# Exhibit 2
# to Declaration of
# Justin R. Wyatt

## INTRODUCTION

The AAP's denial (the "Denial") of ███████ claim doesn't withstand cursory review:





For the foregoing reasons and those provided herein, ███████ respectfully requests that the Denial be overturned as clearly erroneous.

## ARGUMENT

*A.* ██████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████





*B.*





C.





D.



2.    *Heaton*

As the AAP does not challenge ███████'s results in Learning/Memory or Language, he qualifies for the Settlement despite the use of Heaton's race-based norms. Although the issue need not be reached on appeal; out of an abundance of caution, this Firm addresses the application of Heaton to ███████'s Executive Function testing.

a.    *Heaton Makes it Harder for Blacks to Qualify for the Settlement than Whites*

It is unclear when or how the Heaton norms were chosen for the Concussion Battery. The word Heaton does not appear in the Settlement or any public document related to the Settlement. This Firm has been informed that these norms appeared in Qualified Physician MAF Manual sometime after ███████ was tested.

Heaton and other race-based norms are problematic as they make it harder for blacks to qualify for the Settlement than whites. In many instances, black players with the exact same raw scores as white players do not qualify for the Settlement. This is not a controversial statement: any AAP consultant will agree that the use of the Heaton norms results in African American with the exact same raw scores as Caucasians not qualifying for the Settlement.

The reason why blacks need lower raw scores than whites is that when race is applied to individual tests *via* Heaton, African Americans are expected to score lower than Caucasians. Because black players' starting point under Heaton is lower than whites, in order to show impairment – a score that is 1.7/8 or 2 standard deviations away from their racially adjusted normal – a black's raw scores must be lower than their white counterpart to qualify for the Settlement. To be clear: black players whose raw scores would qualify them for the

Settlement if compared against the general population (or whites) become non-qualifiers because race is applied to change their T-scores.

   *b. Heaton Is Not Required by the Settlement*

   As a starting point, the AAP's requiring the use of Heaton is without foundation as the Settlement does not state that Heaton or any specific norm must be used. Exhibit A-2, Section 4 of the Settlement does state that certain tests were selected because demographically-adjusted normative data was available. This does not mean that any norm was required to be used for any given test, merely that certain types of norms were available for use by the MAF Physician and his/her selected neuropsychologist. Where a doctor believes that demographic norms are useful, the Settlement gives him or her the option to use them. In fact, at the time ▮▮▮▮▮▮▮▮ was tested there was no requirement by the AAP or in the Qualified Physician MAF Manual that any specific norm be used. The AAP now requiring that Heaton, or any race-based norm be used, goes beyond the terms of the Settlement and should be rejected. [9] Even to the extent that at some point Heaton did become the applicable norm in a secret agreement not approved by the Court and made without notice, it should not be retroactively applied to a diagnosis made before the requirement was finalized.

   *c. The Use Of Race-Based Norms Violates Equal Protection, including 42 U.S.C. §1981*

   The use of Heaton's race-based norms in the context of this Settlement violates fundamental principles of equal protection, and more specifically 42 U.S.C. §1981. [10] While

---

9  Upon information and belief, there are zero AAP or AAP-C members that are African Americans even though over 2/3 of the players being tested are African American. ***Upon information and belief, there are approximately 3 African Americans out of approximately 116 MAF Physicians or 2.6%.***

10  This brief is not intended fully canvas the entire spectrum of civil rights laws that might be applicable to this case. By way of example, New York (*i.e.*, the law that governs the Settlement) has a large body of civil rights statutes that could apply to this action. There are also numerous other Federal Laws that might apply, including

discrimination is often difficult to evince, this is not such a case. Heaton norms actually alter raw test scores when converted into T-scores *on racial lines*. This conversion increases the chance that African Americans will have higher T-scores, and thus, not qualify for the Settlement. The NFL must be aware of this effect as approximately 70% of players in the NFL are black, and racial norming will reduce their liability with respect to these players.[11]

Discrimination on the basis of race in private contracts and/or employment is expressly forbidden by 42 USC §1981. Section 1981 states in relevant part:

> "(a) Statement of equal rights
>
> All persons within ... the United States shall have the **same** right ... to make and enforce contracts, to sue ... and to the full and equal benefit of all laws and proceedings ... as is enjoyed by white citizens.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, **and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship**.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." (emphasis added)

This statute has been construed to include all aspects employee-employer relationship. In *Ford*

---

statute. Obviously, if ████████ 's case is denied (in part or whole) on the use of discriminatory norms, this Firm will be required to file an independent suit in Federal Court and challenge the Settlement, as applied, on these grounds.

11      While 70% of NFL players are black, 9% of managers in the league office, and 0% of league majority owners, CEOs, or Presidents are black. https://qz.com/1287915/the-nfls-racial-makeup-explains-much-of-its-national-anthem-problems/ ; https://profootballtalk.nbcsports.com/2018/05/28/nfl-needs-more-minority-owners-but-franchise-values-make-that-difficult/

*v. Long*, the 6th Circuit stated:

> "When an employer, public or private, places more stringent requirements on employees because of their race, Section 1981 is violated. The purpose for which the Section was enacted — to afford equal opportunities to secure the benefits of American life regardless of race — requires that a court adopt a broad outlook in enforcing Section 1981. Schemes of discrimination, whether blatant or subtle, are forbidden." 496 F.2d 500, 505 (6th Cir.1974).

Consistent with its purpose, Section 1981 has also been broadly applied in almost every situation where a contract exists or might exist. *See, e.g., Runyon v. McCrary*, 427 U.S. 160 (1976)(Section 1981 found to be applicable with respect to applying to private schools as potential contract between the student and school was involved.); *Brown v. J. Kaz, Inc.*, 581 F. 3d 175, 182 (3rd Cir. 2009)(Section 1981 broadly construed to include potential employee-employer contracts for independent contractors.); *Perry v. Command Performance*, 913 F. 2d 99 (3rd Cir. 1990)(Section 1981 found to applicable with respect to beauty appointment as scheduling the appointment constituted a contract.).

In this case, ▮▮▮▮▮▮▮▮'s injuries and claim arise out of his contracts and employment as a professional football player in the NFL. The section heading in the Notice of Concussion Settlement entitled *What is the litigation about* states that "Plaintiffs claim that retired players experienced head trauma during their NFL football playing careers that resulted in brain injuries … [and] accuse the NFL Parties of being aware of the evidence and the risks associated with repetitive traumatic brain injuries but failing to warn or protect the players. *Exh. F, at p. 5; Settlement, at Recital B, and Exh. G.* Moreover, in order to qualify for the Settlement, a player must have been "under contract to play for a Member Club." *Settlement., at 2.1(a), (kk) and 5.1.* To the extent that the NFL attempts to eschew its contractual/employment relationship with ▮▮▮▮▮▮▮▮, it can also be argued that the Settlement itself is a contract subject to Section 1981. *See, e.g., Singh v. State Farm Mut. Auto. Ins. Co.*, 860 P. 2d 1193 (Alaska 1993)(Settlement found to be a contract for purposes of Section 1981).

In addition to prohibiting racial discrimination in contracting, Section 1981 also guarantees "[a]ll persons within … the United States … the same right … to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." *42. U.S.C. §1981; see Phillip v. University of Rochester,* 316 F.3d 291, 292 (2nd Cir. 2003). In this case, the right to recover an award for the brain damage caused by playing in the NFL constitutes a property interest. *See, e.g., Phillip,* 316 F.3d at 293 (Claims of false arrest and imprisonment, battery and excessive use of force, assault, malicious prosecution, intentional and negligent infliction of emotional distress found to implicate Section 1981); *Hawk v. Perillo,* 642 F. Supp. 380 (N.D. Ill. 1985)(Claim for personal injuries found to come within score of Section 1981 property interest.). The Settlement arises out of the player's 'right to sue' and the litigation and claims process are 'proceedings' used to secure players' property interest. ██████'s claims alleged violations of State negligence and fraud laws. *Exh. F; Settlement, at Recital B; Exh. G.* As the application of Heaton's race-based norms denies blacks players of the **same** application of these laws and proceedings as white players, the use of these norms violate Section 1981.

Unlike many civil rights cases, the use of Heaton's race-based norms is discriminatory on its face. By definition, Heaton's race based norms have the effect of treating blacks differently than whites. Section 1981 expressly provides that races must be treated the **"same"**. In cases such as this one, where a stated policy treats racial groups differently, a violation of Section 1981 naturally follows. *See, e.g., Gratz v. Bollinger,* 539 U.S. 244 (2003)(University of Michigan policy of giving specific point advantage to minorities when evaluating student admissions violates white applicants right to Equal Protection and Section 1981.); *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate,* 416 F.3d 1025 (9th Cir.2005)(Ninth Circuit found that

school policy concerning race was discriminatory on its face, and thus violated Section 1981.); *cf. Brown v. Board of Education*, 347 US 483 (1954)(Finding policy of separate but equal inherently unequal).

 *Gratz v. Bollinger* is particularly instructive.  In *Gratz*, a white applicant to the University of Michigan complained that the admission process was discriminatory and violated Section 1981. As part of the University of Michigan's Affirmative Action program within the admissions process, all African Americans were given a specific point advantage over Caucasian applicants.  Despite the significant historical justification for Affirmative Action, the Supreme Court agreed with Gratz and found that a policy that gave a specific advantage to black applicants was discriminatory and violated Section 1981. Obviously, the instant case is far more compelling than Gratz as Section 1981 was originally intended to protect African Americans against discrimination.  To the extent that a process that gives African Americans an advantage violates Section 1981, the same must also be true for this claims process that gives Caucasians a specific advantage in obtaining monetary awards *via* the application of race-based norms.

 It is well-settled that "claims brought pursuant to Section 1981 are analyzed under the same standards as Title VII claims." *Ganthier v. N. Shore-Long Island Jewish Health Sys., Inc.*, 345 F. Supp. 2d 271, 282 (E.D.N.Y. 2004) (*citing Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000)); *see Brown v. J. Kaz, Inc.*, 581 F. 3d 175, 182 (3rd Cir. 2009)("[W]e have previously held that the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII.").[12]   Congress has made clear within the Title VII context that the use of norms in

_____

12. Title VII and section 1981 are 'parallel or overlapping remedies against discrimination.' Consequently, in fashioning a substantive body of law under section 1981 the courts should, in an effort to avoid undesirable substantive law conflicts, look to the principles of law created under Title VII for direction. *Waters v. Wisconsin*

employment is discriminatory. Specifically, §106 of the 1991 Civil Rights Act, codified at 42

U.S.C. § 2000e-2(l) of Title VII states:

> "Prohibition of discriminatory use of test scores
>
> It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, *to adjust the scores of,* use different cutoff scores for, *or otherwise alter the results of,* employment related tests on the basis of race, color, religion, sex, or national origin. "

Given the significant interconnectedness of purpose between Section 1981 and Title VII, the

Congressional determination that race-based norms are discriminatory should be given

significant weight.

### d. *Failure to Notice the Disparity amongst Class Member and Address Issue at Fairness Hearing*

While the Settlement contains no express requirement that black players be treated

differently than white players, the AAP appears to disagree. The AAP's disparate treatment of

class members creates significant problems with the Rule 23 Notice to Class Members and FRCP

23(e)(2)(D).

The Rule 23 Class Notice fails to state that African Americans would be treated

differently than Caucasians. *Exh. G.* The Notice also makes no mention of the Heaton

norms. Notice in a class action must be the "best practicable, reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812

(1985). "The notice should describe the action and the plaintiffs' rights in it." *Id.* Notice

provides an opportunity for class members to participate in the litigation, to opt-out of the

---

*Steel Works of Int. Harvester Co.*, 502 F.2d 1309 (7th Cir. 1974), *citing, Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

litigation, to monitor the performance of class representatives and class counsel, and to ensure that predictions of adequate representation are fulfilled. *Manual For Complex Litigation (Fourth)* § 21.13 (2004). Discrimination within the testing battery is a major issue that could have affected many players' decisions to opt-out of the Settlement and would have resulted in objections.  If this issue had been noticed, it would have been rectified or we might well not have a Settlement.

Rule 23(e)(2)(D) requires that the Court hold a fairness hearing to determine whether "the proposal treats class members equitably relative to each other."  It is hard to imagine that any Court would find that a Settlement that makes it more difficult for African Americans to recover an award than similarly situated Caucasians is equitable. Needless-to-say, this Court made no such finding, nor does it seem likely that this issue was even addressed as no such requirement is stated within the Settlement.  Given the importance of this issue and the lack of a finding that such treatment is equitable, the AAP's decision to apply the rule without Court approval substantially oversteps its authority.

### e. *Double Penalty*

The manner in which race is being used double penalizes African American players.  As an initial matter, the use of race will generally lower the T-scores of African American on the TOPF. The Settlement Agreement expressly makes it more difficult for players with lower TOPF scores to qualify for an award then players with higher scores.[13]  Thus, race and demographic norming is accounted for across the board because of the manner in which the

---

13      A simple test to demonstrate the impact of race on the testing would be to compare the percentage of African Americans in the Above Average category of intellectual functioning with Caucasians.  While this Firm does not have access to the data, it is likely readily available to the Claims Administrator and such a comparison would be instructive.

TOPF is used. After race is accounted for the first time on the TOPF, African Americans are penalized a second time by norms such as Heaton that increase African American's T-scores on individual tests. To the extent that accounting for race with respect to testing is justifiable at all, it certainly should be accounted for only once. There simply is no justification in the medical literature (and could not be as the Settlement created this construct) for accounting for race multiple times within a single battery of tests.

## CONCLUSION

█████████████ checks all the boxes necessary to qualify for the Settlement:

- ████████████████████████████████████████████████████████████████████████████████████████

- ████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

14      This case involves many of same problems as this Firm's appeal (document # 206349) filed under player ID # 100005553. ████████████████████████████████████████████████████████████████████████████████████████████ Both denials also use race-based norms in an attempt to undermine the overall results.



For the reasons stated herein, ▉▉▉▉▉▉ respectfully requests that the Denial be overturned and that he be issued a long overdue monetary award.

Dated:      New York, New York
            May 22, 2019

                              **JR WYATT LAW, PLLC**

                              Justin R. Wyatt
                              49 West 37th Street, 7th Floor
                              New York, NY 10018
                              (212) 557-2776