## UNITED STATES DISTRICT COURT
## FOR THE EASTER DISTRICT OF PENNSYLVANIA

IN RE: NATIONAL FOOTBALL LEAGUE | No. 2:12-md-02323-AB
PLAYERS' CONCUSSION INJURY | MDL No. 2323
LITIGATION |

## <u>MOTION TO DISCIPLINE OR DISMISS SPECIAL MASTERS AND AUDITORS</u>

Undersigned counsel, pursuant to Cannon 3.C (1) of the Code of Judicial Conduct, Rule

53, Federal Rules of Civil Procedure, U.S. Supreme Court precedent, Title IV, Rule 8, Rules

Governing the Audit of Claims—Standards of Proof Applicable to Special Master, hereby moves

this Court to either discipline or remove the auditors and Special Masters for violation of due

process, standards of impartiality and objectivity, and un-refutable evidence of bias and

appearance of potential bias in their operations and investigations.[1]  As grounds therefore,

undersigned states as follows:

### MEMORANDUM ON LEGAL STANDARD

NFL claims investigators, auditors and Special Masters have a heightened standard of

review and are to serve as the objective eyes and ears of the Court.  When they fail to do so, they

are appropriately dismissed.  Cannon 3.C (1) of the Code of Judicial Conduct; Rule 53, Federal

Rules of Civil Procedure.  *See Cordoza v. Pac. States Steel Corp*., 320 F.3d 989 (9th Cir. 2003)

(Special master failed to accomplish the primary goal assigned, used his position to advance his

professional and economic interests, and overbilled.  Special master dismissed by the federal

judge); *Hofmann v. EMI Resorts, Inc.,* 689 F. Supp. 2d 1361, 1373, 1375 (S.D. Fla. 2010)

("Having carefully considered the contents of the Report and Defendants' arguments, I agree that

---

[1] Index of sworn and indisputable evidence documenting bias, and the appearance of potential bias, attached hereto, is found on page 39.

the Special Master's "impartiality might reasonably be questioned" and that he should therefore be disqualified from performing "judicial functions" in connection with these proceedings as a Special Master."); *In re Murchison*, 349 U.S. 122 (1955) *see also Taylor v. Hayes*, 418 U.S. 488, 501 (1974) ("The inquiry must be not only whether there was actual bias on [the judge or special master's] part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." Quoting *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964)).

Regardless of whether there is "actual" or "potential" bias, if either exist, or if there is even the "appearance" of bias, the investigators, auditors and Special Masters must not have any bias—potential, perceived or actual.[2]  Under the law, even the appearance of "potential" bias warrants dismissal.  *Hoffman, Murchison, supra*.

## CORE UNCONTROVERTED BIAS

The auditor and Special Master bias is glaring.  They interpret "non-communication" for "non-filed" claims as "a misrepresentation, omission, or concealment of a material fact made." If one doesn't communicate, doesn't take an action, and doesn't file a claim, one is not communicating.  How can one non-communicate "a misrepresentation, omission, or concealment of a material fact"?  Is this a violation of thought and intent that doesn't exist in reality but interpolated telepathically?

Use of in-house attorney work product medical evaluations and education efforts, found to be largely accurate, protected under attorney work product privilege, <u>never submitted to the</u>

---

[2]  What is concerning is that the Special Masters on January 22, 2021, issued a ruling directing harm to various parties without having the facts presented, without communicating or requesting a response from the injured parties, in violation of the claim administration rules regulating investigations, in violation of the ethical standards for investigations, and adopting demonstrably false findings.  This indicates bias and the appearance of "potential" bias. The consequences of this bias are clear--dismissal.  *Hoffman, Murchison, supra*.

NFL Claims, explicitly not for use in any claim submission, not qualified for any claim submission, and in fact never used in any claim simply cannot be a "misrepresentation, omission, or concealment of a material fact made." That is unless non-existent *telepathically interpolated evidence* is now the standard applied by the Courts of the United States.

## STANDARDS FOR INVESTIGATIONS

Beyond the Code of Judicial Conduct, Federal Rules of Civil Procedure, U.S. Supreme Court precedent, the Audit Report and investigation is explicitly ethically and morally required to comply with Quality Standards for Investigations,[3]and [4] it fails to do so. The Special Masters and those that have followed or adopted this failing effort had an opportunity to see and understand these failures, improve investigations and Audit Reports and require compliance with Quality Standards for Investigations. They rejected this opportunity and intentionally chose not to. What are these quality standards for? To find the truth. Core standards for investigations and investigative organizations to find the truth are as follows:

> *In all matters relating to investigative work, the investigative organization must be free, both in fact and appearance, from impairments to* independence; *must be organizational independent; and must maintain an* independent attitude.

**Personal Impairments**—Circumstances may occur in which an investigator may experience difficulty in achieving impartiality because of their views and/or personal situations and relationships. These impairments include the following:

---

[3] Quality Standards for Investigations, Council of Inspectors General on Integrity and Efficiency, November 15, 2011, pp. 6-17, A-1.

[4] The Council of the Inspectors General on Integrity and Efficiency oversees all Inspectors General for the United States, including the Offices of the Inspector General for the Department of Justice and its FBI. This is to ensure the integrity and effectiveness of U.S. Department of Justice operations and investigations, which were abused by the FBI and J. Edgar Hoover from 1935 to 1972, and much of this investigative abuse is documented in the Church Committee's 1976 findings. *See* Special Report, 2005, Office of Inspector General, The Federal Bureau of Investigation's Compliance with the Attorney's General Investigative Guidelines. Exhibit B, pp. 1-7 (including not investigating evidence casting doubt on principal informants, that criminal activity be "clear and unambiguous was not only ignored but apparently violated", "incomplete and misleading information", failure to "challenge or test the sufficiency and accuracy of information" and more). If attorneys for the U.S. Department of Justice are included, the U.S Department of Justice Office of Professional Development will assist in addressing.

1.  Official, professional, personal, or financial relationships that might affect the extent of the inquiry; limit disclosure of information; or weaken the investigative work in any way;
2.  Preconceived opinions of individuals, groups, organizations or objectives of a particular program that could bias the investigation;
3.  Previous involvement in a decisionmaking or management capacity that would affect current operations of the entity or program being investigated;
4.  Biases, including those induced by political or social convictions that result from employment in, or loyalty to, a particular group or organization;
. . .

> *Due professional care must be used in conducting investigations and in preparing related reports.*

**Legal Requirements**--. . .Investigations should be conducted with due respect for the rights and privacy of those involved.

**Impartiality**—All investigations must be conducted in a fair and equitable manner, with the perseverance necessary to determine the facts.

**Objectivity**—Evidence must be gathered and reported in an unbiased and independent manner in an effort to determine the validity of an allegation or to resolve an issue.  This includes inculpatory and exculpatory information.

**Ethics**—At all times, the actions of the investigator and the investigative organization must conform with all applicable standards of ethical conduct.

> *Investigations must be conducted in a timely, efficient, thorough, and objective manner.*

The investigator is a fact-gatherer and should not allow conjecture, unsubstantiated opinion, bias, or personal observations or conclusions to affect work assignments.  He or she also has a duty to be receptive to evidence that is exculpatory, as well as incriminating.

> *Reports (oral and written) must thoroughly address all relevant aspects of the investigation and be accurate, clear, complete, concise, logically organized, timely, and objective.[5]*

[5] "Objectivity" is an understanding of reality.  It has metaphysics and epistemology components, mental constructs, and dependence on social structures and world views.  Objectivity in investigations can be easily distorted without discipline and Quality Standards for Investigations, and reality can be lost in bias abstractions.  Then the telepathic shadows take over.

This is what has taken place in this investigation.  Notwithstanding the investigation's collapse into bias and abstract shadows, in this case the shadows and abstractions of the Tipster are exposed by reality.  As noted by Philosopher and Theologian, C.S. Lewis, "reality is harsh to the feet of shadows."   Philosopher George Wilhelm Friedrich Hegel

Reports should contain <u>exculpatory evidence and relevant mitigating information</u> when discovered during any administrative investigation.  <u>Exculpatory evidence</u> in a criminal or civil investigation must be brought to the attention of the assigned prosecutor.

> *Investigative data must be stored in a manner that allows effective retrieval, reference, and analysis, while <u>ensuring the protection of sensitive data</u> (i.e., personally identifiable, confidential, proprietary, or privileged information or materials).*

**Investigative File**—All investigative activity, both <u>exculpatory</u> and incriminating, should be recorded in an official case file.

Ensuring that sensitive information is protected.

**<u>Know evidentiary rules.</u>**
<u>Assess progress and **re-focus when necessary**</u>.
**<u>Review and understand</u>** information gathered.
Write draft report—ensure accuracy, thoroughness, **objectivity**, proper format, clarity and correct grammar.

Quality Standards for Investigations, Council of Inspectors General on Integrity and Efficiency, November 15, 2011, pp. 6-17, A-1 (emphasis added).

To find the "truth" in an investigation, Quality Standards for Investigations require that an investigation must be objective, unbiased, weigh the sources of the allegations, challenge and test the information alleged, use exculpatory evidence, know evidentiary rules, weigh the source of the information, and re-focus the investigative lens when evidence shows re-focus is needed. Special Masters, as are all investigative oversight entities, are to enforce and require application of these standards and this is their opportunity to do so.  To comply with the Quality Standards for Investigations in finding the "truth" the investigator and Special Masters must have

---

points out the damage in following the bias of abstractions, "to make abstractions hold in reality is to destroy reality."  The shadows of this investigation and Audit Report now have to deal with harsh reality. The bias abstractions spewed by criminals and extortionists and adopted by the investigators and Audit Report is a telepathic shadow trying to obfuscate the reality of the Tipster, conspirators, extortionists crimes, legal opportunist bottom feeders, and baseless allegations, and the reality of not only extensive exculpatory evidence, but no conceivable violation of any rule or regulation.

knowledge of the Quality Standards for Investigations and history of investigative abuse, courage, integrity, spirit, and intellectual and staffing skills to take on bias in the investigation, including from informants, testing the source and sufficiency of evidence, as well as the bias in the institution and bias goals of the community engaged with the institution. It is not an advocacy exercise in use of telepathic logic, rather an exercise in finding truth.

In this four-year exercise in learning to do quality investigations, the first draft is a near failure. The Audit Report is a near failure because of the lack of following Quality Standards for Investigations, lack of objectivity, bias, incapacity to investigate and challenged or even consider the agendas and sources of information, failure to apply exculpatory evidence, failure to re-focus the investigation as evidence and its sources were investigated, and failure to apply ethics and evidentiary standards. These failures rooted in bias perverted truth into a demonstrably false report.

Despite the investigators sharing this failing Audit Report with other investigating authorities prior to the Special Masters making a determination on this investigation as required by Title IV, Rule 27 and Rule 30; and prior to ever informing Respondent that it was under audit or providing a copy of this Audit Report to him, the Special Masters had an opportunity to receive or review accurate evidence, or to ensure an investigation that complied with Quality Standards for Investigations. They have chosen not to comply with these standards and have chosen to follow bias and violation of the investigative standards established by this Court. The Audit Report is wholly and completely inaccurate, unreliable, irrelevant, violative of investigative standards, and the evidence found in the investigation in fact demonstrates that no claims submission standard was violated.[6]

---

[6] **There is no misrepresentation, omission or concealment of material fact. There cannot be such violations in protected attorney client work product merely working in-house with staff and in-house experts. There were**

### FIRST EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE DUE TO BIAS AND LACK OF OBJECTIVITY

This Audit Report and the underlying investigation fail in almost every respect.  As a preliminary exemplar of the failures, consider the following simple, knowingly and easily verifiable false statement, concerning an irrelevant and non-related and non-informed target of the investigation, from the Audit Report:

> "Sharon Delaney accompanied Shockman Davis (SPID 950002981) to his neurological examination **and pretended to be his wife**."

Audit Report, p. 3 (emphasis added).  NFL Counsel jumped on this knowingly and easily verifiable false statement seeking her disqualification from the program:

> For example, The Claims Administrator's investigation uncovered that an "NFL Claims Specialist" at a claims preparation company ("S.D.") accompanied a class member to a neuropsychogical evaluation and "pretended to be his wife."  (Id. at 3). Such clear and obvious fraud cannot be excused in this Settlement Program. The NFL Parties respectfully request that the Special Masters conduct an audit report . . . which if substantiated would undoubtedly call for both S.D. and the Settlement Class Member (SPID950002981) to be disqualified from the program."

NFL Parties' Statement of Position and Recommendation on the Claims Administrator's Audit Report on Howard & Associates, P.A., and Related Parties, p. 2.

The distorted lens against Sharon Delaney is verified from our investigation of this unknown target, as this firm had never spoken with this person and had no relationship with Sharon Delaney prior to this false allegation.  From our investigation, we received the facts from

---

no submissions of any document of this Howard & Associates protected attorney work-product pre-claim
education process for the purposes of claims submissions.  This is because the firm, its staff, its independent
contractors, and its experts, as part of its attorney work product privilege, were learning the process, which process
had not crystalized and was not finalized.  The firm had not reviewed, nor finalized, nor prepared any claim for
submission, nor has been paid for its submission of any claim.  The firm has not had access to even view electronic
files of clients from late 2019 until recently due to machinations by the Shenaq, PC., firm.

an accurate lens, which shows that the April 2, 2018 evaluation by Dr. Wisdom specifically

states:

> "Mr. Davis was on time for his appointment and was accompanied by an
> assistant which **the examiner mistakenly thought was his wife for the**
> **beginning of the exam.**"

Neuropsychology Wisdom, PLLC, Independent Medical Examination, Shockman Davis dated

April 2, 2008 (emphasis added).  There is no evidence contrary to this.  In fact, the undisputed

affidavit of Sharon Delaney, attached, documents both the legitimacy of her actions and the

illegitimacy of the sources of this ugly claim.[7]  This unrefuted and documented evidence verifies

schemes to manipulate and bias the investigative and audit process towards intentional and

proven fraudulent outcomes and goals.

Somehow the investigator, who looks to be Brown & Greer Attorney Roma Petkouskas,

and NFL Counsel aligned, with the support of the Special Masters, on this innocuous error by

Dr. Wisdom's examiner, not Sharon Delaney, and this error was intentionally portrayed as

corrupt by a competitor (similar to Don Reinhard's extortion campaign against undersigned with

corrupt allies) and the Special Masters adopted their interpretation of these facts as Sharon

Delaney impersonating a wife.  The Special Masters had the opportunity to correct this glaring

error and the many others found in this suspect, illogical and deeply flawed investigation, yet

intentionally with glaring bias, chose to do nothing.

---

[7] At the end of her unrefuted affidavit, documenting the source and manipulation of the auditor, she states:

> These unconscionable twists of words, and adoption thereof by the auditors, needs to be audited
> and investigated in and of itself by Federal authorities as it unequivocally demonstrates and
> intentional corruption of the audit process and complicity between the auditors and those
> threatened by my services.  If there is any validity to this audit process th[e]n these allegations
> must be dropped immediately.

Notwithstanding this glaring bias and intentional distortion and manipulation, NFL Counsel, the auditor and Special Masters violate basic investigative standards that NFL Counsel disturbingly states are irrelevant, and continues down this logical, fallacious, *ad hominem* path that violates investigative standards and undisputed evidence.  This is a duplicitous and unseemly scheme to justify not paying retired NFL players nor to permit continuing work by those that do an excellent job assisting them.  (NFL Counsel Reply, April 5, 2021, p. 5, fn. 5).  Where is the source of this actual bias?  The sworn affidavit of Sharon Delany lays this out and the evidence of the auditor's bias is undisputed.  The blatant distortion here at a minimum demonstrates the appearance of "potential" bias and such would warrant dismissal of the investigators and Special Masters.  *Hoffman, Murchison, supra*.

Obvious questions from any objective investigation and lens to expose bias are as follows:  Did those threatened by Sharon Delaney's effective work and advocacy for NFL claimants manipulate the investigators because of the bias and lack of objectivity of investigators and provide this distorted information in order for the investigators to do their bidding and impugn the character and integrity of Sharon Delaney.  Was this done because she was effective and a threat to law firm competitors?[8]  Demonstrating explicit bias, the Special Masters intentionally avoid asking such obvious questions.

Consistent with the distorted lens and failure to seek truth and follow Quality Standards for Investigations found in this entire investigation, the investigators and Audit Report got it wrong.  The investigators and Special Masters are not applying their lens to see how they are

---

[8] Similarly, why is Collins & Truett, an independent law firm owned and controlled by a 71-year-old attorney with a spotless record involved in this Audit Report?  NFL Clients can choose any counsel they want and as far as Respondent is aware from its investigation, Collins & Truett has not been alleged or claimed to be involved in any untoward activity of any type.  Whose agenda is being advanced by their reference in this Audit Report?

being manipulated to adopt bias and agendas by the institution, persons and groups.  In this case it would be competing law firms and the NFL, neither of which want this effective advocate for NFL Clients, in Ms. Delaney, and are using the audit process as their bottom feeder destructive advocacy tool, not for truth.

### NEXT EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE DUE TO BIAS, LACK OF OBJECTIVITY AND FAILURE TO COMPLY WITH LOGIC, EVIDENTIARY AND ETHICS STANDARDS

The investigators, auditors and Special Masters know that Howard & Associates never filed a claim, never communicated anything related to the submission of any claim to the claims facility, and never used, nor could use, nor intended to use, its attorney work product education nor in-house experts[9] and staff for any claim submission.  Rather this work was applied as part of its in-house attorney work product strategic leadership in learning and testing "potential" claims.[10]  Demonstrating the bias, lack of objectivity, failure to comply with evidentiary and ethics standards, and refusal to re-focus the investigation, the Audit Report as a grounding and conclusive evidentiary position specifically states:

**"Howard did not file any claims for claimants he represented on the NFL Portal."**

[9] There is a difference between a consulting in-house expert for attorney work product and mock trials, verses a testimonial expert for trial or claims submission purposes.  A law firm can have any type of communication with a consulting expert or in a mock trial that is part of the law firm's educational attorney work product.  None of the consulting in-house expert and protected attorney work product was ever used to testify or submit for a trial or claims submission.  Howard & Associates never authorized any consulting in-house expert, protected attorney work product to be submitted as an NFL Claim, and this protected attorney work product never was.

[10] The protected in-house attorney work product educational operation, like a mock trial, used to determine the competence and capacity of both staff and in-house experts in their efforts, as part of the attorney work product effort for NFL Claims submissions were never used for filing claims, never communicated in any fashion with the claims facility, but only as education.  As a J.D., Ph.D., that has engaged in mock trials, Dr. Howard taught constitutional law, civil liberties law and Presidential leadership at Boston University, directed and advised on nearly 100 doctoral theses, trained nearly 100 doctorates, and taught graduate students in nearly every place on the globe, like a draft dissertation, this is a standard educational, institutional and military technique to validate gaps in operations, improve quality and avoid harm.  As Dr. Howard learned at Harvard from General Petraeus' lessons in Iraq, addressing strategic leadership, "get the big picture right" and "understand mistakes of your team."  Once the flaws of both staff and experts were understood, by the early Spring of 2018, nearly three years ago, the firm got the big picture right, understood the mistakes of experts and staff, and with this knowledge engaged in a more effective approach for NFL Claims submission compliance.

Audit Report, p. 49.  The in-house attorney staff and expert work for clients used for education and operations testing, "not for" the filing claims, are protected attorney work product privilege. *See* Florida Rule of Civil Procedure 1.280(b)(3) ("documents and other tangible things . . . prepared in anticipation of [submission of client claims].").[11]

After paying nearly $1 million for in-house medical evaluations, and nearly $3 million for each and every testing by the Shenaq, PC., <u>Howard & Associate's instructions to the Shenaq, PC's was to file a claim if, and only if, the client met the claims standards through a qualifying diagnosis</u>.  The payment of these $3 million in costs and providing protected attorney work product experience and education to Shenaq, PC., was not for Shenaq, PC. to scheme with the investigators and other opportunists and accelerate the bias in interpretation of the facts in order to take the benefits of that $3 million invested.  Moreover, as to the quality of the testing that Howard & Associates paid the $3 million for, once it knew the proper methods and capacities of experts and staff, there has been no objection or concern as to any claim filed by Shenaq, PC. paid for by Howard & Associates, with its attorney work product used as historical information, never to be submitted as part or in support of a claim, even if mistakenly included by Shenaq, PC, in one claim, and none are discussed in the Audit Report.[12]

---

[11] The primary policy objective of the work-product doctrine is to preserve the effective assistance of attorneys and others employed to help prepare a claim for submission.  Maintaining the privacy of communications between client, attorney, staff for the attorney, consultants, and in-house medical experts in preparing for claims submissions fosters the effectiveness of legal assistance upon which the adversarial system of justice depends. This law firm has not intentionally or unintentionally waived either its fact or opinion work product privilege by staff or its in-house experts.  The discovery from third-party litigation or investigations were all submitted with explicit protections of attorney work product and they were not authorized nor permitted to provide or waive work product privilege in any fashion.

[12] The Audit Report commits a logical fallacy and severe error when it conflates protected in-house attorney work product medical evaluation efforts that were never intended nor ever shared with the claims facility, with ultimate claims submissions and communications with the claims facility.  **The law firm determines when and if anything is communicated with the claim facility and if and when communications and documents are submitted for claims.  The law firm never found the protected attorney work product medical evaluation efforts discussed in the Audit Report to be compliant and sufficient for submission, and consequently never submitted these**

The Audit Report's bias is glaring and is demonstrated in its own language. The Audit

Report and even the Special Masters' Rule 18 Decision use the term "potential" as their standard

for violations.[13]  There is no "potential" to communicate. There is only "actual" communication.

---

records for the claim submission itself, and never communicated with the claim facility concerning any claim submission, ever. Thus, there can be no misrepresentation, concealment, or omission.

**This Audit Report's logical fallacy is using attorney work-product medical evaluation educational drafts as final and as communications with the claims facility, when it "knows" they are "not" final and no communication with the claims facility ever took place.** The draft paper maybe a "D-" because it is a draft. Grading is based on the final, not the draft. These drafts were never submitted by Howard & Associates, and the claims that were submitted by its partner firm, with more experience, Shenaq, PC., were compliant. The final submissions were an "A", and no fault is found in them.

Unfortunately, this Audit Report itself is "actual" and "final". As a J.D., Ph.D., Professor Howard, with course work at Oxford and Harvard Law School, that has trained nearly 100 doctorates at Northeastern University, ranging from FBI, CIA, Judges, Attorneys, Harvard Doctoral Professors, University Presidents, Elected Officials, with Chief Supreme Court Justice, U.S. Senators, Attorneys General, and distinguished national Ph.D., faculty, in Law & Policy, grades this Audit Report a "D -". It is not an "F" because some data work was done, but totally failed to seek or try to find the "truth" in the investigation, due to bias, lack of training, skills or capacity, and being institutionally coopted by those manipulating and feeding on this lack of understanding reality through incompetence and co-dependence for their identity, status, and institutional and economic security. It has violated nearly every standard including but not limited to not investigating evidence casting doubt on principal informants, that claimed violative activity be "clear and unambiguous was not only ignored but apparently violated", "incomplete and misleading information", failure to "challenge or test the sufficiency and accuracy of information" and more. Fortunately, the Special Masters have an opportunity to correct this flawed investigation and Audit Report.

If Howard's doctoral students would have presented this "final" and "actual" Audit Report, he would have given it a D- because of the fallacious logical structure and the obdurate and bias lens in the face of obvious exculpatory evidence, renders the Audit Report a near failure. The Audit Report also raises concerns as to conspiracy and collusion to bias and distort the NFL Claims process to benefit third parties, including the NFL, and their agendas. If this was a "draft" Howard would expect the doctoral student to submit the "re-worked" next draft addressing its bias and failure to comply with Quality Standards for Investigations, and constructively use this review for an intelligent and objective accurately focused investigation and report, and future sound thinking and application. The Special Masters can now correct these errors.

[13] The Special Masters had a chance to correct the absorbed the bias, distorted lens, and failure to apply exculpatory evidence, that the investigator applied in its Audit Report. They have chosen not to. While the Rule 18 may permit "potential" for referrals by the Special Masters, Rule 28 Standard of Proof Applicable to the Special Master rulings requires an "actual" claim submission and an "actual" misrepresentation, omission or concealment of a material fact made in connection with a [filed] claim by the Settlement Class Member. Thus, there can be no violation for a claim that was never filed and never used protected in-house attorney work product. Nor can there be intent for misrepresentation, omission or concealment of a material fact made in connection with a claim filed by a SCM when the instructions from Howard & Associates to its co-counsel are specifically instructed "not" to use any of its in-house medical exams and education attorney work product by in-house experts and staff used to learn about claims, "not" for use in any claim submission for any SCM, and in fact "none were used as the basis for any claim." Audit Report, p. 14.

There can be no misrepresentation, omission or concealment if there no communication.  This alone is a violation of Quality Standards for Investigations.

"Potential" is defined by Meriam Webster as "existing in possibility: capable of development into actuality; expressing possibility."  The opposite or antonym of potential is "actual, existent, factual, real."  What the use of "potential' in this Audit Report and Special Master's Rule 18 Decision on Report of Adverse Finding Regarding Howard & Associates and Related Parties, without ever communicating with Howard & Associates concerning this audit, is that the violations are **not** "actual, existent, factual [or]real."  What the investigator missed due to their lens being perverted is that the word "potential" means that it did not happen.  "Potential" does not mean "actual."[14]  In the words of Hall of Fame NFL Head Coach Bill Parcells, **"Potential means you haven't done anything yet."**

Every attorney work product activity, indeed the activity of every human being and every institution at any given moment, has the "potential" to do harm, even murder.  We all have the potential to communicate hello, but if we don't see the person, and don't say hello, we are not saying hello.  **This Audit Report without ever questioning or hearing from Howard & Associates and never informing the law firm it is under audit, is not "potential" but is "actual, existent, factual, real" and demonstrates that its potential for bias, lack of objectivity, manipulation by persons, criminal informants, failure to investigate the agendas and credibility of sources, institutions, and organizations, violation of ethics, inability to refocus its lens, and violation of the Code of Judicial Conduct, Federal Rules of**

---

[14] The Audit Report states that the "Appeals Advisory Panel should ignore any Howard related provider records when assessing claims." *Id.*  That is obvious. The AAP should ignore these records as none of these records were for claims submissions and were protected attorney work product privilege that were never submitted nor authorized for submission by Howard & Associates.

**Civil Procedure, U.S. Supreme Court precedent, and Quality Standards for Investigations are now confirmed as actual and "real".**

The entire Audit Report relies on this *non sequitur* due to its bias lens and failure to objectively and independently look at the evidence in context nor discuss the context with the target of the investigation.  This distorted lens is the root of this investigation and Audit Report.  It is a *non sequitur* to state that no claim was ever filed yet argue that there were misrepresentations, omissions, or concealment of material facts made in communications to the claims facility, which is based on claims being filed for payment.  It is a physical impossibility.  Non-filed and non-authorized attorney work product privileged documents, in-house medical evaluations and communications that were never used, nor intended for use, specifically instructed by counsel not to use, and were not ever to be filed for any claim or submission.

Consistent with the *non sequitur* of "potential" as being "actual", Title IV, Rule 28 of the Rules Governing The Audit of Claims does not apply "potential" as a **Standard of Proof Applicable to the Special Master.**  Rather it specifically states the Special Master will determine whether there is a:

> reasonable basis to support a finding that there <u>has been a misrepresentation, omission, or concealment of a material fact</u> **made** in connection with **a Claim** [filed] **by** the Settlement Class Member.  The Special Master also may find such misrepresentation, omission or concealment was intentional if the record contains substantial evidence of such intent.

Based on this Standard of Proof there must first be an action made in connection with a claim "filed **by**" a Settlement Class Member.  **There can be no "misrepresentation, omission, or concealment of a material fact" since there was no communication with the claims facility to create a misrepresentation, omission or concealment of a material fact.  That would be an impossibility.**  There is no communication with the NFL Claims facility based on the in-

house attorney work product educational efforts. **No claim has been filed, or authorized to be filed, with any omission, or concealment of a material fact, nor was any material fact on a claim intended to be so filed**. <u>There can be no finding of intent for a "non-filed" claim or unauthorized use of in-house attorney work product medical evaluations and staff work, as one cannot even communicate sufficient to create a misrepresentation, omission or concealment of a material fact unless and until there is communication with the claims facility and a claim is filed.</u> "Potential" means an action has not taken place. Protected attorney work product communications and internal attorney client work product education are not "actual" claims. Especially when never submitted.

Thus, the Audit Report's bias and lack of objectivity, lack of acceptance of exculpatory evidence, lack of investigating evidence casting doubt on principal informants, that violative activity be "clear and unambiguous was not only ignored but apparently violated", "incomplete and misleading information", failure to "challenge or test the sufficiency and accuracy of information", and deeply distorted lens and interpretation is misplaced and results in a deeply flawed, if not fraudulent, Audit Report. This makes an excellent Harvard case study in investigative and Audit Report failures and "pile on" adoption through passive acceptance of errors and incompetence, rather than objective, engaged investigative thinking. Unfortunately, the management oversight and exposure of internal errors to the Special Masters that should have taken place here to correct this flawed product, was intentionally not done by the Special Masters, even after written notice and detailed evidence to them on February 4, 2021.

**THIRD EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE IN ADOPTING
BIAS OF CRIMINALS, CONFIDENCE GAME OPERATORS, AND EXTORTIONERS**

The core allegations by the Tipster—that 350 medical reports to be submitted to the NFL Claims were forged in an attempt to submit fraudulent NFL claims, were shown by the witnesses and documents as demonstrably false.  Consider the following findings from the audit itself:

**Dr. J. Lucas Koberda Confirms All Records Accurate and No SCM Claim
Submission Relying on His Diagnosis.**

Confirming the false narrative and false information provided by the Tipster, that medical documents were forged, as well as the preliminary attorney work-product evaluations not for submission to the NFL Claims facility, Dr. J. Lucas Koberda verifies that "**all documents matched his medical records.  To date, no Settlement Class Member formerly represented by Howard & Associates has submitted a claim to the Settlement Program that relies on a Diagnosing Physician Certification Form by Dr. Koberda**."  Audit Report, pp. 15-16. (emphasis added).

**Dr. Ahmed Sadek Confirms All Records are Accurate and Denies Ever Being
Requested to Edit a Medical Report.**

Confirming the false narrative and false information provided by the Tipster, that medical documents were forged, as well as the preliminary attorney work-product evaluations not for submission to the NFL Claims facility Dr. Ahmed Sadek "**denied ever being requested to make edits to reports**, except to correct name spelling or dates of birth."  Audit Report, p. 16. (emphasis added).

**Dr. Laura Hopper Confirms Accuracy of Medical Reports.**

Confirming the false narrative and false information provided by the Tipster, that medical documents were forged, as well as the preliminary attorney work-product evaluations not for submission to the NFL Claims facility, Dr. Laura Hopper "**noted no other differences in the**

**reports** [other than Dr. Williams name missing on one title page].  Audit Report, p. 18. (emphasis added).

Notwithstanding the verification that the core allegation by the Tipster was false, namely that no medical reports were altered, the Audit Report still adopts the bias of the Tipster and continues is meandering investigation violative of Quality Control Standards and not grounded in reality or objectivity.

### FOURTH EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE BY NOT COMMUNICATING WITH THE LAW FIRM TO GET ACCURATE FACTS

The Audit Report investigator, presumably Brown & Greer Attorney Roma Petkauskas, and Special Masters could have saved much of this time and effort by directly communicating with Howard & Associates as to this false lens and adopted bias of the investigation from extortionate allegations founded in greed.  Fortunately, and expectedly as this is its purpose, the protected attorney work product process uncovered systemic errors, lack of staff capacity, extortioners, confidence game operators, and led to education from experts, and to a claims submission education that were in the client's interests.  The fact that all lawsuits have been settled with Howard & Associates not paying anything, including no disgorgement to the SEC, shows that other than trusting and seeing the good will in others, nothing was done wrong, and no greed nor unscrupulous activity took place.  The protected in-house attorney work product education and exposure process worked.  Notwithstanding, the adopted, distorted and bias lens in violation of investigative Quality Standards for Investigations in the final Audit Report, adopted and not modified by the Special Masters, continues.

That is why objectivity, lack of bias, ethics and compliance with evidentiary rules are required for all investigations and Audit Reports.   Bias is a common human error, and emotional identity commitment combined with doubling down through cognitive dissonance keeps one

buying into an initial false lens on reality, sometimes for life.[15]  If the lens and bias continue to deny reality this can result in personal disintegration, institutional disintegration, and mayhem. Bias and a distorted lens on the facts is a key source of injustice.  Consider the recent storming of the Capital as an example.  This was a good learning opportunity for the Special Masters, investigators, and Attorney Roma Petkauskas, yet they have chosen to continue down their biased path.

**FIFTH EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY WORK PRODUCT WORKING DRAFT TEMPLATES FOR VOLUME MEDICAL REVIEW AND TESTING SYSTEMS.**

The Audit Report lists three claims (Kenneth Davidson, SPID 100003606; Jessie Small, SPID 100014059; Robert Hecko SPID 100006799) submitted by another law firm with NFL Claim compliant medical evaluations by other physicians, with awards issued for two of the claims.  They include historical IMEs from the preliminary attorney work product done by Howard & Associates in-house experts and psychometrist. These experts were providing preliminary medical evaluations for Howard & Associates for understanding of the evolving claims process.

The fact that similar information is found concerning the same client from a similar medical evaluation in-house attorney work product evaluation process, is expected.  The mistake is conflating this in-house attorney work product medical evaluation work with a final product for submissions for claims.

As a matter of course, medical providers don't start from scratch but rely on prior work of other medical providers as they advance their diagnosis and treatment, and often rely upon and

---

[15]  As the Audit Report shows, this same information without the proper lens leads to extortion and injustice.  This is the error of the investigator and the Audit Report.  Their bias in seeing bad intent is embedded based on their incentives and career which distorts their lens.  This lack of objectivity and bias created the distorted lens and is at the root of this *non sequitur* Audit Report.

may even adopt the information from other medical evaluations as part of their clinical and medical evaluation efforts. Especially when dealing with high volumes.  Notwithstanding, these were not used for an NFL Claim. They were only protected in-house attorney work product medical evaluations, not for filing in an "NFL Claim Compliant" medical report.  This was part of the protected in-house attorney work product preliminary medical evaluation screening process by Howard & Associates.

Protected educational efforts as attorney work product with non-board-certified neuropsychologist Dr. Ford-Johnson and neurologist Dr. Sadek as part of the in-house IMEs on CDRs, dates of testing, and employment are appropriate. In fact, the law firm continued to learn about the employment issue and now knows that this is only one data point and does not necessarily exclude a claimant from approval. As a result of this exercise the law firm was able to assess the competency and capacity of both its staff and evaluate future experts in the evolving NFL Claims process.  The appropriateness of this internal strategic approach became clear to the law firm in late 2017, when the law firm learning process concerning staff and in-house medical evaluation experts had run its course.

**SIXTH EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE TO OBJECTIVELY INTERPRET PROTECGTED ATTORNEY WORK PRODUCT WORKING DRAFT TEMPLATES FOR VOLUME MEDICAL REVIEW AND TESTING SYSTEMS.**

Providing templates in word for "working draft reports" that are to be edited based on the assessment and findings of a medical expert, for a high volume of protected in-house attorney work product medical evaluations, is standard activity.  All medical professionals have their templates.  Providing updated facts and information in "working draft reports" is also standard. This working draft protected attorney work product was ultimately reviewed by the law firm and from the lessons from this attorney work product medical evaluation effort guided the law firm

to engage a law firm with more experience in the NFL Claims process. That was the Shenaq, PC., law firm.

As co-counsel, Howard & Associates paid $3 million for all independent testing and assisted with its joint client claims with Shenaq, PC. Shenaq, PC., entered into a joint venture with Howard & Associates due to its expertise in the evolving NFL Claims process. Howard & Associates had learned what was needed for quality staff and claims submissions through its attorney work product efforts from 2015 through early 2018 and determined to participate with a firm that had perfected the process.

Without its experience and knowledge from its protected attorney work product education with other experts and staff, the firm would not have had the judgement and expertise to make this decision. It was the correct one at that time and the attorney work product education and experience informed this decision. Unfortunately, because the investigations continued, sometime in 2019, Shenaq, PC., saw the false allegations, bias, lack of objectivity by the investigators and audit process, as well as pile on by other opportunists, as a method to gain favor, and work strategically to take the benefits of the $3 million, and increase his income. His bottom feeder strategy also failed.

### SEVENTH EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY WORK PRODUCT WORKING DRAFT TEMPLATES FOR VOLUME MEDICAL REVIEW AND TESTING SYSTEMS

Creating protected in-house attorney work product "draft" medical evaluations from 11/5/15 to 11/6/17 that the law firm never authorized to be used for a formal claim submission but were part of its protected attorney work product privilege efforts at medical evaluation of client claims and preparing systems for claims, but never using these documents for final NFL Claims submission, is appropriate. This is regardless of the number of revisions or dates of the

medical evaluation drafts, and regardless of the source of the information, CDR worksheets, and privileged communications, correct and incorrect, between legal staff and experts, *vel non.*

Claims of "cherry-picking" existing and accurate CDR information for medical evaluation working drafts of an protected in-house attorney work product education effort for both staff and in-house experts that was never submitted nor intended to be submitted for an NFL Claim, is irrelevant.  Moreover, the non-testifying in-house experts were able to review the original source documents and modify as desired.  The bias and lack of objectivity distorted the investigator lens and Audit Report.  The Audit Report conflates protected in-house attorney work product medical evaluations and process education with actual submissions.  This bias and lack of objectivity blinds the investigator to the fact that this has no significance.

Inaccuracies and errors in protected attorney work product "working draft" medical evaluations and related documents prepared for internal evaluations, but not for submission to the NFL Claims, is of no significance.  It raises the concern of why the constant conflation of law firm non-use documents and law firm non-authorized documents, as if they were "actual" submissions?  Why and how are drafts that are never used, driving this investigation, and the only substantive evidence of this investigation?  What is the source of this bias?

In the words of Shenaq, PC., a key informant source of this biased investigation, **these were "'historical medical records' that are 'not used as a basis of any claim.'"**  Audit Report, p. 14.  In fact, when the audits of these three claims were concluded, there was **a finding of compliance** and **no** **"Report of Adverse Finding in Audit."**  *Id.*

The bias and lack of objectivity and failure to apply exculpatory information deems the investigation and Audit Report biased, improper in outcome, seeped with severe violations of the code of Judicial Conduct, rules of Federal Civil Procedure, U.S. Supreme Court precedent, and

Quality Control Standards of investigations and audits.  It raises the specter of bias or at a

minimum the appearance of bias, either of which meets the standards for dismissal of the

auditors and Special Masters.

## EIGHTH EXEMPLAR OF INVESTIGATING AND AUDIT FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY WORK PRODUCT "WORKING STAFF" EVALUATION AND DEVELOPMENT

The investigators and Audit Report infers nefarious intent and processes for Dr. Edwardo

Williams working as a psychometrist.  There is no objective basis for any such claim.  This claim

is borne from bias and lack of objectivity.  Dr. Edwardo Williams, with over 30 years of medical

intake and diagnostic experience with similar populations and culture.  As a black and

accomplished physician with a history of serving under resourced black communities and

underserved black populations, he lost his license due to nothing but comments to a handful of

primarily white female patients, continued his development as a psychometrist for

neuropsychological testing.  Black nurse Samantha Barker's CDR interface, as she had

experience with similar populations and culture, was evolving as part of the attorney work

product privilege education efforts.  Similarly, both Dr. Koberda's and Dr. Sadek's interface was

evolving as part of the protected attorney work product privilege medical education efforts.

There was no "machine", nor a claims submission process "created".  This was a protected in-

house attorney work product medical evaluation education process that was never, could never

and will never be used for final claims submissions.

## NINTH EXEMPLAR OF INVESTIGATING AND AUDIT FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY WORK PRODUCT WORKING, STAFF EVALUATION AND DEVELOPMENT

As another example of failure to comply with Quality Standards for Investigations, and

bias, the law firm's focus on and learning the importance of employment as a key component of

the NFL Claims process is not nefarious.  The law firm was learning about this during its protected attorney work product educational process.  Addressing Mr. Small and Mr. Cody (SPID 100002927) employment status was a key part of education on their claims process.  The law firm's education and its ultimate testifying experts must understand that for any claim to be valid, employment was a key issue.  Attorney work product with non-testifying in house experts not for use in claims submissions is not an issue, nor relevant for an investigation, much less in a final Audit Report accepted by Special Masters.  This in-house education is appropriate for a law firm to have in order to understand compliant claims submissions.[16]

Instructions on an in-house protected attorney work product in learning how experts develop accurate CDR scores as part of attorney work product privilege education efforts that were never submitted is not a "gross misrepresentation of facts," but merely highlighting the importance of CDR scores for a true and final claims submission process, which was implemented in Spring of 2018, not during the in-house protected attorney work product education from 2015 or 2017 that the audit is referring to.

Notwithstanding this protected in-house attorney work product learning process, none of this medical evaluation attorney work product was never used, nor authorized for use, in any claim submission.  These were protected attorney work product educational efforts and medical evaluation efforts to prepare for the NFL Claims process as the understanding of the medical

---

[16] What these facts do show is the coordination between Shenaq, PC., which is indicated to eventually become a stalking horse for the investigator so that the investigator assists Shenaq, PC., in taking $100,000s or more in fees for a claim and others that Howard & Associates paid $3 million in costs for, in violation of Shenaq, PC's., co-counsel agreement.  The Audit Report and investigator has become either a knowing or unwitting accomplice or is being duped due to lack of expertise and sophistication, for greed and taking by Shenaq, PC., and others such as Addys Walker, Tipster Don Reinhard and various SCMs coached from prison by Tipster Don Reinhard and his accomplices.

standards evolved both with the experts and with the NFL Claims process from 2015-to early 2018.

As a result of the protected in-house attorney work product medical evaluations, and the NFL Claims process maturing, the firm was able to determine the most effective way to manage client claims. None of the protected attorney client work product educational work with in-house non testifying expert medical evaluations were ever to be used for any claim submission, and none were ever submitted as a claim for any SCM. They were used only to understand the capacity of staff and evaluation of experts and capacity to determine the most effective way to manage client claims.[17]

### TENTH EXEMPLAR OF INVESTIGATION AND AUDIT BIAS AND FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY CLIENT GUIDANCE AND COSTS

As part of its protected attorney work product with its in-house experts, this firm assisted Dr. Koberda in understanding and participating with the NFL Claims process. This is the law firm's guidance as testing for internal evaluation purposes were not for NFL Claims submissions and its guidance was accurate for the internal attorney work product IME evaluations that were not being used for NFL Claims filing, but only medical experience and judgment as the law firm educated itself on the process. Dr. Koberda's statement that "I provided an independent examination and expert opinion" is accurate and appropriate guidance to its expert.

---

[17] Similarly, the purpose of protected attorney work product medical evaluation activities with experts and staff is to understand how the process can work. They are to work to determine what is accurate, legal and appropriate. If the law firm educational materials were submitted for a claim that would violate the instructions by Howard & Associates and would not be appropriate as they were not intended for filing, nor finalized for filing, but were to educate on compliance with claim submission standards, not to avoid them. Howard & Associates did an excellent job in determining lack of medical evaluation expert skills and qualifications, as well as lack of staff skills, including exposing corrupt staff and consultants, and was only able to do so through this learning exercise. Howard & Associates used this information as part of its growing expertise in evaluating claims and capacity to prepare claims, and to partner with a law firm with skills and expertise that its in-house attorney work product staff and experts were shown to lack.

The application guidance on language was also accurate.  Doctor Kobera's statement that "they were general assessments because the Players wanted to see if they had any problems before they applied for the Settlement Program to see if they could qualify and were from Howard & Associates" is accurate.  This was protected attorney work product medical evaluations by an in-house expert for assessments of clients for potential claims submissions, but not for submissions.[18]

Interpreting these statements as nefarious demonstrates the bias, lack of objectivity and influence of other interested parties to accomplish their agendas of greed and criminal conduct through the investigation and Audit Report.

**ELEVENTH EXEMPLAR OF INVESTIGATION AND AUDIT BIAS AND FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY CLIENT GUIDANCE AND COSTS**

Protected attorney work product efforts to educate itself on medical standards, expert capacity and staff, to understand how to best prepare and submit a claim for a client is not "with the purpose to affect whether the Settlement Class Member qualifies for a Monetary Award." There was no filing of a claim to the Monetary Award Fund ("MAF").  The entire effort was to ensure that claims are compliant with and would indeed meet medical and claims standards "prior" to submission to the Monetary Award Fund.

Protected attorney work product education and work with in-house experts on medical evaluations for potential claims and staff is not coaching, nor disregard of basis professional

---

[18] Attempting to sanction a "former" independent contractor--paralegal for the law firm, Neil Epstein, for protected attorney communications in assisting in communicating accurate information to an in-house medical evaluation expert, which in-house expert was never used for any claim submission by the law firm, as part of the law firm's protected attorney work product efforts, violates logic, ethics and law.  This bias and failure to properly evaluate the evidence is similar to the inclusion of Sharon Delaney and Collins & Truett law firm in this Audit Report, without any notice to those parties.  This pattern indicates adoption of third-party agendas by the investigators, investigation and ultimate Audit Report.  It looks like third parties are threatened by whatever work he is doing for another law firm and the investigator is doing their biased bidding.

principles, but educating the law firm on how to properly appraise and apply medical expert knowledge within the then and still evolving Monetary Award Fund submission process.

The language of the Audit Report complaining about claimed "delays" SCMs for timely filings, is the same language that Shenaq, PC., used in its self-interests for more fees on a claim that it paid nothing on, as found in its charging lien allegations.  This again is evidence that investigators and their Audit Report are colluding and advancing the interests of Shenaq, PC., either willingly or unwittingly.  There was no delay in filings, as taking the time to deliberately understanding the claims process, and to understand whether a client, with options ranging from Parkinson's disease to not being qualified, actually expedites the payment of claims.  What has delayed compensation of retired NFL Claimants is a biased and deeply disturbed audit process.  The fact that after nearly four years in operation, only 1,219 claims have been paid out of 20,556 Registered Settlement Class Member, and 3,146 claims packets filed, demonstrates that being deliberate and cautious in filing claims is both prudent, required and expedites payments for clients.  The scant movement of claims also demonstrates a tacit, if not intentional approach to delay and deny valid claims.

The fact that Howard & Associates is seeking costs for the $3 million funds that it paid on behalf of its co-counsel, Shenaq, PC., for joint client final testing for submission packets and travel, is entirely appropriate.  Any direct or indirect manipulation of the Audit Report and investigators to line the pockets of Shenaq, PC., competing opportunist law firms, criminals, extortionists, thieves, or to accomplish the NFL's aim of denying payments, is corrupt.  This adoption of agendas by Shenaq, PC., Don Reinhard, Joe Horne, Addys Walker, Dexter Carter, Corey Fuller, the NFL, and the like, gives clear evidence that this Audit Report, in violation of judicial, rules of civil procedure, U.S. Supreme Court and universal investigative standards, has

adopted the lens and bias of manufactured sophistry by a community of extortioners, confidence

game operators, and legal legerdemain opportunists, including the NFL, based on unscrupulous

greed and bottom feeding.

**BIAS FROM AUDITORS, SPECIAL MASTERS AND NFL COUNSEL ALLIANCE
KNOWINGLY AND INTENTIONALLY HARMS INJURED RETIRED NFL PLAYER
RECOVERIES**

NFL Counsel and the audit both admit that no claim was ever submitted by Howard &

Associates.  "Howard did not file any claims for claimants he represented on the NFL Portal."

*Id.,* p. 6; Audit Report, p. 49.  NFL Counsel admits that Howard & Associates spent $ millions

on in-house attorney-client work product medical evaluations for approximately 350 clients.

(Respondent's Initial Response, February 4, 2021, pp. 7, 17, 19, 21; NFL Counsel Reply, pp. 2-

3).  NFL Counsel and the audit admits that the in-house attorney-client work product medical

neuropsychological evaluations were not intended nor could be submitted for claims as the

medical providers were not qualified for NFL claims submissions.  (NFL Counsel Reply, pp. 3-

4).  NFL Counsel and the audit admits that in-house attorney-client work product medical

evaluations that were never submitted nor intended to be submitted had only the "**potential** to

affect whether class members received a Monetary award in the Settlement Program."  (NFL

Counsel Reply, p. 1).  NFL Counsel and the audit admits that co-counsel submissions by Shenaq,

LLC., were valid and Respondent's investment of approximately $3 million on preparing and

reviewing claims for submission was legal and valid.

NFL Counsel and the audit avoids the written standards for NFL claim audits—"a

misrepresentation, omission, or concealment of a material fact made in connection with [filing] a

claim by the Settlement Class Member."  (Title IV, Rule 8, Rules Governing the Audit of

Claims—Standard of Proof Applicable to Special Master; Response, February 4, 2021, pp. 8-9.).

The undisputed evidence demonstrates the auditor and Special Masters have gone beyond their authority and are operating under "actual" bias and the appearance of "potential" bias.  Again, if there is even the appearance of "potential" bias, the investigators operating under the Special Masters must be dismissed.  *Hoffman, Murchison, supra.*

### Nefarious Twist of In-House Attorney Work Product Into a Claim of a Fraudulent Scheme.

NFL Counsel, the auditors and Special Masters attempt to twist in-house attorney work product medical evaluations into a fraudulent "scheme."  They claim a scheme with 6 medical providers sprawled across the nation from California to Houston, Texas to Tampa, Orlando, Miami and Tallahassee, Florida.  The neurologists and the neuropsychological providers (not qualified for final NFL claims submissions) were independent and had distinct tracks.  Most did not work with or ever communicate with each other.  The scheme would also have to include 10 staff in the then Tallahassee and Fort Lauderdale, Florida offices.

This is a scheme to accomplish what?  Is it a scheme to take advantage of a claims facility that didn't exist and its parameters undefined?  Is it a scheme for claims that were never to be submitted as the neuropsychologists were not qualified for claim submissions?

NFL Counsel and the Special Masters must acknowledge Respondent does have some education and capacity to reason.  Otherwise, they couldn't claim that Respondent could form an intent to scheme.  They know that such claims, without a properly board-certified neuropsychologist report and proper CDR report, could never be submitted for a successful return for clients.  They know that Respondent is rational and intelligent enough to know that

such claims could never be submitted for a successful return for clients.[19]  Thus, what would or could this "phantom" scheme of goofy thinking hope to accomplish?

This is a prime and actual example of sophistic *ad homin*em dissembling to avoid justice for severely injured retired NFL players.  This is a prime example of superficial thinking absorbed from a low-level extortionate criminal and inmate, and adapted, exploited and spread to others who also apply exploitive superficial thinking to advance their "bottom feeding" approach to a career.

The investment, experience and education from 2015 through early 2018, which is standard for high volume and high investment MDL/Class Actions, such as 5,000 BP Oil Spill claims, 18,000 Engle Tobacco Trust cases, and 3,600 Engle Tobacco Progeny cases, Toyota Air Bag claims, and over 350 NFL Claims, led the firm to locate a firm with additional experience, and to build upon its in-house attorney work product, and spend $3 million with Shenaq, LLC, which is approximately $8,500 a claim.  The two firms refined the in-house attorney work product for successful final claims submissions.  This is a sound and deliberate method for high quality claims submissions.  It is not "far-fetched" as NFL Counsel claims.  (NFL Counsel Reply, p. 4).  For competent and quality claims submissions, it is required.  From the "far-fetched" uninformed and unreasoned response, it is clear that NFL Counsel has never risked

---

[19]  The average "conservative" return on an NFL Claim is approximately 10 times the $8,500 expert investment, or around $85,000 in fees, based on a recovery of approximately $500,000 and 17% fee per successful NFL claim. Investing $3 million in preparation for claims is standard and has been done in previous high volume claims submissions.  For instance, Respondent submitted nearly 5,000 successful BP claims before this same claim administrator, Brown Greer, and knows that the claims facility process must be expertly understood and adapted to over-time as the process evolves.  Patience and study of the claims process, $ millions of in-house attorney work product expert work, and hiring experienced experts and work with experienced counsel, was required to successfully navigate the BP claims process, and that led to nearly $100 million for Respondent's BP clients before Brown Greer.  Unfortunately, in the case of NFL Claims, Respondent had destructive operators in his midst, due to his trust and giving a second chance to a high school football teammate, and compassion with and for the black community.

millions to assist others, nor done a simple investment and return calculation.  This firm did so on a regular basis ranging from historic battles against Big Tobacco to BP.  Nothing nefarious, clearly integrous and grounded.

"Potential" to do harm is another *ad hominem* distraction.  Every human being has the potential to do good or bad, to love or hate, to care or to be greedy, to lie or to tell the truth, to murder or to forgive.  **"Potential" means nothing took place and logically can never be made to be "actual."**  As referred to earlier, **"Potential means you haven't done anything yet."**  Hall of Fame NFL Head Coach Bill Parcells.

Pursuing an investigation based on *ad hominem* narrative from a criminal inmate, and "potential" but non-existent harm, demonstrates an unbridled investigation and "potential" and "actual" bias by the investigators and Special Masters.  For Court appointed Special Masters and those working for them, even the perception of "potential" bias warrants dismissal.  *Hoffman, Murchison, supra*.

### NFL Counsel's "Actual" Dissembling.

As an example, every intelligent lawyer has the "potential" to use syllogisms and logical fallacies to dissemble and pervert justice based on an intent of professional advancement and hourly billings.  Some lawyers use their syllogisms and accurate logic to advance justice and others use their syllogisms and logical fallacies to obfuscate justice.

In this case, NFL Counsel has gone beyond "potential" and moved to "actual".  NFL Counsel has "actually" dissembled and uses non-rational, logical fallacy *ad hominem* devices in an attempt to avoid justice and payment to injured NFL clients.  Dissembling with Sharon Delaney, Shockman Davis, and Respondent are examples.  It is clear that this moral and ethical

lapse is not motivated to advance justice or compassion but based on personal professional exploitive advancement and hourly billings.  This moral and ethical lapse is "actual."

### NFL Counsel, Auditors and Special Masters Avoid Indisputable Facts and Logic.

NFL Counsel needed 6 weeks to analyze the evidence to say "Much of the Responses and their exhibits are entirely irrelevant, . . ."  (NFL Reply, p. 1).  Auditors and Special Masters had nearly 4 years.  Despite NFL Counsel's admission that portions of the Responses are relevant, yet nothing from auditors and Special Masters, neither do not to the hard logical and evidentiary work to address the relevant evidence and exhibits.

If NFL Counsel, auditors and Special Masters did so, no violation would exist, since their superficial thinking argument is based on "potential" and "ad hominem."  Both of which are logical fallacies and mean nothing because one is not "actual" in reality, and the other is not factual or logical, but based on a logical fallacy.  **That is why the audit proof standards require "actual" claims submissions, not "potential" claims submissions that never did, never would, and never will happen.**

Not only does NFL Counsel, auditors and Special Masters attempt to avoid the facts and apply logical fallacies, NFL Counsel, auditors and Special Masters deny the relevance and application of ethical standards of investigations.  Use of narratives from extortionate criminal informants, whose claims are demonstrably false, and proven to be so, must ethically be discarded.  Yet NFL Counsel, auditors and Special Masters hold onto use of these extortion and demonstrably false statements, as it accomplishes the NFL's avoidance agenda, with tacit complicity of the auditors and Special Masters, not based on truth and justice, but based on intentional, actual obfuscation and de facto denial of payments to retired NFL Claimants.

This is because use of logical fallacies and *ad hominem* are methods lacking reason, but relying on emotion and impulse, to obfuscate truth and justice.  *Ad hominem* logical fallacy is a "dark arts" method to gain political, economic, professional and institutional power, and to extort, based on fear of *ad hominem*.  *Id*.  Politicians, lawyers and institutional manipulators regularly use this technique for advancement.  They are blind to the truth that capitulation to their use of these "dark arts" kills their integrity and neuters capacity for good and lasting impact.  Respondent does not operate in fear.  Respondent knows who he is, knows what took place, and has extensively documented the same.

**NFL and Special Masters Claim Irrelevance of Investigative Standards.**

It is not surprising that NFL Counsel would claim that ethical investigative standards are irrelevant, when avoiding such standards accomplishes an immoral goal of diminished and delayed payments to retired and severely injured NFL players.  That is because NFL Counsel's client gains by slip shod *ad hominem* investigations, even those that demonstrate no "actual" harm ever took place nor was intended to take place.  What is surprising is that the Court appointed auditor and Special Masters also find these standards irrelevant.  This is a violation of the mission the Court assigned the Special Masters to accomplish and demonstrates significant bias and lack of objectivity.  Such abandonment warrants admonishment or dismissal.

The standards that NFL Counsel find irrelevant include lack of objectivity ("potential" is not "actual"), lack of independence (accepting intentional and known dissembling), and absorption of preconceived opinions (criminal allegations of fraud as part of an explicit extortion scheme), official, professional, personal and financial incentives towards bias (an activity to charge clients for and to claim feigned professional competence), failure to accept and review exculpatory and mitigating evidence (no claim submitted, no forging of any medical reports, no

misrepresentation to any party, all in-house attorney work product medical evaluations), all of which destroy the integrity of this and any investigation.  Inconceivably and immorally, NFL Counsel align with the Special Masters and finds these matters irrelevant.

The harm from failure to follow investigative standards are indisputable, and the harm is taking place here and with Sharon Delaney, Shockman Davis, Respondent, and scores of innocent NFL claimants.  What is concerning is that the investigators and Special Masters are not complying with investigative standards.  This shows "potential" and "actual" bias.  Even the appearance of "potential" bias warrants their dismissal.  *Hoffman, Murchison, supra*.

### Use of Perjured, Fraudulent and False Bar Complaints Never Read nor Filed by Clients.

NFL counsel, auditors and Special Masters attempt to justify dissembling by use of Florida Bar complaints that were fraudulent, never read by the client, ghost written by extortionate counsel, and submitted in violation of perjury, full of admitted false statements, nor filed by the client or his estate, but solely for extortion purposes, is another *ad hominem* deflection from the logical fallacies that both the audit and NFL Counsel relies upon.  Redacted Response to Florida Bar attached with exhibits.  The Auditors and Special Masters adopt the same low watt approach.

This same scheme and narrative were used by Corey Fuller and Dexter Carter, under the guidance of and coordination with criminal Don Reinhard from prison, to complete their scheme to take $800,000 without repayment by filing incendiary lawsuits and Bar Complaints.  Preferred Capital tried the same approach, and former counsel, Amir Shenaq, after Howard invested approximately $3 million for NFL claims testing with his firm, tried to leverage his extortion skills in coordination with the NFL Claims investigators, in an attempt to undercut Respondent's rights to fees and costs and enlarge his own.  Stench of smoke, upon smoke to justify smoke.

This is rooted in extortion agendas by criminals and pseudo criminals and spin.   The investigator, auditor and Special Masters are to be objective and independent in seeing through this smoke.  They failed.

<p align="center">**Failure to do Background Checks.**</p>

NFL Counsel, auditors and Special Master are correct that in 2015 Howard trusted Don Reinhard and Addys Walker and didn't do a background check on either person.  Howard regrets that he was trusting too much, doing too much, and going too fast on too many fronts (Global Graduate University, Movie Company, spending millions on 3,600 tobacco cases, working on the inventory of 5,000 BP claims before Brown Greer, NFL Testing, and real estate development and more) without competent staff to slow down and engage in proper due diligence.  His compassion for and trust in his high school football colleague and efforts to provide opportunity to members of the abused black community were exploited by both.

Mr. Reinhard has since been in prison since March of 2017 and Mr. Walker was exposed for his confidence game operations back in January of 2018 and departed.  It is now 2021.  These errors going back 6 years are not a basis for denying NFL Claims for injured retired NFL players, nor is this misrepresentation nor fraud in any manner.  To rely on the goodness and trusting of others causing a failure to engage in background checks as an intentional basis to avoid paying NFL Claimants is indeed rank dissembling, and worse because it is intentional.

This view is adopted by the investigators, auditors and Special Master demonstrates "potential" and "actual" bias and a violation of their duties of efficient and justified payments to NFL Claimants.  Even the appearance of "potential" bias warrants dismissal.  *Hoffman, Murchison, supra.*

<p align="center">34</p>

### No Scheme, No Profit, No Greed.

As the evidence and reason demonstrate, there was never a scheme.  A scheme would require a rational approach and an end goal of greed and illegal profit.  This is not found in the facts nor in logic and was neither the goal nor the outcome.  All that occurred was imperfect physicians and staff doing in-house attorney work product medical evaluations from 2015 through 2017, with neuropsychologists that were never qualified for submissions to the NFL Claims process and as such their evaluations could never be submitted.  All were working without experience with a claims facility that was undefined and didn't exist during the core relevant time frame.

Howard trusted and gave opportunities to those that exploited his compassion on and for their lives.  Moreover, neither the claims facility staff, nor the physicians, nor Howard's staff, nor Brown Greer at that time, had any experience with the then either non-existent and ultimately inchoate NFL Claims process—it is now 6 years later.  One can't judge on what is known now but has to look at the facts as to what was known 6 years ago.

### Sanctions.

NFL Counsel, auditors and Special Master seek sanctions against non-existent personnel.  There are no staff working at Howard & Associates, nor did any staff engage in anything untoward.  Moreover, the referral to law enforcement and other agencies took place in July of 2018 in violation of audit standards and have been dealt with since then.  It is now April of 2021.

The "potential" and indication of "actual" bias found in the investigation and by the auditor and accepted by the Special Masters is extensively documented in the various responses.  This complacency in the face of "potential" appearance of and "actual" bias warrants their dismissal.  *Hoffman, Murchison, supra*.

**CONCLUSION**

Investigations and Audit Reports are not launching pads for criminals, borderline criminals, extortionists, and legal legerdemain opportunists to leverage for their avarice, exculpation of their crimes, information exchange for accelerated and presumptions of accuracy for claim processing, and greed.  That is why Cannon 3.C (1) of the Code of Judicial Conduct, Rule 53, Federal Rules of Civil Procedure, federal judge oversight, and Quality Standards for Investigations exist—seeking and advancing truth; not fostering bias, exculpation of crimes, extortion and greed.  Otherwise, there is an unbridled abuse of the potent destructive power that a bottom feeding community that gorges on incompetent, biased investigations unleash[20] for extortion and greed with the investigations doing the work for the community of criminal, extortionists and legal legerdemain opportunists.

This is what happened in the instant case. After spending over $3 million for in-house medical evaluations and final review by experienced and MAF neurologists and neuropsychologists for undisputed quality claims submissions, Howard & Associates has expended and has obligations for $2.5 million in legal fees solely from the investigators, auditors and Special Masters empowering opportunists.

An objective, unbiased, ethical investigation that complied with the Court's standards, the Code of Judicial Conduct, the Federal Rules of Civil Procedure and the standards set by the United States Supreme Court, *Hoffman, Murchison, supra*, including evidentiary and confidentiality standards, would have ended this abuse long ago.  Instead, like a virus, the abuse

---

[20] This happened with the Spanish Inquisition from 1478 to 1834; J. Edgar Hoover's fraudulent and illegal FBI investigations from 1935 to 1972; Senator Joseph McCarthy's Senate Permanent Subcommittee on Investigations in the 1950s anti-communist hysteria; and more recently U.S. Attorney General William Bar's November 9, 2020 authorization of FBI investigations into voter fraud, giving validity and support to President Trump's voter fraud disinformation campaign pumped by certain political communities and disinformation media outlets, which disinformation campaign led to the first ever storming of the U.S. Capital and the 117th U.S. Congress by its own citizens on January 6, 2021.

of an extortionist, imprisoned criminal and his allies, demanding $1 million in March of 2017, is empowered by this investigation to let them get away with his actual and attempted theft and to use this investigation to cover criminal conduct, manipulate and accomplish civil and criminal extortionate threats.

This investigation, fed by the NFL Claims process, and shopped by Tipster, criminal and inmate Donald Reinhard to SEC, NFL, NCAA, NFL Claims Class Counsel, Florida Bar, pseudo criminals coordinating with inmate Don Reinhard to get away with their theft, such as Corey Fuller, Dexter Carter and Joe Horne, and scores of legal legerdemain opportunists, such as J.B. Harris and Preferred Capital, created a community of bottom feeders that morphed over the past four years into sprawling nefarious allegations and economic destruction based on false and fraudulent allegations as to protected attorney work product privilege in-house medical evaluations that were never intended, never authorized, and in fact never were used or communicated to any third-party, including but not limited to claims facility or claims facility staff.  These false and nefarious claims were given false validity and credibility by an incompetent and biased investigative staff, investigative process (that was shared with third-parties and other investigations) and a biased and deeply flawed Audit Report—which the Special Masters failed to provide oversight and correction.  If there is any integrity and seeking of truth in this process, these errors would have been analyzed, understood and rooted out, before others, including NFL Claimants and those servicing them with integrity and effectiveness, were harmed by claims stalled for years as a result of this flawed and exposed sub-standard, biased investigative and audit process.  In this case, admonishment or dismissal of the Special Masters and Auditors is warranted.

WHEREFORE for the forgoing reasons, case law, judicial standards, rules of Federal Civil Procedure, and ethical standards governing investigations, audits and Special Masters, and the indisputable evidence provided herein, the auditors and Special Masters must be disciplined or dismissed by this honorable Court for their bias, both actual and/or the appearance of potential bias.

Respectfully submitted on this 7th Day of April 2021,

/s/Tim Howard
Florida Bar No. 655325
Howard & Associates
1415 E. Piedmont Dr, Suite 5
Tallahassee, Florida 32308
Telephone: (850) 298-4455
E-Mail: tim@howardjustice.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via e-service through the U.S.D.C., portal on the court and counsel of record on this 7th Day of April, 2021.

/s/ Tim Howard
Attorney

INDEX OF EVIDENCE

EXHIBIT A        Quality Standards for Investigations

EXHIBIT B        FBI Investigative Guidelines

EXHIBIT C        Wisdom Report (Shockmain Davis) - Veracity of Sharon Delaney

EXHIBIT D        Affidavit of Sharon Delaney

EXHIBIT E        Tipster Inmate Coordination with SCM Corey Fuller, Joe Horn, et.al., for Extortion

EXHIBIT F        Tipster Inmate Attempt at Extortion Through the Florida Bar

EXHIBIT G        Special Masters' Failure to Address Bias in Investigation

EXHIBIT H        Affidavit of Respondent

EXHIBIT I         Federal Order of Disgorgement for Tipster's Illegal Taking Approximately $500,000

EXHIBIT J        SCM Corey Fuller's Attempt at Extortion Coordinated with Tipster

EXHIBIT K        Verified Perjured, Fraudulent, False and Extortionate Florida Bar Complaints, and Extortion Attempts Against Respondent; Respondent's Verified and Undisputed History, Activities, and Motivations

.

# EXHIBIT A


*Council of the*
**INSPECTORS GENERAL**
*on* **INTEGRITY** *and* **EFFICIENCY**

**Council of the Inspectors General
on Integrity and Efficiency**

**Authority**: Section 11 of the Inspector General Act of 1978 (5 U.S.C. app. 3.), as amended.

**Mission**: The mission of the Council of the Inspectors General on Integrity and Efficiency (CIGIE) shall be to address integrity, economy, and effectiveness issues that transcend individual Government agencies and increase the professionalism and effectiveness of personnel by developing policies, standards, and approaches to aid in the establishment of a well-trained and highly skilled workforce in the Offices of Inspectors General.

**CIGIE Investigations Committee**: The Committee contributes to improvements in program integrity, efficiency, and cost effectiveness Governmentwide by providing analysis of investigative issues common to Federal agencies. The Committee provides the CIGIE community with guidance, support, and assistance in conducting high-quality investigations. Provides input to the CIGIE Professional Development Committee and the Training Institute on the training and the development needs of the CIGIE investigations community. The Committee actively engages the Assistant Inspector General for Investigations Committee to assist in carrying out the Committee's goals and strategies.

# QUALITY
# STANDARDS
# FOR
# INVESTIGATIONS

November 15, 2011

**Message From the Chairman of the
CIGIE Investigations Committee**

The Quality Standards for Investigations (QSI), since their inception in 1997, have successfully guided the Inspector General investigative community in producing high-quality investigations.  They were modified in 2003.  This 2011 version will continue to guide the community in high-quality investigative work.

The Inspector General Reform Act of 2008 (IG Reform Act) provided that members of the Council of the Inspectors General on Integrity and Efficiency (CIGIE) "shall adhere to professional standards developed by the Council" (§ 11(c)(2) of the IG Reform Act). For this 2011 edition of the QSI, the Investigations Committee has made technical changes that bring the document into full compliance with the IG Reform Act, including replacing all references to the "PCIE" (President's Council on Integrity and Efficiency) and the "ECIE" (Executive Council on Integrity and Efficiency) with "CIGIE."

The crafters of this QSI version, as did their predecessors, recognized the unique mission and varying statutory responsibilities of each CIGIE member.  As a result, each OIG will adhere to the QSI in accordance with its unique mission, circumstances, and department or agency.

Throughout this version, you will also note a few minor changes for clarification, such as the definition of "periodic training."  Appendix C was also added as a handy, non-exhaustive list of laws and regulations relevant to investigative work.

I want to thank the Assistant IG for Investigations (AIGI) Working Group for their diligence in soliciting input from the AIGI community and in preparing the QSI.  I also want to thank the Investigations Committee for their watchful eye in finalizing the QSI. The members of the AIGI Working Group and of the Investigations Committee are listed in Appendix D.

Carl W. Hoecker
Chairman, Investigations Committee
CIGIE

**TABLE OF CONTENTS**

**Page**

PREFACE……………………………………………………………………………1

GENERAL STANDARDS……………………………………………………………2

        A.  Qualifications……….........................................................................2
        B.  Independence…….............................................................................6
        C.  Due Professional Care…………………………………………………8

QUALITATIVE STANDARDS…………………………………………………10

        A.  Planning……………………………………………………………10
        B.  Executing Investigations………………………………………11
        C.  Reporting……………………………………………………………13
        D.  Managing Investigative Information…………………………14

APPENDICES

        Job Task Illustration for Investigators……………………………......A
        Training Profile Illustration for Investigators …………………………B
        Non-Exhaustive Table of Legislation, Executive Orders ……………C
        AIGI Working Group and Investigations Committee Members………D

*PREFACE*

The standards and principles in this document, commonly referred to as Quality Standards for Investigations (QSI), provide a framework for conducting high-quality investigations for Offices of Inspector General (OIGs) affiliated with the Council of the Inspectors General on Integrity and Efficiency (CIGIE).

Recognizing that members of the OIG community are widely diverse in their missions, authorities, staffing levels, funding, and day-to-day operations, certain foundational standards apply to any investigative organization.  As such, the standards outlined here are comprehensive, relevant, and sufficiently broad to accommodate a full range of OIG criminal, civil, and administrative investigations across the CIGIE membership.

OIGs will incorporate the standards and principles outlined here into an operations manual or handbook.  This should be accomplished in accordance with the OIG's particular mission, unique circumstances, and respective department or agency requirements.  OIGs are encouraged to monitor changes in the laws, regulations, and other guidance cited here and revise their policies as necessary, pending future releases of the QSI.  In the event the QSI are found to be inconsistent with laws, rules, regulations, or other pertinent official pronouncements, the latter take precedence.

The QSI categorize investigative standards as General and Qualitative.  General Standards address qualifications, independence, and due professional care.  Qualitative Standards focus on investigative planning, execution, reporting, and information management.

This QSI supersede the standards published by the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency dated December 2003.

## QUALITY STANDARDS FOR INVESTIGATIONS

### GENERAL STANDARDS

General Standards apply to investigators and the organizational environment in which they perform.  The three general standards address qualifications, independence, and due professional care.

#### A.  QUALIFICATIONS

The first general standard for investigative organizations is:

> *Individuals assigned to conduct the investigative activities must collectively possess professional proficiency for the tasks required.*

This standard places upon the investigative organization the responsibility for ensuring that investigations are conducted by personnel who collectively have the knowledge and skills required to perform the investigative activities.

#### Guidelines

Investigations vary in purpose and scope and may involve alleged violations of criminal or civil laws, as well as administrative requirements.  The focus of an investigation can include the integrity of programs, operations, and personnel in agencies at Federal, State, and local levels of government; procurement and grant fraud schemes; environment, safety, and health violations; benefits fraud; the background and suitability of individuals for employment or a security clearance designation; whistleblower retaliation; and other matters involving alleged violations of law, rules, regulations and policies.  Some of these investigations address both civil and criminal acts, ranging in significance from a misdemeanor to a felony.  Others involve administrative misconduct issues.  They often require using specialized investigative techniques; examining complex financial transactions, contracts, grants, and business operations; and interviewing government and corporate officials.  A wide variety of skills and extensive knowledge are necessary to perform the broad range of activities required by these diverse investigations.

Investigative organizations should establish criteria to be used in recruiting and selecting the best qualified applicants.  At a minimum, factors to be considered in employing entry-level candidates should include:  education and experience, character, physical capabilities, and age.  Each of these factors may be controlled by legislation, regulation, or agency needs.  Investigative organizations should review these criteria to

1

ensure that they assist in providing the best qualified applicants. In addition, organizations should establish appropriate avenues for investigators to acquire and maintain the necessary knowledge, skills, and abilities; complete entry-level training, participate in in-service training; and receive professional development opportunities.

**Education**—It is desirable that all newly appointed investigators possess a 4-year degree from an accredited college. The knowledge acquired from a higher education will enable the investigator to deal with complex problems encountered in day-to-day investigative work. Higher education enhances the investigator's ability to communicate effectively, both orally and in writing, with witnesses, other law enforcement agencies, prosecutors, supervisors, coworkers, and the public.

**Experience**—Depending on the specific needs of the agency, allowances may be made for candidates to substitute job experience for a college education. Suitable job experience would provide the candidate with demonstrable knowledge, skills, and abilities pertinent to the investigative position as discussed later in this document. Depending upon the nature of the investigative organization's mission, additional requirements may be established for specific types of experience (financial skills, computer skills, etc.).

**Character**—Each investigator must possess and maintain the highest standards of conduct and ethics, including unimpeachable honesty and integrity. Every citizen is entitled to have confidence in the integrity of Government employees, particularly investigators who routinely access sensitive information and execute search and arrest warrants. Further, investigative personnel may be subject to statutory and legal requirements relating to integrity (Giglio, Lautenberg, Brady,[1] etc.). Consequently, OIGs should establish sound hiring policies to adequately screen applicants for investigative positions. Processes to consider include, but are not limited to, criminal history checks, queries of commercially available databases, drug testing, personal interviews, previous employment and reference checks, and background investigations.[2]

OIGs should also have policies that require investigative personnel to report any arrest, conviction, or other potential misconduct issue that would jeopardize their performance of duties. Such policies may also include requiring investigative personnel to be subject to periodic criminal history and background checks.

**Physical Capabilities**—Each investigative organization should develop job-related physical or medical requirements consistent with current statutes, regulations, and

agency policies to enable investigators to discharge their duties, while promoting personal well-being.

The physical demands placed upon the investigator will vary among agencies. OIGs employing criminal investigators should establish a physical fitness program to provide and maintain physical fitness and reduce the risks of cardiovascular disease, obesity, stress, and related ailments and disorders.

It is in the interest of an investigative agency to establish and maintain a vibrant workforce because an investigator's duties frequently require irregular unscheduled hours, personal risk, exposure to extreme weather, considerable travel, and arduous exertion. Investigators are frequently engaged in stressful encounters and can be victims of stress-related medical disorders.

**Age**—Consideration should be given to minimum and maximum age requirements for entry-level criminal investigator positions in accordance with applicable statutes and regulations. Waivers may be granted only in accordance with applicable regulations.

**Knowledge, Skills, and Abilities**—Because of the critical and sensitive nature of an investigator's position, investigative agencies should ensure that all investigators, commensurate with grade level, possess the requisite knowledge, skills, and abilities summarized below to fulfill their responsibilities.

1. A knowledge of theories, principles, practices, and techniques of investigation and the education, ability, and experience to apply such knowledge to the type of investigation being conducted;
2. A knowledge of government organizations; programs; activities; functions; and, where applicable, their interrelations with the private sector;
3. A knowledge of applicable laws, rules, and regulations, including the U.S. Constitution; the U.S. Criminal Code (including elements of crimes); the Federal Rules of Evidence; the Federal Rules of Criminal Procedure; and other pertinent statutes, such as the Privacy, Freedom of Information, and Whistleblower Protection Acts;
4. An ability to exercise tact, initiative, ingenuity, resourcefulness, and judgment in collecting and analyzing facts, evidence, and other pertinent data; apply sound deductive reasoning; and deliver oral and written reports;
5. An ability to safely and effectively carry out law enforcement powers, where duly authorized, including carrying firearms, applying for and executing search warrants, serving subpoenas, and making arrests; and
6. The skills necessary for the investigation. This qualification standard recognizes that proper training is required to meet the need for the broad range of special knowledge and skills necessary to conduct investigations. This training should include both formal classroom and on-the-job training. The qualifications listed below apply to the skills of an investigative organization as

---

[1] See *Giglio* v. *United States*, 405 U.S. 150 (1972); Lautenberg Amendment, 18 USC Section 922(g)(9); and *Brady* v. *Maryland* (1963) 373 U.S. 83.
[2] The Office of Personnel Management (OPM) categorizes background investigations as National Agency Checks with Inquiries (NACI); Moderate Risk Background Investigation (MBI); Background Investigation (BI), and Single Scope Background Investigation (SSBI). Please refer to OPM for further guidance.

a whole and not necessarily to every individual investigator. Skills required to conduct an investigation include the ability to:

a) Obtain information from people;
b) Analyze and understand documentary evidence;
c) Understand witness confidentiality and "whistleblower" concepts;
d) Analyze and evaluate facts; make sound and objective assessments and observations; and, where appropriate, make constructive recommendations;
e) Use computer equipment, software, and related systems effectively in support of the investigative process;
f) Deliver clear, concise, accurate, and factual summaries of results of investigations, both orally and in writing;
g) Prepare and obtain signed, sworn statements; and
h) Use appropriate and authorized specialized investigative techniques.

**Criminal Investigator Entry-Level Training**— All OIG investigators who exercise law enforcement powers (authorized by the Inspector General Act (IG Act), section 6(c), and implemented by the Attorney General Guidelines for Offices of Inspector General, US Marshals Service deputation, or other with statutory authority) must successfully complete a formal basic training course, such as the Criminal Investigator Training Program at the Federal Law Enforcement Training Center. As an alternative, this training requirement may be satisfied by completion of a comparable course of instruction.

In addition, OIG investigators exercising law enforcement powers should attend a formal OIG-specific follow-on training program, such as the Inspector General Investigator Training Program at the Inspector General Investigator Academy (IGCIA), or equivalent, or in case of experienced criminal investigators hired from Federal law enforcement agencies outside the IG community, the IG Transitional Training Program at the IGCIA or equivalent.

Each agency should also provide orientation training (formal or informal) specifically relating to the agency's mission, programs, policies, procedure, rules, and regulations. Agencies may also consider in-service training covering similar topics, as best suits the agency's requirements and the investigator's experience. (See Appendix A, "Job Task Illustration for Investigators.")

**Firearms Qualification**—OIGs must ensure that all criminal investigators authorized to carry a firearm train and qualify regularly, as defined by the Attorney General Guidelines or other authoritative guidelines.

The agency must develop a policy that ensures compliance with regular firearms qualification. Such policy should address occasions when failure to qualify or attend

periodic training is justified and the corrective actions taken when failure was not justified. OIG policies should require the surrender of a firearm or suspension of law enforcement authority if the failure reaches an unacceptable level.

OIGs must implement an inventory control system for firearms and related equipment, law enforcement credentials/identification, and specialized technical equipment.

**Periodic Training Requirements**—OIGs should also periodically train criminal investigators on effective and appropriate use of force and constitutional law and other topics articulated in the Attorney General Guidelines or other authoritative guidelines. Additional topics to consider are new laws and court decisions affecting operations; technological improvements; and any changes in agency and national level policies, procedures, rules, and regulations (e.g., Transportation Security Administration (TSA) training on "flying while armed").

All post-basic training should be part of a systematic, progressive, and documented plan to maintain the requisite knowledge, skills, and abilities. OIGs deliver such training depending on the organization's needs and mission requirements. The frequency and nature of such training may be adjusted depending on whether the investigator is in a primary or secondary position.

OIG policies should determine the frequency of, and ensure compliance with, its recurring and periodic training, which, absent unique circumstances, should not exceed 3 years.

**Professional Development**—The training of an investigator should be a continuing process. An investigator should receive formal and on-the-job exposure prior to an assignment requiring independent application of a given subject matter. A continuous career development program should be established to provide the proper preparation, training, and guidance to develop into professionally qualified investigators and supervisors.

To facilitate this effort, the investigative agency should develop a training profile that will satisfy its needs and consider a mentoring program. (See Appendix B, "Training Profile Illustration.")

**B. INDEPENDENCE**

The second general standard for investigative organizations is:

> *In all matters relating to investigative work, the investigative organization must be free, both in fact and appearance, from impairments to independence; must be organizationally independent; and must maintain an independent attitude.*

This standard places upon agencies, investigative organizations, and investigators the responsibility for maintaining independence, so that decisions used in obtaining evidence, conducting interviews, and making recommendations will be impartial and will be viewed as impartial by knowledgeable third parties. There are three general classes of impairments to independence: personal, external, and organizational.

*Due professional care must be used in conducting investigations and in preparing related reports.*

### Guidelines

**Personal Impairments**—Circumstances may occur in which an investigator may experience difficulty in achieving impartially because of their views and/or personal situations and relationships. These impairments may include the following:

1. Official, professional, personal, or financial relationships that might affect the extent of the inquiry; limit disclosure of information; or weaken the investigative work in any way;
2. Preconceived opinions of individuals, groups, organizations or objectives of a particular program or to bias the investigation;
3. Previous involvement in a decision-making or management capacity that would affect current operations of the entity or program being investigated;
4. Biases, including those induced by political or social convictions that result from employment in, or loyalty to, a particular group or organization; and
5. Financial interest in an individual, an entity, or a program being investigated.

**External Impairments**—Factors external to the investigative organization may restrict its ability to conduct an independent and objective investigation and issue reports of investigation. Such factors include:

1. Interference in the assignment of cases or investigative personnel;
2. Restriction on funds or other resources dedicated to the investigation or to investigative organizations;
3. Influence on the extent and thoroughness of the investigative scope, the way in which the investigation is conducted, the individual(s) who should be interviewed, the evidence that should be obtained, and the content of the investigative report; and
4. Denial of access to sources of information, including documents and records.

**Organizational Impairments**—An investigative organization's independence can be affected by its position within the hierarchical structure of the subject Government entity. To help achieve maximum independence, the investigative function should be positioned outside the staff or reporting line of the unit or employees under investigation. Investigations of OIG personnel should always reflect a special sensitivity to this issue of independence.

## C. DUE PROFESSIONAL CARE

The third general standard for investigative organizations is:

*Due professional care must be used in conducting investigations and in preparing related reports.*

This standard requires a constant effort to achieve quality and professional performance. It does not imply infallibility or absolute assurances that an investigation will reveal the truth of a matter.

### Guidelines

This standard requires:

**Thoroughness**—All investigations must be conducted in a diligent and complete manner, and reasonable steps should be taken to ensure that pertinent issues are sufficiently resolved and to ensure that all appropriate criminal, civil, contractual, or administrative remedies are considered.

**Legal Requirements**—Investigations should be initiated, conducted, and reported in accordance with (a) all applicable laws, rules, and regulations; (b) guidelines from the Department of Justice and other prosecuting authorities; and (c) internal agency policies and procedures. Investigations should be conducted with due respect for the rights and privacy of those involved.

**Appropriate Techniques**—Specific methods and techniques used in each investigation should be appropriate for the circumstances and objectives.

**Impartiality**—All investigations must be conducted in a fair and equitable manner, with the perseverance necessary to determine the facts.

**Objectivity**—Evidence must be gathered and reported in an unbiased and independent manner in an effort to determine the validity of an allegation or to resolve an issue. This includes inculpatory and exculpatory information.

**Ethics**—At all times, the actions of the investigator and the investigative organization must conform with all applicable standards of ethical conduct.

**Timeliness**—All investigations should be conducted and reported in a timely manner. This is especially critical given the impact investigations have on the lives of individuals and activities of organizations. Hence, the effectiveness of an investigator depends, in part, on the promptness of finished work products, such as prepared findings and

memorialized witness interviews.

**Accurate and Complete Documentation**—The investigative report findings and accomplishments (indictments, convictions, recoveries, etc.) must be supported by adequate documentation (investigator notes, court orders of judgment and commitment, suspension or debarment notices, settlement agreements, etc.) and maintained in the case file.

**Documentation of Policies and Procedures**—To facilitate due professional care, organizations should establish written investigative policies and procedures via handbook, manual, directives, or similar mechanisms that are revised regularly according to evolving laws, regulations, and executive orders.

9

# QUALITY STANDARDS FOR INVESTIGATIONS

## QUALITATIVE STANDARDS

Qualitative standards address four critical standards that must be addressed if the effort is to be successful. These are: planning, execution, reporting, and information management.

## A. PLANNING

The first qualitative standard for investigative organizations is:

*Organizational and case-specific priorities must be established and objectives developed to ensure that individual case tasks are performed efficiently and effectively.*

Priorities and objectives apply to investigative organizations, in general (the types and numbers of investigations conducted, application of resources, minimal case-opening thresholds, etc.) and to specific investigative tasks in particular (the person(s) to interview, the records to review, and time frames for completing tasks, etc.). This standard may best be achieved by preparing organizational and case-specific plans and strategies.

### Guidelines

**Organizational Planning**—When feasible, OIG should prepare goal-oriented annual investigative plans that are consistent with prevailing law, Attorney General Guidelines (if applicable), and OIG-specific mission and goals. Planning documents should present each organization's goals and objectives, performance measures, and a guide for managers to implement these plans. The plans should project the allocation of resources, identify priorities, describe investigative programs, and include any new initiatives. Such plans may be part of an annual appropriation request or part of the overall OIG annual plan or performance document.

Annual plans should be flexible enough to accommodate individual agency needs and the shifting of investigative priorities and staff resources, as circumstances dictate. However, operational plans should be specific enough to provide a basis for the professional management of investigative resources and workloads during the planning year.

**Individual Case Planning**—Upon receipt, each complaint must be evaluated against the investigative functions, priorities, and guidelines for one of three decisions:

10

- Initiate investigative activity,
- Refer to another appropriate authority, or
- Take no further specific investigative action.

If the decision is to initiate an investigation, the organization should begin any necessary immediate actions and establish, if appropriate, an investigative plan of action (whether verbal or written) as soon as possible. The plan should describe as many of the following components as deemed necessary:

1. Primary nature and complexity of the allegations (criminal, civil, and/or administrative);
2. Planned focus and objectives of the investigation;
3. Possible violation(s) of law, rule, or regulation and the corresponding elements of proof or standards;
4. Coordination with appropriate authorities, if warranted (another OIG, the Federal Bureau of Investigation, etc.);
5. Applicable judicial venue and coordination with prosecutors, when appropriate;
6. Steps necessary to meet investigative objectives; and
7. Resources necessary to meet investigative requirements.

During the investigation, organizations should, when appropriate, also consider the actions suggested below to ensure that the investigation is conducted efficiently and effectively (the list is not exhaustive, but representative).

1. Use of a time-phased approach that ensures that individual leads are pursued on a timely basis and that periodic evaluations of progress occur. This would include an ongoing affirmative decision to continue or terminate the investigation.
2. Identification of any causative factors that should be reported as weaknesses or internal control issues requiring corrective action by agency management.
3. Ongoing coordination with appropriate agency or other Government officials if notable security or public health and safety issues are raised.

## B. EXECUTING INVESTIGATIONS

The second qualitative standard for investigative organizations is:

*Investigations must be conducted in a timely, efficient, thorough, and objective manner.*

The investigator is a fact-gatherer and should not allow conjecture, unsubstantiated opinion, bias, or personal observations or conclusions to affect work assignments. He or she also has a duty to be receptive to evidence that is exculpatory, as well as

11

incriminating. The investigator should collect and analyze evidence through a number of techniques, including, but not limited to, interviews of complainants, witnesses, victims, and subjects, reviews of records, surveillance and consensual monitoring, undercover operations, and use of computer technology.

## Guidelines

The following guidelines should be considered, recognizing that investigations are often fluid and unpredictable.

**Conducting Interviews**—A review of known information should precede a planned interview. An investigator should identify himself/herself at the interview and state the purpose of the interview, if appropriate. Appropriate warnings[1] should be provided to those individuals suspected of violating law or regulation. Witnesses generally do not require rights advisement. When conducting an interview, particular attention should be given to obtaining the interviewee's observations and knowledge of incidents and actions or statements of other persons connected with the event. Interviewees should be asked to provide, or identify the location of, relevant documents. All interviews are subject to inclusion in reports, or contemporaneous interview notes that are prepared in a criminal investigation should be retained (as required by law or agency policy). Requests for witness confidentiality should be honored. In accordance with the IG Act and to the extent legally permissible. In all cases, interviews should be properly documented.

**Collecting Evidence**—Evidence should be collected in such a way as to ensure that all known or obviously relevant material is obtained, the chain of custody is preserved, and the evidence is admissible in any subsequent proceeding. The validity of information and evidence obtained during an investigation should be verified. A procedure for the disposal of physical evidence by an independent party must be followed. When using the work of a specialist, such as criminal laboratory examiners, computer forensic examiners, and financial experts, investigators should assess the specialist's ability to perform and report on the work in an impartial manner and should understand the scope and objective required of the specialist. Investigators should also consider the specialist's professional certification, experience, and relevant standards.

**Documenting Activities**—The results of investigative activities should be accurately and completely documented in the case file. Internal investigative guidelines should specifically and clearly address due diligence and timeliness of the documentation.

[1] For further details, see *Miranda v. Arizona*, 384 U.S. 436 (1966), *Kastigar v. United States*, 473 F.2d 1391, 1393, (Cir. C1. 1973), *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). Also consult agency requirements related to other rights, such as *NASA v. FLRA* (08-369) 527 U.S. 229 (1999) 120 F.3d 1208 (Weingarten).

12

**Complying With Legal Requirements**—Interviews, evidence collection, and other activities must be initiated, conducted, and reported, in accordance with all applicable laws, rules, regulations and should be conducted with due respect for the rights and privacy of those involved. This includes, for example, appropriate warnings and assurances and Grand Jury restrictions.

Additional considerations during an investigation may include:

- Obtaining, securing, and properly using Grand Jury information;
- Using parallel civil and criminal proceedings;
- Respecting the Right to Financial Privacy Act;
- Developing and using confidential informants and other sources of information;
- Obtaining and using hotline information;
- Using IG subpoenas;
- Serving as liaison and interacting with prosecutors; and
- Storing and handling electronic data.

**Conducting Progress Reviews**—Supervisory reviews of case activities should occur periodically to ensure that the case is progressing in an efficient, effective, thorough, and objective manner.

## C. REPORTING

The third qualitative standard for investigative organizations is:

*Reports (oral and written) must thoroughly address all relevant aspects of the investigation and be accurate, clear, complete, concise, logically organized, timely, and objective.*

All reports should accurately, clearly, and concisely reflect the relevant results of the investigator's efforts. Facts should be presented in straightforward, grammatically correct language and should avoid the use of unnecessary, obscure, and confusing verbiage. Graphics should be well-prepared, clearly relevant to the investigation, and supportive of the presentation.

### Guidelines

Organizations should determine the most appropriate report mechanism (verbal or written) and format, on the basis of the circumstances of the issue(s) involved. In pursuing this standard, the following guidelines should be considered:

1. In any report, the facts should be set forth to facilitate reader comprehension.

13

This should include a clear and concise statement of the facts and applicable law, rule, or regulation that was allegedly violated or that formed the basis for an investigation.

2. The principles of good report writing should be followed. A quality report will be logically organized, accurate, complete, impartial, and clear and should be issued in a timely manner.

3. Reports should contain exculpatory evidence and relevant mitigating information when discovered during any administrative investigation. Exculpatory evidence in a criminal or civil investigation must be brought to the attention of the assigned prosecutor.

4. Evidence outlined in a report should be supported by documentation in the investigative case file.

5. In some cases, it may be appropriate to note specific allegations that were not investigated to ensure that decisionmakers can take further action as they deem appropriate.

6. The outcome or accomplishment (fines, savings, recoveries, indictments, convictions, suspensions and debarments, or management recommendations, etc.) should be documented in the file.

7. Systemic weaknesses or management problems disclosed in an investigation should be reported to agency officials as soon as practicable.

## D. MANAGING INVESTIGATIVE INFORMATION

The fourth qualitative standard for investigations is:

*Investigative data must be stored in a manner that allows effective retrieval, reference, and analysis, while ensuring the protection of sensitive data (i.e., personally identifiable, confidential, proprietary, or privileged information or materials).*

One of the many hallmarks of an efficient organization is its ability to retrieve information that it has collected. An effective information management system creates and enhances institutional memory. This, in turn, enhances the entire organization's ability to conduct pattern and trend analyses and to fulfill the mandate of detection and prevention. Such a system also assists in making informed judgments relative to resource allocation, training needs, investigative program development, prevention activities, and implementation of the investigative process. Further, the IG Act requires that certain data elements be reported in the semiannual reports to Congress.[*]

[*] OIGs are encouraged to consult the IG Act for those requirements.

14

## Guidelines

The degree to which an organization efficiently achieves its goals is affected by the quality and relevance of information that is collected, stored, retrieved, and analyzed. Information, or the lack of it, has direct influence on management's ability to make sound decisions relating to investigative matters. Therefore, written directives should exist that define the organizational component responsible for record maintenance and the specific procedures to be performed.

**Information Flow**—Accurate processing of information is essential to the mission of an investigative organization. It should begin with the orderly, systematic, accurate, and secure maintenance of a management information system. Written guidance should define the data elements to be recorded in the system. The guidance should be based on legal requirements and needs and should cover the proper security and storage of personally identifiable and other sensitive information and the storage of discoverable information.

**Complaint-Handling Activities**—The investigative process often begins with a complaint from an individual. The initial complaint will rarely provide the agency with all the necessary information and may be the first indication of a serious violation of law. Policies, procedures, and instructions for handling and processing complaints should be in place. Individuals receiving complaints should obtain all pertinent details. The agency should adopt procedures to ensure that basic information is recorded, held confidential, and tracked to final resolution.

**Case Initiation**—An organization should establish guidelines, including the level of the approving authority, for making a determination to initiate an investigation or to pursue another course of action. Case assignments should be based on resource considerations, geographical dispersion and level of experience of personnel, and current workloads. A decision not to investigate (refer to another entity or take no action) should be documented.

**Management Information System** —Management should have certain information available to perform its responsibilities, measure its accomplishments, and respond to requests by appropriate external customers. Items that may be considered for tracking purposes include, but are not limited to, the following:

**Workload Data**

- Number of complaints handled;
- Cases opened;
- Cases closed;
- Cases pending (active);

- Referrals to program managers and outcomes of such referrals;
- Referrals to other investigative agencies (Federal, State, or local, including agency name);
- Referrals (criminal, civil, and administrative)
  -accepted;
  -declined; and
- Amount of direct and indirect labor-hours expended on each case, where appropriate.

**Identification Data**

- Appropriate dates (allegation received, case opened, case closed, etc.);
- Source information (anonymous, private citizen, etc.);
- Type of violations investigated (criminal, civil, administrative, etc.);
- Category of investigation (contract and grant fraud, theft, bribery, environmental violation, cybercrime, scientific misconduct, etc.);
- Priority (routine, high priority, special interest, etc.);
- Potential violations (Title 18 of the U.S. Code, agency regulations, etc.);
- Suspected dollar loss, where appropriate;
- Joint and task force investigations;
- Operation, program, office, or facility impacted (Departmental bureau or organization);
- Principal State and location where investigation is centered, including judicial venue;
- Investigative techniques employed (consensual monitoring, undercover investigation, searches, hazardous interviews and activities, etc.); and
- Indices of subjects, witnesses, and other individuals.

**Investigative Results Data**

- Number of indictments, convictions, declinations/acceptances, criminal outcomes, and civil actions;
- Amount of recoveries, restitutions, fines, and settlements;
- Reports issued (to prosecutors and agency management);
- Recommendations to agency management for corrective action(s) (take disciplinary action, recover monies, correct internal control weaknesses, etc.);
- Number of disciplinary or other administrative agency actions (terminations, suspensions, debarments, and personnel and contractor actions), and
- Calculated savings from the investigation, if applicable.

The above data will generally allow for the design of a basic system of administrative checks and controls to meet management needs. Depending on the complexity and scope of an investigative activity, additional data can be developed that will enable trend and pattern analyses.

**Investigative File**—All investigative activity, both exculpatory and incriminating, should be recorded in an official case file. A case file may be paper, electronic, or both and should be established upon the opening and assignment of an investigation. The file is used to maintain investigative records (interview writeups, data analysis, reports, etc.). Written directives for file management should specify procedures for at least the following:

- File organization, maintenance, storage, and security;
- Assignment of case numbers;
- Preparation and filing of documents and exhibits;
- Collection and storage of evidence;
- Distribution and dissemination of reports;
- Access control of the files;
- Retention of records, including evidence, interview writeups, investigator notes, and other case file documentation (to be determined on the basis of agency requirements, Federal records regulations, and judicial decisions);
- Ensuring that sensitive information is protected (personally identifiable information, Privacy Act information, Grand Jury information, national security information, etc.); and
- Adequate physical and logical controls over electronic case files, to include backup procedures and protection from cyberthreats.

APPENDICES

November 15, 2011

17

Appendix A

## JOB TASK ILLUSTRATION FOR INVESTIGATORS

### Receipt, Analysis, and Disposition of Allegation(s)

- Obtain data from complainant or source
- Document complaint in writing
- Know prosecutive or regulatory criteria
- Identify violations (elements of crime) or administrative standards
- Review and identify significant information or potential evidence
- Determine correct disposition of complaint (criminal, civil, or administrative)
- Open investigation, if appropriate, and coordinate with appropriate authorities (internally/externally)

### Assessment, Focus, and Preparation of Investigative Plan

- Review available information and evidence
- Review legal decisions and guidelines
- Review agency programs, operational policies, and procedures
- Determine focus and scope of investigation
- Assess and identify required resources
- Identify potential witnesses, suspects, relevant documents, and evidence
- Organize and prioritize investigative activities
- Prepare initial investigative plan

### Conduct Investigation

- Maintain focus and follow investigative plan (revise as necessary)
- Prepare for anticipated investigative activities (interviews, taking statements)
- Apply knowledge of laws and/or regulations
- Understand and apply techniques to ensure constitutional rights
- Project a professional image
- Use good oral and written communicative skills
- Know evidentiary rules
- Collect, analyze, and preserve evidence
- Use appropriate specialized techniques (search warrants, forensics, consensual monitoring)
- Conduct reviews and data inquiries and promptly document such activities
- Collect and analyze financial data
- Assess progress and re-focus when necessary
- Coordinate progress with supervisor (prosecutors or management, as appropriate)

### Review, Organize, and Evaluate Investigative Findings

- Review and understand the information gathered
- Organize the information and evidence gathered
- Correlate data, witnesses, and records
- Consider internal/external customer needs

### Draft Report, Validate Contents, and Submit Final Report

- Write draft report—ensure accuracy, thoroughness, objectivity, proper format, clarity, and correct grammar
- Review report to ensure information is correct and complete
- Consider issues such as confidentiality, the Privacy Act, the Freedom of Information Act, and security classification
- Include disclosure caveats where appropriate
- Write final report
- Distribute to appropriate entities

### Post-Investigative Tasks

- Know rules of criminal and/or civil procedure
- Assist with preparation for court/administrative proceedings
- Serve witness subpoenas
- Assist U.S. Attorney/District Attorney at trial
- Testify at trial
- Document and report results, dispositions, and outcomes
- Obtain disposition of exhibits and evidence after trial/hearing
- Return and document proper disposition of documents and evidence
- Review the organization of investigative files for efficient retrieval
- Archive investigative files
- Ensure information management database reflects accurate and final case information

Appendix B

## TRAINING PROFILE ILLUSTRATION FOR INVESTIGATORS

| Basic/Entry Level Training – GS 5/7[1] | CITP[2] | IGITP[3] |
|---|---|---|
| Administering Rights Warnings | X | X |
| Agent Liability | X | X |
| Basic Computer Applications | X | X |
| Cardiopulmonary Resuscitation | X | X |
| Complaint Assessment | X | X |
| Ethics and Code of Conduct | X | X |
| Federal Rules of Criminal/Civil Procedure | X | X |
| Informant | X | X |
| Sexual Harassment/Diversity | X | X |
| Surveillance | X | X |
| Testifying in Court and Trial Processes | X | X |
| Victim/Witness Awareness | X | X |
| Affidavits and Statements | X | X |
| Applying and Executing of Search Warrants | X | X |
| Arrest Techniques | X | X |
| Assisting US Attorneys and other Prosecutors | X | X |
| Authority and Jurisdiction | X | X |
| Case Development and Liaison | X | X |
| Collection, Protection, and Rules of Evidence | X | X |
| Communication Skills (Oral and Written) | X | X |
| Constitutional Rights | X | X |
| Defensive Tactics | X | X |
| Disclosure/Privacy/FOIA | X | X |
| Electronic Sources of Information | X | X |
| Elements of a Crime | X | X |
| Firearm Proficiency | X | X |
| Fraud Schemes | X | X |
| Interviewing Techniques | X | X |
| Investigative Planning | X | X |
| Relevant Civil and Criminal Statutes | X | X |
| Report Writing | X | X |
| Use of Electronic Evidence | X | X |
| Administrative Remedies | | X |
| Civil Remedies | | X |
| Concepts of Confidentiality | | X |
| Employee Complainants | | X |
| Inspector General Act | | X |
| Inspector General Subpoena | | X |
| Whistleblower Protections | | X |

[1] On-the-Job or In-Service Training should, to some degree, be provided for each of these areas based on the organization's mission and needs.
[2] Criminal Investigator Training Program conducted by the Federal Law Enforcement Training Center
[3] Inspector General Basic Training Program conducted by the Inspector General Criminal Investigator Academy.

## Agency In-Service Training

Recurring[4]
- Code of Conduct
- Sexual Harassment/Diversity
- Ethics
- Agency Authority/Jurisdiction
- Physical Efficiency, Battery
- Health Assessment

Quarterly:
- Firearms Familiarization and Qualification

Periodic[5]:
- Legal Update (Criminal and Civil)
- Arrest Techniques
- Defensive Tactics
- Intermediate Weapon
- Cardiopulmonary Resuscitation
- Inflammatory/Stress
- Victim/Witness Awareness
- Blood Borne Pathogens (annually)

[4] Based on agency requirements.
[5] Conducted on a scheduled basis in accordance with applicable standards (e.g., Attorney General guidelines, Federal regulations, etc.).

| Advanced Training[6] | GS-7 | GS-9 | GS-11 | GS-12 | GS-13 | GS-14 |
|---|---|---|---|---|---|---|
| Data Analysis | x | | | | | |
| Employee Conduct and Integrity | x | x | | | | |
| Financial Fraud (Loans, Credit Cards, etc.) | | x | | | | |
| Accounting Principles | | x | | | | |
| Embezzlement | | x | | | | |
| Environmental Crimes | | x | | | | |
| Computer Crimes | | x | | | | |
| Bribery | | x | | | | |
| Contract and Grant Fraud | | x | | | | |
| Technical Investigative Equipment | | x | | | | |
| Advanced Interviewing | | x | | | | |
| Undercover Operations | | | x | | | |
| Advanced Financial Investigations | | | x | | | |
| Advanced Computer Applications | | | x | | | |
| Electronic Evidence | | | x | | | |
| Electronic Evidence Analysis | | | x | | | |
| Excavation | | | x | | | |
| Anti-Trust Investigations | | | | x | | |
| Case Management | | | | x | x | |
| 1st-Level Supervisors | | | | | x | |
| Problem Solving and Conflict Resolution | | | | x | x | |
| Advanced Supervision | | | | | x | |
| Mentoring | | | | | x | |
| Leadership, Coaching, and Management | | | | | x | |
| Office Administrative | | | | | x | |
| Personnel Management | | | | | | x |

[6] Based on organization's needs and mission requirements

## Appendix C
### Non-Exhaustive Table of Legislation, Executive Orders, Standards, Regulations, and Other Guidance for Investigators

| Legislation | Description |
|---|---|
| Document | Description |
| Crimes, 18 U.S.C. §§ 1-2725 and Criminal Procedure, 18 U.S.C. §§ 3001-3771 | Establishes crimes and criminal procedures as they pertain to OIG oversight of departmental programs. |
| Electronic Communications Protection Act, 18 U.S.C. §§ 2510-2522 (Wiretap Statute) | Limits the ability of law enforcement officers to intercept electronic communications without judicial authorization, and regulates the use and disclosure of information obtained through authorized wiretaps. |
| False Claims Act, 31 U.S.C. §§ 3729-3733 et seq. (P.L. 99-562) | Establishes civil liability for fraudulent claims submitted to the Federal Government. |
| Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g | Imposes additional restrictions on the use of administrative subpoenas to obtain educational records from an educational agency or institution. |
| Federal Conflict of Interest Laws, 18 U.S.C. §§ 202-209 | Establishes criminal conflict of interest penalties for Federal employees. |
| Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 | Authorizes the public to bring civil lawsuits against the Federal Government for the negligent acts of Federal employees within the scope of their employment that cause injury to person or property. |
| Freedom of Information Act, as amended, 5 U.S.C. § 552 (P.L. 104-231) | Allows members of the public to obtain Federal records subject to certain exemptions (including exemptions for certain investigative information). |
| Health Insurance Portability and Accountability Act of 1996, 29 U.S.C. § 1181 (P.L. 104-191) | Protects the privacy of confidential personally identifiable medical information. |
| The Inspector General Act of 1978, as amended, 5 U.S.C. App. 3 (P.L. 95-452), Inspector General Reform Act of 2008, (P.L. 110-409) | Establishes independent and objective Offices of Inspector General; establishes IG subpoena power and other authorities. |
| Law Enforcement Availability Pay Act of 1994, 5 U.S.C. § 5545a | Authorizes additional pay to criminal investigators to ensure availability for unscheduled official duties. |
| Law Enforcement Officers Safety Act of 2003, Chapter 44, 18 U.S.C. § 926 B-C (P.L. 108-277) | Authorizes qualified law enforcement officers (including certain qualified retired officers) to carry a concealed firearm. |
| Pen/Trap Statute, 18 U.S.C. § 3121 | Requires government entities to obtain a warrant before collecting real-time information, such as dialing, routing, and addressing information related to communications. |
| Privacy Act, 5 U.S.C. § 552a (P.L. 93-579) | Protects personal individual information held by Federal agencies, and authorizes individuals to obtain and to seek corrections to those records. |

| | |
|---|---|
| Procurement Integrity Act, 41 U.S.C. § 423 | Prohibits the release of source selection and contractor bid or personal information and sets conflict of interest requirements for procurement personnel. |
| Program Fraud Civil Remedies Act, 31 U.S.C. § 3801 et seq. | Establishes an administrative process to allow Federal agencies to recover for fraudulent claims to the agency of up to $150,000. |
| Right to Financial Privacy Act, 12 U.S.C. § 3401 et seq. | Requires that agencies provide individuals and partnerships with five or fewer partners with notice and an opportunity to object before a financial institution can disclose personal financial information in response to an administrative subpoena. |
| Stored Communications Act, 18 U.S.C. §§ 2701-2712 | Limits the Government's ability to obtain stored account information from network service providers such as ISPs. |
| Trade Secrets Act, 18 U.S.C. § 1905 | Prohibits government employees from disclosing certain confidential or proprietary business information. |
| Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 1512-1515 | Defines tampering with a witness, victim, or informant; requires Federal law enforcement agencies to have guidelines and policies to provide services to victims of crimes. |
| Whistleblower Protection Act, 5 U.S.C. § 1204, 22 U.S.C. § 4137 | Protects the rights of, and prevents retaliation against, Federal employees who disclose governmental fraud, waste, abuse, and other improper activity. |
| 5 U.S.C. §§ 8425(b), 8335 | Authorizes agencies to exempt law enforcement officers from mandatory retirement at age 57 with 20 years of covered law enforcement service. |
| 41 U.S.C. § 265 | Prevents retaliation against contractor employees for certain disclosures of information relating to a substantial violation of law related to a contract. |

2. Executive Orders

| | |
|---|---|
| Administrative Allegations Against Inspectors General, Exec. Order No. 12993, 61 Fed. Reg. 13043 (March 21,1996) | Directs the PCIE and ECIE Integrity Committee to receive, review, and refer for investigation allegations of wrongdoing against IGs and certain staff members of OIGs (Note– superseded by passage of the Inspector General Reform Act of 2008). |
| Integrity and Efficiency in Federal Programs, Exec. Order No. 12805, 57 Fed. Reg. 20627 (May 11, 1992) | Establishes the PCIE and ECIE and describes their functions and responsibilities (note–superseded by passage of the Inspector General Reform Act of 2008). |
| Principles of Ethical Conduct for Government Officers and Employees, Exec. Order 12731, 55 Fed. Reg. 42547 (October 17, 1990). | Lays out principles of ethical conduct, Office of Government Ethics authority, agency responsibilities, delegations of authority, and general provisions. |

3. Standards

| | |
|---|---|
| PCIE/ECIE Quality Standards for Federal Offices of Inspector General (Oct. 2003) | Establishes standards for the management, operation, and conduct of the Federal Offices of Inspector General. |
| Standards of Ethical Conduct for Employees of the Executive Branch, 5 CFR Part 2635 (June 2009) | Establishes general principles for ethical conduct of employees of the Executive Branch. |

4. Other Guidance and Regulations

| | |
|---|---|
| Attorney General Guidelines for Domestic FBI Operations (Sept. 29, 2008) | Addresses the broad operational areas of the FBI's methods of investigative and intelligence gathering, including coordination, analysis and planning. |
| Attorney General Guidelines for Offices of Inspector General with Statutory Law Enforcement Authority (Dec. 8, 2003) | Governs the law enforcement authorities of OIGs that have been granted statutory law enforcement power from the Attorney General. |
| Attorney General's Guidelines on FBI Undercover Operations (Nov. 13, 1992) | Covers authorization of undercover operations, protecting innocent parties against entrapment, and monitoring and control of undercover operations. |
| Attorney General Guidelines Regarding the Use of Confidential Informants (May 2002) | Applies to the use of confidential informants in criminal investigations and prosecutions by Department of Justice law enforcement agencies and Federal prosecuting officers. |
| Attorney General Memorandum for the Heads and Inspectors General of Executive Departments and Agencies re: Procedures for Lawful, Warrantless Monitoring of Verbal Communications (May 30, 2002) | Revises and updates rules and procedures for obtaining authorization to intercept verbal communications without the consent of all parties to the communication, as well as the procedures for consensual monitoring where no written authorization is required. |
| Attorney General Order No. 3168-2010 – Authorization for the Federal Offices of Inspector General to Provide Mutual Assistance in the Execution of Search and Arrest Warrants (June 28, 2010) | Authorizes and sets conditions on OIG sharing of agents to seek and execute search, seizure or arrest warrants. |
| Attorney General Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses ("Giglio Policy") (Dec. 9, 1996) | Ensures that prosecutors receive sufficient information to meet their disclosure obligations under Giglio v. United States, while protecting the legitimate privacy rights of Government employees. |
| CIGIE Guidelines on Undercover Operations (June 2010) | Provides guidance on certain undercover operations in accordance with the Attorney General's Guidelines for Offices of Inspectors General. |

| | |
|---|---|
| CIGIE Qualitative Assessment Review Guidelines/Federal Offices of Inspector General (Investigation Divisions) (May 2009) | Provides guidance on conducting external qualitative assessment reviews of OIG investigative operations. |
| CIGIE Procedures to Obtain Assistance From Another OIG in the Execution of Search and Arrest Warrants (Nov. 15, 2010) | Establishes procedures for OIG sharing of agents for search, seizure or arrest warrants. |
| Deputy Attorney General Guidance for Prosecutors Regarding Criminal Discovery (Jan. 10, 2010) | Provides guidance for prosecution team members (including IG agents) on the government's legal discovery obligations, including discovery of exculpatory and impeachment information as applied to electronic communications. |
| Deputy Attorney General Guidance on the Use, Prevention, and Disclosure of Electronic Communications in Federal Criminal Cases (March 30, 2011) | Provides guidance for prosecution team members (including IG agents) on legal discovery obligations relating to electronic communications among members of the prosecution team, victims and witnesses. |
| Deputy Attorney General Memorandum to Inspectors General Directing Them to Refer Potential Violations of Federal Privacy Statutes to the Department of Justice for Investigation and Prosecution (Oct. 18, 1999) | Directs Inspectors General to refer offenses to the Computer Crimes and Intellectual Property Section in the Criminal Division, Tax Offenses to the Criminal Enforcement Office in the Tax Division, and Privacy Act Violations to the Public Integrity Section in the Criminal Division. |
| Federal Rules of Criminal Procedure, R. 1-17 | Federal court rules governing preliminary proceedings, the grand jury, indictment, arraignment, and preparation for trial. |
| Federal Rules of Evidence, §§ 101-1103 | Federal court rules for introduction of evidence in criminal or civil trials. |
| 2 C.F.R. Part 180 OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) | Establishes causes, procedure and treatment of government-wide suspension and debarment for non-procurement (e.g., loan, guarantee, insurance and grant) actions. Please note individual agency adoption pieces in 2 C.F.R. Subtitle B. |
| 5 C.F.R. Part 731.204-05 | Establishes causes and procedure for debarment from federal employment. |
| 48 C.F.R. Subpart 3.9 | Provides whistleblower protections for contractor employees and sets procedures for filing complaints, investigating complaints, and remedies. |
| 48 C.F.R. Part 9.4 Procurement Suspension and Debarment Regulations | Establishes causes, procedure and treatment of government-wide suspension and debarment for procurement actions. |
| 49 CFR § 1544.219; TSA Regulation regarding carriage of accessible weapons | Sets out situations when it is permissible for a law enforcement officer to carry a weapon aboard a plane. |

C-4

# Appendix D

The QSI working group consisted of the following AIGIs:

| Chair: | Carl W. Hoecker | IG, U.S. Capitol Police |
| Co-chair: | Eric M. Thorson | IG, Treasury Department |

Investigations Committee Members

| Members: | Lanie D'Alessandro | IG, National Reconnaissance Office |
| | Charles K. Edwards | Acting IG, Department of Homeland Security |
| | Arthur A. Elkins | IG, Environmental Protection Agency |
| | Donald A. Gambatesa | IG, Agency for International Development |
| | J. Russell George | IG, Treasury Inspector General for Tax Administration |
| | Peggy E. Gustafson | IG, Small Business Administration |
| | Allison C. Lerner | IG, National Science Foundation |
| | John P. McCarty | Acting IG, Department of Housing and Urban Development |
| | Brian D. Miller | IG, General Services Administration |
| | George J. Opfer | IG, Veterans Administration |
| | Jon T. Rymer | IG, Federal Deposit Insurance Corporation |
| | Cynthia A. Schnedar | Acting IG, Department of Justice |
| | Karl W. Schornagel | IG, Library of Congress |
| | Kathleen S. Tighe | IG, Department of Education |

The following individuals contributed substantially to the final product:

William D. Hamel, AIGI, ED OIG/AIGI Committee Chair
Glenn P. Harris, General Counsel, SBA OIG
John R. Hartman, DIG, DOE OIG
Angela N. Hrdlicka, Director, IGCIA

D-1

# EXHIBIT B

# The Federal Bureau of Investigation's Compliance with the Attorney General's Investigative Guidelines (Redacted)

**Special Report**
**September 2005**
**Office of the Inspector General**

---

## Chapter Two: Historical Background of the Attorney General's Investigative Guidelines

The May 30, 2002, Investigative Guidelines that are the subject of this review are the latest version of the Attorney General's Investigative Guidelines, the first version of which was issued by Attorney General Edward Levi in 1976. Before addressing the FBI's implementation of the Investigative Guidelines in the succeeding chapters of this report, we believe it is important to describe the historical events that prompted issuance of the first set of Guidelines in 1976 and the context in which the various revisions to them were made thereafter.

### I. Introduction

Since their inception nearly 30 years ago, one of the principal legal constraints under which the FBI has operated has been the Attorney General Guidelines. The FBI does not operate under a general statutory charter but, rather, under Attorney General Guidelines that have been revised from time to time pursuant to the authorities set forth in 28 U.S.C. §§ 509, 510, and 533.

Historically, the Investigative Guidelines have been divided into subject areas, addressing both the types of investigations the FBI may conduct (e.g., checking leads, making preliminary inquiries, or conducting full investigations in connection with general crimes or criminal intelligence investigations), and the specialized techniques the FBI may use in the course of such investigations (e.g., using confidential informants, undercover operations, or non-telephonic consensual monitoring).

In this chapter, we summarize the major revisions of the Attorney General's Investigative Guidelines, noting significant changes to investigative authorities and techniques and the events associated with each revision.

### II. The Pre-Guidelines Period

From its inception, the FBI has had as part of its mission the collection of domestic intelligence and the investigation of domestic security matters. Attorney General Charles J. Bonaparte established the Bureau of Investigation within DOJ in 1908. During the post-World War I period, the Bureau of Investigation was charged with the investigation of suspected anarchists, Bolsheviks, socialists, and other radicals in contemplation of prosecution under the Espionage Act and the Immigration Act.

In 1919 and 1920, a series of bombs exploded in eight American cities that targeted federal and local officials, judges, police departments, and financial institutions on Wall Street. In response, Attorney General A. Mitchell Palmer established a position within DOJ to focus on anti-radical activities and obtained funding from Congress to fight subversion. On November 7, 1919, with the assistance of Justice Department attorney J. Edgar Hoover, who headed the DOJ's General Intelligence Division, and the Immigration Service within the Labor Department, Attorney General Palmer ordered the first of a year-long sequence of coordinated raids in 12 cities to round up and deport hundreds of members of the Federation of the Union of Russian Workers and other suspected "radicals." In early January 1920, a second wave of coordinated raids led to the arrest of between 5,000 to 10,000 suspected radicals.

During the 1930s, President Franklin D. Roosevelt expressed concern over the growing indications of subversive activities within the United States, especially those of communist and fascist supporters. At the

direction of President Roosevelt, the FBI began gathering intelligence on the activities of such individuals and groups.[25] After the end of World War II, as Cold War tensions grew, the FBI refocused its attention on counterespionage activities, including the investigation of Ethel and Julius Rosenberg, who were convicted of espionage against the United States on behalf of the Soviet Union, and executed.

From World War II through the 1970s, the FBI conducted what it called "internal security investigations," the objective of which was to collect intelligence about the political influence of organizations and individuals who espoused what the FBI regarded as revolutionary or extremist viewpoints. The FBI carried out these investigations during periods of intense congressional interest in the nation's internal security, leading to the introduction of legislation in the 1940s and 1950s, principally, the Smith Act[26], the Voorhis Act[27], and the Internal Security Act of 1950.[28]

In the 1950s, the FBI also developed a series of covert programs designed to collect intelligence about the Communist influence in the United States (COMINFIL).[29] The FBI established other counterintelligence programs, collectively referred to as COINTELPRO, to investigate "racial matters," "hate organizations," and "revolutionary-type subversives" whose activities were monitored in accordance with internal FBI policy even if they did not satisfy the "advocacy of violence" standard articulated in the Supreme Court's controlling decisions.

During the 1960s, the FBI's internal security investigations extended to the investigation of the activities and supporters of the anti-war and civil rights movements.[30] The FBI used informants throughout this period, including Gary Thomas Rowe, who infiltrated the highest levels of the Birmingham, Alabama chapter of the Ku Klux Klan from 1959 to 1965.[31] Rowe's activities as an informant came to light during the murder trial of three Klan members who were convicted of killing a white civil rights worker, Viola Gregg Liuzzo, on March 25, 1965, the night after the Selma-Montgomery voting rights march.[32] Rowe was one of the four Klansmen in the killer's car and witnessed the murder.[33] He reported the crime to the FBI within hours, and it is undisputed that Rowe's information led to the conviction of the three perpetrators.[34]

In 1975, the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, known as the "Church Committee," under the chairmanship of Senator Frank Church, and the House Select Committee on Intelligence under the chairmanship of Otis Pike ("Pike Committee") conducted parallel hearings. The Church Committee examined what the FBI knew of Rowe's knowledge of and involvement in the Klan's activities and what instructions he was given.[35] The Committee heard evidence that the FBI instructed Rowe to join a Klan "Action Group," which "conducted violent acts against blacks and civil rights workers."[36] Rowe testified that he and other Klansmen "had beaten people severely, had boarded buses and kicked people off; and went in restaurants and beaten them with blackjacks, chains, pistols."[37] On one occasion, Rowe said that despite giving the FBI advance warning that Klan members were planning violence against blacks, his FBI contact agent or "handler" instructed him to "go and see what happened."[38] Rowe admitted he participated in the resulting violence to protect his cover.[39] According to the Church Committee, the FBI appeared to walk a fine line in utilizing Rowe, who had provided important information on a variety of murders and other violent crimes.[40] FBI Headquarters instructed the field office to ensure that Rowe understood that he was not to "direct, lead, or instigate any acts of violence."[41] On the other hand, he was present on many occasions when violence occurred, and he participated in acts of violence. Rowe's FBI handler testified: "If he happened to be with some Klansman and they decided to do something, he couldn't be an angel and be a good informant."[42]

When the Church Committee presented its findings in 1976, Senator Church described the Committee's work evaluating the FBI's involvement in domestic intelligence in the following terms:

> [The Committee investigation's] purpose is . . . to evaluate domestic intelligence according to the standards of the Constitution and the statutes of our land. If fault is to be found, it does not rest in the Bureau alone. It is to be found also in the long line of Attorneys General, Presidents, and Congresses who have given power and responsibility to the FBI, but have failed to give it adequate guidance, direction, and control.[43]

During its 15-month investigation, the Committee determined that FBI Headquarters alone had developed over 500,000 domestic intelligence files on Americans and domestic groups.[44] The targets of the intelligence activities included organizations and individuals espousing revolutionary, racist, or otherwise "extremist" ideological viewpoints, but during the 1960s also included investigations of the civil rights, anti-war, and women's movements. In total, the FBI conducted more than 2,000 COINTELPRO operations before the program was discontinued in April 1971.[45]

Significantly, the Church Committee found that the FBI went beyond investigation and employed COINTELPRO operations to disrupt groups and discredit or harass individuals. While the Committee's final report did not question the need for lawful domestic intelligence, it concluded that the Government's domestic intelligence policies and practices required fundamental reform.[46]

The FBI's use of informants also was the subject of a staff report issued by the Church Committee entitled, "The Use of Informants in FBI Domestic Intelligence Investigations." Noting that the FBI was using more than 1,500 informants in 1975 in connection with domestic security investigations, the report focused on the absence of clear guidance for FBI agents as to how they should operate informants and what constraints applied to handling agents' and informants' activities:

> The [FBI's] Manual contains no standard limiting an informant's reporting to information relating to the commission of criminal offenses or even to violent or potentially violent activity. In fact, intelligence informants report on virtually every aspect of a group's activity serving, in the words of both FBI officials and an informant, as a "vacuum cleaner" of information.

<p style="text-align:center">* * *</p>

> The Manual does not set independent standards which must be supported by facts before an organization can be the subject of informant coverage. Once the criteria for opening a regular intelligence investigation are met, and the case is opened, informants can be used without any restrictions. There is no specific determination made as to whether the substantial intrusion represented by informant coverage is justified by the government's interest in obtaining information. There is nothing that requires that a determination be made of whether less intrusive means will adequately serve the government's interest. There is also no requirement that the decisions of FBI officials to use informants be reviewed by anyone outside the Bureau. In short, intelligence informant coverage has not been subject to the standards which govern the use of other intrusive techniques such as wiretapping or other forms of electronic surveillance.[47]

In response to these ongoing concerns about ineffective internal controls and oversight, the Congress periodically considered subjecting the FBI to a statutory charter. In 1976 the Church Committee in its Final Report proposed a "comprehensive legislative charter defining and controlling the domestic security activities of the Federal Government."[48] Initially, the legislative charter proposal was supported by FBI Director Clarence Kelly and his successor, William Webster.[49]

Two years later, in 1980, the House Judiciary Committee held oversight hearings on a proposal for a legislative charter. Attorney General Civiletti and FBI Director William Webster supported the House bill.[50] Attorney General Civiletti testified that the charter "is intended to be the foundational statement of the basic duties and responsibilities of the FBI and also its general investigative powers and the principal minimum limitation on those powers."[51] He also stated that "the charter depends for enforcement on the internal disciplinary system of the FBI."[52]

As we discuss below, Congress did not adopt a general legislative charter defining the FBI's investigative authorities because of the adoption of the first Attorney General Guidelines in 1976.

## III. **Establishment of the Attorney General Guidelines**

### A. **The Levi Guidelines - 1976**

Attorney General Edward Levi issued the first Attorney General Guidelines, entitled "Domestic Security Investigation Guidelines." These guidelines, which were known as the first of the "Levi Guidelines," became effective on April 6, 1976.[53]

In congressional testimony prior to release of the first Guidelines, Attorney General Levi stated that the Guidelines "proceed from the proposition that Government monitoring of individuals or groups because they hold unpopular or controversial political views is intolerable in our society."[54] The Guidelines represented a significant shift in DOJ's approach to domestic terrorism. For the first time, investigations of domestic terrorism were treated as matters for criminal law enforcement, rather than as avenues for intelligence collection.

The Guidelines placed specific limits on techniques the FBI could use and distinguished three types of domestic security investigations: 1) preliminary investigations, 2) limited investigations, and 3) full investigations.[55] The Guidelines provided that the FBI could commence a full domestic security investigation only on the basis of "specific and articulable facts giving reason to believe that an individual or group is or may be engaged in activities which involve the use of force or violence."[56]

In a memorandum dated December 15, 1976, Attorney General Levi issued the second set of Attorney General Guidelines entitled, "Use of Informants in Domestic Security, Organized Crime, and Other Criminal Investigations" ("Levi Informant Guidelines").[57] Noting that the Government's use of informants may involve deception and intrusion into the privacy of individuals and may require Government cooperation with persons whose reliability and motivation may be open to question, the Guidelines outlined the factors to be evaluated in using informants, the instructions informants were to be given, and the steps to be taken in the event the FBI learned that an informant used in investigating criminal activity had violated the instructions or learned of the commission of a crime.[58]

The Informant Guidelines were part of a broader effort to reform the FBI's investigative and intelligence operations in light of the findings of the Church Committee.[59] Attorney General Levi emphasized that it was imperative that "special care be taken not only to minimize [use of informants] but also to ensure that individual rights [were] not infringed and that the government itself did not become a violator of the law."[60] The Guidelines stated that while informants were not employees of the FBI, "the relationship of an FBI informant to the FBI impos[ed] a special responsibility upon the FBI when the informant engage[d] in activity where he received, or reasonably [thought] he received, encouragement or direction for that activity from the FBI."[61] Attorney General Levi also stressed that while the FBI would have primary responsibility for these investigations, DOJ would have "much greater involvement."[62]

The Levi Informant Guidelines left significant decision-making authority within the discretion of the agents handling the informant. For example, neither the DOJ nor the U.S. Attorneys had any approval or oversight function in connection with an informant's participation in otherwise illegal activity.[63] However, if an informant committed an unauthorized criminal act in connection with an FBI assignment, the Guidelines required notification of the appropriate law enforcement or prosecutive authorities.[64]

The impact of the new Guidelines was readily apparent in FBI case statistics. William Webster, who served as FBI Director from 1978 to 1987, provided information in connection with a March 16, 1978, hearing indicating that the FBI's domestic security investigations had declined from 21,414 in July 1973 to 4,868 in March 1976, and stated publicly on May 3, 1978, that the Bureau was "practically out of the domestic security field."[65]

Before a number of high-profile investigations occurred in the 1980s, the Attorney General Guidelines were generally considered to be working well. As Attorney General Civiletti stated when he testified in 1980 in support of the FBI charter legislation:

> I believe the experience of the last three years with the Levi Guidelines has been highly

encouraging. It has demonstrated that guidelines can be drawn which are well understood by Bureau personnel and by the public and which can be filed and reviewed by the appropriate congressional committees. It has also shown that guidelines can be successfully applied to particular kinds of investigative activity and even to certain specific decisions made on a case-by-case basis. The reasonable conclusion which can be drawn from the success of these guidelines is that the charter need not detail every limitation or safeguard by express statutory terms. Such details are better covered in guidelines, with the charter setting forth the obligatory principles and objectives which the guidelines must meet and achieve.[66]

Within the FBI, however, there was concern that the Levi Guidelines would unduly limit authorized techniques and would not permit the FBI to be proactive, to collect intelligence before disaster struck, and to develop an adequate intelligence base.[67]

## B. The Civiletti Guidelines - 1980-1981

Revelations regarding the conduct of some informants, FBI agents' knowledge of these activities, and interpretations of FBI statements or actions promising immunity for the informants prompted Attorney General Civiletti to issue revised confidential informant guidelines on December 4, 1980.[68] The revised Guidelines explicitly provided that, if necessary and appropriate, informants may be authorized to participate in two different types of "otherwise criminal activity" at the behest of the FBI, "ordinary" and "extraordinary." "Ordinary" criminal activity could be authorized by an FBI field office supervisor or higher FBI official. "Extraordinary" criminal activity was defined as any activity involving a significant risk of violence, corrupt actions by high public officials, or severe financial loss to a victim."[69] Only SACs could authorize extraordinary criminal activity, and only with the approval of the pertinent U.S. Attorney.[70]

In addition, both FBI Headquarters and the Assistant Attorney General in charge of the Criminal Division were to be "immediately" informed of any authorization of extraordinary criminal activity.[71] In the event an informant engaged in unauthorized criminal activity which was deemed "serious", the approval of either the FBI Director or a senior Headquarters official in consultation with the Assistant Attorney General in charge of the Criminal Division was required to continue to use the informant.[72] The Civiletti Informant Guidelines also made modifications to the factors to be considered in determining the advisability of notifying appropriate law enforcement authorities of criminal activity by FBI informants.[73]

In addition, for the first time, the Guidelines assigned federal prosecutors a coordinating role in relation to informant activities:

In any matter presented to a United States Attorney or other federal prosecutor for legal action . . . where the matter has involved the use of an informant or a confidential source in any way or degree, the FBI shall take the initiative to provide full disclosure to the federal prosecutor concerning the nature and scope of the informant's or confidential source's participation in the matter.[74]

The Civiletti Informant Guidelines also revised the terms of the instructions required to be given to informants. The Civiletti Guidelines required FBI agents operating informants to advise informants that their relationship with the FBI would not protect them from arrest or prosecution for any violation of federal, state, or local law, except insofar as a field supervisor or SAC determined pursuant to appropriate Attorney General Guidelines that the informant's criminal activity was justified. If the required warnings were given to informants, they would reasonably understand that the FBI, without the involvement of any prosecutor, lacked the authority to decide if the informants would be protected from arrest and prosecution.[75]

In the 1980s, the Guidelines were again revised following press accounts and congressional hearings concerning the FBI's domestic intelligence and counterespionage activities, and its undercover operations. The most dramatic revelations involved several high profile undercover

operations, one of which targeted members of the United States Congress in the ABSCAM investigation.

ABSCAM was an FBI "sting" operation run out of the FBI's Hauppauge, Long Island office which initially targeted trafficking in stolen property and thereafter was converted to a public corruption investigation. The investigation ultimately led to the conviction of a United States Senator, six members of the House of Representatives, the Mayor of Camden, New Jersey, members of the Philadelphia City Council, and an inspector for the Immigration and Naturalization Service.

During the ABSCAM investigation, the FBI relied on an informant, Melvin Weinberg, who presented himself as a business agent for "Abdul Enterprises," a fictitious organization ostensibly supported by two wealthy Arab sheiks looking for investment opportunities in America.[76] As part of the scheme, the sheiks approached designated public officials and offered them money or other consideration in exchange for favors assisting their cause. The undercover operation called for Weinberg to contact a variety of individuals and tell them that his principals were seeking to invest large sums of money. When the investigation became public in early 1980, controversy centered on the use of the "sting" technique and Weinberg's involvement in selecting targets. Although Weinberg was found to have previously engaged in numerous felonious activities, he avoided a three-year prison sentence and was paid $150,000 in connection with the operation. Ultimately, all of the ABSCAM convictions were upheld on appeal,[77] although some judges criticized the tactics used by the FBI and lapses in FBI and DOJ supervision.[78]

In the wake of ABSCAM, Attorney General Civiletti issued "The Attorney General Guidelines for FBI Undercover Operations" ("Civiletti Undercover Guidelines") on January 5, 1981.[79] These were the first Attorney General Guidelines for undercover operations, and they formalized procedures necessary to conduct undercover operations.

Following the initial press accounts about the ABSCAM investigation, Congress held a series of hearings to examine FBI undercover operations and the new Civiletti Undercover Guidelines. The House Subcommittee on Civil and Constitutional Rights began hearings on FBI undercover operations in March 1980 and concluded with a report in April 1984. Among the concerns expressed during the hearings were the undercover agents' involvement in illegal activity, the possibility of entrapping individuals, the prospect of damaging the reputations of innocent civilians, and the opportunity to undermine legitimate rights to privacy.[81] Several witnesses testified that the Civiletti Undercover Guidelines did not sufficiently address entrapment and called for the revision of the provisions prohibiting inducing subjects not suspected of criminal activity.[82] Congress also heard testimony from numerous individuals who claimed they were unjustly victimized by an FBI-sponsored undercover operation.[83] On April 29, 1982, FBI Director Webster reported that there were 10 undercover operations that resulted in the filing of 30 civil suits implicating the FBI and/or its employees.[84]

In March 1982, after the Senate debated a resolution to expel Senator Harrison A. Williams for his conduct in ABSCAM, the Senate established the Select Committee to Study Undercover Activities.[85] In December 1982, the Committee issued its final report, which was generally supportive of the undercover technique but observed that its use "creates serious risks to citizens' property, privacy, and civil liberties, and may compromise law enforcement itself."[86]

The Committee's final report called for clarification of vague terminology in the Guidelines and strict approval procedures. The Committee stated that there were several weaknesses in the Civiletti Undercover Guidelines.

- The terms "extension," "operation," and "public official" were internally defined by the FBI "in a manner that makes each of those terms redundant, exceedingly narrow, or inconsistent with usage in other guidelines and documents."[87]

- The Guidelines failed to indicate what circumstances justified "the use of violence, the commission of a crime, or interference with a privileged relationship."[88]

- The Guidelines failed to make clear what circumstances required the FBI to perform all the steps required to initiate an undercover operation or to modify an existing undercover operation.[89]

In addition, the report asked that Congress be consulted at least 30 days before the promulgation of every guideline governing undercover or criminal investigations, and every amendment to, or deletion or formal interpretation of, any such guideline.[90]

Both the House Subcommittee on Civil and Constitutional Rights and the Senate Select Committee concluded that the existing Attorney General Guidelines and the FBI's internal controls were insufficient to constrain undercover investigations, and both proposed legislative solutions.[91] The Senate Select Committee recommended federal legislation to govern law enforcement undercover operations and the inclusion of congressional oversight mechanisms. Although the Senate Select Committee supported legislation, it rejected the House's recommendation of a judicial warrant requirement. Instead, the Senate Select Committee proposed a "probable cause" standard for undercover operations seeking to infiltrate governmental, religious, or news media organizations, and a finding of "reasonable suspicion" for all other operations seeking to detect past, ongoing, or planned criminal activity.[92]

Three years after the Civiletti Guidelines were issued and a year following the 1982 House hearings at which DOJ officials provided repeated assurances that the Undercover Guidelines would "ensure that critical judgments are made at appropriate levels of authority," a House Judiciary Subcommittee examined their application in a Cleveland-based undercover operation, code-named "Operation Corkscrew."[93] The investigation was designed to probe case-fixing in the Cleveland Municipal Court. Conducted in 1977 to 1982, the operation did not produce evidence deemed worthy of prosecution by the U.S. Attorney's Office. While the paperwork submitted by the case agents asserted that the primary targets were judges, the only evidence developed was that the Court's "antiquated recordkeeping system . . . could be easily tampered with or circumvented by any employee with access to these documents."[94]

In blunt criticism directed at the FBI's failure to adhere to the Attorney General Guidelines, the House Subcommittee concluded that in Operation Corkscrew "virtually every one of the principal safeguards was either directly violated, ignored, or administratively construed in a manner inconsistent with their stated purposes with profoundly disturbing results to the FBI, the suspects, and the public."[95] The Subcommittee asserted there were major Guidelines violations:

- the operation was initiated without the requisite evidentiary threshold of "reasonable suspicion" of judicial case-fixing;[96]

- the Guidelines' provision requiring that the proposed criminal activity be "clear and unambiguous" was "not only ignored but was apparently deliberately violated in order to produce 'evidence' of wrongdoing;"[97]

- evidence casting doubt on the principal FBI informant's credibility was not investigated by the case agents or brought to the attention of field supervisors or FBI Headquarters;

- the fact that the subject matter of the investigation qualified as a "sensitive circumstance" under the Guidelines did not result in special scrutiny either at FBI Headquarters or DOJ;

- the Undercover Operations Review Committee (composed of both FBI and DOJ personnel) was provided "incomplete and misleading information" and failed to "challenge or test the sufficiency and accuracy of information" provided by field agents;[98] and

- the U.S. Attorney's Office did not appear to assess independently the evidence developed in the investigation.[99]

Finally, the Subcommittee asserted that the problems in the ABSCAM and Corkscrew investigations

"are not aberrations, but in fact reflect a pattern of recurrent problems which are inherent in the process."[100]

## C.  **The Smith Guidelines - 1983**

In the 1980s, Congress also scrutinized the FBI's domestic security investigations. In 1982 and 1983, the Senate Subcommittee on Security and Terrorism held a series of five hearings on the Levi Domestic Security Guidelines.[101] Some members of the Congress believed that the Levi Guidelines "unduly restricted" the FBI's authority to monitor and prevent potential terror or violence against persons and property in the United States, pointing to the provisions that required a criminal predicate to initiate an investigation.[102]

The Subcommittee completed its assessment of the Levi Guidelines with the issuance of a report entitled, "Impact of Attorney General Guidelines for Domestic Security Investigations (The Levi Guidelines)." The Subcommittee concluded that the Attorney General Guidelines are "necessary and desirable" but recommended that the Guidelines be revised to delete the criminal standard for initiating domestic security investigations; extend time limits for investigations, particularly those for preliminary and limited investigations; lower the evidentiary threshold for initiating limited investigations; relax restrictions on the recruitment and use of new informants; and authorize investigations of systematic advocacy of violence, alleged anarchists, or other activities calculated to weaken or undermine federal or state governments.[103] The Subcommittee recommended that the revised Guidelines be tested and evaluated and that DOJ should thereafter "present legislative recommendations to Congress to justify the enactment into law of adequate and effective guidelines for domestic security investigations."[104]

After an 8-month review involving numerous DOJ components and consultation with members of the Congress, Attorney General Smith issued a revised set of Attorney General Guidelines, entitled "The Attorney General's Guidelines on Domestic Security Investigations" (the "Smith Guidelines"), on March 7, 1983.[105] In announcing the revisions, Attorney General William French Smith stated that the Guidelines were needed "to ensure protection of the public from the greater sophistication and changing nature of domestic groups that are prone to violence" but would "retain adequate protections for lawful and peaceful political dissent."[106] Attorney General Smith stated that FBI agents had "demonstrated their professional competence, integrity, and ability to adhere to requirements."[107] Moreover, he said that the integration of all FBI law enforcement investigation guidelines into one document was meant to enhance the effectiveness of terrorism investigations by applying to these investigations the concepts and standards that effectively governed the FBI's racketeering enterprise investigations.[108]

The Smith Guidelines introduced a new type of investigation called the "criminal intelligence investigation," which had a broader organizational focus than a general crimes investigation and authorized the FBI to investigate certain enterprises which sought "either to obtain monetary or commercial gains or profits through racketeering activities or to further political or social goals through activities that involve criminal violence."[109] In addition to retaining the racketeering enterprise investigation carried forward from the Civiletti Guidelines, the Smith Guidelines provided for a "domestic security/terrorism investigation," whose purpose is "to obtain information concerning the nature and structure of the enterprise . . . with a view to the longer range objective of detection, prevention, and prosecution of the criminal activities of the enterprise."[110] A domestic security/terrorism investigation could lawfully collect information regarding "(i) the members of the enterprise and other persons likely to be knowingly acting in furtherance of its criminal objectives, provided that the information concerns such persons' activities on behalf of or in furtherance of the enterprise; (ii) the finances of the enterprise; (iii) the geographic dimensions of the enterprise; and (iv) past and future activities and goals of the enterprise."[111]

FBI Director Webster characterized the changes to the Guidelines as "evolutionary," "not revolutionary," stating that the Guidelines needed to adjust as the FBI learned more about organized crime and criminal enterprises. According to Webster, the revisions allowed agents to

address the needs of the time, particularly those posed by terrorist organizations that were becoming more fluid with inconsistent structure and varied personnel composition.[112]

The Smith Guidelines also lowered the evidentiary thresholds for initiating full domestic security/terrorism investigations, requiring the FBI to identify "facts or circumstances reasonably indicat[ing] that two or more persons are engaged in an enterprise for the purpose of furthering political or social goals wholly or in part through activities that involve force or violence and a violation of the criminal laws of the United States."[113] This replaced the "specific and articulable facts" standard in the Levi Guidelines. The Smith Guidelines provided that the "reasonable indication" standard required an objective, factual basis for initiating the investigation, but did not require specific facts or circumstances indicating a past, current, or impending violation.[114] The Smith Guidelines also filled a gap in the Levi Guidelines by permitting "low-level" monitoring of dormant groups even though they did not appear to be an immediate threat.[115]

The Smith Guidelines restricted the scope of the "preliminary inquiry" tool in domestic security investigations. While the Levi Guidelines permitted preliminary inquiries in domestic security investigations to determine if there was a factual predicate for opening a full investigation, the Smith Guidelines eliminated the use of preliminary inquiries in domestic security investigations, leaving the technique available only for general crimes investigations.[116] Under both the Levi and Smith Guidelines, neither informants nor mail covers could be used during preliminary inquiries. The Smith Guidelines extended the duration of preliminary inquiries from 60 to 90 days, permitting extensions by FBI Headquarters upon "a written request and statement of reasons why further investigative steps are warranted when there is no 'reasonable indication' of criminal activity."[117]

The Smith Guidelines cautioned that investigations could not be initiated solely on the basis of an individual's exercise of First Amendment rights, a restriction that has remained in place for over 20 years and is in effect today. See General Crimes Guidelines § I (General Principles). In addition, the Smith Guidelines instructed agents to consider, in evaluating the use of various law enforcement techniques, the use of "less intrusive means."[118] With respect to use of the undercover technique, the Smith Guidelines required FBI Headquarters' approval with notification to the DOJ if the FBI initiated "undisclosed participation in the activities of an organization by an undercover employee or cooperating private individual in a manner that may influence the exercise of rights protected by the First Amendment."[119]

One key member of Congress observed that the Guidelines were "instrumental in curtailing intelligence abuse by the FBI" and should not be changed "without careful Congressional and public scrutiny to assure that [the Smith Guidelines are] not a retreat."[120]

The following year, coinciding with the House Subcommittee's final year of hearings on FBI undercover operations discussed above, the FBI instituted an internal review of undercover operations. On February 8, 1984, the FBI's Office of Program Evaluation and Audits (OPEA) in the Inspection Division released a study of FBI undercover operations which concluded that the FBI was doing an effective job in undercover investigations in the criminal field. In terms of management controls, the report concluded that the Criminal Undercover Operations Review Committee (CUORC), the Undercover and Special Operations Unit (USOU), and the Undercover Guidelines improved centralized control of undercover activities.[121]

Also during 1983 and 1984, Congress debated a bill which would subject undercover operations to congressional control. The Undercover Operations Act would require that before the FBI could initiate an undercover operation, federal law enforcement agencies would have to establish a factual predicate of "probable cause" or "reasonable suspicion."[122] Director William Webster did not support the entire bill, arguing that it would not allow agents to effectively perform investigations. Director Webster cited the effectiveness of the Attorney General Guidelines, which set thresholds and guidance for undercover operations.[123] Director Webster also stated that the flexibility in the Guidelines allowed "responses in specific situations which arise in the context of the investigative field," while adhering to regulatory requirements.[124]

D. **The Thornburgh Guidelines - 1989**

In September 1981, the FBI opened a criminal investigation of the Committee in Solidarity with the People of El Salvador, or "CISPES," a United States-based group that opposed the Reagan Administration's policies in Central America.[125] According to the FBI, the investigation was opened to determine if CISPES had violated the Foreign Agents Registration Act, 22 U.S.C. § 611-621. The FBI closed the investigation in February 1982, but continued to collect information about CISPES from an informant who claimed that the group was involved in international terrorism. Under the auspices of its Counterterrorism Program, the FBI thereafter opened an international terrorism investigation in March 1983 pursuant to the Foreign Counterintelligence Investigations (FCI) Guidelines, during which it conducted surveillance of CISPES and allied groups. Finding no evidence to support the informant's claims, the FBI closed the investigation in June 1985.

In January 1988, the CISPES investigation was brought to public attention when the Center for Constitutional Rights released material it had obtained under the Freedom of Information Act (FOIA).[126] CISPES later alleged that the FBI investigated the group, its members, and affiliated groups solely because of its political views, and that the investigation violated the First Amendment and the constitutional rights of various individuals and organizations.[127]

After consultations with the Congress in early 1988, FBI Director William S. Sessions ordered an independent inquiry into the FBI's handling of the CISPES investigation to determine if the FBI had broken any laws, violated any Attorney General Guidelines or rules, regulations or policy, or used poor judgment in the course of the investigation. The inquiry also examined whether the requisite evidentiary threshold had been established to initiate the investigation, whether the investigation remained opened for the appropriate period of time, whether DOJ oversight was sufficient, whether the initial informant was reliable, and whether the FBI's practice of "indexing" information obtained from the investigation was proper.[128]

The FBI's May 27, 1988, report concluded that the FBI had conducted an appropriate investigation for the initial period, but that its objectives became overly broad when FBI Headquarters directed all offices to treat each of the estimated 180 chapters of CISPES as subjects of the investigation. The report also concluded that FBI Headquarters and the Dallas Field Office had inadequately supervised the investigation, principally by their failure to conduct a background check of the informant who prompted the investigation, failing to continually ensure that the informant was reliable and accurate, and failing to adequately supervise and direct the informant.[129]

With respect to the Attorney General's FCI Guidelines, the report found 31 separate violations, including:

- conducting inquiries beyond what was permitted without opening an investigation;

- receiving information about individuals' mail without obtaining proper authority; and

- initiating investigations without an adequate evidentiary predicate.[130]

The Senate's Select Committee on Intelligence also investigated the CISPES matter. On September 14, 1988, FBI Director Sessions told the Committee that "the investigation should never have been initiated," but denied that the FBI had acted illegally in conducting the inquiry.[131] Director Sessions notified the Committee that several agents had been disciplined and that internal procedures had been revised to ensure that such errors would not recur.[132]

Although the Senate Committee concluded that the FBI's CISPES investigation did not reflect "significant FBI political or ideological bias," it concluded that its activities "resulted in the investigation of domestic political activities protected by the First Amendment that should not have come under governmental scrutiny."[133] The Committee also stressed the key role FBI policy and, particularly, the Attorney General Guidelines play in constraining the FBI's investigative authorities:

Federal laws do not regulate most of the FBI's standard investigative methods, including

photographic and visual surveillance, trash checks, the use of informants and undercover agents, attendance at meetings and infiltration of groups, interviews of individuals and their employers and associates, and checks of various law enforcement, license, utility, and credit records. Investigations such as the CISPES case using these methods are governed by internal FBI policies and by guidelines issued by the Attorney General. Violations are normally punishable only by internal disciplinary action. The CISPES investigation demonstrated the vital importance of adherence to policies and guidelines that keep the FBI from making unjustified inquiries into political activities and associations.[134]

The controversy surrounding the CISPES investigation ultimately led to the establishment of a DOJ working group which proposed changes to the Attorney General's FCI Guidelines. Those revisions, which became effective in September 1989, provided more guidance to FBI field offices about reporting on international terrorism investigations.[135]

In the wake of the CISPES disclosures, the House Judiciary Committee asked the General Accounting Office (GAO) to review the FBI's international terrorism program. The GAO sampled closed cases and used a questionnaire to develop a profile of international terrorism cases. In its September 1990 report, "International Terrorism: FBI Investigates Domestic Activities to Identify Terrorists," the GAO found that:

- the FBI closed approximately 67 percent of its investigations because it did not develop evidence indicating that the subjects were engaging in international terrorist activities;

- United States citizens and permanent resident aliens were the subject of 38 percent of the 18,144 cases opened during January 1982 - June 1988;

- mosques were among the religious institutions targeted in the 1980s investigations; and

- the FBI monitored First Amendment-related activities in about 11.5 percent of those cases; indexed information about individuals who were not subjects of FBI investigations in about 47.8 percent of the cases; and indexed information about groups which were not subjects of the investigations in about 11.6 percent of the cases.[136]

However, the GAO stated that because it was not afforded access to full case files, it could not determine if the FBI violated First Amendment rights of the individuals and groups which were monitored or if the FBI had the requisite basis to monitor the activities of these individuals and groups. According to the GAO Report, while the FBI declined the opportunity to provide written comments on its report, "GAO discussed the report with FBI officials who generally agreed with the facts."[137]

In addition to the CISPES inquiry, another informant controversy arose in the late 1980s. After a 3-year investigation by the Department of Labor's Office of the Inspector General and DOJ into charges of labor fraud by Teamsters President Jackie Presser, the Department of Justice ended the investigation in the summer of 1985. At the time, Presser's uncle, Allen Friedman, and a Cleveland organized crime leader, John Nardi, Jr., had already been convicted of receiving unauthorized payments while serving as "ghostworkers" for the Teamsters. It later came to light that Presser's FBI contact agent or "handler," Robert S. Friedrick, admitted during an internal FBI investigation that Presser had been authorized by the FBI to employ the "no-show" employees.[138]

The decision to drop the Presser investigation prompted a congressional inquiry by the Senate Permanent Subcommittee on Investigations.[139] Following hearings, the Committee staff published a report that focused on whether DOJ was motivated by improper reasons not to prosecute Presser and what problems prompted the declination decision.[140] The Committee staff concluded that DOJ's decision not to prosecute "was based on its evaluation of the impact of the agents' authorization claims," but the report did not reach a conclusion as to the evidence that the agents' authorization statements were untrue.[141] The report noted that the Levi Guidelines made only passing reference to authorized criminal acts by informants or others. Those Guidelines provided that an informant

may not participate in criminal activities "except insofar as the FBI determines that such participation is necessary to obtain information needed for purposes of federal prosecution."[142] The report noted that the Civiletti Guidelines, by contrast, addressed the issue in some detail, requiring a written determination by an FBI supervisor that:

    a.  the conduct is necessary to obtain information or evidence for paramount prosecutive purposes, to establish and maintain credibility or cover with persons associated with criminal activity under investigation, or to prevent or avoid the danger of death or serious bodily injury; and

    b.  this need outweighs the seriousness of the conduct involved.[143]

Moreover, the Civiletti Guidelines required SAC approval for participation in "extraordinary" illegal activities, defined as those actions presenting a significant risk of "severe financial loss to a victim." DOJ stated that the basic agreement with Presser predated the Levi Guidelines and because there was no retroactive requirement to report either pre- or post-Guidelines authorization of illegal informant activity, there was no violation of DOJ or FBI policy embodied in the Guidelines.

The Committee staff also examined the role DOJ attorneys played in questioning Presser's handlers and their supervisors about Presser's informant relationship. Although DOJ was not at the time required either to approve or monitor the types of activities Presser was involved in, the Senate staff report expressed concern that the DOJ was not exercising adequate oversight of the FBI in informant matters.

## E.  The Reno Guidelines - 2001

On February 26, 1993, terrorists drove a truck loaded with explosives into a garage at the World Trade Center Tower in Manhattan, resulting in the death of 6 and injuring more than 1,000 people. On April 19, 1995, a massive fertilizer bomb destroyed the Alfred P. Murrah federal building in Oklahoma City, killing 168 people, including 19 children, and wounding 674 others. The terrorist attacks prompted renewed congressional concerns about the adequacy of the FBI's tools to prevent and detect terrorism. In 1995, a Subcommittee of the House Judiciary Committee held a hearing on terrorist threats.[144] In response to a suggestion by several lawmakers to rewrite the Attorney General Guidelines addressing domestic security investigations and terrorism, FBI Director Louis Freeh testified that the current Guidelines afforded the authorities and flexibilities needed to investigate terrorist groups.[145] FBI Director Freeh also testified that prior to the Oklahoma City bombing, he and Attorney General Reno discussed the "necessity of reviewing with an objective of changing the interpretation of the guideline to give [the FBI] not broader authority, but more confidence to use the authority already articulated in the guidelines."[146]

On November 1, 1995, the FBI circulated to each of its field offices the reinterpretation of the domestic security/terrorism investigations and preliminary inquiry provisions of the Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Domestic Security/Terrorism Investigations issued in March 1989, restating that the "reasonable indication" standard for opening a full investigation is "substantially lower than probable cause" and that a preliminary investigation could be opened on a lesser showing.[147] With respect to the initiation of domestic security investigations, the 1989 version of the Guidelines provided:

> A domestic security/terrorism investigation may be initiated when the facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of furthering political or social goals . . . through activities that involve force or violence and a violation of the criminal laws of the United States.

The FBI's practice had been to construe the "reasonable indication" standard as requiring evidence of an imminent violation of federal law. After the Oklahoma City bombing, the Guidelines were reinterpreted to justify the investigation of domestic groups that advocate violence provided that they have the ability to carry out violent acts that may violate federal law.[148]

The most extensive revisions to the Confidential Informant Guidelines occurred in January 2001, just before the end of Attorney General Reno's tenure. The Confidential Informant Guidelines had not been modified since Attorney General Civiletti issued the second set of Informant Guidelines in December 1980.

The Reno review of the Guidelines was spurred in large part by the FBI Boston Field Office's mishandling of informants James "Whitey" Bulger and Stephen "The Rifleman" Flemmi. In 1995, the Government indicted Bulger and Flemmi on multiple charges of racketeering, including acts of extortion, murder, bribery, loan sharking, and obstruction of justice.[149] Bulger was tipped off to his pending arrest and remains a fugitive on the FBI's Ten Most Wanted List. Flemmi allegedly was tipped off but was arrested, later pled guilty, and is in prison serving a life sentence. The FBI's relationship with both Bulger and Flemmi was not acknowledged by the Government until court proceedings following their initial indictment.[150]

We provide in Chapter Three a detailed description of the FBI's association with Bulger and Flemmi. Evidence presented during pretrial hearings in the Government's case against Flemmi revealed misconduct and criminal activity by the FBI agents who handled the two mobsters. For example, agents accepted money and exchanged presents with them, hosted them for dinners, and provided intelligence on planned law enforcement activity targeted at their criminal operations, including identifying the location of electronic surveillance and the identities of informants. In one case, agents told Bulger and Flemmi that another FBI informant had implicated them in a murder. The informant was killed as he exited a restaurant in South Boston approximately one week after his request to be placed in the Government's Witness Protection Program was denied. In another matter, agents intervened with prosecutors and succeeded in having Bulger and Flemmi omitted from upcoming indictments. Although other law enforcement agencies, such as the Massachusetts State Police and the federal Drug Enforcement Administration, had succeeded in charging other Winter Hill Gang members, Bulger and Flemmi's ability to evade prosecution for so many years raised suspicions that they were being protected by the FBI.

Following lengthy internal investigations by DOJ and FBI, charges were brought against two FBI agents who handled informants in the Winter Hill Gang. One FBI Special Agent, John Connolly, the principal handler of Bulger and Flemmi, was convicted in April 2002 of multiple counts of obstruction of justice and sentenced to 10 years in prison.[151] The other Special Agent, H. Paul Rico, died in jail prior to his trial on murder conspiracy charges.[152] In addition, approximately 20 civil suits have been brought against the FBI and several of its former agents based on the FBI's handling of Bulger and Flemmi. Many of these suits include claims for wrongful death brought by the families of victims who were murdered by Bulger and Flemmi.

As a result of the Bulger-Flemmi episode and other problem cases involving the FBI's operation of informants, DOJ formed a working group in 1999 to recommend revisions to the Confidential Informant Guidelines. The working group was initially chaired by Mary Jo White, then U.S. Attorney for the Southern District of New York, and later by Jonathan D. Schwartz, Principal Associate Deputy Attorney General, and included representatives of DOJ investigative agencies and federal prosecutors, including FBI Director Mueller, who was then serving as U.S. Attorney for the Northern District of California. The group met regularly for two years and submitted its recommended changes to Attorney General Reno.

In January 2001, DOJ issued revised Informant Guidelines superseding the 1980 Civiletti Guidelines. The changes included the following provisions:

- prohibiting federal prosecuting offices in specified circumstances from withholding informant information from the Department of Justice;

- prohibiting JLEAs from making promises of immunity to informants;

- establishing the Confidential Informant Review Committee to approve and monitor informants who are high level or long-term, or who are under the obligation of privilege or confidentiality or affiliated with the media;

- adding greater detail to informant instructions and requiring that several of them read verbatim to informants; and

- imposing notification and information-sharing requirements on JLEAs, such as the requirement to notify federal prosecutors in circumstances when an informant is the target of a federal investigation.[153]

Both the Informant Guidelines and Domestic Security Guidelines remained in place without further revision until the events of September 11, 2001, prompted the reexamination of the existing Guidelines which led to issuance of the revised Guidelines on May 30, 2002.

## IV. Conclusion

Several themes echo throughout the history of the evolution of the Attorney General's Investigative Guidelines that we found to be instructive in conducting this review.

First, Attorneys General and FBI leadership have uniformly agreed that the Attorney General Guidelines are necessary and desirable, and they have referred to the FBI's adherence to the Attorney General Guidelines as the reason why the FBI should not be subjected to a general legislative charter or to statutory control over the exercise of some of its most intrusive authorities.

Second, problems in the FBI's handling of informants or conducting undercover operations have occurred when field supervisors or FBI Headquarters, or both, failed to exercise appropriate oversight of field activities in accordance with the Guidelines.

Third, historically, the partnership between the FBI and DOJ in making key operational and oversight decisions has promoted adherence to the Attorney General Guidelines and allowed the Department to exercise critical judgments regarding sensitive FBI investigative activities, particularly with respect to its use of confidential informants and undercover operations.

Fourth, oversight by Congress has identified Guidelines violations and gaps in the coverage of the Guidelines.

Below we provide a timeline identifying the Attorney General Guidelines issued between 1976 and 2002, and the significant historical events associated with the revisions.

In the balance of our report, we present our findings with respect to the FBI's compliance with the May 2002 revisions to the Guidelines, mindful of their historical context and the lessons learned over the last 30 years.

### Timeline of Events Associated with the Attorney General Guidelines

*[Not Available Electronically]*

---

## Footnotes

25. The FBI's activities from 1936 to 1945 are described in the final report of the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, *Book II: Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-755, at 23-37 (1976) (hereafter "Church Committee, *Book II: Intelligence Activities and the Rights of Americans*").

26. 18 U.S.C. § 2385 (1952).

27. 18 U.S.C. § 2386 (1952).

28. Pub. L. No. 81-831, 64 Stat. 987 (1950) (codified as amended in 50 U.S.C. §§ 831-32; 834-35). The Supreme Court issued a series of decisions in the 1950s and 1960s examining the scope and constitutionality of some of the key federal statutes criminalizing subversive activities. Among the most significant cases were Dennis v. United States, 341 U.S. 494 (1951)(upholding constitutionality of the Smith Act); Service v. Dulles, 354 U.S. 363 (1957) (reversing Secretary of State's discharge of foreign service officer under the "McCarran Rider" to the Department of State Appropriation Act of 1947); Yates v. United States, 354 U.S. 298 (1957) (overturning convictions of Communist leaders, requiring that the government must show advocacy Activities Control Act); and Brandenburg v. Ohio, 395 U.S. 444 (1969) (striking down state syndicalism law). "of action and not merely abstract doctrine" under the Smith Act); Communist Party of the United Activities Control Act); and Brandenburg v. Ohio, 395 U.S. 444 (1969) (striking down state syndicalism law).

29. Annual Report of the Attorney General for Fiscal Year 1958, at 338. COMINFIL authorized the investigation of legitimate noncommunist organizations that the FBI suspected were being infiltrated by Communist influences.

30. The FBI investigated the activities of the NAACP and its members for 25 years and specifically targeted Dr. Martin Luther King, Jr. in attempts to neutralize his public appeal. The surveillance activity of Dr. King and the Southern Christian Leadership Conference (SCLC) spanned nearly five years from December 1963 until his death in April 1968. It included wiretaps of Dr. King's home telephone and the homes and offices of some of his advisers, wiretaps of the SCLC's telephone, hidden microphones in Dr. King's hotel rooms, and the use of FBI informants. Conducted under the FBI's investigative classification COMINFIL, the efforts to discredit Dr. King included efforts to cut off SCLC's funding sources, disrupt his marriage, undermine his efforts with foreign heads of state, and discredit him with the clerical and academic communities as well as the media. Church Committee, Book III, *Supplemental Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-75, at 79-184 (1976) (hereafter "Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*"). The Church Committee concluded that the investigation was "unjustified and improper." Id. at 85.

31. Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 239.

32. Liuzzo v. United States, 565 F. Supp. 640 (E.D. Mich. 1983).

33. Id. at 642.

34. Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 241. Liuzzo's heirs brought an unsuccessful civil suit against the Government under the Federal Tort Claims Act, 28 U.S.C. § 1291, et seq. The court rejected their claim, holding in Liuzzo v. United States, 565 F. Supp. 640, 646 (E.D. Mich. 1983), that the Government was not liable because the FBI agents who handled Rowe as an FBI informant acted reasonably and prudently. After an Alabama jury found the three Klansmen not guilty of murder, the Klansmen were convicted of violating Liuzzo's civil rights. See Liuzzo v. United States, 485 F. Supp. 1274, 1275-77 (E.D. Mich. 1980).

35. Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 243-44.

36. Id. at 243 (footnote omitted).

37. Id.

38. Id.

39. Id.

40. Id. at 239. The Church Committee's final report included a case study on Rowe, noting Attorney General Nicholas Katzenbach's strong defense of the FBI's use of informants (calling them "critical to the solution

of the three murdered civil rights workers") while at the same time acknowledged that an "effective informant program" may product what Attorney General Katzenbach termed "disruptive results." Id. at 240.

41. Id. at 244.

42. Id. at 244 (footnote omitted). Rowe also testified before the Church Committee. See Intelligence Activities: Hearings on S. Res. 21 Before the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities of the United States, 94th Cong., *Vol. 6: Federal Bureau of Investigation*, at 107-32 (1976) (hereafter "Church Committee, *Vol. 6: Federal Bureau of Investigation*) (statement of Gary Thomas Rowe).

Rowe was also present when Walter Bergman, one of the "Freedom Riders," was attacked and severely beaten by a mob in Birmingham, Alabama in 1961. Bergman brought a civil suit seeking damages under the Federal Tort Claims Act, successfully maintaining that the FBI violated its common law and statutory duties by ignoring credible threats of violence and failing to report them to the Department of Justice until four days after the events. A federal district court upheld two of three theories of liability advanced by Bergman in resolving the "question of the government's responsibility to give effect and meaning to our system of laws, and protect those who sought to exercise their rights of free action." Bergman v. United States, 565 F. Supp. 1353, 1415 (W.D. Mich. 1983). See also Bergman v. United States, 551 F. Supp. 407 (W.D. Mich. 1982); Bergman v. United States, 579 F. Supp. 911 (W.D. Mich. 1984); and Bergman v. United States, 648 F. Supp. 351 (W.D. Mich. 1986), aff'd, 844 F.2d 353 (6th Cir. 1988). Rowe's December 1975 testimony before the Church Committee that he was an FBI informant at the time of the beatings and had told the FBI of the expected attack three weeks before it took place, was referenced in the court's opinion in Bergman v. United States, 565 F. Supp. at 1382-85, 1392. Rowe wrote an account of the Freedom Riders incident in his autobiography, *My Undercover Years with the Ku Klux Klan* (Bantam Books 1976).

43. Church Committee, *Vol 6: Federal Bureau of Investigation*, at 1-2 (statement of Chairman Frank Church).

44. Church Committee, *Book II: Intelligence Activities and the Rights of Americans*, at 6.

45. Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 3 (citation omitted).

46. The Church Committee held hearings on the FBI's role in COINTELPRO in November and December 1975. The body of its publicly released work included 1) an interim report with findings on the United States' involvement in assassination plots against foreign leaders; 2) seven volumes of public hearings; and 3) seven additional "Books" on various topics, including *Book II, Intelligence Activities and the Rights of Americans* (April 26, 1976), and *Book III, Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans* (April 23, 1976).

47. Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 229-30 (footnotes omitted).

48. Church Committee, *Book II: Intelligence Activities and the Rights of Americans* at 293-94.

49. *Legislative Charter for the FBI*: Hearings on H.R. 5030 Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 96th Cong. 1 (1980) (hereafter "*1979-1980 House FBI Charter Bill Hearings*"); *Law Enforcement Undercover Activities*: Hearings Before the Senate Select Committee to Study Law Enforcement Undercover Activities of Components of the Department of Justice, 97th Cong. 1041 (1982) (hereafter "*1982 Senate Select Committee Hearing on Law Enforcement Undercover Activities*") (statement of William H. Webster, Director, FBI).

A major reform that emerged from the Church Committee was passage of the Foreign Intelligence Surveillance Act of 1978 (FISA), Pub. L. No. 95-511, 92 Stat. 1783 (codified at 50 U.S.C. § 1801-11 (1994 & Supp. IV 1998), amended by Act of Dec. 3, 1999, Public L. No. 160-120, 113 Stat. 1606)), which was signed into law by President Carter on October 24, 1978.

50. *1979-1980 House FBI Charter Bill Hearings* 3-15 (Testimony of Benjamin R. Civiletti, Attorney General,

and William Webster, FBI Director). The Senate's bill was S. 1612, The Federal Bureau of Investigation Charter Act of 1979, 96th Cong. (1979), reprinted in *FBI Charter Act of 1979, S.1612: Hearings on S. 1612 Before the Senate Committee on the Judiciary*, 96th Cong. pt. 2, 427 (1980). Section 537 of the bill authorized the FBI Director to impose fines up to $5,000 on agents who willfully abused "sensitive investigative techniques," which included misuse of informants or intrusive surveillance authorities. Id. at 469.

51. *1979-1980 House FBI Charter Bill Hearings*, at 3 (Statement of Benjamin R. Civiletti, Attorney General).

52. Id. at 7.

53. The Levi Guidelines can be found at *FBI Statutory Charter:* Hearings Before the Senate Committee on the Judiciary, 95th Cong. pt. 1, 20-26 (1978) (hereafter "*1978 Senate Hearings on FBI Statutory Charter Part I*") and in *FBI Oversight:* Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Judiciary Committee on the Judiciary, 95th Cong. 181-87 (1978).

Today, the FBI includes a reference to the Levi Guidelines on its history timeline as one of only 12 key events in the 1970s. See www.fbi.gov/fbihistory.htm.

54. *FBI Oversight:* Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong. 257 (1976) (hereafter "*1976 House FBI Oversight Hearing*") (testimony of Edward H. Levi, Attorney General, Department of Justice). A second set of Guidelines issued by Attorney General Levi governed the FBI's authority to investigate groups it suspected of links to foreign powers. The Attorney General's Guidelines for Foreign Counterintelligence Investigations (FCI) are classified. Today, these authorities are set forth in the Attorney General's Guidelines for FBI National Security Investigations and Foreign Intelligence Collection (NSI Guidelines). The unclassified portions are available at: http://www.usdoj.gov/olp.

55. 1978 Senate Hearings on FBI Statutory Charter Part 1 at 20 (Levi Guidelines § II.A). Although titled the "Domestic Security Investigation Guidelines," the Levi Guidelines governed not only investigations of domestic security threats, but the FBI's general criminal investigative authorities.

56. Id. at 22 (Levi Guidelines § II.I).

57. The Levi Informant Guidelines can be found at Final Report of the Select Committee to Study Undercover Activities of Components of the Department of Justice, S. Rep. No. 97-682, at 531-35 (1983) (hereafter "*1982 Final Report of the Senate Select Committee to Study Undercover Activities*").

58. Id. The Guidelines "were intended, in part, to diminish the perceived need for legislation to regulate and restrict the FBI's use of informants." See generally United States v. Salemme, 91 F. Supp. 2d 141, 190-91 (D. Mass. 1999).

59. According to the Church Committee, on December 23, 1974, FBI Headquarters sent employee conduct standards to all FBI field offices. The communication stated: "You are reminded that these instructions relate to informants in the internal security [domestic, intelligence] field and no informant should be operated in a manner which would be in contradiction of such instructions." Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 267. According to the Church Committee report, this instruction was the only written provision applying FBI employee conduct standards to informants. Prior to the issuance of this instruction in 1974, there were no formal or specific provisions relating to informant conduct in FBI directives. Id.

60. *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 531 (Levi Informant Guidelines, Introduction).

61. Id.

62. *1976 House FBI Oversight Hearing*, at 258.

63. Under the Levi Informant Guidelines, the FBI was merely required to notify DOJ if a confidential informant violated the law in furtherance or unconnected to an FBI assignment when notification to local authorities

was inadvisable due to "exceptional circumstances."

As we discuss in Chapters Three and Seven, since the Confidential Informant Guidelines were revised in January 2001, the decision to approve a high level, long-term, or a privileged or media-affiliated confidential informant is made by the joint FBI-DOJ Confidential Informant Review Committee (CIRC).

64. *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 533 (Levi Informant Guidelines § C.2). When an informant violated the law, and notification to local authorities was inadvisable due to "exceptional circumstances", the DOJ determined when law enforcement or prosecutive authorities should be notified; what use, if any, should be made of the information gathered; and whether the FBI should continue using the informant. Id. at 533-34 (Levi Informant Guidelines § C).

65. Report of the Subcommittee on Security and Terrorism, 98th Cong., *Impact of Attorney General's Guidelines for Domestic Security Investigation (The Levi Guidelines)* 5 (Comm. Print 1984) (hereafter "*Impact of the Levi Guidelines*"). The most significant drop occurred prior to the issuance of the Levi Guidelines, a development which the Subcommittee indicated was due in part to the fact that "the FBI was reducing its domestic security work for some time before the Guidelines were imposed." Id. From March 31, 1976, to February 24, 1978, the number of domestic security investigations dropped from 4,868 to 102. Id.

66. *1979-1980 House FBI Charter Bill Hearings*, at 4 (Statement of Benjamin R. Civiletti, Attorney General, Department of Justice).

67. *Impact of the Levi Guidelines*, supra n.65, at 9.

68. Attorney General's Guidelines on FBI Use of Informants and Confidential Sources (hereafter "*Civiletti Informant Guidelines*") can be found at *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 517-30.

69. *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 523 (Civiletti Informant Guidelines § F.2).

70. Id. at 523 (Civiletti Informant Guidelines § F.3).

71. Id.

72. Id. at 524-25 (Civiletti Informant Guidelines § G).

73. Id. at 526.

74. Id. at 520 (Civiletti Informant Guidelines § L). In a memorandum explaining the Civiletti Guidelines, Director Webster stated that this provision was added merely to assist the prosecutor "in protecting the identity of our informants" and "should not be construed as the development of a partnership between the FBI and USDOJ in operating out informants." See Staff Study: *Overview of Government's Handling of Jackie Presser Investigation*, Permanent Subcommittee on Investigations of the Committee on Governmental Affairs (May 9, 1986) (hereafter "*Senate Staff Study on Jackie Presser Investigation*"), reprinted in *Department of Justice's Handling of the Jackie Presser Ghostworkers Case:* Hearing Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 99th Cong. 105-106 (1986) (hereafter "*Senate Subcommittee Hearing on the Jackie Presser Ghostworkers Case*").

75. *1983 Final Report of the Senate Select Committee to Study Undercover Activities*, at 521 (Civiletti Informant Guidelines § E).

76. For a discussion of the techniques used in ABSCAM, see United States v. Kelly, 707 F.2d 1460 (D.C. Cir.) (per curiam), cert. denied, 464 U.S. 908 (1983).

77. United States v. Kelly, 707 F.2d 1460 (D.C. Cir. 1983) (per curiam), rev'g 539 F. Supp. 363 (D.D.C. 1982), cert. denied, 464 U.S. 908 (1983); United States v. Williams, 705 F.2d 603 (2d Cir.), cert. denied, 464 U.S. 1007 (1983); United States v. Myers, 692 F.2d 823 (2d Cir. 1982), cert. denied sub. nom. Lederer v.

United States, 461 U.S. 961 (1983); United States v. Alexandro, 675 F.2d 34 (2d. Cir.), <u>cert. denied</u>, 459 U.S. 835 (1982); United States v. Jannotti, 673 F.2d 578 (3d Cir. 1982) (en banc), <u>rev'g</u>, 501 F. Supp. 1182 (E.D. Pa. 1980), <u>cert. denied</u>, 457 U.S. 1106 (1982).

78. See, e.g., United States v. Jannotti, 673 F.2d at 612, 613-14 (Aldisert, J., dissenting); United States v. Kelly, 539 F. Supp. at 373-74 & n.45.

79. The Civiletti Undercover Guidelines can be found at *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 536-55. Attorney General Civiletti retained the Levi Domestic Security Guidelines but issued a revision on December 2, 1980, called "The Attorney General's Guidelines on Criminal Investigations of Individuals and Organizations." The revisions distinguished between general crimes investigations and "racketeering enterprise investigations", whose "immediate purpose" is to "obtain information concerning the nature and structure of the enterprise . . . with a view to the longer range objective of detection, prevention, and prosecution of the criminal activities of the enterprise." *1982 Final Report of the Senate Select Committee to Study Undercover Activities* at 515 (Civiletti General Crimes Guidelines § II.C).

80. *FBI Undercover Operations*, Report of the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 98th Cong. (1983) (hereafter "*1983 House Subcommittee Report on FBI Undercover Operations*"). The hearings are reported at *FBI Oversight:* Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 96th Cong. (1980); *FBI Undercover Guidelines:* Oversight Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 97th Cong. (1981) (hereafter "*1981 House Oversight Hearings*"); *FBI Undercover Operations:* Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 97th Cong. (1983) (hereafter "*1982 House Subcommittee Hearings*"); *FBI Undercover Activities, Authorization, and H.R. 3232:* Oversight Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 98th Cong. (1983).

81. *1981 House Oversight Hearings*, at 2-7; 33-48 (statements of Professor Goeffrey R. Stone, Univ. of Chicago Law School, and Gary T. Marx, Professor of Sociology, MIT).

82. *1981 House Oversight Hearings.*

83. *1982 House Subcommittee Hearings* at 1-35.

84. Id. at 402.

85. *1982 Final Report of the Senate Select Committee to Study Undercover Activities, at 4-5.*

86. Id. at 11. The Committee observed that undercover operations "have substantially contributed to the detection, investigation, and prosecution of criminal activity, especially organized crime and consensual crimes such as narcotics trafficking, fencing of stolen property, and political corruption." Id.

87. Id. at 54.

88. Id. at 55.

89. Id. at 53.

90. Id. at 25.

91. Id. at 23-29; *1984 House Subcommittee Report on FBI Undercover Operations*, at 9-11.

92. *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 377-78.

93. *1984 House Subcommittee Report on FBI Undercover Operations*, at 7.

94. Id. at 55.

95. Id. at 7.

96. Id.

97. Id. at 8.

98. Id.

99. Id. at 74.

100. Id. at 8-9.

101. *Attorney General's Guidelines for Domestic Security Investigations (Smith Guidelines):* Hearings Before the Subcommittee on Security and Terrorism of the Senate Committee on the Judiciary, 98th Cong. 1 (1983) (hereafter "*1983 Senate Subcommittee Hearings on Smith Guidelines*").

102. Id. at 5 (statement of Senator John P. East, Member, Committee on the Judiciary).

103. *Impact of the Levi Guidelines*, supra n.65, at 29, 34-35.

104. Id. at 35.

105. Press Release, Department of Justice (March 7, 1983), reprinted in *1983 Senate Subcommittee Hearing on Smith Guidelines* at 47. The Smith Guidelines can be found at *FBI Domestic Security Guidelines: Oversight Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary*, 98th Cong. 67-85 (1983) (hereafter "*1983 House Oversight Hearings on Domestic Security Guidelines*").

106. Press Release, Department of Justice (March 7, 1983), reprinted in *1983 Senate Subcommittee Hearing on Smith Guidelines*, at 47.

107. Id. at 48.

108. Id.

109. *1983 House Oversight Hearings on Domestic Security Guidelines*, at 75 (Smith Guidelines § III). There were two types of criminal intelligence investigations depending on the objective of the enterprise: a racketeering enterprise investigation and a domestic security/terrorism enterprise investigation.

110. Id. at 80 (Smith Guidelines § III.B.2). The Smith Guidelines brought the Civilette Guidelines' category of "racketeering enterprise investigations" under the rubric of "criminal intelligence investigations." Id. at 76 (Smith Guidelines § III.A).

111. Id. at 81 (Smith Guidelines § III.B.3).

112. *1983 Senate Subcommittee Hearing on Smith Guidelines*, at 13.

113. *1983 House Oversight Hearings on Domestic Security Guidelines*, at 79 (Smith Guidelines § III.B.1).

114. Don Edwards, Chairman of the House Subcommittee on Civil and Constitutional Rights, and others continued to urge the passage of restrictive charter legislation for the FBI after the Smith Guidelines were issued. See Letter to The Honorable William H. Webster, April 12, 1983, reprinted in *1983 Oversight Hearings on Domestic Security Guidelines*, at 141-144.

115. *1983 House Oversight Hearings on Domestic Security Guidelines*, at 82 (Smith Guidelines § III.B.4.d).

116. Id. at 71 (Smith Guidelines § II.B and III.B). According to a 1976 GAO report, preliminary inquiries were used to open investigations of all black student leaders and in other political intelligence investigations in the 1960s. See General Accounting Office, FBI Domestic Intelligence Operations: Their Purpose and Scope: Issues That Need to be Resolved, GGD-76-50 (Feb. 24, 1976).

117. *1983 House Oversight Hearings on Domestic Security Guidelines*, at 71 (Smith Guidelines § II.B.3).

118. Id. at 82 (Smith Guidelines § IV.A).

119. Id. at 83 (Smith Guidelines § IV.B.3).

120. Leslie Maitland, *Eased F.B.I. Curbs Touch Off Dispute*, The New York Times, May 14, 1983, § 1 (remarks by Rep. Don Edwards, Chairman, Subcommittee on Civil and Constitutional Rights, House Committee on the Judiciary).

121. The OPEA report, *FBI Undercover Operations in Criminal Matters*, made recommendations to refine the FBI's undercover training program, improve agent selection, initiate a debriefing program for lengthy undercover operations, improve national coordination of operations, and increase the fiscal flexibility for undercover operations.

122. See *Undercover Operations Act:* Hearing Before the Senate Subcommittee on Criminal Law of the Senate Committee on the Judiciary, 98th Cong. 9 (1984). The bill was never brought to a vote.

123. See id. at 173-77.

124. Id. at 175-76. With the exception of a number of modifications to the Undercover Guidelines that were made in 1992 by Attorney General William Barr, the Guidelines were not changed again until the May 2002 revisions described infra in Chapter Four. The 1992 revisions included changes to the definition of certain "sensitive circumstances," limited the applicability of the Guidelines to only those cases where an undercover agent was involved, authorized SACs to delegate approval authority to designated ASACs, and allowed SACs to authorize nonsensitive UCOs for up to one year.

125. Senate Select Committee on Intelligence, 101st Cong., *The FBI and CISPES* 11 (Comm. Print 1989) (hereafter *"The FBI and CISPES"*. At the time of the CISPES investigation, the FBI's authorities were governed by the Attorney General's Foreign Counterintelligence Guidelines. Id.

126. Id. at 15.

127. Committee in Solidarity With The People of El Salvador (CISPES) v. Sessions, 929 F.2d 742, 743-44 (D.C. Cir. 1991).

128. General Accounting Office, *International Terrorism: FBI Investigates Domestic Activities to Identify Terrorists*, (hereafter "GAO Report, *International Terrorism: FBI Investigates Domestic Activities to Identify Terrorists*") GAO/GGD-90-112, at 28 (Sept. 7, 1990), available at http://161.203.16.4/d22t8/142382.pdf.

129. *The FBI and CISPES* at 58.

130. Id. at 6, 89-91, 101, 120.

131. Id. at 103.

132. Id.

133. *The FBI and CISPES* at 3, 103. The Committee report that concluded:

"(T)he FBI's international terrorism investigation of CISPES was initiated primarily on the basis of allegations that should not have been considered credible; it was broadened beyond the scope justified even by those allegations; and it continued after the available information had clearly fallen below the standards required by the applicable guidelines."

Id. at 1.

134. *The FBI and CISPES* at 12.

135. The Guidelines revisions issued in March 1989 were relatively minor. They clarified that the use in preliminary inquiries of investigative techniques that require approval by a Supervisory Special Agent (SSA) must comply with the Guidelines' provisions that govern investigative techniques generally,

authorized criminal intelligence investigations against enterprises engaged in narcotics trafficking, and specified that the use of trap and trace devices and access to stored wire and electronic communications and transactional records must be in accordance with Title 18 of the U.S. Code. The revisions were entitled, "The Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Domestic Security/Terrorism Investigations."

136. GAO Report, *International Terrorism: FBI Investigates Domestic Activities to Identify Terrorists*, supra n.128, at 3.

We discuss in Chapter Five our concerns about the FBI's current inability to track the utilization of its broad authorities under Part VI of the General Crimes Guidelines, including its authority to visit public places and attend public events for the purpose of detecting or preventing terrorist activities.

137. Id. at 5.

138. United States v. Friedrick, 842 F.2d 382, 385 (D.C. Cir. 1988) (affirming suppression of statements made to DOJ attorneys in prosecution for false statements in previous interviews). Friedrick subsequently recanted his admission that the FBI had authorized the "no show" employees. The FBI's OPR later concluded that Friedrick had concocted the authorization defense after the fact to protect Presser as a valued informant. Id. at 388.

139. *Senate Subcommittee Hearing on the Jackie Presser Ghostworkers Case.*

140. *Senate Staff Study on Jackie Presser Investigation*, supra n.74.

141. Id. at 87.

142. Id. at 101 (internal quotes omitted).

143. Id. (citing the Civiletti Informant Guidelines).

144. *Combating Domestic Terrorism:* Hearing before Subcommittee on Crime of the House Judiciary Committee, 104th Cong. (1996) (hereafter "*1995 House Subcommittee Hearing*").

145. *1995 House Subcommittee Hearing*, at 13.

146. Id. at 27.

147. *Advice to Field Offices Regarding Domestic Security/Terrorism Investigations and Preliminary Inquiries Under the Attorney General's Guidelines on General Crimes, Racketeering and Doemstic Security/Terrorism Investigations*, November 1, 1995.

148. Id.

149. United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999).

150. Id. at 303.

151. United States v. Connolly, 341 F.3d 16, 21 (1st Cir. 2003).

152. J.M. Lawrence, *At 78, Rico Dies Under Gaurd: Former G-Man Was To Be Tried for Murder*, Boston Herald, Jan. 18, 2004.

153. See Department of Justice Guidelines Regarding the Use of Confidential Informants (January 8, 2001), available at http://www.usdoj.gov/ag/readingroom/ciguidelines.htm. The House Committee on Government Reform held hearings in 2001 and 2002 on the FBI's use of informants in New England, leading to issuance of a report in 2004 entitled, *Everything Secret Degenerates: The FBI's Use of Murderers as Informants*, H. Rep. No. 108-414, 108th Cong. (2004), available at http://www.gpo.gov/hreports/108-414.html. We address the Boston informant matters in the next chapter.

◀ Previous | Table of Contents | Next ▶

# EXHIBIT C

NEUROPSYCHOLOGY WISDOM, PLLC
INDEPENDENT MEDICAL EXAMINATION

Name: Shockmain Davis
Date of Birth (Age): 08/20/1977 (40 years old)
Handedness: Right
Examiner: Nick Wisdom, Ph.D., ABPP/CN

Date of Evaluation: 04/02/2018
Education: 15 years
Race: African-American
Interviewed: Player & Spouse

**IMPAIRMENT RATING: Invalid**

**BACKGROUND:**

*Referral Information:*
Mr. Davis played as a wide receiver and return specialist in the National Football League for one year (2000) with the New England Patriots. He also played for one season in NFL Europe in 2006. He was referred for this neuropsychological evaluation as required by the NFL Players' Concussion Injury Litigation Class-Action Settlement.

*Current Living Situation:*
Mr. Davis resides with his wife of 14 years and their twin daughters in Baytown, Texas. Mr. Davis also has a daughter from a previous relationship that he sees regularly.

*NFL Concussion History:*
Mr. Davis began playing tackle football at nine years of age and over the course of his career he has experienced "hundreds" of collisions that resulted in him seeing stars, feeling dizzy, or forgetting brief periods of time. The first of such collisions he recalled during the interview occurred during training camp his rookie year (2000). He was involved in a tackling drill and he struck a large linebacker resulting in immediate disorientation. Upon standing, Mr. Davis was dazed, disoriented, and "just out there." He returned to practice, but was much more cautious as he continued to "feel a little off." Another event occurred in 2000 in a Thanksgiving game against the Detroit Lions. Mr. Davis was setting a block when the opposing safety made a helmet-to-helmet collision with him unexpectedly. He remembers most of the events leading up to the collision, but very little thereafter despite returning to play. He vaguely recalls feeling happy that there was a TV timeout after the hit as it gave him time to get his bearings without having to alert the coaches and training staff. He denied experiencing any persisting symptoms. Finally, during an NFL Europe game, Mr. Davis sustained a collision that possibly resulted in a brief loss of consciousness. He caught a pass while falling backward and his head struck an opposing player's knee. He reportedly blacked out for a few seconds although Mr. Davis acknowledged that he was not sure if he lost consciousness. He was assisted off the field by trainers and was instructed to remain on the sideline until his dizziness subsided; Mr. Davis did not return to play in the game.

*Presenting Concerns:*
Cognitive: Since 2000, Mr. Davis has noticed his memory and attention have progressively worsened. He stated that he often dazes off or blanks out resulting in him either missing important information from conversations or forgetting appointments later on as he is distracted. For example, when driving he occasionally experiences these lapses in attention and will miss turns for several miles before realizing he has zoned out. He denied any difficulty with navigating/driving in areas around his home, but did describe one instance in which he got lost driving in an area of Houston that he should have known well. His wife helps him manage all of

his appointments and sends him reminders as needed. His wife manages the household finances, a task she has always done, but he denied any trouble with handling small purchases using a bankcard. Mr. Davis still helps with cleaning up clutter around the house and taking the trash out although his wife has to remind him which days are the trash pickup days.

Mood: Mr. Davis reported experiencing depressed mood and loss of interest in previously enjoyed activities. He reported having a lot of guilt regarding the end of his football career as he was not the "ticket out" of poverty for his family like he originally was anticipating. He also reported feeling irritable and angry towards his family and acknowledged that he "snaps at [his] wife and kids" for seemingly minor infractions. He also reported feeling fatigued and sluggish throughout the day which he attributed to ruminating all night and diminished quality of sleep. Finally, he reported having passive suicidal ideation over the past several years without a plan or intent.

Physical: Mr. Davis reported having headaches that can linger for several weeks at a time. His headaches are exacerbated by stress and can range anywhere from a 3 to a 10 on a 1-10 pain scale. He has found that lying down in the dark or decreasing his stress helps him cope. He also reported having chronic pain bilaterally in his knees and shoulders which he manages with over-the-counter Aleve/Advil and getting extra sleep.

*Collateral Informant (Clinical Dementia Rating Worksheet):*
Mr. Davis' wife was interviewed, after receiving his permission, and her responses were used to complete the CDR worksheet. Overall, CDR findings are generally consistent with a level 1.0.

- Community Affairs (rating = 0.5): Reportedly was sometimes having difficulty with work because of headaches and forgetfulness. No difficulties noted with driving. He can sometimes shop independently although will frequently call her to ask about things he may have forgotten. He is no longer engaged in many activities outside of the home. She stated a casual observer would not think that he was ill.

- Home and Hobbies (rating = 1.0): Reportedly no longer involved in many home activities or hobbies. She stated he needs reminders about things he previously managed without error including locking doors, setting the house alarm, and taking out the trash. She indicated he appears to fall into a daze at times, but otherwise attributed his poor household management to amotivation, depression, and apathy.

- Personal Care (rating = 0): No concerns noted.

Academic History:
Mr. Davis was born and raised in Port Arthur, Texas and was reportedly a "pretty good student" in school. He denied any history of diagnosed learning disabilities or having to repeat any grades. He attended Blinn Junior College for two years and then transferred to Angelo State where he was considered a senior by credit hours when he left to pursue his career in the NFL.

Employment History:
Following his career in the NFL, Mr. Davis was briefly employed as a general laborer in a chemical plant warehouse. He discontinued working after six months because he was having difficulty remembering things related to his job including the location of materials and the meaning behind certain chemical

labels. Over the past 10 years, Mr. Davis has worked as an independent personal trainer for teenagers. He works anywhere between 20 – 60 hours of work per week depending on his schedule and availability of clients. He acknowledged he has been having difficulty at work including forgetting training techniques and expressing frustration with clients.

*Personal and Family Medical History:*
Relevant medical history reported by Mr. Davis includes the aforementioned chronic pain and migraines. He also reported breaking his right fibula twice (2003 and 2005) in addition to tearing his ACL (2006). He is not prescribed any medications and takes over-the-counter Advil or Aleve for pain management as needed. Family medical history is noteworthy for holism, hypertension, and Hodgkin's lymphoma in first-degree relatives. He denied any known history of neurodegenerative illness in his immediate or extended family.

*Psychiatric History:*
Mr. Davis denied any history of receiving treatment from mental health providers.

*Substance Use History:*
Mr. Davis reportedly smokes one cigar per week and denied use of any other tobacco products. He also consumes two alcoholic beverages approximately once per week and denied any history of adverse medical, legal, financial, or social consequences. He also denied any history of illicit substance use.

**BEHAVIORAL OBSERVATIONS:**
Mr. Davis was on time for his appointment and was accompanied by an assistant which the examiner mistakenly thought was his wife for the beginning of the exam. He was casually dressed and appeared on par for his age. He ambulated without assistance or apparent difficulty. He understood the purpose of the evaluation and provided written consent without any concerns. Mr. David could not remember the exact date, but was otherwise oriented to person and place. Rate, rhythm and prosody of speech were within normal limits and language was conversationally intact. Mr. Davis presented in a euthymic mood with congruent affect throughout the evaluation. There was no evidence of delusional thinking or responding to internal stimuli. Vision and hearing were adequate for testing purposes.

**TEST RESULTS:**
Note: T scores were obtained using the Advanced Clinical Solutions software in addition to <u>Revised Comprehensive Norms for an Extended Halstead-Reitan Battery.</u> Impairment ratings were determined following the guidelines detailed in <u>Qualified BAP Clinician's Interpretation Guide</u>.

**Performance Validity Testing:**

| Test | Classification |
|---|---|
| ACS Performance Validity Profile Analysis | Suboptimal* |
| Test of Memory Malingering | Suboptimal* |
| Word Memory Test | Suboptimal* |

Mr. Davis demonstrated suboptimal effort across all embedded and standalone measures of performance validity. As such, the following scores represent his minimal capabilities only.

**Premorbid Estimation of Intelligence:**
Mr. Davis' premorbid level of intelligence is estimated to fall in the **Below Average** range based on his TOPF Word Reading Score (Raw Score = 22; Standard Score = 79) and his demographic background using the complex demographic model (Predicted Full Scale IQ = 86).

**Complex Attention:**
Mr. Davis completed 6 WAIS-IV subtests which comprise domains of complex attention/processing speed.

| WAIS-IV Subtest | Raw Score | T Score (Mean = 50, SD = 10) |
|---|---|---|
| WAIS-IV Digit Span | 16 | T = 29 |
| WAIS-IV Arithmetic | 7 | T = 27 |
| WAIS-IV Letter Number Sequencing | 14 | T = 36 |
| WAIS-IV Coding | 32 | T = 29 |
| WAIS-IV Symbol Search | 15 | T = 34 |
| WAIS-IV Cancellation | 18 | T = 32 |

**Executive Functioning:**
Mr. Davis completed 4 measures of executive functioning.

| Test | Raw Score | T Score (Mean = 50, SD = 10) |
|---|---|---|
| F-A-S Verbal Fluency | 18 | T = 30 |
| Trails B | 147 | T = 34 |
| Booklet Category Test | 107 | T = 27 |
| WAIS-IV Similarities | 14 | T = 31 |

**Learning and Memory:**
Mr. Davis completed 6 measures of learning and memory from the Wechsler Memory Scale - fourth edition (WMS-IV).

| Test | Raw Score | T Score (Mean = 50, SD = 10) |
|---|---|---|
| WMS-IV Logical Memory I | 10 | T = 29 |
| WMS-IV Logical Memory II | 3 | T = 23 |
| WMS-IV Verbal Paired Associates I | 12 | T = 32 |
| WMS-IV Verbal Paired Associates II | 4 | T = 35 |
| WMS-IV Visual Reproduction I | 30 | T = 40 |
| WMS-IV Visual Reproduction II | 8 | T = 32 |

**Language Functioning:**
Mr. Davis completed 3 measures of language functioning.

| Test | Raw Score | T Score (Mean = 50, SD = 10) |
|---|---|---|
| Boston Naming Test: | 45 | T = 36 |
| Category Fluency (Animal Naming) | 9 | T = 25 |
| BDAE Complex Ideational Material | 10 | T = 33 |

**Visual Perceptual Functioning:**
Mr. Davis completed 3 measures of visual-perceptual functioning.

| Test | Raw Score | T Score (Mean = 50, SD = 10) |
|---|---|---|
| WAIS-IV Block Design | 20 | T = 36 |
| WAIS-IV Visual Puzzles | 7 | T = 32 |
| WAIS-IV Matrix Reasoning | 11 | T = 41 |

**Objective Personality/Emotional Functioning:**

Objective personality testing was completed with the MMPI-2-RF.  Mr. Davis also completed a structured psychiatric interview.

*Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF)*

> Mr. Davis' MMPI could not be interpreted as it is considered invalid due to significant symptom over endorsement detected across several symptom validity indicators.

*Mini International Neuropsychiatric Inventory (MINI)*

> Likewise, Mr. Davis reported experiencing nearly every symptom on the MINI screening and each of the respective modules and is also considered invalid.

**IMPAIRMENT SUMMARY:**
Mr. Davis demonstrated suboptimal performance across all embedded and standalone measures of performance validity.  Importantly, invalid performance during this evaluation does not preclude the possibility of genuine cognitive decline.  Therefore, findings from the current evaluation cannot be used to accurately substantiate nor repudiate any putative level of cognitive impairment.  His scores during this evaluation represent his minimal capabilities only and should not be used to determine a disability rating. Per the Qualified BAP Clinician's Interpretation Guide, Mr. Davis' overall impairment rating is **Zero**.

**RECOMMENDATIONS:**
It is recommended Mr. Davis participate in a follow-up neuropsychological evaluation if he experiences any decline in his cognitive or functional abilities. Future testing can be compared to this estimate of his minimal capabilities to better identify any possible stability, improvement, or decline.

Nick Wisdom, PhD, ABPP
Board Certified Clinical Neuropsychologist

1300 Bay Area Blvd., Suite B150-15
Houston, Texas 77059
(832) 970-0962
nicholasmwisdom@gmail.com

# EXHIBIT D

## AFFIDAVIT OF SHARON DELANEY

**STATE OF TEXAS**
**COUNTY OF HARRIS**

I, SHARON DELANEY, who upon being sworn do hereby depose and state:

1.   My name is SHARON DELANEY, I am over 18 years of age, I reside at 202 Plaza

Verde Drive, Suite A11, Houston, Texas, and am competent for all legal purposes. Attached is

my Texas Driver's License.

2.   I make this Affidavit based upon my own personal knowledge in involvement in the

subject matter.

3.   I have been involved in the NFL clams processing since 2014 and have effectively

represented 187 NFL claimants with a number of them receiving a Notice of Monetary Award

Claim Determination. I am an effective advocate providing comprehensive on-call services to

retired NFL players regarding their concussion claims and am readily available for any other

client needs. Consequently, because my costs are low and my services are excellent, I am

apparently a threat to others who are paid for representing NFL claimants, and to the NFL itself,

who has to pay the represented claimants.

4.   Consistent with his threat, unknown and unnoticed to me, my name has been placed in

an audit of pre-claim medical evaluations by a law firm that has never submitted those

evaluations. The placement of my name in this audit could have only come from two sources.

One is Shenaq, P.C., who has worked extensively with Dr. Wisdom, and would have had direct

or indirect access to the medical evaluation on Shockmain Davis and Gregory Randall. And, the

only other person would be Dr. Wisdom, himself.

5.    The actual statement in Dr. Wisdom's evaluation of Mr. Davis verifies that there was no misrepresentation by me, but rather a short-term mistake by the evaluator. This mistake was insidiously twisted to appear as my intentional and fraudulent misrepresentation of being the wife of Shockmain Davis. This is dissembling of the medical evaluation report, and what actually took place. This act of taking an honest mistake by an evaluator and maligning it to appear as an intentional fraudulent act by myself is unconscionable.

6.    Similarly, there is another alleged incident in the same audit report where I have been accused of calling Dr. Wisdom to dispute an alleged testimony of Gregory Randall's wife.  This never happened.

7.    In fact, Mr. Randall's wife was not present at his evaluation by Dr. Wisdom. My husband and I escorted Mr. Randall to this evaluation as well, as Mr. Randall's wife had to stay at home with their children and was unable to attend. We wanted to make sure that Mr. Randall did not attend this evaluation all by himself, which is what I ensure for all of my NFL clients.

8.    I never spoke to Dr. Wisdom to dispute anything about Greg Randall's evaluation. This is a phantom incident. The likely sources of these wrongful allegations are Dr. Wisdom and/or Amir Shenaq.

9.    I am aware that Dr. Wisdom and Amir Shenaq coordinate, based upon a random uninvited call from Amir the day after Mr. Randell's evaluation with Dr. Wisdom. Amir began asking questions on the same subjects I had just discussed with Dr. Wisdom immediately after Mr. Randall's appointment in Dr. Wisdom's office. Some of Amir's statements on this call to me were, "How do you have clients, not being a lawyer?" and "It is not good for other law firms that I only charge 5%." It was an uncomfortable and confrontational discussion with Amir

Shenaq, whom I had never spoken to before, nor had given my phone number to. I responded to all Amir's questions honestly. I was wondering where he got my phone number, and asked him. Amir informed me that he got my number from Dr. Wisdom. I may be able to obtain my phone records from the date of Amir's uninvited call to me, establishing the date of the incoming call being the day after Dr. Wisdom's evaluation of SCM Gregory Randall.

10.  In addition, the audit report refers to two different aliases, namely "Nola Delaney," and "Sharon Young." The only sources for this misinformation would be my Facebook page, which uses Nola. Nola is my birth name prior to me being adopted. I use that name as my Facebook identifier so older friends can find me. Dr. Wisdom was a Facebook friend, and is the only likely source that would have sent investigators down this path.

11.  Therefore, there is no other reasonable source for this unfounded attack other than from Mr. Shenaq having an agenda of trying to remove my NFL claims representation as his competition, or from either Amir Shenaq or Dr. Wisdom so as to gain favor with the NFL auditors.

12.  These unconscionable twists of words, and adoption thereof by the auditors, needs to be audited and investigated in and of itself by Federal authorities as it unequivocally demonstrates an intentional corruption of the audit process and complicity between the auditors and those threatened by my services. If there is any validity to this audit process than these allegations must be dropped immediately.



FURTHER AFFIANT SAYETH NOT.

Sharon Delaney (Feb 17, 2021 16:46 CST)

SHARON DELANEY

# EXHIBIT E



# HOWARD JUSTICE

## Howard & Associates
## Attorneys at Law, P.A.

Dr. Tim Howard, J.D., Ph.D., Senior Partner*
Florida Supreme Court Certified Mediator

Tallahassee Office:
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Ph: (850) 298-4455; Fax (850) 216-2537
Tim@howardjustice.com

Fort Lauderdale Office:
101 NE Third Ave., Suite 1500
Fort Lauderdale, Florida 33301
(954) 332-3633
www.howardjustice.com

Jacksonville Office:
Riverplace Tower, 21st Floor
1301 Riverplace Boulevard
Jacksonville Florida 32210
(850) 298-4455

Cambridge Office:
8 Museum Way
Suite 2408
Cambridge, Massachusetts 02141
(857) 277-0990

August 8, 2017

Joe Horne
Retired NFL Player
Client of Howard & Associates

Re: Notice of NFL Concussion Settlement Process Initiation and Next Steps.

Dear Retired NFL Client:

The law firm is providing notice that the NFL Concussion Settlement process has begun and payments will begin over the next few months for those players who qualify. As previously recommended, advances on your claims are not advised as they are very expensive. Over the upcoming weeks and months, the law firm will coordinate final medical reviews, verify with the MAFS Qualified Neurologist that you qualify for recovery, and submit your claims.

Please verify your receipt of this notice with a confirmation email to the law firm at info@howardjustice.com. If you have any question, please let us know that as well.

Sincerely yours,

P. Tim Howard, J.D., Ph.D.
Howard & Associates
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298-4455
tim@howardjustice.com

cc: file

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D, Northeastern University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

## NOTICE OF EXPRESS WAIVER OF CONFLICT AND LIABILITY

As an investor, you may need legal assistance from Howard & Associates, Attorneys at Law, P.A., (Howard & Associates) with various matters that are either related or not related to your investments with Cambridge Capital Group, Cambridge Capital Advisors, LLC., or its investment funds (Investment Funds). Please note, you are not a client of Howard & Associates until you have entered into a written fee agreement with Howard & Associates. If such an agreement has not been entered into, you are not a client of Howard & Associates, and no such relationship is implied.

Regardless of whether you are currently a client of Howard & Associates, or a future client of Howard & Associates, this notice of waiver of conflict and liability is required to disclose the risks associated with the lawyer's dual role as both legal advisor and participant in investment or other transactions, such that the transaction or legal advice favor's the lawyer's interests at the expense of the client. You have engaged the Investment Fund consistent with the terms and conditions found in the Private Offering Memorandum for Offering of Limited Partnership Interests (Private Offering Memorandum), and understand that all of the investment funds carry risk of loss and that the highly leveraged investment funds have a high degree of risk of loss (as well as a potential high rate of return), including total loss of your investment, and should not be invested in unless you have a high degree of liquidity, as detailed in the Certain Risks section of the Private Offering Memorandum.

You understand that neither Howard & Associates, nor its President, Phillip Timothy Howard when acting as an attorney, are a partner or a party to these investment funds, and has no liability for the investments and the returns on investments. You understand that the protections of the attorney-client relationship do not apply to the non-legal services provided by the Investment Funds. You understand that the investment funds are not created to provide legal work for Howard & Associates and its affiliate law firms, such as Crossland & Crossland, to provide legal services such as tax and estate planning, and is not a referral source for Howard & Associates and its affiliate law firms. You understand that Howard & Associates is not providing financial assistance to its clients. You understand that Howard & Associates may obtain confidential information from either its representation or from the investment funds as to the client and their activities, and you are providing informed consent for Howard & Associates and the investment funds to share that confidential information.

To the extent that there is an interest in the investment funds that conflicts with the legal services of Howard & Associates, pursuant to Rule 4-1.7, Conflicts of Interest, or Rule 4-5.7, Rules Regulating the Florida Bar, and the potential for overreaching due to the trust and confidence placed in Howard & Associates, **you are advised that you may seek independent legal representation to review any potential conflict, you are explicitly advised to obtain independent legal representation to review any potential conflict, and confirm that you have obtained independent legal representation to review any potential conflict. By signing this document, you as a client, or a potential client, are providing informed consent to a waiver of any and all potential conflicts and liability of Howard & Associates.**

_____ / _____    _____   _____
Investor                            Date        Howard & Associates                Date

From: cambridge capital irain@cambridgecapitalgroup.holdings
Subject: House Keeping For Next Week and NY
Date: October 10, 2015 at 1:06 AM
To: Tim Howard tim@howardjustice.com
Cc: Tom Woods thomaswoods@gmail.com

Tim

Again, thank you for your support ... I know it is not always easy !!!!

A couple of things and facts that will help because quite frankly this has gone on long enough

- My indictment was largely a tax DEDUCTION issue, NOT TAX EVASION which is a big difference, and a strategic bankruptcy filing for added distraction. I say "strategic" because we had to use potential contingent liabilities as I still had a net worth north of $9 million. Hopefully, potential clients are not overly concerned about a charge like this as every individual who makes substantial income pushes the envelope on tax issues and my indictment REALLY was not a tax issue and bankruptcy issue at all....but anger over the Bear Sterns debacle.

- If potential clients REALLY are concerned about the press that is on Google about the Bear Sterns issue then we MUST be prepared to tell them and even show them, if requested, that an Arbitration Panel found Bear liable in 2011 and the clients that pursued Bear with my assistance recovered every penny of losses.

With regards to FINRA, the SEC jumped the gun and pursued me civilly because they were pushed heavily by some powerful attorneys after they determined that I had NOT done anything criminally wrong. Had they waited until the case went to an Arbitration Panel then they more than likely would not have pursued me at all. It is interesting to note that the Arbitration Panel still found Bear completely liable even after the SEC had pursued me and sanctioned me civilly. That was a big part of Bear's defense !!

SHOULD WE DO A "PAPER" STATING THESE POINTS THAT CAN BE PROVIDED TO INDIVIDUALS IF THIS COMES UP AGAIN.

NEXT WEEK:

- You said you wanted to rent a nice, comfortable vehicle to travel in. Kraft Nissan also does rentals and I could call Chris and arrange a rental for a Pathfinder SUV. It will be almost brand new and they are very comfortable and not bad on fuel since it is a 6 cylinder. I can pickup on Monday evening.

- If we are not doing suits per Frank and Suileman....do we want to get 3 nice Nike Dri Fit shirts from Academy Sports (what color.....) like black or a blue) and get them embroidered Monday with IMG Elite. We should get the shirts over the weekend ( I wear medium). The ones I wear frequently are NikeGolf Tour Performance Dri Fit and are nice ... about $50. We may want to do this since we will have nothing else that says IMG Elite, ie. brochure, business card.

- I have emailed Suileman to confirm that Tuesday 10/20 is confirmed with Rick Green and his group in NYC as we will need to make plans Monday.

- Thinking about Tom's question on liability, none of my Hedge Fund clients were able to pursue me individually after their attorney realized that they had signed our subscription agreement stating they had read the PPM. In fact, a coupled tried and after my defense attorney showed them and questioned them in depositions about the signed subscription agreement and PPM they both dismissed their claims.

Again, thank you my friend

Warner Rhinehart

From: Melvin Mobley melvinmobley@me.com
Subject: Fwd: CCG Info About Don
Date: August 3, 2017 at 8:18 AM
To: Gail Milton gail@howardthoreillors.com

For your information. Keep pressing forward.

Begin forwarded message:

From: Don Reinhard <d12lfav@gmail.com>
Date: August 02, 2017 2:20:29 PM
To: melvinmobley@me.com
Subject: Fwd: CCG Info About Don

--------- Forwarded message ---------
From: Don Reinhard <d12lfav@gmail.com>
Date: Sun, Jul 23, 2017 at 8:28 PM
Subject: CCG Info About Don
To: Don Reinhard <d123fav@gmail.com>

Hopefully by now you have read my recent email as I am aware that your attorney, Tim Howard, has responded via Gail Milton and confirmed this delay albeit with a colorful smoke screen while I will not stoop to his level of elementary behaving. I will continue to be completely transparent with you in our joint effort to successfully expedite the payment of your settlement claim so a proper financial investment strategy can be designed and executed for the life time benefit of you and your family. This is my only goal!

However, I do find it interesting that Tim Howard told you that the information he uncovered about your past experiences was unknown by him when he authored the attached information in 2015. This was done because of your interest in complete disclosure and transparency. This information is also disclosed in the Private Placement Memorandum of each investment fund. Again, this is alarming because this clearly proves as my business partner that he knows about my past experience in 2015 in complete disclosure when he authored the attachments in 2015.

Please do not hesitate to ask me any questions.

Don



TIM HOWARD, J.D., Ph.D., PRESIDENT CAMBRIDGE CAPITAL GROUP
PROVIDES BACKGROUND ON DON REINHARD, EXECUTIVE V.P. CAMBRIDGE CAPITAL GROUP

As a potential client of or participant with Cambridge Capital Group, and as President of Cambridge Capital Group, I would like to add on the information found in the various articles from years ago concerning Don Reinhard, Executive V.P. Cambridge Capital Group, and provide you with key facts and documentation so we can be more fully informed

---

From: cambridge capital info@cambridgecapitalgroup.holdings
Subject: Re: Fwd: Go forward plan for Cambridge Capital Group ...
Date: November 1, 2016 at 1:14 AM
To: Tim Howard tim@howardjustice.com
Cc: Tom Woods thomaswoods@gmail.com
Cc: info@cambridgecapitalgroup.holdings

Tom

I received your email and thank you for your input into the needed procedures for CCG especially after we start receiving and investing client funds. I couldn't agree with you more, in that, CCG will need to develop an appropriate procedures for communicating and discussing CCG'S hedge fund weekly activities once we actually get the Funds funded and start investing. Right now that looks like it should be late February but hopefully sooner.

While I appreciate your thoughts on a written report, it will be much more efficient and productive to have a regularly scheduled meeting every Monday with you, Tim and I to not only discuss CCG'S investment activities but also the activities of other aspects of CCG as well as the weekly meeting and travel schedules. As you recall, I tried to initiate this formal procedure over 2 months ago and after one meeting the procedure was discontinued. This will be even more important and critical if CCG is also responsible for a small Broker Dealer as I am currently researching.

As for reporting to CCG'S investment clients, this procedure is outlined in detail in each PPM and Agreement of LP that Tim and I developed in January and February and includes more reporting requirements than quarterly reports. I can direct you to this information in the PPM that we have completed for Cambridge Capital Partners LP.

A procedure for notifying eventual clients when their portfolios are down a certain percentage is not a normal procedure when the portfolios are invested in a diversified portfolio of hedge funds. It's very easy to do if the client's portfolio is holding ONLY regularly traded public securities such as stocks, regularly traded bonds, mutual funds, ETFs etc. but not if the clients portfolio is holding various hedge funds which are not valued daily. Furthermore, each client will hold various percentages of each hedge fund making the calculation very cumbersome at best if we have more than about 10 clients and I sure hope we will. Hedge Funds are structured this way for a reason and it is why they are only allowed to be marketed to accredited and qualified investors. It is a very different investment strategy than retail investing by stock brokers.

With this said, I am sure I can develop some sort of appropriate procedure for CCG to communicate to clients about investment market difficulties .... I did it for over 20 years. We also might be able to create a program using macros to calculate interim investment performance.

With regards to a possible Broker Dealer operated under CCG, I will continue to research the options as there are many requirements that must be considered as well as structures, but it does help me very viable and lucrative. While I know Suileman can be a resource when it comes to looking for someone to add the the BD, he has no knowledge whatsoever about creating a BD, managing a BD or the requirements to operate a BD .... I do as I did it for over 20 yrs. He also does not at all understand the structure of CCG and hedge funds in general. This is very apparent via conversations with him.

Tom, I very much respectfully disagree with you about the complexities of successful investment work. It has been reported many times that building and managing a successful investment firm and especially hedge fund management firm for extended periods of time, ie. 5 or 10 plus years, is perhaps one of the most difficult and stressful careers in the world. This is why hedge fund managers and structured asset traders are paid so much $$ and frequently more than the CEOs of the firms they work for...they rank number one in annual pay and by a large margin. While my audited annual investment returns are only for 88 months or almost 8 yrs. because I did not initiate my hedge fund until mid to late 1997, my investment strategies returned over 20% to clients for over 13 years going back to 1991. If it's not rocket science ... it's damn near close !!

We will certainly discuss further as we can be prepared for our best clients and then I truly think we will experience a tidal wave of new money and we all will need to work together as we continue to evolve and build CCG and determine our future course.

We have phenomenal opportunities !!

Don

On Oct 31, 2015 10:42 PM, "rj123foy@gmail.com" <rj123foy@gmail.com> wrote:

    --------- Original message ---------
    From: Tom Woods <thomaswoods@gmail.com>
    Date: 10/31/2015 8:25 PM (GMT-06:00)
    To: Don Reinhard <d123fav@gmail.com>
    Cc: Tim Howard <grreaves@hyoyerholief.com>
    Subject: Go forward plan for Cambridge Capital Group ...

    Don, this is the document I told you I would shoot to you.  Tim has blessed it.  We can answer any of your questions

Don Reinhard (Don) founded and owned an extremely successful investment management business for over 20 years and from 11/1997 - 6/2003 his clients recieved an average annual investment return of 25.58% while the S & P 500 returned 0.66% per annum. In late of 2003, Bear Stearns, through a computer error, failed to provide accurate market prices on some Fannie Mae and Freddie Mac bonds. This impacted the margin calculations on 14 of 100 clients, and Don's account as well. This Bear Stearns error caused the liquidation of approximately $7 million in accounts, $3.5 million of which was Don's. Though Bear Stearns admitted its error, it ultimately required Don and his clients to see bear Stearns for repayment. This cavalier approach to liability was a key concern that Bear Stearns caused to build in March of 2008.

    Despite the responsibility of Bear Stearns in causing the margin call, the Securities and Exchange Commission accused Don before he could prosecute Bear Stearns for his admitted error.

    Taking full responsibility to protect his clients' interests, Don organized these fourteen (14) clients to pursue a case against Bear Stearns. Don personally provided over $1 million in litigation fees with a highly experienced and successful prosecution legal team. Unfortunately, four (4) clients, wielding substantial political and media influence, determined that an action against Don, including launching various investigations to weaken his reputation and capacity to defend himself, would generate a better return of their funds. Despite the poor decision by these four clients, Don and the other clients completed a successful arbitration in May of 2011 against Bear Stearns and received full compensation for their losses. (Exhibit 1 - Award).

    The personal investigations launched against Don by the four (4) clients resulted in a 2001 tax deduction (not tax evasion) charge, and an incorrect bankruptcy filing charge. All 2001 tax deductions were reported with documentation and the bankruptcy filing was not corrected by his attorney, which attorney's failure to correct resulted in a legal malpractice settlement. (Exhibit 2 - Affidavit).

    In order to avoid further disruption of his family from potentially endless investigations, Don's attorneys recommended a strategic plea agreement, with no incarceration expected.  While the investigations stopped, the strategy failed and incarceration resulted.

    - I have known Don Reinhard for over 40 years, and I completely trust him with the management of my family investments and with the security and investments of others for Cambridge Capital Group. While Don does not solicit clients, once a client determines to have Cambridge Capital Group manage their investments, Don has the integrity, proven track record of investment success, and trust by the experience to meet the quality investment return solution at Cambridge Capital Group.

    Please do not hesitate to contact me at 850-345-4555 or Don at 530-375-8888 if you require any additional information or have any additional questions.

    Tim Howard, J.D., Ph. D.
    President, Cambridge Capital Group, LLC

    [Exhibit 1 - Award.pdf]   [Exhibit 2 - Affidavit.pdf]

**From:** Melvin McKelvy <mekkelvashby@me.com>
**Subject:** Fwd: NFL Settlement Claim Payment Delay
**Date:** August 3, 2017 at 9:25 AM
**To:** Gail Milon <gail@ccwealthadvisors.com>

Again, keep pressing forward

Begin forwarded message:

**From:** Don Reinhard <dti22turk@gmail.com>
**Date:** August 02, 2017 2:19:45 PM
**To:** mckvinemckky@me.com
**Subject:** NFL Settlement Claim Payment Delay

I have recently had a number of inquiries as to the reason why none, to the best of my knowledge, of the NFL Concussion Settlement clients of Howard & Associates PA have yet to be paid, when payments began in May or earlier.

While I have alluded over the past few months to at least one of the reasons Tim Howard turned on me as co-owner, Executive Vice President and investment advisor of Cambridge Capital Group LLC just days before my planned temporary leave of absence when I basically became defenseless, one of the primary reasons was my confrontation with him about his decision to put his personal interest and interest of his law firm in front of the best interest of his clients and the clients referred to him by Cambridge Capital Group... YOU! The result if his unprofessional, unethical, and basically selfish decision was going to result in a delay of the payments from the NFL Concussion Settlement of 4-6 months.

I sternly expressed to him my dissatisfaction and told him his decision was wrong and "nearsighted" as each of you had patiently waited for these funds for months, if not years, and further delays were damaging to not only your future plans but critical plans for your family as well. Additionally, each additional month was costing most of you that structured a financial advance against your settlement an additional $1,500-$15,000 or more per month in increased interest which was unnecessary.

Tim's decision was to apply to have Dr. Louis Koberda included as one of the board-certified neurologists that could continue evaluating retired players after the final January 6, 2017 settlement effective date. While a small number of you might have been evaluated by Dr. Koberda after January 6th, a vast majority of you were evaluated before this date and the few that were not would have been fine given that the actual effective date was somewhat in question until early February.

However, to achieve this objective which ONLY benefited Howard & Associates ability to continue qualifying players for the settlement even though the NFL would now do it for less, as Dr. Koberda's inclusion did nothing to benefit your evaluation, Tim Howard had to state that Dr. Koberda had not evaluated any players prior to his approval which was not expected until mid-June. Now each of you know that if this statement or declaration were represented to the NFL Claims Administrator ... then it certainly would not be factual since each of you were evaluated by Dr. Koberda prior to his expe... ...s approval in mid-June 2017.

Also, in further complicate and cloud the issue, Tim Howard had to make the unethical and selfish decision to not only delay the filing of your claims with the Claims Administrator for processing and payment until after Dr. Koberda was approved in mid-June, but also adjust the date of your evaluation until after Dr. Koberda's eventual approval date expected in mid-June. The much earlier registration date was only to notify the Claims Administrator of your pending claim to be filed for processing.

Again, this unprofessional, unethical, and selfish decision solely to benefit the future business of Tim Howard and his law firm has delayed the filing of your claims by 4-6 months. Additionally, in my opinion, the decision has also put your claim at risk due to the misrepresentation made to the Claims Administrator about Dr. Koberda's involvement.

My recommendation to each you are that you independently call the NFL Claims Administrator at 1-855-887-3485 and inquire about whether your claim has been filed by your attorney, Howard & Associates PA, and on what date. Hopefully, they will then give you some valuable insight as to the expected processing time

---

and projected payment date. If your claim has NOT been filed then please call your attorney, Howard & Associates PA, to inquire as to the continued delay...but I truly recommend calling the NFL Claims Administrator FIRST.

Again, I thank you for your continued trust, loyalty, and commitment as I truly look forward to strengthening our long-term relationship with my new investment firm. The players that came to me encouraged me to communicate this information to you and I certainly agreed due to my interest in complete transparency and disclosure. Please do not hesitate to email or text me if you have any questions.

---

**From:** Tom Woods <thomaxcwoods@gmail.com>
**Subject:** Re: IMPORTANT INFORMATION !!! PLEASE READ !!!
**Date:** July 29, 2017 at 9:15 PM
**To:** Gail Milon <gail@ccwealthadvisors.com>

Thank you Gail. Tom

Sent from my iPhone

On Jul 28, 2017, at 8:33 PM, Gail Milon <gail@ccwealthadvisors.com> wrote:

Dear Cambridge Capital Group Client,

Some of you may have received correspondence from a Don Reinhard, former periodic consultant for Cambridge Capital Group (CCG), who was discharged in February. He has a no contact, confidentiality agreement that he is violating in these communications to you, and appropriate action is being taken to stop harassing CCG clients. As a courtesy, CCG is advising you to please not accept communications from this individual nor correspond with him individually. He is not a lawyer, does not know the NFL Concussion Settlement claims process, was not part of the law firm, is providing false information, and has a criminal history of harming investors with false statements and perjury.

In response to his latest fraudulent email, we have verified with your counsel that clients are having their files reviewed and finalized by a MAFS NFL qualified neurologist and neuropsychologist. This will provide maximum return on your claim and make it the strongest possible. Appointments have been conducted with some clients and are being scheduled for others. You will hear from the law firm staff over the next several weeks for scheduling.

As part of Mr. Reinhard's criminal history of harming investors with false statements and perjury, CCG has located information that it was not previously aware of and is providing these court documents for your use.

In researching his history, CCG has located the Securities and Exchange Commission complaint against Mr. Reinhard wherein the federal government states, "Reinhard lulled his hedge fun clients into keeping their investments with the hedge fund by providing them with false quarterly account statements showing materially inflated account values. Through all this activity, Reinhard's clients and hedge fund investors lost more than $8 million." Page 1, paragraph 3. Mr. Reinhard then pled guilty to 7 federal criminal crimes, including false statements to federal insured financial institution, perjury, illegal transfer or concealment of property, etc., and served over 3 years in federal prison.

Again, please do not accept or respond to communications from this individual nor his current wife, Katherine Reinhard.

PLEASE NOTE ! Your investments are safe and sound. The purpose of this letter is to provide you with factual documentation regarding Don Reinhard and to advise you not to communicate with him.

Upon completion of the audit, I will provide you with audited numbers and we will move forward with excellent investment returns.

Thank you for your attention to this matter,

Best Regards,

*Gail Milon, CASL, CLTC*

Manager Vice President
Cambridge Capital Group
Email: gail@ccwealthadvisors.com

---

**From:** Gail Milon <gail@ccwealthadvisors.com>
**Subject:** Response To Seeger's Motion
**Date:** January 07, 2018 at 11:14 PM
**To:** Martin Black <blackblack8@gmail.com>, Tim Howard <tim@howardjustice.com>, Adtys Walker <adtyswalker@gmail.com>
**Cc:** BILL BOGAN <bogan@comcast.net>, Al Smith <djazz4@yahoo.com>
**Bcc:** Tom Woods <thomaxcwoods@gmail.com>, Gail Milon <gail@ccwealthadvisors.com>

The following are my notes regarding the motion we received. And to, correct , don't use it at all. We need to identify/attack the root of this issue and not treat the symptoms/side affects.

Proverbs 18:17 states:

There are two sides to every story. The first one to speak sounds true until you hear the other side and they set the record straight (RSV)

Since Don Reinhard want to be the "center of attention", let's give it to him.

On page 9 of the motion - Don Reinhard was not "the former head of Cambridge"

Also on page 9 - Don Reinhard was not a "business partner"

Although you show the most recent charge of Don Reinhard and the bottom of page 9, other "recent" charges consist of "violation of probation" felony charge for shooting from Walmart 4 times with Leon County, Mr. Reinhard had a warrant out for his arrest in early February and turned himself in to the Leon County Jail on March 1, 2017. He was recently released from Federal Prison in 200X for tax evasion and (whatever the other charge was: misrepresenting a bond fund and defrauding clients out of millions of dollars) which cost him his securities license.

Don Reinhard was initially hired by Dr. Howard to teach a class at the Cambridge Capital Group Graduate University International. He was later signed on as a Consultant to assist Dr. Howard with operations of the Cambridge Capital Entities. Don Reinhard has X years of experience in the securities industry. Mr. Reinhard approached Dr. Howard (a high school classmate) when Dr. Howard ran into him at a Costco Supermarket, Mr. Reinhard was selling wine. Mr. Reinhard sought Dr. Howard out, asking him for assistance with his life/career. He told Dr. Howard about the tax evasion, however, the criminal securities charges were not disclosed to Dr. Howard and was not discovered until Mr. Reinhard's was arrested in Leon County for violation of probation (March 1, 2017). Mr. Reinhard's aggravated child abuse charge, mentioned in your motion, was toward an autistic child, making him eat his feces for toilet training (His sentence was for more than 6 years). The reduced sentenced is due to Mr. Reinhard "plea bargaining" testifying on a Mexican drug cartel who provided him with his cocain.

Don Reinhard's responsibilities were to assist the Cambridge Entities in bringing "qualified accredited investors" into the hedge fund. Dr. Reinhard believes in the "redemption method" taking individuals (that society wouldn't give a second chance) and helping them utilize their gifts to make a decent living. Because of Mr. Reinhard's years of experience in the securities industry, he knows the importance of "fact finding". The "know your client" rule requires a securities professional to know the financial status of their "potential investor".

Rule 501 of Regulation D of the Securities Act (Reg. D) provides the definition for an accredited investor through the confines of income and net worth two ways:

1. A natural person with income exceeding $200,000 in each the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year;
2. A natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the purchase, excluding the value of the primary residence of each person

Mr. Reinhard was responsible for screening prospects to make sure they meet the qualifications of the hedge fund

Mr. Reinhard was responsible for ascertaining the financial net-worth of the potential client

Mr. Reinhard was responsible for explaining to the potential client what a hedge fund is and the risk associated with this "investment".

Mr. Reinhard was responsible for making sure potential investors portfolios were diversified

Mr. Reinhard was responsible for providing the potential prospect with the Private Offering Memorandum (POM) before or at the time of the investment.

Mr. Reinhard was responsible for reporting accurate information to Dr. Howard and the investors

Prior to Mr. Reinhard being terminated he went to the Leon County Jail, he took important/confidential client information that belong to Cambridge Capital Group. We have requested the information on several occasions as well as through the legal process with no success. Because we did not have all of the supporting documentation to have an audit completed in a timely manner we had to request a forensic audit, recreating what we did not have. Because Mr. Reinhard's processes were manual (and taken with him when he was services were terminated), we had to enter data into quick books from bank statements and automate the Cambridge Entities processes. Once the resolution changes, the auditor can not complete certain processes surrounding the audit and an

accountant was hired to fulfill those objectives. The audit will be completed six weeks from the time the accountant provides the auditor with the accounting piece of the process. As much as we would like to provide investors with their balances, we can not provide that information until the audit is complete. Gail Milon requested an audit. She was not going to be responsible for improprieties, if any, of another person and wanted to ascertain the accuracy of what was there. That is her fiduciary responsibility.

All "accredited investors" in the Cambridge Entities know what a hedge funds is and understand the risks associated with hedge funds. The individuals filing complaints were not "properly advised" by Mr. Reinhard. Using Seeger's wording; "False or misleading statements were used by Mr. Reinhard to solicit business from the plaintiffs". The plaintiffs in question were solicited by Don Reinhard. He told them they can take their money out at any time when the POM clearly states that a hedge fund is an illiquid investment and procedures are documented in the POM outlining the withdrawal process. Several investors never received a Private Offering Memorandum (which is a requirement with any investment solicitation) and none of the plaintiffs (solicited and sold by Don Reinhard) knew they were in a hedge fund. They didn't know what a hedge fund was. Where initial advances per individual were minimal ($3,000.00), Mr. Reinhard continued to  solicited retired players offering them increases (averaging $18,000) and charging them a fee for each transaction before his contract was terminated. Without the investor's network statement, which should have been in the client's file, I can not ascertain if they are accredited investors.

Even with the false and misleading statements for the solicitation of business by Mr. Reinhard, individuals knew they were "investing" their IRA funds. Any investment has risks and the potential to loose money. If they didn't want to take any risk, they had the option of putting their funds in an IRA money market account or a certificate of deposit. Even those instruments have purchasing power risk.

We responded to Seeger's "inquiry" regarding IRA-rollover monies and denied Cambridge was seeking repayment from Class Members for advanced monies or taking ownership of retirement account monies to offset the advances. Mr. Walker was maintained.

Best Regards,

*Gail Milon, CASL, CLTC*

Manager Vice President
Cambridge Capital Group
Email: gail@cambridgeadvisors.com

Tallahassee, Florida Office:
2120 Killarney Way, Suite 120
Tallahassee, FL 32309
(850) 296-4455 ext 109 (o)
(850) 765-6121 (f)

Jacksonville, Florida Office:
Riverplace Tower
1301 Riverplace Blvd.
Jacksonville, FL 32207

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332-3633 (o)

Massachusetts Office:

From: Don Reinhard <d123fsu@gmail.com>
Date: February 24, 2018 at 7:51:15 PM EST
To: Corey Fuller <boushe24@gmail.com>
Subject: Visitation and email I just sent

Corey, I think you will realize when you read the email I just sent that I am not only scared to death but terrified. Just to let you know Joe did make a very visible sign talking to me so everybody in the dorm would see him. Hopefully that does help for the time being.

Also, please complete and send in the visitation form that was previously emailed to everybody as I truly want to see you soon and hopefully you can take one Saturday or Sunday and drive over. We certainly have a lot to discuss especially about Tim and CCG.

Love ya buddy,
Don

From: Don Reinhard <d123fsu@gmail.com>
Date: February 24, 2018 at 7:42:58 PM EST
To: Corey Fuller <boushe24@gmail.com>, Dad <herbreinhard@bellsouth.net>, Herb Reinhard <hreinhar@valdosta.edu>, Mark Reinhard <mark@capmortcorp.com>, Ann Schildhammer <annschildhammer@comcast.net>, Dave Borden <drbfsu1578@yahoo.com>, Chris Kraft <CKFSU@aol.com>, Jon Sweede <jonsweede@gmail.com>, John Murphy <jpmurph1@aol.com>, Joe Davis <DrJoeDavisPE@gmail.com>, Bonnie Correll <bonnie_correll@yahoo.com>, Ann Abbott - Sissy <bernieann@msc.com>, John Martinez <egglemom530@yahoo.com>, John Martinez <jmdist@yahoo.com>, Adam Corey <adambcorey@gmail.com>
Subject: Incident at knife-point

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5 inmates that are violent and hardened criminals because my roommate and I were told that there was absolutely no available bed space in the dorms that we should have been in for level 1, 2 and 3 inmates which have shorter non-violent sentences. I was told I would be in the dorm for 2-3 days and they would get me out immediately. However on Thursday I was being threatened and pressured to give them food and other items or I would "learn about prison the hard way". I voiced these concerns to my mother and father who immediately called and talked with a captain.

The captain talked with me and told me I would be taken out within the next day or two he was going to immediately look into it and asked me if I feared for my life and I said no that I was very scared and concerned of getting beat up or knifed. I also did not want to be put in solitary confinement which is the alternative if you say you fear for your life. I cannot handle that.

I was told by the dorm officer that I would be moved today which she finally got around to doing at about 5 o'clock and while I was packing my belongings some of the same individuals came into my cell with a knife made visible to me and told me they were going to stab me unless I gave them all of my canteen which was approx. $70 worth of various food items and hygiene. I tried to reason with them but another individual entered the room a so one of them held me off with the knife in his hand and they took all of my canteen.

There's other details involved but I immediately reported it to the sergeant outside because I just wanted to get out of there as soon as possible and they have taken the three individuals in hand-cuffs to solitary confinement. However, my understanding is that they are gang-related and will if they have not already get messages to their other gang members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center including a very close friend of Corey Fuller's who had previously promised and re-

iterated that promise when I came in that he will protect me. However, that will mean following him around like a puppy even if I am safe from other gang members in this dorm.

While the financial loss will hit me hard as I needed this food to last a couple more weeks as I am watching every single penny I have to spend, the real danger is that I am clearly a target at this camp/prison. Again, at this point I do not fear for my life because I certainly do not want to go to solitary confinement but things may change in the coming days. I clearly don't understand this part of the world and do not know how I am going to get through this.

The captain clearly acknowledged to the dorm guard that my roommate and I were not supposed to be housed in dorm F which included the level 4 & 5 inmates because it was breaking DOC policy. Although the dorm officer informed him that they were doing that periodically he said this was still breaking DOC policy. That captain was very helpful and he called mama and daddy yesterday evening to inform them that he was working to get me transferred out.

At this point, I believe the only solution is to do what is necessary to immediately get me moved to another camp/prison or possibly to the annex here at Columbia which is another camp or the work camp at Columbia. I really see no alternative as I'm very scared and nervous as to what the repercussions can be. To do this I assume it will take some sort of orchestrated phone calls possibly to the captain that mama and daddy have already talked to but please tell then that y'all are requesting that this happen and it is not coming from me. Perhaps you can inform him how scared and concerned I am that I am now clearly a target and there does not seem to be any alternative but you will need to be adamant as I should never have been in that dorm.

Please pray for me and I will talk to Wes tomorrow as well as mama and daddy.

Don

**EXHIBIT B**

From: "cambridge capital" <info@cambridgecapitalgroup.holdings>
Date: May 25, 2016 5:57 PM
Subject: Info on Don
To: "Corey Fuller" <bousho24@gmail.com>
Cc:

Tim Howard, J.D., Ph. D.
Don Reinhard
Tom Woods
Harrison Smith
Cambridge Capital Group, LLC
850-270-9898



**TIM HOWARD, J.D., Ph.D., PRESIDENT CAMBRIDGE CAPITAL GROUP**
**PROVIDES BACKGROUND ON DON REINHARD, EXECUTIVE V.P. CAMBRIDGE CAPITAL GROUP**

As a potential client of or participant with Cambridge Capital Group, and as President of Cambridge Capital Group, I would like to address the information found in the various articles from years ago concerning Don Reinhard, Executive V.P. Cambridge Capital Group, and provide you with key facts and documentation so you can be more fully informed.

Don Reinhard (Don) founded and owned an extremely successful investment management business for over 20 years and from 11/1997 – 6/2003 his clients received an average annual investment return of 25.39% while the S & P 500 returned 0.66% per annum. In July of 2003, Bear Stearns, through a computer error, failed to provide accurate market prices on new Fannie Mae and Freddie Mac bonds. This impacted the margin calculations on 14 of 300 clients, and Don's account as well. This Bear Stearns error caused the liquidation of approximately $7 million in accounts, $2.5 million of which was Don's. Though Bear Stearns admitted its error, it callously required Don and his clients to use Bear Stearns for repayment. This cavalier approach to liability was a key reason that Bear Stearns ceased to exist in March of 2008.

Despite the responsibility of Bear Stearns in causing the margin call, the Securities and Exchange Commission sanctioned Don before he would prosecute Bear Stearns for its admitted error.

Taking full responsibility to protect his clients' interests, Don organized these fourteen (14) clients to pursue a case against Bear Stearns. Don personally provided over $1 million in litigation fees with a highly experienced and successful prosecution legal team. Unfortunately, four (4) clients, wielding substantial political and media influence, determined that an action against Don, including launching various investigations to weaken his reputation and capacity to defend himself, would generate a faster return of their funds. Despite the poor decision by these four clients, Don and the other clients completed a successful arbitration in May of 2011 against Bear Stearns and received full compensation for their losses. (Exhibit 1 – Award).

The personal investigations launched against Don by the four (4) clients resulted in a 2001 tax deduction (not tax evasion) charge, and an incorrect bankruptcy filing charge. All 2001 tax deductions were supported with documentation and the bankruptcy filing was not corrected by his attorney, which attorney's failure to correct resulted in a legal malpractice settlement. (Exhibit 2 – Affidavit).

In order to avoid further disruption of his family from potentially endless investigations, Don's attorneys recommended a strategic plea agreement, with no incarceration expected. While the investigations stopped, the strategy failed and incarceration resulted.

I have known Don Reinhard for over 40 years, and I completely trust him with the management of my family investments and with the security and investments of clients for Cambridge Capital Group. While Don does not solicit clients, once a client determines to have Cambridge Capital Group manage their investments, Don has the integrity, proven track record of investment success, and trial by fire experience to meet the quality investment return mission at Cambridge Capital Group.

Please do not hesitate to contact me at 850-259-4455 or Don at 850-270-9898 if you require any additional information or have any additional questions.

Tim Howard, J.D., Ph. D.
President, Cambridge Capital Group, LLC

---



Award
FINRA Dispute Resolution

In the Matter of the Arbitration Between:

Claimants
X
X
X
X
X
X
X

Respondents
Bear, Stearns & Co., Inc.
Bear Stearns Securities Corp.

Case Number (Subordinate Case): 06-01154
(consolidated with 07-02226)

Hearing Site: Tampa, Florida

In the Matter of the Arbitration Between:

Claimants

Respondents
Bear, Stearns & Co., Inc.
Bear Stearns Securities Corp.

Case Number (Master Case): 07-02226
(consolidated with 06-01154)

Hearing Site: Tampa, Florida

Nature of the Disputes: Customer vs. Member.

**REPRESENTATION OF PARTIES**

For Claimants

---

FINRA Dispute Resolution
Arbitration No. 07-02226
Consolidated with No. 06-01154
Award Page 7 of 11

Claimants filed a Consolidated Statement of Claim in which Claimants [redacted] and [redacted], were not reflected as Claimants and/or sought no relief from Respondents. On or about June 22, 2011, [redacted] and [redacted] filed notice with FINRA Dispute Resolution confirming their prior withdrawal of claims to be with prejudice.

Claimants filed a Motion to Amend Consolidated Statement of Claim in which they requested, among other things, leave from the Panel to: (1) request attorneys' fees pursuant to Florida Statute § 57.105(7); (2) withdraw the claims of [redacted]; and (3) clarify clerical and scrivener's errors. In response, Respondents asserted, among other things, that: (1) no amendment was necessary to withdraw certain Claimants' claims, which Respondents did not oppose; (2) no amendment was necessary to correct typographical errors, which Respondents did not oppose; (3) Florida law did not apply to this matter because the agreements between the parties expressly provided that they are governed by New York law; (4) Claimants had no excuse for failing to assert their request for attorneys' fees pursuant to Florida Statute §57.105(7) earlier; and, (5) in the event that the Panel permits Claimants to amend, Respondents' Answer to the Consolidated Statement of Claim should be deemed as Respondents' Answer to the Amended Consolidated Statement of Claim. On May 31, 2011, the Panel issued an Order: (1) granting Claimants' requests to clarify scrivener's errors and to withdraw claims of certain claimants, with prejudice, noting that no prejudice would result from such amendments; and, (2) reserving the Panel's decision on Claimants' request to add a request for attorneys' fees pursuant to Florida Statute §57.105(7) and inviting the parties to submit any authority of which they were aware that would assist the Panel in reaching its decision.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

**AWARD**

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions (if any), the Panel has decided in full and final resolution of the issues submitted for determination as follows:

As to Count I of the Amended Consolidated Statement of Claim, regarding the joint account of [redacted] the Panel finds in favor of said Claimants and awards compensatory damages in the amount of $1,313,750.00, prejudgment interest specifically excluded, against Respondents, jointly and severally.

As to Count II of the Amended Consolidated Statement of Claim, regarding the [redacted] account, the Panel finds in favor of said Claimants and awards compensatory damages in the amount of $677,530.00, prejudgment interest specifically excluded, in favor of [redacted] against Respondents, jointly and severally.

ᴴ

FINRA Dispute Resolution
Arbitration No. 07-02226
Consolidated with No. 06-01154
Award Page 8 of 11

As to Count IV of the Amended Consolidated Statement of Claim, regarding the joint account of ▮▮▮▮▮▮▮▮▮▮▮▮▮, the Panel finds in favor of said Claimants and awards compensatory damages in the amount of $309,736.00, prejudgment interest specifically excluded, to ▮▮▮▮▮▮▮▮▮▮▮▮ against Respondents, jointly and severally.

As to Count VII of the Amended Consolidated Statement of Claim, regarding the account of ▮▮▮▮▮▮▮▮▮▮▮▮▮, the Panel finds in favor of said Claimant and awards compensatory damages in the amount of $784,301.00, prejudgment interest specifically excluded, in favor of ▮▮▮▮▮▮▮ against Respondents, jointly and severally.

As to Count X of the Amended Consolidated Statement of Claim, regarding the respective accounts of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ now known as ▮▮▮▮▮▮▮▮▮, the Panel finds in favor of said Claimants, awards compensatory damages in the amount of $859,608.00, prejudgment interest specifically excluded, to ▮▮▮▮▮▮▮▮▮ against Respondents, jointly and severally, and awards compensatory damages in the amount of $271,347.00, prejudgment interest specifically excluded, to ▮▮▮▮▮▮▮▮▮ against Respondents, jointly and severally.

As to all remaining counts in the Amended Consolidated Statement of Claim, the Panel denies recovery as to such counts.

As to Respondents' counterclaims against Claimants, the Panel finds in favor of Claimants and against Respondents, and denies any recovery as to such counter-claims.

In addition, the Panel awards a cost recovery in favor of Claimants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ against Respondents, jointly and severally, in the amount of $87,706.25 and awards costs in favor of Claimants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the amount of $13,837.00 against Respondents, jointly and severally.

Although Claimants and Respondents each requested an award of attorney's fees, at the final hearing Claimants and Respondents stated they were not submitting that issue to the Panel for its determination. Accordingly, the Panel defers to a court of competent jurisdiction the parties' entitlement to and the amount of a reasonable attorney's fee.

Any and all claims for relief not specifically addressed herein, including Claimants' request for statutory damages pursuant to Chapter 517 of the Florida Statutes in Count XIV and Claimants' request for punitive damages in Count XVI, are denied.

FEES

Pursuant to the Code, the following fees are assessed in Case Number 07-02226:

---

FINRA Dispute Resolution
Arbitration No. 07-02226
Consolidated with No. 06-01154
Award Page 9 of 11

**Filing Fees**
FINRA Dispute Resolution assessed a filing fee* for each claim:
Initial claim filing fee = $1,575.00
Counterclaim filing fee = $2,450.00

*The filing fee is made up of a non-refundable and a refundable portion.

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as parties, Respondents BSC and BSSC are each assessed the following:

BSC
Member surcharge = $2,250.00
Pre-hearing process fee = $ 750.00
Hearing process fee = $4,000.00

BSSC
Member surcharge = $2,250.00
Pre-hearing process fee = $ 750.00
Hearing process fee = $4,000.00

**Discovery-Related Motion Fees**
Fees apply for each decision rendered on a discovery-related motion.

One (1) Decision on a discovery-related motion on the papers with one (1) arbitrator @ $200.00 = $200.00
Respondents submitted one discovery-related motion decided on the papers

Total Discovery-Related Motion Fees = $200.00

The Panel has assessed the total $200.00 discovery-related motion fee to Respondents, jointly and severally.

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s) which lasts four (4) hours or less. Fees associated with these proceedings are:

One (1) Pre-hearing session with the Panel @ $1,200.00/session = $ 1,200.00
Pre-hearing conference:    September 21, 2010    1 session

Fifteen (15) Hearing sessions @ $1,200.00/session = $18,000.00
Hearing Dates:    June 6, 2011    2 sessions
June 7, 2011    2 sessions
June 8, 2011    2 sessions

---

FINRA Dispute Resolution
Arbitration No. 07-02226
Consolidated with No. 06-01154
Award Page 10 of 11

June 9, 2011    2 sessions
June 10, 2011    1 session
June 13, 2011    2 sessions
June 14, 2011    2 sessions
June 15, 2011    2 sessions

Total Hearing Session Fees = $19,200.00

The Panel has assessed the total $19,200.00 in hearing session fees jointly and severally to Respondents.

All balances are payable to FINRA Dispute Resolution and are due upon receipt.

---

FINRA Dispute Resolution
Arbitration No. 07-02226
Consolidated with No. 06-01154
Award Page 11 of 11

**ARBITRATION PANEL**

| Langfred White | - | Public Arbitrator, Presiding Chairperson |
| John Torraco | - | Public Arbitrator |
| Robert Matthews | - | Non-Public Arbitrator |

**Concurring Arbitrators' Signatures**

/s/
John Torraco          July 2, 2011
Public Arbitrator          Signature Date

/s/
Robert Matthews          July 1, 2011
Non-Public Arbitrator          Signature Date

**Dissenting Arbitrator's Signature**

/s/
Langfred White          June 30, 2011
Public Arbitrator, Presiding Chairperson          Signature Date

July 5, 2011
Date of Service (For FINRA Dispute Resolution Office use only)

FINRA Dispute Resolution
Arbitration No. 07-02226
Consolidated with No. 00-01184
Award Page 11 of 11

**ARBITRATION PANEL**

| Langfred White | - | Public Arbitrator, Presiding Chairperson |
| John Torraco | - | Public Arbitrator |
| Robert Matthews | - | Non-Public Arbitrator |

Concurring Arbitrators' Signatures

John Torraco                          7/2/11
Public Arbitrator                     Signature Date

Robert Matthews                       Signature Date
Non-Public Arbitrator

Dissenting Arbitrator's Signature

Langfred White                        Signature Date
Public Arbitrator, Presiding Chairperson

Date of Service (For FINRA Dispute Resolution Office use only)

---

FINRA Dispute Resolution
Arbitration No. 07-02226
Consolidated with No. 00-01184
Award Page 11 of 11

**ARBITRATION PANEL**

| Langfred White | - | Public Arbitrator, Presiding Chairperson |
| John Torraco | - | Public Arbitrator |
| Robert Matthews | - | Non-Public Arbitrator |

Concurring Arbitrators' Signatures

John Torraco                          Signature Date
Public Arbitrator

Robert Matthews                       7/1/11
Non-Public Arbitrator                 Signature Date

Dissenting Arbitrator's Signature

Langfred White                        Signature Date
Public Arbitrator, Presiding Chairperson

Date of Service (For FINRA Dispute Resolution Office use only)

---

Arbitration No. 07-02226
Consolidated with No. 00-01184
Award Page 11 of 11

**ARBITRATION PANEL**

| Langfred White | - | Public Arbitrator, Presiding Chairperson |
| John Torraco | - | Public Arbitrator |
| Robert Matthews | - | Non-Public Arbitrator |

Concurring Arbitrators' Signatures

John Torraco                          Signature Date
Public Arbitrator

Robert Matthews                       Signature Date
Non-Public Arbitrator

Dissenting Arbitrator's Signature

Langfred W. White                     6/30/2011
Langfred White                        Signature Date
Public Arbitrator, Presiding Chairperson

Date of Service (For FINRA Dispute Resolution Office use only)

---

**AFFIDAVIT**

STATE OF FLORIDA

COUNTY OF LEON

_____/

COMES NOW your Affiant, CLYDE M. TAYLOR, JR., being over the age of twenty-one, and of sound mind and memory, and who, after being duly sworn, deposes and states:

1)      Your Affiant is a criminal defense attorney, being a member of The Florida Bar since 1970, focusing almost exclusively on criminal defense; in state and federal courts, since 1978.

2)      Your Affiant has tried cases in federal courts in Texas, Louisiana, Alabama, Florida, Georgia, North and South Carolina, New York, Indiana and Puerto Rico, and has been admitted pro hac vice, and tried cases in the Superior Courts of the State of Georgia.

3)      Your Affiant has tried over 150 felony cases, including death penalty cases, and has argued cases on appeal before the Florida Supreme Court, and has been admitted and handled federal appeals before the 1st, 4th, 5th, 7th and 11th Circuit Courts of Appeal.

4)      Your Affiant was retained to represent Defendant DON WARNER REINHARD in a twenty-three (23) count federal case out of the Northern District of Florida, Tallahassee Division, # 8-00049cr4-RH, which case included: seven counts of concealing bankruptcy assets (Cts. 3-5,8,13,17,19); two counts of making false statements in bankruptcy proceedings (Cts. 9,10); and two counts of transferring assets from bankruptcy (Cts. 15,16).

5)      Following extensive negotiations with the government, a plea agreement was reached wherein the Defendant would plead to seven counts of the twenty-three, including three counts involving the bankruptcy action (Cts. 9,17,19).

6)      Your Affiant during the representation of DON WARNER REINHARD became aware of

the basis for the bankruptcy counts, and is of the opinion, with competent counseling, there never
should have been a decision by the Defendant to proceed to bankruptcy in the first place.

7)     Further, your Affiant, having reviewed the transcript of a bankruptcy creditors meeting
from December 9, 2006, is of the opinion that the Defendant was not prepared for that hearing,
had not reviewed the filings in the bankruptcy case, and as a result, opened himself up for the
federal indictment by responding to questions put to him by creditor's counsel and the trustee.

8)     DON WARNER REINHARD'S counsel, Ed Rade, promised the trustee he (Rade)
would file amendments and provide "corrections" to errors in the filings of his client on two
occasions during the meeting, and also admitted to an error as to payment dates on one of the
schedules.

9)     Attorney Rade filed an amendment to a Schedule F, but it had nothing whatsoever to do
with the promise to amend/correct made by Rade at the December 9th meeting.

10)     The issues raised by the creditors, and the trustee, should have put an experienced
bankruptcy attorney, like Mr. Rade on notice of major problems with his client's bankruptcy
petition and filings, relating to completeness, accuracy and truthfulness, and should have resulted
in modifications/amendments being filed by Mr. Rade. In your Affiant's opinion,
because they were not corrected the Defendant was indicted on multiple bankruptcy counts.

11)     The Defendant was asked about motorcycles, boats, real estate, and investment accounts,
at the meeting.  All of these items became part and parcel of the indictment.
See Ex. A, attached hereto (portions of the governments statement of facts associated with the
plea agreement in this case).  At one point the Defendant even responded "I guess  in a property
sale a transfer?" See Ex. B, attached hereto (copy of transcript of creditors meeting, w.
highlights, pg. 30).  Any alert, competent attorney should have realized at that point, the client

was not aware of what he/she had signed and/or was doing, to his legal detriment.

12)     The bankruptcy counts to which Defendant eventually had to plea to, could have been
avoided had the schedules been amended, as the criminal "intent" element would no longer exist
as to those errors from the original filings. In effect: disclosures would have been made,
eliminating Counts 3,5,8,13,17 and 19; more complete amended answers would have eliminated
"false" statements as alleged in Counts 9 and 10; and full explanations could have been made as
to any transferring of assets, so as to resolve Cts. 15,16, from criminal prosecution.  Filings are
amended all the time in court actions.

13)     The bankruptcy counts to which Defendant pled adversely impacted his overall sentence
range by increasing same at least two levels under the United States Sentencing Guidelines,
which guidelines the court followed in sentencing the Defendant in his case.

14)     The Defendant scored 22 points under the U.S.S.O. for a recommended sentence range of
41-51 months.  A two level reduction in points would have lowered the points to 20, with a
sentence range of 33-41 months, netting the Defendant at least a ten month lower sentence.

15)     More importantly, however, if Attorney Rade had corrected all problems raised at the
December 9, 2006 meeting, and had reviewed in close detail all schedules/financials of DON
WARNER REINHARD, in the opinion of your Affiant, there would have been no bankruptcy
counts in the indictment, reducing the counts from twenty-three to twelve, and eliminating a
whole series of allegedly fraudulent actions of the Defendant from consideration by the trial
court.  Since the sentencing judge referred to the "overall" conduct of DON WARNER
REINHARD in sentencing him at the highest end of the guideline range, in the opinion of your
Affiant, who has been practicing before trial judge Robert Hinkle, since he first came to the
bench, the likely sentence that would have been imposed would have been mid-range, of the

lower guideline range, i.e. midway between 33-41 months or somewhere around 37 months,
possibly even lower,  not the fifty-one months now of record.

16)     A federal inmate must serve eighty-five percent of his/her sentence. The fifty-one months
facing DON WARNER REINHARD should have been lower without the bankruptcy counts, and
thus the net time to serve currently is 43 months, while, without bankruptcy, in your Affiant's
opinion and experience, on a thirty-seven month sentence, the net would be 31 months.

FURTHER AFFIANT SAYETH NAUGHT.

CLYDE M. TAYLOR, JR.

The foregoing instrument was sworn to before me this ___ day of April, 2010, by
Clyde Taylor          , who is personally known to me or who has
produced _____ as identification, and who did take an oath.

NOTARY PUBLIC
My Commission Expires:
Commission Number:

**Bill Acuff**

| | |
|---|---|
| **To:** | Gail Milon |
| **Cc:** | Dr. Tim Howard; Tom Woods |
| **Subject:** | Demand letter 5/2/2017 |
| **Attachments:** | 20161231 Portfolio Report.pdf; 20170227 Confirmation of Note.pdf |

May 2, 2017

Ms. Gail Milon
Manager & Vice President
Cambridge Capital Group
2120 Killarney Way, Ste. 125
Tallahassee, Florida 32309
Main Office: (850) 298-4455
Fax: (850) 216-2537

Via email to: gail@ccwealthadvisors.com and
Via fax to: (850) 216-2537

Gail,

I continue to be confounded by your lack of communications with me in regards to this extremely serious matter, and I have lost confidence in your willingness to deal with us in good faith in regards to your handling of our account. This situation is causing us severe financial distress—if I had had any inkling that there would be this level of drama surrounding the redemption of our money I would never have made the investment in or the loan to Cambridge.

Accordingly, I am demanding the immediate redemption and liquidation of our investment account, as evidenced by the attached statement, and repatriation of the funds by wire to our bank. Although we have not received a statement of the account since Jan 30, 2017, based on information and belief its value has accrued to $130,256.57 after adjusting for the partial $10,000 disbursement of Apr 3, 2017:

| Period | Amount | Interest | Balance |
|---|---|---|---|
| Dec-16 | $118,386.96 | $ 4,143.54 | $ 122,530.50 |
| Jan-17 | $122,530.50 | $ 4,288.57 | $ 126,819.07 |
| Feb-17 | $126,819.07 | $ 4,438.67 | $ 131,257.74 |
| Mar-17 | $131,257.74 | $ 4,594.02 | $ 135,851.76 |
| | $ (10,000.00) | less (April 3 2017 disbursement) | |
| Apr-17 | $125,851.76 | $ 4,404.81 | $ 130,256.57 |

According to the terms of the note, it is not due until May 9, 2017. As we discussed, I will be there at 2120 Killarney Way, Ste. 125 Tallahassee, Florida 32309 at 10AM on May 10 in order to receive the $286,880.75 proceeds of the note.

Continuing to ignore this will not make it go away and will make things worse. I can't believe you are putting so many reputations – yours, Cambridge's, Dr. Howard's, the law firm's – at risk. I have not contacted FINRA or hired counsel yet, but that is my next step. If you have any questions or would like to discuss, please call me on (404) 263-9842.

1

Based on your 12/31/2016 quarterly statement reflecting your portfolio value of $118,386.96, I can see the approximate valuation of $130,256.57 as of May 9, 2017. Your 12/31/16 statement reflects you having approximately 50% in Cambridge Capital Partners (CCP) and 50% in Cambridge Capital Group Equity Option Opportunity (CCGEOO). Seeing that CCP is not reflected on your approximate valuation sheet, I assume Don reallocated your portfolio to 100% CCGEOO. The bank statements reflect 100% of the $250k deposited on January 10, 2017 going into CCGEOO.

I wanted to respond to you before I left for the day. I will continue my dialogue tomorrow. Fatigue has hit me.

Best Regards,
*Gail Milon, CASL, CLTC*

President                                      Managing Vice
**Cambridge Capital**
**Group**         Email: info@cambridgecapitalgroup.holdings



Tallahassee Office:
2120 Killarney Way, Ste. 125
Tallahassee, Florida 32309
Main Office: (850) 298-4455 Ext. 109
Fax: (850) 765-8121

On Tue, Apr 25, 2017 at 4:37 AM, Bill Acuff <wjacuff@servitodo.com> wrote:

Gail,

1. Please find attached the email dated 2/27/2017, including traceable headers, transmitting the Confirmation of Funds letter you requested.
2. Gail, I find your claim that you have not received the $250,000 we loaned you on January 9, 2017 – said note maturing on May 9, 2017 at $286,000 – to be extremely disturbing, to the point of notifying the appropriate authorities, including law enforcement. This sum was remitted by the return to Cambridge of the cashier's check for $221,000 referenced in your attached email and never negotiated by Cambridge, as well as an additional check drawn on ServiTodo's IberiaBank checking account in the amount of $29,000, totaling $250,000. Both of these instruments are easily traced. Nonetheless, please find attached the following additional Exhibits supporting the note.

3

/s/ William (Bill) Acuff, Management Officer | ServiTodo USA | wjacuff@servitodo.com
SBA Certified: 8(a) | HUBZone | ED-WOSB 8(m) | SDB | SB Contractor | CAGE Code: 5KJZ7
PO Box 101906, Atlanta, GA 31119 | Tel (404) 939-2372 | Fax (404) 829-2866

**From:** Don Reinhard [mailto:d123fsu@gmail.com]
**Sent:** Thursday, April 27, 2017 8:51 PM
**To:** gail@ccwealthadvisors.com
**Cc:** Bill Acuff <wja.etn@gmail.com>
**Subject:** Bill Acuff

Gail,
Bill Acuff contacted me about your refusal to acknowledge his $250,000 investment in January. While you will find his original disbursement of $221,000 in January on the EOO contribution log as well as is $250,000 new contribution.
Additionally, the terms of the agreement with Bill are clearly outlined in emails to and from him found in his email folder. This agreement calls for 3.5% simple interest per month for 4 months which would total a disbursement on or about May 9 for about $285,000. This was also noted on the monthly activity log I reviewed with you prior to my departure.
I trust you will insure that CCG will confirm and abide by this agreement so Mr. Acuff does not have to take further legal action.
Don

**From:** cambridge capital [mailto:info@cambridgecapitalgroup.holdings]
**Sent:** Wednesday, April 26, 2017 12:26 AM
**To:** Bill Acuff <wjacuff@servitodo.com>
**Cc:** Gail Milon <gail@ccwealthadvisors.com>; Dr. Tim Howard <tim@howardjustice.com>
**Subject:** Re: Disbursements

Good Evening Bill,

We want to thank you for providing us with the supporting documentation regarding your investment with Cambridge Capital. At the beginning of my initial response to you I documented "I'm going to need your assistance on this". If you found my request to be disturbing, please accept my apologies.

Don received a termination letter from Cambridge Capital on February 13, 2017. As you can see from your attached documentation, he continued to transact business after that termination date. In his departure, he did not leave all records/supporting documents with Cambridge Capital thus the purpose for my initial statement.

I will admit and apologize, I did not look beyond December 31, 2017 for business transactions with Servitodo. The activity you provided was in January of 2017. I see both the $221k as well as the $29k deposited into Cambridge Capital on January 10, 2017. Again, please accept my apologies. Your funds have been received.

2

o   Letter of transmittal dated 1/9/2017 for the funds which were delivered via FedEx 785266265857 and received by M. Brown in your office on 1/10/2017
    ▪ Proof of delivery for the aforementioned FedEx delivery.
o   Scan of Bank of America Cashier's Check #1303203006 to the order of ServiTodo LLC in the amount of $221,000 for investment return. This check was never negotiated by us, and I presume was returned by you to BOA as not used for its intended purpose. I will contact BOA and initiate an investigation as this has apparently been lost or stolen.
o   Scan of ServiTodo's check #6104 in the amount of $29,000. Please note the remittance advice.
    ▪ Copy of cancelled check #6104, which cleared our bank on 1/11/2017.

I encourage you to immediately contact me on 404-263-9842 when you locate our money and confirm the disbursement schedule in my original email before this situation escalates.

**From:** Gail Milon [mailto:gail@ccwealthadvisors.com]
**Sent:** Monday, April 24, 2017 6:23 PM
**To:** Bill Acuff <wjacuff@servitodo.com>
**Cc:** cambridge capital <info@cambridgecapitalgroup.holdings>
**Subject:** Re: Disbursements

Good Afternoon Bill,

Thank You for the advance notice. I'm going to need your assistance on this.

We show a $100,000 wire into Cambridge Capital from Servitodo on August 5, 2016 split 50/50 Cambridge Capital Partners and Cambridge Capital Equity Option Opportunities.

In addition, I show a $200,000 counter credit from Servitodo on October 13, 2016.

We show a cashier's check in the amount of $221,000 made payable to Servitodo on December 27, 2016 for return on investment. In addition a wire in the amount of $10,000 was deposited into your Servitodo account on April 6, 2017.

4

If there are additional investments made into Cambridge Capital, please provide us with the supporting documentation. We show no additional investments/records on our end.

We have in our records one of your attachments: Your 12/31/2016 quarterly statement. We do not have the letter typed with Dr. Howard's name on it (no signature and no date).

Please provide us with the e-mail that was forwarded to you containing that document.

I look forward to receiving the supporting documentation from you that will clear up any discrepancies.

Best Regards,

*Gail Milon, CASL, CLTC*

Manager Vice President

**Cambridge Capital Group**

Email: gail@ccwealthadvisors.com

Tallahassee Office:

2120 Killarney Way, Ste. 125

Tallahassee, Florida 32309

Main Office: (850) 298-4455 Ext. 109

5

---

Fax: (850) 765-8121

On Sun, Apr 23, 2017 at 7:59 PM, Bill Acuff <wjacuff@servitodo.com> wrote:

Sorry I missed you last week Gail.

As I mentioned to you and Don, we were placing our funds with Cambridge for a limited period while we sought sought investment opportunities in real estate. We are making our moves there right now, so I wanted to give you a heads up on our cash requirements over the next 30 days.

Since the note matures on May 9, 2017, please make all these disbursements effective on that day, per the remittance advice contained in the table below:

| Tranche | Valuation* | | Maturity Date | Disbursement Amount | Remittance advice | Balan |
|---|---|---|---|---|---|---|
| CCGEOO/CCG LP | $ 130,256.57 | ** | N/A | $ 86,302.29 | Cashier's check payable to "ServiTodo LLC" | $ |
| CCGEOO/CCG LP | $ 43,954.28 | ** | N/A | $ 3,663.35 | Cashier's check payable to "ServiTodo LLC" | $ |
| Note | $ 286,880.75 | * | 5/9/2017 | $ 253,422.32 | Cashier's check payable to "ServiTodo LLC" | $ |
| Note | $ 33,458.43 | * | | $ 10,000.00 | Wire or ACH to ServiTodo*** | $ |

*Valuation at maturity (May 9, 2017)
**Approximate valuation as of May 9, 2017

I will meet you in your office at 30AM May 10 to pick up the Cashier's Checks. Please give me a call to confirm receipt.

Thanks,

Bill Acuff (404) 263-9842

6

---

From: cambridge capital [mailto:info@cambridgecapitalgroup.holdings]
Sent: Tuesday, April 18, 2017 7:58 PM
To: undisclosed recipients <info@cambridgecapitalgroup.holdings>
Subject: First Quarter 2017

GREETINGS INVESTORS!

The first quarter has come to a prosperous and eventful end.

We, at Cambridge Capital Group, are excited that to be moving forward with a new automated process that will expedite the availability of our quarterly, annual and individual reports.

We are making these necessary improvements for audit and quality control purposes. It is our intention to have this first quarterly report dispersed to you by May 15, 2017 or sooner.

Great things are happening at Cambridge Capital Group. Details will be provided in the quarterly report.

Best Regards,
Gail Milon, CASL, CLTC
President                          Cambridge Capital
Group                                   Managing Vice
Email: info@cambridgecapitalgroup.holdings

7

---

Tallahassee Office:

2120 Killarney Way, Ste. 125

Tallahassee, Florida 32309

Main Office: (850) 298-4455 Ext. 109

Fax: (850) 765-8121

From: Bill Acuff [mailto:wja.etn@gmail.com]
Sent: Wednesday, April 5, 2017 6:46 AM
To: Gail Milon <gail@ccwealthadvisors.com>
Subject: Re: Portfolio Report

Good morning Gail,

Prior to our 1100 call, please forward me via email your FINRA/NASD credentialing data.

Thank you,

Bill Acuff | ServiTodo USA
(404) 939-2372 | wjacuff@servitodo.com
PO Box 191606, Atlanta GA 31119

*Please excuse any misspellings as this message was sent from my iPhone.

On Apr 4, 2017, at 9:29 PM, Bill Acuff <wja.etn@gmail.com> wrote:

If you're unwilling to perform a partial distribution, please liquidate the entire account and wire me the proceeds tomorrow.

From: Gail Milon [mailto:gail@ccwealthadvisors.com]
Sent: Tuesday, April 4, 2017 9:25 PM
To: Bill Acuff <wja.etn@gmail.com>
Subject: Re: Portfolio Report

No, I have not.

I'm sure you know that a hedge fund does not operate like a mutual fund. A hedge fund is not a liquid investment. Hedge funds are long term investments. I will discuss this with you tomorrow at 11:00 am eastern.

Kind regards,

*Gail Milon*
Manager Vice President

8

Cambridge Capital Group
Email: gail@ccwealthadvisors.com

Kind regards,

*Gail Milon*

Manager Vice President

**Cambridge Capital Group**

Email: gail@ccwealthadvisors.com

Tallahassee Office:
2120 Killarney Way, Ste. 125
Tallahassee, Florida 32309
Main Office: (850) 298-4455
Fax: (850) 216-2537

On Tue, Apr 4, 2017 at 9:08 PM, Bill Acuff <wja.etn@gmail.com> wrote:

Please call me tomorrow at 1100 eastern, or propose an alternative time. Have you initiated the wire for the disbursement?

From: Gail Milon [mailto:gail@ccwealthadvisors.com]
Sent: Tuesday, April 4, 2017 9:05 PM

To: Bill Acuff <wjacuff@servitodo.com>
Subject: Re: Portfolio Report

Good Evening Mr. Acuff,

I attempted to reach you by phone.

I can be reached at 850-270-9898.

Tallahassee Office:

2120 Killarney Way, Ste. 125

Tallahassee, Florida 32309

Main Office: (850) 298-4455

Fax: (850) 216-2537

On Tue, Apr 4, 2017 at 1:02 PM, Bill Acuff <wjacuff@servitodo.com> wrote:

Gail,

9

10

As I mentioned in my email to Tom, I'd like to schedule a phone call with you ASAP to discuss:

1) Your qualifications and any changes in investment policies of these funds resulting from Don Reinhard's departure.

2) A partial redemption of $10,000 from our account to be wired to: ServiTodo LLC c/o IberiaBank, RTN: 265270413, Account # 2243707

Please give me a call on (404) 263-9842 as soon as possible.

Thanks,

/s/ William (Bill) Acuff, Management Officer | ServiTodo USA | wjacuff@servitodo.com

SBA Certified: 8(a) | HUDZone | ED-WOSB 8(m) | SDB | SB Contractor | CAGE Code: 5KJZ7

PO Box 191606, Atlanta, GA 31119 | Tel (404) 939-2372 | Fax (404) 829-2866

From: Gail Milon [mailto:gail@ccwealthadvisors.com]
Sent: Monday, April 3, 2017 8:56 PM
To: Bill Acuff <wjacuff@servitodo.com>
Subject: Re: Portfolio Report

Good Evening Bill,

My apologies for the delay in my response.

My phone number is 850-270-9898.

How may I be of service?

Kind regards,

*Gail Milon*

Manager Vice President

**Cambridge Capital Group**

Email: gail@ccwealthadvisors.com

Tallahassee Office:

2120 Killarney Way, Ste. 125

Tallahassee, Florida 32309

Main Office: (850) 298-4455

Fax: (850) 216-2537

From: Tom Woods [mailto:thomascwoods@gmail.com]
Sent: Monday, April 3, 2017 9:15 AM
To: Bill Acuff <wjacuff@servitodo.com>
Subject: Re: Portfolio Report

11

12

Sure.

Sent from my iPhone

From: Bill Acuff [mailto:wjacuff@servitodo.com]
Sent: Monday, April 3, 2017 8:54 AM
To: Tom Woods <thomascwoods@gmail.com>
Cc: Yariti <yariti@servitodo.com>
Subject: Fwd: Portfolio Report

Good morning Tom,

I've been having trouble reaching Gail Milon, would you please have her contact me on (404) 263-9842 as soon as possible?

Thanks,

Bill Acuff | ServiTodo USA
(404) 939-2372 | wjacuff@servitodo.com
PO Box 191606, Atlanta GA 31119

*Please excuse any misspellings as this message was sent from my iPhone.

On Fri, Mar 31, 2017 at 8:14 AM, Bill Acuff <wjacuff@servitodo.com> wrote:

Good morning Gail,

It is my understanding that Don Reinhard is no longer with Cambridge and that you have assumed his portfolio.

Please advise and provide contact information for yourself. Also I'd like to schedule a call early next week.

Bill Acuff | ServiTodo USA

(404) 939-2372 | wjacuff@servitodo.com

PO Box 191606, Atlanta GA 31119

*Please excuse any misspellings as this message was sent from my iPhone.

Begin forwarded message:

13

Thanks,

Bill

Bill Acuff | ServiTodo USA
(404) 939-2372 | wjacuff@servitodo.com
PO Box 191606, Atlanta GA 31119
(sent from a mobile device)

On Feb 27, 2017, at 4:18 AM, cambridge capital <info@cambridgecapitalgroup.holdings> wrote:

Effective Monday 2/27, I am relinquishing my advisory and management responsibilities with the various entities of Cambridge Capital Group to handle a very unfortunate legal situation. Hopefully this period will be very short lived but presently the time frame is uncertain.

In the meantime and in preparation for this decision, I have been working very closely with Gail Milon who recently joined Cambridge Capital Group to manage Cambridge Capital Wealth Advisors. Gail has over 30 years of experience in the wealth management and insurance industry and has shown a remarkable ability to successfully learn and manage the growing entities of Cambridge Capital Group in a relatively short period of time.

Additionally, the proprietary investment funds of Cambridge Capital Group (Cambridge Capital Partners LP & Cambridge Capital Group Equity Option Opportunities LP) are currently structured in a extremely stable position and the portfolio assets are solid and will continue to move forward with little adjustment for the forseeable future....there is no need to have any concerns. Gail will have constant and frequent communication with me during this period to help her guide and mange the investment portfolio as well as the other operations of CCG....again, the portfolio is stable and solid.

We continue to thank you very much for the opportunity you have given us and again, hopefully this period will be short lived. However, in the meantime, please do not hesitate to call Gail if you have any questions at (o) 850-270-9898 or (c) 850-591-4010..

Thank you,
Don

---------- Forwarded message ----------
From: "William J. (Bill) Acuff" <wjacuff@servitodo.com>
To: <info@cambridgecapitalgroup.holdings>
Cc: "Dr. Tim Howard" <tim@howardjustice.com>
Bcc:
Date: Mon, 9 Jan 2017 19:11:21 -0400
Subject: Cambridge Capital additional investment

January 9, 2017

Mr. Don Reinhard

15

From: "Bill Acuff" <wjacuff@servitodo.com>
Date: March 29, 2017 at 7:39:25 AM EST
To: "cambridge capital" <info@cambridgecapitalgroup holdings>
Subject: RE: Portfolio Report

Good morning,

Is this mailbox being monitored? Please contact me as soon as possible to discuss redemption of ServiTodo's position.

/s/ William (Bill) Acuff, Management Officer | ServiTodo USA | wjacuff@servitodo.com

SBA Certified: 8(a) | HUBZone | ED-WOSB 8(m) | SDB | SB Contractor | CAGE Code. 5KJZ7

PO Box 191606, Atlanta, GA 31119 | Tel (404) 939-2372 | Fax (404) 829-2866

---------- Forwarded message ----------
From: cambridge capital <info@cambridgecapitalgroup.holdings>
To: Bill Acuff <wjacuff@servitodo.com>
Cc:
Bcc:
Date: Mon, 27 Feb 2017 09:09:57 -0400
Subject: Re: Management of Cambridge Capital Group

Here you go and again, thank you Bill.

Tim Howard, J.D., Ph. D.
Don Warner
Gail Milon
Harrison Smith
Cambridge Capital Group, LLC
850-270-9898

On Mon, Feb 27, 2017 at 5:28 AM, Bill Acuff <wjacuff@servitodo.com> wrote:
Don,

I need to request your assistance in a somewhat urgent matter. When I provided the $250K in January 2017 for 120 day funds, I mentioned I needed the funds in May to purchase real estate. I have written and executed a contract for the real estate, and now I need to provide proof of the source of funds for the purchase.

Can you please provide this, along with the NPV and maturity date? Sorry for the timing, but I really need it ASAP. Can you handle this or should I reach out to Gail?

14

Dr. Tim Howard

Cambridge Capital Group

2120 Killarney Way

Tallahassee, FL 32309

via Federal Express airbill # 7852 6626 5857

Don,

Please find enclosed $250,000.00 as described below for the 120 day investment per the terms in the attached email dated December 27, 2016, to be disbursed on or about May 9, 2016:

| | |
|---|---|
| ServiTodo check # 6104 from IberiaBank 2243707 | $   29,000.00 |
| BOA Cashier's Check # 1303203006 | $  221,000.00 |
| Total | $ 250,000.00 |

This is in addition to the $100,000.00 basis held by Cambridge since August 5, 2016 and valued at $106,751.10 on Sep 30, 2016.

Please give me a call on (404) 263-9842 with any questions or to discuss.

Thanks,

Bill

/s/ William Acuff, Management Officer

ServiTodo USA, 5115 New Peachtree Rd., Ste 303, Atlanta, GA 30341

Tel (404) 939-2372 | Fax (404) 829-2866 | wjacuff@servitodo.com

16

From: cambridge capital [mailto:info@cambridgecapitalgroup.holdings]
Sent: Tuesday, December 27, 2016 2:35 PM
To: Bill Acuff <wjacuff@servitodo.com>
Subject: Disbursement


Bill


I have your cashiers check prepared .... are you still planning to come to Tallahassee on January 2nd ?


Also, I am on the hunt for a maximum of $500,000 in 120 day funds for opportunities that I want to take
advantage of. I can pay 3.5% per month or if you want to bring in others who have an interest then I can pay
them 3% and you a 1/2 % override.


Hope you are having a great holiday season.


Thank you

Don

17

# EXHIBIT F



## The Florida Bar
651 East Jefferson Street
Tallahassee, FL 32399-2300

John F. Harkness, Jr.
Executive Director

Joshua E. Doyle
Executive Director Designate

December 13, 2017

Mr. Phillip Timothy Howard
Howard and Associates P A
2120 Killarney Way Ste 123
Tallahassee, FL 32309-3402

Re:   Complaint by Don Reinhard against Phillip Timothy Howard
      The Florida Bar File No. 2018-00,265 (2A)

Dear Mr. Howard:

Enclosed is a copy of an inquiry/complaint and any supporting documents submitted by the above referenced complainant(s).  Your response to this complaint is required under the provisions of Rule 4-8.4(g), Rules of Professional Conduct of the Rules Regulating The Florida Bar, and is due in our office by December 29, 2017.  **Responses should not exceed 25 pages** and may refer to any additional documents or exhibits that are available on request.  Failure to provide a written response to this complaint is in itself a violation of Rule 4-8.4(g).  Please note that any correspondence must be sent through the U.S. mail; we cannot accept faxed material.  You are further required to furnish the complainant with a complete copy of your written response, including any documents submitted therewith.

Pursuant to Rule 3-7.1(f), Rules of Discipline, you are further required to complete and return the enclosed Certificate of Disclosure form.

Finally, the filing of this complaint does not preclude communication between the attorney and the complainant(s).  Please review the enclosed Notice for information on submitting your response.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

Enclosures

cc:   Mr. Don Reinhard

---

### NOTICE OF GRIEVANCE PROCEDURES

1.      The enclosed letter is an official inquiry by bar counsel. Your response is required under Rule 4-8.4(g) of the Rules Regulating The Florida Bar. Rule 4-8.4(g)(1) and (2) require that a lawyer submit a written response within 15 days to an initial inquiry and within 10 days to any follow-up inquiry made by bar counsel, the grievance committee or the board of governors during the course of an investigation of the lawyer's conduct.  If you do not respond, the matter will be forwarded to the grievance committee for disposition in accordance with Rule 3-7.3. Failure to respond may also be a matter of contempt and processed in accordance with Rule 3-7.11(f).

2.      Many inquiries considered first by staff counsel are not forwarded to a grievance committee, as they are inquiries which do not involve violations of the Rules of Professional Conduct justifying disciplinary action.

3.      Pursuant to Rule 3-7.1, any reports, correspondence, papers, recordings and/or transcripts of hearings submitted by you in this matter shall become accessible to the public upon dismissal or a decision by the grievance committee.  Please advise Bar Counsel of any material provided to The Florida Bar believed to be confidential under applicable law so that measures can be taken to seal that portion of the file.  Please note that The Florida Bar is required to acknowledge the status of proceedings during the pendency of an investigation, if a specific inquiry is made and the matter is deemed to be in the public domain.

4.      The grievance committee is the Bar's "grand jury." Proceedings before the grievance committee are non-adversarial in nature. The grievance committee's function and procedures are set forth in Rule 3-7.4.

5.      If the grievance committee finds probable cause, formal adversarial proceedings before the Supreme Court of Florida will be initiated pursuant to Rule 3-7.6. A referee will make a recommendation as to guilt and discipline to The Supreme Court of Florida, unless a plea is submitted pursuant to Rule 3-7.9.

---



## The Florida Bar
651 East Jefferson Street
Tallahassee, FL 32399-2300

John F. Harkness, Jr.
Executive Director

Joshua E. Doyle
Executive Director Designate

December 13, 2017

Mr. Don Reinhard
7104 Harvest Ridge Lane
Alpharetta, GA 30022

Re:   Phillip Timothy Howard; The Florida Bar File No. 2018-00,265 (2A)

Dear Mr. Reinhard:

Enclosed is a copy of our letter to Mr. Howard which requires a response to your complaint.

Once you receive Mr. Howard's response, you have 10 days to file a rebuttal if you so desire.  If you decide to file a rebuttal, you must send a copy to Mr. Howard.  Rebuttals should not exceed 25 pages and may refer to any additional documents or exhibits that are available on request.  Please address any and all correspondence to me.  **Please note that any correspondence must be sent through the U.S. mail; we cannot accept faxed material.**

Please be advised that as an arm of the Supreme Court of Florida, The Florida Bar can investigate allegations of misconduct against attorneys, and where appropriate, request that the attorney be disciplined.  The Florida Bar cannot render legal advice nor can The Florida Bar represent individuals or intervene on their behalf in any civil or criminal matter.

Please review the enclosed Notice on mailing instructions for information on submitting your rebuttal.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

Enclosures

cc:   Mr. Phillip Timothy Howard

---

### IMPORTANT NOTICE FOR COMPLAINANTS AND RESPONDENT-ATTORNEYS

#### MAILING INSTRUCTIONS

**Materials Received That Do Not Comply With These Instructions May Be Returned Or Not Otherwise Incorporated Into The File**

The Florida Bar converts its disciplinary files to electronic media. All submissions are scanned into an electronic record and hard copies are discarded. To help ensure the timely processing of inquiries/complaints, responses and rebuttals, please review the following instructions prior to providing your submission.

1.  Please limit your submission to no more than 25 pages including exhibits. If you have additional documents or material available, please make reference to those documents and/or materials in your written submission as available upon request. Should The Florida Bar need to obtain copies of any such documents and/or materials, a subsequent request will be sent to you.

2.  Please do not bind, staple, tab or index your documents. You may underline but do not highlight documents under any circumstances. Please do not submit materials in color. When documents are scanned in our disciplinary files, highlighting and color will obscure the underlying text.

3.  Please do not attach media such as audio tapes, thumb/flash drives, CDs, or photographs. We cannot process any media which cannot be scanned into the electronic record.

4.  Please do not submit your original documents. All documents will be discarded after scanning and we will not be able to return any originals submitted to our office. The only original documents that should be provided to our office are the inquiry/complaint form, response and certificate of disclosure.

5.  Whether you are a complainant or a respondent-attorney, please do not submit confidential or privileged information. Documents submitted to our office become public record. (Respondent-attorneys may wish to consult Rule 4-1.6 (c) of the Rules Regulating The Florida Bar.) Confidential/privileged information should be redacted. Such information includes, but is not limited to, bank account numbers, social security numbers, credit card account numbers, medical records, dependency matters, termination of parental rights, guardian ad litem records, child abuse records, adoption records, documents containing names of minor children, original birth and death certificates, biometric data such as fingerprints, Baker Act records, grand jury records, and juvenile delinquency records. If information of this nature is important to your submission, please describe the nature of the information and indicate that it is available upon request. Bar counsel will contact you to make appropriate arrangements for the protection of any such information (to the extent permitted by law) as part of the investigation of the complaint.

6.  Please provide your submission only one time. Do not submit duplicates via email, facsimile transmission or by any other means. Do not include these instructions. Respondent-attorneys do not need to include a copy of the complaint.

Please be aware that materials received that do not meet these instructions may be returned or not otherwise incorporated into the file. Thank you for your consideration in this respect.



RECEIVED
DEC 11 2017
The Florida Bar
Tallahassee Branch

**The Florida Bar**
651 East Jefferson Street
Tallahassee, FL 32399-2300
(800) 561-6400
www.floridabar.org

John F. Harkness, Jr.
Executive Director

James E. Doyle
Executive Director Designate

November 15, 2017

Mr. Don Reinhard
100 Cabana Cay Cir.
Unit 222
Panama City Beach, FL 32413

Re:   Mr. Phillip Timothy Howard; RFA No. 18-4428

Dear Mr. Reinhard:

The Supreme Court of Florida has adopted rules that require the allegations be signed and under oath. In order to comply with this rule you must sign the oath below and return it to us by November 27, 2017 before we can proceed with an investigation.

Under penalty of perjury, I declare that the facts contained in the inquiry submitted to The Florida Bar concerning Mr. Howard are true, correct and complete.

_____   12/6/17
Mr. Don Reinhard                    Date

If you do not complete and return the oath form to us, we may be unable to proceed with the investigation. A copy of the rule imposing this obligation (3-7.3(c)) may be found on the Bar's web site at www.floridabar.org.

Also, if you have documents that you feel support your allegations, please provide copies of them when you return the oath.  Your response must not exceed 25 pages.

Thank you for your cooperation.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

---

The Florida Bar
651 East Jefferson Street                    OCT 06 2017
Tallahassee, FL 32399-2300

Re:  Ethics Complaint – Jaakan Williams
     Ethics Complaint – Philip Timothy Howard

Please use this letter as my authoriza-
tion to allow my father, Herbert F.
Reinhard Jr., to have full access to all
Florida Bar information regarding the
two ethics complaints I filed on or
about July 25, 2017 on the following:

Jaakan Williams – Fla. Bar File 2018-00,060
Philip Timothy Howard – Florida
                        Bar No. 655325

Both attorneys are employed by Howard &
Associates P.A. in Tallahassee, FL.

Specifically, upon his call, please provide
him with all details about what, if any-
thing, I need to do next. I received a
copy of Mr. Williams' response dated
August 21, 2017 but not Mr. Howard's
response.

_____
DON REINHARD

---

THE FLORIDA BAR
INQUIRY/COMPLAINT FORM

PART ONE (Complainant Information):
Your Name: Don Reinhard
Organization: Cambridge Capital Group LLC
Address: 2120 Killarney Way
City, State, Zip Code: Tallahassee, FL 32309
Telephone: 850-228-9868 (alternative number until mid Dec.)
                                            770-475-1066
Email: donadm531@gmail.com
ACAP Reference No.: _____
Does this complaint pertain to a matter currently in
     litigation   Yes _____   No X

PART TWO (Attorney Information):
Attorney's Name: Philip T. Howard   FL Bar 655325
Address: 2120 Killarney Way
City, State, Zip Code: Tallahassee, FL 32309
Telephone:   850-298-4455  Fax: 850-216-2537

PART THREE (Facts/Allegations): The specific thing or
things I am complaining about are:

1. Tim Howard is an attorney in Tallahassee and a member
   of the Florida Bar (655325).
2. Mr. Howard is a 50% owner of Cambridge Capital
   Group with complainant, Don Reinhard.
3. Mr. Howard is the senior partner and sole owner
   of Howard & Associates, P.A., a law firm located in
   Tallahassee, FL.
4. Mr. Howard represents former NFL players in their

PART THREE CONTINUED

concussion lawsuit against the NFL and has set up various enterprises to take advantage of his contractual obligations to these clients.

5. Cambridge Capital Group LLC was established in 2015 by Don Reinhard with Mr. Howard as his partner as a boutique full service financial services and investment advisory firm. While the state of Florida LLC registration shows Cambridge Capital Group LLC (CCG) as being solely owned by Tim Howard, complainant and Mr. Howard had a written agreement to equally split but profits, losses and equally owned (50% each) CCG and all related companies. Agreed, CCG and all related companies were either jointly operated (established by Tim) adhering to this agreement.

6. Complainant holds the title of Executive Vice President which if Tim Howard held the title of President when it was published monthly in-laws complainant was the CEO and the operating entity of CCG (Cambridge Capital Group LLC and therefore considered the "operating partner" of CCG and Mr. Howard was a "silent partner". (Complainant can provide all documentation upon release.)

7. CCG through its operating partner did refer approximately 100 former NFL players to Tim Howard and Howard & Associates for representation in their concussion lawsuit. A vast majority of these players were either current clients of CCG or active prospects with confirmed business comitments. Therefore,

PART THREE - CONTINUED

complainant, CCG operating partner Don Reinhard, had a direct responsibility and on-going comitment to these referrals to insure that their concussion lawsuit be handled appropriately and with complete integrity by Tim Howard and Howard & Associates PA.

8. While complainant had vague initial knowledge of the inappropriate and fraudulent handling of the testing procedures used by Howard & Associates PA which was brought to the attention of Tim Howard in the spring of 2016 and was assured that the deceptive procedures would be immediately corrected, he was shocked to learn in 11/16 that the deceptive, fraudulent, and inappropriate testing procedures which are the initial criteria to insure that a player has a legal valid claim had not only continued under Tim Howard's direct leadership but had actually manifested itself to be the norm as opposed to the exception. The motive behind this fraudulent activity was average legal fees of approximately $175,000 - $250,000 per qualified player as opposed to an expense of $10,000 - $15,000 per non-qualified player or a revenue/expense swing of $200,000 each

9. Additionally, complainant learned that the initial fraudulent procedures of the testing process had also spread

PART THREE - CONTINUED

throughout the entire qualification process. (Exhibit B)

10. This information was brought to the attention of complainant in mid to late January 2017 after complainant had witnessed Tim Howard forging the signature of the required Board Certified Nuerologist to the report of a player.

11. Complainant confronted his business partner in CCG, Tim Howard senior partner and owner of Howard & Associates PA, on February 23 and 24, 2017 regarding these very egregious and serious concerns as complainant had a fiduciary responsibility to interject his valid concerns on behalf of his many client referrals to Howard & Associates PA due to the significant negative effect the outcome could have on their million dollar claims against the NFL. If determined fraudulent, player would disqualify.

12. Complainant initially felt positive about the response from Tim Howard as he assured complainant he was unaware of the serious issues and allegations of massive fraud in the qualification process.

13. Unfortunately, complainant was required to self surrender to the Leon County Jail to handle an irrelevant alleged criminal charge regarding his probation from a previous charge on February 28th, 2017.

14. Much to complainant's shock, his business

PART THREE - CONTINUED

partner, Tim Howard, senior partner and owner of Howard & Associates PA, chose not only to not investigate the extremely serious fraud allegations but instead chose to initiate a "campaign of personal retaliation against complainant, Don Reinhard, his business partner and 50% owner of Cambridge Capital Group LLC since complainant was for all intensive purposes now defenseless and trusted the multiple agreements and promises he had with this business partner. These agreements and promises included continued financial support from CCG which had been well documented, established, and arranged by complainant and Tim Howard during the building process and enormas financial success of CCG under the management and leadership of complainant.

15. Due to the circumstances, complainant and his family now completely needed to rely on these critical financial support agreements which relied on the honesty of Tim Howard, his business partner, who now had complete management control of CCG. To accomplish this, Tim Howard chose to circumvent the well disguised operational plan created and implemented by complainant and his business partner during the period of his absence.

16. Immediately, Tim Howard chose to not repay

PART THREE — CONTINUED                    page 6

investor funds that he took without authorization from the investment partnerships of CCG which is a significant SEC violation as well as a FINRA compliance violation to once again fill the frequent financial gap of Howard & Associates P.A. as well as to support his lavish lifestyle. This frequent and on-going problem of Tim Howard, having his assistant, Brenda Murphy, "raid" the bank accounts of the CCG investment funds without authorization and other complete agreement with complainant that this illegal activity MUST stop as these funds were not in an acceptable, "slush fund source to Tim Howard or his law firm, Howard & Associates PA, to meet his frequent needs to cover checks that had already been issued, i.e. "kiting", and/or bank overdrafts for items as serious as weekly employee payroll, was an additional problem that complainant confronted Tim Howard, his business partner about on February 24, 2017.

17. Complainant clearly explained to Tim Howard that limited partner investment funds from clients of CCG were heavily regulated by SEC and FINRA policies and guidelines and were not available for his law firm, personal life style or for any need that was strictly not an investment by the investment Limited Partnerships created, structured, founded, and designed by complainant, operated by complainant, and managed by complainant in his capacity as sole employee and operating partner of Cambridge Capital Advisors LLC, (CCA),

PART THREE — CONTINUED                    page 7

General Partner of the Limited Partnerships (CCA). Again, Tim Howard also mysteriously and abruptly unofficially transferred the title of President to his elderly mother-in-law.

18. It was explained multiple times to Tim Howard that CCA was required to maintain an extremely high level of fiduciary responsibility to these limited partners and that responsibility fell on the shoulders of complainant. Therefore, the investment funds of CCG were completely "off limits" to his personal "slush" fund needs to meet the requirements of his lavish life style (million dollar condo in Boston, multi million dollar home in upscale Golden Eagle in Tallahassee, million dollar beach home on St. George Island, and million dollar beach lots (2) on St. George Island but yet he could not meet his law firm's weekly payroll on a regular basis without illegally raiding investor funds from CCG limited partner clients) as well as the on-going financial needs to cover frequent bank overdrafts at Regions Bank and checks that had been issued without available funds to cover law firm weekly payroll and other necessary operating expenses.

19. This "pilfering" of funds started small and could therefore be structured into attractive, strategic investments to benefit the limited partners of CCG by complainant in his sole capacity as investment manager of the Limited Partnerships. However, the early morning "raids" by Brenda Murphy, Tim Howard's assistant, as directed by Tim Howard before complainant

PART THREE — CONTINUED                    page 8

had an opportunity to review accounts grew more frequent and larger, reaching from the tens of thousands to hundreds of thousands of dollars. Additionally, defaulting on agreed upon repayment terms became frequent and more serious extending from weekly to 30, then 60, then 90 days. Then the unknown unknown. As a FL Bar member, Tim Howard knew better.

20. Again, this was the "basis", the "crux", or the 2nd part of the confrontation complainant had with his business partner, Tim Howard who was also senior partner and owner of Howard & Associates P.A. on February 24th, 2017 (the 1st being the massive fraud against the NFL Concussion Settlement to qualify players for million dollar settlements so he and Howard & Associates PA could illegally collect additional fraudulent fees in excess of $18 million at the sole risk of his clients, and their ability to get legally qualified for the settlement per the NFL guidelines). Additionally, Tim Howard chose to delay the proper filing of his client's claims for the sole benefit of himself and Howard & Associates P.A. which has resulted in clients receiving expected settlement funds by well over 7 + months later. This has put many, if not most, of these clients and clients of CCG in critical financial problems without concern from Tim Howard and Howard & Associates P.A.

21. While complainant will be filing individual litigation

PART THREE — CONTINUED                    page 9

which is being prepared as soon as possible with the proper regulatory authorities, he understands that the NFL has initiated an incomplete investigation of the settlement qualification process of Howard & Associates P.A. with little to no details from complainant as there are other concerned employees.

22. The 3rd "basis" or "crux" of the confrontation complainant had with Tim Howard which led to the extremely damaging retaliation on complainant and his family was the completely illegal action as well as sever breach in NCAA compliance regulation of providing fraudulent loans to "straw" buyers (distant relatives) of current NCAA collegiate football players in return of an agreement that the player would hire Tim Howard, Howard & Associates P.A., and CCG as their attorney, agent, and financial advisor upon entering the NFL draft. This activity has just recently been been proven to be criminal with the high profile indictments and arrests by the Manhatten U.S. Attorneys Office and Federal Bureau of Investigation in the NCAA collegiate basketball investigation.

23. CCG was and finally involved in providing institutions supposed to be well established to permit collegiate high profile players relatives so they could purchase vehicles for these players

as their bonafide relatives which per the advice of Harrison Smith, Vice President of Cambridge Sports & Entertainment LLC, was in complete compliance with NCAA policies. CCG had clearly stated that otherwise they would not be involved.

24. However, CCG quickly learned that these loans provided to Howard & Associates P.A. for the purchases were indeed not loans at all but "gifts" of tens of thousands of dollars to the players and their families. Additionally, purchase vehicles for the players that were registered in the names of distant relatives with little to no involvement. Howard & Associates PA was also "covering" all auto insurance ... a huge risk.

25. Complainant quickly removed CCG from this activity which it believed violated NCAA compliance policy and confronted Tim Howard, senior partner and owner of Howard & Associates P.A., due to the serious risk he was taking in jeopardizing these player's futures as well as the collegiate programs they represented. It also was putting CCG at serious risk.

26. These three areas of fraud, deceit, improper financial management, dishonesty, and self interest in front of and at the significant risk of clients by a member of the Florida Bar Association should cause great concern and alarm due to the egregious nature and pattern of these



activities.

27. Additionally, Tim Howard's retaliation against complainant has been extremely damaging to complainant, his spouse, and his children. Complainant and his business partner, Tim Howard, have internal agreements to co-own (50% / 50%) CCG and all related companies and therefore evenly (or as close as possible given Tim Howard's constant need for loans and funds) split all available profits and losses. Therefore, with this agreement in place, complainant routinely made the agreed upon distributions from CCA to himself and Tim Howard via agreed methods, practices, and standards for approximately 1.5 (12/2015–2/2017). These practices are well documented, very well documented, and were closely reviewed and monitored by Brenda Murphy, Tim Howard's assistant, via daily, weekly, and monthly detailed banking reports as well as quarterly distribution analysis presented and discussed by complainant with Tim Howard, his business partner.

28. While complainant routinely invested 70% – 80% of his agreed upon distributions in the investment funds of CCG, Tim Howard directed his distributions in total to be applied to his growing monthly debt



obligations to CCG and to invest the over-flow amount in the investment funds of CCG.

29. This activity by complainant allowed complainant to build a "family" investment portfolio that together with investment gains has grown to approximately $1.5 million through June 30, 2017. However, after complainant confronted Tim Howard on February 24, 2017, as before he was ecstatic with the success and agreed upon partnership with complainant with regards to the creation, structure, and implementation of CCG and all related companies, Tim Howard's campaign of retaliation against complainant immediately led to his "unacknowledgement" of these "family" investment accounts owned by complainant and therefore not allowing the liquidation requests to CCA as of June 30, 2017 to be completed. As a result, complainant has not received the requested funds which has caused significant concern, harm, hardship, and tremendous damage.

30. Additionally, complainant invested additional distributions directly in personal loans to clients and prospects of CCG due to the higher degree of associated risks that were repaid to the CCA designated account of complainant on February 28, 2017 and March 30, 2017. However, Tim Howard



refused to allow CCA to release these funds to complainant knowing that he was defenseless to fight his dishonesty in adhering to his agreement with complainant. This also caused substantial harm and damage to complainant and his family as the $50,000+ expected in March and early April were designated for living expenses and required legal bills. In fact, he tried to cause extreme harm and damage by contacting *

31. Complainant and Tim Howard also had an agreement to continue to pay complainant his weekly pay of $750 during this difficult period for complainant and his family. However, after providing only one payment on March 1st or 2nd to complainant's spouse for $500 and stating, "there will be more provided by the end of the week + then each week going forward", Tim Howard reneged on this obligation and agreement as well. This amount has now grown to well over $21,000 and has equally caused significant undue harm due to the need of complainant's family for weekly cash flow.

32. It is truly difficult to explain the overwhelming harm these decisions of retaliation, dishonesty, and deceit by Tim Howard have caused complainant and his family. The attempt to cause

* Complainant's criminal defense attorney after complainant had self surrendered as a member of the FL Bar to demand the return of the retainer fee paid to complainant's attorney because it was paid from CCG. Tim Howard well knew that this fee was paid from complainant's distribution account at CCG which was allocated for complainant's personal use. This is proven because Tim Howard had to facilitate, not approve, the payment because the check needed his signature. He knew this would cause substantial harm.

Case 2:12-md-02323-AB   Document 11324   Filed 04/07/21   Page 113 of 320

PART THREE — CONTINUED                                        page 14

complainant to not have legal counsel has to break all rules.

33. Again, these agreements for funds owed to complainant by CCG which is jointly owned by complainant and Tim Howard are well documented and embedded in the daily operation of CCG. It was not until complainant's confrontation with Tim Howard about the dishonesty, deceit, and fraud regarding his position as senior attorney and owner of Howard & Associates P.A. in their representation of CCG's clients and prospects referred to Howard & Associates P.A., that Tim Howard's complete disregard of the fiduciary responsibility CCG owed to its investment limited partners which should have been paramount and the utmost most importance to Tim Howard given his role as a member of the Florida Bar Association, and Howard & Associates completely illegal funneling of funds to NCAA collegiate football players for it's own best interest at the significant risk to these players future that Tim Howard planned his strategy to retaliate and use his now complete control of CCG as well as his position as a member of the Florida Bar and a licensed attorney in the state of Florida to severely harm and damage complainant and his family. X

34. As if these decisions were not enough to poten-

*(left margin, vertical):* As only one example, Tim Howard unethically used his membership with the FL Bar in a very clear retaliatory lawsuit against complainant's spouse in July 2017 (a criminal charges) which caused tremendous emotional harm and damage to complainant + his spouse. Another example is the FL Bar license...

---

PART THREE — CONTINUED                                        page 15

tially get Tim Howard's license with the Florida Bar Association revoked or at least temporarily suspended, the frequent check kiting to keep the law firm "afloat" should be sufficient grounds for this and clearly it was done in such manner given concern for client funds held in trust (these funds are managed by Ankur Mehta in the Ft. Lauderdale office who is not a licensed attorney due to a past criminal record but nonetheless practices law and provides legal advice on a daily basis to clients of Howard & Associates P.A. using Tim Howard's Florida Bar license.). Additionally, Tim Howard and Jaekan Williams (see FL Bar File 2018-00,060) recently proceeded to submit to the Leon County State Attorney's office over 70 pages of information irrelevant to complainant's pending criminal case in an attempt to further harm complainant and his family. This is the 2nd attempt to do so after stealing complainant's personal cell phone from complainant's spouse on March 1, 2017 and offering it to the state Attorney's office in a further attempt to his license to harm complainant.

35. These events are completely unethical as Tim Howard and Jaekan Williams have represented complainant and his spouse on at least 3–4 various legal matters over the last 2 1/2 years.

---

PART THREE — CONTINUED                                        page 16

36. In fact, this information was provided to the Leon County State Attorneys office by Tim Howard and Jaekan Williams only after and with clear knowledge that complainant had filed a very detailed ethics complaint against Jaekan Williams, an attorney employed by Howard & Associates P.A., an additional attempt to retaliate and completely unethical given attorney client privilege. Does the FL Bar really allow its licensed members to act in this professional capacity?

37. It is abundantly clear that Tim Howard and Jaekan Williams have no concern whatsoever as to their ethical responsibilities as members of the Florida Bar Association. They will stop at nothing to harm their clients, employees, and business partners to advance their own self interest and in the process cause substantial harm, damage, and risk to others in their path. They routinely use their licenses as attorneys in the state of Florida and also allow their licenses to illegally be used by others who are not allowed to gain a license to not only cause this significant harm, damage, and risk but to literally ruin other's lives. Their motives are simple, to gain additional legal fees with no concern for the repercussions or harm they are causing.

38. It is interesting to note that even though

---

PART THREE — CONTINUED                                        page 17

complainant has not had in-depth detailed discussions with the NFL regarding his knowledge and concern of the massive fraud being committed by Tim Howard and Howard & Associates P.A. in the NFL concussion settlement player qualification procedures and has therefore certainly not revealed any names, the sheer fact that the law firm is under investigation by the NFL should allow the Florida Bar Association to realize that others must be equally concerned and have provided more details and names to the NFL legal authorities. The sheer size and magnitude of this alleged fraud, deceit, and lies to the NFL and the clients of Howard & Associates P.A. (over $120 million in fraudulent claims thereby generating over $30 million in fraudulent legal fees) should give the Florida Bar more than sufficient evidence to at least temporarily suspend Tim Howard's Florida Bar license until further clarity can be provided.

39. The same goes for the NCAA investigation as previously mentioned as once again, complainant has not had the opportunity to discuss details due to his temporary incarceration and has only provided a brief response to a voicemail inquiry. As with the NFL, others must be equally concerned about the on-going pattern of fraud, deceit, lies, and dishonesty perpetuated by

PART THREE — CONTINUED                                      page 18

Tim Howard and Howard & Associates P.A. in its practices of law and other related legal business as licensed to do so by the Florida Bar Association.

40. Complainant will also further note to underscore this pattern and involvement of Joakan Williams, the Florida Bar Ethics Complaint (Inquiry/Complaint Form) filed by William Acuff, a client of CCG, against Phillip T. Howard (Florida Bar 655325) on June 15, 2017 without any involvement by complainant other then confirming Mr. Acuff's records with CCG.

41. And if Tim Howard's retaliation campaign to withhold the ability of CCG to provide the funds legally owed and due to complainant especially during this very difficult period has not caused enough damage, he has also initiated a slanderous, rude and very libelous/outrageous email campaign to CCG's clients and prospects doing everything he can to berate, belittle, damage, and harm complainant/former business partner, his spouse, and family. He does so even after he produced the same glowing words and support of complainant in 2015 upon the initiation of CCG. Complainant can provide all documentation upon release.

*Vehicle was purchased with complainant's distributions from CCG and was titled and registered to complainant.

PART THREE — CONTINUED                                      page 19

42. In addition to this "elementary" fact of retaliation and completely unethical behavior, Tim Howard also used his Florida Bar License to illegally gain access to complainant and his spouse's personal storage unit at Cubesmart in Panama City Beach in April 2017 to illegally gain possession of a 2011 Mercedes Benz S550 (valued at approximately $35,000). It is deemed an illegal seizure of the vehicle and completely beyond any ethical standards because Tim Howard was well aware that ownership of the vehicle is subject to a much larger business dispute caused solely by his retaliation. Furthermore, Tim Howard knew this not only from complainant who has written documentation to prove ownership agreement between complainant and his business partner but he also initially knew that the proper procedure would be to go to law enforcement which he did by attempting to file a theft report with Tallahassee Police Dept. Officer #509, Susan Burton. However, he was informed that this was NOT a theft but a civil matter that would require a court order. Officer Burton informed him of this fact. Therefore, according to Cubesmart officials, Tim Howard used his Florida Bar License to lead them to believe that he had obtained proper authorization and documentation to gain access to complainant and his spouse's personal storage unit to illegally seize the 2011 Mercedes S550 from complainant.

PART THREE — CONTINUED                                      page 20

Complainant requests the assistance of the FL Bar in the return of this vehicle to complainant until a court decision.

43. To add further harm, damage, and pain to complainant, his spouse, and his family and children, Tim Howard also stole numerous personal items from complainant, his spouse, and his children that were stored in the vehicle that he illegally seized. Complainant and his spouse have tried multiple times to retrieve these items which, while they have been acknowledged by Tim Howard and Joakan Williams to be in their possession and while some have been returned, a vast majority have not as again, they use their prestigious license with the FL Bar as if to say "screw you"... sue us.

44. In fact, Tim Howard and Joakan Williams used some of these items to "coax" complainant's spouse to their office as a requirement to retrieve some of the acknowledged stolen property, but also to have someone illegally pose as a certified process server to serve complainant's spouse with a harrassment lawsuit. Once again, this was accomplished because Tim Howard and Joakan Williams have a Florida Bar License further proving their use of this prestigious responsibility to further their own personal agenda while also harming, damaging, and causing severe pain to others including their clients. (Leon County Case #2017-CA-000 888)

45. Below is a list of the items that remain stolen and in the possession of Tim Howard or others at

*Previously mentioned at the end of paragraph 35.

PART THREE — CONTINUED                                      page 21

at Howard & Associates. Perhaps complainant can obtain assistance in having these items immediately returned by the FL Bar.

In addition to the 2011 Mercedes Benz S550:

| | Replacement Value |
|---|---|
| 3 Italian Glass Sculptures | $7,200 |
| 3 Designer Blankets Sculptures were stored in Computer Backpack | $180 |
| | $60 |
| 2 Samsung Tablets * | $360 |
| 4th generation iPad | $300 |
| Apple iPhone5 | $400 |
| Apple Watch | $300 |
| 2 Fitbits | $170 |
| Apple Ear Buds for iPhone 6 plus | $45 |
| Sony Headphones | $280 |
| 2 Children's Sony Headphones | $120 |
| Beats Wireless Headphones | $360 |
| | $9,775 |

All items were in Computer Backpack

* Complainant has confirmed that these items have been used since stolen at the office address of Tim Howard, ie. 2120 Killarney Way, Tallahassee, Fla. 32309.

46. Tim Howard also refuses to release complainant's office furniture that he left in good faith

PART THREE - CONTINUED                                    page 22

at his office at Cambridge Capital Group since the well planned and prepared structure during complainant's absence as agreed upon by complainant and his business partner was the intermittent use of his office by Gail Milon who was hired by complainant and Tim Howard to assist complainant in the operation of CCG while focusing her efforts on furthering complainant's vision of Cambridge Capital Group Wealth Advisors LLC. However, as previously detailed, Tim Howard abruptly changed this plan to inact his vicious and vindictive personal retaliation against complainant and his spouse and family.

47. While Tim Howard apparently believes the office furniture in question is subject to the business dispute between he and complainant due to its purchase date in mid 2015 from Badcock Furniture and while complainant feels certain he will prevail in proving his ownership, there are certain items that are NOT in any way subject to the business dispute as complainant purchased them between 1999 and 2009 well before CCG was created in 2015 and not purchased from Badcock Furniture.

48. As with the previously detailed stolen items, these items are also now considered stolen property and perhaps complainant can obtain

PART THREE - CONTINUED                                    page 23

assistance in having these items immediately returned to complainant. Again, this retaliation, that has caused significant harm, damage, and pain to complainant, his spouse, and family that is not only uncalled for, elementary, and childish but also completely unethical given that Tim Howard truly believes he can proceed in this manner due to his Florida Bar License.

49. Below is a list of these personal office items:

✱ 2 leather club chairs purchased at Rooms To Go in Atlanta, GA in 2009. In fact, 4 were originally purchased and complainant has possession of the other two at his residence. Furthermore, Tim Howard's son assisted complainant in retrieving the 2 that were moved to his CCG office from complainant's storage center in mid 2015.        Replacement Value $500

✱ 1 desk globe. Jaakan Williams has acknowledged possession of this item purchased by complainant in 1999 but would not return it to complainant's spouse        Replacement Value $160

✱ Desk lamp, ipod touch, ipod w/release speaker, Vizio TV, 2 cables, HP printer (all purchased from 1999 to 2009 and T. Williams acknowledged possession as above.        $650.

✱ 1 folder of personal letters from mother   $PRICELESS

PART THREE - CONTINUED                                    page 24

50. Clearly this "elementary" activity is far below the expected ethical standards as required by the members by the Florida Bar Association. These dual campaigns are even more alarming given that complainant has also been represented by Tim Howard, Jaakan Williams, and Howard & Associates P.A.

51. Again, due to the patterns of fraud, deceit, dishonesty, and complicit deceitful behavior and disinterest in stopping harm, damage, and sever risk he is causing his clients, employees, and other business associates by using his Florida Bar Association license to practice law in the state of Florida, complainant prays and begs that the Florida Bar at a minimum temporarily suspend the license of Phillip T. Howard (FL Bar 655325) until further clarity can be gleaned from these egregious acts of unethical professional behavior as well as assist complainant in the recovery of his stolen property and the substantial amount of funds due.

PART FOUR (Witnesses): The witnesses in support of my allegations are:

1. Ankur Mehta
2. Tom Woods
3. Gail Milon

PART FOUR - CONTINUED                                    page 25

4. Lois Koons
5. Addys Walker
6. Jaakan Williams
7. Katherine Reinhard
8. Brenda Murphy
9. William Acuff
10. Harrison Smith
11. Lisa Linda
11. Linda Bedell
12. Dr. Williams
13. Dr. Ford Johnson
14. Nuero psychologist in San Diego, Calif
15. Dr. Louis Kobarda
16. Various retired NFL Players (Names withheld due to current representation by Tim Howard and implications with the Howard associates)

PART FIVE (Signature): Under penalties of perjury, I declare that the foregoing facts are true, correct, and complete.

Don Reinhard
Print Name

_____
Signature

October 16, 2017
Date

Exhibit B

NFL Settlement Fraud Initial Details:

–Involves representation of hundreds of players with potential damages to the NFL of fraudulent claims of over $110 million.

A. Psychological Testing

– The fraud starts from the beginning of the eligibility process as the required psychological testing is performed by a medical doctor who had his medical license revoked in early 2016 and this fact is hidden on the testing documents as his name has been removed.

–After the psychological testing is completed, the unlicensed doctor alters the test answers due to his intimate knowledge of the scoring of the test results to ensure that the players meet the settlements psychological testing criteria to qualify for a financial claim prior to sending the test to the neuropsychologist. This altering process sometimes takes up to 4-6 weeks due to the magnitude of the players tested. The result is qualification of over 90% of the players tested.

–The process began after the initial testing without altering the answers was producing a qualification percentage of 30%. The senior attorney mandated that the presentation of test results be stopped until the scores could be altered to ensure qualification. Some of the initial test results were then altered and represented to the neuropsychologist for rescoring with a fraudulent explanation to the neuropsychologist but she refused to reevaluate the scores. The others were not represented as the tests were completed in pen. From this point forward all testing scores were recorded in pencil so the scores could be properly altered.

–This initial group only included about 10 players and soon after it was realized that the neuropsychologist would not perform a reevaluation and scoring of the tests, a new neuropsychologist was hired that was much more cooperative for all future test scoring and evaluation.

B. Neuropsychological Scoring and Evaluation

–If the new neuropsychologist returns an evaluation and report that shows testing scores are near the criteria required to be qualified as a 2.0 then the test scores are further altered and a new evaluation and report is produced to qualify the player at the level of 2.0

–If the new neuropsychologist returns an evaluation and report that shows testing scores meet the criteria required to be qualified as a 2.0 but the completed CDR does not qualify the player as a 2.0 then the CDR is altered to qualify the player as a 2.0 and a new evaluation and report is produced by the neuropsychologist to qualify the player as a 2.0. There has been instances when this process has been done after the file has already gone to the Board Certified Neuropsychologist and the Neurologist would not agree without an explanation from the neuropsychologist so a letter with a fraudulent excuse is produced from the neuropsychologist. 

C. Clinical Dementia Rating (CDR) and Affidavits

–The details of all CDRs are almost identical as is the information provided for the affidavits.

–CDRs are routinely altered to allow a player to qualify as a 2.0 if the testing scores support the qualification.

–Most all affidavits (probably 80%-90%) are notarized by the "in house" notary who has no knowledge of the affiants. It's basically a rubber stamp process.

D. Board Certified Neurologist (BCN)

–To my knowledge, the BCN is not involved in this organized fraudulent scheme but much of the data used to complete the final report has been altered to substantially effect the final report.

–Most, if not all, players are instructed to lie to the BCN about their employment or ability to work. When they do not or the BCN detects a lie, the language of the final report is altered by the senior attorney to insure the player qualifies.

–When needed to take advantage of the age "cutoff" of receiving a qualified diagnosis, the final report date is altered by the senior attorney, which frequently requires the testing date to be altered.

–When the BCN refuses to change a player's qualification from 1.5 to 2.0 as the change in testing scores and/or CDR is altered after the file has gone to the BCN and evaluated, the senior attorney alters the language and makes the designated change on the final report.

–When the BCN refuses to sign the final report for a variety of reasons, frequently because the file is incomplete or there are discrepancies, the senior

attorney has copied the BCNs signature from another player's final report, cut the signature "block out, taped the signature block to the un-signed report, and re-copied the now signed report.

–The senior attorney is currently in the process of qualifying the BCN for the MAP (I believe this is the correct name) program to allow the BCN to continue qualifying players after the settlement effective date of January 6, 2017. However, to do so I understand that the BCN cannot have previously evaluated and qualified any players prior to their approval under the MAP requirements. Since the BCN has been evaluating and qualifying players since 2016, the senior attorney is changing all of the completed final report dates to a date after the MAP approval is effective.

RECEIVED
NOV 21 2017

THE FLORIDA BAR
651 East Jefferson Street
TALLAHASSEE, FL 32399-2300

Visit our website: www.FloridaBar.org

Mr. Don Reinhard
100 Cabana Cay Cir.
Unit 222
Panama City, FL



**The Florida Bar**
651 East Jefferson Street
Tallahassee, FL 32399-2300
(850) 561-5600
www.floridabar.org

John F. Harkness, Jr.
Executive Director

Joshua E. Doyle
Executive Director Designate

November 15, 2017

Mr. Don Reinhard
100 Cabena Coy Cir.
Unit 222
Panama City Beach, FL 32413

Re: Mr. Phillip Timothy Howard; RFA No. 18-4428

Dear Mr. Reinhard:

The Supreme Court of Florida has adopted rules that require the allegations be signed and under oath. In order to comply with this rule you must sign the oath below and return it to us by November 27, 2017 before we can proceed with an investigation.

Under penalty of perjury, I declare that the facts contained in the inquiry submitted to The Florida Bar concerning Mr. Howard are true, correct and complete.

_____
Mr. Don Reinhard                        Date

If you do not complete and return the oath form to us, we may be unable to proceed with the investigation. A copy of the rule imposing this obligation (3-7.3(e)) may be found on the Bar's web site at www.floridabar.org.

Also, if you have documents that you feel support your allegations, please provide copies of them when you return the oath. Your response must not exceed 25 pages.

Thank you for your cooperation.

Sincerely,

*Charles Hughes*

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

---

**IMPORTANT NOTICE FOR COMPLAINANTS AND RESPONDENT-ATTORNEYS**
**MAILING INSTRUCTIONS**

Materials Received That Do Not Comply With These Instructions May Be Returned Or Not Otherwise Incorporated Into The File

The Florida Bar converts its disciplinary files to electronic media. All submissions are scanned into an electronic record and hard copies are discarded. To help ensure the timely processing of inquiries/complaints, responses and rebuttals, please review the following instructions prior to providing your submission.

1. Please limit your submission to no more than 25 pages including exhibits. If you have additional documents or material available, please make reference to those documents and/or materials in your written submission as available upon request. Should The Florida Bar need to obtain copies of any such documents and/or materials, a subsequent request will be sent to you.

2. Please do not bind, staple, tab or index your documents. You may underline but do not highlight documents under any circumstances. Please do not submit materials in color. When documents are scanned in our disciplinary files, highlighting and color will obscure the underlying text.

3. Please do not attach media such as audio tapes, thumb/flash drives, CDs, or photographs. We cannot process any media which cannot be scanned into the electronic record.

4. Please do not submit your original documents. All documents will be discarded after scanning and we will not be able to return any originals submitted to our office. The only original documents that should be provided to our office are the inquiry/complaint form, response and certificate of disclosure.

5. Whether you are a complainant or a respondent-attorney, please do not submit confidential or privileged information. Documents submitted to our office become public record. (Respondent-attorneys may wish to consult Rule 4-1.6 (c) of the Rules Regulating The Florida Bar.) Confidential/privileged information should be redacted. Such information includes, but is not limited to, bank account numbers, social security numbers, credit card account numbers, medical records, dependency matters, termination of parental rights, guardian ad litem records, child abuse records, adoption records, documents containing names of minor children, original birth and death certificates, biometric data such as fingerprints, Baker Act records, grand jury records, and juvenile delinquency records. If information of this nature is important to your submission, please describe the nature of the information and indicate that it is available upon request. Bar counsel will contact you to make appropriate arrangements for the protection of any such information (to the extent permitted by law) as part of the investigation of the complaint.

6. Please provide your submission only one time. Do not submit duplicates via email, facsimile transmission or by any other means. Do not include these instructions. Respondent-attorneys do not need to include a copy of the complaint.

Please be aware that materials received that do not meet these instructions may be returned or not otherwise incorporated into the file. Thank you for your consideration in this respect.

---



**The Florida Bar**
651 East Jefferson Street
Tallahassee, FL 32399-2300
(850) 561-5600
www.floridabar.org

John F. Harkness, Jr.
Executive Director

Joshua E. Doyle
Executive Director Designate

November 27, 2017

Mr. Don Reinhard
7104 Harvest Ridge Lane
Alpharetta, GA 30022

Re: Mr. Phillip Timothy Howard; RFA No.: 18-4428

Dear Mr. Reinhard:

Enclosed you will find a copy of correspondence which was returned as a result of address issues. Please sign same if it is your intent to file a complaint against the above referenced attorney.

Sincerely,

*Charles Hughes*

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

---

Received      Mon 11/20/2017 8:28AM
From          Don Reinhard
Subject       Florida Bar Ethics Complaint against Philip Timothy Howard and Jaskan Williams
To            Hughes, Charles E
cc
bcc

On or about 11/4 I emailed you a hand-written Florida Bar Ethics complaint against Philip Timothy Howard (Florida Bar # 655325). I apologize for it being hand-written and not filed online as I believe you are aware that I am currently incarcerated in the Leon County Jail.

Please confirm that the complaint has been filed and what is the process going forward?

Additionally, with this filing was a cover letter requesting a copy of my ethics complaint against Jaskan Williams, an attorney employed by Tim Howard, to be either sent to me via email, to my dad at harhreinhard@bellsouth.net who is on record with the Florida Bar as my authorized contact or regular mail. I requested this so I can complete my rebuttal to Mr. Williams response. Unfortunately, I do not have the ability to make copies and need one to properly prepare a rebuttal. To date, I have received neither.

Please provide an update on receiving this copy and it would be more convenient to me if you emailed it to me directly at this email.

Thank you,
Don Reinhard

Please note: Florida has very broad public records laws. Many written communications to or from The Florida Bar regarding Bar business may be considered public records, which must be made available to anyone upon request. Your e-mail communications may therefore be subject to public disclosure.

| Received | Fri 12/08/2017 8:56PM |
| From | Don Reinhard |
| Subject | Re: Bar Complaint |
| To | Hughes, Charles E |
| cc | |
| bcc | |

Mr. Hughes,

Today, I finally received a response from my complaint against Jaakan Williams (Florida Bar File #: 2018-00,060(7a)) that I requested over 3 weeks ago that was apparently sent to my old address even though I had previously requested that all documents be sent to 7104 Harvest Ridge Lane, Alpharetta, Georgia 30022. This information was not sent from the Florida Bar until 11/27. I will now be able to prepare my rebuttal and will mail it to you by 12/11 via my father so he can make me a copy. Again, thank you for understanding the difficult [existance? - inaudible] I am dealing with.

I also received today the "oath" that needs to be signed to proceed with my complaint against Philip Timothy Howard (RFA No. 18-4428) that was originally mailed on 11/15 to my old address and resent by the Florida Bar on 11/27. I will mail the signed oath back to you by 12/7.

Don

---

Please note: Florida has very broad public records laws. Many written communications to or from The Florida Bar regarding Bar business may be considered public records, which must be made available to anyone upon request. Your e-mail communications may therefore be subject to public disclosure.

# EXHIBIT G

**SPECIAL MASTERS' RULE 18 DECISION ON**
**REPORT OF ADVERSE FINDING REGARDING**
**HOWARD & ASSOCIATES AND RELATED PARTIES**

## I.   INTRODUCTION.

Pursuant to Section 10.3 of the Settlement Agreement and Rule 7(b) of the Rules Governing Audit of Claims (the "Audit Rules"), the Claims Administrator audited Howard & Associates and placed in audit certain claims that are related, in some way, to current or former representation by Howard & Associates. After intensive investigation, the Claims Administrator concluded that Howard, and related parties, have "overwhelmingly" misrepresented, omitted, or concealed material facts in connection with certain Claim Packages. Accordingly, the Claims Administrator referred this Audit to the Special Masters for review and findings pursuant to Section 10.3(i) of the Settlement Agreement. The Special Masters have reviewed the full Record of the Audit Proceeding and issue this decision.

## II.   REVIEW OF FACTS.

Howard & Associates initially registered 223 Settlement Class Members. In the Spring of 2018, more than 170 of these SCMs moved from Howard & Associates to Shenaq PC. That representation continued into October of 2020, when Shenaq discontinued its representation of the 170 SCMs who returned to Howard & Associates. The firm currently represents 216 Settlement Class Members.

In March of 2017, the Claims Administrator initiated an audit against Howard & Associates after receiving a tip from an anonymous informant; they submitted to the Special Masters an Interim Investigation Report ("Interim Report") in August of that year. This led to continued investigation until July of 2018. When no claims were submitted by Howard & Associates, the investigation was suspended. It resumed in June of 2019 when SCMs submitted medical records from time periods when they were clients of Howard & Associates. This investigation continued until December of 2020 with the publication of the Claims Administrator's Rule 15 Report.

That Report concluded that:

- Howard & Associates created and/or drafted reports of neuropsychological examinations of Settlement Class Members;
- Howard & Associates directed the actions of medical providers, including Qualified MAF Physicians and BAP Providers;
- Howard & Associates presented inflated costs for reimbursement in a lien dispute before the Court;
- Several physicians were influenced by and/or followed the directions of Howard & Associates;
- Some associates and others employed by Howard & Associates were involved in these activities.

The full outline of these facts is contained in detail in the Rule 15 Report and its 600+ pages of exhibits, including emails from Howard & Associates submitted in the lien dispute before the Court and other documents the Claims Administrator obtained. The Special Masters have reviewed this material in depth and refer to the Report for a full outline of the facts presented.

### III.     **CONCLUSION AND REMEDIES.**

Upon thorough review, the Special Masters agree with the Claims Administrator that there is compelling evidence indicating that Howard & Associates and related parties manipulated the medical examination process and medical records in ways that had the potential to affect whether Settlement Class Members qualify for a Monetary Award.

Accordingly, and pursuant to Section 10.3 of the Settlement Agreement and Audit Rule 18, the Special Masters accept the referral of Howard & Associates and all related parties for further proceedings under Title IV of Rules Governing Audit of Claims, and direct the following:

A.  That these proceedings be expedited to the fullest extent possible;
B.  That the ongoing proceedings cover, as noted, Howard & Associates and all related parties, including: Timothy Howard and Howard & Associates employees, former and current, including Neil Epstein, Don Reinhard, Ankur Mehta, Linda Bedell, Addys Walker, Brenda Murphy, Erin Murphy, Duante Smith, Chelsea Cook, Kyla DeRobbio, Addernika Walker, Harrison Smith, Jaakan Williams, Orentheal Williams, Zane Herman, Luis Achata, Arian Hernandez, and Cortney Hicks; Healthcare Providers Jaroslaw Koberda, Edwardo Williams, Sammantha Barker, Laura Hopper, Lawanda Ford-Johnson, Christine Lloyd, Elizabeth Morgan, Ahmed Sadek, and Tara Velez;
C.  That the Claims Administrator immediately provide a summary report to the Court on the details of fees and expenses submitted by Howard & Associates in the lien actions between Howard & Associates and Shenaq PC;
D.  That, given the significant issues raised in this Audit, the Claims Administrator immediately place all pending claims, not yet processed or paid, by any Settlement Class Member now or ever represented by Howard & Associates into Audit.


_____
Glenn M. Verrier, Special Master

Date:   January 22, 2021


_____
David Hoffman, Special Master

Date:   January 22, 2021

2

# EXHIBIT H

## UNITED STATES DISTRICT COURT
## FOR THE EASTER DISTRICT OF PENNSYLVANIA

IN RE: NATIONAL FOOTBALL LEAGUE      |     No. 2:12-md-02323-AB
PLAYERS' CONCUSSION INJURY         |     MDL No. 2323
LITIGATION                                    |

## RESPONSE TO CLAIMS ADMINISTRATOR'S RULE 15 AUDIT REPORT

## <u>AFFIDAVIT OF PHILLIP TIMOTHY HOWARD</u>

BEFORE ME, the undersigned authority, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, information, and belief, this day personally appeared Phillip Timothy Howard, who, being first duly sworn, deposes and testifies under penalty of perjury as follows:

1.      My name is Phillip Timothy Howard.  I am over 18 years of age and am competent for all legal purposes.

2.      Attached as Exhibit A is my resume in support of this affidavit.

3.      I make this Affidavit based upon my own personal knowledge in involvement in the subject matter.

4.      I have thirty years of experience as an attorney and educator, and prior to this effort at applying faculty skills and experience in reliance on the experienced, and at the time trusted, consultant, as I had no experience in the investment and finance industry.

5.      Starting in the Spring of 2014, I assisted Mr. Don Reinhard ("Consultant") who was a football teammate in high school (one of only 4 of us that played varsity from a freshman to a senior for a brand-new high school that was a state ranked team), in

compassionate rehabilitation to teach an online course in finance and business, as I understood he had an MBA and a deep and humbling experience in finance and investing.

6.      In late 2015, I worked with faculty and staff at Cambridge Graduate University International ("CGUI") to create a Global Investment Advisory Team ("GIAT") with Mr. Reinhard as a consultant in advising compliance with SEC rules and regulations, since he knew both the industry and the importance of compliance.

7.      I am a plaintiff trial attorney and a professor in law, policy and society. Those are my areas of expertise. The university I established and the areas I am knowledgeable cover Global Studies, leadership, critical thinking, philosophy, methods, law, policy, sociology and society.  I had no experience in investing and finance and was pursuing this project as a humanitarian and educational effort to gain experience and application of skills for and with faculty as part of the "praxis" education model of CGUI.

8.      Under the guidance and structure of the consultant, the consultant created the Cambridge corporate entities ("Cambridge"), as well as Private Offering Memorandum and related documents from his prior companies and prior legal counsel.  Not having any experience in the field, my sole substantive input was my biography.

9.      Cambridge corporate entities were created as an applied skill and learning vehicle for CGUI in consultation with the GIAT made of faculty and administrators, and promptings of the consultant who had over 20 years of experience in the finance industry. Out of compassion, seeing the good in people, the chance at rehabilitation and the opportunity for growth, I went forward with the project.

10.     From March 5, 2015 to March 7, 2017, I acted as President, with Mark Hallim (then VP of CGUI) as Vice President and Ankur Mehta (assisting CGUI and paralegal with law firm) as Treasurer during the same time frame.  Don Warner Reinhard was consultant form March 5, 2015 to February 12, 2017.  I have not been an officer since March 7, 2017, and Gail Milon has been sole member since May 3, 2018.

11.     The Cambridge entities had no outside investors until mid to late December of 2015 and was actively managed by the Consultant for approximately 12 months in 2016.

12.     From March 5, 2015 through March 7, 2017, I had an ownership interest as President of Cambridge entities.  Since that date, I have been assisting Cambridge entities in any way I can and continued to provide funds for Cambridge to ensure the success of the fund for investors.

13.     I have placed a net of approximately $1.6 million in Cambridge.

14.     I have provided an additional up to $3.6 million in cash, staff and legal resources from early 2018 through to April of 2020, to assist Cambridge for the success of the fund and investors.

15.     The lending and investment decisions, including options trading, were solely from the skill and responsibility of the consultant who was to take feedback and oversight from the GIAT, as I had no experience or expertise in that industry.

16.     Cambridge has the details on each investment by the consultant.  In general, during the short 12 months of activity, there were small business loans, NFL advances, tobacco litigation advances, litigation travel advances, litigation medical testing advances,

options trading, mortgages, technology start-up, as well as loans to pay taxes, child support obligations, and subsistence housing for NFL advance clients.

17.     I supported Cambridge and based on what I was informed by the consultant and quarterly performance reports, the investments were sound and very profitable. I did accept the information provided as I had no information that the information was not accurate, and the consultant made the recommendations to any investor to invest in Cambridge.

18.     The consultant was hired at $3,000 per month to manage the fund until a full-time experienced and licensed agent could be found and hired, which was the plan from the start of Cambridge and individuals were sought and interviewed through the later part of 2016, with Gail Milon being hired in late December of 2016.

19.     The $3,000 per month as the sole income for the consultant is verified by two financial affidavits expressly filed during the operative time-frame, in both January and December of 2016 in the case of *McClellan v. Reinhard*, Case No. 2012-DR-819 (Fla. 2nd Cir), as well as correspondence to the attorney representing McCelellan concerning the same issue.

20.     Through family, friends, workers, and the GIAT network, the consultant sought out investors and marketed and sold the fund, including drafting, finalizing, explaining and providing the Public Offering Memorandum.

21.     Based on the returns that I was informed of, I did recommend that my son Christopher Gunnar Howard and mother-in-law Lois Koons invest into Cambridge. I would have shared the consultant-reported success of Cambridge with third-parties, and if

4

they were interested, would have referred them to the consultant for exploration of Cambridge or any investment.

22.      During the short 12 months of activity in 2016, I was sporadically in the office and in trial, discovery, hearings, travel or on university assignments.  During a 2-1/2-month tobacco trial in Jacksonville from early May through to mid-July of 2016, the GIAT oversight was abandoned by Don Reinhard.  Being fully absorbed in pre-trial, post-trial and its 18-hour days, I was not aware of nor focused on that activity at that time.

23.      I am sure I shared information with individuals on what I was provided by Don Reinhard on the good returns that the funds had under Don Reinhard's management and guidance, that I was invested in the funds, and that they could get the details from Don Reinhard.

24.      I would have referred anyone interested in investing to the consultant since I was not experienced in finance and investing and did not know the SEC requirements.

25.      The consultant also drafted and provided the Cambridge fund updates. I was not involved with informing investors on their investments nor returns as I did not direct those activities, nor have the financial industry experience and background.

26.      Potential individuals that participated in soliciting family and friends to invest in Cambridge funds, would include Linda Bedell, Addys Walker, Tom Woods, Harrison Smith, GIAT members, Don Reinhard, Brenda Murphy, Suliemon Holmon, Wally Williams, Kay Eubanks, Elton Patterson, Dave Thomas, Toby Jenkins, Jeff Kahn, Gail Milon.  It is unknown precisely when and whom they would have spoken to for investing, if anyone.

27.     All participants, including myself, required the consultant to inform anyone potentially involved with Cambridge, with what he had informed us of, namely, his criminal conviction for tax deductions and provide an affidavit from his criminal defense counsel describing his history, his successful FINRA action prosecuted by now deceased William C. Owens, and SEC sanctions, so that all were fully informed of his past.

28.     This disclosed Mr. Don Reinhard's plea of tax evasion and his sentence, as well as his SEC sanction. I instructed Mr. Don Reinhard to provide this information to anyone that is considering participation with Cambridge entities, and all indications are that he did so.

29.     Mr. Don Reinhard drafted the Private Offering Memorandum based on his prior companies, as he knew what was required by SEC regulations.  He informed the GIAT and myself that he provided this to any and all investors.

30.     I was not an investment advisor, nor familiar with SEC requirements, as I was not trained nor licensed in this field.  The consultant was to meet and qualify the investors and was the temporary and interim investment advisor.

31.     Other than providing a bio that was incorporated into the Private Offering Memorandum, I did not draft, edit, have the knowledge to approve, nor provide the Private Offering Memorandum to any party.  I was never aware of the significance of the Private Offering Memorandum.

32.     The intent and goal of the investment companies was to hire an experienced and licensed broker and that Mr. Don Rienhard was an interim consultant to assist the fund in getting off the ground.

33.     Prior to the consultant's departure, I was not aware of any improper action of Mr. Don Reinhard.

34.     After his departure for matters not involving Cambridge, the consultant began a one-year extortion campaign against me, the employees of the firm, family members and more, threatening with and in fact, going to NFL Class Counsel, SEC, Florida Bar, NCAA, experts, lender, family members, law firm clients, Cambridge clients, and more, in an effort to claim and extort over $1 million from Cambridge.

35.     Other than having to address the Florida Bar Complaint by Mr. Reinhard, I did not respond to these threats in order to let law enforcement properly investigate this matter.

36.     I did provide the imprisoned consultant's extortionate emails and letters to law enforcement, the Florida Bar, the SEC, and to NFL Concussion Settlement class counsel.

37.     After his departure, it was found that Mr. Reinhard had impersonated me in either creating or operating on the accounts in activities that I would not have approved, a TD Ameritrade Account, Millennium Trust Account, 401K Transfer documents, checking accounts, and more.

38.     I had never been on nor established these accounts. In fact, he impersonated me and my name on all TD Ameritrade, Millennium, and 401K emails and contracts as I have never had communications on these subjects or with these companies.

39.     All of Mr. Reinhard's emails came from info@cambridgecapitalgroup.holdings, and this was his sole email when operating as an advisor with Cambridge.  I never used this email nor am I an originator of such emails.

40.     Mr. Reinhard was the person who in the Spring and Summer of 2017, guided and prompted the initial Dexter Carter to reach out to Mr. Seeger, Class Counsel for NFL Concussion Settlement, and NFL counsel, and has spread slanderous misrepresentations, creating a fire from his own corruption that he projected on others, such as I.

41.     Since his departure, Mr. Reinhard has also been guiding and communicating with the second Joe Horne and Corey Fuller and with other investors and/or lenders.

42.     Mr. Reinhard tried to establish his own investment fund from prison and has been communicating directly with both Settlement Class Members and many of the other complainants in order to advance this extortionate scheme

43.     Most clients of my law firm and Cambridge were not persuaded, despite investigators and bottom feeder legal opportunists being influenced by Mr. Reinhard.

44.     Some clients of Cambridge saw this as an opportunity to perpetrate a taking from Cambridge by raising the specter of Mr. Reinhard's narrative to void their paying back loans of over $1.4 million plus interest by Dexter Carter (approximately $130,000 plus interest for 4 years, having received over $1 million from the NFL Concussion Settlement in 2018), Corey Fuller ($648,000 plus interest for 4 years, with a consultant orchestrated illegal wash through of his 401K funds to avoid taxes, and his wife Charisse Fuller fraudulently claim that she is owed $75,000 when she was paid her funds back on a monthly and large lump sum basis, plus interest for a total of approximately $88,280 ) and

8

Joe Horne (over $600,000 plus interest for 4 years, with a consultant orchestrated illegal wash through of his 401K funds to avoid taxes).

45.    My ownership of the Cambridge was transferred with an effective date of March 3, 2017. Ms. Gail Milon took over oversight and organization of Cambridge along with Mr. Addys Walker, for several months, who was trusted at the time.

46.    Mr. Addys Walker was assigned ownership and management of Cambridge for several months in 2017 due to his experience in raising capital and investigative background, and his participation with Jeff Kahn, who also has experience in raising capital on Wall Street. No background check was done on Mr. Walker, who was later found to have extensive criminal charges and later found to be engaging in a confidence game with Cambridge and through lies and misrepresentations, after receiving over $1.2 million, ultimately stole over $293,000 from myself, and a 2010 Mercedes from Cambridge.

47.    When Cambridge has stable income and liquidity, after taking care of all other creditors and investors, and it is convenient for Cambridge to liquidate my interests in Cambridge, I will withdraw all funds provided into Cambridge and fully divest any residual ownership. I took the steps to do this in 2017 in order to avoid any conflicts of interest that may exist, despite conflict of interest waivers provided to and signed by any potential conflict. I am unable to perfect a full divestment until Cambridge takes care of the more immediate needs of creditors, liquidity, and other investors. I will be last on the list in the order of those whose needs are to be addressed.

48.    I continued to assist in the transition to do my best to ensure Cambridge fulfilled its responsibilities, and I still am.

49.     I am not on any active corporate document or bank account nor is anyone that is directly or indirectly related to me.

50.     The intent was always to remove my name and anyone that is directly or indirectly related to me once I sought and received clarity on potential conflicts despite the signed waivers of conflicts.  The Cambridge Companies have gradually removed me and anyone directly or indirectly related to me from any and all corporate documents.

51.     Upon assuming the responsibilities of Mr. Don Reinhard, the previous consultant, Ms. Gail Milon was immediately hit with challenges.  Upon his termination a lot of documentation/property of Cambridge Capital was missing.  The documentation was requested on several occasions with no success.

52.     The previous consultant operations/processes were manual and an indecipherable jumble.  Ms. Milon had to bring herself up to speed regarding the overall operation.

53.     Ms. Milon requested an independent audit and accounting.  She determined that she cannot provide accurate information to investors until she is reassured all dollars are accounted for as well as confirm the accuracy of the returns initially provided. The audit required an accountant to automate the books and records.  Though preliminary work was done in 2017 and 2018, due to lack of readily available records, this was not completed until February of 2019.

54.     The accounting and audit of Cambridge entities ultimately showed that there were no outstanding loans, no outstanding mortgages owed by myself, and no fees, and no distributions received by myself.  The accounting and audit showed a "net" of

nearly $1 million with any loan or mortgage are paid off at the maximum legal interest rate of 18%.

55.   The Cambridge offices were not in the same office suite as the law firm. There were errors on the suite number listed by Cambridge. The offices were in distinct sides of the building.   The law offices now are at 1415 E. Piedmont Drive, Suite 5, Tallahassee, FL 32308, and Cambridge entities are not at these locations.

56.   I am aware that the consultant would change his signature block to be singular, or add myself, Mr. Tom Woods and Mr. Harrison Smith to his signature block, as he determined.  These emails were not from the other parties, only the consultant, as he was the only party using info@cambridgecapitalgroup.holdings.

57.   I completed ethics conflicts research in October of 2015, prior to any outside investors, and instructed the consultant to provide this information and notice to anyone looking to be involved with Cambridge Entities.

58.   To make sure that the ethics standards previously researched still applied when clients received loans or invested, I independently sought guidance from The Florida Bar in August of 2017 seeking the opinion of the Florida Bar with regards to having an interest in Cambridge, distinct from ownership.  The Florida Bar recommended that I take steps to end my interests in Cambridge.

59.   I have taken all prudent and appropriate steps to assign interests to Cambridge, pending completion of the audit and accounting, and informed relevant clients of the law firm of the same. I am not on any bank account, nor on any corporate papers.

60.     Ms. Koons was on two companies prior to the August 2017 guidance I received from the Florida Bar.  She has had no management or participation with the companies in any fashion at any time, and I am informed that she was removed at the corporate renewal period.

61.     I had no interaction with Millennium Trust and if my name is mentioned it is because the consultant was improperly using my name.  The consultant had all interactions concerning 401K and investments, and the emails between the parties confirm the same. My signature was forged on almost all 401K transfer documents.

62.     Similarly, I had no involvement with nor, at the relevant time, did I even know what an ADV is.  I have never filed an ADV at any time and wouldn't know where, how or why to file one to this day.

63.     The consultant regularly improperly used my name to take actions that I was not involved with, managing nor experienced in, and would not have approved if I was fully informed.  I am aware that I have been removed from all Millennium authorizations and that Gail Milon is the authorized contact.

64.     I also sent correspondence to the retired NFL players informing them that advances are expensive and were not recommended.  This is despite their being both legal and permitted by ethics and Florida law, if there is a significant need by the party.  It wasn't until well after the consultant left operations and his loan churning that Judge Brody's Order was issued in December of 2017 that these loans were not permitted.  The substance of Judge Brody's Order was overturned on April 23, 2019, by the United States Circuit Court of Appeals for the Third Circuit in *Thrivest Specialy Funding, LLC., v. William E.,*

*White*, Case No.: 18-3005 (3rd Cir. 2019)(requiring arbitration under terms of advance agreement for White to pay on obligation).

65.     In sum, the process of working to do good with CGUI, GIAT, consultant, and Cambridge, and the impact of human frailties, such as greed, dissembling, ad hominem, fear, insecurity, arrogance, inferiority, and my imprudence in relying on too many untried others for many, many fronts of growth, has brought out in me an authentic depth of insight, strength, wisdom, humility, and compassion that only these tearful and painful circumstances could. I have done all that I know to do in order protect and advance investors interests in the face of the onslaught caused and fomented by the consultant's prison-based extortion and a cadre of opportunists coordinating with him, and/or feeding off of and following this approach and being.  God bless.

FURTHER AFFIANT SAYETH NOT.

PHILLIP TIMOTHY HOWARD

STATE OF  FLORIDA          )
COUNTY OF  LEON            )

Subscribed and sworn/affirmed to before me this 30 day of JANUARY         , 2021, by PHILLIP TIMOTHY HOWARD.

NOTARY PUBLIC

My Commission Expires:  7|23|24

ANDREW J. FRANKS
NOTARY
My Comm. Expires
July 23, 2024
No. HH 23273
STATE OF FLORIDA
PUBLIC

☐ Personally known to me
☒ Presented identification as follows:  FLDL H630-678-61-087-0

# EXHIBIT I

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

CAMBRIDGE CAPITAL GROUP ADVISORS,
LLC, et al.,

Defendants.

Case 4:19-cv-00420

**FINAL JUDGMENT AS TO DEFENDANT DON WARNER REINHARD**

The Securities and Exchange Commission having filed a Complaint and Defendant Don Warner Reinhard having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction and except as otherwise provided herein in paragraph VIII); waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any client or prospective client, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any client or prospective client, about:

(A) any investment strategy or investment in securities,

(B) the prospects for success of any product or company,

(C) the use of client funds,

(D) compensation to any person,

(E) Defendant's qualifications to advise clients; or

(F) the misappropriation of client funds or investment proceeds.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933

("Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

      (a)     to employ any device, scheme, or artifice to defraud;

      (b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)     to engage in any transaction, practice, or course of business which operates or

would operate as a fraud or deceit upon the purchaser,

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any client or prospective client, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any client or prospective client, about:

      (A) any investment strategy or investment in securities,

      (B) the prospects for success of any product or company,

      (C) the use of client funds,

      (D) compensation to any person,

      (E) Defendant's qualifications to advise clients; or

      (F) the misappropriation of client funds or investment proceeds.

      IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers,

agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

<div align="center">III.</div>

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], by using the mails or any means or instrumentality of interstate commerce:

      (a)      to employ any device, scheme, or artifice to defraud any client or prospective client; or

      (b)      to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client,

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any client or prospective client, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any client or prospective client, about:

      (A) any investment strategy or investment in securities,

      (B) the prospects for success of any product or company,

      (C) the use of client funds,

      (D) compensation to any person,

      (E) Defendant's qualifications to advise clients; or

      (F) the misappropriation of client funds or investment proceeds.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

<div align="center">4</div>

receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a) thereunder [17 C.F.R. § 275.206(4)-8(a)], by using the mails or any means or instrumentality of interstate commerce, while engaged in the business of advising a pooled investment vehicle for compensation as to the advisability of investing in, purchasing or selling securities:

    (a)    to make any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in a pooled investment vehicle, or

    (b)    otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative, with respect to any investor or prospective investor in a pooled investment vehicle, by

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any client or prospective client, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any client or prospective client, about:

    (A) any investment strategy or investment in securities,

    (B) the prospects for success of any product or company,

(C) the use of client funds,

(D) compensation to any person,

(E) Defendant's qualifications to advise clients; or

(F) the misappropriation of client funds or investment proceeds.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 203(f) of the Advisers Act [15 U.S.C. § 80b-3(f)] by willfully becoming, or being associated with, an investment adviser in contravention of the Commission's Order barring Reinhard from affiliation with any broker, dealer, or investment adviser, in In the Matter of Don Warner Reinhard, Securities Exchange Act of 1934 Rel. No. 63720, Investment Advisers Act of 1940 Rel. No. 3139, Admin. Proc. File No. 3-13280 (January 14, 2011).

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay disgorgement of ill-gotten gains and prejudgment interest thereon; that the amounts of the disgorgement and civil penalty shall be determined by the Court upon motion of the Commission; and that prejudgment interest shall be calculated from August 29, 2019, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). Upon motion of the Commission, the Court shall determine whether a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] is appropriate and, if so, the amount of the penalty. In connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of the Consent or this Final Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed as true.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the

allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

## IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## X.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

SO ORDERED on March 8, 2021.

s/Robert L. Hinkle_____
United States District Judge

# EXHIBIT J



# HOWARD JUSTICE

## Howard & Associates
## Attorneys at Law, P.A.
*Dr. Tim Howard, J.D., Ph.D., Senior Partner\**
*Florida Supreme Court Certified Mediator*



RECEIVED

FEB 18 2020

THE FLORIDA BAR

Tallahassee, Florida Office:
1415 East Piedmont Drive, Suite 5
Tallahassee, Florida 32308
Ph: (850) 298-4455
Fax: (850) 216-2537
tim@howardjustice.com

February 18, 2019

Charles Hughes, Bar Counsel
ACAP
Florida Bar, 651 East Jefferson Street
Tallahassee, Florida 32399-2300

Re:    TFB Nos. 2020-00,341 and 00,317 (2A), Complaints of Corey Fuller and William Floyd.

Dear Mr. Hughes:

We communicated with Florida Bar staff last week and it was agreed that the responses to the above-referenced Complaints could be combined and submitted on February 19, 2020. In response to these two Bar Complaints consider that these scandalous allegations are found in the civil action filed by these two gentlemen, Mrs. Charisse Fuller, and Mr. Don Reinhard's similar Bar Complaint.1

## CIVIL REMEDIES AND THE FLORIDA BAR

The Florida Supreme Court has ruled that the Florida Bar is not a venue to pursue civil remedies as another venue for political or legal leverage, and based on this standard, appropriately discharged these complaints in the attached letter dated January 15, 2020. Exhibit A. Mr. Hughes, as The Florida Bar representative, stated:

I must conclude that your complaint constitutes a civil dispute as there are **no**

---

1 Charise Fuller falsely claims she is owed money. The records show that she placed $75,000 into the fund, and received $88,238.00 in total proceeds over approximately 12 months, including monthly payments of $1,500 for most months, and as high as $16,500 for a month. *See* Accounting Ledger attached as Exhibit B. Note, that the allegations in Mr. Findley's civil Complaint track the allegations from Don Reinhard, who created and spread this contagious poison that others have adopted.

__allegations independent of the enclosed civil complaint__ and as a result, must be resolved through the civil system.  The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies.

. . .

Consequently, I have closed our record in this matter.

*Id* (emphasis added).

Nothing has changed in the facts and circumstances of these Bar Complaints.  When the decision was made to continue to pursue these Bar Complaints, there was no explanation of what new facts existed or why.  If the Florida Supreme Court ruling applies, and not political or legal leverage, consistent with the letter ruling, these actions must be closed.

As a consequence, these parties are not entitled to use the Florida Bar as a method to gain advantage of a pending civil action that has been proceeding for nearly two years.

## UNDERLYING FACTS

As far as the underlying facts, these two gentlemen received $721,080 in a scheme crafted with a Mr. Don Reinhard, from the funds that they are complaining about, as found in the attached legers from the company they invested in.  Accounting ledger attached as Exhibit B.

Mr. Fuller, the ostensible cousin of Mr. Floyd, received written and personal guidance from prison by Mr. Don Reinhard to go to attorneys, such as Mr. Findley, to pursue Respondent. Mr. Fuller protects Mr. Reinhard in prison.2 *See* Cumulative Exhibit C, discussed *infra.*, as Mr. Fuller has a history of close criminal conduct and ties with inmates, including personal ties going back to high school with convicted child molester, Pastor James Harris. Cumulative Exhibit D.

Mr. Reinhard 3 who is in prison for child abuse, was a former consultant for the fund.  This consultant crafted the loans with both Mr. Fuller and Mr. Floyd and designed the scheme during the operative time.  Relevant documents available upon request.

---

2  Mr. Reinhard is now in prison for child abuse for feeding feces to a three-year-old autistic child. *State v. Reinhard,* Case No. 17005-45CFMA (Fla. 14th Cir.).  In a deep, intimate, direct and ongoing relationship with Mr. Don Reinhard, __Mr. Fuller received $648,385 in extraordinary wealth from Cambridge Capital and Don Reinhard. The $648,385 was to be for his family during an 18-month__ period from April of 2016 through September of 2017. This is in addition to his head coaching salaries, and his NFL Line of Duty monthly income. *See* Accounting Ledger attached as Exhibit B.  Unfortunately, like with his former NFL salary, it is clear these funds were not used for his family. Upon information and belief these funds were used for gambling and funding illicit drug sales. Mr. Reinhard, who invested nothing, had nothing to invest, and was the investment fund consultant, conspired with Mr. Fuller to advance their mutual extortion efforts. Mr. Reinhard has engaged in a two-year extortion campaign against Mr. Howard as well as against attorney Jaakan Williams, and this has been reported to the State Attorney, Exhibit E, attached, and to the Florida Bar, Exhibit F, attached.

3  Tracking the extortion strategies of Mr. Reinhard, Mr. Reinhard's Florida Bar Complaint has some of the same scandalous allegations of Mr. Fuller, Mrs. Fuller and Mr. Floyd as found in their civil action. *See Don Reinhard v. Phillip Timothy Howard,* TFB No. 2018-00,265(2A).

Once this consultant was terminated from employment, an audit by the current management, 4 under Ms. Gail Milon, determined that the consultant made excessive loans in a scheme to pocket $500,000. Contrary to the allegations first spread by Mr. Reinhard and picked up by those attempting to profit and advance from these scandalous allegations, undersigned has over $1,350,000 in net investments into these same funds, received no fees, and has been doing all in his limited power to secure all investors and has spent and is obligated for $ millions in protecting the investments in technology and other fronts as well as covering legal costs.

Note also, these two gentlemen are even now able to receive funds if they would approach the manager and her counsel in a reasonable fashion as the fund is now in capable hands, and after a time of recovery is receiving funds and making returns on investments. Unfortunately, undersigned has no management or control over the fund, which is invested in technology, advances, and real estate.

Mr. Fuller is communicating with Mr. Reinhard and protecting Mr. Reinhard in prison. In return Mr. Reinhard is guiding Mr. Fuller in his same extortionate model, with false dreams of financial wealth.

Prior to Mr. Fuller ever investing into Cambridge companies, in communications solely between Mr. Reinhard and Mr. Fuller, Mr. Reinhard advised adjusting his 401K investments handled by the NFL, and this resulted in an allegation of protection of the assets. January 19, 2016 through July 27, 2016 emails from Mr. Reinhard to Mr. Fuller available upon request. Mr. Reinhard provided a Proposed Portfolio Investment Structure on March 22, 2016, that Mr. Fuller and Ms. Fuller reviewed. Mr. Reinhard also explained on April 8, 2016 that his IRA would have gained $62.000 if he had invested the funds. Finally, within days of the 401K transfer on May 19, 2016 of the investment, **Mr. Fuller was fully advised on May 25, 2016 of what Cambridge companies knew of Mr. Reinhard's background.** *Id.*

Mr. Fuller falsely claims that Mr. Reinhard's background was not provided. In fact, Mr. Fuller knew of Mr. Reinhard when he was a player at Florida State, based on information and belief that Mr. Reinhard assisted him then. Moreover, **Mr. Fuller was expressly provided the background on Mr. Reinhard on May 25, 2016,** as Mr. Reinhard was required to do to all potential clients starting in late October of 2015, when potential investors would have started during his consultancy. **May 25, 2016 email from Mr. Reinhard to Mr. Fuller documenting Mr. Reinhard's background, including his prior criminal "incarceration" and that the SEC "sanctioned" Mr. Reinhard.** Records available upon request.

Mr. Reinhard developed a "very personal" and long-term relationship with Mr. Fuller, Mr. Horne and several other retired NFL clients. From prison, on January 12, 2018, Mr. Reinhard wrote to

---

4 Mr. Fuller has been repeatedly informed by Cambridge ownership and management that Mr. Howard has no interest, management or control, and that his 401K investments are secured with more than sufficient assets for repayment and return, and upon liquidation of a portion of the assets, his retirement funds will be transferred. Moreover, counsel for Mr. Fuller, Mr. Thomas Findley was informed of this in writing. Exhibit G. This has also been confirmed by an independent audit conducted by the respected and former Leon County auditor, Bill Bogan. The audit is available upon request.

Mr. Fuller and numerous retired NFL clients that he was manipulating, stating:

> This is an email I did not want to send to each of you as I truly thought this disaster was coming to an end in early to mid-December and I would be back on course and working with each of you to further plan, develop, structure and implement a solid and productive financial plan for you and your family.

> . . . I had worked 12-18 hour days for the past 18 months to create, develop, and structure the very sound and successful principles of Cambridge Capital Group and was **privileged and honored beyond my wildest dreams to have initiated and built the incredible relationships I had with each of you** and we had only just begun.

> . . . While I have provided each of you with the reasons behind these delays [in NFL concussion settlement claim payments] so you clearly understood the unfortunate private agenda of your attorney which was the majority crux of my concern as to the handling of your claim, hopefully your wait for these much needed funds will end very soon. . . .

> **My dreams of starting a new firm which will mimic the very sound principles and proven work ethic of Cambridge Capital Group will not die** as I continue to fight to resolve these heinous charges. I am a very positive person and know that God has a plan for my family and I and that plan included our paths crossing. Please say a prayer for my family and I and **I will certainly plan on contacting you immediately upon my release in hopes of continuing to build our long-term relationship.** In the meantime, **I will continue to have access as well as text messages at 850-228-9868.** I there anything I can do to assist you then please do not hesitate to contact me and I will do everything in my power to do so. **Please know how important each of you are to me.**

Cumulative Exhibit C.

Mr. Reinhard planned with Mr. Fuller, Mr. Horne and other retired NFL players to create their own investment company, with Mr. Reinhard running this from the prison, claiming that the funds under consultancy "returned over 40% and 70% respectively in 2016." Referenced documents available upon request.

Mr. Reinhard also falsely claimed that he had a partner in Mr. Tom Woods as part of this scheme with Mr. Fuller, with Mr. Woods clarifying that "Mr. Reinhard is trying to drag all of us into his mud bath because he has reached the end of his rope. I think he has nothing but time on his hands and rather than reflect on his own misdeeds, he is instead lashing out at the very people that gave him a second chance. What a shame." *Id.*

Next, from prison, Mr. Reinhard directs Mr. Fuller, Mr. Horne and a few of the investors that he has personal relationships with to file a legal action, and claims he knows the valuation of their investments, and states:

I know some of you have ... contacted me [in prison] to ask questions. It is <u>time for us to take legal action</u> as again my research [from prison] has me concerned. I am very uncomfortable with what I have learned about the current structure of CCG and the management of the portfolio as I have also requested liquidation of my family's assets. I would strongly recommend that you do the same because I am overly concerned that the auditor has not provided any inf01mation since the audit for 2016 was initiated in July 2017. Again, let me underscore that I have a lot of experience in managing limited partnerships and the portfolio when I departed was rock solid as was the structure of the limited partnership.

I am now going to <u>proceed aggressively to follow suit</u> in the next two to three weeks to pursue the liquidation that I had requested over six months ago and <u>I strongly recommend that you do the same.</u> However, our position will be much stronger and attorneys will be much more <u>interested in the case if we proceed together.</u> I think its necessary to do so. Although I am still incarcerated my brother-in-law will be instrumental in helping us manage this process. Again, I believe time is of the essence so please let me know your thoughts as soon as possible. I look forward to hearing from you.

Don

P.S. -I will provide information regarding your approximate account value update for 12/31/17 tomorrow.

January 18, 2018 email from Mr. Reinhard to Mr. Fuller, Ms. Fuller, Mr. Horne, et al., attached as Cumulative Exhibit C (emphasis added).

On February 28, 2018, Mr. Reinhard writes solely to Mr. Fuller and family and select few friends, seeking protection in prison:

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5 inmates that are violent and hardened criminals because my roommate and I were told that there was absolutely no available bed space in the dorms that violent sentences. However on Thursday I was being threatened and pressured to give them food and other items or I would "learn about prison the hard way".

. . . I was packing my belongings some of the same individuals came into my cell with a knife made visible to me and told me they were going to stab me unless I have them all of my canteen which was approx..$70 worth of various food items and hygiene.   However, my understanding is that they are gang-related and will if they have not already got messages to their other gang members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center <u>including a very close friend of Corey Fuller's who had previously promised and</u>

re-iterated that promise when I cam in that he will protect me. However, that will mean following him around like a puppy even if I am safe from other gang members in this dorm.

February 24, 2018 email from Mr. Don Reinhard to Mr. Corey Fuller, *Id.* (emphasis added). Mr. Don Reinhard writes Mr. Fuller on the same day following up for a personal meeting on the extortion scheme:

> Corey, I think you will realize when you read the email I just sent that I am not only scared to death but terrified. Just to let you know Joe did make a very visible sign talking to me so everybody in the dorm would see him.
>
> Hopefully that does help for the time being.
>
> Also, please complete and send in the visitation form that was previously emailed to everybody as I truly want to see you soon and hopefully you can take on Saturday or Sunday to drive over. We certainly have a lot to discuss especially about Tim and CCG.
>
> Love ya buddy,
>
> Don

February 24, 2018 email from Mr. Reinhard to Mr. Fuller. *Id.* (emphasis added). The protection that Mr. Fuller is coordinating and providing Mr. Reinhard in prison is clear, as is the plan to address Mr. Howard and Cambridge Capital Group. Finally, the intimacy of their relationship is found in "Love ya buddy." *Id.*

On February 6, 2018, Mr. Fuller then falsely stated to a Mr. Walker that "he only invested money with Don Reinhard because he trusted Tim Howard." Mr. Howard never advised Mr. Fuller, nor was his background and education within the investment industry. Mr. Fuller then went on to state to Mr. Walker that "he wants to kill everyone, including Tim Howard, Gail, Harrison and myself. I am letting you know this so you can protect yourself." February 6, 2018 email from Mr. Walker to Mr. Leonard and copied to Mr. Howard, attached as Cumulative Exhibit C.

In a series of texts, starting on April 16, 2018, Mr. Fuller attempts to **extort Mr. Howard for money with a series of threats.** Mr. Howard responds, **"Please understand that I am not able to provide money to you.** I will do all that I can in that context. I am happy to work on your claim and as I have so far, and to assist in any legal and ethical way I am allowed. I care about your needs. Perhaps there are loan available until the NFL Disability or your claim is pursued over the next several months?" Mr. Fuller responds, "So should I just turn over all of my paperwork to the court? Since you don't know why I am showing you this paperwork?" Texts from Mr. Fuller to Respondent available upon request.

**I am God's minister for good and to love others. It is God in me that counts. I have helped coach for years, fund the food and support and equipment for**

players, and I have been there for you and others non-stop. Psalm 31. This is God's life and all he wants me to do is bless within my limited ability and means, and he will stand with me in that goodness and love. This time of forging will pass. Let God do a good work in you too.

*Id.*

Further clarifying that he can't comply with his extortion, and Mr. Howard informs Mr. Fuller that "I **am also limited by ethics and have no management, interest and control over these matters. Please seek other sources.**" Mr. Fuller responded, "**You keep playing this law its cool. Since you can't talk now game on for real.** Just know I am very hurt by this game u playing but its cool." Mr. Howard responded, "**I am doing all I can for you with the limitations of Law and ethics and I have and will continue to.**" *Id.*

Mr. Fuller changes approach and on April 17, 2018, the next day, seeks support from Mr. Howard stating, "**Sometimes I just need that confirmation that everything is going to be alright or that person that's going to help me push thru whenever I feel like giving up.**" In response, Mr. Howard comforts Mr. Fuller stating, "**God is alive in you. God loves you.** God will redeem you as he has me. I and coach have been praying over you, releasing you from evil and delivering you as a child of God." *Id.*

On April 23, 2018, Mr. Fuller writes, "Tim just know you are fair game now. You could not be a man of your word. I am and will do everything in my power to make sure u have the same feeling we do as players right now. The devil is real u got my money and played these f_____d games with it." *Id.* Finally, Mr. Fuller writes, "**Keep playing this game u will get your in the end.**" *Id.*

The facts are clear that Mr. Fuller and Mr. Floyd received extraordinary funds, have secure investments, and are conspiring with Mr. Reinhard, with the cover of Mr. Findley, in an extortion scheme that is grounded in criminal conduct.

Under these circumstances, these complaints must not proceed.

Thank you for your attention to this matter.

Sincerely Yours,

(Phillip) Tim Howard, J.D., Ph.D.

# EXHIBIT A

**The Florida Bar**
651 East Jefferson Street
Tallahassee, FL 32399-2300

850/561-5600
www.FLORIDABAR.org

Joshua E. Doyle
Executive Director

January 15, 2020

Mr. Corey B. Fuller
c/o Thomas M. Findley
101 North Monroe Street, Suite 925
Tallahassee, FL 32301

Re:   Mr. Phillip Timothy Howard, RFA No.: 20-8862

Dear Mr. Fuller:

All documentation submitted in this matter has been carefully reviewed. The Florida Bar is the licensing agency for all attorneys admitted to practice law in the State of Florida. In cases where discipline is indicated, the disciplinary action is taken against the attorney's licensure, and will not affect or overturn the outcome of any proceeding.

While I understand that you believe the attorney acted unethically, I must conclude that your complaint constitutes a civil dispute as there are no allegations independent of the enclosed civil complaint and as a result, must be resolved through the civil system. The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitution for civil proceedings and remedies. In the event that a court of competent jurisdiction makes findings in your case which suggest misconduct by the attorney you may re-file your complaint at that time, enclosing the relevant findings.

Additionally, regarding your request to file a claim with the Client Security Fund, you may download a claim form from The Florida Bar's website at www.floridabar.org.

Consequently, I have closed our record in this matter. Pursuant to the Bar's records retention schedule, the computer record and file will be disposed of one year from the date of closing.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

cc:   Mr. Phillip Timothy Howard ✓

# EXHIBIT B

|  | Loaned |  |  |
|---|---|---|---|
| Corey Fuller | 10000 | Cam Cap Advisors Deposit Acct |  |
|  | 61405 | Cam Cap Advisors 2500 |  |
|  | 510930 | Cam Cap Partners 6617 |  |
|  | 66050 | Cam Cap Equity |  |
|  | 648385 |  |  |
| William Floyd | 1835 | Cam Cap Advisors 2500 | 50000 |
|  | 70860 | Cam Cap Partners 6617 | 25000 |
|  | 72695 | Cam Cap Equity | 75000 |
| Charisse Fuller | 61738 |  | Cap Cap Partners 6617 |
|  | 26500 |  | Cam Capital Equity |
|  | 88238 |  | 75000 |
| TOTAL | 721080 |  |  |

# CUMULATIVE EXHIBIT C

---------- Forwarded message ----------
From: Don Reinhard <dwunnercasemophia@gmail.com>
Date: Fri, Jan 12, 2018 at 10:52 PM
Subject: Update on Don's unfortunate situation
To: <anthony.redmon@nickelin.com>, Coach Poole <coachpoole@gmail.com>, Corey Fuller <bushso2@gmail.com>, Dexter Carter <ddexter1332@yahoo.com>, Damien Robinson <dldejohn@comcast.net>, Donald Brady <donnybrady64@gmail.com>, deon apps <davenapps@yahoo.com>, <floydd2@yahoo.com>, Chalitse Fuller <damienrobinson380@gmail.com>, <apg3381@yahoo.com>, aloquez Green <qunxg@aol.com>, <charleskfuller@gmail.com>, frank middleton <frankkmiddleton3@yahoo.com>, <edwjohn@yahoo.com>, Tru Fres <trufres@aol.com>, <spadsman3@yahoo.com>, <dstephens20@yahoo.com>, <dll-b1@aol.com>, <miles.finn@k-elite.txus>, Tru Fres <trupresst07@gmail.com>, <derossasary74@gmail.com>, <bopeland53@yahoo.com>, <mike.finn@b-elitx.txus>, <seddogmail@yahoo.com>, Pat Riley <canast188@gmail.com>, Robert Thomas <robertthomas86@hotmail.com>, <saddagmail@yahoo.com>, <traylorbob@aol.com>, <wallywilliams068@yahoo.com>, chris Williams <cabide@gmail.com>, James Walter <paylonton702@gmail.com>, <copsmith420ca@gmail.com>, Charlie Clemons <damcelot@yahoo.com>, Joe Walter <padanmason20@yahoo.com>, E.MANUEL <anoch-demar@gmail.com>, <hardylove@earthlink.net>, <aycedy/no27@gmail.com>, James Wilder <jswilder37@gmail.com>, Tamarick Vanover <tk671146@gmail.com>, timothy jacobs <timjnaobs@gmail.com>, Tony Galler <galler2217@gmail.com>, <jimjh_dzza@yahoo.com>, <leonardnintrushfc@gmail.com>, Matt Dorsett <eadrgz04@yahoo.com>, <rapallttel66@comcast.net>, <mightpaid54@comcast.net>

This is an email I did not want to send to each of you as I truly thought this disaster was coming to an end in early to mid December and I would be back on course and working with each of you to further plan, develop, structure, and implement a solid and productive financial plan for you and your family. However, I have now learned that Bay County is not going to drop these heinous alleged charges of which they have no evidence until approximately 18-24 more months. If I do not get a plea agreement which will likely require me to go to jail for approximately 18-24 more months. If I do not get a plea agreement which will likely require me to go to jail for approximately 18-24 more months and which I have thought they would hand me today offer than I risk a much longer sentence because of the heinous issues involved in this case and Florida does not offer parole and only allows 15% good time credit. I am able to my stomach thinking about what I am now faced given that I did not commit this heinous crime and again, there is no evidence that proves that I did.

When this all happened in early February 2017 I was on top of the world. I had worked 12-18 hour days for the past 18 months to create, develop, and structure the very sound and successful principles of Cambridge Capital Group and was privileged and honored beyond my wildest dreams to have initiated and built the incredible relationships I had with each of you and we had only just begun.

Additionally, I had met a fabulous woman with three incredible little boys who very much needed a daddy who would love them, teach them, care for them, and give them the tools they needed to become truly successful and productive parts of our society. Molded together with my incredible two children, I finally had the large family I had yearned for since 2005. Everything seemed to be absolutely perfect and then... born within a 2-week period of time, my life was basically destroyed due to the heinous alleged charges leveled by my fiance's, now my wife's, parents who despised me due to the stable environment I provided their daughter and grandchildren. You... believe it or not, that is when I loved a lady but those would have been tasted to death for their daughter and grandchildren to have this stability but yet they felt threatened.

And to make matters much much worse my friend of over 40 years who had become my closest confidant, friend, and business partner at Cambridge Capital Group immediately turned on me due to differences we had with regards to his firm's handling of your concussion settlement cases. He initiated his campaign of retaliation against my family and so quickly that he clearly had planned it and was just waiting for the perfect opportunity. Well, he got it, as I was basically defenseless.

Going forward, hopefully each of you will receive your settlement proceeds soon as I know the unexpected delay have caused many of you and your families extreme hardship that were certainly unnecessary. While I have provided each of you with the necessary behalf these delays so you clearly understand the unfortunate agents of your attorney which was the entirety crux of my concern as to the handling of your claim, hopefully your wait for these much needed funds will end very soon. I have taken these unnecessary delays personal because I feel responsible for the success of each of you due to CCG's involvement and referring you to Tim Howard and Howard & Associates P.A. for legal representation.

My dreams of starting a new firm which will mimic the very sound principles and proven work ethic of Cambridge Capital Group will not die as I continue to fight to resolve these heinous charges. I am a very positive person and know that God has a plan for my family and I and that plan included our paths crossing. Please say a prayer for my family and I and I will certainly plan on contacting you immediately upon my release in hopes of continuing to build our long term

relationship. In the mean time I will continue to have access to my email as well as text messages at 850-228-8868. If there is anything I can do to assist you then please do not hesitate to contact me and I will do everything in my power to do so. Please know how important each of you are to me.

Don

From: Don Rabbard <dwamazdinachpla@gmail.com>
Date: 1/18/18 10:07 PM (GMT-05:00)
To: anthonyradmon@inchealth.com, Corey Fuller <bouchk2@gmail.com>, Coach Coleman <coachcolemen08@gmail.com>, Gaidygan@comcast.net, Donald Brady <donnybrady04@gmail.com>, Chelsee Fuller <chelseefuller@gmail.com>, Joseph horn <Seahorn336@yahoo.com>, jwisteig1178@verizon.net, mike.flim@bc.ellis.tcus, seddiagreak@yahoo.com, wallywilliamsofc8@yahoo.com, <alamonakrdo@gmail.com>, Timothy Jacobs <timjacobs@gmail.com>, Tim Howard, the auditor, and others involved
Subject: An immediate lawsuit against Cambridge Capital Group, Tim Howard, the auditor, and others involved

I have done some research and I am increasingly concerned about what I am learning with regards to the current structure of Cambridge Capital Group and it's respective limited partnerships which each of you are invested in via your 401K, rollover proceeds and other assets. When I deposited the proceeds that had been built was in my opinion, not sold as a vast majority of my family's wealth is invested exactly as your family's wealth is in the limited partnership. As they say "I eat my own home cooking".

I have asked questions of the auditor to receive information about my values but I have not yet received any information. Perhaps you have done the same as I know some of you have as you have contacted me to ask questions. It is time for us to take legal action as again my research has me concerned. I am very uncomfortable with what I have learned about the current structure of CCG and the management of the portfolio as I have also requested a liquidation of my family's assets. I would strongly recommend that you do the same because I am overly concerned that the auditor has not provided any information since the audit for 2016 was initiated in July 2017. Again, let me underscore that I have a lot of experience in managing limited partnerships and the portfolio when I departed was not sold as was the structure of the limited partnership. I have now learned that has been dramatically changed. I am going to proceed aggressively to follow suit in the next two to three weeks to pursue the liquidation that I had requested over six months ago and I strongly recommend you do the same. However, our position will be much stronger and attorneys will be much more interested in the case if we proceed together. I think it's necessary to do so. Although I am still incarcerated my brother-in-law will be instrumental in helping us manage the process. Again, I believe time is of the essence so please let me know your thoughts as soon as possible. I look forward to hearing from you.

Don

P.S. – I will provide information regarding your approximate account value update for 12/31/17 tomorrow.

From: Don Rakhhard <crj2585@gmail.com>
Date: February 24, 2016 at 7:45:58 PM EST
To: Corey Fuller <bcoahx24@gmail.com>, Dad <heckmahlang@bellsouth.net>, Herb Reinhard <hreinhard@volusa.edu>, Mark Reinhard <mark@reinhardgroup.com>, Ann Schidhammer <annschidhammer@bdbummer@...>, Dave Borden <daforden>, Chris Kraft <CKraft@ed.com>, Jon Sweets, Jon Dweds, John Murphy <jdmurph@aol.com>, Ann Abbott- <annweed@gmail.com>, Bonnie Cornell <bonnie.cornell@yahoo.com>, Stacy Martinez <drdonduke77@mac.com>, John Martinez <eaglemom90@yahoo.com>, John Martinez <finda@yahoo.com>, Adam Corey <adamboorey@gmail.com>
Subject: Incident at knife-point

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5 inmates that are violent and hardened criminals because my roommate and I were told that there was absolutely no available bed space in the dorms that we should have been in for level 1, 2 and 3 inmates which have shorter non-violent sentences. I was told I would be in the dorm for 2-3 days and they would get me out immediately. However, when I voiced these concerns to my mother and father who immediately being threatened and pressured to give them food and other items or I "won't leave this prison the hard way". I voiced these concerns to my mother and father who immediately called and talked with a captain.

The captain talked with me and told me I would be taken out within the next day or two he was going to immediately get me transferred. I asked me if I feared for my life and I said no that I was very scared and concerned of getting beat up or knifed. I also did not want to be put in solitary confinement which is the alternative if you say you fear for your life. I cannot handle that.

I was told by the dorm officer that I would be moved today which she finally got around to doing at about 5 o'clock and while I was packing my belongings some of the same individuals came into my cell telling me they were going to stab me unless I gave them all of my canteen which was approx. $70 worth of various food items and hygiene. I tried to reason with them but another individual entered the room in so one of them held me off with the knife in his hand and they took all of my canteen.

There's other details involved but I immediately reported it to the sergeant outside because I just wanted to get out of these as soon as possible and they have taken the three individuals in hand-cuffs to solitary confinement. However, my understanding is that they are gang-related and will if they have not already got messages to their other gang members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center including a very close friend of Corey Fuller's who had previously promised and re-iterated that they would watch out for me. However, that will mean following him around like a puppy even if I am safe from other gang members in this dorm.

While the financial loss within me hard as I needed this food to last a couple more weeks as I am watching every single penny I have to spend, the real danger is that I am clearly a target at this camp/prison. Again, at this point I do not fear for my life because I certainly do not want to go to solitary confinement but things may change in the coming days. I clearly don't understand this part of the world and do not know how I am going to get through this.

The captain clearly acknowledged to the dorm guard that my roommate and I were not supposed to be housed in dorm F which included the level 4 & 5 inmates because it was breaking DOC policy. Although the dorm officer informed him that they were doing that periodically he said this was still breaking DOC policy. That captain was very helpful and he called my mama and daddy yesterday evening to inform them that he was working to get me transferred out.

At this point, I believe the only solution is to do what is necessary to immediately get me moved to another camp/prison or possibly to the annex here at Columbia which is another camp or the work camp at Columbia. I really see no alternative as I'm very scared and nervous as to what the repercussions can be. To do this I assume it will take some sort of orchestrated phone calls possibly to the captain and daddy have already talked to but please tell both that y'all are requesting that this happen and it's not coming from me. Perhaps you can inform him how scared and concerned I am that I am now clearly a target and there does not seem to be any alternative but you will need to be adamant as I should never have been in that dorm.

Please pray for me and I will talk to Wes tomorrow as well as mama and daddy.

Don

From: Don Reinhard <d1f25sui@gmail.com>
Date: February 24, 2018 at 7:51:15 PM EST
To: Corey Fuller <ocushol4@gmail.com>
Subject: Visitation and email I just sent

Corey, I think you will realize when you read the email I just sent that I am not only scared to
death but terrified. Just to let you know Joe did make a very visible sign talking to me so
everybody in the dorm would see him. Hopefully that does help for the time being.

Also, please complete and send in the visitation form that was previously emailed to
everybody as I truly want to see you soon and hopefully you can take one Saturday or
Sunday and drive over. We certainly have a lot to discuss especially about Tim and CCG.

Love ya buddy,
Don

From: Adéya Walker <addyewalker@yahoo.com>
Date: Tue, Feb 6, 2018 at 2:43 PM
Subject: Re: Notice to Cease and Desist from Stalking, Intimidation and Extortion
To: "John P. Leonard" <jleonard@mdmo-law.com>, Lance Friedman <lfriedman@bca-advisors.com>
Cc: Lance Friedman <lanceblfriedman82@gmail.com>, Tim Howard <tim@howardjustice.com>, Thomas Woods
<thomaswoods6@gmail.com>

I have not been to Tom's house. I do not know where he lives. I have been in a meeting for the last couple of hours and I
can prove where I have been all day. Further, I have no intention to contact
Tom directly or indirectly.

Furthermore, I have no affiliation with Lance other than signing documents for A&T Development.

I spoke with Corey Fuller today who said he only invested his money with Don Reinhard because he trusted Tim Howard.
Corey said he wants to kill everyone, including Tim Howard, Gail, Harrison and myself. I am telling you know this so you
can protect yourself.

Adéya

CUMULATIVE EXHIBIT D

THE NEW YORK TIMES

SPORTS | PRO FOOTBALL

## PRO FOOTBALL; There's More Than Football To Worry About for Ravens

By DAMON HACK JUNE 8, 2004

In a small trailer that doubles as a Bible study room, Baltimore Ravens running back Jamal Lewis sat at a news conference Monday and reiterated that he was innocent of federal drug conspiracy charges. In a corner of the Ravens' locker room, no more than two hours later, cornerback Corey Fuller apologized for the embarrassment caused by his arrest for felony firearm possession and for felony and misdemeanor charges that he used his home in Tallahassee, Fla., as a high-stakes gambling house.

Football seemed secondary as the Ravens embarked on a four-day minicamp amid the cicadas in this Baltimore suburb.

"This is the appropriate time to discuss this because it is time to go back to work," Ravens Coach Brian Billick said, of Lewis's situation in particular. "Obviously, we support Jamal, we believe in this process and we will support him in this process. Whatever the time frame, it is important to keep in mind that the players don't live in a sterile environment."

For the Ravens, the American Football Conference North champions last season, matters of legality have swooped into their season before.

In August 2000, the N.F.L. fined the All-Pro linebacker Ray Lewis $250,000 for conduct detrimental to the league after he pleaded guilty to a misdemeanor charge of obstructing justice in a double homicide at an Atlanta nightclub. Lewis had faced two counts of murder before prosecutors dropped those charges.

In December, the second-year pass rusher Terrell Suggs was charged with two counts of felony assault for a March 2003 incident outside Phoenix Municipal Stadium after a three-on-three basketball tournament. Suggs has a Sept. 9 court date.

With Jamal Lewis, who faces charges in Atlanta, Fuller and Suggs, Ravens players currently face six felony charges in three states.

"It seems like the devil is always at work, but I know what it takes to overcome the devil," Fuller, 33, said. "I wouldn't wish this on my worst enemy. But nobody victimized me. I victimized myself."

Billick compared the off-the-field situations with instances that arise in every sport. The Ravens have backed back controversy before, winning Super Bowl XXXV against the Giants only months after Ray Lewis's involvement the Atlanta murder trial.

"Whether it's Jamal, whether it's Corey, whether it's Terrell Suggs, I have a tremendous amount of faith in the character of those individuals," Billick said. "There are going to be things that raise themselves up due to injury, personal situations, births, deaths, any number of things. These aren't machines. They have lives and as a team, you have to respect and understand that."

Jamal Lewis, who was voted the league's offensive player of the year last season, rushed for 2,066 yards, the second-highest total in league history. (Eric Dickerson ran for 2,105 in 1984.) Lewis is accused of conspiring to possess with intent to distribute five kilograms of cocaine and using a cellphone in the commission of a drug crime. The charges resulted from an investigation by the Federal Bureau of Investigation during the summer of 2000, just before Lewis signed a six-year, $35.3 million contract.

## 247 Sports

## Fuller Facing Felony Gun Charges

By May 24, 2004 -

When Corey Fuller played for the Vikings, VU staffers agreed he was a talented player, but also agreed he wasn't going to be asked to join Mensa. His lack of ideal intelligence came into play earlier this year when a shootout at his home resulted in Fuller being arrested for hosting high-stakes gambling nights. Despite making a solid NFL salary, especially when he was with the Browns, the current Ravens player decided playing host to No-Limit Texas Hold 'Em games was in his best interest. Now he faces jail time and a likely suspension from the league.

New charges were added over the weekend, including use of a firearm during the commission of a felony, which carries a maximum of five years in jail if convicted.

**EXHIBIT E**

# Howard & Associates
## Attorneys at Law, P.A.

Drs. Eva Edward, J.D., Ph.D., Senior Partner
Florida Supreme Court Certified Mediator

Tallahassee Office:
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Tel: (850) 298-4455
Fax: (850) 422-2020
TheHowardJustice.com

Fort Lauderdale Office:
101 NE 3rd Ave, Ste 1500
Fort Lauderdale, Florida 33301
(954) 332-2380
www.howardjustice.com

Cambridge Office:
8 Museum Way
Cambridge, Massachusetts 02141
(617) 771-8290

July 28, 2017

**VIA HAND-DELIVERY OR EMAIL**

Jon Fuchs, Assistant State Attorney:
Second Judicial Circuit
301 North Monroe Street, Suite 475
Tallahassee, Florida 32301
(850) 606-6000

Jennifer Ahne Hawkins, Assistant State Attorney
Fourteenth Judicial Circuit
421 Magnolia Avenue
Panama City, Florida 32401
(850) 872-4473

Re: Attempts at Extortion, Retaliation and Obstruction of Justice by Criminal Co-Defendants Don
Reinhard and Katie Reinhard (Braxton). Don Reinhard is Currently Facing Criminal Charges for
Violation of Protection for Grand Theft. Don Reinhard and Katie Reinhard are both Facing Criminal
Charges for Felony Child Abuse of a Disabled Child, A Tragedy for the Disabled Child and for the
Co-Defendants.

Dear Assistant State Attorney Fuchs, and Assistant State Attorney Hawkins:

As part of your respective prosecutions of the above-referenced violation of probation and felony child
abuse charges, the law firm has assisted by sharing evidence and responding to this subpoena verifying the
felony crimes of child abuse on the phone and in texts between the co-defendants that was shared with
Assistant State Attorney Jon Fuchs and Panama City Beach Investigator, Lieutenant Russelio Talamantez.
Cumulative Exhibit A. The law firm was unwilling to participate in obstruction of justice and would not
hide evidence nor assist in their criminal defense. In retaliation, the criminal co-defendants are
aggressively attempting to extort the law firm and those that work for and with the law firm. While these
sordid crimes are a tragedy for the disabled child and for both co-defendants, and we hope that his

* Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of
Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D. Northeastern
University; Law, Policy & Society; Former Visiting Health Law, Bioethics, and Human Rights Scholar, and Constitutional
Law, Media & Politics and Judicial Process Instructor at Barnard University; Former Director of and Professor with
Northeastern University's Law & Policy Doctorate Program, President of Cambridge Graduate University International.

disabled child receives the security and support he needs, we must inform you of continuing extortion and
retaliation by these criminal co-defendants.

Despite receiving "Cease and Desist" letters in late February and early March of 2017, and Don Reinhard
executing a notarized "Law Firm Non-Disclosure and Confidentiality Agreement" that all
workers in the building sign, regardless of whether they actually work as an employee or independent
contractor for the Howard & Associates law firm, colleagues, employees, experts, lenders, accountant,
wife of the owner, owner, registrars, private investigators, and more, have received threatening and
extortionate emails, texts, letters directed at written communications directed or written to Don Reinhard,
and/or through his co-defendant wife Katie Braxton (now Katie Reinhard since he married Katie Braxton while
in the county jail in a fruitless attempt to claim marital privilege for a co-defendant, which marriage was
after the crime and after the testimony and documentation of the crime took place). In violation of the
"Law Firm Non-Disclosure Agreement and Confidentiality Agreement," based on his statements to date,
Don Reinhard may have obtained NFL Commission Settlement Claim files and may have sought to make
changes to the files. The firm doesn't know what is in Don Reinhard's possession. All original client
files in the law firm's possession are in order.

Don Reinhard and Katie Reinhard have falsely claimed and implied fraud in NFL Commission Settlement
client files, and have implied that there are other matters that they will expose. It is suspected that: (1)
the law firm and colleagues participate in obstructing justice and assist Don Reinhard and Katie Reinhard
in their criminal defense, (2) Don Reinhard and Katie Reinhard are entitled to amounts that range from
$1,200,000 and more several million dollars for Don Reinhard's $3,000 a month consulting work for a
private TNRA exempt investment fund, (3) Katie Reinhard is to be paid to Katie Reinhard for a car she does not
own. Cambridge Capital Group (CCG) has responded to each of the claims against that company, and
verified that there were no funds invested nor are there subscription agreements as investors under either
Don Reinhard or Katie Reinhard.

The facts are that Don Reinhard was hired as a periodic consultant for CCG, an independent investment
company, at $3,000 a month. He has no ownership interest in CCG. He was hired as a consultant in an
effort at compassion and rehabilitation of someone that Dr. Howard met at Costco selling tires and who
didn't know what to do with his life. He is a former high school football team mate that Dr. Howard had
known, but he was not someone that Dr. Howard had been close to. He was not involved with the law
firm, and in an abundance of caution, the firm required that all workers on the same floor in with
companies in the same building of the law firm sign and commit to a confidentiality agreement in order to
protect client information. Subsequent to his dismissal, upon investigation, it had been determined that
Don Reinhard was misleading as to the facts and underlying charges for some of his prior crimes.
Affidavit verifying independent contractor and consultant status, and affidavit verifying income of $3,000
monthly, as filed by Don Reinhard in January and December 2016 in his Circuit Civil Court Child
Support cases in Leon County, Florida, and confidentiality agreement, and cease and desist letters, are
attached as Cumulative Exhibit A. Moreover, the investment companies are currently owned and
managed as Omnihive companies are Nevada companies. Dr. Howard had

approximately $2.4 million invested by the end of 2016, and has approximately $5.2 million invested as of July 28, 2017.

Beginning about a year ago, due to concerns as to Don Reinhart's emergence, narcissism, solipsism, and recalcitrance in controlling CCG's operations, as a replacement and/or supervisor of this independent contractor dealer. After interviewing several candidates, a quality, experienced, respected professional with integrity and empathy was found and CCG hired Carl Million, CAST, CEFC, with 30 years of successful experience, as managing Vice President in December of 2016. She has since hired Bogen Public Management Company (RPMC), and Bill Bogen, Jr., CPA, CRPC, and CRPC, to provide a comprehensive audit to assure all investment funds are in place and to determine what company profits may have been absconded. RPMC is mid-way through the audit now.

Starting after his arrest in mid-February of 2016, a retaliatory and extortionate scheme to obstruct justice and extort assets by Don Reinhart and Katie Reinhart (Du'ran) began, and is found in the various letters and emails from them orchestrated from Kent County Jail through his co-Defendant wife Katie Reinhart. The conspiracy between these co-defendants begins with the violation of the February 11, 2017 Court Order that specifically directs Don Reinhart: "Do not contact Jesse Burton or Katherine Burton." Id. The various letters and emails are attached as Cumulative Exhibit B.

As an example, these sordid claims have been spread to experts, clients and leaders of the law firm, falsely claiming that diagnostic medical exams and final reports are forged and hundreds of millions of fraudulent claims have been submitted to the NFL Concussion Settlement Claims facility. Id. The facts are that neither Don Reinhart nor Katie Reinhart ever worked for the law firm, though Don Reinhart did sign the law firm confidentiality agreement to protect any exposure to client confidential information, and Don Reinhart was terminated from his consulting work in the independent investment fund in mid-February of 2017. Exhibit C. Don Reinhart was incarcerated from January of 2017 as a result of violation of probation due to pending felony child abuse charges. As a consequence, neither Don Reinhart nor Katie Reinhart know how various and patently absurd their extortionate and retaliatory allegations are.

These criminal co-defendants don't know that from the currently over 250 clients, and growing, nothing, other than registering them, has been submitted to the NFL Concussion Settlement Claims facility. They don't know that all original medical records and reports are in the files of the doctors, and only copies are in the files of the law firm. They don't know that all medical records and reports have to be reviewed and signed by a board-certified neurologist formally approved by the NFL Concussion Settlement Claims facility. They don't know that the board-certified neurologists contemplated for use by the law firm were only recently approved in May and June by the NFL Concussion Settlement Claims facility. They don't know that the current NFL Concussion Settlement clients must meet individually for an updated clinical evaluation prior to submission of our clients' claims to the NFL Concussion Settlement facility. They don't know that the law firm must have a board-certified neuropsychologist meet with every client to update and finalize their neuropsychological claim, and that these updates will begin in a few weeks. They don't know that the law firm manages its files to ensure the file's integrity and client confidentiality. This is just one example of their respective ignorance, arrogance and their various criminal extortion and retaliation attempts.

These letters and emails are replete with these types of criminal schemes, including (1) attempting to operate a private investment firm from jail and enticing retired NFL players to invest $650,000 with $9,000,000 income and wife (aka known as Scooby/Katie) and I as well as a group of retired players, "(2) attempting to extort a "global settlement" "$50,000," monthly payments of $3,000 to co-defendant Katie Reinhart, and $1,200,000 in assets in response to "turning your back on me" and threats of "train wreck for both of our lives and you have more to lose," "the risk and damage your actions will cause to many . . ." "each event carries significant penalties" "punishment", "your massive fraud", "30-year prison term", "I have been forced to sue Tim Howard for well over $1 million that he is attempting to steal from me, my family, and my children", (3) attempting to extort these payments and assets through threats and claims of fraud against the NFL Concussion Settlement, tax fraud against CPA, bank fraud and worthless check charges against staff, (4) attempting to extort a $25,000 payment to Katie Reinhart for a car she does not own, (5) use of third-parties and/or skin, such as Tim Reinhart and girlfriend @gmail.com, (7) threatening and intimidating the independent auditor (RPMC), (9) spreading false and defamatory statements to Dr. Howard's clients, and (10) the following threatening and extortionate terms to Dr. Howard's wife, Jennifer Howard:

But also, I intend to immediately move forward with current communication I am having with the NFL Claims Administration and law enforcement via a large national law firm regarding this massive fraud Tim and Howard & Associates have perpetrated against the NFL Concussion Settlement and the 300 plus retired NFL players that we list as our clients. Tim and his team have made a massive fraud out of this NFL, out of approximately 250 funding for which he only claims 300, roughly and I as well as $30 million in the assets . . . I fully intended to let the cat out of the bag here so . . . and the related damages to many of his employee and associates who know and are involved would be devastating to many of his . . . this does not even include the many, many families of the retired NFL players who are expecting a financial settlement averaging over $600,000 who will be denied due to the fraud involved in their qualification process by their trusted attorney, Tim Howard. The motive onslaught that you and your family would have to endure, in and of itself, would be devastating and far greater than tobacco days. I and others began keeping records and documented proof in 2016. While I thought the activity was limited, I was shocked to hear from 2 EBA's associates that it was widespread. They came to me in with concerns of their personal liability. For extorting this is specious. I and others have witnessed forging signatures on files to insure eligibility as well as well that Tim was unaware was being collected in many forms. . . . I have told Tim via my letters that I do not want to go down this road unless he is forced to. To date, my communication to the various authorities has been limited by design and anonymous as again, this via a large law firm but they are eager to move forward with details. . . . I must have him simply provide me with what is "under" . . . I cannot start my life over again. . . . Look at the enormous risk he is taking for this, you and your family. Look at the enormous risk he is taking for the employees of this law firm. Look at the enormous risk he is taking for almost 300 families of retired NFL players. Outside of the NFL and the criminal case, Tim would be sued for millions he has borrowed over this last 4-5 months against his future expected fees as they were based on fraud, sued by multiple legal

advance companies because their loans to players would be unpaid based on Tim's fraud, and sued by all of the investors in the Limited Partnership Investment Funds of CCG, due to their losses because of the fraud (including your mother's investment) which would certainly bring in the SEC.   This is certainly well over $3-$40 million in investors in addition to losing the $50 million in fees.  For what ... "Spite for me, which is very foolish" as suggested by 2 of his closest clients who know the situation.  Jennifer, let's not make this a train wreck as y'all have far more to lose than I do.  Please discuss this with Tim and send me an email as I will not wait past 4/7 for a response to jl25fsu@gmail.com. (emphasis added).

Cumulative Exhibit B.  All these actions are an attempt at extortion and in retaliation for not assisting in their criminal defenses, for not participating in obstruction of justice, and for assisting the State of Florida in providing damning evidence in support of the prosecution of their crimes.

In light of their rapid fire backdoor, yet varacous, extortionate and retaliatory actions to date, and the comprehensive evidence of their crimes and the evidence that this firm is providing as a result of its investigation and has provided to assist in the prosecution for these crimes, as well as in compliance with Assistant State Attorney Jon Fuch's subpoena, it is highly likely that these criminal co-defendants will reach out to any source that may come into their respective minds in an attempt to perpetrate their extortion, retaliation and obstruction of justice.  In order to expose the extortion, retaliation, and obstruction of justice, and to avoid any knowing or unknowing and/or direct and indirect complicity by third-parties with their schemes, this law firm is providing a copy of this notice to the Florida Bar, and will provide copies of this notice to any other victim of their criminal schemes that this law firm becomes aware of.

Thank you for your service to Floridians and for your consideration of these matters.  This entire episode is a tragedy and we do hope that these co-defendants get the structure, accountability, discipline, and mental health treatment that they need to be productive citizens.  As stated in the beginning of this letter, we hope that the disabled child that is a victim of their crimes gets the security and support he needs for a healthy life.

Sincerely yours,

Jaskan Williams, Esq.
HOWARD & ASSOCIATES, P.A.
2120 Killearny Way, Suite 125
Tallahassee, Florida 32309
Office: (850) 298-4455
jaskan@howardjustice.com

CC:     Florida Bar

# EXHIBIT F



# HOWARD & JUSTICE

## Howard & Associates
### Attorneys at Law, P.A.

Dr. De Haard, J.D., Ph.D., Senior Partner
Florida Supreme Court Certified Mediator

Tallahassee Office
2120 Killearn Way, Suite 125
Tallahassee, Florida 32309
Ph. (850) 298-4455; Fax (850) 513-4357
FL...@justice.com
www.howardjustice.com

Fort Lauderdale Office
...
Fort Lauderdale, Florida 33301
(866) 338-4455
www.howardjustice.com

Cambridge Office
...Amesbury Way
Suite 3407
Cambridge, Massachusetts 02142
(617) 577-5620

August 21, 2017

Charles Hughes, Bar Counsel
The Florida Bar
651 East Jefferson Street
Tallahassee, FL 32399-2300

RE: Complaint by Don Reinhard against Joshua A. Williams
The Florida Bar File No. 2018-00,061 (2)(A)

Dear Mr. Hughes:

Before addressing the meritless allegations lodged in the complaint against me by Don Reinhard, I first would like to clarify for the record that Don Reinhard was not truthful and forthcoming with this administrative body regarding his current address. Don does not reside at the address that he listed on The Florida Bar Inquiry/Complaint Form. Under penalties of perjury, Don declared that the facts alleged in the complaint are true, correct, and complete, when in fact, they are not.

Under Part One - Complaint Information, Don listed his address as 100 Calusa Cay, Unit 2422, Panama City Beach, FL 32413. However, that information could not be further from the truth. Don Reinhard is an inmate currently residing and has been housed in the Leon County Jail since March 1, 2017 awaiting sentencing for two counts of Violation of Probation/FTA/Grand Theft. See Attachment "A." Moreover, Don Reinhard is also facing serious felony criminal charges that are simultaneously pending in Bay County, FL, for Aggravated Child Abuse for forcing a child with his own feces as part of a "potty-training process." A jury trial in that matter is set for September 5, 2017. See Attachment "B." Ever since Don's termination from Cambridge Capital Group, LLC and his subsequent arrest for the above-referenced criminal offenses, Don has engaged in a pattern of denial, deceit, and extortion in an attempt to shift the blame for his poor decisions and judgment to myself, as well as other employees of Howard & Associates, P.A. Examples of such behavior

will be provided in attachments following my responses below.

My responses to the incredible allegations in the complaint are as follows:

Allegation #1: There is no dispute here. I am a licensed attorney in Tallahassee, FL and have been a member in good standing of the Florida Bar since November 19, 2009.

Allegation #2: There is no dispute here. I am currently employed with Howard & Associates, P.A., 2120 Killearn Way, Suite 125, Tallahassee, FL 32309, as an Associate Attorney since March 28, 2016.

Allegation #3: I did temporarily represent Don Reinhard pro bono in December 2016 in a family law matter, Case No. 2012-DR-0819, in Leon County, FL regarding child support modification. I was approached by the managing partner at the firm, Timothy Howard, in early December 2016 and asked to assist Don with a non-business related, personal child support modification hearing. At that time, Don Reinhard was working for Cambridge Capital Group, LLC as an independent advisor/consultant. Overall, I attended one child support modification hearing for Don on December 8, 2016. My legal representation of Don in the child support modification matter had nothing whatsoever to do with the affairs of Cambridge Capital Group, LLC; or with Don's capacity as an independent advisor/consultant for Cambridge Capital Group, LLC. Cambridge Capital Group, LLC, is an independent holding company, which is comprised of four distinct and separate entities, all of which are separate and distinct from Howard & Associates, P.A.

On or about February 11, 2017, Don Reinhard was arrested in Bay County, FL and charged with Aggravated Child Abuse (Count One) and Battery of a Child (Count Two). That same afternoon, Timothy Howard instructed me to put an appearance on the record on behalf of Howard & Associates, P.A. for Don until we could find out more details about Don's arrest. On Saturday, February 11, 2017, Don made his first appearance and was arraigned before the Hon. Judge John L. Fishel, II. Because it was a weekend arraignment and Don needed to appear telephonically for the hearing, where the charges were announced and Don entered a plea of not guilty. At the hearing, I announced myself and asked the court for a bond, and that was the end of it. I did not gather, review, or learn any confidential information from Don about his arrest prior to the hearing. My telephonic appearance at that hearing concluded my involvement in any of Don's subsequent personal legal matters.

On or about February 13, 2017, Don was relieved of his duties and terminated as a independent advisor/consultant for Cambridge Capital Group, LLC. After his termination, Managing Partner, Timothy Howard advised me and Don that the law firm of Howard & Associates, P.A. would not provide any further legal representation to Don on any of his personal legal matters, as those issues seriously interfered with the integrity and business structure of the law firm. On February 14, 2017, I filed a Notice of Withdrawal of Counsel in the family law matter, Case No. 2012-DR-0819, and on March 3, 2017, the Honorable Jonathan Sjostrom entered an Order Granting my Motion to Withdraw. See Attachment C.

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D., Northeastern University; Law, Policy & Society; Former Visiting Scholar and Lecturer on Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University; Former Director of and Professor with Northeastern University's Law & Policy Doctoral Program, President of Cambridge Graduate University International.

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D., Northeastern University; Law, Policy & Society; Former Visiting Scholar and Lecturer on Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University; Former Director of and Professor with Northeastern University's Law & Policy Doctoral Program, President of Cambridge Graduate University International.

**Allegation #4:** The July 18, 2017 mid referred to as "Exhibit A" by Reinhard speaks for itself. In a two-paragraph response to Don Reinhard and Katherine Reinhard regarding illegal subscription agreements or any investors in Cambridge Capital Group under the names of either Don Reinhard or Katherine based upon staff research. Gail Milton, who is currently serving as Don's replacement and Executive Vice-President of Cambridge Capital Group, LLC, performed the research and review of all accounts managed by Cambridge Capital Group, LLC, and her search did not reveal any of the alleged investment funds allegedly due to Don Reinhard. Cambridge Capital Group, LLC, is currently undergoing an intensive financial audit because it is strongly believed that Don has defrauded the company of thousands of hundreds of thousands of dollars from his fraudulent schemes. Don Reinhard's allegation that I threatened to harm him and his family is simply depraved. See Attachment D. The last sentence in paragraph 4 of Don's complaint is nonsensical as it alleges that I somehow used privileged information and that treated attorney/client privilege when the law firm provided a response to Don Reinhard regarding the very information that he requested from Cambridge Capital Group, LLC, regarding an alleged subscription agreement.

**Allegation #5:** As explained in Allegation #3 above, I temporarily represented Don Reinhard pro bono in a very limited capacity at one child support modification hearing, Case No. 2012-DR-2813, in Leon County, FL. This was not long-term, confidential information that was gathered, shared, or used, which would create a conflict of interest or breach of attorney/client privilege between myself and Don. I neither gathered nor prepared, or was informed by Don of any confidential information that Don alleges that I used against him. I simply attended the hearing pro bono at the request of my managing attorney, Tim Howard, and referenced family law documents that had already been prepared prior to my involvement. Moreover, none of those hearings had anything to do with the allegations at issue in this complaint. This issue being litigated, child support modification, had nothing to do with Don Reinhard's tragedy as a judge advisor to Cambridge Capital Group, LLC, in any capacity, advisor/consultant for Cambridge Capital Group, LLC nor any child support modification hearing on December 8, 2016, and I attended a final hearing on March 3, 2017, when Chief Judge Sjostrom entered an Order discharging my representation of Don in that matter.

*Despite Don's misrepresentations to this body, I affirm that I have neither provided legal representation to Don Reinhard nor Katherine Reinhard in any other legal matter than as explained above. After Don's termination on February 13, 2017, Don was instructed that Howard & Associates, P.A., would not be providing legal representation in any of Don's pending civil and criminal matters. See Exhibit R. I also am not aware of Don Reinhard being the co-owner of or having any ownership interest with Cambridge Capital Vice-President. See Exhibits R & C. Don Reinhard began consulting with Cambridge Capital Group for only one year before I was hired by Howard & Associates, P.A. I've always worked in the litigation department while Don worked in a separate part of its building for a separate entity performing consulting work for Cambridge Capital Group. I rarely interacted with Don.

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D. Northeastern University, Law, Policy & Society; Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University; Former Director and Professor with Northwestern University's Law & Policy Doctorate Program, President of Cambridge Graduate University International.

The conflict of interest that Don Reinhard alleges exists is also absurd. The State of Florida, a governmental body, is prosecuting Don for his perverted criminal actions against a developmentally disabled child. Cambridge Capital Group is not prosecuting Don, and as far as I know, there is no current or past litigation pending between Cambridge Capital Group, LLC, and Don Reinhard, which I have served as legal counsel that would create a conflict of interest.

**Allegation #6:** This allegation is untrue. I've never stolen anything from Katie Reinhard. In fact, I personally assisted Katie Reinhard on one occasion with retrieving personal property belonging to Don Reinhard that he left behind in his office after his departure. Twice during the month of June 2017, Katie Reinhard showed up at Howard & Associates, P.A., unannounced and demanded to retrieve personal items that Don left behind. On the first occasion, the Tallahassee Police Department was called out to our location and the investigating officer instructed Katie that the property dispute between Don and Howard & Associates, P.A., was a civil matter that she needed to address in a civil claim court. On the second occasion, I personally went to our storage closet with Katie and helped her retrieve one of Don's clothing bags, as well as personal items and records that were a part of Don's storage. We then loaded each of the plastic tote bins into the back of her Ford Explorer SUV. Katie thanked me for assisting her.

Moreover, as was explained in a July 18, 2017 letter addressed to Don Reinhard and Katherine Reinhard, which is Exhibit B of the complaint, it is my understanding that Katherine freely returned the cellphone in question to Cambridge Capital staff members after Don's arrest because the cellphone contained confidential company information. That cell phone was later turned over to a law enforcement investigation by Cambridge Capital staff as required under Florida law because the cell phone was believed to contain evidence of criminal activity. I neither saw nor handled the cellphone at any point in time. See Attachment H.

**Allegation #7:** As explained in Allegation #5 above, it is my understanding that Don was a temporary independent consultant/advisor. Don's role as a independent advisor/consultant was terminated effective February 13, 2017. There is no conflict of interest because I've never provided legal representation for Don Reinhard regarding any matter related to the business of Cambridge Capital Group, LLC.

In pertinent part, Section 4-1.9, Florida Rules of Professional Conduct, states that a lawyer who has formerly represented a client in a matter must not afterwards:

(a) Represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent;

(b) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known.

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D. Northeastern University, Law, Policy & Society; Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, University, Law, Policy & Society; Former Walter Leader of Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University; Former Director and Professor with Northwestern University's Law & Policy Doctorate Program, President of Cambridge Graduate University International.

# HOWARD JUSTICE

## Howard & Associates
### Attorneys at Law, P.A.

Dr. Tim Howard, J.D., Ph.D., Juris Doctor
Florida-Based Court Catalyst Warden

THE FLORIDA BAR
RECEIVED
JAN 18 2018

**Tallahassee Office**
2120 Thomasville Road, Suite 200
Tallahassee, Florida 32308
Ph. (850) 298-4455; Fax (850) 513-9507
Tim@howardjustice.com
www.howardjustice.com

**Fort Lauderdale Office**
101 NE Third Ave., Suite 1500
Fort Lauderdale, Florida 33301
(954) 332-2243

**Jacksonville Office**
Riverplace Tower, 27th Floor
1301 Riverplace Blvd.
Jacksonville, Florida 32207
(904) 527-0400

**Cambridge Office**
One Broadway
Cambridge, Massachusetts 02142
(617) 971-0400

January 18, 2017

Charles Hughes, Bar Counsel
The Florida Bar
651 East Jefferson Street
Tallahassee, Florida 32399-2300
(850) 561-5845

Re:     Complaint by Don Reinhard against Phillip Timothy Howard, The Florida Bar File No. 2018-00265(CA).

Dear Bar Counsel Mr. Hughes:

In response to Mr. Reinhard's complaint, please consider the following:

Mr. Reinhard is currently serving two 5-year concurrent sentences for violation of probation and child abuse, and it is the custody of the Florida Department of Corrections. In 2014 and early 2015, when Mr. Reinhard was recently out of federal prison and selling wine at Costco, out of compassion for a former high school football teammate, I hired Mr. Reinhard as an intern, and after several meetings, brainstormed with Mr. Reinhard on how to assist his life. Out of that brainstorming, looking at Mr. Reinhard as one of my doctoral students and trusting the lessons of humility and integrity he had learned from his federal prison experience and applying values of redemption, with Cambridge Graduate University International faculty, I established a small investment company to apply this business and finance skills being taught in our MBA program, and hired Mr. Reinhard as a consultant. Mr. Reinhard is the former commitment for this same investment company that I sold in the Spring of 2017. Mr. Reinhard can go now looks to be a claim of over $1 million, from this investment company. As part of this extortion attempt, Mr. Reinhard is providing false and delusional claims in nearly each and every paragraph, with the exception of paragraphs 1 and 3.

Submitted under penalty of perjury, Mr. Reinhard's paragraphs 5-51 are utter false, incorrect, distorted, dissembled or delusional. Mr. Reinhard never owned my investment company that I was formerly involved with, nor did he invest any money in any investment company that I was formerly involved with, nor he ever executed ownership or investment agreement exist. In fact, Mr. Reinhard has confirmed under oath, that he only made $3,000 per month from the time that he was working as a consultant. See July 8, 2017 letter and verification of no investment, no subscription agreement, affidavits and 3.

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D., Northeastern University, Law, Policy & Society; Former Visiting Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University; Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program, President of Cambridge Graduate University International.

---

There is no litigation currently pending or past litigation between Cambridge Capital Group, LLC, and Don Reinhard, in which I've served as legal counsel for either party, which would now preclude me or any attorney for Howard & Associates, P.A., from providing legal counsel to Cambridge Capital Group, LLC. In the two instances as I've addressed above in which I made an appearance for Don were solely for the personal legal issues that were not the same or substantially related to any affairs concerning Cambridge Capital Group, LLC.

Allegation #8: I take the Oath of Attorney and the Florida Rules of Professional Conduct very seriously, and I would not jeopardize losing my good standing or law license in the Florida Bar by supplying in the baseless actions alleged in this complaint by Don Reinhard.

Allegation #9: Needs no response.

Part Four – Witnesses: Don Reinhard listed Phillip Timothy Howard, Jackson Williams, Neil Bopston, Aidya Walker, Brenda Murphy and Katharine Reinhard as witnesses in support of his allegations. Interestingly, four of six of the persons listed as witnesses are also employed of Howard & Associates, P.A., and have had similar complaints and threats of extortion lodged against them by this same complaint.

Please reference RFA No. 18-1516, which was hand-delivered to the Florida Bar on July 28, 2017 regarding Don Reinhard's attempts at extortion and obstruction of justice against Howard & Associates, P.A. staff. After thoroughly reviewing the materials submitted to this administrative body, I believe the undisputed evidence will clearly demonstrate that Don Reinhard cannot be trusted. He is a convicted, narcissistic, street thug/career felon who refuses to accept responsibility for his actions. Don Reinhard has a lengthy criminal past in both the state and federal penal systems. In an Judgment entered by Chief Clerk David L. Thomas, United States District Court Northern District of Florida, Don Reinhard was ordered to disgorge to the Securities and Exchange Commission the sum of Five Million Eight Hundred Fifty-Seven Thousand, Two-Hundred Forty-One and 09/100 Dollars for committing securities fraud and a host of other Securities Act violations. Don simply cannot be trusted, and had I known this information about Don beforehand, I would have voluntarily rejected any request by any managing partner to assist Don in any matter. See Attachments 1 & 1.

Very truly yours,

By:  /s/ Jackson A. Williams
     Jackson A. Williams, Esq.

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D., Northeastern University, Law, Policy & Society; Former Visiting Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University; Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program, President of Cambridge Graduate University International.

Filed on January 29, 2016, and December 2, 2016 in *Reinhard's v. McClellan*, Case No. 2012-DR-819 (Fla. 2nd Cir.), and email verifying the same to Bill Waters, Esq.; July 28, 2017 letter verifying inaccuracy as interpreted or viewed by any one party; August 21, 2017 Response filed by Attorney/Judson Williams, in Florida Bar File No. 2018-00,060(2A), including Exhibits A through J; 1099 provided to IRS by Assistant State accountant; and July 28, 2017 letter and cumulative Exhibit A, Florida Bar. To avoid page limitations, only the Responses and Letters are attached hereto. If the attachments are desired, they are in the Florida Bar files and Respondent will provide copies as well.

Mr. Reinhard refers to NFL Concussion Claim files that he may have taken or modified. The law firm does know that Mr. Reinhard had taken former investment company files and data and has not returned the materials. In review of law firm files, all is in order. A formal request for return of existing and/or modified legal files and reports owned by law firm, and files, reports or workpapers owned by Cambridge Capital Group was sent on July 8, 2017, and is attached. Mr. Reinhard is deeply confused as to the NFL Commission Claims process and the firm's comprehensive screening and final independent testing and board-certified neuropsychologist. A similar confusion applies to the NCAA, allegations against companies owned by others, administrative staff of the law firm, and prior to selling ownership and interest, small documented loans made from $ millions in personal investment (Borton) in these allegations, however, also is directing Mr. Reinhard, and she became the key witness against Mr. Reinhard, leading to his violation of probation conviction and felony no contest plea, as well as verifying his witness tampering, cocaine purchases and use as found in texts, and attempts at obstruction of justice from the jail. I assisted Ms. Borton as a tutor for her college classes prior to the criminal charges against both Mr. Borton and Mr. Reinhard.

There is no prohibition against Mr. Reinhard, nor has there been any communication with Mr. Reinhard by Respondent. The no-communication was to avoid any potential conflict or confusion as to his two criminal cases. The no-communication was but to avoid any potential conflict or confusion as to let the current owners manage their companies, if any able to let the accounting and audit run their course to verify if any funds were misappropriated, if any forgeries or false representation took place, and to let the current owners manage their companies.

After Mr. Reinhard was released from his commitment work in February of 2017, the accounting and review process was begun, and a formal audit was in compliance with guidance received from the Florida Bar. Respondent is not managing and issues from it. In compliance with guidance received from the Florida Bar, that Mr. Reinhard is seeking memory and interest or control in these companies. See attached letters to the Florida Bar seeking guidance and compliance with that guidance.

Mr. Reinhard's circumstances are of his own doing, and are a tragedy for his second chance at a life of opportunity and prosperity. Mr. Reinhard's issues are with the criminal justice system, and/or accountant and owners of the companies all that was done by Respondent and Judson Williams was to give him support and a second chance at a decent life.

Sincerely yours,



(Philip) Tim Howard, J.D., Ph.D.
5521 Thomasville Road, Suite 500
Tallahassee, FL 32309
(850) 228-4455 (c)
tim@howardjustice.com

cc: file.
Don Reinhard, DOC #N80683

* Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D., Northeastern University; J.D., Florida State University; Former Visiting Scholar and Constitutional Law, University of Miami Law, Policy & Society; Former Visiting Health Law, Bioethics, and Human Rights Fellow with Northeastern's Law, Media & Failure and Judicial Process Interaction Program; President of Cambridge-Graham University International.

# EXHIBIT G

Tim Howard <tim@howardjustice.com>

Re: DEMAND LETTER - Corey and Charisse Fuller
1 message

Tim Howard <tim@howardjustice.com>                                    Tue, May 29, 2018 at 4:06 PM
To: "Barry, Ashley" <asbarry@bakerdonelson.com>
Cc: "Solotow, Dana H." <dsolotow@bakerdonelson.com>, "Findley, Toni" <tfindley@mdmc-law.com>
Bcc: John Leonard <jleonard@mdmc-law.com>

Mr. Findley,

Please be advised that there is no ownership, interest, or control over these companies, having divested ownership well over a year ago. There has been distinct management and ownership since that time and your clients are aware of this. It is not clear why this is being sent to the incorrect parties. There has been no demand on this firm nor myself. This firm has no management, interest or control. This firm does represent Mr. Fuller on his NFL claim and has this information concerning his NFL claim and his file. This notice needs to be directed to the current ownership and management pursuant to their agreements and contracts, as neither myself nor my law firm have the ability to advance the interest of your clients concerning this matter. Your clients have the information needed concerning contacting the management and ownership of these companies, obtaining the information and amounts appropriate from these companies, and can share this information with you.

Thank you for informing us of this error. Please correct this error by sending the notice to the parties that have the power and ability to respond.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Jacksonville, Florida Office:
444 East Duval Street
Jacksonville, FL 32207
(850) 258-4465
(850) 216-2537 (f)
Law Firm Website: www.howardjustice.com
tim@howardjustice.com

Tallahassee, Florida Office:
1415 East Piedmont Drive, Suite 5
Tallahassee, FL 32308
(850) 558-8624 (o)

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373-8075

Pursuant to Rule 3-7.1(f) of the Rules Regulating The Florida Bar, you must execute the applicable section of this form and return it to my attention.  The rule provides that the nature of the charges be described in the notice to your firm or you may attach a copy of the complaint.

## CERTIFICATE OF DISCLOSURE

I HEREBY CERTIFY that  on this ___3___ day of _Febrary_ , 20_2_0 a true copy of the foregoing disclosure was furnished to _mail_ , a member of my present law firm of _Howard, Associate_ , and, if different, to _____; a member of the law firm of _____, with which I was associated at the time of the act(s) giving rise to the complaint in The Florida Bar File No. 2020-00,341 (2A).

_Phillip Timothy Howard_
Phillip Timothy Howard

## CERTIFICATE OF DISCLOSURE
### (Corporate/Government Employment)

I HEREBY CERTIFY that on this _____ day of _____, 20___, a true copy of the foregoing disclosure was furnished to _____, my supervisor at _____ (name of agency), with which I was associated at the time of the act(s) giving rise to the complaint in The Florida Bar File No. 2020-00,341 (2A).

_____
Phillip Timothy Howard

## CERTIFICATE OF NON-LAW FIRM AFFILIATION
### (Sole Practitioner)

I HEREBY CERTIFY to The Florida Bar on this _____ day of _____, 20___, that I am not presently affiliated with a law firm and was not affiliated with a law firm at the time of the act(s) giving rise to the complaint in The Florida Bar File No. 2020-00,341 (2A).

_____
Phillip Timothy Howard

# Former NFL star receiver pleads guilty in Kentucky in investigation of health fraud

**BY BILL ESTEP**, LEXINGTON HERALD LEADER
DECEMBER 20, 2019 09:29 AM,
UPDATED JANUARY 02, 2020 12:51 PM

A former stand-out receiver in the National Football League pleaded guilty in federal court in Lexington Thursday to conspiring to defraud a health plan.

Joe Horn, 47, admitted taking part in seeking reimbursement in 2018 for expensive medical equipment that he didn't actually receive.

In Horn's case, that included a cryosauna valued at more than $50,000.

Horn submitted false or fraudulent claims to the health plan under his name totaling $149,775, according to his plea agreement.

Horn played for the Kansas City Chiefs before becoming a star for the New Orleans Saints between 2000 and 2006 as one of the top receivers in the team's history, making the Pro Bowl four times.

Horn lives in Columbia, S.C., but healthcare fraud charges against him and several other former NFL players are being prosecuted in federal court in Lexington.

That's because the fraudulent claims were submitted to a CIGNA Healthcare data center in Lexington, according to a court document.

The U.S. Department of Justice announced earlier this month that it had charged 10 former NFL players in an alleged conspiracy to defraud the Gene Upshaw NFL Player Health Reimbursement Account Plan, and planned to charge two more, including Horn.

That program provides reimbursement for medical expenses of former players not covered by insurance. It covers former players, their wives and dependents up to a maximum of $350,000 per player, the department said in a news release.

The former players allegedly schemed to submit claims for reimbursement for equipment they hadn't actually bought.

The big-ticket items included hyperbaric oxygen chambers, cryotherapy machines, ultrasound machines designed to be used by doctors to examine women and electromagnetic therapy devices designed for use on horses, the Justice Department said.

The players allegedly faked invoices, prescriptions and letters stating they needed the equipment.

Then, Robert McCune, 40, of Riverdale, Ga., and Correll Buckhalter, 41, of Colleyville, Tex., allegedly called the reimbursement plan and impersonated other players to check on claims, the Justice Department said.

McCune and Buckhalter were among former players accused of recruiting others into the scheme by offering to handle claims in return for kickbacks of up to $10,000 per claim.

The former players allegedly submitted more than $3.9 million in false and fraudulent claims between June 2017 and December 2018, the Justice Department said.

# EXHIBIT K

# IN THE SUPREME COURT OF FLORIDA
### (Before a Referee)

THE FLORIDA BAR,                 Supreme Court Case Nos. ███████████

      Complainant,

vs.

PHILLIP TIMOTHY HOWARD,      The Florida Bar File Nos. ████████

      Respondent.

_____/

## SUBMISSION TO THE FLORIDA BAR AND REFEREE ████████████

I, Respondent, Dr. Howard, wish to thank both the Shanee Hinson with the Florida Bar and Judge Bryan for their work in providing ethical guidance and discipline to the attorneys licensed by the Florida Bar. In this filing, ████████████████████. I am also required to balance the record with evidence not earlier presented by counsel for Respondent that will hopefully put a clearer light on the facts and issues before the Referee ████████████. Respondent ██████ ████████████ all pending matters.

Respondent ███████████████████, only a balanced view of the facts and circumstances so that ██████████████ provide the public his extraordinary and proven services as a qualified lawyer, █████████████ ████████████ ████.

### Summary

Respondent had no knowing, nor intentional, willful misconduct.  Respondent researched and complied with the rules and regulations, and took actions for the clients' interests, that he understood, was aware of, and had capacity to, at the time.  ██████████████████ ████.

Respondent has significant ████████ efforts and accomplishments, willingly accepts and always accepted providing ███████, and has significant history of and future for public good as a result of his work as an attorney.  He has taken steps to avoid any repeat of the matters at issue, namely changing all staff, reducing his activities so that he is not stretched too thin, ██████████████ █████ ████████████, grounded moral and theological basis for life, and actions to demonstrate the substance of that moral and theological grounding.  As a consequence, in compliance with the Florida Bar standards ████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████.

Respondent is also seeking guidance as to how to handle the significant jurisdictional concerns as to each Bar Complaint at issue. Bar Complaint 2019—00,088(2A) is an acknowledged perjurious, false

and fraudulent Bar Complaint that was nevertheless pursued.  Under oath the complainant repeatedly admits she committed perjury in her Bar Complaint that is riddled with false and fraudulent statements. This is covered in more detail at the end of this submission.  As a limited example, this Bar Complainant states:

> Q And so **when this was filed back in 2019**, April of 2019 **you had not read the Bar complaint at that time?**
> A Correct.
> Q And you would have not been able to tell your lawyers whether -- what was in the Bar complaint was true and correct or contained false statements because you hadn't read it?
> A Correct.
> **Q And we now know that it contains statements that you believe to be false?**
> MR. DIAZ: Form.
> BY MR. MONDE:
> **Q Correct?**
> **A Correct.**
> **Q Statements that you believe to be fraudulent, correct?**
> MR. DIAZ: Form.
> **THE WITNESS: Correct.**
> Q. Now that you know that, what steps have you taken to correct that?
> A. At this point nothing that I recall.

*See* transcript attached to Exhibit G, *infra,* pp. 125-126.  The next guidance needed concerns a Bar Complaint that was not authorized to be prosecuted by the rules of the Florida Bar as it is the same as a now settled and then pending civil action.  The final guidance needed concerns Bar Complaint 2016—00,682(2A), where the statute of limitations jurisdictional hurdles for a Bar Complaint that had to be filed by the estate for the decedent-former client, and never was filed by the estate or the decedent client. None of these jurisdictional concerns were presented to the Referee, though known by Florida Bar attorneys.

### Standards for Imposing Sanctions

Florida's standards for imposing lawyer sanctions have 3 objectives:

First, the judgment must be fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the services of a qualified lawyer as a result of undue harshness in imposing a penalty. Second, the judgment must be fair to the respondent, being sufficient to punish a breach of ethics and at the same time encourage reformation and rehabilitation. Third, the judgment must be severe enough to deter others who might be prone or tempted to become involved in similar conduct.

*The Florida Bar v. Lord*, 433 So. 2d 983, 986 (Fla. 1983).

### Definitions Applicable

The definitions applicable are as follows:

> **(a)** "Injury" is harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from "serious" injury to "little or no" injury; a reference to "injury" alone indicates any level of injury greater than "little or no" injury.
> **(b)** "Intent" is the conscious objective or purpose to accomplish a particular result.

**(c)** "Knowledge" is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.

**(d)** "Negligence" is the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard care that a reasonable lawyer would exercise in the situation.

**(e)** "Potential injury" is the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct.

Florida's Standards for Imposing Lawyer Sanctions, pp. 1-2. Rehabilitation is a significant factor for sanctions. Consider the following:

## Rehabilitate the Lawyer

One key purpose of the lawyer disciplinary proceedings is, where appropriate, to rehabilitate the lawyer. In the instant action, Respondent has learned from these Bar complaints and others. In the past 33 years, Respondent has engaged in moral guard rails in his career but has run afoul of technical aspects of the Florida Bar Rules, and in managing staff.[1]

## Interim Rehabilitation

Respondent, in his life forging has found renewed clarity, vigor and power in advancing professional, moral and theological guard rails for every aspect of his life. This rehabilitation is comprehensive and demonstrates new birth. Consider the following:

Deep Community Service—Spiritual and Temporal:

Respondent is a Florida Certified Volunteer Chaplain working for the Florida Department of Children and Families and works with the Florida Governor's Office of Adoption and Child Protection. Exhibit A. He ministers to those in prison at Wakulla Correctional Institution. He ministers in poor neighborhoods providing food (over 400 boxes of food, including milk, oranges, potatoes, tomatoes, cheese, hotdogs, chicken, yogurt, and orange juice, while ministering to spiritual and emotional needs, this past Saturday alone), reuniting of families, location of jobs, medical care, and counseling. He ministers to high school athletes, football and basketball teams. Including acceptance of humble salvation by two entire varsity football teams and having over 20 of the players being baptized at his home. He ministers to those starving in Pakistan and works and funds a prototype farm in Tallahassee, Florida, and in Quetta, Pakistan to create sustainable food sources for those starving and in need. He is a non-sectarian teacher and developing theologian along the lines of C.S. Lewis and Tim Keller and is active at both New Creation Church of Tallahassee, a non-denominational charismatic and currently 99% black church, and Blessed Sacrament Parish, a Catholic Church, where he was baptized, received first communion, confirmed and graduated from its school. He goes into crisis communities facing racial injustice and murders that cry for healing and restoration. He gives his time and money for others. He doesn't take nor is motivated to do so.

---

[1] Respondent's prior Bar complaints benefited others, were morally centered, but missed technical aspects. They delt with: (1) Transposing signatures with authority on the fee contract for the $26 billion Florida recovery from the tobacco industry and the $3.2 billion award of legal fees. Though he provided the date of authority on the contract, and all counsel had a copy of the contract for 5 years and were paid $3.2 billion based on the same contract, he failed to site with permission and authority on 4 of 12 signatures of co-counsel; (2) Overpaying one of his clients approximately $4,000 (who is now also a friend) from his trust account; (3) and Requiring a person that stole $50,000, verified by 13 affidavits, to agree to counseling for a settlement, with Respondent stating that he would go to authorities if the person who stole didn't agree to counseling.

Consider the following sworn statements from those that know and work with Respondent, Dr. Howard, on a daily basis. Senior Pastor Mike Smith under oath states:

5. Phillip "Tim" Howard is a member of my congregation and has been for going on 4 years. I pastor and minister to and with him, and I fellowship with him. We have both ministered to others in sensitive and confidential matters of the soul, heart, and temporal needs. Here is what I know about Tim.

6. From what I understand, Tim's Christian experience has gone from Baptist, to Catholic, Methodist, Charismatic and secular atheism. And for a man in our day to have studied and taught at universities, such as Harvard, Northeastern, Boston University, Oxford and Florida State, and trained nearly 100 doctorates, my heart is overjoyed when we wake up on Saturday morning to feed the less fortunate right here in the Bond community, to share our faith in the parking lots of our local supermarkets, and to have blessed conversations with anyone of God's created beings, shows me that the transforming power of Jesus Christ is alive and at work in him. As a pastor, there is nothing more pleasing and attractive in the people that you get a chance to shepherd than those qualities.

7. I have had the privilege of talking with Tim and to share in some of the successes and challenges that he has faced. As a black pastor for me to see commercials about Big Tobacco coming down and later in my ministry to meet a man that brought that corporate giant down, says a lot about his potential his ability to produce and him as a person.

8. Since I have met him, I have known him to be nothing but generous. Pouring thousands of dollars into the church, into ministries overseas, and thousands of dollars to the people that he works for. And me understanding what has been presented against him, I have not seen him ask for a single dime in four years of knowing him. All he has does is give. I had to make him to tell me if he needed gas money since this ordeal has ensued.

9. I am not going to go into too much than to say in my pastoral discernment, I don't see a man that is a thief or is a taker, and I could be wrong, but what I have witnessed is a brother who all of his life has been taught to work hard, love hard and give hard. I hope that these words fall into consideration of the powers that be in their deliberations and contentions for the life of someone with these qualities.

10. Tim has served our congregation and our city, he has walked with me, he is part of our New Creation praise team, evangelism team, prayer team, Youtube channel, broadcasts from Capital of Florida, to Minneapolis, Minnesota to Quetta, Pakistan, and there is more to come.

11. Tim assists me with the Fellowship of Christian Athletes ministering to 100s of local high school athletes and as men, trying to better our communities with the message we love. One of the joys of our time serving is having the opportunity baptize the Rickards High School football team at his home and the next year those same young men winning the State High School Championship. This shows me he is authentic and is open as all believers need to be.

12. If there is a deeper investigation into his life, I think you will find that these qualities existed prior to his conversion.

13. Tim is a State of Florida Certified Volunteer Chaplain, sanctioned by the Florida Department of Children and Families and the Governor's Office of Adoption and Child Protection through the Share Your Heart Florida Campaign. In this capacity, we have given over 400 boxes of food in the Bond community.

Exhibit B. Pastor and Minister Melvin Youmans under oath describes Dr. Howard as follows:

3.      I have been a Living God Christian pastor and minister for 30 years with numerous churches and currently with New Creation Church Tallahassee.

4.      I have been evangelizing and ministering to the homeless, inmates, praise, prayer, and poor for decades.  I have personally seen the Living God heal the blind in prison and cast out demons from the possessed.  I was invited by the Catholic Church, Good Shepherd Parish in Tallahassee, to teach them about the power of the Holy Spirit and how to stand against evil and taught them for several months.

5.      Phillip "Tim" Howard and I have been ministering together going on 4 years now.  In fact, I am the one that prayed over his back prior to the Living God healing him.

6.      Tim and I regularly go into Wakulla Correctional Institution to share the good news, with salvations and baptism of the Holy Spirit taking place.

7.      Tim and I evangelize throughout neighborhoods and in the Walmart parking lot, regularly seeing the Living God work.

8.      Tim and I minister to those in the Bond community, near FAMU, and bring healing, salvation and power to those that receive free meals and prayer.

9.      Tim and I work on a farm at former Assistant State Attorney Sid White's house and property, that I am leading as a prototype for starving Christians in Pakistan and other under resourced parts of the world.  We have a chicken farm and crops.  We have funded the sustainable farm in Quetta, Pakistan with Good News Pastor Kashif Rasheed Masih, who ministers to Christian orphans and widows, as well as young Christian girls that have been kidnapped and violated in order to be sullied, abandoned, and forced to convert to Islam.

10.     Tim and I participate as bible study teachers and engage in regular intercessory prayer.

11.     Tim is generous with my personal needs and gives to any project that the Living God has sought us to pursue.

12.     Tim loves the Living God and serves him in many fronts and locations.

Exhibit C.  Attached are photographs from the ministering, teaching, praising, feeding and loving that Respondent, Dr. Howard engages in on a daily basis.  Exhibit D.  These are the are the truthful and factual activities and motivations of Respondent, Dr. Howard.



Respondent has not had a Florida Bar sanction in over 15 years.

### Appropriate Sanctions Based on Prior Rulings by the Florida Bar

Respondent has extensive rehabilitation and community service.  Consider the following:

Respondent provides extensive annual *pro bono* and Christian services to numerous parties:

Local Citizens' Divorces;

Local Citizens' Criminal Cases, Estate Cases, and Family Law Disputes;

Latin American Laborer Driving and Worker Permits and Immigration;

Employment Discrimination Guidance;

Graduate and Doctoral Education:

Ph.D. in Law, Policy and Society, with a Dissertation on Cause Lawyer Leadership in Florida's Tobacco Litigation, with methodologies that applied Theology, Law, Policy, Quantitative, Qualitative and Mixed Methods, Historical Methods, Leadership, Economics, Sociology, Conflict Resolution, Critical Thinking.  Dr. Howard also teaches and explores Sustainable Economic Development with Graduate Students and business incubators designed to lift the poor from poverty, and more to global and national students, such as:

African Chieftains and Queen Mothers from Ghana and Nigeria;

Civil Rights Leaders, President, Graduate Students and Pastors in Honduras;

Civil Rights Leaders in Venezuela;

International Monitor of Fair Elections in El Salvadore and Honduras;

Judges in the United States;

U.S. Senators, U.S. Governors, Chancellors, University Presidents, Provosts, Deans, Nationally and Internationally;

Graduate Students in India (New Dehli, Mumbai, Chennai, Hyderbad);

Graduate Students, Business Leaders and Civic Leaders in Pakistan (Lahore);

Business Leaders and Government Officials.

Public Interest Litigation that benefits Floridians, Americans and the global population in a deep and substantial way:

Florida Sovereignty Lands Standards for $10 billion of State property as Special Assistant Attorney General; Florida Environmental Protection as Assistant Attorney General.  *Coastal Petroleum v. American Cyanamid*, 492 So. 2d 339, (Fla. 1986); See AGO 88-22 (June 1, 1988), defining the Ordinary High Water Line ("OHWL") and methodology to secure sovereignty lands as applied by § 253.03(7), Fla. Stat.  *See* Reimer, Monica, *The Public Trust Doctrine: Historic Protection for Florida's Navigable Rivers and Lakes,* Florida Bar Journal, Vol. 75, No. 4, April 2001.

Florida Supreme Court State Court's Administrator Special Counsel;

Florida Health Care protecting senior citizens in nursing homes and expanding health care coverage for millions of Floridians, and identifying and prosecuting health care fraud and abuse;

Finalist for U.S. Attorney for the Northern District of Florida;

Florida Medicaid Tobacco Case--$27 billion for the State of Florida, removal of billboards and child advertising. *Chiles v. The American Tobacco Co., et* al. (No. 95-1466-AO) ("Complaint");

*Agency for Health Care Admin. v. Associated Indus. of Florida, Inc.,* 678 So.2d 1239, 1239, cert. denied, 65 U.S.L.W. 3629 (Fla. Mar. 17, 1997).

Removing cancer causing benzene from soft drinks nationally. *See Coke Sued as Part of Benzene War*, Los Angeles Times, August 26, 2006; *Coca-Cola settles lawsuit over benzene, Associated Press,* May 14, 2007.

Recovering $300 million from tobacco companies for individual victims (husbands, wives, children and families) of addiction, cancer and death. *Engle v. R.J. Reynolds Tobacco Co.,* No. 9408273 CA (20) (D. Fla. Oct. 31, 1994), http://legacy-dc.ucsf.edu/tid/wbn15f00. *R.J. Reynolds Tobacco Co. v. Engle,* 672 So. 2d 39 (Fla. Dist. Ct. App. 1996). *R.J. Reynolds Tobacco Co. v. Engle,* 122 F. Supp. 2d 1355 (S.D. Fla. 2000). *Engle v. Liggett Group, Inc.,* 945 So.2d 1246 (Fla. 2006). *R.J. Reynolds Tobacco Co. v. Engle,* 122 F. Supp. 2d 1355 (S.D. Fla. 2000). *Evans v. Lorillard Tobacco Company*, 465 Mass. 411 (Mass. 2013), including recovery for 13,000 Engle Trust claimants, 100 individual cancer cases, and winning or settling scores of tobacco trials and cases.

BP Oil Spill--$100 million for 5,000 injured clients. *In re* Oil Spill, No. 10-MDL-2179 (E.D. La. Jan. 23, 2015); 21 F. Supp. 3d 657, 668–69 (E.D. La. 2014). *See In re* Oil Spill, 77 F. Supp. 3d 500, 525 (E.D. La. 2014) (finding that 4 million barrels of oil were released into the Gulf but only considering 3.19 million barrels for civil penalties). Damage to 100s of thousands of businesses and individuals in the Southeast United States from Florida to Texas.

Locating and sealing of the source of nuclear isotopes, and toxic nuclear cleaning chemical plumes in water, food, air and ground, causing cancer clusters and leukemia in children and families near the nuclear facility, shutting down elementary, middle and high schools in Southern Ohio. *Walburn, et al., v. Centrus, et al.,* Case No. 20-cv-4621 (S.D. Ohio 2020).

Elementary through High School Coach:

25 years as a coach of flag football, soccer, baseball, pee wee football, junior football, middle school football and track, high school football, track and basketball, training and mentoring 1,000s of young men and women.

Most recently a Fellowship of Christian Athletes Mentor Coach at Rickards High School, which team won the State Championship in 2020, and Jefferson County High School (2020-to present date).

Former Lincoln High School basketball coach for State finalist and State semi-finalist team; former FAMU High School DRS Offensive Line Football (District Champs) and Track Throws Coach; former Gadsden County High School Offensive Line Football Coach.

Exhibit E. This is all done while Respondent is providing Food, Medical Care, Jobs, Counseling, Family Reunification, Housing for the Homeless, Addicts, Ill, and Hurt in the Community as referenced above and as found in Exhibits A through E.

Jason Hall

Respondent understood that Jason Hall was "not" a client based on the research and sworn written documents from 2008. █████████████████████████████████████████████████████

7

There was no knowing, intentional or willful violation, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ limitations hasn't run on the 2008 errors, and the estate was not the party to bring the Bar Complaint, then ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Due to the age ▓▓▓▓▓▓▓▓▓▓▓—13 years ago; the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ application this research to the sworn client directives and sworn end of the client relationship; the prompt offer to have the Florida Bar arbitration review, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ v. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 1995 (The ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

Respondent would have provided a prompt compliance with any accounting or arbitration award concerning the 2008 ▓▓▓▓▓ Jason Hall, if Dana Hall/Sandra Fulup would have agreed to an independent accountant and arbitration. Unfortunately, the age of the matter, not having the file, not having access to bank records, and resistance by Dana Hall/Sandra Fulup for an independent party accounting or arbitration, and/or Florida Bar arbitration to immediately review, made prompt resolution impossible. Thus, there was no intent, willful, or knowing ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

Peggy Harris

Peggy Harris was not harmed nor was there any potential injury to her as a result of missing the probate status conference or the errata on the never to be used discovery deposition. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓.

## Injury to Client

Starting with "injury" to any potential client, consider the following.

Peggy Harris

There was no injury to Peggy Harris. Rather, Peggy Harris received a $10 million verdict and nearly $400,000 of expenses and 3,000 hours of work for free by Respondent. Respondent protected the testimony of Richard Harris despite numerous obstacles by counsel for the tobacco industry and his "end of life" deposition directly led to the $10 million verdict. Respondent even paid counsel for Peggy Harris $21,000 a month during his representation of Peggy Harris. Respondent has received and will receive nothing for his $400,000 in risk, his 3,000 hours of work, the pay of his counsel to work in the Peggy Harris case, and the pay for costs.

Jason Hall

There was no injury to Jason Hall the client of Respondent. Jason Hall never filed a Bar Complaint and Jason Hall never had a complaint against Respondent. In fact, Jason Hall would have recovered nothing "but for" the work of Respondent. The core transaction at issue, namely, whether the attorney client relationship had ended as a result of a sworn direction from the client and written end of representation, such that the former client's loan ▓▓▓▓▓▓▓▓▓▓▓▓▓ was no longer under Florida Bar ambit was in 2008. It is now 2021. In 2008, Respondent and his staff attempted to research and comply with the Florida Bar rules on the matter ▓▓▓▓▓▓▓▓▓▓▓▓▓. No other similar ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ before nor since.

---

[2] The Bar Complaints of JB Harris, under the name of Kim Poling (similar to the Peggy Harris Bar Complaint), concerning the Fort Lauderdale Office operations, detailed trust accounting breakdown, and Fuller/Floyd Bar Complaints that merely copied their settled civil suits and was initially denied by the Florida Bar, have all been responded to. Respondent humbly requests that the sanctions determined in this action resolve all matters currently pending.

Despite not having the file, and not having access to records from any source going back to 2008, Respondent was successful in providing a full accounting. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Accounting spreadsheet, correlated per item in order with approximately 300 pages of checks, ledgers, satisfaction of liens, estate and tenant work done, and verification of payments attached to spreadsheet, and summary report are attached as Exhibit F and found at this link: https://www.dropbox.com/scl/fi/jy6xfmk07wgqrz71oxk3y/10-30-20-a-Jason-Hall-Accounting-Revisd-by-TH.xlsm?dl=0&rlkey=sr3fsw0wv74ham4383fdk5orw. The three items that raised concerns by the ▮▮▮▮ were documented from an affidavit documenting reduction in a lien from TMRMC, and the best available evidence, such as Florida Supreme Court decision on worker's compensation fees that found 10% fee limitation unconstitutional, and the value of work performed and costs expended that were not paid for. The remaining 94 items in the accounting had documents attached to validate each item and were not challenged by the Florida Bar, including that Respondent did estate and landlord tenant work and was not paid, yet still rejected by the Referee. *Id.*

If the accounting of the ▮▮▮▮ is correct, then the law firm of RumbergerKirk and former Florida Bar prosecuting counsel, Richard A. Greenberg, who advised and guided the Florida Bar and Dana Hall/Sandra Fulup in this prosecution, would be liable for damages plus applicable interest due to legal malpractice. Dana Hall/Sandra Fulup had until February 12, 2020 to file a contract action within the statute of limitations period.[3] Dana Hall/Sandra Fulup had counsel experienced and knowledgeable as to their claim and they were not advised to file a contract action, and did not file a contract action, within the statute of limitations period. In light of this liability, it is expected that the law firm of RumbergerKirk and former Florida Bar prosecutor, Richard A. Greenberg will be adopting an accounting closer to that of John Harvard.[4]



## Knowledge

The "knowledge" of Respondent as to the attendant circumstances of the conduct are as follows:

Peggy Harris

Respondent had no knowledge that the Richard Harris estate case management was not covered by Matt Hinson, his board- certified probate counsel. Once he found out, he quickly took action to correct the gap.

Similarly, correcting one day of non-trial deposition testimony through errata sheets that were reviewed with and signed by the client is not a known conscious objective or purpose to harm either the client or the administration of justice. There was no conscious awareness of any negative objective or purpose. In fact, the client, Peggy Harris under oath states the following:

---

[3] As late as February 12, 2015 Dana Hall/Sandra Fulup in writing demanded $200,000 based on the written contract with Respondent and Jason Hall. TFB Hall 00175-200. These writings came along with cursing from Hall/Fulup. Under § 95.11(2) and (3), Florida Statues, there was 5 years from knowing of the right under a written contract, which the Respondent had with Jason Hall, and 4 years on an oral contract and fraud.

[4] If Richard Greenberg and the RumbergerKirk law firm accept the Florida Bar's accounting and lens of the facts, which Richard Greenberg had previously advocated for, Richard Greenberg and the law firm of RumbergerKirk is liable and will be paying Dana Hall/Sandra Fulup damages plus applicable interest.

**Q Clarifying, okay. And is the clarification truthful, meaning that although Richard was having problems with the eyesight, the lawyers came back and went over his deposition with him?**

**A Correct.**

**Q Okay. So the correction in the errata sheet is not false, it's true. Am I right?**

**MR. MONDE: Objection to form.**

**THE WITNESS: Correct.**

Q In the correction it says, "I do remember our attorneys coming over prior to the deposition and reviewing his deposition from the previous days," et cetera. **As you sit here today, and when you did this errata sheet, do you remember, did you then remember that the attorneys were going over the deposition transcripts with Richard after the deposition testimony was taken?**

MR. MONDE: Objection.

**THE WITNESS: Correct.**

. . .

**Q Yes?  So the correction -- is my understanding correct that the correction part of this page 320 is not false, it's true?**

**MR. MONDE: Objection.**

**THE WITNESS: Correct.**

. . .

Q Okay. Is it also a fair and correct statement throughout that **you always felt and understood and perceived and know that the lawyers after the deposition went over the depositions with Mr. Harris either to correct, amend, explain, or change any of his answers?**

MR. MONDE: Objection. Asked and answered.

**THE WITNESS: Correct.**

. . .

Q Now, within that truth, were you at least aware, because of your walking into and back out of the room, **that the lawyers in some measure were going over deposition testimony and these corrections, if you want to call them that, with your husband, Mr. Harris, even though you don't know the particulars?**

MR. MONDE: Objection to form.

**THE WITNESS: Correct.**

. . .

Q Okay. Now, even though you may not have seen the actual interactions between question, answer, errata, and the type and everything else, **was this testimony truthful because your impression, your read, your interpretation of what you were seeing and hearing consistent with them going over the deposition transcripts in the errata sheets?**

**A Correct.**

. . .

**Q Okay. And you said, "And Richard clarified his answers and the changes he wanted made to the transcript." Was that a truthful statement at the time?**

**A Correct.**

**Q Was that a truthful statement in your correction?**

**A Correct.**

**Q And is that still a truthful correction -- or a truthful statement today?**

**A Right.**

. . .

Q Now, in the corrections, you say, "I do remember our attorneys reviewing the errata sheets with Richard to make sure that the errata sheets accurately reflected changes he requested before he signed them." Is that a false statement?

MR. MONDE: Objection.

**THE WITNESS: No.**
BY MR. DIAZ:
**Q Okay. Is that a general -- was that the impression that you had from everything
you saw, <u>the lawyers going over the errata sheets and the depo transcripts with
Richard?</u>**
MR. MONDE: Objection.
**<u>THE WITNESS: Correct.</u>**
. . .
**Q And then when the errata sheets were done and the correction provisions were put
in as a trailer to some of the questions and answers, to the best of your knowledge,
were -- was the information in those corrections also truthful?**
MR. MONDE: Objection.
**<u>THE WITNESS: Correct.</u>**

A detailed analysis of fraudulent and perjurious Peggy Harris Bar Complaint that she never read, admits
is fraudulent and perjurious, as the Florida Bar was informed of in detail in numerous filings, attached as
Exhibit G.

<u>Jason Hall</u>

There was no known knowledge nor any conscious objective or purpose to accomplish a particular result
that would harm Jason Hall or the profession.  There was no knowing, intentional nor willful
misconduct.  Respondent, while managing Northeastern University's mid-career doctoral program as
professor and director, researched the rules, and had his staff research the rules, and based on the
research on the rules in 2008 ensured via affidavit and sworn statement that there was not a loan between
a client and Respondent. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.
Nevertheless, Respondent was trying to comply with the rules and the desires of his client.  Respondent
had no need for ▇▇▇▇▇ making over $1 million annually on average.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇ help other injured clients, namely Alan Landers, former Winston Man, who was
dying of lung cancer in mid-2008, and died from cancer without an heir prior to trial. ▇▇▇▇▇▇for
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

Respondent understood and found that the accounting provided by his staff to the ex-wife of the
deceased client, after a month of ex-wife of deceased client's review, was accurate and agreed upon in
writing by all parties in December of 2013.  Respondent is not an accountant, but the accounting
appeared accurate to all parties.  With full disclosure, Respondent provided the entire file to
complainants in early 2014.  If there was intentional, willful or knowing misconduct, Respondent would
not have given the file away.

Once the concern was raised by the ex-wife, Respondent did not have the file to go over his records from
2008-2016 and could not obtain bank records from the original time frame.  As a consequence, he has
been severely handicapped in accurately responding ever since this matter arose.

With complete transparency and accountability, Respondent offered to go to an independent arbitrator
for the Florida Bar to review and confirm accounting and/or any gap.  Respondent would have been
more than willing to pay for any gap.  Respondent's income in 2013 was $7.9 million.  The Dana
Hall/Sandra Fulup accounting matter was one of 5,000 BP cases, staff management, co-counsel
relationships, 100s of graduate faculty and staff relationships, and guidance of scores of global graduate
students and international graduate intensives throughout the globe (India, Africa, China, Latin America,
Asia, Central Asia and Middle East) that Respondent was managing at the time.  These are not the
actions of someone that has intentional, willful or knowing misconduct.

11

**Negligence**

"Negligence" is the failure to heed a substantial risk that circumstances exist or that a result will follow, deviating from the standard of care.  In the instant action consider the following:

<u>Peggy Harris</u>

Respondent was unknowingly ██████ in not covering the ██████ hearing ██████████████  Respondent ██████ was responsible for this.  He regrets that attacks and abandonment by lawyers that he was paying to work for the clients, such as Peggy Harris, instead of filing fraudulent Bar Complaints against him by the client he was hired to help, caused this harm to his former client.[5]

<u>Jason Hall</u>

Respondent ██████████████ researching the standards for ending a client relationship ██████ ████████████.  Respondent was a ██████████████ researching how and when a trust relationship is created that the ending of a client relationship ██████████.  Respondent's staff provided accounting and records to the estate for final review.  Respondent provided the entire file to complainants.  Respondent did not understand that the client relationship continued.  ████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████    ████████████████████████ ████████████

**Potential Injury**

"Potential injury" is the harm to client, the public, the legal system or profession that is reasonably foreseeable.  In the instant action consider the following:

<u>Peggy Harris</u>

There was no foreseeable injury, ████████████████████████████████████ ████████████ on missing the probate action status conference as the action could be refiled without prejudice and was in fact done so.  Respondent recognized the concern and took all immediate actions in his power once the issue was raised.

There was no foreseeable injury to the client on the errata sheets as the client read and signed the changes to a discovery deposition defendant by a young associate that was never to be used in a trial.  The concern as to professionalism was addressed by no use of the discovery deposition done by a younger associate attorney.  Respondent will be far more circumspect in application of any errata sheets going forward.  In this case, the errata sheets explicitly did not apply to the trial preservation testimony done by Respondent, which was in large part responsible for a $10 million verdict for the client, but only to the discovery depositions.

<u>Jason Hall</u>

████████████████████████████████████.  In this case, ████████████████████ a client that signs a sworn statement instructing Respondent as what to do with his funds ████████████████ ████████████.  ████████████████████████████████████████████

---

[5] In fact, J.B. Harris was working for Respondent at $21,000 a month and instead of assisting Respondent in covering the various matters needed, J.B. Harris orchestrated the entire perjurious Bar Complaint that the client never read before filing, and an attorney being paid by Respondent took over the probate action.

[redacted]

**Respondent Seeks Guidance from Referee in How to Address Violation of Florida Bar Standards by Attorneys for the Florida Bar, The Same Standards that Respondent Accepts Accountability For**

<u>Peggy Harris Admits Bar Complaint Was Never Read, Is Perjurious and False.  JB Harris Fraudulently Used Bar Complaint To Gain Advantage in Civil Case.</u>

The Peggy Harris Bar Complaint was never read by Peggy Harris, and was not drafted by Peggy Harris, but by J.B. Harris, despite Peggy Harris filing the Bar Complaint under oath and under penalty of perjury.  Peggy Harris under oath acknowledges that the Bar Complaint she signed violated criminal perjury and has extensive false and fraudulent statements.  Exhibit E.  Peggy Harris admits that her Bar Complaint is fraudulent and her counsel raised her 5th Amendment rights:[6]

> Q. **You're saying that you signed the Bar complaint without reading it?**
> A. **Correct**.  I know that's—that is my fault.  I'm sorry I didn't read it.
> . . .
> Q. Part five says that, "Signature.): **Under penalties of perjury, I declare that the foregoing facts are true, correct and complete." Do you see that?**
> A. I do.
> Q. And then your name is printed, correct?
> A. Correct.
> Q. **And then you signed your name, correct?**
> A. **You understood when you signed this <u>that you were under penalty of perjury declaring the facts in the statement to be true, correct and complete?</u>**
> **A. Correct.**
> Q. There was no doubt in your mind about what you were signing, correct?
> A. Apparently not—apparently so.
> Q. I want to make sure I understand your answer.
> A. Well, I—**<u>I did not read it, so I was wrong</u>** in not—putting this down, so—
> Q. And I appreciate you're acknowledging that that was wrong.  And I want to understand from you why you agree that was wrong to do.  You understood when you signed this that you were taking an oath to tell the truth –
> A. Correct.
> Q.—Just like the oath you took this morning?
> A. Right.
> Q. And you understood the importance of an oath in a legal proceeding, correct?
> A. Yes.
> Q. I mean, our legal system, you agree, depends on people telling the truth, correct?
> A. Correct.
> Q. Our legal system depends on people telling the full truth and not being deceptive by leaving out certain key parts, correct?
> A. Correct.
> . . .

---

[6] MR. ANDERSON: Okay. Well, I'm going to respectfully disagree with you. And to the extent you ask her about her testimony related to her errata sheets, **<u>I'm going to have to instruct her not to answer on the grounds that she could be incriminating herself</u>**.
**MR. MONDE: Then have her take the Fifth.**

**Q. You understand what perjury means, right?**
**A. Yes.**
**Q. You understand the penalties of perjury?**
**A. Yes.**
**Q. You understand that in some context perjury can be a criminal offense?**
A. Um-hum.
Q. Yes?
**A. Yes.**
**Q. Would you want any part of a judgment that you believed was based on false information?**
. . .
**A. No.**
**Q. That would be wrong?**
A. Right.
Q. Would you want to be **any part of a judgment that you believed was infected by or tainted by fraud?**
A. I wouldn't like it.
**Q. Would you want any part of it?**
**A. No.**
. . .
Q And so **when this was filed back in 2019**, April of 2019 **you had not read the Bar complaint at that time?**
A Correct.
Q And you would have not been able to tell your lawyers whether -- what was in the Bar complaint was true and correct or contained false statements because you hadn't read it?
A Correct.
**Q And we now know that it contains statements that you believe to be false?**
MR. DIAZ: Form.
BY MR. MONDE:
**Q Correct?**
**A Correct.**
**Q Statements that you believe to be fraudulent, correct?**
MR. DIAZ: Form.
**THE WITNESS: Correct.**
Q. Now that you know that, what steps have you taken to correct that?
A. At this point nothing that I recall.

*Id.,* at pp. 23-27, 84-85, 125-126.  Attorneys for the Florida Bar knew this.  This is material information for the Referee that was withheld by the Florida Bar from the Court.  Is this something that the Florida Bar should have immediately acknowledged and presented to the Referee?  Is there jurisdiction to prosecute an admitted perjurious, fraudulent and knowingly false Bar Complaint?  Doesn't this nullify jurisdiction?  In *The Florida Bar v. Cox,* 794 So. 2d 1278 (Fla. 2001), a prosecutor was suspended for 1 year for withholding the name of a confidential informant.  The fact of a fraudulent, perjurious, and false Bar Complaint is far more significant to a prosecution than withholding the name of a confidential informant.  How is this handled by the Referee and the Florida Supreme Court?

Corey Fuller and William Floyd Bar Complaints Merely Copied Civil Complaint.  Used Bar Complaint To Gain Advantage in Civil Case

The Florida Supreme Court has ruled that the Florida Bar is not a venue to pursue civil remedies as another venue for political or legal leverage, and based on this standard, appropriately discharged Corey Fuller and William Floyd complaints in the attached letter dated January 15, 2020.  Exhibit H.  Mr. Hughes, as The Florida Bar representative, stated:

14

I must conclude that your complaint constitutes a civil dispute as there are **no allegations independent of the enclosed civil complaint** and as a result, must be resolved through the civil system.  The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies.
. . .
Consequently, I have closed our record in this matter.

*Id* (emphasis added).

Nothing has changed in the facts and circumstances of these Bar Complaints.  When the decision was made to continue to pursue these Bar Complaints, there was no explanation of what new facts existed or why.  If the Florida Supreme Court ruling applies, consistent with the letter ruling, how are these matters handled?

If, as a consequence, these parties were not entitled to use the Florida Bar as a method to gain advantage of a civil action that had been proceeding for nearly two years at the time.  What happens?  Notwithstanding violation of the confirmed Florida Bar and Supreme Court standards, the Florida Bar went forward with the prosecution.  How does the Florida Supreme Court handle this?

The civil case was settled without Respondent having to pay anything, since Respondent was not involved with the scheme done by a high school football friend that he had given a second chance to and the Complainants' attempts to get retirement funds without paying taxes and penalties.  Respondent received nothing and was not part of the scheme.

The Florida Bar's potential violation of their and the Florida Supreme Court standards was one pressure on Respondent for settling the civil action.  Is this something that the Florida Bar should have immediately acknowledged and not pursued?  How does the Florida Supreme Court handle this?

<u>Client, Jason Hall Never Filed Bar Complaint.  Estate for Jason Hall Had Right to File Bar Complaint and Never Did.  Statute of Limitations Has Run.</u>

The core transaction at issue, namely, whether the attorney client relationship had ended as a result of a sworn direction from the client and sworn and written end of representation, such that the former client's loan with Respondent was no longer under Florida Bar ambit, was in the Summer and early Fall of 2008.

If the decedent has a right of action (which the Florida Bar action can only be brought by the client or the estate for the client), upon death, his estate must bring the action "by the decedent's personal representative" "before the later of the expiration of the time limit for the commencement of the action or 12 months after the decedent's death."  § 733.104(2), Fla. Stat.

In this case, the estate has not brought a Florida Bar action.  Rule 3-7.16 states that "a complainant must make a written inquiry to the Florida Bar within 6 years from the time the matter giving rise to the inquiry or complaint is discovered or, with due diligence, should have been discovered."  Jason Hall never filed a complaint as there was nothing to complain about.

Dana Hall and Sandra Fulup were given the file in January of 2014, with all documents in file, including loan and all payments, accountings and billings.  The matter would have been discovered with due diligence within 10 months of giving the files to Dana Hall and Sandra Fulup.

The estate, the only legal entity that could have filed a Bar Complaint for the deceased, Jason Hall, has never filed a Bar Complaint and the 6 years statute of limitations has run.  There is no tolling based on fraud as there was full disclosure of all transactions and prior accounting completed on 12/23/13, and

complete file and loan document as part of full accounting provided in January of 2014, all over 6 years ago.

The Florida Bar Attorneys know the standards for Statute of Limitations and which parties can bring an action.  They have not informed the Referee of these facts and rules that may nullify jurisdiction for their prosecution.  Is this something that the Florida Bar should have immediately acknowledged and informed the Referee of the same?  How does the Florida Supreme Court handle this?

Respectfully submitted on this 18th Day of March 2021.


Phillip Timothy Howard

# EXHIBIT K-A

Volunteer CHAPLAIN

Phillip Tim Howard

9682 Deer Valley Dr

Tallahassee, Fl 32312

**ID NO. 3817**



| D.O.B. | SEX | HEIGHT |
|--------|-----|--------|
| 03/07/1961 | M | 6-2" |
| **WEIGHT** | **EYES** | **HAIR** |
| 208 | Blue | Brown |

Issued: 02/20/21   Expires: 02/20/22

**NOT VALID IF EXPIRED**

**INFO@SHAREYOURHEART.US**

SHARE YOUR

# Certificate of Completion
# Spiritual Care Training

**Department of Children & Families**
**Pastoral Care - Baptist Health South Florida**

Phillip Tim Howard

*Has completed the 16-hour DCF Training*
*Course for Spiritual Care Providers*

2/19/2021
Date

Roland González
Executive Director, Share Your Heart















**Baptist Health South Florida**





SHARE YOUR ♥

**Victor** for **Youth**
NON-PROFIT 501 (c)3 ORGANIZATION

MIAMI·DADE COUNTY
COMMUNITY ACTION AND HUMAN SERVICES DEPARTMENT

# EXHIBIT K-B

## AFFIDAVIT OF SENIOR PASTOR MICHAEL SMITH

### STATE OF FLORIDA
### COUNTY OF LEON

I, MICHAEL SMITH, who upon being sworn, under penalty of perjury, and for use in any legal proceeding, do hereby under oath state:

1.      My name is MICHAEL SMITH, I am 45 years old. I live at 3772 Everwood Court, Tallahassee, Florida 32303. I am of sound mind and able to testify.

2.      I make this Affidavit based upon my personal knowledge and what I know personally from my history as a pastor.

3.      I have been a Christian pastor for 17 years with Christian Heritage, Restoration Place and New Creation Church Tallahassee. I am Senior Pastor at New Creation Church in Tallahassee, Florida. I graduated from Florida State University.

4.      In my service to the Lord, I have had the opportunity minister to the homeless, bring the Good News of the Jesus Christ to people that God has appointed me to meet with, and preach and teach the Gospel and pastor and bring healing to the body of Christ. In my ministry, I have seen the miraculous power of the Living God bringing sight to the blind and power to walk to the crippled.

5.      Phillip "Tim" Howard is a member of my congregation and has been for going on 4 years. I pastor and minister to and with him, and I fellowship with him. We have both ministered to others in sensitive and confidential matters of the soul, heart, and temporal needs. Here is what I know about Tim.

6.      From what I understand, Tim's Christian experience has gone from Baptist, to Catholic, Methodist, Charismatic and secular atheism. And for a man in our day to have studied and taught at universities, such as Harvard, Northeastern, Boston University, Oxford and Florida

State, and trained nearly 100 doctorates, my heart is overjoyed when we wake up on Saturday morning to feed the less fortunate right here in the Bond community, to share our faith in the parking lots of our local supermarkets, and to have blessed conversations with anyone of God's created beings, shows me that the transforming power of Jesus Christ is alive and at work in him. As a pastor, there is nothing more pleasing and attractive in the people that you get a chance to shepherd than those qualities.

7.       I have had the privilege of talking with Tim and to share in some of the successes and challenges that he has faced. As a black pastor for me to see commercials about Big Tobacco coming down and later in my ministry to meet a man that brought that corporate giant down, says a lot about his potential his ability to produce and him as a person.

8.       Since I have met him, I have known him to be nothing but generous. Pouring thousands of dollars into the church, into ministries overseas, and thousands of dollars to the people that he works for. And me understanding what has been presented against him, I have not seen him ask for a single dime in four years of knowing him. All he has does is give. I had to make him to tell me if he needed gas money since this ordeal has ensued.

9.       I am not going to go into too much than to say in my pastoral discernment, I don't see a man that is a thief or is a taker, and I could be wrong, but what I have witnessed is a brother who all of his life has been taught to work hard, love hard and give hard. I hope that these words fall into consideration of the powers that be in their deliberations and contentions for the life of someone with these qualities.

10.      Tim has served our congregation and our city, he has walked with me, he is part of our New Creation praise team, evangelism team, prayer team, Youtube channel, broadcasts

from Capital of Florida, to Minneapolis, Minnesota to Quetta, Pakistan, and there is more to come.

11.     Tim assists me with the Fellowship of Christian Athletes ministering to 100s of local high school athletes and as men, trying to better our communities with the message we love. One of the joys of our time serving is having the opportunity baptize the Rickards High School football team at his home and the next year those same young men winning the State High School Championship. This shows me he is authentic and is open as all believers need be.

12.     If there is a deeper investigation into his life, I think you will find that these qualities existed prior to his conversion.

13.     Tim is a State of Florida Certified Volunteer Chaplain, sanctioned by the Flor Department of Children and Families and the Governor's Office of Adoption and Child Protection through the Share Your Heart Florida Campaign. In this capacity, we have given 400 boxes of food in the Bond community.

14.     If you need anything further as to Tim, please let me know and I will be happy to provide.

                    FURTHER AFFIANT SAYETH NOT

                    _Michael Smith_  2/22/21
                    SENIOR PASTOR MICHAEL SMITH



# EXHIBIT K- C

## AFFIDAVIT OF PASTOR MELVIN YOUMANS

**STATE OF FLORIDA**
**COUNTY OF LEON**

I, MELVIN YOUMANS, who upon being sworn, under penalty of perjury, and for use in any legal proceeding, do hereby under oath state:

1.      My name is MELVIN YOUMANS, I am 66 years old. I live at 484 Forest Green Drive, Tallahassee, Florida 32308. I am of sound mind and able to testify.

2.      I make this Affidavit based upon my personal knowledge and what I know personally from my history as a minister and pastor.

3.      I have been a Living God Christian pastor and minister for 30 years with numerous churches and currently with New Creation Church Tallahassee.

4.      I have been evangelizing and ministering to the homeless, inmates, praise, prayer, and poor for decades. I have personally seen the Living God heal the blind in prison and cast out demons from the possessed. I was invited by the Catholic Church, Good Shepherd Parish in Tallahassee, to teach them about the power of the Holy Spirit and how to stand against evil and taught them for several months.

5.      Phillip "Tim" Howard and I have been ministering together going on 4 years now. In fact, I am the one that prayed over his back prior to the Living God healing him.

6.      Tim and I regularly go into Wakulla Correctional Institution to share the good news, with salvations and baptism of the Holy Spirit taking place.

7.      Tim and I evangelize throughout neighborhoods and in the Walmart parking lot, regularly seeing the Living God work.

8.      Tim and I minister to those in the Bond community, near FAMU, and bring healing, salvation and power to those that receive free meals and prayer.

9.          Tim and I work on a farm at former Assistant State Attorney Sid White's house and property, that I am leading as a prototype for starving Christians in Pakistan and other under resourced parts of the world. We have a chicken farm and crops. We have funded the sustainable farm in Quetta, Pakistan with Good News Pastor Kashif Rasheed Masih, who ministers to Christian orphans and widows, as well as young Christian girls that have been kidnapped and violated in order to be sullied, abandoned, and forced to convert to Islam.

10.         Tim and I participate as bible study teachers and engage in regular intercessory prayer.

11.         Tim is generous with my personal needs and gives to any project that the Living God has sought us to pursue.

12.         Tim loves the Living God and serves him in many fronts and locations.

13.         Tim is a certified Florida Volunteer Chaplain working with the Florida Department of Children and Families, and the Governor's Office of Adoption and Child Protection, and regularly meets the needs of the lost, last and least.

14.         I have been with him constantly since his revival and he has authentic fire for the Living God. He has been touched by that fire.

15.         Tim goes to where the Holy Spirit is moving through all denominations and groups.

16.         Tim is on the church praise team, prayer team, ministry outreach to the poor, a Florida Certified Volunteer Chaplain, a Fellowship of Christian Athletes mentor coach and speaker. He and I regularly counsel and locate resources for those in need.

17.         Tim and I have been in the Bond Community, Speed Park, near FAMU Football Stadium, with Alexis Annon and Kinsha Mims ministering with free food, prayer, praise, family

reunification, and job assistance to the homeless, addicts, ex-convicts, and poor nearly every Saturday for over a year. The Holy Spirit shows up every time, with families united, addicts delivered, tears of healing shed, medical care such as new eye-glasses and glaucoma treatment, jobs sought, and nourishment to lost and hurting souls provided.

18.     Just this past Saturday, as a Florida Certified Volunteer Chaplain, Tim assisted in distributing 1,300 boxes of food, including meat, fruit, vegetables, cheese, milk, and more, as part of his ministry with the Share Your Heart Campaign, with over 300 distributed, while ministering to those that have lost loved ones from CV19, lost jobs, and are just plain beaten up by life.

19.     In my experience and knowing the history of Tim, he never took anything from anyone and has only given, and he only gives to me, our congregation and all those he sees in need, even to the extent of regularly picking up homeless men and women, giving them a meal, some money for clothes and food, and bringing them to church.

20.     I can see how Tim would trust the wrong persons with manipulative intent, how they would take advantage of him, and can see how they would try to blame him to get away with what they have taken. This is standard psychological projection device by deviants.

21.     Tim is my brother and I love him. His discernment and compassion and love relationship with the Living God has deeply improved from this process of betrayal, pain and suffering. I look forward to sharing with him the many lives and souls that will come to know the love and power of the Living God through his life and testimony.

22.     If you need anything further as to Tim, please let me know and I will be happy to provide.

FURTHER AFFIANT SAYETH NOT

PASTOR MELVIN YOUMANS

DRIVER'S LICENSE ATTACHED

WITNESS: _____     DATE: 2/22/21



# EXHIBIT K- D









Done                    5 of 5

















@NCCOT













# EXHIBIT K- E







































































































# EXHIBIT K-F

**Margaret "Peggy" Harris v. Phillip Timothy Howard, TFB File No. 2019-00,088(2A);
Phillip Timothy Howard v. Jonathan B. Harris, TFB File No. 2019-70,042(11J);
Jonathan B. Harris v. Phillip Timothy Howard, TFB 2018-00,342(2A).**

In a sworn and videotaped deposition of Margaret "Peggy" Harris ("Peggy Harris") taken in *Margaret Harris, et al., v. RJR, et al.,* Case No. 2014-CA-337 (Fla. 2nd Cir), taken on February 13, 2020, Peggy Harris documents the fallacious, fraudulent and intentionally criminally perjurious Bar complaint submitted under oath and penalty of perjury, that Jonathan B. Harris wrote for Peggy Harris, which she never read.  This is consistent with the Responses to these Bar Complaints previously filed with sworn testimony attached on August 22, 23 and 28, 2018.  Peggy Harris admits that her Bar Complaint is fraudulent and her counsel raised her 5th Amendment rights:1

> Q And so when this was filed back in 2019, April of 2019 you had not read the Bar complaint at that time?
> A Correct.
> Q And you would have not been able to tell your lawyers whether -- what was in the Bar complaint was true and correct or contained false statements because you hadn't read it?
> A Correct.
> **Q And we now know that it contains statements that you believe to be false?**
> **MR. DIAZ: Form.**
> **BY MR. MONDE:**
> **Q Correct?**
> **A Correct.**
> **Q Statements that you believe to be fraudulent, correct?**
> **MR. DIAZ: Form.**
> **THE WITNESS: Correct.**

Condensed Transcripts attached as Cumulative Exhibit A.  The Margaret "Peggy" Harris' Inquiry/Complaint under PART FIVE, is submitted with following statement:

**"Under penalties of perjury, I declare that the foregoing facts are true, correct and complete."  Signed by Margaret "Peggy" Harris, on 7-8-18.**

This is an official proceeding under Florida Bar rules and regulations, and based on the language, type set, legal research, attached documents, prior threats to extort, consistency in his attacks in two other bar complaints, and as verified in the deposition of Peggy Harris taken on February 13, 2020, and attached hereto, was prepared and written under the sole guidance, control and direction of Florida attorney, Mr. J.B. Harris.

---

1 MR. ANDERSON: Okay. Well, I'm going to respectfully disagree with you. And to the extent you ask her about her testimony related to her errata sheets, **I'm going to have to instruct her not to answer on the grounds that she could be incriminating herself.**
**MR. MONDE: Then have her take the Fifth.**

Under section 837.02(1), Fla. Stat., when perjury takes place in an official proceeding, such as in a Florida Bar complaint, the **criminal** offense of perjury is a third-degree felony punishable by up to 5 years in prison and a $5,000 fine. If this complaint is considered an unofficial proceeding, perjury would be considered a misdemeanor of the first degree, punishable by up to one (1) year in jail, (1) year of probation, and $1,000 in fines.  Finally, if this Bar Complaint is considered before a public servant in the performance of his or her official duty, perjury would be a misdemeanor of the second degree under section 837.06, Fla. Stat.

Unfortunately for Mrs. Peggy Harris in acceding to Mr. J.B. Harris' agenda and writings, has sworn to this bar complaint under penalties of perjury and verified her violation of the law and her oath.2

As found repeatedly in the Deposition transcript attached to this response, with three attorneys representing Peggy Harris, there is undisputed evidence of multiple instances of perjury and criminal violations under section 867.02(1), Fla. Stat.  These also violates section 837.021(1), Fla., Stat., since there are two or more material statements in official proceeding under oath that contradict each other and constitute a second-degree felony.

Moreover, there are numerous bar violations for presenting false evidence.  Under rule 4-1.2(d), **"A lawyer shall not counsel a client to engage, or assist a client, in conduct the lawyer knows or reasonably should know is criminal or fraudulent.**" *See* Florida Bar Ethics Opinion 75-19.  It is also a bar violation to offer evidence that the lawyer knows to be false and should disclose that the evidence is false to the tribunal.  Rule 4-3.3 (b).  It is indisputable that Mr. J.B. Harris authored and prepared the entire bar complaint and is using Mrs. Peggy Harris, who never read the Bar Complaint, as a front and tool for his own extortionate and denigrating agendas.

In that instance, he has violated Rule 4-3.3(a)(1), (2), and (4), which require candor toward the tribunal, and has made a false statement, and has failed to correct or disclose a false statement of material fact or offered evidence that the lawyer knows to be false.  In addition, Mr. J.B. Harris must report and disclose that he authored this fraudulent Peggy Harris Bar Complaint.

J.B. Harris, and has written similar fraudulent Bar Complaints for himself and Kim Poling in a pattern of scandalous false statements.  This is an abject abuse of the Florida Bar and a gross manipulation of the Florida Bar processes and fraud for monetary gain that cannot stand nor tolerated.  To do otherwise, decimates the ethical and moral legitimacy of the institution of the Florida Bar, and our court system alike.

### BAR COMPLAINTS CONTAIN NUMEROUS FALSE AND FRADULENT STATEMENTS FROM J.B. HARRIS THAT CLIENT DID NOT READ NOR AUTHORIZE AND BOTH ARE SUBJECT TO CRIMINAL PERJURY

---

2 The **exhibits attached to this 7-8-18 sworn statement** are <u>dated 7/30/18, 7/10/18, 7/30/18, 7/30/18, and 7/30/18, respectively.</u> *See* Exhibit A, Exhibit D, Exhibit E, and Exhibit F to the August 21, 2018 Response. **They are all printed from Mr. J.B. Harris' gmail account, jbharrisesq@gmail.com, on <u>July 31, 2018, July 30, 2018, and August 3, 2018.</u>  These emails are not from Mrs. Peggy Harris.**  While these exhibits do not constitute a bar violation, they are material to Mrs. Peggy Harris' (Mr. J.B. Harris') claim of such a violation.  In her February 13, 2020 Deposition Peggy Harris admits to fraud and perjury by both her and J.B. Harris.

<u>COMPLAINANT DID NOT READ BAR COMPLAINT BEFORE OR AFTER FILING</u>

In her deposition taken February 13, 2020, Margaret Peggy Harris, stated under oath that she **<u>"signed the Bar complaint without reading it,"</u>** and that everything in the Bar complaint

"statement **is not true and correct**" and contains statements that are **"fraudulent."**3  In
response, **J.B. Harris now states that Peggy Harris "maligned him" by telling the truth**.4

---

3  From Pages 23-31:

Q. Is it your belief that if the Florida Bar had any written communications about your Bar complaint that J.B. Harris would have them?
A. I would think so.  He's the one that handled it exclusively.
. . .
Q.  All right.  So it's fair to say that you had no changes to make to the Bar complaint that you signed before you signed it?
**A.  Well, I didn't read it.  I did not read it—read the complaint.**
**Q.  You are saying that you signed the Bar complaint without reading it?**
**A.  Correct.  I know that's—that is my fault.  I'm sorry that I didn't read it.**
. . .
Q.  Part five says that, "Signature: Under penalty of perjury, I declare that the foregoing facts are true, correct and **complete."**
**Do you see that?**
**A.  I do.**
Q.  And then your name is printed, correct?
**A.  Correct.**
Q.  And then you signed your name, correct?
**A.  Correct.**
Q.  You understood when you signed this that you were under the penalty of perjury declaring the facts and statements to be true, correct and complete?
**A.  Correct.**
Q.  There is no doubt in your mind about what you were signing, correct?
**A.  Apparently not—apparently so.**
Q.  Well I want to understand your answer.
**A.  Well, I—I did not read it, so I was wrong in not—putting this down, so—**
Q.  And I appreciate you're acknowledging that that was wrong.  And I want to understand from you why you agree that that was wrong to do.
**A.  Correct.**
Q.  —Just like the oath you took this morning?
**A.  Right.**
Q.  And you understand the importance of an oath in a legal proceeding, correct?
**A.  Yes.**
. . .
Q.  Have you had the opportunity to review the statement that is part of your Bar complaint after you signed it?
**A.  Yes.**
Q.  When did you first do that, ma'am?
**A.  Just a few days ago.**
. . .
**Q.  Based on your reading, is everything in the statement true and correct?**
**A.  No, not really.  Not—its not what I discussed.**
. . .
**Q.  You mentioned that the first time you read the Bar complaint that you signed under oath was a few days ago in the comfort of your home, correct?**
**A.  Correct.**
**Q.  So to be clear, you had never read the Bar complaint that you had signed last year, for example, in April of 2019, correct?**
**A.  Correct.**
. . .
**Q  Are you curious where J.B. Harris came up with all this information?**
**A  Yes. Um-hum.**
Q  Now let's go back to page eight. How do you feel about J.B. Harris, now that you had a chance to read this in the comfort of your home, no pressure, you read it two or three times, you let some time pass between reading so that, to use your words, you could digest it? What do you think now that you read it?
**A  I'm disappointed.**
**Q  Why?**
**A  Because not everything is factual.**
Q  Why does that disappoint you?
A  Well, you expect your lawyer to be helpful to you and do it correctly.

Peggy Harris also understands what perjury means and the criminal nature of perjury, stating in response to the following:

**"Q You understand what <u>perjury means,</u> right?  <u>A Yes.</u>  Q You understand the <u>penalties for perjury?  A Yes.</u>   Q You understand that in some context <u>perjury can be a criminal offense? A Um-hum.  Q Yes.  A Yes.</u>"**

<u>DOCUMENTED FALSE STATEMENTS FROM J.B. HARRIS THAT HOWARD HAD NO TOBACCO TRIAL EXPERIENCE</u>

J.B. Harris falsely states that Howard knew nothing about tobacco pretrial preparation and failed to adequately prepare Richard for his testimony.  5  This is despite the fact that the main source of

---

**Q Does it trouble you to learn that your lawyer has not been factual?**
**A Correct.**
Q Does it trouble you --
MR. DIAZ: Form.
BY MR. MONDE:
Q -- that your lawyer has not --It's just an objection for the judge. Does it trouble you that your lawyer, J.B. Harris in
your view has not been factual in connection with a statement that he had you sign?
MR. DIAZ: Form.
MR. ANDERSON: Form.
BY MR. MONDE:
Q Ma'am?
A I can answer?
MR. ANDERSON: Yes, ma'am.
**THE WITNESS: Yes.**
. . .
**Q Now, Ms. Harris, having now before today looked at the Florida Bar complaint from cover to cover, are there things or claims, <u>allegations in that Bar complaint that do not come from Peggy Harris?</u>**
**A Correct.**
**Q Okay. And is it fair to say that wherever J. B. Harris might have gotten the information that you don't subscribe to, you're not aware of, or that you may not agree with, okay, that you don't know what source Mr. Harris had for that part or those insertions in the Florida Bar complaint?**
MR. MONDE: Objection to form.
**THE WITNESS: Correct.**
BY MR. DIAZ:
Q Okay. And you don't know if he got some of his information from you and some from Jaakan Williams, correct?
A Correct.
. . .
Q I clearly understood you to tell me this morning that you had not read the Bar complaint before you signed it and that you
regretted that. And I'm unclear whether I heard you say something different in response to Mr. Diaz. And the fact of the matter is
that the transcript, which is just in rough form right now, doesn't help clarify that. So I've just got to ask you: <u>Did you read any
part of that Bar complaint before you signed it?</u>
**A No.**
Q Thank you, ma'am.

4 MR. [J.B.] HARRIS: No. I want to go on the record right now. I was noticed for the deposition. I was given a call-in number.
I'm Mrs. Harris lawyer. **I sat here and listened to her malign me.** And you asked inappropriate questions. I am entitled to
object. I am entitled to object on my own behalf.

5 Q.  The next paragraph reads as follows: "Knowing nothing about pretrial preparation for an Engle-progeny case,
Howard failed to adequately prepare Richard for his testimony."  <u>Is that true, correct and complete statement?</u>
**A.  I would say no.**
Q. Why do you say that?
A. Tim didn't do a lot with it.  He had people under him that did that.
Q. Did Tim Howard play any role whatsoever in preparing your husband for his deposition prior to June 20, 2016, the first day?

evidence for a $10 million verdict was the trial preservation testimony completely directed and conducted by Dr. Tim Howard. *See Howard v. RJR,* Case No. 1D19-2123 (Fla. 1ˢᵗ DCA), Initial Brief, and extensive citations to the record, and the "but for" his trial testimony preservation work there would be no $10 million verdict. Peggy Harris verifies that she did not know this information, and relied on other lawyers, namely J.B. Harris, who provided the false information that Howard had not tried a tobacco trial. The claim of no tobacco trial experience is patently false as Jaakan Williams, as an attorney for the firm, had worked with Howard for some weeks during the 7-week *Sermons v. RJR* trial, In fact, Howard had to conduct the deposition clean up from Jaakan Williams' first day, and trial preservation testimony that was solely done by Howard in the *Harris v. RJR* action, while the 7-week *Sermons v. RJR* trial in Jacksonville, Florida was taking place. Thus, he could not have provided any claim that Howard had no tobacco trial experience as this was a *non sequitur.* 6

<u>DOCUMENTED FALSE STATEMENT THAT RICHARD HARRIS WAS IN PAIN AND COULDN'T TESTIFY OR PROVIDE CORRECTIONS TO HIS DEPOSITIONS</u>

J.B. Harris places false statements that the decedent Richard Harris was in pain and couldn't

---

A. Some, but not all.
Q. So the statement in your Bar complaint that reads, "Knowing nothing about pretrial preparations for an Engle-progeny case, Howard failed to adequately prepare Richard for his testimony," **you are telling us know that this is a falsehood, that that's a misrepresentation, correct?**
**THE WITNESS: I would say that's done by J.B. Harris.**
. . .
Q If you read the end sentence of that paragraph, it says, quote, "Nevertheless, the trial
had to be continued because defense counsel needed more time to review the tissue samples from the autopsy." **That is a statement that would not have been sourced from you, correct? Would you have known that?**
**A No.**
MR. MONDE: Objection.
BY MR. DIAZ:
**Q Or Mr. Harris got that from some other source?**
**A I would believe that.**
**Q But not you?**
**A Correct.**

6 Q. The next part of the sentence, let's focus on that. "He wasn't competent because," quote, "he had never tried one in the past and has not until this day." Is that true and correct and complete, to the best of your knowledge?
A. Yes.
**Q. What is your source of information for that?**
**A. Other people, other lawyers, I guess I would say.**
**Q. In other words, other lawyers have told you that Tim Howard has never tried a tobacco case?**
**A. Right. Because I wouldn't know that otherwise.**
**Q. Right. What other lawyers?**
**A. I imagine J.B.**
Q. Anyone else?
A. Jaakan Williams.
Q. Anyone else?
A. Not that I recall.

Moreover, Howard had done tobacco work since 1993, and worked on the most successful tobacco cases in history, including the *State of Florida v. American Tobacco,* (1997) ($27 billion recovery for State of Florida) (Howard drafted and filed Complaint for the State of Florida, defended constitutionality, prepared damages model, covered 61 depositions, etc.; *Evans v. Lorillard,* Massachusetts Superior Court (2010) ($180 million verdict) (Howard evaluated action, assisted in trial monitoring and strategy, appeal, and evidence); *In Re: Engle* tobacco (M.D. Fla.)($100 million settlement).

properly address corrections to his deposition. 7  The sworn deposition of Peggy Harris taken
February 13, 2020, is consistent that this is a false statement.

## DOCUMENTED FALSE STATEMENT THAT ERRATA SHEETS WERE FRADULENT, PERJURIOUS AND OBSTRUCTION OF JUSTICE

J.B. Harris next falsely states that the errata sheets to Richard Harris pre-trial deposition were
fabricated.8  Peggy Harris states explicitly and repeatedly that what J.B. Harris wrote was false

---

7  Q.  The next paragraph says the following: "Richard was in so much pain at the time, not only were the depositions torturous,
requiring the attorneys to take a break mid-week to allow Richard a respite," period.  That's an incomplete sentence, but it is
what's on your page.  **Was your husband in pain at the time of the deposition?**
**A. No.**
Q.  Ma'am?
A.  No.
**Q.  So that's a false statement?**
**A.  Yes, yes it is.**
. . .
Q.  Well, let me ask you this. What is your understanding of why J.B. Harris wrote in this sworn Bar complaint that your husband
was in so much pain?
**A.  I have no idea.**
**Q.  Did you ever tell him that?**
**A.  No.**
**Q.  Did you ever suggest it to him?**
**A.  No.**
**Q.  Do you know of any basis in the world that J.B. Harris had for swearing this—or asking you to swear to it?**
**A.  I do not.**

8  Q.  Let's take that sentence I read and break it down into a smaller piece.  I want to focus on these words: "Following the
depositions.  **Howard and his associate Ankur Mehta fabricated errata sheets for each transcript, extensively rewriting
Richard's testimony.  Just that part, is that true, correct and complete?**
**A.  I cannot say.**
Q.  Why not?
**A.  Because I don't know.  I don't know if it was fabricated.  I don't know.  I just don't know.**
**Q.  What does the word fabricated mean to you?**
**A.  Made up, change.  So I really don't know.**
. . .
Q  So when you say in your Bar complaint that the errata sheets extensively rewrote your husband's testimony, is that true,
correct and complete?
A.  Again, I can't say because I don't know.  I don't recall.
. . .
**Q.  Is it accurate to say that whoever was the source of the information for this sentence "fabricated errata sheets,
extensively rewriting testimony," it was not Margaret Peggy Harris?**
**A.  Correct.**
Q.  So is it true and correct that Howard and Mehta ordered our husband to sign errata sheets?
THE WITNESS:  I don't know, because I was in and out.  I do not remember that.
. . .
**A.  I don't know.**
Q.  You say in your statement that not only were the errata sheets fabricated but they were extensively rewritten.
"Specifically following the depositions of Howard and his associate Ankur Mehta fabricated errata sheets for each
transcript extensively rewriting Richard's testimony.  Do you see that?
A.  Um-hm.
Q.  Yes?
**A.  Yes.  I'm sorry.  But I don't believe that though.  I don't know.  I just do not know if they did, because I just don't
know.**
. . .
**Q.  You told me how you define fabricated.  Do you know whether your husband's errata sheets were fabricated, that is**
stated falsehood or were the truth?
. . .

MR. DIAZ:  I think the better question, with all due respect is, as you sit here today to you believe that that statement—**do you believe it's accurate because it's pretty obvious that there are things in this complaint that are not sourced from her; ergo, they were sourced from some other person, or you are suggesting in this case, fraudulent Bar complaint,** whatever.

. . .

**Q.  Mrs. Harris, let me ask you to go back up to the prior paragraph and the sentence from your sworn Bar complaint that says, "Following depositions, Howard and his associate, Ankur fabricated errata sheets for each transcript, extensively rewriting Richard's testimony."  Do you believe that that is true, correct and complete statement?**
**A.  I do not believe that.**

Q.  In what way to you not believe it?

A.  Because I have no clue about what's right and what's wrong or anything about errata sheets.

**Q.  Do you believe that Howard and Mehta ordered your husband to sign the errata sheets as opposed to giving him the option of reviewing them and making changes?**
**A.  I do not know.**
**Q.  Did you ever know?**
**A.  No.  I still don't know, really.**

Q.  Do you believe Howard and Mehta not just ordered your husband to sign the fraudulent errata sheets but did so without even **reading to him the changes?**
**A.  I do not know.**
**Q.  Let's take the first part away.  Do you believe that your husband signed the errata sheets without even reading the changes?**
**A.  I do not know.**
**Q.  Do you know anything about the process by which the errata sheets were prepared, whether they were reviewed or not with your husband before he signed them?**
**A.  No.**
**Q.  Did you ever know that?**
**A.  No.**

. . .

Q.  Okay.  Do you know the source of information that J.B. Harris had when he wrote in a statement for you to swear **under oath that Tim Howard and Ankur Mehta ordered your husband to sign the errata sheets?**
**A.  The only other person there was Jaakan Williams.**
**Q.  But do you know whether Jaakan Williams—Let me ask you this:  Did Jaakan Williams ever tell you that Tim Howard and Ankur Mehta ordered your husband to sign errata sheets?**
**A.  I don't recall.**
**Q.  You don't recall him telling you that?  No?**
**A.  I don't recall.**
**Q.  I'm sorry.**
**A.  I don't recall him telling me that.**

. . .

**Q.  So to finish up this part, Mrs. Harris, to the extent that J.B. Harris had any source of information that Tim Howard and Ankur Mehta ordered your husband to sign the errata sheets without even reading them, it didn't come from you?**
**A.  Correct.**

. . .

Q Okay. The next sentence, "Last, he," referring to Mr. Howard, **"suborned perjury with the errata sheets, obstructed justice and committed a fraud upon the court by attempting to use them in the proceedings."** Do you believe that that is true and accurate?
**A I can't -- I don't know, because I don't know what's -- again, we talked previously about the errata sheets. I have no knowledge of how it works, so I couldn't say.**

Q If anyone, Mr. Howard or anyone else, used the errata sheets to create false testimony, to suborn perjury and used them to obstruct justice or commit a fraud upon the court, would you want any part of that?

A No.

. . .

Q Clarified it. All right.  Whatever adjective we want to put on it, in July you swore to the following: "In discussions with Richard, our attorneys prepared the errata sheets according to Richard's instructions and reviewed them with Richard. Richard verified that the errata sheets were consistent with the testimony that he wanted to give." That was your testimony under oath as of July 6th, 2017, correct?

A Correct.

Q When you said that our attorneys prepared the errata sheets according to Richard's instructions, that was false, wasn't it?

MR. DIAZ: Objection. Form. I'm sorry. Go ahead.

**THE WITNESS: No.**

**BY MR. MONDE:**

**Q How so?**

**A Well, they were there. They talked with him.**

. . .

**A They did do -- they did -- they did question -- they did question --See, I'm getting all upset now.**
MR. DIAZ: I'm sorry. I didn't mean to trigger that.
**THE WITNESS: No. Well --The attorneys talked to my husband. I'm not -- I don't know the term errata sheets, but they went over his testimony.**

. . .

Q Okay. I think you said that Jaakan Williams had told you that in his opinion there was some kind of nefariousness or something wrong or fraud regarding Richard Harris' errata sheets. Do you remember that testimony?
A Yes.
**Q All right. Now, that was Mr. Williams' opinions? Do you know one way or the other whether Mr. Richard Harris' errata sheets were fraud?**
**MR. MONDE: Objection.**
**BY MR. DIAZ:**
**Q Do you have the ability to even know that one way or the other?**
**A No.**
**Q Okay. And you would not know, would you, what reason, if any, Jaakan Williams might have had for his own opinions and impressions about Mr. Richard Harris' errata sheets, correct?**
**A No.**
Okay. All right. In the middle of page 3, the paragraph that starts off with "Howard and Mehta" -- and that's M-E-H-T-A -- "ordered Richard to sign the fraudulent errata sheets." **Just to be clear, that "fraudulent" is not your words and that's not how you would have written this part of the complaint if this were ever done by you, correct?**
MR. MONDE: Objection to form.
**THE WITNESS: Correct.**

. . .

Q Okay. And so you would not know question to question what questions were corrected, clarified, or amplified on. **But you do know, generally speaking, as you sit here today and when you were deposed yourself on the errata sheets of Richard, that there were meetings between Richard and his lawyers for purposes of preparing what you now know to be called errata sheets; am I correct?**
MR. MONDE: Objection to form.
**THE WITNESS: Correct.**

. . .

Q Yeah. Let me start again. Question, "Do you believe that when your husband signed those errata sheets, that he understood what he was signing?" And your answer was, "I think -- I would think he would. I wouldn't think he would sign it if he didn't." Right?
A Right.
Q Was that accurate testimony?
A Right.

. . .

**Q Okay. Then it goes on and it says, "And my question was just a little bit different. Given his health condition at the time, do you think he understood what he was signing when he signed those errata sheets?" And you said, "I would say yes," right? Okay? Yes?**
**A Yes.**
**Q Right. When you said "I would say yes," you're not certifying 100 percent, but you're saying in your best faith belief at the time was that he was able to sign, correct?**
MR. MONDE: Objection to form.
**THE WITNESS: Correct.**
BY MR. DIAZ:
Q Yes, ma'am?
MR. MONDE: Same.
**THE WITNESS: Yes.**

. . .

. . .

Q Answer, ma'am. Is it fair to say, now that you refreshed your memory about what your memory was two years ago when you were asked about Richard signing the errata sheets and the whole exercise of the execution/preparation of the errata sheets, **as you sit here today, is it fair to say that you are not saying that his errata sheets were forged, you don't know if they were signed by him or not, correct?**
MR. MONDE: Same objections.
**THE WITNESS: Correct.**

. . .

Q And you were explaining, "Although Richard was having problems with his eyesight, **I do remember our attorneys coming over prior to Richard's deposition and reviewing his deposition testimony from the previous days with him, and making**

sure that he understood the testimony he had given, and making all the corrections that Richard suggested." Have you read that?

A Right.

Q Okay. Now, here's what I would like to know: When you did the correction, you didn't change your answer above, you were just explaining it further, is that right?

MR. MONDE: Objection.

THE WITNESS: Clarifying it.

BY MR. DIAZ:

Q Clarifying, okay. And is the clarification truthful, meaning that although Richard was having problems with the eyesight, the lawyers came back and went over his deposition with him?

A Correct.

Q Okay. So the correction in the errata sheet is not false, it's true. Am I right?

MR. MONDE: Objection to form.

THE WITNESS: Correct.

Q In the correction it says, "I do remember our attorneys coming over prior to the deposition and reviewing his deposition from the previous days," et cetera. As you sit here today, and when you did this errata sheet, do you remember, did you then remember that the attorneys were going over the deposition transcripts with Richard after the deposition testimony was taken?

MR. MONDE: Objection.

THE WITNESS: Correct.

. . .

Q Yes? So the correction -- is my understanding correct that the correction part of this page 320 is not false, it's true?

MR. MONDE: Objection.

THE WITNESS: Correct.

. . .

Q Okay. Is it also a fair and correct statement throughout that you always felt and understood and perceived and know that the lawyers after the deposition went over the depositions with Mr. Harris either to correct, amend, explain, or change any of his answers?

MR. MONDE: Objection. Asked and answered.

THE WITNESS: Correct.

. . .

Q Now, within that truth, were you at least aware, because of your walking into and back out of the room, that the lawyers in some measure were going over deposition testimony and these corrections, if you want to call them that, with your husband, Mr. Harris, even though you don't know the particulars?

MR. MONDE: Objection to form.

THE WITNESS: Correct.

. . .

Q Okay. Now, even though you may not have seen the actual interactions between question, answer, errata, and the type and everything else, was this testimony truthful because your impression, your read, your interpretation of what you were seeing and hearing consistent with them going over the deposition transcripts in the errata sheets?

A Correct.

. . .

Q Okay. And you said, "And Richard clarified his answers and the changes he wanted made to the transcript." Was that a truthful statement at the time?

A Correct.

Q Was that a truthful statement in your correction?

A Correct.

Q And is that still a truthful correction -- or a truthful statement today?

A Right.

. . .

Q Now, in the corrections, you say, "I do remember our attorneys reviewing the errata sheets with Richard to make sure that the errata sheets accurately reflected changes he requested before he signed them." Is that a false statement?

MR. MONDE: Objection.

THE WITNESS: No.

BY MR. DIAZ:

Q Okay. Is that a general -- was that the impression that you had from everything you saw, the lawyers going over the errata sheets and the depo transcripts with Richard?

MR. MONDE: Objection.

THE WITNESS: Correct.

. . .

Q And then when the errata sheets were done and the correction provisions were put in as a trailer to some of the

and fraudulent in her February 13, 2020 Deposition.  As just one example, consider her response to the following:

> Q Okay. And -- but something different, but similar, but very important, are you satisfied today, based on everything that you knew, saw, perceived, watched going in and out of the room, **that the errata sheets resulted from interchange and exchanges between Mr. Harris' attorneys and Mr. Harris?**
> **A Correct.**
> **Q Ms. Harris, if that's right, do you know why your lawyers in a pleading filed with the court would call those errata sheets the product of fraud that constitute the suborning of perjury, the obstruction of justice, and -- what else did you call it, Rick?**
> MR. DIAZ: I'm not going to be a witness.
> BY MR. MONDE:
> **Q There's another phrase. Oh, yeah, and committed a fraud upon the court. Do you know why your lawyers would do that?**
> **A No, I don't.**

*Id.*

In response to and in support of the above-referenced inquiry/complaints, please consider the following. In support of the second incontrovertible perjury referenced in the August 23, 2018 filing, as is found in the July 8, 2018 sworn Bar complaint allegedly by Mr. Peggy Harris, at pages 3 and 8, Mr. Jaakan Williams' sworn testimony on April 11, 2018, is in contrast to numerous sworn statements:

> In an effort to cure whatever perceived shortcomings may have resulted from Richard's testimony, following the depositions, Howard and his associate Ankur Mehta fabricated errata sheets for each transcript, extensively re-writing Richard's testimony.
> **Howard and Mehta ordered Richard to sign the fraudulent errata sheets without even reading him the changes.**  Indeed, Richard was so near death at the time, **he had no comprehension as to what was happening around him, or what he was even signing**.
> . . .
> **Jaakan Williams, who was present at Richard's depositions and who informed me of Howard's concoction of the fraudulent errata sheets**.  Mr. Williams is a witness in the Bar's investigation of Howard as well.

*Id.* (emphasis added).

Mr Jaakan Williams in his April 11, 2018 deposition, pages 77-78, 86-90, attached hereto, states:

---

questions and answers, to the best of your knowledge, were -- was the information in those corrections also truthful?
MR. MONDE: Objection.
**THE WITNESS: Correct.**

Q.  I'll put it another way.   Isn't it the duty of a lawyer to find the facts, find that law that best represents their client?

A.  Agreed.

Q.  All right.  And if there's errors in the facts, (inaudible) person who's on the verge of death, that need to be clarified isn't it the lawyer's duty to clarify those facts?

A.  I agree.

Q.  And if one of the methods of clarifying the facts is an errata sheet, pointing out the precise language that the deponent said, read that to him as he's dying and then have the clarifying language read to him as he's dying, until he agrees on that change, isn't that an appropriate way to clarify the record for this dying deponent?

A.  I believe so.

. . .

Q.  Okay.  So, Mr. Williams, during your visits with Mr. Harris and Peggy Harris on Thursday and Friday, **you would cover a lot of the same topics that are in the errata sheets, such as smoking history, criminal history, military background, employment, addiction.  Would those topics have been covered in your discussions with Richard and Peggy Harris on Thursday and Friday?**

A.  **We covered a number of topics.  Those are the predominant ones we covered.**

Q.  Okay.  Very good.  **And you would have shared that with counsel or a paralegal on the case, since that's why you were there, to help them with the case?**

A.  **Yes, I would have shared that.**

Q.  Okay.  Mr. Williams, as far as the language in the errata sheet, did we require Richard to accept the proposed correction, or did we seek his ascent to make the change?

Q.  **Could Richard have said, "No, that's not a correct change?"**

A.  **He could have,** I would imagine.

Q.  Right, and so – and Richard was lucid enough to say, "Well, no I (inaudible) with that change," and we would have crossed it out, our handwritten changes, if that's what Richard wanted to do?

THE WITNESS.  **I imagine he would have.** He was – he was coherent that morning.

Q.  He had no problems expressing his viewpoint, regardless of how people felt about it?

A  Yes.

Q.  **So we did not require Richard to agree to this errata sheet, did we?**

Q.  **And Richard could have said, "No, that's not correct"?**

A.  Yes, he could have, if he wanted to, I imagine.

Q.  Right, and Richard's the kind of person that would have no problem telling you that's not correct?

THE WITNESS. From what I remember, yes.

Q.  Okay.  So, as far as your perspective on observing this process, wasn't the errata sheet something that Richard was aware of, understood, and approved to change his testimony from the discovery deposition?

THE WITNESS.  If you're asking me if he agreed to the changes, yes, he agreed to the changes.

Q.  And these changes were after that portion of the transcripts were read to him—

A.  Yes, they were read to him.

*Id.* (emphasis added). This sworn statement says, "<u>he was coherent that morning</u>," "<u>he agreed to the changes</u>," and "<u>they were read to him</u>." *Id.*

This sworn statement on April 11, 2018, and Peggy Harris' sworn testimony on February 13, 2020, attached hereto, is not consistent with Mrs. Peggy Harris' the July 7, 2018 sworn statement before the Florida Bar, and in contrast to the perjurious Bar Complaint prepared by J.B. Harris and signed by Peggy Harris:

> **Howard and Mehta <u>ordered Richard to sign the fraudulent errata sheets without even reading him the changes</u>**. Indeed, Richard was so near death at the time, **he had no comprehension as to what was happening around him, or what he was even signing**.
> . . .
> **Jaakan Williams, who was present at Richard's depositions and <u>who informed me of Howard's concoction of the fraudulent errata sheets</u>**. Mr. Williams is a witness in the Bar's investigation of Howard as well.

Moreover, Mrs. Peggy Harris, consistent with the facts above, was prepared for her sworn deposition testimony by attorney Jaakan Williams 9 and current Bar attorney Adriannette Williams. They would have coordinated the review of her May 23, 2017 deposition and would have coordinated the preparation of her errata sheets after Peggy Harris' review of her deposition transcript. Mrs. Peggy Harris states under oath:

Q. Okay. And so I asked you before the break whether you were aware, whether you knew whether your husband reviewed the deposition that I took of him, which was a multi-hundred-page transcript. **Did he review that?**
A. **I believe he did, but he couldn't see it, but it was read to him**.
Q. Okay. Who read it to him?
A. One of the attorneys.
Q. How long did it take?
A. **A while. They came in early, yeah.**
Q. They came in early the morning of June 25th?
A. **I don't remember the morning, but they came in early to do it.**
. . .
Q. Okay. Do you remember anything about the circumstances of what was read to him?
A. No.
Q. **Do you know one way or the other whether that deposition was read to him from –**
A. **I believe it was.**
Q. **– start to finish?**
A. **I believe it was.**
. . .
Q. **Do you know whether he actually told the lawyers whether he had changes to make to**

---

9 **Moreover, Mr. Jaakan Williams did not say the errata sheets were "Howard's concoction of the fraudulent errata sheets." If he did say such a thing, <u>he would be contradicting not only his own sworn testimony, he would be contradicting his deposition preparation of Mrs. Peggy Harris and his work with Mrs. Peggy Harris in her review of her deposition transcripts and in preparing and coordinating her errata sheets to her deposition.</u> He would be leading Mrs. Peggy Harris into a perjurious trap, which in the Respondent's experience it is unlikely that Jaakan Williams would do.**

**his deposition? Did he actually tell them that?**
A.  **I believe he did.**
Q.  How did he do that?
A.  Verbally, I would think. But I'm not—I shouldn't say, because I'm not sure.
. . .
Q.  **Do you believe that when your husband signed those errata sheets, that he understood what he was signing?**
A.  **I would think he would.  I wouldn't think he would sign if he didn't.**
Q.  **And my question was just a little bit different.  Given his health condition at the time, do you think he understood what he was signing when he signed those errata sheets?**
A.  **I would say yes.**
Q.  Okay.  So is the answer that you're not sure whether he knew what he was signing?
A.  Again, I wouldn't think he would sign unless he knew what he was signing.
Q.  **Were you in the room when he signed them?**
A.  **I don't—yeah, I think I was.**
. . .
Q.  **After his deposition, after I had the opportunity to ask him questions, did Mr. Harris ever say to you that he had changes that he wanted to make to his testimony?**
A.  **I believe he did.**

*Id* (emphasis added).

Moreover, in response to the deposition reviews, Mr. Richard Harris and Mrs. Peggy Harris were both read the relevant portion of their transcripts and under oath made corrections to their transcripts.  This was confirmed by Mr. Richard Harris and reconfirmed by Mrs. Peggy Harris, wherein she repeatedly states under "penalties of perjury" in errata sheets after reviewing her testimony and providing corrections that **"I do remember our attorneys coming over prior to Richard's deposition and reviewing his deposition testimony from the previous days with him, and making sure that the testimony he had given, and making all the corrections that Richard suggested."** 10  *See* relevant portions of transcripts attached to the August 22, 2018 response.  Neither Mr. Richard Harris nor Mrs. Peggy Harris were ordered to sign the errata sheets, and they were reviewed and read by or to both of them by either associate or senior counsel before they signed the errata sheets.

Since Mrs. Peggy Harris states in the July 8, 2018 Bar Complaint under oath the opposite of what she contemporaneously stated and provided under oath on May 23, July 6, 2017, and February 13, 2020, and the opposite of what Jaakan Williams stated in his sworn deposition on April 11, 2018, either she is committing perjury in May 23 and July 6 of 2017, or on July 8 of

_____

10  In her sworn July 6, 2017 errata sheets, under penalty of perjury, Mrs. Peggy Harris states, **"Our attorneys did review Richard's depo transcripts with him each day, and Richard clarified his answers and the changes he wanted made to the transcript."**  She also states, **"In discussions with Richard, our attorneys prepared the errata sheets according to Richard's instructions and reviewed them with Richard.  Richard verified that the errata sheets were consistent with the testimony he wanted to give."**  Finally, she states, **"Richard knew exactly what he was signing because our attorneys reviewed the depo transcripts and errata sheets with Richard before he signed them, and Richard verified that the errata sheets were consistent with the testimony he wanted to give."**

2018.  These incongruent statements cannot be true and honest.  Peggy Harris has chosen that the Bar Complaint written and prepared by J.B. Harris and not read by Peggy Harris until Februay of 2020, is the false and fraudulent statement, not the depositions.

<u>BAR COMPLAINT FULL OF FALSE STATEMENTS CLIENT DID NOT APPROVE OR STATE</u>

J.B. Harris placed incendiary statements that the client did not approve or state.11 This is repeatedly verified in her February 13, 2020 Deposition. This is either perjury by J.B. Harris or by Peggy Harris and both violate the law.

<u>BAR COMPLAINT CONTAINS A PHANTOM CLAIM OF A CHARGE FOR $10,000 THAT IS NOT SUBSTANTIATED BY ANY DOCUMENT AND THAT CIENT IS UNSURE OF</u>

The phantom claim 12 that there was a charge to the client for $10,000 for trial housing, a charge

---

11 Q.  Okay.  When you signed the statement under oath, did you think that the statements written reflected J.B. Harris' beliefs?
THE WITNESS:  I would say some of it.  Some of it.
**Q.  Well, would you have signed the Bar complaint if you had any question about whether the statements reflected J.B. Harris' beliefs?**
<u>THE WITNESS:  I would not have.</u>
. . .
**A.  I told him what I wanted to put on this, and he put more, let me just say it that way.**
**Q.  Did he tell you before he signed that he had gone beyond what you had told him?**
<u>A.  No.</u>
Q.  Is that information you would have wanted to know before you signed under oath?
A.  I would have been helpful.
**Q.  Well, more than helpful, ma'am.  <u>Before you signed under oath, would you have wanted to know that J.B. Harris had put in the statement, your statement, beyond what you had told him?</u>**
<u>THE WITNESS:  Yes.</u>
. . .
Q All right. Let's use Mr. Monde's questions. There are words describing Mr. Howard in the Florida Bar complaint, "dishonest and duplicitous," right?
A Right.
**<u>Q Okay. Now, are those words -- before you saw them in the complaint words that you had heard before?</u>**
<u>A No.</u>
<u>Q Okay. So those were J.B.'s words, not yours?</u>
<u>A Correct.</u>
. . .

12 In no shape or fashion is there language documenting or a request for Margaret Peggy Harris to pay $10,000 for the trial housing. This payment was in the same category as the $12,000 for the pathology opinion. This is a distortion placed into the mind of Margaret Peggy Harris by her counsel and placed into record.  The precise language is found below:

Q May I please get you to go back to Exhibit 3 for a moment. Would you turn to page four. The Bar complaint says that, "In anticipation of trial, Howard paid $12,000 for the autopsy, and supposedly prepaid $10,000 for the rental of the local residence. Howard then had the audacity to insinuate that I, a woman of very meager means, had to pay the combined cost of $22,000." **<u>You believe that to be a false description when it comes to the $12,000 for the autopsy, correct?</u>**
<u>A. Correct.</u>
. . .
Q Okay. And do you know as you sit here today, one way or the other, **do you recall any requests or demands or any other comments or conversations you had with Howard about making the payments, what might happen or what would happen if you didn't make the payments?**
<u>A I don't recall.</u>
Q You don't recall. Okay.
. . .
Q Okay. And do you see where he is saying -- let me just read the whole thing for the record. It says, **"Dear Peggy. The**

that never existed. This is a grossly dissembled legerdemain by J.B. Harris, who created this non-existent sophistic mirage. The language of the email that discusses that Howard paid $12,000 for pathology and $10,000 for trial lodging. This demonstrates the frivolous nature of this claim. Even Peggy Harris, on February 13, 2020, in her deposition, when pushed as to this allegation, states as to whether there was such a demand: **"I'm just not sure."**

## BAR COMPLAINT FALSELY CLAIMS RICHARD HARRIS WAS NOT COHERNT OR CAPABLE OF ANSWERING DEPOSITION QUESTIONS

J.B. Harris next falsely states that Richard Harris was not coherent or capable of answering deposition questions.13  This is refuted by Peggy Harris repeatedly.  Thereby again

---

pathology samples for the pathology opinions that we paid approximately $12,000 for are available, and we can pay the $500 or let us know whoever is now going to pay the cost. <u>We have prepaid 10,000 for the house near the courthouse to be use</u>" -- instead of "used," it says "use" -- "for the four-week trial. We can reschedule the trial date if needed." Okay. All right. "We have paid the $1,000 plus and hired professional probate counsel to handle the probate after the departure of Jaakan Williams." Do you see that?
A Right.
. . .
Q Now that you look at this email today, does it appear to you that when Mr. Howard is suggesting rescheduling the trial date at the same time when he's asking you for payment, if you tie those two things together, would it have been unreasonable for you to believe that Mr. Howard was insinuating that unless these monies could be paid the trial would have to be continued?
MR. MONDE: Objection to form.
BY MR. DIAZ:
Q Do you follow my question?
<u>A Yeah, I follow your question. I'm just not sure.</u>

There were two Harris probate matters out of the over 110 probate cases filed on behalf of Engle tobacco clients, and we had Matt Hinson, Esq., certified probate counsel handling all probate cases.  Counsel had taken care of one Harris probate matter, and thought they were covered.  Once we became aware that there was another Harris probate matter, we were prepared to refile as there is no prejudice to the personal representative and these cases are place markers for the wrongful death component of the Engle tobacco actions.  The fear was more of a problem than the substance of the probate action and this was enhanced by Mr. Harris, as a retaliatory action in his thinking that Respondent has sought out the Gould sisters and took them from him as clients.

13  **Q. The "next near death at the time he had no comprehension as to what was happening around him or what he was even signing." Do you see that?**
A Um-hum.
<u>Q Do you believe that that is true, correct and complete?</u>
<u>A No, I do not.</u>
Q Why not?
A Because he was aware of what was going on, that part of it.
<u>Q Are you saying that based on what you saw and heard, you believe that your husband was aware of what was going on around him throughout the</u>
<u>A Correct.</u>
<u>Q -- from Monday, June 20th until Sunday June 26th?</u>
<u>A Correct.</u>
Q You sat in the deposition on that Monday, Tuesday and Wednesday when the lawyers for Reynolds were asking questions?
A Correct.
Q Number one, you were there to protect your husband?
A Yes. In case -- any needs he had.
Q Yes, ma'am. And so is it fair to say that you were present in the room throughout the time that your husband was being asked questions?
A Yes.
Q You might have stepped away during a break. But in terms of the actual questioning, you were there the whole time?
A Correct.
Q In those three days, did you ever hear your husband say something that you knew to be untrue?
A Yes.
Q. During those three days of testimony, June 20th to June 22nd, you did hear some things from your husband that you did not

demonstrating the fraudulent and perjurious nature of J.B. Harris' putrid extortion tactics and using the Florida Bar as his extortion tool.

<div align="center">

### BAR COMPLAINT FALSELY STATES THAT J.B. HARRIS WAS HIGHLY RECOMMENDED
</div>

Next, J.B. Harris falsely states that he was highly recommended, when he was one of two lawyers that Jaakan Williams knew that did tobacco, and the only reason J.B. Harris was chosen is that he answered the phone, and the other lawyer did not.  He was not highly recommended, only that he had done some tobacco trials.14

<div align="center">

### BAR COMPLAINT FALSELY STATES THAT PEGGY HARRIS STATED THAT HOWARD WAS DUPLICITOUS AND DISHONEST
</div>

 J.B. Harris falsely makes the statement that Peggy Harris signed off on, namely that Howard was duplicitous, deceptive and dishonest.15  Peggy Harris clarifies that she did not say these

---

know about before?
A Correct.
Q Different question now.
A Okay.
**Q In those three days of testimony, did you ever hear your husband say something that you knew or believed to be false?**
**A No.**
Q Was there ever a point during the deposition process, and now I'm going to stretch it out from Monday, June 20 all the way to Sunday, June 26th, was there ever any point where you had some question about whether your husband was able to comprehend or understand the questions so that he could testify?
**A I didn't doubt -- I knew he was alert the whole time.**
Q May I please get you to turn to page eight.  I want to focus on the first paragraph. It says the following: Well, I'm so sorry to do this to you. Did you ever -- Was J.B. Harris present for the deposition of your husband?
A Ugh-ugh.
Q No?
A Didn't know about him. I didn't meet him. I didn't -- Absolutely not.
Q Did you ever tell J.B. Harris in connection with preparing this Bar complaint that your husband had no comprehension as to what was happening around him or what he was even signing when he signed the errata sheets?
. . .
**Q Did you ever hear any doctor assess your husband and diagnose him as lacking comprehension --**
**A No.**
**Q -- during this time period?**
**A No.**

14  Q So Miss Harris, we need to break down the sentence that I read to you a little bit more.  First, you say in your Bar complaint, "Mr. Harris came highly recommended from attorney Jaakan Williams." Is that the fact?
A I don't know highly would be -- I wouldn't use that word. He recommended him.
. . .
Q What did Jaakan Williams tell you in this conversation regarding J.B. Harris?
A He gave me two names for two attorneys. One was in Jacksonville. I tried to call her, I think because she was closer. The number didn't work. So I called J.B., and that's when we ended up with J.B.
Q What did Mr. Williams tell you about J.B. Harris' qualifications, or anything else? I mean, what did he tell you when he recommended him?
**A I believe he said that he had done some work --**
**Q J.B. Harris wrote those words without any authorization or permission from you, correct?**
**A Correct.**
**Q J.B. Harris wrote those words?**
**A Correct.**

15 Q Let me ask you, please, to turn -- page 13, please. The following statement appears in your
sworn statement under oath to the Florida Bar: Quote, "And I know the difference between a donkey and a mule. With

<div align="right">17 | P a g e</div>

things.

## J.B. HARRIS WITHHELD INFORMATION THAT HE WAS BEING PAID BY HOWARD, AND THIS IS INFORMATION THAT CLIENT WANTED TO KNOW

J.B. Harris intentionally fails to disclose information that the client would want to have known, namely that Howard is paying $21,000 a month to J.B. Harris to work on Engle tobacco cases, including Margaret Peggy Harris' case.16  The reality is that Peggy Harris was still hiring Tim Howard's attorneys when she though she went to J.B. Harris, because he was working for Tim Howard.

## PART OF AN EXTORTION SCHEME BY J.B. HARRIS

Mr. J.B. Harris is consistently threatening and extorting, and using perjury, while trying to avoid accountability.  Prior to filing the August 2018 Bar Complaint response, pertaining to health insurance that this firm pays for Mr. J.B. Harris of approximately $2,500 a month, that was understood to be automatically deducted from the account, and was rectified prior to the firm being aware of his threat and extortion, Mr. J.B. Harris wrote:

"Tim, **I suggest you reactivate my insurance today <u>or I will be at your office first thing tomorrow to spend a little quality time with you.</u>**  You've placed the lives of my children at risk and that won't stand."

August 21, 2018 email from Mr. J.B. Harris, attached to Bar Complaint Response.  As to the merits of the Bar Complaint, consider the following:

This firm has been involved in tobacco litigation since its founding in 1995 and has been counsel on

---

that said, I have never in my life met anyone as duplicitous, deceptive and dishonest as Howard." Are those your words? **A They are not my words.**

…

Q Right. So to the best of your belief and knowledge it's simply false to say that Mr. Howard extorted you by threatening not to appear for trial if you would not agree to his demand to pay these costs, correct? **A I do not remember that.**

16 Q You are doing fine. Exhibit F, and then I want the next page. There you go. Okay. This is an email from Tim Howard to someone named Matt. And he says, "She didn't respond to me. Mr. Harris," referring to J.B. Harris, "has an extensive history of Bar violations and extortion that I was forced to report. We sent what we had in the file and I thought that was sufficient at the time. There's nothing to do on this case for now." When you hired J.B. Harris, were you aware that he was in the midst of a dispute with Tim Howard?
A No, I did not.
Q Were you aware that they were actually lawyers working together under contract --
A I did not.
Q-- when you hired -- when you fired Tim Howard and hired J.B. Harris?
A Not that I recall.
Q Were you aware when you fired Tim Howard and hired J.B. Harris that Tim Howard was actually paying J.B. Harris' salary?
A No, I did not.
Q Were you aware when you fired Tim Howard and hired J.B. Harris that they had a contract with each other that in cases -- Engle cases like yours, including yours, that they had a contract that would give Tim Howard a certain percentage of any verdict obtained or judgment collected?
A Not that I recall.
Q Is that information, ma'am, that you would have wanted to know when you hired J.B. Harris?
MR. DIAZ: Form.
THE WITNESS: Yes.

numerous tobacco trials and cases, including some of the largest verdicts in the nation—*Chiles, et al., v. American Tobacco, et al.,* (resulted in over $20 billion for the State of Florida); *Evans v. Lorillard* (resulted in the largest verdict in the history of Massachusetts for a personal injury case at $150 million and settled for over $79 million). Pertaining to this particular complaint, the firm was counsel in a 7-week Jacksonville, Florida trial involving *Sermons v. RJR*, that took place when the depositions of Richard Harris were also taking place, due to his imminent demise and the resistance of defendants to permit him to be deposed earlier. Thus, there was clear capacity to litigate the action, no failure to disclose, nor was there a solicitation. In fact, former counsel for Richard Harris, the law firm of Lyons & Farrar, sought this firm out to assist in the prosecution of the case, and Richard Harris chose to drop former counsel and solely retain this firm. The Lyons & Farrar firm were paid their quantum meruit fees for representing Richard and Peggy Harris for 9 months, while the Howard & Associates firm has to pursue an appeal to obtain even their costs back. This is verified in the record of this action.

It is false for Mr. J.B. Harris (since Mrs. Peggy Harris has verified that she had no capacity or knowledge) to assert that this firm did not know how to prepare a client for a tobacco deposition having done nearly 100 tobacco depositions in the past. The concern was that a junior associate had significant challenges in the first day of defending Mr. Richard Harris in Defendants' deposition of him, while the senior partner was in a 7-week tobacco trial in Jacksonville. The firm's senior partner left the tobacco trial for a day to get the testimony in order and identified the critical issues and reviewed them with the associate and paralegal assisting with the deposition. The intense reprimand of Jaakan Williams was due to the significant lapses in legal analysis necessary to protect the interests of the client. While he did not like the reprimand and discipline, it was necessary to get his attention as it severely threatened justice for Richard and Peggy Harris. Jaakan Williams may have complained to Peggy Harris about this reprimand as this is referenced in Peggy Harris' February 13, 2020 deposition, attached hereto. The trial preservation testimony was organized, focused and covered the materials needed to effectively prosecute Mr. Richard Harris' case. This work was the core basis for the $10 million recovery for Peggy Harris.

This also involved reviewing portions of the deposition defended by the junior associate. This required reviewing the testimony at issue, reviewing the language with the client, and obtaining the client's desired changes through an appropriate errata correction. **Rule 1.310 (e), Florida Rules of Civil Procedure, provides that:**

 **"any changes in form or substance that the witness wants to make must be listed in writing by the offer with a statement of the reasons given by the witness for making the changes. The changes must be attached to the transcript."**

Errata sheet clarifications from a deposition transcript are standard procedure for all depositions. This attempt to make errata sheets nefarious is inconsistent with the Florida Rules of Civil Procedure. Errata sheets were done for both Mr. Richard Harris and Mrs. Peggy Harris.

In fact, under oath, Mrs. Peggy Harris stated in her May 23, 2017 deposition, pages 332-336, relevant pages attached to the August 2020 Responses to the Bar Complaint, the following pertaining to the errata sheets. These statements confirm that the relevant portions of the transcripts were read to him, and that he knowingly agreed to change the testimony and signed confirming the changes. The February 13, 2020 deposition of Peggy Harris, attached hereto, confirms the same.

Q. Okay. And so I asked you before the break whether you were aware, whether you knew whether your husband reviewed the deposition that I took of him, which was a multi-hundred-page transcript. **Did he review that?**
A. **I believe he did, but he couldn't see it, but it was read to him**.
Q. Okay. Who read it to him?

A. One of the attorneys.
Q. How long did it take?
**A. A while.  They came in early, yeah.**
Q. They came in early the morning of June 25th?
**A. I don't remember the morning, but they came in early to do it.**
. . .
Q. Okay.  Do you remember anything about the circumstances of what was read to him?
A. No.
Q. Do you know one way or the other whether that deposition was read to him from –
**A. I believe it was.**
**Q. – start to finish?**
**A. I believe it was.**

. . .
**Q. Do you know whether he actually told the lawyers whether he had changes to make to his deposition? Did he actually tell them that?**
**A. I believe he did.**
Q. How did he do that?
A. Verbally, I would think. But I'm not—I shouldn't say, because I'm not sure.
. . .
**Q. Do you believe that when your husband signed those errata sheets, that he understood what he was signing?**
**A. I would think he would.  I wouldn't think he would sign if he didn't.**
**Q. And my question was just a little bit different.  Given his health condition at the time, do you think he understood what he was signing when he signed those errata sheets?**
**A. I would say yes.**
Q. Okay.  So is the answer that you're not sure whether he knew what he was signing?
A. Again, I wouldn't think he would sign unless he knew what he was signing.
**Q. Where you in the room when he signed them?**
**A. I don't—yeah, I think I was.**

. . .
**Q. After his deposition, after I had the opportunity to ask him questions, did Mr. Harris ever say to you that he had changes that he wanted to make to his testimony?**
**A. I believe he did.**

Moreover, in response to the deposition reviews, Mr. Richard Harris and Mrs. Peggy Harris were both read the relevant portion of their transcripts and under oath made changes to their transcripts.  This was confirmed by Mr. Richard Harris and reconfirmed by Mrs. Peggy Harris, wherein she repeatedly states under "penalties of perjury" in errata sheets after reviewing her testimony and providing corrections that **"I do remember our attorneys coming over prior to Richard's deposition and reviewing his deposition testimony from the previous days with him, and making sure that the testimony he had given, and making all the corrections that Richard suggested."** 17 *See* relevant portions of transcripts attached.  Neither Mr. Richard Harris nor Mrs. Peggy Harris were ordered to sign the errata sheets, and they were reviewed and read to both of them by either associate or senior counsel before they signed the errata sheets.  *See* transcript errata sheets attached to the August 2018 response to the Peggy Harris Bar Complaint, as well as Peggy Harris' February 13, 2020 deposition attached hereto.

---

17 In the errata sheets she stated, "**Our attorneys did review Richard's depo transcripts with him each day, and Richard clarified his answers and the changes he wanted made to the transcript.**" She also stated, "**In discussions with Richard, our attorneys prepared the errata sheets according to Richard's instructions and reviewed them with Richard.  Richard verified that the errata sheets are consistent with the testimony he wanted to give.**" Finally, she stated, "**Richard knew exactly what he was signing because our attorneys reviewed the depo transcripts and errata sheets with Richard before he signed them, and Richard verified that the errata sheets were consistent with the testimony he wanted to give.**"

In Mrs. Peggy Harris' May 23, 2018 deposition, she confirms in pages 344-346, attached, that shortly after Mr. Richard Harris passed, the autopsy was conducted in the Faith Funeral Home in Havana, Florida. Regional Pathology and Autopsy Services out of Oakland, California, attached, had their staff fly into Tallahassee. It is demonstrably false that Mr. Richard Harris' body was shipped to California, and in fact, the firm flew the medical autopsy staff from California into Florida to both do an autopsy and obtain tissue samples for medical pathology determination of disease and etiology. Moreover, there was no inference or reference for the client to pay for the costs expended in the case, and it is not understood where or how the language of the email can be interpreted as such.

There was no abandonment as a client. The probate matter was non-prejudicial, as it could be refiled. The hearing notice was missed due to having two Harris probate matters, thinking that the notice was covered, and over 110 probate cases to manage after the junior associate counsel left. This particular matter was understood to be covered by experienced probate counsel, Matt Hinson, Esq., who was hired to handle the 110 or more probate matters. When the Harris probate matter came to the firm's attention, Mr. Matt Hinson, certified probate and estate specialist, was immediately contacted concerning this particular case, and assigned to handle the probate action. Finally, Mr. J.B. Harris ability to operate as an attorney is due to this law firm paying him to work on this and other Engle cases.18

Unknown to this firm at the time, and verified in the February 13, 2020 deposition of Peggy Harris, Mr. Jaakan Williams recommended several lawyer sources to Mrs. Peggy Harris, including the Searcy, Denny law firm, and Christina Opsohal, who had worked on the Richard Harris action. Mr. J.B. Harris was included due to Mr. Jaakan's meeting him through the Howard & Associates law firm, and was only chosen due to him answering the phone. Moreover, Mr. Jaakan Williams did not say the errata sheets were "Howard's concoction of the fraudulent errata sheets."

There has been no refusal to pay the $500 tissue sample bill, as the emails demonstrate. We stated, **"we can pay the $500 or let us know whoever is going to pay the costs."** All that was asked is how did the client wish to handle the matter, in our efforts to avoid spoliation of the evidence.

Furthermore, it is clearly evident that Mr. J.B. Harris' language is definitively found in this bar complaint, where he again uses his signature labels and terms **"blasphemous"**, **"delusional"**, **"duplicitous"**, **"deceptive"** and **"dishonest"** as he has stated in other writings.19 This language is from Mr. J.B. Harris

---

18 During the trial of this case and during its preparation in 2018, the firm was paying Mr. J.B. Harris $21,000 a month, so that he can prosecute Engle tobacco cases, as is referenced in the current complaint against Mr. J.B. Harris. If this firm didn't pay Mr. Harris, he couldn't be working on Mrs. Peggy Harris' case and continue his fraudulent Bar Complaints and sharing with media to attack this firm.

19 For example, on August 7, 2018, the following was forwarded to the Florida Bar and State Attorney:

As part of the ongoing reporting of the various Bar violations and extortion of Mr. J.B. Harris, consistent with his pattern and practice, attached as Exhibit A please find the July 30, 2018 correspondence from Mr. J.B. Harris, documenting **disparaging remarks, degrading to the legal profession,** in unnecessarily calling Mr. Howard **"pathetic, desperate and delusional."** This language violates the rules regulating the Florida Bar, 3-4.3, 4-8.2(a), and 4-8.4(d), as cited below.

Mr. Harris again distorts the facts when he states that the client was **"abandoned"**. Mr. Harris knows that the law firm experienced a funding gap for 6-8 weeks due to corrupt advisors. This funding gap was solved. In fact, **Mr. Harris is right now being paid $21,000 a month by this law firm** and its lender **so he can pursue tobacco cases, including the action of *Richard Harris v. RJR and Phillip Morris*. In fact, without this firm's funding, he is unable to represent Mrs. Margaret Harris or have a life.** With the funding gap solved, the law firm was able to assign and/or hire probate counsel to address the 100 plus tobacco litigation related probate actions, including the probate action for Mrs. Margaret Harris.

that he uses in the Kim Poling and his own Bar Complaint, and language that Mrs. Peggy Harris confirms that she did not use.

Mr. J.B. Harris then ghost writes to state there was a "ballistic" reaction to new counsel, and defamed and slandered Mr. J.B. Harris. This is from an email intended only to Mr. Matt Hinson and counsel for the firm, not knowing that Mrs. Peggy Harris was embedded in the reply all. Next, as referenced in the prior bar violation reports on Mr. J.B. Harris, it was stated solely to Mr. Matt Hinson, that "Mr. Harris has an extensive history of bar violations and extortion that I was forced to report." This is factually true as verified herein, not slanderous, and does not yet state a record of adjudicated bar violations, as inferred by Mr. Harris.

The facts demonstrate that this fraudulent Bar Complaint, and two others, was written by Mr. J.B. Harris as part of his continued efforts at extortion. As pointed out in the many prior filings, these documented and repeated, upon repeated patterns violate the following rules of professional conduct as promulgated by the Florida Supreme Court:

> A lawyer must not threaten opposing parties with sanctions, **disciplinary complaints**, criminal charges, or additional litigation to gain a tactical advantage. *See* Florida Supreme Court, Professionalism Expectations: Expectation 3.18; and Rules Regulating the Florida Bar: Rule 4-3.4(g).

> A lawyer must not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter. *See* Florida Supreme Court, Rules Regulating the Florida Bar: Rule 4-3.4(g).

> A lawyer must not present, participate in presenting, or threaten to present **disciplinary charges** under these rules solely to obtain an advantage in a civil matter. *See* Florida Supreme Court, Rules Regulating the Florida Bar: Rule 4-3.4(h). 20

---

Mr. Harris uses the terms "**delusional**", "**duplicitous**", and is following through with his extortionate threat wherein he wrote on June 6, 2018:

> Tim, if you think you are having trouble with the Bar's investigation of your practices, BWCI Pension Trustees Limited, Ted Doukas, and everyone else who is still after you, **you are about to walk into a shit storm if you steal the Goulds from me as my clients.**

> I will lien the file for costs and fees, sue you for tortious interference and unpaid contribution to costs, fraud and everything else I can think of. **I will also amend my complaint with the Bar** and file a complaint **against Neil as well.**

On June 8, 2018, Mr. Harris writes: "You're a **first-rate coward and scumbag**. All your talk about Jesus is **blasphemous** garbage." "I can assure you they (Gould sisters) will rip you to shreds once they see through your **sociopathic charade.**"

20 Lawyer disciplined for sending a threatening letter to opposing counsel. *The Florida Bar v. Sayler*, 721 So.2d 1152 (Fla. 1998). A criminal defense lawyer violated Rules 4-4.4(a) and 4-8.4(d) for sending a victim of a crime an objectively humiliating and intimidating letter designed to cause her to abandon her criminal complaint. *The Florida Bar v. Buckle*, 771 So. 2d 1131 ; *see also The Florida Bar v. Ratiner*, 46 So. 3d 35 (Fla. 2010). A lawyer should abstain from conduct that diverts the fact-finder's attention from the relevant facts or causes a fact-finder to make a legally impermissible decision. (Professionalism Expectations: Expectation 5.8)

To opposing parties and their counsel, a lawyer should act with **fairness, integrity, and civility**, not only in court, but also **in all written and oral communications**.  (Oath of Admission)

Candor and civility must be used in all oral and written communications.  (Professionalism Expectations: Expectation 2.2)

**A lawyer must avoid disparaging personal remarks** or acrimony toward opposing parties, counsel, third parties or the court. (Professionalism Expectations: Expectation 2.3). <u>**A lawyer should be civil and courteous in all situations, both professional and personal, and avoid conduct that is degrading to the legal profession.**</u> R. Regulating Fla. Bar 3-4.3. 21

<u>**A lawyer's communications in connection with the practice of law**</u>, including communications on social media, <u>**must not disparage another's character or competence**</u> or be used to inappropriately influence or contact others.  (Professionalism Expectations: Expectation 2.5); *see* R. Regulating Fla. Bar 4-8.4(d).

<u>**A lawyer must not criticize or denigrate opposing parties**</u>, witnesses, or the court **to clients, media, or members of the public**.  (Professionalism Expectations: Expectation 4.20); see R. Regulating Fla. Bar 4-8.2(a) and 4-8.4(d)).

This is a response to the Bar Complaint of Margaret "Peggy" Harris, which in reality is a complaint by J.B. Harris.  Consistent with the prior responses, there are numerous Florida bar and criminal violations by Mr. J.B. Harris.

In response to this sworn evidence, and the constant and dissembling practice of Mr. Jonathan B. Harris, Respondent requests that all of these three Bar complaint, actions created and fraudulently forged by J.B. Harris be dismissed, and that Mr. J.B. Harris be sanctioned for intentionally and perjuriously misleading the Florida Bar and his client, and others, as to the facts and circumstances.

---

21 Lawyer disciplined for sending disparaging emails to opposing counsel, calling him a liar, and making improper outbursts directed toward opposing counsel during the litigation. *The Florida Bar v. Norkin*, 132 So.3d 77 (2013)). *See also The Florida Bar v. Abramson*, 3 So.3d 964 (2009); *The Florida Bar v. Buckle*, 771 So.2d 1131 (Fla. 2000) ; *The Florida Bar v. Sayler*, 721 So. 2d 1152 (Fla. 1998); *The Florida Bar v. Ratiner*, 46 So.3d 35 (Fla. 2010). Lawyer disciplined for sending a letter to a court-appointed provisional director of corporation in which he improperly threatened to file suit against provisional director and accused the provisional director of being involved in a conspiracy. *The Florida Bar v. Norkin*, 132 So. 3d 77 (2013); *See also The Florida Bar v. Abramson*, 3 So. 3d 964 (Fla. 2009).  "The First Amendment does not protect those who make harassing or threatening remarks about the judiciary or opposing counsel. Under Rule of Professional Conduct 4-8.4(d), lawyers are required to refrain from knowingly disparaging or humiliating other lawyers." *The Florida Bar v. Sayler*, 721 So.2d 1152, 1155 (Fla. 1998).

# EXHIBIT K-G



# HOWARD JUSTICE

## Howard & Associates
## Attorneys at Law, P.A.
*Dr. Tim Howard, J.D., Ph.D., Senior Partner*
*Florida Supreme Court Certified Mediator*

Tallahassee, Florida Office:
1415 East Piedmont Drive, Suite 5
Tallahassee, Florida 32308
Ph: (850) 298-4455
Fax: (850) 216-2537
tim@howardjustice.com

February 18, 2019

Charles Hughes, Bar Counsel
ACAP
Florida Bar, 651 East Jefferson Street
Tallahassee, Florida 32399-2300

Re:     TFB Nos. 2020-00,341 and 00,317 (2A), Complaints of Corey Fuller and William Floyd.

Dear Mr. Hughes:

We communicated with Florida Bar staff last week and it was agreed that the responses to the above-referenced Complaints could be combined and submitted on February 19, 2020.  In response to these two Bar Complaints consider that these scandalous allegations are found in the civil action filed by these two gentlemen, Mrs. Charisse Fuller, and Mr. Don Reinhard's similar Bar Complaint.1

## CIVIL REMEDIES AND THE FLORIDA BAR

The Florida Supreme Court has ruled that the Florida Bar is not a venue to pursue civil remedies as another venue for political or legal leverage, and based on this standard, appropriately discharged these complaints in the attached letter dated January 15, 2020.  Exhibit A.  Mr. Hughes, as The Florida Bar representative, stated:

I must conclude that your complaint constitutes a civil dispute as there are **no**

---

1 Charise Fuller falsely claims she is owed money. The records show that she placed $75,000 into the fund, and received $88,238.00 in total proceeds over approximately 12 months, including monthly payments of $1,500 for most months, and as high as $16,500 for a month. *See* Accounting Ledger attached as Exhibit B.  Note, that the allegations in Mr. Findley's civil Complaint track the allegations from Don Reinhard, who created and spread this contagious poison that others have adopted.

**allegations independent of the enclosed civil complaint** and as a result, must be resolved through the civil system.  The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies.
. . .
Consequently, I have closed our record in this matter.

*Id* (emphasis added).

Nothing has changed in the facts and circumstances of these Bar Complaints.  When the decision was made to continue to pursue these Bar Complaints, there was no explanation of what new facts existed or why.  If the Florida Supreme Court ruling applies, and not political or legal leverage, consistent with the letter ruling, these actions must be closed.

As a consequence, these parties are not entitled to use the Florida Bar as a method to gain advantage of a pending civil action that has been proceeding for nearly two years.

## UNDERLYING FACTS

As far as the underlying facts, these two gentlemen received $721,080 in a scheme crafted with a Mr. Don Reinhard, from the funds that they are complaining about, as found in the attached legers from the company they invested in.  Accounting ledger attached as Exhibit B.

Mr. Fuller, the ostensible cousin of Mr. Floyd, received written and personal guidance from prison by Mr. Don Reinhard to go to attorneys, such as Mr. Findley, to pursue Respondent. Mr. Fuller protects Mr. Reinhard in prison.[2] *See* Cumulative Exhibit C, discussed *infra.*, as Mr. Fuller has a history of close criminal conduct and ties with inmates, including personal ties going back to high school with convicted child molester, Pastor James Harris. *See* Cumulative Exhibit D.

Mr. Reinhard [3] who is in prison for child abuse, was a former consultant for the fund.  This consultant crafted the loans with both Mr. Fuller and Mr. Floyd and designed the scheme during the operative time.

---

2  Mr. Reinhard is now in prison for child abuse for feeding feces to a three-year-old autistic child. *State v. Reinhard,* Case No. 17005-45CFMA (Fla. 14th Cir.).  In a deep, intimate, direct and ongoing relationship with Mr. Don Reinhard, **Mr. Fuller received $648,385 in extraordinary wealth from Cambridge Capital and Don Reinhard. The $648,385 was to be for his family during an 18-month** period from April of 2016 through **September of 2017. This is in addition to his head coaching salaries, and his NFL Line of Duty monthly income.** *See* Accounting Ledger attached as Exhibit B.  Unfortunately, like with his former NFL salary, it is clear these funds were not used for his family. Upon information and belief these funds were used for gambling and funding illicit drug sales. Mr. Reinhard, who invested nothing, had nothing to invest, and was the investment fund consultant, conspired with Mr. Fuller to advance their mutual extortion efforts. Mr. Reinhard has engaged in a two-year extortion campaign against Mr. Howard as well as against attorney Jaakan Williams, and this has been reported to the State Attorney, Exhibit E, attached, and to the Florida Bar, Exhibit F, attached.

3  Tracking the extortion strategies of Mr. Reinhard, Mr. Reinhard's Florida Bar Complaint has some of the same scandalous allegations of Mr. Fuller, Mrs. Fuller and Mr. Floyd as found in their civil action.  *See Don Reinhard v. Phillip Timothy Howard,* TFB No. 2018-00,265(2A).

Once this consultant was terminated from employment, an audit by the current management, 4 under Ms. Gail Milon, determined that the consultant made excessive loans in a scheme to pocket $500,000. Contrary to the allegations first spread by Mr. Reinhard and picked up by those attempting to profit and advance from these scandalous allegations, undersigned has over $1,350,000 in net investments into these same funds, received no fees, and has been doing all in his limited power to secure all investors and has spent and is obligated for $ millions in protecting the investments in technology and other fronts as well as covering legal costs.

Note also, these two gentlemen are even now able to receive funds if they would approach the manager and her counsel in a reasonable fashion as the fund is now in capable hands, and after a time of recovery is receiving funds and making returns on investments. Unfortunately, undersigned has no management or control over the fund, which is invested in technology, advances, and real estate.

Mr. Fuller is communicating with Mr. Reinhard and protecting Mr. Reinhard in prison. In return Mr. Reinhard is guiding Mr. Fuller in his same extortionate model, with false dreams of financial wealth.

Prior to Mr. Fuller ever investing into Cambridge companies, in communications solely between Mr. Reinhard and Mr. Fuller, Mr. Reinhard advised adjusting his 401K investments handled by the NFL, and this resulted in an allegation of protection of the assets. January 19, 2016 through July 27, 2016 emails from Mr. Reinhard to Mr. Fuller available upon request. Mr. Reinhard provided a Proposed Portfolio Investment Structure on March 22, 2016, that Mr. Fuller and Ms. Fuller reviewed. Mr. Reinhard also explained on April 8, 2016 that his IRA would have gained $62.000 if he had invested the funds. Finally, within days of the 401K transfer on May 19, 2016 of the investment, **Mr. Fuller was fully advised on May 25, 2016 of what Cambridge companies knew of Mr. Reinhard's background.** *Id.*

Mr. Fuller falsely claims that Mr. Reinhard's background was not provided. In fact, Mr. Fuller knew of Mr. Reinhard when he was a player at Florida State, based on information and belief that Mr. Reinhard assisted him then. Moreover, **Mr. Fuller was expressly provided the background on Mr. Reinhard on May 25, 2016,** as Mr. Reinhard was required to do to all potential clients starting in late October of 2015, when potential investors would have started during his consultancy. **May 25, 2016 email from Mr. Reinhard to Mr. Fuller documenting Mr. Reinhard's background, including his prior criminal "incarceration" and that the SEC "sanctioned" Mr. Reinhard.** Records available upon request.

Mr. Reinhard developed a "very personal" and long-term relationship with Mr. Fuller, Mr. Horne and several other retired NFL clients. From prison, on January 12, 2018, Mr. Reinhard wrote to

---

4  Mr. Fuller has been repeatedly informed by Cambridge ownership and management that Mr. Howard has no interest, management or control, and that his 401K investments are secured with more than sufficient assets for repayment and return, and **upon liquidation of a portion of the assets, his retirement funds will be transferred. Moreover, counsel for Mr. Fuller, Mr. Thomas Findley was informed of this in writing.** Exhibit G. This has also been confirmed by an independent audit conducted by the respected and former Leon County auditor, Bill Bogan. The audit is available upon request.

Mr. Fuller and numerous retired NFL clients that he was manipulating, stating:

> This is an email I did not want to send to each of you as I truly thought this
> disaster was coming to an end in early to mid-December and I would be back on
> course and working with each of you to further plan, develop, structure and
> implement a solid and productive financial plan for you and your family.

> . . . I had worked 12-18 hour days for the past 18 months to create, develop, and
> structure the very sound and successful principles of Cambridge Capital Group
> and was **privileged and honored beyond my wildest dreams to have initiated
> and built the incredible relationships I had with each of you** and we had only
> just begun.

> . . . While I have provided each of you with the reasons behind these delays [in
> NFL concussion settlement claim payments] so you clearly understood the
> unfortunate private agenda of your attorney which was the majority crux of my
> concern as to the handling of your claim, hopefully your wait for these much
> needed funds will end very soon. . ..

> **My dreams of starting a new firm which will mimic the very sound principles
> and proven work ethic of Cambridge Capital Group will not die** as I continue
> to fight to resolve these heinous charges. I am a very positive person and know
> that God has a plan for my family and I and that plan included our paths crossing.
> Please say a prayer for my family and I and **I will certainly plan on contacting
> you immediately upon my release in hopes of continuing to build our long-
> term relationship. In the meantime, I will continue to have access as well as
> text messages at 850-228-9868.** I there anything I can do to assist you then please
> do not hesitate to contact me and I will do everything in my power to do so.
> **Please know how important each of you are to me.**

Cumulative Exhibit C.

Mr. Reinhard planned with Mr. Fuller, Mr. Horne and other retired NFL players to create their
own investment company, with Mr. Reinhard running this from the prison, claiming that the
funds under consultancy "returned over 40% and 70% respectively in 2016." Cumulative
Exhibit L.

Mr. Reinhard also falsely claimed that he had a partner in Mr. Tom Woods as part of this scheme
with Mr. Fuller, with Mr. Woods clarifying that "Mr. Reinhard is trying to drag all of us into his
mud bath because he has reached the end of his rope. I think he has nothing but time on his
hands and rather than reflect on his own misdeeds, he is instead lashing out at the very people
that gave him a second chance. What a shame." *Id.*

Next, from prison, Mr. Reinhard directs Mr. Fuller, Mr. Horne and a few of the investors that he
has personal relationships with to file a legal action, and claims he knows the valuation of their
investments, and states:

I know some of you have ... contacted me [in prison] to ask questions. It is time for us to take legal action as again my research [from prison] has me concerned. I am very uncomfortable with what I have learned about the current structure of CCG and the management of the portfolio as I have also requested liquidation of my family's assets. I would strongly recommend that you do the same because I am overly concerned that the auditor has not provided any inf01mation since the audit for 2016 was initiated in July 2017. Again, let me underscore that I have a lot of experience in managing limited partnerships and the portfolio when I departed was rock solid as was the structure of the limited partnership.

I am now going to proceed aggressively to follow suit in the next two to three weeks to pursue the liquidation that I had requested over six months ago and I strongly recommend that you do the same. However, our position will be much stronger and attorneys will be much more interested in the case if we proceed together. I think its necessary to do so. Although I am still incarcerated my brother-in-law will be instrumental in helping us manage this process. Again, I believe time is of the essence so please let me know your thoughts as soon as possible. I look forward to hearing from you.

Don

P.S. -I will provide information regarding your approximate account value update for 12/31/17 tomorrow.

January 18, 2018 email from Mr. Reinhard to Mr. Fuller, Ms. Fuller, Mr. Horne, et al., attached as Cumulative Exhibit C (emphasis added).

On February 28, 2018, Mr. Reinhard writes solely to Mr. Fuller and family and select few friends, seeking protection in prison:

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5 inmates that are violent and hardened criminals because my roommate and I were told that there was absolutely no available bed space in the dorms that violent sentences.  However on Thursday I was being threatened and pressured to give them food and other items or I would "learn about prison the hard way".

. . . I was packing my belongings some of the same individuals came into my cell with a knife made visible to me and told me they were going to stab me unless I have them all of my canteen which was approx..$70 worth of various food items and hygiene.   However, my understanding is that they are gang-related and will if they have not already got messages to their other gang members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center including a very close friend of Corey Fuller's who had previously promised and

re-iterated that promise when I cam in that he will protect me. However, that will
mean following him around like a puppy even if I am safe from other gang
members in this dorm.

February 24, 2018 email from Mr. Don Reinhard to Mr. Corey Fuller, *Id.* (emphasis added). Mr.
Don Reinhard writes Mr. Fuller on the same day following up for a personal meeting on the
extortion scheme:

> Corey, I think you will realize when you read the email I just sent that I am not
> only scared to death but terrified. Just to let you know Joe did make a very visible
> sign talking to me so everybody in the dorm would see him.
>
> Hopefully that does help for the time being.
>
> Also, please complete and send in the visitation form that was previously emailed
> to everybody as I truly want to see you soon and hopefully you can take on
> Saturday or Sunday to drive over. We certainly have a lot to discuss especially
> about Tim and CCG.
>
> Love ya buddy,
>
> Don

February 24, 2018 email from Mr. Reinhard to Mr. Fuller. *Id.* (emphasis added). The protection
that Mr. Fuller is coordinating and providing Mr. Reinhard in prison is clear, as is the plan to
address Mr. Howard and Cambridge Capital Group. Finally, the intimacy of their relationship is
found in "Love ya buddy." *Id.*

On February 6, 2018, Mr. Fuller then falsely stated to a Mr. Walker that "he only invested money
with Don Reinhard because he trusted Tim Howard." Mr. Howard never advised Mr. Fuller, nor
was his background and education within the investment industry. Mr. Fuller then went on to
state to Mr. Walker that "he wants to kill everyone, including Tim Howard, Gail, Harrison and
myself. I am letting you know this so you can protect yourself." February 6, 2018 email from Mr.
Walker to Mr. Leonard and copied to Mr. Howard, attached as Cumulative Exhibit H.

In a series of texts, starting on April 16, 2018, Mr. Fuller attempts to **extort Mr. Howard for
money with a series of threats.** Mr. Howard responds, **"Please understand that I am not able
to provide money to you.** I will do all that I can in that context. **I am happy to work on your
claim and as I have so far, and to assist in any legal and ethical way I am allowed. I care
about your needs. Perhaps there are loan available until the NFL Disability or your claim is
pursued over the next several months?"** Mr. Fuller responds, **"So should I just turn over all
of my paperwork to the court? Since you don't know why I am showing you this
paperwork?"** Texts from Mr. Fuller to Mr Howard attached as Cumulative Exhibit M (emphasis
added). Mr. Howard clarifies the mission:

> I am God's minister for good and to love others. It is God in me that counts. **I**

> **have helped coach for years, fund the food and support and equipment for**
> **players, and I have been there for you and others non-stop.** Psalm 31. This is
> God's life and all he wants me to do is bless within my limited ability and means,
> and he will stand with me in that goodness and love. This time of forging will
> pass. Let God do a good work in you too.

*Id.*

Further clarifying that he can't comply with his extortion, and Mr. Howard informs Mr. Fuller
that "**I am also limited by ethics and have no management, interest and control over these**
**matters. Please seek other sources.**" Mr. Fuller responded, "**You keep playing this law its**
**cool. Since you can't talk now <u>game on for real.</u>** Just know I am very hurt by this game u
playing but its cool." Mr. Howard responded, "**I am doing all I can for you with the limitations**
**of Law and ethics and I have and will continue to.**" *Id.*

Mr. Fuller changes approach and on April 17, 2018, the next day, seeks support from Mr.
Howard stating, "**Sometimes I just need that confirmation that everything is going to be**
**alright or that person that's going to help me push thru whenever I feel like giving up.**" In
response, Mr. Howard comforts Mr. Fuller stating, "**God is alive in you. God loves you.** God
will redeem you as he has me. I and coach have been praying over you, releasing you from evil
and delivering you as a child of God." *Id.*

On April 23, 2018, Mr. Fuller writes, "Tim just know you are fair game now. You could not be a
man of your word. I am and will do everything in my power to make sure u have the same
feeling we do as players right now.   <u>The devil is real u got my money</u> and played
these **f_____d** games with it." *Id.* Finally, Mr. Fuller writes, "**Keep playing this game u will**
**get your in the end.**" *Id.*

The facts are clear that Mr. Fuller and Mr. Floyd received extraordinary funds, have secure
investments, and are conspiring with Mr. Reinhard, with the cover of Mr. Findley, in an extortion
scheme that is grounded in criminal conduct.

Under these circumstances, these complaints must not proceed.

Thank you for your attention to this matter.

Sincerely Yours,


(Phillip) Tim Howard, J.D., Ph.D.



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

Joshua E. Doyle
Executive Director

850/561-5600
www.FLORIDABAR.org

January 15, 2020

Mr. Corey B. Fuller
c/o Thomas M. Findley
101 North Monroe Street, Suite 925
Tallahassee, FL 32301

Re:     Mr. Phillip Timothy Howard; RFA No.: 20-8862

Dear Mr. Fuller:

All documentation submitted in this matter has been carefully reviewed. The Florida Bar is the licensing agency for all attorneys admitted to practice law in the State of Florida. In cases where discipline is indicated, the disciplinary action is taken against the attorney's licensure, and will not affect or overturn the outcome of any proceeding.

While I understand that you believe the attorney acted unethically, I must conclude that your complaint constitutes a civil dispute as there are no allegations independent of the enclosed civil complaint and as a result, must be resolved through the civil system.  The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies. In the event that a court of competent jurisdiction makes findings in your case which suggest misconduct by the attorney you may re-file your complaint at that time, enclosing the relevant findings.

Additionally, regarding your request to file a claim with the Client Security Fund, you may download a claim form from The Florida Bar's website at www.floriabar.org.

Consequently, I have closed our record in this matter.  Pursuant to the Bar's records retention schedule, the computer record and file will be disposed of one year from the date of closing.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

cc:     Mr. Phillip Timothy Howard ✓

---------- Forwarded message ---------
From: Don Reinhard <dwarner.sd5mcapital@gmail.com>
Date: Fri, Jan 12, 2018 at 10:52 PM
Subject: Update on Don's unfortunate situation
To: <anthony.redmon@michelin.com>, Coach Poole <coachpoole@gmail.com>, Corey Fuller <boushe24@gmail.com>,
Coach Coleman <coachcoleman62@gmail.com>, <daddyash@comcast.net>, Dexter Carter <dexter1335@yahoo.com>,
Donald Brady <donnybrady24@gmail.com>, dwan epps <dwanepps@yahoo.com>, Damien Robinson
<damienrobinson380@gmail.com>, <epg3381@yahoo.com>, <vfloyd26@yahoo.com>, Charisse Fuller
<charissefuller5@gmail.com>, frank middleton <frankmiddleton34@yahoo.com>, Jacquez Green <quezg@ufl.edu>,
<joehorn358@yahoo.com>, <kdogins@yahoo.com>, <s_kingngpf@yahoo.com>, <lwebsterjr79@verizon.net>,
<leonsearcy72@ymail.com>, <operationrb@yahoo.com>, <mike.finn@co.ellis.tx.us>, Tru Pros <trupros01@gmail.com>,
Pat Riley <canes155@gmail.com>, Robert Thomas <robertwthomas55@gmail.com>, <seddagreat@yahoo.com>,
<tracyledon@aol.com>, <wallywilliamsolp63@yahoo.com>, chris Williams <cdubb96@msn.com>, Joe Walker
<jwalkintexas25@gmail.com>, <x_something44jones@yahoo.com>, Charlie Clemons <clemonator56@gmail.com>,
<taycodyhof27@icloud.com>, E. IMMANUEL <enoch.demar@gmail.com>, <hartdykes@earthlink.net>,
<james.burgess5454@yahoo.com>, James Wilder <jcwilder512@gmail.com>, Tamarick Vanover <ttv8714@gmail.com>,
timothy jacobs <timjacobsjr@gmail.com>, Tony Galter <tgalter2217@gmail.com>, <jsmith_dizzo@yahoo.com>,
<leonardmitchell67@yahoo.com>, Matt Dorsett <settup24@yahoo.com>, <rzphifer95@msn.com>,
<marissak94@comcast.net>


This is an email I did not want to send to each of you as I truly thought this disaster was coming to an end in early to mid
December and I would be back on course and working with each of you to further plan, develop, structure, and implement
a solid and productive financial plan for you and your family. However, I have now learned that Bay County is not going to
drop these heinous alleged charges of which they have no evidence unless I accept a plea agreement which will require
me to go to a prison for approximately 18-24 more months. If I do not give in and accept their threat-induced offer then I
risk a much longer sentence because of the heinous issues involved in this case and Florida does not offer parole and
only allows 15% good time credit. I am sick to my stomach thinking about what I am now faced given that I did not
commit this heinous crime and again, there is no evidence that proves that I did.

When this all happened in early February 2017 I was on top of the world. I had worked 12-18 hour days for the past 18
months to create, develop, and structure the very sound and successful principles of Cambridge Capital Group and was
privileged and honored beyond my wildest dreams to have initiated and built the incredible relationships I had with each
of you and we had only just begun.

Additionally, I had met a fabulous woman with three incredible little boys who very much needed a daddy who would love
them, teach them, care for them, and give them the tools they needed to become truly successful and productive parts of
our society. Molded together with my incredible two children, I finally had the large family I had yearned for since 2005.
Everything seemed to be absolutely perfect and then ... bam within a 2-week period of time, my life was basically
destroyed due to the heinous alleged charges levied by my fiance's, now my wife's, parents who despised me due to the
stable environment I provided their daughter and grandchildren. Yes... believe it or not, that is what transpired. You
would have thought they would have been tickled to death for their daughter and grandchildren to have this stability but
yet they felt threatened.

And to make matters much much worse my friend of over 40 years who had become my closest confidant, friend, and
business partner at Cambridge Capital Group immediately turned on me due to differences we had with regards to his
firm's handling of your concussion settlement cases. He initiated his campaign of retaliation against my family and I so
quickly that he clearly had planned it and was just waiting for the perfect opportunity. Well, he got it, as I was basically
defenseless.

Going forward, hopefully each of you will receive your settlement proceeds soon as I know the unexpected delays have
caused many of you and your families extreme hardships that were certainly unnecessary. While I have provided each of
you with the reasons behind these delays so you clearly understood the unfortunate private agenda of your attorney
which was the majority crux of my concern as to the handling of your claim, hopefully your wait for these much needed
funds will end very soon. I have taken these unnecessary delays personal because I feel responsible for the success of
each of you due to CCG's involvement and referring you to Tim Howard and Howard & Associates P.A. for legal
representation.

My dreams of starting a new firm which will mimic the very sound principles and proven work ethic of Cambridge Capital
Group will not die as I continue to fight to resolve these heinous charges. I am a very positive person and know that God
has a plan for my family and I and that plan included our paths crossing. Please say a prayer for my family and I and I
will certainly plan on contacting you immediately upon my release in hopes of continuing to build our long term

relationship.  In the mean time I will continue to have access to my email as well as text messages at 850-228-9868.  If there is anything I can do to assist you then please do not hesitate to contact me and I will do everything in my power to do so.  Please know how important each of you are to me.

Don

From: Don Reinhard <dwarner.sd5mcapital@gmail.com>
Date: 1/18/18 10:07 PM (GMT-05:00)
To: anthony.redmon@michelin.com, Corey Fuller <boushe24@gmail.com>, Coach Coleman
<coachcoleman62@gmail.com>, daddyash@comcast.net, Donald Brady <donnybrady24@gmail.com>, Charisse Fuller
<charissefuller5@gmail.com>, joseph horn <joehorn358@yahoo.com>, lwebsterjr79@verizon.net,
mike.finn@co.ellis.tx.us, seddagreat@yahoo.com, wallywilliamsolp63@yahoo.com, Charlie Clemons
<clemonator56@gmail.com>, timothy jacobs <timjacobsjr@gmail.com>
Subject: An immediate lawsuit against Cambridge Capital Group, Tim Howard, the auditor, and others involved

I have done some research and I am increasingly concerned about what I am learning with regards to the current
structure of Cambridge Capital Group and it's respective limited partnerships which each one of you are invested in via
your 401k rollover proceeds and other assets.  When I departed the portfolio that had been built was in my opinion, rock
solid as a vast majority of my family's wealth is invested exactly as your family's wealth is in the limited partnership.  As
they say "I eat my own home cooking".

I have asked questions of the auditor to receive information about my values but I have not yet received any information.
Perhaps you have done the same as I know some of you have as you have contacted me to ask questions.  It is time for
us to take legal action as again my research has me concerned.  I am very uncomfortable with what I have learned about
the current structure of CCG and the management of the portfolio as I have also requested a liquidation of my family's
assets.  I would strongly recommend that you do the same because I am overly concerned that the auditor has not
provided any information since the audit for 2016 was initiated in July 2017.  Again, let me underscore that I have a lot of
experience in managing limited partnerships and the portfolio when I departed was rock solid as was the structure of the
limited partnership.  I have now learned that that has been dramatically changed.  I am going to proceed aggressively to
follow suit in the next two to three weeks to pursue the liquidation that I had requested over six months ago and I strongly
recommend you do the same.  However, our position will be much stronger and attorneys will be much more interested in
the case if we proceed together.  I think it's necessary to do so.  Although I am still incarcerated my brother-in-law will be
instrumental in helping us manage this process.  Again, I believe time is of the essence so please let me know your
thoughts as soon as possible.  I look forward to hearing from you.

Don

P.S. - I will provide information regarding your approximate account value update for 12/31/17 tomorrow.

**From:** Don Reinhard <d123fsu@gmail.com>
**Date:** February 24, 2018 at 7:42:58 PM EST
**To:** Corey Fuller <boushe24@gmail.com>, Dad <herbreinhard@bellsouth.net>, Herb
Reinhard <hreinhar@valdosta.edu>, Mark Reinhard <mark@capmortcorp.com>, Ann
Schildhammer <annschildhammer@comcast.net>, Dave Borden
<drbfsu1578@yahoo.com>, Chris Kraft <CKFSU@aol.com>, Jon Sweede
<jonsweede@gmail.com>, John Murphy <jgmurph1@aol.com>, Joe Davis
<DrJoeDavisPE@gmail.com>, Bonnie Correll <bonnie_correll@yahoo.com>, Ann Abbott -
Sissy <bernleann@mac.com>, John Martinez <aggiemom530@yahoo.com>, John
Martinez <jmdist@yahoo.com>, Adam Corey <adambcorey@gmail.com>
**Subject: Incident at knife-point**

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5
inmates that are violent and hardened criminals because my roommate and I were told that
there was absolutely no available bed space in the dorms that we should have been in for
level 1, 2 and 3 inmates which have shorter non-violent sentences. I was told I would be in
the dorm for 2-3 days and they would get me out immediately. However on Thursday I was
being threatened and pressured to give them food and other items or I would "learn about
prison the hard way". I voiced these concerns to my mother and father who immediately
called and talked with a captain.

The captain talked with me and told me I would be taken out within the next day or two he
was going to immediately look into it and asked me if I feared for my life and I said no that I
was very scared and concerned of getting beat up or knifed. I also did not want to be put in
solitary confinement which is the alternative if you say you fear for your life. I cannot
handle that.

I was told by the dorm officer that I would be moved today which she finally got around to
doing at about 5 o'clock and while I was packing my belongings some of the same
individuals came into my cell with a knife made visible to me and told me they were going to
stab me unless I gave them all of my canteen which was approx. $70 worth of various food
items and hygiene. I tried to reason with them but another individual entered the room a so
one of them held me off with the knife in his hand and they took all of my canteen.

There's other details involved but I immediately reported it to the sergeant outside because
I just wanted to get out of there as soon as possible and they have taken the three
individuals in hand-cuffs to solitary confinement. However, my understanding is that they
are gang-related and will if they have not already got messages to their other gang
members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center including a
very close friend of Corey Fuller's who had previously promised and re-iterated that
promise when I came in that he will protect me. However, that will mean following him
around like a puppy even if I am safe from other gang members in this dorm.

While the financial loss will hit me hard as I needed this food to last a couple more weeks as I am watching every single penny I have to spend, the real danger is that I am clearly a target at this camp/prison. Again, at this point I do not fear for my life because I certainly do not want to go to solitary confinement but things may change in the coming days. I clearly don't understand this part of the world and do not know how I am going to get through this.

The captain clearly acknowledged to the dorm guard that my roommate and I were not supposed to be housed in dorm F which included the level 4 & 5 inmates because it was breaking DOC policy. Although the dorm officer informed him that they were doing that periodically he said this was still breaking DOC policy. That captain was very helpful and he called mama and daddy yesterday evening to inform them that he was working to get me transferred out.

At this point, I believe the only solution is to do what is necessary to immediately get me moved to another camp/prison or possibly to the annex here at Columbia which is another camp or the work camp at Columbia. I really see no alternative as I'm very scared and nervous as to what the repercussions can be. To do this I assume it will take some sort of orchestrated phone calls possibly to the captain that mama and daddy have already talked to but please tell then that y'all are requesting that this happen and it is not coming from me. Perhaps you can inform him how scared and concerned I am that I am now clearly a target and there does not seem to be any alternative but you will need to be adamant as I should never have been in that dorm.

Please pray for me and I will talk to Wes tomorrow as well as mama and daddy.

Don

**From:** Don Reinhard <d123fsu@gmail.com>
**Date:** February 24, 2018 at 7:51:15 PM EST
**To:** Corey Fuller <boushe24@gmail.com>
**Subject: Visitation and email I just sent**

Corey, I think you will realize when you read the email I just sent that I am not only scared to death but terrified.  Just to let you know Joe did make a very visible sign talking to me so everybody in the dorm would see him.  Hopefully that does help for the time being.

Also, please complete and send in the visitation form that was previously emailed to everybody as I truly want to see you soon and hopefully you can take one Saturday or Sunday and drive over.  We certainly have a lot to discuss especially about Tim and CCG.

Love ya buddy,
Don

From: **Addys Walker** <addyswalker@yahoo.com>
Date: Tue, Feb 6, 2018 at 2:13 PM
Subject: Re: Notice to Cease and Desist from Stalking, Intimidation and Extortion
To: "John P. Leonard" <jleonard@mdmc-law.com>, Lance Friedman <lfriedman@bca-advisors.com>
Cc: Lance Friedman <lancebfriedman62@gmail.com>, Tim Howard <tim@howardjustice.com>, Thomas Woods
<thomascwoods@gmail.com>

I have not been to Tom's house.  I do not know where he lives.  I have been in a meeting for the last couple of hours and I
can prove where I have been all day.  Further, I  have no intention to contact
Tom directly or indirectly.

Furthermore, I have no affiliation with Lance other than signing documents for A&T Development.

I spoke with Corey Fuller today who said he only invested his money with Don Reinhard because he trusted Tim Howard.
Corey said he wants to kill everyone, including Tim Howard, Gail, Harrison and myself.  I am letting you know this so you
can protect yourself.

Addys

**THE NEW YORK TIMES**

**SPORTS** | PRO FOOTBALL

# *PRO FOOTBALL; There's More Than Football To Worry About for Ravens*

**By DAMON HACK** JUNE 8, 2004

In a small trailer that doubles as a Bible study room, Baltimore Ravens running back Jamal Lewis sat at a news conference Monday and reiterated that he was innocent of federal drug conspiracy charges. In a corner of the Ravens' locker room, no more than two hours later, cornerback **Corey Fuller apologized for the embarrassment caused by his arrest for felony firearm possession and for felony and misdemeanor charges that he used his home in Tallahassee, Fla., as a high-stakes gambling house**.

Football seemed secondary as the Ravens embarked on a four-day minicamp amid the cicadas in this Baltimore suburb.

"This is the appropriate time to discuss this because it is time to go back to work," Ravens Coach Brian Billick said, of Lewis's situation in particular. "Obviously, we support Jamal, we believe in this process and we will support him in this process. Whatever the time frame, it is important to keep in mind that the players don't live in a sterile environment."

For the Ravens, the American Football Conference North champions last season, matters of legality have swooped into their season before.

In August 2000, the N.F.L. fined the All-Pro linebacker Ray Lewis $250,000 for conduct detrimental to the league after he pleaded guilty to a misdemeanor charge of obstructing justice in a double homicide at an Atlanta nightclub. Lewis had faced two counts of murder before prosecutors dropped those charges.

In December, the second-year pass rusher Terrell Suggs was charged with two counts of felony assault for a March 2003 incident outside Phoenix Municipal Stadium after a three-on-three basketball tournament. Suggs has a Sept. 9 court date.

With Jamal Lewis, who faces charges in Atlanta, Fuller and Suggs, Ravens players currently face six felony charges in three states.

**"It seems like the devil is always at work, but I know what it takes to overcome the devil," Fuller, 33, said. "I wouldn't wish this on my worst enemy. But nobody victimized me. I victimized myself."**

Billick compared the off-the-field situations with instances that arise in every sport. The Ravens have bucked back controversy before, winning Super Bowl XXXV against the Giants only months after Ray Lewis's involvement the Atlanta murder trial.

"Whether it's Jamal, whether it's Corey, whether it's Terrell Suggs, I have a tremendous amount of faith in the character of those individuals," Billick said. "There are going to be things that raise themselves up due to injury, personal situations, births, deaths, any number of things. These aren't machines. They have lives and as a team, you have to respect and understand that."

Jamal Lewis, who was voted the league's offensive player of the year last season, rushed for 2,066 yards, the second-highest total in league history. (Eric Dickerson ran for 2,105 in 1984.) Lewis is accused of conspiring to possess with intent to distribute five kilograms of cocaine and using a cellphone in the commission of a drug crime. The charges resulted from an investigation by the Federal Bureau of Investigation during the summer of 2000, just before Lewis signed a six-year, $35.3 million contract.

# 247 Sports

# Fuller Facing Felony Gun Charges

BY May 24, 2004
0

When Corey Fuller played for the Vikings, VU staffers agreed he was a talented player, but also agreed he wasn't going to be asked to join Mensa.

His lack of ideal intelligence came into play earlier this year when **a shootout at his home resulted in Fuller being arrested for hosting high-stakes gambling nights. Despite making a solid NFL salary, especially when he was with the Browns, the current Ravens player decided playing host to No-Limit Texas Hold 'Em games was in his best interest.** Now he faces jail time and a likely suspension from the league.

New charges were added over the weekend, including use of a firearm during the commission of a felony, which carries a maximum of five years in jail if convicted.

# Howard & Associates
## Attorneys at Law, P.A.
*Dr. Tim Howard, J.D., Ph.D., Senior Partner\**
*Florida Supreme Court Certified Mediator*

Tallahassee Office:
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Ph: (850) 298-4455; Fax: (850) 216-2537
Tim@howardjustice.com

Fort Lauderdale Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332-3633
www.howardjustice.com

Cambridge Office:
8 Museum Way
Suite 2407
Cambridge, Massachusetts 02141
(857) 277-0990

July 28, 2017

**VIA HAND-DELIVERY OR EMAIL**

Jon Fuchs, Assistant State Attorney
Second Judicial Circuit
301 North Monroe Street, Suite 475
Tallahassee, Florida 32301
(850) 606-6000

Jennifer Alane Hawkins, Assistant State Attorney
Fourteenth Judicial Circuit
421 Magnolia Avenue
Panama City, Florida 32401
(850) 872-4473

Re: Attempts at Extortion, Retaliation and Obstruction of Justice by Criminal Co-Defendants Don
    Reinhard and Katie Reinhard (Buxton).  Don Reinhard is Currently Facing Criminal Charges for
    Violation of Probation for Grand Theft.  Don Reinhard and Katie Reinhard are both Facing Criminal
    Charges for Felony Child Abuse of a Disabled Child, A Tragedy for the Disabled Child and for the
    Co-Defendants.

Dear Assistant State Attorney Fuchs, and Assistant State Attorney Hawkins:

As part of your respective prosecutions of the above referenced violation of probation and felony child
abuse charges, the law firm has assisted by sharing evidence and responding to the subpoena verifying the
felony crimes of child abuse on the phone and in texts between the co-defendants that was shared with
Assistant State Attorney Jon Fuchs and Panama City Beach Investigator, Lieutenant Eusebio Talamantez.
Cumulative Exhibit A.  The law firm was unwilling to participate in obstruction of justice and would not
hide evidence nor assist in their criminal defense.  In retaliation, the criminal co-defendants are
aggressively attempting to extort the law firm and those that work for and with the law firm. While these
sordid crimes are a tragedy for the disabled child and for both co-defendants, and we hope that the

---

\*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of
Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court.  Ph.D, Northeastern
University, Law, Policy & Society.  Former Visiting Health Law, Bioethics, and Human Rights Scholar, and Constitutional
Law, Media & Politics and Judicial Process Instructor at Boston University.  Former Director of and Professor with
Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

disabled child receives the security and support he needs, we must inform you of continuing extortion and retaliation by these criminal co-defendants.

Despite receiving "Cease and Desist" letters in late February and early March of 2017, and Don Reinhard executing a notarized "Law Firm Non-Disclosure Agreement and Confidentiality Agreement" that all workers in the building sign, regardless of whether they actually work as an employee or independent contractor for the Howard & Associates law firm, colleagues, employees, experts, lenders, accountant, wife of the owner, owner, regulators, private investigators, and more, have received threatening and extortionate emails, texts, and/or letters dictated or written from the Leon County Jail by Don Reinhard, and/or through his co-defendant, Katie Buxton (now Katie Reinhard since he married Katie Buxton while in the county jail in a fruitless attempt to claim marital privilege for a co-defendant, which marriage was after the crime and after the testimony and documentation of the crime took place). In violation of the "Law Firm Non-Disclosure Agreement and Confidentiality Agreement," based on his statements to date, Don Reinhard may have obtained NFL Concussion Settlement Claim files and may have sought to make changes to the files. The firm doesn't know what is in Don Reinhard's possession. All original client files in the law firm's possession are in order.

Don Reinhard and Katie Reinhard have falsely claimed and implied fraud in NFL Concussion Settlement client files, and have implied that there are other matters that they will expose, if it is not agreed that: (1) the law firm and colleagues participate in obstructing justice and assist Don Reinhard and Katie Reinhard in their criminal defense, (2) Don Reinhard and Katie Reinhard are entitled to amounts that range from $1,200,000 and more several million dollars for Don Reinhard's $3,000 a month consulting work for a private FINRA exempt investment fund, (3) Katie Reinhard is to be paid Don Reinhard's former consulting fee of $3,000 monthly, and (4) $25,000 is to be paid to Katie Reinhard for a car she does not own. Cambridge Capital Group (CCG) has responded to each of the claims against that company, and verified that there were no funds invested nor are there subscription agreements as investors under either Don Reinhard or Katie Reinhard.

The facts are that Don Reinhard was hired as a periodic consultant for CCG, an independent investment company, at $3,000 a month. He has no ownership interest in CCG. He was hired as a consultant in an effort at compassion and rehabilitation of someone that Dr. Howard met at Costco selling wine and who didn't know what to do with his life. He is a former high school football team mate that Dr. Howard had known, but he was not someone that Dr. Howard had been close to. He was not involved with the law firm, and in an abundance of caution, the firm required that all workers on the same floor in with companies in the same building of the law firm sign and commit to a confidentiality agreement in order to protect client information. Subsequent to his dismissal, upon investigation, it has been determined that Don Reinhard was misleading as to the facts and underlying charges for some of his prior crimes. Affidavit verifying independent contractor and consultant status, and affidavit verifying income of $3,000 monthly, as filed by Don Reinhard in January and December 2016 in his Circuit Civil Court Child Support case in Leon County, Florida, and confidentiality agreement, and cease and desist letters, are attached as Cumulative Exhibit A. Moreover, the investment companies are currently owned and managed by third-parties, that this firm represents, and are Nevada companies. Dr. Howard had

approximately $2.4 million invested by the end of 2016, and has approximately $5.2 million invested as of July 28, 2017.

Beginning about a year ago, due to concerns as to Don Reinhard's arrogance, narcissism, solipsism, and resistance to accountability, CCG started a search for a replacement and/or supervisor of his independent contractor consulting work, with a licensed financial planner, licensed investment agent and broker-dealer. After interviewing several candidates, a quality, experienced, respected, and licensed professional with integrity and empathy was found and CCG hired Gail Milon, CASL, CLTC, with 30 years of successful experience, as managing Vice President in December of 2016.  She has since hired Bogan Public Management Company (BPMC), and Bill Bogan, Jr., CPA, CGFO, and CBFO, to provide a comprehensive audit to ensure all investment funds are in place and to determine what company profits may have been absconded. BPMC is mid-way through the audit now.

Starting after his arrest in mid-February of 2016, a retaliatory and extortionate scheme to obstruct justice and extort assets by Don Reinhard and Katie Reinhard (Buxton) began, and is found in the various letters and emails from them orchestrated from the Leon County Jail through his co-defendant Katie Reinhard. The conspiracy between these co-defendants begins with the violation of the February 11, 2017 Court Order that specifically directs Don Reinhard: "Do not contact Jesse Buxton or Katherine Buxton." *Id.* The various letters and emails are attached as Cumulative Exhibit B.

As an example, these sordid claims have been spread to experts, clients and lenders of the law firm, falsely claiming that diagnostic medical exams and final reports are forged and hundreds of millions of fraudulent claims have been submitted to the NFL Concussion Settlement Claims facility. *Id.* The facts are that neither Don Reinhard nor Katie Reinhard ever worked for the law firm, though Don Reinhard did sign the law firm confidentiality agreement to protect any exposure to client confidential information, and Don Reinhard was terminated from his consulting work for an independent investment fund in mid-February of 2017. Exhibit C. Don Reinhard was imprisoned in late February of 2017 as a result of violation of probation due to pending felony child abuse charges.  As a consequence, neither Don Reinhard nor Katie Reinhard know how vacuous and patently absurd their extortionate and retaliatory allegations are.

These criminal co-defendants don't know that from the currently over 250 clients, and growing, nothing, other than registering them, has been submitted to the NFL Concussion Settlement Claims facility.  They don't know that all original medical reports are in the files of the doctors, and only copies are in the files of the law firm.  They don't know that all medical records and reports have to be reviewed and signed by a board-certified neurologist formally approved by the NFL Concussion Settlement Claims facility.  They don't know that the board-certified neurologists contemplated for use by the law firm were only recently approved in May and June by the NFL Concussion Settlement Claims facility.  They don't know that all our NFL Concussion Settlement clients must meet individually for an updated clinical evaluation prior to submission of our clients' claims to the NFL Concussion Settlement facility.  They don't know that the firm must have a board-certified neuropsychologist meet with every client to update and finalize their neuropsychological status, and that these updates will begin in a few weeks.  They don't know that the law firm manages its files to ensure the file's integrity and client confidentiality.  This is just one example of their respective ignorance, arrogance and their vacuous criminal extortion and retaliation attempts.

These letters and emails are replete with these types of criminal schemes, including: (1) attempting to operate a private investment firm from jail and enticing retired NFL players to invest $650,000 with $9,000 monthly income and doubling of value in 7 years, and running a "new firm, Sd5M Capital Management owned by my wife (also known as Scooby/Katie) and I as well as a group of retired players," (2) attempting to extort a "global settlement", "$50,986", monthly payments of $3,000 to co-defendant Katie Reinhard, and $1,200,000 in assets in response to "turning your back on me" and threats of "train wreck for both of our lives and you have more to lose," "the risk and damage your actions will cause to many . . .", "each event carries significant penalties + punishment", "your massive fraud", "30-year prison term", "I have been forced to sue Tim Howard for well over $1 million that he is attempting to steal from me, my family, and my children", (3) attempting to extort these payments and assets through threats and claims of fraud against the NFL Concussion Settlement, tax fraud against CPA, bank fraud and worthless check charges against staff, (4) attempting to extort a $25,000 payment to Katie Reinhard for a car she does not own, (5) use of third-parties and/or alias, such as Tori Reinhard and nflfraud@gmail.com, as part of their extortionate conspiracy, (6) threatening and intimidating experts and lenders of the law firm, (7) threatening and intimidating the independent auditor (BPMC), (9) spreading false and defamatory statements to NFL Concussion Settlement clients, and (10) the following threatening and extortionate tome to Dr. Howard's wife, Jennifer Howard:

> But also, I intend to immediately move forward with current communication I am having with the NFL Claims Administrator and law enforcement via a large national law firm regarding this massive fraud Tim and Howard & Associates have perpetrated against the NFL Concussion Settlement and the 300 plus retired NFL players that are his clients. . . . **Tim and his team have made a massive fraud out of it to bilk the NFL out of approximately $120 million in claims of which he will be paid approximately $30 million in fees. I have been told that the case would likely carry a 30-year prison term** and the collateral damage to many of his employees and associates who know and are involved would be devastating to many lives . . . this does not even include the many, many families of the retired NFL players who are expecting a financial settlement averaging over $600,000 who will be denied due to the fraud involved in their qualification process by their trusted attorney, Tim Howard. The media onslaught that you and your family would have to endure, in and of itself, would be devastating and far greater than tobacco days. I and others began keeping records and documented proof in 2016. While I thought the activity was limited, I was shocked to hear from 2 H&A associates that it was widespread. They came to me in Jan. with concerns of their personal liability. For example, I and others have witnessed forging signatures on files to insure eligibility as well as changing files as needed. There is an abundance of documented evidence to prove this that Tim was unaware was being collected in many forms. . . . **I have told Tim via my letters that I do not want to go down this road unless he forced me to. To date, my communications to the various authorities has been limited by design and anonymous as again, its via a large law firm but they are eager to move forward with details. . . . I must have him simply provide me what is "mine" . . . I cannot start my life over again.** . . . Look at the enormous risk he is taking for him, you and your family. Look at the enormous risk he is taking for the employees of his law firm. Look at the enormous risk he is taking for almost 300 families of retired NFL players. Outside of the NFL and the criminal case, Tim would be sued for millions he has borrowed over the last 4-5 months against his future expected fees as they were based on fraud, sued by multiple legal

advance companies because their loans to players would be unpaid based on Tim's fraud, and sued by all of the investors in the Limited Partnership Investment Funds of CCG, due to their losses because of the fraud (including your mother's investments) which would certainly bring in the SEC. **This is certainly well over $35-$40 million in lawsuits in addition to losing his $30 million in fees. For what . . . "spit for me, which is very foolish" as suggested by 2 of his closets clients who know the situation. Jennifer, let's not make this a train wreck as y'all have far more to lose than I do.** Please discuss this with Tim and send me an email as I will not wait past 4/17 for a response to d123fsu@gmail.com. (emphasis added).

Cumulative Exhibit B. All these actions are an attempt at extortion and in retaliation for not assisting in their criminal defense, for not participating in obstruction of justice, and for assisting the State of Florida in providing damning evidence in support of the prosecution of their crimes.

In light of their rapid fire buckshot, yet vacuous, extortionate and retaliatory actions to date, and the comprehensive evidence of their crimes and the evidence that this firm is providing as a result of its investigation and has provided to assist in the prosecution for these crimes, as well as in compliance with Assistant State Attorney Jon Fuch's subpoena, it is highly likely that these criminal co-defendants will reach out to any source that may come into their respective minds in an attempt to perpetrate their extortion, retaliation and obstruction of justice. In order to expose the extortion, retaliation, and obstruction of justice, and to avoid any knowing or unknowing, and/or direct and indirect complicity by third-parties with their schemes, this law firm is providing a copy of this notice to the Florida Bar, and will provide copies of this notice to any other victim of their criminal schemes that this law firm becomes aware of.

Thank you for your service to Floridians and for your consideration of these matters. This entire episode is a tragedy and we do hope that these co-defendants get the structure, accountability, discipline, and mental health treatment that they need to be productive citizens. As stated in the beginning of this letter, we hope that the disabled child that is a victim of their crimes gets the security and support he needs for a healthy life.

Sincerely yours,

Jaakan Williams, Esq.
**HOWARD & ASSOCIATES, P.A.**
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Office: (850) 298-4455
jaakan@howardjustice.com

CC:    Florida Bar