IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, <br><br>        Plaintiffs <br><br> v. <br><br> National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., <br><br>        Defendants. | No. 2:12-md-02323-AB <br> MDL No. 2323 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

## REPLY TO CLASS COUNSEL'S RESPONSE IN OPPOSITION TO MOTION TO INTERVENE OR ALTERNATIVELY TO PARTICIPATE AS AMICUS CURIAE AND INCORPORATED MEMORANDUM OF LAW

Class Members Johnnie Lynn and Joshua Bell (hereinafter collectively "Movants"),[1] by and through undersigned counsel, respectfully submit this Reply to Class Counsel's Response in Opposition to their Motion to Intervene or Participate as Amicus Curiae.

---

[1] The Movants are representative of a subclass of living retired NFL players diagnosed outside of the Baseline Assessment Program ("BAP"), who received Pre-effective date Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment by board-certified and MAF Qualified Physicians pursuant to Section 6.3(c) of the Amended Settlement Agreement, but were nevertheless thwarted from participation in the pre-BAP process by the Claims Administrator's imposition of additional corroborating documentation requirements under BAP in contravention of the Agreement.

## FACTUAL FLAWS IN CLASS COUNSEL'S OPPOSITION

Before examining Class Counsel's response in opposition under the governing legal standard, it is necessary to correct two factual errors on which its arguments turn:

- that the Movants never submitted to any type of neuropsychological testing; and

- that the disqualification of Dr. Morariu following the Claims administrator's audit somehow nullified the Movants' protectable interests in this matter.

Make no mistake, the Movants (and every absent class member they are representative of) each submitted to in-office cognitive testing, specifically the Mini-Mental Status Exam ("MMSE"). While the MMSE is not part of the extensive neuropsychological testing battery in Exhibit A-2 of the Settlement Agreement, it is a commonly used screening test to help assess whether there is an increased or decreased chance of dementia or cognitive impairment in a patient and its possible severity [ECF No. 10488, p. 9].

The MMSE is a 30-question assessment of cognitive function that "evaluates attention and orientation, memory, registration, recall, calculation, language and ability to draw a complex polygon (Folstein 1975)."[2] The maximum MMSE score is 30 points. A score of 20 to 24 suggests possible mild dementia, 13 to 20 suggests possible moderate dementia, and less than 12 suggests possible severe dementia. A score above 24 suggests possible normal function [ECF No. 10488, p. 10].

Class Counsel has argued on other occasions that "the MMSE may serve as a preliminary screen"[3] and has agreed that the MMSE is one of the "cognitive screening tests and evaluations

---

[2]Arevalo-Rodriguez, Ingrid. *Mini-Mental State Examination (MMSE) for the detection of Alzheimer's disease and other dementias in people with mild cognitive impairment (MCI),* available at  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6464748/.
[3] May 27, 2020 Special Master Decision re Physician Judgment, p. 2.

that can be used as part of neurological examinations by BAP Providers or MAF Physicians."[4] The MMSE has been described by the Special Master as "a piece of evidence which ... tend[s] to prove [one's] 'true functional abilities,'" and oftentimes MMSE test results will show one's functional abilities are greater than as reported on neuropsychological testing results.[5] Indeed, the Claims Administrator will typically "use such tests as an aspect of its duty to verify claims," and the Program's expert panel has concluded that MMSE scores may be properly employed "to suggest that [the scheduled neuropsychological] testing could have generated valid results."[6]

As a matter of fact, denials of Monetary Award Claims issued by the AAP to the Movants have generally acknowledged the applicant's MMSE exam results and utilized that very data to conclude the diagnosing physician Dr. Morariu's determinations regarding particular diagnoses were unsupported.[7] All in all, Class Counsel's far-reaching assertion that "none of the Class Members in support of whose claims Dr. Morariu issued reports ever underwent neuropsychological testing" is inaccurate, inconsistent, and cannot properly influence this Court's decision regarding Movant's right to intervene or participate in this matter.

As to the disqualification of Dr. Morariu, who initially issued the Diagnosing Physician Certification ("DPC") Forms on which the Movants' original applications for Monetary Awards were based, the Special Master's Rule 27 decision simply does not in any way conclude or foreclose the Movants' rights to participate in the Class Action Settlement. Nor does the subsequent removal of Dr. Suite as a Qualified MAF Physician, who completed the Movants' succeeding DPC forms on paper review of their records and Dr. Morariu's findings, which the Claims Administrator rejected under "[o]ne of the many claims review procedures approved by

---

[4] Sept. 5, 2020 Special Master Decision re Evidence of Qualifying Diagnosis, p. 6.
[5] *Id.*
[6] May 27, 2020 Special Master Decision re Physician Certification Testing, p. 4.
[7] *E.g.,* Notice of Denial of Monetary Award Claim dated Aug. 1, 2018, attached as Exhibit 1.

the Parties for [the Claims Administrator] to follow" that was not part of the Amended Settlement Agreement, specifically that Dr. Suite had not re-examined the applicants in person [ECF No. 8432-1, ¶ 8].

Class Counsel opines that Dr. Suite's removal was "not surprising." The undersigned agrees. Although the termination and removal of Dr. Morariu and Dr. Suite effectually ushered the Movants out of the pre-BAP protocol and right into the very BAP protocol that this Court has directed Special Magistrate Strawbridge to address, those events did not by any means terminate or remove the Movants' ability to participate in that Settlement program. Class Counsel's ill-conceived suggestions to the contrary are incorrect.

Class Counsel omits the fact that the Movants mostly withdrew their Pre-Effective date Qualifying Diagnosis Claims prior to the Special Master's decision on the advice of the Claims Administrator, regardless. Class Counsel also blatantly ignores that the Movants qualify for at least one baseline assessment examination under Section 5.2 of the Amended Settlement Agreement, as follows: "[A]n eligible Retired NFL Football Player who submits a claim for a Monetary Award, whether successful or not, may participate in the BAP, except a Retired NFL Football Player who submits a successful claim for a Monetary Award is not eligible to later receive BAP Supplemental Benefits." [MDL ECF No. 6481-1, pp. 24-25].

In fact, Mr. Lynn recently participated in the BAP after withdrawing his Monetary Award claim and went through the battery of neuropsychological testing listed in the BAP protocol. In January 2021, Mr. Lynn—a graduate of UCLA in 1980 with a BA degree in World History and a GPA of approximately 3.2—received his BAP results, which concluded Mr. Lynn did not have a qualifying diagnosis resulting from the race-norming adjustments with which this Court is

4

concerned and has directed Magistrate Judge Strawbridge to address.[8] It is incredible that Class Counsel could have mistakenly omitted information re the Movants actual and likely participation in the BAP; but despite Class Counsel's omission, it is clear the Movants have protectable interests in the Settlement process, notwithstanding the withdrawal or denial of their initial Monetary Award Claims.

Class Counsel's relative argument that "Movants' own claims do not even implicate the use of demographic adjustments to neuropsychological testing" is likewise false. To the contrary, the MMSE has applicable demographic norms that should be applied when applicable.[9] And, if the AAP had considered and/or applied demographic norms in its review of the Movants' MMSE scores, as recorded by Dr. Morariu, those Pre-Effective date Qualifying Diagnosis Claims could possibly have been certified.

It seems, then, that when race norms are applied under the auspices of the BAP protocol to a vast majority of the class members' detriments, Class Council sits idly by and takes no preventative action; but when application of such demographic norms could potentially help class members, Class Council has taken no action to facilitate the same. In short, Class Counsel has simply done nothing to advocate for these class members one way or the other when it concerns the race-norming issue.

That being said, the bulk of Class Counsel's opposition contends the Movants' claims and interests are generally impertinent or insincere and that none of the Movants were plausibly affected by demographic corrections to test results, as the remainder of this Reply addresses.

[8] *See* BAP Baseline Assessment Examination Results for Mr. Lynn (100009522), dated Jan. 4, 2021, attached as Exhibit 2.

[9] *See* Aevalo-Rodriguez, *Supra,* n. 2 ("[S]everal studies have shown that sociocultural variables, age and education, among other factors, could affect individual scores; therefore local standards must be developed for each population and setting evaluated").

## PROPER APPLICATION OF RULE 24(a)(4)
## PERMITS INTERVENTION AS OF RIGHT

District courts must permit intervention where absent class members who apply to intervene as of right fulfill the requirements of Rule 24(a)(2). *See* Fed. R. Civ. P. 24(a). Application of an improper legal standard in deciding a motion to intervene as of right is an abuse of discretion that requires reversal. *Kleissler v. United States Forest Serv.,* 157 F.3d 964, 969 (3d Cir. 1998); *see also Tech. Training Assocs. v. Buccaneers Ltd. P'ship,* 874 F.3d 692, 696 (11th Cir. 2017) ("We review the denial of a motion to intervene [as] of right de novo. We review subsidiary findings of fact for clear error.").

Class members "should not be put to the risk of having a judgment entered in the action which by its terms extends to [them], and be obliged to test the validity of the judgment as applied to [their] interest[s] by a later collateral attack. Rather [they] should, as a general rule, be entitled to intervene in the action." Advisory Committee Note, Fed. R. Civ. P. 24(a); *see also Tech. Training,* 874 F.3d at 696 (discussing the advisory committee note to the latest substantive amendment to Rule 24(a)(2)).

So, in the class action context, the second and third prongs of the Rule 24(a)(2) inquiry—namely that the applicant has a sufficient interest in the litigation, which interest may be affected or impaired as a practical matter by the disposition of the action—are satisfied by the very nature of Rule 23 representative litigation, and the gravamen of the court's analysis must be on the timeliness of the motion to intervene and on the adequacy of representation. *See In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Sec. Mortg. Loan Litig.,* 418 F.3d 277, 314 (3d Cir. 2005).

1. **The Movants' Application to Intervene is Timely as Contemplated by Rule 24(a)(2):**

Class Counsel perfunctorily suggests the Movants' application is untimely or was somehow waived because they did not seek to intervene in Zuckerman Spaeder's prior motion for relief, filed August 25, 2020, the undersigned would point out that it is Class Council's duty to effectuate the implementation and administration of the settlement embodied in the Settlement Agreement—as by ensuring the formulas employed to assess BAP claims do not explicitly and deliberately discriminate on the basis of race—not the undersigned's responsibility nor that of the Movants nor of other absent class members.

Class Counsel would ignore that the Movants, along with <u>hundreds</u> of class members represented by numerous law firms, have been asking this Court to require the Claims Administrator to disclose its internal procedures and criterion used to evaluate claims and make determinations regarding whether the internal procedures and criterion are consistent with the Settlement Agreement for years [MDL ECF Nos. 8267, 8387, 8397, 8877].

At any rate, the Third Circuit has identified factors that should be considered in determining the timeliness of an intervention request as "the stage of the proceeding, the prejudice that delay may cause the parties, and the reason for the delay." *See In re Cmty. Bank of N. Va.,* 418 F.3d at 314. Class Counsel cannot show intervention by the Movants will unduly delay or prejudice the adjudication of the rights of the original parties at this enforcement stage of proceedings, particularly where no date or directives for the proceedings before Magistrate Judge Strawbridge have been set or announced.

7

2. **The Movants Have an Interest Relating to the Property or Transaction Which is the Subject of the Action as Contemplated by Rule 24(a)(2):**

Class Counsel insinuates the Movants and/or undersigned counsel have misused their application as an opportunity to interject an "impertinent issue," "gripe" or "peeve" concerning Dr. Morariu and/or the purported "evidentiary shortcomings" of their original Monetary Award claims; but this position falls flat in light of the fact that the Movants voluntarily withdrew those initial claims on the Claims Administrator's recommendations—a fact Class Counsel omitted from its Response in Opposition.

Class Counsel seizes upon the fact that undersigned counsel is an Individually Retained Plaintiff's Attorney ("IRPA") for no reason other than to conjecture that he may belong to some portentous group of "unscrupulous lawyers" who would exploit the Settlement's integrity by filing "spurious claims"; but Class Counsel's singular allusion to one piece of evidence the AAP relied on in denying Mr. Bell's Monetary Award Claim, which the AAP concluded "implie[d] relatively preserved cognitive functioning," is so insufficient that it would be laughable if it weren't so perilously misplaced.

Class Counsel's written opposition is not only disingenuous but wreaks of pettiness and entirely misses the major premise of Rule 24 intervention—"the protection of third parties affected by pending litigation. Evenhandedness is of paramount importance." *See Kleissler*, 157 F.3d at 971. This Court should make every effort to eschew the pettifoggery Class Counsel tries to elicit against the Movants and against undersigned counsel. Simply put, the Movants' interests in the Settlement program are clear and direct, as those interests are detailed within the Amended Settlement Agreement itself. Given the Movant's definitive rights and interests in participating in the Settlement program, the Movants' interests are "significantly protectable," and the second prong of Rule 24(a)(2) analysis is fulfilled. *See generally Kleissler* (reversing district court's denial

8

of motion to intervene as of right where the movants, who were timber companies and companies that were dependent on timber contracts as well as those with existing contracts, had substantial interests in suits aimed at halting logging).

### 3. The Movants Are So Situated That Disposition of The Action, as a Practical Matter, May Impede or Impair Their Ability to Protect That Interest as Contemplated by Rule 24(a)(2):

Likewise, Magistrate Judge Strawbridge's conclusions on the race-norming issue could practically impair the Movants' interests given that the Movants have been steered into the BAP program at this juncture and any prospective Modifications of Qualifying Diagnoses (as alluded to in this Court's recent Order dated April 8, 2021 [ECF No. 11325]), must necessarily affect the Movants' participation in that or either of the Settlement programs, both of which turn on the definitions of and protocols for making Qualifying Diagnoses [ECF No. 6481-1 p. 39]. These issues are at the very heart of the Settlement program and the Movants' interests.

Class Counsel argues that any proposed resolution resulting from discussions before the Magistrate Judge "will be put before the Court for its consideration, and Class Members such as Movants will have ample opportunity to weigh in," however this process is neither required under Section 6.6 of the Amended Settlement Agreement, nor has it been employed in prior instances where the Parties were called upon by the Court to address issues related to the implementation of the Settlement Agreement [ECF No. 8908].

Given the foregoing, it is clear the Movants are so situated that any decision by the Magistrate Judge may as a practical matter impair or impede their ability to protect their direct interests under the Amended Settlement Agreement, and the third prong of Rule 24(a)(2) analysis is fulfilled.

### 4. The Movants' Interests are Represented Inadequately By the Existing Parties as Contemplated by Rule 24(a)(2):

The disdainful attitude of Class Counsel's written opposition to the Movants, personally, and to undersigned counsel, should tell the Court all it needs to know about how far astray Class Counsel has come from any ability to faithfully represent the Movants' interests here. To wit, Class Counsel assumes certain absent class members do, and others do not, deserve a fair, adequate and reasonable implementation and administration of the settlement. In other words, Class Counsel no longer advocates for the entire class as a whole.

Despite Class Counsel's maneuvering to reduce the Movants' interests to a "good guys vs. bad guys" narrative, however, the reality is far more complex and perilous to the Movants, who neither see themselves as victims nor criminals, but seek to participate in the Settlement program that they agreed to and accepted under the terms of a Settlement Agreement as it was represented to them at the time. At its heart, this matter is truly about the absent class members abilities to participate in the Settlement program in a predictable, consistent and nondiscriminatory manner, and that is the pivotal reason why this Court should permit the Movants to intervene or otherwise participate in these proceedings.

"[T]he presumption [that an applicant's interest is no longer adequately protected] is weak; in effect, it merely imposes upon the proposed interven[o]rs the burden of coming forward with some evidence to the contrary." *Tech Training,* 874 F.3d at 697. Given Class Counsel's remarkable antagonism to the Movants and undersigned counsel in its written response, it is clear that the Movants interests are no longer adequately protected and intervention as of right under Rule 24(a)(2) is warranted.

## THE COURT MAY PERMIT INTERVENTION UNDER RULE 24(b)

Class Counsel's argument in opposition to permissive intervention by the Movants' rests entirely on a fallacy that the Movants' interests are unrelated or tangential to the race-norming issue that the Court directed Magistrate Judge Strawbridge to address. As noted above, however, the foundation of the Court's directive is the **effect** that race-norming has or may have on the definitions of and protocols for making Qualifying Diagnoses, prospective Modifications of the same, and ultimately a fair, adequate, and reasonable administration of the settlement embodied in the Settlement Agreement.

Because the Movants have vested interests in participating in the Settlement program irrespective of the apparent foreclosure of their pre-BAP claims and because intervention will not unduly delay or prejudice the adjudication of the rights of the original parties, it is clearly within this Court's discretion to grant permissive intervention under Rule 24(b). *See, e.g., Diduck v. Kaszycki & Sons Contractors, Inc.*, 149 F.R.D. 55 (S.D.N.Y. 1993) (granting intervention as of right under Rule 42(a) and further granting intervention by permission under Rule 42(b)).

## THE COURT MAY ALLOW THE MOVANTS TO PARTICIPATE AS AMICI CURIAE

Class Counsel contends the Movants do not have a special interest in the matter this Court has assigned to Magistrate Judge Strawbridge and that the Movants have no useful information to offer. The Movants disagree—their special interests regarding the effect that race-norming has or will have on the Settlement program, as detailed above, are unquestionable. Likewise, the Movants' information and experience from having brought objections regarding the administration and monitoring of claims before this Court, which resulted in a closed conference on the matter,

may certainly be useful to Magistrate Judge Strawbridge and the Parties in addressing the race-norming issue.

Most importantly (which Class Counsel utterly disregards), is the rapidly growing public-perception that administration of the Settlement program is biased against or discriminatory towards former NFL players like the Movants and other absent class members. It is imperative that this Court take active steps toward fulfilling the public entreaty for greater oversight and transparency in this process to ensure complete and plenary presentation of difficult issues so it may reach and ultimately make a proper decision. *See generally Liberty Res., Inc. v. Phila. Hous. Auth.,* 395 F. Supp. 2d 206, 209 (E.D. Pa. 2005) (exercising its discretion in tailoring the extent and manner of the participation of an amicus).

## CONCLUSION

For the foregoing reasons, the Court should grant intervention as of right under Rule 42(a), or permit intervention under Rule 42(b), or, in light of the general public's interest in this matter, should allow the Movants to participate as amici curiae.

Dated: April 15, 2021

Respectfully Submitted,

Attorneys for Plaintiffs/Movants
Patrick J. Tighe
X1LAW, P.A. f/k/a Patrick J. Tighe, P.A.
721 US Highway 1, Ste 101
North Palm Beach, FL 33408
Phone: (561)537-3319
Fax: (561)537-7193
Pat@X1LAW.com
Florida Bar No. 568155

*s/Patrick J. Tighe*
Patrick J. Tighe

12

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2021, the foregoing document was electronically filed with the United States District Court for the Eastern District of Pennsylvania via the Court's CM/ECF system, and that the filing is available for downloading and viewing from the electronic court filing system by counsel for all parties.

X1LAW, P.A.

*s/Patrick J. Tighe*
Patrick J. Tighe

13

EXHIBIT 1



# NFL CONCUSSION SETTLEMENT

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. Pa.)

## NOTICE OF DENIAL OF MONETARY AWARD CLAIM
### DATE OF NOTICE: **August 1, 2018**
### DEADLINE TO APPEAL: **August 31, 2018**

### I. SETTLEMENT CLASS MEMBER INFORMATION

| | | | | | |
|---|---|---|---|---|---|
| **Settlement Program ID** | 100009522 | | | | |
| **Name** | First<br>Johnnie | | M.I. | Last<br>Lynn | |
| **Settlement Class Member Type** | Retired NFL Football Player | | | | |
| **Lawyer** | X1Law, PA | | | | |
| **Asserted Qualifying Diagnosis** | Level 1.5 Neurocognitive Impairment | | Date | | 1/4/83 |

### II. EXPLANATION OF CLAIM DETERMINATION

This Notice is an official communication from the Claims Administrator for the NFL Concussion Settlement Program. We reviewed your Claim Package and determined that you are not entitled to a Monetary Award because:

| | |
|---|---|
| 1. | A member of the Appeals Advisory Panel reviewed your Qualifying Diagnosis based on principles generally consistent with the diagnostic criteria set forth in Exhibit A-1 (Injury Definitions), as set forth in Section 6.4(b) of the Settlement Agreement, and determined that the Retired NFL Football Player does not have the Qualifying Diagnosis indicated on the Diagnosing Physician Certification Form. The Appeals Advisory Panel member provided this explanation: The Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment was not made in a manner that is generally consistent with the settlement criteria. Specifically, the MMSE score of 30/30 documented by the Diagnosing Physician in the note dated 10/28/2016 (Doc ID 52397) is not generally consistent with a moderate to severe cognitive decline. Also, there is not a clear description of the functional abilities or description of ability to perform daily activities and no third party affidavit to corroborate any functional impairments. Finally, there is no neuropsychological testing information to provide an objective and quantified assessment of the cognitive functioning and any impairments. |

Section III below explains your right to appeal this denied claim, but you also have the option to submit a new Claim Package under Section 9.1(c)(i) of the Settlement Agreement. We will determine whether the new claim can be considered for a Monetary Award based on several factors, including whether the new claim shows materially changed circumstances from the earlier claim. These materially changed circumstances may include: (a) a different type of Qualifying Diagnosis than the one that was denied; or (b) the same type of Qualifying Diagnosis but with a different diagnosis date supported by additional medical records. If you submit a new claim within 365 days of this denial notice, Section 10.3(d)(ii) of the Settlement Agreement requires us to audit that new claim if it is based on the same Qualifying Diagnosis as this denied claim, but the new diagnosis was made by a different physician.

### III. YOUR RIGHT TO APPEAL THIS DETERMINATION

If you have a good faith belief that the decision to deny your Monetary Award claim is incorrect, you may appeal this determination to the Court under Section 9.5 of the Settlement Agreement. To do so, click the Appeal Denied Claim button on your secure online portal and follow the instructions provided. You must submit supporting evidence to support your appeal. Any written statement may not be more than 10 double-spaced pages. You must do so on or before the Deadline to Appeal stated at the top of this Notice.

If you decide to appeal, the Settlement Agreement requires you to pay an Appeal Fee of $1,000, which you can do using the online PayPal option or by check made payable to the NFL Claims Administrator. This fee will be refunded if your appeal is successful. If you are unable to pay the $1,000 fee, you may make a hardship request to us to waive the fee and will have to submit financial information showing a sufficient hardship.

If paying the $1,000 Appeal Fee by check, mail the check to the address below.
    NFL Concussion Settlement
    Claims Administrator
    P.O. Box 25369
    Richmond, VA  23260

The Special Master appointed by the Court will decide your appeal based upon a showing by you of clear and convincing evidence. The Special Master's factual determinations will be final and binding, but you or Co-Lead Class Counsel or the NFL Parties may object to any of the Special Master's conclusions of law, which will then be subject to de novo (*i.e.*, a new) review by the Court.

If an appeal is not submitted on or before the deadline stated at the top of this Notice, the determination in this Notice will become final.

## IV. CO-LEAD CLASS COUNSEL'S RIGHT TO APPEAL THIS DETERMINATION

Section 9.5 of the Settlement Agreement also gives Co-Lead Class Counsel the right to challenge our decision to deny your Monetary Award claim. If Co-Lead Class Counsel chooses to appeal, it must do so by the Deadline to Appeal stated at the top of this Notice and must provide a written copy of its Appeals Form and any supporting evidence to you, the NFL Parties, and us.

If an appeal is taken by you or Co-Lead Class Counsel, the NFL Parties may submit a written opposition (not to exceed 10 double-spaced pages) no later than 30 days after receipt of the Appeals Form. The party taking the appeal is not permitted to submit a reply.

Co-Lead Class Counsel may also submit a written statement (not to exceed 10 double-spaced pages) in response to your appeal no later than 15 days after receipt of the Appeals Form, and you and the NFL Parties may each submit a reply to any such submission by Co-Lead Class Counsel.

## V. HOW TO CONTACT US WITH QUESTIONS OR FOR HELP

If you are represented by a lawyer, consult with your lawyer if you have questions or need assistance. If you are unrepresented and have any questions about this Notice or need help, contact us at 1-855-887-3485 or send an email to ClaimsAdministrator@NFLConcussionSettlement.com. If you are a lawyer, call or email your designated Firm Contact for assistance. For more information about the Settlement program, visit the official website at www.NFLConcussionSettlement.com to read the Frequently Asked Questions or download a copy of the complete Settlement Agreement.



# EXHIBIT 2



**NFL CONCUSSION SETTLEMENT**
IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. Pa.)

January 4, 2021

Johnnie Lynn

**RE: BAP Baseline Assessment Examination Results for Johnnie Lynn (100009522)**

Dear Johnnie Lynn c/o Patrick Tighe:

The Qualified BAP Providers who administered your BAP baseline assessment examination have determined that you do not meet the criteria for any diagnosis as defined in Exhibit A-1 of the NFL Concussion Settlement Agreement.

This determination was agreed upon by the two Qualified BAP Providers who performed your baseline assessment examination. Full descriptions of the injury definitions for Level 1 Neurocognitive Impairment, Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment can be found in Exhibit A-1 of the Settlement Agreement, which you can access through the Court Documents section of the official Settlement Website at https://www.nflconcussionsettlement.com.

Copies of your medical records are available at our secure Web portal, which you also can access through the official Settlement Website at https://www.nflconcussionsettlement.com.

If you have questions, contact the BAP Administrator by using the secure Web portal available through the official Settlement Website at https://www.nflconcussionsettlement.com, or by calling toll-free 855-887-3485.

Sincerely,

Baseline Assessment Program Administrator

CC: X1Law, PA

NEUROPSYCHOLOGICAL EVALUATION

*CONFIDENTIAL*

**EXAMINEE NAME: Mr. Johnnie R. Lynn**

**EXAMINEE DATE OF BIRTH:** ████████

**TEST DATE: November 10, 2020**

**REPORT DATE: November 10, 2020**

**DEMOGRAPHICS AND REASON FOR CONSULT**: Mr. Lynn is a 63-year-old, married, right-handed Black male with 16 years of education. Mr. Lynn was referred for a neuropsychological assessment through the NFL Settlement Agreement Baseline Assessment Program (BAP) to determine his current neurocognitive functioning and aid in diagnostic clarification.

**INFORMED CONSENT:** The following information was gathered from clinical interview with Mr. Lynn and telephone interview with his wife, Laurie Lynn on November 10, 2020. There were no medical records available for review. Prior to the beginning of the clinical interviews, Mr. Lynn was provided with a verbal description of the nature and purpose of the present evaluation. Also reviewed was the referral source, specific referral question for this evaluation, risks/benefits, time commitment, the limits of confidentiality, and mandatory reporting requirements of this provider. Mr. Lynn was given the opportunity to ask questions and receive answers about the present evaluation. Written and verbal consent to participate in this evaluation was provided by the examinee, who also provided consent for this consultant to share results and discuss his care with the BAP administrator and the assigned neurologist. Mr. Lynn noted that he is represented by the law firm of X1 Law in North Palm Beach, FL.

**COVID-19:** Mr. Lynn agreed to attend the evaluation during the coronavirus pandemic. A separate consent form was completed for this. Noncontact infrared temperatures of examinee, examiner and technician were obtained at the start of the evaluation and throughout the day. All temperatures were measured below 98 degrees Fahrenheit. Face masks were worn by all and a circulating fan and overhead exhaust filtered the air in the room. Hand sanitizer was on the desk and readily available.

**HISTORY OF PRESENTING PROBLEMS:** Mr. Lynn denied any difficulty in thinking or emotions.

**RELEVANT PERSONAL/MEDICAL HISTORY:** Mr. Lynn stated he was raised in Pasadena, CA. He denied a history of grade repetitions or special classes. He reported he was not diagnosed with a neurodevelopmental disorder (e.g., ADHD or learning disability). Mr. Lynn stated he graduated from John Muir High School in Pasadena, CA in 1975. He attended the University of California at Los Angeles (UCLA). He stated he graduated in 1980 with a BA degree in World History and a GPA of approximately 3.2.

Mr. Lynn has had a long football career. He stated he played cornerback in college for four years. He stated he was drafted in the 4th Round of the NFL Draft in 1979 by the New York Jets. He played for the Jets for eight seasons until 1986. He stated he played as a cornerback for the first seven seasons and then as a safety in his last season. He has eight credited seasons in the NFL as a player.

Mr. Lynn coached football over the next 30 years. He stated he was assistant coach at the University of Arizona from 1986 to 1992. He was a defensive coach for the Tampa Bay Buccaneers for two seasons (1994, 1995) and then for the San Francisco 49ers for one season (1996). He was defensive coach for the New York Giants for six years and defensive coordinator for two years (1997-2004). He was a defensive coach for the Baltimore Ravens for two seasons (2004, 2005) and then was back as defensive coach for the San Francisco 49ers for six seasons (2006-2013). From there, he was defensive coach for the Philadelphia Eagles for one season (2012), the Oakland Raiders for two seasons (2013, 2014) and the Denver Broncos for one season (2017). Mr. Lynn stated he has 21 credited seasons as an NFL coach. He is now retired.

Mr. Lynn has been married to his wife, Laurie, for 40 years. They have lived in their home in Mooresville, NC for six years. Mr. Lynn's brother lives with them. The Lynns have three adult children and six grandchildren.

Mr. Lynn provided his medical history. He stated he was diagnosed with hypertension and high cholesterol formally in 2003; these had been closely monitored for several years. He was diagnosed with obstructive sleep apnea in 2015 and uses his CPAP nightly. He also described a chronic dry cough chronic that was eventually tied to postnasal drip. His uvula was removed as part of this treatment. The latter is treated with a sinus "cocktail" comprised of Dymista, Breo ellipta, fluticasone, Azelastine and ipratropium. In addition to these medications, Mr. Lynn is also prescribed losartan (50mg), simvastatin (40mg), hydrochlorothiazide (25mg), gabapentin (600mg TID), low dose baby aspirin, Allegra, Flonase and Vitamin D. He brought all medications with him to the appointment and this list was generated from the prescription bottles. Mr. Lynn stated that he last saw his primary care provider (Adrian Hurst, MD) six weeks ago. He stated he is also followed by a pulmonologist (Steven Lindbloom, MD). Mr. Lynn stated that he has left sided pain. He underwent left knee replacement in 2019. He has had torn left ACL and PCL. He has had left shoulder surgeries, left carpal tunnel syndrome, left elbow injuries and treatment, an implant in C4-C5 and a T7 rupture. He has tingling and cramping in his left upper extremity. He has found weekly acupuncture to be of benefit.

Mr. Lynn described his history of sports-related concussions. He stated that concussions were not diagnosed often during his years in college and professional football. He stated that he experienced momentary loss of consciousness (LOC) during a practice in the fall of 1979 and was sidelined for two days with headache; he regained consciousness while on the football field. He denied experiencing poor balance, confusion, light/sound sensitivity, visual disturbance or

memory difficulty after this event. Mr. Lynn described several very hard hits in his NFL career. One occurred in perhaps 1983 or 1984 during a game. He described altered consciousness (e.g., seeing "stars") and left the field. He was sidelined for 5-6 days. He stated he also was seen at the hospital after this event because of neck spasms. Mr. Lynn stated that players had to fight with team doctors for permission to be seen by medical providers outside the NFL. He denied current symptoms of postconcussive syndrome.

Mr. Lynn denied current or past use of alcohol or other substances. He denied current or past mental health diagnosis or treatment. He stated the NFL referred him to a wellness program at the University of North Carolina at Charlotte more recently. His brief description of the program was of preventive physical and mental health. He stated that he had about three hours of testing when he began the program but was unclear about the type of testing. He stated he underwent Worker's Compensation evaluation in 1986 but was unsure if this involved thorough neurocognitive evaluation.

Mr. Lynn stated that he sleeps 6-7 hours nightly including 7 hours the night prior to this examination. He rated his pain at 2-3 on a 0-10 scale generally and on the day of testing. He reported he does not exercise as he did previously and perhaps walks some, but not as formal exercise. He enjoys working with his hands, building things, spending time with his grandchildren, socializing and boating.

**RELEVANT FAMILY HISTORY:** Mr. Lynn was raised in Pasadena, CA and is one of eight children who survived infancy; he stated that three children "died early". Mr. Lynn stated his mother had 12 years of education and worked at an industrial laundry (Royal Laundry). She is 87 years old. His father had about three years education and was a musician but work in his later years at the Jet Propulsion Laboratory. Mr. Lynn stated that his mother was diagnosed with dementia (not Alzheimer's disease) at age 80 and that his maternal grandmother had dementia. Mr. Lynn did not serve in the military.

**BEHAVIORAL OBSERVATIONS:** Mr. Lynn independently arrived on time for his appointment. He ambulated independently and with no clear gait abnormalities. He wore magnifying lenses ("readers", 2.5 magnification) and hearing appeared adequate for the evaluation. Mr. Lynn was alert and was oriented to person, place, and time. Spontaneous speech was within normal limits in terms of rhythm, rate, and volume. There were no word-finding difficulties during conversational speech. Affect was broad, he laughed at times and he described his mood as "good". He had frequent left arm spasms during the interview which caused momentary pauses in responding to questions. Mr. Lynn denied current or past suicidal or homicidal ideation, plan or intent.

Mr. Lynn's speech and motor behavior during testing was normal. Auditory comprehension appeared to be within normal limits. He was able to stay on task without undue apparent distraction, although became frustrated on two tasks (Verbal Paired Associates and Category Test); during these tasks he was tearful and commented that he struggles with items like these on

a daily basis. He uttered verbal calming reminders. He appeared to put forth consistent effort throughout testing. Thought process was judged to be linear and goal-directed. Thought content was appropriate with no evidence of hallucinations, delusions, or disinhibition. Interpersonally, he was pleasant and cooperative. Affect was generally positive throughout the appointment. Of note, Mr. Lynn stated he recognized the first but not the second story from the Logical Memory subtest of the WMS-IV.

**LIMITATIONS OF EXAMINEE:** There were no significant mental or physical limitations that impacted Mr. Lynn's ability to perform the required tasks.

**VALIDITY SUMMARY:** Performance validity was assessed using embedded and stand-alone measures, as well as application and review of the clinical criteria for assessing performance validity and malingering as proposed by Slick et al. (Slick DJ, Sherman EM, Iverson GL. Diagnostic criteria for malingered neurocognitive dysfunction: proposed standards for clinical practice and research. *The Clinical Neuropsychologist*, 1999, 13(4): 545-61.). A summary of Mr. Lynn's results on the Slick criteria checklist is included below.

Mr. Lynn performed in the optimal range on all embedded and stand-alone measures of cognitive performance validity. In addition, Mr. Lynn's performance was determined to be optimal according to the Slick criteria checklist. Thus, test results are considered to be a valid representation of Mr. Lynn's neurocognitive functioning at the time of the evaluation.

| Slick Criteria Checklist | Performance |
|---|---|
| Scores on embedded and stand-alone performance validity measures | WNL |
| Pattern of performance markedly discrepant from accepted models of CNS dysfunction | WNL |
| Discrepancy between test data and observed behavior | WNL |
| Discrepancy between test data and reliable collateral reports | WNL |
| Discrepancy between test data and documented background or history | WNL |
| Self-reported history discrepant with documented history | WNL |
| Self-reported symptoms discrepant with known patterns of brain abnormality | WNL |
| Self-reported symptoms discrepant with behavioral observations | WNL |
| Self-reported symptoms discrepant with reliable collaterals' descriptions of behavior | WNL |

### *PRIMARY TEST RESULTS*

PREMORBID INTELLECTUAL FUNCTIONING: Mr. Lynn's premorbid intellectual functioning was estimated to be in the Average range. This is based on the Complex Demographics with TOPF Predictive Model which estimated a premorbid IQ of 102. This score translates into an Average IQ which was used to calculate Impairment Scores across domains.

Refer to the following chart for the purposes of describing this examinee's individual cognitive test scores:

| Standard Score | Percentile | T-score | Score Label |
|---|---|---|---|
| >130 | >98 | >72 | Exceptionally high score |
| 120-129 | 91-97 | 63-71 | Above average score |
| 110-119 | 75-90 | 57-62 | High average score |
| 90-109 | 25-74 | 43-56 | Average score |
| 80-89 | 9-24 | 37-42 | Low average score |
| 70-79 | 2-8 | 28-36 | Below average score |
| <70 | <2 | <28 | Exceptionally low score |

CURRENT GENERAL INTELLECTUAL FUNCTIONING:  Mr. Lynn's current Full-Scale IQ was not computed for the purposes of this evaluation.

COMPLEX ATTENTION & PROCESSING SPEED:  Mr. Lynn's complex attention and processing speed performances were unimpaired overall as noted by an Impairment Score of "None" for this domain. He obtained an Average score on a task of rote repetition of numbers forward and backward (WAIS-IV Digit Span, T=50). His score was Average on a speeded test of simple arithmetic (WAIS-IV Arithmetic, T=43). His score was Average on complex auditory divided attention (WAIS-IV Letter Number Sequencing, T=50).  He obtained an Average score on a visual discrimination task (WAIS-IV Symbol Search, T=50). He obtained an Average score on speeded graphomotor processing (WAIS-IV Coding, T=53). Finally, he obtained a High Average score on a speeded task requiring cancellation of targeted shapes (WAIS-IV Cancellation, T=57).

LEARNING AND MEMORY:  Mr. Lynn's learning and memory performances were unimpaired overall as noted by an Impairment Score of "None" for this domain. He obtained an Average score on acquisition of verbal contextual information (WMS-IV Logical Memory I, T=50) and obtained an Average score on the retrieval task (WMS-IV Logical Memory II, T=50). He obtained an Average score on a task of associative memory for auditory details (WMS-IV Verbal Paired Associates I, T=50) and obtained a High Average score on the recall portion of this task (WMS-IV Verbal Paired Associates II, T=60). Mr. Lynn obtained an Average score on acquisition of simple visual figural memory (WMS-IV Visual Reproduction I, T=47) and obtained a High Average score on the retrieval task (WMS-IV Visual Reproduction II, T=60).

VISUAL-PERCEPTUAL PROCESSING:  Mr. Lynn's visual-perceptual performances were unimpaired overall as noted by an Impairment Score of "None" for this domain. He obtained an Average score on a speeded task of 2-dimensional visuoconstruction (WAIS-IV Block Design, T=47). He obtained a High Average score on a nonverbal visual logic task (WAIS-IV Matrix Reasoning, T=57). He obtained an Average score on a complex visual integration task (WAIS-IV Visual Puzzles, T=53).

LANGUAGE:  Mr. Lynn's language performances were unimpaired overall as noted by an Impairment Score of "None" for this domain. He obtained an Average score on a test of

confrontation naming (Boston Naming Test, T=50). He obtained an Above Average score on semantic fluency (Animal Naming, T=64). He obtained an Average score on a task requiring simple attention and response to verbal conceptual questions and 2 sentence stories (BDAE Complex Ideational Material, T=56).

EXECUTIVE FUNCTIONING: Mr. Lynn's executive functioning performances were unimpaired overall as noted by an Impairment Score of "None" for this domain. He obtained an Average score on a verbal abstract reasoning task (WAIS-IV Similarities, T=53). He obtained a Low Average score on a speeded phonemic fluency (COWAT FAS, T=39). He obtained an Average score on a test of efficiency in following new sequential procedures (TMT Part B, T=54). Finally, he obtained an Average score on a test of deductive reasoning (Booklet Category Test, T=54).

**FUNCTIONAL STATUS:** Mr. Lynn is reportedly able to independently participate in community affairs (e.g., work, shopping, and social groups), home life (e.g., performing household chores), and preferred hobbies (e.g., building things, working on home projects). He also completes daily living activities such as grooming, dressing, washing and eating independently and without difficulty.

| Category | Clinical Dementia Rating (CDR) |
|---|---|
| Community Affairs | 0-No Impairment |
| Home and Hobbies | 0-No Impairment |
| Personal Care | 0-No Impairment |

## SUMMARY OF PSYCHIATRIC RATING SCALES

Mr. Lynn's psychiatric status was assessed with the MMPI-2-RF and the MINI (version 5). Validity data from the MMPI-2-RF suggest that the profile is valid with no evidence of response inconsistency or exaggeration. All Higher-Order and Restructured Clinical Scales, except one, were within the average range, suggesting lack of psychiatric symptomatology consistent with his self-report. Mr. Lynn endorsed items suggesting somatic complaints (RC1, T=70) and this is more specific to neurological symptoms and complaints (NUC, T=80). Interest Scales noted above average interest in activities of an aesthetic or literary nature (AES, T=73) and activities of a mechanical or physical nature (MEC, T=69). The latter is consistent with his hobby of building objects at their home. Mr. Lynn denied symptoms of anxiety, depression, mania, trauma, psychosis or substance disorders on a structured clinical interview (MINI, Version 5.0).

**SUMMARY AND CONCLUSIONS:** Mr. Lynn is a 63-year-old married former NFL defensive player (8 years) and coach (21 years). He is retired. He reported one episode of momentary loss of consciousness while playing football in college and one episode of altered consciousness while playing professional football. He was sidelined for several days following each event. He stated he had numerous additional hard hits as required in his position as cornerback. He has medical diagnoses of hypertension, high cholesterol and obstructive sleep apnea. He uses his CPAP nightly. He has routine medical care. He denied current or past substance use or mental health diagnosis or treatment. Mr. Lynn's performances on this test battery were valid. All scores

were well within the average to above average ranges except for one Low Average score on a test of phonemic fluency. In summary, Mr. Lynn demonstrated NO IMPAIRMENT across the 5 cognitive domains assessed and there is NO IMPAIRMENT in his functional status. He denied any psychiatric symptoms and appears to be very well adjusted, albeit with some pain in the left side of his body, particularly his arm. Taken together, the overall preliminary diagnosis level for Mr. Lynn is NO DIAGNOSIS of Level 1, 1.5 or 2.0 Neurocognitive Impairment.

**PREFACE:** Raw and standardized scores are presented only for use by appropriately trained professionals and to allow for any future test-retest comparison. These scores should not be interpreted without consideration of all the information that is contained in the rest of the report. The most recent standardization samples from the test publisher were used whenever possible to derive standard scores and percentiles; scores were corrected for age, gender, ethnicity and education (16 years) when available.

**ASSESSMENT MEASURES:** TOMM; WMT; ACS WCT; Test of Premorbid Functioning (TOPF); Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) Block Design, Similarities, Matrix Reasoning, Visual Puzzles, Digit span, Arithmetic, Letter-Number Sequencing, Coding, Symbol Search, and Cancellation subtests; Wechsler Memory Scale-Fourth Edition (WMS-IV) Logical Memory I, II, and Recognition, Verbal Paired Associates I, II, and Recognition, and Visual Reproduction I, II, and Recognition subtests; Boston Naming Test (BNT); Controlled Oral Word Association (COWA) Category and Letter Fluency; Trail Making Test (TMT); Boston Diagnostic Aphasia Examination (BDAE) Complex Ideational Material subtest; Booklet Category Test; Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF); Mini International Neuropsychiatric Interview-Version 5 (MINI); Clinical Dementia Rating Scale.

Thank you for this referral and please let me know if any additional information would be helpful.

*Electronically signed*

Ruth Yoash-Gantz, Psy.D., ABPP
Board Certified in Clinical Neuropsychology
Licensed Psychologist (NC # 1698)

The neuropsychological testing described in this report was administered by S. Parks, MA under the supervision of Dr. Yoash-Gantz. Technician face-to-face time spent: 4.5 hours, 4.5 units of 96119; Psychologist time interviewing examinee and informant in diagnostic interview (90791), reviewing medical records, scoring/interpreting/integrating findings, preparing written report and providing feedback: 4.0 Hours, 4.0 units of 96118. This report was prepared by Ruth Yoash-Gantz, PsyD, ABPP. Though reviewed, it may contain errors in syntax, grammar or spelling.

## APPENDIX A: NFL BAP DATA FACE SHEET

| Patient Name: Johnnie Lynn | | | Patient DOB: 12/19/1956 | |
|---|---|---|---|---|
| Neuropsychologist: Ruth Yoash-Gantz, Psy.D., ABPP-CN | | | Date of Exam: 11/10/2020 | |
| Technician: Sydney Park, M.A. | | | Patient Age: 63 | |
| TOPF Estimated FSIQ: | | 102 | Premorbid Range: | Average |

| DOMAIN | TEST | SCORE | T-SCORE | IMPAIRMENT SCORE |
|---|---|---|---|---|
| **COMPLEX ATTENTION AND PROCESSING SPEED** | WAIS-IV Digit Span | 10 | 50 | None |
| | WAIS-IV Arithmetic | 8 | 43 | |
| | WAIS-IV Letter-Number | 10 | 50 | |
| | WAIS-IV Symbol Search | 10 | 50 | |
| | WAIS-IV Coding | 11 | 53 | |
| | WAIS-IV Cancellation | 12 | 57 | |
| **LEARNING AND MEMORY** | WMS-IV LM I | 10 | 50 | None |
| | WMS-IV LM II | 10 | 50 | |
| | WMS-IV VPA I | 10 | 50 | |
| | WMS-IV VPA II | 13 | 60 | |
| | WMS-IV VR I | 9 | 47 | |
| | WMS-IV VR II | 13 | 60 | |
| **VISUAL-PERCEPTUAL PROCESSING** | WAIS-IV Block Design | 9 | 47 | None |
| | WAIS-IV Matrix Reasoning | 12 | 57 | |
| | WAIS-IV Visual Puzzles | 11 | 53 | |
| **LANGUAGE** | Boston Naming Test | 55 | 50 | None |
| | COWAT Animals | 26 | 64 | |
| | BDAE Complex Ideational | 12 | 56 | |
| **EXECUTIVE FUNCTIONING** | WAIS-IV Similarities | 11 | 53 | None |
| | COWAT FAS | 28 | 39 | |
| | TMT-B | 88* | 54 | |
| | Booklet Category | 55 | 54 | |

| DOMAIN | TEST | RAW | SCORE | DESCRIPTOR |
|---|---|---|---|---|
| **EFFORT** | ACS Word Choice | 50 | >25 | PASS |
| | WMS-IV LM Recognition | 26 | >25 | PASS |
| | WMS-IV VPA Recognition | 39 | >25 | PASS |
| | WMS-IV VR Recognition | 6 | >25 | PASS |
| | WAIS-IV RDS | 10 | >25 | PASS |
| | TOMM Trial 1 | 48 | N/A | PASS |
| | TOMM Trial 2 | 50 | N/A | |
| | TOMM Retention | 50 | N/A | |
| | WMT Immediate | N/A | 100.0% | PASS |
| | WMT Delayed | N/A | 100.0% | |
| | WMT Consistency | N/A | 100.0% | |
| | WMT Multiple Choice | N/A | 85.0% | |
| | WMT Paired Associates | N/A | 85.0% | |
| | WMT Free Recall | N/A | 50.0% | |

| TEST | SCALE | SCORE |
|---|---|---|
| **MMPI-2-RF** | ? | 0 |
| | VRIN | 39 |
| | TRIN | 50 |
| | F-r | 56 |
| | Fp-r | 42 |
| | Fs | 50 |
| | FBS-r | 51 |
| | RBS | 54 |
| | L-r | 66 |
| | K-r | 62 |
| | EID | 30 |
| | THD | 39 |
| | BXD | 48 |
| | RCd | 37 |
| | RC1 | 70 |
| | RC2 | 34 |
| | RC3 | 57 |
| | RC4 | 43 |
| | RC6 | 43 |
| | RC7 | 38 |
| | RC8 | 39 |
| | RC9 | 48 |

| TEST | SCORE |
|---|---|
| CDR | 0 |

Johnnie R. Lynn; DOS 11/10/2020

12/19/2020                    Encounter - Office Visit Date of service: 12/16/20 Patient: JOHNNIE R LYNN DOB: 12/19/1956 PRN: LJ691926

| PATIENT | | FACILITY | ENCOUNTER | |
|---|---|---|---|---|
| **JOHNNIE R LYNN** | | **Lakeside Neurology** | NOTE TYPE | SOAP Note |
| DOB | ~~12/19/1956~~ | T   (704) 896-5591 | SEEN BY | Lori Schneider M.D. |
| AGE | 64 yrs | F   (704) 896-5809 | DATE | 12/16/2020 |
| SEX | Male | 19615 Liverpool Pkwy., Ste. A | AGE AT DOS | 63 yrs |
| PRN | LJ691926 | Cornelius, NC 28031 | Electronically signed by Lori Schneider | |
| | | | M.D. at 12/19/2020 05:31 pm | |

### Chief complaint

NFL ID: 02116

Chronic left-sided neck pain, left hand numbness, intermittent jerking of his left arm and problems with memory.

| Vitals for this encounter | |
|---|---|
| | **12/16/20**<br>**4:45 PM** |
| Height | 72 in |
| Weight | 233 lb |
| Pulse | 68 bpm |
| BMI | 31.60 |
| Blood pressure | 150/78 mmHg |

## Diagnoses

Was diagnosis reconciliation completed?
**Yes, reconciliation performed**

| Current | ACUITY | START | STOP |
|---|---|---|---|
| Knee replacement | | | |
| (S06.0X9S) Concussion with loss of consciousness of unspecified duration, sequela | | | |
| (R25.2) Cramp and spasm | | | |
| (M54.2) Cervicalgia (G89.29) Other chronic pain | | | |
| Carpal tunnel release | | | |
| (G56.22) Lesion of ulnar nerve, left upper limb | | | |
| (R41.3) Other amnesia | | | |
| (I10) Essential (primary) hypertension | | | |
| (R41.3) Other amnesia | | | |
| (S49.92XA) Unspecified injury of left shoulder and upper arm, initial encounter | | | |
| (J45.990) Exercise induced bronchospasm | | | |
| (E78.5) Hyperlipidemia, unspecified | | | |
| (E55.9) Vitamin D deficiency, unspecified | | | |
| (G47.33) Obstructive sleep apnea (adult) (pediatric) | | | |
| (S83.512S) Sprain of anterior cruciate ligament of left knee, sequela | | | |
| (M23.52) Chronic instability of knee, left knee | | | |
| (M50.90) Cervical disc disorder, unspecified, unspecified cervical region | | | |

| Historical | ACUITY | START | STOP |
|---|---|---|---|
| No historical diagnoses | | | |

## Drug Allergies

Was medication allergy reconciliation completed?
**Yes, reconciliation performed**

| Active | | SEVERITY/REACTIONS | ONSET |
|---|---|---|---|
| Patient has no known drug allergies | | | |

## Food Allergies

| Active | | SEVERITY/REACTIONS | ONSET |
|---|---|---|---|
| No food allergies recorded | | | |

## Environmental Allergies

| Active | | SEVERITY/REACTIONS | ONSET |
|---|---|---|---|
| No environmental allergies recorded | | | |

## Medications

Was medication reconciliation completed?
**Yes, reconciliation performed**

| Active | SIG | START/STOP | ASSOCIATED DX |
|---|---|---|---|
| Aspirin 81 MG Oral Tablet Chewable | 1 tab PO QD | - | - |
| Ergocalciferol 1.25 MG (50000 UT) Oral Capsule | 1 cap PO Q week | - | - |
| Fluticasone Propionate (Nasal) (Fluticasone Propionate) 50 MCG/ACT Nasal Suspension | Q am | - | - |
| Gabapentin 600 MG Oral Tablet | 1 tab PO TID | - | - |
| hydroCHLOROthiazide 25 MG Oral Tablet | 1 tab PO Q am | - | - |
| Losartan Potassium 50 MG Oral Tablet | 1 tab PO QD | - | - |
| Simvastatin 40 MG Oral Tablet | 1 tab PO Q am | - | - |
| **Historical** | SIG | START/STOP | ASSOCIATED DX |
| No historical medications recorded | | | |

## Social history

| TOBACCO USE | RECORDED |
|---|---|
| Current tobacco use Non-smoker | 12/16/2020 |
| ALCOHOL USE | RECORDED |
| No alcohol use history available for this patient | |
| SOCIAL HISTORY (FREE-TEXT) | |
| No social history (free-text) recorded for this patient | |
| FINANCIAL RESOURCES | RECORDED |
| No financial resources recorded for this patient | |
| EDUCATION | RECORDED |
| No education recorded for this patient | |
| PHYSICAL ACTIVITY | RECORDED |
| No physical activity available for this patient | |
| NUTRITION HISTORY | RECORDED |
| No nutrition history available for this patient | |
| STRESS | RECORDED |
| No stress available for this patient | |
| SOCIAL ISOLATION AND CONNECTION | RECORDED |
| No social isolation and connection available for this patient | |
| EXPOSURE TO VIOLENCE | RECORDED |
| No exposure to violence history available for this patient | |
| GENDER IDENTITY | |
| No gender identity recorded for this patient | |
| SEXUAL ORIENTATION | |
| No sexual orientation recorded for this patient | |

## Subjective

Mr. Lynn is a 63-year-old right-handed black man with a history of hypertension, obstructive sleep apnea treated with CPAP, left knee replacement, and chronic left-sided neck pain associated with jerking of his left arm, who I was asked to evaluate for the purposes of the NFL Settlement Agreement Baseline Assessment Program (BAP). Mr. Lynn states that he played professional football for the NFL for eight years, as a quarterback and safety. He retired in 1986. He then coached football for the NFL for 28 years and retired in 2017. During the course of his professional football career, Mr. Lynn states that he suffered several concussions. Some of his concussions were associated with a brief loss of consciousness. He states that he only missed one game as a result of his head trauma. He reports a history of headaches following his head trauma, which eventually resolved. He no longer suffers from headaches. Over the past few years, Mr. Lynn has noticed mild problems with his short-term memory. He describes himself as being very forgetful and he has to write everything down. He states that his wife often notices his memory problem. Mr. Lynn states that he is independent in all his activities of daily living. He denies any difficulty driving and denies any problems with concentration. He does report some mild word finding difficulty. He denies feeling depressed and denies a history of impulsivity and aggression. He enjoys building furniture. He no longer works out due to chronic neck pain. He states that he sleeps well with a CPAP device and feels well-rested in the morning.

Mr. Lynn reports a history of multiple joint injuries as a result of his football career. He underwent surgical repair (Putti Platt Procedure) of his left shoulder in 1980. He underwent repair of his left anterior cruciate ligament in 1980 and his left posterior cruciate ligament in 1986. He underwent a total left knee replacement in 2019. Since 2016, Mr. Lynn has been suffering from severe left-sided neck pain which radiates down his left arm and numbness of his left hand. His neck pain is associated with severe diffuse muscle spasms and jerking of his left arm. These episodes are not associated with alteration or loss of consciousness. He

states that he can decrease the jerking of his left arm with relaxation techniques. He underwent an extensive neurologic and orthopedic evaluation due to his chronic neck pain and jerking of his arm . Unfortunately, I do not have any of these medical records for review. Mr. Lynn states that his brain MRI was unrevealing. He denies that he ever had an EEG.

Mr. Lynn states that he was diagnosed with severe disc disease at C4-5 and underwent a disc replacement in 2016. He also reports a history of a "T7 rupture" in 2017.
Mr. Lynn reports some improvement in his neck pain since undergoing a disc replacement. However, he continues to suffer from intermittent shock-like pain down his left arm, which is associated with spasms and jerking of his left arm. These episodes can occur multiple times per day. He also continues to suffer from numbness of his left hand. He reports only modest improvement in his symptoms with gabapentin 600 mg p.o. t.i.d. which he has been taking since 2016. He reports some improvement in his symptoms with acupuncture. He denies sensory symptoms in his other extremities. He denies weakness of his extremities. He states that he had an EMG/NCV study of his left upper extremity and underwent left carpal tunnel release and transposition of his left ulnar nerve at the ulnar groove in 2017.

A neuropsychological evaluation performed by Dr. Ruth Yoash-Gantz on November 10, 2020 revealed no impairment across the five cognitive domains assessed and no impairment in his functional status. Dr Yoash-Gantz did not feel that Mr. Lynn was suffering from a Level 1, 1.5 or 2.0 Neurocognitive Impairment.

PAST MEDICAL AND SURGICAL HISTORY:
1. Left shoulder repair (Putti-Platt Procedure) in 1980 as a result of an injury while playing football for the NFL.
2. Left ACL repair in 1980 as a result of a football injury.
3. Surgical resection of his uvula in 2002 due to sleep apnea.
4. Obstructive sleep apnea treated with CPAP.
5. Surgical correction of his left PCL in 1986 as a result of a football injury.
6. Left-sided neck pain status post disc replacement at
C4-5.
7. "Ruptured T7" in 2017.
8. Left carpal tunnel surgery and transposition of his left ulnar nerve at the ulnar groove in 2017.
9. Total left knee replacement.
10. Hypertension.
11. Exercise-induced asthma.
12. Hyperlipidemia.
13. Vitamin D deficiency.

ALLERGIES: No known drug allergies

SOCIAL HISTORY: Denies cigarette smoking, alcohol or drug use. The patient is married and has three adult children. He played professional football for the NFL for eight years. He retired in 1986. He then coached football for the NFL for 28 years. His last season was in 2017. He has a BA in history.

FAMILY HISTORY: His mother is 87 and suffers from dementia. His father had HTN and died at age 76 as a result of an infection involving an open wound on his leg. He has six siblings. His oldest brother has a history of polio and prostate cancer.

REVIEW OF SYSTEMS: As per history of present illness.

## Objective

General: The patient is noted to be a well-developed, well-nourished, extremely pleasant, well-groomed, muscular 63-year-old black man, in no apparent distress. Neck: Reveals a well-healed horizontal incision over his anterior left neck. There is a well-healed vertical incision over his cervical spine. Neck is supple and nontender with good range of motion. There are negative Lhermitte and Spurling signs. Carotids are 2+ bilaterally without bruits. Lungs: Clear. Heart: Regular rate and rhythm. Abdomen: Benign. Extremities: Without cyanosis, clubbing or edema.

On neuro exam, affect and thought content are appropriate. Speech is fluent without aphasia or dysarthria. The patient is a fair historian. He was polite and cooperative with the exam. He scored 26/30 on the Montreal cognitive assessment (MOCA) which is at the lower limit of normal. He had mild problems with attention and was unable to accurately repeat three numbers in reverse order. He had significant difficulty repeating a sentence. He had mild difficulty with delayed recall, recalling only four out of five words after five minutes. Cranial nerves II through XII are intact. There is no nystagmus. Motor strength is 5/5 throughout with

12/18/2020                Encounter - Office Visit Date of service: 12/16/20 Patient: JOHNNIE R LYNN DOB [redacted] PRN: LJ691926

normal tone and bulk. There is no pronator drift. There is no tremor. Mr. Lynn was noted to have intermittent tonic-clonic activity in his left upper extremity with flexion at his elbow and clenching of his fist with a cortical thumb. This activity only lasted for a few seconds at a time and was not associated with any alteration of consciousness or any other symptoms. With relaxation, Mr. Lynn was able to stop the movements. On sensory testing, there is a decrease in light touch and pinprick involving the entire left hand up to the wrist. Light touch and pinprick are intact in the other extremities. Proprioception and vibratory sensation are intact throughout. Deep tendon reflexes are brisk at the left biceps, brachioradialis, and triceps. Deep tendon reflexes were 2+ throughout in the right upper extremity. Deep tendon reflexes are 2+ in the right knee and right ankle. Deep tendon reflexes were slightly increased at the left knee and ankle. Toes are down-going. There is no clonus. On coordination testing, finger-to-nose and heel-to-shin are intact bilaterally. Gait is narrow based and steady. Gait was initially stiff and slow, which the patient attributes to pain in his hips. The patient is able to walk on heels and toes. Tandem gait is mildly unsteady with veering towards the right side. There is a negative Romberg. The patient is able to squat and rise without support. The patient does not use an assistive device for ambulation.

---

## Assessment

1. History of recurrent concussions while playing football for the NFL for eight years. Some of these impacts were associated with a brief loss of consciousness and headaches.

2. Subjective complaints of mild problems with short-term memory. Mr. Lynn underwent a neuropsychological evaluation performed by Dr. Ruth Yoash-Gantz on November 10, 2020, which revealed no impairment across the five cognitive domains assessed and no impairment in his functional status. Mr. Lynn scored a 26/30 on the Montreal Cognitive Assessment (MOCA) today, which is at the lower limit of normal. **Mr. Lynn does not fulfill criteria for a diagnosis of Level 1, 1.5 or 2.0 Neurocognitive Impairment.**

   Mr. Lynn does suffer from chronic pain and is maintained on gabapentin 600 mg p.o. t.i.d. which may be contributing to some of his cognitive problems such as short-term memory impairment and word finding difficulty. I would also recommend ruling out cerebrovascular disease and an underlying nutritional or metabolic abnormality such as thyroid disease, vitamin B12 deficiency, etc.

4. Tonic-clonic activity in his left upper extremity since suffering from severe neck pain and degenerative disc disease in 2016. These episodes are brief and can occur several times per day.

   Neurologic exam is remarkable for brisk reflexes in his left upper extremity and decreased sensation in his left hand, up to his wrist. **I would recommend ruling out a cortical lesion involving the left motor strip and simple focal seizures.** Unfortunately, I do not have any of Mr. Lynn's medical records for review.

5. Hypertension.   ·

6. Left knee replacement in 2019.

7. Exercise-induced asthma.

8. Hyperlipidemia.

9. Vitamin D deficiency.

10. Obstructive sleep apnea status post surgical resection of his uvula in 2002. Mr. Lynn is maintained on CPAP and states that he sleeps well.

11. Disc replacement at C4-5 in 2016.

12. History of a "T7 rupture" in 2017.

13. Left shoulder repair (Putti-Platt Procedure) in 1980 –due to a football injury.

14. Left ACL repair in 1980 due to a football injury.

15. Left PCL repair in 1986 due to football injury.

16. Left carpal tunnel surgery and transposition of the left ulnar nerve at the ulnar groove in 2017.

---

## Plan

1. If not done so recently, I would recommend scheduling a brain MRI without and with contrast in order to rule-out a lesion involving the lateral left motor cortex.

2. I would also recommend scheduling a baseline EEG. If this is unrevealing, I would recommend a 72 hour ambulatory EEG.

3. If not done so recently, I would recommend checking thyroid function tests, vitamin B12 level, red blood cell folate level, methylmalonic acid level, homocysteine level, vitamin D 25-hydroxy level, CBC, and comprehensive metabolic profile and RBC magnesium level.

---

 practice fusion