## UNITED STATES DISTRICT COURT
## FOR THE EASTER DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | MDL No. 2323 |
| LITIGATION | |

## <u>MOTION TO DISCIPLINE OR DISMISS SPECIAL MASTERS AND AUDITORS</u>

Undersigned counsel, pursuant to Cannon 3.C (1) of the Code of Judicial Conduct, Rule 53, Federal Rules of Civil Procedure, U.S. Supreme Court precedent, Title IV, Rule 8, Rules Governing the Audit of Claims—Standards of Proof Applicable to Special Master, hereby moves this Court to either discipline or remove the auditors and Special Masters for violation of due process, standards of impartiality and objectivity, and un-refutable evidence of bias and appearance of potential bias in their operations and investigations.[1]  As grounds therefore, undersigned states as follows:

## MEMORANDUM ON LEGAL STANDARD

NFL claims investigators, auditors and Special Masters have a heightened standard of review and are to serve as the objective eyes and ears of the Court.  When they fail to do so, they are appropriately dismissed.  Cannon 3.C (1) of the Code of Judicial Conduct; Rule 53, Federal Rules of Civil Procedure.  *See Cordoza v. Pac. States Steel Corp*., 320 F.3d 989 (9th Cir. 2003) (Special master failed to accomplish the primary goal assigned, used his position to advance his professional and economic interests, and overbilled.  Special master dismissed by the federal judge); *Hofmann v. EMI Resorts, Inc.,* 689 F. Supp. 2d 1361, 1373, 1375 (S.D. Fla. 2010) ("Having carefully considered the contents of the Report and Defendants' arguments, I agree that

---

[1] Index of sworn and indisputable evidence documenting bias, and the appearance of potential bias, attached hereto, is found on page 39.

the Special Master's "impartiality might reasonably be questioned" and that he should therefore be disqualified from performing "judicial functions" in connection with these proceedings as a Special Master.*"); In re Murchison*, 349 U.S. 122 (1955) *see also Taylor v. Hayes*, 418 U.S. 488, 501 (1974) ("The inquiry must be not only whether there was actual bias on [the judge or special master's] part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." Quoting *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964)).

Regardless of whether there is "actual" or "potential" bias, if either exist, or if there is even the "appearance" of bias, the investigators, auditors and Special Masters must not have any bias—potential, perceived or actual.[2]  Under the law, even the appearance of "potential" bias warrants dismissal.  *Hoffman, Murchison, supra*.

## CORE UNCONTROVERTED BIAS

The auditor and Special Master bias is glaring.  They interpret "non-communication" for "non-filed" claims as "a misrepresentation, omission, or concealment of a material fact made."  If one doesn't communicate, doesn't take an action, and doesn't file a claim, one is not communicating.  How can one non-communicate "a misrepresentation, omission, or concealment of a material fact"?  Is this a violation of thought and intent that doesn't exist in reality but interpolated telepathically?

Use of in-house attorney work product medical evaluations and education efforts, found to be largely accurate, protected under attorney work product privilege, <u>never submitted to the</u>

---

[2]  What is concerning is that the Special Masters on January 22, 2021, issued a ruling directing harm to various parties without having the facts presented, without communicating or requesting a response from the injured parties, in violation of the claim administration rules regulating investigations, in violation of the ethical standards for investigations, and adopting demonstrably false findings.  This indicates bias and the appearance of "potential" bias. The consequences of this bias are clear--dismissal.  *Hoffman, Murchison, supra*.

NFL Claims, explicitly not for use in any claim submission, not qualified for any claim submission, and in fact never used in any claim simply cannot be a "misrepresentation, omission, or concealment of a material fact made." That is unless non-existent *telepathically interpolated evidence* is now the standard applied by the Courts of the United States.

## STANDARDS FOR INVESTIGATIONS

Beyond the Code of Judicial Conduct, Federal Rules of Civil Procedure, U.S. Supreme Court precedent, the Audit Report and investigation is explicitly ethically and morally required to comply with Quality Standards for Investigations,[3]and [4] it fails to do so. The Special Masters and those that have followed or adopted this failing effort had an opportunity to see and understand these failures, improve investigations and Audit Reports and require compliance with Quality Standards for Investigations. They rejected this opportunity and intentionally chose not to. What are these quality standards for? To find the truth. Core standards for investigations and investigative organizations to find the truth are as follows:

> *In all matters relating to investigative work, the investigative organization must be free, both in fact and appearance, from impairments to* independence; *must be organizational independent; and must maintain an* independent attitude.

**Personal Impairments**—Circumstances may occur in which an investigator may experience difficulty in achieving impartiality because of their views and/or personal situations and relationships. These impairments include the following:

---

[3] Quality Standards for Investigations, Council of Inspectors General on Integrity and Efficiency, November 15, 2011, pp. 6-17, A-1.

[4] The Council of the Inspectors General on Integrity and Efficiency oversees all Inspectors General for the United States, including the Offices of the Inspector General for the Department of Justice and its FBI. This is to ensure the integrity and effectiveness of U.S. Department of Justice operations and investigations, which were abused by the FBI and J. Edgar Hoover from 1935 to 1972, and much of this investigative abuse is documented in the Church Committee's 1976 findings. *See* Special Report, 2005, Office of Inspector General, The Federal Bureau of Investigation's Compliance with the Attorney's General Investigative Guidelines. Exhibit B, pp. 1-7 (including not investigating evidence casting doubt on principal informants, that criminal activity be "clear and unambiguous was not only ignored but apparently violated", "incomplete and misleading information", failure to "challenge or test the sufficiency and accuracy of information" and more). If attorneys for the U.S. Department of Justice are included, the U.S Department of Justice Office of Professional Development will assist in addressing.

1.  <u>Official, professional, personal, or financial relationships</u> that might affect the extent of the inquiry; limit disclosure of information; or weaken the investigative work in any way;
2.  <u>Preconceived opinions</u> of individuals, groups, organizations or objectives of a particular program <u>that could bias the investigation</u>;
3.  Previous involvement in a decisionmaking or management capacity that would affect current operations of the entity or program being investigated;
4.  <u>Biases</u>, including those induced by political or social convictions that result from employment in, or loyalty to, a particular group or organization;
. . .

> *<u>Due professional care</u> must be used in conducting investigations and in preparing related reports.*

**Legal Requirements**--. . .Investigations should be conducted with due respect for the rights and privacy of those involved.

**Impartiality**—All investigations must be conducted in a <u>fair and equitable</u> manner, with the perseverance necessary to determine the facts.

**Objectivity**—<u>Evidence must be gathered and reported in an unbiased and independent manner</u> in an effort to determine the validity of an allegation or to resolve an issue.  This includes inculpatory and <u>exculpatory information</u>.

**Ethics**—At all times, the actions of the investigator and the investigative organization must conform with all applicable standards of ethical conduct.

> *Investigations must be conducted in a timely, efficient, thorough, and <u>objective manner</u>.*

The investigator is a <u>fact-gatherer</u> and should not allow conjecture, <u>unsubstantiated opinion, bias, or personal observations or conclusions</u> to affect work assignments.  He or she also has a <u>duty to be receptive to evidence that is exculpatory</u>, as well as incriminating.

> *Reports (oral and written) must thoroughly address all relevant aspects of the investigation and be accurate, clear, complete, concise, logically organized, timely, and <u>objective</u>.*[5]

---

[5] "Objectivity" is an understanding of reality.  It has metaphysics and epistemology components, mental constructs, and dependence on social structures and world views.  Objectivity in investigations can be easily distorted without discipline and Quality Standards for Investigations, and reality can be lost in bias abstractions.  Then the telepathic shadows take over.

This is what has taken place in this investigation.  Notwithstanding the investigation's collapse into bias and abstract shadows, in this case the shadows and abstractions of the Tipster are exposed by reality.  As noted by Philosopher and Theologian, C.S. Lewis, "reality is harsh to the feet of shadows."   Philosopher George Wilhelm Friedrich Hegel

Reports should contain <u>exculpatory evidence and relevant mitigating information</u> when discovered during any administrative investigation.  <u>Exculpatory evidence</u> in a criminal or civil investigation must be brought to the attention of the assigned prosecutor.

> *Investigative data must be stored in a manner that allows effective retrieval, reference, and analysis, while <u>ensuring the protection of sensitive data</u> (i.e., personally identifiable, confidential, proprietary, or privileged information or materials).*

**Investigative File**—All investigative activity, both <u>exculpatory</u> and incriminating, should be recorded in an official case file.

Ensuring that sensitive information is protected.

**<u>Know evidentiary rules.</u>**
<u>Assess progress and **re-focus when necessary**</u>.
**<u>Review and understand</u>** information gathered.
Write draft report—ensure accuracy, thoroughness, **objectivity**, proper format, clarity and correct grammar.

Quality Standards for Investigations, Council of Inspectors General on Integrity and Efficiency, November 15, 2011, pp. 6-17, A-1 (emphasis added).

To find the "truth" in an investigation, Quality Standards for Investigations require that an investigation must be objective, unbiased, weigh the sources of the allegations, challenge and test the information alleged, use exculpatory evidence, know evidentiary rules, weigh the source of the information, and re-focus the investigative lens when evidence shows re-focus is needed. Special Masters, as are all investigative oversight entities, are to enforce and require application of these standards and this is their opportunity to do so.  To comply with the Quality Standards for Investigations in finding the "truth" the investigator and Special Masters must have

---

points out the damage in following the bias of abstractions, "to make abstractions hold in reality is to destroy reality."  The shadows of this investigation and Audit Report now have to deal with harsh reality. The bias abstractions spewed by criminals and extortionists and adopted by the investigators and Audit Report is a telepathic shadow trying to obfuscate the reality of the Tipster, conspirators, extortionists crimes, legal opportunist bottom feeders, and baseless allegations, and the reality of not only extensive exculpatory evidence, but no conceivable violation of any rule or regulation.

knowledge of the Quality Standards for Investigations and history of investigative abuse, courage, integrity, spirit, and intellectual and staffing skills to take on bias in the investigation, including from informants, testing the source and sufficiency of evidence, as well as the bias in the institution and bias goals of the community engaged with the institution. It is not an advocacy exercise in use of telepathic logic, rather an exercise in finding truth.

In this four-year exercise in learning to do quality investigations, the first draft is a near failure.  The Audit Report is a near failure because of the lack of following Quality Standards for Investigations, lack of objectivity, bias, incapacity to investigate and challenged or even consider the agendas and sources of information, failure to apply exculpatory evidence, failure to re-focus the investigation as evidence and its sources were investigated, and failure to apply ethics and evidentiary standards.  These failures rooted in bias perverted truth into a demonstrably false report.

Despite the investigators sharing this failing Audit Report with other investigating authorities prior to the Special Masters making a determination on this investigation as required by Title IV, Rule 27 and Rule 30; and prior to ever informing Respondent that it was under audit or providing a copy of this Audit Report to him, the Special Masters had an opportunity to receive or review accurate evidence, or to ensure an investigation that complied with Quality Standards for Investigations.  They have chosen not to comply with these standards and have chosen to follow bias and violation of the investigative standards established by this Court.  The Audit Report is wholly and completely inaccurate, unreliable, irrelevant, violative of investigative standards, and the evidence found in the investigation in fact demonstrates that no claims submission standard was violated.[6]

---

[6] **There is no misrepresentation, omission or concealment of material fact.  There cannot be such violations in protected attorney client work product merely working in-house with staff and in-house experts. There were**

## FIRST EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE DUE TO BIAS AND LACK OF OBJECTIVITY

This Audit Report and the underlying investigation fail in almost every respect.  As a preliminary exemplar of the failures, consider the following simple, knowingly and easily verifiable false statement, concerning an irrelevant and non-related and non-informed target of the investigation, from the Audit Report:

> "Sharon Delaney accompanied ▮▮▮▮ ▮▮▮ (SPID ▮▮▮▮▮ to his neurological examination **and pretended to be his wife**."

Audit Report, p. 3 (emphasis added).  NFL Counsel jumped on this knowingly and easily verifiable false statement seeking her disqualification from the program:

> For example, The Claims Administrator's investigation uncovered that an "NFL Claims Specialist" at a claims preparation company ("S.D.") accompanied a class member to a neuropsychogical evaluation and "pretended to be his wife."  (Id. at 3). Such clear and obvious fraud cannot be excused in this Settlement Program. The NFL Parties respectfully request that the Special Masters conduct an audit report . . . which if substantiated would undoubtedly call for both S.D. and the Settlement Class Member (▮▮▮▮▮▮▮ to be disqualified from the program."

NFL Parties' Statement of Position and Recommendation on the Claims Administrator's Audit Report on Howard & Associates, P.A., and Related Parties, p. 2.

The distorted lens against Sharon Delaney is verified from our investigation of this unknown target, as this firm had never spoken with this person and had no relationship with Sharon Delaney prior to this false allegation.  From our investigation, we received the facts from

---

**no submissions of any document of this Howard & Associates protected attorney work-product pre-claim education process for the purposes of claims submissions.**  This is because the firm, its staff, its independent contractors, and its experts, as part of its attorney work product privilege, were learning the process, which process had not crystalized and was not finalized.  The firm had not reviewed, nor finalized, nor prepared any claim for submission, nor has been paid for its submission of any claim.  The firm has not had access to even view electronic files of clients from late 2019 until recently due to machinations by the Shenaq, PC., firm.

an accurate lens, which shows that the ███ 2018 evaluation by Dr. Wisdom specifically

states:

> "Mr. ███ was on time for his appointment and was accompanied by an
> assistant which **the examiner mistakenly thought was his wife for the
> beginning of the exam.**"

Neuropsychology Wisdom, PLLC, Independent Medical Examination, ███ ███ dated

███ 2018 (emphasis added).  There is no evidence contrary to this.  In fact, the undisputed

affidavit of Sharon Delaney, attached, documents both the legitimacy of her actions and the

illegitimacy of the sources of this ugly claim.[7]  This unrefuted and documented evidence verifies

schemes to manipulate and bias the investigative and audit process towards intentional and

proven fraudulent outcomes and goals.

Somehow the investigator, who looks to be Brown & Greer Attorney Roma Petkouskas,

and NFL Counsel aligned, with the support of the Special Masters, on this innocuous error by

Dr. Wisdom's examiner, not Sharon Delaney, and this error was intentionally portrayed as

corrupt by a competitor (similar to Don Reinhard's extortion campaign against undersigned with

corrupt allies) and the Special Masters adopted their interpretation of these facts as Sharon

Delaney impersonating a wife.  The Special Masters had the opportunity to correct this glaring

error and the many others found in this suspect, illogical and deeply flawed investigation, yet

intentionally with glaring bias, chose to do nothing.

---

[7] At the end of her unrefuted affidavit, documenting the source and manipulation of the auditor, she states:

> These unconscionable twists of words, and adoption thereof by the auditors, needs to be audited
> and investigated in and of itself by Federal authorities as it unequivocally demonstrates and
> intentional corruption of the audit process and complicity between the auditors and those
> threatened by my services.  If there is any validity to this audit process th[e]n these allegations
> must be dropped immediately.

Notwithstanding this glaring bias and intentional distortion and manipulation, NFL Counsel, the auditor and Special Masters violate basic investigative standards that NFL Counsel disturbingly states are irrelevant, and continues down this logical, fallacious, *ad hominem* path that violates investigative standards and undisputed evidence.  This is a duplicitous and unseemly scheme to justify not paying retired NFL players nor to permit continuing work by those that do an excellent job assisting them.  (NFL Counsel Reply, April 5, 2021, p. 5, fn. 5).  Where is the source of this actual bias?  The sworn affidavit of Sharon Delany lays this out and the evidence of the auditor's bias is undisputed.  The blatant distortion here at a minimum demonstrates the appearance of "potential" bias and such would warrant dismissal of the investigators and Special Masters.  *Hoffman, Murchison, supra*.

Obvious questions from any objective investigation and lens to expose bias are as follows:  Did those threatened by Sharon Delaney's effective work and advocacy for NFL claimants manipulate the investigators because of the bias and lack of objectivity of investigators and provide this distorted information in order for the investigators to do their bidding and impugn the character and integrity of Sharon Delaney.  Was this done because she was effective and a threat to law firm competitors?[8]  Demonstrating explicit bias, the Special Masters intentionally avoid asking such obvious questions.

Consistent with the distorted lens and failure to seek truth and follow Quality Standards for Investigations found in this entire investigation, the investigators and Audit Report got it wrong.  The investigators and Special Masters are not applying their lens to see how they are

---

[8] Similarly, why is Collins & Truett, an independent law firm owned and controlled by a 71-year-old attorney with a spotless record involved in this Audit Report?  NFL Clients can choose any counsel they want and as far as Respondent is aware from its investigation, Collins & Truett has not been alleged or claimed to be involved in any untoward activity of any type.  Whose agenda is being advanced by their reference in this Audit Report?

being manipulated to adopt bias and agendas by the institution, persons and groups.  In this case it would be competing law firms and the NFL, neither of which want this effective advocate for NFL Clients, in Ms. Delaney, and are using the audit process as their bottom feeder destructive advocacy tool, not for truth.

## NEXT EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE DUE TO BIAS, LACK OF OBJECTIVITY AND FAILURE TO COMPLY WITH LOGIC, EVIDENTIARY AND ETHICS STANDARDS

The investigators, auditors and Special Masters know that <u>Howard & Associates never filed a claim</u>, never communicated anything related to the submission of any claim to the claims facility, and never used, nor could use, nor intended to use, its attorney work product education nor in-house experts[9] and staff for any claim submission.  Rather this work was applied as part of its in-house attorney work product strategic leadership in learning and testing "potential" claims.[10]  Demonstrating the bias, lack of objectivity, failure to comply with evidentiary and ethics standards, and refusal to re-focus the investigation, the Audit Report as a grounding and conclusive evidentiary position specifically states:

**<u>"Howard did not file any claims for claimants he represented on the NFL Portal."</u>**

---

[9] There is a difference between a consulting in-house expert for attorney work product and mock trials, verses a testimonial expert for trial or claims submission purposes.  A law firm can have any type of communication with a consulting expert or in a mock trial that is part of the law firm's educational attorney work product.  None of the consulting in-house expert and protected attorney work product was ever used to testify or submit for a trial or claims submission.  Howard & Associates never authorized any consulting in-house expert, protected attorney work product to be submitted as an NFL Claim, and this protected attorney work product never was.

[10] The protected in-house attorney work product educational operation, like a mock trial, used to determine the competence and capacity of both staff and in-house experts in their efforts, as part of the attorney work product effort for NFL Claims submissions were never used for filing claims, never communicated in any fashion with the claims facility, but only as education.  As a J.D., Ph.D., that has engaged in mock trials, Dr. Howard taught constitutional law, civil liberties law and Presidential leadership at Boston University, directed and advised on nearly 100 doctoral theses, trained nearly 100 doctorates, and taught graduate students in nearly every place on the globe, like a draft dissertation, this is a standard educational, institutional and military technique to validate gaps in operations, improve quality and avoid harm.  As Dr. Howard learned at Harvard from General Petraeus' lessons in Iraq, addressing strategic leadership, "get the big picture right" and "understand mistakes of your team."  Once the flaws of both staff and experts were understood, by the early Spring of 2018, nearly three years ago, the firm got the big picture right, understood the mistakes of experts and staff, and with this knowledge engaged in a more effective approach for NFL Claims submission compliance.

Audit Report, p. 49.  The in-house attorney staff and expert work for clients used for education and operations testing, "not for" the filing claims, are protected attorney work product privilege. *See* Florida Rule of Civil Procedure 1.280(b)(3) ("documents and other tangible things . . . prepared in anticipation of [submission of client claims].").[11]

After paying nearly $1 million for in-house medical evaluations, and nearly $3 million for each and every testing by the Shenaq, PC., <u>Howard & Associate's instructions to the Shenaq, PC's was to file a claim if, and only if, the client met the claims standards through a qualifying diagnosis</u>.  The payment of these $3 million in costs and providing protected attorney work product experience and education to Shenaq, PC., was not for Shenaq, PC. to scheme with the investigators and other opportunists and accelerate the bias in interpretation of the facts in order to take the benefits of that $3 million invested.  Moreover, as to the quality of the testing that Howard & Associates paid the $3 million for, once it knew the proper methods and capacities of experts and staff, there has been no objection or concern as to any claim filed by Shenaq, PC. paid for by Howard & Associates, with its attorney work product used as historical information, never to be submitted as part or in support of a claim, even if mistakenly included by Shenaq, PC, in one claim, and none are discussed in the Audit Report. [12]

---

[11] The primary policy objective of the work-product doctrine is to preserve the effective assistance of attorneys and others employed to help prepare a claim for submission.  Maintaining the privacy of communications between client, attorney, staff for the attorney, consultants, and in-house medical experts in preparing for claims submissions fosters the effectiveness of legal assistance upon which the adversarial system of justice depends. This law firm has not intentionally or unintentionally waived either its fact or opinion work product privilege by staff or its in-house experts.  The discovery from third-party litigation or investigations were all submitted with explicit protections of attorney work product and they were not authorized nor permitted to provide or waive work product privilege in any fashion.

[12] The Audit Report commits a logical fallacy and severe error when it conflates protected in-house attorney work product medical evaluation efforts that were never intended nor ever shared with the claims facility, with ultimate claims submissions and communications with the claims facility.  **The law firm determines when and if anything is communicated with the claim facility and if and when communications and documents are submitted for claims.  The law firm never found the protected attorney work product medical evaluation efforts discussed in the Audit Report to be compliant and sufficient for submission, and consequently never submitted these**

The Audit Report's bias is glaring and is demonstrated in its own language. The Audit

Report and even the Special Masters' Rule 18 Decision use the term "potential" as their standard

for violations.[13]   There is no "potential" to communicate.  There is only "actual" communication.

---

records for the claim submission itself, and never communicated with the claim facility concerning any claim submission, ever.  Thus, there can be no misrepresentation, concealment, or omission.

**This Audit Report's logical fallacy is using attorney work-product medical evaluation educational drafts as final and as communications with the claims facility, when it "knows" they are "not" final and no communication with the claims facility ever took place.**  The draft paper maybe a "D-" because it is a draft. Grading is based on the final, not the draft.  These drafts were never submitted by Howard & Associates, and the claims that were submitted by its partner firm, with more experience, Shenaq, PC, were compliant.  The final submissions were an "A", and no fault is found in them.

Unfortunately, this Audit Report itself is "actual" and "final".  As a J.D., Ph.D., Professor Howard, with course work at Oxford and Harvard Law School, that has trained nearly 100 doctorates at Northeastern University, ranging from FBI, CIA, Judges, Attorneys, Harvard Doctoral Professors, University Presidents, Elected Officials, with Chief Supreme Court Justice, U.S. Senators, Attorneys General, and distinguished national Ph.D., faculty, in Law & Policy, grades this Audit Report a "D -".  It is not an "F" because some data work was done, but totally failed to seek or try to find the "truth" in the investigation, due to bias, lack of training, skills or capacity, and being institutionally coopted by those manipulating and feeding on this lack of understanding reality through incompetence and co-dependence for their identity, status, and institutional and economic security.  It has violated nearly every standard including but not limited to not investigating evidence casting doubt on principal informants, that claimed violative activity be "clear and unambiguous was not only ignored but apparently violated", "incomplete and misleading information", failure to "challenge or test the sufficiency and accuracy of information" and more.  Fortunately, the Special Masters have an opportunity to correct this flawed investigation and Audit Report.

If Howard's doctoral students would have presented this "final" and "actual" Audit Report, he would have given it a D- because of the fallacious logical structure and the obdurate and bias lens in the face of obvious exculpatory evidence, renders the Audit Report a near failure.  The Audit Report also raises concerns as to conspiracy and collusion to bias and distort the NFL Claims process to benefit third parties, including the NFL, and their agendas. If this was a "draft" Howard would expect the doctoral student to submit the "re-worked" next draft addressing its bias and failure to comply with Quality Standards for Investigations, and constructively use this review for an intelligent and objective accurately focused investigation and report, and future sound thinking and application.  The Special Masters can now correct these errors.

[13] The Special Masters had a chance to correct the absorbed the bias, distorted lens, and failure to apply exculpatory evidence, that the investigator applied in its Audit Report.  They have chosen not to.  While the Rule 18 may permit "potential" for referrals by the Special Masters, Rule 28 Standard of Proof Applicable to the Special Master rulings requires an "actual" claim submission and an "actual" misrepresentation, omission or concealment of a material fact made in connection with a [filed] claim by the Settlement Class Member.  Thus, there can be no violation for a claim that was never filed and never used protected in-house attorney work product.  Nor can there be intent for misrepresentation, omission or concealment of a material fact made in connection with a claim filed by a SCM when the instructions from Howard & Associates to its co-counsel are specifically instructed "not" to use any of its in-house medical exams and education attorney work product by in-house experts and staff used to learn about claims, "not" for use in any claim submission for any SCM, and in fact "none were used as the basis for any claim."  Audit Report, p. 14.

There can be no misrepresentation, omission or concealment if there no communication.  This alone is a violation of Quality Standards for Investigations.

"Potential" is defined by Meriam Webster as "existing in possibility: capable of development into actuality; expressing possibility."  The opposite or antonym of potential is "actual, existent, factual, real."  What the use of "potential' in this Audit Report and Special Master's Rule 18 Decision on Report of Adverse Finding Regarding Howard & Associates and Related Parties, without ever communicating with Howard & Associates concerning this audit, is that the violations are **not** "actual, existent, factual [or]real."  What the investigator missed due to their lens being perverted is that the word "potential" means that it did not happen.  "Potential" does not mean "actual."[14]  In the words of Hall of Fame NFL Head Coach Bill Parcells, **"Potential means you haven't done anything yet."**

Every attorney work product activity, indeed the activity of every human being and every institution at any given moment, has the "potential" to do harm, even murder.  We all have the potential to communicate hello, but if we don't see the person, and don't say hello, we are not saying hello.  **This Audit Report without ever questioning or hearing from Howard & Associates and never informing the law firm it is under audit, is not "potential" but is "actual, existent, factual, real" and demonstrates that its potential for bias, lack of objectivity, manipulation by persons, criminal informants, failure to investigate the agendas and credibility of sources, institutions, and organizations, violation of ethics, inability to refocus its lens, and violation of the Code of Judicial Conduct, Federal Rules of**

---

[14] The Audit Report states that the "Appeals Advisory Panel should ignore any Howard related provider records when assessing claims." *Id.*  That is obvious. The AAP should ignore these records as none of these records were for claims submissions and were protected attorney work product privilege that were never submitted nor authorized for submission by Howard & Associates.

**Civil Procedure, U.S. Supreme Court precedent, and Quality Standards for Investigations are now confirmed as actual and "real".**

The entire Audit Report relies on this *non sequitur* due to its bias lens and failure to objectively and independently look at the evidence in context nor discuss the context with the target of the investigation.  This distorted lens is the root of this investigation and Audit Report. It is a *non sequitur* to state that no claim was ever filed yet argue that there were misrepresentations, omissions, or concealment of material facts made in communications to the claims facility, which is based on claims being filed for payment.  It is a physical impossibility. Non-filed and non-authorized attorney work product privileged documents, in-house medical evaluations and communications that were never used, nor intended for use, specifically instructed by counsel not to use, and were not ever to be filed for any claim or submission.

Consistent with the *non sequitur* of "potential" as being "actual", Title IV, Rule 28 of the Rules Governing The Audit of Claims does not apply "potential" as a **Standard of Proof Applicable to the Special Master.**  Rather it specifically states the Special Master will determine whether there is a:

> reasonable basis to support a finding that there has been a misrepresentation, omission, or concealment of a material fact **made** in connection with **a Claim** [filed] **by** the Settlement Class Member.  The Special Master also may find such misrepresentation, omission or concealment was intentional if the record contains substantial evidence of such intent.

Based on this Standard of Proof there must first be an action made in connection with a claim "filed **by**" a Settlement Class Member.  **There can be no "misrepresentation, omission, or concealment of a material fact" since there was no communication with the claims facility to create a misrepresentation, omission or concealment of a material fact.  That would be an impossibility.**  There is no communication with the NFL Claims facility based on the in-

house attorney work product educational efforts.  **No claim has been filed, or authorized to be filed, with any omission, or concealment of a material fact, nor was any material fact on a claim intended to be so filed**.  <u>There can be no finding of intent for a "non-filed" claim or unauthorized use of in-house attorney work product medical evaluations and staff work, as one cannot even communicate sufficient to create a misrepresentation, omission or concealment of a material fact unless and until there is communication with the claims facility and a claim is filed.</u> "Potential" means an action has not taken place.  Protected attorney work product communications and internal attorney client work product education are not "actual" claims.  Especially when never submitted.

Thus, the Audit Report's bias and lack of objectivity, lack of acceptance of exculpatory evidence, lack of investigating evidence casting doubt on principal informants, that violative activity be "clear and unambiguous was not only ignored but apparently violated", "incomplete and misleading information", failure to "challenge or test the sufficiency and accuracy of information", and deeply distorted lens and interpretation is misplaced and results in a deeply flawed, if not fraudulent, Audit Report.  This makes an excellent Harvard case study in investigative and Audit Report failures and "pile on" adoption through passive acceptance of errors and incompetence, rather than objective, engaged investigative thinking.  Unfortunately, the management oversight and exposure of internal errors to the Special Masters that should have taken place here to correct this flawed product, was intentionally not done by the Special Masters, even after written notice and detailed evidence to them on February 4, 2021.

**THIRD EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE IN ADOPTING BIAS OF CRIMINALS, CONFIDENCE GAME OPERATORS, AND EXTORTIONERS**

The core allegations by the Tipster—that 350 medical reports to be submitted to the NFL Claims were forged in an attempt to submit fraudulent NFL claims, were shown by the witnesses and documents as demonstrably false.  Consider the following findings from the audit itself:

**Dr. J. Lucas Koberda Confirms All Records Accurate and No SCM Claim Submission Relying on His Diagnosis.**

Confirming the false narrative and false information provided by the Tipster, that medical documents were forged, as well as the preliminary attorney work-product evaluations not for submission to the NFL Claims facility, Dr. J. Lucas Koberda verifies that "**all documents matched his medical records.  To date, no Settlement Class Member formerly represented by Howard & Associates has submitted a claim to the Settlement Program that relies on a Diagnosing Physician Certification Form by Dr. Koberda**."  Audit Report, pp. 15-16. (emphasis added).

**Dr. Ahmed Sadek Confirms All Records are Accurate and Denies Ever Being Requested to Edit a Medical Report.**

Confirming the false narrative and false information provided by the Tipster, that medical documents were forged, as well as the preliminary attorney work-product evaluations not for submission to the NFL Claims facility Dr. Ahmed Sadek "**denied ever being requested to make edits to reports**, except to correct name spelling or dates of birth."  Audit Report, p. 16. (emphasis added).

**Dr. Laura Hopper Confirms Accuracy of Medical Reports.**

Confirming the false narrative and false information provided by the Tipster, that medical documents were forged, as well as the preliminary attorney work-product evaluations not for submission to the NFL Claims facility, Dr. Laura Hopper "**noted no other differences in the**

**reports** [other than Dr. Williams name missing on one title page].  Audit Report, p. 18. (emphasis added).

Notwithstanding the verification that the core allegation by the Tipster was false, namely that no medical reports were altered, the Audit Report still adopts the bias of the Tipster and continues is meandering investigation violative of Quality Control Standards and not grounded in reality or objectivity.

### FOURTH EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE BY NOT COMMUNICATING WITH THE LAW FIRM TO GET ACCURATE FACTS

The Audit Report investigator, presumably Brown & Greer Attorney Roma Petkauskas, and Special Masters could have saved much of this time and effort by directly communicating with Howard & Associates as to this false lens and adopted bias of the investigation from extortionate allegations founded in greed.  Fortunately, and expectedly as this is its purpose, the protected attorney work product process uncovered systemic errors, lack of staff capacity, extortioners, confidence game operators, and led to education from experts, and to a claims submission education that were in the client's interests.  The fact that all lawsuits have been settled with Howard & Associates not paying anything, including no disgorgement to the SEC, shows that other than trusting and seeing the good will in others, nothing was done wrong, and no greed nor unscrupulous activity took place.  The protected in-house attorney work product education and exposure process worked.  Notwithstanding, the adopted, distorted and bias lens in violation of investigative Quality Standards for Investigations in the final Audit Report, adopted and not modified by the Special Masters, continues.

That is why objectivity, lack of bias, ethics and compliance with evidentiary rules are required for all investigations and Audit Reports.   Bias is a common human error, and emotional identity commitment combined with doubling down through cognitive dissonance keeps one

buying into an initial false lens on reality, sometimes for life.[15]  If the lens and bias continue to

deny reality this can result in personal disintegration, institutional disintegration, and mayhem.

Bias and a distorted lens on the facts is a key source of injustice.  Consider the recent storming of

the Capital as an example.  This was a good learning opportunity for the Special Masters,

investigators, and Attorney Roma Petkauskas, yet they have chosen to continue down their

biased path.

**FIFTH EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE TO OBJECTIVELY
INTERPRET PROTECTED ATTORNEY WORK PRODUCT WORKING DRAFT
TEMPLATES FOR VOLUME MEDICAL REVIEW AND TESTING SYSTEMS.**



The Audit Report lists three claims (███ ████ SPID ████ ██ █

SPID ████ ██ █ SPID █████ submitted by another law firm with NFL

Claim compliant medical evaluations by other physicians, with awards issued for two of the

claims.  They include historical IMEs from the preliminary attorney work product done by

Howard & Associates in-house experts and psychometrist. These experts were providing

preliminary medical evaluations for Howard & Associates for understanding of the evolving

claims process.

The fact that similar information is found concerning the same client from a similar

medical evaluation in-house attorney work product evaluation process, is expected.  The mistake

is conflating this in-house attorney work product medical evaluation work with a final product

for submissions for claims.

As a matter of course, medical providers don't start from scratch but rely on prior work

of other medical providers as they advance their diagnosis and treatment, and often rely upon and

---

[15]  As the Audit Report shows, this same information without the proper lens leads to extortion and injustice.  This is
the error of the investigator and the Audit Report.  Their bias in seeing bad intent is embedded based on their
incentives and career which distorts their lens.  This lack of objectivity and bias created the distorted lens and is at
the root of this *non sequitur* Audit Report.

may even adopt the information from other medical evaluations as part of their clinical and

medical evaluation efforts. Especially when dealing with high volumes.  Notwithstanding, these

were not used for an NFL Claim. They were only protected in-house attorney work product

medical evaluations, not for filing in an "NFL Claim Compliant" medical report.  This was part

of the protected in-house attorney work product preliminary medical evaluation screening

process by Howard & Associates.

      Protected educational efforts as attorney work product with non-board-certified

neuropsychologist Dr. Ford-Johnson and neurologist Dr. Sadek as part of the in-house IMEs on

CDRs, dates of testing, and employment are appropriate. In fact, the law firm continued to learn

about the employment issue and now knows that this is only one data point and does not

necessarily exclude a claimant from approval. As a result of this exercise the law firm was able

to assess the competency and capacity of both its staff and evaluate future experts in the evolving

NFL Claims process.  The appropriateness of this internal strategic approach became clear to the

law firm in late 2017, when the law firm learning process concerning staff and in-house medical

evaluation experts had run its course.

**SIXTH EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE TO OBJECTIVELY INTERPRET PROTECGTED ATTORNEY WORK PRODUCT WORKING DRAFT TEMPLATES FOR VOLUME MEDICAL REVIEW AND TESTING SYSTEMS.**

      Providing templates in word for "working draft reports" that are to be edited based on the

assessment and findings of a medical expert, for a high volume of protected in-house attorney

work product medical evaluations, is standard activity.  All medical professionals have their

templates.  Providing updated facts and information in "working draft reports" is also standard.

This working draft protected attorney work product was ultimately reviewed by the law firm and

from the lessons from this attorney work product medical evaluation effort guided the law firm

to engage a law firm with more experience in the NFL Claims process. That was the Shenaq, PC., law firm.

As co-counsel, Howard & Associates paid $3 million for all independent testing and assisted with its joint client claims with Shenaq, PC.  Shenaq, PC., entered into a joint venture with Howard & Associates due to its expertise in the evolving NFL Claims process.  Howard & Associates had learned what was needed for quality staff and claims submissions through its attorney work product efforts from 2015 through early 2018 and determined to participate with a firm that had perfected the process.

Without its experience and knowledge from its protected attorney work product education with other experts and staff, the firm would not have had the judgement and expertise to make this decision.  It was the correct one at that time and the attorney work product education and experience informed this decision.  Unfortunately, because the investigations continued, sometime in 2019, Shenaq, PC., saw the false allegations, bias, lack of objectivity by the investigators and audit process, as well as pile on by other opportunists, as a method to gain favor, and work strategically to take the benefits of the $3 million, and increase his income.  His bottom feeder strategy also failed.

### SEVENTH EXEMPLAR OF INVESTIGATIVE AND AUDIT FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY WORK PRODUCT WORKING DRAFT TEMPLATES FOR VOLUME MEDICAL REVIEW AND TESTING SYSTEMS

Creating protected in-house attorney work product "draft" medical evaluations from 11/5/15 to 11/6/17 that the law firm never authorized to be used for a formal claim submission but were part of its protected attorney work product privilege efforts at medical evaluation of client claims and preparing systems for claims, but never using these documents for final NFL Claims submission, is appropriate. This is regardless of the number of revisions or dates of the

medical evaluation drafts, and regardless of the source of the information, CDR worksheets, and privileged communications, correct and incorrect, between legal staff and experts, *vel non.*

Claims of "cherry-picking" existing and accurate CDR information for medical evaluation working drafts of an protected in-house attorney work product education effort for both staff and in-house experts that was never submitted nor intended to be submitted for an NFL Claim, is irrelevant.  Moreover, the non-testifying in-house experts were able to review the original source documents and modify as desired.  The bias and lack of objectivity distorted the investigator lens and Audit Report.  The Audit Report conflates protected in-house attorney work product medical evaluations and process education with actual submissions.  This bias and lack of objectivity blinds the investigator to the fact that this has no significance.

Inaccuracies and errors in protected attorney work product "working draft" medical evaluations and related documents prepared for internal evaluations, but not for submission to the NFL Claims, is of no significance.  It raises the concern of why the constant conflation of law firm non-use documents and law firm non-authorized documents, as if they were "actual" submissions?  Why and how are drafts that are never used, driving this investigation, and the only substantive evidence of this investigation?  What is the source of this bias?

In the words of Shenaq, PC., a key informant source of this biased investigation, **these were "'historical medical records' that are 'not used as a basis of any claim.'"**  Audit Report, p. 14.  In fact, when the audits of these three claims were concluded, there was **a finding of compliance** and **no** **"Report of Adverse Finding in Audit."**  *Id.*

The bias and lack of objectivity and failure to apply exculpatory information deems the investigation and Audit Report biased, improper in outcome, seeped with severe violations of the code of Judicial Conduct, rules of Federal Civil Procedure, U.S. Supreme Court precedent, and

Quality Control Standards of investigations and audits.  It raises the specter of bias or at a minimum the appearance of bias, either of which meets the standards for dismissal of the auditors and Special Masters.

**EIGHTH EXEMPLAR OF INVESTIGATING AND AUDIT FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY WORK PRODUCT "WORKING STAFF" EVALUATION AND DEVELOPMENT**

The investigators and Audit Report infers nefarious intent and processes for Dr. Edwardo Williams working as a psychometrist.  There is no objective basis for any such claim.  This claim is borne from bias and lack of objectivity.  Dr. Edwardo Williams, with over 30 years of medical intake and diagnostic experience with similar populations and culture.  As a black and accomplished physician with a history of serving under resourced black communities and underserved black populations, he lost his license due to nothing but comments to a handful of primarily white female patients, continued his development as a psychometrist for neuropsychological testing.  Black nurse Samantha Barker's CDR interface, as she had experience with similar populations and culture, was evolving as part of the attorney work product privilege education efforts.  Similarly, both Dr. Koberda's and Dr. Sadek's interface was evolving as part of the protected attorney work product privilege medical education efforts.  There was no "machine", nor a claims submission process "created".  This was a protected in-house attorney work product medical evaluation education process that was never, could never and will never be used for final claims submissions.

**NINTH EXEMPLAR OF INVESTIGATING AND AUDIT FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY WORK PRODUCT WORKING, STAFF EVALUATION AND DEVELOPMENT**

As another example of failure to comply with Quality Standards for Investigations, and bias, the law firm's focus on and learning the importance of employment as a key component of

the NFL Claims process is not nefarious.  The law firm was learning about this during its

protected attorney work product educational process.  Addressing Mr. ███ and Mr. ███

(SPID ██████ employment status was a key part of education on their claims process.  The

law firm's education and its ultimate testifying experts must understand that for any claim to be

valid, employment was a key issue.  Attorney work product with non-testifying in house experts

not for use in claims submissions is not an issue, nor relevant for an investigation, much less in a

final Audit Report accepted by Special Masters.  This in-house education is appropriate for a law

firm to have in order to understand compliant claims submissions.[16]

Instructions on an in-house protected attorney work product in learning how experts

develop accurate CDR scores as part of attorney work product privilege education efforts that

were never submitted is not a "gross misrepresentation of facts," but merely highlighting the

importance of CDR scores for a true and final claims submission process, which was

implemented in Spring of 2018, not during the in-house protected attorney work product

education from 2015 or 2017 that the audit is referring to.

Notwithstanding this protected in-house attorney work product learning process, none of

this medical evaluation attorney work product was never used, nor authorized for use, in any

claim submission.  These were protected attorney work product educational efforts and medical

evaluation efforts to prepare for the NFL Claims process as the understanding of the medical

---

[16] What these facts do show is the coordination between Shenaq, PC., which is indicated to eventually become a stalking horse for the investigator so that the investigator assists Shenaq, PC., in taking $100,000s or more in fees for a claim and others that Howard & Associates paid $3 million in costs for, in violation of Shenaq, PC.'s, co-counsel agreement.  The Audit Report and investigator has become either a knowing or unwitting accomplice or is being duped due to lack of expertise and sophistication, for greed and taking by Shenaq, PC., and others such as Addys Walker, Tipster Don Reinhard and various SCMs coached from prison by Tipster Don Reinhard and his accomplices.

standards evolved both with the experts and with the NFL Claims process from 2015-to early 2018.

As a result of the protected in-house attorney work product medical evaluations, and the NFL Claims process maturing, the firm was able to determine the most effective way to manage client claims.  None of the protected attorney client work product educational work with in-house non testifying expert medical evaluations were ever to be used for any claim submission, and none were ever submitted as a claim for any SCM.  They were used only to understand the capacity of staff and evaluation of experts and capacity to determine the most effective way to manage client claims.[17]

### TENTH EXEMPLAR OF INVESTIGATION AND AUDIT BIAS AND FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY CLIENT GUIDANCE AND COSTS

As part of its protected attorney work product with its in-house experts, this firm assisted Dr. Koberda in understanding and participating with the NFL Claims process.  This is the law firm's guidance as testing for internal evaluation purposes were not for NFL Claims submissions and its guidance was accurate for the internal attorney work product IME evaluations that were not being used for NFL Claims filing, but only medical experience and judgment as the law firm educated itself on the process.  Dr. Koberda's statement that "I provided an independent examination and expert opinion" is accurate and appropriate guidance to its expert.

---

[17] Similarly, the purpose of protected attorney work product medical evaluation activities with experts and staff is to understand how the process can work.  They are to work to determine what is accurate, legal and appropriate.  If the law firm educational materials were submitted for a claim that would violate the instructions by Howard & Associates and would not be appropriate as they were not intended for filing, nor finalized for filing, but were to educate on compliance with claim submission standards, not to avoid them.  Howard & Associates did an excellent job in determining lack of medical evaluation expert skills and qualifications, as well as lack of staff skills, including exposing corrupt staff and consultants, and was only able to do so through this learning exercise.  Howard & Associates used this information as part of its growing expertise in evaluating claims and capacity to prepare claims, and to partner with a law firm with skills and expertise that its in-house attorney work product staff and experts were shown to lack.

The application guidance on language was also accurate.  Doctor Kobera's statement that "they were general assessments because the Players wanted to see if they had any problems before they applied for the Settlement Program to see if they could qualify and were from Howard & Associates" is accurate.  This was protected attorney work product medical evaluations by an in-house expert for assessments of clients for potential claims submissions, but not for submissions.[18]

Interpreting these statements as nefarious demonstrates the bias, lack of objectivity and influence of other interested parties to accomplish their agendas of greed and criminal conduct through the investigation and Audit Report.

**ELEVENTH EXEMPLAR OF INVESTIGATION AND AUDIT BIAS AND FAILURE TO OBJECTIVELY INTERPRET PROTECTED ATTORNEY CLIENT GUIDANCE AND COSTS**

Protected attorney work product efforts to educate itself on medical standards, expert capacity and staff, to understand how to best prepare and submit a claim for a client is not "with the purpose to <u>affect</u> whether the Settlement Class Member qualifies for a Monetary Award." There was no filing of a claim to the Monetary Award Fund ("MAF").  The entire effort was to ensure that claims are compliant with and would indeed meet medical and claims standards "prior" to submission to the Monetary Award Fund.

Protected attorney work product education and work with in-house experts on medical evaluations for potential claims and staff is not coaching, nor disregard of basis professional

---

[18] Attempting to sanction a "former" independent contractor--paralegal for the law firm, Neil Epstein, for protected attorney communications in assisting in communicating accurate information to an in-house medical evaluation expert, <u>which in-house expert was never used for any claim submission by the law firm</u>, as part of the law firm's protected attorney work product efforts, violates logic, ethics and law.  This bias and failure to properly evaluate the evidence is similar to the inclusion of Sharon Delaney and Collins & Truett law firm in this Audit Report, without any notice to those parties.  This pattern indicates adoption of third-party agendas by the investigators, investigation and ultimate Audit Report.  It looks like third parties are threatened by whatever work he is doing for another law firm and the investigator is doing their biased bidding.

principles, but educating the law firm on how to properly appraise and apply medical expert knowledge within the then and still evolving Monetary Award Fund submission process.

The language ▇▇▇ Audit Report complaining about claimed "delays" SCMs for timely filings, is the same language that Shenaq, PC., used in its self-interests for more fees on a claim that it paid nothing on, as found in its charging lien allegations. This again is evidence that investigators and their Audit Report are colluding and advancing the interests of Shenaq, PC., either willingly or unwittingly. There was no delay in filings, as taking the time to deliberately understanding the claims process, and to understand whether a client, with options ranging from Parkinson's disease to not being qualified, actually expedites the payment of claims. What has delayed compensation of retired NFL Claimants is a biased and deeply disturbed audit process. The fact that after nearly four years in operation, only 1,219 claims have been paid out of 20,556 Registered Settlement Class Member, and 3,146 claims packets filed, demonstrates that being deliberate and cautious in filing claims is both prudent, required and expedites payments for clients. The scant movement of claims also demonstrates a tacit, if not intentional approach to delay and deny valid claims.

The fact that Howard & Associates is seeking costs for the $3 million funds that it paid on behalf of its co-counsel, Shenaq, PC., for joint client final testing for submission packets and travel, is entirely appropriate. Any direct or indirect manipulation of the Audit Report and investigators to line the pockets of Shenaq, PC., competing opportunist law firms, criminals, extortionists, thieves, or to accomplish the NFL's aim of denying payments, is corrupt. This adoption of agendas by Shenaq, PC., Don Reinhard, Joe ▇▇▇ Addys Walker, Dexter ▇▇▇ Corey ▇▇▇ the NFL, and the like, gives clear evidence that this Audit Report, in violation of judicial, rules of civil procedure, U.S. Supreme Court and universal investigative standards, has

adopted the lens and bias of manufactured sophistry by a community of extortioners, confidence

game operators, and legal legerdemain opportunists, including the NFL, based on unscrupulous

greed and bottom feeding.

**BIAS FROM AUDITORS, SPECIAL MASTERS AND NFL COUNSEL ALLIANCE KNOWINGLY AND INTENTIONALLY HARMS INJURED RETIRED NFL PLAYER RECOVERIES**

NFL Counsel and the audit both admit that no claim was ever submitted by Howard &

Associates.  "Howard did not file any claims for claimants he represented on the NFL Portal."

*Id.,* p. 6; Audit Report, p. 49.  NFL Counsel admits that Howard & Associates spent $ millions

on in-house attorney-client work product medical evaluations for approximately 350 clients.

(Respondent's Initial Response, February 4, 2021, pp. 7, 17, 19, 21; NFL Counsel Reply, pp. 2-

3).  NFL Counsel and the audit admits that the in-house attorney-client work product medical

neuropsychological evaluations were not intended nor could be submitted for claims as the

medical providers were not qualified for NFL claims submissions.  (NFL Counsel Reply, pp. 3-

4).  NFL Counsel and the audit admits that in-house attorney-client work product medical

evaluations that were never submitted nor intended to be submitted had only the "**potential** to

affect whether class members received a Monetary award in the Settlement Program."  (NFL

Counsel Reply, p. 1).  NFL Counsel and the audit admits that co-counsel submissions by Shenaq,

LLC., were valid and Respondent's investment of approximately $3 million on preparing and

reviewing claims for submission was legal and valid.

NFL Counsel and the audit avoids the written standards for NFL claim audits—"a

misrepresentation, omission, or concealment of a material fact made in connection with [filing] a

claim by the Settlement Class Member."  (Title IV, Rule 8, Rules Governing the Audit of

Claims—Standard of Proof Applicable to Special Master; Response, February 4, 2021, pp. 8-9.).

The undisputed evidence demonstrates the auditor and Special Masters have gone beyond their authority and are operating under "actual" bias and the appearance of "potential" bias.  Again, if there is even the appearance of "potential" bias, the investigators operating under the Special Masters must be dismissed.  *Hoffman, Murchison, supra*.

### Nefarious Twist of In-House Attorney Work Product Into a Claim of a Fraudulent Scheme.

NFL Counsel, the auditors and Special Masters attempt to twist in-house attorney work product medical evaluations into a fraudulent "scheme."  They claim a scheme with 6 medical providers sprawled across the nation from California to Houston, Texas to Tampa, Orlando, Miami and Tallahassee, Florida.  The neurologists and the neuropsychological providers (not qualified for final NFL claims submissions) were independent and had distinct tracks.  Most did not work with or ever communicate with each other.  The scheme would also have to include 10 staff in the then Tallahassee and Fort Lauderdale, Florida offices.

This is a scheme to accomplish what?  Is it a scheme to take advantage of a claims facility that didn't exist and its parameters undefined?  Is it a scheme for claims that were never to be submitted as the neuropsychologists were not qualified for claim submissions?

NFL Counsel and the Special Masters must acknowledge Respondent does have some education and capacity to reason.  Otherwise, they couldn't claim that Respondent could form an intent to scheme.  They know that such claims, without a properly board-certified neuropsychologist report and proper CDR report, could never be submitted for a successful return for clients.  They know that Respondent is rational and intelligent enough to know that

such claims could never be submitted for a successful return for clients.[19]  Thus, what would or could this "phantom" scheme of goofy thinking hope to accomplish?

This is a prime and actual example of sophistic *ad homin*em dissembling to avoid justice for severely injured retired NFL players.  This is a prime example of superficial thinking absorbed from a low-level extortionate criminal and inmate, and adapted, exploited and spread to others who also apply exploitive superficial thinking to advance their "bottom feeding" approach to a career.

The investment, experience and education from 2015 through early 2018, which is standard for high volume and high investment MDL/Class Actions, such as 5,000 BP Oil Spill claims, 18,000 Engle Tobacco Trust cases, and 3,600 Engle Tobacco Progeny cases, Toyota Air Bag claims, and over 350 NFL Claims, led the firm to locate a firm with additional experience, and to build upon its in-house attorney work product, and spend $3 million with Shenaq, LLC, which is approximately $8,500 a claim.  The two firms refined the in-house attorney work product for successful final claims submissions.  This is a sound and deliberate method for high quality claims submissions.  It is not "far-fetched" as NFL Counsel claims.  (NFL Counsel Reply, p. 4).  For competent and quality claims submissions, it is required.  From the "far-fetched" uninformed and unreasoned response, it is clear that NFL Counsel has never risked

---

[19]  The average "conservative" return on an NFL Claim is approximately 10 times the $8,500 expert investment, or around $85,000 in fees, based on a recovery of approximately $500,000 and 17% fee per successful NFL claim. Investing $3 million in preparation for claims is standard and has been done in previous high volume claims submissions.  For instance, Respondent submitted nearly 5,000 successful BP claims before this same claim administrator, Brown Greer, and knows that the claims facility process must be expertly understood and adapted to over-time as the process evolves.  Patience and study of the claims process, $ millions of in-house attorney work product expert work, and hiring experienced experts and work with experienced counsel, was required to successfully navigate the BP claims process, and that led to nearly $100 million for Respondent's BP clients before Brown Greer.  Unfortunately, in the case of NFL Claims, Respondent had destructive operators in his midst, due to his trust and giving a second chance to a high school football teammate, and compassion with and for the black community.

millions to assist others, nor done a simple investment and return calculation.  This firm did so

on a regular basis ranging from historic battles against Big Tobacco to BP.  Nothing nefarious,

clearly integrous and grounded.

"Potential" to do harm is another *ad hominem* distraction.  Every human being has the

potential to do good or bad, to love or hate, to care or to be greedy, to lie or to tell the truth, to

murder or to forgive.  **"Potential" means nothing took place and logically can never be made**

**to be "actual."**  As referred to earlier, **"Potential means you haven't done anything yet."**  Hall

of Fame NFL Head Coach Bill Parcells.

Pursuing an investigation based on *ad hominem* narrative from a criminal inmate, and

"potential" but non-existent harm, demonstrates an unbridled investigation and "potential" and

"actual" bias by the investigators and Special Masters.  For Court appointed Special Masters and

those working for them, even the perception of "potential" bias warrants dismissal.  *Hoffman,*

*Murchison, supra*.

### NFL Counsel's "Actual" Dissembling.

As an example, every intelligent lawyer has the "potential" to use syllogisms and logical

fallacies to dissemble and pervert justice based on an intent of professional advancement and

hourly billings.  Some lawyers use their syllogisms and accurate logic to advance justice and

others use their syllogisms and logical fallacies to obfuscate justice.

In this case, NFL Counsel has gone beyond "potential" and moved to "actual".  NFL

Counsel has "actually" dissembled and uses non-rational, logical fallacy *ad hominem* devices in

an attempt to avoid justice and payment to injured NFL clients.  Dissembling with Sharon

Delaney, ███████ ████ and Respondent are examples.  It is clear that this moral and ethical

lapse is not motivated to advance justice or compassion but based on personal professional exploitive advancement and hourly billings.  This moral and ethical lapse is "actual."

### NFL Counsel, Auditors and Special Masters Avoid Indisputable Facts and Logic.

NFL Counsel needed 6 weeks to analyze the evidence to say "Much of the Responses and their exhibits are entirely irrelevant,  . . ."  (NFL Reply, p. 1).  Auditors and Special Masters had nearly 4 years.  Despite NFL Counsel's admission that portions of the Responses are relevant, yet nothing from auditors and Special Masters, neither do not to the hard logical and evidentiary work to address the relevant evidence and exhibits.

If NFL Counsel, auditors and Special Masters did so, no violation would exist, since their superficial thinking argument is based on "potential" and "ad hominem."  Both of which are logical fallacies and mean nothing because one is not "actual" in reality, and the other is not factual or logical, but based on a logical fallacy.  **That is why the audit proof standards require "actual" claims submissions, not "potential" claims submissions that never did, never would, and never will happen.**

Not only does NFL Counsel, auditors and Special Masters attempt to avoid the facts and apply logical fallacies, NFL Counsel, auditors and Special Masters deny the relevance and application of ethical standards of investigations.  Use of narratives from extortionate criminal informants, whose claims are demonstrably false, and proven to be so, must ethically be discarded.  Yet NFL Counsel, auditors and Special Masters hold onto use of these extortion and demonstrably false statements, as it accomplishes the NFL's avoidance agenda, with tacit complicity of the auditors and Special Masters, not based on truth and justice, but based on intentional, actual obfuscation and de facto denial of payments to retired NFL Claimants.

This is because use of logical fallacies and *ad hominem* are methods lacking reason, but relying on emotion and impulse, to obfuscate truth and justice.  *Ad hominem* logical fallacy is a "dark arts" method to gain political, economic, professional and institutional power, and to extort, based on fear of *ad hominem*.  *Id*.  Politicians, lawyers and institutional manipulators regularly use this technique for advancement.  They are blind to the truth that capitulation to their use of these "dark arts" kills their integrity and neuters capacity for good and lasting impact.  Respondent does not operate in fear.  Respondent knows who he is, knows what took place, and has extensively documented the same.

**NFL and Special Masters Claim Irrelevance of Investigative Standards.**

It is not surprising that NFL Counsel would claim that ethical investigative standards are irrelevant, when avoiding such standards accomplishes an immoral goal of diminished and delayed payments to retired and severely injured NFL players.  That is because NFL Counsel's client gains by slip shod *ad hominem* investigations, even those that demonstrate no "actual" harm ever took place nor was intended to take place.  What is surprising is that the Court appointed auditor and Special Masters also find these standards irrelevant.  This is a violation of the mission the Court assigned the Special Masters to accomplish and demonstrates significant bias and lack of objectivity.  Such abandonment warrants admonishment or dismissal.

The standards that NFL Counsel find irrelevant include lack of objectivity ("potential" is not "actual"), lack of independence (accepting intentional and known dissembling), and absorption of preconceived opinions (criminal allegations of fraud as part of an explicit extortion scheme), official, professional, personal and financial incentives towards bias (an activity to charge clients for and to claim feigned professional competence), failure to accept and review exculpatory and mitigating evidence (no claim submitted, no forging of any medical reports, no

misrepresentation to any party, all in-house attorney work product medical evaluations), all of which destroy the integrity of this and any investigation.  Inconceivably and immorally, NFL Counsel align with the Special Masters and finds these matters irrelevant.

The harm from failure to follow investigative standards are indisputable, and the harm is taking place here and with Sharon Delaney, ███████ ███████ Respondent, and scores of innocent NFL claimants.  What is concerning is that the investigators and Special Masters are not complying with investigative standards.  This shows "potential" and "actual" bias.  Even the appearance of "potential" bias warrants their dismissal.  *Hoffman, Murchison, supra*.

### Use of Perjured, Fraudulent and False Bar Complaints Never Read nor Filed by Clients.

NFL counsel, auditors and Special Masters attempt to justify dissembling by use of Florida Bar complaints that were fraudulent, never read by the client, ghost written by extortionate counsel, and submitted in violation of perjury, full of admitted false statements, nor filed by the client or his estate, but solely for extortion purposes, is another *ad hominem* deflection from the logical fallacies that both the audit and NFL Counsel relies upon.  Redacted Response to Florida Bar attached with exhibits.  The Auditors and Special Masters adopt the same low watt approach.

This same scheme and narrative were used by Corey ██████ and Dexter ██████ under the guidance of and coordination with criminal Don Reinhard from prison, to complete their scheme to take $800,000 without repayment by filing incendiary lawsuits and Bar Complaints.  Preferred Capital tried the same approach, and former counsel, Amir Shenaq, after Howard invested approximately $3 million for NFL claims testing with his firm, tried to leverage his extortion skills in coordination with the NFL Claims investigators, in an attempt to undercut Respondent's rights to fees and costs and enlarge his own.  Stench of smoke, upon smoke to justify smoke.

This is rooted in extortion agendas by criminals and pseudo criminals and spin.   The investigator, auditor and Special Masters are to be objective and independent in seeing through this smoke.  They failed.

**Failure to do Background Checks.**

NFL Counsel, auditors and Special Master are correct that in 2015 Howard trusted Don Reinhard and Addys Walker and didn't do a background check on either person.  Howard regrets that he was trusting too much, doing too much, and going too fast on too many fronts (Global Graduate University, Movie Company, spending millions on 3,600 tobacco cases, working on the inventory of 5,000 BP claims before Brown Greer, NFL Testing, and real estate development and more) without competent staff to slow down and engage in proper due diligence.  His compassion for and trust in his high school football colleague and efforts to provide opportunity to members of the abused black community were exploited by both.

Mr. Reinhard has since been in prison since March of 2017 and Mr. Walker was exposed for his confidence game operations back in January of 2018 and departed.  It is now 2021.  These errors going back 6 years are not a basis for denying NFL Claims for injured retired NFL players, nor is this misrepresentation nor fraud in any manner.  To rely on the goodness and trusting of others causing a failure to engage in background checks as an intentional basis to avoid paying NFL Claimants is indeed rank dissembling, and worse because it is intentional.

This view is adopted by the investigators, auditors and Special Master demonstrates "potential" and "actual" bias and a violation of their duties of efficient and justified payments to NFL Claimants.  Even the appearance of "potential" bias warrants dismissal. *Hoffman, Murchison, supra.*

**No Scheme, No Profit, No Greed.**

As the evidence and reason demonstrate, there was never a scheme.  A scheme would require a rational approach and an end goal of greed and illegal profit.  This is not found in the facts nor in logic and was neither the goal nor the outcome.  All that occurred was imperfect physicians and staff doing in-house attorney work product medical evaluations from 2015 through 2017, with neuropsychologists that were never qualified for submissions to the NFL Claims process and as such their evaluations could never be submitted.  All were working without experience with a claims facility that was undefined and didn't exist during the core relevant time frame.

Howard trusted and gave opportunities to those that exploited his compassion on and for their lives.  Moreover, neither the claims facility staff, nor the physicians, nor Howard's staff, nor Brown Greer at that time, had any experience with the then either non-existent and ultimately inchoate NFL Claims process—it is now 6 years later.  One can't judge on what is known now but has to look at the facts as to what was known 6 years ago.

**Sanctions.**

NFL Counsel, auditors and Special Master seek sanctions against non-existent personnel. There are no staff working at Howard & Associates, nor did any staff engage in anything untoward.  Moreover, the referral to law enforcement and other agencies took place in July of 2018 in violation of audit standards and have been dealt with since then.  It is now April of 2021.

The "potential" and indication of "actual" bias found in the investigation and by the auditor and accepted by the Special Masters is extensively documented in the various responses. This complacency in the face of "potential" appearance of and "actual" bias warrants their dismissal.  *Hoffman, Murchison, supra*.

**CONCLUSION**

Investigations and Audit Reports are not launching pads for criminals, borderline criminals, extortionists, and legal legerdemain opportunists to leverage for their avarice, exculpation of their crimes, information exchange for accelerated and presumptions of accuracy for claim processing, and greed.  That is why Cannon 3.C (1) of the Code of Judicial Conduct, Rule 53, Federal Rules of Civil Procedure, federal judge oversight, and Quality Standards for Investigations exist—seeking and advancing truth; not fostering bias, exculpation of crimes, extortion and greed.  Otherwise, there is an unbridled abuse of the potent destructive power that a bottom feeding community that gorges on incompetent, biased investigations unleash[20] for extortion and greed with the investigations doing the work for the community of criminal, extortionists and legal legerdemain opportunists.

This is what happened in the instant case. After spending over $3 million for in-house medical evaluations and final review by experienced and MAF neurologists and neuropsychologists for undisputed quality claims submissions, Howard & Associates has expended and has obligations for $2.5 million in legal fees solely from the investigators, auditors and Special Masters empowering opportunists.

An objective, unbiased, ethical investigation that complied with the Court's standards, the Code of Judicial Conduct, the Federal Rules of Civil Procedure and the standards set by the United States Supreme Court, *Hoffman, Murchison, supra*, including evidentiary and confidentiality standards, would have ended this abuse long ago.  Instead, like a virus, the abuse

---

[20] This happened with the Spanish Inquisition from 1478 to 1834; J. Edgar Hoover's fraudulent and illegal FBI investigations from 1935 to 1972; Senator Joseph McCarthy's Senate Permanent Subcommittee on Investigations in the 1950s anti-communist hysteria; and more recently U.S. Attorney General William Bar's November 9, 2020 authorization of FBI investigations into voter fraud, giving validity and support to President Trump's voter fraud disinformation campaign pumped by certain political communities and disinformation media outlets, which disinformation campaign led to the first ever storming of the U.S. Capital and the 117th U.S. Congress by its own citizens on January 6, 2021.

of an extortionist, imprisoned criminal and his allies, demanding $1 million in March of 2017, is empowered by this investigation to let them get away with his actual and attempted theft and to use this investigation to cover criminal conduct, manipulate and accomplish civil and criminal extortionate threats.

   This investigation, fed by the NFL Claims process, and shopped by Tipster, criminal and inmate Donald Reinhard to SEC, NFL, NCAA, NFL Claims Class Counsel, Florida Bar, pseudo criminals coordinating with inmate Don Reinhard to get away with their theft, such as Corey ████ Dexter ████ and Joe ████ and scores of legal legerdemain opportunists, such as J.B. Harris and Preferred Capital, created a community of bottom feeders that morphed over the past four years into sprawling nefarious allegations and economic destruction based on false and fraudulent allegations as to protected attorney work product privilege in-house medical evaluations that were never intended, never authorized, and in fact never were used or communicated to any third-party, including but not limited to claims facility or claims facility staff.  These false and nefarious claims were given false validity and credibility by an incompetent and biased investigative staff, investigative process (that was shared with third-parties and other investigations) and a biased and deeply flawed Audit Report—which the Special Masters failed to provide oversight and correction.  If there is any integrity and seeking of truth in this process, these errors would have been analyzed, understood and rooted out, before others, including NFL Claimants and those servicing them with integrity and effectiveness, were harmed by claims stalled for years as a result of this flawed and exposed sub-standard, biased investigative and audit process.  In this case, admonishment or dismissal of the Special Masters and Auditors is warranted.

WHEREFORE for the forgoing reasons, case law, judicial standards, rules of Federal Civil Procedure, and ethical standards governing investigations, audits and Special Masters, and the indisputable evidence provided herein, the auditors and Special Masters must be disciplined or dismissed by this honorable Court for their bias, both actual and/or the appearance of potential bias.

Respectfully submitted on this 7th Day of April 2021,

/s/Tim Howard
Florida Bar No. 655325
Howard & Associates
1415 E. Piedmont Dr, Suite 5
Tallahassee, Florida 32308
Telephone: (850) 298-4455
E-Mail: tim@howardjustice.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via e-service through the U.S.D.C., portal on the court and counsel of record on this 7th Day of April, 2021.

/s/ Tim Howard
Attorney

INDEX OF EVIDENCE

EXHIBIT A          Quality Standards for Investigations

EXHIBIT B          FBI Investigative Guidelines

EXHIBIT C          Wisdom Report (██████████) - Veracity of Sharon
                   Delaney

EXHIBIT D          Affidavit of Sharon Delaney

EXHIBIT E          Tipster Inmate Coordination with SCM Corey ████ Joe ████
                   et.al., for Extortion

EXHIBIT F          Tipster Inmate Attempt at Extortion Through the Florida Bar

EXHIBIT G          Special Masters' Failure to Address Bias in Investigation

EXHIBIT H          Affidavit of Respondent

EXHIBIT I          Federal Order of Disgorgement for Tipster's Illegal Taking
                   Approximately $500,000

EXHIBIT J          SCM Corey ████ Attempt at Extortion Coordinated with
                   Tipster

EXHIBIT K          Verified Perjured, Fraudulent, False and Extortionate Florida
                   Bar Complaints, and Extortion Attempts Against Respondent;
                   Respondent's Verified and Undisputed History, Activities, and
                   Motivations