INDEX OF EVIDENCE

EXHIBIT A          Quality Standards for Investigations

EXHIBIT B          FBI Investigative Guidelines

EXHIBIT C          Wisdom Report (███████████) - Veracity of Sharon
                   Delaney

EXHIBIT D          Affidavit of Sharon Delaney

EXHIBIT E          Tipster Inmate Coordination with SCM Corey ████ Joe ██████
                   et.al., for Extortion

EXHIBIT F          Tipster Inmate Attempt at Extortion Through the Florida Bar

EXHIBIT G          Special Masters' Failure to Address Bias in Investigation

EXHIBIT H          Affidavit of Respondent

EXHIBIT I          Federal Order of Disgorgement for Tipster's Illegal Taking
                   Approximately $500,000

EXHIBIT J          SCM Corey ██████ Attempt at Extortion Coordinated with
                   Tipster

EXHIBIT K          Verified Perjured, Fraudulent, False and Extortionate Florida
                   Bar Complaints, and Extortion Attempts Against Respondent;
                   Respondent's Verified and Undisputed History, Activities, and
                   Motivations

.

# EXHIBIT A

**Council of the Inspectors General
on Integrity and Efficiency**



**Authority**:  Section 11 of the Inspector General Act of 1978 (5 U.S.C. app. 3.), as amended.

**Mission**:  The mission of the Council of the Inspectors General on Integrity and Efficiency (CIGIE) shall be to address integrity, economy, and effectiveness issues that transcend individual Government agencies and increase the professionalism and effectiveness of personnel by developing policies. standards, and approaches to aid in the establishment of a well trained and highly skilled workforce in the Offices of Inspectors General.

**CIGIE Investigations Committee**:  The Committee contributes to improvements in program integrity, efficiency, and cost effectiveness Governmentwide by providing analysis of investigative issues common to Federal agencies. The Committee provides the CIGIE community with guidance, support, and assistance in conducting high quality investigations. Provides input to the CIGIE Professional Development Committee and the Training Institute on the training and the development needs of the CIGIE investigations community. The Committee actively engages the Assistant Inspector General for Investigations Committee to assist in carrying out the Committee's goals and strategies.

# QUALITY
# STANDARDS
# FOR
# INVESTIGATIONS

November 15, 2011

**Message From the Chairman of the**
**CIGIE Investigations Committee**

The Quality Standards for Investigations (QSI), since their inception in 1997, have successfully guided the Inspector General investigative community in producing high quality investigations. They were modified in 2003. This 2011 version will continue to guide the community in high-quality investigative work.

The Inspector General Reform Act of 2008 (IG Reform Act) provided that members of the Council of the Inspectors General on Integrity and Efficiency (CIGIE) "shall adhere to professional standards developed by the Council" (§ 11(c)(2) of the IG Reform Act). For this 2011 edition of the QSI, the Investigations Committee has made technical changes that bring the document into full compliance with the IG Reform Act, including replacing all references to the "PCIE" (President's Council on Integrity and Efficiency) and the "ECIE" (Executive Council on Integrity and Efficiency) with "CIGIE."

The crafters of this QSI version, as did their predecessors, recognized the unique mission and varying statutory responsibilities of each CIGIE member. As a result, each OIG will adhere to the QSI in accordance with its unique mission, circumstances, and department or agency.

Throughout this version, you will also note a few minor changes for clarification, such as the definition of "periodic training." Appendix C was also added as a handy, non exhaustive list of laws and regulations relevant to investigative work.

I want to thank the Assistant IG for Investigations (AIGI) Working Group for their diligence in soliciting input from the AIGI community and in preparing the QSI. I also want to thank the Investigations Committee for their watchful eye in finalizing the QSI. The members of the AIGI Working Group and of the Investigations Committee are listed in Appendix D.

Carl W. Hoecker
Chairman, Investigations Committee
CIGIE

## TABLE OF CONTENTS

**Page**

PREFACE.................................................................................1

GENERAL STANDARDS.......................................................2

    A. Qualifications............................................................2
    B. Independence...........................................................6
    C. Due Professional Care.............................................8

QUALITATIVE STANDARDS.................................................10

    A. Planning..................................................................10
    B. Executing Investigations........................................11
    C. Reporting................................................................13
    D. Managing Investigative Information.........................14

APPENDICES

    Job Task Illustration for Investigators...............................A
    Training Profile Illustration for Investigators ....................B
    Non Exhaustive Table of Legislation, Executive Orders ...............C
    AIGI Working Group and Investigations Committee Members.........D

## PREFACE

The standards and principles in this document, commonly referred to as Quality Standards for Investigations (QSI), provide a framework for conducting high quality investigations for Offices of Inspector General (OIGs) affiliated with the Council of the Inspectors General on Integrity and Efficiency (CIGIE).

Recognizing that members of the OIG community are widely diverse in their missions, authorities, staffing levels, funding, and day to day operations, certain foundational standards apply to any investigative organization. As such, the standards outlined here are comprehensive, relevant, and sufficiently broad to accommodate a full range of OIG criminal, civil, and administrative investigations across the CIGIE membership.

OIGs will incorporate the standards and principles outlined here into an operations manual or handbook. This should be accomplished in accordance with the OIG's particular mission, unique circumstances, and respective department or agency requirements. OIGs are encouraged to monitor changes in the laws, regulations, and other guidance cited here and revise their policies as necessary, pending future releases of the QSI. In the event the QSI are found to be inconsistent with laws, rules, regulations, or other pertinent official pronouncements, the latter take precedence.

The QSI categorize investigative standards as General and Qualitative. General Standards address qualifications, independence, and due professional care. Qualitative Standards focus on investigative planning, execution, reporting, and information management.

This QSI supersede the standards published by the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency dated December 2003.

## QUALITY STANDARDS FOR INVESTIGATIONS

### GENERAL STANDARDS

General Standards apply to investigators and the organizational environment in which they perform. The three general standards address qualifications, independence, and due professional care.

#### A. QUALIFICATIONS

The first general standard for investigative organizations is:

*Individuals assigned to conduct the investigative activities must collectively possess professional proficiency for the tasks required.*

This standard places upon the investigative organization the responsibility for ensuring that investigations are conducted by personnel who collectively have the knowledge and skills required to perform the investigative activities.

#### Guidelines

Investigations vary in purpose and scope and may involve alleged violations of criminal or civil laws, as well as administrative requirements. The focus of an investigation can include the integrity of programs, operations, and personnel in agencies at Federal, State, and local levels of government; procurement and grant fraud schemes; environment, safety, and health violations; benefits fraud; the background and suitability of individuals for employment or a security clearance designation; whistleblower retaliation; and other matters involving alleged violations of law, rules, regulations and policies. Some of these investigations address both civil and criminal acts, ranging in significance from a misdemeanor to a felony. Others involve administrative misconduct issues. They often require using specialized investigative techniques; examining complex financial transactions, contracts, grants, and business operations; and interviewing government and corporate officials. A wide variety of skills and extensive knowledge are necessary to perform the broad range of activities required by these diverse investigations.

Investigative organizations should establish criteria to be used in recruiting and selecting the best qualified applicants. At a minimum, factors to be considered in employing entry level candidates should include: education and experience, character, physical capabilities, and age. Each of these factors may be controlled by legislation, regulation, or agency needs. Investigative organizations should review these criteria to

ensure that they assist in providing the best qualified applicants. In addition, organizations should establish appropriate avenues for investigators to acquire and maintain the necessary knowledge, skills, and abilities; complete entry level training, participate in in service training; and receive professional development opportunities.

**Education**—It is desirable that all newly appointed investigators possess a 4-year degree from an accredited college. The knowledge acquired from a higher education will enable the investigator to deal with complex problems encountered in day to day investigative work. Higher education enhances the investigator's ability to communicate effectively, both orally and in writing, with witnesses, other law enforcement agencies, prosecutors, supervisors, coworkers, and the public.

**Experience**—Depending on the specific needs of the agency, allowances may be made for candidates to substitute job experience for a college education. Suitable job experience would provide the candidate with demonstrable knowledge, skills, and abilities pertinent to the investigative position as discussed later in this document. Depending upon the nature of the investigative organization's mission, additional requirements may be established for specific types of experience (financial skills, computer skills, etc.).

**Character**—Each investigator must possess and maintain the highest standards of conduct and ethics, including unimpeachable honesty and integrity. Every citizen is entitled to have confidence in the integrity of Government employees, particularly investigators who routinely access sensitive information and execute search and arrest warrants. Further, investigative personnel may be subject to statutory and legal requirements relating to integrity (Giglio, Lautenberg, Brady,[1] etc.). Consequently, OIGs should establish sound hiring policies to adequately screen applicants for investigative positions. Processes to consider include, but are not limited to, criminal history checks, queries of commercially available databases, drug testing, personal interviews, previous employment and reference checks, and background investigations.[2]

OIGs should also have policies that require investigative personnel to report any arrest, conviction, or other potential misconduct issue that would jeopardize their performance of duties. Such policies may also include requiring investigative personnel to be subject to periodic criminal history and background checks.

**Physical Capabilities**—Each investigative organization should develop job related physical or medical requirements consistent with current statutes, regulations, and

agency policies to enable investigators to discharge their duties, while promoting personal well being.

The physical demands placed upon the investigator will vary among agencies. OIGs employing criminal investigators should establish a physical fitness program to provide and maintain physical fitness and reduce the risks of cardiovascular disease, obesity, stress, and related ailments and disorders.

It is in the interest of an investigative agency to establish and maintain a vibrant workforce because an investigator's duties frequently require irregular unscheduled hours, personal risk, exposure to extreme weather, considerable travel, and arduous exertion. Investigators are frequently engaged in stressful encounters and can be victims of stress related medical disorders.

**Age**—Consideration should be given to minimum and maximum age requirements for entry-level criminal investigator positions in accordance with applicable statutes and regulations. Waivers may be granted only in accordance with applicable regulations.

**Knowledge, Skills, and Abilities**—Because of the critical and sensitive nature of an investigator's position, investigative agencies should ensure that all investigators, commensurate with grade level, possess the requisite knowledge, skills, and abilities summarized below to fulfill their responsibilities.

1. A knowledge of theories, principles, practices, and techniques of investigation and the education, ability, and experience to apply such knowledge to the type of investigation being conducted;
2. A knowledge of government organizations; programs; activities; functions; and, where applicable, their interrelations with the private sector;
3. A knowledge of applicable laws, rules, and regulations, including the U.S. Constitution; the U.S. Criminal Code (including elements of crimes); the Federal Rules of Evidence; the Federal Rules of Criminal Procedure; and other pertinent statutes, such as the Privacy, Freedom of Information, and Whistleblower Protection Acts;
4. An ability to exercise tact, initiative, ingenuity, resourcefulness, and judgment in collecting and analyzing facts, evidence, and other pertinent data; apply sound deductive reasoning; and deliver oral and written reports;
5. An ability to safely and effectively carry out law enforcement powers, where duly authorized, including carrying firearms, applying for and executing search warrants, serving subpoenas, and making arrests; and
6. The skills necessary for the investigation. This qualification standard recognizes that proper training is required to meet the need for the broad range of special knowledge and skills necessary to conduct investigations. This training should include both formal classroom and on-the job training. The qualifications listed below apply to the skills of an investigative organization as

---

[1] See *Giglio* v. *United States*, 405 U.S. 150 (1972); Lautenberg Amendment, 18 USC Section 922(g)(9); and *Brady* v. *Maryland* (1963) 373 U.S. 83.
[2] The Office of Personnel Management (OPM) categorizes background investigations as National Agency Checks with Inquiries (NACI); Moderate Risk Background Investigation (MBI); Background Investigation (BI), and Single Scope Background Investigation (SSBI) Please refer to OPM for further guidance.

a whole and not necessarily to every individual investigator. Skills required to conduct an investigation include the ability to:

a) Obtain information from people;
b) Analyze and understand documentary evidence;
c) Understand witness confidentiality and "whistleblower" concepts;
d) Analyze and evaluate facts; make sound and objective assessments and observations; and, where appropriate, make constructive recommendations;
e) Use computer equipment, software, and related systems effectively in support of the investigative process;
f) Deliver clear, concise, accurate, and factual summaries of results of investigations, both orally and in writing;
g) Prepare and obtain signed, sworn statements; and
h) Use appropriate and authorized specialized investigative techniques.

**Criminal Investigator Entry-Level Training**   All OIG investigators who exercise law enforcement powers (authorized by the Inspector General Act (IG Act), section 6(c), and implemented by the Attorney General Guidelines for Offices of Inspector General, US Marshals Service deputation, or other with statutory authority) must successfully complete a formal basic training course, such as the Criminal Investigator Training Program at the Federal Law Enforcement Training Center. As an alternative, this training requirement may be satisfied by completion of a comparable course of instruction.

In addition, OIG investigators exercising law enforcement powers should attend a formal OIG specific follow on training program, such as the Inspector General Investigator Training Program at the Inspector General Investigator Academy (IGCIA), or equivalent, or in case of experienced criminal investigators hired from Federal law enforcement agencies outside the IG community, the IG Transitional Training Program at the IGCIA or equivalent.

Each agency should also provide orientation training (formal or informal) specifically relating to the agency's mission, programs, policies, procedure, rules, and regulations. Agencies may also consider in service training covering similar topics, as best suits the agency's requirements and the investigator's experience. (See Appendix A, "Job Task Illustration for Investigators.")

**Firearms Qualification**   OIGs must ensure that all criminal investigators authorized to carry a firearm train and qualify regularly, as defined by the Attorney General Guidelines or other authoritative guidelines.

The agency must develop a policy that ensures compliance with regular firearms qualification. Such policy should address occasions when failure to qualify or attend periodic training is justified and the corrective actions taken when failure was not justified. OIG policies should require the surrender of a firearm or suspension of law enforcement authority if the failure reaches an unacceptable level.

OIGs must implement an inventory control system for firearms and related equipment, law enforcement credentials/identification, and specialized technical equipment.

**Periodic Training Requirements**   OIGs should also periodically train criminal investigators on effective and appropriate use of force and constitutional law and other topics articulated in the Attorney General Guidelines or other authoritative guidelines. Additional topics to consider are new laws and court decisions affecting operations; technological improvements; and any changes in agency and national level policies, procedures, rules, and regulations (e.g., Transportation Security Administration (TSA) training on "flying while armed").

All post basic training should be part of a systematic, progressive, and documented plan to maintain the requisite knowledge, skills, and abilities. OIGs deliver such training depending on the organization's needs and mission requirements. The frequency and nature of such training may be adjusted depending on whether the investigator is in a primary or secondary position.

OIG policies should determine the frequency of, and ensure compliance with, its recurring and periodic training, which, absent unique circumstances, should not exceed 3 years.

**Professional Development**   The training of an investigator should be a continuing process. An investigator should receive formal and on-the-job exposure prior to an assignment requiring independent application of a given subject matter. A continuous career development program should be established to provide the proper preparation, training, and guidance to develop into professionally qualified investigators and supervisors.

To facilitate this effort, the investigative agency should develop a training profile that will satisfy its needs and consider a mentoring program. (See Appendix B, "Training Profile Illustration.")

## B. INDEPENDENCE

The second general standard for investigative organizations is:

*In all matters relating to investigative work, the investigative organization must be free, both in fact and appearance, from impairments to independence; must be organizationally independent; and must maintain an independent attitude.*

This standard places upon agencies, investigative organizations, and investigators the responsibility for maintaining independence, so that decisions used in obtaining evidence, conducting interviews, and making recommendations will be impartial and will be viewed as impartial by knowledgeable third parties.  There are three general classes of impairments to independence:  personal, external, and organizational.

## Guidelines

**Personal Impairments**—Circumstances may occur in which an investigator may experience difficulty in achieving impartiality because of their views and/or personal situations and relationships.  These impairments may include the following:

1. Official, professional, personal, or financial relationships that might affect the extent of the inquiry; limit disclosure of information; or weaken the investigative work in any way;
2. Preconceived opinions of individuals, groups, organizations or objectives of a particular program that could bias the investigation;
3. Previous involvement in a decisionmaking or management capacity that would affect current operations of the entity or program being investigated;
4. Biases, including those induced by political or social convictions that result from employment in, or loyalty to, a particular group or organization; and
5. Financial interest in an individual, an entity, or a program being investigated.

**External Impairments**— Factors external to the investigative organization may restrict its ability to conduct an independent and objective investigation and issue reports of investigation.  Such factors include:

1. Interference in the assignment of cases or investigative personnel;
2. Restriction on funds or other resources dedicated to the investigation or to investigative organizations;
3. Influence on the extent and thoroughness of the investigative scope, the way in which the investigation is conducted, the individual(s) who should be interviewed, the evidence that should be obtained, and the content of the investigative report; and
4. Denial of access to sources of information, including documents and records.

**Organizational Impairments**—An investigative organization's independence can be affected by its position within the hierarchical structure of the subject Government entity. To help achieve maximum independence, the investigative function should be positioned outside the staff or reporting line of the unit or employees under investigation. Investigations of OIG personnel should always reflect a special sensitivity to this issue of independence.

## C.  DUE PROFESSIONAL CARE

The third general standard for investigative organizations is:

> *Due professional care must be used in conducting investigations and in preparing related reports.*

This standard requires a constant effort to achieve quality and professional performance.  It does not imply infallibility or absolute assurances that an investigation will reveal the truth of a matter.

## Guidelines

This standard requires:

**Thoroughness**—All investigations must be conducted in a diligent and complete manner, and reasonable steps should be taken to ensure that pertinent issues are sufficiently resolved and to ensure that all appropriate criminal, civil, contractual, or administrative remedies are considered.

**Legal Requirements**—Investigations should be initiated, conducted, and reported in accordance with (a) all applicable laws, rules, and regulations; (b) guidelines from the Department of Justice and other prosecuting authorities; and (c) internal agency policies and procedures.  Investigations should be conducted with due respect for the rights and privacy of those involved.

**Appropriate Techniques**—Specific methods and techniques used in each investigation should be appropriate for the circumstances and objectives.

**Impartiality**—All investigations must be conducted in a fair and equitable manner, with the perseverance necessary to determine the facts.

**Objectivity**—Evidence must be gathered and reported in an unbiased and independent manner in an effort to determine the validity of an allegation or to resolve an issue.  This includes inculpatory and exculpatory information.

**Ethics**—At all times, the actions of the investigator and the investigative organization must conform with all applicable standards of ethical conduct.

**Timeliness**—All investigations should be conducted and reported in a timely manner. This is especially critical given the impact investigations have on the lives of individuals and activities of organizations.  Hence, the effectiveness of an investigator depends, in part, on the promptness of finished work products, such as prepared findings and

7

8

memorialized witness interviews.

**Accurate and Complete Documentation—**The investigative report findings and accomplishments (indictments, convictions, recoveries, etc.) must be supported by adequate documentation (investigator notes, court orders of judgment and commitment, suspension or debarment notices, settlement agreements, etc.) and maintained in the case file.

**Documentation of Policies and Procedures—**To facilitate due professional care, organizations should establish written investigative policies and procedures via handbook, manual, directives, or similar mechanisms that are revised regularly according to evolving laws, regulations, and executive orders.

# QUALITY STANDARDS FOR INVESTIGATIONS

## QUALITATIVE STANDARDS

Qualitative standards address four critical standards that must be addressed if the effort is to be successful. These are: planning, execution, reporting, and information management.

### A. PLANNING

The first qualitative standard for investigative organizations is:

> *Organizational and case-specific priorities must be established and objectives developed to ensure that individual case tasks are performed efficiently and effectively.*

Priorities and objectives apply to investigative organizations, in general (the types and numbers of investigations conducted, application of resources, minimal case-opening thresholds, etc.) and to specific investigative tasks in particular (the person(s) to interview, the records to review, and time frames for completing tasks, etc.). This standard may best be achieved by preparing organizational and case-specific plans and strategies.

### Guidelines

**Organizational Planning—**When feasible, OIG should prepare goal-oriented annual investigative plans that are consistent with prevailing law, Attorney General Guidelines (if applicable), and OIG-specific mission and goals. Planning documents should present each organization's goals and objectives, performance measures, and a guide for managers to implement these plans. The plans should project the allocation of resources, identify priorities, describe investigative programs, and include any new initiatives. Such plans may be part of an annual appropriation request or part of the overall OIG annual plan or performance document.

Annual plans should be flexible enough to accommodate individual agency needs and the shifting of investigative priorities and staff resources, as circumstances dictate. However, operational plans should be specific enough to provide a basis for the professional management of investigative resources and workloads during the planning year.

**Individual Case Planning—**Upon receipt, each complaint must be evaluated against the investigative functions, priorities, and guidelines for one of three decisions:

• Initiate investigative activity,
• Refer to another appropriate authority, or
• Take no further specific investigative action.

If the decision is to initiate an investigation, the organization should begin any necessary immediate actions and establish, if appropriate, an investigative plan of action (whether verbal or written) as soon as possible. The plan should describe as many of the following components as deemed necessary:

1. Primary nature and complexity of the allegations (criminal, civil, and/or administrative);
2. Planned focus and objectives of the investigation;
3. Possible violation(s) of law, rule, or regulation and the corresponding elements of proof or standards;
4. Coordination with appropriate authorities, if warranted (another OIG, the Federal Bureau of Investigation, etc.);
5. Applicable judicial venue and coordination with prosecutors, when appropriate;
6. Steps necessary to meet investigative objectives; and
7. Resources necessary to meet investigative requirements.

During the investigation, organizations should, when appropriate, also consider the actions suggested below to ensure that the investigation is conducted efficiently and effectively (the list is not exhaustive, but representative).

1. Use of a time-phased approach that ensures that individual leads are pursued on a timely basis and that periodic evaluations of progress occur. This would include an ongoing affirmative decision to continue or terminate the investigation.
2. Identification of any causative factors that should be reported as weaknesses or internal control issues requiring corrective action by agency management.
3. Ongoing coordination with appropriate agency or other Government officials if notable security or public health and safety issues are raised.

## B. EXECUTING INVESTIGATIONS

The second qualitative standard for investigative organizations is:

*Investigations must be conducted in a timely, efficient, thorough, and objective manner.*

The investigator is a fact-gatherer and should not allow conjecture, unsubstantiated opinion, bias, or personal observations or conclusions to affect work assignments. He or she also has a duty to be receptive to evidence that is exculpatory, as well as

incriminating. The investigator should collect and analyze evidence through a number of techniques, including, but not limited to, interviews of complainants, witnesses, victims, and subjects; reviews of records; surveillance and consensual monitoring; undercover operations; and use of computer technology.

## Guidelines

The following guidelines should be considered, recognizing that investigations are often fluid and unpredictable:

**Conducting Interviews**—A review of known information should precede a planned interview. An investigator should identify himself/herself to the interviewee and state the purpose of the interview, if appropriate. Appropriate warnings[3] should be provided to those individuals suspected of violating law or regulation. Witnesses generally do not require rights advisement. When conducting an interview, particular attention should be given to obtaining the interviewee's observations and knowledge of incidents and actions or statements of other persons connected with the event. Interviewees should be asked to provide, or identify the location of, relevant documents. All interviews are subject to inclusion in reports. Any contemporaneous interview notes that are prepared in a criminal investigation should be retained as required by law or agency policy. Requests for witness confidentiality should be honored, in accordance with the IG Act and to the extent legally permissible. In all cases, interviews should be properly documented.

**Collecting Evidence**—Evidence should be collected in such a way as to ensure that all known or obviously relevant material is obtained, the chain of custody is preserved, and the evidence is admissible in any subsequent proceeding. The validity of information and evidence obtained during an investigation should be verified. A procedure for the disposal of physical evidence by an independent party must be followed. When using the work of a specialist, such as criminal laboratory examiners, computer forensic examiners, and financial experts, investigators should assess the specialist's ability to perform and report on the work in an impartial manner and should understand the scope and objective required of the specialist. Investigators should also consider the specialist's professional certification, experience, and relevant standards.

**Documenting Activities**—The results of investigative activities should be accurately and completely documented in the case file. Internal investigative guidelines should specifically and clearly address due diligence and timeliness of the documentation.

---

[3] For further details, see *Miranda v. Arizona*, 384 U.S. 436 (1966); *Kalkine v. United States*, 473 F.2d 1391, 1393, (Cr. Cl. 1973); *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). Also consult agency requirements related to other rights, such as *NASA v. FLRA* (98-369) 527 U.S. 229 (1999) 120 F.3d 1208 (Weingarten).

**Complying With Legal Requirements**—Interviews, evidence collection, and other activities must be initiated, conducted, and reported in accordance with all applicable laws, rules, regulations and should be conducted with due respect for the rights and privacy of those involved. This includes, for example, appropriate warnings and assurances and Grand Jury restrictions.

Additional considerations during an investigation may include:

- Obtaining, securing, and properly using Grand Jury information;
- Using parallel civil and criminal proceedings;
- Respecting the Right to Financial Privacy Act;
- Developing and using confidential informants and other sources of information;
- Obtaining and using hotline information;
- Using IG subpoenas;
- Serving as liaison and interacting with prosecutors; and
- Storing and handling electronic data.

**Conducting Progress Reviews**—Supervisory reviews of case activities should occur periodically to ensure that the case is progressing in an efficient, effective, thorough, and objective manner.

## C.  REPORTING

The third qualitative standard for investigative organizations is:

> *Reports (oral and written) must thoroughly address all relevant aspects of the investigation and be accurate, clear, complete, concise, logically organized, timely, and objective.*

All reports should accurately, clearly, and concisely reflect the relevant results of the investigator's efforts. Facts should be presented in straightforward, grammatically correct language and should avoid the use of unnecessary, obscure, and confusing verbiage. Graphics should be well-prepared, clearly relevant to the investigation, and supportive of the presentation.

### Guidelines

Organizations should determine the most appropriate report mechanism (verbal or written) and format, on the basis of the circumstances of the issue(s) involved. In pursuing this standard, the following guidelines should be considered:

1. In any report, the facts should be set forth to facilitate reader comprehension.

This should include a clear and concise statement of the facts and applicable law, rule, or regulation that was allegedly violated or that formed the basis for an investigation.
2. The principles of good report writing should be followed. A quality report should be logically organized, accurate, complete, concise, impartial, and clear and should be issued in a timely manner.
3. Reports should contain exculpatory evidence and relevant mitigating information when discovered during any administrative investigation. Exculpatory evidence in a criminal or civil investigation must be brought to the attention of the assigned prosecutor.
4. Evidence outlined in a report should be supported by documentation in the investigative case file.
5. In some cases, it may be appropriate to note specific allegations that were not investigated to ensure that decisionmakers can take further action as they deem appropriate.
6. The outcome or accomplishment (fines, savings, recoveries, indictments, convictions, suspensions and debarments, or management recommendations, etc.) should be documented in the file.
7. Systemic weaknesses or management problems disclosed in an investigation should be reported to agency officials as soon as practicable.

## D.  MANAGING INVESTIGATIVE INFORMATION

The fourth qualitative standard for investigations is:

> *Investigative data must be stored in a manner that allows effective retrieval, reference, and analysis, while ensuring the protection of sensitive data (i.e., personally identifiable, confidential, proprietary, or privileged information or materials.).*

One of the many hallmarks of an efficient organization is its ability to retrieve information that it has collected. An effective information management system creates and enhances institutional memory. This, in turn, enhances the entire organization's ability to conduct pattern and trend analyses and to fulfill the mandate of detection and prevention. Such a system also assists in making informed judgments relative to resource allocation, training needs, investigative program development, prevention activities, and implementation of the investigative process. Further, the IG Act requires that certain data elements be reported in the semiannual reports to Congress.[4]

---

[4] OIGs are encouraged to consult the IG Act for those requirements.

## Guidelines

The degree to which an organization efficiently achieves its goals is affected by the quality and relevance of information that is collected, stored, retrieved, and analyzed. Information, or the lack of it, has direct influence on management's ability to make sound decisions relating to investigative matters. Therefore, written directives should exist that define the organizational component responsible for record maintenance and the specific procedures to be performed.

**Information Flow**—Accurate processing of information is essential to the mission of an investigative organization. It should begin with the orderly, systematic, accurate, and secure maintenance of a management information system. Written guidance should define the data elements to be recorded in the system. The guidance should be based on legal requirements and needs and should cover the proper security and storage of personally identifiable and other sensitive information and the storage of discoverable information.

**Complaint-Handling Activities**—The investigative process often begins with a complaint from an individual. The initial complaint will rarely provide the agency with all the necessary information and may be the first indication of a serious violation of law. Policies, procedures, and instructions for handling and processing complaints should be in place. Individuals receiving complaints should obtain all pertinent details. The agency should adopt procedures to ensure that basic information is recorded, held confidential, and tracked to final resolution.

**Case Initiation**—An organization should establish guidelines, including the level of the approving authority, for making a determination to initiate an investigation or to pursue another course of action. Case assignments should be based on resource considerations, geographical dispersion and level of experience of personnel, and current workloads. A decision not to investigate (refer to another entity or take no action) should be documented.

**Management Information System**—Management should have certain information available to perform its responsibilities, measure its accomplishments, and respond to requests by appropriate external customers. Items that may be considered for tracking purposes include, but are not limited to, the following:

Workload Data

- Number of complaints handled;
- Cases opened;
- Cases closed;
- Cases pending (active);

- Referrals to program managers and outcomes of such referrals;
- Referrals to other investigative agencies (Federal, State, or local, including agency name);
- Referrals (criminal, civil, and administrative)
  - -accepted and
  - -declined; and
- Amount of direct and indirect labor-hours expended on each case, where appropriate.

Identification Data

- Appropriate dates (allegation received, case opened, case closed, etc.);
- Source information (anonymous, private citizen, etc.);
- Type of violations investigated (criminal, civil, administrative, etc.);
- Category of investigation (contract and grant fraud, theft, bribery, environmental violation, cybercrime, scientific misconduct, etc.);
- Priority (routine, high priority, special interest, etc.);
- Potential violations (Title 18 of the U.S. Code, agency regulations, etc.);
- Suspected dollar loss, where appropriate;
- Joint and task force investigations;
- Operation,     program, office, or facility impacted (Departmental bureau or organization);
- Principal State and location where investigation is centered, including judicial venue;
- Investigative techniques employed (consensual monitoring, undercover investigation, searches, hazardous interviews and activities, etc.); and
- Indices of subjects, witnesses, and other individuals.

Investigative Results Data

- Number of indictments, convictions, declinations/acceptances, criminal outcomes, and civil actions;
- Amount of recoveries, restitutions, fines, and settlements;
- Reports issued (to prosecutors and agency management);
- Recommendations to agency management for corrective action(s) (take disciplinary action, recover monies, correct internal control weaknesses, etc.);
- Number of disciplinary or other administrative agency actions (terminations, suspensions, debarments, and personnel and contractor actions); and
- Calculated savings from the investigation, if applicable.

The above data will generally allow for the design of a basic system of administrative checks and controls to meet management needs. Depending on the complexity and scope of an investigative activity, additional data can be developed that will enable trend and pattern analyses.

**Investigative File**—All investigative activity, both exculpatory and incriminating, should be recorded in an official case file.  A case file may be paper, electronic, or both and should be established upon the opening and assignment of an investigation.  The file is used to maintain investigative records (interview writeups, data analysis, reports, etc.). Written directives for file management should specify procedures for at least the following:

- File organization, maintenance, storage, and security;
- Assignment of case numbers;
- Preparation and filing of documents and exhibits;
- Collection and storage of evidence;
- Distribution and dissemination of reports;
- Access control of the files;
- Retention of records, including evidence, interview writeups, investigator notes, and other case file documentation (to be determined on the basis of agency requirements, Federal records regulations, and judicial decisions);
- Ensuring that sensitive information is protected (personally identifiable information, Privacy Act information, Grand Jury information, national security information, etc.); and
- Adequate physical and logical controls over electronic case files, to include backup procedures and protection from cyberthreats.

# APPENDICES

November 15, 2011

Appendix A

JOB TASK ILLUSTRATION FOR INVESTIGATORS

**Receipt, Analysis, and Disposition of Allegations(s)**

- Obtain data from complainant or source
- Document complaint in writing
- Know prosecutive or regulatory criteria
- Identify violations (elements of crime) or administrative standards
- Review and identify significant information or potential evidence
- Determine correct disposition of complaint (criminal, civil, or administrative)
- Open investigation, if appropriate, and coordinate with appropriate authorities (internally/externally)

**Assessment, Focus, and Preparation of Investigative Plan**

- Review available information and evidence
- Review legal decisions and guidelines
- Review agency programs, operational policies, and procedures
- Determine focus and scope of investigation
- Assess and identify required resources
- Identify potential witnesses, suspects, relevant documents, and evidence
- Organize and prioritize investigative activities
- Prepare initial investigative plan

**Conduct Investigation**

- Maintain focus and follow investigative plan (revise as necessary)
- Prepare for anticipated investigative activities (interviews, taking statements)
- Apply knowledge of laws and/or regulations
- Understand and apply techniques to ensure constitutional rights
- Project a professional image
- Use good oral and written communicative skills
- Know evidentiary rules
- Collect, analyze, and preserve evidence
- Use appropriate specialized techniques (search warrants, forensics, consensual monitoring)
- Conduct reviews and data inquiries and promptly document such activities
- Collect and analyze financial data
- Assess progress and re-focus when necessary
- Coordinate progress with supervisor (prosecutors or management, as appropriate)

- Maintain appropriate liaison
- Effectively manage the case and assist personnel and meet planned milestones
- Obtain IG or grand jury subpoenas and/or testify before grand jury

**Review, Organize, and Evaluate Investigative Findings**

- Review and understand the information gathered
- Organize the information and evidence gathered
- Correlate data, witnesses, and records
- Consider internal/external customer needs

**Draft Report, Validate Contents, and Submit Final Report**

- Write draft report--ensure accuracy, thoroughness, objectivity, proper format, clarity, and correct grammar
- Review report to ensure information is correct and complete
- Consider issues such as confidentiality, the Privacy Act, the Freedom of Information Act, and security classification
- Include disclosure caveats where appropriate
- Write final report
- Distribute to appropriate entities

**Post-Investigative Tasks**

- Know rules of criminal and/or civil procedure
- Assist with preparation for court/administrative proceedings
- Serve witness subpoenas
- Assist U.S. Attorney/District Attorney at trial
- Testify at trial
- Document and report results, dispositions, and outcomes
- Obtain disposition of exhibits and evidence after trial/hearing
- Return and document proper disposition of documents and evidence
- Review the organization of investigative files for efficient retrieval
- Archive investigative files
- Ensure information management database reflects accurate and final case information

Appendix B

### TRAINING PROFILE ILLUSTRATION FOR INVESTIGATORS

| Basic/Entry Level Training – GS 5/7[1] | CITP[2] | IGITP[3] |
|---|---|---|
| Administering Rights Warnings | X | |
| Agent Liability | X | |
| Basic Computer Applications | X | |
| Cardiopulmonary Resuscitation | X | |
| Complaint Assessment | X | |
| Ethics and Code of Conduct | X | |
| Federal Rules of Criminal/Civil Procedure | X | |
| Informants | X | |
| Sexual Harassment/Diversity | X | |
| Surveillance | X | |
| Testifying in Court and Trial Processes | X | |
| Victim/Witness Awareness | X | |
| Affidavits and Statements | X | X |
| Applying and Executing of Search Warrants | X | X |
| Arrest Techniques | X | X |
| Assisting US Attorneys and other Prosecutors | X | X |
| Authority and Jurisdiction | X | X |
| Case Development and Liaison | X | X |
| Collection, Protection, and Rules of Evidence | X | X |
| Communication Skills (Oral and Written) | X | X |
| Constitutional Rights | X | X |
| Defensive Tactics | X | X |
| Disclosure/Privacy/FOIA | X | X |
| Electronic Sources of Information | X | X |
| Elements of a Crime | X | X |
| Firearms Proficiency | X | X |
| Fraud Schemes | X | X |
| Interviewing Techniques | X | X |
| Investigative Planning | X | X |
| Relevant Civil and Criminal Statutes | X | X |
| Report Writing | X | X |
| Use of Electronic Evidence | X | X |
| Administrative Remedies | | X |
| Civil Remedies | | X |
| Concepts of Confidentiality | | X |
| Employee Complainants | | X |
| Inspector General Act | | X |
| Inspector General Subpoena | | X |
| Whistleblower Protections | | X |

[1] On-the-Job or In-Service Training should, to some degree, be provided for each of these areas based on the organization's mission and needs.
[2] Criminal Investigator Training Program conducted by the Federal Law Enforcement Training Center.
[3] Inspector General Basic Training Program conducted by the Inspector General Criminal Investigator Academy.

B-1

### Agency In-Service Training

Recurring[4]
    Code of Conduct
    Sexual Harassment/Diversity
    Ethics
    Agency Authority/Jurisdiction
    Physical Efficiency Battery
    Health Assessment
Quarterly
    Firearms Familiarization and Qualification
    Use of Force Policy (including Deadly Force)
Periodic[5]
    Legal Update (Criminal and Civil)
    Arrest Techniques
    Defensive Tactics
    Intermediate Weapons
    Cardiopulmonary Resuscitation
    Lifestyle Management/Stress
    Victim/Witness Awareness
    Blood Borne Pathogens (annually)

[4] Based on agency requirements.
[5] Conducted on a scheduled basis in accordance with applicable standards (e.g., Attorney General guidelines, Federal regulations, etc.).

B-2

| Advanced Training[6] | GS-7 | GS-9 | GS-11 | GS-12 | GS-13 | GS-14 |
|---|---|---|---|---|---|---|
| Data Analysis | X | X | | | | |
| Employee Conduct and Integrity | X | X | | | | |
| Financial Fraud (Loans, Credit Cards, etc.) | | X | | | | |
| Accounting Principles | | X | | | | |
| Embezzlement | | X | | | | |
| Environmental Crimes | | X | | | | |
| Computer Crimes | | X | | | | |
| Bribery | | X | | | | |
| Contract and Grant Fraud | | X | | | | |
| Technical Investigative Equipment | | X | | | | |
| Advanced Interviewing | | X | | | | |
| Undercover Operations | | X | | | | |
| Advanced Financial Investigations | | | X | | | |
| Advanced Computer Applications | | | X | | | |
| Electronic Evidence Extraction | | | X | | | |
| Electronic Evidence Analysis | | | X | | | |
| Anti-Trust Investigations | | | X | | | |
| 1st-Level Supervision | | | | X | X | |
| Case Management | | | | X | X | |
| Problem Solving and Conflict Resolution | | | | | X | |
| Advanced Supervision | | | | | X | |
| Leadership, Coaching, and Mentoring | | | | | X | |
| Office Administration/ Management | | | | | X | |
| Personnel Management | | | | | | X |

---

[6] Based on organization's needs and mission requirements.

## Appendix C
## Non-Exhaustive Table of Legislation, Executive Orders, Standards, Regulations, and Other Guidance for Investigators

| Document | Description |
|---|---|
| 1. Legislation | |
| Crimes, 18 U.S.C. §§ 1-2725 and Criminal Procedure, 18 U.S.C. §§ 3001-3771 | Establishes crimes and criminal procedures as they pertain to OIG oversight of departmental programs. |
| Electronic Communications Protection Act, 18 U.S.C. §§ 2510-2522 (Wiretap Statute) | Limits the ability of law enforcement officers to intercept electronic communications without judicial authorization, and regulates the use and disclosure of information obtained through authorized wiretaps. |
| False Claims Act, 31 U.S.C. §§ 3729-3733 et seq. (P.L. 99-562) | Establishes civil liability for fraudulent claims submitted to the Federal Government. |
| Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g | Imposes additional restrictions on the use of administrative subpoenas to obtain educational records from an educational agency or institution. |
| Federal Conflict of Interest Laws, 18 U.S.C. §§ 202-209 | Establishes criminal conflict of interest penalties for Federal employees. |
| Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 | Authorizes the public to bring civil lawsuits against the Federal Government for the negligent acts of Federal employees within the scope of their employment that cause injury to person or property. |
| Freedom of Information Act, as amended, 5 U.S.C. § 552 (P.L. 104-231) | Allows members of the public to obtain Federal records subject to certain exemptions (including exemptions for certain investigative information). |
| Health Insurance Portability and Accountability Act of 1996, 29 U.S.C. § 1181 (P.L. 104-191) | Protects the privacy of confidential personally identifiable medical information. |
| The Inspector General Act of 1978, as amended, 5 U.S.C. App. 3 (P.L. 95-452); Inspector General Reform Act of 2008, (P.L. 110-409) | Establishes independent and objective Offices of Inspector General; establishes IG subpoena power and other authorities. |
| Law Enforcement Availability Pay Act of 1994, 5 U.S.C. § 5545a | Authorizes additional pay to criminal investigators to ensure availability for unscheduled official duties. |
| Law Enforcement Officers Safety Act of 2003, Chapter 44, 18 U.S.C. § 926 B-C (P.L. 108-277) | Authorizes qualified law enforcement officers (including certain qualified retired officers) to carry a concealed firearm. |
| Pen/Trap Statute, 18 U.S.C. § 3121 | Requires government entities to obtain a warrant before collecting real-time information, such as dialing, routing, and addressing information related to communications. |
| Privacy Act, 5 U.S.C. § 552a (P.L. 93-579) | Protects personal individual information held by Federal agencies, and authorizes individuals to obtain and to seek corrections to those records. |

| | |
|---|---|
| Procurement Integrity Act, 41 U.S.C. § 423 | Prohibits the release of source selection and contractor bid or personal information and sets conflict of interest requirements for procurement personnel. |
| Program Fraud Civil Remedies Act, 31 U.S.C. § 3801 et seq. | Establishes an administrative process to allow Federal agencies to recover for fraudulent claims to the agency of up to $150,000. |
| Right to Financial Privacy, 12 U.S.C. § 3401 et seq. | Requires that agencies provide individuals and partnerships with five or fewer partners with notice and an opportunity to object before a financial institution can disclose personal financial information in response to an administrative subpoena. |
| Stored Communications Act, 18 U.S.C. §§ 2701-2712 | Limits the Government's ability to obtain stored account information from network service providers such as ISPs. |
| Trade Secrets Act, 18 U.S.C. § 1905 | Prohibits government employees from disclosing certain confidential or proprietary business information. |
| Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 1512-1515 | Defines tampering with a witness, victim, or informant; requires Federal law enforcement agencies to have guidelines and policies to provide services to victims of crimes. |
| Whistleblower Protection Act, 5 U.S.C. § 1204, 22 U.S.C. § 4137 | Protects the rights of, and prevents retaliation against, Federal employees who disclose governmental fraud, waste, abuse, and other improper activity. |
| 5 U.S.C. §§ 8425(b), 8335 | Authorizes agencies to exempt law enforcement officers from mandatory retirement at age 57 with 20 years of covered law enforcement service. |
| 41 U.S.C. § 265 | Prevents retaliation against contractor employees for certain disclosures of information relating to a substantial violation of law related to a contract. |
| 2. Executive Orders | |
| Administrative Allegations Against Inspectors General, Exec. Order No. 12993, 61 Fed. Reg. 13043 (March 21,1996) | Directs the PCIE and ECIE Integrity Committee to receive, review, and refer for investigation allegations of wrongdoing against IGs and certain staff members of OIGs (Note – superseded by passage of the Inspector General Reform Act of 2008). |
| Integrity and Efficiency in Federal Programs, Exec. Order No. 12805, 57 Fed. Reg. 20627 (May 11, 1992) | Establishes the PCIE and ECIE and describes their functions and responsibilities (note—superseded by passage of the Inspector General Reform Act of 2008). |
| Principles of Ethical Conduct for Government Officers and Employees, Exec. Order 12731, 55 Fed. Reg. 42547 (October 17, 1990) | Lays out principles of ethical conduct, Office of Government Ethics authority, agency responsibilities, delegations of authority, and general provisions. |

C-2

| 3. Standards | |
|---|---|
| PCIE/ECIE Quality Standards for Federal Offices of Inspector General (Oct. 2003) | Establishes standards for the management, operation, and conduct of the Federal Offices of Inspector General. |
| Standards of Ethical Conduct for Employees of the Executive Branch, 5 CFR Part 2635 (June 2009) | Establishes general principles for ethical conduct of employees of the Executive Branch. |
| 4. Other Guidance and Regulations | |
| Attorney General Guidelines for Domestic FBI Operations (Sept. 29, 2008) | Addresses the broad operational areas of the FBI's methods of investigative and intelligence gathering, including coordination, analysis and planning. |
| Attorney General Guidelines for Offices of Inspector General with Statutory Law Enforcement Authority (Dec. 8, 2003) | Governs the law enforcement authorities of OIGs that have been granted statutory law enforcement power from the Attorney General. |
| Attorney General's Guidelines on FBI Undercover Operations (Nov. 13, 1992) | Covers authorization of undercover operations, protecting innocent parties against entrapment, and monitoring and control of undercover operations. |
| Attorney General Guidelines Regarding the Use of Confidential Informants (May 2002) | Applies to the use of confidential informants in criminal investigations and prosecutions by Department of Justice law enforcement agencies and Federal prosecuting officers. |
| Attorney General Memorandum for the Heads and Inspectors General of Executive Departments and Agencies re: Procedures for Lawful, Warrantless Monitoring of Verbal Communications (May 30, 2002) | Revises and updates rules and procedures for obtaining authorization to intercept verbal communications without the consent of all parties to the communication, as well as the procedures for consensual monitoring where no written authorization is required. |
| Attorney General Order No. 3168-2010 – Authorization for the Federal Offices of Inspector General to Provide Mutual Assistance in the Execution of Search and Arrest Warrants (June 28, 2010) | Authorizes and sets conditions on OIG sharing of agents to seek and execute search, seizure or arrest warrants. |
| Attorney General Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses ("Giglio Policy") (Dec. 9, 1996) | Ensures that prosecutors receive sufficient information to meet their disclosure obligations under Giglio v. United States, while protecting the legitimate privacy rights of Government employees. |
| CIGIE Guidelines on Undercover Operations (June 2010) | Provides guidance on certain undercover operations in accordance with the Attorney General's Guidelines for Offices of Inspectors General. |

C-3

| | |
|---|---|
| CIGIE Qualitative Assessment Review Guidelines Federal Offices of Inspector General (Investigation Divisions) (May 2009) | Provides guidance on conducting external qualitative assessment reviews of OIG investigative operations. |
| CIGIE Procedures to Obtain Assistance From Another OIG In the Execution of Search and Arrest Warrants (Nov. 15, 2010) | Establishes procedures for OIG sharing of agents for search, seizure or arrest warrants. |
| Deputy Attorney General Guidance for Prosecutors Regarding Criminal Discovery (Jan. 10, 2010) | Provides guidance for prosecution team members (including IG agents) on the government's legal discovery obligations, including discovery of exculpatory and impeachment information as applied to electronic communications. |
| Deputy Attorney General Guidance on the Use, Prevention, and Disclosure of Electronic Communications in Federal Criminal Cases (March 30, 2011) | Provides guidance for prosecution team members (including IG agents) on legal discovery obligations relating to electronic communications among members of the prosecution team, victims and witnesses. |
| Deputy Attorney General Memorandum to Inspectors General Directing Them to Refer Potential Violations of Federal Privacy Statutes to the Department of Justice for Investigation and Prosecution (Oct. 18, 1999) | Directs Inspectors General to refer 18 U.S.C. § 1030(a)(2) offenses to the Computer Crimes and Intellectual Property Section in the Criminal Division; Tax Offenses to the Criminal Enforcement Office in the Tax Division; and Privacy Act Violations to the Public Integrity Section in the Criminal Division. |
| Federal Rules of Criminal Procedure, R. 1-17 | Federal court rules governing preliminary proceedings, the grand jury, indictment, arraignment, and preparation for trial. |
| Federal Rules of Evidence, §§ 101-1103 | Federal court rules for introduction of evidence in criminal or civil trials. |
| 2 C.F.R. Part 180 OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) | Establishes causes, procedure and treatment of government-wide suspension and debarment for non-procurement (e.g., loan, guarantee, insurance and grant) actions. Please note individual agency adoption pieces in 2 C.F.R Subtitle B. |
| 5 C.F.R. Part 731.204-05 | Establishes causes and procedure for debarment from federal employment. |
| 48 C.F.R. Subpart 3.9 | Provides whistleblower protections for contractor employees and sets procedures for filing complaints, investigating complaints, and remedies. |
| 48 C.F.R. Part 9.4 Procurement Suspension and Debarment Regulations | Establishes causes, procedure and treatment of government-wide suspension and debarment for procurement actions. |
| 49 CFR § 1544.219: TSA Regulation regarding carriage of accessible weapons | Sets out situations when it is permissible for a law enforcement officer to carry a weapon aboard a plane. |

**Appendix D**

The QSI working group consisted of the following AIGIs:

John E. Brennan, II, TVA OIG
John E. Dupuy, DOI OIG
Karen L. Ellis, USDA OIG
Jay Hodes, HHS OIG
Aaron R. Jordan, PBGC OIG
Joseph A. McMillan, NRC OIG

**Investigations Committee Members**

| | | |
|---|---|---|
| Chair: | Carl W. Hoecker | IG, U.S. Capitol Police |
| Co-chair: | Eric M. Thorson | IG, Treasury Department |
| Members: | Lanie D'Alessandro | IG, National Reconnaissance Office |
| | Charles K. Edwards | Acting IG, Department of Homeland Security |
| | Arthur A. Elkins | IG, Environmental Protection Agency |
| | Donald A. Gambatesa | IG, Agency for International Development |
| | J. Russell George | IG, Treasury Inspector General for Tax Administration |
| | Peggy E. Gustafson | IG, Small Business Administration |
| | Allison C. Lerner | IG, National Science Foundation |
| | John P. McCarty | Acting IG, Department of Housing and Urban Development |
| | Brian D. Miller | IG, General Services Administration |
| | George J. Opfer | IG, Veterans Administration |
| | Jon T. Rymer | IG, Federal Deposit Insurance Corporation |
| | Cynthia A. Schnedar | Acting IG, Department of Justice |
| | Karl W. Schornagel | IG, Library of Congress |
| | Kathleen S. Tighe | IG, Department of Education |

The following individuals contributed substantially to the final product:

William D. Hamel, AIGI, ED OIG/AIGI Committee Chair
Glenn P. Harris, General Counsel, SBA OIG
John R. Hartman, DOE OIG
Angela N. Hrdlicka, Director, IGCIA

# EXHIBIT B

## The Federal Bureau of Investigation's Compliance with the Attorney General's Investigative Guidelines (Redacted)

**Special Report**
**September 2005**
**Office of the Inspector General**

# Chapter Two: Historical Background of the Attorney General's Investigative Guidelines

The May 30, 2002, Investigative Guidelines that are the subject of this review are the latest version of the Attorney General's Investigative Guidelines, the first version of which was issued by Attorney General Edward Levi in 1976. Before addressing the FBI's implementation of the Investigative Guidelines in the succeeding chapters of this report, we believe it is important to describe the historical events that prompted issuance of the first set of Guidelines in 1976 and the context in which the various revisions to them were made thereafter.

## I. **Introduction**

Since their inception nearly 30 years ago, one of the principal legal constraints under which the FBI has operated has been the Attorney General Guidelines. The FBI does not operate under a general statutory charter but, rather, under Attorney General Guidelines that have been revised from time to time pursuant to the authorities set forth in 28 U.S.C. §§ 509, 510, and 533.

Historically, the Investigative Guidelines have been divided into subject areas, addressing both the types of investigations the FBI may conduct (e.g., checking leads, making preliminary inquiries, or conducting full investigations in connection with general crimes or criminal intelligence investigations), and the specialized techniques the FBI may use in the course of such investigations (e.g., using confidential informants, undercover operations, or non-telephonic consensual monitoring).

In this chapter, we summarize the major revisions of the Attorney General's Investigative Guidelines, noting significant changes to investigative authorities and techniques and the events associated with each revision.

## II. **The Pre-Guidelines Period**

From its inception, the FBI has had as part of its mission the collection of domestic intelligence and the investigation of domestic security matters. Attorney General Charles J. Bonaparte established the Bureau of Investigation within DOJ in 1908. During the post-World War I period, the Bureau of Investigation was charged with the investigation of suspected anarchists, Bolsheviks, socialists, and other radicals in contemplation of prosecution under the Espionage Act and the Immigration Act.

In 1919 and 1920, a series of bombs exploded in eight American cities that targeted federal and local officials, judges, police departments, and financial institutions on Wall Street. In response, Attorney General A. Mitchell Palmer established a position within DOJ to focus on anti-radical activities and obtained funding from Congress to fight subversion. On November 7, 1919, with the assistance of Justice Department attorney J. Edgar Hoover, who headed the DOJ's General Intelligence Division, and the Immigration Service within the Labor Department, Attorney General Palmer ordered the first of a year-long sequence of coordinated raids in 12 cities to round up and deport hundreds of members of the Federation of the Union of Russian Workers and other suspected "radicals." In early January 1920, a second wave of coordinated raids led to the arrest of between 5,000 to 10,000 suspected radicals.

During the 1930s, President Franklin D. Roosevelt expressed concern over the growing indications of subversive activities within the United States, especially those of communist and fascist supporters. At the

direction of President Roosevelt, the FBI began gathering intelligence on the activities of such individuals and groups.[25] After the end of World War II, as Cold War tensions grew, the FBI refocused its attention on counterespionage activities, including the investigation of Ethel and Julius Rosenberg, who were convicted of espionage against the United States on behalf of the Soviet Union, and executed.

From World War II through the 1970s, the FBI conducted what it called "internal security investigations," the objective of which was to collect intelligence about the political influence of organizations and individuals who espoused what the FBI regarded as revolutionary or extremist viewpoints. The FBI carried out these investigations during periods of intense congressional interest in the nation's internal security, leading to the introduction of legislation in the 1940s and 1950s, principally, the Smith Act[26], the Voorhis Act[27], and the Internal Security Act of 1950.[28]

In the 1950s, the FBI also developed a series of covert programs designed to collect intelligence about the Communist influence in the United States (COMINFIL).[29] The FBI established other counterintelligence programs, collectively referred to as COINTELPRO, to investigate "racial matters," "hate organizations," and "revolutionary-type subversives" whose activities were monitored in accordance with internal FBI policy even if they did not satisfy the "advocacy of violence" standard articulated in the Supreme Court's controlling decisions.

During the 1960s, the FBI's internal security investigations extended to the investigation of the activities and supporters of the anti-war and civil rights movements.[30] The FBI used informants throughout this period, including Gary Thomas Rowe, who infiltrated the highest levels of the Birmingham, Alabama chapter of the Ku Klux Klan from 1959 to 1965.[31] Rowe's activities as an informant came to light during the murder trial of three Klan members who were convicted of killing a white civil rights worker, Viola Gregg Liuzzo, on March 25, 1965, the night after the Selma-Montgomery voting rights march.[32] Rowe was one of the four Klansmen in the killer's car and witnessed the murder.[33] He reported the crime to the FBI within hours, and it is undisputed that Rowe's information led to the conviction of the three perpetrators.[34]

In 1975, the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, known as the "Church Committee," under the chairmanship of Senator Frank Church, and the House Select Committee on Intelligence under the chairmanship of Otis Pike ("Pike Committee") conducted parallel hearings. The Church Committee examined what the FBI knew of Rowe's knowledge of and involvement in the Klan's activities and what instructions he was given.[35] The Committee heard evidence that the FBI instructed Rowe to join a Klan "Action Group," which "conducted violent acts against blacks and civil rights workers."[36] Rowe testified that he and other Klansmen "had beaten people severely, had boarded buses and kicked people off; and went in restaurants and beaten them with blackjacks, chains, pistols."[37] On one occasion, Rowe said that despite giving the FBI advance warning that Klan members were planning violence against blacks, his FBI contact agent or "handler" instructed him to "go and see what happened."[38] Rowe admitted he participated in the resulting violence to protect his cover.[39] According to the Church Committee, the FBI appeared to walk a fine line in utilizing Rowe, who had provided important information on a variety of murders and other violent crimes.[40] FBI Headquarters instructed the field office to ensure that Rowe understood that he was not to "direct, lead, or instigate any acts of violence."[41] On the other hand, he was present on many occasions when violence occurred, and he participated in acts of violence. Rowe's FBI handler testified: "If he happened to be with some Klansman and they decided to do something, he couldn't be an angel and be a good informant."[42]

When the Church Committee presented its findings in 1976, Senator Church described the Committee's work evaluating the FBI's involvement in domestic intelligence in the following terms:

> [The Committee investigation's] purpose is . . . to evaluate domestic intelligence according to the standards of the Constitution and the statutes of our land. If fault is to be found, it does not rest in the Bureau alone. It is to be found also in the long line of Attorneys General, Presidents, and Congresses who have given power and responsibility to the FBI, but have failed to give it adequate guidance, direction, and control.[43]

During its 15-month investigation, the Committee determined that FBI Headquarters alone had developed over 500,000 domestic intelligence files on Americans and domestic groups.[44] The targets of the intelligence activities included organizations and individuals espousing revolutionary, racist, or otherwise "extremist" ideological viewpoints, but during the 1960s also included investigations of the civil rights, anti-war, and women's movements. In total, the FBI conducted more than 2,000 COINTELPRO operations before the program was discontinued in April 1971.[45]

Significantly, the Church Committee found that the FBI went beyond investigation and employed COINTELPRO operations to disrupt groups and discredit or harass individuals. While the Committee's final report did not question the need for lawful domestic intelligence, it concluded that the Government's domestic intelligence policies and practices required fundamental reform.[46]

The FBI's use of informants also was the subject of a staff report issued by the Church Committee entitled, "The Use of Informants in FBI Domestic Intelligence Investigations." Noting that the FBI was using more than 1,500 informants in 1975 in connection with domestic security investigations, the report focused on the absence of clear guidance for FBI agents as to how they should operate informants and what constraints applied to handling agents' and informants' activities:

> The [FBI's] Manual contains no standard limiting an informant's reporting to information relating to the commission of criminal offenses or even to violent or potentially violent activity. In fact, intelligence informants report on virtually every aspect of a group's activity serving, in the words of both FBI officials and an informant, as a "vacuum cleaner" of information.

* * *

> The Manual does not set independent standards which must be supported by facts before an organization can be the subject of informant coverage. Once the criteria for opening a regular intelligence investigation are met, and the case is opened, informants can be used without any restrictions. There is no specific determination made as to whether the substantial intrusion represented by informant coverage is justified by the government's interest in obtaining information. There is nothing that requires that a determination be made of whether less intrusive means will adequately serve the government's interest. There is also no requirement that the decisions of FBI officials to use informants be reviewed by anyone outside the Bureau. In short, intelligence informant coverage has not been subject to the standards which govern the use of other intrusive techniques such as wiretapping or other forms of electronic surveillance.[47]

In response to these ongoing concerns about ineffective internal controls and oversight, the Congress periodically considered subjecting the FBI to a statutory charter. In 1976 the Church Committee in its Final Report proposed a "comprehensive legislative charter defining and controlling the domestic security activities of the Federal Government."[48] Initially, the legislative charter proposal was supported by FBI Director Clarence Kelly and his successor, William Webster.[49]

Two years later, in 1980, the House Judiciary Committee held oversight hearings on a proposal for a legislative charter. Attorney General Civiletti and FBI Director William Webster supported the House bill.[50] Attorney General Civiletti testified that the charter "is intended to be the foundational statement of the basic duties and responsibilities of the FBI and also its general investigative powers and the principal minimum limitation on those powers."[51] He also stated that "the charter depends for enforcement on the internal disciplinary system of the FBI."[52]

As we discuss below, Congress did not adopt a general legislative charter defining the FBI's investigative authorities because of the adoption of the first Attorney General Guidelines in 1976.

## III.  Establishment of the Attorney General Guidelines

### A.  The Levi Guidelines - 1976

Attorney General Edward Levi issued the first Attorney General Guidelines, entitled "Domestic Security Investigation Guidelines." These guidelines, which were known as the first of the "Levi Guidelines," became effective on April 6, 1976.[53]

In congressional testimony prior to release of the first Guidelines, Attorney General Levi stated that the Guidelines "proceed from the proposition that Government monitoring of individuals or groups because they hold unpopular or controversial political views is intolerable in our society."[54] The Guidelines represented a significant shift in DOJ's approach to domestic terrorism. For the first time, investigations of domestic terrorism were treated as matters for criminal law enforcement, rather than as avenues for intelligence collection.

The Guidelines placed specific limits on techniques the FBI could use and distinguished three types of domestic security investigations: 1) preliminary investigations, 2) limited investigations, and 3) full investigations.[55] The Guidelines provided that the FBI could commence a full domestic security investigation only on the basis of "specific and articulable facts giving reason to believe that an individual or group is or may be engaged in activities which involve the use of force or violence."[56]

In a memorandum dated December 15, 1976, Attorney General Levi issued the second set of Attorney General Guidelines entitled, "Use of Informants in Domestic Security, Organized Crime, and Other Criminal Investigations" ("Levi Informant Guidelines").[57] Noting that the Government's use of informants may involve deception and intrusion into the privacy of individuals and may require Government cooperation with persons whose reliability and motivation may be open to question, the Guidelines outlined the factors to be evaluated in using informants, the instructions informants were to be given, and the steps to be taken in the event the FBI learned that an informant used in investigating criminal activity had violated the instructions or learned of the commission of a crime.[58]

The Informant Guidelines were part of a broader effort to reform the FBI's investigative and intelligence operations in light of the findings of the Church Committee.[59] Attorney General Levi emphasized that it was imperative that "special care be taken not only to minimize [use of informants] but also to ensure that individual rights [were] not infringed and that the government itself did not become a violator of the law."[60] The Guidelines stated that while informants were not employees of the FBI, "the relationship of an FBI informant to the FBI impos[ed] a special responsibility upon the FBI when the informant engage[d] in activity where he received, or reasonably [thought] he received, encouragement or direction for that activity from the FBI."[61] Attorney General Levi also stressed that while the FBI would have primary responsibility for these investigations, DOJ would have "much greater involvement."[62]

The Levi Informant Guidelines left significant decision-making authority within the discretion of the agents handling the informant. For example, neither the DOJ nor the U.S. Attorneys had any approval or oversight function in connection with an informant's participation in otherwise illegal activity.[63] However, if an informant committed an unauthorized criminal act in connection with an FBI assignment, the Guidelines required notification of the appropriate law enforcement or prosecutive authorities.[64]

The impact of the new Guidelines was readily apparent in FBI case statistics. William Webster, who served as FBI Director from 1978 to 1987, provided information in connection with a March 16, 1978, hearing indicating that the FBI's domestic security investigations had declined from 21,414 in July 1973 to 4,868 in March 1976, and stated publicly on May 3, 1978, that the Bureau was "practically out of the domestic security field."[65]

Before a number of high-profile investigations occurred in the 1980s, the Attorney General Guidelines were generally considered to be working well. As Attorney General Civiletti stated when he testified in 1980 in support of the FBI charter legislation:

> I believe the experience of the last three years with the Levi Guidelines has been highly

encouraging. It has demonstrated that guidelines can be drawn which are well understood by Bureau personnel and by the public and which can be filed and reviewed by the appropriate congressional committees. It has also shown that guidelines can be successfully applied to particular kinds of investigative activity and even to certain specific decisions made on a case-by-case basis. The reasonable conclusion which can be drawn from the success of these guidelines is that the charter need not detail every limitation or safeguard by express statutory terms. Such details are better covered in guidelines, with the charter setting forth the obligatory principles and objectives which the guidelines must meet and achieve.[66]

Within the FBI, however, there was concern that the Levi Guidelines would unduly limit authorized techniques and would not permit the FBI to be proactive, to collect intelligence before disaster struck, and to develop an adequate intelligence base.[67]

## B.  The Civiletti Guidelines - 1980-1981

Revelations regarding the conduct of some informants, FBI agents' knowledge of these activities, and interpretations of FBI statements or actions promising immunity for the informants prompted Attorney General Civiletti to issue revised confidential informant guidelines on December 4, 1980.[68] The revised Guidelines explicitly provided that, if necessary and appropriate, informants may be authorized to participate in two different types of "otherwise criminal activity" at the behest of the FBI, "ordinary" and "extraordinary." "Ordinary" criminal activity could be authorized by an FBI field office supervisor or higher FBI official. "Extraordinary" criminal activity was defined as any activity involving a significant risk of violence, corrupt actions by high public officials, or severe financial loss to a victim."[69] Only SACs could authorize extraordinary criminal activity, and only with the approval of the pertinent U.S. Attorney.[70]

In addition, both FBI Headquarters and the Assistant Attorney General in charge of the Criminal Division were to be "immediately" informed of any authorization of extraordinary criminal activity.[71] In the event an informant engaged in unauthorized criminal activity which was deemed "serious", the approval of either the FBI Director or a senior Headquarters official in consultation with the Assistant Attorney General in charge of the Criminal Division was required to continue to use the informant.[72] The Civiletti Informant Guidelines also made modifications to the factors to be considered in determining the advisability of notifying appropriate law enforcement authorities of criminal activity by FBI informants.[73]

In addition, for the first time, the Guidelines assigned federal prosecutors a coordinating role in relation to informant activities:

> In any matter presented to a United States Attorney or other federal prosecutor for legal action . . . where the matter has involved the use of an informant or a confidential source in any way or degree, the FBI shall take the initiative to provide full disclosure to the federal prosecutor concerning the nature and scope of the informant's or confidential source's participation in the matter.[74]

The Civiletti Informant Guidelines also revised the terms of the instructions required to be given to informants. The Civiletti Guidelines required FBI agents operating informants to advise informants that their relationship with the FBI would not protect them from arrest or prosecution for any violation of federal, state, or local law, except insofar as a field supervisor or SAC determined pursuant to appropriate Attorney General Guidelines that the informant's criminal activity was justified. If the required warnings were given to informants, they would reasonably understand that the FBI, without the involvement of any prosecutor, lacked the authority to decide if the informants would be protected from arrest and prosecution.[75]

In the 1980s, the Guidelines were again revised following press accounts and congressional hearings concerning the FBI's domestic intelligence and counterespionage activities, and its undercover operations. The most dramatic revelations involved several high profile undercover

operations, one of which targeted members of the United States Congress in the ABSCAM investigation.

ABSCAM was an FBI "sting" operation run out of the FBI's Hauppauge, Long Island office which initially targeted trafficking in stolen property and thereafter was converted to a public corruption investigation. The investigation ultimately led to the conviction of a United States Senator, six members of the House of Representatives, the Mayor of Camden, New Jersey, members of the Philadelphia City Council, and an inspector for the Immigration and Naturalization Service.

During the ABSCAM investigation, the FBI relied on an informant, Melvin Weinberg, who presented himself as a business agent for "Abdul Enterprises," a fictitious organization ostensibly supported by two wealthy Arab sheiks looking for investment opportunities in America.[76] As part of the scheme, the sheiks approached designated public officials and offered them money or other consideration in exchange for favors assisting their cause. The undercover operation called for Weinberg to contact a variety of individuals and tell them that his principals were seeking to invest large sums of money. When the investigation became public in early 1980, controversy centered on the use of the "sting" technique and Weinberg's involvement in selecting targets. Although Weinberg was found to have previously engaged in numerous felonious activities, he avoided a three-year prison sentence and was paid $150,000 in connection with the operation. Ultimately, all of the ABSCAM convictions were upheld on appeal,[77] although some judges criticized the tactics used by the FBI and lapses in FBI and DOJ supervision.[78]

In the wake of ABSCAM, Attorney General Civiletti issued "The Attorney General Guidelines for FBI Undercover Operations" ("Civiletti Undercover Guidelines") on January 5, 1981.[79] These were the first Attorney General Guidelines for undercover operations, and they formalized procedures necessary to conduct undercover operations.

Following the initial press accounts about the ABSCAM investigation, Congress held a series of hearings to examine FBI undercover operations and the new Civiletti Undercover Guidelines. The House Subcommittee on Civil and Constitutional Rights began hearings on FBI undercover operations in March 1980 and concluded with a report in April 1984. Among the concerns expressed during the hearings were the undercover agents' involvement in illegal activity, the possibility of entrapping individuals, the prospect of damaging the reputations of innocent civilians, and the opportunity to undermine legitimate rights to privacy.[81] Several witnesses testified that the Civiletti Undercover Guidelines did not sufficiently address entrapment and called for the revision of the provisions prohibiting inducing subjects not suspected of criminal activity.[82] Congress also heard testimony from numerous individuals who claimed they were unjustly victimized by an FBI-sponsored undercover operation.[83] On April 29, 1982, FBI Director Webster reported that there were 10 undercover operations that resulted in the filing of 30 civil suits implicating the FBI and/or its employees.[84]

In March 1982, after the Senate debated a resolution to expel Senator Harrison A. Williams for his conduct in ABSCAM, the Senate established the Select Committee to Study Undercover Activities.[85] In December 1982, the Committee issued its final report, which was generally supportive of the undercover technique but observed that its use "creates serious risks to citizens' property, privacy, and civil liberties, and may compromise law enforcement itself."[86]

The Committee's final report called for clarification of vague terminology in the Guidelines and strict approval procedures. The Committee stated that there were several weaknesses in the Civiletti Undercover Guidelines.

- The terms "extension," "operation," and "public official" were internally defined by the FBI "in a manner that makes each of those terms redundant, exceedingly narrow, or inconsistent with usage in other guidelines and documents."[87]

- The Guidelines failed to indicate what circumstances justified "the use of violence, the commission of a crime, or interference with a privileged relationship."[88]

- The Guidelines failed to make clear what circumstances required the FBI to perform all the steps required to initiate an undercover operation or to modify an existing undercover operation.[89]

In addition, the report asked that Congress be consulted at least 30 days before the promulgation of every guideline governing undercover or criminal investigations, and every amendment to, or deletion or formal interpretation of, any such guideline.[90]

Both the House Subcommittee on Civil and Constitutional Rights and the Senate Select Committee concluded that the existing Attorney General Guidelines and the FBI's internal controls were insufficient to constrain undercover investigations, and both proposed legislative solutions.[91] The Senate Select Committee recommended federal legislation to govern law enforcement undercover operations and the inclusion of congressional oversight mechanisms. Although the Senate Select Committee supported legislation, it rejected the House's recommendation of a judicial warrant requirement. Instead, the Senate Select Committee proposed a "probable cause" standard for undercover operations seeking to infiltrate governmental, religious, or news media organizations, and a finding of "reasonable suspicion" for all other operations seeking to detect past, ongoing, or planned criminal activity.[92]

Three years after the Civiletti Guidelines were issued and a year following the 1982 House hearings at which DOJ officials provided repeated assurances that the Undercover Guidelines would "ensure that critical judgments are made at appropriate levels of authority," a House Judiciary Subcommittee examined their application in a Cleveland-based undercover operation, code-named "Operation Corkscrew."[93] The investigation was designed to probe case-fixing in the Cleveland Municipal Court. Conducted in 1977 to 1982, the operation did not produce evidence deemed worthy of prosecution by the U.S. Attorney's Office. While the paperwork submitted by the case agents asserted that the primary targets were judges, the only evidence developed was that the Court's "antiquated recordkeeping system . . . could be easily tampered with or circumvented by any employee with access to these documents."[94]

In blunt criticism directed at the FBI's failure to adhere to the Attorney General Guidelines, the House Subcommittee concluded that in Operation Corkscrew "virtually every one of the principal safeguards was either directly violated, ignored, or administratively construed in a manner inconsistent with their stated purposes with profoundly disturbing results to the FBI, the suspects, and the public."[95] The Subcommittee asserted there were major Guidelines violations:

- the operation was initiated without the requisite evidentiary threshold of "reasonable suspicion" of judicial case-fixing;[96]

- the Guidelines' provision requiring that the proposed criminal activity be "clear and unambiguous" was "not only ignored but was apparently deliberately violated in order to produce 'evidence' of wrongdoing;"[97]

- evidence casting doubt on the principal FBI informant's credibility was not investigated by the case agents or brought to the attention of field supervisors or FBI Headquarters;

- the fact that the subject matter of the investigation qualified as a "sensitive circumstance" under the Guidelines did not result in special scrutiny either at FBI Headquarters or DOJ;

- the Undercover Operations Review Committee (composed of both FBI and DOJ personnel) was provided "incomplete and misleading information" and failed to "challenge or test the sufficiency and accuracy of information" provided by field agents;[98] and

- the U.S. Attorney's Office did not appear to assess independently the evidence developed in the investigation.[99]

Finally, the Subcommittee asserted that the problems in the ABSCAM and Corkscrew investigations

"are not aberrations, but in fact reflect a pattern of recurrent problems which are inherent in the process."[100]

## C. **The Smith Guidelines - 1983**

In the 1980s, Congress also scrutinized the FBI's domestic security investigations. In 1982 and 1983, the Senate Subcommittee on Security and Terrorism held a series of five hearings on the Levi Domestic Security Guidelines.[101] Some members of the Congress believed that the Levi Guidelines "unduly restricted" the FBI's authority to monitor and prevent potential terror or violence against persons and property in the United States, pointing to the provisions that required a criminal predicate to initiate an investigation.[102]

The Subcommittee completed its assessment of the Levi Guidelines with the issuance of a report entitled, "Impact of Attorney General Guidelines for Domestic Security Investigations (The Levi Guidelines)." The Subcommittee concluded that the Attorney General Guidelines are "necessary and desirable" but recommended that the Guidelines be revised to delete the criminal standard for initiating domestic security investigations; extend time limits for investigations, particularly those for preliminary and limited investigations; lower the evidentiary threshold for initiating limited investigations; relax restrictions on the recruitment and use of new informants; and authorize investigations of systematic advocacy of violence, alleged anarchists, or other activities calculated to weaken or undermine federal or state governments.[103] The Subcommittee recommended that the revised Guidelines be tested and evaluated and that DOJ should thereafter "present legislative recommendations to Congress to justify the enactment into law of adequate and effective guidelines for domestic security investigations."[104]

After an 8-month review involving numerous DOJ components and consultation with members of the Congress, Attorney General Smith issued a revised set of Attorney General Guidelines, entitled "The Attorney General's Guidelines on Domestic Security Investigations" (the "Smith Guidelines"), on March 7, 1983.[105] In announcing the revisions, Attorney General William French Smith stated that the Guidelines were needed "to ensure protection of the public from the greater sophistication and changing nature of domestic groups that are prone to violence" but would "retain adequate protections for lawful and peaceful political dissent."[106] Attorney General Smith stated that FBI agents had "demonstrated their professional competence, integrity, and ability to adhere to requirements."[107] Moreover, he said that the integration of all FBI law enforcement investigation guidelines into one document was meant to enhance the effectiveness of terrorism investigations by applying to these investigations the concepts and standards that effectively governed the FBI's racketeering enterprise investigations.[108]

The Smith Guidelines introduced a new type of investigation called the "criminal intelligence investigation," which had a broader organizational focus than a general crimes investigation and authorized the FBI to investigate certain enterprises which sought "either to obtain monetary or commercial gains or profits through racketeering activities or to further political or social goals through activities that involve criminal violence."[109] In addition to retaining the racketeering enterprise investigation carried forward from the Civiletti Guidelines, the Smith Guidelines provided for a "domestic security/terrorism investigation," whose purpose is "to obtain information concerning the nature and structure of the enterprise . . . with a view to the longer range objective of detection, prevention, and prosecution of the criminal activities of the enterprise."[110] A domestic security/terrorism investigation could lawfully collect information regarding "(i) the members of the enterprise and other persons likely to be knowingly acting in furtherance of its criminal objectives, provided that the information concerns such persons' activities on behalf of or in furtherance of the enterprise; (ii) the finances of the enterprise; (iii) the geographic dimensions of the enterprise; and (iv) past and future activities and goals of the enterprise."[111]

FBI Director Webster characterized the changes to the Guidelines as "evolutionary," "not revolutionary," stating that the Guidelines needed to adjust as the FBI learned more about organized crime and criminal enterprises. According to Webster, the revisions allowed agents to

address the needs of the time, particularly those posed by terrorist organizations that were becoming more fluid with inconsistent structure and varied personnel composition.[112]

The Smith Guidelines also lowered the evidentiary thresholds for initiating full domestic security/terrorism investigations, requiring the FBI to identify "facts or circumstances reasonably indicat[ing] that two or more persons are engaged in an enterprise for the purpose of furthering political or social goals wholly or in part through activities that involve force or violence and a violation of the criminal laws of the United States."[113] This replaced the "specific and articulable facts" standard in the Levi Guidelines. The Smith Guidelines provided that the "reasonable indication" standard required an objective, factual basis for initiating the investigation, but did not require specific facts or circumstances indicating a past, current, or impending violation.[114] The Smith Guidelines also filled a gap in the Levi Guidelines by permitting "low-level" monitoring of dormant groups even though they did not appear to be an immediate threat.[115]

The Smith Guidelines restricted the scope of the "preliminary inquiry" tool in domestic security investigations. While the Levi Guidelines permitted preliminary inquiries in domestic security investigations to determine if there was a factual predicate for opening a full investigation, the Smith Guidelines eliminated the use of preliminary inquiries in domestic security investigations, leaving the technique available only for general crimes investigations.[116] Under both the Levi and Smith Guidelines, neither informants nor mail covers could be used during preliminary inquiries. The Smith Guidelines extended the duration of preliminary inquiries from 60 to 90 days, permitting extensions by FBI Headquarters upon "a written request and statement of reasons why further investigative steps are warranted when there is no 'reasonable indication' of criminal activity."[117]

The Smith Guidelines cautioned that investigations could not be initiated solely on the basis of an individual's exercise of First Amendment rights, a restriction that has remained in place for over 20 years and is in effect today. See General Crimes Guidelines § I (General Principles). In addition, the Smith Guidelines instructed agents to consider, in evaluating the use of various law enforcement techniques, the use of "less intrusive means."[118] With respect to use of the undercover technique, the Smith Guidelines required FBI Headquarters' approval with notification to the DOJ if the FBI initiated "undisclosed participation in the activities of an organization by an undercover employee or cooperating private individual in a manner that may influence the exercise of rights protected by the First Amendment."[119]

One key member of Congress observed that the Guidelines were "instrumental in curtailing intelligence abuse by the FBI" and should not be changed "without careful Congressional and public scrutiny to assure that [the Smith Guidelines are] not a retreat."[120]

The following year, coinciding with the House Subcommittee's final year of hearings on FBI undercover operations discussed above, the FBI instituted an internal review of undercover operations. On February 8, 1984, the FBI's Office of Program Evaluation and Audits (OPEA) in the Inspection Division released a study of FBI undercover operations which concluded that the FBI was doing an effective job in undercover investigations in the criminal field. In terms of management controls, the report concluded that the Criminal Undercover Operations Review Committee (CUORC), the Undercover and Special Operations Unit (USOU), and the Undercover Guidelines improved centralized control of undercover activities.[121]

Also during 1983 and 1984, Congress debated a bill which would subject undercover operations to congressional control. The Undercover Operations Act would require that before the FBI could initiate an undercover operation, federal law enforcement agencies would have to establish a factual predicate of "probable cause" or "reasonable suspicion."[122] Director William Webster did not support the entire bill, arguing that it would not allow agents to effectively perform investigations. Director Webster cited the effectiveness of the Attorney General Guidelines, which set thresholds and guidance for undercover operations.[123] Director Webster also stated that the flexibility in the Guidelines allowed "responses in specific situations which arise in the context of the investigative field," while adhering to regulatory requirements.[124]

D. **The Thornburgh Guidelines - 1989**

In September 1981, the FBI opened a criminal investigation of the Committee in Solidarity with the People of El Salvador, or "CISPES," a United States-based group that opposed the Reagan Administration's policies in Central America.[125] According to the FBI, the investigation was opened to determine if CISPES had violated the Foreign Agents Registration Act, 22 U.S.C. § 611-621. The FBI closed the investigation in February 1982, but continued to collect information about CISPES from an informant who claimed that the group was involved in international terrorism. Under the auspices of its Counterterrorism Program, the FBI thereafter opened an international terrorism investigation in March 1983 pursuant to the Foreign Counterintelligence Investigations (FCI) Guidelines, during which it conducted surveillance of CISPES and allied groups. Finding no evidence to support the informant's claims, the FBI closed the investigation in June 1985.

In January 1988, the CISPES investigation was brought to public attention when the Center for Constitutional Rights released material it had obtained under the Freedom of Information Act (FOIA).[126] CISPES later alleged that the FBI investigated the group, its members, and affiliated groups solely because of its political views, and that the investigation violated the First Amendment and the constitutional rights of various individuals and organizations.[127]

After consultations with the Congress in early 1988, FBI Director William S. Sessions ordered an independent inquiry into the FBI's handling of the CISPES investigation to determine if the FBI had broken any laws, violated any Attorney General Guidelines or rules, regulations or policy, or used poor judgment in the course of the investigation. The inquiry also examined whether the requisite evidentiary threshold had been established to initiate the investigation, whether the investigation remained opened for the appropriate period of time, whether DOJ oversight was sufficient, whether the initial informant was reliable, and whether the FBI's practice of "indexing" information obtained from the investigation was proper.[128]

The FBI's May 27, 1988, report concluded that the FBI had conducted an appropriate investigation for the initial period, but that its objectives became overly broad when FBI Headquarters directed all offices to treat each of the estimated 180 chapters of CISPES as subjects of the investigation. The report also concluded that FBI Headquarters and the Dallas Field Office had inadequately supervised the investigation, principally by their failure to conduct a background check of the informant who prompted the investigation, failing to continually ensure that the informant was reliable and accurate, and failing to adequately supervise and direct the informant.[129]

With respect to the Attorney General's FCI Guidelines, the report found 31 separate violations, including:

- conducting inquiries beyond what was permitted without opening an investigation;

- receiving information about individuals' mail without obtaining proper authority; and

- initiating investigations without an adequate evidentiary predicate.[130]

The Senate's Select Committee on Intelligence also investigated the CISPES matter. On September 14, 1988, FBI Director Sessions told the Committee that "the investigation should never have been initiated," but denied that the FBI had acted illegally in conducting the inquiry.[131] Director Sessions notified the Committee that several agents had been disciplined and that internal procedures had been revised to ensure that such errors would not recur.[132]

Although the Senate Committee concluded that the FBI's CISPES investigation did not reflect "significant FBI political or ideological bias," it concluded that its activities "resulted in the investigation of domestic political activities protected by the First Amendment that should not have come under governmental scrutiny."[133] The Committee also stressed the key role FBI policy and, particularly, the Attorney General Guidelines play in constraining the FBI's investigative authorities:

Federal laws do not regulate most of the FBI's standard investigative methods, including

photographic and visual surveillance, trash checks, the use of informants and undercover agents, attendance at meetings and infiltration of groups, interviews of individuals and their employers and associates, and checks of various law enforcement, license, utility, and credit records. Investigations such as the CISPES case using these methods are governed by internal FBI policies and by guidelines issued by the Attorney General. Violations are normally punishable only by internal disciplinary action. The CISPES investigation demonstrated the vital importance of adherence to policies and guidelines that keep the FBI from making unjustified inquiries into political activities and associations.[134]

The controversy surrounding the CISPES investigation ultimately led to the establishment of a DOJ working group which proposed changes to the Attorney General's FCI Guidelines. Those revisions, which became effective in September 1989, provided more guidance to FBI field offices about reporting on international terrorism investigations.[135]

In the wake of the CISPES disclosures, the House Judiciary Committee asked the General Accounting Office (GAO) to review the FBI's international terrorism program. The GAO sampled closed cases and used a questionnaire to develop a profile of international terrorism cases. In its September 1990 report, "International Terrorism: FBI Investigates Domestic Activities to Identify Terrorists," the GAO found that:

- the FBI closed approximately 67 percent of its investigations because it did not develop evidence indicating that the subjects were engaging in international terrorist activities;

- United States citizens and permanent resident aliens were the subject of 38 percent of the 18,144 cases opened during January 1982 - June 1988;

- mosques were among the religious institutions targeted in the 1980s investigations; and

- the FBI monitored First Amendment-related activities in about 11.5 percent of those cases; indexed information about individuals who were not subjects of FBI investigations in about 47.8 percent of the cases; and indexed information about groups which were not subjects of the investigations in about 11.6 percent of the cases.[136]

However, the GAO stated that because it was not afforded access to full case files, it could not determine if the FBI violated First Amendment rights of the individuals and groups which were monitored or if the FBI had the requisite basis to monitor the activities of these individuals and groups. According to the GAO Report, while the FBI declined the opportunity to provide written comments on its report, "GAO discussed the report with FBI officials who generally agreed with the facts."[137]

In addition to the CISPES inquiry, another informant controversy arose in the late 1980s. After a 3-year investigation by the Department of Labor's Office of the Inspector General and DOJ into charges of labor fraud by Teamsters President Jackie Presser, the Department of Justice ended the investigation in the summer of 1985. At the time, Presser's uncle, Allen Friedman, and a Cleveland organized crime leader, John Nardi, Jr., had already been convicted of receiving unauthorized payments while serving as "ghostworkers" for the Teamsters. It later came to light that Presser's FBI contact agent or "handler," Robert S. Friedrick, admitted during an internal FBI investigation that Presser had been authorized by the FBI to employ the "no-show" employees.[138]

The decision to drop the Presser investigation prompted a congressional inquiry by the Senate Permanent Subcommittee on Investigations.[139] Following hearings, the Committee staff published a report that focused on whether DOJ was motivated by improper reasons not to prosecute Presser and what problems prompted the declination decision.[140] The Committee staff concluded that DOJ's decision not to prosecute "was based on its evaluation of the impact of the agents' authorization claims," but the report did not reach a conclusion as to the evidence that the agents' authorization statements were untrue.[141] The report noted that the Levi Guidelines made only passing reference to authorized criminal acts by informants or others. Those Guidelines provided that an informant

may not participate in criminal activities "except insofar as the FBI determines that such participation is necessary to obtain information needed for purposes of federal prosecution."[142] The report noted that the Civiletti Guidelines, by contrast, addressed the issue in some detail, requiring a written determination by an FBI supervisor that:

    a.  the conduct is necessary to obtain information or evidence for paramount prosecutive purposes, to establish and maintain credibility or cover with persons associated with criminal activity under investigation, or to prevent or avoid the danger of death or serious bodily injury; and

    b.  this need outweighs the seriousness of the conduct involved.[143]

Moreover, the Civiletti Guidelines required SAC approval for participation in "extraordinary" illegal activities, defined as those actions presenting a significant risk of "severe financial loss to a victim." DOJ stated that the basic agreement with Presser predated the Levi Guidelines and because there was no retroactive requirement to report either pre- or post-Guidelines authorization of illegal informant activity, there was no violation of DOJ or FBI policy embodied in the Guidelines.

The Committee staff also examined the role DOJ attorneys played in questioning Presser's handlers and their supervisors about Presser's informant relationship. Although DOJ was not at the time required either to approve or monitor the types of activities Presser was involved in, the Senate staff report expressed concern that the DOJ was not exercising adequate oversight of the FBI in informant matters.

## E.  The Reno Guidelines - 2001

On February 26, 1993, terrorists drove a truck loaded with explosives into a garage at the World Trade Center Tower in Manhattan, resulting in the death of 6 and injuring more than 1,000 people. On April 19, 1995, a massive fertilizer bomb destroyed the Alfred P. Murrah federal building in Oklahoma City, killing 168 people, including 19 children, and wounding 674 others. The terrorist attacks prompted renewed congressional concerns about the adequacy of the FBI's tools to prevent and detect terrorism. In 1995, a Subcommittee of the House Judiciary Committee held a hearing on terrorist threats.[144] In response to a suggestion by several lawmakers to rewrite the Attorney General Guidelines addressing domestic security investigations and terrorism, FBI Director Louis Freeh testified that the current Guidelines afforded the authorities and flexibilities needed to investigate terrorist groups.[145] FBI Director Freeh also testified that prior to the Oklahoma City bombing, he and Attorney General Reno discussed the "necessity of reviewing with an objective of changing the interpretation of the guideline to give [the FBI] not broader authority, but more confidence to use the authority already articulated in the guidelines."[146]

On November 1, 1995, the FBI circulated to each of its field offices the reinterpretation of the domestic security/terrorism investigations and preliminary inquiry provisions of the Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Domestic Security/Terrorism Investigations issued in March 1989, restating that the "reasonable indication" standard for opening a full investigation is "substantially lower than probable cause" and that a preliminary investigation could be opened on a lesser showing.[147] With respect to the initiation of domestic security investigations, the 1989 version of the Guidelines provided:

    A domestic security/terrorism investigation may be initiated when the facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of furthering political or social goals . . . through activities that involve force or violence and a violation of the criminal laws of the United States.

The FBI's practice had been to construe the "reasonable indication" standard as requiring evidence of an imminent violation of federal law. After the Oklahoma City bombing, the Guidelines were reinterpreted to justify the investigation of domestic groups that advocate violence provided that they have the ability to carry out violent acts that may violate federal law.[148]

The most extensive revisions to the Confidential Informant Guidelines occurred in January 2001, just before the end of Attorney General Reno's tenure. The Confidential Informant Guidelines had not been modified since Attorney General Civiletti issued the second set of Informant Guidelines in December 1980.

The Reno review of the Guidelines was spurred in large part by the FBI Boston Field Office's mishandling of informants James "Whitey" Bulger and Stephen "The Rifleman" Flemmi. In 1995, the Government indicted Bulger and Flemmi on multiple charges of racketeering, including acts of extortion, murder, bribery, loan sharking, and obstruction of justice.[149] Bulger was tipped off to his pending arrest and remains a fugitive on the FBI's Ten Most Wanted List. Flemmi allegedly was tipped off but was arrested, later pled guilty, and is in prison serving a life sentence. The FBI's relationship with both Bulger and Flemmi was not acknowledged by the Government until court proceedings following their initial indictment.[150]

We provide in Chapter Three a detailed description of the FBI's association with Bulger and Flemmi. Evidence presented during pretrial hearings in the Government's case against Flemmi revealed misconduct and criminal activity by the FBI agents who handled the two mobsters. For example, agents accepted money and exchanged presents with them, hosted them for dinners, and provided intelligence on planned law enforcement activity targeted at their criminal operations, including identifying the location of electronic surveillance and the identities of informants. In one case, agents told Bulger and Flemmi that another FBI informant had implicated them in a murder. The informant was killed as he exited a restaurant in South Boston approximately one week after his request to be placed in the Government's Witness Protection Program was denied. In another matter, agents intervened with prosecutors and succeeded in having Bulger and Flemmi omitted from upcoming indictments. Although other law enforcement agencies, such as the Massachusetts State Police and the federal Drug Enforcement Administration, had succeeded in charging other Winter Hill Gang members, Bulger and Flemmi's ability to evade prosecution for so many years raised suspicions that they were being protected by the FBI.

Following lengthy internal investigations by DOJ and FBI, charges were brought against two FBI agents who handled informants in the Winter Hill Gang. One FBI Special Agent, John Connolly, the principal handler of Bulger and Flemmi, was convicted in April 2002 of multiple counts of obstruction of justice and sentenced to 10 years in prison.[151] The other Special Agent, H. Paul Rico, died in jail prior to his trial on murder conspiracy charges.[152] In addition, approximately 20 civil suits have been brought against the FBI and several of its former agents based on the FBI's handling of Bulger and Flemmi. Many of these suits include claims for wrongful death brought by the families of victims who were murdered by Bulger and Flemmi.

As a result of the Bulger-Flemmi episode and other problem cases involving the FBI's operation of informants, DOJ formed a working group in 1999 to recommend revisions to the Confidential Informant Guidelines. The working group was initially chaired by Mary Jo White, then U.S. Attorney for the Southern District of New York, and later by Jonathan D. Schwartz, Principal Associate Deputy Attorney General, and included representatives of DOJ investigative agencies and federal prosecutors, including FBI Director Mueller, who was then serving as U.S. Attorney for the Northern District of California. The group met regularly for two years and submitted its recommended changes to Attorney General Reno.

In January 2001, DOJ issued revised Informant Guidelines superseding the 1980 Civiletti Guidelines. The changes included the following provisions:

- prohibiting federal prosecuting offices in specified circumstances from withholding informant information from the Department of Justice;

- prohibiting JLEAs from making promises of immunity to informants;

- establishing the Confidential Informant Review Committee to approve and monitor informants who are high level or long-term, or who are under the obligation of privilege or confidentiality or affiliated with the media;

- adding greater detail to informant instructions and requiring that several of them read verbatim to informants; and

- imposing notification and information-sharing requirements on JLEAs, such as the requirement to notify federal prosecutors in circumstances when an informant is the target of a federal investigation.[153]

Both the Informant Guidelines and Domestic Security Guidelines remained in place without further revision until the events of September 11, 2001, prompted the reexamination of the existing Guidelines which led to issuance of the revised Guidelines on May 30, 2002.

## IV. Conclusion

Several themes echo throughout the history of the evolution of the Attorney General's Investigative Guidelines that we found to be instructive in conducting this review.

First, Attorneys General and FBI leadership have uniformly agreed that the Attorney General Guidelines are necessary and desirable, and they have referred to the FBI's adherence to the Attorney General Guidelines as the reason why the FBI should not be subjected to a general legislative charter or to statutory control over the exercise of some of its most intrusive authorities.

Second, problems in the FBI's handling of informants or conducting undercover operations have occurred when field supervisors or FBI Headquarters, or both, failed to exercise appropriate oversight of field activities in accordance with the Guidelines.

Third, historically, the partnership between the FBI and DOJ in making key operational and oversight decisions has promoted adherence to the Attorney General Guidelines and allowed the Department to exercise critical judgments regarding sensitive FBI investigative activities, particularly with respect to its use of confidential informants and undercover operations.

Fourth, oversight by Congress has identified Guidelines violations and gaps in the coverage of the Guidelines.

Below we provide a timeline identifying the Attorney General Guidelines issued between 1976 and 2002, and the significant historical events associated with the revisions.

In the balance of our report, we present our findings with respect to the FBI's compliance with the May 2002 revisions to the Guidelines, mindful of their historical context and the lessons learned over the last 30 years.

**Timeline of Events Associated
with the Attorney General Guidelines**

*[Not Available Electronically]*

---

## Footnotes

25. The FBI's activities from 1936 to 1945 are described in the final report of the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities, *Book II: Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-755, at 23-37 (1976) (hereafter "Church Committee, *Book II: Intelligence Activities and the Rights of Americans*").

26. 18 U.S.C. § 2385 (1952).

27. 18 U.S.C. § 2386 (1952).

28. Pub. L. No. 81-831, 64 Stat. 987 (1950) (codified as amended in 50 U.S.C. §§ 831-32; 834-35). The Supreme Court issued a series of decisions in the 1950s and 1960s examining the scope and constitutionality of some of the key federal statutes criminalizing subversive activities. Among the most significant cases were Dennis v. United States, 341 U.S. 494 (1951)(upholding constitutionality of the Smith Act); Service v. Dulles, 354 U.S. 363 (1957) (reversing Secretary of State's discharge of foreign service officer under the "McCarran Rider" to the Department of State Appropriation Act of 1947); Yates v. United States, 354 U.S. 298 (1957) (overturning convictions of Communist leaders, requiring that the government must show advocacy Activities Control Act); and Brandenburg v. Ohio, 395 U.S. 444 (1969) (striking down state syndicalism law). "of action and not merely abstract doctrine" under the Smith Act); Communist Party of the United Activities Control Act); and Brandenburg v. Ohio, 395 U.S. 444 (1969) (striking down state syndicalism law).

29. Annual Report of the Attorney General for Fiscal Year 1958, at 338. COMINFIL authorized the investigation of legitimate noncommunist organizations that the FBI suspected were being infiltrated by Communist influences.

30. The FBI investigated the activities of the NAACP and its members for 25 years and specifically targeted Dr. Martin Luther King, Jr. in attempts to neutralize his public appeal. The surveillance activity of Dr. King and the Southern Christian Leadership Conference (SCLC) spanned nearly five years from December 1963 until his death in April 1968. It included wiretaps of Dr. King's home telephone and the homes and offices of some of his advisers, wiretaps of the SCLC's telephone, hidden microphones in Dr. King's hotel rooms, and the use of FBI informants. Conducted under the FBI's investigative classification COMINFIL, the efforts to discredit Dr. King included efforts to cut off SCLC's funding sources, disrupt his marriage, undermine his efforts with foreign heads of state, and discredit him with the clerical and academic communities as well as the media. Church Committee, Book III, *Supplemental Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, S. Rep. No. 94-75, at 79-184 (1976) (hereafter "Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*"). The Church Committee concluded that the investigation was "unjustified and improper." Id. at 85.

31. Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 239.

32. Liuzzo v. United States, 565 F. Supp. 640 (E.D. Mich. 1983).

33. Id. at 642.

34. Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 241. Liuzzo's heirs brought an unsuccessful civil suit against the Government under the Federal Tort Claims Act, 28 U.S.C. § 1291, et seq. The court rejected their claim, holding in Liuzzo v. United States, 565 F. Supp. 640, 646 (E.D. Mich. 1983), that the Government was not liable because the FBI agents who handled Rowe as an FBI informant acted reasonably and prudently. After an Alabama jury found the three Klansmen not guilty of murder, the Klansmen were convicted of violating Liuzzo's civil rights. See Liuzzo v. United States, 485 F. Supp. 1274, 1275-77 (E.D. Mich. 1980).

35. Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 243-44.

36. Id. at 243 (footnote omitted).

37. Id.

38. Id.

39. Id.

40. Id. at 239. The Church Committee's final report included a case study on Rowe, noting Attorney General Nicholas Katzenbach's strong defense of the FBI's use of informants (calling them "critical to the solution

of the three murdered civil rights workers") while at the same time acknowledged that an "effective informant program" may product what Attorney General Katzenbach termed "disruptive results." Id. at 240.

41. Id. at 244.

42. Id. at 244 (footnote omitted). Rowe also testified before the Church Committee. See Intelligence Activities: Hearings on S. Res. 21 Before the Senate Select Committee to Study Governmental Operations with Respect to Intelligence Activities of the United States, 94th Cong., *Vol. 6: Federal Bureau of Investigation*, at 107-32 (1976) (hereafter "Church Committee, *Vol. 6: Federal Bureau of Investigation*) (statement of Gary Thomas Rowe).

Rowe was also present when Walter Bergman, one of the "Freedom Riders," was attacked and severely beaten by a mob in Birmingham, Alabama in 1961. Bergman brought a civil suit seeking damages under the Federal Tort Claims Act, successfully maintaining that the FBI violated its common law and statutory duties by ignoring credible threats of violence and failing to report them to the Department of Justice until four days after the events. A federal district court upheld two of three theories of liability advanced by Bergman in resolving the "question of the government's responsibility to give effect and meaning to our system of laws, and protect those who sought to exercise their rights of free action." Bergman v. United States, 565 F. Supp. 1353, 1415 (W.D. Mich. 1983). See also Bergman v. United States, 551 F. Supp. 407 (W.D. Mich. 1982); Bergman v. United States, 579 F. Supp. 911 (W.D. Mich. 1984); and Bergman v. United States, 648 F. Supp. 351 (W.D. Mich. 1986), aff'd, 844 F.2d 353 (6th Cir. 1988). Rowe's December 1975 testimony before the Church Committee that he was an FBI informant at the time of the beatings and had told the FBI of the expected attack three weeks before it took place, was referenced in the court's opinion in Bergman v. United States, 565 F. Supp. at 1382-85, 1392. Rowe wrote an account of the Freedom Riders incident in his autobiography, *My Undercover Years with the Ku Klux Klan* (Bantam Books 1976).

43. Church Committee, *Vol 6: Federal Bureau of Investigation*, at 1-2 (statement of Chairman Frank Church).

44. Church Committee, *Book II: Intelligence Activities and the Rights of Americans*, at 6.

45. Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 3 (citation omitted).

46. The Church Committee held hearings on the FBI's role in COINTELPRO in November and December 1975. The body of its publicly released work included 1) an interim report with findings on the United States' involvement in assassination plots against foreign leaders; 2) seven volumes of public hearings; and 3) seven additional "Books" on various topics, including *Book II, Intelligence Activities and the Rights of Americans* (April 26, 1976), and *Book III, Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans* (April 23, 1976).

47. Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 229-30 (footnotes omitted).

48. Church Committee, *Book II: Intelligence Activities and the Rights of Americans* at 293-94.

49. *Legislative Charter for the FBI*: Hearings on H.R. 5030 Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 96th Cong. 1 (1980) (hereafter "*1979-1980 House FBI Charter Bill Hearings*"); *Law Enforcement Undercover Activities*: Hearings Before the Senate Select Committee to Study Law Enforcement Undercover Activities of Components of the Department of Justice, 97th Cong. 1041 (1982) (hereafter "*1982 Senate Select Committee Hearing on Law Enforcement Undercover Activities*") (statement of William H. Webster, Director, FBI).

A major reform that emerged from the Church Committee was passage of the Foreign Intelligence Surveillance Act of 1978 (FISA), Pub. L. No. 95-511, 92 Stat. 1783 (codified at 50 U.S.C. § 1801-11 (1994 & Supp. IV 1998), amended by Act of Dec. 3, 1999, Public L. No. 160-120, 113 Stat. 1606)), which was signed into law by President Carter on October 24, 1978.

50. *1979-1980 House FBI Charter Bill Hearings* 3-15 (Testimony of Benjamin R. Civiletti, Attorney General,

and William Webster, FBI Director). The Senate's bill was S. 1612, The Federal Bureau of Investigation Charter Act of 1979, 96th Cong. (1979), reprinted in *FBI Charter Act of 1979, S.1612: Hearings on S. 1612 Before the Senate Committee on the Judiciary*, 96th Cong. pt. 2, 427 (1980). Section 537 of the bill authorized the FBI Director to impose fines up to $5,000 on agents who willfully abused "sensitive investigative techniques," which included misuse of informants or intrusive surveillance authorities. Id. at 469.

51. *1979-1980 House FBI Charter Bill Hearings*, at 3 (Statement of Benjamin R. Civiletti, Attorney General).

52. Id. at 7.

53. The Levi Guidelines can be found at *FBI Statutory Charter:* Hearings Before the Senate Committee on the Judiciary, 95th Cong. pt. 1, 20-26 (1978) (hereafter "*1978 Senate Hearings on FBI Statutory Charter Part I*") and in *FBI Oversight:* Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Judiciary Committee on the Judiciary, 95th Cong. 181-87 (1978).

   Today, the FBI includes a reference to the Levi Guidelines on its history timeline as one of only 12 key events in the 1970s. See www.fbi.gov/fbihistory.htm.

54. *FBI Oversight:* Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong. 257 (1976) (hereafter "*1976 House FBI Oversight Hearing*") (testimony of Edward H. Levi, Attorney General, Department of Justice). A second set of Guidelines issued by Attorney General Levi governed the FBI's authority to investigate groups it suspected of links to foreign powers. The Attorney General's Guidelines for Foreign Counterintelligence Investigations (FCI) are classified. Today, these authorities are set forth in the Attorney General's Guidelines for FBI National Security Investigations and Foreign Intelligence Collection (NSI Guidelines). The unclassified portions are available at: http://www.usdoj.gov/olp.

55. 1978 Senate Hearings on FBI Statutory Charter Part 1 at 20 (Levi Guidelines § II.A). Although titled the "Domestic Security Investigation Guidelines," the Levi Guidelines governed not only investigations of domestic security threats, but the FBI's general criminal investigative authorities.

56. Id. at 22 (Levi Guidelines § II.I).

57. The Levi Informant Guidelines can be found at Final Report of the Select Committee to Study Undercover Activities of Components of the Department of Justice, S. Rep. No. 97-682, at 531-35 (1983) (hereafter "*1982 Final Report of the Senate Select Committee to Study Undercover Activities*").

58. Id. The Guidelines "were intended, in part, to diminish the perceived need for legislation to regulate and restrict the FBI's use of informants." See generally United States v. Salemme, 91 F. Supp. 2d 141, 190-91 (D. Mass. 1999).

59. According to the Church Committee, on December 23, 1974, FBI Headquarters sent employee conduct standards to all FBI field offices. The communication stated: "You are reminded that these instructions relate to informants in the internal security [domestic, intelligence] field and no informant should be operated in a manner which would be in contradiction of such instructions." Church Committee, *Book III: Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans*, at 267. According to the Church Committee report, this instruction was the only written provision applying FBI employee conduct standards to informants. Prior to the issuance of this instruction in 1974, there were no formal or specific provisions relating to informant conduct in FBI directives. Id.

60. *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 531 (Levi Informant Guidelines, Introduction).

61. Id.

62. *1976 House FBI Oversight Hearing*, at 258.

63. Under the Levi Informant Guidelines, the FBI was merely required to notify DOJ if a confidential informant violated the law in furtherance or unconnected to an FBI assignment when notification to local authorities

was inadvisable due to "exceptional circumstances."

As we discuss in Chapters Three and Seven, since the Confidential Informant Guidelines were revised in January 2001, the decision to approve a high level, long-term, or a privileged or media-affiliated confidential informant is made by the joint FBI-DOJ Confidential Informant Review Committee (CIRC).

64. *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 533 (Levi Informant Guidelines § C.2). When an informant violated the law, and notification to local authorities was inadvisable due to "exceptional circumstances", the DOJ determined when law enforcement or prosecutive authorities should be notified; what use, if any, should be made of the information gathered; and whether the FBI should continue using the informant. Id. at 533-34 (Levi Informant Guidelines § C).

65. Report of the Subcommittee on Security and Terrorism, 98th Cong., *Impact of Attorney General's Guidelines for Domestic Security Investigation (The Levi Guidelines)* 5 (Comm. Print 1984) (hereafter "*Impact of the Levi Guidelines*"). The most significant drop occurred prior to the issuance of the Levi Guidelines, a development which the Subcommittee indicated was due in part to the fact that "the FBI was reducing its domestic security work for some time before the Guidelines were imposed." Id. From March 31, 1976, to February 24, 1978, the number of domestic security investigations dropped from 4,868 to 102. Id.

66. *1979-1980 House FBI Charter Bill Hearings*, at 4 (Statement of Benjamin R. Civiletti, Attorney General, Department of Justice).

67. *Impact of the Levi Guidelines*, supra n.65, at 9.

68. Attorney General's Guidelines on FBI Use of Informants and Confidential Sources (hereafter "*Civiletti Informant Guidelines*") can be found at *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 517-30.

69. *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 523 (Civiletti Informant Guidelines § F.2).

70. Id. at 523 (Civiletti Informant Guidelines § F.3).

71. Id.

72. Id. at 524-25 (Civiletti Informant Guidelines § G).

73. Id. at 526.

74. Id. at 520 (Civiletti Informant Guidelines § L). In a memorandum explaining the Civiletti Guidelines, Director Webster stated that this provision was added merely to assist the prosecutor "in protecting the identity of our informants" and "should not be construed as the development of a partnership between the FBI and USDOJ in operating out informants." See Staff Study: *Overview of Government's Handling of Jackie Presser Investigation*, Permanent Subcommittee on Investigations of the Committee on Governmental Affairs (May 9, 1986) (hereafter "*Senate Staff Study on Jackie Presser Investigation*"), reprinted in *Department of Justice's Handling of the Jackie Presser Ghostworkers Case:* Hearing Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 99th Cong. 105-106 (1986) (hereafter "*Senate Subcommittee Hearing on the Jackie Presser Ghostworkers Case*").

75. *1983 Final Report of the Senate Select Committee to Study Undercover Activities*, at 521 (Civiletti Informant Guidelines § E).

76. For a discussion of the techniques used in ABSCAM, see United States v. Kelly, 707 F.2d 1460 (D.C. Cir.) (per curiam), cert. denied, 464 U.S. 908 (1983).

77. United States v. Kelly, 707 F.2d 1460 (D.C. Cir. 1983) (per curiam), rev'g 539 F. Supp. 363 (D.D.C. 1982), cert. denied, 464 U.S. 908 (1983); United States v. Williams, 705 F.2d 603 (2d Cir.), cert. denied, 464 U.S. 1007 (1983); United States v. Myers, 692 F.2d 823 (2d Cir. 1982), cert. denied sub. nom. Lederer v.

United States, 461 U.S. 961 (1983); United States v. Alexandro, 675 F.2d 34 (2d. Cir.), cert. denied, 459 U.S. 835 (1982); United States v. Jannotti, 673 F.2d 578 (3d Cir. 1982) (en banc), rev'g, 501 F. Supp. 1182 (E.D. Pa. 1980), cert. denied, 457 U.S. 1106 (1982).

78. See, e.g., United States v. Jannotti, 673 F.2d at 612, 613-14 (Aldisert, J., dissenting); United States v. Kelly, 539 F. Supp. at 373-74 & n.45.

79. The Civiletti Undercover Guidelines can be found at *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 536-55. Attorney General Civiletti retained the Levi Domestic Security Guidelines but issued a revision on December 2, 1980, called "The Attorney General's Guidelines on Criminal Investigations of Individuals and Organizations." The revisions distinguished between general crimes investigations and "racketeering enterprise investigations", whose "immediate purpose" is to "obtain information concerning the nature and structure of the enterprise . . . with a view to the longer range objective of detection, prevention, and prosecution of the criminal activities of the enterprise." *1982 Final Report of the Senate Select Committee to Study Undercover Activities* at 515 (Civiletti General Crimes Guidelines § II.C).

80. *FBI Undercover Operations*, Report of the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 98th Cong. (1983) (hereafter "*1983 House Subcommittee Report on FBI Undercover Operations*"). The hearings are reported at *FBI Oversight:* Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 96th Cong. (1980); *FBI Undercover Guidelines:* Oversight Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 97th Cong. (1981) (hereafter "*1981 House Oversight Hearings*"); *FBI Undercover Operations:* Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 97th Cong. (1983) (hereafter "*1982 House Subcommittee Hearings*"); *FBI Undercover Activities, Authorization, and H.R. 3232:* Oversight Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 98th Cong. (1983).

81. *1981 House Oversight Hearings*, at 2-7; 33-48 (statements of Professor Goeffrey R. Stone, Univ. of Chicago Law School, and Gary T. Marx, Professor of Sociology, MIT).

82. *1981 House Oversight Hearings*.

83. *1982 House Subcommittee Hearings* at 1-35.

84. Id. at 402.

85. *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 4-5.

86. Id. at 11. The Committee observed that undercover operations "have substantially contributed to the detection, investigation, and prosecution of criminal activity, especially organized crime and consensual crimes such as narcotics trafficking, fencing of stolen property, and political corruption." Id.

87. Id. at 54.

88. Id. at 55.

89. Id. at 53.

90. Id. at 25.

91. Id. at 23-29; *1984 House Subcommittee Report on FBI Undercover Operations*, at 9-11.

92. *1982 Final Report of the Senate Select Committee to Study Undercover Activities*, at 377-78.

93. *1984 House Subcommittee Report on FBI Undercover Operations*, at 7.

94. Id. at 55.

95. Id. at 7.

96. Id.

97. Id. at 8.

98. Id.

99. Id. at 74.

100. Id. at 8-9.

101. *Attorney General's Guidelines for Domestic Security Investigations (Smith Guidelines):* Hearings Before the Subcommittee on Security and Terrorism of the Senate Committee on the Judiciary, 98th Cong. 1 (1983) (hereafter "*1983 Senate Subcommittee Hearings on Smith Guidelines*").

102. Id. at 5 (statement of Senator John P. East, Member, Committee on the Judiciary).

103. *Impact of the Levi Guidelines,* supra n.65, at 29, 34-35.

104. Id. at 35.

105. Press Release, Department of Justice (March 7, 1983), reprinted in *1983 Senate Subcommittee Hearing on Smith Guidelines* at 47. The Smith Guidelines can be found at *FBI Domestic Security Guidelines:* Oversight Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 98th Cong. 67-85 (1983) (hereafter "*1983 House Oversight Hearings on Domestic Security Guidelines*").

106. Press Release, Department of Justice (March 7, 1983), reprinted in *1983 Senate Subcommittee Hearing on Smith Guidelines,* at 47.

107. Id. at 48.

108. Id.

109. *1983 House Oversight Hearings on Domestic Security Guidelines,* at 75 (Smith Guidelines § III). There were two types of criminal intelligence investigations depending on the objective of the enterprise: a racketeering enterprise investigation and a domestic security/terrorism enterprise investigation.

110. Id. at 80 (Smith Guidelines § III.B.2). The Smith Guidelines brought the Civilette Guidelines' category of "racketeering enterprise investigations" under the rubric of "criminal intelligence investigations." Id. at 76 (Smith Guidelines § III.A).

111. Id. at 81 (Smith Guidelines § III.B.3).

112. *1983 Senate Subcommittee Hearing on Smith Guidelines,* at 13.

113. *1983 House Oversight Hearings on Domestic Security Guidelines,* at 79 (Smith Guidelines § III.B.1).

114. Don Edwards, Chairman of the House Subcommittee on Civil and Constitutional Rights, and others continued to urge the passage of restrictive charter legislation for the FBI after the Smith Guidelines were issued. See Letter to The Honorable William H. Webster, April 12, 1983, reprinted in *1983 Oversight Hearings on Domestic Security Guidelines,* at 141-144.

115. *1983 House Oversight Hearings on Domestic Security Guidelines,* at 82 (Smith Guidelines § III.B.4.d).

116. Id. at 71 (Smith Guidelines § II.B and III.B). According to a 1976 GAO report, preliminary inquiries were used to open investigations of all black student leaders and in other political intelligence investigations in the 1960s. See General Accounting Office, FBI Domestic Intelligence Operations: Their Purpose and Scope: Issues That Need to be Resolved, GGD-76-50 (Feb. 24, 1976).

117. *1983 House Oversight Hearings on Domestic Security Guidelines,* at 71 (Smith Guidelines § II.B.3).

118. Id. at 82 (Smith Guidelines § IV.A).

119. Id. at 83 (Smith Guidelines § IV.B.3).

120. Leslie Maitland, *Eased F.B.I. Curbs Touch Off Dispute*, The New York Times, May 14, 1983, § 1 (remarks by Rep. Don Edwards, Chairman, Subcommittee on Civil and Constitutional Rights, House Committee on the Judiciary).

121. The OPEA report, *FBI Undercover Operations in Criminal Matters*, made recommendations to refine the FBI's undercover training program, improve agent selection, initiate a debriefing program for lengthy undercover operations, improve national coordination of operations, and increase the fiscal flexibility for undercover operations.

122. See *Undercover Operations Act:* Hearing Before the Senate Subcommittee on Criminal Law of the Senate Committee on the Judiciary, 98th Cong. 9 (1984). The bill was never brought to a vote.

123. See id. at 173-77.

124. Id. at 175-76. With the exception of a number of modifications to the Undercover Guidelines that were made in 1992 by Attorney General William Barr, the Guidelines were not changed again until the May 2002 revisions described infra in Chapter Four. The 1992 revisions included changes to the definition of certain "sensitive circumstances," limited the applicability of the Guidelines to only those cases where an undercover agent was involved, authorized SACs to delegate approval authority to designated ASACs, and allowed SACs to authorize nonsensitive UCOs for up to one year.

125. Senate Select Committee on Intelligence, 101st Cong., *The FBI and CISPES* 11 (Comm. Print 1989) (hereafter *"The FBI and CISPES"*. At the time of the CISPES investigation, the FBI's authorities were governed by the Attorney General's Foreign Counterintelligence Guidelines. Id.

126. Id. at 15.

127. Committee in Solidarity With The People of El Salvador (CISPES) v. Sessions, 929 F.2d 742, 743-44 (D.C. Cir. 1991).

128. General Accounting Office, *International Terrorism: FBI Investigates Domestic Activities to Identify Terrorists*, (hereafter "GAO Report, *International Terrorism: FBI Investigates Domestic Activities to Identify Terrorists*") GAO/GGD-90-112, at 28 (Sept. 7, 1990), available at http://161.203.16.4/d22t8/142382.pdf.

129. *The FBI and CISPES* at 58.

130. Id. at 6, 89-91, 101, 120.

131. Id. at 103.

132. Id.

133. *The FBI and CISPES* at 3, 103. The Committee report that concluded:

"(T)he FBI's international terrorism investigation of CISPES was initiated primarily on the basis of allegations that should not have been considered credible; it was broadened beyond the scope justified even by those allegations; and it continued after the available information had clearly fallen below the standards required by the applicable guidelines."

Id. at 1.

134. *The FBI and CISPES* at 12.

135. The Guidelines revisions issued in March 1989 were relatively minor. They clarified that the use in preliminary inquiries of investigative techniques that require approval by a Supervisory Special Agent (SSA) must comply with the Guidelines' provisions that govern investigative techniques generally,

authorized criminal intelligence investigations against enterprises engaged in narcotics trafficking, and specified that the use of trap and trace devices and access to stored wire and electronic communications and transactional records must be in accordance with Title 18 of the U.S. Code. The revisions were entitled, "The Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Domestic Security/Terrorism Investigations."

136. GAO Report, *International Terrorism: FBI Investigates Domestic Activities to Identify Terrorists*, supra n.128, at 3.

We discuss in Chapter Five our concerns about the FBI's current inability to track the utilization of its broad authorities under Part VI of the General Crimes Guidelines, including its authority to visit public places and attend public events for the purpose of detecting or preventing terrorist activities.

137. Id. at 5.

138. United States v. Friedrick, 842 F.2d 382, 385 (D.C. Cir. 1988) (affirming suppression of statements made to DOJ attorneys in prosecution for false statements in previous interviews). Friedrick subsequently recanted his admission that the FBI had authorized the "no show" employees. The FBI's OPR later concluded that Friedrick had concocted the authorization defense after the fact to protect Presser as a valued informant. Id. at 388.

139. *Senate Subcommittee Hearing on the Jackie Presser Ghostworkers Case.*

140. *Senate Staff Study on Jackie Presser Investigation*, supra n.74.

141. Id. at 87.

142. Id. at 101 (internal quotes omitted).

143. Id. (citing the Civiletti Informant Guidelines).

144. *Combating Domestic Terrorism:* Hearing before Subcommittee on Crime of the House Judiciary Committee, 104th Cong. (1996) (hereafter "*1995 House Subcommittee Hearing*").

145. *1995 House Subcommittee Hearing*, at 13.

146. Id. at 27.

147. *Advice to Field Offices Regarding Domestic Security/Terrorism Investigations and Preliminary Inquiries Under the Attorney General's Guidelines on General Crimes, Racketeering and Doemstic Security/Terrorism Investigations*, November 1, 1995.

148. Id.

149. United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999).

150. Id. at 303.

151. United States v. Connolly, 341 F.3d 16, 21 (1st Cir. 2003).

152. J.M. Lawrence, *At 78, Rico Dies Under Gaurd: Former G-Man Was To Be Tried for Murder*, Boston Herald, Jan. 18, 2004.

153. See Department of Justice Guidelines Regarding the Use of Confidential Informants (January 8, 2001), available at http://www.usdoj.gov/ag/readingroom/ciguidelines.htm. The House Committee on Government Reform held hearings in 2001 and 2002 on the FBI's use of informants in New England, leading to issuance of a report in 2004 entitled, *Everything Secret Degenerates: The FBI's Use of Murderers as Informants*, H. Rep. No. 108-414, 108th Cong. (2004), available at http://www.gpo.gov/hreports/108-414.html. We address the Boston informant matters in the next chapter.

◄ Previous | Table of Contents | Next ►

# EXHIBIT C

**NEUROPSYCHOLOGY WISDOM, PLLC**
**INDEPENDENT MEDICAL EXAMINATION**

Name: ▮▮▮▮▮▮                                    Date of Evaluation: ▮▮ 2018
Date of Birth (Age): ▮▮▮▮▮▮▮▮▮▮▮          Education: 15 years
Handedness: Right                                   Race: African-American
Examiner: Nick Wisdom, Ph.D., ABPP/CN      Interviewed: Player & Spouse

**IMPAIRMENT RATING: Invalid**

**BACKGROUND:**

*Referral Information:*
Mr. ▮▮▮ played as a wide receiver and return specialist in the National Football League for ▮▮▮▮.
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He was
referred for this neuropsychological evaluation as required by the NFL Players' Concussion Injury
Litigation Class-Action Settlement.

*Current Living Situation:*
Mr. ▮▮▮ resides with his wife of 14 years ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*NFL Concussion History:*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Presenting Concerns:*
Cognitive: Since 2000, Mr. ▮▮▮ has noticed his memory and attention have progressively
worsened. He stated that he often dazes off or blanks out resulting in him either missing
important information from conversations or forgetting appointments later on as he is
distracted. For example, when driving he occasionally experiences these lapses in attention and
will miss turns for several miles before realizing he has zoned out. He denied any difficulty with
navigating/driving in areas around his home, but did describe one instance in which he got lost
driving in an area of ▮▮▮▮ that he should have known well. His wife helps him manage all of

his appointments and sends him reminders as needed. His wife manages the household finances, a task she has always done, but he denied any trouble with handling small purchases using a bankcard. Mr. ▓ still helps with cleaning up clutter around the house and taking the trash out although his wife has to remind him which days are the trash pickup days.

Mood: Mr. ▓ reported experiencing depressed mood and loss of interest in previously enjoyed activities. He reported having a lot of guilt regarding the end of his football career as he was not the "ticket out" of poverty for his family like he originally was anticipating. He also reported feeling irritable and angry towards his family and acknowledged that he "snaps at [his] wife and kids" for seemingly minor infractions. He also reported feeling fatigued and sluggish throughout the day which he attributed to ruminating all night and diminished quality of sleep. Finally, he reported having passive suicidal ideation over the past several years without a plan or intent.

Physical: Mr. ▓ reported having headaches that can linger for several weeks at a time. His headaches are exacerbated by stress and can range anywhere from a 3 to a 10 on a 1-10 pain scale. He has found that lying down in the dark or decreasing his stress helps him cope. He also reported having chronic pain bilaterally in his knees and shoulders which he manages with over-the-counter Aleve/Advil and getting extra sleep.

*Collateral Informant (Clinical Dementia Rating Worksheet):*
Mr. ▓ wife was interviewed, after receiving his permission, and her responses were used to complete the CDR worksheet. Overall, CDR findings are generally consistent with a level 1.0.

- Community Affairs (rating = 0.5): Reportedly was sometimes having difficulty with work because of headaches and forgetfulness. No difficulties noted with driving. He can sometimes shop independently although will frequently call her to ask about things he may have forgotten. He is no longer engaged in many activities outside of the home. She stated a casual observer would not think that he was ill.

- Home and Hobbies (rating = 1.0): Reportedly no longer involved in many home activities or hobbies. She stated he needs reminders about things he previously managed without error including locking doors, setting the house alarm, and taking out the trash. She indicated he appears to fall into a daze at times, but otherwise attributed his poor household management to amotivation, depression, and apathy.

- Personal Care (rating = 0): No concerns noted.

Academic History:
Mr. ▓ was born and raised in ▓ and was reportedly a "pretty good student" in school. He denied any history of diagnosed learning disabilities or having to repeat any grades. He attended ▓ Junior College for two years and then transferred to ▓ State where he was considered a senior by credit hours when he left to pursue his career in the NFL.

Employment History:
Following his career in the NFL, Mr. ▓
▓. He discontinued working after six months because he was having difficulty remembering things related to his job including the location of materials and the meaning behind certain ▓

labels. Over the past 10 years, Mr. ▮▮▮ has worked as an independent personal trainer for teenagers. He works anywhere between 20 – 60 hours of work per week depending on his schedule and availability of clients. He acknowledged he has been having difficulty at work including forgetting training techniques and expressing frustration with clients.

*Personal and Family Medical History:*
Relevant medical history reported by Mr. ▮▮▮ includes the aforementioned chronic pain and migraines. He also reported breaking his ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in addition to tearing his ACL (▮▮▮ He is not prescribed any medications and takes over-the-counter Advil or Aleve for pain management as needed. Family medical history is noteworthy for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ He denied any known history of neurodegenerative illness in his immediate or extended family.

*Psychiatric History:*
Mr. ▮▮▮ denied any history of receiving treatment from mental health providers.

*Substance Use History:*
Mr. ▮▮▮ reportedly smokes one cigar per week and denied use of any other tobacco products. He also consumes two alcoholic beverages approximately once per week and denied any history of adverse medical, legal, financial, or social consequences. He also denied any history of illicit substance use.

**BEHAVIORAL OBSERVATIONS:**
Mr. ▮▮▮ was on time for his appointment and was accompanied by an assistant which the examiner mistakenly thought was his wife for the beginning of the exam. He was casually dressed and appeared on par for his age. He ambulated without assistance or apparent difficulty. He understood the purpose of the evaluation and provided written consent without any concerns. Mr. ▮▮▮ could not remember the exact date, but was otherwise oriented to person and place. Rate, rhythm and prosody of speech were within normal limits and language was conversationally intact. Mr. ▮▮▮ presented in a euthymic mood with congruent affect throughout the evaluation. There was no evidence of delusional thinking or responding to internal stimuli. Vision and hearing were adequate for testing purposes.

**TEST RESULTS:**
Note: T scores were obtained using the Advanced Clinical Solutions software in addition to <u>Revised Comprehensive Norms for an Extended Halstead-Reitan Battery.</u> Impairment ratings were determined following the guidelines detailed in <u>Qualified BAP Clinician's Interpretation Guide.</u>

**Performance Validity Testing:**

| Test | Classification |
| --- | --- |
| ACS Performance Validity Profile Analysis | Suboptimal* |
| Test of Memory Malingering | Suboptimal* |
| Word Memory Test | Suboptimal* |

Mr. ▮▮▮ demonstrated suboptimal effort across all embedded and standalone measures of performance validity. As such, the following scores represent his minimal capabilities only.

**Premorbid Estimation of Intelligence:**

Mr. ___ premorbid level of intelligence is estimated to fall in the **Below Average** range based on his TOPF Word Reading Score (Raw Score = 22; Standard Score = 79) and his demographic background using the complex demographic model (Predicted Full Scale IQ = 86).

**Complex Attention:**

Mr. ___ completed 6 WAIS-IV subtests which comprise domains of complex attention/processing speed.

| WAIS-IV Subtest | Raw Score | T Score (Mean = 50, SD = 10) |
|---|---|---|
| WAIS-IV Digit Span | 16 | T = 29 |
| WAIS-IV Arithmetic | 7 | T = 27 |
| WAIS-IV Letter Number Sequencing | 14 | T = 36 |
| WAIS-IV Coding | 32 | T = 29 |
| WAIS-IV Symbol Search | 15 | T = 34 |
| WAIS-IV Cancellation | 18 | T = 32 |

**Executive Functioning:**

Mr. ___ completed 4 measures of executive functioning.

| Test | Raw Score | T Score (Mean = 50, SD = 10) |
|---|---|---|
| F-A-S Verbal Fluency | 18 | T = 30 |
| Trails B | 147 | T = 34 |
| Booklet Category Test | 107 | T = 27 |
| WAIS-IV Similarities | 14 | T = 31 |

**Learning and Memory:**

Mr. ___ completed 6 measures of learning and memory from the Wechsler Memory Scale - fourth edition (WMS-IV).

| Test | Raw Score | T Score (Mean = 50, SD = 10) |
|---|---|---|
| WMS-IV Logical Memory I | 10 | T = 29 |
| WMS-IV Logical Memory II | 3 | T = 23 |
| WMS-IV Verbal Paired Associates I | 12 | T = 32 |
| WMS-IV Verbal Paired Associates II | 4 | T = 35 |
| WMS-IV Visual Reproduction I | 30 | T = 40 |
| WMS-IV Visual Reproduction II | 8 | T = 32 |

**Language Functioning:**

Mr. ___ completed 3 measures of language functioning.

| Test | Raw Score | T Score (Mean = 50, SD = 10) |
|---|---|---|
| Boston Naming Test: | 45 | T = 36 |
| Category Fluency (Animal Naming) | 9 | T = 25 |
| BDAE Complex Ideational Material | 10 | T = 33 |

**Visual Perceptual Functioning:**

Mr. ▮ completed 3 measures of visual-perceptual functioning.

| Test | Raw Score | T Score (Mean = 50, SD = 10) |
|---|---|---|
| WAIS-IV Block Design | 20 | T = 36 |
| WAIS-IV Visual Puzzles | 7 | T = 32 |
| WAIS-IV Matrix Reasoning | 11 | T = 41 |

**Objective Personality/Emotional Functioning:**

Objective personality testing was completed with the MMPI-2-RF. Mr. ▮ also completed a structured psychiatric interview.

*Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF)*

Mr. ▮ MMPI could not be interpreted as it is considered invalid due to significant symptom over endorsement detected across several symptom validity indicators.

*Mini International Neuropsychiatric Inventory (MINI)*

Likewise, Mr. ▮ reported experiencing nearly every symptom on the MINI screening and each of the respective modules and is also considered invalid.

**IMPAIRMENT SUMMARY:**

Mr. ▮ demonstrated suboptimal performance across all embedded and standalone measures of performance validity. Importantly, invalid performance during this evaluation does not preclude the possibility of genuine cognitive decline. Therefore, findings from the current evaluation cannot be used to accurately substantiate nor repudiate any putative level of cognitive impairment. His scores during this evaluation represent his minimal capabilities only and should not be used to determine a disability rating. Per the Qualified BAP Clinician's Interpretation Guide, Mr. ▮ overall impairment rating is **Zero**.

**RECOMMENDATIONS:**

It is recommended Mr. ▮ participate in a follow-up neuropsychological evaluation if he experiences any decline in his cognitive or functional abilities. Future testing can be compared to this estimate of his minimal capabilities to better identify any possible stability, improvement, or decline.

Nick Wisdom, PhD, ABPP
Board Certified Clinical Neuropsychologist

1300 Bay Area Blvd., Suite B150-15
Houston, Texas 77059
(832) 970-0962
nicholasmwisdom@gmail.com



# EXHIBIT D

# **AFFIDAVIT OF SHARON DELANEY**

## **STATE OF TEXAS**
## **COUNTY OF HARRIS**

I, SHARON DELANEY, who upon being sworn do hereby depose and state:

1.   My name is SHARON DELANEY, I am over 18 years of age, I reside at 202 Plaza
Verde Drive, Suite A11, Houston, Texas, and am competent for all legal purposes. Attached is
my Texas Driver's License.

2.   I make this Affidavit based upon my own personal knowledge in involvement in the
subject matter.

3.   I have been involved in the NFL clams processing since 2014 and have effectively
represented 187 NFL claimants with a number of them receiving a Notice of Monetary Award
Claim Determination. I am an effective advocate providing comprehensive on-call services to
retired NFL players regarding their concussion claims and am readily available for any other
client needs. Consequently, because my costs are low and my services are excellent, I am
apparently a threat to others who are paid for representing NFL claimants, and to the NFL itself,
who has to pay the represented claimants.

4.   Consistent with his threat, unknown and unnoticed to me, my name has been placed in
an audit of pre-claim medical evaluations by a law firm that has never submitted those
evaluations. The placement of my name in this audit could have only come from two sources.
One is Shenaq, P.C., who has worked extensively with Dr. Wisdom, and would have had direct
or indirect access to the medical evaluation on                                              And, the
only other person would be Dr. Wisdom, himself.

5.    The actual statement in Dr. Wisdom's evaluation of Mr. ███ verifies that there was no misrepresentation by me, but rather a short-term mistake by the evaluator. This mistake was insidiously twisted to appear as my intentional and fraudulent misrepresentation of being the wife of ███████ This is dissembling of the medical evaluation report, and what actually took place. This act of taking an honest mistake by an evaluator and maligning it to appear as an intentional fraudulent act by myself is unconscionable.

6.    Similarly, there is another alleged incident in the same audit report where I have been accused of calling Dr. Wisdom to dispute an alleged testimony of ████████ wife. This never happened.

7.    In fact, ███████ wife was not present at his evaluation by Dr. Wisdom. My husband and I escorted ███████ to this evaluation as well, as ██████ s wife had to stay at home with their children and was unable to attend. We wanted to make sure that ███████ did not attend this evaluation all by himself, which is what I ensure for all of my NFL clients.

8.    I never spoke to Dr. Wisdom to dispute anything about ████████████ This is a phantom incident. The likely sources of these wrongful allegations are Dr. Wisdom and/or Amir Shenaq.

9.    I am aware that Dr. Wisdom and Amir Shenaq coordinate, based upon a random uninvited call from Amir the day after ███████ evaluation with Dr. Wisdom. Amir began asking questions on the same subjects I had just discussed with Dr. Wisdom immediately after ███████ s appointment in Dr. Wisdom's office. Some of Amir's statements on this call to me were, "How do you have clients, not being a lawyer?" and "It is not good for other law firms that I only charge 5%." It was an uncomfortable and confrontational discussion with Amir

Shenaq, whom I had never spoken to before, nor had given my phone number to. I responded to all Amir's questions honestly. I was wondering where he got my phone number, and asked him. Amir informed me that he got my number from Dr. Wisdom. I may be able to obtain my phone records from the date of Amir's uninvited call to me, establishing the date of the incoming call being the day after Dr. Wisdom's evaluation of SCM ▮▮▮▮▮▮▮▮

10. In addition, the audit report refers to two different aliases, namely "Nola Delaney," and "Sharon Young." The only sources for this misinformation would be my Facebook page, which uses Nola. Nola is my birth name prior to me being adopted. I use that name as my Facebook identifier so older friends can find me. Dr. Wisdom was a Facebook friend, and is the only likely source that would have sent investigators down this path.

11. Therefore, there is no other reasonable source for this unfounded attack other than from Mr. Shenaq having an agenda of trying to remove my NFL claims representation as his competition, or from either Amir Shenaq or Dr. Wisdom so as to gain favor with the NFL auditors.

12. These unconscionable twists of words, and adoption thereof by the auditors, needs to be audited and investigated in and of itself by Federal authorities as it unequivocally demonstrates an intentional corruption of the audit process and complicity between the auditors and those threatened by my services. If there is any validity to this audit process than these allegations must be dropped immediately.



FURTHER AFFIANT SAYETH NOT.

Sharon Delaney (Feb 17, 2021 16:46 CST)

SHARON DELANEY

# EXHIBIT E



**HOWARD & JUSTICE**

## Howard & Associates
## Attorneys at Law, P.A.

Dr. Tim Howard, J.D., Ph.D., Senior Partner*
Florida Supreme Court Certified Mediator

| | | | |
|---|---|---|---|
| **Tallahassee Office:** | **Fort Lauderdale Office:** | **Jacksonville Office:** | **Cambridge Office:** |
| 2120 Killarney Way, Suite 125 | 101 NE Third Ave., Suite 1500 | Riverplace Tower, 21ˢᵗ Floor | 8 Museum Way |
| Tallahassee, Florida 32309 | Fort Lauderdale, Florida 33301 | 1301 Riverplace Boulevard | Suite 2408 |
| Ph: (850) 298-4455; Fax (850) 216-2537 | (954) 332-3633 | Jacksonville Florida 32210 | Cambridge, Massachusetts 02141 |
| Tim@howardjustice.com | www.howardjustice.com | (850) 298-4455 | (857) 277-0990 |

August 8, 2017

Joe Horne
Retired NFL Player
Client of Howard & Associates

Re: Notice of NFL Concussion Settlement Process Initiation and Next Steps.

Dear Retired NFL Client:

The law firm is providing notice that the NFL Concussion Settlement process has begun and payments will begin over the next few months for those players who qualify. As previously recommended, advances on your claims are not advised as they are very expensive. Over the upcoming weeks and months, the law firm will coordinate final medical reviews, verify with the MAFS Qualified Neurologist that you qualify for recovery, and submit your claims.

Please verify your receipt of this notice with a confirmation email to the law firm at info@howardjustice.com. If you have any question, please let us know that as well.

Sincerely yours,

P. Tim Howard, J.D., Ph.D.
Howard & Associates
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298-4455
tim@howardjustice.com

cc: file

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11ᵗʰ Circuit, and the United States Supreme Court. Ph.D, Northeastern University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

## NOTICE OF EXPRESS WAIVER OF CONFLICT AND LIABILITY

As an investor, you may need legal assistance from Howard & Associates, Attorneys at Law, P.A., (Howard & Associates) with various matters that are either related or not related to your investments with Cambridge Capital Group, Cambridge Capital Advisors, LLC., or its investment funds (Investment Funds). Please note, you are not a client of Howard & Associates until you have entered into a written fee agreement with Howard & Associates. If such an agreement has not been entered into, you are not a client of Howard & Associates, and no such relationship is implied.

Regardless of whether you are currently a client of Howard & Associates, or a future client of Howard & Associates, this notice of waiver of conflict and liability is required to disclose the risks associated with the lawyer's dual role as both legal advisor and participant in investment or other transactions, such that the transaction or legal advice favor's the lawyer's interests at the expense of the client. You have engaged the Investment Fund consistent with the terms and conditions found in the Private Offering Memorandum for Offering of Limited Partnership Interests (Private Offering Memorandum), and understand that all of the investment funds carry risk of loss and that the highly leveraged investment funds have a high degree of risk of loss (as well as a potential high rate of return), including total loss of your investment, and should not be invested in unless you have a high degree of liquidity, as detailed in the Certain Risks section of the Private Offering Memorandum.

You understand that neither Howard & Associates, nor its President, Phillip Timothy Howard when acting as an attorney, are a partner or a party to these investment funds, and has no liability for the investments and the returns on investments. You understand that the protections of the attorney-client relationship do not apply to the non-legal services provided by the Investment Funds. You understand that the investment funds are not created to provide legal work for Howard & Associates and its affiliate law firms, such as Crossland & Crossland, to provide legal services such as tax and estate planning, and is not a referral source for Howard & Associates and its affiliate law firms. You understand that Howard & Associates is not providing financial assistance to its clients. You understand that Howard & Associates may obtain confidential information from either its representation or from the investment funds as to the client and their activities, and you are providing informed consent for Howard & Associates and the investment funds to share that confidential information.

To the extent that there is an interest in the investment funds that conflicts with the legal services of Howard & Associates, pursuant to Rule 4-1.7, Conflicts of Interest, or Rule 4-5.7, Rules Regulating the Florida Bar, and the potential for overreaching due to the trust and confidence placed in Howard & Associates, **you are advised that you may seek independent legal representation to review any potential conflict, you are explicitly advised to obtain independent legal representation to review any potential conflict, and confirm that you have obtained independent legal representation to review any potential conflict. By signing this document, you as a client, or a potential client, are providing informed consent to a waiver of any and all potential conflicts and liability of Howard & Associates.**

_____ / _____     _____ / _____
Investor                    Date         Howard & Associates          Date



**From:** Melvin Mobley <melvinmobley@me.com>
**Subject:** Fwd: NFL Settlement Claim Payment Delay
**Date:** August 3, 2017 at 8:25 AM
**To:** Gail Milon gail@cowealthadvisors.com

Again, keep pressing forward

Begin forwarded message:

**From:** Don Reinhard <dfr22@suril@gmail.com>
**Date:** August 02, 2017 2:19:46 PM
**To:** melvinmobley@me.com
**Subject:** NFL Settlement Claim Payment Delay

I have recently had a number of inquiries as to the reason why none, to the best of my knowledge, of the NFL Concussion Settlement clients of Howard & Associates PA have yet to be paid, when payments began in May or earlier.

While I have alluded over the past few months to at least one of the reasons Tim Howard turned on me as co-owner, Executive Vice President and investment advisor of Cambridge Capital Group LLC just days before my planned temporary leave of absence when I basically became defenseless, one of the primary reasons was my confrontation with him about his decision to put his personal interest and interest of his law firm in front of the best interest of his clients and the clients referred to him by Cambridge Capital Group... YOU! The result if his unprofessional, unethical, and basically selfish decision was going to result in a delay of the payments from the NFL Concussion Settlement of 4-6 months.

I sternly expressed to him my dissatisfaction and told him his decision was wrong and "nearsighted" as each of you had patiently waited for these funds for months, if not years, and further delays were damaging to not only your future plans but critical plans for your family as well. Additionally, each additional month was costing most of you that structured a financial advance against your settlement an additional $1,500-$15,000 or more per month in increased interest which was unnecessary.

Tim's decision was to apply to have Dr. Louis Koberda included as one of the board-certified neurologists that could continue evaluating retired players after the final January 6, 2017 settlement effective date. While a small number of you might have been evaluated by Dr. Koberda after January 6th, a vast majority of you were evaluated before this date and the few that were not would have been given that the actual effective date was somewhat in question until early February.

However, to achieve this objective which ONLY benefited Howard & Associates ability to continue qualifying players for the settlement even though the NFL would now do it for less, as Dr. Koberda's inclusion did nothing to benefit your evaluation, Tim Howard had to state that Dr. Koberda had not evaluated any players prior to his approval which was not expected until mid-June. Now each of you know that if this statement or declaration were represented to the NFL Claims Administrator... then it certainly would not be factual since each of you were evaluated by Dr. Koberda prior to his expected approval in mid-June 2017.

Also, in further complicate and cloud the issue, Tim Howard had to make the unethical and selfish decision to not only delay the filing of your claims with the Claims Administrator for processing and payment until after Dr. Koberda was approved in mid-June, but also adjust the date of your evaluation until after Dr. Koberda's eventual approval expected in mid-June. The much earlier registration date was only to notify the Claims Administrator of your pending claim to be filed for processing.

Again, this unprofessional, unethical, and selfish decision solely to benefit the future business of Tim Howard and his law firm has delayed the filing of your claims by 4-6 months. Additionally, in my opinion, the decision has also put your claim at risk due to the misrepresentation made to the Claims Administrator about Dr. Koberda's involvement.

My recommendation to each you are that you independently call the NFL Claims Administrator at 1-855-887-3485 and inquire about whether your claim has been filed by your attorney, Howard & Associates PA, and on what date. Hopefully, they will then give you some valuable insight as to the expected processing time

---

and projected payment date. If your claim has NOT been filed then please call your attorney, Howard & Associates PA, to inquire as to the continued delay...but I truly recommend calling the NFL Claims Administrator FIRST.

Again, I thank you for your continued trust, loyalty, and commitment as I truly look forward to strengthening our long-term relationship with my new investment firm. The players that came to me encouraged me to communicate this information to you and I certainly agreed due to my interest in complete transparency and disclosure. Please do not hesitate to email or text me if you have any questions.

---

**From:** Tom Woods thomaxwoods@gmail.com
**Subject:** Fw: IMPORTANT INFORMATION !!! PLEASE READ !!!
**Date:** July 25, 2017 at 9:14 PM
**To:** Gail Milon gail@cowealthadvisors.com

Thank you. Tom

Sent from my iPhone

On Jul 25, 2017, at 8:33 PM, Gail Milon <gail@cowealthadvisors.com> wrote:

Dear Cambridge Capital Group Client,

Some of you may have received correspondence from a Don Reinhard, former periodic consultant for Cambridge Capital Group (CCG), who was discharged in February. He has a no contact, confidentiality agreement that he is violating in these communications to you, and appropriate action is being taken to stop harassing CCG clients. As a courtesy, CCG is advising you to please not accept communications from this individual nor communicate with this individual. He is not a lawyer, does not know the NFL Concussion Settlement claims process, was not part of the law firm, is providing false information, and has a criminal history of harming investors with false statements and perjury.

In response to his latest fraudulent email, we have settled with your counsel that clients are having their files reviewed and finalized by a MAFS NFL qualified neurologist and neuropsychologist. We will provide maximum return on your claim and make it the strongest possible. Appointments have been conducted with some clients and are being scheduled for others. You will hear from the law firm staff over the next several weeks for scheduling.

As part of Mr. Reinhard's criminal history of harming investors with false statements and perjury, CCG has located information that it was not previously aware of and is providing these court documents for your use.

In researching his history, CCG has located the Securities and Exchange Commission complaint against Mr. Reinhard wherein the federal government states, "**Reinhard lulled his hedge fun clients into keeping their investments with the hedge fund by providing them with false quarterly account statements showing materially inflated account values. Through all this activity, Reinhard's clients and hedge fund investors lost more than $6 million.**" Page 1, paragraph 3. Mr. Reinhard then pled guilty to 7 federal criminal crimes, including false statements to federal insured financial institution, perjury, illegal transfer or concealment of property, etc., and served over 3 years in federal prison.

Again, please do not accept or respond to communications from this individual nor his current wife, Katherine Reinhard.

PLEASE NOTE ! Your investments are safe and sound. The purpose of this letter is to provide you with factual documentation regarding Don Reinhard and to advise you not to communicate with him.

Upon completion of the audit, I will provide you with audited numbers and we will move forward with excellent investment returns.

Thank you for your attention to this matter.

Best Regards,

*Gail Milon, CASL, CLTC*

Manager Vice President
Cambridge Capital Group
Email: gail@cowealthadvisors.com

---

**From:** Gail Milon gail@cowealthadvisors.com
**Subject:** Response To Beeger's Motion
**Date:** August 7, 2016 at 11:14 PM
**To:** Martin Black kbhblack@gmail.com, Tim Howard @howardjustice.com, Addys Walker addyswalker@gmail.com
**Cc:** BILL BOGAR bogar@comcast.net, Al Smith ajsezzz@yahoo.com
**Bcc:** Tom Woods thomaxwoods@gmail.com, Gail Milon gail@cowealthadvisors.com

The following are my notes regarding the motion we received. Add to, correct , don't use it at all. We need to identify/attack the root of this issue and not treat the symptom/side affects.

Proverbs 18:17 says:

There are two sides to every story. The first one to speak sounds true until you hear the other side and they set the record straight (RSV)

Since Don Reinhard want to be the "center of attention", let's give it to him.

On page 9 of the motion - Don Reinhard was not "the former head of Cambridge"

Also on page 9 - Don Reinhard was not a "business partner"

Although you show the most recent charge of Don Reinhard from the bottom of page 9, other "recent" charges consist of "Violation of probation" felony charges for shorting from Walmart 4 times with Leon County. Mr. Reinhard had a warrant out for his arrest in early February and turned himself in to the Leon County Jail on March 1, 2017. He was recently released from Federal Prison in 200X for tax evasion and (whatever the other charge was: misrepresenting a bond fund and defrauding clients out of millions of dollars) which cost him his securities license.

Don Reinhard was initially hired by Dr. Howard to teach a class at the Cambridge Capital Group Graduate University International. He was later signed on as a Consultant to assist Dr. Howard with operations of the Cambridge Capital Entities. Don Reinhard has X years of experience in the securities industry. Mr. Reinhard approached Dr. Howard (a high school classmate) when Dr. Howard ran into him at a Costco Supermarket. Mr. Reinhard was exiting wine. Mr. Reinhard sought Dr. Howard out, asking him for assistance with his life/career. He told Dr. Howard about the tax evasion, however, the criminal securities charges were not disclosed to Dr. Howard and was not discovered until Mr. Reinhard's was arrested in Leon County for violation of probation (March 1, 2017). Mr. Reinhard's aggravated child abuse charge, mentioned in your motion, was toward an autistic child, making him eat his bone for toilet training (His sentence was for more than 5 years). The reduced sentenced is due to Mr. Reinhard "plea bargaining" testifying on a Mexican drug cartel who provided him with his cousin.

Don Reinhard's responsibilities were to assist the Cambridge Entities in bringing "qualified accredited investors" into the hedge fund. Dr. Reinhard believes in the "redemption method" taking individuals (that society wouldn't give a second chance) and helping them utilize their gifts to make a decent living. Because of Mr. Reinhard's years of experience in the securities industry, he knows the importance of "test finding". The "know your client" rule requires a securities professional to know the financial state of their "potential investor".

Rule 501 of Regulation D of the Securities Act (Reg. D) provides the definition for an accredited investor through the confines of income and net worth two ways:

1. A natural person with income exceeding $200,000 in each the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year;
2. a natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the purchase, excluding the value of the primary residence of such person

Mr. Reinhard was responsible for screening prospects to make sure they meet the qualifications of the hedge fund
Mr. Reinhard was responsible for ascertaining the financial net-worth of the potential client
Mr. Reinhard was responsible for explaining to the potential client what a hedge fund is and the risk associated with this "investment".
Mr. Reinhard was responsible for making sure potential investors portfolios were diversified
Mr. Reinhard was responsible for providing the potential prospect with the Private Offering Memorandum (POM) before or at the time of the investment.
Mr. Reinhard was responsible for reporting accurate information to Dr. Howard and the investors

Prior to Mr. Reinhard being hired to work in the Leon County Jail, he took important/confidential client information that belong to Cambridge Capital Group. We have requested the information on several occasions as well as through the legal process with no success. Because we did not have all of the supporting documentation to have an audit completed in a timely manner we had to request a forensic audit, recreating what we did not have. Because Mr. Reinhard's processes were manual (and taken with him when his services were terminated), we had to enter data into quick books from bank statements and automate the Cambridge Entities processes. Due to resolution changes, the auditor can not complete certain processes surrounding the audit and an

accountant was hired to fulfill those objectives. The audit will be completed six weeks from the time the accountant provides the auditor with the accounting pieces of the process. As much as we would like to provide investors with their balances, we can not provide that information until the audit is complete. Gail Milon requested an audit. She was not going to be responsible for improprieties, if any, of another person and wanted to ascertain the accuracy of what was there. That is her fiduciary responsibility.

All "accredited investors" in the Cambridge Entities know what a hedge funds is and understand the risks associated with hedge funds. The individuals filing complaints were not "properly advised" by Mr. Reinhard. Using Seeger's wording: "False or misleading statements were used by Mr. Reinhard to solicit business from the plaintiffs". The plaintiffs in question were solicited by Don Reinhard. He told them they can take their money out at any time when the POM clearly states that a hedge fund is an illiquid investment and procedures are documented in the POM outlining the withdrawal process. Several investors never received a Private Offering Memorandum (which is a requirement with any investment solicitation) and none of the plaintiffs (solicited and sold by Don Reinhard) knew they were in a hedge fund. They didn't know what a hedge fund was. Where initial advances per individual were minimal ($3,000.00), Mr. Reinhard continued to  solicited retired players offering them increases (averaging $10,000) and charging them a fee for each transaction before his contract was terminated. Without the investor's network statement, which should have been in the client's file, I can not ascertain if they are accredited investors.

Even with the false and misleading statements for the solicitation of business by Mr. Reinhard, individuals knew they were "investing" their IRA funds. Any investment has risks and the potential to loose money. If they didn't want to take any risk, they held the option of putting their funds in an IRA money market account or a certificate of deposit. Even those instruments have purchasing power risk.

We responded to Seeger's "inquiry" regarding IRA-rollover monies and denied Cambridge was seeking repayment from Class Members for advanced monies or taking ownership of retirement account monies to offset the advances. Mr. Walker was maintained.

Best Regards,

*Gail Milon, CASL, CLTC*

Manager Vice President
Cambridge Capital Group
Email: gail@lovemailtwlvlvdocs.com



Tallahassee, Florida Office:
2120 Killarney Way, Suite 120
Tallahassee, FL 32309
(850) 296-4455 ext 109  (o)
(850) 765-6121 (f)

Jacksonville, Florida Office:
Riverplace Tower
1301 Riverplace Blvd.
Jacksonville, FL 32207

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332-3633 (o)

Massachusetts Office:

From: Don Reinhard <d123fsu@gmail.com>
Date: February 24, 2018 at 7:51:15 PM EST
To: Corey ▮▮▮▮
Subject: Visitation and email I just sent

Corey, I think you will realize when you read the email I just sent that I am not only scared to death but terrified. Just to let you know Joe did make a very visible sign talking to me so everybody in the dorm would see him. Hopefully that does help for the time being.

Also, please complete and send in the visitation form that was previously emailed to everybody as I truly want to see you soon and hopefully you can take one Saturday or Sunday and drive over. We certainly have a lot to discuss especially about Tim and CCG.

Love ya buddy,
Don

iterated that promise when I came in that he will protect me. However, that will mean following him around like a puppy even if I am safe from other gang members in this dorm.

While the financial loss will hit me hard as I needed this food to last a couple more weeks as I am watching every single penny I have to spend, the real danger is that I am clearly a target at this camp/prison. Again, at this point I do not fear for my life because I certainly do not want to go to solitary confinement but things may change in the coming days. I clearly don't understand this part of the world and do not know how I am going to get through this.

The captain clearly acknowledged to the dorm guard that my roommate and I were not supposed to be housed in dorm F which included the level 4 & 5 inmates because it was breaking DOC policy. Although the dorm officer informed him that they were doing that periodically he said this was still breaking DOC policy. That captain was very helpful and he called mama and daddy yesterday evening to inform them that he was working to get me transferred out.

At this point, I believe the only solution is to do what is necessary to immediately get me moved to another camp/prison or possibly to the annex here at Columbia which is another camp or the work camp at Columbia. I really see no alternative as I'm very scared and nervous as to what the repercussions can be. To do this I assume it will take some sort of orchestrated phone calls possibly to the captain that mama and daddy have already talked to but please tell then that y'all are requesting that this happen and it is not coming from me. Perhaps you can inform him how scared and concerned I am that I am now clearly a target and there does not seem to be any alternative but you will need to be adamant as I should never have been in that dorm.

Please pray for me and I will talk to Wes tomorrow as well as mama and daddy.

Don

From: Don Reinhard <d123fsu@gmail.com>
Date: February 24, 2018 at 7:42:58 PM EST
To: Corey ▮▮▮▮



Subject: Incident at knife-point

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5 inmates that are violent and hardened criminals because my roommate and I were told that there was absolutely no available bed space in the dorms that we should have been in for level 1, 2 and 3 inmates which have shorter non-violent sentences. I was told I would be in the dorm for 2-3 days and they would get me out immediately. However on Thursday I was being threatened and pressured to give them food and other items or I would "learn about prison the hard way". I voiced these concerns to my mother and father who immediately called and talked with a captain.

The captain talked with me and told me I would be taken out within the next day or two he was going to immediately look into it and asked me if I feared for my life and I said no that I was very scared and concerned of getting beat up or knifed. I also did not want to be put to solitary confinement which is the alternative if you say you fear for your life. I cannot handle that.

I was told by the dorm officer that I would be moved today which she finally got around to doing at about 5 o'clock and while I was packing my belongings some of the same individuals came into my cell with a knife made visible to me and told me they were going to stab me unless I gave them all of my canteen which was approx. $70 worth of various food items and hygiene. I tried to reason with them but another individual entered the room a so one of them held me off with the knife in his hand and they took all of my canteen.

There's other details involved but I immediately reported it to the sergeant outside because I just wanted to get out of there as soon as possible and they have taken the three individuals in hand-cuffs to solitary confinement. However, my understanding is that they are gang-related and will if they have not already got messages to their other gang members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center including a very close friend of Corey ▮▮▮▮ who had previously promised and re-

**EXHIBIT B**

From: "cambridge capital" <info@cambridgecapitalgroup.holdings>
Date: May 25, 2016 5:57 PM
Subject: info on Don
To: "Corey ▮▮▮▮▮▮▮"
Cc:

*Tim Howard, J.D., Ph. D.*
*Don Reinhard*
*Tom Woods*
*Harrison Smith*
*Cambridge Capital Group, LLC*
**850-270-9898**



### TIM HOWARD, J.D., Ph.D., PRESIDENT CAMBRIDGE CAPITAL GROUP
### PROVIDES BACKGROUND ON DON REINHARD, EXECUTIVE V.P. CAMBRIDGE CAPITAL GROUP

As a potential client of or participant with Cambridge Capital Group, and as President of Cambridge Capital Group, I would like to address the information found in the various articles from years ago concerning Don Reinhard, Executive V.P. Cambridge Capital Group, and provide you with key facts and documentation so you can be more fully informed.

Don Reinhard (Don) founded and owned an extremely successful investment management business for over 20 years and from 11/1997 – 6/2003 his clients received an average annual investment return of 25.19% while the S & P 500 returned 0.66% per annum. In July of 2003, Bear Stearns, through a computer error, failed to provide accurate market prices on new Fannie Mae and Freddie Mac bonds. This impacted the margin calculations on 14 of 300 clients, and Don's account as well. This Bear Stearns error caused the liquidation of approximately $7 million in accounts, $2.5 million of which was Don's. Though Bear Stearns admitted its error, it callously required Don and his clients to use Bear Stearns for repayment. This unfair approach to liability was a key reason that Bear Stearns ceased to exist in March of 2008.

Despite the responsibility of Bear Stearns in causing the margin call, the Securities and Exchange Commission sanctioned Don before he could prosecute Bear Stearns for its admitted error.

Taking full responsibility to protect his clients' interests, Don organized these fourteen (14) clients to pursue a case against Bear Stearns. Don personally provided over $1 million in litigation fees with a highly experienced and successful prosecution legal team. Unfortunately, four (4) clients, wielding substantial political and media influence, determined that an action against Don, including launching various investigations to weaken his reputation and capacity to defend himself, would generate a faster return of their funds. Despite the poor decision by these four clients, Don and the other clients completed a successful arbitration in May of 2011 against Bear Stearns and received full compensation for their losses. (Exhibit 1 – Award).

The personal investigations launched against Don by the four (4) clients resulted in a 2001 tax deduction (not tax evasion) charge, and in forced bankruptcy filing charge. All 2001 tax deductions were supported with documentation and the bankruptcy filing was not corrected by his attorney, which attorney's failure to correct resulted in a legal malpractice settlement. (Exhibit 2 – Affidavit).

In order to avoid further disruption of his family from potentially endless investigations, Don's attorneys recommended a strategic plea agreement, with no incarceration expected. While the investigations stopped, the strategy failed and incarceration resulted.

I have known Don Reinhard for over 40 years, and I completely trust him with the management of my family investments and with the security and investments of clients for Cambridge Capital Group. While Don does not solicit clients, once a client determines to have Cambridge Capital Group manage their investments, Don has the integrity, proven track record of investment success, and trial by fire experience to meet the quality investment return mission at Cambridge Capital Group.

Please do not hesitate to contact me at 850-259-4435 or Don at 850-270-9898 if you require any additional information or have any additional questions.

Tim Howard, J.D., Ph. D.
President, Cambridge Capital Group, LLC

---



**Award**
**FINRA Dispute Resolution**

In the Matter of the Arbitration Between:

Claimants
X ▮▮▮▮▮▮▮▮
X ▮▮▮▮▮▮▮▮
X ▮▮▮▮▮▮▮▮
X ▮▮▮▮▮▮▮▮
X ▮▮▮▮▮▮▮▮

*Case Number (Subordinate Case):* 06-01154
(consolidated with 07-02226)

Respondents
Bear, Stearns & Co., Inc.
Bear Stearns Securities Corp.

*Hearing Site:* Tampa, Florida

In the Matter of the Arbitration Between:

Claimants
▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮

*Case Number (Master Case):* 07-02226
(consolidated with 06-01154)

Respondents
Bear, Stearns & Co., Inc.
Bear Stearns Securities Corp.

*Hearing Site:* Tampa, Florida

Nature of the Disputes:  Customer vs. Member.

### REPRESENTATION OF PARTIES

For Claimants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

FINRA Dispute Resolution
Arbitration No. 07-02226
Consolidated with No. 06-01154
Award Page 7 of 11

Claimants filed a Consolidated Statement of Claim in which Claimants ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ were not reflected as Claimants and/or sought no relief from Respondents. On or about June 22, 2011, ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ filed notice with FINRA Dispute Resolution confirming their prior withdrawal of claims to be with prejudice.

Claimants filed a Motion to Amend Consolidated Statement of Claim in which they requested, among other things, leave from the Panel to: (1) request attorneys' fees pursuant to Florida Statute § 57.105(7); (2) withdraw the claims of ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮, and (3) clarify clerical and scrivener's errors. In response, Respondents asserted, among other things, that: (1) no amendment was necessary to withdraw certain Claimants' claims, which Respondents did not oppose; (2) no amendment was necessary to correct typographical errors, which Respondents did not oppose; (3) Florida law did not apply to this matter because the agreements between the parties expressly provided that they are governed by New York law; (4) Claimants had no excuse for failing to assert their request for attorneys' fees pursuant to Florida Statute §57.105(7) earlier; and, (5) In the event that the Panel permits Claimants to amend, Respondents' Answer to the Consolidated Statement of Claim should be deemed as Respondents' Answer to the Amended Consolidated Statement of Claim. On May 31, 2011, the Panel issued an Order: (1) granting Claimants' requests to clarify scrivener's errors and to withdraw claims of certain claimants, with prejudice, noting that no prejudice would result from such amendments; and, (2) reserving the Panel's decision on Claimants' request to add a request for attorneys' fees pursuant to Florida Statute §57.105(7) and inviting the parties to submit any authority of which they were aware that would assist the Panel in reaching its decision.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

### AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions (if any), the Panel has decided in full and final resolution of the issues submitted for determination as follows:

As to Count I of the Amended Consolidated Statement of Claim, regarding the joint account of ▮▮▮▮▮▮▮ the Panel finds in favor of said Claimants and awards compensatory damages in the amount of $1,313,750.00, prejudgment interest specifically excluded, to ▮▮▮▮▮▮▮ against Respondents, jointly and severally.

As to Count II of the Amended Consolidated Statement of Claim, regarding the ▮▮▮▮▮▮▮ account, the Panel finds in favor of said Claimants and awards compensatory damages in the amount of $677,638.00, prejudgment interest specifically excluded, in favor of ▮▮▮▮▮▮▮ against Respondents, jointly and severally.

FINRA Dispute Resolution
Arbitration No. 07-02228
Consolidated with No. 08-01154
Award Page 8 of 11

As to Count V of the Amended Consolidated Statement of Claim, regarding the joint account of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, the Panel finds in favor of said Claimants and awards compensatory damages in the amount of $300,736.00, prejudgment interest specifically excluded, to ▇▇▇▇▇▇▇▇▇▇▇ against Respondents, jointly and severally.

As to Count VII of the Amended Consolidated Statement of Claim, regarding the account of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ the Panel finds in favor of said Claimant and awards compensatory damages in the amount of $784,301.00, prejudgment interest specifically excluded, in favor of ▇▇▇▇▇▇▇▇▇ against Respondents, jointly and severally.

As to Count X of the Amended Consolidated Statement of Claim, regarding the respective accounts of ▇▇▇▇▇▇▇▇▇▇▇, the Panel finds in favor of said Claimants, awards compensatory damages in the amount of $659,608.00, prejudgment interest specifically excluded, to ▇▇▇▇▇▇▇▇▇ against Respondents, jointly and severally, and awards compensatory damages in the amount of $271,347.00, prejudgment interest specifically excluded, to ▇▇▇▇▇▇▇▇▇ against Respondents, jointly and severally.

As to all remaining counts in the Amended Consolidated Statement of Claim, the Panel denies recovery as to such counts.

As to Respondents' counterclaims against Claimants, the Panel finds in favor of Claimants and against Respondents, and denies any recovery as to such counterclaims.

In addition, the Panel awards a cost recovery in favor of Claimants ▇▇▇▇▇▇▇▇▇▇ against Respondents, jointly and severally, in the amount of $87,706.25 and awards costs in favor of Claimants ▇▇▇▇▇▇▇▇▇ in the amount of $13,837.00 against Respondents, jointly and severally.

Although Claimants and Respondents each requested an award of attorney's fees, at the final hearing Claimants and Respondents stated they were not submitting that issue to the Panel for its determination. Accordingly, the Panel defers to a court of competent jurisdiction the parties' entitlement to and the amount of a reasonable attorney's fee.

Any and all claims for relief not specifically addressed herein, including Claimants' request for statutory damages pursuant to Chapter 517 of the Florida Statutes in Count XIV and Claimants' request for punitive damages in Count XVI, are denied.

**FEES**

Pursuant to the Code, the following fees are assessed in Case Number 07-02226:

---

FINRA Dispute Resolution
Arbitration No. 07-02228
Consolidated with No. 08-01154
Award Page 9 of 11

**Filing Fees**
FINRA Dispute Resolution assessed a filing fee* for each claim:

| | | |
|---|---|---|
| Initial claim filing fee | | = $1,575.00 |
| Counterclaim filing fee | | = $2,450.00 |

*The filing fee is made up of a non-refundable and a refundable portion.

**Member Fees**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as parties, Respondents BSC and BSSC are each assessed the following:

| BSC | | |
|---|---|---|
| Member surcharge | | = $2,250.00 |
| Pre-hearing process fee | | = $ 750.00 |
| Hearing process fee | | = $4,000.00 |

| BSSC | | |
|---|---|---|
| Member surcharge | | = $2,250.00 |
| Pre-hearing process fee | | = $ 750.00 |
| Hearing process fee | | = $4,000.00 |

**Discovery-Related Motion Fees**
Fees apply for each decision rendered on a discovery-related motion.

| | | |
|---|---|---|
| One (1) Decision on a discovery-related motion on the papers with one (1) arbitrator @ $200.00 | | = $200.00 |
| Respondents submitted one discovery-related motion decided on the papers | | |
| Total Discovery-Related Motion Fees | | = $200.00 |

The Panel has assessed the total $200.00 discovery-related motion fee to Respondents, jointly and severally.

**Hearing Session Fees and Assessments**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s) which lasts four (4) hours or less. Fees associated with these proceedings are:

| | | |
|---|---|---|
| One (1) Pre-hearing session with the Panel @ $1,200.00/session | | = $ 1,200.00 |
| Pre-hearing conference:  September 21, 2010 | 1 session | |

| Fifteen (15) Hearing sessions @ $1,200.00/session | | = $18,000.00 |
|---|---|---|
| Hearing Dates: | June 6, 2011 | 2 sessions |
| | June 7, 2011 | 2 sessions |
| | June 8, 2011 | 2 sessions |

---

FINRA Dispute Resolution
Arbitration No. 07-02228
Consolidated with No. 08-01154
Award Page 10 of 11

| | June 9, 2011 | 2 sessions |
|---|---|---|
| | June 10, 2011 | 1 session |
| | June 13, 2011 | 2 sessions |
| | June 14, 2011 | 2 sessions |
| | June 15, 2011 | 2 sessions |

| Total Hearing Session Fees | = $18,200.00 |
|---|---|

The Panel has assessed the total $18,200.00 in hearing session fees jointly and severally to Respondents.

All balances are payable to FINRA Dispute Resolution and are due upon receipt.

---

FINRA Dispute Resolution
Arbitration No. 07-02228
Consolidated with No. 08-01154
Award Page 11 of 11

**ARBITRATION PANEL**

| Langford White | - | Public Arbitrator, Presiding Chairperson |
|---|---|---|
| John Torraco | - | Public Arbitrator |
| Robert Matthews | - | Non-Public Arbitrator |

**Concurring Arbitrators' Signatures**

| /s/ | July 2, 2011 |
|---|---|
| John Torraco | Signature Date |
| Public Arbitrator | |

| /s/ | July 1, 2011 |
|---|---|
| Robert Matthews | Signature Date |
| Non-Public Arbitrator | |

**Dissenting Arbitrator's Signature**

| /s/ | June 30, 2011 |
|---|---|
| Langford White | Signature Date |
| Public Arbitrator, Presiding Chairperson | |

July 5, 2011
Date of Service (For FINRA Dispute Resolution Office use only)

FINRA Dispute Resolution
Arbitration No. 07-02226
Consolidated with No. 06-01154
Award Page 11 of 11

## ARBITRATION PANEL

| Langfred White | : | Public Arbitrator, Presiding Chairperson |
| John Tornaco | : | Public Arbitrator |
| Robert Matthews | : | Non-Public Arbitrator |

**Concurring Arbitrators' Signatures**

_____
John Tornaco                    7/2/11
Public Arbitrator               Signature Date

_____
Robert Matthews                 Signature Date
Non-Public Arbitrator

**Dissenting Arbitrator's Signature**

_____
Langfred White                  Signature Date
Public Arbitrator, Presiding Chairperson

Date of Service (For FINRA Dispute Resolution Office use only)

---

FINRA Dispute Resolution
Arbitration No. 07-02226
Consolidated with No. 06-01154
Award Page 11 of 11

## ARBITRATION PANEL

| Langfred White | : | Public Arbitrator, Presiding Chairperson |
| John Tornaco | : | Public Arbitrator |
| Robert Matthews | : | Non-Public Arbitrator |

**Concurring Arbitrators' Signatures**

_____
John Tornaco                    Signature Date
Public Arbitrator

Robert Matthews                 7/1/11
Robert Matthews                 Signature Date
Non-Public Arbitrator

**Dissenting Arbitrator's Signature**

_____
Langfred White                  Signature Date
Public Arbitrator, Presiding Chairperson

Date of Service (For FINRA Dispute Resolution Office use only)

---

Arbitration No. 07-02226
Consolidated with No. 06-01154
Award Page 11 of 11

## ARBITRATION PANEL

| Langfred White | Public Arbitrator, Presiding Chairperson |
| John Tornaco | Public Arbitrator |
| Robert Matthews | Non-Public Arbitrator |

**Concurring Arbitrators' Signatures**

_____
John Tornaco                    Signature Date
Public Arbitrator

_____
Robert Matthews                 Signature Date
Non-Public Arbitrator

**Dissenting Arbitrator's Signature**

Langfred W White                6/30/2011
Langfred White                  Signature Date
Public Arbitrator, Presiding Chairperson

Date of Service (For FINRA Dispute Resolution Office use only)

---

## AFFIDAVIT

STATE OF FLORIDA

COUNTY OF LEON

_____/

COMES NOW your Affiant, CLYDE M. TAYLOR, JR., being over the age of twenty-one, and of sound mind and memory, and who, after being duly sworn, deposes and states:

1) Your Affiant is a criminal defense attorney, being a member of The Florida Bar since 1970, focusing almost exclusively on criminal defense, in state and federal courts, since 1978.

2) Your Affiant has tried cases in federal courts in Texas, Louisiana, Alabama, Florida, Georgia, North and South Carolina, New York, Indiana and Puerto Rico, and has been admitted pro hac vice, and tried cases in the Superior Courts of the State of Georgia.

3) Your Affiant has tried over 150 felony cases, including death penalty cases, and has argued cases on appeal before the Florida Supreme Court, and has been admitted and handled federal appeals before the 1st, 4th, 5th, 7th and 11th Circuit Courts of Appeal.

4) Your Affiant was retained to represent Defendant DON WARNER REINHARD in a twenty-three (23) count federal case out of the Northern District of Florida, Tallahassee Division, # 8-00045crt-RH, which case included: seven counts of concealing bankruptcy assets (Cts. 3-5,8,13,17,19); two counts of making false statements in bankruptcy proceedings (Cts. 9,10); and two counts of transferring assets from bankruptcy (Cts. 15,16).

5) Following extensive negotiations with the government, a plea agreement was reached wherein the Defendant would plead to seven counts of the twenty-three, including three counts involving the bankruptcy action (Cts. 9,17,19).

6) Your Affiant during the representation of DON WARNER REINHARD became aware of

the basis for the bankruptcy counts, and is of the opinion, with competent counseling, there never should have been a decision by the Defendant to proceed to bankruptcy in the first place.

7)  Further, your Affiant, having reviewed the transcript of a bankruptcy creditors meeting from December 9, 2006, is of the opinion that the Defendant was not prepared for that hearing, had not reviewed the filings in the bankruptcy case, and as a result, opened himself up for the federal indictment by responding to questions put to him by creditor's counsel and the trustee.

8)  DON WARNER REINHARD'S counsel, Ed Rade, promised the trustee he (Rade) would file amendments and provide "corrections" to errors in the filings of his client on two occasions during the meeting, and also admitted to an error as to payment dates on one of the schedules.

9)  Attorney Rade filed an amendment to a Schedule F, but it had nothing whatsoever to do with the promises to amend/correct made by Rade at the December 9th meeting.

10)  The issues raised by the creditors, and the trustee, should have put an experienced bankruptcy attorney, like Mr. Rade on notice of major problems with his client's bankruptcy petition and filings, relating to completeness, accuracy and truthfulness, and should have resulted in modifications/amendments being filed by Mr. Rade. In your Affiant's opinion, because they were not corrected the Defendant was indicted on multiple bankruptcy counts.

11)  The Defendant was asked about motorcycles, boats, real estate, and investment accounts, at the meeting. All of these items became part and parcel of the indictment. See Ex. A, attached hereto (portions of the governments statement of facts associated with the plea agreement in this case). At one point the Defendant even responded "I guess  its a property sale a transfer?" See Ex. B, attached hereto (copy of transcript of creditors meeting, w. highlights, pg. 30). Any alert, competent attorney should have realized at that point, the client

was not aware of what he/she had signed and/or was doing, to his legal detriment.

12)  The bankruptcy counts to which Defendant eventually had to plea to, could have been avoided had the schedules been amended, as the criminal "intent" element would no longer exist as to those errors from the original filings. In effect: disclosures would have been made, eliminating Counts 3,5,8,13,17 and 19; more complete amended answers would have eliminated "false" statements as alleged in Counts 9 and 10; and full explanations could have been made as to any transferring of assets, so as to resolve Cts. 15,16, from criminal prosecution. Filings are amended all the time in court actions.

13)  The bankruptcy counts to which Defendant pled adversely impacted his overall sentence range by increasing same at least two levels under the United States Sentencing Guidelines, which guidelines the court followed in sentencing the Defendant in his case.

14)  The Defendant scored 22 points under the U.S.S.G. for a recommended sentence range of 41-51 months. A two level reduction in points would have lowered the points to 20, with a sentence range of 33-41 months; netting the Defendant at least a ten month lower sentence.

15)  More importantly, however, if Attorney Rade had corrected all problems raised at the December 9, 2006 meeting, and had reviewed in close detail all schedules/financials of DON WARNER REINHARD, in the opinion of your Affiant, there would have been no bankruptcy counts in the indictment, reducing the counts from twenty-three to twelve, and eliminating a whole series of allegedly fraudulent actions of the Defendant from consideration by the trial court.  Since the bankruptcy judge referred to the "overall" conduct of DON WARNER REINHARD in sentencing him at the highest end of the guideline range, in the opinion of your Affiant, who has been practicing before trial judge Robert Hinkle, since he first came to the bench, the likely sentence that would have been imposed would have been mid range, of the

lower guideline range, i.e. midway between 33-41 months or somewhere around 37 months, possibly even lower,  not the fifty-one months now of record.

16)  A federal inmate must serve eighty-five percent of his/her sentence. The fifty-one months facing DON WARNER REINHARD should have been lower without the bankruptcy counts, and thus the net time to serve currently is 43 months, while, without bankruptcy, in your Affiant's opinion and experience, on a thirty-seven month sentence, the net would be 31 months.

FURTHER AFFIANT SAYETH NAUGHT.

_Clyde M. Taylor_
CLYDE M. TAYLOR, JR.

The foregoing instrument was sworn to before me this _____ day of April, 2010, by
_Clyde Taylor_____ , who is personally known to me or who has
produced _____ as identification, and who did take an oath.

_Antoinette Mitchell_
NOTARY PUBLIC
My Commission Expires
Commission Number

**Bill Acuff**

| | |
|---|---|
| To: | Gail Milon |
| Cc: | Dr. Tim Howard, Tom Woods |
| Subject: | Demand letter 5/2/2017 |
| Attachments: | 20161231 Portfolio Report.pdf; 20170227 Confirmation of Note.pdf |

May 2, 2017

Ms. Gail Milon
Manager & Vice President
Cambridge Capital Group
2120 Killarney Way, Ste. 125
Tallahassee, Florida 32309
Main Office: (850) 298-4455
Fax: (850) 216-2537

Via email to: gail@ccwealthadvisors.com and
Via fax to: (850) 216-2537

Gail,

I continue to be confounded by your lack of communications with me in regards to this extremely serious matter, and I have lost confidence in your willingness to deal with us in good faith in regards to your handling of our account. This situation is causing us severe financial distress—if I had had any inkling that there would be this level of drama surrounding the redemption of our money I would never have made the investment in or the loan to Cambridge.

Accordingly, I am demanding the immediate redemption and liquidation of our investment account, as evidenced by the attached statement, and repatriation of the funds by wire to our bank. Although we have not received a statement of the account since Jan 30, 2017, based on information and belief its value has accrued to $130,256.57 after adjusting for the partial $10,000 disbursement on Apr 3, 2017:

| Period | Amount | Interest | Balance |
|---|---|---|---|
| Dec-16 | $118,386.96 | $ 4,143.54 | $ 122,530.50 |
| Jan-17 | $122,530.50 | $ 4,288.57 | $ 126,819.07 |
| Feb-17 | $126,819.07 | $ 4,438.67 | $ 131,257.74 |
| Mar-17 | $131,257.74 | $ 4,594.02 | $ 135,851.76 |
| | $ (10,000.00) | less (April 3 2017 disbursement) | |
| Apr-17 | $125,851.76 | $ 4,404.81 | $ 130,256.57 |

According to the terms of the note, it is not due until May 9, 2017. As we discussed, I will be there at 2120 Killarney Way, Ste. 125 Tallahassee, Florida 32309 at 10AM on May 10 in order to receive the $286,830.75 proceeds of the note.

Continuing to ignore this will not make it go away and will make things worse. I can't believe you are putting so many reputations – yours, Cambridge's, Dr. Howard's, the law firm's – at risk. I have not contacted FINRA or hired counsel yet, but that is my next step. If you have any questions or would like to discuss, please call me on (404) 263-9842.

1

Based on your 12/31/2016 quarterly statement reflecting your portfolio value of $118,386.96, I can see the approximate valuation of $130,256.57 as of May 9, 2017. Your 12/31/16 statement reflects you having approximately 50% in Cambridge Capital Partners (CCP) and 50% in Cambridge Capital Group Equity Option Opportunity (CCGEOO). Seeing that CCP is not reflected on your approximate valuation sheet, I assume Don reallocated your portfolio to 100% CCGEOO. The bank statements reflect 100% of the $250k deposited on January 10, 2017 going into CCGEOO.

I wanted to respond to you before I left for the day. I will continue my dialogue tomorrow. Fatigue has hit me.

Best Regards,

*Gail Milon, CASL, CLTC*
President                                                          Managing Vice
**Group**                          **Cambridge Capital**
                                   Email: info@cambridgecapitalgroup.holdings

Tallahassee Office:
2120 Killarney Way, Ste. 125
Tallahassee, Florida 32309
Main Office: (850) 298-4455 Ext. 109
Fax: (850) 765-8121

On Tue, Apr 25, 2017 at 4:37 AM, Bill Acuff <wjacuff@servitodo.com> wrote:

Gail,

1. Please find attached the email dated 2/27/2017, including traceable headers, transmitting the Confirmation of Funds letter you requested.

2. Gail, I find your claim that you have not received the $250,000 we loaned you on January 9, 2017 – said note maturing on May 9, 2017 at $286,000 – to be extremely disturbing, to the point of notifying the appropriate authorities, including law enforcement. This sum was remitted by the return to Cambridge of the cashier's check for $221,000 referenced in your attached email and never negotiated by ServiTodo, as well as an additional check drawn on ServiTodo's IberiaBank checking account in the amount of $29,000, totaling $250,000. Both of these instruments are easily traced. Nonetheless, please find attached the following additional Exhibits supporting the note.

3

/s/ William (Bill) Acuff, Management Officer | ServiTodo USA | wjacuff@servitodo.com
SBA Certified: 8(a) | HUBZone | ED-WOSB 8(m) | SDB | SB Contractor | CAGE Code: 5KJZ7
PO Box 191036, Atlanta, GA 31119 | Tel (404) 939-2372 | Fax (404) 829-2366

From: Don Reinhard [mailto:d123fsu@gmail.com]
Sent: Thursday, April 27, 2017 8:51 PM
To: gail@ccwealthadvisors.com
Cc: Bill Acuff <wja.etn@gmail.com>
Subject: Bill Acuff

Gail,

Bill Acuff contacted me about your refusal to acknowledge his $250,000 investment in January. While you will find his original disbursement of $221,000 in January on the EOO contribution log as well as is $250,000 new contribution.

Additionally, the terms of the agreement with Bill are clearly outlined in emails to and from him found in his email folder. This agreement calls for 3.5% simple interest per month for 4 months which would total a disbursement on or about May 9 for about $285,000. This was also noted on the monthly activity log I reviewed with you prior to my departure.

I trust you will insure that CCG will confirm and abide by this agreement so Mr. Acuff does not have to take further legal action.
Don

From: cambridge capital [mailto:info@cambridgecapitalgroup.holdings]
Sent: Wednesday, April 26, 2017 12:26 AM
To: Bill Acuff <wjacuff@servitodo.com>
Cc: Gail Milon <gail@ccwealthadvisors.com>; Dr. Tim Howard <tim@howardjustice.com>
Subject: Re: Disbursements

Good Evening Bill,

We want to thank you for providing us with the supporting documentation regarding your investment with Cambridge Capital. At the beginning of my initial response to you I documented "I'm going to need your assistance on this". If you found my request to be disturbing, please accept my apologies.

Don received a termination letter from Cambridge Capital on February 13, 2017. As you can see from your attached documentation, he continued to transact business after that termination date. In his departure, he did not leave all records/supporting documents with Cambridge Capital thus the purpose for my initial statement.

I will admit and apologize, I did not look beyond December 31, 2017 for business transactions with Servitodo. The activity you provided was in January of 2017. I see both the $221k as well as the $29k deposited into Cambridge Capital on January 10, 2017. Again, please accept my apologies. Your funds have been received.

2

- o Letter of transmittal dated 1/9/2017 for the funds which were delivered via FedEx 785266265857 and received by M. Brown in your office on 1/10/2017
  - Proof of delivery for the aforementioned FedEx delivery.
- o Scan of Bank of America Cashier's Check #1303203006 in the amount of ServiToDo LLC in the amount of $221,000 for investment return. This check was never negotiated by us, and I presume was returned by you to BOA as not used for its intended purpose. I will contact BOA and initiate an investigation as this has apparently been lost or stolen.
- o Scan of ServiTodo's check #6104 in the amount of $29,000. Please note the remittance advice.
  - Copy of cancelled check #6104, which cleared our bank on 1/11/2017.

I encourage you to immediately contact me on 404-263-9842 when you locate our money and confirm the disbursement schedule in my original email before this situation escalates.

From: Gail Milon [mailto:gail@ccwealthadvisors.com]
Sent: Monday, April 24, 2017 6:23 PM
To: Bill Acuff <wjacuff@servitodo.com>
Cc: cambridge capital <info@cambridgecapitalgroup.holdings>
Subject: Re: Disbursements

Good Afternoon Bill,

Thank You for the advance notice. I'm going to need your assistance on this.

We show a $100,000 wire into Cambridge Capital from Servitodo on August 5, 2016 split 50/50 Cambridge Capital Partners and Cambridge Capital Equity Option Opportunities.

In addition, I show a $200,000 counter credit from Servitodo on October 13, 2016.

We show a cashier's check in the amount of $221,000 made payable to Servitodo on December 27, 2016 for return on investment. In addition a wire in the amount of $10,000 was deposited into your Servitodo account on April 6, 2017.

4

If there are additional investments made into Cambridge Capital, please provide us with the supporting documentation. We show no additional investments/records on our end.

We have in our records one of your attachments: Your 12/31/2016 quarterly statement. We do not have the letter typed with Dr. Howard's name on it (no signature and no date).

Please provide us with the e-mail that was forwarded to you containing that document.

I look forward to receiving the supporting documentation from you that will clear up any discrepancies.

Best Regards,

*Gail Milon, CASL, CLTC*

Manager Vice President

**Cambridge Capital Group**

Email: gail@ccwealthadvisors.com



Tallahassee Office:

2120 Killarney Way, Ste. 125

Tallahassee, Florida 32309

Main Office: (850) 298-4455 Ext. 109

5

**From:** cambridge capital [mailto:info@cambridgecapitalgroup.holdings]
**Sent:** Tuesday, April 18, 2017 7:58 PM
**To:** undisclosed recipients <info@cambridgecapitalgroup.holdings>
**Subject:** First Quarter 2017

GREETINGS INVESTORS!

The first quarter has come to a prosperous and eventful end.

We, at Cambridge Capital Group, are excited that to be moving forward with a new automated process that will expedite the availability of our quarterly, annual and individual reports.

We are making these necessary improvements for audit and quality control purposes. It is our intention to have this first quarterly report dispersed to you by May 15, 2017 or sooner.

Great things are happening at Cambridge Capital Group. Details will be provided in the quarterly report.

Best Regards,
Gail Milon, CASL, CLTC
President                        **Cambridge Capital**          Managing Vice
**Group**                        Email: info@cambridgecapitalgroup.holdings

---

Fax: (850) 765-8121

On Sun, Apr 23, 2017 at 7:59 PM, Bill Acuff <wjacuff@servitodo.com> wrote:

Sorry I missed you last week Gail.

As I mentioned to you and Don, we were placing our funds with Cambridge for a limited period while we sought ought investment opportunities in real estate. We are making our moves there right now, so I wanted to give you a heads up on our cash requirements over the next 30 days.

Since the note matures on May 9, 2017, please make all these disbursements effective on that day, per the remittance advice contained in the table below:

| Tranche | Valuation* | | Maturity Date | Disbursement Amount | Remittance advice | Balan |
|---|---|---|---|---|---|---|
| CCGEOO/CCG LP | $ 130,256.57 | ** | N/A | $  86,302.29 | Cashier's check payable to "ServiTodo LLC" | $ |
| CCGEOO/CCG LP | $  43,954.28 | ** | N/A | $   3,663.35 | Cashier's check payable to "ServiTodo LLC" | $ |
| Note | $ 286,880.75 | * | 5/9/2017 | $ 253,422.32 | Cashier's check payable to "ServiTodo LLC" | $ |
| Note | $  33,458.43 | * | | $  10,000.00 | Wire or ACH to ServiTodo*** | $ |

*Valuation at maturity (May 9, 2017)
**Approximate valuation as of May 9, 2017

I will meet you in your office at 10AM May 10 to pick up the Cashier's Checks. Please give me a call to confirm receipt.

Thanks,

Bill Acuff (404) 263-9842

6

Tallahassee Office:

2120 Killarney Way, Ste. 125

Tallahassee, Florida 32309

Main Office: (850) 298-4455 Ext. 109

Fax: (850) 765-8121

**From:** Bill Acuff [mailto:wja.etn@gmail.com]
**Sent:** Wednesday, April 5, 2017 6:46 AM
**To:** Gail Milon <gail@ccwealthadvisors.com>
**Subject:** Re: Portfolio Report

Good morning Gail,

Prior to our 1100 call, please forward me via email your FINRA/NASD credentialing data.

Thank you,

Bill Acuff| ServiTodo USA
(404) 939-2372 | wjacuff@servitodo.com
PO Box 191606, Atlanta GA 31119

*Please excuse any misspellings as this message was sent from my iPhone.

On Apr 4, 2017, at 9:29 PM, Bill Acuff <wja.etn@gmail.com> wrote:

If you're unwilling to perform a partial distribution, please liquidate the entire account and wire me the proceeds tomorrow.

**From:** Gail Milon [mailto:gail@ccwealthadvisors.com]
**Sent:** Tuesday, April 4, 2017 9:25 PM
**To:** Bill Acuff <wja.etn@gmail.com>
**Subject:** Re: Portfolio Report

No, I have not.

I'm sure you know that a hedge fund does not operate like a mutual fund.  A hedge fund is not a liquid investment. Hedge funds are long term investments. I will discuss this with you tomorrow at 11:00 am eastern.

Kind regards,

*Gail Milon*
Manager Vice President

7                                                        8

Cambridge Capital Group
Email: gail@ccwealthadvisors.com

Kind regards,

*Gail Milon*

Manager Vice President

Cambridge Capital Group

Email: gail@ccwealthadvisors.com

Tallahassee Office:
2120 Killarney Way, Ste. 125
Tallahassee, Florida 32309
Main Office: (850) 298-4455
Fax: (850) 216-2537

On Tue, Apr 4, 2017 at 9:08 PM, Bill Acuff <wja.ctn@gmail.com> wrote:

Please call me tomorrow at 1100 eastern, or propose an alternative time. Have you initiated the wire for the disbursement?

From: Gail Milon [mailto:gail@ccwealthadvisors.com]
Sent: Tuesday, April 4, 2017 9:05 PM

To: Bill Acuff <wjacuff@servitodo.com>
Subject: Re: Portfolio Report

Good Evening Mr. Acuff,

I attempted to reach you by phone.

I can be reached at 850-270-9898.

9

Tallahassee Office:

2120 Killarney Way, Ste. 125

Tallahassee, Florida 32309

Main Office: (850) 298-4455

Fax: (850) 216-2537

On Tue, Apr 4, 2017 at 1:02 PM, Bill Acuff <wjacuff@servitodo.com> wrote:

Gail,

10

As I mentioned in my email to Tom, I'd like to schedule a phone call with you ASAP to discuss:

1) Your qualifications and any changes in investment policies of these funds resulting from Don Reinhard's departure.

2) A partial redemption of $10,000 from our account to be wired to: ServiTodo LLC c/o IberiaBank, RTN: 265270413, Account # 2243707

Please give me a call on (404) 263-9842 as soon as possible.

Thanks,

/s/ William (Bill) Acuff, Management Officer | ServiTodo USA | wjacuff@servitodo.com

SBA Certified: 8(a) | HUBZone | ED-WOSB 8(m) | SDB | SB Contractor | CAGE Code: 5KIZ7

PO Box 191606, Atlanta, GA 31119 | Tel (404) 939-2372 | Fax (404) 829-7866

Kind regards,

*Gail Milon*

Manager Vice President

Cambridge Capital Group

Email: gail@ccwealthadvisors.com

From: Gail Milon [mailto:gail@ccwealthadvisors.com]
Sent: Monday, April 3, 2017 8:56 PM
To: Bill Acuff <wjacuff@servitodo.com>
Subject: Re: Portfolio Report

Good Evening Bill,

My apologies for the delay in my response.

My phone number is 850-270-9898.

How may I be of service?

11

Tallahassee Office:

2120 Killarney Way, Ste. 125

Tallahassee, Florida 32309

Main Office: (850) 298-4455

Fax: (850) 216-2537

From: Tom Woods [mailto:thomascwoods@gmail.com]
Sent: Monday, April 3, 2017 9:15 AM
To: Bill Acuff <wjacuff@servitodo.com>
Subject: Re: Portfolio Report

12

Sure.

Sent from my iPhone

From: Bill Acuff [mailto:wjacuff@servitodo.com]
Sent: Monday, April 3, 2017 8:54 AM
To: Tom Woods <thomascwoods@gmail.com>
Cc: Yarit <yarit@servitodo.com>
Subject: Fwd: Portfolio Report

Good morning Tom,

I've been having trouble reaching Gail Milon, would you please have her contact me on (404) 263-9842 as soon as possible?

Thanks,

Bill Acuff | ServiTodo USA
(404) 939-2372 | wjacuff@servitodo.com
PO Box 191606, Atlanta GA 31119

*Please excuse any misspellings as this message was sent from my iPhone.

On Fri, Mar 31, 2017 at 8:14 AM, Bill Acuff <wjacuff@servitodo.com> wrote:

Good morning Gail,

It is my understanding that Don Reinhard is no longer with Cambridge and that you have assumed his portfolio.

Please advise and provide contact information for yourself. Also I'd like to schedule a call early next week.

Bill Acuff | ServiTodo USA

(404) 939-2372 | wjacuff@servitodo.com

PO Box 191606, Atlanta GA 31119

*Please excuse any misspellings as this message was sent from my iPhone.

Begin forwarded message:

13

Thanks,

Bill

Bill Acuff | ServiTodo USA
(404) 939-2372 | wjacuff@servitodo.com
PO Box 191606, Atlanta GA 31119
(sent from a mobile device)

On Feb 27, 2017, at 4:18 AM, cambridge capital <info@cambridgecapitalgroup.holdings> wrote:

Effective Monday 2/27, I am relinquishing my advisory and management responsibilities with the various entities of Cambridge Capital Group to handle a very unfortunate legal situation. Hopefully this period will be very short lived but presently the time frame is uncertain.

In the meantime and in preparation for this decision, I have been working very closely with Gail Milon who recently joined Cambridge Capital Group to manage Cambridge Capital Wealth Advisors. Gail has over 30 years of experience in the wealth management and insurance industry and has shown a remarkable ability to successfully learn and manage the growing entities of Cambridge Capital Group in a relatively short period of time.

Additionally, the proprietary investment funds of Cambridge Capital Group (Cambridge Capital Partners LP & Cambridge Capital Group Equity Option Opportunities LP) are currently structured in a extremely stable position and the portfolio assets are solid and will continue to move forward with little adjustment for the forseeable future...there is no need to have any concerns. Gail will have constant and frequent communication with me during this period to help her guide and mange the investment portfolio as well as the other operations of CCG...again, the portfolio is stable and solid.

We continue to thank you very much for the opportunity you have given us and again, hopefully this period will be short lived. However, in the meantime, please do not hesitate to call Gail if you have any questions at (o) 850-270-9898 or (c) 850-591-4010.

Thank you,
Don

---------- Forwarded message ----------
From: "William J. (Bill) Acuff" <wjacuff@servitodo.com>
To: <info@cambridgecapitalgroup.holdings>
Cc: "Dr. Tim Howard" <tim@howardjustice.com>
Bcc:
Date: Mon, 9 Jan 2017 19:11:21 -0400
Subject: Cambridge Capital additional investment

January 9, 2017

Mr. Don Reinhard

15

From: "Bill Acuff" <wjacuff@servitodo.com>
Date: March 29, 2017 at 7:39:25 AM EST
To: "cambridge capital" <info@cambridgecapitalgroup.holdings>
Subject: RE: Portfolio Report

Good morning,

Is this mailbox being monitored? Please contact me as soon as possible to discuss redemption of ServiTodo's position.

/s/ William (Bill) Acuff, Management Officer | ServiTodo USA | wjacuff@servitodo.com

SBA Certified: 8(a) | HUBZone | ED-WOSB 8(m) | SDB | SB Contractor | CAGE Code: 5KJZ7

PO Box 191606, Atlanta, GA 31119 | Tel (404) 939-2372 | Fax (404) 829-2866

---------- Forwarded message ----------
From: cambridge capital <info@cambridgecapitalgroup.holdings>
To: Bill Acuff <wjacuff@servitodo.com>
Cc:
Bcc:
Date: Mon, 27 Feb 2017 09:09:57 -0400
Subject: Re: Management of Cambridge Capital Group

Here you go and again, thank you Bill.

Tim Howard, J.D., Ph.D.
Don Warner
Gail Milon
Harrison Smith
Cambridge Capital Group, LLC
850-270-9898

On Mon, Feb 27, 2017 at 5:28 AM, Bill Acuff <wjacuff@servitodo.com> wrote:
Don,

I need to request your assistance in a somewhat urgent matter. When I provided the $250K in January 2017 for 120 day funds, I mentioned I needed the funds in May to purchase real estate. I have written and executed a contract for the real estate, and now I need to provide proof of the source of funds for the purchase.

Can you please provide this, along with the NPV and maturity date? Sorry for the timing, but I really need it ASAP. Can you handle this or should I reach out to Gail?

14

Dr. Tim Howard

Cambridge Capital Group

2120 Killarney Way

Tallahassee, FL 32309

via Federal Express airbill # 7852 6626 5857

Don,

Please find enclosed $250,000.00 as described below for the 120 day investment per the terms in the attached email dated December 27, 2016, to be disbursed on or about May 9, 2016:

ServiTodo check # 6104 from IberiaBank 2243707     $  29,000.00
BOA Cashier's Check # 1303203006                        $ 221,000.00
Total                                                             $ 250,000.00

This is in addition to the $100,000.00 basis held by Cambridge since August 5, 2016 and valued at $106,751.10 on Sep 30, 2016.

Please give me a call on (404) 263-9842 with any questions or to discuss.

Thanks,

Bill

/s/ William Acuff, Management Officer

ServiTodo USA, 5115 New Peachtree Rd., Ste 303, Atlanta, GA 30341

Tel (404) 939-2372 | Fax (404) 829-2866 | wjacuff@servitodo.com

16

From: cambridge capital [mailto:info@cambridgecapitalgroup.holdings]
Sent: Tuesday, December 27, 2016 2:35 PM
To: Bill Acuff <wjacuff@servitodo.com>
Subject: Disbursement

Bill

I have your cashiers check prepared .... are you still planning to come to Tallahassee on January 2nd ?

Also, I am on the hunt for a maximum of $500,000 in 120 day funds for opportunities that I want to take advantage of. I can pay 3.5% per month or if you want to bring in others who have an interest then I can pay them 3% and you a 1/2 % override.

Hope you are having a great holiday season.

Thank you

Don

17

# EXHIBIT F



**The Florida Bar**
651 East Jefferson Street
Tallahassee, FL 32399-2300

John F. Harkness, Jr.
Executive Director

Joshua E. Doyle
Executive Director Designate

December 13, 2017

Mr. Phillip Timothy Howard
Howard and Associates P A
2120 Killarney Way Ste 123
Tallahassee, FL 32309-3402

Re:   Complaint by Don Reinhard against Phillip Timothy Howard
The Florida Bar File No. 2018-00,265 (2A)

Dear Mr. Howard:

Enclosed is a copy of an inquiry/complaint and any supporting documents submitted by the above referenced complainant(s). Your response to this complaint is required under the provisions of Rule 4-8.4(g), Rules of Professional Conduct of the Rules Regulating The Florida Bar, and is due in our office by December 29, 2017. **Responses should not exceed 25 pages** and may refer to any additional documents or exhibits that are available on request. Failure to provide a written response to this complaint is itself a violation of Rule 4-8.4(g). Please note that any correspondence must be sent through the U.S. mail; we cannot accept faxed material. **You are further required to furnish the complainant with a complete copy of your written response, including any documents submitted therewith.**

Pursuant to Rule 3-7.1(f), Rules of Discipline, you are further required to complete and return the enclosed Certificate of Disclosure form.

Finally, the filing of this complaint does not preclude communication between the attorney and the complainant(s). Please review the enclosed Notice for information on submitting your response.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

Enclosures

cc:   Mr. Don Reinhard

---

### NOTICE OF GRIEVANCE PROCEDURES

1.   The enclosed letter is an official inquiry by bar counsel. Your response is required under Rule 4-8.4(g) of the Rules Regulating The Florida Bar. Rule 4-8.4(g)(1) and (2) require that a lawyer submit a written response within 15 days to an initial inquiry and within 10 days to any follow-up inquiry made by bar counsel, the grievance committee or the board of governors during the course of an investigation of the lawyer's conduct. If you do not respond, the matter will be forwarded to the grievance committee for disposition in accordance with Rule 3-7.3. Failure to respond may also be a matter of contempt and processed in accordance with Rule 3-7.11(f).

2.   Many inquiries considered first by staff counsel are not forwarded to a grievance committee, as they do not involve violations of the Rules of Professional Conduct justifying disciplinary action.

3.   Pursuant to Rule 3-7.1, any reports, correspondence, papers, recordings and/or transcripts of hearings submitted by you in this matter shall become accessible to the public upon dismissal or a decision by the grievance committee. Please advise Bar Counsel of any material provided to The Florida Bar believed to be confidential under applicable law so that measures can be taken to seal that portion of the file. Please note that The Florida Bar is required to acknowledge the status of proceedings during the pendency of an investigation, if a specific inquiry is made and the matter is deemed to be in the public domain.

4.   The grievance committee is the Bar's "grand jury." Proceedings before the grievance committee are non-adversarial in nature. The grievance committee's function and procedures are set forth in Rule 3-7.4.

5.   If the grievance committee finds probable cause, formal adversarial proceedings before the Supreme Court of Florida will be initiated pursuant to Rule 3-7.6. A referee will make a recommendation as to guilt and discipline to The Supreme Court of Florida, unless a plea is submitted pursuant to Rule 3-7.9.

---



**The Florida Bar**
651 East Jefferson Street
Tallahassee, FL 32399-2300

John F. Harkness, Jr.
Executive Director

Joshua E. Doyle
Executive Director Designate

December 13, 2017

Mr. Don Reinhard
7104 Harvest Ridge Lane
Alpharetta, GA 30022

Re:   Phillip Timothy Howard; The Florida Bar File No. 2018-00,265 (2A)

Dear Mr. Reinhard:

Enclosed is a copy of our letter to Mr. Howard which requires a response to your complaint.

Once you receive Mr. Howard's response, you have 10 days to file a rebuttal if you so desire. If you decide to file a rebuttal, you must send a copy to Mr. Howard. Rebuttals should not exceed 25 pages and may refer to any additional documents or exhibits that are available on request. Please address any and all correspondence to me. Please note that any correspondence must be sent through the U.S. mail; we cannot accept faxed material.

Please be advised that as an arm of the Supreme Court of Florida, The Florida Bar can investigate allegations of misconduct against attorneys, and where appropriate, request that the attorney be disciplined. The Florida Bar cannot render legal advice nor can The Florida Bar represent individuals or intervene on their behalf in any civil or criminal matter.

Please review the enclosed Notice on mailing instructions for information on submitting your rebuttal.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

Enclosures

cc:   Mr. Phillip Timothy Howard

---

### IMPORTANT NOTICE FOR COMPLAINANTS AND RESPONDENT-ATTORNEYS

#### MAILING INSTRUCTIONS

Materials Received That Do Not Comply With These Instructions May Be Returned Or Not Otherwise Incorporated Into The File

The Florida Bar converts its disciplinary files to electronic media. All submissions are scanned into an electronic record and hard copies are discarded. To help ensure the timely processing of inquiries/complaints, responses and rebuttals, please review the following instructions prior to providing your submission.

1.   Please limit your submission to no more than 25 pages including exhibits. If you have additional documents or material available, please make reference to those documents and/or materials in your written submission as available upon request. Should The Florida Bar need to obtain copies of any such documents and/or materials, a subsequent request will be sent to you.

2.   Please do not bind, staple, tab or index your documents. You may underline but do not highlight documents under any circumstances. Please do not submit materials in color. When documents are scanned in our disciplinary files, highlighting and color will obscure the underlying text.

3.   Please do not attach media such as audio tapes, thumb/flash drives, CDs, or photographs. We cannot process any media which cannot be scanned into the electronic record.

4.   Please do not submit your original documents. All documents will be discarded after scanning and we will not be able to return any originals submitted to our office. The only original documents that should be provided to our office are the inquiry/complaint form, response and certificate of disclosure.

5.   Whether you are a complainant or a respondent-attorney, please do not submit confidential or privileged information. Documents submitted to our office become public record. (Respondent-attorneys may wish to consult Rule 4-1.6 (e) of the Rules Regulating The Florida Bar.) Confidential/privileged information should be redacted. Such information includes, but is not limited to, bank account numbers, social security numbers, credit card account numbers, medical records, dependency matters, termination of parental rights, guardian ad litem records, child abuse records, adoption records, documents containing names of minor children, original birth and death certificates, biometric data such as fingerprints, Baker Act records, grand jury records, and juvenile delinquency records. If information of this nature is important to your submission, please describe the nature of the information and indicate that it is available upon request. Bar counsel will contact you to make appropriate arrangements for the protection of any such information (to the extent permitted by law) as part of the investigation of the complaint.

6.   Please provide your submission only one time. Do not submit duplicates via email, facsimile transmission or by any other means. Do not include these instructions. Respondent-attorneys do not need to include a copy of the complaint.

Please be aware that materials received that do not meet these instructions may be returned or not otherwise incorporated into the file. Thank you for your consideration in this respect.



RECEIVED
DEC 11 2017
THE FLORIDA BAR
A.C.A.P.

**The Florida Bar**
651 East Jefferson Street
Tallahassee, FL 32399-2300
(850) 561-5600
www.floridabar.org

John F. Harkness, Jr.
Executive Director

Joshua E. Doyle
Executive Director Designate

November 15, 2017

Mr. Don Reinhard
100 Cabana Cay Cir,
Unit 222
Panama City Beach, FL 32413

Re:   Mr. Phillip Timothy Howard; RFA No. 18-4421

Dear Mr. Reinhard:

The Supreme Court of Florida has adopted rules that require the allegations be signed and under oath. In order to comply with this rule you must sign the oath below and return it to us by November 27, 2017 before we can proceed with an investigation.

Under penalty of perjury, I declare that the facts contained in the inquiry submitted to The Florida Bar concerning Mr. Howard are true, correct and complete.

_____          12/6/17
Mr. Don Reinhard                              Date

If you do not complete and return the oath form to us, we may be unable to proceed with the investigation. A copy of the rule imposing this obligation (3-7.3(c)) may be found on the Bar's web site at www.floridabar.org.

Also, if you have documents that you feel support your allegations, please provide copies of them when you return the oath. Your response must not exceed 25 pages.

Thank you for your cooperation.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

---

The Florida Bar
651 East Jefferson Street
Tallahassee, FL 32399-2300

Charles Hughes, Bar Counsel
651 East Jefferson Street
Tallahassee, FL 32399-2300

Don Reinhard
#55325
PO Box 2718
Tall, FL 323JC

---

The Florida Bar
651 East Jefferson Street
Tallahassee, FL 32399-2300

OCT 06 2017

Re: Ethics Complaint - Jonathan Williams
Ethics Complaint - Philip Timothy Howard

Please use this letter as my authorization to allow my father, Herbert F. Reinhard Jr., to have full access to all Florida Bar information regarding the two ethics complaints I filed on or about July 25, 2017 on the following:

Jonathan Williams - Fla Bar File 2018-00,060
Philip Timothy Howard - Florida
Bar No. 655325

Both attorneys accompanied by Howard & Associates, P.A. in Tallahassee, FL.

Specifically, upon his call, please provide him with all details about what, if any-thing, I need to do next. I received a copy of Mr. Williams response dated August 21, 2017 but not Mr. Howard's response.

DON REINHARD

---

THE FLORIDA BAR
INQUIRY/COMPLAINT FORM

PART ONE (Complaint Information):
Your Name: Don Reinhard.
Organization: Cambridge Capital Group LLC
Address: 2120 Killarney Way
City, State, Zip Code: Tallahassee, FL 32309
Telephone: 850-228-9868 (alternative number until mid Dec.)
Email: donreidm531@gmail.com        770-475-1066,
ACAP Reference No.: _____
Does this complaint pertain to a matter currently in litigation   Yes ____   No _X_

PART TWO (Attorney Information):
Attorney's Name: Philip T. Howard      FL Bar 655325
Address: 2120 Killarney Way
City, State, Zip Code: Tallahassee, FL 32309
Telephone: 850-298-4455 Fax: 850-216-2537

PART THREE (Facts/Allegations): The specific thing or things I am complaining about are:

1. Tim Howard is an attorney in Tallahassee and a member of the Florida Bar (655325).

2. Mr. Howard is a 50% owner of Cambridge Capital Group with complainant, Don Reinhard.

3. Mr. Howard is the senior partner and sole owner of Howard & Associates, P.A., a law firm located in Tallahassee, FL.

4. Mr. Howard represents former NFL players in their

page 2

PART THREE CONTINUED

concussion lawsuit against the NFL and has set up various enterprises to take advantage of his contractual obligations to these clients.

5. Cambridge Capital Group LLC was established in 2015 by Don Reinhard with Mr. Howard as his partner as a boutique full service financial services and investment advisory firm. While the state of Florida LLC registration shows Cambridge Capital Group LLC (CCG) as being solely owned by Tim Howard, complainant and Mr. Howard had a written agreement to equally split but profits and also equally own (50% each) CCG and all related companies, assets, clients and all future companies were officially operated (shall be this) as they thisis agreements.

6. Complainant holds the title of Executive Vice President which CCG which had the title of President which is used in any special internal or this elderly month by in-laws complainant was the social employer of the operating entity of CCG and this Cambridge Capital Advisors LLC and therefore considered the "operating partner" of CCG and Mr. Howard was a "silent partner". (Complainant can provide all documentation upon release)

7. CCG through its operating partner did refer approximately 100 former NFL players to Tim Howard and Howard & Associates for representation in their concussion lawsuit. A vast majority of these players were either current clients of CCG or active prospects with confirmed business comittments. Therefore,

page 3

PART THREE – CONTINUED

complainant, CCG operating partner Don Reinhard, had a direct responsibility and on-going comittment to these referrals to insure that their concussion lawsuit be handled appropriately and with complete integrity by Tim Howard and Howard & Associates PA.

8. While complainant had vague initial knowledge of the inappropriate and fraudulent handling of the testing procedures used by Howard & Associates PA which was brought to the attention of Tim Howard in the spring of 2016 and was assured that the deceptive procedures would be immediately corrected, he was shocked to learn in 'll that the deceptive, fraudulent, and inappropriate testing procedures which are the initial criteria to insure that a player has a legal valid claim had not only continued under Tim Howard's direct leadership but had actually manifested itself to be the norm as opposed to the exception. The motive behind this fraudulent activity was average legal fees of approximately $175,000 – $250,000 per qualified player as opposed to an expense of $10,000 – $15,000 per non-qualified player or a resource fee having turned into $100,000 each

9. Additionally, complainant learned that the initial fraudulent procedures of the testing process had also speed

page 4

PART THREE – CONTINUED

throughout the entire qualification process. (Exhibit B)

10. This information was brought to the attention of complainant in mid to late January 2017 after complainant had witnessed Tim Howard forging the signiture of of the required Board Certified Nuerologist to the report of a player.

11. Complainant confronted his business partner in CCG, Tim Howard senior partner and owner of Howard & Associates PA, on February 23 and 24, 2017 regarding these very egregious and serious concerns as complainant had a fiduciary responsibility to interject his valid concerns on behalf of his many client referrals to Howard & Associates PA due to the significant negative effect the outcome could have on their million dollar claims against the NFL. If determined fraudulent, player would disqualify.

12. Complainant initially felt positive about the response from Tim Howard as he assured complainant he was unaware of the serious issues and allegations of massive fraud in the qualification process.

13. Unfortunately, complainant was required to self surrender to the Leon County Jail to handle an irrelevant alleged criminal charge regarding his probation from a previous charge on February 28, 2017.

14. Much to complainant's shock, his business

page 5

PART THREE– CONTINUED

partner, Tim Howard, senior partner and owner of Howard & Associates PA., chose not only to not investigate the extremely serious fraud allegations but instead chose to initiate a "campaign" of personal retaliation against complainant, Don Reinhard, his business partner and 50% owner of Cambridge Capital Group LLC. Since complainant was for all intensive purposes now defenseless and trusted the multiple agreements and promises he had with this business partner. These agreements and promises included continued financial support from CCG which had been well documented, established, and arranged by complainant and Tim Howard during the building process and enormous financial success of CCG under the management and leadership of complainant.

15. Due to the circumstances, complainant and his family now completely needed to rely on these critical fiancial support agreements which relied on the honesty of Tim Howard, his business partner, who now had complete management control of CCG. To accomplish this, Tim Howard chose to circumvent the well developed a operational plan created and implemented by complainant and his business partner during the period of his absence.

16. Immediately, Tim Howard chose to not repay

PART THREE—CONTINUED                                          page 6

investor funds, that he took without authorization from the investment partnerships of CCG which is a significant SEC violation as well as a FINRA compliance violation to once again fill the frequent financial gap of Howard & Associates P.A. as well as to support his lavish lifestyle. This frequent and on-going problem of Tim Howard, having his assistant, Brenda Murphy, "raid" the bank accounts of the CCG investment funds without authorization and without complete agreement with complainant that this illegal activity MUST stop as these funds were not an acceptable, "slush fund" source to Tim Howard or his law firm, Howard & Associates PA, to meet his frequent needs to cover checks that had already been issued, ie. "kiting", and/or bank overdrafts for items as serious as weekly employee payroll, was an additional problem that complainant confronted Tim Howard, his business partner about on February 24, 2017.

17. Complainant clearly explained to Tim Howard that limited partner investment funds from clients of CCG were heavily regulated by SEC and FINRA policies and guidelines and were not available for his law firm, personal life style or for any need that was strictly not an investment by the investment Limited Partnerships created, structured, founded, and designed by complainant, operated by complainant, and managed by complainant in his capacity as sole employee and operating partner of Cambridge Capital Advisors LLC, (CCA),

PART THREE—CONTINUED                                          page 7

General Partner of the Limited Partnerships (CCA). Again, Tim Howard also mysteriously and abruptly legally officially transferred the title of President to his elderly mother in-law.

18. It was explained multiple times to Tim Howard that CCA was required to maintain an extremely high level of fiduciary responsibility to these limited partners and that responsibility fell on the shoulders of complainant. Therefore, the investment funds of CCG were completely "off limits" to his personal "slush" fund needs to meet the requirements of his lavish life style (million dollar condo in Boston, multi million dollar home in upscale Golden Eagle in Tallahassee, million dollar beach home on St. George Island, and million dollar beach lots (2) on St George Island but yet he could not meet his law firm's weekly payroll on a regular basis without illegally raiding investor funds from CCG limited partner clients) as well as the on-going financial needs to cover frequent bank overdrafts at Regions Bank and checks that had been issued without available funds to cover law firm weekly payroll and other necessary operating expenses.

19. This "pilfering" of funds started small and could therefore be structured into attractive, strategic investments to benefit the limited partners of CCG by complainant in his sole capacity as investment manager of the Limited Partnerships. However the early morning "raids" by Brenda Murphy, Tim Howard's assistant, as directed by Tim Howard before complainant

PART THREE—CONTINUED                                          page 8

had an opportunity to review accounts grew more frequent and larger, reaching from the tens of thousands to hundreds of thousands of dollars. Additionally, defaulting on agreed upon repayment terms became frequent and more serious extending from weekly to 30, than 60, then 90 days and then the unknown unknown. As a FL Bar member, Tim Howard knew better.

20. Again, this was the "basis", the "crux", of the 2nd part of the confrontation complainant had with his business partner, Tim Howard who was also senior partner and owner of Howard & Associates P.A., on February 24th, 2017 (the 1st being the massive fraud against the NFL Concussion Settlement to qualify players for million dollar settlements so he and Howard & Associates PA could illegally collect additional fraudulent fees in excess of $110 million at the sole risk of his clients and their ability to get legally qualified for the settlement per the NFL guidelines). Additionally, Tim Howard chose to delay the proper filing of his client's claims for the sole benefit of himself and Howard & Associates P.A. which has resulted in clients receiving expected settlement funds by well over 7+ months later. This has put many, if not most, of these clients and clients of CCG in critical financial problems without concern from Tim Howard and Howard & Associates P.A.

21. While complainant will be filing individual litigation

PART THREE—CONTINUED                                          page 9

which is being prepared as soon as possible with the proper regulatory authorities, he understands that the NFL has reinitiated an incomplete investigation of the settlement qualification process of Howard & Associates P.A. with little to no details from complainant as there are other concerned employees.

22. The 3rd "basis" or "crux" of the confrontation complainant had with Tim Howard which led to the extremely damaging retaliation on complainant and his family was the completely illegal action as well as sever breach in NCAA compliance regulation of providing fraudulent loans to "straw" buyers (distant relatives) of current NCAA collegiate football players in return of an agreement that the player would hire Tim Howard, Howard & Associates P.A., and CCG as their attorney, agent, and financial advisor upon entering the NFL Draft. This activity has just recently been been proven to be criminal with the high profile idictments and arrests by the Manhatten U.S. Attorneys Office and Federal Bureau of Investigation in the NCAA collegiate basketball investigation.

23. CCG was initially involved in providing initiatives supposedly proven to benefit these high profile players relatives to present collegiate high profile players relatives so they could purchase vehicles for these players

as their bonafide relatives which per the advice of Harrison Smith, Vice President of Cambridge Sports & Entertainment LLC, was in complete compliance with NCAA policies. CCG had clearly stated that otherwise they would not be involved.

24. However, CCG quickly learned that these loans provided to Howard & Associates P. A. for the purchases were indeed not loans at all but "gifts" of tens of thousands of dollars to the players and their families. Additionally, purchase vehicles for the players that were registered in the names of distant relatives with little to no involvement. Howard & Associates PA was also "covering" all auto insurance . . . a huge risk.

25. Complainant quickly realized CCG from this activity which it believed violated NCAA compliance policy and confronted Tim Howard, senior partner and owner of Howard & Associates P.A., due to the serious risk he was taking in jeopardizing these player's futures as well as the collegiate programs they represented. It also was putting CCG at serious risk.

26. These three areas of fraud, deceit, improper financial management, dishonesty, and self interest in front of and at the significant risk of clients by a member of the Florida Bar Association should cause great concern and alarm due to the egregious nature and pattern of these

activities.

27. Additionally, Tim Howard's retaliation against complainant has been extremely damaging to complainant, his spouse, and his children. Complainant and his business partner, Tim Howard, have 'internal agreements to co-own (50%. /50%.) CCG and all related companies and therefore evenly (or as close as possible given Tim Howard's constant need for loans and funds) split all available profits and losses. Therefore, with this agreement in place, complainant routinely made the agreed upon distributions from CCA to himself and Tim Howard via agreed methods, procedures, and standards for approximately 18 (18 months/years). These practices are well documented, very well documented, and were closely reviewed and monitored by Brenда Murphy, Tim Howard's assistant, via daily, weekly, and monthly detailed banking reports as well as quarterly distribution analysis presented and discussed by complainant with Tim Howard, his business partner.

28. While complainant routinely invested 70% - 80% of his agreed upon distributions in the investment funds of CCG, Tim Howard directed his distributions in total to be applied to his growing monthly debt

obligations to CCG and to invest the over-flow amount in the investment funds of CCG.

29. This activity by complainant allowed complainant to build a 'family' investment portfolio that together with investment gains has grown to approximately $1.5 million through June 30, 2017. However, after complainant confronted Tim Howard on February 24, 2017, as before he was ecstatic with the success and agreed upon partnership with complainant with regards to the creation, structure, and implementation of CCG and all related companies, Tim Howard's campaign of retaliation against complainant immediately tied to his "unacknowledgement" of these "family" investment accounts owned by complainant and therefore not allowing the liquidation requests to CCA as of June 30, 2017 to be completed. As a result, complainant has not received the re-quested funds which has caused significant concern, harm, hardship, and tremendous damage.

30. Additionally, complainant invested additional distributions in personal loans to clients and prospects of CCG due to the higher degree of associated risks that were repaid to the CCA designated account of complainant on February 28, 2017 and March 30, 2017. However, Tim Howard

refused to allow CCA to release these funds to complainant knowing that he was defense-less to fight this dishonesty in adhering to his agreement with complainant. This also caused substantial harm and damage to complain-ant and his family as the $50,000 + expected in March and early April were designated for thriving expenses and required legal bills. In fact, he would cause extreme harm and damage by contacting

31. Complainant and Tim Howard also had an agreement to continue to pay complainant his weekly pay of $750 during this difficult period for complainant and his family. How-ever, after providing only one payment on March 1st or 2nd to complainant's spouse for $500 and stating, "there will be more provided by the the end of the week + then each week going forward", Tim Howard reneged on this obligation and agreement as well. This amount has now grown to well over $21,000 and has equally caused significant undue harm due to the need of complainant's family for weekly cash flow.

32. It is truly difficult to explain the overwhelm-ing harm these decisions of retaliation, dis-honesty, and deceit by Tim Howard have caused complainant and his family. The attempt to cause

complainant to not have legal counsel has to break all rules.

33. Again, these agreements for funds owed to complainant by CCG which is jointly owned by complainant and TimHoward are well documented and embedded in the daily operation of CCG. It was not until complainant's confrontation with Tim Howard about the dishonesty, deceit, and fraud regarding his position as senior attorney and owner of Howard & Associates P.A. in their representation of CCG's clients and prospects referred to Howard & Associates P.A., Tim Howard's complete disregard of the fiduciary responsibility CCG owed to its investment limited partners which should have been paramount and the utmost most importance to Tim Howard given his role as a member of the Florida Bar Association, and Howard & Associates completely illegal funneling of funds to NCAA collegiate football players for it's own benefit at the significant risk to these players future that Tim Howard planned his strategy to retaliate and use his now complete control of CCG as well as his position as a member of the Florida Bar and a licensed attorney in the state of Florida to severely harm and damage complainant and his family.

34. As if these decisions were not enough to poten-

-tially get Tim Howard's license with the Florida Bar Association revoked or at least temporarily suspended, the frequent check kiting to keep the law firm "afloat" should be sufficient grounds for Tim Howard to proceed in this manner given concern for client funds held in trust (those funds are managed by Ankur Mehta in the Ft. Lauderdale office who is a licensed attorney due to a past criminal record but nonetheless practices law and provides legal advise on a daily basis to clients of Howard & Associates P.A. using Tim Howard's Florida Bar license.). Additionally, Tim Howard and Jaakan Williams (see FL Bar File 2018-60,060) recently proceeded to submit to the Leon County State Attorney's office over 70 pages of information irrelevent to complainant's pending criminal case in an attempt to further harm complainant and his family. This is the 2nd attempt to do so after stealing complainant's personal cell phone from complainant's spouse on March 1, 2017 and offering it to the State Attorney's office in a further attempt to his license to harm complainant.

35. These events are completely unethical as Tim Howard and Jaakan Williams without represented complainant and his spouse on at least 3-4 various legal matters over the last 2 1/2 years.

36. In fact, this information was provided to the Leon County State Attorneys office by Tim Howard and Jaakan Williams only after and with clear knowledge that complainant had filed a very detailed ethics complaint against Jaakan Williams, an attorney employed by Howard & Associates P.A., an additional attempt to retaliate and completely unethical given attorney client priviledge. Does the FL Bar really allow its licensed members to act in this professional capacity?

37. It is abundantly clear that Tim Howard and Jaakan Williams have no concern whatsoever as to their ethical responsibilities as members of the Florida Bar Association. They will stop at nothing to harm their clients, employees, and business partners to advance their own self interest and in the process cause substantial harm, damage, and risk to others in their path. They routinely use their licenses as attorneys in the state of Florida and also allow their licenses to illegally be used by others who are not allowed to gain a license to not only cause this significant harm, damage, and risk but to literally ruin others lives. Their motives are simple, to gain additional legal fees with no concern for the repercussions or harm they are causing.

38. It is interesting to note that even though

complainant has not had in-depth detailed discussions with the NFL regarding his knowledge and concern of the massive fraud being committed by Tim Howard and Howard & Associates P.A. in the NFL concussion settlement player qualification procedures and has therefore certainly not revealed any names, the shear fact that the law firm is under investigation by the NFL should allow the Florida Bar Association to realize that others must be equally concerned and have provided more details and names to the NFL legal authorities. The shear size and magnitude of this alleged fraud, deceit, and lies to the NFL and the clients of Howard & Associates P.A. (over $120 million in fraudulent claims thereby generating over $30 million in fraudulent legal fees) should give the Florida Bar more than sufficient evidence to at least temporarily suspend Tim Howard's Florida Bar license until further clarity can be provided.

39. The same goes for the NCAA investigation as previously mentioned as once again, complainant has not had the opportunity to discuss details due to his temporary incarceration and has only provided a brief response to a voicemail inquiry. As with the NFL, others must be equally concerned about the on-going pattern of fraud, deceit, lies, and dishonesty perpetuated by

PART THREE — CONTINUED                                    page 18

Tim Howard and Howard & Associates P.A. in its practices of law and other related legal business as licensed to do so by the Florida Bar Association.

40. Complainant will also further note to underscore this pattern and involvement of Jaakan Williams, the Florida Bar Ethics Complaint (Inquiry / Complaint Form) filed by William Acuff, a client of CCG, against Phillip T. Howard (Florida Bar 655325) on June 15, 2017 without any involvement by complainant other than confirming Mr. Acuff's records with CCG.

41. And if Tim Howard's retaliation campaign to withhold the ability of CCG to provide the funds legally owed and due to complainant especially during this very difficult period has not caused enough damage, he has also initiated a slanderous, rude and very vicious/belittling/atrocious email campaign to CCG's clients and prospects doing everything he can to berate, belittle, damage, and harm complainant/former business partner, his spouse, and family. He does so even after he produced the same glowing words and support of complainant in 2015 upon the initiation of CCG. Complainant can provide all documentation upon release.

PART THREE — CONTINUED                                    page 19

42. In addition to this "elementary" fact of retaliation and completely unethical behavior, Tim Howard also used his Florida Bar License to illegally gain access to complainant and his spouse's personal storage unit at Cubesmart in Panama City Beach in April 2017 to illegally gain possession of a 2011 Mercedes Benz S550 (valued at approximately $35,000). It is deemed an illegal seizure of the vehicle and completely beyond any ethical standards because Tim Howard was well aware that ownership of the vehicle is subject to a much larger business dispute caused solely by his retaliation. Furthermore, Tim Howard knew this not only from complainant who has written documentation to prove ownership agreement between complainant and his business partner but also because he also initially knew that the proper procedure would be to go to law enforcement which he did by attempting to file a theft report with Tallahassee Police Dept. Officer #509, Susan Burton. However, he was informed that this was NOT a theft but a civil matter that would require a court order. Officer Burton informed him of this fact. Therefore, according to Cubesmart officials, Tim Howard used his Florida Bar License to lead them to believe that he had obtained proper authorization and documentation to gain access to complainant and his spouse's personal storage unit to illegally seize the 2011 Mercedes S550 from complainant.

* Vehicle was purchased with complainant's distributions from CCG and was titled and registered to complainant.

PART THREE — CONTINUED                                    page 20

Complainant requests the assistance of the FL Bar in the return of this vehicle to complainant until a court decides.

43. To add further harm, damage, and pain to complainant, his spouse, and his family and children, Tim Howard also stole numerous personal items from complainant, his spouse, and his children that were stored in the vehicle that he illegally seized. Complainant and his spouse have tried multiple times to retrieve these items which while they have been acknowledged by Tim Howard and Jaakan Williams to be in their possession and while some have been returned, a vast majority have not as again, they use their prestigious license with the FL Bar as if to say "screw you". . . sue us.

44. In fact, Tim Howard and Jaakan Williams used some of these items to "coax" complainant's spouse to their office as a requirement to retrieve some of the acknowledged stolen property, but also to have someone illegally pose as a certified process server to serve complainant's spouse with a harassment lawsuit. Once again, this was accomplished because Tim Howard and Jaakan Williams have a Florida Bar License further proving their use of this prestigious responsibility to further their own personal agenda while also harming, damaging, and causing severe pain to others including their clients. (Leon County Case #2017-CA-000888)

45. Below is a list of the items that remain stolen and in the possession of Tim Howard or others at

* Previously mentioned at the end of paragraph 35.

PART THREE — CONTINUED                                    page 21

at Howard & Associates. Perhaps complainant can obtain assistance in having these items immediately returned by the FL Bar.

In addition to the 2011 Mercedes Benz S550:

|  | Replacement Value |
|---|---|
| 3 Italian Glass Sculptures | $7,200 |
| 3 Designer Blankets Sculptures were stored in Computer Backpack | $180 |
|  | $60 |
| 2 Samsung Tablets * | $360 |
| 4th generation iPad | $300 |
| Apple iPhone S | $400 |
| Apple Watch | $300 |
| 2 Fitbits | $170 |
| Apple Ear Buds for iPhone 6 plus | $45 |
| Sony Headphones | $280 |
| 2 Children's Sony Headphones | $120 |
| Beats Wireless Headphones | $360 |
|  | $9,775 |

All items were in computer Backpack

* Complainant has confirmed that these items have been used since stolen at the office address of Tim Howard, ie. 2120 Killarney Way, Tallahassee, Fla. 32309.

46. Tim Howard also refuses to release complainant's office furniture that he left in good faith

PART THREE — CONTINUED                                    page 22

at his office at Cambridge Capital Group since the well planned and prepared structure during complainant's absence as agreed upon by complainant and his business partner was the intermittent use of his office by Gail Milon who was hired by complainant and Tim Howard to asst. complainant in the operation of CCG while focusing her efforts on furthering complainant's vision of Cambridge Capital Group Wealth Advisors LLC. However, as previously detailed, Tim Howard abruptly changed this plan to inact his vicious and vindictive personal retaliation against complainant and his spouse and family.

47. While Tim Howard apparently believes the office furniture in question is subject to the business dispute between he and complainant due to its purchase date in mid 2015 from Badcock Furniture and while complainant feels certain he will prevail in proving his ownership, there are certain items that are NOT in any way subject to the business dispute as complainant purchased them between 1999 and 2009 well before CCG was created in 2015 and not purchased from Badcock Furniture.

48. As with the previously detailed stolen items, these items are also now considered stolen property and perhaps complainant can obtain

PART THREE — CONTINUED                                    page 23

assistance in having these items immediately returned to complainant. Again, this retaliation, that has caused significant harm, damage, and pain to complainant, his spouse, and family first is not only uncalled for, elementary, and childish but also completely unethical given then Tim Howard truly believes he can proceed in this manner due to his Florida Bar License.

49. Below is a list of these personal office items:

* 2 leather club chairs purchased at Rooms To Go in Atlanta, GA in 2009. In fact, 4 were originally purchased and complainant has possession of the other two at his residence. Furthermore, Tim Howard's son assisted complainant in retrieving the 2 that were moved to his CCG office from complainant's storage center in mid 2015.      Replacement Value $500

* 1 desk globe. Jazkan Williams has acknowledged possession of this item purchased by complainant in 1999 but would not return it to complainant's spouse      Replacement Value $160

* Desk lamp, iPad, desktop iPad w/ wireless speaker, Vizio TV w/ cables, H.P. printer (1 lap) purchased from 1999 to 2009 and Williams acknowledged possession as above. $650.

* 1 folder of personal letters from mother . $PRICELESS

PART THREE — CONTINUED                                    page 24

50. Clearly this "elementary" activity is far below the expected ethical standards as required by the members by the Florida Bar Association. These dual campaigns are even more alarming given that complainant has also been represented by Tim Howard, Jazkan Williams, and Howard & Associates P. A.

51. Again, due to the patterns of fraud, deceit, dishonesty, and complete disregard of harm and disinterest in the harm, damage, and sever risk he is causing his clients, employees, and other business associates by using his Florida Bar Association license to practice law in the state of Florida, complainant prays and begs that the Florida Bar at a minimum temporarily suspend the license of Phillip T. Howard (FL Bar 655325) until further clarity can be gleaned from these egregious acts of unethical professional behavior as well as assist complainant in the recovery of his stolen property and the substantial amount of funds due.

PART FOUR (Witnesses): The witnesses in support of my allegations are:

1. Ankur Mehta
2. Tom Woods
3. Gail Milon

PART FOUR — CONTINUED                                    page 25

4. Lois Koons
5. Addys Walker
6. Jazkan Williams
7. Katherine Reinhard
8. Brenda Murphy
9. William Acuff
10. Harrison Smith
11. ...

11. Linda Bedell
12. Dr. Williams
13. Dr. Ford Johnson
14. Nueropsychologist in San Diego, Calif
15. Dr. Louis Kobarda
16. Various retired NFL Players (names withheld due to current representation by Tim Howard and Howard & ... Associates)

PART FIVE (Signature): Under penalties of perjury, I declare that the foregoing facts are true, correct and complete.

Don Reinhard
Print Name

_____
Signature

October 16, 2017
Date

Exhibit B

**NFL Settlement Fraud Initial Details:**

-Involves representation of hundreds of players with potential damages to the NFL of fraudulent claims of over $110 million.

**A. Psychological Testing**

- The fraud starts from the beginning of the eligibility process as the required psychological testing is performed by a medical doctor who had his medical license revoked in early 2016 and this fact is hidden on the testing documents as his name has been removed.

-After the psychological testing is completed, the unlicensed doctor alters the test answers due to his intimate knowledge of the scoring of the test results to ensure that the players meet the settlements psychological testing criteria to qualify for a financial claim prior to sending the test to the neuropsychologist. This altering process sometimes takes up to 4-6 weeks due to the magnitude of the players tested. The result is qualification of over 90% of the players tested.

-The process began after the initial testing without altering the answers was producing a qualification percentage of 30%. The senior attorney mandated that the presentation of test results be stopped until the scores could be altered to ensure qualification. Some of the initial test results were then altered and represented to the neuropsychologist for rescoring with a fraudulent explanation to the neuropsychologist but she refused to reevaluate the scores. The others were not represented as the tests were completed in pencil from this point forward all testing scores were recorded in pencil so the scores could be properly altered.

-This initial group only included about 10 players and soon after it was realized that the neuropsychologist would not perform a reevaluation and scoring of the tests, a new neuropsychologist was hired that was much more cooperative for all future test scoring and evaluation.

**B. Neuropsychologist Scoring and Evaluation**

-If the new neuropsychologist returns an evaluation and report that shows testing scores are near the criteria required to be qualified as a 2.0 then the test scores are further altered and a new evaluation and report is produced to qualify the player at the level of 2.0

-If the new neuropsychologist returns an evaluation and report that shows testing scores meet the criteria required to be qualified as a 2.0 but the completed CDR does not qualify the player as a 2.0 then the completed CDR is altered to qualify the player as a 2.0 and a new evaluation and report is produced by the neuropsychologist to qualify the player as a 2.0. There has been instances when this process has been done after the file has already gone to the Board Certified ~~Neuropsychologist~~ and the Neurologist would not agree without an explanation from the neuropsychologist so a letter with a fraudulent excuse is produced from the neuropsychologist. [Neurologist]

**C. Clinical Dementia Rating (CDR) and Affidavits**

-The details of all CDRs are almost identical as is the information provided for the affidavits.

-CDRs are routinely altered to allow a player to qualify as a 2.0 if the testing scores support the qualification.

-Most all affidavits (probably 80%-90%) are notarized by the "in house" notary who has no knowledge of the affiants. It's basically a rubber stamp process.

**D. Board Certified Neurologist (BCN)**

-To my knowledge, the BCN is not involved in this organized fraudulent scheme but much of the data used to complete the final report has been altered to substantially effect the final report.

-Most, if not all, players are instructed to lie to the BCN about their employment or ability to work. When they do not or the BCN detects a lie, the language of the final report is altered by the senior attorney to insure the player qualifies.

-When needed to take advantage of the age "cutoff" of receiving a qualified diagnosis, the final report date is altered by the senior attorney, which frequently requires the testing date to be altered.

-When the BCN refuses to change a player's qualification from 1.5 to 2.0 as the change in testing scores and/or CDR is altered after the file has gone to the BCN and evaluated, the senior attorney alters the language and makes the designated change on the final report.

-When the BCN refuses to sign the final report for a variety of reasons, frequently because the file is incomplete or there are discrepancies, the senior

attorney has copied the BCNs signature from another player's final report, cut the signature "block out, taped the signature block to the un-signed report, and re-copied the now signed report.

-The senior attorney is currently in the process of qualifying the BCN for the MAP (I believe this is the correct name) program to allow the BCN to continue qualifying players after the settlement effective date of January 6, 2017. However, to do so I understand that the BCN cannot have previously evaluated and qualified any players prior to their approval under the MAP requirements. Since the BCN has been evaluating and qualifying players since 2016, the senior attorney is changing all of the completed final report dates to a date after the MAP approval is effective.



RECEIVED
NOV 21 2017
The Florida Bar
Tallahassee, Florida

Mr. Don Reinhard
100 Cabana Cay Cir.
Unit 222
Panama City, FL

THE FLORIDA BAR
651 East Jefferson Street
Tallahassee, FL 32399-2300

Visit our website: www.FloridaBar.org



**The Florida Bar**

651 East Jefferson Street
Tallahassee, FL 33399-2300
(850) 561-5600
www.floridabar.org

John F. Harkness, Jr.
Executive Director

Joshua E. Doyle
Executive Director Designate

November 15, 2017

Mr. Don Reinhard
100 Cabana Cay Cir,
Unit 222
Panama City Beach, FL 32413

Re:    Mr. Phillip Timothy Howard; RFA No. 18-4428

Dear Mr. Reinhard:

The Supreme Court of Florida has adopted rules that require the allegations be signed and under oath. In order to comply with this rule you must sign the oath below and return it to us by November 27, 2017 before we can proceed with an investigation.

Under penalty of perjury, I declare that the facts contained in the inquiry submitted to The Florida Bar concerning Mr. Howard are true, correct and complete.

_____
Mr. Don Reinhard                               Date

If you do not complete and return the oath form to us, we may be unable to proceed with the investigation. A copy of the rule imposing this obligation (3-7.3(c)) may be found on the Bar's web site at www.floridabar.org.

Also, if you have documents that you feel support your allegations, please provide copies of them when you return the oath. Your response must not exceed 25 pages.

Thank you for your cooperation.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

---

**IMPORTANT NOTICE FOR COMPLAINANTS AND RESPONDENT-ATTORNEYS**

**MAILING INSTRUCTIONS**

Materials Received That Do Not Comply With These Instructions May Be Returned Or Not Otherwise Incorporated Into The File

The Florida Bar converts its disciplinary files to electronic media. All submissions are scanned into an electronic record and hard copies are discarded. To help ensure the timely processing of inquiries/complaints, responses and rebuttals, please review the following instructions prior to providing your submission.

1. Please limit your submission to no more than 25 pages including exhibits. If you have additional documents or material available, please make reference to those documents and/or materials in your written submission as available upon request. Should The Florida Bar need to obtain copies of any such documents and/or materials, a subsequent request will be sent to you.

2. Please do not kind, staple, tab or index your documents. You may underline but do not highlight documents under any circumstances. Please do not submit materials in color. When documents are scanned in our disciplinary files, highlighting and color will obscure the underlying text.

3. Please do not attach media such as audio tapes, thumb/flash drives, CDs, or photographs. We cannot process any media which cannot be scanned into the electronic record.

4. Please do not submit your original documents. All documents will be discarded after scanning and we will not be able to return any originals submitted to our office. The only original documents that should be provided to our office are the inquiry/complaint form, response and certificate of disclosure.

5. Whether you are a complainant or a respondent-attorney, please do not submit confidential or privileged information. Documents submitted to our office become public record. (Respondent-attorneys may wish to consult Rule 4-1.6 (c) of the Rules Regulating The Florida Bar.) Confidential/privileged information should be redacted. Such information includes, but is not limited to, bank account numbers, social security numbers, credit card account numbers, medical records, dependency matters, termination of parental rights, guardian ad litem records, child abuse records, adoption records, documents containing names of minor children, original birth and death certificates, biometric data such as fingerprints, Baker Act records, grand jury records, and juvenile delinquency records. If information of this nature is important to your submission, please describe the nature of the information and indicate that it is available upon request. Bar counsel will contact you to make appropriate arrangements for the protection of any such information (to the extent permitted by law) as part of the investigation of the complaint.

6. Please provide your submission only one time. Do not submit duplicates via email, facsimile transmission or by any other means. Do not include these instructions. Respondent-attorneys do not need to include a copy of the complaint.

Please be aware that materials received that do not meet these instructions may be returned or not otherwise incorporated into the file. Thank you for your consideration in this respect.

---



**The Florida Bar**

651 East Jefferson Street
Tallahassee, FL 33399-2300
(850) 561-5600
www.floridabar.org

John F. Harkness, Jr.
Executive Director

Joshua E. Doyle
Executive Director Designate

November 27, 2017

Mr. Don Reinhard
7104 Harvest Ridge Lane
Alpharetta, GA 30022

Re:    Mr. Phillip Timothy Howard; RFA No.: 18-4428

Dear Mr. Reinhard:

Enclosed you will find a copy of correspondence which was returned as a result of address issues. Please sign same if it is your intent to file a complaint against the above referenced attorney.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

---

Received    Mon 11/20/2017 8:28AM

From        Don Reinhard

Subject     Florida Bar Ethics Complaint against Philip Timothy Howard and Jaskan Williams

To          Hughes, Charlie B

cc

bcc

On or about 11/4 I emailed you a hand-written Florida Bar Ethics complaint against Philip Timothy Howard (Florida Bar # 655325). I apologize for it being hand-written and not filed online as I believe you are aware that I am currently incarcerated in the Leon County Jail.

Please confirm that the complaint has been filed and what is the process going forward?

Additionally, with this filing was a cover letter requesting a copy of my ethics complaint against Jaskan Williams, an attorney employed by Tim Howard, to be either sent to me via email, to my dad at barhreinhard@bellsouth.net who is on record with the Florida Bar as my authorized contact or regular mail. I requested this so I can complete my rebuttal to Mr. Williams response. Unfortunately, I do not have the ability to make copies and need one to properly prepare a rebuttal. To date, I have received neither.

Please provide an update on receiving this copy and it would be more convenient to me if you emailed it to me directly at this email.

Thank you,
Don Reinhard

Please note: Florida has very broad public records laws. Many written communications to or from The Florida Bar regarding Bar business may be considered public records, which must be made available to anyone upon request. Your e-mail communications may therefore be subject to public disclosure.

| | |
|---|---|
| Received | Fri 12/08/2017 8:56PM |
| From | Don Reinhard |
| Subject | Re: Bar Complaint |
| To | Hughes, Charles E |
| cc | |
| bcc | |

Mr. Hughes,

Today, I finally received a response from my complaint against Jeakan Williams (Florida Bar File #: 2018-00,060(7a)) that I requested over 3 weeks ago that was apparently sent to my old address even though I had previously requested that all documents be sent to 7104 Harvest Ridge Lane, Alpharetta, Georgia 30022. This information was not sent from the Florida Bar until 11/27. I will now be able to prepare my rebuttal and will mail it to you by 12/11 via my father so he can make me a copy. Again, thank you for understanding the difficult [resistance? - inaudible] I am dealing with.

I also received today the "oath" that needs to be signed to proceed with my complaint against Philip Timothy Howard (RFA No. 18-4428) that was originally mailed on 11/15 to my old address and resent by the Florida Bar on 11/27. I will mail the signed oath back to you by 12/7.

Don

Please note: Florida has very broad public records laws. Many written communications to or from The Florida Bar regarding Bar business may be considered public records, which must be made available to anyone upon request. Your e-mail communications may therefore be subject to public disclosure.

# EXHIBIT G

## SPECIAL MASTERS' RULE 18 DECISION ON
## REPORT OF ADVERSE FINDING REGARDING
## HOWARD & ASSOCIATES AND RELATED PARTIES

## I. INTRODUCTION.

Pursuant to Section 10.3 of the Settlement Agreement and Rule 7(b) of the Rules Governing Audit of Claims (the "Audit Rules"), the Claims Administrator audited Howard & Associates and placed in audit certain claims that are related, in some way, to current or former representation by Howard & Associates. After intensive investigation, the Claims Administrator concluded that Howard, and related parties, have "overwhelmingly" misrepresented, omitted, or concealed material facts in connection with certain Claim Packages. Accordingly, the Claims Administrator referred this Audit to the Special Masters for review and findings pursuant to Section 10.3(i) of the Settlement Agreement. The Special Masters have reviewed the full Record of the Audit Proceeding and issue this decision.

## II. REVIEW OF FACTS.

Howard & Associates initially registered 223 Settlement Class Members. In the Spring of 2018, more than 170 of these SCMs moved from Howard & Associates to Shenaq PC. That representation continued into October of 2020, when Shenaq discontinued its representation of the 170 SCMs who returned to Howard & Associates. The firm currently represents 216 Settlement Class Members.

In March of 2017, the Claims Administrator initiated an audit against Howard & Associates after receiving a tip from an anonymous informant; they submitted to the Special Masters an Interim Investigation Report ("Interim Report") in August of that year. This led to continued investigation until July of 2018. When no claims were submitted by Howard & Associates, the investigation was suspended. It resumed in June of 2019 when SCMs submitted medical records from time periods when they were clients of Howard & Associates. This investigation continued until December of 2020 with the publication of the Claims Administrator's Rule 15 Report.

That Report concludes that:

Howard & Associates altered and/or drafted documents on behalf of their clients and Class Members;

- Howard & Associates directed the actions of medical providers, including Qualified MAF Physicians and BAP Providers;
- Howard & Associates presented inflated costs for reimbursement in a lien dispute before the Court;
- Several physicians were influenced by and/or followed the directions of Howard & Associates;
- Some associates and others employed by Howard & Associates were involved in these activities.

The full outline of these facts is contained in detail in the Rule 15 Report and its 600+ pages of exhibits, including emails from Howard & Associates submitted in the lien dispute before the Court and other documents the Claims Administrator obtained. The Special Masters have reviewed this material in depth and refer to the Report for a full outline of the facts presented.

1

## III. CONCLUSION AND REMEDIES.

Upon thorough review, the Special Masters agree with the Claims Administrator that there is compelling evidence indicating that Howard & Associates and related parties manipulated the medical examination process and medical records in ways that had the potential to affect whether Settlement Class Members qualify for a Monetary Award.

Accordingly, and pursuant to Section 10.3 of the Settlement Agreement and Audit Rule 18, the Special Masters accept the referral of Howard & Associates and all related parties for further proceedings under Title IV of Rules Governing Audit of Claims, and direct the following:

A. That these proceedings be expedited to the fullest extent possible;
B. That the ongoing proceedings cover, as noted, Howard & Associates and all related parties, including: Timothy Howard and Howard & Associates employees, former and current, including Neil Epstein, Don Reinhard, Ankur Mehta, Linda Bedell, Addys Walker, Brenda Murphy, Erin Murphy, Duante Smith, Chelsea Cook, Kyla DeRobbio, Addernika Walker, Harrison Smith, Jaakan Williams, Orentheal Williams, Zane Herman, Luis Achata, Arian Hernandez, and Cortney Hicks; Healthcare Providers Jaroslaw Koberda, Edwardo Williams, Sammantha Barker, Laura Hopper, Lawanda Ford-Johnson, Christine Lloyd, Elizabeth Morgan, Ahmed Sadek, and Tara Velez;
C. That the Claims Administrator immediately provide a summary report to the Court on the details of fees and expenses submitted by Howard & Associates in the lien actions between Howard & Associates and Shenaq PC;
D. That, given the significant issues raised in this Audit, the Claims Administrator immediately place all pending claims, not yet processed or paid, by any Settlement Class Member now or ever represented by Howard & Associates into Audit.

Jenn M Verres

Special Master

David Hoffman, Special Master

Date: January 22, 2021

Date: January 22, 2021