INDEX OF EVIDENCE

EXHIBIT A          Quality Standards for Investigations

EXHIBIT B          FBI Investigative Guidelines

EXHIBIT C          Wisdom Report (█████████████) - Veracity of Sharon
                   Delaney

EXHIBIT D          Affidavit of Sharon Delaney

EXHIBIT E          Tipster Inmate Coordination with SCM Corey █████ Joe ██████
                   et.al., for Extortion

EXHIBIT F          Tipster Inmate Attempt at Extortion Through the Florida Bar

EXHIBIT G          Special Masters' Failure to Address Bias in Investigation

EXHIBIT H          Affidavit of Respondent

EXHIBIT I          Federal Order of Disgorgement for Tipster's Illegal Taking
                   Approximately $500,000

EXHIBIT J          SCM Corey ████████ Attempt at Extortion Coordinated with
                   Tipster

EXHIBIT K          Verified Perjured, Fraudulent, False and Extortionate Florida
                   Bar Complaints, and Extortion Attempts Against Respondent;
                   Respondent's Verified and Undisputed History, Activities, and
                   Motivations

# EXHIBIT H

# UNITED STATES DISTRICT COURT
## FOR THE EASTER DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | MDL No. 2323 |
| LITIGATION | |

## RESPONSE TO CLAIMS ADMINISTRATOR'S RULE 15 AUDIT REPORT

### AFFIDAVIT OF PHILLIP TIMOTHY HOWARD

BEFORE ME, the undersigned authority, pursuant to 28 U.S.C. § 1746, based upon his personal knowledge, information, and belief, this day personally appeared Phillip Timothy Howard, who, being first duly sworn, deposes and testifies under penalty of perjury as follows:

1.    My name is Phillip Timothy Howard.  I am over 18 years of age and am competent for all legal purposes.

2.    Attached as Exhibit A is my resume in support of this affidavit.

3.    I make this Affidavit based upon my own personal knowledge in involvement in the subject matter.

4.    I have thirty years of experience as an attorney and educator, and prior to this effort at applying faculty skills and experience in reliance on the experienced, and at the time trusted, consultant, as I had no experience in the investment and finance industry.

5.    Starting in the Spring of 2014, I assisted Mr. Don Reinhard ("Consultant") who was a football teammate in high school (one of only 4 of us that played varsity from a freshman to a senior for a brand-new high school that was a state ranked team), in

compassionate rehabilitation to teach an online course in finance and business, as I understood he had an MBA and a deep and humbling experience in finance and investing.

6.    In late 2015, I worked with faculty and staff at Cambridge Graduate University International ("CGUI") to create a Global Investment Advisory Team ("GIAT") with Mr. Reinhard as a consultant in advising compliance with SEC rules and regulations, since he knew both the industry and the importance of compliance.

7.    I am a plaintiff trial attorney and a professor in law, policy and society. Those are my areas of expertise. The university I established and the areas I am knowledgeable cover Global Studies, leadership, critical thinking, philosophy, methods, law, policy, sociology and society. I had no experience in investing and finance and was pursuing this project as a humanitarian and educational effort to gain experience and application of skills for and with faculty as part of the "praxis" education model of CGUI.

8.    Under the guidance and structure of the consultant, the consultant created the Cambridge corporate entities ("Cambridge"), as well as Private Offering Memorandum and related documents from his prior companies and prior legal counsel. Not having any experience in the field, my sole substantive input was my biography.

9.    Cambridge corporate entities were created as an applied skill and learning vehicle for CGUI in consultation with the GIAT made of faculty and administrators, and promptings of the consultant who had over 20 years of experience in the finance industry. Out of compassion, seeing the good in people, the chance at rehabilitation and the opportunity for growth, I went forward with the project.

10.     From March 5, 2015 to March 7, 2017, I acted as President, with Mark Hallim (then VP of CGUI) as Vice President and Ankur Mehta (assisting CGUI and paralegal with law firm) as Treasurer during the same time frame. Don Warner Reinhard was consultant form March 5, 2015 to February 12, 2017. I have not been an officer since March 7, 2017, and Gail Milon has been sole member since May 3, 2018.

11.     The Cambridge entities had no outside investors until mid to late December of 2015 and was actively managed by the Consultant for approximately 12 months in 2016.

12.     From March 5, 2015 through March 7, 2017, I had an ownership interest as President of Cambridge entities. Since that date, I have been assisting Cambridge entities in any way I can and continued to provide funds for Cambridge to ensure the success of the fund for investors.

13.     I have placed a net of approximately $1.6 million in Cambridge.

14.     I have provided an additional up to $3.6 million in cash, staff and legal resources from early 2018 through to April of 2020, to assist Cambridge for the success of the fund and investors.

15.     The lending and investment decisions, including options trading, were solely from the skill and responsibility of the consultant who was to take feedback and oversight from the GIAT, as I had no experience or expertise in that industry.

16.     Cambridge has the details on each investment by the consultant. In general, during the short 12 months of activity, there were small business loans, NFL advances, tobacco litigation advances, litigation travel advances, litigation medical testing advances,

options trading, mortgages, technology start-up, as well as loans to pay taxes, child support obligations, and subsistence housing for NFL advance clients.

17.     I supported Cambridge and based on what I was informed by the consultant and quarterly performance reports, the investments were sound and very profitable. I did accept the information provided as I had no information that the information was not accurate, and the consultant made the recommendations to any investor to invest in Cambridge.

18.     The consultant was hired at $3,000 per month to manage the fund until a full-time experienced and licensed agent could be found and hired, which was the plan from the start of Cambridge and individuals were sought and interviewed through the later part of 2016, with Gail Milon being hired in late December of 2016.

19.     The $3,000 per month as the sole income for the consultant is verified by two financial affidavits expressly filed during the operative time-frame, in both January and December of 2016 in the case of *McClellan v. Reinhard*, Case No. 2012-DR-819 (Fla. 2nd Cir), as well as correspondence to the attorney representing McCelellan concerning the same issue.

20.     Through family, friends, workers, and the GIAT network, the consultant sought out investors and marketed and sold the fund, including drafting, finalizing, explaining and providing the Public Offering Memorandum.

21.     Based on the returns that I was informed of, I did recommend that my son Christopher Gunnar Howard and mother-in-law Lois Koons invest into Cambridge.  I would have shared the consultant-reported success of Cambridge with third-parties, and if

4

they were interested, would have referred them to the consultant for exploration of Cambridge or any investment.

22.     During the short 12 months of activity in 2016, I was sporadically in the office and in trial, discovery, hearings, travel or on university assignments. During a 2-1/2-month tobacco trial in Jacksonville from early May through to mid-July of 2016, the GIAT oversight was abandoned by Don Reinhard. Being fully absorbed in pre-trial, post-trial and its 18-hour days, I was not aware of nor focused on that activity at that time.

23.     I am sure I shared information with individuals on what I was provided by Don Reinhard on the good returns that the funds had under Don Reinhard's management and guidance, that I was invested in the funds, and that they could get the details from Don Reinhard.

24.     I would have referred anyone interested in investing to the consultant since I was not experienced in finance and investing and did not know the SEC requirements.

25.     The consultant also drafted and provided the Cambridge fund updates. I was not involved with informing investors on their investments nor returns as I did not direct those activities, nor have the financial industry experience and background.

26.     Potential individuals that participated in soliciting family and friends to invest in Cambridge funds, would include Linda Bedell, Addys Walker, Tom Woods, Harrison Smith, GIAT members, Don Reinhard, Brenda Murphy, Suliemon Holmon, Wally Williams, Kay Eubanks, Elton Patterson, Dave Thomas, Toby Jenkins, Jeff Kahn, Gail Milon. It is unknown precisely when and whom they would have spoken to for investing, if anyone.

27.    All participants, including myself, required the consultant to inform anyone potentially involved with Cambridge, with what he had informed us of, namely, his criminal conviction for tax deductions and provide an affidavit from his criminal defense counsel describing his history, his successful FINRA action prosecuted by now deceased William C. Owens, and SEC sanctions, so that all were fully informed of his past.

28.    This disclosed Mr. Don Reinhard's plea of tax evasion and his sentence, as well as his SEC sanction. I instructed Mr. Don Reinhard to provide this information to anyone that is considering participation with Cambridge entities, and all indications are that he did so.

29.    Mr. Don Reinhard drafted the Private Offering Memorandum based on his prior companies, as he knew what was required by SEC regulations. He informed the GIAT and myself that he provided this to any and all investors.

30.    I was not an investment advisor, nor familiar with SEC requirements, as I was not trained nor licensed in this field. The consultant was to meet and qualify the investors and was the temporary and interim investment advisor.

31.    Other than providing a bio that was incorporated into the Private Offering Memorandum, I did not draft, edit, have the knowledge to approve, nor provide the Private Offering Memorandum to any party. I was never aware of the significance of the Private Offering Memorandum.

32.    The intent and goal of the investment companies was to hire an experienced and licensed broker and that Mr. Don Rienhard was an interim consultant to assist the fund in getting off the ground.

33.    Prior to the consultant's departure, I was not aware of any improper action of Mr. Don Reinhard.

34.    After his departure for matters not involving Cambridge, the consultant began a one-year extortion campaign against me, the employees of the firm, family members and more, threatening with and in fact, going to NFL Class Counsel, SEC, Florida Bar, NCAA, experts, lender, family members, law firm clients, Cambridge clients, and more, in an effort to claim and extort over $1 million from Cambridge.

35.    Other than having to address the Florida Bar Complaint by Mr. Reinhard, I did not respond to these threats in order to let law enforcement properly investigate this matter.

36.    I did provide the imprisoned consultant's extortionate emails and letters to law enforcement, the Florida Bar, the SEC, and to NFL Concussion Settlement class counsel.

37.    After his departure, it was found that Mr. Reinhard had impersonated me in either creating or operating on the accounts in activities that I would not have approved, a TD Ameritrade Account, Millennium Trust Account, 401K Transfer documents, checking accounts, and more.

38.    I had never been on nor established these accounts. In fact, he impersonated me and my name on all TD Ameritrade, Millennium, and 401K emails and contracts as I have never had communications on these subjects or with these companies.

7

39.     All of Mr. Reinhard's emails came from

info@cambridgecapitalgroup.holdings, and this was his sole email when operating as an

advisor with Cambridge. I never used this email nor am I an originator of such emails.

40.     Mr. Reinhard was the person who in the Spring and Summer of 2017, guided

and prompted the initial Dexter ▆▆▆ to reach out to Mr. Seeger, Class Counsel for NFL

Concussion Settlement, and NFL counsel, and has spread slanderous misrepresentations,

creating a fire from his own corruption that he projected on others, such as I.

41.     Since his departure, Mr. Reinhard has also been guiding and communicating

with the second Joe ▆▆▆ and Corey ▆▆▆ and with other investors and/or lenders.

42.     Mr. Reinhard tried to establish his own investment fund from prison and has

been communicating directly with both Settlement Class Members and many of the other

complainants in order to advance this extortionate scheme

43.     Most clients of my law firm and Cambridge were not persuaded, despite

investigators and bottom feeder legal opportunists being influenced by Mr. Reinhard.

44.     Some clients of Cambridge saw this as an opportunity to perpetrate a taking

from Cambridge by raising the specter of Mr. Reinhard's narrative to void their paying

back loans of over $1.4 million plus interest by Dexter ▆▆▆ (approximately $130,000

plus interest for 4 years, having received over $1 million from the NFL Concussion

Settlement in 2018), Corey ▆▆▆ ($648,000 plus interest for 4 years, with a consultant

orchestrated illegal wash through of his 401K funds to avoid taxes, and his wife ▆▆▆

▆▆▆ fraudulently claim that she is owed $75,000 when she was paid her funds back on a

monthly and large lump sum basis, plus interest for a total of approximately $88,280 ) and

Joe Horne (over $600,000 plus interest for 4 years, with a consultant orchestrated illegal wash through of his 401K funds to avoid taxes).

45.     My ownership of the Cambridge was transferred with an effective date of March 3, 2017. Ms. Gail Milon took over oversight and organization of Cambridge along with Mr. Addys Walker, for several months, who was trusted at the time.

46.     Mr. Addys Walker was assigned ownership and management of Cambridge for several months in 2017 due to his experience in raising capital and investigative background, and his participation with Jeff Kahn, who also has experience in raising capital on Wall Street. No background check was done on Mr. Walker, who was later found to have extensive criminal charges and later found to be engaging in a confidence game with Cambridge and through lies and misrepresentations, after receiving over $1.2 million, ultimately stole over $293,000 from myself, and a 2010 Mercedes from Cambridge.

47.     When Cambridge has stable income and liquidity, after taking care of all other creditors and investors, and it is convenient for Cambridge to liquidate my interests in Cambridge, I will withdraw all funds provided into Cambridge and fully divest any residual ownership. I took the steps to do this in 2017 in order to avoid any conflicts of interest that may exist, despite conflict of interest waivers provided to and signed by any potential conflict. I am unable to perfect a full divestment until Cambridge takes care of the more immediate needs of creditors, liquidity, and other investors. I will be last on the list in the order of those whose needs are to be addressed.

48.     I continued to assist in the transition to do my best to ensure Cambridge fulfilled its responsibilities, and I still am.

49.     I am not on any active corporate document or bank account nor is anyone that is directly or indirectly related to me.

50.     The intent was always to remove my name and anyone that is directly or indirectly related to me once I sought and received clarity on potential conflicts despite the signed waivers of conflicts.  The Cambridge Companies have gradually removed me and anyone directly or indirectly related to me from any and all corporate documents.

51.     Upon assuming the responsibilities of Mr. Don Reinhard, the previous consultant, Ms. Gail Milon was immediately hit with challenges.  Upon his termination a lot of documentation/property of Cambridge Capital was missing.  The documentation was requested on several occasions with no success.

52.     The previous consultant operations/processes were manual and an indecipherable jumble.  Ms. Milon had to bring herself up to speed regarding the overall operation.

53.     Ms. Milon requested an independent audit and accounting.  She determined that she cannot provide accurate information to investors until she is reassured all dollars are accounted for as well as confirm the accuracy of the returns initially provided. The audit required an accountant to automate the books and records.  Though preliminary work was done in 2017 and 2018, due to lack of readily available records, this was not completed until February of 2019.

54.     The accounting and audit of Cambridge entities ultimately showed that there were no outstanding loans, no outstanding mortgages owed by myself, and no fees, and no distributions received by myself.  The accounting and audit showed a "net" of

nearly $1 million with any loan or mortgage are paid off at the maximum legal interest rate of 18%.

55.     The Cambridge offices were not in the same office suite as the law firm. There were errors on the suite number listed by Cambridge. The offices were in distinct sides of the building.  The law offices now are at 1415 E. Piedmont Drive, Suite 5, Tallahassee, FL 32308, and Cambridge entities are not at these locations.

56.     I am aware that the consultant would change his signature block to be singular, or add myself, Mr. Tom Woods and Mr. Harrison Smith to his signature block, as he determined.  These emails were not from the other parties, only the consultant, as he was the only party using info@cambridgecapitalgroup.holdings.

57.     I completed ethics conflicts research in October of 2015, prior to any outside investors, and instructed the consultant to provide this information and notice to anyone looking to be involved with Cambridge Entities.

58.     To make sure that the ethics standards previously researched still applied when clients received loans or invested, I independently sought guidance from The Florida Bar in August of 2017 seeking the opinion of the Florida Bar with regards to having an interest in Cambridge, distinct from ownership.  The Florida Bar recommended that I take steps to end my interests in Cambridge.

59.     I have taken all prudent and appropriate steps to assign interests to Cambridge, pending completion of the audit and accounting, and informed relevant clients of the law firm of the same. I am not on any bank account, nor on any corporate papers.

60.     Ms. Koons was on two companies prior to the August 2017 guidance I received from the Florida Bar. She has had no management or participation with the companies in any fashion at any time, and I am informed that she was removed at the corporate renewal period.

61.     I had no interaction with Millennium Trust and if my name is mentioned it is because the consultant was improperly using my name. The consultant had all interactions concerning 401K and investments, and the emails between the parties confirm the same. My signature was forged on almost all 401K transfer documents.

62.     Similarly, I had no involvement with nor, at the relevant time, did I even know what an ADV is. I have never filed an ADV at any time and wouldn't know where, how or why to file one to this day.

63.     The consultant regularly improperly used my name to take actions that I was not involved with, managing nor experienced in, and would not have approved if I was fully informed. I am aware that I have been removed from all Millennium authorizations and that Gail Milon is the authorized contact.

64.     I also sent correspondence to the retired NFL players informing them that advances are expensive and were not recommended. This is despite their being both legal and permitted by ethics and Florida law, if there is a significant need by the party. It wasn't until well after the consultant left operations and his loan churning that Judge Brody's Order was issued in December of 2017 that these loans were not permitted. The substance of Judge Brody's Order was overturned on April 23, 2019, by the United States Circuit Court of Appeals for the Third Circuit in *Thrivest Specialy Funding, LLC., v. William E.,*

*White*, Case No.: 18-3005 (3rd Cir. 2019)(requiring arbitration under terms of advance agreement for White to pay on obligation).

65.     In sum, the process of working to do good with CGUI, GIAT, consultant, and Cambridge, and the impact of human frailties, such as greed, dissembling, ad hominem, fear, insecurity, arrogance, inferiority, and my imprudence in relying on too many untried others for many, many fronts of growth, has brought out in me an authentic depth of insight, strength, wisdom, humility, and compassion that only these tearful and painful circumstances could. I have done all that I know to do in order protect and advance investors interests in the face of the onslaught caused and fomented by the consultant's prison-based extortion and a cadre of opportunists coordinating with him, and/or feeding off of and following this approach and being. God bless.

FURTHER AFFIANT SAYETH NOT.

_____
PHILLIP TIMOTHY HOWARD

STATE OF _FLORIDA_          )
COUNTY OF _LEON_          )

Subscribed and sworn/affirmed to before me this 3O day of JANUARY, 2021, by PHILLIP TIMOTHY HOWARD.

_____
NOTARY PUBLIC

My Commission Expires: 7|23|24

ANDREW J. FRANKS
NOTARY
My Comm. Expires
July 23, 2024
No. HH 23273
PUBLIC
STATE OF FLORIDA

☐ Personally known to me

☒ Presented identification as follows: _FLDL H630-678-61-087-0_

13

# EXHIBIT I

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>   v.<br><br>CAMBRIDGE CAPITAL GROUP ADVISORS,<br>LLC, et al.,<br><br>       Defendants. | Case 4:19-cv-00420 |

**FINAL JUDGMENT AS TO DEFENDANT DON WARNER REINHARD**

  The Securities and Exchange Commission having filed a Complaint and Defendant Don Warner Reinhard having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final Judgment without admitting or denying the allegations of the Complaint (except as to jurisdiction and except as otherwise provided herein in paragraph VIII); waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

I.

  IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

  (a)  to employ any device, scheme, or artifice to defraud;

(b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any client or prospective client, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any client or prospective client, about:

(A) any investment strategy or investment in securities,

(B) the prospects for success of any product or company,

(C) the use of client funds,

(D) compensation to any person,

(E) Defendant's qualifications to advise clients; or

(F) the misappropriation of client funds or investment proceeds.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933

("Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

> (a)    to employ any device, scheme, or artifice to defraud;

> (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (c)    to engage in any transaction, practice, or course of business which operates or

would operate as a fraud or deceit upon the purchaser,

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any client or prospective client, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any client or prospective client, about:

> (A) any investment strategy or investment in securities,

> (B) the prospects for success of any product or company,

> (C) the use of client funds,

> (D) compensation to any person,

> (E) Defendant's qualifications to advise clients; or

> (F) the misappropriation of client funds or investment proceeds.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers,

agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], by using the mails or any means or instrumentality of interstate commerce:

  (a)  to employ any device, scheme, or artifice to defraud any client or prospective client; or

  (b)  to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client,

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any client or prospective client, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any client or prospective client, about:

  (A) any investment strategy or investment in securities,

  (B) the prospects for success of any product or company,

  (C) the use of client funds,

  (D) compensation to any person,

  (E) Defendant's qualifications to advise clients; or

  (F) the misappropriation of client funds or investment proceeds.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

4

receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a) thereunder [17 C.F.R. § 275.206(4)-8(a)], by using the mails or any means or instrumentality of interstate commerce, while engaged in the business of advising a pooled investment vehicle for compensation as to the advisability of investing in, purchasing or selling securities:

(a)     to make any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in a pooled investment vehicle, or

(b)     otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative, with respect to any investor or prospective investor in a pooled investment vehicle, by

by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any client or prospective client, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any client or prospective client, about:

(A) any investment strategy or investment in securities,

(B) the prospects for success of any product or company,

5

(C) the use of client funds,

(D) compensation to any person,

(E) Defendant's qualifications to advise clients; or

(F) the misappropriation of client funds or investment proceeds.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 203(f) of the Advisers Act [15 U.S.C. § 80b-3(f)] by willfully becoming, or being associated with, an investment adviser in contravention of the Commission's Order barring Reinhard from affiliation with any broker, dealer, or investment adviser, in In the Matter of Don Warner Reinhard, Securities Exchange Act of 1934 Rel. No. 63720, Investment Advisers Act of 1940 Rel. No. 3139, Admin. Proc. File No. 3-13280 (January 14, 2011).

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

VI.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay disgorgement of ill-gotten gains and prejudgment interest thereon; that the amounts of the disgorgement and civil penalty shall be determined by the Court upon motion of the Commission; and that prejudgment interest shall be calculated from August 29, 2019, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). Upon motion of the Commission, the Court shall determine whether a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] is appropriate and, if so, the amount of the penalty. In connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of the Consent or this Final Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed as true.

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

VIII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the

allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

IX.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

X.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

SO ORDERED on March 8, 2021.

s/Robert L. Hinkle_____
United States District Judge

# EXHIBIT J



# Howard & Associates
# Attorneys at Law, P.A.

*Dr. Tim Howard, J.D., Ph.D., Senior Partner*
*Florida Supreme Court Certified Mediator*



RECEIVED

FEB 18 2020

THE FLORIDA BAR

Tallahassee, Florida Office:
1415 East Piedmont Drive, Suite 5
Tallahassee, Florida 32308
Ph: (850) 298-4455
Fax: (850) 216-2537
tim@howardjustice.com

February 18, 2019

Charles Hughes, Bar Counsel
ACAP
Florida Bar, 651 East Jefferson Street
Tallahassee, Florida 32399-2300

Re:   TFB Nos. 2020-00,341 and 00,317 (2A), Complaints of Corey █████ and William █████

Dear Mr. Hughes:

We communicated with Florida Bar staff last week and it was agreed that the responses to the above-referenced Complaints could be combined and submitted on February 19, 2020. In response to these two Bar Complaints consider that these scandalous allegations are found in the civil action filed by these two gentlemen, Mrs. ████████, and Mr. Don Reinhard's similar Bar Complaint.1

### CIVIL REMEDIES AND THE FLORIDA BAR

The Florida Supreme Court has ruled that the Florida Bar is not a venue to pursue civil remedies as another venue for political or legal leverage, and based on this standard, appropriately discharged these complaints in the attached letter dated January 15, 2020. Exhibit A. Mr. Hughes, as The Florida Bar representative, stated:

I must conclude that your complaint constitutes a civil dispute as there are **no**

---

1 ████████ falsely claims she is owed money. The records show that she placed $75,000 into the fund, and received $88,238.00 in total proceeds over approximately 12 months, including monthly payments of $1,500 for most months, and as high as $16,500 for a month. *See* Accounting Ledger attached as Exhibit B. Note, that the allegations in Mr. ███████ vil Complaint track the allegations from Don Reinhard, who created and spread this contagious poison that others have adopted.

1

**allegations independent of the enclosed civil complaint** and as a result, must be resolved through the civil system. The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies.

. . .

Consequently, I have closed our record in this matter.

*Id* (emphasis added).

Nothing has changed in the facts and circumstances of these Bar Complaints. When the decision was made to continue to pursue these Bar Complaints, there was no explanation of what new facts existed or why. If the Florida Supreme Court ruling applies, and not political or legal leverage, consistent with the letter ruling, these actions must be closed.

As a consequence, these parties are not entitled to use the Florida Bar as a method to gain advantage of a pending civil action that has been proceeding for nearly two years.

## UNDERLYING FACTS

As far as the underlying facts, these two gentlemen received $721,080 in a scheme crafted with a Mr. Don Reinhard, from the funds that they are complaining about, as found in the attached legers from the company they invested in. Accounting ledger attached as Exhibit B.

Mr. ▆ the ostensible cousin of Mr. ▆ received written and personal guidance from prison by Mr. Don Reinhard to go to attorneys, such as Mr. ▆ to pursue Respondent. Mr. ▆ protects Mr. Reinhard in prison.2 *See* Cumulative Exhibit C, discussed *infra.*, as Mr. ▆ has a history of close criminal conduct and ties with inmates, including personal ties going back to high school with convicted child molester, Pastor James Harris. Cumulative Exhibit D.

Mr. Reinhard 3 who is in prison for child abuse, was a former consultant for the fund. This consultant crafted the loans with both Mr. ▆ and Mr. ▆ and designed the scheme during the operative time. Relevant documents available upon request.

---

2  Mr. Reinhard is now in prison for child abuse for feeding feces to a three-year-old autistic child. *State v. Reinhard,* Case No. 17005-45CFMA (Fla. 14ᵗʰ Cir.). In a deep, intimate, direct and ongoing relationship with Mr. Don Reinhard, **Mr. ▆ received $648,385 in extraordinary wealth from Cambridge Capital and Don Reinhard. The $648,385 was to be for his family during an 18-month** period from April of 2016 through **September of 2017. This is in addition to his head coaching salaries, and his NFL Line of Duty monthly income.** *See* Accounting Ledger attached as Exhibit B. Unfortunately, like with his former NFL salary, it is clear these funds were not used for his family. Upon information and belief these funds were used for gambling and funding illicit drug sales. Mr. Reinhard, who invested nothing, had nothing to invest, and was the investment fund consultant, conspired with Mr. ▆ to advance their mutual extortion efforts. Mr. Reinhard has engaged in a two-year extortion campaign against Mr. Howard as well as against attorney Jaakan Williams, and this has been reported to the State Attorney, Exhibit E, attached, and to the Florida Bar, Exhibit F, attached.

3  Tracking the extortion strategies of Mr. Reinhard, Mr. Reinhard's Florida Bar Complaint has some of the same scandalous allegations of Mr. ▆ Mrs. ▆ and Mr. Floyd as found in their civil action. *See Don Reinhard v. Phillip Timothy Howard,* TFB No. 2018-00,265(2A).

Once this consultant was terminated from employment, an audit by the current management, 4 under Ms. Gail Milon, determined that the consultant made excessive loans in a scheme to pocket $500,000. Contrary to the allegations first spread by Mr. Reinhard and picked up by those attempting to profit and advance from these scandalous allegations, undersigned has over $1,350,000 in net investments into these same funds, received no fees, and has been doing all in his limited power to secure all investors and has spent and is obligated for $ millions in protecting the investments in technology and other fronts as well as covering legal costs.

Note also, these two gentlemen are even now able to receive funds if they would approach the manager and her counsel in a reasonable fashion as the fund is now in capable hands, and after a time of recovery is receiving funds and making returns on investments. Unfortunately, undersigned has no management or control over the fund, which is invested in technology, advances, and real estate.

Mr. ████ is communicating with Mr. Reinhard and protecting Mr. Reinhard in prison. In return Mr. Reinhard is guiding Mr ████ in his same extortionate model, with false dreams of financial wealth.

Prior to Mr. ████ ever investing into Cambridge companies, in communications solely between Mr. Reinhard and Mr ████ Mr. Reinhard advised adjusting his 401K investments handled by the NFL, and this resulted in an allegation of protection of the assets. January 19, 2016 through July 27, 2016 emails from Mr. Reinhard to Mr. ████ available upon request. Mr. Reinhard provided a Proposed Portfolio Investment Structure on March 22, 2016, that Mr. ████ and Ms. ████ reviewed. Mr. Reinhard also explained on April 8, 2016 that his IRA would have gained $62.000 if he had invested the funds. Finally, within days of the 401K transfer on May 19, 2016 of the investment, Mr. ████ **was fully advised on May 25, 2016 of what Cambridge companies knew of Mr. Reinhard's background.** *Id.*

Mr. ████r falsely claims that Mr. Reinhard's background was not provided. In fact, Mr. ████ knew of Mr. Reinhard when he was a player at Florida State, based on information and belief that Mr. Reinhard assisted him then. Moreover, **Mr. ████ as expressly provided the background on Mr. Reinhard on May 25, 2016,** as Mr. Reinhard was required to do to all potential clients starting in late October of 2015, when potential investors would have started during his consultancy. **May 25, 2016 email from Mr. Reinhard to Mr. ████r documenting Mr. Reinhard's background, including his prior criminal "incarceration" and that the SEC "sanctioned" Mr. Reinhard.** Records available upon request.

Mr. Reinhard developed a "very personal" and long-term relationship with Mr ████ Mr. ████ and several other retired NFL clients. From prison, on January 12, 2018, Mr. Reinhard wrote to

---

4 Mr. ████ has been repeatedly informed by Cambridge ownership and management that Mr. Howard has no interest, management or control, and that his 401K investments are secured with more than sufficient assets for repayment and return, and upon liquidation of a portion of the assets, his retirement funds will be transferred. **Moreover, counsel for Mr. ████ Mr. Thomas ████ was informed of this in writing.** Exhibit G. This has also been confirmed by an independent audit conducted by the respected and former Leon County auditor, Bill Bogan. The audit is available upon request.

Mr. ▮ and numerous retired NFL clients that he was manipulating, stating:

> This is an email I did not want to send to each of you as I truly thought this disaster was coming to an end in early to mid-December and I would be back on course and working with each of you to further plan, develop, structure and implement a solid and productive financial plan for you and your family.

> . . . I had worked 12-18 hour days for the past 18 months to create, develop, and structure the very sound and successful principles of Cambridge Capital Group and was **privileged and honored beyond my wildest dreams to have initiated and built the incredible relationships I had with each of you** and we had only just begun.

> . . . While I have provided each of you with the reasons behind these delays [in NFL concussion settlement claim payments] so you clearly understood the unfortunate private agenda of your attorney which was the majority crux of my concern as to the handling of your claim, hopefully your wait for these much needed funds will end very soon. . . .

> **My dreams of starting a new firm which will mimic the very sound principles and proven work ethic of Cambridge Capital Group will not die** as I continue to fight to resolve these heinous charges. I am a very positive person and know that God has a plan for my family and I and that plan included our paths crossing. Please say a prayer for my family and I and **I will certainly plan on contacting you immediately upon my release in hopes of continuing to build our long-term relationship. In the meantime, I will continue to have access as well as text messages at 850-228-9868.** I there anything I can do to assist you then please do not hesitate to contact me and I will do everything in my power to do so. **Please know how important each of you are to me.**

Cumulative Exhibit C.

Mr. Reinhard planned with Mr. ▮ Mr. ▮ and other retired NFL players to create their own investment company, with Mr. Reinhard running this from the prison, claiming that the funds under consultancy "returned over 40% and 70% respectively in 2016." Referenced documents available upon request.

Mr. Reinhard also falsely claimed that he had a partner in Mr. Tom Woods as part of this scheme with Mr. ▮ with Mr. Woods clarifying that "Mr. Reinhard is trying to drag all of us into his mud bath because he has reached the end of his rope. I think he has nothing but time on his hands and rather than reflect on his own misdeeds, he is instead lashing out at the very people that gave him a second chance. What a shame." *Id.*

Next, from prison, Mr. Reinhard directs Mr. ▮ Mr. ▮ and a few of the investors that he has personal relationships with to file a legal action, and claims he knows the valuation of their investments, and states:

I know some of you have ... contacted me [in prison] to ask questions. It is <u>time for us to take legal action</u> as again my research [from prison] has me concerned. I am very uncomfortable with what I have learned about the current structure of CCG and the management of the portfolio as I have also requested liquidation of my family's assets. I would strongly recommend that you do the same because I am overly concerned that the auditor has not provided any inf01mation since the audit for 2016 was initiated in July 2017. Again, let me underscore that I have a lot of experience in managing limited partnerships and the portfolio when I departed was rock solid as was the structure of the limited partnership.

I am now going to <u>proceed aggressively to follow suit</u> in the next two to three weeks to pursue the liquidation that I had requested over six months ago and <u>I strongly recommend that you do the same.</u> However, our position will be much stronger and <u>attorneys will be much more</u> interested in the case if we proceed together. I think its necessary to do so. Although I am still incarcerated my brother-in-law will be instrumental in helping us manage this process. Again, I believe time is of the essence so please let me know your thoughts as soon as possible. I look forward to hearing from you.

Don

P.S. -I will provide information regarding your approximate account value update for 12/31/17 tomorrow.

January 18, 2018 email from Mr. Reinhard to Mr. ▮▮▮ Ms. ▮▮▮ Mr. ▮▮▮ et al., attached as Cumulative Exhibit C (emphasis added).

On February 28, 2018, Mr. Reinhard writes solely to Mr. ▮▮▮ and family and select few friends, seeking protection in prison:

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5 inmates that are violent and hardened criminals because my roommate and I were told that there was absolutely no available bed space in the dorms that violent sentences. However on Thursday I was being threatened and pressured to give them food and other items or I would "learn about prison the hard way".

... I was packing my belongings some of the same individuals came into my cell with a knife made visible to me and told me they were going to stab me unless I have them all of my canteen which was approx..$70 worth of various food items and hygiene.   However, my understanding is that they are gang-related and will if they have not already got messages to their other gang members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center including a very close friend of Corey ▮▮▮ who had previously promised and

re-iterated that promise when I cam in that he will protect me. However, that will
mean following him around like a puppy even if I am safe from other gang
members in this dorm.

February 24, 2018 email from Mr. Don Reinhard to Mr. Corey ▮▮▮ *Id.* (emphasis added). Mr.
Don Reinhard writes Mr. ▮▮▮ on the same day following up for a personal meeting on the
extortion scheme:

> Corey, I think you will realize when you read the email I just sent that I am not
> only scared to death but terrified. Just to let you know Joe did make a very visible
> sign talking to me so everybody in the dorm would see him.
>
> Hopefully that does help for the time being.
>
> Also, please complete and send in the visitation form that was previously emailed
> to everybody as I truly want to see you soon and hopefully you can take on
> Saturday or Sunday to drive over. We certainly have a lot to discuss especially
> about Tim and CCG.
>
> Love ya buddy,
>
> Don

February 24, 2018 email from Mr. Reinhard to Mr. ▮▮▮ *Id.* (emphasis added). The protection
that Mr. ▮▮▮ is coordinating and providing Mr. Reinhard in prison is clear, as is the plan to
address Mr. Howard and Cambridge Capital Group. Finally, the intimacy of their relationship is
found in "Love ya buddy." *Id.*

On February 6, 2018, Mr. ▮▮▮ then falsely stated to a Mr. Walker that "he only invested money
with Don Reinhard because he trusted Tim Howard." Mr. Howard never advised Mr. ▮▮▮ nor
was his background and education within the investment industry. Mr. ▮▮▮ then went on to
state to Mr. Walker that "he wants to kill everyone, including Tim Howard, Gail, Harrison and
myself. I am letting you know this so you can protect yourself." February 6, 2018 email from Mr.
Walker to Mr. Leonard and copied to Mr. Howard, attached as Cumulative Exhibit C.

In a series of texts, starting on April 16, 2018, Mr. ▮▮▮ attempts to **extort Mr. Howard for
money with a series of threats.** Mr. Howard responds, **"Please understand that I am not able
to provide money to you.** I will do all that I can in that context. I am happy to work on your
claim and as I have so far, and to assist in any legal and ethical way I am allowed. I care
about your needs. Perhaps there are loan available until the NFL Disability or your claim is
pursued over the next several months?"** Mr. ▮▮▮ responds, "So should I just turn over all
of my paperwork to the court? Since you don't know why I am showing you this
paperwork?"** Texts from Mr. ▮▮▮ to Respondent available upon request.

I am God's minister for good and to love others. It is God in me that counts. **I
have helped coach for years, fund the food and support and equipment for**

players, **and I have been there for you and others non-stop**. Psalm 31. This is
God's life and all he wants me to do is bless within my limited ability and means,
and he will stand with me in that goodness and love. This time of forging will
pass. Let God do a good work in you too.

*Id.*

Further clarifying that he can't comply with his extortion, and Mr. Howard informs Mr. ▮
that "I **am also limited by ethics and have no management, interest and control over these
matters. Please seek other sources.**" Mr. ▮ responded, "**You keep playing this law its
cool. Since you can't talk now game on for real.** Just know I am very hurt by this game u
playing but its cool." Mr. Howard responded, "**I am doing all I can for you with the limitations
of Law and ethics and I have and will continue to.**" *Id.*

Mr. ▮ changes approach and on April 17, 2018, the next day, seeks support from Mr.
Howard stating, "**Sometimes I just need that confirmation that everything is going to be
alright or that person that's going to help me push thru whenever I feel like giving up.**" In
response, Mr. Howard comforts Mr. ▮ stating, "**God is alive in you. God loves you.** God
will redeem you as he has me. I and coach have been praying over you, releasing you from evil
and delivering you as a child of God." *Id.*

On April 23, 2018, Mr. ▮ writes, "Tim just know you are fair game now. You could not be a
man of your word. I am and will do everything in my power to make sure u have the same
feeling we do as players right now. The devil is real u got my money and played
these **f_____d** games with it." *Id.* Finally, Mr. Fuller writes, "**Keep playing this game u will
get your in the end.**" *Id.*

The facts are clear that Mr. ▮ and Mr. ▮ received extraordinary funds, have secure
investments, and are conspiring with Mr. Reinhard, with the cover of Mr. ▮ in an extortion
scheme that is grounded in criminal conduct.

Under these circumstances, these complaints must not proceed.

Thank you for your attention to this matter.

Sincerely Yours,

*[signature]*

(Phillip) Tim Howard, J.D., Ph.D.

7



**The Florida Bar**
651 East Jefferson Street
Tallahassee, FL 32399-2300

Joshua E. Doyle
Executive Director

850/561-5600
www.FLORIDABAR.org

January 15, 2020

**EXHIBIT A**

Mr. Corey B. Fuller
c/o Thomas M. Findley
101 North Monroe Street, Suite 925
Tallahassee, FL 32301

Re:   Mr. Phillip Timothy Howard; RFA No.: 20-8862

Dear Mr. █████

All documentation submitted in this matter has been carefully reviewed. The Florida Bar is the licensing agency for all attorneys admitted to practice law in the State of Florida. In cases where discipline is indicated, the disciplinary action is taken against the attorney's licensure, and will not affect or overturn the outcome of any proceeding.

While I understand that you believe the attorney acted unethically, I must conclude that your complaint constitutes a civil dispute as there are no allegations independent of the enclosed civil complaint and as a result, must be resolved through the civil system. The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies. In the event that a court of competent jurisdiction makes findings in your case which suggest misconduct by the attorney you may re-file your complaint at that time, enclosing the relevant findings.

Additionally, regarding your request to file a claim with the Client Security Fund, you may download a claim form from The Florida Bar's website at www.floridabar.org.

Consequently, I have closed our record in this matter. Pursuant to the Bar's records retention schedule, the computer record and file will be disposed of one year from the date of closing.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

cc:     Mr. Phillip Timothy Howard ✓

# EXHIBIT B

| | Loaned | | |
|---|---|---|---|
| ██████ | 10000 | | Cam Cap Advisors Deposit Acct |
| | 61405 | | Cam Cap Advisors 2500 |
| | 510930 | | Cam Cap Partners 6617 |
| | 66050 | | Cam Cap Equity |
| | 648385 | | |
| ██████rd | 1835 | | Cam Cap Advisors 2500 |
| | 70860 | | Cam Cap Partners 6617 |
| | | | Cam Cap Equity |
| | 72695 | | |
| TOTAL | 721080 | | |
| ██████ | | | |
| | 61738 | 50000 | Cap Cap Partners 6617 |
| | 26500 | 25000 | Cam Capital Equity |
| | 88238 | 75000 | |

———— Forwarded message ————
From: Don Reinhard <dwarner.sd5mcapital@gmail.com>
Date: Fri, Jan 12, 2018 at 10:52 PM
Subject: Update on Don's unfortunate situation
To:

CUMULATIVE EXHIBIT C

This is an email I did not want to send to each of you as I truly thought this disaster was coming to an end in early to mid
December and I would be back on course and working with each of you to further plan, develop, structure, and implement
a solid and productive financial plan for you and your family. However, I have now learned that Bay County is not going to
drop these heinous alleged charges of which they have no evidence unless I accept a plea agreement which will require
me to go to a prison for approximately 18-24 more months. If I do not give in and accept their threat-induced offer then I
risk a much longer sentence because of the heinous issues involved in this case and Florida does not offer parole and
only allows 15% good time credit. I am sick to my stomach thinking about what I am now faced given that I did not
commit this heinous crime and again, there is no evidence that proves that I did.

When this all happened in early February 2017 I was on top of the world. I had worked 12-18 hour days for the past 18
months to create, develop, and structure the very sound and successful principles of Cambridge Capital Group and was
privileged and honored beyond my wildest dreams to have initiated and built the incredible relationships I had with each
of you and we had only just begun.

Additionally, I had met a fabulous woman with three incredible little boys who very much needed a daddy who would love
them, teach them, care for them, and give them the tools they needed to become truly successful and productive parts of
our society. Molded together with my incredible two children, I finally had the large family I had yearned for since 2005.
Everything seemed to be absolutely perfect and then ... bam within a 2-week period of time, my life was basically
destroyed due to the heinous alleged charges levied by my fiance's, now my wife's, parents who despised me due to the
stable environment I provided their daughter and grandchildren. Yes... believe it or not, that is what transpired. You
would have thought they would have been tickled to death for their daughter and grandchildren to have this stability but
yet they felt threatened.

And to make matters much much worse my friend of over 40 years who had become my closest confidant, friend, and
business partner at Cambridge Capital Group immediately turned on me due to differences we had with regards to his
firm's handling of your concussion settlement cases. He initiated his campaign of retaliation against my family and I so
quickly that he clearly had planned it and was just waiting for the perfect opportunity. Well, he got it, as I was basically
defenseless.

Going forward, hopefully each of you will receive your settlement proceeds soon as I know the unexpected delays have
caused many of you and your families extreme hardships that were certainly unnecessary. While I have provided each of
you with the reasons behind these delays so you clearly understood the unfortunate private agenda of your attorney
which was the majority crux of my concern as to the handling of your claim, hopefully your wait for these much needed
funds will end very soon. I have taken these unnecessary delays  personal because I feel responsible for the success of
each of you due to CCG's involvement and referring you to Tim Howard and Howard & Associates P.A. for legal
representation.

My dreams of starting a new firm which will mimic the very sound principles and proven work ethic of Cambridge Capital
Group will not die as I continue to fight to resolve these heinous charges. I am a very positive person and know that God
has a plan for my family and I and that plan included our paths crossing. Please say a prayer for my family and I and I
will certainly plan on contacting you immediately upon my release in hopes of continuing to build our long term

relationship. In the mean time I will continue to have access to my email as well as text messages at 850-228-8668. If there is anything I can do to assist you then please do not hesitate to contact me and I will do everything in my power to do so. Please know how important each of you are to me.

Don

From: Don Reinhard <dwarner.sd5mcapital@gmail.com>
Date: 1/18/18 10:07 PM (GMT-05:00)
To:

Subject: An immediate lawsuit against Cambridge Capital Group, Tim Howard, the auditor, and others involved

I have done some research and I am increasingly concerned about what I am learning with regards to the current structure of Cambridge Capital Group and it's respective limited partnerships which each one of you are invested in via your 401k rollover proceeds and other assets. When I departed the portfolio that had been built was in my opinion, rock solid as a vast majority of my family's wealth is invested exactly as your family's wealth is in the limited partnership. As they say "I eat my own home cooking".

I have asked questions of the auditor to receive information about my values but I have not yet received any information. Perhaps you have done the same as I know some of you have as you have contacted me to ask questions. It is time for us to take legal action as again my research has me concerned. I am very uncomfortable with what I have learned about the current structure of CCG and the management of the portfolio as I have also requested a liquidation of my family's assets. I would strongly recommend that you do the same because I am overly concerned that the auditor has not provided any information since the audit for 2016 was initiated in July 2017. Again, let me underscore that I have a lot of experience in managing limited partnerships and the portfolio when I departed was rock solid as was the structure of the limited partnership. I have now learned that that has been dramatically changed. I am going to proceed aggressively to follow suit in the next two to three weeks to pursue the liquidation that I had requested over six months ago and I strongly recommend you do the same. However, our position will be much stronger and attorneys will be much more interested in the case if we proceed together. I think it's necessary to do so. Although I am still incarcerated my brother-in-law will be instrumental in helping us manage this process. Again, I believe time is of the essence so please let me know your thoughts as soon as possible. I look forward to hearing from you.

Don

P.S. – I will provide information regarding your approximate account value update for 12/31/17 tomorrow.

From: Don Reinhard <d123fiau@gmail.com>
Date: February 24, 2018 at 7:42:58 PM EST
To: ███████████████

███████████████████████████
███████████████████████████████
███████████████████████████

There's no way to sugar coat this, so I won't.  I was put in a dorm that is for level 4 and 5 inmates that are violent and hardened criminals because my roommate and I were told that there was absolutely no available bed space in the dorms that we should have been in for level 1, 2 and 3 inmates which have shorter non-violent sentences.  I was told I would be in the dorm for 2-3 days and they would get me out immediately.  However on Thursday I was being threatened and pressured to give them food and other items or I would "learn about prison the hard way".  I voiced these concerns to my mother and father who immediately called and talked with a captain.

The captain talked with me and told me I would be taken out within the next day or two he was going to immediately look into it and asked me if I feared for my life and I said no that I was very scared and concerned of getting beat up or knifed.  I also did not want to be put in solitary confinement which is the alternative if you say you fear for your life.  I cannot handle that.

I was told by the dorm officer that I would be moved today which she finally got around to doing at about 5 o'clock and while I was packing my belongings some of the same individuals came into my cell with a knife made visible to me and told me they were going to stab me unless I gave them all of my canteen which was approx. $70 worth of various food items and hygiene.  I tried to reason with them but another individual entered the room a so one of them held me off with the knife in his hand and they took all of my canteen.

There's other details involved but I immediately reported it to the sergeant outside because I just wanted to get out of there as soon as possible and they have taken the three individuals in hand-cuffs to solitary confinement.  However, my understanding is that they are gang-related and will if they have not already got messages to their other gang members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center including a very close friend of Corey Fuller's who had previously promised and re-iterated that promise when I came in that he will protect me.  However, that will mean following him around like a puppy even if I am safe from other gang members in this dorm.

While the financial loss within me hard as I needed this food to last a couple more weeks as I am watching every single penny I have to spend, the real danger is that I am clearly a target at this camp/prison.  Again, at this point I do not fear for my life because I certainly do not want to go to solitary confinement but things may change in the coming days.  I clearly don't understand this part of the world and do not know how I am going to get through this.

The captain clearly acknowledged to the dorm guard that my roommate and I were not supposed to be housed in dorm F which included the level 4 & 5 inmates because it was breaking DOC policy.  Although the dorm officer informed him that they were doing that periodically he said this was still breaking DOC policy.  That captain was very helpful and he called mama and daddy yesterday evening to inform them that he was working to get me transferred out.

At this point, I believe the only solution is to do what is necessary to immediately get me moved to another camp/prison or possibly to the annex here at Columbia which is another camp or the work camp at Columbia.  I really see no alternative as I'm very scared and nervous as to what the repercussions can be.  To do this I assume it will take some sort of orchestrated phone calls possibly to the captain that mama and daddy have already talked to but please tell then that y'all are requesting that this happen and it is not coming from me.  Perhaps you can inform him how scared and concerned I am that I am now clearly a target and there does not seem to be any alternative but you will need to be adamant as I should never have been in that dorm.

Please pray for me and I will talk to Wes tomorrow as well as mama and daddy.

Don

From: Don Reinhard <d123fsu@gmail.com>
Date: February 24, 2018 at 7:51:15 PM EST
To: Corey ████████████████████
Subject: Visitation and email I just sent

Corey, I think you will realize when you read the email I just sent that I am not only scared to death but terrified. Just to let you know Joe did make a very visible sign talking to me so everybody in the dorm would see him. Hopefully that does help for the time being.

Also, please complete and send in the visitation form that was previously emailed to everybody as I truly want to see you soon and hopefully you can take one Saturday or Sunday and drive over. We certainly have a lot to discuss especially about Tim and CCG.

Love ya buddy,
Don

From: Addys Walker <addyswalker@yahoo.com>
Date: Tue, Feb 6, 2018 at 2:13 PM
Subject: Re: Notice to Cease and Desist from Stalking, Intimidation and Extortion
To: "John P. Leonard" <jleonard@mdmc-law.com>, Lance Friedman <lfriedman@bca-advisors.com>
Cc: Lance Friedman <lancebfriedman62@gmail.com>, Tim Howard <tim@howardjustice.com>, Thomas Woods <thomaswoods@gmail.com>

I have not been to Tom's house. I do not know where he lives. I have been in a meeting for the last couple of hours and I can prove where I have been all day. Further, I have no intention to contact Tom directly or indirectly.

Furthermore, I have no affiliation with Lance other than signing documents for A&T Development.

I spoke with Corey ████ today who said he only invested his money with Don Reinhard because he trusted Tim Howard. Corey said he wants to kill everyone, including Tim Howard, Gail, Harrison and myself. I am letting you know this so you can protect yourself.

Addys

CUMULATIVE EXHIBIT D

THE NEW YORK TIMES

SPORTS | PRO FOOTBALL

## PRO FOOTBALL; There's More Than Football To Worry About for Ravens

By DAMON HACK JUNE 8, 2004

In a small trailer that doubles as a Bible study room, Baltimore Ravens running back Jamal Lewis sat at a news conference Monday and reiterated that he was innocent of federal drug conspiracy charges. In a corner of the Ravens' locker room, no more than two hours later, cornerback Corey ▮▮▮▮ apologized for the embarrassment caused by his arrest for felony firearm possession and for felony and misdemeanor charges that he used his home in Tallahassee, Fla., as a high-stakes gambling house.

Football seemed secondary as the Ravens embarked on a four-day minicamp amid the cicadas in this Baltimore suburb.

"This is the appropriate time to discuss this because it is time to go back to work," Ravens Coach Brian Billick said, of Lewis's situation in particular. "Obviously, we support Jamal, we believe in this process and we will support him in this process. Whatever the time frame, it is important to keep in mind that the players don't live in a sterile environment."

For the Ravens, the American Football Conference North champions last season, matters of legality have swooped into their season before.

In August 2000, the N.F.L. fined the All-Pro linebacker Ray Lewis $250,000 for conduct detrimental to the league after he pleaded guilty to a misdemeanor charge of obstructing justice in a double homicide at an Atlanta nightclub. Lewis had faced two counts of murder before prosecutors dropped those charges.

In December, the second-year pass rusher Terrell Suggs was charged with two counts of felony assault for a March 2003 incident outside Phoenix Municipal Stadium after a three-on-three basketball tournament. Suggs has a Sept. 9 court date.

With Jamal Lewis, who faces charges in Atlanta, Fuller and Suggs, Ravens players currently face six felony charges in three states.

"It seems like the devil is always at work, but I know what it takes to overcome the devil." ▮▮▮▮ 33, said. "I wouldn't wish this on my worst enemy. But nobody victimized me. I victimized myself."

Billick compared the off-the-field situations with instances that arise in every sport. The Ravens have bucked back controversy before, winning Super Bowl XXXV against the Giants only months after Ray Lewis's involvement the Atlanta murder trial.

"Whether it's Jamal, whether it's Corey, whether it's Terrell Suggs, I have a tremendous amount of faith in the character of those individuals," Billick said. "There are going to be things that raise themselves up due to injury, personal situations, births, deaths, any number of things. These aren't machines. They have lives and as a team, you have to respect and understand that."

Jamal Lewis, who was voted the league's offensive player of the year last season, rushed for 2,066 yards, the second-highest total in league history. (Eric Dickerson ran for 2,105 in 1984.) Lewis is accused of conspiring to possess with intent to distribute five kilograms of cocaine and using a cellphone in the commission of a drug crime. The charges resulted from an investigation by the Federal Bureau of Investigation during the summer of 2000, just before Lewis signed a six-year, $35.3 million contract.

# 247 Sports

##  Facing Felony Gun Charges

BY May 24, 2004
§

When Corey ███ played for the Vikings, VU staffers agreed he was a talented player, but also agreed he wasn't going to be asked to join Mensa.

His lack of ideal intelligence came into play earlier this year when <u>a shootout at his home resulted in Fuller being arrested for hosting high-stakes gambling nights. Despite making a solid NFL salary, especially when he was with the Browns, the current Ravens player decided playing host to No-Limit Texas Hold 'Em games was in his best interest.</u> Now he faces jail time and a likely suspension from the league.

New charges were added over the weekend, including use of a firearm during the commission of a felony, which carries a maximum of five years in jail if convicted.

EXHIBIT E

**Howard & Associates**
**Attorneys at Law, P.A.**
*Dr. Tim Howard, J.D., Ph.D., Senior Partner\**
*Florida Supreme Court Certified Mediator*

Tallahassee Office                    East Lauderdale Office          Cambridge Office
1234 Mahanney Way, Suite 225          101 NE Third Ave., Ste. 1500    5 Mercer Way
Tallahassee, Florida 32810            Fort Lauderdale, Florida 32301  2450-1427
Ph: (850) 298-4455 Fax: (850) 216-2537 (954) 210-8651                 Cambridge, Massachusetts 02141
Tim@howardjustice.com                 www.howardjustice.com           (857) 277-0090

July 28, 2017

VIA HAND-DELIVERY OR EMAIL

Jon Fuchs, Assistant State Attorney
Second Judicial Circuit
301 North Monroe Street, Suite 475
Tallahassee, Florida 32301
(850) 606-6000

Jennifer Alene Hawkins, Assistant State Attorney
Fourteenth Judicial Circuit
421 Magnolia Avenue
Panama City, Florida 32401
(850) 872-4473

Re:  Attempts at Extortion, Retaliation and Obstruction of Justice by Criminal Co-Defendants Don Reinhard and Katie Reinhard (Buxton). Don Reinhard is Currently Facing Criminal Charges for Violation of Probation for Grand Theft. Don Reinhard and Katie Reinhard are both Facing Criminal Charges for Felony Child Abuse of a Disabled Child, A Tragedy for the Disabled Child and for the Co-Defendants.

Dear Assistant State Attorney Fuchs, and Assistant State Attorney Hawkins:

As part of your respective prosecutions of the above referenced violation of probation and felony child abuse charges, the law firm has assisted by sharing evidence and responding to the subpoena verifying the felony crimes of child abuse on the phone and in texts between the co-defendants that was shared with Assistant State Attorney Jon Fuchs and Panama City Beach Investigator, Lieutenant Eusebio Talamantez Cumulative Exhibit A. The law firm was unwilling to participate in obstruction of justice and would not hide evidence nor assist in their criminal defense. In retaliation, the criminal co-defendants are aggressively attempting to extort the law firm and those that work for and with the law firm. While these sordid crimes are a tragedy for the disabled child and for both co-defendants, and we hope that the

\*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D, Northeastern University, Law, Policy & Society. Former Visiting Harvard Law, Bioethics, and Human Rights Scholar, and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

disabled child receives the security and support she needs, we must inform you of continuing extortion and retaliation by these criminal co-defendants.

Despite receiving "Cease and Desist" letters in late February and early March of 2017, and Don Reinhard executing a notarized "Law Firm Non-Disclosure Agreement and Confidentiality Agreement" that all workers in the building sign, regardless of whether they actually work as an employee or independent contractor for the Howard & Associates law firm, colleagues, employees, experts, lenders, accountants, wife of the owner, owner, regulators, private investigators, and more, have received threatening and extortionate emails, texts, and/or letters dictated or written from the Leon County Jail by Don Reinhard, and/or through his co-defendant, Katie Buxton (now Katie Reinhard since he married Katie Buxton while in the county jail in a fruitless attempt to claim marital privilege for a co-defendant, which marriage was after the crime and after the testimony and documentation of the crime took place). In violation of the "Law Firm Non-Disclosure Agreement and Confidentiality Agreement," based on his statements to date, Don Reinhard may have obtained NFL Concussion Settlement Claim files and may have sought to make changes to the files. The firm doesn't know what is in Don Reinhard's possession. All original client files in the law firm's possession are in order.

Don Reinhard and Katie Reinhard have falsely claimed and implied fraud in NFL Concussion Settlement client files, and have implied that there are other matters that they will expose, if it is not agreed that: (1) the law firm and colleagues participate in obstructing justice and assist Don Reinhard and Katie Reinhard in their criminal defense, (2) Don Reinhard and Katie Reinhard are entitled to amounts that range from $1,200,000 and more several million dollars for Don Reinhard's $3,000 a month consulting work for a private FINRA exempt investment fund, (3) Katie Reinhard is to be paid Don Reinhard's former consulting fee of $3,000 monthly, and (4) $25,000 is to be paid to Katie Reinhard for a car she does not own. Cambridge Capital Group (CCG) has responded to each of the claims against that company, and verified that there were no funds invested nor are there subscription agreements as investors under either Don Reinhard or Katie Reinhard.

The facts are that Don Reinhard was hired as a periodic consultant for CCG, an independent investment company, at $3,000 a month. He has no ownership interest in CCG. He was hired as a consultant in an effort at compassion and rehabilitation of someone that Dr. Howard met at Costco selling wine and who didn't know what to do with his life. He is a former high school football team mate that Dr. Howard had known, but he was not someone that Dr. Howard had been close to. He was not involved with the law firm, and in an abundance of caution, the firm required that all workers on the same floor in with companies in the same building of the law firm sign and commit to a confidentiality agreement in order to protect client information. Subsequent to his dismissal, upon investigation, it has been determined that Don Reinhard was misleading as to the facts and underlying charges for some of his prior crimes. Affidavit verifying independent contractor and consultant status, and affidavit verifying income of $3,000 monthly, as filed by Don Reinhard in January and December 2016 in his Circuit Civil Court Child Support case in Leon County, Florida, and confidentiality agreement, and cease and desist letters, are attached as Cumulative Exhibit A. Moreover, the investment companies are currently owned and managed by third-parties, that this firm represents, and are Nevada companies. Dr. Howard had

approximately $2.4 million invested by the end of 2016, and has approximately $5.2 million invested as of July 28, 2017.

Beginning about a year ago, due to concerns as to Don Reinhard's arrogance, narcissism, solipsism, and resistance to accountability, CCG started a search for a replacement and/or supervisor of his independent contractor consulting work, with a licensed financial planner, licensed investment agent and broker-dealer. After interviewing several candidates, a quality, experienced, respected, and licensed professional with integrity and empathy was found and CCG hired Gail Milon, CASL, CLTC, with 30 years of successful experience, as managing Vice President in December of 2016. She has since hired Bogan Public Management Company (BPMC), and Bill Bogan, Jr., CPA, CGFO, and CBFO, to provide a comprehensive audit to ensure all investment funds are in place and to determine what company profits may have been absconded. BPMC is mid-way through the audit now.

Starting after his arrest in mid-February of 2016, a retaliatory and extortionate scheme to obstruct justice and extort assets by Don Reinhard and Katie Reinhard (Buxton) began, and is found in the various letters and emails from them orchestrated from the Leon County Jail through his co-defendant Katie Reinhard. The conspiracy between these co-defendants begins with the violation of the February 11, 2017 Court Order that specifically directs Don Reinhard: "Do not contact Jesse Buxton or Katherine Buxton." *Id.* The various letters and emails are attached as Cumulative Exhibit B.

As an example, these sordid claims have been spread to experts, clients and lenders of the law firm, falsely claiming that diagnostic medical exams and final reports are forged and hundreds of millions of fraudulent claims have been submitted to the NFL Concussion Settlement Claims facility. *Id.* The facts are that neither Don Reinhard nor Katie Reinhard ever worked for the law firm, though Don Reinhard did sign the law firm confidentiality agreement to protect any exposure to client confidential information, and Don Reinhard was terminated from his consulting work for an independent investment fund in mid-February of 2017. Exhibit C. Don Reinhard was imprisoned in late February of 2017 as a result of violation of probation due to pending felony child abuse charges. As a consequence, neither Don Reinhard nor Katie Reinhard know how vacuous and patently absurd their extortionate and retaliatory allegations are.

These criminal co-defendants don't know that from the currently over 250 clients, and growing, nothing, other than registering them, has been submitted to the NFL Concussion Settlement Claims facility. They don't know that all original medical reports are in the files of the doctors, and only copies are in the files of the law firm. They don't know that all medical records and reports have to be reviewed and signed by a board-certified neurologist formally approved by the NFL Concussion Settlement Claims facility. They don't know that the board-certified neurologists contemplated for use by the law firm were only recently approved in May and June by the NFL Concussion Settlement Claims facility. They don't know that all our NFL Concussion Settlement clients must meet individually for an updated clinical evaluation prior to submission of our clients' claims to the NFL Concussion Settlement facility. They don't know that the firm must have a board-certified neuropsychologist meet with every client to update and finalize their neuropsychological status, and that these updates will begin in a few weeks. They don't know that the law firm manages its files to ensure the file's integrity and client confidentiality. This is just one example of their respective ignorance, arrogance and their vacuous criminal extortion and retaliation attempts.

These letters and emails are replete with these types of criminal schemes, including: (1) attempting to operate a private investment firm from jail and enticing retired NFL players to invest $650,000 with $9,000 monthly income and doubling of value in 7 years, and running a "new firm, S&5M Capital Management owned by my wife (also known as Scooby/Katie) and I as well as a group of retired players," (2) attempting to extort a "global settlement", "$50,956", monthly payments of $3,000 to co-defendant Katie Reinhard, and $1,200,000 in assets in response to "turning your back on me" and threats of "train wreck for both of our lives and you have more to lose," "the risk and damage your actions will cause to many . . .", "each event carries significant penalties + punishment", "your massive fraud", "30-year prison term", "I have been forced to sue Tim Howard for well over $1 million that he is attempting to steal from me, my family, and my children", (3) attempting to extort these payments and assets through threats and claims of fraud against the NFL Concussion Settlement, tax fraud against CPA, bank fraud and worthless check charges against staff, (4) attempting to extort a $25,000 payment to Katie Reinhard for a car she does not own, (5) use of third-parties and/or alias, such as Tori Reinhard and nflfraud@gmail.com, as part of their extortionate conspiracy, (6) threatening and intimidating experts and lenders of the law firm, (7) threatening and intimidating the independent auditor (BPMC), (8) spreading false and defamatory statements to NFL Concussion Settlement clients, and (10) the following threatening and extortionate tome to Dr. Howard's wife, Jennifer Howard:

> But also, I intend to immediately move forward with current communication I am having with the NFL Claims Administrator and law enforcement via a large national law firm regarding this massive fraud Tim and Howard & Associates have perpetrated against the NFL Concussion Settlement and the 300 plus retired NFL players that are his clients. . . . Tim and his team have made a massive fraud out of it to bilk the NFL out of approximately $120 million in claims of which he will be paid approximately $30 million in fees. I have been told that the case would likely carry a 30-year prison term and the collateral damage to many of his employees and associates who know and are involved would be devastating to many lives . . . this does not even include the many, many families of the retired NFL players who are expecting a financial settlement averaging over $600,000 who will be denied due to the fraud involved in their qualification process by their trusted attorney, Tim Howard. The media onslaught that you and your family would have to endure, in and of itself, would be devastating and far greater than tobacco days. I and others began keeping records and documented proof in 2016. While I thought the activity was limited, I was shocked to hear from 2 H&A associates that it was widespread. They came to me in Jan. with concerns of their personal liability. For example, I and others have witnessed forging signatures on files to insure eligibility as well as changing files as needed. There is an abundance of documented evidence to prove this that Tim was unaware was being collected in many forms. . . . I have told Tim via my letters that I do not want to go down this road unless he forced me to. To date, my communications to the various authorities has been limited by design and anonymous as again, its via a large law firm but they are eager to move forward with details. . . . I must have him simply provide me what is "mine". . . . I cannot start my life over again. . . . Look at the enormous risk he is taking for him, you, and your family. Look at the enormous risk he is taking for the employees of his law firm. Look at the enormous risk he is taking for almost 300 families of retired NFL players . Outside of the NFL and the criminal case, Tim would be sued for millions as he borrowed over the last 4-5 months against his future expected fees as they were based on fraud, sued by multiple legal

[illegible text block]

d123fee@gmail.com. (emphasis added).

Cumulative Exhibit B. All these actions are an attempt at extortion and in retaliation for not assisting in their criminal defense, for not participating in obstruction of justice, and for assisting the State of Florida in providing damning evidence in support of the prosecution of their crimes.

In light of their rapid fire buckshot, yet vacuous, extortionate and retaliatory actions to date, and the comprehensive evidence of their crimes and the evidence that this firm is providing as a result of its investigation and has provided to assist in the prosecution for these crimes, as well as in compliance with Assistant State Attorney Jon Fuch's subpoena, it is highly likely that these criminal co-defendants will reach out to any source that may come into their respective minds in an attempt to perpetrate their extortion, retaliation and obstruction of justice. In order to expose the extortion, retaliation, and obstruction of justice, and to avoid any knowing or unknowing, and/or direct and indirect complicity by third-parties with their schemes, this law firm is providing a copy of this notice to the Florida Bar, and will provide copies of this notice to any other victim of their criminal schemes that this law firm becomes aware of.

Thank you for your service to Floridians and for your consideration of these matters. This entire episode is a tragedy and we do hope that these co-defendants get the structure, accountability, discipline, and mental health treatment that they need to be productive citizens. As stated in the beginning of this letter, we hope that the disabled child that is a victim of their crimes gets the security and support he needs for a healthy life.

Sincerely yours,

Jaskan Williams, Esq.
HOWARD & ASSOCIATES, P.A.
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Office: (850) 298-4455
jaskan@howardjustice.com

CC:   Florida Bar

5 | P a g e

**EXHIBIT F**



Howard & Associates
Attorneys at Law, P.A.
Dr. Tim Howard, J.D., Ph.D., Senior Partner*
Florida Supreme Court Certified Mediator

Tallahassee Office:
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Ph: (850) 298-4455; Fax (850) 216-2537
Tim@howardjustice.com

Fort Lauderdale Office:
101 NE Third Ave., Suite 1500
Fort Lauderdale, Florida 33801
(954) 332-2333
www.howardjustice.com

Cambridge Office:
8 Museum Way
Suite 2407
Cambridge, Massachusetts 02141
(857) 277-0290

August 21, 2017

Charles Hughes, Bar Counsel
The Florida Bar
651 East Jefferson Street
Tallahassee, FL 32399-2300

RE:    Complaint by Don Reinhard against Jaakan A. Williams
       The Florida Bar File No. 2018-00,060 (2)(A)

Dear Mr. Hughes:

Before addressing the meritless allegations lodged in the complaint against me by Don Reinhard, I first would like to clarify for the record that Don Reinhard was not truthful and forthcoming with this administrative body regarding his current address. Under penalties of perjury, Don declared that the facts alleged in the complaint are true, correct, and complete, when in fact, they are not.

Under Part One - Complainant Information, Don listed his address as 100 Cabana Cxy - CIrcle, Unit 222, Panama City Beach, FL 32413. However, that information could not be further from the truth. Don Reinhard is an inmate currently residing and has been housed in the Leon County Jail since March 1, 2017 awaiting sentencing for two counts of Violation of Probation/FTA/Grand Theft. See Attachment "A." Moreover, Don Reinhard is also facing serious felony criminal charges that are simultaneously pending in Bay County, FL, for Aggravated Child Abuse for forcing a child with developmental disabilities to eat his own feces as part of a "potty-training process." A jury trial in that matter is set for September 5, 2017. See Attachment "B." Ever since Don's termination from Cambridge Capital Group, LLC and his subsequent arrest for the above-referenced criminal offenses; Don has engaged in a pattern of denial, deceit, and extortion in an attempt to shift the blame for his poor decisions and judgment to myself, as well as other employees of Howard & Associates, P.A.. Examples of such behavior

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D. Northeastern University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

will be provided in attachments following my responses below.

My responses to the incredible allegations in the complaint are as follows:

Allegation #1: There is no dispute here. I am a licensed attorney in Tallahassee, FL and have been a member in good standing of the Florida Bar since November 19, 2009.

Allegation #2: There is no dispute here. I am currently employed with Howard & Associates, P.A., 2120 Killarney Way, Suite 125, Tallahassee, FL 32309, as an Associate Attorney since March 28, 2016.

Allegation #3: I did temporarily represent Don Reinhard pro bono in December 2016 in a family law matter, Case No.: 2012-DR-0819, in Leon County, FL regarding child support modification. I was approached by the managing partner at the firm, Timothy Howard, in early December 2016 and asked to assist Don with a non-business related, personal child support modification hearing. At that time, Don Reinhard was working for Cambridge Capital Group, LLC as a independent advisor/consultant. Overall, I attended one child support modification hearing for Don on December 8, 2016. My legal representation of Don in the child support modification matter had nothing in common whatsoever with the affairs of Cambridge Capital Group, LLC, or with Don's capacity as a independent advisor/consultant for Cambridge Capital Group, LLC. Cambridge Capital Group, LLC, is an independent holding company, which is comprised of four distinct and separate entities, all of which are separate and distinct from Howard & Associates, P.A.

On or about February 11, 2017, Don Reinhard was arrested in Bay County, FL and charged with Aggravated Child Abuse (Count One) and Battery of a Child (Count Two). That same afternoon, Timothy Howard instructed me to put an appearance on the record on behalf of Howard & Associates, P.A., for Don until we could find out more details about Don's arrest. On Saturday, February 12, 2017, Don made his first appearance and was arraigned before the Hon. Judge John L. Fishel, II. Because it was a weekend arraignment, Judge Fishel granted permission for me to appear telephonically for the hearing, where the charges were announced and Don entered a plea of not guilty. At the hearing, I announced myself, asked the court for a bond, and that was the end of it. I did not gather, review, or learn any confidential information from Don about his arrest prior to the hearing. My telephonic appearance at that hearing concluded my involvement in any of Don's subsequent personal legal matters.

On or about February 13, 2017, Don was relieved of his duties and terminated as a independent advisor/consultant for Cambridge Capital Group, LLC. After his termination, Managing Partner Timothy Howard advised staff and Don that the law firm of Howard & Associates, P.A. would not provide any further legal representation to Don in any of his personal legal matters, as those issues seriously interfered with the integrity and business structures of the law firm. On February 24, 2017, I filed a Notice of Withdrawal of Counsel in the family law matter, Case No.: 2012-DR-0819, and on March 3, 2017, the Honorable Jonathan Sjostrom entered an Order Granting my Motion to Withdraw. See Attachment C.

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D. Northeastern University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

Allegation #4: The Letter dated July 18, 2017 and referred to as "Exhibit A" by Complainant speaks for itself. In a two-paragraph response to Don Reinhard and Katharine Reinhard regarding alleged subscription agreements, Howard & Associates, P.A., provided a very thorough explanation that there are no subscription agreements or any investors in Cambridge Capital Group under the names of either Don Reinhard or Katharine Reinhard based upon staff's research. Gail Milon, who is currently serving as Don's replacement and Executive Vice-President of Cambridge Capital Group, LLC, and her search did not reveal any of the alleged investment funds allegedly due to Don Reinhard. Cambridge Capital Group, LLC, is currently undergoing an intensive financial audit because it is strongly believed that Don defrauded the company of hundreds of thousands of dollars in investment funds before his departure. Don Reinhard's allegation that I threatened to harm him and his family is simply absurd. See Attachment D. The last sentence in paragraph 4 of Don's complaint is nonsensical as it alleges that I somehow used privileged information and then breached attorney/client privilege when the law firm provided a response to Don Reinhard regarding the very information that he requested from Cambridge Capital Group, LLC, regarding an alleged subscription agreement.

Allegation #5: As explained in Allegation #3 above, I temporarily represented Don Reinhard pro bono in a very limited capacity at one child support modification hearing, Case No. 2012-DR-0819, in Leon County, FL. This was not a long-term, deeply involved relationship. There was no confidential information that was gathered, shared, or used, which would create a conflict of interest or breach of attorney/client privilege between myself and Don. I neither gathered nor prepared, or was informed by Don of any confidential information that Don alleges that I used against him. I simply attended the hearing pro bono at the request of my managing attorney, Tim Howard, and referenced family law documents that had already been prepared prior to my involvement. Moreover, none of the information at those hearings had anything to do with the allegations at issue in this complaint. The issue being litigated, child support modification, had nothing to do with Don Reinhard in his capacity as a independent advisor/consultant for Cambridge Capital Group, LLC. I attended one child support modification hearing on December 8, 2016, and I attended a final hearing on March 3, 2017, when Chief Judge Sjostrom entered an Order discharging my representation of Don in that matter.

Despite Don's misrepresentations to this body, I affirm that I have neither provided legal representation to Don Reinhard nor Katharine Reinhard in any other legal matter other than as explained above. After Don's termination on February 13, 2017, Don was instructed that Howard & Associates, P.A., would not be providing legal representation in any of Don's pending civil and criminal matters. See Exhibit E. I also am not aware of Don Reinhard being the co-owner of or having any ownership interest whatsoever in Cambridge Capital Group as Executive Vice President. See Exhibits F & G. Don Reinhard began consulting with Cambridge Capital Group well over one year before I was hired by Howard & Associates, P.A. I've always worked in the litigation department while Don worked in a separate part of the building for a separate entity performing consulting work for Cambridge Capital Group. I rarely interacted with Don.

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D, Northeastern University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program, President of Cambridge Graduate University International.

The conflict of interest that Don Reinhard alleges exists is also absurd. The State of Florida, a governmental body, is prosecuting Don for his perverted criminal actions against a developmentally disabled child. Cambridge Capital Group is not prosecuting Don, and as far as I know, there is no current or past litigation pending between Cambridge Capital Group, LLC, and Don Reinhard, which I have served as legal counsel that would create a conflict of interest.

Allegation #6: This allegation is untrue. I've never stolen anything from Katie Reinhard. In fact, I personally assisted Katie Reinhard on one occasion with retrieving personal property belonging to Don Reinhard that he left behind in his office after his departure. Twice during the month of June 2017, Katie Reinhard showed up at Howard & Associates, P.A., unannounced and demanded to retrieve personal items that Don left behind. On the first occasion, the Tallahassee Police Department was called out to our location and the investigating officer instructed Katharine that the property dispute between Don and Howard & Associates, P.A. was a civil matter that needed to be handled in small claims court. On the other occasion, I personally went to our storage closet with Katie and helped her retrieve about eight (8) plastic tote bins which contained children's shoes, toys, clothes, and tax records belonging to Don, as well as personal letters that were sent by Don's mother. We then loaded each of the plastic tote bins into the back of her Ford Explorer SUV. Katharine thanked me for assisting her.

Moreover, as was explained in a July 18, 2017 letter addressed to Don Reinhard and Katherine Reinhard, which is Exhibit B of the complaint, it is my understanding that Katharine freely returned the cellphone in question to Cambridge Capital staff members after Don's arrest because the cellphone contained confidential company information. That cell phone was later turned over to law enforcement investigators by Cambridge Capital staff as required under Florida law because the cell phone was believed to contain evidence of felony criminal activity. I neither saw nor handled the cellphone at any point in time. See Attachment H.

Allegation #7: As explained in allegation #5 above, it is my understanding that Don Reinhard has no ownership interest in Cambridge Capital Group, LLC. Don was a temporary independent advisor/consultant and his Don's role as a independent advisor/consultant was terminated effective February 13, 2017. There is no conflict of interest because I've never provided legal representation for Don Reinhard regarding any matter related to the business of Cambridge Capital Group, LLC.

In pertinent parts, Section 4-1.9, Florida Rules of Professional Conduct, states that a lawyer who has formerly represented a client in a matter must not afterwards:

(a) Represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent;

(b) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known.

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D, Northeastern University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

There is no litigation currently pending or past litigation between Cambridge Capital Group, LLC, and Don Reinhard, in which I've served as legal counsel for either party, which would now preclude me or any attorney for Howard & Associates, P.A., from providing legal counsel to Cambridge Capital Group, LLC. In the two instances as I've addressed above in which I made an appearance for Don were solely for personal legal issues that were not the same or substantially related to any affairs concerning Cambridge Capital Group, LLC.

Allegation #8: I take the Oath of Attorney and the Florida Rules of Professional Conduct very seriously, and I would not jeopardize losing my good standing or law license in the Florida Bar by engaging in the senseless actions alleged in this complaint by Don Reinhard.

Allegation # 9: Needs no response.

Part Four – Witnesses: Don Reinhard listed Phillip Timothy Howard, Jaakan Williams, Neil Epstein, Addys Walker, Brenda Murphy, and Katherine Reinhard as witnesses in support of his allegations. Interestingly, four out of six of the persons listed as witnesses are also employees of Howard & Associates, P.A., and have had similar complaints and threats of extortion lodged against them by this same complaint.

Please reference RFA No. 18-1536, which was hand-delivered to the Florida Bar on July 28, 2017 regarding Don Reinhard's attempts at extortion and obstruction of justice against Howard & Associates, P.A. staff. After thoroughly reviewing the materials submitted to this administrative body, I believe the undisputed evidence will clearly demonstrate that Don Reinhard cannot be trusted. He is a morally bankrupt, narcissistic, street thug/career felon who refuses to accept responsibility for his own actions. Don Reinhard has a lengthy criminal past in both the state and federal penal systems. In an Judgment entered by Deputy Clerk David L. Thomas, United States District Court Northern District of Florida, Don Reinhard was ordered to disgorge to the Securities and Exchange Commission the sum of Five Million Eight Hundred Fifty-Seven Thousand, Two-Hundred Forty-One and 09/100 Dollars for committing securities fraud and a host of other Securities Act violations. Don simply cannot be trusted, and had I known this information about Don beforehand, I would have vehemently rejected any request by my managing partner to assist Don in any matter. See Attachments I & J.

Very truly yours,

By: /s/ Jaakan A. Williams
Jaakan A. Williams, Esq.

---

HOWARD JUSTICE

Howard & Associates
Attorneys at Law, P.A.

January 18, 2017

Charles Hughes, Bar Counsel
The Florida Bar
651 East Jefferson Street
Tallahassee, Florida 32399-2300
(850) 561-5845

Re:   Complaint by Don Reinhard against Phillip Timothy Howard, The Florida Bar File No. 2018-00,265(2A).

Dear Bar Counsel Mr. Hughes:

In response to Mr. Reinhard's complaint, please consider the following:

Mr. Reinhard is currently serving two 5-year concurrent sentences for violation of probation and child abuse, and is in the custody of the Florida Department of Corrections. In late 2014 and early 2015, when Mr. Reinhard was recently out of federal prison and selling wine at Costco, out of compassion for a former high school football team-mate, I invited him to my office to discuss teaching in an online course in finance, since he had an MBA and significant experience, and after several meetings, brainstormed with Mr. Reinhard on how to assist his life. Out of that brainstorming, looking at Mr. Reinhard as one of my doctoral students and trusting the lessons of humility and integrity he had learned from his federal prison experience and applying values of redemption, with Cambridge Graduate University International faculty, I established a small investment company to apply the business and finance skills being taught in our MBA program, and hired Mr. Reinhard as a consultant. Mr. Reinhard is the former consultant for this same investment company that I sold in the Spring of 2017. Mr. Reinhard once goal now looks to be a claim of over $1 million from this same investment company. As part of this extortion attempt, Mr. Reinhard is providing false and delusional claims in nearly each and every paragraph, with the exception of paragraphs 1 and 3.

Submitted under penalty of perjury, Mr. Reinhard's paragraphs 5-51 are either false, inaccurate, distorted, dissembled or delusional. Mr. Reinhard never owned any investment company that I was formerly involved with, nor did he invest any money in any investment company that I was formerly involved with, nor does a written and executed ownership or investment agreement exist. In fact, Mr. Reinhard has confirmed under oath that he only made $3,000 per month during the time that he was working as a consultant. See July 8, 2017 letter and verification of no investment, no subscription agreement, affidavits

filed on January 29, 2016, and December 2, 2016 in *Reinhard v. McClellan*, Case No. 2012-DR-819 (Fla. 2nd Cir.), and email verifying the same to Bill Waters, Esq.; July 28, 2017 letter verifying incapacity as investor or owner in any capacity; August 21, 2017 Response filed by Attorney Jaakan Williams, in Florida Bar File No. 2018-00,060(2A), including Exhibits A through I; 1099 provided to IRS by independent accountant; and July 28, 2017 letter and cumulative Exhibit A, provided to Jon Fuchs, Assistant State Attorney, Jennifer Hawkins, Assistant State Attorney, and to the Florida Bar. To meet page limitations, only the Response and Letters are attached hereto. If the attachments are desired, they are in the Florida Bar files and Respondent will provide copies as well.

Mr. Reinhard refers to NFL Concussion Claim files that he may have taken or modified. The law firm does know that Mr. Reinhard had taken former investment company files and data and has not returned the materials. In review of law firm files, all is in order. A formal request for return of missing and/or modified legal files and reports owned by law firm, and files, reports or worksheets owned by Cambridge Capital Group was sent on July 8, 2017, and is attached. Mr. Reinhard is deeply confused as to the NFL Concussion Claims process and the firm's comprehensive screening and final independent testing and screening protocols done by NFL MAFS approved board-certified neurologist and board-certified neuropsychologist. A similar confusion applies to the NCAA allegations against companies owned by others, administrative staff of the law firm, and prior to selling ownership and interest, small documented loans made from $ millions in personal investments.

Mr. Reinhard refers to Katie Reinhard (Buxton) in these allegations, however, she is divorcing Mr. Reinhard, and she became the key witness against Mr. Reinhard, leading to his violation of probation conviction and felony no contest plea, as well as verifying his witness tampering, cocaine purchases and use as found in texts, and attempts at obstruction of justice from the jail. I assisted Ms. Buxton as a tutor for her college classes prior to the criminal charges against both Ms. Buxton and Mr. Reinhard.

There is no retaliation against Mr. Reinhard, nor has there been any communication with Mr. Reinhard by Respondent. The no-communication from Respondent was done not to harm Mr. Reinhard, but to avoid any potential conflict or confusion as to his two criminal cases. The no-communication was also to let the accounting and audit run their course to verify if any funds were misappropriated, if any forgeries or false representations took place, and to let the current owners manage their companies.

After Mr. Reinhard was released from his consultant work in February of 2017, the accounting and review process was begun, and a formal audit was initiated. Respondent is a non-owner of the companies that Mr. Reinhard is seeking money and items from. In compliance with guidance received from the Florida Bar, Respondent does not have management, interest or control in these companies. *See* attached letters to the Florida Bar seeking guidance and compliance with that guidance.

Mr. Reinhard's circumstances are of his own doing, and are a tragedy for his second chance at a life of opportunity and prosperity. Mr. Reinhard's issues are with the criminal justice system, auditor, accountant and owners of the companies that he is complaining about. Mr. Reinhard's issues are not with Respondent nor with Jaakan Williams, as all that was done by Respondent and Jaakan Williams was to give him support and a second chance at a decent life.

Sincerely yours,

(Phillip) Tim Howard, J.D., Ph.D.
3522 Thomasville Road, Suite 500
Tallahassee, FL 32309
(850) 298-4455 (o)
tim@howardjustice.com

cc: file.
Don Reinhard, DOC # N30663

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D, Northwestern University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

EXHIBIT G



Tim Howard <tim@howardjustice.com>

Re: DEMAND LETTER - Corey and ▇▇▇▇▇▇▇
1 message

Tim Howard <tim@howardjustice.com>                                      Tue, May 29, 2018 at 4:06 PM
To: "Berry, Ashley" <asberry@bakerdonelson.com>
Cc: "Sokolow, Dena H." <dsokolow@bakerdonelson.com>, ▇▇▇▇▇▇▇▇▇▇▇▇▇om>
Bcc: John Leonard <jleonard@mdmo-law.com>

Mr. Findley,

Please be advised that there is no ownership, interest, or control over these companies, having divested ownership well over a year ago. There has been distinct management and ownership since that time and your clients are aware of this. It is not clear why this is being sent to the incorrect parties. There has been no demand on this firm nor myself. This firm has made it clear that it has no management, interest or control. This firm does represent Mr. ▇▇▇ on his NFL claim and has information concerning his NFL claim and his file. This notice needs to be directed to the current ownership and management pursuant to their agreements and contracts, as neither myself nor my law firm have the ability to advance the interests of your clients concerning this matter. Your clients have the information needed concerning contacting the management and ownership of these companies, obtaining the information and amounts appropriate from these companies, and can share this information with you.

Thank you for informing us of this error. Please correct this error by sending the notice to the parties that have the power and ability to respond.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.



Tallahassee, Florida Office:
1415 East Piedmont Drive, Suite 5
Tallahassee, FL 32308
(850) 999-8624 (o)

Jacksonville, Florida Office:
444 East Duval Street
Jacksonville, FL 32207
(850) 298-4455 (o)
(850) 216-2537 (f)
Law Firm Website: www.howardjustice.com
tim@howardjustice.com

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373-6076

Pursuant to Rule 3-7.1(f) of the Rules Regulating The Florida Bar, you must execute the applicable section of this form and return it to my attention. The rule provides that the nature of the charges be described in the notice to your firm or you may attach a copy of the complaint.

## CERTIFICATE OF DISCLOSURE

I HEREBY CERTIFY that on this __3__ day of __February__, 20_20_ a true copy of the foregoing disclosure was furnished to ___mail___, a member of my present law firm of __Howard Associates__, and, if different, to _____; a member of the law firm of _____, with which I was associated at the time of the act(s) giving rise to the complaint in The Florida Bar File No. 2020-00,341 (2A).

_____
Phillip Timothy Howard

## CERTIFICATE OF DISCLOSURE
(Corporate/Government Employment)

I HEREBY CERTIFY that on this _____ day of _____, 20___, a true copy of the foregoing disclosure was furnished to _____, my supervisor at _____ (name of agency), with which I was associated at the time of the act(s) giving rise to the complaint in The Florida Bar File No. 2020-00,341 (2A).

_____
Phillip Timothy Howard

## CERTIFICATE OF NON-LAW FIRM AFFILIATION
(Sole Practitioner)

I HEREBY CERTIFY to The Florida Bar on this _____ day of _____, 20___, that I am not presently affiliated with a law firm and was not affiliated with a law firm at the time of the act(s) giving rise to the complaint in The Florida Bar File No. 2020-00,341 (2A).

_____
Phillip Timothy Howard

# Former NFL star receiver pleads guilty in Kentucky in investigation of health fraud

**BY BILL ESTEP**, LEXINGTON HERALD LEADER
DECEMBER 20, 2019 09:29 AM,
UPDATED JANUARY 02, 2020 12:51 PM

A former stand-out receiver in the National Football League pleaded guilty in federal court in Lexington Thursday to conspiring to defraud a health plan.

Joe Horn, 47, admitted taking part in seeking reimbursement in 2018 for expensive medical equipment that he didn't actually receive.

In Horn's case, that included a cryosauna valued at more than $50,000.

Horn submitted false or fraudulent claims to the health plan under his name totaling $149,775, according to his plea agreement.

Horn played for the Kansas City Chiefs before becoming a star for the New Orleans Saints between 2000 and 2006 as one of the top receivers in the team's history, making the Pro Bowl four times.

Horn lives in Columbia, S.C., but healthcare fraud charges against him and several other former NFL players are being prosecuted in federal court in Lexington.

That's because the fraudulent claims were submitted to a CIGNA Healthcare data center in Lexington, according to a court document.

The U.S. Department of Justice announced earlier this month that it had charged 10 former NFL players in an alleged conspiracy to defraud the Gene Upshaw NFL Player Health Reimbursement Account Plan, and planned to charge two more, including Horn.

That program provides reimbursement for medical expenses of former players not covered by insurance. It covers former players, their wives and dependents up to a maximum of $350,000 per player, the department said in a news release.

The former players allegedly schemed to submit claims for reimbursement for equipment they hadn't actually bought.

The big-ticket items included hyperbaric oxygen chambers, cryotherapy machines, ultrasound machines designed to be used by doctors to examine women and electromagnetic therapy devices designed for use on horses, the Justice Department said.

The players allegedly faked invoices, prescriptions and letters stating they needed the equipment.

Then, Robert McCune, 40, of Riverdale, Ga., and Correll Buckhalter, 41, of Colleyville, Tex., allegedly called the reimbursement plan and impersonated other players to check on claims, the Justice Department said.

McCune and Buckhalter were among former players accused of recruiting others into the scheme by offering to handle claims in return for kickbacks of up to $10,000 per claim.

The former players allegedly submitted more than $3.9 million in false and fraudulent claims between June 2017 and December 2018, the Justice Department said.

# EXHIBIT K

**IN THE SUPREME COURT OF FLORIDA**
**(Before a Referee)**

THE FLORIDA BAR,

      Complainant,

vs.

PHILLIP TIMOTHY HOWARD,

      Respondent.

_____/

Supreme Court Case Nos. ▮▮▮▮▮▮▮

The Florida Bar File Nos. ▮▮▮▮▮▮

**SUBMISSION TO THE FLORIDA BAR AND REFEREE** ▮▮▮▮▮▮▮

I, Respondent, Dr. Howard, wish to thank both the Shanee Hinson with the Florida Bar and Judge Bryan for their work in providing ethical guidance and discipline to the attorneys licensed by the Florida Bar. In this filing, ▮▮▮▮▮▮▮▮▮▮. I am also required to balance the record with evidence not earlier presented by counsel for Respondent that will hopefully put a clearer light on the facts and issues before the Referee ▮▮▮▮▮▮▮. Respondent ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ all pending matters.

Respondent ▮▮▮▮▮▮▮▮▮, only a balanced view of the facts and circumstances so that ▮▮▮▮▮▮▮ provide the public his extraordinary and proven services as a qualified lawyer, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ ▮▮▮.

**Summary**

Respondent had no knowing, nor intentional, willful misconduct. Respondent researched and complied with the rules and regulations, and took actions for the clients' interests, that he understood, was aware of, and had capacity to, at the time. I ▮▮▮▮▮▮▮▮▮ ▮▮▮▮.

Respondent has significant ▮▮▮▮ efforts and accomplishments, willingly accepts and always accepted providing ▮▮▮▮, and has significant history of and future for public good as a result of his work as an attorney. He has taken steps to avoid any repeat of the matters at issue, namely changing all staff, reducing his activities so that he is not stretched too thin, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ grounded moral and theological basis for life, and actions to demonstrate the substance of that moral and theological grounding. As a consequence, in compliance with the Florida Bar standards ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮).

Respondent is also seeking guidance as to how to handle the significant jurisdictional concerns as to each Bar Complaint at issue. Bar Complaint 2019—00,088(2A) is an acknowledged perjurious, false

and fraudulent Bar Complaint that was nevertheless pursued. Under oath the complainant repeatedly admits she committed perjury in her Bar Complaint that is riddled with false and fraudulent statements. This is covered in more detail at the end of this submission. As a limited example, this Bar Complainant states:

> Q And so **when this was filed back in 2019**, April of 2019 **you had not read the Bar complaint at that time?**
> A Correct.
> Q And you would have not been able to tell your lawyers whether -- what was in the Bar complaint was true and correct or contained false statements because you hadn't read it?
> A Correct.
> **Q And we now know that it contains statements that you believe to be false?**
> MR. DIAZ: Form.
> BY MR. MONDE:
> **Q Correct?**
> **A Correct.**
> **Q Statements that you believe to be fraudulent, correct?**
> MR. DIAZ: Form.
> **THE WITNESS: Correct.**
> Q. Now that you know that, what steps have you taken to correct that?
> A. At this point nothing that I recall.

*See* transcript attached to Exhibit G, *infra*, pp. 125-126. The next guidance needed concerns a Bar Complaint that was not authorized to be prosecuted by the rules of the Florida Bar as it is the same as a now settled and then pending civil action. The final guidance needed concerns Bar Complaint 2016—00,682(2A), where the statute of limitations jurisdictional hurdles for a Bar Complaint that had to be filed by the estate for the decedent-former client, and never was filed by the estate or the decedent client. None of these jurisdictional concerns were presented to the Referee, though known by Florida Bar attorneys.

## Standards for Imposing Sanctions

Florida's standards for imposing lawyer sanctions have 3 objectives:

First, the judgment must be fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the services of a qualified lawyer as a result of undue harshness in imposing a penalty. Second, the judgment must be fair to the respondent, being sufficient to punish a breach of ethics and at the same time encourage reformation and rehabilitation. Third, the judgment must be severe enough to deter others who might be prone or tempted to become involved in similar conduct.

*The Florida Bar v. Lord*, 433 So. 2d 983, 986 (Fla. 1983).

## Definitions Applicable

The definitions applicable are as follows:

> (a) "Injury" is harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from "serious" injury to "little or no" injury; a reference to "injury" alone indicates any level of injury greater than "little or no" injury.
> (b) "Intent" is the conscious objective or purpose to accomplish a particular result.

2

**(c)** "Knowledge" is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.

**(d)** "Negligence" is the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard care that a reasonable lawyer would exercise in the situation.

**(e)** "Potential injury" is the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct.

Florida's Standards for Imposing Lawyer Sanctions, pp. 1-2. Rehabilitation is a significant factor for sanctions. Consider the following:

## Rehabilitate the Lawyer

One key purpose of the lawyer disciplinary proceedings is, where appropriate, to rehabilitate the lawyer. In the instant action, Respondent has learned from these Bar complaints and others. In the past 33 years, Respondent has engaged in moral guard rails in his career but has run afoul of technical aspects of the Florida Bar Rules, and in managing staff.[1]

## Interim Rehabilitation

Respondent, in his life forging has found renewed clarity, vigor and power in advancing professional, moral and theological guard rails for every aspect of his life. This rehabilitation is comprehensive and demonstrates new birth. Consider the following:

Deep Community Service—Spiritual and Temporal:

Respondent is a Florida Certified Volunteer Chaplain working for the Florida Department of Children and Families and works with the Florida Governor's Office of Adoption and Child Protection. Exhibit A. He ministers to those in prison at Wakulla Correctional Institution. He ministers in poor neighborhoods providing food (over 400 boxes of food, including milk, oranges, potatoes, tomatoes, cheese, hotdogs, chicken, yogurt, and orange juice, while ministering to spiritual and emotional needs, this past Saturday alone), reuniting of families, location of jobs, medical care, and counseling. He ministers to high school athletes, football and basketball teams. Including acceptance of humble salvation by two entire varsity football teams and having over 20 of the players being baptized at his home. He ministers to those starving in Pakistan and works and funds a prototype farm in Tallahassee, Florida, and in Quetta, Pakistan to create sustainable food sources for those starving and in need. He is a non-sectarian teacher and developing theologian along the lines of C.S. Lewis and Tim Keller and is active at both New Creation Church of Tallahassee, a non-denominational charismatic and currently 99% black church, and Blessed Sacrament Parish, a Catholic Church, where he was baptized, received first communion, confirmed and graduated from its school. He goes into crisis communities facing racial injustice and murders that cry for healing and restoration. He gives his time and money for others. He doesn't take nor is motivated to do so.

---

[1] Respondent's prior Bar complaints benefited others, were morally centered, but missed technical aspects. They delt with: (1) Transposing signatures with authority on the fee contract for the $26 billion Florida recovery from the tobacco industry and the $3.2 billion award of legal fees. Though he provided the date of authority on the contract, and all counsel had a copy of the contract for 5 years and were paid $3.2 billion based on the same contract, he failed to site with permission and authority on 4 of 12 signatures of co-counsel; (2) Overpaying one of his clients approximately $4,000 (who is now also a friend) from his trust account; (3) and Requiring a person that stole $50,000, verified by 13 affidavits, to agree to counseling for a settlement, with Respondent stating that he would go to authorities if the person who stole didn't agree to counseling.

Consider the following sworn statements from those that know and work with Respondent, Dr. Howard, on a daily basis. Senior Pastor Mike Smith under oath states:

 5.     Phillip "Tim" Howard is a member of my congregation and has been for going on 4 years. I pastor and minister to and with him, and I fellowship with him. We have both ministered to others in sensitive and confidential matters of the soul, heart, and temporal needs. Here is what I know about Tim.

 6.     From what I understand, Tim's Christian experience has gone from Baptist, to Catholic, Methodist, Charismatic and secular atheism. And for a man in our day to have studied and taught at universities, such as Harvard, Northeastern, Boston University, Oxford and Florida State, and trained nearly 100 doctorates, my heart is overjoyed when we wake up on Saturday morning to feed the less fortunate right here in the Bond community, to share our faith in the parking lots of our local supermarkets, and to have blessed conversations with anyone of God's created beings, shows me that the transforming power of Jesus Christ is alive and at work in him. As a pastor, there is nothing more pleasing and attractive in the people that you get a chance to shepherd than those qualities.

 7.     I have had the privilege of talking with Tim and to share in some of the successes and challenges that he has faced. As a black pastor for me to see commercials about Big Tobacco coming down and later in my ministry to meet a man that brought that corporate giant down, says a lot about his potential his ability to produce and him as a person.

 8.     Since I have met him, I have known him to be nothing but generous. Pouring thousands of dollars into the church, into ministries overseas, and thousands of dollars to the people that he works for. And me understanding what has been presented against him, I have not seen him ask for a single dime in four years of knowing him. All he has does is give. I had to make him to tell me if he needed gas money since this ordeal has ensued.

 9.     I am not going to go into too much than to say in my pastoral discernment, I don't see a man that is a thief or is a taker, and I could be wrong, but what I have witnessed is a brother who all of his life has been taught to work hard, love hard and give hard. I hope that these words fall into consideration of the powers that be in their deliberations and contentions for the life of someone with these qualities.

 10.     Tim has served our congregation and our city, he has walked with me, he is part of our New Creation praise team, evangelism team, prayer team, Youtube channel, broadcasts from Capital of Florida, to Minneapolis, Minnesota to Quetta, Pakistan, and there is more to come.

 11.     Tim assists me with the Fellowship of Christian Athletes ministering to 100s of local high school athletes and as men, trying to better our communities with the message we love. One of the joys of our time serving is having the opportunity baptize the Rickards High School football team at his home and the next year those same young men winning the State High School Championship. This shows me he is authentic and is open as all believers need to be.

 12.     If there is a deeper investigation into his life, I think you will find that these qualities existed prior to his conversion.

 13.     Tim is a State of Florida Certified Volunteer Chaplain, sanctioned by the Florida Department of Children and Families and the Governor's Office of Adoption and Child Protection through the Share Your Heart Florida Campaign. In this capacity, we have given over 400 boxes of food in the Bond community.

Exhibit B. Pastor and Minister Melvin Youmans under oath describes Dr. Howard as follows:

3.     I have been a Living God Christian pastor and minister for 30 years with numerous churches and currently with New Creation Church Tallahassee.

4.     I have been evangelizing and ministering to the homeless, inmates, praise, prayer, and poor for decades.  I have personally seen the Living God heal the blind in prison and cast out demons from the possessed.  I was invited by the Catholic Church, Good Shepherd Parish in Tallahassee, to teach them about the power of the Holy Spirit and how to stand against evil and taught them for several months.

5.     Phillip "Tim" Howard and I have been ministering together going on 4 years now.  In fact, I am the one that prayed over his back prior to the Living God healing him.

6.     Tim and I regularly go into Wakulla Correctional Institution to share the good news, with salvations and baptism of the Holy Spirit taking place.

7.     Tim and I evangelize throughout neighborhoods and in the Walmart parking lot, regularly seeing the Living God work.

8.     Tim and I minister to those in the Bond community, near FAMU, and bring healing, salvation and power to those that receive free meals and prayer.

9.     Tim and I work on a farm at former Assistant State Attorney Sid White's house and property, that I am leading as a prototype for starving Christians in Pakistan and other under resourced parts of the world.  We have a chicken farm and crops.  We have funded the sustainable farm in Quetta, Pakistan with Good News Pastor Kashif Rasheed Masih, who ministers to Christian orphans and widows, as well as young Christian girls that have been kidnapped and violated in order to be sullied, abandoned, and forced to convert to Islam.

10.    Tim and I participate as bible study teachers and engage in regular intercessory prayer.

11.    Tim is generous with my personal needs and gives to any project that the Living God has sought us to pursue.

12.    Tim loves the Living God and serves him in many fronts and locations.

Exhibit C.  Attached are photographs from the ministering, teaching, praising, feeding and loving that Respondent, Dr. Howard engages in on a daily basis.  Exhibit D.  These are the are the truthful and factual activities and motivations of Respondent, Dr. Howard.



Respondent has not had a Florida Bar sanction in over 15 years.

## Appropriate Sanctions Based on Prior Rulings by the Florida Bar

Respondent has extensive rehabilitation and community service.  Consider the following:

Respondent provides extensive annual *pro bono* and Christian services to numerous parties:

Local Citizens' Divorces;

Local Citizens' Criminal Cases, Estate Cases, and Family Law Disputes;

Latin American Laborer Driving and Worker Permits and Immigration;

Employment Discrimination Guidance;

Graduate and Doctoral Education:

Ph.D. in Law, Policy and Society, with a Dissertation on Cause Lawyer Leadership in Florida's Tobacco Litigation, with methodologies that applied Theology, Law, Policy, Quantitative, Qualitative and Mixed Methods, Historical Methods, Leadership, Economics, Sociology, Conflict Resolution, Critical Thinking. Dr. Howard also teaches and explores Sustainable Economic Development with Graduate Students and business incubators designed to lift the poor from poverty, and more to global and national students, such as:

African Chieftains and Queen Mothers from Ghana and Nigeria;

Civil Rights Leaders, President, Graduate Students and Pastors in Honduras;

Civil Rights Leaders in Venezuela;

International Monitor of Fair Elections in El Salvadore and Honduras;

Judges in the United States;

U.S. Senators, U.S. Governors, Chancellors, University Presidents, Provosts, Deans, Nationally and Internationally;

Graduate Students in India (New Dehli, Mumbai, Chennai, Hyderbad);

Graduate Students, Business Leaders and Civic Leaders in Pakistan (Lahore);

Business Leaders and Government Officials.

Public Interest Litigation that benefits Floridians, Americans and the global population in a deep and substantial way:

Florida Sovereignty Lands Standards for $10 billion of State property as Special Assistant Attorney General; Florida Environmental Protection as Assistant Attorney General. *Coastal Petroleum v. American Cyanamid*, 492 So. 2d 339, (Fla. 1986); See AGO 88-22 (June 1, 1988), defining the Ordinary High Water Line ("OHWL") and methodology to secure sovereignty lands as applied by § 253.03(7), Fla. Stat. *See* Reimer, Monica, *The Public Trust Doctrine: Historic Protection for Florida's Navigable Rivers and Lakes,* Florida Bar Journal, Vol. 75, No. 4, April 2001.

Florida Supreme Court State Court's Administrator Special Counsel;

Florida Health Care protecting senior citizens in nursing homes and expanding health care coverage for millions of Floridians, and identifying and prosecuting health care fraud and abuse;

Finalist for U.S. Attorney for the Northern District of Florida;

Florida Medicaid Tobacco Case--$27 billion for the State of Florida, removal of billboards and child advertising. *Chiles v. The American Tobacco Co., et* al. (No. 95-1466-AO) ("Complaint");

*Agency for Health Care Admin. v. Associated Indus. of Florida, Inc.,* 678 So.2d 1239, 1239, cert. denied, 65 U.S.L.W. 3629 (Fla. Mar. 17, 1997).

Removing cancer causing benzene from soft drinks nationally. *See Coke Sued as Part of Benzene War*, Los Angeles Times, August 26, 2006; *Coca-Cola settles lawsuit over benzene, Associated Press,* May 14, 2007.

Recovering $300 million from tobacco companies for individual victims (husbands, wives, children and families) of addiction, cancer and death. *Engle v. R.J. Reynolds Tobacco Co.,* No. 9408273 CA (20) (D. Fla. Oct. 31, 1994), http://legacy-dc.ucsf.edu/tid/wbn15f00. *R.J. Reynolds Tobacco Co. v. Engle*, 672 So. 2d 39 (Fla. Dist. Ct. App. 1996). *R.J. Reynolds Tobacco Co. v. Engle*, 122 F. Supp. 2d 1355 (S.D. Fla. 2000). *Engle v. Liggett Group, Inc.,* 945 So.2d 1246 (Fla. 2006). *R.J. Reynolds Tobacco Co. v. Engle*, 122 F. Supp. 2d 1355 (S.D. Fla. 2000). *Evans v. Lorillard Tobacco Company*, 465 Mass. 411 (Mass. 2013), including recovery for 13,000 Engle Trust claimants, 100 individual cancer cases, and winning or settling scores of tobacco trials and cases.

BP Oil Spill--$100 million for 5,000 injured clients. *In re* Oil Spill, No. 10-MDL-2179 (E.D. La. Jan. 23, 2015); 21 F. Supp. 3d 657, 668–69 (E.D. La. 2014). *See In re* Oil Spill, 77 F. Supp. 3d 500, 525 (E.D. La. 2014) (finding that 4 million barrels of oil were released into the Gulf but only considering 3.19 million barrels for civil penalties). Damage to 100s of thousands of businesses and individuals in the Southeast United States from Florida to Texas.

Locating and sealing of the source of nuclear isotopes, and toxic nuclear cleaning chemical plumes in water, food, air and ground, causing cancer clusters and leukemia in children and families near the nuclear facility, shutting down elementary, middle and high schools in Southern Ohio. *Walburn, et al., v. Centrus, et al.,* Case No. 20-cv-4621 (S.D. Ohio 2020).

Elementary through High School Coach:

25 years as a coach of flag football, soccer, baseball, pee wee football, junior football, middle school football and track, high school football, track and basketball, training and mentoring 1,000s of young men and women.

Most recently a Fellowship of Christian Athletes Mentor Coach at Rickards High School, which team won the State Championship in 2020, and Jefferson County High School (2020-to present date).

Former Lincoln High School basketball coach for State finalist and State semi-finalist team; former FAMU High School DRS Offensive Line Football (District Champs) and Track Throws Coach; former Gadsden County High School Offensive Line Football Coach.

Exhibit E. This is all done while Respondent is providing Food, Medical Care, Jobs, Counseling, Family Reunification, Housing for the Homeless, Addicts, Ill, and Hurt in the Community as referenced above and as found in Exhibits A through E.

Jason Hall

Respondent understood that Jason Hall was "not" a client based on the research and sworn written documents from 2008. ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████

There was no knowing, intentional or willful violation, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
limitations hasn't run on the 2008 errors, and the estate was not the party to bring the Bar Complaint,
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ly. Due to the age
▓▓▓▓▓▓▓▓▓▓—13 years ago; the ▓▓▓▓▓▓▓▓▓▓▓▓▓ application this research to the sworn client
directives and sworn end of the client relationship; the prompt offer to have the Florida Bar arbitration
review, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

Respondent would have provided a prompt compliance with any accounting or arbitration award
concerning the 2008 ▓▓▓▓▓ Jason Hall, if Dana Hall/Sandra Fulup would have agreed to an independent
accountant and arbitration. Unfortunately, the age of the matter, not having the file, not having access to
bank records, and resistance by Dana Hall/Sandra Fulup for an independent party accounting or
arbitration, and/or Florida Bar arbitration to immediately review, made prompt resolution impossible.
Thus, there was no intent, willful, or knowing ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓e.

### Peggy Harris

Peggy Harris was not harmed nor was there any potential injury to her as a result of missing the probate
status conference or the errata on the never to be used discovery deposition. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓.

## Injury to Client

Starting with "injury" to any potential client, consider the following.

### Peggy Harris

There was no injury to Peggy Harris. Rather, Peggy Harris received a $10 million verdict and nearly
$400,000 of expenses and 3,000 hours of work for free by Respondent. Respondent protected the
testimony of Richard Harris despite numerous obstacles by counsel for the tobacco industry and his "end
of life" deposition directly led to the $10 million verdict. Respondent even paid counsel for Peggy
Harris $21,000 a month during his representation of Peggy Harris. Respondent has received and will
receive nothing for his $400,000 in risk, his 3,000 hours of work, the pay of his counsel to work in the
Peggy Harris case, and the pay for costs.

### Jason Hall

There was no injury to Jason Hall the client of Respondent. Jason Hall never filed a Bar Complaint and
Jason Hall never had a complaint against Respondent. In fact, Jason Hall would have recovered nothing
"but for" the work of Respondent. The core transaction at issue, namely, whether the attorney client
relationship had ended as a result of a sworn direction from the client and written end of representation,
such that the former client's loan ▓▓▓▓▓▓▓▓▓▓ was no longer under Florida Bar ambit was in 2008.
It is now 2021. In 2008, Respondent and his staff attempted to research and comply with the Florida Bar
rules on the matter ▓▓▓▓▓▓▓▓▓▓▓▓. No other similar ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ before nor since.

---

[2] The Bar Complaints of JB Harris, under the name of Kim Poling (similar to the Peggy Harris Bar Complaint), concerning
the Fort Lauderdale Office operations, detailed trust accounting breakdown, and ▓▓▓▓▓ Bar Complaints that merely
copied their settled civil suits and was initially denied by the Florida Bar, have all been responded to. Respondent humbly
requests that the sanctions determined in this action resolve all matters currently pending.

8

Despite not having the file, and not having access to records from any source going back to 2008, Respondent was successful in providing a full accounting. ██████████████████████

████████ Accounting spreadsheet, correlated per item in order with approximately 300 pages of checks, ledgers, satisfaction of liens, estate and tenant work done, and verification of payments attached to spreadsheet, and summary report are attached as Exhibit F and found at this link: https://www.dropbox.com/scl/fi/jy6xfmk07wgqrz71oxk3y/10-30-20-a-Jason-Hall-Accounting-Revisd-by-TH.xlsm?dl=0&rlkey=sr3fsw0wv74ham4383fdk5orw. The three items that raised concerns by the ████████ were documented from an affidavit documenting reduction in a lien from TMRMC, and the best available evidence, such as Florida Supreme Court decision on worker's compensation fees that found 10% fee limitation unconstitutional, and the value of work performed and costs expended that were not paid for. The remaining 94 items in the accounting had documents attached to validate each item and were not challenged by the Florida Bar, including that Respondent did estate and landlord tenant work and was not paid, yet still rejected by the Referee. *Id.*

If the accounting of the ████████ is correct, then the law firm of RumbergerKirk and former Florida Bar prosecuting counsel, Richard A. Greenberg, who advised and guided the Florida Bar and Dana Hall/Sandra Fulup in this prosecution, would be liable for damages plus applicable interest due to legal malpractice. Dana Hall/Sandra Fulup had until February 12, 2020 to file a contract action within the statute of limitations period.[3] Dana Hall/Sandra Fulup had counsel experienced and knowledgeable as to their claim and they were not advised to file a contract action, and did not file a contract action, within the statute of limitations period. In light of this liability, it is expected that the law firm of RumbergerKirk and former Florida Bar prosecutor, Richard A. Greenberg will be adopting an accounting closer to that of John Harvard.[4]



## Knowledge

The "knowledge" of Respondent as to the attendant circumstances of the conduct are as follows:

### Peggy Harris

Respondent had no knowledge that the Richard Harris estate case management was not covered by Matt Hinson, his board- certified probate counsel. Once he found out, he quickly took action to correct the gap.

Similarly, correcting one day of non-trial deposition testimony through errata sheets that were reviewed with and signed by the client is not a known conscious objective or purpose to harm either the client or the administration of justice. There was no conscious awareness of any negative objective or purpose. In fact, the client, Peggy Harris under oath states the following:

---

[3] As late as February 12, 2015 Dana Hall/Sandra Fulup in writing demanded $200,000 based on the written contract with Respondent and Jason Hall. TFB Hall 00175-200. These writings came along with cursing from Hall/Fulup. Under § 95.11(2) and (3), Florida Statues, there was 5 years from knowing of the right under a written contract, which the Respondent had with Jason Hall, and 4 years on an oral contract and fraud.

[4] If Richard Greenberg and the RumbergerKirk law firm accept the Florida Bar's accounting and lens of the facts, which Richard Greenberg had previously advocated for, Richard Greenberg and the law firm of RumbergerKirk is liable and will be paying Dana Hall/Sandra Fulup damages plus applicable interest.

Q Clarifying, okay. And is the clarification truthful, meaning that although Richard was having problems with the eyesight, the lawyers came back and went over his deposition with him?

A Correct.

<u>Q Okay. So the correction in the errata sheet is not false, it's true. Am I right?</u>

MR. MONDE: Objection to form.

<u>THE WITNESS: Correct.</u>

Q In the correction it says, "I do remember our attorneys coming over prior to the deposition and reviewing his deposition from the previous days," et cetera. **As you sit here today, and when you did this errata sheet, do you remember, did you then remember that the attorneys were going over the deposition transcripts with Richard after the deposition testimony was taken?**

MR. MONDE: Objection.

<u>THE WITNESS: Correct.</u>

. . .

**Q Yes?** <u>**So the correction -- is my understanding correct that the correction part of this page 320 is not false, it's true?**</u>

MR. MONDE: Objection.

<u>THE WITNESS: Correct.</u>

. . .

Q Okay. Is it also a fair and correct statement throughout that **you always felt and understood and perceived and know that the lawyers after the deposition went over the depositions with Mr. Harris either to correct, amend, explain, or change any of his answers?**

MR. MONDE: Objection. Asked and answered.

<u>THE WITNESS: Correct.</u>

. . .

Q Now, within that truth, were you at least aware, because of your walking into and back out of the room, **that the lawyers in some measure were going over deposition testimony and these corrections, if you want to call them that, with your husband, Mr. Harris, even though you don't know the particulars?**

MR. MONDE: Objection to form.

<u>THE WITNESS: Correct.</u>

. . .

Q Okay. Now, even though you may not have seen the actual interactions between question, answer, errata, and the type and everything else, **was this testimony truthful because your impression, your read, your interpretation of what you were seeing and hearing consistent with them going over the deposition transcripts in the errata sheets?**

**A Correct.**

. . .

Q Okay. And you said, "<u>And Richard clarified his answers and the changes he wanted made to the transcript.</u>" Was that a truthful statement at the time?

**A Correct.**

<u>Q Was that a truthful statement in your correction?</u>

**A Correct.**

<u>Q And is that still a truthful correction -- or a truthful statement today?</u>

**A Right.**

. . .

Q Now, in the corrections, you say, "**I do remember our attorneys reviewing the errata sheets with Richard to make sure that the errata sheets accurately reflected changes he requested before he signed them.**" Is that a false statement?

MR. MONDE: Objection.

**THE WITNESS: No.**
BY MR. DIAZ:
**Q Okay. Is that a general -- was that the impression that you had from everything
you saw, <u>the lawyers going over the errata sheets and the depo transcripts with
Richard?</u>**
**MR. MONDE: Objection.**
**THE WITNESS: Correct.**

. . .

**Q And then when the errata sheets were done and the correction provisions were put
in as a trailer to some of the questions and answers, to the best of your knowledge,
were -- was the information in those corrections also truthful?**
MR. MONDE: Objection.
**THE WITNESS: Correct.**

A detailed analysis of fraudulent and perjurious Peggy Harris Bar Complaint that she never read, admits
is fraudulent and perjurious, as the Florida Bar was informed of in detail in numerous filings, attached as
Exhibit G.

Jason Hall

There was no known knowledge nor any conscious objective or purpose to accomplish a particular result
that would harm Jason Hall or the profession. There was no knowing, intentional nor willful
misconduct. Respondent, while managing Northeastern University's mid-career doctoral program as
professor and director, researched the rules, and had his staff research the rules, and based on the
research on the rules in 2008 ensured via affidavit and sworn statement that there was not a loan between
a client and Respondent. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
Nevertheless, Respondent was trying to comply with the rules and the desires of his client. Respondent
had no need for ▮▮▮▮▮ making over $1 million annually on average. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ help other injured clients, namely Alan Landers, former Winston Man, who was
dying of lung cancer in mid-2008, and died from cancer without an heir prior to trial. ▮▮▮▮▮▮ for
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Respondent understood and found that the accounting provided by his staff to the ex-wife of the
deceased client, after a month of ex-wife of deceased client's review, was accurate and agreed upon in
writing by all parties in December of 2013. Respondent is not an accountant, but the accounting
appeared accurate to all parties. With full disclosure, Respondent provided the entire file to
complainants in early 2014. If there was intentional, willful or knowing misconduct, Respondent would
not have given the file away.

Once the concern was raised by the ex-wife, Respondent did not have the file to go over his records from
2008-2016 and could not obtain bank records from the original time frame. As a consequence, he has
been severely handicapped in accurately responding ever since this matter arose.

With complete transparency and accountability, Respondent offered to go to an independent arbitrator
for the Florida Bar to review and confirm accounting and/or any gap. Respondent would have been
more than willing to pay for any gap. Respondent's income in 2013 was $7.9 million. The Dana
Hall/Sandra Fulup accounting matter was one of 5,000 BP cases, staff management, co-counsel
relationships, 100s of graduate faculty and staff relationships, and guidance of scores of global graduate
students and international graduate intensives throughout the globe (India, Africa, China, Latin America,
Asia, Central Asia and Middle East) that Respondent was managing at the time. These are not the
actions of someone that has intentional, willful or knowing misconduct.

11

## Negligence

"Negligence" is the failure to heed a substantial risk that circumstances exist or that a result will follow, deviating from the standard of care. In the instant action consider the following:

### Peggy Harris

Respondent was unknowingly ▮▮▮▮▮▮ in not covering the ▮▮▮▮▮ hearing ▮▮▮▮▮▮▮▮▮▮ Respondent ▮▮▮▮ was responsible for this. He regrets that attacks and abandonment by lawyers that he was paying to work for the clients, such as Peggy Harris, instead of filing fraudulent Bar Complaints against him by the client he was hired to help, caused this harm to his former client.[5]

### Jason Hall

Respondent ▮▮▮▮▮▮▮▮▮▮ researching the standards for ending a client relationship ▮▮▮▮ ▮▮▮▮▮▮▮▮. Respondent was a▮▮▮▮▮▮▮▮▮▮▮ researching how and when a trust relationship is created that the ending of a client relationship ▮▮▮▮▮▮. Respondent's staff provided accounting and records to the estate for final review. Respondent provided the entire file to complainants. Respondent did not understand that the client relationship continued. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮

## Potential Injury

"Potential injury" is the harm to client, the public, the legal system or profession that is reasonably foreseeable. In the instant action consider the following:

### Peggy Harris

There was no foreseeable injury, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ on missing the probate action status conference as the action could be refiled without prejudice and was in fact done so. Respondent recognized the concern and took all immediate actions in his power once the issue was raised.

There was no foreseeable injury to the client on the errata sheets as the client read and signed the changes to a discovery deposition defendant by a young associate that was never to be used in a trial. The concern as to professionalism was addressed by no use of the discovery deposition done by a younger associate attorney. Respondent will be far more circumspect in application of any errata sheets going forward. In this case, the errata sheets explicitly did not apply to the trial preservation testimony done by Respondent, which was in large part responsible for a $10 million verdict for the client, but only to the discovery depositions.

### Jason Hall

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. In this case, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a client that signs a sworn statement instructing Respondent as what to do with his funds ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[5] In fact, J.B. Harris was working for Respondent at $21,000 a month and instead of assisting Respondent in covering the various matters needed, J.B. Harris orchestrated the entire perjurious Bar Complaint that the client never read before filing, and an attorney being paid by Respondent took over the probate action.

~~[redacted text]~~

**Respondent Seeks Guidance from Referee in How to Address Violation of Florida Bar Standards by Attorneys for the Florida Bar, The Same Standards that Respondent Accepts Accountability For**

Peggy Harris Admits Bar Complaint Was Never Read, Is Perjurious and False.  JB Harris Fraudulently Used Bar Complaint To Gain Advantage in Civil Case.

The Peggy Harris Bar Complaint was never read by Peggy Harris, and was not drafted by Peggy Harris, but by J.B. Harris, despite Peggy Harris filing the Bar Complaint under oath and under penalty of perjury.  Peggy Harris under oath acknowledges that the Bar Complaint she signed violated criminal perjury and has extensive false and fraudulent statements.  Exhibit E.  Peggy Harris admits that her Bar Complaint is fraudulent and her counsel raised her 5th Amendment rights:[6]

Q. **You're saying that you signed the Bar complaint without reading it?**
A. **Correct**.  I know that's—that is my fault.  I'm sorry I didn't read it.
. . .
Q. Part five says that, "Signature.): **Under penalties of perjury, I declare that the foregoing facts are true, correct and complete."  Do you see that?**
A. I do.
Q. And then your name is printed, correct?
A. Correct.
Q. **And then you signed your name, correct?**
A. **You understood when you signed this <u>that you were under penalty of perjury declaring the facts in the statement to be true, correct and complete?</u>**
A. **Correct.**
Q. There was no doubt in your mind about what you were signing, correct?
A. Apparently not—apparently so.
Q. I want to make sure I understand your answer.
A. Well, I—**I did not read it, so I was wrong** in not—putting this down, so—
Q. And I appreciate you're acknowledging that that was wrong.  And I want to understand from you why you agree that was wrong to do.  You understood when you signed this that you were taking an oath to tell the truth –
A. Correct.
Q.—Just like the oath you took this morning?
A. Right.
Q. And you understood the importance of an oath in a legal proceeding, correct?
A. Yes.
Q. I mean, our legal system, you agree, depends on people telling the truth, correct?
A. Correct.
Q. Our legal system depends on people telling the full truth and not being deceptive by leaving out certain key parts, correct?
A. Correct.
. . .

---

[6] MR. ANDERSON: Okay.  Well, I'm going to respectfully disagree with you.  And to the extent you ask her about her testimony related to her errata sheets, **I'm going to have to instruct her not to answer on the grounds that she could be incriminating herself**.
**MR. MONDE: Then have her take the Fifth.**

**Q. You understand what perjury means, right?**
**A. Yes.**
**Q. You understand the penalties of perjury?**
**A. Yes.**
**Q. You understand that in some context perjury can be a criminal offense?**
A. Um-hum.
Q. Yes?
**A. Yes.**
**Q. Would you want any part of a judgment that you believed was based on false information?**
. . .
**A. No.**
**Q. That would be wrong?**
A. Right.
Q. Would you want to be **any part of a judgment that you believed was <u>infected by or tainted by fraud?</u>**
A. I wouldn't like it.
**Q. Would you want any part of it?**
**A. <u>No.</u>**
. . .
Q And so **when this was filed back in 2019**, April of 2019 **you had not read the Bar complaint at that time?**
A Correct.
Q And you would have not been able to tell your lawyers whether -- what was in the Bar complaint was true and correct or contained false statements because you hadn't read it?
A Correct.
**Q And we now know that it contains <u>statements that you believe to be false?</u>**
MR. DIAZ: Form.
BY MR. MONDE:
**Q Correct?**
**A Correct.**
**Q <u>Statements that you believe to be fraudulent</u>, correct?**
MR. DIAZ: Form.
**THE WITNESS: <u>Correct.</u>**
Q. Now that you know that, what steps have you taken to correct that?
A. At this point nothing that I recall.

*Id.,* at pp. 23-27, 84-85, 125-126. Attorneys for the Florida Bar knew this. This is material information for the Referee that was withheld by the Florida Bar from the Court. Is this something that the Florida Bar should have immediately acknowledged and presented to the Referee? Is there jurisdiction to prosecute an admitted perjurious, fraudulent and knowingly false Bar Complaint? Doesn't this nullify jurisdiction? In *The Florida Bar v. Cox,* 794 So. 2d 1278 (Fla. 2001), a prosecutor was suspended for 1 year for withholding the name of a confidential informant. The fact of a fraudulent, perjurious, and false Bar Complaint is far more significant to a prosecution than withholding the name of a confidential informant. How is this handled by the Referee and the Florida Supreme Court?

<u>Corey ███ and William ███ Bar Complaints Merely Copied Civil Complaint. Used Bar Complaint To Gain Advantage in Civil Case</u>

The Florida Supreme Court has ruled that the Florida Bar is not a venue to pursue civil remedies as another venue for political or legal leverage, and based on this standard, appropriately discharged Corey ███ and William ███ complaints in the attached letter dated January 15, 2020. Exhibit H. Mr. Hughes, as The Florida Bar representative, stated:

14

I must conclude that your complaint constitutes a civil dispute as there are **no allegations independent of the enclosed civil complaint** and as a result, must be resolved through the civil system. The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies.
. . .
Consequently, I have closed our record in this matter.

*Id* (emphasis added).

Nothing has changed in the facts and circumstances of these Bar Complaints. When the decision was made to continue to pursue these Bar Complaints, there was no explanation of what new facts existed or why. If the Florida Supreme Court ruling applies, consistent with the letter ruling, how are these matters handled?

If, as a consequence, these parties were not entitled to use the Florida Bar as a method to gain advantage of a civil action that had been proceeding for nearly two years at the time. What happens? Notwithstanding violation of the confirmed Florida Bar and Supreme Court standards, the Florida Bar went forward with the prosecution. How does the Florida Supreme Court handle this?

The civil case was settled without Respondent having to pay anything, since Respondent was not involved with the scheme done by a high school football friend that he had given a second chance to and the Complainants' attempts to get retirement funds without paying taxes and penalties. Respondent received nothing and was not part of the scheme.

The Florida Bar's potential violation of their and the Florida Supreme Court standards was one pressure on Respondent for settling the civil action. Is this something that the Florida Bar should have immediately acknowledged and not pursued? How does the Florida Supreme Court handle this?

Client, Jason Hall Never Filed Bar Complaint. Estate for Jason Hall Had Right to File Bar Complaint and Never Did. Statute of Limitations Has Run.

The core transaction at issue, namely, whether the attorney client relationship had ended as a result of a sworn direction from the client and sworn and written end of representation, such that the former client's loan with Respondent was no longer under Florida Bar ambit, was in the Summer and early Fall of 2008.

If the decedent has a right of action (which the Florida Bar action can only be brought by the client or the estate for the client), upon death, his estate must bring the action "by the decedent's personal representative" "before the later of the expiration of the time limit for the commencement of the action or 12 months after the decedent's death." § 733.104(2), Fla. Stat.

In this case, the estate has not brought a Florida Bar action. Rule 3-7.16 states that "a complainant must make a written inquiry to the Florida Bar within 6 years from the time the matter giving rise to the inquiry or complaint is discovered or, with due diligence, should have been discovered." Jason Hall never filed a complaint as there was nothing to complain about.

Dana Hall and Sandra Fulup were given the file in January of 2014, with all documents in file, including loan and all payments, accountings and billings. The matter would have been discovered with due diligence within 10 months of giving the files to Dana Hall and Sandra Fulup.

The estate, the only legal entity that could have filed a Bar Complaint for the deceased, Jason Hall, has never filed a Bar Complaint and the 6 years statute of limitations has run. There is no tolling based on fraud as there was full disclosure of all transactions and prior accounting completed on 12/23/13, and

complete file and loan document as part of full accounting provided in January of 2014, all over 6 years ago.

The Florida Bar Attorneys know the standards for Statute of Limitations and which parties can bring an action. They have not informed the Referee of these facts and rules that may nullify jurisdiction for their prosecution. Is this something that the Florida Bar should have immediately acknowledged and informed the Referee of the same? How does the Florida Supreme Court handle this?

Respectfully submitted on this 18th Day of March 2021.


Phillip Timothy Howard

16

# EXHIBIT K-A

Volunteer CHAPLAIN

Phillip Tim Howard
9682 Deer Valley Dr
Tallahassee, Fl 32312

ID NO. 3817

| | D.O.B. | SEX | HEIGHT |
|---|---|---|---|
| | 03/07/1961 | M | 6-2" |
| | WEIGHT | EYES | HAIR |
| | 208 | Blue | Brown |

Issued: 02/20/21   Expires: 02/20/22

NOT VALID IF EXPIRED
INFO@SHAREYOURHEART.US

SHARE YOUR



# Certificate of Completion
# Spiritual Care Training

**Department of Children & Families**
**Pastoral Care - Baptist Health South Florida**

## Phillip Tim Howard

*Has completed the 16-hour DCF Training*
*Course for Spiritual Care Providers*



NON-FOR PROFIT 501 (c)3 ORGANIZATION

Roland González
Executive Director, Share Your Heart



2/19/2021
Date










# EXHIBIT K-B

## AFFIDAVIT OF SENIOR PASTOR MICHAEL SMITH

### STATE OF FLORIDA
### COUNTY OF LEON

I, MICHAEL SMITH, who upon being sworn, under penalty of perjury, and for use in any legal proceeding, do hereby under oath state:

1.     My name is MICHAEL SMITH, I am 45 years old. I live at 3772 Everwood Court, Tallahassee, Florida 32303. I am of sound mind and able to testify.

2.     I make this Affidavit based upon my personal knowledge and what I know personally from my history as a pastor.

3.     I have been a Christian pastor for 17 years with Christian Heritage, Restoration Place and New Creation Church Tallahassee. I am Senior Pastor at New Creation Church in Tallahassee, Florida. I graduated from Florida State University.

4.     In my service to the Lord, I have had the opportunity minister to the homeless, bring the Good News of the Jesus Christ to people that God has appointed me to meet with, and preach and teach the Gospel and pastor and bring healing to the body of Christ. In my ministry, I have seen the miraculous power of the Living God bringing sight to the blind and power to walk to the crippled.

5.     Phillip "Tim" Howard is a member of my congregation and has been for going on 4 years. I pastor and minister to and with him, and I fellowship with him. We have both ministered to others in sensitive and confidential matters of the soul, heart, and temporal needs. Here is what I know about Tim.

6.     From what I understand, Tim's Christian experience has gone from Baptist, to Catholic, Methodist, Charismatic and secular atheism. And for a man in our day to have studied and taught at universities, such as Harvard, Northeastern, Boston University, Oxford and Florida

State, and trained nearly 100 doctorates, my heart is overjoyed when we wake up on Saturday morning to feed the less fortunate right here in the Bond community, to share our faith in the parking lots of our local supermarkets, and to have blessed conversations with anyone of God's created beings, shows me that the transforming power of Jesus Christ is alive and at work in him. As a pastor, there is nothing more pleasing and attractive in the people that you get a chance to shepherd than those qualities.

7.      I have had the privilege of talking with Tim and to share in some of the successes and challenges that he has faced. As a black pastor for me to see commercials about Big Tobacco coming down and later in my ministry to meet a man that brought that corporate giant down, says a lot about his potential his ability to produce and him as a person.

8.      Since I have met him, I have known him to be nothing but generous. Pouring thousands of dollars into the church, into ministries overseas, and thousands of dollars to the people that he works for. And me understanding what has been presented against him, I have not seen him ask for a single dime in four years of knowing him. All he has does is give. I had to make him to tell me if he needed gas money since this ordeal has ensued.

9.      I am not going to go into too much than to say in my pastoral discernment, I don't see a man that is a thief or is a taker, and I could be wrong, but what I have witnessed is a brother who all of his life has been taught to work hard, love hard and give hard. I hope that these words fall into consideration of the powers that be in their deliberations and contentions for the life of someone with these qualities.

10.     Tim has served our congregation and our city, he has walked with me, he is part of our New Creation praise team, evangelism team, prayer team, Youtube channel, broadcasts

from Capital of Florida, to Minneapolis, Minnesota to Quetta, Pakistan, and there is more to come.

11.        Tim assists me with the Fellowship of Christian Athletes ministering to 100s local high school athletes and as men, trying to better our communities with the message we love.  One of the joys of our time serving is having the opportunity baptize the Rickards High School football team at his home and the next year those same young men winning the State High School Championship.  This shows me he is authentic and is open as all believers need be.

12.        If there is a deeper investigation into his life, I think you will find that these qualities existed prior to his conversion.

13.        Tim is a State of Florida Certified Volunteer Chaplain, sanctioned by the Flor Department of Children and Families and the Governor's Office of Adoption and Child Protection through the Share Your Heart Florida Campaign.  In this capacity, we have given 400 boxes of food in the Bond community.

14.        If you need anything further as to Tim, please let me know and I will be happy provide.

FURTHER AFFIANT SAYETH NOT

SENIOR PASTOR MICHAEL SMITH    2/22/21



# EXHIBIT K- C

## AFFIDAVIT OF PASTOR MELVIN YOUMANS

**STATE OF FLORIDA**
**COUNTY OF LEON**

I, MELVIN YOUMANS, who upon being sworn, under penalty of perjury, and for use in any legal proceeding, do hereby under oath state:

1.　　　My name is MELVIN YOUMANS, I am 66 years old. I live at 484 Forest Green Drive, Tallahassee, Florida 32308. I am of sound mind and able to testify.

2.　　　I make this Affidavit based upon my personal knowledge and what I know personally from my history as a minister and pastor.

3.　　　I have been a Living God Christian pastor and minister for 30 years with numerous churches and currently with New Creation Church Tallahassee.

4.　　　I have been evangelizing and ministering to the homeless, inmates, praise, prayer, and poor for decades. I have personally seen the Living God heal the blind in prison and cast out demons from the possessed. I was invited by the Catholic Church, Good Shepherd Parish in Tallahassee, to teach them about the power of the Holy Spirit and how to stand against evil and taught them for several months.

5.　　　Phillip "Tim" Howard and I have been ministering together going on 4 years now. In fact, I am the one that prayed over his back prior to the Living God healing him.

6.　　　Tim and I regularly go into Wakulla Correctional Institution to share the good news, with salvations and baptism of the Holy Spirit taking place.

7.　　　Tim and I evangelize throughout neighborhoods and in the Walmart parking lot, regularly seeing the Living God work.

8.　　　Tim and I minister to those in the Bond community, near FAMU, and bring healing, salvation and power to those that receive free meals and prayer.

9.       Tim and I work on a farm at former Assistant State Attorney Sid White's house and property, that I am leading as a prototype for starving Christians in Pakistan and other under resourced parts of the world. We have a chicken farm and crops. We have funded the sustainable farm in Quetta, Pakistan with Good News Pastor Kashif Rasheed Masih, who ministers to Christian orphans and widows, as well as young Christian girls that have been kidnapped and violated in order to be sullied, abandoned, and forced to convert to Islam.

10.      Tim and I participate as bible study teachers and engage in regular intercessory prayer.

11.      Tim is generous with my personal needs and gives to any project that the Living God has sought us to pursue.

12.      Tim loves the Living God and serves him in many fronts and locations.

13.      Tim is a certified Florida Volunteer Chaplain working with the Florida Department of Children and Families, and the Governor's Office of Adoption and Child Protection, and regularly meets the needs of the lost, last and least.

14.      I have been with him constantly since his revival and he has authentic fire for the Living God. He has been touched by that fire.

15.      Tim goes to where the Holy Spirit is moving through all denominations and groups.

16.      Tim is on the church praise team, prayer team, ministry outreach to the poor, a Florida Certified Volunteer Chaplain, a Fellowship of Christian Athletes mentor coach and speaker. He and I regularly counsel and locate resources for those in need.

17.      Tim and I have been in the Bond Community, Speed Park, near FAMU Football Stadium, with Alexis Annon and Kinsha Mims ministering with free food, prayer, praise, family

reunification, and job assistance to the homeless, addicts, ex-convicts, and poor nearly every Saturday for over a year. The Holy Spirit shows up every time, with families united, addicts delivered, tears of healing shed, medical care such as new eye-glasses and glaucoma treatment, jobs sought, and nourishment to lost and hurting souls provided.

18.     Just this past Saturday, as a Florida Certified Volunteer Chaplain, Tim assisted in distributing 1,300 boxes of food, including meat, fruit, vegetables, cheese, milk, and more, as part of his ministry with the Share Your Heart Campaign, with over 300 distributed, while ministering to those that have lost loved ones from CV19, lost jobs, and are just plain beaten up by life.

19.     In my experience and knowing the history of Tim, he never took anything from anyone and has only given, and he only gives to me, our congregation and all those he sees in need, even to the extent of regularly picking up homeless men and women, giving them a meal, some money for clothes and food, and bringing them to church.

20.     I can see how Tim would trust the wrong persons with manipulative intent, how they would take advantage of him, and can see how they would try to blame him to get away with what they have taken. This is standard psychological projection device by deviants.

21.     Tim is my brother and I love him. His discernment and compassion and love relationship with the Living God has deeply improved from this process of betrayal, pain and suffering. I look forward to sharing with him the many lives and souls that will come to know the love and power of the Living God through his life and testimony.

22.     If you need anything further as to Tim, please let me know and I will be happy to provide.

FURTHER AFFIANT SAYETH NOT

_____

PASTOR MELVIN YOUMANS

DRIVER'S LICENSE ATTACHED

WITNESS: _____         DATE: 2/22/21



# EXHIBIT K- D









**Done**          5 of 5



























