INDEX OF EVIDENCE

EXHIBIT A          Quality Standards for Investigations

EXHIBIT B          FBI Investigative Guidelines

EXHIBIT C          Wisdom Report (███████████) - Veracity of Sharon
                   Delaney

EXHIBIT D          Affidavit of Sharon Delaney

EXHIBIT E          Tipster Inmate Coordination with SCM Corey ████ Joe ██████
                   et.al., for Extortion

EXHIBIT F          Tipster Inmate Attempt at Extortion Through the Florida Bar

EXHIBIT G          Special Masters' Failure to Address Bias in Investigation

EXHIBIT H          Affidavit of Respondent

EXHIBIT I          Federal Order of Disgorgement for Tipster's Illegal Taking
                   Approximately $500,000

EXHIBIT J          SCM Corey ████ Attempt at Extortion Coordinated with
                   Tipster

EXHIBIT K          Verified Perjured, Fraudulent, False and Extortionate Florida
                   Bar Complaints, and Extortion Attempts Against Respondent;
                   Respondent's Verified and Undisputed History, Activities, and
                   Motivations

# EXHIBIT K- E









































































































# EXHIBIT K-F

**Margaret "Peggy" Harris v. Phillip Timothy Howard, TFB File No. 2019-00,088(2A);**
**Phillip Timothy Howard v. Jonathan B. Harris, TFB File No. 2019-70,042(11J);**
**Jonathan B. Harris v. Phillip Timothy Howard, TFB 2018-00,342(2A).**

In a sworn and videotaped deposition of Margaret "Peggy" Harris ("Peggy Harris") taken in *Margaret Harris, et al., v. RJR, et al.,* Case No. 2014-CA-337 (Fla. 2nd Cir), taken on February 13, 2020, Peggy Harris documents the fallacious, fraudulent and intentionally criminally perjurious Bar complaint submitted under oath and penalty of perjury, that Jonathan B. Harris wrote for Peggy Harris, which she never read. This is consistent with the Responses to these Bar Complaints previously filed with sworn testimony attached on August 22, 23 and 28, 2018. Peggy Harris admits that her Bar Complaint is fraudulent and her counsel raised her 5th Amendment rights:[1]

> Q And so when this was filed back in 2019, April of 2019 you had not read the Bar complaint at that time?
> A Correct.
> Q And you would have not been able to tell your lawyers whether -- what was in the Bar complaint was true and correct or contained false statements because you hadn't read it?
> A Correct.
> **Q And we now know that it contains statements that you believe to be false?**
> **MR. DIAZ: Form.**
> **BY MR. MONDE:**
> **Q Correct?**
> **A Correct.**
> **Q Statements that you believe to be fraudulent, correct?**
> **MR. DIAZ: Form.**
> **THE WITNESS: Correct.**

Condensed Transcripts attached as Cumulative Exhibit A. The Margaret "Peggy" Harris' Inquiry/Complaint under PART FIVE, is submitted with following statement:

**"Under penalties of perjury, I declare that the foregoing facts are true, correct and complete."  Signed by Margaret "Peggy" Harris, on <u>7-8-18</u>.**

This is an official proceeding under Florida Bar rules and regulations, and based on the language, type set, legal research, attached documents, prior threats to extort, consistency in his attacks in two other bar complaints, and as verified in the deposition of Peggy Harris taken on February 13, 2020, and attached hereto, was prepared and written under the sole guidance, control and direction of Florida attorney, Mr. J.B. Harris.

---

1 MR. ANDERSON: Okay. Well, I'm going to respectfully disagree with you. And to the extent you ask her about her testimony related to her errata sheets, **I'm going to have to instruct her not to answer on the grounds that she could be incriminating herself.**
**MR. MONDE: Then have her take the Fifth.**

Under section 837.02(1), Fla. Stat., when perjury takes place in an official proceeding, such as in a Florida Bar complaint, the **criminal** offense of perjury is a third-degree felony punishable by up to 5 years in prison and a $5,000 fine. If this complaint is considered an unofficial proceeding, perjury would be considered a misdemeanor of the first degree, punishable by up to one (1) year in jail, (1) year of probation, and $1,000 in fines.  Finally, if this Bar Complaint is considered before a public servant in the performance of his or her official duty, perjury would be a misdemeanor of the second degree under section 837.06, Fla. Stat.

Unfortunately for Mrs. Peggy Harris in acceding to Mr. J.B. Harris' agenda and writings, has sworn to this bar complaint under penalties of perjury and verified her violation of the law and her oath.2

As found repeatedly in the Deposition transcript attached to this response, with three attorneys representing Peggy Harris, there is undisputed evidence of multiple instances of perjury and criminal violations under section 867.02(1), Fla. Stat.  These also violates section 837.021(1), Fla., Stat., since there are two or more material statements in official proceeding under oath that contradict each other and constitute a second-degree felony.

Moreover, there are numerous bar violations for presenting false evidence.  Under rule 4-1.2(d), **"A lawyer shall not counsel a client to engage, or assist a client, in conduct the lawyer knows or reasonably should know is criminal or fraudulent."**  *See* Florida Bar Ethics Opinion 75-19.  It is also a bar violation to offer evidence that the lawyer knows to be false and should disclose that the evidence is false to the tribunal. Rule 4-3.3 (b).  It is indisputable that Mr. J.B. Harris authored and prepared the entire bar complaint and is using Mrs. Peggy Harris, who never read the Bar Complaint, as a front and tool for his own extortionate and denigrating agendas.

In that instance, he has violated Rule 4-3.3(a)(1), (2), and (4), which require candor toward the tribunal, and has made a false statement, and has failed to correct or disclose a false statement of material fact or offered evidence that the lawyer knows to be false.  In addition, Mr. J.B. Harris must report and disclose that he authored this fraudulent Peggy Harris Bar Complaint.

J.B. Harris, and has written similar fraudulent Bar Complaints for himself and Kim Poling in a pattern of scandalous false statements.  This is an abject abuse of the Florida Bar and a gross manipulation of the Florida Bar processes and fraud for monetary gain that cannot stand nor tolerated.  To do otherwise, decimates the ethical and moral legitimacy of the institution of the Florida Bar, and our court system alike.

## BAR COMPLAINTS CONTAIN NUMEROUS FALSE AND FRADULENT STATEMENTS FROM J.B. HARRIS THAT CLIENT DID NOT READ NOR AUTHORIZE AND BOTH ARE SUBJECT TO CRIMINAL PERJURY

---

2 The **exhibits attached to this 7-8-18 sworn statement** are <u>dated **7/30/18, 7/10/18, 7/30/18, 7/30/18, and 7/30/18, respectively.**</u> *See* Exhibit A, Exhibit D, Exhibit E, and Exhibit F to the August 21, 2018 Response. **They are all printed from Mr. J.B. Harris' gmail account, jbharrisesq@gmail.com, on <u>July 31, 2018, July 30, 2018, and August 3, 2018.</u>  These emails are not from Mrs. Peggy Harris.**  While these exhibits do not constitute a bar violation, they are material to Mrs. Peggy Harris' (Mr. J.B. Harris') claim of such a violation.  In her February 13, 2020 Deposition Peggy Harris admits to fraud and perjury by both her and J.B. Harris.

## COMPLAINANT DID NOT READ BAR COMPLAINT BEFORE OR AFTER FILING

In her deposition taken February 13, 2020, Margaret Peggy Harris, stated under oath that she **"signed the Bar complaint without reading it,"** and that everything in the Bar complaint

"statement **is not true and correct**" and contains statements that are **"fraudulent. "**3  In response, **J.B. Harris now states that Peggy Harris "maligned him" by telling the truth**.4

---

3  From Pages 23-31:

Q.  Is it your belief that if the Florida Bar had any written communications about your Bar complaint that J.B. Harris would have them?
A.  I would think so.  He's the one that handled it exclusively.
. . .
Q.  All right.  So it's fair to say that you had no changes to make to the Bar complaint that you signed before you signed it?
**A.  Well, I didn't read it.  I did not read it—read the complaint.**
**Q.  You are saying that you signed the Bar complaint without reading it?**
**A.  Correct.  I know that's—that is my fault.  I'm sorry that I didn't read it.**
. . .
Q.  Part five says that, "Signature: Under penalty of perjury, I declare that the foregoing facts are true, correct and **complete.**" **Do you see that?**
A.  I do.
Q.  And then your name is printed, correct?
A.  Correct.
Q.  And then you signed your name, correct?
A.  Correct.
Q.  You understood when you signed this that you were under the penalty of perjury declaring the facts and statements to be true, correct and complete?
A.  Correct.
Q.  There is no doubt in your mind about what you were signing, correct?
A.  Apparently not—apparently so.
Q.  Well I want to understand your answer.
A.  Well, I—I did not read it, so I was wrong in not—putting this down, so—
Q.  And I appreciate you're acknowledging that that was wrong.  And I want to understand from you why you agree that that was wrong to do.
A.  Correct.
Q.  –Just like the oath you took this morning?
A.  Right.
Q.  And you understand the importance of an oath in a legal proceeding, correct?
A.  Yes.
. . .
Q.  Have you had the opportunity to review the statement that is part of your Bar complaint after you signed it?
A.  Yes.
Q.  When did you first do that, ma'am?
A.  Just a few days ago.
. . .
**Q.  Based on your reading, is everything in the statement true and correct?**
**A.  No, not really.  Not—its not what I discussed.**
. . .
**Q.  You mentioned that the first time you read the Bar complaint that you signed under oath was a few days ago in the comfort of your home, correct?**
**A.  Correct.**
**Q.  So to be clear, you had never read the Bar complaint that you had signed last year, for example, in April of 2019, correct?**
**A.  Correct.**
. . .
**Q  Are you curious where J.B. Harris came up with all this information?**
**A Yes. Um-hum.**
Q Now let's go back to page eight. How do you feel about J.B. Harris, now that you had a chance to read this in the comfort of your home, no pressure, you read it two or three times, you let some time pass between reading so that, to use your words, you could digest it? What do you think now that you read it?
**A I'm disappointed.**
**Q Why?**
**A Because not everything is factual.**
Q Why does that disappoint you?
A Well, you expect your lawyer to be helpful to you and do it correctly.

Peggy Harris also understands what perjury means and the criminal nature of perjury, stating in response to the following:

**"Q You understand what <u>perjury means,</u> right? <u>A Yes.</u> Q You understand the <u>penalties for perjury?  A Yes.</u>  Q You understand that in some context <u>perjury can be a criminal offense? A Um-hum.  Q Yes.  A Yes.</u>"**

<u>DOCUMENTED FALSE STATEMENTS FROM J.B. HARRIS THAT HOWARD HAD NO TOBACCO TRIAL EXPERIENCE</u>

J.B. Harris falsely states that Howard knew nothing about tobacco pretrial preparation and failed to adequately prepare Richard for his testimony.  5  This is despite the fact that the main source of

---

Q Does it trouble you to learn that your lawyer has not been factual?
<u>A Correct.</u>
Q Does it trouble you --
MR. DIAZ: Form.
BY MR. MONDE:
Q -- that your lawyer has not --It's just an objection for the judge. Does it trouble you that your lawyer, J.B. Harris in your view has not been factual in connection with a statement that he had you sign?
MR. DIAZ: Form.
MR. ANDERSON: Form.
BY MR. MONDE:
Q Ma'am?
A I can answer?
MR. ANDERSON: Yes, ma'am.
<u>THE WITNESS: Yes.</u>
. . .
Q Now, Ms. Harris, having now before today looked at the Florida Bar complaint from cover to cover, are there things or claims, <u>allegations in that Bar complaint that do not come from Peggy Harris?</u>
<u>A Correct.</u>
Q Okay. And is it fair to say that wherever J. B. Harris might have gotten the information that you don't subscribe to, you're not aware of, or that you may not agree with, okay, that you don't know what source Mr. Harris had for that part or those insertions in the Florida Bar complaint?
MR. MONDE: Objection to form.
<u>THE WITNESS: Correct.</u>
BY MR. DIAZ:
Q Okay. And you don't know if he got some of his information from you and some from Jaakan Williams, correct?
A Correct.
. . .
Q I clearly understood you to tell me this morning that you had not read the Bar complaint before you signed it and that you regretted that. And I'm unclear whether I heard you say something different in response to Mr. Diaz. And the fact of the matter is that the transcript, which is just in rough form right now, doesn't help clarify that. So I've just got to ask <u>you; Did you read any part of that Bar complaint before you signed it?</u>
<u>A No.</u>
Q Thank you, ma'am.

4  MR. [J.B.] HARRIS: No. I want to go on the record right now. I was noticed for the deposition. I was given a call-in number. I'm Mrs. Harris lawyer. <u>I sat here and listened to her malign me.</u> And you asked inappropriate questions. I am entitled to object. I am entitled to object on my own behalf.

5  Q.  The next paragraph reads as follows: "Knowing nothing about pretrial preparation for an Engle-progeny case, Howard failed to adequately prepare Richard for his testimony."  <u>Is that true, correct and complete statement?</u>
<u>A.  I would say no.</u>
Q.  Why do you say that?
A.  Tim didn't do a lot with it.  He had people under him that did that.
Q.  Did Tim Howard play any role whatsoever in preparing your husband for his deposition prior to June 20, 2016, the first day?

evidence for a $10 million verdict was the trial preservation testimony completely directed and conducted by Dr. Tim Howard. *See Howard v. RJR,* Case No. 1D19-2123 (Fla. 1ˢᵗ DCA), Initial Brief, and extensive citations to the record, and the "but for" his trial testimony preservation work there would be no $10 million verdict.  Peggy Harris verifies that she did not know this information, and relied on other lawyers, namely J.B. Harris, who provided the false information that Howard had not tried a tobacco trial.   The claim of no tobacco trial experience is patently false as Jaakan Williams, as an attorney for the firm, had worked with Howard for some weeks during the 7-week *Sermons v. RJR* trial,  In fact, Howard had to conduct the deposition clean up from Jaakan Williams' first day, and trial preservation testimony that was solely done by Howard in the *Harris v. RJR* action, while the 7-week *Sermons v. RJR* trial in Jacksonville, Florida was taking place.  Thus, he could not have provided any claim that Howard had no tobacco trial experience as this was a *non sequitur*. 6

<u>DOCUMENTED FALSE STATEMENT THAT RICHARD HARRIS WAS IN PAIN AND COULDN'T TESTIFY OR PROVIDE CORRECTIONS TO HIS DEPOSITIONS</u>

J.B. Harris places false statements that the decedent Richard Harris was in pain and couldn't

---

A.  Some, but not all.
Q.  So the statement in your Bar complaint that reads, "Knowing nothing about pretrial preparations for an Engle-progeny case, Howard failed to adequately prepare Richard for his testimony," **you are telling us know that this is a falsehood, that that's a misrepresentation, correct?**
**THE WITNESS:  I would say that's done by J.B. Harris.**
. . .
Q If you read the end sentence of that paragraph, it says, quote, "Nevertheless, the trial
had to be continued because defense counsel needed more time to review the tissue samples from the autopsy." **That is a statement that would not have been sourced from you, correct? Would you have known that?**
**A No.**
MR. MONDE: Objection.
BY MR. DIAZ:
**Q Or Mr. Harris got that from some other source?**
**A I would believe that.**
**Q But not you?**
**A Correct.**

6 Q.  The next part of the sentence, let's focus on that.  "He wasn't competent because," quote, "he had never tried one in the past and has not until this day."  Is that true and correct and complete, to the best of your knowledge?
A.  Yes.
**Q.  What is your source of information for that?**
**A.  Other people, other lawyers, I guess I would say.**
**Q.  In other words, other lawyers have told you that Tim Howard has never tried a tobacco case?**
**A.  Right.  Because I wouldn't know that otherwise.**
**Q.  Right.  What other lawyers?**
**A.  I imagine J.B.**
Q.  Anyone else?
A.  Jaakan Williams.
Q.  Anyone else?
A.  Not that I recall.

Moreover, Howard had done tobacco work since 1993, and worked on the most successful tobacco cases in history, including the *State of Florida v. American Tobacco*, (1997)  ($27 billion recovery for State of Florida) (Howard drafted and filed Complaint for the State of Florida, defended constitutionality, prepared damages model, covered 61 depositions, etc.; *Evans v. Lorillard*, Massachusetts Superior Court (2010) ($180 million verdict) (Howard evaluated action, assisted in trial monitoring and strategy, appeal, and evidence); *In Re: Engle* tobacco (M.D. Fla.)($100 million settlement).

properly address corrections to his deposition. 7  The sworn deposition of Peggy Harris taken February 13, 2020, is consistent that this is a false statement.

## DOCUMENTED FALSE STATEMENT THAT ERRATA SHEETS WERE FRADULENT, PERJURIOUS AND OBSTRUCTION OF JUSTICE

J.B. Harris next falsely states that the errata sheets to Richard Harris pre-trial deposition were fabricated.8  Peggy Harris states explicitly and repeatedly that what J.B. Harris wrote was false

---

7  Q. The next paragraph says the following: "Richard was in so much pain at the time, not only were the depositions torturous, requiring the attorneys to take a break mid-week to allow Richard a respite," period.  That's an incomplete sentence, but it is what's on your page.  **Was your husband in pain at the time of the deposition?**
**A. No.**
Q. Ma'am?
A. No.
**Q. So that's a false statement?**
**A. Yes, yes it is.**
. . .
Q. Well, let me ask you this. What is your understanding of why J.B. Harris wrote in this sworn Bar complaint that your husband was in so much pain?
**A. I have no idea.**
**Q. Did you ever tell him that?**
**A. No.**
**Q. Did you ever suggest it to him?**
**A. No.**
**Q. Do you know of any basis in the world that J.B. Harris had for swearing this   or asking you to swear to it?**
**A. I do not.**

8  Q. Let's take that sentence I read and break it down into a smaller piece.  I want to focus on these words: "Following the depositions.  **Howard and his associate Ankur Mehta fabricated errata sheets for each transcript, extensively rewriting Richard's testimony.  Just that part, is that true, correct and complete?**
**A. I cannot say.**
Q. Why not?
**A. Because I don't know.  I don't know if it was fabricated.  I don't know.  I just don't know.**
**Q. What does the word fabricated mean to you?**
**A. Made up, change.  So I really don't know.**
. . .
Q So when you say in your Bar complaint that the errata sheets extensively rewrote your husband's testimony, is that true, correct and complete?
A. Again, I can't say because I don't know.  I don't recall.
. . .
**Q. Is it accurate to say that whoever was the source of the information for this sentence "fabricated errata sheets, extensively rewriting testimony," it was not Margaret Peggy Harris?**
**A. Correct.**
Q. So is it true and correct that Howard and Mehta ordered our husband to sign errata sheets?
THE WITNESS: I don't know, because I was in and out.  I do not remember that.
. . .
A. I don't know.
Q. You say in your statement that not only were the errata sheets fabricated but they were extensively rewritten. "Specifically following the depositions of Howard and his associate Ankur Mehta fabricated errata sheets for each transcript extensively rewriting Richard's testimony.  Do you see that?
A. Um-hm.
Q. Yes?
**A. Yes.  I'm sorry.  But I don't believe that though.  I don't know.  I just do not know if they did, because I just don't know.**
. . .
**Q. You told me how you define fabricated.  Do you know whether your husband's errata sheets were fabricated, that is** stated falsehood or were the truth?
. . .

MR. DIAZ:  I think the better question, with all due respect is, as you sit here today to you believe that that statement—**do you believe it's accurate because it's pretty obvious that there are things in this complaint that are not sourced from her; ergo, they were sourced from some other person, or you are suggesting in this case, fraudulent Bar complaint, whatever.**

. . .

Q.  **Mrs. Harris, let me ask you to go back up to the prior paragraph and the sentence from your sworn Bar complaint that says, "Following depositions, Howard and his associate, Ankur fabricated errata sheets for each transcript, extensively rewriting Richard's testimony." Do you believe that that is true, correct and complete statement?**
**A. I do not believe that.**
Q.  In what way to you not believe it?
A.  Because I have no clue about what's right and what's wrong or anything about errata sheets.
Q.  **Do you believe that Howard and Mehta ordered your husband to sign the errata sheets as opposed to giving him the option of reviewing them and making changes?**
**A. I do not know.**
**Q. Did you ever know?**
**A.  No.  I still don't know, really.**
Q.  Do you believe Howard and Mehta not just ordered your husband to sign the fraudulent errata sheets but did so without even **reading to him the changes?**
**A. I do not know.**
Q.  **Let's take the first part away.  Do you believe that your husband signed the errata sheets without even reading the changes?**
**A. I do not know.**
Q.  **Do you know anything about the process by which the errata sheets were prepared, whether they were reviewed or not with your husband before he signed them?**
**A. No.**
Q.  Did you ever know that?
**A. No.**

. . .

Q.  Okay.  Do you know the source of information that J.B. Harris had when he wrote in a statement for you to swear **under oath that Tim Howard and Ankur Mehta ordered your husband to sign the errata sheets?**
**A.  The only other person there was Jaakan Williams.**
**Q.  But do you know whether Jaakan Williams   Let me ask you this:  Did Jaakan Williams ever tell you that Tim Howard and Ankur Mehta ordered your husband to sign errata sheets?**
**A.  I don't recall.**
**Q.  You don't recall him telling you that?  No?**
**A.  I don't recall.**
**Q.  I'm sorry.**
**A.  I don't recall him telling me that.**

. . .

**Q.  So to finish up this part, Mrs. Harris, to the extent that J.B. Harris had any source of information that Tim Howard and Ankur Mehta ordered your husband to sign the errata sheets without even reading them, it didn't come from you?**
**A.  Correct.**

. . .

Q Okay. The next sentence, "Last, he," referring to Mr. Howard, **"suborned perjury with the errata sheets, obstructed justice and committed a fraud upon the court by attempting to use them in the proceedings." Do you believe that that is true and accurate?**
**A I can't -- I don't know, because I don't know what's -- again, we talked previously about the errata sheets. I have no knowledge of how it works, so I couldn't say.**
Q If anyone, Mr. Howard or anyone else, used the errata sheets to create false testimony, to suborn perjury and used them to obstruct justice or commit a fraud upon the court, would you want any part of that?
A No.

. . .

Q Clarified it. All right.  Whatever adjective we want to put on it, in July you swore to the following: "In discussions with Richard, our attorneys prepared the errata sheets according to Richard's instructions and reviewed them with Richard. Richard verified that the errata sheets were consistent with the testimony that he wanted to give." That was your testimony under oath as of July 6th, 2017, correct?
A Correct.
Q When you said that our attorneys prepared the errata sheets according to Richard's instructions, that was false, wasn't it?
MR. DIAZ: Objection. Form. I'm sorry. Go ahead.
THE WITNESS: No.
BY MR. MONDE:
Q How so?

**A Well, they were there. They talked with him.**

. . .

**A They did do -- they did -- they did question -- they did question --See, I'm getting all upset now.**
MR. DIAZ: I'm sorry. I didn't mean to trigger that.
**THE WITNESS: No. Well --The attorneys talked to my husband. I'm not -- I don't know the term errata sheets, but they went over his testimony.**

. . .

Q Okay. I think you said that Jaakan Williams had told you that in his opinion there was some kind of nefariousness or something wrong or fraud regarding Richard Harris' errata sheets. Do you remember that testimony?
A Yes.
**Q All right. Now, that was Mr. Williams' opinions? Do you know one way or the other whether Mr. Richard Harris' errata sheets were fraud?**
**MR. MONDE: Objection.**
**BY MR. DIAZ:**
**Q Do you have the ability to even know that one way or the other?**
**A No.**
**Q Okay. And you would not know, would you, what reason, if any, Jaakan Williams might have had for his own opinions and impressions about Mr. Richard Harris' errata sheets, correct?**
**A No.**
Okay. All right. In the middle of page 3, the paragraph that starts off with "Howard and Mehta" -- and that's M-E-H-T-A -- "ordered Richard to sign the fraudulent errata sheets." **Just to be clear, that "fraudulent" is not your words and that's not how you would have written this part of the complaint if this were ever done by you, correct?**
MR. MONDE: Objection to form.
**THE WITNESS: Correct.**

. . .

Q Okay. And so you would not know question to question what questions were corrected, clarified, or amplified on. **But you do know, generally speaking, as you sit here today and when you were deposed yourself on the errata sheets of Richard, that there were meetings between Richard and his lawyers for purposes of preparing what you now know to be called errata sheets; am I correct?**
MR. MONDE: Objection to form.
**THE WITNESS: Correct.**

. . .

Q Yeah. Let me start again. Question, "Do you believe that when your husband signed those errata sheets, that he understood what he was signing?" And your answer was, "I think -- I would think he would. I wouldn't think he would sign it if he didn't." Right?
A Right.
Q Was that accurate testimony?
A Right.

. . .

**Q Okay. Then it goes on and it says, "And my question was just a little bit different. Given his health condition at the time, do you think he understood what he was signing when he signed those errata sheets?" And you said, "I would say yes," right? Okay? Yes?**
**A Yes.**
**Q Right. When you said "I would say yes," you're not certifying 100 percent, but you're saying in your best faith belief at the time was that he was able to sign, correct?**
MR. MONDE: Objection to form.
**THE WITNESS: Correct.**
BY MR. DIAZ:
Q Yes, ma'am?
MR. MONDE: Same.
**THE WITNESS: Yes.**

. . .

Q Answer, ma'am. Is it fair to say, now that you refreshed your memory about what your memory was two years ago when you were asked about Richard signing the errata sheets and the whole exercise of the execution/preparation of the errata sheets, **as you sit here today, is it fair to say that you are not saying that his errata sheets were forged, you don't know if they were signed by him or not, correct?**
MR. MONDE: Same objections.
**THE WITNESS: Correct.**

. . .

Q And you were explaining, "Although Richard was having problems with his eyesight, **I do remember our attorneys coming over prior to Richard's deposition and reviewing his deposition testimony from the previous days with him, and making**

sure that he understood the testimony he had given, and making all the corrections that Richard suggested." Have you read that?

A Right.

Q Okay. Now, here's what I would like to know: When you did the correction, you didn't change your answer above, you were just explaining it further, is that right?

MR. MONDE: Objection.

THE WITNESS: Clarifying it.

BY MR. DIAZ:

Q Clarifying, okay. And is the clarification truthful, meaning that although Richard was having problems with the eyesight, the lawyers came back and went over his deposition with him?

A Correct.

Q Okay. So the correction in the errata sheet is not false, it's true. Am I right?

MR. MONDE: Objection to form.

THE WITNESS: Correct.

Q In the correction it says, "I do remember our attorneys coming over prior to the deposition and reviewing his deposition from the previous days," et cetera. As you sit here today, and when you did this errata sheet, do you remember, did you then remember that the attorneys were going over the deposition transcripts with Richard after the deposition testimony was taken?

MR. MONDE: Objection.

THE WITNESS: Correct.

. . .

Q Yes?  So the correction -- is my understanding correct that the correction part of this page 320 is not false, it's true?

MR. MONDE: Objection.

THE WITNESS: Correct.

. . .

Q Okay. Is it also a fair and correct statement throughout that you always felt and understood and perceived and know that the lawyers after the deposition went over the depositions with Mr. Harris either to correct, amend, explain, or change any of his answers?

MR. MONDE: Objection. Asked and answered.

THE WITNESS: Correct.

. . .

Q Now, within that truth, were you at least aware, because of your walking into and back out of the room, that the lawyers in some measure were going over deposition testimony and these corrections, if you want to call them that, with your husband, Mr. Harris, even though you don't know the particulars?

MR. MONDE: Objection to form.

THE WITNESS: Correct.

. . .

Q Okay. Now, even though you may not have seen the actual interactions between question, answer, errata, and the type and everything else, was this testimony truthful because your impression, your read, your interpretation of what you were seeing and hearing consistent with them going over the deposition transcripts in the errata sheets?

A Correct.

. . .

Q Okay. And you said, "And Richard clarified his answers and the changes he wanted made to the transcript." Was that a truthful statement at the time?

A Correct.

Q Was that a truthful statement in your correction?

A Correct.

Q And is that still a truthful correction -- or a truthful statement today?

A Right.

. . .

Q Now, in the corrections, you say, "I do remember our attorneys reviewing the errata sheets with Richard to make sure that the errata sheets accurately reflected changes he requested before he signed them." Is that a false statement?

MR. MONDE: Objection.

THE WITNESS: No.

BY MR. DIAZ:

Q Okay. Is that a general -- was that the impression that you had from everything you saw, the lawyers going over the errata sheets and the depo transcripts with Richard?

MR. MONDE: Objection.

THE WITNESS: Correct.

. . .

Q And then when the errata sheets were done and the correction provisions were put in as a trailer to some of the

and fraudulent in her February 13, 2020 Deposition.  As just one example, consider her response to the following:

> Q Okay. And -- but something different, but similar, but very important, are you satisfied today, based on everything that you knew, saw, perceived, watched going in and out of the room, **that the errata sheets resulted from interchange and exchanges between Mr. Harris' attorneys and Mr. Harris?**
> **A Correct.**
> **Q Ms. Harris, if that's right, do you know why your lawyers in a pleading filed with the court would call those errata sheets the product of fraud that constitute the suborning of perjury, the obstruction of justice, and -- what else did you call it, Rick?**
> MR. DIAZ: I'm not going to be a witness.
> BY MR. MONDE:
> **Q There's another phrase. Oh, yeah, and committed a fraud upon the court. Do you know why your lawyers would do that?**
> **A No, I don't.**

*Id.*

In response to and in support of the above-referenced inquiry/complaints, please consider the following. In support of the second incontrovertible perjury referenced in the August 23, 2018 filing, as is found in the July 8, 2018 sworn Bar complaint allegedly by Mr. Peggy Harris, at pages 3 and 8, Mr. Jaakan Williams' sworn testimony on April 11, 2018, is in contrast to numerous sworn statements:

> In an effort to cure whatever perceived shortcomings may have resulted from Richard's testimony, following the depositions, Howard and his associate Ankur Mehta fabricated errata sheets for each transcript, extensively re-writing Richard's testimony.
> **Howard and Mehta ordered Richard to sign the fraudulent errata sheets without even reading him the changes.**  Indeed, Richard was so near death at the time, **he had no comprehension as to what was happening around him, or what he was even signing.**
> . . .
> **Jaakan Williams, who was present at Richard's depositions and who informed me of Howard's concoction of the fraudulent errata sheets.**  Mr. Williams is a witness in the Bar's investigation of Howard as well.

*Id.* (emphasis added).

Mr Jaakan Williams in his April 11, 2018 deposition, pages 77-78, 86-90, attached hereto, states:

---

questions and answers, to the best of your knowledge, were -- was the information in those corrections also truthful?
MR. MONDE: Objection.
**THE WITNESS: Correct.**

Q. I'll put it another way.  Isn't it the duty of a lawyer to find the facts, find that law that best represents their client?

A. Agreed.

Q. All right.  And if there's errors in the facts, (inaudible) person who's on the verge of death, that need to be clarified isn't it the lawyer's duty to clarify those facts?

A. I agree.

Q. And if one of the methods of clarifying the facts is an errata sheet, pointing out the precise language that the deponent said, read that to him as he's dying and then have the clarifying language read to him as he's dying, until he agrees on that change, isn't that an appropriate way to clarify the record for this dying deponent?

A. I believe so.

. . .

Q. Okay.  So, Mr. Williams, during your visits with Mr. Harris and Peggy Harris on Thursday and Friday, **you would cover a lot of the same topics that are in the errata sheets, such as smoking history, criminal history, military background, employment, addiction.  Would those topics have been covered in your discussions with Richard and Peggy Harris on Thursday and Friday?**

A. **We covered a number of topics.  Those are the predominant ones we covered.**

Q. Okay.  Very good.  **And you would have shared that with counsel or a paralegal on the case, since that's why you were there, to help them with the case?**

A. **Yes, I would have shared that.**

Q. Okay.  Mr. Williams, as far as the language in the errata sheet, did we require Richard to accept the proposed correction, or did we seek his ascent to make the change?

Q. **Could Richard have said, "No, that's not a correct change?"**

A. **He could have,** I would imagine.

Q. Right, and so   and Richard was lucid enough to say, "Well, no I (inaudible) with that change," and we would have crossed it out, our handwritten changes, if that's what Richard wanted to do?

THE WITNESS.  **I imagine he would have.** He was   he was coherent that morning.

Q. He had no problems expressing his viewpoint, regardless of how people felt about it?

A  Yes.

Q. **So we did not require Richard to agree to this errata sheet, did we?**

Q. **And Richard could have said, "No, that's not correct"?**

A. **Yes, he could have, if he wanted to, I imagine.**

Q. **Right, and Richard's the kind of person that would have no problem telling you that's not correct?**

THE WITNESS. **From what I remember, yes.**

Q. **Okay.  So, as far as your perspective on observing this process, wasn't the errata sheet something that Richard was aware of, understood, and approved to change his testimony from the discovery deposition?**

THE WITNESS. **If you're asking me if he agreed to the changes, yes, he agreed to the changes.**

Q. **And these changes were after that portion of the transcripts were read to him—**

A. **Yes, they were read to him.**

*Id.* (emphasis added).  This sworn statement says, "<u>he was coherent that morning,</u>" "<u>he agreed to the changes,</u>" and "<u>they were read to him.</u>"  *Id.*

This sworn statement on April 11, 2018, and Peggy Harris' sworn testimony on February 13, 2020, attached hereto, is not consistent with Mrs. Peggy Harris' the July 7, 2018 sworn statement before the Florida Bar, and in contrast to the perjurious Bar Complaint prepared by J.B. Harris and signed by Peggy Harris:

> **Howard and Mehta <u>ordered Richard to sign the fraudulent errata sheets without even reading him the changes</u>**.  Indeed, Richard was so near death at the time, **he had no comprehension as to what was happening around him, or what he was even signing**.
> . . .
> **Jaakan Williams, who was present at Richard's depositions and <u>who informed me of Howard's concoction of the fraudulent errata sheets</u>**.  Mr. Williams is a witness in the Bar's investigation of Howard as well.

Moreover, Mrs. Peggy Harris, consistent with the facts above, was prepared for her sworn deposition testimony by attorney Jaakan Williams 9 and current Bar attorney Adriannette Williams.  They would have coordinated the review of her May 23, 2017 deposition and would have coordinated the preparation of her errata sheets after Peggy Harris' review of her deposition transcript.  Mrs. Peggy Harris states under oath:

Q.  Okay.  And so I asked you before the break whether you were aware, whether you knew whether your husband reviewed the deposition that I took of him, which was a multi-hundred-page transcript.  **Did he review that?**
A.  **I believe he did, but he couldn't see it, but it was read to him**.
Q.  Okay.  Who read it to him?
A.  One of the attorneys.
Q.  How long did it take?
A.  **A while.  They came in early, yeah.**
Q.  They came in early the morning of June 25th?
A.  **I don't remember the morning, but they came in early to do it.**
. . .
Q.  Okay.  Do you remember anything about the circumstances of what was read to him?
A.  No.
Q.  **Do you know one way or the other whether that deposition was read to him from –**
A.  **I believe it was.**
Q.  **– start to finish?**
A.  **I believe it was.**
. . .
Q.  **Do you know whether he actually told the lawyers whether he had changes to make to**

---

9 Moreover, Mr. Jaakan Williams did not say the errata sheets were "Howard's concoction of the fraudulent errata sheets."  If he did say such a thing, <u>he would be contradicting not only his own sworn testimony, he would be contradicting his deposition preparation of Mrs. Peggy Harris and his work with Mrs. Peggy Harris in her review of her deposition transcripts and in preparing and coordinating her errata sheets to her deposition</u>.  He would be leading Mrs. Peggy Harris into a perjurious trap, which in the Respondent's experience it is unlikely that Jaakan Williams would do.

his deposition? Did he actually tell them that?
A. **I believe he did.**
Q. How did he do that?
A. Verbally, I would think. But I'm not    I shouldn't say, because I'm not sure.
. . .
Q. **Do you believe that when your husband signed those errata sheets, that he understood what he was signing?**
A. **I would think he would. I wouldn't think he would sign if he didn't.**
Q. **And my question was just a little bit different. Given his health condition at the time, do you think he understood what he was signing when he signed those errata sheets?**
A. **I would say yes.**
Q. Okay. So is the answer that you're not sure whether he knew what he was signing?
A. Again, I wouldn't think he would sign unless he knew what he was signing.
Q. **Were you in the room when he signed them?**
A. **I don't—yeah, I think I was.**
. . .
Q. **After his deposition, after I had the opportunity to ask him questions, did Mr. Harris ever say to you that he had changes that he wanted to make to his testimony?**
A. **I believe he did.**

*Id* (emphasis added).

Moreover, in response to the deposition reviews, Mr. Richard Harris and Mrs. Peggy Harris were both read the relevant portion of their transcripts and under oath made corrections to their transcripts. This was confirmed by Mr. Richard Harris and reconfirmed by Mrs. Peggy Harris, wherein she repeatedly states under "penalties of perjury" in errata sheets after reviewing her testimony and providing corrections that **"I do remember our attorneys coming over prior to Richard's deposition and reviewing his deposition testimony from the previous days with him, and making sure that the testimony he had given, and making all the corrections that Richard suggested."** 10  *See* relevant portions of transcripts attached to the August 22, 2018 response. Neither Mr. Richard Harris nor Mrs. Peggy Harris were ordered to sign the errata sheets, and they were reviewed and read by or to both of them by either associate or senior counsel before they signed the errata sheets.

Since Mrs. Peggy Harris states in the July 8, 2018 Bar Complaint under oath the opposite of what she contemporaneously stated and provided under oath on May 23, July 6, 2017, and February 13, 2020, and the opposite of what Jaakan Williams stated in his sworn deposition on April 11, 2018, either she is committing perjury in May 23 and July 6 of 2017, or on July 8 of

---

10  In her sworn July 6, 2017 errata sheets, under penalty of perjury, Mrs. Peggy Harris states, **"Our attorneys did review Richard's depo transcripts with him each day, and Richard clarified his answers and the changes he wanted made to the transcript."** She also states, **"In discussions with Richard, our attorneys prepared the errata sheets according to Richard's instructions and reviewed them with Richard. Richard verified that the errata sheets were consistent with the testimony he wanted to give."** Finally, she states, **"Richard knew exactly what he was signing because our attorneys reviewed the depo transcripts and errata sheets with Richard before he signed them, and Richard verified that the errata sheets were consistent with the testimony he wanted to give."**

2018.  These incongruent statements cannot be true and honest.  Peggy Harris has chosen that the Bar Complaint written and prepared by J.B. Harris and not read by Peggy Harris until Februay of 2020, is the false and fraudulent statement, not the depositions.

## BAR COMPLAINT FULL OF FALSE STATEMENTS CLIENT DID NOT APPROVE OR STATE

J.B. Harris placed incendiary statements that the client did not approve or state.11 This is repeatedly verified in her February 13, 2020 Deposition. This is either perjury by J.B. Harris or by Peggy Harris and both violate the law.

## BAR COMPLAINT CONTAINS A PHANTOM CLAIM OF A CHARGE FOR $10,000 THAT IS NOT SUBSTANTIATED BY ANY DOCUMENT AND THAT CIENT IS UNSURE OF

The phantom claim 12 that there was a charge to the client for $10,000 for trial housing, a charge

---

11 Q.  Okay.  When you signed the statement under oath, did you think that the statements written reflected J.B. Harris' beliefs?
THE WITNESS:  I would say some of it.  Some of it.
**Q.  Well, would you have signed the Bar complaint if you had any question about whether the statements reflected J.B. Harris' beliefs?**
**THE WITNESS:  I would not have.**
. . .
**A.  I told him what I wanted to put on this, and he put more, let me just say it that way.**
**Q.  Did he tell you before he signed that he had gone beyond what you had told him?**
**A.  No.**
Q.  Is that information you would have wanted to know before you signed under oath?
A.  I would have been helpful.
**Q.  Well, more than helpful, ma'am.  Before you signed under oath, would you have wanted to know that J.B. Harris had put in the statement, your statement, beyond what you had told him?**
**THE WITNESS:  Yes.**
. . .
Q All right. Let's use Mr. Monde's questions. There are words describing Mr. Howard in the Florida Bar complaint, "dishonest and duplicitous," right?
A Right.
**Q Okay. Now, are those words -- before you saw them in the complaint words that you had heard before?**
**A No.**
**Q Okay. So those were J.B.'s words, not yours?**
**A Correct.**
. . .

12 In no shape or fashion is there language documenting or a request for Margaret Peggy Harris to pay $10,000 for the trial housing. This payment was in the same category as the $12,000 for the pathology opinion. This is a distortion placed into the mind of Margaret Peggy Harris by her counsel and placed into record.  The precise language is found below:

Q May I please get you to go back to Exhibit 3 for a moment. Would you turn to page four. The Bar complaint says that, "In anticipation of trial, Howard paid $12,000 for the autopsy, and supposedly prepaid $10,000 for the rental of the local residence. Howard then had the audacity to insinuate that I, a woman of very meager means, had to pay the combined cost of $22,000." **You believe that to be a false description when it comes to the $12,000 for the autopsy, correct?**
**A Correct.**
. . .
Q Okay. And do you know as you sit here today, one way or the other, **do you recall any requests or demands or any other comments or conversations you had with Howard about making the payments, what might happen or what would happen if you didn't make the payments?**
**A I don't recall.**
Q You don't recall. Okay.
. . .
Q Okay. And do you see where he is saying -- let me just read the whole thing for the record. It says, **"Dear Peggy. The**

that never existed. This is a grossly dissembled legerdemain by J.B. Harris, who created this non-existent sophistic mirage.  The language of the email that discusses that Howard paid $12,000 for pathology and $10,000 for trial lodging.  This demonstrates the frivolous nature of this claim. Even Peggy Harris, on February 13, 2020, in her deposition, when pushed as to this allegation, states as to whether there was such a demand: **"I'm just not sure."**

## BAR COMPLAINT FALSELY CLAIMS RICHARD HARRIS WAS NOT COHERNT OR CAPABLE OF ANSWERING DEPOSITION QUESTIONS

J.B. Harris next falsely states that Richard Harris was not coherent or capable of answering deposition questions.13  This is refuted by Peggy Harris repeatedly.  Thereby again

---

pathology samples for the pathology opinions that we paid approximately $12,000 for are available, and we can pay the $500 or let us know whoever is now going to pay the cost. We have prepaid 10,000 for the house near the courthouse to be use" -- instead of "used," it says "use" -- "for the four-week trial. We can reschedule the trial date if needed." Okay. All right. "We have paid the $1,000 plus and hired professional probate counsel to handle the probate after the departure of Jaakan Williams." Do you see that?
A Right.
. . .
Q Now that you look at this email today, does it appear to you that when Mr. Howard is suggesting rescheduling the trial date at the same time when he's asking you for payment, if you tie those two things together, would it have been unreasonable for you to believe that Mr. Howard was insinuating that unless these monies could be paid the trial would have to be continued?
MR. MONDE: Objection to form.
BY MR. DIAZ:
Q Do you follow my question?
A Yeah, I follow your question. I'm just not sure.

There were two Harris probate matters out of the over 110 probate cases filed on behalf of Engle tobacco clients, and we had Matt Hinson, Esq., certified probate counsel handling all probate cases.  Counsel had taken care of one Harris probate matter, and thought they were covered.  Once we became aware that there was another Harris probate matter, we were prepared to refile as there is no prejudice to the personal representative and these cases are place markers for the wrongful death component of the Engle tobacco actions.  The fear was more of a problem than the substance of the probate action and this was enhanced by Mr. Harris, as a retaliatory action in his thinking that Respondent has sought out the Gould sisters and took them from him as clients.

13  Q.  The "next near death at the time he had no comprehension as to what was happening around him or what he was even signing." Do you see that?
A Um-hum.
Q Do you believe that that is true, correct and complete?
A No, I do not.
Q Why not?
A Because he was aware of what was going on, that part of it.
Q Are you saying that based on what you saw and heard, you believe that your husband was aware of what was going on around him throughout the
A Correct.
Q -- from Monday, June 20th until Sunday June 26th?
A Correct.
Q You sat in the deposition on that Monday, Tuesday and Wednesday when the lawyers for Reynolds were asking questions?
A Correct.
Q Number one, you were there to protect your husband?
A Yes. In case -- any needs he had.
Q Yes, ma'am. And so is it fair to say that you were present in the room throughout the time that your husband was being asked questions?
A Yes.
Q You might have stepped away during a break. But in terms of the actual questioning, you were there the whole time?
A Correct.
Q In those three days, did you ever hear your husband say something that you knew to be untrue?
A Yes.
Q. During those three days of testimony, June 20th to June 22nd, you did hear some things from your husband that you did not

demonstrating the fraudulent and perjurious nature of J.B. Harris' putrid extortion tactics and using the Florida Bar as his extortion tool.

## BAR COMPLAINT FALSELY STATES THAT J.B. HARRIS WAS HIGHLY RECOMMENDED

Next, J.B. Harris falsely states that he was highly recommended, when he was one of two lawyers that Jaakan Williams knew that did tobacco, and the only reason J.B. Harris was chosen is that he answered the phone, and the other lawyer did not.  He was not highly recommended, only that he had done some tobacco trials.14

## BAR COMPLAINT FALSELY STATES THAT PEGGY HARRIS STATED THAT HOWARD WAS DUPLICITOUS AND DISHONEST

 J.B. Harris falsely makes the statement that Peggy Harris signed off on, namely that Howard was duplicitous, deceptive and dishonest.15  Peggy Harris clarifies that she did not say these

---

know about before?
A Correct.
Q Different question now.
A Okay.
**Q In those three days of testimony, did you ever hear your husband say something that you knew or believed to be false?**
**A No.**
Q Was there ever a point during the deposition process, and now I'm going to stretch it out from Monday, June 20 all the way to Sunday, June 26th, was there ever any point where you had some question about whether your husband was able to comprehend or understand the questions so that he could testify?
**A I didn't doubt -- I knew he was alert the whole time.**
Q May I please get you to turn to page eight.  I want to focus on the first paragraph. It says the following: Well, I'm so sorry to do this to you. Did you ever -- Was J.B. Harris present for the deposition of your husband?
A Ugh-ugh.
Q No?
A Didn't know about him. I didn't meet him. I didn't -- Absolutely not.
Q Did you ever tell J.B. Harris in connection with preparing this Bar complaint that your husband had no comprehension as to what was happening around him or what he was even signing when he signed the errata sheets?
. . .
**Q Did you ever hear any doctor assess your husband and diagnose him as lacking comprehension --**
**A No.**
**Q -- during this time period?**
**A No.**

14  Q So Miss Harris, we need to break down the sentence that I read to you a little bit more.  First, you say in your Bar complaint, "Mr. Harris came highly recommended from attorney Jaakan Williams." Is that the fact?
A I don't know highly would be -- I wouldn't use that word. He recommended him.
. . .
Q What did Jaakan Williams tell you in this conversation regarding J.B. Harris?
A He gave me two names for two attorneys. One was in Jacksonville. I tried to call her, I think because she was closer. The number didn't work. So I called J.B., and that's when we ended up with J.B.
Q What did Mr. Williams tell you about J.B. Harris' qualifications, or anything else? I mean, what did he tell you when he recommended him?
**A I believe he said that he had done some work –**
**Q J.B. Harris wrote those words without any authorization or permission from you, correct?**
**A Correct.**
**Q J.B. Harris wrote those words?**
**A Correct.**

15 Q Let me ask you, please, to turn -- page 13, please. The following statement appears in your
sworn statement under oath to the Florida Bar: Quote, "And I know the difference between a donkey and a mule. With

things.

## J.B. HARRIS WITHHELD INFORMATION THAT HE WAS BEING PAID BY HOWARD, AND THIS IS INFORMATION THAT CLIENT WANTED TO KNOW

J.B. Harris intentionally fails to disclose information that the client would want to have known, namely that Howard is paying $21,000 a month to J.B. Harris to work on Engle tobacco cases, including Margaret Peggy Harris' case.16  The reality is that Peggy Harris was still hiring Tim Howard's attorneys when she though she went to J.B. Harris, because he was working for Tim Howard.

## PART OF AN EXTORTION SCHEME BY J.B. HARRIS

Mr. J.B. Harris is consistently threatening and extorting, and using perjury, while trying to avoid accountability.  Prior to filing the August 2018 Bar Complaint response, pertaining to health insurance that this firm pays for Mr. J.B. Harris of approximately $2,500 a month, that was understood to be automatically deducted from the account, and was rectified prior to the firm being aware of his threat and extortion, Mr. J.B. Harris wrote:

"Tim, **I suggest you reactivate my insurance today <u>or I will be at your office first thing tomorrow to spend a little quality time with you.</u>**  You've placed the lives of my children at risk and that won't stand."

August 21, 2018 email from Mr. J.B. Harris, attached to Bar Complaint Response.  As to the merits of the Bar Complaint, consider the following:

This firm has been involved in tobacco litigation since its founding in 1995 and has been counsel on

---

**that said, I have never in my life met anyone as duplicitous, deceptive and dishonest as Howard." Are those your words? A They are not my words.**

…

**Q Right. So to the best of your belief and knowledge it's simply false to say that Mr. Howard extorted you by threatening not to appear for trial if you would not agree to his demand to pay these costs, correct? A I do not remember that.**

16 Q You are doing fine. Exhibit F, and then I want the next page. There you go. Okay. This is an email from Tim Howard to someone named Matt. And he says, "She didn't respond to me. Mr. Harris," referring to J.B. Harris, "has an extensive history of Bar violations and extortion that I was forced to report. We sent what we had in the file and I thought that was sufficient at the time. There's nothing to do on this case for now." When you hired J B. Harris, were you aware that he was in the midst of a dispute with Tim Howard?
A No, I did not.
Q Were you aware that they were actually lawyers working together under contract --
A I did not.
Q-- when you hired -- when you fired Tim Howard and hired J.B. Harris?
A Not that I recall.
Q Were you aware when you fired Tim Howard and hired J.B. Harris that Tim Howard was actually paying J.B. Harris' salary?
A No, I did not.
Q Were you aware when you fired Tim Howard and hired J.B. Harris that they had a contract with each other that in cases -- Engle cases like yours, including yours, that they had a contract that would give Tim Howard a certain percentage of any verdict obtained or judgment collected?
A Not that I recall.
Q Is that information, ma'am, that you would have wanted to know when you hired J.B. Harris?
MR. DIAZ: Form.
THE WITNESS: Yes.

numerous tobacco trials and cases, including some of the largest verdicts in the nation *Chiles, et al., v. American Tobacco, et al.,* (resulted in over $20 billion for the State of Florida); *Evans v. Lorillard* (resulted in the largest verdict in the history of Massachusetts for a personal injury case at $150 million and settled for over $79 million). Pertaining to this particular complaint, the firm was counsel in a 7-week Jacksonville, Florida trial involving *Sermons v. RJR*, that took place when the depositions of Richard Harris were also taking place, due to his imminent demise and the resistance of defendants to permit him to be deposed earlier. Thus, there was clear capacity to litigate the action, no failure to disclose, nor was there a solicitation. In fact, former counsel for Richard Harris, the law firm of Lyons & Farrar, sought this firm out to assist in the prosecution of the case, and Richard Harris chose to drop former counsel and solely retain this firm. The Lyons & Farrar firm were paid their quantum meruit fees for representing Richard and Peggy Harris for 9 months, while the Howard & Associates firm has to pursue an appeal to obtain even their costs back. This is verified in the record of this action.

It is false for Mr. J.B. Harris (since Mrs. Peggy Harris has verified that she had no capacity or knowledge) to assert that this firm did not know how to prepare a client for a tobacco deposition having done nearly 100 tobacco depositions in the past. The concern was that a junior associate had significant challenges in the first day of defending Mr. Richard Harris in Defendants' deposition of him, while the senior partner was in a 7-week tobacco trial in Jacksonville. The firm's senior partner left the tobacco trial for a day to get the testimony in order and identified the critical issues and reviewed them with the associate and paralegal assisting with the deposition. The intense reprimand of Jaakan Williams was due to the significant lapses in legal analysis necessary to protect the interests of the client. While he did not like the reprimand and discipline, it was necessary to get his attention as it severely threatened justice for Richard and Peggy Harris. Jaakan Williams may have complained to Peggy Harris about this reprimand as this is referenced in Peggy Harris' February 13, 2020 deposition, attached hereto. The trial preservation testimony was organized, focused and covered the materials needed to effectively prosecute Mr. Richard Harris' case. This work was the core basis for the $10 million recovery for Peggy Harris.

This also involved reviewing portions of the deposition defended by the junior associate. This required reviewing the testimony at issue, reviewing the language with the client, and obtaining the client's desired changes through an appropriate errata correction. **Rule 1.310 (e), Florida Rules of Civil Procedure, provides that:**

**"any changes in form or substance that the witness wants to make must be listed in writing by the offer with a statement of the reasons given by the witness for making the changes. The changes must be attached to the transcript."**

Errata sheet clarifications from a deposition transcript are standard procedure for all depositions. This attempt to make errata sheets nefarious is inconsistent with the Florida Rules of Civil Procedure. Errata sheets were done for both Mr. Richard Harris and Mrs. Peggy Harris.

In fact, under oath, Mrs. Peggy Harris stated in her May 23, 2017 deposition, pages 332-336, relevant pages attached to the August 2020 Responses to the Bar Complaint, the following pertaining to the errata sheets. These statements confirm that the relevant portions of the transcripts were read to him, and that he knowingly agreed to change the testimony and signed confirming the changes. The February 13, 2020 deposition of Peggy Harris, attached hereto, confirms the same.

Q. Okay. And so I asked you before the break whether you were aware, whether you knew whether your husband reviewed the deposition that I took of him, which was a multi-hundred-page transcript. **Did he review that?**
A. **I believe he did, but he couldn't see it, but it was read to him**.
Q. Okay. Who read it to him?

A. One of the attorneys.
Q. How long did it take?
**A. A while.  They came in early, yeah.**
Q. They came in early the morning of June 25th?
**A. I don't remember the morning, but they came in early to do it.**
. . .
Q. Okay.  Do you remember anything about the circumstances of what was read to him?
A. No.
Q. Do you know one way or the other whether that deposition was read to him from –
**A. I believe it was.**
**Q. – start to finish?**
**A. I believe it was.**
. . .
**Q. Do you know whether he actually told the lawyers whether he had changes to make to his deposition? Did he actually tell them that?**
**A. I believe he did.**
Q. How did he do that?
A. Verbally, I would think. But I'm not—I shouldn't say, because I'm not sure.
. . .
**Q. Do you believe that when your husband signed those errata sheets, that he understood what he was signing?**
**A. I would think he would.  I wouldn't think he would sign if he didn't.**
**Q. And my question was just a little bit different.  Given his health condition at the time, do you think he understood what he was signing when he signed those errata sheets?**
**A. I would say yes.**
Q. Okay.  So is the answer that you're not sure whether he knew what he was signing?
A. Again, I wouldn't think he would sign unless he knew what he was signing.
**Q. Where you in the room when he signed them?**
**A. I don't—yeah, I think I was.**
. . .
**Q. After his deposition, after I had the opportunity to ask him questions, did Mr. Harris ever say to you that he had changes that he wanted to make to his testimony?**
**A. I believe he did.**

Moreover, in response to the deposition reviews, Mr. Richard Harris and Mrs. Peggy Harris were both read the relevant portion of their transcripts and under oath made changes to their transcripts.  This was confirmed by Mr. Richard Harris and reconfirmed by Mrs. Peggy Harris, wherein she repeatedly states under "penalties of perjury" in errata sheets after reviewing her testimony and providing corrections that **"I do remember our attorneys coming over prior to Richard's deposition and reviewing his deposition testimony from the previous days with him, and making sure that the testimony he had given, and making all the corrections that Richard suggested."** 17  *See* relevant portions of transcripts attached.  Neither Mr. Richard Harris nor Mrs. Peggy Harris were ordered to sign the errata sheets, and they were reviewed and read to both of them by either associate or senior counsel before they signed the errata sheets.  *See* transcript errata sheets attached to the August 2018 response to the Peggy Harris Bar Complaint, as well as Peggy Harris' February 13, 2020 deposition attached hereto.

---

17 In the errata sheets she stated, "**Our attorneys did review Richard's depo transcripts with him each day, and Richard clarified his answers and the changes he wanted made to the transcript.**" She also stated, "**In discussions with Richard, our attorneys prepared the errata sheets according to Richard's instructions and reviewed them with Richard. Richard verified that the errata sheets were consistent with the testimony he wanted to give.**" Finally, she stated, "**Richard knew exactly what he was signing because our attorneys reviewed the depo transcripts and errata sheets with Richard before he signed them, and Richard verified that the errata sheets were consistent with the testimony he wanted to give.**"

In Mrs. Peggy Harris' May 23, 2018 deposition, she confirms in pages 344-346, attached, that shortly after Mr. Richard Harris passed, the autopsy was conducted in the Faith Funeral Home in Havana, Florida. Regional Pathology and Autopsy Services out of Oakland, California, had their staff fly into Tallahassee. It is demonstrably false that Mr. Richard Harris' body was shipped to California, and in fact, the firm flew the medical autopsy staff from California into Florida to both do an autopsy and obtain tissue samples for medical pathology determination of disease and etiology. Moreover, there was no inference or reference for the client to pay for the costs expended in the case, and it is not understood where or how the language of the email can be interpreted as such.

There was no abandonment as a client. The probate matter was non-prejudicial, as it could be refiled. The hearing notice was missed due to having two Harris probate matters, thinking that the notice was covered, and over 110 probate cases to manage after the junior associate counsel left. This particular matter was understood to be covered by experienced probate counsel, Matt Hinson, Esq., who was hired to handle the 110 or more probate matters. When the Harris probate matter came to the firm's attention, Mr. Matt Hinson, certified probate and estate specialist, was immediately contacted concerning this particular case, and assigned to handle the probate action. Finally, Mr. J.B. Harris ability to operate as an attorney is due to this law firm paying him to work on this and other Engle cases.18

Unknown to this firm at the time, and verified in the February 13, 2020 deposition of Peggy Harris, Mr. Jaakan Williams recommended several lawyer sources to Mrs. Peggy Harris, including the Searcy, Denny law firm, and Christina Opsohal, who had worked on the Richard Harris action. Mr. J.B. Harris was included due to Mr. Jaakan's meeting him through the Howard & Associates law firm, and was only chosen due to him answering the phone. Moreover, Mr. Jaakan Williams did not say the errata sheets were "Howard's concoction of the fraudulent errata sheets."

There has been no refusal to pay the $500 tissue sample bill, as the emails demonstrate. We stated, **"we can pay the $500 or let us know whoever is going to pay the costs."** All that was asked is how did the client wish to handle the matter, in our efforts to avoid spoliation of the evidence.

Furthermore, it is clearly evident that Mr. J.B. Harris' language is definitively found in this bar complaint, where he again uses his signature labels and terms **"blasphemous"**, **"delusional"**, **"duplicitous"**, **"deceptive"** and **"dishonest"** as he has stated in other writings.19 This is language from Mr. J.B. Harris

---

18 During the trial of this case and during its preparation in 2018, the firm was paying Mr. J.B. Harris $21,000 a month, so that he can prosecute Engle tobacco cases, as is referenced in the current complaint against Mr. J.B. Harris. If this firm didn't pay Mr. Harris, he couldn't be working on Mrs. Peggy Harris' case and continue his fraudulent Bar Complaints and sharing with media to attack this firm.

19 For example, on August 7, 2018, the following was forwarded to the Florida Bar and State Attorney:

As part of the ongoing reporting of the various Bar violations and extortion of Mr. J.B. Harris, consistent with his pattern and practice, attached as Exhibit A please find the July 30, 2018 correspondence from Mr. J.B. Harris, documenting **disparaging remarks, degrading to the legal profession**, in unnecessarily calling Mr. Howard **"pathetic, desperate and delusional."** This language violates the rules regulating the Florida Bar, 3-4.3, 4-8.2(a), and 4-8.4(d), as cited below.

Mr. Harris again distorts the facts when he states that the client was **"abandoned"**. Mr. Harris knows that the law firm experienced a funding gap for 6-8 weeks due to corrupt advisors. This funding gap was solved. In fact, **Mr. Harris is right now being paid $21,000 a month by this law firm** and its lender **so he can pursue tobacco cases, including the action of** *Richard Harris v. RJR and Phillip Morris*. **In fact, without this firm's funding, he is unable to represent Mrs. Margaret Harris or have a life**. With the funding gap solved, the law firm was able to assign and/or hire probate counsel to address the 100 plus tobacco litigation related probate actions, including the probate action for Mrs. Margaret Harris.

that he uses in the Kim Poling and his own Bar Complaint, and language that Mrs. Peggy Harris confirms that she did not use.

Mr. J.B. Harris then ghost writes to state there was a "ballistic" reaction to new counsel, and defamed and slandered Mr. J.B. Harris. This is from an email intended only to Mr. Matt Hinson and counsel for the firm, not knowing that Mrs. Peggy Harris was embedded in the reply all. Next, as referenced in the prior bar violation reports on Mr. J.B. Harris, it was stated solely to Mr. Matt Hinson, that "Mr. Harris has an extensive history of bar violations and extortion that I was forced to report." This is factually true as verified herein, not slanderous, and does not yet state a record of adjudicated bar violations, as inferred by Mr. Harris.

The facts demonstrate that this fraudulent Bar Complaint, and two others, was written by Mr. J.B. Harris as part of his continued efforts at extortion. As pointed out in the many prior filings, these documented and repeated, upon repeated patterns violate the following rules of professional conduct as promulgated by the Florida Supreme Court:

> A lawyer must not threaten opposing parties with sanctions, **disciplinary complaints**, criminal charges, or additional litigation to gain a tactical advantage. *See* Florida Supreme Court, Professionalism Expectations: Expectation 3.18; and Rules Regulating the Florida Bar: Rule 4-3.4(g).

> A lawyer must not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter. *See* Florida Supreme Court, Rules Regulating the Florida Bar: Rule 4-3.4(g).

> A lawyer must not present, participate in presenting, or threaten to present **disciplinary charges** under these rules solely to obtain an advantage in a civil matter. *See* Florida Supreme Court, Rules Regulating the Florida Bar: Rule 4-3.4(h). 20

---

Mr. Harris uses the terms "**delusional**", "**duplicitous**", and is following through with his extortionate threat wherein he wrote on June 6, 2018:

> Tim, if you think you are having trouble with the Bar's investigation of your practices, BWCI Pension Trustees Limited, Ted Doukas, and everyone else who is still after you, **you are about to walk into a shit storm if you steal the Goulds from me as my clients.**

> I will lien the file for costs and fees, sue you for tortious interference and unpaid contribution to costs, fraud and everything else I can think of. **I will also amend my complaint with the Bar** and file a complaint against Neil as well.

On June 8, 2018, Mr. Harris writes: "You're a **first-rate coward and scumbag**. All your talk about Jesus is **blasphemous** garbage." "I can assure you they (Gould sisters) will rip you to shreds once they see through your **sociopathic charade.**"

20 Lawyer disciplined for sending a threatening letter to opposing counsel. *The Florida Bar v. Sayler*, 721 So.2d 1152 (Fla. 1998). A criminal defense lawyer violated Rules 4-4.4(a) and 4-8.4(d) for sending a victim of a crime an objectively humiliating and intimidating letter designed to cause her to abandon her criminal complaint. *The Florida Bar v. Buckle*, 771 So. 2d 1131 ; *see also The Florida Bar v. Ratiner*, 46 So. 3d 35 (Fla. 2010). A lawyer should abstain from conduct that diverts the fact-finder's attention from the relevant facts or causes a fact-finder to make a legally impermissible decision. (Professionalism Expectations: Expectation 5.8)

To opposing parties and their counsel, a lawyer should act with **fairness, integrity, and civility**, not only in court, but also **in all written and oral communications**.  (Oath of Admission)

Candor and civility must be used in all oral and written communications. (Professionalism Expectations: Expectation 2.2)

**A lawyer must avoid disparaging personal remarks** or acrimony toward opposing parties, counsel, third parties or the court. (Professionalism Expectations: Expectation 2.3). <u>**A lawyer should be civil and courteous in all situations, both professional and personal, and avoid conduct that is degrading to the legal profession.**</u> R. Regulating Fla. Bar 3-4.3. 21

<u>**A lawyer's communications in connection with the practice of law**</u>, including communications on social media, <u>**must not disparage another's character or competence**</u> or be used to inappropriately influence or contact others.  (Professionalism Expectations: Expectation 2.5); *see* R. Regulating Fla. Bar 4-8.4(d).

<u>**A lawyer must not criticize or denigrate opposing parties**</u>, witnesses, or the court **to clients, media, or members of the public.**  (Professionalism Expectations: Expectation 4.20); see R. Regulating Fla. Bar 4-8.2(a) and 4-8.4(d)).

This is a response to the Bar Complaint of Margaret "Peggy" Harris, which in reality is a complaint by J.B. Harris.  Consistent with the prior responses, there are numerous Florida bar and criminal violations by Mr. J.B. Harris.

In response to this sworn evidence, and the constant and dissembling practice of Mr. Jonathan B. Harris, Respondent requests that all of these three Bar complaint, actions created and fraudulently forged by J.B. Harris be dismissed, and that Mr. J.B. Harris be sanctioned for intentionally and perjuriously misleading the Florida Bar and his client, and others, as to the facts and circumstances.

---

21 Lawyer disciplined for sending disparaging emails to opposing counsel, calling him a liar, and making improper outbursts directed toward opposing counsel during the litigation. *The Florida Bar v. Norkin*, 132 So.3d 77 (2013)). *See also The Florida Bar v. Abramson*, 3 So.3d 964 (2009); *The Florida Bar v. Buckle*, 771 So.2d 1131 (Fla. 2000) ; *The Florida Bar v. Sayler*, 721 So. 2d 1152 (Fla. 1998); *The Florida Bar v. Ratiner*, 46 So.3d 35 (Fla. 2010). Lawyer disciplined for sending a letter to a court-appointed provisional director of corporation in which he improperly threatened to file suit against provisional director and accused the provisional director of being involved in a conspiracy. *The Florida Bar v. Norkin*, 132 So. 3d 77 (2013); *See also The Florida Bar v. Abramson*, 3 So. 3d 964 (Fla. 2009). "The First Amendment does not protect those who make harassing or threatening remarks about the judiciary or opposing counsel. Under Rule of Professional Conduct 4-8.4(d), lawyers are required to refrain from knowingly disparaging or humiliating other lawyers." *The Florida Bar v. Sayler*, 721 So.2d 1152, 1155 (Fla. 1998).

# EXHIBIT K-G



# Howard & Associates
# Attorneys at Law, P.A.

Dr. Tim Howard, J.D., Ph.D., Senior Partner*
Florida Supreme Court Certified Mediator

Tallahassee, Florida Office:
1415 East Piedmont Drive, Suite 5
Tallahassee, Florida 32308
Ph: (850) 298-4455
Fax: (850) 216-2537
tim@howardjustice.com

February 18, 2019

Charles Hughes, Bar Counsel
ACAP
Florida Bar, 651 East Jefferson Street
Tallahassee, Florida 32399-2300

Re:     TFB Nos. 2020-00,341 and 00,317 (2A), Complaints of Corey██████ and William█

Dear Mr. Hughes:

We communicated with Florida Bar staff last week and it was agreed that the responses to the
above-referenced Complaints could be combined and submitted on February 19, 2020. In
response to these two Bar Complaints consider that these scandalous allegations are found in the
civil action filed by these two gentlemen, Mrs. ██████████, and Mr. Don Reinhard's similar
Bar Complaint.1

## CIVIL REMEDIES AND THE FLORIDA BAR

The Florida Supreme Court has ruled that the Florida Bar is not a venue to pursue civil remedies
as another venue for political or legal leverage, and based on this standard, appropriately
discharged these complaints in the attached letter dated January 15, 2020. Exhibit A. Mr.
Hughes, as The Florida Bar representative, stated:

    I must conclude that your complaint constitutes a civil dispute as there are **no**

---

1 ██████ falsely claims she is owed money. The records show that she placed $75,000 into the fund, and
received $88,238.00 in total proceeds over approximately 12 months, including monthly payments of $1,500 for
most months, and as high as $16,500 for a month. *See* Accounting Ledger attached as Exhibit B. Note, that the
allegations in Mr. Findley's civil Complaint track the allegations from Don Reinhard, who created and spread this contagious
poison that others have adopted.

**allegations independent of the enclosed civil complaint** and as a result, must be resolved through the civil system. The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies.

. . .

Consequently, I have closed our record in this matter.

*Id* (emphasis added).

Nothing has changed in the facts and circumstances of these Bar Complaints. When the decision was made to continue to pursue these Bar Complaints, there was no explanation of what new facts existed or why. If the Florida Supreme Court ruling applies, and not political or legal leverage, consistent with the letter ruling, these actions must be closed.

As a consequence, these parties are not entitled to use the Florida Bar as a method to gain advantage of a pending civil action that has been proceeding for nearly two years.

## UNDERLYING FACTS

As far as the underlying facts, these two gentlemen received $721,080 in a scheme crafted with a Mr. Don Reinhard, from the funds that they are complaining about, as found in the attached legers from the company they invested in. Accounting ledger attached as Exhibit B.

Mr. ▮ the ostensible cousin of Mr. ▮ received written and personal guidance from prison by Mr. Don Reinhard to go to attorneys, such as Mr. ▮ to pursue Respondent. Mr. ▮ protects Mr. Reinhard in prison.2 *See* Cumulative Exhibit C, discussed *infra.*, as Mr. ▮ has a history of close criminal conduct and ties with inmates, including personal ties going back to high school with convicted child molester, Pastor James Harris. *See* Cumulative Exhibit D.

Mr. Reinhard 3 who is in prison for child abuse, was a former consultant for the fund. This consultant crafted the loans with both Mr. ▮ and Mr. ▮ and designed the scheme during the operative time.

---

2 Mr. Reinhard is now in prison for child abuse for feeding feces to a three-year-old autistic child. *State v. Reinhard,* Case No. 17005-45CFMA (Fla. 14th Cir.). In a deep, intimate, direct and ongoing relationship with Mr. Don Reinhard, **Mr. ▮ received $648,385 in extraordinary wealth from Cambridge Capital and Don Reinhard. The $648,385 was to be for his family during an 18-month period from April of 2016 through September of 2017. This is in addition to his head coaching salaries, and his NFL Line of Duty monthly income.** *See* Accounting Ledger attached as Exhibit B. Unfortunately, like with his former NFL salary, it is clear these funds were not used for his family. Upon information and belief these funds were used for gambling and funding illicit drug sales. Mr. Reinhard, who invested nothing, had nothing to invest, and was the investment fund consultant, conspired with Mr. ▮ o advance their mutual extortion efforts. Mr. Reinhard has engaged in a two-year extortion campaign against Mr. Howard as well as against attorney Jaakan Williams, and this has been reported to the State Attorney, Exhibit E, attached, and to the Florida Bar, Exhibit F, attached.

3 Tracking the extortion strategies of Mr. Reinhard, Mr. Reinhard's Florida Bar Complaint has some of the same scandalous allegations of Mr. ▮ Mrs. F▮ nd Mr. ▮ found in their civil action. *See Don Reinhard v. Phillip Timothy Howard,* TFB No. 2018-00,265(2A).

Once this consultant was terminated from employment, an audit by the current management, 4 under Ms. Gail Milon, determined that the consultant made excessive loans in a scheme to pocket $500,000. Contrary to the allegations first spread by Mr. Reinhard and picked up by those attempting to profit and advance from these scandalous allegations, undersigned has over $1,350,000 in net investments into these same funds, received no fees, and has been doing all in his limited power to secure all investors and has spent and is obligated for $ millions in protecting the investments in technology and other fronts as well as covering legal costs.

Note also, these two gentlemen are even now able to receive funds if they would approach the manager and her counsel in a reasonable fashion as the fund is now in capable hands, and after a time of recovery is receiving funds and making returns on investments. Unfortunately, undersigned has no management or control over the fund, which is invested in technology, advances, and real estate.

Mr. ███ is communicating with Mr. Reinhard and protecting Mr. Reinhard in prison. In return Mr. Reinhard is guiding Mr. ███ in his same extortionate model, with false dreams of financial wealth.

Prior to Mr. ███ ever investing into Cambridge companies, in communications solely between Mr. Reinhard and Mr. ███ Mr. Reinhard advised adjusting his 401K investments handled by the NFL, and this resulted in an allegation of protection of the assets. January 19, 2016 through July 27, 2016 emails from Mr. Reinhard to Mr. ███ available upon request. Mr. Reinhard provided a Proposed Portfolio Investment Structure on March 22, 2016, that Mr. ███ and Ms. ███ reviewed. Mr. Reinhard also explained on April 8, 2016 that his IRA would have gained $62.000 if he had invested the funds. Finally, within days of the 401K transfer on May 19, 2016 of the investment, **Mr. ███ was fully advised on May 25, 2016 of what Cambridge companies knew of Mr. Reinhard's background.** *Id.*

Mr. ███ falsely claims that Mr. Reinhard's background was not provided. In fact, Mr. ███ knew of Mr. Reinhard when he was a player at Florida State, based on information and belief that Mr. Reinhard assisted him then. Moreover, **Mr. ███ was expressly provided the background on Mr. Reinhard on May 25, 2016,** as Mr. Reinhard was required to do to all potential clients starting in late October of 2015, when potential investors would have started during his consultancy. **May 25, 2016 email from Mr. Reinhard to Mr. ███ documenting Mr. Reinhard's background, including his prior criminal "incarceration" and that the SEC "sanctioned" Mr. Reinhard.** Records available upon request.

Mr. Reinhard developed a "very personal" and long-term relationship with Mr. ███ Mr. Horne and several other retired NFL clients. From prison, on January 12, 2018, Mr. Reinhard wrote to

---

4 Mr. ███ has been repeatedly informed by Cambridge ownership and management that Mr. Howard has no interest, management or control, and that his 401K investments are secured with more than sufficient assets for repayment and return, and **upon liquidation of a portion of the assets, his retirement funds will be transferred. Moreover, counsel for Mr. ███, Mr. Thomas ███ was informed of this in writing.** Exhibit G. This has also been confirmed by an independent audit conducted by the respected and former Leon County auditor, Bill Bogan. The audit is available upon request.

Mr. ▮▮▮ and numerous retired NFL clients that he was manipulating, stating:

> This is an email I did not want to send to each of you as I truly thought this disaster was coming to an end in early to mid-December and I would be back on course and working with each of you to further plan, develop, structure and implement a solid and productive financial plan for you and your family.

> . . . I had worked 12-18 hour days for the past 18 months to create, develop, and structure the very sound and successful principles of Cambridge Capital Group and was **privileged and honored beyond my wildest dreams to have initiated and built the incredible relationships I had with each of you** and we had only just begun.

> . . . While I have provided each of you with the reasons behind these delays [in NFL concussion settlement claim payments] so you clearly understood the unfortunate private agenda of your attorney which was the majority crux of my concern as to the handling of your claim, hopefully your wait for these much needed funds will end very soon. . ..

> **My dreams of starting a new firm which will mimic the very sound principles and proven work ethic of Cambridge Capital Group will not die** as I continue to fight to resolve these heinous charges. I am a very positive person and know that God has a plan for my family and I and that plan included our paths crossing. Please say a prayer for my family and I and **I will certainly plan on contacting you immediately upon my release in hopes of continuing to build our long-term relationship. In the meantime, I will continue to have access as well as text messages at 850-228-9868.** I there anything I can do to assist you then please do not hesitate to contact me and I will do everything in my power to do so. **Please know how important each of you are to me.**

Cumulative Exhibit C.

Mr. Reinhard planned with Mr. ▮▮▮, Mr. ▮▮▮ and other retired NFL players to create their own investment company, with Mr. Reinhard running this from the prison, claiming that the funds under consultancy "returned over 40% and 70% respectively in 2016." Cumulative Exhibit L.

Mr. Reinhard also falsely claimed that he had a partner in Mr. Tom Woods as part of this scheme with Mr. ▮▮▮ with Mr. Woods clarifying that "Mr. Reinhard is trying to drag all of us into his mud bath because he has reached the end of his rope. I think he has nothing but time on his hands and rather than reflect on his own misdeeds, he is instead lashing out at the very people that gave him a second chance. What a shame." *Id.*

Next, from prison, Mr. Reinhard directs Mr. ▮▮▮ Mr. ▮▮▮ and a few of the investors that he has personal relationships with to file a legal action, and claims he knows the valuation of their investments, and states:

I know some of you have ... contacted me [in prison] to ask questions. It is <u>time for us to take legal action</u> as again my research [from prison] has me concerned. I am very uncomfortable with what I have learned about the current structure of CCG and the management of the portfolio as I have also requested liquidation of my family's assets. I would strongly recommend that you do the same because I am overly concerned that the auditor has not provided any inf01mation since the audit for 2016 was initiated in July 2017. Again, let me underscore that I have a lot of experience in managing limited partnerships and the portfolio when I departed was rock solid as was the structure of the limited partnership.

I am now going to <u>proceed aggressively to follow suit</u> in the next two to three weeks to pursue the liquidation that I had requested over six months ago and <u>I strongly recommend that you do the same.</u> However, our position will be much stronger and <u>attorneys will be much more</u> interested in the case if we proceed together. I think its necessary to do so. Although I am still incarcerated my brother-in-law will be instrumental in helping us manage this process. Again, I believe time is of the essence so please let me know your thoughts as soon as possible. I look forward to hearing from you.

Don

P.S. -I will provide information regarding your approximate account value update for 12/31/17 tomorrow.

January 18, 2018 email from Mr. Reinhard to Mr. ▮▮▮, Ms. ▮▮▮, Mr. ▮▮▮, et al., attached as Cumulative Exhibit C (emphasis added).

On February 28, 2018, Mr. Reinhard writes solely to Mr. ▮▮▮ and family and select few friends, seeking protection in prison:

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5 inmates that are violent and hardened criminals because my roommate and I were told that there was absolutely no available bed space in the dorms that violent sentences. However on Thursday I was being threatened and pressured to give them food and other items or I would "learn about prison the hard way".

. . . I was packing my belongings some of the same individuals came into my cell with a knife made visible to me and told me they were going to stab me unless I have them all of my canteen which was approx..$70 worth of various food items and hygiene. However, my understanding is that they are gang-related and will if they have not already got messages to their other gang members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center including a very close friend of Corey ▮▮▮ who had previously promised and

re-iterated that promise when I cam in that he will protect me. However, that will mean following him around like a puppy even if I am safe from other gang members in this dorm.

February 24, 2018 email from Mr. Don Reinhard to Mr. Corey ████, *Id.* (emphasis added). Mr. Don Reinhard writes Mr. ████ on the same day following up for a personal meeting on the extortion scheme:

Corey, I think you will realize when you read the email I just sent that I am not only scared to death but terrified. Just to let you know Joe did make a very visible sign talking to me so everybody in the dorm would see him.

Hopefully that does help for the time being.

Also, please complete and send in the visitation form that was previously emailed to everybody as I truly want to see you soon and hopefully you can take on Saturday or Sunday to drive over. We certainly have a lot to discuss especially about Tim and CCG.

Love ya buddy,

Don

February 24, 2018 email from Mr. Reinhard to Mr. ████ *Id.* (emphasis added). The protection that Mr. ████ is coordinating and providing Mr. Reinhard in prison is clear, as is the plan to address Mr. Howard and Cambridge Capital Group. Finally, the intimacy of their relationship is found in "Love ya buddy." *Id.*

On February 6, 2018, Mr. ████ then falsely stated to a Mr. Walker that "he only invested money with Don Reinhard because he trusted Tim Howard." Mr. Howard never advised Mr. ████, nor was his background and education within the investment industry. Mr. ████ then went on to state to Mr. Walker that "he wants to kill everyone, including Tim Howard, Gail, Harrison and myself. I am letting you know this so you can protect yourself." February 6, 2018 email from Mr. Walker to Mr. Leonard and copied to Mr. Howard, attached as Cumulative Exhibit H.

In a series of texts, starting on April 16, 2018, Mr. ████ attempts to **extort Mr. Howard for money with a series of threats.** Mr. Howard responds, **"Please understand that I am not able to provide money to you,** I will do all that I can in that context. I **am happy to work on your claim and as** I **have so far, and to assist in any legal and ethical way I am allowed.** I **care about your needs. Perhaps there are loan available until the NFL Disability or your claim is pursued over the next several months?"** Mr. ████ responds, **"So should** I **just turn over all of my paperwork to the court? Since you don't know why** I **am showing you this paperwork?"** Texts from Mr. ████ to Mr Howard attached as Cumulative Exhibit M (emphasis added). Mr. Howard clarifies the mission:

I am God's minister for good and to love others. It is God in me that counts. **I**

**have helped coach for years, fund the food and support and equipment for players, and I have been there for you and others non-stop.** Psalm 31. This is God's life and all he wants me to do is bless within my limited ability and means, and he will stand with me in that goodness and love. This time of forging will pass. Let God do a good work in you too.

*Id.*

Further clarifying that he can't comply with his extortion, and Mr. Howard informs Mr. ▮▮ that "I **am also limited by ethics and have no management, interest and control over these matters. Please seek other sources."** Mr. ▮▮ responded, **"You keep playing this law its cool. Since you can't talk now game on for real.** Just know I am very hurt by this game u playing but its cool." Mr. Howard responded, "I **am doing all** I **can for you with the limitations of Law and ethics and** I **have and will continue to."** *Id.*

Mr. ▮▮ changes approach and on April 17, 2018, the next day, seeks support from Mr. Howard stating, **"Sometimes** I **just need that confirmation that everything is going to be alright or that person that's going to help me push thru whenever** I **feel like giving up."** In response, Mr. Howard comforts Mr. ▮▮ stating, **"God is alive in you. God loves you**. God will redeem you as he has me. I and coach have been praying over you, releasing you from evil and delivering you as a child of God." *Id.*

On April 23, 2018, Mr. ▮▮ writes, "Tim just know you are fair game now. You could not be a man of your word. I am and will do everything in my power to make sure u have the same feeling we do as players right now.  The devil is real u got my money and played these **f____d** games with it." *Id.* Finally, Mr. ▮▮ writes, **"Keep playing this game u will get your in the end."** *Id.*

The facts are clear that Mr. ▮▮ and Mr. ▮▮ received extraordinary funds, have secure investments, and are conspiring with Mr. Reinhard, with the cover of Mr. ▮▮, in an extortion scheme that is grounded in criminal conduct.

Under these circumstances, these complaints must not proceed.

Thank you for your attention to this matter.

Sincerely Yours,

(Phillip) Tim Howard, J.D., Ph.D.



# The Florida Bar

**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

Joshua E. Doyle
Executive Director

850/561-5600
www.FLORIDABAR.org

January 15, 2020



Mr. Corey
c/o Thomas

Re:     Mr. Phillip Timothy Howard; RFA No.: 20-8862

Dear Mr.

All documentation submitted in this matter has been carefully reviewed. The Florida Bar is the licensing agency for all attorneys admitted to practice law in the State of Florida. In cases where discipline is indicated, the disciplinary action is taken against the attorney's licensure, and will not affect or overturn the outcome of any proceeding.

While I understand that you believe the attorney acted unethically, I must conclude that your complaint constitutes a civil dispute as there are no allegations independent of the enclosed civil complaint and as a result, must be resolved through the civil system. The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies. In the event that a court of competent jurisdiction makes findings in your case which suggest misconduct by the attorney you may re-file your complaint at that time, enclosing the relevant findings.

Additionally, regarding your request to file a claim with the Client Security Fund, you may download a claim form from The Florida Bar's website at www.floriabar.org.

Consequently, I have closed our record in this matter. Pursuant to the Bar's records retention schedule, the computer record and file will be disposed of one year from the date of closing.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

cc:     Mr. Phillip Timothy Howard ✓

---------- Forwarded message ---------
From: Don Reinhard <dwarner.sd5mcapital@gmail.com>
Date: Fri, Jan 12, 2018 at 10:52 PM
Subject: Update on Don's unfortunate situation
To:



This is an email I did not want to send to each of you as I truly thought this disaster was coming to an end in early to mid December and I would be back on course and working with each of you to further plan, develop, structure, and implement a solid and productive financial plan for you and your family. However, I have now learned that Bay County is not going to drop these heinous alleged charges of which they have no evidence unless I accept a plea agreement which will require me to go to a prison for approximately 18-24 more months. If I do not give in and accept their threat-induced offer then I risk a much longer sentence because of the heinous issues involved in this case and Florida does not offer parole and only allows 15% good time credit. I am sick to my stomach thinking about what I am now faced given that I did not commit this heinous crime and again, there is no evidence that proves that I did.

When this all happened in early February 2017 I was on top of the world. I had worked 12-18 hour days for the past 18 months to create, develop, and structure the very sound and successful principles of Cambridge Capital Group and was privileged and honored beyond my wildest dreams to have initiated and built the incredible relationships I had with each of you and we had only just begun.

Additionally, I had met a fabulous woman with three incredible little boys who very much needed a daddy who would love them, teach them, care for them, and give them the tools they needed to become truly successful and productive parts of our society. Molded together with my incredible two children, I finally had the large family I had yearned for since 2005. Everything seemed to be absolutely perfect and then ... bam within a 2-week period of time, my life was basically destroyed due to the heinous alleged charges levied by my fiance's, now my wife's, parents who despised me due to the stable environment I provided their daughter and grandchildren. Yes... believe it or not, that is what transpired. You would have thought they would have been tickled to death for their daughter and grandchildren to have this stability but yet they felt threatened.

And to make matters much much worse my friend of over 40 years who had become my closest confidant, friend, and business partner at Cambridge Capital Group immediately turned on me due to differences we had with regards to his firm's handling of your concussion settlement cases. He initiated his campaign of retaliation against my family and I so quickly that he clearly had planned it and was just waiting for the perfect opportunity. Well, he got it, as I was basically defenseless.

Going forward, hopefully each of you will receive your settlement proceeds soon as I know the unexpected delays have caused many of you and your families extreme hardships that were certainly unnecessary. While I have provided each of you with the reasons behind these delays so you clearly understood the unfortunate private agenda of your attorney which was the majority crux of my concern as to the handling of your claim, hopefully your wait for these much needed funds will end very soon. I have taken these unnecessary delays personal because I feel responsible for the success of each of you due to CCG's involvement and referring you to Tim Howard and Howard & Associates P.A. for legal representation.

My dreams of starting a new firm which will mimic the very sound principles and proven work ethic of Cambridge Capital Group will not die as I continue to fight to resolve these heinous charges. I am a very positive person and know that God has a plan for my family and I and that plan included our paths crossing. Please say a prayer for my family and I and I will certainly plan on contacting you immediately upon my release in hopes of continuing to build our long term

relationship.  In the mean time I will continue to have access to my email as well as text messages at 850-228-9868.  If there is anything I can do to assist you then please do not hesitate to contact me and I will do everything in my power to do so.  Please know how important each of you are to me.

Don

From: Don Reinhard <dwamer.sd5mcapital@gmail.com>
Date: 1/18/18 10:07 PM (GMT-05:00)
To:

‌

n>

Subject: An immediate lawsuit against Cambridge Capital Group, Tim Howard, the auditor, and others involved

I have done some research and I am increasingly concerned about what I am learning with regards to the current structure of Cambridge Capital Group and it's respective limited partnerships which each one of you are invested in via your 401k rollover proceeds and other assets. When I departed the portfolio that had been built was in my opinion, rock solid as a vast majority of my family's wealth is invested exactly as your family's wealth is in the limited partnership. As they say "I eat my own home cooking".

I have asked questions of the auditor to receive information about my values but I have not yet received any information. Perhaps you have done the same as I know some of you have as you have contacted me to ask questions. It is time for us to take legal action as again my research has me concerned. I am very uncomfortable with what I have learned about the current structure of CCG and the management of the portfolio as I have also requested a liquidation of my family's assets. I would strongly recommend that you do the same because I am overly concerned that the auditor has not provided any information since the audit for 2016 was initiated in July 2017. Again, let me underscore that I have a lot of experience in managing limited partnerships and the portfolio when I departed was rock solid as was the structure of the limited partnership. I have now learned that that has been dramatically changed. I am going to proceed aggressively to follow suit in the next two to three weeks to pursue the liquidation that I had requested over six months ago and I strongly recommend you do the same. However, our position will be much stronger and attorneys will be much more interested in the case if we proceed together. I think it's necessary to do so. Although I am still incarcerated my brother-in-law will be instrumental in helping us manage this process. Again, I believe time is of the essence so please let me know your thoughts as soon as possible. I look forward to hearing from you.

Don

P.S. - I will provide information regarding your approximate account value update for 12/31/17 tomorrow.

**From:** Don Reinhard <d123fsu@gmail.com>
**Date:** February 24, 2018 at 7:42:58 PM EST
**To:** Corey



**Subject: Incident at knife-point**

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5 inmates that are violent and hardened criminals because my roommate and I were told that there was absolutely no available bed space in the dorms that we should have been in for level 1, 2 and 3 inmates which have shorter non-violent sentences. I was told I would be in the dorm for 2-3 days and they would get me out immediately. However on Thursday I was being threatened and pressured to give them food and other items or I would "learn about prison the hard way". I voiced these concerns to my mother and father who immediately called and talked with a captain.

The captain talked with me and told me I would be taken out within the next day or two he was going to immediately look into it and asked me if I feared for my life and I said no that I was very scared and concerned of getting beat up or knifed. I also did not want to be put in solitary confinement which is the alternative if you say you fear for your life. I cannot handle that.

I was told by the dorm officer that I would be moved today which she finally got around to doing at about 5 o'clock and while I was packing my belongings some of the same individuals came into my cell with a knife made visible to me and told me they were going to stab me unless I gave them all of my canteen which was approx. $70 worth of various food items and hygiene. I tried to reason with them but another individual entered the room a so one of them held me off with the knife in his hand and they took all of my canteen.

There's other details involved but I immediately reported it to the sergeant outside because I just wanted to get out of there as soon as possible and they have taken the three individuals in hand-cuffs to solitary confinement. However, my understanding is that they are gang-related and will if they have not already got messages to their other gang members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center including a very close friend of Corey ███████ who had previously promised and re-iterated that promise when I came in that he will protect me. However, that will mean following him around like a puppy even if I am safe from other gang members in this dorm.

While the financial loss will hit me hard as I needed this food to last a couple more weeks as I am watching every single penny I have to spend, the real danger is that I am clearly a target at this camp/prison. Again, at this point I do not fear for my life because I certainly do not want to go to solitary confinement but things may change in the coming days. I clearly don't understand this part of the world and do not know how I am going to get through this.

The captain clearly acknowledged to the dorm guard that my roommate and I were not supposed to be housed in dorm F which included the level 4 & 5 inmates because it was breaking DOC policy. Although the dorm officer informed him that they were doing that periodically he said this was still breaking DOC policy. That captain was very helpful and he called mama and daddy yesterday evening to inform them that he was working to get me transferred out.

At this point, I believe the only solution is to do what is necessary to immediately get me moved to another camp/prison or possibly to the annex here at Columbia which is another camp or the work camp at Columbia. I really see no alternative as I'm very scared and nervous as to what the repercussions can be. To do this I assume it will take some sort of orchestrated phone calls possibly to the captain that mama and daddy have already talked to but please tell then that y'all are requesting that this happen and it is not coming from me. Perhaps you can inform him how scared and concerned I am that I am now clearly a target and there does not seem to be any alternative but you will need to be adamant as I should never have been in that dorm.

Please pray for me and I will talk to Wes tomorrow as well as mama and daddy.

Don

**From:** Don Reinhard <d123fsu@gmail.com>
**Date:** February 24, 2018 at 7:51:15 PM EST
**To:** Corey ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject: Visitation and email I just sent**

Corey, I think you will realize when you read the email I just sent that I am not only scared to death but terrified. Just to let you know Joe did make a very visible sign talking to me so everybody in the dorm would see him. Hopefully that does help for the time being.

Also, please complete and send in the visitation form that was previously emailed to everybody as I truly want to see you soon and hopefully you can take one Saturday or Sunday and drive over. We certainly have a lot to discuss especially about Tim and CCG.

Love ya buddy,
Don

From: **Addys Walker** <addyswalker@yahoo.com>
Date: Tue, Feb 6, 2018 at 2:13 PM
Subject: Re: Notice to Cease and Desist from Stalking, Intimidation and Extortion
To: "John P. Leonard" <jleonard@mdmc-law.com>, Lance Friedman <lfriedman@bca-advisors.com>
Cc: Lance Friedman <lancebfriedman62@gmail.com>, Tim Howard <tim@howardjustice.com>, Thomas Woods <thomascwoods@gmail.com>

I have not been to Tom's house. I do not know where he lives. I have been in a meeting for the last couple of hours and I can prove where I have been all day. Further, I have no intention to contact Tom directly or indirectly.

Furthermore, I have no affiliation with Lance other than signing documents for A&T Development.

I spoke with Corey ▇▇▇ today who said he only invested his money with Don Reinhard because he trusted Tim Howard. Corey said he wants to kill everyone, including Tim Howard, Gail, Harrison and myself. I am letting you know this so you can protect yourself.

Addys

**THE NEW YORK TIMES**

**SPORTS** | PRO FOOTBALL
## *PRO FOOTBALL; There's More Than Football To Worry About for Ravens*

**By DAMON HACK** JUNE 8, 2004

In a small trailer that doubles as a Bible study room, Baltimore Ravens running back Jamal Lewis sat at a news conference Monday and reiterated that he was innocent of federal drug conspiracy charges. In a corner of the Ravens' locker room, no more than two hours later, cornerback **Corey** ███ **apologized for the embarrassment caused by his arrest for felony firearm possession and for felony and misdemeanor charges that he used his home in Tallahassee, Fla., as a high-stakes gambling house**.

Football seemed secondary as the Ravens embarked on a four-day minicamp amid the cicadas in this Baltimore suburb.

"This is the appropriate time to discuss this because it is time to go back to work," Ravens Coach Brian Billick said, of Lewis's situation in particular. "Obviously, we support Jamal, we believe in this process and we will support him in this process. Whatever the time frame, it is important to keep in mind that the players don't live in a sterile environment."

For the Ravens, the American Football Conference North champions last season, matters of legality have swooped into their season before.

In August 2000, the N.F.L. fined the All-Pro linebacker Ray Lewis $250,000 for conduct detrimental to the league after he pleaded guilty to a misdemeanor charge of obstructing justice in a double homicide at an Atlanta nightclub. Lewis had faced two counts of murder before prosecutors dropped those charges.

In December, the second-year pass rusher Terrell Suggs was charged with two counts of felony assault for a March 2003 incident outside Phoenix Municipal Stadium after a three-on-three basketball tournament. Suggs has a Sept. 9 court date.

With Jamal Lewis, who faces charges in Atlanta, ███ and Suggs, Ravens players currently face six felony charges in three states.

**"It seems like the devil is always at work, but I know what it takes to overcome the devil,"** ███ **, 33, said. "I wouldn't wish this on my worst enemy. But nobody victimized me. I victimized myself."**

Billick compared the off-the-field situations with instances that arise in every sport. The Ravens have bucked back controversy before, winning Super Bowl XXXV against the Giants only months after Ray Lewis's involvement the Atlanta murder trial.

"Whether it's Jamal, whether it's Corey, whether it's Terrell Suggs, I have a tremendous amount of faith in the character of those individuals," Billick said. "There are going to be things that raise themselves up due to injury, personal situations, births, deaths, any number of things. These aren't machines. They have lives and as a team, you have to respect and understand that."

Jamal Lewis, who was voted the league's offensive player of the year last season, rushed for 2,066 yards, the second-highest total in league history. (Eric Dickerson ran for 2,105 in 1984.) Lewis is accused of conspiring to possess with intent to distribute five kilograms of cocaine and using a cellphone in the commission of a drug crime. The charges resulted from an investigation by the Federal Bureau of Investigation during the summer of 2000, just before Lewis signed a six-year, $35.3 million contract.

# 247 Sports

# ██████ Facing Felony Gun Charges

BY May 24, 2004 ·
0

When Corey ████ played for the Vikings, VU staffers agreed he was a talented player, but also agreed he wasn't going to be asked to join Mensa.

His lack of ideal intelligence came into play earlier this year when **a shootout at his home resulted in ████ being arrested for hosting high-stakes gambling nights. Despite making a solid NFL salary, especially when he was with the ██████, the current ████ s player decided playing host to No-Limit Texas Hold 'Em games was in his best interest.** Now he faces jail time and a likely suspension from the league.

New charges were added over the weekend, including use of a firearm during the commission of a felony, which carries a maximum of five years in jail if convicted.

# Howard & Associates
## Attorneys at Law, P.A.
*Dr. Tim Howard, J.D., Ph.D., Senior Partner\**
*Florida Supreme Court Certified Mediator*

Tallahassee Office:
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Ph: (850) 298-4455; Fax: (850) 216-2537
Tim@howardjustice.com

Fort Lauderdale Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332-3633
www.howardjustice.com

Cambridge Office:
8 Museum Way
Suite 2407
Cambridge, Massachusetts 02141
(857) 277-0999

July 28, 2017

**VIA HAND-DELIVERY OR EMAIL**

Jon Fuchs, Assistant State Attorney
Second Judicial Circuit
301 North Monroe Street, Suite 475
Tallahassee, Florida 32301
(850) 606-6000

Jennifer Alane Hawkins, Assistant State Attorney
Fourteenth Judicial Circuit
421 Magnolia Avenue
Panama City, Florida 32401
(850) 872-4473

Re: Attempts at Extortion, Retaliation and Obstruction of Justice by Criminal Co-Defendants Don Reinhard and Katie Reinhard (Buxton). Don Reinhard is Currently Facing Criminal Charges for Violation of Probation for Grand Theft. Don Reinhard and Katie Reinhard are both Facing Criminal Charges for Felony Child Abuse of a Disabled Child, A Tragedy for the Disabled Child and for the Co-Defendants.

Dear Assistant State Attorney Fuchs, and Assistant State Attorney Hawkins:

As part of your respective prosecutions of the above referenced violation of probation and felony child abuse charges, the law firm has assisted by sharing evidence and responding to the subpoena verifying the felony crimes of child abuse on the phone and in texts between the co-defendants that was shared with Assistant State Attorney Jon Fuchs and Panama City Beach Investigator, Lieutenant Eusebio Talamantez. Cumulative Exhibit A. The law firm was unwilling to participate in obstruction of justice and would not hide evidence nor assist in their criminal defense. In retaliation, the criminal co-defendants are aggressively attempting to extort the law firm and those that work for and with the law firm. While these sordid crimes are a tragedy for the disabled child and for both co-defendants, and we hope that the

\*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D, Northeastern University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar, and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

disabled child receives the security and support he needs, we must inform you of continuing extortion and retaliation by these criminal co-defendants.

Despite receiving "Cease and Desist" letters in late February and early March of 2017, and Don Reinhard executing a notarized "Law Firm Non-Disclosure Agreement and Confidentiality Agreement" that all workers in the building sign, regardless of whether they actually work as an employee or independent contractor for the Howard & Associates law firm, colleagues, employees, experts, lenders, accountant, wife of the owner, owner, regulators, private investigators, and more, have received threatening and extortionate emails, texts, and/or letters dictated or written from the Leon County Jail by Don Reinhard, and/or through his co-defendant, Katie Buxton (now Katie Reinhard since he married Katie Buxton while in the county jail in a fruitless attempt to claim marital privilege for a co-defendant, which marriage was after the crime and after the testimony and documentation of the crime took place). In violation of the "Law Firm Non-Disclosure Agreement and Confidentiality Agreement," based on his statements to date, Don Reinhard may have obtained NFL Concussion Settlement Claim files and may have sought to make changes to the files. The firm doesn't know what is in Don Reinhard's possession. All original client files in the law firm's possession are in order.

Don Reinhard and Katie Reinhard have falsely claimed and implied fraud in NFL Concussion Settlement client files, and have implied that there are other matters that they will expose, if it is not agreed that: (1) the law firm and colleagues participate in obstructing justice and assist Don Reinhard and Katie Reinhard in their criminal defense, (2) Don Reinhard and Katie Reinhard are entitled to amounts that range from $1,200,000 and more several million dollars for Don Reinhard's $3,000 a month consulting work for a private FINRA exempt investment fund, (3) Katie Reinhard is to be paid Don Reinhard's former consulting fee of $3,000 monthly, and (4) $25,000 is to be paid to Katie Reinhard for a car she does not own. Cambridge Capital Group (CCG) has responded to each of the claims against that company, and verified that there were no funds invested nor are there subscription agreements as investors under either Don Reinhard or Katie Reinhard.

The facts are that Don Reinhard was hired as a periodic consultant for CCG, an independent investment company, at $3,000 a month. He has no ownership interest in CCG. He was hired as a consultant in an effort at compassion and rehabilitation of someone that Dr. Howard met at Costco selling wine and who didn't know what to do with his life. He is a former high school football team mate that Dr. Howard had known, but he was not someone that Dr. Howard had been close to. He was not involved with the law firm, and in an abundance of caution, the firm required that all workers on the same floor in with companies in the same building of the law firm sign and commit to a confidentiality agreement in order to protect client information. Subsequent to his dismissal, upon investigation, it has been determined that Don Reinhard was misleading as to the facts and underlying charges for some of his prior crimes. Affidavit verifying independent contractor and consultant status, and affidavit verifying income of $3,000 monthly, as filed by Don Reinhard in January and December 2016 in his Circuit Civil Court Child Support case in Leon County, Florida, and confidentiality agreement, and cease and desist letters, are attached as Cumulative Exhibit A. Moreover, the investment companies are currently owned and managed by third-parties, that this firm represents, and are Nevada companies. Dr. Howard had

approximately $2.4 million invested by the end of 2016, and has approximately $5.2 million invested as of July 28, 2017.

Beginning about a year ago, due to concerns as to Don Reinhard's arrogance, narcissism, solipsism, and resistance to accountability, CCG started a search for a replacement and/or supervisor of his independent contractor consulting work, with a licensed financial planner, licensed investment agent and broker-dealer. After interviewing several candidates, a quality, experienced, respected, and licensed professional with integrity and empathy was found and CCG hired Gail Milon, CASL, CLTC, with 30 years of successful experience, as managing Vice President in December of 2016. She has since hired Bogan Public Management Company (BPMC), and Bill Bogan, Jr., CPA, CGFO, and CBFO, to provide a comprehensive audit to ensure all investment funds are in place and to determine what company profits may have been absconded. BPMC is mid-way through the audit now.

Starting after his arrest in mid-February of 2016, a retaliatory and extortionate scheme to obstruct justice and extort assets by Don Reinhard and Katie Reinhard (Buxton) began, and is found in the various letters and emails from them orchestrated from the Leon County Jail through his co-defendant Katie Reinhard. The conspiracy between these co-defendants begins with the violation of the February 11, 2017 Court Order that specifically directs Don Reinhard: "Do not contact Jesse Buxton or Katherine Buxton." *Id.* The various letters and emails are attached as Cumulative Exhibit B.

As an example, these sordid claims have been spread to experts, clients and lenders of the law firm, falsely claiming that diagnostic medical exams and final reports are forged and hundreds of millions of fraudulent claims have been submitted to the NFL Concussion Settlement Claims facility. *Id.* The facts are that neither Don Reinhard nor Katie Reinhard ever worked for the law firm, though Don Reinhard did sign the law firm confidentiality agreement to protect any exposure to client confidential information, and Don Reinhard was terminated from his consulting work for an independent investment fund in mid-February of 2017. Exhibit C. Don Reinhard was imprisoned in late February of 2017 as a result of violation of probation due to pending felony child abuse charges. As a consequence, neither Don Reinhard nor Katie Reinhard know how vacuous and patently absurd their extortionate and retaliatory allegations are.

These criminal co-defendants don't know that from the currently over 250 clients, and growing, nothing, other than registering them, has been submitted to the NFL Concussion Settlement Claims facility. They don't know that all original medical reports are in the files of the doctors, and only copies are in the files of the law firm. They don't know that all medical records and reports have to be reviewed and signed by a board-certified neurologist formally approved by the NFL Concussion Settlement Claims facility. They don't know that the board-certified neurologists contemplated for use by the law firm were only recently approved in May and June by the NFL Concussion Settlement Claims facility. They don't know that all our NFL Concussion Settlement clients must meet individually for an updated clinical evaluation prior to submission of our clients' claims to the NFL Concussion Settlement facility. They don't know that the firm must have a board-certified neuropsychologist meet with every client to update and finalize their neuropsychological status, and that these updates will begin in a few weeks. They don't know that the law firm manages its files to ensure the file's integrity and client confidentiality. This is just one example of their respective ignorance, arrogance and their vacuous criminal extortion and retaliation attempts.

These letters and emails are replete with these types of criminal schemes, including: (1) attempting to operate a private investment firm from jail and enticing retired NFL players to invest $650,000 with $9,000 monthly income and doubling of value in 7 years, and running a "new firm, Sd5M Capital Management owned by my wife (also known as Scooby/Katie) and I as well as a group of retired players," (2) attempting to extort a "global settlement", "$50,986", monthly payments of $3,000 to co-defendant Katie Reinhard, and $1,200,000 in assets in response to "turning your back on me" and threats of "train wreck for both of our lives and you have more to lose," "the risk and damage your actions will cause to many . . .", "each event carries significant penalties + punishment", "your massive fraud", "30-year prison term", "I have been forced to sue Tim Howard for well over $1 million that he is attempting to steal from me, my family, and my children", (3) attempting to extort these payments and assets through threats and claims of fraud against the NFL Concussion Settlement, tax fraud against CPA, bank fraud and worthless check charges against staff, (4) attempting to extort a $25,000 payment to Katie Reinhard for a car she does not own, (5) use of third-parties and/or alias, such as Tori Reinhard and nflfraud@gmail.com, as part of their extortionate conspiracy, (6) threatening and intimidating experts and lenders of the law firm, (7) threatening and intimidating the independent auditor (BPMC), (9) spreading false and defamatory statements to NFL Concussion Settlement clients, and (10) the following threatening and extortionate tome to Dr. Howard's wife, Jennifer Howard:

> But also, I intend to immediately move forward with current communication I am having with the NFL Claims Administrator and law enforcement via a large national law firm regarding this massive fraud Tim and Howard & Associates have perpetrated against the NFL Concussion Settlement and the 300 plus retired NFL players that are his clients. . . . **Tim and his team have made a massive fraud out of it to bilk the NFL out of approximately $120 million in claims of which he will be paid approximately $30 million in fees. I have been told that the case would likely carry a 30-year prison term** and the collateral damage to many of his employees and associates who know and are involved would be devastating to many lives . . . this does not even include the many, many families of the retired NFL players who are expecting a financial settlement averaging over $600,000 who will be denied due to the fraud involved in their qualification process by their trusted attorney, Tim Howard. The media onslaught that you and your family would have to endure, in and of itself, would be devastating and far greater than tobacco days. I and others began keeping records and documented proof in 2016. While I thought the activity was limited, I was shocked to hear from 2 H&A associates that it was widespread. They came to me in Jan. with concerns of their personal liability. For example, I and others have witnessed forging signatures on files to insure eligibility as well as changing files as needed. There is an abundance of documented evidence to prove this that Tim was unaware was being collected in many forms. . . . **I have told Tim via my letters that I do not want to go down this road unless he forced me to. To date, my communications to the various authorities has been limited by design and anonymous as again, its via a large law firm but they are eager to move forward with details. . . . I must have him simply provide me what is "mine" . . . I cannot start my life over again.** . . . Look at the enormous risk he is taking for him, you and your family. Look at the enormous risk he is taking for the employees of his law firm. Look at the enormous risk he is taking for almost 300 families of retired NFL players. Outside of the NFL and the criminal case, Tim would be sued for millions he has borrowed over the last 4-5 months against his future expected fees as they were based on fraud, sued by multiple legal

advance companies because their loans to players would be unpaid based on Tim's fraud, and sued by all of the investors in the Limited Partnership Investment Funds of CCG, due to their losses because of the fraud (including your mother's investments) which would certainly bring in the SEC. **This is certainly well over $35-$40 million in lawsuits in addition to losing his $30 million in fees. For what . . . "spit for me, which is very foolish" as suggested by 2 of his closets clients who know the situation. Jennifer, let's not make this a train wreck as y'all have far more to lose than I do.** Please discuss this with Tim and send me an email as I will not wait past 4/17 for a response to d123fsu@gmail.com. (emphasis added).

Cumulative Exhibit B.  All these actions are an attempt at extortion and in retaliation for not assisting in their criminal defense, for not participating in obstruction of justice, and for assisting the State of Florida in providing damning evidence in support of the prosecution of their crimes.

In light of their rapid fire buckshot, yet vacuous, extortionate and retaliatory actions to date, and the comprehensive evidence of their crimes and the evidence that this firm is providing as a result of its investigation and has provided to assist in the prosecution for these crimes, as well as in compliance with Assistant State Attorney Jon Fuch's subpoena, it is highly likely that these criminal co-defendants will reach out to any source that may come into their respective minds in an attempt to perpetrate their extortion, retaliation and obstruction of justice.  In order to expose the extortion, retaliation, and obstruction of justice, and to avoid any knowing or unknowing, and/or direct and indirect complicity by third-parties with their schemes, this law firm is providing a copy of this notice to the Florida Bar, and will provide copies of this notice to any other victim of their criminal schemes that this law firm becomes aware of.

Thank you for your service to Floridians and for your consideration of these matters.  This entire episode is a tragedy and we do hope that these co-defendants get the structure, accountability, discipline, and mental health treatment that they need to be productive citizens.  As stated in the beginning of this letter, we hope that the disabled child that is a victim of their crimes gets the security and support he needs for a healthy life.

Sincerely yours,

Jaakan Williams, Esq.
**HOWARD & ASSOCIATES, P.A.**
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Office: (850) 298-4455
jaakan@howardjustice.com

CC:   Florida Bar