# EXHIBIT 1

IN THE SUPREME COURT OF FLORIDA
(Before a Referee)

THE FLORIDA BAR,

    Complainant,

v.

PHILLIP TIMOTHY HOWARD,

    Respondent.

Supreme Court Case Nos.
SC19-488 and SC19-1570
(Consolidated)

The Florida Bar File Nos.
2016-00,682(2A), 2019-00,088(2B)

_____/

## **REPORT OF REFEREE**

I.   <u>SUMMARY OF PROCEEDINGS</u>

    Pursuant to the undersigned being duly appointed as referee to

conduct disciplinary proceedings herein according to Rule 3-7.6, Rules of

Discipline, the following proceedings occurred:

    On March 26, 2019, The Florida Bar filed its Complaint in SC19-488

against respondent in these proceedings. The undersigned was appointed

April 2, 2019. On May 24, 2019, the respondent filed his Answer. On

September 17, 2019, The Florida Bar filed its Complaint in SC19-1570. The

undersigned was appointed on September 26, 2019. On January 22, 2020,

respondent filed his Answer. On December 9, 2019, the cases were

consolidated. Discovery was conducted in both cases. On November 16-

18, 2020, a final hearing was held in the first case in this matter. On

December 7-8, 2020, a final hearing was held in the second case in this matter. This referee filed his preliminary findings on February 22, 2021. On March 22, 2021, a sanction hearing was held. Both parties submitted their closing arguments in writing following the sanction hearing. All items properly filed including pleadings, recorded testimony (if transcribed), exhibits in evidence and the report of referee constitute the record in this case and are forwarded to the Supreme Court of Florida.

II.   FINDINGS OF FACT

A.   Jurisdictional Statement.  Respondent is, and at all times mentioned during this investigation was, a member of The Florida Bar, subject to the jurisdiction and Disciplinary Rules of the Supreme Court of Florida.

**NOTE:** Today's Findings of Fact incorporate two attached documents written earlier by the Referee:

1. February 22, 2021 "Draft (Preliminary) Findings"

2. April 15, 2021 "Additional Findings and Referee's Recommendation After Sanctions Hearing 3-22-21."

Each and both succinctly summarize the Referee's Findings – and in many ways better inform the reader in brief form of the Referee's determinations.

2

IN THE SUPREME COURT OF FLORIDA
(Before a Referee)

THE FLORIDA BAR,

      Complainant,

vs.

PHILLIP TIMOTHY HOWARD,

      Respondent.

Supreme Court Case No. SC 19-488

The Florida Bar File No. 2016-
00,682(2A)

THE FLORIDA BAR,

      Complainant,

vs.

PHILLIP TIMOTHY HOWARD,

      Respondent.

Supreme Court Case No. SC 19-
1570

The Florida Bar File No. 2019-
00,088(2A)

## DRAFT (PRELIMINARY) FINDINGS

After many hours of hearings (days), the Court allowed written Final

Arguments. Those have been received and considered. What follows are DRAFT

(Preliminary) Findings based on all evidence, testimony, exhibits, and argument.

This is intended to assist counsel for The Bar and Mr. Howard but is not the final

report — which will be written and submitted only after agreement(s) are reached

3

-or additional hearing(s) on appropriate sanctions to be imposed by the Supreme Court. (Note: a third action: # SC20-1596 remains pending; has not yet been heard; and is not a part of this DRAFT.)

### 1 - Case No: SC19-488 (Fulop-Hall)

The first case was heard 11/16/20; 11/17/20; 11/18/20. The Referee took 33 pages of handwritten notes on this case — prior to Final Arguments. To say that the presentation was long, detailed, conflicting, mathematically challenging, and difficult is to understate the matter! The difference(s) between the expert opinions were "day-n-night" and "at opposite ends of the spectrum." The opinion of Bar Counsel on violation(s): that there were clear and convincing proofs of many rules violations; were diametrically opposite those of defense counsel and Mr. Howard: that he didn't do anything wrong, violate any rules, or intentionally try to circumvent the letter and intent of the Fla. Bar Rules / Regulations / Code.

To this Referee, the Truth lies somewhere in-between; but not near "in the middle." Attorney Howard has in fact violated both the letter and the intent of the Rules — repeatedly; and engaged in conduct calculated to circumvent the requirements of the rules. The evidence shows Attorney Howard is far closer to the Bar's portrayal of him; than to the attempted image he tries to portray of a "protector" of Jason Hall and his assets.

4

Attorney Howard's firm's skills may well have led to a substantial monetary recovery to Jason Hall under difficult factual evidence (J.H's impairment); but Mr. Howard's actions thereafter were clear violations of Rules regarding trust accounting, (dis) honesty, safekeeping property, commingling, charging clearly unearned or excessive fees, explanatory responsibilities, competence requirements (Jason Hall's probate case); and false statements (to client[s] and The Bar).

This is not a "close case." Only a significantly strained view of rule compliance — and an intentional avoidance of the rules - can be seen in Attorney Howard's conduct relating to Jason Hall. Though Attorney Howard views himself as a "protector" of an injured and alcohol / drug-impaired Jason Hall and his assets, actually the opposite appears to be true. Howard helped himself to hundreds of thousands of dollars (calling it a "loan" — rather than keeping it in Trust), kept his client(s) / and The Bar / in the dark; and attempted to use "creative accounting" (see footnote 1) to try to show that Jason Hall (and/or J. H.'s estate) actually owed him money! The multiple theoretical calculations employed by accountant John Harvard rest almost exclusively on what Attorney Howard told him — and very little on what the monetary trail actually should have shown him.

---

1 "creative accounting" used herein is a kind and gentle term – in actuality, speculative, non-fact-based or unfounded are more appropriate.

Preliminarily — and to guide Bar counsel on preparation of a proposed set of Findings, (IF needed) the Referee finds Mr. Howard violated each and every rule argued by the Fla. Bar in its Final Argument (11/24/20) — for the reasons argued. The Bar's Final Argument could be mostly incorporated into the Findings. The findings/testimony of accountant Harvard are not only suspect, they are not supportable or supported by the actual facts. His conclusions about the values of Howard's representation on numerous matters (including probate, 3-day eviction, divorce, Worker's Comp.) are suspect and speculative at best as are Harvard's other conclusions. (Example: ignoring requirements for only the judge in certain case(s) to set a fee; or fees being limited to those which are statutorily — allowed.)

<u>11- Case No.: SC19-1570 (Richard and Margaret Harris)</u>

After the Jason Hall / Fulop Hearing(s) and written final arguments; the same Referee heard this second matter on 12/7/20 and 12/8/20. Final Arguments were submitted thereafter. In reaching Findings on the Margaret Harris complaint, the Referee considered all evidence submitted, and arguments of counsel. The Referee took 15 pages of handwritten notes on this 2d matter vs. Attorney Howard.

Based upon all the evidence and arguments, the Referee finds that Attorney Howard violated the following Rules:

6

4-1.1 Competence

4-1.3 Diligence

4-5.1 Responsibility of Supervisory Lawyers

For the reasons set out in the Bar counsel's final argument; each violation has been established. Attorney Howard was apparently competent in tobacco litigation cases — generally. He strayed from that by his unusual (and incorrect) use of errata sheets after a deposition; and his improper handling of not only an attempted "hand-off" of the tobacco case to a firm Attorney Howard wanted to have it (Attorney Howard was fired by the Harris client); and by his lack of diligence on the probate case (see footnote 2) of Richard Harris. Attorney Howard is not found guilty of wrongdoing related to the "improperly demanded" payment of hard costs: a $10,000 house rental (for use during the trial); or for $12,000 relating to tissue preservation costs. The "improper demand" was not shown.

The injection of attorney JB Harris (described as a "bitterly disgruntled former colleague of Mr. Howard" by defense counsel Brunetti) into the Richard and Margaret Harris representation is unfortunate. Counsel Brunetti was able to show animus, (not-so) veiled threats, and other negative behaviors by JB Harris directed at Attorney Howard. Keeping that fact in mind - however - does not

---

2 Attorney Howard's inactivity on the probate case caused it to be dismissed / closed-though it was later re-opened.

7

relieve Attorney Howard of his professional duties towards his client(s). JB Harris may well be wrong in his actions / threats toward Attorney Howard (and may have been instrumental in getting the Bar complaint filed); but Attorney Howard's conduct is not thereby excused.

An additional observation: There is (appropriately) a compounding effect of Bar rules violations: one(s) have been found before the Hall / Fulop case; violations are now found in the Hall / Fulop case itself; and additional violations are now found in this Richard and Margaret Harris case. There is yet another TFB case filed vs. Attorney Howard — and not yet set for hearing.

of February 2021.

Honorable Paul S. Bryan, Referee

Copies provided to:

James Myers, Respondent's Counsel, jmyers@mdmc-law.com
Alfred Brunetti, Respondent's Counsel, abrunetti@mdmc-law.com
Shaneé L. Hinson, Bar Counsel, shinson@floridabar.org

IN THE SUPREME COURT OF FLORIDA

(Before a Referee)

THE FLORIDA BAR,              Supreme Court Case No. SC 19-488

      Complainant,

vs.

PHILLIP TIMOTHY HOWARD,     The Florida Bar File No. 2016-00, 682(2A)

      Respondent.

THE FLORIDA BAR,              Supreme Court Case No. SC 19-1570

      Complainant,

vs.

PHILLIP TIMOTHY HOWARD,     The Florida Bar File No. 2019-00, 088 (2A)

      Respondent.

                           /

## ADDITIONAL FINDINGS AND REFEREE'S RECOMMENDATION AFTER SANCTIONS HEARING 3-22-21

The Referee received a "Submission to the Florida Bar and Referee for Appropriate Sanctions" on Thursday, March 18, 2021 at 8:26 p.m. It consisted of

approximately 500 pages including argument; caselaw; many photographs, transcripts, and documents.

The Referee also received "The Florida Bar's Case-Law and Standards for Imposing Lawyer Discipline Chart" and caselaw / argument (violation by violation); Affidavit of Dana F. Thrash (TFB Tallahassee Branch Manager) re: disciplinary records of Respondent Howard; the caselaw referred to by TFB; and a 3-26-07 letter to Mr. Howard from The Florida Bar on TFB File No. 2004-01, 090 (2A): detailing Respondent Howard's public reprimand; 18-month probation; costs; fees; LOMAS requirement(s); trust account workshop within 6 months; C.P.A. requirement and monthly reconciliation(s) and semi-annual reports.

Approximately 3-3.5 hours were utilized in the hearing plus related matters (including a mid-hearing private discussion: Hinson / Howard) on March 22, 2021. The Referee had earlier made <u>Draft (Preliminary) Findings</u> (signed 2-22-21). At times Mr. Howard seemed to agree with the Bar's request for disbarment (5 yrs., petition to re-instate possible thereafter); but clearly wanted the Referee to hear his "mitigation." Respondent's opinion (accurate or not) that the Bar was giving him no mitigation consideration seemed to be the reason for today's hearing on sanctions.

<u>Additional Findings:</u>

1. The cases cited by the Florida Bar counsel:

(a.) <u>TFB v. Horton,</u> SC17-782 (Fla. 2019)

(b.) <u>TFB v. Alters,</u> 260 So.2d 72 (Fla. 2018)

(c.) <u>TFB v. Mirk,</u> 64 So.2d 1180 (Fla. 2011)

(d.) <u>TFB v. Brownstein,</u> 953 So.2d 502 (Fla. 2007)

(e.) <u>TFB v. Spear,</u> 887 So.2d 1242 (Fla. 2004)

(f.) <u>TFB v. Barley,</u> 831 So2d 163 (Fla. 2003)

(g.) <u>TFB v. Tavis, Jr.,</u> 765 So2d 689 (Fla. 2000)

are far closer factually to these Howard cases; than are the cases cited by Respondent.

2. Mr. Howard – while on probation regarding Trust Account problems / violations – continued to blatantly and intentionally avoid the requirements of the Trust Account rules; most particularly as related to Jason Hall's settlement; Respondent's $200,000 "loan" from the proceeds of a client whom the Respondent describes as drug and alcohol dependent / addicted; severely injured / disabled; and not well-educated. Jason Hall was a particularly vulnerable client. In addition to the Draft (Preliminary) Findings, it is now even more clear that Respondent Howard has not – to this day – actually/sufficiently accounted for hundreds of thousands of dollars from that Jason Hall settlement. Respondent (and his hired accountant: Harvard) have not shown where all the money went; cannot account

for it; and still Mr. Howard claims he is owed more fees / money by Jason Hall / his estate!

3. Even taken in the best light for Respondent Howard: including his claims that the Fla. Bar did not follow their own procedures; listened to and accepted false complaints and have been part of fostering / promoting / assisting extortion of money from him – the Fla. Bar made their <u>own</u> investigation(s) and filed their own complaints after these investigations.   Initial complaints may not have been completely truthful – but they caused the independent Fla. Bar investigation and yielded the discovery of many now-proven violations by Attorney Howard:

4.1 FAILURE TO PRESERVE THE CLIENT'S PROPERTY

4.3 FAILURE TO AVOID CONFLICTS OF INTEREST

4.4 LACK OF DILIGENCE

4.5. LACK OF COMPETENCE

4.6 LACK OF CANDOR

5.1 FAILURE TO MAINTAIN PERSONAL INTEGRITY

6.1 FALSE STATEMENTS, FRAUD, AND MISREPRESENTATION

7.1 DECEPTIVE CONDUCT OR STATEMENTS AND UNREASONABLE OR IMPROPER FEES

8.1 VIOLATION OF COURT ORDER OR ENGAGING IN SUBSEQUENT SAME OR SIMILAR MISCONDUCT

The Referee does <u>not</u> find violation of 6.2: Abuse of the Legal Process.

In Respondent Howard's 500-pg. "Submission…", he presented many examples he intended to be mitigation. In the March 22, 2021 hearing he went over many of those. Respondent Howard also detailed how in many cases he received (or was a part of a team to receive) many millions of dollars in fees year by year (one year he said he received $6 million + income). No one asked him those income questions – but he detailed tobacco cases; oil spill cases; workman's compensation cases; earnings from teaching around the world, etc.

As a result of his prosperity, Mr. Howard engaged in many benevolent activities, which he detailed in the "Submission…" and testimony: feeding the hungry, ministering as a chaplain, working to create and export sustainable agricultural endeavors, coaching young people, being an active church member, to name just a few. These are good works, and worthy of consideration.

However, on balance, good works do not offset clear, intentional, knowing violation of the rules all attorneys are required to follow. Mr. Howard's violations have been going on for many years (in this Third Circuit alone, he has been found in violation by Judge Peach; Judge Fina, and now Judge Bryan – as Referees).

Aggravators offered by the Bar are <u>found</u> as follows:

1. prior disciplinary offenses;

13

2. dishonest or selfish motive; he clearly sought ways to "get-around" (avoid) Trust / accounting rules

3. a pattern of misconduct; multiple cases / clients victims

4. multiple offenses;

5. bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

6. submission of false evidence, false statements, or other deceptive practices during the disciplinary process (most explicitly by the use of his accounting expert Mr. Harvard by Mr. Howard giving the expert partial / incomplete / inaccurate information through which the expert reached questionable ["wrong"] conclusions);

7. refusal to acknowledge the wrongful nature of the conduct;

8. vulnerability of the victim;

9. substantial experience in the practice of law; and

10. indifference to making restitution.

The Fla. Bar has not asked for lifetime / permanent disbarment. It is difficult to see how even five (5) years from now Respondent Howard could or should be again placed in the position of trust held by attorneys in Florida. If not practicing law – perhaps Mr. Howard can continue to pursue other worthwhile endeavors (as he claimed for mitigation).

It is without pleasure that this Referee must make the following recommendation: <u>Disbarment</u>. It is the only appropriate sanction. Costs / fees / and restitution are reserved for now.

Dated this 15th day of April 2021.

_____
PAUL S. BRYAN, REFEREE

I hereby certify that copy of the foregoing was furnished via e-mail to the following:

Shanee L. Hinson, Bar Counsel: shinson@flabar.org

Phillip Timothy Howard, Respondent: tim@howardjustice.com

Alfred Brunetti, Respondent's Counsel, abrunetti@mdmc-law.com

## Case No SC19-488 – Sandra Fulop

1.     Jason Hall (now deceased) was a former client of respondent. On March 16, 2006, Jason Hall was injured in a workplace accident that left him a paraplegic.

2.     On October 3, 2006, Jason and Dana Hall ("Ms. Hall," his then wife) entered into a contingency fee agreement with respondent as a result of Jason's Worker's Compensation claim being denied by his employer's insurance carrier.

3.     On July 15, 2008, before the settlement was approved by the court, respondent had Jason Hall sign a "Distribution Plan for Non-refundable, Non-Client Funds" which, among other things, provided that funds would "remain in the determined account until paid to the annuity". The document states that by signing, Jason Hall's "notarized signature below verifies your directives as listed above." (TFB Exhibit 3).

4.     On July 15, 2008, Jason Hall signed another letter titled "Non-refundable, Non-Client Funds for Deposit and Distribution".  (TFB Exhibit 4). This document read: "This document is provided in order to comply with

16

professional standards and to verify that you have identified and directed that various funds from Summit as a result of your worker's compensation settlement received by this firm are non-refundable, non-client funds that are to be deposited at this firm's discretion for distribution. They include a $20,000 lump sum, and another approximate $410,000 lump sum. Your notarized signature below verifies your agreement with this as directed by you.

5.     Respondent did not give Jason Hall the option of opening a separate, interest bearing trust account in his name. Rather, he explained that he would be better able to negotiate discounts on the outstanding medical bills and personal debts and would provide funds to Jason and Dana as needed from his operating account.

6.     On August 5, 2008, the court approved the settlement for Jason's injuries. (TFB Exhibit 1). On August 8, 2008, a deposit was made in the amount of $612,828.00 into respondent's law firm's operating account. Respondent had no trust account at the time he received settlement funds on behalf of Jason Hall.

7.     Jason and Dana were divorced in August 2010.

8.     On May 3, 2012, Jason Hall passed away from injuries sustained in an automobile crash.

17

9.    Respondent offered to represent Ms. Hall and the minor
children pro bono in settling Jason's estate and filed papers with the court
acknowledging his representation and requesting Ms. Hall be appointed the
Personal Representative. It was later discovered that the divorce
settlement included a clause that prevented Dana Hall from being
appointed the Personal Representative. Sandra Fulop (Dana's mother and
grandmother of the minor children) was substituted as the Personal
Representative.

10.    On December 23, 2013, respondent met with Ms. Hall and Ms.
Fulop and provided an accounting and a check to Ms. Fulop in the amount
of $16,200.00, claiming they were "non-refundable, non-client funds". He
also provided a separate check to pay delinquent property taxes owed for
Jason's home. Respondent required that Ms. Fulop sign a letter stating that
this was the "Full and Final Distribution of Jason R. Hall Non-refundable,
Non-Client Funds."

11.    Ms. Hall subsequently retrieved all of Jason Hall's files. She
discovered a "Contract and Agreement" of a loan for $200,000, dated
September 5, 2008, from Jason Hall to respondent. (TFB Exhibit 11).
Terms of repayment of the loan were not included in any accounting or any
of respondent's discussions with Ms. Hall and/or Ms. Fulop.

18

12.     On September 5, 2008, the same day that the loan was
entered, Jason Hall executed a document titled "Completion of
Representation." The date on the header of the document is September 2,
2008, three (3) days prior to execution of the contract, indicating that the
loan was at least contemplated prior to the formal ending of the
attorney/client relationship.

13.     An audit of trust accounting matters related to the complaint
was performed for the period of July 1, 2008, through December 31, 2016.
(TFB Exhibit 19). The purpose of the audit was to determine whether the
respondent complied with the Chapter 5 Trust Accounting Rules. The
Report is discussed below in the testimony of TFB Staff Auditor Roy Jeter.

14.     On July 15, 2008, the day the "Distribution Plan for Non-
refundable, Non-Client Funds" letter was signed by Jason, respondent was
on probation for previous trust account violations.

15.     The respondent had an incentive to avoid using an IOTA that
might be reviewed by The Florida Bar before his probation ended.

16.     The respondent's 2008 accounting included a lien negotiation
agreement providing the respondent with a 20% fee for "any savings from
the approximately $300,000.00 in medical expenses that this firm

19

negotiates payment on". The 2016 accounting included a total of $281,258.00 in medical liens owed to Tallahassee Memorial Hospital.

17.    The respondent claimed that he negotiated these liens to $0 and earned a 20% lien negotiation fee of $56,251.58. Ms. Hall and Ms. Fulop provided documentation showing these medical bills were paid by a charity, by Medicaid, or otherwise written off before July 15, 2008, when the agreement was signed.

18.    The respondent did not provide any evidence to support his claim that he earned a lien negotiation fee for negotiating the Tallahassee Memorial Hospital lien amounts. However, the respondent paid himself a $56,251.58 lien negotiation fee from the settlement funds.

19.    The respondent and Jason Hall signed a loan agreement on September 5, 2008. The loan agreement allowed the respondent to borrow $200,000.00 from the settlement funds at 10% annual interest. (TFB Exhibit 7).

20.    The loan terms allowed Jason Hall to receive the earned interest at his discretion. Any amount of earned interest that was not disbursed to Jason Hall was to be held by the respondent until the end of the loan.

21.     The loan agreement specified in paragraph 3 that "Tim Howard can end this loan any time after six months from today's date, and interest will be calculated up to the date of the loan repayment." The loan agreement did not provide for the partial repayment of loan principle or the repayment of the loan before 6 months from the commencement.

22.     Respondent's 2016 accounting indicated most of the loan principle, $139,987.82, was repaid by the end of 2008, less than four months after the loan agreement was signed. That conflicts with the loan agreement that did not allow the respondent to repay the loan principle until six months after the loan agreement was signed, on March 5, 2009, at the earliest. There is no evidence that any items from 2008 were repayments of loan principle.

23.     The undersigned received testimony under oath from the following witnesses: Sandra Fulop; Dana Hall; Kim Matthews; Roy Jeter; John Harvard and Respondent, Phillip Timothy Howard.

24.     The Referee received the Complainant's Exhibits 1-19 and Respondent's Exhibit 1.

### Sandra Fulop

25.     Sandra Fulop is the former mother-in-law of Jason Hall and the grandmother of his 2 children with her daughter, Dana Hall.

21

26.   After Jason's work-related accident she inquired at her church about possible attorneys to handle his case. Respondent's mother-in-law happened to be a member of the church and recommended respondent. Ms. Fulop passed the information along and had little to do with the case until she became the personal representative of Jason Hall's estate.

27.   After it was determined that the final judgment of divorce prohibited Dana Hall from serving as the personal representee (PR) of Jason's estate, Ms. Fulop was named the successor PR. Ms. Fulop had no knowledge of the duties and responsibilities which she was required to perform, and respondent offered no guidance or assistance. Ms. Fulop ultimately searched Google and found a "probate checklist" which she used to complete her duties.

28.   She took out a personal loan to have repairs done on the marital home in order for it to be sold through the probate. It was agreed that she would be reimbursed from Jason's remaining funds. During this time, she learned from the realtor that a guardianship case needed to be opened for the benefit of the minor children since they were the only beneficiaries of the estate. Ms. Fulop discussed this matter with the respondent and was told that the relator was incorrect, and no guardianship

needed to be opened. This proved to be incorrect. Ms. Fulop eventually hired an attorney to handle this matter and it was successfully completed.

29.    On December 23, 2013, Ms. Fulop accompanied Dana Hall to respondent's office. Ms. Hall was attempting to obtain funds to cover an emergency trip involving a family member.

30.    During this meeting, respondent produced a spreadsheet with several bills he allegedly paid and a check for $16,200 as the full and final balance of Jason Hall's settlement funds. In order to receive the check, he had her sign a letter acknowledging this amount as the final balance. (TFB Exhibit 15). Although not at the office for that purpose, Ms. Fulop accepted the check. No accounting, ledger, or credible testimony shows how the $16,200 figure could possibly or reasonably be the "full balance of Jason Hall's settlement funds."

31.    Ms. Fulop testified that at the time she had no reason to doubt what respondent told her.

32.    At some point Ms. Fulop learned from her daughter that respondent took a $200,000 personal loan from Jason and she could find no evidence that it had ever been repaid. Despite repeated attempts to obtain a full accounting from respondent, none was ever provided.

23

33.     Ms. Fulop terminated respondent's services and she filed a bar complaint against him.

34.     The Referee finds that the great majority of Ms. Fulop's testimony was credible.

## Dana Hall

35.     Dana Hall is the former wife of Jason Hall. They were married at the time his case settled in 2008 and subsequently divorced in 2010.

36.     After Jason's death in 2012, Ms. Hall was the initial personal representative for his estate. Ms. Hall testified that in 2008 they were given respondent's name by her mother. Jason ultimately hired respondent to handle Jason's worker's compensation case.

37.     While Jason Hall was in the hospital following his injury, Ms. Hall communicated directly with the hospital regarding the invoices. Apparently, as a result of her efforts, and/or the hospital's own decisions, the majority of the bills were either written off by the hospital or paid by charities. (TFB Composite Exhibit 13).

38.     When questioned as to whether respondent assisted in any way, she was adamant that he had not. She stated that all of this was done prior to the case settling and bills were coming directly to the home, not to respondent. Even if some hospital / medical bills remained, there has been

no credible showing that Respondent's effort caused the reduction / write-off. At most, respondent's correspondence / communication with the hospital (See Kim Matthews; paragraphs 44-46) may have been a factor in the hospital not seeking to reinstate (seek to collect) their bill – but the hospital had already zero' d; written-off the bill.

39.    After Jason's death she was contacted by respondent's office to pick up Jason's files or they would be destroyed. At some point she went through the boxes and came across a one-page document titled "Contract and Agreement" signed by Jason Hall and the respondent on September 5, 2008. (TFB Exhibit 7). The contract set forth specific terms of repayment for a $200,000 loan from Jason to respondent.

40.    Ms. Hall and Ms. Fulop subsequently confronted respondent about his failure to disclose the loan contract and demanded proof of repayment and a full accounting of the settlement funds (TFB Exhibit 14). She, along with her mother, subsequently filed a bar complaint.

41.    The Referee finds that the great majority of Ms. Hall's testimony was forthright, and she also is a credible witness.

## Kim Mathews

42.     Kim Mathews was formerly employed at respondent's firm from approximately 2002 to 2014. She has access to make deposits into his operating account at the time.

43.     Ms. Mathews noticed that once Jason Hall's settlement check cleared, all the funds were moved to respondent's personal account at Regions Bank. Respondent would then transfer funds back to his operating account to cover checks written to Jason.

44.     Ms. Mathews was aware of medical liens submitted for the firm's clients and was certain that respondent did not negotiate any hospital bills on behalf of Jason Hall.

45.     Kim Matthews recalled that the hospital attempted to seek payment after the case settled and per respondent's instructions, she notified the hospital billing department that the settlement was based on no bill being owed to the hospital at the time of settlement (since the bill had already been written off). The Referee finds that there is little to no credible evidence that respondent's actions or efforts were the reason the hospital did not further request payment; and respondent did not earn a fee for any write-off / reduction.

46.     The firm never heard from the hospital billing department again.

47.    Ms. Matthews usually wrote the checks for funds being paid to Jason Hall and always put "settlement advancement" on the memo and never "loan repayment."

48.    Ms. Mathews believed that respondent had limited probate experience; and corroborated that Ms. Fulop communicated with the office frequently seeking guidance on what she should be doing as personal representative.  Ms. Fulop received little or no direction / assistance from respondent, but Ms. Matthews tried to help her as much as she could.

49.    She was aware that Jason had a serious alcohol and drug problem, and so was respondent. The Referee finds that Jason Hall was a particularly vulnerable client – which was acknowledged by the Respondent.

50.    The Referee finds that Ms. Mathews' is a credible witness.

### Roy Jeter (TFB Staff Auditor)

51.    Mr. Roy Jeter has been employed by The Florida Bar as a staff auditor for over six years and is tasked specifically with auditing law firm trust and operating accounts for Chapter 5 violations.

52.    Jeter endeavored to conduct an audit of respondent's operating account, as this (and/or respondent's personal account) is where Jason Hall's settlement funds were deposited. Despite repeated attempts to

27

gather information from respondent, complete records were never provided. (TFB Exhibits 17-18).

53.     Despite respondent's failure to maintain and provide the requested records, Jeter reviewed every single document provided by any party. After his extensive review, he determined that the $200,000 loan had never been repaid by the respondent. He also determined that no documentation or evidence of a hospital lien reduction as a result of respondent's efforts was ever provided. Therefore, in Mr. Jeter's opinion, respondent was not (and should not be) given credit for the $56,251.58 he paid himself as a lien reduction fee. The Referee agrees.

54.     Additionally, Jeter determined that only approximately $94,000 in medicals bills had been paid by respondent;  and,  even if respondent had paid all the outstanding bills owed by Jason Hall, it would have only amounted to approximately $108,000. See Exhibit E to Jeter's Audit Report. (TFB Exhibit 19). Both Jeter's audit report and the corresponding exhibits reflect that respondent availed himself of a $56,251.58 lien reduction fee (to which he was not entitled), the $200,000 loan and the balance of Jason's $300,000 allotment for past medical bills.

55.     Trust accounting record requirements are provided in Rule 5-1.2(b) and required monthly procedures are provided in Rule 5-1.2(d). Rule

5-1.2(f) requires trust accounting records to be maintained "for six years subsequent to the final resolution of each representation".

56.    The respondent last paid a lien on behalf of Jason Hall on July 29, 2015, when he paid a Medicaid lien. The respondent is required to maintain records for six years after a case is resolved. The respondent never fully accounted for the settlement funds, meaning the six-year retention period has likely not even started yet.

57.    The respondent did not provide all bank statements, all cancelled checks, all lien documentation, a settlement statement, and other required records for the audit period. The respondent failed to create trust accounting records required by Rule 5-1.2(b) and failed to follow the procedures required by Rule 5-1.2(d). The respondent failed to maintain trust accounting records as required by Rule 5-1.2(f).

58.    Mr. Jeter verified payments for the third-party medical liens and calculated the number of days that elapsed between the payment dates and August 5, 2008, when the settlement funds for the liens were deposited.

59.    The respondent paid one lien for $44,235.00 after more than 2 months, one lien for $7,175.20 after more than 9 months, two liens totaling $4,740.00 after more than 14 months, and one lien for $38,483.08 after

29

more than 6 years. The respondent did not provide any payment documentation for liens totaling $11,584.52, that were likely never paid.

60.    The respondent did not handle the liens promptly. He deposited the settlement funds for the liens in his operating account, where he could use the funds for his personal use, and that created a disincentive for the respondent to promptly pay the liens. The respondent did not promptly disburse trust funds owed to third party lienholders, in violation of Rule 5-1.1(e).

61.    Mr. Jeter concluded (as does the Referee) that the respondent did not have a trust account at the time he settled Jason Hall's case. The settlement funds were deposited into his operating account. However, his review of respondent's operating account bank statements reflected that the account was overdrawn as of December 2010. (TFB Exhibit 12).

62.    Mr. Jeter found this significant because the respondent continued to disburse settlement funds after 2010, including a "final payment" of $16,200.00, to the personal representative of Jason Hall's estate.

63.    Mr. Jeter also found that the respondent did not repay the $200,000.00 loan principle and owed earned interest totaling $66,830.28 as of December 31, 2016.

64.    The court accepts Mr. Jeter's testimony; and finds that his
report is thoughtful, detailed, and accurate, and concludes based on Mr.
Jeter's testimony and the other evidence that respondent did not maintain a
trust account during the time periods relevant to this case. Respondent
actively and personally sought varied ways to avoid and circumvent the
protections which the trust account(ing) provides, and which the rules
require.  His acts were intentional – and repeated: after prior trust account
violations and / or interventions.

## John Harvard, C.P.A.

65.    Mr. John Harvard is a CPA and the principal at Harvard and
Associates, P.A. in Tallahassee. He was hired as an expert witness by
respondent.

66.    Mr. Harvard testified that he has never audited a law firm trust
account and never conducted an audit on behalf of any attorney. He
testified that he has never attended a Florida Bar trust account workshop,
has never presented a CLE regarding trust account matters and that he is
not familiar with the Chapter 5 Trust Account rules.

67.    Mr. Harvard admitted he had incomplete information; and that
most of his determinations and conclusions were sourced directly from
information provided to him by the respondent. The evidence clearly shows

31

the information provided by respondent was inaccurate, incomplete, self-serving, and false. Mr. Harvard's opinions and conclusions were directly affected by inaccurate and incomplete information.

68. Mr. Harvard testified that in his opinion the respondent owed no funds to Jason Hall's estate and that respondent was in fact owed outstanding fees for various legal services.

69. The Referee finds Mr. Harvard's opinion should be given very little weight. (Please see Referee's Findings 2/22/21 and 4/15/21 and paragraph 74 below)

## Findings

70. To say that the presentation was long, detailed, conflicting, mathematically challenging, and difficult is to understate the matter. The difference(s) between the expert opinions were day and night and at opposite ends of the spectrum. The opinion of Bar Counsel on violation(s): that there were clear and convincing proofs of many rules' violations; were diametrically opposite those of defense counsel and respondent: that he didn't do anything wrong, violate any rules, or intentionally try to circumvent the letter and intent of the Florida Bar Rules.

71. To this Referee, the truth lies somewhere in-between; but not near "in the middle." Respondent has in fact violated both the letter and the

32

intent of the Rules...repeatedly; and engaged in conduct calculated to circumvent the requirements of the rules. The evidence shows respondent is far closer to the Fla. Bar's portrayal of him; than to the attempted image he tries to portray of a "protector" of Jason Hall and his assets.

72.    Respondent's firm's skills may well have led to a substantial monetary recovery to Jason Hall under difficult factual evidence (Jason Hall's impairment); but his actions thereafter were clear violations of Rules regarding trust accounting, (dis)honesty, safekeeping property, commingling, charging clearly unearned or excessive fees, explanatory responsibilities, and competence requirements (Jason Hall's probate case and false statements to clients and The Bar).

73.    This is not a close case. Only a significantly strained view of rule compliance - and an intentional avoidance of the rules - can be seen in respondent's conduct relating to Jason Hall. Though respondent views himself as a "protector" of an injured and alcohol/ drug-impaired Jason Hall and his assets, actually the opposite appears to be true. Respondent helped himself to hundreds of thousands of dollars (calling it a "loan" - rather than keeping it in trust), kept his client(s) and the Fla. Bar in the dark; and attempted to use "creative accounting" (See footnote 3) to try to show

---

3 "creative accounting" used herein is a kind and gentle term - in actuality, speculative, non-fact-based or

that Jason Hall (and/or Jason Hall's estate) actually owed him money. The multiple theoretical calculations employed by accountant John Harvard rest almost exclusively on what respondent told him - and very little on what the monetary trail actually should have shown him.

74.    The findings/testimony of accountant Harvard are not only suspect, but they are not supportable or supported by the actual facts. His conclusions about the inflated and extraordinary values of respondent's representation on numerous matters (including probate, 3-day eviction, divorce, Worker's Comp. cases) are suspect and speculative at best as are Harvard's other conclusions. (Example: ignoring requirements that only the judge in certain cases can set a fee; or fees being limited to those which are statutorily allowed.)

75.    Respondent, while on probation regarding trust account violations, continued to blatantly and intentionally avoid the requirements of the trust account rules; most particularly as related to Jason Hall's settlement; Respondent's $200,000 "loan" from the proceeds of a client whom the respondent describes as drug and alcohol dependent/addicted; severely injured disabled; and not well-educated. Jason Hall was a particularly vulnerable client. It is now even more clear that respondent has

---

unfounded are more appropriate.

not - to this day - sufficiently accounted for hundreds of thousands of dollars from Jason Hall's settlement. Respondent (and his expert Harvard) have not shown where all the money went; cannot account for it; and still respondent claims he is owed more fees by Jason Hall's estate!

76.    Even taken in the best light for respondent: (including his claims that the Florida Bar did not follow their own procedures; listened to and accepted false complaints and have been part of fostering / assisting extortion of money from him) - the Florida Bar conducted their own investigation and as a result filed a formal complaint in this matter. Initial complaints may not have been completely accurate, but they were the catalyst for an independent Florida Bar investigation which yielded the discovery of many now-proven violations by respondent.

## SC19-1570 – Margaret Peggy Harris

77.    On or about April 29, 2014, respondent began representation of Richard and Margaret Harris in a lawsuit that was part of the Engle-progeny tobacco litigation.

78.    The lawsuit was originally filed in Miami-Dade County by another attorney. On March 12, 2014, the case was transferred to Gadsden County. At the time the case was transferred, Richard Harris was alive.

79.   When Mr. Harris' health began to rapidly deteriorate, a deposition was scheduled between June 20-25, 2016 to preserve his trial testimony and for opposing counsel to conduct their deposition. Due to his serious health issues, the deposition had to be taken at his bedside and required frequent breaks. Four days later, On June 29, 2016, Richard Harris passed away.

80.   Following the depositions, respondent, and his employee, Ankur Mehta, a non-lawyer, prepared errata sheets for each day and effectively re-wrote Mr. Harris' testimony. The opposing counsel moved to strike the errata sheets.

81.   Following Mr. Harris' death, a probate case was opened, and Mrs. Harris was appointed personal representative.

82.   A trial date was set for August 2018 in the tobacco litigation case.

83.   In anticipation of trial, respondent claimed to have paid $12,000 for an autopsy (to be performed in California) and / or preservation of body tissue; and $10,000 for the rental of a local residence near the courthouse for his trial team to stay in during the trial. It was disputed as to whether respondent requested reimbursement of these costs from Ms. Harris. The

Referee does not find these two matters to be on the same level of seriousness as many other proven violations by respondent.

84.    Respondent left the handling of the Harris probate case and numerous other probate cases to a junior associate Jaakan Williams. Mr. Williams had no probate experience prior to working at respondent's firm and eventually resigned in January 2018.

85.    On March 6, 2018, the probate court entered an order requiring respondent to file a written status report by April 5, 1018. Respondent was the only attorney copied on the order. Respondent failed to file a written status report.

86.    On March 28, 2018, respondent sent an email to Matthew Hinson, a probate attorney in Jacksonville, Florida, requesting that he review the probate case. Mr. Hinson did not respond.

87.    In its order of April 26, 2018, the court noted respondent's failure to comply with the previous order and set a case management conference for May 15, 2018.

88.    Respondent failed to appear at the May 15, 2018 case management conference. As a result, on May 16, 2018, the court entered an order removing Mrs. Harris as personal representative of the estate, revoking her letters of administration, and dismissing the probate case.

37

89.     On May 24, 2018, respondent communicated with Mr. Hinson about the probate case via email. He again asked Mr. Hinson to handle the case and claimed to have recently spoken to Mrs. Harris. He failed to inform Mr. Hinson that the probate case had been dismissed.

90.     On May 29, 2018, Mrs. Harris sent respondent a certified letter terminating his services. The letter was eventually returned as unclaimed.

91.     On June 6, 2018, Mr. Hinson agreed to review the probate case file and on June 7, 2018, informed respondent that his firm would handle the case contingent upon the client's consent.

92.     Mr. Hinson did not become aware that the probate case had been dismissed until he reviewed the case docket.

93.     Although respondent subsequently emailed Mrs. Harris requesting permission for Mr. Hinson to begin representation, she never responded. Therefore, Mr. Hinson was never authorized by the client to file a notice of representation or any other documents. As a result, no documents were filed by Mr. Hinson, nor was an attorney-client relationship with Mrs. Harris established.

94.     On June 27, 2018, Mrs. Harris sent respondent an email again notifying him of termination of his services.

95. Respondent replied to the email asserting that his office had attempted to reach her via email and telephone for over a month to no avail. He informed Mrs. Harris that Matthew Hinson had been hired to handle the probate case. There was no mention of the case dismissal in his email.

96. Mrs. Harris subsequently retained other counsel to represent her in both cases and to file an emergency motion to reopen the probate case, which was granted on September 5, 2018.

97. In lieu of proceeding to a hearing on the outstanding motion to strike the errata sheets, Mrs. Harris' new counsel, Mr. J.B. Harris, stipulated that he would not use them.

98. The undersigned received testimony under oath from the following witnesses: Margaret Harris, Matthew Hinson, Jaakan Williams and Respondent, Phillip Timothy Howard.

99. The Referee received the Complainant's Exhibits 1-9.

### Margaret "Peggy" Harris

100. Mrs. Harris testified that neither she nor her husband understood why the case was taking so long.

101. Mr. Harris died just 4 days after the depositions concluded. Respondent informed Mrs. Harris that an estate had to be opened, as that

39

was the only way the tobacco litigation could continue. In January 2017, the estate was opened, and Peggy Harris was named personal representative (PR).

102. Respondent failed to notify Mrs. Harris of the hearing and failed to appear on her behalf. As a result, On May 16, 2018, the court dismissed the case and removed Mrs. Harris as PR of the estate. She learned of the dismissal when she received receipt of a copy of the order via mail. (TFB Harris Exhibit 1).

103. Mrs. Harris immediately began trying to contact respondent to no avail, prompting her to contact the bar's Attorney Consumer Assistance Program (ACAP) for assistance. On May 25, 2018, ACAP sent respondent a letter requiring him to contact Mrs. Harris. (TFB Harris Exhibit 6).

104. Having become disappointed with respondent's representation, Mrs. Harris sent him a termination letter via certified mail. (TFB Harris Exhibit 2). That letter was returned unclaimed.

105. On June 27, 2018, she sent respondent an email, again notifying him of his termination. In his reply email, respondent advised her that he had hired an attorney to handle the case. (TFB Harris Exhibit 3).

106. Throughout her direct testimony and cross-examination, Mrs. Harris made clear that she no longer wanted respondent to represent her

and that she never authorized him to retain another attorney on her behalf. She also made clear that it was her intent to file a bar complaint.

107. Mrs. Harris testified that she subsequently contacted Jaakan Williams about the dismissal and requested referrals for other a new attorney. Mr. Williams provided the names of two attorneys and she ultimately retained JB Harris to complete both cases.

108. Mrs. Harris admitted that she allowed JB Harris to draft the bar complaint for her and did not thoroughly read it before signing. She further admitted that while it contained additional allegations which were not hers, it did in fact contain her specific complaints against respondent, which she listed for the court during the final hearing.

109. Ms. Harris testified that she never consented to representation by Matt Hinson.

110. After firing respondent and hiring new counsel, Ms. Harris testified that the tobacco case went to trial just 5 months later and the Harris's prevailed.

111. The Referee finds that the majority of Ms. Harris' testimony was credible. Her filing of a sworn complaint containing inaccuracies or falsehoods (prepared by J.B. Harris) is very concerning. However, even if the Fla. Bar's independent investigation and allegations (now proven)

41

started with a faulty / partially false complaint – the proof at hearing of many violations by respondent is clear.

### Jaakan Williams

112.  In March 2016, respondent hired associate attorney, Jaakan Williams. At the time, Mr. Williams had been admitted to practice for seven years, all of which was spent as government attorney for the Department of Alcohol, Tobacco and Firearms and the Florida Elections Commission. This experience consisted of prosecuting violations for both agencies.

113.  Mr. Williams testified that he had no prior experience handling tobacco litigation cases or probate matters, or any experience at all in private practice. He was assigned approximately 100 probate cases by respondent.

114.  Mr. Williams testified that he was left to educate himself on how to move probate cases through the courts by reading the Florida Probate Code and reviewing a couple of probate cases previously handled by the firm.

115.  Mr. Williams testified that he was directed to a storage closet at the firm which held fifteen bankers' boxes of Richard Harris's files which he had to review and become familiar with in one week (to prepare for depositions).

116.  Mr. Williams testified that respondent became enraged with him for what he deemed inadequate preparation of Mr. Harris. Mr. Williams testified that nothing he could have done would have restored Mr. Harris's memory.

117.  It was undisputed, that on the morning of the fourth day, respondent, and his business partner, Ankur Mehta, arrived at the Harris home with prepared errata sheets. Respondent then insisted that they needed to be reviewed and signed by Mr. Harris.

118.  Mr. Williams testified that although he was tasked with prepping Mr. Harris for deposition and attended each day, he was neither notified nor consulted regarding the preparation of any errata sheets. He unwaveringly testified that Mr. Harris never requested errata sheets and never requested to clarify or correct any prior testimony.

119.  Mr. Williams surmised that Mr. Harris's memory was simply failing him due his rapid and severe decline. Mr. Williams also testified that the volumes of transcripts were never reviewed with Mr. Harris and review of the errata sheets lasted no more than 30 minutes.

120.  Prior to January 2018, Jaakan Williams submitted his resignation to respondent and accepted a job out of state. He testified that

he stayed in town until after the new year, to make sure the probate files were up to date and organized for respondent.

121. Mr. Williams also testified that he was never listed on any of the probate cases as the attorney of record per respondent's instruction.

122. The Referee finds that Mr. Williams appeared to be a credible witness; though understandably very negative towards respondent for being treated crudely, yelled at, and tasked with legal matters (probate and preparation of Mr. Harris) without adequate training or supervision.

### Matthew Hinson

123. Matthew Hinson is an attorney in Jacksonville who specializes in probate matters.

124. By way of background, Mr. Hinson explained that the bulk of the probate cases being handled by respondent were cases he was contracted to handle by the Wilner and Farah firms, for their clients. At some point, the firms pulled their cases from respondent and retained the services of Mr. Hinson to handle them.

125. The Richard Harris case was not one of those originally provided to him by the other firms. The Harris case originated with respondent's firm.

126.  On March 28, 2018, respondent emailed Mr. Hinson regarding the court ordered report, as if to advise Mr. Hinson of the date it was due. (TFB Harris Exhibit 5).

127.  After confirming with the Wilner firm that it was not one of their cases, Mr. Hinson took no further action and did not respond to respondent's email. He noted that this was due in part to warnings he received from other attorneys about dealing with respondent.

128.  From May 24 to July 30, 2018, respondent engaged in a series of emails with Matt Hinson, attempting to persuade him to take over the Richard Harris probate case. (TFB Harris Exhibit 5). Respondent never informed Mr. Hinson that the case had been dismissed on May 16, 2018 and never informed him that he had not obtained Mrs. Harris' consent to hire him.

129.  Respondent continued to communicate with Mr. Hinson in July 2018, never advising that he'd been fired by Mrs. Harris.

130.  Mr. Hinson testified that there was never any confusion about whether he had accepted the representation since he was never given consent by the client.

131.  At one point, he did attempt to reach out to Mrs. Harris, and this is when he learned that she had already retained new counsel.

45

132.  I find that Mr. Hinson's testimony was corroborated by other communications / evidence, and he is a credible witness.

## Findings

133.  For the reasons set out in the Bar counsel's final argument; each violation has been established. Respondent was apparently competent in tobacco litigation cases - generally. He strayed from that by his unusual and incorrect use of errata sheets after a deposition and his improper handling of an attempted "hand-off" of the probate case to Mr. Hinson, even though respondent had been fired by Ms. Harris.

134.  Respondent showed a lack of diligence on the probate case of Richard Harris. (see footnote 4).

135.   Respondent is not found guilty of wrongdoing related to the "improperly demanded" payment of hard costs: a $10,000 house rental (for use during the trial); or for $12,000 relating to tissue preservation costs. The "improper demand" was not shown.

136.  The injection of attorney JB Harris (described as a "bitterly disgruntled former colleague of Mr. Howard" by defense counsel) into the Richard and Margaret Harris representation is unfortunate. Respondent's

---

4 Respondent's activity on the probate case caused it to be dismissed though it was later re- opened.

counsel was able to show animus, not-so veiled threats, and other negative behaviors by JB Harris directed at respondent.

137. Keeping that fact in mind, however, does not relieve respondent of his professional duties towards his clients. JB Harris may well be wrong in his actions toward respondent and may have been instrumental in getting the Bar complaint filed, but respondent's conduct is not thereby excused.

III. <u>RECOMMENDATIONS AS TO GUILT.</u>

I recommend that Respondent be found guilty of violating the following Rules Regulating The Florida Bar:

In <u>SC19-488</u>: 3-4.3 (Misconduct and Minor Misconduct), 4-1.1 (Competence), 4-1.3 (Diligence), 4-1.4(b) (A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.), 4-1.5(a)(1) (An attorney shall not enter into an agreement for, charge, or collect an illegal, prohibited, or clearly excessive fee or cost.), 4-1.8(a)(2) (Business Transactions With or Acquiring Interest Adverse to Client), 4-1.15 (Safekeeping Property), 4-4.1(a) (A lawyer shall not knowingly make a false statement of material fact or law to a third person.), 4-8.1(a) (An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection

47

with a disciplinary matter, shall not knowingly make a false statement of material fact.), 4-8.4(c) (A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.) 4-8.4(d) (A lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice.), 5-1.1(a)(1) (Trust Account Required; Commingling Prohibited), 5-1.1(b) (Application of Trust Funds or Property to Specific Purpose), 5-1.2(b) (Records may be maintained in their original format or stored in digital media as long as the copies include all data contained in the original documents and may be produced when required.), 5-1.2(d) (Minimum Trust Accounting Procedures), and 5-1.2(f) (Record Retention).

In SC19-1570: 4-1.1 (Competence), 4-1.3 (Diligence), and 4-5.1 (Responsibilities of Supervisory Lawyers).

## IV. STANDARDS FOR IMPOSING LAWYER SANCTIONS

I considered the following Standards prior to recommending discipline:

4.1 Failure to Preserve the Client's Property
Disbarment is appropriate when a lawyer intentionally or knowingly converts client property regardless of injury or potential injury.

4.3 Failure to Avoid Conflicts of Interest
Disbarment is appropriate when a lawyer causes serious or potentially serious injury to the client and, without the informed

48

consent of the affected client(s), represents a client in a matter substantially related to a matter in which the interests of a present or former client are materially adverse, and knowingly uses information relating to the representation of a client with the intent to benefit the lawyer or another.

4.4   Lack of Diligence
Disbarment is appropriate when a lawyer causes serious or potentially serious injury to a client and knowingly fails to perform services for a client.

Disbarment is appropriate when a lawyer engages in a pattern of neglect with respect to client matters.

4.5   Lack of Competence
Disbarment is appropriate when a lawyer's course of conduct demonstrates that the lawyer does not understand the most fundamental legal doctrines or procedures and causes injury or potential injury to a client.

4.6   Lack of Candor
Disbarment is appropriate when a lawyer knowingly or intentionally deceives a client with the intent to benefit the lawyer or another regardless of injury or potential injury to the client.

6.1   False Statements, Fraud, and Misrepresentation
Disbarment is appropriate when a lawyer improperly withholds material information and causes serious or potentially serious injury to a party or causes a significant or potentially significant adverse effect on the legal proceeding.

7.1   Deceptive Conduct or Statements an Unreasonable or Improper Fees
Disbarment is appropriate when a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another and causes serious or potentially serious injury to a client, the public, or the legal system.

49

8.1   Violation of Court Order or Engaging in Subsequent Same or
      Similar Misconduct
      Disbarment is appropriate when a lawyer intentionally violates
      the terms of a prior disciplinary order and the violation causes
      injury to a client, the public, the legal system, or the profession.

   The Referee does not find violation of 6.2: Abuse of the Legal

Process, as argued by the bar.

V.   CASE LAW

   I considered the following case law prior to recommending discipline:

The Florida Bar v. Horton, --- So.3d ---- (Fla. 2019) [44 Fla. L. Weekly
S201], the attorney was disbarred for intentionally misappropriating client
funds, engaging in a pattern of misconduct involving multiple clients over a
period of approximately two years, and all of the affected clients were
elderly and had no support from family or friends, in violation of the bar
rules.

The Florida Bar v. Alters, 260 So.3d 72 (Fla. 2018), the attorney was
disbarred for failing to ensure funds received from a client were properly
preserved and used only for the purposes intended by the client, and not
for any other unauthorized purpose.

The Florida Bar v. Mirk, 64 So.3d 1180 (Fla. 2011), the attorney was
disbarred for engaging in misconduct involving the misuse or
misappropriation of client funds. The attorney's misappropriation of
$31,487.50 in client funds held in his trust account violated bar rules
regulating trust accounts.  Although the attorney claimed that he had an
agreement with client entitling him to $40,000 as a flat fee, such agreement
was not in writing; the attorney made a number of withdrawals from his
client trust account without his client's knowledge or permission; and the
fee dispute could not be handled in such manner.

The Florida Bar v. Brownstein, 953 So.2d 502 (Fla. 2007), when a lawyer
intentionally takes funds held in a client trust account for the attorney's own
use, such misconduct necessarily must result in the severest of sanctions,
not only because of the seriousness of the offense in respect to the

individual client, but also because of the extreme detriment to the public's confidence in members of the bar. Disbarment is the presumed attorney disciplinary sanction for the misappropriation of client funds, and the presumption will be overcome only in unique circumstances. The court held that in such instances, the disbarment presumption will be overcome only in unique circumstances.

The Florida Bar v. Spear, 887 So.2d 1242 (Fla. 2004), the attorney who transferred $75,000 of client's funds from his trust account and obtained a loan from another client in order to repay client violated the Rules of Professional Conduct requiring an attorney to comply with rules governing trust accounts and to respond to an inquiry made by a disciplinary agency, and the Rules Regulating Trust Accounts requiring a lawyer to keep trust funds separate from the attorney's own funds, to use trust funds only for their designated purpose, to promptly notify client of receipt of trust funds, to keep certain minimum trust account records, to follow certain minimum trust account procedures, and to keep trust account records for a minimum of six years.

The Florida Bar v. Tavis, Jr., 765 So.2d 689 (Fla. 2000), intentionally misappropriating clients' funds over a substantial period of time warranted disbarment for five years, rather than a 90-day suspension, even though the attorney had no past disciplinary record, had performed good works for the community, and cooperated with the bar; the attorney did not begin to make restitution when he could. The presumption of disbarment for misusing client funds is exceptionally weighty when the attorney's misuse is intentional, rather than a result of neglect or inadvertence.

I did not find the case law presented by respondent to be persuasive.

The Florida Bar has not asked for permanent disbarment. It is difficult to

see how even five (5) years from now respondent could or should be again

placed in the position of trust held by attorneys in Florida. If not practicing

law, perhaps respondent can continue to pursue other worthwhile

endeavors (as he claimed for mitigation).

## VI.   RECOMMENDATION AS TO DISCIPLINARY MEASURES TO BE APPLIED

I recommend that Respondent be found guilty of misconduct justifying

disciplinary measures, and that  be disciplined by:

A.   Disbarment.

B.   Payment of The Florida Bar's costs in these proceedings.

C.   Restitution to the Estate of Jason Hall.

## VII.   PERSONAL HISTORY, PAST DISCIPLINARY RECORD

Prior to recommending discipline pursuant to Rule 3-7.6(m)(1)(D), I

considered the following:

Personal History of Respondent:

Age:  60

Date admitted to the Bar:  May 29, 1987

3.3(b) Aggravating Factors:

(1)   Prior Discipline:

In SC02-1148, the Court ordered that respondent receive a public reprimand administered by court order dated August 21, 2003.

In SC04-1785, the Court ordered that respondent receive a public reprimand administered by court order dated June 9, 2005.  Respondent was also placed on probation for one year and ordered to attend and complete Ethics School.

In SC06-1099, the Court ordered that respondent receive a public reprimand administered by court order dated March 22, 2007.  Respondent was also placed on probation for 18

months, ordered to participate with Law Office Management
Assistance Service, attend and complete the Trust Accounting
Workshop, and submit semi-annual trust accounting reports.

(2)   Dishonest or selfish motive. (Respondent clearly sought
ways to get around/avoid trust accounting rules).

(3)   A pattern of misconduct. (Multiple cases/clients).

(4)   Multiple offenses.

(5)   Bad faith obstruction of the disciplinary proceeding by
intentionally failing to comply with rules or orders of the
disciplinary agency.

(6)   Submission of false evidence, false statements, or other
deceptive practices during the disciplinary process. (most
explicitly by the Mr. Howard giving his accounting expert
partial/incomplete/inaccurate information through which the
expert reached questionable ["wrong"] conclusions.

(7)   Refusal to acknowledge the wrongful nature of the
conduct.

(8)   Vulnerability of the victim.

(9)   Substantial experience in the practice of law.

(10)  Indifference to making restitution.

3.2(b) Mitigating Factors:

See this page and next page.

The Referee received The Florida Bar's Case-Law and Standards for

Imposing Lawyer Discipline Chart, Affidavit of Dana F. Thrash (TFB

Tallahassee Branch Manager) re: disciplinary records of respondent.

The Referee also received respondent's "Submission to the Florida Bar and Referee for Appropriate Sanctions" on March 18, 2021. It consisted of approximately 500 pages including argument; case law; many photographs, transcripts, and documents, intended to be mitigation.

During the March 22, 2021 Sanction Hearing, Respondent detailed how in many cases he received (or was a part of a team to receive) many millions of dollars in fees year by year. No one asked him those income questions, but he detailed tobacco cases; oil spill cases; workman's compensation cases; and earnings from teaching around the world, etc.

As a result of his prosperity, respondent engaged in many benevolent activities, feeding the hungry, ministering as a chaplain, working to create and export sustainable agricultural endeavors, coaching young people, being an active church member, to name just a few. These are good works, and worthy of consideration.

However, on balance, good works do not offset clear, intentional, knowing violation of the rules all attorneys are required to follow. Respondent's violations have been going on for many years and his good works do not overcome the overwhelming testimony against him.

VIII.   STATEMENT OF COSTS AND MANNER IN WHICH COSTS
SHOULD BE TAXED

The Referee finds the following costs were reasonably incurred by

The Florida Bar:

| | |
|---|---|
| Administrative Fee | $1,250.00 |
| Investigative Costs | 1,811.25 |
| Audit Costs | 5,488.00 |
| Court Reporters' Fees | 6,900.45 |
| TOTAL | $15,449.70 |

It is recommended that such costs be charged to respondent and that

interest at the statutory rate shall accrue and be deemed delinquent 30

days after the judgment in this case becomes final unless paid in full or

otherwise deferred by the Board of Governors of The Florida Bar.

Dated this 22nd day of April 2021.

_____
Paul S. Bryan, Referee

Original to:

Clerk of the Supreme Court of Florida, Supreme Court Building, 500 South
Duval Street, Tallahassee, Florida 32399-1927

Conformed Copies to:

Phillip Timothy Howard, Respondent, tim@howardjustice.com
Shaneé L. Hinson, Bar Counsel, shinson@flabar.org
Patricia Ann Toro Savitz, Staff Counsel, psavitz@floridabar.org