**UNITED STATES DISTRICT COURT**
**FOR THE EASTER DISTRICT OF PENNSYLVANIA**

| IN RE: NATIONAL FOOTBALL LEAGUE | | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | | MDL No. 2323 |
| LITIGATION | | |

### REPLY TO CLASS COUNSEL'S SECOND ATTEMPT TO AVOID MERITS OF MOTION TO DISCIPLINE OR DISMISS SPECIAL MASTERS AND AUDITORS

In reply to Class Counsel's most recent filing, Response to Motions to Discipline or Dismiss Special Masters and Auditors, (ECF No. 11344), undersigned counsel points out that this filing by Class Counsel is not relevant to the bias of the audit process but is another deflection by Class Counsel and does not advance the interests of the clients he is indulgently paid to represent.

However, to set the record straight, consider that toxic narratives now being used by Class Counsel, adopted from extorters and picked up by institutions and legal legerdemain opportunists, spread and infuse and infect the judicial process as much as it impacts the political process. This is an example of deflection by Class Counsel.

As to the Florida Bar filing, so the record is clear, consider the following:

The facts are that no client filed a bar complaint. The first bar complaint that was filed was verified under sworn deposition by the complainant that it was submitted under perjury, fraudulent, false, and never read. Similar to the extortion of others in this process, and opportunism of Class Counsel and NFL Counsel, it was submitted as an extortion effort by an attorney then working for the firm.

The other bar complaint was also never filed by the client. In the Spring of 2008, undersigned obtained the highest worker's compensation verdict ever received in the region for

the former client, despite his being full of THC at the time of the injury, and the fact that no firm would represent him.

The firm ceased its client relationship in late summer of 2008, and the former client was deceased in 2012.  The file was closed with all accounting reviewed and accepted in writing by the ex-wife and the representative of the estate of the deceased former client in 2013.  The file was given to the ex-wife in 2014.

In 2016, the ex-wife attempted extortion, writing that this firm pay her $353,000 or she was going to file a bar complaint.  By 2016, bank records did not exist and the ex-wife had the file.  Accounting was ultimately reconstructed and showed all was in order.  In 2016, the ex-wife refused to go to an independent accountant and arbitrator with the Florida Bar to review and address any concerns.

Unfortunately, toxic narratives and extortioner's have an impact.  The referee failed to consider the facts and went with the toxic institutional narrative as this momentum was easier to follow.  What is unfortunate is that similar to the political process, our judicial system can be distorted by toxic narratives.

Attached please find a thorough filing to the Florida Bar documenting in detail the above.  However, this is not relevant to the lack of objectivity and integrity in the audit process and is a deflection by Class Counsel.

WHEREFORE for the forgoing reasons, case law, judicial standards, rules of Federal Civil Procedure, and ethical standards governing investigations, audits and Special Masters, and the indisputable evidence provided herein, the auditors and Special Masters must be disciplined or dismissed by this honorable Court for their bias, both actual and/or the appearance of potential bias.

Respectfully submitted on this 29th Day of April 2021,

/s/Tim Howard
Florida Bar No. 655325
Howard & Associates
1415 E. Piedmont Dr, Suite 5
Tallahassee, Florida 32308
Telephone: (850) 298-4455
E-Mail: tim@howardjustice.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing was served via e-service through the U.S.D.C., portal on the court and counsel of record on this 29th Day of April, 2021.

/s/ Tim Howard
Attorney

## IN THE SUPREME COURT OF FLORIDA
### (Before a Referee)

THE FLORIDA BAR,                                    Supreme Court Case Nos. SC 19-488 and 19-1570

          Complainant,

vs.

PHILLIP TIMOTHY HOWARD,                             The Florida Bar File Nos. 2016-00,682(2A) and
                                                   2019-00,088(2A)
          Respondent.

_____/

## SUBMISSION TO THE FLORIDA BAR AND REFEREE FOR APPROPRIATE SANCTIONS

I, Respondent, Dr. Howard, wish to thank both the Shanee Hinson with the Florida Bar and Judge Bryan for their work in providing ethical guidance and discipline to the attorneys licensed by the Florida Bar. In this filing, I am showing remorse and accountability for my errors. I am also required to balance the record with evidence not earlier presented by counsel for Respondent that will hopefully put a clearer light on the facts and issues before the Referee as sanctions are determined. Respondent is seeking a 1-year suspension and 2-year probation as a sanction for all pending matters.

Respondent is not trying to avoid punishment and sanctions <u>for his errors</u>, only a balanced view of the facts and circumstances so that the sanctions are such that he can continue to provide the public his extraordinary and proven services as a qualified lawyer, and to encourage reformation and rehabilitation, while severe enough to deter others who might be prone or tempted to become involved in similar conduct.

### Summary

Respondent had no knowing, nor intentional, willful misconduct. Respondent researched and complied with the rules and regulations, and took actions for the clients' interests, that he understood, was aware of, and had capacity to, at the time. He made significant errors and accepts responsibility and accountability for those errors.

Respondent has significant rehabilitation efforts and accomplishments, willingly accepts and always accepted providing restitution, and has significant history of and future for public good as a result of his work as an attorney. He has taken steps to avoid any repeat of the matters at issue, namely changing all staff, reducing his activities so that he is not stretched too thin, having a senior attorney and former Bar President for him to work with and for, grounded moral and theological basis for life, and actions to demonstrate the substance of that moral and theological grounding. As a consequence, in compliance with the Florida Bar standards for sanctions, and case law, Respondent is seeking a one-year suspension and two-year probation as his sanction. *See Florida Bar v. Brutus*, 216 So. 3d 1286 (Fla. 2017) (suspension for 1-year, followed by a 2-year probation, where respondent improperly distributed marital funds and was negligent in maintaining the trust account); *Florida Bar v. Ross*, 140 So. 3d 518 (Fla. 2014)(suspension for filing a fraudulent document with forged signature, and intentionally making a false statement of fact to tribunal); and *Florida Bar v. Shoureas*, 913 So. 2d 554 (Fla. 2005) (when there is no willful misconduct or a dishonest or selfish motive on attorney's part in committing the disciplinary violations, suspension is appropriate as opposed to disbarment).

Respondent is also seeking guidance as to how to handle the significant jurisdictional concerns as to each Bar Complaint at issue. Bar Complaint 2019—00,088(2A) is an acknowledged perjurious, false

and fraudulent Bar Complaint that was nevertheless pursued.  Under oath the complainant repeatedly admits she committed perjury in her Bar Complaint that is riddled with false and fraudulent statements. This is covered in more detail at the end of this submission.  As a limited example, this Bar Complainant states:

> Q And so **when this was filed back in 2019**, April of 2019 **you had not read the Bar complaint at that time?**
> A Correct.
> Q And you would have not been able to tell your lawyers whether -- what was in the Bar complaint was true and correct or contained false statements because you hadn't read it?
> A Correct.
> **Q And we now know that it contains statements that you believe to be false?**
> MR. DIAZ: Form.
> BY MR. MONDE:
> **Q Correct?**
> **A Correct.**
> **Q Statements that you believe to be fraudulent, correct?**
> MR. DIAZ: Form.
> **THE WITNESS: Correct.**
> Q. Now that you know that, what steps have you taken to correct that?
> A. At this point nothing that I recall.

*See* transcript attached to Exhibit G, *infra,* pp. 125-126.  The next guidance needed concerns a Bar Complaint that was not authorized to be prosecuted by the rules of the Florida Bar as it is the same as a now settled and then pending civil action.  The final guidance needed concerns Bar Complaint 2016—00,682(2A), where the statute of limitations jurisdictional hurdles for a Bar Complaint that had to be filed by the estate for the decedent-former client, and never was filed by the estate or the decedent client. None of these jurisdictional concerns were presented to the Referee, though known by Florida Bar attorneys.

## Standards for Imposing Sanctions

Florida's standards for imposing lawyer sanctions have 3 objectives:

First, the judgment must be fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the services of a qualified lawyer as a result of undue harshness in imposing a penalty. Second, the judgment must be fair to the respondent, being sufficient to punish a breach of ethics and at the same time encourage reformation and rehabilitation. Third, the judgment must be severe enough to deter others who might be prone or tempted to become involved in similar conduct.

*The Florida Bar v. Lord*, 433 So. 2d 983, 986 (Fla. 1983).

## Definitions Applicable

The definitions applicable are as follows:

(a) "Injury" is harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from "serious" injury to "little or no" injury; a reference to "injury" alone indicates any level of injury greater than "little or no" injury.
(b) "Intent" is the conscious objective or purpose to accomplish a particular result.

2

**(c)** "Knowledge" is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.

**(d)** "Negligence" is the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard care that a reasonable lawyer would exercise in the situation.

**(e)** "Potential injury" is the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct.

Florida's Standards for Imposing Lawyer Sanctions, pp. 1-2. Rehabilitation is a significant factor for sanctions. Consider the following:

## Rehabilitate the Lawyer

One key purpose of the lawyer disciplinary proceedings is, where appropriate, to rehabilitate the lawyer. In the instant action, Respondent has learned from these Bar complaints and others. In the past 33 years, Respondent has engaged in moral guard rails in his career but has run afoul of technical aspects of the Florida Bar Rules, and in managing staff.[1]

## Interim Rehabilitation

Respondent, in his life forging has found renewed clarity, vigor and power in advancing professional, moral and theological guard rails for every aspect of his life. This rehabilitation is comprehensive and demonstrates new birth. Consider the following:

Deep Community Service—Spiritual and Temporal:

Respondent is a Florida Certified Volunteer Chaplain working for the Florida Department of Children and Families and works with the Florida Governor's Office of Adoption and Child Protection. Exhibit A. He ministers to those in prison at Wakulla Correctional Institution. He ministers in poor neighborhoods providing food (over 400 boxes of food, including milk, oranges, potatoes, tomatoes, cheese, hotdogs, chicken, yogurt, and orange juice, while ministering to spiritual and emotional needs, this past Saturday alone), reuniting of families, location of jobs, medical care, and counseling. He ministers to high school athletes, football and basketball teams. Including acceptance of humble salvation by two entire varsity football teams and having over 20 of the players being baptized at his home. He ministers to those starving in Pakistan and works and funds a prototype farm in Tallahassee, Florida, and in Quetta, Pakistan to create sustainable food sources for those starving and in need. He is a non-sectarian teacher and developing theologian along the lines of C.S. Lewis and Tim Keller and is active at both New Creation Church of Tallahassee, a non-denominational charismatic and currently 99% black church, and Blessed Sacrament Parish, a Catholic Church, where he was baptized, received first communion, confirmed and graduated from its school. He goes into crisis communities facing racial injustice and murders that cry for healing and restoration. He gives his time and money for others. He doesn't take nor is motivated to do so.

---

[1] Respondent's prior Bar complaints benefited others, were morally centered, but missed technical aspects. They delt with: (1) Transposing signatures with authority on the fee contract for the $26 billion Florida recovery from the tobacco industry and the $3.2 billion award of legal fees. Though he provided the date of authority on the contract, and all counsel had a copy of the contract for 5 years and were paid $3.2 billion based on the same contract, he failed to site with permission and authority on 4 of 12 signatures of co-counsel; (2) Overpaying one of his clients approximately $4,000 (who is now also a friend) from his trust account; and (3) Requiring a person that stole $50,000, verified by 13 affidavits, to agree to counseling for a settlement, with Respondent stating that he would go to authorities if the person who stole didn't agree to counseling.

Consider the following sworn statements from those that know and work with Respondent, Dr. Howard, on a daily basis. Senior Pastor Mike Smith under oath states:

5.      Phillip "Tim" Howard is a member of my congregation and has been for going on 4 years. I pastor and minister to and with him, and I fellowship with him. We have both ministered to others in sensitive and confidential matters of the soul, heart, and temporal needs. Here is what I know about Tim.

6.      From what I understand, Tim's Christian experience has gone from Baptist, to Catholic, Methodist, Charismatic and secular atheism. And for a man in our day to have studied and taught at universities, such as Harvard, Northeastern, Boston University, Oxford and Florida State, and trained nearly 100 doctorates, my heart is overjoyed when we wake up on Saturday morning to feed the less fortunate right here in the Bond community, to share our faith in the parking lots of our local supermarkets, and to have blessed conversations with anyone of God's created beings, shows me that the transforming power of Jesus Christ is alive and at work in him. As a pastor, there is nothing more pleasing and attractive in the people that you get a chance to shepherd than those qualities.

7.      I have had the privilege of talking with Tim and to share in some of the successes and challenges that he has faced. As a black pastor for me to see commercials about Big Tobacco coming down and later in my ministry to meet a man that brought that corporate giant down, says a lot about his potential his ability to produce and him as a person.

8.      Since I have met him, I have known him to be nothing but generous. Pouring thousands of dollars into the church, into ministries overseas, and thousands of dollars to the people that he works for. And me understanding what has been presented against him, I have not seen him ask for a single dime in four years of knowing him. All he has does is give. I had to make him to tell me if he needed gas money since this ordeal has ensued.

9.      I am not going to go into too much than to say in my pastoral discernment, I don't see a man that is a thief or is a taker, and I could be wrong, but what I have witnessed is a brother who all of his life has been taught to work hard, love hard and give hard. I hope that these words fall into consideration of the powers that be in their deliberations and contentions for the life of someone with these qualities.

10.      Tim has served our congregation and our city, he has walked with me, he is part of our New Creation praise team, evangelism team, prayer team, Youtube channel, broadcasts from Capital of Florida, to Minneapolis, Minnesota to Quetta, Pakistan, and there is more to come.

11.      Tim assists me with the Fellowship of Christian Athletes ministering to 100s of local high school athletes and as men, trying to better our communities with the message we love. One of the joys of our time serving is having the opportunity baptize the Rickards High School football team at his home and the next year those same young men winning the State High School Championship. This shows me he is authentic and is open as all believers need to be.

12.      If there is a deeper investigation into his life, I think you will find that these qualities existed prior to his conversion.

13.      Tim is a State of Florida Certified Volunteer Chaplain, sanctioned by the Florida Department of Children and Families and the Governor's Office of Adoption and Child Protection through the Share Your Heart Florida Campaign. In this capacity, we have given over 400 boxes of food in the Bond community.

Exhibit B. Pastor and Minister Melvin Youmans under oath describes Dr. Howard as follows:

3.    I have been a Living God Christian pastor and minister for 30 years with numerous churches and currently with New Creation Church Tallahassee.

4.    I have been evangelizing and ministering to the homeless, inmates, praise, prayer, and poor for decades. I have personally seen the Living God heal the blind in prison and cast out demons from the possessed. I was invited by the Catholic Church, Good Shepherd Parish in Tallahassee, to teach them about the power of the Holy Spirit and how to stand against evil and taught them for several months.

5.    Phillip "Tim" Howard and I have been ministering together going on 4 years now. In fact, I am the one that prayed over his back prior to the Living God healing him.

6.    Tim and I regularly go into Wakulla Correctional Institution to share the good news, with salvations and baptism of the Holy Spirit taking place.

7.    Tim and I evangelize throughout neighborhoods and in the Walmart parking lot, regularly seeing the Living God work.

8.    Tim and I minister to those in the Bond community, near FAMU, and bring healing, salvation and power to those that receive free meals and prayer.

9.    Tim and I work on a farm at former Assistant State Attorney Sid White's house and property, that I am leading as a prototype for starving Christians in Pakistan and other under resourced parts of the world. We have a chicken farm and crops. We have funded the sustainable farm in Quetta, Pakistan with Good News Pastor Kashif Rasheed Masih, who ministers to Christian orphans and widows, as well as young Christian girls that have been kidnapped and violated in order to be sullied, abandoned, and forced to convert to Islam.

10.    Tim and I participate as bible study teachers and engage in regular intercessory prayer.

11.    Tim is generous with my personal needs and gives to any project that the Living God has sought us to pursue.

12.    Tim loves the Living God and serves him in many fronts and locations.

Exhibit C. Attached are photographs from the ministering, teaching, praising, feeding and loving that Respondent, Dr. Howard engages in on a daily basis. Exhibit D. These are the are the truthful and factual activities and motivations of Respondent, Dr. Howard.

<u>Senior Bar President and Mentor Guiding Respondent:</u>

Respondent now works with a senior attorney with 47 years of experience in the practice of law and is a former Bar President. If Respondent would have had an experienced senior attorney to counsel with, instead of making his best decisions as a sole practitioner, he would not have made the staffing and judgement mistakes that led to these Bar complaints. He has since remedied these structural failures.

Respondent has not had a Florida Bar sanction in over 15 years. Respondent now has and works with experienced senior counsel to consult with to avoid the mistakes that he made as a sole practitioner.

## Appropriate Sanctions Based on Prior Rulings by the Florida Bar

Respondent has extensive rehabilitation and community service. Consider the following:

<u>Respondent provides extensive annual *pro bono* and Christian services to numerous parties:</u>

Local Citizens' Divorces;

Local Citizens' Criminal Cases, Estate Cases, and Family Law Disputes;

Latin American Laborer Driving and Worker Permits and Immigration;

Employment Discrimination Guidance;

Graduate and Doctoral Education:

Ph.D. in Law, Policy and Society, with a Dissertation on Cause Lawyer Leadership in Florida's Tobacco Litigation, with methodologies that applied Theology, Law, Policy, Quantitative, Qualitative and Mixed Methods, Historical Methods, Leadership, Economics, Sociology, Conflict Resolution, Critical Thinking. Dr. Howard also teaches and explores Sustainable Economic Development with Graduate Students and business incubators designed to lift the poor from poverty, and more to global and national students, such as:

African Chieftains and Queen Mothers from Ghana and Nigeria;

Civil Rights Leaders, President, Graduate Students and Pastors in Honduras;

Civil Rights Leaders in Venezuela;

International Monitor of Fair Elections in El Salvadore and Honduras;

Judges in the United States;

U.S. Senators, U.S. Governors, Chancellors, University Presidents, Provosts, Deans, Nationally and Internationally;

Graduate Students in India (New Dehli, Mumbai, Chennai, Hyderbad);

Graduate Students, Business Leaders and Civic Leaders in Pakistan (Lahore);

Business Leaders and Government Officials.

Public Interest Litigation that benefits Floridians, Americans and the global population in a deep and substantial way:

Florida Sovereignty Lands Standards for $10 billion of State property as Special Assistant Attorney General; Florida Environmental Protection as Assistant Attorney General. *Coastal Petroleum v. American Cyanamid*, 492 So. 2d 339, (Fla. 1986); See AGO 88-22 (June 1, 1988), defining the Ordinary High Water Line ("OHWL") and methodology to secure sovereignty lands as applied by § 253.03(7), Fla. Stat. *See* Reimer, Monica, *The Public Trust Doctrine: Historic Protection for Florida's Navigable Rivers and Lakes,* Florida Bar Journal, Vol. 75, No. 4, April 2001.

Florida Supreme Court State Court's Administrator Special Counsel;

Florida Health Care protecting senior citizens in nursing homes and expanding health care coverage for millions of Floridians, and identifying and prosecuting health care fraud and abuse;

Finalist for U.S. Attorney for the Northern District of Florida;

Florida Medicaid Tobacco Case--$27 billion for the State of Florida, removal of billboards and child advertising. *Chiles v. The American Tobacco Co., et* al. (No. 95-1466-AO) ("Complaint");

*Agency for Health Care Admin. v. Associated Indus. of Florida, Inc.,* 678 So.2d 1239, 1239, cert. denied, 65 U.S.L.W. 3629 (Fla. Mar. 17, 1997).

Removing cancer causing benzene from soft drinks nationally. *See Coke Sued as Part of Benzene War*, Los Angeles Times, August 26, 2006; *Coca-Cola settles lawsuit over benzene, Associated Press,* May 14, 2007.

Recovering $300 million from tobacco companies for individual victims (husbands, wives, children and families) of addiction, cancer and death. *Engle v. R.J. Reynolds Tobacco Co.,* No. 9408273 CA (20) (D. Fla. Oct. 31, 1994), http://legacy-dc.ucsf.edu/tid/wbn15f00. *R.J. Reynolds Tobacco Co. v. Engle,* 672 So. 2d 39 (Fla. Dist. Ct. App. 1996). *R.J. Reynolds Tobacco Co. v. Engle,* 122 F. Supp. 2d 1355 (S.D. Fla. 2000). *Engle v. Liggett Group, Inc.,* 945 So.2d 1246 (Fla. 2006). *R.J. Reynolds Tobacco Co. v. Engle,* 122 F. Supp. 2d 1355 (S.D. Fla. 2000). *Evans v. Lorillard Tobacco Company,* 465 Mass. 411 (Mass. 2013), including recovery for 13,000 Engle Trust claimants, 100 individual cancer cases, and winning or settling scores of tobacco trials and cases.

BP Oil Spill--$100 million for 5,000 injured clients. *In re* Oil Spill, No. 10-MDL-2179 (E.D. La. Jan. 23, 2015); 21 F. Supp. 3d 657, 668–69 (E.D. La. 2014). *See In re* Oil Spill, 77 F. Supp. 3d 500, 525 (E.D. La. 2014) (finding that 4 million barrels of oil were released into the Gulf but only considering 3.19 million barrels for civil penalties). Damage to 100s of thousands of businesses and individuals in the Southeast United States from Florida to Texas.

Locating and sealing of the source of nuclear isotopes, and toxic nuclear cleaning chemical plumes in water, food, air and ground, causing cancer clusters and leukemia in children and families near the nuclear facility, shutting down elementary, middle and high schools in Southern Ohio. *Walburn, et al., v. Centrus, et al.,* Case No. 20-cv-4621 (S.D. Ohio 2020).

Elementary through High School Coach:

25 years as a coach of flag football, soccer, baseball, pee wee football, junior football, middle school football and track, high school football, track and basketball, training and mentoring 1,000s of young men and women.

Most recently a Fellowship of Christian Athletes Mentor Coach at Rickards High School, which team won the State Championship in 2020, and Jefferson County High School (2020-to present date).

Former Lincoln High School basketball coach for State finalist and State semi-finalist team; former FAMU High School DRS Offensive Line Football (District Champs) and Track Throws Coach; former Gadsden County High School Offensive Line Football Coach.

Exhibit E. This is all done while Respondent is providing Food, Medical Care, Jobs, Counseling, Family Reunification, Housing for the Homeless, Addicts, Ill, and Hurt in the Community as referenced above and as found in Exhibits A through E.

Jason Hall

Respondent understood that Jason Hall was "not" a client based on the research and sworn written documents from 2008. However, with a determination that Jason Hall was a client when the loan was made, suspension is appropriate when lawyers commingle client funds with their own or fail to remit client funds promptly.

There was no knowing, intentional or willful violation, but if Jason Hall was a client and if the statute of limitations hasn't run on the 2008 errors, and the estate was not the party to bring the Bar Complaint, then Respondent necessarily comingled funds and failed to remit client funds promptly. Due to the age of the violation—13 years ago; the inadequate research, and application this research to the sworn client directives and sworn end of the client relationship; the prompt offer to have the Florida Bar arbitration review, and agreement to repay what the Referee's accepted accounting shows is inaccurate, *Florida Bar v. Brutus*, 216 So. 3d 1286 (Fla. 2017), is most applicable. In *Brutus*, the respondent was suspended for 1-year, followed by a 2-year probation, where respondent improperly distributed marital funds and was negligent in maintaining the trust account.[2]

Respondent would have provided a prompt compliance with any accounting or arbitration award concerning the 2008 loan by Jason Hall, if Dana Hall/Sandra Fulup would have agreed to an independent accountant and arbitration. Unfortunately, the age of the matter, not having the file, not having access to bank records, and resistance by Dana Hall/Sandra Fulup for an independent party accounting or arbitration, and/or Florida Bar arbitration to immediately review, made prompt resolution impossible. Thus, there was no intent, willful, or knowing misappropriation or conversion that is applicable.

Peggy Harris

Peggy Harris was not harmed nor was there any potential injury to her as a result of missing the probate status conference or the errata on the never to be used discovery deposition. Therefore, admonishment is appropriate for these violations, and can be incorporated within the 1-year suspension and 2-year probation sanction.

### Injury to Client

Starting with "injury" to any potential client, consider the following.

Peggy Harris

There was no injury to Peggy Harris. Rather, Peggy Harris received a $10 million verdict and nearly $400,000 of expenses and 3,000 hours of work for free by Respondent. Respondent protected the testimony of Richard Harris despite numerous obstacles by counsel for the tobacco industry and his "end of life" deposition directly led to the $10 million verdict. Respondent even paid counsel for Peggy Harris $21,000 a month during his representation of Peggy Harris. Respondent has received and will receive nothing for his $400,000 in risk, his 3,000 hours of work, the pay of his counsel to work in the Peggy Harris case, and the pay for costs.

Jason Hall

There was no injury to Jason Hall the client of Respondent. Jason Hall never filed a Bar Complaint and Jason Hall never had a complaint against Respondent. In fact, Jason Hall would have recovered nothing "but for" the work of Respondent. The core transaction at issue, namely, whether the attorney client relationship had ended as a result of a sworn direction from the client and written end of representation, such that the former client's loan with Respondent was no longer under Florida Bar ambit was in 2008. It is now 2021. In 2008, Respondent and his staff attempted to research and comply with the Florida Bar rules on the matter and missed the mark. No other similar transactions had taken place before nor since.

---

[2] The Bar Complaints of JB Harris, under the name of Kim Poling (similar to the Peggy Harris Bar Complaint), concerning the Fort Lauderdale Office operations, detailed trust accounting breakdown, and Fuller/Floyd Bar Complaints that merely copied their settled civil suits and was initially denied by the Florida Bar, have all been responded to. Respondent humbly requests that the sanctions determined in this action resolve all matters currently pending.

Despite not having the file, and not having access to records from any source going back to 2008, Respondent was successful in providing a full accounting. The Referee accepted the accounting of the Florida Bar over John Harvard and cites three items at issue from the 97 items documenting the accounting. Accounting spreadsheet, correlated per item in order with approximately 300 pages of checks, ledgers, satisfaction of liens, estate and tenant work done, and verification of payments attached to spreadsheet, and summary report are attached as Exhibit F and found at this link: https://www.dropbox.com/scl/fi/jy6xfmk07wgqrz71oxk3y/10-30-20-a-Jason-Hall-Accounting-Revisd-by-TH.xlsm?dl=0&rlkey=sr3fsw0wv74ham4383fdk5orw. The three items that raised concerns by the Referee were documented from an affidavit documenting reduction in a lien from TMRMC, and the best available evidence, such as Florida Supreme Court decision on worker's compensation fees that found 10% fee limitation unconstitutional, and the value of work performed and costs expended that were not paid for. The remaining 94 items in the accounting had documents attached to validate each item and were not challenged by the Florida Bar, including that Respondent did estate and landlord tenant work and was not paid, yet still rejected by the Referee. *Id.*

If the accounting of the Florida Bar is correct, then the law firm of RumbergerKirk and former Florida Bar prosecuting counsel, Richard A. Greenberg, who advised and guided the Florida Bar and Dana Hall/Sandra Fulup in this prosecution, would be liable for damages plus applicable interest due to legal malpractice. Dana Hall/Sandra Fulup had until February 12, 2020 to file a contract action within the statute of limitations period.[3] Dana Hall/Sandra Fulup had counsel experienced and knowledgeable as to their claim and they were not advised to file a contract action, and did not file a contract action, within the statute of limitations period. In light of this liability, it is expected that the law firm of RumbergerKirk and former Florida Bar prosecutor, Richard A. Greenberg will be adopting an accounting closer to that of John Harvard.[4]

Respondent is willing to provide any restitution that the Referee deems appropriate as part of the sanctions in this matter.

## Knowledge

The "knowledge" of Respondent as to the attendant circumstances of the conduct are as follows:

Peggy Harris

Respondent had no knowledge that the Richard Harris estate case management was not covered by Matt Hinson, his board- certified probate counsel. Once he found out, he quickly took action to correct the gap.

Similarly, correcting one day of non-trial deposition testimony through errata sheets that were reviewed with and signed by the client is not a known conscious objective or purpose to harm either the client or the administration of justice. There was no conscious awareness of any negative objective or purpose. In fact, the client, Peggy Harris under oath states the following:

---

[3] As late as February 12, 2015 Dana Hall/Sandra Fulup in writing demanded $200,000 based on the written contract with Respondent and Jason Hall. TFB Hall 00175-200. These writings came along with cursing from Hall/Fulup. Under § 95.11(2) and (3), Florida Statues, there was 5 years from knowing of the right under a written contract, which the Respondent had with Jason Hall, and 4 years on an oral contract and fraud.

[4] If Richard Greenberg and the RumbergerKirk law firm accept the Florida Bar's accounting and lens of the facts, which Richard Greenberg had previously advocated for, Richard Greenberg and the law firm of RumbergerKirk is liable and will be paying Dana Hall/Sandra Fulup damages plus applicable interest.

Q Clarifying, okay. And is the clarification truthful, meaning that although Richard was having problems with the eyesight, the lawyers came back and went over his deposition with him?

A Correct.

**Q Okay. So the correction in the errata sheet is not false, it's true. Am I right?**

MR. MONDE: Objection to form.

**THE WITNESS: Correct.**

Q In the correction it says, "I do remember our attorneys coming over prior to the deposition and reviewing his deposition from the previous days," et cetera. **As you sit here today, and when you did this errata sheet, do you remember, did you then remember that the attorneys were going over the deposition transcripts with Richard after the deposition testimony was taken?**

MR. MONDE: Objection.

**THE WITNESS: Correct.**

. . .

Q Yes?  **So the correction -- is my understanding correct that the correction part of this page 320 is not false, it's true?**

MR. MONDE: Objection.

**THE WITNESS: Correct.**

. . .

Q Okay. Is it also a fair and correct statement throughout that **you always felt and understood and perceived and know that the lawyers after the deposition went over the depositions with Mr. Harris either to correct, amend, explain, or change any of his answers?**

MR. MONDE: Objection. Asked and answered.

**THE WITNESS: Correct.**

. . .

Q Now, within that truth, were you at least aware, because of your walking into and back out of the room, **that the lawyers in some measure were going over deposition testimony and these corrections, if you want to call them that, with your husband, Mr. Harris, even though you don't know the particulars?**

MR. MONDE: Objection to form.

**THE WITNESS: Correct.**

. . .

Q Okay. Now, even though you may not have seen the actual interactions between question, answer, errata, and the type and everything else, **was this testimony truthful because your impression, your read, your interpretation of what you were seeing and hearing consistent with them going over the deposition transcripts in the errata sheets?**

**A Correct.**

. . .

Q Okay. And you said, **"And Richard clarified his answers and the changes he wanted made to the transcript." Was that a truthful statement at the time?**

**A Correct.**

**Q Was that a truthful statement in your correction?**

**A Correct.**

**Q And is that still a truthful correction -- or a truthful statement today?**

**A Right.**

. . .

Q Now, in the corrections, you say, **"I do remember our attorneys reviewing the errata sheets with Richard to make sure that the errata sheets accurately reflected changes he requested before he signed them." Is that a false statement?**

MR. MONDE: Objection.

**THE WITNESS: No.**
BY MR. DIAZ:
**Q Okay. Is that a general -- was that the impression that you had from everything you saw, <u>the lawyers going over the errata sheets and the depo transcripts with Richard?</u>**
**MR. MONDE: Objection.**
**THE WITNESS: Correct.**
. . .
**Q And then when the errata sheets were done and the correction provisions were put in as a trailer to some of the questions and answers, to the best of your knowledge, were -- was the information in those corrections also truthful?**
MR. MONDE: Objection.
**THE WITNESS: Correct.**

A detailed analysis of fraudulent and perjurious Peggy Harris Bar Complaint that she never read, admits is fraudulent and perjurious, as the Florida Bar was informed of in detail in numerous filings, attached as Exhibit G.

<u>Jason Hall</u>

There was no known knowledge nor any conscious objective or purpose to accomplish a particular result that would harm Jason Hall or the profession. There was no knowing, intentional nor willful misconduct. Respondent, while managing Northeastern University's mid-career doctoral program as professor and director, researched the rules, and had his staff research the rules, and based on the research on the rules in 2008 ensured via affidavit and sworn statement that there was not a loan between a client and Respondent. The Florida Bar and Referee find that research and structure flawed. Nevertheless, Respondent was trying to comply with the rules and the desires of his client. Respondent had no need for the loan, making over $1 million annually on average. The net of approximately $70,000 was used to help other injured clients, namely Alan Landers, former Winston Man, who was dying of lung cancer in mid-2008, and died from cancer without an heir prior to trial. It was not for Respondent and he did not benefit therefrom in any way.

Respondent understood and found that the accounting provided by his staff to the ex-wife of the deceased client, after a month of ex-wife of deceased client's review, was accurate and agreed upon in writing by all parties in December of 2013. Respondent is not an accountant, but the accounting appeared accurate to all parties. With full disclosure, Respondent provided the entire file to complainants in early 2014. If there was intentional, willful or knowing misconduct, Respondent would not have given the file away.

Once the concern was raised by the ex-wife, Respondent did not have the file to go over his records from 2008-2016 and could not obtain bank records from the original time frame. As a consequence, he has been severely handicapped in accurately responding ever since this matter arose.

With complete transparency and accountability, Respondent offered to go to an independent arbitrator for the Florida Bar to review and confirm accounting and/or any gap. Respondent would have been more than willing to pay for any gap. Respondent's income in 2013 was $7.9 million. The Dana Hall/Sandra Fulup accounting matter was one of 5,000 BP cases, staff management, co-counsel relationships, 100s of graduate faculty and staff relationships, and guidance of scores of global graduate students and international graduate intensives throughout the globe (India, Africa, China, Latin America, Asia, Central Asia and Middle East) that Respondent was managing at the time. These are not the actions of someone that has intentional, willful or knowing misconduct.

## Negligence

"Negligence" is the failure to heed a substantial risk that circumstances exist or that a result will follow, deviating from the standard of care. In the instant action consider the following:

### Peggy Harris

Respondent was unknowingly negligent in not covering the probate hearing for Peggy Harris. Respondent is and was responsible for this. He regrets that attacks and abandonment by lawyers that he was paying to work for the clients, such as Peggy Harris, instead of filing fraudulent Bar Complaints against him by the client he was hired to help, caused this harm to his former client.[5]

### Jason Hall

Respondent was negligent in effectively researching the standards for ending a client relationship so that a loan could be made. Respondent was also negligent in effectively researching how and when a trust relationship is created that the ending of a client relationship could not annul. Respondent's staff provided accounting and records to the estate for final review. Respondent provided the entire file to complainants. Respondent did not understand that the client relationship continued. Harming the client was not the intent of the Respondent, nor willful, nevertheless this was a deviation of the standard of care that the Florida Bar and Referee have found. Respondent regrets these errors and accepts responsibility for those errors.

## Potential Injury

"Potential injury" is the harm to client, the public, the legal system or profession that is reasonably foreseeable. In the instant action consider the following:

### Peggy Harris

There was no foreseeable injury, other than the worry of the client and Respondent setting lax standards of professionalism, on missing the probate action status conference as the action could be refiled without prejudice and was in fact done so. Respondent recognized the concern and took all immediate actions in his power once the issue was raised.

There was no foreseeable injury to the client on the errata sheets as the client read and signed the changes to a discovery deposition defendant by a young associate that was never to be used in a trial. The concern as to professionalism was addressed by no use of the discovery deposition done by a younger associate attorney. Respondent will be far more circumspect in application of any errata sheets going forward. In this case, the errata sheets explicitly did not apply to the trial preservation testimony done by Respondent, which was in large part responsible for a $10 million verdict for the client, but only to the discovery depositions.

### Jason Hall

Abuse of a trusting client is always a potential injury. In this case, there is potential injury for a client that signs a sworn statement instructing Respondent as what to do with his funds and that makes a loan to his former attorney. Respondent failed to effectively research the bar standards, complied with his

---

[5] In fact, J.B. Harris was working for Respondent at $21,000 a month and instead of assisting Respondent in covering the various matters needed, J.B. Harris orchestrated the entire perjurious Bar Complaint that the client never read before filing, and an attorney being paid by Respondent took over the probate action.

client's written and sworn directives, and has never before or since engaged in this mistake. Respondent should have told his client that this can't be done, regardless of whether he ends the relationship with the lawyer since the perception will be that the lawyer is taking advantage of the client. Respondent will never engage in this activity again.

**Respondent Seeks Guidance from Referee in How to Address Violation of Florida Bar Standards by Attorneys for the Florida Bar, The Same Standards that Respondent Accepts Accountability For**

Peggy Harris Admits Bar Complaint Was Never Read, Is Perjurious and False.  JB Harris Fraudulently Used Bar Complaint To Gain Advantage in Civil Case.

The Peggy Harris Bar Complaint was never read by Peggy Harris, and was not drafted by Peggy Harris, but by J.B. Harris, despite Peggy Harris filing the Bar Complaint under oath and under penalty of perjury. Peggy Harris under oath acknowledges that the Bar Complaint she signed violated criminal perjury and has extensive false and fraudulent statements.  Exhibit E.  Peggy Harris admits that her Bar Complaint is fraudulent and her counsel raised her 5th Amendment rights:[6]

    Q. **You're saying that you signed the Bar complaint without reading it?**
    A. **Correct**. I know that's—that is my fault. I'm sorry I didn't read it.
    . . .
    Q. Part five says that, "Signature.): **Under penalties of perjury, I declare that the foregoing facts are true, correct and complete." Do you see that?**
    A. I do.
    Q. And then your name is printed, correct?
    A. Correct.
    Q. **And then you signed your name, correct?**
    A. **You understood when you signed this <u>that you were under penalty of perjury declaring the facts in the statement to be true, correct and complete?</u>**
    A. **Correct.**
    Q. There was no doubt in your mind about what you were signing, correct?
    A. Apparently not—apparently so.
    Q. I want to make sure I understand your answer.
    A. Well, I—**I did not read it, so I was wrong** in not—putting this down, so—
    Q. And I appreciate you're acknowledging that that was wrong. And I want to understand from you why you agree that was wrong to do. You understood when you signed this that you were taking an oath to tell the truth –
    A. Correct.
    Q.—Just like the oath you took this morning?
    A. Right.
    Q. And you understood the importance of an oath in a legal proceeding, correct?
    A. Yes.
    Q. I mean, our legal system, you agree, depends on people telling the truth, correct?
    A. Correct.
    Q. Our legal system depends on people telling the full truth and not being deceptive by leaving out certain key parts, correct?
    A. Correct.
    . . .

---

[6] MR. ANDERSON: Okay. Well, I'm going to respectfully disagree with you. And to the extent you ask her about her testimony related to her errata sheets, **I'm going to have to instruct her not to answer on the grounds that she could be incriminating herself.**
**MR. MONDE: Then have her take the Fifth.**

**Q. You understand what perjury means, right?**
**A. Yes.**
**Q. You understand the penalties of perjury?**
**A. Yes.**
**Q. You understand that in some context perjury can be a criminal offense?**
A. Um-hum.
Q. Yes?
**A. Yes.**
**Q. Would you want any part of a judgment that you believed was based on false information?**
. . .
**A. No.**
**Q. That would be wrong?**
A. Right.
Q. Would you want to be **any part of a judgment that you believed was infected by or tainted by fraud?**
A. I wouldn't like it.
**Q. Would you want any part of it?**
**A. No.**
. . .
Q And so **when this was filed back in 2019**, April of 2019 **you had not read the Bar complaint at that time?**
A Correct.
Q And you would have not been able to tell your lawyers whether -- what was in the Bar complaint was true and correct or contained false statements because you hadn't read it?
A Correct.
**Q And we now know that it contains statements that you believe to be false?**
MR. DIAZ: Form.
BY MR. MONDE:
**Q Correct?**
**A Correct.**
**Q Statements that you believe to be fraudulent, correct?**
MR. DIAZ: Form.
**THE WITNESS: Correct.**
Q. Now that you know that, what steps have you taken to correct that?
A. At this point nothing that I recall.

*Id.*, at pp. 23-27, 84-85, 125-126. Attorneys for the Florida Bar knew this. This is material information for the Referee that was withheld by the Florida Bar from the Court. Is this something that the Florida Bar should have immediately acknowledged and presented to the Referee? Is there jurisdiction to prosecute an admitted perjurious, fraudulent and knowingly false Bar Complaint? Doesn't this nullify jurisdiction? In *The Florida Bar v. Cox*, 794 So. 2d 1278 (Fla. 2001), a prosecutor was suspended for 1 year for withholding the name of a confidential informant. The fact of a fraudulent, perjurious, and false Bar Complaint is far more significant to a prosecution than withholding the name of a confidential informant. How is this handled by the Referee and the Florida Supreme Court?

Corey Fuller and William Floyd Bar Complaints Merely Copied Civil Complaint, Used Bar Complaint To Gain Advantage in Civil Case

The Florida Supreme Court has ruled that the Florida Bar is not a venue to pursue civil remedies as another venue for political or legal leverage, and based on this standard, appropriately discharged Corey Fuller and William Floyd complaints in the attached letter dated January 15, 2020. Exhibit H. Mr. Hughes, as The Florida Bar representative, stated:

I must conclude that your complaint constitutes a civil dispute as there are **no allegations independent of the enclosed civil complaint** and as a result, must be resolved through the civil system. The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies.
. . .
Consequently, I have closed our record in this matter.

*Id* (emphasis added).

Nothing has changed in the facts and circumstances of these Bar Complaints. When the decision was made to continue to pursue these Bar Complaints, there was no explanation of what new facts existed or why. If the Florida Supreme Court ruling applies, consistent with the letter ruling, how are these matters handled?

If, as a consequence, these parties were not entitled to use the Florida Bar as a method to gain advantage of a civil action that had been proceeding for nearly two years at the time. What happens? Notwithstanding violation of the confirmed Florida Bar and Supreme Court standards, the Florida Bar went forward with the prosecution. How does the Florida Supreme Court handle this?

The civil case was settled without Respondent having to pay anything, since Respondent was not involved with the scheme done by a high school football friend that he had given a second chance to and the Complainants' attempts to get retirement funds without paying taxes and penalties. Respondent received nothing and was not part of the scheme.

The Florida Bar's potential violation of their and the Florida Supreme Court standards was one pressure on Respondent for settling the civil action. Is this something that the Florida Bar should have immediately acknowledged and not pursued? How does the Florida Supreme Court handle this?

<u>Client, Jason Hall Never Filed Bar Complaint. Estate for Jason Hall Had Right to File Bar Complaint and Never Did. Statute of Limitations Has Run.</u>

The core transaction at issue, namely, whether the attorney client relationship had ended as a result of a sworn direction from the client and sworn and written end of representation, such that the former client's loan with Respondent was no longer under Florida Bar ambit, was in the Summer and early Fall of 2008.

If the decedent has a right of action (which the Florida Bar action can only be brought by the client or the estate for the client), upon death, his estate must bring the action "by the decedent's personal representative" "before the later of the expiration of the time limit for the commencement of the action or 12 months after the decedent's death." § 733.104(2), Fla. Stat.

In this case, the estate has not brought a Florida Bar action. Rule 3-7.16 states that "a complainant must make a written inquiry to the Florida Bar within 6 years from the time the matter giving rise to the inquiry or complaint is discovered or, with due diligence, should have been discovered." Jason Hall never filed a complaint as there was nothing to complain about.

Dana Hall and Sandra Fulup were given the file in January of 2014, with all documents in file, including loan and all payments, accountings and billings. The matter would have been discovered with due diligence within 10 months of giving the files to Dana Hall and Sandra Fulup.

The estate, the only legal entity that could have filed a Bar Complaint for the deceased, Jason Hall, has never filed a Bar Complaint and the 6 years statute of limitations has run. There is no tolling based on fraud as there was full disclosure of all transactions and prior accounting completed on 12/23/13, and

complete file and loan document as part of full accounting provided in January of 2014, all over 6 years ago.

The Florida Bar Attorneys know the standards for Statute of Limitations and which parties can bring an action. They have not informed the Referee of these facts and rules that may nullify jurisdiction for their prosecution. Is this something that the Florida Bar should have immediately acknowledged and informed the Referee of the same? How does the Florida Supreme Court handle this?

Respectfully submitted on this 18ᵗʰ Day of March 2021.

Phillip Timothy Howard

# EXHIBIT A

Volunteer CHAPLAIN

Phillip Tim Howard

9682 Deer Valley Dr

Tallahassee, Fl 32312




ID NO. 3817

| D.O.B. | SEX | HEIGHT |
|---|---|---|
| 03/07/1961 | M | 6-2" |
| **WEIGHT** | **EYES** | **HAIR** |
| 208 | Blue | Brown |

Issued: 02/20/21   Expires: 02/20/22

**NOT VALID IF EXPIRED**
**INFO@SHAREYOURHEART.US**

# Certificate of Completion
# Spiritual Care Training

**Department of Children & Families**
**Pastoral Care - Baptist Health South Florida**

Phillip Tim Howard

*Has completed the 16-hour DCF Training*
*Course for Spiritual Care Providers*

_____
2/19/2021
Date

_____
Roland González
Executive Director, Share Your Heart








**Baptist Health South Florida**





MIAMI-DADE COUNTY
COMMUNITY ACTION and HUMAN SERVICES DEPARTMENT

**Victor** for Youth
NON-FOR-PROFIT 501 (c)3 ORGANIZATION

SHARE YOUR ❤

# EXHIBIT B

## AFFIDAVIT OF SENIOR PASTOR MICHAEL SMITH

### STATE OF FLORIDA
### COUNTY OF LEON

I, MICHAEL SMITH, who upon being sworn, under penalty of perjury, and for use in any legal proceeding, do hereby under oath state:

1.      My name is MICHAEL SMITH, I am 45 years old. I live at 3772 Everwood Court, Tallahassee, Florida 32303. I am of sound mind and able to testify.

2.      I make this Affidavit based upon my personal knowledge and what I know personally from my history as a pastor.

3.      I have been a Christian pastor for 17 years with Christian Heritage, Restoration Place and New Creation Church Tallahassee. I am Senior Pastor at New Creation Church in Tallahassee, Florida. I graduated from Florida State University.

4.      In my service to the Lord, I have had the opportunity minister to the homeless, bring the Good News of the Jesus Christ to people that God has appointed me to meet with, and preach and teach the Gospel and pastor and bring healing to the body of Christ. In my ministry, I have seen the miraculous power of the Living God bringing sight to the blind and power to walk to the crippled.

5.      Phillip "Tim" Howard is a member of my congregation and has been for going on 4 years. I pastor and minister to and with him, and I fellowship with him. We have both ministered to others in sensitive and confidential matters of the soul, heart, and temporal needs. Here is what I know about Tim.

6.      From what I understand, Tim's Christian experience has gone from Baptist, to Catholic, Methodist, Charismatic and secular atheism. And for a man in our day to have studied and taught at universities, such as Harvard, Northeastern, Boston University, Oxford and Florida

State, and trained nearly 100 doctorates, my heart is overjoyed when we wake up on Saturday morning to feed the less fortunate right here in the Bond community, to share our faith in the parking lots of our local supermarkets, and to have blessed conversations with anyone of God's created beings, shows me that the transforming power of Jesus Christ is alive and at work in him. As a pastor, there is nothing more pleasing and attractive in the people that you get a chance to shepherd than those qualities.

7.     I have had the privilege of talking with Tim and to share in some of the successes and challenges that he has faced. As a black pastor for me to see commercials about Big Tobacco coming down and later in my ministry to meet a man that brought that corporate giant down, says a lot about his potential his ability to produce and him as a person.

8.     Since I have met him, I have known him to be nothing but generous. Pouring thousands of dollars into the church, into ministries overseas, and thousands of dollars to the people that he works for. And me understanding what has been presented against him, I have not seen him ask for a single dime in four years of knowing him. All he has does is give. I had to make him to tell me if he needed gas money since this ordeal has ensued.

9.     I am not going to go into too much than to say in my pastoral discernment, I don't see a man that is a thief or is a taker, and I could be wrong, but what I have witnessed is a brother who all of his life has been taught to work hard, love hard and give hard. I hope that these words fall into consideration of the powers that be in their deliberations and contentions for the life of someone with these qualities.

10.     Tim has served our congregation and our city, he has walked with me, he is part of our New Creation praise team, evangelism team, prayer team, Youtube channel, broadcasts

from Capital of Florida, to Minneapolis, Minnesota to Quetta, Pakistan, and there is more to come.

11.     Tim assists me with the Fellowship of Christian Athletes ministering to 100s of local high school athletes and as men, trying to better our communities with the message we love. One of the joys of our time serving is having the opportunity baptize the Rickards High School football team at his home and the next year those same young men winning the State High School Championship. This shows me he is authentic and is open as all believers need be.

12.     If there is a deeper investigation into his life, I think you will find that these qualities existed prior to his conversion.

13.     Tim is a State of Florida Certified Volunteer Chaplain, sanctioned by the Florida Department of Children and Families and the Governor's Office of Adoption and Child Protection through the Share Your Heart Florida Campaign. In this capacity, we have given 400 boxes of food in the Bond community.

14.     If you need anything further as to Tim, please let me know and I will be happy to provide.

FURTHER AFFIANT SAYETH NOT

SENIOR PASTOR MICHAEL SMITH          2/22/21

# EXHIBIT C

## AFFIDAVIT OF PASTOR MELVIN YOUMANS

**STATE OF FLORIDA**
**COUNTY OF LEON**

I, MELVIN YOUMANS, who upon being sworn, under penalty of perjury, and for use in any legal proceeding, do hereby under oath state:

1.      My name is MELVIN YOUMANS, I am 66 years old. I live at 484 Forest Green Drive, Tallahassee, Florida 32308. I am of sound mind and able to testify.

2.      I make this Affidavit based upon my personal knowledge and what I know personally from my history as a minister and pastor.

3.      I have been a Living God Christian pastor and minister for 30 years with numerous churches and currently with New Creation Church Tallahassee.

4.      I have been evangelizing and ministering to the homeless, inmates, praise, prayer, and poor for decades. I have personally seen the Living God heal the blind in prison and cast out demons from the possessed. I was invited by the Catholic Church, Good Shepherd Parish in Tallahassee, to teach them about the power of the Holy Spirit and how to stand against evil and taught them for several months.

5.      Phillip "Tim" Howard and I have been ministering together going on 4 years now. In fact, I am the one that prayed over his back prior to the Living God healing him.

6.      Tim and I regularly go into Wakulla Correctional Institution to share the good news, with salvations and baptism of the Holy Spirit taking place.

7.      Tim and I evangelize throughout neighborhoods and in the Walmart parking lot, regularly seeing the Living God work.

8.      Tim and I minister to those in the Bond community, near FAMU, and bring healing, salvation and power to those that receive free meals and prayer.

9.        Tim and I work on a farm at former Assistant State Attorney Sid White's house and property, that I am leading as a prototype for starving Christians in Pakistan and other under resourced parts of the world. We have a chicken farm and crops. We have funded the sustainable farm in Quetta, Pakistan with Good News Pastor Kashif Rasheed Masih, who ministers to Christian orphans and widows, as well as young Christian girls that have been kidnapped and violated in order to be sullied, abandoned, and forced to convert to Islam.

10.        Tim and I participate as bible study teachers and engage in regular intercessory prayer.

11.        Tim is generous with my personal needs and gives to any project that the Living God has sought us to pursue.

12.        Tim loves the Living God and serves him in many fronts and locations.

13.        Tim is a certified Florida Volunteer Chaplain working with the Florida Department of Children and Families, and the Governor's Office of Adoption and Child Protection, and regularly meets the needs of the lost, last and least.

14.        I have been with him constantly since his revival and he has authentic fire for the Living God. He has been touched by that fire.

15.        Tim goes to where the Holy Spirit is moving through all denominations and groups.

16.        Tim is on the church praise team, prayer team, ministry outreach to the poor, a Florida Certified Volunteer Chaplain, a Fellowship of Christian Athletes mentor coach and speaker. He and I regularly counsel and locate resources for those in need.

17.        Tim and I have been in the Bond Community, Speed Park, near FAMU Football Stadium, with Alexis Annon and Kinsha Mims ministering with free food, prayer, praise, family

reunification, and job assistance to the homeless, addicts, ex-convicts, and poor nearly every Saturday for over a year. The Holy Spirit shows up every time, with families united, addicts delivered, tears of healing shed, medical care such as new eye-glasses and glaucoma treatment, jobs sought, and nourishment to lost and hurting souls provided.

18.       Just this past Saturday, as a Florida Certified Volunteer Chaplain, Tim assisted in distributing 1,300 boxes of food, including meat, fruit, vegetables, cheese, milk, and more, as part of his ministry with the Share Your Heart Campaign, with over 300 distributed, while ministering to those that have lost loved ones from CV19, lost jobs, and are just plain beaten up by life.

19.       In my experience and knowing the history of Tim, he never took anything from anyone and has only given, and he only gives to me, our congregation and all those he sees in need, even to the extent of regularly picking up homeless men and women, giving them a meal, some money for clothes and food, and bringing them to church.

20.       I can see how Tim would trust the wrong persons with manipulative intent, how they would take advantage of him, and can see how they would try to blame him to get away with what they have taken. This is standard psychological projection device by deviants.

21.       Tim is my brother and I love him. His discernment and compassion and love relationship with the Living God has deeply improved from this process of betrayal, pain and suffering. I look forward to sharing with him the many lives and souls that will come to know the love and power of the Living God through his life and testimony.

22.       If you need anything further as to Tim, please let me know and I will be happy to provide.

FURTHER AFFIANT SAYETH NOT

PASTOR MELVIN YOUMANS

DRIVER'S LICENSE ATTACHED

WITNESS: _____          DATE: 2/22/21



# EXHIBIT D

















Case 2:12-md-02323-AB Document 11546 Filed 04/29/21 Page 41 of 503





















# EXHIBIT E







































































































# EXHIBIT F

| | | | | | | | Associated Document | Document Page |
|---|---|---|---|---|---|---|---|---|
| Howard & Associates, P.A. | 7/3/08 | 2767637, 1765158, 1767159, 1765361 | 1737564 | | $20,000.00 | Settlement | Initial Deposit | 1 |
| Howard & Associates, P.A. | 8/5/08 | Regions | 7304 | | $612,828.00 | | | |
| | | | | TOTAL | $632,828.00 | Settlement - Net Deposit | Initial Deposit | 1 |
| | | | | | $100,000.00 | × | IRS Attorney's Fee | 15% Attorney's Fees | 102 |
| | | | | | $0.00 | × | Amount Paid Towards $12,500 Costs | Initial Deposit | 1 |
| | | | | | $56,510.38 | × | Attorney's Fees - 20% Negotiated Reductions | Fee Motion - Attach | 10 |
| | | | | | $2,938.79 | × | Shelby Florida Pre Paid College | Bells #4 | 103 |
| | | | | | $701.04 | × | Shelby Florida Pre Paid College | | |
| 6/1/09 | DEBIT | | | | $7,750.00 | × | Attorney's Fees - Mediation/Divorce (Discounted from $24,000) | Dissolution Letter | 18 |
| | | | | | $2,864.96 | × | Notes Payable | Check Number | 88 |
| | | | | TOTAL | $179,865.17 | | | |

| # | Entity | Date | Ref # | Account | Acct # | Amount | | | | Description | Associated Document | Document Page |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | | | | | | | | | | | | |
| 22 | Leon County TMH | 4/2/06 | | | | $868.74 | x | | | EMS | EMS Invoice | 104 |
| 23 | Nursing Facility | 4/7/06 | | | | $3,490.00 | x | | | Nursing Facility | Nursing Invoice | 105 |
| 24 | Radiology Associates of Tallahassee | 4/30/06 | Verified in ledger / documents | | | $1,955.70 | x | | | Radiology Associates | Radiology Invoice | 35 |
| 25 | TMH - ER Physician Group | 6/5/06 | Verified in ledger / documents | | | $148.00 | x | | | Physician Group | TMH ER Invoice | 34 |
| 26 | Brooks Rehabilitation | 8/14/06 | Verified in ledger / documents | | | $23,573.25 | x | | | Invoice Pd Info | Invoice Confirmation of Payment | 23 |
| 27 | Heart Surgery Center | 3/8/07 | Verified in ledger / documents | | | $3,259.00 | x | | | Heart Surgery Center | SBC Invoice | 33 |
| 28 | Tallahassee Pain Mngmnt | 6/10/08 | Verified in ledger / documents | Operating Account | | $1,600.00 | x | | | Pain Management | Pain Management Invoice | 16 |
| 29 | Sandy Fulop | 7/15/08 | 2871 | Operating Account | 7904 | $3,800.00 | x | | | Payment on $35,000 Loan | Check 3271 | 76 |
| 30 | Jason R. Hall | 7/15/08 | 2872 | Operating Account | 7504 | $3,000.00 | x | | | Non-Client Funds Disbursement | Check 3272 | 80 |
| 31 | HSHC | 7/15/08 | 2873 | | 7504 | $750.00 | x | | | Payment - Joint Debit (HSHC card $500) | Check 3273 | 35 |
| 32 | Target | 7/15/08 | 2874 | | | $150.00 | x | | | Payment - Joint Debit | Placement Letter | 18 |
| 33 | Jason R. Hall | 7/25/08 | 2889 | | | $200.00 | x | | | Non-Client Funds Disbursement | Check 3289 | 78 |
| 34 | Jason R. Hall | 8/4/08 | 2894 | | | $200.00 | x | | | Non-Client Funds Disbursement | Check 3294 | 77 |
| 35 | Jason R. Hall | 8/6/08 | 2897 | | | $100.00 | x | | | Non-Client Funds Disbursement | Check 3297 | 85 |
| 36 | Citifinancial | 8/6/08 | 2899 | AmSouth Bank | 7904 | $10,021.64 | x | | | Payoff Jeep - Citifinancial Auto | Check 3299 | 86 |
| 37 | Anthony Hall | 8/18/08 | 2910 | | | $5,500.00 | x | | | Loan Repayment | Check 3210 | 31 |
| 38 | Clifford Hall | 8/14/08 | 2909 | AmSouth Bank | 7904 | $3,500.00 | x | | | Repay Loan in full | Check 3209 | 4 |
| 39 | Comten Appraisal | 8/21/08 | 2913 | | | $385.00 | x | | | Comten Johnson Appraisal of Home | Check 3213 | 24 |
| 40 | ANES of Tallahassee | 8/25/08 | 2914 | | | $0.00 | x | | | 20% Negotiated Discount - N-etical bill - Recs Freelance #3 - Original Bill $5,769 + Savings of $1,754 (ANES of Tallahassee) | Check 3214 | 27 |
| 41 | Jason R. Hall | 8/27/08 | 2915 | Operating Account | | $14,065.00 | x | | | CMA Payment (Medicare Set-aside) | Check 3215 | 82 |
| 42 | Jason R. Hall | 8/27/08 | 2916 | AmSouth Bank | 7904 | $2,000.00 | x | | | Non-Client Funds Disbursement | Check 3216 | 5 |
| 43 | Jason R. Hall | 8/25/08 | 2906 | Operating Account | | $2,000.00 | x | | | Non-Client Funds Disbursement | Check 3206 | 79 |
| 44 | Sandy Fulop | 8/25/08 | 2923 | AmSouth Bank | 7504 | $23,206.00 | x | | | Full construction of debts owed by (Jason/Dana Hall) | Check 3223 | 6 |

| # | Name | Date | No. | Bank | Account | Amount | | | Analyzed Document | | Document Page |
|---|------|------|-----|------|---------|--------|---|---|-------------------|---|--------------|
| 45 | Dana Hall | 8/19/08 | 2924 | AmSouth Bank | 7904 | $7,500.00 | x | | Payment PER Signed Settlement Agreement | Check 2924 | 7 |
| 46 | Jason R. Hall | 9/10/08 | 2932 | AmSouth Bank | 7904 | $1,000.00 | x | | Non-Client Funds Disbursement | Check 2932 | 8 |
| 47 | Sandy Rung | 9/10/08 | 2933 | AmSouth Bank | 7904 | $3,800.00 | x | | Application Payment | Check 2933 | 9 |
| 48.1 | Tallahassee Neurological Clinic | 10/17/08 | 2966 | | | $44,235.00 | x | | Tallahassee Neurological Clinic | Ashby Confirmation of Funds | 21 |
| 49 | Dell | 11/12/09 | 2981 | | Operating Account | $2,207.18 | x | | Dana Credit Card Prepyt - Dell | Check 1159 | 20 |
| 50 | Jason R. Hall | 12/17/08 | 3042 | AmSouth Bank | 7904 | $5,000.00 | x | | Non-Client Funds Disbursement | Check 1251 | 81 |
| 51 | Dana Hall | 1/8/09 | 3008 | AmSouth Bank | 7904 | $400.00 | x | | Jason Car Insurance Reimbursement | Check 2994 | 11 |
| 52 | Dana Hall | 1/20/09 | 3021 | AmSouth Bank | 7904 | $650.00 | x | | Child Support for Jason Hall | Check 2994 | 12 |
| 53 | Dana Hall | 2/10/09 | 3058 | AmSouth Bank | 7904 | $650.00 | x | | Child Support According to Mediation Agreement | Check 3026 | 13 |
| 54 | Dana Hall | 2/27/09 | 3065 | AmSouth Bank | 7904 | $5,626.82 | x | | Partial Lump Sum Divorce Settlement | Check 3041 | 14 |
| 55 | Dana Hall | 3/23/09 | 3074 | AmSouth Bank | 7904 | $3,000.00 | x | | Additional Partial Lump Sum Payment | Check 3074 | 15 |
| 56 | Dana Hall | 4/10/09 | 3087 | AmSouth Bank | 7904 | $500.00 | x | | Draw of $40,000 Child Support Lump Sum | Check 3087 | 16 |
| 57 | Jason R. Hall | 4/20/09 | 3051 | AmSouth Bank | 7904 | $4,500.00 | x | | Divorce Settlement Child Support Advance | Check 3091 | 17 |
| 58 | Jason R. Hall | 4/23/09 | 3093 | AmSouth Bank | 7904 | $1,000.00 | x | x | Truck Purchase | Check 1021 | 37 |
| 59 | Auto-Owners Life Insurance | 5/11/09 | 3101 | AmSouth Bank | 7904 | $9,000.00 | x | | Auto Owners Life Insurance Company | Check 3101 | 38 |
| 60 | NLAkreon Collection | 5/14/09 | 3106 | AmSouth Bank | 7904 | $50,000.00 | x | x | Acts Owners Life Insurance Company | Check 3106 | 29 |
| 61 | MRS | 6/1/09 | Varied w/ inquiry / payments | | | $2,705.00 | x | | Tallahassee Pulmonary Care | Check 3128 | 25 |
| 62 | Chase Manhattan | 6/4/09 | 3128 | AmSouth Bank | 7904 | $7,175.20 | x | x | 20% Negotiated Discount - Medical Bill - Re: Footnote #1 - Original Bill $9,569 + Savings of $1,794 (net) of Total above) | Solicitation Letters | 28 |
| 63 | Vista Healthsystem | 7/20/09 | 3129 | | | $768.50 | x | | Prepaid Mortgages | Check 3129 | 30 |
| 64 | NU Akreon Collection | 7/20/09 | 3160 | AmSouth Bank | 7904 | $105,343.60 | x | | Vista Health Plan | Check 3160 | 87 |
| 65 | Chase Manhattan | 7/30/09 | 3159 | | | $2,000.00 | x | x | Non-Client Funds Disbursement | Check 3159 | 39 |
| 66 | Jason R. Hall | 7/30/09 | 3169 | | | $1,600.00 | x | x | Non-Client Funds Disbursement | Ledger | |
| 67 | Jason R. Hall | 8/14/09 | 3167 | AmSouth Bank | 7904 | $1,200.00 | x | x | Non-Client Funds Disbursement | Check 3167 | 40 |
| 68 | Credit Bureau Associates | 10/15/09 | 3196 | | | $4,740.00 | x | x | Credit Bureau/Associates | Check 1105 | 3 |
| 69 | Jason R. Hall | 3/22/10 | 3291 | AmSouth Bank | 7904 | $500.00 | x | x | Non-Client Funds Disbursement | Check 1111 | 41 |

| | | | | | | | | | Associated Document | Document Page |
|---|---|---|---|---|---|---|---|---|---|---|
| Jason R. Hall | 4/19/10 | 3301 | AmSouth Bank | 7904 | $600.00 | | x | Non-Client Funds Disbursement | Check 1331 | 42 |
| Jason R. Hall | 7/29/10 | 3359 | AmSouth Bank | 7904 | $700.00 | | x | Non-Client Funds Disbursement | Check 1332 | 43 |
| Jason R. Hall | 9/21/10 | 3390 | AmSouth Bank | | $1,000.00 | | x | Bryan's Beauty Shop | Check 1390 | 83 |
| Jason R. Hall | 9/21/10 | 3391 | AmSouth Bank | 7904 | $400.00 | | x | Non-Client Funds Disbursement | Check 1391 | 44 |
| Jason R. Hall | 10/21/10 | 3406 | AmSouth Bank | 7904 | $1,500.00 | | x | Non-Client Funds Disbursement | Check 1406 | 45 |
| Jason R. Hall | 12/16/10 | 3430 | AmSouth Bank | 7904 | $1,000.00 | | x | Non-Client Funds Disbursement | Check 1419 | 46 |
| Jason R. Hall | 1/4/11 | 3440 | AmSouth Bank | 7904 | $3,000.00 | | x | Non-Client Funds Disbursement | Check 1440 | 47 |
| Jason R. Hall | 3/23/11 | 3527 | AmSouth Bank | 7904 | $500.00 | | x | Non-Client Funds Disbursement | Check 1537 | 48 |
| Jason R. Hall | 4/9/11 | 3541 | AmSouth Bank | 7904 | $600.00 | | x | Non-Client Funds Disbursement | Check 1541 | 49 |
| Jason R. Hall | 4/29/11 | 3557 | | 7904 | $1,000.00 | | x | Non-Client Funds Disbursement | (date) | 106 |
| Jason R. Hall | 6/6/11 | 3599 | AmSouth Bank | 7904 | $500.00 | | x | Non-Client Funds Disbursement | Check 1599 | 54 |
| Jason R. Hall | 6/7/11 | 3593 | AmSouth Bank | 7904 | $500.00 | | x | Non-Client Funds Disbursement | Check 1593 | 53 |
| Jason R. Hall | 5/21/11 | 3592 | AmSouth Bank | 7904 | $1,100.00 | | x | Non-Client Funds Disbursement | Check 1593 | 52 |
| Jason R. Hall | 5/20/11 | 3585 | AmSouth Bank | 7904 | $500.00 | | x | Non-Client Funds Disbursement | Check 1585 | 51 |
| Jason R. Hall | 5/12/11 | 3574 | AmSouth Bank | 7904 | $1,000.00 | | x | Non-Client Funds Disbursement | Check 1574 | 50 |
| Jason R. Hall | 8/24/11 | 3682 | AmSouth Bank | 7904 | $250.00 | | x | Non-Client Funds Disbursement | Check 1682 | 55 |
| Jason R. Hall | 7/12/11 | 3634 | AmSouth Bank | 7904 | $750.00 | | x | Non-Client Funds Disbursement | Check 1634 | 56 |
| Jason R. Hall | 9/1/11 | 3697 | AmSouth Bank | 7904 | $500.00 | | x | Non-Client Funds Disbursement | Check 1697 | 57 |
| Jason R. Hall | 9/20/11 | 3734 | AmSouth Bank | 7904 | $2,000.00 | | x | Non-Client Funds Disbursement | Check 1734 | 58 |
| Jason R. Hall | 10/26/11 | 3761 | Regions Bank | 7904 | $1,000.00 | | x | Non-Client Funds Disbursement | Check 1773 | 59 |
| Jason R. Hall | 11/21/11 | 3801 | Regions Bank | 7904 | $1,500.00 | | x | Non-Client Funds Disbursement | Check 1801 | 60 |
| Jason R. Hall | 12/12/11 | 3824 | Regions Bank | 7904 | $2,500.00 | | x | Non-Client Funds Disbursement | Check 1824 | 61 |
| Jason R. Hall | 1/5/12 | 3847 | Regions Bank | 7904 | $1,000.00 | | x | Non-Client Funds Disbursement | Check 1847 | 82 |
| Jason R. Hall | 2/10/12 | 3889 | Regions Bank | 7904 | $1,000.00 | | x | Non-Client Funds Disbursement | Check 1889 | 63 |
| Jason R. Hall | 2/2/12 | 3910 | Regions Bank | 7904 | $2,000.00 | | x | Non-Client Funds Disbursement | Check 1910 | 64 |

| | | | | | | | | Associated Document | | Document Page |
|---|---|---|---|---|---|---|---|---|---|---|
| Jason R. Hall | 4/2/12 | 3960 | Regions Bank | 7904 | $2,000.00 | | x | Non-Client Funds Disbursement | Doc14160 | 65 |
| Jason R. Hall | 4/18/12 | 3973 | Regions Bank | 7904 | $1,000.00 | | x | Non-Client Funds Disbursement | Doc14173 | 66 |
| Department of Health | 5/8/12 | Verbal Ledger / Document | | | $5,416.89 | x | | DOH, BSCIP (Brain and Spinal Cord Injury Program) | DOH Invoice | 32 |
| Dana Hall | 5/24/12 | 4054 | Regions Bank | 7904 | $150.00 | | x | Partial filing fee personal rep. | Doc14054 | 67 |
| Dana Hall | 2/1/13 | 4331 | Regions Bank | 7904 | $750.00 | | x | Jason Hall Settlement Proceeds to Dana Hall | Doc14331 | 68 |
| Dana Hall | 4/11/13 | 4389 | Regions Bank | 7904 | $500.00 | | x | Jason Hall Settlement Proceeds to Dana Hall | Doc14389 | 69 |
| Doris Maloy Tax Collector | 4/24/13 | 986069 | Regions Cashier's Check | | $1,693.37 | | | Leon County Tax Collector's Office | Tax Payment Docs | 19 |
| Dana Hall | 6/28/13 | 4477 | Regions Bank | 7904 | $2,000.00 | | x | Jason Hall Settlement Proceeds to Dana Hall | Doc14477 | 70 |
| Dana Hall | 9/23/13 | 4587 | Regions Bank | 7904 | $600.00 | | x | Jason Hall Settlement Proceeds to Dana Hall | Doc14587 | 71 |
| Dana Hall | 10/29/13 | 4622 | Regions Bank | 7904 | $2,700.00 | | x | Jason Hall Settlement Proceeds to Dana Hall | Doc14622 | 72 |
| Dana Hall | 11/20/13 | 4758 | Regions Bank | 7904 | $3,500.00 | | x | Jason Hall Settlement Proceeds to Dana Hall | Doc14758 | 73 |
| Sandy Fulop | 12/19/13 | 4816 | Regions Bank | 7904 | $16,200.00 | | x | Final Distribution of Non-Client Funds (all funds received for Jason Hall) | Doc14816 | 74 |
| Sandy Fulop | 2/24/14 | 4879 | Regions Bank | 7904 | $3,500.00 | | x | Property Taxes | Doc14879 | 75 |
| Sandy Fulop | 3/24/14 | 4880 | Regions Bank | 7904 | $1,500.00 | | x | Sandy Fulop | Doc14880 | 84 |
| Medicaid/Xerox Medicaid No: 7724245149 | 5/8/15 | 5532 | | | $25,000.00 | x | | Medicaid Lien Payoff (#1) - Total Payoff: $38,483.28 | Medicaid Lien Payoff (1) | 2 |
| Medicaid/Xerox Medicaid No: 7724245149 | 7/27/15 | 5732 | | | $13,483.28 | x | | Medicaid Lien Payoff (#2) - Total Payoff: $38,483.28 | Medicaid Lien Payoff (2) | 2 |
| Total Payout | | | | | $632,894.94 | $561,940.57 | $70,953.37 | | | |

| | | | | | | | Loan Assessment | | | | | | | Attached Document | Document Page |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Payout | | | | | $393,894.94 | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | $196,853.53 | $30,000.00 | | | | | | | |
| | | | | | | | $146,594.30 | $4,000.00 | | | | | | | |
| | | | | | | | $4,740.00 | | | | | | | | |
| | | | | | | | $5,616.89 | | | | | | | | |
| | | | | | | | $175,865.12 | $26,493.97 | | | | | | | |
| | | | | | | | $38,483.08 | | | | | | | | |
| | | | | | | | $561,940.97 | $70,953.97 | | | | | | | |
| | | | | | | | Total Non-Client Loan Amount; Total Available Toward NA Loan | | | | $200K(Loan) Agreement | | | |
| | Total Net Non-Cure Funds Paid | | $38,483.08 | | | | | | | | | | | | |
| | Total of All Funds Disbursed | $563,940.97 | | | | | $70,953.97 | | | | | | | | |
| | Total Settlement | $432,828.00 | | | | | | | | | | | | | |
| | Difference | -$66.94 | | | | | | | | | | | | | |
| | | | | | | Total Amount Still Owed to Firm | $38,034.19 | | | | BREAKDOWN OF FUNDS STILL OWED TO FIRM | | | |

| Amount | | Amount 2 | | | Date | Doc # | | | Description | Attached Document | Document Page |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $9,780.00 | | $0.00 | | | 10/2/06 | | | | Landlord Tenant Legal Assistance | Suisse/Fed Repossession | 100 |
| $9,600.00 | | $0.00 | | | | | | | Proberto of the estate valued at $226,474 | Probate Designation | 89 |
| $34,000.00 | | $7,740.00 | | | | | | | Deserve Repossession | Chrylser Loaner | 18 |
| $166,635.15 | $166,635.15 | $109,000.00 | | | | | | | Supreme Court Approved Workers' Comp Reasonable Attorney's Fees | 112k Ranney's Fees | 102 |
| $9,000.00 | | | | | 10/2/06 | | | | | Hihel Trust | 101 |
| $775.00 | | | | | 4/12/08 | 1883 | | | Medical Rehabilitation Specialists | Dockbook.register - 2843 | 96 |
| $1,200.00 | | | | | 3/21/08 | 2823 | | | Dr. Kirk Marino | Check 5813 | 94 |
| $650.00 | | | | | 2/6/08 | 2801 | | | Executive Reporting - Court Reporter | Check 2891 | 96 |
| $565.00 | | | | | 2/8/08 | 2802 | | | For The Record - Deposition Transcripts | Check 1391 | 96 |
| $2,340.25 | | | | | 4/14/08 | 2822 | | | Fla. Med. Record Service | Backup of Payment | 97 |
| $1,000.00 | | | | | 4/17/06 | 2596 | | | Dr. Ira Richardz | Check 2199 | 99 |
| $1,000.00 | | | | | 12/9/04 | 2646 | | | Dr. Ira Blakand | Check 2414 | 98 |
| $4,000.00 | | | | | 7/19/07 | 2714 | | | Accurate StenoType-Deposition Transcripts | Duplicate/Register 2314 | 96 |
| $3,314.00 | | | | | 12/14/07 | 2775 | | | Accurate StenoType-Deposition Transcripts | Quickbooks Register - 2775 | 93 |
| $675.00 | | | | | 12/14/08 | 3083 | | | Pretrial & Associates | Quickbooks Register - 3083 | 93 |
| $3,825.00 | | | | | 1/25/06 | x | | | Surgical Group | Backup for Payment | 95 |
| $37.53 | | | | | | | | | | | |
| $58.75 | | | | | 4/25/08 | x | | | Tallahassee Neurological Clinic - 78 Medical Records | TNC Invoice 91 | 90 |
| $150.00 | | | | | 8/6/07 | x | | | Tallahassee Neurological Clinic - Cancelled Deposition | TNC Invoice 92 | 91 |
| | | | | | | | | | | | 92 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $17,762.71 | $6,000.00 | TOTAL FEES & COSTS NOT PAID TO FIRM BY CLIENT | $208,076.15 | $107,750.60 | | | | | |
| Total Costs STILL Owed | $6,732.71 | Total Legal Fees STILL Owed | $100,286.13 | | | | | | |
| $100,981.16 | | | | | | | | | |
| (MAIN LEDGER) | | | | | | | | | |

**FLORIDA BAR**
FULOP v. HOWARD, TFB File No. 2013-0[illegible](2A)

**AFFIDAVIT OF KEVEN "KIM" MARIE MATHEWS**

BEFORE ME, the undersigned authority, based upon her personal knowledge, information, and belief, this day personally appeared Keven "Kim" Marie Mathews, who, being first duly sworn, deposes and states under penalty of perjury as follows:

1. My name is Keven "Kim" Marie Mathews. I am over 18 years of age, and am competent for all legal purposes.

2. I live at 8 Sparrow Path, Crawfordville, Florida, 32327.

3. I make this Affidavit based upon my own personal knowledge and involvement in the subject matter.

4. I was the office manager and paralegal for Howard & Associates from April 2002 through July 2014 and handled all of the handling during my employment. I was the only employee at the firm for the duration of Jason Hall's worker's compensation action, which settled in mid 2008.

5. I was the key paralegal for the pro bono work on Jason Hall's estate case from the time of Jason Hall's death in May 2012 until I left the firm in 2014. At that time, to my knowledge, the only pending financial issue regarding funds held by Howard & Associates was Medicaid's demand for payment for which the amount requested had been held pending verification of the amount they were requesting.

6. I am familiar with the allocation of funds for both of Jason Hall's cases, including Tallahassee Memorial Hospital's request for reimbursement of funds paid by their Charity Care program for Jason Hall's initial medical procedures, payments made directly to or on behalf of Jason Hall or the requested funds held (at Jason Hall's request) by Howard & Associates, and

[page 2]

ongoing accounting to Jason Hall, Dana Hall, and Sandra Fulop as the became the Personal Representative of Jason Hall's estate.

7. Jason Hall's worker's compensation settlement included $30,000 for payment of any past due medical bills. An agreement was made between Jason Hall and Tim Howard where Howard & Associates would receive a 20% fee for any savings realized by the firm's negotiations of Jason bills.

8. Upon the settlement of Jason Hall's worker's compensation action Tallahassee Memorial Hospital sent a letter seeking reimbursement of the payments made by their Charity Care program for Jason Hall, which was approximately $250,000. I contacted Tallahassee Memorial Hospital's billing department and explained that the worker's compensation settlement amount was based on those payments having been paid by the charity and that there were no funds available for reimbursement. Tallahassee Memorial Hospital sent no further communication regarding the matter.

9. Jason Hall, knowing his drug use and potential loss of income set to his economic security, wanted a return on his money and wanted Tim Howard to provide this for him. Jason then ended that money-other relationship to accomplish this, and although I do not recall the exact language of the document, I witnessed Jason Hall's signature on a letter designating that the remaining funds held by Howard & Associates from his worker's compensation settlement as non client and non-refundable funds. These funds were referred to as such for the remainder of my employment at Howard & Associates.

10. Throughout the time that Howard & Associates held his funds for Jason Hall he would come to the office on a regular basis requesting funds for various needs. When he came by the office, his drug and alcohol abuse was apparent, as well as a clear abuse by one of the

[page 3]

individuals around him, he was counseled to stop and remove himself from association with these individuals that were obviously using him.

11. Spiraling from alcohol and drug use, Jason Hall died in a car wreck in May 2012 and to assist the family Howard & Associates represented the estate at no cost. Sandra Fulop, grandmother to the minor children, was appointed the Personal Representative of the estate. The firm also addressed a landlord tenant dispute, and assisted in readying the condition and repairs of the decedent's house for sale for the estate.

12. Subsequent to Jason Hall's death I had several meetings with Dana Hall where I provided accounting documents while Tim Howard had limited direct involvement other than to make sure that I provided all accounting and documents that were available to me at the time of meeting with her for full disclosure.

13. Finally in December 2013, Sandra Fulop and Dana Hall met with Tim Howard and Ankur Mehta, another firm employee at the time, where a review of the payments to and on behalf of Jason Hall were provided and a balance due to Jason Hall's estate was submitted to Sandy Fulop in the amount of approximately $16,000.

14. A short time later a wire was submitted to Sandy Fulop for payment of past due property taxes due on Jason Hall's house, as the amount of approximately $3,000 that had not been paid prior to dividing the amounts held by Howard & Associates.

15. Based on the file being closed, and full disclosure and all documents previously provided the review and accounting, Dana Hall and Sandra Fulop were given the original files

[page 4]

16. Throughout the entire time that the law firm represented Jason Hall and his estate, to my knowledge, the firm did all in its power to ensure that both Jason Hall and his estate were properly represented and their interest pursued.

FURTHER AFFIANT SAYETH NOT.

_____
KEVEN "KIM" MARIE MATHEWS

STATE OF FLORIDA
COUNTY OF LEON

Subscribed and sworn before me this 22 day of September, 2015, by KEVEN "KIM" MARIE MATHEWS.

_____
NOTARY PUBLIC

My Commission Expires: 1/21/21

☐ Personally known to me.
☒ Presented identification as follows: DL

schedule and notice an additional final hearing after conferring with counsel for the Employer/Carrier.   In the alternative, either party may file a motion to set final hearing for consideration by the undersigned judge.

DONE AND ORDERED at Tallahassee, Leon County, Florida.



John J. Lazzara
Judge of Compensation Claims
Division of Administrative Hearings
Office of the Judges of Compensation Claims
Tallahassee District Office
P.O. Box 6400
Tallahassee, Florida  32314-6400
(850)488-2110
www.jcc.state.fl.us

25

regardless of whether he was under the influence, if any, of an illegal drug at the time of the accident.

The Employer/Carrier here having failed to meet their burden of establishing "by the greater weight of the evidence" that the Claimant's accident was caused primarily by the use of drugs or alcohol", I find the work accident of 3/16/2006 which resulted in serious injuries to the Claimant, is compensable and the Claimant should be afforded those benefits provided by the Florida Workers' Compensation Law.  See European Marble Company v. Robinson, 885 So. 2d 502 (Fla. 1st DCA 2004).

WHEREFORE, it is ORDERED as follows:

1.   That the accident of the Employee, Jason Ray Hall, on March 16, 2006, arose out of and within the course and scope of the Claimant's employment with Stephen Ferrell Roofing, Inc., and is hereby adjudged compensable under the Florida Workers' Compensation Law; and

2.   That jurisdiction is retained over the remaining claims for workers' compensation benefits, attorney's fees and costs, and the same shall be determined at a later time or agreement of the parties.

IT IS FURTHER ORDERED that should the parties herein be unable to resolve the remaining claims for specific workers' compensation benefits, then counsel for the Employee shall

24

make the following findings of fact and conclusions of law:

1. The undersigned judge of compensation claims has jurisdiction of the parties and the subject matter of this claim;

2. The stipulations entered into by and between the parties herein are hereby approved and adopted as findings of fact and are incorporated herein by reference.

3. In my determination herein I have attempted to distill the testimony and salient facts together with the findings and conclusions necessary to the resolution of this matter. I have not necessarily attempted to summarize the substance of the claimant's testimony or the testimony of any live or deposition witness, nor have I attempted to state nonessential facts. Because I have not done so should not be construed that I have failed to consider all of the evidence.

4. Except for the issues, claims and defenses which are reserved for later hearing, any issues raised in the petition for benefits which was the subject matter of the final hearing, but which issues were not tried at the hearing are presumed resolved, or in the alternative, deemed abandoned by the employee/claimant and therefore denied. See Betancourt v. Sears Roebuck & Co., 693 So.2d 253 (Fla. 1st DCA 1997).

5. Employer/Carrier's ore tenus Motion for Sample of

5

deposition of TMH Records Custodian.)

**Joint Exhibits**

1.   Pretrial Stipulation and Order entered 10/12/2007.

**The following persons testified live before me:**

1.   Dana Hall, Claimant's spouse.

2.   Jason Ray Hall, the Claimant.

3.   Bart David Warmach, Claimant's co-employee.

4.   Christopher Charles Butler, former Claimant's co-employee.

5.   Derrick Butler, Claimant's co-employee.

6.   Michael W. Perry, Claimant's co-employee.

7.   Pamela Jean Pagel, Carrier's Field Case Manager.

8.   Neil Andrew Spearing, Claimant's co-employee.

9.   Dr. Ira Stephens Richards, Ph.D., Claimant's Toxicologist.

10.   Dr. Raymond D. Harbison, Ph.D., Employer/Carrier's Toxicologist.   (Telephonic testimony).

After due consideration of this matter and after having the opportunity to review and consider the aforesaid exhibits which were admitted into evidence, and having observed and considered the candor and demeanor of the witnesses who appeared and testified before me, and having endeavored to resolve all conflicts of facts in the evidence presented herein, I hereby

4

At the trial of this cause, the following Exhibits were admitted into evidence.

### Claimant's Exhibits

1.   Petition for Benefits filed 5/9/2007.[1]

2.   Deposition of Ratliff Wade Parnell taken 10/30/2007.

3.   (Proffered only) Merriam-Webster Online Dictionary's definition of "Intoxicate".   (Employer/Carrier's hearsay and relevancy objections were sustained).

4.   (Proffered only) National Academy of Science article entitled "First, Do No Harm: Consequence of Marijuana Use and Abuse.   (1999)."   (Employer/Carrier's hearsay objection was sustained.)

5.   Eight photocopies of the two-story home on the job site.

6.   Curriculum Vitae of Dr. Ira Richards, Ph.D.

### Employer/Carrier's Exhibits

1.   Deposition of Dr. Chris Van Sickle, M.D., together with attachments, taken 11/28/2007.

2.   Deposition of Tien Van Cao taken 11/27/2007.

3.   Deposition of Kaysa Green taken 11/27/2007.

4.   Curriculum Vitae of Dr. Raymond Harbison, Ph.D.

5.   Tallahassee Memorial Hospital Laboratory Services Report of 3/16/2006.   (Filed on 1/14/2008 in lieu of the

---

[1] The prior PFB filed on 7/20/2006 was voluntarily dismissed on 1/29/2007.

3

the intoxication of the Employee or from the influence of drugs, thereby barring compensation as provided in section 440.09(3), Florida Statutes, (2003).

All other claims and issues raised in Petition for Benefits (PFB) filed on May 9, 2007 as well as the Employer/Carrier's defenses thereto were, by agreement of the parties, bifurcated for trial and reserved for a later hearing, if necessary.

The parties have entered into the following stipulations:

1.    The Judge of Compensation Claims has jurisdiction of the parties and the subject matter of this claim.

2.    Venue properly lies in Leon County, Florida.

3.    Notice of Hearing and Notice of Injury were properly furnished and received as required by the Workers' Compensation Law.

4.    On March 16, 2006, the captioned Claimant was employed by the captioned Employer.

5.    The   following   was   also   stipulated   at   the   final hearing:

a.    The Employer had not implemented a drug-free work place at the time of the captioned accident; and

b.    The Claimant, Jason Hall, over a period of 13 years prior to the captioned date of accident was a consistent smoker of marijuana.

2

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS
OFFICE OF THE JUDGES OF COMPENSATION CLAIMS
TALLAHASSEE DISTRICT OFFICE

Jason R. Hall,                        )
         Employee/Claimant,           )
                                      )
vs.                                   )
                                      )     OJCC Case No.  06-021297JJL
Stephen Ferrell Roofing               )
Inc./Claims Center,                   )     Accident Date: 3/16/2006
         Employer/Carrier/            )
Servicing Agent.                      )

---

## FINAL ORDER

**AFTER DUE NOTICE** to the parties, a Final Hearing on this matter was commenced in Tallahassee, Leon County, Florida, on December 5, 2007. Because the deposition of the Record Custodian from Tallahassee Memorial Hospital (TMH) was unable to be taken by counsel for the Employer/Carrier prior to the Final Hearing, the final hearing was recessed to allow the submission of such evidence, and was subsequently reconvened and adjourned on January 14, 2008.

The parties were represented by counsel as indicated below. The undersigned judge of compensation claims has jurisdiction of the parties and the subject matter.

At the final hearing the sole issue presented for adjudication was the issue of compensability of the Employee's accident of March 16, 2006 and the Employer/Carrier's defense thereto that the aforesaid accident was occasioned primarily by

11.  If at any time, you, the client, believe that your lawyer has charged an excessive or illegal fee, you, the client, have the right to report the matter to The Florida Bar, the agency that oversees the practice and behavior of all lawyers in Florida. For information on how to reach The Florida Bar, call 1-800-342-8060, or contact the local bar association. Any disagreement between you and your lawyer about a fee can be taken to court and you may wish to hire another lawyer to help you resolve this disagreement. Usually fee disputes must be handled in a separate lawsuit.

Howard & Associates,
Attorneys at Law, P.A.

Client's signature

Printed name: JASON R. HALL

P. Tim Howard
For the Firm

Date: 10-3-06

3



Upon conclusion of the claim, Howard & Associates, Attorneys at Law, P.A., will provide the client with a closing statement listing all of the financial details of the case, including the amount recovered, all expenses and a precise statement of attorneys' fees.

### V.  SIGNATURE OF THE PARTIES.

I agree to employ the above-named attorneys.  This contract contains our entire agreement and is not valid unless signed by both parties.  I have received a copy.

_____          Oct 3, 2006
Client                                                            Date

_____          10/7/2006
Attorney                                                       Date

Employment is accepted on the foregoing terms.

HOWARD & ASSOCIATES,
ATTORNEYS AT LAW, P.A.


By: Dr. Tim Howard
For the Firm.


(admin)a:\fee.01


3

obligations or liability to pay past, present and future monetary compensation,

medical, vocational rehabilitation, death benefits or any other benefits of any

classification or type whatsoever, including any penalties and interest, on account

of injury, disability and death resulting, in whole or in part, from or arising out of

the work related accident(s) or occupational disease claimed by the Employee.

The parties agree that the lump sum consideration shall be allocated as follows:

Past Medical:                                    $ 100,000.00      — cash

Medicare Set Aside account:                      $ 200,474.00      — annuity
(per the recommended allocation)

Non-Medicare covered services:                   $ 140,563.00

Past and future Monetary Compensation            $ 151,904.00

Attorneys Fees:                                  $ 100,000.00

Costs:                                           $ 100,000.00

                    TOTAL             $ 1,111,041.00

2)      Upon receipt of the lump sum consideration, the Employer/Carrier will be forever

released and discharged from the obligation or liability to pay past, present and

future monetary compensation, medical benefits, vocational rehabilitation

benefits, death benefits or any other benefits of any classification whatsoever,

including penalties and interest, which are or may in the future be owed to the

Employee, the Employee's dependents, assigns, successors or any other person or

entity who may have a claim under Chapter 440, Florida Statutes, as a result of the

accident(s) which is the subject of this Settlement Agreement and Release. Which

sums shall be payable as follows upon Order by the Judge of Compensation

612,828.00

## CONTINGENT FEE AGREEMENT

I, Jason Hall and Dana Hall to the extent applicable (hereinafter "the client" employ Howard & Associates, Attorneys at Law, P.A., (hereinafter "the attorneys") as my attorneys to represent me in my claim for damages arising out of: workplace slip and fall accident ; Date of Incident: 3/16/2006 .

## I. CONTINGENT FEE

1. 20 percent of the first $5,000 of the amount of the benefits secured,

2. 15 percent of the next $5,000 of the amount of the benefits secured,

3. 10 percent of the remaining amount of the benefits secured to be provided during the first 10 years after the date the claim is filed,

4. 5 percent of the benefits secured after 10 years.

   These attorneys fees shall be interpreted and applied so as to be consistent with section 440.34, Florida Statutes. Costs shall be in addition to attorneys fees.

## II. COSTS.

Howard & Associates, Attorneys at Law, P.A. agree to advance the payment of costs reasonably necessary to prepare the case until a recovery is obtained. The client agrees to reimburse all costs incurred if a recovery is obtained. "Costs" include filing fees, witness fees, expert witness costs, travel expenses, telephone charges, copying charges, fax charges, deposition costs, investigator costs and time, messenger service cost, mediation expenses, computer research fees, medical or nursing consultations, and all out-of-pocket expenses incurred on the client's behalf.

1

"innumerable economic factors," this Court stated, "enter into the fixing of reasonable *fees* in one section of the State and in one community which might not be present in others." *Id.*

In addition to the minimum schedule, this Court explained that "it appears to us that supplemental evidence should be presented." *Id.* This Court specifically noted the principle that, "especially in this type of matter[,] *fees* should be carefully considered so that on the one hand they will not be so low as to lack attraction for capable and experienced lawyers to represent workmen's *compensation* claimants" while, "[o]n the other hand, they should not be so high as to reflect adversely on the profession or in actuality to enter disproportionately [**23] into the cost of maintaining the workmen's *compensation* program." *Id. at 4.*

Then, in *Lee Engineering,* this Court rejected the strict application of a contingent [*440] percentage of the benefit award based on a schedule of minimum *fees,* holding that a "schedule of *fees* . . . was helpful but unreliable" and remanding for the determination of a reasonable *attorney's fee. 209 So. 2d at 458-59.* According to this Court, a statutory *fee* schedule is "less sensitive to the changing needs of the program," and, "in the absence of a stipulation or other evidence, is not an appropriate method for fixing a *fee* in Workmen's *Compensation* cases." *Id. At 458.* Reaffirming *Florida Silica Sand,* this Court concluded that the factors set forth in Canon 12 of the Canons of Professional Ethics, the predecessor to *rule 4-1.5,* must be considered to determine whether an *attorney's fee* is reasonable and stated that findings by the JCC to support the award are required. *Id. at 458-59.*

Ironically, the Lee Engineering decision was a response to what this Court perceived as "excessive" *attorney's fees. Id. at 457.* In 1977, responding to this Court's decision in *Lee Engineering,* the Legislature significantly revised *section 440.34* to add discretionary factors the JCC must consider when increasing [*24] or decreasing the *fee,* but also added a statutory formula to be used as the starting point for determining a reasonable *attorney's fee* award for a successful claimant:

(1) If the employer or carrier shall file notice of controversy as provided in s. 440.20, or shall decline to pay a claim on or before the 21st day after they have notice of same, or shall otherwise resist unsuccessfully the payment of *compensation,* and the *claimant*

injured person shall have employed an *attorney* at law in the successful prosecution of the claim, there shall, in addition to the award for *compensation,* be awarded a reasonable *attorney's fee* of 25 percent of the first $5,000 of the amount of the benefits secured, 20 percent of the next $5,000 of the amount of the benefits secured, and 15 percent of the remaining amount of the benefits secured, to be approved by the judge of industrial claims, which *fee* may be paid direct to the *attorney* for the *claimant* in a lump sum. However, the judge of industrial claims shall consider the following factors in each case and may increase or decrease the *attorney's fee* if in his judgment the circumstances of the particular case warrant such action:

(a) The time and labor [**25] required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(b) The likelihood, if apparent to the claimant, that the acceptance of the particular employment will preclude employment of the lawyer by others or cause antagonisms with other clients.

(c) The *fee* customarily charged in the locality for similar legal services.

(d) The amount involved in the controversy and the benefits resulting to the claimant.

(e) The time limitation imposed by the claimant or the circumstances.

(f) The nature and length of the professional relationship with the claimant.

(g) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(h) The contingency or certainty of a *fee.*

Ch. 77-290, *§ 9,* at 1293-94, Laws of *Fla.* (statutory additions underlined; statutory deletions struck-through).

"Thus, to determine a reasonable *fee,* the JCC applied the formula and then increased or decreased the amount after consideration of the factors in order to determine a reasonable *fee." Murray, 994 [*441] So. 2d at 1059.* As the First District noted, the sliding *fee* schedule "embodies a legislative intent to standardize

◆ Positive
As of: October 17, 2019 9:59 PM Z

# *Castellanos v. Next Door Co.*

Supreme Court of Florida

April 28, 2016, Decided

No. SC13-2082

**Reporter**

192 So. 3d 431 *; 2016 Fla. LEXIS 885 **; 166 Lab. Cas. (CCH) P61,703; 41 Fla. L. Weekly S 197; 2016 WL 1700521

MARVIN CASTELLANOS, Petitioner, vs. NEXT DOOR COMPANY, et al., Respondents.

**Prior History:** [**1] Application for Review of the Decision of the District Court of Appeal - Certified Great Public Importance. First District - Case No. 1D12-3639.

*Castellanos v. Next Door Co., 124 So. 3d 392, 2013 Fla. App. LEXIS 16898 (Fla. Dist. Ct. App. 1st Dist., 2013)*

## Core Terms

claimant, *attorney*'s *fees*, *workers' compensation*, benefits, *fee* schedule, reasonable *attorney*'s *fees*, cases, injured *worker*, carrier, irrebuttable presumption, statutory *fee*, *fee* award, factors, percent, due process, amount of benefits, circumstances, conclusive presumption, *compensation* claim, elimination, reasonable *fee*, facial challenge, awarding, defenses, invalid, Door, mandatory, facial, skill, statutory formula

## Case Summary

### Overview

HOLDINGS: [1]-Because the mandatory *fee* schedule in *§ 440.34, Fla. Stat,* which created an irrebuttable presumption that precluded any consideration of whether an *attorney*'s *fee* award in a *workers' compensation* case was reasonable to compensate the *attorney,* was unconstitutional under both the Fourteenth Amendment and *Art. I, § 9, Fla. Const.* as a violation of due process, and the application of the *fee* schedule here resulted in a patently unreasonable *fee* of $1.53 per hour, remand was required for the judge of *compensation* claims to enter a reasonable *attorney*'s *fee* in accordance with the statute's immediate predecessor.

**Outcome**

Certified question answered in affirmative; decision upholding *fee* award quashed; and case remanded.

## LexisNexis® Headnotes

Constitutional Law > Substantive Due Process

*Workers' Compensation* & SSDI > Administrative Proceedings > Costs & *Attorney Fees*

HN1[ ] **Constitutional Law, Substantive Due Process**

The mandatory *fee* schedule in *§ 440.34, Fla. Stat* (2009), which creates an irrebuttable presumption that precludes any consideration of whether the *fee* award is reasonable to compensate the *attorney,* is unconstitutional under both the *Florida* and United States Constitutions as a violation of due process. *Art. I, § 9, Fla. Const.;* U.S. Const. amend. XIV, § 1.

Business & Corporate Compliance > ... > Benefit Determinations > *Workers' Compensation* & SSDI > Benefit Determinations

Governments > Legislation > Interpretation

HN2[ ] **Workers' Compensation, Benefit Determinations**

See *§ 440.015, Fla. Stat.*

Constitutional Law > The Judiciary > Case or

## CONTINGENT FEE AGREEMENT

I, Jason Hall and Dana Hall to the extent applicable, (hereinafter "the client" employ Howard & Associates, Attorneys at Law, P.A., (hereinafter "the attorneys") as my attorneys to represent me in my claim for damages arising out of: __workplace slip and fall accident__; Date of incident: 1/16/2006 .

### I. CONTINGENT FEE.

1.   20 percent of the first $5,000 of the amount of the benefits secured.

2.   15 percent of the next $5,000 of the amount of the benefits secured.

3.   10 percent of the remaining amount of the benefits secured to be provided during the first 10 years after the date the claim is filed.

4.   5 percent of the benefits secured after 10 years.

These attorneys fees shall be interpreted and applied so as to be consistent with section 440.34, Florida Statutes. Costs shall be in addition to attorneys fees.

### II. COSTS.

Howard & Associates, Attorneys at Law, P.A. agree to advance the payment of costs reasonably necessary to prepare the case until a recovery is obtained. The client agrees to reimburse all costs incurred if a recovery is obtained. "Costs" include filing fees, witness fees, expert witness costs, travel expenses, telephone charges, copying charges, fax charges, deposition costs, investigation costs and time, messenger service cost, mediation expenses, computer research fees, medical or nursing consultations, and all out-of-pocket expenses incurred on the client's behalf.

1

---

obligations or liability to pay past, present and future monetary compensation, medical, vocational rehabilitation, death benefits or any other benefits of any classification or type whatsoever, including any penalties and interest, on account of injury, disability and death resulting, in whole or in part, from or arising out of the work related accident(s) or occupational disease claimed by the Employee. The parties agree that the lump sum consideration shall be allocated as follows:

| | | |
|---|---|---|
| Past Medical: | $ 30,000.00 | — one time |
| Medicare Set Aside account: (per the recommended allocation) | $ 60,724.00 | — another |
| Non-Medicare covered services: | $ 359,583.00 | 340,961 |
| Past and future Monetary Compensation: | $ 161,304.00 | —160 and fields aug 2008 |
| Attorneys Fees: | $ 100,000.00 | |
| Costs: | $ 757,000.00 | |
| TOTAL | $ 1,411,041.00 | |

2)   Upon receipt of the lump sum consideration, the Employee/Carrier will be forever released and discharged from the obligation or liability to pay past, present and future monetary compensation, medical benefits, vocational rehabilitation benefits, death benefits or any other benefits of any classification or whatsoever, including penalties and interest, which are or may in the future be owed to the Employee, the Employee's dependents, assigns, successors or any other parties or entity who may have a claim under Chapter 440, Florida Statutes, as a result of the accident(s) which is the subject of this Settlement Agreement and Release. Which sums shall be payable as follows upon Order by the Judge of Compensation

Page 2 of 8          612,828. 00

---

Upon conclusion of the claim, Howard & Associates, Attorneys at Law, P.A., will provide the client with a closing statement listing all of the financial details of the case, including the amount recovered, all expenses and a precise statement of attorneys' fees.

### V. SIGNATURE OF THE PARTIES.

I agree to employ the above-named attorneys. This contract contains our entire agreement and is not valid unless signed by both parties. I have received a copy.

_Dana R. Hall_                     _Oct 3, 2006_
Client                                         Date

_[signature]_                        _10/3/2006_
Attorney                                     Date

Employment is accepted on the foregoing terms.

HOWARD & ASSOCIATES,
ATTORNEYS AT LAW, P.A.

By: Dr. Tim Howard
For the Firm

(whois3c3/co36)

---

11.   If at any time, you, the client, believe that your lawyer has charged an excessive or illegal fee, you, the client, have the right to report the matter to The Florida Bar, the agency that oversees the practice and behavior of all lawyers in Florida.  For information on how to reach The Florida Bar, call 1-800-342-8060, or contact the local bar association.  Any disagreement between you and your lawyer about a fee can be taken to court and you may wish to hire another lawyer to help you resolve this disagreement.  Usually fee disputes must be handled in a separate lawsuit.

Howard & Associates,
Attorneys at Law, P.A.

_Dana R. Hall_                _[signature]_
Client's signature              P. Tim Howard
Printed name: Jason R. Hall     For the Firm

Date: _10-3-06_

EXHIBIT B

EX
B

# REGIONS
Customer Receipt

```
PD08-05-2008 01:54P #00186
FL00032      #003
DA3401007904
CHK DEP          $612,828.00
```

---

**BRIDGEFIELD EMPLOYERS INSURANCE COMPANY**                               No. **1767557**

| ASE # | EMPLOYEE NAME | REMARKS | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| 07756 | HALL, JASON R. | | 03/16/05 | 07/29/08 | 07/29/08 | 140,000.00 |
| COMPENSATION | | LUMP SUM | 11 | | | |

---

**BRIDGEFIELD EMPLOYERS INSURANCE COMPANY**                               No. **1767558**

| ASE # | EMPLOYEE NAME | REMARKS | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| 07756 | HALL, JASON R. | | 03/16/05 | 07/29/08 | 07/29/08 | 109,000.00 |
| CLAIMANT ATTORN | | ATTY/FEES & COSTS | 14 | | | |

---

**BRIDGEFIELD EMPLOYERS INSURANCE COMPANY**                               No. **1767559**

| ASE # | EMPLOYEE NAME | REMARKS | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| 07756 | HALL, JASON R. | | 03/16/05 | 07/29/08 | 07/29/08 | 14,065.00 |
| MISCELLANEOUS-M | | LUMP SUM MEDICAL | 27 | | | |

---

**BRIDGEFIELD EMPLOYERS INSURANCE COMPANY**                               No. **1767560**

| ASE # | EMPLOYEE NAME | REMARKS | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| 07756 | HALL, JASON R. | | 03/16/05 | 07/29/08 | 07/29/08 | 349,763.00 |
| MISCELLANEOUS-M | | LUMP SUM MEDICAL | 27 | | | |

---

**BRIDGEFIELD EMPLOYERS INSURANCE COMPANY**                               No. **1757264**

| ASE # | EMPLOYEE NAME | REMARKS | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| 07756 | HALL, JASON R. | | 03/16/05 | 07/03/08 | 07/03/08 | 25,000.00 |
| COMPENSATION | | ADVANCE ON LUMP SUM | 11 | | | |

pg.12

## Tallahassee Memorial Center For Pain Management

2824-2 Mahan Drive • Tallahassee, FL 32308

(850) 558-1270

# PROCEDURES AND FEES

This is an estimate of charges and copay amounts for the FACILITY only.

Code      Description

102311     Lumbar ESI

I hereby confirm that _Atty: Howard and Associates_ is my current insurance and after verifying benefits, my insurance will pay ___100___ % after a ___0___ copay and ___0___ deductible is met. I also understand that this is only an estimate, and the amount is subject to change. I also understand that I am responsible for any non allowed amount, deductible, and copays which may differ from below.

|                                         |            |
|-----------------------------------------|------------|
| Total Charge                            | $1600.00   |
| Allowed Amount                          | $1600.00   |
| Deductible                              | 0          |
| Percentage Due                          | 0          |
| Copay                                   | 0          |
| Patient's Total Estimated Responsibility | 0          |

_Jason Ray Hall_
Patient Signature

_June 10, 2008_
Date

_7/10/08_

Hall, Jason
DOB:07/03/1973 34
Sex:M DOS:07/10/2008
Dr.Fuhrmeister
ASC034116

Witness

**HEART SURGERY CENTER**
1405 Centerville Rd. Suite 5000
Tallahassee, Florida 32308
(850) 878-6164

# STATEMENT

F/C: 50          Page:   1

Closing Date: MAR 6,2007

Account number:          34187

Please pay this amount:          3,250.00

Jason Hall
6600 Donerail Trail
Tallahassee, FL 32309

Amount enclosed: _____

For questions, call 850-877-7886 or
850-878-6164

| DATE | CPT | DESCRIPTION | DIAG. | QTY. | AMOUNT |
|------|-----|-------------|-------|------|--------|
| Jason Hall attended by C. PATRICK MURRAH M.D., M.D  (E53774) | | | | | |
| 03/18/06 | 32020 | CHEST TUBE | 860.0 | 1 | 550.00 |
| 05/02/06 | | WORKER'S COMPENSATION (claim filed) | | | |
| 10/30/06 | | Payment-WORKER'S COMPENSATION | | | 0.00 |
| | | INSURANCE DENIED     BALANCE DUE B | | | |
| | | Visit Balance:          550.00 | | | |
| Jason Hall attended by C. PATRICK MURRAH M.D., M.D  (E53775) | | | | | |
| 03/17/06 | 32100 | THORACOT MAJOR BX & | 805.8 | 1 | 2,700.00 |
| 05/02/06 | | WORKER'S COMPENSATION (claim filed) | | | |
| 10/30/06 | | Payment-WORKER'S COMPENSATION | | | 0.00 |
| | | INSURANCE DENIED     BALANCE DUE B | | | |
| | | Visit Balance:          2,700.00 | | | |

3250.00
1490.00
4740.00

| DO NOT USE FOR INSURANCE CLAIM | Total account balance: | 3,250.00 |
|---|---|---|
| | Pending insurance: | 0.00 |
| | **Patient amount due:** | 3,250.00 |

# BROOKS REHABILITATION

A Member of the Brooks Health System
3599 University Blvd. South ● Jacksonville, FL 32216

| | 11 |
|---|---|
| AMOUNT ENCLOSED | type |
| $ | FINAL |

PLEASE DETACH AT PERFORATION AND RETURN WITH YOUR REMITTANCE

| PATIENT NAME | PATIENT ACCOUNT NUMBER | ADMISSION DATE | DISCHARGE DATE | BILLING DATE |
|---|---|---|---|---|
| HALL, JASON | FAD65887 | 05/27/06 | 06/10/06 | 06/14/06 |

| GUARANTOR | INSURANCE COVERAGE | POLICY NUMBER |
|---|---|---|
| HALL, JASON 6600 DONERAIL TRAIL TALLAHASSEE FL 32309 | | |

| SERVICE DATE | | DESCRIPTION | QTY | AMOUNT |
|---|---|---|---|---|
| 06/09/06 | 816888 | *THERAPEUTIC EXERCISE - 15 MIN | 1 | 68.00 |
| 06/09/06 | 816887 | *THERAPEUTIC ACTIVITY - 15 MIN | 1 | 74.00 |
| 06/09/06 | 816888 | *THERAPEUTIC EXERCISE - 15 MIN | 1 | 68.00 |
| 06/09/06 | 816887 | *THERAPEUTIC ACTIVITY - 15 MIN | 1 | 74.00 |
| | | | | ---------- |
| | | | | 3304.00 |
| | *** | 433 OCCUPT THERAPY GROUP CHG *** | | |
| 05/31/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 05/31/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 05/31/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 05/31/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 05/31/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 05/31/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 05/31/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 05/31/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 05/31/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 06/01/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 06/02/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 06/03/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 06/03/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 06/06/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 06/06/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 06/07/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 06/08/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| 06/09/06 | 816926 | *GROUP EX/ACTIVITY | 1 | 55.00 |
| | | | | ---------- |
| | | | | 990.00 |
| | *** | 434 OCCUPT THERAPY EVALUATE *** | | |
| 05/28/06 | 816886 | *OT EVALUATION | 1 | 139.00 |
| 05/28/06 | 816886 | *OT EVALUATION | 1 | 139.00 |
| 05/28/06 | 816886 | *OT EVALUATION | 1 | 139.00 |
| 05/28/06 | 816886 | *OT EVALUATION | 1 | 139.00 |
| | | | | ---------- |
| | | | | 556.00 |
| | *** | 990 PT CONVENIENCE GENERAL *** | | |
| 06/01/06 | 300652 | TOOTH BRUSH | 1 | 0.25 |
| | | | | ---------- |
| | | | | 0.25 |

| ACCOUNT NUMBER | F00010097471 |
|---|---|

| | |
|---|---|
| TOTAL | 21576.25 |
| TOTAL CREDITS | |
| TOTAL DUE | 21576.25 |
| ESTIMATED INSURANCE COVERAGE | |
| ESTIMATED PATIENT DUE | |

This bill contains charges for hospital services only. Charges for physician services related to your care will be billed separately.



**FAX**
TRANSMISSION

To:

From:      Brooks Rehabilitation

Subject:   [sendsecure]RE: Verification of Payment on Brooks Rehabilitation Bill for Jason Hall--DOB 7/3/73

Message:

*I sent response yesterday. However, I have to send secure so you may not have received it. Please confirm receipt of this fax.*

**From: Neumann, Dana**
**Sent: Tuesday, October 15, 2019 2:17 PM**
**To: 'Tim Howard'; Neil Epstein**
**Subject: [sendsecure]RE: Verification of Payment on Brooks Rehabilitation Bill for Jason Hall--DOB 7/3/73**

*Good day Tim,*

*What I can tell you is this account is at a zero balance reflecting that we have received proper payment on this account. Thank you for your patience and if you need anything else please do not hesitate to reach out to me directly. My condolences to Mr. Hall's family and friends.*

*Kind regards,*

Kindest regards,

# Dana Neumann
Workers Compensation
Business Service Representative
Brooks Outpatient Business Office
Phone: 904-345-7392
Fax: 904-345-7136
dana.neumann@brooksrehab.org

CONFIDENTIALITY NOTICE: The information and all attachments contained in this communication are privileged and confidential information and intended only for the use of the intended recipients. If the reader of this document is not an intended recipient, you are hereby notified that any review, use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this

Tallahassee Memorial Healthcare
Tallahassee Memorial, Emergency Rm. Phys. Grp.
P.O. Box 31438
Tampa, FL 33631-3438

9673-0356

| | | CHECK CARD USING FOR PAYMENT | | |
|---|---|---|---|---|
| | | ☐ MASTERCARD | ☐ VISA | |
| CARD NUMBER | | | | AMOUNT |
| SIGNATURE | | | | EXP. DATE |

| STATEMENT DATE | PAY THIS AMOUNT | ACCT. # |
|---|---|---|
| 06/09/06 | $348.00 | 951624-00 |

RETURN SERVICE REQUESTED

FOR BILLING INQUIRIES, CALL: (850) 431-8923
PLEASE VERIFY THIS IS YOUR CURRENT INSURANCE CARRIER & POLICY #:
SUMMIT

| SHOW AMOUNT PAID HERE | $ |
|---|---|

PAGE: 1 of 1

0101

ADDRESSEE:

JASON HALL
6600 DONERAIL TRAIL
TALLAHASSEE, FL 32309-1638

REMIT TO:

TMH – ER PHYSICIAN GROUP
P.O. BOX 31438
TAMPA, FL 33631-3438

9673-0356*1TM0OSPLC002718

☐ Please check box if above address is incorrect or insurance
information has changed, and indicate change(s) on reverse side.

**STATEMENT**

PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

*BALANCE FORWARD*  0.00

| DATE | PHYS | PATIENT | CODE | PROCEDURE | CHARGE | PAY/ADJ | BALANCE |
|---|---|---|---|---|---|---|---|
| 03/16/06 | JS | JASON | 99285 | ER PHYS. EXAM LEVEL 5 | 320.00 | | |
| 06/08/06 | JS | | | ADJUSTMENT       SUMMIT | | 0.00 | |
| 06/08/06 | JS | | | CLM DENIED. PT. RESP. RR | | | |
| 03/16/06 | JS | JASON | 93042 | RHYTHM ECG, REPORT ONLY | 28.00 | | |
| | JS | | | BILL # 445341     BALANCE | | | 348.00 |

| CURRENT | 30 DAYS | 60 DAYS | 90 DAYS | 120+ DAYS |
|---|---|---|---|---|
| 348.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| DUE FROM PATIENT |
|---|
| ▸▸▸▸▸▸ $348.00 |

ACCOUNT NUMBER: 951624-00      STATEMENT DATE: 06/09/06

MESSAGES:

CREDITS AND CHARGES AFTER STATEMENT DATE WILL APPEAR ON NEXT MONTH'S STATEMENT
FOR BILLING INQUIRIES, CALL: (850) 431-8923

9673-0356*1TM0OSPLC00271R





**MAIN LEDGER**

PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

If address or insurance information has changed, please indicate change(s) on reverse side.

| | | | | | |
|---|---|---|---|---|---|
| 03/29/06 | LOUCKS | INIT. NURS. FAC.<br>DENIED PT<br>AMOUNT DUE | 204.00<br>CANNOT BE | IDENT AS INSURED. | 204.00 |
| 03/31/06 | LOUCKS | NURSING FACILITY<br>DENIED PT<br>AMOUNT DUE | 64.00<br>CANNOT BE | IDENT AS INSURED. | 64.00 |
| 04/03/06 | LOUCKS | NURSING FACILITY<br>DENIED PT<br>AMOUNT DUE | 106.00<br>CANNOT BE | IDENT AS INSURED. | 106.00 |
| 04/04/06 | LOUCKS | NURSING FACILITY<br>DENIED PT<br>AMOUNT DUE | 64.00<br>CANNOT BE | IDENT AS INSURED. | 64.00 |
| 04/12/06 | LOUCKS | NURSING FACILITY<br>DENIED PT<br>AMOUNT DUE | 64.00<br>CANNOT BE | IDENT AS INSURED. | 64.0C |
| 04/14/06 | LOUCKS | NURSING FACILITY<br>DENIED PT<br>AMOUNT DUE | 64.00<br>CANNOT BE | IDENT AS INSURED. | 64.00 |
| 04/17/06 | LOUCKS | NURSING FACILITY<br>DENIED PT<br>AMOUNT DUE | 64.00<br>CANNOT BE | IDENT AS INSURED. | 64.00 |

| | 90-120 DAYS | 61-90 DAYS | AMOUNT DUE | INSURANCE | OVER 120 DAYS | WE ACCEPT ALL MAJOR<br>CREDIT CARDS | CONTINUED |
|---|---|---|---|---|---|---|---|
| | .00 | .00 | .00 | .00 | 1490.00 | | |

PAYMENT DUE UPON RECEIPT. THANK YOU.

## STATEMENT

PAGE   1   CALL 850-216-0190                    80876

# STATEMENT

LEON COUNTY EMS
PO BOX 863383
ORLANDO, FL 32886

RETURN SERVICE REQUESTED

DATE  4/03/86

ACCOUNT NUMBER

OUR TOLL FREE PHONE NUMBER IS   1-866-750-2743
PLEASE DIAL NUMBER AS SHOWN

AMOUNT PAID $ _____

MAKE CHECKS PAYABLE IN U.S. DOLLARS TO:

605472-01
JASON HALL
8600 DONERAIL TRAIL
TALLAHASSEE, FL 22309

LEON COUNTY EMS
PO BOX 863383
ORLANDO, FL 32886

TO INSURE PROPER CREDIT TO YOUR ACCOUNT · PLEASE DETACH AND RETURN THIS STUB WITH YOUR CHECK

605472-01        0

PATIENT NAME:   JASON HALL          TRANSPORTED TO:  TALLAHASSEE MEMORIAL
PHONE NUMBER:

| DATE | DESCRIPTION OF SERVICE | CHARGES | PAYMENTS |
|------|------------------------|---------|----------|
| 3/16/06 | EMS TRANSPORT | 787.88 | |
| | MILEAGE CHARGE 0006.0  @  $12.29 | 73.74 | |

You are responsible for the emergency transport services itemized above.
There is an indication that these services were related to an auto
accident. In addition to your Medicare, Medicaid or Private Insurance,
please provide your auto insurance information on the reverse side of this
form. You may also update your insurance information on the internet at
WWW.EMSCLAIMS.NET. Otherwise, payment is due within 14 days.

Thank you for your cooperation.

| | PAY THIS AMOUNT |  |
|---|---|---|

PRINT YOUR MEDICARE NUMBER HERE _____  MEDICAID # _____

PRINT YOUR HOME PHONE NUMBER HERE _____  BUSINESS PHONE # _____

IF YOU HAVE INSURANCE OR PARTICIPATE IN ANY PROGRAM WHICH WILL PAY FOR
THESE SERVICES, PLEASE COMPLETE AND SIGN THE REVERSE SIDE OF THIS BILL
AND RETURN IN THE ENCLOSED ENVELOPE.

ACCOUNT NUMBER

IF THERE IS ANY PROBLEM REGARDING PAYMENT OF THIS BILL, CONTACT OUR
OFFICE AT ( 1-866-750-2743  ) WITHIN 5 DAYS TO MAKE ARRANGEMENTS.
PLEASE SHOW ACCOUNT NUMBER ON ALL CHECKS.

## IMPORTANT YOU MUST SIGN REVERSE SIDE TO RECEIVE INSURANCE PAYMENT

12:16 PM
12/10/13
Accrual Basis

# Howard & Associates P.A.
## Register QuickReport
### As of July 30, 2009

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Chase | | | | | | | |
| Check | 5/6/2001 | 1499 | | Operating Account | X | Notes Payable... | -2,193.00 |
| Check | 4/1/2009 | debit | | Operating Account | X | Miscellaneous | -173.29 |
| Check | 6/1/2009 | DEBIT | | Operating Account | X | Miscellaneous | -2,954.98 |
| Check | 7/30/2009 | 3180 | Payoll Acct ... | Operating Account | | Settlemet | -105,843.60 |
| Total Chase | | | | | | | -111,464.82 |
| TOTAL | | | | | | | -111,464.82 |

109,281.8

Page 1

OR BK: 4149 PG: 2051

Petitioner will have the first week after school releases for the holiday with exchange being on Christmas Day at 3:00 p.m.

Respondent will have the second week until the Sunday before school resumes.

Visitation with Respondent will begin when school releases for each holiday, unless there are scheduled activities or doctor appointments, and the children will be returned the Sunday before school resumes at 6:00 p.m.

The visitation exchange will be facilitated by a third party, Sandy Fulop, the maternal grandmother.

Both children are attending psychological counseling and have been progressing well. Dakota has been diagnosed with ADHD, for which he is taking medications that cannot be discontinued without medical supervision. Shelby's doctor has recommended that Shelby not be forced to visit and be left to decide when she is ready to visit with Respondent.

Petitioner and Respondent agree that in the event either parent fails to exchange the minor children according to this visitation schedule any law enforcement agency available will have the authority to intervene and take whatever actions necessary to enforce this agreement including arresting the offending parent.

_____        _____
Dana F. Hall           Date         Jason R. Hall           Date

_____        _____
DANA F. Hall                         Jason R Hall
Print Name                           Print Name

STATE OF FLORIDA
COUNTY OF LEON

Sworn to and subscribed by me this 16th day of April, 2009.

_____
Keven Marie Mathews
Notary

_____
Keven Marie Mathews
Print Name

OR BK: 4149 PG: 2050

EXHIBIT A

Petitioner and Respondent have agreed to the following visitation schedules with the minor children:

Dakota Hall, 5 years old, will visit with Respondent every other weekend on Saturday from 9:00 a.m. until Sunday at 6:00 p.m. This schedule will be temporary for 6 months at which time Petitioner agrees to extend weekend visits from Friday at 6:00 p.m. until Sunday at 6:00 p.m. unless Respondent shows by objective, verifiable proof that he is not capable of providing a stable, sober, and safe environment for the child.

This includes but is not limited to Respondent not drinking, using illegal drugs, and not associating with known current illegal drug users and/or anyone under the influence of alcohol or illegal drugs. Respondent agrees that he will not travel outside of a 200 mile radius of his home without the express permission of Petitioner, during his visits with the children. If Respondent fails to follow these guidelines Petitioner will have the option of immediately ceasing visitation pursuant to this agreement and will have to seek the court's directions as to visitation.

Petitioner agrees to abide by all of the above limitations during her custody of the children with communication concerning travel to be facilitated through third party Sandy Fulop.

Shelby Hall, 13 years old, will visit with Respondent, during the dinner time period, which is approximately between 4 p.m, and 6 p.m., on either the Saturday or Sunday that Dakota is scheduled to visit, whichever day she chooses.

Holiday schedule: .

Odd numbered years;
Petitioner
Spring Break, Easter, Labor Day, and Thanksgiving.

Respondent
Memorial Day, July 4th and Halloween.

Even numbered years;
Petitioner
Memorial Day, July 4th and Halloween.

Respondent
Spring Break, Easter, Labor Day, and Thanksgiving.

Christmas



OR BK: 4149 PG: 2056

| DATE | RECEIPT | AMOUNT | CATEGORY | JASON | JOINT |
|---|---|---|---|---|---|
| 07/15/08 | Jason Hall | $2,000.00 | Distribution | $2,000.00 | |
| 07/15/08 | Target | $160.00 | Dana Credit Card Payoff | | $160.00 |
| 07/15/08 | Sandy Fulop | $3,900.00 | Advance on $35,000 Loan | | $3,900.00 |
| 07/15/08 | HSBC | $750.00 | Dana Credit Card Payoff | | $750.00 |
| 07/25/08 | Jason Hall | $200.00 | Distribution | $200.00 | |
| 08/04/08 | Jason Hall | $200.00 | Distribution | $200.00 | |
| 08/06/08 | Jason Hall | $100.00 | Distribution | $100.00 | |
| 08/08/08 | Cit Financial Auto | $10,021.64 | Jeep Payoff | | $10,021.64 |
| 08/15/08 | Jason Hall | $2,000.00 | 1/2 Computer Replacement | $1,000.00 | $1,000.00 |
| 08/15/08 | Clifford Hall | $3,500.00 | Loan Repayment | | $3,500.00 |
| 08/15/08 | Anthony Hall | $3,500.00 | Loan Repayment/Sale of mothers' home | | $3,500.00 |
| 08/27/08 | Jason Hall | $2,000.00 | Distribution | $2,000.00 | |
| 08/27/08 | Cureton Johnson & Assoc. | $365.00 | Appraisal | | $365.00 |
| 08/27/08 | Jason Hall | $14,085.00 | MSA Funds for Deposit | $14,085.00 | |
| | | $44,671.64 | | $19,585.00 | $25,106.64 |

OR BK: 4140 PG: 2055

Hall: At any time during the 6 months should Jason Hall produce a positive drug or alcohol test result Jason Hall agrees to have no unsupervised visits with the children until he has successfully completed at least 6 consecutive months, from the date of the positive test result, of random drug testing with negative results. Jason Hall will also forfeit the $7,500 payment to Dana Hall and she can file for divorce immediately. Dana Hall agrees in good faith that she is not involved with another potential party and further agrees to abide by her marital vows during this period. If Dana Hall violates her good faith and determines to file for divorce prior to the end of the 6 month period, the $7,500 shall go towards child support for 15 months. Jason Hall will not monitor, stalk or harass Dana Hall in any fashion and will provide mature respect for her independence and judgment.

Dana Hall has the right to keep Hall as her legal last name.

If at the end of 6 months and either party determines to divorce the other, the distribution of assets and obligations described herein will be binding and operational, with no right to challenge, reconsider, file suit in attempt to cancel this agreement, or to change the terms of this agreement without the written consent of the other party. Either party can file for dissolution of marriage and seek a final court order consistent with this agreement. Each party waives their rights to challenge this agreement based on any factual basis or legal theory.

## SWORN AGREEMENT TO BINDING NATURE OF OBLIGATIONS HEREIN

Jason Hall and Dana Hall both agree under penalty of perjury that they are bound by this agreement and this agreement can not be modified except in writing and signed by both parties.

Sworn before me on this 2nd day of September, 2008, personally appeared Jason Hall and Dana Hall who are personally known to me and hereby verify under oath and penalty of perjury that they have executed this agreement freely and are fully bound thereby and will comply with any and all conditions and will not contest or oppose any motion seeking a Court order to enforce any and all portions of this agreement.

_Jason R. Hall_  9/2/08          _Dana Hall_  9/2/08
Jason Hall          Date          Dana Hall          Date

Notary Public: _Keven Marie Mathews_     Notary Public: _Keven Marie Mathews_
Date: 9-2-08                              Date: 9-2-08

_Tim Howard_  9/3/08
Tim Howard          Date

child support begins when annuity payments begin.

4

be shared and divided evenly, with the first week with Dana Hall and the second week with Jason Hall. Thanksgiving holidays shall be shared. On odd years Dana Hall will have Spring break, Easter, and Labor Day, and Jason Hall will have Memorial Day, July 4th, and Halloween. On even years the holiday divisions will be in reverse with Jason Hall having Spring break, Easter, and Labor Day, and Dana Hall will have Memorial Day, July 4th, and Halloween. The parties will evenly divide birthdays over a several day period, and will cooperate and share the celebration where possible.

Jason Hall agrees that he will not ever drink or be under the influence of drugs or alcohol when driving with the children, and will drive with caution at the speed limit when the children are in the car. If Jason Hall violates this obligation, he will agree to supervised visitation.

In light of Jason Hall's paraplegic condition, limited education, contribution of $50,000 towards the children's future, and Dana Hall's healthy condition and college degree availing her the advantage of increasing her future income, and the $804 a month in Social Security Disability income provided to the children as a result of Jason's injuries and his inability to earn a living, the parties agree that Jason Hall will contribute $300 toward child support for both children monthly, and an additional $200 a month (this includes upto $50 per month for co-payments and up to $50 per month for medicine for both children) for medical insurance and care for both children, for a total of $500 a month. Out of pockets beyond those listed are paid by the parties 50/50. Jason Hall agrees to pay an additional $150 a month for afterschool for Dakota while he is in such program. This is consistent with Florida law that requires that Social Security payments made directly to the children by a severely handicapped parent "should be credited against that parent's child support obligations." *Williams v. Williams*, 560 So.2d 308 (Fla. 1st DCA 1990). That amount of child support will cease upon the older child reaching the age of 18 and will be decreased by ½ and will continue until the younger child reaches the age of 18. Payments for child support shall go through an appropriate third party to ensure timely payment and enforcement—the court registry is a potential option.

A Florida court order for child support may be modified if it has been at least 3 years since the existing support amount was ordered or since the case was last reviewed for a modification. To petition the court for modification when the previous order was entered three or more years ago, the difference between the current support amount and the proposed amount, using current information and statutory guidelines, must be at least 10% or $25 per month (whichever amount is greater). If it has been less than 3 years since the last review, a Florida support order may still be modified if there has been a significant change in circumstances. To petition the court for modification when the previous order was entered less than three years ago, the difference between the current support amount and the proposed amount, using current information and statutory guidelines, must be at least 15% or $50 per month (whichever amount is greater).

## DISSOLUTION AND COUNSELING PROCESSS

The parties agree to continue in this marriage for a period of 6 months from the date of this settlement. During that 6 month period the parties agree to attend joint marriage counseling for at least two one-hour sessions a month from a professional marriage counselor recommended by Donna St. Hilliar, and agree to one dinner for a maximum of 2 hours every month. The counseling and dinners will alternate. If there is no family activity during the month, the parties agree to two dinners. This will be in addition to family activities with the children of the marriage. Jason Hall agrees to leave a message at the home or office and to wait 48 hours for a response prior to making another call. The counseling and dinners will be paid for by Jason Hall. Dana Hall will choose the date, time and venue in consultation with Jason Hall.

Dana Hall has the option of living at a distinct location at her own cost. Jason Hall agrees to end his use of alcohol and opiates and agrees to weekly random drug testing during the 6 month period not to exceed 4 times monthly and which costs of testing will be paid by Jason

OR BK: 4149 PG: 2053

Jason Hall and Dana Hall have had the opportunity to or have already consulted with an outside attorney and they have both agreed to pursue the mediation process and to be bound by this agreement in order to avoid the joint expense of outside counsel.

## DISTRIBUTION OF ASSETS AND RESPONSIBILITIES

**Equity in Marital Home at Demarrall Trail**. The parties purchased the marital home in October of 2002 for $115,000. The parties' joint mortgage on this marital home is approximately $106,000. The home was appraised at $157,439 using the cost approach and $159,000 using the sales comparison approach. For equitable distribution, the parties have agreed to divide the difference and agree upon a valuation of $158,250. Appraisal attached hereto and incorporated herein as Exhibit A. Thus, there is approximately $52,250 in equity that the parties are entitled to from this home. An even division of $52,250 amounts to $26,125.

Ms. Hall independently advanced the following resources in the purchase, maintenance and improvements of this home:

Ms. Hall provided $5,644.85 towards the down-payment from the proceeds from the sale of her prior home. Ms. Hall paid IRS obligations of Jason Hall in the amount of $4,813.11, so that Jason Hall could be added to the mortgage on this home.

Mr. Hall independently advanced various resources in the purchase, maintenance and improvements of this home including a portion of the monthly payments on the mortgage during approximately 4 years of joint ownership from October of 2002, until becoming a paraplegic on March 16, 2006.

Based on the distinct investments and portion of ownership in the home, and the allocation of joint debts and obligations as listed below, the distribution agreed upon is that Jason Hall shall pay the marital obligations and shall also retain the equity in the home.

**Joint Debt Obligations**. The parties borrowed $32,000 from Sandy Fulop, Dana Hall's mother; $3,500 from Jason Hall's brother; and $5,500 from Jason Hall's father, to secure the family home, food, and activities during the 28 months from Jason Hall's injury on March 15, 2006 until today's date.

Mr. Hall has paid $26,106.64, towards joint debt obligations, including $3,800 in payments made to Sandy Fulop. These are detailed and attached hereto and incorporated herein as Exhibit B. Jason Hall also paid $2,000 towards a lap top computer for Shelby Hall.

The parties still owe Dana Hall's mother $28,200 ($32,000 - $3,800=$28,200) and they agree that this is a joint obligation that they both benefited from. Dana Hall and Jason Hall have reviewed the use of these funds to determine the use allocation. A review by Dana Hall is attached hereto and incorporated herein as Exhibit C.

The parties agree that the costs of this mediation process and legal assistance over the past several months shall be jointly shared. The parties have been using paralegal time ($150 an hour discounted to $100) at 10 hours a week for the past 10 weeks (100 hours paralegal time), and senior partner time ($450 an hour discounted to $275) at 2 hours a week for the past 10 weeks (20 hours legal time). The already discounted fee ($24,000 reduced to $15,500) for this time amounts to $5,500 in senior partner time and $10,000 in paralegal time, for a total of $15,500. If this mediation is resolved today, the fee will be reduced by an additional 50%, for a total reduction of over 67%, for a total of $7,750. The even distribution of these costs amounts to $3,875 per party.

Based on a review of these joint debt obligations, the parties agree to the following: All liabilities will be paid by Jason Hall and all equity in the home will be owned by Jason Hall. Upon payment of these obligations, Dana Hall will assign her interests through a Quit Claim Deed to Jason Hall for total ownership of all equity and obligations on the home.

**Custody, Visitation, and Child Support Obligations**. The parties agree that they shall have joint custody of the children, with primary residence with Dana Hall, and a visitation schedule as follows: Every other weekend visitation with Jason Hall. Christmas holidays shall

2

OR BK: 4149 PG: 2052

## Agreement to Divide Assets and Responsibilities, and to Divorce if Desired by Either Party

### MEDIATION AND SETTLEMENT PROCESS

Jason Hall and Dana Hall (hereinafter referred to as "parties") hereby agreed to mediate their potential dissolution of marriage and respective rights and interests pertaining to assets and the two children of the marriage. Prior to this mediation, undersigned counsel represented Jason Hall in his workers compensation action against Ferrell Roofing, Inc., but did not represent Dana Hall. A significant portion of the assets and income stream for Jason Hall is as a result of the representation of Jason Hall by the undersigned counsel.

For purposes of this mediation both parties agreed to waive any conflict that they may have with undersigned counsel and both parties agree to waive any issues of professional liability on family law matters or any legal issue, in that for purposes of this mediation, undersigned counsel is not acting as counsel for either party, nor is he providing legal advice on any family matter or any other legal matter. Rather, for this mediation, undersigned counsel is working to reach an agreement that is acceptable between the parties to reduce litigation costs.

Since the April 2008 settlement of the workers compensation action against Summit and Ferrell Roofing brought by Jason Hall and litigated by undersigned counsel for over two years, both parties have been receiving and are requesting daily, weekend, and evening consults from undersigned's paralegal and from undersigned. This has been continuous for months, and averages at 10 hours a week between the two parties. The paralegal hourly rate is $150 an hour and undersigned's hourly rate is $450 an hour. The parties will receive a discounted rate of $100 an hour for paralegal services and $275 an hour for attorney services, with all services agreed to be paid at the end of mediation.

Jason Hall is a paraplegic, with only a 10th Grade education and no marketable skills. He will receive approximately $2,750 monthly in social security disability and annuity income from his worker's compensation settlement. This amounts to approximately $30,000 annually. Dana Hall has a college degree in nursing paid for during the marriage. During the marriage, prior to Jason's injuries, she did not work outside the home. She has no disabilities. She began her work outside the home after Jason Hall's injuries. She is currently making approximately $27,000 annually. Thus, the parties acknowledge that Jason Hall is not of able body and has no means to increase his income at this time. The parties acknowledge that Dana Hall is of able body, has a college degree and has means to increase her income over time.

The parties have two children, one prior to their marriage that Jason Hall adopted, Shelby Hall, who is 13 years old, and 5 year old Dakota, who is a product of the marriage. Jason Hall has established a trust of $25,000 for each child, for a total of $50,000, of which upon distribution of trust proceeds, each child will receive between $45,000 and $30,000 respectively, for a total of approximately $75,000. The parties have also jointly paid for Florida Pre-paid College Plan, 2 + 2 Tuition, at a cost of approximately $77 a month (with a current pay off of approximately $3,600) for Shelby Hall and agree to provide an equal amount for Dakota Hall, at a monthly cost of $77 per month.

As a result of Jason's paraplegic condition, Social Security currently pays $804 towards the maintenance of the children. This amounts to approximately $25,000 for the daughter over the next 5 years, and $65,000 for the son over the next 13 years, for a total of $90,000.

The parties jointly own a home appraised at $159,000, and that has approximately $52,000 in equity. See below. The parties also have joint debts and obligations that amount to approximately $50,000. See below.

The parties have reached a mediated resolution. All discussions and materials presented in mediation are confidential and are not for use in any contested or litigated matter. If this is violated, the violating party can be held in contempt of court.



10/29/2015

3008.png





# MJ ALTMAN COMPANIES, INC.

*Your Collection And Information Source*

www.mjaltman.com • Account Services Group

JAN 12, 2007

Phillip Timothy Howard, P.A.
1113 Lochknoll Ct
Tallahassee, FL 32312

Pd. 6-1-09

Guarantor: JASON HALL

| Acct. #: | Balance: | DOS: | Client: |
|----------|----------|------|---------|
| 01315887 | $2705.00 | 03/29/06 | TALLAHASSEE PULMONARY CARE |

Dear Sir:

Please be advised that our office is handling the collection of the above referenced account(s) and the consumer has advised that you are representing them regarding the indebtedness.

Please provide us with any information you feel would result in resolution of this matter. Accordingly, we must have a signed authorization from your client before we can release any information.

I would like a response within 45 days of receipt of this letter. Your prompt attention is greatly appreciated.

Very truly yours,

Courtney Blair
Unit Supervisor
800-927-2655 ext. 112
MJ ALTMAN COMPANIES, INC.
A DEBT COLLECTION COMPANY

This is an attempt to collect a debt; any information obtained will be used for that purpose.

L300

12:23 PM
12/10/13
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Auto-Owners Life Ins. Company | | | | | | | |
| Check | 9/14/2009 | 3106 | Annuity Depo... | Operating Account | X | Settlemt | -30,000.00 |
| Total Auto-Owners Life Ins. Company | | | | | | | -30,000.00 |
| TOTAL | | | | | | | -30,000.00 |

10/29/2015

3101.png



‖0ᴸ1000ᴸ4ᴸ‖
05/13/2007
ᴸ23ᴸ4ᴸ4ᴸᴸ

This is a LEGAL COPY of
your check. You can use it
the same way you would
use the original check.

⎡003101⎤ ⎡⎡063210112⎤ 340100790⎤ ⎡00009000000⎤



10/29/2015

3091.png



⑃003091⑃   ⑃⑃063210112⑃   ⑃3401007904⑃   ⑃0000850000⑃

10/29/2015                                    3087.png



10/29/2015

3074.png



10/29/2015                                          3085.png



https://mail.google.com/_/scs/mail-static/_/js/k=gmail.main.en.UhpDFmWbOKc.O#m==m_i.t,Wam=PIPeOMA9G0cHcY1xOLP0AOp77z8_uQ:d:YNDS9dMAJGB...   V1

10/29/2015                                    3058.png



*003058*    ⑈063210112⑈    *3401007904*    /0000065000/

10/29/2015                                    3021.png





# MJ ALTMAN COMPANIES, INC.

Your Collection And Information Source

www.mjaltman.com • Account Services Group

JAN 12, 2007

Phillip Timothy Howard, P.A.
1113 Lochknoll Ct
Tallahassee, FL 32312

Pd. 6-1-09

Guarantor:   JASON HALL

| Acct. #: | Balance: | DOS: | Client: |
|---|---|---|---|
| 0131S887 | $2705.00 | 03/29/06 | TALLAHASSEE PULMONARY CARE |

Dear Sir:

Please be advised that our office is handling the collection of the above referenced account(s) and the consumer has advised that you are representing them regarding the indebtedness.

Please provide us with any information you feel would result in resolution of this matter.  Accordingly, we must have a signed authorization from your client before we can release any information.

I would like a response within 45 days of receipt of this letter. Your prompt attention is greatly appreciated.

Very truly yours,

Courtney Blair
Unit Supervisor
800-927-2655 ext. 112
MJ ALTMAN COMPANIES, INC.
A DEBT COLLECTION COMPANY

This is an attempt to collect a debt; any information obtained will be used for that purpose.

L300

112 East Fort King Street • Ocala, Florida 34471

Collection Department: 352-690-1899 / 800-927-5510 • Management & Administration: 352-732-1112 / 800-927-2655 • Fax: 352-732-1138

12:23 PM
12/10/13
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
**All Transactions**

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Auto-Owners Life Ins. Company | | | | | | | |
| Check | 6/14/2009 | 3105 | Annuity Depo... | Operating Account | K | Settlemet | -30,000.00 |
| Total Auto-Owners Life Ins. Company | | | | | | | -30,000.00 |
| TOTAL | | | | | | | -30,000.00 |

10/29/2015

3101.png



#003101#     4:0063210112:     340 1007904#     /00009000000/

10/29/2015

3093.png



*0613000148*
04/27/2009
L213939752

This is a LEGAL COPY of
your check. You can use it
the same way you would
use the original check.

10/29/2015

3091.png



⁰⁰⁰³⁰⁹¹⁰   ⁰⁰⁶³²¹⁰¹¹²⁰   ⁰³⁴⁰¹⁰⁰⁷⁹⁰⁴⁰   ⁰⁰⁰⁰⁰⁸⁵⁰⁰⁰⁰

10/29/2015

3087.png



10/29/2015

3074.png



3065.png



10/29/2015                                   3058.png



*061000146*
02/12/2007
L312218577

This is a LEGAL COPY of
your check. You can use it
the same way you would
use the original check.

#003058#      i:063210112:      #3401007904#      /0000065000/

10/29/2015                                    3021.png



10/29/2015                                                3008.png





HOWARD & ASSOCIATES  OPERATING ACCOUNT

4/23/2009

Jason R. Hall

12/17/2008

Page 1 of 1

HOWARD & ASSOCIATES
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8911 DIAL HEADLEY RD., SUITE 69
TALLAHASSEE, FL 32312
(850) 205-4455

AmSouth BANK
THE RELATIONSHIP PEOPLE

2981

| DATE | CHECK | AMOUNT |
| 11/12/2008 | | **2,037.28 |

Dell

PAY Two Thousand Thirty-Seven and 28/100***************************************

TO THE
ORDER
OF:
Dell
Payment Processing Center
PO BOX 6403
Carol Stream, IL 60197-6403
6879450129008874021

⑈002981⑈ ⑆063210112⑆ 340100790④⑈

PAY TO THE ORDER OF BANK OF AMERICA
FOR DEPOSIT ONLY TO Call Financial
Service 8108000007

HOWARD & ASSOCIATES  OPERATING ACCOUNT

2981

Dell                                                          11/12/2008

Jason/Dana Hall Settlement Agreement                      2,037.28

Operating Account                                            2,037.28

Dell

Jul. 15 08 03:31p    OFHall                    850-893-9299              p.3

 **DELL** | Financial Services

Contact Dell Financial Services Customer Service at 1-800-283-2210 or visit us online at www.dell.com. Please see reverse side for important contact information and contact information.

Before you make your next purchase,
be sure to check for special DPA offers!
Call 1-877-319-3272 or
Go online at www.dell.com/specialoffers

| Previous Balance | Payments & Credits | Purchases/Other Charges | Finance Charges | New Balance |
|---|---|---|---|---|
| $2,279.20 | $241.92 | $0.00 | $0.00 | $2,037.28 |

| | | | |
|---|---|---|---|
| Statement Date | June 22, 2008 | Payment Due Date: | July 17, 2008 |
| Total Credit Line | $2,500.00 | Current Month Minimum Payment | $62.00 |
| Total Available Credit | $462.72 | Past Due Amount | $0.00 |
| Amount Over Credit Limit | | Total Minimum Payment Due | $62.00 |

PLEASE NOTE: TO AVOID DEFERRED FINANCE CHARGES, PAY THE NEW PLAN BALANCE BY THE PROMOTION EXPIRATION DATE. THE PROMOTION EXPIRATION DATE, SHOWN BELOW, MAY DIFFER FROM YOUR PAYMENT DUE DATE. PAYMENTS ARE APPLIED FIRST TO MINIMUM REQUIRED PAYMENTS WITH EXCESS TO CREDIT PLANS IN ORDER OF PROMOTION EXPIRATION DATE.

| Plan Type | | Balance Subject to Finance Charge | Daily Periodic Rate | Corresponding Annual Percentage Rate | Days in Cycle | FINANCE CHARGES | | New Plan Balance | Minimum Amount Due Per Plan |
|---|---|---|---|---|---|---|---|---|---|
| NO INT UNTIL 2009 XP4 | | $0.00 | 0.07890% | 28.24% | 31 | $0.00 | | $2,037.28 | $62.00 |

| Transaction Date | Description | Detail | Amount |
|---|---|---|---|
| 06-01-08 | PAYMENT - THANK YOU! | | -100.00 |
| 06-14-08 | PAYMENT - THANK YOU! | | -141.92 |

 Please return payment coupon with check in the enclosed return envelope. Do not staple, paper clip, or tape coupons.



| | |
|---|---|
| Account #: | 6879 4501 2900 8746 021 |
| New Balance: | $2,037.28 |
| Total Minimum Payment Due: | $62.00 |
| Payment Due Date: | July 17, 2008 |

Amount Enclosed: $

New Address or Phone Number?
Please check box and complete reverse side

Please make your check payable to Dell Financial Services. Include your account number on your check or money order. You can also pay your bill online at www.dell.com/payDPA

DANA HALL
6600 DONERAIL TRL
TALLAHASSEE FL  32309-1638

DELL PREFERRED ACCOUNT
PAYMENT PROCESSING CENTER
P.O. BOX 6403
CAROL STREAM, IL  60197-6403

16879450129036748021000002037280000062000000062000717200800001492

# AUSLEY & McMULLEN

### ATTORNEYS AND COUNSELORS AT LAW

227 SOUTH CALHOUN STREET
P.O. BOX 391 (ZIP 32302)
TALLAHASSEE, FLORIDA 32301
(850) 425-5428  FAX (850) 558-1513
ewaugh@ausley.com

October 21, 2008

Tim Howard, J.D., Ph.D.
Howard & Associates
8511 Bull Headley Road, Suite 405
Tallahassee, Florida 32312

> RE:   Tallahassee Memorial Center for Pain Management—Jason R. Hall

Dear Mr. Howard:

I received your check yesterday payable to Tallahassee Neurological Clinic for $44,235.00. We delivered the check to the Clinic yesterday.

You have not responded to my previous two letters with respect to the amount which Mr. Hall owes to Tallahassee Memorial Center for Pain Management. The amount owed is $1,600.00. Please advise as to your client's intentions with respect to paying that amount. If you do not still represent Mr. Hall, please let me know that as well.

Sincerely,

Emily S. Waugh

ESW/jg

cc:   Ms. Gwen McRae, Tallahassee Memorial Center for Pain Management

h:\erw\caducrus\tmcpm\2008\corres\howard-ltr (102108).doc

10/29/2015                                     2933.png                                              2933

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 296-8453

**AmSouth BANK**
THE RELATIONSHIP PEOPLE®

|   | DATE | CHECK | AMOUNT |
|---|------|-------|--------|
|   | 9/10/2008 |   | ***3,800.00 |

Sandy Fulop

PAY Three Thousand Eight Hundred and 00/100****************************************

TO THE
ORDER
OF:     Sandy Fulop

Jason Hall Appreciation Payment

⑈002933⑈ ⑈063210112⑈ 3401007904⑈                    /0000380000/

10/29/2015                                            2932.png



10/29/2015

2924.png



10/29/2015                                    2923.png

HOWARD & ASSOCIATES                 **AMSOUTH** BANK                          2923
ATTORNEY AT LAW, P.A.            THE RELATIONSHIP PEOPLE®
OPERATING ACCOUNT
8311 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312                                        8/29/2008
(850) 298-4455
                                          DATE      CHECK      AMOUNT

        Sandy Fulop                                          **28,200.00

PAY Twenty-Eight Thousand Two Hundred and 00/100*******************************************************

TO THE
ORDER   Sandy Fulop
OF:

        .

        Full consideration of debts owed by Jason/Dana Hall

        #002923#  :063210112:  34010079O4#              /00028 20000/

Operating Account      Re: I Distribution                                                    2,000.00

HOWARD & ASSOCIATES  OPERATING ACCOUNT                         8/25/2008

                                                                        8/29/08                    .00

Jason Hill



10/29/2015

2916.png



*0610003146*
09/03/2006
L23903D647

This is a LEGAL COPY of
your check. You can use it
the same way you would
use the original check.

#002916# 4:0632101126: 340100790G6



HOWARD & ASSOCIATES  OPERATING ACCOUNT

Jason R. Hall

12/17/2008

8/27/2008

*Nationwide*
# RECOVERY
*Service*

Formerly AMO Recoveries, Inc

545 W Inman St.
Cleveland, TN 7311
423-472-4600
1-800-776-4600

*Ames A580c
Paid in full*

Re: _Orson Hall_

Ref # _44720160_

Thank you for payment on the above mentioned account. Regretfully, we are unable to process your payment due to the reason marked below. Please make the needful correction and resend your payment. Please call our office if further information is needed.

_____ We cannot locate the account. Please send with either the file number (NRS number) or the reference number.

___✓___ The account is paid in full.

_____ No signature on check.

_____ The amount is not the agreed payment amount. Please contact our office.

_____ There is no payment arrangement on this account. Please contact our office to discuss possible payment arrangements.

_____ We cannot accept a personal check on this account. (Please send a money order or cashier's check).

_____ The wrong payee is listed on the payment.

_____ The account has been recalled by Client and is no longer at this agency. Please contact the Client.

_____ Other: _____

THIS COMMUNICATION IS FROM A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION WILL BE USED FOR THAT PURPOSE.

ANES ASSOC OF TALLAHASSEE
P O BOX 452198
SUNRISE, FL 33345-2198

31403-4483

| | CHECK CARD USING FOR PAYMENT | | |
|---|---|---|---|
| MASTERCARD | VISA | | AMERICAN EXPRESS |
| CARD NUMBER | | SIGNATURE CODE | |
| SIGNATURE | | EXP. DATE | |

| STATEMENT DATE | PAY THIS AMOUNT | ACCT # |
|---|---|---|
| 05/31/2006 | $4104.00 | 2491105AI |

ADDRESS SERVICE REQUESTED

FOR BILLING INQUIRIES, CALL (800) 296-2611
PATIENT NAME: HALL            JASON

0101

PAGE: 1 of 1

SHOW AMOUNT
PAID HERE   $

ADDRESSEE:

JASON            HALL
6600 DONERAIL TRL
TALLAHASSEE, FL 32309-1638

REMIT TO:

ANES ASSOC OF TALLAHASSEE
P O BOX 452198
SUNRISE, FL 33345-2198

31403-4483*1TB0XU2FY009492

**STATEMENT**   PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

☐ Please check box if address is incorrect or insurance
information has changed, and indicate change(s) on reverse side.

| DATE | DESCRIPTION | CHARGES | PAYMENTS/ADJS. |
|---|---|---|---|
| 03/21/06 | SERVICES PERFORMED AT TALLAHASSEE MEMORIAL HEALTHCARE | | |
| 03/21/06 | PROFESSIONAL ANESTHESIA SVC | 3888.00 | |
| | INSERT MONITORING LINES | 216.00 | |
| | | | |
| | PAYMENT IN FULL OR PAYMENT ARRANGEMENTS MUST BE MADE WITHIN | | |
| | 30 DAYS. YOUR ACCOUNT IS BEING TRANSFERRED TO AN OUTSIDE | | |
| | COLLECTION AGENCY. | | |

| PREVIOUS BALANCE | CHARGES | CREDITS | NEW BALANCE | MIN. AMOUNT DUE |
|---|---|---|---|---|
| 4104.00 | 0.00 | 0.00 | 4104.00 | 4104.00 |

PATIENT NAME: HALL            JASON
ACCOUNT NO.: 2491105AI

OFFICE HOURS: M-THURS 8AM-12PM & 1PM-4PM EST

31403-4483*1TB0XU2FY009492

PAYMENT DUE BY: 06/14/2006

PLEASE PAY THIS AMOUNT
>>>>>>>>>>      $4104.00

HOWARD & ASSOCIATES - OPERATING ACCOUNT

NRS                                                                    6/25/2008                   2914

Total paid in Full Jason Hall                                                              7,175.20

Operating Account        ANES of Tall. 2491105AI & 2490848AI Paid in F                             7,175.20

NRS                                                                    6/25/2008

2:08 PM
03/03/09
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Cureton, Johnson & Associates | | | | | | | |
| Check | | | Jason & Dan... | Operating Account | | Client Costs a... | -385.00 |
| | | | | | | | -385.00 |
| **TOTAL** | | | | | | | **-385.00** |

HOWARD & ASSOCIATES  OPERATING ACCOUNT

Cureton, Johnson & Associates

Operating Account

985.00

21/2008



HOWARD & ASSOCIATES   OPERATING ACCOUNT

Operating Account     Repay loan in full

Anthony Hall



11:48 AM
08/15/08
Accrual Basis

## Howard & Associates P.A.
## Register QuickReport
### All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Citifinancial Auto | | | | | | | |
| Check | 07/30/2008 | 12891 | Payment in t... | Operating Account | | Client Costs a... | -10,021.54 |
| Total Citifinancial Auto | | | | | | | -10,021.54 |
| TOTAL | | | | | | | -10,021.54 |

OR BK: 4149 PG: 2058

| DATE | RECEIPT | AMOUNT | CATEGORY | JASON | JOINT |
|------|---------|--------|----------|-------|-------|
| 07/15/08 | Jason Hall | $2,000.00 | Distribution | $2,000.00 | |
| 07/15/08 | Target | $150.00 | Dana Credit Card Payoff | | $150.00 |
| 07/15/08 | Sandy Fulop | $3,800.00 | Advance on $35,000 Loan | | $3,800.00 |
| 07/15/08 | HSBC | $750.00 | Dana Credit Card Payoff | | $750.00 |
| 07/23/08 | Jason Hall | $200.00 | Distribution | $200.00 | |
| 08/04/08 | Jason Hall | $200.00 | Distribution | $200.00 | |
| 08/08/08 | Jason Hall | $100.00 | Distribution | $100.00 | |
| 08/08/08 | Citifinancial Auto | $10,021.64 | Jeep Payoff | | $10,021.64 |
| 08/15/08 | Jason Hall | $2,000.00 | 1/2 Computer Replacement | $1,000.00 | $1,000.00 |
| 08/15/08 | Clifford Hall | $3,500.00 | Loan Repayment | | $3,500.00 |
| 08/15/08 | Anthony Hall | $5,500.00 | Loan Repayment/Sale of mothers' home | | $5,500.00 |
| 08/27/08 | Jason Hall | $2,000.00 | Distribution | $2,000.00 | |
| 08/27/08 | Curston Johnson & Assoc. | $365.00 | Appraisal | | $365.00 |
| 08/27/08 | Jason Hall | $14,085.00 | USA Funds for Deposit | $14,085.00 | |
| | | $44,671.64 | | $19,585.00 | $25,106.64 |

11:38 AM
10/28/13
Accrual Basis

# Howard & Associates P.A.
## Register QuickReport
### All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|
| **Jason R. Hall** | | | | | | | |
| Check | ~~3/10/2008~~ | ~~2872~~ | Hall Distributi... | Operating Account | x | Settlement | ~~-2,500.00~~ |
| Check | ~~3/25/2008~~ | ~~2888~~ | | Operating Account | x | Client Costs a... | ~~-500.00~~ |
| Check | ~~4/15/2008~~ | ~~2894~~ | | Operating Account | x | Client Costs a... | ~~-3,615.48~~ |
| Check | ~~8/5/2008~~ | ~~2897~~ | Settlement a... | Operating Account | x | Settlement | ~~-2,000.00~~ |
| Check | ~~4/23/2008~~ | ~~2908~~ | Advance | Operating Account | x | Settlement | ~~-2,000.00~~ |
| Check | ~~4/23/2008~~ | ~~2915~~ | Initial MSA P... | Operating Account | x | Client Costs a... | ~~-16,683.00~~ |
| Check | ~~4/23/2008~~ | ~~2916~~ | Settlement A... | Operating Account | x | Client Costs a... | ~~-2,000.00~~ |
| Check | 8/23/2008 | 2906 | Settlement A... | Operating Account | | Client Costs a... | -2,000.00 |
| Check | ~~9/10/2008~~ | ~~2932~~ | Settlement A... | Operating Account | x | Client Costs a... | -6,000.00 |
| Check | ~~12/17/2008~~ | ~~2072~~ | Settlement A... | Operating Account | x | Settlement | -1,000.00 |
| Check | ~~4/28/2009~~ | ~~3095~~ | Settlement A... | Operating Account | x | Settlement | -1,000.00 |
| Check | ~~5/14/2009~~ | ~~3101~~ | Settlement Oi... | Operating Account | x | Settlement | -9,000.00 |
| Check | ~~7/30/2009~~ | ~~3159~~ | Partial Settle... | Operating Account | x | Settlement | -2,000.00 |
| Check | ~~8/14/2009~~ | ~~3167~~ | Settlement a... | Operating Account | x | Settlement | -1,000.00 |
| Check | 3/22/2010 | 3291 | Settlement a... | Operating Account | | Settlement | -500.00 |
| Check | 4/19/2010 | 3301 | Settlement a... | Operating Account | | Settlement | -600.00 |
| Check | 6/16/2010 | | Settlement A... | Operating Account | | Settlement | -1,000.00 |
| Check | 7/29/2010 | 3359 | Settlement A... | Operating Account | | Settlement | -700.00 |
| Check | 9/21/2010 | 3391 | Settlement A... | Operating Account | | Settlement | -400.00 |
| Check | 10/21/2010 | 3406 | Settlement A... | Operating Account | | Settlement | -500.00 |
| Check | 11/19/2010 | 3426 | Settlement a... | Operating Account | | Settlement | -1,000.00 |
| Check | 12/16/2010 | 3430 | Settlement A... | Operating Account | | Settlement | -1,000.00 |
| Check | 1/4/2011 | 3440 | Settlement A... | Operating Account | | Settlement | -1,000.00 |
| Check | 3/23/2011 | 3527 | Settlement Di... | Operating Account | | Settlement | -3,000.00 |
| Check | 4/8/2011 | 3541 | Settlement Di... | Operating Account | | Settlement | -500.00 |
| Check | 4/29/2011 | 3557 | Settlement A... | Operating Account | | Settlement | -500.00 |
| Check | 5/12/2011 | 3574 | Settlement A... | Operating Account | | Settlement | -800.00 |
| Check | 5/20/2011 | 3586 | Settlement A... | Operating Account | | Settlement | -1,000.00 |
| Check | 5/31/2011 | 3592 | Settlement A... | Operating Account | | Settlement | -100.00 |
| Check | 6/2/2011 | 3593 | Settlement A... | Operating Account | | Settlement | -100.00 |
| Check | 6/6/2011 | 3599 | Settlement A... | Operating Account | | Settlement | -500.00 |
| Check | 7/12/2011 | 3634 | Settlement Di... | Operating Account | | Settlement | -1,760.00 |
| Check | 8/24/2011 | 3662 | Settlement P... | Operating Account | | Settlement | -250.00 |
| Check | 8/24/2011 | 3683 | Settlement P... | Operating Account | | Settlement | -750.00 |
| Check | 9/1/2011 | 3697 | Settlement P... | Operating Account | | Settlement | -500.00 |
| Check | 9/30/2011 | 3734 | Settlement P... | Operating Account | | Settlement | -2,000.00 |
| Check | 10/26/2011 | 3781 | Settlement P... | Operating Account | | Settlement | -1,000.00 |
| Check | 11/21/2011 | 3801 | Settlement P... | Operating Account | | Settlement | -1,500.00 |
| Check | 12/12/2011 | 3824 | Settlement P... | Operating Account | | Settlement | -2,000.00 |
| Check | 1/5/2012 | 3847 | Settlement P... | Operating Account | | Settlement | -2,500.00 |
| Check | 2/10/2012 | 3889 | Settlement P... | Operating Account | | Settlement | -1,000.00 |
| Check | 3/2/2012 | 3930 | Settlement P... | Operating Account | | Settlement | -1,000.00 |
| Check | 4/2/2012 | 3960 | Settlement P... | Operating Account | | Settlement | -2,000.00 |
| Check | 4/18/2012 | 3973 | Settlement P... | Operating Account | | Settlement | -1,000.00 |
| **Total Jason R. Hall** | | | | | | | -73,025.00 |

**TOTAL**



Operating Account    Disbursement schedule    200.00

Wickersham              8/4/2008
HOWARD & ASSOCIATES   OPERATING ACCOUNT                       2.89
Jason R. Hall                                    8/5/2008    100.00



11:50 AM
68/15/08
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| HSBC | | | | | | | |
| Check | 7/15/2008 | 2873 | Account 515... | Operating Account | | Settlement | -750.00 |
| 07/05/1955ct | | | | | | | -750.00 |
| TOTAL | | | | | | | -750.00 |

HOWARD & ASSOCIATES   OPERATING ACCOUNT

HSBC                                                                        2873

Dana Hall Credit Card              7/15/2008

750.00

*part of divorce*

Operating Account     Account 5155970021526500                      750.00

HSBC                                                    7/15/2008

Page 1





**HOWARD & ASSOCIATES  OPERATING ACCOUNT**

Sandy Fulop

2871

1/15/2008

3,800.00

Operating Account    **Distribution on behalf of Jason Hall Funds**

**Sandy Fulop**

1/15/2008

3,800.00

10/20/2015                                            H4880.prg

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
6511 BULL HEADLEY RD., SUITE 40b
TALLAHASSEE, FL 32312
(850) 298-4455

REGIONS BANK                        4880

63-1011-632                         3/29/2014

PAY TO THE
ORDER OF     Sandy Fulop                                    $  **1,500.00

One Thousand Five Hundred and 00/100***********************************    DOLLARS

Sandy Fulop

MEMO                                              AUTHORIZED SIGNATURE

⑈004880⑈ ⑆063210112⑆ 3401007904⑈

10/29/2015

h4879.png



10/29/2015          N4816.png



4816

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
2671 BULL HEADLEY RD., SUITE 406
TALLAHASSEE, FL 32317
(850) 298-4455

REGIONS BANK
63-3611-622

12/26/2013

PAY TO THE
ORDER OF    Sandy Fulop                  $   **16,200.00

Sixteen Thousand Two Hundred and 00/100              DOLLARS

Sandy Fulop

MEMO    Final Distribution Non-Client Funds for Jason R. Hall

⑈004816⑈ ⑆063361022⑆ 340100790⑈



10/29/2015                                                    M4822.png

**4822**

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
4471 BILL MEADLEY RD., SUITE 485
TALLAHASSEE, FL 32312
(850) 298-1525

HOWARD & ASSOCIATES OPERATING ACCOUNT
REGIONS BANK
63-269-631

| | DATE | CHECK | AMOUNT |
|---|---|---|---|
| | | | |

10/29/2013

Dana Hall                                                          **2,700.00

PAY Two Thousand Seven Hundred and 00/100************************************

TO THE
ORDER
OF:        Dana Hall

⌐004822⌐ ⌐063210112⌐ 3401007904⌐

https://mail.google.com/_/scs/mail-static/_/js/k=gmail.main.en.U9pCFmWbOKc.O/m=m_i,t/am=kPBPeOMA9GfcHcY1xGLPGAQp77z8_uCjxkYhO99dMAJG9.../1

10/29/2015                                                    N-4587.jpg



10/28/2013

H4477.png

4477

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
6511 BULL HEADLEY RD, SUITE 255
TALLAHASSEE, FL 32312
(850) 298-4455

HOWARD & ASSOCIATES OPERATING ACCOUNT
REGIONS BANK
63-1012-631

8/29/2013

| DATE | CHECK | AMOUNT |
|------|-------|--------|
|      |       | **2,000.00 |

Dana Hall

PAY Two Thousand and 00/100**

TO THE
ORDER
OF:      Dana Hall

⌐004477⌐  ⌐063210112⌐  3401007904⌐

Date. 04/24/2013
Time: 11:26

www.leontaxcollector.net

**Honorable Doris Maloy, Tax Collector**
**Leon County Tax Collector's Office**
**P.O. Box 1835**
**Tallahassee,FL 32302-1835**


It's Breezy,
Quick and Easy!

**Customer Transaction Receipt**

| | |
|---|---|
| Office: Carriage Gate Customer Service | Payment Date  04/24/2013  Total Amount of Transactions: $1,693.9 |
| Receipt Number: 308 2012 0003251.0001 | Posting Date:  04/24/2013  Total Paid By Customer: $1,693.97 |
| Paid By Name:  HALL DANA | |

PAYMENT DETAILS

| TYPE | DESCRIPTION | AMOUNT | | |
|---|---|---|---|---|
| CHK | CHECKS | 1,693.97 | Check Number: | 936059 |

TRANSACTION DETAILS

| SEQUENCE NO. | AMOUNT | TYPE | DESCRIPTION | REFERENCE/ACCOUNT |
|---|---|---|---|---|
| 0003251.0001 | 1,693.97 | Payment | Certificates | C00001793 2011 |

|  |  |  |  |  |
|---|---|---|---|---|
| Transaction Count | 1 | Total Cash Amount | .00 |
| | | Total Check Amount | 1,693.97 |
| | | Total Tendered Amount | 1,693.97 |
| | | Transaction Total | 1,693.97 |

10/29/2016                                    N5000366008.png

**NOT NEGOTIABLE**                    **COUNTER CHECK**

                                                              4-24-13

City                          State                 Date  1693.97

Pay to *Myself Only* (when properly endorsed on the reverse side) $

_____ **DOLLARS**

This Counter Check is for use Only at any Office of Regions by the Drawer Personally.

**▲ REGIONS**                         Phillip T. Howard
                                      PRINT NAME

ACCOUNT
NUMBER    3440101 8909          SIGNATURE                MC1002 (Rev. 1/09)

    ⑈5000⸱0005⑈

## ▲ REGIONS

**CASHIER'S CHECK**
04/24/2013

5500986059

Phillip Howard / *Ann Hill*
Purchaser / Purchased For

ONE THOUSAND SIX HUNDRED NINETY THREE DOLLARS AND 97 CENTS

PAY TO THE ORDER OF: **Doris Maloy Leon County Tax Collector**

$1,693.97        Fee _____ $0.00

**NOT NEGOTIABLE**
**CUSTOMER COPY**

Branch FLD0032
CC032100

Regions Bank

*Per ... #148560  A50130*

10/29/2016                                    N4389.png



10/28/2015                                    N-4351.prg

HOWARD & ASSOCIATES                 HOWARD & ASSOCIATES  OPERATING ACCOUNT     4351
ATTORNEY AT LAW, P.A.                        REGIONS BANK
OPERATING ACCOUNT
8471 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 222-1362

                                          DATE        CHECK       AMOUNT

Dana Hall                                                        **750.00

PAY Seven Hundred Fifty and 00/100**

TO THE
ORDER    Dana Hall
OF:

Settlement Proceeds RE: Jason R. Hall Estate

#004331#  #063210112#  34010079044#

10/30/2016                              4054.png

**4054**

HOWARD & ASSOCIATES
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 894-4965

HOWARD & ASSOCIATES, OPERATING ACCOUNT
REGIONS BANK
63-555-630

|        | DATE      | CHECK | AMOUNT |
|--------|-----------|-------|--------|
|        | 6/28/2012 |       | **150.00** |

Dana Hall

PAY One Hundred Fifty and 00/100***********************************************

TO THE
ORDER     Dana Hall
OF:

partial filing fee personal rep.

⑈004054⑈  ⑆063210112⑆  340100790⑈

| Cancelled | Regular | $ 0.00 | $ 0.00 | $ 0.00 | 06/09/2006 | 1 | D01 |

**Vendor Name:** KLEIN, RUTHERFORD J.  
**Vendor Type:** DME/HME Reseller  
**Customer ID:** 451956589  
**Customer Name:** Hall, Jason  

**Program Type:** General Program - Adult  
**Updated Date:** 06/09/2006  
**Updated By:** Ventry, Belinda A

| Line | Fee Cd | Orig Auth | Entry Date | | Dates of Service | |
|------|--------|-----------|------------|---|---|---|
| 0001 | G10006 | $1,210.00 | 06/09/2006 | From: 06/09/2006 | To: 06/09/2006 |
| 0002 | E13990 |  | 06/09/2006 | From: | To: |
| 0003 | E01640 |  | 06/09/2006 | From: | To: |

| Completed | Regular | $ 450.00 | $ 450.00 | $ 450.00 | 05/16/2006 | 1 | D01 |

**Vendor Name:** BARRETT, PATRICIA A.  
**Vendor Type:** Home Modification Evaluation  
**Customer ID:** 451956589  
**Customer Name:** Hall, Jason  

**Program Type:** General Program - Adult  
**Updated Date:** 07/20/2006  
**Updated By:** Ventry, Belinda A

| Line | Fee Cd | Orig Auth | Entry Date | | Dates of Service | |
|------|--------|-----------|------------|---|---|---|
| 0001 | G20401 | $450.00 | 05/16/2006 | From: 05/16/2006 | To: 05/16/2006 |

**Report Total**  
Number of Authorizations:   9      Authorized:  $5,416.89   Approved:   $5,416.89   Paid:  $5,416.89

05/09/2012   09:14   8502454692          GENERAL COUNSEL          PAGE  04/05

| Completed | Regular | $ 1,127.00 | $ 1,127.00 | $ 1,127.00 | 06/16/2006 | 1 | D01 |

**Vendor Name:** ACCESSIBILITY SOLUTIONS, INC
**Vendor Type:** Home Modification Evaluation
**Customer ID:** 451956589
**Customer Name:** Hall, Jason

**Program Type:** General Program - Adult
**Updated Date:** 07/27/2006
**Updated By:** Ventry, Belinda A

| Line | Fee Cd | Orig Auth | Entry Date | Dates of Service |
|------|--------|-----------|------------|------------------|
| 0001 | G20400 | $1,456.00 | 06/16/2006 | From: 06/16/2006   To: 06/16/2006 |

| Voided | Regular | $ 0.00 | $ 0.00 | $ 0.00 | 06/16/2006 | 1 | D01 |

**Vendor Name:** ACCESSIBILITY SOLUTIONS, INC
**Vendor Type:** Home Modification Evaluation
**Customer ID:** 451956589
**Customer Name:** Hall, Jason

**Program Type:** General Program - Adult
**Updated Date:** 08/16/2006
**Updated By:** Ventry, Belinda A

| Line | Fee Cd | Orig Auth | Entry Date | Dates of Service |
|------|--------|-----------|------------|------------------|
| 0001 | G20400 | $3,461.00 | 08/16/2006 | From: 06/16/2006   To: 06/16/2006 |

| Completed | Regular | $ 463.05 | $ 463.05 | $ 463.05 | 06/09/2006 | 1 | D01 |

**Vendor Name:** KLEIN, RUTHERFORD J.
**Vendor Type:** DME/HME Reseller
**Customer ID:** 451956589
**Customer Name:** Hall, Jason

**Program Type:** General Program - Adult
**Updated Date:** 03/30/2007
**Updated By:** Ventry, Belinda A

| Line | Fee Cd | Orig Auth | Entry Date | Dates of Service |
|------|--------|-----------|------------|------------------|
| 0001 | E13990 | $67.95 | 06/08/2006 | From: 06/09/2006   To: 06/09/2006 |
| 0002 | E01640 | $395.10 | 06/08/2006 | From: 06/09/2006   To: 06/09/2006 |

| Completed | Regular | $ 1,210.00 | $ 1,210.00 | $ 1,210.00 | 06/09/2006 | 1 | D01 |

**Vendor Name:** KLEIN, RUTHERFORD J.
**Vendor Type:** DME/HME Reseller
**Customer ID:** 451956589
**Customer Name:** Hall, Jason

**Program Type:** General Program - Adult
**Updated Date:** 08/17/2006
**Updated By:** Ventry, Belinda A

| Line | Fee Cd | Orig Auth | Entry Date | Dates of Service |
|------|--------|-----------|------------|------------------|
| 0001 | G10006 | $1,210.00 | 06/09/2006 | From: 06/09/2006   To: 06/09/2006 |

05/09/2012   08:14   8502454692                    GENERAL COUNSEL                    PAGE  03/05

# Department of Health
# Brain and Spinal Cord Injury Program
## Authorization List

Page 1 of 3
Run Date: 5/8/2012   4:01:42PM
Requested by: Flowers, Sophia X

**Selection Parameters:**

| | |
|---|---|
| Invoice: | Region: |
| Status: | Unit ID: |
| Type: | Individual: Hall, Jason |
| Vendor Name: | |
| Program Type: | |

---

| Completed | Regular | $ 970.00 | $ 970.00 | $ 970.00 | 01/29/2007 | 1 | D01 |

**Vendor Name:** ADVANCED DRIVING SYSTEMS INC.
**Vendor Type:** Vehicle Modification Reseller
**Customer ID:** 451956589
**Customer Name:** Hall, Jason

**Program Type:** General Program - Adult
**Updated Date:** 04/27/2007
**Updated By:** Ventry, Belinda A

| Line | Fee Cd | Orig Auth | Entry Date | Dates of Service |
|---|---|---|---|---|
| 0001 | E13990 | $870.00 | 01/29/2007 | From: 01/29/2007    To: 01/29/2007 |

---

| Completed | Regular | $ 926.84 | $ 926.84 | $ 926.84 | 01/05/2007 | 1 | D01 |

**Vendor Name:** ADAPTIVE MOBILITY SERVICES, INC
**Vendor Type:** Home Modification Evaluation
**Customer ID:** 451956589
**Customer Name:** Hall, Jason

**Program Type:** General Program - Adult
**Updated Date:** 03/30/2007
**Updated By:** Ventry, Belinda A

| Line | Fee Cd | Orig Auth | Entry Date | Dates of Service |
|---|---|---|---|---|
| 0001 | A10210 | $999.00 | 01/05/2007 | From: 01/05/2007    To: 01/05/2007 |

---

| Completed | Regular | $ 270.00 | $ 270.00 | $ 270.00 | 08/20/2006 | 1 | D01 |

**Vendor Name:** KLEIN, RUTHERFORD J.
**Vendor Type:** DME/HME Reseller
**Customer ID:** 451956589
**Customer Name:** Hall, Jason

**Program Type:** General Program - Adult
**Updated Date:** 03/30/2007
**Updated By:** Ventry, Belinda A

| Line | Fee Cd | Orig Auth | Entry Date | Dates of Service |
|---|---|---|---|---|
| 0001 | E13980 | $270.00 | 08/20/2006 | From: 08/20/2006    To: 08/20/2006 |

1



**Mission:**
To protect, promote & improve the health
of all people in Florida through integrated
state, county & community efforts.

**Florida
HEALTH**

**Ron DeSantis**
Governor

**Scott A. Rivkees, MD**
State Surgeon General

**Vision:** To be the Healthiest State in the Nation

November 7, 2019

<u>VIA U.S. MAIL and FACSIMILE: 850-216-2537</u>

Tim Howard
Howard & Associates, P.A.
1415 East Piedmont Drive, Suite 5
Tallahassee, FL 32308

Re:     Brain and Spinal Cord Injury Program Lien
         Client's Name:     Jason Hall
         Lien Amount:   $5,416.89

Dear Mr. Howard:

      This letter confirms receipt of your firm's check in the amount of $5,416.89 in full and complete satisfaction of the Brain & Spinal Cord Injury Program's Lien pertaining to the above-referenced client.

      If you have any questions or desire any additional information, please do not hesitate to contact me.

Sincerely,

Deidre Butler
Legal Assistant




Accredited Health Department
Public Health Accreditation Board

10/30/2015

3973.png

3973

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8311 BULL HEADLEY RD., SUITE 465
TALLAHASSEE, FL 32312
(850) 298-1435

HOWARD & ASSOCIATES OPERATING ACCOUNT
REGIONS BANK
63-489-630

4/18/2012

DATE        CHECK        AMOUNT

Jason R. Hall                                      ***1,000.00

PAY One Thousand and 00/100**********************************************

TO THE
ORDER      Jason R. Hall
OF:

Settlement Proceeds

⑈003973⑈ ⑆063321011 2⑆ 34010079404⑈

10/30/2015                                              3950.png                                                    3950

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
1817 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32317
(850) 298-4455

HOWARD & ASSOCIATES OPERATING ACCOUNT
REGIONS BANK
63-201-631

|                | DATE      | CHECK | AMOUNT     |
|----------------|-----------|-------|------------|
|                | 4/9/2012  |       | **2,000.00 |

Jason R. Hall

PAY Two Thousand and 00/100*********************************************************************

TO THE
ORDER
OF:        Jason R. Hall

Settlement Proceeds

⑈003950⑈ ⑆063210112⑆ 3401007904⑈

10/30/2015                                    3930.png

**3930**

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
6711 BULL HEADLEY RD., SUITE 466
TALLAHASSEE, FL 32312
(850) 385-1400

HOWARD & ASSOCIATES  OPERATING ACCOUNT
REGIONS BANK
63-132-642

|              | DATE     | CHECK | AMOUNT   |
|--------------|----------|-------|----------|
|              | 3/27/2012 |       | **2,000.00 |

Jason R. Hall

PAY  Two Thousand and 00/100**************************************************************

TO THE
ORDER    Jason R. Hall
OF:

Settlement Proceeds

⑂003930⑂  ⑊063210112⑊  3401007904⑂

10/30/2015

3889.png



3889

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
4651 BELL BRADLEY RD., SUITE 465
TALLAHASSEE, FL 32312
(850) 386-1450

HOWARD & ASSOCIATES OPERATING ACCOUNT
REGIONS BANK
63-1011-631

2/10/2012

| DATE | CHECK | AMOUNT |
|------|-------|--------|
| | | **1,000.00 |

Jason R. Hall

PAY One Thousand and 00/100

TO THE
ORDER    Jason R. Hall
OF:

Settlement Proceeds

⑆003889⑆ ⑉063210112⑉ 340100?904⑆

10/30/2015                                3847.png



3847

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 298-7400

HOWARD & ASSOCIATES  OPERATING ACCOUNT
MERIDIAN BANK

|  | DATE | CHECK | AMOUNT |
| --- | --- | --- | --- |
| Jason R. Hall |  |  | 1/5/2012 |
|  |  |  | **1,000.00 |

PAY One Thousand and 00/100****************************

TO THE
ORDER
OF:   Jason R. Hall

Settlement Proceeds

⑈003847⑈ ⑆063210112⑈ 340100790⑈

10/30/2015                                        3824.png



**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
6541 BULL HEADLEY RD., SUITE 446
TALLAHASSEE, FL 32312
(850) 298-4455

HOWARD & ASSOCIATES OPERATING ACCOUNT
REGIONS BANK
63-395-88

                                              3824

                                    DATE        CHECK        AMOUNT

                                  12/12/2011              **2,500.00

                Jason R. Hall

PAY  Two Thousand Five Hundred and 00/100***********************

TO THE
ORDER     Jason R. Hall
OF:

Settlement Proceeds

⑆003824⑆ ⑉063210112⑉ 3401007904⑆

10/30/2015                                            3801.png



**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 298-4455

3801

HOWARD & ASSOCIATES  OPERATING ACCOUNT
REGIONS BANK
63-211-631

11/21/2011

DATE       CHECK       AMOUNT

Jason R. Hall                                     **1,500.00

PAY One Thousand Five Hundred and 00/100************************************************

TO THE
ORDER
OF:       Jason R. Hall

Settlement Proceeds

⑆003801⑆  ⑈063210112⑈  3401007904⑈

10/29/2015                                                    3761.png                                                    3761

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8411 MCLL WEADLEY RD., SUITE #85
TALLAHASSEE, FL. 32312
(850) 385-4453

HOWARD & ASSOCIATES OPERATING ACCOUNT
REFERENCE NAME
63-324-631

|        | DATE | CHECK | 10/28/2011<br>AMOUNT |
|--------|------|-------|----------------------|
|        |      |       | **1,000.00           |

Jason R. Hall

PAY One Thousand and 00/100***************************************************************

TO THE
ORDER    Jason R. Hall
OF:

Settlement Proceeds

⑈003761⑈ ⑆063324011⑆ 3401007904⑈

10/30/2015                                                    3734.png

**3734**

HOWARD & ASSOCIATES
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 216-2400

**AMSOUTHBANK**
THE RELATIONSHIP PROFILE®
Member FDIC

|                | DATE      | CHECK | AMOUNT    |
|----------------|-----------|-------|-----------|
|                | 9/30/2011 |       | **2,000.00 |

Jason R. Hall

PAY Two Thousand and 00/100************************************************************

TO THE
ORDER    Jason R. Hall
OF:

Settlement Proceeds

⑈003734⑈ ⑆063210112⑆ 3401007904⑈

https://mail.google.com/_/scs/mail-static/_/js/k=gmail.main.en.UhpOFmWbGKo.O#m=m_i,t,it#m#=PiPsOtIABGkdHcYbxGLP0AOp77z9_uqoxYhDSG9iAIJG9... 1/1

10/30/2015                                                3697.png



HOWARD & ASSOCIATES                                                              3697
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
1511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 298-4455

AmSouth BANK
THE RELATIONSHIP PEOPLE®
CH-389-CN

                                                        9/1/2011
                                        DATE        CHECK      AMOUNT
Jason R. Hall                                                 **600.00

PAY Five Hundred and 00/100***************************************************

TO THE
ORDER
OF:        Jason R. Hall

____ Settlement Proceeds

⑈003697⑈  ⑈063210112⑈  3401007904⑈

10/29/2015

3683.png

3683

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 298-4455

**AmSOUTH BANK**
THE RELATIONSHIP PEOPLE®
D-694-CB

| | DATE | CHECK | AMOUNT |
|---|---|---|---|
| | 5/24/2011 | | **750.00 |

Jason R. Hall

PA\Seven Hundred Fifty and 00/100***************************************************

TO THE
ORDER
OF:      Jason R. Hall

Settlement Proceeds

⑈"003683⑈  ⑆063210112⑆  340100790⑈"

https://mail.google.com/_/scs/mail-static/_/js/k=gmail.main.en.UhpDFmWbGKcLO/m=m_i,t/am=PiPeQMA9GkHcYfx0LP0AOp77z8_uOpckYhO35d/AAJG9...   1/1

10/30/2015                                              3682.png

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8311 BULL HEADLEY RD., SUITE 368
TALLAHASSEE, FL 32312
850 250-1453

**AmSouth BANK**
THE RELATIONSHIP PEOPLE®

3682

|  | DATE | CHECK | AMOUNT |
|--|------|-------|--------|
|  | 8/24/2011 |  | **250.00** |

Jason R. Hall

PAY Two Hundred Fifty and 00/100**********************************************

TO THE
ORDER
OF:     Jason R. Hall

Settlement Proceeds

⑃003682⑃ ⑈063251011215 3401007904⑈

10/29/2015                                    3593.org



3593

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 298-4455

**AMSOUTH BANK**
THE RELATIONSHIP PEOPLE®
63-88-631

                                    DATE        CHECK       AMOUNT

                                                8/29/2011

Jason R. Hall                                               **500.00

PAY Five Hundred and 00/100**********************************************

TO THE
ORDER    Jason R. Hall
OF:

Settlement Advance

⑆003593⑆ ⑉063281012⑉ 3401007904⑈

https://mail.google.com/_/scs/mail-static/_/js/k=gmail.main.en.UftpOFmWbGKc.O#m=m_i,U#am=RPwQMABGfcHcYbdQLPDVQp77c8_uOpk1h0l93dMAJG8...   1/1

10/29/2015                                3592.png

**3592**

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
1511 BULL HEADLEY RD., SUITE 401
TALLAHASSEE, FL 30302
(850) 230-4416

**AMSOUTH BANK**
THE RELATIONSHIP PEOPLE®
63-181-43

|       | DATE      | CHECK | AMOUNT  |
|-------|-----------|-------|---------|
|       | 5/31/2011 |       | **100.00** |

Jason R. Hall

PAY One Hundred and 00/100 ************************************************************

TO THE
ORDER
OF:     Jason R. Hall

Settlement Advance

⑈003592⑈ ⑆063210112⑆ 340100?904⑈

3585

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
6511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 298-4455

**AMSOUTH** BANK
THE RELATIONSHIP PEOPLE®

|   | DATE | CHECK | AMOUNT |
|---|------|-------|--------|
|   |      |       | 5/20/2011 |
|   |      |       | **100.00 |

Jason R. Hall

PAY  One Hundred and 00/100****************************************

TO THE
ORDER    Jason R. Hall
OF:

Settlement Advance

⑈003585⑈ ⑆063210112⑆ 3401007904⑈

10/30/2015                                3682.png



3682

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8511 BULL HEADLEY WD., SUITE 405
TALLAHASSEE, FL 32312
(850) 878-5455

**AMSOUTH BANK**
THE RELATIONSHIP PEOPLE
63-405-20

8/24/2011

| DATE | CHECK | AMOUNT |
| --- | --- | --- |

Jason R. Hall                                          **250.00

PAY Two Hundred Fifty and 00/100 ********************************************

TO THE
ORDER    Jason R. Hall
OF:

Settlement Proceeds

⑈003682⑈  ⑈063210112⑈  3401007904⑈

10/29/2015                                      3574.png

**3574**

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
1041 PAUL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 210-1456

**AMSOUTH BANK**
THE RELATIONSHIP PEOPLE®

5/12/2011

| | DATE | CHECK | AMOUNT |
|---|---|---|---|

Jason R. Hall                                        ***1,000.00**

PAY One Thousand and 00/100*************************************************

TO THE
ORDER    Jason R. Hall
OF:

Settlement Advance

⑆003574⑆ ⑈063210112⑈ 3401007904⑆

11:38 AM
10/28/13
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
All Transactions

*1,000,000*
*805,600*

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| **Jason R. Hall** | | | | | | | |
| Check | | 2472 | Hall Distribut.. | Operating Account | X | Settlement | |
| Check | | 2480 | | Operating Account | X | Client Costs a.. | |
| Check | | 2484 | Settlement e.. | Operating Account | X | Settlement | |
| Check | | 2487 | Advance | Operating Account | X | Settlement | |
| Check | | 2906 | | Operating Account | X | Settlement | |
| Check | | 2913 | Initial MSA P.. | Operating Account | X | Client Costs a.. | |
| Check | | 2916 | Settlement A.. | Operating Account | X | Client Costs a.. | |
| Check | 5/29/2008 | 2906 | Settlement A.. | Operating Account | | Client Costs a.. | -3,000.00 |
| Check | | 2932 | Settlement A.. | Operating Account | | Client Costs a.. | -1,000.00 |
| Check | 12/17/2008 | 9043 | Settlement A.. | Operating Account | X | Gardenal | -5,000.00 |
| Check | | 3083 | Settlement A.. | Operating Account | X | Settlement | -1,000.00 |
| Check | 8/14/2009 | 3101 | Settlement DL.. | Operating Account | X | Settlement | -9,000.00 |
| Check | 7/28/2009 | 3180 | Parcel Settle.. | Operating Account | X | Settlement | -2,000.00 |
| Check | 9/14/2009 | 3187 | Settlement A.. | Operating Account | X | Settlement | -1,000.00 |
| Check | 3/22/2010 | 3291 | Settlement a.. | Operating Account | X | Settlement | -500.00 |
| Check | 4/19/2010 | 3301 | Settlement A.. | Operating Account | X | Settlement | -800.00 |
| Check | 6/16/2010 | | Settlement A.. | Operating Account | | Settlement | -1,000.00 |
| Check | 7/29/2010 | 3388 | Settlement A.. | Operating Account | | Settlement | -700.00 |
| Check | 9/21/2010 | 3391 | Settlement A.. | Operating Account | | Settlement | -400.00 |
| Check | 10/21/2010 | 3406 | Settlement a.. | Operating Account | | Settlement | -1,500.00 |
| Check | 11/19/2010 | 3425 | Settlement a.. | Operating Account | | Settlement | -1,000.00 |
| Check | 12/16/2010 | 3430 | Settlement A.. | Operating Account | | Settlement | -1,000.00 |
| Check | 1/4/2011 | 3440 | Settlement A.. | Operating Account | | Settlement | -3,800.00 |
| Check | 3/22/2011 | 3527 | Settlement Di.. | Operating Account | | Settlement | -500.00 |
| Check | 4/8/2011 | 3541 | Settlement Di.. | Operating Account | | Settlement | -800.00 |
| Check | 4/29/2011 | 3557 | Settlement A.. | Operating Account | | Settlement | -1,000.00 |
| Check | 5/12/2011 | 3574 | Settlement A.. | Operating Account | | Settlement | -1,000.00 |
| Check | 5/20/2011 | 3585 | Settlement A.. | Operating Account | | Settlement | -100.00 |
| Check | 5/31/2011 | 3582 | Settlement A.. | Operating Account | | Settlement | -100.00 |
| Check | 5/2/2011 | 3593 | Settlement A.. | Operating Account | | Settlement | -500.00 |
| Check | 5/5/2011 | 3599 | Settlement A.. | Operating Account | | Settlement | -500.00 |
| Check | 7/12/2011 | 3634 | Settlement DL.. | Operating Account | | Settlement | -1,780.00 |
| Check | 8/24/2011 | 3682 | Settlement P.. | Operating Account | | Settlement | -250.00 |
| Check | 8/24/2011 | 3683 | Settlement P.. | Operating Account | | Settlement | -750.00 |
| Check | 9/1/2011 | 3697 | Settlement P.. | Operating Account | | Settlement | -500.00 |
| Check | 8/30/2011 | 3734 | Settlement P.. | Operating Account | | Settlement | -2,000.00 |
| Check | 10/28/2011 | 3761 | Settlement P.. | Operating Account | | Settlement | -1,000.00 |
| Check | 11/21/2011 | 3801 | Settlement P.. | Operating Account | | Settlement | -1,500.00 |
| Check | 12/12/2011 | 3824 | Settlement P.. | Operating Account | | Settlement | -2,500.00 |
| Check | 1/5/2012 | 3847 | Settlement P.. | Operating Account | | Settlement | -1,000.00 |
| Check | 2/10/2012 | 3889 | Settlement P.. | Operating Account | | Settlement | -1,000.00 |
| Check | 3/2/2012 | 3930 | Settlement P.. | Operating Account | | Settlement | -3,000.00 |
| Check | 4/2/2012 | 3960 | Settlement P.. | Operating Account | | Settlement | -2,000.00 |
| Check | 4/16/2012 | 3973 | Settlement P.. | Operating Account | | Settlement | -1,000.00 |
| **Total Jason R. Hall** | | | | | | | -73,025.00 |
| **TOTAL** | | | | | | | |

*53 checks*

| | Date | Num | Memo | | Amount |
|---|------|-----|------|---|--------|
| | | | Tony Hall | | 5500.00 |
| | 2008 | 2909 | Clifford Hall | | 3500.00 |
| | 2013 | 4816 | Sandy Fulop | | 16,200.00 |
| | 2014 | 4879 | Sandy Fulop | | 3500.00 |
| | 2008 | 2973 | Dana/HSBC/divorce | | 750.00 |
| | 2008 | 2844 | Dana/Target/divorce | | 150.00 |
| | 2009 | 2981 | Dell/Divorce | | 2,037.28 |
| | 2008 | 2404 | Exec. Reporters (depos) | | 650.00 |
| | 2008 | 2902 | For the Record Reporting (depos) | | 585.00 |
| | 2007 | 2773 | Accurate Stenotype (depos) | | 878.00 |
| | 2009 | 2932 | FL. Med. Record Service | | 2349.25 |
| | 2007 | 2914 | NRS/Anes. Assn. | | 7175.20 |

*should fall under fees with attly*

Page 1

10/29/2015                                    3541.png

3541

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
1511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32313
(850) 298-4455

**AMSOUTH BANK**
THE RELATIONSHIP PEOPLE®
63-591-632

|  | DATE | CHECK | AMOUNT |
|--|------|-------|--------|
|  | 4/8/2011 |  | **800.00 |

Jason R. Hall

PAY  Eight Hundred and 00/100**********************************************

TO THE
ORDER
OF:    Jason R. Hall

Settlement Distribution

⑈003541⑈ ⑈063210112⑈ 3401007904⑈

10/29/2016                                   3527.png

**3527**

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
2671 BULL HEADLEY RD., SUITE 400
TALLAHASSEE, FL 32312
(850) 298-4455

**AmSOUTH BANK**
THE RELATIONSHIP PEOPLE

|       | DATE | CHECK | 3/23/2011 |
|-------|------|-------|-----------|
|       |      |       | AMOUNT    |
|       |      |       | **500.00** |

PAY Five Hundred and 00/100***************************************

TO THE
ORDER    Jason R. Hall
OF:

Settlement Distribution

⑈003527⑈ ⑆063210112⑈ 3⑈01001⑈904⑈

https://mail.google.com/_/scs/mail-static/_/js/k=gmail.main.en.UhpOFmWbGKc.O/m=m_i,t,it/am=PtPeQMA6Gfd4cYbxOLP0AQp77c8_u0jxb1hO96dMAJG8...   1/1

10/29/2016                                    3440.png

3440

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8801 BULL HEADLEY RD., SUITE 499
TALLAHASSEE, FL 32312
(850) 385-4895

**AmSouth BANK**
THE RELATIONSHIP PEOPLE
63-340-662

DATE        CHECK        1/4/2011
                          AMOUNT

Jason R. Hall                          **3,000.00

PAY
TO THE   Three Thousand and 00/100********************
ORDER
OF:      Jason R. Hall

Settlement Advance

⑆003440⑆ ⑈063210112⑈ 3401007904⑆

10/28/2016 3430.png

3430

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
2631 BULL HEADLEY RD., SUITE 605
TALLAHASSEE, FL 32317
(850) 298-4455

**AmSouth BANK**
THE RELATIONSHIP PEOPLE
63-411-63

| | DATE | CHECK | 12/10/2010 AMOUNT |
|---|---|---|---|

Jason R. Hall                                                    **1,000.00

PAY
TO THE        One Thousand and 00/100*******************************************
ORDER
OF:          Jason R. Hall

Settlement Advance

⑈003430⑈ ⑈063210112⑈ 340100⑈904⑈

3406.jpg

3406

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 298-5625

**AmSouth BANK**
THE RELATIONSHIP PEOPLE®

DATE          CHECK          AMOUNT
10/21/2010

Jason R. Hall                              **1,500.00

PAY  One Thousand Five Hundred and 00/100***********************************
TO THE
ORDER
OF:  Jason R. Hall

Settlement Advance

⑈003406⑈ ⑈063210112⑈ 3401007904⑈

10/29/2016                                                    3391.png

**3391**

HOWARD & ASSOCIATES
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8111 BULL HEADLEY RD., SUITE 466
TALLAHASSEE, FL 32312
(850) 385-1850

AmSOUTH BANK
THE RELATIONSHIP PEOPLE®

| DATE | CHECK | AMOUNT |
|------|-------|--------|
| 9/21/2010 | | **400.00 |

Jason R. Hall

PAY
Four Hundred and 00/100**
TO THE
ORDER
OF:     Jason R. Hall

Settlement Advance

⑈003391⑈ ⑆063210112⑆ 340100790⑈

12:25 PM
12/10/13
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
**All Transactions**

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Bryant's Body Shop | | | | | | | |
| Check | 9/21/2010 | 3390 | Jason Hall D... | Operating Account | | Settlement | -1,000.00 |
| | | | | | | | -1,000.00 |
| Total Bryant's Body Shop | | | | | | | -1,000.00 |
| TOTAL | | | | | | | -1,000.00 |

10/28/2016

3359.png

3359

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
8511 BULL HEADLEY RD., STE 405
TALLAHASSEE, FL 32312
(850) 250-1605

**AmSouth BANK**
THE RELATIONSHIP PEOPLE®

DATE          CHECK          7/29/2010
                                  AMOUNT

Jason R. Hall                     **700.00

PAY
TO THE     Seven Hundred and 00/100**
ORDER
OF:        Jason R. Hall

Settlement Advance

⑆003359⑆ ⑆063210112⑆ 3401007904⑆

10/29/2015

3301.png



This is a LEGAL COPY of
your check. You can use it
the same way you would
use the original check.

⑈003301⑈     ⑆063210112⑈     3401007904⑈     ⑆0000060000⑆

10/29/2015

3291.png



This is a LEGAL COPY of your check. You can use it the same way you would use the original check.

#003291#   4:063210112:   34010079404#   /00000050000/



**CBA**

**Credit Bureau Associates**

**COLLECTION ACCOUNT BREAKDOWN**

Amount #1  5666404

Debtor Name  Jason R. Hall

Account #

Client  Southern Medical Heart Surgery

Authorized by  Sonja

Date  10/30/02

---

**HEART SURGERY CENTER**
1465 Centerville Rd, Suite 1075
Tallahassee, Florida 32308
(850) 877-6164

# STATEMENT

PAGE NO    Page  1
Closing Date  MAR 6 2009
Account number
Please pay this amount   3,250.00

For questions, call 850-877-2188 or
850-878-6164

| DATE | CPT | DESCRIPTION | DIAG | QTY | AMOUNT |
|------|-----|-------------|------|-----|--------|
| | | Jason Hall attended by C. PATRICK MURRAH M.D. (255374) | | | |
| 03/18/06 | 32020 | CHEST TUBE | 860.0 | 1 | 550.00 |
| 05/02/06 | | WORKER'S COMPENSATION (claim filed) | | | |
| 10/30/06 | | Payment-WORKER'S COMPENSATION | | | 0.00 |
| | | INSURANCE DENIED   BALANCE DUE B | | | |
| | | Visit Balance  550.00 | | | |
| | | Jason Hall attended by C. PATRICK MURRAH M.D. (255375) | | | |
| 03/18/06 | 32100 | THORACO, MAJOR SX# | 807.5 | 1 | 2,700.00 |
| 05/02/06 | | WORKER'S COMPENSATION (claim filed) | | | |
| 10/30/06 | | Payment-WORKER'S COMPENSATION | | | 0.00 |
| | | INSURANCE DENIED   BALANCE DUE B | | | |
| | | Visit Balance  2,700.00 | | | |

DO NOT USE FOR INSURANCE CLAIM

Total account balance  3,250.00
Pending insurance  0.00
Payment amount dues  3,250.00

---

**CBA**

**Credit Bureau Associates**

To  Kim                    From  Sonja
Date  10/30/02

Check to see invoiced in Workman's Comp Case

Thanks,
Sonja

135 North Monroe Street • Valdosta, Georgia 31601
(800) 828-3483 • (312) 244-2004 • Fx (229) 244-2004



3198

HOWARD & ASSOCIATES  OPERATING ACCOUNT

Credit Bureau Associates

558404      1,490.00
496997      3,250.00

10/15/2009

Operating Account:     Accts. 496997 and 558404 Re: Jason Hall

Credit Bureau Associates

4,740.00 $     10/15/2009

Source: Dan Hall
10-13-11



10/29/2015                                    3159.png



20100003398 RECORDED IN PUBLIC RECORDS   LEON COUNTY FL   BK: 4074   PG: 1926,
01/20/2010 at 03:00 PM,   BOB INZER, CLERK OF COURTS

FLORIDA SATISFACTION

Prepared by/Record and Return To
DANA HALL
9600 DONERAIL TRL

TALLAHASSEE, FL 32309
Loan Number 15416449993
Inv:
MERS Phone, if applicable (-888-679-6377
Outbound Date: 12/31/69

## SATISFACTION OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS: CHASE HOME FINANCE, LLC, the Owner and Holder of a certain Mortgage Deed executed by DANA HALL AND JASON R. HALL to PEOPLES FIRST COMMUNITY BANK bearing the date of October 21, 2002, recorded October 29, 2002 in Official Records Volume/Book R2734 Page 01806   Document R2002097675 in the Office of the Clerk of the Circuit Court of LEON COUNTY County, State of Florida, securing a certain note in the principal sum of $134,086.60 and certain premises and obligations set forth in said Mortgage Deed, upon the property situated in said State and County described as follows, to wit:

Property Address: 6600 DONERAIL TRAIL, TALLAHASSEE, FL 32309

Hereby acknowledges full payment and satisfaction of said Note and Mortgage Deed, and surrenders the same so cancelled, and hereby directs the Clerk of said Circuit Court to cancel the same of record.

In witness whereof CHASE HOME FINANCE, LLC has caused these presents to be executed in its name, and its corporate seal to be hereunto affixed, by its proper officers thereto duly authorized, 01/08/10.

CHASE HOME FINANCE, LLC SUCCESSOR BY MERGER TO CHASE MANHATTAN MORTGAGE CORPORATION

ARLETHIA REED
Vice President

Signed, sealed and delivered
in the presence of:

NETTIE MARSHALL

ALLISHA MCKEITHEN

State of Louisiana
Parish/County of OUACHITA

On this 01/08/10, before me a Notary Public, the undersigned officer, personally appeared ARLETHIA REED, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and did depose and that he/she executed the same for the entity named and for the purposes therein contained.
IN WITNESS WHEREOF, I set my hand and signature which certifies to my seal.

KAREN A. BAKER #86136
Notary Public
LIFETIME COMMISSION

FL1b
8616677

12:16 PM
12/10/13
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
As of July 30, 2009

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Chase | | | | | | | |
| Check | 5/4/2001 | 1460 | | Operating Account | X | Notes Payable... | -2,183.00 |
| Check | 4/7/2009 | debit | | Operating Account | X | Miscellaneous | -479.26 |
| Check | 6/1/2009 | DEBIT | | Operating Account | X | Miscellaneous | -2,864.06 |
| Check | 7/30/2009 | 3160 | Payoff Acct ... | Operating Account | | Settlemet | -105,943.50 |
| Total Chase | | | | | | | -111,464.82 |
| TOTAL | | | | | | | -111,464.82 |

*109,281.8.3*

Page 1

**Total Amount Billed:** $43,305.61          **Total Amount Paid:** $760.60

| Claim # | Provider | Date of Service | Amount Billed | Amount Paid | Diagnosis Code |
|---------|----------|-----------------|---------------|-------------|----------------|
| 0101120702552 | SAWYER W PAUL | 1/4/2007 | $227.40 | $60.25 | 607.84 |
| 0101150761984 | ROLLINS RALEIGH | 1/5/2007 | $97.88 | $26.61 | 607.84 |
| 0102220703445 | JOSHUA FUHRMEISTER | 1/12/2007 | $917.00 | $127.59 | 806.4 |
| 0102220680226 | CTR FOR PAIN M TALLAHASSEE MEMORIAL | 1/12/2007 | $1,040.00 | $319.86 | 724.2 |
| 0103010703190 | JOSHUA FUHRMEISTER | 1/29/2007 | $125.00 | $77.22 | 806.4 |
| 0104070702067 | JOSHUA FUHRMEISTER | 4/4/2007 | $3,979.00 | $0.00 | 806.4 |
| 0104090764460 | SAWYER W PAUL | 3/27/2007 | $97.88 | $26.61 | 099.0 |
| 0104160708166 | TALLAHASSEE MEMORIAL HOSPITAL | 4/4/2007 | $36,420.57 | $0.00 | 806.4 |
| 0105090703725 | CUFFE MARK | 5/7/2007 | $95.00 | $0.00 | 806.4 |
| 0105290761313 | ROLLINS RALEIGH | 5/11/2007 | $97.88 | $26.61 | 257.2 |
| 0105300760071 | PATIENTS FIRST UNKNOWN | 5/19/2007 | $196.00 | $93.42 | 693.0 |
| 0105060701739 | PATHOLOGY ASSOCIATES UNKNOWN | 4/4/2007 | $10.00 | $2.20 | 806.4 |

TOTAL P.02

APR-18-2008  16:04          VISTA HEALTHPLAN                                    P.01


**VISTA** ◆
Healthplans™

FAX
954.858.3638

4/18/2008

Howard & Associates, P.A.                    Number of Pages Including This One:(2)
Phillip Timothy Howard                       ORIGINAL WILL NOT FOLLOW VIA MAIL
8511 Bull Headley Rd., Suite 400             850-216-2537
Tallahassee , Florida  32312-6131

                                             Current Lien Amount $760.50

RE:   Your Client Jason Hall
      Member ID: 7724204349D
      LOB: Medicaid
      Date of Accident: 3/18/2008                        *Fd*  *lo+8*

Dear Counsel,

Our file indicates that you represent our above-referenced member in a claim for damages from a tortfeasor(s). The related benefit payment is the lien amount listed above. Please fax or mail written confirmation of all unrelated charges to our office.

This amount is subject to change as related claims continue to come in. The claims that are listed are the only claims paid by the Plan as of today. Accordingly, this lien is valid for 14 days of this correspondence, as full and final satisfaction of our lien in the above-referenced case. An updated lien will be provided to you periodically, or per your request. Please fax or mail written confirmation of all unrelated charges to our office.

Please make your draft payable to Vista Healthplan and forward to my attention at the address below.

        *** NOTE:HIP Healthplan of Florida, Healthplan Southeast and Beacon Healthplans are now VISTA
                                  HEALTHPLAN.

Your prompt attention and cooperation in this matter is greatly appreciated.

Cordially,

*Rafael Diaz*

Rafael Diaz
954-858-3233
Subrogation Department

The information contained in this facsimile may be privileged and/or confidential. It is intended only for use of the individual or entity named above. If you are not the intended recipient, or the agency or employee responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is prohibited. If you have received this facsimile in error, please notify us immediately.

1340 Concord Terrace, MS 1350, Sunrise, FL 33325 | PH (954) 858-3000 | www.vistahealthplan.com

12:23 PM
12/10/13
Accrual Basis

# Howard & Associates P.A.
## Register QuickReport
### All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Vista Healthplan | | | | | | | |
| Check | 6/4/2009 | 3129 | Client Jason ... | Operating Account | X | Client Costs a .. | -760.50 |
| Total Vista Healthplan | | | | | | | -760.50 |
| **TOTAL** | | | | | | | **-760.50** |

*Nationwide*

# RECOVERY
*Service*

Formerly AMO Recoveries, Inc

545 W Inman St.
Cleveland, TN 7311
423-472-4600
1-800-776-4600

Re: *Anon Hall*

Ref # *44220060*

Thank you for payment on the above mentioned account. Regretfully, we are unable to process your payment due to the reason marked below. Please make the needful correction and resend your payment. Please call our office if further information is needed.

_____ We cannot locate the account. Please send with either the file number (NRS number) or the reference number.

___✓___ The account is paid in full.

_____ No signature on check.

_____ The amount is not the agreed payment amount. Please contact our office.

_____ There is no payment arrangement on this account. Please contact our office to discuss possible payment arrangements.

_____ We cannot accept a personal check on this account. (Please send a money order or cashier's check).

_____ The wrong payee is listed on the payment.

_____ The account has been recalled by Client and is no longer at this agency. Please contact the Client.

_____ Other: _____

THIS COMMUNICATION IS FROM A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION WILL BE USED FOR THAT PURPOSE.

*Anes. Assoc*
*paid in full*

*Thanks*

ANES ASSOC OF TALLAHASSEE
P O BOX 452198
SUNRISE, FL 33345-2198

31403-4492

ADDRESS SERVICE REQUESTED

FOR BILLING INQUIRIES, CALL (800) 296-2611
PATIENT NAME: HALL          JASON

0101

**CHECK CARD USING FOR PAYMENT**

| | | |
|---|---|---|
| MASTERCARD | VISA | AMERICAN EXPRESS |
| CARD NUMBER | | SIGNATURE CODE |
| SIGNATURE | | EXP. DATE |

| STATEMENT DATE | PAY THIS AMOUNT | ACCT. # |
|---|---|---|
| 05/31/2006 | $4104.00 | 2491105AI |

PAGE: 1 of 1

| SHOW AMOUNT PAID HERE | $ |
|---|---|

ADDRESSEE:

JASON          HALL
6600 DONERAIL TRL
TALLAHASSEE, FL 32309-1638

REMIT TO:

ANES ASSOC OF TALLAHASSEE
P O BOX 452198
SUNRISE, FL 33345-2198

31403-4492*1TE0XU3FYD00492

**STATEMENT**     PLEASE DETACH AND RETURN TOP PORTION WITH YOUR PAYMENT

☐ Please check box if address is incorrect or insurance
information has changed, and indicate change(s) on reverse side.

| DATE | DESCRIPTION | CHARGES | PAYMENTS/ADJS. |
|---|---|---|---|
| 03/21/06 | SERVICES PERFORMED AT TALLAHASSEE MEMORIAL HEALTHCARE | | |
| 03/21/06 | PROFESSIONAL ANESTHESIA SVC | 3888.00 | |
| | INSERT MONITORING LINES | 216.00 | |
| | PAYMENT IN FULL OR PAYMENT ARRANGEMENTS MUST BE MADE WITHIN 30 DAYS. YOUR ACCOUNT IS BEING TRANSFERRED TO AN OUTSIDE COLLECTION AGENCY. | | |

*20% Discount*
*#7175.20*
*NS*
*6-4-09*
*Pd*

| PREVIOUS BALANCE | CHARGES | CREDITS | NEW BALANCE | MIN. AMOUNT DUE |
|---|---|---|---|---|
| 4104.00 | 0.00 | 0.00 | 4104.00 | 4104.00 |

PAYMENT DUE BY 06/14/2006

PATIENT NAME: HALL          JASON
ACCOUNT NO.: 2491105AI

PLEASE PAY THIS AMOUNT
>>>>>>>>>>    $4104.00

OFFICE HOURS: M-THURS 8AM-12PM & 1PM-4PM EST

31403-4492*1TE0XU3FYD00492

*Carri. Ho 16-*

3128

**HOWARD & ASSOCIATES**
ATTORNEY AT LAW, P.A.
OPERATING ACCOUNT
6511 BULL HEADLEY RD., SUITE 405
TALLAHASSEE, FL 32312
(850) 298-4455

**AmSOUTH** BANK
THE RELATIONSHIP PEOPLE®
63-1411-642

| DATE | CHECK | 8/4/2009 AMOUNT |
|------|-------|-----------------|

NRS

**7,175.20

PAY Seven Thousand One Hundred Seventy-Five and 20/100************************************************************

TO THE
ORDER
OF:
NRS
545 W. Inman St
Cleveland, TN 37311
Acct. 4472080

aNes associates of Tall.
All Accts Paid in Full for Jason R Hall by Cashing this is check

⑈003128⑈ ⑆063210112⑆ 3401007904⑈



# BREAKDOWN OF FUNDS
# STILL OWED TO FIRM



**TALLAHASSEE NEUROLOGICAL CLINIC**

8/6/077

**DEPARTMENT OF NEUROLOGY**
1401 Centerville Road • Suite 300
Phone (850) 878-5115
Fax (850) 942-5245

J. TRUE MARTIN, M.D., F.A.A.D.E.R
Diplomate of
the American Board of
Psychiatry and Neurology

RICARDO AYALA, M.D.
Diplomate of
The American Board of
Psychiatry and Neurology

WINSON R. ORTIZ, M.D.
Diplomate of
The American Board of
Psychiatry and Neurology

LEONARD DEMITRI DASILVA, M.D.
Diplomate of
The American Board of
Psychiatry and Neurology
Subspecialty Vascular Neurology (Stroke)
Diplomate of
The American Board of
Internal Medicine

**DEPARTMENT OF NEUROSURGERY**
1401 Centerville Road • Suite 300
Phone (850) 877-5115
Fax (850) 656-6641

MARK L. CUFFE, M.D., F.A.C.S.
Diplomate of
The American Board of
Neurological Surgery

CHRISTOPHER S. RUMANA, M.D., F.A.C.S.
Diplomate of
The American Board of
Neurological Surgery

ALBERT S. LEE, M.D.
Diplomate of
the American Board of
Neurological Surgery

**DIVISION of PAIN MANAGEMENT**
2824 Mahan Drive • Suite 1
Phone (850) 558-1360
Fax (850) 558-1700

MILDAN MULLIN, M.D.
Director
Board Certified
The American Board of
Anesthesiology with
Qualification in
Pain Management

JOSHUA E. FUHRMEISTER, M.D.
Board Certified
The American Board of
Anesthesiology
Board Eligible
in Pain Management

FRANK M. DAVIS, M.D., F.A.C.S. (1940-1987)
JAMES D. GEISSINGER, M.D., F.A.C.S. (1958-1997)
FRED O. VROOM, M.D. (1962-2009)
BRYAN W. ROBINSON, M.D. (1977-1979)
NAPA MABE VOETEE, M.D., F.A.C.S. (1994-1996)

Atty Tim Howard
Fax# 850-216-2537
Re: Jason R Hall

Attn: Kim

Dear Kim,

The deposition scheduled for today 8/6/07, was cancelled. There is a cancelation fee of 250.00. The check can be made payable to Tallahassee Neurological Clinic. Our Tax ID number is 59-1286000. Please forward this amount ASAP.

If you have any questions, Please call me at 850-877-5115

Thank you,

Patti A Horne
Front Office Supervisor
Tallahassee Neurological Clinic
Department of Neurosurgery

1401 Centerville Road   Suite 300   Tallahassee, Florida  32308
Satellite Office and Open MRI Center - 2824 Mahan Drive Suite 1, Tallahassee, Florida 32308



## TALLAHASSEE
## NEUROLOGICAL
## C L I N I C

**DEPARTMENT OF NEUROLOGY**
1401 Centerville Road • Suite 300
Phone (850) 878-8123
Fax (850) 942-6515

J. TRUE MARTIN, M.D., F.A.A.D.E.P.
Diplomate of
The American Board of
Psychiatry and Neurology

RICARDO AYALA, M.D.
Diplomate of
The American Board of
Psychiatry and Neurology

WINSTON E. ORTIZ, M.D.
Diplomate of
The American Board of
Psychiatry and Neurology

LEONARD DIMITRI DaSILVA, M.D.
Diplomate of
The American Board of
Psychiatry and Neurology
Subspecialty: Vascular Neurology (Stroke)
Diplomate of
The American Board of
Internal Medicine

**DEPARTMENT OF NEUROSURGERY**
1401 Centerville Road • Suite 300
Phone (850) 877-3115
Fax (850) 656-3643

MARK J. CUFF, M.D., F.A.C.S.
Diplomate of
The American Board of
Neurological Surgery

CHRISTOPHER S. RUMANA, M.D., F.A.C.S.
Diplomate of
The American Board of
Neurological Surgery

ALBERT S. LEE, M.D.
Diplomate of
The American Board of
Neurological Surgery

**DIVISION of PAIN MANAGEMENT**
2824 Mahan Drive • Suite 1
Phone (850) 558-1760
Fax (850) 558-1758

VILDAN MULLIN, M.D.
Director
Board Certified
The American Board of
Anesthesiology with
Qualifications in
Pain Management

JOSHUA E. ELFRASTEIN, M.D.
Board Certified
The American Board of
Anesthesiology
Board Eligible
in Pain Management

BRIAN N. DAVIS, M.D., F.A.C.S. (Retired)
JAMES D. GIBBANGES, M.D., F.A.C.S. (Retired)
FRED O. VROOM, M.D. (Retired)
BRYAN W. ROBINSON, M.D. (1939 - 1975)
DANA HARE VOGTER, M.D., F.A.C.S. (1926 - 1998)

### Department of Neurosurgery

### INVOICE FOR COPIES OF MEDICAL RECORDS

To Attorney/Insurance Company
Tim Howard

Fax: _____

Re: Prepayment for Medical Records

Patient: Jason Hall

DOB/SSN: 7/3/73

Number of Copies: 78

Date of Invoice: 4/15/08

Amount Due: $38.25

If payment is not received within 30 days of this statement, the request for records will be discarded. If you have any questions please contact Medical Records Processor, Whitney Graham at 850-877-5115. If you have any legal concerns please address them to Gwen McRae, administrator.

CONFIDENTIALITY STATEMENT: The information contained in this facsimiles message is legally privileged and confidential and is intended only for the use of the individual or entity named above. If the reader of the information is not the intended recipient, you are hereby notified that the use, distribution dissemination, or copy of this telecopy is strictly prohibited. If you have received this telecopy in error, please notify us immediately by telephone and return the original message to us at the above address via the United States Postal Service. Thank you.

1401 Centerville Road   Suite 300   Tallahassee, Florida  32308
Satellite Office and Open 1401 Center • 2824 Mahan Drive Suite 1   Tallahassee  Florida  32308

JAN-25-2008 FRI 03:28 AM                                          P. 001/001

# MERCHANTS ADJUSTMENT SERVICE
## PO BOX 7511
## MOBILE, AL 36670
### PHONE: (251) 476-6666 / FAX: (251) 476-6667

FACSIMILE TRANSMITTAL SHEET

TO: Tim Howard                    FROM: Sheri Jones

TOTAL NUMBER OF PAGES:            DATE: 1-25-08

FAX NUMBER:                       PHONE NUMBER:

RE: Receipt for payment

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

NOTES/COMMENTS:

---

MAS, Inc.                                 Acct # 3795701
Receipt credit card for payment

Name: Phillip "T" Howard       Date Received: 1-25-08

Client Name: INC Nelms Surils   Client Acct # 69423

Amount Paid $ 30.53   Group   Bal Remaining $

This payment will appear on your credit card statements as Merchants Adjustment Service (MAS).

If you have any further questions, please call our office at (251) 476-6666 or (800) 239-6041.
THANK YOU

M Jones

**Patrick & Associates**
4263 Millwood Lane
Tallahassee, FL 32312
e-mail: drjimpatrick@earthlink.net
www.drjamespatrick.com

850-894-5020 office

850-894-5021 fax

Timothy Howard
Howard & Associates
8511 Bull Headly Road, Suite 405
Tallahassee, FL 32312

Matter: Hall, Jason
Statement Date: 4/18/2008
Amount Due: $3,000.00
Statement Number: 1305

**FEES**

| Date | Biller | Description | Code | Hours | Amount |
|------|--------|-------------|------|-------|--------|
| 3/23/2008 | 250 | File Setup and Initial Review | F001 | 1.00 | $250.00 |
| 3/29/2008 | 250 | Client Interview | I002 | 2.50 | $625.00 |
| 4/11/2008 | 250 | File Review and Analysis | F001 | 1.00 | $250.00 |
| 4/12/2008 | 250 | Research | R002 | 1.50 | $375.00 |
| 4/12/2008 | 250 | Vocational Assessment | R003 | 4.50 | $1,125.00 |
| 4/14/2008 | 250 | Deposition - travel to and from as well as the deposition itself | D006 | 1.50 | $375.00 |
| | | | SUBTOTAL: | 12.00 | $3,000.00 |

**BILL SUMMARY**

| | |
|---|---|
| Previous Balance: | $0.00 |
| Current Fees: | $3,000.00 |
| Current Expenses: | $0.00 |
| Current Other: | $0.00 |
| Current Payments: | $0.00 |
| Total Amount Due: | $3,000.00 |

| Aging Summary: | 0-30 Days | 31-60 Days | 61-90 Days | Over 90 Days |
|----------------|-----------|------------|------------|--------------|
| | $3,000.00 | $0.00 | $0.00 | $0.00 |

2:01 PM

09/03/09

Accrual Basis

## Howard & Associates P.A.
## Register QuickReport
### All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| **Patrick & Associates** | | | | | | | |
| Check | 11/24/2008 | 10337 | Jason Hall V... | Operating Account | | Client Costs a... | -2,625.00 |
| **Total Patrick & Associates** | | | | | | | -2,625.00 |
| TOTAL | | | | | | | -2,625.00 |

3:33 PM
04/24/06
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
January 2007 through December 2008

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Accurate Stenotype Reporters | | | | | | | |
| Check | | | Payment in f... | Operating Account | | Client Soft Ex... | -3,314.00 |
| Check | | | Invoice #2341... | Operating Account | | Client Soft Ex... | -878.00 |
| | | | | | | | -4,192.00 |
| TOTAL | | | | | | | -4,192.00 |

*no stub*

Page 1

3:33 PM
04/24/08
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
January 2007 through December 2008

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Accurate Stenotype Reporters | | | | | | | |
| Check | ████████ | ████ | Payment in f... | Operating Account | | Client Soft Ex... | -3,314.00 |
| Check | ████████ | ████ | Invoice 82H1... | Operating Account | | Client Soft Ex... | -878.00 |
| ████████████████████████ | | | | | | | -4,192.00 |
| TOTAL | | | | | | | -4,192.00 |

no stub



11:42 AM
10/28/13
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
All Transactions

| Type | Date | Num | Memo | Account | Cur | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Dr. Ira Richards | | | | | | | |
| Check | 11/17/2006 | 2586 | down payme... | Operating Account | | Client Soft Ex... | -1,000.00 |
| Check | 12/08/2006 | 2616 | Exped Relati... | Operating Account | X | Client Soft Ex... | -4,000.00 |
| Total Dr. Ira Richards | | | | | | | -5,000.00 |
| **TOTAL** | | | | | | | **-5,000.00** |

**FLORIDA MEDICAL RECORD SERVICE**
405 ST.PETERSBURG DRIVE EAST SUITE 6
OLDSMAR, FL 34677

Tim Howard                                    4/14/08

FACILITY: Tallahassee Memorial Hospital
PATIENT: Hall, Jason          REFERENCE CODE: 36- 041408

WE ARE IN RECEIPT OF YOUR REQUEST FOR COPIES OF MEDICAL RECORDS ON
THE ABOVE NAMED PATIENT. PLEASE BE ADVISED THAT IN ORDER TO PROCESS
YOUR REQUEST, WE REQUIRE PREPAYMENT IN THE AMOUNT OF $2,349.23
PLEASE SEND A COPY OF THIS LETTER, ALONG WITH YOUR REMITTANCE MADE
PAYABLE TO: **FLORIDA MEDICAL RECORD SERVICE** AND MAIL TO:

**FLORIDA MEDICAL RECORD SERVICE**
405 ST.PETERSBURG DRIVE SUITE 6
OLDSMAR, FL 34677          TAX ID # 58-2379198

ONCE WE HAVE RECEIVED PAYMENT, WE WILL PROMPTLY FURNISH THE
REQUESTED INFORMATION TO YOU.
SHOULD YOU HAVE ANY QUESTIONS, PLEASE FEEL FREE TO CONTACT US AT:
850-431-5454

THANK YOU.
FMRS. Inc.

Angela
ANGELA

2,189 PAGES @ 1.00 PER PAGE

7 YEAR SEARCH FEE @ $1.00 PER YEAR

_____ POSTAGE

153.23 TAX

_____ CERTIFICATION / NOTARY FEE

Pd 4-11-08

_____ LESS PREPAYMENT - CHECK #

$ 2349.23 TOTAL

!!!!!! PLEASE PLACE THIS REFERENCE CODE ON YOUR CHECK: 36- 041408 !!!!!!

**For the Record Reporting, Inc.**
1500 Mahan Drive, Suite 140
Post Office Box 12042
Tallahassee, FL 32317-2042
(850) 222-5491 Phone   (850) 224-5318 Fax
Tax ID: 59-3618998

November 13, 2007

Mr. Tim Howard, Esq.
Howard & Associates, P.A.
8511 Bull Headley Road
Suite 405
Tallahassee, FL 32312
(850) 298-4455

Invoice Number
L 4341

Re:  Jason R. Hall vs. Stephen Ferrell Roofing, Inc. and Summit Insurance
     Case No. 06-021297JJL
     Depos of Ferrell, Parnell, Perry, Warmack, Pittman and Butler

| Description of Services | | Pgs/Qty | Rate | Extension |
|---|---|---|---|---|
| Appearance-1st hour | Inv. No. 4341, Taken on 10/30/07, 10:00-3:00 | 1.00 | 60.00 | 60.00 |
| Appearance-Succ hours | | 4.00 | 30.00 | 120.00 |
| Transcript copy | | 114.00 | 2.00 | 228.00 |
| ASCII disk - n/c | | 1.00 | 0.00 | n/c |
| | | Invoice total: | | $408.00 |

**For the Record Reporting, Inc.**
1500 Mahan Drive, Suite 140
Post Office Box 12042
Tallahassee, FL  32317-2042
(850) 222-5491 Phone   (850) 224-5316 Fax
Tax ID: 59-3616998

December 3, 2007

Mr. Tim Howard, Esq.
Howard & Associates, P.A.
8511 Bull Headley Road
Suite 405
Tallahassee, FL 32312
(850) 298-1455

Invoice Number
F 4430

Re:  Jason Hall vs. Stephen Farrell Roofing, Inc.
     Case No. 06-021297JJL
     Deposition's of  Tien Vanceo and Kayse Green

| Description of Services | | Pgs/Qty | Rate | Extension |
|---|---|---|---|---|
| Transcript copy | Inv. No. 4430. Taken on 11/27/07 | 42.00 | 2.00 | 84.00 |
| ASCII disk - n/c | | 1.00 | 0.00 | n/c |
| | | Invoice total: | | $84.00 |

*PAST DUE*

**For the Record Reporting, Inc.**
1500 Mahan Drive, Suite 140
Post Office Box 12042
Tallahassee, FL 32317-2042
(850) 222-5491 Phone   (850) 224-5316 Fax
Tax ID: 59-3616998

December 3, 2007

Mr. Tim Howard, Esq.
Howard & Associates, P.A.
8511 Bull Headley Road
Suite 405
Tallahassee, FL 32312
(850) 298-4455

| | |
|---|---|
| **Invoice Number** | |
| **M 4431** | |

Re:   Jason Hall vs. Stephen Farrell Roofing, Inc.
Case No. 06-02127JJL
Deposition of Chris Van Sickle, M.D.

| Description of Services | | Pgs/Qty | Rate | Extension |
|---|---|---|---|---|
| Transcript copy | Inv. No. 4431, Taken on 11/20/07 | 9.00 | 2.00 | 18.00 |
| ASCII disk - n/c | | 1.00 | 0.00 | n/c |
| Exhibit copy | | 150.00 | 0.50 | 75.00 |
| | | | Invoice total: | $93.00 |

HOWARD & ASSOCIATES  OPERATING ACCOUNT

For The Record Reporting, Inc.                                    2/8/2008                    2802

| | |
|---|---|
| Invoice M 4431 | 93.00 |
| Invoice F 4430 | 84.00 |
| Invoice L 4341 | 400.00 |

Operating Account       Invoices M 4431, F 4430 & L 4341                          585.00

3:27 PM
04/24/08
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
January 1 through April 24, 2008

| | Type | Date | Num | Memo | Account | Clr | Split | | Amount |
|---|---|---|---|---|---|---|---|---|---|
| For The Record Reporting, Inc. | | | | | | | | | |
| Check | | 02/20/2008 | 1702/20 | Invoice M 4... | Operating Account | | -SPLIT- | | -535.00 |
| Total For The Record Reporting, Inc. | | | | | | | | | -585.00 |
| **TOTAL** | | | | | | | | | -585.00 |

3:27 PM
04/24/08
Accrual Basis

# Howard & Associates P.A.
## Register QuickReport
### All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Executive Reporters Check | 2/12/2008 | 2871 | Invoice No. 9... | Operating Account | | Client Costs a... | -650.00 |
| Total Executive Reporters | | | | | | | -650.00 |
| TOTAL | | | | | | | -650.00 |

Page

**EXECUTIVE REPORTERS, INC.**
233 EAST BAY STREET
1113 BLACKSTONE BUILDING
JACKSONVILLE, FLORIDA 32202
PHONE - 904-355-7801  FAX 904-358-5824

HOWARD & ASSOCIATES
1133 LOCKNELL COURT
TALLAHASSEE, FL 32313

INVOICE NO. :        95044
INVOICE DATE:    12/03/2007
REPORTER:
ELLEN NELSON

TIM HOWARD, ESQUIRE

ID#  59-3129093

JASON HALL VS
STEPHEN FARRELL ROOFING INC.

| Date | Description | Amount |
|------|-------------|--------|
| 11/30/2007 | REPORTING THE DEPOSITION OF | |
| | DR. RAYMOND HARBISON | |
| | APPEARANCE FEE | 60.00 |
| | ORIGINAL, COPY & CONDENSED | 540.00 |
| | EMAIL | 15.00 |
| | FEDERAL EXPRESS | 35.00 |
| | Sub Total | 650.00 |
| | Paid | 0.00 |
| | Balance Due | 650.00 |

TERMS:  NET 60 DAYS.  A SERVICE CHARGE OF 1.5% PER MONTH
WILL BE APPLIED TO ALL PAST-DUE BALANCES
WE ACCEPT VISA, MASTERCARD, DISCOVER & AMERICAN EXPRESS

10:43 AM
08/30/06
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Dr. Kirk Mauro, M.D. | | | | | | | |
| Check | 3/21/2006 | 2823 | Jason Hall A... | Operating Account | | Client Scrt Ex... | -1,200.00 |
| | | | | | | | -1,200.00 |
| TOTAL | | | | | | | -1,200.00 |

HOWARD & ASSOCIATES  OPERATING ACCOUNT

Dr. Kirk Mauro, M.D.

2823

3/21/2006

Expert Physiatrist-Jason Hall

1,200.00

3:27 PM
04/24/08
Accrual Basis

**Howard & Associates P.A.**
**Register QuickReport**
All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Executive Reporters | | | | | | | |
| Check | 12/20/04 | 2071 | Invoice No. B... | Operating Account | | Client Costs R... | -650.00 |
| Total Executive Reporters | | | | | | | -650.00 |
| TOTAL | | | | | | | -650.00 |

Page

**EXECUTIVE REPORTERS, INC.**
**233 EAST BAY STREET**
**1113 BLACKSTONE BUILDING**
**JACKSONVILLE, FLORIDA 32202**
**PHONE - 904-355-7801  FAX 904-356-5824**

HOWARD & ASSOCIATES
1133 LOCKNOLL COURT
TALLAHASSEE, FL 32313

| | |
|---|---|
| INVOICE NO. : | 95844 |
| INVOICE DATE: | 12/03/2007 |
| REPORTER: | |
| ELLEN NELSON | |

TIM HOWARD, ESQUIRE

ID# 59-3129083

JASON HALL VS
STEPHEN FARRELL ROOFING INC.

| Date | Description | Amount |
|---|---|---|
| 11/30/2007 | REPORTING THE DEPOSITION OF | |
| | DR. RAYMOND HARBISON | |
| | APPEARANCE FEE | 60.00 |
| | ORIGINAL, COPY & CONDENSED | 540.00 |
| | EMAIL | 15.00 |
| | FEDERAL EXPRESS | 35.00 |
| | Sub Total | 650.00 |
| | Paid | 0.00 |
| | Balance Due | 650.00 |

**TERMS: NET 60 DAYS.  A SERVICE CHARGE OF 1.5% PER MONTH**
**WILL BE APPLIED TO ALL PAST-DUE BALANCES**
**WE ACCEPT VISA, MASTERCARD, DISCOVER & AMERICAN EXPRESS**

## CONTINGENT FEE AGREEMENT

I, __Jason Hall_ and Dave Hall to the extent applicable_ (hereinafter "the client" employ Howard & Associates, Attorneys at Law, P.A., (hereinafter "the attorneys") as my attorneys to represent me in my claim for damages arising out of __ workplace slip and fall accident _ ; Date of incident: _3/16/2006_.

### I. CONTINGENT FEE

1.   20 percent of the first $5,000 of the amount of the benefits secured,

2.   15 percent of the next $5,000 of the amount of the benefits secured,

3.   10 percent of the remaining amount of the benefits secured to be provided during the first 10 years after the date the claim is filed,

4.   5 percent of the benefits secured after 10 years

These attorneys fees shall be interpreted and applied so as to be consistent with section 440.34, Florida Statutes. Costs shall be in addition to attorneys fees.

### II. COSTS

Howard & Associates, Attorneys at Law, P.A. agree to advance the payment of costs reasonably necessary to prepare the case until a recovery is obtained. The client agrees to reimburse all costs incurred if a recovery is obtained. "Costs" include filing fees, witness fees, expert witness costs, travel expenses, telephone charges, copying charges, fax charges, deposition costs, investigation costs and time, messenger service cost, mediation expenses, computer research fees, medical or nursing consultations, and all out-of-pocket expenses incurred on the client's behalf.

1

---

obligations or liability to pay past, present and future monetary compensation, medical, vocational rehabilitation, death benefits or any other benefits of any classification or type whatsoever, including any penalties and interest, on account of injury, disability and death resulting, in whole or in part, from or arising out of the work related accident(s) or occupational disease claimed by the Employee.

The parties agree that the lump sum consideration shall be allocated as follows:

| | |
|---|---|
| Past Medical: | $150,000.00 |
| Medicare Set Aside account: (per the recommended allocation) | $120,474.00 |
| Non-Medicare covered services: | $109,585.00 |
| Past and future Monetary Compensation | $182,394.00 |
| Attorneys Fees: | $100,000.00 |
| Costs: | $50,000.00 |
| TOTAL | $612,114.01 |

2)   Upon receipt of the lump sum consideration, the Employer/Carrier will be forever released and discharged from the obligation or liability to pay past, present and future monetary compensation, medical benefits, vocational rehabilitation benefits, death benefits or any other benefits of any classification whatsoever, including penalties and interest, which are or may in the future be paid to the Employee, the Employee's dependents, assigns, successors or any other person or entity who may have a claim under Chapter 440, Florida Statutes, as a result of this accident(s) which is the subject of this Settlement Agreement and Release. Which sums shall be payable as follows upon Order by the Judge of Compensation

Page 2 of 6

612,808.00

---

Upon conclusion of the claim, Howard & Associates, Attorneys at Law, P.A., will provide the client with a closing statement listing all of the financial details of the case, including the amount recovered, all expenses and a precise statement of attorneys' fees.

### V. SIGNATURE OF THE PARTIES

I agree to employ the above-named attorney. This contract contains our entire agreement and is not valid unless signed by both parties. I have received a copy.

_Jason R. Hall_                         _Oct 3, 2006_
Client                                     Date

_[signature]_                            _10/3/2006_
Attorney                                  Date

Employment is accepted on the foregoing terms.

HOWARD & ASSOCIATES,
ATTORNEYS AT LAW, P.A.

By: Dr. Tim Howard
For the Firm

(strike)(0ba01)

3

---

11.   If at any time, you, the client, believe that your lawyer has charged an excessive or illegal fee, You, the client, have the right to report the matter to The Florida Bar, the agency that oversees the practice and behavior of all lawyers in Florida. For information on how to reach The Florida Bar, call 1-850-342-3060, or contact the local bar association. Any disagreement between you and your lawyer about a fee can be taken to court and you may wish to hire another lawyer to help you resolve this disagreement. Usually fee disputes must be handled in a separate lawsuit.

Howard & Associates,
Attorneys at Law, P.A.

_Jason R. Hall_                          _[signature]_
Client's signature                        P. Tim Howard
Printed name: _Jason R. Hall_             For the Firm

Date: _10-3-06_

3

EXHIBIT B

Ex B

## REGIONS
Customer Receipt

```
08-05-2008 01:54P #00186
FL00032      #003
DA3401007904

CHK DEP        $612,828.00
```

### BRIDGEFIELD EMPLOYERS INSURANCE COMPANY
No. 1767557

| ASE # | EMPLOYEE NAME | REMARKS | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| 077561 | HALL, JASON R | | 03/16/06 | 07/29/08 | 07/29/08 | |
| | COMPENSATION | LUMP SUM | 11 | | | 140,000.00 |

### BRIDGEFIELD EMPLOYERS INSURANCE COMPANY
No. 1767558

| ASE # | EMPLOYEE NAME | REMARKS | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| 07756 | HALL, JASON R | | 03/16/06 | 07/29/08 | 07/29/08 | |
| | CLAIMANT ATTORN | ATTY FEES & COSTS | 14 | | | 199,000.00 |

### BRIDGEFIELD EMPLOYERS INSURANCE COMPANY
No. 1767559

| ASE # | EMPLOYEE NAME | REMARKS | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| 07756 | HALL, JASON R | | 03/16/06 | 07/29/08 | 07/29/08 | |
| | MISCELLANEOUS-M | LUMP SUM MEDICAL | 27 | | | 14,065.00 |

### BRIDGEFIELD EMPLOYERS INSURANCE COMPANY
No. 1767560

| ASE # | EMPLOYEE NAME | REMARKS | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| 07756 | HALL, JASON R | | 03/16/06 | 07/29/08 | 07/29/08 | |
| | MISCELLANEOUS-M | LUMP SUM MEDICAL | 27 | | | 349,763.00 |

### BRIDGEFIELD EMPLOYERS INSURANCE COMPANY
No. 1757284

| ASE # | EMPLOYEE NAME | REMARKS | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| 07756 | HALL, JASON R | | 03/16/06 | 07/03/08 | 07/03/08 | |
| | COMPENSATION | ADVANCE ON LUMP SUM | 11 | | | 20,000.00 |

pg.12

schedule and notice an additional final hearing after conferring with counsel for the Employer/Carrier.   In the alternative, either party may file a motion to set final hearing for consideration by the undersigned judge.

DONE AND ORDERED at Tallahassee, Leon County, Florida.



John J. Lazzara
Judge of Compensation Claims
Division of Administrative Hearings
Office of the Judges of Compensation Claims
Tallahassee District Office
P.O. Box 6400
Tallahassee, Florida  32314-6400
(850)488-2110
www.jcc.state.fl.us

25

regardless of whether he was under the influence, if any, of an illegal drug at the time of the accident.

The Employer/Carrier here having failed to meet their burden of establishing "by the greater weight of the evidence" that the Claimant's accident was caused primarily by the use of drugs or alcohol", I find the work accident of 3/16/2006 which resulted in serious injuries to the Claimant, is compensable and the Claimant should be afforded those benefits provided by the Florida Workers' Compensation Law. See European Marble Company v. Robinson, 885 So. 2d 502 (Fla. 1st DCA 2004).

**WHEREFORE**, it is **ORDERED** as follows:

1. That the accident of the Employee, Jason Ray Hall, on March 16, 2006, arose out of and within the course and scope of the Claimant's employment with Stephen Ferrell Roofing, Inc., and is hereby adjudged compensable under the Florida Workers' Compensation Law; and

2. That jurisdiction is retained over the remaining claims for workers' compensation benefits, attorney's fees and costs, and the same shall be determined at a later time or agreement of the parties.

**IT IS FURTHER ORDERED** that should the parties herein be unable to resolve the remaining claims for specific workers' compensation benefits, then counsel for the Employee shall

24

make the following findings of fact and conclusions of law:

1.    The undersigned judge of compensation claims has jurisdiction of the parties and the subject matter of this claim;

2.    The stipulations entered into by and between the parties herein are hereby approved and adopted as findings of fact and are incorporated herein by reference.

3.    In my determination herein I have attempted to distill the testimony and salient facts together with the findings and conclusions necessary to the resolution of this matter.  I have not necessarily attempted to summarize the substance of the claimant's testimony or the testimony of any live or deposition witness, nor have I attempted to state nonessential facts. Because I have not done so should not be construed that I have failed to consider all of the evidence.

4.    Except for the issues, claims and defenses which are reserved for later hearing, any issues raised in the petition for benefits which was the subject matter of the final hearing, but which issues were not tried at the hearing are presumed resolved, or in the alternative, deemed abandoned by the employee/claimant and therefore denied.  See Betancourt v. Sears Roebuck & Co., 693 So.2d 253 (Fla. 1st DCA 1997).

5.    Employer/Carrier's ore tenus Motion for Sample of

5

deposition of TMH Records Custodian.)

### Joint Exhibits

1.   Pretrial Stipulation and Order entered 10/12/2007.

**The following persons testified live before me:**

1.   Dana Hall, Claimant's spouse.

2.   Jason Ray Hall, the Claimant.

3.   Bart David Warmach, Claimant's co-employee.

4.   Christopher Charles Butler, former Claimant's co-employee.

5.   Derrick Butler, Claimant's co-employee.

6.   Michael W. Perry, Claimant's co-employee.

7.   Pamela Jean Pagel, Carrier's Field Case Manager.

8.   Neil Andrew Spearing, Claimant's co-employee.

9.   Dr. Ira Stephens Richards, Ph.D., Claimant's Toxicologist.

10.  Dr. Raymond D. Harbison, Ph.D., Employer/Carrier's Toxicologist. (Telephonic testimony).

**After due consideration of this matter and after having the opportunity to review and consider the aforesaid exhibits which were admitted into evidence, and having observed and considered the candor and demeanor of the witnesses who appeared and testified before me, and having endeavored to resolve all conflicts of facts in the evidence presented herein, I hereby**

4

At the trial of this cause, the following Exhibits were admitted into evidence.

### Claimant's Exhibits

1.   Petition for Benefits filed 5/9/2007.[1]

2.   Deposition of Ratliff Wade Parnell taken 10/30/2007.

3.   (Proffered only) Merriam-Webster Online Dictionary's definition of "Intoxicate".  (Employer/Carrier's hearsay and relevancy objections were sustained).

4.   (Proffered only) National Academy of Science article entitled "First, Do No Harm: Consequence of Marijuana Use and Abuse.  (1999)."  (Employer/Carrier's hearsay objection was sustained.)

5.   Eight photocopies of the two-story home on the job site.

6.   Curriculum Vitae of Dr. Ira Richards, Ph.D.

### Employer/Carrier's Exhibits

1.   Deposition of Dr. Chris Van Sickle, M.D., together with attachments, taken 11/28/2007.

2.   Deposition of Tien Van Cao taken 11/27/2007.

3.   Deposition of Kayse Green taken 11/27/2007.

4.   Curriculum Vitae of Dr. Raymond Harbison, Ph.D.

5.   Tallahassee Memorial Hospital Laboratory Services Report of 3/16/2006.   (Filed on 1/14/2008 in lieu of the

---

[1] The prior PFB filed on 7/20/2006 was voluntarily dismissed on 1/29/2007.

the intoxication of the Employee or from the influence of drugs, thereby barring compensation as provided in section 440.09(3), Florida Statutes, (2003).

All other claims and issues raised in Petition for Benefits (PFB) filed on May 9, 2007 as well as the Employer/Carrier's defenses thereto were, by agreement of the parties, bifurcated for trial and reserved for a later hearing, if necessary.

**The parties have entered into the following stipulations:**

1.   The Judge of Compensation Claims has jurisdiction of the parties and the subject matter of this claim.

2.   Venue properly lies in Leon County, Florida.

3.   Notice of Hearing and Notice of Injury were properly furnished and received as required by the Workers' Compensation Law.

4.   On March 16, 2006, the captioned Claimant was employed by the captioned Employer.

5.   The following was also stipulated at the final hearing:

a.   The Employer had not implemented a drug-free work place at the time of the captioned accident; and

b.   The Claimant, Jason Hall, over a period of 13 years prior to the captioned date of accident was a consistent smoker of marijuana.

2

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS
OFFICE OF THE JUDGES OF COMPENSATION CLAIMS
TALLAHASSEE DISTRICT OFFICE

Jason R. Hall,                          )
        Employee/Claimant,              )
                                        )
vs.                                     )
                                        )    OJCC Case No.   06-021297JJL
Stephen Ferrell Roofing                 )
Inc./Claims Center,                     )    Accident Date: 3/16/2006
        Employer/Carrier/               )
Servicing Agent.

_____

**FINAL ORDER**

**AFTER DUE NOTICE** to the parties, a Final Hearing on this

matter was commenced in Tallahassee, Leon County, Florida, on

December 5, 2007.    Because the deposition of the Record

Custodian from Tallahassee Memorial Hospital (TMH) was unable to

be taken by counsel for the Employer/Carrier prior to the Final

Hearing, the final hearing was recessed to allow the submission

of such evidence, and was subsequently reconvened and adjourned

on January 14, 2008.

     The parties were represented by counsel as indicated below.

The undersigned judge of compensation claims has jurisdiction of

the parties and the subject matter.

     At the final hearing the sole issue presented for

adjudication was the issue of compensability of the Employee's

accident of March 16, 2006 and the Employer/Carrier's defense

thereto that the aforesaid accident was occasioned primarily by

11.    If at any time, you, the client, believe that your lawyer has charged an excessive or illegal fee, you, the client, have the right to report the matter to The Florida Bar, the agency that oversees the practice and behavior of all lawyers in Florida. For information on how to reach The Florida Bar, call 1-800-342-8060, or contact the local bar association. Any disagreement between you and your lawyer about a fee can be taken to court and you may wish to hire another lawyer to help you resolve this disagreement. Usually fee disputes must be handled in a separate lawsuit.

Howard & Associates,
Attorneys at Law, P.A.



Client's signature

Printed name: JASON R HALL

P. Tim Howard
For the Firm

Date: 10-3-06

3

Upon conclusion of the claim, Howard & Associates, Attorneys at Law, P.A., will provide the client with a closing statement listing all of the financial details of the case, including the amount recovered, all expenses and a precise statement of attorneys' fees.

### V.  SIGNATURE OF THE PARTIES.

I agree to employ the above-named attorneys.  This contract contains our entire agreement and is not valid unless signed by both parties.  I have received a copy.

_Jesse R. Hall_ _____       _Oct 3, 2006_
Client                                                Date

_____       _10/7/2006_
Attorney                                             Date

Employment is accepted on the foregoing terms.

HOWARD & ASSOCIATES,
ATTORNEYS AT LAW, P.A.

By: Dr. Tim Howard
For the Firm

(admin)a:\fee.01

3

obligations or liability to pay past, present and future monetary compensation, medical, vocational rehabilitation, death benefits or any other benefits of any classification or type whatsoever, including any penalties and interest, on account of injury, disability and death resulting, in whole or in part, from or arising out of the work related accident(s) or occupational disease claimed by the Employee. The parties agree that the lump sum consideration shall be allocated as follows:



Past Medical:       $ 800,000.00

Medicare Set Aside account:    $ 200,474.00
(per the recommended allocation)

Non-Medicare covered services:   $ 92,563.00

Past and future Monetary Compensation   $ 451,904.00

Attorneys Fees:       $ 100,000.00

Costs:         $ 139,000.00

TOTAL      $1,111,041.00

2)    Upon receipt of the lump sum consideration, the Employer/Carrier will be forever released and discharged from the obligation or liability to pay past, present and future monetary compensation, medical benefits, vocational rehabilitation benefits, death benefits or any other benefits of any classification whatsoever, including penalties and interest, which are or may in the future be owed to the Employee, the Employee's dependents, assigns, successors or any other person or entity who may have a claim under Chapter 440, Florida Statutes, as a result of the accident(s) which is the subject of this Settlement Agreement and Release. Which sums shall be payable as follows upon Order by the Judge of Compensation

612,828.00

## CONTINGENT FEE AGREEMENT

I,  Jason Hall  and Dana Hall to the extent applicable  (hereinafter "the client" employ Howard & Associates, Attorneys at Law, P.A., (hereinafter "the attorneys") as my attorneys to represent me in my claim for damages arising out of:   workplace slip and fall accident   ; Date of Incident:  3/16/2006  .

### I. CONTINGENT FEE.

1.  20 percent of the first $5,000 of the amount of the benefits secured,

2.  15 percent of the next $5,000 of the amount of the benefits secured,

3.  10 percent of the remaining amount of the benefits secured to be provided during the first 10 years after the date the claim is filed,

4.  5 percent of the benefits secured after 10 years.

These attorneys fees shall be interpreted and applied so as to be consistent with section 440.34, Florida Statutes.  Costs shall be in addition to attorneys fees.

### II. COSTS.

Howard & Associates, Attorneys at Law, P.A. agree to advance the payment of costs reasonably necessary to prepare the case until a recovery is obtained.  The client agrees to reimburse all costs incurred if a recovery is obtained.  "Costs" include filing fees, witness fees, expert witness costs, travel expenses, telephone charges, copying charges, fax charges, deposition costs, investigator costs and time, messenger service cost, mediation expenses, computer research fees, medical or nursing consultations, and all out-of-pocket expenses incurred on the client's behalf.

1

REGIONS
Customer Receipt

Ex B

```
PD08-05-2008 01:54P #00186
FL00032    #003
DA3461007904

CHK DEP          $612,928.00
```

**BRIDGEFIELD EMPLOYERS INSURANCE COMPANY**                     No. **1767557**

| ASE # | EMPLOYEE NAME | | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| PMNT TYPE | | REMARKS | | | | |
| 07756 | HALL, JASON R | | 03/16/06 | 07/29/08 | 07/29/08 | 140,000.00 |
| COMPENSATION | | LUMP SUM | | | | |

**BRIDGEFIELD EMPLOYERS INSURANCE COMPANY**                     No. **1767558**

| ASE # | EMPLOYEE NAME | | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| PMNT TYPE | | REMARKS | | | | |
| 07756 | HALL, JASON R | | 03/16/06 | 07/29/08 | 07/29/08 | 100,000.00 |
| CLAIMANT ATTORN | | ATTY FEES & COSTS | 14 | | | |

**BRIDGEFIELD EMPLOYERS INSURANCE COMPANY**                     No. **1767559**

| ASE # | EMPLOYEE NAME | | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| PMNT TYPE | | REMARKS | | | | |
| 07756 | HALL, JASON R | | 03/16/06 | 07/29/08 | 07/29/08 | 14,000.00 |
| MISCELLANEOUS-M | | LUMP SUM MEDICAL | 27 | | | |

**BRIDGEFIELD EMPLOYERS INSURANCE COMPANY**                     No. **1767560**

| ASE # | EMPLOYEE NAME | | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| PMNT TYPE | | REMARKS | | | | |
| 07756 | HALL, JASON R | | 03/16/06 | 07/29/08 | 07/29/08 | 349,763.08 |
| MISCELLANEOUS-M | | LUMP SUM MEDICAL | 27 | | | |

**BRIDGEFIELD EMPLOYERS INSURANCE COMPANY**                     No. **1757264**

| ASE # | EMPLOYEE NAME | | DOA | FROM | TO | AMOUNT |
|---|---|---|---|---|---|---|
| PMNT TYPE | | REMARKS | | | | |
| 07756 | HALL, JASON R | | 03/16/06 | 07/03/08 | 07/03/08 | 20,000.00 |
| COMPENSATION | | ADVANCE OF LUMP SUM | 11 | | | |

pg.12

"Innumerable economic factors," this Court stated, "enter into the fixing of reasonable *fees* in one section of the State and in one community which might not be present in others." *Id.*

In addition to the minimum schedule, this Court explained that "it appears to us that supplemental evidence should be presented." *Id.* This Court specifically noted the principle that, "especially in this type of matter[,] *fees* should be carefully considered so that on the one hand they will not be so low as to lack attraction for capable and experienced lawyers to represent workmen's *compensation* claimants" while, "[o]n the other hand, they should not be so high as to reflect adversely on the profession or in actuality to enter disproportionately [**23] into the cost of maintaining the workmen's *compensation* program." *Id. at 4.*

Then, in *Lee Engineering*, this Court rejected the strict application of a contingent [*440] percentage of the benefit award based on a schedule of minimum *fees*, holding that a "schedule of *fees* . . . was helpful but unreliable" and remanding for the determination of a reasonable *attorney's fee.* 209 So. 2d at 458-59. According to this Court, a statutory *fee* schedule is "less sensitive to the changing needs of the program," and, "in the absence of a stipulation or other evidence, is not an appropriate method for fixing a *fee* in Workmen's *Compensation* cases." *Id. At 458.* Reaffirming *Florida Silica Sand*, this Court concluded that the factors set forth in Canon 12 of the Canons of Professional Ethics, the predecessor to *rule 4-1.5*, must be considered to determine whether an *attorney's fee* is reasonable and stated that findings by the JCC to support the award are required. *Id. at 458-59.*

Ironically, the Lee Engineering decision was a response to what this Court perceived as "excessive" *attorney's fees. Id. at 457.* In 1977, responding to this Court's decision in *Lee Engineering*, the Legislature significantly revised *section 440.34* to add discretionary factors the JCC must consider when increasing [**24] or decreasing the *fee*, but also added a statutory formula to be used as the starting point for determining a reasonable *attorney's fee* award for a successful claimant:

(1) If the employer or carrier shall file notice of controversy as provided in s. 440.20, or shall decline to pay a claim on or before the 21st day after they have notice of same, or shall otherwise resist unsuccessfully the payment of

*compensation*, and the claimant

injured person shall have employed an *attorney* at law in the successful prosecution of the claim, there shall, in addition to the award for *compensation*, be awarded a reasonable *attorney's fee* of 25 percent of the first $5,000 of the amount of the benefits secured, 20 percent of the next $5,000 of the amount of the benefits secured, and 15 percent of the remaining amount of the benefits secured, to be approved by the judge of industrial claims, which *fee* may be paid direct to the *attorney* for the claimant in a lump sum. However, the judge of industrial claims shall consider the following factors in each case and may increase or decrease the *attorney's fee* if in his judgment the circumstances of the particular case warrant such action:

(a) The time and labor [**25] required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(b) The likelihood, if apparent to the claimant, that the acceptance of the particular employment will preclude employment of the lawyer by others or cause antagonisms with other clients.

(c) The *fee* customarily charged in the locality for similar legal services.

(d) The amount involved in the controversy and the benefits resulting to the claimant.

(e) The time limitation imposed by the claimant or the circumstances.

(f) The nature and length of the professional relationship with the claimant.

(g) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(h) The contingency or certainty of a *fee*.

Ch. 77-290, *§ 9*, at 1293-94, Laws of *Fla.* (statutory additions underlined; statutory deletions struck-through).

"Thus, to determine a reasonable *fee*, the JCC applied the formula and then increased or decreased the amount after consideration of the factors in order to determine a reasonable *fee*." *Murray, 994 [*441] So. 2d at 1059.* As the First District noted, the sliding *fee* schedule "embodies a legislative intent to standardize

 Positive
As of: October 17, 2019 9:59 PM Z

# *Castellanos v. Next Door Co.*

Supreme Court of Florida

April 28, 2016, Decided

No. SC13-2082

**Reporter**

192 So. 3d 431 *; 2016 Fla. LEXIS 885 **; 166 Lab. Cas. (CCH) P61,703; 41 Fla. L. Weekly S 197; 2016 WL 1700521

MARVIN CASTELLANOS, Petitioner, vs. NEXT DOOR COMPANY, et al., Respondents.

**Prior History:** [**1] Application for Review of the Decision of the District Court of Appeal - Certified Great Public Importance. First District - Case No. 1D12-3639.

*Castellanos v. Next Door Co., 124 So. 3d 392, 2013 Fla. App. LEXIS 16090 (Fla. Dist. Ct. App. 1st Dist., 2013)*

## Core Terms

claimant, *attorney*'s *fees*, *workers' compensation*, benefits, *fee* schedule, reasonable *attorney*'s *fees*, cases, injured *worker*, carrier, irrebuttable presumption, statutory *fee*, *fee* award, factors, percent, due process, amount of benefits, circumstances, conclusive presumption, *compensation* claim, elimination, reasonable *fee*, facial challenge, awarding, defenses, invalid, Door, mandatory, facial, skill, statutory formula

## Case Summary

**Overview**

HOLDINGS: [1]-Because the mandatory *fee* schedule in *§ 440.34, Fla. Stat.*, which created an irrebuttable presumption that precluded any consideration of whether an *attorney*'s *fee* award in a *workers' compensation* case was reasonable to compensate the *attorney*, was unconstitutional under both the Fourteenth Amendment and *Art. I, § 9, Fla. Const.* as a violation of due process, and the application of the *fee* schedule here resulted in a patently unreasonable *fee* of $1.53 per hour, remand was required for the judge of *compensation* claims to enter a reasonable *attorney*'s *fee* in accordance with the statute's immediate predecessor.

**Outcome**

Certified question answered in affirmative; decision upholding *fee* award quashed; and case remanded.

## LexisNexis® Headnotes

Constitutional Law > Substantive Due Process

*Workers' Compensation* & SSDI > Administrative Proceedings > Costs & *Attorney Fees*

*HN1* Constitutional Law, Substantive Due Process

The mandatory *fee* schedule in *§ 440.34, Fla. Stat.* (2009), which creates an irrebuttable presumption that precludes any consideration of whether the *fee* award is reasonable to compensate the *attorney*, is unconstitutional under both the *Florida* and United States Constitutions as a violation of due process. *Art. I, § 9, Fla. Const.*; U.S. Const. amend. XIV, § 1.

Business & Corporate Compliance > ... > Benefit Determinations > *Workers' Compensation* & SSDI > Benefit Determinations

Governments > Legislation > Interpretation

*HN2* Workers' Compensation, Benefit Determinations

See *§ 440.015, Fla. Stat.*

Constitutional Law > The Judiciary > Case or

Tim Howard

OR BK: 4149 PG: 2051

Petitioner will have the first week after school releases for the holiday with exchange being on Christmas Day at 3:00 p.m.

Respondent will have the second week until the Sunday before school resumes.

Visitation with Respondent will begin when school releases for each holiday, unless there are scheduled activities or doctor appointments, and the children will be returned the Sunday before school resumes at 6:00 p.m.

The visitation exchange will be facilitated by a third party, Sandy Fulop, the maternal grandmother.

Both children are attending psychological counseling and have been progressing well. Dakota has been diagnosed with ADHD, for which he is taking medications that cannot be discontinued without medical supervision. Shelby's doctor has recommended that Shelby not be forced to visit and be left to decide when she is ready to visit with Respondent.

Petitioner and Respondent agree that in the event either parent fails to exchange the minor children according to this visitation schedule any law enforcement agency available will have the authority to intervene and take whatever actions necessary to enforce this agreement including arresting the offending parent.

_____     _____
Dana F. Hall              Date         Jason R. Hall             Date

_____     _____
Print Name                             Print Name

STATE OF FLORIDA
COUNTY OF LEON

Sworn to and subscribed by me this 16th day of April, 2009.

_____
Notary

_____
Print Name

OR BK: 4149 PG: 2050

EXHIBIT A

Petitioner and Respondent have agreed to the following visitation schedules with the minor children:

Dakota Hall, 5 years old, will visit with Respondent every other weekend on Saturday from 9:00 a.m. until Sunday at 6:00 p.m. This schedule will be temporary for 6 months at which time Petitioner agrees to extend weekend visits from Friday at 6:00 p.m. until Sunday at 6:00 p.m. unless Respondent shows by objective, verifiable proof that he is not capable of providing a stable, sober, and safe environment for the child.

This includes but is not limited to Respondent not drinking, using illegal drugs, and not associating with known current illegal drug users and/or anyone under the influence of alcohol or illegal drugs. Respondent agrees that he will not travel outside of a 200 mile radius of his home without the express permission of Petitioner, during his visits with the children. If Respondent fails to follow these guidelines Petitioner will have the option of immediately ceasing visitation pursuant to this agreement and will have to seek the court's directions as to visitation.

Petitioner agrees to abide by all of the above limitations during her custody of the children with communication concerning travel to be facilitated through third party Sandy Fulop.

Shelby Hall, 13 years old, will visit with Respondent, during the dinner time period, which is approximately between 4 p.m. and 6 p.m., on either the Saturday or Sunday that Dakota is scheduled to visit, whichever day she chooses.

Holiday schedule:

Odd numbered years;
Petitioner
Spring Break, Easter, Labor Day, and Thanksgiving.

Respondent
Memorial Day, July 4th and Halloween.

Even numbered years;
Petitioner
Memorial Day, July 4th and Halloween.

Respondent
Spring Break, Easter, Labor Day, and Thanksgiving.

Christmas



OR BK: 4149 PG: 2056

| DATE | RECEIPT | AMOUNT | CATEGORY | JASON | JOINT |
|---|---|---|---|---|---|
| 07/18/08 | Jason Hall | $2,000.00 | Distribution | $2,000.00 | |
| 07/18/08 | Target | $160.00 | Dana Credit Card Payoff | | $160.00 |
| 07/15/08 | Sandy Fulop | $3,800.00 | Advance on $35,000 Loan | | $3,800.00 |
| 07/15/08 | HSBC | $760.00 | Dana Credit Card Payoff | | $760.00 |
| 07/23/08 | Jason Hall | $200.00 | Distribution | $200.00 | |
| 08/04/08 | Jason Hall | $200.00 | Distribution | $200.00 | |
| 08/06/08 | Jason Hall | $100.00 | Distribution | $100.00 | |
| 08/08/08 | Citifinancial Auto | $10,021.64 | Jeep Payoff | | $10,021.64 |
| 08/15/08 | Jason Hall | $2,000.00 | 1/2 Computer Replacement | $1,000.00 | $1,000.00 |
| 08/18/08 | Clifford Hall | $3,500.00 | Loan Repayment | | $3,500.00 |
| 08/18/08 | Anthony Hall | $5,500.00 | Loan Repayment/Sale of mothers' home | | $5,500.00 |
| 08/27/08 | Jason Hall | $2,000.00 | Distribution | $2,000.00 | |
| 08/27/08 | Cureton Johnson & Assoc. | $385.00 | Appraisal | | $385.00 |
| 08/27/08 | Jason Hall | $14,065.00 | MSA Funds for Deposit | $14,065.00 | |
| | | $44,671.64 | | $19,565.00 | $25,106.64 |

OR BK: 4149 PG: 2055

Hall. At any time during the 6 months should Jason Hall produce a positive drug or alcohol test result Jason Hall agrees to have no unsupervised visits with the children until he has successfully completed at least 6 consecutive months, from the date of the positive test result, of random drug testing with negative results. Jason Hall will also forfeit the $7,500 payment to Dana Hall and she can file for divorce immediately. Dana Hall agrees in good faith that she is not involved with another potential party and further agrees to abide by her marital vows during this period. If Dana Hall violates her good faith and determines to file for divorce prior to the end of the 6 month period, the $7,500 shall go towards child support for 15 months. Jason Hall will not monitor, stalk or harass Dana Hall in any fashion and will provide mature respect for her independence and judgment.

Dana Hall has the right to keep Hall as her legal last name.

If at the end of 6 months and either party determines to divorce the other, the distribution of assets and obligations described herein will be binding and operational, with no right to challenge, reconsider, file suit in attempt to cancel this agreement, or to change the terms of this agreement without the written consent of the other party. Either party can file for dissolution of marriage and seek a final court order consistent with this agreement. Each party waives their rights to challenge this agreement based on any factual basis or legal theory.

## SWORN AGREEMENT TO BINDING NATURE OF OBLIGATIONS HEREIN

Jason Hall and Dana Hall both agree under penalty of perjury that they are bound by this agreement and this agreement can not be modified except in writing and signed by both parties.

Sworn before me on this ___ day of September, 2008, personally appeared Jason Hall and Dana Hall who are personally known to me and hereby verify under oath and penalty of perjury that they have executed this agreement freely and are fully bound thereby and will comply with any and all conditions and will not contest or oppose any motion seeking a Court order to enforce any and all portions of this agreement.

_Jason C. Hall_  9/2/08
Jason Hall            Date

_Dana Hall_  9/2/08
Dana Hall           Date

Notary Public: _Keven Marie Mathews_
Date: 9-2-08

Notary Public: _Keven Marie Mathews_
Date: 9-2-08

_Tim Howard_  9/3/08
Tim Howard        Date

child support begins when annuity payments begin.

J.R.H.

4

OR BK: 4149 PG: 2054

be shared and divided evenly, with the first week with Dana Hall and the second week with Jason Hall. Thanksgiving holidays shall be shared. On odd years Dana Hall will have Spring break, Easter, and Labor Day, and Jason Hall will have Memorial Day, July 4th, and Halloween. On even years the holiday divisions will be in reverse with Jason Hall having Spring break, Easter, and Labor Day, and Dana Hall will have Memorial Day, July 4th, and Halloween. The parties will evenly divide birthdays over a several day period, and will cooperate and share the celebration where possible.

Jason Hall agrees that he will not ever drink or be under the influence of drugs or alcohol when driving with the children, and will drive with caution at the speed limit when the children are in the car. If Jason Hall violates this obligation, he will agree to supervised visitation.

In light of Jason Hall's paraplegic condition, limited education, contribution of $50,000 towards the children's future, and Dana Hall's healthy condition and college degree availing her the advantage of increasing her future income, and the $304 a month in Social Security Disability income provided to the children as a result of Jason's injuries and his inability to earn a living, the parties agree that Jason Hall will contribute $300 toward child support for both children monthly, and an additional $200 a month (this includes upto $50 per month for co-payments and up to $30 per month for medicine for both children) for medical insurance and care for both children, for a total of $500 a month. Out of pockets beyond those listed are paid by the parties 50/50. Jason Hall agrees to pay an additional $150 a month for afterschool for Dakota while he is in such program. This is consistent with Florida law that requires that Social Security payments made directly to the children by a severely handicapped parent "should be credited against that parent's child support obligations." *Williams v. Williams*, 560 So.2d 308 (Fla. 1st DCA 1990). That amount of child support will cease upon the older child reaching the age of 18 and will be decreased by ½ and will continue until the younger child reaches the age of 18. Payments for child support shall go through an appropriate third party to ensure timely payment and enforcement—the court registry is a potential option.

A Florida court order for child support may be modified if it has been at least 3 years since the existing support amount was ordered or since the case was last reviewed for a modification. To petition the court for modification when the previous order was entered three or more years ago, the difference between the current support amount and the proposed amount, using current information and statutory guidelines, must be at least 10% or $25 per month (whichever amount is greater). If it has been less than 3 years since the last review, a Florida support order may still be modified if there has been a significant change in circumstances. To petition the court for modification when the previous order was entered less than three years ago, the difference between the current support amount and the proposed amount, using current information and statutory guidelines, must be at least 15% or $50 per month (whichever amount is greater).

## DISSOLUTION AND COUNSELING PROCESSS

The parties agree to continue in this marriage for a period of 6 months from the date of this settlement. During that 6 month period the parties agree to attend joint marriage counseling for at least two one-hour sessions a month from a professional marriage counselor recommended by Donna St. Hilliar, and agree to one dinner for a maximum of 2 hours every month. The counseling and dinners will alternate. If there is no family activity during the month, the parties agree to two dinners. This will be in addition to family activities with the children of the marriage. Jason Hall agrees to leave a message at the home or office and to wait 48 hours for a response prior to making another call. The counseling and dinners will be paid for by Jason Hall. Dana Hall will choose the date, time and venue in consultation with Jason Hall.

Dana Hall has the option of living at a distinct location at her own cost. Jason Hall agrees to end his use of alcohol and opiates and agrees to weekly random drug testing during the 6 month period not to exceed 4 times monthly and which costs of testing will be paid by Jason

3

OR BK: 4149 PG: 2053

Jason Hall and Dana Hall have had the opportunity to or have already consulted with an outside attorney and they have both agreed to pursue the mediation process and to be bound by this agreement in order to avoid the joint expense of outside counsel.

## DISTRIBUTION OF ASSETS AND RESPONSIBILITIES

**Equity in Marital Home at Dognacall Trail.** The parties purchased the marital home in October of 2002 for $115,000. The parties' joint mortgage on this marital home is approximately $106,000. The home was appraised at $157,439 using the cost approach and $159,000 using the sales comparison approach. For equitable distribution, the parties have agreed to divide the difference and agree upon a valuation of $158,250. Appraisal attached hereto and incorporated herein as Exhibit A. Thus, there is approximately $52,250 in equity that the parties are entitled to from this home.. An even division of $52,250 amounts to $26,125.

Ms. Hall independently advanced the following resources in the purchase, maintenance and improvements of this home:

Ms. Hall provided $5,644.85 towards the down-payment from the proceeds from the sale of her prior home. Ms. Hall paid IRS obligations of Jason Hall in the amount of $4,813.11, so that Jason Hall could be added to the mortgage on this home.

Mr. Hall independently advanced various resources in the purchase, maintenance and improvements of this home including a portion of the monthly payments on the mortgage during approximately 4 years of joint ownership from October of 2002, until becoming a paraplegic on March 16, 2006.

Based on the distinct investments and portion of ownership in the equity in the home, and the allocation of joint debts and obligations as listed below, the distribution agreed upon is that Jason Hall shall pay the marital obligations and shall also retain the equity in the home.

**Joint Debt Obligations.** The parties borrowed $32,000 from Sandy Fulop, Dana Hall's mother; $3,500 from Jason Hall's brother; and $5,500 from Jason Hall's father, to secure the family home, food, and activities during the 28 months from Jason Hall's injury on March 15, 2006 until today's date.

Mr. Hall has paid $26,106.64, towards joint debt obligations, including $3,800 in payments made to Sandy Fulop. These are detailed and attached hereto and incorporated herein as Exhibit B. Jason Hall also paid $2,000 towards a lap top computer for Shelby Hall.

The parties still owe Dana Hall's mother $28,200 ($32,000 - $3,800=$28,200) and they agree that this is a joint obligation that they both benefited from. Dana Hall and Jason Hall have reviewed the use of these funds to determine the use allocation. A review by Dana Hall is attached hereto and incorporated herein as Exhibit C.

The parties agree that the costs of this mediation process and legal assistance over the past several months shall be jointly shared. The parties have been using paralegal time ($150 an hour discounted to $100) at 10 hours a week for the past 10 weeks (100 hours paralegal time), and senior partner time ($450 an hour discounted to $275) at 2 hours a week for the past 10 weeks (20 hours legal time). The already discounted fee ($24,000 reduced to $15,500) for this time amounts to $5,500 in senior partner time and $10,000 in paralegal time, for a total of $15,500. If this mediation is resolved today, the fee will be reduced by an additional 50%, for a total reduction of over 67%, for a total of $7,750. The even distribution of these costs amounts to $3,875 per party.

Based on a review of these joint debt obligations, the parties agree to the following: All liabilities will be paid by Jason Hall and all equity in the home will be owned by Jason Hall. Upon payment of these obligations, Dana Hall will assign her interests through a Quit Claim Deed to Jason Hall for total ownership of all equity and obligations on the home.

**Custody, Visitation, and Child Support Obligations.** The parties agree that they shall have joint custody of the children, with primary residence with Dana Hall, and a visitation schedule as follows: Every other weekend visitation with Jason Hall. Christmas holidays shall

2

OR BK: 4149 PG: 2052

## Agreement to Divide Assets and Responsibilities, and to Divorce if Desired by Either Party

### MEDIATION AND SETTLEMENT PROCESS

Jason Hall and Dana Hall (hereinafter referred to as "parties") hereby agreed to mediate their potential dissolution of marriage and respective rights and interests pertaining to assets and the two children of the marriage. Prior to this mediation, undersigned counsel represented Jason Hall in his workers compensation action against Ferrell Roofing, Inc., but did not represent Dana Hall. A significant portion of the assets and income stream for Jason Hall is as a result of the representation of Jason Hall by the undersigned counsel.

For purposes of this mediation both parties agreed to waive any conflict that they may have with undersigned counsel and both parties agree to waive any issues of professional liability on family law matters or any legal issue, in that for purposes of this mediation, undersigned counsel is not acting as counsel for either party, nor is he providing legal advice on any family matter or any other legal matter. Rather, for this mediation, undersigned counsel is working to reach an agreement that is acceptable between the parties to reduce litigation costs.

Since the April 2008 settlement of the workers compensation action against Summit and Ferrell Roofing brought by Jason Hall and litigated by undersigned counsel for over two years, both parties have been receiving and are requesting daily, weekend, and evening consults from undersigned's paralegal and from undersigned. This has been continuous for months, and averages at 10 hours a week between the two parties. The paralegal hourly rate is $150 an hour and undersigned's hourly rate is $450 an hour. The parties will receive a discounted rate of $100 an hour for paralegal services and $275 an hour for attorney services, with all services agreed to be paid at the end of mediation.

Jason Hall is a paraplegic, with only a 10th Grade education and no marketable skills. He will receive approximately $2,750 monthly in social security disability and annuity income from his worker's compensation settlement. This amounts to approximately $30,000 annually. Dana Hall has a college degree in nursing paid for during the marriage. During the marriage, prior to Jason's injuries, she did not work outside the home. She has no disabilities. She began her work outside the home after Jason Hall's injuries. She is currently making approximately $27,000 annually. Thus, the parties acknowledge that Jason Hall is not of able body and has no means to increase his income at this time. The parties acknowledge that Dana Hall is of able body, has a college degree and has means to increase her income over time.

The parties have two children, one prior to their marriage that Jason Hall adopted, Shelby Hall, who is 13 years old, and 5 year old Dakota, who is a product of the marriage. Jason Hall has established a trust of $25,000 for each child, for a total of $50,000, of which upon distribution of trust proceeds, each child will receive between $45,000 and $30,000 respectively, for a total of approximately $75,000. The parties have also jointly paid for Florida Pre-paid College Plan, 2 + 2 Tuition, at a cost of approximately $77 a month (with a current pay off of approximately $3,600) for Shelby Hall and agree to provide an equal amount for Dakota Hall, at a monthly cost of $77 per month.

As a result of Jason's paraplegic condition, Social Security currently pays $804 towards the maintenance of the children. This amounts to approximately $25,000 for the daughter over the next 5 years, and $65,000 for the son over the next 13 years, for a total of $90,000.

The parties jointly own a home appraised at $159,000, and that has approximately $52,000 in equity. See below. The parties also have joint debts and obligations that amount to approximately $50,000. See below.

The parties have reached a mediated resolution. All discussions and materials presented in mediation are confidential and are not for use in any contested or litigated matter. If this is violated, the violating party can be held in contempt of court.



WHEREFORE for the foregoing reasons, undersigned counsel for the Estate of JASON

R. HALL, hereby provides this Notice of Withdrawal. Upon resolution of the Florida Bar

Arbitration and Mediation, undersigned counsel is willing to assist to close the Estate of Jason R.

Hall.

Respectfully submitted on this 14th day of July, 2016,

Tim Howard, Esq., Ph.D.
Howard & Associates, P.A.
Florida Bar Number 655325
2021 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298-4455 (o)
tim@howardjustice.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Notice of

Withdrawal As Counsel for the Estate has been served via E-Mail and regular mail to Sandra A.

Fulup, Executor of the Estate, 308 Birch Lane, Tallahassee, FL 32301, at

safpassport@yahoo.com, on this 14th day of July, 2016.

Tim Howard, Esq., Ph.D.

2

**In the County Court for the Second Judicial Circuit**
**In and For Leon County, Florida**

IN RE ESTATE OF JASON R. HALL

Probate Division 37 2012 CP 000473

Deceased.
_____/

## NOTICE OF WITHDRAWAL AS COUNSEL FOR THE ESTATE

COMES NOW undersigned counsel for the Estate of JASON R. HALL, deceased, File Number 37-2012-CP-000473, which is pending in the Circuit Court for Leon County, Florida, Probate Division, and provides this NOTICE OF WITHDRAWAL AS COUNSEL FOR THE ESTATE. As grounds therefore, undersigned pro bono counsel states as follows:

1. Through the joint efforts of undersigned counsel and Sandra A. Fulup, Executor of the Estate of Jason R. Hall, all matters pertaining to property sale, notice to creditors, eviction of tenants, custody of children, payment of any outstanding liens on Jason R. Hall's worker's compensation claim, etc., as well as accounting of the workers compensation claim fees and costs, etc., of Jason R. Hall, that was settled in July of 2008, have been either resolved or fully provided to the Executor of the Estate.

2. The Executor of the Estate has recently issued an inappropriate demand to counsel.

3. Due to the resulting conflict of interest, undersigned counsel must withdraw as counsel for the estate.

4. The Executor of the Estate and undersigned counsel have both agreed in writing to arbitrate this issue before the Florida Bar Arbitration and Mediation Service.

5. Once this issue is resolved in arbitration, at that time, counsel for the Estate of Jason R. Hall is willing to assist to close the Estate of Jason R. Hall.

1

In the County Court for the Second Judicial Circuit
In and For Leon County, Florida

IN RE ESTATE OF JASON R. HALL

Probate Division _____

Deceased.

_____/

## ORDER APPOINTING PERSONAL REPRESENTATIVE

On the petition of Dana F. Hall, for administration of the estate of Jason R. Hall,
deceased, the court finding that the decedent died on May 3, 2012, and that Dana R. Hall is
entitled to appointment as personal representative by reason of the Petition and the affidavit and
that she is the mother of the minor children of the decedent and that they are the only
beneficiaries, it is:

ADJUDGED that Dana F. Hall is appointed personal representative of the decedent, and
that upon taking the prescribed oath filing designation of resident agent and acceptance, and
letters of administration shall be issued.

ORDERED on _____, 2012.

_____
Circuit Judge

1

Son                Dakota Ray Hall           308 Birch Lane, Tallahassee, FL 32301

5. Venue of this proceeding is in Leon County because both minor children reside in Leon County, Florida, and the Decedent both resided and died in Leon County, Florida.

6. Dana F. Hall, the ex-wife and mother of both minor children and whose address is 308 Birch Lane, Tallahassee, FL 32301, is qualified under the laws of the State of Florida to serve as Personal Representative of the Decedent's Estate and is entitled to preference in appointment as Personal Representative because she and her children are the only beneficiaries and heirs of the Decedent.

7. Copies of the minor children's birth certificates and social security cards attached.

8. The nature of the estate includes real estate, an automobile, a bank account, personal items, furniture, televisions and appliances, and an annuity of which Dana F. Hall was the named beneficiary at the time of Decedent's death. The value of the estate is estimated at $120,000.

9. The estate will not be required to file federal estate tax return.

10. Petitioner is unaware of any unrevoked will or codicil or Decedent.

11. Petitioner requests that an Order be entered probating the estate of Jason R. Hall; and that Dana F. Hall be appointed as Personal Representative of the estate of Decedent; and that bond not be required.

Under penalties of perjury, I declare that I have read the foregoing, and the facts alleged are true, to the best of my knowledge and belief. Signed June 27, 2012.

TIM HOWARD, ESQ.
ATTORNEY FOR PETITIONER
Florida Bar Number: 0655325
Howard & Associates, P.A.
8511 Bull Headley Rd., Ste. 405
Tallahassee, FL 32312
(850) 298-4455 office; (850) 216-2537 facsimile

PETITIONER

2

In the County Court for the Second Judicial Circuit
In and For Leon County, Florida

IN RE ESTATE OF JASON R. HALL

Probate Division _____

Deceased.
_____/

## PETITION FOR PROBATION OF INTESTATE ESTATE AND APPOINTMENT OF PERSONAL REPRESENTATIVE

Petitioner alleges:

1. After the exercise of reasonable diligence, the petitioner is unaware of any unrevoked wills or codicils. Petitioner has an interest in the above estate as designated Personal Representative and Beneficiary of Jason R. Hall. Petitioner's name and address is: Dana F. Hall, 308 Birch Lane, Tallahassee, FL 32301.

2. Decedent, Jason R. Hall, whose last known address was 6600 Donerail Trail, Tallahassee, FL 32309, and whose age was 38 years old and whose social security number is 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, died on May 3, 2012, in an automobile accident at Whirlaway Trail at Brokers Tip Trail, Tallahassee, Florida 32309, and on the date of death Decedent was domiciled in Leon County, Florida.

3. The Decedent's Death Certificate is attached.

4. The persons and entities who would be entitled to the property devised are the following heirs at law of the Decedent and the beneficiaries, including their address and relationship to Decedent are:

| RELATIONSHIP | NAME | ADDRESS |
|---|---|---|
| Daughter | Shelby Rain Hall | 308 Birch Lane, Tallahassee, FL 32301 |

1

# Howard & Associates
## Attorneys at Law, P.A.

Dr. Tim Howard, J.D., Ph.D., Senior Partner*
Florida Court Certified Mediator

Howard & Associates, P.A.
8311 Bull Headley Road, Suite 405
Tallahassee, Florida 32312
Telephone: (850) 298-4455
Telecopy: (850) 216-2537
e-mail: jtim@aol.com

Cambridge Office
8 Museum Way Ste. 2407
Cambridge, MA 02141
(857) 277-0990
t.howard@neu.edu

Northeastern University
Law & Policy Doctorate Program, Director
42 Schuler
360 Huntington Avenue
Boston, Massachusetts 02115-5000
Telephone: (617) 373-0276

June 27, 2012

Clerk of the Court
Probate Division
Leon County Courthouse
Tallahassee, Florida 32301

RE:    Estate of Jason R. Hall

Dear Clerk,

Enclosed please find the Petition for Probate of In testate Estate and Appointment of Personal Representative (including proposed order); Oath of Personal Representative, Designation of Resident Agent, and Acceptance; Statement Regarding Creditors; Letter of Administration for use by Personal Representative; Petition Verifying Homestead Status and Transferring Ownership of Real Property Solely to Personal Representative (including proposed order). The filing fee is being provided along with this filing.

Though there does not appear to be any other creditor than those listed, once the Letter of Administration is executed, the Personal Representative will submit the required publication.

Thanks for your attention to this matter.

Sincerely,

Kim Mathews, Director of Firm Operations
for Dr. Tim Howard

PTH/kmm

---

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D., Northeastern University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process instructor at Boston University. Professor and former Director of Northeastern University's Law & Policy Doctorate Program. President Cambridge Graduate University.

ON: 05/30/2013

| Date | Code | | Description | | | Source |
|---|---|---|---|---|---|---|
| 4/16/2014 | PRPU | ☐ «-*Req* | PROOF OF PUBLICATION | | | BM |
| 5/30/2014 | JRPAO | | JUDGE REASSIGNMENT PER ADMIN ORDER AO2014-05 FROM JUDGE Reynolds TO JUDGE Fulford reassigned on: 06/30/2014 | | | BM |
| 10/22/2014 | RECEIPT | ☐ «-*Req* | PAYMENT $70.00 RECEIPT #961351 | | | BM |
| 10/22/2014 | MO | ☐ «-*Req* | MOTION FOR APPOINTMENT OF GUARDIAN AD LITEM | | | BM |
| 10/22/2014 | PETI | ☐ «-*Req* | PETITION OF GUARDIAN FOR LEAVE TO SELL PROPERTY AT PRIVATE SALE | | | BM |
| 10/24/2014 | ANF | ☐ «-*Req* | AFFIDAVIT OF NO FLORIDA ESTATE TAX DUE - Recorded (OR 4727.1476 / 20140085519) | 4727 | 1476 | BM |
| 11/13/2014 | PETI | ☐ «-*Req* | PETITION TO AMEND ORDER VERIFYING HOMESTEAD STATUS AND TRANSFERRING OWNERSHIP OF REAL PROPERTY JOINTLY TO DANA F. HALL AND THE ONLY HEIRS TO THE ESTATE, SHELBY RAINE HALL AND DAKOTA RAY HALL | | | BM |
| 11/20/2014 | AMPE | ☐ «-*Req* | AMENDED PETITION TO AMEND ORDER VERIFYING HOMESTEAD STATUS AND TRANSFERRING OWNERSHIP OF REAL PROPERTY JOINTLY TO DANA F. HALL AND THE ONLY HEIRS TO THE ESTATE, SHELBY RAINE HALL AND DAKOTA RAY HALL | | | BM |
| 11/21/2014 | AMO | ☐ «-*Req* | AMENDED ORDER VERIFYING HOMESTEAD STATUS AND TRANSFERRING OWNERSHIP OF REAL PROPERTY JOINTLY TO DANA F. HALL AND THE ONLY HEIRS TO THE ESTATE, SHELBY RAINE HALL AND DAKOTA RAY HALL - Recorded (OR 4737.65 / 20140091781) | 4737 | 65 | BM |

Top of Page

| Event | Date | Start | Location | Judge | Result | Source |
|---|---|---|---|---|---|---|

Top of Page

| Docket Application | Owed | Paid | Dismissed | Due |
|---|---|---|---|---|
| COPIES | $8.00 | $8.00 | $0.00 | $0.00 |
| COPIES | $5.00 | $5.00 | $0.00 | $0.00 |
| PETITION FOR ADMINISTRATION | $400.00 | $400.00 | $0.00 | $0.00 |
| COPIES | $70.00 | $70.00 | $0.00 | $0.00 |

Top of Page

| | | Ar Plan | | |
|---|---|---|---|---|
| Ordered Amt | Paid | Dismissed | Balance | Delinquent |

Top of Page

| Date | Code | | Description | BK | PG | |
|---|---|---|---|---|---|---|
| 6/27/2012 | OPRD | ☐ «-*Req* | OATH OF PERSONAL REPRESENTATIVE, DESIGNATION OF RESIDENT AGENT & ACCEPTANCE \| BK:4388 PG:477 | 4388 | 477 | BM |
| 6/27/2012 | SRC | ☐ «-*Req* | STATEMENT REGARDING CREDITORS | | | BM |
| 6/27/2012 | PETI | ☐ «-*Req* | PETITION VERIFYING HOMESTEAD STATUS AND TRANSFERRING OWNERSHIP OF REAL PROPERTY SOLELY TO PERSONAL REPRESENTATIVE \| BK:4388 PG:501 | 4388 | 501 | BM |
| 6/30/2012 | JRPAO | | JUDGE REASSIGNMENT PER ADMIN ORDER AO2012-08 FROM JUDGE GIEVERS TO JUDGE FULFORD REASSIGNED ON: 06/30/2012 | | | BM |
| 7/3/2012 | OAPR | ☐ «-*Req* | ORDER APPOINTING PERSONAL REPRESENTATIVE FILED \| BK:4390 PG:100 | 4390 | 100 | BM |
| 7/3/2012 | LA_CP | ☐ «-*Req* | LETTERS OF ADMINISTRATION FILED \| BK:4390 PG:99 | 4390 | 99 | BM |
| 7/3/2012 | ORDR | ☐ «-*Req* | ORDER VERIFYING HOMESTEAD STATUS AND TRANSFERRING OWNERSHIP OF REAL PROPERTY SOLELY TO PERSONAL REPRESENTATIVE FILED \| BK:4390 PG:413 | 4390 | 413 | BM |
| 7/9/2012 | COI_CP | ☐ «-*Req $* | COPIES RECEIPT: 667782 DATE: 07/09/2012 | | | BM |
| 7/17/2012 | LETR | ☐ «-*Req* | LETTER TO JUDGE FULFORD REGARDING PERSONAL REPRESENTATIVE FROM PIPER AND RICHARD PECKHAM | | | BM |
| 7/18/2012 | COI_CP | ☐ «-*Req $* | COPIES RECEIPT: 671183 DATE: 07/18/2012 | | | BM |
| 11/5/2012 | OPRD | ☐ «-*Req* | OATH OF PERSONAL REPRESENTATIVE, DESIGNATION OF RESIDENT AGENT AND ACCEPTANCE \| BK:4439 PG:23 | 4439 | 23 | BM |
| 11/5/2012 | MOTO | ☐ «-*Req* | MOTION VERIFYING HOMESTEAD STATUS AND TRANSFERRING OWNERSHIP OF REAL PROPERTY JOINTLY TO DANA F. HALL AND THE ONLY HEIRS TO THE ESTATE, SHELBY RAINE HALL AND DAKOTA RAY HALL \| BK:4439 PG:20 | 4439 | 20 | BM |
| 11/5/2012 | MOTO | ☐ «-*Req* | MOTION TO AMEND THE APPOINTMENT OF PERSONAL REPRESENTATIVE TO SANDRA A. FULOP MATERNAL GRANDMOTHER OF DECEDANTS [SIC] MINOR CHILDREN, TO REPLACE FORMER PERSONAL REPRESENTATIVE DANA HALL | | | BM |
| 12/21/2012 | ODH | ☐ «-*Req* | ORDER VERIFYING HOMESTEAD AND TRANSFERRING OWNERSHIP OF REAL PROPERTY JOINTLY TO DANA F. HALL AND THE ONLY HEIRS TO THE ESTATE, SHELBY RAINE HALL AND DAKOTA RAY HALL \| BK:4460 PG:628 | 4460 | 628 | BM |
| 12/21/2012 | LA_CP | ☐ «-*Req* | LETTERS OF ADMINISTRATION \| BK:4460 PG:627 | 4460 | 627 | BM |
| 12/21/2012 | ORDR | ☐ «-*Req* | ORDER AMENDING THE APPOINTMENT OF PERSONAL REPRESENTATIVE TO SANDRA A. FULOP MATERNAL GRANDMOTHER OF DECEDENTS MINOR CHILDREN \| BK:4460 PG:626 | 4460 | 626 | BM |
| 5/30/2013 | JRPAO | | JUDGE REASSIGNMENT PER ADMIN ORDER AO2012-08 THIRD AMENDMENT FROM JUDGE FULFORD TO JUDGE REYNOLDS REASSIGNED | | | BM |

Full Case View 🐾                                                      Previous Page

**37 2012 CP 000473 - Decedent: HALL, JASON R Personal Rep.: HALL, DANA F**

| Status | Party | Party Code | Attorney |
|---|---|---|---|
| DISMISSED | HALL, DANA F | PERSONAL REPRESENTATIVE | |
| | HALL, DAKOTA RAY | BENEFECIARY | PRO SE |
| | HALL, DAKOTA RAY | BENEFICIARY | PRO SE |
| | HALL, SHELBY RAIN | BENEFECIARY | PRO SE |
| | HALL, SHELBY RAIN | BENEFICIARY | PRO SE |
| | HALL, JASON R | DECEDENT | PRO SE |
| | FULOP, SANDRA A | PERSONAL REPRESENTATIVE | PHILLIP TIM HOWARD |
| | HALL, DANA F | APPLICANT | PHILLIP TIM HOWARD |

Top of Page

| Action Descr | Status | Status Date | Disposition | Disposition Date | Judge |
|---|---|---|---|---|---|
| FORMAL ADMINISTRATION | OPEN | 6/27/2012 | | | FULFORD |

Top of Page

| Charge # | Action Code | Description | Plea Date | Plea | Decision Date | Court Action | Charge Disposition | Citation |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Top of Page

**Judges Appearing on Case**

| Last Name | First Name | Date Assigned | Source |
|---|---|---|---|
| FULFORD | JACKIE | 6/30/2014 6:24:32 PM | BM |
| REYNOLDS | GEORGE | 6/29/2012 3:05:35 PM | BM |

Top of Page

VOR Statuses

Viewable on Request Documents

Starting on December 1, 2015 there will be a $1.00/page charge for all document requests that must be scanned from paper. The icon -- Req$ -- reflects this charge.

DOCKET TABLE HEADERS ARE SORTABLE. CLICK FOR ASCENDING, AGAIN FOR DESCENDING ORDER

Source Table Abbreviations: BM = Benchmark; JIS = Justice Informations System

| DOCKET DATE | DOCKET CODE | DOCKET TEXT | OR BOOK | OR PAGE | SOURCE |
|---|---|---|---|---|---|
| 6/27/2012 | PA1_CP [] «_Req_ | PETITION FOR PROBATION OF INTESTATE ESTATE AND APPOINTMENT OF PERSONAL REPRESENTATIVE RECEIPT: 665231 DATE: 07/02/2012 \| BK:4388 PG:462 | 4388 | 462 | BM |
| 6/27/2012 | DCRT [] «_Req_ | DEATH CERTIFICATE | | | BM |

20120094969 ELECTRONICALLY RECORDED IN THE PUBLIC RECORDS OF LEON COUNTY, FL
BK: 4460  PG: 626   12/26/2012 at 02:41 PM   BOB INZER, CLERK OF COURTS

In the County Court for the Second Judicial Circuit
In and For Leon County, Florida

IN RE ESTATE OF JASON R. HALL

Probate Division 37 2012 CP 000473

Deceased.

_____/

### ORDER AMENDING THE APPOINTMENT OF PERSONAL REPRESENTATIVE TO SANDRA A. FULOP MATERNAL GRANDMOTHER OF DECEDENT'S MINOR CHILDREN

Order entering probate of the estate of Jason R. Hall; and that Sandra A. Fulop be

appointed Personal Representative of the estate of Decedent; and that bond not be required.

DONE AND ORDERED on _November 14_, 2012

_____
Circuit Judge

A Certified Copy
Attest:
**Bob Inzer**
Clerk Circuit Court
Leon County, Florida

_____ D.C.
10/31/13

IN
COMPUTER

1



STATE OF FLORIDA
OFFICE OF VITAL STATISTICS
CERTIFICATION OF BIRTH

NAME: DAKOTA RAY HALL

DATE OF BIRTH: 5/22/03        SEX: MALE

PLACE OF BIRTH: LEON COUNTY, FLORIDA

CERTIFICATE NUMBER: 109-03-075897

DATE FILED: 5/27/03        DATE ISSUED: 7/22/03

MOTHER'S MAIDEN NAME: DANA LYNETTE FULOP

FATHER'S NAME: JASON RAY HALL

This is to certify that this is a true abstract of the official record filed with this office.

By

State Registrar

WARNING: 6365460

HEALTH

YOUR SOCIAL SECURITY C...

Keep this stub with your personal records. The other side contains important information.

Detach the card below and sign it in ink immediately. Keep your card in a safe place to prevent loss or theft. Do not laminate your card.

DAKOTA RAY HALL
6600 DONERAIL TRL
TALLAHASSEE FL 32...



SOCIAL SECURITY

DAKOTA RAY HALL



STATE OF FLORIDA
OFFICE OF VITAL STATISTICS
CERTIFICATION OF BIRTH

NAME: SHELBY RAINE HALL

DATE OF BIRTH: 8/26/95        SEX: FEMALE

PLACE OF BIRTH: LEON COUNTY, FLORIDA

CERTIFICATE NUMBER: 109-95-120644

DATE FILED: 9/06/95        DATE ISSUED: 5/17/00

MOTHER'S MAIDEN NAME: DANA LYNETTE FULOP

FATHER'S NAME: JASON RAY HALL

This is to certify that this is a true abstract of the official record filed with this office.

By _____ State Registrar

WARNING:
4653321

HEALTH

SHELBY RAINE HALL

Shelby Raine Hall

Son                    Dakota Ray Hall                308 Birch Lane, Tallahassee, FL 32301

     5.  Venue of this proceeding is in Leon County because both minor children reside in Leon County, Florida, and the Decedent both resided and died in Leon County, Florida.

     6.  Dana F. Hall, the ex-wife and mother of both minor children and whose address is 308 Birch Lane, Tallahassee, FL 32301, is qualified under the laws of the State of Florida to serve as Personal Representative of the Decedent's Estate and is entitled to preference in appointment as Personal Representative because she and her children are the only beneficiaries and heirs of the Decedent.

     7.  Copies of the minor children's birth certificates and social security cards attached.

     8.  The nature of the estate includes real estate, an automobile, a bank account, personal items, furniture, televisions and appliances, and an annuity of which Dana F. Hall was the named beneficiary at the time of Decedent's death.  The value of the estate is estimated at $120,000.

     9.  The estate will not be required to file federal estate tax return.

     10.  Petitioner is unaware of any unrevoked will or codicil or Decedent.

     11.  Petitioner requests that an Order be entered probating the estate of Jason R. Hall; and that Dana F. Hall be appointed as Personal Representative of the estate of Decedent; and that bond not be required.

     Under penalties of perjury, I declare that I have read the foregoing, and the facts alleged are true, to the best of my knowledge and belief.  Signed June 27, 2012.

TIM HOWARD, ESQ.                                    PETITIONER
ATTORNEY FOR PETITIONER
Florida Bar Number: 0655325
Howard & Associates, P.A.
8511 Bull Headley Rd., Ste. 405
Tallahassee, FL 32312
(850) 298-4455 office; (850) 216-2537 facsimile

2

In the County Court for the Second Judicial Circuit
In and For Leon County, Florida

IN RE ESTATE OF JASON R. HALL

Probate Division 12CP473

Deceased.

_____/

## PETITION FOR PROBATION OF INTESTATE ESTATE AND APPOINTMENT OF PERSONAL REPRESENTATIVE

Petitioner alleges:

1. After the exercise of reasonable diligence, the petitioner is unaware of any unrevoked wills or codicils. Petitioner has an interest in the above estate as designated Personal Representative and Beneficiary of Jason R. Hall. Petitioner's name and address is: Dana F. Hall, 308 Birch Lane, Tallahassee, FL 32301.

2. Decedent, Jason R. Hall, whose last known address was 6600 Donerail Trail, Tallahassee, FL 32309, and whose age was 38 years old and whose social security number is ████████, died on May 3, 2012, in an automobile accident at Whirlaway Trail at Brokers Tip Trail, Tallahassee, Florida 32309, and on the date of death Decedent was domiciled in Leon County, Florida.

3. The Decedent's Death Certificate is attached.

4. The persons and entities who would be entitled to the property devised are the following heirs at law of the Decedent and the beneficiaries, including their address and relationship to Decedent are:

| RELATIONSHIP | NAME | ADDRESS |
|---|---|---|
| Daughter | Shelby Rain Hall | 308 Birch Lane, Tallahassee, FL 3230 |

Recorded in the Official Records
of Leon County

obligations or liability to pay past, present and future monetary compensation, medical, vocational rehabilitation, death benefits or any other benefits of any classification or type whatsoever, including any penalties and interest, on account of injury, disability and death resulting, in whole or in part, from or arising out of the work related accident(s) or occupational disease claimed by the Employee. The parties agree that the lump sum consideration shall be allocated as follows:

Past Medical:                                    $ 600,000.00

Medicare Set Aside account:             $ 200,474.00
(per the recommended allocation)

Non-Medicare covered services:        $ 23,563.00

Past and future Monetary Compensation   $ 151,304.00

Attorneys Fees:                              $ 100,000.00

Costs:                                         $ 57,000.00

                        TOTAL           $ 1,111,041.00

2)    Upon receipt of the lump sum consideration, the Employer/Carrier will be forever released and discharged from the obligation or liability to pay past, present and future monetary compensation, medical benefits, vocational rehabilitation benefits, death benefits or any other benefits of any classification whatsoever, including penalties and interest, which are or may in the future be owed to the Employee, the Employee's dependents, assigns, successors or any other person or entity who may have a claim under Chapter 440, Florida Statutes, as a result of the accident(s) which is the subject of this Settlement Agreement and Release. Which sums shall be payable as follows upon Order by the Judge of Compensation

Page 2 of 8                   612,828.00

handling employee benefit or retirement proceeds, prompt assessment request, or request for release of personal liability for payment of tax.

(d)   Review of estate tax return and preparation or review of other tax returns required to be filed by the personal representative.

(e)   Preparation of the estate's federal estate tax return. If this return is prepared by the attorney, a fee of one-half of 1 percent up to a value of $10 million and one-fourth of 1 percent on the value in excess of $10 million of the gross estate as finally determined for federal estate tax purposes, is presumed to be reasonable compensation for the attorney for this service. These fees shall include services for routine audit of the return, not beyond the examining agent level, if required.

(f)   Purchase, sale, lease, or encumbrance of real property by the personal representative or involvement in zoning, land use, environmental, or other similar matters.

(g)   Legal advice regarding carrying on of the decedent's business or conducting other commercial activity by the personal representative.

(h)   Legal advice regarding claims for damage to the environment or related procedures.

(i)   Legal advice regarding homestead status of real property or proceedings involving that status and services related to protected homestead.

(j)   Involvement in fiduciary, employee, or attorney compensation disputes.

(k)   Proceedings involving ancillary administration of assets not subject to administration in this state.

(5)   Upon petition of any interested person, the court may increase or decrease the compensation for ordinary services of the attorney or award compensation for extraordinary services if the facts and circumstances of the particular administration warrant. In determining reasonable compensation, the court shall consider all of the following factors, giving weight to each as it determines to be appropriate:

(a)   The promptness, efficiency, and skill with which the administration was handled by the attorney.

(b)   The responsibilities assumed by and the potential liabilities of the attorney.

(c)   The nature and value of the assets that are affected by the decedent's death.

(d)   The benefits or detriments resulting to the estate or interested persons from the attorney's services.

(e)   The complexity or simplicity of the administration and the novelty of issues presented.

(f)   The attorney's participation in tax planning for the estate and the estate's beneficiaries and tax return preparation, review, or approval.

(g)   The nature of the probate, nonprobate, and exempt assets, the expenses of administration, the liabilities of the decedent, and the compensation paid to other professionals and fiduciaries.

(h)   Any delay in payment of the compensation after the services were furnished.

(i)   Any other relevant factors.

(6)   If a separate written agreement regarding compensation exists between the attorney and the decedent, the attorney shall furnish a copy to the personal representative prior to commencement of employment, and, if employed, shall promptly file and serve a copy on all interested persons. Neither a separate agreement nor a provision in the will suggesting or directing that the personal representative retain a specific attorney will obligate the personal representative to employ the attorney or obligate the attorney to accept the representation, but if the attorney who is a party to the agreement or who drafted the will is employed, the compensation paid shall not exceed the compensation provided in the agreement or in the will.

History.—s. 4, ch. 93-257; s. 2, ch. 95-401; s. 142, ch. 2001-226.

Select Year:   2019   ⟳)   Go )

# The 2019 Florida Statutes

| Title XLII | Chapter 733 | View Entire Chapter |
| --- | --- | --- |
| ESTATES AND TRUSTS | PROBATE CODE: ADMINISTRATION OF ESTATES | |

**733.6171   Compensation of attorney for the personal representative.—**

(1)   Attorneys for personal representatives shall be entitled to reasonable compensation payable from the estate assets without court order.

(2)   The attorney, the personal representative, and persons bearing the impact of the compensation may agree to compensation determined in a different manner than provided in this section. Compensation may also be determined in a different manner than provided in this section if the manner is disclosed to the parties bearing the impact of the compensation and if no objection is made as provided for in the Florida Probate Rules.

(3)   Compensation for ordinary services of attorneys in formal estate administration is presumed to be reasonable if based on the compensable value of the estate, which is the inventory value of the probate estate assets and the income earned by the estate during the administration as provided in the following schedule:

(a)   One thousand five hundred dollars for estates having a value of $40,000 or less.

(b)   An additional $750 for estates having a value of more than $40,000 and not exceeding $70,000.

(c)   An additional $750 for estates having a value of more than $70,000 and not exceeding $100,000.

(d)   For estates having a value in excess of $100,000, at the rate of 3 percent on the next $900,000.

(e)   At the rate of 2.5 percent for all above $1 million and not exceeding $3 million.

(f)   At the rate of 2 percent for all above $3 million and not exceeding $5 million.

(g)   At the rate of 1.5 percent for all above $5 million and not exceeding $10 million.

(h)   At the rate of 1 percent for all above $10 million.

(4)   In addition to fees for ordinary services, the attorney for the personal representative shall be allowed further reasonable compensation for any extraordinary service. What is an extraordinary service may vary depending on many factors, including the size of the estate. Extraordinary services may include, but are not limited to:

(a)   Involvement in a will contest, will construction, a proceeding for determination of beneficiaries, a contested claim, elective share proceeding, apportionment of estate taxes, or any adversarial proceeding or litigation by or against the estate.

(b)   Representation of the personal representative in audit or any proceeding for adjustment, determination, or collection of any taxes.

(c)   Tax advice on postmortem tax planning, including, but not limited to, disclaimer, renunciation of fiduciary commission, alternate valuation date, allocation of administrative expenses between tax returns, the QTIP or reverse QTIP election, allocation of GST exemption, qualification for Internal Revenue Code ss. 6166 and 303 privileges, deduction of last illness expenses, fiscal year planning, distribution planning, asset basis considerations, handling income or deductions in respect of a decedent, valuation discounts, special use and other valuation,

Hall v. Peckham, Fla. 2nd Judicial Circuit, Case No 12CC1669

Attorney Tim Howard--$500 An Hour

| Date | Activity | Time |
|------|----------|------|
| May 30, 2012 | Draft Complaint | 2.4 |
| June 5, 2012 | Edit Draft Complaint | 1.5 |
| June 6, 2012 | Provide Complaint to Client | 0.4 |
| June 17, 2012 | Review Home, Repairs, Meet With Tenant, Client | 3.2 |
| June 20, 2012 | Motion to Strike Sham Pleadings Termination of Lease/Eviction | 2.5 |
| July 16, 2012 | Review Letter to Judge Affidavits, Conference w/Client | 3.3 |
| **Total** | | **13.3 x $500=$6,650** |

Paralegal Kim Mathews--$150 An Hour

| | | |
|------|----------|------|
| May 29, 2012 | Facts Review | 2.0 |
| May 30, 2012 | Draft Complaint | 2.5 |
| June 5, 2012 | Edit Draft Complaint | 1.8 |
| June 6, 2012 | Provide Complaint to Client | 0.5 |
| June 17, 2012 | Review Home, Repairs, Meet With Tenant, Client | 4.5 |
| July 16, 2012 | Review Letter to Judge | |
| June 20, 2012 | Motion to Strike Sham Pleadings Termination of Lease/Eviction Affidavits, Conference w/Client | 2.5 2.9 |
| **Total** | | **15.9 x $150=$2,130** |

The Honorable Jackie Fulford                                                                Pg. 3
In re Estate of Jason R. Hall; Probate Div. 12CP473

Sincerely and respectfully,

Richard Peckham

Piper Peckham

/rp/pp

The Honorable Jackie Fulford
In re Estate of Jason R. Hall; Probate Div. 12CP473

Pg. 2

Noteworthy is that less than 24 hours after Jason's death, Ms. Hall entered the residence, against our objections, announced that she owned the property and commenced to ransack the entire premises and remove numerous items alleged to belong to Jason, *including but not limited to*, Jason's lock box out of his bedroom which contained ALL of Jason's important documents and papers. See, Affidavit of Richard James Peckham, II, and Affidavit of Piper Gene Peckham, enclosed herewith. Jason specifically pointed out his lock box to us, prior to his death, and advised both of us that all of his important documents and papers were contained in that lock box, including the Quit Claim Deed that Ms. Hall had signed over to him; he also spoke of a will and last testament. Jason admitted to us, however, that he had not yet recorded the Quit Claim Deed with the clerk. Unfortunately, because Ms. Hall illegally seized Jason's lock box, we may never know what specific documents were contained in that lock box as well as other documents she may have removed from *his* property.

Moreover, Jason specifically gave Piper a signed and dated Beneficiary form regarding his Liberty Mutual annuity policy, in which he named his son, Dakota, as the sole beneficiary (100%) and specifically asked Piper to hold on to it, a copy of which is enclosed. He further told Piper that if anything ever happened to him, he wanted her to send the form directly to Liberty Mutual, which Piper did pursuant to his wishes after Jason's death. As stated in the Affidavit of Piper Gene Peckham, Jason had been taken in as a member of her family when she was four-years-old and Piper and Jason considered each other siblings; he was a dear friend to both of us and he clearly had put his trust in us.

To be clear, we are not attempting to lay claim to any part of Jason's estate. We *are* attempting to remain on the premises pursuant to the two-year Residential Tenancy Agreement in force at the time of Jason's death, and to carry out our responsibilities and obligations as Jason wanted pursuant to that agreement. We also have two minor children who are registered to attend school in the area and we do not want to uproot them from a stable environment.

Given Ms. Hall's previously questionable actions regarding Jason's real and personal property, which is fully outlined in the enclosed affidavits, as well as her apparent lack of forthcoming with this Court when she petitioned to be named as Personal Representative, we are extremely concerned about what action(s) Ms. Hall will next attempt to take against us and Jason's property once she has obtained full control of his estate and we respectfully ask this Court to consider this letter and the enclosed documents in this regard. Pursuant to the Marital and Property Settlement Agreement, as well as statements made by Jason directly to us, Jason clearly did *not* want Ms. Hall to represent him, his affairs or his estate in *any* capacity. He did, however, want his son, Dakota, to be properly provided for in the event of his death.

We pray that your Honor will consider the concerns stated herein as well as the enclosed documents before awarding Ms. Hall final sole control over Jason's estate, and in particular, final sole control of the real property in question.

**PIPER PECKHAM and RICHARD PECKHAM**
6600 Donerail Trail
Tallahassee, Florida 32309

July 16, 2012

*VIA HAND-DELIVERY*
The Honorable Jackie Fulford
Second Judicial Circuit
Leon County Courthouse
301 South Monroe Street
Tallahassee, Florida 32301
Ph: 850-577-4305

C-OH
BOB INZER
CLERK CIRCUIT COURT
LEON COUNTY, FLORIDA

12 JUL 17  PM 2: 40

FILED

     RE:   Estate of Jason R. Hall, Case No. 2012 CP 000473

Dear Judge Fulford:

     We bring to your attention possible perjury committed by Dana Hall in her petition to be named as Personal Representative of Jason Hall's estate and, in particular, her request to transfer ownership of real property solely to her, located at 6600 Donerail Trail, Tallahassee, Florida, 32309, that being that she is "qualified" under law to serve as Personal Representative of the decedent's estate, and her claim that at the time of Jason Hall's death the property was "jointly owned by the decedent and Dana Hall". We are the current tenants of the property and we have resided at the property with our two minor children since November 1, 2011, when we entered into a two-year Residential Tenancy Agreement with Jason Hall while he was living full-time in the residence prior to his untimely death. For numerous reasons, Jason asked us to enter into the agreement and to share the common areas of the residence with him. These reasons are laid out in copies of affidavits enclosed with this letter and we pray this Court will choose to review all of the enclosed.

     Shortly after Jason's death, Ms. Hall attempted to evict us from the residence by filing an untruthful and slanderous Complaint for eviction on June 6, 2012, Case No. 12OC1669. We timely responded to the action and it was heard before Judge Robert Wheeler on July 2, 2012, and at that hearing the court dismissed the action based upon its finding that Ms. Hall was *not an owner of the property*. Specifically, we brought to the court's attention the Marital & Property Settlement Agreement, entered into by Jason and Dana Hall on August 10, 2011 (Case No. 2009-DR-1881) which clearly states, in part, that "all equity in the home will be owned by Jason Hall" and "Dana Hall will assign her interests through a Quit Claim Deed to Jason Hall for total ownership of all equity and obligations on the home." (Marital & Property Settlement Agreement, Pg. 2) (Emphasis added). It further states on Page 9, Paragraph 20.b. of the agreement that Dana Hall *waived* and *released* her right(s) to "share in the other party's estate" and "the right to *act as* executor, administrator or personal representative of the other party's estate; . . . This release is binding on all executors, administrators, personal representatives, heirs, and assigns of each of the parties.". (Emphasis added). A complete copy of the settlement agreement is enclosed for this Court's review.

IN THE COUNTY COURT FOR THE SECOND JUDICIAL CIRCUIT,
IN AND FOR LEON COUNTY, FLORIDA

**DANA HALL**
6607 Donerail Trail
Tallahassee, Florida 32309,
       Plaintiff,

vs.

**RICHARD PECKHAM and PIPER PECKHAM**
6600 Donerail Trail
Tallahassee, Florida 32309,
       Defendants, Pro Se.

_____/

COUNTY CASE NO. 12CC1669

FILED

12 JUL 17 PM 2:41

C-09
BOB INZER
CLERK CIRCUIT COURT
LEON COUNTY, FLORIDA

### AFFIDAVIT OF PIPER GENE PECKHAM

I, Piper Gene Peckham, under penalty of perjury, do hereby swear to and affirm the following:

1.    My legal name is Piper Gene Peckham.

2.    I am 18 years of age or older and a naturally born citizen of the United States.

3.    I am married to Richard Peckham; we have one minor son and one minor daughter..

4.    I reside in a single-family dwelling located at 6600 Donerail Trail, Tallahassee, Florida, 32309, as a tenant along with my husband and our two minor children.

5.    Our minor children travel by school bus to Apalachee Elementary School where they are currently registered to attend when school is in session.

6.    We have lived at this address since November 1, 2011, pursuant to a 2-year Residential Tenancy Agreement.

7.    The sole parties to the Residential Tenancy Agreement are: Richard Peckham and Piper Peckham (Tenants), and Jason R. Hall (Landlord).

8.    To the best of my knowledge and belief, on November 1, 2011, Jason Hall was the sole owner of the dwelling located at 6600 Donerail Trail, Tallahassee, Florida, 32309.

9.    Jason Hall also lived in the dwelling as a full-time resident on November 1, 2011, and continued to live there and share the premises with us until his untimely death on May 3, 2012.

IN THE COUNTY COURT FOR THE SECOND JUDICIAL CIRCUIT,
IN AND FOR LEON COUNTY, FLORIDA

**DANA HALL**
6607 Donerail Trail
Tallahassee, Florida 32309,
     Plaintiff,

vs.

**RICHARD PECKHAM** and **PIPER PECKHAM**
6600 Donerail Trail
Tallahassee, Florida 32309,
     Defendants, Pro Se.

**COUNTY CASE NO. 12CC1669**

C-09
BOB INZER
CLERK CIRCUIT COURT
LEON COUNTY, FLORIDA
12 JUL 17 PM 2: 41
FILED

---

## AFFIDAVIT OF RICHARD JAMES PECKHAM, II

    I, Richard James Peckham, II, under penalty of perjury, do hereby swear to and affirm the following:

    1.    My legal name is Richard James Peckham, II.

    2.    I am 18 years of age or older and a naturally born citizen of the United States.

    3.    I am married to Piper Peckham; we have one minor son and one minor daughter..

    4.    I reside in a single-family dwelling located at 6600 Donerail Trail, Tallahassee, Florida, 32309, as a tenant along with my wife and our two minor children.

    5.    Our minor children travel by school bus to Apalachee Elementary School where they are currently registered to attend when school is in session.

    6.    We have lived at this address since November 1, 2011, pursuant to a 2-year Residential Tenancy Agreement.

    7.    The sole parties to the Residential Tenancy Agreement are: Richard Peckham and Piper Peckham (Tenants), and Jason R. Hall (Landlord).

    8.    To the best of my knowledge and belief, on November 1, 2011, Jason Hall was the sole owner of the dwelling located at 6600 Donerail Trail, Tallahassee, Florida, 32309.

    9.    Jason Hall also lived in the dwelling as a full-time resident on November 1, 2011, and continued to live there and share the premises with us until his untimely death on May 3, 2012.

| A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | $8,780.00 | $3.00 | | | | | | Landlord Tenant Legal Assistance | Enforcing Documentation | 100 |
| | | | | $8,600.00 | $0.00 | | | | | | Probate of the estate valued at $258,474 | Probate Documentation | 89 |
| | | | | $14,500.00 | $7,755.00 | | | | | | Divorce Representation | Divorce Documents | 18 |
| | | | | $100,000.05 | $100,000.00 | | | | | | Supreme Court Approved Workers' Comp Reasonable Attorney's Fees | Work Attorney's Fees | 102 |
| | $3,000.00 | | | | | | 10/2/06 | | | | | Initial Report | 101 |
| $575.00 | | | | | | | 4/13/06 | 2853 | | | Medical Rehabilitation Specialists | Reimbursing Doctor - 2853 | 96 |
| $1,200.00 | | | | | | | 3/21/08 | 2873 | | | Dr. Kirk Moore | Check 2873 | 94 |
| $850.00 | | | | | | | 3/8/05 | 2601 | | | Executive Reporting - Court Reporter | Check 2601 | 96 |
| $680.00 | | | | | | | 2/8/08 | 2862 | | | For The Record-Deposition Transcripts | Check 2862 | 97 |
| $2,349.33 | | | | | | | 4/14/06 | 2842 | | | Fla. Med. Records Service | Record of Payment | 99 |
| $5,709.00 | | | | | | | 11/17/06 | 2586 | | | Dr. Ira Richholt | Check 2586 | 98 |
| $4,200.00 | | | | | | | 12/9/06 | 2616 | | | Dr. Ira Richholt | Check 2616 | 98 |
| $3,254.00 | | | | | | | 7/19/07 | 2714 | | | Accurate Stenotype - Deposition Transcripts | Quickbooks Register - 2714 | 93 |
| $870.00 | | | | | | | 12/14/07 | 2775 | | | Accurate Stenotype - Deposition Transcripts | Quickbooks Register - 2775 | 93 |
| $2,654.00 | | | | | | | 17/4/06 | 2033 | | | Parikh & Associates | Quickbook Number - 2033 | 95 |
| $97.53 | | | | | | | 1/25/08 | 4 | | | Surgical Group | Example for Payment | 90 |
| $38.25 | Verified or Adjusted | | | | | | 4/15/06 | X | | | Tallahassee Neurological Clinic - 78 Medical Record | TNC Invoice 01 | 51 |
| $250.00 | Verified or Adjusted | | | | | | 6/1/07 | X | | | Tallahassee Neurological Clinic - Cancelled Deposition | TNC Invoice 02 | 92 |
| $37,700.04 | $9,000.00 | | $706,496.15 | $167,750.00 | | | | | | | | | |
| | Total Costs STILL Owed $8,701.01 | | Total Legal Fees STILL Owed | $100,388.15 | | | | | | | | | |
| | | | TOTAL FEES & COSTS ON PAY TO PAID BY CLIENT | $108,988.16 | | | | | | | | | |
| **MAIN LEDGER** | | | | | | | | | | | | | |



## Contract and Agreement

Jason Hall and Tim Howard (hereinafter referred to as "parties") hereby agree to the following contract terms:

1. A loan of $200,000 at 10% annual interest is being made from Jason Hall to Tim Howard.

2. At Jason Hall's discretion, Mr. Howard will pay Jason Hall $1,250 a month, starting today's date, during the term of this loan to approximate the amount of annuity income that he would receive on $200,000.

3. Tim Howard can end this loan anytime after 6 months from today's date, and interest will be calculated up to the date of the loan repayment. For instance, if the loan is only for 6 months, then Mr. Hall would be entitled to $10,000 interest in addition to the $200,000 for a total of $210,000. Thus, the monthly interest is $1,667.00

4. The $1,250 a month payments will be deducted from the interest owed on the loan. For instance, if the loan goes for a full 12 months, the interest will be $20,000; the monthly payments of $1,250 will amount to $15,000. Thus, the net amount returned to Mr. Hall will be $205,000.

5. If Mr. Hall determines not to take the $1,250 a month, then this would increase the net amount of interest to him. For instance, if the loan goes for a full 12 months, the interest will be $20,000. If Mr. Hall determines not to take the $1,250 a month, the net amount returned to Mr. Hall will be $220,000.

6. In order to assure that Mr. Hall receives all funds, Mr. Howard will reduce his vested ownership of 20% of the medical costs reductions as needed to ensure payment of all funds to Mr. Hall.

7. This is a binding agreement between the parties and enforceable through a one-day binding private arbitration pursuant to Florida law to be resolved in Leon County. The Florida trial courts will not be used and the option of filing an action within the public courts is hereby waived.

8. If there is any dispute concerning this agreement, the parties will provide written notice to the other and if not resolved within 5 working days, the parties will go to a mediation in Leon County within 20 working days, and if not resolved, to binding arbitration before one arbitrator acceptable to both parties, within 20 additional working days.

9. Each party understands that it has the right and opportunity to have an attorney review this contract and agreement before signing and agreeing to its terms.

Agreed to on this _5th_ day of September, 2008.

_Jason R. Hall_          _9-5-08_
Jason Hall                Date

_Tim_                     _9/5/08_
Tim Howard                Date

*Copy*

pg. 21

Howard and Associates, P.A. Mail - Re: Medicaid Lien for Jason R. Hall

10/15/19, 12:20 PM



Tim Howard   tim@howardjustice.com

## Re: Medicaid Lien for Jason R. Hall

1 message

**Tim Howard** <tim@howardjustice.com>                                     Tue, Jul 21, 2015 at 12:53 PM
To: "Boler, Alexander" <Alexander.Boler@xerox.com>
Cc: Shannon Carlson <Shannon@howardjustice.com>, Ankur Mehta <Ankur@howardjustice.com>, FL TPL Legal
<FLTPLLegal@xerox.com>, "Smith, Keli" <Keli.Smith@xerox.com>

Mr. Boler,

We have confirmed that the $25,000 check has been tendered and payment received by Medicaid. We will be
forwarding the remaining balance and upon receipt understand that the full Medicaid release provided will be
executed and sent to us.

Thank you for your attention to this matter,

Tim

On Tue, Jul 14, 2015 at 3:26 PM, Boler, Alexander <Alexander.Boler@xerox.com> wrote:

> Dr. Howard,
>
> Thank you for the e-mail. I've conferred with the Agency for Health Care Administration's administrator on this
> matter, and we are unable to reduce the amount of lien below $38,483.08.
>
> Our office is holding a check from your office. That check is in the amount of $25,000. We can return that check for
> you to send a new one in the full amount, or you can just send the difference of $13,483.08. Please let me know
> what would be most convenient for you.
>
> To address your requests: Attached is a template satisfaction of lien that will be filled out and sent after we receive
> payment. We have also sent a letter via U.S. mail that confirms the amount of the lien is $38,483.08 (I'm unable to
> send an electronic copy of this letter).
>
> This is the full amount owed to the Agency on its Medicaid casualty lien. There is no Medicaid estate claim. So, this
> will resolve all Medicaid issues concerning repayment to the Agency. (If Mr. Hall had a Medicaid HMO (which is a
> relatively new type of coverage, so it is unlikely), the HMO may have some sort of claim. I can only speak to the
> Agency's interests.)
>
> Thank you,

# Howard & Associates
## Attorneys at Law, P.A.
Dr. Tim Howard, J.D., Ph.D., Senior Partner*
Florida Supreme Court Certified Mediator

Howard & Associates, P.A.
8190 Killarney Way, Suite 105
Tallahassee, Florida 34309
Telephone: (850) 298-4455
Telecopy: (850) 216-2587
tim@howardjustice.com

Cambridge Office
8 Museum Way Ste. 2407
Cambridge, MA 02141
(857) 277-0090

President, Cambridge Graduate University
One Broadway, 14th Floor
Cambridge, MA 02141
(877) 845-0625
www.cguedu.com
president@cguedu.com

May 1, 2015

Alexander R. Boler
Associate Corporate Counsel
Xerox Recovery Services
2073 Summit Lake Drive, Suite 300
Tallahassee, FL 32317
Office: (801) 352-5038
Cell: (850) 408-5692
E-mail: alexander.boler@xerox.com

RE:   Confidential Settlement Offer Estate of Jason Hall.

Dear Mr. Boler,

Consistent with our prior communications, my client has authorized me to provide a payment of $25,000 as payment in full for any liens or claims that Medicaid may have on the estate. This is based on my client's needs to take care of two minor children, statute of limitations, and the estate status of the claim. Acceptance of this payment satisfies any and all claims that Medicaid may have on the estate of Jason Hall.

Sincerely Yours,

Dr. Tim Howard, Esq., Ph.D.

PTH/sc

*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D, Northeastern University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar and Constitutional Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

5732

**HOWARD & ASSOCIATES**
ATTORNEYS AT LAW P.A.
OPERATING ACCOUNT
2120 KILLARNEY WAY
TALLAHASSEE, FL 32309
(850) 298-4455

REGIONS BANK
63-1033-632

7/27/2015

PAY TO THE
ORDER OF___ Agency for Healthcare Administration _____  $ **13,483.08

Thirteen Thousand Four Hundred Eighty-Three and 08/100************************ DOLLARS

Agency for Healthcare Administration
Attn: Alexander Boler
2073 Summit Lake Drive, Ste. 300
Tallahassee, FL 32317

MEMO
Jason R. Hall- Medicaid Paid in Full

⑈005732⑈ ⑆063210112⑆ 3401007904⑈

Seq: 129
Batch: 885569
Date: 07/29/15

5532

**HOWARD & ASSOCIATES**
ATTORNEYS AT LAW, P.A.
OPERATING ACCOUNT
2120 KILLARNEY WAY
TALLAHASSEE, FL 32309
(850) 298-4455

REGIONS BANK
63-1011-632

5/8/2015

PAY TO THE
ORDER OF   Agency for Healthcare Administration                      $ **25,000.00

Twenty-Five Thousand and 00/100****************************************************************   DOLLARS

Agency for Healthcare Administration
Attn: Alexander Boler
2073 Summit Lake Drive, Ste. 300
Tallahassee, FL 32317

MEMO   Estate of Jason R. Hall  Case ID: 125347                   AUTHORIZED SIGNATURE

⑆005532⑆ ⑆063210112⑆ 3401007904⑆

---

**HOWARD & ASSOCIATES  OPERATING ACCOUNT**                    5532

Agency for Healthcare Administration           5/8/2015
                       Jason R. Hall- Medicaid Lien-Case ID 125347        25,000.00

Checking - Operating   Estate of Jason R. Hall  Case ID: 125347              25,000.00

**HOWARD & ASSOCIATES  OPERATING ACCOUNT**                    5532

Agency for Healthcare Administration           5/8/2015
                       Jason R. Hall- Medicaid Lien-Case ID 125347        25,000.00

Checking - Operating   Estate of Jason R. Hall  Case ID: 125347              25,000.00

STATE OF FLORIDA
AGENCY FOR HEALTH CARE ADMINISTRATION

SATISFACTION OF LIEN

Medicaid Number: 7724204348

Case ID: 125347

Know All Men By These Presents:

That the State of Florida Agency for Health Care Administration has heretofore issued its NOTICE OF LIEN against Jason R. Hall, which has been duly recorded in the Public Records of LEON COUNTY, Florida, CNF#230800003007, BK#907, PG#,330-332, 2PGS.

And know also that the State of Florida Agency for Health Care Administration has received and hereby acknowledges full payment of all amounts claimed by said lien and hereby directs that they be cancelled of record.

Executed this 10th day of December, A.D. 2015.

_Nika Biller_
Casualty Recovery Manager
Xerox Recovery Services
P.O. Box 12188
Tallahassee, FL 32317-2188
877-357-3268

Contract Representative for
State of Florida
Agency for Health Care Administration
Medicaid Third Party Liability

STATE OF FLORIDA
AGENCY FOR HEALTH CARE ADMINISTRATION

State of Florida
County of Leon

Sworn to and subscribed before me by _Nika Biller_ who is personally known to me, on this _14th_ day of _December_, 2015.

_(signature)_
(Notary Public)

_Martha T. Avalos_
(Notary Public's Printed Name)

MARTHA T. AVALOS
MY COMMISSION # FF 055199
EXPIRES: October 14, 2017
Bonded Thru Budget Notary Services

xerox 🔴

Xerox Recovery Services
P.O. Box 12188
Tallahassee, FL 32317-2188

Phone: 877-357-3268
Fax: 866-443-5559
www.FLMedicaidTPLRecovery.com

November 11, 2015

Mr. Tim Howard
Attorney at Law
2120 Killarney Way   Ste 125
Tallahassee, FL   32309

Medicaid Recipient:    Jason R. Hall
Our Case ID:             125347
Date of Incident:       03/16/2006

Dear Clerk of Circuit Court:

Xerox Recovery Services is the authorized contract representative for the Florida
Agency for Health Care Administration, Medicaid Third Party Liability Program.

Enclosed is an executed Satisfaction of Lien relative to the above captioned
case.

Please send all correspondence to the above address.

Thank you for your assistance in this matter.  If you have any questions, or if
additional information is necessary, please contact me.

Sincerely,

Mr. Mark E. Lyles
Recovery Specialist
Xerox Recovery Services
(877) 357-3268 Opt. 3, Ext. 7372

(Enclosure)



## *Harvard*
### AND ASSOCIATES, PA
**CERTIFIED PUBLIC ACCOUNTANTS**

October 30, 2020

Alfred R. Bruetti, Partner
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mount Kemble Avenue
Morristown, NJ 07962

Re: Phillip Timothy Howard – Florida Bar Matter

Mr. Bruetti:

### Qualifications

I am a Certified Public Accountant licensed in the State of Florida since 2004. I am also a member of the Florida Institute of Certified Public Accountants and the American Institute of Certified Public Accountants. I have majors from Florida State University in Accounting and Finance, and I have a minor in Real Estate. I have worked in Public Accounting since 2002 and began my own firm in 2007. My practice areas include individual and business tax and financial statement preparation, reviews, and audits. I have also been recognized as an expert in three jurisdictions.

### My Engagement

I was engaged by Mr. Howard to review the documents he provided to determine if the settlement funds of $632,282 from the Jason Hall case were ultimately used for the benefit of his client, Jason Hall. I was provided supporting documents for each transaction by Mr. Howard's office and asked to objectively review the supporting documents and determine the total funds spent for the benefit of Mr. Hall. I was later asked to review Mr. Jeter's report dated March 27, 2018 and provide any insight on what Mr. Jeter represented in his report. The documentation that was provided to me for my review were accounting records provided by Mr. Howard (Exhibit A), Mr. Jeter's report dated March 27, 2018 and Mr. Jeter's deposition dated September 29, 2020.

### Findings

Per my review I confirmed the starting point of the net settlement amount of $632,828. This amount matched both Mr. Jeter's and Mr. Howard's reports. Per my review of Mr. Howard's accounting and review of supporting documents of each transaction related to this case, I was able to determine Mr. Howard's firm had support for $632,794.94 of payments to Mr. Hall or for the benefit of Mr. Hall as represented in Exhibit A. Due to the length of time from 2008 to 2020 and because many bank records are no longer available at this time, the supporting documents are limited and are represented in several different forms. However, I believe Mr. Howard has provided a reasonable amount of documentation due to the bank retention limitations.

John D. Harvard, CPA
Stephen D. Cutright, CPA

1408 North Piedmont Way
Tallahassee FL 32308
O: 850-224-9008
F: 850-561-0708
www.harvardandassociates.com

Adriana R. Bush, CPA
Steven B. Liedy, CPA



AND ASSOCIATES, PA
CERTIFIED PUBLIC ACCOUNTANTS

October 30, 2020
Page 2 of 2

The one item not accounted for in Mr. Howard's report was the accrual of interest on the loan amount of $70,953.97 for the time period of September 8, 2008 to March 30, 2014. The Original Loan Amount was determined as follows:

| | |
|---|---|
| Total payments paid for the benefit of Mr. Hall | $ 632,794.94 |
| Total payments paid for the benefit of Mr. Hall regarding the case | $ 561,840.97 |
| Amount loaned to Mr. Howard | $  70,953.97 |

The interest accrual per my calculation is $25,530.98 for this period of time per Exhibit B. The interest is based on the 10% annual interest per the loan document that was in Mr. Jeter's report labeled Exhibit F. Per the original agreement Mr. Howard was loaned $200,000, but what was not known at the time of signing the loan document was Mr. Howard had paid significantly more on behalf of Mr. Hall and therefore the loan to Mr. Howard should reflect all of the payments for the benefit of Mr. Hall. This is the point where Mr. Jeter chose to disregard payments Mr. Howard paid or fees earned on behalf of Mr. Hall. Exhibit G of Mr. Jeter's report represents total payments of $148,145.60 and acknowledges the payments or fees earned, yet he deems them unallowed based solely on his discretion.

In addition, Mr. Howard provided documentation of $38,034.19 of unpaid legal bills or costs that were not collected from Mr. Hall. Therefore, my conclusion is that Mr. Howard has accounted for payments of $632,794.94 and unrecovered legal costs of $38,034.19 totaling **$670,829.13**. Below is a summary with my calculation of what was due to Mr. Hall:

| | |
|---|---|
| Net Settlement Amount | $ 632,828.00 |
| Accrued Interest on Loan | $  25,530.98 |
| Total Amount Due to Mr. Hall | **$ 658,358.98** |

Based on the documentation I reviewed, it is my opinion Mr. Howard has provided support for more than the original settlement amount plus the accrued interest on the loan reference above.

Best regards,

John Harvard, CPA

John D. Harvard, CPA                1408 North Piedmont Way                Adriana R. Bush, CPA
Stephen D. Cutright, CPA             Tallahassee FL 32308                   Steven B. Liedy, CPA
                                     O: 850-224-9008
                                     F: 850-561-0708
                                     www.harvardandassociates.com

# EXHIBIT G

**Margaret "Peggy" Harris v. Phillip Timothy Howard, TFB File No. 2019-00,088(2A);
Phillip Timothy Howard v. Jonathan B. Harris, TFB File No. 2019-70,042(11J);
Jonathan B. Harris v. Phillip Timothy Howard, TFB 2018-00,342(2A).**

In a sworn and videotaped deposition of Margaret "Peggy" Harris ("Peggy Harris") taken in *Margaret Harris, et al., v. RJR, et al.,* Case No. 2014-CA-337 (Fla. 2nd Cir), taken on February 13, 2020, Peggy Harris documents the fallacious, fraudulent and intentionally criminally perjurious Bar complaint submitted under oath and penalty of perjury, that Jonathan B. Harris wrote for Peggy Harris, which she never read.  This is consistent with the Responses to these Bar Complaints previously filed with sworn testimony attached on August 22, 23 and 28, 2018.  Peggy Harris admits that her Bar Complaint is fraudulent and her counsel raised her 5th Amendment rights;[1]

> Q And so when this was filed back in 2019, April of 2019 you had not read the Bar complaint at that time?
> A Correct.
> Q And you would have not been able to tell your lawyers whether -- what was in the Bar complaint was true and correct or contained false statements because you hadn't read it?
> A Correct.
> **Q And we now know that it contains statements that you believe to be false?**
> **MR. DIAZ: Form.**
> **BY MR. MONDE:**
> **Q Correct?**
> **A Correct.**
> **Q Statements that you believe to be fraudulent, correct?**
> **MR. DIAZ: Form.**
> **THE WITNESS: Correct.**

Condensed Transcripts attached as Cumulative Exhibit A.  The Margaret "Peggy" Harris' Inquiry/Complaint under PART FIVE, is submitted with following statement:

**"Under penalties of perjury, I declare that the foregoing facts are true, correct and complete."  Signed by Margaret "Peggy" Harris, on 7-8-18.**

This is an official proceeding under Florida Bar rules and regulations, and based on the language, type set, legal research, attached documents, prior threats to extort, consistency in his attacks in two other bar complaints, and as verified in the deposition of Peggy Harris taken on February 13, 2020, and attached hereto, was prepared and written under the sole guidance, control and direction of Florida attorney, Mr. J.B. Harris.

---

1 MR. ANDERSON: Okay. Well, I'm going to respectfully disagree with you. And to the extent you ask her about her testimony related to her errata sheets, **I'm going to have to instruct her not to answer on the grounds that she could be incriminating herself.**
**MR. MONDE: Then have her take the Fifth.**

Under section 837.02(1), Fla. Stat., when perjury takes place in an official proceeding, such as in a Florida Bar complaint, the **criminal** offense of perjury is a third-degree felony punishable by up to 5 years in prison and a $5,000 fine. If this complaint is considered an unofficial proceeding, perjury would be considered a misdemeanor of the first degree, punishable by up to one (1) year in jail, (1) year of probation, and $1,000 in fines.  Finally, if this Bar Complaint is considered before a public servant in the performance of his or her official duty, perjury would be a misdemeanor of the second degree under section 837.06, Fla. Stat.

Unfortunately for Mrs. Peggy Harris in acceding to Mr. J.B. Harris' agenda and writings, has sworn to this bar complaint under penalties of perjury and verified her violation of the law and her oath.2

As found repeatedly in the Deposition transcript attached to this response, with three attorneys representing Peggy Harris, there is undisputed evidence of multiple instances of perjury and criminal violations under section 867.02(1), Fla. Stat.  These also violates section 837.021(1), Fla., Stat., since there are two or more material statements in official proceeding under oath that contradict each other and constitute a second-degree felony.

Moreover, there are numerous bar violations for presenting false evidence.  Under rule 4-1.2(d), **"A lawyer shall not counsel a client to engage, or assist a client, in conduct the lawyer knows or reasonably should know is criminal or fraudulent."**  *See* Florida Bar Ethics Opinion 75-19.  It is also a bar violation to offer evidence that the lawyer knows to be false and should disclose that the evidence is false to the tribunal.  Rule 4-3.3 (b).  It is indisputable that Mr. J.B. Harris authored and prepared the entire bar complaint and is using Mrs. Peggy Harris, who never read the Bar Complaint, as a front and tool for his own extortionate and denigrating agendas.

In that instance, he has violated Rule 4-3.3(a)(1), (2), and (4), which require candor toward the tribunal, and has made a false statement, and has failed to correct or disclose a false statement of material fact or offered evidence that the lawyer knows to be false.  In addition, Mr. J.B. Harris must report and disclose that he authored this fraudulent Peggy Harris Bar Complaint.

J.B. Harris, and has written similar fraudulent Bar Complaints for himself and Kim Poling in a pattern of scandalous false statements.  This is an abject abuse of the Florida Bar and a gross manipulation of the Florida Bar processes and fraud for monetary gain that cannot stand nor tolerated.  To do otherwise, decimates the ethical and moral legitimacy of the institution of the Florida Bar, and our court system alike.

### BAR COMPLAINTS CONTAIN NUMEROUS FALSE AND FRADULENT STATEMENTS FROM J.B. HARRIS THAT CLIENT DID NOT READ NOR AUTHORIZE AND BOTH ARE SUBJECT TO CRIMINAL PERJURY

---

2 The **exhibits attached to this 7-8-18 sworn statement** are dated <u>7/30/18, 7/10/18, 7/30/18, 7/30/18, and 7/30/18, respectively.</u> *See* Exhibit A, Exhibit D, Exhibit E, and Exhibit F to the August 21, 2018 Response. **They are all printed from Mr. J.B. Harris' gmail account, jbharrisesq@gmail.com, on July 31, 2018, July 30, 2018, and August 3, 2018. These emails are not from Mrs. Peggy Harris.**  While these exhibits do not constitute a bar violation, they are material to Mrs. Peggy Harris' (Mr. J.B. Harris') claim of such a violation.  In her February 13, 2020 Deposition Peggy Harris admits to fraud and perjury by both her and J.B. Harris.

COMPLAINANT DID NOT READ BAR COMPLAINT BEFORE OR AFTER FILING

In her deposition taken February 13, 2020, Margaret Peggy Harris, stated under oath that she "**signed the Bar complaint without reading it**," and that everything in the Bar complaint

"statement **is not true and correct**" and contains statements that are "**fraudulent.**"3  In response, **J.B. Harris now states that Peggy Harris "maligned him" by telling the truth**.4

---

3  From Pages 23-31:

Q. Is it your belief that if the Florida Bar had any written communications about your Bar complaint that J.B. Harris would have them?
A. I would think so.  He's the one that handled it exclusively.

. . .

Q. All right.  So it's fair to say that you had no changes to make to the Bar complaint that you signed before you signed it?
A. **Well, I didn't read it.  I did not read it—read the complaint.**
Q. **You are saying that you signed the Bar complaint without reading it?**
A. **Correct.  I know that's—that is my fault.  I'm sorry that I didn't read it.**

. . .

Q. Part five says that, "Signature: Under penalty of perjury, I declare that the foregoing facts are true, correct and **complete.**"
Do you see that?
A. I do.
Q. And then your name is printed, correct?
A. Correct.
Q. And then you signed your name, correct?
A. Correct.
Q. You understood when you signed this that you were under the penalty of perjury declaring the facts and statements to be true, correct and complete?
A. Correct.
Q. There is no doubt in your mind about what you were signing, correct?
A. Apparently not—apparently so.
Q. Well I want to understand your answer.
A. Well, I—I did not read it, so I was wrong in not—putting this down, so—
Q. And I appreciate you're acknowledging that that was wrong.  And I want to understand from you why you agree that that was wrong to do.
A. Correct.
Q. —Just like the oath you took this morning?
A. Right.
Q. And you understand the importance of an oath in a legal proceeding, correct?
A. Yes.

. . .

Q. Have you had the opportunity to review the statement that is part of your Bar complaint after you signed it?
A. Yes.
Q. When did you first do that, ma'am?
A. Just a few days ago.

. . .

Q. **Based on your reading, is everything in the statement true and correct?**
A. **No, not really.  Not—its not what I discussed.**

. . .

Q. **You mentioned that the first time you read the Bar complaint that you signed under oath was a few days ago in the comfort of your home, correct?**
A. **Correct.**
Q. **So to be clear, you had never read the Bar complaint that you had signed last year, for example, in April of 2019, correct?**
A. **Correct.**

. . .

Q **Are you curious where J.B. Harris came up with all this information?**
A **Yes. Um-hum.**
Q Now let's go back to page eight. How do you feel about J.B. Harris, now that you had a chance to read this in the comfort of your home, no pressure, you read it two or three times, you let some time pass between reading so that, to use your words, you could digest it? What do you think now that you read it?
A **I'm disappointed.**
Q **Why?**
A **Because not everything is factual.**
Q Why does that disappoint you?
A Well, you expect your lawyer to be helpful to you and do it correctly.

Peggy Harris also understands what perjury means and the criminal nature of perjury, stating in response to the following:

**"Q You understand what <u>perjury means</u>, right? <u>A Yes</u>. Q You understand the <u>penalties for perjury?  A Yes</u>.  Q You understand that in some context <u>perjury can be a criminal offense? A Um-hum.  Q Yes.  A Yes</u>."**

<u>DOCUMENTED FALSE STATEMENTS FROM J.B. HARRIS THAT HOWARD HAD NO TOBACCO TRIAL EXPERIENCE</u>

J.B. Harris falsely states that Howard knew nothing about tobacco pretrial preparation and failed to adequately prepare Richard for his testimony. 5  This is despite the fact that the main source of

---

Q Does it trouble you to learn that your lawyer has not been factual?
<u>A Correct.</u>
Q Does it trouble you --
MR. DIAZ: Form.
BY MR. MONDE:
Q -- that your lawyer has not --It's just an objection for the judge. Does it trouble you that your lawyer, J.B. Harris in your view has not been factual in connection with a statement that he had you sign?
MR. DIAZ: Form.
MR. ANDERSON: Form.
BY MR. MONDE:
Q Ma'am?
A I can answer?
MR. ANDERSON: Yes, ma'am.
<u>THE WITNESS: Yes.</u>
. . .
Q Now, Ms. Harris, having now before today looked at the Florida Bar complaint from cover to cover, are there things or claims, <u>allegations in that Bar complaint that do not come from Peggy Harris?</u>
<u>A Correct.</u>
Q Okay. And is it fair to say that wherever J. B. Harris might have gotten the information that you don't subscribe to, you're not aware of, or that you may not agree with, okay, that you don't know what source Mr. Harris had for that part or those insertions in the Florida Bar complaint?
MR. MONDE: Objection to form.
<u>THE WITNESS: Correct.</u>
BY MR. DIAZ:
Q Okay. And you don't know if he got some of his information from you and some from Jaakan Williams, correct?
A Correct.
. . .
Q I clearly understood you to tell me this morning that you had not read the Bar complaint before you signed it and that you regretted that. And I'm unclear whether I heard you say something different in response to Mr. Diaz. And the fact of the matter is that the transcript, which is just in rough form right now, doesn't help clarify that. So I've just got to ask you: <u>Did you read any part of that Bar complaint before you signed it?</u>
<u>A No.</u>
Q Thank you, ma'am.

4  MR. [J.B.] HARRIS: No. I want to go on the record right now. I was noticed for the deposition. I was given a call-in number. I'm Mrs. Harris lawyer. <u>I sat here and listened to her malign me.</u> And you asked inappropriate questions. I am entitled to object. I am entitled to object on my own behalf.

5  Q. The next paragraph reads as follows: "Knowing nothing about pretrial preparation for an Engle-progeny case, Howard failed to adequately prepare Richard for his testimony." <u>Is that true, correct and complete statement?</u>
<u>A. I would say no.</u>
Q.  Why do you say that?
A.  Tim didn't do a lot with it.  He had people under him that did that.
Q.  Did Tim Howard play any role whatsoever in preparing your husband for his deposition prior to June 20, 2016, the first day?

evidence for a $10 million verdict was the trial preservation testimony completely directed and conducted by Dr. Tim Howard. *See Howard v. RJR*, Case No. 1D19-2123 (Fla. 1st DCA), Initial Brief, and extensive citations to the record, and the "but for" his trial testimony preservation work there would be no $10 million verdict. Peggy Harris verifies that she did not know this information, and relied on other lawyers, namely J.B. Harris, who provided the false information that Howard had not tried a tobacco trial. The claim of no tobacco trial experience is patently false as Jaakan Williams, as an attorney for the firm, had worked with Howard for some weeks during the 7-week *Sermons v. RJR* trial, In fact, Howard had to conduct the deposition clean up from Jaakan Williams' first day, and trial preservation testimony that was solely done by Howard in the *Harris v. RJR* action, while the 7-week *Sermons v. RJR* trial in Jacksonville, Florida was taking place. Thus, he could not have provided any claim that Howard had no tobacco trial experience as this was a *non sequitur*. 6

<u>DOCUMENTED FALSE STATEMENT THAT RICHARD HARRIS WAS IN PAIN AND COULDN'T TESTIFY OR PROVIDE CORRECTIONS TO HIS DEPOSITIONS</u>

J.B. Harris places false statements that the decedent Richard Harris was in pain and couldn't

---

A. Some, but not all.
Q. So the statement in your Bar complaint that reads, "Knowing nothing about pretrial preparations for an Engle-progeny case, Howard failed to adequately prepare Richard for his testimony," **you are telling us know that this is a falsehood, that that's a misrepresentation, correct?**
**THE WITNESS: I would say that's done by J.B. Harris.**
. . .
Q If you read the end sentence of that paragraph, it says, quote, "Nevertheless, the trial
had to be continued because defense counsel needed more time to review the tissue samples from the autopsy." **That is a statement that would not have been sourced from you, correct? Would you have known that?**
**A No.**
MR. MONDE: Objection.
BY MR. DIAZ:
Q Or Mr. Harris got that from some other source?
A I would believe that.
**Q But not you?**
**A Correct.**

6 Q. The next part of the sentence, let's focus on that. "He wasn't competent because," quote, "he had never tried one in the past and has not until this day." Is that true and correct and complete, to the best of your knowledge?
A. Yes.
**Q. What is your source of information for that?**
**A. Other people, other lawyers, I guess I would say.**
**Q. In other words, other lawyers have told you that Tim Howard has never tried a tobacco case?**
**A. Right. Because I wouldn't know that otherwise.**
**Q. Right. What other lawyers?**
**A. I imagine J.B.**
Q. Anyone else?
A. Jaakan Williams.
Q. Anyone else?
A. Not that I recall.

Moreover, Howard had done tobacco work since 1993, and worked on the most successful tobacco cases in history, including the *State of Florida v. American Tobacco*, (1997) ($27 billion recovery for State of Florida) (Howard drafted and filed Complaint for the State of Florida, defended constitutionally, prepared damages model, covered 61 depositions, etc.; *Evans v. Lorillard*, Massachusetts Superior Court (2010) ($180 million verdict) (Howard evaluated action, assisted in trial monitoring and strategy, appeal, and evidence); *In Re: Engle* tobacco (M.D. Fla.)($100 million settlement).

properly address corrections to his deposition. 7  The sworn deposition of Peggy Harris taken
February 13, 2020, is consistent that this is a false statement.

## DOCUMENTED FALSE STATEMENT THAT ERRATA SHEETS WERE FRADULENT, PERJURIOUS AND OBSTRUCTION OF JUSTICE

J.B. Harris next falsely states that the errata sheets to Richard Harris pre-trial deposition were
fabricated.8  Peggy Harris states explicitly and repeatedly that what J.B. Harris wrote was false

---

7  Q.  The next paragraph says the following: "Richard was in so much pain at the time, not only were the depositions torturous,
requiring the attorneys to take a break mid-week to allow Richard a respite," period.  That's an incomplete sentence, but it is
what's on your page.  **Was your husband in pain at the time of the deposition?**
**A. No.**
Q.  Ma'am?
A.  No.
**Q.  So that's a false statement?**
**A.  Yes, yes it is.**
...
Q.  Well, let me ask you this.  What is your understanding of why J.B. Harris wrote in this sworn Bar complaint that your husband
was in so much pain?
**A.  I have no idea.**
**Q.  Did you ever tell him that?**
**A.  No.**
**Q.  Did you ever suggest it to him?**
**A.  No.**
**Q.  Do you know of any basis in the world that J.B. Harris had for swearing this—or asking you to swear to it?**
**A.  I do not.**

8  Q.  Let's take that sentence I read and break it down into a smaller piece.  I want to focus on these words: "Following the
depositions.  Howard and his associate Ankur Mehta fabricated errata sheets for each transcript, extensively rewriting
Richard's testimony.  Just that part, is that true, correct and complete?**
**A.  I cannot say.**
Q.  Why not?
**A.  Because I don't know.  I don't know if it was fabricated.  I don't know.  I just don't know.**
Q.  What does the word fabricated mean to you?
A.  Made up, change.  So I really don't know.
...
Q  So when you say in your Bar complaint that the errata sheets extensively rewrote your husband's testimony, is that true,
correct and complete?
A.  Again, I can't say because I don't know.  I don't recall.
...
**Q.  Is it accurate to say that whoever was the source of the information for this sentence "fabricated errata sheets,**
**extensively rewriting testimony," it was not Margaret Peggy Harris?**
**A.  Correct.**
Q.  So is it true and correct that Howard and Mehta ordered our husband to sign errata sheets?
THE WITNESS: I don't know, because I was in and out.  I do not remember that.
...
A.  I don't know.
Q.  You say in your statement that not only were the errata sheets fabricated but they were extensively rewritten.
"Specifically following the depositions of Howard and his associate Ankur Mehta fabricated errata sheets for each
transcript extensively rewriting Richard's testimony.  Do you see that?
A.  Um-hm.
Q.  Yes?
**A.  Yes.  I'm sorry.  But I don't believe that though.  I don't know.  I just do not know if they did, because I just don't**
**know.**
...
**Q.  You told me how you define fabricated.  Do you know whether your husband's errata sheets were fabricated, that is**
stated falsehood or were the truth?
...

MR. DIAZ: I think the better question, with all due respect is, as you sit here today to you believe that that statement—**do you believe it's accurate because it's pretty obvious that there are things in this complaint that are not sourced from her; ergo, they were sourced from some other person, or you are suggesting in this case, fraudulent Bar complaint, whatever.**

. . .

Q. Mrs. Harris, let me ask you to go back up to the prior paragraph and the sentence from your sworn Bar complaint that says, "Following depositions, Howard and his associate, Ankur fabricated errata sheets for each transcript, extensively rewriting Richard's testimony." Do you believe that that is true, correct and complete statement?
A. I do not believe that.
Q. In what way to you not believe it?
A. Because I have no clue about what's right and what's wrong or anything about errata sheets.
Q. Do you believe that Howard and Mehta ordered your husband to sign the errata sheets as opposed to giving him the option of reviewing them and making changes?
A. I do not know.
Q. Did you ever know?
A. No. I still don't know, really.
Q. Do you believe Howard and Mehta not just ordered your husband to sign the fraudulent errata sheets but did so without even reading to him the changes?
A. I do not know.
Q. Let's take the first part away. Do you believe that your husband signed the errata sheets without even reading the changes?
A. I do not know.
Q. Do you know anything about the process by which the errata sheets were prepared, whether they were reviewed or not with your husband before he signed them?
A. No.
Q. Did you ever know that?
A. No.

. . .

Q. Okay. Do you know the source of information that J.B. Harris had when he wrote in a statement for you to swear under oath that Tim Howard and Ankur Mehta ordered your husband to sign the errata sheets?
A. The only other person there was Jaakan Williams.
Q. But do you know whether Jaakan Williams—Let me ask you this: Did Jaakan Williams ever tell you that Tim Howard and Ankur Mehta ordered your husband to sign errata sheets?
A. I don't recall.
Q. You don't recall him telling you that? No?
A. I don't recall.
Q. I'm sorry.
A. I don't recall him telling me that.

Q. So to finish up this part, Mrs. Harris, to the extent that J.B. Harris had any source of information that Tim Howard and Ankur Mehta ordered your husband to sign the errata sheets without even reading them, it didn't come from you?
A. Correct.

. . .

Q Okay. The next sentence, "Last, he," referring to Mr. Howard, "suborned perjury with the errata sheets, obstructed justice and committed a fraud upon the court by attempting to use them in the proceedings." Do you believe that that is true and accurate?
A I can't -- I don't know, because I don't know what's -- again, we talked previously about the errata sheets. I have no knowledge of how it works, so I couldn't say.
Q If anyone, Mr. Howard or anyone else, used the errata sheets to create false testimony, to suborn perjury and used them to obstruct justice or commit a fraud upon the court, would you want any part of that?
A No.

. . .

Q Clarified it. All right. Whatever adjective we want to put on it, in July you swore to the following: "In discussions with Richard, our attorneys prepared the errata sheets according to Richard's instructions and reviewed them with Richard. Richard verified that the errata sheets were consistent with the testimony that he wanted to give." That was your testimony under oath as of July 6th, 2017, correct?
A Correct.
Q When you said that our attorneys prepared the errata sheets according to Richard's instructions, that was false, wasn't it?
MR. DIAZ: Objection. Form. I'm sorry. Go ahead.
THE WITNESS: No.
BY MR. MONDE:
Q How so?

---

A Well, they were there. They talked with him.

. . .

A They did do -- they did -- they did question -- they did question --See, I'm getting all upset now.

MR. DIAZ: I'm sorry. I didn't mean to trigger that.

THE WITNESS: No. Well --The attorneys talked to my husband. I'm not -- I don't know the term errata sheets, but they went over his testimony.

. . .

Q Okay. I think you said that Jaakan Williams had told you that in his opinion there was some kind of nefariousness or something wrong or fraud regarding Richard Harris' errata sheets. Do you remember that testimony?

A Yes.

Q All right. Now, that was Mr. Williams' opinions? Do you know one way or the other whether Mr. Richard Harris' errata sheets were fraud?

MR. MONDE: Objection.

BY MR. DIAZ:

Q Do you have the ability to even know that one way or the other?

A No.

Q Okay. And you would not know, would you, what reason, if any, Jaakan Williams might have had for his own opinions and impressions about Mr. Richard Harris' errata sheets, correct?

A No.

Okay. All right. In the middle of page 3, the paragraph that starts off with "Howard and Mehta" -- and that's M-E-H-T-A -- "ordered Richard to sign the fraudulent errata sheets." Just to be clear, that "fraudulent" is not your words and that's not how you would have written this part of the complaint if this were ever done by you, correct?

MR. MONDE: Objection to form.

THE WITNESS: Correct.

. . .

Q Okay. And so you would not know question to question what questions were corrected, clarified, or amplified on. But you do know, generally speaking, as you sit here today and when you were deposed yourself on the errata sheets of Richard, that there were meetings between Richard and his lawyers for purposes of preparing what you now know to be called errata sheets; am I correct?

MR. MONDE: Objection to form.

THE WITNESS: Correct.

. . .

Q Yeah. Let me start again. Question, "Do you believe that when your husband signed those errata sheets, that he understood what he was signing?" And your answer was, "I think -- I would think he would. I wouldn't think he would sign it if he didn't." Right?

A Right.

Q Was that accurate testimony?

A Right.

Q Okay. Then it goes on and it says, "And my question was just a little bit different. Given his health condition at the time, do you think he understood what he was signing when he signed those errata sheets?" And you said, "I would say yes," right? Okay? Yes?

A Yes.

Q Right. When you said "I would say yes," you're not certifying 100 percent, but you're saying in your best faith belief at the time was that he was able to sign, correct?

MR. MONDE: Objection to form.

THE WITNESS: Correct.

BY MR. DIAZ:

Q Yes, ma'am?

MR. MONDE: Same.

THE WITNESS: Yes.

. . .

Q Answer, ma'am. Is it fair to say, now that you refreshed your memory about what your memory was two years ago when you were asked about Richard signing the errata sheets and the whole exercise of the execution/preparation of the errata sheets, as you sit here today, is it fair to say that you are not saying that his errata sheets were forged, you don't know if they were signed by him or not, correct?

MR. MONDE: Same objections.

THE WITNESS: Correct.

. . .

Q And you were explaining, "Although Richard was having problems with his eyesight, I do remember our attorneys coming over prior to Richard's deposition and reviewing his deposition testimony from the previous days with him, and making

sure that he understood the testimony he had given, and making all the corrections that Richard suggested." Have you read that?

A Right.

Q Okay. Now, here's what I would like to know: When you did the correction, you didn't change your answer above, you were just explaining it further, is that right?

MR. MONDE: Objection.

THE WITNESS: Clarifying it.

BY MR. DIAZ:

Q Clarifying, okay. And is the clarification truthful, meaning that although Richard was having problems with the eyesight, the lawyers came back and went over his deposition with him?

A Correct.

Q Okay. So the correction in the errata sheet is not false, it's true. Am I right?

MR. MONDE: Objection to form.

THE WITNESS: Correct.

Q In the correction it says, "I do remember our attorneys coming over prior to the deposition and reviewing his deposition from the previous days," et cetera. As you sit here today, and when you did this errata sheet, do you remember, did you then remember that the attorneys were going over the deposition transcripts with Richard after the deposition testimony was taken?

MR. MONDE: Objection.

THE WITNESS: Correct.

. . .

Q Yes?  So the correction -- is my understanding correct that the correction part of this page 320 is not false, it's true?

MR. MONDE: Objection.

THE WITNESS: Correct.

. . .

Q Okay. Is it also a fair and correct statement throughout that you always felt and understood and perceived and know that the lawyers after the deposition went over the depositions with Mr. Harris either to correct, amend, explain, or change any of his answers?

MR. MONDE: Objection. Asked and answered.

THE WITNESS: Correct.

. . .

Q Now, within that truth, were you at least aware, because of your walking into and back out of the room, that the lawyers in some measure were going over deposition testimony and these corrections, if you want to call them that, with your husband, Mr. Harris, even though you don't know the particulars?

MR. MONDE: Objection to form.

THE WITNESS: Correct.

. . .

Q Okay. Now, even though you may not have seen the actual interactions between question, answer, errata, and the type and everything else, was this testimony truthful because your impression, your read, your interpretation of what you were seeing and hearing consistent with them going over the deposition transcripts in the errata sheets?

A Correct.

. . .

Q Okay. And you said, "And Richard clarified his answers and the changes he wanted made to the transcript." Was that a truthful statement at the time?

A Correct.

Q Was that a truthful statement in your correction?

A Correct.

Q And is that still a truthful correction -- or a truthful statement today?

A Right.

. . .

Q Now, in the corrections, you say, "I do remember our attorneys reviewing the errata sheets with Richard to make sure that the errata sheets accurately reflected changes he requested before he signed them." Is that a false statement?

MR. MONDE: Objection.

THE WITNESS: No.

BY MR. DIAZ:

Q Okay. Is that a general -- was that the impression that you had from everything you saw, the lawyers going over the errata sheets and the depo transcripts with Richard?

MR. MONDE: Objection.

THE WITNESS: Correct.

. . .

Q And then when the errata sheets were done and the correction provisions were put in as a trailer to some of the

and fraudulent in her February 13, 2020 Deposition.  As just one example, consider her response to the following:

> Q Okay. And -- but something different, but similar, but very important, are you satisfied today, based on everything that you knew, saw, perceived, watched going in and out of the room, **that the errata sheets resulted from interchange and exchanges between Mr. Harris' attorneys and Mr. Harris?**
> **A Correct.**
> **Q Ms. Harris, if that's right, do you know why your lawyers in a pleading filed with the court would call those errata sheets the product of fraud that constitute the suborning of perjury, the obstruction of justice, and -- what else did you call it, Rick?**
> MR. DIAZ: I'm not going to be a witness.
> BY MR. MONDE:
> **Q There's another phrase. Oh, yeah, and committed a fraud upon the court. Do you know why your lawyers would do that?**
> **A No, I don't.**

*Id.*

In response to and in support of the above-referenced inquiry/complaints, please consider the following. In support of the second incontrovertible perjury referenced in the August 23, 2018 filing, as is found in the July 8, 2018 sworn Bar complaint allegedly by Mr. Peggy Harris, at pages 3 and 8, Mr. Jaakan Williams' sworn testimony on April 11, 2018, is in contrast to numerous sworn statements:

> In an effort to cure whatever perceived shortcomings may have resulted from Richard's testimony, following the depositions, Howard and his associate Ankur Mehta fabricated errata sheets for each transcript, extensively re-writing Richard's testimony.
>   **Howard and Mehta ordered Richard to sign the fraudulent errata sheets without even reading him the changes.**  Indeed, Richard was so near death at the time, **he had no comprehension as to what was happening around him, or what he was even signing.**
>   . . .
>   **Jaakan Williams, who was present at Richard's depositions and who informed me of Howard's concoction of the fraudulent errata sheets.**  Mr. Williams is a witness in the Bar's investigation of Howard as well.

*Id.* (emphasis added).

Mr Jaakan Williams in his April 11, 2018 deposition, pages 77-78, 86-90, attached hereto, states:

---

questions and answers, to the best of your knowledge, were -- was the information in those corrections also truthful?
MR. MONDE: Objection.
**THE WITNESS: Correct.**

Q. I'll put it another way.  Isn't it the duty of a lawyer to find the facts, find that law that best represents their client?

A. Agreed.

Q. All right.  And if there's errors in the facts, (inaudible) person who's on the verge of death, that need to be clarified isn't it the lawyer's duty to clarify those facts?

A. I agree.

Q. And if one of the methods of clarifying the facts is an errata sheet, pointing out the precise language that the deponent said, read that to him as he's dying and then have the clarifying language read to him as he's dying, until he agrees on that change, isn't that an appropriate way to clarify the record for this dying deponent?

A. I believe so.

. . .

Q. Okay.  So, Mr. Williams, during your visits with Mr. Harris and Peggy Harris on Thursday and Friday, **you would cover a lot of the same topics that are in the errata sheets, such as smoking history, criminal history, military background, employment, addiction.  Would those topics have been covered in your discussions with Richard and Peggy Harris on Thursday and Friday?**

A. **We covered a number of topics.  Those are the predominant ones we covered.**

Q. Okay.  Very good.  **And you would have shared that with counsel or a paralegal on the case, since that's why you were there, to help them with the case?**

A. **Yes, I would have shared that.**

Q. Okay.  Mr. Williams, as far as the language in the errata sheet, did we require Richard to accept the proposed correction, or did we seek his ascent to make the change?

Q. **Could Richard have said, "No, that's not a correct change?"**

A. **He could have,** I would imagine.

Q. Right, and so – and Richard was lucid enough to say, "Well, no I (inaudible) with that change," and we would have crossed it out, our handwritten changes, if that's what Richard wanted to do?

THE WITNESS.  **I imagine he would have.  He was – he was coherent that morning.**

Q. He had no problems expressing his viewpoint, regardless of how people felt about it?

A  Yes.

Q. So we did not require Richard to agree to this errata sheet, did we?

Q. **And Richard could have said, "No, that's not correct"?**

A. **Yes, he could have, if he wanted to, I imagine.**

Q. **Right, and Richard's the kind of person that would have no problem telling you that's not correct?**

THE WITNESS. **From what I remember, yes.**

Q. **Okay.  So, as far as your perspective on observing this process, wasn't the errata sheet something that Richard was aware of, understood, and approved to change his testimony from the discovery deposition?**

THE WITNESS. **If you're asking me if he agreed to the changes, yes, he agreed to the changes.**

Q. **And these changes were after that portion of the transcripts were read to him—**

A. **Yes, they were read to him.**

*Id.* (emphasis added). This sworn statement says, "<u>he was coherent that morning</u>," "<u>he agreed to the changes</u>," and "<u>they were read to him</u>." *Id.*

This sworn statement on April 11, 2018, and Peggy Harris' sworn testimony on February 13, 2020, attached hereto, is not consistent with Mrs. Peggy Harris' the July 7, 2018 sworn statement before the Florida Bar, and in contrast to the perjurious Bar Complaint prepared by J.B. Harris and signed by Peggy Harris:

> **Howard and Mehta <u>ordered Richard to sign the fraudulent errata sheets without even reading him the changes</u>.** Indeed, Richard was so near death at the time, **he had no comprehension as to what was happening around him, or what he was even signing.**
>
> . . .
>
> **Jaakan Williams, who was present at Richard's depositions and <u>who informed me of Howard's concoction of the fraudulent errata sheets</u>.** Mr. Williams is a witness in the Bar's investigation of Howard as well.

Moreover, Mrs. Peggy Harris, consistent with the facts above, was prepared for her sworn deposition testimony by attorney Jaakan Williams 9 and current Bar attorney Adriannette Williams. They would have coordinated the review of her May 23, 2017 deposition and would have coordinated the preparation of her errata sheets after Peggy Harris' review of her deposition transcript. Mrs. Peggy Harris states under oath:

Q. Okay. And so I asked you before the break whether you were aware, whether you knew whether your husband reviewed the deposition that I took of him, which was a multi-hundred-page transcript. **Did he review that?**
A. **I believe he did, but he couldn't see it, but it was read to him.**
Q. Okay. Who read it to him?
A. One of the attorneys.
Q. How long did it take?
A. **A while. They came in early, yeah.**
Q. They came in early the morning of June 25th?
A. **I don't remember the morning, but they came in early to do it.**
. . .
Q. Okay. Do you remember anything about the circumstances of what was read to him?
A. No.
Q. **Do you know one way or the other whether that deposition was read to him from –**
A. **I believe it was.**
Q. **– start to finish?**
A. **I believe it was.**
. . .
Q. **Do you know whether he actually told the lawyers whether he had changes to make to**

---

9 Moreover, Mr. Jaakan Williams did not say the errata sheets were "Howard's concoction of the fraudulent errata sheets." If he did say such a thing, <u>he would be contradicting not only his own sworn testimony, he would be contradicting his deposition preparation of Mrs. Peggy Harris and his work with Mrs. Peggy Harris in her review of her deposition transcripts and in preparing and coordinating her errata sheets to her deposition.</u> He would be leading Mrs. Peggy Harris into a perjurious trap, which in the Respondent's experience it is unlikely that Jaakan Williams would do.

his deposition? Did he actually tell them that?

A. **I believe he did.**

Q. How did he do that?

A. Verbally, I would think. But I'm not—I shouldn't say, because I'm not sure.

. . .

Q. **Do you believe that when your husband signed those errata sheets, that he understood what he was signing?**

A. **I would think he would. I wouldn't think he would sign if he didn't.**

Q. **And my question was just a little bit different. Given his health condition at the time, do you think he understood what he was signing when he signed those errata sheets?**

A. **I would say yes.**

Q. Okay. So is the answer that you're not sure whether he knew what he was signing?

A. Again, I wouldn't think he would sign unless he knew what he was signing.

Q. **Were you in the room when he signed them?**

A. **I don't—yeah, I think I was.**

. . .

Q. **After his deposition, after I had the opportunity to ask him questions, did Mr. Harris ever say to you that he had changes that he wanted to make to his testimony?**

A. **I believe he did.**

*Id* (emphasis added).

Moreover, in response to the deposition reviews, Mr. Richard Harris and Mrs. Peggy Harris were both read the relevant portion of their transcripts and under oath made corrections to their transcripts. This was confirmed by Mr. Richard Harris and reconfirmed by Mrs. Peggy Harris, wherein she repeatedly states under "penalties of perjury" in errata sheets after reviewing her testimony and providing corrections that **"I do remember our attorneys coming over prior to Richard's deposition and reviewing his deposition testimony from the previous days with him, and making sure that the testimony he had given, and making all the corrections that Richard suggested."** 10  *See* relevant portions of transcripts attached to the August 22, 2018 response. Neither Mr. Richard Harris nor Mrs. Peggy Harris were ordered to sign the errata sheets, and they were reviewed and read by or to both of them by either associate or senior counsel before they signed the errata sheets.

Since Mrs. Peggy Harris states in the July 8, 2018 Bar Complaint under oath the opposite of what she contemporaneously stated and provided under oath on May 23, July 6, 2017, and February 13, 2020, and the opposite of what Jaakan Williams stated in his sworn deposition on April 11, 2018, either she is committing perjury in May 23 and July 6 of 2017, or on July 8 of

---

10  In her sworn July 6, 2017 errata sheets, under penalty of perjury, Mrs. Peggy Harris states, **"Our attorneys did review Richard's depo transcripts with him each day, and Richard clarified his answers and the changes he wanted made to the transcript."** She also states, **"In discussions with Richard, our attorneys prepared the errata sheets according to Richard's instructions and reviewed them with Richard. Richard verified that the errata sheets were consistent with the testimony he wanted to give."** Finally, she states, **"Richard knew exactly what he was signing because our attorneys reviewed the depo transcripts and errata sheets with Richard before he signed them, and Richard verified that the errata sheets were consistent with the testimony he wanted to give."**

2018.  These incongruent statements cannot be true and honest.  Peggy Harris has chosen that the Bar Complaint written and prepared by J.B. Harris and not read by Peggy Harris until Februay of 2020, is the false and fraudulent statement, not the depositions.

<u>BAR COMPLAINT FULL OF FALSE STATEMENTS CLIENT DID NOT APPROVE OR STATE</u>

J.B. Harris placed incendiary statements that the client did not approve or state.11 This is repeatedly verified in her February 13, 2020 Deposition. This is either perjury by J.B. Harris or by Peggy Harris and both violate the law.

<u>BAR COMPLAINT CONTAINS A PHANTOM CLAIM OF A CHARGE FOR $10,000 THAT IS NOT SUBSTANTIATED BY ANY DOCUMENT AND THAT CIENT IS UNSURE OF</u>

The phantom claim 12 that there was a charge to the client for $10,000 for trial housing, a charge

---

11 Q.  Okay.  When you signed the statement under oath, did you think that the statements written reflected J.B. Harris' beliefs?
THE WITNESS: I would say some of it.  Some of it.
**Q. Well, would you have signed the Bar complaint if you had any question about whether the statements reflected J.B. Harris' beliefs?**
**THE WITNESS: I would not have.**
. . .
**A. I told him what I wanted to put on this, and he put more, let me just say it that way.**
**Q. Did he tell you before he signed that he had gone beyond what you had told him?**
**A. No.**
Q. Is that information you would have wanted to know before you signed under oath?
A. I would have been helpful.
**Q. Well, more than helpful, ma'am.  Before you signed under oath, would you have wanted to know that J.B. Harris had put in the statement, your statement, beyond what you had told him?**
**THE WITNESS: Yes.**
. . .
Q All right. Let's use Mr. Monde's questions. There are words describing Mr. Howard in the Florida Bar complaint, "dishonest and duplicitous," right?
A Right.
**Q Okay. Now, are those words -- before you saw them in the complaint words that you had heard before?**
**A No.**
**Q Okay. So those were J.B.'s words, not yours?**
**A Correct.**
. . .

12 In no shape or fashion is there language documenting or a request for Margaret Peggy Harris to pay $10,000 for the trial housing. This payment was in the same category as the $12,000 for the pathology opinion. This is a distortion placed into the mind of Margaret Peggy Harris by her counsel and placed into record. The precise language is found below:

Q May I please get you to go back to Exhibit 3 for a moment. Would you turn to page four. The Bar complaint says that, "In anticipation of trial, Howard paid $12,000 for the autopsy, and supposedly prepaid $10,000 for the rental of the local residence. Howard then had the audacity to insinuate that I, a woman of very meager means, had to pay the combined cost of $22,000." **You believe that to be a false description when it comes to the $12,000 for the autopsy, correct?**
**A Correct.**
. . .
Q Okay. And do you know as you sit here today, one way or the other, **do you recall any requests or demands or any other comments or conversations you had with Howard about making the payments, what might happen or what would happen if you didn't make the payments?**
**A I don't recall.**
Q You don't recall. Okay.
. . .
Q Okay. And do you see where he is saying -- let me just read the whole thing for the record. it says, **"Dear Peggy. The**

that never existed. This is a grossly dissembled legerdemain by J.B. Harris, who created this non-existent sophistic mirage. The language of the email that discusses that Howard paid $12,000 for pathology and $10,000 for trial lodging. This demonstrates the frivolous nature of this claim. Even Peggy Harris, on February 13, 2020, in her deposition, when pushed as to this allegation, states as to whether there was such a demand: **"I'm just not sure."**

## BAR COMPLAINT FALSELY CLAIMS RICHARD HARRIS WAS NOT COHERNT OR CAPABLE OF ANSWERING DEPOSITION QUESTIONS

J.B. Harris next falsely states that Richard Harris was not coherent or capable of answering deposition questions.13  This is refuted by Peggy Harris repeatedly.  Thereby again

---

pathology samples for the pathology opinions that we paid approximately $12,000 for are available, and we can pay the $500 or let us know whoever is now going to pay the cost. <u>We have prepaid 10,000 for the house near the courthouse to be use" -- instead of "used," it says "use" -- "for the four-week trial. We can reschedule the trial date if needed."</u> Okay. All right. "We have paid the $1,000 plus and hired professional probate counsel to handle the probate after the departure of Jaakan Williams." Do you see that?
A Right.
. . .
Q Now that you look at this email today, does it appear to you that when Mr. Howard is suggesting rescheduling the trial date at the same time when he's asking you for payment, if you tie those two things together, would it have been unreasonable for you to believe that Mr. Howard was insinuating that unless these monies could be paid the trial would have to be continued?
MR. MONDE: Objection to form.
BY MR. DIAZ:
Q Do you follow my question?
<u>A Yeah, I follow your question. I'm just not sure.</u>

There were two Harris probate matters out of the over 110 probate cases filed on behalf of Engle tobacco clients, and we had Matt Hinson, Esq., certified probate counsel handling all probate cases. Counsel had taken care of one Harris probate matter, and thought they were covered. Once we became aware that there was another Harris probate matter, we were prepared to refile as there is no prejudice to the personal representative and these cases are place markers for the wrongful death component of the Engle tobacco actions. The fear was more of a problem than the substance of the probate action and this was enhanced by Mr. Harris, as a retaliatory action in his thinking that Respondent has sought out the Gould sisters and took them from him as clients.

13  Q. **The "next near death at the time he had no comprehension as to what was happening around him or what he was even signing." Do you see that?**
A Um-hum.
<u>Q Do you believe that that is true, correct and complete?</u>
<u>A No, I do not.</u>
Q Why not?
A Because he was aware of what was going on, that part of it.
<u>Q Are you saying that based on what you saw and heard, you believe that your husband was aware of what was going on around him throughout the</u>
<u>A Correct.</u>
<u>Q -- from Monday, June 20th until Sunday June 26th?</u>
<u>A Correct.</u>
Q You sat in the deposition on that Monday, Tuesday and Wednesday when the lawyers for Reynolds were asking questions?
A Correct.
Q Number one, you were there to protect your husband?
A Yes. In case -- any needs he had.
Q Yes, ma'am. And so is it fair to say that you were present in the room throughout the time that your husband was being asked questions?
A Yes.
Q You might have stepped away during a break. But in terms of the actual questioning, you were there the whole time?
A Correct.
Q In those three days, did you ever hear your husband say something that you knew to be untrue?
A Yes.
Q.  During those three days of testimony, June 20th to June 22nd, you did hear some things from your husband that you did not

demonstrating the fraudulent and perjurious nature of J.B. Harris' putrid extortion tactics and using the Florida Bar as his extortion tool.

## BAR COMPLAINT FALSELY STATES THAT J.B. HARRIS WAS HIGHLY RECOMMENDED

Next, J.B. Harris falsely states that he was highly recommended, when he was one of two lawyers that Jaakan Williams knew that did tobacco, and the only reason J.B. Harris was chosen is that he answered the phone, and the other lawyer did not. He was not highly recommended, only that he had done some tobacco trials.14

## BAR COMPLAINT FALSELY STATES THAT PEGGY HARRIS STATED THAT HOWARD WAS DUPLICITOUS AND DISHONEST

J.B. Harris falsely makes the statement that Peggy Harris signed off on, namely that Howard was duplicitous, deceptive and dishonest.15 Peggy Harris clarifies that she did not say these

---

know about before?
A Correct.
Q Different question now.
A Okay.
**Q In those three days of testimony, did you ever hear your husband say something that you knew or believed to be false?**
**A No.**
Q Was there ever a point during the deposition process, and now I'm going to stretch it out from Monday, June 20 all the way to Sunday, June 26th, was there ever any point where you had some question about whether your husband was able to comprehend or understand the questions so that he could testify?
**A I didn't doubt -- I knew he was alert the whole time.**
Q May I please get you to turn to page eight. I want to focus on the first paragraph. It says the following: Well, I'm so sorry to do this to you. Did you ever -- Was J.B. Harris present for the deposition of your husband?
A Ugh-ugh.
Q No?
A Didn't know about him. I didn't meet him. I didn't -- Absolutely not.
Q Did you ever tell J.B. Harris in connection with preparing this Bar complaint that your husband had no comprehension as to what was happening around him or what he was even signing when he signed the errata sheets?
. . .
**Q Did you ever hear any doctor assess your husband and diagnose him as lacking comprehension --**
**A No.**
**Q -- during this time period?**
**A No.**

14 Q So Miss Harris, we need to break down the sentence that I read to you a little bit more. First, you say in your Bar complaint, "Mr. Harris came highly recommended from attorney Jaakan Williams." Is that the fact?
A I don't know highly would be -- I wouldn't use that word. He recommended him.
. . .
Q What did Jaakan Williams tell you in this conversation regarding J.B. Harris?
A He gave me two names for two attorneys. One was in Jacksonville. I tried to call her, I think because she was closer. The number didn't work. So I called J.B., and that's when we ended up with J.B.
Q What did Mr. Williams tell you about J.B. Harris' qualifications, or anything else? I mean, what did he tell you when he recommended him?
**A I believe he said that he had done some work --**
**Q J.B. Harris wrote those words without any authorization or permission from you, correct?**
**A Correct.**
**Q J.B. Harris wrote those words?**
**A Correct.**

15 Q Let me ask you, please, to turn -- page 13, please. The following statement appears in your sworn statement under oath to the Florida Bar: Quote, "And I know the difference between a donkey and a mule. With

things.

## J.B. HARRIS WITHHELD INFORMATION THAT HE WAS BEING PAID BY HOWARD, AND THIS IS INFORMATION THAT CLIENT WANTED TO KNOW

J.B. Harris intentionally fails to disclose information that the client would want to have known, namely that Howard is paying $21,000 a month to J.B. Harris to work on Engle tobacco cases, including Margaret Peggy Harris' case.16  The reality is that Peggy Harris was still hiring Tim Howard's attorneys when she though she went to J.B. Harris, because he was working for Tim Howard.

## PART OF AN EXTORTION SCHEME BY J.B. HARRIS

Mr. J.B. Harris is consistently threatening and extorting, and using perjury, while trying to avoid accountability.  Prior to filing the August 2018 Bar Complaint response, pertaining to health insurance that this firm pays for Mr. J.B. Harris of approximately $2,500 a month, that was understood to be automatically deducted from the account, and was rectified prior to the firm being aware of his threat and extortion, Mr. J.B. Harris wrote:

**"Tim, I suggest you reactivate my insurance today <u>or I will be at your office first thing tomorrow to spend a little quality time with you.</u>  You've placed the lives of my children at risk and that won't stand."**

August 21, 2018 email from Mr. J.B. Harris, attached to Bar Complaint Response.  As to the merits of the Bar Complaint, consider the following:

This firm has been involved in tobacco litigation since its founding in 1995 and has been counsel on

---

that said, I have never in my life met anyone as duplicitous, deceptive and dishonest as Howard." Are those your words? <u>A They are not my words.</u>

...

Q Right. So to the best of your belief and knowledge it's simply false to say that Mr. Howard extorted you by threatening not to appear for trial if you would not agree to his demand to pay these costs, correct? <u>A I do not remember that.</u>

16 Q You are doing fine. Exhibit F, and then I want the next page. There you go. Okay. This is an email from Tim Howard to someone named Matt. And he says, "She didn't respond to me. Mr. Harris," referring to J.B. Harris, "has an extensive history of Bar violations and extortion that I was forced to report. We sent what we had in the file and I thought that was sufficient at the time. There's nothing to do on this case for now." When you hired J.B. Harris, were you aware that he was in the midst of a dispute with Tim Howard?
A No, I did not.
Q Were you aware that they were actually lawyers working together under contract --
A I did not.
Q-- when you hired -- when you fired Tim Howard and hired J.B. Harris?
A Not that I recall.
Q Were you aware when you fired Tim Howard and hired J.B. Harris that Tim Howard was actually paying J.B. Harris' salary?
A No, I did not.
Q Were you aware when you fired Tim Howard and hired J.B. Harris that they had a contract with each other that in cases --
Engle cases like yours, including yours, that they had a contract that would give Tim Howard a certain percentage of any verdict obtained or judgment collected?
A Not that I recall.
Q Is that information, ma'am, that you would have wanted to know when you hired J.B. Harris?
MR. DIAZ: Form.
THE WITNESS: Yes.

numerous tobacco trials and cases, including some of the largest verdicts in the nation—*Chiles, et al., v. American Tobacco, et al.,* (resulted in over $20 billion for the State of Florida); *Evans v. Lorillard* (resulted in the largest verdict in the history of Massachusetts for a personal injury case at $150 million and settled for over $79 million). Pertaining to this particular complaint, the firm was counsel in a 7-week Jacksonville, Florida trial involving *Sermons v. RJR,* that took place when the depositions of Richard Harris were also taking place, due to his imminent demise and the resistance of defendants to permit him to be deposed earlier. Thus, there was clear capacity to litigate the action, no failure to disclose, nor was there a solicitation. In fact, former counsel for Richard Harris, the law firm of Lyons & Farrar, sought this firm out to assist in the prosecution of the case, and Richard Harris chose to drop former counsel and solely retain this firm. The Lyons & Farrar firm were paid their quantum meruit fees for representing Richard and Peggy Harris for 9 months, while the Howard & Associates firm has to pursue an appeal to obtain even their costs back. This is verified in the record of this action.

It is false for Mr. J.B. Harris (since Mrs. Peggy Harris has verified that she had no capacity or knowledge) to assert that this firm did not know how to prepare a client for a tobacco deposition having done nearly 100 tobacco depositions in the past. The concern was that a junior associate had significant challenges in the first day of defending Mr. Richard Harris in Defendants' deposition of him, while the senior partner was in a 7-week tobacco trial in Jacksonville. The firm's senior partner left the tobacco trial for a day to get the testimony in order and identified the critical issues and reviewed them with the associate and paralegal assisting with the deposition. The intense reprimand of Jaakan Williams was due to the significant lapses in legal analysis necessary to protect the interests of the client. While he did not like the reprimand and discipline, it was necessary to get his attention as it severely threatened justice for Richard and Peggy Harris. Jaakan Williams may have complained to Peggy Harris about this reprimand as this is referenced in Peggy Harris' February 13, 2020 deposition, attached hereto. The trial preservation testimony was organized, focused and covered the materials needed to effectively prosecute Mr. Richard Harris' case. This work was the core basis for the $10 million recovery for Peggy Harris.

This also involved reviewing portions of the deposition defended by the junior associate. This required reviewing the testimony at issue, reviewing the language with the client, and obtaining the client's desired changes through an appropriate errata correction. **Rule 1.310 (e), Florida Rules of Civil Procedure, provides that:**

**"any changes in form or substance that the witness wants to make must be listed in writing by the offer with a statement of the reasons given by the witness for making the changes. The changes must be attached to the transcript."**

Errata sheet clarifications from a deposition transcript are standard procedure for all depositions. This attempt to make errata sheets nefarious is inconsistent with the Florida Rules of Civil Procedure. Errata sheets were done for both Mr. Richard Harris and Mrs. Peggy Harris.

In fact, under oath, Mrs. Peggy Harris stated in her May 23, 2017 deposition, pages 332-336, relevant pages attached to the August 2020 Responses to the Bar Complaint, the following pertaining to the errata sheets. These statements confirm that the relevant portions of the transcripts were read to him, and that he knowingly agreed to change the testimony and signed confirming the changes. The February 13, 2020 deposition of Peggy Harris, attached hereto, confirms the same.

Q. Okay. And so I asked you before the break whether you were aware, whether you knew whether your husband reviewed the deposition that I took of him, which was a multi-hundred-page transcript. **Did he review that?**
A. **I believe he did, but he couldn't see it, but it was read to him.**
Q. Okay. Who read it to him?

A. One of the attorneys.

Q. How long did it take?

**A. A while. They came in early, yeah.**

Q. They came in early the morning of June 25th?

**A. I don't remember the morning, but they came in early to do it.**

. . .

Q. Okay. Do you remember anything about the circumstances of what was read to him?

A. No.

Q. Do you know one way or the other whether that deposition was read to him from –

**A. I believe it was.**

**Q. – start to finish?**

**A. I believe it was.**

. . .

**Q. Do you know whether he actually told the lawyers whether he had changes to make to his deposition? Did he actually tell them that?**

**A. I believe he did.**

Q. How did he do that?

A. Verbally, I would think. But I'm not—I shouldn't say, because I'm not sure.

. . .

**Q. Do you believe that when your husband signed those errata sheets, that he understood what he was signing?**

**A. I would think he would. I wouldn't think he would sign if he didn't.**

**Q. And my question was just a little bit different. Given his health condition at the time, do you think he understood what he was signing when he signed those errata sheets?**

**A. I would say yes.**

Q. Okay. So is the answer that you're not sure whether he knew what he was signing?

A. Again, I wouldn't think he would sign unless he knew what he was signing.

**Q. Where you in the room when he signed them?**

**A. I don't—yeah, I think I was.**

. . .

**Q. After his deposition, after I had the opportunity to ask him questions, did Mr. Harris ever say to you that he had changes that he wanted to make to his testimony?**

**A. I believe he did.**

Moreover, in response to the deposition reviews, Mr. Richard Harris and Mrs. Peggy Harris were both read the relevant portion of their transcripts and under oath made changes to their transcripts. This was confirmed by Mr. Richard Harris and reconfirmed by Mrs. Peggy Harris, wherein she repeatedly states under "penalties of perjury" in errata sheets after reviewing her testimony and providing corrections that **"I do remember our attorneys coming over prior to Richard's deposition and reviewing his deposition testimony from the previous days with him, and making sure that the testimony that he had given, and making all the corrections that Richard suggested."** 17 *See* relevant portions of transcripts attached. Neither Mr. Richard Harris nor Mrs. Peggy Harris were ordered to sign the errata sheets, and they were reviewed and read to both of them by either associate or senior counsel before they signed the errata sheets. *See* transcript errata sheets attached to the August 2018 response to the Peggy Harris Bar Complaint, as well as Peggy Harris' February 13, 2020 deposition attached hereto.

---

17 In the errata sheets she stated, "Our attorneys did review Richard's depo transcripts with him each day, and Richard clarified his answers and the changes he wanted made to the transcript." She also stated, "In discussions with Richard, our attorneys prepared the errata sheets according to Richard's instructions and reviewed them with Richard. Richard verified that the errata sheets were consistent with the testimony he wanted to give." Finally, she stated, "Richard knew exactly what he was signing because our attorneys reviewed the depo transcripts and errata sheets with Richard before he signed them, and Richard verified that the errata sheets were consistent with the testimony he wanted to give."

In Mrs. Peggy Harris' May 23, 2018 deposition, she confirms in pages 344-346, attached, that shortly after Mr. Richard Harris passed, the autopsy was conducted in the Faith Funeral Home in Havana, Florida. Regional Pathology and Autopsy Services out of Oakland, California, attached, had their staff fly into Tallahassee. It is demonstrably false that Mr. Richard Harris' body was shipped to California, and in fact, the firm flew the medical autopsy staff from California into Florida to both do an autopsy and obtain tissue samples for medical pathology determination of disease and etiology. Moreover, there was no inference or reference for the client to pay for the costs expended in the case, and it is not understood where or how the language of the email can be interpreted as such.

There was no abandonment as a client. The probate matter was non-prejudicial, as it could be refiled. The hearing notice was missed due to having two Harris probate matters, thinking that the notice was covered, and over 110 probate cases to manage after the junior associate counsel left. This particular matter was understood to be covered by experienced probate counsel, Matt Hinson, Esq., who was hired to handle the 110 or more probate matters. When the Harris probate matter came to the firm's attention, Mr. Matt Hinson, certified probate and estate specialist, was immediately contacted concerning this particular case, and assigned to handle the probate action. Finally, Mr. J.B. Harris ability to operate as an attorney is due to this law firm paying him to work on this and other Engle cases.18

Unknown to this firm at the time, and verified in the February 13, 2020 deposition of Peggy Harris, Mr. Jaakan Williams recommended several lawyer sources to Mrs. Peggy Harris, including the Searcy, Denny law firm, and Christina Opsohal, who had worked on the Richard Harris action. Mr. J.B. Harris was included due to Mr. Jaakan's meeting him through the Howard & Associates law firm, and was only chosen due to him answering the phone. Moreover, Mr. Jaakan Williams did not say the errata sheets were "Howard's concoction of the fraudulent errata sheets."

There has been no refusal to pay the $500 tissue sample bill, as the emails demonstrate. We stated, **"we can pay the $500 or let us know whoever is going to pay the costs."** All that was asked is how did the client wish to handle the matter, in our efforts to avoid spoliation of the evidence.

Furthermore, it is clearly evident that Mr. J.B. Harris' language is definitively found in this bar complaint, where he again uses his signature labels and terms **"blasphemous"**, **"delusional"**, **"duplicitous"**, **"deceptive"** and **"dishonest"** as he has stated in other writings.19 This is language from Mr. J.B. Harris

---

18 During the trial of this case and during its preparation in 2018, the firm was paying Mr. J.B. Harris $21,000 a month, so that he can prosecute Engle tobacco cases, as is referenced in the current complaint against Mr. J.B. Harris. If this firm didn't pay Mr. Harris, he couldn't be working on Mrs. Peggy Harris' case and continue his fraudulent Bar Complaints and sharing with media to attack this firm.

19 For example, on August 7, 2018, the following was forwarded to the Florida Bar and State Attorney:

As part of the ongoing reporting of the various Bar violations and extortion of Mr. J.B. Harris, consistent with his pattern and practice, attached as Exhibit A please find the July 30, 2018 correspondence from Mr. J.B. Harris, documenting **disparaging remarks, degrading to the legal profession**, in unnecessarily calling Mr. Howard **"pathetic, desperate and delusional."** This language violates the rules regulating the Florida Bar, 3-4.3, 4-8.2(a), and 4-8.4(d), as cited below.

Mr. Harris again distorts the facts when he states that the client was **"abandoned"**. Mr. Harris knows that the law firm experienced a funding gap for 6-8 weeks due to corrupt advisors. This funding gap was solved. In fact, **Mr. Harris is right now being paid $21,000 a month by this law firm** and its lender **so he can pursue tobacco cases, including the action of *Richard Harris v. RJR and Phillip Morris*. In fact, without this firm's funding, he is unable to represent Mrs. Margaret Harris or have a life.** With the funding gap solved, the law firm was able to assign and/or hire probate counsel to address the 100 plus tobacco litigation related probate actions, including the probate action for Mrs. Margaret Harris.

that he uses in the Kim Poling and his own Bar Complaint, and language that Mrs. Peggy Harris confirms that she did not use.

Mr. J.B. Harris then ghost writes to state there was a "ballistic" reaction to new counsel, and defamed and slandered Mr. J.B. Harris. This is from an email intended only to Mr. Matt Hinson and counsel for the firm, not knowing that Mrs. Peggy Harris was embedded in the reply all. Next, as referenced in the prior bar violation reports on Mr. J.B. Harris, it was stated solely to Mr. Matt Hinson, that "Mr. Harris has an extensive history of bar violations and extortion that I was forced to report." This is factually true as verified herein, not slanderous, and does not yet state a record of adjudicated bar violations, as inferred by Mr. Harris.

The facts demonstrate that this fraudulent Bar Complaint, and two others, was written by Mr. J.B. Harris as part of his continued efforts at extortion. As pointed out in the many prior filings, these documented and repeated, upon repeated patterns violate the following rules of professional conduct as promulgated by the Florida Supreme Court:

> A lawyer must not threaten opposing parties with sanctions, **disciplinary complaints**, criminal charges, or additional litigation to gain a tactical advantage. *See* Florida Supreme Court, Professionalism Expectations: Expectation 3.18; and Rules Regulating the Florida Bar: Rule 4-3.4(g).

> A lawyer must not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter. *See* Florida Supreme Court, Rules Regulating the Florida Bar: Rule 4-3.4(g).

> A lawyer must not present, participate in presenting, or threaten to present **disciplinary charges** under these rules solely to obtain an advantage in a civil matter. *See* Florida Supreme Court, Rules Regulating the Florida Bar: Rule 4-3.4(h). 20

---

Mr. Harris uses the terms "**delusional**", "**duplicitous**", and is following through with his extortionate threat wherein he wrote on June 6, 2018:

> Tim, if you think you are having trouble with the Bar's investigation of your practices, BWCI Pension Trustees Limited, Ted Doukas, and everyone else who is still after you, **you are about to walk into a shit storm if you steal the Goulds from me as my clients.**

> I will lien the file for costs and fees, sue you for tortious interference and unpaid contribution to costs, fraud and everything else I can think of. **I will also amend my complaint with the Bar** and file a complaint against Neil as well.

On June 8, 2018, Mr. Harris writes: "You're a **first-rate coward and scumbag**. All your talk about Jesus is **blasphemous** garbage." "I can assure they (Gould sisters) will rip you to shreds once they see through your sociopathic charade."

20 Lawyer disciplined for sending a threatening letter to opposing counsel. *The Florida Bar v. Sayler*, 721 So.2d 1152 (Fla. 1998). A criminal defense lawyer violated Rules 4-4.4(a) and 4-8.4(d) for sending a victim of a crime an objectively humiliating and intimidating letter designed to cause her to abandon her criminal complaint. *The Florida Bar v. Buckle*, 771 So. 2d 1131 ; *see also The Florida Bar v. Ratiner*, 46 So. 3d 35 (Fla. 2010). A lawyer should abstain from conduct that diverts the fact-finder's attention from the relevant facts or causes a fact-finder to make a legally impermissible decision. (Professionalism Expectations: Expectation 5.8)

To opposing parties and their counsel, a lawyer should act with **fairness, integrity, and civility**, not only in court, but also **in all written and oral communications**.  (Oath of Admission)

Candor and civility must be used in all oral and written communications. (Professionalism Expectations: Expectation 2.2)

**A lawyer must avoid disparaging personal remarks** or acrimony toward opposing parties, counsel, third parties or the court. (Professionalism Expectations: Expectation 2.3). **<u>A lawyer should be civil and courteous in all situations, both professional and personal, and avoid conduct that is degrading to the legal profession.</u>** R. Regulating Fla. Bar 3-4.3. 21

**<u>A lawyer's communications in connection with the practice of law</u>**, including communications on social media, **<u>must not disparage another's character or competence</u>** or be used to inappropriately influence or contact others.  (Professionalism Expectations: Expectation 2.5); *see* R. Regulating Fla. Bar 4-8.4(d).

**<u>A lawyer must not criticize or denigrate opposing parties</u>**, witnesses, or the court **to clients, media, or members of the public.** (Professionalism Expectations: Expectation 4.20); see R. Regulating Fla. Bar 4-8.2(a) and 4-8.4(d)).

This is a response to the Bar Complaint of Margaret "Peggy" Harris, which in reality is a complaint by J.B. Harris.  Consistent with the prior responses, there are numerous Florida bar and criminal violations by Mr. J.B. Harris.

In response to this sworn evidence, and the constant and dissembling practice of Mr. Jonathan B. Harris, Respondent requests that all of these three Bar complaint, actions created and fraudulently forged by J.B. Harris be dismissed, and that Mr. J.B. Harris be sanctioned for intentionally and perjuriously misleading the Florida Bar and his client, and others, as to the facts and circumstances.

---

21 Lawyer disciplined for sending disparaging emails to opposing counsel, calling him a liar, and making improper outbursts directed toward opposing counsel during the litigation. *The Florida Bar v. Norkin*, 132 So.3d 77 (2013)). *See also The Florida Bar v. Abramson*, 3 So.3d 964 (2009); *The Florida Bar v. Buckle*, 771 So.2d 1131 (Fla. 2000) ; *The Florida Bar v. Sayler*, 721 So. 2d 1152 (Fla. 1998); *The Florida Bar v. Ratiner*, 46 So.3d 35 (Fla. 2010). Lawyer disciplined for sending a letter to a court-appointed provisional director of corporation in which he improperly threatened to file suit against provisional director and accused the provisional director of being involved in a conspiracy. *The Florida Bar v. Norkin*, 132 So.3d 77 (2013); *See also The Florida Bar v. Abramson*, 3 So.3d 964 (Fla. 2009). "The First Amendment does not protect those who make harassing or threatening remarks about the judiciary or opposing counsel. Under Rule of Professional Conduct 4-8.4(d), lawyers are required to refrain from knowingly disparaging or humiliating other lawyers." *The Florida Bar v. Sayler*, 721 So.2d 1152, 1155 (Fla. 1998).

Page 1

1           IN THE CIRCUIT COURT OF THE
               SECOND JUDICIAL CIRCUIT,
2         IN AND FOR GADSDEN COUNTY, FLORIDA
                    CIVIL DIVISION

3

4              CASE NO. 2014 CA 337

5

MARGARET HARRIS, individually, and
6   as Personal Representative of the Estate
    of RICHARD HARRIS,
7            Plaintiff,
    vs.

8

9   R.J. REYNOLDS TOBACCO COMPANY, et al.,
             Defendants.
10   _____/

11

12                   Volume I

13

14      DEPOSITION OF MARGARET "PEGGY" HARRIS

15              PAGES 1 - 199

16        Thursday, February 13, 2020

17           9:31 a.m. - 4:07 p.m.

18

19

20            Anderson & Hart, P.A.
           1584 Metropolitan Boulevard
21          Tallahassee, Florida  32308

22

23

24      STENOGRAPHICALLY REPORTED BY:
          JUDY CHIN, RPR, CRR, FPR

25

Page 2

1 APPEARANCES:
2
3 ON BEHALF OF THE PLAINTIFF:
4     J.B. HARRIS, P.A.
      3127 Ponce de Leon Boulevard
5     Coral Gables, Florida 33134
      786-303-8333
6     BY: J.B. HARRIS, ESQUIRE
      jbharrisesq@gmail.com
7     (via phone)
8
9 ON BEHALF OF THE PLAINTIFF:
10    RICHARD J. DIAZ, ESQUIRE
      3127 Ponce de Leon Boulevard
11    Coral Gables, Florida 33134
      305-444-7181
12    rick@rjdpa.com
13
14 ON BEHALF OF THE PLAINTIFF:
15    ANDERSON & HART, P.A.
      1584 Metropolitan Boulevard
16    Tallahassee, Florida 32308
      850-894-3000
17    BY: PAUL M. ANDERSON, ESQUIRE
      paul@becausejusticematters.com
18
19 ON BEHALF OF THE PLAINTIFF:
20    ROBERT TRAMMELL, ESQUIRE
      P.O. Box 1799
21    Tallahassee, Florida 32302-1799
      850-510-2187
22    roberttrammell45@gmail.com
23
24
25

Page 4

INDEX

1
2 WITNESS                                          PAGE
3 MARGARET "PEGGY" HARRIS                            7
   Direct Examination by Mr. Monde          7
4  Cross Examination by Mr. Diaz            174
5
6                      EXHIBITS
7 NO. DESCRIPTION                                  PAGE
8 Exhibit 1  Notice Of Videotaped Deposition    10
              Duces Tecum
9 Exhibit 2  Plaintiff's Response To Notice of   14
              Deposition Duces Tecum
10 Exhibit 3 The Florida Bar Inquiry/Complaint    16
              Form
11 Exhibit 4 Florida Bar Letter 5/25/18          18
   Exhibit 5 Cash4Cases, Inc.                    20
12 Exhibit 6 Order Removing Personal             34
              Representative, Revoking Letters of
13            Administration, and Order of
              Dismissal
14 Exhibit 7 Errata Sheet, Volume 1, Richard    107
              Harris
15 Exhibit 8 Errata Sheet, Volume 2, Richard    109
              Harris
16 Exhibit 9 Errata Sheet, Volume 3, Richard    110
              Harris
17 Exhibit 10 Plaintiff's Response In Opposition 113
              to Tim Howard's Omnibus Motion Filed
18            on April 3, 2019
   Exhibit 11 Letter to Tim Howard, 5/29/18     120
19 Exhibit 12 Deposition Margaret "Peggy" Harris 127
              Depo 5/23/17
20 Exhibit 13 Acknowledgment of Deponent/Margaret 133
              "Peggy" Harris
21
22 CERTIFICATE OF REPORTER                      197
   ACKNOWLEDGMENT OF DEPONENT                   198
23 ERRATA SHEET                            199
24
25

Page 3

1 APPEARANCES CONTINUED:
2
3 ON BEHALF OF THE DEFENDANT/R.J. REYNOLDS:
4     JONES DAY
      1420 Peachtree Street, NE, Suite 800
5     Atlanta, Georgia 30309-3053
      404-521-3939
6     BY: DAVID MONDE, ESQUIRE
      dmmonde@jonesday.com
7 -and-
8     JONES DAY
      901 Lakeside Avenue
9     Cleveland, Ohio 44114-1190
      614-469-3939
10    BY: BRAD HARRISON, ESQUIRE
      bwharrison@jonesday.com
11
12
13 ALSO PRESENT: Vann Patacxil, Videographer
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1     The following proceedings began at 9:31
      a.m.
2                   ****
3     THE VIDEOGRAPHER:  Good morning.
4     We are on the record at 9:31 a.m. on
5     February 13th, 2020.
6     Please note that the microphones are
7     sensitive and may pick up whispering, private
8     conversations.
9     Please turn off all cellphones or place
10    them away from the microphones as they can
11    interfere with the deposition audio.
12    Audio and video recording will continue to
13    take place unless all parties agree to go off
14    the record.
15    This is media unit one of the video
16    recorded deposition of Margaret "Peggy" Harris
17    taken for counsel for the plaintiff in the
18    matter of Harris Margaret versus R.J. Reynolds,
19    et al., filed in the Circuit Court of the
20    Second Judicial Circuit in and for Gadsden
21    County, Florida, Circuit Civil Division, Case
22    Number 2014-CA-000337.
23    This deposition is being held at Anderson
24    & Hart, P.A., located at 1584 Metropolitan
25    Boulevard.

2 (Pages 2 - 5)

Page 6

1    My name is Vann Patacxil, from the firm
2  Unique Video Creations, and I am the
3  videographer.
4    The court reporter is Judy Chin from the
5  firm Veritext.
6    I am not authorized to administer an oath.
7  I am not related to any party in this action
8  nor am I financially interested in the outcome.
9    Counsel and all present in the room and
10  everyone attending remotely will now state
11  their appearances and affiliations for the
12  record.
13    If there are any objections to the
14  proceeding, please state them at the time of
15  your appearance, beginning with the noticing
16  attorney.
17    Will the court reporter please swear in
18  the witness.
19    THE STENOGRAPHER:  Please raise your right
20  hand.
21    Do you swear or affirm to tell the truth,
22  the whole truth, and nothing but the truth?
23    THE WITNESS:  I do.
24  Thereupon,
25    MARGARET "PEGGY" HARRIS

Page 7

1  having been first duly sworn or affirmed,
2  hereinafter certified testified as follows:
3    MR. MONDE:  This is David Monde, from
4  Jones Day, on behalf of R.J. Reynolds Tobacco.
5    MR. HARRISON:  Brad Harrison, also from
6  Jones Day, and also for R.J. Reynolds Tobacco.
7    MR. TRAMMELL:  Robert Trammell, for the
8  plaintiff.
9    MR. DIAZ:  Richard Diaz, for the
10  plaintiff.
11    MR. ANDERSON:  Paul Anderson, representing
12  Peggy Harris.
13    MR. HARRIS:  J.B. Harris, for the
14  plaintiff.
15    THE VIDEOGRAPHER:  Thank you.
16    You may proceed.
17  Thereupon,
18    MARGARET "PEGGY" HARRIS
19  having been first duly sworn or affirmed,
20  hereinafter certified testified as follows:
21    DIRECT EXAMINATION
22  BY MR. MONDE:
23    Q    Mrs. Harris, what's your full name?
24    A    Margaret Ann Harris.
25    Q    You were married to Richard Harris?

Page 8

1    A    Correct.
2    Q    You are the personal representative of the
3  estate of Richard Harris?
4    A    Yes, I am.
5    Q    And in that capacity you were the
6  plaintiff in a lawsuit against Reynolds Tobacco
7  involving Mr. Harris' smoking of cigarettes,
8  correct?
9    A    Correct.
10    Q    As you know, I represent R.J. Reynolds,
11  and I'm here to ask you some questions today in
12  connection with the lawsuit.  You understood that?
13    A    Correct.
14    Q    You understand that you have taken an oath
15  to tell the truth today?
16    A    Yes, I have.
17    Q    You understand that your testimony is
18  being videotaped and that the court reporter here is
19  taking a record of what I ask and what you say,
20  correct?
21    A    Correct.
22    Q    You also understand that the transcript
23  that the court reporter prepares will be used at a
24  future hearing in this case --
25    A    I understand.

Page 9

1    Q    -- as well as the videotape?
2    A    Correct.
3    Q    All right.  Now, I understand that this is
4  not your first deposition.  But there are a couple
5  of points that are important enough for me just to
6  go over again.
7    First, do I have your commitment that if I
8  confuse you with a question or you just don't
9  understand what I'm asking, that you'll stop and
10  tell me that?
11    A    I will.
12    Q    If you need to take a break at any point,
13  you understand that all you have to do is say,
14  Mr. Monde, I would like to take a break and then we
15  will do that.  Okay?
16    A    I will. Yes.
17    Q    All right.  Now, your lawyer may have some
18  objections.  If the lawyer objects, you are to still
19  go ahead and answer the question unless the lawyer
20  tells you, Mrs. Harris, do not answer that question.
21  Okay?
22    A    Okay.
23    Q    I'm sure they will be clear if they don't
24  want you to answer something.
25    A    Okay.

3 (Pages 6 - 9)

Page 10

1    Q   Now, are you taking any medication this
2  morning that causes you concern that you might
3  struggle to understand my questions and to give
4  truthful testimony?
5    A   No, I'm not.
6    Q   All right. Mrs. Harris, Exhibit 1 is what
7  we call the Notice of Deposition for today's
8  deposition. And the last page, Exhibit A asked you
9  to bring certain documents.
10       Do you see that?
11       (Exhibit No. 1 marked for
12  identification.)
13       THE WITNESS: Um-hum.
14  BY MR. MONDE:
15    Q   Could you say yes or no, please.
16    A   Yes. I'm sorry.
17    Q   That's okay.
18    A   I was concentrating on this.
19    Q   You've seen this document, this list of
20  requests before today, correct?
21    A   I think I just got it the day -- either
22  yesterday or the day before.
23    Q   All right. Have you looked for the
24  documents that are listed here on Exhibit A?
25    A   I did look for them.

Page 11

1    Q   Okay. And did you bring the document --
2       MR. HARRIS: Excuse me. I can't hear a
3  word Mrs. Harris is saying.
4       MR. ANDERSON: She is very soft spoken.
5       MR. HARRIS: I would ask her to speak up,
6  please.
7       MR. MONDE: I can hear her fine, J.B., so
8  I will not ask her to speak above her comfort
9  level.
10       MR. DIAZ: Let me ask you this --
11       THE WITNESS: It is recording in here or
12  here?
13       MR. DIAZ: Hold on a second. J.B., hold
14  on a second.
15       Let's not start this deposition with
16  unnecessary controversy, please.
17       You could have come up here, and you
18  decided not to, and we respect that. We will
19  try to accommodate you. Let's just try to get
20  the deposition done, please.
21       So just hold -- just put yourself on hold
22  for just one minute. I think I will be able to
23  help you.
24       MR. MONDE: I will move the phone a little
25  closer.

Page 12

1       MR. ANDERSON: As long as it doesn't block
2  your video.
3       MR. DIAZ: We are good with the phone
4  there?
5       Now, Peggy, can you say, test, one, two,
6  three, to make sure J.B. can hear you?
7       THE WITNESS: Test, one, two, three.
8       MR. DIAZ: Is that better, J.B.? J.B.?
9       MR. ANDERSON: Did he get disconnected?
10       MR. MONDE: No good deed goes unpunished.
11       MR. DIAZ: If she can put the mic a little
12  closer.
13       MR. MONDE: It's not the mic.
14       MR. DIAZ: That's right. Because he is
15  hearing over the phone.
16       MR. MONDE: He hung up.
17       MR. DIAZ: You know what, let's continue.
18  If he calls back in -- we got as close as we
19  can get the phone to her.
20       MR. MONDE: I guess.
21       MR. DIAZ: Then that's it. It is what it
22  is.
23       Okay. I'm sorry to all of you.
24       MR. ANDERSON: That's good. I think you
25  pissed him off very well.

Page 13

1       MR. TRAMMELL: Outstanding. Local counsel
2  says very good.
3       MR. MONDE: You guys are two for two this
4  morning so far.
5       All kidding aside, I have no objection if
6  anyone wants to try to get Mr. Harris -- J.B.
7  Harris back on the phone.
8       I just want to be clear on that.
9       MR. DIAZ: I appreciate that.
10       Since we are on the record, I'll send him
11  a text message telling him that the line got
12  disconnected, telling him we moved the phone as
13  close as we can to Peggy --
14       MR. MONDE: Right.
15       MR. DIAZ: -- and we are going to resume,
16  and he is welcome to call back in.
17       It is going to be on my phone and on the
18  record.
19       MR. MONDE: And I appreciate that. I just
20  wouldn't want any -- I wouldn't want J.B. to
21  later say that I did something to prevent him
22  from listening in.
23       MR. DIAZ: Absolutely not.
24       And we so stipulate.
25       And I will send that text to him right

4 (Pages 10 - 13)

Page 14

1 now.
2     MR. MONDE: Thank you.
3     MR. DIAZ: Yeah.
4     MR. ANDERSON: I will leave the door open.
5 It will have more circulation in here. It only
6 has access to my paralegal, so --
7     MR. MONDE: You can really feel the
8 difference.
9     MR. ANDERSON: I have turned it down, too.
10 J.B.?
11     MR. HARRIS: Yeah. That's better.
12     MR. DIAZ: Okay. Good. All right.
13 BY MR. MONDE:
14     Q   Miss Harris, I was asking you whether you
15 had located documents that were called for in
16 Exhibit A, and you said that you found some and you
17 gave them to Mr. Anderson, is that --
18     A   Correct.
19     Q   All right. I'm going to mark as Exhibit 2
20 the documents that Mr. Anderson gave us yesterday.
21     (Exhibit No. 2 marked for
22 identification.)
23 BY MR. MONDE:
24     Q   This is Plaintiff's Response to Notice of
25 Deposition Duces Tecum.

Page 15

1     I'll hand that to you and just ask you to
2 confirm that those are the documents that you gave
3 Mr. Anderson in response to Exhibit A.
4     MR. ANDERSON: Counsel, just to be clear,
5 I added, because I already had it, the Bar
6 complaint. She did not provide that to me
7 yesterday.
8     MR. MONDE: You had that already?
9     MR. ANDERSON: I had that already and
10 added it to the pile.
11     MR. MONDE: Can I just get a
12 clarification, please, if you had received it
13 from Miss Harris or whether you had gotten it
14 from another source?
15     MR. ANDERSON: I had gotten it from other
16 counsel.
17     MR. MONDE: Okay.
18 BY MR. MONDE:
19     Q   So with that clarification, is that the
20 set of materials that you're producing in response
21 to Exhibit A?
22     A   It looks like it, yes.
23     Q   All right.
24     A   Can I just leave these here?
25     Q   You can. If you start a pile there, a

Page 16

1 neat pile and put them in order, it will help us.
2     A   Okay.
3     Q   Thank you.
4     Now, this morning you obtained from the
5 Florida Bar a signed copy of the Bar complaint that
6 you signed on July 8th, 2018, correct?
7     A   Correct.
8     Q   Because up until this morning you didn't
9 have a signed copy in your possession?
10     A   Correct.
11     MR. MONDE: Paul, would you please --
12     Yes.
13     MR. ANDERSON: Do you want to mark that
14 one?
15 BY MR. MONDE:
16     Q   The signed Bar complaint is marked as
17 Exhibit 3.
18     (Exhibit No. 3 marked for
19 identification.)
20 BY MR. MONDE:
21     Q   Let me ask you to turn to the second page,
22 please.
23     Is that your signature?
24     A   Yes, it is.
25     Q   And did you sign this on July 8th, 2018?

Page 17

1     A   That's how it's dated; yes.
2     Q   My question is, did you sign it on that
3 day?
4     A   I would assume I did. I wouldn't have put
5 it otherwise.
6     Q   The first page of Exhibit 3 contains a
7 stamp of receipt from the Florida Bar dated
8 August 10th, 2018. Do you see that?
9     A   Yes, I do.
10     Q   Did you mail the Bar complaint to the
11 Florida Bar or did someone else?
12     A   I truthfully can't say. I don't know. I
13 do not remember. I don't think I sent it, because I
14 don't think I would have had that information.
15     Q   In other words, you don't think you would
16 have had the information of where to send it?
17     A   Right. Correct.
18     Q   Okay. If you did not mail it to the
19 Florida Bar yourself, who do you believe did?
20     A   J.B. Harris. He is the one I was working
21 with for this.
22     Q   And so J.B. Harris was your lawyer in
23 connection with the Florida Bar complaint?
24     A   Correct.
25     Q   Let me ask you about some other materials

5 (Pages 14 - 17)

Page 18

1 that were part of what your lawyer, Mr. Anderson,
2 gave us yesterday.
3     To be clear, what I'm marking now as
4 Exhibit 4 is part of composite Exhibit 2.
5     (Exhibit No. 4 marked for
6 identification.)
7 BY MR. MONDE:
8   Q   And this is a letter to Tim Howard, your
9 former lawyer in this case, correct?
10   A   Um-hum.
11   Q   Yes?
12   A   Yes. I'm sorry.
13   Q   I don't mean to be rude, Mrs. Harris --
14   A   No. No. I understand that.
15   Q   Okay. And it is addressed to your former
16 lawyer in this case, Tim Howard, correct?
17   A   Right.
18     MR. ANDERSON: Counsel, I just want to
19   make sure we are talking about the May 25, 2018
20   letter.
21     MR. MONDE: It is.
22     MR. ANDERSON: Okay.
23 BY MR. MONDE:
24   Q   When did you get this letter?
25   A   I do not recall.

Page 19

1   Q   All right. You are shown as a carbon copy
2 recipient at the bottom. Do you see that?
3   A   Correct.
4   Q   All right. When did you first contact the
5 Florida Bar about Tim Howard?
6   A   My memory with dates is really bad, so I
7 really couldn't say.
8   Q   This letter says that the Florida Bar had
9 received a request for assistance from you. The
10 letter is dated May 25, 2018.
11   A   Um-hum.
12   Q   Can you give us your best estimate of how
13 long before May 25 you made this request for
14 assistance to the Florida Bar?
15   A   No, I could not.
16   Q   How did you contact the Florida Bar?
17   A   I think I just talked to J.B. I don't
18 think I directly called them. But I'm not sure.
19   Q   Well, my question is, do you recall
20 telephoning the Attorney Consumer Assistance Program
21 at the Florida Bar with a complaint about Tim
22 Howard?
23   A   I cannot say with certainty that I did.
24   Q   Do you recall writing a letter to them?
25   A   I don't believe I did that.

Page 20

1   Q   Your best recollection, as I understand
2 it, is that J.B. Harris contacted the Florida Bar on
3 your behalf?
4   A   I believe so.
5   Q   Now, the letter says that the Florida Bar
6 will assume the matter is resolved if it has not
7 heard from either you or J.B. Harris on your behalf
8 or Mr. Howard within 30 days.
9     Do you know if there was a follow-up
10 communication to the Florida Bar before you sent in
11 -- or J.B. Harris sent in your Bar complaint?
12   A   I do not -- I do not recall.
13   Q   Okay. You don't have any records or
14 letters --
15   A   Not that I can recall.
16   Q   Okay. Exhibit 5 is a set of documents
17 from Cash4Cases, Inc. It is also part of composite
18 Exhibit 2, the materials that you and Mr. Anderson
19 gave me.
20     I'm going to hand that to you now, please.
21     (Exhibit No. 5 marked for
22 identification.)
23 BY MR. MONDE:
24   Q   Is it fair to say that Exhibit 5 is a
25 contract and related documents concerning a loan to

Page 21

1 your husband --
2   A   Correct.
3   Q   -- and you?
4   A   Correct.
5   Q   Why did you apply for this loan on
6 August 18, 2015?
7   A   We were financially strapped at that time,
8 and we understood that we could get this, and that's
9 why we did it.
10   Q   Did you use any of the loan proceeds to
11 pay any of your costs or expenses in the litigation
12 or did you use it for unrelated reasons?
13   A   Yeah, unrelated reasons. Yeah.
14   Q   Okay. After the Bar received your
15 complaint on August 10th, 2018, did you receive from
16 the Bar any communications, a letter, an
17 acknowledgment that they had received it, anything
18 at all?
19   A   Not that I can recall.
20   Q   And you've looked to see if you have
21 anything?
22   A   Yes. Yes.
23   Q   Is it your belief that if the Florida Bar
24 had any written communications about your Bar
25 complaint that J.B. Harris would have them?

6 (Pages 18 - 21)

1    A   I would think so. He's the one that
2 handled it exclusively.
3    Q   If I could get you to please just look
4 again at Exhibit 1, the last page.
5    A   Page one you said?
6    Q   You got Exhibit 2.
7    A   Oh.
8       MR. ANDERSON:  Exhibit 1 is the --
9       MR. MONDE:  Deposition notice.
10      MR. ANDERSON:  -- deposition notice. Here
11 we go.
12      MR. MONDE:  Thank you, Paul.
13 BY MR. MONDE:
14   Q   Miss Harris, if I could please get you to
15 turn to page four.
16   A   My fingers don't work --
17   A   They will get there.
18   A   Okay. Exhibit A?
19   Q   Yes, ma'am.
20   A   Okay.
21   Q   All right. So the first request is for
22 the signed complaint made by you or on your behalf
23 to the Florida Bar regarding your former attorney
24 Tim Howard. And we now have that. And I appreciate
25 your help in getting that this morning.

1      This also asked for all drafts of the
2 document.
3      Before you received the Bar complaint to
4 sign on July 8th, did you receive any earlier draft
5 or version of it?
6    A   Not that I recall.
7    Q   Do you recall --
8      You used email at the time, correct?
9    A   Yes.
10   Q   All right.
11   A   Very hesitantly, because I'm not good at
12 it.
13   Q   Okay. Do you recall receiving by email
14 any earlier version or draft of the Bar complaint
15 that you signed?
16   A   I do not recall.
17   Q   In other words, you don't recall receiving
18 any earlier drafts?
19   A   Correct.
20   Q   All right. So it's fair to say that you
21 had no changes to make to the Bar complaint that you
22 signed before you signed it?
23   A   Well, I didn't read it. I did not read it
24 -- read the complaint.
25   Q   You're saying that you signed the Bar

1 complaint without reading it?
2    A   Correct. I know that's -- that is my
3 fault. I'm sorry that I didn't read it.
4    Q   Can I please get you to look at Exhibit 3.
5      Let's look at the first page. That is
6 your name at the top, Margaret "Peggy" Harris,
7 correct?
8    A   Correct.
9    Q   It correctly states your address, your
10 telephone number, and your email address, correct?
11   A   Correct.
12   Q   There's a box checked "no" after the
13 question, "Does this complaint pertain to a matter
14 currently in litigation?" And you see where that's
15 checked "no"?
16   A   Right.
17   Q   Now, your lawsuit against Reynolds Tobacco
18 was very much in litigation on August 18 -- or I
19 should say on July 8th, 2018, correct?
20   A   Correct.
21   Q   Do you know why the "no" box is checked?
22   A   I have no clue.
23   Q   All right. Then in part two it lists Tim
24 Howard, your former lawyer, correct?
25   A   Correct.

1    Q   Part three asks the following:  "The
2 specific thing or things I'm complaining about are"
3    A   --
4    A   Which page is that?
5    Q   On the first page.
6    A   Oh, okay.
7    Q   Do you see that?
8    A   Right. Correct.
9    Q   And it says, "See attached," correct?
10   A   Right.
11   Q   And the attached is the statement that
12 starts on the third page of this exhibit, correct,
13 where it says, "Margaret "Peggy" Harris Bar
14 complaint against the attorney Phillip Timothy
15 Harris"?
16   A   Correct.
17   Q   All right. Now, let's go to the second
18 page of this exhibit, please, where you signed.
19      MR. ANDERSON:  Let me move this for you so
20 it's easier.
21      THE WITNESS:  Okay.
22 BY MR. MONDE:
23   Q   Part five says that, "Signature.): Under
24 penalties of perjury, I declare that the foregoing
25 facts are true, correct and complete."

Page 26

1    Do you see that?
2    A  I do.
3    Q  And then your name is printed, correct?
4    A  Correct.
5    Q  And then you signed your name, correct?
6    A  Correct.
7    Q  You understood when you signed this that
8  you were under penalty of perjury declaring the
9  facts in the statement to be true, correct and
10  complete?
11    A  Correct.
12    Q  There was no doubt in your mind about what
13  you were signing, correct?
14    A  Apparently not -- apparently so.
15    Q  I want to make sure I understand your
16  answer.
17    A  Well, I -- I did not read it, so I was
18  wrong in not -- putting this down, so --
19    Q  And I appreciate you're acknowledging that
20  that was wrong. And I want to understand from you
21  why you agree that that was wrong to do.
22    You understood when you signed this that
23  you were taking an oath to tell the truth --
24    A  Correct.
25    Q  -- just like the oath you took this

Page 27

1  morning?
2    A  Right.
3    Q  And you understand the importance of an
4  oath in a legal proceeding, correct?
5    A  Yes.
6    Q  I mean, our legal system, you agree,
7  depends on people telling the truth, correct?
8    A  Correct.
9    Q  Our legal system depends on people telling
10  the full truth and not being deceptive by leaving
11  out certain key parts, correct?
12    A  Correct.
13    Q  You understand that our legal system
14  cannot function if people violate their oath or
15  ignore their oath to tell the truth, correct?
16    MR. DIAZ:  Form.
17    MR. MONDE:  That was just an objection.
18  You can go ahead and answer.
19    THE WITNESS:  Correct.
20  BY MR. MONDE:
21    Q  Okay. Did Mr. Harris in any way, J.B.
22  Harris --
23    First of all, let me establish this:
24  There is no relationship between you and J.B.
25  Harris, no familial relationship?

Page 28

1    A  Correct.
2    Q  All right. Did anyone pressure you or
3  coerce you to sign your name under penalty of
4  perjury to the Bar complaint?
5    A  No.
6    Q  Did you feel any pressure whatsoever when
7  you signed it?
8    A  No.
9    Q  Can you say without qualification that you
10  signed Exhibit 3, this Bar complaint of your own
11  freewill?
12    A  Yes.
13    Q  Do you agree that you had a full
14  opportunity to read the statement before you signed?
15    A  I did.
16    Q  Do you agree that you had the statement to
17  read?
18    A  Yes, but I did not read it. And that's my
19  fault.
20    Q  Okay.
21    A  It's all legalese that I didn't
22  understand, so --
23    Q  And we will turn to the content of it in a
24  moment.
25    A  Um-hum.

Page 29

1    Q  Why didn't you read it?
2    A  Well, I figured my lawyer knows best how
3  to do all that, so I just left it in his hands. He
4  knows -- he has the knowledge, and I did not.
5    Q  Why did you file a Bar complaint?
6    A  Because Tim did wrong on my case, and I
7  felt that -- I know he had done a lot of other
8  things, and I felt he needed to be disbarred for
9  doing this.
10    Q  Who told you about the other things that
11  Tim Howard did?
12    A  In the paper, on TV.
13    Q  Did J.B. Harris talk to you about --
14    MR. ANDERSON:  Objection. Attorney-client
15  privilege.
16  BY MR. MONDE:
17    Q  Are you going to decline to answer based
18  on your attorney's instruction?
19    MR. ANDERSON:  She is.
20    THE WITNESS:  Yes.
21    MR. MONDE:  Just making a record, Paul.
22    THE WITNESS:  Um-hum.
23  BY MR. MONDE:
24    Q  Whose idea was it initially to file a Bar
25  complaint against Tim Howard, yours or J.B. Harris'?

8 (Pages 26 - 29)

Page 30

1  A  I believe it was mine to start with. Yes.
2  Q  What triggered it, Miss Harris?
3  A  Well, he didn't show up for a probate
4 hearing which was pretty big. He billed me for a
5 motel, bed and breakfast. He had the case for four
6 years. I understand that two is -- they want it to
7 be done in two years. Just all around
8 dissatisfaction with how he took care of the case.
9  Q  Do you understand the gravity, the
10 significance, the importance of filing a Bar
11 complaint against a lawyer?
12  A  Yes.
13  Q  And you mentioned that you wanted to see
14 Tim Howard disbarred. You understand the gravity of
15 that as well, correct?
16  A  Yes.
17  Q  Have you had an opportunity to review the
18 statement that is part of your Bar complaint after
19 you signed it?
20  A  Yes.
21  Q  When did you first do that, ma'am?
22  A  Just a few days ago.
23  Q  Okay. When you did that, did you have a
24 full and ample opportunity to read it or did you
25 feel rushed?

Page 31

1  A  No, I did not feel rushed. I took time.
2  Q  Where did you do it?
3  A  Home.
4  Q  At your home?
5  A  Correct.
6  Q  Okay. No one was hovering over your
7 shoulder or pressing you to read quickly or anything
8 like that?
9  A  No.
10  Q  How long did you spend reading it?
11  A  Well, I read it a couple -- three times.
12  Q  Okay.
13  A  So over a period of time, let it digest,
14 and then read it another couple of times.
15  Q  Understood.
16      Based upon that reading, is everything in
17 the statement true and correct?
18  A  No, not really. Not -- it's not what I
19 discussed.
20  Q  Did you --
21      Where is the copy of the Bar complaint
22 that you had with you at home and that you read at
23 home?
24  A  Where is it?
25  Q  Yes.

Page 32

1  A  At home.
2  Q  Did you make any notes on it?
3  A  No.
4  Q  Did you in any way mark the pages to show
5 the parts that you disagreed with?
6  A  No.
7  Q  It's a clean copy?
8  A  Oh, yes. Absolutely. Yes.
9  Q  Well, why didn't you take any notes in the
10 margin to, you know, say this isn't right or this
11 didn't happen or I didn't say this?
12  A  Really, I don't recall.
13  Q  Okay. All right. When you signed the Bar
14 complaint on July 8th, 2018, was it your
15 understanding that the statement was based on
16 information that you had shared with J.B. Harris?
17  A  Correct.
18  Q  Did you --
19      And I don't want to get into the content
20 of what you spoke about with Mr. Harris, at least
21 not yet.
22      I just want to ask this question: Did you
23 have conversations with J.B. Harris about what had
24 happened before J.B. Harris got involved in the
25 case?

Page 33

1  A  We -- we --
2  Q  Did I confuse you there?
3  A  Well, I just have to get it in my mind.
4      Repeat it for me, if you will.
5  Q  I sure will.
6      In May of 2018, you fired Tim Howard?
7  A  Correct.
8  Q  And around that time you hired J.B. Harris
9 as your lawyer?
10  A  Correct.
11  Q  All right. And between --
12      Let me ask you this: About when did you
13 hire J.B. Harris?
14  A  Again, me and dates are not good, so I
15 really don't know. It wasn't too long --
16      Let me think now.
17      I was so concerned about the probate --
18  Q  Yes, ma'am.
19  A  -- there wasn't much time that elapsed.
20 But I couldn't give you a date -- a time.
21  Q  So how did you learn that Tim Howard had
22 missed the probate hearing? Were you there?
23  A  No. I got a letter from Gadsden County --
24  Q  Probate court?
25  A  -- that -- I don't know the legal terms,

9 (Pages 30 - 33)

Page 34

1 that they canceled it because of nonappearance by
2 him and me. That's the first I knew.
3    Q   I know just what you're talking about, I
4 think. We will find out.
5    A   I don't know what -- really much about it,
6 but I know that's important --
7    Q   I appreciate that. And I'm going to try
8 to help our understanding the facts here.
9        Mrs. Harris, I'm handing you --
10       Proper protocol is that I hand it to Paul
11 first. Again, I don't mean to be rude.
12   A   Okay.
13   Q   I just --
14       Exhibit 6 is part of what Mr. Anderson and
15 you produced to us yesterday.
16       (Exhibit No. 6 marked for
17 identification.)
18 BY MR. MONDE:
19   Q   And it is an order from the Gadsden County
20 Probate Court, and it's an order removing you as
21 personal representative and revoking your letters of
22 administration and ordering a dismissal.
23       Do you see that?
24   A   Yes.
25   Q   This is dated May 16, 2018 by Judge

Page 35

1 Allman.
2        Do you see that?
3    A   Yes.
4    Q   Is this --
5        And then you got a copy of this, correct?
6    A   I believe that -- I believe so.
7    Q   In fact, if you look at the second page,
8 it shows that the court mailed you a copy to your
9 address, 708 2nd Street in Havana, Florida, correct?
10   A   Right.
11   Q   And that was your address, correct?
12   A   Correct.
13   Q   And so this is the order that you received
14 letting you know that you had been removed as
15 personal representative from your husband's estate,
16 correct?
17   A   Correct.
18   Q   And this is the order that led you to --
19 the last straw, if you will, to decide to fire Tim
20 Howard --
21   A   Correct.
22   Q   -- and to hire a new lawyer?
23   A   Right.
24   Q   And you hired J.B. Harris --
25   A   Right.

Page 36

1    Q   -- shortly after this order dated May 16,
2 2018?
3    A   Right.
4    Q   Between May and July 8th, when you signed
5 the Bar complaint, you spoke with J.B. Harris to
6 tell him about things that Tim Howard had done in
7 your case, correct?
8    A   Correct.
9    Q   And it was your understanding that J.B.
10 Harris, based on the information that you gave him,
11 prepared or drafted this Bar complaint?
12   A   Correct.
13   Q   Bear with me one minute, Miss Harris.
14   A   Um-hum.
15   Q   All right. Let's look at the statement
16 that is attached as part three to the Bar complaint.
17       And would you please --
18       When I use page numbers now, Mrs. Harris,
19 I will refer to the page numbers of the statement.
20   A   Is this the one?
21   Q   Yes. And I want you to turn to the third
22 page, please. You see that at the top it says,
23 "Margaret "Peggy" Harris, Bar complaint against
24 attorney Phillip Timothy Harris"?
25   A   Correct.

Page 37

1    Q   Now, that was a typo, wasn't it?
2        It is actually Phillip Timothy Howard,
3 correct? Maybe what we call a Freudian slip but --
4    A   I didn't pick up on that.
5    Q   Yup. And on page one of the statement
6 attached to your Bar complaint, I want you to look
7 at the third paragraph, please, it says, "My name is
8 Margaret "Peggy" Harris. I'm a God-fearing, 78-year
9 old, economically underprivileged widow living in
10 Havana, Florida, a small rural town near the
11 Florida-Georgia border."
12       Is that sentence -- rather, that paragraph
13 true and correct and complete?
14   A   I would not use those -- I would not use
15 it -- write it like that.
16   Q   Well, understanding that, is there
17 anything untrue in that paragraph?
18   A   Well, I find it insulting that I'm
19 economically underprivileged, although I might be.
20 I just don't want to admit that, I guess.
21   Q   Yes, ma'am.
22   A   I love the Lord. I'm a Christian, so
23 that's very true.
24   Q   Okay.
25   A   I guess -- it's just -- it would not be

Page 38

1 the way I would word it.
2    Q  So while you would have worded it
3 differently, everything in that paragraph is true
4 and correct?
5    A  Right.
6    Q  The next paragraph says the following:
7 "On December 12, 2007, a lawsuit was filed on behalf
8 of my husband Richard and me in Miami-Dade County
9 Florida, Case Number 2007-44066-CA-32. The suit was
10 if against five major cigarette manufacturers for
11 Richard's illnesses caused by his addiction to
12 nicotine contained in cigarettes. Richard was alive
13 at the time the suit was filed."
14        Is everything in that paragraph true and
15 correct to the best of your knowledge?
16    A  To the best of my --
17        You know, I don't remember the case and --
18 it's so long ago, I do not. But --
19    Q  You have no reason to think that the
20 information regarding the case number is incorrect?
21    A  Correct.
22    Q  All right. Let me ask you to turn to the
23 second page of the statement attached to the Bar
24 complaint and ask you to focus on the second
25 paragraph, which says, "On March 12, 2014, the case

Page 39

1 was transferred to Gadsden County Circuit Court and
2 assigned a new case number. On April 29, 2014, the
3 court entered an order allowing Howard to substitute
4 as counsel of record for a prior firm, who we had
5 little contact with prior to the transfer."
6        Is everything in that paragraph true,
7 correct and complete?
8    A  I would -- I would think so.
9    Q  The next paragraph, it says, "After a
10 while, it became obvious that Howard was not
11 competent to handle a complex tobacco case, much
12 less ours, since he had never tried one in the past
13 and has not until this day. Howard failed to
14 disclose this fact to us at the time he solicited
15 our representation."
16        Is that true, correct and complete, to the
17 best of your knowledge?
18    A  I -- I -- I don't know if I agree with
19 that. But, you know, come to find out he wasn't.
20 But I don't know. At the time I don't.
21    Q  Let's take it in smaller pieces then.
22    A  Um-hum.
23    Q  Okay? Let's focus on the following words:
24 "After a while it became obvious that Howard was not
25 competent to handle a complex tobacco case, much

Page 40

1 less ours." Let's just stop there.
2        Is that true and correct to the best of
3 your knowledge?
4    A  Yeah, I would say so. Yes.
5    Q  And why do you say -- or did you say in
6 your statement that he was not competent to handle a
7 complex tobacco case?
8    A  Well, it seemed to take so long. He kept
9 postponing the trials. He just didn't seem like he
10 knew what he was doing.
11    Q  What other reasons do you believe
12 demonstrate that Mr. Howard was not competent to
13 handle a complex tobacco case?
14    A  Other than what I just said, really.
15    Q  No other reasons at all?
16    A  Not that I can recall.
17    Q  What about not showing up at probate
18 court?
19    A  Well, yeah. Yeah. That came later.
20 Absolutely. That was the straw that broke the
21 camel's back.
22    Q  Right. Now, you say it came later, but I
23 do want to point out to you again that you signed
24 this Bar complaint on July 8, 2018 after you had
25 received that order dismissing you as PR.

Page 41

1    A  Okay. Yeah.
2    Q  All right. So delay, and the fact that he
3 didn't show up at probate court resulting in an
4 order of dismissal of you as PR. Are there any
5 other reasons sitting here today that you believe
6 demonstrate that you believe Mr. Howard was not
7 competent to handle a complex tobacco case?
8    A  Well, one thing was he tried to bill me
9 for a motel. I thought -- it was a contingency
10 basis, so --
11    Q  In other words, your understanding of your
12 agreement with Mr. Howard was that he would advance
13 all costs and expenses in connection with the
14 litigation, at least until the time of collecting a
15 judgment --
16    A  Correct.
17    Q  -- or a settlement?
18    A  Right.
19    Q  All right. And you're saying that
20 contrary to that, Mr. Howard tried to get you to pay
21 --
22    A  He sent me a bill.
23    Q  He sent you a bill?
24    A  I believe. I believe he did.
25    Q  Do you have that bill?

11 (Pages 38 - 41)

Page 42

1  A  I went through my stuff, and I didn't find
2  it.
3  Q  About how much was it for?
4  A  I believe 10,000.
5  Q  $10,000?
6  A  Correct.
7  Q  What did you do when you got the bill?
8  A  I can't recall. I don't remember.
9  Q  What did Mr. Howard say to you would
10 happen if you didn't pay the bill?
11 A  I don't think he -- I don't think we had
12 that conversation.
13     I just knew it was wrong that he did it,
14 so --
15 Q  Did you pay the bill?
16 A  Absolutely not.
17 Q  Just asking.
18 A  I know.
19 Q  The next part of the sentence, let's focus
20 on that. "He wasn't competent because," quote, "he
21 had never tried one in the past and has not until
22 this day."
23     Is that true and correct and complete, to
24 the best of your knowledge?
25 A  Yes.

Page 43

1  Q  What is your source of information for
2  that?
3  A  Other people, other lawyers, I guess I
4  would say.
5  Q  In other words, other lawyers have told
6  you that Tim Howard has never tried a tobacco case?
7  A  Right. Because I wouldn't know that
8  otherwise.
9  Q  Right. What other lawyers?
10 A  I imagine J.B.
11 Q  Anyone else?
12 A  Jaakan Williams.
13 Q  Okay. Anyone else?
14 A  No, not that I recall.
15     MR. MONDE: Paul, I'm not going to claim
16 that's a waiver. I see you twitching over
17 there.
18     MR. DIAZ: I think the same thing. It was
19 dead on the border. Dead on the border.
20     MR. MONDE: We are good. If we are going
21 to have a privilege issue it is out front in
22 front of us all on the table.
23     MR. ANDERSON: I will give you a little
24 latitude, because quite frankly she already
25 told you that she relied on attorneys to even

Page 44

1  prepare this thing, so --
2      MR. MONDE: It is what it is.
3  BY MR. MONDE:
4  Q  All right. Now, let's look at the last
5  sentence of that paragraph that says, "Howard failed
6  to disclose this fact," meaning that he hadn't tried
7  a tobacco case, "at the time he solicited our
8  representation." Is that true, correct and
9  complete?
10 A  Correct.
11 Q  And that's information that you gave to
12 Mr. Harris, correct?
13 A  Correct.
14 Q  All right.
15     MR. ANDERSON: That was a backdoor way of
16 getting it.
17     THE WITNESS: Tim had told us he had had
18 cases.
19 BY MR. MONDE:
20 Q  That's what I'm getting at.
21     What had he told you about his prior
22 experience?
23 A  I don't remember. That he had tried other
24 cases.
25     Am I saying too much?

Page 45

1      MR. ANDERSON: We will not go into what
2  Mr. Howard told her. He may not be attorney of
3  record now, but he was at one point. She is
4  still entitled to invoke privilege.
5      MR. MONDE: Right. And I'm entitled to
6  understand the factual basis for her
7  statements. But I think I've gotten what I
8  need for now.
9  BY MR. MONDE:
10 Q  The next paragraph of your statement says,
11 "In the summer of 2016, while Richard's health began
12 to deteriorate rapidly and his death became
13 imminent, the need to take his discovery and trial
14 preservation depositions grew more urgent."
15     Do you see that?
16 A  Right.
17 Q  And is that true, correct and complete?
18 A  Correct.
19 Q  Did --
20     Without telling me the details of any
21 discussion you had with Mr. Howard, did you tell him
22 that your husband's health was failing and that his
23 deposition needed to be taken?
24 A  Well, we talked about it.
25 Q  Yes. Okay.

12 (Pages 42 - 45)

Page 46

1    And then depositions were set up starting
2  on June 20th, 2016, correct?
3    A  Correct.
4    Q  The next paragraph says the following:
5  "Richard was in so much pain at the time, not only
6  were the depositions torturous, requiring the
7  attorneys to take a break mid-week to allow Richard
8  a respite," period.  That's an incomplete sentence,
9  but it is what's on the page.
10    Was your husband in pain at the time of
11  the depositions?
12    A  No.
13    Q  Ma'am?
14    A  No.
15    Q  So that's a false statement?
16    MR. DIAZ:  Form.
17  BY MR. MONDE:
18    Q  Go ahead.
19    A  Yes.  Yes, it is.
20    Q  Was your husband in any pain at all that
21  you know of, based on seeing him, being married to
22  him, and hearing what he had to say at any point
23  during the period of June 20 to June 25 when the
24  depositions were taken?
25    A  No.

Page 47

1    Q  Was he on any pain medication?
2    A  No.
3    Q  What medication was he on at the time?
4    A  Little or none, because he hadn't eaten in
5  weeks and he had diarrhea every day.  So he was just
6  taking fluids, not liquids.
7    Q  Were you --
8    Your husband was bedridden at the time,
9  correct?
10    A  Yes.
11    Q  I mean, he literally could not get out of
12  his bed?
13    A  Correct.
14    Q  And you are a nurse by training, is that
15  right?
16    A  Yes, I am.
17    Q  And so he had a catheter?
18    A  Yes.
19    Q  All right.  As his wife, and a former
20  nurse, were you the one responsible for giving him
21  his medicines?
22    A  Yes.
23    Q  And so is that the basis you have for
24  saying that during the time of these depositions he
25  was not under any pain medication?

Page 48

1    A  Absolutely not.
2    Q  You know, because if he were, you would
3  have given them --
4    A  Right.
5    Q  -- the pain medications?
6    A  Right.
7    Q  The next --
8    Well, let me ask you this:  What is your
9  understanding of why J.B. Harris wrote in this sworn
10  Bar complaint that your husband was in so much pain?
11    A  I have no idea.
12    Q  Did you ever tell him that?
13    A  No.
14    Q  Did you ever suggest it to him?
15    A  No.
16    Q  Do you know of any basis in the world that
17  J.B. Harris had for swearing this -- or asking you
18  to swear to it?
19    A  I do not.
20    Q  The next sentence says the following:
21  "The depositions also had to be taken bedside to
22  accommodate his failing health."  We already talked
23  about that.  That's true and correct and complete?
24    A  Absolutely.
25    Q  The next paragraph reads as follows:

Page 49

1  "Knowing nothing about pretrial preparations for an
2  Engle-progeny case, Howard failed to adequately
3  prepare Richard for his testimony."
4    Is that a true, correct and complete
5  statement?
6    A  I would say no.
7    Q  Why do you say that?
8    A  Tim didn't do a lot with it.  He had
9  people under him that did that.
10    Q  Did Tim Howard play any role whatsoever in
11  preparing your husband for his deposition prior to
12  June 20, 2016, the first day?
13    A  Some, but not all.
14    Q  How much?
15    A  It would be hard to say.
16    Q  Give me your best description, please.
17    A  Twenty, 30 percent, maybe.  I don't know.
18    Q  About how much time, ma'am?
19    A  Oh, see, that I don't --
20    Me and time are just --
21    Q  So Mr. Harris, your husband, Richard
22  Harris was bedridden for about how long before these
23  depositions started on June 20th?
24    A  That's another thing, I'm not sure.
25    Q  I know thinking back you may not know the

13 (Pages 46 - 49)

Page 50

1 exact day or even maybe the exact number of weeks.
2      I'm just really asking for just your best
3 good faith estimate.
4    A   I'd say maybe a month, or maybe a little
5 more.
6    Q   Do you know how long before June 20, the
7 first day of the deposition, it had been that you
8 first received word from Mr. Howard or his
9 associates that your husband's deposition was going
10 to be taken that day?
11    A   I have no clue.
12    Q   In other words, did you have advance
13 notice of a day, a week, a month?
14    A   I really don't recall at all.
15    Q   What's your best estimate?
16    A   I wouldn't even begin to make an estimate,
17 because I just don't know.
18    Q   Okay.
19    A   At that time it was very difficult, and
20 everything going on, so I just don't have a memory
21 of that.
22    Q   Okay. What's your best estimate of the
23 amount of time that Tim Howard himself spent
24 preparing your husband for his deposition before it
25 was taken; for example, an hour or two, ten hours,

Page 51

1 dozens of hours?
2      I mean, this would have been in your home,
3 so --
4    A   Yeah. I would just say not very long.
5    Q   But that can mean a lot of different
6 things to different folks --
7    A   I know. I just don't recall how long.
8    Q   What's your best estimate?
9    A   I just really couldn't say.
10    Q   Now, whenever Tim Howard or Jaakan
11 Williams, or any other lawyer came to your home to
12 work with your husband, you were home, too?
13    A   Yes.
14    Q   Is it fair to say that to the best of your
15 knowledge neither Tim Howard nor anyone from his
16 office was ever present with your husband without
17 you being present, too?
18    A   Probably not.
19    Q   Am I correct about that?
20    A   I would say yes.
21    Q   Okay. How much time did Jaakan Williams
22 spend with your husband preparing him for his
23 deposition before June 20th?
24    A   He did most of it.
25    Q   Okay. Did he come over every day for a

Page 52

1 week? Did he come over parts of the day?
2    A   Probably parts of the day.
3      Again, it's all like a fog, really.
4    Q   Is it accurate then to say that you simply
5 have no idea at this point how many minutes or hours
6 any lawyer spent preparing your husband for his
7 deposition before June 20th?
8    A   That would be correct.
9    Q   So the statement in your Bar complaint
10 that reads, "Knowing nothing about pretrial
11 preparations for an Engle-progeny case, Howard
12 failed to adequately prepare Richard for his
13 testimony," you are telling us now that that is a
14 falsehood, that that's a misrepresentation, correct?
15      MR. DIAZ:   Form.
16      THE WITNESS:   I would say that's done by
17 J.B. Harris.
18 BY MR. MONDE:
19    Q   Okay.
20    A   That's all I would say.
21    Q   But regardless of who wrote it, you told
22 me a little while ago that you thought it was wrong.
23 And so I'll just ask you again, that statement --
24      Let's do this: I'm going to take out the
25 first clause, whether Tim Howard knew anything about

Page 53

1 pretrial preparation or not. Let's just set that
2 aside.
3    A   Because I wouldn't have knowledge of that.
4    Q   Understood.
5      Let's just focus on the next clause. It
6 says, "Howard failed to adequately prepare Richard
7 for his testimony."
8      Mrs. Harris, is that true, correct and
9 complete?
10    A   I don't know. I really -- my first
11 instinct would say he did --
12      There was preparation. How adequate it
13 was, I couldn't say.
14    Q   And how long it was you cannot say?
15    A   No.
16    Q   Okay. The next sentence says the
17 following: "In an effort to cure whatever perceived
18 shortcomings may have resulted from Richard's
19 testimony, following the depositions Howard and his
20 associate Ankur Mehta fabricated errata sheets for
21 each transcript, extensively rewriting Richard's
22 testimony."
23      Do you see that?
24    A   I see that.
25    Q   Do you understand what that sentence is

14 (Pages 50 - 53)

Page 54

1 saying?
2    A    Yes, I do.
3    Q    Is it true, correct and complete?
4    A    That I could not say, because I know
5 little or nothing about errata sheets, and I don't
6 know what's right or what's wrong with them, so I
7 just would not be able to say that.
8    Q    All right. Let's break that down in
9 smaller pieces.
10    Now, you are familiar with the term errata
11 sheets? You heard that before today?
12    A    I am now, yes. Then I just -- I was
13 clueless.
14    Q    Do you recall signing --
15    What's your understanding, ma'am, of an
16 errata sheet?
17    A    To this day I really don't know. I guess
18 it's like a correction of previous testimony.
19    Q    Yes, ma'am. And you signed errata sheets
20 to your deposition?
21    A    Right. Right.
22    Q    When you signed those errata sheets to
23 your deposition, did you know what you were doing?
24    MR. DIAZ: Form.
25

Page 55

1 BY MR. MONDE:
2    Q    Did you --
3    Let me --
4    Rick made an objection, so I'm going to
5 rephrase the question.
6    When you signed the errata sheets to your
7 deposition, did you understand that what you were
8 doing was stating under oath that you were changing
9 your testimony?
10    MR. DIAZ: Form.
11    THE WITNESS: I believe I did.
12    MR. MONDE: That's okay. I cleaned it up
13 enough. He objected again.
14    THE WITNESS: So I should answer?
15    MR. DIAZ: You have to answer. I'm just
16 doing it for the record.
17 BY MR. MONDE:
18    Q    I know it can be disconcerting to somebody
19 in your position.
20    Again, for some reason, right now anyway
21 I'm tolerating two different lawyers objecting. We
22 will see how that goes, too. They have been pretty
23 good about it so far.
24    But if either of them objects, if they
25 tell you not to answer, don't answer. But otherwise

Page 56

1 the objections are just for the court to figure out
2 later. They are in no way --
3    A    I don't know which is which so --
4    MR. DIAZ: If yOu hear me say form, you
5 can ignore it and answer.
6    If you hear Mr. Anderson tell you don't
7 answer, you need to listen to him.
8    MR. MONDE: We will clear this up, because
9 I want it to be clear in your mind.
10    Rick and Paul, will you please reassure
11 your client that if you don't want her to
12 answer one of my questions you will clearly
13 tell her that?
14    MR. DIAZ: Yes, sir. Yes, sir.
15    MR. ANDERSON: I assure you I will.
16    MR. DIAZ: Yes, sir.
17    THE WITNESS: Maybe kick me under the
18 table.
19    MR. ANDERSON: I'm not going to do that.
20    MR. DIAZ: Not going to do that.
21 BY MR. MONDE:
22    Q    All right. Okay. And when your husband
23 signed his errata sheets, you understood that he was
24 stating under oath that he was changing his
25 testimony, correct?

Page 57

1    A    I would say so.
2    Q    Let's take that sentence I read and break
3 it down into a smaller piece.
4    I want to focus on these words:
5 "Following the depositions, Howard and his associate
6 Ankur Mehta fabricated errata sheets for each
7 transcript, extensively rewriting Richard's
8 testimony."
9    Just that part, is that true, correct and
10 complete?
11    A    I cannot say.
12    Q    Why not?
13    A    Because I don't know. I don't know if it
14 was fabricated. I don't know. I just don't know.
15    Q    What does the word fabricated mean to you?
16    A    Make up, change. So I really don't know.
17    Q    Now, you were present when Mr. Howard
18 presented your husband with the errata sheets,
19 correct?
20    A    I was in and out of the room. I was not
21 there the whole time. I just went in and out, go to
22 the bathroom, check on things. I wasn't there the
23 whole time.
24    Q    Okay. Have you looked at the errata
25 sheets of your husband?

15 (Pages 54 - 57)

Page 58

1   A   Yes.
2   Q   When?
3       Let me try to make it easier.  Did you
4   first look at the errata sheets to your husband's
5   deposition around the time that he signed them in
6   June of 2016?
7   A   No.  No.
8   Q   You never looked at the errata sheets in
9   June of 2016?
10  A   I don't recall.
11  Q   Your deposition was taken in May of 2017.
12  Did you look at your husband's errata sheets between
13  the time of his passing and the time of your
14  deposition in May of 2017?
15  A   I just don't recall.
16  Q   What is your first recollection of seeing
17  and reading the errata sheets to your husband's
18  deposition?
19  A   I really don't remember.
20  Q   We have been going a while.
21      Let's take a short break and I will ask
22  you, please, to work on your break and to just try
23  to do your best to recall when it was that you first
24  saw your husband's errata sheets.
25      Okay?  Will you do that for me?

Page 59

1   A   Yes.
2       MR. MONDE:  Thank you.  And gentlemen,
3   different people have different practices, I
4   just want to understand how we are operating
5   here.
6       Do you agree that there will be no
7   discussion with your client about the substance
8   of her testimony during the breaks?
9       MR. DIAZ:  100 percent.
10      MR. ANDERSON:  Fine.
11      MR. DIAZ:  That includes Bob as well.
12      MR. TRAMMELL:  Yes.  Yes.
13      MR. MONDE:  Very good.  Thank you.
14      THE VIDEOGRAPHER:  We are going off the
15  record.  The time is 10:38.
16      (Brief recess 10:38 a.m. - 10:49 a.m.)
17      THE VIDEOGRAPHER:  We are back on the
18  record.  The time is 10:49.
19  BY MR. MONDE:
20  Q   Miss Harris, are you ready to continue?
21  A   Yes, sir.
22  Q   All right.  Is it correct that you signed
23  the Bar complaint under oath on July 8th -- I'm
24  sorry -- July 7th, 2018 because you believed that
25  the statement reflected the thoughts and beliefs of

Page 60

1   J.B. Harris?
2       MR. DIAZ:  Form.
3   BY MR. MONDE:
4   Q   You can go ahead and answer.
5       MR. ANDERSON:  You may need him to repeat
6   the question, because I'm not even sure I
7   understood the question.
8   BY MR. MONDE:
9   Q   Okay.  When you signed the statement under
10  oath, did you think that the statements written
11  reflected J.B. Harris' beliefs?
12      MR. ANDERSON:  Form.
13      MR. DIAZ:  Form.
14      THE WITNESS:  I would say some of it.
15  Some of it.
16  BY MR. MONDE:
17  Q   Well, would you have signed the Bar
18  complaint if you had any question about whether the
19  statement reflected J.B. Harris' beliefs?
20      MR. DIAZ:  Form.
21      THE WITNESS:  I would not have.
22  BY MR. MONDE:
23  Q   In other words, you relied on J.B. Harris
24  to prepare it?
25  A   Correct.

Page 61

1   Q   You relied on J.B. Harris to prepare it
2   accurately and truthfully?
3   A   Correct.
4   Q   You relied, when you signed under oath
5   that the statements in it reflected J.B.'s belief
6   about the facts, correct?
7       MR. DIAZ:  Form.
8       MR. ANDERSON:  Form.
9       THE WITNESS:  I like the way you said it
10  -- I understood it better the way you said it
11  previously.
12  BY MR. MONDE:
13  Q   You signed it because you thought it was
14  the way J.B. saw things at the time --
15      MR. DIAZ:  Form.
16  BY MR. MONDE:
17  Q   -- correct?
18  A   I told him what I wanted to put on this,
19  and he put more, let me just say it that way.
20  Q   Did he tell you before you signed that he
21  had gone beyond what you had told him?
22  A   No.
23  Q   Is that information you would have wanted
24  to know before you signed under oath?
25  A   It would have been helpful.

16 (Pages 58 - 61)

Page 62

1  Q   Well, more than helpful, ma'am.
2     Before you signed under oath, would you
3 have wanted to know that J.B. Harris had put in the
4 statement, your statement, things beyond what you
5 had told him?
6     MR. DIAZ:  Form.
7     THE WITNESS:  Yes.
8 BY MR. MONDE:
9  Q   You mentioned that you did not --
10    Strike that.
11    You mentioned that the first time you read
12 the Bar complaint that you signed under oath was a
13 few days ago in the comfort of your home, correct?
14  A   Correct.
15  Q   So to be clear, you had never read the Bar
16 complaint that you had signed last year, for
17 example, in April of 2019, correct?
18  A   Correct.
19  Q   We will see what happens.  Did you tell
20 any of your lawyers that you had read the Bar
21 statement and confirmed its accuracy at any time in
22 this lawsuit?
23  A   Not that I recall.
24  Q   You told me how you define fabricated.
25    Do you know whether your husband's errata

Page 63

1 sheets were fabricated, that is stated falsehoods or
2 were the truth?
3  A   I do not know.
4  Q   You say in your statement that not only
5 were the errata sheets fabricated but they were
6 extensively rewritten.  "Specifically following the
7 depositions Howard and his associate Ankur Mehta
8 fabricated errata sheets for each transcript,
9 extensively rewriting Richard's testimony."  Do you
10 see that?
11  A   Um-hum.
12  Q   Yes?
13  A   Yes.  I'm sorry.  But I don't believe
14 that, though.  I don't know.  I just do not know if
15 they did, because I just don't know about them.
16  Q   What I hear you saying to me now, Mrs.
17 Harris, under oath is that you just don't know the
18 process by which your husband's errata sheets were
19 prepared and signed?
20  A   Correct.
21  Q   Now, you do know that Mr. Howard showed up
22 at your home on June 25th with the errata sheets in
23 hand, correct?
24  A   Again, what day, I just don't know.
25  Q   Let me help you with that.

Page 64

1    Your husband's deposition started with
2 three days of questions by my colleague Emily Baker
3 on June 20th, the 21st and the 22nd.  Does that
4 sound right to you?
5  A   It was a Monday, Tuesday, Wednesday -- I
6 don't remember.
7  Q   Well, your memory is right spot on.  It
8 was a Monday, Tuesday and Wednesday.
9    And then there were no depositions taken
10 on the Thursday and the Friday, June 23rd and the
11 24th, correct?
12  A   Correct.
13  Q   And then the depositions resumed on
14 Saturday, June 25th, correct?
15  A   Right.
16  Q   And Mr. Howard asked the questions that
17 day, correct?
18  A   See, again, I don't remember who did what
19 when.
20  Q   But you remember a period of time when Mr.
21 Howard was asking your husband questions, correct?
22  A   Correct.  Correct.
23  Q   And you were present?
24  A   Right.
25  Q   And then Sunday, June 26th, another

Page 65

1 colleague of mine, Ed Carter came in and asked some
2 questions.  Do you recall that?
3  A   See, I don't remember that at all.
4  Q   Okay.  Now, an errata sheet cannot be
5 prepared, at least properly, until after the
6 deposition is over.
7    So the errata sheets that your husband
8 signed had to have been prepared and signed sometime
9 between Wednesday, June 23rd and Saturday June 25th
10 -- I said Wednesday -- I mean Thursday the 23rd and
11 Saturday the 25th.
12    What is your best recollection of when Mr.
13 Howard first showed up with the errata sheets?
14  A   I have no recollection at all.
15  Q   Do you have any recollection of Mr. Howard
16 or Jaakan Williams or Ankur Mehta sitting down with
17 your husband and reviewing with him, either having
18 him read or reading to him his deposition
19 transcript; in other words the things he testified
20 to on the Monday, Tuesday and Wednesday?
21  A   Again, I was in and out of the room.  I
22 didn't really know what was going on.  I had been in
23 the room for days, and just needed a little, you
24 know, getting out.  So I do not know.
25  Q   So sitting here today, you have no

17 (Pages 62 - 65)

Page 66

1 recollection of anybody from Tim Howard's office
2 coming in and reading the deposition testimony to
3 your husband that he had given the days earlier?
4    A   I don't recall.
5    Q   You have no memory of that?
6    A   Exactly. I'm almost 80, so the brain
7 doesn't work as good.
8    Q   Did Mr. Howard and his associates read the
9 errata sheet changes, the changes to your husband's
10 deposition to him and ask him if he agreed with
11 those or not?
12    A   I don't recall.
13    Q   You have no memory of that at all?
14    A   No.
15    Q   To the best of your knowledge, it never
16 happened?
17    A   I couldn't say either way.
18    Q   So when you say in your Bar complaint that
19 the errata sheets extensively rewrote your husband's
20 testimony, is that true, correct and complete?
21    A   Again, I can't say because I don't know.
22 I don't recall.
23    Q   Did you tell J.B. Harris this?
24       MR. ANDERSON: Object. Attorney-client
25    privilege.

Page 67

1       You don't have to answer.
2       MR. MONDE: We will have to work a little
3    harder on this one.
4 BY MR. MONDE:
5    Q   First, your husband had passed away almost
6 a year before you hired J.B. Harris, correct?
7 I will help you with that.
8    A   Timewise --
9    Q   Your husband passed away on June 29, 2016.
10    A   That I remember.
11    Q   And we talked a little earlier today that
12 you hired J.B. Harris sometime in May after the
13 probate court removed you as personal
14 representative, correct?
15    A   Right.
16    Q   So had you ever spoken with J.B. Harris
17 while your husband was alive about hiring him?
18    A   I did not know him. I never had heard
19 about him.
20    Q   Okay. So you agree that your husband
21 could not have been the source of information for
22 the statements that we've been talking about here,
23 about fabricated errata sheets and extensive
24 rewriting?
25    A   Correct.

Page 68

1    Q   Right? That didn't come from your
2 husband?
3    A   No.
4    Q   Do you know of any other human being
5 alive, or not, who could have been a source of
6 information for the statements that the errata
7 sheets were fabricated and extensively rewrote your
8 husband's testimony?
9    A   Jaakan Williams would be the other one.
10 Ankur Mehta, they were there some of those days.
11    Q   Was Jaakan Williams present on the day
12 that the errata sheets prepared by Tim Howard were
13 presented to your husband?
14    A   Again, I don't know who was there when.
15    Q   Was Ankur Mehta?
16    A   Again, I don't recall who it was, which
17 one of them. I know Tim was there, but I don't know
18 the other two.
19    Q   Is it accurate to say that whoever was the
20 source of the information for this sentence
21 "fabricated errata sheets, extensively rewriting
22 testimony," it was not Margaret Peggy Harris?
23    A   Correct.
24    Q   Let's look at the next sentence.
25       "Howard and Mehta ordered Richard to sign

Page 69

1 the fraudulent errata sheets without even reading to
2 him the changes."
3       First of all, as you told me, errata
4 sheets are changes given under oath to the testimony
5 you previously gave in your deposition under oath,
6 right?
7    A   Correct.
8    Q   That's your understanding?
9    A   Right.
10    Q   Is that a true, correct and complete
11 statement that Howard and Mehta ordered your husband
12 to sign the errata sheets?
13       MR. DIAZ: Form.
14 BY MR. MONDE:
15    Q   Let me --
16       What I want to do, Mrs. Harris, is I want
17 to remove the word fraudulent from the equation.
18 Okay? Because whatever that means -- I don't want
19 to complicate the question and your answer with
20 that.
21       So is it true and correct that Howard and
22 Mehta ordered your husband to sign errata sheets?
23       MR. DIAZ: Form.
24       THE WITNESS: I don't know, because I was
25 in and out. I do not remember that.

18 (Pages 66 - 69)

1      MR. MONDE:  What is the basis for the
2    form?
3      MR. DIAZ:  The form?
4      Well, do you want the witness to step out
5    so you don't accuse me of coaching her?
6      MR. MONDE:  Sure.  I appreciate it.
7    (Thereupon, Mrs. Harris stepped out of the
8    deposition room and the following proceedings
9    were held:)
10      MR. DIAZ:  Okay.  Here is the problem that
11    I see with that question.
12      If you asked her --
13      I think the better question, with all due
14    respect is, as you sit here today do you
15    believe that that statement -- do you believe
16    it's accurate because it's pretty obvious that
17    there are things in this complaint that are not
18    sourced from her; ergo, they were sourced from
19    some other person, or you are suggesting in
20    this case, fraudulent Bar complaints, whatever.
21      But if --
22      Somebody else --
23      If that's a true statement, but it comes
24    from some other source to J.B., then her answer
25    -- she would have no way of knowing.

1      You know, so I think the first question
2    has to be a predicate -- it is a predicate
3    problem.
4      Did you give this information to your
5    attorney?  Okay.  All right.  That's not the
6    right question because it is privileged.
7      The question would be, do you believe that
8    to be an accurate statement?  No, I don't.
9    Okay?  Do you know where Mr. Harris would have
10    gotten that?  No, I don't know.
11      But I'm not sure you get what you need to
12    get by asking her if it is true and correct,
13    because it may be true and correct, she just
14    doesn't know if it's true or correct.  She just
15    doesn't have a basis to answer the question.
16      MR. ANDERSON:  I would agree with that on
17    some of your prior questions, you know, some of
18    this information could be true and correct --
19      MR. DIAZ:  From another source.
20      MR. ANDERSON:  But where it came from --
21      MR. DIAZ:  If you are asking her
22    perception, I think that's an appropriate line
23    of question.
24      MR. MONDE:  I appreciate it.  It's not --
25      It's -- to me it's as clear as a goat's

1    nose --
2      MR. DIAZ:  Okay.
3      MR. MONDE:  -- that when I say is that
4    true and correct, it's based on her belief,
5    because that's all she can testify about.
6      But I'll do it that way if it helps avoid
7    an objection.  I have no problem with that.
8      MR. DIAZ:  It does.  Yeah.
9      MR. ANDERSON:  It's as simple as, do you,
10    Miss Harris, believe this to be a true and
11    correct statement.
12      MR. MONDE:  I don't have any quarrel with
13    rephrasing it that way.  I just don't think
14    it's necessary.
15      But I also don't want to have unnecessary
16    disagreements.  So I'll change it.
17      MR. DIAZ:  Right.  I think the question
18    and answer, if somebody just reads that, her --
19      Well, some of her answers are okay.
20    That's why I -- I'm struggling with making this
21    objection, because I just don't know.
22      So that answer cures the objection.
23      But I don't know if she will answer that
24    after you ask the question.  Follow me?  If you
25    want to do it that way, that's fine.  I have no

1    form objection to that.  Is that all right?
2      MR. MONDE:  It is.
3      MR. ANDERSON:  Okay.
4      MR. DIAZ:  We don't need this on the
5    record.
6      (Discussion off the record.)
7      (Thereupon, Mrs. Harris entered the deposition
8    room and the following proceedings were held:)
9      MR. MONDE:  Back on the record?
10      MR. DIAZ:  You are the one that needs to
11    tell us.
12      MR. MONDE:  May we please go back on the
13    record?
14      THE VIDEOGRAPHER:  You are.  Yes.
15      We are back on the record.  It is 11:07.
16    BY MR. MONDE:
17    Q   Mrs. Harris, let me ask you to go back up
18    to the prior paragraph and the sentence from your
19    sworn Bar complaint that says, "Following the
20    depositions, Howard and his associate Ankur
21    fabricated errata sheets for each transcript,
22    extensively rewriting Richard's testimony."
23      Do you believe that that is a true,
24    correct and complete statement?
25    A   I do not believe that.

19 (Pages 70 - 73)

Page 74

1    Q   In what way do you not believe it?
2    A   Because I have no clue about what's right
3 and what's wrong or anything about errata sheets.
4    Q   So what you're saying is you don't know
5 one way or the other whether it's true and correct?
6    A   No. No.
7    Q   I don't want to put words in your mouth.
8    A   No, I don't know, because I'm not a
9 lawyer.
10   Q   Well, understanding you are not a lawyer,
11 you did tell me what fabricated means.
12       And using your definition, made up, do you
13 believe that Howard and Ankur Mehta made up errata
14 sheets?
15   A   I can't say, because I don't know.
16   Q   Do you believe that Ankur Mehta and Howard
17 extensively rewrote your husband's deposition?
18   A   I cannot say, because I do not know.
19   Q   Do you believe that Howard and Mehta
20 ordered your husband to sign the errata sheets as
21 opposed to giving him the option of reviewing them
22 and making changes?
23   A   I do not know.
24   Q   Did you ever know?
25   A   No. I still don't know, really.

Page 75

1    Q   Do you believe that Howard and Mehta not
2 just ordered your husband to sign the fraudulent
3 errata sheets but did so without even reading to him
4 the changes?
5    A   I do not know.
6    Q   Let's take the first part away.
7        Do you believe that your husband signed
8 the errata sheets without even reading the changes?
9    A   I do not know.
10   Q   Do you know anything about the process by
11 which the errata sheets were prepared, whether they
12 were reviewed or not with your husband before he
13 signed them?
14   A   No.
15   Q   Did you ever know that?
16   A   No.
17   Q   Are you sure?
18   A   I just — I don't know anything about
19 them, because I -- I just don't know.
20   Q   And I just want to be sure that it's not a
21 memory issue.
22       To the best of your knowledge, sitting
23 here today, your testimony is that you never knew
24 the process by which the errata sheets were
25 prepared, whether or not they were reviewed with

Page 76

1 your husband, and then the manner by which they were
2 signed, correct?
3    A   That's correct.
4    Q   Okay. Do you know the source of
5 information that J.B. Harris had when he wrote in a
6 statement for you to swear to under oath that Tim
7 Howard and Ankur Mehta ordered your husband to sign
8 the errata sheets?
9    A   The only other person that was there was
10 Jaakan Williams.
11   Q   But do you know whether Jaakan Williams --
12       Let me ask you this: Did Jaakan Williams
13 ever tell you that Tim Howard and Ankur Mehta
14 ordered your husband to sign errata sheets?
15   A   I don't recall.
16   Q   You don't recall him doing that? No?
17   A   I don't recall.
18   Q   I'm sorry.
19   A   I don't recall him telling me that.
20   Q   Okay. Did --
21       MR. ANDERSON:  Can we go off the record
22 for just a second?  I need to speak to counsel.
23       MR. MONDE:  Yes.
24       THE VIDEOGRAPHER:  It is 11:11.  We are
25 going off the record.

Page 77

1        (Brief recess 11:11 a.m. - 11:12 a.m.)
2        THE VIDEOGRAPHER:  The time is 11:12, and
3 we are back on the record.
4 BY MR. MONDE:
5    Q   So to finish up this part, Mrs. Harris, to
6 the extent that J.B. Harris had any source of
7 information that Tim Howard and Ankur Mehta ordered
8 your husband to sign the errata sheets without even
9 reading to them, it didn't come from you?
10   A   Correct.
11   Q   The next sentence says that, "Richard was
12 so near death at the time he had no comprehension as
13 to what was happening around him or what he was even
14 signing."
15       Do you see that?
16   A   Um-hum.
17   Q   Do you believe that that is true, correct
18 and complete?
19   A   No, I do not.
20   Q   Why not?
21   A   Because he was aware of what was going on,
22 that part of it.
23   Q   Are you saying that based on what you saw
24 and heard, you believe that your husband was aware
25 of what was going on around him throughout the

Page 78

1 deposition process --
2    A   Correct.
3    Q   -- from Monday, June 20th until Sunday
4 June 26th?
5    A   Correct.
6    Q   You sat in the deposition on that Monday,
7 Tuesday and Wednesday when the lawyers for Reynolds
8 were asking questions?
9    A   Correct.
10    Q   Number one, you were there to protect your
11 husband?
12    A   Yes.  In case -- any needs he had.
13    Q   Yes, ma'am.
14        And so is it fair to say that you were
15 present in the room throughout the time that your
16 husband was being asked questions?
17    A   Yes.
18    Q   You might have stepped away during a
19 break.  But in terms of the actual questioning, you
20 were there the whole time?
21    A   Correct.
22    Q   In those three days, did you ever hear
23 your husband say something that you knew to be
24 untrue?
25    A   Yes.

Page 79

1    Q   What did you hear him say?
2    A   Quite a bit, as far as his background and
3 things like that.
4    Q   Now, I want to be careful here.  I
5 understand that there were things that your husband
6 said that you did not know before.
7    A   Correct.  Well, that's a better way --
8    Q   That's what I thought.
9    A   Thank you for doing that.
10    Q   No problem.  We are all trying to
11 understand the facts here.
12        So let me ask that again.  I'll break it
13 down.
14    A   Um-hum.
15    Q   During those three days of testimony,
16 June 20th to June 22nd, you did hear some things
17 from your husband that you did not know about
18 before?
19    A   Correct.
20    Q   Different question now.
21    A   Okay.
22    Q   In those three days of testimony, did you
23 ever hear your husband say something that you knew
24 or believed to be false?
25    A   No.

Page 80

1    Q   Was there ever a point during the
2 deposition process, and now I'm going to stretch it
3 out from Monday, June 20 all the way to Sunday,
4 June 26th, was there ever any point where you had
5 some question about whether your husband was able to
6 comprehend or understand the questions so that he
7 could testify?
8    A   I didn't doubt -- I knew he was alert the
9 whole time.
10    Q   May I please get you to turn to page
11 eight.
12        I want to focus on the first paragraph.
13 It says the following:
14        Well, I'm so sorry to do this to you.  Did
15 you ever --
16        Was J.B. Harris present for the deposition
17 of your husband?
18    A   Ugh-ugh.
19    Q   No?
20    A   Didn't know about him.  I didn't meet him.
21 I didn't --
22        Absolutely not.
23    Q   Did you ever tell J.B. Harris in
24 connection with preparing this Bar complaint that
25 your husband had no comprehension as to what was

Page 81

1 happening around him or what he was even signing?
2        MR. ANDERSON:  I'm sorry.  I didn't hear.
3        Could you repeat the question so that I
4 can hear it?
5        MR. MONDE:  I'll do it.
6        MR. ANDERSON:  Okay.  Thank you.
7        MR. MONDE:  Guys, I'm sorry.  I went back
8 to page three.
9        MR. ANDERSON:  All right.  All right.  I
10 thought you were still on page eight.  Got you.
11        MR. MONDE:  Are we all on the same page,
12 literally?
13        MR. ANDERSON:  Literally.
14        THE WITNESS:  Figuratively, too.
15        MR. DIAZ:  That, too.
16 BY MR. MONDE:
17    Q   All right.  Did you ever tell J.B. Harris
18 in connection with preparing your sworn Bar
19 complaint that your husband had no comprehension as
20 to what was happening around him or what he was even
21 signing when he signed the errata sheets?
22        MR. ANDERSON:  I have to object on
23 attorney-client privilege and instruct the
24 witness not to answer.
25

21 (Pages 78 - 81)

Page 82

1 BY MR. MONDE:
2   Q   Did you ever hear any doctor assess your
3 husband and diagnose him as lacking comprehension --
4   A   No.
5   Q   -- during this time period?
6   A   No.
7       MR. ANDERSON:  And please let him finish
8 the question.
9       THE WITNESS: I know. I know.
10 BY MR. MONDE:
11   Q   You have been doing a good job at that.
12       MR. ANDERSON: I don't want you to slide.
13       THE WITNESS: I know.
14 BY MR. MONDE:
15   Q   Do you know the source of J.B. Harris'
16 information when he wrote that your husband had no
17 comprehension as to what was happening around him or
18 what he was even signing when he signed the errata
19 sheets?
20   A   The only other one that was there was
21 Jaakan Williams. That would be my answer.
22   Q   Do you know if Jaakan Williams spoke with
23 J.B. Harris in connection with preparing this Bar
24 complaint?
25   A   I do not know.

Page 83

1   Q   Are you curious where J.B. Harris came up
2 with all this information?
3   A   Yes. Um-hum.
4   Q   Now let's go back to page eight.
5       How do you feel about J.B. Harris, now
6 that you had a chance to read this in the comfort of
7 your home, no pressure, you read it two or three
8 times, you let some time pass between reading so
9 that, to use your words, you could digest it? What
10 do you think now that you read it?
11   A   I'm disappointed.
12   Q   Why?
13   A   Because not everything is factual.
14   Q   Why does that disappoint you?
15   A   Well, you expect your lawyer to be helpful
16 to you and do it correctly.
17   Q   Does it trouble you to learn that your
18 lawyer has not been factual?
19   A   Correct.
20   Q   Does it trouble you --
21       MR. DIAZ: Form.
22 BY MR. MONDE:
23   Q   -- that your lawyer has not --
24       It's just an objection for the judge.
25       Does it trouble you that your lawyer, J.B.

Page 84

1 Harris in your view has not been factual in
2 connection with a statement that he had you sign?
3       MR. DIAZ: Form.
4       MR. ANDERSON: Form.
5 BY MR. MONDE:
6   Q   Ma'am?
7   A   I can answer?
8       MR. ANDERSON: Yes, ma'am.
9       THE WITNESS: Yes.
10 BY MR. MONDE:
11   Q   You understand what perjury means, right?
12   A   Yes.
13   Q   You understand the penalties for perjury?
14   A   Yes.
15   Q   You understand that in some context
16 perjury can be a criminal offense?
17   A   Um-hum.
18   Q·  Yes?
19   A   Yes.
20   Q   Would you want any part of a judgment that
21 you believed was based on false information?
22       MR. DIAZ: Object to form.
23 BY MR. MONDE:
24   Q   You can answer.
25   A   No.

Page 85

1   Q   That would be wrong?
2   A   Right.
3       MR. DIAZ: Form.
4 BY MR. MONDE:
5   Q   Ma'am?
6   A   Yes.
7   Q   Would you want any part of a judgment that
8 you believed was infected by or tainted by fraud?
9       MR. DIAZ: Form.
10       THE WITNESS: I wouldn't like it.
11 BY MR. MONDE:
12   Q   Would you want any part of it?
13       MR. DIAZ: Form.
14       THE WITNESS: No.
15 BY MR. MONDE:
16   Q   Back to page eight.
17       MR. MONDE: J.B., if you are in your car,
18 we can hear the car buzzing.
19       Thank you.
20       I think he put it on mute.
21       MR. DIAZ: Yeah.
22 BY MR. MONDE:
23   Q   I promise I will stick to page eight now.
24 I'm sorry.
25       The first full paragraph says, "Indeed,

22 (Pages 82 - 85)

Page 86

1 Mr. Harris came highly recommended from attorney
2 Jaakan Williams who was present at Richard's
3 depositions and who informed me of Howard's
4 concoction of the fraudulent errata sheets."
5     Do you believe that that is factually
6 correct?
7   A   Yes.
8   Q   Now, when did Jaakan Williams recommend to
9 you J.B. Harris?
10   A   (Indicating). Timeline, again, I think we
11 discussed that previously --
12   Q   Right.
13   A   But datewise I just don't keep it in my
14 mind.
15   Q   Okay. Was it --
16     How did the -- how did the topic come up
17 between you and Jaakan Williams?
18     MR. DIAZ: I think Jaakan was her lawyer,
19 wasn't it?
20     MR. MONDE: Excuse me just one minute,
21 Miss Harris.
22     Guys, I'm trying to determine when the
23 conversation took place either before or after
24 the termination of representation.
25     MR. DIAZ: I think that's a fair point

Page 87

1 that you need to establish.
2     We can try to do it maybe without going
3 into the communications.
4     Before we go into that, your last
5 question, and I should have objected to form,
6 because it starts, "Indeed Miss Harris came
7 highly recommended from attorney Jaakan
8 Williams, who was present at Richard's
9 deposition and informed me of Howard's
10 concoction." And you said is that a truthful
11 statement? And she said, "Yes." And there's
12 two statements in there. So the question is is
13 that a truthful statement, but it is a
14 compounded sentence.
15     So I'll get to it on cross.
16     But I want to alert you to the fact that
17 I'm not sure if her answer was yes to the first
18 part of it and yes to the second --
19     MR. MONDE: Okay.
20     MR. DIAZ: If you want to clarify that
21 now. If not, I will get it later.
22     But I know where you are going on your
23 follow-up question. If you don't want to clear
24 it up now, I will later.
25     MR. MONDE: Listen, I understand what

Page 88

1 you're saying. And I'm happy to take it as --
2 I will be granular about it.
3     MR. DIAZ: Okay. All right. Thank you.
4 BY MR. MONDE:
5   Q   So Miss Harris, we need to break down the
6 sentence that I read to you a little bit more.
7     First, you say in your Bar complaint,
8 "Mr. Harris came highly recommended from attorney
9 Jaakan Williams." Is that the fact?
10   A   I don't know highly would be -- I wouldn't
11 use that word. He recommended him.
12   Q   Did he recommend him after you had fired
13 Tim Howard?
14   A   Yes, I believe so. Timeline --
15   Q   And what do you recall Jaakan Williams
16 telling you?
17     MR. ANDERSON: That's attorney-client
18 privilege.
19     MR. MONDE: Why?
20     MR. ANDERSON: That's a very open
21 question.
22     What's your specific question? About
23 what?
24     MR. MONDE: Well, Paul --
25     MR. ANDERSON: About Harris'

Page 89

1 qualifications, or what?
2     MR. MONDE: It's very clear from the
3 context of the sentence preceding.
4     But I'll take out the surgical knife and
5 we will dice this as clean as you want.
6     MR. ANDERSON: Thank you.
7 BY MR. MONDE:
8   Q   To the best of your recollection, Mrs.
9 Harris, what I hear you saying is that this
10 conversation you had with Jaakan Williams was after
11 you had fired Tim Howard?
12   A   Correct.
13   Q   What did Jaakan Williams tell you in this
14 conversation regarding J.B. Harris?
15   A   He gave me two names for two attorneys.
16 One was in Jacksonville. I tried to call her, I
17 think because she was closer. The number didn't
18 work.
19     So I called J.B., and that's when we ended
20 up with J.B.
21   Q   What did Mr. Williams tell you about J.B.
22 Harris' qualifications, or anything else? I mean,
23 what did he tell you when he recommended him?
24   A   I believe he said that he had done some
25 work --

23 (Pages 86 - 89)

Page 90

1     MR. HARRIS: Objection. Attorney-client
2 privilege.
3     MR. ANDERSON: Technically, yes, but --
4     MR. DIAZ: I will defer to Paul on this.
5     MR. MONDE: Hold the thought, Mrs. Harris.
6     MR. ANDERSON: My problem with your
7 question is if you asked her did he tell you
8 anything about Mr. Harris' qualification, I
9 would like that -- that's a more comfortable
10 question.
11     MR. MONDE: If he didn't say anything, she
12 can tell me. That's why I disagree with you.
13 I think it's just more efficient.
14     Number two, I have, for now, and without
15 waiving objections down the road, although I
16 don't feel that it's going to be needed, I
17 tolerated two lawyers objecting when I don't
18 think there is a clear basis for that. We
19 don't have to argue about it now because I'm
20 tolerating it.
21     What I will not tolerate, and I don't
22 think I shouldn't have to, is three lawyers
23 objecting.
24     MR. DIAZ: That's a fair request.
25     Hold on. Hold on.

Page 91

1     MR. HARRIS: No. I want to go on the
2 record right now.
3     I was noticed for the deposition. I was
4 given a call-in number. I'm Mrs. Harris'
5 lawyer.
6     I sat here and listened to her malign me.
7 And you asked inappropriate questions. I am
8 entitled to object. I am entitled to object on
9 my own behalf.
10     MR. MONDE: Gentlemen, that's patently
11 wrong.
12     And my sense from you all is that you will
13 cooperate with me in reigning this in.
14     So I will stay out of this and let you all
15 deal with it.
16     I'm happy to step out of the room and have
17 Miss Harris step out if that would help.
18     MR. ANDERSON: Yeah. Let me just note for
19 the record that even though Mr. Diaz and I have
20 both objected, and you will been kind enough to
21 tolerate that, my objections have really been
22 limited to attorney-client privilege,
23 conversations she had with her attorneys.
24     I have not been making the form objections
25 and such. And really -- I'll leave that to Mr.

Page 92

1 Diaz.
2     We are not double-dipping on you, so to
3 speak.
4     He is not objecting -- I haven't heard him
5 object on attorney-client privilege grounds.
6     I represent Miss Harris. I'm not part of
7 the litigation that generated this judgment.
8     MR. MONDE: Paul, you are fussing at the
9 wrong guy.
10     MR. ANDERSON: I understand.
11     MR. DIAZ: Maybe, I'm wondering if --
12     Take maybe just a two-minute break and I
13 can call J.B. or talk to him now on the phone
14 off the record.
15     Just -- because -- I'm only saying what
16 may happen, there might be -- and then we will
17 be back to where we were.
18     MR. MONDE: Right. So I appreciate your
19 offer to do that. It sounds like a good idea
20 to me. I just want to be transparent about
21 where I cannot go.
22     MR. DIAZ: I got you. Right.
23     MR. MONDE: I cannot have three different
24 lawyers representing the same woman objecting.
25     MR. ANDERSON: Understood.

Page 93

1     MR. DIAZ: Look, I will say this for the
2 record. I think you are --
3     I agree with you that three lawyers is not
4 necessary and probably not appropriate if there
5 were a judge ruling on some kind of motion
6 here.
7     I do believe, though, in all candor and
8 good faith that because Mr. Anderson is her
9 personal attorney for the depo, and I represent
10 the estate, which is the PR, and you have been
11 kind enough to tolerate it -- when you say
12 tolerate it, it almost sounds like we shouldn't
13 be doing it and you are allowing it -- I want
14 to be clear, I believe wholeheartedly I have a
15 right to object, because she is my client as a
16 PR. I represent the estate.
17     We don't have to discuss any more whether
18 it's tolerating or accepting, or whatever word
19 we want to use.
20     But I do agree your point is very well
21 taken that a third lawyer objecting is
22 problematic and probably not permitted.
23     If we can have a chance to talk with J.B.
24 I think we will be able to resolve it. Fair
25 enough?

24 (Pages 90 - 93)

Page 94

1      MR. ANDERSON: J.B., I will put you on
2  hold for a minute --
3      MR. HARRIS: No. No. No. Listen.
4  Listen.
5      MR. MONDE: Don't cut him off, gentlemen.
6  Go ahead, J.B.
7      MR. HARRIS: No. Listen, I have sat here
8  respectfully for what, two, three hours now
9  while Mr. Monde has asked the same question
10  three or four times and I haven't said a word.
11  And I intend to stay quiet. I intend to let
12  Rick and Paul make the objections.
13      MR. ANDERSON: Okay. Well, thank you very
14  much.
15      MR. HARRIS: Okay. You can continue.
16      MR. DIAZ: Okay. We don't need a break.
17  BY MR. MONDE:
18      Q   You don't remember the last question, do
19  you?
20      MR. DIAZ: I don't either, and I'm
21  younger.
22      MR. ANDERSON: We must be done then.
23      MR. MONDE: I'll get there.
24  BY MR. MONDE:
25      Q   All right. Miss Harris, how did the topic

Page 95

1  --
2      Give me a moment. Okay.
3      What did Jaakan Williams say to you when
4  he recommended J.B. Harris?
5      A   That he had done tobacco cases. That's
6  pretty much the bottom line.
7      Q   Now, the next part of the sentence,
8  "Mr. Harris came highly recommended from attorney
9  Jaakan Williams who was present at Richard's
10  depositions."
11      That's true, we know that from the
12  transcripts, right?
13      A   Correct.
14      Q   Now, the next part. "And who," that means
15  Jaakan Williams, "informed me of Howard's concoction
16  of the fraudulent errata sheets."
17      Did Jaakan Williams tell you that Howard
18  concocted the fraudulent --
19      Let me --
20      Did Jaakan Williams tell you that Howard
21  concocted the errata sheets, or words to that
22  effect?
23      A   I believe he did.
24      Q   Okay. How did that make you feel?
25      A   I can't remember the timeframe, again, so

Page 96

1  --
2      Q   Whenever you heard that from Jaakan
3  Williams, how did that make you feel?
4      A   Not good.
5      Q   Because you knew that was wrong?
6      A   Right.
7      MR. DIAZ: Form.
8  BY MR. MONDE:
9      Q   That first day of the deposition,
10  June 20th, the Monday, Mr. Howard was not present.
11  Do you know why?
12      A   I have no clue.
13      Q   And so your case was in the hands of
14  Jaakan Williams and Ankur Mehta, correct?
15      A   Yes.
16      Q   What did you know, at that time, taking
17  you back to that Monday, 2016, what did you know at
18  that time about Jaakan Williams' prior experience
19  with tobacco cases?
20      A   I didn't know.
21      Q   What did you know about Jaakan Williams'
22  prior experience in civil cases of any kind?
23      A   I did not know.
24      Q   What did you know about Jaakan Williams'
25  experience in defending a deposition in a civil

Page 97

1  case?
2      A   I did not know.
3      Q   One minute.
4      A   Um-hum.
5      MR. MONDE: Let's go off the record one
6  minute.
7      THE VIDEOGRAPHER: The time is 11:36. We
8  are going off the record.
9      (Brief recess 11:36 a.m. - 11:39 a.m.)
10      THE VIDEOGRAPHER: The time is 11:39, and
11  we are back on the record.
12  BY MR. MONDE:
13      Q   Did Mr. Howard ever explain to you why he
14  wasn't present on June 20th?
15      A   Not that I recall.
16      Q   Did you, without telling me what was
17  discussed, did you have any discussion with Mr.
18  Howard after that deposition ended that first day,
19  Monday, June 20th?
20      A   Not that I recall.
21      Q   In a pleading that Mr. Howard filed on
22  April 1st, 2019, Mr. Howard represented to the court
23  that on that Monday, June 20th, when he was a no
24  show to the first day of your husband's deposition,
25  that he spent ten hours working on your case.

25 (Pages 94 - 97)

Page 98

1    Do you know of anything that Mr. Howard
2  did on your case, your husband's case on that
3  Monday, never mind ten hours?
4    A   Not that I know of.
5    Q   Now, the deposition transcripts from the
6  first three days, before the errata sheets were
7  prepared, they totaled 419 pages. I'm just asking
8  you to take that as a fact.
9    A   Okay.
10    Q   Was your husband's eyesight at the time,
11  June 25th, would it have allowed him to read 419
12  pages of transcript?
13    A   He had -- he had one eye he was getting
14  the shots for macular degeneration. So it would
15  depend when he was getting the shots how good he
16  could read. The other eye didn't work well at all.
17    Q   Well, do you know whether your husband had
18  even the physical ability given his challenges to
19  his sight to read 419 pages of deposition
20  transcript?
21    A   It sounds doubtful.
22    Q   Based on what you know, is it accurate to
23  say that Tim Howard selected the answers to be
24  changed in your husband's deposition and wrote out
25  the new answers before he had even spoken with your

Page 99

1  husband?
2    MR. DIAZ:  Form.
3    MR. ANDERSON:  Form.
4    THE WITNESS:  I can't -- I couldn't answer
5    that, because I don't know.
6  BY MR. MONDE:
7    Q   In other words, you are repeating what you
8  said earlier, that you just do not have any
9  information and never did about the process by which
10  the errata sheets were prepared or if they were
11  reviewed with your husband and the way in which they
12  were signed, correct?
13    A   Correct. Correct.
14    MR. ANDERSON:  We are talking about apart
15    from her acknowledgment of what Jaakan Williams
16    told her.
17    MR. MONDE:  And that was after the fact.
18    MR. ANDERSON:  After the fact, right.
19    THE WITNESS:  Yeah.
20  BY MR. MONDE:
21    Q   Let me ask you, please, to turn -- page
22  13, please.
23    The following statement appears in your
24  sworn statement under oath to the Florida Bar:
25  Quote, "And I know the difference between a donkey

Page 100

1  and a mule. With that said, I have never in my life
2  met anyone as duplicitous, deceptive and dishonest
3  as Howard."
4    Are those your words?
5    A   They are not my words.
6    Q   J.B. Harris wrote those words?
7    A   Correct.
8    Q   J.B. Harris wrote those words without any
9  authorization or permission from you, correct?
10    A   Correct.
11    Q   Based on what you know from your dealings
12  with Tim Howard, do you believe it is accurate to
13  say that Mr. Howard is duplicities, deceptive and
14  dishonest, based on what you saw in your case?
15    A   I don't know if I should judge somebody.
16    Q   And that's why I'm trying to make it as
17  specific as possible, Miss Harris.
18    So let me ask it again. I'm trying to
19  make it narrow just based on what you saw and heard.
20  You are not speaking to anything else that went on
21  in his life, Tim Howard's life.
22    My question is this:  Based solely on what
23  you saw and heard in the course of Tim Howard's
24  representation of you and your husband in your case,
25  do you believe that Mr. Howard is duplicitous -- or

Page 101

1  was duplicitous, deceptive and dishonest in his
2  handling of your case?
3    A   I would say that he did not do his job,
4  and I was very unhappy with it. I would not use
5  this term. That's not my kind of language.
6    Q   I understand those aren't your words.
7    But based on what you saw and heard, was
8  Tim Howard in the handling of your case deceptive
9  and dishonest?
10    A   Yes.
11    Q   What's that based on?
12    A   Well, he told us that he did tobacco
13  cases, he didn't show up on a very important thing
14  with the --
15    Q   The deposition? Oh, the probate?
16    A   The probate. Yeah.
17    Q   Anything else?
18    A   Not that I can recall right now.
19    Now, he did try to call me after -- after
20  I fired him, tried to get me to go back to him. I
21  don't know if that's --
22    Q   No, I appreciate that.
23    Tell me, the best you can remember, what
24  he said in that phone call.
25    A   Other than he wanted me to not get rid of

26 (Pages 98 - 101)

Page 102

1 him.
2 Q   Did you tell him that you had hired J.B.
3 Harris in the interim?
4       MR. DIAZ: Can I ask for a clarification?
5 Is there still an attorney-client privilege at
6 this time between you and Howard? If you want
7 to waive it, you can. I leave that really for
8 Paul to advise you on.
9       MR. MONDE: Rick, I know --
10 Excuse me, Paul.
11       I know you are trying to do two things at
12 once, looking at your Blackberry and listening
13 to the testimony.
14       But it's quite clear that she said after
15 she fired him he called her.
16       MR. DIAZ: Then I missed it. I apologize.
17       MR. MONDE: That's all I'm saying. I
18 think you missed it.
19       MR. ANDERSON: That's in the Bar complaint
20 somewhere.
21       MR. DIAZ: Fair enough. Good.
22       MR. ANDERSON: There is a reference to it.
23       MR. MONDE: We are good.
24       MR. DIAZ: Yes.
25       MR. MONDE: I'm sorry about that.

Page 103

1       MR. DIAZ: My fault.
2       MR. MONDE: No problem.
3       MR. ANDERSON: Privilege does continue,
4 though, at least in this state.
5       MR. MONDE: Miss Harris, we are talking
6 shop.
7       MR. ANDERSON: We are having fun.
8       THE WITNESS: What are we going to do with
9 lawyers --
10       MR. MONDE: Don't listen to Shakespeare.
11       MR. ANDERSON: Or Don Henley.
12 BY MR. MONDE:
13 Q   Anyway, Miss Harris, the best that you can
14 remember, what did Mr. Howard say to you in this
15 phone call after you had fired him?
16 A   Just other than he wanted me to -- to take
17 him back or, you know, continue to use him.
18 Q   What did you say?
19 A   No.
20 Q   What did he say in response?
21 A   See, that's all the main part I remember.
22 Because I was -- knew he shouldn't have called me
23 back.
24 Q   Did he say anything to you in this phone
25 call about J.B. Harris?

Page 104

1 A   No.
2 Q   Why did you not rehire Mr. Howard?
3 A   Because I was -- I was disappointed in
4 what he did or didn't do, with the probate, and
5 sending me a bill, and having the case for four
6 years, all of the things I was complaining about.
7 Q   And have you thought about firing J.B.
8 Harris for the same reason, that you are
9 disappointed in what he did signing your name under
10 oath to a Bar complaint?
11 A   Not really. You know, he's my main lawyer
12 for that case, was Rick, so he was the main -- the
13 main one, so --
14       I hadn't even thought about it.
15 Q   When you say that Rick Diaz was the main
16 lawyer, what do you mean?
17 A   He was the lead lawyer for the tobacco
18 case.
19 Q   You hired Mr. Diaz well after you hired
20 J.B. Harris, correct?
21 A   J.B. -- you know, he is the one that made
22 arrangements for me to have Rick Diaz.
23 Q   And about how long was it after you had
24 hired J.B. Harris that you hired Rick?
25 A   Again, I do not know.

Page 105

1       MR. MONDE: Rick, do you recall the notice
2 of appearance?
3       MR. DIAZ: I don't. And I might have been
4 involved before my notice was filed, in
5 fairness.
6       MR. MONDE: Yeah. We are on the same
7 page. That's where I'm going.
8       MR. DIAZ: Look, I'll help you. I'm not a
9 witness to the deposition, but J.B. and I have
10 known each other since 2012, well before he
11 even had contact with Mrs. Harris.
12       We have done many tobacco cases before
13 then -- since then and before this one.
14       He may have talked to me about this case
15 days, weeks, months, years before I even
16 thought of getting involved. And that's a
17 truthful -- that's the best I can tell you. If
18 you want me to go back and look -- I don't know
19 where I can go and look to be more precise.
20       Today --
21       Yesterday he called me on a new case
22 that's set for trial next year.
23       MR. MONDE: Got it.
24       MR. DIAZ: I'm not filing a notice of
25 appearance. I may never do it.

27 (Pages 102 - 105)

Page 106

1      MR. MONDE: Right.
2      MR. DIAZ: So you understand the
3  relationship.
4      MR. MONDE: I do. I appreciate that.
5      MR. DIAZ: All right.
6  BY MR. MONDE:
7    Q   As you use the word fabricated, do you
8  agree with Merriam Webster's Dictionary definition
9  as fabricated as some -- as to make up for the
10  purpose of deception? Is that your understanding of
11  the word fabricated --
12    A   Right.
13    Q   -- when you use it?
14    A   Yes.
15    Q   And Merriam Webster defines fraudulent as
16  an intentional perversion of the truth, an act of
17  deceiving or misrepresenting. Is that consistent
18  with your definition when you use the word
19  fraudulent?
20    A   Correct.
21    Q   You agree it would be wrong for Tim Howard
22  or anyone else to use fabricated and fraudulent
23  errata sheets in your case for any purpose, correct?
24    A   Correct.
25    Q   We've been speaking about your husband

Page 107

1  Richard's errata sheets. But let's just mark them
2  as an exhibit.
3      MR. MONDE: Are we up to 8 already?
4      Do you guys want another copy?
5      MR. DIAZ: No.
6  BY MR. MONDE:
7    Q   Mrs. Harris, Exhibit 7 are the errata
8  sheets to your husband's depositions taken on
9  June 20th, 21, 22, 2016.
10      Do you recognize his signature on the
11  first page?
12      (Exhibit No. 7 marked for
13  identification.)
14      THE WITNESS: It looks a little less clear
15      than it usually is.
16  BY MR. MONDE:
17    Q   Do you have some question about whether
18  that's actually your husband's signature?
19    A   I would say so.
20    Q   All right. Let me ask you to turn to the
21  third page. This is volume two.
22      Do you also have questions about whether
23  that's actually your husband's signature?
24    A   What page did you say?
25    Q   The third page, ma'am.

Page 108

1    A   I got three here. It's something
2  different. It says three.
3    Q   The reason it's confusing is because the
4  page numbers start at one again.
5      There you go.
6    A   Okay.
7    Q   All right. So for the record, we are
8  looking at the third page of Exhibit 7, which is the
9  errata sheet for volume two of Mr. Harris'
10  deposition.
11    A   Correct. Correct.
12      MR. ANDERSON: It's actually page four of
13  the exhibit. I got three pages here as the
14  first part.
15      MR. MONDE: Is there a blank?
16      MR. ANDERSON: No.
17      MR. HARRISON: Yours is double-sided.
18      MR. MONDE: Thank you.
19  BY MR. MONDE:
20    Q   All right. So we are on the fourth page
21  of Exhibit 7.
22    A   Should it say four at the bottom?
23      MR. ANDERSON: No.
24  BY MR. MONDE:
25    Q   I'll do something better.

Page 109

1      May I have that back for a minute, please?
2      MR. ANDERSON: Do you want to break it
3  out?
4      MR. MONDE: Yeah. Good with you? Can I?
5      MR. ANDERSON: Yeah. Yeah.
6  BY MR. MONDE:
7    Q   Exhibit 7 is the errata sheet to the first
8  day of your husband's deposition, Volume 1, taken
9  June 20th.
10      That's the one where you are unsure
11  whether that's even your husband's signature,
12  correct?
13    A   True.
14    Q   Sitting here today, your belief is that's
15  not your husband's signature, someone else signed?
16    A   I'm not sure.
17    Q   But you have a real concern about that?
18    A   I do.
19    Q   Exhibit 8 is the errata sheet to the
20  second day of your husband's deposition, Volume 2.
21  This deposition was June 21.
22      And, again, do you have serious questions
23  about whether that's actually your husband's
24  signature on Exhibit 8?
25      (Exhibit No. 8 marked for

28 (Pages 106 - 109)

1 identification.)
2      MR. DIAZ: Form.
3      THE WITNESS: I do.
4 BY MR. MONDE:
5    Q    And you know, having been married to him
6 for 28 years, what your husband's signature looks
7 like?
8    A    Yes.
9    Q    And you know what it looked like even when
10 he was failing in health?
11    A    Correct.
12      MR. DIAZ: Form.
13 BY MR. MONDE:
14    Q    Exhibit 9 is the errata sheet to the third
15 day of your husband's deposition taken June 22nd,
16 2016, Volume 3.  This errata sheet is also dated
17 6/25/16.
18      And, again, is it fair to say that you
19 have serious questions about whether that's actually
20 your husband's signature?
21      MR. DIAZ: Form.
22      THE WITNESS: I do.
23      (Exhibit No. 9 marked for
24 identification.)
25

1 BY MR. MONDE:
2    Q    And I just want to be sure that your
3 answer will be clear in the future.
4      Do you have serious concerns about whether
5 that's even your husband's signature on Exhibit 9?
6      MR. DIAZ: Form.
7      THE WITNESS: I'm not sure. He was weak,
8 but, you know, it doesn't look like what I'm
9 used to, would be a better way to say it.
10 BY MR. MONDE:
11    Q    Including what you are used to even as he
12 was getting weak and his health was failing?
13      MR. DIAZ: Form.
14      THE WITNESS: Right.
15 BY MR. MONDE:
16    Q    And if you would just put those three
17 exhibits together.
18      MR. ANDERSON: They are all right here.
19      MR. MONDE: All right.
20 BY MR. MONDE:
21    Q    So when you had testified today that you
22 don't know anything about the process by which the
23 errata sheets were presented, whether they were
24 prepared and whether they were actually reviewed
25 with your husband and whether he was ordered to sign

1 them or not, you are referring to these Exhibits 7
2 through 9, correct?
3    A    Correct.
4    Q    Miss Harris, until I gave them to you
5 today, have you ever read, looked at Exhibit 7
6 through 9?
7    A    No, not that I recall.
8    Q    About when did Jaakan Williams tell you
9 that the errata sheets had been concocted?
10    A    I have no clue.
11    Q    It was sometime between the time you fired
12 Tim Howard and the time of your trial, is that
13 right?
14    A    What trial?
15    Q    The trial of this case in February of
16 2019.
17    A    I don't recall.
18    Q    Well, I know you don't recall the date.
19    A    Um-hum.
20    Q    But whenever Jaakan Williams told you that
21 the errata sheets were concocted, that had to have
22 been before August of 2018 when the Bar complaint
23 was submitted, correct?  Right?
24    A    Yes.
25    Q    Okay.  I'm marking as Exhibit 10 a

1 pleading called Plaintiff's Response In Opposition
2 To Tim Howard's Omnibus Motion Filed On April 3,
3 2019.  It's signed by Rick Diaz, and it was filed on
4 April 15, 2019.
5      So this is something that your lawyer has
6 filed with the court.
7      (Exhibit No. 10 marked for
8 identification.)
9 BY MR. MONDE:
10    Q    Would you please turn to the second page.
11      And I want to ask you about the second
12 paragraph.  It says, "Mr. Howard was terminated for
13 cause."  Do you believe that to be true and
14 accurate?
15    A    Yes.
16    Q    Next it says, "Additionally, his
17 pre-termination work was well below community
18 standards.  He breached the contract with his client
19 by attempting to shift the cost obligation to her
20 even though he agreed to pay them and get reimbursed
21 if there was a verdict from the gross recovery.  He
22 then extorted her by threatening not to appear for
23 trial if she would not agree."
24      Do you believe that that's true and
25 accurate?

29 (Pages 110 - 113)

Page 114

1   A   I believe everything up until when it
2   starts he extorted her. I'm not familiar with that.
3   Q   Okay. So --
4       And that's what you told me earlier.
5   Remember when I asked you when Mr. Howard presented
6   you with the bill for the motel --
7   A   Um-hum.
8   Q   -- and you got it, but I asked you did he
9   threaten you if you didn't pay it, and you said, no,
10  he didn't; right?
11  A   Not that I recall.
12  Q   Right. So to the best of your belief and
13  knowledge it's simply false to say that Mr. Howard
14  extorted you by threatening not to appear for trial
15  if you would not agree to his demand to pay these
16  costs, correct?
17  A   I do not remember that.
18  Q   Okay. And as far as you know, that did
19  not happen?
20      MR. DIAZ: Form.
21      MR. ANDERSON: She just said she didn't
22  remember that.
23      MR. MONDE: I want to be very clear about
24  what she is saying.
25      MR. DIAZ: I want to make an objection.

Page 115

1       You can't say you want to be clear to a
2   question that's already been asked and answered
3   or otherwise we will never get out of -- out of
4   the exercise.
5       MR. MONDE: This is where --
6       MR. DIAZ: You got a good answer, then she
7   gave you an answer and says I don't remember
8   that. You don't like that, and now you want to
9   try to beat her into a different answer.
10  I will object. I cannot instruct her not to
11  answer, but I am objecting to asked and
12  answered.
13      MR. MONDE: Objection is noted.
14  And now you are crossing the line.
15      MR. DIAZ: No, I'm not.
16      MR. MONDE: Let me finish.
17      You are crossing the lines where you both
18  are making a form objection. That's not
19  consistent with the spirit by which we have
20  been operating so far.
21  BY MR. MONDE:
22  Q   Was there any cost obligation, other than
23  paying for this motel to be used during the trial
24  that Mr. Howard tried to shift to you?
25  A   Not that I recall.

Page 116

1   Q   Did he ever try to shift to you the cost
2   associated with the autopsy done on your husband or
3   the preservation of pathology from that?
4   A   I never got a bill for that.
5   Q   Okay. Did Mr. Howard -- I know he didn't
6   give you a bill, but did he ever call up or email
7   you and say, Peggy, you need to pay this?
8   A   No. The funeral home called and said who
9   would pay the bill, and I told the lawyer, and that
10  was the end of that.
11  Q   So to be clear, the only bill for expenses
12  that Mr. Howard gave you was for the motel, about
13  $10,000?
14  A   Right.
15  Q   Okay. And you didn't pay it?
16  A   Correct.
17  Q   And he didn't threaten you for failing to
18  pay it?
19  A   Not that I recall.
20  Q   Okay. The next sentence, "Last, he,"
21  referring to Mr. Howard, "suborned perjury with the
22  errata sheets, obstructed justice and committed a
23  fraud upon the court by attempting to use them in
24  the proceedings."
25      Do you believe that that is true and

Page 117

1   accurate?
2   A   I can't -- I don't know, because I don't
3   know what's -- again, we talked previously about the
4   errata sheets. I have no knowledge of how it works,
5   so I couldn't say.
6   Q   If anyone, Mr. Howard or anyone else, used
7   the errata sheets to create false testimony, to
8   suborn perjury and used them to obstruct justice or
9   commit a fraud upon the court, would you want any
10  part of that?
11  A   No.
12      MR. DIAZ: Form.
13  BY MR. MONDE:
14  Q   Would you have authorized your lawyers to
15  do that?
16      MR. DIAZ: Form.
17      THE WITNESS: No.
18  BY MR. MONDE:
19  Q   If they had come to you and asked you to
20  authorize that, would you have?
21      MR. DIAZ: Form.
22      THE WITNESS: No.
23  BY MR. MONDE:
24  Q   May I please get you to go back to Exhibit
25  3 for a moment.

30 (Pages 114 - 117)

Page 118

```
 1       Would you turn to page four.
 2       The Bar complaint says that, "In
 3  anticipation of trial, Howard paid $12,000 for the
 4  autopsy, and supposedly prepaid $10,000 for the
 5  rental of the local residence. Howard then had the
 6  audacity to insinuate that I, a woman of very meager
 7  means, had to pay the combined cost of $22,000."
 8       You believe that to be a false description
 9  when it comes to the $12,000 for the autopsy,
10  correct?
11   A   Correct.
12   Q   Now, I do want to ask you to turn, and
13  Paul if you can help her with this, to Exhibit A, to
14  the Bar complaint.
15       MR. ANDERSON: Okay.
16  BY MR. MONDE:
17   Q   And Exhibit A, Miss Harris, is an email
18  that Tim Howard sent to you regarding $12,000 for
19  pathology and $10,000 for the house rental. Do you
20  see that?
21   A   Um-hum.
22   Q   Yes?
23   A   Yes.
24   Q   Did --
25       And Mr. Harris, J.B. Harris has cited to
```

Page 119

```
 1  Exhibit A as proof that in anticipation of trial if
 2  you didn't pay those costs to Mr. Howard, Mr. Howard
 3  was not going to show up at trial.
 4       Do you see the date of Mr. Howard's email
 5  to you attached as Exhibit A?
 6   A   Yes.
 7   Q   That's July 10, 2018, correct?
 8   A   Correct.
 9   Q   You had fired Tim Howard two months
10  before, right?
11   A   Yeah.
12   Q   Right? Yes?
13   A   If I --
14       Again, datewise I don't know. If that's
15  what we decided -- because my memory is not good.
16   Q   And I'll help you with that.
17       MR. MONDE: Paul, would you please help
18  her get to Exhibit C in the Bar complaint.
19       MR. ANDERSON: Any particular --
20       MR. MONDE: The third page, the letter
21  itself.
22  BY MR. MONDE:
23   Q   So Exhibit C --
24       MR. ANDERSON: That may be tough for her
25  to read.
```

Page 120

```
 1       MR. MONDE: It's a little tough for all us
 2  to read.
 3  BY MR. MONDE:
 4   Q   But we will work through this,
 5  Miss Harris.
 6       According to your Bar complaint --
 7       MR. ANDERSON: Let me do this. I have a
 8  cleaner copy.
 9       MR. MONDE: I appreciate that.
10       We will go off the record for a moment
11  because Mr. Anderson has a better copy.
12       THE VIDEOGRAPHER: The time is 12:12, and
13  we are going off the record.
14       (Brief recess 12:12 p.m. - 12:14 p.m.)
15       THE VIDEOGRAPHER: The time is 12:14, and
16  we are back on the record.
17  BY MR. MONDE:
18   Q   Mrs. Harris, I will swap copies with you.
19       Exhibit 11 is a copy of your May 29, 2018
20  letter firing Tim Howard.
21       (Exhibit No. 11 marked for
22  identification.)
23  BY MR. MONDE:
24   Q   Have I described that accurately?
25   A   Correct.
```

Page 121

```
 1   Q   Who wrote this?
 2   A   I collaborated with a friend, because I
 3  didn't know how to do any of this stuff.
 4   Q   Did J.B. Harris have any involvement in
 5  preparing this?
 6   A   No.
 7   Q   What friend?
 8   A   His name is Rob Hawkins.
 9   Q   Up in Havana?
10   A   He lives in Tallahassee.
11   Q   Is he a lawyer?
12   A   No.
13   Q   Okay.
14   A   No. A friend of his had done some legal
15  work.
16   Q   Okay. So based on Exhibit 11, is it clear
17  that no later than May 29th, 2018 you had fired Tim
18  Howard?
19   A   Correct.
20   Q   And so it would not have been possible on
21  July 8th -- the 10th, 2018 for Mr. Howard to have
22  threatened to not show up at your trial as your
23  lawyer if you didn't pay because you had fired him?
24   A   Right.
25       MR. DIAZ: Form.
```

31 (Pages 118 - 121)

Page 122

1       MR. ANDERSON: Yeah.
2 BY MR. MONDE:
3    Q   Let me ask you to turn to the last page of
4 the Bar complaint, Exhibit 3, the very last page.
5    A   The envelope?
6    Q   No. One more.
7    A   I have arthritis in my fingers. They
8 don't work good.
9    Q   You are doing fine. Exhibit F, and then I
10 want the next page. There you go. Okay.
11       This is an email from Tim Howard to
12 someone named Matt. And he says, "She didn't
13 respond to me. Mr. Harris," referring to J.B.
14 Harris, "has an extensive history of Bar violations
15 and extortion that I was forced to report. We sent
16 what we had in the file and I thought that was
17 sufficient at the time. There's nothing to do on
18 this case for now."
19       When you hired J.B. Harris, were you aware
20 that he was in the midst of a dispute with Tim
21 Howard?
22    A   No, I did not.
23    Q   Were you aware that they were actually
24 lawyers working together under contract --
25    A   I did not.

Page 123

1    Q   -- when you hired -- when you fired Tim
2 Howard and hired J.B. Harris?
3    A   Not that I recall.
4    Q   Were you aware when you fired Tim Howard
5 and hired J.B. Harris that Tim Howard was actually
6 paying J.B. Harris' salary?
7    A   No, I did not.
8    Q   Were you aware when you fired Tim Howard
9 and hired J.B. Harris that they had a contract with
10 each other that in cases -- Engle cases like yours,
11 including yours, that they had a contract that would
12 give Tim Howard a certain percentage of any verdict
13 obtained or judgment collected?
14    A   Not that I recall.
15    Q   Is that information, ma'am, that you would
16 have wanted to know when you hired J.B. Harris?
17       MR. DIAZ: Form.
18       THE WITNESS: Yes.
19 BY MR. MONDE:
20    Q   Now --
21       MR. MONDE: Actually, you know what, so
22 I'm more efficient with your time, I would like
23 to take a short break and let me just set up.
24       We are getting towards the end. Okay?
25 And I just want to get organized so that we can

Page 124

1 be as efficient as possible.
2       THE WITNESS: Okay.
3       MR. MONDE: Let's take a break.
4       THE VIDEOGRAPHER: The time is 12:20, and
5 we are going off the record.
6       (Brief recess 12:20 p.m. - 12:41 p.m.)
7       THE VIDEOGRAPHER: The time is 12:41, and
8 we are back on the record.
9 BY MR. MONDE:
10    Q   Mrs. Harris, would you please look at
11 Exhibit 10 again for a moment.
12       Do you got that in front of you?
13    A   Yes.
14    Q   All right. Again, this is a pleading
15 that your lawyers filed in the case on April 15,
16 2009 -- 2019. And Exhibit B to this filing --
17 Exhibit B to this filing is the Bar complaint.
18    A   Okay.
19    Q   Would you just confirm that for me.
20    A   Correct.
21    Q   All right. And would you look at the
22 second page.
23       Now, this doesn't have your signature on
24 it. Do you see that?
25    A   Correct.

Page 125

1    Q   Your lawyers have represented to me that
2 they have no reason to believe that Exhibit B, the
3 unsigned version is any different from the signed
4 version. Okay. That's what they told me.
5       But I want to be very clear about
6 something.
7       You told me that you've only looked at the
8 Bar complaint for the first time, only read it for
9 the first time a few days ago, correct?
10    A   Correct.
11    Q   And so when this was filed back in 2019,
12 April of 2019 you had not read the Bar complaint at
13 that time?
14    A   Correct.
15    Q   And you would have not been able to tell
16 your lawyers whether -- what was in the Bar
17 complaint was true and correct or contained false
18 statements because you hadn't read it?
19    A   Correct.
20    Q   And we now know that it contains
21 statements that you believe to be false?
22       MR. DIAZ: Form.
23 BY MR. MONDE:
24    Q   Correct?
25    A   Correct.

32 (Pages 122 - 125)

Page 126

1    Q    Statements that you believe to be
2 fraudulent, correct?
3        MR. DIAZ: Form.
4        THE WITNESS:  Correct.
5 BY MR. MONDE:
6    Q    Now that you know that, what steps have
7 you taken to correct that?
8    A    At this point nothing that I recall.
9    Q    All right.  You recall giving a deposition
10 in this case, correct?
11   A    Which case?
12   Q    The litigation regarding your husband.
13   A    Correct.
14   Q    I'm going to just hand you the entire
15 deposition transcript, just so that we have it in
16 the record.
17        I'll mark it as Exhibit 12, your
18 deposition transcript which shows that it was taken
19 on May 23rd, 2017.
20        You have no reason to doubt that date,
21 correct?
22   A    No.
23   Q    And it is in two volumes -- three volumes.
24        MR. ANDERSON: Three volumes.
25

Page 127

1 BY MR. MONDE:
2    Q    And included a number of exhibits.  So the
3 whole thing is right there.
4        (Exhibit No. 12 marked for
5 identification.)
6 BY MR. MONDE:
7    Q    Now, your lawyer at the time of your
8 deposition was Tim Howard, correct?
9        I can help you with this.
10        Turn to the first page.
11        MR. ANDERSON:  What he really means is
12 page two.
13        MR. MONDE:  Maybe page one of the
14 transcript.
15        MR. ANDERSON:  It's page --
16        Maybe I'm anticipating what you're
17 thinking.
18        MR. HARRISON: Page two of the transcript.
19 BY MR. MONDE:
20   Q    You see, that as Mr. Anderson has politely
21 reminded me, on page two there is a list of the
22 lawyers representing the various parties, and
23 representing plaintiff, which was you, is Howard &
24 Associates, Dr. Tim Howard, J.D., Ph.D. and Jaakan
25 Williams and Christina Opsahl.

Page 128

1        Do you see that?
2    A    Yes.
3    Q    So Tim Howard was still your lawyer when
4 you gave your deposition, correct?
5    A    Correct.
6    Q    You met with Mr. Howard and Mr. Williams
7 to prepare for your deposition?
8    A    Correct.
9    Q    I don't want to know what you said.  But
10 you met with Tim Howard and Jaakan Williams --
11   A    Yeah.
12   Q    -- to get ready?
13   A    Yes.
14   Q    If Mr. Howard told the Florida Bar under
15 oath that he had nothing to do with preparing you
16 for your deposition, do you believe that that would
17 be false?
18   A    I remember more of Jaakan doing it.  He
19 had a lady with him --
20   Q    Christina --
21   A    No.  I don't recognize that.
22        Adrianne Annette Williams --
23   Q    Yes.
24   A    -- or something like that.
25   Q    Yes.

Page 129

1    A    Yeah.
2    Q    But I want to be -- I want to be as clear
3 as you can be on this.
4        Did Tim Howard have any involvement in
5 helping you get ready for your deposition?
6        MR. DIAZ: Form.
7        THE WITNESS:  I really can't remember any
8 specific times.  I remember more it was Jaakan
9 and this other lady, another girl.
10 BY MR. MONDE:
11   Q    Do you recall Tim Howard being at your
12 deposition?
13   A    Oh, yes.  Yeah.
14   Q    Okay.  They took place at Mr. Howard's
15 office?
16   A    Correct.
17   Q    And you took an oath to tell the truth
18 then?
19   A    Correct.
20   Q    You knew you were testifying under oath,
21 correct?
22   A    Correct.
23   Q    You knew you had taken an oath to tell the
24 truth, the whole truth and nothing but the truth,
25 correct?

33 (Pages 126 - 129)

1    A   Correct.

2    Q   And would you turn to page 333 of your
3 deposition.

4       MR. MONDE: Paul, if you could give her a
5 hand, I would be grateful.

6       MR. ANDERSON: Sure.

7       THE WITNESS: I can't tell where the pages
8 are.

9       MR. MONDE: They are in the upper
10 right-hand corner.

11      MR. ANDERSON: Here you go, ma'am. 333.
12 It is a little confusing -- there are four
13 pages on one sheet. Right.

14 BY MR. MONDE:

15   Q   All right. So at page 333, line 16 this
16 question was asked: "So who prepared -- these were
17 errata sheets that were prepared to your husband's
18 deposition. Who prepared those?"

19      And you answered, "I don't know. I would
20 presume the lawyers did."

21      "Q   Do you know one way or the other?"

22      "A   No."

23      "And how were they prepared?"

24      "A   I don't really recall."

25      "Q   Did your husband actually dictate the

1 errata or do you have any idea how these were
2 prepared?"

3       Your answer, "No, I do not."

4       "Q   When the lawyers came and things were
5 being read to him, did they actually read him
6 the deposition transcript or just the errata
7 sheets?"

8       "I don't remember."

9       Was that truthful information when you
10 gave it?

11   A   Yes.

12   Q   And then turn over to page 335.

13      MR. ANDERSON: Do you see it?

14      THE WITNESS: Um-hum.

15      MR. ANDERSON: Okay.

16 BY MR. MONDE:

17   Q   Line five.

18      "Q   Do you know whether he actually told"
19 -- he being your husband -- "actually told the
20 lawyers whether he had changes to make to the
21 deposition? Did he actually tell them that?"

22      "A   I believe he did."

23      "Q   How did he do so?"

24      "Verbally I would think, but I'm not -- I
25 shouldn't say because I'm not sure."

1       "Q   So would you -- is it fair to say
2 that you just don't know how those errata
3 sheets were prepared?

4       "A   Correct."

5       "Q   And you just don't know whether your
6 husband was involved in the preparation of the
7 errata sheets?"

8       "A   I would say I'm not sure."

9       That was your testimony at the time?

10   A   Correct.

11   Q   That was under oath?

12   A   Correct.

13   Q   Now, turn to page 402, please. Let me
14 know when you're there.

15   A   Okay.

16   Q   All right. And now this is a question
17 from Mr. Nease, Philip Morris' lawyer, at line 21.

18      "Q   And if I understood your testimony
19 correctly, you have no idea how that errata
20 sheet was prepared or even who prepared it,
21 right?"

22      "A   No, I don't."

23      Do you see that?

24   A   Correct.

25   Q   And was that testimony truthful when you

1 gave it?

2    A   Do I answer?

3       MR. ANDERSON: I'm sorry. I was trying to
4 get him the page.

5       THE WITNESS: Repeat it, please.

6 BY MR. MONDE:

7    Q   When you told Mr. Nease that you had no
8 idea how the errata sheet was prepared or even who
9 prepared it, was that truthful?

10   A   Correct.

11   Q   After your deposition, you were presented
12 with errata sheets, changes to your deposition,
13 correct?

14   A   Again, I don't remember.

15   Q   Well, do you remember Mr. Howard and maybe
16 Mr. Williams coming to you or sending to you errata
17 sheets with changes to your deposition testimony?

18   A   I do not recall.

19   Q   Let me see if I can refresh your memory.

20      We are going to mark as Exhibit 13 your
21 errata sheets.

22      (Exhibit No. 13 marked for
23 identification.)

24 BY MR. MONDE:

25   Q   Is that your signature on the first page

34 (Pages 130 - 133)

Page 134

1 of Exhibit 13?
2    A   Right.
3    Q   You signed your name under the following
4 statement: "I have read the foregoing transcript of
5 my deposition and except for any corrections or
6 changes noted on the errata sheet, I hereby
7 subscribe to the transcript as an accurate record of
8 the statements made by me." And then you signed,
9 correct?
10    A   Correct.
11    Q   Then would you turn to the second page of
12 the exhibit.
13        It says, "Under penalties of perjury, I
14 declare that I have read the foregoing transcript of
15 my deposition and hereby subscribe to same including
16 any corrections and/or amendments listed below."
17 And then you signed, correct?
18    A   Correct.
19    Q   That's your signature?
20    A   Correct.
21    Q   No doubt about it?
22    A   Right.
23    Q   Dated July 6th, 2017, correct?
24    A   Correct.
25    Q   And you understood when you signed your

Page 135

1 name to these corrections that you were taking an
2 oath that they were truthful corrections, yes?
3    A   Correct.
4    Q   Would you turn to Volume 2 errata sheet.
5 It is two or three pages more in.
6        MR. ANDERSON: Here, let me help you.
7        There you go.
8 BY MR. MONDE:
9    Q   Again, you signed your name there,
10 correct, on that page?
11    A   Correct.
12    Q   That's your signature?
13    A   Right.
14    Q   When you signed it, you understood that
15 under penalty of perjury you were declaring that the
16 corrections and the reasons for the corrections were
17 truthful, yes?
18    A   Correct.
19    Q   And then the fifth page from the back,
20 Volume 3.
21    A   Your fingers are better than mine.
22        MR. ANDERSON: That's okay. Here you go.
23 BY MR. MONDE:
24    Q   Again, you signed your name under the
25 statement that says, "Under penalties of perjury I

Page 136

1 declare that I read the foregoing transcript of my
2 deposition and hereby subscribe to same including
3 any corrections or amendments listed below." That's
4 your signature, correct?
5    A   Right.
6    Q   That's the writing of the date of July 6,
7 2017?
8    A   Correct.
9    Q   You knew when you signed this that you
10 were now swearing under oath that your corrections
11 to your prior testimony were the facts and the
12 truth, yes?
13    A   Yes.
14    Q   How were these errata sheets, Exhibit 13
15 prepared?
16    A   I have no recollection of those. Total
17 blank. I don't remember where it was or what it
18 was, other than I see the date here. It's just
19 clueless.
20    Q   Did Tim Howard prepare these errata sheets
21 before speaking with you?
22    A   I don't recall.
23    Q   Did Jaakan Williams?
24    A   I don't recall.
25    Q   Who was involved with preparing and

Page 137

1 reviewing with you the errata sheets?
2    A   I don't remember.
3    Q   Mrs. Harris, did you review the errata
4 sheet changes, the changes to your testimony before
5 you signed?
6    A   I do not recall. I don't remember signing
7 or reading it.
8    Q   You don't recall reading it?
9    A   No.
10    Q   So you believe it's possible that you
11 signed your name to these without having read the
12 changes?
13        MR. DIAZ: Form.
14 BY MR. MONDE:
15    Q   Ma'am?
16    A   I believe so.
17    Q   Is that what you believe happened?
18    A   Right.
19        MR. DIAZ: Form.
20        THE WITNESS: I just don't have any
21 recollection at all.
22 BY MR. MONDE:
23    Q   So in your deposition in May of 2017, you
24 testified in essence that you had no idea how your
25 husband's errata sheets were prepared?

35 (Pages 134 - 137)

Page 138

1   A   Correct.
2   Q   That's your testimony today?
3   A   Correct.
4   Q   Would you read your sworn answer to the
5   question of how the errata sheets of your husband
6   were prepared, where it says "correction" on the
7   fifth page in?
8       MR. ANDERSON: Volume?
9       MR. MONDE: Three.
10      MR. ANDERSON: What is the page reference
11  on the left?
12      MR. MONDE: Page 333, 334, the same
13  testimony that I just asked her about.
14      Take your time.
15      MR. ANDERSON: There?
16      THE WITNESS: 334 or 333.
17      MR. MONDE: 333.
18      MR. ANDERSON: 333.
19  BY MR. MONDE:
20  Q   So in part of your testimony in the
21  deposition you were asked if your husband actually
22  dictated the errata or do you have any idea how
23  these were prepared, and your answer was, "No, I do
24  not."
25      Now, read the corrected answer that you

Page 139

1   gave under oath on July 6th, 2017, please, where it
2   says "correction."
3   A   "I don't remember," is that where it
4   starts out?
5   Q   No. "Correction."
6   A   "Our attorneys did review Richard's depo
7   transcripts with him each day, and Richard clarified
8   his answers and the changes he wanted made to the
9   transcript. This is consistent at how I answered
10  this question in the affirmative at lines 19 and 21,
11  page 334."
12  Q   That statement, "Our attorneys did review
13  Richard's deposition transcripts with him each day
14  and Richard clarified his answers and then changes
15  he wanted to make" was false, correct?
16      MR. DIAZ: Objection.
17      THE WITNESS: Correct.
18  BY MR. MONDE:
19  Q   Would you turn to the next page, please.
20      In your deposition at page 334, 335 you
21  were asked, "Am I correct that you do not know how
22  the errata sheets were prepared to his deposition?"
23  And you answered, "No."
24      Yes? Am I correct?
25  A   Yes.

Page 140

1   Q   Now read your correction under oath to
2   that testimony.
3   A   "Our attorneys did review Richard's depo
4   transcripts with him each day, and Richard clarified
5   his answers and the changes he wanted made to the
6   transcript."
7   Q   You can stop there. That's false, isn't
8   it?
9       MR. DIAZ: Form.
10      THE WITNESS: Correct.
11  BY MR. MONDE:
12  Q   It's untrue?
13      MR. DIAZ: Form.
14      THE WITNESS: Correct.
15  BY MR. MONDE:
16  Q   Would you look at 335, line 12 through 17,
17  please.
18      MR. DIAZ: Let me make an objection to the
19  record.
20      I will ask to take a break so I can speak
21  with counsel outside.
22      I think that these questions about her
23  errata sheet go outside of the scope of this
24  deposition and the motion. I may be wrong and
25  I'm happy to reconsider my position. But I

Page 141

1   don't think this deposition is permissive to go
2   into areas that are outside of the scope of the
3   motion.
4       Am I wrong? Is there somewhere you can
5   show me in the motion where you are claiming
6   the rights to a new trial based upon her errata
7   sheets or her trial testimony or her deposition
8   testimony?
9       If you can't, then I will talk with
10  counsel and I will be suggesting that both of
11  us jointly instruct the witness not to answer
12  questions on a track which I don't think is
13  within the scope of this deposition.
14      MR. MONDE: I'm happy to have that
15  discussion outside of the presence of Mrs.
16  Harris.
17      MR. DIAZ: Sure.
18      MR. ANDERSON: Miss Harris.
19      Lillie, we will send Miss Harris back to
20  you.
21      THE VIDEOGRAPHER: Are we going off the
22  record?
23      MR. MONDE: No.
24      MR. DIAZ: Don't have to.
25      (Thereupon, the following proceedings were

36 (Pages 138 - 141)

Page 142

1  held outside the presence of Ms. Harris:)
2      MR. MONDE: Can we get the door, please,
3  Paul?
4      MR. ANDERSON: Sure.
5      MR. MONDE: The motion is based on fraud.
6      MR. DIAZ: Wrong. Sorry. Disagree.
7      MR. MONDE: Okay. Great.
8      MR. DIAZ: What fraud? The specific
9  fraud -- as you know under Florida law fraud
10  has to be specifically pled.
11      And what you specifically pled, as I
12  recall, and, you know, this is a huge record,
13  and if I'm wrong you can take me to it and
14  I will reconsider, I will say that for the
15  second time, as I recall the specific fraud
16  pled in your motion is, and it's confusing both
17  to Mr. Anderson and me, and a lot of people,
18  but let me try to articulate it as best I
19  can -- what you all seem to be saying is even
20  though you had competent and qualified and
21  armies of lawyers to make a decision on whether
22  to -- on what to do with Richard's deposition
23  testimony, when I say deposition testimony, I'm
24  talking about discovery, errata, and what was
25  going to be used at trial, okay -- that you

Page 143

1  were dealing with in a motion to suppress
2  pretrial was, a claim, a belief, a theory that
3  the errata sheets were fraudulent, obstruction
4  of justice, perjury, whatever you want to say.
5      And there was a deal that was struck
6  between both lawyers, that, you know what,
7  maybe you are right, maybe you are wrong, you
8  want to litigate the motion in front of Judge
9  Gievers you can. And you made a calculated
10  decision to not want to live with the judge's
11  ruling at the time.
12      Now, because you got a verdict against
13  you, you want to say that wasn't -- hold on --
14  that was an uninformed decision, okay, and we
15  now think that had we known about how Peggy
16  felt about Richard's errata sheets, based on
17  what she wrote in the Bar complaint, that had
18  we known her feelings at the time, we never
19  would have struck the deal, we would have
20  forced the motion and forced the ruling. Fine.
21      But that whole motion goes to her
22  perceptions and belief about the legitimacy
23  with regards to Richard's errata sheet and
24  Richard's deposition.
25      The motion is well taken.

Page 144

1      So I think you are entitled to go into
2  everything, and you've done an excellent job,
3  about her perception of the Bar complaint, her
4  perception of Richard's testimony.
5      We allowed you, and I didn't object to
6  going into her deposition testimony about the
7  errata sheets.
8      But now you are going into a whole
9  different field of fraud which you haven't
10  pled, David.
11      Show me in the motion where I'm wrong.
12      MR. MONDE: Rick, this deals directly with
13  Richard's errata sheets and her different
14  testimony about them.
15      MR. DIAZ: I'm sorry.
16      MR. ANDERSON: I don't get the connection.
17  You are in her errata sheets now.
18      MR. MONDE: Talking about his. Okay.
19  Guys, I am not sure what the confusion is
20  about. This is really straightforward.
21  It's -- it's --
22      The Bar complaint is about his errata
23  sheets. This testimony of hers is about his
24  errata sheets.
25      MR. ANDERSON: And you have gone through

Page 145

1  that.
2      Now you are asking her about the truth and
3  veracity of her signature on her errata sheets.
4      MR. MONDE: About his errata sheets.
5      MR. ANDERSON: That's not what we are in,
6  counsel. That's not what I see us in.
7      You are asking her about her errata
8  sheets.
9      MR. MONDE: Let me try one more time and
10  then you can jump in.
11      First, this is --
12      This is not the time or place to be
13  arguing about the motion.
14      But this is really simple. Our position
15  is that the errata sheets of Richard Harris are
16  the product of fraud and that they infect --
17  infected the whole trial.
18      MR. ANDERSON: I understand that.
19  But don't you --
20      Assuming I accepted your argument, don't
21  you have that with her testimony about those
22  sheets, and in fact counsel's own omnibus
23  motion basically says as much?
24      MR. MONDE: I'm not done yet, Paul. I'm
25  not done asking my questions.

37 (Pages 142 - 145)

Page 146

1    So she's talked about --
2    Hang on. Let me -- let me get a word in
3  edgewise.
4    MR. ANDERSON: But --
5    Are we off the record or on the record?
6    MR. MONDE: No, we are on the record.
7    MR. ANDERSON: Okay. Then what you are
8  pushing me towards is having to instruct her
9  not to answer any questions at all about her
10  errata sheets because you are putting her in a
11  position of having committed perjury as related
12  to her own situation.
13    MR. MONDE: I'm absolutely doing that.
14    MR. ANDERSON: Oh. See.
15    MR. MONDE: I'm absolutely doing that.
16  And it's her perjury regarding her husband's
17  errata sheets.
18    I'm not asking her --
19    Let me be really clear about this. Let me
20  be really clear.
21    I'm not asking her about errata sheet
22  changes she made that have anything to do with
23  anything other than Richard Harris' fraudulent
24  errata sheets. That's it.
25    I'm limiting my questions. I'm not going

Page 147

1  to ask Peggy Harris a single question about
2  changes she made to her deposition testimony
3  except as they relate to the core issue in
4  question on this motion, which is whether or
5  not Richard Harris' errata sheets were
6  fraudulent or not, and then the significance of
7  that. So that's it. I'm limiting it right
8  there.
9    If I ask one question of Miss Harris that
10  goes beyond her testimony about his errata
11  sheets, call me on it, stop me.
12    MR. ANDERSON: Yeah. But you are putting
13  me in a position of having to call you on it
14  anyway because they are her errata sheets that
15  you are on.
16    MR. MONDE: They are.
17    MR. ANDERSON: And while you question her
18  about his, I have no objection.
19    But now you are asking me to put my client
20  in a position that is untenable.
21    MR. MONDE: Paul, your client has given
22  what appears to me to be fundamentally
23  conflicting testimony under oath at different
24  times about her husband's errata sheets. And
25  I'm entitled to go into that. That's all I'm

Page 148

1  trying to do.
2    MR. ANDERSON: Okay. Well, I'm going to
3  respectfully disagree with you.
4    And to the extent you ask her about her
5  testimony related to her errata sheets, I'm
6  going to have to instruct her not to answer on
7  the grounds that she could be incriminating
8  herself.
9    MR. MONDE: Then have her take the Fifth.
10    MR. ANDERSON: I will have to.
11    MR. DIAZ: Let me make a suggestion. Is
12  lunch here?
13    MR. MONDE: No. No. No. No. I want to
14  resolve this, guys.
15    MR. DIAZ: I'm going to take a break.
16    MR. MONDE: Excuse me?
17    MR. DIAZ: Let's go. Let's take a break.
18    You don't want to accommodate me, you
19  don't want to be professional. We will take a
20  break. We have a right to take a break. We
21  are taking a break. How is that?
22    (Thereupon, Mr. Diaz and Mr. Anderson left
23  the deposition room.)
24    MR. MONDE: Let the record reflect that
25  Mr. Diaz stood up, leaned over into my side of

Page 149

1  the table in a way that I perceived to be
2  threatening, and then stormed out of the room.
3    We can now go off the record.
4    THE VIDEOGRAPHER: The time is 1:10, and
5  we are going off the record.
6    (Lunch recess 1:10 p.m. - 1:20 p.m and Ms.
7  Harris returned to the room."
8    THE VIDEOGRAPHER: The time is 1:20, and
9  we are back on the record.
10    MR. MONDE: Do you want to say something?
11    MR. ANDERSON: Well, counsel, I don't know
12  where you are going with all of this.
13    But let me state for purposes of where
14  you've been, we've been at this almost four
15  hours, and 90 percent of the focus of your
16  questioning has been related to errata sheets
17  signed by Richard Harris and thus. And you're
18  still there.
19    My client has answered every one of your
20  questions. She has confirmed her prior
21  testimony regarding all these issues.
22    And at this point, counsel, your questions
23  have become harassing, intimidating, and are
24  inappropriate. And so if you have questions
25  related to any subject other than the errata

38 (Pages 146 - 149)

Page 150

1 sheets, please ask them.
2    But as you ask continuing questions, and
3 you are welcome to certify those questions, as
4 you ask continuing questions about these errata
5 sheets, I'm going to instruct my client not to
6 answer on the basis I just outlined.
7    And we can have the judge decide whether
8 or not she needs to answer those questions.
9    MR. MONDE: I understand your position.
10    We will need to make a record for the
11 judge.
12    MR. ANDERSON: You are welcome to do that.
13    MR. MONDE: I should say I understand your
14 position and I disagree with it.
15    MR. ANDERSON: I didn't think you would.
16    But I want to be clear, I'm not trying to
17 stop you from asking questions regarding any
18 other subject matter that may be appropriate in
19 this proceeding.
20    MR. MONDE: And I want to make it clear
21 that I'm still asking about Richard Harris'
22 errata sheets.
23    MR. ANDERSON: Okay.
24    MR. MONDE: Which is --
25    MR. ANDERSON: I --

Page 151

1    MR. MONDE: Excuse me. Let me finish.
2    MR. ANDERSON: I thought you were done.
3 I'm sorry.
4    MR. MONDE: No. Let me finish.
5    I'm still asking questions about Richard
6 Harris' errata sheets which go to the core of
7 our motion.
8    And I'm still asking questions about those
9 errata sheets now having had the benefit of the
10 Bar complaint, okay, which we didn't have until
11 after the trial.
12    And so before we broke, you talked about
13 possibly instructing her on the basis of the
14 Fifth Amendment.
15    After the break, you're now saying that
16 I've been harassing, intimidating, which -- a
17 lawyer would take offense at, because the last
18 thing I would ever do is intimidate a witness.
19 I have never been accused of that before. So I
20 guess there is a first.
21    But I'm going to continue to ask my
22 questions and then you'll do what you need to
23 do.
24    MR. ANDERSON: I will.
25

Page 152

1 BY MR. MONDE:
2    Q   Mrs. Harris, would you please look at your
3 errata sheet, Exhibit 13, and your correction to
4 testimony at page 335 where you were testifying
5 about your husband Richard's errata sheets.
6    So in the deposition you were asked, do
7 you know how the errata sheets were prepared. You
8 said no in your deposition.
9    Then a little farther down on 335 you were
10 asked, "Is it fair you just don't know how those
11 errata sheets were prepared?" You said, "Correct."
12    And then you were asked, "So you just
13 don't know whether your husband was involved in the
14 preparation of the errata sheets?" And your answer
15 was, "I would say I'm not sure."
16    Then would you read your correction,
17 please?
18    MR. ANDERSON: I'm going to instruct her
19 not to because I want to let you finish your
20 question. I'm not sure it is even a question
21 at this point.
22    Do you have a question for her so that I
23 can possibly object?
24    MR. MONDE: Oh, it's a question. But I'll
25 rephrase it so that it's clear to you.

Page 153

1 BY MR. MONDE:
2    Q   In your deposition testimony you testified
3 that you had no idea how it was that your husband's
4 errata sheets were prepared. Do you recall that
5 from your testimony?
6    A   Yes.
7    Q   Then under oath after your deposition you
8 stated the following: "In discussions with Richard,
9 our attorneys prepared the errata sheets according
10 to Richard's instructions and reviewed them with
11 Richard. Richard verified that the errata sheets
12 were consistent with the testimony that he wanted to
13 give."
14    Now, you knew when you were giving that
15 correction that it was being done under oath because
16 you told me you signed these and understood what you
17 were signing, correct?
18    A   Correct.
19    Q   And that correction, whether it was
20 prepared by Tim Howard or Jaakan Williams or you,
21 that was false, correct?
22    MR. DIAZ: Form.
23    MR. ANDERSON: Stop. I'm going to object.
24    This has been a topic of discussion that
25 has been addressed multiple times in the last

39 (Pages 150 - 153)

Page 154

1    four hours. You have reached the point of
2    attempting to intimidate, and you are certainly
3    harassing Miss Harris.
4        And so I'm instructing her on that basis
5    not to answer the question.
6        MR. MONDE: Miss Harris, it's my duty as a
7    lawyer, as an officer of the court to abide by
8    that instruction. So I'm not going to ask you
9    additional questions about that.
10       I'm going to make clear that I would have
11   asked you if I had been permitted additional
12   questions regarding changes you made under oath
13   to your testimony about your husband Richard's
14   errata sheets.
15       And I want to make clear that my questions
16   would go no further than that.
17       To be clear, I don't want to ask you about
18   changes you made to your errata sheets on any
19   subject other than your husband Richard's
20   errata sheets.
21       And so there's no sense in trying to get
22   ahold of Judge Frank right now. We will go on
23   and finish our business. We will get this up
24   in front of Judge Frank. He will give us a
25   ruling. And then if permitted, I will come

Page 155

1    back and ask those questions.
2        Acceptable to you, Paul?
3        MR. ANDERSON: That's acceptable.
4        MR. MONDE: To be clear, we are leaving
5    the deposition open -- I'm leaving the
6    deposition open so that the instruction not to
7    answer can be ruled upon.
8        And what I'm hearing you say, Paul, is
9    that to perfect the record you are not going to
10   ask -- you are not going to require me to ask
11   the three or four additional questions I would
12   ask on the same topic about changes to her
13   testimony in the errata sheet?
14       MR. ANDERSON: Well, I'm not going to ask
15   you to do that. If you think that the law
16   requires you to do that -- I'm not here to give
17   you legal advise on what you should or should
18   not do.
19       MR. MONDE: I wasn't seeking your legal
20   advice.
21       I just don't want there to be any --
22       Let's be clear about this. I mean, I'm
23   focused on Volume 3. It's only two or three
24   pages long of errata sheets.
25       And so --

Page 156

1        MR. ANDERSON: Let me recommend, and you
2    can accept or reject my recommendation, that
3    you detail your questions for the court so that
4    we are not coming back and doing this again.
5        And perhaps there is a question you
6    actually have that is not something I think is
7    harassing or intimidating.
8        MR. MONDE: What have I done that's
9    harassing and intimidating?
10       MR. ANDERSON: It is the -- making this
11   witness go over and over the same thing again
12   hoping you are going to get, I guess, a
13   different answer. I'm not sure what your
14   motivation is.
15       But we have been at this four hours, and
16   you are asking her questions that you asked
17   four hours ago. And she answered those
18   questions. We objected to them.
19       And now you are getting -- you are going
20   again and again over the same thing.
21       You know, there is a point at which the
22   horse has left the barn on this issue, in my
23   estimation. And you've gotten what you're
24   going to get. So why beat it?
25       MR. MONDE: Because there's two horses.

Page 157

1    There are two horses.
2        There's the horse where she testified
3    under oath that she didn't know how her
4    husband's errata sheets were prepared. And
5    then there is the second horse. That second
6    horse hasn't been beaten, hasn't even been
7    touched except for two questions.
8        MR. ANDERSON: Okay.
9        MR. MONDE: I'm just fixing to get close
10   to the horse at this point.
11       And that second horse is -- testimony
12   completely different than the first horse.
13       The second horse is, oh, I do know exactly
14   how the process worked with my husband's errata
15   sheets. And that's what I want to ask her
16   about. Because I can't -- I can't reconcile
17   the two. Maybe you can. Maybe the judge can.
18       But I'm just trying to make a record so
19   that the judge understands our position that
20   from our viewpoint these sworn statements of
21   Miss Harris, first in her May deposition, then
22   in her July 2017 errata sheet, and then in her
23   Bar complaint, those are conflicting. And I'm
24   entitled to understand why and to probe into
25   that.

40 (Pages 154 - 157)

Page 158

1    And all you let me do is ask about the
2  deposition testimony, because you like that,
3  and the Bar complaint which she says, you know,
4  that's wrong. But you're not letting me ask
5  about the part in the middle that's
6  conflicting.
7    MR. ANDERSON: Well, I disagree with you.
8  Perhaps I just don't understand. I'm just a
9  country lawyer and, you know,
10  I don't understand the importance of errata
11  sheets, that if I understood correctly, never
12  went in in the first place. So -- I'm missing
13  something.
14    MR. MONDE: I can't claim to be a country
15  lawyer.
16    But I think we've hashed this out as much
17  as we can.
18    MR. ANDERSON: Okay. If judge Frank tells
19  her to answer, I'll have her answer.
20    MR. MONDE: All right. Then let me make
21  clear to Judge Frank that I would ask her to
22  confirm that her correction on the errata
23  sheet, that's Exhibit 13, her correction at
24  page 335, lines 12 through 17 where she says,
25  "In discussion was Richard our attorneys

Page 159

1  prepared the errata sheets according to
2  Richard's instructions and reviewed them with
3  Richard. Richard verified that the errata
4  sheets were consistent with the testimony that
5  he wanted to give."
6    I would ask Miss Harris to confirm that
7  that is a false statement.
8    Then, on 336, the lawyer asking the
9  questions in the deposition asked, "So is the
10  answer that you're not sure whether he knew
11  what he was signing?" And Miss Harris answered
12  in the deposition, "Again, I wouldn't think he
13  would sign unless he knew what he was signing."
14  And then there is a correction that says,
15  quote, "Richard knew exactly what he was
16  signing because our attorneys reviewed the depo
17  transcripts and the errata sheets with Richard
18  before he signed them and Richard verified that
19  the errata sheets were consistent with the
20  testimony he wanted to give."
21    I would simply ask Miss Harris to tell me
22  that that is a false statement, it was a false
23  statement when written, it is a false statement
24  today in her belief. And I have every reason
25  to think that she would agree with me based on

Page 160

1  her testimony up to this point.
2    And subject to conferring with my
3  co-counsel, I think that's the last question
4  I'd ask her on this.
5    So there you have it.
6  BY MR. MONDE:
7    Q   Let me see if you will indulge me on one
8  more question on her errata sheet. And that is,
9  Mrs. Harris, and don't answer until he says it is
10  okay, Mrs. Harris, do you agree that your errata
11  sheets, the errata sheets to your depositions, the
12  ones that we have just been talking about,
13  Exhibit 13, that those were written by your lawyers,
14  Tim Howard and Jaakan Williams, not by you?
15    MR. DIAZ: Object to the form of the
16  question.
17    MR. ANDERSON: Yeah, I think I'll extend
18  just for now the same objection in an abundance
19  of caution.
20    MR. MONDE: And so --
21    MR. ANDERSON: The same basis.
22    MR. MONDE: Understood.
23    And so we are at an impasse. I feel like
24  we've professionally defined the impasse,
25  Miss Harris.

Page 161

1    We will get it worked out with the judge.
2    I appreciate your patience with us as we
3  did this.
4    And I believe lunch is here.
5    MR. ANDERSON: Lunch is here.
6    MR. DIAZ: We should probably have a
7  discussion about whether we want to go ahead,
8  you, me, or whatever.
9    MR. ANDERSON: Yeah. I don't know. You
10  may have more questions.
11    MR. MONDE: I'm going to look to see what,
12  if anything, more I got.
13    MR. ANDERSON: Okay.
14    MR. MONDE: I can tell you this,
15  gentlemen, it wouldn't belong.
16    MR. ANDERSON: Okay. But if you guys want
17  to take the small conference room over there
18  and have your lunch and chat with each other,
19  you have a little privacy over there.
20    MR. MONDE: We appreciate it. Let's go
21  off the record.
22    THE VIDEOGRAPHER: The time is 1:35, and
23  we are off the record.
24    (Luncheon recess 1:35 p.m. - 2:11 p.m.)
25    THE VIDEOGRAPHER: The time is 2:11. We

41 (Pages 158 - 161)

Page 162

1  are back on the record.
2      MR. MONDE:  Paul, I think you wanted to
3  say something.
4      MR. ANDERSON:  Yeah. I gave it careful
5  thought while I ate my sandwich, and I think we
6  are going to withdraw our objection to your
7  line of questioning regarding Miss Harris'
8  errata sheets and let you go ahead and ask your
9  questions if you still want to ask them.
10     MR. MONDE:  I do. And I appreciate it.
11     MR. ANDERSON:  Sure.
12 BY MR. MONDE:
13     Q   So Miss Harris, let's go back to
14 Exhibit 13, please.
15     I wish we had almost numbered these.
16     But what I want to ask you about are the
17 questions relating to pages 335 of your deposition
18 and 336.
19     Paul, can you help her?
20     MR. ANDERSON:  She's almost there.
21     MR. MONDE:  Yup.
22     MR. ANDERSON:  Here, let me. See, this is
23 what we call lawyer abuse.
24     THE WITNESS:  Make it difficult --
25     MR. ANDERSON:  The only problem, John

Page 163

1  Morgan hasn't figured out how to sue somebody
2  for it.
3      MR. MONDE:  Yet.
4      MR. ANDERSON:  Yet.
5  BY MR. MONDE:
6      Q   All right. Miss Harris, you see that on
7  page 335, lines 12 through 17, in your deposition
8  you were asked, "Is it fair to say that you just
9  don't know how those errata sheets were prepared?"
10     And you answered, "Correct."
11     Do you see that?
12     A   Yes.
13     Q   And then you said --
14     Then the question was asked, "And you just
15 don't know whether your husband was involved in the
16 preparation of the errata sheets?"
17     The answer was, "I would say I'm not
18 sure."
19     Do you see that?
20     A   Yes.
21     Q   That was your testimony under oath in May
22 of 2017, correct?
23     A   Correct.
24     Q   Then in July of 2017, you changed your
25 answer to those questions, correct?

Page 164

1      MR. DIAZ:  I will object.
2      MR. ANDERSON:  I will object --
3      Go ahead and make the objection.
4      MR. DIAZ:  It says correction not changed.
5  That's a misleading question, and I object.
6      You can laugh all you want, sir. It's
7  misleading and you should know better.
8      It says correction, not change. And there
9  is a difference. Go ahead.
10     MR. ANDERSON:  I would view it more as
11 clarification than a change in testimony.
12     MR. MONDE:  Gentlemen, first of all, you
13 are arguing the same point. That contravenes
14 the spirit of our understanding.
15     MR. DIAZ:  I agree. I apologize. One of
16 us should --
17     MR. ANDERSON:  I'm still in the Christmas
18 spirit. I apologize.
19     MR. MONDE:  I'm starting to feel like
20 Grinch.
21     MR. TRAMMELL:  That's good.
22 BY MR. MONDE:
23     Q   Number two, I wasn't purporting to read
24 the word correction, but if that's how you would
25 like me to ask it, gentlemen, I'm happy to do it

Page 165

1  that way.
2      In July you corrected your answer,
3  correct?
4      A   Correct. Well, clarified it.
5      Q   Clarified it. All right.
6      Whatever adjective we want to put on it,
7  in July you swore to the following: "In discussions
8  with Richard, our attorneys prepared the errata
9  sheets according to Richard's instructions and
10 reviewed them with Richard. Richard verified that
11 the errata sheets were consistent with the testimony
12 that he wanted to give."
13     That was your testimony under oath as of
14 July 6th, 2017, correct?
15     A   Correct.
16     Q   When you said that our attorneys prepared
17 the errata sheets according to Richard's
18 instructions, that was false, wasn't it?
19     MR. DIAZ:  Objection. Form.
20     I'm sorry. Go ahead.
21     THE WITNESS:  No.
22 BY MR. MONDE:
23     Q   How so?
24     A   Well, they were there. They talked with
25 him.

42 (Pages 162 - 165)

Page 166

1    Q    But you testified in May that you didn't
2  know how the errata sheets were prepared and you
3  told me today that you didn't know.
4    A    Well, they did some corrections, you know,
5  clarifications.
6    Q    Miss Harris, which is it, do you know how
7  those errata sheets of your husband's were prepared
8  or do you not know?
9         MR. DIAZ: I object to the form. I think
10  it is misleading. I have to object. One
11  question.
12         MR. MONDE: Your objection has been noted.
13         MR. DIAZ: All right. Fine. It is a
14  misleading question.
15  BY MR. MONDE:
16    Q    Go ahead, please. Go ahead.
17    A    They did do -- they did -- they did
18  question -- they did question --
19         See, I'm getting all upset now.
20         MR. DIAZ: I'm sorry. I didn't mean to
21  trigger that.
22         THE WITNESS: No. Well --
23         The attorneys talked to my husband. I'm
24  not -- I don't know the term errata sheets, but
25  they went over his testimony.

Page 167

1  BY MR. MONDE:
2    Q    Miss Harris, my question is more simple.
3         Do you know -- do you know the process
4  that was used regarding your husband's errata sheets
5  or not?
6    A    Not the process; no.
7    Q    Do you know how those errata sheets came
8  to be?
9    A    No, I do not.
10    Q    Do you know how they came into your house?
11    A    No, I do not.
12    Q    Do you know if they were preprepared,
13  prepared in advance by Mr. Howard or were prepared
14  only after your attorney spoke with Mr. Harris?
15    A    No, I do not.
16    Q    Do you know if your husband was given the
17  opportunity to even see the errata sheet contents
18  before he signed?
19    A    I'm not sure. I was in and out, so I do
20  not know.
21    Q    Do you know whether the errata sheets were
22  the reflection of your husband's instructions or
23  whether they were prepared without any instruction
24  from your husband? Do you know?
25         MR. DIAZ: Objection. Form.

Page 168

1  BY MR. MONDE:
2    Q    Do you know?
3    A    That I do not know.
4    Q    Do you know whether any of your husband's
5  attorneys reviewed the errata sheets with your
6  husband?
7         MR. DIAZ: Form.
8         THE WITNESS: Again, I don't know.
9  BY MR. MONDE:
10    Q    And do you know whether your husband
11  verified that the errata sheets were consistent with
12  the testimony that he wanted to give?
13    A    I don't know.
14         MR. DIAZ: Form.
15         MR. MONDE: Thank you, ma'am.
16         Paul, I should make clear, may I also ask
17  the additional question that you instructed me
18  not to?
19         MR. ANDERSON: Yes, please.
20         MR. MONDE: Okay.
21  BY MR. MONDE:
22    Q    On page 336, lines two through ten there
23  were questions about -- I'm going down to the one
24  here at the bottom of the page. "Okay. So is the
25  answer that you're not sure whether he knew what he

Page 169

1  was signing?"
2         Your answer was, "Again, I wouldn't think
3  he would sign unless he knew what he was signing."
4         That was your testimony in May of 2017,
5  correct?
6    A    Correct.
7    Q    And then using the word -- on your errata
8  sheet you made a correction. And your correction
9  says as follows: "Richard knew exactly what he was
10  signing because our attorneys reviewed the depo
11  transcripts and the errata sheets with Richard
12  before he signed them."
13         Let me stop right here. Mrs. Harris, do
14  you know whether the attorneys reviewed the depo
15  transcripts and errata sheets with Richard before he
16  signed them?
17    A    I don't --
18         At this time I don't recall.
19    Q    And do you know whether Richard --
20         Well, I already asked that.
21         Did any --
22         I asked you these questions about the Bar
23  complaint, so I don't want you to think that I'm
24  reasking the same questions, or anyone else in the
25  room thinking that.

43 (Pages 166 - 169)

1     When you signed your errata sheet on
2 July 6th, 2017, and I should say errata sheets --
3     Where did you sign them?  Did you go to
4 Mr. Howard's office?
5     A   I don't remember.
6     Q   Who was there?
7     A   Again, I don't remember.
8     Q   When you did sign your name, you did
9 understand the importance of honoring your oath
10 where you said, "Under penalties of perjury I
11 declare that I have read the foregoing transcript
12 and hereby subscribe to same including any
13 corrections or amendments listed below."
14     You understood the import of what you were
15 signing?
16     A   Yes.
17     Q   You understood that you were giving
18 written answers that were different than your
19 deposition testimony, correct?
20     MR. DIAZ:  Form.
21     THE WITNESS:  Repeat that again.
22 BY MR. MONDE:
23     Q   I don't need to.  I will withdraw the
24 question.  Thank you.
25     Did anybody pressure you to sign your

1 errata sheets, Exhibit 13?
2     A   Not that I recall.
3     Q   Is it fair to say that you signed your
4 errata sheets under your own freewill?
5     A   I would say so.
6     Q   Fully aware of the consequences of giving
7 false corrections?
8     MR. DIAZ:  I will object.  I think that's
9 an intimidating question.
10     I think Mr. Andrews put you on notice
11 about this concern.  I know he raised it.
12     I got to tell you, I'm just raising an
13 objection because I think the tone of your
14 question and the form are both improper.
15     If you don't feel intimidated, answer the
16 question.
17     THE WITNESS:  I feel intimidated.
18     MR. DIAZ:  We started the deposition and
19 made her aware of the oath, and I think when
20 you come back and come at it again and again it
21 becomes intimidating, especially for a lady of
22 Ms. Harris' age.  But I made my record.
23     MR. MONDE:  The videotape and the
24 recording will reflect the only person who has
25 used an intimidating tone is you, Rick.

1     MR. DIAZ:  I strongly disagree.  You are
2 entitled to your opinion.
3     MR. MONDE:  I have a job to do.  I am
4 asking the questions just as politely and
5 respectfully as I know how to do and I've been
6 raised and mentored to do.  I know this --
7     MR. DIAZ:  Finish up.
8     MR. MONDE:  I know that neither of us are
9 supposed to be engaging in this kind of
10 dialogue right now.
11     MR. DIAZ:  Let me be very clear, because I
12 don't want to leave it unaddressed --
13     MR. MONDE:  That's where lawyers go south.
14     MR. DIAZ:  You will not go south and me go
15 north.  I will follow you, because we have a
16 record.
17     And it is improper to continually, during
18 a deposition or trial, remind a witness that
19 they are under oath.  They are sworn in at the
20 beginning of testimony, and if it's false there
21 can be consequences.
22     But to precede a question with a
23 recognition a remembrance that you are under
24 oath is intimidating, period.  There is no
25 reason for it.  There is no reason for it.

1     Go ahead.
2     MR. MONDE:  I didn't do that.
3     MR. DIAZ:  I think you did.
4     MR. MONDE:  I understand we are going to
5 agree to disagree.
6     MR. DIAZ:  100 percent.
7     MR. MONDE:  All right.  And as I was
8 taught to disagree without being disagreeable.
9     MR. DIAZ:  All right.  I'm smiling and
10 laughing.  I concur.
11     MR. MONDE:  All right.
12     MR. DIAZ:  All right.
13 BY MR. MONDE:
14     Q   If I asked you this already, I apologize.
15 I frankly just don't recall.
16     A   Join the club.
17     Q   Did the attorneys representing you prepare
18 these corrections to your errata sheets or did you
19 do this?
20     A   I don't recall.
21     Q   Okay.  Do you recall one way or the other
22 whether Tim Howard, Jaakan Williams or Ankur Mehta
23 came to your home on June 23rd and June 24th, the
24 days between the depositions to prepare your
25 husband?  Do you remember one way or the other?

44 (Pages 170 - 173)

1  A  I do not.

2  Q  Okay.  And do you remember --

3     The deposition on that Saturday morning,

4  as I recall, started at 11:15 -- a little after

5  11:00.

6     Do you recall one way or the other for how

7  long Tim Howard was in your home before the

8  deposition started at about 11:15?

9  A  No, I do not.

10    MR. MONDE:  Okay.  Because we resolved our

11 earlier impasse without the need to go to Judge

12 Frank, I have no further questions at this time

13 and may have some after your lawyers ask

14 questions.

15    But I appreciate your time today.

16    And, gentlemen, the only thing I ask is

17 that one of you ask questions.

18    MR. ANDERSON:  We anticipated that.

19    MR. MONDE:  Appreciate it.

20         CROSS EXAMINATION

21 BY MR. DIAZ:

22 Q  Ready, Ms. Harris?

23 A  Yes, sir.

24 Q  Same situation as before, meaning if you

25 need a break, let us know.  If my question is not

1  clear, let us know, and we will do our best to --

2  I'll do my best to change it.  All right?

3  A  All right.

4  Q  Okay.  First of all, how old are you

5  today?

6  A  Seventy-nine and three-quarters.  August,

7  I'll be 80.

8  Q  Okay.  And is your memory today about

9  events that occurred back in 2016 and '17 better

10 than it was back in 2017 when you did the errata

11 sheets, or has it gotten worse?

12    MR. MONDE:  Objection.

13 BY MR. DIAZ:

14 Q  Go ahead.

15 A  Worse.

16 Q  Okay.

17    MR. MONDE:  And, Mrs. Harris, I may have

18 some objections to Rick's questions, so just

19 give me a quick moment --

20    THE WITNESS:  Okay.  Okay.

21    MR. MONDE:  -- to intervene.  Thank you.

22 Because I don't want to interrupt your answer.

23 BY MR. DIAZ:

24 Q  And you're not an attorney; am I correct?

25 A  Correct.

1  Q  And when you hired Mr. Howard initially to

2  represent the estate -- Richard was still alive at

3  the time, actually -- were you relying upon him to

4  do his work as an attorney?  Were you expecting him

5  to do things competently and correctly?

6  A  Correctly, yes.

7  Q  Okay.  And, similarly, when you discharged

8  him for the reasons that you've discussed -- and I

9  may come back to those in a moment -- when you hired

10 Mr. Harris and you had your Bar complaint against

11 Mr. Howard, were you relying on J. B. Harris to, as

12 best he could with the information he had, file the

13 complaint that you wanted filed against Mr. Howard?

14 A  Yes.

15 Q  Okay.  And is that the reason -- and there

16 may be more reasons -- why you didn't read the Bar

17 complaint which was filed with the Florida Bar, at

18 least in part, when you didn't read it cover to

19 cover?

20    MR. MONDE:  Ob--- well, objection to form

21 and misstates prior testimony to the extent

22 you're asking about whether she read it before

23 she signed it, because that's --

24    MR. DIAZ:  Objection noted.

25

1  BY MR. DIAZ:

2  Q  Answer the question, ma'am.

3  A  Repeat it, please.

4  Q  Yes.  Is one of the reasons why you did

5  not read the Florida Bar complaint -- and there

6  might have been others -- was one of the reasons at

7  least when you did not read the Florida Bar

8  complaint cover to cover before it went --

9     Are you going to interrupt the question?

10    MR. MONDE:  I'm just waiting -- excuse me.

11 Excuse me.

12    MR. DIAZ:  Okay.  You're making hand

13 gestures, you're shaking your head, you're

14 distracting my questions, and I don't think

15 that's appropriate.  I think you can make the

16 objection when I finish my question.

17    MR. MONDE:  Mr. Diaz, first of all, my

18 hands have stayed motionless throughout your

19 question, number one.

20    MR. DIAZ:  Okay.

21    MR. MONDE:  Number two, I am at a loss to

22 understand your good-faith basis for suggesting

23 to this witness that she may have read the Bar

24 complaint before she signed it, just not cover

25 to cover.  What is your good-faith basis for

45 (Pages 174 - 177)

Page 178

1  that, sir?
2      MR. DIAZ: I'm not going to answer your
3  question, sir. I'm not the witness.
4      MR. MONDE: Well, then, I object to the
5  question and --
6      MR. DIAZ: Object.
7      MR. MONDE: -- and I'm really troubled by
8  it.
9      MR. DIAZ: I'm glad you are.
10 BY MR. DIAZ:
11     Q   Ms. Harris, before -- is one of the
12 reasons why you did not read the Florida Bar
13 complaint cover to cover is because when it was --
14 when you were assisted in sending it to the Bar by
15 Mr. Harris, was one of the reasons why you didn't
16 read it cover to cover was because Mr. Harris was
17 helping you do it and that's why you didn't read it
18 from page one to the last page?
19     A   Correct.
20     MR. MONDE: Objection to form.
21     MR. DIAZ: Okay.
22     THE COURT REPORTER: I didn't hear the
23 answer.
24     THE WITNESS: Correct.
25     MR. DIAZ: Correct? Okay.

Page 179

1      You can't have speaking objections, sir,
2  I'm sorry. Object to form all you want, but
3  you're interrupting my -- my cross. I think
4  it's inappropriate. You don't like my
5  questions because you don't like the answers
6  that are coming now against your interest in
7  this matter, and I'm sorry. The witness is
8  under oath. She's answering my questions. You
9  will have redirect.
10     MR. MONDE: May I please make a request of
11 you?
12     MR. DIAZ: You can make any request you
13 like, and it will be considered, but I also
14 have a request, and that is to allow me to
15 conclude my cross-examination.
16     MR. MONDE: Rick, may I please make a
17 request?
18     MR. DIAZ: Sure.
19     MR. MONDE: Would you please ask your
20 client to give me a brief opportunity to object
21 before she answers?
22     MR. DIAZ: Sure. Absolutely.
23     MR. MONDE: Thank you.
24     MR. DIAZ: Yeah.
25

Page 180

1  BY MR. DIAZ:
2      Q   Now, Ms. Harris, having now before today
3  looked at the Florida Bar complaint from cover to
4  cover, are there things or claims, allegations in
5  that Bar complaint that do not come from Peggy
6  Harris?
7      A   Correct.
8      Q   Okay. And is it fair to say that wherever
9  J. B. Harris might have gotten the information that
10 you don't subscribe to, you're not aware of, or that
11 you may not agree with, okay, that you don't know
12 what source Mr. Harris had for that part or those
13 insertions in the Florida Bar complaint?
14     MR. MONDE: Objection to form.
15     THE WITNESS: Correct.
16 BY MR. DIAZ:
17     Q   Okay. And you don't know if he got some
18 of his information from you and some from Jaakan
19 Williams, correct?
20     A   Correct.
21     Q   So when you were asked leading questions
22 on direct examination about something in the Florida
23 Bar complaint that you didn't subscribe to and you
24 were told that is false and you said "yes," is it
25 really that you just don't know if it's true and you

Page 181

1  don't know if it's false because it did not come
2  from you as a source to go into that complaint?
3      MR. MONDE: Objection to form.
4      THE WITNESS: Correct.
5  BY MR. DIAZ:
6      Q   Okay. So things that are in the Florida
7  Bar complaint that you signed that you didn't read
8  before it was sent which you don't subscribe to may
9  be true and may be false, you just don't know one
10 way or the other, correct?
11     MR. MONDE: Objection.
12     THE WITNESS: Correct.
13 BY MR. DIAZ:
14     Q   And if, for example, in one of those -- in
15 that complaint, let's say that, for example, Mr.
16 Howard was described as -- there was a description
17 --
18     Let me rephrase the question.
19     MR. MONDE: Dishonest and duplicitous?
20     MR. DIAZ: Nope. Well, we can use that.
21 BY MR. DIAZ:
22     Q   All right. Let's use Mr. Monde's
23 questions.
24     There are words describing Mr. Howard in
25 the Florida Bar complaint, "dishonest and

46 (Pages 178 - 181)

Page 182

1 duplicitous," right?
2   A   Right.
3   Q   Okay. Now, are those words -- before you
4 saw them in the complaint words that you had heard
5 before?
6   A   No.
7   Q   Okay. So those were J.B.'s words, not
8 yours?
9   A   Correct.
10   Q   Okay. Now, those are adjectives. They
11 describe. And do you agree that sometimes you and I
12 can see a same event, an identical event, you
13 describe it one way, I describe it another, but the
14 event doesn't change --
15       MR. MONDE: Objection to form.
16 BY MR. DIAZ:
17   Q   -- right?
18   A   Right.
19   Q   Okay. Now, do you know what "duplicitous"
20 means?
21   A   Not really.
22   Q   Okay. And so for someone to know what
23 J.B. meant by what was written, since you didn't
24 write the Bar complaint yourself, you don't know,
25 but we would have to ask J.B.; am I correct?

Page 183

1   A   Say the last part.
2   Q   We would have to ask J.B. what he meant by
3 that?
4   A   Correct.
5   Q   Now, you are familiar or are you not
6 familiar with the word --
7       MR. MONDE: Dishonest.
8 BY MR. DIAZ:
9   Q   -- "dishonest" or -- "dishonest,"
10 "disingenuous"?
11   A   I know that word.
12   Q   Now, whether or not you told J.B. that
13 that's how you felt about Howard, as you sit here
14 today, is that how you feel about Mr. Howard?
15   A   Correct.
16   Q   Is that how you felt about him when you
17 discharged him?
18   A   Correct.
19   Q   So does it make any difference whether it
20 was J.B.'s word or yours? Is that still an accurate
21 reflection of how you viewed Mr. Howard and the
22 reason -- one of the reasons why you got rid of him?
23   A   Correct.
24   Q   Okay. You were asked about some words in
25 the Bar complaint. I think some of the words were

Page 184

1 "fabricated," "fraudulent," and I think you
2 indicated on direct that those were words that you,
3 yourself would not have utilized, correct?
4       MR. MONDE: Objection to form.
5       THE WITNESS: Correct.
6 BY MR. DIAZ:
7   Q   And because this Bar complaint isn't
8 entirely, as we now know it, your complaint, let's
9 say, why don't you just tell us if you were today
10 talking to the Florida Bar sitting over here, and
11 they said "What are your complaints about
12 Mr. Harris" -- excuse me -- "Mr. Howard," what would
13 those complaints have been?
14       MR. MONDE: Objection to form.
15 BY MR. DIAZ:
16   Q   What would they have been?
17   A   I had a list of like four.
18   Q   Okay.
19   A   One -- first was -- give me a minute now
20 to get it in my mind.
21       The main one was the probate.
22   Q   Okay.
23   A   He had the case for four years, and he
24 should have done it probably two or less.
25       He billed me for the motel or bed and

Page 185

1 breakfast.
2   Q   Okay.
3   A   He called me after I had fired him, and I
4 understand that that's not -- you're not supposed to
5 do that.
6   Q   Okay.
7   A   And then another thing, which is kind of
8 superficial, but it really upset me, he verbally
9 abused Jaakan in my house, in front of me, with vile
10 language, and then he took it outside and continued
11 to do that.
12   Q   So the suggestion has been made here today
13 by counsel on direct that you file --
14       MR. MONDE: Excuse me.
15       MR. DIAZ: Excuse me.
16       MR. MONDE: Excuse me. I didn't hear --
17       MR. DIAZ: I'm not finished.
18       MR. MONDE: I --
19       MR. DIAZ: I'm not finished, sir.
20       MR. MONDE: But my question goes to the
21 prior answer.
22       MR. DIAZ: I'm sorry, go ahead. Raise
23 your objection.
24       MR. MONDE: I didn't hear what the witness
25 said.

47 (Pages 182 - 185)

Page 186

1   MR. DIAZ:  Do you have the witness'
2   answer, ma'am?
3   THE COURT REPORTER:  Yeah.
4   MR. DIAZ:  So the court reporter heard the
5   answer, right?
6   THE COURT REPORTER:  I have what I took
7   down.
8   MR. MONDE:  Rick, before you jump to the
9   conclusion, let's have the court reporter read
10  what she typed, which will explain why I'm
11  confused.
12  MR. DIAZ:  Go ahead, ma'am.
13  (Whereupon, the court reporter read back the
14  requested portion of the record.)
15  BY MR. DIAZ:
16  Q   "And took it outside to do that," was that
17  the end of your answer?
18  A   Yes.
19  MR. DIAZ:  The court reporter was able to
20  hear it and get it in the record.
21  THE COURT REPORTER:  That's what I heard.
22  MR. DIAZ:  Fair enough.
23  MR. MONDE:  Excuse me.
24  MR. DIAZ:  No, sir, I think the record is
25  going to start showing that you're being

Page 187

1   deliberately obstructive.  If the court
2   reporter could hear it and put in the
3   transcript, and you're saying you didn't, then,
4   you know, it comes to a point in time where
5   it's pretty clear what you're trying to do
6   here, and it ain't going to happen.
7   MR. MONDE:  Okay.  Are you done?
8   MR. DIAZ:  With what?  My questions?
9   MR. MONDE:  Your commentary.
10  MR. DIAZ:  I'm ready to ask the next
11  question.
12  MR. MONDE:  No, I'm -- we're going to
13  first look at what is on my screen in terms of
14  the last answer.
15  "And another thing, which is kind of
16  superficial, but it upset me, he ver- --
17  probably abused Jaakan in my house with
18  violent."
19  MR. ANDERSON:  Vile.
20  THE COURT REPORTER:  Vile.
21  THE WITNESS:  Vile.
22  MR. MONDE:  Okay.  But I didn't hear the
23  word "vile language," and my screen says
24  "violent," and so I just asked a question.  I'm
25  not impeding anything.  I'm just trying to -- I

Page 188

1   didn't hear it, guys.  I'm sorry.  I'm 60.  My
2   hearing is not great.
3   MR. TRAMMELL:  You don't look it.
4   MR. MONDE:  I used to be 6 feet tall, too.
5   MR. DIAZ:  Ready?
6   BY MR. DIAZ:
7   Q   So, Ms. Harris, if some were to -- were
8   those four complaints, either one, two, three, or
9   all four of those, in one way, shape, or form, even
10  though perhaps in -- not in your own words, were
11  those expressed to the Florida Bar in the complaint
12  against Mr. Howard?
13  MR. MONDE:  Objection.
14  THE WITNESS:  Not all of them.
15  BY MR. DIAZ:
16  Q   Okay.  Which ones weren't?
17  A   The last one with the foul language --
18  Q   All right.
19  A   -- and --
20  Q   But dropping the case in probate, sending
21  you a bill that he shouldn't have, and what was the
22  third one?
23  A   He -- having the case for four years.
24  Q   And the delay in getting the case --
25  A   Right.

Page 189

1   Q   Okay.  Were those all in the Bar
2   complaint?
3   A   Not the last one.
4   Q   The first three?
5   A   The following -- yes.
6   Q   And so if someone were to say that your
7   Florida Bar complaint was false or fraud, do you
8   agree or disagree with that --
9   MR. MONDE:  Objection.
10  BY MR. DIAZ:
11  Q   -- in terms of what you have just
12  complained about -- without going into the
13  conversations you had with J.B., but that were in
14  the complaint to the Bar itself, are those truths or
15  are those falsities?
16  A   Truth.
17  Q   Okay.
18  MR. MONDE:  I object to the form.
19  And, Rick, in those instances where Mrs.
20  Harris answers before I get to object, you're
21  not going to claim I was untimely, are you?
22  MR. DIAZ:  No, will not do so.
23  MR. MONDE:  Thank you.  I appreciate that.
24  MR. DIAZ:  Yes, sir.
25

48 (Pages 186 - 189)

Page 190

1 BY MR. DIAZ:
2     Q   Okay. At the time that your deposition
3 was taken and errata sheets were done, were you
4 aware of what errata sheets were?
5     A   No.
6     Q   Had you ever heard the word before?
7     A   No.
8     Q   Okay. And on direct examination, you've
9 been asked whether or not the errata sheets were to
10 change testimony?
11        THE COURT REPORTER: I'm sorry?
12 BY MR. DIAZ:
13     Q   You were asked about errata sheets
14 changing testimony. Do you believe now and did you
15 believe when you did your errata sheets that erratas
16 were not just to change testimony, but you could
17 correct testimony, you could clarify testimony, but
18 you could also change it?
19        MR. MONDE: Objection to form.
20        THE WITNESS: Correct.
21 BY MR. DIAZ:
22     Q   Yes?
23     A   Yes.
24     Q   Okay. And is that what you did at least
25 with regards to your or some of your deposition

Page 191

1 testimony?
2     A   Correct.
3     Q   Right?
4        Okay. And do you know one way or the
5 other whether Richard Harris had any more knowledge
6 about errata sheets than you did at the time that he
7 did his errata sheets?
8     A   I don't believe he did.
9     Q   Okay. I think you said that Jaakan
10 Williams had told you that in his opinion there was
11 some kind of nefariousness or something wrong or
12 fraud regarding Richard Harris' errata sheets. Do
13 you remember that testimony?
14     A   Yes.
15     Q   All right. Now, that was Mr. Williams'
16 opinions? Do you know one way or the other whether
17 Mr. Richard Harris' errata sheets were fraud?
18        MR. MONDE: Objection.
19 BY MR. DIAZ:
20     Q   Do you have the ability to even know that
21 one way or the other?
22     A   No.
23        MR. MONDE: Objec- -- excuse me.
24 Objection to form.
25

Page 192

1 BY MR. DIAZ:
2     Q   Okay. And you would not know, would you,
3 what reason, if any, Jaakan Williams might have had
4 for his own opinions and impressions about
5 Mr. Richard Harris' errata sheets, correct?
6     A   No.
7     Q   Okay. All right. Staying with the
8 Florida Bar complaint letter for now of May 25th of
9 '18, you indicated that you were uncertain if J.B.
10 or if you initiated a call to the Florida Bar. Do
11 you remember that?
12     A   Yes.
13     Q   And then you were asked some questions as
14 to whether or not -- it was sort of a leading
15 question about whether or not it was Richard, and
16 you said I -- it was J.B., I'm sorry, and you said
17 it might be.
18        I want to make -- I want to make -- be
19 very clear in my questions. I'm not asking you to
20 speculate or guess.
21        So on that topic, can you tell us as you
22 sit here today, to the best of your memory, one way
23 or the other, whether J.B. Harris initiated the call
24 to the Florida Bar to make the complaint against Mr.
25 Howard or was it you or do you just not know?

Page 193

1        MR. MONDE: I object to the colloquy. I
2 have no objection to the question.
3        THE WITNESS: I would say I don't know.
4 BY MR. DIAZ:
5     Q   You don't know one way or the other?
6     A   Correct.
7     Q   Thank you.
8        You were asked some questions about at the
9 time that you signed the Florida Bar complaint, you
10 had not read it carefully. I would like to explore
11 that a little bit. That can mean different things
12 to different people, and a judge is going to
13 read this transcript.
14        Is it A, you didn't look at it at all? Is
15 it B, you looked through it page by page and maybe
16 just kind of glanced through it? Can you describe
17 for us -- when you say you didn't read it carefully,
18 what do you mean by that?
19        MR. MONDE: Objection to form, including
20 misstates prior testimony.
21        THE WITNESS: I don't recall reading it
22 all --
23 BY MR. DIAZ:
24     Q   Okay. All right.
25     A   -- until recently.

49 (Pages 190 - 193)

Page 194

1   Q   Okay. And you said that when you looked
2   at it carefully the first time was a few days ago?
3       MR. MONDE: Objection to form.
4       THE WITNESS: Yes.
5   BY MR. DIAZ:
6   Q   And you read it two or three times?
7   A   Correct.
8   Q   Okay. And I just want to be very clear on
9   this. That's when you said that there were things
10  that you noted could not have come from you as a
11  source because you just didn't know if they were
12  true or false, correct?
13  A   Correct.
14  Q   You're not sitting here telling us, are
15  you, that you know for sure that something in that
16  Bar complaint that was alleged against Mr. Harris
17  was false, you're just saying that some of it that
18  comes from you was true, and that which does not
19  come from you may be true or may be false? Is that
20  a fair description of your views as to the Bar
21  complaint being true or being false?
22  A   Correct.
23      MR. MONDE: Objection to form.
24      THE COURT REPORTER: I'm sorry, I didn't
25  hear you.

Page 195

1       THE WITNESS: Correct.
2       (End of Volume I)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 196

1       CERTIFICATE OF OATH
2
3   STATE OF FLORIDA      )
4   COUNTY OF LEON        )
5
6
7
8       I, the undersigned authority, certify that
9   the above-named witness personally appeared before
10  me and was duly sworn.
11
12      WITNESS my hand and official seal this
13  14th day of January, 2020.
14
15
16
17
18
19      JUDY CHIN, RPR, CRR, FPR
        Notary Public
20      Commission #GG098479
        EXPIRES: MAY 25, 2021
21
22
23
24
25

Page 197

1
2       CERTIFICATE OF REPORTER
3   STATE OF FLORIDA    )
4   COUNTY OF LEON     )
5       I, JUDY CHIN, Registered Professional
6   Reporter, certify that the foregoing proceedings
7   were taken before me at the time and place therein
8   designated; that my shorthand notes were thereafter
9   translated under my supervision; and the foregoing
10  pages numbered 1 through 195 are a true and correct
11  record of the aforesaid proceedings.
12      I further certify that I am not a
13  relative, employee, attorney or counsel of any of
14  the parties, nor am I a relative or employee of any
15  of the parties' attorney or counsel connected with
16  the action, nor am I financially interested in the
17  action.
18      DATED this 14th day of January, 2020.
19
20
21
22
23      JUDY CHIN, RPR, CRR, FPR
        Notary Public
24      Commission #GG098479
        EXPIRES: MAY 25, 2021
25

50 (Pages 194 - 197)

Page 198

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3        I have read the foregoing transcript of
     my deposition and except for any corrections or
 4   changes noted on the errata sheet, I hereby
     subscribe to the transcript as an accurate record
 5   of the statements made by me.
 6
 7        _____
 8        MARGARET "PEGGY" HARRIS
 9
10        SUBSCRIBED AND SWORN before and to me
11   this ____ day of _____ _____, 20___.
12
13        _____
14             NOTARY PUBLIC
15   My Commission expires:
16
17   _____  _____
18   OFFICER
19   REASON FOR WITNESS'S NON-SIGNATURE
20   _____ WITNESS FAILED TO APPEAR
21   _____ WITNESS COULD NOT BE LOCATED
22   _____ WITNESS IS ILL
23   _____ WITNESS REFUSED TO SIGN
24   ____ OTHER _____
25
```

Page 199

```
 1        E R R A T A  S H E E T
 2   IN RE: HARRIS vs. R.J. REYNOLDS, et al.
 3   DATE: 2/13/2020
 4   PAGE  LINE  CORRECTION AND REASON
 5   ____  ____  _____
 6   ____  ____  _____
 7   ____  ____  _____
 8   ____  ____  _____
 9   ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23
24   _____
25   (DATE)    MARGARET "PEGGY" HARRIS
```

51 (Pages 198 - 199)

**[& - 333]**

**&**

**&** 1:20 2:15 5:24
  127:23

**0**

**000337** 5:22

**1**

**1** 1:15 4:8,14 10:6
  10:11 22:4,8
  109:8 197:10
**10** 4:8,17 112:25
  113:7 119:7
  124:11
**10,000** 42:4,5
  116:13 118:4,19
**100** 59:9 173:6
**107** 4:14
**109** 4:15
**10:38** 59:15,16
**10:49** 59:16,18
**10th** 17:8 21:15
  121:21
**11** 4:18 120:19,21
  121:16
**110** 4:16
**113** 4:17
**11:00** 174:5
**11:07** 73:15
**11:11** 76:24 77:1
**11:12** 77:1,2
**11:15** 174:4,8
**11:36** 97:7,9
**11:39** 97:9,10
**12** 4:19 38:7,25
  126:17 127:4
  140:16 158:24
  163:7
**12,000** 118:3,9,18
**120** 4:18
**127** 4:19

**12:12** 120:12,14
**12:14** 120:14,15
**12:20** 124:4,6
**12:41** 124:6,7
**13** 1:16 4:20 99:22
  133:20,22 134:1
  136:14 152:3
  158:23 160:13
  162:14 171:1
**133** 4:20
**13th** 5:5
**14** 4:9
**1420** 3:4
**14th** 196:13
  197:18
**15** 113:4 124:15
**1584** 1:20 2:15
  5:24
**16** 4:10 34:25 36:1
  130:15
**17** 140:16 158:24
  163:7 175:9
**174** 4:4
**1799** 2:20
**18** 4:11 21:6 24:18
  192:9
**19** 139:10
**195** 197:10
**197** 4:22
**198** 4:22
**199** 1:15 4:23
**1:10** 149:4,6
**1:20** 149:6,8
**1:35** 161:22,24
**1st** 97:22

**2**

**2** 4:9,15 14:19,21
  18:4 20:18 22:6
  109:20 135:4
**2/13/2020** 199:3

**20** 4:11 46:23
  49:12 50:6 80:3
  198:11
**2007** 38:7
**2007-44066** 38:9
**2009** 124:16
**2012** 105:10
**2014** 1:4 5:22
  38:25 39:2
**2015** 21:6
**2016** 45:11 46:2
  49:12 58:6,9 67:9
  96:17 107:9
  110:16 175:9
**2017** 58:11,14
  126:19 134:23
  136:7 137:23
  139:1 157:22
  163:22,24 165:14
  169:4 170:2
  175:10
**2018** 16:6,25 17:8
  18:19 19:10 21:15
  24:19 32:14 33:6
  34:25 36:2 40:24
  59:24 112:22
  119:7 120:19
  121:17,21
**2019** 4:18 62:17
  97:22 112:16
  113:3,4 124:16
  125:11,12
**2020** 1:16 5:5
  196:13 197:18
**2021** 196:20
  197:24
**20th** 46:2 49:23
  51:23 52:7 64:3
  78:3 79:16 96:10
  97:14,19,23 107:9
  109:9

**21** 107:9 109:21
  132:17 139:10
**21st** 64:3
**22** 107:9
**22,000** 118:7
**22nd** 64:3 79:16
  110:15
**23rd** 64:10 65:9,10
  126:19 173:23
**24th** 64:11 173:23
**25** 18:19 19:10,13
  46:23 196:20
  197:24
**25th** 63:22 64:14
  65:9,11 98:11
  192:8
**26th** 64:25 78:4
  80:4
**28** 110:6
**29** 39:2 67:9
  120:19
**29th** 121:17
**2:11** 161:24,25
**2nd** 35:9

**3**

**3** 4:10,16,18 16:17
  16:18 17:6 24:4
  28:10 110:16
  113:2 117:25
  122:4 135:20
  155:23
**30** 20:8 49:17
**30309-3053** 3:5
**305-444-7181** 2:11
**3127** 2:4,10
**32** 38:9
**32302-1799** 2:21
**32308** 1:21 2:16
**33134** 2:5,11
**333** 130:2,11,15
  138:12,16,17,18

**334** 138:12,16
139:11,20
**335** 131:12 139:20
140:16 152:4,9
158:24 162:17
163:7
**336** 159:8 162:18
168:22
**337** 1:4
**34** 4:12

**4**

**4** 4:11 18:4,5
**402** 132:13
**404-521-3939** 3:5
**419** 98:7,11,19
**44114-1190** 3:9
**4:07** 1:17

**5**

**5** 4:11 20:16,21,24
**5/23/17** 4:19
**5/25/18** 4:11
**5/29/18** 4:18

**6**

**6** 4:12 34:14,16
136:6 188:4
**6/25/16** 110:17
**60** 188:1
**614-469-3939** 3:9
**6th** 134:23 139:1
165:14 170:2

**7**

**7** 4:3,3,14 107:7,12
108:8,21 109:7
112:1,5
**708** 35:9
**78** 37:8
**786-303-8333** 2:5
**7th** 59:24

**8**

**8** 4:15 40:24 107:3
109:19,24,25
**80** 66:6 175:7
**800** 3:4
**850-510-2187** 2:21
**850-894-3000** 2:16
**8th** 16:6,25 23:4
24:19 32:14 36:4
59:23 121:21

**9**

**9** 4:16 110:14,23
111:5 112:2,6
**90** 149:15
**901** 3:8

**a**

**a.m.** 1:17 5:1,4
59:16,16 77:1,1
97:9,9
**abide** 154:7
**ability** 98:18
191:20
able 11:22 54:7
80:5 93:24 125:15
186:19
**absolutely** 13:23
32:8 40:20 42:16
48:1,24 80:22
146:13,15 179:22
**abundance** 160:18
**abuse** 162:23
**abused** 185:9
187:17
accept 156:2
**acceptable** 155:2,3
**accepted** 145:20
**accepting** 93:18
access 14:6
**accommodate**
11:19 48:22

148:18
**accuracy** 62:21
**accurate** 52:4
68:19 70:16 71:8
98:22 100:12
113:14,25 117:1
134:7 183:20
198:4
**accurately** 61:2
120:24
accuse 70:5
accused 151:19
**acknowledging**
26:19
**acknowledgment**
4:20,22 21:17
99:15 198:1
act 106:16
action 6:7 197:16
197:17
actual 78:19
added 15:5,10
addiction 38:11
additional 154:9
154:11 155:11
168:17
additionally
113:16
address 24:9,10
35:9,11
addressed 18:15
153:25
adequate 53:12
adequately 49:2
52:12 53:6
adjective 165:6
adjectives 182:10
administer 6:6
administration
4:13 34:22

admit 37:20
adrianne 128:22
advance 41:12
50:12 167:13
advice 155:20
advise 102:8
155:17
affiliations 6:11
affirm 6:21
affirmative 139:10
affirmed 7:1,19
aforesaid 197:11
age 171:22
ago 30:22 38:18
52:22 62:13 125:9
156:17 194:2
agree 5:13 26:21
27:6 28:13,16
39:18 59:6 67:20
71:16 93:3,20
106:8,21 113:23
114:15 159:25
160:10 164:15
173:5 180:11
182:11 189:8
agreed 66:10
113:20
agreement 41:12
ahead 9:19 27:18
46:18 60:4 94:6
161:7 162:8 164:3
164:9 165:20
166:16,16 173:1
175:14 185:22
186:12
ahold 154:22
ain't 187:6
al 1:9 5:19 199:2
alert 80:8 87:16
alive 38:12 67:17
68:5 176:2

[allegations - asked]                                                    Page 3

allegations  180:4
alleged  194:16
allman  35:1
allow  46:7 179:14
allowed  98:11
  144:5
allowing  39:3
  93:13
amendment
  151:14
amendments
  134:16 136:3
  170:13
amount  50:23
ample  30:24
anderson  1:20
  2:15,17 5:23 7:11
  7:11 11:4 12:1,9
  12:24 14:4,9,17,20
  15:3,4,9,15 16:13
  18:1,18,22 20:18
  22:8,10 25:19
  29:14,19 34:14
  43:23 44:15 45:1
  56:6,15,19 59:10
  60:5,12 61:8
  66:24 71:16,20
  72:9 73:3 76:21
  81:2,6,9,13,22
  82:7,12 84:4,8
  88:17,20,25 89:6
  90:3,6 91:18
  92:10,25 93:8
  94:1,13,22 99:3,14
  99:18 102:19,22
  103:3,7,11 108:12
  108:16,23 109:2,5
  111:18 114:21
  118:15 119:19,24
  120:7,11 122:1
  126:24 127:11,15

127:20 130:6,11
131:13,15 133:3
135:6,22 138:8,10
138:15,18 141:18
142:4,17 144:16
144:25 145:5,18
146:4,7,14 147:12
147:17 148:2,10
148:22 149:11
150:12,15,23,25
151:2,24 152:18
153:23 155:3,14
156:1,10 157:8
158:7,18 160:17
160:21 161:5,9,13
161:16 162:4,11
162:20,22,25
163:4 164:2,10,17
168:19 174:18
187:19
andrews  171:10
ankur  53:20 57:6
  63:7 65:16 68:10
  68:15 73:20 74:13
  74:16 76:7,13
  77:7 96:14 173:22
ann  7:24
annette  128:22
answer  9:19,20,24
  26:16 27:18 29:17
  55:14,15,25,25
  56:5,7,12 60:4
  67:1 69:19 70:24
  71:15 72:18,22,23
  81:24 82:21 84:7
  84:24 87:17 99:4
  111:3 115:6,7,9,11
  131:3 133:2 138:4
  138:23,25 141:11
  146:9 148:6 150:6
  150:8 152:14

154:5 155:7
156:13 158:19,19
159:10 160:9
163:17,25 165:2
168:25 169:2
171:15 175:22
177:2 178:2,23
185:21 186:2,5,17
187:14
answered  115:2
  115:12 130:19
  139:9,23 149:19
  156:17 159:11
  163:10
answering  179:8
answers  72:19
  98:23,25 139:8,14
  140:5 170:18
  179:5,21 189:20
anticipated  174:18
anticipating
  127:16
anticipation  118:3
  119:1
anybody  66:1
  170:25
anyway  55:20
  103:13 147:14
apart  99:14
apologize  102:16
  164:15,18 173:14
apparently  26:14
  26:14
appear  113:22
  114:14 198:20
appearance  6:15
  105:2,25
appearances  2:1
  3:1 6:11
appeared  196:9

appears  99:23
  147:22
apply  21:5
appreciate  13:9,19
  22:24 26:19 34:7
  70:6 71:24 92:18
  101:22 106:4
  120:9 161:2,20
  162:10 174:15,19
  189:23
appropriate  71:22
  93:4 150:18
  177:15
april  4:18 39:2
  62:17 97:22 113:2
  113:4 124:15
  125:12
areas  141:2
argue  90:19
arguing  145:13
  164:13
argument  145:20
armies  142:21
arrangements
  104:22
arthritis  122:7
articulate  142:18
aside  13:5 53:2
asked  10:8 23:1
  64:16 65:1 70:12
  78:16 90:7 91:7
  94:9 114:5,8
  115:2,11 117:19
  130:16 138:13,21
  139:21 152:6,10
  152:12 154:11
  156:16 159:9
  163:8,14 169:20
  169:22 173:14
  180:21 183:24
  187:24 190:9,13

192:13 193:8
**asking**  9:9 14:14
  42:17 48:17 50:2
  64:21 71:12,21
  78:8 98:7 145:2,7
  145:25 146:18,21
  147:19 150:17,21
  151:5,8 156:16
  159:8 172:4
  176:22 192:19
**asks**  25:1
**assess**  82:2
**assigned**  39:2
**assistance**  19:9,14
  19:20
**assisted**  178:14
**associate**  53:20
  57:5 63:7 73:20
**associated**  116:2
**associates**  50:9
  66:8 127:24
**assume**  17:4 20:6
**assuming**  145:20
**assure**  56:15
**ate**  162:5
**atlanta**  3:5
**attached**  25:9,11
  36:16 37:6 38:23
  119:5
**attempting**  113:19
  116:23 154:2
**attending**  6:10
**attorney**  6:16
  19:20 22:23 25:14
  29:14 36:24 45:2
  66:24 71:5 81:23
  86:1 87:7 88:8,17
  90:1 91:22 92:5
  93:9 95:8 102:5
  167:14 175:24
  176:4 197:13,15

**attorney's**  29:18
**attorneys**  43:25
  46:7 89:15 91:23
  139:6,12 140:3
  153:9 158:25
  159:16 165:8,16
  166:23 168:5
  169:10,14 173:17
**audacity**  118:6
**audio**  5:11,12
**august**  17:8 21:6
  21:15 24:18
  112:22 175:6
**authority**  196:8
**authorization**
  100:9
**authorize**  117:20
**authorized**  6:6
  117:14
**autopsy**  116:2
  118:4,9
**avenue**  3:8
**avoid**  72:6
**aware**  77:21,24
  122:19,23 123:4,8
  171:6,19 180:10
  190:4

**b**

**b**  124:16,17 125:2
  176:11 180:9
  193:15
**back**  12:18 13:7
  13:16 40:21 49:25
  59:17 73:9,12,15
  73:17 77:3 81:7
  83:4 85:16 92:17
  96:17 97:11
  101:20 103:17,23
  105:18 109:1
  117:24 120:16
  124:8 125:11

135:19 141:19
  149:9 155:1 156:4
  162:1,13 171:20
  175:9,10 176:9
  186:13
**backdoor**  44:15
**background**  79:2
**bad**  19:6
**baker**  64:2
**bar**  4:10,11 15:5
  16:5,5,16 17:7,10
  17:11,19,23 19:5,8
  19:14,16,21 20:2,5
  20:10,11 21:14,16
  21:23,24 22:23
  23:3,14,21,25
  25:13 28:4,10
  29:5,24 30:10,18
  31:21 32:13 36:5
  36:11,16,23 37:6
  38:23 40:24 48:10
  52:9 59:23 60:17
  62:12,15,20 66:18
  70:20 73:19 80:24
  81:18 82:23 88:7
  99:24 102:19
  104:10 112:22
  118:2,14 119:18
  120:6 122:4,14
  124:17 125:8,12
  125:16 128:14
  143:17 144:3,22
  151:10 157:23
  158:3 169:22
  176:10,16,17
  177:5,7,23 178:12
  178:14 180:3,5,13
  180:23 181:7,25
  182:24 183:25
  184:7,10 188:11
  189:1,7,14 192:8

192:10,24 193:9
  194:16,20
**barn**  156:22
**based**  29:17 31:16
  32:15 36:10 46:21
  72:4 77:23 84:21
  98:22 100:11,14
  100:19,22 101:7
  101:11 121:16
  141:6 142:5
  143:16 159:25
**basically**  145:23
**basis**  41:10 45:6
  47:23 48:16 70:1
  71:15 90:18 150:6
  151:13 154:4
  160:21 177:22,25
**bathroom**  57:22
**bear**  36:13
**beat**  115:9 156:24
**beaten**  157:6
**becausejusticem...**
  2:17
**bed**  30:5 47:12
  184:25
**bedridden**  47:8
  49:22
**bedside**  48:21
**began**  5:1 45:11
**beginning**  6:15
  172:20
**behalf**  2:3,9,14,19
  3:3 7:4 20:3,7
  22:22 38:7 91:9
**belief**  21:23 61:5
  72:4 109:14
  114:12 143:2,22
  159:24
**beliefs**  59:25 60:11
  60:19

[believe - changes]                                    Page 5

**believe**  17:19
    19:25 20:4 30:1
    35:6,6 40:11 41:5
    41:6,24,24 42:4
    55:11 63:13 70:15
    70:15 71:7 72:10
    73:23,25 74:1,13
    74:16,19 75:1,7
    77:17,24 86:5
    88:14 89:24 93:7
    93:14 95:23
    100:12,25 113:13
    113:24 114:1
    116:25 118:8
    125:2,21 126:1
    128:16 131:22
    137:10,16,17
    161:4 190:14,15
    191:8
**believed**  59:24
    79:24 84:21 85:8
**belong**  161:15
**benefit**  151:9
**best**  19:12 20:1
    29:2 38:15,16
    39:17 40:2 42:24
    49:16 50:2,15,22
    51:8,14 58:23
    65:12 66:15 75:22
    89:8 101:23
    103:13 105:17
    114:12 142:18
    175:1,2 176:12
    192:22
**better**  12:8 14:11
    61:10 70:13 79:7
    108:25 111:9
    120:11 135:21
    164:7 175:9
**beyond**  61:21 62:4
    147:10

**big**  30:4
**bill**  41:8,22,23,25
    42:7,10,15 104:5
    114:6 116:4,6,9,11
    188:21
**billed**  30:4 184:25
**bit**  79:2 88:6
    193:11
**blackberry**  102:12
**blank**  108:15
    136:17
**block**  12:1
**bob**  59:11
**border**  37:11
    43:19,19
**bottom**  19:2 95:6
    108:22 168:24
**boulevard**  1:20
    2:4,10,15 5:25
**box**  2:20 24:12,21
**brad**  3:10 7:5
**brain**  66:6
**breached**  113:18
**break**  9:12,14 46:7
    54:8 57:2 58:21
    58:22 78:19 79:12
    88:5 92:12 94:16
    109:2 123:23
    124:3 140:20
    148:15,17,20,20
    148:21 151:15
    174:25
**breakfast**  30:5
    185:1
**breaks**  59:8
**brief**  59:16 77:1
    97:9 120:14 124:6
    179:20
**bring**  10:9 11:1
**broke**  40:20
    151:12

**business**  154:23
**buzzing**  85:18
**bwharrison**  3:10

**c**
**c**  119:18,23
**ca**  1:4 5:22 38:9
**calculated**  143:9
**call**  10:7 13:16
    37:3 89:16 91:4
    92:13 101:19,24
    103:15,25 116:6
    147:11,13 162:23
    192:10,23
**called**  14:15 19:18
    89:19 102:15
    103:22 105:21
    113:1 116:8 185:3
**calls**  12:18
**camel's**  40:21
**canceled**  34:1
**candor**  93:7
**capacity**  8:5
**car**  85:17,18
**carbon**  19:1
**care**  30:8
**careful**  79:4 162:4
**carefully**  193:10
    193:17 194:2
**carter**  65:1
**case**  1:4 5:21 8:24
    18:9,16 29:6 30:5
    30:8 32:25 36:7
    38:9,17,20,25 39:2
    39:11,25 40:7,13
    41:7 43:6 44:7
    49:2 52:11 70:20
    78:12 96:13 97:1
    97:25 98:2,2
    100:14,24 101:2,8
    104:5,12,18
    105:14,21 106:23

112:15 122:18
    124:15 126:10,11
    184:23 188:20,23
    188:24
**cases**  44:18,24
    95:5 96:19,22
    101:13 105:12
    123:10,10
**cash4cases**  4:11
    20:17
**catheter**  47:17
**cause**  113:13
**caused**  38:11
**causes**  10:2
**caution**  160:19
**cellphones**  5:9
**certain**  10:9 27:11
    123:12
**certainly**  154:2
**certainty**  19:23
**certificate**  4:22
    196:1 197:2
**certified**  7:2,20
**certify**  150:3
    196:8 197:6,12
**challenges**  98:18
**chance**  83:6 93:23
**change**  57:16
    72:16 164:8,11
    175:2 182:14
    190:10,16,18
**changed**  98:24
    163:24 164:4
**changes**  23:21
    66:9,9 69:2,4
    74:22 75:4,8
    131:20 133:12,17
    134:6 137:4,4,12
    139:8,14 140:5
    146:22 147:2
    154:12,18 155:12

[changes - completely]

198:4
changing  55:8
  56:24 190:14
chat  161:18
check  57:22
checked  24:12,15
  24:21
chin  1:24 6:4
  196:19 197:5,23
christian  37:22
christina  127:25
  128:20
christmas  164:17
cigarette  38:10
cigarettes  8:7
  38:12
circuit  1:1,1 5:19
  5:20,21 39:1
circulation  14:5
cited  118:25
civil  1:2 5:21
  96:22,25
claim  43:15 143:2
  158:14 189:21
claiming  141:5
claims  180:4
clarification  15:12
  15:19 102:4
  164:11
clarifications
  166:5
clarified  139:7,14
  140:4 165:4,5
clarify  87:20
  190:17
clause  52:25 53:5
clean  32:7 89:5
cleaned  55:12
cleaner  120:8
clear  9:23 13:8
  15:4 18:3 56:8,9

62:15 71:25 87:23
  89:2 90:18 93:14
  102:14 107:14
  111:3 114:23
  115:1 116:11
  121:16 125:5
  129:2 146:19,20
  150:16,20 152:25
  154:10,15,17
  155:4,22 158:21
  168:16 172:11
  175:1 187:5
  192:19 194:8
clearly  56:12
cleveland  3:9
client  29:14 56:11
  59:7 66:24 81:23
  88:17 90:1 91:22
  92:5 93:15 102:5
  113:18 147:19,21
  149:19 150:5
  179:20
close  12:18 13:13
  157:9
closer  11:25 12:12
  89:17
club  173:16
clue  24:22 50:11
  74:2 96:12 112:10
clueless  54:13
  136:19
coaching  70:5
coerce  28:3
collaborated
  121:2
colleague  64:2
  65:1
collected  123:13
collecting  41:14
colloquy  193:1

combined  118:7
come  11:17 39:19
  51:25 52:1 68:1
  77:9 86:16 117:19
  154:25 171:20,20
  176:9 180:5 181:1
  194:10,19
comes  70:23 118:9
  187:4 194:18
comfort  11:8
  62:13 83:6
comfortable  90:9
coming  66:2
  133:16 156:4
  179:6
commentary
  187:9
commission
  196:20 197:24
  198:15
commit  117:9
commitment  9:7
committed  116:22
  146:11
communication
  20:10
communications
  21:16,24 87:3
community
  113:17
company  1:9
competent  39:11
  39:25 40:6,12
  41:7 42:20 142:20
competently  176:5
complained
  189:12
complaining  25:2
  104:6
complaint  4:10
  15:6 16:5,16

17:10,23 19:21
  20:11 21:15,25
  22:22 23:3,14,21
  23:24 24:1,13
  25:14 28:4,10
  29:5,25 30:11,18
  31:21 32:14 36:5
  36:11,16,23 37:6
  38:24 40:24 48:10
  52:9 59:23 60:18
  62:12,16 66:18
  70:17 73:19 80:24
  81:19 82:24 88:7
  102:19 104:10
  112:22 118:2,14
  119:18 120:6
  122:4 124:17
  125:8,12,17
  143:17 144:3,22
  151:10 157:23
  158:3 169:23
  176:10,13,17
  177:5,8,24 178:13
  180:3,5,13,23
  181:2,7,15,25
  182:4,24 183:25
  184:7,8 188:11
  189:2,7,14 192:8
  192:24 193:9
  194:16,21
complaints  70:20
  184:11,13 188:8
complete  25:25
  26:10 37:13 39:7
  39:16 42:23 44:9
  45:17 48:23 49:4
  53:9 54:3 57:10
  66:20 69:10 73:24
  77:18
completely  157:12

[complex - correct]

complex  39:11,25
  40:7,13 41:7
complicate  69:19
composite  18:4
  20:17
compounded
  87:14
comprehend  80:6
comprehension
  77:12 80:25 81:19
  82:3,17
concentrating
  10:18
concern  10:2
  109:17 171:11
concerned  33:17
concerning  20:25
concerns  111:4
conclude  179:15
conclusion  186:9
concocted  95:18
  95:21 112:9,21
concoction  86:4
  87:10 95:15
concnr  173:10
conference  161:17
conferring  160:2
confirm  15:2
  124:19 158:22
  159:6
confirmed  62:21
  149:20
conflicting  147:23
  157:23 158:6
confuse  9:8 33:2
confused  186:11
confusing  108:3
  130:12 142:16
confusion  144:19
connected  197:15

connection  8:12
  17:23 41:13 80:24
  81:18 82:23 84:2
  144:16
consequences
  171:6 172:21
considered  179:13
consistent  106:17
  115:19 139:9
  153:12 159:4,19
  165:11 168:11
consumer  19:20
contact  19:4,16
  39:5 105:11
contacted  20:2
contained  38:12
  125:17
contains  17:6
  125:20
content  28:23
  32:19
contents  167:17
context  84:15 89:3
contingency  41:9
continually
  172:17
continue  5:12
  12:17 59:20 94:15
  103:3,17 151:21
continued  3:1
  185:10
continuing  150:2
  150:4
contract  20:25
  113:18 122:24
  123:9,11
contrary  41:20
contravenes
  164:13
controversy  11:16

conversation
  42:12 86:23 89:10
  89:14
conversations  5:8
  32:23 91:23
  189:13
cooperate  91:13
copies  120:18
copy  16:5,9 19:1
  31:21 32:7 35:5,8
  107:4 120:8,11,19
coral  2:5,11
core  147:3 151:6
corner  130:10
correct  8:1,8,9,13
  8:20,21 9:2 10:20
  14:18 16:6,7,10
  17:17,24 18:9,16
  19:3 21:2,4 23:8
  23:19 24:2,7,8,10
  24:11,19,20,24,25
  25:8,9,12,16,25
  26:3,4,5,6,9,11,13
  26:24 27:4,7,8,11
  27:12,15,19 28:1
  30:15 31:5,17
  32:17 33:7,10
  35:5,9,11,12,16,17
  35:21 36:7,8,12,25
  37:3,13 38:4,15,21
  39:7,16 40:2
  41:16 42:6,23
  44:8,10,12,13
  45:17,18 46:2,3
  47:9,13 48:23
  49:4 51:19 52:8
  52:14 53:8 54:3
  56:25 57:9,19
  59:22 60:25 61:3
  61:6,17 62:13,14
  62:17,18 63:20,23

  64:11,12,14,17,21
  64:22,22 66:20
  67:6,14,25 68:23
  69:7,10,21 71:12
  71:13,14,18 72:4
  72:11 73:24 74:5
  76:2,3 77:10,17
  78:2,5,9,21 79:7
  79:19 83:19 86:6
  89:12 95:13 96:14
  99:12,13,13 100:7
  100:9,10 104:20
  106:20,23,24
  108:11,11 109:12
  110:11 112:2,3,23
  114:16 116:16
  118:10,11 119:7,8
  120:25 121:19
  124:20,25 125:9
  125:10,14,17,19
  125:24,25 126:2,4
  126:7,10,13,21
  127:8 128:4,5,8
  129:16,19,21,22
  129:25 130:1
  132:4,10,12,24
  133:10,13 134:9
  134:10,17,18,20
  134:23,24 135:3
  135:10,11,18
  136:4,8 138:1,3
  139:15,17,21,24
  140:10,14 152:11
  153:17,18,21
  163:10,22,23,25
  165:3,4,14,15
  169:5,6 170:19
  175:24,25 178:19
  178:24,25 180:7
  180:15,19,20
  181:4,10,12 182:9

182:25 183:4,15
183:18,23 184:3,5
190:17,20 191:2
192:5 193:6 194:7
194:12,13,22
195:1 197:10
**corrected** 138:25
165:2
**correction** 54:18
138:6 139:2,5
140:1 152:3,16
153:15,19 158:22
158:23 159:14
164:4,8,24 169:8,8
199:4
**corrections** 134:5
134:16 135:1,2,16
135:16 136:3,10
166:4 170:13
171:7 173:18
198:3
**correctly** 24:9
83:16 132:19
158:11 176:5,6
**cost** 113:19 115:22
116:1 118:7
**costs** 21:11 41:13
114:16 119:2
**counsel** 5:17 6:9
13:1 15:4,16
18:18 39:4 76:22
140:21 141:10
145:6 149:11,22
160:3 185:13
197:13,15
**counsel's** 145:22
**conntry** 158:9,14
**county** 1:2 5:21
33:23 34:19 38:8
39:1 196:4 197:4

**couple** 9:4 31:11
31:14
**course** 100:23
**court** 1:1 5:19 6:4
6:17 8:18,23
33:24 34:20 35:8
39:1,3 40:18 41:3
56:1 67:13 97:22
113:6 116:23
117:9 154:7 156:3
178:22 186:3,4,6,9
186:13,19,21
187:1,20 190:11
194:24
**cover** 176:18,19
177:8,8,24,25
178:13,13,16,16
180:3,4
**create** 117:7
**creations** 6:2
**criminal** 84:16
**cross** 4:4 87:15
174:20 179:3,15
**crossing** 115:14,17
**crr** 1:24 196:19
197:23
**cure** 53:17
**cures** 72:22
**curious** 83:1
**currently** 24:14
**cut** 94:5

**d**

**d** 4:1
**dade** 38:8
**date** 33:20 112:18
119:4 126:20
136:6,18 199:3,25
**dated** 17:1,7 19:10
34:25 36:1 110:16
134:23 197:18

**dates** 19:6 33:14
**datewise** 86:13
119:14
**david** 3:6 7:3
144:10
**day** 3:4,8 7:4,6
10:21,22 17:3
39:13 42:22 47:5
49:12 50:1,7,10,13
51:25 52:1,2
54:17 63:24 64:17
68:11 96:9 97:18
97:24 109:8,20
110:15 139:7,13
140:4 196:13
197:18 198:11
**days** 20:8 30:22
62:13 64:2 65:23
66:3 68:10 78:22
79:15,22 98:6
105:15 125:9
173:24 194:2
**de** 2:4,10
**dead** 43:19,19
**deal** 91:15 143:5
143:19
**dealing** 143:1
**dealings** 100:11
**deals** 144:12
**death** 45:12 77:12
**deceiving** 106:17
**december** 38:7
**deception** 106:10
**deceptive** 27:10
100:2,13 101:1,8
**decide** 35:19 150:7
**decided** 11:18
119:15
**decision** 142:21
143:10,14

**declare** 25:24
134:14 136:1
170:11
**declaring** 26:8
135:15
**decline** 29:17
**deed** 12:10
**defendant** 3:3
**defendants** 1:9
**defending** 96:25
**defer** 90:4
**define** 62:24
**defined** 160:24
**defines** 106:15
**definition** 74:12
106:8,18
**degeneration**
98:14
**delay** 41:2 188:24
**deliberately** 187:1
**demand** 114:15
**demonstrate**
40:12 41:6
**depend** 98:15
**depends** 27:7,9
**depo** 4:19 93:9
139:6 140:3
159:16 169:10,14
**deponent** 4:20,22
198:1
**deposition** 1:14
4:8,9,19 5:11,16
5:23 9:4 10:7,8
11:15,20 14:25
22:9,10 45:23
49:11 50:7,9,24
51:23 52:7 54:20
54:23 55:7 58:5
58:11,14,18 64:1
65:6,18 66:2,10
69:5 70:8 73:7

[deposition - discussion]

74:17 78:1,6 80:2
80:16 87:9 91:3
96:9,25 97:18,24
98:5,19,24 101:15
105:9 108:10
109:8,20,21
110:15 126:9,15
126:18 127:8
128:4,7,16 129:5
129:12 130:3,18
131:6,21 133:11
133:12,17 134:5
134:15 136:2
137:23 138:21
139:13,20,22
140:24 141:1,7,13
142:22,23 143:24
144:6 147:2
148:23 152:6,8
153:2,7 155:5,6
157:21 158:2
159:9,12 162:17
163:7 170:19
171:18 172:18
174:3,8 190:2,25
198:3
**depositions** 45:14
46:1,6,11,24 47:24
48:21 49:23 53:19
57:5 63:7 64:9,13
73:20 86:3 95:10
107:8 160:11
173:24
**describe** 182:11
182:13,13 193:16
**described** 120:24
181:16
**describing** 181:24
**description** 4:7
49:16 118:8
181:16 194:20

**designated** 197:8
**detail** 156:3
**details** 45:20
**deteriorate** 45:12
**determine** 86:22
**diagnose** 82:3
**dialogue** 172:10
**diarrhea** 47:5
**diaz** 2:10 4:4 7:9,9
11:10,13 12:3,8,11
12:14,17,21 13:9
13:15,23 14:3,12
27:16 43:18 46:16
52:15 54:24 55:10
55:15 56:4,14,16
56:20 59:9,11
60:2,13,20 61:7,15
62:6 69:13,23
70:3,10 71:19,21
72:2,8,17 73:4,10
81:15 83:21 84:3
84:22 85:3,9,13,21
86:18,25 87:20
88:3 90:4,24
91:19 92:1,11,22
93:1 94:16,20
96:7 99:2 102:4
102:16,21,24
103:1 104:15,19
104:22 105:3,8,24
106:2,5 107:5
110:2,12,21 111:6
111:13 113:3
114:20,25 115:6
115:15 117:12,16
117:21 121:25
123:17 125:22
126:3 129:6
137:13,19 139:16
140:9,13,18
141:17,24 142:6,8

144:15 148:11,15
148:17,22,25
153:22 160:15
161:6 164:1,4,15
165:19 166:9,13
166:20 167:25
168:7,14 170:20
171:8,18 172:1,7
172:11,14 173:3,6
173:9,12 174:21
175:13,23 176:24
177:1,12,17,20
178:2,6,9,10,21,25
179:12,18,22,24
180:1,16 181:5,13
181:20,21 182:16
183:8 184:6,15
185:15,17,19,22
186:1,4,12,15,19
186:22,24 187:8
187:10 188:5,6,15
189:10,22,24
190:1,12,21
191:19 192:1
193:4,23 194:5
**dice** 89:5
**dictate** 130:25
**dictated** 138:22
**dictionary** 106:8
**difference** 14:8
99:25 164:9
183:19
**different** 51:5,6
55:21 59:3,3
79:20 92:23 108:2
115:9 125:3 144:9
144:13 147:23
156:13 157:12
170:18 193:11,12
**differently** 38:3

**difficult** 50:19
162:24
**digest** 31:13 83:9
**dipping** 92:2
**direct** 4:3 7:21
180:22 184:2
185:13 190:8
**directly** 19:18
144:12
**disagree** 90:12
142:6 148:3
150:14 158:7
172:1 173:5,8
189:8
**disagreeable**
173:8
**disagreed** 32:5
**disagreements**
72:16
**disappoint** 83:14
**disappointed**
83:11 104:3,9
**disbarred** 29:8
30:14
**discharged** 176:7
183:17
**disclose** 39:14
44:6
**disconcerting**
55:18
**disconnected** 12:9
13:12
**discovery** 45:13
142:24
**discuss** 93:17
**discussed** 31:19
86:11 97:17 176:8
**discussion** 45:21
59:7 73:6 97:17
141:15 153:24
158:25 161:7

[discussions - exactly]                                                    Page 10

discussions  153:8
  165:7
dishonest  100:2,14
  101:1,9 181:19,25
  183:7,9,9
disingenuous
  183:10
dismissal  4:13
  34:22 41:4
dismissing  40:25
dispute  122:20
dissatisfaction
  30:8
distracting  177:14
division  1:2 5:21
dmmonde  3:6
doctor  82:2
document  10:19
  11:1 23:2
documents  10:9
  10:24 14:15,20
  15:2 20:16,25
doing  29:9 40:10
  54:23 55:8,16
  76:16 79:9 82:11
  93:13 122:9
  128:18 146:13,15
  156:4
don  103:11
donkey  99:25
door  14:4 142:2
double  92:2
  108:17
doubt  26:12 80:8
  126:20 134:21
doubtful  98:21
dozens  51:1
dr  127:24
draft  23:4,14
drafted  36:11

drafts  23:1,18
dropping  188:20
duces  4:8,9 14:25
due  70:13
duly  7:1,19 196:10
duplicities  100:13
duplicitous  100:2
  100:25 101:1
  181:19 182:1,19
duty  154:6

            e
e  4:1 199:1,1,1
earlier  23:4,14,18
  66:3 67:11 99:8
  114:4 174:11
easier  25:20 58:3
eaten  47:4
economically  37:9
  37:19
ed  65:1
edgewise  146:3
effect  95:22
efficient  90:13
  123:22 124:1
effort  53:17
eight  80:11 81:10
  83:4 85:16,23
either  10:21 20:7
  55:24 65:17 66:17
  86:23 94:20 188:8
elapsed  33:19
email  23:8,13
  24:10 116:6
  118:17 119:4
  122:11
emily  64:2
employee  197:13
  197:14
ended  89:19 97:18
engaging  172:9

engle  49:2 52:11
  123:10
entered  39:3 73:7
entire  126:14
entirely  184:8
entitled  45:4,5
  91:8,8 144:1
  147:25 157:24
  172:2
envelope  122:5
equation  69:17
ergo  70:18
errata  4:14,15,16
  4:23 53:20 54:5
  54:10,16,19,22
  55:6 56:23 57:6
  57:18,24 58:4,8,12
  58:17,24 62:25
  63:5,8,18,22 65:4
  65:7,13 66:9,19
  67:23 68:6,12,21
  69:1,3,12,22 73:21
  74:3,13,20 75:3,8
  75:11,24 76:8,14
  77:8 81:21 82:18
  86:4 95:16,21
  98:6 99:10 106:23
  107:1,7 108:9
  109:7,19 110:14
  110:16 111:23
  112:9,21 116:22
  117:4,7 130:17
  131:1,6 132:2,7,19
  133:8,12,16,21
  134:6 135:4
  136:14,20 137:1,3
  137:25 138:5,22
  139:22 140:23
  141:6 142:24
  143:3,16,23 144:7
  144:13,17,22,24

145:3,4,7,15
  146:10,17,21,24
  147:5,10,14,24
  148:5 149:16,25
  150:4,22 151:6,9
  152:3,5,7,11,14
  153:4,9,11 154:14
  154:18,20 155:13
  155:24 157:4,14
  157:22 158:10,22
  159:1,3,17,19
  160:8,10,11 162:8
  163:9,16 165:8,11
  165:17 166:2,7,24
  167:4,7,17,21
  168:5,11 169:7,11
  169:15 170:1,2
  171:1,4 173:18
  175:10 190:3,4,9
  190:13,15 191:6,7
  191:12,17 192:5
  198:4
erratas  190:15
especially  171:21
esquire  2:6,10,17
  2:20 3:6,10
essence  137:24
establish  27:23
  87:1
estate  1:6 8:3
  35:15 93:10,16
  176:2
estimate  19:12
  50:3,15,16,22 51:8
estimation  156:23
et  1:9 5:19 199:2
event  182:12,12,14
events  175:9
exact  50:1,1
exactly  66:6
  157:13 159:15

169:9
examination 4:3,4
7:21 174:20
179:15 180:22
190:8
example 50:25
62:17 181:14,15
excellent 144:2
exclusively 22:2
excuse 11:2 86:20
102:10 148:16
151:1 177:10,11
184:12 185:14,15
185:16 186:23
191:23
exercise 115:4
exhibit 4:8,9,10,11
4:11,12,14,15,16
4:17,18,19,20 10:6
10:8,11,24 14:16
14:19,21 15:3,21
16:17,18 17:6
18:4,4,5 20:16,18
20:21,24 22:4,6,8
22:18 24:4 25:12
25:18 28:10 34:14
34:16 107:2,7,12
108:8,13,21 109:7
109:19,24,25
110:14,23 111:5
112:5,25 113:7
117:24 118:13,17
119:1,5,18,23
120:19,21 121:16
122:4,9 124:11,16
124:17 125:2
126:17 127:4
133:20,22 134:1
134:12 136:14
152:3 158:23
160:13 162:14

171:1
exhibits 4:6
111:17 112:1
127:2
expect 83:15
expecting 176:4
expenses 21:11
41:13 116:11
experience 44:22
96:18,22,25
expires 196:20
197:24 198:15
explain 97:13
186:10
explore 193:10
expressed 188:11
extend 160:17
extensive 67:23
122:14
extensively 53:21
57:7 63:6,9 66:19
68:7,21 73:22
74:17
extent 77:6 148:4
176:21
extorted 113:22
114:2,14
extortion 122:15
eye 98:13,16
eyesight 98:10

**f**

f 122:9
fabricated 53:20
57:6,14,15 62:24
63:1,5,8 67:23
68:7,21 73:21
74:11 106:7,9,11
106:22 184:1
fact 35:7 39:14
41:2 44:6 87:16
88:9 98:8 99:17

99:18 145:22
facts 25:25 26:9
34:8 61:6 79:11
136:11
factual 45:6 83:13
83:18 84:1
factually 86:5
failed 39:13 44:5
49:2 52:12 53:6
198:20
failing 45:22 48:22
110:10 111:12
116:17
fair 20:24 23:20
51:14 78:14 86:25
90:24 93:24
102:21 110:18
132:1 152:10
163:8 171:3 180:8
186:22 194:20
fairness 105:5
faith 50:3 93:8
177:22,25
false 46:15 79:24
84:21 114:13
117:7 118:8
125:17,21 128:17
139:15 140:7
153:21 159:7,22
159:22,23 165:18
171:7 172:20
180:24 181:1,9
189:7 194:12,17
194:19,21
falsehood 52:14
falsehoods 63:1
falsities 189:15
familial 27:25
familiar 54:10
114:2 183:5,6

far 13:4 55:23
79:2 114:18
115:20
farther 152:9
fault 24:3 28:19
103:1
fearing 37:8
february 1:16 5:5
112:15
feel 14:7 28:6
30:25 31:1 83:5
90:16 95:24 96:3
160:23 164:19
171:15,17 183:14
feelings 143:18
feet 188:4
felt 29:7,8 143:16
183:13,16
field 144:9
fifth 135:19 138:7
148:9 151:14
figuratively 81:14
figure 56:1
figured 29:2 163:1
file 29:5,24 122:16
176:12 185:13
filed 4:17 5:19
38:7,13 97:21
105:4 113:2,3,6
124:15 125:11
176:13,17
filing 30:10 105:24
124:16,17
financially 6:8
21:7 197:16
find 34:4 37:18
39:19 42:1
fine 11:7 59:10
72:25 122:9
143:20 166:13

fingers 22:16
122:7 135:21
finish 77:5 82:7
115:16 151:1,4
152:19 154:23
172:7 177:16
finished 185:17,19
fire 35:19
fired 33:6 88:12
89:11 101:20
102:15 103:15
112:11 119:9
121:17,23 123:1,4
123:8 185:3
firing 104:7
120:20
firm 6:1,5 39:4
first 7:1,19 9:4,7
17:6 19:4 22:21
24:5 25:5 27:23
30:21 34:2,11
49:12 50:7,8
52:25 53:10 58:4
58:16,23 62:11
65:13 67:5 69:3
71:1 75:6 80:12
85:25 87:17 88:7
96:9 97:18,24
98:6 107:11
108:14 109:7
125:8,9 127:10
133:25 145:11
151:20 157:12,21
158:12 164:12
175:4 177:17
184:19 187:13
189:4 194:2
five 25:23 38:10
131:17
fixing 157:9

florida 1:2,21 2:5
2:11,16,21 4:10,11
5:21 16:5 17:7,11
17:19,23 19:5,8,14
19:16,21 20:2,5,10
21:23 22:23 35:9
37:10,11 38:9
99:24 128:14
142:9 176:17
177:5,7 178:12
180:3,13,22 181:6
181:25 184:10
188:11 189:7
192:8,10,24 193:9
196:3 197:3
fluids 47:6
focus 38:24 39:23
42:19 53:5 57:4
80:12 149:15
focused 155:23
fog 52:3
folks 51:6
follow 20:9 72:24
87:23 172:15
following 5:1 25:1
38:6 39:23 46:4
48:20 53:17,19
57:5 63:6 70:8
73:8,19 80:13
99:23 134:3
141:25 153:8
165:7 189:5
follows 7:2,20
48:25 169:9
forced 122:15
143:20,20
foregoing 25:24
134:4,14 136:1
170:11 197:6,9
198:3

form 4:10 27:16
46:16 52:15 54:24
55:10 56:4 60:2
60:12,13,20 61:7,8
61:15 62:6 69:13
69:23 70:2,3 73:1
83:21 84:3,4,22
85:3,9,13 87:5
91:24 96:7 99:2,3
110:2,12,21 111:6
111:13 114:20
115:18 117:12,16
117:21 121:25
123:17 125:22
126:3 129:6
137:13,19 140:9
140:13 153:22
160:15 165:19
166:9 167:25
168:7,14 170:20
171:14 176:20
178:20 179:2
180:14 181:3
182:15 184:4,14
188:9 189:18
190:19 191:24
193:19 194:3,23
former 18:9,15
22:23 24:24 47:19
foul 188:17
found 14:16
four 22:15 30:5
94:10 104:5
108:12,22 118:1
130:12 149:14
154:1 155:11
156:15,17 184:17
184:23 188:8,9,23
fourth 108:20
fpr 1:24 196:19
197:23

frank 154:22,24
158:18,21 174:12
frankly 43:24
173:15
fraud 85:8 116:23
117:9 142:5,8,9,9
142:15 144:9
145:16 189:7
191:12,17
fraudulent 69:1
69:17 70:20 75:2
86:4 95:16,18
106:15,19,22
126:2 143:3
146:23 147:6
184:1
freewill 28:11
171:4
freudian 37:3
friday 64:10
friend 121:2,7,14
front 43:21,22
124:12 143:8
154:24 185:9
full 7:23 27:10
28:13 30:24 85:25
fully 171:6
fun 103:7
function 27:14
fundamentally
147:22
funeral 116:8
further 154:16
174:12 197:12
fussing 92:8
future 8:24 111:3
                    g
gables 2:5,11
gadsden 1:2 5:20
33:23 34:19 39:1

generated 92:7
gentlemen 59:2
  91:10 94:5 161:15
  164:12,25 174:16
georgia 3:5 37:11
gestures 177:13
getting 22:25
  44:16,20 65:24
  98:13,15 105:16
  111:12 123:24
  156:19 166:19
  188:24
gg098479 196:20
  197:24
gievers 143:9
girl 129:9
give 10:3 19:12
  33:20 43:23 49:16
  71:4 95:2 116:6
  123:12 130:4
  153:13 154:24
  155:16 159:5,20
  165:12 168:12
  175:19 179:20
  184:19
given 48:3 66:3
  69:4 91:4 98:18
  147:21 167:16
giving 47:20 74:21
  126:9 153:14
  170:17 171:6
glad 178:9
glanced 193:16
gmail.com 2:6,22
go 5:13 9:6,19
  22:11 25:17 27:18
  45:1 46:18 57:21
  60:4 73:12,17
  76:21 83:4 87:4
  91:1 92:21 94:6
  97:5 101:20

105:18,19 108:5
  117:24 120:10
  122:10 130:11
  135:7,22 140:23
  141:1 144:1
  147:25 148:17
  149:3 151:6
  154:16,22 156:11
  161:7,20 162:8,13
  164:3,9 165:20
  166:16,16 170:3
  172:13,14,14
  173:1 174:11
  175:14 181:2
  185:22 186:12
goat's 71:25
god 37:8
goes 12:10 55:22
  143:21 147:10
  185:20
going 13:15,17
  14:19 20:20 29:17
  34:7 43:15,20
  50:9,20 52:24
  55:4 56:19,20
  58:20 59:14 65:22
  76:25 77:21,25
  80:2 87:2,22
  90:16 97:8 103:8
  105:7 119:3
  120:13 124:5
  126:14 133:20
  141:21 142:25
  144:6,8 146:25
  148:2,6,15 149:5
  149:12 150:5
  151:21 152:18
  153:23 154:8,10
  155:9,10,14
  156:12,19,24
  161:11 162:6

168:23 173:4
  177:9 178:2
  186:25 187:6,12
  189:12,21 193:12
good 5:3 12:3,10
  12:24 13:2 14:12
  23:11 33:14 43:20
  50:3 55:23 59:13
  66:7 82:11 92:19
  93:8 96:4 98:15
  102:21,23 109:4
  115:6 119:15
  122:8 164:21
  177:22,25
gotten 15:13,15
  45:7 71:10 156:23
  175:11 180:9
granular 88:2
gratefnl 130:5
gravity 30:9,14
great 142:7 188:2
grew 45:14
grinch 164:20
gross 113:21
gronnds 92:5
  148:7
guess 12:20 37:20
  37:25 43:3 54:17
  151:20 156:12
  192:20
guy 92:9
guys 13:3 81:7
  86:22 107:4
  144:19 148:14
  161:16 188:1

h

h 199:1
hand 6:20 15:1
  20:20 34:10 63:23
  126:14 130:5,10
  177:12 196:12

handing 34:9
handle 39:11,25
  40:6,13 41:7
handled 22:2
handling 101:2,8
hands 29:3 96:13
  177:18
hang 146:2
happen 32:11
  42:10 92:16
  114:19 187:6
happened 32:24
  66:16 137:17
happening 77:13
  81:1,20 82:17
happens 62:19
happy 88:1 91:16
  140:25 141:14
  164:25
harassing 149:23
  151:16 154:3
  156:7,9
hard 49:15
harder 67:3
harris 1:5,6,14 2:4
  2:6 4:3,14,15,16
  4:19,20 5:16,18
  6:25 7:12,13,13,18
  7:23,24,25 8:3,7
  9:20 10:6 11:2,3,5
  13:6,7 14:11,14
  15:13 17:20,22
  18:13 20:2,7,11
  21:25 22:14 24:6
  25:13,15 27:21,22
  27:25 29:13,25
  30:2 32:16,20,23
  32:24 33:8,13
  34:9 35:24 36:5
  36:10,13,18,23,24
  37:8 44:12 48:9

**[harris - howard]**                                                     Page 14

48:17 49:21,22
52:17 53:8 59:20
60:1,11,19,23 61:1
62:3 63:17 66:23
67:6,12,16 68:22
69:16 70:7 71:9
72:10 73:7,17
76:5 77:5,6 80:16
80:23 81:17 82:15
82:23 83:1,5 84:1
86:1,9,21 87:6
88:5,8,25 89:9,14
89:22 90:1,5,8
91:1,4,17 92:6
94:3,7,15,25 95:4
95:8 100:6,8,17
102:3 103:5,13,25
104:8,20,24
105:11 107:7
108:9 112:4
118:17,25,25
120:5,18 121:4
122:13,14,19
123:2,5,6,9,16
124:10 137:3
141:16,18,19
142:1 145:15
146:23 147:1,5,9
149:7,17 150:21
151:6 152:2 154:3
154:6 157:21
159:6,11,21 160:9
160:10,25 162:7
162:13 163:6
166:6 167:2,14
169:13 171:22
174:22 175:17
176:10,11 178:11
178:15,16 180:2,6
180:9,12 184:12
188:7 189:20

191:5,12,17 192:5
192:23 194:16
198:8 199:2,25
**harrison** 3:10 7:5
7:5 108:17 127:18
**hart** 1:20 2:15
5:24
**hashed** 158:16
**havana** 35:9 37:10
121:9
**hawkins** 121:8
**head** 177:13
**health** 45:11,22
48:22 110:10
111:12
**hear** 11:2,7 12:6
56:4,6 63:16
78:22 79:1,16,23
81:2,4 82:2 85:18
89:9 178:22
185:16,24 186:20
187:2,22 188:1
194:25
**heard** 20:7 54:11
67:18 77:24 92:4
96:2 100:19,23
101:7 182:4 186:4
186:21 190:6
**hearing** 8:24
12:15 30:4 33:22
46:22 155:8 188:2
**held** 5:23 70:9
73:8 142:1
**help** 11:23 16:1
22:25 34:8 63:25
67:7 91:17 105:8
118:13 119:16,17
127:9 135:6
162:19
**helpful** 61:25 62:1
83:15

**helping** 129:5
178:17
**helps** 72:6
**henley** 103:11
**hereinafter** 7:2,20
**hesitantly** 23:11
**highly** 86:1 87:7
88:8,10 95:8
**hire** 33:13 35:22
**hired** 33:8 35:24
67:6,12 102:2
104:19,19,24,24
122:19 123:1,2,5,9
123:16 176:1,9
**hiring** 67:17
**history** 122:14
**hold** 11:13,13,21
11:21 90:5,25,25
94:2 143:13
**home** 31:3,4,22,23
32:1 51:2,11,12
62:13 63:22 83:7
116:8 173:23
174:7
**honoring** 170:9
**hoping** 156:12
**horse** 156:22
157:2,5,6,10,11,12
157:13
**horses** 156:25
157:1
**hour** 50:25
**hours** 50:25 51:1
52:5 94:8 97:25
98:3 149:15 154:1
156:15,17
**house** 118:19
167:10 185:9
187:17
**hovering** 31:6

**howard** 4:18 18:8
18:16 19:5,22
20:8 22:24 24:24
29:11,25 30:14
33:6,21 35:20
36:6 37:2 39:3,10
39:13,24 40:12
41:6,12,20 42:9
43:6 44:5 45:2,21
49:2,10 50:8,23
51:10,15 52:11,25
53:6,19 57:5,17
63:7,21 64:16,21
65:13,15 66:8
68:12,25 69:11,21
73:20 74:13,16,19
75:1 76:7,13 77:7
88:13 89:11 95:17
95:20 96:10 97:13
97:18,21,22 98:1
98:23 100:3,12,13
100:25 101:8
102:6 103:14
104:2 106:21
112:12 113:12
114:5,13 115:24
116:5,12,21 117:6
118:3,5,18 119:2,2
119:9 120:20
121:18,21 122:11
122:21 123:2,4,5,8
123:12 127:8,23
127:24 128:3,6,10
128:14 129:4,11
133:15 136:20
153:20 160:14
167:13 173:22
174:7 176:1,11,13
181:16,24 183:13
183:14,21 184:12
188:12 192:25

[howard's - involvement]                                    Page 15

**howard's**  4:17
  66:1 86:3 87:9
  95:15 100:21,23
  113:2 119:4
  129:14 170:4
**huge**  142:12
**hum**  10:13 18:10
  19:11 28:25 29:22
  36:14 39:22 63:11
  77:16 79:14 83:3
  84:17 97:4 112:19
  114:7 118:21
  131:14
**human**  68:4
**hung**  12:16
**husband**  21:1 38:8
  46:10,20 47:8
  48:10 49:11,21
  50:24 51:12,16,22
  52:6 56:22 57:18
  57:25 64:21 65:7
  65:17 66:3 67:5,9
  67:17,20 68:2,13
  69:11,22 74:20
  75:2,7,12 76:1,7
  76:14 77:8,24
  78:11,16,23 79:5
  79:17,23 80:5,17
  80:25 81:19 82:3
  82:16 98:17 99:1
  99:11 100:24
  106:25 111:25
  116:2 126:12
  130:25 131:19
  132:6 138:5,21
  152:5,13 154:13
  154:19 163:15
  166:23 167:16,24
  168:6,10 173:25
**husband's**  35:15
  45:22 50:9 58:4

  58:12,17,24 62:25
  63:18 64:1 66:9
  66:19 68:8 74:17
  97:24 98:2,10,24
  107:8,18,23 109:8
  109:11,15,20,23
  110:6,15,20 111:5
  130:17 137:25
  146:16 147:24
  153:3 157:4,14
  166:7 167:4,22
  168:4

**i**

**idea**  29:24 48:11
  52:5 92:19 131:1
  132:19 133:8
  137:24 138:22
  153:3
**identical**  182:12
**identification**
  10:12 14:22 16:19
  18:6 20:22 34:17
  107:13 110:1,24
  113:8 120:22
  127:5 133:23
**ignore**  27:15 56:5
**illnesses**  38:11
**imagine**  43:10
**imminent**  45:13
**impasse**  160:23,24
  174:11
**impeding**  187:25
**import**  170:14
**importance**  27:3
  30:10 158:10
  170:9
**important**  9:5
  34:6 101:13
**impressions**  192:4
**improper**  171:14
  172:17

**inappropriate**
  91:7 149:24 179:4
**included**  127:2
**includes**  59:11
**including**  111:11
  123:11 134:15
  136:2 170:12
  193:19
**incomplete**  46:8
**incorrect**  38:20
**incriminating**
  148:7
**indicated**  184:2
  192:9
**indicating**  86:10
**individually**  1:5
**indulge**  160:7
**infect**  145:16
**infected**  85:8
  145:17
**information**  17:14
  17:16 32:16 36:10
  38:20 43:1 44:11
  61:23 67:21 68:6
  68:20 71:4,18
  76:5 77:7 82:16
  83:2 84:21 99:9
  123:15 131:9
  176:12 180:9,18
**informed**  86:3
  87:9 95:15
**initially**  29:24
  176:1
**initiated**  192:10
  192:23
**inquiry**  4:10
**insertions**  180:13
**insinuate**  118:6
**instances**  189:19
**instinct**  53:11

**instruct**  81:23
  115:10 141:11
  146:8 148:6 150:5
  152:18
**instructed**  168:17
**instructing**  151:13
  154:4
**instruction**  29:18
  154:8 155:6
  167:23
**instructions**
  153:10 159:2
  165:9,18 167:22
**insulting**  37:18
**intend**  94:11,11
**intentional**  106:16
**interest**  179:6
**interested**  6:8
  197:16
**interfere**  5:11
**interim**  102:3
**interrupt**  175:22
  177:9
**interrupting**  179:3
**intervene**  175:21
**intimidate**  151:18
  154:2
**intimidated**
  171:15,17
**intimidating**
  149:23 151:16
  156:7,9 171:9,21
  171:25 172:24
**invoke**  45:4
**involved**  32:24
  105:4,16 132:6
  136:25 152:13
  163:15
**involvement**  121:4
  129:4

involving  8:7
issue  43:21 75:21
  147:3 156:22
issues  149:21

          j
j  2:10 176:11
  180:9
j.b  12:8
j.b.  2:4,6 7:13 11:7
  11:13 12:6,8 13:6
  13:20 14:10 17:20
  17:22 19:17 20:2
  20:7,11 21:25
  27:21,24 29:13,25
  32:16,23,24 33:8
  33:13 35:24 36:5
  36:9 43:10 48:9
  48:17 52:17 60:1
  60:11,19,23 61:1
  61:14 62:3 66:23
  67:6,12,16 70:24
  76:5 77:6 80:16
  80:23 81:17 82:15
  82:23 83:1,5,25
  85:17 86:9 89:14
  89:19,20,21 92:13
  93:23 94:1,6 95:4
  100:6,8 102:2
  103:25 104:7,20
  104:21,24 105:9
  118:25 121:4
  122:13,19 123:2,5
  123:6,9,16 182:23
  182:25 183:2,12
  189:13 192:9,16
  192:23
j.b.'s  61:5 182:7
  183:20
j.d.  127:24
jaakan  43:12
  51:10,21 65:16

68:9,11 76:10,11
76:12 82:21,22
86:2,8,17,18 87:7
88:9,15 89:10,13
95:3,9,15,17,20
96:2,14,18,21,24
99:15 112:8,20
127:24 128:10,18
129:8 136:23
153:20 160:14
173:22 180:18
185:9 187:17
191:9 192:3
jacksonville  89:16
january  196:13
  197:18
jbharrisesq  2:6
job  82:11 101:3
  144:2 172:3
john  162:25
join  173:16
jointly  141:11
jones  3:4,8 7:4,6
jonesday.com  3:6
  3:10
judge  34:25 83:24
  93:5 100:15 143:8
  150:7,11 154:22
  154:24 157:17,19
  158:18,21 161:1
  174:11 193:12
judge's  143:10
judgment  41:15
  84:20 85:7 92:7
  123:13
judicial  1:1 5:20
judy  1:24 6:4
  196:19 197:5,23
july  16:6,25 23:4
  24:19 32:14 36:4
  40:24 59:23,24

119:7 121:21
134:23 136:6
139:1 157:22
163:24 165:2,7,14
170:2
jump  145:10
  186:8
june  46:2,23,23
  49:12,23 50:6
  51:23 52:7 58:6,9
  63:22 64:3,10,14
  64:25 65:9,9 67:9
  78:3,4 79:16,16
  80:3,4 96:10
  97:14,19,23 98:11
  107:9 109:9,21
  110:15 173:23,23
justice  116:22
  117:8 143:4

          k
keep  86:13
kept  40:8
key  27:11
kick  56:17
kidding  13:5
kind  91:20 93:5,11
  96:22 101:5 172:9
  185:7 187:15
  191:11 193:16
knew  34:2 40:10
  42:13 52:25 75:23
  78:23 79:23 80:8
  96:5 103:22
  129:20,23 136:9
  153:14 159:10,13
  159:15 168:25
  169:3,9
knife  89:4
know  8:10 12:17
  17:12 20:9 24:2
  24:21 29:7 32:10

33:15,25 34:3,5,6
35:14 38:17 39:18
39:19,20,20 42:18
43:7 46:21 48:2
48:16 49:17,25,25
50:6,17 51:7
53:10 54:4,6,17,23
55:18 56:3 57:13
57:13,14,14,16
61:24 62:3,25
63:3,14,14,15,17
63:21,24 65:22,24
65:24 66:21 67:18
68:4,14,17,17
69:24 71:1,9,10,14
71:17 72:21,23
74:4,8,15,18,23,24
74:25 75:5,9,10,15
75:18,19 76:4,11
79:6,17 80:20
82:9,9,13,15,22,25
87:22 88:10 95:11
96:11,16,17,20,21
96:23,24 97:2
98:1,4,17,22 99:5
99:25 100:11,15
101:21 102:9,11
103:17 104:11,21
104:25 105:18
110:5,9 111:8,22
112:18 114:18
116:5 117:2,3
119:14 121:3
123:16,21 125:20
126:6 128:9
130:19,21 131:18
132:2,5,14 139:21
142:9,12 143:6
149:11 152:7,10
152:13 156:21
157:3,13 158:3,9

161:9 163:9,15
164:7 166:2,3,4,6
166:8,24 167:3,3,7
167:10,12,16,20
167:21,24 168:2,3
168:4,8,10,13
169:14,19 171:11
172:5,6,8 174:25
175:1 180:11,17
180:25 181:1,9
182:19,22,24
183:11 184:8
187:4 191:4,16,20
192:2,25 193:3,5
194:11,15
**knowing** 49:1
52:10 70:25
**knowledge** 29:4
38:15 39:17 40:3
42:24 51:15 53:3
66:15 75:22
114:13 117:4
191:5
**known** 105:10
143:15,18
**knows** 29:2,4

**l**

**lacking** 82:3
**lady** 128:19 129:9
171:21
**lakeside** 3:8
**language** 101:5
185:10 187:23
188:17
**latitude** 43:24
**laugh** 164:6
**laughing** 173:10
**law** 142:9 155:15
**lawsuit** 8:6,12
24:17 38:7 62:22

**lawyer** 9:17,18,19
17:22 18:1,9,16
24:24 29:2 30:11
33:9 35:22 51:11
52:6 74:9,10
83:15,18,23,25
86:18 91:5 93:21
104:11,16,17
113:5 116:9
121:11,23 127:7
128:3 132:17
151:17 154:7
158:9,15 159:8
162:23
**lawyers** 43:3,5,9
55:21 62:20 78:7
90:17,22 92:24
93:3 103:9 117:14
122:24 124:15
125:1,16 127:22
130:20 131:4,20
142:21 143:6
160:13 172:13
174:13
**lead** 104:17
**leading** 180:21
192:14
**leaned** 148:25
**learn** 33:21 83:17
**leave** 14:4 15:24
91:25 102:7
172:12
**leaving** 27:10
155:4,5
**led** 35:18
**left** 29:3 138:11
148:22 156:22
**legal** 27:4,6,9,13
33:25 121:14
155:17,19

**legalese** 28:21
**legitimacy** 143:22
**leon** 2:4,10 196:4
197:4
**letter** 4:11,18 18:8
18:20,24 19:8,10
19:24 20:5 21:16
33:23 119:20
120:20 192:8
**letters** 4:12 20:14
34:21
**letting** 35:14 158:4
**level** 11:9
**life** 100:1,21,21
**lillie** 141:19
**limited** 91:22
**limiting** 146:25
147:7
**line** 13:11 71:22
95:6 115:14
130:15 131:17
132:17 140:16
162:7 199:4
**lines** 115:17
139:10 158:24
163:7 168:22
**liquids** 47:6
**list** 10:19 127:21
184:17
**listed** 10:24
134:16 136:3
170:13
**listen** 56:7 87:25
94:3,4,7 103:10
**listened** 91:6
**listening** 13:22
102:12
**lists** 24:23
**literally** 47:11
81:12,13

**litigate** 143:8
**litigation** 21:11
24:14,18 41:14
92:7 126:12
**little** 11:24 12:11
39:5 43:23 47:4
50:4 52:22 54:5
65:23 67:2,11
88:6 107:14 120:1
130:12 152:9
161:19 174:4
193:11
**live** 143:10
**lives** 121:10
**living** 37:9
**loan** 20:25 21:5,10
**local** 13:1 118:5
**located** 5:24 14:15
198:21
**long** 12:1 19:13
31:10 33:15 38:18
40:8 49:22 50:6
51:4,7 53:14
104:23 155:24
174:7
**look** 10:25 22:3
24:4,5 35:7 36:15
37:6 44:4 58:4,12
68:24 93:1 105:8
105:18,19 111:8
124:10,21 140:16
152:2 161:11
187:13 188:3
193:14
**looked** 10:23
21:20 57:24 58:8
110:9 112:5 125:7
180:3 193:15
194:1
**looking** 102:12
108:8

**looks** 15:22 107:14
  110:6
**lord** 37:22
**loss** 177:21
**lot** 29:7 49:8 51:5
  142:17
**love** 37:22
**lunch** 148:12
  149:6 161:4,5,18
**luncheon** 161:24

**m**

**m** 2:17
**ma'am** 22:19
  30:21 33:18 37:21
  46:13 49:18 54:15
  54:19 62:1 78:13
  84:6,8 85:5
  107:25 123:15
  130:11 137:15
  168:15 177:2
  186:2,12
**macular** 98:14
**mail** 17:10,18
**mailed** 35:8
**main** 103:21
  104:11,12,13,15
  184:21
**major** 38:10
**making** 29:21
  72:20 74:22 91:24
  115:18 156:10
  177:12
**malign** 91:6
**manner** 76:1
**manufacturers**
  38:10
**march** 38:25
**margaret** 1:5,14
  4:3,19,20 5:16,18
  6:25 7:18,24 24:6
  25:13 36:23 37:8

68:22 198:8
  199:25
**margin** 32:10
**mark** 14:19 16:13
  32:4 107:1 126:17
  133:20
**marked** 10:11
  14:21 16:16,18
  18:5 20:21 34:16
  107:12 109:25
  110:23 113:7
  120:21 127:4
  133:22
**marking** 18:3
  112:25
**married** 7:25
  46:21 110:5
**materials** 15:20
  17:25 20:18
**matt** 122:12
**matter** 5:18 20:6
  24:13 150:18
  179:7
**meager** 118:6
**mean** 18:13 27:6
  34:11 47:11 51:2
  51:5 57:15 65:10
  89:22 104:16
  155:22 166:20
  193:11,18
**meaning** 44:6
  174:24
**means** 69:18 74:11
  84:11 95:14 118:7
  127:11 182:20
**meant** 182:23
  183:2
**media** 5:15
**medication** 10:1
  47:1,3,25

**medications** 48:5
**medicines** 47:21
**meet** 80:20
**mehta** 53:20 57:6
  63:7 65:16 68:10
  68:15,25 69:11,22
  74:13,16,19 75:1
  76:7,13 77:7
  96:14 173:22
**memory** 19:6
  50:20 64:7 66:5
  66:13 75:21
  119:15 133:19
  175:8 192:22
**mentioned** 30:13
  62:9,11
**mentored** 172:6
**merriam** 106:8,15
**message** 13:11
**met** 100:2 128:6
  128:10
**metropolitan** 1:20
  2:15 5:24
**miami** 38:8
**mic** 12:11,13
**microphones** 5:6
  5:10
**mid** 46:7
**middle** 158:5
**midst** 122:20
**mind** 26:12 33:3
  56:9 86:14 98:3
  184:20
**mine** 30:1 65:1
  135:21
**minute** 11:22
  36:13 86:20 92:12
  94:2 97:3,6 109:1
  184:19
**minutes** 52:5

**misleading** 164:5
  164:7 166:10,14
**misrepresentation**
  52:14
**misrepresenting**
  106:17
**missed** 33:22
  102:16,18
**missing** 158:12
**misstates** 176:21
  193:20
**moment** 28:24
  95:2 117:25
  120:10 124:11
  175:19 176:9
**monday** 64:5,8
  65:20 78:3,6 80:3
  96:10,17 97:19,23
  98:3
**monde** 3:6 4:3 7:3
  7:3,22 9:14 10:14
  11:7,24 12:10,13
  12:16,20 13:3,14
  13:19 14:2,7,13,23
  15:8,11,17,18
  16:11,15,20 18:7
  18:21,23 20:23
  22:9,12,13 25:22
  27:17,20 29:16,21
  29:23 34:18 43:15
  43:20 44:2,3,19
  45:5,9 46:17
  52:18 55:1,12,17
  56:8,21 59:2,13,19
  60:3,8,16,22 61:12
  61:16 62:8 67:2,4
  69:14 70:1,6
  71:24 72:3,12
  73:2,9,12,16 76:23
  77:4 81:5,7,11,16
  82:1,10,14 83:22

[monde - number]                                                      Page 19

84:5,10,23 85:4,11
85:15,17,22 86:20
87:19,25 88:4,19
88:24 89:2,7 90:5
90:11 91:10 92:8
92:18,23 94:5,9,17
94:23,24 96:8
97:5,12 99:6,17,20
102:9,17,23,25
103:2,5,10,12
105:1,6,23 106:1,4
106:6 107:3,6,16
108:15,18,19,24
109:4,6 110:4,13
111:1,10,15,19,20
113:9 114:23
115:5,13,16,21
117:13,18,23
118:16 119:17,20
119:22 120:1,3,9
120:17,23 122:2
123:19,21 124:3,9
125:23 126:5
127:1,6,13,19
129:10 130:4,9,14
131:16 133:6,24
135:8,23 137:14
137:22 138:9,12
138:17,19 139:18
140:11,15 141:14
141:23 142:2,5,7
144:12,18 145:4,9
145:24 146:6,13
146:15 147:16,21
148:9,13,16,24
149:10 150:9,13
150:20,24 151:1,4
152:1,24 153:1
154:6 155:4,19
156:8,25 157:9
158:14,20 160:6

160:20,22 161:11
161:14,20 162:2
162:10,12,21
163:3,5 164:12,19
164:22 165:22
166:12,15 167:1
168:1,9,15,20,21
170:22 171:23
172:3,8,13 173:2,4
173:7,11,13
174:10,19 175:12
175:17,21 176:20
177:10,17,21
178:4,7,20 179:10
179:16,19,23
180:14 181:3,11
181:19 182:15
183:7 184:4,14
185:14,16,18,20
185:24 186:8,23
187:7,9,12,22
188:4,13 189:9,18
189:23 190:19
191:18,23 193:1
193:19 194:3,23
**monde's** 181:22
**month** 50:4,13
**months** 105:15
  119:9
**morgan** 163:1
**morning** 5:3 10:2
  13:4 16:4,8 22:25
  27:1 174:3
**morris** 132:17
**motel** 30:5 41:9
  114:6 115:23
  116:12 184:25
**motion** 4:17 93:5
  113:2 140:24
  141:3,5 142:5,16
  143:1,8,20,21,25

144:11 145:13,23
  147:4 151:7
**motionless** 177:18
**motivation** 156:14
**mouth** 74:7
**move** 11:24 25:19
**moved** 13:12
**mule** 100:1
**multiple** 153:25
**mute** 85:20

### n

**n** 4:1
**name** 6:1 7:23
  24:6 26:3,5 28:3
  37:7 104:9 121:8
  134:3 135:1,9,24
  137:11 170:8
**named** 122:12
  196:9
**names** 89:15
**narrow** 100:19
**ne** 3:4
**near** 37:10 77:12
**nease** 132:17
  133:7
**neat** 16:1
**necessary** 72:14
  93:4
**need** 9:12 45:8,13
  56:7 60:5 71:11
  73:4 76:22 87:1
  88:5 94:16 116:7
  150:10 151:22
  170:23 174:11,25
**needed** 29:8 45:23
  65:23 90:16
**needs** 73:10 78:12
  150:8
**nefariousness**
  191:11

**neither** 51:15
  172:8
**never** 39:12 42:21
  43:6 58:8 62:15
  66:15 67:18 75:23
  98:3 99:9 100:1
  105:25 115:3
  116:4 143:18
  151:19 158:11
**new** 35:22 39:2
  98:25 105:21
  141:6
**nicotine** 38:12
**nine** 175:6
**non** 198:19
**nonappearance**
  34:1
**nope** 181:20
**north** 172:15
**nose** 72:1
**notary** 196:19
  197:23 198:14
**note** 5:6 91:18
**noted** 115:13
  134:6 166:12
  176:24 194:10
  198:4
**notes** 32:2,9 197:8
**notice** 4:8,9 10:7
  14:24 22:9,10
  50:13 105:1,4,24
  171:10
**noticed** 91:3
**noticing** 6:15
**number** 5:22
  24:10 38:9,20
  39:2 50:1 78:10
  89:17 90:14 91:4
  127:2 164:23
  177:19,21

**numbered** 162:15
197:10
**numbers** 36:18,19
108:4
**nurse** 47:14,20

**o**

**oath** 6:6 8:14
26:23,25 27:4,14
27:15 55:8 56:24
59:23 60:10 61:4
61:24 62:2,12
63:17 69:4,5 76:6
99:24 104:10
128:15 129:17,20
129:23 132:11
135:2 136:10
139:1 140:1
147:23 153:7,15
154:12 157:3
163:21 165:13
170:9 171:19
172:19,24 179:8
196:1
**ob** 176:20
**objec** 191:23
**object** 66:24 81:22
84:22 91:8,8 92:5
93:15 115:10
144:5 152:23
153:23 160:15
164:1,2,5 166:9,10
171:8 178:4,6
179:2,20 189:18
189:20 193:1
**objected** 55:13
87:5 91:20 156:18
**objecting** 55:21
90:17,23 92:4,24
93:21 115:11
**objection** 13:5
27:17 29:14 55:4

72:7,21,22 73:1
83:24 90:1 114:25
115:13,18 139:16
140:18 147:18
160:18 162:6
164:3 165:19
166:12 167:25
171:13 175:12
176:20,24 177:16
178:20 180:14
181:3,11 182:15
184:4,14 185:23
188:13 189:9
190:19 191:18,24
193:2,19 194:3,23
**objections** 6:13
9:18 56:1 90:15
91:21,24 94:12
175:18 179:1
**objects** 9:18 55:24
**obligation** 113:19
115:22
**obstruct** 117:8
**obstructed** 116:22
**obstruction** 143:3
**obstructive** 187:1
**obtained** 16:4
123:13
**obvious** 39:10,24
70:16
**occurred** 175:9
**offense** 84:16
151:17
**offer** 92:19
**office** 51:16 66:1
129:15 170:4
**officer** 154:7
198:18
**official** 196:12
**oh** 22:7 25:6 32:8
49:19 101:15

129:13 146:14
152:24 157:13
**ohio** 3:9
**okay** 9:15,21,22
9:25 10:17 11:1
12:23 14:12 15:17
16:2 17:18 18:15
18:22 20:13,16
21:14 22:18,20
23:13 25:6,21
27:21 28:20 30:23
31:6,12 32:13
34:12 37:24 39:23
41:1 43:13 45:25
50:18,22 51:21,25
52:19 53:16 55:12
56:22 57:24 58:25
60:9 65:4 67:20
69:18 70:10 71:5
71:9 72:2,19 73:3
76:4,20 79:21
81:6 86:15 87:19
88:3 94:13,15,16
95:2,24 98:9
108:6 112:25
114:3,18 116:5,15
116:20 118:15
121:13,16 122:10
123:24 124:2,18
125:4 129:14
131:15 132:15
135:22 142:7,25
143:14 144:18
146:7 148:2
150:23 151:10
157:8 158:18
160:10 161:13,16
168:20,24 173:21
174:2,10 175:4,8
175:16,20,20
176:7,15 177:12

177:20 178:21,25
180:8,11,17 181:6
182:3,7,10,19,22
183:24 184:18,22
185:2,6 187:7,22
188:16 189:1,17
190:2,8,24 191:4,9
192:2,7 193:24
194:1,8
**old** 37:9 175:4
**omnibus** 4:17
113:2 145:22
**once** 102:12
**ones** 160:12
188:16
**open** 14:4 88:20
155:5,6
**operating** 59:4
115:20
**opinion** 172:2
191:10
**opinions** 191:16
192:4
**opportunity** 28:14
30:17,24 167:17
179:20
**opposed** 74:21
**opposition** 4:17
113:1
**opsahl** 127:25
**option** 74:21
**order** 4:12,13 16:1
34:19,20 35:13,18
36:1 39:3 40:25
41:4
**ordered** 68:25
69:11,22 74:20
75:2 76:7,14 77:7
111:25
**ordering** 34:22

[organized - plaintiff]                                                    Page 21

organized  123:25
outcome  6:8
outlined  150:6
outside  140:21,23
  141:2,15 142:1
  185:10 186:16
outstanding  13:1

**p**

p.a.  1:20 2:4,15
  5:24
p.m  149:6
p.m.  1:17 120:14
  120:14 124:6,6
  149:6 161:24,24
p.o.  2:20
page  4:2,7 10:8
  16:21 17:6 22:4,5
  22:15 24:5 25:4,5
  25:12,18 35:7
  36:18,19,22 37:5
  38:23 46:9 80:10
  81:8,10,11 83:4
  85:16,23 99:21
  105:7 107:11,21
  107:24,25 108:4,8
  108:12,20 113:10
  118:1 119:20
  122:3,4,10 124:22
  127:10,12,13,15
  127:18,21 130:2
  130:15 131:12
  132:13 133:4,25
  134:11 135:10,19
  138:7,10,12
  139:11,19,20
  152:4 158:24
  163:7 168:22,24
  178:18,18 193:15
  193:15 199:4
pages  1:15 32:4
  98:7,12,19 108:13

130:7,13 135:5
  155:24 162:17
  197:10
paid  118:3
pain  46:5,10,20
  47:1,25 48:5,10
paper  29:12
paragraph  37:7
  37:12,17 38:3,6,14
  38:25 39:6,9 44:5
  45:10 46:4 48:25
  73:18 80:12 85:25
  113:12
paralegal  14:6
part  18:1,4 20:17
  24:23 25:1,23
  30:18 34:14 36:16
  42:19 57:9 75:6
  77:5,22 84:20
  85:7,12 87:18
  92:6 95:7,14
  103:21 108:14
  117:10 138:20
  158:5 176:18
  180:12 183:1
particular  119:19
parties  5:13
  127:22 197:14,15
parts  27:11 32:5
  52:1,2
party  6:7
pass  83:8
passed  67:5,9
passing  58:13
patacxil  3:13 6:1
patently  91:10
pathology  116:3
  118:19
patience  161:2
paul  2:17,17 7:11
  16:11 22:12 29:21

34:10 43:15 56:10
  88:24 90:4 92:8
  94:12 102:8,10
  118:13 119:17
  130:4 142:3
  145:24 147:21
  155:2,8 162:2,19
  168:16
pay  21:11 41:20
  42:10,15 113:20
  114:9,15 116:7,9
  116:15,18 118:7
  119:2 121:23
paying  115:23
  123:6
peachtree  3:4
peggy  1:14 4:3,19
  4:20 5:16 6:25
  7:12,18 12:5
  13:13 24:6 25:13
  36:23 37:8 68:22
  116:7 143:15
  147:1 180:5 198:8
  199:25
penalties  25:24
  84:13 134:13
  135:25 170:10
penalty  26:8 28:3
  135:15
people  27:7,9,14
  43:3 49:9 59:3
  142:17 193:12
perceived  53:17
  149:1
percent  49:17 59:9
  149:15 173:6
percentage  123:12
perception  71:22
  144:3,4
perceptions
  143:22

perfect  155:9
period  31:13 46:8
  46:23 64:20 82:5
  172:24
perjury  25:24
  26:8 28:4 84:11
  84:13,16 116:21
  117:8 134:13
  135:15,25 143:4
  146:11,16 170:10
permission  100:9
permissive  141:1
permitted  93:22
  154:11,25
person  70:19 76:9
  171:24
personal  1:6 4:12
  8:2 34:21 35:15
  67:13 93:9
personally  196:9
pertain  24:13
perversion  106:16
ph.d.  127:24
philip  132:17
phillip  25:14
  36:24 37:2
phone  2:7 11:24
  12:3,15,19 13:7,12
  13:17 92:13
  101:24 103:15,24
physical  98:18
pick  5:7 37:4
piece  57:3
pieces  39:21 54:9
pile  15:10,25 16:1
pissed  12:25
place  5:9,13 86:23
  129:14 145:12
  158:12 197:7
plaintiff  1:7 2:3,9
  2:14,19 5:17 7:8

[plaintiff - progeny]

7:10,14 8:6
127:23
plaintiff's 4:9,17
14:24 113:1
play 49:10
pleading 97:21
113:1 124:14
please 5:6,9 6:14
6:17,19 10:15
11:6,16,20 15:12
16:11,22 20:20
22:3,14 24:4
25:18 36:17,22
37:7 49:16 56:10
58:22 73:12 80:10
82:7 99:21,22
109:1 113:10
117:24 119:17
124:10 132:13
133:5 139:1,19
140:17 142:2
150:1 152:2,17
162:14 166:16
168:19 177:3
179:10,16,19
pled 142:10,11,16
144:10
point 9:12 40:23
45:3 46:22 52:5
80:1,4 86:25
93:20 126:8
149:22 152:21
154:1 156:21
157:10 160:1
164:13 187:4
points 9:5
politely 127:20
172:4
ponce 2:4,10
portion 186:14

position 55:19
140:25 145:14
146:11 147:13,20
150:9,14 157:19
possession 16:9
possible 100:17
121:20 124:1
137:10
possibly 151:13
152:23
postponing 40:9
pr 40:25 41:4
93:10,16
practices 59:3
pre 113:17
precede 172:22
preceding 89:3
precise 105:19
predicate 71:2,2
prepaid 118:4
preparation 53:1
53:12 132:6
152:14 163:16
preparations 49:1
52:11
prepare 44:1 49:3
52:12 53:6 60:24
61:1 128:7 136:20
173:17,24
prepared 36:11
63:19 65:5,8
68:12 75:11,25
98:7 99:10 111:24
130:16,17,18,23
131:2 132:3,20,20
133:8,9 136:15
137:25 138:6,23
139:22 152:7,11
153:4,9,20 157:4
159:1 163:9 165:8
165:16 166:2,7

167:13,13,23
prepares 8:23
preparing 49:11
50:24 51:22 52:6
80:24 81:18 82:23
121:5 128:15
136:25
preprepared
167:12
presence 141:15
142:1
present 3:13 6:9
51:16,17 57:17
64:23 68:11 78:15
80:16 86:2 87:8
95:9 96:10 97:14
presented 57:18
68:13 111:23
114:5 133:11
preservation
45:14 116:3
pressing 31:7
pressure 28:2,6
83:7 170:25
presume 130:20
pretrial 49:1
52:10 53:1 143:2
pretty 30:4 55:22
70:16 95:6 187:5
prevent 13:21
previous 54:18
previously 61:11
69:5 86:11 117:3
printed 26:3
prior 39:4,5 44:21
49:11 71:17 73:18
96:18,22 136:11
149:20 176:21
185:21 193:20
privacy 161:19

private 5:7
privilege 29:15
43:21 45:4 66:25
81:23 88:18 90:2
91:22 92:5 102:5
103:3
privileged 71:6
probably 51:18
52:2 93:4,22
161:6 184:24
187:17
probate 30:3
33:17,22,24 34:20
40:17 41:3 67:13
101:15,16 104:4
184:21 188:20
probe 157:24
problem 70:10
71:3 72:7 79:10
90:6 103:2 162:25
problematic 93:22
proceed 7:16
proceeding 6:14
27:4 150:19
proceedings 5:1
70:8 73:8 116:24
141:25 197:6,11
proceeds 21:10
process 63:18
75:10,24 78:1
80:2 99:9 111:22
157:14 167:3,6
produced 34:15
producing 15:20
product 145:16
professional
148:19 197:5
professionally
160:24
progeny 49:2
52:11

**program**  19:20
**promise**  85:23
**proof**  119:1
**proper**  34:10
**properly**  65:5
**protect**  78:10
**protocol**  34:10
**provide**  15:6
**public**  196:19
   197:23 198:14
**purporting**  164:23
**purpose**  106:10,23
**purposes**  149:13
**pushing**  146:8
**put**  11:21 12:11
   16:1 17:4 61:18
   61:19 62:3 74:7
   85:20 94:1 111:16
   147:19 165:6
   171:10 187:2
**putting**  26:18
   146:10 147:12

**q**
**qualification**  28:9
   90:8
**qualifications**  89:1
   89:22
**qualified**  142:20
**quarrel**  72:12
**quarters**  175:6
**question**  9:8,19,20
   17:2 19:19 24:13
   32:22 55:5 60:6,7
   60:18 69:19 70:11
   70:13 71:1,6,7,15
   71:23 72:17,24
   79:20 80:5 81:3
   82:8 87:5,12,23
   88:21,22 90:7,10
   94:9,18 100:22
   107:17 115:2

130:16 132:16
138:5 139:10
147:1,4,9,17
152:20,20,22,24
154:5 156:5 160:3
160:8,16 163:14
164:5 166:11,14
166:18,18 167:2
168:17 170:24
171:9,14,16
172:22 174:25
177:2,9,16,19
178:3,5 181:18
185:20 187:11,24
192:15 193:2
**questioning**  78:19
149:16 162:7
**questions**  8:11
   10:3 56:12 64:2
   64:16,21 65:2
   71:17 78:8,16
   80:6 91:7 107:22
   109:22 110:19
   140:22 141:12
   145:25 146:9,25
   149:20,22,24
   150:2,3,4,8,17
   151:5,8,22 154:9
   154:12,15 155:1
   155:11 156:3,16
   156:18 157:7
   159:9 161:10
   162:9,17 163:25
   168:23 169:22,24
   172:4 174:12,14
   174:17 175:18
   177:14 179:5,8
   180:21 181:23
   187:8 192:13,19
   193:8

**quick**  175:19
**quickly**  31:7
**quiet**  94:11
**quite**  43:24 79:2
   102:14
**quote**  42:20 99:25
   159:15

**r**
**r**  199:1,1
**r.j.**  1:9 3:3 5:18
   7:4,6 8:10 199:2
**raise**  6:19 185:22
**raised**  171:11
   172:6
**raising**  171:12
**rapidly**  45:12
**reached**  154:1
**read**  23:23,23,24
   24:3 26:17 28:14
   28:17,18 29:1
   30:24 31:7,11,14
   31:22 57:2 62:11
   62:15,20 65:18
   66:8 83:6,7,10
   88:6 98:11,16,19
   112:5 119:25
   120:2 125:8,12,18
   131:5,5 134:4,14
   136:1 137:11
   138:4,25 140:1
   152:16 164:23
   170:11 176:16,18
   176:22 177:5,7,23
   178:12,16,17
   181:7 186:9,13
   193:10,13,17
   194:6 198:3
**reading**  24:1
   31:10,16 58:17
   65:18 66:2 69:1
   75:3,8 77:9 83:8

137:7,8 193:21
**reads**  48:25 52:10
   72:18
**ready**  59:20
   128:12 129:5
   174:22 187:10
   188:5
**real**  109:17
**really**  14:7 19:6,7
   31:18 32:12 33:15
   34:5 40:14 50:2
   50:14 51:9 52:3
   53:10 54:17 57:16
   58:19 65:22 74:25
   91:21,25 102:7
   104:11 127:11
   129:7 130:24
   144:20 145:14
   146:19,20 178:7
   180:25 182:21
   185:8
**reasking**  169:24
**reason**  38:19
   55:20 104:8 108:3
   125:2 126:20
   159:24 172:25,25
   176:15 183:22
   192:3 198:19
   199:4
**reasons**  21:12,13
   40:11,15 41:5
   135:16 176:8,16
   177:4,6 178:12,15
   183:22
**reassure**  56:10
**recall**  18:25 19:19
   19:24 20:12,15
   21:19 23:6,7,13,16
   23:17 32:12 40:16
   42:8 43:14 50:14
   51:7 54:14 58:10

58:15,23 62:23
65:2 66:4,12,22
68:16 76:15,16,17
76:19 88:15 97:15
97:20 101:18
105:1 112:7,17,18
114:11 115:25
116:19 123:3,14
126:8,9 129:11
130:24 133:18
136:22,24 137:6,8
142:12,15 153:4
169:18 171:2
173:15,20,21
174:4,6 193:21
**receipt** 17:7
**receive** 21:15 23:4
**received** 15:12
19:9 21:14,17
23:3 35:13 40:25
50:8
**receiving** 23:13,17
**recess** 59:16 77:1
97:9 120:14 124:6
149:6 161:24
**recipient** 19:2
**recognition**
172:23
**recognize** 107:10
128:21
**recollection** 20:1
58:16 65:12,14,15
66:1 89:8 136:16
137:21
**recommend** 86:8
88:12 156:1
**recommendation**
156:2
**recommended**
86:1 87:7 88:8,11
89:23 95:4,8

**reconcile** 157:16
**reconsider** 140:25
142:14
**record** 5:4,14 6:12
8:19 13:10,18
29:21 39:4 45:3
55:16 59:15,18
73:5,6,9,13,15
76:21,25 77:3
91:2,19 92:14
93:2 97:5,8,11
108:7 120:10,13
120:16 124:5,8
126:16 134:7
140:19 141:22
142:12 146:5,5,6
148:24 149:3,5,9
150:10 155:9
157:18 161:21,23
162:1 171:22
172:16 186:14,20
186:24 197:11
198:4
**recorded** 5:16
**recording** 5:12
11:11 171:24
**records** 20:13
**recovery** 113:21
**redirect** 179:9
**refer** 36:19
**reference** 102:22
138:10
**referring** 112:1
116:21 122:13
**reflect** 148:24
171:24
**reflected** 59:25
60:11,19 61:5
**reflection** 167:22
183:21

**refresh** 133:19
**refused** 198:23
**regarding** 22:23
38:20 89:14
118:18 126:12
146:16 149:21
150:17 154:12
162:7 167:4
191:12
**regardless** 52:21
**regards** 143:23
190:25
**registered** 197:5
**rehire** 104:2
**reigning** 91:13
**reimbursed**
113:20
**reject** 156:2
**relate** 147:3
**related** 6:7 20:25
146:11 148:5
149:16,25
**relating** 162:17
**relationship** 27:24
27:25 106:3
**relative** 197:13,14
**relied** 43:25 60:23
61:1,4
**relying** 176:3,11
**remember** 17:13
38:17 42:8 44:23
58:19 64:6,18,20
65:3 67:10 69:25
94:18 95:25
101:23 103:14,21
114:5,17,22 115:7
128:18 129:7,8
131:8 133:14,15
136:17 137:2,6
139:3 170:5,7
173:25 174:2

191:13 192:11
**remembrance**
172:23
**remind** 172:18
**reminded** 127:21
**remotely** 6:10
**remove** 69:17
**removed** 35:14
67:13
**removing** 4:12
34:20
**rental** 118:5,19
**repeat** 33:4 60:5
81:3 133:5 170:21
177:3
**repeating** 99:7
**rephrase** 55:5
152:25 181:18
**rephrasing** 72:13
**report** 122:15
**reported** 1:24
**reporter** 4:22 6:4
6:17 8:18,23
178:22 186:3,4,6,9
186:13,19,21
187:2,20 190:11
194:24 197:2,6
**represent** 8:10
92:6 93:9,16
176:2
**representation**
39:15 44:8 86:24
100:24
**representative** 1:6
4:12 8:2 34:21
35:15 67:14
**represented** 97:22
125:1
**representing** 7:11
92:24 127:22,23
173:17

**request** 19:9,13
  22:21 90:24
  179:10,12,14,17
**requested** 186:14
**requests** 10:20
**require** 155:10
**requires** 155:16
**requiring** 46:6
**residence** 118:5
**resolve** 93:24
  148:14
**resolved** 20:6
  174:10
**respect** 11:18
  70:14
**respectfully** 94:8
  148:3 172:5
**respite** 46:8
**respond** 122:13
**response** 4:9,17
  14:24 15:3,20
  103:20 113:1
**responsible** 47:20
**resulted** 53:18
**resulting** 41:3
**resume** 13:15
**resumed** 64:13
**returned** 149:7
**review** 30:17
  137:3 139:6,12
  140:3
**reviewed** 75:12,25
  99:11 111:24
  153:10 159:2,16
  165:10 168:5
  169:10,14
**reviewing** 65:17
  74:21 137:1
**revoking** 4:12
  34:21

**rewriting** 53:21
  57:7 63:9 67:24
  68:21 73:22
**rewritten** 63:6
**rewrote** 66:19
  68:7 74:17
**reynolds** 1:9 3:3
  5:18 7:4,6 8:6,10
  24:17 78:7 199:2
**richard** 1:6 2:10
  4:14,15,16 7:9,25
  8:3 38:8,12 46:5,7
  49:3,21 52:12
  53:6 68:25 77:11
  139:7,14 140:4
  145:15 146:23
  147:5 149:17
  150:21 151:5
  153:8,11,11
  158:25 159:3,3,15
  159:17,18 165:8
  165:10,10 169:9
  169:11,15,19
  176:2 191:5,12,17
  192:5,15
**richard's** 38:11
  45:11 53:18,21
  57:7 63:9 73:22
  86:2 87:8 95:9
  107:1 139:6,13
  140:3 142:22
  143:16,23,24
  144:4,13 152:5
  153:10 154:13,19
  159:2 165:9,17
**rick** 2:12 55:4
  56:10 94:12 102:9
  104:12,15,22,24
  105:1 113:3
  144:12 171:25
  179:16 186:8

189:19
**rick's** 175:18
**rid** 101:25 183:22
**right** 6:19 9:3,17
  10:6,23 12:14
  13:14,25 14:12,19
  15:23 17:17 18:17
  19:1,4 22:21
  23:10,20 24:16,23
  25:8,10,17 27:2
  28:2 32:10,13
  33:11 35:10,23,25
  36:3,15 38:5,22
  40:22 41:2,18,19
  43:7,9 44:4,14
  45:5,16 47:15,19
  48:4,6 54:6,8,21
  54:21 55:20 56:22
  59:22 64:4,7,15,24
  67:15 68:1 69:6,9
  71:5,6 72:17 73:1
  74:2 81:9,9,17
  84:11 85:2 86:12
  88:3 91:2 92:18
  92:22 93:15 94:25
  95:12 96:6 99:18
  101:18 106:1,5,12
  107:20 108:7,20
  111:14,18,19
  112:13,23 114:10
  114:12 116:14
  119:10,12 121:24
  124:14,21 126:9
  127:3 130:10,13
  130:15 132:16,21
  134:2,22 135:13
  136:5 137:18
  143:7 147:7
  148:20 154:22
  158:20 163:6
  165:5 166:13

169:13 172:10
  173:7,9,11,12
  175:2,3 181:22
  182:1,2,17,18
  186:5 188:18,25
  191:3,15 192:7
  193:24
**rights** 141:6
**rjdpa.com** 2:12
**road** 90:15
**rob** 121:8
**robert** 2:20 7:7
**roberttrammell45**
  2:22
**role** 49:10
**room** 6:9 57:20
  65:21,23 70:8
  73:8 78:15 91:16
  148:23 149:2,7
  161:17 169:25
**rpr** 1:24 196:19
  197:23
**rude** 18:13 34:11
**ruled** 155:7
**ruling** 93:5 143:11
  143:20 154:25
**rural** 37:10
**rushed** 30:25 31:1

                **s**
**s** 199:1
**salary** 123:6
**sandwich** 162:5
**sat** 78:6 91:6 94:7
**saturday** 64:14
  65:9,11 174:3
**saw** 58:24 61:14
  77:23 100:14,19
  100:23 101:7
  182:4
**saying** 11:3 23:25
  41:19 44:25 47:24

54:1 63:16 74:4
77:23 88:1 89:9
92:15 102:17
114:24 142:19
151:15 187:3
194:17
**says** 13:2 19:8
20:5 25:9,13,23
36:22 37:7 38:6
38:25 39:9 44:5
45:10 46:4 48:20
53:6,16 73:19
77:11 80:13 85:25
108:2 113:12,16
115:7 118:2
122:12 134:13
135:25 138:6
139:2 145:23
158:3,24 159:14
160:9 164:4,8
169:9 187:23
**scope** 140:23
141:2,13
**screen** 187:13,23
**seal** 196:12
**second** 1:1 5:20
11:13,14 16:21
25:17 35:7 38:23
38:24 76:22 87:18
109:20 113:10,11
124:22 134:11
142:15 157:5,5,11
157:13
**see** 10:10 17:8
19:2 21:20 24:14
25:7,9 26:1 30:13
34:23 35:2 36:22
43:16 45:15 49:19
53:23,24 55:22
62:19 63:10 64:18
65:3 70:11 77:15

103:21 118:20
119:4 124:24
127:20 128:1
131:13 132:23
133:19 136:18
145:6 146:14
160:7 161:11
162:22 163:6,11
163:19 166:19
167:17 182:12
**seeing** 46:21 58:16
**seeking** 155:19
**seen** 10:19
**selected** 98:23
**send** 13:10,25
17:16 141:19
**sending** 104:5
133:16 178:14
188:20
**sense** 91:12 154:21
**sensitive** 5:7
**sent** 17:13 20:10
20:11 41:22,23
118:18 122:15
181:8
**sentence** 37:12
42:19 44:5 46:8
48:20 53:16,25
57:2 68:20,24
73:18 77:11 87:14
88:6 89:3 95:7
116:20
**serious** 109:22
110:19 111:4
**set** 15:20 20:16
46:1 53:1 105:22
123:23
**settlement** 41:17
**seventy** 175:6
**shakespeare**
103:10

**shaking** 177:13
**shape** 188:9
**shared** 32:16
**sheet** 4:14,15,16
4:23 54:16 65:4
66:9 108:9 109:7
109:19 110:14,16
130:13 132:20
133:8 134:6 135:4
137:4 140:23
143:23 146:21
152:3 155:13
157:22 158:23
160:8 167:17
169:8 170:1 198:4
**sheets** 53:20 54:5
54:11,19,22 55:6
56:23 57:6,18,25
58:4,8,12,17,24
63:1,5,8,18,22
65:7,13 66:19
67:23 68:7,12,21
69:1,4,12,22 73:21
74:3,14,20 75:3,8
75:11,24 76:8,14
77:8 81:21 82:19
86:4 95:16,21
98:6 99:10 106:23
107:1,8 111:23
112:9,21 116:22
117:4,7 130:17
131:7 132:3,7
133:12,17,21
136:14,20 137:1
137:25 138:5
139:22 141:7
143:3,16 144:7,13
144:17,23,24
145:3,4,8,15,22
146:10,17,24
147:5,11,14,24

148:5 149:16
150:1,5,22 151:6,9
152:5,7,11,14
153:4,9,11 154:14
154:18,20 155:24
157:4,15 158:11
159:1,4,17,19
160:11,11 162:8
163:9,16 165:9,11
165:17 166:2,7,24
167:4,7,21 168:5
168:11 169:11,15
170:2 171:1,4
173:18 175:11
190:3,4,9,13,15
191:6,7,12,17
192:5
**shift** 113:19
115:24 116:1
**shop** 103:6
**short** 58:21 123:23
**shortcomings**
53:18
**shorthand** 197:8
**shortly** 36:1
**shots** 98:14,15
**shoulder** 31:7
**show** 30:3 32:4
41:3 97:24 101:13
119:3 121:22
141:5 144:11
**showed** 63:21
65:13
**showing** 40:17
186:25
**shown** 19:1
**shows** 35:8 126:18
**side** 148:25
**sided** 108:17
**sight** 98:19

**[sign - staying]**

sign  16:25 17:2
  23:4 28:3 68:25
  69:12,22 74:20
  75:2 76:7,14 77:8
  84:2 111:25
  159:13 169:3
  170:3,8,25 198:23
signature  16:23
  25:23 107:10,18
  107:23 109:11,15
  109:24 110:6,20
  111:5 124:23
  133:25 134:19
  135:12 136:4
  145:3 198:19
signed  16:5,6,9,16
  22:22 23:15,22,22
  23:25 25:18 26:5
  26:7,22 28:7,10,14
  30:19 32:13 36:4
  40:23 54:19,22
  55:6 56:23 58:5
  59:22 60:9,17
  61:4,13,20,24 62:2
  62:12,16 63:19
  65:8,8 75:7,13
  76:2 81:21 82:18
  99:12 109:15
  113:3 125:3 134:3
  134:8,17,25 135:9
  135:14,24 136:9
  137:5,11 149:17
  153:16 159:18
  167:18 169:12,16
  170:1 171:3
  176:23 177:24
  181:7 193:9
significance  30:10
  147:6
signing  26:13
  54:14 77:14 81:1

81:21 82:18 104:9
  137:6 153:17
  159:11,13,16
  169:1,3,10 170:15
similarly  176:7
simple  72:9
  145:14 167:2
simply  52:4
  114:13 159:21
single  147:1
sir  56:14,14,16
  59:21 164:6
  174:23 178:1,3
  179:1 185:19
  186:24 189:24
sit  70:14 183:13
  192:22
sitting  41:5 65:16
  65:25 75:22
  109:14 184:10
  194:14
situation  146:12
  174:24
slide  82:12
slip  37:3
small  37:10
  161:17
smaller  39:21 54:9
  57:3
smiling  173:9
smoking  8:7
soft  11:4
solely  100:22
solicited  39:14
  44:7
somebody  55:18
  70:22 72:18
  100:15 163:1
sorry  10:16 12:23
  18:12 24:3 59:24
  63:13 76:18 80:14

81:2,7 85:24
  102:25 133:3
  142:6 144:15
  151:3 165:20
  166:20 179:2,7
  185:22 188:1
  190:11 192:16
  194:24
sort  192:14
sound  64:4
sounds  92:19
  93:12 98:21
source  15:14 43:1
  67:21 68:5,20
  70:24 71:19 76:4
  77:6 82:15 180:12
  181:2 194:11
sourced  70:18,18
south  172:13,14
speak  11:5,8 76:22
  92:3 140:20
speaking  100:20
  106:25 136:21
  179:1
specific  25:2 88:22
  100:17 129:8
  142:8,15
specifically  63:6
  142:10,11
speculate  192:20
spend  31:10 51:22
spent  50:23 52:6
  97:25
spirit  115:19
  164:14,18
spoke  32:20 36:5
  82:22 167:14
spoken  11:4 67:16
  98:25
spot  64:7

stamp  17:7
standards  113:18
start  11:15 15:25
  30:1 108:4 186:25
started  49:23 64:1
  171:18 174:4,8
starting  46:1
  164:19
starts  25:12 87:6
  114:2 139:4
state  6:10,14 103:4
  149:13 196:3
  197:3
stated  63:1 153:8
statement  25:11
  26:9 28:14,16
  30:18 31:17 32:15
  36:15,19 37:5
  38:23 40:6 45:10
  46:15 49:5 52:9
  52:23 59:25 60:9
  60:19 62:4,4,21
  63:4 69:11 70:15
  70:23 71:8 72:11
  73:24 76:6 84:2
  87:11,13 99:23,24
  134:4 135:25
  139:12 159:7,22
  159:23,23
statements  45:7
  60:10 61:5 67:22
  68:6 87:12 125:18
  125:21 126:1
  134:8 157:20
  198:5
states  24:9
stating  55:8 56:24
stay  91:14 94:11
stayed  177:18
staying  192:7

stenographer 6:19
stenographically
  1:24
step 70:4 91:16,17
stepped 70:7
  78:18
steps 126:6
stick 85:23
stipulate 13:24
stood 148:25
stop 9:9 40:1
  140:7 147:11
  150:17 153:23
  169:13
stormed 149:2
straightforward
  144:20
strapped 21:7
straw 35:19 40:20
street 3:4 35:9
stretch 80:2
strike 62:10
strongly 172:1
struck 143:5,19
struggle 10:3
struggling 72:20
stuff 42:1 121:3
subject 149:25
  150:18 154:19
  160:2
submitted 112:23
suborn 117:8
suborned 116:21
subscribe 134:7
  134:15 136:2
  170:12 180:10,23
  181:8 198:4
subscribed 198:10
substance 59:7
substitute 39:3

sue 163:1
sufficient 122:17
suggest 48:14
suggesting 70:19
  141:10 177:22
suggestion 148:11
  185:12
suit 38:9,13
suite 3:4
summer 45:11
sunday 64:25 78:3
  80:3
superficial 185:8
  187:16
supervision 197:9
supposed 172:9
  185:4
supposedly 118:4
suppress 143:1
sure 9:23 12:6
  18:19 19:18 26:15
  33:5 49:24 60:6
  70:6 71:11 75:17
  75:20 87:17
  109:16 111:2,7
  130:6 131:25
  132:8 141:17
  142:4 144:19
  152:15,20 156:13
  159:10 162:11
  163:18 167:19
  168:25 179:18,22
  194:15
surgical 89:4
swap 120:18
swear 6:17,21
  48:18 76:6
swearing 48:17
  136:10
swore 165:7

sworn 7:1,19 48:9
  73:19 81:18 99:24
  138:4 157:20
  172:19 196:10
  198:10
system 27:6,9,13

t

t 199:1,1
table 43:22 56:18
  149:1
tainted 85:8
take 5:13 9:12,14
  32:9 39:21 40:8
  45:13 46:7 52:24
  57:2 58:21 75:6
  88:1 89:4 92:12
  98:8 103:16
  123:23 124:3
  138:14 140:20
  142:13 148:9,15
  148:17,19,20
  151:17 161:17
taken 5:17 8:14
  45:23 46:24 48:21
  50:10,25 58:11
  64:9 93:21 107:8
  109:8 110:15
  126:7,18 129:23
  143:25 190:3
  197:7
talk 29:13 92:13
  93:23 141:9
talked 19:17 45:24
  48:22 67:11
  105:14 117:3
  146:1 151:12
  165:24 166:23
talking 18:19 34:3
  67:22 99:14 103:5
  142:24 144:18
  160:12 184:10

tall 188:4
tallahassee 1:21
  2:16,21 121:10
taught 173:8
technically 90:3
tecum 4:8,9 14:25
telephone 24:10
telephoning 19:20
tell 6:21 8:15 9:10
  26:23 27:15 36:6
  45:21 48:12 55:25
  56:6,13 61:20
  62:19 66:23 73:11
  74:11 76:13 80:23
  81:17 89:13,21,23
  90:7,12 95:17,20
  101:23 102:2
  105:17 112:8
  125:15 129:17,23
  130:7 131:21
  159:21 161:14
  171:12 184:9
  192:21
telling 13:11,12
  27:7,9 45:20
  52:13 76:19 88:16
  97:16 194:14
tells 9:20 158:18
ten 50:25 97:25
  98:3 168:22
term 54:10 101:5
  166:24
terminated 113:12
termination 86:24
  113:17
terms 33:25 78:19
  187:13 189:11
test 12:5,7
testified 7:2,20
  65:19 111:21
  137:24 153:2

| | | | |
|---|---|---|---|
| 157:2 166:1 | theory 143:2 | third 25:12 36:21 | 88:13 89:11 98:23 |
| testify 72:5 80:7 | thing 25:2 41:8 | 37:7 93:21 107:21 | 100:12,21,23 |
| testifying 129:20 | 43:18 44:1 49:24 | 107:25 108:8 | 101:8 106:21 |
| 152:4 | 101:13 127:3 | 110:14 119:20 | 112:12 113:2 |
| testimony 8:17 | 151:18 156:11,20 | 188:22 | 118:18 119:9 |
| 10:4 49:3 52:13 | 174:16 185:7 | thought 41:9 | 120:20 121:17 |
| 53:7,19,22 54:18 | 187:15 | 52:22 61:13 79:8 | 122:11,20 123:1,4 |
| 55:9 56:25 57:8 | things 25:2 29:8 | 81:10 90:5 104:7 | 123:5,8,12 127:8 |
| 59:8 63:9 66:2,20 | 29:10 36:6 51:6 | 104:14 105:16 | 127:24 128:3,10 |
| 68:8,22 69:4 | 57:22 61:14 62:4 | 122:16 151:2 | 129:4,11 136:20 |
| 73:22 75:23 79:15 | 65:19 70:17 79:3 | 162:5 | 153:20 160:14 |
| 79:22 102:13 | 79:5,16 102:11 | thoughts 59:25 | 173:22 174:7 |
| 117:7 132:9,18,25 | 104:6 131:4 176:5 | threaten 114:9 | time 6:14 21:7 |
| 133:17 136:11 | 180:4 181:6 | 116:17 | 23:8 31:1,13 33:8 |
| 137:4 138:2,13,20 | 193:11 194:9 | threatened 121:22 | 33:19,20 38:13 |
| 140:2 141:7,8 | think 10:21 11:22 | threatening | 39:14,20 41:14 |
| 142:23,23 144:4,6 | 12:24 17:13,14,15 | 113:22 114:14 | 44:7 46:5,10 47:3 |
| 144:14,23 145:21 | 19:17,18 22:1 | 149:2 | 47:8,24 49:18,20 |
| 147:2,10,23 148:5 | 33:16 34:4 38:19 | three 12:6,7 25:1 | 50:19,23 51:21 |
| 149:21 152:4 | 39:8 42:11,11 | 31:11 36:16 64:2 | 57:21,23 58:5,13 |
| 153:2,5,12 154:13 | 43:18 45:7 60:10 | 78:22 79:15,22 | 58:13 59:15,18 |
| 155:13 157:11 | 70:13 71:1,22 | 81:8 83:7 90:22 | 61:14 62:11,21 |
| 158:2 159:4,20 | 72:13,17 83:10 | 92:23 93:3 94:8 | 64:20 77:2,12 |
| 160:1 163:21 | 85:20 86:10,18,25 | 94:10 98:6 108:1 | 78:15,20 80:9 |
| 164:11 165:11,13 | 89:17 90:13,18,22 | 108:2,13 111:16 | 82:5 83:8 96:16 |
| 166:25 168:12 | 93:2,24 102:18 | 126:23,24 135:5 | 96:18 97:7,10 |
| 169:4 170:19 | 131:24 140:22 | 138:9 155:11,23 | 98:10 102:6 |
| 172:20 176:21 | 141:1,12 143:15 | 175:6 188:8 189:4 | 112:11,12 120:12 |
| 190:10,14,16,17 | 144:1 150:15 | 194:6 | 120:15 122:17 |
| 190:17 191:1,13 | 155:15 156:6 | thursday 1:16 | 123:22 124:4,7 |
| 193:20 | 158:16 159:12,25 | 64:10 65:10 | 125:8,9,13 127:7 |
| text 13:11,25 | 160:3,17 162:2,5 | tim 4:17,18 18:8 | 132:9 138:14 |
| thank 7:15 14:2 | 166:9 169:2,23 | 18:16 19:5,21 | 142:15 143:11,18 |
| 16:3 22:12 59:2 | 171:8,10,13,19 | 22:24 24:23 29:6 | 145:9,12 149:4,8 |
| 59:13 79:9 81:6 | 173:3 177:14,15 | 29:11,25 30:14 | 161:22,25 169:18 |
| 85:19 88:3 89:6 | 179:3 183:25 | 33:6,21 35:19 | 174:12,15 176:3 |
| 94:13 108:18 | 184:1 186:24 | 36:6 43:6 44:17 | 187:4 190:2 191:6 |
| 168:15 170:24 | 191:9 | 49:8,10 50:23 | 193:9 194:2 197:7 |
| 175:21 179:23 | thinking 49:25 | 51:10,15 52:25 | timeframe 95:25 |
| 189:23 193:7 | 127:17 169:25 | 66:1 68:12,17 | timeline 86:10 |
| | | 76:6,13 77:7 | 88:14 |

**times** 31:11,14
  83:8 94:10 129:8
  147:24 153:25
  194:6
**timewise** 67:8
**timothy** 25:14
  36:24 37:2
**tobacco** 1:9 7:4,6
  8:6 24:17 39:11
  39:25 40:7,13
  41:7 43:6 44:7
  95:5 96:19 101:12
  104:17 105:12
**today** 8:11,15
  10:20 41:5 54:11
  65:25 67:11 70:14
  75:23 105:20
  109:14 111:21
  112:5 138:2
  159:24 166:3
  174:15 175:5,8
  180:2 183:14
  184:9 185:12
  192:22
**today's** 10:7
**told** 29:10 43:5,25
  44:17,21 45:2
  52:21 61:18,21
  62:5,24 69:3
  99:16 101:12
  112:20 114:4
  116:9 125:4,7
  128:14 131:18,19
  133:7 153:16
  166:3 180:24
  183:12 191:10
**tolerate** 90:21
  91:21 93:11,12
**tolerated** 90:17
**tolerating** 55:21
  90:20 93:18

**tone** 171:13,25
**top** 24:6 36:22
**topic** 86:16 94:25
  153:24 155:12
  192:21
**torturous** 46:6
**total** 136:16
**totaled** 98:7
**touched** 157:7
**tough** 119:24
  120:1
**town** 37:10
**track** 141:12
**training** 47:14
**trammell** 2:20 7:7
  7:7 13:1 59:12
  164:21 188:3
**transcript** 8:22
  53:21 57:7 63:8
  65:19 73:21 98:12
  98:20 126:15,18
  127:14,18 131:6
  134:4,7,14 136:1
  139:9 140:6
  170:11 187:3
  193:13 198:3,4
**transcripts** 95:12
  98:5 139:7,13
  140:4 159:17
  169:11,15
**transfer** 39:5
**transferred** 39:1
**translated** 197:9
**transparent** 92:20
**trial** 45:13 105:22
  112:12,14,15
  113:23 114:14
  115:23 118:3
  119:1,3 121:22
  141:6,7 142:25
  145:17 151:11

**172**:18
**trials** 40:9
**tried** 39:12 41:8
  41:20 42:21 43:6
  44:6,23 89:16
  101:20 115:24
**trigger** 166:21
**triggered** 30:2
**trouble** 83:17,20
  83:25
**troubled** 178:7
**true** 25:25 26:9
  31:17 37:13,23
  38:3,14 39:6,16
  40:2 42:23 44:8
  45:17 48:23 49:4
  53:8 54:3 57:9
  66:20 69:10,21
  70:23 71:12,13,14
  71:18 72:4,10
  73:23 74:5 77:17
  95:11 109:13
  113:13,24 116:25
  125:17 180:25
  181:9 194:12,18
  194:19,21 197:10
**truth** 6:21,22,22
  8:15 26:23 27:7
  27:10,15 63:2
  106:16 129:17,24
  129:24,24 136:12
  145:2 189:16
**truthful** 10:4
  87:10,13 105:17
  131:9 132:25
  133:9 135:2,17
**truthfully** 17:12
  61:2
**truths** 189:14
**try** 11:19,19 13:6
  34:7 58:3,22 87:2

**101**:19 115:9
  116:1 142:18
  145:9
**trying** 79:10 86:22
  100:16,18 102:11
  133:3 148:1
  150:16 154:21
  157:18 187:5,25
**tuesday** 64:5,8
  65:20 78:7
**turn** 5:9 16:21
  22:15 28:23 36:21
  38:22 80:10 99:21
  107:20 113:10
  118:1,12 122:3
  127:10 130:2
  131:12 132:13
  134:11 135:4
  139:19
**turned** 14:9
**tv** 29:12
**twenty** 49:17
**twitching** 43:16
**two** 12:5,7 13:3,3
  24:23 30:6,7
  50:25 55:21 68:18
  83:7 87:12 89:15
  89:15 90:14,17
  92:12 94:8 102:11
  107:21 108:9
  119:9 126:23
  127:12,18,21
  135:5 155:23
  156:25 157:1,7,17
  164:23 168:22
  177:21 184:24
  188:8 194:6
**typed** 186:10
**typo** 37:1

[ugh - wanted]

**u**

ugh  80:18,18
um  10:13 18:10
  19:11 28:25 29:22
  36:14 39:22 63:11
  77:16 79:14 83:3
  84:17 97:4 112:19
  114:7 118:21
  131:14
unaddressed
  172:12
uncertain  192:9
underprivileged
  37:9,19
undersigned  196:8
understand  8:14
  8:17,22,25 9:3,9
  9:13 10:3 18:14
  20:1 26:15,20
  27:3,13 28:22
  30:6,9,14 45:6
  53:25 55:7 59:4
  79:5,11 80:6
  84:11,13,15 87:25
  92:10 101:6 106:2
  145:18 150:9,13
  157:24 158:8,10
  170:9 173:4
  177:22 185:4
understanding
  32:15 34:8 36:9
  37:16 41:11 48:9
  54:15 69:8 74:10
  106:10 164:14
understands
  157:19
understood  8:12
  21:8 26:7,22
  31:15 53:4 56:23
  60:7 61:10 92:25
  132:18 134:25

135:14 153:16
158:11 160:22
170:14,17
unhappy  101:4
uninformed
  143:14
unique  6:2
unit  5:15
unnecessary  11:16
  72:15
unpunished  12:10
unrelated  21:12
  21:13
unsigned  125:3
unsure  109:10
untenable  147:20
untimely  189:21
untrue  37:17
  78:24 140:12
upper  130:9
upset  166:19
  185:8 187:16
urgent  45:14
use  21:10,12 36:18
  37:14,14 83:9
  88:11 93:19 101:4
  103:17 106:7,13
  106:18,22 116:23
  181:20,22
usually  107:15
utilized  184:3

**v**

vann  3:13 6:1
various  127:22
ver  187:16
veracity  145:3
verbally  131:24
  185:8
verdict  113:21
  123:12 143:12

verified  153:11
  159:3,18 165:10
  168:11
veritext  6:5
version  23:5,14
  125:3,4
versus  5:18
video  5:12,15 6:2
  12:2
videographer  3:13
  5:3 6:3 7:15 59:14
  59:17 73:14 76:24
  77:2 97:7,10
  120:12,15 124:4,7
  141:21 149:4,8
  161:22,25
videotape  9:1
  171:23
videotaped  4:8
  8:18
view  84:1 164:10
viewed  183:21
viewpoint  157:20
views  194:20
vile  185:9 187:19
  187:20,21,23
violate  27:14
violations  122:14
violent  187:18,24
volume  1:12 4:14
  4:15,16 107:21
  108:9 109:8,20
  110:16 135:4,20
  138:8 155:23
  195:2
volumes  126:23,23
  126:24
vs  1:7 199:2

**w**

waiting  177:10
waive  102:7
waiver  43:16
waiving  90:15
want  9:24 13:8,20
  13:20 16:13 18:18
  26:15,20 30:6
  32:19,22 36:21
  37:6,20 40:23
  56:9,11 57:4 59:4
  69:16,16,18 70:4
  72:15,25 74:7
  75:20 79:4 80:12
  82:12 84:20 85:7
  85:12 87:16,20,23
  89:5 91:1 92:20
  93:13,19 102:6
  105:18 107:4
  109:2 111:2
  113:11 114:23,25
  115:1,8 117:9
  118:12 122:10
  123:25 125:5
  128:9 129:2,2
  143:4,8,10,13
  148:13,18,19
  149:10 150:16,20
  152:19 154:15,17
  155:21 157:15
  161:7,16 162:9,16
  164:6 165:6
  169:23 172:12
  175:22 179:2
  192:18,18 194:8
wanted  30:13
  61:18,23 62:3
  101:25 103:16
  123:16 139:8,15
  140:5 153:12
  159:5,20 162:2

[wanted - years]                                                    Page 32

165:12 168:12
176:13
wants   13:6
way   27:21 32:4
38:1 44:15 56:2
61:9,10,14,19
66:17 70:25 72:6
72:13,25 74:1,5
79:7 80:3 99:11
111:9 130:21
149:1 165:1
173:21,25 174:6
181:10 182:13
188:9 191:4,16,21
192:22 193:5
we've   67:22
106:25 149:14
158:16 160:24
weak   111:7,12
webster   106:15
webster's   106:8
wednesday   64:5,8
65:9,10,20 78:7
week   46:7 50:13
52:1
weeks   47:5 50:1
105:15
welcome   13:16
150:3,12
went   42:1 57:21
81:7 100:20
158:12 166:25
177:8
whatsoever   28:6
49:10
whispering   5:7
wholeheartedly
93:14
widow   37:9
wife   47:19

williams   43:12
51:11,21 65:16
68:9,11 76:10,11
76:12 82:21,22
86:2,8,17 87:8
88:9,15 89:10,13
89:21 95:3,9,15,17
95:20 96:3,14,18
96:21,24 99:15
112:8,20 127:25
128:6,10,22
133:16 136:23
153:20 160:14
173:22 180:19
191:10,15 192:3
wish   162:15
withdraw   162:6
170:23
witness   4:2 6:18
6:23 10:13 11:11
12:7 25:21 27:19
29:20,22 44:17
52:16 55:11,14
56:17 60:14,21
61:9 62:7 69:24
70:4 81:14,24
82:9,13 84:9
85:10,14 99:4,19
103:8 105:9
107:14 110:3,22
111:7,14 117:17
117:22 123:18
124:2 126:4 129:7
130:7 131:14
133:5 137:20
138:16 139:17
140:10,14 141:11
151:18 156:11
162:24 165:21
166:22 168:8
170:21 171:17

172:18 175:20
177:23 178:3,24
179:7 180:15
181:4,12 184:5
185:24 186:1
187:21 188:14
190:20 193:3,21
194:4 195:1 196:9
196:12 198:20,21
198:22,23
witness's   198:19
woman   92:24
118:6
wondering   92:11
word   11:3 38:1
50:8 57:15 69:17
88:11 93:18 94:10
106:7,11,18 146:2
164:24 169:7
183:6,11,20
187:23 190:6
worded   38:2
words   17:15 23:17
39:23 41:11 43:5
50:12 57:4 60:23
65:19 74:7 83:9
95:21 99:7 100:4
100:5,6,8 101:6
181:24 182:3,4,7
183:24,25 184:2
188:10
work   22:16 51:12
58:22 66:7 67:2
89:18,25 98:16
113:17 120:4
121:15 122:8
176:4
worked   157:14
161:1
working   17:20
97:25 122:24

works   117:4
world   48:16
worse   175:11,15
write   37:15 182:24
writing   19:24
136:6
written   21:24
60:10 159:23
160:13 170:18
182:23
wrong   26:18,20,21
29:6 42:13 52:22
54:6 74:3 85:1
91:11 92:9 96:5
106:21 140:24
141:4 142:6,13
143:7 144:11
158:4 191:11
wrote   48:9 52:21
76:5 82:16 98:24
100:6,8 121:1
143:17

              x

x   4:1

              y

yeah   14:3,11
21:13,13 40:4,19
40:19 41:1 51:4
72:8 85:21 91:18
99:19 101:16
105:6 109:4,5,5
119:11 122:1
128:11 129:1,13
147:12 160:17
161:9 162:4
179:24 186:3
year   37:8 62:16
67:6 105:22
years   30:6,7 104:6
105:15 110:6

**[years - yup]**

184:23 188:23
**yesterday**  10:22
14:20 15:7 18:2
34:15 105:21
**younger**  94:21
**yup**  37:5 162:21

# EXHIBIT E

# Howard & Associates
## Attorneys at Law, P.A.

*Dr. Tim Howard, J.D., Ph.D., Senior Partner\**
*Florida Supreme Court Certified Mediator*

Tallahassee Office:
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Ph: (850) 298-4455; Fax: (850) 216-2537
Tim@howardjustice.com

Fort Lauderdale Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332-3633
www.howardjustice.com

Cambridge Office:
8 Museum Way
Suite 2407
Cambridge, Massachusetts 02141
(857) 277-0990

July 28, 2017

**VIA HAND-DELIVERY OR EMAIL**

Jon Fuchs, Assistant State Attorney
Second Judicial Circuit
301 North Monroe Street, Suite 475
Tallahassee, Florida 32301
(850) 606-6000

Jennifer Alane Hawkins, Assistant State Attorney
Fourteenth Judicial Circuit
421 Magnolia Avenue
Panama City, Florida 32401
(850) 872-4473

Re: Attempts at Extortion, Retaliation and Obstruction of Justice by Criminal Co-Defendants Don
Reinhard and Katie Reinhard (Buxton). Don Reinhard is Currently Facing Criminal Charges for
Violation of Probation for Grand Theft. Don Reinhard and Katie Reinhard are both Facing Criminal
Charges for Felony Child Abuse of a Disabled Child, A Tragedy for the Disabled Child and for the
Co-Defendants.

Dear Assistant State Attorney Fuchs, and Assistant State Attorney Hawkins:

As part of your respective prosecutions of the above referenced violation of probation and felony child
abuse charges, the law firm has assisted by sharing evidence and responding to the subpoena verifying the
felony crimes of child abuse on the phone and in texts between the co-defendants that was shared with
Assistant State Attorney Jon Fuchs and Panama City Beach Investigator, Lieutenant Eusebio Talamantez.
Cumulative Exhibit A. The law firm was unwilling to participate in obstruction of justice and would not
hide evidence nor assist in their criminal defense. In retaliation, the criminal co-defendants are
aggressively attempting to extort the law firm and those that work for and with the law firm. While these
sordid crimes are a tragedy for the disabled child and for both co-defendants, and we hope that the

\*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of
Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D, Northeastern
University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar, and Constitutional
Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with
Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

disabled child receives the security and support he needs, we must inform you of continuing extortion and retaliation by these criminal co-defendants.

Despite receiving "Cease and Desist" letters in late February and early March of 2017, and Don Reinhard executing a notarized "Law Firm Non-Disclosure Agreement and Confidentiality Agreement" that all workers in the building sign, regardless of whether they actually work as an employee or independent contractor for the Howard & Associates law firm, colleagues, employees, experts, lenders, accountant, wife of the owner, owner, regulators, private investigators, and more, have received threatening and extortionate emails, texts, and/or letters dictated or written from the Leon County Jail by Don Reinhard, and/or through his co-defendant, Katie Buxton (now Katie Reinhard since he married Katie Buxton while in the county jail in a fruitless attempt to claim marital privilege for a co-defendant, which marriage was after the crime and after the testimony and documentation of the crime took place). In violation of the "Law Firm Non-Disclosure Agreement and Confidentiality Agreement," based on his statements to date, Don Reinhard may have obtained NFL Concussion Settlement Claim files and may have sought to make changes to the files. The firm doesn't know what is in Don Reinhard's possession. All original client files in the law firm's possession are in order.

Don Reinhard and Katie Reinhard have falsely claimed and implied fraud in NFL Concussion Settlement client files, and have implied that there are other matters that they will expose, if it is not agreed that: (1) the law firm and colleagues participate in obstructing justice and assist Don Reinhard and Katie Reinhard in their criminal defense, (2) Don Reinhard and Katie Reinhard are entitled to amounts that range from $1,200,000 and more several million dollars for Don Reinhard's $3,000 a month consulting work for a private FINRA exempt investment fund, (3) Katie Reinhard is to be paid Don Reinhard's former consulting fee of $3,000 monthly, and (4) $25,000 is to be paid to Katie Reinhard for a car she does not own. Cambridge Capital Group (CCG) has responded to each of the claims against that company, and verified that there were no funds invested nor are there subscription agreements as investors under either Don Reinhard or Katie Reinhard.

The facts are that Don Reinhard was hired as a periodic consultant for CCG, an independent investment company, at $3,000 a month. He has no ownership interest in CCG. He was hired as a consultant in an effort at compassion and rehabilitation of someone that Dr. Howard met at Costco selling wine and who didn't know what to do with his life. He is a former high school football team mate that Dr. Howard had known, but he was not someone that Dr. Howard had been close to. He was not involved with the law firm, and in an abundance of caution, the firm required that all workers on the same floor in with companies in the same building of the law firm sign and commit to a confidentiality agreement in order to protect client information. Subsequent to his dismissal, upon investigation, it has been determined that Don Reinhard was misleading as to the facts and underlying charges for some of his prior crimes. Affidavit verifying independent contractor and consultant status, and affidavit verifying income of $3,000 monthly, as filed by Don Reinhard in January and December 2016 in his Circuit Civil Court Child Support case in Leon County, Florida, and confidentiality agreement, and cease and desist letters, are attached as Cumulative Exhibit A. Moreover, the investment companies are currently owned and managed by third-parties, that this firm represents, and are Nevada companies. Dr. Howard had

approximately $2.4 million invested by the end of 2016, and has approximately $5.2 million invested as of July 28, 2017.

Beginning about a year ago, due to concerns as to Don Reinhard's arrogance, narcissism, solipsism, and resistance to accountability, CCG started a search for a replacement and/or supervisor of his independent contractor consulting work, with a licensed financial planner, licensed investment agent and broker-dealer. After interviewing several candidates, a quality, experienced, respected, and licensed professional with integrity and empathy was found and CCG hired Gail Milon, CASL, CLTC, with 30 years of successful experience, as managing Vice President in December of 2016. She has since hired Bogan Public Management Company (BPMC), and Bill Bogan, Jr., CPA, CGFO, and CBFO, to provide a comprehensive audit to ensure all investment funds are in place and to determine what company profits may have been absconded. BPMC is mid-way through the audit now.

Starting after his arrest in mid-February of 2016, a retaliatory and extortionate scheme to obstruct justice and extort assets by Don Reinhard and Katie Reinhard (Buxton) began, and is found in the various letters and emails from them orchestrated from the Leon County Jail through his co-defendant Katie Reinhard. The conspiracy between these co-defendants begins with the violation of the February 11, 2017 Court Order that specifically directs Don Reinhard: "Do not contact Jesse Buxton or Katherine Buxton." *Id.* The various letters and emails are attached as Cumulative Exhibit B.

As an example, these sordid claims have been spread to experts, clients and lenders of the law firm, falsely claiming that diagnostic medical exams and final reports are forged and hundreds of millions of fraudulent claims have been submitted to the NFL Concussion Settlement Claims facility. *Id.* The facts are that neither Don Reinhard nor Katie Reinhard ever worked for the law firm, though Don Reinhard did sign the law firm confidentiality agreement to protect any exposure to client confidential information, and Don Reinhard was terminated from his consulting work for an independent investment fund in mid-February of 2017. Exhibit C. Don Reinhard was imprisoned in late February of 2017 as a result of violation of probation due to pending felony child abuse charges. As a consequence, neither Don Reinhard nor Katie Reinhard know how vacuous and patently absurd their extortionate and retaliatory allegations are.

These criminal co-defendants don't know that from the currently over 250 clients, and growing, nothing, other than registering them, has been submitted to the NFL Concussion Settlement Claims facility. They don't know that all original medical reports are in the files of the doctors, and only copies are in the files of the law firm. They don't know that all medical records and reports have to be reviewed and signed by a board-certified neurologist formally approved by the NFL Concussion Settlement Claims facility. They don't know that the board-certified neurologists contemplated for use by the law firm were only recently approved in May and June by the NFL Concussion Settlement Claims facility. They don't know that all our NFL Concussion Settlement clients must meet individually for an updated clinical evaluation prior to submission of our clients' claims to the NFL Concussion Settlement facility. They don't know that the firm must have a board-certified neuropsychologist meet with every client to update and finalize their neuropsychological status, and that these updates will begin in a few weeks. They don't know that the law firm manages its files to ensure the file's integrity and client confidentiality. This is just one example of their respective ignorance, arrogance and their vacuous criminal extortion and retaliation attempts.

These letters and emails are replete with these types of criminal schemes, including: (1) attempting to operate a private investment firm from jail and enticing retired NFL players to invest $650,000 with $9,000 monthly income and doubling of value in 7 years, and running a "new firm, Sd5M Capital Management owned by my wife (also known as Scooby/Katie) and I as well as a group of retired players," (2) attempting to extort a "global settlement", "$50,986", monthly payments of $3,000 to co-defendant Katie Reinhard, and $1,200,000 in assets in response to "turning your back on me" and threats of "train wreck for both of our lives and you have more to lose," "the risk and damage your actions will cause to many . . .", "each event carries significant penalties + punishment", "your massive fraud", "30-year prison term", "I have been forced to sue Tim Howard for well over $1 million that he is attempting to steal from me, my family, and my children", (3) attempting to extort these payments and assets through threats and claims of fraud against the NFL Concussion Settlement, tax fraud against CPA, bank fraud and worthless check charges against staff, (4) attempting to extort a $25,000 payment to Katie Reinhard for a car she does not own, (5) use of third-parties and/or alias, such as Tori Reinhard and nflfraud@gmail.com, as part of their extortionate conspiracy, (6) threatening and intimidating experts and lenders of the law firm, (7) threatening and intimidating the independent auditor (BPMC), (9) spreading false and defamatory statements to NFL Concussion Settlement clients, and (10) the following threatening and extortionate tome to Dr. Howard's wife, Jennifer Howard:

> But also, I intend to immediately move forward with current communication I am having with the NFL Claims Administrator and law enforcement via a large national law firm regarding this massive fraud Tim and Howard & Associates have perpetrated against the NFL Concussion Settlement and the 300 plus retired NFL players that are his clients. . . . **Tim and his team have made a massive fraud out of it to bilk the NFL out of approximately $120 million in claims of which he will be paid approximately $30 million in fees. I have been told that the case would likely carry a 30-year prison term** and the collateral damage to many of his employees and associates who know and are involved would be devastating to many lives . . . this does not even include the many, many families of the retired NFL players who are expecting a financial settlement averaging over $600,000 who will be denied due to the fraud involved in their qualification process by their trusted attorney, Tim Howard. The media onslaught that you and your family would have to endure, in and of itself, would be devastating and far greater than tobacco days. I and others began keeping records and documented proof in 2016. While I thought the activity was limited, I was shocked to hear from 2 H&A associates that it was widespread. They came to me in Jan. with concerns of their personal liability. For example, I and others have witnessed forging signatures on files to insure eligibility as well as changing files as needed. There is an abundance of documented evidence to prove this that Tim was unaware was being collected in many forms. . . . **I have told Tim via my letters that I do not want to go down this road unless he forced me to. To date, my communications to the various authorities has been limited by design and anonymous as again, its via a large law firm but they are eager to move forward with details. . . . I must have him simply provide me what is "mine" . . . I cannot start my life over again.** . . . Look at the enormous risk he is taking for him, you and your family. Look at the enormous risk he is taking for the employees of his law firm. Look at the enormous risk he is taking for almost 300 families of retired NFL players. Outside of the NFL and the criminal case, Tim would be sued for millions he has borrowed over the last 4-5 months against his future expected fees as they were based on fraud, sued by multiple legal

advance companies because their loans to players would be unpaid based on Tim's fraud, and sued by all of the investors in the Limited Partnership Investment Funds of CCG, due to their losses because of the fraud (including your mother's investments) which would certainly bring in the SEC. **This is certainly well over $35-$40 million in lawsuits in addition to losing his $30 million in fees. For what . . . "spit for me, which is very foolish" as suggested by 2 of his closets clients who know the situation. Jennifer, let's not make this a train wreck as y'all have far more to lose than I do.** Please discuss this with Tim and send me an email as I will not wait past 4/17 for a response to d123fsu@gmail.com. (emphasis added).

Cumulative Exhibit B. All these actions are an attempt at extortion and in retaliation for not assisting in their criminal defense, for not participating in obstruction of justice, and for assisting the State of Florida in providing damning evidence in support of the prosecution of their crimes.

In light of their rapid fire buckshot, yet vacuous, extortionate and retaliatory actions to date, and the comprehensive evidence of their crimes and the evidence that this firm is providing as a result of its investigation and has provided to assist in the prosecution for these crimes, as well as in compliance with Assistant State Attorney Jon Fuch's subpoena, it is highly likely that these criminal co-defendants will reach out to any source that may come into their respective minds in an attempt to perpetrate their extortion, retaliation and obstruction of justice. In order to expose the extortion, retaliation, and obstruction of justice, and to avoid any knowing or unknowing, and/or direct and indirect complicity by third-parties with their schemes, this law firm is providing a copy of this notice to the Florida Bar, and will provide copies of this notice to any other victim of their criminal schemes that this law firm becomes aware of.

Thank you for your service to Floridians and for your consideration of these matters. This entire episode is a tragedy and we do hope that these co-defendants get the structure, accountability, discipline, and mental health treatment that they need to be productive citizens. As stated in the beginning of this letter, we hope that the disabled child that is a victim of their crimes gets the security and support he needs for a healthy life.

Sincerely yours,

Jaakan Williams, Esq.
**HOWARD & ASSOCIATES, P.A.**
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Office: (850) 298-4455
jaakan@howardjustice.com

CC:   Florida Bar

Page 200

1            IN THE CIRCUIT COURT OF THE
             SECOND JUDICIAL CIRCUIT,
2         IN AND FOR GADSDEN COUNTY, FLORIDA
                  CIVIL DIVISION
3
4              CASE NO. 2014 CA 337
5
MARGARET HARRIS, individually, and
6  as Personal Representative of the Estate
   of RICHARD HARRIS,
7            Plaintiff,
   vs.
8
9  R.J. REYNOLDS TOBACCO COMPANY, et al.,
             Defendants.
10 _____/
11
12                  Volume II
13                 (Continued)
14
15      DEPOSITION OF MARGARET "PEGGY" HARRIS
16             PAGES 200 - 274
17         Thursday, February 13, 2020
18           9:31 a.m. - 4:07 p.m.
19
20
21             Anderson & Hart, P.A.
             1584 Metropolitan Boulevard
22           Tallahassee, Florida  32308
23
24         STENOGRAPHICALLY REPORTED BY:
             JUDY CHIN, RPR, CRR, FPR
25

Page 201

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFF:
4      J.B. HARRIS, P.A.
       3127 Ponce de Leon Boulevard
5      Coral Gables, Florida 33134
       786-303-8333
6      BY: J.B. HARRIS, ESQUIRE
       jbharrisesq@gmail.com
7      (via phone)
8
9  ON BEHALF OF THE PLAINTIFF:
10     RICHARD J. DIAZ, ESQUIRE
       3127 Ponce de Leon Boulevard
11     Coral Gables, Florida 33134
       305-444-7181
12     rick@rjdpa.com
13
14 ON BEHALF OF THE PLAINTIFF:
15     ANDERSON & HART, P.A.
       1584 Metropolitan Boulevard
16     Tallahassee, Florida 32308
       850-894-3000
17     BY: PAUL M. ANDERSON, ESQUIRE
       paul@becausejusticematters.com
18
19 ON BEHALF OF THE PLAINTIFF:
20     ROBERT TRAMMELJ., ESQUIRE
       P.O. Box 1799
21     Tallahassee, Florida 32302-1799
       850-510-2187
22     roberttrammell45@gmail.com
23
24
25

Page 202

1  APPEARANCES CONTINUED:
2
3  ON BEHALF OF THE DEFENDANT/R.J. REYNOLDS:
4      JONES DAY
       1420 Peachtree Street, NE, Suite 800
5      Atlanta, Georgia 30309-3053
       404-521-3939
6      BY: DAVID MONDE, ESQUIRE
       dmmonde@jonesday.com
7  -and-
8      JONES DAY
       901 Lakeside Avenue
9      Cleveland, Ohio 44114-1190
       614-469-3939
10     BY: BRAD HARRISON, ESQUIRE
       bwharrison@jonesday.com
11
12
13 ALSO PRESENT:  Vann Patacxil, Videographer
14
15
16
17
18
19
20
21
22
23
24
25

Page 203

1                    I N D E X
2  WITNESS                          PAGE
3  MARGARET "PEGGY" HARRIS                    7
4  Direct Examination by Mr. Monde            7
   Cross Examination by Mr. Diaz        174
5  (Volume I)
6  **********************************************
7  Redirect Examination by Mr. Monde    259
   Recross Examination by Mr. Diaz      267
8  Further Redirect Examination by Mr.  269
   Monde
9  (Volume II)
10
11 CERTIFICATE OF REPORTER            272
   ACKNOWLEDGMENT OF DEPONENT              273
12 ERRATA SHEET              274
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 204

1  (Volume II - Continued proceedings)
2          MR. DIAZ:  Okay.  Now, do you have the
3  exhibit, the Bar complaint?  Can you show that
4  to her, please, Paul?  Exhibit 3.  Why don't we
5  start with page 2.
6  BY MR. DIAZ:
7      Q   All right.  Ms. Harris, if you can go to
8  the bottom of page 2, it's the first paragraph, it
9  starts by saying, quote, "Richard was in so much
10 pain at the time," then there's a comma.  I'm going
11 to stop there.  Do you see that?
12     A   Right.
13     Q   Okay.  Now, you said that in your view you
14 --
15         Let me say it this way:  You would not
16 have written the word "pain" in there, correct?
17     A   Correct.
18         MR. MONDE:  Objection to form.
19 BY MR. DIAZ:
20     Q   Right?
21     A   Correct.
22         MR. MONDE:  Same objection.
23 BY MR. DIAZ:
24     Q   And meaning physical pain is not what you
25 perceived Richard was suffering, if under anything,

2 (Pages 201 - 204)

Page 205

1  at the time?
2      MR. MONDE: Objection.
3      THE WITNESS: Correct.
4  BY MR. DIAZ:
5      Q   Okay. Now, do you agree that Richard at
6  the time, nevertheless, was -- was -- it may not
7  have been continually throughout the day, but from
8  time to time, Richard at this point in time when
9  he's giving these depositions, and the errata sheets
10  are going on, that at times he was in discomfort?
11      MR. MONDE: Objection.
12      THE WITNESS: Well, truthfully, the only
13  discomfort he would have had was he was having
14  diarrhea continuously. So discomfort maybe
15  because he was embarrassed or -- or --
16  BY MR. DIAZ:
17      Q   Okay. All right. And if you go over to
18  the next page, up to the top where it says, "Knowing
19  nothing about pretrial preparations for an
20  Engle-progeny case, Howard failed to adequately
21  prepare Richard for his testimony."
22      Do you see that?
23      A   Right.
24      Q   Now, you were asked some questions about
25  that. And the reason I am going to ask you some

Page 206

1  follow-ups is because "adequately preparing" could
2  mean something to you different than to me. And so
3  let me start with the basic.
4      Do you believe that at least to some
5  degree Mr. Howard did do some preparation in your
6  case?
7      A   Yes.
8      Q   Okay. And so do you believe that things
9  that he did in your case were not adequate? In
10  other words, he -- he didn't adequately make sure
11  that the probate did not get dismissed, would that
12  be an inadequacy in Mr. Howard's performance, or a
13  shortcoming?
14      A   Not being an attorney, I wouldn't really
15  know.
16      Q   Okay. Did you expect him to be able to
17  keep your case from getting dismissed before trial?
18      A   I didn't expect it.
19      Q   Okay. All right. Okay. And did you
20  think that it was a shortcoming or an inadequacy for
21  him to try to alter your fee agreement; in other
22  words, make you start paying the cost in the case?
23  Do you think that that was something that was
24  improper?
25      A   Improper?

Page 207

1      Q   Yes.
2      A   Correct.
3      Q   And so whether we call it something that's
4  inadequate or whether we use a different adjective,
5  like a shortcoming, the meaning is the same, is it
6  not?
7      A   Right.
8      Q   The message is the same?
9      A   Right.
10      Q   He was not performing as a professional
11  attorney as you thought he should, correct?
12      A   Correct.
13      Q   You can use all sorts of words you want,
14  but at the end of the day, the message is the same;
15  do you agree?
16      A   Right.
17      Q   Okay. All right. In the middle of page
18  3, the paragraph that starts off with "Howard and
19  Mehta" -- and that's M-E-H-T-A -- "ordered Richard
20  to sign the fraudulent errata sheets."
21      Just to be clear, that "fraudulent" is not
22  your words and that's not how you would have written
23  this part of the complaint if this were ever done by
24  you, correct?
25      MR. MONDE: Objection to form.

Page 208

1      THE WITNESS: Correct.
2  BY MR. DIAZ:
3      Q   Okay. And then it says, "without even
4  reading to him the changes." Let me talk about that
5  for a minute.
6      It sounds to me like -- and I want you to
7  tell me if I'm saying too much or too little --
8  that, generally speaking, you know that Richard was
9  deposed, right?
10      A   Correct.
11      Q   And at some time after his deposition,
12  there was a transcript put together, and he had some
13  meeting or meetings with one or more lawyers to go
14  over the deposition, yes?
15      MR. MONDE: Objection to form.
16      THE WITNESS: Correct.
17  BY MR. DIAZ:
18      Q   Yes?
19      A   Yes.
20      MR. MONDE: Same objection.
21  BY MR. DIAZ:
22      Q   Even though at the time if I asked you
23  what it was, you may not have known to say the word
24  "errata," you know that one of the purposes in
25  doing this exercise was to correct, clarify, or

3 (Pages 205 - 208)

Page 209

1  change testimony as needed, correct?
2       MR. MONDE: Objection to form.
3       THE WITNESS: Correct.
4  BY MR. DIAZ:
5     Q   Okay. And you would not have been -- you
6  were not in the room --
7       MR. MONDE: Leading your own witness to
8     give conflicting testimony, if that's an
9     objection that's cognizable.
10      MR. DIAZ: Are you done?
11      MR. MONDE: I am.
12  BY MR. DIAZ:
13    Q   Okay. And you were not in the room from
14  start to finish during these sessions, whatever you
15  want to call them, errata, deposition testimony
16  review; am I correct?
17      MR. MONDE: Objection to form. Misstates
18    the evidence. No good-faith basis.
19      THE WITNESS: Correct.
20  BY MR. DIAZ:
21    Q   Okay. And so you would not know question
22  to question what questions were corrected,
23  clarified, or amplified on. But you do know,
24  generally speaking, as you sit here today and when
25  you were deposed yourself on the errata sheets of

Page 210

1  Richard, that there were meetings between Richard
2  and his lawyers for purposes of preparing what you
3  now know to be called errata sheets; am I correct?
4       MR. MONDE: Objection to form.
5       THE WITNESS: Correct.
6  BY MR. DIAZ:
7     Q   Okay. All right. Then you were asked
8  some questions about whether or not Richard had
9  signed the errata sheets. Do you remember that,
10  ma'am?
11    A   Yes.
12    Q   And you were shown the errata sheets by
13  opposing counsel on direct, and you said that in
14  looking at Richard's signatures on the erratas --
15      MR. DIAZ: If you have those, Paul, I
16    think they're on page 13.
17  BY MR. DIAZ:
18    Q   Do you see those?
19    A   Um-hum.
20    Q   All right. Now, if you can look at his
21  signatures, meaning Richard's, on those errata
22  sheets --
23      MR. MONDE: Let's just make sure the
24    record is clear that she's looking at Exhibit
25    7.

Page 211

1       MR. DIAZ: Seven? Okay.
2       MR. MONDE: Thank you.
3       MR. ANDERSON: We've got 7, 8, and 9.
4       MR. MONDE: Fair enough.
5       MR. DIAZ: All three. Thank you.
6  BY MR. DIAZ:
7     Q   Now, you're not telling us that those are
8  forged signatures of Mr. Harris; am I correct?
9       MR. MONDE: Objection to form.
10  BY MR. DIAZ:
11    Q   What you're saying is -- what you're
12  saying --
13      MR. MONDE: I didn't hear --
14      MR. DIAZ: I can withdraw the question,
15    sir.
16      MR. MONDE: Yes, you may, and you did.
17    Thank you.
18  BY MR. DIAZ:
19    Q   You don't know one way or the other
20  whether or not Richard signed those errata sheets;
21  fair enough?
22      MR. MONDE: Objection.
23      THE WITNESS: Correct.
24  BY MR. DIAZ:
25    Q   That's as you sit here today?

Page 212

1       MR. MONDE: Objection.
2       MR. DIAZ: Okay. Now, do you have her
3  deposition testimony?
4       THE COURT REPORTER: I didn't hear an
5    answer.
6       THE WITNESS: Correct.
7       MR. DIAZ: Correct.
8       Do you have her deposition testimony?
9  Here, take her to page 335.
10      MR. ANDERSON: Give me a second.
11      MR. DIAZ: 335, Line 18.
12      MR. ANDERSON: 335, Line 18.
13  BY MR. DIAZ:
14    Q   Now, a while ago you said that your memory
15  today was not as good as it was a few years ago,
16  right?
17    A   Correct.
18      MR. MONDE: Objection.
19  BY MR. DIAZ:
20    Q   Now, do you remember as you sit here
21  today, without looking at your deposition transcript
22  which is in front of you, do you remember all the
23  questions that you gave and all the answers you
24  gave?
25    A   No.

4 (Pages 209 - 212)

Page 213

1    Q   That would be impossible to do, right?
2    A   Um-hum.
3    Q   Why don't you take a minute a look at page
4    335, Line 18. I'm going to read along with you so
5    we have it in the record, and you tell me -- I'm
6    going to have a follow-up question after that, okay?
7        Line 18, question, "Do you believe that
8    when your husband signed those errata sheets, that
9    he understood what he was signing?"  And your answer
10   was, "I would think he would. I wouldn't think he
11   would sign it if he didn't."
12       Do you remember that? As you sit here
13   now, do you remember that being your memory then?
14   A   Correct.
15       MR. MONDE: Objection to form.
16   BY MR. DIAZ:
17   Q   And in your answer, did you say that you
18   suspected that he had not signed the errata sheets?
19       MR. MONDE: Objection.
20       THE WITNESS: Say that last --
21   BY MR. DIAZ:
22   Q   Yes. In your answer, did you say that you
23   thought that he had not signed the errata sheets?
24   A   Did I --
25   Q   No. In the deposition.

Page 214

1    A   Okay. Yes.
2    Q   Where did you say that?
3    A   Repeat the whole thing again.
4    Q   Yeah. Let me start again.
5        Question, "Do you believe that when your
6    husband signed those errata sheets, that he
7    understood what he was signing?"  And your answer
8    was, "I think -- I would think he would. I wouldn't
9    think he would sign it if he didn't."
10       Right?
11   A   Right.
12   Q   Was that accurate testimony?
13   A   Right.
14   Q   Okay. Then it goes on and it says, "And
15   my question was just a little bit different. Given
16   his health condition at the time, do you think he
17   understood what he was signing when he signed those
18   errata sheets?"  And you said, "I would say yes,"
19   right? Okay? Yes?
20   A   Yes.
21   Q   Right. When you said "I would say yes,"
22   you're not certifying 100 percent, but you're saying
23   in your best faith belief at the time was that he
24   was able to sign, correct?
25       MR. MONDE: Objection to form.

Page 215

1        THE WITNESS: Correct.
2    BY MR. DIAZ:
3    Q   Yes, ma'am?
4        MR. MONDE: Same.
5        THE WITNESS: Yes.
6    BY MR. DIAZ:
7    Q   Yes, okay.
8        And then it says -- then they ask you, "Do
9    you know one way or the other?"  And then they ask a
10   second follow-up question before you answer. Do you
11   see this carrying over on 336? Are you with me?
12   Line 3. "Do you know one way or the other? Did you
13   have a conversation with him?"  There's an
14   objection, and then you say you're not sure, right?
15   A   Correct.
16   Q   When you said you weren't sure, was that a
17   truthful answer, that you just don't remember having
18   discussions with Richard about him having read or
19   signed the errata sheets?
20       MR. MONDE: Objection to form.
21       THE WITNESS: Correct.
22   BY MR. DIAZ:
23   Q   Okay. And then you go on and it says,
24   "Okay. So is the answer that you're not sure
25   whether he knew what he was signing," and you say,

Page 216

1    "Again, I wouldn't think he would sign unless he
2    knew what he was signing."
3        Question, "Were you in the room when he
4    signed them?"  Answer, "I don't -- yeah, I think I
5    was."
6        "Do you recall whether you were or not?"
7    And you say "I believe I was."
8        Right?
9    A   Right.
10   Q   Okay. So now that you've refreshed your
11   memory with testimony two years ago about some of
12   these events surrounding Richard going over the
13   errata sheets and signing them, okay, looking at the
14   errata sheets that you have now, is it fair to say
15   that you are not saying, you are not suggesting that
16   somebody forged Mr. Harris', Richard's, signature or
17   the errata sheets, you just can't say it's his and
18   you just can't say it's not his? Is that a fair
19   statement?
20       MR. MONDE: Excuse me. Objection to form
21       and an improper attempt to refresh the witness'
22       recollection.
23   BY MR. DIAZ:
24   Q   Answer, ma'am. Is it fair to say, now
25   that you refreshed your memory about what your

5 (Pages 213 - 216)

Page 217

1  memory was two years ago when you were asked about
2  Richard signing the errata sheets and the whole
3  exercise of the execution/preparation of the errata
4  sheets, as you sit here today, is it fair to say
5  that you are not saying that his errata sheets were
6  forged, you don't know if they were signed by him or
7  not, correct?
8      MR. MONDE: Same objections.
9      THE WITNESS: Correct.
10 BY MR. DIAZ:
11     Q   Okay. All right. Now, if you go to page
12 4 of the Bar complaint, it says, "In anticipation of
13 trial," if you go to that paragraph.
14     MR. ANDERSON: Right there.
15     THE WITNESS: Um-hum.
16 BY MR. DIAZ:
17     Q   Here's where you talk about the $12,000
18 autopsy expense and the $10,000 residence rental.
19 Do you see that?
20     A   Um-hum.
21     Q   All right. And in this Bar complaint --
22 let me not hold you to the language of the Bar
23 complaint. I would rather just talk about the
24 event.
25     Did there come a point in time when the

Page 218

1  case was coming up for trial, and shortly before
2  that trial, Mr. Howard was asking you for money for
3  the autopsy and for the lodging?
4      MR. MONDE: Objection to form and asked
5  and answered.
6      THE WITNESS: I don't remember the
7  timeframe, but I know he did, you know, ask
8  about the 10,000 for the bed and breakfast.
9  BY MR. DIAZ:
10     Q   Okay. As you sit here today, do you know
11 one way or the other whether or not -- well, was
12 there a --
13     First of all, you did not agree that you
14 owed any money for costs; am I right?
15     A   Correct.
16     Q   And that upset you?
17     A   Yes.
18     Q   Okay. And do you know as you sit here
19 today, one way or the other, do you recall any
20 requests or demands or any other comments or
21 conversations you had with Howard about making the
22 payments, what might happen or what would happen if
23 you didn't make the payments?
24     A   I don't recall.
25     Q   You don't recall. Okay.

Page 219

1      MR. MONDE: Objection to the prior
2  question as asked and answered.
3  BY MR. DIAZ:
4      Q   If you read the end sentence of that
5  paragraph, it says, quote, "Nevertheless, the trial
6  had to be continued because defense counsel needed
7  more time to review the tissue samples from the
8  autopsy."
9      That is a statement that would not have
10 been sourced from you, correct? Would you have
11 known that?
12     A   No.
13     MR. MONDE: Objection.
14 BY MR. DIAZ:
15     Q   Or Mr. Harris got that from some other
16 source?
17     A   I would believe that.
18     Q   But not you?
19     A   Correct.
20     Q   Okay. All right. Now, I would like to
21 switch gears here a little bit and go through some
22 chronology. So see if you can follow me, okay?
23     All right. I know you don't remember
24 dates, but I'm going to help you. There is an
25 exhibit -- I think it is No. 11.

Page 220

1      MR. DIAZ: Can you show that to
2  Ms. Harris, please?
3  BY MR. DIAZ:
4      Q   All right. So this letter is dated -- it
5  looks like May 20-something of 2018. I can't make
6  out the exact date, but it's May of 2018.
7      MR. MONDE: For the record, it's May 29th.
8      MR. DIAZ: I can't see that on mine, but
9  I'll -- I'm happy with that, too.
10 BY MR. DIAZ:
11     Q   Okay. This is the letter that you signed,
12 Ms. Harris?
13     A   Yes.
14     Q   Discharging Mr. Howard?
15     A   Correct.
16     Q   Okay. And in the way that you were
17 questioned on this letter, it sounds like there was
18 an assumption that Mr. Howard received this the very
19 next day, within two or three or four days, and I
20 want to clarify this based on things that occurred
21 after May 29th of 2018.
22     Was this letter sent certified return
23 receipt to Mr. Howard?
24     A   Yes.
25     Q   And did you get -- do you know when or how

6 (Pages 217 - 220)

Page 221

1  long it was until it was claimed by him?
2      A   No. The first one came back because they
3  couldn't find him.
4      Q   Exactly.
5      A   And I don't know the length of time.
6      Q   Right. And how long did the first -- how
7  long was it from the time that the first letter came
8  back before you sent a second one?
9      A   I don't know.
10     Q   Okay. Was the second letter the same
11  letter that you had sent before, just with a new
12  date on it?
13     A   Again, I don't recall that.
14     Q   Okay. Is the May 29th letter, to your
15  recollection -- and I know I'm pressing your memory
16  here -- the first or the second letter that went
17  out, if you know?
18     A   I don't know.
19     Q   Okay. So did the second letter go out
20  certified return receipt or just regular mail?
21     A   I think we did probably return receipt
22  requested.
23     Q   Okay. And do you remember ever getting
24  back the receipt for the second letter suggesting
25  that him or somebody on his behalf signed for it?

Page 222

1      A   I don't recall.
2      Q   Okay. So is it fair to say that as you
3  sit here today, you cannot say with definitive
4  certainty that Mr. Howard got the May 29th, '18,
5  letter and/or the other one, whether it was the
6  first or before or after, before things started
7  happening in July, a month and a half later?
8      A   I couldn't say the dates.
9      Q   Okay. Would you agree with me that Mr.
10  Howard was acting -- and we're going to talk about
11  some of those documents, okay -- was acting as if he
12  never got that letter --
13     MR. MONDE: Objection.
14  BY MR. DIAZ:
15     Q   -- in communications he was having with
16  you and things that were going on in the case?
17     MR. MONDE: Objection to form.
18     (Interruption occurred.)
19     MR. DIAZ: Can we --
20     THE WITNESS: Repeat it. I have a
21  one-track mind and --
22  BY MR. DIAZ:
23     Q   Let's go to -- let's go back to the Bar
24  complaint. Let's go to Exhibit A.
25     All right. Now, this is an email, okay,

Page 223

1  and it's Richard Harris to J.B. Harris. Do you see
2  that?
3      A   Right.
4      Q   All right. And there is also -- that's on
5  the very top. But if you go down a little bit,
6  because this is what we call a string email --
7      (Interruption occurred.)
8      MR. ANDERSON: J.B., you need to put us on
9  mute.
10  BY MR. DIAZ:
11     Q   Okay. I'm sorry, Ms. Harris.
12     All right. This is a single-page document
13  -- actually, it may be multiple, but I would like to
14  start with -- if you look at the bottom of this
15  document, there's a -- a -- it's called --
16  stationery for "Howard Justice." Do you see that?
17     A   Um-hum.
18     Q   Okay. If you go up a little bit, there's
19  an email, and on the bottom it's sort of like a
20  letter because it has his stationery on it. But
21  it's from Tim Howard, and it says, "Dear Peggy."
22  And on top of that, the date is July 10th, 2018. Do
23  you see that?
24     A   Right.
25     Q   Now, I think we can all agree that July

Page 224

1  10th of 2018 is about six weeks after your May
2  letter, correct?
3      A   Um-hum.
4      Q   And in this letter, did Mr. Howard
5  acknowledge to you that he had ever received the
6  termination letter?
7      A   No. Not that I'm aware of.
8      Q   Right. And -- and he was not even
9  acknowledging that he had been terminated; is that
10  correct?
11     A   It appears that way.
12     Q   And were you surprised when you saw this
13  email in light of the fact that six weeks earlier
14  you had sent him the letter?
15     A   I don't remember seeing this.
16     Q   Okay. All right. But is one explanation
17  why Mr. Howard would be sending this type of an
18  email to you, now that you're looking at it, even
19  though you don't remember it, after the termination
20  letter, would one explanation be because he had not
21  yet received the termination letter?
22     A   It seems like it would be that way.
23     Q   Yes?
24     MR. MONDE: Excuse me. Objection to form.

Page 225

BY MR. DIAZ:

2    Q   I'm sorry? Is that a logical explanation
3 as to why after the May 29th letter Mr. Howard is
4 still talking to you and treating you in an email
5 like he's your lawyer?
6       MR. MONDE: Objection to form.
7       THE WITNESS: I would agree with that.
8 BY MR. DIAZ:
9    Q   Okay. All right. And is it -- and is it
10 in this email where -- and look at it, please, very
11 carefully, Ms. Harris -- where he's talking about
12 the pathology samples for 12,000 and the -- and the
13 lodging fee for 10,000? Do you see that?
14    A   Right.
15    Q   Okay. And do you see where he is saying
16 -- let me just read the whole thing for the record.
17 It says, "Dear Peggy. The pathology samples for the
18 pathology opinions that we paid approximately
19 $12,000 for are available, and we can pay the $500
20 or let us know whoever is now going to pay the cost.
21 We have prepaid 10,000 for the house near the
22 courthouse to be use" -- instead of "used," it says
23 "use" -- "for the four-week trial. We can
24 reschedule the trial date if needed."
25       Okay. All right.

Page 226

1       "We have paid the $1,000 plus and hired
2 professional probate counsel to handle the probate
3 after the departure of Jaakan Williams."
4       Do you see that?
5    A   Right.
6    Q   Now that you look at this email today,
7 does it appear to you that when Mr. Howard is
8 suggesting rescheduling the trial date at the same
9 time when he's asking you for payment, if you tie
10 those two things together, would it have been
11 unreasonable for you to believe that Mr. Howard was
12 insinuating that unless these monies could be paid
13 the trial would have to be continued?
14       MR. MONDE: Objection to form.
15 BY MR. DIAZ:
16    Q   Do you follow my question?
17    A   Yeah, I follow your question. I'm just
18 not sure.
19    Q   But do you see how in this email both
20 things are tied together?
21    A   Right.
22    Q   The trial date with the payment?
23       MR. MONDE: Badgering the witness.
24 BY MR. DIAZ:
25    Q   Yes?

Page 227

1       MR. MONDE: I should say badgering your
2 own witness. Objection to form.
3       THE WITNESS: I truthfully just can't say.
4 BY MR. DIAZ:
5    Q   Okay. But can you truthfully tell us
6 whether or not in July of 2018 you were anxious to
7 get the case tried?
8    A   Yes.
9    Q   And were you able to pay Mr. Howard
10 $10,000 for the house or $12,000 for the autopsy?
11    A   No.
12    Q   Okay. And if you want to flip through the
13 next couple of pages and get to, for example,
14 Exhibit -- let's go to Exhibit D. Exhibit D, right.
15 And you see there somewhere close to the middle
16 where it says, "On Wednesday, June 27, 2018, Tim
17 Howard writes to you"? Do you see that --
18    A   Um-hum.
19    Q   -- in this email?
20       You said earlier that you didn't use or
21 you don't like to use a lot of email. But would you
22 have some email traffic with Mr. Harris -- or, I'm
23 sorry, with Mr. Howard from time to time?
24    A   Very -- I really don't recall. I just
25 don't.

Page 228

1    Q   Okay. But even here, this is June 27th,
2 this is four weeks after your discharge letter, is
3 Mr. Howard communicating with you in a way that
4 would suggest that he knew he had been fired --
5       MR. MONDE: Objection to form.
6 BY MR. DIAZ:
7    Q   -- or does it look from this email like he
8 still thinks he's your lawyer?
9       MR. MONDE: Same objection.
10       THE WITNESS: I would think he still
11 thinks that he's my lawyer because he's trying
12 to get other people to do work for him.
13 BY MR. DIAZ:
14    Q   Now, there must have come a point in time
15 when -- and you may not know when, but when
16 somebody, yourself or maybe Mr. Harris, made it
17 clear to Mr. Howard he was no longer to be your
18 lawyer; am I right?
19    A   Right.
20    Q   As you sit here today, do you know if it
21 was you who made that communication, or whether it
22 was Mr. Harris --
23       MR. MONDE: Objection.
24 BY MR. DIAZ:
25    Q   -- or somebody else?

8 (Pages 225 - 228)

Page 229

1        Do you remember how that came to be?
2     A   No.
3     Q   Okay. Even though we don't have them
4  here, I don't see any response emails, meaning
5  Howard writes to you and you respond back. Do you
6  remember -- do you have an independent memory of
7  ever writing back to Mr. Howard by email?
8     A   I do not.
9     Q   Okay. All right. You were asked some
10 questions about whether you were intimately familiar
11 with the fee arrangement or employer/employee
12 agreement between Mr. Howard and Mr. J.B. Harris.
13 Do you remember those questions?
14    A   Um-hum.
15    Q   All right.
16    A   Yes.
17    Q   And I think you said that you were not
18 aware of those details, correct?
19    A   Correct.
20    Q   But did you sign an agreement, which we
21 put into the evidence in this case, did you sign an
22 agreement which laid out the lawyers and the fees
23 and how people were going to divide the fee
24 structure if there were a successful verdict?
25       MR. MONDE: Objection to form.

Page 230

1  BY MR. DIAZ:
2     Q   You remember there being a contract?
3     A   Right.
4     Q   All right.
5        MR. MONDE: Object -- hang on, please.
6        MR. DIAZ: Go ahead.
7        MR. MONDE: Thank you.
8        Objection to form and the document speaks
9     for itself.
10 BY MR. MONDE:
11    Q   Okay. So just to make sure that we don't
12 have a question and an answer which leads the reader
13 -- misleads them down into a rabbit hole, I'm going
14 to ask you another question, okay, and here's the
15 question --
16       MR. MONDE: And I am going to object to
17    the colloquy.
18       MR. DIAZ: Excuse me, sir.
19 BY MR. DIAZ:
20    Q   Are you satisfied that you had a fee
21 agreement with your lawyers in this case which laid
22 out the percentage that they would have as a whole
23 and then the breakdowns as to how they were going to
24 get paid?
25       MR. MONDE: Objection.

Page 231

1        THE WITNESS: I --
2  BY MR. DIAZ:
3     Q   You may not remember the numbers --
4     A   Right.
5     Q   -- but did you have such an agreement?
6     A   Yes.
7     Q   Okay. And were you satisfied with that
8  breakdown to the point that you didn't really care,
9  once you knew what the breakdowns were, what
10 happened after there might be a payment? Is that
11 a fair statement?
12    A   Right.
13       MR. MONDE: Objection.
14 BY MR. DIAZ:
15    Q   Right? Was it important to you to know if
16 J.B. was on a salary with Mr. Howard? Did that
17 matter to you?
18       MR. MONDE: Asked and answered.
19       THE WITNESS: No.
20 BY MR. DIAZ:
21    Q   Okay. Did it change the numbers on the
22 sheet that you'd have to pay if you won the case?
23       MR. MONDE: Objection.
24       THE WITNESS: I can't -- I really can't
25    answer that because I don't know.

Page 232

1  BY MR. DIAZ:
2     Q   Okay. Fair enough.
3        You were asked -- and this relates to, I
4  think, Exhibit 10, but I don't know if we need to
5  waste time showing it to you.
6        But the question was, "What steps have you
7  taken to correct things that were in the Bar
8  complaint that really were not subscribed to by you,
9  or what steps have you taken with regards to your
10 own errata sheets?"
11       Is one of the things that you've done in
12 this case -- and then I think you said your answer
13 was no, but let me find out. Is one of -- without
14 going into attorney-client issues, but is one of the
15 things that you've done in this case, since this
16 motion was filed with all of these allegations, is
17 one of the things that you did to guide you through
18 this was have Mr. Anderson as independent counsel to
19 you?
20       MR. MONDE: Objection to form, and you're
21    treading really close to opening a door that I
22    don't think you want to open.
23       MR. DIAZ: I don't think any door is open.
24       MR. MONDE: I'm just saying --
25       MR. DIAZ: I appreciate it.

9 (Pages 229 - 232)

Page 233

1     MR. MONDE:  Please don't make me have
2  to --
3     MR. DIAZ:  You have your mentor.  You're
4  not going to become mine here, okay?
5     MR. MONDE:  I'm not mentoring.
6     MR. DIAZ:  You don't need to preach to me,
7  you don't need to suggest to me, you don't need
8  to try to educate me.  I'm not opening up a
9  door.
10     You've asked a question which leaves a
11  misimpression to the reader in this record that
12  this lady has not done anything to correct
13  claims that have been made against her which
14  are very serious in nature, and her -- I'm
15  simply trying to balance that answer with a
16  truthful, fair answer so the person reading
17  this transcript can get the full flavor, which
18  you don't want them to get, which is whether or
19  not one of the measures she took was to hire an
20  independent lawyer, okay, who happens to be
21  named Mr. Anderson.  That does not open up the
22  door.
23     And don't suggest to me or try to
24  intimidate me from asking this question to get
25  an answer that you don't want in the record by

Page 234

1  suggesting that if you do this, this is what's
2  going to happen.
3     So having said that --
4     MR. MONDE:  Excuse me.
5     MR. DIAZ:  Go ahead.
6     MR. MONDE:  I object to the colloquy.
7     MR. DIAZ:  Fine.
8     MR. MONDE:  I felt it was my professional
9  obligation to let you know that I believe that
10  you are coming very close to opening the door
11  to your privilege claim, a claim that's been
12  asserted here.  And I don't play gotcha.  And
13  so I didn't feel that it was appropriate for me
14  to just sit on that until you busted through
15  the door.  That's all.
16     MR. DIAZ:  All right.
17  BY MR. DIAZ:
18     Q    Ms. Harris, is one of the reasons -- is
19  one of the things that you did, when you were asked
20  what steps have you taken, to use opposing counsel's
21  word, is one of the steps that you've taken in this
22  case, because of the nature of the allegations in
23  the motion, is to have a lawyer who is not part of
24  your trial team in this case, independent counsel,
25  Mr. Anderson.  Just yes or no.

Page 235

1     A    Yes.
2     Q    All right.  All right.  Now, I would like
3  to -- and I'm going to have this last area of
4  questioning, then I'm going to take a quick little
5  break and consult with Mr. Anderson and I may be
6  done, okay?  And I'm going to try to do this in a
7  collective way to save some time.
8     But you were asked generally questions
9  about your own errata sheets at the end of opposing
10  counsel's examination.  And there's three volumes of
11  deposition testimony.  And if I'm correct, I don't
12  think many questions, if any, were asked on Volume 1
13  or 2, I think they were all focused -- or there
14  might be -- let me see.  Yeah.  So I think the
15  questions all came from Volumes 2 and 3.  And I'm
16  going to -- actually, let me do it -- let me do it
17  one by one.
18     So why don't we go to Volume 2.  Let's
19  start with 319 at the bottom, 5-11.  It really
20  starts with an answer on 319, "Right."  And I'd
21  really like to start with the top of the next page,
22  which is still page 319 of the depo transcript.
23     Ms. Harris, before we start, I want to be
24  clear so we know what track we're on.  The Q&As --
25  because of the way that this visually may look to

Page 236

1  you, the questions and answers are excerpts from the
2  deposition transcript, okay.  And then you'll see,
3  for example, on the bottom it says the word
4  "correction," and then there's some further typeset,
5  all right?
6     MR. MONDE:  I beg your pardon?
7     MR. DIAZ:  Typeset.  There's typewritten
8  words, okay?
9     MR. MONDE:  The correction?
10     MR. DIAZ:  I've said the word
11  "correction."
12  BY MR. DIAZ:
13     Q    Okay.  So starting from the top on this
14  page of Volume 2, which comes from 319 of the
15  deposition, "Q" means question:  "Okay.  And because
16  of his condition and his problems with his eyesight,
17  he certainly would not have been able to review a
18  multi-hundred page deposition transcript, right?"
19  Mr. Howard objects to the form, and then you say, "I
20  don't think so.  I don't know."  Okay?
21     Now, when you say "I don't think so, I
22  don't know," when you said that in the deposition,
23  was that a truthful answer?
24     A    No.  Well --
25     Q    Look at the question.

10 (Pages 233 - 236)

Page 237

1  MR. MONDE: Excuse me, Rick. Let her
2  finish, please.
3  BY MR. DIAZ:
4  Q  Do you understand the question?
5  MR. MONDE: Excuse me.
6  MR. DIAZ: I have a right to ask --
7  MR. MONDE: You don't have a right to cut
8  the witness off.
9  MR. DIAZ: I have the right to ask her if
10  she understands the question.
11  MR. MONDE: No, you don't have the right
12  to interrupt the witness. It is not clear to
13  me --
14  MR. DIAZ: I have the right to ask --
15  MR. MONDE: -- nor will it be clear --
16  excuse me. We can only talk one at a time.
17  The court reporter can only take us down one at
18  a time.
19  The video record will show that there's at
20  least a good-faith basis to wonder if the
21  witness had been done with her answer before
22  you interjected with your next question. And
23  I'm asking you to please not do that.
24  BY MR. DIAZ:
25  Q  Ma'am, do you understand the question?

Page 238

1  A  Yes.
2  Q  Okay. And so when you answered the
3  question on the top in the deposition, after
4  Howard's objection when you said, "I don't think so,
5  I don't know," was it true at the time that you did
6  not know whether or not Mr. Harris' conditions and
7  his problems with his eyesight had an impact? You
8  didn't know one way or the other on his ability to
9  review a multi-hundred page deposition transcript?
10  MR. MONDE: Objection to form. Asked and
11  answered. You asked her a little more
12  concisely the first time the exact same
13  question.
14  BY MR. DIAZ:
15  Q  When you said "I don't know," at the time,
16  was it true that you didn't know whether his
17  eyesight impeded his abil- --
18  (Interruption occurred.)
19  BY MR. DIAZ:
20  Q  When you said at the time that you didn't
21  know, was it true that you didn't know if his
22  eyesight might have been giving him problems with
23  his ability to read hundreds of pages of depositions
24  at a time?
25  MR. MONDE: Objection. Asked and

Page 239

1  answered.
2  THE WITNESS: That's correct.
3  BY MR. DIAZ:
4  Q  Okay. So that was an answer at the time
5  that was truthful. You didn't change the answer
6  when it says "correction," you just added some more
7  information, is that right?
8  MR. MONDE: Objection to form.
9  BY MR. DIAZ:
10  Q  Yes?
11  A  Correct.
12  MR. MONDE: Same.
13  BY MR. DIAZ:
14  Q  And you were explaining, "Although Richard
15  was having problems with his eyesight, I do remember
16  our attorneys coming over prior to Richard's
17  deposition and reviewing his deposition testimony
18  from the previous days with him, and making sure
19  that he understood the testimony he had given, and
20  making all the corrections that Richard suggested."
21  Have you read that?
22  A  Right.
23  Q  Okay. Now, here's what I would like to
24  know: When you did the correction, you didn't
25  change your answer above, you were just explaining

Page 240

1  it further, is that right?
2  MR. MONDE: Objection.
3  THE WITNESS: Clarifying it.
4  BY MR. DIAZ:
5  Q  Clarifying, okay.
6  And is the clarification truthful, meaning
7  that although Richard was having problems with the
8  eyesight, the lawyers came back and went over his
9  deposition with him?
10  A  Correct.
11  Q  Okay. So the correction in the errata
12  sheet is not false, it's true. Am I right?
13  MR. MONDE: Objection to form.
14  THE WITNESS: Correct.
15  BY MR. DIAZ:
16  Q  Okay. All right. Now let's go down to
17  the next block, which is 320. And, again, it starts
18  with answer, "Yeah," and then question, "All right.
19  And did your husband review the transcript?" You
20  said, "I don't know," right?
21  A  That's what I wrote.
22  Q  And at the time, was it true that you did
23  not know if Richard had actually read all the
24  transcripts?
25  MR. MONDE: At which time?

11 (Pages 237 - 240)

Page 241

1  BY MR. DIAZ:
2      Q   When you gave the errata sheet.
3          MR. MONDE: Objection to form.
4  BY MR. DIAZ:
5      Q   I'm sorry, when you gave your deposition.
6      A   Correct.
7      Q   Right. So was that a truthful answer?
8          MR. MONDE: Objection.
9          THE WITNESS: Yes.
10 BY MR. DIAZ:
11     Q   Yeah. And it says, "You don't know one
12 way or the other?" That, of course, is a leading
13 question. And then you say, "No. I don't. I don't
14 recall one way or the other?" Correct?
15     A   Um-hum.
16     Q   So in your deposition, you first say you
17 didn't know if Richard had reviewed the transcripts,
18 and then you said you really weren't sure one way or
19 the other, correct?
20         MR. MONDE: Objection.
21         THE WITNESS: Correct.
22 BY MR. DIAZ:
23     Q   Right?
24         MR. MONDE: Objection.
25 BY MR. DIAZ:

Page 242

1      Q   And now the correction is, "I do remember
2  our attorneys coming over" --
3          THE COURT REPORTER: I'm sorry?
4  BY MR. DIAZ:
5      Q   In the correction it says, "I do remember
6  our attorneys coming over prior to the deposition
7  and reviewing his deposition from the previous
8  days," et cetera.
9          As you sit here today, and when you did
10 this errata sheet, do you remember, did you then
11 remember that the attorneys were going over the
12 deposition transcripts with Richard after the
13 deposition testimony was taken?
14         MR. MONDE: Objection.
15         THE WITNESS: Correct.
16 BY MR. DIAZ:
17     Q   Now, you may not know the word "errata" at
18 the time, but was it to go over the accuracy of his
19 answers?
20         MR. MONDE: Same.
21         THE WITNESS: Yes.
22 BY MR. DIAZ:
23     Q   Yes?
24         So the correction -- is my understanding
25 correct that the correction part of this page 320 is

Page 243

1  not false, it's true?
2          MR. MONDE: Objection.
3          THE WITNESS: Correct.
4  BY MR. DIAZ:
5      Q   And it doesn't change your answer, it just
6  explains the process that you observed in terms of
7  the lawyers coming over to the house, going over the
8  deposition transcripts to correct, clarify, or
9  change testimony, whatever adjective you want to
10 use?
11         MR. MONDE: Just a tad argumentative for
12 direct exam.
13         THE WITNESS: Correct.
14         MR. MONDE: Objection.
15 BY MR. DIAZ:
16     Q   Yes, ma'am?
17     A   Correct.
18     Q   Okay. Now, going on to pages 320 and 321.
19 Again, it starts with a "Yeah." "In your deposition
20 you were asked, and you were -- and he was not able
21 to --
22         MR. MONDE: Excuse me. I'm sorry to
23 interrupt you in the middle of that question,
24 which I did, and I'm sorry for that. But I
25 didn't ask her any questions from this errata

Page 244

1  sheet. So you're really going beyond the
2  scope.
3          MR. DIAZ: It's a discovery deposition,
4  but let me take a look at it and maybe I can
5  save us some time. Give me just a minute.
6          (Brief pause.)
7          MR. DIAZ: I will tell you that I had
8  marked in blue highlight where I was following
9  you with the questions, and if I put it
10 there by mistake, and you will acknowledge that
11 on the record, I will jump to the next section.
12 But it's marked blue because I thought you had
13 talked to her about that.
14         MR. MONDE: Yeah, I only asked her from
15 Volume 3.
16         MR. DIAZ: Okay. All right. So let's go
17 into Volume 3 then.
18         Okay. And, again, I think I blue
19 highlighted what you went into, but, please, if
20 I didn't -- if I did and you didn't go into it,
21 let me know and I --
22         MR. MONDE: I'll indulge you, no problem.
23 It's just that we are going into the third set
24 on something I haven't covered.
25         MR. DIAZ: I got you. Okay.

12 (Pages 241 - 244)

1  BY MR. DIAZ:
2     Q   All right.  So Volume 3, 333 through 334,
3  that's on the first page.  Do you see that, Ms.
4  Harris?
5     A   Right.
6     Q   All right.  And in there, it starts with
7  answer, "I don't recall."
8         Question, "Did your husband actually
9  dictate the errata or do you have any idea how those
10  were prepared?"  Answer, "No.  I do not."
11        Let me stop here for just one minute.
12        Has your testimony been consistent
13  throughout, whether it was in a Bar complaint,
14  whether it was in deposition testimony today,
15  whether it was in your errata sheet, have you always
16  maintained a position that you do not have knowledge
17  as to the mechanics and the logistics of how the
18  errata sheets were prepared for Mr. Harris?  Is that
19  a fair statement?
20        MR. MONDE:  Objection to form.
21        THE WITNESS:  Correct.
22  BY MR. DIAZ:
23     Q   Okay.  Is it also a fair and correct
24  statement throughout that you always felt and
25  understood and perceived and know that the lawyers

1  after the deposition went over the depositions with
2  Mr. Harris either to correct, amend, explain, or
3  change any of his answers?
4         MR. MONDE:  Objection.  Asked and
5  answered.
6         THE WITNESS:  Correct.
7         MR. MONDE:  And asked and answered.
8  BY MR. DIAZ:
9     Q   Okay.  And as you sit here today, you
10  don't know the particulars of questions and answers
11  that were changed, right?  Without looking at the
12  errata sheets, you wouldn't know, would you?
13     A   Correct.
14     Q   And, also, is it fair to say that you --
15  or am I -- do you believe -- well, let me -- is it
16  also fair to say that you don't know what answers,
17  if any, in the errata sheets of Richard Harris are
18  truthful or untruthful, you just don't know?
19        MR. MONDE:  Objection to form.
20        THE WITNESS:  Correct.
21  BY MR. DIAZ:
22     Q   Okay.  All right.  Now, keep reading down.
23  It says, "When the lawyers came and things were
24  being read to him, did they actually read him the
25  deposition transcript or just the errata sheets?"

1  Your answer was, "I don't remember."
2         Do you see that in the --
3     A   Show me which one --
4     Q   Sure.  Just go down one question and
5  answer, Paul, please.
6     A   Oh, I see here.  This one?
7     Q   Yeah.
8     A   Okay.  Okay.
9     Q   Okay.  So just so we're clear, it says,
10  question, "When the lawyers came and things were
11  being read to him, did they actually read him the
12  deposition transcript or just the errata sheets?"
13  And your answer at the time was, "I don't remember."
14        Do you see that?
15     A   Right.
16     Q   Was that a truthful answer at the time?
17        MR. MONDE:  Objection.
18        THE WITNESS:  Correct.
19  BY MR. DIAZ:
20     Q   And today is that still a truthful answer?
21     A   Correct.
22     Q   Okay.  And then, question, "So I guess my
23  question is, because you were present during his --
24  the entire time that I asked him questions and you
25  were, of course, present when Mr. Howard asked him

1  questions and Mr. Carter and Mr. Geary, were you not
2  in the room when things were being read to him?"
3  Your answer is, "I don't know.  There was so much
4  going on, I don't remember."
5         Was that a truthful answer at the time,
6  and is it still a truthful answer today?
7         MR. MONDE:  Objection.
8         THE WITNESS:  Correct.
9  BY MR. DIAZ:
10     Q   Now, within that truth, were you at least
11  aware, because of your walking into and back out of
12  the room, that the lawyers in some measure were
13  going over deposition testimony and these
14  corrections, if you want to call them that, with
15  your husband, Mr. Harris, even though you don't know
16  the particulars?
17        MR. MONDE:  Objection to form.
18        THE WITNESS:  Correct.
19  BY MR. DIAZ:
20     Q   Okay.  And then when it says "correction"
21  on the bottom, all right, it says, "Our attorneys
22  did not review Richard's depo transcripts with him
23  each day."
24     A   Did.
25     Q   "Did review with him each day."  Okay.

Page 249

1    So are you now being a little more
2  particular and descriptive of the activities that
3  we've been discussing regarding the deposition
4  transcripts and errata sheets --
5    MR. MONDE: Objection.
6  BY MR. DIAZ:
7    Q  -- in your correction?
8    A  Correct.
9    Q  Okay. And was this just to give a little
10  more detail to your answer?
11    MR. MONDE: Objection, leading.
12    THE WITNESS: Correct.
13  BY MR. DIAZ:
14    Q  Okay. Is this correction false?
15    A  No.
16    MR. MONDE: Objection.
17  BY MR. DIAZ:
18    Q  Okay. And you said, "And Richard
19  clarified his answers and the changes he wanted made
20  to the transcript."
21    Was that a truthful statement at the time?
22    A  Correct.
23    Q  Was that a truthful statement in your
24  correction?
25    A  Correct.

Page 250

1    Q  And is that still a truthful correction --
2  or a truthful statement today?
3    A  Right.
4    Q  Okay.
5    MR. MONDE: Asked and answered.
6    THE COURT REPORTER: I'm sorry, I didn't
7  hear the answer.
8    MR. MONDE: She said "correct."
9    MR. DIAZ: And at the end of that -- go
10  ahead.
11    MR. MONDE: Asked and answered. Objection
12  to the last three questions.
13  BY MR. DIAZ:
14    Q  Okay. And then it says, "This is
15  consistent at how I answered this question in the
16  affirmative at Lines 19 and 21, page 334."
17    Do you see that?
18    A  Right.
19    Q  So were you, in this correction, reminding
20  the reader that this correction was consistent with
21  the way you had answered the question at some
22  earlier part of the deposition?
23    A  Correct.
24    Q  So is anything in this correction false or
25  untrue?

Page 251

1    A  No.
2    Q  Okay. Top of page -- the next page, 334,
3  335. Answer, "I should say no, because I'm not
4  sure."
5    Question, "And am I correct that you do
6  not know how the errata sheets were prepared?" Your
7  answer was "No."
8    True answer at the time?
9    A  Correct.
10    Q  True answer today?
11    A  Correct.
12    Q  True answer always?
13    A  Correct.
14    MR. MONDE: Objection, asked and answered
15  to the last three questions.
16  BY MR. DIAZ:
17    Q  To his deposition, the answer is no.
18    The correction, does that correction
19  change your answer above, or does it just explain as
20  before -- because it looks like there's a little
21  cutting and pasting here, frankly -- but does this
22  correction simply just explain the procedure, the
23  daily procedure, and Richard clarifying the answers
24  and changes being made to the transcript?
25    MR. MONDE: Objection.

Page 252

1    THE WITNESS: Correct.
2  BY MR. DIAZ:
3    Q  So is this correction false in any way,
4  shape, or form, or is it truthful, it's just more
5  explicative, it just defines or explains the daily
6  procedure?
7    MR. MONDE: Objection.
8    THE WITNESS: Correct.
9  BY MR. DIAZ:
10    Q  Okay. 335. "Again, so is it fair to say
11  you just don't know how the errata sheets were
12  prepared?" Answer, "Correct."
13    And then it goes on, "And you just don't
14  know whether your husband was involved in the
15  preparation of the errata sheets?" And you said, "I
16  would say I'm not sure."
17    Truthful testimony then, truthful
18  testimony today?
19    MR. MONDE: Objection.
20    THE WITNESS: Correct.
21  BY MR. DIAZ:
22    Q  Does the correction change that testimony?
23  Did you say in the correction, yes, he did; or no,
24  he didn't --
25    MR. MONDE: Objection.

14 (Pages 249 - 252)

Page 253

1  BY MR. DIAZ:
2  Q  -- or did you just explain the procedure?
3  A  Explain.
4  Q  Okay. 336, question, "Do you know one way
5  or the other? Did you have a conversation with
6  him?" There's an objection. "I'm not sure."
7      I'm not sure what conversation is
8  referenced here that you weren't sure to, but does
9  that -- is that -- was that an accurate answer --
10  A  Correct.
11  Q  -- as far as you can tell from what's on
12  the document?
13  A  Correct.
14  Q  And then it says, "Okay. So is the answer
15  that you're not sure whether he knew what he was
16  signing?" Answer, "Again, I wouldn't think he would
17  sign unless he knew what he was signing."
18      Okay. Was that a truthful answer at the
19  time?
20  A  Correct.
21  Q  Okay. And then when you put "correction"
22  in there, did that change your answers in your
23  deposition, or did it just extrapolate and explain
24  more the procedure that we've been talking about --
25  in fact, let me read it for you, because this is a

Page 254

1  little different than we've had before.
2      It says, "Correction: Richard knew
3  exactly what he was signing because our attorneys
4  reviewed the depo transcripts and the errata sheets
5  with Richard before he signed them, and Richard
6  verified that the errata sheets were consistent with
7  the testimony he wanted to give."
8      That correction, is that a truthful
9  statement?
10      MR. MONDE: Objection.
11      THE WITNESS: Correct.
12  BY MR. DIAZ:
13  Q  Okay. Now, even though you may not have
14  seen the actual interactions between question,
15  answer, errata, and the type and everything else,
16  was this testimony truthful because your impression,
17  your read, your interpretation of what you were
18  seeing and hearing consistent with them going over
19  the deposition transcripts in the errata sheets?
20  A  Correct.
21      MR. MONDE: Objection.
22  BY MR. DIAZ:
23  Q  And then 336, "Do you know whether he was
24  able to review, read those errata sheets, and
25  review" --

Page 255

1      THE COURT REPORTER: I'm sorry.
2      MR. DIAZ: I'm sorry.
3  BY MR. DIAZ:
4  Q  "Do you know whether he was able to
5  review, read those errata sheets, and review them
6  for accuracy?" And you said at that point you don't
7  know, correct?
8  A  Correct.
9  Q  Now, that "I don't know," was that because
10  you weren't there to see every question and answer
11  that was gone over on the errata sheets with him?
12      MR. MONDE: Objection.
13      THE WITNESS: Correct.
14  BY MR. DIAZ:
15  Q  All right. And so was that a truthful
16  answer?
17      MR. MONDE: Form.
18      THE WITNESS: Correct.
19  BY MR. DIAZ:
20  Q  Now, in the corrections, you say, "I do
21  remember our attorneys reviewing the errata sheets
22  with Richard to make sure that the errata sheets
23  accurately reflected changes he requested before he
24  signed them."
25      Is that a false statement?

Page 256

1      MR. MONDE: Objection.
2      THE WITNESS: No.
3  BY MR. DIAZ:
4  Q  Okay. Is that a general -- was that the
5  impression that you had from everything you saw, the
6  lawyers going over the errata sheets and the depo
7  transcripts with Richard?
8      MR. MONDE: Objection.
9      THE WITNESS: Correct.
10  BY MR. DIAZ:
11  Q  Okay. Going maybe two pages down, I
12  think, Ms. Harris, to 402, 403, there's a discussion
13  there about the errata sheet --
14      THE COURT REPORTER: I'm sorry.
15  BY MR. DIAZ:
16  Q  402, 403. Do you see that?
17  A  Yes.
18  Q  Okay. And, again, this is, you know,
19  again, for the tenth time here, you were asked in
20  the deposition, "And if you understood your
21  testimony correctly, you have no idea how that
22  errata sheet was prepared or who prepared it," and
23  your testimony was you did not, right?
24  A  Right.
25  Q  In your deposition, was that truthful?

15 (Pages 253 - 256)

Page 257

1 A Yes.

2 Q And when you -- it goes on and it says,

3 "And you have no recollection regarding the

4 circumstances in which he signed the errata sheets?"

5 And you said, "No." And you were asked, "Is that

6 correct," and you said, "Yeah."

7  Again, does the correction part change

8 your deposition testimony or does it just, again,

9 explain the procedure under which the errata sheets

10 were prepared?

11 MR. MONDE: Objection.

12 THE WITNESS: Correct.

13 MR. DIAZ: Okay. I just need a quick

14 break.

15 MR. MONDE: No worries.

16 MR. DIAZ: Good. Okay.

17 THE VIDEOGRAPHER: The time is 3:29, and

18 we are off the record.

19 (Brief recess 3:29 p.m. - 3:42 p.m.)

20 THE VIDEOGRAPHER: The time is 3:42, and

21 we're back on the record.

22 BY MR. DIAZ:

23 Q Hello, again, Ms. Harris.

24 A Hello.

25 Q I'm almost done.

Page 258

1  This is a generalized question directed to

2 all of the questions that you were asked on direct

3 and cross about your errata sheets, okay?

4  First, was all of the deposition testimony

5 you gave, before you even got to the errata sheets,

6 your deposition testimony before trial, was all of

7 that testimony truthful?

8 MR. MONDE: Objection.

9 THE WITNESS: Yes.

10 BY MR. DIAZ:

11 Q And then when the errata sheets were done

12 and the correction provisions were put in as a

13 trailer to some of the questions and answers, to the

14 best of your knowledge, were -- was the information

15 in those corrections also truthful?

16 MR. MONDE: Objection.

17 THE WITNESS: Correct.

18 MR. DIAZ: That's all we have.

19 One second.

20 (Discussion off the record.)

21 BY MR. DIAZ:

22 Q And so when you say "yes" to the last

23 question, was that based upon your general

24 understanding of the overall picture of the subject

25 matter of those different errata entries?

Page 259

1 MR. MONDE: Objection.

2 THE WITNESS: Correct.

3 MR. DIAZ: Okay. I'm done.

4 MR. MONDE: All right. I want five

5 minutes, please.

6 MR. ANDERSON: Go ahead, take your time.

7 MR. MONDE: I'm not trying to belabor

8 this, guys.

9 THE VIDEOGRAPHER: Do we need to go off?

10 MR. MONDE: Yes. I didn't realize we

11 weren't off.

12 THE VIDEOGRAPHER: The time is 3:44, and

13 we are off the record.

14 (Recess 3:44 p.m. - 3:53 p.m.)

15 THE VIDEOGRAPHER: The time is 3:53, and

16 we are back on the record.

17 REDIRECT EXAMINATION

18 BY MR. MONDE:

19 Q Mrs. Harris, describe for me what happened

20 when Tim Howard used vile language directed at

21 Jaakan Williams, please.

22 A I don't know what it was about, but just

23 -- whatever foul language you could hear, he used in

24 my house and then he took it outside for the

25 neighbors to hear and he just kept going at it.

Page 260

1 So --

2 Q Raising his voice?

3 A Hollering and just (indicating). I'm not

4 used to that. I was very offended by it.

5 Q Yes, ma'am. And was this on one of the

6 days that the deposition of your husband was taking

7 place?

8 A I can't remember what day.

9 Q I know you can't remember which day, but

10 was it on a day during which the depositions were

11 happening, or was it on a day before the

12 depositions?

13 A See, again, I don't remember. I was

14 trying to remember if anybody else was there, the

15 other attorneys were there. I don't remember that.

16 Q What was happening when this -- when these

17 vile words got used?

18 A See, I don't know what prompted it. It

19 was between him and Jaakan.

20 Q Did you talk to him about -- did you talk

21 to Mr. Howard about it?

22 A No.

23 Q Did you ask your husband what it was

24 about?

25 A I don't think he knew. He was -- you

16 (Pages 257 - 260)

Page 261

1  know, the house is very long, and he was way at the
2  end of the bedroom. This is toward the front of --
3  the other end of the house.
4    Q   I clearly understood you to tell me this
5  morning that you had not read the Bar complaint
6  before you signed it and that you regretted that.
7  And I'm unclear whether I heard you say something
8  different in response to Mr. Diaz. And the fact of
9  the matter is that the transcript, which is just in
10 rough form right now, doesn't help clarify that. So
11 I've just got to ask you: Did you read any part of
12 that Bar complaint before you signed it?
13   A   No.
14   Q   Thank you, ma'am.
15     Then, and last, can you please look at
16 Exhibit 13 again?
17     (Discussion off the record.)
18 BY MR. MONDE:
19   Q   First, Ms. Harris, when you were
20 testifying in your deposition, did you understand
21 the difference between saying "I don't know" and
22 describing an event that happened?
23     MR. ANDERSON: I'm sorry, Counsel, because
24 I don't even understand your question.
25     MR. MONDE: Okay. I think you want me to

Page 262

1  rephrase it.
2      MR. ANDERSON: I would ask you if you
3  would be kind enough to.
4      MR. MONDE: And I will.
5  BY MR. MONDE:
6    Q   When you answered "I don't know" in your
7  deposition, did that mean just what you said, "I
8  don't know"?
9    A   I would think in most cases, unless I
10 would recall it some other time.
11   Q   Yes. And was there any instance where you
12 recalled something after your deposition, after
13 talking with Jaakan Williams and Tim Howard, that
14 you didn't remember at the time of your deposition?
15   A   I'd have to have specifics, because that's
16 pretty broad.
17   Q   And we can get to some specifics. But
18 does any event like that stick out in your mind?
19   A   No.
20   Q   Do you remember that happening?
21   A   No.
22   Q   In fact, you don't remember how your
23 errata sheets came about, correct?
24   A   Correct.
25   Q   You don't remember whether the lawyers

Page 263

1  drafted them and then gave them to you to just sign,
2  or whether you sat down with the lawyers and went
3  over the transcript, correct?
4    A   Correct.
5    Q   We can agree that when it says in your
6  correction, "This is consistent at how I answered
7  this question in the affirmative at Lines 19 and 21,
8  page 334," is that Peggy Harris language?
9    A   I'd like to look at it.
10     MR. ANDERSON: Certainly. Okay. Which
11 section number?
12     MR. MONDE: 334, Paul.
13     MR. ANDERSON: 334. Okay. "This is
14 consistent with" --
15     THE WITNESS: Uh-huh.
16 BY MR. MONDE:
17   Q   Yeah, take your -- go ahead and read that
18 correction, 334, 335. Do you see that?
19   A   Right.
20   Q   And I'm looking at the sentence that says,
21 "This is consistent at how I answered this question
22 in the affirmative at Lines 19 and 21, page 334."
23     Is that Peggy Harris language?
24   A   No, that's lawyer language.
25   Q   Would you look at the next box down. And

Page 264

1  let me be clear. Page 335, Lines 12 to 17.
2  Question, "Okay. So would you -- is it fair to say
3  that you just don't know how those errata sheets
4  were prepared," referring to your husband's errata
5  sheets, and you answered "Correct"?
6    A   Right.
7    Q   Next question, "And you just don't know
8  whether your husband was involved in the preparation
9  of the errata sheets?" Answer, "I would say I'm not
10 sure," correct? Did I read those correctly?
11   A   You did.
12   Q   And when you say "I just don't know," and
13 when you say "I'm just not sure," that means just
14 what it says there, you don't know, correct?
15     MR. DIAZ: Form.
16     THE WITNESS: I guess at that time, that's
17 how -- that was my answer.
18 BY MR. MONDE:
19   Q   Okay. And then in the correction,
20 somebody describes that "In discussions with
21 Richard, our attorneys prepared the errata sheets
22 according to Richard's instructions and reviewed
23 them with Richard."
24     First of all, when you signed this errata
25 sheet in July of 2017, your husband had been passed

17 (Pages 261 - 264)

1 away over a year --
2    A   Um-hum.
3    Q   -- right?
4    A   Yes.
5    Q   And so you couldn't have had any
6 discussions with Richard between the time of your
7 deposition and the time of your errata sheets,
8 correct?
9    A   Well, that's true if he wasn't here.
10   Q   And you don't recall any discussions that
11 you ever had with Richard about the preparation of
12 his errata sheets, correct?
13       MR. DIAZ: Form.
14       THE WITNESS: I'm kind of confused, so I
15 --
16 BY MR. MONDE:
17   Q   Sitting here today, do you recall any
18 conversations you ever had with your husband about
19 the preparation of his errata sheets?
20       MR. DIAZ: Form.
21       THE WITNESS: I don't recall.
22       MR. MONDE: Okay.
23       (Discussion off the record.)
24 BY MR. MONDE:
25   Q   The last question or two.

1       Sitting here right now, do you have any
2 recollection whatsoever about the preparation of
3 your husband's errata sheets?
4       MR. DIAZ: Form.
5       THE WITNESS: As far as the preparation,
6 no, I don't recall. I'll just say I don't
7 recall.
8 BY MR. MONDE:
9    Q   Yes, ma'am.
10      And just so that there's no question about
11 what you and I mean by preparation, again, do you
12 know who drafted the language of your husband's
13 errata sheets?
14   A   No.
15   Q   Do you know when your husband was shown
16 the errata sheets?
17   A   Let me say on that other one, the lawyers
18 had to do it. Who else would do it? That's all I
19 can say.
20   Q   But you don't know?
21   A   (Indicating).
22   Q   Common sense tells you it had to be the
23 lawyers?
24       MR. DIAZ: Form.
25       THE WITNESS: Well, yeah, the lawyers that

1 were on the case.
2 BY MR. MONDE:
3    Q   And, Ms. Harris, that's a fair point.
4       Listen, do you have any reason to think
5 based on what you know and what you remember
6 that your husband had any role in preparing those
7 errata sheets?
8       MR. DIAZ: Form.
9       THE WITNESS: I truthfully cannot answer
10 that to know, really. I don't recall.
11      MR. MONDE: Thank you. Nothing further.
12      MR. DIAZ: I do have something further.
13          RECROSS EXAMINATION
14 BY MR. DIAZ:
15   Q   You do know, even though you don't know
16 specifics, that the lawyers at the time for your
17 husband were going over the deposition transcripts
18 with him, and that after that exercise, the errata
19 sheets were produced. Am I correct?
20   A   Correct.
21      MR. MONDE: Objection.
22 BY MR. DIAZ:
23   Q   Yes?
24   A   Correct.
25   Q   And did you -- are you aware of that

1 because you would come into the room from time to
2 time and see that?
3       MR. MONDE: Objection.
4       THE WITNESS: Correct.
5 BY MR. DIAZ:
6    Q   Okay. And so is it fair to say that even
7 though you don't know -- for example, let's talk
8 about the chronology. You don't know if the errata
9 sheets were prepared first, or notes were taken
10 during the interview with Richard and then prepared
11 later and brought back. When you say you don't know
12 how they were prepared, are you referring to you
13 don't know the logistics, the mechanics, and the
14 chronology?
15   A   Correct.
16   Q   Is that a fair, truthful statement?
17   A   Correct.
18   Q   And was that fair and truthful when you
19 gave your deposition testimony and your errata
20 testimony before?
21      MR. MONDE: Objection, form, leading,
22 asked and answered.
23      THE WITNESS: Correct.
24 BY MR. DIAZ:
25   Q   Okay. And -- but something different, but

18 (Pages 265 - 268)

Page 269

1  similar, but very important, are you satisfied
2  today, based on everything that you knew, saw,
3  perceived, watched going in and out of the room,
4  that the errata sheets resulted from interchange and
5  exchanges between Mr. Harris' attorneys and
6  Mr. Harris?
7      A   Correct.
8      Q   Okay.
9          FURTHER REDIRECT EXAMINATION
10 BY MR. MONDE:
11     Q   Ms. Harris, if that's right, do you know
12 why your lawyers in a pleading filed with the court
13 would call those errata sheets the product of fraud
14 that constitute the suborning of perjury, the
15 obstruction of justice, and -- what else did you
16 call it, Rick?
17         MR. DIAZ:  I'm not going to be a witness.
18 BY MR. MONDE:
19     Q   There's another phrase.  Oh, yeah, and
20 committed a fraud upon the court.  Do you know why
21 your lawyers would do that?
22     A   No, I don't.
23         MR. MONDE:  Nothing further.
24         MR. ANDERSON:  No questions.  Guess what?
25 We are going to read so that we can do errata

Page 270

1  sheets.
2          THE COURT REPORTER:  Do you want this
3  transcribed?
4          MR. MONDE:  Yes.  There is a request to
5  have the final done by Monday.  So yes.
6          THE COURT REPORTER:  Would you like a
7  copy?
8          MR. DIAZ:  We'll take one.
9          MR. MONDE:  Anybody else?
10         THE COURT REPORTER:  Do you want the
11 exhibits attached?
12         MR. MONDE:  Yes, please.
13         MR. DIAZ:  Yeah.
14         (Discussion off the record.)
15         THE VIDEOGRAPHER:  We are off the record
16 at 4:07.
17         This concludes today's testimony given by
18 Margaret Harris.
19         The total number of media units was one
20 and will be retained by Unique Media Creations.
21         (Thereupon, the deposition was concluded
22 at 4:07 p.m.)
23
24
25

Page 271

1          CERTIFICATE OF OATH
2
3  STATE OF FLORIDA      )
4  COUNTY OF LEON        )
5
6
7
8      I, the undersigned authority, certify that
9  the above-named witness personally appeared before
10 me and was duly sworn.
11
12     WITNESS my hand and official seal this
13 14th day of January, 2020.
14
15
16
17
18
19
         JUDY CHIN, RPR, CRR, FPR
         Notary Public
20       Commission #GG098479
         EXPIRES: MAY 25, 2021
21
22
23
24
25

Page 272

1
2          CERTIFICATE OF REPORTER
3  STATE OF FLORIDA    )
4  COUNTY OF LEON      )
5      I, JUDY CHIN, Registered Professional
6  Reporter, certify that the foregoing proceedings
7  were taken before me at the time and place therein
8  designated; that my shorthand notes were thereafter
9  translated under my supervision; and the foregoing
10 pages numbered 200 through 270 are a true and
11 correct record of the aforesaid proceedings.
12     I further certify that I am not a
13 relative, employee, attorney or counsel of any of
14 the parties, nor am I a relative or employee of any
15 of the parties' attorney or counsel connected with
16 the action, nor am I financially interested in the
17 action.
18     DATED this 14th day of January, 2020.
19
20
21
22
23       JUDY CHIN, RPR, CRR, FPR
         Notary Public
24       Commission #GG098479
         EXPIRES: MAY 25, 2021

19 (Pages 269 - 272)

Page 273

1     ACKNOWLEDGMENT OF DEPONENT
2
3         I have read the foregoing transcript of
      my deposition and except for any corrections or
4     changes noted on the errata sheet, I hereby
      subscribe to the transcript as an accurate record
5     of the statements made by me.
6
7         _____
8         MARGARET "PEGGY" HARRIS
9
10        SUBSCRIBED AND SWORN before and to me
11    this _____ day of _____, 20____.
12
13        _____
14                NOTARY PUBLIC
15    My Commission expires:
16
17    _____
18    OFFICER
19    REASON FOR WITNESS'S NON-SIGNATURE
20    ___ _____ WITNESS FAILED TO APPEAR
21    _____ WITNESS COULD NOT BE LOCATED
22    _____ WITNESS IS ILL
23    _____ WITNESS REFUSED TO SIGN
24    ___ _____ OTHER _____
25

Page 274

1         E R R A T A   S H E E T
2     IN RE: HARRIS vs. R.J. REYNOLDS, et al.
3     DATE:  2/13/2020
4     PAGE   LINE   CORRECTION AND REASON
5     ____ ____ _____
6     ____ ____ _____
7     ____ ____ _____
8     ____ ____ _____
9     ____ ____ _____
10    ____ ____ _____
11    ____ ____ _____
12    ____ ____ _____
13    ____ ____ _____
14    ____ ____ _____
15    ____ ____ _____
16    ____ ____ _____
17    ____ ____ _____
18    ____ ____ _____
19    ____ ____ _____
20    ____ ____ _____
21    ____ ____ _____
22    ____ ____ _____
23
24    _____
25    (DATE)    MARGARET "PEGGY" HARRIS

20 (Pages 273 - 274)

[& - agree]

Page 1

**&**

**&** 200:21 201:15

**1**

**1** 235:12
**1,000** 226:1
**10** 232:4
**10,000** 217:18
218:8 225:13,21
227:10
**100** 214:22
**10th** 223:22 224:1
**11** 219:25
**12** 264:1
**12,000** 217:17
225:12,19 227:10
**13** 200:17 210:16
261:16
**1420** 202:4
**14th** 271:13
272:18
**1584** 200:21
201:15
**17** 264:1
**174** 203:4
**1799** 201:20
**18** 212:11,12 213:4
213:7 222:4
**19** 250:16 263:7,22

**2**

**2** 204:5,8 235:13
235:15,18 236:14
**2/13/2020** 274:3
**20** 220:5 273:11
**200** 200:16 272:10
**2014** 200:4
**2017** 264:25
**2018** 220:5,6,21
223:22 224:1
227:6,16

**2020** 200:17
271:13 272:18
**2021** 271:20
272:24
**21** 250:16 263:7,22
**25** 271:20 272:24
**259** 203:7
**267** 203:7
**269** 203:8
**27** 227:16
**270** 272:10
**272** 203:11
**273** 203:11
**274** 200:16 203:12
**27th** 228:1
**29th** 220:7,21
221:14 222:4
225:3

**3**

**3** 204:4 207:18
215:12 235:15
244:15,17 245:2
**30309-3053** 202:5
**305-444-7181**
201:11
**3127** 201:4,10
**319** 235:19,20,22
236:14
**320** 240:17 242:25
243:18
**321** 243:18
**32302-1799**
201:21
**32308** 200:22
201:16
**33134** 201:5,11
**333** 245:2
**334** 245:2 250:16
251:2 263:8,12,13
263:18,22

**335** 212:9,11,12
213:4 251:3
252:10 263:18
264:1
**336** 215:11 253:4
254:23
**337** 200:4
**3:29** 257:17,19
**3:42** 257:19,20
**3:44** 259:12,14
**3:53** 259:14,15

**4**

**4** 217:12
**402** 256:12,16
**403** 256:12,16
**404-521-3939**
202:5
**44114-1190** 202:9
**4:07** 200:18
270:16,22

**5**

**5-11** 235:19
**500** 225:19

**6**

**614-469-3939**
202:9

**7**

**7** 203:3,4 210:25
211:3
**786-303-8333**
201:5

**8**

**8** 211:3
**800** 202:4
**850-510-2187**
201:21
**850-894-3000**
201:16

**9**

**9** 211:3
**901** 202:8
**9:31** 200:18

**a**

**a.m.** 200:18
**abil** 238:17
**ability** 238:8,23
**able** 206:16
214:24 227:9
236:17 243:20
254:24 255:4
**accuracy** 242:18
255:6
**accurate** 214:12
253:9 273:4
**accurately** 255:23
**acknowledge**
224:5 244:10
**acknowledging**
224:9
**acknowledgment**
203:11 273:1
**acting** 222:10,11
**action** 272:16,17
**activities** 249:2
**actual** 254:14
**added** 239:6
**adequate** 206:9
**adequately** 205:20
206:1,10
**adjective** 207:4
243:9
**affirmative** 250:16
263:7,22
**aforesaid** 272:11
**ago** 212:14,15
216:11 217:1
**agree** 205:5
207:15 218:13

222:9 223:25
225:7 263:5
**agreement** 206:21
229:12,20,22
230:21 231:5
**ahead** 230:6 234:5
250:10 259:6
263:17
**al** 200:9 274:2
**allegations** 232:16
234:22
**alter** 206:21
**amend** 246:2
**amplified** 209:23
**anderson** 200:21
201:15,17 211:3
212:10,12 217:14
223:8 232:18
233:21 234:25
235:5 259:6
261:23 262:2
263:10,13 269:24
**answer** 212:5
213:9,17,22 214:7
215:10,17,24
216:4,24 230:12
231:25 232:12
233:15,16,25
235:20 236:23
237:21 239:4,5,25
240:18 241:7
243:5 245:7,10
247:1,5,13,16,20
248:3,5,6 249:10
250:7 251:3,7,8,10
251:12,17,19
252:12 253:9,14
253:16,18 254:15
255:10,16 264:9
264:17 267:9

**answered** 218:5
219:2 231:18
238:2,11 239:1
246:5,7 250:5,11
250:15,21 251:14
262:6 263:6,21
264:5 268:22
**answers** 212:23
236:1 242:19
246:3,10,16
249:19 251:23
253:22 258:13
**anticipation**
217:12
**anxious** 227:6
**anybody** 260:14
270:9
**appear** 226:7
273:20
**appearances**
201:1 202:1
**appeared** 271:9
**appears** 224:11
**appreciate** 232:25
**appropriate**
234:13
**approximately**
225:18
**area** 235:3
**argumentative**
243:11
**arrangement**
229:11
**asked** 205:24
208:22 210:7
217:1 218:4 219:2
229:9 231:18
232:3 233:10
234:19 235:8,12
238:10,11,25
243:20 244:14

246:4,7 247:24,25
250:5,11 251:14
256:19 257:5
258:2 268:22
**asking** 218:2
226:9 233:24
237:23
**asserted** 234:12
**assumption**
220:18
**atlanta** 202:5
**attached** 270:11
**attempt** 216:21
**attorney** 206:14
207:11 232:14
272:13,15
**attorneys** 239:16
242:2,6,11 248:21
254:3 255:21
260:15 264:21
269:5
**authority** 271:8
**autopsy** 217:18
218:3 219:8
227:10
**available** 225:19
**avenue** 202:8
**aware** 224:7
229:18 248:11
267:25

**b**

**back** 221:2,8,24
222:23 229:5,7
240:8 248:11
257:21 259:16
268:11
**badgering** 226:23
227:1
**balance** 233:15
**bar** 204:3 217:12
217:21,22 222:23

232:7 245:13
261:5,12
**based** 220:20
258:23 267:5
269:2
**basic** 206:3
**basis** 209:18
237:20
**becausejusticem...**
201:17
**bed** 218:8
**bedroom** 261:2
**beg** 236:6
**behalf** 201:3,9,14
201:19 202:3
221:25
**belabor** 259:7
**belief** 214:23
**believe** 206:4,8
213:7 214:5 216:7
219:17 226:11
234:9 246:15
**best** 214:23 258:14
**beyond** 244:1
**bit** 214:15 219:21
223:5,18
**block** 240:17
**blue** 244:8,12,18
**bottom** 204:8
223:14,19 235:19
236:3 248:21
**boulevard** 200:21
201:4,10,15
**box** 201:20 263:25
**brad** 202:10
**break** 235:5
257:14
**breakdown** 231:8
**breakdowns**
230:23 231:9

breakfast 218:8
brief 244:6 257:19
broad 262:16
brought 268:11
busted 234:14
bwharrison
  202:10

          c

ca 200:4
call 207:3 209:15
  223:6 248:14
  269:13,16
called 210:3
  223:15
care 231:8
carefully 225:11
carrying 215:11
carter 248:1
case 200:4 205:20
  206:6,9,17,22
  218:1 222:16
  227:7 229:21
  230:21 231:22
  232:12,15 234:22
  234:24 267:1
cases 262:9
certainly 236:17
  263:10
certainty 222:4
certificate 203:11
  271:1 272:2
certified 220:22
  221:20
certify 271:8
  272:6,12
certifying 214:22
cetera 242:8
change 209:1
  231:21 239:5,25
  243:5,9 246:3
  251:19 252:22

changed 246:11
changes 208:4
  249:19 251:24
  255:23 273:4
chin 200:24
  271:19 272:5,23
chronology
  219:22 268:8,14
circuit 200:1,1
circumstances
  257:4
civil 200:2
claim 234:11,11
claimed 221:1
claims 233:13
clarification 240:6
clarified 209:23
  249:19
clarify 208:25
  220:20 243:8
  261:10
clarifying 240:3,5
  251:23
clear 207:21
  210:24 228:17
  235:24 237:12,15
  247:9 264:1
clearly 261:4
cleveland 202:9
client 232:14
close 227:15
  232:11 234:10
cognizable 209:9
collective 235:7
colloquy 230:17
  234:6
come 217:25
  228:14 268:1
comes 236:14

coming 218:1
  234:10 239:16
  242:2,6 243:7
comma 204:10
comments 218:20
commission
  271:20 272:24
  273:15
committed 269:20
common 266:22
communicating
  228:3
communication
  228:21
communications
  222:15
company 200:9
complaint 204:3
  207:23 217:12,21
  217:23 222:24
  232:8 245:13
  261:5,12
concisely 238:12
concluded 270:21
concludes 270:17
condition 214:16
  236:16
conditions 238:6
conflicting 209:8
confused 265:14
connected 272:15
consistent 245:12
  250:15,20 254:6
  254:18 263:6,14
  263:21
constitute 269:14
consult 235:5
continually 205:7
continued 200:13
  202:1 204:1 219:6
  226:13

continuously
  205:14
contract 230:2
conversation
  215:13 253:5,7
conversations
  218:21 265:18
copy 270:7
coral 201:5,11
correct 204:16,17
  204:21 205:3
  207:2,11,12,24
  208:1,10,16,25
  209:1,3,16,19.
  210:3,5 211:8,23
  212:6,7,17 213:14
  214:24 215:1,9
  215:21 217:7,9
  218:15 219:10,19
  220:15 224:2,10
  229:18,19 232:7
  233:12 235:11
  239:2,11 240:10
  240:14 241:6,14
  241:19,21 242:15
  242:25 243:3,8,13
  243:17 245:21,23
  246:2,6,13,20
  247:18,21 248:8
  248:18 249:8,12
  249:22,25 250:8
  250:23 251:5,9,11
  251:13 252:1,8,12
  252:20 253:10,13
  253:20 254:11,20
  255:7,8,13,18
  256:9 257:6,12
  258:17 259:2
  262:23,24 263:3,4
  264:5,10,14 265:8
  265:12 267:19,20

[correct - different]                                                      Page 4

267:24 268:4,15
268:17,23 269:7
272:11
**corrected** 209:22
**correction** 236:4,9
236:11 239:6,24
240:11 242:1,5,24
242:25 248:20
249:7,14,24 250:1
250:19,20,24
251:18,18,22
252:3,22,23
253:21 254:2,8
257:7 258:12
263:6,18 264:19
274:4
**corrections** 239:20
248:14 255:20
258:15 273:3
**correctly** 256:21
264:10
**cost** 206:22 225:20
**costs** 218:14
**counsel** 210:13
219:6 226:2
232:18 234:24
261:23 272:13,15
**counsel's** 234:20
235:10
**county** 200:2
271:4 272:4
**couple** 227:13
**course** 241:12
247:25
**court** 200:1 212:4
237:17 242:3
250:6 255:1
256:14 269:12,20
270:2,6,10
**courthouse** 225:22

**covered** 244:24
**creations** 270:20
**cross** 203:4 258:3
**crr** 200:24 271:19
272:23
**cut** 237:7
**cutting** 251:21

**d**

**d** 203:1 227:14,14
**daily** 251:23 252:5
**date** 220:6 221:12
223:22 225:24
226:8,22 274:3,25
**dated** 220:4
272:18
**dates** 219:24 222:8
**david** 202:6
**day** 202:4,8 205:7
207:14 220:19
248:23,25 260:8,9
260:10,11 271:13
272:18 273:11
**days** 220:19
239:18 242:8
260:6
**de** 201:4,10
**dear** 223:21
225:17
**defendant** 202:3
**defendants** 200:9
**defense** 219:6
**defines** 252:5
**definitive** 222:3
**degree** 206:5
**demands** 218:20
**departure** 226:3
**depo** 235:22
248:22 254:4
256:6
**deponent** 203:11
273:1

**deposed** 208:9
209:25
**deposition** 200:15
208:11,14 209:15
212:3,8,21 213:25
235:11 236:2,15
236:18,22 238:3,9
239:17,17 240:9
241:5,16 242:6,7
242:12,13 243:8
243:19 244:3
245:14 246:1,25
247:12 248:13
249:3 250:22
251:17 253:23
254:19 256:20,25
257:8 258:4,6
260:6 261:20
262:7,12,14 265:7
267:17 268:19
270:21 273:3
**depositions** 205:9
238:23 246:1
260:10,12
**describe** 259:19
**describes** 264:20
**describing** 261:22
**descriptive** 249:2
**designated** 272:8
**detail** 249:10
**details** 229:18
**diarrhea** 205:14
**diaz** 201:10 203:4
203:7 204:2,6,19
204:23 205:4,16
208:2,17,21 209:4
209:10,12,20
210:6,15,17 211:1
211:5,6,10,14,18
211:24 212:2,7,11
212:13,19 213:16

213:21 215:2,6,22
216:23 217:10,16
218:9 219:3,14
220:1,3,8,10
222:14,19,22
223:10 225:1,8
226:15,24 227:4
228:6,13,24 230:1
230:6,18,19 231:2
231:14,20 232:1
232:23,25 233:3,6
234:5,7,16,17
236:7,10,12 237:3
237:6,9,14,24
238:14,19 239:3,9
239:13 240:4,15
241:1,4,10,22,25
242:4,16,22 243:4
243:15 244:3,7,16
244:25 245:1,22
246:8,21 247:19
248:9,19 249:6,13
249:17 250:9,13
251:16 252:2,9,21
253:1 254:12,22
255:2,3,14,19
256:3,10,15
257:13,16,22
258:10,18,21
259:3 261:8
264:15 265:13,20
266:4,24 267:8,12
267:14,22 268:5
268:24 269:17
270:8,13
**dictate** 245:9
**difference** 261:21
**different** 206:2
207:4 214:15
254:1 258:25
261:8 268:25

**direct** 203:4
210:13 243:12
258:2
**directed** 258:1
259:20
**discharge** 228:2
**discharging**
220:14
**discomfort** 205:10
205:13,14
**discovery** 244:3
**discussing** 249:3
**discussion** 256:12
258:20 261:17
265:23 270:14
**discussions** 215:18
264:20 265:6,10
**dismissed** 206:11
206:17
**divide** 229:23
**division** 200:2
**dmmonde** 202:6
**document** 223:12
223:15 230:8
253:12
**documents** 222:11
**doing** 208:25
**door** 232:21,23
233:9,22 234:10
234:15
**drafted** 263:1
266:12
**duly** 271:10

**e**

**e** 203:1 207:19
274:1,1,1
**earlier** 224:13
227:20 250:22
**educate** 233:8
**either** 246:2

**email** 222:25
223:6,19 224:13
224:18 225:4,10
226:6,19 227:19
227:21,22 228:7
229:7
**emails** 229:4
**embarrassed**
205:15
**employee** 229:11
272:13,14
**employer** 229:11
**engle** 205:20
**entire** 247:24
**entries** 258:25
**errata** 203:12
205:9 207:20
208:24 209:15,25
210:3,9,12,21
211:20 213:8,18
213:23 214:6,18
215:19 216:13,14
216:17 217:2,3,5
232:10 235:9
240:11 241:2
242:10,17 243:25
245:9,15,18
246:12,17,25
247:12 249:4
251:6 252:11,15
254:4,6,15,19,24
255:5,11,21,22
256:6,13,22 257:4
257:9 258:3,5,11
258:25 262:23
264:3,4,9,21,24
265:7,12,19 266:3
266:13,16 267:7
267:18 268:8,19
269:4,13,25 273:4

**erratas** 210:14
**esquire** 201:6,10
201:17,20 202:6
202:10
**estate** 200:6
**et** 200:9 242:8
274:2
**event** 217:24
261:22 262:18
**events** 216:12
**evidence** 209:18
229:21
**exact** 220:6 238:12
**exactly** 221:4
254:3
**exam** 243:12
**examination** 203:4
203:4,7,7,8 235:10
259:17 267:13
269:9
**example** 227:13
236:3 268:7
**excerpts** 236:1
**exchanges** 269:5
**excuse** 216:20
224:24 230:18
234:4 237:1,5,16
243:22
**execution** 217:3
**exercise** 208:25
217:3 267:18
**exhibit** 204:3,4
210:24 219:25
222:24 227:14,14
227:14 232:4
261:16
**exhibits** 270:11
**expect** 206:16,18
**expense** 217:18
**expires** 271:20
272:24 273:15

**explain** 246:2
251:19,22 253:2,3
253:23 257:9
**explaining** 239:14
239:25
**explains** 243:6
252:5
**explanation**
224:16,20 225:2
**explicative** 252:5
**extrapolate**
253:23
**eyesight** 236:16
238:7,17,22
239:15 240:8

**f**

**fact** 224:13 253:25
261:8 262:22
**failed** 205:20
273:20
**fair** 211:4,21
216:14,18,24
217:4 222:2
231:11 232:2
233:16 245:19,23
246:14,16 252:10
264:2 267:3 268:6
268:16,18
**faith** 209:18
214:23 237:20
**false** 240:12 243:1
249:14 250:24
252:3 255:25
**familiar** 229:10
**far** 253:11 266:5
**february** 200:17
**fee** 206:21 225:13
229:11,23 230:20
**feel** 234:13
**fees** 229:22

[felt - help]                                                                Page 6

felt  234:8 245:24
filed  232:16
  269:12
final  270:5
financially  272:16
find  221:3 232:13
fine  234:7
finish  209:14
  237:2
fired  228:4
first  204:8 218:13
  221:2,6,7,16 222:6
  238:12 241:16
  245:3 258:4
  261:19 264:24
  268:9
five  259:4
flavor  233:17
flip  227:12
florida  200:2,22
  201:5,11,16,21
  271:3 272:3
focused  235:13
follow  206:1 213:6
  215:10 219:22
  226:16,17
following  244:8
foregoing  272:6,9
  273:3
forged  211:8
  216:16 217:6
form  204:18
  207:25 208:15
  209:2,17 210:4
  211:9 213:15
  214:25 215:20
  216:20 218:4
  222:17 224:24
  225:6 226:14
  227:2 228:5
  229:25 230:8

232:20 236:19
238:10 239:8
240:13 241:3
245:20 246:19
248:17 252:4
255:17 261:10
264:15 265:13,20
266:4,24 267:8
268:21
foul  259:23
four  220:19
  225:23 228:2
fpr  200:24 271:19
  272:23
frankly  251:21
fraud  269:13,20
fraudulent  207:20
  207:21
front  212:22 261:2
full  233:17
further  203:8
  236:4 240:1
  267:11,12 269:9
  269:23 272:12

**g**

gables  201:5,11
gadsden  200:2
gears  219:21
geary  248:1
general  256:4
  258:23
generalized  258:1
generally  208:8
  209:24 235:8
georgia  202:5
getting  206:17
  221:23
gg098479  271:20
  272:24
give  209:8 212:10
  244:5 249:9 254:7

given  214:15
  239:19 270:17
giving  205:9
  238:22
gmail.com  201:6
  201:22
go  204:7 205:17
  208:13 215:23
  217:11,13 219:21
  221:19 222:23,23
  222:24 223:5,18
  227:14 230:6
  234:5 235:18
  240:16 242:18
  244:16,20 247:4
  250:9 259:6,9
  263:17
goes  214:14
  252:13 257:2
going  204:10
  205:10,25 213:4,6
  216:12 219:24
  222:10,16 225:20
  229:23 230:13,16
  230:23 232:14
  233:4 234:2 235:3
  235:4,6,16 242:11
  243:7,18 244:1,23
  248:4,13 254:18
  256:6,11 259:25
  267:17 269:3,17
  269:25
good  209:18
  212:15 237:20
  257:16
gotcha  234:12
guess  247:22
  264:16 269:24
guide  232:17
guys  259:8

**h**

h  207:19 274:1
half  222:7
hand  271:12
handle  226:2
hang  230:5
happen  218:22,22
  234:2
happened  231:10
  259:19 261:22
happening  222:7
  260:11,16 262:20
happens  233:20
happy  220:9
harris  200:5,6,15
  201:4,6 203:3
  204:7 211:8
  216:16 219:15
  220:2,12 223:1,1
  223:11 225:11
  227:22 228:16,22
  229:12 234:18
  235:23 238:6
  245:4,18 246:2,17
  248:15 256:12
  257:23 259:19
  261:19 263:8,23
  267:3 269:5,6,11
  270:18 273:8
  274:2,25
harrison  202:10
hart  200:21
  201:15
health  214:16
hear  211:13 212:4
  250:7 259:23,25
heard  261:7
hearing  254:18
hello  257:23,24
help  219:24
  261:10

**highlight** 244:8
**highlighted**
244:19
**hire** 233:19
**hired** 226:1
**hold** 217:22
**hole** 230:13
**hollering** 260:3
**house** 225:21
227:10 243:7
259:24 261:1,3
**howard** 205:20
206:5 207:18
218:2,21 220:14
220:18,23 222:4
222:10 223:16,21
224:4,17 225:3
226:7,11 227:9,17
227:23 228:3,17
229:5,7,12 231:16
236:19 247:25
259:20 260:21
262:13
**howard's** 206:12
238:4
**huh** 263:15
**hum** 210:19 213:2
217:15,20 223:17
224:3 227:18
229:14 241:15
265:2
**hundred** 236:18
238:9
**hundreds** 238:23
**husband** 213:8
214:6 240:19
245:8 248:15
252:14 260:6,23
264:8,25 265:18
266:15 267:6,17

**husband's** 264:4
266:3,12

**i**

**idea** 245:9 256:21
**ii** 200:12 203:9
204:1
**impact** 238:7
**impeded** 238:17
**important** 231:15
269:1
**impossible** 213:1
**impression** 254:16
256:5
**improper** 206:24
206:25 216:21
**inadequacy**
206:12,20
**inadequate** 207:4
**independent** 229:6
232:18 233:20
234:24
**indicating** 260:3
266:21
**individually** 200:5
**indulge** 244:22
**information** 239:7
258:14
**insinuating** 226:12
**instance** 262:11
**instructions**
264:22
**interactions**
254:14
**interchange** 269:4
**interested** 272:16
**interjected** 237:22
**interpretation**
254:17
**interrupt** 237:12
243:23

**interruption**
222:18 223:7
238:18
**interview** 268:10
**intimately** 229:10
**intimidate** 233:24
**involved** 252:14
264:8
**issues** 232:14

**j**

**j** 201:10
**j.b.** 201:4,6 223:1
223:8 229:12
231:16
**jaakan** 226:3
259:21 260:19
262:13
**january** 271:13
272:18
**jbharrisesq** 201:6
**jones** 202:4,8
**jonesday.com**
202:6,10
**judicial** 200:1
**judy** 200:24
271:19 272:5,23
**july** 222:7 223:22
223:25 227:6
264:25
**jump** 244:11
**june** 227:16 228:1
**justice** 223:16
269:15

**k**

**keep** 206:17
246:22
**kept** 259:25
**kind** 262:3 265:14
**knew** 215:25
216:2 228:4 231:9

253:15,17 254:2
260:25 269:2
**know** 206:15
208:8,24 209:21
209:23 210:3
211:19 215:9,12
217:6 218:7,7,10
218:18 219:23
220:25 221:5,9,15
221:17,18 225:20
228:15,20 231:15
231:25 232:4
234:9 235:24
236:20,22 238:5,6
238:8,15,16,21,21
239:24 240:20,23
241:11,17 242:17
244:21 245:25
246:10,12,16,18
248:3,15 251:6
252:11,14 253:4
254:23 255:4,7,9
256:18 259:22
260:9,18 261:1,21
262:6,8 264:3,7,12
264:14 266:12,15
266:20 267:5,10
267:15,15 268:7,8
268:11,13 269:11
269:20
**knowing** 205:18
**knowledge** 245:16
258:14
**known** 208:23
219:11

**l**

**lady** 233:12
**laid** 229:22 230:21
**lakeside** 202:8
**language** 217:22
259:20,23 263:8

263:23,24 266:12
**lawyer** 225:5
  228:8,11,18
  233:20 234:23
  263:24
**lawyers** 208:13
  210:2 229:22
  230:21 240:8
  243:7 245:25
  246:23 247:10
  248:12 256:6
  262:25 263:2
  266:17,23,25
  267:16 269:12,21
**leading** 209:7
  241:12 249:11
  268:21
**leads** 230:12
**leaves** 233:10
**length** 221:5
**leon** 201:4,10
  271:4 272:4
**letter** 220:4,11,17
  220:22 221:7,10
  221:11,14,16,19
  221:24 222:5,12
  223:20 224:2,4,6
  224:14,20,21
  225:3 228:2
**light** 224:13
**line** 212:11,12
  213:4,7 215:12
  274:4
**lines** 250:16 263:7
  263:22 264:1
**listen** 267:4
**little** 208:7 214:15
  219:21 223:5,18
  235:4 238:11
  249:1,9 251:20
  254:1

**located** 273:21
**lodging** 218:3
  225:13
**logical** 225:2
**logistics** 245:17
  268:13
**long** 221:1,6,7
  261:1
**longer** 228:17
**look** 210:20 213:3
  223:14 225:10
  226:6 228:7
  235:25 236:25
  244:4 261:15
  263:9,25
**looking** 210:14,24
  212:21 216:13
  224:18 246:11
  263:20
**looks** 220:5 251:20
**lot** 227:21

**m**

**m** 201:17 207:19
**ma'am** 210:10
  215:3 216:24
  237:25 243:16
  260:5 261:14
  266:9
**mail** 221:20
**maintained**
  245:16
**making** 218:21
  239:18,20
**margaret** 200:5,15
  203:3 270:18
  273:8 274:25
**marked** 244:8,12
**matter** 231:17
  258:25 261:9
**mean** 206:2 262:7
  266:11

**meaning** 204:24
  207:5 210:21
  229:4 240:6
**means** 236:15
  264:13
**measure** 248:12
**measures** 233:19
**mechanics** 245:17
  268:13
**media** 270:19,20
**meeting** 208:13
**meetings** 208:13
  210:1
**mehta** 207:19
**memory** 212:14
  213:13 216:11,25
  217:1 221:15
  229:6
**mentor** 233:3
**mentoring** 233:5
**message** 207:8,14
**metropolitan**
  200:21 201:15
**middle** 207:17
  227:15 243:23
**mind** 222:21
  262:18
**mine** 220:8 233:4
**minute** 208:5
  213:3 244:5
  245:11
**minutes** 259:5
**misimpression**
  233:11
**misleads** 230:13
**misstates** 209:17
**mistake** 244:10
**monday** 270:5
**monde** 202:6
  203:4,7,8 204:18
  204:22 205:2,11

207:25 208:15,20
209:2,7,11,17
210:4,23 211:2,4,9
211:13,16,22
212:1,18 213:15
213:19 214:25
215:4,20 216:20
217:8 218:4 219:1
219:13 220:7
222:13,17 224:24
225:6 226:14,23
227:1 228:5,9,23
229:25 230:5,7,10
230:16,25 231:13
231:18,23 232:20
232:24 233:1,5
234:4,6,8 236:6,9
237:1,5,7,11,15
238:10,25 239:8
239:12 240:2,13
240:25 241:3,8,20
241:24 242:14,20
243:2,11,14,22
244:14,22 245:20
246:4,7,19 247:17
248:7,17 249:5,11
249:16 250:5,8,11
251:14,25 252:7
252:19,25 254:10
254:21 255:12,17
256:1,8 257:11,15
258:8,16 259:1,4,7
259:10,18 261:18
261:25 262:4,5
263:12,16 264:18
265:16,22,24
266:8 267:2,11,21
268:3,21 269:10
269:18,23 270:4,9
270:12

[money - part]

**money** 218:2,14
**monies** 226:12
**month** 222:7
**morning** 261:5
**motion** 232:16
  234:23
**multi** 236:18
  238:9
**multiple** 223:13
**mute** 223:9

_____ **n** _____

**n** 203:1
**named** 233:21
  271:9
**nature** 233:14
  234:22
**ne** 202:4
**near** 225:21
**need** 223:8 232:4
  233:6,7,7 257:13
  259:9
**needed** 209:1
  219:6 225:24
**neighbors** 259:25
**never** 222:12
**nevertheless** 205:6
  219:5
**new** 221:11
**non** 273:19
**notary** 271:19
  272:23 273:14
**noted** 273:4
**notes** 268:9 272:8
**number** 263:11
  270:19
**numbered** 272:10
**numbers** 231:3,21

_____ **o** _____

**oath** 271:1

**object** 230:5,16
  234:6
**objection** 204:18
  204:22 205:2,11
  207:25 208:15,20
  209:2,9,17 210:4
  211:9,22 212:1,18
  213:15,19 214:25
  215:14,20 216:20
  218:4 219:1,13
  222:13,17 224:24
  225:6 226:14
  227:2 228:5,9,23
  229:25 230:8,25
  231:13,23 232:20
  238:4,10,25 239:8
  240:2,13 241:3,8
  241:20,24 242:14
  243:2,14 245:20
  246:4,19 247:17
  248:7,17 249:5,11
  249:16 250:11
  251:14,25 252:7
  252:19,25 253:6
  254:10,21 255:12
  256:1,8 257:11
  258:8,16 259:1
  267:21 268:3,21
**objections** 217:8
**objects** 236:19
**obligation** 234:9
**observed** 243:6
**obstruction**
  269:15
**occurred** 220:20
  222:18 223:7
  238:18
**offended** 260:4
**officer** 273:18
**official** 271:12

**oh** 247:6 269:19
**ohio** 202:9
**okay** 204:2,13
  205:5,17 206:8,16
  206:19,19 207:17
  208:3 209:5,13,21
  210:7 211:1 212:2
  213:6 214:1,14,19
  215:7,23,24
  216:10,13 217:11
  218:10,18,25
  219:20,22 220:11
  220:16 221:10,14
  221:19,23 222:2,9
  222:11,25 223:11
  223:18 224:16
  225:9,15,25 227:5
  227:12 228:1
  229:3,9 230:11,14
  231:7,21 232:2
  233:4,20 235:6
  236:2,8,13,15,20
  238:2 239:4,23
  240:5,11,16
  243:18 244:16,18
  244:25 245:23
  246:9,22 247:8,8,9
  247:22 248:20,25
  249:9,14,18 250:4
  250:14 251:2
  252:10 253:4,14
  253:18,21 254:13
  256:4,11,18
  257:13,16 258:3
  259:3 261:25
  263:10,13 264:2
  264:19 265:22
  268:6,25 269:8
**once** 231:9
**open** 232:22,23
  233:21

**opening** 232:21
  233:8 234:10
**opinions** 225:18
**opposing** 210:13
  234:20 235:9
**ordered** 207:19
**outside** 259:24
**overall** 258:24
**owed** 218:14

_____ **p** _____

**p.a.** 200:21 201:4
  201:15
**p.m.** 200:18
  257:19,19 259:14
  259:14 270:22
**p.o.** 201:20
**page** 203:2 204:5,8
  205:18 207:17
  210:16 212:9
  213:3 217:11
  223:12 235:21,22
  236:14,18 238:9
  242:25 245:3
  250:16 251:2,2
  263:8,22 264:1
  274:4
**pages** 200:16
  227:13 238:23
  243:18 256:11
  272:10
**paid** 225:18 226:1
  226:12 230:24
**pain** 204:10,16,24
**paragraph** 204:8
  207:18 217:13
  219:5
**pardon** 236:6
**part** 207:23
  234:23 242:25
  250:22 257:7
  261:11

particular 249:2
particulars 246:10
  248:16
parties 272:14,15
passed 264:25
pasting 251:21
patacxil 202:13
pathology 225:12
  225:17,18
paul 201:17,17
  204:4 210:15
  247:5 263:12
pause 244:6
pay 225:19,20
  227:9 231:22
paying 206:22
payment 226:9,22
  231:12
payments 218:22
  218:23
peachtree 202:4
peggy 200:15
  203:3 223:21
  225:17 263:8,23
  273:8 274:25
people 228:12
  229:23
perceived 204:25
  245:25 269:3
percent 214:22
percentage 230:22
performance
  206:12
performing
  207:10
perjury 269:14
person 233:16
personal 200:6
personally 271:9
phone 201:7

phrase 269:19
physical 204:24
picture 258:24
place 260:7 272:7
plaintiff 200:7
  201:3,9,14,19
play 234:12
pleading 269:12
please 204:4 220:2
  225:10 230:5
  233:1 237:2,23
  244:19 247:5
  259:5,21 261:15
  270:12
plus 226:1
point 205:8 217:25
  228:14 231:8
  255:6 267:3
ponce 201:4,10
position 245:16
preach 233:6
prepaid 225:21
preparation 206:5
  217:3 252:15
  264:8 265:11,19
  266:2,5,11
preparations
  205:19
prepare 205:21
prepared 245:10
  245:18 251:6
  252:12 256:22,22
  257:10 264:4,21
  268:9,10,12
preparing 206:1
  210:2 267:6
present 202:13
  247:23,25
pressing 221:15
pretrial 205:19

pretty 262:16
previous 239:18
  242:7
prior 219:1 239:16
  242:6
privilege 234:11
probably 221:21
probate 206:11
  226:2,2
problem 244:22
problems 236:16
  238:7,22 239:15
  240:7
procedure 251:22
  251:23 252:6
  253:2,24 257:9
proceedings 204:1
  272:6,11
process 243:6
produced 267:19
product 269:13
professional
  207:10 226:2
  234:8 272:5
progeny 205:20
prompted 260:18
provisions 258:12
public 271:19
  272:23 273:14
purposes 208:24
  210:2
put 208:12 223:8
  229:21 244:9
  253:21 258:12

**q**

q&as 235:24
question 209:21
  209:22 211:14
  213:6,7 214:5,15
  215:10 216:3
  219:2 226:16,17

230:12,14,15
232:6 233:10,24
236:15,25 237:4
237:10,22,25
238:3,13 240:18
241:13 243:23
245:8 247:4,10,22
247:23 250:15,21
251:5 253:4
254:14 255:10
258:1,23 261:24
263:7,21 264:2,7
265:25 266:10
questioned 220:17
questioning 235:4
questions 205:24
  209:22 210:8
  212:23 229:10,13
  235:8,12,15 236:1
  243:25 244:9
  246:10 247:24
  248:1 250:12
  251:15 258:2,13
  269:24
quick 235:4
  257:13
quote 204:9 219:5

**r**

r 274:1,1
r.j. 200:9 202:3
  274:2
rabbit 230:13
raising 260:2
read 213:4 215:18
  219:4 225:16
  238:23 239:21
  240:23 246:24,24
  247:11,11 248:2
  253:25 254:17,24
  255:5 261:5,11
  263:17 264:10

269:25 273:3
**reader** 230:12
233:11 250:20
**reading** 208:4
233:16 246:22
**realize** 259:10
**really** 206:14
227:24 231:8,24
232:8,21 235:19
235:21 241:18
244:1 267:10
**reason** 205:25
267:4 273:19
274:4
**reasons** 234:18
**recall** 216:6
218:19,24,25
221:13 222:1
227:24 241:14
245:7 262:10
265:10,17,21
266:6,7 267:10
**recalled** 262:12
**receipt** 220:23
221:20,21,24
**received** 220:18
224:5,21
**recess** 257:19
259:14
**recollection**
216:22 221:15
257:3 266:2
**record** 210:24
213:5 220:7
225:16 233:11,25
237:19 244:11
257:18,21 258:20
259:13,16 261:17
265:23 270:14,15
272:11 273:4

**recross** 203:7
267:13
**redirect** 203:7,8
259:17 269:9
**referenced** 253:8
**referring** 264:4
268:12
**reflected** 255:23
**refresh** 216:21
**refreshed** 216:10
216:25
**refused** 273:23
**regarding** 249:3
257:3
**regards** 232:9
**registered** 272:5
**regretted** 261:6
**regular** 221:20
**relates** 232:3
**relative** 272:13,14
**remember** 210:9
212:20,22 213:12
213:13 215:17
218:6 219:23
221:23 224:15,19
229:1,6,13 230:2
231:3 239:15
242:1,5,10,11
247:1,13 248:4
255:21 260:8,9,13
260:14,15 262:14
262:20,22,25
267:5
**reminding** 250:19
**rental** 217:18
**repeat** 214:3
222:20
**rephrase** 262:1
**reported** 200:24
**reporter** 203:11
212:4 237:17

242:3 250:6 255:1
256:14 270:2,6,10
272:2,6
**representative**
200:6
**request** 270:4
**requested** 221:22
255:23
**requests** 218:20
**reschedule** 225:24
**rescheduling**
226:8
**residence** 217:18
**respond** 229:5
**response** 229:4
261:8
**resulted** 269:4
**retained** 270:20
**return** 220:22
221:20,21
**review** 209:16
219:7 236:17
238:9 240:19
248:22,25 254:24
254:25 255:5,5
**reviewed** 241:17
254:4 264:22
**reviewing** 239:17
242:7 255:21
**reynolds** 200:9
202:3 274:2
**richard** 200:6
201:10 204:9,25
205:5,8,21 207:19
208:8 210:1,1,8
211:20 215:18
216:12 217:2
223:1 239:14,20
240:7,23 241:17
242:12 246:17
249:18 251:23

254:2,5,5 255:22
256:7 264:21,23
265:6,11 268:10
**richard's** 210:14
210:21 216:16
239:16 248:22
264:22
**rick** 201:12 237:1
269:16
**right** 204:7,12,20
205:17,23 206:19
207:7,9,16,17
208:9 210:7,20
212:16 213:1
214:10,11,13,19
214:21 215:14
216:8,9 217:11,14
217:21 218:14
219:20,23 220:4
221:6 222:25
223:3,4,12,24
224:8,16 225:9,14
225:25 226:5,21
227:14 228:18,19
229:9,15 230:3,4
231:4,12,15
234:16 235:2,2,20
236:5,18 237:6,7,9
237:11,14 239:7
239:22 240:1,12
240:16,18,20
241:7,23 244:16
245:2,5,6 246:11
246:22 247:15
248:21 250:3,18
255:15 256:23,24
259:4 261:10
263:19 264:6
265:3 266:1
269:11

**rjdpa.com** 201:12
**robert** 201:20
**roberttrammell45**
  201:22
**role** 267:6
**room** 209:6,13
  216:3 248:2,12
  268:1 269:3
**rough** 261:10
**rpr** 200:24 271:19
  272:23

**s**

**s** 274:1
**salary** 231:16
**samples** 219:7
  225:12,17
**sat** 263:2
**satisfied** 230:20
  231:7 269:1
**save** 235:7 244:5
**saw** 224:12 256:5
  269:2
**saying** 204:9 208:7
  211:11,12 214:22
  216:15 217:5
  225:15 232:24
  261:21
**says** 205:18 208:3
  214:14 215:8,23
  217:12 219:5
  223:21 225:17,22
  227:16 236:3
  239:6 241:11
  242:5 246:23
  247:9 248:20,21
  250:14 253:14
  254:2 257:2 263:5
  263:20 264:14
**scope** 244:2
**seal** 271:12

**second** 200:1
  212:10 215:10
  221:8,10,16,19,24
  258:19
**section** 244:11
  263:11
**see** 204:11 205:22
  210:18 215:11
  217:19 219:22
  220:8 223:1,16,23
  225:13,15 226:4
  226:19 227:15,17
  229:4 235:14
  236:2 245:3 247:2
  247:6,14 250:17
  255:10 256:16
  260:13,18 263:18
  268:2
**seeing** 224:15
  254:18
**seen** 254:14
**sending** 224:17
**sense** 266:22
**sent** 220:22 221:8
  221:11 224:14
**sentence** 219:4
  263:20
**serious** 233:14
**sessions** 209:14
**set** 244:23
**seven** 211:1
**shape** 252:4
**sheet** 203:12
  231:22 240:12
  241:2 242:10
  244:1 245:15
  256:13,22 264:25
  273:4
**sheets** 205:9
  207:20 209:25
  210:3,9,12,22

211:20 213:8,18
  213:23 214:6,18
  215:19 216:13,14
  216:17 217:2,4,5
  232:10 235:9
  245:18 246:12,17
  246:25 247:12
  249:4 251:6
  252:11,15 254:4,6
  254:19,24 255:5
  255:11,21,22
  256:6 257:4,9
  258:3,5,11 262:23
  264:3,5,9,21 265:7
  265:12,19 266:3
  266:13,16 267:7
  267:19 268:9
  269:4,13 270:1
**shortcoming**
  206:13,20 207:5
**shorthand** 272:8
**shortly** 218:1
**show** 204:3 220:1
  237:19 247:3
**showing** 232:5
**shown** 210:12
  266:15
**sign** 207:20 213:11
  214:9,24 216:1
  229:20,21 253:17
  263:1 273:23
**signature** 216:16
  273:19
**signatures** 210:14
  210:21 211:8
**signed** 210:9
  211:20 213:8,18
  213:23 214:6,17
  215:19 216:4
  217:6 220:11
  221:25 254:5

255:24 257:4
  261:6,12 264:24
**signing** 213:9
  214:7,17 215:25
  216:2,13 217:2
  253:16,17 254:3
**similar** 269:1
**simply** 233:15
  251:22
**single** 223:12
**sir** 211:15 230:18
**sit** 209:24 211:25
  212:20 213:12
  217:4 218:10,18
  222:3 228:20
  234:14 242:9
  246:9
**sitting** 265:17
  266:1
**six** 224:1,13
**somebody** 216:16
  221:25 228:16,25
  264:20
**sorry** 223:11
  225:2 227:23
  241:5 242:3
  243:22,24 250:6
  255:1,2 256:14
  261:23
**sort** 223:19
**sorts** 207:13
**sounds** 208:6
  220:17
**source** 219:16
**sourced** 219:10
**speaking** 208:8
  209:24
**speaks** 230:8
**specifics** 262:15
  262:17 267:16

**start** 204:5 206:3 206:22 209:14 214:4 223:14 235:19,21,23
**started** 222:6
**starting** 236:13
**starts** 204:9 207:18 235:20 240:17 243:19 245:6
**state** 271:3 272:3
**statement** 216:19 219:9 231:11 245:19,24 249:21 249:23 250:2 254:9 255:25 268:16
**statements** 273:5
**stationery** 223:16 223:20
**stenographically** 200:24
**steps** 232:6,9 234:20,21
**stick** 262:18
**stop** 204:11 245:11
**street** 202:4
**string** 223:6
**structure** 229:24
**subject** 258:24
**suborning** 269:14
**subscribe** 273:4
**subscribed** 232:8 273:10
**successful** 229:24
**suffering** 204:25
**suggest** 228:4 233:7,23
**suggested** 239:20

**suggesting** 216:15 221:24 226:8 234:1
**suite** 202:4
**supervision** 272:9
**sure** 206:10 210:23 215:14,16 215:24 226:18 230:11 239:18 241:18 247:4 251:4 252:16 253:6,7,8,15 255:22 264:10,13
**surprised** 224:12
**surrounding** 216:12
**suspected** 213:18
**switch** 219:21
**sworn** 271:10 273:10

**t**
**t** 207:19 274:1,1
**tad** 243:11
**take** 212:9 213:3 235:4 237:17 244:4 259:6 263:17 270:8
**taken** 232:7,9 234:20,21 242:13 268:9 272:7
**talk** 208:4 217:17 217:23 222:10 237:16 260:20,20 268:7
**talked** 244:13
**talking** 225:4,11 253:24 262:13
**tallahassee** 200:22 201:16,21
**team** 234:24

**tell** 208:7 213:5 227:5 244:7 253:11 261:4
**telling** 211:7
**tells** 266:22
**tenth** 256:19
**terminated** 224:9
**termination** 224:6 224:19,21
**terms** 243:6
**testifying** 261:20
**testimony** 205:21 209:1,8,15 212:3,8 214:12 216:11 235:11 239:17,19 242:13 243:9 245:12,14 248:13 252:17,18,22 254:7,16 256:21 256:23 257:8 258:4,6,7 268:19 268:20 270:17
**thank** 211:2,5,17 230:7 261:14 267:11
**thing** 214:3 225:16
**things** 206:8 220:20 222:6,16 226:10,20 232:7 232:11,15,17 234:19 246:23 247:10 248:2
**think** 206:20,23 210:16 213:10,10 214:8,8,9,16 216:1 216:4 219:25 221:21 223:25 228:10 229:17 232:4,12,22,23 235:12,13,14 236:20,21 238:4

244:18 253:16 256:12 260:25 261:25 262:9 267:4
**thinks** 228:8,11
**third** 244:23
**thought** 207:11 213:23 244:12
**three** 211:5 220:19 235:10 250:12 251:15
**thursday** 200:17
**tie** 226:9
**tied** 226:20
**tim** 223:21 227:16 259:20 262:13
**time** 204:10 205:1 205:6,8,8,8 208:11 208:22 214:16,23 217:25 219:7 221:5,7 226:9 227:23,23 228:14 232:5 235:7 237:16,18 238:5 238:12,15,20,24 239:4 240:22,25 242:18 244:5 247:13,16,24 248:5 249:21 251:8 253:19 256:19 257:17,20 259:6,12,15 262:10,14 264:16 265:6,7 267:16 268:1,2 272:7
**timeframe** 218:7
**times** 205:10
**tissue** 219:7
**tobacco** 200:9
**today** 209:24 211:25 212:15,21

217:4 218:10,19
222:3 226:6
228:20 242:9
245:14 246:9
247:20 248:6
250:2 251:10
252:18 265:17
269:2
**today's** 270:17
**top** 205:18 223:5
223:22 235:21
236:13 238:3
251:2
**total** 270:19
**track** 222:21
235:24
**traffic** 227:22
**trailer** 258:13
**trammell** 201:20
**transcribed** 270:3
**transcript** 208:12
212:21 233:17
235:22 236:2,18
238:9 240:19
246:25 247:12
249:20 251:24
261:9 263:3 273:3
273:4
**transcripts** 240:24
241:17 242:12
243:8 248:22
249:4 254:4,19
256:7 267:17
**translated** 272:9
**treading** 232:21
**treatiug** 225:4
**trial** 206:17
217:13 218:1,2
219:5 225:23,24
226:8,13,22
234:24 258:6

**tried** 227:7
**true** 238:5,16,21
240:12,22 243:1
251:8,10,12 265:9
272:10
**truth** 248:10
**truthful** 215:17
233:16 236:23
239:5 240:6 241:7
246:18 247:16,20
248:5,6 249:21,23
250:1,2 252:4,17
252:17 253:18
254:8,16 255:15
256:25 258:7,15
268:16,18
**truthfully** 205:12
227:3,5 267:9
**try** 206:21 233:8
233:23 235:6
**trying** 228:11
233:15 259:7
260:14
**two** 216:11 217:1
220:19 226:10
256:11 265:25
**type** 224:17
254:15
**typeset** 236:4,7
**typewritten** 236:7

**u**

**uh** 263:15
**um** 210:19 213:2
217:15,20 223:17
224:3 227:18
229:14 241:15
265:2
**unclear** 261:7
**undersigned** 271:8
**understand** 237:4
237:25 261:20,24

**understanding**
242:24 258:24
**understands**
237:10
**understood** 213:9
214:7,17 239:19
245:25 256:20
261:4
**unique** 270:20
**units** 270:19
**unreasonable**
226:11
**untrue** 250:25
**untruthful** 246:18
**ups** 206:1
**upset** 218:16
**use** 207:4,13
225:22,23 227:20
227:21 234:20
243:10

**v**

**vann** 202:13
**verdict** 229:24
**verified** 254:6
**video** 237:19
**videographer**
202:13 257:17,20
259:9,12,15
270:15
**view** 204:13
**vile** 259:20 260:17
**visually** 235:25
**voice** 260:2
**volume** 200:12
203:5,9 204:1
235:12,18 236:14
244:15,17 245:2
**volumes** 235:10,15
**vs** 200:7 274:2

**w**

**walking** 248:11
**want** 207:13 208:6
209:15 220:20
227:12 232:22
233:18,25 235:23
243:9 248:14
259:4 261:25
270:2,10
**wanted** 249:19
254:7
**waste** 232:5
**watched** 269:3
**way** 204:15 211:19
215:9,12 218:11
218:19 220:16
224:11,22 228:3
235:7,25 238:8
241:12,14,18
250:21 252:3
253:4 261:1
**we've** 211:3 249:3
253:24 254:1
**wednesday** 227:16
**week** 225:23
**weeks** 224:1,13
228:2
**went** 221:16 240:8
244:19 246:1
263:2
**whatsoever** 266:2
**williams** 226:3
259:21 262:13
**withdraw** 211:14
**witness** 203:2
205:3,12 208:1,16
209:3,7,19 210:5
211:23 212:6
213:20 215:1,5,21
216:21 217:9,15
218:6 222:20

[witness - years]                                        Page 15

225:7 226:23
227:2,3 228:10
231:1,19,24 237:8
237:12,21 239:2
240:3,14 241:9,21
242:15,21 243:3
243:13 245:21
246:6,20 247:18
248:8,18 249:12
252:1,8,20 254:11
255:13,18 256:2,9
257:12 258:9,17
259:2 263:15
264:16 265:14,21
266:5,25 267:9
268:4,23 269:17
271:9,12 273:20
273:21,22,23
**witness's**  273:19
**won**  231:22
**wonder**  237:20
**word**  204:16
208:23 234:21
236:3,10 242:17
**words**  206:10,22
207:13,22 236:8
260:17
**work**  228:12
**worries**  257:15
**writes**  227:17
229:5
**writing**  229:7
**written**  204:16
207:22
**wrote**  240:21

_____ **x** _____
**x**  203:1

_____ **y** _____
**yeah**  214:4 216:4
226:17 235:14

240:18 241:11
243:19 244:14
247:7 257:6
263:17 266:25
269:19 270:13
**year**  265:1
**years**  212:15
216:11 217:1

# EXHIBIT H



## Howard & Associates
## Attorneys at Law, P.A.
*Dr. Tim Howard, J.D., Ph.D., Senior Partner*
*Florida Supreme Court Certified Mediator*

Tallahassee, Florida Office:
1415 East Piedmont Drive, Suite 5
Tallahassee, Florida 32308
Ph: (850) 298-4455
Fax: (850) 216-2537
tim@howardjustice.com

February 18, 2019

Charles Hughes, Bar Counsel
ACAP
Florida Bar, 651 East Jefferson Street
Tallahassee, Florida 32399-2300

Re:    TFB Nos. 2020-00,341 and 00,317 (2A), Complaints of Corey Fuller and William Floyd.

Dear Mr. Hughes:

We communicated with Florida Bar staff last week and it was agreed that the responses to the above-referenced Complaints could be combined and submitted on February 19, 2020. In response to these two Bar Complaints consider that these scandalous allegations are found in the civil action filed by these two gentlemen, Mrs. Charisse Fuller, and Mr. Don Reinhard's similar Bar Complaint.1

### CIVIL REMEDIES AND THE FLORIDA BAR

The Florida Supreme Court has ruled that the Florida Bar is not a venue to pursue civil remedies as another venue for political or legal leverage, and based on this standard, appropriately discharged these complaints in the attached letter dated January 15, 2020. Exhibit A. Mr. Hughes, as The Florida Bar representative, stated:

I must conclude that your complaint constitutes a civil dispute as there are **no**

---

1 Charise Fuller falsely claims she is owed money. The records show that she placed $75,000 into the fund, and received $88,238.00 in total proceeds over approximately 12 months, including monthly payments of $1,500 for most months, and as high as $16,500 for a month. *See* Accounting Ledger attached as Exhibit B. Note, that the allegations in Mr. Findley's civil Complaint track the allegations from Don Reinhard, who created and spread this contagious poison that others have adopted.

**allegations independent of the enclosed civil complaint** and as a result, must be resolved through the civil system. The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies.

. . .

Consequently, I have closed our record in this matter.

*Id* (emphasis added).

Nothing has changed in the facts and circumstances of these Bar Complaints. When the decision was made to continue to pursue these Bar Complaints, there was no explanation of what new facts existed or why. If the Florida Supreme Court ruling applies, and not political or legal leverage, consistent with the letter ruling, these actions must be closed.

As a consequence, these parties are not entitled to use the Florida Bar as a method to gain advantage of a pending civil action that has been proceeding for nearly two years.

## UNDERLYING FACTS

As far as the underlying facts, these two gentlemen received $721,080 in a scheme crafted with a Mr. Don Reinhard, from the funds that they are complaining about, as found in the attached legers from the company they invested in. Accounting ledger attached as Exhibit B.

Mr. Fuller, the ostensible cousin of Mr. Floyd, received written and personal guidance from prison by Mr. Don Reinhard to go to attorneys, such as Mr. Findley, to pursue Respondent. Mr. Fuller protects Mr. Reinhard in prison.2 *See* Cumulative Exhibit C, discussed *infra.*, as Mr. Fuller has a history of close criminal conduct and ties with inmates, including personal ties going back to high school with convicted child molester, Pastor James Harris. *See* Cumulative Exhibit D.

Mr. Reinhard 3 who is in prison for child abuse, was a former consultant for the fund. This consultant crafted the loans with both Mr. Fuller and Mr. Floyd and designed the scheme during the operative time.

---

2  Mr. Reinhard is now in prison for child abuse for feeding feces to a three-year-old autistic child. *State v. Reinhard,* Case No. 17005-45CFMA (Fla. 14th Cir.). In a deep, intimate, direct and ongoing relationship with Mr. Don Reinhard, **Mr. Fuller received $648,385 in extraordinary wealth from Cambridge Capital and Don Reinhard. The $648,385 was to be for his family during an 18-month** period from April of 2016 through September of 2017. This is in addition to his head coaching salaries, and his NFL Line of Duty monthly income. *See* Accounting Ledger attached as Exhibit B. Unfortunately, like with his former NFL salary, it is clear these funds were not used for his family. Upon information and belief these funds were used for gambling and funding illicit drug sales. Mr. Reinhard, who invested nothing, had nothing to invest, and was the investment fund consultant, conspired with Mr. Fuller to advance their mutual extortion efforts. Mr. Reinhard has engaged in a two-year extortion campaign against Mr. Howard as well as against attorney Jaakan Williams, and this has been reported to the State Attorney, Exhibit E, attached, and to the Florida Bar, Exhibit F, attached.

3  Tracking the extortion strategies of Mr. Reinhard, Mr. Reinhard's Florida Bar Complaint has some of the same scandalous allegations of Mr. Fuller, Mrs. Fuller and Mr. Floyd as found in their civil action. *See Don Reinhard v. Phillip Timothy Howard,* TFB No. 2018-00,265(2A).

Once this consultant was terminated from employment, an audit by the current management, 4 under Ms. Gail Milon, determined that the consultant made excessive loans in a scheme to pocket $500,000. Contrary to the allegations first spread by Mr. Reinhard and picked up by those attempting to profit and advance from these scandalous allegations, undersigned has over $1,350,000 in net investments into these same funds, received no fees, and has been doing all in his limited power to secure all investors and has spent and is obligated for $ millions in protecting the investments in technology and other fronts as well as covering legal costs.

Note also, these two gentlemen are even now able to receive funds if they would approach the manager and her counsel in a reasonable fashion as the fund is now in capable hands, and after a time of recovery is receiving funds and making returns on investments. Unfortunately, undersigned has no management or control over the fund, which is invested in technology, advances, and real estate.

Mr. Fuller is communicating with Mr. Reinhard and protecting Mr. Reinhard in prison. In return Mr. Reinhard is guiding Mr. Fuller in his same extortionate model, with false dreams of financial wealth.

Prior to Mr. Fuller ever investing into Cambridge companies, in communications solely between Mr. Reinhard and Mr. Fuller, Mr. Reinhard advised adjusting his 401K investments handled by the NFL, and this resulted in an allegation of protection of the assets. January 19, 2016 through July 27, 2016 emails from Mr. Reinhard to Mr. Fuller available upon request. Mr. Reinhard provided a Proposed Portfolio Investment Structure on March 22, 2016, that Mr. Fuller and Ms. Fuller reviewed. Mr. Reinhard also explained on April 8, 2016 that his IRA would have gained $62.000 if he had invested the funds. Finally, within days of the 401K transfer on May 19, 2016 of the investment, **Mr. Fuller was fully advised on May 25, 2016 of what Cambridge companies knew of Mr. Reinhard's background.** *Id.*

Mr. Fuller falsely claims that Mr. Reinhard's background was not provided. In fact, Mr. Fuller knew of Mr. Reinhard when he was a player at Florida State, based on information and belief that Mr. Reinhard assisted him then. Moreover, **Mr. Fuller was expressly provided the background on Mr. Reinhard on May 25, 2016,** as Mr. Reinhard was required to do to all potential clients starting in late October of 2015, when potential investors would have started during his consultancy. **May 25, 2016 email from Mr. Reinhard to Mr. Fuller documenting Mr. Reinhard's background, including his prior criminal "incarceration" and that the SEC "sanctioned" Mr. Reinhard.** Records available upon request.

Mr. Reinhard developed a "very personal" and long-term relationship with Mr. Fuller, Mr. Horne and several other retired NFL clients. From prison, on January 12, 2018, Mr. Reinhard wrote to

---

4  Mr. Fuller has been repeatedly informed by Cambridge ownership and management that Mr. Howard has no interest, management or control, and that his 401K investments are secured with more than sufficient assets for repayment and return, and **upon liquidation of a portion of the assets, his retirement funds will be transferred. Moreover, counsel for Mr. Fuller, Mr. Thomas Findley was informed of this in writing.** Exhibit G. This has also been confirmed by an independent audit conducted by the respected and former Leon County auditor, Bill Bogan. The audit is available upon request.

Mr. Fuller and numerous retired NFL clients that he was manipulating, stating:

> This is an email I did not want to send to each of you as I truly thought this disaster was coming to an end in early to mid-December and I would be back on course and working with each of you to further plan, develop, structure and implement a solid and productive financial plan for you and your family.
>
> . . . I had worked 12-18 hour days for the past 18 months to create, develop, and structure the very sound and successful principles of Cambridge Capital Group and was **privileged and honored beyond my wildest dreams to have initiated and built the incredible relationships I had with each of you** and we had only just begun.
>
> . . . While I have provided each of you with the reasons behind these delays [in NFL concussion settlement claim payments] so you clearly understood the unfortunate private agenda of your attorney which was the majority crux of my concern as to the handling of your claim, hopefully your wait for these much needed funds will end very soon. . ..
>
> **My dreams of starting a new firm which will mimic the very sound principles and proven work ethic of Cambridge Capital Group will not die** as I continue to fight to resolve these heinous charges. I am a very positive person and know that God has a plan for my family and I and that plan included our paths crossing. Please say a prayer for my family and I and **I will certainly plan on contacting you immediately upon my release in hopes of continuing to build our long-term relationship. In the meantime, I will continue to have access as well as text messages at 850-228-9868.** I there anything I can do to assist you then please do not hesitate to contact me and I will do everything in my power to do so. **Please know how important each of you are to me.**

Cumulative Exhibit C.

Mr. Reinhard planned with Mr. Fuller, Mr. Horne and other retired NFL players to create their own investment company, with Mr. Reinhard running this from the prison, claiming that the funds under consultancy "returned over 40% and 70% respectively in 2016." Cumulative Exhibit L.

Mr. Reinhard also falsely claimed that he had a partner in Mr. Tom Woods as part of this scheme with Mr. Fuller, with Mr. Woods clarifying that "Mr. Reinhard is trying to drag all of us into his mud bath because he has reached the end of his rope. I think he has nothing but time on his hands and rather than reflect on his own misdeeds, he is instead lashing out at the very people that gave him a second chance. What a shame." *Id.*

Next, from prison, Mr. Reinhard directs Mr. Fuller, Mr. Horne and a few of the investors that he has personal relationships with to file a legal action, and claims he knows the valuation of their investments, and states:

I know some of you have ... contacted me [in prison] to ask questions. It is <u>time for us to take legal action</u> as again my research [from prison] has me concerned. I am very uncomfortable with what I have learned about the current structure of CCG and the management of the portfolio as I have also requested liquidation of my family's assets. I would strongly recommend that you do the same because I am overly concerned that the auditor has not provided any inf01mation since the audit for 2016 was initiated in July 2017. Again, let me underscore that I have a lot of experience in managing limited partnerships and the portfolio when I departed was rock solid as was the structure of the limited partnership.

I am now going to <u>proceed aggressively to follow suit</u> in the next two to three weeks to pursue the liquidation that I had requested over six months ago and <u>I strongly recommend that you do the same.</u> However, our position will be much stronger and <u>attorneys will be much more interested in the case if we proceed together.</u> I think its necessary to do so. Although I am still incarcerated my brother-in-law will be instrumental in helping us manage this process. Again, I believe time is of the essence so please let me know your thoughts as soon as possible. I look forward to hearing from you.

Don

P.S. -I will provide information regarding your approximate account value update for 12/31/17 tomorrow.

January 18, 2018 email from Mr. Reinhard to Mr. Fuller, Ms. Fuller, Mr. Horne, et al., attached as Cumulative Exhibit C (emphasis added).

On February 28, 2018, Mr. Reinhard writes solely to Mr. Fuller and family and select few friends, seeking protection in prison:

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5 inmates that are violent and hardened criminals because my roommate and I were told that there was absolutely no available bed space in the dorms that violent sentences. However on Thursday I was being threatened and pressured to give them food and other items or I would "learn about prison the hard way".

. . . I was packing my belongings some of the same individuals came into my cell with a knife made visible to me and told me they were going to stab me unless I have them all of my canteen which was approx..$70 worth of various food items and hygiene. However, my understanding is that they are gang-related and will if they have not already got messages to their other gang members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center <u>including a very close friend of Corey Fuller's who had previously promised and</u>

<u>re-iterated that promise when I cam in that he will protect me.</u> However, that will mean following him around like a puppy even if I am safe from other gang members in this dorm.

February 24, 2018 email from Mr. Don Reinhard to Mr. Corey Fuller, *Id.* (emphasis added). Mr. Don Reinhard writes Mr. Fuller on the same day following up for a personal meeting on the extortion scheme:

> <u>Corey, I think you will realize when you read the email I just sent that I am not only scared to death but terrified.</u> Just to let you know Joe did make a very visible sign talking to me so everybody in the dorm would see him.
>
> Hopefully that does help for the time being.
>
> Also, please complete and send in the visitation form that was previously emailed to everybody as I truly want to see you soon and hopefully you can take on Saturday or Sunday to drive over. <u>We certainly have a lot to discuss especially about Tim and CCG.</u>
>
> <u>Love ya buddy,</u>
>
> Don

February 24, 2018 email from Mr. Reinhard to Mr. Fuller. *Id.* (emphasis added). The protection that Mr. Fuller is coordinating and providing Mr. Reinhard in prison is clear, as is the plan to address Mr. Howard and Cambridge Capital Group. Finally, the intimacy of their relationship is found in "Love ya buddy." *Id.*

On February 6, 2018, Mr. Fuller then falsely stated to a Mr. Walker that "he only invested money with Don Reinhard because he trusted Tim Howard." Mr. Howard never advised Mr. Fuller, nor was his background and education within the investment industry. Mr. Fuller then went on to state to Mr. Walker that "he wants to <u>kill everyone, including Tim Howard,</u> Gail, Harrison and myself. I am letting you know this so you can protect yourself." February 6, 2018 email from Mr. Walker to Mr. Leonard and copied to Mr. Howard, attached as Cumulative Exhibit H.

In a series of texts, starting on April 16, 2018, Mr. Fuller attempts to **extort Mr. Howard for money with a series of threats.** Mr. Howard responds, **"Please understand that I am not able to provide money to you,** I will do all that I can in that context. I am happy to work on your claim and as I have so far, and to assist in any legal and ethical way I am allowed. I care about your needs. Perhaps there are loan available until the NFL Disability or your claim is pursued over the next several months?"** Mr. Fuller responds, "So should I just turn over all of my paperwork to the court? Since you don't know why I am showing you this paperwork?"** Texts from Mr. Fuller to Mr Howard attached as Cumulative Exhibit M (emphasis added). Mr. Howard clarifies the mission:

> I am God's minister for good and to love others. It is God in me that counts. I

> have helped coach for years, fund the food and support and equipment for players, and I have been there for you and others non-stop. Psalm 31. This is God's life and all he wants me to do is bless within my limited ability and means, and he will stand with me in that goodness and love. This time of forging will pass. Let God do a good work in you too.

*Id.*

Further clarifying that he can't comply with his extortion, and Mr. Howard informs Mr. Fuller that "I am also limited by ethics and have no management, interest and control over these matters. Please seek other sources." Mr. Fuller responded, "You keep playing this law its cool. Since you can't talk now game on for real. Just know I am very hurt by this game u playing but its cool." Mr. Howard responded, "I am doing all I can for you with the limitations of Law and ethics and I have and will continue to." *Id.*

Mr. Fuller changes approach and on April 17, 2018, the next day, seeks support from Mr. Howard stating, "Sometimes I just need that confirmation that everything is going to be alright or that person that's going to help me push thru whenever I feel like giving up." In response, Mr. Howard comforts Mr. Fuller stating, "God is alive in you. God loves you. God will redeem you as he has me. I and coach have been praying over you, releasing you from evil and delivering you as a child of God." *Id.*

On April 23, 2018, Mr. Fuller writes, "Tim just know you are fair game now. You could not be a man of your word. I am and will do everything in my power to make sure u have the same feeling we do as players right now. The devil is real u got my money and played these f_____d games with it." *Id.* Finally, Mr. Fuller writes, "Keep playing this game u will get your in the end." *Id.*

The facts are clear that Mr. Fuller and Mr. Floyd received extraordinary funds, have secure investments, and are conspiring with Mr. Reinhard, with the cover of Mr. Findley, in an extortion scheme that is grounded in criminal conduct.

Under these circumstances, these complaints must not proceed.

Thank you for your attention to this matter.

Sincerely Yours,


(Phillip) Tim Howard, J.D., Ph.D.

# EXHIBIT A



# The Florida Bar
**651 East Jefferson Street**
**Tallahassee, FL 32399-2300**

Joshua E. Doyle
Executive Director

850/561-5600
www.FLORIDABAR.org

January 15, 2020

Mr. Corey B. Fuller
c/o Thomas M. Findley
101 North Monroe Street, Suite 925
Tallahassee, FL 32301

Re:    Mr. Phillip Timothy Howard; RFA No.: 20-8862

Dear Mr. Fuller:

All documentation submitted in this matter has been carefully reviewed. The Florida Bar is the licensing agency for all attorneys admitted to practice law in the State of Florida. In cases where discipline is indicated, the disciplinary action is taken against the attorney's licensure, and will not affect or overturn the outcome of any proceeding.

While I understand that you believe the attorney acted unethically, I must conclude that your complaint constitutes a civil dispute as there are no allegations independent of the enclosed civil complaint and as a result, must be resolved through the civil system. The Supreme Court of Florida has ruled that the disciplinary process and proceedings are not to be used as a substitute for civil proceedings and remedies. In the event that a court of competent jurisdiction makes findings in your case which suggest misconduct by the attorney you may re-file your complaint at that time, enclosing the relevant findings.

Additionally, regarding your request to file a claim with the Client Security Fund, you may download a claim form from The Florida Bar's website at www.floridabar.org.

Consequently, I have closed our record in this matter. Pursuant to the Bar's records retention schedule, the computer record and file will be disposed of one year from the date of closing.

Sincerely,

Charles Hughes, Bar Counsel
Attorney Consumer Assistance Program
ACAP Hotline 866-352-0707

cc:    Mr. Phillip Timothy Howard ✓

# EXHIBIT B

|                 |       | Loaned |       |                               |
|-----------------|-------|--------|-------|-------------------------------|
| Corey Fuller    |       | 10000  |       | Cam Cap Advisors Deposit Acct |
|                 |       | 61405  |       | Cam Cap Advisors 2500         |
|                 |       | 510930 |       | Cam Cap Partners 6617         |
|                 |       | 66050  |       | Cam Cap Equity                |
|                 |       |        |       |                               |
|                 |       | 648385 |       |                               |
|                 |       |        |       |                               |
|                 |       |        |       |                               |
| Wiliam Floyd    |       | 1835   |       | Cam Cap Advisors 2500         |
|                 |       | 70860  |       | Cam Cap Partners 6617         |
|                 |       |        |       | Cam Cap Equity                |
|                 |       | 72695  |       |                               |
|                 |       |        |       |                               |
|                 |       |        |       |                               |
|                 | TOTAL | 721080 |       |                               |
|                 |       |        |       |                               |
| Charisse Fuller |       |        |       |                               |
|                 |       | 61738  | 50000 | Cap Cap Partners 6617         |
|                 |       | 26500  | 25000 | Cam Capital Equity            |
|                 |       | 88238  | 75000 |                               |

/

CUMULATIVE EXHIBIT C

--------- Forwarded message ---------
From: Don Reinhard <dwarner.sd5mcapital@gmail.com>
Date: Fri, Jan 12, 2018 at 10:52 PM
Subject: Update on Don's unfortunate situation
To: <anthony.redmon@michelin.com>, Coach Poole <coachpoole@gmail.com>, Corey Fuller <boushe24@gmail.com>, Coach Coleman <coachcoleman62@gmail.com>, <daddyash@comcast.net>, Dexter Carter <dexter1335@yahoo.com>, Donald Brady <donnybrady24@gmail.com>, dwan epps <dwanepps@yahoo.com>, Damien Robinson <damienrobinson380@gmail.com>, <epg3381@yahoo.com>, <vfloyd26@yahoo.com>, Cherisse Fuller <charissefuller5@gmail.com>, frank middleton <frankmiddleton34@yahoo.com>, Jacquez Green <quezg@ufl.edu>, <joehorn358@yahoo.com>, <kdogins@yahoo.com>, <s_kingngpf@yahoo.com>, <iwebsterjr79@verizon.net>, <leonsearcy72@ymail.com>, <operationrb@yahoo.com>, <mike.finn@co.ellis.tx.us>, Tru Pros <trupros01@gmail.com>, Pat Riley <canes155@gmail.com>, Robert Thomas <robertwthomas55@gmail.com>, <seddagreat@yahoo.com>, <tracyledon@aol.com>, <wallywilliamsolph63@yahoo.com>, chris Williams <cdubb96@msn.com>, Joe Walker <jwalkintexas25@gmail.com>, <x_something44jones@yahoo.com>, Charlie Clemons <clemonator56@gmail.com>, <taycodyhof27@icloud.com>, E. IMMANUEL <enoch.demar@gmail.com>, <hartdykes@earthlink.net>, <james.burgess5454@yahoo.com>, James Wilder <jcwilder512@gmail.com>, Tamarick Vanover <ttv8714@gmail.com>, timothy jacobs <timjacobsjr@gmail.com>, Tony Gaiter <tgaiter2217@gmail.com>, <jsmith_dizzo@yahoo.com>, <leonardmitchell67@yahoo.com>, Matt Dorsett <settup24@yahoo.com>, <rzphifer95@msn.com>, <marissak94@comcast.net>

This is an email I did not want to send to each of you as I truly thought this disaster was coming to an end in early to mid December and I would be back on course and working with each of you to further plan, develop, structure, and implement a solid and productive financial plan for you and your family. However, I have now learned that Bay County is not going to drop these heinous alleged charges of which they have no evidence unless I accept a plea agreement which will require me to go to a prison for approximately 18-24 more months. If I do not give in and accept their threat-induced offer then I risk a much longer sentence because of the heinous issues involved in this case and Florida does not offer parole and only allows 15% good time credit. I am sick to my stomach thinking about what I am now faced given that I did not commit this heinous crime and again, there is no evidence that proves that I did.

When this all happened in early February 2017 I was on top of the world. I had worked 12-18 hour days for the past 18 months to create, develop, and structure the very sound and successful principles of Cambridge Capital Group and was privileged and honored beyond my wildest dreams to have initiated and built the incredible relationships I had with each of you and we had only just begun.

Additionally, I had met a fabulous woman with three incredible little boys who very much needed a daddy who would love them, teach them, care for them, and give them the tools they needed to become truly successful and productive parts of our society. Molded together with my incredible two children, I finally had the large family I had yearned for since 2005. Everything seemed to be absolutely perfect and then ... bam within a 2-week period of time, my life was basically destroyed due to the heinous alleged charges levied by my fiance's, now my wife's, parents who despised me due to the stable environment I provided their daughter and grandchildren. Yes... believe it or not, that is what transpired. You would have thought they would have been tickled to death for their daughter and grandchildren to have this stability but yet they felt threatened.

And to make matters much much worse my friend of over 40 years who had become my closest confidant, friend, and business partner at Cambridge Capital Group immediately turned on me due to differences we had with regards to his firm's handling of your concussion settlement cases. He initiated his campaign of retaliation against my family and I so quickly that he clearly had planned it and was just waiting for the perfect opportunity. Well, he got it, as I was basically defenseless.

Going forward, hopefully each of you will receive your settlement proceeds soon as I know the unexpected delays have caused many of you and your families extreme hardships that were certainly unnecessary. While I have provided each of you with the reasons behind these delays so you clearly understood the unfortunate private agenda of your attorney which was the majority crux of my concerns as to the handling of your claim, hopefully your wait for these much needed funds will end very soon. I have taken these unnecessary delays personal because I feel responsible for the success of each of you due to CCG's involvement and referring you to Tim Howard and Howard & Associates P.A. for legal representation.

My dreams of starting a new firm which will mimic the very sound principles and proven work ethic of Cambridge Capital Group will not die as I continue to fight to resolve these heinous charges. I am a very positive person and know that God has a plan for my family and I and that plan included our paths crossing. Please say a prayer for my family and I and I will certainly plan on contacting you immediately upon my release in hopes of continuing to build our long term

relationship.  In the mean time I will continue to have access to my email as well as text messages at 850-228-9868.  If there is anything I can do to assist you then please do not hesitate to contact me and I will do everything in my power to do so.  Please know how important each of you are to me.

Don

From: Don Reinhard <dwarner.sd5mcapital@gmail.com>
Date: 1/18/18 10:07 PM (GMT-05:00)
To: anthony.redmon@michelin.com, Corey Fuller <boushe24@gmail.com>, Coach Coleman
<coachcoleman62@gmail.com>, daddyash@comcast.net, Donald Brady <donnybrady24@gmail.com>, Charisse Fuller
<charissefuller5@gmail.com>, joseph horn <joehorn358@yahoo.com>, lwebsterjr79@verizon.net,
mike.finn@co.ellis.tx.us, seddagreat@yahoo.com, wallywilliamsolp63@yahoo.com, Charlie Clemons
<clemonator56@gmail.com>, timothy jacobs <timjacobsjr@gmail.com>
Subject: An immediate lawsuit against Cambridge Capital Group, Tim Howard, the auditor, and others involved

I have done some research and I am increasingly concerned about what I am learning with regards to the current
structure of Cambridge Capital Group and it's respective limited partnerships which each one of you are invested in via
your 401k rollover proceeds and other assets.  When I departed the portfolio that had been built was in my opinion, rock
solid as a vast majority of my family's wealth is invested exactly as your family's wealth is in the limited partnership.  As
they say "I eat my own home cooking".

I have asked questions of the auditor to receive information about my values but I have not yet received any information.
Perhaps you have done the same as I know some of you have as you have contacted me to ask questions.  It is time for
us to take legal action as again my research has me concerned.  I am very uncomfortable with what I have learned about
the current structure of CCG and the management of the portfolio as I have also requested a liquidation of my family's
assets.  I would strongly recommend that you do the same because I am overly concerned that the auditor has not
provided any information since the audit for 2016 was initiated in July 2017.  Again, let me underscore that I have a lot of
experience in managing limited partnerships and the portfolio when I departed was rock solid as was the structure of the
limited partnership.  I have now learned that that has been dramatically changed.  I am going to proceed aggressively to
follow suit in the next two to three weeks to pursue the liquidation that I had requested over six months ago and I strongly
recommend you do the same.  However, our position will be much stronger and attorneys will be much more interested in
the case if we proceed together.  I think it's necessary to do so.  Although I am still incarcerated my brother-in-law will be
instrumental in helping us manage this process.  Again, I believe time is of the essence so please let me know your
thoughts as soon as possible.  I look forward to hearing from you.

Don

P.S. - I will provide information regarding your approximate account value update for 12/31/17 tomorrow.

**From:** Don Reinhard <d123fsu@gmail.com>
**Date:** February 24, 2018 at 7:42:58 PM EST
**To:** Corey Fuller <boushe24@gmail.com>, Dad <herbreinhard@bellsouth.net>, Herb
Reinhard <hreinhar@valdosta.edu>, Mark Reinhard <mark@capmortcorp.com>, Ann
Schildhammer <annschildhammer@comcast.net>, Dave Borden
<drbfsu1578@yahoo.com>, Chris Kraft <CKFSU@aol.com>, Jon Sweede
<jonsweede@gmail.com>, John Murphy <jgmurph1@aol.com>, Joe Davis
<DrJoeDavisPE@gmail.com>, Bonnie Correll <bonnie_correll@yahoo.com>, Ann Abbott -
Sissy <bernieann@mac.com>, John Martinez <agglemom530@yahoo.com>, John
Martinez <jmdist@yahoo.com>, Adam Corey <adambcorey@gmail.com>
**Subject: Incident at knife-point**

There's no way to sugar coat this, so I won't. I was put in a dorm that is for level 4 and 5
inmates that are violent and hardened criminals because my roommate and I were told that
there was absolutely no available bed space in the dorms that we should have been in for
level 1, 2 and 3 inmates which have shorter non-violent sentences. I was told I would be in
the dorm for 2-3 days and they would get me out immediately. However on Thursday I was
being threatened and pressured to give them food and other items or I would "learn about
prison the hard way". I voiced these concerns to my mother and father who immediately
called and talked with a captain.

The captain talked with me and told me I would be taken out within the next day or two he
was going to immediately look into it and asked me if I feared for my life and I said no that I
was very scared and concerned of getting beat up or knifed. I also did not want to be put in
solitary confinement which is the alternative if you say you fear for your life. I cannot
handle that.

I was told by the dorm officer that I would be moved today which she finally got around to
doing at about 5 o'clock and while I was packing my belongings some of the same
individuals came into my cell with a knife made visible to me and told me they were going to
stab me unless I gave them all of my canteen which was approx. $70 worth of various food
items and hygiene. I tried to reason with them but another individual entered the room a so
one of them held me off with the knife in his hand and they took all of my canteen.

There's other details involved but I immediately reported it to the sergeant outside because
I just wanted to get out of there as soon as possible and they have taken the three
individuals in hand-cuffs to solitary confinement. However, my understanding is that they
are gang-related and will if they have not already got messages to their other gang
members and probably targeting me.

I am in another dorm with a few individuals that I know from the reception center including a
very close friend of Corey Fuller's who had previously promised and re-iterated that
promise when I came in that he will protect me. However, that will mean following him
around like a puppy even if I am safe from other gang members in this dorm.

While the financial loss will hit me hard as I needed this food to last a couple more weeks as I am watching every single penny I have to spend, the real danger is that I am clearly a target at this camp/prison. Again, at this point I do not fear for my life because I certainly do not want to go to solitary confinement but things may change in the coming days. I clearly don't understand this part of the world and do not know how I am going to get through this.

The captain clearly acknowledged to the dorm guard that my roommate and I were not supposed to be housed in dorm F which included the level 4 & 5 inmates because it was breaking DOC policy. Although the dorm officer informed him that they were doing that periodically he said this was still breaking DOC policy. That captain was very helpful and he called mama and daddy yesterday evening to inform them that he was working to get me transferred out.

At this point, I believe the only solution is to do what is necessary to immediately get me moved to another camp/prison or possibly to the annex here at Columbia which is another camp or the work camp at Columbia. I really see no alternative as I'm very scared and nervous as to what the repercussions can be. To do this I assume it will take some sort of orchestrated phone calls possibly to the captain that mama and daddy have already talked to but please tell then that y'all are requesting that this happen and it is not coming from me. Perhaps you can inform him how scared and concerned I am that I am now clearly a target and there does not seem to be any alternative but you will need to be adamant as I should never have been in that dorm.

Please pray for me and I will talk to Wes tomorrow as well as mama and daddy.

Don

**From:** Don Reinhard <d123fsu@gmail.com>
**Date:** February 24, 2018 at 7:51:15 PM EST
**To:** Corey Fuller <boushe24@gmail.com>
**Subject: Visitation and email I just sent**

Corey, I think you will realize when you read the email I just sent that I am not only scared to death but terrified.  Just to let you know Joe did make a very visible sign talking to me so everybody in the dorm would see him.  Hopefully that does help for the time being.

Also, please complete and send in the visitation form that was previously emailed to everybody as I truly want to see you soon and hopefully you can take one Saturday or Sunday and drive over.  We certainly have a lot to discuss especially about Tim and CCG.

Love ya buddy,
Don

From: **Addys Walker** <addyswalker@yahoo.com>
Date: Tue, Feb 6, 2018 at 2:13 PM
Subject: Re: Notice to Cease and Desist from Stalking, Intimidation and Extortion
To: "John P. Leonard" <jleonard@mdmc-law.com>, Lance Friedman <lfriedman@bca-advisors.com>
Cc: Lance Friedman <lancebfriedman62@gmail.com>, Tim Howard <tim@howardjustice.com>, Thomas Woods
<thomascwoods@gmail.com>

I have not been to Tom's house.  I do not know where he lives.  I have been in a meeting for the last couple of hours and I
can prove where I have been all day.  Further, I have no intention to contact
Tom directly or indirectly.

Furthermore, I have no affiliation with Lance other than signing documents for A&T Development.

I spoke with Corey Fuller today who said he only invested his money with Don Reinhard because he trusted Tim Howard.
Corey said he wants to kill everyone, including Tim Howard, Gail, Harrison and myself.  I am letting you know this so you
can protect yourself.

Addys

CUMULATIVE EXHIBIT D

**THE NEW YORK TIMES**

**SPORTS** | PRO FOOTBALL

# *PRO FOOTBALL; There's More Than Football To Worry About for Ravens*

**By DAMON HACK JUNE 8, 2004**

In a small trailer that doubles as a Bible study room, Baltimore Ravens running back Jamal Lewis sat at a news conference Monday and reiterated that he was innocent of federal drug conspiracy charges. In a corner of the Ravens' locker room, no more than two hours later, cornerback **Corey Fuller apologized for the embarrassment caused by his arrest for felony firearm possession and for felony and misdemeanor charges that he used his home in Tallahassee, Fla., as a high-stakes gambling house**.

Football seemed secondary as the Ravens embarked on a four-day minicamp amid the cicadas in this Baltimore suburb.

"This is the appropriate time to discuss this because it is time to go back to work," Ravens Coach Brian Billick said, of Lewis's situation in particular. "Obviously, we support Jamal, we believe in this process and we will support him in this process. Whatever the time frame, it is important to keep in mind that the players don't live in a sterile environment."

For the Ravens, the American Football Conference North champions last season, matters of legality have swooped into their season before.

In August 2000, the N.F.L. fined the All-Pro linebacker Ray Lewis $250,000 for conduct detrimental to the league after he pleaded guilty to a misdemeanor charge of obstructing justice in a double homicide at an Atlanta nightclub. Lewis had faced two counts of murder before prosecutors dropped those charges.

In December, the second-year pass rusher Terrell Suggs was charged with two counts of felony assault for a March 2003 incident outside Phoenix Municipal Stadium after a three-on-three basketball tournament. Suggs has a Sept. 9 court date.

With Jamal Lewis, who faces charges in Atlanta, Fuller and Suggs, Ravens players currently face six felony charges in three states.

**"It seems like the devil is always at work, but I know what it takes to overcome the devil," Fuller, 33, said. "I wouldn't wish this on my worst enemy. But nobody victimized me. I victimized myself."**

Billick compared the off-the-field situations with instances that arise in every sport. The Ravens have bucked back controversy before, winning Super Bowl XXXV against the Giants only months after Ray Lewis's involvement the Atlanta murder trial.

"Whether it's Jamal, whether it's Corey, whether it's Terrell Suggs, I have a tremendous amount of faith in the character of those individuals," Billick said. "There are going to be things that raise themselves up due to injury, personal situations, births, deaths, any number of things. These aren't machines. They have lives and as a team, you have to respect and understand that."

Jamal Lewis, who was voted the league's offensive player of the year last season, rushed for 2,066 yards, the second-highest total in league history. (Eric Dickerson ran for 2,105 in 1984.) Lewis is accused of conspiring to possess with intent to distribute five kilograms of cocaine and using a cellphone in the commission of a drug crime. The charges resulted from an investigation by the Federal Bureau of Investigation during the summer of 2000, just before Lewis signed a six-year, $35.3 million contract.

# 247 Sports

# Fuller Facing Felony Gun Charges

BY May 24, 2004 ·
S

When Corey Fuller played for the Vikings, VU staffers agreed he was a talented player, but also agreed he wasn't going to be asked to join Mensa.

His lack of ideal intelligence came into play earlier this year when **a shootout at his home resulted in Fuller being arrested for hosting high-stakes gambling nights. Despite making a solid NFL salary, especially when he was with the Browns, the current Ravens player decided playing host to No-Limit Texas Hold 'Em games was in his best interest.** Now he faces jail time and a likely suspension from the league.

New charges were added over the weekend, including use of a firearm during the commission of a felony, which carries a maximum of five years in jail if convicted.

# EXHIBIT E

# Howard & Associates
## Attorneys at Law, P.A.
*Dr. Tim Howard, J.D., Ph.D., Senior Partner\**
*Florida Supreme Court Certified Mediator*

Tallahassee Office:
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Ph: (850) 298-4455; Fax: (850) 216-2537
Tim@howardjustice.com

Fort Lauderdale Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332-3633
www.howardjustice.com

Cambridge Office:
8 Museum Way
Suite 2407
Cambridge, Massachusetts 01141
(857) 277-0990

July 28, 2017

**VIA HAND-DELIVERY OR EMAIL**

Jon Fuchs, Assistant State Attorney
Second Judicial Circuit
301 North Monroe Street, Suite 475
Tallahassee, Florida 32301
(850) 606-6000

Jennifer Alane Hawkins, Assistant State Attorney
Fourteenth Judicial Circuit
421 Magnolia Avenue
Panama City, Florida 32401
(850) 872-4473

Re: Attempts at Extortion, Retaliation and Obstruction of Justice by Criminal Co-Defendants Don
 Reinhard and Katie Reinhard (Buxton). Don Reinhard is Currently Facing Criminal Charges for
 Violation of Probation for Grand Theft. Don Reinhard and Katie Reinhard are both Facing Criminal
 Charges for Felony Child Abuse of a Disabled Child, A Tragedy for the Disabled Child and for the
 Co-Defendants.

Dear Assistant State Attorney Fuchs, and Assistant State Attorney Hawkins:

As part of your respective prosecutions of the above referenced violation of probation and felony child
abuse charges, the law firm has assisted by sharing evidence and responding to the subpoena verifying the
felony crimes of child abuse on the phone and in texts between the co-defendants that was shared with
Assistant State Attorney Jon Fuchs and Panama City Beach Investigator, Lieutenant Eusebio Talamantez.
Cumulative Exhibit A. The law firm was unwilling to participate in obstruction of justice and would not
hide evidence nor assist in their criminal defense. In retaliation, the criminal co-defendants are
aggressively attempting to extort the law firm and those that work for and with the law firm. While these
sordid crimes are a tragedy for the disabled child and for both co-defendants, and we hope that the

\*Admitted to practice in Florida, the District of Columbia, Northern, Middle, and Southern United States District Courts of
Florida, the United States Court of Appeals for the 11th Circuit, and the United States Supreme Court. Ph.D, Northeastern
University, Law, Policy & Society. Former Visiting Health Law, Bioethics, and Human Rights Scholar, and Constitutional
Law, Media & Politics and Judicial Process Instructor at Boston University. Former Director of and Professor with
Northeastern University's Law & Policy Doctorate Program. President of Cambridge Graduate University International.

disabled child receives the security and support he needs, we must inform you of continuing extortion and retaliation by these criminal co-defendants.

Despite receiving "Cease and Desist" letters in late February and early March of 2017, and Don Reinhard executing a notarized "Law Firm Non-Disclosure Agreement and Confidentiality Agreement" that all workers in the building sign, regardless of whether they actually work as an employee or independent contractor for the Howard & Associates law firm, colleagues, employees, experts, lenders, accountant, wife of the owner, owner, regulators, private investigators, and more, have received threatening and extortionate emails, texts, and/or letters dictated or written from the Leon County Jail by Don Reinhard, and/or through his co-defendant, Katie Buxton (now Katie Reinhard since he married Katie Buxton while in the county jail in a fruitless attempt to claim marital privilege for a co-defendant, which marriage was after the crime and after the testimony and documentation of the crime took place). In violation of the "Law Firm Non-Disclosure Agreement and Confidentiality Agreement," based on his statements to date, Don Reinhard may have obtained NFL Concussion Settlement Claim files and may have sought to make changes to the files. The firm doesn't know what is in Don Reinhard's possession. All original client files in the law firm's possession are in order.

Don Reinhard and Katie Reinhard have falsely claimed and implied fraud in NFL Concussion Settlement client files, and have implied that there are other matters that they will expose, if it is not agreed that: (1) the law firm and colleagues participate in obstructing justice and assist Don Reinhard and Katie Reinhard in their criminal defense, (2) Don Reinhard and Katie Reinhard are entitled to amounts that range from $1,200,000 and more several million dollars for Don Reinhard's $3,000 a month consulting work for a private FINRA exempt investment fund, (3) Katie Reinhard is to be paid Don Reinhard's former consulting fee of $3,000 monthly, and (4) $25,000 is to be paid to Katie Reinhard for a car she does not own. Cambridge Capital Group (CCG) has responded to each of the claims against that company, and verified that there were no funds invested nor are there subscription agreements as investors under either Don Reinhard or Katie Reinhard.

The facts are that Don Reinhard was hired as a periodic consultant for CCG, an independent investment company, at $3,000 a month. He has no ownership interest in CCG. He was hired as a consultant in an effort at compassion and rehabilitation of someone that Dr. Howard met at Costco selling wine and who didn't know what to do with his life. He is a former high school football team mate that Dr. Howard had known, but he was not someone that Dr. Howard had been close to. He was not involved with the law firm, and in an abundance of caution, the firm required that all workers on the same floor in with companies in the same building of the law firm sign and commit to a confidentiality agreement in order to protect client information. Subsequent to his dismissal, upon investigation, it has been determined that Don Reinhard was misleading as to the facts and underlying charges for some of his prior crimes. Affidavit verifying independent contractor and consultant status, and affidavit verifying income of $3,000 monthly, as filed by Don Reinhard in January and December 2016 in his Circuit Civil Court Child Support case in Leon County, Florida, and confidentiality agreement, and cease and desist letters, are attached as Cumulative Exhibit A. Moreover, the investment companies are currently owned and managed by third-parties, that this firm represents, and are Nevada companies. Dr. Howard had

approximately $2.4 million invested by the end of 2016, and has approximately $5.2 million invested as of July 28, 2017.

Beginning about a year ago, due to concerns as to Don Reinhard's arrogance, narcissism, solipsism, and resistance to accountability, CCG started a search for a replacement and/or supervisor of his independent contractor consulting work, with a licensed financial planner, licensed investment agent and broker-dealer. After interviewing several candidates, a quality, experienced, respected, and licensed professional with integrity and empathy was found and CCG hired Gail Milon, CASL, CLTC, with 30 years of successful experience, as managing Vice President in December of 2016.  She has since hired Bogan Public Management Company (BPMC), and Bill Bogan, Jr., CPA, CGFO, and CBFO, to provide a comprehensive audit to ensure all investment funds are in place and to determine what company profits may have been absconded. BPMC is mid-way through the audit now.

Starting after his arrest in mid-February of 2016, a retaliatory and extortionate scheme to obstruct justice and extort assets by Don Reinhard and Katie Reinhard (Buxton) began, and is found in the various letters and emails from them orchestrated from the Leon County Jail through his co-defendant Katie Reinhard. The conspiracy between these co-defendants begins with the violation of the February 11, 2017 Court Order that specifically directs Don Reinhard: "Do not contact Jesse Buxton or Katherine Buxton." *Id.* The various letters and emails are attached as Cumulative Exhibit B.

As an example, these sordid claims have been spread to experts, clients and lenders of the law firm, falsely claiming that diagnostic medical exams and final reports are forged and hundreds of millions of fraudulent claims have been submitted to the NFL Concussion Settlement Claims facility. *Id.* The facts are that neither Don Reinhard nor Katie Reinhard ever worked for the law firm, though Don Reinhard did sign the law firm confidentiality agreement to protect any exposure to client confidential information, and Don Reinhard was terminated from his consulting work for an independent investment fund in mid-February of 2017. Exhibit C. Don Reinhard was imprisoned in late February of 2017 as a result of violation of probation due to pending felony child abuse charges.  As a consequence, neither Don Reinhard nor Katie Reinhard know how vacuous and patently absurd their extortionate and retaliatory allegations are.

These criminal co-defendants don't know that from the currently over 250 clients, and growing, nothing, other than registering them, has been submitted to the NFL Concussion Settlement Claims facility.  They don't know that all original medical reports are in the files of the doctors, and only copies are in the files of the law firm.  They don't know that all medical records and reports have to be reviewed and signed by a board-certified neurologist formally approved by the NFL Concussion Settlement Claims facility.  They don't know that the board-certified neurologists contemplated for use by the law firm were only recently approved in May and June by the NFL Concussion Settlement Claims facility.  They don't know that all our NFL Concussion Settlement clients must meet individually for an updated clinical evaluation prior to submission of our clients' claims to the NFL Concussion Settlement facility.  They don't know that the firm must have a board-certified neuropsychologist meet with every client to update and finalize their neuropsychological status, and that these updates will begin in a few weeks.  They don't know that the law firm manages its files to ensure the file's integrity and client confidentiality.  This is just one example of their respective ignorance, arrogance and their vacuous criminal extortion and retaliation attempts.

These letters and emails are replete with these types of criminal schemes, including: (1) attempting to operate a private investment firm from jail and enticing retired NFL players to invest $650,000 with $9,000 monthly income and doubling of value in 7 years, and running a "new firm, Sd5M Capital Management owned by my wife (also known as Scooby/Katie) and I as well as a group of retired players," (2) attempting to extort a "global settlement", "$50,986", monthly payments of $3,000 to co-defendant Katie Reinhard, and $1,200,000 in assets in response to "turning your back on me" and threats of "train wreck for both of our lives and you have more to lose," "the risk and damage your actions will cause to many . . .", "each event carries significant penalties + punishment", "your massive fraud", "30-year prison term", "I have been forced to sue Tim Howard for well over $1 million that he is attempting to steal from me, my family, and my children", (3) attempting to extort these payments and assets through threats and claims of fraud against the NFL Concussion Settlement, tax fraud against CPA, bank fraud and worthless check charges against staff, (4) attempting to extort a $25,000 payment to Katie Reinhard for a car she does not own, (5) use of third-parties and/or alias, such as Tori Reinhard and nflfraud@gmail.com, as part of their extortionate conspiracy, (6) threatening and intimidating experts and lenders of the law firm, (7) threatening and intimidating the independent auditor (BPMC), (9) spreading false and defamatory statements to NFL Concussion Settlement clients, and (10) the following threatening and extortionate tome to Dr. Howard's wife, Jennifer Howard:

> But also, I intend to immediately move forward with current communication I am having with the NFL Claims Administrator and law enforcement via a large national law firm regarding this massive fraud Tim Howard & Associates have perpetrated against the NFL Concussion Settlement and the 300 plus retired NFL players that are his clients. . . . **Tim and his team have made a massive fraud out of it to bilk the NFL out of approximately $120 million in claims of which he will be paid approximately $30 million in fees. I have been told that the case would likely carry a 30-year prison term** and the collateral damage to many of his employees and associates who know and are involved would be devastating to many lives . . . this does not even include the many, many families of the retired NFL players who are expecting a financial settlement averaging over $600,000 who will be denied due to the fraud involved in their qualification process by their trusted attorney, Tim Howard. The media onslaught that you and your family would have to endure, in and of itself, would be devastating and far greater than tobacco days. I and others began keeping records and documented proof in 2016. While I thought the activity was limited, I was shocked to hear from 2 H&A associates that it was widespread. They came to me in Jan. with concerns of their personal liability. For example, I and others have witnessed forging signatures on files to insure eligibility as well as changing files as needed. There is an abundance of documented evidence to prove this that Tim was unaware was being collected in many forms. . . . **I have told Tim via my letters that I do not want to go down this road unless he forced me to. To date, my communications to the various authorities has been limited by design and anonymous as again, its via a large law firm but they are eager to move forward with details. . . . I must have him simply provide me what is "mine" . . . I cannot start my life over again.** . . . Look at the enormous risk he is taking for him, you and your family. Look at the enormous risk he is taking for the employees of his law firm. Look at the enormous risk he is taking for almost 300 families of retired NFL players. Outside of the NFL and the criminal case, Tim would be sued for millions he has borrowed over the last 4-5 months against his future expected fees as they were based on fraud, sued by multiple legal

advance companies because their loans to players would be unpaid based on Tim's fraud, and sued by all of the investors in the Limited Partnership Investment Funds of CCG, due to their losses because of the fraud (including your mother's investments) which would certainly bring in the SEC. **This is certainly well over $35-$40 million in lawsuits in addition to losing his $30 million in fees. For what . . . "spit for me, which is very foolish" as suggested by 2 of his closets clients who know the situation. Jennifer, let's not make this a train wreck as y'all have far more to lose than I do.** Please discuss this with Tim and send me an email as I will not wait past 4/17 for a response to d123fsu@gmail.com. (emphasis added).

Cumulative Exhibit B. All these actions are an attempt at extortion and in retaliation for not assisting in their criminal defense, for not participating in obstruction of justice, and for assisting the State of Florida in providing damning evidence in support of the prosecution of their crimes.

In light of their rapid fire buckshot, yet vacuous, extortionate and retaliatory actions to date, and the comprehensive evidence of their crimes and the evidence that this firm is providing as a result of its investigation and has provided to assist in the prosecution for these crimes, as well as in compliance with Assistant State Attorney Jon Fuch's subpoena, it is highly likely that these criminal co-defendants will reach out to any source that may come into their respective minds in an attempt to perpetrate their extortion, retaliation and obstruction of justice. In order to expose the extortion, retaliation, and obstruction of justice, and to avoid any knowing or unknowing, and/or direct and indirect complicity by third-parties with their schemes, this law firm is providing a copy of this notice to the Florida Bar, and will provide copies of this notice to any other victim of their criminal schemes that this law firm becomes aware of.

Thank you for your service to Floridians and for your consideration of these matters. This entire episode is a tragedy and we do hope that these co-defendants get the structure, accountability, discipline, and mental health treatment that they need to be productive citizens. As stated in the beginning of this letter, we hope that the disabled child that is a victim of their crimes gets the security and support he needs for a healthy life.

Sincerely yours,

Jaakan Williams

Jaakan Williams, Esq.
**HOWARD & ASSOCIATES, P.A.**
2120 Killarney Way, Suite 125
Tallahassee, Florida 32309
Office: (850) 298-4455
jaakan@howardjustice.com

CC:    Florida Bar