## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | |

## INTERIM REPORT RE: MEDIATION ON RACE-NORMING ISSUE

On March 8, 2021, you referred Class Counsel Seeger Weiss and counsel for the NFL ("the Parties") to me "to seek to address the concerns relating to the race-norming issue" that were raised in the related case of *Henry v. National Football League*, Civ. No. 20-4165. (ECF No. 11302.) On March 15, 2021, Henry and Davenport (the "Intervenors"), the plaintiffs in Civ. No. 20-4165, filed a motion on this docket to intervene in those discussions and to stay the mediation pending your ruling on their intervention request. (ECF No. 11306.) On April 8, 2021, you entered an Explanation and Order that you were reserving decision on the Intervenors' motion and that you awaited a report from me regarding this mediation, "including comment upon the involvement of individuals beyond the NFL and Class Counsel in this process." (ECF No. 11325.) You ultimately granted the intervention request on June 3, 2021. (ECF No. 11368.) We provide an interim report to you at this time consistent with your direction given on June 4, 2021. (ECF No. 11371.)

1

**Prospective relief – looking forward**

We start with your March 8, 2021 referral but we pause here as to provide background and context.  The potential for use of racial norms in testing related to claims under the Settlement Agreement arises from the incorporation of specified testing batteries for the dementia-based diagnoses defined in the Settlement Agreement, Level 1, 1.5, or 2 Neurocognitive Impairments, that confer certain benefits upon the Settlement Class Member.  The particulars have been set out in the Retired NFL Football Players' Baseline Assessment Program: Neuropsychologist Handbook (the "Guide"), which provides information for the clinicians who evaluate Settlement Class Members for potential claims under the Settlement Agreement.[1]

The Qualifying Diagnoses for these dementia-based claims have four elements, one of which is "evidence of … cognitive decline from a previous level of performance" in particular cognitive domains and "as determined by and in accordance with" the testing protocol set out in Exhibit A-2 to the Settlement Agreement.  Exhibit A-2 identifies the test battery and defines the qualifications for Level 1, 1.5, or 2 Neurocognitive Impairment based upon Impairment Criteria grids that take into account pre-morbid IQ (e.g., pre-injury intellectual functioning) and the degree to which "T scores" (scaled scores) in various domains deviate from set cutoff scores.  As we have learned, the Guide "recommends" that clinicians use the "full demographic norms" that are available when scaling scores under the tests that measure current cognitive functioning. Circumstances have suggested that there is reason to be concerned over the use of racial norming in this context.  The application of the racial norms results in the circumstance that the conversion of a raw score to a scaled score yields different results under the Impairment Criteria grids based

---

[1] Given the central role that the Guide has in the process, the Parties have agreed certain edits will be needed.

upon whether the comparator (normative) population sample was the population of Caucasians or African Americans.[2]

Prior to the commencement of this mediation, Class Counsel and the NFL were already in agreement that new protocols should be developed to eliminate the use of demographic norms that differentiate based on race. As the Settlement Agreement defines award criteria in part based upon neuropsychological testing, neuropsychologists who administer and score the tests used in that Agreement to diagnose dementia (for "qualifying diagnoses" of Level 1, 1.5, or 2 Neurocognitive Impairment) will need to apply different norming techniques going forward that do not involve applying any adjustments from raw scores to scaled scores based upon race. Class Counsel and the NFL then empaneled a group of neuropsychologists (the "Panel") and charged them with developing alternative standards to replace norms that take into account race and that will produce results with sufficient diagnostic accuracy for utilization in the Settlement Program. Class Counsel and the NFL each initially contributed two such experts to this endeavor, one of whom served as a consultant to the development of the original settlement standards and others of whom have no prior involvement with the Settlement Program. They are joined by a neutral court-appointed Appeals Advisory Panel Consultant ("AAPC") who has worked with the Settlement Program since 2017. Two additional neuropsychologists were also added to provide further diverse viewpoints. Finally, two other leading neuropsychologists with significant experience in testing and norming, including one with whom the Intervenors have consulted, have been proposed as additional members of, or advisors/reviewers to, the Panel. The Intervenors' consultant is well-regarded by the members of this Panel and we expect will engage with them in this work. The court-appointed

---

[2] The filings in this case have described the rationale for the neuropsychological community's development of this approach – to correct for measuring techniques that tended to over-diagnose African Americans as having cognitive impairment due to test bias and/or societal inequities.

AAPC member has assured us that these new consultants will have access to all datasets and processes utilized in the development of the Panel's proposals.

We have been in regular contact with the court-appointed AAPC over the past several months about the progress of the experts in this forward-looking work.  He has described a great deal of collegiality and mutual respect among the members of this group, and they have been meeting weekly to discuss various proposals.  There have been several related proposals that are being vetted by the Panel.  The Panel members are mindful of the impact on an individual of a dementia diagnosis as well as what it means for an award in this settlement program.  They thus want to avoid false-positive dementia diagnoses to individuals who undergo testing as part of the Settlement Program.  They will require a high degree of confidence in the reliability of scores that any new norms would yield, as they consider this a matter of real importance to their field.   They have begun the preparation of a "white paper" that will set out their conclusions and recommendations for employing testing methodologies that do not utilize corrections based upon the individual and normative populations' race or ethnic identification.  We have given them a deadline July 15 to present to us the first iteration of that white paper.  All recognize that they are participating in a ground-breaking project, the effects of which will go well beyond the resolution of this case.  We are confident that this will address your concerns.[3]

---

[3] This work has been ongoing for several months.  The July 15 date pertains to what the Panel characterized as a short-term solution.  We have been assured, however, that while the work will continue, this proposal will be sufficiently vetted such that the Panel would recommend its use as a clinically-justifiable solution to the race-norming concerns.

**Retrospective relief – looking backward**

Another objective of our work in the mediation is to assist in the development of a plan to review the cases of those Settlement Class Members who were already evaluated in the BAP program or who have filed an MAF claim and whose neurocognitive testing scores may have been negatively impacted by the application of racial norms.  The Parties are undertaking, with the Claims Administrator, to identify those Settlement Class Members who, based upon a re-scoring of the neurocognitive tests, might meet the criteria for a higher-level Qualifying Diagnosis, i.e., Level 2 instead of 1.5 or 1, 1.5 instead of 1, or 1, 1.5, or 2 instead of No Impairment. We have directed the Parties and Intervenors to consider the contours of such a review, given that the Intervenors have a somewhat different view of how this retrospective review should be undertaken and the universe of claims that would be re-examined.   While we have been awaiting the development of new standards from the expert panel, these separate questions of implementation will be the focus of our mediation work.

We have considered whether the matter of re-scoring the tests of the Settlement Class Members that the Intervenors have referred to as "legacy Black retirees" (already considered for Level 1, 1.5, or 2 awards) could involve some interim system that could be implemented as to their concerns of discrimination while the experts work on developing a new system prospectively. Even in the limited context of the re-evaluation of claims of legacy Black players, however, there is some reluctance in replacing the current system – which had the blessing of leading neuropsychologists when it was adopted – with a new process which may not have been formally vetted.  This will be the subject of further discussion upon the acceptance of new norms, following upon the current work of the expert panel.

**Claims Administrator review of current (pending) cases – looking at the present**

While the process of developing new norms is underway, the Claims Administrator has adjudicated Monetary Award Fund claims for Neurocognitive Impairment Levels under the guidance that the Special Masters set out in their decision dated August 20, 2020.[4]  In this manner, claims continue to be processed and paid.  By way of context, we note that in the quarter that was the subject of the Claims Administrator's most recent Status Report, reflecting data as of April 12, 2021, 793 claims were submitted for Level 2 awards and 1,216 were submitted for Level 1.5 awards.  Of the Level 2 claims, 210 (26%) resulted in issuance of a Notice of Monetary Award, and 391 (32%) of the Level 1.5 claims were similarly approved.  (ECF No. 11353 at 6.)  Class Counsel reports, based on information provided by the Claims Administrator, that as of last week, some 130 dementia claims were pending and that claims continue to be approved.  It is our understanding that the Claims Administrator will seek an explanation from the testing neuropsychologist in any cases in which either it is unclear which norms have been administered or if the clinician used non-recommended norms but did not offer an explanation of why they did so.  If a claim would face denial solely due to the clinician's use of full demographic adjustments as contemplated by the Settlement Agreement, the Claims Administrator will hold that claim pending the results of this mediation process.

---

[4] In their August 20, 2020 opinion, the Special Masters recognized that clinicians approved under the MAF and BAP have discretion to adopt any normative adjustment that they think appropriate. MAF Physicians must produce results that are "generally consistent" with the BAP Protocol.  The present version of the Guide permits them to choose the TOPF alone or, at their discretion, several demographically-linked models to make estimates of the player's pre-morbid condition.  For measures of cognitive decline, the Guide presently recommends use of the full ACS and Heaton norms.  Again, as explained by the Special Masters in their decision, however, that recommendation will give way to the clinician's documented judgment that a different comparative pool is appropriate.

**Next steps**

While we await the analysis of the experts and their proposals for prospective changes to the neuropsychological testing component of the dementia claims, we are focusing the Parties' and Intervenors' attention on the questions of retrospective relief for the legacy Black players. We have reached the stage where we are sharing with counsel each other's positions and convening sessions to discuss the areas in which their approaches differ and to attempt to work towards consensus. We are optimistic that the work of the experts will result in the elimination of the use of race norms in the scoring of the tests identified in the Settlement Agreement and will allow them to craft relief to those Settlement Class Members who have suffered a quantifiable harm from the application of racial norms. With the work progressing as it has, we believe that the essentials of an agreement can be set out before summer's end. We do not believe that the intervention of any other parties would be beneficial to these efforts, as the positions of the legacy Black players are well-represented by Zuckerman Spaeder and Class Counsel.

We will provide you with an additional report once we have the proposal of the expert panel. We continue to nudge the Parties and Intervention to resolution.

Respectfully submitted,

Dated: June 11, 2021                    /s/ David R. Strawbidge, USMJ
                                        DAVID R. STRAWBRIDGE
                                        UNITED STATES MAGISTRATE JUDGE