## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>        Plaintiffs,<br>   v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br>        Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Goldberg Persky & White<br>v.<br>SPID No. 100002840 (R.C.)<br>Attorney's Lien Dispute<br>Case No. 593 | |

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE        July 28, 2021

## I. INTRODUCTION

  Before the Court for Report and Recommendation is a Lien filed by Goldberg Persky & White ("Goldberg") seeking attorneys' fees and costs from the Award granted to its former client, R.C., in the litigation which became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.). Goldberg seeks payment of attorneys' fees of 22% of the Award issued to this settlement class member ("SCM"). R.C., who is now represented by the Mokaram Law Firm ("Mokaram"), opposes the Lien.

  As we set out in our January 7, 2019 Report and Recommendation assessing the first

grouping of attorney lien disputes, our evaluation of the validity of Goldberg's lien involves a consideration of the contingency fee agreement ("CFA") between the parties and an assessment of the reasonableness of the requested fee in light of the five factors enumerated by the Third Circuit in the *McKenzie* cases.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This requires us to scrutinize the reasonableness of the CFA at the time of the contact's signing and then determine if the circumstances compel a different evaluation of the CFA at the time of its enforcement.  We then examine the results obtained, the quality of the representation provided by Goldberg, and whether the efforts of Goldberg substantially contributed to the result.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.

## II.    FACTS AND PROCEDURAL HISTORY[1]

Goldberg entered into a CFA with R.C. on July 21, 2011.  The firm agreed to pursue a claim for injuries and damages allegedly caused by the NFL's conduct associated with football-related concussions and head injuries.  R.C. agreed that the attorney's fees for services rendered would be 40% of the gross amount recovered.  The agreement also authorized Goldberg to deduct the costs of prosecution from any settlement or judgment proceeds.  The firm later reduced the contingent fee percentage to 25%.

During the course of its representation, Goldberg prepared and filed a multi-party

---

[1] We derive the factual background principally from the Statement of Dispute submitted by Goldberg.  Mokaram responded to Goldberg's Statement but did not submit its own.  The Claims Administrator has also provided us with the dates of certain administrative filings that helped us to understand this chronology.

complaint in the Superior Court of Los Angeles County, California that included claims on behalf of R.C.  It later also prepared and filed a short-form complaint for the MDL and litigation in this federal district.  In preparation for this litigation, it obtained and reviewed team records and worker's compensation files concerning R.C. and compiled questionnaires and other information necessary to advance R.C.'s interests.  It also advised R.C. on testing options and explored appropriate doctors; counseled R.C. on whether to accept, reject or appeal the Settlement Agreement; and advised R.C. on the settlement agreement criteria concerning qualifying diagnoses.  (Stmt. of Dispute at Ex. A.)

On June 18, 2014, however, R.C. discharged the firm.  (*Id.*)  Goldberg accordingly filed its Notice of Lien on the docket.  The record before us shows that, simultaneous to his discharge of Goldberg, R.C. engaged Mokaram.  Their CFA provided for a contingent fee of 33 1/3% if a settlement were obtained before a lawsuit was filed or 40% if collection was made after a lawsuit was filed.

The record before us provides little information as to what happened thereafter, particularly as it relates to anything Mokaram may have done on behalf of R.C.  The Claims Administrator's records indicate that R.C. was registered in the settlement program on February 15, 2017 by Attorney David Buckley, PLLC ("Buckley"), who is not a party to this lien dispute.  The Claims Administrator's records also indicate that claim forms were submitted by Buckley on April 21, 2017 and October 27, 2017.  When the Claims Administrator sought to give notice of Goldberg's lien to counsel in March 2018, Buckley was identified as primary counsel to be advised of that development.

The record provides even less insight into what happened in the following two years.  On

July 13, 2020, however, R.C. underwent examination with a Qualified BAP Provider.  (Award Notice.)  The Claims Administrator's records then reflect that on September 21, 2020 Buckley submitted a third claim form on behalf of R.C., seeking an award for Level 1.5 Neurocognitive Impairment based upon the qualifying diagnosis rendered by the BAP physician two months earlier.  Then, for reasons not apparent in the record, on September 22, 2020, R.C. notified the Claims Administrator that *Mokaram* was to be listed as his counsel.  Accordingly, when the Claims Administrator concluded its consideration of the claim that had been filed by Buckley on September 21, 2020 and issued a Notice of Monetary Award Claim Determination on November 10, 2020, the form identified *Mokaram* as R.C.'s counsel.

After the award was finalized, the Claims Administrator withheld funds acknowledging the Goldberg lien and issued a Schedule of Document Submissions to the parties, Goldberg and Mokaram, as part of the attorneys' liens dispute resolution process.  The February 22, 2021 Schedule advised the parties that, pursuant to Rule 19 of the Amended Rules Governing Attorney's Liens, they were obligated to submit a Statement of Dispute by March 24, 2021.

In accordance with the Schedule of Document Submissions, Goldberg submitted its Statement of Dispute on March 23, 2021.  Mokaram did not submit any Statement of Dispute.  It did, however, submit a Response Memorandum to Goldberg's Statement on May 6, 2021, appending a statement from its client opposing any fee award to Goldberg.  The Claims Administrator transferred the Record of Dispute to us on June 4, 2021.

III.    **DISCUSSION**

Given the posture of this case and the content of the dispute record, we recommend that

4

Goldberg's lien be recognized and the firm be awarded a portion of the contingent fee available in this case.  Inasmuch as Goldberg's role was limited, however, we recommend that it receive no more than 8% of R.C.'s award.  We are unable, however, to recommend that any portion of the fee be awarded to Mokaram in that the firm failed to engage in our process, providing no particulars sufficient to justify any portion of the fee.  Our recommendation is informed by both a waiver analysis and our merits assessment below.

### A.  Non-compliance with Attorney Lien Rules

The procedures outlined in the Schedule of Document Submissions described above are grounded in the Amended Rules Governing Attorney's Liens that were approved by the undersigned by Order entered on October 2, 2018 and adopted by Judge Brody on October 3, 2018. (ECF Doc. 10283.)  Rule 14 requires the parties to engage in efforts to reach an agreement on the lien dispute.  Rule 12 explains that the Claims Administrator will refer the dispute to me or to another United States Magistrate Judge, either for resolution or for preparation of a Report and Recommendation.  Rule 17(a) provides that "each Attorney Lienholder ***and the current attorney***, if the SCM is represented, ***must*** serve the Claims Administrator with a Statement of Dispute.  (Lien Rule 17(a) (emphasis added).)  Thereafter, the party in receipt of a Statement of Dispute may serve the Claims Administrator with a Response Memorandum to the opposing party's Statement of Dispute.  (Lien Rule 18.)  The purpose of these Rules is to provide the adjudicator with support for the positions asserted by the parties.

Mokaram did not file a Statement of Dispute as it was required to do under Rule 17(a). While it did file a Response to Goldberg's Statement of Dispute, that Response was no substitute for what it was required to have filed by way of a Statement of Dispute.  That statement, if properly

prepared, would have provided "a chronology of the tasks performed by the attorney, the date each task was performed, and the time spent on each task," all of which would have aided us in making the evaluation we describe below under *McKenzie*.

### B. *McKenzie* analysis

As we have explained in prior Reports regarding lien disputes involving other settlement class members in this litigation, Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to contingency fee contracts but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The Court has explained in its prior opinions that all attorneys seeking fees in this litigation – whether those fee requests are submitted through a Lien or otherwise – are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*.  *See, e.g.,* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence).  Where, as here, we are presented with presumptively valid contingency fee contracts, we assess whether the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity."  *McKenzie I,* 758 F.2d at 101.

The *McKenzie* five-part reasonableness analysis obligates us to evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney."  *McKenzie I*, 758 F.2d at 101.  Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement.  *McKenzie II*, 823 F.2d at 45 n.1.

Recognizing that the District Court previously adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the contract's enforcement.  We will then review (1) the result in the case, (2) the quality of the work performed by Goldberg (and Mokaram), and (3) the substantiality of each's contribution to the overall result.

As is discussed in greater detail below, circumstances here at the time of contracting and the time of execution evolved to some extent.  In evaluating the remaining three prongs, we are satisfied that Goldberg provided quality representation and made contributions to the ultimate Award received in this case.  At the same time, we recognize that Goldberg no longer represented R.C. when registration in the settlement program opened and therefore did not submit the claim form that was approved in November 2020 -- work that appears to have been performed by Buckley, which is not a party to this dispute.  Considering the substantiality of Goldberg's contribution as an individually-retained plaintiff's attorney, however, we conclude that it should receive a portion of the fee described in the CFA.

## 1.    The CFA at the time of contracting

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.

Goldberg and R.C. entered into the fee agreement on July 21, 2011.  This was shortly after the first lawsuit was brought by former players against the NFL in California state court but before individual cases had been consolidated for pretrial purposes into this MDL.  This is what Professor

Rubenstein[2] characterized as "Phase 1" of the litigation.  As has been noted in prior opinions in this MDL, at that time the plaintiffs faced stiff challenges surmounting the issues of preemption, and the claims involved complex scientific and medical issues that had not yet been studied comprehensively.

Risk as it related to overall workload varied over time in this litigation.  When law firms undertake large-scale litigation, they are obligated to decline to take on other litigation.  The cost to law firms in deciding to participate and thus forego alternative matters must be recognized.  In this first phase of the litigation, the law firms that undertook representation of players individually, without the benefit of the efficiencies contained within an MDL, faced monumental challenges and risked having to pursue the entire case themselves, perhaps even through trial.  Fee arrangements reflecting those large contingencies "would have been expected and appropriate." (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL in January 2012, the risk related to the *volume* of work to be undertaken by a law firm changed dramatically.  Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the formation of the Plaintiffs' Executive

---

[2]  The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court.  After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped individually-retained counsel fees at 22% plus reasonable costs.  (Doc. No. 9862 at 2).

Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case.  *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from individually-retained player attorneys to Plaintiffs' Committees, which would be compensated through a common benefit fund).[3]  The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

R.C. remained in a contractual relationship with Goldberg from the signing date of July 21, 2011 until June 18, 2014, when he discharged the firm.  During this time substantial progress had been made in moving the cases forward.  The NFL's motions to dismiss and to sever were argued in April 2013, but in July 2013, without yet ruling on these motions, Judge Brody ordered the parties to mediation, and by the end of August 2013 a term sheet had been signed.   This led to class counsel's motion for preliminary approval filed on January 6, 2014.  Judge Brody denied the motion and sent the matter back for further discussion.  In June 2014, an amended agreement was presented for preliminary approval.  It was in this posture that Goldberg's representation of R.C. was terminated.

### 2.      The CFA at time of enforcement – impact of changed circumstances

In contracting with R.C on July 21, 2011, Goldberg undertook representation at a time of substantial risk.  A degree of risk still remained when the representation ended on June 18, 2014, before the Settlement received final approval and a claims process was established.[4]  Thereafter

---

[3]   We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

[4] The amended agreement would not be approved initially in the District Court until July 7, 2014. Following a fairness hearing on April 22, 2015, the court granted final approval.  The Third Circuit

other counsel (apparently Buckley) assisted R.C. in registering in the settlement program.  Other counsel (again, Buckley) also filed the claim in September 2020 that led to the Monetary Award Claim Determination in November 2020.  The award was predicated upon the BAP exam from July 2020.  Thus, it was ultimately other counsel, not Goldberg, who assisted R.C. with obtaining the necessary medical evidence and presenting it to the Claims Administrator to conclude the claim process.

### 3.     The results obtained

On November 10, 2020, R.C. was found qualified for an award based upon the date of the qualifying diagnosis, the nature of the diagnosis, and his age at diagnosis.  Records provided by Mokaram reflect expenditures in 2017 and 2018 by Buckley for neuropsychological evaluations.[5] The Claims Administrator advises us, however, that claims submitted by the Buckley firm on behalf of R.C. in April and October 2017 did not lead to an award.  Rather, it was a BAP examination conducted in July 2020, for which no costs appear to have been incurred by counsel, that led to the positive outcome.  *See* Stmt. of Attorney's Fees & Costs at attached Transaction Detail Report (reflecting no costs incurred for examination in July 2020).

### 4.     The quality of the work performed

Goldberg has detailed the work that it performed during its period of representation in its Statement of Dispute and accompanying exhibits.  We credit Goldberg's submission that in the

---

Court of Appeals resolved the first appeals in an April 18, 2016 decision that affirmed the District Court's approval of the Settlement Agreement.

[5] Mokaram has not offered any explanation as to its connection, if any, with Buckley, although it presented as its costs a detail report that purports to have been maintained by Buckley.  (Stmt. of Attorney's Fees and Costs.)

course of this representation of R.C. it obtained and reviewed worker's compensation and other

medical records; gathered other information in 2011 and 2012 that would be necessary to include

R.C. in the multi-plaintiff complaint that initiated the head injury lawsuit against the NFL in July

2012; kept R.C. abreast of developments in the litigation and eventual settlement discussions; and

counseled R.C. as to whether to participate in the settlement and what criteria would be necessary

to obtain a qualifying diagnosis under the settlement.  (Stmt. of Disp. at Ex. A.)

The Response that Mokaram submitted on behalf of R.C. to Goldberg's Statement of

Dispute presents an affidavit from R.C. dated April 28, 2021.[6]  In pertinent part it states:

> 2.  I am providing this affidavit in response to the Attorney Lien
> Dispute from Goldberg Persky and White to show why they should
> not be entitled to any funds from the Settlement.
>
> 3.  I signed a contract with Goldberg Persky and White July 21,
> 2011.
>
> 4.  In the three years I was with Goldberg Persky and White I was
> not scheduled to see any doctors nor did I ever meet them in person.
> I had very limited conversations over the phone in regards to my
> claim and at times never received a response to my questions and
> concerns.
>
> 5.  After being told my case was not strong enough to move forward
> by Mr. Luckasevic, I searched for new counsel ….

(SCM Resp. at Ex. A.)  Thus, the gravamen of R.C.'s challenge to the quality of Goldberg's

representation of him was that the firm did not schedule him for medical evaluations, did not meet

with him in person, and was not consistently responsive to his questions or concerns.

Insofar as R.C., through Mokaram, makes this argument in a Response memorandum rather

than in a Statement of Dispute, he has deprived Goldberg of an opportunity to respond to these

---

[6] The title of the document misstates the client's first name.  The remaining references correctly
identify him, however, and his signature matches that on the CFAs.

allegations.  However, we read R.C.'s concerns in light of the record of this litigation.  Given that the Settlement was not finally approved in the District Court until April 2015, we would have expected that Goldberg would have pushed for a proper medical assessment closer to early 2017 when registration had opened and claims were being accepted for consideration, not in 2014. Furthermore, while R.C. appears to have taken offense to Goldberg's alleged assessment in June 2014 that his case "was not strong enough to move forward," we note that even with the involvement of subsequent counsel, who appear to have had R.C. examined more than once, he did not secure a qualifying diagnosis for a Level 1.5 Neurocognitive Impairment until an evaluation conducted by a Qualified BAP Provider on July 13, 2020.  Therefore, Goldberg's assessment – that R.C.'s condition in 2014 would not qualify him for an award under the Agreement as it was developing – may have been valid.

The representation that Goldberg provided to R.C. from 2011 to 2014 involved the tasks that we would have expected for that very early stage of multi-plaintiff litigation.  No deficiencies in the firm's work are apparent from this record.  We have no serious concern about the quality of the representation provided by Goldberg during this phase prior to R.C.'s development of a qualifying diagnosis.

## 5.    The substantiality of the work

The substantiality of Goldberg's work in securing a Monetary Award for R.C. between 2011 and 2014 is necessarily reduced given that the work of Class Counsel clearly "reduced the amount of work required of" individually-retained counsel to secure awards in this program.  (Doc. No. 9862 at 4).  In its establishment of a 22% presumptive fee cap, the District Court has already taken actions to contain individual contingent fees, accounting for the substantial benefit provided by

Class Counsel.  This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials.

Ultimately, the period of Goldberg's representation of R.C. did not extend beyond the period that largely overlapped with the work of Class Counsel.  That does not mean it was insubstantial. As we outlined above, Goldberg ensured that R.C. was a party to the litigation and informed about the developments leading to the settlement.  Goldberg gathered initial records and, according to R.C., provided an assessment in 2014 of his prospects for an award based upon his condition as it existed at that time.  New counsel, Mokaram, did no better for R.C. until a Qualified BAP Provider found him to qualify for a Level 1.5 Neurocognitive Impairment approximately *six years* after Mokaram was first engaged.

Our assessment of the "substantiality of the work," which is critical to the *McKenzie* analysis, is dependent upon what the lawyers put before us, as well as explanations of what was not put before us.  The Court anticipated that disputes between lawyers would emerge over fees and endorsed the set of Rules to resolve attorney's liens to be followed by the parties. Those Rules provide for the submission of Statements of Dispute to the Claims Administrator, which then serves them simultaneously on the parties so that they may submit a Response.  The Rules, as also set forth in the Schedule of Document Submissions issued by the Claims Administrator on my behalf, detail the required content for the Statement of Dispute, including: (1) a statement of all issues in dispute; (2) a chronology of the tasks performed by the attorney, the date each task was

13

performed, and the time spent on each task; (3) a list of costs with a brief explanation of the purpose of incurring the costs and the date on which they were incurred; (4) the relief sought; and (5) a summary of the attempts to reach an agreement with the opposing party.  (R. 19.)  Mokaram has not complied with the relevant requirements.[7]

As this dispute resolution process focuses on the ultimate question of the substantiality of work leading to the award, we note that we have little information, and mainly from the Claims Administrator, concerning a role played by Buckley.  Buckley presented claims on three different occasions, with the final submission ultimately leading to the award.  Buckley appears to have maintained a list of costs for its work on behalf of the Settlement Class Member, which Mokaram now presents.  But after Mokaram replaced Buckley the day after the (ultimately successful) claim was filed, Buckley did not file a lien or otherwise seek to protect its interest in a fee in these proceedings.

Our recommendation for resolution of this attorney lien dispute between Goldberg and Mokaram is based in our analysis of the *McKenzie* factors as to Goldberg, the consequence of Mokaram's failure to provide a Statement of Dispute as required by the Schedule of Document

---

[7]  This is not the first case in which Mokaram has failed to comply with the requirements of the attorney lien dispute resolution process.  As set forth in a Report and Recommendation we filed in a lien dispute involving lienholder Provost Umphrew Law Firm (ECF No. 11044, filed Apr. 3, 2020), Mokaram failed to respond to a timely and reasonable settlement proposal made by the lienholder.  It then failed to file a Statement of Dispute.  It then sought approval for a fee and reimbursement of costs without having put on file the terms of its fee agreement with the settlement class member.  We explained that to award Mokaram a fee in those circumstances did not sit well with us and that it would "undermine the authority of the Court and respect for the processes that the Court and [Claims Administrator] labored to establish if Mokaram were awarded a counsel fee or costs[.]"  (R&R at 19.)  The Court ultimately approved our recommendation and disbursed the withheld funds to the lienholder firm and the settlement class member.

Submissions, and the absence of Buckley from this lien dispute.[8]  We conclude that Goldberg's work in this matter warrants a fee of 8% of R.C.'s award.

We cannot recommend any fee to Mokaram for its representation where it has not demonstrated that it did anything on this claim that led to the award.  It is not even clear if it shouldered the risk, as is ordinarily the case in a contingent fee arrangement, of advancing costs to R.C. as it represented him in litigation and/or the claims process.[9]  Given the inadequacy in this record as to the respective roles of counsel, we recommend that Mokaram get no portion of the fee and that the remainder of the funds withheld for counsel fee be refunded to the Settlement Class Member.  These amounts would be reduced to account for the 5% holdback.

### C.    Costs

Goldberg seeks reimbursement for $204.60 in copying and postage over the three years of representation, as well as $13.48 for a messenger service.  The CFA provides for recovery for these types of costs.  We therefore recommend that Goldberg be permitted to recover payment of $218.08.

Mokaram's February 23, 2021 Statement of Attorney's Fees and Costs reflects that it seeks $6,908.58 in costs.  What it appends in support of that proposition is a "Custom Transaction Detail Report," run on February 25, 2021 by "Attorney David Buckley, PLLC."  This accounting lists expenses for hotels and travel, courier and express mail charges, and payments to "Neurosurgical

---

[8]  The Schedule of Document Submissions bears my name and electronic signature.  It was served via e-mail on the Mokaram firm's authorized contacts by the Settlement Claims Administrator.

[9]  Mokaram appended to the Statement of Attorney's Fees and Costs document an accounting maintained by the *Buckley* firm of expenses in R.C.'s case.  It provided no explanation for why *Mokaram* should be reimbursed for those costs.

Consultants LLC" (in 2017) and "Neuropsychology Wisdom, PLLC" (in 2018).   There are references to reimbursement to "Stern Law Group" and credits between Mokaram and Buckley for expenses paid.  Mokaram has not, however, explained the relationship between the lawyers involved in this case since Mokaram assumed representation in 2014.  Therefore, we are unwilling to recommend that Mokaram be reimbursed from R.C.'s award for any of these alleged expenses.

## IV.   CONCLUSION

The evidence recounted here suggests to us a fee to Goldberg in the amount of 8% of its former client's Monetary Award is appropriate and that Goldberg should also recover its costs. The remainder of withheld funds could then be released to R.C. Our recommendation follows.

**RECOMMENDATION**

**AND NOW**, this 28th  day of July, 2021, it is respectfully **RECOMMENDED** that the Claims Administrator be ordered to designate and release the funds withheld for attorney's fee and costs as follows:

1.       Of the funds currently held by the Claims Administrator for payment of a contingent fee pending resolution of this lien dispute, reflecting 17% of R.C.'s Monetary Award:

    a.  Goldberg shall receive 8/22nds as attorney's fees; and

    b.   The balance of funds currently withheld by the Claims Administrator for payment of a contingent fee pending resolution of this lien dispute shall be released to R.C.;

2.        Of the funds currently withheld by the Claims Administrator for reimbursement to counsel for costs:

a. Goldberg shall receive $218.08 in costs; and

b. The balance of funds currently withheld by the Claims Administrator for costs ($8,266.08) shall be released to R.C.; and

3.      The 5% holdback funds shall be released by the Claims Administrator to Goldberg and R.C. in accordance with future orders of the Court and in the proportion allocated above for the 17% portion.

The Parties may file objections to this Report and Recommendation.  *See* Rule 25(d).

BY THE COURT:


/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE