**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

## CLAIMS ADMINISTRATOR STATUS REPORT NO. 13

## I.  INTRODUCTION

1.  ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 13 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 12 filed on May 13, 2021 (Document 11353).  Our earlier Status Reports are posted to the Settlement Website (under "Documents," click "Status Reports").  We do not repeat here what we covered in them.  All numbers and other information in this Status Report No. 13 are as of July 12, 2021.[1]  We will cover developments after that date in future reports.

---

[1] All dates formatted as 7/12/21 in this Status Report mean July 12, 2021.

## II.    MONETARY AWARD CLAIMS

2.    *Total Claims Received.*  Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted.  We have received 38 new Monetary Award claims since Status Report No. 12 and have completed a review of all but 23 claims.  As of July 12, 2021, the total Monetary Award Claim Packages received from Retired NFL Football Players and Representative Claimants is 3,206[2] (20% of the 16,139 Retired NFL Football Players and Representative Claimants who received favorable registration determinations).[3]  Nine of the 3,206 claims were denied as untimely.[4]  We have received about three new claims a week since Status Report No. 12 in April 2021.  Of the 3,206 Monetary Award claims submitted, 1,978 (62%) rest on pre-Effective Date diagnoses, while 973 (29%) are for post-Effective Date diagnoses, of which 291 (30% of the 973) were made in the Baseline Assessment Program ("BAP")[5] and 682 (70% of the 973) were made by Qualified MAF Physicians.[6]  The other 255 claims did not tell us what diagnosis date they assert.  Table 1 compares these numbers to those in Status Report No. 12:

---

[2] Section 3 of the Summary Report indicates that 3,231 Monetary Award Claim Packages have been submitted, which includes 25 Supplemental Monetary Award claims that we do not include in the rest of our numbers in this section of the Status Report. See section III of the Status Report for details on the Supplemental Monetary Award claims.

[3] Of these Monetary Award claims, 590 (18%) have at least one associated Derivative Claimant who has registered and 2,616 (82%) have no registered Derivative Claimants.  Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations (16,139) is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible); of these, 2,820 unique Settlement Class Members submitted the 3,206 claims.

[4] We reviewed 28 claims for potential untimeliness and denied nine as untimely.  We accepted 19 as timely, which includes two claims that showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

[5] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award.  The BAP Administrator's status reports explain more about BAP diagnoses.

[6] This includes two claims where the Settlement Class Members submitted claims after the Effective Date, but the diagnoses were not rendered by MAF Physicians.  Given unique circumstances, the Parties allowed an AAP member or AAP Consultant to review the medical records to determine if there was a Qualifying Diagnosis.

| Table 1 | QUALIFYING DIAGNOSIS DATES IN MONETARY AWARD CLAIMS | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 4/12/21** | **AS OF 7/12/21** | **CHANGE** | **AS OF 4/12/21** | **AS OF 7/12/21** | **CHANGE** |
| 1. | Pre-Effective Date | 1,978 | 1,978 | 0 | 62.4% | 61.7% | -0.7% |
| 2. | Post-Effective Date | 933 | 973 | 40 | 29.5% | 30.3% | 0.8% |
| | *(a)  BAP* | *276* | *291* | *15* | *8.7%* | *9.1%* | *0.4%* |
| | *(b)  MAF* | *657* | *682* | *25* | *20.7%* | *21.3%* | *0.6%* |
| 3. | No Date Asserted | 257 | 255 | -2 | 8.1% | 8.0% | -0.1% |
| 4. | **Totals** | **3,168** | **3,206** | **38** | | | |

Table 2 shows by diagnosis date how many claims we have for each type of Qualifying

Diagnosis:

| Table 2 | QUALIFYING DIAGNOSES PRESENTED IN MONETARY AWARD CLAIMS | | |
|---|---|---|---|
| | **DIAGNOSIS** | **PRE-EFFECTIVE DATE** | **POST-EFFECTIVE DATE** | |
| | | | **MAF** | **BAP** |
| 1. | Death with CTE | 124 | 0 | N/A |
| 2. | ALS | 51 | 10 | |
| 3. | Alzheimer's Disease | 425 | 108 | |
| 4. | Parkinson's Disease | 137 | 52 | |
| 5. | Level 2 | 505 | 200 | 101 |
| 6. | Level 1.5 | 736 | 311 | 181 |

We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the

Summary Report on the Settlement Website.  We also show the current status of all Monetary

Award claims based on the last notice or action taken in Section 8 of the Summary Report on the

Settlement Website.  There are 42 claims (1% of 3,206) in our review process after an initial

Claim Package submission or a response to a notice requesting additional information and/or

documents (see Row 1 in Section 8 of the Summary Report).

### 3.   *Monetary Awards and Payments.*

(a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website.  We have issued Notices of Monetary Award for 1,267 claims totaling $863,791,064.[7]  We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit.  Of the 1,267 claims with Notices of Monetary Award, we requested $854,434,640 from the NFL Parties for all 1,243 claims that have reached the point at which we can request funding.  The NFL Parties have deposited funds for all 1,243 of those claims.[8]  Of the 1,243 Monetary Award claims for which the NFL Parties have deposited funds, the Program paid 1,226 claims for a total of $794,771,589.[9]  The remaining 17 funded claims were not yet ready for payment when we submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount.  For the 1,226 Retired NFL Football Players and Representative Claimants who have been paid, the Trustee sent $42,681,913 (5% of those Monetary Awards) to the Attorneys' Fees Qualified Settlement Fund, in accordance with the

---

[7] The amount of these Notices of Monetary Award includes the 1% Derivative Claimant Award deductions allocated to eligible Derivative Claimants (see Paragraph 21 of this Status Report).  Section 7 of the Summary Report indicates that we have issued Notices of Monetary Award for 1,282 claims totaling $866,508,373, which includes 15 Supplemental Monetary Award claims.  We do not cover Supplemental Monetary Award claims in our numbers in this section of the Status Report.  See section III of this Status Report for details on Supplemental Monetary Award claims.
[8] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.
[9] Section 7 of the Summary Report indicates that we have issued Payments to 1,236 Retired Players and Representative Claimants totaling $795,899,380, which includes Supplemental Monetary Award payments to ten claimants.  We do not cover Supplemental Monetary Award claims in our numbers in this section of the Status Report.  See Section III of this Status Report for details on Supplemental Monetary Award claims.

Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104).

Finally, we are required to withhold money for unresolved Liens and for third-party funders.

Table 3 shows the distribution of the $794,771,589 paid by the Settlement Program and

compares the totals to those reported in Status Report No. 12:

| Table 3 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | **PAID TO** | **AS OF 4/12/21** | **AS OF 7/12/21** | **CHANGE** |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $745,507,154 | $767,377,074 | $21,869,920 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $3,628,011 | $3,729,939 | $101,928 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $10,853,691 | $11,242,167 | $388,476 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $11,062,893 | $12,422,409 | $1,359,516 |
| 5. | **Totals** | **$771,051,749** | **$794,771,589** | **$23,719,840** |

     (b) Table 4 shows the changes in figures for payments and claims with Notices of

Monetary Award since Status Report No. 12:

| Table 4 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 11 | | | | | |
|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **AMOUNT** | | |
| | | AS OF 4/12/21 | AS OF 7/12/21 | CHANGE | AS OF 4/12/21 | AS OF 7/12/21 | CHANGE |
| 1. | Notice of Monetary Award Issued | 1,230 | 1,267 | 37 | $837,787,028 | $863,791,064 | $26,004,036 |
| 2. | Paid | 1,189 | 1,226 | 37 | $771,051,749 | $794,771,589 | $23,719,840 |

(c) Table 5 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:[10]

| Table 5 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS[11] | | | | | |
|---|---|---|---|---|---|---|
| | **DIAGNOSIS** | **CLAIMS SUBMITTED** | **NOTICE OF MONETARY AWARD** | | **PAID** | |
| | | | HOW MANY | %[12] | HOW MANY | %[13] |
| 1. | Death with CTE | 124 | 80 | 65% | 80 | 65% |
| 2. | ALS | 61 | 43 | 70% | 43 | 70% |
| 3. | Alzheimer's Disease | 533 | 356 | 67% | 350 | 66% |
| 4. | Parkinson's Disease | 189 | 158 | 84% | 155 | 82% |
| 5. | Level 2 | 806 | 221 | 27% | 209 | 26% |
| 6. | Level 1.5 | 1,228 | 409 | 33% | 389 | 32% |

**4.    *Monetary Award Claims Reviewed by the AAP.***

(a) There are nine claims in or still requiring Appeals Advisory Panel ("AAP") review, which is one fewer claim than we reported in Status Report No. 12.  Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel Consultants ("AAPC"), as highlighted in sub-paragraph (b) below.  The AAP

---

[10] Section 8 of the Summary Report on the Settlement Website identifies where claims that have not received a Notice of Monetary Award or been paid stand in the process.

[11] These do not include claims submitted where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.

[12] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that received a Notice of Monetary Award.

[13] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that were paid.

has completed reviews on 892 pre-Effective Date diagnosis Monetary Award claims, approving 498 (56%) of those claims.[14]  Under FAQ 151 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 98 claims.  Under Rule 27 of the Rules Governing Qualified MAF Physicians, the AAP has reviewed 160 Monetary Award claims for diagnoses made by terminated Qualified MAF Physicians, approving 52 (33%) of those claims.[15]

(b) We have assigned 731 claims (an increase of three since Status Report No. 12) to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing supporting an Alzheimer's Disease diagnosis.  The AAPC has completed 726 reviews (99% of those assigned to it) and provided their assessments to the AAP.  An AAPC is reviewing the other pending claims.

5.  ***Notices for Missing Materials***.  We have sent one or more notices requesting additional documents or information on 2,159 Monetary Award claims (35 more since Status Report No. 12), as shown in Table 6:

---

[14] Broken down by Qualifying Diagnosis, the AAP members approved 100% of Death with CTE claims, 95% of ALS claims, 86% of Alzheimer's claims, 94% of Parkinson's claims, 31% of Level 2 claims and 28% of Level 1.5 claims.  The number of claims approved or denied by the AAP may fluctuate depending on multiple factors including ongoing audit investigations, remands of AAP decisions, and re-review of determinations that have not yet been finalized to ensure compliance with current Settlement Program rules and guidelines.
[15] This figure excludes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award.  At our request, the AAP has reviewed 60 claims to verify the sufficiency of the claimed Qualifying Diagnosis and approved 24 of them.

| Table 6 | NOTICES FOR MISSING MATERIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[16] | TOTAL |
| 1. | Total Reviewed | 124 | 61 | 525 | 189 | 799 | 1,223 | 262 | 3,183 |
| 2. | Notice Issued | 48 | 30 | 310 | 105 | 564 | 874 | 228 | 2,159 |
| 3. | % Missing Materials | 39% | 49% | 59% | 56% | 71% | 71% | 87% | 68% |

So far, 88% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice.  Settlement Class Members take an average of about 59 days to respond.  We generally receive up to two responses to these notices each week and review each reply to determine if it cures the problem.  Of those who responded, 43% cured the problem.  Section 6 of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

**6.      *Statute of Limitations Matters*.**  We received 136 Claim Packages from Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006.[17]  The Rules Governing Statute of Limitations Proceedings explain how the Special Masters make determinations as to whether such claims are barred by statutes of limitations, as specified in Section 6.2(b) of the Settlement Agreement.  Statute of Limitations Rule 7 requires that a Claim Package be complete before a statute of limitations proceeding may begin.  Of the 136 claims we received and processed: (a) 73 were complete

---

[16] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.  We process and pay a person for only one Qualifying Diagnosis per claim submission.

[17] We received Registration Forms from 370 Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006, but 134 of them did not properly register because of uncured incompleteness reasons or the player was not a Settlement Class Member because he did not play NFL Football as required by the Settlement Agreement.  Of the 236 Representative Claimants who successfully registered, 100 (42%) did not submit a Claim Package.

and asserted a potentially compensable Qualifying Diagnosis if the claim is not time-barred under Settlement Agreement Section 6.2(b); (b) one was withdrawn; and (c) 62 were denied for failing to cure deficiencies or for not asserting a compensable Qualifying Diagnosis.

The Special Masters originally stayed a decision on all claims presenting this issue until all were fully briefed, to permit all affected Representative Claimants to be heard before any ruling and allow for the consideration of all arguments in a uniform and efficient manner.  On December 11, 2019, the Court appointed United States Magistrate Judge Diane M. Welsh as the Mediator to seek to resolve all claims implicated by Section 6.2(b) of the Settlement Agreement.

Since September 14, 2020, the Claims Administrator and Special Masters received notice that 73 claimants were withdrawing their submitted Monetary Award claim, which simultaneously concludes the pending claim and the Statute of Limitations briefing under Rule 29 of the Rules Governing Statute of Limitations Proceedings.  This leaves only one remaining pending Statute of Limitations claim that must be adjudicated by the Special Master under the applicable Rules.[18]  Table 7 summarizes the current status of claims requiring a statute of limitation analysis after the appointment of the Mediator:

---

[18] The 2021 Grid Value for the one remaining Statute of Limitations claim is $21,578.

| Table 7 | STATUS OF CLAIMS REQUIRING STATUTE OF LIMITATIONS ANALYSIS | | | | | |
|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 4/12/21** | **AS OF 7/12/21** | **CHANGE** | **AS OF 4/12/21** | **AS OF 7/12/21** | **CHANGE** |
| 1. | Complete - Potentially Compensable Qualifying Diagnosis | 2 | 1 | -1 | 1% | <1% | -<1% |
| 2. | Claim Package Withdrawn | 72 | 73 | +1 | 53% | 54% | +1% |
| 3. | Denied – Deficient or No Compensable Qualifying Diagnosis | 62 | 62 | 0 | 46% | 46% | 0% |
| 4. | **Totals** | **136** | **136** | **0** | | | |

7.    *Monetary Award Denials.*  There are 1,080 denials of Monetary Award claims for reasons other than an Audit (one more since Status Report No. 12), as shown in Table 8.[19]

| Table 8 | MONETARY AWARD DENIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **CLAIMS** | **DEATH WITH CTE** | **ALS** | **ALZHEIMER'S DISEASE** | **PARKINSON'S DISEASE** | **LEVEL 2** | **LEVEL 1.5** | **MULTIPLE/ UNKNOWN** | **TOTALS** |
| 1. | Total Reviewed | 124 | 61 | 525 | 189 | 799 | 1223 | 262 | 3,183 |
| 2. | Denied | 41 | 3 | 75 | 11 | 256 | 460 | 234 | 1,080 |
| 3. | % Denied | 33% | 5% | 14% | 6% | 32% | 38% | 89% | 34% |

Sections 6 and 10 of the Summary Report on the Settlement Website show these denials and the reasons for them.  Overall, the AAP found 620 (52%) of these claims did not reflect a valid Qualifying Diagnosis.  When an AAP member denies a claim, we include in the notice comments from that AAP member explaining why.  When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the

---

[19] The 1,080 denials are the count of claims where the most recent determination notice is a denial notice. We discuss Audit denials in Paragraph 18 of this Status Report.

missing mandatory information and/or documents.  Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam.  Settlement Class Members have appealed a total of 392 denial notices; 11 of the currently active denial notices are under appeal.

### III.  SUPPLEMENTAL MONETARY AWARD CLAIMS

8.  ***Supplemental Monetary Award Claims Received.***  A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis.  The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid.  We have received claims from 23 Retired NFL Football Players and two Representative Claimant seeking Supplemental Monetary Awards, 21 for Qualifying Diagnoses of Alzheimer's Disease and four for a Level 2 Neurocognitive Impairment diagnosis.  This is four more Supplemental claims than we reported in Status Report No. 12.

9.  ***Supplemental Monetary Award Reviews and Payments.***  A Supplemental Monetary Award is the difference between the Monetary Award Grid value of the new Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis. We have issued fifteen Notices of Supplemental Monetary Award to eligible Retired NFL Football Players and denied three claims for a Supplemental Monetary Award.  The combined Monetary Award Grid value of these fifteen Supplemental Monetary Awards was $6,062,060,

but after subtracting the prior Monetary Award payments, totaled $2,717,310, as set out below in Table 9:

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| 1. | Alzheimer's Disease | $187,217 | Level 1.5 | $93,904 | $93,313 |
| 2. | Alzheimer's Disease | $713,504 | Level 1.5 | $255,175 | $458,329 |
| 3. | Level 2 | $268,132 | Level 1.5 | $153,105 | $115,027 |
| 4. | Alzheimer's Disease | $316,188 | Level 1.5 | $99,620 | $216,568 |
| 5. | Alzheimer's Disease | $118,571 | Level 1.5 | $41,604 | $76,967 |
| 6. | Alzheimer's Disease | $404,326 | Level 2 | $253,783 | $150,543 |
| 7. | Level 2 | $78,737 | Level 1.5 | $55,125 | $23,612 |
| 8. | Alzheimer's Disease | $202,588 | Level 1.5 | $71,974 | $130,614 |
| 9 | Alzheimer's Disease | $119,170 | Level 1.5 | $42,870 | $76,300 |
| 10. | Alzheimer's Disease | $369,420 | Level 1.5 | $158,094 | $211,326 |
| 11. | Level 2 | $323,674 | Level 1.5 | $200,261 | $123,412 |
| 12. | Alzheimer's Disease | $1,154,435 | Level 2 | $853,340 | $301,095 |
| 13. | Alzheimer's Disease | $513,562 | Level 1.5 | $179,936 | $333,626 |
| 14. | Alzheimer's Disease | $409,986 | Level 1.5 | $218,420 | $191,566 |
| 15. | Alzheimer's Disease | $882,550 | Level 2 | $667,538 | $215,012 |
| 16. | Totals | $6,062,060 | | $3,344,749 | $2,717,310 |

The Program has paid seven Retired NFL Football Players and three Representative Claimants a total of $1,127,791 for their Supplemental Monetary Awards.

## IV.  QUALIFIED MAF PHYSICIANS

**10.**  *Maintaining the MAF Network.*

(a) Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website.  There are 94 Qualified MAF Physicians on the website now, representing 35 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside.  We hope to add another 26 approved

Qualified MAF Physicians as we confirm their participation and/or contract with them.  Table 10 shows the changes in these numbers since Status Report No. 12:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | ASPECT | AS OF 4/12/21 | AS OF 7/12/21 | CHANGE |
| 1. | Approved Physician – On Posted List | 91 | 94 | +3 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 35 | 35 | 0 |
| 3. | Approved Physician – Not Yet Posted | 25 | 26 | +1 |

We have added three physicians back to the website, one initially resigned but asked to be reinstated.  Two physicians, affiliated with the same practice, were previously in a "temporarily removed" status but have recently returned to the website because they now have capacity to start MAF evaluations again. The Parties have approved one new Qualified MAF Physician since Status Report No. 11.[20]  We are still working with the approved physician to get a signed contract in place so we can add the physician to the posted list.

(b) We have 429 physicians on our radar, eight of whom Class Counsel and/or the NFL are considering whether to approve as Qualified MAF Physicians, 246 with whom we are engaged in initial and follow-up communications to determine interest and 175 who we have identified as possibly having appropriate qualifications but who we need to research more fully before contacting.

## 11.    *150-Mile Rule.*

(a) Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired NFL Football Player be examined by a Qualified MAF Physician whose office is within 150

---

[20] The "Parties" are the parties to the Settlement Agreement, Class Counsel and the NFL Parties.  Our contacts with Class Counsel are at Seeger Weiss LLP.  We work with counsel for the NFL Parties at Paul, Weiss, Rifkind, Wharton & Garrison LLP.

miles of his primary residence.[21]  We can make exceptions to this 150-Mile Rule if the

exception is requested prior to the appointment.  We have received 102 requests for

exceptions to the 150-Mile Rule, of which we granted 80 (78.4%) and denied 22 (21.6%).

Table 11 shows the changes since Status Report No. 12:

| Table 11 | | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | |
|---|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | AS OF 4/12/21 | AS OF 7/12/21 | CHANGE | AS OF 4/12/21 | AS OF 7/12/21 | CHANGE |
| 1. | Granted | 74 | 80 | +6 | 77.9% | 78.4% | +0.5% |
| 2. | Denied | 21 | 22 | +1 | 22.1% | 21.6% | -0.5% |
| 4. | Totals | 95 | 102 | +7 | | | |

   (b) The 150-Mile Rule is a flexible rule with broad exceptions.  Of the living Retired

NFL Football Players registered in the Program, 90% have a Qualified MAF Physician

within 150 miles of their primary residence.  We work with those who do not to help them

schedule appointments with physicians further away, when they tell us they are ready to be

examined.

   **12.**     *50-Mile Rule.*  Rule 10(b) of the Rules Governing Qualified MAF Physicians

requires that, where neuropsychological testing is necessary as part of an MAF examination,

the Qualified MAF Physician must refer a Retired NFL Football Player to a

neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office.

Like the 150-Mile Rule, we have discretion to grant exceptions.  We have received 19

requests for exceptions to the 50-Mile Rule, of which we granted 17 (89.5%) and denied two

(10.5%).  Table 12 shows how many exception requests we have received and our decisions

on those requests (no change since Status Report No. 11):

---

[21] This requirement applies only to appointments made after April 11, 2019.  Appointments made on or before April 11, 2019, did not need to be rescheduled with a different Qualified MAF Physician.

| Table 12 | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 4/12/21** | **AS OF 7/12/21** | **CHANGE** | **AS OF 4/12/21** | **AS OF 7/12/21** | **CHANGE** |
| 1. | Granted | 17 | 17 | 0 | 89.5% | 89.5% | 0% |
| 2. | Denied | 2 | 2 | 0 | 10.5% | 10.5% | 0% |
| 3. | **Totals** | **19** | **19** | **0** | | | |

Of the 94 Qualified MAF Physicians who are actively scheduling appointments, 87 (92.6%) have an approved neuropsychologist within 50 miles of their office, and we will grant exceptions on a case by case basis for the seven Qualified MAF Physicians who do not.

13.    ***Deviation Explanations for Level 1.5 and Level 2 Diagnoses.***  Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we determine more information is needed.  We cannot process these claims further until we receive the required explanation.  We report on these claims in Section 8 (Row 2) of the Summary Report on the Settlement Website.  There are currently 18 claims that require additional explanation from a Qualified MAF Physician and/or neuropsychologist, representing less than 1% of all Claim Packages submitted to the Program, nine claims (50%) based on a diagnosis of Level 1.5 Neurocognitive Impairment and nine claims (50%) based on a diagnosis of Level 2 Neurocognitive Impairment.  Table 13 shows how many claims require additional explanation from the Qualified MAF Physician before we can issue award or denial notices:

| Table 13 | CLAIMS REQUIRING ADDITIONAL EXPLANATION FROM QUALIFIED MAF PHYSICIANS | | | | | | |
|---|---|---|---|---|---|---|---|
| | DECISION | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 4/12/21 | AS OF 7/12/21 | CHANGE | AS OF 4/12/21 | AS OF 7/12/21 | CHANGE |
| 1. | Level 1.5 | 12 | 9 | -3 | 70.6% | 50% | -20.6% |
| 2. | Level 2 | 5 | 9 | +4 | 29.4% | 50% | +20.6% |
| 3. | Totals | 17 | 18 | +1 | | | |

14.     ***AAP Leadership Council.***  Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network.  We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses.  In addition, the AAP Leadership Council assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the Settlement Agreement criteria.  The AAP Leadership Council also facilitates discussions and solicits guidance from the MAF Steering Committee, a group of six Qualified MAF Physicians, who render advice and assistance on providing peer-to-peer feedback to Qualified MAF Physicians and provide suggestions on how to improve the operations and performance of the network of Qualified MAF Physicians. Overall, our collaboration with the AAP Leadership Council has been successful, and the Qualified MAF Physicians have responded positively to receiving feedback from AAP members.

15.     ***MAF Steering Committee.***  Six Qualified MAF Physicians serve on the MAF Steering Committee as authorized by Rule 24 of the Rules Governing Qualified MAF Physicians.  The Committee members have participated in a roundtable discussion with the

AAP Leadership Council, assisted in developing training for the Qualified MAF Physicians to address most common issues, and provided other suggestions for improvement of the Qualified MAF Physicians network. We have held regular roundtable meetings with the MAF Steering Committee and the AAP Leadership Council. Overall, the peer-to-peer communications regarding the operation and performance of the network of Qualified MAF Physicians has been positive.

<h2 align="center">V.   <u>AUDIT</u></h2>

16. **_Closed Audits._** We have concluded the Audit investigations of 1,169 Settlement Class Members with Monetary Award claims by denying a claim through Audit, by making no adverse finding and removing a claim from Audit, or because the Settlement Class Member withdrew his or her claim during our Audit. Table 14 summarizes the reasons for these closures and changes in the numbers since Status Report No. 12:

| Table 14 | CLOSED AUDITS | | | |
|---|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 4/12/21** | **AS OF 7/12/21** | **CHANGE** |
| 1. | Claim Denied in Audit | 372 | 372 | 0 |
| 2. | No Finding of Misrepresentation, Omission, or Concealment | 580 | 593 | +13 |
| 3. | Claim Withdrawn by Settlement Class Member | 204 | 204 | 0 |
| 4. | **Totals** | **1,156** | **1,169** | **+13** |

17. **_Reports of Adverse Finding in Audit._** We have issued to the Parties 20 Reports of Adverse Finding in Audit (the same as we reported in Status Report No. 11) affecting 566 Monetary Award claims, all 20 of which were then referred to the Special Masters. The 20 Audit Reports concern four neurologists, 12 neuropsychologists, three law firms, seven individual Settlement Class Members and one claims preparation company. Table 15 summarizes the Special Masters' and Court's decisions on these Audit reports:

| Table 15 | DECISIONS ON AUDIT REPORTS | |
|---|---|---|
| | **DECISION** | **AUDIT REPORTS** |
| **1.** | Claims Denied in Audit | 12 |
| **2.** | Claims Removed from Audit and Subjected to Specialized Review | 2 |
| **3.** | Claims Removed from Audit and Returned to Normal Review | 3 |
| **4.** | All Claims Withdrawn before Decision | 1 |
| **5.** | Special Master Decision Issued, Objection Filed | 1 |
| **6.** | Special Master Decision Issued, Objection Period Still Open | 1 |
| **7.** | **Total** | **20** |

18.      *Audit Proceeding Decisions.* We have denied 372 claims after Audit based on decisions by the Court or Special Masters.[22]  Sections 6 and 8 (Row 17) of the Summary Report on the Settlement Website show these denials.  A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors.  We have received 93 new claims submitted by Settlement Class Members following an Audit Denial, of which 17 have been paid or are in the payment process.

19.      *Ongoing Audit Investigations.*  We have other Audit investigations underway affecting 18 Monetary Award claims (seven less than the number we reported in Status Report No. 12).  Of these, five are subject to one group investigation of claims with similar characteristics and 13 are individual claims.

20.      *Claims Investigated More than Once.*  Claims on which we have concluded an Audit may be the subject of another Audit if we later learn of information that requires

---

[22] Of the 372 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims).  Six individual Retired NFL Football Players' claims have been denied.  The Special Masters directed us to deny 170 claims based on their findings related to the Special Investigator's investigation of a law firm.  We denied the remaining claim for failing to cooperate with our requests for information during an Audit.

further investigation.  We notify Settlement Class Members when this happens.  We have audited 93 Monetary Award claims more than one time (the same number we reported in Status Report No. 12); the most times a Monetary Award claim has been audited is twice.

## VI.   DERIVATIVE CLAIMANTS

21.   *Derivative Claims.*  We have received 598 Derivative Claim Packages (no change since Status Report No. 12).  Table 16 shows the status of these claims:

| Table 16 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | HOW MANY | % OF TOTAL |
| 1. | Paid Derivative Claimant Award ($956,116[23]) | 215 | 36% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($668.92) | 1 | <1% |
| 3. | Denied – Associated Retired NFL Football Player's Claim Denied | 48 | 8% |
| 4. | Denied – No Timely Claim for Associated Retired NFL Football Player | 42 | 7% |
| 5. | Denied – No Timely or Proper Registration for Associated Retired NFL Football Player | 34 | 6% |
| 6. | Denied – Retired NFL Football Player's Claim Withdrawn During Statute of Limitations Proceeding | 16 | 3% |
| 7. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 8. | Denied – Deceased Derivative Claimant | 4 | 1% |
| 9. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 10. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 3% |
| 11. | Withdrawn | 8 | 1% |
| 12. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 201 | 34% |
| 13. | Total | 598 | |

The 216 Derivative Claimants who received Notices of Derivative Claimant Award are associated with 107 Retired NFL Football Players.  We have paid 215 (99.5%) of the 216 Derivative Claimants with Notices of Derivative Claimant Award; the one eligible Derivative

---

[23] This includes a Supplemental Derivative Claimant Award payment issued to a Derivative Claimant who was previously paid an initial Derivative Claimant Award.

Claimant who has not yet been paid is in the payment process.  We did not receive a timely objection from any of the 158 Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

22.    ***Additional Derivative Claimant Details.***  We received challenges from 29 Retired NFL Football Players (or their Representative Claimants) to 41 Derivative Claimants (no change since Status Report No. 12); 19 (46%) of those 41 challenged Derivative Claimants are not eligible for a Derivative Claimant Award because they never submitted a timely Derivative Claim Package.  We have issued a Notice of Derivative Claim Package Submission Deadline to 466 registered Derivative Claimants.  Table 17 summarizes their claim submission statuses and the changes since Status Report No. 12:

| Table 17 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 4/12/21 | AS OF 7/12/21 | CHANGE | AS OF 4/12/21 | AS OF 7/12/21 | CHANGE |
| 1. | Claim Submitted | 154 | 154 | 0 | 33% | 33% | 0% |
| 2. | No Claim Submitted | 309 | 310 | +1 | 67% | 67% | 0% |
| 3. | Within 30-Day Deadline | 1 | 2 | +1 | <1% | <1% | 0% |
| 4. | **Totals** | **464** | **466** | **+2** | | | |

23.    ***Supplemental Derivative Claimant Awards.***  Section G of the Overview of Derivative Claimant Process on the Settlement Website (https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf) explains how Supplemental Derivative Claimant Awards are handled.  As discussed in Paragraph 9 of this Status Report, we issued Notices of Supplemental Monetary Award to 15 Retired NFL Football Players.  Of those 15, 11 Retired NFL Football Players had no registered Derivative Claimants associated with them, and three Retired NFL Football

Players each had one registered Derivative Claimant, but those three Derivative Claimants did not submit Derivative Claim Packages to share 1% of the Retired NFL Football Players' earlier Monetary Awards and were not eligible for any portion of the Players' Supplemental Monetary Awards.  The last Player's Supplemental Monetary Award Notice had a 1% offset for potential Derivative Claimant Awards, which has been paid to an eligible Derivative Claimant.[24]

## VII.   OTHER CLAIM PROCESSES

**24.**   ***Handling of Attempted Assignments of Claims.***  On September 27, 2019, the Court issued a Notice (Document 10858) directing us to streamline the process regarding attempted assignments by Settlement Class Members of claims to third-party lenders.  At that time, we suspended the process for handling such assignment questions under the Rules Governing Assignment of Claims and worked with the Court and the Special Master to modify these Rules.  On March 19, 2020, the Special Masters adopted the Rules Governing Payment of Claims Involving Third-Party Funders and the Rules Governing Third-Party Funding Resolution Protocol, which superseded the previous Rules (collectively, the "New Payment Rules").  Under the New Payment Rules Governing Payment of Claims Involving Third-Party Funders, all Settlement Class Members must complete and submit a Sworn Statement regarding the Status of Assignment of Monetary Claim ("SWS-5") to receive payment. There are two versions of the SWS-5, one for those identified as a borrower by a Third-Party Funder that is participating in the Rules Governing Third-Party Funding Resolution Protocol ("Resolution Protocol") (the SWS-5(A)) and another for those not so identified (the SWS-5(B)).  As of July 12, 2021, 24 Third-Party Funder entities are

---

[24] See Row 1 of Table 16 in this Status Report.

participating in the Resolution Protocol.  We have worked with those participating funders to resolve cash advances for 20 Settlement Class Members since the adoption of the New Payment Rules.

25.    ***Petitions for Deviation from the Attorneys' Fee Cap.***[25]  We have received seven Petitions for Deviation, one of which was withdrawn.  The Court resolved three of the remaining six Petitions for Deviation in conjunction with the Attorneys' Liens Dispute Process: two by final decision, and one upheld on appeal by the Third Circuit.  The other three Petitions are pending final resolution.

26.    ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a)  Table 18 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 12:

| Table 18 | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | **AS OF 4/12/21** | **AS OF 7/12/21** | **CHANGE** | **AS OF 4/12/21** | | **CHANGE** | **AS OF 4/12/21** | | **CHANGE** |
| 1. | Attorneys' | 1,260[26] | 1,279[27] | +19 | 480 | 486 | +6 | 275 | 264 | -11 |
| 2. | Child Support | 348 | 348 | 0 | 51 | 51 | 0 | 19 | 19 | 0 |
| 3. | Judgment | 62 | 63 | +1 | 16 | 16 | 0 | 8 | 8 | 0 |
| 4. | Tax | 53 | 53 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| **5.** | **Totals** | **1,723** | **1,743** | **+20** | **550** | **556** | **+6** | **302** | **291** | **-11** |

(b) Table 19 shows the status of Liens in the Attorneys' Liens dispute resolution process:

---

[25] Judge Brody entered a Memorandum and Order in April of 2018 limiting attorneys' fees in the Program to 22% of each SCM's Monetary Award, plus reasonable costs (ECF Nos. 9862 and 9863).  In the Memorandum, the Judge decided that attorneys should have the opportunity to petition the Court to go above and beyond the cap in exceptional circumstances, which is what the Petitions for Deviation process is meant to cover.
[26] These 1,260 Attorneys' Liens were asserted by 56 law firms.
[27] These 1,279 Attorneys' Liens were asserted by 56 law firms.

| Table 19 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[28] | | |
|---|---|---|---|
| **PENDING** | **RESOLVED** | | **TOTAL** |
| | **BY AGREED WITHDRAWAL** | **BY COURT DETERMINATION** | |
| 23 | 92 | 19 | 134 |

(c) Table 20 breaks down the Non-Medical Lien holdbacks[29] by Lien type:

| Table 20 | | NON-MEDICAL LIEN HOLDBACKS | | |
|---|---|---|---|---|
| | **LIEN TYPE** | **MONETARY AWARDS AFFECTED** | **MONETARY AWARD AMOUNTS** | **LIEN HOLDBACKS** |
| 1. | Attorneys' | 19 | $15,495,525.57 | $3,296,327.29 |
| 2. | Child Support | 2 | $1,026,110.23 | $6,589.64 |
| 3. | Judgment | 1 | $3,192,046 | $229,733.96 |
| 4. | Tax | 0 | N/A | N/A |
| 5. | **Totals** | **22** | **$19,713,681.80** | **$3,532,650.89** |

(d) Table 21 summarizes the Non-Medical Lien payments by Lien type:

| Table 21 | | NON-MEDICAL LIEN PAYMENTS | | |
|---|---|---|---|---|
| | **LIEN TYPE** | **MONETARY AWARDS AFFECTED** | **MONETARY AWARD AMOUNTS** | **LIEN PAYMENTS** |
| 1. | Attorneys' | 98 | $111,125,081.35 | $7,630,725.71 |
| 2. | Child Support | 15 | $12,641,523.94 | $737,062.17 |
| 3. | Judgment | 5 | $5,802,161.20 | $2,867,886.18 |
| 4. | Tax | 1 | $33,282.80 | $6,492.65 |
| 5. | **Totals** | 119 | $129,602,049.29 | $11,242,166.71 |

---

[28] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.

[29] The holdbacks are the amount of funds we are withholding pending resolution of a Dispute. As of 7/12/21, there are 20 disputed Attorneys' Liens currently pending resolution by Judge Strawbridge where the Settlement Class Member has received payment of the rest of his Monetary Award.  After the Court enters a final order (whether by Judge Strawbridge or Judge Brody's approval of his Report and Recommendation) resolving the Disputes and any appeal period passes, we disburse the held back funds on the next available monthly Disbursement.

## VIII.   COMMUNICATIONS CENTER FOR THE PROGRAM

**27.**     *Our Contact Activity.*  Since our contact center opened on February 6, 2017, we

have handled 85,070 total communications, including 53,741 calls made or received and 27,492

emails to us at our Claims Administrator email box. Since Status Report No. 12, we handled 943

such total communications. The most common topics of these communications have been

General Settlement Information, Payment, Claim Package Status – Retired Player, Change in

Lawyers, and Baseline Assessment Program (BAP).

**28.**     *Law Firm Contacts.*  Our Law Firm Contacts are assigned to 559 different law

firms or lawyers representing Settlement Class Members in the Program.  This is one more law

firms or lawyers than we reported in Status Report No. 12.  The calls and emails handled by the

Law Firm Contacts are part of the total contact activity described in Paragraph 27 above.

**29.**     *Insights Newsletters.*  Since Status Report No. 12, we issued one new edition of

our quarterly "Insights" newsletter (Second Quarter 2021).  We send the newsletters to

unrepresented Settlement Class Members and lawyers by email or mail.  We also post them to

the Settlement Website (under "Documents" click "Newsletters").  We invite all lawyers and

Settlement Class Members to send us suggested topics for our newsletters.

**30.**     *Program Physician Newsletters*.  In the fourth quarter of 2020, we issued our

first newsletter to MAF Physicians as a tool to share relevant and valuable information.  We

issued a second newsletter to the MAF Physicians on March 30, 2021. With the Second

Quarter 2021 edition, we expanded our newsletter audience to include all Program doctors.

We emailed the Second Quarter 2021 Program Physician Newsletter to all Qualified MAF

Physicians, Qualified BAP Providers and other approved evaluating Neuropsychologists and

posted the newsletter on the MAF Physician Portals on June 30, 2021.  The newsletter

conveyed information on training sessions, a reminder on communications with law firms and guidance on the use of Biomarker Tests for Alzheimer's Disease, sworn statements corroborating functional impairment and providing reports to support BAP Exams.  We plan to continue to issue Program Physician newsletters on a quarterly basis.

31.     ***Settlement Program Website.***  We regularly update the Settlement Website to reflect progress and changes to the Program.  Since Status Report No. 12, we posted a Report of the Special Masters (Document 11351, filed May 13, 2021), Claims Administrator Status Report No. 12 (Document 11353, filed May 13, 2021) and BAP Administrator Status Report 1st Quarter 2021 (Document 11352, filed May 13, 2021) to the Status Reports page at

https://www.nflconcussionsettlement.com/Status_Reports.aspx.  The Program's Home page has had 8,801 more unique visits, giving us 596,151 total unique visits, coming from 190 countries and all 50 of the United States.  The top five downloaded documents since Status Report No. 12 in April 2021 were the Settlement Agreement (381 clicks), Monetary Award Grid (145 clicks), Diagnosis and Review Table (77 clicks), Exhibit 1 Injury Definitions (63 clicks) and Payment Process Timeline (29 clicks).  The three most frequently visited pages were Published Special Master Decisions – Monetary Award Claims (893 unique views), Physician Search (837 unique views), and Reports and Statistics (708 views).

## IX.    SPECIAL MASTERS

32.     ***Our Work with the Special Masters.***  Since Status Report No. 12, we continue to have regularly scheduled calls to discuss policy and operational issues, and have held 111 such calls with the Special Masters to date.  We have many other calls and exchange countless emails with them to address issues as they arise.  The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

33.     *Program Rules.*  There are 10 sets of Rules available on the Settlement Website (under "Documents," click "Governing Rules") and on the online portals of law firms, lawyers and *pro se* Settlement Class Members.  We have not made changes to any posted Rules since Status Report No. 9 filed in July 2020.

34.     *Published Decisions.*  Since Status Report No. 12, the Special Masters have issued four new decisions they designated for publication.  These decisions dated April 27, 2021, through July 1, 2021, all relate to issues that affect how we analyze claims for Monetary Awards. We post all such rulings to the Settlement Website (under "Documents" select "Special Master" under "Published Decisions" and then click the Monetary Award Claims button).  The Special Masters have so far issued 36 published Monetary Award appeal decisions and nine Audit decisions (45 total such decisions).[30]

## X.     PROCEDURES AND FREQUENTLY ASKED QUESTIONS

35.     *Frequently Asked Questions*.  Since Status Report No. 12, we added two new FAQs in the Special Master Appeal Decisions category:

> (a) FAQ 373 ("Is the diagnosing physician required to interview a knowledgeable informant as part of the CDR evaluation?"); and
>
> (b) FAQ 374 ("Is driving generally consistent with the required CDR scores for Level 2 Neurocognitive Impairment?").

We also made substantive revisions to five existing FAQs:

> (a) FAQ 103 ("What does "generally consistent" mean?"), to clarify further based on a published Special Master decision;
>
> (b) FAQ 109 ("What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses made in the BAP by Qualified BAP Providers?"), to add a *Reminder* explaining what it means for cognitive deficits to occur exclusively in the context of a delirium, acute substance abuse, or as a result of medication side effects, and to note that a diagnosing

---

[30] On October 28, 2020, the Special Master issued contextually similar decisions on deviation from BAP Criteria for six claimants.  One of the six decisions appears on the Settlement Website.

physician may reschedule a Retired NFL Football Player's appointment if he or she believes that the Player's clinical presentation may be, in part, the result of substance abuse or medication side effects;

(c) FAQ 364 ("How should a Qualified MAF Physician apply the Generally Consistent standard when making a Qualifying Diagnosis? How will the Claims Administrator confirm that a Qualifying Diagnosis is Generally Consistent with the Settlement criteria?"), to include information about how the Claims Administrator confirms that a Qualifying Diagnosis is generally consistent with the Settlement criteria;

(d) FAQ 367 ("Does my evaluating physician need to address my medication side-effects or other conditions that may affect my cognitive function when deciding whether I have a Qualifying Diagnosis?"), to add a reference to a Special Master decision about the use of alcohol or other substances and its effect on cognitive function; and

(e) FAQ 372 ("Do the Claims Administrator and/or the AAP defer to the clinician's judgment when reviewing the Slick criteria?"), to elaborate on the meaning of "clearly erroneous."

There now are 374 FAQs in 17 categories. "FAQs" is one of the options in the green menu bar on the Settlement Website. These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program. The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs. Note that when we add new FAQs, we place them within the existing set where it makes the most sense. This means that the numbering of FAQs within the set may change from time to time.

## XI.     REGISTRATION

### 36.    *Registration Submissions.*

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover Registration. Table 22 here shows changes in the number of timely Registration submissions since our Status Report No. 12:

| Table 22 | TIMELY REGISTRATION SUBMISSIONS | | |
|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 4/12/21** | **AS OF 7/12/21** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,880 | 15,877 | -3 |
| 2. | Representative Claimants | 1,364 | 1,367 | +3 |
| 3. | Derivative Claimants | 3,314 | 3,314 | 0 |
| 4. | **Totals** | **20,558** | **20,558** | **0** |

The number of Retired NFL Football Players (Row 1) went down by three from Status Report No. 12 because they were replaced by Representative Claimants. Of the 20,558 to whom we issued Registration notices, we were able to confirm that 19,397 of them are Settlement Class Members under the Settlement Agreement, 12,837 of whom are Retired NFL Football Players eligible to participate in the BAP. The other 1,161 persons are not Settlement Class Members under the Settlement Agreement because of one or more of these reasons: (1) they were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not provide us with the information or support required by the Settlement Agreement to register, after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a Derivative Claimant but did not have a relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals. We have made determinations on 300 such Registrations and found that 160 (53%) of them presented good reasons to be allowed to register after August 7, 2017. Table 23 shows the change in these numbers since Status Report No. 12:

| Table 23 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | STATUS | AS OF 4/12/21 | AS OF 7/12/21 | CHANGE |
| 1. | Accepted | 160 | 160 | 0 |
| 2. | Not Accepted | 138 | 140 | +2 |
| **3.** | **Totals** | **298** | **300** | **+2** |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge.  The NFL Parties also may challenge our good cause exception decisions.  We have received 378 challenges, which is the same number we have reported since in Status Report No. 11.  Table 24 explains these challenges and what happened to them:

| Table 24 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | |
|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 245 | Settlement Class Member | 77 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 23 | Settlement Class Member | 5 | 18 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| **7.** | **Totals** | **378** | | **150** | **228** |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters.  Table 25 shows the appeals thus far and the Special Masters' rulings on them (no changes since Status Report No. 11):

| Table 25 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO APPEALED | DECISION UPHELD | DECISION OVERTURNED |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 6 | Settlement Class Member | 5 | 1 |
| 5. | Totals | 36 | | 33 | 3 |

37. ***Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.*** The Special Masters have approved 433 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants. There have been two new Representative Claimant approvals and no new Derivative Claimant Representatives since Status Report No. 12.

## XII.   CONCLUSION

38. ***General Status.*** We have 207,436 document files (21,529 gigabytes, or 21.5 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 2,084 more than when we filed Status Report No. 12. We have issued 38,487 notices (129 more since Status Report No. 12) of various kinds (Registration, claims, appeals, Audit, etc.) to 20,990 different persons since March 23, 2017, and developed over 100 different types of notices and forms for use in the Program.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By: *Roma Petkauskas*
Roma Petkauskas
Virginia State Bar No.: 71357
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
Telephone: (804) 521-7218
Facsimile: (804) 521-7299
Email: rpetkauskas@browngreer.com