**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE | : | No. 2:12-md-02323-AB |
| PLAYERS' CONCUSSION INJURY | : | |
| LITIGATION | : | MDL No. 2323 |
| | : | |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| ALL ACTIONS | : | |
| | : | |

## CLAIMS ADMINISTRATOR STATUS REPORT NO. 14

## I.      INTRODUCTION

1.      ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-
appointed Claims Administrator of the Settlement Program established under the Class
Action Settlement Agreement in this litigation, submits this Status Report No. 14 to apprise
the Court on the implementation of its duties as the Claims Administrator and developments
since Status Report No. 13 filed on July 29, 2021 (Document 11451).  Our earlier Status
Reports are posted to the Settlement Website (under "Documents," click "Status Reports").
We do not repeat here what we covered in them.  All numbers and other information in this
Status Report No. 14 are as of October 11, 2021.[1]  We will cover developments after that
date in future reports.

---

[1] All dates formatted as 10/11/21 in this Status Report mean October 11, 2021.

## II.    MONETARY AWARD CLAIMS

**2.**    ***Total Claims Received.***  Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted.  We have received 34 new Monetary Award claims since Status Report No. 13 and have completed a review of all but four claims.  As of October 11, 2021, the total Monetary Award Claim Packages received from Retired NFL Football Players and Representative Claimants is 3,240[2] (20% of the 16,140 Retired NFL Football Players and Representative Claimants who received favorable registration determinations).[3]  Ten of the 3,240 claims were denied as untimely.[4]  We have received about three new claims a week since Status Report No. 13 in July 2021.  Of the 3,240 Monetary Award claims submitted, 1,978 (61%) rest on pre-Effective Date diagnoses, while 1,010 (31%) are for post-Effective Date diagnoses, of which 301 (30% of the 1,010) were made in the Baseline Assessment Program ("BAP")[5] and 709 (70% of the 1,010) were made by Qualified MAF Physicians.[6]  The other 252 claims did not tell us what diagnosis date they assert.  Table 1 compares these numbers to those in Status Report No. 13:

---

[2] Section 3 of the Summary Report indicates that 3,269 Monetary Award Claim Packages have been submitted, which includes 29 Supplemental Monetary Award claims that we do not include in the rest of our numbers in this section of the Status Report. See section III of the Status Report for details on the Supplemental Monetary Award claims.

[3] Of these Monetary Award claims, 597 (18%) have at least one associated Derivative Claimant who has registered and 2,643 (82%) have no registered Derivative Claimants.  Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations (16,140) is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible); of these, 2,838 unique Settlement Class Members submitted the 3,240 claims.

[4] We reviewed 30 claims for potential untimeliness and denied ten as untimely.  We accepted 20 as timely, which includes two claims that showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

[5] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award.  The BAP Administrator's status reports explain more about BAP diagnoses.

[6] This includes claims where the Settlement Class Members submitted claims after the Effective Date, but the diagnoses were not rendered by MAF Physicians.  Given unique circumstances, the Parties allowed an AAP member or AAP Consultant to review the medical records to determine if there was a Qualifying Diagnosis.

| Table 1 | QUALIFYING DIAGNOSIS DATES IN MONETARY AWARD CLAIMS | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE |
| 1. | Pre-Effective Date | 1,978 | 1,978 | 0 | 61.7% | 61.0% | -0.7% |
| 2. | Post-Effective Date | 973 | 1,010 | +37 | 30.3% | 31.2% | +0.9% |
| | *(a) BAP* | *291* | *301* | *+10* | *9.1%* | *9.3%* | *+0.2%* |
| | *(b) MAF* | *682* | *709* | *+27* | *21.3%* | *21.9%* | *+0.6%* |
| 3. | No Date Asserted | 255 | 252 | -3 | 8.0% | 7.8% | -0.2% |
| **4.** | **Totals** | **3,206** | **3,240** | **+34** | | | |

Table 2 shows by diagnosis date how many claims we have for each type of Qualifying

Diagnosis:

| Table 2 | QUALIFYING DIAGNOSES PRESENTED IN MONETARY AWARD CLAIMS | | |
|---|---|---|---|
| | **DIAGNOSIS** | **PRE-EFFECTIVE DATE** | **POST-EFFECTIVE DATE** | |
| | | | **MAF** | **BAP** |
| 1. | Death with CTE | 124 | 0 | N/A |
| 2. | ALS | 51 | 10 | N/A |
| 3. | Alzheimer's Disease | 425 | 120 | N/A |
| 4. | Parkinson's Disease | 137 | 60 | N/A |
| 5. | Level 2 | 505 | 202 | 106 |
| 6. | Level 1.5 | 736 | 316 | 186 |

We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the

Summary Report on the Settlement Website.  We also show the current status of all Monetary

Award claims based on the last notice or action taken in Section 8 of the Summary Report on the

Settlement Website.  There are 22 claims (<1% of 3,240) in our review process after an initial

Claim Package submission or a response to a notice requesting additional information and/or

documents (see Row 1 in Section 8 of the Summary Report, which includes three Supplemental

claims).

### 3. *Monetary Awards and Payments.*

(a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website.  We have issued Notices of Monetary Award for 1,326 claims totaling $922,570,383.[7]  We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit.  Of the 1,326 claims with Notices of Monetary Award, we requested $874,396,466 from the NFL Parties for all 1,269 claims that have reached the point at which we can request funding.  The NFL Parties have deposited funds for all 1,269 of those claims.[8]  Of the 1,269 Monetary Award claims for which the NFL Parties have deposited funds, the Program paid 1,253 claims for a total of $819,132,546.[9]  The remaining 16 funded claims were not yet ready for payment when we submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount.  For the 1,253 Retired NFL Football Players and Representative Claimants who have been paid, the Trustee sent $43,854,061 (5% of those Monetary Awards) to the Attorneys' Fees Qualified Settlement Fund, in accordance with the

---

[7] The amount of these Notices of Monetary Award includes the 1% Derivative Claimant Award deductions allocated to eligible Derivative Claimants (see Paragraph 21 of this Status Report).  Section 7 of the Summary Report indicates that we have issued Notices of Monetary Award for 1,343 claims totaling $925,451,226, which includes 17 Supplemental Monetary Award claims.  We do not cover Supplemental Monetary Award claims in our numbers in this section of the Status Report.  See section III of this Status Report for details on Supplemental Monetary Award claims.

[8] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.

[9] Section 7 of the Summary Report indicates that we have issued Payments to 1,265 Retired Players and Representative Claimants totaling $820,668,266, which includes Supplemental Monetary Award payments to 12 claimants.  We do not cover Supplemental Monetary Award claims in our numbers in this section of the Status Report.  See Section III of this Status Report for details on Supplemental Monetary Award claims.

Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104).

Finally, we are required to withhold money for unresolved Liens and for third-party funders.

Table 3 shows the distribution of the $819,132,546 paid by the Settlement Program and

compares the totals to those reported in Status Report No. 13:

| Table 3 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | PAID TO | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $767,377,074 | $790,546,919 | $23,168,845 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $3,729,939 | $3,855,582 | $125,643 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $11,242,167 | $11,860,242 | $618,075 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $12,422,409 | $12,869,803 | $447,394 |
| 5. | **Totals** | **$794,771,589** | **$819,132,546** | **$24,360,957** |

(b) Table 4 shows the changes in figures for payments and claims with Notices of

Monetary Award since Status Report No. 13:

| Table 4 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 11 | | | | | |
|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **AMOUNT** | | |
| | | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** |
| 1. | Notice of Monetary Award Issued | 1,267 | 1,326 | 59 | $863,791,064 | $922,570,383 | $58,779,319 |
| 2. | Paid | 1,226 | 1,253 | 27 | $794,771,589 | $819,132,546 | $24,360,957 |

(c) Table 5 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:[10]

| Table 5 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS[11] | | | | | |
|---|---|---|---|---|---|---|
| | **DIAGNOSIS** | **CLAIMS SUBMITTED** | **NOTICE OF MONETARY AWARD** | | **PAID** | |
| | | | **HOW MANY** | **%[12]** | **HOW MANY** | **%[13]** |
| 1. | Death with CTE | 124 | 80 | 65% | 80 | 65% |
| 2. | ALS | 61 | 44 | 72% | 43 | 70% |
| 3. | Alzheimer's Disease | 545 | 369 | 68% | 354 | 65% |
| 4. | Parkinson's Disease | 197 | 168 | 85% | 158 | 80% |
| 5. | Level 2 | 813 | 231 | 28% | 216 | 27% |
| 6. | Level 1.5 | 1,238 | 434 | 35% | 402 | 32% |

**4.**   *Monetary Award Claims Reviewed by the AAP.*

(a) There are two claims in or still requiring Appeals Advisory Panel ("AAP") review, which is seven fewer claims than we reported in Status Report No. 13.  Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel Consultants ("AAPC"), as highlighted in sub-paragraph (b) below.  The AAP has completed

---

[10] Section 8 of the Summary Report on the Settlement Website identifies where claims that have not received a Notice of Monetary Award or been paid stand in the process.

[11] These do not include claims submitted where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.

[12] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that received a Notice of Monetary Award.

[13] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that were paid.

reviews on 897 pre-Effective Date diagnosis Monetary Award claims, approving 498 (56%) of those claims.[14]  Under FAQ 151 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 119 claims.  Under Rule 27 of the Rules Governing Qualified MAF Physicians, the AAP has reviewed 160 Monetary Award claims for diagnoses made by terminated Qualified MAF Physicians, approving 53 (33%) of those claims.[15]

(b) We have assigned 739 claims (an increase of eight since Status Report No. 13) to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing supporting an Alzheimer's Disease diagnosis.  The AAPC has completed 738 reviews (99.9% of those assigned to it) and provided their assessments to the AAP.  An AAPC is reviewing the one pending claim.

5.     ***Notices for Missing Materials***.  We have sent one or more notices requesting additional documents or information on 2,184 Monetary Award claims (25 more since Status Report No. 13), as shown in Table 6:

---

[14] Broken down by Qualifying Diagnosis, the AAP members approved 100% of Death with CTE claims, 95% of ALS claims, 86% of Alzheimer's claims, 94% of Parkinson's claims, 30% of Level 2 claims and 28% of Level 1.5 claims.  The number of claims approved or denied by the AAP may fluctuate depending on multiple factors including ongoing audit investigations, remands of AAP decisions, and re-review of determinations that have not yet been finalized to ensure compliance with current Settlement Program rules and guidelines.
[15] This figure excludes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award.  At our request, the AAP has reviewed 60 claims to verify the sufficiency of the claimed Qualifying Diagnosis and approved 30 of them.

| Table 6 | NOTICES FOR MISSING MATERIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[16] | TOTAL |
| 1. | Total Reviewed | 124 | 61 | 544 | 197 | 812 | 1,237 | 261 | 3,236 |
| 2. | Notice Issued | 48 | 29 | 321 | 105 | 570 | 883 | 228 | 2,184 |
| 3. | % Missing Materials | 39% | 48% | 59% | 53% | 70% | 71% | 87% | 67% |

So far, 88% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice.  Settlement Class Members take an average of about 58 days to respond.  We generally receive up to two responses to these notices each week and review each reply to determine if it cures the problem.  Of those who responded, 44% cured the problem.  Section 6 of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

**6.**  ***Statute of Limitations Matters.***  We have received 136 Claim Packages from Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006.[17]  The Rules Governing Statute of Limitations Proceedings explain how the Special Masters make determinations as to whether such claims are barred by statutes of limitations, as specified in Section 6.2(b) of the Settlement Agreement.  Statute of Limitations Rule 7 requires that a Claim Package be complete before a statute of limitations proceeding may begin.  Of the 136 claims we received and processed: (a) 73 were complete

---

[16] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.  We process and pay a person for only one Qualifying Diagnosis per claim submission.

[17] We received Registration Forms from 370 Representative Claimants on behalf of Retired NFL Football Players who died before January 1, 2006, but 134 of them did not properly register because of uncured incompleteness reasons or the player was not a Settlement Class Member because he did not play NFL Football as required by the Settlement Agreement.  Of the 236 Representative Claimants who successfully registered, 100 (42%) did not submit a Claim Package.

and asserted a potentially compensable Qualifying Diagnosis if the claim is not time-barred under Settlement Agreement Section 6.2(b); (b) one was withdrawn; and (c) 62 were denied for failing to cure deficiencies or for not asserting a compensable Qualifying Diagnosis.

The Special Masters originally stayed a decision on all claims presenting this issue until all were fully briefed, to permit all affected Representative Claimants to be heard before any ruling and allow for the consideration of all arguments in a uniform and efficient manner.  On December 11, 2019, the Court appointed United States Magistrate Judge Diane M. Welsh as the Mediator to seek to resolve all claims implicated by Section 6.2(b) of the Settlement Agreement.

Since September 14, 2020, the Claims Administrator and Special Masters received notice that 72 claimants were withdrawing their submitted Monetary Award claims, which simultaneously concludes the pending claim and the Statute of Limitations briefing under Rule 29 of the Rules Governing Statute of Limitations Proceedings.  This leaves only one remaining pending Statute of Limitations claim that must be adjudicated by the Special Master under the applicable Rules.[18]  Table 7 summarizes the current status of claims requiring a statute of limitation analysis after the appointment of the Mediator (no changes since Status Report No.13):

---

[18] The 2021 Grid Value for the one remaining Statute of Limitations claim is $21,578.

| Table 7 | STATUS OF CLAIMS REQUIRING STATUTE OF LIMITATIONS ANALYSIS | | | | | |
|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE |
| 1. | Complete - Potentially Compensable Qualifying Diagnosis | 1 | 1 | 0 | <1% | <1% | 0 |
| 2. | Claim Package Withdrawn | 73 | 73 | 0 | 54% | 54% | 0 |
| 3. | Denied – Deficient or No Compensable Qualifying Diagnosis | 62 | 62 | 0 | 46% | 46% | 0 |
| 4. | Totals | 136 | 136 | 0 | | | |

7.   *Monetary Award Denials*.  There are 1,082 denials of Monetary Award claims for reasons other than an Audit (two more since Status Report No. 13), as shown in Table 8.[19]

| Table 8 | MONETARY AWARD DENIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTALS |
| 1. | Total Reviewed | 124 | 61 | 544 | 197 | 812 | 1,237 | 261 | 3,236 |
| 2. | Denied | 41 | 3 | 76 | 11 | 257 | 460 | 234 | 1,082 |
| 3. | % Denied | 33% | 5% | 14% | 6% | 32% | 37% | 90% | 33% |

Sections 6 and 10 of the Summary Report on the Settlement Website show these denials and the reasons for them.  Overall, the AAP found 630 (52%) of these claims did not reflect a valid Qualifying Diagnosis.  When an AAP member denies a claim, we include in the notice comments from that AAP member explaining why.  When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting

---

[19] The 1,082 denials are the count of claims where the most recent determination notice is a denial notice. We discuss Audit denials in Paragraph 18 of this Status Report.

the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents.  Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam.  Settlement Class Members have appealed a total of 392 denial notices; five of the currently active denial notices are under appeal.

### III.    SUPPLEMENTAL MONETARY AWARD CLAIMS

**8.    *Supplemental Monetary Award Claims Received*.**  A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis.  The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid.  We have received claims from 27 Retired NFL Football Players and two Representative Claimant seeking Supplemental Monetary Awards, 24 for Qualifying Diagnoses of Alzheimer's Disease, one for Parkinson's Disease, and four for a Level 2 Neurocognitive Impairment diagnosis.  This is four more Supplemental claims than we reported in Status Report No. 13.

**9.    *Supplemental Monetary Award Reviews and Payments*.**  A Supplemental Monetary Award is the difference between the Monetary Award Grid value of the new Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis.  We have issued 17 Notices of Supplemental Monetary Award to eligible Retired NFL Football Players and denied four claims for a Supplemental Monetary Award.  The combined Monetary

Award Grid value of these 17 Supplemental Monetary Awards was $6,369,333, but after

subtracting the prior Monetary Award payments, totaled $2,880,842, as set out below in Table 9:

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| 1. | Alzheimer's Disease | $187,217 | Level 1.5 | $93,904 | $93,313 |
| 2. | Alzheimer's Disease | $713,504 | Level 1.5 | $255,175 | $458,329 |
| 3. | Level 2 | $268,132 | Level 1.5 | $153,105 | $115,027 |
| 4. | Alzheimer's Disease | $316,188 | Level 1.5 | $99,620 | $216,568 |
| 5. | Alzheimer's Disease | $118,571 | Level 1.5 | $41,604 | $76,967 |
| 6. | Alzheimer's Disease | $404,326 | Level 2 | $253,783 | $150,543 |
| 7. | Level 2 | $78,737 | Level 1.5 | $55,125 | $23,612 |
| 8. | Alzheimer's Disease | $202,588 | Level 1.5 | $71,974 | $130,614 |
| 9 | Alzheimer's Disease | $119,170 | Level 1.5 | $42,870 | $76,300 |
| 10. | Alzheimer's Disease | $369,420 | Level 1.5 | $158,094 | $211,326 |
| 11. | Level 2 | $323,674 | Level 1.5 | $200,261 | $123,412 |
| 12. | Alzheimer's Disease | $1,154,435 | Level 2 | $853,340 | $301,095 |
| 13. | Alzheimer's Disease | $513,562 | Level 1.5 | $179,936 | $333,626 |
| 14. | Alzheimer's Disease | $409,986 | Level 1.5 | $218,420 | $191,566 |
| 15. | Alzheimer's Disease | $882,550 | Level 2 | $667,538 | $215,012 |
| 16. | Alzheimer's Disease | $190,752 | Level 1.5 | $75,719 | $115,033 |
| 17. | Level 2 | $116,522 | Level 1.5 | $68,022 | $48,500 |
| 18. | **Totals** | **$6,369,333** | | **$3,488,491** | **$2,880,842** |

The Program has paid ten Retired NFL Football Players and two Representative Claimants a

total of $1,535,720 for their Supplemental Monetary Awards.

## IV.   QUALIFIED MAF PHYSICIANS

**10.   *Maintaining the MAF Network.***

(a) Settlement Class Members and lawyers can locate Qualified MAF Physicians using

the MAF Physician Locator Tool on the Settlement Website.  There are a total of 84 Qualified

MAF Physicians.  Seventy-nine out of the 84 Qualified MAF Physicians on the website now,

representing 34 of the 53 target cities closest to where the majority of living Retired NFL
Football Players reside.  We hope to add another 23 approved Qualified MAF Physicians as we
confirm their participation and/or contract with them.  Table 10 shows the changes in these
numbers since Status Report No. 13:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | ASPECT | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE |
| 1. | Approved Physician – On Posted List | 94 | 79 | -15 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 35 | 34 | -1 |
| 3. | Approved Physician – Not Yet Posted | 26 | 23 | -3 |

We have removed 15 physicians from the website.  Five physicians, affiliated with the same
practice, were removed because their practice withdrew its participation.  Additionally, two
physicians withdrew without providing a reason and one physician changed practices.  Finally,
there are five physicians, affiliated with the same practice, who have been placed in a
"temporarily removed" status and as such have been removed from the posted list.  The Parties
have not approved any new Qualified MAF Physicians since Status Report No. 12.[20]  We are still
working with the 23 approved physicians to get their signed contracts in place so we can add
them to the posted list.  We are also in contact with the physician who changed practices to invite
his new practice to contract with us.

(b) We have 586 physicians on our radar, six of whom Class Counsel and/or the NFL are
considering whether to approve as Qualified MAF Physicians, 347 with whom we are engaged in
initial and follow-up communications to determine interest and 234 who we have identified as

---

[20] The "Parties" are the parties to the Settlement Agreement, Class Counsel and the NFL Parties.  Our contacts with
Class Counsel are at Seeger Weiss LLP.  We work with counsel for the NFL Parties at Paul, Weiss, Rifkind,
Wharton & Garrison LLP.

possibly having appropriate qualifications but who we need to research more fully before contacting.

**11.** *150-Mile Rule.*

(a) Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired NFL Football Player be examined by a Qualified MAF Physician whose office is within 150 miles of his primary residence.[21]  We can make exceptions to this 150-Mile Rule if the exception is requested prior to the appointment.  We have received 107 requests for exceptions to the 150-Mile Rule, of which we granted 85 (79.4%) and denied 22 (20.6%). Table 11 shows the changes since Status Report No. 13:

| Table 11 | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** |
| 1. | Granted | 80 | 85 | +5 | 78.4% | 79.4% | +1% |
| 2. | Denied | 22 | 22 | 0 | 21.6% | 20.6% | -1% |
| 4. | **Totals** | **102** | **107** | **+5** | | | |

(b) The 150-Mile Rule is a flexible rule with broad exceptions.  Of the living Retired NFL Football Players registered in the Program, 89.1% have a Qualified MAF Physician within 150 miles of their primary residence.  We work with those who do not to help them schedule appointments with physicians further away, when they tell us they are ready to be examined.

**12.**    *50-Mile Rule.*  Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a

---

[21] This requirement applies only to appointments made after April 11, 2019.  Appointments made on or before April 11, 2019, did not need to be rescheduled with a different Qualified MAF Physician.

neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office.
Like the 150-Mile Rule, we have discretion to grant exceptions.  We have received 20
requests for exceptions to the 50-Mile Rule, of which we granted 18 (90%) and denied two
(10%).  Table 12 shows how many exception requests we have received and our decisions on
those requests (an increase of one since Status Report No. 13):

| Table 12 | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** |
| 1. | Granted | 17 | 18 | +1 | 89.5% | 90.0% | -0.5% |
| 2. | Denied | 2 | 2 | 0 | 10.5% | 10.0% | +0.5% |
| 3. | **Totals** | **19** | **20** | **+1** | | | |

Of the 84 Qualified MAF Physicians who are actively scheduling appointments, 76 (90.5%)
have an approved neuropsychologist within 50 miles of their office, and we will grant
exceptions on a case by case basis for the seven Qualified MAF Physicians who do not.

13.     ***Deviation Explanations for Level 1.5 and Level 2 Diagnoses.***  Under Rule 20
of the Rules Governing Qualified MAF Physicians, we request an explanation from a
Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not
strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we
determine more information is needed.  We cannot process these claims further until we
receive the required explanation.  We report on these claims in Section 8 (Row 2) of the
Summary Report on the Settlement Website.  There are currently nine claims that require
additional explanation from a Qualified MAF Physician and/or neuropsychologist,
representing less than 1% of all Claim Packages submitted to the Program, three claims
(33.3%) based on a diagnosis of Level 1.5 Neurocognitive Impairment and six claims
(66.7%) based on a diagnosis of Level 2 Neurocognitive Impairment.  Table 13 shows how

many claims require additional explanation from the Qualified MAF Physician before we can issue award or denial notices:

| Table 13 | CLAIMS REQUIRING ADDITIONAL EXPLANATION FROM QUALIFIED MAF PHYSICIANS | | | | | |
|---|---|---|---|---|---|---|
| | DECISION | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE |
| 1. | Level 1.5 | 9 | 3 | -6 | 50% | 33.3% | -16.7% |
| 2. | Level 2 | 9 | 6 | -3 | 50% | 66.7% | +16.7% |
| 3. | Totals | 18 | 9 | -9 | | | |

14.    ***AAP Leadership Council.***  Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network.  We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses.  In addition, the AAP Leadership Council assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the Settlement Agreement criteria.  The AAP Leadership Council also facilitates discussions and solicits guidance from the MAF Steering Committee, a group of six Qualified MAF Physicians, who render advice and assistance on providing peer-to-peer feedback to Qualified MAF Physicians and provide suggestions on how to improve the operations and performance of the network of Qualified MAF Physicians. Overall, our collaboration with the AAP Leadership Council has been successful, and the Qualified MAF Physicians have responded positively to receiving feedback from AAP members.

15.    *MAF Steering Committee.*  Six Qualified MAF Physicians serve on the MAF

Steering Committee as authorized by Rule 24 of the Rules Governing Qualified MAF

Physicians.  The Committee members have participated in regular roundtable discussions

with the AAP Leadership Council, assisted in developing training for the Qualified MAF

Physicians to address most common issues, and provided other suggestions for improvement

of the Qualified MAF Physicians network.  Overall, the peer-to-peer communications

regarding the operation and performance of the network of Qualified MAF Physicians has

been positive.

## V.    AUDIT

16.    *Closed Audits.*  We have concluded the Audit investigations of 1,191

Settlement Class Members with Monetary Award claims by denying a claim through Audit,

by making no adverse finding and removing a claim from Audit, or because the Settlement

Class Member withdrew his or her claim during our Audit.  Table 14 summarizes the reasons

for these closures and changes in the numbers since Status Report No. 13:

| Table 14 | CLOSED AUDITS | | | |
|---|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** |
| 1. | Claim Denied in Audit | 372 | 372 | 0 |
| 2. | No Finding of Misrepresentation, Omission, or Concealment | 593 | 615 | +22 |
| 3. | Claim Withdrawn by Settlement Class Member | 204 | 204 | 0 |
| 4. | **Totals** | **1,169** | **1,191** | **+22** |

17.    *Reports of Adverse Finding in Audit.* We have issued to the Parties 20

Reports of Adverse Finding in Audit (the same as we reported since Status Report No. 11)

affecting 566 Monetary Award claims, all 20 of which were then referred to the Special

Masters.  The 20 Audit Reports concern four neurologists, 12 neuropsychologists, three law firms, seven individual Settlement Class Members and one claims preparation company. Table 15 summarizes the Special Masters' and Court's decisions on these Audit reports:

| Table 15 | DECISIONS ON AUDIT REPORTS | |
|---|---|---|
| | **DECISION** | **AUDIT REPORTS** |
| **1.** | Claims Denied in Audit | 12 |
| **2.** | Claims Removed from Audit and Subjected to Specialized Review | 3 |
| **3.** | Claims Removed from Audit and Returned to Normal Review | 3 |
| **4.** | All Claims Withdrawn before Decision | 1 |
| **5.** | Special Master Decision Issued, Objection Filed | 1 |
| **6.** | **Total** | **20** |

18.  *Audit Proceeding Decisions.*  We have denied 372 claims after Audit based on decisions by the Court or Special Masters.[22]  Sections 6 and 8 (Row 17) of the Summary Report on the Settlement Website show these denials.  Since Status Report No. 13, we posted on the Settlement Website one Special Masters' Decision[23] and two Court's Decisions[24] related to audits.  A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors.  We have received 96 new claims submitted by Settlement Class Members following an Audit Denial, of which 26 have been paid or are in the payment process.

---

[22] Of the 372 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims).  Six individual Retired NFL Football Players' claims have been denied.  The Special Masters directed us to deny 170 claims based on their findings related to the Special Investigator's investigation of a law firm.  We denied the remaining claim for failing to cooperate with our requests for information during an Audit.

[23] https://www.nflconcussionsettlement.com/Docs/howard_associates_sm.pdf.

[24] lps_court_decision.pdf (nflconcussionsettlement.com) and order_lps_motion_for_reconsideration.pdf (nflconcussionsettlement.com).

**19.**     ***Ongoing Audit Investigations.***   We have other Audit investigations underway affecting four Monetary Award claims (fourteen less than the number we reported in Status Report No. 13).  All four are individual claims.

**20.**     ***Claims Investigated More than Once.***   Claims on which we have concluded an Audit may be the subject of another Audit if we later learn of information that requires further investigation.  We notify Settlement Class Members when this happens.  We have audited 94 Monetary Award claims more than one time (one more than the number we reported in Status Report No. 13); the most times a Monetary Award claim has been audited is twice.

## VI.   DERIVATIVE CLAIMANTS

**21.**     ***Derivative Claims.***   We have received 599 Derivative Claim Packages (an increase of one since Status Report No. 13).  Table 16 shows the status of these claims:

| Table 16 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | HOW MANY | % OF TOTAL |
| 1. | Paid Derivative Claimant Award ($958,888[25]) | 217 | 36% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($2,432.94) | 2 | <1% |
| 3. | Denied – Associated Retired NFL Football Player's Claim Denied | 48 | 8% |
| 4. | Denied – No Timely Claim for Associated Retired NFL Football Player | 42 | 7% |
| 5. | Denied – No Timely or Proper Registration for Associated Retired NFL Football Player | 34 | 6% |
| 6. | Denied – Retired NFL Football Player's Claim Withdrawn During Statute of Limitations Proceeding | 16 | 3% |
| 7. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 8. | Denied – Deceased Derivative Claimant | 4 | 1% |
| 9. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 10. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 3% |

---

[25] This includes a Supplemental Derivative Claimant Award payment issued to a Derivative Claimant who was previously paid an initial Derivative Claimant Award.

| Table 16 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | **STATUS** | **HOW MANY** | **% OF TOTAL** |
| 11. | Withdrawn | 8 | 1% |
| 12. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 199 | 33% |
| **13.** | **Total** | **599** | |

We issued three Notices of Derivative Claimant Award since Status Report No. 13.  Table 17 shows how many eligible Derivative Claimants received the entire 1% amount deducted from the associated Retired NFL Football Player's Monetary Award, and how many shared that 1% amount with other eligible Derivative Claimants:

| Table 17 | SHARED AWARD STATUS FOR ELIGIBLE DERIVATIVE CLAIMANTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** |
| 1. | Received Entire 1% Amount | 58 | 59 | +1 | 27% | 27% | 0% |
| 2. | Shared 1% Amount with Other Eligible Derivative Claimants[26] | 158 | 160 | +2 | 73% | 73% | 0% |
| **4.** | **Totals** | **216** | **219** | **+3** | | | |

The 219 Derivative Claimants who received Notices of Derivative Claimant Award are associated with 109 Retired NFL Football Players. We issued payment to two Derivative Claimants since Status Report No. 13 and have paid 217 (99%) of the 219 Derivative Claimants with Notices of Derivative Claimant Award; one of the eligible Derivative Claimants who has not been paid is in the payment process, and the other is not yet ready for payment.

---

[26] We have not received an Allocation Objection from any of the Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

22.     *Additional Derivative Claimant Details*.  We received challenges from 29 Retired NFL Football Players (or their Representative Claimants) to 41 Derivative Claimants (no change since Status Report No. 13); 19 (46%) of those 41 challenged Derivative Claimants are not eligible for a Derivative Claimant Award because they never submitted a timely Derivative Claim Package.  We have issued a Notice of Derivative Claim Package Submission Deadline to 473 registered Derivative Claimants.  Table 18 summarizes their claim submission statuses and the changes since Status Report No. 13:

| Table 18 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | | |
|---|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** |
| 1. | Claim Submitted | 154 | 154 | 0 | 33% | 33% | 0% |
| 2. | No Claim Submitted | 310 | 314 | +4 | 67% | 66% | -1% |
| 3. | Within 30-Day Deadline | 2 | 5 | +3 | <1% | 1% | +1% |
| 4. | **Totals** | **466** | **473** | **+7** | | | |

23.     *Supplemental Derivative Claimant Awards*.  Section G of the Overview of Derivative Claimant Process on the Settlement Website (https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf) explains how Supplemental Derivative Claimant Awards are handled.  As discussed in Paragraph 9 of this Status Report, we issued Notices of Supplemental Monetary Award to 17 Retired NFL Football Players.  Of those 17, 13 Retired NFL Football Players had no registered Derivative Claimants associated with them, and three Retired NFL Football Players each had one registered Derivative Claimant, but those three Derivative Claimants did not submit Derivative Claim Packages to share 1% of the Retired NFL Football Players' earlier Monetary Awards and were not eligible for any portion of the Players' Supplemental Monetary Awards.  The last Player's Supplemental Monetary Award Notice had a 1% offset

for potential Derivative Claimant Awards, which has been paid to an eligible Derivative Claimant.[27]

## VII.   OTHER CLAIM PROCESSES

**24.**   *Handling of Attempted Assignments of Claims*.   On September 27, 2019, the Court issued a Notice (Document 10858) directing us to streamline the process regarding attempted assignments by Settlement Class Members of claims to third-party lenders.   At that time, we suspended the process for handling such assignment questions under the Rules Governing Assignment of Claims and worked with the Court and the Special Master to modify these Rules.   On March 19, 2020, the Special Masters adopted the Rules Governing Payment of Claims Involving Third-Party Funders and the Rules Governing Third-Party Funding Resolution Protocol, which superseded the previous Rules (collectively, the "New Payment Rules").   Under the New Payment Rules Governing Payment of Claims Involving Third-Party Funders, all Settlement Class Members must complete and submit a Sworn Statement regarding the Status of Assignment of Monetary Claim ("SWS-5") to receive payment. There are two versions of the SWS-5, one for those identified as a borrower by a Third-Party Funder that is participating in the Rules Governing Third-Party Funding Resolution Protocol ("Resolution Protocol") (the SWS-5(A)) and another for those not so identified (the SWS-5(B)).   As of July 12, 2021, 24 Third-Party Funder entities are participating in the Resolution Protocol.   We have worked with those participating funders to resolve cash advances for 21 Settlement Class Members since the adoption of the New Payment Rules.

---

[27] See Row 1 of Table 16 in this Status Report.

25.   *Petitions for Deviation from the Attorneys' Fee Cap.*[28]  We have received seven Petitions for Deviation, one of which was withdrawn.  The Court resolved three of the remaining six Petitions for Deviation in conjunction with the Attorneys' Liens Dispute Process: two by final decision, and one upheld on appeal by the Third Circuit.  The other three Petitions are pending final resolution.

26.   *Non-Medical Liens Process and Attorneys' Lien Disputes.*

(a)   Table 18 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 13:

| Table 18 | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | LIEN TYPE | LIENS ASSERTED | | | NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR | | | LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS | | |
| | | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE |
| 1. | Attorneys' | 1,279[29] | 1,288[30] | +9 | 486 | 489 | +3 | 264 | 262 | -2 |
| 2. | Child Support | 348 | 348 | 0 | 51 | 51 | 0 | 19 | 19 | 0 |
| 3. | Judgment | 63 | 64 | +1 | 16 | 17 | +1 | 8 | 8 | 0 |
| 4. | Tax | 53 | 53 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| 5. | **Totals** | **1,743** | **1,753** | **+10** | **556** | **560** | **+4** | **291** | **289** | **-2** |

(b) Table 19 shows the status of Liens in the Attorneys' Liens dispute resolution process:

| Table 19 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[31] | | |
|---|---|---|---|
| PENDING | RESOLVED | | TOTAL |
| | BY AGREED WITHDRAWAL | BY COURT DETERMINATION | |
| **28** | **107** | **19** | **154** |

---

[28] Judge Brody entered a Memorandum and Order in April of 2018 limiting attorneys' fees in the Program to 22% of each SCM's Monetary Award, plus reasonable costs (ECF Nos. 9862 and 9863).  In the Memorandum, the Judge decided that attorneys should have the opportunity to petition the Court to go above and beyond the cap in exceptional circumstances, which is what the Petitions for Deviation process is meant to cover.

[29] These 1,279 Attorneys' Liens were asserted by 56 law firms.

[30] These 1,288 Attorneys' Liens were asserted by 57 law firms.

[31] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.

(c) Table 20 breaks down the Non-Medical Lien holdbacks[32] by Lien type:

| Table 20 | NON-MEDICAL LIEN HOLDBACKS | | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN HOLDBACKS |
| 1. | Attorneys' | 10 | $5,628,544.79 | $1,232,515.70 |
| 2. | Child Support | 2 | $1,026,110.23 | $6,589.64 |
| 3. | Judgment | 1 | $3,192,046 | $229,733.96 |
| 4. | Tax | 0 | N/A | N/A |
| 5. | **Totals** | **13** | **$9,846,701.02** | **$1,468,839.30** |

(d) Table 21 summarizes the Non-Medical Lien payments by Lien type:

| Table 21 | NON-MEDICAL LIEN PAYMENTS | | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN PAYMENTS |
| 1. | Attorneys' | 113 | $125,997,552.91 | $8,248,801.07 |
| 2. | Child Support | 15 | $12,641,523.94 | $737,062.17 |
| 3. | Judgment | 5 | $5,802,161.20 | $2,867,886.18 |
| 4. | Tax | 1 | $33,282.80 | $6,492.65 |
| 5. | **Totals** | **134** | **$144,474,520.85** | **$11,860,242.07** |

## VIII.   COMMUNICATIONS CENTER FOR THE PROGRAM

**27.**   *Our Contact Activity*.  Since our contact center opened on February 6, 2017, we have handled 86,183 total communications, including 54,218 calls made or received and 27,776 emails to us at our Claims Administrator email box. Since Status Report No. 13, we handled 796 such total communications. The most common topics of these communications have been

---

[32] The holdbacks are the amount of funds we are withholding pending resolution of a Dispute. As of 10/11/21, there are ten disputed Attorneys' Liens currently pending resolution by Judge Strawbridge where the Settlement Class Member has received payment of the rest of his Monetary Award.  After the Court enters a final order (whether by Judge Strawbridge or Judge Brody's approval of his Report and Recommendation) resolving the Disputes and any appeal period passes, we disburse the held back funds on the next available monthly Disbursement.

General Settlement Information, Payment, Claim Package Status – Retired Player, Change in Lawyers, and Baseline Assessment Program (BAP).

28.     ***Law Firm Contacts.***  Our Law Firm Contacts are assigned to 563 different law firms or lawyers representing Settlement Class Members in the Program.  This is four more law firms or lawyers than we reported in Status Report No. 13.  The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 27 above.

29.     ***Insights Newsletters.***  Since Status Report No. 13, we issued one new edition of our quarterly "Insights" newsletter (Third Quarter 2021).  We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail.  We also post them to the Settlement Website at https://www.nflconcussionsettlement.com/Newsletters.aspx (under "Documents" click "Newsletters").  We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters by email to ClaimsAdministrator@NFLConcussionSettlement.com or through the online submission screen on the Newsletters page of the Settlement Website.

30.     ***Program Doctors Newsletters***.  In the fourth quarter of 2020, we issued our first newsletter to MAF Physicians as a tool to share relevant and valuable information. With the Second Quarter 2021 edition, we expanded our newsletter audience to include all Program doctors. We emailed the Third Quarter 2021 Program Doctors Newsletter to all Qualified MAF Physicians, Qualified BAP Providers and other approved evaluating Neuropsychologists and posted the newsletter on the MAF Physician Portals on September 29, 2021.  The newsletter conveyed information on CDR assessments, Rules regarding Program Doctors serving as experts, and training sessions.  We plan to continue to issue newsletters to Program Doctors on a quarterly basis.

31.   *Settlement Program Website.*  We regularly update the Settlement Website to reflect progress and changes to the Program.  We have made these changes since Status Report No. 13:

    (1) Posted a Report of the Special Masters (Document 11449, filed July 29, 2021), Claims Administrator Status Report No. 13 (Document 11451, filed July 29, 2021) and BAP Administrator Status Report 2nd Quarter 2021 (Document 11450, filed July 29, 2021) to the Status Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.

    (2) Added a new Settlement Implementation Determination by the Court and related Order to the Audit section of the Published Court Decisions page at https://www.nflconcussionsettlement.com/PD-CourtDec-ActAudit.aspx.

    (3) Added two Special Master decisions to the Monetary Award Claims section of the Published Special Master Decisions page at https://www.nflconcussionsettlement.com/PD-SpecialMasterDecisions-MonetaryAwardClaims.aspx.

Since Status Report No. 13 in July 2021, the Program's Home page has had 8,540 more unique visits, giving us 604,691 total unique visits, coming from 190 countries and all 50 of the United States.  The three most frequently visited pages since July, after Home and Login, were Published Special Master Decisions – Monetary Award Claims (833 unique views), Physician Search (736 unique views), and Reports and Statistics (693 views).  Also since July, visitors conducted 2,967 searches on the website using 843 unique keywords and completed 1,126 unique downloads.  The top five downloaded documents were the Settlement Agreement (298 clicks), Monetary Award Grid (115 clicks), Exhibit 1 Injury Definitions (39 clicks), Guide to Summary Report (38 clicks) and Diagnosis and Review Table (35 clicks).

## IX.   SPECIAL MASTERS

32.   *Our Work with the Special Masters.*  Since Status Report No. 13, we continue to have regularly scheduled calls to discuss policy and operational issues, and have held 116 such

calls with the Special Masters to date.  We have many other calls and exchange countless emails with them to address issues as they arise.  The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

33.   ***Program Rules.***  There are 10 sets of Rules available on the Settlement Website (under "Documents," click "Governing Rules") and on the online portals of law firms, lawyers and *pro se* Settlement Class Members.  We have not made changes to any posted Rules since Status Report No. 9 filed in July 2020.

34.   ***Published Decisions.***  Since Status Report No. 13, the Special Masters have issued two new decisions they designated for publication.  These decisions dated September 7, 2021, and September 23, 2021, both relate to issues that affect how we analyze claims for Monetary Awards.

### Neuropsychological Testing

September 23, 2021

The Claims Administrator denied the Level 2 Neurological Impairment claim because of the lack of evidence to support the diagnosing physician's determination that neuropsychological testing was unnecessary. As FAQ 363 explains, if the diagnosing physician indicates that neuropsychological testing is medically unnecessary because of the severity of the Player's dementia, the Claims Administrator has the obligation to determine if that conclusion was "reasonably determined." In rejecting the Player's appeal, the Special Master deferred to the AAP's conclusion that the Player's cognitive screening test results did not indicate a severity of impairment that would lead a diagnosing physician to reasonably conclude that further testing was medically unnecessary.

### Functional Impairment/Cognitive Decline

September 7, 2021

The Claims Administrator denied the Level 2 Neurocognitive Impairment claim because the Player did not submit a valid assessment of neuropsychological impairment (criterion (ii)) and did not show sufficient evidence of impaired daily functioning (criterion (iii)). The Special Master overturned that decision. An AAP Consultant and the AAPLC reviewed the claim on appeal and agreed that criterion (ii) for a Qualifying Diagnosis of Level 2 Neurological Impairment was fulfilled under the exception that a neuropsychological evaluation was not necessary because of the severity of the dementia. The Special Master deferred to the independent experts' analysis that the diagnosing physician's conclusion that neurological testing was medically unnecessary was reasonably determined. The Special Master rejected the AAPLC's adverse recommendation regarding criterion (iii), instead finding that the diagnosing physician's articulated consideration of psychiatric symptoms in assessing his functional impairment, and the conclusion that the Player nevertheless has dementia, was generally consistent with what the Settlement requires.

We post all such rulings to the Settlement Website (under "Documents" select "Special Master" under "Published Decisions" and then click the Monetary Award Claims button).  The Special

Masters have so far issued 38 published Monetary Award appeal decisions and 10 Audit decisions (48 total such decisions).[33]

35.    ***Decisions Upheld by the Court.***  The Court affirmed the Special Masters' October 4, 2019 Rule 27 Decision on the Report of Adverse Finding Regarding Legacy Pro Sports in a Settlement Implementation Determination dated August 25, 2021, which it clarified further by Order dated September 30, 2021.  Both decisions are posted on the Settlement Website (under "Documents" select "Court" under "Published Decisions" and then click the Audit button).

**Order Regarding Legacy Pro Sports' Motion for Reconsideration or Clarification**
September 30, 2021
Denies Legacy Pro Sports' Motion for Reconsideration of the Court's Settlement Implementation Determination of August 25, 2021, and provides clarification on the treatment of future claims submitted by Legacy Pro Sports' clients.

---

**Legacy Pro Sports**
August 25, 2021
Affirms the Special Masters' Rule 27 Decision on Report of Adverse Finding Regarding Legacy Pro Sports, concludes that the Special Masters did not abuse their discretion by finding that the actions of LPS have significant implications for the integrity and fair administration of the Settlement Agreement as a whole, and upholds the Special Masters' decision to disqualify LPS from participating in the Settlement Program. The Court also clarifies that the word "Claim" in the Rules Governing the Audit of Claims applies to past, pending, and future claims.

## X.    PROCEDURES AND FREQUENTLY ASKED QUESTIONS

36.    ***Frequently Asked Questions.***  Since Status Report No. 13, we have not added any new FAQs or made substantive revisions to any existing FAQs.  There are 374 FAQs in 17 categories.  "FAQs" is one of the options in the green menu bar on the Settlement Website.  These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program.  The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs.  Note that when we add new FAQs, we place them within the existing set

---

[33] On October 28, 2020, the Special Master issued contextually similar decisions on deviation from BAP Criteria for six claimants.  One of the six decisions appears on the Settlement Website.

where it makes the most sense.  This means that the numbering of FAQs within the set may change from time to time.

## XI.   REGISTRATION

**37.**   *Registration Submissions.*

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover Registration.  Table 22 here shows changes in the number of timely Registration submissions since our Status Report No. 13:

| Table 22 | TIMELY REGISTRATION SUBMISSIONS | | | |
|---|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 7/12/21** | **AS OF 10/11/21** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,877 | 15,869 | -8 |
| 2. | Representative Claimants | 1,367 | 1,376 | +9 |
| 3. | Derivative Claimants | 3,314 | 3,315 | +1 |
| **4.** | **Totals** | **20,558** | **20,560** | **+2** |

The number of Retired NFL Football Players (Row 1) went down by eight from Status Report No. 13 because they were replaced by Representative Claimants.  Of the 20,560 to whom we issued Registration notices, we were able to confirm that 19,399 of them are Settlement Class Members under the Settlement Agreement, 12,838 of whom are Retired NFL Football Players eligible to participate in the BAP.  The other 1,161 persons are not Settlement Class Members under the Settlement Agreement because of one or more of these reasons:  (1) they were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not provide us with the information or support required by the Settlement Agreement to register, after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a

Derivative Claimant but did not have a relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals. We have made determinations on 303 such Registrations and found that 162 (53%) of them presented good reasons to be allowed to register after August 7, 2017. Table 23 shows the change in these numbers since Status Report No. 13:

| Table 23 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | STATUS | AS OF 7/12/21 | AS OF 10/11/21 | CHANGE |
| 1. | Accepted | 160 | 162 | +2 |
| 2. | Not Accepted | 140 | 141 | +1 |
| 3. | Totals | 300 | 303 | +3 |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge. The NFL Parties also may challenge our good cause exception decisions. We have received 378 challenges, which is the same number we have reported since in Status Report No. 11. Table 24 explains these challenges and what happened to them:

| Table 24 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 245 | Settlement Class Member | 77 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |

| Table 24 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | **ISSUE** | **HOW MANY** | **WHO CHALLENGED** | **CHALLENGE SUCCESSFUL** | **CHALLENGE NOT SUCCESSFUL** |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 23 | Settlement Class Member | 5 | 18 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | **Totals** | **378** | | **150** | **228** |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters.  Table 25 shows the appeals thus far and the Special Masters' rulings on them (no changes since Status Report No. 11):

| Table 25 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | **ISSUE** | **HOW MANY** | **WHO APPEALED** | **DECISION UPHELD** | **DECISION OVERTURNED** |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 6 | Settlement Class Member | 5 | 1 |
| 5. | **Totals** | **36** | | **33** | **3** |

38.     *Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives*.  The Special Masters have approved 437 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants.  There have been four new

Representative Claimant approvals and no new Derivative Claimant Representatives since Status Report No. 13.

## XII.   <u>CONCLUSION</u>

39.   ***General Status.***   We have 209,537 document files (21,554 gigabytes, or 21.5 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 2,101 more than when we filed Status Report No. 13. We have issued 38,645 notices (158 more since Status Report No. 13) of various kinds (Registration, claims, appeals, Audit, etc.) to 20,993 different persons since March 23, 2017, and developed over 100 different types of notices and forms for use in the Program.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By: *Roma Petkauskas*

    Roma Petkauskas
    Virginia State Bar No.: 71357
    BrownGreer PLC
    250 Rocketts Way
    Richmond, Virginia 23231
    Telephone: (804) 521-7218
    Facsimile: (804) 521-7299
    Email: rpetkauskas@browngreer.com