## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB <br> MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc., <br><br> Defendants. | |
| THIS DOCUMENT RELATES TO: <br><br> Locks Law Firm v. SPID 950000313 (R.S.) <br> Attorney Lien Dispute <br> (Lien Case No. 01585) | |

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                   November 12, 2021

## I.    INTRODUCTION

Presently before the Court in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Locks Law Firm ("Locks") against the Award granted to their former client, Settlement Class Member No. 950000313, R.S. ("Player"), in the litigation that became part of this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).  By its lien, Locks Law seeks reimbursement of its costs and payment of attorneys' fees of 22% of the Award that has been authorized for Player.  By his current counsel, Langfitt Garner PLLC ("Langfitt"), Player

challenges the Lien, given that Langfitt also seeks a contingent fee for its work in representing him.  That work, which Player agreed would be compensated with a contingent fee of 20% of any monetary award he received, involved the filing of the claim that ultimately resulted in approval of a monetary award.  The parties consented that my ruling on this matter will constitute the final determination of the district court.

As we set out in past opinions, our evaluation of these positions involves a consideration of the contingent fee agreements ("CFAs") between Player and his counsel and an assessment of the reasonableness of the requested fees of both law firms in light of the analysis set out by the Third Circuit's *McKenzie* decision.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach obligates us to scrutinize the reasonableness of the CFA at the time of the signing and then determine whether the circumstances compel a different evaluation of the agreement at the time the lienholder seeks enforcement.  We will then examine the results Player obtained, the quality of the representation provided by each firm, and most importantly the extent to which the efforts of the lienholder firm substantially contributed to the result obtained while the client was represented by current counsel. *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.  Ultimately, we conclude that Locks's role in this player's representation does not justify the entirety of the authorized attorney fee but rather would entitle it to share the total contingency fee with Langfitt on a 25%-75% basis.

## II.    FACTS AND PROCEDURAL HISTORY

Player entered into a CFA with Locks on February 13, 2012 for litigation against the NFL for alleged cognitive deficiencies resulting from injuries sustained while playing in the NFL. Under the terms of the fee agreement, and contingent upon Player obtaining a recovery, Locks

2

would charge a fee of 33.33% of the net recovery.  Apparently even before securing a signed contingent fee agreement with Player, the firm filed a short form complaint in this district on his behalf in January 2012.  The firm also arranged for Player to undergo prompt neuropsychological testing in March 2012 and thereafter provided the neuropsychologist with Player's medical records in order to best understand Player's diagnosis.  Locks included Player's claim in a Master Administrative Class Action Complaint for Medical Monitoring filed in June 2012.

For the next several years, Locks was heavily involved in work on behalf of the class, in addition to monitoring the MDL docket and individual filings for its individual clients.  It regularly issued communications to update its client base concerning developments in the litigation and eventual settlement.  The NFL and counsel for the proposed class of retired NFL players ultimately reached a settlement, and following court approval and resolution of appeals, a claims process was established for those players who did not opt out of the settlement.

As the class action settlement wound its way through the appeals process, Locks arranged for Player to undergo a brain scan and consult with a neurologist to evaluate his eligibility for what might be particular qualifying diagnoses under the Settlement.  It also became important to understand the etiology of his symptoms, as it was learned that Player had suffered two previous strokes.  He was evaluated by neurologist Jon D. Peters, M.D., in February 2016 and referred for an amyloid PET scan, which was undertaken in July 2016.[1]  The PET scan did not reveal indicia of Alzheimer's disease.

---

[1]  Amyloid PET imaging detects beta-amyloid build-up in plaques and in the blood vessels supplying the brain.  Inasmuch as plaques are found in all patients with Alzheimer's disease, it has been suggested that beta-amyloid plays an important role in the disease.  A negative scan indicates few to no amyloid plaques and that the cause of any cognitive impairment "is likely to be something other than [Alzheimer's disease]."  *See Frequently asked questions about beta-amyloid imaging,*  https://www.alz.org/media/documents/health-care-pros-faqs-beta-amyloid-imaging.pdf (last visited Nov. 8, 2021).

Around this same time, Locks assisted player in his pursuit of benefits under the NFL's "88 Plan," a benefit program unrelated to the class action litigation that provides former players with funding for medical and custodial care resulting from dementia, Alzheimer's disease, ALS, and/or Parkinson's disease. In September and October 2016, Locks consulted with a different neurologist, who ordered a brain MRI. He found that Player met the clinical criteria for vascular dementia and possible CTE. Locks then submitted an application on Player's behalf for the 88 Plan benefits, which was approved in December 2016.

When registration in the Settlement Program opened in February 2017, Locks promptly registered Player. It did not, however, immediately submit a claim, presumably in light of what it refers to as "the issues surrounding [Player's] diagnosis," and so that it would ultimately be able to file a "successful" claim. (LH Stmt. of Disp. at 3.) *See also* LH Resp. at 2 (explaining that filing a pre-effective date claim "would have been harmful to achieving a qualified diagnosis in the future"). In late 2018, it arranged for Player's records to be reviewed by another specialist, Andrea Casher, Psy.D. It did not file a claim, although it states that it "would have" had Player tested through the MAF.[2]

On June 7, 2019, the attorney who principally handled Player's representation, David Langfitt, left Locks and formed his own firm, Langfitt Garner. Player was notified of this development and on October 16, 2019 entered into a CFA with Langfitt that provided for a 20% attorney's fee for representation in this settlement claims process. In light of its termination as counsel in a case in which it had not yet collected a fee, Locks promptly filed a Notice of Lien seeking reasonable attorney's fees and costs for its work on behalf of Player. At the time of this

---

[2] The parties seem to agree that the testing undertaken and the reports obtained by Locks through 2018 could not be used to support a claim under the Settlement because they had expired and/or showed dementia that was not of the type to qualify under the Settlement Agreement.

change in representation, however, Player did not have a claim actively pending with the Claims Administrator.

Langfitt scheduled Player for an examination through the MAF program and provided Player's full medical history – including the medical records and reports procured by Locks during its representation – to a new pair of experts: Joseph S. Lubeck, D.O., who examined Player on December 11, 2019, and Frazin Irani, Ph.D., who administered testing on January 15, 2020.  Dr. Lubeck ultimately authored a report on April 23, 2020 justifying his finding that Player met the criteria for a Level 1.5 Neurocognitive Impairment.  Langfitt filed a claim on Player's behalf in June 2020 seeking an award for Level 1.5 Neurocognitive Impairment.  The Claims Administrator required further information upon its Preliminary Review, as the neuropsychology report "showed dementia that did not qualify under the strict terms of the Settlement," which specifies the number of criteria at which the class member needs to attain a particular score.  (SCM Stmt. of Disp. at 2.) Langfitt secured a response from Dr. Lubeck and facilitated contact between the Claims Administrator and the affiant of a third-party statement in support of Player's claim.  A Monetary Award was approved in February 2021 based on the qualifying diagnosis of Level 1.5 Neurocognitive Impairment rendered by Dr. Lubeck as of December 11, 2019.  The award was subject to a 75% offset under the terms of the Settlement Agreement due to a medically-diagnosed stroke having occurred prior to the Qualifying Diagnosis.  The NFL did not file an appeal.

In light of the attorney lien and the contingency fee agreements of record, the Claims Administrator withheld from Player's award funds for payment of attorney fees in an amount equal to 22% of the Monetary Award.  This percentage reflects the presumptive cap on attorney's fees imposed by the Court's April 5, 2018 Opinion and Order.  (Doc. No. 9863.)  Of the attorney fee withholding, a portion reflecting 5% of the Award was separately deposited into the Attorneys'

Fees Qualified Settlement Fund ("AFQSF") pursuant to the Court's June 27, 2018 Order Regarding Withholdings for the Common Benefit Fund.  (Doc. No. 10104.)  Those funds may be distributed at a later date upon further order(s) of Judge Brody.  The Claims Administrator also withheld funds for reimbursement of attorney costs based upon assertions made by counsel up to that point.

Pursuant to a briefing schedule we issued through the Claims Administrator, and in accordance with the Lien Rules, both law firms submitted simultaneous Statements of Dispute on August 25, 2021 concerning their entitlement to a fee in light of the other firm's CFA or attorney lien.  Each submitted a Response to the other's filing on September 10, 2021.  Pursuant to Lien Rule 17, the Record of Dispute was then referred to us for a determination as to the appropriate distribution for the attorney fees currently available for disbursement (representing 17% of Player's Award) and the allocation of those funds that are currently held in the AFQSF (representing 5% of Player's Award), if those funds, or a portion thereof, are distributed by the Court at a future date.  We also address the question of how the funds withheld for reimbursement of attorney costs may be allocated.

## III.    THE APPLICABLE LEGAL PRINCIPLES

Third Circuit authority makes clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances."  *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts).  The District Court's prior opinions in this class action settlement did not relieve attorneys of this obligation.  Indeed, the Court explained that all attorneys seeking fees, whether through a lien or otherwise, are obligated to ensure that their fees are "reasonable" under the

standards articulated in *McKenzie*.  *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity."  *McKenzie I,* 758 F.2d at 101.

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney."  *McKenzie I*, 758 F.2d at 101.  Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement.  *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based.  We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

## IV.   DISCUSSION

Langfitt contends that it should be paid "the far larger share" of the attorney's fees approved in this case in light of "its successful work, the known risks it understood despite a looming stroke, its minimization of costs, and its willingness to shepherd through a claim that it knew would be difficult because it did not strictly satisfy BAP standards."   (SCM Stmt. of Disp. at 3.)  It argues that "Locks advanced $14,000 in expenses but never filed a claim on [Player's] behalf and obtained no useful medical records that could contribute to the eventual award."  (*Id.*)

We agree with Langfitt in part but conclude that the work performed by Locks nonetheless warrants a share of the fee derived from Player's award.

### A.   The CFAs at the time of contracting and enforcement – impact of any changed circumstances

When we assess the reasonableness of the contingent fee arrangements at the time Player entered into them with each firm, we examine: (1) the legal challenges in his pursuit of a monetary award and (2) the time-intensive nature of the representation.  We then compare the landscape at the time of contracting with the circumstances at the time the Locks attorney-client relationship terminated.

#### 1.   Locks Law

Locks Law began to represent Player's interests as early as January 2012, when it filed an individual complaint on his behalf.  It entered into a formal contingent fee agreement on February 13, 2012.  At the time Locks filed the complaint on Player's behalf, the NFL's motion to consolidate cases was pending, and it would ultimately be granted on January 31, 2012.  When the parties executed the CFA on February 13, 2012, then, the litigation was at the beginning of what has been described as "Phase 2": just after the MDL had been created.  Any litigation at this time carried substantial risks, as the plaintiffs faced stiff challenges including surmounting the issues of preemption and establishing causation, but counsel knew that their work could benefit from shared resources.

Risk as it related to overall workload also varied over time in this litigation.  When law firms undertake large-scale litigation, they may be obligated to decline to take on other litigation. The cost to law firms in deciding to participate and thus forego alternative matters must be recognized.  As we have noted in previous opinions, in the first phase of the litigation, the law

firms that undertook representation of players individually, without the benefit of the efficiencies contained within an MDL, faced monumental challenges and risked having to pursue the entire case themselves, perhaps even through trial.  Fee arrangements reflecting those large contingencies "would have been expected and appropriate."  (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL at the end of January 2012, however, the risk related to the volume of work to be undertaken by any law firm changed dramatically.  Once an MDL was formed, firms such as Locks Law contracting to represent individual clients "were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case. See Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from individually-retained player attorneys to Plaintiffs' Committees, which would be compensated through a common benefit fund).   To be sure, Locks Law personnel served on important committees, for which the firm was awarded fees from the common benefit fund.  The risks as to the legal challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

Player remained in a contractual relationship with Locks Law from the signing date of February 13, 2012 – post-consolidation – until September 11, 2019 when Player moved to Langfitt Garner.  During this time substantial progress had been made in moving forward the many cases in the class. The motion of various defendants (such as helmet manufacturers) to sever their cases from those against the NFL, as well as the motions to dismiss filed by those parties and the NFL,

were argued in April 2013.  In July 2013, without yet ruling on the motions, Judge Brody ordered the plaintiffs and the NFL to mediation, and by the end of August 2013 a term sheet had been signed.  Class counsel moved for preliminary approval on January 6, 2014.  On April 16, 2014, Judge Brody sent the matter back for further discussion given her dissatisfaction with the Monetary Award cap, but an amended agreement that eliminated the cap was presented in June 2014.  The Court gave preliminary approval on July 7, 2014 and held a fairness hearing in November 2014. After additional changes were made to the settlement agreement, it was again presented to the Court on February 13, 2015 and given final approval on April 22, 2015.  Appeals followed, but the Third Circuit affirmed the District Court's approval of the Settlement Agreement on April 18, 2016, and the Supreme Court denied certiorari on December 12, 2016.  Registration in the settlement program opened in February 2017.

Thus, during the period in which Locks represented Player, the risk inherent in the litigation decreased significantly.  This reduction in risk was ultimately accomplished through the efforts of Class Counsel and those other firms, including Locks, whose attorneys served on various MDL committees and performed work for the common benefit of the class, for which many firms including theirs were awarded compensation.  See Doc. No. 10019 (the Court's May 24, 2018 Explanation and Order distributing the common benefit fees among petitioning firms).  This does not alter the fact, however, that Locks undertook the representation at a time of significant risk.

### 2.  Langfitt Garner

When Langfitt Garner took over the representation of Player September 11, 2019, the major risks confronting prior counsel in terms of liability and the defenses the NFL could assert had been eliminated.  A claims administration process had been rolled out and Player was already registered in the program.  At this point, the challenges were specific to the evidentiary record of each SCM.

Here, the specific challenges that Player faced with respect to any claim he would file were: (1) that testing for Alzheimer's disease had essentially refuted the possibility that he could obtain an award for that diagnosis; and (2) any other award for which he might qualify would be subjected to a substantial reduction in light of his stroke history.

This background knowledge, however, had already been developed from the Locks representation. And as the attorney who directed much of the work done on behalf of Player at Locks, Attorney Langfitt had the benefit of that background knowledge when the Langfitt firm undertook representation of Player in 2019. Thus, when Langfitt Garner assumed representation of Player, it could anticipate that it would need to obtain new medical evidence to establish a qualifying diagnosis to support a claim submission on behalf of Player. The fact that it would have had to advance costs for MAF-compliant examinations to achieve any award for Player was a clear and present risk. There were no changes, however, in the circumstances as to risk factors during the time between when Langfitt agreed to represent Player and when it sought to enforce its contingent fee agreement upon the approval of his award. To be sure, the risk factors were largely known when Langfitt undertook the representation.

### B. The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the attorneys' efforts in bringing about the result. The claim that ultimately led to a Monetary Award on February 12, 2021 was filed on Player's behalf by Langfitt. The qualifying diagnosis identified in the award notice was made by Dr. Lubeck in his report dated April 23, 2020 following his examination on December 11, 2019 on referral from Langfitt. Ultimately the qualifying diagnosis was for Level 1.5 Neurocognitive Impairment. The Alzheimer's Disease diagnosis explored during the period of representation by Locks could not be

supported in light of the imaging studies.

### C.     The quality of the work performed

The quality of the work performed by Langfitt is unchallenged, inasmuch as Langfitt obtained medical records that enabled it to file a claim on Player's behalf and achieve a favorable award.   For its part, however, Langfitt challenges the quality of work performed by Locks in relation to the amount expended on exams and studies, comparing the utility of the records utilized in its claim submission against those not used in the submission.  *See* SCM Stmt. of Disp. at 3. Locks contends, however, that the tests ordered early on "ultimately laid the groundwork for what was and was not going to work for filing a claim."  (LH Resp. at 2.)  In addition, inasmuch as Player was a prominent client at the time, we have every reason to believe that Locks was providing adequate communications to him and meeting his needs.  To be sure, he was sufficiently satisfied with the representation he received that he followed his Locks representative to Langfitt in 2019. We ultimately accept that each firm provided quality work on behalf of Player and in accordance with the demands of the respective stage of the litigation and claims process.

### D.     The substantiality of the work performed

The more important question in this lien dispute is how the two firms contributed to the work that was necessary to obtain the award for which Player was approved in February 2021. Langfitt characterizes the contribution of Locks as limited to registering Player in the Settlement, which it considers "a routine administrative task."  *See* SCM Stmt. of Disp.  at 2.  Locks argues, however, that it did much to develop background information and explore other diagnoses to the benefit of Player when Langfitt pursued the MAF evaluation that he did in 2019.  We therefore lay out the efforts undertaken by each firm in the various aspects of their representation to aid in our

evaluation of this critical and final factor in the *McKenzie* analysis.

As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;
>
> (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,
>
> (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,
>
> (6) support of clients who were seeking loans and were exposed to predatory lending practices; and
>
> (7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories, and there may be other categories of tasks undertaken or services provided by IRPAs that would be relevant to this analysis.   In the absence of any suggestion of other relevant criteria, we will use these categories as checkpoints as we consider the substantiality of the IRPA's efforts and the role each may have played in achieving Player's award.

> **(1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date**

It is undisputed that Locks sent Player for diagnostic consultations and evaluations in 2012, upon undertaking the representation, and in 2016, in anticipation of the implementation of the Settlement Program.  It also obtained Player's prior medical records in May 2012.

When Langfitt assumed representation in September 2019, it knew that the existing medical record development would not support a claim on behalf of Player.  It arranged for Player to be seen by an MAF physician in December 2019 and then undergo neuropsychological testing in January 2020.  Thus, both firms undertook efforts to identify a qualifying impairment at an early date upon its assumption of the representation.

**(2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial**

During the time that there was a possibility of litigation, *i.e.*, prior to the conclusion of the opt-out period, Locks represented Player's interests by gathering medical records and having him examined.

**(3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted**

This factor does not appear to pertain to the work of either of the firms.

**(4) Support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class**

Locks was available to Player during the time period in which he had to consider whether to opt out of the class.

**(5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award**

Locks registered Player in the settlement but did not file a claim on his behalf.  Langfitt filed a claim and has continued to represent Player through receipt of a Monetary Award.

14

**(6) Support of clients who were seeking loans and were exposed to predatory lending practices; and**

We are unaware of this work having played a role in either firm's representation of Player.

**(7) Providing necessary support in other personal matters collaterally related to this litigation**

Locks assisted Player with the pursuit of benefits under the 88 Plan.

### E.   <u>Apportionment</u>

Langfitt resists any more than a *de minimis* share of the attorney fee being apportioned to Locks.  Langfitt argues that when it undertook its representation of Player in 2019, there were known and serious risks that minimized the likelihood of a significant recovery, given that Player had pre-existing conditions that reduced the compensation available through the Settlement Program.  For its part, Locks contends that it undertook much work during periods of its risk in its more than seven-year period of representation, including having Player evaluated and undergo studies.  It argues that Player would not have been able to achieve his success through the MAF program had Locks not made the contributions it did to understanding Player's complex history.

We think Locks's contributions to the understanding of Player's condition were a necessary component or precursor of the work that Langfitt ultimately utilized to have Player evaluated for Level 1.5 neurocognitive impairment.  Leading up to when Player changed representation in September 2019, Locks had evaluated his records and sent him for further evaluations by clinicians with Ph.D., Psy.D., and M.D. backgrounds, in addition to obtaining the imaging studies to support or rule out possible diagnoses.  Locks argues that, while the evaluations it obtained could not themselves be submitted as the basis for a claim, they nonetheless had value in that they were shared with subsequent doctors and enabled Player to narrow the focus of the claim that he ultimately filed.  This is undoubtedly the case.

We appreciate that it was Langfitt who ultimately saw Player to the finish line in pursuing an MAF evaluation when he did.  However, from 2012 to 2019, Locks counseled Player to remain in the settlement class, registered him, and obtained medical records and pursued tests and evaluations to narrow the scope of the qualifying diagnosis that might be sought on Player's behalf. We award Locks a 25% portion of the total attorney fee.[3]

## F.    Costs

Locks seeks to recover expenditures totaling $13,981.48 for postage and delivery fees, copying costs, out of town travel by counsel, and more substantial payments made to various providers for their evaluation of Player or diagnostic tests.  Langfitt also seeks reimbursement for the expenditure it made for the evaluations that ultimately led to the successful claim determination.

Langfitt opposes the reimbursement request of Locks consistent with its position that "Locks contributed nothing" to the successful claim.  (SCM Resp. at 5.)  Langfitt also notes that the amount of costs requested by Locks represents over 12% of the total award to Player.  (SCM Stmt. of Disp. at 3 n.1.)

In another dispute involving these two firms with a similar chronology, we took a somewhat novel approach to reimbursing Locks for expenses it incurred in an unsuccessful claim before the client then changed representation.  Langfitt invites us to view the recovery of costs by Locks in relation to the firm's proportional recovery of the available attorney fee.  We applied a proportional

---

[3] This is a larger share than the 15% portion of the total fee that we allotted to Locks in the case of SPID 100014274 (E.W.).  In that case, Locks had put a deficient claim before the Claims Administrator, which gave rise to delays and suspicions regarding validity.  Those concerns ultimately led to an audit and claim denial, to the detriment of the client.  *See* ECF No. 11288. Here, Locks created no such harm for Player.

recovery of costs in the case to which Langfitt refers.[4]   We find the circumstances of Player's case

to be distinguishable.   Here, Locks did not submit an unsuccessful claim with attendant validity

concerns and waiting periods as in that case.   Its record development could not support a claim,

but it was undertaken in good faith and served the useful function of narrowing the scope of

diagnoses that would be worth pursuing.   We thus will not reduce Locks's recovery of costs.

The costs for which Locks seeks reimbursement were for evaluations by or consultations

with the following medical or psychological experts: Carol L. Armstrong, Ph.D. ($2,700 paid on

July 12, 2012); Dr. Peters ($5,000 paid on February 3, 2016); MRI of Reston and PET of Reston

($750 and $1,500 respectively, paid on February 29, 2016); and Andrea Casher, Psy.D. ($3,000

paid on October 5, 2018).   It also seeks a total of $7.29 in postage costs and $583.02 for out of

town travel by counsel on March 18, 2016.   Player's CFA with Locks Law provided that he would

reimburse the firm for expenses of this nature from any award that he received.   Similarly, Langfitt

seeks reimbursement for a total of $3,937.99 in costs relating to postage/delivery ($87.99), Dr.

Lubeck ($1,000), and neuropsychological testing ($2,850).   Both firms are entitled to

reimbursement in full for these costs.

## V.   CONCLUSION

The work performed by Locks during the claim development and filing stages did not yield

a diagnosis that enabled it to file a claim on Player's behalf before Attorney Langfitt left in 2019

and set up the Langfitt firm.   At the same time, Locks had not done anything to jeopardize Player's

ability to obtain new documentation and file a claim in the future.   Given Attorney Langfitt's

familiarity with the development of Player's condition from the time he spent at Locks, Langfitt

---

[4]   *See* ECF No. 11288, described *infra* n.3, re: SPID 100014274 (E.W.).

Garner was primed to assist Player.  Some advocacy was still required, as the claim filed by Langfitt went through a Preliminary Review requiring further supporting explanations.

Inasmuch as it was the claim filed by Langfitt that ultimately created the fund and achieved the successful result for Player, we will set the total fee according to the CFA that Player entered into with Langfitt.  Thus, the total fee to be divided between counsel represents 20% of the Monetary Award, rather than the 22% sought by Locks.  As alluded to above, we have concluded that a fair resolution of this dispute is to divide the fee such that 25% of the fee is allocated to Locks and 75% is allocated to Langfitt.  The Claims Administrator shall reduce the disbursements in light of the 5% holdback and shall apportion the holdback funds between Locks Law, Langfitt Garner, and Player according to the proportion set forth above.  The Claims Administrator shall also disburse $13,981.48 to Locks for its costs and $3,937.99 to Langfitt for its costs.  Any remaining withheld funds must be disbursed to Player.

An appropriate Order follows.

BY THE COURT:


 /s/ David R. Strawbridge, USMJ_____
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE