IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>                                        Plaintiffs,<br>        v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>                                        Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Zimmerman Reed LLP v. SPID 950004136 (D.W.)<br>Attorney Lien Dispute<br>(Lien Disp. No. 00400) | |

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                            November 12, 2021

**I.        INTRODUCTION**

Presently before the Court for in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Zimmerman Reed LLP ("Zimmerman") against the Award granted to their former client, Settlement Class Member ("SCM") SPID 950004136 ("Player"), in the litigation that became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).  By its lien, the firm sought payment of attorneys' fees of 20%[1] of the Award issued to Player pursuant to the contingency fee agreement

---

[1] As we describe below, on April 5, 2018, the District Court determined that presumptively no

("CFA") that he entered into with them on September 1, 2012. Player, now proceeding *pro se*, challenges the lien. He believes that Zimmerman does not "deserve to be paid any portion of [the] settlement percentage" because it did not assist him regarding his case by setting up any screenings or testing. SCM Statement at 1.

As we set out in a Report and Recommendation ("R&R") filed on January 7, 2019,[2] our evaluation of these positions involves a consideration of the CFA between Player and his former counsel and an assessment of the reasonableness of the requested fees in light of the five factors enumerated by the Third Circuit in *McKenzie*. *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")). This approach will require us to scrutinize the reasonableness of the CFA at the time of the signing of the contracts and then determine if the circumstances compel a different evaluation of the CFA at the time Zimmerman, as lienholder, seeks to enforce it. We will then examine the results obtained, the quality of the representation provided by Zimmerman, and whether the efforts of Zimmerman substantially contributed to the result. *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1. We conclude that Player's fee agreement with Zimmerman must be honored. We ultimately value Zimmerman's reasonable fee for the firm's work on behalf of Player at 8% of the monetary award.

---

Individually Retained Plaintiff's Attorneys ("IRPAs") should receive more than 22% of a Monetary Award in fees. ("Fee Cap"). (Doc. No. 9863). *See* Doc. No. 10368 at 10-11 (discussing the District Court's decision relating to the presumptive Fee Cap).

[2] The District Court referred to us all "all petitions for individual attorneys' liens." (Doc. No. 7446). On January 7, 2019, we issued an R&R pertaining to three separate cases. (Doc. No. 10368). In that R&R we set out the legal principles that would guide our analysis in these cases. We have since issued opinions resolving similar disputes in which the parties consented for the magistrate judge to resolve the lien dispute. *See* Doc. Nos. 10383 (Owens) & 10514 (McElroy).

## II.     FACTS AND PROCEDURAL HISTORY

On September 1, 2012, Player signed a document entitled "Agreement for Legal Services," which reflected that he agreed to have Zimmerman represent him in connection with the damage he asserted he suffered due to head injuries incurred from his career in the NFL. (Lienholder Stmt., Ex. 1 at 1.) Under the terms of the agreement, if recovery were made, Zimmerman was entitled to a fee distribution in the amount of 33 1/3% of the net recovery as the legal fee.

Zimmerman promptly began to gather from Player details of his medical and playing history, information on his NFL career, history of head injuries, and any symptoms of cognitive deficits. Following review of the information that Zimmerman obtained from Player, the firm filed an individual short form complaint in the MDL on Player's behalf on January 10, 2013. (Lienholder Stmt., Ex. 2.) The firm kept Player apprised of the status of the litigation and the proposed settlements and legal challenges thereto. In 2016, Zimmerman shared with Player its assessment that he did not then have a Qualifying Diagnosis under the terms of the Settlement Agreement that had been approved by the Court and was going through the appeals process. Zimmerman offered to Player to participate in an online cognitive testing program that would identify cognitive decline. It also spoke to him about obtaining a baseline evaluation through the BAP program when it became effective. However, Player did not give Zimmerman the chance to pursue those options. On October 25, 2016, he notified Zimmerman that he terminated the relationship and that he had obtained other counsel. (Lienholder Stmt., Ex. 6.)

The record before us from the Claims Administrator indicates that Player's registration form was submitted by Howard and Associates, P.A. on March 15, 2017 and that a claim form was submitted on April 18, 2019 by Shenaq PC ("Shenaq"). In light of the pending claim, the Claims Administrator provided notice to Shenaq on April 30, 2019 that Zimmerman had filed a

lien in this matter shortly after it was terminated in 2016. (Dispute Rec. Doc. 2.) At some time not apparent in the record, Zimmerman and Shenaq negotiated a resolution of Zimmerman's attorney lien. (Lienholder Stmt. at 4.)

On April 27, 2020, Player's claim was finally approved. The Notice of Monetary Award Claim Determination reflected that Player had been approved for a Monetary Award based upon the qualifying diagnosis of a Level 1.5 Neurocognitive Impairment rendered on February 25, 2019. (Dispute Rec. Doc. 1 & Cover Sheet.) The Notice of Award also reflected the Claims Administrator's understanding that Player was represented at that time by Shenaq.

At some time not apparent in the record, Player terminated Shenaq. (Lienholder Stmt. at 4.) Shenaq has not filed a lien on Player's award and no further information is in the Lien Dispute Record concerning the terms of any fee agreement between Player and Shenaq or between Player and Howard, who completed Player's registration in the Program. On July 29, 2021, the Claims Administrator issued a Schedule of Document Submissions concerning the Zimmerman lien. Zimmerman reports that it attempted to resolve the lien with Player and contacted him by phone but that Player returned the calls of the firm representative only once and did not leave a message or make any further response. On August 30, 2021, Zimmerman submitted its Lienholder Statement of Dispute, and Player provided an email communication on August 31, 2021 setting forth his position.

In light of the unresolved lien based upon Zimmerman's contingency fee agreement, the Claims Administrator withheld from Player's award funds for payment of attorneys fees in an amount equal to 20% of his Award, as asserted in Zimmerman's Notice of Lien. Of that attorney fee withholding, a portion reflecting 5% of Player's Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund pursuant to the Court's June 27, 2018 Order Regarding

Withholdings for Common Benefit Fund counsel. (Doc. No. 10104.) Those funds may be distributed at a later date upon further order(s) of Judge Brody. This leaves the Court to determine the appropriate distribution for the attorneys fees currently available for disbursement (representing 15% of Player's Award) and the allocation of those funds that are currently held in the Attorneys' Fees Qualified Settlement Fund (representing 5% of Player's Award), if those funds, or a portion thereof, are distributed by the Court at a future date.

As noted above, pursuant to a briefing schedule issued by the Court through the Claims Administrator and in accordance with the Lien Rules, the parties submitted simultaneous Statements of Dispute concerning Zimmerman's entitlement to a fee. (Dispute Rec. Doc. Nos. 7 & 8.) Neither party submitted a response to the other's Statement nor requested that the Court hold an evidentiary hearing. Pursuant to Lien Rule 17, the Record of Dispute was then transferred to the Court. We do not find it necessary to hold an evidentiary hearing before evaluating this dispute and resolving it. The matter is ripe for review.

**III.   DISCUSSION**

Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in this class action settlement in no way relieved attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees – whether those fee requests are submitted through a Lien or otherwise – are obligated to ensure that their fees are "reasonable" under the standards set out in *McKenzie*. *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing

5

reasonableness by a preponderance of the evidence).  Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity."  *McKenzie I,* 758 F.2d at 101.

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney."  *McKenzie I*, 758 F.2d at 101.  Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement.  *McKenzie II*, 823 F.2d at 45 n.1.  Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based.  We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

As we outline below, circumstances changed significantly from the time of Player's initial contracting with Zimmerman to the time that Zimmerman sought to enforce its contract.  Based upon our evaluation of the remaining three prongs of the *McKenzie* test, however, we are satisfied that Zimmerman provided quality representation and made contributions to the ultimate Award received in this case, taking into account that it must not be credited with work done by other counsel who chose not to assert liens.  We will therefore approve Zimmerman's fee request in part and provide for the refund of remaining withheld fees to go directly to the Player.

A.   **The CFAs at the time of contracting and enforcement – impact of changed circumstances**

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing by Player and Zimmerman, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation. We then compare the landscape at the time of contracting with the circumstances at the time the attorney-client relationship terminated.

Zimmerman agreed to represent Player in his dispute with the NFL in September 2012, after the first lawsuits brought by former players against the NFL had been consolidated for pretrial purposes into this MDL. This is what Professor Rubenstein[3] characterized as "Phase 2" of the litigation. As has been noted in prior opinions in this MDL, at that time the MDL had been created. Any litigation at this time carried substantial risks, as the plaintiffs faced stiff challenges including surmounting the issues of preemption and establishing causation, but counsel knew that their work could benefit from shared resources.

Risk as it related to the overall workload also varied over time in this litigation. When law firms undertake large-scale litigation, they may find it necessary to decline to take on other litigation. The cost to law firms in deciding to participate and thus forego alternative matters must be recognized. As we have noted in previous opinions, in the first phase of the litigation, the law firms that undertook representation of players individually, without the benefit of the efficiencies contained within an MDL, faced monumental challenges and risked having to pursue the entire

---

[3] The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court. After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2).

case themselves, perhaps even through trial.  Fee arrangements reflecting those large contingencies "would have been expected and appropriate." (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL at the end of January 2012, the risk related to the *volume* of work to be undertaken by a law firm representing a retired player changed dramatically.  Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly." (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case.  *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from IRPAs to Plaintiffs' Committees, which would be compensated through a common benefit fund).[4]  The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  This case remained a "high-risk, long-odds litigation." (Doc. No. 9860 at 10).

Player remained in a contractual relationship with Zimmerman from September 2012 until October 2016.  During this time, of course, substantial progress had been made in moving the cases forward, collectively and individually.  The NFL's motions to dismiss and to sever were argued in April 2013, but in July 2013, without yet ruling on these motions, Judge Brody ordered the parties to mediation, and by the end of August 2013 a term sheet had been signed.  This led to class counsel's motion for preliminary approval filed on January 6, 2014, which was further amended and finally approved on April 22, 2015.  On April 18, 2016, the Third Circuit Court of Appeals

---

[4]  We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

affirmed the District Court's approval of the Settlement Agreement, and the United States Supreme Court later denied *certiorari*. The risk inherent in the litigation was then decreased significantly, thanks to the efforts of Class Counsel and those other lawyers who served on various MDL committees and performed work for the common benefit.[5] This does not alter the fact, however, that Zimmerman undertook the representation of Player at a time of risk.

There were thus several key changes in the circumstances during the time between when Zimmerman agreed to represent Player and when it sought to enforce the contract upon Player's decision to change counsel. While the evidence-gathering tasks and case development relating to damages were much the same, by late 2016, it would have been clear to Zimmerman that it had only to adhere to an administrative process in order to secure the award and did not have to defend against legal challenges from the NFL Parties.

### B. The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the firm's efforts in bringing about the result. We observe that Player qualified for an award based on his diagnosis of February 25, 2019. (Notice of Monetary Award Claim Determination). That was more than two years after he terminated Zimmerman's representation and after he had retained substitute counsel. It appears to have been during a period of representation by Howard and/or Shenaq that Player met the diagnostic criteria for an award of Level 1.5 neurocognitive impairment.[6]

---

[5] To be sure, Zimmerman personnel served on such committees and Judge Brody authorized the firm to be compensated with an allocation of common benefit funds.

[6] Inasmuch as those firms have not filed liens here, the value of their work will ultimately be credited back to Player.

### C. The quality of the work performed

Zimmerman contends that it provided quality work when it represented Player by regularly communicating with him about the status of the litigation and the settlement and by documenting his cognitive condition over time. Zimmerman contends that it also retained a neurosurgeon to provide guidance to all of the firm's clients and who was "another resource available to [Player] to evaluate his medical condition." (Lienholder Stmt. at 8.) Player, however, has contended that "they never setup for any screenings" and that it was not until he retained subsequent counsel that he underwent any testing. (SCM Stmt. at 1.)

As is demonstrated in our discussion below, we find that Zimmerman provided quality work on behalf of Player and in accordance with the demands of the litigation and settlement administration at the time of the representation.

### D. The substantiality of the work performed

Perhaps the more important question is to consider Zimmerman's contribution to the work necessary to obtain the Monetary Award that Player received in this case. In cases where more than one firm represented a settlement class member leading up to the receipt of the Notice of Award, we have looked to the contributions of each firm, comparing the value each added in advancing legal theories and in the work it performed individually for the client, with the effect on the ultimate outcome of the client's award. We typically lay out the efforts undertaken by the firms in the various aspects of their representation to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.

Here, we understand well the extent of the role played by Zimmerman, but we have limited information as to tasks undertaken by Howard and/or Shenaq, neither of which have filed a lien on Player's award to compete for the funds available for counsel fees. Player contends that no

IRPA fee should be payable to Zimmerman because the firm "didn't contribute any help to me regarding the NFL concussion case and therefore I feel they don't deserve to be paid any portion of settlement percentage." (SCM Stmt. at 1.)

We will evaluate Zimmerman's contributions here in accordance with Circuit case law and our prior decisions. As we have described there, we look to as many as seven non-exclusive categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;
>
> (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,
>
> (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,
>
> (6) support of clients who were seeking loans and were exposed to predatory lending practices; and
>
> (7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories. We will, however, use these categories as checkpoints as we consider the substantiality of Zimmerman's efforts as an IRPA and the role Zimmerman played in the eventual receipt of an award to Player.

> **(1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date**

Zimmerman contends that it gathered information early on concerning Player's medical history, history of injuries, and symptomatology. It offered Player access to an online program that would track his cognitive performance over time. It admittedly had not scheduled a medical evaluation pre-effective date because its initial assessment, based on the information it had at the time in 2016, was that Player did not likely yet have a Qualifying Diagnosis. It viewed Player's future participation in the BAP and repeat testing through its online program as an appropriate way to continuously evaluate Player for a potential Qualifying Diagnosis.

> **(2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial**

We accept Zimmerman's assertion that it engaged in appropriate early efforts to document Player's cognitive health and decline, including encouraging contact with a neurologist, and that it suggested ways for Player and his wife to document his symptoms.

> **(3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted**

This factor is not applicable to this dispute.

> **(4) Support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class**

Zimmerman counseled Player to join the MDL litigation has represented that it had regular communications with Player concerning the status of settlement discussions and the future of the litigation. *See, e.g.,* Lienholder Stmt at 11 & Ex. 3. It encouraged Player not to opt out of the Settlement and he remained in the class.

> **(5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award**

Player terminated Zimmerman prior to the effective date of the Settlement. Zimmerman

contends, however, that it educated Player about the settlement and preparing him to participate in the Settlement.

**(6) Support of clients who were seeking loans and were exposed to predatory lending practices**

Zimmerman represents that it warned its clients, including Players, of financial scams.

**(7) Providing necessary support in other personal matters collaterally related to this litigation**

Zimmerman represents that it provided information to Player about benefits of "the 88 Plan"[7] and shared information on other resources related to brain injury.

\*   \*   \*

In this attorney lien process, we are called upon to synthesize this information to apportion fees for the quality representation provided to the retired player that yielded the positive outcome of a Monetary Award. We are cognizant that, here, four entities contributed to the work necessary to obtain that Award: Zimmerman acting for Player individually; Class Counsel and law firms that acted for the common benefit in negotiating and defending the Settlement Agreement; Howard, which registered Player in the program; and Shenaq, which submitted the claim that was ultimately successful.

The substantiality of Zimmerman's work as an IRPA in securing Player's Monetary Award is necessarily reduced by the work of Class Counsel and the attorneys working with them for the common benefit for much of the same time period in which Zimmerman represented him. The Court has already observed that class counsel's efforts clearly "reduced the amount of work required of IRPAs." (Doc. No. 9862 at 4.) Its establishment of a 22% presumptive fee cap for

---

[7] This neurocognitive benefit plan arises from a collective bargaining agreement between the NFL and the Players' Association. It is unrelated to this Settlement. *See* Lienholder Stmt. at 12.

IRPAs reflects this, taking into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials. Zimmerman was there to advise Player during the period in which the settlement was being negotiated and while protocols were finalized and qualifying diagnoses could be secured. It was subsequent counsel, however, that guided Player through claim submission and award receipt.

Our task is to determine the reasonableness of the fee sought by Zimmerman, which has suggested that 10% of Player's Monetary award would be appropriate. We agree that Zimmerman's work warrants a reasonable fee, even if it did not "set [him] up for any screenings" prior to October 2016. The record contains no evidence of any complaints by Player that Zimmerman was not providing the services described in the CFA. Rather, Zimmerman appears to have been available to him and assisted as necessary throughout. We cannot accept the proposition Player advances that Zimmerman "didn't contribute any help to [him] regarding the NFL concussion case[.]" (SCM Statement of Disp. at 1.)

Of course, it appears that Player received assistance from other IRPAs in securing and making many of the arrangements to see the doctors who would ultimately provide the necessary testing and qualified diagnosis. In light of the little that we know of the involvement of other counsel in guiding Player through the claim process, we find that an appropriate fee award to Zimmerman is 8% of Player's Monetary Award.

E. **Costs**

Zimmerman is not seeking reimbursement for costs incurred in its representation of Player.

IV.    CONCLUSION

Zimmerman's IRPA contribution to Player's ultimate Award is sufficient to support a fee of 8%, although this amount must be reduced by the Common Benefit Fee deduction currently applicable to all Awards. Accordingly, the Claims Administrator should distribute the funds as follows:

1) Disburse from the currently withheld funds, representing 17% of Player's monetary award:

    a. To Zimmerman: 8/22nds of the funds; and

    b. To Player: 14/22nds of the funds;

2) Disburse to Player any funds currently withheld for reimbursement of IRPA costs; and

3) At such time as the Court rules upon the 5% holdback request, disburse from those currently set aside funds:

    a. To Zimmerman: 8/22nds of the funds released for payment to IRPAs; and

    b. To Player: 14/22nds of the funds released.

An appropriate order follows.

BY THE COURT:

 /s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE
