IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION** | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| **THIS DOCUMENT RELATES TO:**<br><br>**REGARDING SETTLEMENT CLASS MEMBER J.S.** | Honorable Anita B. Brody |

**SUPPLEMENTAL OBJECTION TO MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION REGARDING
DISCHARGE OF ATTORNEY LIEN BY HOWARD AND ASSOCIATES, P.A.**

Shenaq PC ("Shenaq"), on behalf of its client and Settlement Class Member, J.S., requests that the Court review and set aside the Magistrate's Supplemental Report and Recommendation regarding the assertion of an Attorney Lien by Howard and Associates, P.A. ("Howard") in the National Football League's Player's Concussion Injury Litigation (the "Supp'l Report," ECF Doc. No. 11565). The Magistrate initially determined that Howard and Shenaq should split the fee from J.S.'s award 88/12 in favor of Howard. (the "Initial Report," ECF Doc. No. 11193). Shenaq objected, noting that the effect of the Magistrate's recommendation was to reward Howard for defrauding and harming J.S. (ECF Doc. No. 11209). While Shenaq's objection was pending, this Court remanded the recommendation to the Magistrate in light of the Claims Administrator's audit findings that Howard submitted materially inflated costs to the Court as part of his "wide-ranging, long-standing, and brazen pattern and practice of manufacturing evidence for submission to the Settlement Program,"[1] ultimately recommending Howard be permanently disqualified from participating in the Settlement Program. (ECF Doc. No. 11290). In the Supplemental Report, the Magistrate revised his recommendation to a 50/50 split between Shenaq and Howard. Shenaq and

---

[1] **Exhibit 5, Special Master's Rule 27 Decision Regarding Howard & Associates, June 22, 2021** at p.7

1

J.S. appreciate the Magistrate's diligence in revising his recommendation, but respectfully object for the following reasons.

Any fee awarded to Howard would be ill-gotten gains. Howard ensnared J.S. in predatory and usurious loans that benefited Howard directly and lied to J.S. about the nature of his representation and J.S.'s claim. Howard submitted false evidence that could have doomed J.S.'s claim, and certainly subjected it to audits which delayed the claim for years. Since the Initial Report was submitted, Howard has been permanently disqualified from participating in the Settlement Program and is pending permanent disbarment in Florida for engaging in conduct consistent with the avarice, fraud, and deceit J.S. experienced firsthand. Awarding Howard fees is also inconsistent with the remedy of fee disgorgement for unilaterally breaching his fiduciary duties to J.S. by (1) lying to J.S. about his ability to terminate Howard's services; (2) exposing J.S. to usurious loans benefitting Howard; (3) preparing J.S.'s potential claim with falsified information; and (4) lying to J.S. about whether the claim was filed. While Shenaq and J.S. do not object to any factual findings in either Report, they do respectfully object to the legal conclusion that, in light of the detailed record of his malfeasance, Howard is entitled to any fees whatsoever.

I. FACTUAL BACKGROUND

A. HOWARD IS PERMANENTLY DISQUALIFIED FROM THE SETTLEMENT PROGRAM.

Since the Initial Report was issued, Howard's gross malfeasance has been well documented, resulting in Howard being permanently disqualified from Settlement Program. **Exhibit 5,** *Special Masters' Rule 27 Decision on the Report of Adverse Finding Regarding Howard & Associates, PA.*, **June 22, 2021 at p.7.** The Rule 27 Decision included the following findings of fact, amid a litany of Howard's misdeeds:

- Howard & Associates engaged in a process of "continuous edits and changes passed from the doctors and testers to the law firm" to modify and alter its clients' medical reports;

- Howard instructed multiple medical providers to misrepresent class members' employment statuses, including J.S.'s;

- Howard manufactured score reports without adequate examinations and often performing sham examinations in Howard's own offices rather than a healthcare facility;

- Howard fabricated portions, and in one instance, the entirety, of medical reports; and

- Howard submitted materially inflated costs to the Court when seeking reimbursement for examination and services rendered by medical providers.

*Id*. at pp 4-5. The Special Masters summarized Howard's gross abuse of the Settlement Program:

> The facts here show that Howard & Associates directed doctors to falsely report Players' CDR scores and functional impairment, changed provider names and evaluation dates on medical records such that the reports wrongly appear to have been performed by doctors with the certifications required by the Settlement, and fabricated medical records in their entirety, each a material breach of the Settlement's requirements.

Id. at p.6. The Special Master determined "Howard & Associates engaged in a wide-ranging, long-standing, and brazen pattern and practice of manufacturing evidence for submission to the Settlement Program." *Id*. 7. As a result, Howard was "permanently disqualified from participation in Settlement Program." *Id*. at 7-8.

The Special Master also recognized that Howard's brazen misconduct harmed not only individual clients such as J.S., but overall "materially and adversely impacted the Settlement Program." *Id*. at p.7. The ripple effect of Howard's malfeasance includes greater measures the Settlement Program has been forced to institute to ensure transparency, resulting in further harm caused by Howard to class members who must now overcome additional hurdles and complications to establish their rightful claims.

Mr. Howard's pernicious and inadequate representation of clients such as J.S. has also resulted in him being sanctioned by the Florida Bar. **Exhibit 6, <u>Report of Referee</u>,** *The Florida*

*Bar v. Phillip T. Howard*, **SC19-488 and SC19-1579 (consolidated) in the Supreme Court of Florida, June 21, 2021**. The referee in the state bar proceedings concluded that Howard was guilty of nine different ethical violations, including: (i) failure to avoid conflicts of interest; (ii) lack of diligence; (iii) lack of competence; (iv) lack of candor; (v) failure to maintain personal integrity; (vi) false statements, fraud, and misrepresentation; (viii) deceptive conduct or statements and unreasonable or improper fees; and (ix) violation of a court order. *Id.* At pp. 12-13. As a result of these serious findings, the referee recommended that Howard be permanently disbarred from the practice of law. *Id.* at p. 15 ("It is difficult to see how even five (5) years from now [Howard] could or should be again placed in the position of trust held by attorneys in Florida…It is without pleasure that this Referee must make the following recommendation: <u>Disbarment</u>. It is the only appropriate sanction."). On January 10, 2022, the Florida Supreme Court dismissed Howard's challenge to that recommendation. **Exhibit 7, Order Jan. 10, 2022,** *The Florida Bar v. Phillip Timothy Howard*, **SC19-488 and SC19-1570, in the Supreme Court of Florida.**

    **B. HOWARD'S MISREPRESENTATION OF J.S.**

Howard did little to benefit J.S. In fact, his representation of J.S. was only detrimental to J.S.'s claims that were later submitted by Shenaq in 2018 and 2019:

- Howard retained a neurologist who relied upon testing from a neuropsychologist who lacked the appropriate credentials to allow a Qualifying Diagnosis under Settlement Agreement.

- These errors required a complete re-evaluation of J.S.'s claim delaying its submission by a year, which likely cost J.S. at least $100,000 because the age of the claimant is a factor affecting the amount of a player's claim under the NFL Settlement.

- Howard's use of improper doctors caused J.S.'s claims to be delayed by two audits.

4

- Howard failed to disclose these missteps to J.S. and his wife, leaving J.S. and his wife to incorrectly believe for nearly a year that J.S. received a Qualifying Diagnosis and that they would be compensated under the terms of the Settlement Agreement.

- Turning mishandling into outright victimization, Howard steered J.S. and his wife to a predatory lending company that advanced them money against J.S.'s eventual claim at a predatory and usurious 39.95% annual interest rate.

- Howard then failed to submit J.S.'s claim, leaving the clock spinning on usurious interest rates.

It was not until J.S. sought additional assistance from Shenaq that he received medical evaluations from appropriately credentialed physicians, which culminated in a Qualifying Diagnosis in 2018 and a more severe Qualifying Diagnosis in 2019, and a properly processed claim that was ultimately approved for more than $1.5 million. In September 2019, J.S. formally severed his relationship with Howard proceeding with Shenaq as his sole representative.

Notably, J.S. would have severed his relationship with Howard much earlier but for the fact that Howard misrepresented to him that if he severed his relationship with Howard, he would no longer have the benefit of working with Shenaq. At the hearing before the Magistrate, Mrs. Small testified as follows:

> And let me just say this. The only reason -- my husband wanted to sever your services, and I was like, but you represented to him kind of like if he severs your services that we wouldn't have access to Amir anymore, because he was your employee, and he worked for you.
>
> And that was a misrepresentation. Because we could secure his services. And you made my husband believe that without you, Amir wouldn't be there. And the only reason we had stayed there was because of Amir's services.
>
> And his fantastic and exemplary communication with us, and the way that he handled our case. So I -- I don't think the time frame that we left was even a factor,

5

because you misrepresented that, that he worked for you and pretty much that if we severed your services it would sever his services.

**Exhibit 3, Hrg. Tr. at 90:3-17.** Mrs. Small has supplemented her testimony, explaining that her husband would have terminated Howard's representation as early as May or June 2018, but for his misrepresentations at that time. **Exhibit 4, Unsworn Declaration of Renessa Small.** Following the October 28, 2019 resolution of his second audit, J.S.'s claim was approved for approximately $1.5 million. On December 13, 2019, Howard filed the attorneys' lien that is the subject of the Magistrate's Report. The Magistrate conducted an attorney lien hearing on July 7, 2020 and issued its Initial Report on September 28, 2020. The Magistrate issued its Supplemental Report on December 23, 2021.

## II.  OBJECTIONS TO MAGISTRATE'S REPORTS

In his Initial Report, the Magistrate conducted an analysis pursuant to the five *McKenzie* factors identified by the third circuit. *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*"). The *McKenzie* factors require the Court to consider (1) J.S.'s agreement with Howard at the time of contracting; (2) any change in circumstances by the time the court enforces the agreement; (3) the results obtained; (4) the quality of the work performed; and (5) how much of the work contributed to the result. *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 19-1760, 2020 WL 5409015, at *2 (3d Cir. Sept. 9, 2020). The Magistrate did not explicitly address the *McKenzie* factors in the Supplemental Report but revised his recommendation in light of the Audit Report and Special Masters' Decision. **Exhibit 2, Supp'l Report at 7** ("Based upon the information uncovered in the Audit and outlined in the Special Masters decision, we amend our prior Recommendation and allocate a much smaller fee to Howard in this matter."). Shenaq agrees that *McKenzie* provides the appropriate analysis, but objects to the Magistrate's

recommendation that Howard and Shenaq should equally share the fee. **Exhibit 2, Supp'l Report at 10.**

### A. THE MAGISTRATE'S FINDINGS OF FACT

The Magistrate's Report made several correct findings of fact concluding that not only did Howard do little to advance J.S.'s claim, he in fact hindered it, and that it was entirely through Shenaq's efforts that J.S. was able to successfully resolve his claim. These findings include:

- "We find that the delays J.S. experienced from the two audits initiated by the Claims Administrator are attributable to Howard and diminish the quality of work performed by Howard in its representation of J.S. between 2016 and 2019." **Exhibit 1, Initial Report at 14.**

- "The record reflects no deficiencies in the quality of Shenaq's work either at the time of his association with Howard or otherwise." **Exhibit 1, Initial Report at 14.**

- "Howard may have risked *exposing* J.S. to predatory lending practices." **Exhibit 1, Initial Report at 18.**

- "Shenaq later saved J.S. 'more than $90,000' when it assisted him in modifying the terms of loans that Howard allegedly recommended." **Exhibit 1, Initial Report at 18.**

- "Both firms shared a role in [shepherding the individual client through a claims process], although Howard largely chose to remain in the background and use Shenaq as the liaison with the Claims Administrator." **Exhibit 1, Initial Report at 17.**

7

- "The Audit Report has shed new light on the value (or lack thereof) of Howard's initial 'efforts' on Player's behalf and whether there was any benefit—or even a detriment—by having exposed Player to the evaluations that have provide only trouble to Player." **Exhibit 2, Supp'l Report at 8.**

- "Therefore, in light of this new information, and in recognition of Shenaq's continued work on behalf of Player in this lien dispute, we will recommend a larger share of the contingent fee be authorized for Shenaq." **Exhibit 2, Supp'l Report at 8.**

Shenaq does not object to these findings of fact. However, in light of Howard's general misconduct in the Settlement Program and specific mishandling and victimization of J.S., Shenaq and J.S. do object to the Magistrate's recommendation that Howard receive half of the attorneys' fees from J.S.'s claim.

### B. HOWARD SHOULD NOT RECOVER ANY FEES BECAUSE HE HAS BEEN PERMENANTLY DISQUALIFIED FROM PARTICIPATING IN THE SETTLEMENT PROGRAM

The Magistrate certainly considered the substance of the Special Masters' Rule 27 Decision detailing Howard's fraudulent conduct and abuse of the Settlement Program. However, the Supplemental Report appears not to appreciate the effect of the Special Masters' determination that Howard is "permanently disqualified from participation in the Settlement Program." **Exhibit 5,** *Special Masters' Rule 27 Decision on the Report of Adverse Finding Regarding Howard & Associates, PA.***, June 22, 2021 at p.8.** The Decision clarified that Howard may no longer "play any role in recruiting Settlement Class Members, in preparing Claims for submission, or in working on the adjudication of those Claims in the Appeals Process." *Id*. Howard should not be unjustly enriched from a Settlement Program he undermined and from which he has been

permanently disqualified. Denying Howard's request for fees altogether is consistent with the breadth of Howard's misconduct and disqualification, and the "foundational principle that 'it would be inequitable that a wrongdoer should make a profit out of his own wrong.'" *Liu v. Securities Exchange Commission*, 140 S.Ct. 1936, 1943, 207 L.Ed.2d 401 (2020) (quoting *Root v. Railway Co.*, 105 U.S. 189, 297, 26 L.Ed. 975 (1882).

### C. THE MAGISTRATE DID NOT CONSIDER UNREBUTTED EVIDENCE OF CHANGED CIRCUMSTANCES ARISING FROM HOWARD'S MISREPRESENTATIONS TO J.S.

The Supplemental Report also failed to correct the fundamental analytical flaw in the Initial Report. Under a proper *McKenzie* analysis, the Magistrate's findings would strongly support significantly reducing Howard's fee under the last three factors: (3) the results obtained; (4) the quality of the work performed (which the Magistrate correctly referred to as "the more important question in this analysis" (**Exhibit 1, Initial Report at 15**)); and (5) how much of the work contributed to the result. However, the Magistrate appears to have given undue consideration to the first factor, the fee agreement at the time of execution, at the expense of the other more important factors, and did not properly consider evidence of changed circumstances when enforcing that agreement.

Despite finding that Shenaq clearly did all the work that advanced J.S.'s claim, and that Howard hindered the claim, the Magistrate gave Howard full credit for Shenaq's work up until the point J.S. formally severed his relationship with Howard. The Magistrate held that "until September 20, 2019, when J.S. terminated Howard and entered into a CFA with Shenaq, work performed by Shenaq personnel was done in support of Howard's CFA with J.S." **Exhibit 1, Initial Report at 15.** The Magistrate determined that it "cannot conflate the two time periods." **Exhibit 1, Initial Report at 19**. The Magistrate reemphasized this fact in the supplemental report.

**Exhibit 2, Supp'l Report at 8** ("We also recognized that Shenaq only being its sole representation of Player—as opposed to the associated counsel arrangement with Howard, for which it would be reimbursed by Howard for expenditures—on September 20, 2019."). While the Magistrate reduced Howard's portion of the fee in his Supplemental Report on the basis that the Audit Report's finding that Howard's representation did not benefit J.S.'s claim, and in fact hindered it, the Magistrate did not set aside his prior analysis. Accordingly, the reasoning supporting the reduced award in the Supplemental Report must be based upon the Initial Report's reliance on the amount of time J.S. remained Howard's client prior to severing the relationship in September 2019.

However, neither the Initial nor Supplemental Reports considered evidence that the amount of time Howard represented J.S. was artificially enlarged because Howard mispresented to J.S. and his wife that if they severed their relationship with Howard, they would lose the benefit of working with Shenaq. If Howard had been honest with them, they would have severed their relationship with Howard as early as May or June of 2018. Mrs. J.S.'s testimony on the subject is not rebutted.

### D. THE MAGISTRATE UNDERRATED THE RISK BORNE BY SHENAQ.

While the Supplemental Report recognized that Howard's work did not benefit (and in fact was detrimental to) J.S.'s claim, it continued to underrate the risks borne by Shenaq associated with J.S.'s claim and overrate the fact that Howard reimbursed Shenaq less than $10,000 of costs incurred developing J.S.'s claim. The Magistrate based his recommendation significantly on his determination that "Shenaq conducted its work knowing it was operating under a CFA that might yield no recovery and thus no fee for counsel, yet Shenaq did not have to take upon itself the additional risk and burden of advancing costs on behalf of Player as did Howard." **Exhibit 2, Supp'l Report at p8 n9.** However, this does not accurately summarize the nature of the risks

borne by Shenaq, as a result of the co-counsel agreement Howard fraudulently induced Shenaq into accepting. Shenaq advanced these sums, not knowing whether Howard would honor his commitment to reimbursement. Shenaq's co-counsel relationship with Howard was plagued with similar problems, even requiring Shenaq to engage outside counsel on numerous occasions to address lengthy audits provoked by Howard's misconduct in the Settlement Program and defend itself against Howard's third-party creditors. Howard breached its co-counsel agreement with Shenaq on multiple occasions, leaving Shenaq exposed as one of Howard's many creditors from which Howard is currently seeking bankruptcy protection. Howard's reimbursement of less than $10,000 in costs associated with J.S.'s claim does not begin to accurately paint the picture of risk borne by Shenaq as a result of Howard's misdeeds.

In this specific case, Howard's use of fraudulent materials to prepare J.S.'s claim increased the risk of an appeal following J.S.'s diagnosis for Parkinson's Disease, which Shenaq would have had to bear the costs of retaining an expert to defend the appeal. Forcing Howard to honor his commitment in this case costed significant time and resources, and Howard still owes Shenaq significant sums incurred developing several other claims and indemnification obligations under the earlier co-counsel agreement. Howard's misconduct in the Settlement Program harmed many people, beginning with his clients and extending to the entire program, including counsel such as Shenaq. Much like the players should not bear the costs of Howard's misconduct, Shenaq should not be penalized for having the misfortune of encountering Howard.

### E. HOWARD'S BREACHES OF FIDUCIARY DUTY JUSTIFY FEE DISGORGEMENT.

"It is well-settled law, regardless of jurisdiction, that attorneys owe their clients a fiduciary duty." *Huber v. Taylor*, 469 F.3d 67, 81 (3d Cir. 2006). "The duty includes undivided loyalty, candor, and provision of material information." *Id*. Howard breached his fiduciary duties to J.S.

11

by (1) lying to J.S. and his wife about their ability to terminate his services; (2) luring J.S. and his wife into a predatory and usurious loan for his own benefit; (3) preparing false materials with respect to J.S.'s potential claim; and (4) lying to J.S. that he had filed his claim when he did not. *Huber v. Taylor*, 469 F.3d 67, 81 (3d Cir. 2006) ("The attorney stands in a fiduciary relationship with the client and should exercise professional judgment solely for the benefit of the client and free of compromising influences and loyalties."). These transgressions alone justify disgorging any fee Howard may be awarded. *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 415 (3d Cir. 2013) ("Generally, disgorgement claims for breach of fiduciary duty do not require that a plaintiff suffer a financial loss, as relief in a disgorgement claim 'is measured by the defendant's profits.' This is because disgorgement claims seek not to compensate for a loss, but to 'deprive[] wrongdoers of ill-gotten gains.'" (internal citations omitted)). But because the Magistrate declined to penalize Howard's misrepresentations, the opposite occurred, and Howard is in fact being awarded ill-gotten gains.

### III. CONCLUSION

Howard's disqualification from the Settlement Program should generally preclude any fee award. Howard's many breaches of fiduciary duty to J.S. mandates disgorging any fee associated with J.S.'s claim. The Magistrate failed to adequately consider these circumstances in either report, resulting in awarding Howard over $100,000 in ill-gotten gains from J.S. Shenaq did all the work that resulted in J.S.'s claim being awarded. Accordingly, on this record, Shenaq should be awarded the full fee. In the alternative, the half fee that the Magistrate recommended be awarded to Howard should be disgorged and returned to J.S.

Respectfully submitted,

SHENAQ PC

   /s/ Amir Shenaq
Amir Shenaq
State Bar No. 505281
3500 Lenox Road Ste. 1500
Atlanta, GA 30326
Telephone: (888) 909-9993
Telecopier: (713) 583-3538
E-mail: amir@shenaqpc.com

Attorney for Settlement Class Member J.S.

## **CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing Notice of Attorney's Lien to be served via the Electronic Case Filing (ECF) system in the United States District Court for the Eastern District of Pennsylvania, on all parties registered for CM/ECF in the litigation.

Dated: January 18, 2022.

                                            */s/ Amir Shenaq*
                                            Amir Shenaq