IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HOWARD & ASSOCIATES, P.A., | ) | 12-MD-2323 |
| | ) | |
| Plaintiff, | ) | (Heard via Zoom) |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| JESSIE SMALL, | ) | Philadelphia, PA |
| | ) | July 7, 2020 |
| Defendant. | ) | 9:54 a.m. |

TRANSCRIPT OF ATTORNEY LIEN HEARING
BEFORE THE HONORABLE DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:     PHILLIP TIMOTHY HOWARD, ESQUIRE
                       HOWARD & ASSOCIATES, P.A.
                       1415 East Piedmont Drive, Ste. 5
                       Tallahassee, FL  32308


For the Defendant:     AMIR SHENAQ, ESQUIRE
                       SHENAQ, P.C.
                       3500 Lenox Road, Ste. 1500
                       Atlanta, GA  30326


Audio Operator:        ALISHA KINLAW


Transcribed by:        DIANA DOMAN TRANSCRIBING, LLC
                       P.O. Box 129
                       Gibbsboro, New Jersey  08026-0129
                       Office:   (856) 435-7172
                       Fax:      (856) 435-7124
                       Email:    dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Exhibit**

**3**

1                                I N D E X

2    ARGUMENT:                                         PAGE

3    By Mr. Howard                                3, 106, 113

4    By Mr. Shenaq                                14, 109

5

6    WITNESS:          DIRECT    CROSS    REDIRECT    RECROSS

7    Amir Shenaq                47/How

8    Renessa Small     65/She    86/How

9

10   EXHIBITS MARKED:                              IDENT.   EVID.

11   Exhibit 1  (Document refers to termination)     84

12

13   THE COURT

14   Colloquy                                        115

15

16

17

18

19   *Inaudibles due to static or blips in audio on Zoom.

20

21

22

23

24

25

1          (The following was heard via Zoom at 9:54 a.m.)

2                THE COURT:  Mr. Shenaq is on?  Sir, yes?

3                MR. SHENAQ:  Yes, Your Honor.

4                THE COURT:  Mr. Howard?  Good morning, Mr. Howard.

5                MR. HOWARD:  Good morning.

6                THE COURT:  And just in terms of other faces, my law

7      clerk, who is the Zoom master for this in my office, deals

8      with all these Zoom things, Alisha is on.  You'll see her

9      face.  And Mr. and Mrs. Small.  Good morning.

10               ALL:  Good morning.

11               THE CLERK:  Judge, if I may interrupt quickly, I

12     think your video is not on.

13               THE COURT:  Oh, me?  My video is not on.  Okay.

14               MR. SHENAQ:  Yeah.

15               THE COURT:  There you go.  So now they can see me,

16     instead of just hear me.

17               THE CLERK:  Can you click it one more time?  There

18     you go.

19               THE COURT:  We got that?

20               THE CLERK:  Uh-huh.

21               THE COURT:  All righty.  Let's see who else we have

22     here.

23               UNIDENTIFIED COUNSEL:  Your Honor, as I mentioned,

24     there are a few law students, and thank you for not objecting

25     to their participation.  These are students who've just

1    finished their first year of law school and are spending time

2    with me.  Unfortunately, it's all remote but spend time with

3    me on a number of different things that I handle.

4            THE COURT:  Okay.  So this morning we are here in

5    order to resolve a question with respect to the question of

6    allocation of attorneys -- the attorneys fee associated with

7    the claim that was presented to the NFL through the claims

8    administrator by Mr. Small and certain claims represented by

9    Mr. Howard -- apparently, at some point represented by Mr.

10   Howard and in connection with Mr. Shenaq.  And then

11   subsequently -- and as I understand it, in December of 2019 --

12   sorry, September of 2019, more fully represented by Mr.

13   Shenaq, when there was a termination notice with respect to

14   Mr. Howard.

15           So, Mr. Howard, we -- I see you here today as the

16   individual who has asserted the lien.  I see you, therefore,

17   as a moving party and also would point out that you also made

18   a request -- you're the individual who made the request -- I'm

19   not criticizing you in any way at all but made the request for

20   the hearing, which we have now granted.  I would like to at

21   least try to make clear, if I can, the documents that have

22   been submitted.  And, Mr. Howard, this is not going to have

23   any impact upon anything that I do, but we didn't get from you

24   a Statement of Dispute, but we got your position in the

25   response to Mr. Shenaq's Statement of Dispute.  And in

1   connection with that, you did append certain exhibits which I

2   believe were characterized in your documents by letters

3   Exhibits A through F.

4           And then, as to Mr. Shenaq, there were exhibits that

5   were presented at the time that he submitted his Statement of

6   Dispute of which I have it that there were three.  And then

7   Mr. Shenaq, on behalf of Mr. Smalls (sic), further appended

8   Exhibits 1 through 11 at the time that he responded to the

9   notification that this hearing was going to take place and an

10  indication on our part that we would be prepared to accept

11  certain hearings -- certain exhibits -- if exhibits wanted to

12  be offered, the opportunity for them to be -- to be offered.

13  And we have, I believe, 11 exhibits that fit within that

14  category.  But those are all things that have been before us.

15  I know that there have been certain objections with respect to

16  some exhibits.

17          I want to hear from the moving party -- I mean,

18  initially, with you, Mr. Howard, and then from Mr. Shenaq.

19  And you want to cover what's in the exhibits, it's up to you,

20  any way you want to make your presentation.  Considering that

21  I'm here for the purpose of residing over these proceedings

22  and ultimately to make a recommendation to Judge Brody, since

23  this is not a consent case for me to make final resolution.

24  It is to make a recommendation upon certain findings of fact

25  and is -- as I think you've indicated, Mr. Howard -- although

1   you did ask for the hearing, you did indicate, also, as I

2   understand it, that you didn't believe there were significant

3   disputes of fact.  I think from the way in which you looked at

4   the -- at the case, that may well be -- that may well be the

5   case.

6          Okay.  We'll leave that -- we'll leave that for now,

7   but I'm going to ask you to -- well, I'm going to indicate,

8   broadly speaking, I have the exhibits.  I've looked at certain

9   of the exhibits.  Varying degrees of intensity, quite frankly.

10  Those exhibits that appear to me to be relevant and might

11  potentially have some bearing will be identified.  There will

12  be other exhibits that will have limited bearing, but I'm not

13  going to exclude them.  I want to hear from Mr. Shenaq and

14  even from yourself as to why you think certain exhibits ought

15  to be offered and were not offered.

16         But enough of that.  So I also would ask, if we may

17  -- Mr. Howard, no offense meant.  I'm going to ask Mr. Shenaq

18  the same thing.  To the extent that the presentation seems to

19  me will necessarily have to have certain factual references to

20  it, there may be some disagreement between you and Mr. Shenaq

21  as to certain facts.  I'm going to ask you, Mr. Howard -- and

22  I must ask Alisha to remind me when I go to Mr. Shenaq -- ask

23  Mr. Shenaq, then ask Mr. and Mrs. Smalls.  If you'd be good

24  enough, please, to raise your right hand.  And then, Mr.

25  Howard, are you able to hear me?  (No audible response)  So if

1    you'd raise your right hand, sir.

2              TIMOTHY HOWARD, PLAINTIFF, SWORN

3              THE COURT:  Okay.  Thank you very much, Mr. Howard.

4    Okay.  You're on.

5              MR. HOWARD:  Well, Your Honor, I don't think this is

6    that complicated.

7              THE COURT: (Laughter)  You know, how would I make

8    things more complicated.  That's not a good trait to have.

9              MR. HOWARD:  Right.  So we entered a contract on

10   December 6, 2016.  We represented the client until September

11   of 2019; for two years and nine months.  We did preliminary

12   testing with both Dr. Koberda and Dr. -- I mean, Koberda and

13   another doctor out of Orlando.  And they're both MAF approved

14   and certified.  We paid for all costs, we paid for all travel,

15   we helped the client dealing with emotional issues, dealing

16   with suicidal ideations, dealing with Workers' Compensation,

17   dealing with Disability.  We had staff that was always on-

18   call, driving to his home, counseling him.  We have emails

19   non-stop going on because this client had a lot of issues,

20   both, with his wife's concern about Disability.  Both of them

21   were out of work for a long time.  They have a child that has

22   autism, and they had a hard time managing all those pieces, as

23   well.  He was -- he had lost his job at Florida A&M, and that

24   was challenging for him, as well.

25              We had various meetings in the office.  And we

1   eventually found co-counsel.  They had a lot of success

2   experience -- Mr. Shenaq.  We entered into -- invited him

3   onboard with about 320 clients in April and May of 2018, and

4   we proceeded to pay for all of this testing costs.  Mr. Shenaq

5   has paid for nothing, has no investment of capital at all in

6   the process.  He has about two paralegals that does work

7   administratively, and that's the full extent of the staff.

8   Whereas, we have been -- any need that Mr. Small has had over

9   the two years and nine months we've been there servicing that.

10  The records prove that.

11          And we finally got an award letter in around May of

12  2019.  It took awhile because his condition kept on

13  deteriorating.  He went from a level 2.0 to a Parkinson's.

14  And with the Parkinson's, his award was ultimately, I think,

15  1.9 million.  Everything was fine.  Apparently, both Mr. Small

16  and some of his cohorts, Myron Guyton and I think another

17  gentleman, Aaron Jones, I think it is, they wanted a discount

18  on their fees.  And we had never agreed to give them a

19  discount on the fees.  And -- but now I could not -- I was not

20  opposing the discount; it was fine with me.  But I could not

21  require my co-counsel to do that, and I couldn't require the

22  advanced lender to do that.  So we were not able to do a

23  discount on the fees.  And once we were not able to do a

24  discount on the fees, that's when he dropped us, five months

25  after the award letter, five months after the contingency had

1    already been perfected.

2              Under Florida law, you cannot -- once the -- the

3    contingency takes place, you cannot, after the fact, drop the

4    attorney and say you're not entitled to pay them.  If that's

5    the case, every client in the world would wait till they got

6    their $2 million judgments, and the attorney spends all the

7    money and they drop them and not pay the fee.  It's -- that's

8    why the law is the way the law is.  If that happens in real

9    estate, you don't close the deal and then say I'm not going to

10   pay you the commission.  And you don't complete the legal

11   representation and went across the line, make sure his family

12   is secure with 1.9 million recovery and then after that's

13   done, five months later say we're not going to pay you a fee.

14             It's not that complicated.  There's a lot of smoke

15   out there because people have attacked me, but they're all

16   unproven allegations and those are all fading away bit by bit.

17   And smoke does not mean there's fire.  It's just smoke upon

18   smoke.  I'm used to being attacked.  I've been attacked my

19   entire career.  We deal with -- that happened in a tobacco

20   case 20 years ago.  They said I was a rat, even though we won

21   the largest cases in the world, and we all got paid very well

22   in the process.  So being attacked is not the issue.  Ad

23   hominem attacks are basically what you're seeing from both Mr.

24   Shenaq and the -- and the press.  And the last I heard, ad

25   hominem does not make truth, it's just ad hominem.  And so I'm

Howard - Argument                                        10

1   going to go forward.  You can call me a snake, you can call me

2   a worm, you can call me whatever you want to call me, but I'm

3   going to stand for what I've done, what we do and keep on

4   doing truth.  And that's it.

5          THE COURT:  I call you only a counsel who is seeking

6   relief he's entitled to with respect to the percentage of the

7   award and the enforcement of the agreement that you have.

8          MR. HOWARD:  Correct.

9          THE COURT:  Let me -- let me put out a couple

10  things, if I may.  And by the way, as part of the process

11  here, I do think Mr. Shenaq should have the opportunity to ask

12  questions of you if he cares to do so with respect to any

13  factual references, and you of him when he makes certain

14  factual references.

15         MR. HOWARD:  Yeah.

16         THE COURT:  But I would ask you whether or not you

17  have reviewed any of the opinions that have come out from this

18  particular MDL referring to the circumstances of how it is

19  that counsel fees and contingency arrangements are ultimately

20  handled.  There's a -- there's a -- civil opinions, the --

21  sort of the motherlode of the big opinions was in January of

22  2019, when citing a case called McKenzie, the Third Circuit,

23  which we believe from, I think, what you've found in that

24  opinion and is -- I would consider to be guiding principle --

25  perhaps a guiding principle for me, even here, would be that

1   the consideration with respect to choice of law, as it were,

2   indicates that the -- that the issue about the opponent

3   counsel fee needs to be -- needs to be resolved by virtue of

4   Third Circuit law.  And Third Circuit law, essentially, says

5   we take a look at the situation, the contingency fee contract

6   that was executed, and then compare it to the time that the --

7   that the situation either has become full -- all the way

8   through the process or you've been -- or you've been

9   terminated.  And as you point out, you were terminated when

10  there had been a notice of monetary award, as I understand it.

11  Although I do understand, also, that the claim was in audit at

12  the time that the second audit was involved in this claim, and

13  that it was not until December of 2019, where, finally, the

14  award came to be paid.  Is that --

15          MR. HOWARD:  Yeah, there was an issue with the

16  dollar amount, so I think it was sometime in late 2019.

17          THE COURT:  Yes, but subsequent to your being

18  terminated?

19          MR. HOWARD:  Yeah, three months later.  Yes,

20  correct.

21          THE COURT:  Okay.  All right.  So -- and at that

22  point there was -- at least the audit process was -- had not

23  yet been completed up to that time.  Okay.  So just a narrow

24  -- a narrow point.  But I guess what I'm saying to you is that

25  it may very well be that the resolution of this is one that we

1    -- I feel that we have to look at as a Magistrate Judge doing

2    this recommendation for Judge Brody based upon the McKenzie

3    analysis and lots of different factors that go into this, some

4    of which are the factors that you would ordinarily expect.

5           You know, at the time that you came into the case,

6    obviously, the -- the class action had been -- the class had

7    been formed, the administrative process was just getting

8    geared up, registrations were being accepted in early of 2017,

9    I believe it was.  And so that when -- you know, when you came

10   in, it was really more of an administrative process as opposed

11   to an (inaudible) with the earlier lawyers who became class

12   counsel.  It's not a knock, it just happened to be the way

13   that -- the way that it was.  But we did a lot of analysis

14   with respect to all of that.  All right.  Thank you for that

15   presentation.

16          Mr. Shenaq, is there anything that you would like to

17   ask Mr. Howard at this time?

18          MR. SHENAQ:  No, Your Honor, I don't have any

19   questions for Mr. Howard.  Although, at some point I would

20   like to give the Smalls -- in particular, Mrs. Small -- an

21   opportunity to be able to provide some of their perspectives

22   surrounding simple terms.

23          THE COURT:  Sure.  I will certainly -- you'll

24   certainly have that -- certainly have that opportunity.

25          Okay.  So, Mr. Howard -- so, I hear what you -- I

1    hear what you have to say and I -- it's pretty much consistent

2    with the way you made it out for me in the -- in the paper

3    documents, maybe feeling more of a matter of interpretation of

4    the -- of the legal question would be the principal -- I guess

5    the principal concern sort of raised by this.  But is there

6    anything else that you'd like to say or to add, given the

7    remarks that I've made, or anything else?

8              MR. HOWARD:  No, Your Honor, we -- I've not gone

9    through the McKenzie standards, but what I need to articulate

10   was that you look at the time of representation and the amount

11   of time that I was there and we -- you know, again, we just

12   started representation of December of 2016, and we actually

13   still represented a client up to September of 2019.  And, in

14   fact, you know, we argue that even Shenaq -- we paid for

15   Shenaq's costs (inaudible) we're still representing Mr. Small,

16   even through Shenaq.  So -- but for us there is no Amir Shenaq

17   involved in this process.  So -- and we're still paying for

18   the costs of this case, and we paid for all the costs of all

19   Shenaq's testing and work that he does for our clients.  Joint

20   clients, in fact.  We only represented --

21             THE COURT:  Joint clients?

22             MR. HOWARD:  Correct.

23             THE COURT:  Okay.  And was that -- was that

24   arrangement committed to a written form?

25             MR. HOWARD:  Yes, it is, Your Honor.  We have a

1    joint -- prosecution joint co-counsel arrangement that we're

2    still complying.

3              THE COURT:  Okay.  All right.  Let's hear from Mr.

4    Shenaq.

5              MR. SHENAQ:  Your Honor, thank you.  Amir Shenaq,

6    for the record, co-counsel --

7              THE CLERK:  Swear him in.

8              THE COURT:  Oh.  Thank you, Alisha.

9              I warned everybody this might happen.

10             AMIR SHENAQ, DEFENSE COUNSEL, SWORN

11             THE COURT:  All right.  Thank you, sir.

12             MR. SHENAQ:  Thank you, Your Honor.  On behalf of

13   Jessie Small, we're here today asking the Court to grant

14   relief to discharge Howard & Associates' attorney lien in its

15   entirety and only award those expenses to Howard & Associates

16   that this Court deems reasonable and appropriate.  Your Honor,

17   it's our contention that there are no such expenses under

18   these circumstances.  The medical doctors that Howard &

19   Associates engaged at the beginning of Mr. Small's NFL

20   concussion claim process could not even render a diagnosis for

21   Mr. Small that would even entitle Mr. Small to submit a claim

22   into the settlement program.  The methods in which the doctors

23   used as far as the evaluation of Mr. Small were suspect.  The

24   manner in which the reports were procured were highly suspect,

25   as well.

1          In addition to that, Your Honor, many of these

2     expenses were not actually advanced by Howard & Associates but

3     rather by a hedge fund that Howard & Associates controlled.

4     Mr. Small had no privity, no agreement with any hedge fund to

5     advance expenses on behalf of this case.  As you've

6     recognized, Your Honor, in your June 4th holding, it is the

7     principles of <u>McKenzie</u> that guides the Court as it relates to

8     adjudication of attorney lien disputes such as this one.

9          In addition to that, in particular, Your Honor, the

10    June 4th opinion also acknowledged that a private agreement

11    amongst attorneys was not relevant as it relates to the

12    analysis of <u>McKenzie</u>.  Looking through the lens of <u>McKenzie</u>

13    and applying these facts at hand, Your Honor, the facts

14    strongly support our contention that the entirety of the

15    attorney fee in this case should be awarded to Shenaq, P.C.,

16    and any expenses that have been withheld by the claims

17    administrator on the Smalls' claim should, in fact, be

18    refunded to the Smalls, given that there is no -- they were

19    not reasonable under the circumstances.

20         And, Your Honor, you know, even setting aside the

21    fact that we do know that Florida law does not govern this

22    dispute -- even taking Mr. Howard's argument and even assuming

23    that Florida law is applicable here, and even assuming that

24    the Florida case that they cite is applicable, Mr. Howard

25    would still not be entitled to any contingency fee.  There was

1   no such contingency, Your Honor, that had taken place prior to

2   Mr. Small's termination of Howard & Associates on September

3   20, 2019.  In fact, Mr. Small was far from receiving any of

4   the benefits under the settlement, agreeing that Mr. Small's

5   claim was in the midst of a second audit, Your Honor.

6         An audit process completely suspends any sort of

7   monetary award and, in fact, retracts a monetary award and

8   post an audit, Your Honor.  The claim is reevaluated and an

9   award may be reissued, assuming that the audit process was

10  navigated and completed successfully.  Mr. Small had an

11  initial audit of his claim back in early 2019, Your Honor.

12  That audit process spanned seven months.  You know, at the

13  outset we're never given a finite time frame of how long an

14  audit would last.  The scope of the audit and the purpose of

15  the audit, as Your Honor is probably aware, is to ensure the

16  veracity of claims that have been filed into the settlement

17  program.  And that requires a settlement class member to

18  provide written discovery responses in the form of responses

19  to interrogatories, document production requests, until the

20  claims administrator is satisfied that they have all the

21  information they need to verify the veracity of a particular

22  claim.

23        What's, you know, notable in this circumstance, Your

24  Honor, is that the audit of Mr. Small's claim for the

25  Parkinson's claim was actually triggered by medical doctors

1    that Howard engaged -- the conduct that Howard engaged in with

2    these medical doctors in 2017.  None of those medical reports

3    had any bearing to the Small's Parkinson diagnosis for the

4    claim that was under consideration, yet -- or the very reason

5    why Mr. Small's claim was held up in audit a second time.

6    Even assuming, Your Honor, that a retired player successfully

7    navigates the audit process, in the case of Mr. Small, who was

8    diagnosed in his early '50s with a diagnosis as severe as

9    Parkinson's, would likely face -- and there's a high risk of

10   dealing with an NFL -- you know, given the severity of his

11   diagnosis that he alleged at such a young age and the high

12   value of any monetary award the NFL would have had to pay,

13   Your Honor, we were -- we were prepared to brief and respond

14   to any such NFL appeal.  And as you've acknowledged, that is a

15   significant risk to the progression and the ultimate receipt

16   of any benefits under the NFL Concussion Settlement agreement

17   and obviously requires skilled advocacy in order to

18   successfully oppose an appeal filed by the NFL and the lawyers

19   of Paul, Weiss.  Fortunately, that didn't happen here, but

20   that was certainly a risk that we faced and another hurdle to

21   any sort of contingency that may have occurred.

22            In addition, Your Honor, if we look even closer at

23   the fee agreement that the Smalls entered into with Howard &

24   Associates in December of 2016, there is a specific provision

25   that outlines what happens when the attorney is discharged for

1    representation.  And specifically, in that document it

2    provides that Howard & Associates is entitled to a lien for

3    the expenses incurred in connection with the representation,

4    as well as a lien for the time that they spent on the case.

5    Your Honor, it's our contention that the time Howard &

6    Associates spent on the case was *de minimis* at best, and the

7    conduct of Howard & Associates early on in Mr. Small's claim

8    process undermine the prospects of Mr. Small getting recovery.

9    And, therefore, it's our position that the time they spent

10   provided absolutely no value to the Smalls with respect to the

11   claim that they were ultimately paid for.

12            And if you look even further, Your Honor, in Howard

13   & Associates cumulative Exhibit A, which referenced 1,800

14   pages of documents to support the notion that they actually

15   did any meaningful work to the Smalls, it contained

16   approximately 1,400 pages of duplicative material, of which

17   none had any bearing to the claim that Mr. Small was

18   ultimately paid for.  However, if you did closely examine what

19   was in the contents of that production which Howard &

20   Associates produced to justify the work they did for Mr.

21   Small, there were some very, very concerning things in that

22   production, Your Honor.  And I would like to introduce Exhibit

23   2, to show the sort of work that Howard & Associates alleges

24   that they have performed and actually stated that they

25   performed.  Because this is not the nature of legal work that

1   -- you know, that any lawyer, you know, should be engaging in.

2   I'm happy to do a screen share, Your Honor, to show Exhibit 2.

3   Or alternatively, I can read for the record the contents of

4   Exhibit 2.

5            THE COURT:  Is it Exhibit 2 of the -- you submitted

6   at the time of your statement of dispute?

7            MR. SHENAQ:  No, Your Honor, these are the 11

8   exhibits that we requested the Court admit into the record for

9   purposes of the hearing today.

10           THE COURT:  So Exhibit 2 then is a portion of what

11  was in the cumulative Exhibit A that was submitted by Mr.

12  Howard?

13           MR. SHENAQ:  Yes, Your Honor.  However, you know, we

14  want to flag certain items, given the voluminous production

15  and the fact that certain documents would likely be missed if

16  they were not specifically flagged.

17           THE COURT:  Yes.  Okay.  Well, I appreciate that.

18  And we did take note of that.  I think Alisha may have it up

19  on part of the screen or screen share.  If you want to go

20  ahead -- I'm out of my league now in terms of how this works.

21           MR. SHENAQ:  Sure.

22           THE COURT:  If you want to go ahead and screen

23  share.  You're saying what I will then see, and everybody in

24  the conference will see, will be a document, and you'll be

25  able to speak and address issues in the process?

1          MR. SHENAQ:  Yes, Your Honor.

2          THE COURT:  All right.  Let's give that a try.

3          MR. SHENAQ:  Alisha, it shows that the host has

4     disabled screen share.  Is it possible to --

5          THE COURT:  It's very possible.

6          MR. SHENAQ:  Okay.

7          THE CLERK:  Yeah.  So I think that I will have to do

8     it then --

9          MR. SHENAQ:  Okay.

10          THE CLERK:  -- if that's okay?

11          MR. SHENAQ:  No problem.

12          THE CLERK:  Okay.

13          MR. SHENAQ:  Okay.

14          THE CLERK:  I think you all see it.

15          MR. SHENAQ:  Okay.  Your Honor, Exhibit 2 reflects

16     an email that was produced by Howard & Associates in their

17     cumulative Exhibit A, which was part of their response to

18     Shenaq, P.C.'s Rule 23 Statement of Dispute.  The subject of

19     the email, Your Honor, is "F-J report names."  It was an email

20     from Erin Murphy, who was an employee and I believe an

21     attorney of Howard & Associates, to another individual of

22     Howard & Associates, Duante Smith, dated Thursday, August 31,

23     2017.  The email states, "Hey, Duante, here are some more

24     names for you to type a report for.  All Ford-Johnson or

25     Hopper reports can be found in the one drive."  There are a

Shenaq - Argument                                    21

1    list of a number of names, including my client, Jessie Small,

2    in this email.  You know, what is very peculiar, Your Honor,

3    is that law firms typically -- especially in this settlement,

4    do not type reports for medical doctors.  You know, that is,

5    you know, one thing that was highly concerning.

6              Alisha, can you flip to the next email?

7              THE COURT:  Before you -- before you do that, Mr.

8    Shenaq, if you scroll down, does this document have a Bates

9    number on it?

10             MR. SHENAQ:  It does.  1290 is --

11             THE COURT:  Yes, make sure they're all uniquely

12   identified.  Okay.

13             MR. SHENAQ:  Okay.  Bates number 1290.

14             THE COURT:  Okay.

15             MR. SHENAQ:  Alisha, could you flip to the next

16   email?  Thank you.

17             THE COURT:  Give us the Bates number on that.

18             MR. SHENAQ:  This is Bates number --

19             Alisha, could you scroll to the bottom?

20             -- 1202, Your Honor.

21             THE COURT:  Okay.

22             MR. SHENAQ:  This is another email from Erin Murphy

23   to Duante Smith, both of whom are Howard & Associates

24   employees.  This was dated September 13, 2017.  Although it

25   does not appear particularly -- it doesn't reference Jessie

1    Small, it was part of Howard's production.  It states, "Hey,

2    Duante, you can do the reports for Eric Joyce and Darryl

3    Ashmore.  Both should be in the one drive.  If you have any

4    questions, please let me know."

5           Again, it's concerning that the office appears to be

6    writing reports on behalf of medical doctors who were

7    supposedly tasked with evaluating these retired players and

8    also preparing, you know, expert reports to support any claim

9    of diagnosis.

10          Alisha, can you flip to the next email as well,

11   please?

12          This one is Bates 1203, Your Honor.  This email is

13   from Duante Smith to Erin Murphy, dated Wednesday, September

14   13, 2017.  Your Honor, this email is a link, which, at the

15   time of production, if you were to click on the link, would

16   actually take you to a share folder drive that contained

17   approximately 80 medical reports that appears to be what

18   Howard & Associates' office used to either write reports,

19   modify, or alter reports.  I'm not sure what but, you know,

20   that was the link.

21          Alisha, could you flip to the next document?

22          Okay.  Your Honor, this document was not in Howard's

23   production, but this is a screen shot, Your Honor.  When you

24   do click the link -- this is what one sees when you click the

25   link.  For the record, the title of the folder is called "NFL

1   Master Player File pdf-word." Your Honor, I am not a computer

2   expert, however, you know, the titling of this folder, "pdf-

3   word" implies to me that these were pdf documents converted to

4   Word document. Typically, what these (inaudible) as you can

5   imagine, this is highly, highly suspect. And this was the

6   basis for the second audit that the Smalls had to endure yet

7   again. All of -- all of this, again, was before my firm got

8   involved in the case.

9          THE COURT: Hang on just a minute. This comes up as

10  part of your Exhibit 2, which came from his Attachment A, but

11  you're saying that this particular page is not part of that

12  exhibit.

13         MR. SHENAQ: Well, Your Honor, it is. It is because

14  Howard & Associates provided a link. And that link, when you

15  clicked on it, it would take you to that particular folder.

16  And --

17         THE COURT: Oh, I see.

18         MR. SHENAQ: -- that was a screen shot to preserve

19  the contents of the folder before any action was taken by

20  Howard & Associates to remove those files. So to avoid any

21  inference or suggestion that this didn't exist, I wanted to

22  preserve it for the record, Your Honor.

23         THE COURT: I understand.

24         MR. SHENAQ: Alisha, could you flip to the next

25  page, please?

1          This also shows, Your Honor -- same page -- shows

2     that the owner of the ShareFile is Kyla DeRobbio, who is

3     another employee of Howard & Associates.

4          Next page, Alisha, please.

5          Okay.  Your Honor, this is Bates number 628, Your

6     Honor.  And this was another document that was part of Howard

7     & Associates production.  This is an email from Tim Howard

8     personally to a number of individuals, including an MAF-

9     approved neurologist who supposedly evaluated Mr. Small in

10    late 2017.  You know, there are some concerning things that I

11    wanted to flag for you, and I'm going to read this for the

12    record, Your Honor.  It says, "Dear Tara, dates all look good.

13    This is the best approach.  Dr. Sadek's report coming about a

14    month later works."

15         I'm going to skip the next paragraph.  The third

16    paragraph, Your Honor, says, "Another item that we need to

17    focus on for every claims is to ensure that employment

18    comments are consistent in the underlying CDR and

19    neuropsychological reports and Dr. Sadek's report all showing

20    that there is no current employment.  Note, if there is any

21    employment, the claim will be denied."

22         Your Honor, to suggest that the doctor take a one-

23    size-fits-all approach and ignore the facts and the

24    circumstances of a individual player and take an approach that

25    tries to -- you know, try to beat or cheat the settlement

1    process is very concerning, Your Honor.  And this is the type

2    of work that Tim Howard and his firm alleges that they

3    performed on behalf of the Smalls that they believe led to the

4    results in Mr. Small's case.  None of these medical records,

5    Your Honor, were utilized for the purposes of Mr. Small's

6    Parkinson's claim, yet these were the very things, Your Honor,

7    that served as a detriment to Mr. Small moving his case

8    forward.

9             THE COURT:  Let me just interrupt you for a second

10   and ask you something about the way in which the information

11   was utilized here.  And I take your point with respect to what

12   you see as to circumstances of this looking rather suspicious,

13   but was the information at this stage, back in 2017, to your

14   knowledge, utilized at the time that the claim -- the first

15   claim was put in, which was later withdrawn?  And I understand

16   that to be sometime in the spring of 2018, close in time to

17   when it was that you effectuated an association with Mr.

18   Howard?

19            MR. SHENAQ:  No, Your Honor, none of these medical

20   reports were utilized in any manner for the Smalls' first

21   claim or the second claim.  In fact, when I -- when I was

22   associated into the case by the Smalls, Your Honor, the Smalls

23   had no claim.  No claim had ever been filed on their case.  I

24   started from scratch with evaluations with new MAF

25   neurologists and a VAP-approved neuropsychologist, Dr.

1   Randolph Evans, and a neuropsychologist -- the name escapes me

2   at the moment, Your Honor.  But both of those physicians were

3   approved and performed an evaluation from scratch, without

4   utilizing any of this prior information.

5           THE COURT:  Okay.  Is that including anything that

6   would have come from Dr. Lloyd or Dr. Morgan?

7           MR. SHENAQ:  Your Honor, we did not provide this

8   documentation.  It is our understanding that Dr. Sadek had

9   uploaded this documentation into the NFL Concussion Settlement

10  portal, and this documentation was obtained by the claims

11  administrator during the course of the first audit of Mr.

12  Small.

13          THE COURT:  And that was -- that was -- what was --

14  the result of that audit was what?

15          MR. SHENAQ:  Your Honor, there was never a

16  completion or culmination of that audit.  That audit went away

17  when we took steps to withdraw Mr. Smalls' claim --

18          THE COURT:  Okay.

19          MR. SHENAQ:  -- because we obtained, you know, a

20  diagnosis of Parkinson's for him based upon, you know, records

21  that I had uncovered when reviewing some of his primary care

22  doctor's records.

23          THE COURT:  Okay.  So you're saying it was your work

24  that brought about that particular claim?  And I believe that

25  claim was for cognitive impairment 2.0; is that right?

1          MR. SHENAQ:  Yes, Your Honor, 100 percent.  100

2   percent.  And, you know, at any point, Your Honor, I'm happy

3   to have Mrs. Small opine because, you know, her perspective, I

4   think, is going to be very helpful in aiding --

5          THE COURT:  What I just get that that was -- that

6   was based upon physicians that were providing information --

7          MR. HOWARD: Your Honor, we --

8          THE COURT:  -- is that right?

9          MR. SHENAQ:  I'm sorry --

10         MR. HOWARD:  -- lost -- we lost connection about ten

11  minutes ago.

12         THE COURT:  Oh.

13         MR. HOWARD:  Five minutes ago.  We're back online.

14  We had a -- we had a break.  I left at the medical reports

15  discussion dealing with the skipping of paragraph 2.  So the

16  inference was "all showing" there's no current -- and it's a

17  -- suddenly what happened.  And that's where I broke off,

18  would be skipping paragraph 2 and going to the "all showing"

19  there's no current employment.

20         THE COURT:  Yes.  Okay.  Well, we got to -- we got

21  to fix that.  Alisha, can you -- are you able to see what

22  happened here?

23         THE CLERK:  Can you hear me?

24         THE COURT:  Yes, I can hear you.

25         THE CLERK:  I think he just had an internet issue.

1    I think everyone else was still here.

2              MR. HOWARD:  Right.  Yeah, there was -- we got a lot

3    of rain here and the wi-fi dropped -- shut down, so I had to

4    go into another Zoom.

5              THE COURT:  Okay.  So, Mr. Howard -- and -- was the

6    document that is now on the screen -- this "Dear Tara"

7    document, apparently from you, was that where -- is that where

8    you were at the time that you lost connection?

9              MR. HOWARD:  Correct.  Mr. Shenaq had skipped

10   paragraph (inaudible -- static) to paragraph 3.  And there's

11   the word "all showing" for employment that was referring to

12   the two reports.  But that's where I left off.

13             THE COURT:  All right.  So pick up at that point,

14   Mr. Shenaq.

15             MR. SHENAQ:  Yeah.

16             THE COURT:  Can we hear -- I'm not sure if you can

17   do this, but is there a way in which you can visually or at

18   least send a text, if Alisha would be good enough to provide

19   her text number, that if you have an interruption again, Mr.

20   Howard, we could know it right away?  If visually you can give

21   her a wave or send her a text message?

22             MR. HOWARD:  Yeah, the time that it freezes -- you

23   can't tell -- you can see my picture, but you'll -- you won't

24   see me move.  So if you have a text number, Ms. Alisha, just

25   give it to me.

1          THE CLERK:  Sure.  (215) --

2          MR. HOWARD:  Right.

3          THE CLERK:  -- 896 --

4          MR. HOWARD:  All right.

5          THE CLERK:  -- 8579.

6          MR. HOWARD:  All right.  Thank you.

7          THE COURT:  Okay.  Go ahead, Mr. Shenaq.

8          MR. SHENAQ:  Yeah.  Your Honor, you know, going back

9    to paragraph 3 of this email from Tim Howard to a number of

10   individuals, including an MAF neurologist, paragraph 3

11   provides some context as to Mr. Howard was trying to approach

12   every claim.  Mr. Howard was trying to suggest to the doctor

13   to ignore the underlying facts and circumstances of each

14   individual player but take an approach of a one-size-fits-all

15   and ask that the doctor state that -- for every claim show

16   that there is no current employment and stress that if there's

17   any employment, the claim would be denied.  I don't know how,

18   you know, you would characterize that, but that's something

19   that is highly suspicious and the very conduct that the NFL

20   claims audit process investigates and seeks to deter.  But

21   this is, you know, highly inappropriate to make this kind of

22   suggestion.

23          THE COURT:  Okay.  Go ahead.

24          MR. SHENAQ:  That is -- that is pretty much it for

25   Exhibit 3, Your Honor.  You know, I'd also like to, you know,

1    include --

2              Alisha, if we could introduce Exhibit number 3.

3              MR. SHENAQ:  Okay.  Exhibit number 3, Your Honor, is

4    Bates number 614 from Howard & Associates cumulative Exhibit

5    A.  This reflects an email from an administrator to an

6    attorney in Mr. Howard's office named Erin Murphy.  And it's a

7    listing of all messages that Howard & Associates office or

8    Erin received on a particular day.  And this email was dated

9    January 11, 2018.  There was an email -- or, excuse me, a

10   message left from Ariel from Gibbs & Parnell.  They had a

11   question regarding Mark Word, a former client of Howard &

12   Associates, in which he is currently being audited.  And there

13   are questions regarding the testing he did when he was our

14   client.  But the relevance of this email, Your Honor, is to

15   indicate that this -- you know, the particulars of Jessie

16   Small was not an isolated incidence [sic], but rather

17   something that the claims administrator was laser focused on

18   as early as 2018.  So any notion or suggestion that my firm

19   had in any way prejudiced or created an impediment for Mr.

20   Small is just -- is blatantly wrong.

21             Alisha, I'd like to introduce Exhibit 4 as well, if

22   you don't mind.

23             Exhibit 4, Your Honor, is an email from the claims

24   administrator to me on July 15, 2019, regarding certain

25   anomalies they found in a medical report that was part of the

1   batch of reports that Howard & Associates supposedly wrote the

2   reports for identifying an anomaly between a Dr. Ford-Johnson

3   report and a Dr. Lloyd report and asked that my firm explain

4   the discrepancy.  Your Honor, both these physicians were not

5   engaged by my firm, they were engaged by Howard & Associates

6   in 2017.  But, as you can see, this was part of the audit in

7   July of 2019 that essentially resulted in the retraction of

8   Mr. Small's monetary award and required us to, you know, go

9   through an arduous audit process a second time to try to get

10  Mr. Small the benefits out of the settlement.

11            Alisha, could you provide --

12            THE COURT:  When did that second audit process

13  commence?

14            MR. SHENAQ:  Right around this time, Your Honor.

15  July 15, 2019, Your Honor.

16            THE COURT:  Okay.

17            MR. SHENAQ:  Alisha, could you please provide

18  Exhibit 5?

19            Your Honor, Exhibit 5 is another email sent to me

20  from the claims administrator regarding Jessie Small's claim

21  and another settlement class member's claim who saw the same

22  physicians that Howard arranged for in 2017.  There were

23  questions regarding whether or not Mr. Small was personally

24  examined by Dr. Lloyd and Dr. Morgan.  They were, you know,

25  obviously very focused on the early testing that Howard &

1    Associates did.  Again, none of which had any relation in any

2    way to a claim of Parkinson's.

3              Alisha, could you introduce Exhibit number 6 as

4    well, please?

5              Your Honor, Exhibit number 6 is an email from the

6    claims administrator to myself on December 3, 2019, related to

7    another settlement class member who was the subject of an

8    audit.  Again, the focus of the inquiry was the testing

9    performed by Howard & Associates and the experts they engaged

10   in 2017.

11             Alisha, if you don't mind, could you scroll down to

12   the -- to the second page?

13             Your Honor, you know, as you can see, based on these

14   questions, there was significant scrutiny on the physicians

15   that Howard engaged.  Question number 5 specifically states,

16   "Your response to our audit questions explains that your

17   previous attorney, Howard & Associates, directed you to Dr.

18   Ford-Johnson.  Your answer for question number 28 explains

19   that you do not remember seeing Ford-Johnson's report or other

20   neuropsychologist that Howard's firm recommended to me.  Who

21   are the other neuropsychologist that Howard & Associates

22   recommended to you?  When were you examined by these

23   providers?"

24             THE COURT:  This was obviously meant to be for Mr.

25   Small?

1          MR. SHENAQ:  No, Your Honor, this was another

2     settlement class member who was formerly represented by Howard

3     & Associates, who had been engaged by the same medical

4     experts, and the same sort of anomalies were found in their

5     medical reports that triggered this audit.

6          THE COURT:  Well, I thought that this particular

7     email looked as if it was addressed to Amir?

8          MR. SHENAQ:  Well, yeah, it was addressed to me,

9     Your Honor, as counsel for that particular class member.

10          THE COURT:  I see.

11          MR. SHENAQ:  Alisha, could you please put Exhibit

12     number 7 up on the screen, as well?

13          Your Honor, Exhibit number 7 reflects an initial set

14     of written interrogatories in the audit process that are

15     directed to a retired NFL player in the audit.  These are the

16     sorts of questions that we generally have to assist a class

17     member in responding to in order to move forward in the -- in

18     the audit process, and this is generally the beginning.

19          Alisha, could you go to the last page of this

20     document, please?

21          This was another set of questions, again, related to

22     medical doctors engaged by Howard & Associates in 2017 and

23     late 2016.  This one, question number 28, specifically says,

24     "You were evaluated by neuropsychologist Dr. Lawanda Ford-

25     Johnson on 12/1/16.  Who recommended that you be evaluated by

1   Dr. Ford-Johnson?  What did this person say about Dr. Ford-

2   Johnson?  Who was present at this evaluation?  Did you review

3   Ford-Johnson's report before it was submitted to the

4   settlement program?  Were any other neuropsychologist

5   recommended to you?"

6           Again, Your Honor, these questions were provided

7   around October of 2019, when this, you know, audit was being

8   conducted of Mr. Small's claim and a number of other retired

9   class members who had previously been represented by Howard &

10  Associates and, you know, saw medical experts that Howard &

11  Associates have engaged.

12          THE COURT:  Were any of those witnesses provided by

13  you or by Mr. Small?

14          MR. SHENAQ:  These were -- there were responses

15  provided by our firm, Your Honor.  Again, these sets of

16  questions were directed to a different settlement class

17  member.  But, again, as you can see, there was significant

18  focus on the medical experts that Howard engaged.

19          THE COURT:  Are you saying that -- you're saying

20  that presentations made by Mr. Howard on behalf of Mr. Small

21  included reports or evaluations from Dr. Ford-Johnson?

22          MR. SHENAQ:  Yes, Your Honor.

23          THE COURT:  (Inaudible) between this document and

24  what you're saying would be its relevance to Mr. Small?

25          MR. SHENAQ:  In between July 2019, Your Honor, and

1    December 2019, we received numerous discovery requests from

2    the claims administrator that solely related to the conduct of

3    Howard & Associates and the medical experts that they engaged

4    to evaluate these players early on in the settlement.  And

5    it's no coincidence, Your Honor, when you see that members of

6    Howard's staff were allegedly writing these medical reports.

7    You know, the claims administrator was wise to pick up on what

8    they picked up.

9             Alisha, I'd like to put up Exhibit number 8, as

10   well, please?

11            Your Honor, Exhibit number 8 is another email from

12   the claims administrator in the audit process, dated July 16,

13   2019, addressed to me.  This is an email, again, that's

14   specifically asking questions about medical experts that

15   Howard & Associates engaged for a retired NFL player.  And,

16   you know, I'd like to read question number 1 because, you

17   know, this is one that's, you know, difficult to explain, Drs.

18   Lloyd and Morgan's report notes that they administered the

19   Mini and MMPI-2-RF tests only, and that they reviewed Dr.

20   Ford-Johnson's neuropsychological test scores.  We compared

21   the test scores between Dr. Ford-Johnson's report and Drs.

22   Lloyd and Morgan and identified that in six tests the Scaled

23   score and the T score is different.  Can you tell us why six

24   test scores are different between the reports if Drs. Lloyd

25   and Morgan incorporated Dr. Ford-Johnson's test scores?  And

1    that's a question that we still don't know the answer.

2             But again, if you look back at the -- you know, the

3    communications inside the firm, they suggest that the firm

4    modified original reports of Ford-Johnson before they went to

5    Drs. Lloyd and Morgan.  And as you can imagine, you know, when

6    you look at this altogether, it's highly suspect.  And this is

7    certainly not the type of legal work that anyone would expect

8    to be performed with respect to, you know, any retired

9    member's claim.  And it certainly should not be rewarded in

10   any means, whether there's a lien or a McKenzie or under any

11   circumstance, Your Honor.

12            THE COURT:  All right.  So -- why don't you go on to

13   your next exhibit.

14            MR. SHENAQ:  Sure.  Exhibit number 9, Your Honor.

15   Exhibit number 9 is an email from Brian Garelli, who is the

16   CEO of a funder called Preferred Capital Funding.  This is a

17   lender that Mr. Small was recommended to obtain a loan from by

18   Howard & Associates on March 20, 2017.  Actually, March 20,

19   2017, is when Mr. Small actually signed the documents to

20   obtain an advance from this funding company.

21            Your Honor, the terms of this advance stipulated a

22   39.95 annual interest rate with a full recourse loan to the

23   Smalls that was enforceable under Nevada law.  This was merely

24   four days after the Smalls saw Dr. Koberda, who was the

25   original MAF neurologist.  Or at the time he was not an MAF

1    neurologist because this was prior to the effective date of

2    the settlement.  But after seeing Dr. Koberda, within four

3    days, you know, Mr. Small was, you know, convinced to go get a

4    loan because he was going to receive payment on his claim, you

5    know, in a short period of time because of how strong it was.

6    At least those were the representations made to Mr. Small by

7    Howard & Associates at the time.

8              Your Honor, Brian Garelli is now suing Tim Howard

9    for fraud, alleging that Tim Howard fraudulently induced their

10   outfit to provide almost $6 million in loans to retired

11   football players that at one point some or all were

12   represented by Howard & Associates, so that Howard &

13   Associates could take that money and invest into his hedge

14   fund that he controlled and then lend the money back to these

15   retired players, much like a Ponzi scheme, Your Honor.  And

16   this Preferred Capital, you know, believed that they were

17   defrauded by Tim Howard.  And we had to go back and forth at

18   length to try to reduce the interest rate on my client Mr.

19   Small's, loan.

20             THE COURT:  Let me -- let me just ask you about

21   this.  So I understand there have been a number of allegations

22   in some of the earlier documents that you've presented with

23   respect to litigation, including litigation for the SE -- by

24   the SEC.  My particular question is, you came to be involved

25   in representing Mr. Small in September of 2019.  And so we're

1   talking about -- if we look at the <u>McKenzie</u> analysis, we need

2   to put aside the circumstances for any work that you did prior

3   to that particular date, since it appears that you were

4   working in connection with Mr. Howard up until September of

5   2019.  How does this particular conduct with respect to what

6   you say or allege or assert or believe Mr. Howard was involved

7   in have a particular impact upon Mr. Howard's entitlement to a

8   portion of the contingency fee and/or your entitlement to a

9   portion of the contingency fee?

10              MR. SHENAQ:  Yes, Your Honor.  So, you're absolutely

11   correct in that we did represent Mr. Small in conjunction with

12   Mr. Howard for approximately a year-and-a-half.  At the time

13   the Smalls elected to terminate Howard & Associates, Your

14   Honor, the Smalls were in the midst of an audit process.  As

15   you can imagine, an audit process is just as arduous and

16   vigorous as defending any appeal from the NFL.  In fact, it's

17   even more difficult because of the fact that there are no

18   finite time periods, there's no information that they provide

19   -- the claims administrator provides, other than the

20   interrogatories and potential hearing and document requests,

21   for you to know where things are at in the audit process.  And

22   given the stigma and the cloud and all these, you know,

23   exogenous factors that normally are not -- you know, are not

24   present in any claim -- you know, these are very atypical

25   things, Your Honor.  You know, the Smalls felt that their

Shenaq - Argument                                      39

1    claim was highly clouded by the actions of Howard.  And, you

2    know, those were, you know, difficult things to overcome,

3    especially when the claims administrator was laser focused on,

4    you know, the actions of Howard and the potential impediments

5    that may have caused, you know, the Smalls' claim to move

6    forward.

7              So the audit process was not a typical one, Your

8    Honor.  It wasn't, you know, hey, you said you were working

9    and the documents show something different.  This goes well

10   beyond that.  And, as you can imagine, being in the position

11   of the claims administrator, it's very difficult for a claim

12   with a cloud such as this one to move forward without thorough

13   and sufficient explanation.

14             THE CLERK:  Sorry to interrupt.  I think we may have

15   lost Mr. Howard again.  I think we just lost him.  I saw his

16   picture leave the screen.

17             THE COURT:  Did you -- can you call him?

18             THE CLERK:  Yeah, it looks like he's back now.

19             THE COURT:  All right.  So, Mr. Howard, can you hear

20   me now?

21             MR. HOWARD:  I can.  Yeah, the internet keeps coming

22   out.  So I -- we left off at the represented -- Shenaq

23   represented for a year-and-a-half and talked about the

24   difficulty of the process, where we broke off.

25             MR. SHENAQ:  Your Honor, I mean, in sum, this was

Shenaq - Argument                                        40

1    not a typical audit process.  I've handled many different

2    audits on many different claims, Your Honor, and this is far

3    from typical.  This audit process did not stem from any

4    actions or concealment of information or potential

5    misrepresentations of the Smalls, but rather it was driven by

6    all the exogenous factors related to Mr. Small's former

7    counsel that ended up prejudicing, you know, his claim.  And

8    so, you know, there was a significant risk of the audit

9    process not being concluded in favor of the Smalls.  And if

10   there was evidence of any, you know, adverse finding, Your

11   Honor, we would have had to go through a contested, you know,

12   audit process with the Special Master that could have

13   subjected Mr. Small to significant ramifications, including

14   myself.  And, you know, he could have lost his monetary award,

15   as well.  And, you know, even --

16            THE CLERK:  Again, sorry.

17                      (Pause)

18            MR. SHENAQ:  And, Your Honor, even upon a successful

19   conclusion --

20            THE COURT:  Wait, wait.  Wait, Mr. Shenaq.  We've

21   got to make sure that Mr. Howard is on.

22            THE CLERK:  I see that --

23            MR. HOWARD:  Yes, we're back.  I'm sorry, we're

24   having internet -- storms are here.  I'm back on.

25            THE COURT:  Would it be better, Alisha, do you

1   think, to just have him on by his cell phone?

2          THE CLERK:  I think it wouldn't cut out if we had

3   him do that.  But then he wouldn't be able to see the

4   exhibits.

5          MR. HOWARD:  Well, I can put it on mute.

6          THE CLERK:  So if he could -- he can just call,

7   yeah.

8          MR. HOWARD:  I put it on both.  I'll mute it and

9   I'll have the cell phone.

10          THE CLERK:  Okay.  So I'm going to stop the screen

11   share quickly.  I'm going to, Mr. Howard, be on a chat on

12   Zoom.  I'm going to message you the call-in information.  I'll

13   just send it to everyone, but everyone else can disregard.

14          Do you see that?  (No audible response)

15                         (Pause)

16          THE COURT:  Alisha, how we doing?

17          THE CLERK:  I think he's back.

18          MR. HOWARD:  I've got -- I've got both.

19          THE COURT:  All right.  Thank you.  Thank you, Mr.

20   Howard.

21       (Transcriber change)

22          THE COURT:  All right, Mr. Shenaq.

23          MR. SHENAQ:  Yes, Your Honor.  So picking up where I

24   -- where I left off and addressing your -- your question, you

25   know, there was an audit process that, you know, was not a

```
 1    normal audit process.  It was certainly driven by all the

 2    exogenous factors in the cloud surrounding Howard's

 3    involvement in Mr. Small's claim.

 4              THE COURT:  So let me -- I want to ask you a

 5    specific question about that.  Exhibit 7 which is entitled

 6    just questions to a retired NFL football player in audit.

 7              MR. SHENAQ:  Yes, Your Honor.

 8              THE COURT:  Was this a document that was sent to you

 9    on behalf of Mr. Small as well as other lawyers on behalf of

10    their respective clients?

11              MR. SHENAQ:  Your Honor, this particular document

12    was not propounded to Mr. Small, it was actually in relation

13    to another retired class member, but generally this is a

14    pretty standard set of interrogatories.  But usually towards

15    the end, Your Honor, after seeing probably 30 to 40 of these

16    now, the last few questions sort of give you the genesis of,

17    you know, what -- what the claims administrator is really

18    trying to ascertain through the audit process.

19              THE COURT:  Yeah, okay.  So you're -- so I -- I may

20    take from that, what you want me to take from that is that

21    most of the generalized kinds of questions here, which are

22    also specific in the types of treatment and some of the

23    history with respect to the players' previous activity in

24    football, et cetera, et cetera, is -- would have been

25    something that was received by Mr. Small with certain
```

1    particulars concerning his past history?

2              MR. SHENAQ:  Yes, Your Honor.  This -- this document

3    was actually received by Mr. Small at the outset of his first

4    audit, although at the time, Your Honor, there was not a

5    specific question like in question number 28 of this document

6    that specifically references the neuropsychologist, you know,

7    that the claims administrator was focused on.

8              THE COURT:  So if I look at this document,

9    paragraphs 1 through 26, it looks as if they might have

10   applied to any number of different players.  But as to this

11   document, 27, 28 are specific with respect to a particular

12   player, I think.

13             MR. SHENAQ:  Yes, Your Honor, that's right.  One

14   through 26 are more or less generalized, you know, discovery

15   or written interrogatories.

16             THE COURT:  Yes.

17             MR. SHENAQ:  And then usually beyond 26 is when they

18   ask some specifics.  And again I don't profess to know the

19   inner workings of the audit process, but I've seen enough of

20   these to, you know, to have a sense of, you know, what the --

21   what the focus is.  And when you, you know, look at the timing

22   of this with the timing of the questions that we actually

23   received on behalf of Mr. Small and the other questions that

24   we've identified in, you know, Exhibits 3, 4, 5, 6, you know,

25   it's easy to, you know, sort of draw the conclusion that there

1   was a specific focus on the conduct of Howard & Associates and

2   the doctors they engaged in the early part of the settlement.

3              THE COURT:  Okay.  So how did that get resolved?

4              MR. SHENAQ:  Well, in Mr. Small's case, fortunately

5   we were -- you know, we provided responses to the best of our

6   ability information that we knew at the time and were

7   successfully able to navigate the audit process, which

8   concluded in a notice of completed audit, that there had been

9   no adverse outcome with respect to Mr. Small's claim.

10             Following the completion of the audit, there's still

11  a process in which the claim, from my understanding, is

12  evaluated and a monetary award would either need to be

13  reissued or the claim is to be denied.  So, you know, in Mr.

14  Small's case, he did receive a notice of monetary award some

15  time after the conclusion of the audit for approximately $1.58

16  million or so.

17             Even then, Your Honor, there was obviously still a

18  great risk of the NFL filing an opposition to that monetary

19  award again.  An individual who has alleged Parkinson's in his

20  early fifties is not typical, and certainly something, given

21  the dollar amount, something that, you know, was concerning to

22  us in the form of having to, you know, oppose an appeal that

23  the -- the NFL may have filed.

24             THE COURT:  All right.  Now, at the beginning of the

25  -- your presentation, you made obvious references to your

1   representation of Mr. Small.  Your evidence has broadened a

2   bit.  So I'm going to ask you to tell me something about the

3   background and experience that you had with respect to dealing

4   with the claims that you believe -- I presume you believe

5   would render you someone who is adequately informed and

6   credible with respect to some of the inferences that you

7   appear to have drawn from the background and all that you've

8   had with respect to dealing with NFL players.

9              MR. SHENAQ:  Sure.  I'm happy to state on the

10  record, Your Honor.  You know, I am by no means a glamour

11  show.  Mr. Howard is certainly correct; we gave a very small

12  footprint, Your Honor, but we make a very big impact.  And the

13  reason for that is, you know, I am dedicated to this work.  I

14  have represented now over 300 retired NFL football players.  I

15  act as of counsel to another law firm that also represents in

16  excess of 300 retired NFL football players.

17             I have been actively involved in the NFL concussion

18  settlement since December of 2016, Your Honor.  I've helped

19  facilitate well over 500 medical evaluations.

20             My firm alone has garnered approximately 60 monetary

21  awards for retired NFL football players.  We've recovered in

22  excess of $40 million, Your Honor, in this NFL concussion

23  settlement.

24             I have personally briefed over 30 appeals, both

25  opposing NFL appeals, as well as seeking to overturn denials

1    for my clients.  I've handled approximately 30 audits, Your

2    Honor.

3              I have been given the -- you know, the -- the inside

4    in the form of an audit myself.  The claims administrator in

5    2018 examined me upside and down, vetted me, requested all

6    sorts of communications between my firm and physicians,

7    including communications between myself and clients, Your

8    Honor.  We have produced voluminous information to the claims

9    administrator.

10             We had absolutely no -- no issues in any audit

11   process of my law firm or any retired NFL clients that I

12   represent.  I think that you -- you know, if one were to ask

13   the claims administrator, I suspect that, you know, they would

14   say good things about my firm and the quality of work we do

15   and our transparency, integrity, and honest and zeal in

16   representing our clients.

17             THE COURT:  All right.  Well, thank you for that.

18   Is there anything short of going to Mrs. Small that you'd like

19   to add to your presentation up to this point?

20             MR. SHENAQ:  You know, no, Your Honor.  I think it

21   would be helpful to hear from -- from Mrs. Small.

22             THE COURT:  All right.  But first of all, I want to

23   give Mr. Howard, if he chooses to exercise it, an opportunity

24   to ask you any questions.

25             MR. HOWARD:  Yes, Your Honor.

1                            CROSS-EXAMINATION

2    BY MR. HOWARD:

3    Q     Mr. Shenaq --

4              THE COURT:  I'm sorry, before you do this.  Perhaps

5    I've been inattentive to what personal needs people might have

6    and you might -- I don't know how long you want to take or

7    expect to take in connection with Mr. Shenaq.  If anybody has

8    any particular needs, we can take a five-minute recess, or are

9    we okay to carry on?

10             Nobody's given me any indication, so, Mr. Howard,

11   let's go ahead.

12                           CROSS-EXAMINATION

13   BY MR. HOWARD:

14   Q     Mr. Shenaq, have -- were all of your claims under audit

15   at any given time for your clients?

16   A     Yes.

17   Q     And how long did that audit take?

18   A     That audit lasted probably eight to ten months.

19   Q     Okay.  And were any of those audits -- was that audit of

20   all your clients caused by any of our clients?

21   A     It's impossible for me to say yes or no, but I'm certain

22   that my association with you and your firm, given that class

23   counsel and numerous others were investigating your firm's

24   conduct, certainly have something to do with -- with the audit

25   of my firm.

1    Q    Was the audit dealing with communications you had with a

2    doctor that we're not -- there was -- as in the inferences

3    there that were nothing to do with regard to my clients?

4    A    The audit process requested numerous communications with

5    clients, with medical physicians that we had utilized and was

6    very broad.

7    Q    And did they -- did they not take inferences from your

8    email and said you were improperly coaching your doctors?

9    A    I'm not sure what email you're referring to.  I don't

10   influence or seek to influence any physician in any way.  But

11   that's why we hired them because they are the experts and they

12   are the ones who opine whether or not a player has a

13   particular medical condition, not me.

14   Q    Did you not have a conversation with me about how they

15   took inferences from your email with a doctor which is part of

16   the audit?

17   A    I don't recall that conversation, so I don't know.

18   Q    And -- and at the end of the audit process, did they find

19   everything was okay?

20   A    With respect to my firm, yes.

21   Q    Right.  And the inferences that they -- they read from

22   your email was not -- not accurate?

23   A    I mean I cannot profess to know what they've -- what

24   inferences they took, but they cleared my firm of any audit

25   improprieties or any concerns with respect to any of my firm's

1    communications with any client or doctors.

2            But, as you know, the audit process is obviously an

3    evolving thing and they may not know certain things at the

4    time that they know today.  So there's certainly a possibility

5    if, you know, they were satisfied at the time, circumstances

6    may have changed, they may learn new information, that could

7    trigger something different.

8            One other important thing to note, Mr. Howard, is

9    that the claims administrator audits claims that are filed.

10   Your firm did not file any claims, therefore you did not

11   subject yourself to any audit scrutiny.  So that's actually a

12   product of -- of you guys not taking any steps to filing your

13   claims on behalf of your clients.

14   Q    Now, when an audit is completed, does -- does that

15   release the claim to be processed?

16   A    It puts the claim back in processing.  It doesn't

17   guarantee the same outcome or any outcome.

18   Q    Did Jessie -- did the audit of Jessie Small's claim, did

19   -- was it found anything wrong with his claim when the audit

20   was done?

21   A    The audit was -- like I said before was concluded without

22   any misrepresentations that the claims administrator had

23   found.  But again it was based on information that the claims

24   administrator knew at the time, and the information we used to

25   respond to the questions about the -- you know, the anomalies

1  they identified with medical reports was provided from you to

2  me.

3          So we relied on your representations to answer those

4  questions.  So if those were incorrect or wrong, you know, at

5  the time, you know, we weren't aware of how your office

6  prepared medical reports.  So that was -- that was new

7  information that you produced in your -- your response to our

8  memorandum.

9  Q    So the -- and you've taken inferences from which you read

10 -- you've -- you inferred issues that you don't know that are

11 true, is that correct?

12 A    I think there's a significant amount of circumstantial

13 evidence to the point that there have been improprieties in

14 the work product that your office has prepared.  Was I there

15 in person; was I involved, absolutely not.  Is there any way

16 for me to know definitively, at this point no.  But I think it

17 is something that serious that warrants further scrutiny and

18 investigation.

19 Q    So there's been an audit of both -- is Dr. Koberda MAF

20 certified?

21 A    No.  He's no longer -- he was terminated without giving

22 30-day notice, which only happens when there's allegations or

23 concerns about fraudulent activity.

24 Q    When did that take place?

25 A    That happened probably a few days after he received a

1   subpoena from the company that's suing you, Mr. Howard.

2   Q    Okay.  And did you -- did you -- did you not talk with

3   the company that was suing me before they sued me?

4   A    Of course I did.  I had to resolve my client's lien to

5   try to help them save money on their loan.

6   Q    Right.  And did you -- did you not cite these same

7   allegations you put here to them to sort of foment them to

8   filing a suit?

9   A    Not at all.

10  Q    Well, then why did they say thank you for getting the

11  information, because he got the information from you, didn't

12  he?

13  A    Yeah, because he asked for case status updates on my

14  clients, which I provided.

15  Q    And -- and you did not, you said, that you actually

16  fomented him to filing -- filing a suit because you guys --

17  A    I did not -- if you're trying to accuse me of having

18  somebody sue you, no.  I think it's your actions and your

19  acts, Mr. Howard, that, you know, created all of this.  I did

20  not foment, I have not pressured anybody to file suit against

21  you.  You have -- that's why we have this forum, to address

22  any issues that we have amongst one another.

23  Q    And are you not doing the same thing now?  I would like

24  to go back through the exhibits and show you've misinterpreted

25  both exhibits through paralegals and not lawyers.

1           I go back to Exhibit 2 and how you interpret the

2     Exhibit 2.

3           Can we see Exhibit 2 on the -- on the record,

4     please?

5     A     Well, Mr. Howard, you as the lawyer are -- you know,

6     you're supposed to supervise the folks in your office and

7     their work.  It is under your supervision.  So, you know, you

8     can hide behind that all you want, but --

9     Q     Okay.  So -- so we have -- Duante is a young paralegal

10    just out of -- out of -- out of college.  Same with Erin

11    Murphy.  She's a paralegal, has -- has -- she does clerical

12    work.  They were talking -- they're not -- they're talking

13    about doing affidavits.  They're not talking about typing

14    reports for it.  If there was an issue with us typing reports,

15    they would be -- go over to the audits.  They'll be covered in

16    all the coverage we've had.  So that would clarify that's

17    what's going on with --

18    A     You're assuming, Mr. Howard.  You're not involved in the

19    audit process.  You don't work for the claims administrator

20    and you've never filed a claim to trigger any audit of your

21    work, sir.

22    Q     I'm explaining -- I'm explaining your Exhibit 2, what had

23    taken place between Duante and Erin.  So --

24    A     Yeah, it -- it clearly states that to type a report for

25    and the link is to medical reports, Mr. Howard, not affidavits

```
 1    or third-party statements, as you're suggesting.  You know, I
 2    think it's important that you provide accurate information to
 3    the Court.
 4    Q    I am.  So we understand what happened, Duante and Erin
 5    work on affidavits.  They look at the Ford-Johnson reports to
 6    see what -- what they're finding in that -- the affidavit is
 7    -- is -- is correlated with the -- with the reports.  And so
 8    all they're doing is looking and typing up affidavits.  That's
 9    what is going on here, they're working on affidavits.  And --
10    and once the client receives the affidavit or third-party,
11    they have to make their own changes, their own -- own details.
12    But they're trying to get affidavits here.
13              Let's go on to -- let's go on to -- further down on
14    Exhibit 2.
15    A    Mr. Howard, if -- if they were working on affidavits, why
16    are they sharing a link to reports that were converted from
17    PDF to Word files?  Why would they want the medical reports
18    and why would they be talking about reports.  Erin Murphy is
19    an attorney.  She is not a paralegal.
20    Q    No, Erin Murphy is -- actually doesn't even have a
21    college -- an undergraduate degree.
22    A    Okay.
23    Q    So you don't know what you're talking about.  And so --
24    and same with Duante, Duante is just undergraduate.  So
25    they're using some of the wrong terminology.  They're -- in
```

Shenaq - Cross                                    54

1  fact they're putting it in Word so they can take the

2  information from the reports and put it in affidavits.  These

3  are young kids that don't know what they're doing in detail.

4         Let's go a little further down here.  Okay, there's

5  the OneDrive.  Now, what's also interesting -- and just go

6  further down, next -- next -- further down.  We have Mr.

7  Shenaq going -- going into my one -- OneDrive as of June 23,

8  202, which is access -- a wider access to do that.  Very

9  strange to see that done --

10 A    Mr. Howard, your office provided me --

11        THE COURT:  Wait a minute.  Wait, Mr. Shenaq, just

12 hang on a second.  Please don't interrupt his question.  Let

13 him finish his question.  When he's finished his question, you

14 can respond.

15        Mr. Howard, please don't interrupt his response.

16 Let him give a full response.  I don't want to have you

17 talking over each other.  It's hard enough for the -- for the

18 court reporter.  And you gentleman have shown me a lot of

19 southern hospitality, despite some of the strong accusations

20 that have been made or allegations that are made or implied.

21 So let's not lose it.

22        Go ahead, Mr. -- Mr. Howard, restate your question,

23 please.

24 BY MR. HOWARD:

25 Q    Yeah.  I'm pointing out the fact that Mr. Shenaq has gone

1    into my private OneDrive as of last week without authority.

2    And even the documents he has shows that they're all distinct;

3    they're not some template.  And conversation of a PDF to Word

4    at the time, I don't know where it's -- we've done nothing

5    with these files for almost two years, two and a half years,

6    but the -- it would have helped them, assist them with the

7    affidavit process of the third-party reviews.

8              And, Mr. Shenaq, if you want to comment on that, you

9    can go right ahead.

10   A     Yes, Mr. Howard.  Given that you provided this link and

11   suggested that this was the basis of the work that you

12   performed for Mr. Small, my client, to suggest that you should

13   be entitled to an attorney fee in this matter, is something in

14   which I need to verify and actually see for myself what you're

15   suggesting.

16             You provided this link in a filing knowing that we

17   would review your submission, that the claims administrator,

18   that the Court would review the submission.  If you intended

19   for this information to be private and not accessible by any

20   third party, you would have changed any sort of privacy

21   setting to that effect or simply not shared the link.

22             So the fact that you're suggesting that I'm

23   committing an illegal act is actually -- is slanderous and

24   slander per se, in fact.  So I would suggest you be very

25   careful with your accusations because it is you who has put

1    this in the public domain.

2    Q    Let's go further down, please.  Next one.  So if you look

3    at this email, I'm dealing with the assistance of Dr. Sadek.

4    We're talking about two reports and we're dealing with Dr.

5    Lloyd and Dr. Morgan.  Dr. -- Dr. Lloyd and Morgan worked

6    together.  They're both at a place.  I think Dr. Lloyd's board

7    certified and Dr. Morgan is not.  They both work with Dr.

8    Sadek who the last I know was a MAF certified doctor.  And so

9    that -- that is the context.

10            We're talking about two reports.  I'm informing them

11   that employment is a key issue, especially for Mr. Small is a

12   key issue.  And so we have to talk about his cognitive

13   limitations that caused him to lose employment due to his

14   current cognitive is not -- that's why he's unemployment.

15            I'm referring -- and this is all showing there's no

16   current employment.  I'm referring to the prior two reports.

17   That's the context of the entire -- this entire email.  And so

18   -- and there go -- there's -- if there is any employment, the

19   claim will be denied.  So letting Dr. Sadek know that

20   employment is a key issue.  That was a similar is sue that Mr.

21   Shenaq dealt with in one of the -- and that's why they caused

22   the audit with his claims --

23   A    That's incorrect, Mr. Howard.

24   Q    There's the inference that that caused an audit of his

25   claims in reference to one of his doctors.  And so this is --

1    the reason why Mr. Shenaq knows how to do these things,

2    because it's the same kind of stuff he's dealing with in

3    taking inferences out of emails or from the audits.  This --

4    this -- this is not -- we're not instructing them to -- what

5    to do, we're letting them know that employment is a key issue,

6    and we're talking about two reports here.

7            And Mr. -- Mr. Shenaq, you can respond if you'd

8    like.

9            MR. SHENAQ:  Your Honor, I'd like to correct a

10   number of facts and representations that Mr. Howard made.

11   First of all, Dr. Lloyd and Dr. Morgan, neither of these

12   physicians, they may be board certified, but they lack the

13   certifications and credentials that a neuropsychologist needs

14   in order to support a neurologist in making a finding of a

15   Level 1.5 or Level 2 claim.

16           In addition, Mr. Howard's contention is that he is

17   referring to two reports.  If that was the case, why would he

18   want to focus on for every claim?  That to me doesn't seem

19   like two reports.  And to suggest that for every claim, you

20   know, the doctor should take an approach that there's no

21   current employment, is the very type of conduct that the audit

22   process is designed to investigate, Your Honor.  This is not

23   the typical work that a lawyer employs and -- you know, in

24   working up any of these cases.

25           I don't take a one size fits all approach.  I don't

Shenaq - Cross                                    58

1    instruct the doctors to make up facts that don't exist.

2    That's very troubling, and that type of conduct should not be

3    rewarded in any manner.

4            MR. HOWARD:  Your Honor, if I may respond.  Again,

5    taking this out of context, the -- receipt of employment

6    context are consistent with the underlying CDR and

7    neuropsychological reports, in Dr. Sadek's reports.  In these

8    two cases, they're all showing there's no current employment.

9    And so, you know, this taking -- it's disassembling

10   information in order to make smoke that doesn't exist.

11           And, Your Honor, (inaudible) correct that Dr. Morgan

12   -- Dr. Lloyd was board certified but not in the correct area

13   and neither was Dr. Morgan.  That is why they went through the

14   process.  We realized we -- we had to start over with the

15   proper board certified doctors.  But that's part of the less

16   -- the learning process.

17           Some of these things actually helped us understand

18   the -- in fact, all the -- all these reports and studies help

19   us understand the condition of the client, gave a good

20   foundation of what we're dealing with and allowed the properly

21   board certified doctors in the final reports that we did with

22   -- with the mission of to complete the report.  This -- this

23   effort was not wasted and in fact -- without the foundation

24   work that the final doctors relied upon.

25           THE COURT:  All right.  I'm sorry, I didn't mean to

1   interrupt you, other than just to say I understand.  But we're

2   now obviously into argument, we're not into questions of Mr.

3   Shenaq, which is what I -- what I wanted to focus on now to

4   get that completed.  You'll have a chance to make some

5   argument.

6   BY MR. HOWARD:

7   Q    All right.  So I wanted to focus on the -- I think it's

8   Exhibit No. 9, I think.  I want just to point out verified to

9   -- to -- I don't have it on the screen.  It may be 11.  Okay,

10  that -- we've got -- I've already covered nine, that's the --

11  the -- taking smoke and creating more smoke.  I think it's

12  number three, is that one?  So 11, Exhibit 11.

13           So I want to -- Mr. Shenaq, this is dealing with our

14  consistent communication with Jessie Small, and Mr. Small's

15  asking -- constantly asking questions.  I'm giving responses.

16  Mr. Shenaq, doesn't this evidence show we're constantly

17  communicating with Jessie Small?

18  A    Well, to the contrary, and I think Mrs. Small can -- you

19  know, is going to be in a better position to -- to describe

20  the communications.  But it is interesting that, you know, in

21  your voluminous 1800 page production, this email was -- was

22  not included.  So, you know, that seems sort of peculiar.

23  Q    What's the -- what's the Bates number on this?

24  A    There's no Bates number, Your Honor.

25  Q    So let's just say it's an email from Mr. Small to Mr.

Shenaq - Cross                                         60

1   Howard on February 19, 2018.  Okay.

2   A    Yes, it's Exhibit 11, Your Honor, and --

3   Q    Thank you.  And I guess I'm missing some of the portions,

4   but I think, you know, that I'm seeing evidence there that has

5   nothing to do with Jessie Small's claim.  I think the number

6   27 that we're talking about on the -- the audit question

7   dealing with Laurie Morgan and Dr. Hopper.

8                THE COURT:  That was Exhibit 7, wasn't it?

9                MR. HOWARD: This was (inaudible).

10               THE COURT:  Yeah.

11  BY MR. HOWARD:

12  Q    Mr. Shenaq, you're -- you're -- this has nothing to do

13  with -- with Jessie Small's claim, right?  These doctors were

14  not for Jessie Small's claim?

15  A    Mr. Howard, these questions were not propounded to Mr.

16  Small, they were to another settlement class member who were

17  evaluated by physicians that you collaborated with, that also

18  happen to be the very same physicians that Mr. Small saw when

19  he was represented by your firm.  And these questions were

20  received around the same time Mr. Small received similar sets

21  of questions questioning anomalies that they found in these

22  particular doctors' medical reports.

23  Q    But these were the -- these had nothing to do with Mr.

24  Small's claim, this was for another client?

25  A    These questions were not directed to Mr. Small.

Shenaq - Cross                                   61

1    Q    And were all these issues resolved and all -- and claims

2    processed and taken out of audit?

3    A    The -- you know, I don't know the status of every one of

4    these claims off the top of my head, but a number of these

5    claims were resolved in the audit process, yes.

6    Q    Okay.  So which means that someone investigated this and

7    found there was nothing wrong?

8    A    Well, I'm not sure what extent their investigation was.

9    I suspect that there was -- there is tremendous credibility

10   between my firm and the claims administrator and they put a

11   lot of weight in my responses, a number of my responses for a

12   lot of representations you made to me and my firm as the basis

13   of the response which, you know, now seeing some of the

14   documents that you've recently produced are somewhat

15   concerning in the sense that they may not actually have been

16   correct.

17          THE COURT:  Mr. Shenaq, let me just question you a

18   bit in a comment that Mr. Howard had made.  I was led to

19   believe, I felt that this document that's up on the screen

20   now, I think it's Exhibit 7, Alicia, is that right?  Exhibit

21   7.  That you had said that there was a comparable document

22   that was sent to Mr. Small and that the questions up to number

23   27 that were specific.  Let's go to the papers.

24          Go through it, Alicia, paragraph -- yeah.  So -- no,

25   no, go back -- go back where you were, 25, 26.

1          So -- great.  So as you can see on this one, on

2     paragraph number 27, it's specific with respect to someone's

3     high school job -- or job that they might have had coaching

4     football?  But 26 and earlier were more generalized questions

5     as to -- as they say detail your community activities, detail

6     your goal with respect to shopping (phonetic).

7          You had led me to believe -- I think you were trying

8     to lead me to believe that questions like up to that point, up

9     to something specific about whether or not you worked as a

10    high school coach, that were -- they were asked of Mr. Small.

11    Now you're saying in response to Mr. Howard's question it had

12    nothing to do with Mr. Small.

13         MR. SHENAQ:  Your Honor, your assertion in that Mr.

14    Small received a similar equivalent document without questions

15    27 and 28, more or less the same genesis of written questions,

16    was in fact received by Mr. Small and that was received during

17    Mr. Small's first audit.  These questions were not propounded

18    to Mr. Small during this second audit, which began sometime in

19    July of 2019.

20         THE COURT:  Okay.  But they were in the first audit.

21    And I -- by the way, I'm not comfortable with you

22    characterizing something as my assertion.  I'm not trying to

23    assert anything.  I'm just --

24         MR. SHENAQ:  Sure.

25         THE COURT:  -- trying to get some clarity as to the

1    -- as to the --

2                MR. SHENAQ:  Understood, Your Honor.

3                THE COURT:  -- my understanding of the answer to the

4    question on the use of this document.  So you're saying that

5    the essence of it, but for the specifics in 27 and 28, would

6    have been applicable to the first audit, but not as to the

7    second audit?

8                MR. SHENAQ:  Yes, Your Honor.

9                THE COURT:  All right.  Thank you.  I'm sorry, Mr.

10   Howard.  Go ahead.

11               MR. HOWARD:  Let me see if I have any other

12   questions, Your Honor.

13   BY MR. HOWARD:

14   Q    Ms. Shenaq, you will agree that the inferences are not

15   facts?

16               THE COURT:  That's a hard question to ask a lawyer

17   to answer.

18   A    It depends, is my answer.

19   Q    Okay.  Do you think attorneys use inferences for

20   advocacy?

21   A    Of course they do, but the overwhelming -- I mean this --

22   this is sort of an expression, if there's a turd, there's

23   generally something more.  And the number of allegations

24   against you, Mr. Howard, especially the serious allegations of

25   fraud brought by so many different individuals and entities,

1   you know, it's hard to say this is a one-time occurrence.  I

2   mean it's a pattern of practice.  So I think the inferences

3   here very much support and very much closely track what likely

4   really happened.

5   Q    If the -- if the inferences all derive from the same core

6   source of people and it didn't take place in the prior 33

7   years, do you think maybe there's some -- some coordination

8   going on to create these inferences?

9          THE COURT:  Gentlemen, if you don't mind, I don't

10   think that this kind of line of questioning and the responses,

11   the way -- are very helpful to my process.

12          MR. HOWARD:  True.

13          THE COURT:  I understand the difficulty that would

14   be between the two of you.  I take that into account in a way

15   I think is fair and reasonable.  But certainly the way in

16   which you responded to the question, I'm not sure was

17   particularly appropriate in my mind, Mr. Shenaq.  I mean I get

18   it, I understand about advocacy.  (Inaudible) I understand.

19          So do you have anything else factually that you want

20   to question Mr. Shenaq about, Mr. Howard?

21   BY MR. HOWARD:

22   Q    Just to complete, Mr. Shenaq, did the -- was the Jessie

23   Small claim cleared of all issues both in the first or second

24   audit and did his claim get paid?

25   A    Jessie Small's claim successfully concluded the audit

1   process and he did receive payment after the completion of the

2   second audit.

3   Q    Okay.  Thank you.

4            THE COURT:  All right.  Mr. Shenaq, something else

5   you wanted to present, sir?

6            MR. SHENAQ:  Yeah, I'd like to call Mrs. Small, Your

7   Honor.  I think -- you know, she is the spouse of -- of Mr.

8   Small and intimately familiar with, you know, all of his day-

9   to-day affairs as well as his choice of counsel and the scope

10  of work performed by --

11           THE COURT:  Okay, fine.

12           MR. SHENAQ:  Okay.

13           THE COURT:  So, Mrs. Small, would you be good enough

14  to raise your right hand, please.

15      RENESSA SMALL, DEFENDANT'S WITNESS, SWORN

16           THE COURT:  Mr. Shenaq.

17           MR. SHENAQ:  Thank you, Your Honor.

18                         DIRECT EXAMINATION

19  BY MR. SHENAQ:

20  Q    Mrs. Small, thank you for allocating some of your time

21  this morning.  I'd like to start by having you tell the Court

22  how you became aware of Tim Howard and Howard Associates.

23  A    We became aware through another retired NFL player who

24  was considering Mr. Howard.  And before I get into any other

25  questions, I would like to say that I am totally stunned right

1    now because Mr. Howard started this process by perjuring

2    himself how he never thought and we never had testing or ever

3    been diagnosed that my child has autism, and I don't know

4    where that statement came from and it's totally untrue.

5    Neither have any of their associates or Mr. Howard ever

6    visited my home.  That is totally incorrect.  That's never

7    happened.  And I'm just floored that he is saying that my

8    husband has ideations of suicide.  That has never happened.

9    And the doctor's statements will state that.  And I am at a

10   loss of words by his statements just to make himself look

11   good.

12   Q    Mrs. Small, thank you.  We'll -- we'll get -- we'll get

13   to that, you know, in the sense of the legal work that Howard

14   & Associates performed on your husband's case.  But I want to,

15   you know, just for the record, if you could, you know, explain

16   how you came to find Tim Howard and Howard & Associates and

17   why you decided to have his firm represent you and your

18   husband in this NFL concussion filing.

19   A    Well, we -- we went to his office in Tallahassee and upon

20   sitting down with him, he explained to us, you know, that he

21   has had, you know, a large case with tobacco and that he was

22   successful in those cases and knew how to handle large

23   entities like tobacco and the NFL and that he would represent

24   us well.  And, you know, we would have total access to him

25   during the time of our case.  So those kinds of statements

1   made from him kind of -- it's the reason why we -- we -- we

2   got his services.

3   Q    Did -- did Mr. Howard, you know, make you feel like he

4   would be able to successfully help you get compensated in the

5   NFL settlement?

6   A    He did, especially after we had like an appointment with

7   Dr. Koberda and he was telling us, you know, how qualified Dr.

8   Koberda was, and that once we had that particular medical

9   appointment, he stated that my husband had a very solid case

10  with the NFL and that we would -- that once the case started

11  and the claim was filed, that we were looking at maybe 90 to

12  180 days of receiving compensation because of the medical

13  issues that my husband had.

14  Q    And -- and once you retained Howard & Associates, how

15  many times would you say that you actually communicated with

16  Tim Howard?

17  A    Only a handful of times.  We had a very -- a very

18  difficult time communicating with him.  Initially, like in the

19  first part of it, he communicated a few times when we got the

20  medical report back from Dr. Koberda, and then he talked to my

21  husband about the loans and investing in like a -- in

22  Cambridge, a Cambridge Fund.  And a few days after we were --

23  we were still thinking -- because he told us about the up to

24  180 days that the case would go through, my husband actually

25  secured a loan with a group called Preferred Capital, and he

1   was thinking that he could repay the loan very quickly because

2   of the information he had gotten from Attorney Howard.

3   Q    And who was the primary person that you and your husband

4   interacted with at Howard & Associates?

5   A    Primarily Tom Woods and some of the lower level

6   employees.  Like I said, we had a difficult time getting in

7   touch with Attorney Howard or having our inquiries responded

8   to by him.  And so the other employees, Tom was the sort of a

9   lawyer that would give us a call back or respond to emails.

10  But they never had any pertinent information regarding our

11  case and couldn't answer our questions.

12            So we continued to try to get in touch with Attorney

13  to see like where our claim was in the process because he kept

14  telling us that he was going to file the claim, he had

15  registered us and he was going to file the claim.  And we kept

16  asking like where it is.  I mean weeks would go by and we

17  would have no response from him as to where we were in the

18  process, where the claim was, and what was going on.

19  Q    And when did you or Mr. Small make Howard's office aware

20  that Mr. Small was not registered into the settlement under

21  the correct name?

22  A    In 2017, I think it was.  They had -- Jessie had told

23  them that his -- his name was spelled incorrectly.

24  Q    And do you know if Howard & Associates ever fixed that?

25  A    They did not.

1   Q    Can you tell us what sort of legal services Howard &

2   Associates performed on your husband's case?

3   A    I don't think I can -- I don't think I can refer to what

4   he does -- he did as legal services.  I think that the actions

5   that he took on my husband's case actually and his claim

6   actually like made it worse because they -- they took us into

7   a lot of audits regarding information that the physicians that

8   he had sent us to provided to them, and all of our audits were

9   based on those particular physicians.

10          He had registered him under the wrong name and then

11  corrected.  That correction didn't occur until we got with you

12  actually to make that adjustment.

13          He arranged for him to see, what was it, Dr. Edwardo

14  Williams, I think it was, and that particular appointment took

15  place at Attorney Howard's office, which was a little

16  concerning for me, and then he arranged appointments with like

17  Dr. Koberda and Dr. Sadek and Drs. Lloyd and Morgan.  And at

18  the time, we weren't aware even with Dr. Williams' appointment

19  that he had had some other issues and couldn't see female

20  patients, only male patients at the time.  So we were very

21  concerned about the lack of legal services that we received

22  from Mr. Howard.

23  Q    But -- but it sounds like, Mrs. Small, there were

24  physician visits that Howard's office did schedule for your

25  husband, correct?

1   A    Correct.

2   Q    And you -- you didn't mention Dr. Ford-Johnson, but was

3   that -- was Dr. Ford-Johnson a physician that Howard &

4   Associates scheduled and arranged your husband to visit with?

5   A    He didn't see Dr. Ford-Johnson.  I think she -- or Dr.

6   Ford-Johnson took the medical information from the visit with

7   Dr. Edwardo Williams to use.  So he never actually saw that

8   particular physician.

9   Q    I see.  And -- and these medical visits, Mrs. Small, when

10  were they -- what year did they all take place in?

11  A    2017 that would be.

12  Q    Okay.  Did -- would you say that Howard constantly

13  communicated with you and your husband throughout the claims

14  process?

15  A    No.  Early on we saw that we were having issues,

16  communication issues with Attorney Howard and getting

17  responses from him.  And if we got a response, they normally

18  were not accurate, or he just didn't respond at all.  But he

19  -- he may have had a couple of times some of his employees

20  contact us, and they never had pertinent information regarding

21  the case or the claim and could never really respond to our

22  questions.  So we were very frustrated early on about his lack

23  of attention to the case.

24          So my husband was like maybe if I, you know, advise

25  him, since the last emails -- because he had sent one in

R. Small - Direct                                      71

1  December, around the end of December stating that, you know,

2  it had been weeks and Mr. Howard told us that our claim would

3  be filed.  And he said earlier, and he said, well, like it's

4  been weeks and we haven't heard anything, where's our claim.

5  And then we got a response back that they were reviewing the

6  claim and had not filed it.  And until we got with you, our

7  claim had actually never been filed and we had no idea that it

8  has never been filed because of the lack of communication.

9  Q    And when would you say, Mrs. Small, that you and your

10  husband stopped hearing from Mr. Howard?

11  A    I would say very early on.  And -- and looking at some of

12  the information that -- when we did some research and started

13  hearing about legal matters that was going on, I would say

14  soon after Dr. Koberda's appointment and us declining kind of

15  like to invest in some of the things that he was asking us to

16  invest in, unless my husband got like the loan from Preferred

17  Capital, we didn't hear from Mr. Howard, on very rare

18  occasions.

19  Q    And there was an email, Mrs. Small, that your husband

20  sent on February 13th, 2018 which is incorporated into Mr.

21  Howard's response to our dispute statement where your husband

22  emailed Tim Howard and requested assistance with Social

23  Security Disability.  Did Howard & Associates assist your

24  husband with Social Security Disability?

25  A    I would say no.  My husband asked him -- inquired as to

1   whether or not he knew of any attorneys who could assist him

2   with Social Security, and he told us that he had a few in

3   mind.  But my husband kept sending him correspondence like,

4   you know, do you have anybody that I can talk to because we

5   didn't know of any particular Social Security attorneys.  And

6   he said he was still looking into it and waited so long that

7   we actually contacted another attorney, got some information

8   from someone else.  And I had gotten in touch with another

9   attorney before -- I think he sent information like weeks and

10  weeks later, and we had gotten in touch with another attorney

11  to handle my husband's Social Security.

12  Q    Okay.  How did Howard --

13  A    I would say that helped in getting assistance from

14  Attorney Howard.

15  Q    Okay.  Thank you, Mrs. Small.  How did Howard &

16  Associates assist your husband with depression?

17  A    He did not.

18  Q    What about --

19  A    What do you mean by assist?

20  Q    Well, I don't know, Mr. Howard, you know, has alleged in

21  his memorandum that he has assisted your husband with

22  depression.

23  A    That -- that has not happened.

24  Q    Okay.  What about suicide ideations?

25  A    My husband never had suicide ideations, so he didn't

1    assist him with that.

2    Q     And how did Howard & Associates assist you or your

3    husband with health coverage for your family?

4    A     They didn't assist us because we already had health

5    coverage.

6    Q     Okay.  How did Howard & Associates assist your husband

7    with lack of employment?  Did they offer him a job?

8    A     No.

9    Q     What other benefits did Howard & Associates assist your

10   husband with?

11   A     He hasn't assisted us with public assistance that I'm

12   aware of.

13   Q     Okay.

14   A     Never has.

15   Q     And during -- during the course of your representation

16   with Howard, did he ever represent to you or your husband that

17   your husband was impaired to a degree that he would have a

18   claim to submit in the NFL concussion settlement?

19   A     He originally told us that we have a claim because of Dr.

20   Koberda's evaluation and that we would have -- a claim would

21   go through probably pretty quickly.  He said between 90 and

22   180 days we should have something, and that concerned me

23   because, you know, in my background, I have never seen

24   somebody be able to give you like a time frame on a court case

25   because there are always things that can come up.

1           So that concerned me a little bit, but I was like --

2    you know, he was so adamant about knowing what he was doing

3    because of the big tobacco and dealing with large entities

4    like the NFL and big tobacco, I was just like, okay, maybe he

5    understands something that we're not aware of.

6    Q    And did you or your husband believe at that time that he

7    was in fact eligible for compensation himself?

8    A    We did, which is why he actually took the loan that Mr.

9    Howard suggested through Preferred Capital.  Mr. Howard and

10   his associates suggested that he go to that company to get

11   funding.

12           He -- he asked us about joining into Cambridge, but

13   we actually declined.  For me, I thought it was a conflict of

14   interest with him being their attorney, and then we didn't

15   know about him actually being associated with the company.

16   But I just thought it was a conflict in an attorney who was

17   handling like a case and then kind of asking you to join some

18   kind of venture.  It just didn't sit right with me.  So we

19   declined.

20   Q    Okay.  And did -- for the record, did Howard & Associates

21   file a claim for your husband?

22   A    No.  He registered him in the settlement, but a claim

23   wasn't filed until you actually took over our case.  And --

24   and we got so much erroneous information from them that we

25   actually started communicating just with your office to know

R. Small - Direct                                    75

1    that we were getting true and accurate information.

2              There were times when my husband was asking about

3    the claim and he told us that we're there.  And there were

4    times when, you know, we asked about whether or not we were

5    like, you know, early on in our audit process or why was it

6    being held up, was there some issue.  And he -- his office

7    told us that we weren't in an audit when we were actually in

8    an audit.

9              So just getting so much erroneous information, we

10   just really stopped communicating with him and had sole

11   communication with your office.

12   Q    Okay.  And -- and help the Court understand, Mrs. Small,

13   you know, you say that Howard & Associates represented that

14   your husband was impaired and he would qualify for the

15   settlement, but you're also saying he never filed a claim for

16   your husband.  Why would he not file a claim?

17   A    I haven't the slightest idea, because we initially

18   thought that a claim was filed.  I mean we were actually taken

19   aback when we started communicating directly with you about

20   that a claim had never been filed, and you actually filed a

21   claim on our behalf into the settlement case.

22   Q    And did Howard & Associates recommend that you obtain a

23   loan against a potential settlement award, Mrs. Small?

24   A    Yes, he did.  He recommended that to my husband.  It was

25   actually two loans through his office and associates.  One

1   through Preferred Capital and the other through a company

2   called Beacon.

3   Q    Okay.  And did --

4   A    And we found out later that they were like very high

5   interest loans.  I was concerned because he knew that my

6   husband had neurological issues and I was very concerned that,

7   you know, he had steered him towards loans with such high

8   interest.  But he assured him that the case would not take

9   long and would soon be resolved, that he could pay the loan

10  balances off.

11  Q    And did Howard & Associates actually help your husband

12  obtain that loan?

13  A    Yes, they did.  They actually gave him the information

14  about the company, set up his -- his and another player's like

15  travel, hotels, everything to procure the loan.  And soon

16  after he procured it, I mean he was asking him about going

17  into a venture with a Cambridge Fund.

18          He also asked us about some other investment that he

19  was involved in, and that one stuck out because at the time

20  that he called my husband, we were -- we were at the hospital

21  with my daughter having a medical issue, we were in the

22  emergency room, and he called my husband asking him about

23  getting involved in some other investment that he had.  But we

24  declined that one also.  And I was just very perturbed with

25  him because we had -- we were going through some issues at the

1   time with our daughter and that he was -- asked us for funding

2   knowing that there were employment issues and other things

3   like that.  It was just a little confusing for me, I would

4   say.

5   Q    And to clarify, when you mean getting involved, what does

6   that mean, when Mr. Howard asked your husband to get involved

7   in a business venture?

8   A    Financially.  He wanted him to invest money.  So from my

9   perspective, you know, he was helping him procure loans so

10  that he could invest it in companies or investment ideas that

11  he had.

12  Q    I see.

13  A    Which I didn't think was appropriate for, you know, the

14  attorney that was supposedly working on our case to do.

15  Q    And --

16  A    I figured if there were any legal issues, that he would

17  be aware of that.

18  Q    And -- and -- and why did your husband need to travel to

19  (inaudible)?

20  A    He told him about a company out of Nevada, and so he set

21  up the hotel and cars to take them there, because I had

22  already told him that he had issues like finding his way

23  around sometimes and would actually use like navigational

24  systems.  So he procured cars to take them there, hotel rooms,

25  airplane tickets.  And I just thought that was strange that he

1    would set all of that up for him to get funding and then ask

2    for him to use it for a Cambridge Fund.

3    Q    And at the time, Mrs. Small, your husband signed the

4    loan, did Howard & Associates explain any of the terms of the

5    loan like the fact that it was a full recourse loan to your

6    husband and that it had a 39.95 percent annual interest rate?

7    A    No, he did not.

8    Q    And then circling back, can you confirm for the record

9    Mr. Howard sought to have Mr. Small invest the proceeds from

10   that loan into investments that Mr. Howard managed, is that

11   correct?

12   A    Yes, and -- and so for me, I was thinking that the only

13   reason he wanted him to get the loans were to invest in these

14   funds that he had.  And so we started seeing like

15   informational things going on.

16        We saw an article in like Law360 regarding these

17   hedge funds and what he was doing.  And so we were like, he

18   asked us to procure this loan so that we could invest in his

19   company and then he loaned the money back to us, because my

20   husband knew like one or two of the players that he was having

21   legal issues against regarding investing in this fund and then

22   he was kind of loaning them their money back.

23        And, you know, we had seen other information and

24   articles regarding him.  We found out that he was being sued

25   by the FEC -- the SEC, that he was being sued by other retired

R. Small - Direct                                   79

1   players that we were aware of, and that he just had a lot of

2   -- lot of legal issues going on.

3           And, you know, that article was just like the last

4   straw for us, when we kind of put it together that he was kind

5   of like trying to include us in these schemes that he had for

6   the hedge fund.  And so we just terminated his services

7   because I was like, this is it, this is too much, there's like

8   a lot going on and, you know, he's kind of like included us,

9   although we declined to invest.

10          I mean we could have been one of those people that

11  we know that, you know, just procured these loans and then we

12  owed like a lot of money back on these loans because of the

13  time frame that the case took.  And it was extended due to the

14  fact that these doctors that he referred us to were in

15  question in regards to how the -- the medical reports were

16  obtained, you know, contradicting information on the medical

17  reports.  So the case was extended through these audit

18  processes, and all of the audit information had to do with the

19  doctors that he referred us to.

20  Q    And again, Mrs. Small, at this time Howard & Associates

21  was still solely representing you and your husband, they had

22  you obtain a loan, sought for you to use the proceeds from

23  that loan that was procured by medical reports from Howard's

24  experts to invest in Howard's hedge fund entities, and then,

25  you know, he made you and your husband believe that you were

R. Small - Direct                                   80

1   so impaired and had you do all this, yet never filed a claim

2   for you.  I still don't understand why he did not file a

3   claim.  Can you provide any possible explanation of why that

4   didn't happen?

5   A    Well, I -- for me personally, and we -- and we discussed

6   this, I think that his -- that what he wanted was for us to

7   invest in the fund.  I don't think it had anything to do with

8   my husband's settlement claim.

9        I think he wanted us to get these loans so that we

10  could invest in the funds to enrich himself, and it had

11  nothing to do with advancing our claim and helping my husband

12  get assistance.  Actually, I think he -- he's cost us a lot of

13  money because a lot of this medical information I think could

14  have been found out sooner.  And it kind of -- at the time

15  that the diagnosis was made, my husband was older, so it

16  actually reduced the amount of his settlement because of his

17  age at the time.

18       (Transcriber change)

19  Q    And, Mrs. Small, why did you decide to associate Shenaq,

20  PC into your husband's case?

21  A    Because we weren't -- we weren't getting any information

22  from Mr. Howard.  It was -- we didn't get any responses from

23  him.  And so in the response that we got from his office was

24  erroneous information a lot of the time.

25       So we came to you, because you were giving us

1    accurate information.  You actually filed our claim into the

2    settlement case.  You corrected my husband's name where we had

3    sent him information, Mr. Howard, to do name corrections and

4    that never happed.

5              You also reviewed like his medical information to

6    get him the best possible outcome on the settlement claim.

7    You actually sent us to the MAF and BAP physicians that we

8    needed to actually get a valid claim filed.  Because we found

9    out that the information that Mr. Howard had wasn't valid, and

10   that those doctors weren't actually be able to give us an

11   accurate diagnosis under the settlement.

12             And you guided us through the audit process, the

13   initial audit process, which was totally based on the

14   physicians that Mr. Howard had recommended to us early on in

15   the process that had nothing to do with my husband's

16   diagnosis.  That you reviewed the medical documentation that

17   kind of identified that he had a more serious diagnosis with

18   the Parkinson's disease.

19             And actually removed the first claim and filed

20   another claim for that Parkinson's diagnosis, which gave him a

21   bigger settlement.  And that was through the second audit

22   process, which occurred from the doctors that Mr. Howard had

23   initially sent us to that, again, had nothing to do with the

24   Parkinson's diagnosis, but we went into audit because of those

25   initial physician.

1  Q    And was the outcome (inaudible) Howard's firm recommended

2  that you and your husband enter into?

3  A    We actually owed them a lot of money, but -- during the

4  time that our settlement was going to be over.  And your

5  office, and you particularly, actually negotiated almost by 40

6  percent the rates down to 10 percent, which saved us probably

7  more than like $90,000.

8  Q    And I know you touched on some of the legal services that

9  our firm provided.  Was there anything that we provided beyond

10  what we were obligated to under our representation of you and

11  your husband?

12  A    Yes, you worked with us to try to find methods to assist

13  him with the Parkinson's and things that we could do to kind

14  of stop the Parkinson's -- not totally stop it, but slow its

15  progress, which for me was outside of your normal duties as an

16  attorney, and I really appreciated that from you and your

17  office.  And we're forever grateful that you helped us with

18  that.

19        You know, identifying various methods that we could

20  use to help with the Parkinson's disease and slow it down.

21  Q    And how about any other, you know, benefits that we were

22  able to help your firm (sic) with?  Were there any other

23  programs that we assisted you and your husband with?

24  A    You helped us with -- also with going through the NFL

25  plan, 88 plan.  And trying to secure those benefits through

1    the NFL 88 plan.

2    Q    And who was your day-to-day contact, or who did you

3    normally contact at Shenaq, PC?

4    A    We talked to you.  Which I was grateful for.  But we had

5    -- we had a hard time with Mr. Howard and the lack of

6    communication.  And you responded to questions that we had.  I

7    mean, you responded to them yourself.  There were a few

8    occasions where you were not available, and you had some of

9    your associates contact us.

10            But even after that, I mean, you still called us to

11   ask if we had any residual questions, any residual inquiries.

12   And you gave us kind of like that one-on-one care that we

13   needed that -- that we were missing with Mr. Howard.

14   Q    And how regularly would you say those contacts or

15   communications were from Shenaq, PC's offices?

16   A    Oh, we talked to you probably about every day, every

17   other day, or a few times a week.  It was just a lot because

18   we -- we wanted to know what was going on and you relayed that

19   information to us, and if we had any residual questions

20   regarding that, you returned our calls within like 24 hours.

21            And that was something that we were not used to with

22   our initial attorney, Mr. Howard.

23   Q    And why did you decide to terminate your attorney-client

24   relationship with Tim Howard and his law firm Howard &

25   Associates?

1    A    Besides the communication issues -- but there was just a

2    lot of information and researching that we got regarding some

3    of his legal issues, there was a Law 360 article that we read

4    regarding, you know, the hedge fund and how he was having

5    players invest in this fund.

6          And we know that it was introduced to us, and that

7    he was having the issues with the SEC and with the Florida --

8    with the Bar regarding some of his practices.

9          And it was kind of like a last straw issue.  And so

10   we decided, probably the next day I think it was, or a day or

11   two to terminate his services.  We didn't think that he could

12   adequately, with all of that going on, pay attention to our

13   case because he was giving it so much -- a lot of attention

14   prior to that, that we just decided to sever his services.

15         Because we weren't getting any legal services from

16   him that we can identify anyway.

17         MR. SHENAQ:  And, Your Honor, I'd like to introduce

18   Exhibit 1, which references what Mrs. Small is referring to in

19   the documents that they've obtained that were instrumental, or

20   a significant factor of their basis of termination of --

21         THE COURT:  I'm familiar with it.  It may have some

22   potential bearing on the questions with respect to their

23   determination as to terminate Mr. Howard.  But I don't need to

24   have her go through it at all, please.

25         And I'm familiar with the allegations.  I'm familiar

R. Small - Direct                                      85

1   with Mr. Howard's denial with respect to those -- to the

2   allegations.  I think it -- you know, I accept it as backdrop

3   for the reasons and rationale from Ms. Small's perspective as

4   to why she terminated Mr. Howard.

5              So let's move on beyond that.

6              MR. SHENAQ:  Thank you, Your Honor.

7              THE COURT:  The same thing with attorney --

8              MS. SMALL:  And I would just like to say that we,

9   you know, Amir offered us the same -- we went with him with

10  the same agreement that we initially had with Attorney Howard.

11  And so for us it just made sense, because he was the person

12  that we were doing all the communication with that gave us all

13  the answers, that filed our case -- that filed our claim.

14             Actually, two claims.  And so it just made sense to

15  us to move, because we weren't getting any services from

16  Attorney Howard.

17             MR. SHENAQ:  And, Your Honor, I just have one

18  question for the Smalls, and I'll hand it over.

19             THE COURT:  Are you going to make it a non-leading

20  question?

21             MR. SHENAQ:  I'll do my best, Your Honor.

22  MR. SHENAQ:

23  Q    Mrs. Small, how were Howard's contributions related to

24  the outcome of your husband's NFL concussion claim?

25  A    He didn't have any contributions to the outcome.  Our

1    claim and our settlement came from the second claim that you

2    filed for Parkinson's, which was what he was finally diagnosed

3    with.  And the first claim was actually rescinded and a second

4    claim was filed for the Parkinson's diagnosis.

5            So our outcome actually came from the work that you

6    and your office did as far as finding out all of the medical

7    history, and reviewing bills, documentation's on what was

8    really going on with my husband.  And that he had a

9    Parkinson's diagnosis.

10           So I wouldn't say that Mr. Howard did anything.  All

11   of the doctors that he referred us to were called into

12   question.  And none of their information was actually used for

13   our Parkinson's claim on that diagnosis.

14           MR. SHENAQ:  Thank you, Mrs. Small.  And thank you,

15   Your Honor.  I have no further questions for Mrs. Small.

16           THE COURT:  Mr. Howard?

17           MR. HOWARD:  Just a few questions.

18                     CROSS-EXAMINATION

19   BY MR. HOWARD:

20   Q    Thank you, Ms. Small.  Ms. Small, are you a client of

21   Howard & Associates, or Shenaq?

22   A    My husband is a client.

23   Q    But you're not a client, though, were you?

24   A    But I help him in his day-to-day.  I handle the medical

25   issues that he has.  So I'm very involved in his day-to-day

1    matters.

2    Q    How much time did you spend with Mr. Shenaq in preparing

3    for today's testimony?

4    A    How much time?

5    Q    Um-hum.

6    A    I have not -- we just discussed that we were going to

7    have a hearing and that there -- we would have to give

8    testimony as far as, you know, what our experiences were

9    during this time.

10   Q    Did you discuss these facts just presented with Mr.

11   Shenaq?

12   A    Of course, we've discussed them during the course of this

13   whole settlement process.  This is all information that went

14   on during the settlement process.  Like I said, we had a

15   serious communication issue with you, so all of our doctors'

16   outcomes and all of that had to be discussed with Mr. Shenaq.

17   Q    And --

18   A    And, Tim, I'm just gonna say this.  I mean, you did not

19   respond to us.  You did not respond to communications that we

20   had for your office.  I mean, and when we had like questions

21   for you, you didn't respond to those questions.  We had no

22   idea that our claim wasn't filed, that you hadn't filed it.

23         You had registered us, but you had never filed a

24   claim when you told us that you would.

25   Q    Did you --

1    A    And that was in December of seventeen.  And we didn't

2    find out until we were with Mr. Shenaq that there was a claim

3    that had never been filed, and he had to file a claim on our

4    behalf.  And I think that is awful for you to have told us

5    that you would file a claim for us, and you never did.

6    Q    Did -- how did you get in touch with Mr. Shenaq's law

7    firm?

8    A    I'm sorry?

9    Q    How did you come -- how did you -- you're not the client,

10   but actually attorney to Mr. Small.  But how did -- how did

11   Mr. Small come in contact with the Shenaq law firm?

12   A    We came in contact with him through your office, because

13   you said that he would be assisting me.  In that process, we

14   found that he was actually the only one that we could contact

15   that would give us accurate and true information.

16         You office had given us information that we were in

17   a claim process, which was totally inaccurate, that our claim

18   was doing well, and there was no claim filed.  And that is a

19   misrepresentation because you never filed a claim.  And you

20   actually gave us false information.

21   Q    Do you know when the Shenaq firm was retained by Mr.

22   Small?

23   A    When it was retained?

24   Q    Correct.  When Mr. Small entered into a contract with

25   Amir Shenaq's firm, and the Howard firm, do you know when that

1   took place?

2   A    I think it was 2018.

3   Q    All right.  Do you know month that took place?

4   A    I'm not -- I don't have the documents in front of me.

5   Q    It took place --

6   A    I was aware of that information, but I don't have those

7   particular documents in front of me.

8   Q    It took place in early May, late April of 2018.  And do

9   you know what -- what month Mr. Small ceased us as -- even

10  though Amir Shenaq works with and for me, by the way, you need

11  to know that --

12            MR. SHENAQ:  Objection, Your Honor.  I don't work

13  for Mr. Howard.  That's completely false.  I don't work for

14  that man.

15            MR. HOWARD:  Yes.  We have joint co-counsel, do you

16  know we have a co-counsel relationship, Mr. Small and Mrs.

17  Small?

18            THE COURT:  Well let's see -- let me see what the

19  document says, if you would submit that, either one of you, I

20  don't care, but submit that document to me and that might very

21  well clarify it with me.

22            MS. SMALL:  I think we terminated his services in

23  September of 2020, if I'm not mistaken -- I mean 2019, I

24  apologize.

25  BY MR. HOWARD:

1    Q    Correct.  So that would have been a year and a half after

2    we had been jointly representing you, is that correct?

3    A    And let me just say this.  The only reason -- my husband

4    wanted to sever your services, and I was like, but you

5    represented to him kind of like if he severs your services

6    that we wouldn't have access to Amir anymore, because he was

7    your employee, and he worked for you.

8             And that was a misrepresentation.  Because we could

9    secure his services.  And you made my husband believe that

10   without you, Amir wouldn't be there.  And the only reason we

11   had stayed there was because of Amir's services.

12            And his fantastic and exemplary communication with

13   us, and the way that he handled our case.  So I -- I don't

14   think the time frame that we left was even a factor, because

15   you misrepresented that, that he worked for you and pretty

16   much that if we severed your services it would sever his

17   services.

18   Q    Did you not state the reason you left our services is

19   because we were not providing care for you, and that's why you

20   went with Amir Shenaq?

21   A    I said there were multiple reasons that we left your

22   services.  And one of them was the fact that you, who were

23   supposed to be our major attorney, would never return our

24   calls or communications.  And that, for me, is egregious.

25   Q    Ms. Small, how many emails did you ever send me?

R. Small - Direct                                         91

1    A     How many emails?  We sent --

2    Q     Not -- Mr. Small I responded to, I'm talking about from

3    you?

4    A     I'm sorry?  You sent email to my husband?  It was --

5    Q     No.  My question is how many --

6    A     -- to me because --

7    Q     -- emails did you send me?

8    A     No, you can't over-talk me in this.

9    Q     (Inaudible)?

10   A     You know that I assisted him in that.  And you know that

11   I was there, and you didn't respond to our communications, so

12   much to the fact that one of the players had to suggest to you

13   to give telephonic meetings to give us updates on what was

14   happening on these cases.

15              And even on those telephone meetings nothing was

16   relayed that was pertinent to the cases.  And actually false

17   information was given on those calls.

18   Q     So you acknowledge that we had bi-weekly phone calls with

19   all of our clients available to listen?

20   A     I acknowledge that you had phone calls, I didn't

21   acknowledge that we were on all of them.

22   Q     And you know that --

23   A     And that even on those calls misinformation was given to

24   your clients.  And on a few occasions you shared information

25   about your clients that should never have been shared in that

1    environment.  And being with a background of HR, I'm aware

2    that personal medical information should never be shared in

3    that environment, and you gave some of that information.

4              And then you asked when they were asking you --

5    because multiple people that were clients of yours were on

6    that, and that's when we realized that we weren't the only

7    ones with issues regarding communication problems between you.

8    Because there were multiple ones who had no response from you

9    on where their medical information was, where their claims

10   were, where they were in the process.

11             They had none of that information.  And early on on

12   those calls you started asking that people call you

13   individually.  And when those call -- after the total call,

14   when they did that, they would come back and say that they

15   never got in touch with you, which is the same issue we were

16   having.

17             And so I was like, this is futile for us to keep up

18   these communications, because this -- this doesn't make sense

19   that our attorney is giving us fake and false information.

20   Q    And isn't it true that Mr. Small wanted a discount on his

21   fee?

22   A    No.  It was addressed that if they brought in clients to

23   you, that you would give them discounts on their fee, which

24   never occurred.

25   Q    And isn't it true that --

1   A    And I was like that is -- and I said that is strange,

2   because most attorneys don't discount fees.  But you asked

3   them to bring in additional players for your services.

4           Which, in fact, you only wanted to get them these

5   loans so that you could invest them in your own personal get

6   rich scheme.  And that is egregious to me as an attorney, and

7   you never represented to them that you were even a part of

8   these funds, which was a conflict of interest on your behalf.

9           And you got out away from -- well over two thousand

10  --

11          THE COURT:  Ms. Small -- Ms. Small, he's asking a

12  limited -- limited question.  I appreciate your desire to get

13  more information in, but I think we have -- I understand your

14  allegations with respect to that.  Proceed, Mr. Howard.

15  BY MR. HOWARD:

16  Q    And, Ms. Small, just on that subject, are you aware that

17  I ceased all participation in that company in March of 2017?

18  A    Am I aware of what?

19  Q    I ceased all participation in that Cambridge company in

20  March of 2017, only four months after you -- you signed up

21  with us?  Are you aware of that?

22  A    That is not the information that I saw in the research

23  that we did, Tim.

24  Q    Correct.  And that's why this is not public yet.  Are you

25  aware that there's settlements was taking place with the SEC

1   and --

2   A    But those are things, there's still an issue that --

3            THE COURT:  Ms. Small -- Ms. Small, I'm sorry, but

4   you're responsibility is to answer his question, if you could,

5   please?

6            MS. SMALL:  Okay.

7            THE COURT:  Go ahead.

8   BY MR. HOWARD:

9   Q    That would be the question.  So are you aware that I left

10  the company in March of 2017.

11  A    I was not.

12  Q    Okay.  And are you aware that the SEC claim is in the

13  process of being dropped?

14  A    I was not.

15  Q    Are you aware --

16  A    And that was the only reason that we secured your

17  services -- or we terminated your services (inaudible) but it

18  wasn't the only reason.  And you are aware of that.

19  Q    And is it true that you terminated my services within a

20  week of us not agreeing to reduce our fee?

21  A    That is incorrect.

22  Q    Okay.  And is it true that our communications were

23  primarily with our client, Jesse Small, and not with you?

24  A    That is incorrect.

25  Q    And --

1    A    Cases came from Jesse's email, which we were both there.

2    Q    And we have submitted I think four hundred more pages --

3    1800 total pages of our constant communication with Mr. Small

4    and yourself.

5    A    I have 400 pages of communication with my husband.  If

6    you have 400 pages, there was something added, because you did

7    not communicate with us that often.

8    Q    Well it's right in the record.  And we were dealing with

9    Mr. Small, not yourself?

10   A    That is incorrect.

11   Q    And you're aware that you received -- Mr. Small received

12   an award letter as of May of 2019, is that correct?  Are you

13   aware of that?

14   A    I'm aware that there was an award received.  However,

15   from the outline that they gave us of the case goes, it can go

16   on appeal at any time, which it did.  And it went into audit.

17   And that at the point that it went into audit, that the award

18   was rescinded.  We actually did not get an award until late

19   2019.

20         And that was after your services were terminated.

21   Q    And you're aware the --

22   A    We were in another audit process.

23   Q    The May -- the May 2019 award letter was for Parkinson's,

24   are you aware of that?

25   A    It was not for Parkinson's.

R. Small - Direct                          96

1    Q    And you are also aware that this firm brought Amir Shenaq

2    to help with this case, that you did not seek Amir Shenaq out?

3    A    I'm aware of that.

4    Q    And you're aware that this firm was advancing your claim

5    and finds good expertise to assist that is something that's

6    appropriate for a law firm to do?

7    A    Actually, you did not advance our claim.  Amir advanced

8    our claim.  You didn't file a claim for us.  There was no

9    claim filed from you.

10   Q    Where did -- how did --

11   A    You served (phonetic) us in the settlement.  And then you

12   ceased communication with us and provided us no information as

13   to how our case was moving forward.  And you misrepresented

14   that we have a claim filed when we did not.

15   Q    The records show we did not cease communication, and do

16   you -- excuse me, I don't want to be argumentative.  You

17   disagree with the forwarded pages of emails between just Mr.

18   Small and ourselves, showing -- documenting communication?

19   A    Tim, I can't tell how many pages there were.  What I can

20   tell you is that you did not provide us with any pertinent

21   information regarding our claims case while it was moving

22   forward, or, in that matter that you hadn't filed a claim on

23   our behalf, which cost Jesse not to be able to get into the

24   settlement at an earlier date and an earlier age.

25             Which has literally cost him money, because at an

1  earlier age that his claim could have been filed with a higher

2  settlement, which could have possibly helped us further along

3  with getting medical care for his medical issues.

4              And that, to me, as someone who's supposed to be a

5  legal attorney, or legal authority, is egregious on your

6  behalf.

7  Q    And just to reiterate, you did not have any experience or

8  knowledge of Amir Shenaq's firm until we brought his firm to

9  assist?

10  A    That's correct.

11  Q    And then you did not seek out Amir Shenaq's firm, but we

12  did?

13  A    That is accurate.

14  Q    Are you aware that Amir Shenaq's firm did not pay one

15  penny towards your claim, that my firm paid for everything?

16  A    That's actually inaccurate.

17  Q    That Amir Shenaq got paid for testing?

18  A    That's inaccurate.

19  Q    Amir Shenaq did not pay for --

20  A    You actually sent something saying that how much that was

21  -- where we asked you what was, I think prior to us

22  terminating your services, what fees we had.  The only ones

23  you gave us were the ones from Shamir -- I mean Amir, I'm

24  sorry.  And when you called us about that second investment

25  when our daughter was in the hospital, you only made that call

1   because Jesse had contacted somebody to tell you that he was

2   considering terminating your services.

3          And when you called us, you didn't even speak of the

4   lack of services that you were providing, and the fact that he

5   wanted to terminate your services, you took that opportunity

6   to ask him about an investment.

7   Q   Just for the record I never -- never -- never talked to

8   Jesse about investments.

9   A   And then you think (inaudible) something which would have

10  no claim to because you didn't do anything.

11  Q   Just for the record, there was no phone call between

12  Jesse and I about investments, that's untrue.  I'm not sure

13  where it comes from.

14          MR. HOWARD:  I have no further questions.

15          THE COURT:  All right.  Thank you.  Mr. Shenaq, I'm

16  tempted to preclude you from asking any further questions.  Is

17  there anything that you think that you absolutely must answer

18  that would be new, that was brought out by Mr. Howard's

19  questions?

20          MR. SHENAQ:  Your Honor, I just want to make one

21  quick statement in rebuttal in that the Smalls --

22          THE COURT:  All right.  I'm going to give you a

23  opportunity to make statements in terms of argument.  All

24  right?  When we get to the end of this.

25          What I need to address is the exhibit that makes

R. Small - Direct                                    99

1   reference to costs.  There's an exhibit that was provided, it

2   is Exhibit E, I believe that was part of the exhibits that

3   were provided by Mr. Howard.  And can we get that one up

4   Alisha?

5           THE CLERK:  I don't think I have a copy of that.

6           THE COURT:  It's part of Mr. Howard's exhibits.

7           THE CLERK:  Right.

8           THE COURT:  Exhibit E.

9           THE CLERK:  Yeah, I only have a copy that has some

10  writing on it.

11          THE COURT:  I thought you guys worked that out this

12  morning.  No?

13          THE CLERK:  I received another email, but I -- I am

14  not seeing that exhibit.  Maybe if one of the attorneys has it

15  available right now they could email --

16          THE COURT:  Let's do this.  Let's do this.  Let's

17  have us our group go into a separate caucus.  I'm going to

18  take a five-minute recess, or a ten-minute recess.  All right?

19  If you want, I can put you, Mr. Shenaq, in caucus with your

20  client and separate out Mr. Howard, or you could all just be

21  in your own caucus.

22          Jimmy, this going to be not part of the record.

23  We're just going to take a break.

24          THE CLERK:  Okay, Judge.

25          THE COURT:  All right?  For ten minutes.

R. Small - Direct                          100

1          (Court in recess 12:25 p.m.)

2              THE COURT:  So let's, I mean, so you address -- and

3      this is to Mr. Howard -- Exhibit E, which is some -- what

4      appears to me to be some kind of a worksheet with some

5      information.  Alisha, if you could put that up on the screen?

6              So, Mr. Howard?

7              MR. HOWARD:  Yes, Your Honor.  This deals with my

8      Dr. Wisdom, Dr. Bertelson, Dr. Evans, neurology.  Ground

9      transportation via cab fare; neuro psych costs $2,500; air

10     fare getting Mr. Small there, back and forth; hotel costs.  It

11     deals also with Dr. Lloyd and Dr. Morgan's work up, and Dr.

12     Sadek's work up,  Charges of Dr. Koberta and his work up as

13     well.  At the time all of them were MAF certified doctors.

14             Dr. Barker's -- the Nurse Barker's (inaudible)

15     reading, and an MRI that was done by MRI Health Imaging, which

16     was just to see if there's any -- that we can find from the

17     MRI to see if there's any damage to the brain and to document

18     through the MRI.

19             THE COURT:  All right.  Can you supplement this by

20     giving us dates, the dates of these examinations might --

21     might have some relevance.

22             MR. HOWARD:  Yes, I -- I can do that, I don't have

23     it in front of me.  But the work with Wisdom, Bertelson and

24     Evans I would think would take place sometime in 2019, maybe

25     the latter part of 2018.  Sadek and Morgan would have been

1   sometime in mid or the late twenty eight -- 17.

2            Koberta would have been probably early 2017.  The

3   MRI would have been early 2017 if we found anything with brain

4   damage.  And when we did the MRI's we found some players with

5   brain cancers and tumors, and we found some -- some -- we

6   could verify some denigration of certain parts of their lobes.

7   That's why we did the MRI on some clients that were more

8   severe.

9            And Nurse Barker CDR -- also charged for the CDR.

10           THE COURT:  All right.  So the reference on the far

11  right starting with Laurie Morgan, I mean, there's a --

12  there's an obvious break there, as you can see.

13           MR. HOWARD:  Correct.

14           THE COURT:  And on the lower half of the break, it

15  looked -- I presume H ampersand A is Howard & Associates?

16           MR. HOWARD:  Correct.

17           THE COURT:  That has -- but that has to do with work

18  done prior to Mr. Shenaq's affiliation with you?

19           MR. HOWARD:  Correct.  These -- they were done prior

20  to April of 2018, and Mr. Shenaq would have been after April

21  of 2018.

22           But we were working together.  And, Your Honor, I

23  didn't -- we're still operating under the same contract.  I

24  don't think that the client has entered into a new contract

25  with Shenaq, I think it's under our same contract.

R. Small - Direct                                        102

1          THE COURT:  All right.  Well I want to ask you to
2     produce that contract.  You can just, you know, send it to me.
3          MR. HOWARD:  That -- it was done in a -- in the
4     DocuSign format, and I'm not sure that I have it in my email.
5     I know Mr. Shenaq has it.  But I have to look for the
6     DocuSign, I'm not sure we have it in the One Drive.  But we'll
7     look into it now.
8          THE COURT:  All right.  Mr. Shenaq, do you have it?
9          MR. SHENAQ:  Yeah.  Can you clarify which contract
10    you're referring to?  Because I'm unclear as to what -- what
11    Mr. Howard is referencing on the front of the contract.
12         THE COURT:  Well what I'm referencing is that there
13    was in the -- in the presentations made, I can't cite verse
14    and rhyme at this point, but in the presentations made that
15    there was some kind of an arrangement between the two of you
16    when you came in in April of 2018.  And I asked the questions
17    to one or the other of you, with whether or not that was
18    (inaudible) and I got a positive response.
19         So I wanted to see what the writing was in term -- I
20    meant it to be, or I thought it to be some overall arrangement
21    between the two of you as to how you, Mr. Shenaq, would be
22    compensated for the work and effort that you undertook during
23    the time that you were, up until September 2019, during the
24    time that you were associated with Howard & Associates on this
25    case.

1    MR. SHENAQ:  Yes, Your Honor.  And, you know, before

2    we were able to undertake efforts with representation of any

3    client who is a -- you know, currently represented, they have

4    to sign a consent to associate document.  That document sets

5    forth the applicable fee percentages that are attributable to

6    each firm at the time that that writing was signed, before our

7    firm can commence any work.

8         And that document had to be signed by Mr. Small, and

9    he obviously had to consent to our association and us doing

10   any work on his case before --

11        THE COURT:  That's apparently the document I need to

12   see.

13        MR. SHENAQ:  Okay.

14        MR. HOWARD:  Your Honor, just to clarify, there are

15   two documents.  One is our co-counsel internal document, joint

16   prosecution document where we share -- we determine fee

17   division internally, and I'm happy to share that.  I may need

18   to get a waiver from either Mr. Shenaq or -- to do that.

19        And then we have, of course, the co-counsel document

20   with the client where we have signed that through DocuSign.

21        THE COURT:  Okay.  But what I want is what you guys

22   have and you're relying upon.  And it's a little bit

23   different, and I presume Mr. Shenaq will get authority from

24   his client to be able to have this reviewed.

25        And then that will be helpful.  Now going back to

1    the -- and, by the way, what you can do is just give me -- you
2    can send it to the -- to my Chambers.  You can send it
3    electronically, and you can use the Strawbridge Chambers email
4    address, which I think you folks have used before, you're
5    familiar with.  Strawbridgechambers@gaed.uscourts.gov.  I
6    presume you're familiar with that and the suffix following the
7    at.  So that's where I'd like to have this submitted.
8            And then I will just have it incorporated into the
9    record here.  So one of the -- I had to take note that we
10    understood, Mr. Howard, that your claim for costs was a sum of
11    $16,750.  But I believe that's in one of the narratives.  And
12    obviously more or less $11,000 less than what appears on the
13    papers.
14            MR. HOWARD:  If we go by the documents here, I think
15    the 16,000 would have been my firm's portion, and the other
16    would have been the rest of it.  So the total amount of costs
17    is 47,689, of which my firm paid for all of it.
18            THE COURT:  All right.  So, Mr. Shenaq, do you
19    accept that representation?
20            MR. SHENAQ:  To some degree, Your Honor.  Our firm
21    did incur all of the costs starting from neurology 1,100, and
22    going up towards that page of their Exhibit E.  Howard &
23    Associates did reimburse our firm for all of those costs
24    incurred pursuant to a co-counsel agreement that we had.
25            However, it's our position that Howard & Associates

1    has also materially breached that document, although that's,

2    you know, may not be particularly relevant to your analysis,

3    but that is our position on this larger co-counsel document.

4            MR. HOWARD:  And, Your Honor, if I may -- that's the

5    first I've heard of any repudiation.  I will let my counsel

6    know that that's their position, and I think that starts a

7    lawsuit between us.  I did not know that that was the position

8    of Mr. Shenaq until this very moment.

9            MR. SHENAQ:  We have made representations to Mr.

10   Howard, Your Honor, on a number of occasions that they've been

11   in material breach of a co-counsel document.

12           THE COURT:  Well I'm going to leave that to you guys

13   separately.  The last thing I want to do is to be in the

14   middle of a dispute between the two of you that is not

15   directly related to the proceeding that would be associated

16   with securing the award for the benefit of Mr. Small.

17           So, Mr. Shenaq, are you -- you see the document and

18   you recognize the part -- the top half of it I'll say, it's

19   not exactly half, but the top half of it where your name is

20   attached to two or three or more expensive items.

21           These -- do you recognize them as all costs that

22   look like they were costs that were undertaken during the time

23   when you apparently from -- it was after the April of 2018,

24   you apparently had associated at this point with Howard &

25   Associates and you had taken over a lot of responsibility as

1   Ms. Small articulated in her testimony.

2               You were carrying the -- you were carrying ball

3   forward up until September of '19 when you did it on your own

4   account after he was terminated?

5               MR. SHENAQ:  Yes, Your Honor, that's correct.  And

6   every cost included is to the penny, the exact penny dollar

7   amount that we've incurred with respect to each of those line

8   items.

9               THE COURT:  All right.  Well you -- maybe you have

10  to be involved in the updating of that particular document, at

11  least with respect to dates and the nature of service.  I

12  mean, I can -- I find out the nature of service, I recognize

13  the names of the physicians.

14              So, okay.  All right.  Okay.

15              I'm ready to hear argument.  I'm frankly not sure I

16  need a whole lot of argument.  We've had sort of argument

17  throughout the course of the -- during the course of the

18  hearing off and on.  But, Mr. Howard, let me give you a

19  opportunity to go first.

20              MR. HOWARD:  Your Honor, there's no dispute that

21  this firm has paid for all the costs.  The notice that this

22  firm brought on Amir Shenaq in April of 2018, there's no

23  dispute that we have provided services.  There's no dispute

24  that the doctors that did these workups were MAF certified and

25  qualified on the NFL program.

1              There's no dispute that we communicated regularly

2      with the client.  There's no dispute that our services were

3      provided, and there's no dispute that there's regular

4      communications as documented in the file.

5              There's no dispute that, but for our participation

6      and guidance in the case, there would be no recovery for this

7      client.  There's no dispute that the client received a great

8      award in large part thanks to our guidance.  And that being

9      the process, as the NFL claims process has gone through

10     various iterations, through change, and the standard has

11     changed quite a bit over the past 30 months.

12             THE COURT:  How -- how long?

13             MR. HOWARD:  Thirty months.

14             MR. SHENAQ:  Thirty months, right.

15             MR. HOWARD:  And whether it's the Heaton principle,

16     more that they just showed up, or whether it's the how we

17     measure the -- the medical reviews, the independent medical

18     reviews, so there's a lot of nuances in it that we've helped

19     navigate through.

20             And in fact prior to the past eight -- over the past

21     seven months, eight months ago we were on regular calls with

22     Amir Shenaq regarding the claims and cases. There was no

23     dispute amongst the parties.  This -- this current break-up

24     only took place over the past -- at some time around September

25     or October of last year.

1        So during the operative time of Mr. Small's claim,

2   we were actually working almost daily with Shenaq and his

3   staff organizing meetings, getting updates on medical reports,

4   providing information to the client.

5        There really is no separation between this firm and

6   Shenaq when it comes to joint prosecution of cases.  And that

7   contract, whether it's with the Smalls or with jointly has not

8   been repudiated.  And the best I can tell there's not a

9   separate with Amir Shenaq and the Smalls, they're still

10  operating under my contract with Amir -- with Mr. Shenaq and

11  the Smalls.

12       And I didn't know until this past ten minutes that

13  Shenaq is now saying we don't have a joint co-counsel

14  agreement.  So I'll inform my counsel we're now in conflict.

15  We'll take care of that.  But as far as the benefits to the

16  client, the success speaks for itself, the joint work speaks

17  for itself, the fact verified just a moment ago that we paid

18  for all costs speaks for itself.  And this really comes down

19  to what really happened here, as we would not give a discount

20  to Mr. Small or Mr. Guyton on the fee, and that -- when that

21  was done, that is why they ceased the representation in

22  September of 2019, five months after the May 30th award of the

23  Parkinson's award of 1.9 million.

24       And that took place May 30th of 2019 during our

25  operative time while we were jointly co-working on the file.

1    I don't think the Smalls realize that when they were talking

2    with Amir Shenaq's firm, they were talking with my firm.   When

3    they talked with his staff, they're talking with my staff.

4           My staff was regularly dealing with Mr. Small,

5    whether Harrison Smith, Tom Woods.   We had bi-weekly phone

6    calls to make sure they were informed.   We had break-out calls

7    on each of that.   Basically this entire process is a coached

8    smoke upon smoke, inference upon inference in order to

9    maximize cash in people's pockets.

10          And let's get to the truth, and let's get this claim

11   processed, and let's get the people paid based on the

12   contract.

13          THE COURT:   Mr. Shenaq?

14          MR. SHENAQ:   Your Honor, I think it's really

15   important to focus on the law here that guides the Court in

16   determining how an attorney related dispute is to be decided.

17   As Your Honor has indicated multiple times now, and most

18   recently in your June 4th opinion, the Court is guided by the

19   principles of McKenzie in determining how an attorney dispute

20   is to be decided.

21          And of particular importance, especially in this

22   case, Your Honor, the opinion also held that a private

23   agreement amongst attorneys was not relevant when it comes to

24   the analysis and the application of the McKenzie principles.

25   Looking at the McKenzie factors in, you know, specifics, you

1    know, there are a number of key considerations.

2         The first of which was the reasonableness of the

3    attorney fee contract at the time the contract was entered

4    into, and any other circumstances at that time.  Contrary to

5    Mr. Howard's assertion, the Smalls did terminate his services

6    on September 20th, 2019 and entered into a new fee agreement

7    with my firm on September 20th, '19.

8         The fee percentage that the Smalls agreed to pay my

9    firm was identical to what they agreed to pay Mr. Howard in

10   2016.  This was not a termination related to financial aspects

11   or refusal to provide a reduction in fees as Mr. Howard

12   asserts.  It was a fee premised on the work that my firm

13   performed, the risks that we undertook to go through an audit

14   process that was triggered primarily by the acts of prior

15   counsel.

16        We had to potentially stave off an NFL appeal.

17   There were also obviously risks in the fact that prior counsel

18   may assert a lien, that Your Honor has acknowledged is a real

19   risk.  And, moreover, Mr. Howard's third-party creditors have

20   also threatened to come after me to potentially take any fee

21   award that my firm may be entitled to.

22        These are not risks that any client should have to

23   face, and I'm certain very few lawyers would have been willing

24   to undertake the representation of Mr. Smalls (sic) under all

25   of these circumstances.  Mr. Small did not receive a monetary

1    award until after the Smalls terminated Howard & Associates,

2    and even then we still face the opposition -- potential

3    opposition of an NFL appeal.  As Your Honor noted, requires

4    skilled advocacy in order to defend an appeal.

5            We were very ready, willing, and able to defend that

6    appeal, like we've done in many instances.  And this was no

7    different exception.  Moreover, Your Honor, the fee percentage

8    that we've -- that the Smalls agreed to pay our firm is well

9    within the presumptive fee cap that this Court has deemed to

10   be presumed reasonable under the circumstances.

11           And, in addition, the Smalls had a opportunity, and

12   an express acknowledgment that in my firm's fee contract they

13   have the ability to negotiate the fees, and the fees are

14   negotiable.  The Smalls sought out my firm and my assistance,

15   and were gladly able to pay my firm 20 percent to correct all

16   of the wrongs that were, you know, performed by prior counsel,

17   to put them in a position to be able to obtain benefits out of

18   the settlement.

19           With respect to the second factor, Your Honor, that

20   this Court looks into, the result obtained in the case, it

21   sort of speaks for itself.  Mr. Small got diagnosed with the

22   highest possible diagnosis given his medical condition, at the

23   earliest possible age in which my firm became aware of his

24   condition.

25           I don't know of any better results.  He obviously

Shenaq - Argument                                112

1    received an award in excess of $1.5 million.  We were able to

2    successfully negotiate third-party liens to save the Smalls

3    almost $100,000, Your Honor, with lenders who were actively

4    seeking to litigate against Tim Howard.

5            If Mr. Howard was still involved in the Smalls'

6    case, the lender would have never agreed to reduce Mr. Small's

7    lien with respect to the funding that they took from Preferred

8    Capital.  I don't know of any other direct evidence that shows

9    the prejudice that Mr. Howard's involvement has caused the

10   Smalls, Your Honor.

11           In addition to that, we've also helped Mr. Small

12   secure Plan 88 benefits due to his Parkinson's diagnosis.

13   That provides the Smalls with a guarantee of approximately

14   $130,000 of annual benefits towards in-home care for his

15   severe cognitive condition, Your Honor.

16           Moreover --

17           THE COURT:  Is that $130,000 per year?

18           MR. SHENAQ:  Per year, Your Honor.  Plan 88 because

19   of his Parkinson's diagnosis.  In addition to that, Your

20   Honor, with respect to the other element, you know, the

21   respective contributions towards the underlying outcome, it's

22   abundantly clear, even by looking at the expense record

23   itself, there's a clear delineation when Howard & Associates

24   firm stopped actively doing any sort of work on Mr. Small's

25   case.  And the work that they engaged in prior to 2018 in and

1   of itself was suspect and created a detriment to Mr. Small

2   getting his second claim through the process.

3           So I don't see how under any circumstance that his

4   work could be associated with the outcome of this case, Your

5   Honor.

6           So, you know, in that sense we strongly believe,

7   Your Honor, that our firm should be entitled to the entirety

8   of the attorney's fees, Howard's firm's lien that should be

9   discharged in its entirety.  And only those costs which Your

10  Honor deems reasonable should be returned to Mr. Howard.

11          It's our position that there are very few costs in

12  that Exhibit E that warrant reimbursement to Mr. Howard.

13  Inappropriate medical experts should not be reimbursed to the

14  firm.  It's unreasonable to rely on experts whose opinions

15  could never support a claim, and seek to be reimbursed for

16  that -- for those expenses.

17          The attorney should have known better.  The

18  settlement agreement is very clear regarding the credentials

19  that a doctor needs to have.  And if one simply read the

20  document, Your Honor, you know, which is a basic tenet of

21  being an attorney, they would know what type of medical expert

22  would be appropriate to engage in this particular matter.

23          THE COURT:  All right.  Thank you.  Now I do want

24  to --

25          MR. HOWARD:  One quick rebuttal.

1          THE COURT:  Yes.

2          MR. HOWARD:  If you look at Exhibit F, and the date

3     is Wednesday, September 19th, 2019.  This is from Jesse Small,

4     I'm still representing him.  And he says -- he's asking me to

5     consider dropping their fees.  He says there was the mention

6     of a possible modification.

7          "Please keep me in the circle of the possibly

8     modifications addressed to referrals.  Thank you for all the

9     work you have put in this far.  The (inaudible) probably

10    caused your constant calling and worries."

11         It means we're communicating.

12         "I look forward to cross the finish line together."

13          We could not modify the fee.  This is September

14    19th, 20 --

15         MR. SHENAQ:  2018, Your Honor.

16         MR. HOWARD:  And we couldn't do it, and eventually

17    he dropped us because we wouldn't modify the fee.

18         MR. SHENAQ:  Your Honor -- Your Honor, that

19    statement is disingenuous because that email was sent 2018,

20    not 2019 as Mr. Howard is trying to make the Court believe.

21         MR. HOWARD:  Your Honor that is correct, it is 2018,

22    Your Honor.  I misread that.  But that's the issue that caused

23    the separation.  Thank you, Your Honor.

24         THE COURT:  All right.  So I want to say a couple of

25    things.  First of all, I am presuming neither of you believe

1    that your client should pay -- your client should be

2    responsible for more than 20 percent for attorney's fees,

3    regardless of which attorney -- what portion of the 20 percent

4    goes to which particular attorney.

5              This is an exercise for me -- and I want Mr. Small

6    and Ms. Small to, you know, clearly understand, they've

7    already -- they've gotten the award as I understand it now,

8    it's backed, all those provisions have been made -- is that

9    there's nothing that I'm going to do here that's going to have

10   any impact upon the question with respect to the award that

11   has been provided.  This only has to do with, and Mr. Shenaq

12   has articulated it, and his advocacy position that the league

13   should not be honored at all for the reasons that he

14   articulated.

15             Mr. Howard has presented his own position by virtue

16   of the way that he's interpreted the law and what he believes

17   happened during the time where from the beginning when Mr.

18   Small was first retained in December of 2016, up until

19   September of 2019, a lot of things -- yes, there were lots of

20   problems along the way.  But once you got to September of

21   2019, you were practically there, across the goal line, close

22   to the goal line, whatever.  So I get it.

23             From my position, my responsibility is to sort all

24   this out against the background of what it is that you folks

25   have articulated in your argument.  So I'm going to ask you

1    for the further documentation that I asked you to address,

2    both with respect to the costs and with respect to the

3    document or documents between Mr. Small and Mr. Shenaq, and

4    between Mr. Small -- between Mr. Shenaq and Mr. Howard and

5    whether or not it makes a difference in terms of how this

6    analysis ends up is -- it seems to me it might, I think it is

7    -- there's some relevance to that.

8           I'm not going to remember back to exactly what I

9    said in my June opinion, Mr. Shenaq, but I think they may have

10   some relevance, this is a pretty unique -- pretty unique

11   situation for me anyway.  You guys have been involved in this

12   situation a lot, but not -- not me at least that has gotten to

13   the point where the lawyers have so vigorously felt the need

14   to have me for their position.  So thank you very much for

15   your participation.

16          This is a very serious issue, obviously, between

17   these two lawyers.  But I have felt since the beginning and

18   getting involved in this, and learning about Mr. Small, that I

19   was probably one of the 60,000 people that were in the stands

20   in Philadelphia when Mr. Small was in the -- in the 1989 team,

21   and the Buddy Ryan teams, and all that -- and Cunningham's

22   involvement.  So I'm sure he was one of the people on the

23   field that I was clapping for.

24          So thank you very much.  You will hear from us in

25   due course.  I'm cautioned by my folks not to put any

1   particular time line on it.  But this is, you know, it's fresh

2   in our minds and we'll do our best to try to sort through

3   this.  So thank you very much for your participation.

4          Jimmy Cruz, we are now adjourned.

5        (Proceedings concluded at 1:02 p.m.)

6                    * * * * *

7            **C E R T I F I C A T I O N**

8            We, Roxanne Galanti, Josette Jones and Brenda

9   Boulden, court approved transcribers, certify that the

10  foregoing is a correct transcript from the official electronic

11  sound recording of the proceedings in the above-entitled

12  matter.

13

14     /s/Roxanne Galanti

15  ROXANNE GALANTI

16

17     /s/Josette Jones

18  JOSETTE JONES

19

20     /s/Brenda Boulden                    07/27/20

21  BRENDA BOULDEN                          DATE

22  DIANA DOMAN TRANSCRIBING, LLC

23

24

25