## SPECIAL MASTERS' RULE 27 DECISION ON THE REPORT OF ADVERSE FINDING  REGARDING HOWARD & ASSOCIATES, P.A., AND RELATED PARTIES

### 1.  Introduction

Under Section 10.3 of the Settlement Agreement and Rule 7(b) of the Rules Governing Audit of Claims, the Claims Administrator audited Howard & Associates, P.A. Following an intensive investigation, the Claims Administrator concluded that Howard & Associates and related parties had "overwhelmingly" misrepresented, omitted, or concealed material facts in connection with certain Monetary Award Claim Packages. Accordingly, the Claims Administrator referred this Audit to the Special Masters for review and findings pursuant to Section 10.3(i) of the Settlement Agreement. Doc. 231086, at 1, 50-51.

After reviewing the Claims Administrator's Audit Report and NFL Parties' Audit Rule 17 Statement of Position, and under Rule 18 of the Audit Rules, the Special Masters accepted the referral of Howard & Associates for further proceedings. The Special Masters directed:

- that the proceedings be expedited to the fullest extent possible;
- that they cover Howard & Associates and all related parties;[1]
- that the Claims Administrator immediately provide a summary report detailing the fees and expenses submitted by Howard & Associates in the lien actions between them and ████████████ ; and
- that the Claims Administrator immediately place into audit all pending Claims, not yet processed or paid, by any Settlement Class Member now or ever represented by Howard & Associates.

Doc. 232071, at 2. Howard & Associates filed several memoranda in response to the Special Masters' Rule 18 Decision, as Rule 20 permits. Doc. 233441; 233442; 233443; 234583. The NFL Parties filed a single reply. Doc. 234464.

The Special Masters have reviewed the full Record of the Audit Proceeding, considered the responsive memoranda, and now issue this Decision regarding Howard & Associates and its employees.[2]

---

[1] Specifically: Timothy Howard, and Howard & Associates employees (former and current) Worker 1 , Worker 2 , Worker 3 , Worker 4 , Worker 5 , Worker 6 , Worker 7 , Worker 8 , Worker 9 , Worker 10 , Worker 11 , Worker 12 , Worker 13 , Worker 14 , Worker 15 , Worker 16 , Worker 17 , and Worker 18 ; healthcare providers Provider 1 , Provider 2 , Provider 3 , Provider 4 , Provider 5 , Provider 6 , Provider 7 , Provider 8 , and Provider 9.

[2] The subject of this Rule 27 Decision is Howard & Associates' actions and not those of the various healthcare providers implicated in the Audit Report. A separate opinion regarding these parties is forthcoming.

Exhibit

5

exhibitsticker.com

## 2.  Background

### 2.1.  Howard & Associates and the Settlement Program

Howard & Associates initially registered 223 Players with the Settlement Program. Around April 2018, the ▇▇▇▇▇ law firm assumed representation of over 170 of those 223 Players, leaving 47 represented by Howard & Associates, but the firm has yet to file a claim for any of those Players. ▇▇▇▇▇ filed claims for 32 of the Players previously represented by Howard & Associates, but then terminated its representation of all 170 Players—including the 32 filed claims—in October 2020. The 170 Players subsequently resumed representation by Howard & Associates.

The Firm currently represents 216 Settlement Class Members, including the 32 Players for whom ▇▇▇▇▇ filed Monetary Award Claims—of which 21 have been paid, two have been withdrawn, four denied, and the remaining five placed in audit.  Each of the 21 Claims that have been paid were based on diagnoses made by doctors who are *not* implicated in the Audit Report. Doc. 231086, at 2-3.

### 2.2  The Audit Proceedings

In March, April, and August 2017, the Claims Administrator received tips from an informant claiming that Howard & Associates recruited various doctors, demanded revisions to medical reports, and, in some cases, altered or forged reports to support inflated diagnoses. *Id.* at 1-2. In August 2017, the Claims Administrator began auditing Howard & Associates and submitted an Interim Investigation Report to the Special Masters and Parties detailing the allegations, as well as next steps in its investigation. *Id.* at 5, Ex. 3. After almost a year, the Claims Administrator suspended the investigation because it had not received any claims submitted by Howard & Associates. However, it resumed the investigation in June 2019, after Settlement Class Members who had previously been represented by Howard & Associates submitted medical records from time periods when they were clients of the Firm.

The audit investigation continued until November 2020, following which the Claims Administrator issued a Rule 15 Audit Report. It concluded that Howard & Associates:

- edited and/or drafted medical records with the purpose to affect whether the Settlement Class Members qualify for a Monetary Award;
- instructed medical providers, including Qualified MAF Physicians and BAP Providers, to misrepresent material information in medical records for the Settlement Program;
- engaged in discussions with numerous healthcare providers about changes to Players' medical reports, and provided instructions to the providers about what the medical reports should include;

- directed a physician[3] to omit material facts from the Network Provider Application and communicate untruthful information to become a (now former) Qualified MAF Physician and BAP Provider; and
- presented inflated costs for reimbursement in a lien dispute before the Court.

*Id.* at 6-7. The Claims Administrator deemed these actions to be material. *Id.* at 49-50.

The full outline of these facts is contained in detail in the 51-page Rule 15 Report and its 600+ pages of exhibits, including emails from Howard & Associates that the firm submitted in a lien dispute before the Court.

### 2.3   Findings of Fact

The Special Masters, considering the Record, adopt the factual findings of the Claims Administrator.  We highlight the following facts here as illustrative.

1. Twenty-two Settlement Class Members submitted records believed to be compiled, at least in part, by Howard & Associates as part of a current or former Claim Package. *Id.* at 14-15, Ex. 9.
2. Howard & Associates maintained a OneDrive folder that contained 143 neuropsychological reports, all in a similar Microsoft Word format and many with overlapping language and grammatical errors.[4] *Id.* at 19, 30-36, Ex. 48. Eighty percent of these reports included a Qualifying Diagnosis, a rate that is dramatically higher than typically observed by the Program. *Id.* at 21, 30.
3. Howard & Associates engaged in a process of "continuous edits and changes passed from the doctors and testers to the law firm" to modify medical reports so that they would meet the Settlement's Qualifying Diagnosis thresholds. *Id.* at 19-23.
   a. A former Howard & Associates employee alleged that Howard personally altered testing data within Settlement Class Members' medical reports. *Id.* at 39, Ex. 57. Howard & Associates offered no credible rebuttal to this allegation.
   b. Howard & Associates asked ▇Provider 4▇ , ▇Provider 8▇, and ▇Provider 7▇ to make revisions to their medical reports. *Id.* at 20, 22. Howard himself requested that ▇Provider 8▇ and ▇Provider 7▇ edit dates and provider names on their reports. *Id.* at 26-27, Ex. 31, 32. He requested that ▇Provider 8▇ place ▇Provider 6▇'s name—whom he believed held the proper board certification required by the Program—on his reports, even though ▇Provider 6▇ claimed not to have personally examined any Settlement Class Members

---

[3] The Claims Administrator referred to this physician, ▇Provider 1▇ , as Howard's "go-to person" for neurological reports. *Id.* at 21. However, within a month of becoming a Qualified MAF Physician and BAP Provider, ▇Provider 1▇ received an email from the tipster outlining the alleged fraud that Howard was perpetrating. Howard's relationship with ▇Provider 1▇ fell apart shortly thereafter—leading Howard to turn his attention to other physicians.

[4] Howard & Associates argues that the OneDrive folder (which the firm submitted as evidence to the Court evaluating their lien dispute with ▇▇▇▇▇), as well as the medical reports they drafted were analogous to a mock trial or "dry run," done for educational purposes only. Doc. 233441, at 6. We do not credit this explanation, for which Howard & Associates offered no credible evidence.

for the Program. *Id.* at 18, 26, Ex. 32. He also instructed Provider 8 and Provider 7 as to what information they should include in their reports. *Id.* at 27, Ex. 33.

4. Tim Howard instructed Provider 8 and Provider 7 to misrepresent Settlement Class Members' employment statuses by falsely classifying them as being unemployed in their CDR and neuropsychological reports. *Id.* at 24, Ex. 26. As Howard explained in an email to these doctors and several employees, "Note, if there is any employment, the claim will be denied." *Id.* at 24. He also instructed Howard & Associates employees to review medical reports for "errors" listing Settlement Class Members as being employed. *Id.* at 25, Ex. 28.

5. Tim Howard suggested modifying at least two CDR score reports sent to him by Provider 5 Provider 5 without additional in-person evaluation of the Settlement Class Member. *Id.* at 26, Ex. 30. He also instructed Howard & Associates employees to have all score reports reflect a blanket CDR score of 2. *Id.* at 28, Ex. 39. CDR score reports found in the OneDrive folder selectively included information from the CDR assessment that would be most favorable to a Settlement Class Member's Claim, while omitting factors from the CDR that would show lack of impairment. *Id.* at 34-36.

6. Howard & Associates instructed Provider 8 through Provider 9 on what materials to submit as part of Settlement Class Members' Claim Packages and asked that Provider 9 send medical reports to Howard & Associates for review before submission. *Id.* at 27-28, Ex. 34, 35.

7. Tim Howard sent "working draft report[s]" for Settlement Class Members in Microsoft Word format addressing Provider 8, Provider 6, and Provider 7, as well as several Howard & Associates employees with instructions to make "any changes . . . for any updates on the testing." *Id.* at 28-29, Ex. 40, 43. In a subsequent email, he referred to the updated report as a "template for future clients going forward." *Id.* at 29, Ex. 42.

8. Howard & Associates employees exchanged draft medical reports internally. *Id.* at 29-30, Ex. 44, 45, 46, 47.

9. Howard & Associates facilitated several Settlement Class Members' medical examinations, which were conducted at Howard & Associates' office, rather than a healthcare facility. *Id.* at 38, Ex. 55.

10. In a sample of 10 reports taken from the OneDrive folder that Howard & Associates submitted in their lien dispute, several contained "clear misinterpretations" of data. For example, Settlement Class Members had consistently failed embedded validity indicators but the reports indicated that they had passed. At least one report was entirely fabricated. *Id.* at 38-39, Ex. 56.

11. Tim Howard facilitated Provider 1 's application to become a Qualified MAF Physician by personally dictating the information Provider 1 gave to the Settlement Program during and after the application process, at times instructing Provider 1 to omit certain information pertaining to his examination of Howard & Associates' clients. *Id.* at 46-49, Ex. 6, 72-84.

12. Howard & Associates submitted materially inflated costs to the Court when seeking reimbursement for examinations and services rendered by Provider 3, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮, and possibly Provider 1 . *Id.* at 39-41, Ex. 58, 59.

13. In the Fall of 2020, the Claims Administrator received notice that a new firm, ▮▮▮▮▮▮ ▮▮▮, had requested access to the Portal. That firm employs a former employee of

Howard & Associates and has a relationship with Mr. Howard himself. Most of the Settlement Class Members currently represented by ███████████ were previously represented by Howard & Associates.

3. **Conclusions and Remedies**

Rule 28 requires that the Special Masters determine whether the subject of an Audit has "established that there is no reasonable basis to support a finding that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim by the Settlement Class Member." Upon thorough review, the Special Masters find that there is compelling evidence to support a finding that the owner and employees of Howard & Associates misrepresented, omitted, or concealed material facts in submitting Claims to the Program. Specifically, the Special Masters find that the owner and employees of Howard & Associates manipulated the medical examination process and medical records with the intent to affect whether Settlement Class Members qualified for Monetary Awards.[5]

Howard & Associates maintains that there is no reasonable basis to reach that conclusion. In part, their argument rests on the assertion that no Claims were ever submitted by them on behalf of any Settlement Class Members. Admitting that the Claim Packages they compiled were neither compliant nor sufficient for submission, the Firm argues that these failures are why they did not submit those Claims. Doc. 233441, at 6-9; Doc. 233442, at 6-7. Thus, in essence, Howard & Associates argues that its behavior—even if otherwise wrongful—did not materially affect the Settlement Program.

We do not agree.

First, the plain language of both the Settlement Agreement and the Audit Rules makes clear that the audit process is in no way limited to already-submitted Claims. The Settlement states that the Claims Administrator must "establish and implement procedures to *detect and prevent fraudulent submissions* to, and payments of fraudulent claims from, the Monetary Award Fund." Settlement Agreement, Section 10.3 (emphasis added).[6] Prevention inherently requires proactive

---

[5] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[6] That mandate to prevent fraud continues in Section 10.4, which reads:

> The Claims Administrator, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties, will also establish system-wide processes to detect and prevent fraud, including, without limitation, . . . alteration of documents, questionable signatures, duplicative documents submitted on claims, the number of claims from similar addresses or supported by the same physician or office of physicians, data metrics indicating patterns of fraudulent submissions, and such other attributes of claim submissions that create a reasonable suspicion of fraud."

This non-exhaustive list, detailing examples of the precise type of illicit activity that the Settlement aims to prevent, has a remarkable degree of overlap with the facts about Howard & Associates' actions as detailed in the Claims Administrator's report.

measures. The core goal of the Agreement's Audit provisions and associated Rules is to impede efforts to defraud the Settlement—and, as the actions of Howard & Associates make clear, extensively fraudulent activity can take place before a Claim has been submitted.

Turning to the Audit Rules, Rule 3(d) states that:

'Claim' means any Claim Package (or portion of a Claim Package) submitted *or that may be submitted* to the Claims Administrator seeking or relating to a Monetary Award or Supplemental Monetary Award, or a Derivative Claim Package (or any portion of a Derivative Claim Package) submitted *or that may be submitted* to the Claims Administrator seeking a Derivative Claimant Award. (Emphasis added.)

And Rule 12(c) deems a misrepresented, omitted, or concealed fact "material" to an audit investigation if it "did affect or has any potential to affect" a Claim.

Howard & Associates misrepresented, omitted, and concealed material facts in connection with Claims that may have been submitted to the Claims Administrator. In fact, it is precisely *material facts* that Howard & Associates went to tremendous lengths to alter. The facts here show that Howard & Associates directed doctors to falsely report Players' CDR scores and functional impairment, changed provider names and evaluation dates on medical records such that the reports wrongly appeared to have been performed by doctors with the certifications required by the Settlement, and fabricated medical records in their entirety, each a material breach of the Settlement's requirements.

Further, the premise of Howard & Associates' argument—that the firm never successfully submitted a Claim—is inaccurate. Although Howard & Associates is not the named attorney on any Claim Packages, it has worked on Claims submitted to the Settlement and has been paid as a result of work done in connection with those Claims.[7]  Tim Howard testified that he controlled Claims without being the named attorney on the Registration form.[8] And the Firm has asserted

---

[7]  ███████ has filed Claims for thirty-two of the Settlement Class Members previously represented by Howard & Associates, and twenty-one of those Claims have been paid. Moreover, the co-counsel agreement between Howard & Associates and ███████ provided that ███████ was to handle day-to-day management of Claims, but that the distribution of Settlement proceeds and reimbursement of expenses would be split between Howard & Associates and ███████ after Claims were filed. This split would be based on Howard & Associates' duties, which included handling day-to-day client questions, and reimbursement for ███████'s out-of-pocket expenses. Doc. 231086, Ex. 14; Amended and Restated Co-Counsel Agreement, at 2-4. Howard & Associates has continued to be paid for Claims that ███████ filed—an arrangement which may continue to this day.

[8] One example is especially illustrative: the ███SCM 1███ (SPID 100014059) lien dispute. This is a case where a Claim Package was nominally submitted by ███████ and determined to be eligible for a Diagnosis of Parkinson's, leading to an award of over $1.5 million. At a lien hearing in July 2020, Howard argued at length that he was involved intensely in ███SCM 1███'s Claim from December 2016 until ███SCM 1███ terminated his representation in September 2019. Indeed, Howard stated that his firm covered ███SCM 1███'s costs and travel expenses and that ███████ paid for "nothing." Howard even asserted that Howard & Associates still represented ███SCM 1███ through ███████, and that "but for us there is no ███████ involved in this process." Doc. 231086, at 41-42, Ex. 27, 61, 62. As a result of this lien, and Howard's testimony, Magistrate Judge Strawbridge, without having the benefit of the facts

liens (that is, entitlement to a share of money, if the Program grants an Award) in at least nineteen different cases.[9]

Furthermore, Howard & Associates' fraudulent actions are not limited to the preparation of Claim Packages and the submission of them through associated counsel: the Firm engaged in a process of perpetuating misinformation to secure a physician's qualification as a MAF Physician and BAP Provider. Individual Claims aside, this fact would be enough on its own to find that the Firm had materially and adversely impacted the Settlement Program.

As the facts above demonstrate, Howard & Associates engaged in a wide-ranging, long-standing, and brazen pattern and practice of manufacturing evidence for submission to the Settlement Program. It drew multiple professionals into its scheme. And it submitted Claims to the Program—and sought reimbursement for that work—during the very time that this behavior was ongoing. There is a factual basis for a finding of misrepresentation, omission, or concealment of material facts in connection with both Claims submitted, and Claims not yet submitted, to the Settlement Program.

And the problem continues. Howard has more recently undertaken a relationship with a new firm, ▮▮▮▮▮▮▮▮, which has submitted multiple Claims to the Settlement, and intends to submit more. Importantly, Worker 1 —a former employee of Howard & Associates, who was an instrumental participant in the Firm's undertakings—is now an employee of ▮▮▮▮▮▮▮▮, and emailed the Claims Administrator in August 2020 stating that he is the "NFL Concussion law firm contact" for the firm. *Id.* at 4. Thus, the Program faces the likelihood of an additional wave of Claims touched by Howard & Associates.

The audit process has amassed compelling factual evidence that Howard & Associates engaged in behavior that has significant implications for the integrity and fair administration of the Settlement Program as a whole. Certainly, neither the firm nor any of its employees has met the Rule 28 burden of establishing that "there is no reasonable basis to support a finding that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim by the Settlement Class Member."

On that basis, to prevent future wrongdoing and to ensure this behavior did not and will not implicate any Claims, and pursuant to Section 10.3 of the Settlement Agreement and Audit Rule 27, the Special Masters direct the following remedies:

**A. Disqualification of Howard & Associates and its Employees:** Tim Howard, Worker 1 , Worker 2 , Worker 3 , Worker 4 , Worker 5 , Worker 6 , Worker 7 , Worker 8 , Worker 9 , Worker 10 ,

---

uncovered in this Audit, recommended that Howard & Associates be paid $258,698.56. *Id.*, Ex. 14. The payment is currently in abeyance.

[9] These nineteen cases represent the minimum number of submitted Claims in the Settlement that the Firm and its proxies have worked on: there may be (and likely are) additional Claims where Howard & Associates have worked on the Claim Package but have not yet filed a lien.

[Worker 11] , [Worker 12] , [Worker 13] , [Worker 14] , [Worker 15] [Worker 15] , [Worker 16] , [Worker 17] , and [Worker 18] are permanently disqualified from participation in the Settlement Program, as is Howard & Associates itself.

    i.   Any Monetary Award Claim currently under review that was submitted by a Settlement Class Member who is currently represented by any of the individuals or entities named in the paragraph above is denied without prejudice to the Retired Player's ability to file a subsequent claim with new representation.

    ii.   "[P]articipation in the Settlement Program" means that such individuals may not play any role in recruiting Settlement Class Members, in preparing Claims for submission, or in working on the adjudication of those Claims in the Appeals Process.

    iii.   The Claims Administrator shall directly notify any Claimant represented by Howard & Associates and its Employees of the results of this Audit, share with them this Decision, and shall consult with Class Counsel about what options, if any, to offer those Claimants.

    iv.   The Claims Administrator shall transmit a copy of this Decision, as well as the underlying Audit Report, to Magistrate Judge David Strawbridge, who is hearing all lien matters.

**B. Referral to Federal Authorities:** Given the substantial amount of resources dedicated to this Audit Proceeding, including significant financial costs to both the NFL Parties and the Claims Administrator, the Claims Administrator will share this Decision, along with the full Record of the Audit Proceeding, with federal criminal authorities.

**C. Particular Claim Files:** Any Claims by Settlement Class Members who were at any time represented by Howard & Associates (including its employees) shall be audited, whether those Claims are currently pending or submitted in the future. The Claims Administrator shall certify to the Special Masters, before releasing each Claim from audit, that there is no indication or evidence that any material from Howard & Associates affected its disposition.

**D. Notice and Reporting For All Registered Counsel:** The Claims Administrator shall make this Decision accessible to the public and shall distribute it to every attorney currently connected to the Program, so that they are aware of its findings and requirements. Any firm registered with the Program that has any financial or contractual or referral arrangement with Tim Howard, or with any former employees of Howard & Associates, must identify these arrangements and then assure the Claims Administrator that it has taken affirmative steps to ensure that those individuals will not participate in Program-related business. The Claims Administrator shall develop a process by which all participating firms can certify their compliance with this step.

Failure to participate in this process in good faith shall be the basis for disqualification from the Program.

    **E.  Additional Investigation:** Given the apparent connection between ███████ ████ and Tim Howard, the Claims Administrator shall investigate the relationship between the two firms and ███████████ 's current representation of Settlement Class Members in the Program.

    **F.  Judgment As To Medical Professionals:**  The Special Masters reserve judgment on any objections to the Audit Report raised by medical professionals Provider 1 , Provider 2 , Provider 3 , Provider 4 , Provider 5 Provider 5 , Provider 6 , Provider 7 , Provider 8 , and Provider 9. The names of these medical professionals shall be redacted from the public version of this Decision until further notice.

_David A. Hoffman_ _____

David A. Hoffman, Special Master

_Jo-Ann M. Verrier_ _____

Jo-Ann M. Verrier, Special Master

Dated June 22, 2021



**NFL CONCUSSION SETTLEMENT**

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. PENN.)

# CLAIMS ADMINISTRATOR'S RULE 15 AUDIT REPORT:

# HOWARD & ASSOCIATES, P.A. AND RELATED PARTIES

### November 25, 2020
### Updated December 10, 2020



## TABLE OF CONTENTS

**PAGE**

I.    Introduction .................................................................................................1
II.   Scope of Audit ............................................................................................1
III.  Background ..................................................................................................1
    A.  The Tip We Received .................................................................................1
    B.  Subjects of Audit Report and Other Participants ....................................2
        1.  Timothy Howard and Howard & Associates ....................................2
        2.  ████████████████████████████ ...................................3
        3.  Tipster Worker 2 ...............................................................................4
        4.  ████████████████████ .......................................................4
    C.  Audit Investigation......................................................................................5
    D.  Summary of the Findings ...........................................................................6
IV.   Developments After Our Interim Report ....................................................7
    A.  Communication with Provider 1 ...............................................................7
    B.  Communication with Worker 2 .................................................................8
    C.  Communication with Worker 3 .................................................................9
V.    Medical Records Originating From Howard & Associates ........................9
    A.  Three Monetary Award Claims with Overlapping Reports.....................10
    B.  Investigation of the Overlapping Reports ..............................................13
    C.  Identification of Howard & Associates Records .....................................14
    D.  Communication with Medical Providers to Corroborate the Worker 2 Tip.......................15
        1.  Provider 1 (Former Qualified MAF Physician and BAP Provider) ...............15
        2.  Provider 8 (Qualified MAF Physician and BAP Provider)........................16
        3.  Provider 4 (Neuropsychologist)........................................................16
        4.  Provider 6 and Provider 7 (Neuropsychologists).......................18
        5.  Provider 5 (Clinical Psychologist) ...............................................18
        6.  Provider 3 (Nurse) ..........................................................................18
VI.   Information Learned From SCM 1's Lien Dispute, ████████████████ Lawsuit, and Other Documents ........................................................18
    A.  The Howard & Associates Examination and Report Drafting Process ...........19
    B.  Howard & Associates' Instruction to Medical Providers to Misrepresent Information and Edit Reports......................................................23
        1.  Howard's Instruction to Misrepresent Players' Employment Status .....................24
        2.  Howard & Associates' Other Instructions to Providers and to a Settlement Class Member.....................................................26
    C.  Howard's Instructions to Staff to Misrepresent CDR Scores.........................28
    D.  Howard & Associates' Editing and Drafting of Neuropsychological Reports .................28



1.  Emails Between Howard & Associates Employees and Medical Providers .........28
2.  Howard & Associates' OneDrive Folder ................................................30
3.  Howard's Explanation of the Reports ................................................36

E.  Appeals Advisory Panel Consultant Review .............................................38
F.  Deposition of  Worker 5  ......................................................................39
G.  Questionable Costs.............................................................................39
H.  Howard & Associates' Involvement in Claims Represented by ▮▮▮▮▮ ..................41
I.  Provider 8's Misrepresentations Regarding His Involvement with Howard & Associates ..........................................................................................42
J.  Provider 4's Questionable Practices and Misrepresentations to the Program.................43
K.  Provider 6, Provider 7, and Provider 5 .........................................................46
L.  Provider 1's Relationship and Collaboration with Howard...........................................46

VII.   Materiality...................................................................................49
VIII.  Conclusion and Recommendation ..........................................................50



## I.     INTRODUCTION.

Pursuant to Section 10.3 of the Settlement Agreement and Rule 7(b) of the Rules Governing the Audit of Claims ("Audit Rules"), we audited the law firm of Howard & Associates, P.A. ("Howard & Associates"), and placed in audit certain claims to determine how and if they are affected by the firm's representation. We prepared this Rule 15 Audit Report after completing the Audit and determining that there is an overwhelming evidence to find that there is a reasonable basis to support a finding of misrepresentation, omission or concealment of material fact. We issued this Audit Report to the Parties on 11/25/2020. Counsel for the NFL Parties and Class Counsel agreed with referral to the Special Masters on 12/10/2020. We are referring this Audit Report to the Special Masters under Rule 16 of the Audit Rules.

## II.    SCOPE OF AUDIT.

In an Audit, we determine whether there is a reasonable basis to support a finding that a Settlement Class Member or a third party misrepresented, omitted, or concealed a material fact in connection with a Monetary Award Claim Package. A material fact is a statement or an omission that did affect or has any potential to affect whether the Settlement Class Member qualifies for a Monetary Award and/or the amount of such award in favor of the Settlement Class Member under the provisions of the Settlement Agreement. A third party includes counsel for the Settlement Class Member, doctors providing Qualifying Diagnoses, and persons signing third-party sworn affidavits in support of a claim. We do not determine whether a misrepresentation, omission or concealment was made with knowledge or intent, which instead may be assessed by the Special Masters when they deem it appropriate or necessary to do so.

## III.   BACKGROUND.

### A.  The Tip We Received.

We received an anonymous tip about potential fraud on 3/22/2017 and a letter explaining the conduct on 4/4/2017. The letter detailed coordinated efforts by staff at a law firm and various doctors to inflate the diagnoses of clients, but it did not identify the firm or any doctors involved in the scheme. The write-up alleged that the firm's staff recruited various doctors, demanded revisions to reports, and, in some cases, altered or forged reports, to support the inflated diagnoses. During the subsequent months, we attempted to obtain details about the person(s) involved in this fraud. Then on 8/26/2017, ▇▇ Worker 2 ▇▇ emailed us, stating that he was the tipster and identified the firm as Howard & Associates. He said:

> This is ▇▇ Worker 2 ▇▇. Three - four months ago I sent you information about a $110 million fraud case involving qualifying players for the concussion settlement. The original attachment was titled "NFL Settlement Fraud Details". In our last communication you requested the name of the law firm involved and the senior partner involved. Since then I have lost access to the original email address.

> Therefore, please send me a copy of our conversation to date and the name of the law firm is Howard and Associates PA in Tallahassee, FL and the senior partner is Phillip Timothy Howard.



Furthermore, it is my understanding that in June you approved ███ Provider 1 ███, a bored [sic] certified neurologist for the MASF program even though he is a neurologist he has been evaluating every player for this law firm since early 2016 or even late 2015 which I understand is not allowed by the MASF program.

That day, we informed the Special Masters of this matter and that we would open an investigation.

### B. Subjects of Audit Report and Other Participants.

The subjects of this Audit Report are the law firm of Howard & Associates, lawyer Timothy Howard, and his associates and staff. There are many participants whose dealings with the subjects to the Audit Report are outlined, and questioned, in this Audit Report. Exhibit 1 (pages 55-57 of this pdf) is a quick reference guide listing every significant person/entity discussed, to help the readers follow this Report. Also, the Report covers the span of almost five years of activity. Exhibit 2 (page 58 of this pdf) is a timeline of critical events to show when particular persons/entities were involved. Here is a brief introduction of the main persons/entities:

### 1. Timothy Howard and Howard & Associates.

Lawyer Timothy Howard is the sole proprietor of Howard & Associates, a law firm with offices in Cambridge, Massachusetts, and in Tallahassee, Fort Lauderdale, and Jacksonville, Florida. The firm's website states that it "represents 100s of players" in the NFL Concussion Settlement Program.[1]

In 2007, Howard was found guilty of misconduct and subjected to disciplinary measures under the Florida Bar rules.[2] He is the subject of other bar complaints, including one in February 2018 that he allowed a non-lawyer to practice law, misused the firm's trust account for operating expenses, and solicited potential clients in violation of bar rules.[3] Howard is also a defendant in several lawsuits and was accused of stealing millions from his Player clients through his former investment firm, ████████████████████ and related entities.[4]

Howard & Associates initially registered 223 Retired NFL Football Players (Players), then that number dropped to around 47 after ████████[5] assumed representation of over 170 Players around April 2018. None of these 47 Players represented by Howard & Associates have

---

[1] http://howardjustice.com/nfl/.
[2] https://www.floridasupremecourt.org/content/download/373639/3229435/06-1099_ROR.pdf.
[3] ████████████████████████████████████████████████████████████
████████████████████████ ██ ████████████████████████████████
[4] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████
[5] ████████ established portal access in the NFL Program on 3/6/2018 and first began assuming representation of Players from ████████████████ in March 2018. ████████ currently represents 163 Players, 98 of whom have submitted 132 claims.

2



filed claims with the Program. ███████ filed claims for 32 of the Players previously represented by Howard & Associates and then terminated its representation of 170 Players in October 2020. These Players resumed representation by Howard & Associates, and now the firm represents 216 Settlement Class Members.

Because of this change in representation from ███████, Howard & Associates now represents 32 Players who have submitted Monetary Award Claims. Of those, 21 have been paid, all while represented by ███████ and based on diagnoses made by doctors that are not any of the doctors mentioned in this Report. Two claims have been withdrawn, four denied, and the remaining five pending claims we placed in Audit.

2. ███████████████████

On 8/8/2020, a Tallahassee, Florida law firm of ███████████████ requested access to the NFL Program's Settlement Portal. On its website, the firm states that:

> The traps and complexities of the NFL Concussion Settlement process are significant. We work to get through the claims processing gauntlet for your successful recovery. We work to assure comprehensive analysis of your claim. From your playing history, to your medical history, to maximizing your seasons played, to NFL certified physicians, to claims submissions, and appeals, we know how to get clients the maximum recovery.[6]

Beginning on 8/22/2020, we have received ten requests from Players to change their representation from Howard & Associates to ███████████████. The only other Player that the firm now represents was previously unrepresented, but he was registered and represented by Howard & Associates until 2/12/2018. ███████████ has three Settlement Program Portal users, and we have interacted with two of them so far, both with prior histories in the Program:

(a) ███████████, NFL Claims Specialist: We first learned of ███████ ███████████, a former employee at ███████ ███████████, a Texas law firm, in early 2018. After leaving ███████████████████, started ███████████████, a claims preparation company, and we noticed several Players who requested us to authorize release of their claim information to ███████████. In September 2018, ███████████ informed us of several interactions with ███████████. In one of these interactions, ███████████ accompanied SCM 2 SCM 2 (SPID 950002981) to his neuropsychological evaluation and pretended to be his wife. In another interaction, SCM 3's (SPID 100012500) wife reported to ███████████ that she had not noticed any cognitive impairment in her husband. After SCM 3 and his wife left the exam, ███ ███████████ received a call from ███████████, who disputed the wife's account of SCM 3's condition. Both of the Players in these interactions were

---

[6] ███████████████████



unrepresented at the time of their exams with █████████ but were previously represented by Howard & Associates.

(b) **██████ Worker 1 ██████ / Litigation Specialist – Paralegal:** ██Worker 1██ emailed us on 8/19/2020 to let us know that he is the NFL Concussion law firm contact at ██████████████.[7] Significantly, at least through October 2020, ██Worker 1██ was also an employee of Howard & Associates, and an instrumental participant in the firm's process described in this Report.

3. **Tipster** ██████ Worker 2 ██████.

██ Worker 2 ██ is the tipster who alleged fraudulent activity on the part of Howard & Associates. ██Worker 2██ is a former registered investment advisor who worked with Howard at ████████████████ beginning around March 2015.[8] He previously had a financial advising company, █████████████████, that was the subject of a two-year FBI investigation, which found that he had falsified tax returns and concealed assets in bankruptcy filings.[9] In 2009, after pleading guilty to fraud and money-laundering related charges, he was sentenced to 51 months in federal prison.[10]

██Worker 2██ told us he confronted Howard about the alleged fraud in February 2017, one week before he was arrested for charges he was then facing for child abuse.[11] Then, in December 2017, ██Worker 2██ was sentenced to five years in a Florida state prison for violating his probation after a shoplifting incident, and, in January 2018, he was convicted on charges of child abuse.[12] He is serving his sentences concurrently at the Lawtey Correctional Institution, with a release date of 8/5/2021.

4. ██████████████████.

Howard was the president of ██████████████, an investment firm based in Tallahassee, Florida.[13] In 2017, an anonymous Settlement Class Member contacted Class Counsel with allegations against Howard. Class Counsel investigated and determined that Howard had made serious misrepresentations about the Settlement Program to the Settlement Class Members he represented.[14] Class Counsel also found that many of Howard's clients took out high-interest loans and invested their 401(k)s with █████████████, and that Howard encouraged the Settlement Class Members he represented to invest their retirement monies despite their possible impairments and the level of financial risk involved.

---

[7] Exhibit 4.
[8] ███████████████████████████████
[9] ██████████████████████████████████████████
[10] *Id.*
[11] Exhibit 5, pp. 70-71.
[12] ████████████████████████████████████████████████
[13] ████████ and ████████████████ were dissolved. These businesses are no longer in operation.
[14] ████████████████████.

4



On 8/29/2019, the Securities and Exchange Commission charged ███████████, Howard, and ███████ of defrauding investors, most of whom were Players involved in the Settlement Program.[15]  The SEC complaint alleged the defendants had: (1) defrauded 20 investors in two hedge funds operated out of Howard & Associates; (2) advertised that the funds would be invested in various instruments, but unknown to investors, the funds were used in advance settlement loans to Howard's retired NFL clients; and (3) failed to disclose to investors that ███████ had been barred by the SEC from working for any investment adviser firm.  They also accused Howard of defrauding investors by borrowing $612,000 in undisclosed personal mortgage loans, which he did not repay; and Howard and ███████ of using investor funds to pay themselves "broker fees" on advance settlement loans to Howard's Player clients.[16]  In September 2020, Howard ultimately agreed to pay a civil penalty of $385,536, without admitting to or denying the charges, as part of a consent agreement with the SEC.[17]

## C. __Audit Investigation__.

This Report is chronological in outlining the steps of our audit investigation – from Spring of 2017, when we learned of potential issues related to Timothy Howard, through various investigation steps, until the present conclusion of the investigation:

- We initiated the investigation and sent the Parties and the Special Masters an Interim Investigation Report ("Interim Report") on 8/31/2017, attached as Exhibit 3 (pages 59-66 of this pdf), which explained the allegations, what we had learned by that time and our next steps for the investigation;
- We continued our investigation of the firm until its suspension in July 2018 because we had received no Monetary Award Claim Packages from any Settlement Class Member represented by Howard & Associates;
- In June 2019, we reopened the investigation to look into the medical records submitted by Settlement Class Members who were former clients of Howard & Associates but had switched to different counsel and while that inquiry was ongoing, we obtained additional information related to Howard & Associates' practices that necessitated investigating those matters, which led us to the current Audit Report.

The chronological order helps to see the lack of cooperation, and the misleading information that we were able to collect from the persons involved in this Audit over time (Sections III – V).  Section VI then discusses what we learned from the documents we obtained.  These documents, which include Howard & Associates' email communications with various providers, highlight the misrepresentations to us and provide an in-depth look into how Howard & Associates' process worked.  Because of the presence and strength of the evidence, which cannot be refuted, we did not ask questions or seek explanations from Howard.  As Section VII of the Report outlines, there is reasonable basis to conclude that Howard also made statements and submissions to the Court that are misrepresentations of material facts.

---

[15] ████████████████████████████████████████
[16] *Id*.
[17] ████████████████████████████████████████████████████████████



**D.  Summary of the Findings.**

We have found evidence that:

A.  Howard & Associates edited and/or drafted medical records with the purpose to affect whether the Settlement Class Members qualify for a Monetary Award;

B.  Howard & Associates instructed medical providers, including Qualified MAF Physicians and BAP Providers, to misrepresent material information in medical records for the Settlement Program;

C.  Howard & Associates presented to the Court inflated costs for reimbursement in the lien dispute of Settlement Class Member ███SCM 1███;

D.  Howard & Associates directed a former Qualified MAF Physician and BAP Provider, ███Provider 1███, to omit material facts from the Network Provider Application, and misled the Claims Administrator and the Parties regarding Players' evaluations that ███Provider 1███ had performed for the purposes of the Program;

E.  ███Provider 1███ engaged with Howard & Associates to prepare, and then communicate, untruthful information to the Settlement Program in an attempt to become a Qualified MAF Physician and BAP Provider;

F.  Howard & Associates discussed changes to medical reports with ███Provider 8███, a Qualified MAF Physician and BAP Provider, and instructed him about what those medical reports should include;

G.  ███Provider 8███ misrepresented to us his interactions with and relationship with Howard & Associates;

H.  ███Provider 8███ engaged in discussions with Howard & Associates about changes to medical reports and received instructions from the firm about what those medical reports should include;

I.  ███Provider 4███ engaged in discussions with Howard & Associates about changes to medical reports, received instructions from the firm about what those medical reports should include, and offered to re-administer performance validity tests to cure issues with performance validity results;

J.  ███Provider 4███ is not licensed to practice in Florida and did not personally meet with many of the Players for whom ███Provider 2███ performed the testing in the Florida offices of Howard & Associates and for whom she prepared and signed the reports. ███Provider 4███ ignored test security violations and did not question ███Provider 2███ competency despite mistakes he made in testing;



K.   ████ Provider 5 ████ did not actually examine many of the Players whose reports she prepared and signed, and appears to have used the same process as ████ Provider 4 ;

L.   ████ Provider 5 ████ engaged in discussions with Howard & Associates about changes to medical reports and received instructions from the firm about what those medical reports should include;

M.   ████ Provider 6 ████ did not see any of the Players whose reports she prepared and signed;

N.   ████ Provider 7 ████ engaged in discussions with Howard & Associates about changes to medical reports and received instructions from the firm about what those medical reports should include;

O.   Provider 6 Provider 7 's reports incorporated testing previously performed by ████ Provider 2 and reported by Provider 4 and Provider 5 , without signifying that that was what they had done;

P.   The law firm of ████████████ started taking over representation of Howard & Associates' clients; the point of contact for the Program at that firm is (or was until at least October 2020) also a key employee of Howard & Associates.

## IV.   DEVELOPMENTS AFTER OUR INTERIM REPORT.

The Interim Report that we sent the Parties and the Special Masters on 8/31/2017 (attached as Exhibit 3 - pages 59-66 of this pdf) explains the allegations related to Howard & Associates, what our investigation has uncovered by that time and what we planned to do next. Following our Interim Report, we received additional information from Provider 1 , Worker 2 Worker 2 and Worker 3 concerning Howard & Associates, which we set out below.  In July 2018, after our conversations with Provider 1 , Worker 2 , and Worker 3 , we suspended our investigation of Howard & Associates because the firm had not submitted any claims to the Settlement Program.  At that time, many Players had changed representation from Howard & Associates to ████ .  We continued to monitor for claim filings from Howard & Associates, but suspended our active investigation pending such filings.

### A.   Communication with ████ Provider 1 ████.

Provider 1 was a Qualified MAF Physician and BAP Provider in Tallahassee, Florida. He contacted us, expressing interest to become a Qualified MAF Physician.  On his application (attached as Exhibit 6 – pages 74-83 of this pdf), Provider 1 indicated that he had seen former NFL Players in hospital settings and his office, for clinical research, and for IME evaluations. Through subsequent phone interviews and written questions sent to Provider 1 , we attempted to clarify what Players he evaluated and why, and subsequently learned that, before he became a Qualified MAF Physician or received a copy of the Qualified MAF Physician Manual, he had seen nearly 100 Players for Howard & Associates and prepared 85 reports for those Players. ████ Provider 1 told us that after he received the Manual, he determined that his evaluations did not



comply with Settlement Program requirements and that he did not authorize Howard & Associates to use his records to support Monetary Award Claims. On 9/18/2017, Provider 1 sent us a memorandum on the steps he took to ensure that Howard & Associates did not submit any Monetary Award Claim Packages to the Settlement Program with his withdrawn opinions. Provider 1's memorandum is attached as Exhibit 7 (pages 84-88 of this pdf). He acted as if he were confused over the purpose of this Program, workers compensation and NFL Benefits Plan, and overall purpose of the IMEs he performed, to explain why he did not disclose all that information in his application and indicated that he performed most of the IMEs after submitting the Network Provider Application. Provider 1 submitted two Diagnosing Physician Certification Forms with a Qualifying Diagnosis.[18] Then, on 5/19/2020, Provider 1 withdrew from the MAF and BAP Programs, citing COVID-19 as a reason.

**B. Communication with Worker 2.**

On 5/4/2018, the tipster, Worker 2, mailed a letter (copy attached as Exhibit 5 – pages 69-73 of this pdf), dated 4/29/2018, to Counsel for the NFL Parties, in which he again reported that an unnamed law firm was committing fraud, that he witnessed the "senior partner/attorney" forge a doctor's signature and that the attorneys and providers were in on the scheme.

We interviewed Worker 2 by phone on 5/24/2018. He reiterated the same accusations he had made in his 4/29/2018 letter:

1. The fraud began when Howard had Players "tested in-house."

2. Howard hired an unlicensed medical doctor, Provider 2, to do most of the testing. Provider 2 had his medical license revoked by the Florida Board of Medicine for inappropriately touching female patients.[19]

3. Provider 2 conducted testing in Florida, and then would send reports to Provider 4, who was in San Diego, California. Provider 2 was paid per test and received a higher amount if he qualified a Player for the Settlement Program.

4. Provider 4 evaluated Howard & Associates' first clients and was paid per Player. If Provider 4 did not qualify a Player, Howard would try to convince her to change the diagnosis. Provider 4 would send reports back to Howard for manipulation.

5. Provider 4 started turning down reports submitted by Provider 2. At some point, Provider 4 stopped accepting reports done by Provider 2, so the firm started using Provider 5.

---

[18] SPID 100005185; represented by ████; Level 1.5 claim denied; SPID 100015867; *pro se*; Alzheimer's Disease claim paid.

[19] Howard represented Provider 2 in this matter. ████████████████████



6. ▓Provider 1▓ was the only neurologist Howard & Associates worked with but ▓Worker 2▓ was unsure of their relationship.

7. Howard's main partner was an unlicensed lawyer in Fort Lauderdale, Florida.

On 5/30/2018, ▓Worker 2▓ sent a follow-up letter (see Exhibit 8 - pages 89-96 of this pdf), dated 5/24/2018, and outlined ▓▓▓▓▓▓▓▓▓'s involvement with Players and certain Howard & Associates employees' roles with the firm.

### C. **Communication with** ▓Worker 3▓.

▓Worker 3▓ is a former Howard & Associates employee. ▓Worker 2▓ told us that ▓Worker 3▓ was an "unlicensed attorney" and Howard's business partner and was involved in managing the claim qualification process from the firm's office in Fort Lauderdale, Florida.

Through his attorney, ▓▓▓▓▓▓▓▓, we spoke with ▓Worker 3▓ on 6/7/2018. We asked questions related to his employment at Howard & Associates, the firm's involvement in the Settlement Program, and the neuropsychologists or psychologists the firm used. ▓▓▓▓ clarified that ▓Worker 3▓ no longer worked at Howard & Associates but he did not explain why.

▓Worker 3▓ did not substantiate any of the claims contained in ▓Worker 2▓'s tip or provide much useful information. He told us that, during his employment at Howard & Associates, he worked primarily on BP oil spill claims, then on tobacco and other litigation. Beginning in December 2015, ▓Worker 3▓ worked chiefly in the Fort Lauderdale office, occasionally visiting the Tallahassee location.

Around October/November 2017, ▓Worker 3▓ started reviewing claims from Players to determine eligibility in the Settlement Program. He did not work directly with any Player and was unsure of the firm's process for interaction with Players. He said he worked on three claims, none of which were ever filed with us. He alleged he did not witness Howard, or any member of the firm, do anything inappropriate regarding the Settlement Program.

## V. MEDICAL RECORDS ORIGINATING FROM HOWARD & ASSOCIATES.

As a result of our monitoring for Howard & Associates-related activity, in June 2019, we noticed that the scores and/or language in reports that ▓Provider 6▓ and ▓Provider 7▓ ▓Provider 7▓ jointly prepared matched earlier reports by ▓Provider 5▓, for some Players who each filed a claim after changing representation from Howard & Associates to a different firm.

▓Provider 6▓ and ▓Provider 7▓ are neuropsychologists at ▓▓▓▓▓▓▓▓▓▓ in Orlando, Florida.[20] ▓▓▓▓ Provider 5 ▓▓▓▓ was a clinical

---

[20] ▓Provider 6▓ is certified in neuropsychology by the American Board of Professional Neuropsychology but is not qualified to evaluate Players for the Settlement Program. ▓Provider 7▓ is board-certified in clinical neuropsychology through the American Board of Professional Psychology, but she did not hold this certification at the time she evaluated Players for Howard & Associates.



psychologist at ███████████████████ in Tampa/St. Petersburg, Florida,[21] and a provider ██Worker 2██ implicated in his tip[22].

### A. Three Monetary Award Claims with Overlapping Reports.

We identified three Players whose files contained overlapping reports:

1. ████ SCM 4 ████ **(SPID 100003606).** ███ SCM 4 ███ submitted a Monetary Award Claim asserting Level 1.5 Neurocognitive Impairment, relying on a diagnosis made by a terminated Qualified MAF Physician ██████, supported by neuropsychological testing from ██████. The claim file also contained previous neurological testing report from a Qualified MAF Physician ██Provider 8██, and neuropsychological testing reports from evaluations performed by ██Provider 6████Provider 7██ and ████ Provider 5 ████ SCM 4 ████. The language and scores in neuropsychological report by ██Provider 6████Provider 7██ (dated 7/7/2017) matched an earlier report from ████ Provider 5 ████ (dated 12/21/2016). The language throughout the two reports is identical except for differences in assessment date, report date, neuropsychologist names, some of the headings, and a one-sentence section.

For example, both reports include these sections with identical wording where ██SCM 4██ ████ SCM 4 ████ purportedly reported his background information:

Example 1:

| Provider 5 report on ████ SCM 4 ████ |
|---|
| ████ SCM 4 ████ was raised by his biological parents and described his upbringing as "normal." He is the oldest child of his two siblings. He denied any history of psychiatric illness, learning disabilities, or problems with alcohol and illicit drugs within his family. He currently lives with his wife and son, and relies on his family for support. |

| Provider 6 ██Provider 7██ report on ████ SCM 4 ████ |
|---|
| ████ SCM 4 ████ was raised by his biological parents and described his upbringing as "normal." He is the oldest child of his two siblings. He denied any history of psychiatric illness, learning disabilities, or problems with alcohol and illicit drugs within his family. He currently lives with his wife and son, and relies on his family for support. |

---

[21] ██ Provider 5 ██ no longer works at ███████████████; this business closed. She is not board-certified or qualified to evaluate Players for the Settlement Program.

[22] *See* Notes of our call with ██ Worker 2 ██, above Section IV.B.

**NFL CONCUSSION SETTLEMENT**

Example 2:



All of the test scores are also identical between the two reports. For example, in the Visual-Perceptual domain both reports show identical T scores for all three tests: Block Design (33), Visual Puzzles (33), and Matrix Reasoning (30).

The two reports are exactly the same in their entirety except for the few minor differences noted above. SCM 4 is now represented by ▮▮▮▮▮.

2. **SCM 1 (SPID 100014059).** SCM 1 submitted a Monetary Award Claim asserting Level 2 Neurocognitive Impairment, relying on a diagnosis made by a terminated Qualified MAF Physician ▮▮▮▮, supported by neuropsychological testing from ▮▮▮▮.[23] The claim file also contained previous neurological testing report from a Qualified MAF Physician Provider 8 [24], and neuropsychological testing reports from evaluations performed by Provider 6 Provider 7 and Provider 5 Provider 5. The reports from Provider 5 (dated 2/1/2017) and Provider 6 Provider 7 (dated 10/3/2017) contain nearly identical test scores and some overlapping language. Provider 6 Provider 7 refer to Provider 5 's report and testing ("The test data and 03/10/2017 psychological report by Provider 5 Provider 5 were reviewed. Based on the results of neuropsychological testing, there is evidence of severe cognitive decline from his previous level of function.") . Nearly all of the test scores are identical between the two reports. For example, in the Visual-Perceptual domain both reports show identical T scores for all three tests:

---

[23] This claim was eventually withdrawn and the Player filed a claim asserting Parkinson's Disease, relying on a diagnosis from a Qualified MAF Physician ▮▮▮▮. The Parkinson's Disease diagnosis claim was paid.

[24] Provider 8 is a Qualified MAF Physician and BAP Provider at ▮▮▮▮ in Orlando, Florida.

NFL CONCUSSION SETTLEMENT



| Provider 5 report on SCM 1 | | | | |
|---|---|---|---|---|
| Visual-Perceptual (3 scores) = Level 2.0 | Scale Score | T score | % | Descriptor |
| | | | | Borderline |
| WAIS-IV Block Design | 5 | 33 | 5 | Borderline |
| WAIS-IV Visual Puzzles | 5 | 33 | 5 | Borderline |
| WAIS-IV Matrix Reasoning | 4 | 30 | 2 | Borderline |
| Clinical Dementia Rating Scale (CDR) by Licensed ... | | | | |

| Provider 6 Provider 7 report on SCM 1 | | | | |
|---|---|---|---|---|
| Visual-Perceptual (3 scores) = Level 2.0 | Scale Score | T score | % | Descriptor |
| WAIS-IV Block Design | 5 | 33 | 5 | Borderline |
| WAIS-IV Visual Puzzles | 5 | 33 | 5 | Borderline |
| WAIS-IV Matrix Reasoning | 4 | 30 | 2 | Borderline |

One scaled score in the Language domain is different (but the T-score is the same). Provider 6 Provider 7 administered two tests, the MINI and MMPI, that were not included in Provider 5 's report. The language in the two reports is mostly different, but there are a few phrases and sentences that appear in both reports. SCM 1 SCM 1 is now represented by ▮▮▮▮.

3.   SCM 5 (SPID 100006799).   SCM 5 submitted a Monetary Award Claim asserting Level 1.5 Neurocognitive Impairment, relying on a diagnosis made by the Qualified MAF Physician Provider 8, supported by neuropsychological testing from Provider 6 Provider 7. The reports from Provider 5 (dated 2/1/2017) and Provider 6 Provider 7 (dated 1/6/2018) contain nearly identical test scores and some overlapping language. Provider 6 Provider 7 refer to Provider 5 's report and testing. Nearly all of the test scores are identical between the two reports. For example, in the Learning & Memory domain both reports show identical T scores for all six tests:

| Provider 5 report on SCM 5 | | | | |
|---|---|---|---|---|
| Learning & Memory (6 scores) = Level 2.0 | Scale Score | T score | % | Descriptor |
| WMS-IV Logical Memory I | 4 | 30 | 2 | Borderline |
| WMS-IV Logical Memory II | 1 | 20 | <1 | Severe |
| WMS-IV Verbal Pairs Associates I | 3 | 27 | 1 | Severe |
| WMS-IV Verbal Pairs Associates II | 2 | 23 | <1 | Severe |
| WMS-IV Visual Reproduction I | 1 | 20 | <1 | Severe |
| WMS-IV Visual Reproduction II | 4 | 30 | 2 | Borderline |

| Provider 6 Provider 7 report on SCM 5 | | | | |
|---|---|---|---|---|
| Learning & Memory (6 scores) = Level 2 ... | Scale Score | T score | % | Descriptor |
| WMS-IV Logical Memory I | 4 | 30 | 2 | Well Below Average |
| WMS-IV Logical Memory II | 1 | 20 | 0.1 | Extremely Low |
| WMS-IV Verbal Paired Associates I | 3 | 27 | 1 | Extremely Low |
| WMS-IV Verbal Paired Associates II | 2 | 23 | 0.4 | Extremely Low |
| WMS-IV Visual Reproduction I | 1 | 20 | 0.1 | Extremely Low |
| WMS-IV Visual Reproduction II | 4 | 30 | 2 | Well Below Average |

One score in the Language domain is different.  One score in the Visual-Perceptual domain is different.  The Clinical Dementia Rating (CDR) score is different.  Provider 6 Provider 7 administered two tests, the MINI and MMPI, that were not included in Provider 5 's report.  The language in the two reports is mostly different, but there are a few phrases and sentences that appear in both reports.  SCM 5 is now represented by _____.

## B.  Investigation of the Overlapping Reports.

We placed the Monetary Award claims from SCM 4 , SCM 1 , and SCM 5 in Audit, reviewed the information in their Claim Packages and sent questions to them about their neuropsychological evaluations and reports.  SCM 5 's claim relied on the testing in question; for SCM 4 and SCM 1 those tests were part of the historic record that the diagnosing physician reviewed.  Recognizing that these Players were represented by Howard & Associates at the time of these evaluations, we knew that any information we learn could further our investigation into the firm.

In response to our questions, SCM 4 and SCM 1 reported that Provider 8 Provider 8 referred them to Provider 6 and Provider 7 .[25]

SCM 4 and SCM 1 also stated that both Provider 6 and Provider 7 were present during their neuropsychological evaluations and individually administered parts of the testing.[26] SCM 1 reported that the testing took approximately three hours and that they administered a 300-question evaluation.[27] SCM 5 did not provide any helpful information relevant to Provider 6 , Provider 7 or Provider 5 .[28]

In June and July 2019, we spoke with the lawyer for SCM 1 and SCM 4 , _____ of _____, and asked that he explain why reports by Provider 6 Provider 7 matched earlier reports by Provider 5 .  _____ said that he did not represent the Players at the time of their neuropsychological evaluations, and therefore had no direct knowledge of what happened during those exams.  However, he talked to SCM 1 , SCM 4 , and Howard & Associates to find out what happened.  He explained:

1. The Players first saw Provider 5 , who administered a battery of tests, excluding the Mini International Neuropsychiatric Interview (MINI) and Minnesota Multiphasic Personality Inventory (MMPI).

2. Howard & Associates then realized that Provider 5 did not conduct all necessary neuropsychological tests.

---

[25] SPID 100003606, Doc ID 210136; SPID 100014059, Doc ID 210135.
[26] SPID 100003606, Doc ID 213839; SPID 100014059, Doc ID 213838.
[27] SPID 100014059, Doc ID 210135.
[28] SPID 100006799, Doc ID 211184.



3. Next, the Players saw [Provider 8], who referred them to [Provider 6] [Provider 7] to finish their neuropsychological testing.

4. The Players then saw [Provider 6] [Provider 7], who administered the MINI and MMPI.

5. [Provider 6] [Provider 7] incorporated [Provider 5]'s findings into their own report.

[REDACTED] opined that the "similar neuropsychological reports are the result of a lack of understanding of the [Settlement] process early on" and that "a lot of lawyers do not understand what is needed regarding the neuropsychological test battery." Overall, [REDACTED] viewed the reports as "historical medical records" that are "not used as a basis of any claim."

We asked a member of the Appeals Advisory Panel ("AAP") to review the Monetary Award claims from [SCM 1], [SCM 4] and [SCM 5], excluding the records from [REDACTED]. [Provider 6] [Provider 7] and [Provider 5]. [SCM 1] and [SCM 4]'s claims appeared supported without the questionable records; [SCM 5]'s claim was denied.

We then concluded our Audits of the three claims without issuing Reports of Adverse Finding in Audit.[29]

C. **Identification of Howard & Associates Records.**

While investigating the overlapping records present in the claims of [SCM 4], [SCM 1] and [SCM 5], we found eight other Players with neuropsychological reports from [Provider 6] [Provider 7] and/or [Provider 5]. Of these, one has overlapping reports similar to [SCM 4], [SCM 1] and [SCM 5], six have reports from [Provider 5] only, and one has report from [Provider 6] and [Provider 7] only.[30] [Provider 5]'s records are often accompanied by additional documents that were dated at the time the Players were represented by Howard & Associates. The entire set of records is usually in the same order of one Document ID uploaded to the portal. Given the age and presentation of these records, we believed that the records were compiled by Howard & Associates to support claims. We refer to this typical set of records as a "Howard Packet," which may include these medical records or other documents:

1. A neurological report from [Provider 1];

---

[29] We issued a Notice of Monetary Award Claim Determination to [SCM 1]; he withdrew that claim and submitted a claim for Parkinson's diagnosis, which we paid on 2/24/2020. We issued a Notice of Monetary Award Claim Determination to [SCM 4] on 1/31/2020 and issued payment on 4/24/2020. We sent [SCM 5] a Notice of Denial of Monetary Award Claim on 11/12/2019. [SCM 5] did not appeal the Notice and his deadline to appeal has expired.

[30] We also identified two Players, [SCM 6] (SPID 100006083) and [SCM 7] (SPID 100013147), with neuropsychological reports from [Provider /] that do not appear in the same format and that do not appear to have originated with Howard & Associates. Neither Player has a history of representation with Howard & Associates and the reports appear in a different format than those in question.

NFL CONCUSSION SETTLEMENT

2. A "Diagnosing Physician Certification" affidavit from **Provider 1**, notarized by **Worker 6**;[31]

3. **Provider 1**'s Curriculum Vitae;

4. A neuropsychological report from **Provider 5**;

5. **Provider 5**'s Curriculum Vitae;

6. A handwritten note with the Player's name, and name and contact information for family members and third-party affiants;

7. A CDR worksheet;

8. A CDR affidavit signed by **Provider 3**; and

9. **Provider 3**'s resume.

In total, we have identified five Players who have a "Howard Packet" that includes all of these records as a part of their current or former Claim Package. We also identified 12 Players with a packet that includes some, but not all, of the Howard Packet records. A list of all Players we have identified with records associated with Howard & Associates is attached as Exhibit 9 (page 97 of this pdf). On 7/24/2019, we instructed AAP and AAPC members to ignore any records from such packet in their decision making and confirmed with any diagnosing physicians that such records were not relied upon by them in making the diagnosis.

**D.** **Communication with Medical Providers to Corroborate the** **Worker 2** **Tip**.

Because we began to find Claim Packages that included medical records that appeared to originate at the time of Players' representation with Howard & Associates, we reopened our larger investigation of the firm. In July and August of 2019, we sent questions and requests to the medical providers who we knew saw Players Howard & Associates represented. This section explains the purpose of our outreach to each provider, and what we learned:

**1.** **Provider 1** **(Former Qualified MAF Physician and BAP Provider).**

To investigate **Worker 2**'s allegation that Howard & Associates altered medical reports, on 7/25/2019, we sent **Provider 1** copies of 14 neurological reports authored by him and six Sworn Written Statements that Settlement Class Members submitted to the Settlement Program as a part of their Monetary Award Claim Packages. We asked **Provider 1** to review the documents and to confirm that they were accurate and unaltered in comparison to his own records. **Provider 1** replied to our request on 11/8/2019 and informed us that all the documents matched his records. To date, no Settlement Class Member formerly represented by Howard &

---

[31] In his 5/24/2018 letter, **Worker 2** stated that **Worker 6** is Howard's administrative assistant who provided notarization for Players and affiants despite not being physically present to do so.



Associates has submitted a claim to the Settlement Program that relies on a Diagnosing Physician Certification Form by Provider 1.

**2.    Provider 8    (Qualified MAF Physician and BAP Provider).**

Provider 8 is the neurologist who evaluated former Howard & Associates clients SCM 4, SCM 1, and SCM 5. To research his connection with Howard & Associates, on 7/1/2019, we sent Provider 8 questions about his examination of Players, arrangements with any attorneys or law firms, and experience with Provider 6 and Provider 7. In his answers, Provider 8 told us that Howard asked him to perform record reviews and Independent Medical Examinations (IMEs) of his clients. He denied that Howard gave him any instructions. He informed us that he personally knows Provider 6 and Provider 7, that they sent neuropsychological reports directly to him, and that no one suggested that he refer Players to them.

We then sent follow-up questions to Provider 8 and received responses on 8/14/2019 and 9/5/2019 from his Provider 9. Through these answers, we learned that Howard first contacted Provider 8's office in June 2017 about examining clients. At that time, Provider 8 was already a Qualified MAF Physician (he was contracted on 4/11/2017). Provider 9 told us that Provider 8 had a financial agreement with Howard that consisted of $750 for record reviews and $1,250 for IMEs per hour. She further reported to us that Provider 8 evaluated 38 of Howard & Associates' clients, beginning on 7/5/2017 and ending on 10/26/2017, though she did not confirm if these examinations were in person. When asked if Provider 8 was familiar with Provider 5, Provider 9 replied that he had not heard of her until Howard gave him one of her reports. Provider 9 informed us that Provider 8 did not rely on Provider 5's records, although it is apparent to us that Provider 8 did rely on records from Provider 6 Provider 7 that may have originated with Provider 5. She also stated that Provider 8 sent his records to Howard & Associates in PDF Form and denied ever being requested to make edits to reports, except to correct name spelling or dates of birth. We also asked for a copy of the IME and medical records review agreement Provider 8 had with Howard & Associates and for copies of all written communications the practice had with Howard or anyone working with him. Provider 9 indicated that the IME and records review agreement was archived and put away but they would provide it. After following up with Provider 8's office, we received a voicemail from Provider 9 on 12/10/2019. Provider 9 indicated that their communications with Howard & Associates were over two years ago and that she did not have anything from over two years ago in her system. Provider 8's communications are attached as Exhibit 10 (pages 98-105 of this pdf).

**3.    Provider 4    (Neuropsychologist).**

Provider 4 is a neuropsychologist at _____ in San Diego, California. She is licensed by the California Board of Psychology (Exhibit 11 - pages 106-107 of this pdf), but is not board certified by ABPP/ABCN. [32] Worker 2 alleged that Provider 2

---

[32] Provider 4 is not certified by the American Board of Professional Psychology (ABPP) or the American Board of Clinical Neuropsychology (ABCN, a member board of ABPP) as of 11/25/2020.



Provider 2 conducted testing in Florida and then sent reports to Provider 4 in California, that Howard tried to convince Provider 4 to change diagnoses, and that Provider 4 sent reports to Howard for manipulation.

We sent Provider 4 questions about her evaluations of Players, her experience with Howard & Associates and her neuropsychological reports. From her answers, we learned that Howard contacted her after she examined one of his clients at a mental health facility, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. She told us that she began evaluating Players for the Settlement Program around the end of 2014 or the beginning of 2015. In total, she evaluated 33 clients of Howard & Associates (two of them in person, and the remaining 31 Players were examined by Provider 2). Provider 2 sent Provider 4 the raw data from his evaluations for her to interpret and complete a written report. Provider 4 also informed us that she was never asked to change anything in her reports, and that she had spoken with Provider 2 about his qualifications prior to beginning testing.

To research Howard & Associates' alleged manipulation of her records, we also asked Provider 4 to review copies of her medical records for three Players that had been represented by Howard & Associates and who submitted records from Provider 4 to the Settlement Program. We sent the records we identified - a neuropsychological report, a set of testing materials, and Personal History Forms, all authored by Provider 4 - to her and requested that she compare these records against the versions she saved.[33]

She noted one difference in one report. Her final copy included Provider 2' name as the examiner:

CONFIDENTIAL PSYCHOLOGICAL REPORT

Name: SCM 8
Date of Birth: ▆▆▆▆▆▆▆
Dates of Assessment: May 16 and 17, 2016
Examiner: Provider 2 , Provider 4
Date of report: August 11, 2016

However, in the Portal document, Provider 2' name had been removed as an evaluator:

CONFIDENTIAL PSYCHOLOGICAL REPORT

Name: SCM 8
Date of Birth: ▆▆▆▆▆▆▆
Dates of Assessment: May 16 and 17, 2016
Examiner: Provider 4
Date of report: August 11, 2016

---

[33] SPIDs 100005531, 100002124, 100016757.



██Provider 4██ noted no other differences in the reports.  ██Provider 4██'s answers to our questions are attached as Exhibit 12 (pages 108-110 of this pdf).

**4.** ██████ **Provider 6** ██████ **and** ██████ **Provider 7** ██████ **(Neuropsychologists).**

To investigate her connection to Howard & Associates, we sent ██Provider 6██ questions about her exams of Players. ██Provider 6██ responded that she supervised another neuropsychologist, but that she never saw any Players herself.  We sent follow-up questions to ██Provider 6██ about her supervisory role, but she did not reply.

We also sent ██Provider 7██ questions on 9/5/2019 about her evaluations of Players, but she did not respond.  We followed up with her on 9/23/2019.  She did not reply.

**5.** ██████ **Provider 5** ██████ **(Clinical Psychologist).**

We called ██████ **Provider 5** ██████'s medical practice and left three voicemails.  We were able to locate her cell phone number and left two additional voicemails. ██████ **Provider 5** ██████ has not returned our calls.

**6.** ██████ **Provider 3** ██████ **(Nurse).**

██████ **Provider 3** ██████ is a nurse who worked at the ████████████████████ ████████████ in Tallahassee, Florida.[34]  She administered the CDR for Players Howard & Associates represented.  We sent her questions concerning her evaluations and connection to Howard & Associates and learned that she met Howard through her son's involvement with high school football. ██Provider 3██ told Howard that she was a nurse qualified to conduct the CDR.  She stated she was paid $500 for each evaluation and never was asked to change her assessments.  ██████ ██Provider 3██'s answers to our questions are attached as Exhibit 13 (pages 111-113 of this pdf).

**VI.** **INFORMATION LEARNED FROM** ██████ **SCM 1** ██████ **'S LIEN DISPUTE,** ████████████████████████████ **LAWSUIT AND OTHER DOCUMENTS.**

On 6/24/2020, we learned of an Attorneys' Lien Dispute between Howard and ████ ████████ related to ██**SCM 1**██'s Monetary Award Claim.[35]  ████████████ assumed official representation of ██**SCM 1**██ from Howard & Associates on 4/12/2018.  However, Howard & Associates allege that they were continuously involved in ██**SCM 1**██'s claim until September 2019.  In response to ████████████'s Rule 23 Statement of Dispute pursuant to the Rules Governing Attorneys' Liens ("Liens Rules"), Howard submitted a Rule 18 Response and produced, among other items, a 1,813-page document consisting of emails and medical records related to his work on ██**SCM 1**██'s claim.  Within that production was included an email

---

[34] ██Provider 3██'s CV reflects that she worked at the ████████████████████████████ beginning in August 2015 (SPID 100006799, Doc ID 176420, pp. 58-59).  We do not know if she works there today.

[35] On 9/28/2020, Magistrate Judge David Strawbridge issued his Report and Recommendation in the Lien Dispute, recommending that the Court approve a 20% attorney fee to be shared by Howard & Associates (88%) and ████████ (12%) *(see* Exhibit 14).



exchange among Howard & Associates' employees that included a link to a OneDrive Folder. We accessed that link and downloaded 143 neuropsychological reports, all in Microsoft Word format.

We also obtained a 35,946-page document produced by Howard & Associates in Case ████ (████████ v. ██████, Phillip Timothy Howard and Howard & Associates, P.A.). This production contains numerous communications between Howard & Associates staff and their medical providers, among other items.

Finally, we reviewed a filing in Case ████████ (The Securities and Exchange Commission v. ████████ *et al*), specifically ████████ to ████████, which is a deposition transcript of Worker 5.

The information we learned from analyzing this information shows that Howard & Associates provided instruction to medical providers and the firm's staff to misrepresent information, confirms that Howard & Associates was editing and/or drafting neuropsychological reports, and brings the credibility of Provider 8, Provider 1, Provider 4, Provider 5, Provider 6, and Provider 7 into question.

## A. The Howard & Associates Examination and Report Drafting Process.

Based on the review of the materials and results of our investigation, we have found evidence to materially substantiate Worker 2's tip and determined that there is an overwhelming amount of evidence to find a reasonable basis that Howard & Associates employed a potentially fraudulent process in attempting to obtain records for their clients to qualify for Monetary Awards. This section describes the process, as it emerged from the evidence, at a high level, and then we delve into specific problematic areas in more detail in the following sections.

First, from around February 2016 until November 2017, approximately 146 Players underwent neuropsychological testing in Howard & Associates' offices that Provider 2 Provider 2 performed.[36] By early 2016, Provider 2 was in a tough spot – his medical license was restricted in 2014, prohibiting him from seeing female patients, and the matter was still under review by the Florida Board of Medicine, he was fighting criminal battery charges, but most importantly, he was "desperate desperate" for money.[37] Tim Howard was representing Provider 2 related to all his legal issues, and offered him a good paying job, $4,000 a month, to test Players for the Program. Overwhelmed with gratitude and appreciation, Provider 2 later observed his commitment in an email to Howard: "I doubt you can find anyone that worked as hard and diligently as I have and has been as cooperative as I have."[38] He definitely "was part of the team," with growing list of responsibilities: it started as a job to perform testing, but then he was asked to do "in house audits before we send."[39] While Provider 2 welcomed "the evolution of this process," he was asking to be involved in "the front end including conversation with ████

---

[36] Exhibit 15.
[37] Exhibit 16.
[38] Exhibit 17.
[39] Exhibit 18.



Provider 4," concerned that he would "inadvertently compromise things since I will be responsible for results."[40]  It is clear that Provider 2 had no experience to perform the testing, but learned while doing it and making mistakes.  It is less clear what was the purpose and process of the "in house audits," but any manipulation of the test results, at the direction of the firm, would be inappropriate.

At around the same time, Provider 3, an LPN whom Howard met through their sons' football game, met with the Players and administered a CDR assessment.  We do not know much about Provider 3, other than Provider 1's frustrations that "Provider 3 is not detail oriented and practically every client's case is requiring corrections."[41]

The firm would then send Provider 2' testing materials (presumably after performing the in house audit, as the process evolved), Provider 3's CDR sheets, personal history forms prepared by unknown persons, presumably Provider 3 Provider 2/Howard's staff, and other medical records to Provider 4, who then prepared reports using these materials, without ever seeing or talking to the Players.  Provider 4 saw a few Players in person at the beginning, but due to the volume of testing that needed to be completed ("hundreds"), Howard offered that Provider 2 examine the Players in Florida (do the "heavy lifting").[42]  Even though it soon became apparent that Provider 2 did not know how to do the testing, and in at least several cases, Howard & Associates provided feedback questioning the findings in the reports, and sent revised testing materials after "auditing" the results to Provider 4 and asked her to make revisions to her reports, Provider 4 appeared to be a willing and contributing participant of the process.  She was also a problem solver, offering solutions to address testing that indicated poor performance validity.  Nonetheless, Howard has questioned her qualifications to render usable reports, given that she was not board certified.  Although not clear, it is likely for that reason that Howard & Associates then found another neuropsychologist's name to put on the reports to replace ███ Provider 4.

Around August 2016, they employed Provider 5, who did not examine many of the Players whose reports she created and signed.  While we do not have direct evidence to show it, it appears that Provider 2 continued to personally administer testing and then Provider 5 Provider 5 would "sign off" on that testing using her own name, similar to the process with Provider 4.  This is supported by ███████'s testimony that SCM 1 did not see Provider 5 Provider 5, and by two players' responses to our audit questions indicating someone acting as a psychometrist may have performed some of the evaluations and Provider 5 did not personally meet with one player (one player could not recall any details).

The reports that came out of this testing from Provider 2, Provider 4 and Provider 5, while questionable in their own right, may have served as the starting document for Howard & Associates' manipulation.  While these reports contained information and testing data from these examinations, Howard & Associates' emails confirm the firm changed provider names and testing dates in the reports and suggest that they may have altered testing data, and/or provider

---

[40] *Id.*
[41] Exhibit 19.
[42] Exhibit 20.

signatures and incorporated information from other individuals with whom they had ties. Notably, Howard & Associates employees appear to have drafted at least one section of the questionable reports based on a CDR exam from **Provider 3**. That section of the reports contains a bias: to paint a picture of a severely impaired individual without presenting the full results of the assessment. While the full extent of the firm's manipulation of the reports is unclear, as are the providers' actual roles in the drafting of any of the reports that bear their name, the emails between the firm's employees show they, not the providers, were in fact drafting and editing, or requesting changes to be made to, the reports.

Since February 2016, **Provider 1** was Howard's go-to person for the neurological assessments. In the latter part of 2016 and into 2017, **Provider 1** examined Howard & Associates' Player clients for an evaluation for the Settlement Program. Using neuropsychological reports from **Provider 4** and **Provider 5**, CDR evaluations from **Provider 3**, and any other documentation given to him by Howard & Associates, **Provider 1** appears to have examined at least 89 Players and gave a Level 1.5/Level 2 Neurocognitive Impairment diagnoses with 73 of them.[43] Such an 82% rate of diagnosis is remarkable as the Program's statistics as of 11/16/2020 show that out of 20,556 registered Players, 3,083 have filed claims (15%).[44] Based on reliable information from firms and providers, the more reasonable rate of diagnosis is around 15 – 20%. The bigger plan, however, had always been for **Provider 1** to become a Qualified MAF Physician.[45] While the validity of some of them appears unfounded, Howard expressed several perceived benefits for this strategic decision.[46] Through omissions and misrepresentations in his application and in subsequent responses to the Program's questions – all wordsmith done by Howard – **Provider 1** became a Qualified MAF Physician and a BAP provider, an event that elicited a "Success!!! Good job, TEAM!" from **Worker 1**, one of Howard's staff. The excitement was somewhat short lived. Less than a month later **Provider 1** received an email from **Worker 2**, outlining the alleged fraud that Howard was perpetrating. Concerned for his reputation, **Provider 1** insisted on a new agreement with Howard that would put in place a "compliance professional" to verify information and oversee the process, and withdrew all his opinions from any prior evaluations.[47]

As Howard & Associates' ties with **Provider 1** fell apart, they then turned to **Provider 8**, who was an already approved Qualified MAF Physician. It is unclear if **Provider 8** picked **Provider 6** and **Provider 7** to serve as the neuropsychologists, or whether the providers were selected by Howard & Associates. The latter seems more likely. It also remains unclear if **Provider 6** personally examined any of the Players, or if the testing was administered by **Provider 7** only and then **Provider 6** simply served to sign off on the diagnoses, similar to **Provider 4** and **Provider 5**. The latter also seems more likely, based on **Provider 6**'s own admission to us that she did not evaluate any of the Players herself. It seems apparent from Howard's emails that he (mistakenly) believed **Provider 6** held the proper certification required for a neuropsychologist in the Settlement Program after the Effective Date. With numerous neuropsychological reports already produced from the **Provider 2** **Provider 4** **Provider 5** machine, Howard did not appear to

---

[43] Exhibit 21.
[44] See https://www.nflconcussionsettlement.com/Reports_Statistics.aspx
[45] Exhibit 22.
[46] Id.
[47] Exhibit 23.



see a need to perform new neuropsychological battery of testing.  Instead, Provider 6 and/or Provider 7 performed only two tests: the MINI and MMPI.  They would draft sections to discuss the findings of those tests and plug them into the reports that had already undergone the extensive editing.  They incorporated (without clearly denoting that that was what they were doing) the results of previous neuropsychological testing and exams, which may or may not have occurred, from Provider 2, Provider 4, and Provider 5.  Howard provided input for which existing sections of those reports – dates, signatures, etc. – to update to make these into the final "Provider 6" reports.

At this stage, Howard & Associates then reviewed Provider 8's report and communicated directly with Provider 8 and Provider 9, requesting edits to their records.  The extent of Provider 8's involvement in the questionable activity is unclear, but it is apparent that much of Provider 8's opinion rested on the neuropsychological report from Provider 6 and Provider 7, a document which had been manipulated by the firm over time.

The process of the neuropsychological test results and reports changing so many hands, with continuous edits and changes passed from the doctors and testers to the law firm, this back and forth, is fundamentally flawed.  The cornerstone principle of the neuropsychological testing is test security, meaning that test results can be shared among professionals, but they cannot be disclosed, for example, to lawyers.[48]  The reason for this rule is obvious: sharing test results could allow for test manipulations and misinterpretations by persons that do not have special training.  Here, Provider 2 shared the test results with Howard and his staff, who then sent the results to Provider 4, Provider 6, Provider 7.  Just doing that is a major violation of test security and compromises the entire process.

Howard must have had some concerns about the process that he created.  He followed the Claims Administrator's work and shared the Program's Audit Reports with his staff and doctors and providers, with subject lines such as "Insights from Neuropsychological Investigation of --Please Review to Avoid Issues."[49]

The diagram below shows individuals and entities involved in the process:

---

[48] *See* N.C.S. Pearson, Advanced Clinical Solutions for WAIS-IV and WMS-IV: Clinical and Interpretive Manual, at 7 (2009).
[49] Exhibit 24.





## B. Howard & Associates' Instruction to Medical Providers to Misrepresent Information and Edit Reports.

In determining what an inappropriate behavior may look like, we take into account that accurate and complete medical records are essential for quality of care, compliance with payment requirements and for use in legal proceedings.[50]  It is widely recognized that, for various reasons, a provider may not realize the inadequacies in his/her documentation and that at such times there can be a strong temptation to add to the medical record to "clarify" what actually occurred, remove potentially damaging information or even to create a completely new record.[51]  It is for these reasons that many authorities, including Medicare/Medicaid, created standards for record keeping and making any changes to the medical record.[52]  Any change to a medical record has to be identified clearly in the original document or in a signed addendum.[53]  Improper alterations of a medical record can carry serious consequences for the practitioner; making suggestions to make improper alterations and making unauthorized changes to the medical record by a lawyer is a misrepresentation that similarly carries serious consequences for that lawyer.  To avoid such improper influence, we clarified to the Qualified MAF Physicians that "lawyers may not

---

[50] https://www.mlmic.com/blog/physicians/alteration-of-a-medical-record-carries-serious-consequences
[51] *Id.*
[52] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c03.pdf
[53] *Id.*



interview you about your methodology or instruct you or influence you in any way regarding how you perform your examinations and diagnoses."[54]

This Program expects that doctors and lawyers follow basic requirements that are fundamental for anyone acting in their professional capacity.  The Court overseeing this Program, the Special Masters, and the Claim Administrators have also stressed many times the importance of being truthful, probably best summed up by the Special Masters in this statement:

> The Special Masters are committed to the principle that all former Players and/or Representative Claimants who are entitled to compensation under the agreed-upon terms of the settlement, and only those entitled to compensation, receive an Award. This can only be effectuated if all submitted materials are truthful, honest, free from undue influence, and compiled with careful attention to the requirements of the claims process.[55]

Any process that is not that – not truthful, not honest, conducted with undue influence, without careful attention – will cause delays and raise questions, burdening the administration of the Program and will prevent payments to potentially deserving Class Members.  Unfortunately, that is exactly the type of process that this Audit Report is about.  In the next section we focus on the extent of the undue influence.  We walk through examples of instructions that Howard & Associates, and specifically Howard, has given to various providers and to his staff, to manipulate medical reports.

### 1.   Howard's Instruction to Misrepresent Players' Employment Status.

On 1/5/2018, Howard emailed Provider 9, Provider 8, Provider 7, and several Howard & Associates employees.  In his email, Howard stated:

> Another item that we need to focus on for every claims [*sic*], is to ensure that "employment" comments are consistent in the underlying CDR and neuropsycholodigal [*sic*] reports, and Provider 8's report. All showing that there is no current employment. Note, if there is any employment, the claim will be denied. For SCM 1, we need to be clear that "he has had cognitive limitations that has caused him to lose employment, and due to his current cognitive limitations is not employed.'[56]

The email instructs Provider 8 and Provider 7 to prepare reports "all showing there is no current employment;" that is, to misrepresent material information related to Players' employment status and history.

On 7/7/2020, Howard and _____ presented oral argument in front of Judge Strawbridge.[57]  A copy of the transcript from this hearing is attached as Exhibit 27 (pages 184-

---

[54] June 14, 2017 Email to Qualified MAF Physicians, Subject: NFL Concussion Settlement Program Alert #2: Role of Lawyers Representing Settlement Class Members (see Exhibit 25).
[55] https://www.nflconcussionsettlement.com/Docs/notice_special_investigations.pdf
[56] Exhibit 26.
[57] The hearing was conducted via Zoom meeting.



300 of this pdf). During that hearing, ███████ introduced his "Exhibit 2," which included emails produced by Howard, including the email discussed in this section of the Report. ███████ read Howard's email to the Court and expressed concern over the instruction.[58] Later in the proceeding, Howard offered an explanation of this email, arguing that he was simply discussing and referring to two prior reports, informing the providers that employment is a "key issue," especially for ▆SCM 1▆.[59] Howard explained that he was simply attempting to explain to ▆Provider 8▆ that employment was a key issue and that all of ▆SCM 1▆'s reports should be consistent when discussing ▆SCM 1▆'s employment situation (that ▆SCM 1▆ was unemployed), or his claim may be denied.[60]

We find this explanation unreasonable given the very wording of his email ("need to focus on for every claims [*sic*] … All showing that there is no current employment.").

Also, we looked into Howard's assertion to Judge Strawbridge that he was referring to "two reports" when discussing employment. There is a 1/3/2018 email from ▆Provider 9▆ forwarding "corrected" reports from ▆Provider 8▆, ▆Worker 7▆ and Howard for ▆SCM 1▆ and ▆SCM 9▆ ▆SCM 9▆ (SPID 100002927).[61] Howard then forwarded these reports to ▆Worker 7▆, ▆Worker 8▆, and two other Howard & Associates employees, ▆Worker 10▆ and ▆Worker 11▆, and stated:

, and ▆Worker 11▆:

Please review for errors on dates and unemployment consistency.[62]

This 1/3/2018 email, which predates Howard's 1/5/2018 email instructions to ▆Provider 9▆, ▆Provider 8▆, and ▆Provider 7▆, shows that he was instructing staff members to identify or correct information that may adversely affect the claims for both ▆SCM 1▆ and ▆SCM 9▆. Instead of using the term "employment consistency," which would indicate a neutral approach to the reporting of Players' employment, Howard used the term "unemployment consistency," suggesting he wanted both reports to show that the Players were unemployed. Additionally, Howard asked his staff to review for "errors" related to unemployment, suggesting a process to identify and manipulate information after the Players' actual examinations with ▆Provider 8▆ and after ▆Provider 8▆ had drafted his reports. In addition, while this email discusses only two reports, the tone of the email and the wording used indicates that the instruction to record "unemployment" was broad and the practice to look for "errors" to correct reports widespread.

Finally, Howard's instruction to include specific language attributing ▆SCM 1▆'s lack of employment to his cognitive limitations is improper and a potential misrepresentation. ▆Provider 8▆'s report on ▆SCM 1▆ that ▆Provider 9▆ emailed to Howard on 1/3/2018 only states "currently unemployed" when discussing ▆SCM 1▆'s employment status and history.[63] Nowhere in the report does ▆SCM 1▆ attribute that unemployment to cognitive impairment.

---

[58] Exhibit 27, pp. 207, 212.
[59] Exhibit 27, p. 239.
[60] Exhibit 27, pp. 239-240.
[61] ▆SCM 9▆ is represented by ███████. As of 11/25/2020, he has not filed a claim with the Settlement Program.
[62] Exhibit 28.
[63] Exhibit 29.



2. <u>**Howard & Associates' Other Instructions to Providers and to a Settlement Class Member.**</u>

Howard & Associates' email communications show that the firm also provided updated CDR Ratings without an explanation what necessitated the change, requested medical providers to edit their reports, and instructed providers on what materials to upload to Players' Claim Packages.

On 8/29/2016, <span style="background:black;color:white">Provider 5</span> sent Howard & Associates her "final" neuropsychological reports and test score addenda for <span style="background:black;color:white">SCM 10</span> (SPID 100006418) and <span style="background:black;color:white">SCM 11</span> <span style="background:black;color:white">SCM 11</span> (SPID 100004935). Both of <span style="background:black;color:white">Provider 5</span>'s reports arrived at diagnoses of Level 1.5 impairment. Howard then responded to <span style="background:black;color:white">Provider 5</span>:

> Thank you for the excellent work. We will forward the updated CDR at Moderate, 2.0 for both <span style="background:black;color:white">SCM 11</span> and <span style="background:black;color:white">SCM 10</span>.
>
> It also looks like <span style="background:black;color:white">SCM 11</span> meets the 2.0 on Executive Function in that he has two scores below a 30. "Level 2 Impairment: 2 or more scores below a T score of 30."
>
> With these adjustments both of these players meet the 2.0 Neuropsych standards.[64]

On 12/20/2017, Howard emailed <span style="background:black;color:white">Provider 8</span> and <span style="background:black;color:white">Provider 7</span>:

> Let's get the dates adjusted on all of <span style="background:black;color:white">Provider 8</span>'s reports so that they are well past the time frames of the testing and the clinical assessment by <span style="background:black;color:white">Provider 8</span>.[65]

On 1/5/2018, in the same email in which he offered <span style="background:black;color:white">Provider 9</span>, <span style="background:black;color:white">Provider 8</span> and <span style="background:black;color:white">Provider 7</span> instruction on reporting employment, Howard also stated:

> Dates all look good. This is the best approach. <span style="background:black;color:white">Provider 8</span>'s report coming about a month later works.
>
> In review of these two reports, we need to place <span style="background:black;color:white">Provider 6</span>, who has the required board certification, as the primary neurologist along with <span style="background:black;color:white">Provider 7</span>. Thus, on page 4 of each report under Impressioin [*sic*]: should read " based on data provided by <span style="background:black;color:white">Provider 6</span>'s Neuropscychological [*sic*] report."[66]

While we have not confirmed which dates Howard was referring to in this email, we believe he may have been referring to the date difference between <span style="background:black;color:white">Provider 8</span>'s report and his exam or the neuropsychological exam with <span style="background:black;color:white">Provider 6</span> and <span style="background:black;color:white">Provider 7</span>. <span style="background:black;color:white">Provider 8</span>'s report date

---

[64] Exhibit 30.
[65] Exhibit 31.
[66] Exhibit 32.



(10/24/2017) is approximately one month after the date of his evaluation and the neuropsychological exam with Provider 6 and Provider 7 (9/20/2017). We also observed a difference in Provider 8's report that was provided to the Settlement Program, which he uploaded to the portal on 11/30/2017, and the report attached to and discussed in the 1/5/2018 email. In the version attached to the email, Provider 8 refers to Provider 6 and Provider 7's report dated 10/3/2017, whereas the version uploaded to the portal does not discuss the date of the report. This indicates that Provider 8 may have been requested to add the date of Provider 6 and Provider 7's report to his own.

Not only do Howard's emails indicate that he may have been requesting that provider examination and/or report dates be added or changed, but it also confirms that he instructed Provider 8's office to include Provider 6's name in Provider 8's report. This is also troubling given Provider 6's assertion to us that she never personally examined any Players.

On 1/16/2018, Howard emailed Provider 8, Provider 9, Provider 7 and several Howard & Associates employees about SCM 1's report and stated:

> SCM 1 had a prior diagnosis of brain damage in 2009 and this should be incorporated into your final report documenting the 2009 diagnosis date and your October 2018 confirmation. The reports are attached.[67]

In addition, the emails also show that Howard & Associates instructed providers on what documentation to provide to the Settlement Program. On 11/17/2017, Worker 7 emailed Provider 9 and stated:

> Dr. Howard just told me that you are preparing to upload reports to the claims center today. Please don't upload documents for SCM 9 or SCM 1. There is an error in Provider 7's report on pg 3 of SCM 9's report. SCM 1's has a typo on the first page of Provider 8's report. If you have corrected the spelling of SCM 1's name please send over the updated version and I will review the document. When uploading, please only upload reports. No testing materials should be uploaded at this time.[68]

Worker 7's instruction to only upload reports and to not upload the testing materials in effect omits material information from Players' Claim Packages. It also presents a possibility that there may have been discrepancies between Provider 8's records and source neuropsychological testing on which he relied and that the firm was editing those records before providing them to the Settlement Program. This possibility is further supported by Worker 7's 11/14/2017 and 11/20/2017 emails to Provider 9 and Provider 8, in which she provided "corrected" versions of the neuropsychological reports for SCM 1 and SCM 9 to Provider 8,

---

[67] Exhibit 33. The "reports" that are mentioned here are the 2009 Worker's Compensation reports from ▮▮▮.

[68] Exhibit 34.



instead of the more traditional process of the neuropsychologist providing the report to the diagnosing physician.[69]

The only emails we have of Howard & Associates' communications with Players are from the lien production related to **SCM 1**. In an email ▮▮▮▮▮ sent to **SCM 1** on 4/1/2018, when apparently referring to the Program's questions, he said "we must provide only the answer to each question posed. No more. No less."[70]  Such an instruction does not encourage truthful and complete communication, which is what we expect.

**C.  Howard's Instruction to Staff to Misrepresent CDR Scores.**

In addition to Howard & Associates' instructions to providers, Howard himself also instructed his staff to misrepresent CDR scores.  On 9/18/2016, Howard asked **Provider 1** whether there was a CDR update for **SCM 12** (SPID 100013651) that would support Level 2 impairment.  **Provider 1** replied that such a document was not in his file, to which Howard stated that they would send him an "updated CDR showing moderate 2.0 tomorrow."[71]  In response to this, **Provider 1** said that "Any change in cognitive status requires separate full evaluation with conclusion of decline in time not just simple correction on paper."[72]  The next day, Howard forwarded **Provider 1**'s email to **Worker 4**, **Provider 3**, ▮▮▮▮▮, and **Worker 7** and said:

> Going forward we will need to have all CDRs in the 2.0 or moderate range so that we don't have these issues with **Provider 1**.[73]

This instruction to apply blanket scores of 2 to all CDR assessments is a gross misrepresentation of the facts.

**D.  Howard & Associates' Editing and Drafting of Neuropsychological Reports.**

**1.  Emails Between Howard & Associates Employees and Medical Providers.**

Throughout the documentation produced by Howard & Associates for **SCM 1**'s lien dispute and the ▮▮▮▮▮ production, there are email communications showing that Howard & Associates employees were drafting and editing neuropsychological reports.

On 7/6/2017, Howard emailed **Provider 8**, **Provider 6**, **Provider 7**, **Provider 9**, and several Howard & Associates employees a "working draft report" for a Player for them to make "any changes … for any updates on the testing":

> **Provider 6**, **Provider 7**, and **Provider 8**,
> Attached please find a working draft report in word on **SCM 4** that is

---

[69] Exhibit 35.
[70] Exhibit 36.
[71] Exhibit 37.
[72] Exhibit 38.
[73] Exhibit 39.



based on the underlying testing and report done by **Provider 5**. The date of the assessment, date of report, and signature blocks are updated. If any changes are needed for any updates on the testing, they can be modified on this document as well. We have clarified that this is a referral from **Provider 8** and have placed both **Provider 6** and **Provider 7** on the signature block, but only listed **Provider 6** as the examiner, as she is who the NFL will look to for the opinion that **Provider 8** will rely upon. We will provide this document for each player that has been previously tested for their updates. There are approximately 160 reports in the files now and we will have all nearly 300 done before each player goes for a final review and opinion by **Provider 8**. We expect that an Online Upload will take place for these files. We will also provide the supporting medical records, such as MRI and EEGs that we have in the files.[74]

On the same day, Howard emailed the same group and stated:

We will be obtaining a word version of **Provider 5**'s Neuropsychological reports so that an update by **Provider 7** and **Provider 6** will be easy to modify, and we will provide a new signature block and date for **Provider 7** and **Provider 6**'s use. We will also provide a working draft template for **Provider 8** to ensure that the language of the final report meets all legal standards.[75]

Howard also emailed **Provider 8** and **Provider 7** again on 7/6/2017 and attached a copy of **Provider 6** and **Provider 7**'s neuropsychological report:

I am attaching an updated report for **SCM 4** that uses the organizing titles provided by the Qualified MAFS Physician Manual. The content is the same, but we have included the sectional terms found in the manual. We will use and update this particular [*sic*] template for future clients going forward.[76]

Similarly, on 7/7/2017, Howard emailed **Provider 8** and **Provider 7**:

I am attaching a working draft report for **SCM 13** for your use.[77]

On 8/31/2017, in an email entitled "▇ Report Names," **Worker 7** emailed **Worker 8** **Worker 8**, both employees of Howard & Associates, and stated:

Here are some more names for you to type report for. All **Provider 5** or **Provider 4** reports can be found in the OneDrive.[78]

---

[74] Exhibit 40.
[75] Exhibit 41.
[76] Exhibit 42.
[77] Exhibit 43.
[78] Exhibit 44.

NFL CONCUSSION SETTLEMENT

██Worker 7██ also provided ██Worker 8██ with 10 names of Settlement Class Members.  On 9/1/2017, in an email entitled "██SCM 1██'s [*sic*] Report," ██Worker 8██ then sent ██Worker 7██ a copy of ██SCM 1██'s neuropsychological report that listed the Examiner as ██Provider 5██.[79]

On 9/7/2017, ██Worker 8██ replied to ██Worker 7██'s 8/31/2017 email ("██ Report Names") and stated:

> I only have one more to convert, so I'll be needing another list soon. ██ is working on ██SCM 14██.[80]

On 9/13/2017, ██Worker 7██ sent ██Worker 8██ an email ("Re: ██ Report Names") and stated:

> You can do the reports for ██SCM 15██ and ██SCM 16██. Both should be on the OneDrive. If you have any questions please let me know.[81]

These communications support ██Worker 2██'s tip and confirm that Howard & Associates were at the very least creating draft neuropsychological and neurological reports and likely re-drafting or adding information to these reports in an effort to affect the outcome of claims.

**2. Howard & Associates' OneDrive Folder.**

On the same day ██Worker 7██ told ██Worker 8██ that he can do reports for ██SCM 15██ and ██SCM 16██, ██Worker 8██ shared a link to Howard & Associates' OneDrive folder with ██Worker██ ██Worker 7██.  We accessed this folder, titled "Shared > NFL Master player file > PDF – Word," on 7/7/2020 and downloaded 143 neuropsychological reports, all in Microsoft Word format.  A PDF screenshot of this folder is attached as Exhibit 48 (pages 339-341 of this pdf).  We reviewed each of the 143 reports in the OneDrive folder and analyzed the data, authorship and revision history. From this analysis, we found:

> (a) **Diagnoses**: The 143 reports relate to 137 unique Players.[82]  Of those, 68 have Diagnoses of Level 2, 47 Level 1.5, 3 are Level 1, and 25 have either no diagnosis listed or diagnosis is "0."  That is an 80% rate of diagnosis.  While it is hard to draw immediate conclusions about the reasonableness of this number, as discussed in Section VI.A of this Report, it does appear to be an outlier.

> (b) **Format**: The reports all have the same general format and structure seen in the overlapping reports from ██Provider 5██ and ██Provider 6██ and ██Provider 7██;

> (c) **Claim Filings**: Of the 137 Players with reports on the OneDrive, 29 of those Players have filed Monetary Award claims.  Only one claim was based on the

---

[79] Exhibit 45.
[80] Exhibit 46.
[81] Exhibit 47.
[82] Six Players have two reports on the OneDrive.



OneDrive report (SPID 100006799)[83]; for the others the OneDrive reports, where submitted, were historical records in all other claims[84];

(d) **Reports In the Program's Portal:** Twelve Players have a version of their OneDrive report in the NFL Settlement Program's portal. The portal reports include nine purportedly from ██ Provider 5 ██ and three purportedly from ██ Provider 4 ██. In all but one case, the Qualifying Diagnosis listed in the report on the OneDrive matches the Qualifying Diagnosis listed in the portal report. The exception is ██ SCM 17 ██ (SPID 100005185), whose OneDrive report does not include a Qualifying Diagnosis. However, the version of the report submitted to the Settlement Program includes a "Conclusion" section that includes a Qualifying Diagnosis, a section absent from the OneDrive version, as well as a signature from ██ Provider 4 ██ (Doc ID 224083, pp. 11-12). Howard and ██ Provider 4 ██ communicated about ██ SCM 17 ██'s report throughout 2015 and 2016, during which the two exchanged multiple versions of the report and suggested revisions. ██ Provider 4 ██ then sent a version of her report for ██ SCM 17 ██ to Howard & Associates on or around 2/3/2016.[85] Howard informed ██ Provider 4 ██ that she would need to add a Conclusion to the report, sign the report and "send via scan".[86] She did that, and sent another version to Howard, and that version matches the report in the portal.[87]

(e) **Neuropsychologists:** 120 of the reports list the neuropsychologist as ██ ██ Provider 5 ██, 21 list the neuropsychologist as ██ Provider 4 ██, and two do not list a neuropsychologist;

(f) **Exam Dates:** The dates of the exams on the reports range from 5/5/2015 to 10/11/2017.[88] Twenty-four of the reports list exam dates that span multiple days.

(g) **Report Dates:** The dates of the reports range from 5/18/2015 to 11/27/2017. The report dates are often at least several months after the listed exam dates.

(h) **Document Creation Dates:** Based on the document metadata, where available, the document creation dates range from 11/5/2015 to 11/6/2017. These document creation dates are typically several months to over a year after the report dates.

(i) **Document Edit Dates:** Metadata shows that the last edit dates range from 11/5/2015 to 2/6/2020. The last edit dates are often the same date as the

---

[83] The claim was denied after AAP review, after we instructed the AAP to ignore Howard related records.
[84] Section V. discusses these claims.
[85] Exhibit 49.
[86] *Id.*
[87] Exhibit 50.
[88] One report lists an apparent erroneous exam date of 3/3/1967.



document creation date, although some last edit dates are several weeks after the document creation date.

(j) **Document Authors:** Also saved in the metadata, the authors of the reports include Tim Howard, ████████ of ███████ (Provider 5 's practice), Provider 4 and "Provider 2" (presumably Provider 2 ).

| Table 1 | |
|---|---|
| **Report Author** | **Number of Reports** |
| Tim Howard | 51 |
| ████████ | 51 |
| No Author Listed | 31 |
| Provider 4 | 6 |
| Worker 9 | 3 |
| Provider 2 | 1 |

(k) **Last Saved By:** The majority of the reports were last saved by Tim Howard or Worker 9 , a former Howard & Associates employee.[89]

| Table 2 | |
|---|---|
| **Report Last Saved By** | **Number of Reports** |
| Tim Howard | 67 |
| Worker 9 | 49 |
| Guest | 20 |
| Worker 10 | 4 |
| Provider 4 | 1 |
| Provider 2 | 1 |
| Worker 11 | 1 |

(l) **Number of Revisions:** The document properties for the associated reports list the number of revisions for each given document. These revisions range from 1 to 56 with an average number of revisions of 5.95. None of the reports have a previous version that is accessible.

(m) **Overlapping Language/Grammatical Errors:** We reviewed the language in all of the reports and found that many, primarily those bearing Provider 5 Provider 5 's name, contained overlapping language and various grammatical errors, further indicating the use of a template. While the use of a template is, by itself, not an immediate red flag, the grammatical errors present in the

---

[89] Public records indicate that Worker 9 previously had a Howard & Associates email address.



reports indicate that the author was simply copying and pasting the Player's name or the names of the informants into the document.

One particular paragraph, usually found on page 2 of any given report allegedly prepared by ████ Provider 5 ████, appears strikingly similar. This paragraph concerns collateral information provided by informants. The paragraph begins with the source(s) of the information and then comments on various aspects of the Player's functional impairment. Based on the language used in this section of the reports, we believe the author described information reported during ████Provider 3████'s CDR assessment of the Player. Much of the language describing specific symptoms and difficulties appears to be taken directly from the CDR worksheet (a copy of which is attached as Exhibit 51 - pages 357-366 of this pdf). For example, statements such as "memory problems interfering with activities of daily living," "the ability to solve problems, handle small sums of money, and manage financial and business transactions," and "the ability to handle household emergencies as worse than before" are very similar, and in some cases identical, to questions on the CDR worksheet. Typically, we do not see neuropsychologists using such "anchor text" language in their reports.

The table below shows this specific paragraph from three reports bearing ████ ████ Provider 5 ████'s name. We color-coded overlapping language between the paragraphs and bolded in red font the reoccurring grammatical errors.

| Table 3 | |
| --- | --- |
| **Player** | **Report Language** |
| ████ SCM 4 ████ (SPID 100003606) | ████ SCM 4 ████'s **wife and friend was** asked to provide additional information about his current level of functioning. His wife and friend stated that his memory deficits interfere with his ability to perform activities of daily living. His wife reported that he requires assistance with activities of daily and cannot complete household chores anymore. His wife and friend noted that he needs things written down in order to remember them. His wife stated that his memory problems have interfered with his ability to maintain employment. His wife and friend indicated that ████ SCM 4 ████ **still drives but there are concerns due to his poor thinking.** His wife and friend reported that he forgets major family events (i.e. son's birthday or plans with friends), familiar streets, and places outside of the neighborhood. When asked about his ability to solve problems, handle small sums of money, or manage financial and business transactions, his friends stated that he is poor. Reportedly, ████ SCM 4 ████ **involvement** in social activities is limited as he tends to be isolative and withdrawn from family and friends. ████ SCM 4 ████'s wife noted that he has declined more significantly over the past year. |

| Table 3 |
|---|
| **Table 3** |

| | |
|---|---|
| **SCM 2**<br><br>(SPID 950002981) | **SCM 2** 's wife and a close friend were asked to provide additional information about his current level of functioning. His wife and close friend both ==stated that his memory deficits interfere with his ability to perform activities of daily living.== His wife noted that he does not perform household chores except for cooking due to his inability to remember what to do. She indicated that she has to write things done in order for **SCM 2** to remember them. Although his friend indicated that **SCM 2** **SCM 2** <mark>still drives, there are concerns</mark> as he forgotten how to get home from several events. Additionally, his wife and friend reported that <mark>he forgets major family events,</mark> familiar streets, <mark>and places outside of the neighborhood.</mark> His friend reported that he has forgotten conversations in the middle of them talking to each other. His wife and close friend stated that his ability to solve problems or handle small sums of money or manage financial and business transactions is not good. **SCM 2** 's wife noted that <mark>he has declined more significantly over the past year.</mark> |
| **SCM 3**<br><br>(SPID 100012500) | **SCM 3** 's wife and friend were asked to provide additional information about his current level of functioning. His wife and friend said that <mark>he forgets major family events and places outside of the neighborhood.</mark> When asked about his ability to solve problems, handle small sums of money, or manage financial and business transactions, she stated that he is fair. <mark>Reportedly,</mark> **SCM 3** <mark>involvement</mark> in <mark>social activities is limited as he becomes quite anxious and as a result, he tends to be isolative and withdrawn from family and friends.</mark> **SCM 3** 's wife noted that <mark>he has declined more significantly over the past year.</mark> |

   **(n) CDR Analysis:** For the six Players with CDR worksheets completed by ███ **Provider 3**, we compared the information provided in the CDR assessment with the language in the reports.[90],[91]  We observed that the author appears to have selectively picked the information from **Provider 3** 's CDR assessment that would be most favorable to the Player's claim and omitted other information in areas where the informant reported that the Player did not exhibit problems. This concerns us because the language in the reports is not a fair and objective summary of the information gathered from informants.  Instead, the reports are the product of careful "cherry-picking" by an author with an intent to present a narrative of impairment.  This "cherry-picking" is evident in the total exclusion of some categories of the CDR from the functional impairment paragraph where information given by informants does not paint a picture of impairment.

   For example, the informant for **SCM 2** (SPID 950002981) indicated in the CDR interview that the Player's memory was "impaired to such a degree that it would have interfered with activities of daily life a few years

---

[90] We have identified documentation from **Provider 3** for seven total Players across six Players' Claim Packages. One of the six Players' records also contains an incomplete CDR note of another Player registered with the Settlement Program.
[91] **Provider 3** 's CDR documentation typically includes handwritten notes on the personal details and histories of informants, handwritten notes of information gathered from informants, handwritten entries on the CDR worksheet, and, in some cases, typed affidavits from one or both of the informants. The CDR interviews are typically with the wife and a friend of the Player.



ago."[92] **Provider 5** 's report indicates, "His wife and close friend both stated that his memory deficits interfere with his ability to perform activities of daily living." The same informant indicated in the interview that "he does not perform household tasks anymore," but that he could still cook well.[93] **Provider 5** 's report indicates, "[h]is wife noted that he does not perform household chores except for cooking due to his inability to remember what to do." When asked if the Player can remember a short list of items, the informant answered "no," and the word "list" was notated next to the answer.[94] **Provider 5** 's report indicates, "[s]he indicated that she has to write things done [*sic*] in order for **SCM 2** to remember them."

However, the informant for **SCM 2** also indicated that the Player had full, unaided function in personal care, including impairment scores of zero in dressing, washing, grooming, eating habits, and fluid control.[95] This information is not discussed nor is there any reference to personal care in **Provider 5** 's report. The informant reported that the Player is taken to social functions outside of the home and that he sometimes behaves appropriately in social settings.[96] Again, there is no reference to social activity in **Provider 5** 's report. The informant also reported that the Player is still working and rarely or never has problems in employment related to memory or thinking.[97] **Provider 5** 's report makes no mention of employment.

Additionally, there are instances where it appears **Provider 5** 's report mischaracterizes information gathered from collateral informants. For example, **Provider 5** 's report for **SCM 2** states that, "his wife and friend reported that he forgets major family events, familiar streets, and places outside of the neighborhood." However, the Player's wife actually selected the least-impaired answer, "Usually," to the questions of "Can he/she find his/her way around familiar streets?" and "How often does he/she know how to get from one place to another outside his/her neighborhood?" and "How often can he/she find his/her way around indoors?".[98] **Provider 5** 's report for **SCM 5** (SPID 100006799) states that, "[h]is brother also stated that his memory problems have interfered with his ability to maintain employment." However, the Player's brother actually answered that the Player was still working and that he doesn't know whether memory or thinking problems contributed to the patient's decision to retire.[99] **Provider 5** 's report for **SCM 3** (SPID 100012500) states that, "[w]hen asked about his

---

[92] SPID 950002981, Doc ID 161054, p. 46.
[93] *Id.* at 50.
[94] *Id.* at 46.
[95] *Id.* at 51.
[96] *Id.* at 49.
[97] *Id.* at 49.
[98] *Id.* at 47.
[99] SPID 100006799, Doc ID 176424, p. 16.



ability to solve problems, handle small sums of money, or manage financial and business transactions, she stated that he is fair," in which "fair" is the intermediate, third level of impairment out of five possible answers. In actuality, the Player's wife indicated that the Player's ability to solve problems was "good, but not as good as before," a level of functionality higher than "fair." Additionally, the Player's wife answered that the Player had "[n]o loss" in ability to cope with small sums of money or handle complicated financial or business transactions.[100]

### 3.   **Howard's Explanation of the Reports**.

As a part of the 7/7/2020 hearing regarding ██SCM 1██'s attorney lien dispute, █████████, included Howard & Associates' emails about drafting reports, as well as the link to and a screenshot of the OneDrive folder in his "Exhibit 2." During the hearing, █████████ read and summarized Howard & Associates' emails for the Court, pointing out that law firms do not typically draft reports for medical providers.[101] █████████ also alerted the Court to Howard & Associates' OneDrive link, noting that, in his opinion, the title of the folder "pdf-word" indicates that the contents of the folder were converted from PDF format to Microsoft Word format, to possibly allow editing of those reports.[102]

Later in the proceeding, Howard offered an explanation of the emails and the reports in the OneDrive folder.[103] Howard attempted to explain away the emails between ██Worker 7██ and ██Worker 8██ by stating that both employees were simply "young paralegals"[104] who used the wrong terminology; instead of drafting reports, they were working on drafting affidavits. Howard further explained that the employees would review the reports on the OneDrive, take information from the reports in Word format, and then type affidavits, which could later be edited for accuracy by the Player or third party.[105]

We believe that Howard's explanation is not only implausible on its face, but also presents serious concerns if it were in fact true. Howard's primary assertion is that his staff members were drafting third party affidavits instead of medical reports. However, this assertion is not supported by the available evidence in any way. First, we did not find that any of the 143 documents on Howard & Associates' OneDrive were third party affidavits. All of the documents were purported neuropsychological reports from ██Provider 5██, ██Provider 4██, or an unnamed provider. As discussed in Section VI.D.2, the reports on the OneDrive appear to have been last revised by Howard & Associates staff, including Howard himself.

---

[100] SPID 100012500, Doc ID 160961, p. 42.
[101] Exhibit 27, pp. 203-204.
[102] *Id.* at 204-206.
[103] *Id.* at 230-242.
[104] In the hearing transcript, Howard refers to ██Worker 8██ as a "young paralegal just out of college," and then says "same with ██Worker 7██. She's a paralegal…." He then goes on to state that ██Worker██ "doesn't even have a college – an undergraduate degree" and that "██Worker 8██ is just undergraduate" and further that "These are young kids that don't know what they're doing in detail" (*see* Exhibit 27, pp. 235-237).
[105] *Id.*



Howard & Associates' emails also do not support Howard's assertion. For example, as discussed in Section VI.D.1, on 7/6/2017, Howard provides a "working draft report in word" to Provider 6, Provider 7 and Provider 8, and stated that the date of assessment, date of report and signature blocks are updated. Howard also notes that "we have clarified that this is a referral from Provider 8 and have placed both Provider 6 and Provider 7 on the signature block, but only listed Provider 6 as the examiner…" and "we will provide this document for each player that has been previously tested for their updates. There are approximately 160 reports in the files now and we will have all nearly 300 done before each player goes for a final review and opinion…."[106] Howard also states that his firm will provide a template for Provider 8 that ensures the language "meets all legal standards."[107] Additionally, on 9/1/2017, Worker 8 sent Worker 7 SCM 1 SCM 1's neuropsychological report a day after their 8/31/2017 discussion of typing "reports" for certain Players, including SCM 1.[108] This document was not an affidavit, but a neuropsychological report bearing Provider 5's name. Yet another email produced by Howard also calls his statements into question. On 2/17/2017, Worker 7 emailed SCM 1, explaining that "the person who writes most of the affidavits in our office is out of town because she is taking the Florida Bar early next week. I asked her to email the affidavits to me yesterday, but I'm not sure she has had time to do so."[109],[110] Not only does this email indicate that Worker 7 was not writing affidavits herself as of February 2017, but also that the firm had a designated, female individual for this task, as opposed to Worker 8. In addition, Worker 7 also uses the term "affidavits," as opposed to "reports," three times in the email. This appears to contradict Howard's assertion that Worker 7 was not familiar with the correct terminology in her later email communications.

Howard's assertion that his staff was drafting affidavits using specific statements in the neuropsychological reports from Provider 5 is also concerning if it is in fact true. During the 7/7/2020 hearing, SCM 1's wife, , stated that SCM 1 was never actually examined by Provider 5. Specifically, when asked by whether Provider 5 was a physician that Howard & Associates scheduled and arranged for her husband to see, replied:

> He didn't see Provider 5. I think she -- or Provider 5 took the medical
> information from the visit with Provider 2 to use. So he never actually saw
> that particular physician.[111],[112]

---

[106] Exhibit 40.
[107] Exhibit 41.
[108] Exhibit 45.
[109] Exhibit 52.
[110] We believe the author of the affidavits referred to by Worker 7 was Worker 10, who graduated from Florida State University College of Law in 2016 and was admitted to the Florida Bar in September 2018. A March 2017 email confirms Worker 10 had been out of the office at that time (see Exhibit 53).
[111] Exhibit 27, p. 253.
[112] It is unclear if SCM 1 was personally examined by Provider 5. In SCM 1's Health Care Provider History Form submitted to us as a part of his audit on 7/4/2018, SCM 1 listed Provider 5 as a health care provider he had seen in the last five years (see SPID 100014059, Doc ID 178107, p. 3).



At the very least, Howard's explanation when viewed alongside ████████'s statement means that Howard & Associates staff was drafting affidavits to support Monetary Award Claims based on medical records from exams that never actually occurred.

Because of ████████'s assertions during the lien dispute hearing that **SCM 1** was never actually examined by **Provider 5**, we investigated this potential concern in more detail. We determined that one Player, **SCM 18** (SPID 100002309), could not have been personally evaluated by **Provider 5** because he was incarcerated on the purported evaluation date. **Provider 5**'s report on Howard & Associates' OneDrive states that **SCM 18**'s examination occurred on 11/17/2016. However, through our research, we determined that **SCM 18** was arrested on 5/13/2014 for possession of MDMA and sentenced to 27 months in federal prison on 1/30/2015.[113] The Federal Bureau of Prisons online database confirms that **SCM 18** was not released from incarceration until 1/9/2017.[114]

We also sent questions to the six Players whose claims we placed in Audit as a part of this investigation.[115] Four of these Players listed **Provider 5** as a provider on their Health Care Provider History Form. Two of these Players told us that they were personally examined by **Provider 5**; however, one of the two explained that an African-American man worked with **Provider 5** and that individual administered most of the testing. One Player confirmed his visit with **Provider 5** but could not recall any details. The remaining Player told us that he was not personally examined by **Provider 5**, that he was examined by a man who was under the supervision of **Provider 5**, and that **Provider 5** would be preparing and signing off on the report. It appears that a person acting as a psychometrist may have performed some of the evaluations, and **Provider 5** never met with the Players. Another Player, who listed **Provider 4** on his Health Care Provider History Form, told us that **Provider 2** performed the evaluation and sent his findings to **Provider 4** for her review. Another Player told us he did not know if he saw **Provider 4** personally, but stated he was personally examined by **Provider 2** on several occasions and listed **Provider 2** on his Health Care Provider History Form. Notably, four of the Players also reported that their examinations occurred at Howard & Associates' office. A copy of all of these Players' responses to our questions is attached as Exhibit 55 (pages 370-376 of this pdf).

**E.   Appeals Advisory Panel Consultant Review.**

We asked an AAP Consultant to review a sample of 10 of the reports from Howard & Associates' OneDrive. A copy of the AAPC's opinion is attached as Exhibit 56 (pages 377-378 of this pdf). The AAPC noted that the reports appear in a template format that crosses providers and found that some of the reports contain "clear misinterpretations" of data, where Players had consistently failed embedded validity indicators but the reports indicate that the Players passed these indicators. He noted other inconsistencies in the reports as well. For example, some Players obtained high average TOPF scores but the reports indicated that the Players had

---

[113] ████████████████████████████████████████████████████████████████
[114] Exhibit 54.
[115] These six Players are **SCM 19** (SPID 100008089), **SCM 15** (SPID 100008314), **SCM 20** (SPID 100009244), **SCM 21** (SPID 100015129), **SCM 22** (SPID 950004136), and **SCM 23** (SPID 100016757).



severely impaired verbal comprehension indices. The AAPC observed that this is "highly implausible" and that word recognition reading would not have begun to decline if the Players' verbal reasoning scores had degraded to such a degree. Overall, the AAPC was most concerned with the reports bearing ▮▮Provider 5▮▮'s name and expressed concern that someone, possibly an individual other than a psychologist, fabricated at least one of ▮▮Provider 6▮▮'s reports.

### F. Description of ▮▮Worker 5▮▮.

▮▮Worker 5▮▮ is a former Howard & Associates employee who recruited retired NFL Players for the firm to represent in the Settlement Program.[116] On 2/19/2020, ▮▮Worker 5▮▮ was deposed in the case of ▮▮▮▮▮▮ v. Howard.[117] We reviewed the deposition transcript which is attached as Exhibit 57 (pages 379-570 of this pdf). In this, ▮▮Worker 5▮▮ alleged that Howard altered medical records related to the treatment of NFL Players. ▮▮Worker 5▮▮ initially referred to "the doctor reports that were coming in and how Mr. Howard was changing them."[118] Later in the deposition, ▮▮Worker 5▮▮ provided more details:

> He [Mr. Howard] was going to use some of the money that was raised to do trials for tobacco, and he was going to use some of it for NFL players that had been brought in. A lot of that money, too, was used for the doctors that -- as I was explaining to you before, to do treatment on the players. And what Mr. Howard would do is if the doctor would send a report back that he didn't -- he felt like this person should have a 2.0 instead of a 1.5, he would go in there and change the doctor's report and say "got one done." And we – I think I still have a copy of those reports he changed, if I need to provide them. But that was just part of what he did. And by then [2017] we realized that we were dealing with someone that -- I mean, he just had no scruples at all. He just did whatever he wanted to do.[119]

Toward the end of the deposition, ▮▮Worker 5▮▮ confirmed he still has copies of the medical reports that Howard altered.[120] However, the extent of the records in ▮▮Worker 5▮▮'s possession is unclear.

### G. Questionable Costs.

From the produced documents emerges a picture of a complex process for cost billing that Howard has set up, using ▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮ is run by ▮▮▮▮▮▮, who is the President of ▮▮▮▮▮▮▮▮▮▮ in Austin, Texas, as well as a practicing attorney in Texas. The set up may be best illustrated through ▮▮Provider 1▮▮'s question regarding billing for the MRI:

> ▮▮Provider 1▮▮ emailed Howard and ▮▮▮▮▮▮ noting that "I have requested MRI of brain for ▮▮SCM 23▮▮ at ▮▮▮▮▮▮▮▮. Are you planning on using your funds

---

[116] Exhibit 57, p. 387.
[117] ▮▮▮▮▮▮
[118] Exhibit 57, p. 394.
[119] Id. at 417.
[120] Id. at 529-530.



money for that? We have discounted cash rate with them if I remember well around $ 500 per brain imaging."[121] ▌ responds saying:

> Pls arrange for the MRI and add the charge (discounted) on your invoice to us.
> Dr. Howard:
> Each MRI will be invoiced by ▌ as $1000 per scan. Pls reply to this message that you are okay with that. This will prevent us from having to cut another contract.[122]

Howard responds with "Makes sense and thank you."[123]

Provider 1 seeks clarification:

> Please clarify your proposal?
> Who should write a check to the MRI facility?
> MRI would agree to complete the testing for $525 per patient.

▌ responds with "you pay the MRI and bill me. I will pay you. Because I prepay you, you should not have to come out of pocket at all."[124]  And Howard adds: "we will seek to have these costs added to SCM 23 account with ▌."

What seems to have confused Provider 1 is how a testing that costs $525 becomes a $1,000 cost to the Player.  That seems to have been *modus operandi* for Howard.  In his Report and Recommendation regarding SCM 1 's lien dispute, Judge Strawbridge concluded with a recommendation that the entirety of the $16,750 withheld by the Claims Administrator for Howard's costs – based on the figure identified by Howard in its 2019 lien – be released to Howard.[125]  Those costs submitted for reimbursement prior to ▌ 's association with the case include:

> 1/4/2017 $900.00 "Provider 3 CDR"
> 3/16/2017 $1,125.00 MRI ▌
> 3/16/2017 $7,000.00 Provider 1
> 9/20/2017 $4,000.00 Provider 8
> 9/20/2017 $4,000.00 "Provider 6 Provider 7"
> -------------------------------
> Total: $17,025.00

Remarkably, the cost for the MRI by ▌, which we know from Provider 1 's email costs $525 per evaluation, is submitted for reimbursement at $1,125.  Similarly, Provider 3 told us she was paid $500 per CDR evaluation,[126] but the reimbursement sought for her

---

[121] Exhibit 58.
[122] *Id.*
[123] *Id.*
[124] Exhibit 59.
[125] ▌, Filed 9/28/20.  The recommendation is still pending a final ruling by Judge Brody.
[126] Exhibit 13.

NFL CONCUSSION SETTLEMENT

evaluation is at $900.  It is more difficult to definitively determine what ██Provider 1██ was paid, but it appears it was $3,500 per Player;[127] the reimbursement sought for his costs is at $7,000.  Granted, Howard would not stand to recover 100% of these alleged costs.  However, he had submitted these costs to the Court, making a representation that they were correct accounting of the costs incurred.  They are not.

## H.  Howard & Associates' Involvement in Claims Represented by ████.

████████ initially told us in October 2018 that Howard & Associates approached him in the spring of 2018, seeking a firm willing to take over the day-to-day claims administration process for their clients and who could handle lenders and settlement funders who provided loans to Howard & Associates' clients.  ████████ explained that at the time he took over "primary representation" of Howard & Associates' clients, none had filed Monetary Award Claims with the Settlement Program.

Throughout June and July of 2019, we followed up with ████████ regarding his relationship and arrangements with Howard & Associates, and clarified that ████ began a Co-Counsel relationship with Howard & Associates in April 2018 and that the two firms have a fee-sharing relationship.  ████ asserted that he is completely independent of Howard & Associates, that the firms share no employees, and that he is not familiar with Howard & Associates' operations.  ████████ further explained that Howard has no control over his claims and that he only provides claim status updates to Howard.

We found evidence that Howard, and other employees of Howard & Associates, were still engaged to some degree in matters related to the Settlement Program and Monetary Award claims well after ████████ assumed primary representation of their claims in April 2018.  Specifically related to ██SCM 1██'s lien dispute, in his Rule 18 response, Howard argues that he was involved heavily in ██SCM 1██'s claim.  Howard points to a 7/3/2019 email that outlines his firm's purported responsibilities with their clients.  These duties include direct contact with Players when ████████ is unable to reach them, "daily, evening, and weekly" contact with Players, as well as client education forums and bi-monthly conference calls that include 20 to 25 Players.[128]  Also, on 9/19/2018, ██SCM 1██ emailed Howard directly and said: "thank you, for all the work you have put in thus far and the headaches we have probably caused with our constant calling and worries. I look forward to us crossing the finish line together."[129]

At the 7/7/2020 hearing, Howard argued at length that he was involved immensely in ██SCM 1██ ██SCM 1██'s claim from December 2016 until ██SCM 1██ terminated his representation in September 2019.[130]  Howard argued that Howard & Associates covered ██SCM 1██'s costs and travel expenses and that ████████ paid for "nothing."[131]  Howard also argued that they still represented ██SCM 1██ through ████████ and "but for us there is no ████████ involved in

---

[127] Exhibit 60.
[128] Exhibit 61, p. 578.
[129] Exhibit 62.
[130] A copy of ██SCM 1██'s 9/20/2019 email terminating his representation with Howard & Associates is attached as Exhibit 63.
[131] Exhibit 27, pp. 190-191.



this process."[132]  Howard also stated that his staff communicated regularly with SCM 1, counseling him and even driving to his home.

While there are some inconsistencies regarding Howard & Associates' involvement in the Settlement Program, it appears that Howard & Associates remained somewhat active in claims represented by ███████, more so than we were led to believe.

**I.** Provider 8**'s Misrepresentations Regarding His Involvement with Howard & Associates.**

As discussed in Section V.D.2, we asked Provider 8 about his examination of Players, arrangements and communications with Howard & Associates, and experience with Provider 6 and Provider 7.  At the time of these communications, we did not find Provider 8's or Provider 9's responses to be concerning.  However, the evidence shows that Provider 8 and Provider 9 misrepresented to us their relationship and interactions with Howard.

1. Provider 8 stated to us that no law firm had given him instructions about evaluating Players and Provider 9 confirmed that no one at Howard & Associates had asked for any edits to his reports, except to fix an incorrect spelling of a name or date of birth on a report.  However, as discussed in Section VI.B, Howard:

    (a) Provided Provider 8 with a template to use for his reports;

    (b) Instructed Provider 8 to adjust dates on all of his reports;

    (c) Instructed Provider 8 and Provider 9 that all reports should show that there is no current employment and specific to SCM 1's report, that his cognitive limitations caused him to be unemployed;

    (d) Instructed Provider 8 and Provider 9 to include Provider 6's name in Provider 8's report;

    (e) Instructed Provider 8 and Provider 9 to incorporate SCM 1's historical medical records into his report; and

    (f) Instructed Provider 8 and Provider 9 to not upload any testing materials to the portal and to only upload reports.

2. Provider 8 stated to us that Provider 6 and Provider 7 sent their neuropsychological reports directly to him.  However, as discussed in Section VI.D.1, on 7/6/2017, Howard sent a draft neuropsychological report with Provider 6 and Provider 7's names in the signature block directly to Provider 8.  We also observed that Howard sent Provider 6 and Provider 7's report for SCM 13 (SPID

---

[132] Exhibit 27, p. 196.

100004936) directly to ▓Provider 8▓ on 7/7/2017.[133]  Similarly, on 12/5/2017, ▓Worker 7▓ ▓Worker 7▓ emailed ▓Provider 9▓ a neuropsychological report from ▓Provider 6▓ and ▓Provider 7▓ (presumably for ▓SCM 24▓), indicating that Howard & Associates actually provided the reports from ▓Provider 6▓ and ▓Provider 7▓ to ▓Provider 8▓'s office.[134]  We also observed several other instances of Howard & Associates providing "corrected" neuropsychological reports directly to ▓Provider 8▓'s office on 11/14/2017 and 11/20/2017, as discussed in Section VI.B.

3. ▓Provider 9▓ stated to us on 12/10/2019 that she did not have any communications with Howard & Associates because the communications were over two years old.  However, Howard communicated by email with both ▓Provider 8▓ and ▓Provider 9▓ as recently as 1/5/2018, within the two-year window.

▓Provider 8▓'s and ▓Provider 9▓' communications with Howard & Associates, and their responses to our questions, call into question their relationship with Howard & Associates, as well as ▓Provider 8▓'s credibility and role as a Qualified MAF Physician and BAP Provider.

J. **▓Provider 4▓'s Questionable Practices and Misrepresentations to the Program.**

As discussed earlier in Section VI.A, the fact that ▓Provider 4▓ accepted test results emailed to her by Howard or his staff is a violation of test security, and compromises the entire process.  There are additional concerns regarding ▓Provider 4▓, as outlined below.

On 2/29/2016, Howard relayed a message from ▓▓▓▓▓▓▓, a ▓▓▓ at ▓▓▓▓▓▓▓▓▓, to ▓Provider 2▓ and ▓Provider 4▓.  ▓▓▓ provided feedback on the neuropsychological testing results for ▓SCM 17▓ (SPID 100005185), noting that the testing data did not meet settlement criteria.  Howard then requested ▓Provider 4▓ to update her report or create an addendum to her report to address ▓▓▓▓▓▓'s concerns.  ▓Provider 4▓ responded to this email on 3/6/2016 and provided possible revisions to her report and stated that she will "update the report."[135]

On 8/19/2016, Howard emailed ▓Provider 4▓ and informed her that ▓Provider 1▓ requested that she update the Conclusion of her reports to clarify the final Qualifying Diagnosis.[136]  ▓Provider 4▓ stated that she would "be happy to include whatever is necessary" and "Please advise on how I might create the language that ▓Provider 1▓ is asking for."[137]  These emails directly contradict ▓Provider 4▓'s assertion to us that she was never asked to change anything in her reports.

▓Provider 4▓ also appears to have attempted to "explain away" poor validity scores for "▓SCM 25▓" (▓SCM 25▓, SPID 100010453) and have the Player re-tested to achieve better results.  ▓Provider 4▓ wrote to ▓Provider 2▓ and Howard:

---

[133] Exhibit 43.
[134] Exhibit 64.
[135] Exhibit 65.
[136] Exhibit 66.
[137] *Id.*



His scores on the validity measures will raise suspicion about his performance. Although I may be able to explain his sub-par scores, it is likely it will be "subjected to independent review," which is likely a means to disqualify him … If possible, I suggest readministering Word Choice and the TOMM in the hopes he [SCM 25] obtains better scores.[138]

In a later email Provider 4 continues to strategize on this "readministering" of the performance validity tests, saying that "in terms of validity issues, some individuals will be able to be re-tested, some will not. I'd be happy to explain this in more detail when we have this call rather than try to explain in this email."[139]

Howard agrees with the approach and comments that "if you identify any anomalies, Provider 2 is happy to do a prompt retest with the player on a particular domain or sub-test."[140] Provider 2 then does as suggested, noting "I also retested SCM 25 as you recommended."[141] Provider 4 reports back that "with your re-test of SCM 25, we should be able to get him qualified. Thanks!"[142]

The emails also show that Provider 2 was having difficulty administering the neuropsychological testing battery to Players, and that he informed Provider 4 of these issues. For example, on 3/20/2016, Provider 2 emailed Provider 4, admitting that he made mistakes in the scoring and asking what data he needs to tabulate.[143] The emails indicate that Provider 2 was not qualified to administer this testing,[144] bringing Provider 4's response to our questions that she had spoken with Provider 2' about his qualifications into question.

Provider 4 also allowed Howard & Associates employees to pre-fill a Personal History Form for Players on her own letterhead, passing this document off as one she created. The firm would then send these documents to Provider 4 along with other testing materials. This too calls into question Provider 4's judgment.

We explained Provider 4's role in evaluating Howard & Associates' clients to an AAP Consultant, and asked for his opinion. The AAPC pointed out these concerns:

1. Provider 4 was not legally allowed to examine and sign off on the neuropsychological evaluations of the majority of Howard & Associates' clients (those examined in person in Florida by Provider 2) because she did not hold a Florida psychologist's license.[145]

---

[138] Exhibit 67.
[139] Exhibit 68.
[140] *Id.*
[141] Exhibit 69.
[142] *Id.*
[143] Exhibit 70.
[144] Exhibit 71.
[145] The Florida Department of Health online search portal returns no past or current Board of Psychology licenses for Provider 4 (https://mqa-internet.doh.state.fl.us/MQASearchServices/HealthCareProviders).



2. **Provider 2**' credentials as a Medical Doctor are irrelevant to his competency to administer neuropsychological testing. One may only be competent to administer testing with lengthy and supervised training. **Provider 2**' unfamiliarity with, and errors produced during, the neuropsychological testing he administered strongly indicated he was not competent and present an ethics concern related to **Provider 4**'s judgment. **Provider 4** is ethically and legally responsible for all aspects of the evaluations she signed off. She should have assured the competence of anyone collecting psychological data on her behalf and should have maintained a level of oversight and quality control of **Provider 2**' testing. His lack of knowledge and repeated errors should have signaled a red flag to **Provider 4** and her willingness to accept **Provider 2** as a tester and continue signing off on his materials calls into question her credibility and ethics.

3. The process by which Howard & Associates would send **Provider 2**' testing results and materials to **Provider 4** violates test security. Standard practice dictates that the testing materials would not pass through the hands of third parties including lawyers, for example, before being sent to the neuropsychologist. A neuropsychologist who received such materials from a lawyer, such as ██, **Provider 4**, should be concerned that a third party manipulated the data. There is no evidence that **Provider 4** expressed concern over this process.

4. Similarly, **Provider 4** employed a poor standard of care when accepting Personal History Forms from Howard & Associates that had been pre-filled on her letterhead.

5. **Provider 4** should not have accepted revised testing materials from Howard & Associates and her willingness to do so is a red flag. The AAPC opined that in doing so, **Provider 4** was simply working "for hire"--not conducting an independent evaluation.

6. **Provider 4**'s recommendation to re-administer tests where a Player performed poorly, including on validity measures, was inappropriate and does not signify a neutral or valid approach to performance validity. It indicates that her goal was not to determine if Players were exerting effort sufficient to generate valid neuropsychological data, but rather to manipulate scores to a pre-determined level to qualify Players for awards.

Overall, the AAPC expressed immense concern with **Provider 4**'s judgment and actions and opined that the process she engaged in with **Provider 2** and Howard & Associates should not only disqualify her as a provider in the Settlement Program, but also warrants referral to the appropriate state board of psychology.



**K. Provider 6, Provider 7, and Provider 5.**

Fewer details are known about the work of these providers.  However, what we know is this:

1. Provider 6 told us she never saw any Players herself, but there are five reports submitted in the Program's portal that bear her signature;
2. Provider 5 did not see at least some of the Players whose reports bear her signature;
3. Provider 7 and Provider 5 did not respond to the Program's repeated questions about their work;
4. Provider 7 and Provider 5 received and participated in many discussions with Howard & Associates discussing revisions to the reports and taking other instructions from the firm.  *Note*: Provider 6 is addressed in many such emails, but she does not appear to have been copied on those discussions;
5. Many reports prepared/signed by Provider 6, Provider 7 and Provider 5 are based on medical record created by someone else, but they do not identify that information;
6. An AAPC expressed concerns with Reports prepared by Provider 6, Provider 7 and Provider 5 as discussed in Section VI.E of this Report;
7. In addition, if we assume the process of creating the reports by Provider 5 and Provider 6/Provider 7 is similar to Provider 4's, which the evidence we have suggests it was, the concerns AAPC raised about Provider 4's process would apply here as well.

**L. Provider 1's Relationship and Collaboration with Howard.**

The email communications portray how Howard was involved in the application process for Provider 1 to become a Qualified MAF Physician, influencing and even personally providing the information Provider 1 gave to the Settlement Program on his Network Provider Application and during follow-up questions from the Parties and us.

While the full extent of email communications between Provider 1 and Howard are unavailable to us, we see now that the information reported to the Settlement Program regarding Provider 1's treatment of Retired NFL Football Players was discussed and dictated by Howard, who instructed his employees and Provider 1 to omit specific references to his examination of Retired NFL Football Players, including his clients.  After receiving a Network Provider Application from the BAP Administrator, on 1/16/2017, Howard emailed Provider 1 and several Howard & Associates employees and stated:

Provider 1 will meet the requirements and he has not been a consultant or expert in any actions against the NFL. The current reports are not submitted, nor are they against the NFL, only in compliance with the current settlement. I would not reference or discuss the



current testing efforts of the 150+ players. Note, we are getting more players every day now.[146]

Provider 1's practice then reached out to us expressing interest in becoming a Qualified MAF Physician and BAP Provider on 1/17/2017 and we sent him an application the next day. On 1/20/2017, Provider 1 sent his completed application to Howard and asked if he had any corrections to it. Howard then responded, "We will review and plan a strategy before filing for the MAFS."[147]

On 1/23/2017, Howard discussed Provider 1's various work on IMEs and other examinations of Players with Provider 1 and a Howard & Associates employee, Worker 1. Howard stated:

> Let's talk as how to sort this out. The email is not an issue for an abstract that is being pulled back. The IME in the one case, as well as the various other worker's compensation actions, etc., that we have verified are good for the MAFS application. The fact that there is research on NFL brain injury is not a problem, but we need to weigh the risks of opening the door to the 42 players and how the MAFS will weigh your objectivity.[148]

On 1/24/2017, Worker 1 provided Provider 1 with the "final MAF Application," a list of cases in which Provider 1 served as an expert witness, and specific instructions for submitting the documents to us.[149] Provider 1 then submitted his Network Provider Application to us on 1/26/2017. A copy of Provider 1's application is attached as Exhibit 6 (pages 74-83 of this pdf). In his application, Provider 1 reported that "Over 19 years of my neurology practice I have seen former NFL players in hospital settings (psychiatric hospital) and in my office as regular patients, clinical research, and for IME evaluations."[150]

After receiving Provider 1's application, we asked him if these Players he examined came to him independently or if any were referred to him by attorneys as part of any kind of litigation. Provider 1 then forwarded our question to Howard and Worker 1 and asked how he should respond. Howard replied to Provider 1, "We can discuss. We need to consider the disability case, since the report was not paid for by any law firm. The other cases are not being paid for by a law firm, but only for the players, and the reports are going to be at a preliminary stage and not final until after MAFS approval."[151] Worker 1 also replied to Provider 1, indicating that they would deliberate on our question and decide on the best response.[152]

The following day, Howard responded to Provider 1 with specific language for a response, "We can consider adding: I have also received referrals from other health care

---

[146] Exhibit 72.
[147] Exhibit 73.
[148] Exhibit 74.
[149] Exhibit 75.
[150] Exhibit 6, p. 79.
[151] Exhibit 76.
[152] Exhibit 77.


NFL CONCUSSION SETTLEMENT

providers."[153] **Provider 1** then asked Howard if his version of the language was acceptable, offering "'During my neurology practice I have seen former NFL players referred to my office by other medical providers as well as represented by their attorneys."[154] Howard then suggests combining both of their responses: "As noted in my attachment, **SCM 16** was seen in this office but was referred to us by another doctor. The psychiatric hospital treatment for the NFL player was not for litigation. As a result, I have seen former NFL players referred to my office both by other medical providers as well as represented by attorneys."[155] **Provider 1** acknowledged this response and then replied to us with it that day.

After we submitted **Provider 1**'s application to the Parties for approval, Howard & Associates continued to serve as the voice of **Provider 1**, providing information to the Parties that would directly affect **Provider 1**'s eligibility to serve as a Qualified MAF Physician. On 2/10/2017, Counsel for the NFL Parties asked us for more context of what **Provider 1**'s independent neurological evaluation in the case of **SCM 16** v. NFL Player Disability and Neurocognitive Benefit Plan entailed. Based on the emails, it appears **Provider 1** forwarded our question to Howard, who replied "The answer is 'I provided an independent examination and expert opinion'. If they ask for a copy, let me see the copy before we send to make sure that the document has no errors."[156] Howard then followed up to his email with, "We may want to modify stating, 'I provided an independent examination and expert opinion, not a workers' comp evaluation.'"[157] **Provider 1** then replied to us with that information and we shared it with Counsel for the NFL.

On 3/15/2017, Class Counsel asked us for more information on **Provider 1**'s IMEs and whether they were related to the NFL Player Disability & Neurocognitive Benefit Plan. We asked **Provider 1** about this and he again forwarded the question to Howard and **Worker 1** and Howard replied, "The IME was requested and paid for by the attorney. I am not sure what the attorney used this IME for, other than for a neurological evaluation. This was referenced in the 13 cases in which I have provided expert witness services. The list of cases in which I have provided expert witness services for over the past 19 years is found in my submission."[158] **Provider 1** simply responded to us, "Yes, The IMEs were requested and paid for by the attorneys. Players were expressing cognitive problems."

These emails show that Howard distorted the truth in his attempts to qualify **Provider 1** and implant him in the Program as a Qualified MAF Physician. Both **Provider 1** and Howard hid the fact that **Provider 1** was examining his clients and downplayed the examination of other Players as they felt the information would affect **Provider 1**'s chances of being approved to serve in the position. **Provider 1** did not push back against Howard's influence, instead requesting his assistance and relying upon it. At no time did **Provider 1** inform us of Howard's involvement in responding to our questions and this certainly affected our opinion of his character and qualifications.

---

[153] Exhibit 78.
[154] Exhibit 79.
[155] Exhibit 80.
[156] Exhibit 81.
[157] Exhibit 82.
[158] Exhibit 83.



Furthermore, **Provider 1** does not appear to have been truthful to us during an 8/29/2017 phone call we had with him.  Because we learned from **Worker 2** on 8/26/2017 that **Provider 1** was implicated as the MAF Physician related to Howard, we asked **Provider 1** for more information on the IMEs he performed and whether they were related to the NFL Player Disability & Neurocognitive Benefit Plan or the Settlement Program.  **Provider 1** stated that the IMEs were performed before he was approved as a MAF Physician and that they were performed in order to determine existence of cognitive issues.  He appeared to not understand the difference between the NFL Player Disability & Neurocognitive Benefit Plan and the Settlement Program so we again asked if he knew for what purposes he performed IMEs.  **Provider 1** indicated that they were general assessments because the Players wanted to see if they had any problems before they applied for the Settlement Program to see if they could qualify.  We asked **Provider 1** about the attorneys that contacted him for the IMEs and he did confirm that the majority of them came from Howard & Associates and he estimated that he performed less than 100 for the firm. When asked about the timeframe during which these IMEs occurred, **Provider 1** indicated they occurred in the last six months.[159]

We see now that **Provider 1**'s statements on the call were questionable, given his email communications with Howard & Associates earlier that year. The emails we have seen do not indicate that **Provider 1** was at all confused about whether the IMEs he performed for Howard & Associates were related to the Settlement Program or that he was confused about the difference in the Settlement and NFL Benefits programs.  Additionally, **Provider 1**'s statement that the IMEs were performed in the last six months, which would have been from late February to August of 2017, appears to be false, as **Provider 1** began his examination of Howard & Associates clients in mid to late-2016.  Leading us to believe that the IMEs were performed after he submitted his signed Network Provider Application prevented us from questioning those answers.

## VII.    MATERIALITY.

There is no question that the process outlined in this Audit Report was set up, and the work of all its participants was directed with the purpose "to affect whether the Settlement Class Member qualifies for a Monetary Award," and therefore material.  The Program monitored filings and prevented payments that were the result of this process: (1) Howard did not file any claims for claimants he represents in the NFL Portal, (2) for claims that were under ███████'s name from April 2018 until October 2020, only one claimant relied on the "Howard related" documents and the claim was denied; in other instances, when offered, these reports were historical records; and (3) we instructed Appeals Advisory Panel to ignore any Howard related provider records when assessing claims.

However, after seeing the extent of coordination, coaching, and disregard for basic professional principles, we prepared this Audit Report, because this Program cannot be implicated in even giving the appearance of condoning the process that is so deeply flawed.  It also is apparent that lies and manipulations are prevalent in every aspect of the dealings and willingness to circumvent the rules is so abundantly clear that we simply cannot trust anything

---

[159] Exhibit 84.



that has been presented to us, or could be presented to us in the future, by any of these professionals.

Through deceit, Howard was successful in the Program approving of Provider 1 as Qualified MAF Physician and BAP Provider. Through his actions, he infected the work of another Qualified MAF Physician and BAP Provider: Provider 8. Similarly, Provider 8's willingness to discuss changes to medical records and then deny to us any such communication took place, and Provider 1's going along with Howard's deceitful answers to the Program, even after we clearly communicated our expectations when dealing with lawyers, all those actions affected the integrity of the Program's network of the Qualified MAF Physicians and BAP Providers.

Howard's actions have also caused delays to Settlement Class Members from timely receiving a reliable Qualifying Diagnosis, if they had it, from qualified doctors in the process that was free of undue influence. Because of Howard's various strategies – centered around his own conduct – none of these claims were ever filed with the Program despite Settlement Class Members undergoing multiple expensive testings (the fact that these tests are of suboptimal quality cannot be seen as a fault of the Settlement Class Members). In his communications with Howard, SCM 1 insistently questioned when his claim would be filed by Howard.[160][161] ▮ ▮ most likely were never told what Howard expressed in a 5/17/2018 letter to Provider 1, saying that "consistent with this firm's reputation, the plan has always been that no claim will be submitted to the NFL Claims Administrator until any and all files are reviewed for final opinion after Provider 1 is MAFS qualified."[162]

Howard has asserted 19 liens in the Program, typically seeking 20% of any Monetary Award plus costs, which range from $9,687 to $18,980 (where the amounts are known to us).[163] As we have seen with SCM 1's Attorney Lien Dispute, Howard is likely to tout reasonableness and quality of his work, and testify to the validity of the costs, seeking recovery.

## VIII.   CONCLUSION AND RECOMMENDATION.

We have found evidence that Howard & Associates and related providers manipulated and altered the integrity of the medical examination process and medical records to affect whether the Settlement Class Member qualifies for a Monetary Award. For these reasons, we recommend that the Special Masters:

A.  Disqualify Howard & Associates from participating in the Program and no longer accept claim submissions by that law firm;

B.  Disqualify Tim Howard and Worker 1 from participating in the Program or submitting claims for Settlement Class Members;

---

[160] Exhibit 85.
[161] Exhibit 86.
[162] Exhibit 87.
[163] Exhibit 88.



**C.** Consider disqualifying ▮▮▮▮▮▮▮▮ law firm from participating in the Program and no longer accept claim submissions by that law firm;

**D.** Deny Howard's attorney lien submissions, and deny any costs for testing done by any of the Howard related providers;

**E.** Disqualify Provider 1, Provider 8, Provider 4, Provider 5, Provider 6, and Provider 7 from participating in the Program;[164]

**F.** With assistance from AAP members and consultants, refer the providers to appropriate disciplinary boards.

---

[164] Exhibit 89 lists all claims submitted with diagnoses relying on these providers.  There is only one claim that remains pending on appeal to the Third Circuit (SPID 260006736).



**Subject**: Fwd: Fw: ███ SCM 9 ███ & ███ SCM 1 ███ 's reports
**From**: Tim Howard <tim@howardjustice.com>
**To**: | ███████ Provider 9 ███████ | ███████████ Provider 8 ███████████ | ███ Worker 7 ███ |

| ███ Worker 7 ███ | ███████ Worker 10 ███████ | ███ Worker 8 ███ |
| ███████ Worker 8 ███████ | ███████ Provider 7 ███████ | ███ Worker 3 ███ |
| ███ Worker 3 ███ |

**Bcc**: | ███████████ Worker 4 ███████████ |
**Date Sent**: Friday, January 5, 2018 2:59:43 PM GMT 05:00
**Date Received**: Friday, January 5, 2018 2:59:43 PM GMT 05:00
**Attachments**: Final ███ SCM 1 ███ 12.22.2017.pdf,Final ███ SCM 9 ███ 20.22.2017.pdf

---

Dear ███Provider 9███,

Dates all look good.  This is the best approach. ███ Provider 8 ███ 's report coming about a month later works.

In review of these two reports, we need to place ███ Provider 6 ███ , who has the required board certification, as the primary neurologist along with ███ Provider 7 ███   Thus, on page 4 of each report under Impressioin: should read " based on data provided by ███ Provider 6 ███ 's Neuropscholigical report."

Another item that we need to focus on for every claims,  is to ensure that "employment" comments are consistent in the underlying CDR and neuropscholodigal reports, and ███ Provider 8 ███ 's report.  All showing that there is no current employment.  Note, if there is any employment, the claim will be denied.   For ███ SCM 1 ███ , we need to be clear that "he has had cognitive limitations that has caused him to lose employment,  and due to his current cognitive limitations is not employed.'

Thank you for your hard work and assistance,

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.


Tallahassee, Florida Office:
3522 Thomasville Road, Ste. 500
Tallahassee, FL 32309
(850) 298 4455 (o)
(850 216 2537 (f)
Law Firm Website:  www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Jacksonville, Florida Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.
Jacksonville, FL  32207

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

**Subject**: Fwd: Fw: ███ SCM 9 ███ & ███ SCM 1 ███ 's reports
**From**: Tim Howard <tim@howardjustice.com>
**To**: ████████ Worker 3 ████████
**Date Sent**: Monday, January 8, 2018 6:02:56 PM GMT 05:00
**Date Received**: Monday, January 8, 2018 6:02:56 PM GMT 05:00
**Attachments**: Final ███ SCM 1 ███ 12.22.2017.pdf,Final ███ SCM 9 ███ 20.22.2017.pdf

---

### *Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
3522 Thomasville Road, Ste. 500
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website:  www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Jacksonville, Florida Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.
Jacksonville, FL  32207

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts  02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential
information. Any distribution or use of this communication by anyone other than the intended
recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender
by replying to this message and delete it from your system.

        Forwarded message
From: **Tim Howard** <tim@howardjustice.com>
Date: Wed, Jan 3, 2018 at 8:04 PM
Subject: Fwd: Fw: ███ SCM 9 ███ & ███ SCM 1 ███ 's reports
To: ████████████ Worker 7 ████████████ , ███████████ Worker 10 ███████████ ,
████████ Worker 11 ████████ , ██████ Worker 8 ██████
████████ Worker 8 ████████

[Worker 10] , [Worker 7] , [Worker 8] and [Worker 11] :

Please review for errors on dates and unemployment consistency.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
3522 Thomasville Road, Ste. 500
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website:  www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Jacksonville, Florida Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.
Jacksonville, FL  32207

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts  02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

        Forwarded message
From: [Provider 9]
Date: Wed, Jan 3, 2018 at 6:12 PM
Subject: Fw: [SCM 9] & [SCM 1] 's reports
To: [Worker 7] , Tim Howard <tim@howardjustice.com>

Here are the corrected reports. Let me know when you would like to proceed with me uploading them. Thanks

Best Regards
[Provider 9]



----- Forwarded Message -----

**From:** ████████ Provider 8 ████████
**To:** ████████████ Provider 9 ████████████████
**Cc:** ████████ Provider 8 ████████████████
**Sent:** Thursday, December 21, 2017 9:44 PM
**Subject:** ███ SCM 9 ███ & ███ SCM 1 ███ 's reports

Hi ███ Provider 9 ███

Please find the attached reports.

████████ Provider 8 ████████

**Subject**: Re: Neuropsych Reports
**From**: Tim Howard <tim@howardjustice.com>
**To**: ███████████████ Provider 5 ████████████████████
**Cc**: ████████ Worker 7 ████████, ████████ Worker 4 ████████, Worker 6
████████ Worker 6 ██████████,
██████████████████, ████████████████████, Provider 2
████████ Provider 2 ████████
**Date Sent**: Monday, August 29, 2016 12:06:49 PM GMT 04:00
**Date Received**: Monday, August 29, 2016 12:06:49 PM GMT 04:00

---

██████ Provider 5 ██████,

Thank you for the excellent work.  We will forward the updated CDR at Moderate, 2.0 for both SCM 11 and SCM 10.

 It also looks like SCM 11 meets the 2.0 on Executive Function in that he has two scores below a 30.  "Level 2 Impairment:  2 or more scores below a T score of 30."

With these adjustments both of these players meet the 2.0 Neuropsych standards.

We will be forwarding the CDR pages for these other 5 players a little later today.

*Tim Howard*
Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website:  www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts  02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

On Mon, Aug 29, 2016 at 11:54 AM, ████████ Provider 5 ████████
████████ Provider 5 ████████ wrote:

**Subject**: Neuropsych Reports
**From**: ████████ Provider 5 ████████
**To**: ████ Worker 7 ████ | ████ Worker 4 ████ | ██ Worker 6 ██
████ Worker 6 ████ , ███████████████
███████████ | ██ Provider 2 ██
████ Provider 2 ████ ,Tim Howard <Tim@howardjustice.com>
**Date Sent**: Monday, August 29, 2016 11:54:39 AM GMT 04:00
**Date Received**: Monday, August 29, 2016 11:54:44 AM GMT 04:00
**Attachments**: ██SCM 11██ NP report final.pdf,██SCM 10██ NP report final.pdf,signature page.pdf

All,

Attached is a copy of the final NP reports for ██ SCM 10 ██ and ██ SCM 11 ██. I have included in the report an addendum page of the required test scores used to determine Impairment Criteria for your reference.

I will finalize the reports for the following cases once I receive the Clinical Dementia Rating scale provided by the Licensed Practical Nurse:



██ SCM 26 ██
██ SCM 27 ██
██ SCM 28 ██
██ SCM 29 ██
██ SCM 30 ██

If there are any additional questions, comments, or concerns regarding reports, please let me know.

Best,
██ Provider 5 ██

**Subject**: ███ SCM 1 ███'s Claim
**From**: Tim Howard <tim@howardjustice.com>
**To**: ████ Provider 9 ████ | ████ Provider 8 ████ | ██ Provider 7 ██
████ Provider 7 ████ | ████ Worker 10 ████ | ██ Worker 7 ██
████ Worker 7 ████ | ███████ Worker 18 ███████
███ Worker 18 ███
**Date Sent**: Wednesday, December 20, 2017 4:43:01 PM GMT 05:00
**Date Received**: Wednesday, December 20, 2017 4:43:01 PM GMT 05:00

---

,

Let's get the dates adjusted on all of ███ Provider 8 ███'s reports so that they are well past the time frames of the testing and the clinical assessment by ███ Provider 8 ███. Let's get ███ SCM 1 ███'s documents in order so that we can file late this week or late next week, and get the process going for him.

Thank you for your consideration,

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
3522 Thomasville Road, Ste. 500
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website: www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Jacksonville, Florida Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.
Jacksonville, FL 32207

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts 02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

Exhibit 3: Proswant to email to Doctors

**Subject**: Fwd: Neurologist report from 2009 NFL workers comp case
**From**: Tim Howard <tim@howardjustice.com>
**To**:

| Provider 9 | | Provider 8 | | Provider 7 |
| Provider 7 | | Worker 7 | | Worker 8 |
| Worker 8 | | Worker 10 | | |

**Date Sent**: Tuesday, January 16, 2018 5:38:52 PM GMT 05:00
**Date Received**: Tuesday, January 16, 2018 5:38:52 PM GMT 05:00
**Attachments**: app ▮▮SCM 1▮▮ med rpt ▮▮▮▮.010709.doc.pdf,app ▮▮SCM 1▮▮ supplemental med rpt ▮▮▮▮.101009.doc.pdf

---

▮▮Provider 8▮▮ ,

▮▮SCM 1▮▮ had a prior diagnosis of brain damage in 2009 and this should be incorporated into your final report documenting the 2009 diagnosis date and your October 2018 confirmation. The reports are attached.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
3522 Thomasville Road, Ste. 500
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website: www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Jacksonville, Florida Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.
Jacksonville, FL 32207

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts 02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

**Subject**: Reports Upload
**From**: ████████ Worker 7 ██████
**To**: ████████ Provider 9 ████████
**Date Sent**: Friday, November 17, 2017 1:09:52 PM GMT 05:00
**Date Received**: Tuesday, March 10, 2020 4:07:51 PM GMT 05:00

---

Good Afternoon █Provider 9█,

 Dr. Howard just told me that you are preparing to upload reports to the claims center today. Please don't upload documents for ██SCM 9██ or ██SCM 1██ . There is an error in ██Provider 7██ 's report on pg 3 of ██SCM 9██ 's report. ██SCM 1██ 's has a typo on the first page of ██Provider 8██ 's report. If you have corrected the spelling of ██SCM 1██ 's name please send over the updated version and I will review the document.

When uploading, please only upload reports. No testing materials should be uploaded at this time.

Thanks,


██Worker 7██ , NFL Case Coordinator
Howard and Associates, P.A.
www.howardjustice.com
Email: ████ Worker 7 ████

Howard and Associates, P.A.
3522 Thomasville Road, Ste. 500
Tallahassee, Florida 32309
Main Office: (850) 298 - 4455
Fax: (850) 216 - 2537

Fort Lauderdale Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
Office:        (954) 332 3633

Jacksonville Office:
Riverplace Tower
1301 Riverplace Blvd.
Jacksonville, FL  32207

**Subject**: Re: Reports Upload
**From**: ████████ Worker 7 ████████
**To**: ████████ Provider 9 ████████, ███ Provider 8 ███
**Cc**: Tim Howard <Tim@howardjustice.com>
**Date Sent**: Monday, November 20, 2017 12:49:51 PM GMT 05:00
**Date Received**: Monday, November 20, 2017 12:50:32 PM GMT 05:00

---

Good Afternoon ▪Provider 9▪ and ▪Provider 8▪ ,

 Have you uploaded any records to the claims portal yet? If you could let us know when you submit those records that would be great. You can now upload all 5 completed reports to the portal. I forwarded you the corrected version of ███ SCM 9 ███'s neuropsychological report just a little while ago. I am going to send you some medical records that can also be uploaded with the reports. If you have any questions please let me know.

Thanks,

On Fri, Nov 17, 2017 at 2:04 PM, ████████ Worker 7 ████████ wrote:



▪ Worker 7 ▪, NFL Case Coordinator
Howard and Associates, P.A.
www.howardjustice.com
Email: ████ Worker 7 ████

Howard and Associates, P.A.
3522 Thomasville Road, Ste. 500
Tallahassee, Florida 32309
Main Office: (850) 298 - 4455
Fax: (850) 216 - 2537

Fort Lauderdale Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
Office:      (954) 332 3633

Jacksonville Office:
Riverplace Tower
1301 Riverplace Blvd.
Jacksonville, FL  32207

**Subject**: Report Error
**From**: ████████████ Worker 7 ████████████
**To**: ████████████ Provider 9 ████████████
**Cc**: ████████████ Worker 4 ████████████, Tim Howard <Tim@howardjustice.com>
**Date Sent**: Tuesday, November 14, 2017 10:48:14 AM GMT 05:00
**Date Received**: Tuesday, November 14, 2017 10:48:55 AM GMT 05:00
**Attachments**: SCM 1   Provider 6  Report.pdf

---

Good Morning Provider 9,

 As I was reviewing ████ SCM 1 ████ 's report I noticed that his name is spelled incorrectly on the first page after "Patient's Name". I have also attached the corrected version of ████ SCM 1 ████ 's neuropsych report.

If you have any questions please let me know.

Thanks,


████ Worker 7 ████ , NFL Case Coordinator
Howard and Associates, P.A.
www.howardjustice.com
Email: ████████ Worker 7 ████████

Tallahassee Office:
2120 Killarney Way, Ste. 125
Tallahassee, Florida 32309
Main Office: (850) 298 4455
Fax:           (850) 216 2537

Fort Lauderdale Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
Office:           (954) 332 3633

Jacksonville Office:
Riverplace Tower
1301 Riverplace Blvd.
Jacksonville, FL  32207

**Subject**: Re: Thank You for Report on ████; Status of NFL Impairment Reports?
**From**: Tim Howard <tim@howardjustice.com>
**To**: █████████████ Provider 1 █████████ , ███ Worker 7 ███
████ Worker 7 ████ , ████████ Worker 4 ████████
**Date Sent**: Sunday, September 18, 2016 6:19:29 PM GMT 04:00
**Date Received**: Sunday, September 18, 2016 6:19:30 PM GMT 04:00

---

We will send the updated CDR showing moderate 2.0 tomorrow.

Sent from my iPhone

On Sep 18, 2016, at 5:44 PM, ████████████ Provider 1 ████████████ wrote:

**Subject**: Fwd: Thank You for Report on ▮▮▮; Status of NFL Impairment Reports?
**From**: Tim Howard <tim@howardjustice.com>
**To**: ▮▮▮▮▮▮▮▮ Worker 4 ▮▮▮▮▮▮▮, ▮▮▮▮▮ Provider 3 ▮▮▮▮▮
▮▮▮▮▮▮▮▮ Provider 3 ▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Worker 7
▮▮▮▮▮ Worker 7 ▮▮▮▮▮
**Date Sent**: Monday, September 19, 2016 9:48:23 AM GMT 04:00
**Date Received**: Monday, September 19, 2016 9:48:23 AM GMT 04:00

Going forward we will need to have all CDRs in the 2.0 or moderate range so that we don't have these issues with ▮▮ Provider 1 ▮▮.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

☐

Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website: www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts 02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

        Forwarded message
From: ▮▮▮▮▮▮▮▮▮▮ Provider 1 ▮▮▮▮▮▮▮▮▮▮
Date: Sun, Sep 18, 2016 at 6:50 PM
Subject: Re: Thank You for Report on ▮▮▮; Status of NFL Impairment Reports?
To: Tim Howard <tim@howardjustice.com>

Any change in cognitive status requires separate full evaluation with conclusion of decline in
▮▮▮▮▮▮

time not just simple correction on paper.

Sent from Yahoo Mail on Android

**Subject**: Re: MAF Qualified Physician Manual  Test Battery, Independent Examination and Review of Medical Records; Template for Use
**From**: Tim Howard <tim@howardjustice.com>
**To**: 

| Provider 9 | | Provider 7 | |
|---|---|---|---|
| Provider 7 | Provider 8 | Worker 4 | Worker 7 |
| Worker 7 | | Worker 8 | Worker 11 |
| Worker 11 | | Worker 18 | |

**Date Sent**: Thursday, July 6, 2017 5:15:58 PM GMT 04:00
**Date Received**: Thursday, July 6, 2017 5:15:58 PM GMT 04:00
**Attachments**: NFL ██ SCM 4 ██ NP Report ██Provider 6██ and ██Provider 7██ .docx

██Provider 6██ , ██Provider 7██ , and ██Provider 8██ ,

Attached please find a working draft report in word on ████ SCM 4 ████ that is based on the underlying testing and report done by ████Provider 5████ .

The date of the assessment, date of report, and signature blocks are updated.

If any changes are needed for any updates on the testing, they can be modified on this document as well.  We have clarified that this is a referral from ██Provider 8██ and have placed both ██Provider 6██ and ██Provider 7██ on the signature block, but only listed ██Provider 6██ as the examiner, as she is who the NFL will look to for the opinion that ██Provider 8██ will rely upon.

We will provide this document for each player that has been previously tested for their updates. There are approximately 160 reports in the files now and we will have all nearly 300 done before each player goes for a final review and opinion by ██Provider 8██ .

We expect that an Online Upload will take place for these files.  We will also provide the supporting medical records, such as MRI and EEGs that we have in the files.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website:  www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Jacksonville, Florida Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.
Jacksonville, FL  32207

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

**Subject**: MAF Qualified Physician Manual  Test Battery, Independent Examination and Review of Medical Records; Template for Use
**From**: Tim Howard <tim@howardjustice.com>
**To**:

| Provider 9 | | Provider 7 | |
|---|---|---|---|
| Provider 7 | Provider 8 | Worker 4 | Worker 7 |
| Worker 7 | | Worker 8 | Worker 11 |
| Worker 11 | | Worker 18 | |

**Date Sent**: Thursday, July 6, 2017 1:19:36 PM GMT 04:00
**Date Received**: Thursday, July 6, 2017 1:19:36 PM GMT 04:00
**Attachments**: Qualified MAF Physician Manual.pdf

Dear  Provider 8 ,  Provider 6  and  Provider 7 ,

Attached please find the Qualified MAF Physician Manual.  We will be taking our current third party affidavits, and update the Third Party Sworn Statement: Functional Impairment forms. The content in the form is the same as our current affidavits.  We will provide these executed forms, attaching the  underlyhing affidavits, to you prior to the final submission.  We will also obtain an updated HIPPA form consistent with this submission manual.

We will be obtaining a word version of  Provider 5 's Neuropsychological reports so that an update by  Provider 7  and  Provider 6  will be easy to modify, and we will provide a new signature block and date for  Provider 7   and  Provider 6 's use.  We will also provide a working draft template for  Provider 8  to ensure that the language of the final report meets all legal standards.

I am copying some of our law firm staff that are working on this project.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website:  www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Jacksonville, Florida Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.
Jacksonville, FL  32207

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts  02142

**Subject**: Re: MAF Qualified Physician Manual Test Battery, Independent Examination and Review of Medical Records; Template for Use
**From**: Tim Howard <tim@howardjustice.com>
**To**: ▮▮Provider 9▮▮ ▮▮Provider 7▮▮ ▮▮Provider 7▮▮ ▮▮Provider 8▮▮ ▮▮Worker 4▮▮ ▮Worker 7▮ ▮▮Worker 7▮▮ ▮▮Worker 8▮▮ ▮Worker 11▮ ▮▮Worker 11▮▮ ▮▮Worker 18▮▮

**Date Sent**: Thursday, July 6, 2017 5:42:07 PM GMT 04:00
**Date Received**: Thursday, July 6, 2017 5:42:07 PM GMT 04:00
**Attachments**: NFL ▮SCM 4▮ NP Report ▮Provider 6▮ and ▮Provider 7▮ .docx

▮Provider 6▮ , ▮Provider 7▮ and ▮Provider 8▮ ,

I am attaching an updated report for ▮▮SCM 4▮▮ that uses the organizing titles provided by the Qualified MAFS Physician Manual. The content is the same, but we have included the sectional terms found in the manual. We will use and update this particiular template for future clients going forward.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website: www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Jacksonville, Florida Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.
Jacksonville, FL 32207

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts 02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender

**Subject**: Re: MAF Qualified Physician Manual  Test Battery, Independent Examination and Review of Medical Records; Template for Use
**From**: Tim Howard <tim@howardjustice.com>
**To**: [Provider 9]  [Provider 7]
[Provider 7]  [Provider 8]  [Worker 4]  [Worker 7]
[Worker 7]  [Worker 8]  [Worker 11]
[Worker 11]  [Worker 18]
**Date Sent**: Friday, July 7, 2017 2:40:12 PM GMT 04:00
**Date Received**: Friday, July 7, 2017 2:40:12 PM GMT 04:00
**Attachments**: [SCM 13] NP report final.docx

---

[Provider 8] , [Provider 7] , and [Provider 6] ,

I am attaching a working draft report for [SCM 13]  for your use.

### Tim Howard

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.


Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website:  www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Jacksonville, Florida Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.
Jacksonville, FL  32207

Cambridge, Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts  02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861


PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

**Subject**:  Report Names
**From**: ██████████ Worker 7 ██████████
**To**: ████████ Worker 8 ████████
**Date Sent**: Thursday, August 31, 2017 11:06:12 AM GMT 04:00
**Date Received**: Tuesday, March 10, 2020 6:03:01 PM GMT 04:00

---

Hey ██ Worker 8 ██,

  Here are some more names for you to type report for. All ████ Provider 5 ████ or ██ Provider 4 ██ reports can be found in the OneDrive.

██ SCM 31 ██
██ SCM 32 ██
██ SCM 33 ██
████ SCM 14 ████
███ SCM 9 ███
██ SCM 34 ██
██ SCM 35 ██
██ SCM 24 ██
██ SCM 1 ██
██ SCM 36 ██

Thanks,


██ Worker 7 ██, NFL Case Coordinator
Howard and Associates, P.A.
www.howardjustice.com
Email: ████ Worker 7 ████

Tallahassee Office:
2120 Killarney Way, Ste. 125
Tallahassee, Florida 32309
Main Office: (850) 298 4455
Fax:          (850) 216 2537

Fort Lauderdale Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
Office:          (954) 332 3633

Jacksonville Office:
Riverplace Tower
1301 Riverplace Blvd.
Jacksonville, FL  32207

**Subject**: Re: ▓ Report Names
**From**: ██████ Worker 8 ██████
**To**: ████████ Worker 7 ████████
**Date Sent**: Thursday, September 7, 2017 10:35:53 AM GMT 04:00
**Date Received**: Tuesday, March 10, 2020 6:01:23 PM GMT 04:00

---

Morning,

I only have one more to convert, so I'll be needing another list soon. ██████ is working on ████ SCM 14 ████.

Thanks

On Thu, Aug 31, 2017 at 11:06 AM, ████████ Worker 7 ████████ wrote:

████ Worker 8 ████ , Legal Assistant
**Howard and Associates, P.A.**
www.howardjustice.com
Email: ████████ Worker 8 ████████

Tallahassee Office:
2120 Killarney Way, Ste. 125
Tallahassee, Florida, 32309
Main Office: (850) 298-4455
Fax: (850) 216-2537

Fort Lauderdale Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
Office: (954) 332-3633

Jacksonville Office:
Riverplace Tower, Suite 2101
1301 Riverplace Blvd.

**Subject**: Re: ██ Report Names
**From**: ████████ Worker 7 ████████
**To**: ████████ Worker 8 ████████
**Date Sent**: Wednesday, September 13, 2017 5:10:27 PM GMT 04:00
**Date Received**: Tuesday, March 10, 2020 6:01:54 PM GMT 04:00

---

Hey ██ Worker 8 ██,

You can do the reports for ██ SCM 15 ██ and ████ SCM 16 ████. Both should be in the OneDrive. If you have any questions please let me know.

Thanks,

On Wed, Sep 13, 2017 at 9:51 AM, ████████████ Worker 8 ████████████ wrote:

██ Worker 7 ██, NFL Case Coordinator
Howard and Associates, P.A.
www.howardjustice.com
Email: ████████ Worker 7 ████████

Tallahassee Office:
2120 Killarney Way, Ste. 125
Tallahassee, Florida 32309
Main Office: (850) 298 4455
Fax:           (850) 216 2537

Fort Lauderdale Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
Office:        (954) 332 3633

Jacksonville Office:
Riverplace Tower
1301 Riverplace Blvd.
Jacksonville, FL  32207

**Subject**: Re: █ SCM 23 █
**From**: Tim Howard <tim@howardjustice.com>
**To**: ████████████████████████████
**Cc**: ████████████████ Provider 1 ████████████ , █ Worker 4 █
████ Worker 4 ████ , ████████ Provider 4 ████████ █
████████████
**Date Sent**: Monday, April 18, 2016 8:27:42 PM GMT 04:00
**Date Received**: Monday, April 18, 2016 8:27:42 PM GMT 04:00

---

Makes sense and thank you.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.



Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850 216 2537 (f)
Law Firm Website: www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts 02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

On Mon, Apr 18, 2016 at 7:52 PM, ████████████████████████████ wrote:

**Subject**: RE: ███ SCM 23 ███
**From**: ███████████████████████████████████████
**To**: Tim Howard <tim@howardjustice.com>, ███████████ Provider 1 █████████████
████ Provider 1 ████████ , ████████ Worker 4 ████████████ , ████ Provider 4 ████
████████ Provider 4 ████████████████████████████████ ,
**Date Sent**: Monday, April 18, 2016 7:52:48 PM GMT 04:00
**Date Received**: Monday, April 18, 2016 7:52:52 PM GMT 04:00

---

███ Provider 1 ███ :

Pls arrange for the MRI and add the charge (discounted) on  your invoice to us.

Dr. Howard:

Each MRI will be invoiced by ████████ as $1000 per scan.  Pls reply to this message that you are okay with that.  This will prevent us from having to cut another contract.

███████████████
██████████████

███████████
█████████████████
███████████
███████████
██████████
█████████████████
█████████████████████████████████████
.

CONFIDENTIALITY NOTICE:  This transmission may be subject to Federal and state privacy laws, HIPAA regulations and/or may contain proprietary and privileged information.  If you are not the intended recipient of this message, you may not disclose, print, copy or disseminate this information.  If you have received this in error, please reply and notify only the sender and delete the message.  Unauthorized interception of this e-mail is a violation of Federal criminal law.

**From:** Tim Howard [mailto:tim@howardjustice.com]
**Sent:** Monday, April 18, 2016 11:12 AM
**To:** ████ Provider 1 ████ ; ██ Worker 4 ██ ; ███████████████ ; ███ Provider 4 ███ ; ███████████
**Subject:** Re: ███ SCM 23 ███

███ Provider 1 ███ ,

We will seek to have these costs added to ███ SCM 23 ███ account with ████████████████ .

Note, the NFL Concussion Settlement was upheld by the Third Circuit United States Court of Appeals and the claims facility will likely open over the next several months.  We will be moving the clients through very quickly now, and have 24 that have completed the neuropsych testing to date, and ███ Provider 4 ███ 's reports are also starting to move at a faster clip.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

⌐                ¬

Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298-4455 (o)
(850 216-2537 (f)
Law Firm Website:  www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332-3633 (o)

Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373-6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts  02142
(877) 645 6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

On Mon, Apr 18, 2016 at 11:59 AM, ▮▮▮▮ Provider 1 ▮▮▮▮ wrote:
Tim,

I have requested MRI of brain for ▮ SCM 23 ▮ at ▮▮▮▮▮▮▮▮. Are you planning on using your funds money for that? We have discounted cash rate with them if I remember well around $ 500 per brain imaging.
Please advise?

▮ Provider 1 ▮

Sent from Windows Mail

**Subject**: Re: New Orleans meeting
**From**: Tim Howard <tim@howardjustice.com>
**To**: ███████████████ Provider 1 ███████████████
**Cc**: ███████████ Worker 1 ███████████████████████
**Date Sent**: Monday, January 23, 2017 5:00:16 PM GMT 05:00
**Date Received**: Monday, January 23, 2017 5:00:16 PM GMT 05:00

---

Let's talk as how to sort this out. The email is not an issue for an abstract that is being pulled back. The IME in the one case, as well as the various other worker's compensation actions, etc., that we have verified are good for the MAFS application. The fact that there is research on NFL brain injury is not a problem, but we need to weigh the risks of opening the door to the 42 players and how the MAFS will weigh your objectivity.

### *Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850 216 2537 (f)
Law Firm Website: www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts  02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861


PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.


On Mon, Jan 23, 2017 at 4:32 PM, ███████████████ Provider 1 ███████████████ wrote:

**Subject**: Re: Fw: MAF/BAP application
**From**: ████████ Provider 1 ████████
**To**: Tim Howard <tim@howardjustice.com>
**Date Sent**: Friday, January 27, 2017 4:50:01 PM GMT 05:00
**Date Received**: Friday, January 27, 2017 4:50:03 PM GMT 05:00

---

OK, acceptable, will send back to them.
Thanks,

# Provider 1

On Friday, January 27, 2017 4:42 PM, Tim Howard <tim@howardjustice.com> wrote:

How about combining the two:

As noted in my attachment ███ SCM 16 ███ was seen in this office but was referred to us by another doctor. The psychiatric hospital treatment for the NFL player was not for litigation. As a result, I have seen former NFL players referred to my office both by other medical providers as well as represented by attorneys

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850 216-2537 (f)
Law Firm Website: www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373-6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts 02142
(877) 645-6225 (6GLOBAL)
www.cgu.edu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your

**Subject**: Re: Fw: NFL application
**From**: Tim Howard <tim@howardjustice.com>
**To**: ▇▇▇▇▇▇▇▇▇▇▇ Provider 1 ▇▇▇▇▇▇▇▇▇▇▇
**Cc**: ▇▇▇▇▇▇▇▇▇▇▇ Worker 1 ▇▇▇▇▇▇▇▇▇▇▇
**Date Sent**: Friday, February 10, 2017 3:42:25 PM GMT 05:00
**Date Received**: Friday, February 10, 2017 3:42:25 PM GMT 05:00

---

The answer is "I provided an independent examination and expert opinion". If they ask for a copy, let me see the copy before we send to make sure that the document has no errors.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850 216 2537 (f)
Law Firm Website: www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts 02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

On Fri, Feb 10, 2017 at 3:18 PM, ▇▇▇▇▇▇▇▇▇▇ Provider 1 ▇▇▇▇▇▇▇▇▇▇ wrote:

**Subject**: Re: NFL application additional question
**From**: Tim Howard <tim@howardjustice.com>
**To**: ████████████ Provider 1 ████████████
**Cc**: ████████████ Worker 1 ████████████
**Date Sent**: Thursday, March 16, 2017 5:12:11 PM GMT 04:00
**Date Received**: Thursday, March 16, 2017 5:12:11 PM GMT 04:00

---

The IME was requested and paid for by the attorney.  I am not sure what the attorney used this IME for, other than for a neurological evaluation.  This was referenced in the 13 cases in which I have provided expert witness services. The list of cases in which I have provided expert witness services for over the past 19 years is found in my submission.

*Tim Howard*

Professor Tim Howard, J.D., Ph.D.
Howard & Associates, P.A.

Tallahassee, Florida Office:
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
(850) 298 4455 (o)
(850) 216 2537 (f)
Law Firm Website:  www.howardjustice.com
tim@howardjustice.com

Fort Lauderdale, Florida Office:
101 NE Third Ave., Ste. 1500
Fort Lauderdale, Florida 33301
(954) 332 3633 (o)

Massachusetts Office:
8 Museum Way, Suite 2407
Cambridge, MA 02141
(617) 373 6076

President, Cambridge Graduate University International
One Broad Street, 14th Floor
Cambridge, Massachusetts  02142
(877) 645-6225 (6GLOBAL)
www.cguiedu.com
president@cguglobal.net
https://www.facebook.com/tim.howard.752861

PLEASE NOTE: This message, including any attachments, may include privileged or confidential information. Any distribution or use of this communication by anyone other than the intended recipient(s) is strictly prohibited. If you are not the intended recipient, please notify the sender by replying to this message and delete it from your system.

On Thu, Mar 16, 2017 at 11:46 AM, ████████████ Provider 1 ████████████ wrote: