# EXHIBIT A

# 'Race-norming' kept former NFL players from dementia diagnoses. Their families want answers.

 **Listen to article** 15 min

By Will Hobson

September 29, 2021 at 10:00 a.m. EDT

  

For Michelle Haselrig, widow of former Pittsburgh Steeler Carlton Haselrig, the moment she realized her husband's race might have deprived him of money from the NFL concussion settlement came this summer, after a friend texted her a news story about something called "race-norming."

For Laurie Dirden, wife of former Houston Oiler Johnnie Dirden, that moment came last month, she said, when a doctor told her that if her husband were White, he would have met the settlement's definition for a dementia diagnosis and a six-figure payment last year.

And for the wife of a third Black former NFL player, who doesn't want to be publicly identified with his medical condition, that moment came last fall, when she read the report from her husband's doctor. It confirmed that if her husband were White, he would have qualified for a payment in 2019.

It has been more than a year since Black former players seeking payments from the landmark NFL concussion settlement first drew attention to the use of race-norming, a controversial practice in neuropsychology in which Black patients' cognitive test scores are curved differently than White patients' scores. Though a judge rejected the former players' civil rights lawsuit, she sent attorneys for the players and the league into confidential, ongoing mediation to address concerns about race-norming.

The NFL publicly pledged in June to remove race-norming from the settlement. But the league and its lawyers have continued to defend the practice in public statements and court filings. Race-norming did not make it harder for Black players to qualify for payouts, the NFL has asserted. If any dementia claims were affected by race-norming, the NFL has said, they were only "a fraction" of the hundreds alleged by former players' lawyers. Race-norming is not required under the settlement, the league has said, and any doctors who believe otherwise are wrong.

But a Washington Post review of hundreds of pages of confidential medical and legal records, provided by the families of these three former players, underscores how race-norming put Black players seeking settlement payouts at a disadvantage and illustrates how the practice easily could have affected the potential dementia claims of hundreds of former players, saving the NFL millions of dollars.

For Haselrig, who died suddenly last year at 54, The Post found that race-norming prevented him from qualifying for NFL-funded medical care and potentially a seven-figure payment in the final years of his life. For Dirden, 69, race-norming prevented him from even filing a claim for an NFL settlement payment last year even though his neurologist diagnosed him with dementia and started him on medication. For the third player, race-norming prevented a dementia diagnosis in 2019, his medical records show, and a potential $400,000 payment from the NFL.

In response to requests from members of Congress and reporters for data on the racial breakdown of dementia payouts from the settlement, the NFL claimed such figures don't exist. Because settlement claim records are confidential, it's impossible to determine through public court records how many dementia claims by Black former players have been denied, reduced or never filed because of race-norming. But publicly available figures suggest race-norming's impact has been more far-reaching than the NFL has acknowledged.

Black players typically comprise 50 to 70 percent of the league in any given year, according to surveys and news reports. More than 1,000 former players have filed dementia claims that were later denied, court records show. Haselrig, Dirden and the third player are among nearly 5,000 former NFL players who have been evaluated by doctors in a network established by the settlement — and funded by the NFL — and walked away without a diagnosis.

Doctors working in the NFL-funded network thought they were required to race-norm scores, according to documents and interviews previously reported by The Post. A confidential guidebook directed doctors to use several tests and score-curving systems that require race-norming. And when some doctors attempted to diagnose Black former players with dementia without race-norming their scores, documents show, they repeatedly faced challenges from the law firm overseeing the claims process and the NFL.

The NFL referred questions and a request for comment for this story to the league's lead lawyer on the settlement, Brad Karp, chairman of law firm Paul, Weiss. In an email to The Post, Karp declined to comment on the experiences of Haselrig, Dirden and the third player and again asserted race-norming didn't discriminate against Black former players.

"Race norms are not being removed from the Settlement Program because they have been found to 'affect the potential dementia claims' of Black claimants," Karp wrote. "Race norms are being eliminated because they have recently been called into question in many areas of medicine, including in the Settlement Program, and the NFL is committed to driving positive change, even ahead of the field of neuropsychology at large."

Karp is right that the NFL's race-norming controversy has prompted what several experts acknowledged is a long-overdue discussion in neuropsychology about the practice. But in interviews with The Post, independent experts and doctors who have evaluated former players disputed the NFL's position that race-norming did not make it more difficult for Black former players to qualify for settlement payments.

In the case of Dirden, his neurologist was so outraged that her diagnosis was overruled, she said in an interview, that she quit the network of doctors evaluating players in the settlement.

"I just felt the patients were getting jerked around, rooked and cheated," said Maureen Leehey, professor of neurology at University of Colorado. "It just wasn't right."

Chris Seeger, the lead lawyer for about 20,000 former players in the settlement, declined to comment for this story. In response to questions, he referred to public comments he has made, apologizing to Black former players for not acting sooner and vowing to have any case in which a Black player's claim was affected by race-norming reexamined.

As another NFL season kicked off this month, the league again promoted its newfound commitment to social justice by stenciling "End Racism" in end zones and permitting players to put stickers with phrases such as "Black Lives Matter" on their helmets.

Michelle Haselrig takes a dim view of these efforts. In a recent interview in her home in Johnstown, Pa., she wondered why the NFL's lawyers fought to keep race-norming part of the evaluation of dementia claims. Then she provided her own theory, after referencing the predominantly Black makeup of former players.

"There you go," she said. "To save money."

Nearly six years after the first lawsuits were filed accusing the NFL of failing to protect its players from concussions, the settlement went into effect in January 2017.

The NFL admitted no liability, but it agreed to pay sums ranging from $25,000 to $5 million to any member of the class of more than 20,000 former players who developed one of several brain diseases.

To compensate players living with chronic traumatic encephalopathy (CTE), which can be definitively diagnosed only after death, experts hired by the NFL and lawyers for the players negotiated strict definitions for two dementia-related diagnoses: early dementia and moderate dementia. Players diagnosed with early dementia could earn payments as high as $1.5 million. A moderate dementia diagnosis paid as high as $3 million.

A third diagnosis — mild cognitive impairment — was negotiated for players considered at high risk of developing dementia. For these players, the NFL would pay for follow-up medical treatment, including expensive brain scans that can produce evidence of brain damage and disease.

To get a diagnosis, players needed to meet with a neurologist, who would evaluate for physical signs and symptoms of dementia. They also needed to meet with a neuropsychologist, who would administer a series of cognitive tests. To issue a dementia diagnosis, the doctors needed to agree the player's symptoms were significantly interfering with his day-to-day life and that his cognitive test scores were low enough to meet the settlement's definitions for early and moderate dementia.

The NFL agreed to fund a network of neurologists and neuropsychologists across the country to evaluate players free of charge. In statements to The Post, the NFL's Karp argued the settlement's evaluation process was simply designed to duplicate what happens in regular clinical care when doctors look for possible brain disease.

"The parties had a singular goal in creating the Settlement Program: accurate diagnoses," Karp wrote.

But according to experts interviewed by The Post, the settlement's evaluation process differed from their regular diagnostic work in key areas.

The settlement placed inordinate weight on cognitive test scores, these experts said. To qualify for a dementia diagnosis, players needed to show their thinking ability had declined by taking 22 tests of cognitive ability and logging scores low enough to meet a strict rubric spelled out in the settlement. The swing of a few points on a few tests could mean the difference between a dementia diagnosis — and a multimillion-dollar payment — and no diagnosis at all.

In regular examinations, these scores are just one component of a broad evaluation and would never on their own disqualify a patient from a dementia diagnosis, said Leehey, the neurology professor.

"We never make a diagnosis — or decide not to make a diagnosis — based on a few test scores," Leehey said. "That's just one part of the picture."

And by placing so much weight on test scores, the NFL concussion settlement guaranteed that race-norming could affect the potential claims of Black former players.

In regular neuropsychological care, experts said, race-norming is optional, used to prevent the misdiagnosis of brain injury or disease. The practice dates from the late 1990s, when several peer-reviewed research papers found Black Americans performed worse on many tests of cognition than White Americans.



### How race-norming makes it harder for Black NFL players to qualify for settlement payments

When seeking NFL concussion settlement payments for dementia, players must show significant cognitive decline in two of five categories of thinking, measured by a total of **22 tests.**

**Complex attention and processing speed** — 6 tests

**Executive functioning** — 4 tests

**Language** — 3 tests

**Learning and memory** — 6 tests

**Visual perceptual** — 3 tests

The number of questions a player gets right on each test produces a **raw score** for each test.

**Raw score**

**T-score**

To determine if raw scores are normal or concerning, doctors curve them — usually using computer software — to produce **"T-scores,"** which show where a player's performance ranks among his demographic peers.

### How race-norming works

When a doctor factors a player's race into demographic curving, it typically produces higher T-scores for **Black players** than for **White players.**

0   10   20   30   40   50   60   70   80   90   100



If two players — one **Black**, one **White** — obtained **identical raw scores**, race-norming will curve the **Black player's T-scores** higher — in some cases, significantly higher — than the **White player's**.

For example, these are the T-scores in the six *complex attention and processing speed* tests of two players — one **White**, one **Black** — who obtained **identical raw scores**.

The players need **three** scores below **35** to qualify

The **White player**, with three T-scores under 35, qualifies as having dementia.

The **Black player**, with just one score under 35, doesn't.

ARTUR GALOCHA/THE WASHINGTON POST

While race-norming is a common practice in neuropsychology, some experts have long noted its potential, in situations such as litigation, to result in the denial of benefits to Black people. In interviews with The Post, several neuropsychologists said they use race-based norms only selectively because they consider race-based data in some common test-curving software outdated or unreliable.

In June, when the NFL publicly agreed to remove race-norming from the settlement, the league portrayed the practice as unavoidable.

"Everyone agrees race-based norms should be replaced, but no off-the-shelf alternative exists," league spokesman Brian McCarthy said.

Alternatives do exist, said several experts, including Charles Golden, a neuropsychologist and professor of psychology at Nova Southeastern University in Fort Lauderdale, Fla.

"You absolutely can score these tests without using racial norms," Golden said. "You just ran into trouble [in the NFL concussion settlement] whenever you tried not to."

Golden is one of four neuropsychologists who said in interviews with The Post that his dementia diagnoses of former players were challenged by either the law firm that oversees settlement payments or the NFL over a failure to race-norm. The other three neuropsychologists spoke on the condition of anonymity, given the confidentiality requirements of the settlement. The four neuropsychologists collectively have examined hundreds of former players.

"For me, it was very simple," Golden said. "When we're talking about qualifying somebody for a payment for difficulties they're having … the criteria should be exactly the same for Black and White players."

In the history of Johnstown, a small city in the mountains east of Pittsburgh, there are few athletes who have accomplished more than Carlton Haselrig.

As a college wrestler at Division II University of Pittsburgh Johnstown, Haselrig won an unparalleled six NCAA championships — including three Division I titles, beating wrestlers from larger, more historically successful programs along the way. The NCAA later barred Division II wrestlers from competing in Division I tournaments, a policy change known as the "Haselrig rule."

In 1989, the Steelers took a chance on Haselrig with a 12th-round draft pick even though he hadn't played football since high school. In 1991, Haselrig, known by his teammates as "Rig," started all 16 games at right guard for the Steelers. In 1992, he made the Pro Bowl.

A promising NFL career unraveled after five seasons, however, amid drunken driving arrests, stints in rehab and a cocaine problem. Haselrig would later tell his wife and children he believed his struggles stemmed from 20 or more concussions he suffered in the NFL.

After his football career ended in 1995, Haselrig moved back to Johnstown and married Michelle, and they had five children together. After a brief attempt at a career in mixed martial arts, Haselrig started coaching football and wrestling at Greater Johnstown High, where a shrine commemorates his athletic achievements.

Michelle noticed her husband's memory beginning to slip in his mid-40s, she said. At first, he struggled to remember the names of new acquaintances and details of recent conversations. Michelle grew concerned when he began repeatedly asking her at night how her day went.

In 2017, he met with doctors to be evaluated as part of the NFL settlement, describing how he struggled to memorize his football playbook and explain certain holds to his wrestlers. He had recently tried to do laundry, he told a doctor, only to realize he was loading clothes into the freezer. At night, he had started occasionally wetting the bed.

The neurologist and neuropsychologist agreed Haselrig's symptoms merited a diagnosis of mild cognitive impairment, which meant he was at high risk of developing dementia and the NFL would pay for follow-up treatment. His cognitive test scores were just shy of the settlement's requirements, however, so no diagnosis was given.

Both the neurologist and neuropsychologist who examined Haselrig declined to comment. Michelle Haselrig agreed to let The Post send her late husband's cognitive test results to an independent neuropsychologist to determine whether race-norming affected his eligibility for medical care or money from the NFL. It did, with dramatic results.

According to Eric Watson, a clinical neuropsychologist at the Brain Injury Research Center of Mount Sinai in New York, Haselrig's scores were curved using Black race norms in 2017. When Watson recurved the same results, using White norms, Haselrig's scores dropped across the board, falling into range for a diagnosis of moderate dementia under the settlement, worth a potential payment in the range of $600,000 to $1.2 million.

> To qualify for NFL-funded medical care and settlement payments, former players must show impairment in two of the five categories of cognitive testing. When **Carlton Haselrig** was examined in 2017, the neuropsychologist race-normed his scores **Black**, and he only showed impairment in one category.



Had the doctor curved Haselrig's scores the same as his **White** former teammates', according to an independent analysis, Haselrig would've showed impairment in four domains, qualifying for NFL-funded medical care and, potentially, a seven-figure settlement payment.

ARTUR GALOCHA/THE WASHINGTON POST

Even if his scores were curved as if he were White, Haselrig wouldn't have instantly qualified for a dementia diagnosis and payment in 2017, because his doctors believed his physical symptoms fell short of the settlement's definition for dementia. But he would have qualified for a mild cognitive impairment diagnosis, giving him access to NFL-funded follow-up medical care. The NFL's lawyer, Karp, declined to comment on Haselrig's case or other specific ones.

Haselrig never consulted another neurologist. His memory worsened, and soon other health complications developed. Years of heavy drinking had taken their toll, and he developed cirrhosis of the liver. In July 2020, he collapsed on a staircase in his home and died several hours later.

Michelle said her husband would have taken advantage of NFL-funded medical care had he qualified for it in 2017. And had she known his test scores met the settlement's standard for dementia, she said, she would have insisted he consult other doctors and get a second opinion about his symptoms.

"This is devastating," she said after being informed of race-norming's impact on her husband's scores. "My husband did not get what he deserved when he was alive … and he was every bit as intelligent as his White teammates. How is this legal?"

A journeyman wide receiver, Johnnie Dirden played for the Oilers, Kansas City Chiefs and Steelers between 1978 and 1981. He got most of his playing time — and suffered most of his concussions — on special teams, where he returned kickoffs and punts.

After retiring from football, Dirden settled in Denver, married Laurie and got a job as a salesman for a medical supplies company. Memory problems started about a decade ago, Laurie said, when Johnnie started occasionally visiting the same doctor twice in one day, forgetting the first visit.

As his short-term memory disappeared, Johnnie has kept his job, thanks in part to understanding co-workers, Laurie said, and a series of coping mechanisms.

His bosses excuse him from training and meetings, Johnnie said, and assistants help him fill out reports. Several smartphone apps have proved vital, he said, including one that records all of his phone calls and another that helps him dictate text messages and emails.

"They've made so many concessions for him because they just like him," Laurie Dirden said. "Johnnie just goes out there with a committed, caring attitude, and he brings the sales in. … The doctors and nurses love him, and they love talking football."

Johnnie Dirden first consulted doctors to see whether he qualified for an NFL settlement payment in 2017. He came away without a diagnosis. In July 2020, after switching attorneys, Dirden scheduled another evaluation, with Leehey, the Colorado neurologist.

At their initial evaluation, Leehey administered the Montreal Cognitive Assessment, a dementia screening test of thinking ability. Dirden scored a 13 out of 30, in the range of where Alzheimer's patients typically score. At a follow-up appointment, after interviewing Johnnie twice and reviewing medical records, including an MRI exam, Leehey diagnosed him with dementia and prescribed him Donepezil, a drug that can slow cognitive deterioration.

"He was just so clearly dealing with dementia," Leehey said. "There was no question about it."

When Dirden went through a neuropsychological evaluation in November, however, his test results fell short of the settlement's requirements.

The neuropsychologist who evaluated Dirden did not reply to multiple requests for comment. In her report, she included a series of comments about the impact on Dirden's scores of the "specified procedures of the NFL Concussion Settlement," including the use of race norms, which are also called "demographic corrections."

"The demographic corrections in this case ... limit the ability to assign levels of impairment" to Dirden's scores, the neuropsychologist wrote.

Without a confirming diagnosis from the neuropsychologist, Dirden couldn't file a claim.

"It made absolutely no sense to me," Leehey said. "He clearly deserved a settlement payment."

The Dirdens' experience aligns with that of another Black former NFL player, who agreed to share his medical records with The Post on the condition he remain anonymous. In 2019, a neurologist expressed concern about the former player's worsening memory symptoms. But the doctor didn't make a diagnosis, in part because of his test scores.

Last year, however, the neurologist ordered the former player's scores curved again, this time as if he were White. The result: His scores qualified him for an early dementia diagnosis and potentially a $400,000 settlement payment.

In an interview, the former player's wife said the failure to get a diagnosis two years ago had larger ramifications than just on their finances. Her husband blamed himself for his thinking difficulties and wondered whether he was imagining them or people thought he was exaggerating.

"You have people who are being told there's nothing wrong with them when they know there's something wrong," she said. "That's bigger, to me, than any settlement money."

The first public accusations that race-norming discriminated against Black players in the settlement came in a lawsuit in August 2020, filed by former players Najeh Davenport and Kevin Henry. In the lawsuit, both players said they received dementia diagnoses that were later overturned because their neuropsychologists had failed to race-norm their scores.

Judge Anita Brody, who has overseen the concussion case, dismissed the lawsuit, calling it "a collateral attack" on the entire settlement. But in March, she also made the unusual decision to direct lawyers for the NFL and former players, as well as the lawyers for Davenport and Henry, into confidential mediation to "address the concerns" raised by the lawsuit.

In June, the NFL and Seeger, the lead lawyer for the players in the settlement, publicly pledged to remove race-norming from the evaluation of claims. Seeger, who had for months claimed he was aware of no evidence the practice had discriminated against Black former players, issued a public apology. The NFL has issued no such apology.

As the mediation between the league and ex-players continues, families of former players across the country are reviewing medical records and contacting lawyers to see whether race-norming affected their loved ones' claims.

The former player who didn't want his name revealed filed a dementia claim in November, his wife said. They have yet to get a response from the law firm that oversees settlement payments, a delay their lawyer has told them is due to the race-norming mediation.

The Dirdens are also waiting to hear whether Johnnie qualifies for a settlement payment. Leehey, Johnnie Dirden's new neurologist, recently filed paperwork supporting his claim for a settlement payment from the NFL, even though his race-normed scores didn't qualify. Johnnie is still taking medication for dementia, he said, and he believes it's helping. He recently remembered the name of his dog, Lacey, for the first time in years.

Michelle Haselrig, meanwhile, is consulting attorneys.

After discussing her husband with a reporter a few weeks ago, Michelle led a short tour of Johnstown. First, she stopped by the bridge near their home that the city recently renamed after him. Then over to the high school football stadium where his funeral was held last year. And then over to Carlton's grave.

The crowd at the football stadium exceeded 350 that day, Michelle recalled with pride. When the hearse carrying Carlton reached the graveyard, the funeral procession of cars behind it still stretched back to the stadium, two miles away.

For the first few months after Carlton's death, Michelle said, it was too painful to visit his grave. But this past summer she began stopping by every few weeks. Sometimes she brings a lawn chair and reads to him; other times she stays just a few minutes to talk, giving him updates on their five children and four grandchildren. Recently, she told him about race-norming — and her discussions with lawyers.

"I told him I'm fighting for him and his children and his grandkids," Michelle said. "And that I'm not going to stop until the NFL pays up."

## Read more about sports and social issues

Jerry Brewer: Brian Flores is done pretending, and the NFL is losing control

Sally Jenkins: On paper, Tom Brady was unremarkable. On the field, he grew into a legend.

Kevin B. Blackistone: Washington football is using the military as a deodorant, and the whole thing stinks

Candace Buckner: Behind-the-scenes sports docuseries are everywhere, and the messiness is the best part

Barry Svrluga: Is Barry Bonds's Hall of Fame banishment a tragedy or a shame? How about both?

# EXHIBIT B

Parties of this Agreement have been duly authorized by all necessary corporate action; (iii) this Agreement has been duly and validly executed and delivered by the NFL Parties; and (iv) this Agreement constitutes the NFL Parties' legal, valid, and binding obligation.

## ARTICLE IX
### Acknowledgements and Agreements

Section 9.1  The Parties acknowledge and agree, as endorsed by the Expert Panel, that:

(a)  Demographically-adjusted test scores have long been used in standard clinical neuropsychology to avoid misdiagnosis. Adjustments to test scores often take into account a person's age, level of education, gender, and race. This practice was not introduced by the NFL Parties or Class Counsel, and according to the NFL Parties and Class Counsel, was recommended by experts as part of the Class Action Settlement Agreement.

(b)  The Settlement Program does not require, and has never required, the use of so-called "Race Norms." The NFL Parties and Class Counsel represent that Heaton and Advanced Clinical Solution tests were selected for use in making Qualifying Diagnoses of neurocognitive impairment under the Class Action Settlement Agreement because these tests permitted full demographic adjustments that are widely accepted by neuropsychologists for use in the diagnosis of cognitive impairment in clinical practice.

(c)  The NFL Parties and Class Counsel represent that diagnostic accuracy is the cornerstone of the Class Action Settlement Agreement, and also represent that they followed the advice of their respective experts concerning the use of fully demographically adjusted test scores under the Class Action Settlement Agreement to make accurate Qualifying Diagnoses.

(d)  The NFL Parties and Class Counsel further represent that the use of full demographic adjustments in the Class Action Settlement Agreement was never intended by Class Counsel or the NFL Parties to be discriminatory. The NFL Parties and Class Counsel also represent that the Expert Panel, including experts retained by the NFL Parties and Class Counsel, has analyzed a sample of nearly 700 claimants. The Expert Panel found that use of full demographic adjustments did not have a differential impact on impairment ratings assigned to Black and White players within the Settlement Program. Experts continue to examine this issue.

(e)  The NFL Parties have committed to fund a working group of experts to develop methods that do not reference race, specifically applicable to the population of NFL Players. The Parties hope that this work will provide a basis for accurate diagnosis for former NFL players, and potentially beyond that.

(f)  The NFL Parties and Class Counsel were committed from the outset of the Mediation to find an alternative to the use of race in demographic adjustments in

23

# EXHIBIT C

**858 F.3d 298 (2017)**

**IN RE: DEEPWATER HORIZON.**

**Lake Eugenie Land & Development, Incorporated; Bon Secour Fisheries, Incorporated; Fort Morgan Realty, Incorporated; LFBP 1, L.L.C., Doing Business as GW Fins; Panama City Beach Dolphin Tours & More, L.L.C.; Zekes Charter Fleet, L.L.C.; William Sellers; Kathleen Irwin; Ronald Lundy; Corliss Gallo; John Tesvich; Michael Guidry, on Behalf of Themselves and All Others Similarly Situated; Henry Hutto; Brad Friloux; Jerry J. Kee, Plaintiffs-Appellants**

**v.**

**BP Exploration & Production, Incorporated; BP America Production Company; BP, P.L.C., Defendants-Appellees.**

No. 15-30377.

**United States Court of Appeals, Fifth Circuit.**

Filed May 22, 2017.

300   *300 Appeal from the United States District Court for the Eastern District of Louisiana.

Stephen Jay Herman, Esq., Soren E. Gisleson, Esq., Herman Herman & Katz, L.L.C., New Orleans, LA, James Parkerson Roy, Domengeaux Wright Roy Edwards & Colomb, L.L.C., Lafayette, LA, Samuel Issacharoff, New York University, School of Law, New York, NY, for Plaintiffs-Appellants.

Amir Cameron Tayrani, Miguel Angel Estrada, Theodore Olson, Gibson, Dunn & Crutcher, L.L.P., Washington, DC, George Howard Brown, Esq., Gibson, Dunn & Crutcher, L.L.P., Palo Alto, CA, for Defendants-Appellees.

Before DAVIS, CLEMENT, and COSTA, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This appeal addresses the computation of economic losses arising out of the BP oil spill and based on the BP Settlement Agreement. In an attempt to adhere to our decision in *In re Deepwater Horizon* ("*Deepwater Horizon I*"), 732 F.3d 326 (5th Cir. 2013), the district court has approved a policy adopted by the Claims Administrator known as Policy 495. Policy 495 consists of five methodologies pursuant to which the Claims Administrator is to calculate claimant compensation: one Annual Variable Margin Methodology ("AVMM") and four Industry-Specific Methodologies ("ISMs"). Class Counsel challenges all five. Because the AVMM is
301   consistent with the text of the Settlement Agreement, but the four ISMs are not, we *301 AFFIRM as to the AVMM, REVERSE as to the ISMs, and REMAND for proceedings consistent with this opinion.[1]

# I.

The Settlement Agreement seeks to reimburse claimants for economic losses related to the BP oil spill. Losses that bear a temporal relationship to the spill are said to be related to the spill. Somewhat simplified,

and more than somewhat condensed, the claims process works as follows: The Claims Administrator compares a claimant's financial performance prior to and after the spill. If the former is greater than the latter, BP is liable for the difference. Causation is, in all other respects, presumed.

The Settlement Agreement grants each claimant the right to choose his or her Compensation Period, so long as it consists of three or more consecutive months between May and December 2010. The Compensation Period constitutes the post-spill period, which is then subtracted from the same pre-spill period,[2] in order to deduce the damages owed.

We first addressed damages in the context of this litigation in *Deepwater Horizon I*. The question in *Deepwater Horizon I* was whether the Settlement Agreement requires the Claims Administrator to match all unmatched profit and loss statements. Before discussing our holding in *Deepwater Horizon I*, an explanation of the terms "matched" and "unmatched" is in order.

In a matched profit and loss statement, costs follow revenue, which is registered when generated or received. The two appear as part of the same month, and provide a clear picture of net income.

In an unmatched profit and loss statement, costs do not follow revenue. Revenue is registered when generated or received, and costs are registered at least one month earlier when incurred. Unmatched profit and loss statements can, pursuant to the Settlement Agreement, make it appear as if a claimant has suffered damages that he, in fact, did not suffer. Here's how.

Assume that Claimant A is a used car dealer, who chose a Compensation Period of August to October 2010. Assume that during the Compensation Period, Claimant A sold two cars. Assume that both of those cars were sold in September. Assume that the sale generated a combined $50,000 in revenue. And assume that Claimant A paid $40,000 for those two cars in June.

If the costs follow the revenue, *i.e.*, if the claimant's profit and loss statements are matched, the Claims Administrator should conclude that Claimant A generated $10,000 in profits during the Compensation Period. His profit and loss statements, from August to October 2010, should list $50,000 in revenue and $40,000 in costs. The fact that the costs were incurred outside of the Compensation Period in June does not matter, because the costs follow the revenue, which was both generated and received during the Compensation Period in September. Claimant A generated $10,000 in net profits from August to October 2010.

302 Now assume that Claimant A's financial performance in August to October 2009 mirrored that of August to October 2010. But assume that Claimant A submitted his 2009 profit and loss statements unmatched. *302 If the costs do not follow the revenue, the $40,000 that Claimant A incurred in June will not be considered, because June falls outside of the Compensation Period. Claimant A will thus appear to have generated $50,000 in net profits from August to October 2009, and $10,000 in net profits from August to October 2010. And after subtracting the latter from the former, Claimant A will be entitled to 40,000 in damages related to the spill.

In *Deepwater Horizon I,* we sought to determine whether the Settlement Agreement supports this result, or whether the Claims Administrator should be required to match all unmatched profit and loss statements. We noted that

> In interpreting a settlement, surely some weight has to be given to what damages recoverable in civil litigation actually are. If clear words in a settlement require the use of randomly

associated numbers for calculating damages, even if there is little likelihood that, after subtracting one of those numbers from the other, the remainder will in fact show anything relevant to damages, then so be it. We do not perceive such clarity here.[3]

Finding the text of the Settlement Agreement ambiguous, we remanded to the district court with instructions to review relevant extrinsic evidence to ensure that the Settlement Agreement was being implemented in a manner consistent with intent of the parties at the time of the Settlement Agreement's ratification.

On remand, the district court held that the parties did not discuss the issue of "matching" prior to signing the Settlement Agreement, but "did discuss and were in agreement that similarly situated claimants must be treated alike." In order to treat similarly situated claimants alike, the district court held that the Settlement Agreement should be interpreted to mandate the matching of all unmatched profit and loss statements, and ordered the Claims Administrator to craft a policy to that end.

The resultant policy is Policy 495. Policy 495 consists of five methodologies, and effectively divides claimants into two categories: those engaged in construction, education, agriculture, and professional services are subject to ISMs, and those engaged in everything else are subject to an AVMM. Class Counsel objects to all five methodologies. We review the AVMM separately, and the four ISMs together.

## II.

### A.

The AVMM requires the Claims Administrator to match all unmatched profit and loss statements. This means that prior to calculating damages, the Claims Administrator must ensure that costs are registered in the same month as corresponding revenue, regardless of when those costs were incurred. In *Deepwater Horizon I*, we held that the Settlement Agreement is ambiguous as to matching. Where a contractual provision "is ambiguous, such that its construction turns on a consideration of extrinsic evidence, ... we review the district court's interpretation for clear error."[4]

303   Class Counsel has not presented evidence sufficient for us to find that the district court's approval of the AVMM constituted clear error, and we now hold that it did not. The Settlement Agreement is a *303 maritime contract,[5] pursuant to which all ambiguities are to be resolved "consistent with the intent of the parties."[6] The parties intended for all "similarly situated claimants [to] be treated alike." Matching unmatched profit and loss statements promotes this goal. Error is clear when it leaves us with a "definite and firm conviction that a mistake has been committed."[7] Because we hold no such conviction, the district court's approval of the AVMM is affirmed.

### B.

The ISMs also require matching, but go a significant step farther, requiring the Claims Administrator to move, smooth, or otherwise reallocate revenue for claimants engaged in construction, education, agriculture, and professional services. Claimants in these four industries tend to be paid in lump sums, which are capable of generating damages awards that do not comport with tort principles. Thus, BP argues

that the ISMs are necessary in order to ensure that the Claims Administrator can "process claims in accordance with economic reality,"[8] quoting our opinion in *Deepwater Horizon I*.

An example is, once again, helpful. Assume that Claimant A is a farmer, who chose a Compensation Period of August to October 2010. Assume that in 2009, Claimant A sold all of his crops on October 31st, generating $200,000 in net profits. And assume that in 2010, Claimant A sold all of his crops on November 1st, generating $200,000 in net profits again.

Claimant A did not suffer economic losses pursuant to tort principles. His net profits, after all, did not decline from 2009 to 2010.

Claimant A did, however, suffer economic losses pursuant to the Settlement Agreement. The Settlement Agreement precludes the Claims Administrator from considering the 2010 transaction, because it took place in November, outside of the Compensation Period. Thus, BP owes Claimant A $200,000. $200,000 in net profits in 2009 minus $0 in net profits in 2010 equals $200,000 in damages for Claimant A.

BP argues that the parties did not intend for Claimant A to collect $200,000. And the relevant ISM would preclude this result. The relevant ISM would spread revenue across the crop season, ensuring that damages are awarded to those who have suffered real losses. This may well be a fairer alternative. But it cannot be implemented, because it is inconsistent with the plain text of the Settlement Agreement.[9]

"The interpretation of an unambiguous contract[ual provision] is a question of law, subject to de novo review."[10] "De novo [review warrants] here, as it ordinarily does, a fresh, independent determination of the matter at stake."[11]

304   *304 The Settlement Agreement grants each claimant the right to choose his or her Compensation Period, consisting of three or more consecutive months between May and December 2010. If the Claims Administrator is permitted to remove revenue from the Compensation Period, and spread it throughout the non-compensation months, the claimant's choice no longer matters. June is the same as December, and November is the same as July.

This is not the agreement that the parties entered into. And we decline to re-write the Settlement Agreement under the guise of contractual interpretation. When we said, in *Deepwater Horizon I*, that the Claims Administrator should "process claims in accordance with economic reality," we assumed that doing so would comport with the text of the Settlement Agreement. That assumption has proven to be wrong in light of the moving, smoothing, and otherwise reallocation of revenue inherent in the ISMs.

The Settlement Agreement grants claimants the right to choose their own Compensation Period. Because the ISMs infringe upon that right, the district court's approval of the ISMs was in error and is reversed.

## III.

The district court's approval of the ISMs was in error because the ISMs require the Claims Administrator to move, smooth, or otherwise reallocate revenue in violation of the Settlement Agreement. However, the ISMs, as stated, also require the Claims Administrator to match all unmatched profit and loss statements.

Having the Claims Administrator match all unmatched profit and loss statements helps ensure that all similarly situated claimants are treated alike, and is consistent with the text of the Settlement Agreement.

Thus, we hold that all claimants — including those engaged in construction, agriculture, education, and professional services — shall, on remand, be subject to the AVMM.

## IV.

For the reasons set out above, we AFFIRM as to the AVMM, REVERSE as to the ISMs, and REMAND for further proceedings consistent with this opinion.

[1] We have jurisdiction to decide this appeal pursuant to the collateral order doctrine. *See Deepwater Horizon I,* 732 F.3d at 332 n.3.

[2] Financial performance in the pre-spill period will, subject to the claimant's choice, be restricted to 2009; 2008 and 2009; or 2007, 2008, and 2009.

[3] 732 F.3d at 339.

[4] *See Alford v. Kuhlman Elec. Corp., 716 F.3d 909, 912 (5th Cir. 2013).*

[5] *Holmes Motors, Inc. v. BP Expl. & Prod., Inc., 829 F.3d 313, 315 (5th Cir. 2016); see also Guidry v. Halliburton Geophysical Servs., Inc., 976 F.2d 938, 940 (5th Cir. 1992)* ("A settlement agreement is a contract.").

[6] *See Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 31, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004).*

[7] *United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).*

[8] 732 F.3d at 339.

[9] *See Luv N' Care, Ltd. v. Groupo Rimar, 844 F.3d 442, 447 (5th Cir. 2016)* ("Contractual intent is determined by the words of the contract.").

[10] *Alford, 716 F.3d at 912.*

[11] *Doe v. United States, 821 F.2d 694, 697-98 (D.C. Cir. 1987) (en banc)* (internal quotations omitted); *see also Goodman v. United States, 518 F.2d 505, 509 (5th Cir. 1975)* ("The phrase `de novo' means `the court should make an independent determination of the issues.'").

Save trees - read court opinions online on Google Scholar.