# EXHIBIT 8

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT ("Agreement"), dated this 20th day of October, 2021, is made and entered into by and among the National Football League ("NFL") and NFL Properties LLC (together the "NFL Parties"), Seeger Weiss LLP ("Class Counsel"), and Kevin Henry and Najeh Davenport ("Intervenors").

# RECITALS

A.     On August 29, 2013, the parties to the NFL concussion lawsuits consolidated in the United States District Court for the Eastern District of Pennsylvania as a Multidistrict Litigation captioned *In re: National Football League Players' Concussion Injury Litigation*, 12-md-2323 (E.D. Pa.) (the "MDL") announced that they had reached a settlement agreement.  On April 22 and May 8, 2015, the Court issued a Final Order and Judgment, and Amended Final Order and Judgment, respectively, granting final approval to the Class Action Settlement Agreement and certifying a Settlement Class that includes all retired NFL players as of July 7, 2014 and their derivative and representative claimants, as defined by the Class Action Settlement Agreement.  After the Third Circuit affirmed the District Court's Order, the Settlement became effective on January 7, 2017.

B.     The Class Action Settlement Agreement provides Monetary Awards for, as relevant here and among other diagnoses, Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, and provides Supplemental Benefits for diagnoses of Level 1 Neurocognitive Impairment.  Diagnoses of Levels 1, 1.5, or 2 Neurocognitive Impairment generally require neuropsychological testing and other evidence establishing that the Settlement Class Member is experiencing the degree of cognitive decline set forth in the Class Action Settlement Agreement's Injury Definitions for each diagnosis.  The Settlement Agreement permitted but did not require the clinicians who render Settlement Program diagnoses to use Race Norms in administering the requisite neuropsychological testing.

C.     In early 2017, Class Counsel and the NFL Parties, with input from the BAP Administrator, developed a user manual for Settlement Program neuropsychologists pursuant to Class Action Settlement Agreement Exhibit 2 Section 4—the BAP Clinician's Interpretation Guide.  That BAP Clinician's Interpretation Guide recommended, but did not require, clinicians who render Settlement Program diagnoses to use full demographic corrections—which would include the use of Race Norms—in administering neuropsychological testing.

D.     On August 20, 2020, Settlement Class Member Najeh Davenport filed an Objection to the Special Masters' August 20, 2020 decision remanding his Settlement Claim for Level 1.5 Neurocognitive Impairment to the Claims Administrator (the "Objection"), arguing that the Special Masters' decision had misconstrued the Class Action Settlement Agreement and deprived him of equal rights under the law in conflict with 42 U.S.C. § 1981 as a result of the use of Race Norms in the Settlement Program.  The Court denied the Objection without prejudice on November 20, 2020, and Najeh Davenport filed a Motion for Reconsideration on December 3, 2020 that remains pending.

E.      On August 25, 2020, Najeh Davenport and another Settlement Class Member, Kevin Henry, filed a Motion for Relief in *In re: National Football League Players' Concussion Injury Litigation*, 12-md-2323 (E.D. Pa. Aug. 25, 2020), ECF No. 11169 (the "Motion for Relief"), asking the District Court to construe the Class Action Settlement Agreement so as to avoid racial discrimination, and a separate class action complaint against the NFL Parties, *Henry et al.* v. *Nat'l Football League et al.*, 2:20-cv-04165 (E.D. Pa. Aug. 25, 2020), ECF No. 1 (the "Complaint"), alleging that the Settlement Program is racially discriminatory and deprives them of equal rights on the basis of race, and purporting to assert a claim under 42 U.S.C. § 1981 for deprivation of equal rights under the law against the NFL Parties.

F.      On November 20, 2020, the District Court denied the Motion for Relief without prejudice because Intervenors failed to exhaust their administrative remedies under the Class Action Settlement Agreement's Settlement Claim process before petitioning the District Court.  On November 24, 2020, the Intervenors appealed the District Court's determination to the Third Circuit Court of Appeals in *In re: Nat'l Football League Retired Players' Concussion Injury Litigation*, 20-3401 (3d Cir.) (the "Motion for Relief Appeal").  On July 26, 2021, the Third Circuit dismissed the Motion for Relief Appeal.

G.      The NFL Parties filed a motion to dismiss the Complaint on November 2, 2020 on the ground that the lawsuit constituted an improper collateral attack on the Class Action Settlement Agreement, which the District Court granted on March 8, 2021, while noting its "concern[] about the race-norming issue."   The Intervenors appealed the District Court's determination to the Third Circuit Court of Appeals, *Henry* v. *Nat'l Football League*, 21-1434 (3d Cir.) (the "Complaint Appeal").

H.      Pursuant to the March 8, 2021 order dismissing Intervenors' case, the District Court referred the NFL Parties and Class Counsel to mediation, as supervised by Magistrate Judge David Strawbridge, to address the concerns relating to the potential use of Race Norms in connection with the Settlement Program (the "Mediation").  Intervenors filed a motion to intervene and, on April 8, 2021, the District Court entered an Order "[a]ppreciating that Henry and Davenport, through their counsel . . . had raised a very important issue—particularly in the context of the 65-year life of the [Class Action] Settlement Agreement. . . ."  The Court "decided to take the unusual step of attempting to reach some understanding of how this issue might be amicably resolved outside an adversarial setting," and directed Magistrate Judge Strawbridge to "comment upon the involvement of individuals beyond the NFL and Class Counsel" in the process.

I.      On June 3, 2021, the District Court granted the motion to intervene in part, noting that "intervention may facilitate the ongoing mediation process" because "Movants have presented research on the appropriate use of norms, and they may have information that would be useful to the mediation."  Since then, the NFL Parties, Class Counsel, and Intervenors have been working under the supervision of the Magistrate Judge in furtherance of the District Court's March 8, 2021 order.

J.       On June 11, 2021, Magistrate Judge Strawbridge submitted an interim report to the Court pursuant to the Court's directive, noting that "Class Counsel and the NFL were already in agreement that new protocols should be developed to eliminate the use of demographic norms that differentiate based on race" prior to the Mediation, and describing "a great deal of collegiality and mutual respect among the members of" the Expert Panel in working toward that goal.

K.       In connection with the Mediation, a panel of expert neuropsychologists, including those retained by Class Counsel and the NFL Parties, as well as an Appeal Advisory Panel Consultant ("AAPC"), has developed a new assessment method, which eliminates race as a consideration in the evaluation of Retired Players' estimated premorbid intellectual ability and neuropsychological test results.

L.       After the Mediation and arm's length negotiations between and among the Parties, the NFL Parties, Class Counsel, and Intervenors desire to settle, compromise, and resolve fully all Released Claims.

M.       All Parties, in consultation with their counsel, have concluded that it is in their best interest to compromise and settle all claims and allegations in the Complaint and Motion for Relief and as set forth in Article IV of this Agreement against the Released Parties in return for the terms and benefits of this Agreement.  The Parties have considered, among other things: (1) the complexity, expense, and likely duration of the litigation; (2) the potential for all Parties to prevail on threshold issues and on the merits; and (3) the range of possible recovery, including the Monetary Awards potentially available to the Intervenors and Settlement Class pursuant to the Class Action Settlement Agreement.

N.       The NFL Parties and Class Counsel deny the allegations and claims in the Complaint, Motion for Relief, and Objection, and deny any and all liability to the Intervenors or the Settlement Class.

O.       This Agreement will not be construed as evidence of, or as an admission by the NFL Parties or any Released Party of any liability or wrongdoing by Class Counsel, the NFL Parties or any Released Party, and this Agreement is intended by the Parties fully, finally, and forever to resolve, discharge, and settle all Released Claims, including without limitation all disputes and controversies relating to or arising from the use of Race Norms or Race Demographic Estimates in the Settlement Program, against the NFL/Class Counsel Released Parties, as defined and set forth below.

NOW, THEREFORE, it is agreed that the foregoing recitals are expressly incorporated into this Agreement and made a part hereof and further, that in consideration of the agreements, promises, and covenants set forth in this Agreement, including the Releases and Covenants set forth in Article IV and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, these actions shall be settled and compromised under the following terms and conditions:

# ARTICLE I
## Definitions

For the purposes of this Agreement, the following terms (designated by initial capitalization throughout this Agreement) will have the meanings set forth in this Article I. Capitalized terms not defined in this Article I or elsewhere in the Agreement shall have the meaning ascribed to them in the Class Action Settlement Agreement.

A.     "Appeals Advisory Panel Leadership Council" or "AAPLC" means the advisory group of AAP members appointed and directed by the Claims Administrator and overseen by the Special Masters to provide the Claims Administrator with advice and assistance on medical issues arising in the monitoring of the work of Qualified MAF Physicians.

B.     "BAP Administrator" means the Baseline Assessment Program Fund Administrator as that term is defined in the Class Action Settlement Agreement.

C.     "BAP Clinician's Interpretation Guide" means the document titled "Retired NFL Football Players' Baseline Assessment Program Neuropsychologist Handbook (the Clinician's Interpretation Guide)," jointly negotiated and implemented by Class Counsel and the NFL Parties pursuant to Exhibit 2, Section 4 of the Class Action Settlement Agreement.

D.     "Black Race Demographic Estimates" means the use of Race Demographic Estimates in estimating premorbid intellectual functioning in a manner that treats the examinee's race as non-White.

E.     "Black Race Norms" means Race Norms that have been used in a manner that treats the examinee's race as non-White in connection with neuropsychological testing.

F.     "Claimant" means a Settlement Class Member who has submitted a Settlement Claim.

G.     "Class Counsel" means Seeger Weiss LLP.

H.     "Class Action Settlement Agreement" means the class action settlement finally approved by the United States District Court for the Eastern District of Pennsylvania on April 22, 2015, as amended May 8, 2015, in *In re: National Football League Players' Concussion Injury Litigation*, 12-md-2323.

I.     "Clinical Dementia Rating" or "CDR" means the rating assigned to an individual's level of functional impairment pursuant to the National Alzheimer's Coordinating Center's Clinical Dementia Rating scale as set forth in Exhibit 1 (Injury Definitions) of the Class Action Settlement Agreement.

J.     "Complaint" means the complaint captioned *Henry et al.* v. *Nat'l Football League et al.*, 2:20-cv-04165 (E.D. Pa. Aug. 25, 2020), ECF No. 1.

K.     "Demographic Estimates" means the use of demographics to estimate an individual's premorbid intellectual functioning.

L.     "Expert Panel" means the group of neuropsychologists who developed the New Method through the Mediation as currently constituted and with (i) any additional neuropsychologists or other experts who either the NFL Parties or Class Counsel appoint to represent them in the Expert Panel's ongoing work in the future; and (ii) any additional experts appointed to the Expert Panel by the Court upon the joint agreement of Class Counsel and the NFL Parties.

M.     "Heaton Norms" means the Revised Comprehensive Norms for an Expanded Halstead-Reitan Battery: Demographically Adjusted Neuropsychological Norms for African American and Caucasian Adults, as published by Robert K. Heaton, S. Walden Miller, Michael J. Taylor, and Igor Grant.

N.     "Intervenor Released Parties" means (i) the Intervenors, together with (ii) each of the Intervenors' respective past, present, and future agents, attorneys, consultants, and assigns and each of their past, present, and future spouses, heirs, beneficiaries, estates, executors, administrators, and personal representatives; and (iii) any natural, legal or juridical person or entity acting on behalf of or having liability in respect of the Intervenors.

O.     "Intervenor Releasors" means the releasors set forth in Section 4.1 of this Settlement Agreement.

P.     "Intervenors" means Kevin Henry and Najeh Davenport.

Q.     "Intervenors' Counsel" means Zuckerman Spaeder LLP, JR Wyatt Law PLLC, and Edward Stone Law P.C.

R.     "Intervenors' Released Claims" means the claims released by the Intervenors in Sections 4.1–4.3.

S.     "MAF Claim" means a post-Effective Date Settlement Claim that is based on a diagnosis from a Qualified MAF Physician rather than a diagnosis rendered through the BAP by Qualified BAP Providers.

T.     "Mediation" means the mediation undertaken by the Parties and ordered by the Court in its March 8, 2021 order dismissing the Complaint.

U.     "Motion for Relief" means the Motion for Relief under Article XXVII of the Settlement Agreement or for Relief from Judgment filed by Intervenors on August 25, 2020, in *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).

V.     "NFL/Class Counsel's Released Claims" means the claims released by the NFL Parties and Class Counsel in Sections 4.4–4.6.

W.     "NFL/Class Counsel Released Parties" means: (i) the NFL Parties, Class Counsel, Claims Administrator, BAP Administrator, Special Masters, Qualified MAF Physicians, neuropsychologists permitted to support MAF Claims, Qualified BAP Providers, AAP members, AAPCs, and AAPLC members (including all persons, entities, subsidiaries,

divisions, and business units), together with (ii) each of the Member Clubs, (iii) each of the NFL Parties', Class Counsel's, Claims Administrator's, BAP Administrator's, Special Masters', Qualified MAF Physicians', neuropsychologists permitted to support MAF Claims', Qualified BAP Providers', AAP members', AAPCs', and AAPLC members' respective past, present, and future agents, directors, officers, employees, independent contractors (including consultants), general or limited partners, members, joint venturers, shareholders, attorneys, trustees, insurers (solely in their capacities as liability insurers of the persons or entities referred to in subparagraphs (i) and (ii) above and/or arising out of their relationship as liability insurers to such persons or entities), predecessors, successors, indemnitees, and assigns and each of their past, present, and future spouses, heirs, beneficiaries, estates, executors, administrators, and personal representatives; (iv) any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the NFL Parties, Class Counsel, Claims Administrator, BAP Administrator, Special Masters, Qualified MAF Physicians, neuropsychologists permitted to support MAF Claims, Qualified BAP Providers, AAP members, AAPCs, and AAPLC members, in their capacity as such; and (v) as to the persons or entities named in (i)–(ii) above, each of their respective Affiliates, including their Affiliates' officers, directors, shareholders, employees, and agents.

X. "NFL/Class Counsel Releasors" means the releasors set forth in Section 4.4 of this Settlement Agreement.

Y. "New Method" means the neuropsychological testing assessment method developed by the Expert Panel as set forth in the Expert Panel's report, attached hereto as Exhibit A.

Z. "Norms" means normative databases that aggregate neuropsychological test scores from people who represent the general population without the presence of neurocognitive problems, against which specific neuropsychological test scores obtained from an examinee are compared in order to help identify if the examinee's performances are similar to, or significantly different from, what is expected for a person of similar background characteristics.

AA. "Norming" means the process of using Norms.

BB. "Objection" means Najeh Davenport's Objection to the Special Masters' August 20, 2020 decision remanding his Settlement Claim for Level 1.5 Neurocognitive Impairment to the Claims Administrator.

CC. "Parties" means the Intervenors, Class Counsel, and NFL Parties.

DD. "Post-Effective Date" means after January 7, 2017; when used in conjunction with "Settlement Claim" or "MAF Claim," "Post-Effective Date" means a Settlement Claim submitted based on a Qualifying Diagnosis with a date of diagnosis after January 7, 2017.

EE. "Race Demographic Estimates" means the use of demographics in a manner that takes into account the examinee's race or ethnicity, along with age and gender, to estimate an individual's premorbid intellectual functioning.

FF.    "Race Norms" means Norms that have been used in a manner that takes into account the examinee's race or ethnicity, along with age and gender, as a variable in adjusting the examinee's neuropsychological test scores.

GG.    "Race Norming" means the process of using Race Norms.

HH.    "Released Claims" means the Intervenors' Released Claims and the NFL/Class Counsel's Released Claims together.

II.    "Released Parties" means the NFL/Class Counsel Released Parties and the Intervenor Released Parties together.

JJ.    "Releases" means the releases set forth in Article IV.

KK.    "Releasors" means the NFL/Class Counsel Releasors and the Intervenor Releasors together.

LL.    "Settlement Agreement" or "Agreement" means this settlement agreement, including any subsequent amendments thereto.

MM.    "Settlement Claim" means a Qualifying Diagnosis that has been submitted to the Settlement Program accompanied by a Claim Package and Claim Form.

NN.    "Settlement Date" means the date by which the Intervenors, and duly authorized agents for the Intervenors' Counsel, Class Counsel, and the NFL Parties have signed this Agreement.

OO.    "Settlement Program" means all functions, processes, or programs carried out pursuant or in relation to the Class Action Settlement Agreement, including but not limited to all medical evaluations, Settlement Claim processes, and Settlement Claim appeal processes and determinations, undertaken in connection with the Class Action Settlement Agreement.

PP.    "Special AAP Panel" means a panel of AAPs and AAPCs agreed jointly by the NFL Parties and Class Counsel to carry out the purposes set forth in this Agreement.

Unless the context requires otherwise, (i) words expressed in the masculine will include the feminine and neuter gender and vice versa; (ii) the word "will" shall be construed to have the same meaning and effect as the word "shall"; (iii) the word "or" will not be exclusive; (iv) the word "extent" in the phrase "to the extent" will mean the degree to which a subject or other thing extends, and such phrase will not simply mean "if"; (v) references to day or days in the lower case are to calendar days, but if the last day is a Saturday, Sunday, or legal holiday, the period will continue to run until the end of the next day that is not a Saturday, Sunday, or legal holiday; (vi) references to any law will include all rules and regulations promulgated thereunder; (vii) the terms "include," "includes," and "including" will be deemed to be followed by "without limitation," whether or not they are in fact followed by such words or words of similar import.

# ARTICLE II
## Settlement Consideration

Section 2.1    The following processes will be instituted in the Settlement Program in full settlement of the Released Claims.

Section 2.2    Elimination of Race Norming and Race Demographic Estimates. No Race Norms or Race Demographic Estimates—whether Black or White—shall be used in the Settlement Program going forward, and no party or Claimant shall have the right to appeal a Settlement Claim determination on the ground that Race Norms or Race Demographic Estimates were not applied, nor shall the failure to use Black Race Norms or Black Race Demographic Estimates be used as a basis to deny, reduce, or in any way justify the reduction or denial of a Settlement Claim.

Section 2.3    Prospective Use of Norms.  The New Method will be used in the Settlement Program until such time as the Expert Panel develops longer-term new Norms in accordance with Article III below.  Specifically, the New Method will be applied to: (i) all future neuropsychological testing done through the BAP or MAF, (ii) all Settlement Claims that have not yet been adjudicated, in such case the AAPC will rescore the neuropsychological testing using the New Method, and (iii) all Settlement Claims that are currently on appeal in which Race Norms or Race Demographic Estimates are potentially at issue, in such case the Special Masters will remand, for application of the New Method by an AAPC.

Section 2.4    Retrospective Use of Norms and Demographic Estimates: Review, Rescoring, and Reevaluation.  The replacement of Race Norming and Race Demographic Estimates with the New Method will be accompanied by (i) a review to determine which MAF Claims and BAP neuropsychological test results of Retired Players may have been impacted by the use of Black Race Norms or Black Race Demographic Estimates, as contemplated in Section 2.5, (ii) the automatic rescoring of all eligible neuropsychological test results of Retired Players for whom Black Race Norms or Black Race Demographic Estimates were applied, using the New Method, as set forth in Section 2.5, (iii) the availability of new BAP exams to certain eligible Retired Players for whom Black Race Norms or Black Race Demographic Estimates were applied, as set forth in Section 2.6, and (iv) the ability of certain Retired Players not eligible for automatic rescoring pursuant to Section 2.5, but for whom Black Race Norms or Black Race Demographic Estimates were applied, to have their neuropsychological test results rescored using the New Method as set forth in Section 2.7.

Section 2.5    Automatic Retrospective Rescoring.

(a)    *Automatically Rescored Settlement Claims.*  The New Method shall be used to rescore the following Settlement Claims and diagnoses, where such rescoring could potentially result in a Qualifying Diagnosis or a higher Qualifying Diagnosis solely due to a change in the Retired Player's neuropsychological T scores—i.e., the Retired Player otherwise

meets the Class Action Settlement Agreement's functional impairment and validity requirements for a more severe Qualifying Diagnosis based on his prior evaluations:

i.        all BAP diagnoses of no impairment or Level 1 Neurocognitive Impairment, where Black Race Norms or Black Race Demographic Estimates were applied to the Retired Player's neuropsychological testing; and

ii.       all BAP and Post-Effective Date MAF approved Level 1.5 Neurocognitive Impairment Settlement Claims or denied Level 1.5 or Level 2 Neurocognitive Impairment Settlement Claims of Retired Players who had Black Race Norms or Black Race Demographic Estimates applied to their neuropsychological testing or whose Settlement Claims were denied or reduced due to a failure to use Black Race Norms or Black Race Demographic Estimates.

(b)      *Determination of Rescoring Eligibility*.  The Claims Administrator and BAP Administrator, with guidance from the AAP/AAPLC/AAPC and the Special Masters as necessary, will determine who qualifies for rescoring.  To qualify for rescoring, the standard is if the Claims Administrator would have approved a more severe Qualifying Diagnosis had the Retired Player's T scores qualified for that more severe Qualifying Diagnosis.  Determinations on who qualifies for rescoring are final and unappealable.

(c)      *Excluded Settlement Claims*.    Notwithstanding Section 2.5(a) above, the following categories of Settlement Claims shall not automatically be rescored under this Section 2:  (i) Settlement Claims denied for incompleteness; (ii) Settlement Claims denied as a result of audit; (iii) withdrawn Settlement Claims; and (iv) Settlement Claims based on diagnoses rendered by providers who have been disqualified from the Settlement Program.  The determination of whether one of the foregoing exclusions applies shall be made by the Claims Administrator, with guidance from the AAP/AAPLC/AAPC and the Special Masters as necessary.  Determinations on whether an exclusion under this Section 2.5(c) applies are final and unappealable.

(d)      *Rescoring Process*.    AAPCs will conduct the rescoring of the neuropsychological testing of eligible Settlement Claims.  The Special Masters will have direct oversight of the rescoring of eligible Retired Players' neuropsychological test results and will provide the Court with periodic status reports regarding their findings.

(e)      *Incomplete Settlement Claim File*.  The Claims Administrator and AAP/AAPC/AAPLC shall make reasonable efforts to determine if a particular Settlement Claim file or evaluation file, if incomplete but not denied for incompleteness, satisfies the criteria set forth in the Class Action Settlement Agreement for a more severe Qualifying Diagnosis once Race Norms and Race Demographic Estimates are removed.

(f)      *Settlement Claims Previously Approved for Level 1 or Level 1.5 Neurocognitive Impairment*.  When reviewing any Settlement Claim that has already been paid as a Level 1.5 Neurocognitive Impairment Qualifying Diagnosis (whether a MAF Claim or BAP Settlement Claim), or any Settlement Claim from a Retired Player receiving Supplemental

9

Benefits based on a prior Qualifying Diagnosis of Level 1 Neurocognitive Impairment, the AAPC will accept the test results as valid for purposes of performance validity testing and *Slick* criteria assessments.

        (g)    *Notice of Determination*.  For Settlement Claims eligible for rescoring under this Section 2.5, once the Claims Administrator and AAP/AAPLC/AAPC have made their final determination based on the results of the rescoring occurring under this Section 2.5, the Claims Administrator will send the appropriate notice to Retired Players advising them of the determination.

        i.    For those Retired Players diagnosed with Level 1 Neurocognitive Impairment following rescoring who initially had a BAP diagnosis of no impairment, the BAP Administrator will begin the process of making Supplemental Benefits available to them.

        ii.    Those Retired Players diagnosed with Level 1.5 or Level 2 Neurocognitive Impairment following rescoring who initially had a BAP diagnosis of no impairment or a Level 1 Neurocognitive Impairment will be advised that they need to file a formal Settlement Claim, which will then be processed by the Claims Administrator.  The Retired Player, NFL Parties, and Class Counsel retain the right to appeal any Monetary Award Settlement Claim determination ultimately issued as a result of any such revised diagnosis pursuant to Section 9.5 of the Class Action Settlement Agreement, except for on the grounds that Race Norms or Race Demographic Estimates were not used.

        iii.    Those Retired Players who went through the BAP originally and receive a "no impairment" determination following rescoring, or whose diagnosis did not change from the original diagnosis following rescoring, will be advised of that determination.  Such determination is final and unappealable.

        iv.    Those Retired Players who were evaluated by a Qualified MAF Physician and do not receive a more severe Qualifying Diagnosis following rescoring will be advised of that determination.  Such Retired Players may appeal the determination pursuant to Class Action Settlement Agreement Section 9.5, provided that such appeal (i) is not on the grounds that Race Norms or Race Demographic Estimates were not used, and (ii) does not, if a Retired Player appealed the original Settlement Claim determination, re-raise in the Retired Player's new appeal any issues previously briefed in his prior appeal.  The Special Masters, however, will consider any prior appeal and opposition and the arguments (other than Race Norms or Race Demographic Estimate arguments) raised therein in connection with their determination on the new appeal.  For the avoidance of doubt, an argument that the Retired Player's T scores meet the Class Action Settlement Agreement's criteria for a more severe Qualifying Diagnosis as a result of the rescoring will be construed as a new argument that can be raised in any new appeal.

        v.    Those Retired Players who initially had a BAP or Post-Effective Date MAF approved Level 1.5 Neurocognitive Impairment Settlement Claim or a denied Level 1.5 or Level 2 Neurocognitive Impairment Settlement Claim who, following

rescoring, qualify for a Monetary Award (or an increased Monetary Award), will be advised that they do not need to resubmit a Settlement Claim. The Retired Player, NFL Parties, and Class Counsel retain the right to appeal any Monetary Award Settlement Claim determination or increased Monetary Award Settlement Claim determination ultimately issued as a result of any such revised diagnosis pursuant to Section 9.5 of the Class Action Settlement Agreement, except for on the grounds that Race Norms or Race Demographic Estimates were not used.

Section 2.6      <u>Expanded BAP Examinations</u>.

(a)      *Eligibility for Expanded BAP Examinations*.  The NFL Parties will pay for, or cause to be paid, one (1) free BAP examination (including an evaluation by a Qualified BAP Provider neurologist and a Qualified BAP Provider neuropsychologist) (regardless of whether the Retired Player has already had a BAP examination prior to the Settlement Date or is otherwise BAP-eligible) for any Retired Player whose neuropsychological test scores or estimated premorbid intellectual functioning determination included the use of Black Race Norms or Black Race Demographic Estimates, if that Retired Player's Settlement Claim was denied in part because of the insufficiency of his T scores, or if the Retired Player did not file a Settlement Claim because the Qualified BAP Providers or Qualified MAF Physician who examined him did not diagnose him with a Qualifying Diagnosis in part because of the insufficiency of his T scores.  A Retired Player's eligibility for a BAP examination under this Section 2.6 shall be determined by the BAP Administrator, with guidance from the Claims Administrator and Special Masters as necessary, and such determination is final and unappealable.

(b)      *Exclusions*.  Retired Players will not be eligible for a BAP examination under this Section 2.6 if: (i) they had their testing automatically rescored under Section 2.5 ("Automatic Retrospective Rescoring"); (ii) they avail themselves of the rescoring mechanism provided in Section 2.7 ("New Settlement Claim Submissions"); (iii) their Settlement Claims were denied as the result of an audit; or (iv) their Settlement Claims were withdrawn, and would have been denied as the result of an audit had they not been withdrawn. The determination of whether one of the foregoing exclusions applies shall be made by the BAP Administrator, with guidance from the Claims Administrator, AAP/AAPLC/AAPC, and the Special Masters as necessary.  This determination is final and unappealable.

(c)      *Time Period*.  New BAP examinations conducted under this Section 2.6 must occur within twenty-four (24) months of the Court's order adopting this Agreement.  If an eligible Retired Player contacts the BAP Administrator to make his appointment within the twenty-four (24) month period, he will be deemed to have taken a timely BAP examination.

(d)      *Medically Unnecessary Neuropsychological Testing*.  If a new BAP examination occurring pursuant to this Section 2.6 results in the diagnosing Qualified BAP Provider's reasonable determination that the Retired Player's neuropsychological testing is now medically unnecessary under the Class Action Settlement Agreement's Injury Definitions, a Retired Player can request to have his original test scores rescored, and proceed with the remaining parts of the BAP examination.

11

(e)    *Date of Diagnosis*.   A diagnosis arising from a new BAP examination occurring pursuant to this Section 2.6 may relate back to the date of an earlier exam that, upon application of the New Method, sufficiently demonstrates that the Retired Player previously met all of the criteria for the new diagnosis, notwithstanding any other timing rules in the Class Action Settlement Agreement.  Any such backdating will be reviewed by an AAP member—and, if the backdating involves rescored prior neuropsychological testing, an AAPC—and will be subject to the Settlement Program's current requirements for backdated diagnoses.

(f)    *"Good Cause" Travel and Deceased Retired Player Exceptions*. If a Retired Player cannot travel for a new BAP examination that is scheduled pursuant to this Section 2.6, subject to a "good cause" standard, or if a Retired Player has died and cannot now be retested, a Special AAP Panel will determine if the Retired Player's rescored test results and Settlement Claim file meets the criteria for a new or more severe Qualifying Diagnosis, on application by the Retired Player and/or his Representative Claimant.   The Claims Administrator, with guidance from the Special Masters as necessary, will determine whether the "good cause" standard has been met.

(g)    *Notice of Determination*.  Once the Qualified BAP Providers have made their final determination based on the results of the additional BAP examinations occurring under this Section 2.6 and submitted the requisite paperwork to the BAP Administrator, the BAP Administrator will send the appropriate notice to Retired Players advising them of the determination.

i.      For those Retired Players diagnosed with Level 1 Neurocognitive Impairment, the BAP Administrator will begin the process of making Supplemental Benefits available to them in accordance with the terms of the Class Action Settlement Agreement.

ii.     Those Retired Players diagnosed with Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment will be advised that they need to file a formal Settlement Claim, which will then be processed by the Claims Administrator.  The Retired Player, NFL Parties, and Class Counsel retain the right to appeal any Monetary Award Settlement Claim determination ultimately issued as a result of any such diagnosis pursuant to Section 9.5 of the Class Action Settlement Agreement, except for on the grounds that Race Norms or Race Demographic Estimates were not used.

iii.    Those Retired Players who received a "no impairment" determination or whose diagnosis did not change from the original diagnosis will be advised of that determination and that the determination is final and unappealable.

(h)    Unless otherwise stated herein, all procedures set forth under the terms of the Class Action Settlement Agreement for BAP examinations shall be followed in the expanded BAP examinations that occur under this Section 2.6.

Section 2.7     New Settlement Claim Submissions.

(a)     *Eligibility for New Settlement Claim Submissions.*  Retired Players who received a valid Post-Effective Date neuropsychological evaluation from a neuropsychologist approved to support diagnoses from Qualified MAF Physicians through the MAF program (rather than a Qualified BAP Provider through the BAP) and either (i) did not submit a Settlement Claim because Black Race Norms or Black Race Demographic Estimates were applied to their neuropsychological testing, or (ii) submitted a Settlement Claim that was denied in part because their neuropsychological testing did not qualify them for a Monetary Award as a result of the use of Black Race Norms or Black Race Demographic Estimates may, at their option and expense instead of receiving a BAP examination under Section 2.6, have the neuropsychologist who administered the testing or an AAPC rescore the prior valid Post-Effective Date MAF program neuropsychological testing using the New Method and submit a new MAF Claim using the rescored testing.  If the neuropsychologist who administered the original testing is deceased or is no longer in the Settlement Program, another BAP neuropsychologist or an AAPC may conduct the rescoring.  For the avoidance of doubt, nothing in this Section 2.7 shall be construed to deprive any Class Member of any right afforded to them by the terms of the Class Action Settlement Agreement, or any benefit afforded by the post-implementation rules and FAQs previously established by the Parties with respect to a Class Member's ability to submit a Settlement Claim for Monetary Award and/or the documents or other materials that a Qualified MAF Physician may rely upon for rendering a diagnosis.

(b)     *Evidence of Eligibility*.  The application of Black Race Norms or Black Race Demographic Estimates must be evident on the face of the original neuropsychological testing documents or supported by a statement from the examining or rescoring neuropsychologist demonstrating that Black Race Norms or Black Race Demographic Estimates were used.

(c)     *Exclusions*.  Retired Players will not be eligible to have their testing rescored under this provision if:  (i) their test results were found to be invalid in any final decision; (ii) they had their testing automatically rescored under Section 2.5 ("Automatic Retrospective Rescoring"); (iii) they avail themselves of an expanded BAP examination under Section 2.6 ("Expanded BAP Examinations"); (iv) their Settlement Claims were denied as the result of an audit; (v) their Settlement Claims were withdrawn, and would have been denied as the result of an audit had they not been withdrawn; or (vi) their testing was administered by a clinician who has been disqualified from the Settlement Program. The determination of whether one of the foregoing exclusions applies shall be made by the Claims Administrator, with guidance from the AAP/AAPLC/AAPC, and the Special Masters as necessary.   This determination shall be final and unappealable.

(d)     *AAPC Review*.  An AAPC will review any rescoring that occurs under this Section 2.7.

(e)     *Date of Diagnosis*.  If the diagnosing Qualified MAF Physician determines, and an AAPC agrees, that, upon the application of the New Method, all of the criteria for a Qualifying Diagnosis were met as of the earlier date of the neuropsychological

13

examination, the earlier date of the neuropsychological exam may be used as the date of the Qualifying Diagnosis, notwithstanding any other timing rules in the Class Action Settlement Agreement or the Settlement Program. For the avoidance of doubt, if any of the Class Action Settlement Agreement's requirements for the claimed Qualifying Diagnosis were not met until the date of a later evaluation, the date of the later evaluation will be used as the date of the Qualifying Diagnosis. Any backdating will be subject to the Settlement Program's current requirements for backdated Qualifying Diagnoses. For the avoidance of doubt, if the Retired Player did not meet the Class Action Settlement Agreement's criteria for a Qualifying Diagnosis as of any date, including as of the date of the later evaluation, the Settlement Claim will be denied.

(f)     *Timing*. New Settlement Claim submissions made pursuant to this Section 2.7 must be made within twenty-four (24) months of the Court's Order approving this Agreement. New Settlement Claim submissions made pursuant to this Section 2.7 will automatically qualify for the "substantial hardship" exception contemplated by Class Action Settlement Agreement Section 8.3(a)(i), which otherwise requires that diagnoses must be submitted to the Claims Administrator no later than two (2) years after the date of the Qualifying Diagnosis or within two (2) years after the Settlement Class Supplemental Notice is posted on the Settlement Website, whichever is later.

(g)     *Deceased Retired Players*. If a Retired Player has died and cannot now be reevaluated or seek rescoring under this Section 2.7, upon application by the Retired Player's Representative, a Special AAP Panel will determine if the Retired Player's scores and Settlement Claim file supports a new or more severe Qualifying Diagnosis once the New Method is applied.

(h)     *Appeal*. The Retired Player, NFL Parties, and Class Counsel retain the right to appeal any Monetary Award Settlement Claim determination ultimately issued as a result of Settlement Claims submitted under this Section 2.7, pursuant to Section 9.5 of the Class Action Settlement Agreement, except for on the grounds that Race Norms or Race Demographic Estimates were not used.

Section 2.8     <u>Additional AAPCs</u>.     The Parties agree that this Agreement may give rise to a need for additional AAPCs to conduct the rescoring and review processes contemplated herein. In that event, the NFL Parties and Class Counsel agree to meet and confer regarding the process for identifying and approving additional AAPCs.

Section 2.9     <u>BAP Clinician's Interpretation Guide</u>.     The Expert Panel will propose potential adjustments to the BAP Clinician's Interpretation Guide, to be agreed jointly by the NFL Parties and Class Counsel prior to implementation, that will require that the New Method be used for all neuropsychological evaluations. For the avoidance of doubt, any changes to the BAP Clinician's Interpretation Guide related to Race Norms or Race Demographic Estimates shall be consistent with the terms of this Settlement Agreement.

Section 2.10  Communication.  The Claims Administrator, in consultation with Class Counsel and the NFL Parties, will communicate the results of the Mediation, including the elimination of Race Norms and Race Demographic Estimates, to all Settlement Class Members, their attorneys, Qualified MAF Physicians, Qualified BAP Providers, AAP members, and AAPCs, and will inform them of the rescoring, reexamination, and new submission processes set forth in Sections 2.5–2.7 of this Agreement, in a form and manner to be approved by the NFL Parties and Class Counsel.  The form and manner of such communications shall be provided to Intervenors for review and comment, prior to adoption.

Section 2.11  Improved Reporting, Training, and Oversight.  The NFL Parties and Class Counsel acknowledge that the development of the New Method will require training of all Qualified MAF Physicians, neuropsychologists permitted to support MAF Claims, Qualified BAP Providers, AAP members and AAPCs, to ensure that all such individuals and entities fully understand how to apply the New Method and to make clear that Race Norming and Race Demographic Estimates—whether using Black, White, or any other Race Norms or Race Demographic Estimates—is strictly prohibited.  In addition to providing training regarding the application of the New Method, additional training will be developed with respect to the following assessments to ensure that they are properly administered, evidence-based, and do not consider race:

(a)  Assessment of Retired Players' functional impairments under the Class Action Settlement Agreement—i.e., the assignment of CDR scores; and

(b)  Assessment of the validity of Retired Players' neuropsychological test results, including the *Slick* analysis.

The training material shall also include a review of the Special Masters' controlling decisions regarding the above issues.

All such training detailed in this Section 2.11 will be developed by the Claims Administrator, with the guidance of the Expert Panel and Special Masters and the agreement of the NFL Parties and Class Counsel, and will be overseen by the Special Masters.

Section 2.12  No Further Retrospective Review.  The retrospective review of Settlement Claims and evaluations provided for in Article II with the New Method will be the full and final universe of retrospective review that occurs in relation to Race Norming or Race Demographic Estimates in the Settlement Program.  For the avoidance of doubt, the implementation of long-term Norms developed under Article III will solely be used prospectively, and will not result in additional retrospective review or rescoring of Settlement Claims or evaluations using the long-term Norms.

Section 2.13  Retention of Records by the Claims Administrator and BAP Administrator.  The Claims Administrator and BAP Administrator will maintain Retired Players'

medical records and other Settlement Program-defined forms provided to them by, or on behalf of, Retired Players for the duration of the Settlement Program.

Section 2.14    Settlement Implementation.  The Parties acknowledge that the implementation of this Agreement might give rise to issues that have not been expressly contemplated herein.  It is the intention of the Parties that the Claims Administrator, with oversight from the Special Masters, will perform its responsibilities under this Agreement and will have the authority to take all steps necessary to faithfully implement and administer this Agreement.

Section 2.15    Class Action Settlement Agreement.  The Class Action Settlement Agreement remains in full force and effect.  Unless expressly stated herein, nothing in this Agreement modifies the terms of the Class Action Settlement Agreement, including, without limitation, the requirement that Settlement Class Members must meet the Class Action Settlement Agreement's criteria for a Qualifying Diagnosis or Level 1 Neurocognitive Impairment in order to qualify for a Monetary Award or Supplemental Benefits, respectively.

Section 2.16    Najeh Davenport's Settlement Claim.  The NFL Parties will not appeal any Monetary Award Settlement Claim determination for Level 1.5 Neurocognitive Impairment that may be issued to Najeh Davenport in the Settlement Program.

### ARTICLE III
### Long-Term Norms

Section 3.1    Long-Term Norms.

(a)    The Parties agree that the Expert Panel shall continue its work to create a set of diagnostically accurate, race neutral, long-term Norms applicable to the population of NFL players based on the Expert Panel's analysis of the data gathered through the BAP and/or other available data sources, with the goal of a completion date of one (1) year from the Settlement Date.

(b)    The NFL Parties will fund the Expert Panel's continued work in developing such long-term Norms.

(c)    Once diagnostically accurate long-term Norms are developed, they will replace the New Method prospectively in the Settlement Program in accordance with the terms of this Agreement (as amended by the Parties if necessary), and the New Method will no longer be used.

(d)    The long-term Norms will only be used prospectively.  For the avoidance of doubt, there will be no retrospective review of past Settlement Claims with the long-term Norms.

**ARTICLE IV**
**Releases and Covenants**

Section 4.1    Intervenors' Release.  In consideration of the benefits described and the agreements and covenants contained in this Agreement, the Intervenors, on their own behalf and on behalf of their parents, siblings, all predecessors, successors, assigns, assignors, representatives, attorneys (including Intervenors' Counsel), agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, personal representatives, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on behalf of the Intervenors (the "Intervenor Releasors"), hereby knowingly and voluntarily waive and release, forever discharge and hold harmless the NFL/Class Counsel Released Parties, and each of them, of and from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, motions for relief, suits, demands, damages, losses, payments, judgments, extents, executions, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, variances, trespasses, obligations, or promises whatsoever, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum ("Claims") that the Intervenor Releasors, and each of them, ever had or now has, or may have in the future, that are, were, or could have been asserted in the Motion for Relief, Complaint, or Objection, including but not limited to, Claims:

(a)    premised on or regarding any purported or alleged racial classification, discrimination, inequitable treatment between individuals of different races, and/or breach of the Equal Protection Clause, 42 U.S.C. § 1981, or any similar laws, rules, or regulations regarding equal protection and treatment under the law, in connection with the Class Action Settlement Agreement, Settlement Program, BAP Clinician's Interpretation Guide, and/or this Agreement; and/or

(b)    that arise out of or relate in any way to the use, potential use, presumptive use, or contemplated use of Norms, Demographic Estimates, and/or demographic considerations in the Class Action Settlement Agreement, Settlement Program, or BAP Clinician's Interpretation Guide, including but not limited to Race Norms, Race Demographic Estimates, and/or consideration of race; and/or

(c)    that arise out of or relate in any way to the Class Action Settlement Agreement, Settlement Program, or BAP Clinician's Interpretation Guide, including but not limited to the terms, content, negotiation, development, or implementation of the Class Action Settlement Agreement, Settlement Program, or BAP Clinician's Interpretation Guide, and including but not limited to the neuropsychological test battery and diagnostic criteria set forth in the Injury Definitions of the Class Action Settlement Agreement.

For the avoidance of doubt, nothing in this Settlement Agreement shall prevent Intervenors from pursuing a claim for benefits owed or alleged to be owed under the Class

Action Settlement Agreement, the Bert Bell/Pete Rozelle NFL Player Retirement Plan, for worker's compensation, or for any other present or future program of benefits created, sponsored, or maintained by any of the NFL/Class Counsel Released Parties or by state, local or federal law, where such claim is not founded on the application, use, or potential use of Race Norms or Race Demographic Estimates.

Section 4.2     <u>Intervenors' Covenant Not to Sue</u>.  From and after the Settlement Date, for the consideration provided for herein, the Intervenors, on their own behalf and on behalf of the Intervenor Releasors, covenant, promise, and agree that they will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on their, his, her or its behalf, or on behalf of any other individual or entity, any proceeding, motion, or objection: (a) alleging or asserting any of his or her respective Intervenors' Released Claims against the NFL/Class Counsel Released Parties in any state court, federal court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the claims set forth in Sections 4.1–4.3; (b) challenging the validity of the Releases set forth in Sections 4.1–4.3; or (c) based on conduct arising out of or relating to the Intervenors' Released Claims.  To the extent any such proceeding exists in any court, tribunal or other forum as of the Settlement Date, the Intervenors, on their own behalf and on behalf of the Intervenor Releasors, covenant, promise, and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

Section 4.3     <u>Intervenors' Release of Unknown Claims</u>.  In connection with the releases in Sections 4.1–4.3, the Intervenors, on their own behalf and on behalf of the Intervenor Releasors, acknowledge that they are aware that they may hereafter discover claims now unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, with respect to actions or matters released herein.  The Intervenors, on their own behalf and on behalf of the Intervenor Releasors, explicitly took unknown or unsuspected claims into account in entering into the Agreement and it is the intention of the Parties fully, finally and forever to settle and release all claims as provided in Sections 4.1–4.3 with respect to all such matters.  Accordingly, the Intervenors, on their own behalf and on behalf of the Intervenor Releasors, hereby expressly waive any and all rights and benefits respectively conferred upon them by the provisions of Section 1542 of the California Civil Code, or any similar provision, right and benefit conferred by any law of any state or territory of the United States, or principle of common law.  Section 1542 reads in pertinent part:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Section 4.4     <u>NFL/Class Counsel's Release</u>.  In consideration of the benefits described and the agreements and covenants contained in this Agreement, the NFL Parties and

Class Counsel, on their own behalf and on behalf of all predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, beneficiaries, personal representatives, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on behalf of the NFL Parties or Class Counsel (the "NFL/Class Counsel Releasors"), hereby knowingly and voluntarily waive and release, forever discharge and hold harmless the Intervenor Released Parties, and each of them, of and from any and all Claims that the NFL/Class Counsel Releasors, and each of them, ever had or now has, or may have in the future, arising out of the filing of the Complaint, Motion for Relief, or Objection, and the Intervenor Released Parties' past public statements regarding the same up to the Settlement Date.

Section 4.5    NFL/Class Counsel's Covenant Not to Sue.  From and after the Settlement Date, for the consideration provided for herein, the NFL Parties and Class Counsel, on their own behalf and on behalf of the NFL/Class Counsel Releasors, covenant, promise, and agree that they will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on their, his, her or its behalf, or on behalf of any other individual or entity, any proceeding, motion, or objection: (a) alleging or asserting any of his or her respective NFL/Class Counsel's Released Claims against the Intervenor Released Parties in any state court, federal court, arbitration, regulatory agency, or other tribunal or forum, including, without limitation, the claims set forth in Sections 4.4–4.6; (b) challenging the validity of the releases set forth in Sections 4.4–4.6; or (c) based on conduct arising out of or relating to the NFL/Class Counsel's Released Claims.  To the extent any such proceeding exists in any court, tribunal or other forum as of the Settlement Date, the NFL and Class Counsel, on their own behalf and on behalf of the NFL/Class Counsel Releasors, covenant, promise, and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

Section 4.6    NFL/Class Counsel's Release of Unknown Claims.  In connection with the releases in Sections 4.4–4.6, the NFL Parties and Class Counsel, on their own behalf and on behalf of the NFL/Class Counsel Releasors, acknowledge that they are aware that they may hereafter discover claims now unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, with respect to actions or matters released herein.  The NFL Parties and Class Counsel, on their own behalf and on behalf of the NFL/Class Counsel Releasors, explicitly took unknown or unsuspected claims into account in entering into the Agreement and it is the intention of the Parties fully, finally and forever to settle and release all claims as provided in Sections 4.4–4.6 with respect to all such matters.  Accordingly, the NFL Parties and Class Counsel, on their own behalf and on behalf of the NFL/Class Counsel Releasors, hereby expressly waive any and all rights and benefits respectively conferred upon them by the provisions of Section 1542 of the California Civil Code, or any similar provision, right and benefit conferred by any law of any state or territory of the United States, or principle of common law.  Section 1542 reads in pertinent part:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO

EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Section 4.7    <u>Scope of Releases</u>.

(a)    Each of the Releasors intend to be legally bound by the Releases.

(b)    The Releases are not intended to prevent any of the Released Parties from exercising their rights of contribution, subrogation, or indemnity under any law.

(c)    Nothing in the Releases will preclude any action to enforce the terms of this Agreement.

(d)    The Parties represent and warrant that no promise or inducement has been offered or made for the Releases contained in this Article IV except as set forth in this Agreement and that the Releases are executed without reliance on any statements or any representations not contained in this Agreement.

(e)    Nothing in this Agreement or the Releases herein modifies or limits the releases set forth in Article XVIII of the Class Action Settlement Agreement.

## ARTICLE V
## Dismissal of Appeal

Section 5.1    Within five (5) business days of the Settlement Date, and as a condition to the Settlement, the Intervenors shall file a Joint Stipulation of Dismissal of Appeal, in the form attached as Exhibit B, which dismisses the Complaint Appeal without further costs, including claims for interest, penalties, costs, and attorneys' fees.

## ARTICLE VI
## Enforceability of Agreement and Dismissal of Claims

Section 6.1    From and after the Settlement Date, the Parties agree that the Intervenor Releasors will be permanently barred and enjoined from commencing, filing, initiating, instituting, prosecuting, and/or maintaining any judicial, arbitral, or regulatory action, or any motion for relief, against any of the NFL/Class Counsel Released Parties with respect to any and all of the Intervenors' Released Claims.  For the avoidance of doubt, nothing in this Settlement Agreement shall prevent Intervenors from pursuing a claim for benefits owed or alleged to be owed under the Class Action Settlement Agreement, the Bert Bell/Pete Rozelle NFL Player Retirement Plan, for worker's compensation, or for any other present or future program of benefits created, sponsored, or maintained by any of the NFL/Class Counsel Released Parties or by state, local or federal law, where such claim is not founded on the application, use, or potential use of Race Norms or Race Demographic Estimates.

Section 6.2    From and after the Settlement Date, this Agreement will be the exclusive remedy for any and all of the Intervenors' Released Claims by or on behalf of the Intervenor Releasors against the NFL/Class Counsel Released Parties, and the Intervenor Releasors will not recover, directly or indirectly, any sums from the NFL/Class Counsel Released Parties for the Intervenors' Released Claims other than those received for the Intervenors' Released Claims under the terms of this Agreement, if any.

Section 6.3    From and after the Effective Date, if any of the Intervenor Releasors, in violation of Section 4.2, commences, files, initiates, or institutes any new action, motion for relief, or other proceeding for any of the Intervenors' Released Claims against any of the NFL/Class Counsel Released Parties, or continues to prosecute any pending claims, or challenges the validity of the Releases, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, such action or other proceeding will be dismissed with prejudice.

Section 6.4    From and after the Settlement Date, the Parties agree that the NFL/Class Counsel Releasors will be permanently barred and enjoined from commencing, filing, initiating, instituting, prosecuting, and/or maintaining any judicial, arbitral, or regulatory action, or any motion for relief, against any of the Intervenor Released Parties with respect to any and all of the NFL/Class Counsel's Released Claims.

Section 6.5    From and after the Settlement Date, this Agreement will be the exclusive remedy for any and all of the NFL/Class Counsel's Released Claims by or on behalf of the NFL/Class Counsel Releasors against the Intervenor Released Parties, and the NFL/Class Counsel Releasors will not recover, directly or indirectly, any sums from the Intervenor Released Parties for the NFL/Class Counsel's Released Claims other than those received for the NFL/Class Counsel's Released Claims under the terms of this Agreement, if any.

Section 6.6    From and after the Effective Date, if any of the NFL/Class Counsel Releasors, in violation of Section 4.5, commences, files, initiates, or institutes any new action for any of the NFL/Class Counsel's Released Claims against any of the Intervenor Released Parties, or continues to prosecute any pending claims, or challenges the validity of the Releases, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, such action or other proceeding will be dismissed with prejudice.

## ARTICLE VII
### Denial of Wrongdoing; No Admission of Liability; No Evidence

Section 7.1    The NFL Parties and Class Counsel expressly deny that they have violated any duty to, breached any obligation to, committed any discrimination or inequitable treatment as to, or otherwise engaged in any wrongdoing with respect to the Settlement Class or any Settlement Class Member, including without limitation the Intervenors, and expressly deny the allegations advanced in the Motion for Relief, Complaint, or Objection, and any appeals or motions for reconsideration related to the foregoing, including the Motion for Relief Appeal and Complaint Appeal, and deny any and all liability related thereto.

Section 7.2    In no event will this Agreement, any of its provisions, the Mediation, the promulgation of the New Method or any revised New Method or long-term Norms, or any negotiations, statements, or court proceedings relating to its provisions, or any actions undertaken in this Agreement, in any way be construed as, offered as, received as, used as, or deemed to be: (a) evidence, admissible or otherwise, of any kind, or used in any other fashion, in any litigation, action, hearing, or any judicial, arbitral, administrative, regulatory or other proceeding for any purpose, except a proceeding to resolve a dispute arising under, or to enforce, the Agreement including any claim under Article XI; (b) an admission or concession of any liability, damages, or wrongdoing whatsoever on the part of any person or entity, including, but not limited to, the NFL Parties or Class Counsel; (c) an admission, concession, or recognition of any claim or argument advanced in the Motion for Relief, Complaint, Objection, Motion for Relief Appeal, Complaint Appeal, or any appeals or motions for reconsideration related to the foregoing; or (d) a waiver by the NFL Parties or Class Counsel of any applicable defense, claims, causes of action, or remedies, or an admission by the NFL Parties or Class Counsel that the arguments advanced in the Motion for Relief, Complaint, Objection, Motion for Relief Appeal, Complaint Appeal, or any appeals or motions for reconsideration related to the foregoing, have merit.   For the avoidance of doubt, nothing in this paragraph shall prevent Intervenors from pursuing a claim for benefits owed or alleged to be owed under the Class Action Settlement Agreement, the Bert Bell/Pete Rozelle NFL Player Retirement Plan, for worker's compensation, or for any other present or future program of benefits created, sponsored, or maintained by any of the NFL/Class Counsel Released Parties or by state, local or federal law, where such claim is not founded on the application, use, or potential use of Race Norms or Race Demographic Estimates.

## ARTICLE VIII
## Representations and Warranties

Section 8.1    <u>The Intervenors</u>.  The Intervenors represent and warrant, as of the Settlement Date, that: (i) they are empowered and authorized to sign on behalf of and bind the individuals for whom they have signed; and (ii) this Agreement constitutes the Intervenors' legal, valid, and binding obligation.

Section 8.2    <u>Class Counsel</u>.  Class Counsel represents and warrants, as of the Settlement Date, that: (i) it is empowered and authorized to sign on behalf of and bind the individuals for whom it has signed; and (ii) this Agreement constitutes Class Counsel's legal, valid, and binding obligation.

Section 8.3    <u>Intervenors' Counsel</u>.  For the purposes of Article X and Section 11.3, Intervenors' Counsel represents and warrants, as of the Settlement Date, that: (i) they are empowered and authorized to sign on behalf of and bind the individuals for whom they have signed; and (ii) this Agreement constitutes the Intervenors' Counsel's legal, valid, and binding obligation.

Section 8.4    <u>The NFL Parties</u>.  The NFL Parties represent and warrant, as of the Settlement Date, that: (i) they have all requisite corporate power and authority to execute, deliver, and perform this Agreement; (ii) the execution, delivery, and performance by the NFL

Parties of this Agreement have been duly authorized by all necessary corporate action; (iii) this Agreement has been duly and validly executed and delivered by the NFL Parties; and (iv) this Agreement constitutes the NFL Parties' legal, valid, and binding obligation.

## ARTICLE IX
### Acknowledgements and Agreements

Section 9.1    The Parties acknowledge and agree, as endorsed by the Expert Panel, that:

(a)    Demographically-adjusted test scores have long been used in standard clinical neuropsychology to avoid misdiagnosis.  Adjustments to test scores often take into account a person's age, level of education, gender, and race.  This practice was not introduced by the NFL Parties or Class Counsel, and according to the NFL Parties and Class Counsel, was recommended by experts as part of the Class Action Settlement Agreement.

(b)    The Settlement Program does not require, and has never required, the use of so-called "Race Norms."  The NFL Parties and Class Counsel represent that Heaton and Advanced Clinical Solution tests were selected for use in making Qualifying Diagnoses of neurocognitive impairment under the Class Action Settlement Agreement because these tests permitted full demographic adjustments that are widely accepted by neuropsychologists for use in the diagnosis of cognitive impairment in clinical practice.

(c)    The NFL Parties and Class Counsel represent that diagnostic accuracy is the cornerstone of the Class Action Settlement Agreement, and also represent that they followed the advice of their respective experts concerning the use of fully demographically adjusted test scores under the Class Action Settlement Agreement to make accurate Qualifying Diagnoses.

(d)    The NFL Parties and Class Counsel further represent that the use of full demographic adjustments in the Class Action Settlement Agreement was never intended by Class Counsel or the NFL Parties to be discriminatory.  The NFL Parties and Class Counsel also represent that the Expert Panel, including experts retained by the NFL Parties and Class Counsel, has analyzed a sample of nearly 700 claimants.  The Expert Panel found that use of full demographic adjustments did not have a differential impact on impairment ratings assigned to Black and White players within the Settlement Program.  Experts continue to examine this issue.

(e)    The NFL Parties have committed to fund a working group of experts to develop methods that do not reference race, specifically applicable to the population of NFL Players.  The Parties hope that this work will provide a basis for accurate diagnosis for former NFL players, and potentially beyond that.

(f)    The NFL Parties and Class Counsel were committed from the outset of the Mediation to find an alternative to the use of race in demographic adjustments in

23

the Settlement Program and acted in good faith to do so. The New Method under which Settlement Claims will be scored both prospectively and retrospectively is expressly race neutral.

Section 9.2    The NFL Parties and Class Counsel agree that the adoption of the New Method, and any changes to the Class Action Settlement Agreement required for its implementation, are a benefit to the Settlement Class and do not result in any detriment to the Settlement Class. The Parties agree that the matters set forth in this Agreement do not fundamentally change the terms of the Class Action Settlement Agreement.

## ARTICLE X
### Confidentiality

Section 10.1   Consistent with Magistrate Judge Strawbridge's July 16, 2021 order directing the Parties not to discuss the status of Mediation negotiations, the Parties agree to treat all Settlement negotiation communications as confidential information. The Parties agree that such confidentiality is a material term of the Agreement. The Parties agree not to disclose the substance or content of any settlement negotiation or mediation communications regarding this Agreement, except as required by applicable law, regulation, or by order or request of a court of competent jurisdiction, regulator, or self-regulatory organization or federal, state or local legislative body (including subpoena or document request), provided that (a) the other Parties are given prompt written notice thereof and, to the extent practicable, an opportunity to seek a protective order or other confidential treatment thereof; (b) the Party subject to such requirement or request (the "Obliged Party") cooperates fully with the other Parties in connection therewith; and (c) only such confidential information is disclosed as is legally required to be disclosed. Except as set forth herein, communications mutually agreed to in writing by the Parties will be the only exceptions to the confidentiality provisions of this Article X, provided, however, that general statements about the results of the Mediation process shall not be deemed a violation of this Section 10.1.

Section 10.2   The Intervenors and Intervenors' Counsel agree not to make any public statements, or to permit any public statements to be made on their behalf, including statements to the media (including posting any information on any social media or other internet site) that are inconsistent with the Acknowledgments and Agreements set forth in Article IX. The Intervenors shall instruct in writing all counsel who represented them at any time in connection with the Complaint, Motion for Relief, or Objection, and with whom the Intervenors remain in contact, that counsel shall not make any public statements, including statements to the media (including posting any information on any social media or other internet site) concerning the Intervenors' involvement in the Complaint, Motion for Relief, Objection, or this Agreement that are inconsistent with the Acknowledgements and Agreements in Article IX.

Section 10.3   The Intervenors and Intervenors' Counsel agree not to disparage or defame any NFL/Class Counsel Released Party with respect to the subject matter of the Complaint, Motion for Relief, or Objection, and agree to support and not disparage the

Settlement Agreement, from the Settlement Date forward. "Disparage" and "defame" shall have their meanings under the law. With respect to the Intervenors, the foregoing obligation shall only apply to acts committed with the intent to violate this Agreement.

Notwithstanding anything to the contrary, Intervenors and Intervenors' Counsel may make reference to the contents of the pleadings filed by Intervenors' Counsel in connection with the Complaint, the Objection, or the Motion for Relief in connection with the implementation of this Agreement, or to filings previously made under the Class Action Settlement Agreement, in each case provided that Intervenors and Intervenors' Counsel do not make any statements that are inconsistent with the acknowledgments and agreements set forth in Article IX of this Agreement. This includes but is not limited to statements made in any future filings or pleadings by Intervenors' Counsel and any statements made in approval, fairness or other court-sponsored proceedings or presentations, including but not limited to any motion for attorneys' fees and expenses.

Intervenors' Counsel agrees to share any written media or press statements regarding the Settlement Agreement with the NFL Parties prior to their publication. For the avoidance of doubt, any statements by Intervenors or Intervenors' Counsel that are inconsistent with the acknowledgments and agreements set forth in Article IX of this Agreement shall be a violation of this Section 10.3.

## ARTICLE XI
## Fees and Expenses

Section 11.1 All reasonable fees and expenses incurred by the Claims Administrator and BAP Administrator with respect to the Mediation process and the development of the New Method, as well as those fees and expenses that will be incurred in the implementation of the New Method following the Mediation, as set forth in this Agreement, shall be submitted to the Court for approval. The NFL Parties shall pay for, or cause to be paid, all such fees and expenses approved by the Court out of the Monetary Award Fund.

Section 11.2 With respect to fees and expenses incurred, or that will be incurred, by the BAP Administrator related to the Mediation process and the implementation of the New Method, the BAP Administrator will not be paid out of the BAP Fund. Rather, the NFL Parties will pay, or cause to be paid, the BAP Administrator separately, so as to ensure that Retired Players' BAP Fund is not depleted from the additional work undertaken to address Race Norming or Race Demographic Estimates. For the avoidance of doubt, payment for any BAP reevaluations occurring under Section 2.6, and payment for any BAP Supplemental Benefits received as a result of the implementation of the New Method, will be paid out of the BAP Fund.

Section 11.3 Intervenors' Counsel may file a motion for attorneys' fees and expenses to the Court, to which the NFL Parties reserve the right to object. In consideration of the undertakings in this Agreement, the NFL Parties agree to pay, or cause to be paid, and be responsible for all fees and expenses that the Court approves and that were sought pursuant to this Section 11.3, or that the NFL Parties and Intervenors' Counsel otherwise agree to.

# ARTICLE XII
## Miscellaneous Provisions

Section 12.1 <u>No Assignment of Claims</u>. The Intervenors have not and shall not assign any rights or claims relating to the subject matter of the Released Claims, Complaint, Motion for Relief, Objection, Complaint Appeal, or Motion for Relief Appeal. Any such assignment, or attempt to assign, to any person or entity other than the National Football League any rights or claims relating to the subject matter of the Released Claims, Complaint, Motion for Relief, Objection, Complaint Appeal, or Motion for Relief Appeal will be void, invalid, and of no force and effect. Provided that nothing in this provision will preclude contingent fee arrangements or related undertakings.

Section 12.2 <u>Integration</u>. This Agreement will constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, letters, conversations, agreements, term sheets, and understandings, whether written or oral, relating to the subject matter of this Agreement. The Parties acknowledge, stipulate, and agree that no covenant, obligation, condition, representation, warranty, inducement, negotiation, agreement, arrangement, or understanding, whether written or oral, concerning any part or all of the subject matter of this Agreement has been made or relied on except as expressly set forth in this Agreement.

Section 12.3 <u>Mutual Preparation</u>. The Parties have negotiated all of the terms and conditions of this Agreement at arm's length. Neither the Intervenors, nor any of their counsel, the NFL Parties, nor any of its counsel, or Class Counsel, will be considered to be the sole drafter of this Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement. This Agreement will be deemed to have been mutually prepared by the Parties and will not be construed against any of them by reason of authorship.

Section 12.4 <u>Modification</u>. This Agreement may be modified, varied or otherwise amended only by a writing signed by all Parties.

Section 12.5 <u>Beneficiaries</u>. This Agreement will be binding upon the Parties and will inure to the benefit of the NFL Parties, Intervenors, Intervenors' Counsel, Class Counsel, and the Released Parties, as well as all Class Members in the Class Action Settlement Agreement. No provision in this Agreement is intended to create any other third-party beneficiary to this Agreement other than those expressly referenced in this Section 12.5. Nothing expressed or implied in this Agreement is intended to or will be construed to confer upon or give any person or entity other than the NFL Parties, Intervenors, Intervenors' Counsel, Class Counsel, the Released Parties, and Class Members in the Class Action Settlement Agreement, any right or remedy under or by reason of this Agreement.

Section 12.6 <u>Execution in Counterparts</u>. This Agreement may be executed in counterparts, and a facsimile signature will be deemed an original signature for purposes of this Agreement.

Section 12.7    Force Majeure.    The Parties will be excused from any failure to perform timely any obligation hereunder to the extent such failure is caused by war, acts of public enemies or terrorists, strikes or other labor disturbances, fires, floods, acts of God, pandemics (including without limitation COVID-19), epidemics, or any causes of the like or different kind beyond the reasonable control of the Parties.

Section 12.8    Waiver.    The waiver by any Party of any breach of this Agreement by another Party will not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, of this Agreement.

Section 12.9    Choice of Law.    This Agreement and the Releases hereunder, and all claims arising out of or relating to them, will be interpreted and enforced in accordance with the laws of the State of New York, without regard to conflict of law principles.

Section 12.10   Personal Jurisdiction and Venue.    The Parties hereby consent to the exercise of personal jurisdiction by the United States District Court for the Eastern District of Pennsylvania, Judge Anita Brody (or any successor judge designated by the United States District Court for the Eastern District of Pennsylvania, or a magistrate judge designated by Judge Brody or such designated successor judge, as set forth in and pursuant to Federal Rule of Civil Procedure 72), presiding in *In re: National Football League Players' Concussion Injury Litigation*, MDL No. 2323, for any dispute arising out of or relating to this Agreement or the Releases hereunder.    The Parties agree that the United States District Court for the Eastern District of Pennsylvania, Judge Anita Brody (or any successor judge designated by the United States District Court for the Eastern District of Pennsylvania, or a magistrate judge designated by Judge Brody or such designated successor judge, as set forth in and pursuant to Federal Rule of Civil Procedure 72), presiding in *In re: National Football League Players' Concussion Injury Litigation*, MDL No. 2323, will be the exclusive venue for litigation of any such dispute.

Section 12.11   Headings.    The headings in each paragraph herein are for convenience of reference only and shall be of no legal effect in the interpretation of the terms hereof.    Any inconsistency between the headings used in the Agreement and the text of the paragraphs will be resolved in favor of the text.

Agreed to as of this 20th day of October, 2021.

NATIONAL FOOTBALL LEAGUE
By:

NFL PROPERTIES LLC
By:

SEEGER WEISS LLP
By: _____

KEVIN HENRY
By: _____
         Kevin Henry

NAJEH DAVENPORT
By: _____
         Najeh Davenport

ZUCKERMAN SPAEDER LLP
By: _____

JR WYATT LAW PLLC
By: _____

EDWARD STONE LAW P.C.
By: _____

Agreed to as of this 20th day of October, 2021.

NATIONAL FOOTBALL LEAGUE
By: _____

NFL PROPERTIES LLC
By: _____

SEEGER WEISS LLP
By: _____

KEVIN HENRY
By: _____
     Kevin Henry

NAJEH DAVENPORT
By: _____
     Najeh Davenport

ZUCKERMAN SPAEDER LLP
By: _____

JR WYATT LAW PLLC
By: _____

EDWARD STONE LAW P.C.
By: _____

Agreed to as of this 20th day of October, 2021.

NATIONAL FOOTBALL LEAGUE
By: _____

NFL PROPERTIES LLC
By: _____

SEEGER WEISS LLP
By: _____

KEVIN HENRY
By: _____
       Kevin Henry

NAJEH DAVENPORT
By: _____
       Najeh Davenport

ZUCKERMAN SPAEDER LLP
By: _____

JR WYATT LAW PLLC
By: _____

EDWARD STONE LAW P.C.
By: _____

Agreed to as of this 20th day of October, 2021

NATIONAL FOOTBALL LEAGUE
By

_____

NFL PROPERTIES LLC
By

_____

SEEGER WEISS LLP
By

_____

KEVIN HENRY
By

_____
    Kevin Henry

NAJEH DAVENPORT
By

    NAJEH DAVENPORT
_____
    Najeh Davenport

ZUCKERMAN SPAEDER LLP
By

_____

JR WYATT LAW PLLC
By

_____

EDWARD STONE LAW P C
By

Agreed to as of this 20th day of October, 2021

NATIONAL FOOTBALL LEAGUE
By: _____

NFL PROPERTIES LLC
By: _____

SEEGER WEISS LLP
By: _____

KEVIN HENRY
By: _____
      Kevin Henry

NAJEH DAVENPORT
By: _____
      Najeh Davenport

ZUCKERMAN SPAEDER LLP
By: _____

JR WYATT LAW PLLC
By: _____

EDWARD STONE LAW P.C.
By: _____

28

Agreed to as of this 20th day of October, 2021.


NATIONAL FOOTBALL LEAGUE
By:

_____


NFL PROPERTIES LLC
By:

_____


SEEGER WEISS LLP
By:

_____


KEVIN HENRY
By:

_____
    Kevin Henry


NAJEH DAVENPORT
By:

_____
    Najeh Davenport


ZUCKERMAN SPAEDER LLP
By:

_____


JR WYATT LAW PLLC
By:

_____


EDWARD STONE LAW P.C.
By:

_____

Agreed to as of this 20th day of October, 2021.

NATIONAL FOOTBALL LEAGUE
By: _____

NFL PROPERTIES LLC
By: _____

SEEGER WEISS LLP
By: _____

KEVIN HENRY
By: _____

     Kevin Henry

NAJEH DAVENPORT
By: _____

     Najeh Davenport

ZUCKERMAN SPAEDER LLP
By: _____

JR WYATT LAW PLLC
By: _____

EDWARD STONE LAW P.C.
By: _____

**EXHIBIT A:**
**EXPERT REPORT REGARDING THE NEW METHOD**

**Recommendation for Revising the Clinician's Manual for the**
**Retired NFL Football Players' Baseline Assessment Program:**
**Using Age and Education Adjusted Normative Reference Values**
**and Revised Cutoffs for Defining Low Scores**
October 19, 2021

The Baseline Assessment Program (BAP) includes a battery of neuropsychological tests and clinical rating instruments designed to provide a standardized evaluation of the cognitive functioning of retired professional football players. Section 4 of the Baseline Neuropsychology Test Battery and Specific Impairment Criteria for Retired NFL Football Players set forth in Exhibit A-2 of the Settlement Agreement (the "Test Battery") references a "user manual" to be provided to neuropsychologists setting out the cutoff scores, criteria for identifying impairment in each cognitive domain, and statistical normative data to support the impairment criteria. Consistent with general practices in the field of clinical neuropsychology, that user manual suggested using fully-demographically adjusted T scores as the normative reference values for interpreting the neuropsychological test scores. Fully demographically adjusted T scores consider a person's age, sex, level of education, and race in a regression model for deriving a normative score.

**Instructions Given to the Working Group**

The working group was instructed by the legal parties to *remove race as a variable for consideration when scoring or classifying test results from the neuropsychological evaluations* of retired National Football League (NFL) players participating in the BAP.

**Summary of Recommended Changes**

In order to remove race as a variable from scoring the neuropsychological tests, three changes to the current system are recommended. First, discontinue the use of estimating longstanding ("premorbid") functioning using the Test of Premorbid Functioning Simple and Complex equations. Instead, estimate longstanding Reading Level only using the TOPF Reading Standard Score. Second, discontinue the use of fully demographically adjusted normative reference values and replace that system with normative reference values adjusted for age and education only (when available, as described below). Third, raise the cutoff scores for defining low scores in a modest manner across reading levels and cognitive domains.

**Estimating Longstanding Reading Level**

The current methodology is to use either the Test of Premorbid Functioning (TOPF) Reading Standard Score or the TOPF Reading score combined with "simple demographics" or "complex demographics" to estimate longstanding ability. Both of the latter methods use race as one of many variables in a regression model (e.g., the "simple" model includes region of the country, sex, race, education, and occupation). The use of the regression models (i.e., "simple" or "complex" demographics) for the TOPF will be discontinued. Instead, only the TOPF Reading

45    Standard Score will ordinarily be used.[1] There are many published studies, over many years,
46    supporting the use of a reading test for this purpose, including published studies illustrating the
47    usefulness of using a reading test in evaluations with Black older adult Americans. The reading
48    score is positively correlated with neuropsychological test performance in retired NFL players,
49    meaning that, on average, those scoring higher on the reading test obtain higher scores on other
50    neuropsychological tests, and those scoring considerably lower on the reading test, on average,
51    obtain lower scores on other neuropsychological tests. The term "premorbid" functioning will
52    not be used in the algorithms for defining impairment. Instead, the term "reading level" will be
53    used (i.e., Below Average Reading Level, Average Reading Level, and Above Average Reading
54    Level).
55
56    **Using Age- and Education-Adjusted Normative Scores**
57
58    For the subtests from the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) and the
59    Wechsler Memory Scale-Fourth Edition (WMS-IV), use age- and education-adjusted T scores
60    instead of fully demographically adjusted T scores. The normative sample for the Expanded
61    Halstead-Reitan Neuropsychological Battery (E-HRNB) currently used for deriving normative
62    scores for the Trail Making Test (Parts A and B), Controlled Word Association Test (Letter
63    Fluency, F-A-S) and Category Fluency (Animal Naming), Boston Naming Test, and the Booklet
64    Category Test, will be discontinued for all tests except the BDAE Complex Ideation Test. For
65    the other tests, meta-norms from Mitrushina et al. (2005)[2] will be used.
66
67    For one test in the BAP battery, the Boston Diagnostic Aphasia Exam Complex Ideational
68    Material subtest, the E-HRNB normative T scores can continue to be used. As indicated on page
69    20 (Table 4) of the professional manual, no Black adults were included in the normative sample
70    for that test, so the demographically adjusted T scores do not include race as a variable in
71    norming. Therefore, these norms are identical for both racial groups (and no suitable alternative
72    norms have been identified). This test is not included in the Mitrushina et al. (2005) handbook,
73    and meta-normative data for this test are not available. Therefore, the E-HRNB normative
74    reference values will be retained.
75

---

[1] The TOPF Reading Standard Score should not be used for choosing an algorithm when the examiner has a strong indication from the patient's history, behavioral observations, and other language test results suggesting that an acquired language disorder or severe learning disability is present. Moreover, if English was learned as a second language in adulthood, the TOPF Reading Standard Score need not be relied upon for choosing an algorithm. If a clinician documents a person's reading score to be fundamentally inaccurate and not representative of his longstanding reading ability, that person could be classified as having "Average Reading Level" for the purpose of applying the algorithms below. Having poor reading skills, or a possible mild learning disability, is not a rationale for classifying a person in a higher reading level (i.e., from Below Average to Average Reading Level). However, a clinician can use clinical judgement in cases of severe language-based learning disability (i.e., severe dyslexia) to use the Average Reading Level algorithms.

[2] Mitrushina M, Boone KB, Razani J, D'Elia LF. Handbook of normative data for neuropsychological assessment. 2nd ed. New York, NY: Oxford University Press; 2005.

Page **2** of **6**

**Specific Steps for Classifying Levels of Cognitive Impairment**

76

77

78  The specific steps illustrating the recommended changes are set out below.

79

80  1)  Classification of reading level is determined based on the **TOPF Reading Standard Score**
81      using the 3 classifications below.
82      a)  TOPF Standard Score < 90 = Below Average Reading Level.
83      b)  TOPF Standard Score 90 - 109 = Average Reading Level.
84      c)  TOPF Standard Score ≥ 110 = Above Average Reading Level.

85

86  2)  Use T-distribution scores (i.e., "T scores"), adjusted for age and education, to summarize
87      neuropsychological test performance. There are 3 tests for which the Mitrushina et al. meta-
88      norms adjust for age only, as described below.
89      a)  Use age and education norms provided by the Advanced Clinical Solutions software
90          package for the WAIS-IV and WMS-IV tests included in the battery.
91      b)  Use meta-norms from Mitrushina et al. (2005) that are based on age and education for the
92          other tests included in the battery with the exceptions listed below. Age and education
93          adjusted meta-norms are used for Trail Making Test, Part A, Trail Making Test, Part B,
94          and the Controlled Oral Word Association, Letter Fluency (F-A-S) test.
95          i)  Mitrushina meta-norms are not available for the Boston Diagnostic Aphasia Exam
96              Complex Ideational Material subtest. The Expanded Halstead-Reitan
97              Neuropsychological Battery norms can continue to be used for this test. The
98              demographically adjusted T scores for this test do not include race as a variable in
99              norming.
100         ii) Mitrushina meta-norms for the Boston Naming Test, the Category Test, and the
101             Controlled Oral Word Association Category Fluency (Animal Naming) Test include
102             age, but not education adjustments, because education was not an important predictor
103             of test scores in the meta-regression equations—and thus the authors did not
104             recommend an education adjustment to the meta-norms.

105

106 3)  In the tables below, there are no changes to the structure of the performance classification
107     algorithms, as set out in the current Clinician's Manual. The changes to the cutoffs for
108     defining low scores were informed by statistical analyses of data from retired players who
109     have undergone evaluations, knowledge of base rates of low scores among adults in
110     normative samples, and clinical judgement. Slight adjustments could occur if errors are found
111     as a result of the final verification process.

112

113 4)  The algorithms for classifying cognitive impairment within each cognitive domain,
114     stratified by reading level, are provided in Tables 1-3 below.

115

116    **Table 1. Impairment Criteria: Below Average Reading Level**
117

| Complex Attention and Processing Speed (6 test scores) |
| --- |
| 1.   Level 1 Impairment: 3 or more scores below a T score of 37 |
| 2.   Level 1.5 Impairment: 4 or more scores below a T score of 37; or meet for Level 1 and 2 scores below a T score of 32 |
| 3.   Level 2 Impairment: 3 or more scores below a T score of 32 |
| **Learning and Memory (6 test scores)** |
| 1.   Level 1 Impairment: 3 or more scores below a T score of 37 |
| 2.   Level 1.5 Impairment: 4 or more scores below a T score of 37; or meet for Level 1 and 2 scores below a T score of 32 |
| 3.   Level 2 Impairment: 3 or more scores below a T score of 32 |
| **Visual-Perceptual (3 test scores)** |
| 1.   Level 1 Impairment: 3 or more scores below a T score of 39 |
| 2.   Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 37 |
| 3.   Level 2 Impairment: 3 or more scores below a T score of 37 |
| **Language (3 test scores)** |
| 1.   Level 1 Impairment: 3 or more scores below a T score of 39 |
| 2.   Level 1.5 Impairment: meet for Level 1 and 2 scores below a T score of 37 |
| 3.   Level 2 Impairment: 3 or more scores below a T score of 37 |
| **Executive Function (4 test scores)** |
| 1.   Level 1 Impairment: 2 or more scores below a T score of 37 |
| 2.   Level 1.5 Impairment: 3 or more scores below a T score of 37; or meet for Level 1 and 1 score below a T score of 32 |
| 3.   Level 2 Impairment: 2 or more scores below a T score of 32 |

118
119

120 **Table 2. Impairment Criteria: Average Reading Level**
121

| Complex Attention and Processing Speed (6 test scores) |
| --- |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 38 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 38; or meet for Level 1 and 1 score below a T score of 33 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 33 |
| **Learning and Memory (6 test scores)** |
| 1.  Level 1 Impairment: 3 or more scores below a T score of 38 |
| 2.  Level 1.5 Impairment: 4 or more scores below a T score of 38; or meet for Level 1 and 1 score below a T score of 33 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 33 |
| **Visual-Perceptual (3 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 40 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 40; or meet for Level 1 and 1 score below a T score of 38 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 38 |
| **Language (3 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 40 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 40; or meet for Level 1 and 1 score below a T score of 38 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 38 |
| **Executive Function (4 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 38 |
| 2.  Level 1.5 Impairment: 3 or more scores below a T score of 38; or meet for Level 1 and 1 score below a T score of 33 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 33 |

122
123

124    **Table 3. Impairment Criteria: Above Average Reading Level**

125

| |
|---|
| **Complex Attention and Processing Speed (6 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 38 |
| 2.  Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 40 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 38 |
| **Learning and Memory (6 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 38 |
| 2.  Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 40 |
| 3.  Level 2 Impairment: 3 or more scores below a T score of 38 |
| **Visual-Perceptual (3 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 43 |
| 2.  Level 1.5 Impairment: 3 scores below at T score of 43; or meet for Level 1 and 1 score below a T score of 40 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 40 |
| **Language (3 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 43 |
| 2.  Level 1.5 Impairment: 3 scores below at T score of 43; or meet for Level 1 and 1 score below a T score of 40 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 40 |
| **Executive Function (4 test scores)** |
| 1.  Level 1 Impairment: 2 or more scores below a T score of 40 |
| 2.  Level 1.5 Impairment: meet for Level 1 and 3 or more scores below a T score of 40; or meet for Level 1 and 1 score below a T score of 33 |
| 3.  Level 2 Impairment: 2 or more scores below a T score of 33 |

126

127

**EXHIBIT B:**
**JOINT STIPULATION OF DISMISSAL OF APPEAL**

# In the United States Court of Appeals for the Third Circuit

---

No. 21-1434

KEVIN HENRY and NAJEH DAVENPORT,
on behalf of themselves and all others
similarly situated, APPELLANTS

*v.*

NATIONAL FOOTBALL LEAGUE and NFL
PROPERTIES LLC, successor-in-interest to
NFL Properties, Inc., APPELLEES

---

**JOINT STIPULATION OF DISMISSAL OF APPEAL**

---

Pursuant to Federal Rule of Appellate Procedure 42(b) and the parties' settlement, appellants KEVIN HENRY and NAJEH DAVENPORT, and appellees National Football League and NFL Properties LLC do hereby stipulate and agree that appellants' appeal is voluntarily dismissed, with each side to bear its own costs and attorney's fees.

Respectfully submitted,

_____
  /S/ [Draft]
CYRIL V. SMITH
ZUCKERMAN SPAEDER LLP
*100 E. Pratt Street, Suite 2440*
*Baltimore, MD 21202*
*(410) 332-0444*
*csmith@zuckerman.com*
AITAN D. GOELMAN
EZRA B. MARCUS
ZUCKERMAN SPAEDER LLP
*1800 M Street, 10th Floor*
*Washington, DC 20036*
*(202) 778-1800*
*agoelman@zuckerman.com*
*emarcus@zuckerman.com*

_____
  /S/ [Draft]
EDWARD S. STONE
EDWARD STONE LAW P.C.
*300 Park Avenue, 12th Floor*
*New York, New York 10022*
*(203) 504-8425*
*eddie@edwardstonelaw.com*

_____
  /S/ [Draft]
JUSTIN R. WYATT
JR WYATT LAW PLLC
*49 West 37th Street, 7th Floor*
*New York, New York 10018*
*(215) 557-2776*
*justin@jrwyattlaw.com*
*Counsel for Appellants*

/S/ [Draft]
_____

BRAD S. KARP
BRUCE BIRENBOIM
LYNN B. BAYARD
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, New York 10019*
*Counsel for Appellees*

[INSERT DATE HERE]

# CERTIFICATE OF SERVICE

I, Cyril V. Smith, counsel for appellants and a member of the Bar of this Court, certify that, on [INSERT DATE], a copy of the Joint Stipulation of Dismissal of Appeal was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

                           /S/ [Draft]_____

                          CYRIL V. SMITH