# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ERRICT RHETT, EDDIE KENNISON, III, KENDEL SHELLO, REGINALD FREEMAN, REGINALD NELSON, EDWARD JOHNSON, III, KARL HANKTON, GABE NORTHERN, ELLIOTT JACKSON, JR., JUSTIN JENKINS, MARCUS GARRETT, ARNOLD MILLER, JAMES DAVIS, HENRIETTA DAVIS, BRANDON WINEY, EDDIE FULLER, BRADLEY SAMS, CARLOS PENNYWELL, CHRIS CARRIER, CHRISTOPHER WHITE and RODNEY PHILLIPS, individually and on behalf of all others similarly situated<br>Plaintiffs,<br><br>vs.<br><br>NATIONAL FOOTBALL LEAGUE, RIDDELL, INC. d/b/a RIDDELL SPORTS GROUP, INC., ALL AMERICAN SPORTS CORPORATION d/b/a RIDDELL/ALL AMERICAN, and RIDDELL SPORTS GROUP, INC.<br>Defendants. | CIVIL ACTION NO.<br>JURY TRIAL DEMANDED |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CLASS ACTION COMPLAINT AND REQUEST FOR JURY TRIAL

NOW INTO COURT, come plaintiffs, ERRICT RHETT, EDDIE KENNISON, III, KENDEL SHELLO, REGINALD FREEMAN, REGINALD NELSON, EDWARD JOHNSON, III, KARL HANKTON, GABE NORTHERN, ELLIOTT JACKSON, JR., JUSTIN JENKINS, MARCUS GARRETT, ARNOLD MILLER, JAMES DAVIS, HENRIETTA DAVIS, BRANDON WINEY, EDDIE FULLER, BRADLEY SAMS, CARLOS PENNYWELL, CHRIS CARRIER, CHRISTOPHER WHITE and RODNEY PHILLIPS, who, by and through counsel, bring this action against Defendants National Football League ("NFL"), Riddell, Inc., d/b/a

1

Riddell Sports Group, Inc., All American Sports Corporation d/b/a Riddell/All American, and Riddell Sports Group, Inc. ( collectively, "Riddell") and allege the following upon information and belief and investigation of counsel:

## NATURE OF THE ACTION

1.

This action seeks to recover damages for injuries sustained by the Plaintiffs as the direct and proximate result of the wrongful conduct of the Defendants in connection with the failure to take effective action to protect players and/or failure to inform players of the true risks associated with concussions, brain injury, and brain trauma.

2.

The NFL, or the "League," is America's most successful and popular sports league. The League is a multi-billion dollar business comprised of 32 member teams. With so much money at stake, the NFL is and always has been eager to avoid negative publicity and protect the product on the field. As a result, the NFL regulates just about everything as it pertains to its' member teams. The NFL regulates league policies, player appearance, marketing, and safety, among other items.

3.

Football is unquestionably a tough, aggressive, physically demanding sport. Injuries are common. As such, it is vital to the safety of the players that the NFL act reasonably, through research, studies, and other means, to identify the risks of serious injury associated with playing professional football; to keep the teams and players informed of the risks that they identify; and to take reasonable steps based upon their findings to protect their players. Aware of this responsibility, the NFL, through its own initiative, created the Mild Traumatic Brain Injury

("MTBI") Committee in 1994 to research and presumably to look to improve problems related to concussions in the league.

4.

The rash of head injuries has been noted in a wide variety of news articles and television segments, and was addressed recently by the League in an announcement that it would clamp down on illegal blows to the head. But, as previously alluded to, this spate of head injuries is not a new problem at all. For decades, the League's players have been plagued by the devastating effects of concussions.

5.

Despite overwhelming medical evidence that on field concussions led directly to brain injuries and frequently had tragic repercussions for retired players, the NFL not only failed to take effective action in an attempt to protect players from suffering a similar fate, but reprehensibly failed to inform players of the true risks associated with concussions, instead misrepresenting and/or concealing medical evidence on the issue through its "hand-picked" committee of unqualified physicians who were purportedly researching same. While athletes in other professional sports who had suffered concussions were being effectively "shut down" for a long period of time or full seasons, NFL protocol was to return players who had suffered a concussion to the playing field in that very game.

6.

The NFL has not taken an issue that requires the utmost attention very seriously. Wanting their players on the field instead of training tables, and in an attempt to protect a multi-billion dollar business, the NFL has purposefully attempted to obfuscate the issue and has repeatedly refuted the connection between concussions and brain injury to the disgust of Congress, which has blasted the NFL's handling of the issue on multiple occasions, and expert neurologists who know the score. The unfortunate reality is that in the 17 years since its formation, the MTBI has

3

served as nothing short of a roadblock to any real attempt to protect NFL players from concussions and resultant brain injury. In fact, the committee's concealment and misrepresentation of relevant medical and study information over the years has caused an increased risk of life-threatening injury to players who were being kept in the dark.

7.

At the end of the day, the NFL has not only failed to satisfy its duty to take the reasonable steps necessary to protect players from devastating head injuries, they have done everything in their power to hide the issue and mislead the players concerning the risks associated with concussions.

## JURISDICTION AND VENUE

8.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a different State than that of one of the Defendants.

9.

This Court has personal jurisdiction over the Defendants because the Defendants do business in the State of Louisiana and this judicial district, and because the Defendants derive substantial revenue from their contacts with the State of Louisiana and this judicial district.

10.

Venue is proper in this District pursuant to 28 U.D.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this jurisdiction, because the Defendants conduct substantial business in this jurisdiction, and because Plaintiffs sustained damages in this jurisdiction.

## PARTIES

### 11.

Plaintiff Errict Rhett is an adult resident of the State of Florida. Plaintiff Errict Rhett played in the NFL for the Tampa Bay Bucaneers, Baltimore Ravens, and Cleveland Browns, all member clubs of the League.

### 12.

Plaintiff Eddie Kennison, III is an adult resident of the State of Kansas. Plaintiff Eddie Kennison, III played in the NFL for the St. Louis Rams, New Orleans Saints, Chicago Bears, Denver Broncos and Kansas City Chiefs, all member clubs of the League.

### 13.

Plaintiff Kendel Shello is an adult resident of the State of Louisiana. Plaintiff Kendel Shello played in the NFL for the Indianapolis Colts, Oakland Raiders and San Diego Chargers, all member clubs of the League.

### 14.

Plaintiff Reginald Freeman is an adult resident of the State of Florida. Plaintiff Reginald Freeman played in the NFL for the New Orleans Saints and the Jacksonville Jaguars, all member clubs of the League.

### 15.

Plaintiff Reginald Nelson is an adult resident of the State of Louisiana. Plaintiff Reginald Nelson played in the NFL for the Jacksonville Jaguars, San Diego Chargers, Minnesota Vikings, Greenbay Packers, Frankfurt Galaxy and Barcelona Dragons, all member clubs of the League or its affiliates.

16.

Plaintiff Edward Johnson, III is an adult resident of the State of Maryland. Plaintiff Edward Johnson, III played in the NFL for the Washington Redskins and the Cleveland Browns, all member clubs of the League.

17.

Plaintiff Karl Hankton is an adult resident of the State of Louisiana. Plaintiff Karl Hankton played in the NFL for the Washington Redskins, Philadelphia Eagles and the Carolina Panthers, all member clubs of the League.

18.

Plaintiff Gabe Northern is an adult resident of the State of Texas. Plaintiff Gabe Northern played in the NFL for the Minnesota Vikings and Buffalo Bills, all member clubs of the League.

19.

Plaintiff Elliott Jackson, Jr. is an adult resident of the State of Louisiana. Plaintiff Elliott Jackson, Jr. played in the NFL for the Chicago Bears, a member club of the League.

20.

Plaintiff Justin Jenkins is an adult resident of the State of Mississippi. Plaintiff Justin Jenkins played in the NFL for the Philadelphia Eagles and the Buffalo Bills, all member clubs of the League.

21.

Plaintiff Marcus Garrett is an adult resident of the State of Louisiana. Plaintiff Marcus Garrett played in the NFL for the Cincinnati Bengals, a member club of the League.

22.

Plaintiff Arnold Miller is an adult resident of the State of Louisiana. Plaintiff Arnold Miller played in the NFL for the Carolina Panthers and Cleveland Browns, all member clubs of the League.

23.

Plaintiff James Davis is an adult resident of the State of Louisiana. Plaintiff James Davis played in the NFL for the Oakland Raiders, a member club of the League.

24.

Plaintiff Henrietta Davis is the spouse of James Davis. Plaintiff Henrietta Davis is an adult resident of the State of Louisiana.

25.

Plaintiff Brandon Winey is an adult resident of the State of Louisiana. Plaintiff Brandon Winey played in the NFL for the Miami Dolphins, Denver Broncos, Washington Redskins and New York Giants, all member clubs of the League.

26.

Plaintiff Eddie Fuller is an adult resident of the State of Louisiana. Plaintiff Eddie Fuller played in the NFL for the Buffalo Bills, a member club of the League.

27.

Plaintiff Bradley Sams is an adult resident of the State of Louisiana. Plaintiff Bradley Sams played in the NFL for the Baltimore Ravens and Kansas City Chiefs, all member clubs of the League.

28.

Plaintiff Carlos Pennywell is an adult resident of the State of Louisiana. Plaintiff Carlos Pennywell played in the NFL for the New England Patriots, a member club of the League.

29.

Plaintiff Chris Carrier is an adult resident of the State of Louisiana. Plaintiff Chris Carrier played in the NFL for the Indianapolis Colts and Arizona Cardinals, all member clubs of the League.

30.

Plaintiff Christopher White is an adult resident of the State of Texas. Plaintiff Christopher White played in the NFL for the Jacksonville Jaguars, Atlanta Falcons and Dallas Cowboys, all member clubs of the League.

31.

Plaintiff Rodney Phillips is an adult resident of the State of Mississippi. Plaintiff Rodney Phillips played in the NFL for the Los Angeles Rams and St. Louis Cardinals, all member clubs of the League.

32.

Defendant National Football League ("NFL") is a nonprofit, non-incorporated entity organized and existing under the laws of the State of New York, with its principal place of business at 280 Park Avenue, 15 Floor, New York, NY 10017. The National Football League is not, and has not, been the employer of Plaintiffs, who were employed by independent clubs, during their respective careers in professional football.

33.

Defendant Riddell, Inc., d/b/a Riddell Sports Group, Inc. is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business at 3670 North Milwaukee Avenue, Chicago, IL 60641. Riddell Sports Group designs, manufactures, markets, sells, and distributes football helmets and other equipment, and since 1989 has been the official helmet of the NFL.

34.

Defendant All America Sports Corporation, d/b/a Riddell/All America is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 669 Sugar Lane, Elyria, OH 44035. Riddell/All America designs, manufactures,

markets, sells, and distributes football helmets and other equipment, and since 1989 has been the official helmet of the NFL.

35.

Defendant Riddell Sports Group, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 6225 North State Highway 161, Suite 300, Irving, TX 75038. Riddell Sports Group, Inc. designs, manufactures, markets, sells, and distributes football helmets and other equipment, and since 1989 has been the official helmet of the NFL.

36.

Defendants Riddell, Inc., d/b/a Riddell Sports Group, Inc.; All America Sports Corporation, d/b/a Riddell/All America; and Riddell Sports Group, Inc. are collectively referred to as "Riddell," and the NFL and Riddell are collectively referred to as "Defendants."

**MASS ACTION AND JOINDER ALLEGATIONS**

37.

Joinder is permissible under Fed. R. Civ. P. 20(a) in that the claims alleged herein arise out of the same occurrences, and questions of law and/or fact common to all Plaintiffs arise in this action.

38.

Common questions of law and fact will arise in this action, including but not limited to the following:

(a)     Whether the NFL, through its own voluntary undertaking, was negligent in its response to the health effects of repetitive traumatic brain injuries and/or concussions sustained by the Plaintiffs during NFL games, practices and other activities;

(b)     Whether the NFL conspired to defraud the Plaintiffs by ignoring and/or misrepresenting the risks of repetitive traumatic brain injuries and/or

9

concussions sustained by the Plaintiffs during NFL games, practices and other activities; and

(c)  Whether the repetitive traumatic brain injuries and/or concussions sustained by the Plaintiffs during NFL games, practices and other activities cause, among other things, latent neurodegenerative brain disorders, memory loss, and brain disease.

## FACTUAL ALLEGATIONS

39.

The NFL oversees America's most popular sport, football, and acts as a trade association for 32 franchise owners. The NFL has grown dramatically since its inception.  In 1920, eleven teams formed the American Professional Football League. In 1922, the league changed its name to the National Football League. In 1936, the NFL held its first draft.  The NFL is currently comprised of 32 teams. The NFL's average attendance per game was 67,509 in 2009.

40.

In 1959, six teams formed the American Football League ("AFL").  The AFL became a significant rival of the NFL. This rivalry helped increase the popularity of professional football in America. During this period, football became America's favorite sport, surpassing baseball. In 1967, the leagues held a championship game between the NFL and AFL champions. This game later became known as Super Bowl I.

41.

In 1970, the NFL and the AFL officially merged. Following the merger, the NFL entered a new age of growth and prosperity.  Other than the short-lived United States Football League, the NFL has had no major competitor, and it has profited enormously from a monopoly on professional football in America.

42.

The NFL governs and promotes the game of football, sets and enforces rules and league policies, and regulates team ownership. It generates revenue mostly through marketing

sponsorships, licensing merchandise, and by selling national broadcasting rights to games. The teams share a percentage of the league's overall revenue.

43.

NFL league revenues far exceed any other sports league. Frequently surpassing $7 billion annually, the NFL experienced its third most profitable year in 2008, earning some $7.6 billion. A substantial part of the NFL's revenue comes from broadcasting deals. The NFL currently has a $1.1 billion deal with ESPN, a $1 billion deal with DirecTV, a $650 million deal with NBC, a $712.5 million deal with Fox, and a $622.5 million deal with CBS. The NFL also generates substantial revenue from advertising. The NFL currently has a $2.3 billion deal with Pepsi, a $1.2 billion deal with Anheuser-Busch, $1.1 billion deal with Nike, a $720 million deal with Verizon, and a $45 million per year deal with Gatorade.

44.

The NFL distributes some of its revenues, around $4 billion annually, to its member teams. A *Forbes* magazine article recently stated that 19 NFL franchises are worth $1 billion or more. Even the lowest-valued of the 32 NFL teams is worth approximately $800 million. Over the last 15 years, the values of franchises in the NFL have gone up 500 percent.

45.

The NFL also exerts nearly total control and influence over the way football is played and understood at all levels, from youth football leagues through college. As current NFL Commissioner Roger Goodell has explained, "the NFL is fortunate to be the most popular spectator sport in America. In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football every year; more than one million high school players also do so and nearly seventy five thousand collegiate players as well. We must act in their best interests even if these young men never play professional football."

11

46.

In growing the sport, the NFL has explicitly relied on violence. The recent controversy surrounding former New Orleans Saints defensive coordinator Gregg Williams speaks loudly about the culture of the NFL. For many years and for several different teams, Williams ran a bounty program that paid players for purposefully injuring opponents. In fact, in January 2012, before a playoff game against the San Francisco 49ers, Williams deliberately encouraged his players to injure the 49ers. One of his favorite slogans was "kill the head and the body will die." Williams went after specific players as well. "We've got to do everything in the world to make sure we kill Frank Gore's head. We want him running sideways. We want his head sideways." As to Kyle Williams, who had recently suffered a concussion, Greg Williams said, "we need to find out in the first two series of the game, that little wide receiver, No. 10, about his concussion. We need to f@@@king put a lick on him right now."

47.

There is nothing new or unique about what Gregg Williams said. Although the NFL has now punished Gregg Williams and the Saints, for almost its entire history the NFL has glorified violent hits. For example, the NFL and its partners have produced and sold a number of films that glorify the most violent hits in the NFL, the vast majority of which involve hits to the head. One such film, released in 1992, is titled "The Best of Thunder and Destruction – NFL's Hardest Hits." The front cover of the VHS tape shows one player striking the back of an opponent's head and another player pulling the facemask of the same opponent.

48.

The NFL has deliberately promoted violent hits, and it has encouraged its players to think of themselves as gladiators. As described on the back cover of the same VHS tape, the NFL invites fans to "discover the areas of the playing field where thunder and destruction never let up; places like 'The Pit' where lineman lock horns like ancient gladiators. There's also the pass

pocket; the target of the king-sized quarterback crushers seeking to 'KO' the quarterback." The NFL has encouraged its players to get bigger, stronger, and faster. It has encouraged them to do whatever it takes to win, including "knocking out a quarterback" and bringing "thunder and destruction" with every hit. This gladiator mentality may have allowed the NFL to generate enormous profits, but it has left its players with serious life-altering injuries, including various degrees of brain damage.

49.

The true cost of the NFL's gladiator mentality is revealed by this long history of medical research demonstrating the long-term health problems of concussions. Donned with armor that consists of plastic helmets and padding, the NFL encourages its players to believe that they are invincible. But the truth is that an NFL player is not a gladiator, and he is certainly not invincible. Just like anyone else, an NFL player is human, and the human brain is nothing more than soft jelly-like tissue easily susceptible to permanent damage.

50.

According to a recent *Wall Street Journal Article*, the NFL has spent nearly $5.5 million on lobbying firms since 2006, tripling its lobbying expenses over the previous four years. The lobbying firms "address a host of issues from player concussions to Internet gambling to cable and satellite television matters and labor issues."

51.

Owing in part to its immense financial power and monopoly status in American football, the NFL has assumed enormous influence over the research and education of football injuries to physicians, trainers, coaches, and amateur football players at all levels of the game.

13

52.

Indeed, the website www.nflhealthandsafety.com states that USA Football, the sport's national governing body, "is the Official Youth Football Development Partner of the NFL and the NFL Players' Association. ("NFLPA"). The independent non-profit organization leads the development of youth, high school and international amateur football. In addition, USA Football operates programs and builds resources to address key health and safety issues in partnership with leading medical organizations. The organization was endowed by the NFL and NFLPA through the NFL Youth Football Fund in 2002. USA Football stands among the leaders in youth sports concussion education, particularly for football."

53.

Until March of 2011, all NFL players were members of a union called the National Football League Players Association ("NFLPA"). The NFLPA negotiates the general minimum contract for all players in the League with the National Football League Management Council ("NFLMC"). This contract is called the Collective Bargaining Agreement ("CBA") and it is the central document that governs the negotiation of individual player contracts for all of the 24 League's players. However, the NFL retired players have not been the subject of or a party to the CBA.

54.

Plaintiffs are retirees and not signatories to the CBA, nor are they the subject of or a party to an agreement between the NFL and the NFLPA. Plaintiffs' claims are not preempted by federal labor law since the CBA does not apply to their claims.

55.

Riddell designs, manufactures, markets, sells, and distributes football helmets and other football equipment. Since 1989, Riddell has worked with the NFL on helmets as the "official

helmet of the NFL," and it publicly touts its' innovation and research in the advancement of football equipment.

## THE NATURE OF HEAD INJURIES SUFFERED BY NFL PLAYERS

56.

The Plaintiff-Players played in the NFL. None received any information from the NFL about the long-term health problems of concussions before they joined the league. Nor did they receive such information while they were playing or after they retired.

57.

Each of the Plaintiff-Players has suffered brain damage that resulted from concussions and other brain injuries that occurred while they played in the NFL. That brain damage has caused Plaintiff-Players to suffer physically and mentally, including severe headaches, dizziness, memory loss, emotional liability, depression, loss of executive functioning, and economic harm. Plaintiff-Players will continue to suffer as the brain damage is likely to worsen as they age. Because of the NFL's misconduct, the Plaintiff-Players did not learn about the cause of their injuries or the full extent of the injuries until well after they had occurred.

58.

The Plaintiff-Spouses have also suffered injuries. Each has been deprived of the full benefit of their marriages, had to pay out-of-pocket for the medical and household care of their husbands, and has been deprived of the full earning potential of their husbands. Plaintiff-Spouses will continue to suffer as their husbands' injuries will worsen as they age.

59.

The American Association of Neurological Surgeons defines a concussion as "a clinical syndrome characterized by an immediate and transient alteration in brain function, including an alteration of mental status and level of consciousness, resulting from mechanical force or trauma."

15

60.

The injury generally occurs when the head either accelerates rapidly and then is stopped, or is spun rapidly. The results frequently include confusion, blurred vision, memory loss, nausea, and, sometimes, unconsciousness.

61.

Dr. Wise Young, a neurosurgery professor at New York University, described concussion as follows: "Picture your brain as a hunk of Jell-O floating in a bowl; your cranium. When you get hit in the head, the bowl suddenly shifts and the Jell-O bangs against the side, then rebounds and bangs against the other side. At the same time, the Jell-O is twisted and wrenched. This smashing, jiggling, and torquing of the brain causes strains and tears, snapping blood vessels, killing brain cells (neurons) and shearing the delicate connections (axons) that link this incredibly complex cerebral telephone system." Further, "when somebody is severely injured, you see breaks of the axons and nerve fibers all over the brain."

62.

Medical evidence has shown that symptoms of a concussion can reappear hours or days after the injury, indicating that the injured party had not healed from the initial blow.

63.

According to neurologists, once a person suffers a concussion, he is as much as four times more likely to sustain a second one. Additionally, after several concussions, a lesser blow may cause the injury, and the injured player requires more time to recover.

64.

Clinical and neuropathological studies by some of the nation's foremost experts demonstrate that multiple concussions sustained during an NFL player's career cause severe cognitive problems such as depression and early-onset dementia.

65.

Chronic Traumatic Encephalopathy ("CTE") is a progressive degenerative disease of the brain found in athletes (and others) with a history of repetitive concussions. Conclusive studies have shown this condition to be prevalent in retired professional football players who have a history of head injury.

66.

This head trauma, which includes multiple concussions, triggers progressive degeneration of the brain tissue. These changes in the brain can begin months, years, or even decades after the last concussion or end of active athletic involvement. The brain degeneration is associated with memory loss, confusion, impaired judgment, paranoia, impulse control problems, aggression, depression, and eventually, progressive dementia.

67.

For more than 100 years, literature available to the public has posited that traumatic head injuries have a causal connection with many symptoms associated with, and leading to a diagnosis of, ALS. ALS is a disease characterized by a degeneration of the neurons in the brain. Published literature has reported that repeated head trauma is a significant risk factor for neurodegenerative processes, including ALS. The incidence and mortality of ALS is statistically higher in athletes who suffer repeated head trauma.

68.

Not surprisingly, the University of North Carolina's Center for the Study of Retired Athletes published survey-based papers in 2005 through 2007 that found a clear correlation between NFL football and depression, dementia, and other cognitive impairment.

69.

To date, neuroanatomists have performed autopsies on 13 former NFL players who died after exhibiting signs of degenerative brain disease. Twelve of these players were found to have suffered from CTE.

## THE DEFICIENT RESPONSE TO THE CONCUSSION ISSUE

70.

The NFL's concussion problem is not new. In 1994, well after Riddell had partnered with the NFL to become the "official helmet of the NFL," and following the well-publicized retirements of NFL players Al Toon and Merrill Hodge, both of whom had sustained serious head injuries while playing and developed post-concussion syndrome, then-NFL Commissioner Paul Tagliabue established the Mild Traumatic Brain Injury ("MTBI") Committee to study, among other things, post- concussion syndrome in NFL players.

71.

The NFL affirmatively assumed a duty to use reasonable care in the study of post-concussion syndrome, and to use reasonable care in the publication of data from the MTBI Committee's work.

72.

Rather than exercising reasonable care in these duties, the NFL immediately engaged in a long-running course of negligent conduct.

73.

Instead of naming a noted neurologist to chair the newly formed committee or, at least, a physician with extensive training and experience treating head injuries, Tagliabue appointed a puppet, Dr. Elliot Pellman, to this post.

18

74.

Dr. Pellman, a rheumatologist with training in the treatment of joints and muscles, not head injuries, would go on to chair the MTBI Committee from 1994 to 2007. Dr. Pellman's leadership of this committee came under frequent harsh criticism for his deficient medical training, background, and experience to head the committee and lead its research efforts, not to mention his bias.

75.

By 1994, when the NFL's committee was formed, scientists and neurologists alike were already convinced that all concussion – even seemingly mild ones – were serious injuries that permanently damage the brain, impair thinking ability and memory, and hasten the onset of mental decay and senility, especially when they are inflicted frequently.

76.

The NFL's team of hand-picked experts had a different take on the issue, however. They did not find concussions to be of significant concern and felt it more than appropriate for players suffering a concussion to continue playing football during the same game in which one was suffered.

77.

When asked in or about 2005 about his history of concussions, San Francisco Quarterback Steve Young admitted to six "official" concussions. His definition of an official concussion: "When you're lying on your back and they cart you off. That's an 'official' concussion."

78.

With the NFL "party-line" in place minimizing the significance of concussions, players who suffered them were told not to be overly concerned, and were regularly returned to game action mere minutes after sustaining them.

19

79.

This practice, set in motion by the MTBI Committee, was irresponsible and dangerous. A noted neurologist, Dr. Dennis Choi, a professor and head of neurology at Washington University in St. Louis, discussed in 2005 his opinion that the most pernicious concussions are those that occur before earlier concussions have healed. "The brain has a wonderful ability to partially heal itself," said Dr. Choi, but "[i]f you take another shot before healing has taken place, the chances of compounding the injury are very real."

80.

In 1999, the National Center for Catastrophic Sports Injury Research at the University of North Carolina in Chapel Hill conducted a study involving 18,000 collegiate and high school football players. The research showed that once a player suffered one concussion, he was three times more likely to sustain a second in the same season following the initial concussion.

81.

A 2000 study, which surveyed 1,090 former NFL players, found that more than 60 percent had suffered at least one concussion, and 26 percent had suffered three or more, during their careers. Those who had sustained concussions reported more problems with memory, concentration, speech impediments, headaches, and other neurological problems than those who had not been concussed.

82.

The MTBI Committee has published multiple research articles since its inception. The findings of the committee have regularly contradicted the research and experiences of neurologists who treat sports concussions, and to players who endured them.

83.

For example, in the October 2004 edition of *Neurosurgery*, the MTBI Committee published a paper in which it asserted that the Committee's research found no risk of repeated

concussions in players with previous concussions and that there was no "7- to 10-day window of

increased susceptibility to sustaining another concussion."

84.

In a comment to the study published in *Neurosurgery*, one doctor wrote that "[t]he article

sends a message that it is acceptable to return players while still symptomatic, which contradicts

literature published over the past twenty years suggesting that athletes be returned to play only

after they are asymptomatic, and in some cases for seven days."

85.

For further example, in January 2005 the Committee wrote that returning to play after a

concussion "does not involve significant risk of a second injury either in the same game or

during the season." However, a 2003 NCAA study of 2,905 college football players found just

the opposite: Those who have suffered concussions are more susceptible to further head trauma

for seven to 10 days after the injury."

86.

In 2005, Dr. Bennet Omalu, at the time a Pittsburgh-area pathologist, studied the brain of

former NFL player Mike Webster, who had recently committed suicide. Dr. Omalu determined

that Webster suffered from CTE, and published his findings in the June 2005 edition of

*Neurosurgery*. Three members of the NFL's MTBI Committee – Drs. Pellman, Viano, and

Casson – attacked the article and said they wanted it retracted.

87.

Dr. Julian Bailes, a neurosurgeon from West Virginia University, briefed the NFL

Committee on the findings of Dr. Omalu and other independent studies linking multiple NFL

head injuries with cognitive decline. Dr. Bailes recalled the MTBI Committee's reaction to his

presentation: "the Committee got mad . . . we got into it. And I'm thinking, 'This is a . . . disease

in America's most popular sport and how are its leaders responding? Alienate the scientist who found it? Refuse to accept the science coming from him?"

88.

In November 2006, Dr. Omalu studied the brain of former NFL player Andre Waters, who had died of a self-inflicted gunshot wound. The analysis of Waters' brain tissue conducted by Dr. Omalu showed signs of CTE.

89.

A November 2006 *ESPN The Magazine* article described how the MTBI Committee failed to include hundreds of neuropsychological tests done on NFL players when studying the effects of concussions on the results of such tests. The article further revealed that Dr. Pellman had fired a neuropsychologist for the New York Jets, Dr. William Barr, after Dr. Barr voiced concern that Dr. Pellman might be picking and choosing what data to include in the Committee's research to get results that would downplay the effects of concussions.

90.

Dr. Pellman stepped down as the head of the MTBI Committee in February 2007. Dr. Kevin Guskiewicz, research director of UNC's Center for the Study of Retired Athletes, said at the time that Dr. Pellman was "the wrong person to chair the committee from a scientific perspective and the right person from the league's perspective."

91.

Regarding the work of Dr. Pellman, Dr. Guskiewicz stated, "[w]e found this at the high school level, the college level and the professional level, that once you had a concussion or two you are at increased risk for future concussions;" but "[Dr. Pellman] continued to say on the record that's not what they find and there's no truth to it."

92.

Dr. Pellman was replaced by Drs. Ira Casson and David Viano. Dr. Casson continued to dismiss outside studies and overwhelming evidence linking dementia and other cognitive decline to brain injuries. When asked in 2007 whether concussions could lead to brain damage, dementia, or depression, Dr. Casson denied the linkage six separate times.

93.

In June 2007, the NFL convened a concussion summit for team doctors and trainers. At the summit, the co-chair of the MTBI Committee, Dr. Ira Casson, told team doctors and trainers that CTE has never been scientifically documented in football players.

94.

In August 2007, the NFL issued a concussion pamphlet to players. Independent scientists and neurologists were disgusted and dismayed when the following statement appeared in the pamphlet: "current research with professional athletes *has not shown* that having more than one or two concussions leads to permanent problems if each is managed properly. It is important to understand that there is no magic number for how many concussions is too many."

95.

The concussion pamphlet clearly created player reliance. "We want to make sure all NFL players . . . *are fully informed* and take advantage of the *most up to date information* and resources as we continue to study the long-term impact on concussions." (emphasis added). Evidently, the "most up to date information" did not include the findings of Drs. Guskiewicz, Cantu, Omalu, and Bailes indicating a causal link between multiple concussions and later life cognitive decline.

96.

In 2008, the University of Michigan's Institute for Social Research conducted a study on the health of retired players, with over 1,000 former NFL players taking part. The results of the

study, which were released in 2009, reported that "Alzheimer's disease or similar memory-related diseases appear to have been diagnosed in the league's former players vastly more often than in the national population; including a rate of 19 times the normal rate for men ages 30 through 49."

97.

The NFL, which had commissioned the study, responded to its results by claiming that the study was incomplete. Further findings, it said, would be needed. Several experts in the field found the NFL's reaction to be "bizarre," noting that "they paid for the study, yet they tried to distance themselves from it."

98.

Shortly after the results from this study were released, Representative John Conyers, Jr., Chairman of the House Judiciary Committee, called for hearings on the impact of head injuries sustained by NFL players.

99.

In the first hearing, in October 2009, Rep. Maxine Waters stated, "I believe you are an $8 billion organization that has failed in your responsibility to the players. We all know it's a dangerous sport. Players are always going to get injured. The only question is, are you going to pay for it? I know that you dearly want to hold on to your profits. I think it's the responsibility of Congress to look at your antitrust exemption and take it away."

100.

NFL Commissioner Roger Goodell testified at the hearing. He stated that "[w]e are fortunate to be the most popular spectator sport in America. In addition to our millions of fans, more than three million youngsters aged 6-14 play tackle football each year; more than one million high school players also do so and nearly seventy five thousand collegiate players as

well. We must act in their best interests even if these young men never play professional football."

101.

Goodell testified that "[i]n the past 15 years, the N.F.L. has made significant investments in medical and biomedical research. All of that information has been made public, subject to thorough and on-going peer review, published in leading journals, and distributed to the N.F.L.P.A. and their medical consultants. We have been open and transparent, and have invited dialogue throughout the medical community."

102.

Also in the October hearing, NFLPA Executive Director DeMaurice Smith stated that the study was not the first study on this issue. "While this is the first N.F.L.-accepted study that demonstrated a connection between on-field injury and post career mental illness, there have been studies over the last decade highlighting that fact. Unfortunately, the N.F.L. has diminished those studies, urged the suppression of the findings and for years, moved slowly in an area where speed should have been the impetus."

103.

After the Congressional Hearings, the NFLPA called for the removal of Dr. Casson as MTBI co-chair. "Our view is that he's a polarizing figure on this issue, and the players certainly don't feel like he can be an impartial party on this subject," said NFLPA Assistant Executive Director George Atallah.

104.

Dr. Casson and Dr. David Viano resigned as co-committee chairmen after the 2009 Congressional Hearing. Dr. Casson, as noted, came under criticism during the hearings for his "continued denials of any link among retired players between injuries sustained in professional football and heightened rates of dementia."

25

105.

Shortly after the October 2009 hearings, the NFL announced that it would impose its most stringent rules to date on managing concussions, requiring players who exhibit any significant sign of a concussion to be removed from a game or practice and be barred from returning the same day. The league's former practice of allowing players to return when their concussion symptoms subside, a practice experienced by each and every plaintiff, has been soundly criticized for putting its players at risk.

106.

In the apparent change in policy, the NFL indicated that "independent experts" would decide who returns to play and who has to sit out so their brain can heal. Not surprisingly, the "independent experts," were selected by Dr. Pellman.

107.

The change contradicted past recommendations by the Committee, which had recommended as safe the league's practice of returning players after concussion. The Committee had published a paper in the journal *Neurosurgery* in 2005 that stated "[p]layers who are concussed and return to the same game have fewer initial signs and symptoms than those removed from play. Return to play does not involve a significant risk of a second injury either in the same game or during the season."

108.

In December 2009, an NFL Spokesman stated that it was "quite obvious from the medical research that's been done that concussions can lead to long-term problems." This fact had been quite obvious to virtually every person involved in the study of concussions for more than a decade with the exception of the NFL and its' so called "experts."

109.

On December 17, 2009, Cincinnati Bengals wide receiver Chris Henry, 26, died after falling from the back of a pickup truck. Drs. Omalu and Bailes performed a postmortem study on Henry's brain and diagnosed Henry with CTE.

110.

In January 2010, the House Judiciary Committee held further hearings on Football Player Head Injuries. Committee Chairman Rep. John Conyers, Jr. noted that "until recently, the NFL had minimized and disputed evidence linking head injuries to mental impairment in the future."

111.

Dr. Casson provided oral and written testimony at the January 2010 hearings. He continued to deny the validity of other studies, stating that "[t]here is not enough valid, reliable or objective scientific evidence at present to determine whether or not repeat head impacts in professional football result in long term brain damage."

112.

Rep. Linda Sanchez soundly criticized the NFL at the hearings. "I find it really ridiculous that he's saying that concussion don't cause long-term cognitive problems. I think most people you ask on the street would figure that repeated blows to the head aren't good for you." She further commented that "It seems to me that the N.F.L. has literally been dragging its feet on this issue until the past few years. Why did it take 15 years?"

113.

In 2010, the NFL re-named the panel, to the "Head, Neck and Spine Medical Committee" and announced that Dr. Pellman would no longer be a member of the panel. Drs. H. Hunt Batjer and Richard G. Ellenbogen were selected to replace Drs. Casson and Viano. The two new co-chairmen selected Dr. Mitchell S. Berger to serve on the panel.

114.

Under its new leadership, the Committee admitted that data collected by the NFL's former brain-injury leadership was "infected," and said that their committee should be assembled anew. Attempting to distance itself from the prior regime, the new Committee formally requested that the group's former chairman, Dr. Elliot Pellman, not speak at one of their initial conferences.

115.

During a May 2010 Congressional Hearing, Congressman Anthony Weiner addressed Drs. Batjer and Ellenbogen with the following comment: "you have years of an infected system here, and your job is . . . to mop [it] up." Step one should have been for the NFL's committee to issue an adequate warning to league players about the causal link between multiple NFL concussions and cognitive decline. At one juncture during the Congressional Hearing, Rep. Weiner, infuriated by the answers he was being given by Ellenbogen chided, "You're in charge of the brains of these players!"

116.

Shortly after the May 2010 hearings, Dr. Batjer was quoted as saying, "[w]e all had issues with some of the methodologies described, the inherent conflict of interest that was there in many areas, that was not acceptable by any modern standards or not acceptable to us. I wouldn't put up with that, our universities wouldn't put up with that, and we don't want our professional reputations damaged by conflicts that were put upon us."

117.

The NFL continued its deficient response to head injuries as the 2010 season began, and the league's concussion woes continued. In an early season game in 2010, when Philadelphia Eagles' Middle Linebacker Stewart Bradley was injured, staggered onto the field and stumbled over, it was clear he was injured.

28

118.

Troy Aikman, the former Dallas Cowboys quarterback who had suffered multiple concussions and was analyzing the game on television, commented that "[i]t's hard to image him coming back into this game in light of what we just saw." But after about four minutes of real time, the Eagles sent Bradley back on the field. Bradley was soon removed from the game, this time diagnosed with a concussion.

119.

In the same game, Philadelphia Eagles' Quarterback Kevin Kolb was also sidelined by a concussion. He, too, was initially cleared to play and briefly returned to the game.

120.

Recently, when legendary New York Giants' Linebacker Harry Carson was asked about the concussion issue, he was quoted as saying: "Physically, I have aches and pains, but that comes with playing the game. But if somebody tells you neurologically you could sustain some kind of brain damage that will go with you the rest of your life. If somebody had told me that a long time ago, I don't frankly think I would have [played]."

121.

After some 16 years of essentially ignoring the issue, it appears as though the NFL has only very recently begun to take the concussion issue seriously. On October 20, 2010, in the wake of a series of dangerous and flagrant hits resulting in concussions, the NFL levied fines totaling $175,000 on three players, James Harrison, Brandon Meriweather, and Duanta Robinson.

122.

In discussing Meriweather's helmet to helmet hit on Baltimore Ravens' Tight End Todd Heap, NFL Executive Vice President of Football Operations Ray Anderson was quoted as saying that "in our view, the hit was flagrant and egregious. *Effective immediately*, that's going to be

looked at at a very aggressive level, which would include suspension without pay . . . What I would tell you is that if there are flagrant and egregious violations of our current rules, we will be enforcing, *effective immediately*, discipline at a higher level." (emphasis added).

123.

That same day, NFL Commissioner Roger Goodell forwarded a memo to all 32 NFL teams with a message that was to be read to all players and coaches. Also forwarded to each team was a video showing "what kind of hits are against the rules."

124.

Goodell's memo provided in part that "violations of the playing rules that unreasonably put the safety of another player in jeopardy have no place in the game, and that is especially true in the case of hits to the head and neck. Accordingly, from this point forward, you should be clear on the following points: (1) Players are expected to play within the rules. Those who do not will face increased discipline, including suspensions, starting with the first offense; (2) Coaches are expected to teach playing within the rules. Failure to do so will subject both the coach and the employing club to discipline; (3) Game officials have been directed to emphasize protecting the players from illegal and dangerous hits, and particularly from hits to the head and neck. In appropriate cases, they have the authority to eject players from a game."

125.

Two days later, a second memo was sent out to all teams by Ray Anderson providing each coach with the names of only his own players who have multiple infractions. As NFL Spokesman Greg Aiello provided, "the purpose was to provide an opportunity for the coach to give extra caution to those players to abide by the safety rules."

126.

On February 17, 2011, former Chicago Bears and New York Giants player Dave Duerson committed suicide. Only 50 at the time of his death, Duerson had suffered months of headaches,

30

blurred vision, and faltering memory. After his death, Boston University researchers determined that Duerson was suffering from CTE.

127.

In October 2011, Dr. Berger of the Head, Neck, and Spine Medical Committee announced that a new study was in the planning process. Addressing problems with the previous long-range study, a *New York Times* article noted that Dr. Berger said "There was no science in that." Dr. Berger further stated that "data from pervious study would not be used. We're really moving on from that data. There's really nothing we can do with that data in terms of how it was collected and assessed."

128.

In November 2011, the league's injury and safety panel issued a directive telling its game officials to watch closely for concussion symptoms in players. The directive came ten days after San Diego Chargers' Guard Kris Dielman sustained a head injury against the Jets and later had a grand mal seizure on the team's flight home. Dielman sustained a head injury during a game on October 23, finished playing the game, and was not assessed until afterward.

129.

Following a decade and a half of burying its head in the sand, the first serious actions taken to address the rampant concussion problem in the League has already had positive effects. NFL Officiating Chief Carl Johnson was quoted on NBC's "Football Night in America," stating that he's "seen a change in players' behavior in one week."

130.

Why league policy changes, accurate information sharing, strict fines, and warnings of this nature were not recommended by the NFL's so called "expert" committee soon after its creation in 1994, or even earlier by the League and/or its "official helmet" manufacturer, is difficult to comprehend. That it took 16 years to admit that there was a problem and to take any

31

real action to address same is willful and wanton and exhibits a reckless disregard for the safety of the players.

## EQUITABLE TOLLING

### 131.

The applicable statute of limitations is tolled because Defendants' fraudulent concealment of the dangers and adverse effects of head injuries made it impossible for Plaintiffs to learn of the hazards to their health.

### 132.

Plaintiffs did not become reasonably aware of the dangerous nature of, and the unreasonable adverse side effects associated with, nor establish any provable compensable damages caused by, their head injuries prior to the date of this Complaint. The accrual of a complete cause of action relating to the cognizable physical manifestation of the injury did not exist until that time.

### 133.

Defendants were under a continuing duty to disclose the true character, quality, and nature of the after effects of head injuries. Because of Defendants' concealment of the true character, quality, and nature of these injuries, Defendants is stopped from relying on any statute of limitations defense.

### 134.

Defendants, in the course of its business, omitted material key facts about the effects of head injuries, which prevented Plaintiffs from discovering a link between their premature return to action and their head injuries.

CLASS ACTION

135.

Plaintiffs bring this action on behalf of themselves and, under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), as representatives of a Class defined as follows:

> All persons, and spouses of persons, who sustained one or more concussions, or suffered concussion like symptoms, while playing in an NFL football game and who has developed or will develop mental or physical problems as a result of the concussions or concussion like symptoms.

136.

The members of the Class are so numerous and geographically dispersed that joinder is impracticable. Plaintiffs believe that the Class includes hundreds if not thousands of persons and spouses of persons who have developed mental or physical problems as a result of the sustaining concussions or concussion like symptoms in an NFL football game, and that the locations of such persons is geographically dispersed throughout the country. Although the exact number and locations of such persons is unknown to Plaintiffs at this time, records in the possession of Defendants will contain information on the identities and locations of such parties.

137.

Numerous questions of law and fact are common to all the members of the Class because the Class Members all played under the same rules and practices; all played with the same equipment; and they all suffered concussions or concussion like symptoms while playing under these rules and practices. Such common questions include:

> a. whether the Defendants had a duty to provide warnings to players about the injuries associated with concussions and concussion like symptoms;

b. whether the Defendants willfully and wantonly concealed evidence related to the injuries associated with concussions and concussion like symptoms; and

c. whether the NFL had a duty to enact rules that protect players from the dangers of sustaining one or more concussions or concussion like symptoms in a football game.

138.

Plaintiffs' claims are typical of the claims of the members of the Class and the claims of the Named Plaintiffs originate from the same practices on the part of Defendants.  For example, Plaintiffs, ERRICT RHETT, EDDIE KENNISON, III, KENDEL SHELLO, REGINALD FREEMAN, REGINALD NELSON, EDWARD JOHNSON, III, KARL HANKTON, GABE NORTHERN, ELLIOTT JACKSON, JR., JUSTIN JENKINS, MARCUS GARRETT, ARNOLD MILLER, JAMES DAVIS, BRANDON WINEY, EDDIE FULLER, BRADLEY SAMS, CARLOS PENNYWELL, CHRIS CARRIER, CHRISTOPHER WHITE and RODNEY PHILLIPS, are each, persons who sustained one or more concussions, or suffered concussion like symptoms, while playing in an NFL football game and have developed mental or physical problems as a result of the concussions or concussion like symptoms.

139.

Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the other Class Members.

140.

Plaintiffs are represented by counsel with experience in the prosecution of class action litigation, and with particular experience with class action litigation involving medical injuries.

141.

Class action treatment is also appropriate because the common questions of law and fact identified above predominate over questions affecting only individual members.

142.

Class action treatment is also the superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender, and will prevent inconsistent rulings or decisions.

143.

Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## COUNT I

## NEGLIGENCE

144.

Plaintiffs re-aver and re-allege all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

145.

Defendants, as purveyors of safety equipment and rules for the League, owed Plaintiffs a duty to use reasonable care in researching, studying, and/or examining the dangers and risks of head injuries and/or concussions to NFL players, to inform and warn the players of such risks, and to effectuate reasonable policies and/or take other reasonable action to minimize the risks of head injuries.

146.

Defendant NFL affirmatively and voluntarily established the MTBI Committee to examine the dangers and consequences of head injuries to NFL players, to report on its' findings, to provide information and guidance from its' research and studies concerning concussions to

teams and players, and to make recommendations to lessen the risks of concussions. Defendant NFL is responsible for the staffing and conduct of the MTBI Committee.

147.

The NFL failed to use reasonable care in the manner in which it created the MTBI Committee and in the appointment of physicians to head the Committee who were not qualified for the job.

148.

The Defendants and the NFL's MTBI Committee also failed to use reasonable care in researching, studying, and/or examining the risks of head injuries and/or concussions in professional football and in downplaying and in many cases denying both the severity of such injuries and the clear link between concussions and brain damage, thereby breaching the duty to the players, including the Plaintiffs.

149.

The Defendants and the NFL's MTBI Committee failed to inform, warn and/or advise the players and/or misinformed them of the risks and complications inherent in sustaining concussions, thereby breaching the duty to the players, including the Plaintiffs.

150.

The Defendants and the NFL's MTBI Committee were further negligent, careless and/or grossly negligent in the following respects:

    a.  in failing to use reasonable care in overseeing, controlling and/or regulating policies and procedures of the League so as to minimize the risk of head injuries and/or concussions;

    b. in failing to use reasonable care in the research and/or investigation of the concussion issue;

    c. in failing to appoint a qualified physician or panel of physicians to head the aforesaid MTBI Committee;

d. in placing a physician in charge of the Committee whose primary motive was to appease the NFL rather than to report accurately;

e. in disregarding independent scientific studies which showed the risks of head injuries and/or concussions to NFL players' health;

f. in failing to acknowledge, either publically or to the players, the linkage between playing football and long-term brain injuries;

g. in failing to make and/or timely make necessary League policy changes as it pertain to intentional hits to the head, hits to the head of a defenseless player, helmet to helmet hits, and concussions in general;

h. in publishing misleading and erroneous findings;

i. in failing to issue a timely warning, through a concussion pamphlet or other means to the players concerning the causal link between concussions and later life cognitive decline;

j. in issuing misinformation and purposefully attempting to mislead the players through the concussion pamphlet which they issued in August 2007;

k. in collecting and reporting upon data that was "infected" and/or not reliable;

l. in causing, by and through their negligent conduct and omissions, an increased risk of harm to their players;

m. in failing to provide competent information to teams, players, coaches, trainers, and medical personnel with respect to the significance of head injuries and/or concussions, their symptoms, and necessary and/or proper treatment of same;

n. and in creating a "culture" within the NFL in which concussions and their devastating effects would run rampant.


151.

As a direct and proximate result of Defendants' negligent, careless, and/or grossly negligent conduct and omissions as aforesaid, Plaintiffs have suffered serious injury, including but not limited to brain damage with a resultant loss therefrom.

152.

That by reason of the foregoing negligence on the part of the said Defendants, Plaintiffs are informed and believe that their aforesaid injuries are permanent and that they will

permanently suffer from the effects of their injuries, including but not limited to continuous pain and suffering and sever emotional distress.

### 153.

That by reason of the foregoing, Plaintiffs were compelled and will be compelled in the future to require medical aid and attention, with a resultant cost therefrom.

### 154.

That by reason of the foregoing, Plaintiffs have suffered loss of opportunity of employment and will continue to suffer such loss of opportunity in the future with a resultantloss therefrom.

## COUNT II

## NEGLIGENT HIRING

### 155.

The NFL negligently hired, retained, and supervised members of the MTBI Committee from 1994 to 2010.

### 156.

The NFL had a duty to exercise reasonable care in hiring, retaining, and supervising members of the MTBI Committee.

### 157.

As set forth in the first three claims for relief, members of the MTBI Committee engaged in tortious conduct towards the Plaintiff-Players.

### 158.

The NFL knew or should have known that Drs. Pellman, Casson, Viano, and other members of the MTBI Committee were not suited to serve on the MTBI Committee or otherwise influence the NFL's concussion policy. Many members of the MTBI Committee were not medically qualified to evaluate the risks of concussions, publish articles discussing risks of

concussions, and make recommendations to the NFL and its players regarding treatment of concussions. The NFL also permitted members of the MTBI Committee to serve even though doing so presented material conflicts of interest. Therefore, the NFL breached its duty of reasonable care in hiring, retaining, and supervising members of the MTBI Committee.

159.

The NFL knew or should have known of the tendency of members of the MTBI Committee to make fraudulent or negligent misrepresentations about the nature of concussions and the long-term health problems associated with concussions. The NFL also knew or should have known of the failure of members of the MTBI Committee to use reasonable care in their research of concussions and recommendations to the NFL.

160.

As a result of the NFL's failure to use reasonable care in hiring, retaining, and supervising members of the MTBI Committee and the tortious conduct of those members, the Plaintiff-Players suffer from physical and mental injuries, including severe headaches, dizziness, memory loss, emotional liability, depression, loss of executive functioning, and economic harm.

161.

Because of their injuries, the Plaintiff-Players are entitled to compensatory damages in an amount to be proven at trial.


## COUNT III

## FRAUDULENT MISREPRESENTATIONS

162.

Plaintiffs re-aver and re-allege all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

163.

Defendants materially misrepresented the risks faced by Plaintiffs related to head injuries. Defendants and the NFL's MTBI Committee, through misleading public statements, published articles and the concussion pamphlet issued to the players, downplayed known long-term risks of concussions to NFL players.

164.

Material misrepresentations were made by members of the NFL's Committee on multiple occasions, including but not limited to testimony given at Congressional Hearings and the "informational" pamphlet which they issued to the players.

165.

The material misrepresentations included remarks that Plaintiffs were not at an increased risk of head injury if they returned too soon to an NFL game or training session after suffering a head injury.

166.

The material misrepresentations also included criticism of legitimate scientific studies which illustrated the dangers and risks of head injuries.

167.

Defendants knew the misleading nature of these statements when they were made.

168.

Defendants knew, or should have known, that Plaintiffs would rely on these misrepresentations.

169.

Plaintiffs relied on these misrepresentations when playing in the NFL. Had Plaintiffs known the risks to their health, they would not have agreed to jeopardize their health.

170.

As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered physical injury, including, but not limited to, memory and cognitive problems, and have suffered multiple economic losses.

171.

The aforementioned acts and omissions of Defendants demonstrate that they acted deliberately, willfully, and wantonly with indifference to the rights and duties owed and consequences to Plaintiffs.

172.

Defendants knew that a substantial risk of physical and mental harm to the NFL players existed in connection with repeated concussive blows to the head, to wit: the danger of irreversible brain-damage and/or dementia. Defendants willfully and deliberately disregarded the safety of others in continually undertaking to establish and promulgate safety rules for the NFL that failed to reasonably address or disclose substantial risk of head injury.

173.

Because of the NFL's willful misconduct or conscious indifference to the consequences of its actions, the Plaintiff-Players are also entitled to punitive damages in an amount to be proven at trial. And, because the NFL has acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT III

## FRAUDULENT CONCEALMENT

174.

Plaintiffs re-aver and re-allege all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

41

175.

Since the early 1970s, Defendant has known or had reason to know, by way of its supervisory and management roles, that NFL players suffering repeated concussions were more likely to experience evolving symptoms of post-traumatic brain injury including headaches, dizziness, memory loss, impulse control problems, Chronic Traumatic Encephalopathy (CTE), dementia, ALS, Alzheimer's disease, etc. Even armed with this knowledge, until August 4, 2011, Defendant continued to deny any connection or correlation between players suffering concussions and long-term chronic brain injury or illness.

176.

Defendants' and the NFL's MTBI Committee concealed the risks of head injuries to Plaintiffs, and the risks to Plaintiffs if they returned to the playing field before making a proper recovery from their injuries.

177.

Defendants and the NFL's MTI Committee, through misleading public statements, published articles and the concussion pamphlet issued to players, and concealed and downplayed known long-term risks of concussions to NFL players.

178.

The concussion pamphlet clearly created player reliance. The NFL stated that "we want to make sure all NFL players are fully informed and take advantage of the most up to date information and resources as we continue to study the long-term impact on concussions."

179.

Further concealment of material information occurred in January 2010. Dr. Casson provided oral and written testimony at the January 2009 Congressional Hearings. He continued to deny the validity of other studies.

180.

Defendants failed to acknowledge, either publicly or privately to players, the clear link between concussions and brain injuries being suffered.

181.

Defendants failed to acknowledge, either publically or privately to players, the linkage between playing football and long-term brain injuries.

182.

Defendants willfully concealed this information from Plaintiffs in order to prevent negative publicity and increased scrutiny of their practices.

183.

Defendants knew that Plaintiffs would rely on the inaccurate information provided by Defendants.

184.

Plaintiffs relied on the inaccurate information during their NFL careers.

185.

As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered physical injury, including but not limited to, memory and cognitive problems, and multiple economic loss.

**COUNT IV**

**NEGLIGENT MISREPRESENTATION**

186.

Plaintiffs re-aver and re-allege all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

187.

Defendants misrepresented the dangers that NFL players faced in returning to action too quickly after sustaining a head injury. Defendants and the NFL's MTBI Committee, through public statements which it knew or should have known were misleading, published articles and issued the concussion pamphlet to its players, and downplayed the long-term risks of concussions to NFL players.

188.

Material misrepresentations were made by members of the NFL's Committee on multiple occasions, including but not limited to testimony at Congressional Hearings and the "informational" pamphlet issued to players.

189.

The misrepresentations included remarks that Plaintiffs were not at an increased risk of head injury if they returned too soon to an NFL game or training session after suffering a head injury.

190.

The material misrepresentations also included criticism of legitimate scientific studies that illustrated the dangers and risks of head injuries.

191.

Defendants made these misrepresentations and actively concealed adverse information at a time when they knew, or should have known, because of their superior position of knowledge, that Plaintiffs faced health problems if they were to return to a game too soon.

192.

Defendants knew or should have known the misleading nature of these statements when they were made.

44

193.

Defendants made misrepresentations and actively concealed information with the intention that Plaintiffs would rely on the misrepresentations or omissions in selecting their course of action.

194.

As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered physical injury, including but not limited to, memory and cognitive problems, and multiple economic loss.

## COUNT V

## CONSPIRACY

195.

Plaintiffs re-aver and re-allege all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

196.

Defendants actively and deliberately conspired with NFL teams and/or independent contractors, who were directed to continuously discount and reject the causal connection between multiple concussions suffered while playing in the NFL.

197.

This conduct between the Defendants and others was a proximate cause of the chronic injuries and damages suffered by the Plaintiffs.

198.

As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered physical injury, including but not limited to, memory and cognitive problems, and multiple economic loss.

## COUNT VI

## LOSS OF CONSORTIUM

### 199.

Plaintiffs re-aver and re-allege all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

### 200.

The actions of the Defendants as described above has caused and will continue in the future to cause the spouses of those who played professional football in the NFL to be deprived of the services, society, and companionship of their husbands.

### 201.

The actions of the Defendants as described above has caused and will continue in the future to cause the spouses of those who played professional football in the NFL to both pay for and provide the medical treatment and care needed by their husbands.

### 202.

As a direct and proximate result of Defendants' conduct, the spouses of those who played professional football in the NFL have suffered and will continue to suffer economic loss, and have been and will continue to be deprived of the services and society of their husbands.

## COUNT VII

## MEDICAL MONITORING

### 203.

Plaintiffs re-aver and re-allege all preceding paragraphs as if fully set forth herein and further allege on information and belief as follows.

### 204.

The NFL's tortious conduct has increased the risk that the Plaintiff-Players will develop neurodegenerative disorders and diseases later in life, if they have not done so already.

46

205.

As a result of the NFL's tortious conduct, the Plaintiff-Players and other Class Members suffered traumatic brain injuries while playing in the NFL. The Plaintiff-Players continue to suffer harm from those injuries, including severe headaches, dizziness, memory loss, emotional liability, depression, loss of cognitive functioning, and economic harm.

206.

Because they suffered traumatic brain injuries, the Plaintiff-Players have an increased risk of developing neurodegenerative disorders and diseases, including CTE, ALS, Alzheimer's disease, dementia, or similar conditions affecting cognitive functioning.

207.

There are monitoring procedures that (a) are supported by contemporary scientific principles, (b) are not routinely used by the general public, and (c) make early detection of cognitive impairment possible. These monitoring procedures will help detect, prevent, or mitigate the symptoms of neurodegenerative diseases and disorders.

208.

Therefore, the Plaintiff-Players ask the Court to order and supervise an NFL-funded medical monitoring regime for the Plaintiff-Players. The objectives of the medical monitoring regime include the following:

A. monitoring, detection, and diagnosis of brain damage or other related conditions that have arisen from the traumatic brain injuries suffered by the Plaintiff-Players while playing in the NFL; and

B. provision of adequate treatment in the event a neurodegenerative disorder or disease is diagnosed.

209.

The Plaintiff-Players ask the Court to create a regime that will allow for the detection of currently latent injuries and the treatment of such injuries. The Plaintiff-Players do not seek compensation for the increased risk of harm or for the increased apprehension of such harm.

210.

The Plaintiff-Players do not have an adequate remedy at law for their increased risk of developing additional neurodegenerative disorders and diseases.  Without a medical monitoring regime, the Plaintiff-Players will continue to face an unreasonable risk of suffering further injury and disability caused by the NFL's tortious conduct.

211.

The Named Plaintiffs and the other Class Members who played in the NFL have each incurred past medical expenses and will incur future medical expenses as a result of the injuries they suffered as described above.

212.

The Spouses of the Named Plaintiffs and of the other Class Members who played in the NFL, have been and will continue to spend money to pay for the medical care need by their husbands, and have been and will continue to provide care to their husbands.

213.

The available specialized testing and monitoring procedures are specific and necessary to detect and treat the headaches, dizziness, memory loss, depression, cognitive dysfunction and other injuries resulting from the injuries suffered as described above.

214.

Because of the need for specialized testing and monitoring procedures, Plaintiffs seek certification of a medical monitoring class that is comprised of all former and current NFL

players; that is established and funded by the Defendants; and that provides for the monitoring, testing and treatment of all past, current, and future NFL players for post-concussion injuries.

## JURY DEMAND

215.

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray:

    a.   that process be issued according to law;

    b. that the Defendants be served with a copy of Plaintiffs' Complaint and show cause why the prayers for relief requested by Plaintiffs should not be granted;

    c. that Plaintiffs be granted a trial by jury in this matter;

    d. that the Court enter judgment against the Defendants for all general and compensatory damages allowable to Plaintiffs;

    e. that the Court enter judgment against the Defendants for all special damages allowable to Plaintiffs;

    f. that the Court enter judgment against the Defendants for all equitable relief allowable to Plaintiffs, including but not limited to punitive damages in an amount sufficient to punish the wrongful conduct and deter similar wrongful conduct in the future;

    g. that the Court enter judgment against the Defendants for all declaratory relief allowable to Plaintiffs;

    h. that the Court enter judgment against the Defendants for all other relief allowable to Plaintiffs;

    i. that the Court award Plaintiffs prejudgment interest on all damages;

    j. that the Court award Plaintiffs the costs and expenses in this litigation, including reasonable attorneys' fees and expert fees; and

    k. that the Court award Plaintiffs such other and further relief as may be just and proper under the circumstances.

Dated: June 1, 2012

Respectfully submitted by:

THE LAW OFFICE OF
DERRIEL C. McCORVEY, L.L.C.
/s/ Derriel C. McCorvey

Derriel C. McCorvey
LABR# 26083 / TXBR# 24073351
115 W. Main Street Suite 14
P.O. Box 2473
Lafayette, LA 70501
Tel. 337-291-2431
Fax 337-291-2433
derriel@mccorveylaw.com

/s/ W. James Singleton
LABR# 17801
The Singleton Law Firm, APLC
4050 Linwood Avenue
Shreveport, LA 71108
Ph. 318-631-5200
Fax 318-636-7759
wjsingleton@singletonlaw.com

/s/ Vance R. Andrus
Vance R Andrus
LABR# 2484
ANDRUS HOOD & WAGSTAFF
1999 Broadway, Suite 4150
Denver, CO 80202
Ph. (303) 376-6360
Fax (303) 376-6371
vance.andrus@ahw-law.com

/s/ Mike Espy
MSBR# 5240
Mike Espy PLLC
317 E. Capitol Street, Ste. 101
Jackson, MS 39201
Ph. 601-355-9101
Fax 601-355-6021
mikesmike@mikespy.com
Attorneys for Plaintiffs