**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB |
| | : | MDL No. 2323 |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : : | |
| ALL ACTIONS | : : | |

<u>**CLAIMS ADMINISTRATOR STATUS REPORT NO. 16**</u>

## I.  <u>INTRODUCTION</u>

1.      ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 16 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 15 filed on January 28, 2022 (Document 11616).  Our earlier Status Reports are posted to the Settlement Website (under "Documents," click "Status Reports").  We do not repeat here what we covered in them.  All numbers and other information in this Status Report No. 16 are as of May 9, 2022.[1]  We will cover developments after that date in future reports.

---

[1] All dates formatted as 5/9/22 in this Status Report mean May 9, 2022.

## II.   <u>NORMING AGREEMENT IMPLEMENTATION</u>

2.    *Current Status.* On March 4, 2022, Judge Brody entered an Order approving

certain modifications to the NFL Concussion Settlement Agreement Pursuant to Section 6.6

of the Class Action Settlement Agreement.  These modifications, outlined in the Norming

Agreement, removed race norms and demographic estimates based on race from the NFL

Concussion Settlement Program. The Special Masters sent the Settlement Class Members a

Notice providing information about their administration of the Court's March 4, 2022 Order

regarding the implementation of the Norming Agreement.  We worked with the BAP

Administrator under the direct supervision of the Special Masters to determine who qualified

for Automatic Retrospective Rescoring or for an Expanded Baseline Assessment Program

(BAP) exam under the Judge's Order. We carefully analyzed: (1) every BAP evaluation that

resulted in a diagnosis of no impairment or Level 1 Neurocognitive Impairment; (2) every

BAP and Post-Effective Date MAF approved Level 1.5 Neurocognitive Impairment

Settlement Claim; and (3) every denied BAP and Post-Effective Date MAF Level 1.5 or

Level 2 Neurocognitive Impairment Settlement Claim. By the middle of April 2022, we

began notifying all affected Settlement Class Members whether they qualified for Automatic

Retrospective Rescoring and if so, the result of that Rescoring and/or whether they qualified

for an Expanded BAP exam.  Table 1 summarizes the outcome of our analysis of settlement

claims:

| Table 1 | NORMING AGREEMENT ANALYSIS | |
|---|---|---|
| | REVIEW OUTCOME | TOTAL |
| 1. | Qualified for Automatic Retrospective Rescoring | 613 |
| 2. | Qualified for an Expanded BAP exam | 2,405 |
| 3. | Pending BAP evaluations or Settlement Claims to be processed under New Method that removes race from consideration | 1,629 |
| 4. | Not directly affected | 11,447 |

| Table 1 | NORMING AGREEMENT ANALYSIS | |
|---|---|---|
| | REVIEW OUTCOME | TOTAL |
| 5. | Excluded from eligibility for Automatic Retrospective Rescoring or Expanded BAP Exam | 3 |
| 6. | Require additional information to make a final determination | 43 |
| 7. | **Total Registered Settlement Class Members** | **16,140** |

The 11,447 that we found not directly affected by the Norming Agreement (Row 4) could potentially be eligible for an Expanded BAP exam or to submit a New Settlement Claim under Section 2.7 of the Norming Agreement. We are notifying the 43 Settlement Class Members in Row 6 of Table 1 whether they qualify for Automatic Retrospective Rescoring or an Expanded BAP Exam on a rolling basis as we obtain the information necessary to finalize those determinations.

## III.   MONETARY AWARD CLAIMS

3.   *Total Claims Received.* Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted. We have received 52 new Monetary Award claims since Status Report No. 15 and have completed a review of all but 24 claims. As of May 9, 2022, 2,983 unique Retired NFL Football Players and Representative Claimants (18.5% of the 16,140 Retired NFL Football Players and Representative Claimants who received favorable registration determinations) submitted 3,323 Monetary Award Claim Packages. [2]  Twelve of the 3,323 claims[3] were denied as untimely.[4]  We have received about

---

[2] Section 3 of the Summary Report indicates that 3,357 Monetary Award Claim Packages have been submitted, which includes 34 Supplemental Monetary Award claims that we do not include in the rest of our numbers in this section of the Status Report. See section III of the Status Report for details on the Supplemental Monetary Award claims.

[3] Of these Monetary Award claims, 605 (18%) have at least one associated Derivative Claimant who has registered and 2,718 (82%) have no registered Derivative Claimants. Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations (16,140) is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible).

[4] We reviewed 34 claims for potential untimeliness and denied 12 as untimely. We accepted 22 as timely, which includes two claims that showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

three new claims a week since Status Report No. 15 in January 2022.  Of the 3,323 Monetary

Award claims submitted, 1,978 (60%) rest on pre-Effective Date diagnoses, while 1,079 (32%)

are for post-Effective Date diagnoses, of which 315 (29% of the 1,079) were made in the

Baseline Assessment Program ("BAP")[5] and 764 (71% of the 1,079 were made by Qualified

MAF Physicians.[6]  The other 266 claims (8%) did not tell us what diagnosis date they assert.

Table 2 compares these numbers to those in Status Report No. 15:

| Table 2 | QUALIFYING DIAGNOSIS DATES IN MONETARY AWARD CLAIMS | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** |
| 1. | Pre-Effective Date | 1,978 | 1,978 | 0 | 60.5% | 59.5% | -1.0% |
| 2. | Post-Effective Date | 1,038 | 1,079 | +41 | 31.7% | 32.5% | +0.8% |
| | *(a) BAP* | *308* | 315 | +7 | *9.4%* | 9.5% | +0.1% |
| | *(b) MAF* | *730* | 764 | +34 | *22.3%* | 23.0% | +0.7% |
| 3. | No Date Asserted | 255 | 266 | +11 | 7.8% | 8.0% | +0.2% |
| **4.** | **Totals** | **3,271** | **3,323** | **+52** | | | |

Table 3 shows by diagnosis date how many claims we have for each type of Qualifying

Diagnosis:

| Table 3 | MONETARY AWARD CLAIMS BY QUALIFYING DIAGNOSIS TYPE | | | |
|---|---|---|---|---|
| | **DIAGNOSIS** | **PRE-EFFECTIVE DATE** | **POST-EFFECTIVE DATE** | |
| | | | **MAF** | **BAP** |
| 1. | Death with CTE | 124 | 0 | N/A |
| 2. | ALS | 51 | 10 | |
| 3. | Alzheimer's Disease | 425 | 140 | |
| 4. | Parkinson's Disease | 137 | 72 | |
| 5. | Level 2 | 505 | 207 | 109 |
| 6. | Level 1.5 | 736 | 334 | 196 |

---

[5] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award.  The BAP Administrator's status reports explain more about BAP diagnoses.

[6] This includes claims where the Settlement Class Members submitted claims after the Effective Date, but the diagnoses were not rendered by MAF Physicians.  Given unique circumstances, the Parties allowed an AAP member or AAP Consultant to review the medical records to determine if there was a Qualifying Diagnosis.

We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the Summary Report on the Settlement Website.  We also show the current status of all Monetary Award claims based on the last notice or action taken in Section 8 of the Summary Report on the Settlement Website.  There are 68 claims (2% of 3,357) in our review process after an initial Claim Package submission or a response to a notice requesting additional information and/or documents (see Row 1 in Section 8 of the Summary Report, which includes one Supplemental claim).

**4.**      ***Monetary Awards and Payments.***

(a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website.  We have issued Notices of Monetary Award for 1,368 claims totaling $964,754,632.[7]  We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit.  Of the 1,368 claims with Notices of Monetary Award, we requested $961,701,634 from the NFL Parties for all 1,362 claims that have reached the point at which we can request funding.  The NFL Parties have deposited funds for 1,352 of those claims.[8]  Of the 1,352 Monetary Award claims for which the NFL Parties have deposited funds, the Program paid 1,343 claims for a total of $894,050,866.[9]  The remaining nine funded claims were not yet ready for payment when we

---

[7] The amount of these Notices of Monetary Award includes the 1% Derivative Claimant Award deductions allocated to eligible Derivative Claimants (see Paragraph 21 of this Status Report).  Section 7 of the Summary Report indicates that we have issued Notices of Monetary Award for 1,391 claims totaling $971,944,125 which includes 23 Supplemental Monetary Award Claims.  We do not cover Supplemental Monetary Award claims in our numbers in this section of the Status Report.  See section III of this Status Report for details on Supplemental Monetary Award claims.

[8] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.

[9] Section 7 of the Summary Report indicates that we have issued Payments to 1,365 Retired Players and

submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount.  For the 1,343 Retired NFL Football Players and Representative Claimants who have been paid, the Trustee sent $47,892,142 (5% of those Monetary Awards) to the Attorneys' Fees Qualified Settlement Fund, in accordance with the Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104). Finally, we are required to withhold money for unresolved Liens and for third-party funders. Table 4 shows the distribution of the $894,050,866 paid by the Settlement Program and compares the totals to those reported in Status Report No. 15:

| Table 4 | | MONETARY AWARD PAYMENTS | | |
|---|---|---|---|---|
| | **PAID TO** | AS OF 1/10/22 | AS OF 5/9/22 | CHANGE |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $830,914,775 | $861,704,185 | $30,789,410 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $3,885,103 | $3,943,033 | $57,930 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $11,939,056 | $13,169,918 | $1,230,862 |

Representative Claimants totaling $898,300,175, which includes Supplemental Monetary Award payments to 22 claimants.  We do not cover Supplemental Monetary Award claims in our numbers in this section of the Status Report.  See Section III of this Status Report for details on Supplemental Monetary Award claims.

| Table 4 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | **PAID TO** | AS OF 1/10/22 | AS OF 5/9/22 | CHANGE |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $14,456,459 | $15,233,730 | $777,271 |
| **5.** | **Totals** | **$861,195,393** | **$894,050,866** | **$32,855,473** |

(b) Table 5 shows the changes in figures for payments and claims with Notices of

Monetary Award since Status Report No. 15:

| Table 5 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 15 | | | | | |
|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **AMOUNT** | | |
| | | AS OF 1/10/22 | AS OF 5/9/22 | CHANGE | AS OF 1/10/22 | AS OF 5/9/22 | CHANGE |
| 1. | Notice of Monetary Award Issued | 1,356 | 1,368 | 12 | $944,503,499 | $964,754,632 | $20,251,133 |
| 2. | Paid | 1,311 | 1,343 | 32 | $861,195,393 | $894,050,866 | $32,855,473 |

(c) Table 6 shows how many claims for each type of Qualifying Diagnosis have

received a Notice of Monetary Award and been paid:[10]

| Table 6 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS[11] | | | | | |
|---|---|---|---|---|---|---|
| | **DIAGNOSIS** | **CLAIMS SUBMITTED** | **NOTICE OF MONETARY AWARD** | | **PAID** | |
| | | | HOW MANY | %[12] | HOW MANY | %[13] |
| 1. | Death with CTE | 124 | 80 | 65% | 80 | 65% |
| 2. | ALS | 61 | 44 | 72% | 44 | 72% |
| 3. | Alzheimer's Disease | 565 | 377 | 67% | 371 | 66% |

---

[10] Section 8 of the Summary Report on the Settlement Website identifies where claims that have not received a Notice of Monetary Award or been paid stand in the process.

[11] These do not include claims submitted where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.

[12] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that received a Notice of Monetary Award.

[13] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that were paid.

| Table 6 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS[11] | | | | | |
|---|---|---|---|---|---|---|
| | **DIAGNOSIS** | **CLAIMS SUBMITTED** | **NOTICE OF MONETARY AWARD** | | **PAID** | |
| | | | **HOW MANY** | **%[12]** | **HOW MANY** | **%[13]** |
| 4. | Parkinson's Disease | 209 | 176 | 84% | 173 | 83% |
| 5. | Level 2 | 821 | 242 | 29% | 237 | 29% |
| 6. | Level 1.5 | 1,266 | 449 | 35% | 438 | 35% |

### 5. *Monetary Award Claims Reviewed by the AAP*.

(a) In addition to reviewing claims based on pre-Effective Date diagnoses, the Appeals Advisory Panel ("AAP") and Appeals Advisory Panel Leadership Council ("AAPLC") assist us with the medical aspects of claims review.  Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel Consultants ("AAPC"), as highlighted in sub-paragraph (b) below.  The AAP has completed reviews on 1,140 pre-Effective Date diagnosis Monetary Award claims[14], approving 562 (49%) of those claims.[15]  Under FAQ 151 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 131 claims.  In accordance with Rules 23 and 27 of the Rules Governing Qualified MAF Physicians, the AAP and AAPLC have reviewed 310 out of the 764 total Monetary Award claims submitted for diagnoses made by

---

[14] This figure includes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award.

[15] Broken down by Qualifying Diagnosis, the AAP members approved 100% of Death with CTE claims, 95% of ALS claims, 76% of Alzheimer's claims, 87% of Parkinson's claims, 27% of Level 2 claims and 29% of Level 1.5 claims.  The number of claims approved or denied by the AAP may fluctuate depending on multiple factors including ongoing audit investigations, remands of AAP decisions, and re-review of determinations that have not yet been finalized to ensure compliance with current Settlement Program rules and guidelines.

Qualified MAF Physicians, approving 117 (38%) of those claims.[16]  Section 2 of Exhibit A-2 to the Settlement Agreement states that a Player's failure on two or more effort tests may result in the Player's test results being subject to independent review.  Under that provision, as well as Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award, the AAP and AAPLC have reviewed 54 claims out of the 315 total claims submitted based on Qualifying Diagnoses made through the BAP, approving 27 (50%) of those reviewed claims.

(b) We have assigned 748 claims to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing supporting an Alzheimer's Disease diagnosis.  The AAPC have completed 747 reviews (99.9% of those assigned to them) and provided their assessments to the AAP and are reviewing the one pending claim.

**6.**    ***Notices for Missing Materials.***  We have sent one or more notices requesting additional documents or information on 2,190 Monetary Award claims (three more since Status Report No. 15), as shown in Table 7:

---

[16] This figure includes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement as well as claims based on diagnoses made by Qualified MAF Physicians who have been terminated from participation in the Program under Rule 27 of the Rules Governing Qualified MAF Physicians.

| Table 7 | | NOTICES FOR MISSING MATERIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[17] | TOTAL |
| 1. | Total Reviewed | 124 | 61 | 552 | 201 | 815 | 1,247 | 263 | 3,263 |
| 2. | Notice Issued | 48 | 29 | 322 | 105 | 568[18] | 887 | 228 | 2,187 |
| 3. | % Missing Materials | 39% | 48% | 58% | 52% | 70% | 71% | 87% | 67% |

So far, 88% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice.  Settlement Class Members take an average of about 59 days to respond.  We generally receive up to one response to these notices each week and review each reply to determine if it cures the problem.  Of those who responded, 44% cured the problem.  Section 6 of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

 **7.** *Monetary Award Denials.*  There are 1,100 denials of Monetary Award claims for reasons other than an Audit (five more since Status Report No. 15), as shown in Table 8.[19]

| Table 8 | | MONETARY AWARD DENIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTALS |
| 1. | Total Reviewed | 124 | 61 | 565 | 208 | 816 | 1,255 | 270 | 3,299 |
| 2. | Denied | 41 | 3 | 76 | 12 | 261 | 467 | 240 | 1,100 |
| 3. | % Denied | 33% | 5% | 13% | 6% | 32% | 37% | 89% | 33% |

---

[17] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.  We process and pay a person for only one Qualifying Diagnosis per claim submission.

[18] The number of Level 2 claims with notices issued decreased by one since Status Report No. 15 because the claimant's Qualifying Diagnosis changed to Level 1.5 after going through review.

[19] The 1,100 denials are the count of claims where the most recent determination notice is a denial notice. We discuss Audit denials in Paragraph 18 of this Status Report.

Sections 6 and 10 of the Summary Report on the Settlement Website show these denials and the reasons for them.  Overall, the AAP has denied 633 claims for not having a valid Qualifying Diagnosis, which is 52% of the claims that currently have a denial notice.  When an AAP member denies a claim, we include in the notice comments from that AAP member explaining why.  When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents.  Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam.  Settlement Class Members have appealed a total of 400 denial notices; none of the currently active denial notices are under appeal.

## IV.    SUPPLEMENTAL MONETARY AWARD CLAIMS

**8.    *Supplemental Monetary Award Claims Received*.**  A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis.  The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid.  We have received claims from 31 Retired NFL Football Players and three Representative Claimant seeking Supplemental Monetary Awards, 27 for Qualifying Diagnoses of Alzheimer's Disease, two for Parkinson's Disease, and five for a Level 2 Neurocognitive Impairment diagnosis.  This is three more Supplemental claims than we reported in Status Report No. 15.

9.    *Supplemental Monetary Award Reviews and Payments.*  A Supplemental

Monetary Award is the difference between the Monetary Award Grid value of the new

Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis.

We have 23 Notices of Supplemental Monetary Award to eligible Retired NFL Football Players

and denied four claims for a Supplemental Monetary Award.  The combined Monetary Award

Grid value of these 23 Supplemental Monetary Awards was $14,668,321, but after subtracting

the prior Monetary Award payments, totaled $7,179,513, as set out below in Table 9 (no change

since Status Report No.15):

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| 1. | Alzheimer's Disease | $187,217 | Level 1.5 | $93,904 | $93,313 |
| 2. | Alzheimer's Disease | $713,504 | Level 1.5 | $255,175 | $458,329 |
| 3. | Level 2 | $268,132 | Level 1.5 | $153,105 | $115,027 |
| 4. | Alzheimer's Disease | $316,188 | Level 1.5 | $99,620 | $216,568 |
| 5. | Alzheimer's Disease | $118,571 | Level 1.5 | $41,604 | $76,967 |
| 6. | Alzheimer's Disease | $404,326 | Level 2 | $253,783 | $150,543 |
| 7. | Level 2 | $78,737 | Level 1.5 | $55,125 | $23,612 |
| 8. | Alzheimer's Disease | $202,588 | Level 1.5 | $71,974 | $130,614 |
| 9 | Alzheimer's Disease | $119,170 | Level 1.5 | $42,870 | $76,300 |
| 10. | Alzheimer's Disease | $369,420 | Level 1.5 | $158,094 | $211,326 |
| 11. | Level 2 | $323,674 | Level 1.5 | $200,261 | $123,412 |
| 12. | Alzheimer's Disease | $1,154,435 | Level 2 | $853,340 | $301,095 |
| 13. | Alzheimer's Disease | $513,562 | Level 1.5 | $179,936 | $333,626 |
| 14. | Alzheimer's Disease | $409,986 | Level 1.5 | $218,420 | $191,566 |
| 15. | Alzheimer's Disease | $882,550 | Level 2 | $667,538 | $215,012 |
| 16. | Alzheimer's Disease | $190,752 | Level 1.5 | $75,719 | $115,033 |
| 17. | Level 2 | $116,522 | Level 1.5 | $68,022 | $48,500 |
| 18. | Alzheimer's Disease | $1,024,966 | Level 1.5 | $387,302 | $637,664 |
| 19. | Alzheimer's Disease | $1,225,644 | Level 2 | $992,598 | $233,046 |
| 20. | Alzheimer's Disease | $1,154,435 | Level 1.5 | $494,045 | $660,390 |
| 21. | Parkinson's Disease | $2,049,932 | Level 1.5 | $722,870 | $1,327,062 |

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| 22. | Alzheimer's Disease | $2,330,449 | Level 1.5 | $1,205,884 | $1,124,565 |
| 23. | Alzheimer's Disease | $513,562 | Level 1.5 | $197,618 | $315,944 |
| 24. | Totals | $14,668,321 | | $7,488,809 | $7,179,513 |

The Program has paid 20 Retired NFL Football Players and two Representative Claimants a total of $4,249,309 for their Supplemental Monetary Awards.

## V.   QUALIFIED MAF PHYSICIANS

**10.   *Maintaining the MAF Network.***

(a) Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website.  There is a total of 76 Qualified MAF Physicians on the website now, representing 33 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside.  We hope to add another 25 approved Qualified MAF Physicians as we confirm their participation and/or contract with them.  Table 10 shows the changes in these numbers since Status Report No. 15:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | ASPECT | AS OF 1/10/22 | AS OF 5/9/22 | CHANGE |
| 1. | Approved Physician – On Posted List | 74 | 76 | +2 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 33 | 33 | 0 |
| 3. | Approved Physician – Not Yet Posted | 25 | 25 | 0 |

We have removed two physicians from the website.  One physician was terminated from the Program and the other withdrew stating that he no longer had time to participate because of his

schedule. The Parties[20] have approved four new Qualified MAF Physicians since Status Report No. 15.  They have completed orientation and appear on the posted list. In addition, we are still working with a total of 25 approved physicians to get their signed contracts in place so we can add them to the posted list.

(b) We have 613 physicians on our radar, 325 of whom we are engaged in initial and follow-up communications to determine interest and 288 who we have identified as possibly having the appropriate qualifications but we need to research more fully before contacting.

**11.**     *150-Mile Rule.*

(a) Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired NFL Football Player be examined by a Qualified MAF Physician whose office is within 150 miles of his primary residence.[21]  We can make exceptions to this 150-Mile Rule if the exception is requested prior to the appointment.  We have received 137 requests for exceptions to the 150-Mile Rule, of which we granted 110 (80.3%) and we denied 25 (18.2%).  There are currently two (1.5%) requests pending while we await more information from the requesting law firm or *pro se* Player.  Table 11 shows the changes since Status Report No. 15:

| Table 11 | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** |
| 1. | Granted | 98 | 110 | +12 | 79.0% | 80.3% | +1.3% |
| 2. | Denied | 23 | 25 | +2 | 18.6% | 18.2% | -0.4% |
| 3. | Pending | 3 | 2 | -1 | 2.4% | 1.5% | -0.9% |
| 4. | **Totals** | 124 | 137 | +13 | | | |

---

[20] The "Parties" are the parties to the Settlement Agreement, Class Counsel and the NFL Parties.  Our contacts with Class Counsel are at Seeger Weiss LLP.  We work with counsel for the NFL Parties at Paul, Weiss, Rifkind, Wharton & Garrison LLP.
[21] This requirement applies only to appointments made after April 11, 2019.  Appointments made on or before April 11, 2019, did not need to be rescheduled with a different Qualified MAF Physician.

(b) The 150-Mile Rule is a flexible rule with broad exceptions.  Of the living Retired NFL Football Players registered in the Program, 91% have a Qualified MAF Physician within 150 miles of their primary residence.  We work with those who do not to help them schedule appointments with physicians further away, when they tell us they are ready to be examined.

12.     *50-Mile Rule.*  Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office.  Like the 150-Mile Rule, we have discretion to grant exceptions.  We have received 26 requests for exceptions to the 50-Mile Rule, of which we granted 24 (92.3%) and denied two (7.7%).  Table 12 shows how many exception requests we have received and our decisions on those requests (an increase of three since Status Report No. 15):

| Table 12 | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** |
| 1. | Granted | 21 | 24 | +3 | 91% | 92.3% | +1.3% |
| 2. | Denied | 2 | 2 | +0 | 9% | 7.7% | -1.3% |
| 3. | **Totals** | **23** | **26** | **+3** | | | |

Of the 76 Qualified MAF Physicians who are actively scheduling appointments, 70 (92.1%) have an approved neuropsychologist within 50 miles of their office, and we will grant exceptions on a case by case basis for the six Qualified MAF Physicians who do not.

13.     *Deviation Explanations for Level 1.5 and Level 2 Diagnoses.*  Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not

strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we determine more information is needed.  We cannot process these claims further until we receive the required explanation.  We report on these claims in Section 8 (Row 2) of the Summary Report on the Settlement Website.  There are currently two claims that require additional explanation from a Qualified MAF Physician and/or neuropsychologist, representing less than 1% of all Claim Packages submitted to the Program, one claim (50%) based on a diagnosis of Level 1.5 Neurocognitive Impairment and one claim (50%) based on a diagnosis of Level 2 Neurocognitive Impairment.  Table 13 shows how many claims require additional explanation from the Qualified MAF Physician before we can issue award or denial notices:

| Table 13 | CLAIMS REQUIRING ADDITIONAL EXPLANATION FROM QUALIFIED MAF PHYSICIANS | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** |
| 1. | Level 1.5 | 2 | 1 | -1 | 33.3% | 50.0% | +16.7 |
| 2. | Level 2 | 4 | 1 | -3 | 66.7% | 50.0% | -16.7 |
| 3. | **Totals** | **6** | **2** | **-4** | | | |

**14.**  *AAP Leadership Council.*  Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network.  We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses.  In addition, the AAP Leadership Council assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the

Settlement Agreement criteria.  The AAP Leadership Council also facilitates discussions and solicits guidance from the MAF Steering Committee, a group of six Qualified MAF Physicians, who render advice and assistance on providing peer-to-peer feedback to Qualified MAF Physicians and provide suggestions on how to improve the operations and performance of the network of Qualified MAF Physicians. Overall, our collaboration with the AAP Leadership Council has been successful, and the Qualified MAF Physicians have responded positively to receiving feedback from AAP members.

15.     ***MAF Steering Committee.***  Six Qualified MAF Physicians serve on the MAF Steering Committee as authorized by Rule 24 of the Rules Governing Qualified MAF Physicians.  The Committee members have participated in regular roundtable discussions with the AAP Leadership Council, assisted in developing training for the Qualified MAF Physicians to address most common issues, and provided other suggestions for improvement of the Qualified MAF Physicians network.  Overall, the peer-to-peer communications regarding the operation and performance of the network of Qualified MAF Physicians has been positive.

## VI.   <u>AUDIT</u>

16.     ***Closed Audits.***  We have concluded the Audit investigations of 1,256 Settlement Class Members with Monetary Award claims by denying a claim through Audit, by making no adverse finding and removing a claim from Audit, or because the Settlement Class Member withdrew his or her claim during our Audit.  Table 14 summarizes the reasons for these closures and changes in the numbers since Status Report No. 15:

| Table 14 | CLOSED AUDITS | | | |
|---|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** |
| 1. | Claim Denied in Audit | 372 | 372 | 0 |
| 2. | No Finding of Misrepresentation, Omission, or Concealment | 672 | 679 | +7 |
| 3. | Claim Withdrawn by Settlement Class Member | 204 | 205 | +1 |
| **4.** | **Totals** | **1,248** | **1,256** | **+8** |

17. *Reports of Adverse Finding in Audit.* We have issued to the Parties 20 Reports of Adverse Finding in Audit (the same as we reported since Status Report No. 11) affecting 566 Monetary Award claims, all 20 of which were then referred to the Special Masters.  The 20 Audit Reports concern four neurologists, 12 neuropsychologists, three law firms, seven individual Settlement Class Members and one claims preparation company. Table 15 summarizes the Special Masters' and Court's decisions on these Audit reports :

| Table 15 | DECISIONS ON AUDIT REPORTS | |
|---|---|---|
| | **DECISION** | **AUDIT REPORTS** |
| **1.** | Claims Denied in Audit | 12 |
| **2.** | Claims Removed from Audit and Subjected to Specialized Review | 3 |
| **3.** | Claims Removed from Audit and Returned to Normal Review | 3 |
| **4.** | All Claims Withdrawn before Decision | 1 |
| **5.** | Special Master Decision Issued, Objection Filed | 1 |
| **6.** | **Total** | **20** |

18. *Audit Proceeding Decisions.* We have denied 372 claims after Audit based on decisions by the Court or Special Masters.[22]  Sections 6 and 8 (Row 17) of the Summary

---

[22] Of the 372 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims).  Six individual Retired NFL Football Players' claims have been denied.  The Special Masters directed us to deny 170 claims based on their findings related to the Special Investigator's investigation of a law firm.  We denied the remaining claim for failing to cooperate with our requests for information during an Audit.

Report on the Settlement Website show these denials.  A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors.  We have received 99 new claims submitted by Settlement Class Members following an Audit Denial, of which 33 have been paid or are in the payment process.

19.    ***Ongoing Audit Investigations.***  We have other Audit investigations underway affecting ten Monetary Award claims (two less than the number we reported in Status Report No. 15).  All ten are individual claims.

20.    ***Claims Investigated More than Once.***  Claims on which we have concluded an Audit may be the subject of another Audit if we later learn of information that requires further investigation.  We notify Settlement Class Members when this happens.  We have audited 94 Monetary Award claims more than one time (the same as we reported since Status Report No. 14); the most times a Monetary Award claim has been audited is twice.

## VII.   DERIVATIVE CLAIMANTS

21.    ***Derivative Claims.***  We have received 609 Derivative Claim Packages (an increase of eight since Status Report No. 15).  Table 16 shows the status of these claims:

| Table 16 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | **STATUS** | **HOW MANY** | **% OF TOTAL** |
| 1. | Paid Derivative Claimant Award ($993,086[23]) | 221 | 36% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($3,358.43) | 6 | 1% |
| 3. | Denied – Associated Retired NFL Football Player's Claim Denied | 48 | 8% |
| 4. | Denied – No Timely Claim for Associated Retired NFL Football Player | 42 | 7% |

---

[23] This includes a Supplemental Derivative Claimant Award payment issued to a Derivative Claimant who was previously paid an initial Derivative Claimant Award.

| Table 16 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | **STATUS** | **HOW MANY** | **% OF TOTAL** |
| 5. | Denied – No Timely or Proper Registration for Associated Retired NFL Football Player | 35 | 6% |
| 6. | Denied – Retired NFL Football Player's Claim Withdrawn During Statute of Limitations Proceeding | 16 | 3% |
| 7. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 8. | Denied – Deceased Derivative Claimant | 4 | <1% |
| 9. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 10. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 2% |
| 11. | Withdrawn | 8 | 1% |
| 12. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 200 | 33% |
| **13.** | **Total** | **609** | |

We issued five Notices of Derivative Claimant Award since Status Report No. 15.  Table 17 shows how many eligible Derivative Claimants received the entire 1% amount deducted from the associated Retired NFL Football Player's Monetary Award, and how many shared that 1% amount with other eligible Derivative Claimants:

| Table 17 | SHARED AWARD STATUS FOR ELIGIBLE DERIVATIVE CLAIMANTS | | | | | |
|---|---|---|---|---|---|---|
| | | **HOW MANY** | | | **% OF TOTAL** | | |
| | **STATUS** | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** |
| 1. | Received Entire 1% Amount | 62 | 63 | +1 | 28% | 28% | 0% |
| 2. | Shared 1% Amount with Other Eligible Derivative Claimants[24] | 160 | 164 | +4 | 72% | 72% | 0% |
| **4.** | **Totals** | **222** | **227** | **+5** | | | |

The 227 Derivative Claimants who received Notices of Derivative Claimant Award are associated with 114 Retired NFL Football Players. We issued payment to one Derivative Claimant since Status Report No. 15 and have paid 221 (97%) of the 227 Derivative

---

[24] We have not received an Allocation Objection from any of the Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

Claimants with Notices of Derivative Claimant Award; two of the eligible Derivative Claimants who have not been paid are in the payment process, and the other four are not yet ready for payment.

22.    ***Additional Derivative Claimant Details.***  We received challenges from 29 Retired NFL Football Players (or their Representative Claimants) to 41 Derivative Claimants (no change since Status Report No. 8); 19 (46%) of those 41 challenged Derivative Claimants are not eligible for a Derivative Claimant Award because they never submitted a timely Derivative Claim Package.  We have issued a Notice of Derivative Claim Package Submission Deadline to 475 registered Derivative Claimants.  Table 18 summarizes their claim submission statuses and the changes since Status Report No. 15:

| Table 18 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | | |
|---|---|---|---|---|---|---|---|
| | | **HOW MANY** | | | **% OF TOTAL** | | |
| | **STATUS** | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** |
| 1. | Claim Submitted | 156 | 157 | +1 | 33% | 33% | 0% |
| 2. | No Claim Submitted | 317 | 318 | +1 | 67% | 67% | 0% |
| 3. | Within 30-Day Deadline | 1 | 0 | -1 | <1% | 0% | -<1% |
| **4.** | **Totals** | **474** | **475** | **+1** | | | |

23.    ***Supplemental Derivative Claimant Awards.***  Section G of the Overview of Derivative Claimant Process on the Settlement Website (https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf) explains how Supplemental Derivative Claimant Awards are handled.  As discussed in Paragraph 9 of this Status Report, we issued Notices of Supplemental Monetary Award to 23 Retired NFL Football Players (no change since Status Report No. 15).  Of those 23, 19 Retired NFL Football Players had no registered Derivative Claimants associated with them, and three Retired NFL Football Players each had one registered Derivative Claimant, but

those three Derivative Claimants did not submit Derivative Claim Packages to share 1% of the Retired NFL Football Players' earlier Monetary Awards and were not eligible for any portion of the Players' Supplemental Monetary Awards.  The last Player's Supplemental Monetary Award Notice had a 1% offset for potential Derivative Claimant Awards, which has been paid to an eligible Derivative Claimant.[25]

## VIII.  OTHER CLAIM PROCESSES

**24.**  *Handling of Attempted Assignments of Claims.*  On September 27, 2019, the Court issued a Notice (Document 10858) directing us to streamline the process regarding attempted assignments by Settlement Class Members of claims to third-party lenders.  At that time, we suspended the process for handling such assignment questions under the Rules Governing Assignment of Claims and worked with the Court and the Special Master to modify these Rules.  On March 19, 2020, the Special Masters adopted the Rules Governing Payment of Claims Involving Third-Party Funders and the Rules Governing Third-Party Funding Resolution Protocol, which superseded the previous Rules (collectively, the "New Payment Rules").  Under the New Payment Rules Governing Payment of Claims Involving Third-Party Funders, all Settlement Class Members must complete and submit a Sworn Statement regarding the Status of Assignment of Monetary Claim ("SWS-5") to receive payment. There are two versions of the SWS-5, one for those identified as a borrower by a Third-Party Funder that is participating in the Rules Governing Third-Party Funding Resolution Protocol ("Resolution Protocol") (the SWS-5(A)) and another for those not so identified (the SWS-5(B)).  As of May 9, 2022, 24 Third-Party Funder entities are participating in the Resolution Protocol.  We have worked with those participating funders to

---

[25] See Row 1 of Table 17 in this Status Report.

resolve cash advances for 30 Settlement Class Members since the adoption of the New Payment Rules.

25.    ***Petitions for Deviation from the Attorneys' Fee Cap.***[26]  We have received seven Petitions for Deviation, one of which was withdrawn.  The Court resolved three of the remaining six Petitions for Deviation in conjunction with the Attorneys' Liens Dispute Process: two by final decision, and one upheld on appeal by the Third Circuit.  The other three Petitions are pending final resolution.

26.    ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a)   Table 19 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 15:

| Table 19 | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | AS OF 1/10/22 | AS OF 5/9/22 | CHANGE | AS OF 1/10/22 | AS OF 5/9/22 | CHANGE | AS OF 1/10/22 | AS OF 5/9/22 | CHANGE |
| 1. | Attorneys' | 1,484 | 1,507[27] | +23 | 494 | 496 | +2 | 276 | 255 | -21 |
| 2. | Child Support | 350 | 350 | 0 | 52 | 52 | 0 | 21 | 21 | 0 |
| 3. | Judgment | 67 | 67 | 0 | 17 | 17 | 0 | 9 | 9 | 0 |
| 4. | Tax | 57 | 57 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| **5.** | **Totals** | **1,958** | **1,981** | **+23** | **566** | **568** | **+2** | **306** | **285** | **-21** |

(b) Table 20 shows the status of Liens in the Attorneys' Liens dispute resolution process:

---

[26] Judge Brody entered a Memorandum and Order in April of 2018 limiting attorneys' fees in the Program to 22% of each SCM's Monetary Award, plus reasonable costs (ECF Nos. 9862 and 9863).  In the Memorandum, the Judge decided that attorneys should have the opportunity to petition the Court to go above and beyond the cap in exceptional circumstances, which is what the Petitions for Deviation process is meant to cover.

[27] These 1,507 Attorneys' Liens were asserted by 60 law firms.

| Table 20 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[28] | | |
|---|---|---|---|
| PENDING | RESOLVED | | TOTAL |
| | BY AGREED WITHDRAWAL | BY COURT DETERMINATION | |
| 21 | 132 | 21 | 174 |

(c) Table 21 breaks down the Non-Medical Lien holdbacks[29] by Lien type:

| Table 21 | | NON-MEDICAL LIEN HOLDBACKS | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN HOLDBACKS |
| 1. | Attorneys' | 14 | $10,782,163.40 | $2,018,121.29 |
| 2. | Child Support | 3 | $2,482,640.53 | $90,987.34 |
| 3. | Judgment | 1 | $3,192,046 | $229,733.96 |
| 4. | Tax | 0 | N/A | N/A |
| 5. | Totals | 18 | $16,456,849.93 | $2,338,842.59 |

(d) Table 22 summarizes the Non-Medical Lien payments by Lien type:

| Table 22 | | NON-MEDICAL LIEN PAYMENTS | | |
|---|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN PAYMENTS |
| 1. | Attorneys' | 136 | $155,576,074.17 | $9,557,726.75 |
| 2. | Child Support | 15 | $12,641,523.94 | $737,062.17 |
| 3. | Judgment | 6 | $7,333,211.20 | $2,868,636.18 |
| 4. | Tax | 1 | $33,282.80 | $6,492.65 |
| 5. | Totals | 158 | $175,584,092.11 | $13,169,917.75 |

---

[28] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.

[29] The holdbacks are the amount of funds we are withholding pending resolution of a Dispute. As of 5/9/22, there are 14 disputed Attorneys' Liens currently pending resolution by Judge Strawbridge where the Settlement Class Member has received payment of the rest of his Monetary Award.  After the Court enters a final order (whether by Judge Strawbridge or Judge Brody's approval of his Report and Recommendation) resolving the Disputes and any appeal period passes, we disburse the held back funds on the next available monthly Disbursement.

## IX.  COMMUNICATIONS CENTER FOR THE PROGRAM

**27.**  *Our Contact Activity.*  Since our contact center opened on February 6, 2017, we have handled 90,628 total communications, including 55,663 calls made or received and 30,722 emails to us at our Claims Administrator email box. Since Status Report No. 15, we handled 3,561 such total communications. The most common topics of these communications have been Change in Lawyers, General Settlement Information, Norming Agreement, Liens – Non-Medical, and Payment.

**28.**  *Law Firm Contacts.*  Our Law Firm Contacts are assigned to 566 different law firms or lawyers representing Settlement Class Members in the Program.  This is two more law firms or lawyers than we reported in Status Report No. 15.  The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 27 above.

**29.**  *Insights Newsletters.*  Since Status Report No. 15, we issued one new edition of our quarterly "Insights" newsletter (First Quarter 2022).  We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail.  We also post them to the Settlement Website at https://www.nflconcussionsettlement.com/Newsletters.aspx (under "Documents" click "Newsletters").  We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters by email to ClaimsAdministrator@NFLConcussionSettlement.com or through the online submission screen on the Newsletters page of the Settlement Website.

**30.**  *Program Doctors Newsletters.*  In the fourth quarter of 2020, we issued our first newsletter to MAF Physicians as a tool to share relevant and valuable information. With the Second Quarter 2021 edition, we expanded our newsletter audience to include all Program doctors. We emailed the First Quarter 2022 Program Doctors Newsletter to all

Qualified MAF Physicians, Qualified BAP Providers and other approved evaluating

Neuropsychologists on March 24, 2022.  Qualified MAF Physicians also can access the

newsletter on their MAF Physician Portals.  The newsletter conveyed information on the

Parties' norming agreement, including the New Method, expanded free BAP Exams, a new

portal for Program Doctors and requests to rescore prior testing.  We plan to continue to issue

newsletters to Program Doctors on a quarterly basis.

     **31.**    *Settlement Program Website.*  We regularly update the Settlement Website to

reflect progress and changes to the Program.  We have made these changes since Status Report

No. 15:

(1) Posted a Report of the Special Masters (Document 11615, filed January 28, 2022), Claims Administrator Status Report No. 15 (Document 11616, filed January 28, 2022) and BAP Administrator Status Report 4th Quarter 2021 (Document 11617, filed January 28, 2022) to the Status Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.

(2) Published an Alert (dated January 12, 2022) about the annual inflation adjustment to Monetary Award amounts on the Alerts page at https://www.nflconcussionsettlement.com/Alerts.aspx and corresponding 2022 Monetary Award Grid on the Reference Guides page at https://www.nflconcussionsettlement.com/Reference_Guides.aspx.

(3) Added nine new Special Master decisions to the Monetary Award Claims section of the Published Special Master Decisions page at https://www.nflconcussionsettlement.com/PD-SpecialMasterDecisions-MonetaryAwardClaims.aspx.

(4) Placed 14 new documents on the Norming Agreement page (under "Documents" click "Norming Agreement (1-3-22)"), including: Court's Order Directing Claims Administrator to File Memorandum on Comments and Questions Received and Setting Deadline for Response (Document 11619, filed February 1, 2022); Claims Administrator's Memorandum Regarding Submissions to the Inquiry Inbox (Document 11622, filed February 4, 2022); Mediating Parties' Response to Comments and Questions Submitted by Class Members (Document 11630, filed February 11, 2022); Court's Order Granting Motion of the NFL Parties and Class Counsel to Approve Modifications to the NFL Concussion Settlement Agreement Pursuant to Section 6.6 (Document 11648, filed March 4, 2022) and eight corresponding Exhibits (Documents 11648-1 through 11648-8, filed March 4, 2022); Special Masters' Notice Regarding Order Approving Implementation of the Norming Agreement (issued March 8, 2022); and Special Masters' Notice Regarding Timing of Decisions by the Claims Administrator (issued April 6, 2022).

Since Status Report No. 15 in January 2022, the Program's Home page has had 16,248 more unique visits, giving us 629,025 total unique visits, coming from 190 countries and all 50 of the United States.  The five most frequently visited pages since January, after Home and Login, were Alerts (1,549 unique views), Physician Search (1,256 unique views), Published Special Master Decisions – Monetary Award Claims (1,220 unique views), Reports and Statistics (1,039 unique views), and Norming Agreement (778 unique views).  Also since January, visitors conducted 6,094 searches on the website using 1,210 unique keywords and completed 3,595 unique downloads.  The top five downloaded documents were the Special Masters' March 8, 2022, and April 6, 2022, Notices regarding the Order approving implementation of the Norming Agreement and timing of decisions by the Claims Administrator, accessed through the link on the Home page of the public website and all Portals (1,274 clicks); the Settlement Agreement (558 clicks); the Court's January 3, 2022 Notice of Elimination of Race as a Consideration in Neuropsychological Test Results (474 clicks); the Monetary Award Grid (202 clicks); and the Diagnosis and Review Table (93 clicks).

## X.    SPECIAL MASTERS

**32.    *Our Work with the Special Masters*.**  Since Status Report No. 15, we continue to have regularly scheduled calls to discuss policy and operational issues, and have held 133 such calls with the Special Masters to date.  We have many other calls and exchange countless emails with them to address issues as they arise.  The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

**33.    *Program Rules*.**  There are 10 sets of Rules available on the Settlement Website (under "Documents," click "Governing Rules") and on the online portals of law firms, lawyers

and *pro se* Settlement Class Members.  We have not made changes to any posted Rules since Status Report No. 9 filed in July 2020.

34.     ***Published Decisions.***  Since Status Report No. 15, the Special Masters have issued nine new decisions they designated for publication.  These decisions all relate to issues that affect how we analyze claims for Monetary Awards.

### Validity Testing and Functional Impairment

April 25, 2022

The Claims Administrator denied a Retired NFL Football Player's Level 1.5 Neurocognitive Impairment claim on two grounds: criterion (ii) due to multiple validity concerns; and criterion (iii) because it was unclear to what extent the Player's functional decline was related to untreated major depression, headaches and insomnia rather than cognitive impairment.  According to the Program's experts and even his own doctors, the Player's testing did not offer valid estimates for any impairment level under the Settlement.  As to criterion (iii), the diagnosing neurologist neither provided a careful analysis of functional impairment in her original report nor did any supplemental analysis to support an appropriate finding. The Special Master determined that the Player had not offered clear and convincing evidence of error in the Claims Administrator's findings.

### Stroke Definition

April 25, 2022

The Claims Administrator granted a Retired NFL Football Player's Level 2 Neurocognitive Impairment claim and applied the Stroke Offset, which reduced the Monetary Award by 75%, because the Player suffered two strokes before the date of his Qualifying Diagnosis. The Settlement provides that if a Player receives a Qualifying Diagnosis after suffering a medically diagnosed stroke, the 75% Stroke Offset will not apply "if the Settlement Class Member demonstrates, by *clear and convincing evidence*, that the Qualifying Diagnosis was *not causally related* to the Stroke." The Special Master defined the issue on appeal to be whether the claimant offered sufficient evidence to produce a firm belief or conviction that the stroke did not cause the Qualifying Diagnosis. When reviewing whether the Stroke Offset should apply, an AAP Member's task is to evaluate the sufficiency of the *reasoned judgment of the diagnosing physician*—not to offer their own, independent judgment as a substitute. The diagnosing physician, after conducting a careful examination of the Player, reviewing numerous other records, and providing a thoughtful explanation of his process and reasoning, concluded that the Stroke Offset should not apply. The AAP did not defer to that reasoned explanation. Because of this inappropriate level of scrutiny and more than sufficient proof that the Player suffered significant cognitive decline prior to his first stroke, the Special Master granted the Player's appeal and directed the Claims Administrator to reissue the Monetary award without the 75% Stroke Offset.

### Validity Testing

April 18, 2022

The NFL Parties appealed the Claims Administrator's determination that a Retired NFL Football Player was entitled to a Level 1.5 Neurocognitive Impairment Monetary Award on the grounds of invalid neuropsychological testing and deference to the clinicians' determination. At the Special Master's request, the AAP Consultants met as a group to review this Claim and concluded that deferral to the clinicians' determinations was not possible because their clinical judgment regarding validity was not well-reasoned. The consensus review by the AAP Consultants found the evidence overwhelming that the Player was not exerting adequate effort to perform well on testing; therefore, the test results and conclusion could not be considered valid. Accordingly, the Special Master determined that deference to the Player's clinicians would violate the Settlement's requirement that the Player's diagnosis resulted from test scores that validly reflect his "optimal level of neurocognitive functioning" and granted the appeal.

### Validity Testing

April 1, 2022

The NFL Parties appealed the Claims Administrator's determination that a Retired NFL Football Player was entitled to a Level 1.5 Neurocognitive Impairment Monetary Award on the grounds of invalid neuropsychological testing. The Special Master acknowledged the NFL Parties' assertions that the BAP Provider's *Slick* analysis was not fully articulated and that his judgment could be set aside for lack of foundation because the Player's test scores indicated a high likelihood of invalid performance.  However, two different AAP Consultants reviewed the validity of the Player's neuropsychological test scores and thoroughly and independently assured themselves the criteria did not indicate invalid testing.  The Special Master deferred to their expert judgment and denied the appeal.

### Qualifying Diagnoses Criteria

March 30, 2022

The Claims Administrator denied a Retired NFL Football Player's Level 1.5 Neurocognitive Impairment claim because his diagnosing physician ultimately did not issue a Qualifying Diagnosis and the Player appealed. Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment made outside of the BAP must be generally consistent with four diagnostic criteria. Under criterion ii, the diagnosing physician determined that the Player did not appear to meet criteria for impairment in two or more cognitive domains. Criterion (iii) requires evidence of a decline in functioning that is consistent with a Clinical Dementia Rating ("CDR") score of 1.0 in three specific categories: Community Affairs, Home & Hobbies, and Personal Care.  The Player scored 0.0 in all three categories. The Special Master denied the appeal because the Player did not satisfy criterion (ii) or (iii) of the four diagnostic criteria needed for a Level 1.5 Neurocognitive Impairment Qualifying Diagnosis.

### Eligible Seasons and Date of Diagnosis

March 21, 2022

The Special Master denied the appeal of a Retired NFL Football Player who disputed the total number of Eligible Seasons and the date of Diagnosis that the Claims Administrator used in calculating his Monetary Award. A Player injured in a preseason game and subsequently placed on the injured reserve list for that year does not qualify for an Eligible Season under the Settlement Agreement. The date of Diagnosis is ordinarily set by the diagnosing physician, at the point when he or she "has enough information and materials, including test results, to be able to render a medically sound and reliable judgment about the Player's condition, the way a physician normally does in his or her clinical practice." Although the Retired NFL Football Player experienced delays trying to schedule a BAP exam, no Diagnosis resulted from that exam and he did not receive a Qualifying Diagnosis until his MAF Physician diagnosed him with Alzheimer's Disease in 2021, so there was no earlier Diagnosis date to consider.

### Validity Testing

March 21, 2022

The NFL Parties appealed the Claims Administrator's determination that a Retired NFL Football Player was entitled to a Level 2.0 Neurocognitive Impairment Monetary Award on the grounds of invalid neuropsychological testing. Where the examining clinician fully articulated his or her judgment about validity, the Appeals Advisory Panel Consultant should determine whether the analysis was clearly erroneous. The Program's medical experts, applying that standard, concluded the Player's test scores did not represent valid estimates of his optimal level of neurocognitive functioning. The Special Master therefore granted the Appeal.

### Functional Impairment

March 11, 2022

The NFL Parties appealed the Claims Administrator's determination that a Retired NFL Football Player was entitled to a Level 1.5 Monetary Award because the Player's reported abilities were inconsistent with the functional impairment required of his diagnosis. For a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, the Player must exhibit functional impairment generally consistent with the criteria set forth in the CDR scale category 1.0 in the areas of Community Affairs, Home & Hobbies, and Personal Care. The BAP neuropsychologist analysis, which had used a third-party affidavit to supplant rather than corroborate a CDR analysis, did not support the requisite functional impairment. During the appeal, the Player submitted additional medical reports from 2021 showing mild functional impairment, but those records were not probative of whether the Player was similarly afflicted in 2018. The Special Master therefore granted the Appeal.

### Qualifying Diagnoses Criteria

January 25, 2022

To be paid through the Settlement, a Claimant must meet the specific requirements outlined for any of six "Qualifying Diagnoses." In this case, there was documentation of the Retired NFL Football Player's progressive cognitive decline, and unrebutted evidence that he suffered from CTE at the time of his death. But those diagnoses, and their supporting medical records, did not fit into the Settlement's prescribed boxes for the claimed Qualifying Diagnosis of Level 1.5 Neurocognitive impairment, and therefore the Special Master agreed with the Claims Administrator's denial of the claim.

We post all such rulings to the Settlement Website (under "Documents" select "Special Master" under "Published Decisions" and then click the Monetary Award Claims button).  The Special Masters have so far issued 48 published Monetary Award appeal decisions and 10 Audit decisions (58 total such decisions).[30]

### XI.    PROCEDURES AND FREQUENTLY ASKED QUESTIONS

**35.**    *Frequently Asked Questions*. In March 2022, we added a category on the Settlement Website called "Norming Agreement," to include 20 new FAQs (under "FAQs"

---

[30] On October 28, 2020, the Special Master issued contextually similar decisions on deviation from BAP Criteria for six claimants.  One of the six decisions appears on the Settlement Website.

in the green menu bar select "Norming Agreement").  On May 6, 2022, we added one FAQ

to this category.  The 21 new FAQs address these questions about the Norming Agreement:

(1)  What are Black Race Norms and Black Race Demographics?
(2)  What is the Norming Agreement?
(3)  What is the New Method?
(4)  What modifications were made to the Settlement Program's neuropsychological testing protocol?
(5)  What happens next if I think my prior Settlement Claim(s) or neuropsychological test results may have been adversely affected by the consideration of race?
(6)  Who is eligible for Automatic Retrospective Rescoring under the Norming Agreement?
(7)  Are any Settlement Class Members excluded from Automatic Retrospective Rescoring under the Norming Agreement?
(8)  Who determines whether prior testing qualifies for Automatic Retrospective Rescoring?
(9)  Who will conduct the Automatic Retrospective Rescoring?
(10) Will I be notified as to whether my prior test results qualify for Automatic Retrospective Rescoring?
(11) When will I be notified if my prior testing qualifies for Automatic Retrospective Rescoring?
(12) What will happen if my prior testing is not eligible for Automatic Retrospective Rescoring?
(13) Who is eligible for an Expanded BAP Examination under the Norming Agreement?
(14) Are any Retired NFL Football Players excluded from eligibility for an Expanded BAP Examination under the Norming Agreement?
(15) Who determines eligibility for the Expanded BAP Examination?
(16) Is there a deadline for requesting an Expanded BAP Examination?
(17) Will I be notified of my Expanded BAP Examination results?
(18) Can I get my tests rescored without going through an Expanded BAP Examination?
(19) Is there a deadline to get my tests rescored without going through the Expanded BAP Examinations?
(20) Who is not eligible to submit new Settlement Claims based on rescored prior testing?
(21) If I am eligible to get my previous neuropsychological testing rescored at my own expense as described in FAQs 392 to 394, and choose to do so, what do I need to submit with my new Settlement Claim?

There now are 395 FAQs in 18 categories.  These FAQs contain links to other tools

and resource guides posted on the Settlement Website to help Settlement Class Members and

their lawyers navigate the Program.  The banner at the top of the page contains a link to a

printable PDF version of the full set of FAQs.  Note that when we add new FAQs, we place them within the existing set where it makes the most sense.  This means that the numbering of FAQs within the set may change from time to time.

## XII.   REGISTRATION

**36.**   *Registration Submissions.*

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover Registration.  Table 23 shows changes in the number of timely Registration submissions since our Status Report No. 15:

| Table 23 | | TIMELY REGISTRATION SUBMISSIONS | | |
|---|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 1/10/22** | **AS OF 5/9/22** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,866 | 15,861 | -5 |
| 2. | Representative Claimants | 1,379 | 1,384 | 5 |
| 3. | Derivative Claimants | 3,316 | 3,326 | 10 |
| **4.** | **Totals** | **20,561** | **20,571** | **10** |

The number of Retired NFL Football Players (Row 1) went down by five from Status Report No. 15 because they were replaced by Representative Claimants.  Of the 20,571 to whom we issued Registration notices, we were able to confirm that 19,409 of them are Settlement Class Members under the Settlement Agreement, 12,838 of whom are Retired NFL Football Players eligible to participate in the BAP.  The other 1,161 persons are not Settlement Class Members under the Settlement Agreement because of one or more of these reasons: (1) they were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not provide us with the information or support required by the Settlement Agreement to register, after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a

Derivative Claimant but did not have a relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals We have made determinations on 314 such Registrations and found that 173 (55%) of them presented good reasons to be allowed to register after August 7, 2017.  Table 24 shows the change in these numbers since Status Report No. 15:

| Table 24 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | STATUS | AS OF 1/10/22 | AS OF 5/9/22 | CHANGE |
| 1. | Accepted | 163 | 173 | +10 |
| 2. | Not Accepted | 141 | 141 | 0 |
| 3. | Totals | 304 | 314 | +10 |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge.  The NFL Parties also may challenge our good cause exception decisions.  We have received 378 challenges, which is the same number we have reported since in Status Report No. 11.  Table 25 explains these challenges and what happened to them:

| Table 25 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | |
|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 245 | Settlement Class Member | 77 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |

| Table 25 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | **ISSUE** | **HOW MANY** | **WHO CHALLENGED** | **CHALLENGE SUCCESSFUL** | **CHALLENGE NOT SUCCESSFUL** |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 23 | Settlement Class Member | 5 | 18 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | **Totals** | **378** | | **150** | **228** |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters.  Table 26 shows the appeals thus far and the Special Masters' rulings on them (no changes since Status Report No. 11):

| Table 26 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | **ISSUE** | **HOW MANY** | **WHO APPEALED** | **DECISION UPHELD** | **DECISION OVERTURNED** |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 6 | Settlement Class Member | 5 | 1 |
| 5. | **Totals** | **36** | | **33** | **3** |

37.    *Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.*  The Special Masters have approved 444 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants.  There have been five new

Representative Claimant approvals and no new Derivative Claimant Representatives since Status Report No. 15.

## XIII.   CONCLUSION

38.   ***General Status.***  We have 233,258 document files (21,716 gigabytes, or 21.7 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 21,183 more than when we filed Status Report No. 15. We have issued 38,780 notices (16,292 more since Status Report No. 15) to 21,009 different persons since March 23, 2017, many of which were one of seven new types of Notices we developed as part of our implementation of the Norming Agreement.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By: _Roma Petkauskas_
   Roma Petkauskas
   Virginia State Bar No.: 71357
   BrownGreer PLC
   250 Rocketts Way
   Richmond, Virginia 23231
   Telephone: (804) 521-7218
   Facsimile: (804) 521-7299
   Email: rpetkauskas@browngreer.com