## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |

Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,

Plaintiffs,

v.

National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,

Defendants.

THIS DOCUMENT RELATES TO:

Goldberg Persky & White, P.C.
v.
SPID 100012706 (M.R.)

Attorney Lien Dispute
(Lien Disp. No. 01702)

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                           July 25, 2022

## I.     INTRODUCTION

Presently before the Court in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Goldberg Persky & White, P.C. ("Goldberg") against the Award granted to its former client, Settlement Class Member ("SCM") SPID 100012706, M.R. ("Player"), in the litigation that became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).  By its lien, the firm

sought payment of attorneys' fees of 22%[1] of the Award issued to Player pursuant to the contingency fee agreement ("CFA") that he entered into with Goldberg on February 20, 2012. Player, now represented by Tailim Song Law Firm ("Song"), challenges the lien.

As we set out in a Report and Recommendation ("R&R") filed on January 7, 2019,[2] our evaluation of these positions involves a consideration of the CFA between Player and his former counsel and an assessment of the reasonableness of the requested fees in light of the five factors enumerated by the Third Circuit in *McKenzie*.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I"*) and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This approach will require us to scrutinize the reasonableness of the CFA at the time of the signing of the contracts and then determine if the circumstances compel a different evaluation of the CFA at the time Goldberg, as lienholder, seeks to enforce it.  We will then examine the results obtained, the quality of the representation provided by Goldberg, and whether the efforts of Goldberg substantially contributed to the result.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II*, 823 F. 2d at 45 n.1.  This necessarily also involves a consideration of the role of Song. We conclude that Goldberg's reasonable fee is a 1/4th portion of the total counsel fee, with 3/4ths of the total fee allocated to Song.

---

[1]  As we describe below, on April 5, 2018, the District Court determined that presumptively no Individually Retained Plaintiff's Attorneys ("IRPAs") should receive more than 22% of a Monetary Award in fees.  ("Fee Cap").  (Doc. No. 9863).  *See* Doc. No. 10368 at 10-11 (discussing the District Court's decision relating to the presumptive Fee Cap).

[2]  The District Court referred to us all "all petitions for individual attorneys' liens."  (Doc. No. 7446).  On January 7, 2019, we issued an R&R pertaining to three separate cases.  (Doc. No. 10368).  In that R&R we set out the legal principles that would guide our analysis in these cases. We have since issued opinions resolving similar disputes in which the parties consented for the magistrate judge to resolve the lien dispute.  *See, e.g.,* Doc. Nos. 10383 & 10514.

## II.      FACTS AND PROCEDURAL HISTORY

On February 20, 2012, Player signed a document entitled "Power of Attorney," which reflected that he agreed to have Goldberg represent him in connection with the damages he asserted he suffered due to head injuries sustained during his career in the NFL.  (Notice of Lien.)  Under the terms of the agreement, if recovery were made for these injuries, Goldberg was entitled to a fee in the amount of 40% of the net recovery.

Goldberg promptly began to gather from Player details of his medical and playing history, information on his NFL career, history of head injuries, and any symptoms of cognitive deficits. Following review of the information that Goldberg obtained from Player, the firm included Player in a multiple-plaintiff complaint filed in the Eastern District of Pennsylvania in May 2012.  It also filed a short-form complaint on Player's behalf in the MDL in July 2012.  The firm kept Player apprised of the status of the litigation and the proposed settlements and legal challenges thereto. It also communicated with him periodically regarding his medical status.

Following implementation of the Settlement Agreement, Goldberg reviewed medical records of Player's contacts in October and December 2017 with a leading neuroscientist at the University of Texas.   That doctor noted "balance issues with spine disease and peripheral neuropathy." (Lienholder Resp. at Ex. 2.)  He did not make any notations as to Parkinson's Disease or referral to a movement disorder specialist.  Rather, he noted that Player had obtained repeat neuropsychological testing that showed decline in several areas and that an MRI showed "mild global atrophy."  (*Id.*)   He diagnosed "mild dementia" and "mild Alzheimer's disease" and noted the therapies that Player and his family were considering.  (*Id.*)  Player was already 75 years old at the time he was seen at the University of Texas.

Following review of those records, Goldberg then assisted Player in scheduling a formal

Baseline Assessment Program ("BAP") examination provided by the Settlement Program.  Player underwent neurological evaluation by Dr. Suresh Kumar in March 2018, as well as separate neuropsychological testing.  Utilizing the criteria set forth in the Settlement Program materials, Dr. Kumar rendered an opinion that Player's condition reflected a Level 1.0 neurocognitive impairment.[3]  Goldberg consulted with Player about the results, offering its assessment that the existing medical records and evaluation results did not provide a sufficient basis to make a successful claim under the Settlement Program.  Goldberg counseled Player regarding his options. Two years passed.

On August 20, 2020, Player retained Song to represent him in the Settlement.[4]  Song then made contact with Dr. Kumar, who had examined Player through the BAP two years earlier, during the period of Goldberg's representation of Player.  Song's billing records reflect that firm personnel spoke with Dr. Kumar in mid-September 2020 and arranged for new imaging scans to be taken at Dr. Kumar's recommendation.  These scans showed early manifestations of a form of Parkinson's Disease.  At the firm's recommendation, Player also received an assessment by a Dallas-area Parkinson's specialist, Dr. Nirav Pavasia, who concurred that Player suffered from Parkinsonism.  (SCM Statement at 1.)[5]

Song consulted with Player and Dr. Kumar over the following months for the documentation necessary to file a claim based upon Parkinson's Disease.  Song advanced the funds

---

[3]  Dr. Kumar's 2018 report reflected that Player's CDR score was only 1.0.  He also documented that, at that time, Player had "no evidence of tremor or Parkinson's disease."  (Lienholder Resp. at Ex. 3.)

[4]  The Claims Administrator advised Goldberg of the change in representation in early September 2020, prompting it to file its notice of lien.

[5]  The date and the nature of Dr. Pavasia's involvement is not indicated in the record before us.

for Dr. Kumar's evaluation. Dr. Kumar submitted a MAF Diagnosing Physician Certification Form for Player on May 28, 2021 certifying that Player suffered from Parkinson's Disease. Song ultimately submitted a claim to the Monetary Award Fund program on Player's behalf on June 2, 2021. On September 10, 2021, Player was approved for a Monetary Award based upon the qualifying diagnosis of Parkinson's Disease attributed to Dr. Kumar and dated as of January 8, 2021.

After the claim had been filed and shortly before it was approved, the Claims Administrator provided notice to Song that Goldberg had filed a lien in this matter. On December 1, 2021, after the claim was approved and was approaching disbursement, the Claims Administrator issued a Schedule of Document Submissions concerning the Goldberg lien on the award. Goldberg and Song engaged in some communications about the lien but were unable to resolve the dispute. On December 8, 2021, Song submitted its Settlement Class Member Statement of Dispute ("SCM Statement"), and Goldberg submitted its Lienholder Statement of Dispute on December 13, 2021 ("Lienholder Statement"). Goldberg opted to file a response on January 12, 2022 to the Settlement Class Member memorandum ("Lienholder Resp.") but Song did not opt to do so in response to Goldberg's opening brief.

In light of the unresolved lien based upon Goldberg's contingency fee agreement, the Claims Administrator withheld from Player's award funds for payment of attorneys fees in an amount equal to 22% of his Award. This figure represents the presumptive fee cap for individually-retained player's counsel in this litigation. Of that attorney fee withholding, a portion reflecting 5% of Player's Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund pursuant to the Court's June 27, 2018 Order Regarding Withholdings for Common Benefit Fund counsel. (Doc. No. 10104.) Those funds may be distributed at a later date

upon further order(s) of Judge Brody. This leaves the Court to determine the appropriate distribution for the attorneys fees currently available for disbursement (representing 17% of Player's Award) and the allocation of those funds that are currently held in the Attorneys' Fees Qualified Settlement Fund (representing 5% of Player's Award), if those funds, or a portion thereof, are distributed by the Court at a future date.

Pursuant to Lien Rule 17, the Record of Dispute has been transferred to the Court. We do not find it necessary to hold an evidentiary hearing before evaluating this dispute and resolving it. The matter is ripe for review.

## III. DISCUSSION

Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in this class action settlement in no way relieved attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees – whether those fee requests are submitted through a Lien or otherwise – are obligated to ensure that their fees are "reasonable" under the standards set out in *McKenzie*. *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance

of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based. We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

As we outline below, circumstances changed significantly from the time of Player's initial contracting with Goldberg to the time that Goldberg sought to enforce its contract. Based upon our evaluation of the remaining three prongs of the *McKenzie* test, however, we are satisfied that Goldberg provided quality representation and made some contribution to the ultimate Award received in this case. We will therefore approve Goldberg's fee request in part and authorize the release of remaining withheld fees to Song as current counsel for Player.[6]

---

[6] We note here Player's contention that no fee should be authorized to Goldberg because the "Power of Attorney Agreement" they entered into is not a valid contingency fee agreement but rather an agreement concerning "the possible filing of [a] lawsuit on behalf of [Player] which did not occur." (SCM Statement at 3.) Player also asserts that Goldberg provided no assistance in obtaining the qualifying diagnosis of Parkinson's Disease for which he submitted a successful claim. (*Id*.) Finally, Player faults Goldberg for not seeking to recover costs and fees as to *his* case at the time when the firm previously sought attorneys' fees, specifically referring to an attorney fee award of $328,575.00 that the Court authorized in 2018. (*Id*. at 2-3.)
The first contention is inapt, as the contract between Player and Goldberg was a valid contingent fee agreement. Moreover, Goldberg did, in fact, file a lawsuit on Player's behalf. The third contention is also inapt, in that the prior fee petition to which Player refers was for fees for common benefit work, which is distinct from work on behalf of settlement class members who

A.    **The CFAs at the time of contracting and enforcement – impact of changed circumstances**

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing by Player and Goldberg, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation.  We then compare the landscape at the time of contracting with the circumstances at the time the attorney-client relationship terminated.

Goldberg agreed to represent Player in his dispute with the NFL in February 2012, after the first lawsuits brought by former players against the NFL had been consolidated for pretrial purposes into this MDL.  This is what Professor Rubenstein[7] characterized as "Phase 2" of the litigation.  The MDL had been created.  Litigation at this time still carried substantial risks, as the plaintiffs faced stiff challenges including surmounting the issues of preemption and establishing causation, but counsel knew that their work could benefit from shared resources.

Risk as it related to the overall workload also varied over time in this litigation.  When law firms undertake large-scale litigation, they may find it necessary to decline to take on other litigation.  The cost to law firms in deciding to participate and thus forego alternative matters must be recognized.  As we have noted in previous opinions, in the first phase of the litigation, the law firms that undertook representation of players individually, without the benefit of the efficiencies

retain Goldberg for their individual cases.  We address the remaining contention, however, in our discussion that follows.

[7]  The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court.  After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2).

contained within an MDL, faced monumental challenges and risked having to pursue the entire case themselves, perhaps even through trial.  Fee arrangements reflecting those large contingencies "would have been expected and appropriate."  (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL at the end of January 2012, the risk related to the *volume* of work to be undertaken by a law firm representing a retired player changed dramatically.  Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case.  *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from individually-retained attorneys to Plaintiffs' Committees, which would be compensated through a common benefit fund).[8]  The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

Player remained in a contractual relationship with Goldberg from February 2012 until September 2020.  During this time, of course, substantial progress had been made in moving the cases forward, collectively and individually.  The NFL's motions to dismiss and to sever were argued in April 2013, but in July 2013, without yet ruling on these motions, Judge Brody ordered the parties to mediation, and by the end of August 2013 a term sheet had been signed.  This led to

---

[8]   We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

class counsel's motion for preliminary approval filed on January 6, 2014, which was further amended and finally approved on April 22, 2015.  On April 18, 2016, the Third Circuit Court of Appeals affirmed the District Court's approval of the Settlement Agreement, and the United States Supreme Court later denied *certiorari.*  The risk inherent in the litigation was then decreased significantly, thanks to the efforts of Class Counsel and those other lawyers who served on various MDL committees and performed work for the common benefit.[9]  This does not alter the fact, however, that Goldberg undertook the representation of Player at a time of risk.

There were thus several key changes in the circumstances during the time between when Goldberg agreed to represent Player and when it sought to enforce the contract upon Player's decision to change counsel and upon receipt of his award.  While the evidence-gathering tasks and case development relating to damages were much the same, by 2020, it was abundantly clear that counsel had only to adhere to an administrative process in order to secure the award (assuming valid medical support) and did not have to defend against legal challenges from the NFL Parties.

### B.    The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the firms' efforts in bringing about the result.  We observe that Player qualified for an award based on a Parkinson's Disease diagnosis made as of January 8, 2021.  (Notice of Monetary Award Claim Determination).  That was approximately four months after he retained substitute counsel and terminated Goldberg's representation.  It appears there was not an evidentiary basis for a successful claim for any of the qualifying diagnoses during the period of

---

[9]  To be sure, Goldberg personnel served on such committees and Judge Brody authorized the firm to be compensated with an allocation of common benefit funds.

the Goldberg representation.

### C.     The quality of the work performed

Goldberg contends that it provided quality work when it represented Player by regularly communicating with him about the status of the litigation and the settlement and by documenting his cognitive condition over time.  Player asserts that Goldberg was not responsive to his needs, citing "their inactivity and failure to communicate with him," and argues that Goldberg should have referred him to a specialist in movement disorders.  (SCM Statement at 1, 3.)

As is demonstrated in our discussion below, we find that Goldberg provided quality work on behalf of Player and in accordance with the demands of the litigation and settlement administration at the time of the representation.  Song also provided quality work, however, which resulted in an award based upon a condition that manifested at a later date.

### D.     The substantiality of the work performed

We consider the more important question to be Goldberg's contribution to the work necessary to obtain the Monetary Award that Player received in this case.  In this context, we look to the contributions of each firm, comparing the value each added in advancing legal theories and in the work they performed individually for the client, with the effect on the ultimate outcome of the client's award.  We evaluate the contributions in accordance with our prior decisions and the Circuit case law pertaining to individual attorneys' fees in the context of a class action settlement. As we have described there, we look to as many as seven non-exclusive categories of work undertaken by individually-retained players' attorneys ("IRPAs") who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest

possible date;

(2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;

(3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;

(4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,

(5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award,

(6) support of clients who were seeking loans and were exposed to predatory lending practices; and

(7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories. We will, however, use these categories as checkpoints as we consider the substantiality of Goldberg's efforts as an IRPA and the role Goldberg played in the eventual receipt of an award to Player.[10]

### (1) The review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date

Goldberg asserts that it compiled Player's information regarding his medical history, history of injuries, and symptomatology. Once the Settlement was implemented, it scheduled a BAP exam for him and advised him of his options under the Settlement in light of the BAP results. Based on the testing results and the scoring systems then employed in the Program, Player did not yet have

---

[10] We recognize that this attorney lien concerns Goldberg's work *as an IRPA acting on behalf of Player M.R.* The Court has already determined and awarded to Goldberg compensation for the firm's work *on behalf of the class as a whole* with the 2018 award of $328,575.00 from the Common Benefit Fund. That award from the Common Benefit Fund was determined using the lodestar method. Goldberg here seeks an award based on a percentage of Player's recovery pursuant to the contract that it entered into with Player individually on February 20, 2012.

a Qualifying Diagnosis.[11]  To be sure, the Notice of Award in the record before us reflects that the diagnosis for which Player received an award was made on January 8, 2021.  That post-dates Goldberg's period of representation, which concluded in early September 2020.  Therefore, it is apparent that the medical evaluations arranged for by Goldberg would not seem to have played a role in the benefit received.

We accept Song's assertion that it performed significant work with respect to scheduling appointments for a "CT DAT scan" shortly after it was retained.  It also advanced $5,000.00 for expenses related to the re-evaluation by Dr. Kumar and consideration on the development of a Parkinsonism condition that accounted for Player's diminished mental abilities.

### (2) Support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial

We accept that Goldberg engaged in appropriate early efforts to document Player's cognitive status and to ascertain the universe of medical records that might bear upon the litigation.

By the time Song was representing Player, however, the Settlement had already been implemented and it was clear that the matter was one for preparation of a claim in a settlement, not of trial preparation.

### (3) Review of other litigation that was related to ensure claims in this litigation would not be negatively impacted

This factor is not applicable to this dispute.

### (4) Support of their individual clients in understanding the on-going settlement negotiations and risks, and in ultimately

---

[11] We note Player's criticism that if Goldberg had referred Player for consultation with "a neurologist who specializes in movement disorders" rather than a neurologist who relied upon the testing of a neuropsychologist, "it is likely [Player] would have received a qualifying diagnosis earlier and received greater compensation."  (SCM Stmt. at 3.)  The record before us neither supports nor refutes this statement.

**making the determination of whether to opt out of the class**

Goldberg encouraged Player to bring suit against the NFL in 2012 but also counseled him as the preliminary settlement was coming together.  It advised him on whether to accept, reject, or appeal the Settlement Agreement.  It was in regular communication with Player concerning the status of settlement discussions and the future of the litigation.  Player remained in the class.

Again, this factor was not relevant to the period of Song's representation, which post-dated the effective date of the Settlement.

### (5) Shepherding the individual client through a claims process from registration to receipt of a Monetary Award

Goldberg shepherded Player through the BAP process for a 2018 baseline examination. That examination revealed no neurocognitive condition that would have qualified him for a Monetary Award.  The report of the examiner also explicitly noted the absence of tremor or evidence of Parkinson's Disease.  Accordingly, there was no basis for Goldberg to file a claim at that time, and it did not do so in the remaining two years of representation.  Song, however, prepared Player's claim submission in 2021 and has continued to represent him through this receipt of an award.

### (6) Support of clients who were seeking loans and were exposed to predatory lending practices

Goldberg represents that it warned its clients, including Player, of third-party loans.  The record does not indicate what counsel Song may have provided in this area.

### (7) Providing necessary support in other personal matters collaterally related to this litigation

This factor is not applicable to this dispute.

\*        \*        \*

In this attorney lien process, we are called upon to synthesize this information to apportion

14

fees for the quality representation provided to the retired player that yielded the positive outcome of a Monetary Award.  We are cognizant that, here, three entities contributed to the work necessary to obtain that Award: Goldberg acting for Player individually; Class Counsel and law firms such as Goldberg that acted for the common benefit in negotiating and defending the Settlement Agreement; and Song, which agreed to represent Player when it was clear that his case would be resolved according to the terms of the class action settlement and which submitted the claim that was ultimately successful.

We first find that the substantiality of Goldberg's work as an IRPA in Player securing the Monetary Award that he received is necessarily reduced given that the work of Class Counsel, and the attorneys working with them for the common benefit during that same period, clearly "reduced the amount of work required of IRPAs."  (Doc. No. 9862 at 4). In its establishment of a 22% presumptive fee cap, the District Court has already taken actions to reduce IRPA fees, accounting for the substantial benefit provided by Class Counsel.  This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials.  While we reject the argument advanced by Song that *it* was *solely* responsible for the successful results achieved for Player, we are convinced that Goldberg's hand in bringing about the award Player received would not warrant the full 22% fee.  It provided early guidance to Player, assisted him in obtaining his baseline evaluation in 2018, and counseled him about his options in light of the examination results.  The firm did not, however, make further investment in subsequent evaluations to account for any deterioration in Player's condition.

When we account for the meaningful work of Song from its engagement in 2020 to the claim filed and approved in 2021, we are satisfied that it is due the majority of the credit.  It was on Song's watch that Player was more thoroughly evaluated for Parkinson's Disease, and with the input of a Parkinson's specialist, Dr. Pavasia, and the certification from Dr. Kumar, Player was quickly approved for an award.

When we consider the contributions of each firm to the five categories of tasks described above, and valuing each task category based on its significance to this case, we find that the efforts of Song were much more substantial to the result in this case than that of Goldberg.  As between Goldberg and Song, we do value the risk that Goldberg willingly shouldered when it agreed in early 2012 to represent Player in his uphill battle.  Accordingly, we settle upon what we consider to be a fair resolution, apportioning the fee in a 75%-25% ratio between Song and Goldberg.  In light of the District Court's prior order that a portion of these IRPA fees be set aside in the Attorneys' Fees Qualified Settlement Fund, we recommend that the 5% "holdback funds" be apportioned among counsel in the same proportion in which they share the 17% portion that is currently available for distribution to counsel.

### E. Costs

Song's Statement of Attorney's Fees and Costs reflects that it seeks $15,663.50 in costs.  That appears to reflect a misconception of what is meant by costs, as that figure is also identified as what its fee would be using a lodestar analysis.  The documentation that it submitted concerning its time and expenses reflects that a total of *$5,000.00* was incurred for medical consultation with Dr. Suresh Kumar.  *See also* SCM Statement, Song Aff. ¶ 6 (confirming that "total expenses" incurred as to neurological exam costs that it advance at Player's request were $5,000).  That is the entirety of the sum for costs that can be approved.

Goldberg seeks $205.08 in costs, reflecting postage and copying charges as well as medical records obtained in 2018 from the University of Texas.  Records of that doctor's evaluations would have been pertinent to the representation and the cost associated with obtaining a copy of those records is properly reimbursable to Goldberg.

## IV.    CONCLUSION

Goldberg's IRPA contribution to Player's Award is sufficient to support a portion of the total 22% attorney fee.  The Claims Administrator should distribute the funds as follows:

1) Disburse from the currently withheld funds, representing 17% of Player's monetary award:

   a. To Goldberg: 25% of the funds; and

   b. To Song: 75% of the funds;

2) Disburse from the currently withheld funds for costs:

   a. To Goldberg: $205.08;

   b. To Song: $5,000.00; and

   c. The remainder to Player; and

3)  At such time as the Court rules upon the 5% holdback request, disburse from those currently set aside funds:

   a. To Goldberg: 25% of the funds released for payment to IRPAs; and

   b. To Song: 75% of the funds released.

An appropriate order follows.

BY THE COURT:

/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE