## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB MDL No. 2323 |

Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,

Plaintiffs,

v.

National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,

Defendants.

THIS DOCUMENT RELATES TO:

Zimmerman Reed
v.
SPID No. 950004390 (H.L.D.)
Attorney's Lien Dispute
Case No. 367

AND

Collins & Truett Attorneys, P.A.
v.
SPID No. 950004390 (H.L.D.)
Attorney's Lien Dispute
Case No. 1773

## <u>REPORT AND RECOMMENDATION</u>

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                           August 4, 2022

## I.   INTRODUCTION

Before the Court for Report and Recommendation are liens filed by Zimmerman Reed

("Zimmerman") and Collins & Truett Attorneys, P.A. ("Collins") seeking attorneys' fees and costs

from the Award granted to their mutual former client, settlement class member H.L.D. ("Player"),

in the litigation which became this class action, *In re: National Football League Players'*
*Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).  Player, who is now represented by JR
Wyatt Law ("Wyatt"), does not oppose Zimmerman's request but rather joins in a proposal with
Zimmerman as to how those two firms could share in a total fee representing as much as 20% of
his monetary award and that the balance of withheld funds be returned to Player.  However, the
other lienholder, Collins, seeks its full contracted contingency fee of 15% of Player's award.

    As we set out in our January 7, 2019 Report and Recommendation assessing the first
grouping of attorney lien disputes, our evaluation of the validity of the liens filed by Zimmerman
and Collins involves a consideration of the contingency fee agreements ("CFAs") that Player had
with his respective attorneys and an assessment of the reasonableness of the requested fees in light
of the five factors enumerated by the Third Circuit in the *McKenzie* cases.  *See* Doc. No. 10368 at
11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie
I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*")).  This
requires us to scrutinize the reasonableness of each CFA at the time of the contact's signing and
then determine if the circumstances compel a different evaluation of the CFA at the time of its
enforcement.  We then examine the results obtained, the quality of the representation provided by
former counsel and to what extent the efforts of the firms substantially contributed to the result.
*See McKenzie I*, 750 F.2d at 101; *McKenzie II*, 823 F. 2d at 45 n.1.

II.     **FACTS AND PROCEDURAL HISTORY**[1]

   A.  **Zimmerman representation (2012-2016)**

Zimmerman entered into a CFA with Player on March 26, 2012.  The firm agreed to pursue

a claim for injuries and damages allegedly caused by the NFL's conduct associated with football-

related concussions and head injuries.  Player agreed that the attorney's fees for services rendered

would be 33⅓% of the gross amount recovered.  The agreement also authorized Zimmerman to

recoup costs.

In July 2012, Zimmerman included Player in a multi-party complaint it prepared and filed

in this district.  In support of this litigation, in August and September 2014 it also engaged experts

in  the  Twin  Cities  metropolitan  area  to  examine  Player  and  review  appropriate  records.

Zimmerman also kept Player apprised of those developments as a settlement was being negotiated

on behalf of a potential class.  On October 14, 2016, however, Player notified Zimmerman that he

was terminating the representation, as he preferred to have a local attorney in Texas.  Zimmerman

filed its attorney lien in November 2016 to protect its interest in securing a fee out of any future

recovery by Player.

   B.  **Howard, Shenaq representation (2017-2020)**

Player next engaged Howard & Associates, P.A. ("Howard"), a firm based in Florida, to

represent him in what had become a settlement claim process.  Howard formally registered Player

---

[1]   The  history  recited  here  derives  from  the  Statements  of  Dispute  filed  with  the  Claims
Administrator by Zimmerman, Collins, and Wyatt, and the response to each other's Statements
filed by Collins and Wyatt.  We note that Wyatt's Statement included a "Statement Under Oath"
signed by Player on December 20, 2021.  We also were given basic historical data from the Claims
Administrator as to date of registration and the party submitting the registration; the date of claim
submission and the party submitting it; the dates of the monetary award notices issued (denial and
post-appeal award); and the date of the appeal and the party that filed it.

in the settlement program on February 24, 2017.  Around this same time, Player was diagnosed by Dr. Randolph W. Evans with a condition that would later be found to qualify him for a monetary award.[2]

Howard subsequently partnered with Shenaq, P.C. ("Shenaq"), a firm based in Texas, to jointly represent settlement class members in the claims process.  On June 19, 2018, Shenaq submitted a MAF claim on behalf of Player, following which Shenaq became the principal representative for Player with whom the Claims Administrator corresponded.[3]

Shortly after the claim was filed, it was subjected to an audit.  On behalf of Player, Shenaq responded in July 2018 to a request for information from the Claims Administrator's audit team. Pending conclusion of the audit, however, the Claims Administrator suspended substantive review of the claim.  It is not clear from the record when the audit process concluded, but on January 6, 2020, the Claims Administrator gave notice that the claim was denied.  Shenaq filed an appeal on behalf of Player and secured a decision from the Special Masters on May 28, 2020 that remanded the claim for re-review.  At some point thereafter, however, Shenaq withdrew from the representation and Player was left with Howard as his sole representative.  Another notice of audit followed on November 5, 2020, addressed to Howard as counsel for Player.

---

[2]  Player has represented that Howard also arranged for him to be evaluated by Dr. Koberda, following which Howard told him that he would qualify for an award.  Howard then arranged for him to get loans from Esquire Bank based on his anticipated award.  According to documentation described by subsequent counsel, Player entered into advance loan agreements on June 23, 2017 and September 10, 2018.  A final loan with Esquire, signed on April 8, 2019, established a reserve account to make interest payments on the two earlier loans.

[3]  Neither Howard nor Shenaq has filed any liens seeking to enforce a claim for attorney's fees or costs for their work on behalf of Player.  We note that Player refers in his submissions to a lien for $2,150.00 asserted by Cambridge Capital for expenses advanced for testing during the Howard representation, but we are unaware of any such lien on Player's award here.

### C.  Collins representation (2020-2021)

Around this same time, Player received an unsolicited phone call from another retired NFL player.  This retiree informed him that Howard was in the midst of legal trouble and suggested that he consider retaining Collins to represent him as to his NFL claim.  The next day, on November 6, 2020, Player participated in an intake interview by zoom with two non-attorney personnel from Collins.[4]  On November 10, 2020, he signed a CFA with the firm, providing that it could collect a fee of 15% from any eventual monetary award in the settlement.  Collins arranged to obtain from Player copies of his medical records.  It also submitted a response to the Claims Administrator on December 7, 2020 requesting information for the pending audit.  The audit request was identical to that made in 2018, seeking the names of all health care providers seen by Player, as well as any employers of Player, in the preceding five years.  The responses given by Player were identical as well.

At Player's request, Collins also reached out to Esquire Bank to determine the status of the funding loan he had taken out there, which he believed was negatively affecting his credit report and preventing him from being able to refinance his house. By Collins's estimation, it negotiated

---

[4] Player asserts that he was led to believe that one of the persons he spoke with was an attorney. To refute that contention, Collins provided as part of its response submission in this lien dispute a video recording of the intake meeting held over zoom.  The video provided to us does not reflect how either of these employees identified themselves to Player.  Neither of the firm personnel describe themselves as attorneys, nor do they describe their role at the firm in terms of being an attorney or a non-attorney.  The firm personnel who participated in the meeting were someone whose email communications identify him as a "litigation specialist - paralegal" but which also identify him as having a "J.D." degree, and another individual who is described as the firm's "NFL Coordinator."  Richard Collins, the attorney whose name appears on the lien filing and the submissions made in this dispute, did not participate in the intake meeting and was not referred to by either of the firm's employees during that meeting.

a reduction in the loan obligation by some $70,000, although it received only an oral agreement on this point.  Apart from the audit submission in December 2020 and the December 2020 and January 2021 contacts with Esquire Bank, the record before us does not point to any actions taken by Collins to advance Player's NFL concussion claim or collateral interests in any way.

### D.  Wyatt representation (2021-present)

Eight months into his representation by Collins, Player reached out to Wyatt.  Player professed that he was unsure of the status of his NFL claim.  Wyatt agreed to represent him, and they entered into a CFA on July 26, 2021.  Wyatt advised Collins on August 17, 2021 that it had been retained, prompting Collins to file a notice of its attorney's lien on Player's future award.  Wyatt also proceeded to undertake its own review of Player's medical records and claim file.  Wyatt surmised that the claim was in audit due to the conduct of Howard and its use of doctors who were later found to be ineligible to make qualifying diagnoses under the program.  *See generally* Special Masters' Rule 27 Decision (June 22, 2021).

Wyatt advocated for the Claims Administrator to reconsider the case, as Player had received a qualifying diagnosis from a doctor who had not been implicated in wrongdoing.  On August 11, 2021, the Claims Administrator interviewed Player.  On August 18, 2021, it notified Player that his claim was being removed from the audit process.  On August 27, 2021, the Claims Administrator issued to Player its notice of award based upon the qualifying diagnosis of Level 1.5 Neurocognitive Impairment dating to February 20, 2017 and made by Dr. Randolph Evans, who carries the designation of "Qualified MAF Provider."

After the award was finalized, the Claims Administrator withheld funds for counsel fees, which it knew to be contested in light of the Zimmerman and Collins liens.  The Claims

Administrator issued a Schedule of Document Submissions to the parties – Zimmerman, Collins, and Wyatt – as part of the attorneys' liens dispute resolution process.  In accordance with the Schedule of Document Submissions, the three firms submitted their Statements of Dispute on December 22 and 23, 2021.  Both Collins and Wyatt also submitted Response Memoranda, on January 21 and 22, 2022.  The Claims Administrator transferred the Record of Dispute to us on January 25, 2022.

## III.    DISCUSSION

As we have explained in prior Reports regarding lien disputes involving other settlement class members in this litigation, Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to contingency fee contracts but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts).  The Court has explained in its prior opinions that all attorneys seeking fees in this litigation – whether those fee requests are submitted through a Lien or otherwise – are obligated to ensure that their fees are "reasonable" under the standards articulated in *McKenzie*.  *See, e.g.,* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence).  Where, as here, we are presented with presumptively valid contingency fee contracts,[5] we assess whether the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends

---

[5]  We recognize that the copy of the CFA between Collins and Player that was produced by the firm in support of its attorney lien is not signed by a Collins representative: the name of Richard Collins appears on the CFA as the party to bind the Collins firm, but the signature line remains blank.  However, inasmuch as Player signed the agreement, we will consider this agreement enforceable by Collins against Player.

a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

The *McKenzie* five-part reasonableness analysis obligates us to evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court previously adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the contract's enforcement. We will then review (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

As is discussed in greater detail below, circumstances in some cases changed from the time of Player's initial contracting with a firm to the time each lienholder sought to enforce its contract. In evaluating the remaining three prongs, we are satisfied that Zimmerman provided adequate representation and made contributions to the ultimate Award received in this case, while Collins did so to a substantially lesser degree. At the same time, we recognize that neither firm represented Player when registration in the settlement program opened and did not submit the claim form or appeal that was approved in August 2021 -- work that appears to have been performed between 2017 and 2020 by Howard and/or Shenaq, which are not parties to this attorney lien dispute. Considering also Wyatt's contributions and the substantiality of its work with respect to resolving the audit concerns, securing approval of the claim in 2021, and negotiating third-party liens, we

8

will recommend that the Court approve each firm's fee request in part but only in part.

1.    **The CFAs at the time of contracting and of enforcement; impact of changed circumstances**

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing by Player and the firms, there are two primary factors that we must examine: (1) the legal challenges in Player's pursuit of a monetary award and (2) the time-intensive nature of the litigation. We then compare the landscape at the time of contracting with the circumstances at the time the attorney-client relationships terminated.

a.  **Zimmerman (March 2012 – October 2016)**

Zimmerman agreed to represent Player in his dispute with the NFL on March 26, 2012, after the first lawsuits brought by former players against the NFL had been consolidated for pretrial purposes into this MDL. This is what Professor Rubenstein[6] characterized as "Phase 2" of the litigation. As has been noted in prior opinions in this MDL, litigation at this time carried substantial risks, as the plaintiffs faced stiff challenges including surmounting the issues of preemption and establishing causation. But, at the same time, counsel knew that their work could benefit from shared resources.

Risk as it related to the overall workload also varied over time in this litigation. When law firms undertake large-scale litigation, they may find it necessary to decline to take on other litigation. The cost to law firms in deciding to participate and thus forego alternative matters must

---

[6] The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court. After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2).

be recognized.  As we have noted in previous opinions, in the first phase of the litigation, the law firms that undertook representation of players individually, without the benefit of the efficiencies contained within an MDL, faced particularly difficult challenges and risked having to pursue the entire case themselves, perhaps even through trial.  Fee arrangements reflecting those large contingencies "would have been expected and appropriate."  (Doc. No. 9526 at 25-26).

Once the individual cases were consolidated into an MDL at the end of January 2012, however, the risk related to the *volume* of work to be undertaken by a law firm representing a retired player changed dramatically.  Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the formation of the Plaintiffs' Executive Committee ("PEC"), a Plaintiffs' Steering Committee ("PSC"), and other committees that took over the primary work in the case.  *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from IRPAs to Plaintiffs' Committees, which would be compensated through a common benefit fund).[7]  It was in this posture that Zimmerman began its representation of Player in March 2012.  At the same time, the risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation remained substantial.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

Player remained in a contractual relationship with Zimmerman from March 2012 until

---

[7]   We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

October 2016.  During this time substantial progress had been made in moving the cases forward, collectively and individually.  The NFL's motions to dismiss and to sever were argued in April 2013, but in July 2013, without yet ruling on these motions, Judge Brody ordered the parties to mediation, and by the end of August 2013 a term sheet had been signed.  This led to class counsel's motion for preliminary approval filed on January 6, 2014, which was further amended and finally approved on April 22, 2015.  An appeal to the Third Circuit Court of Appeals was resolved on April 18, 2016, but a petition to the United States Supreme Court was pending until December 2016.

Thus, during the period in which Zimmerman represented Player, the risk inherent in the litigation decreased significantly. While the evidence-gathering tasks and case development relating to damages were much the same, it would have been relatively clear that by late 2016 Zimmerman would only have to adhere to an administrative process in order to secure an award for Player and would not have to defend against legal challenges from the NFL Parties.  This reduction in risk was ultimately accomplished through the efforts of Class Counsel and those other lawyers including Zimmerman personnel who served on the Plaintiffs' Steering Committee and the Ethics Committee and performed work for the common benefit.  This does not alter the fact, however, that Zimmerman undertook the representation of players such as H.L.D. as an IRPA at a time of great risk.

### b.  Collins (November 2020 to July 2021)

At the time Collins personnel offered to represent Player in November 2020, the Settlement Agreement had met with the approval of all levels of the federal court and had been implemented for some time.  Collins would undertake representation of Player in his claims against the NFL

11

relating to head injuries. Collins knew that Player was already registered with the Claims Administrator and that he had a claim pending that was stalled in an audit arising from the conduct of former counsel Howard. At the time of contracting, then, Collins could anticipate that the representation would involve trying to resurrect the claim mired in audit or perhaps presenting a new claim. It knew that the major risks confronting prior counsel in terms of liability and the defenses the NFL could assert had been alleviated. The principal risk was whether a new claim would need to be supported with new evidence, for which the firm might have to advance funds.

In addition, the parties knew at the time of contracting that the Court had accepted a recommendation to presumptively cap IRPA fees at 22% of the Monetary Awards. Collins contracted for a 15% fee from any monetary award issued by the Claims Administrator. Collins also knew of the involvement of prior counsel that could affect the fees available from Player's award.

In sum, there were no significant changes in the circumstances during the time between when Collins began to represent Player and when it sought to enforce the contract upon Player's decision to terminate the representation.

### c. Wyatt (July 2021-present)

At the time Wyatt contracted with Player in July 2021, the case was in a similar posture to that of eight months earlier, when Player retained Collins. The risks and benefits of the representation were largely known as to the case being part of an administrative claim process and Player's particular claim having been subject to audit due to the prior involvement of Howard. Wyatt would have known that it was necessary to review the existing claim file and advocate for the audit to be concluded, and that it might be necessary to obtain further medical evidence to

12

support the pending claim or to file a new one.

Again, the parties also knew at the time of contracting that the Court had accepted a recommendation to presumptively cap IRPA fees at 22% of the Monetary Awards. Wyatt contracted for a 22% fee. Wyatt would also have known of the involvement of prior counsel that could affect the fees available from Player's award. There were no significant changes in the circumstances during the time between when Wyatt agreed to represent Player and when it sought to enforce its contract and receive a fee upon the approval of Player's award.

2.      **The results obtained**

On August 27, 2021, during the period of the Wyatt representation, Player was found qualified for an award based upon the date of the qualifying diagnosis, the nature of the diagnosis, and his age at diagnosis. His award was subject to an offset due to the limited number of seasons he played.

Records provided by Zimmerman reflect that it made expenditures in 2014 for neuropsychological and/or neurological evaluations of Player. But Zimmerman was no longer counsel for Player at the time the settlement program opened to claims filing. The Claims Administrator advises us that the ultimately successful claim in Player's case was submitted on June 18, 2018 by Shenaq and was supported by the certification given by Qualified MAF Provider Dr. Randolph W. Evans. The date of the qualifying diagnosis, like the date of the claim submission, date to the Howard-Shenaq era. Therefore, Zimmerman's work in developing a record of Player's condition did not ultimately contribute to the award.

It does not appear that Collins or Wyatt, who represented Player while his claim was pending, were required to invest in an expert to provide an opinion as to Player's qualifying

diagnosis.  Collins and Wyatt, however, both engaged with the Claims Administrator in an effort to maintain in good standing or advance Player's case from the audit phase.  Where Collins's efforts extended only to submission of the audit response, Wyatt doggedly advocated for Player and achieved the most success at that final phase of the claims process.

**3.    The quality of the work performed**

Each of the firms has detailed the tasks that it performed during its period of representation and seek to justify it as "quality work."

We credit Zimmerman's submission that in the course of its representation of Player it obtained and reviewed records of Player's medical and playing history; gathered other information in 2011 and 2012 that would be necessary to include Player in the multi-plaintiff complaint that it filed against the NFL on behalf of Player and others in 2012; kept Player abreast of developments in the litigation and eventual settlement discussions; counseled Player as to whether to participate in the settlement and what criteria would be necessary to obtain a qualifying diagnosis under the settlement; and engaged a board-certified neurosurgeon to evaluate Player and provide advice going forward.  Player, through Wyatt, does not contest that.[8]

We also credit Wyatt's submission that in the course of its representation of Player it very quickly undertook responsibility for moving the claim past audit.  Within a short time after it was retained, Wyatt achieved what Collins, Shenaq, and Howard did not: advocate with the Claims

---

[8]  Collins fails to recognize the role that Zimmerman played.  It contends in its responsive memorandum that "[its] research tell us the Zimmerman Law Firm did nothing more than to register [Player] for the NFL Concussion Settlement prior to August 7, 2017."  (Collins Resp. at 6-7.)  That argument only reflects its misunderstanding – even with benefit of the Statements of Dispute provided by Zimmerman and Wyatt – of the chronology of representation here and the relative roles of the various firms.

Administrator for the conclusion of the audit of Player's claim such that his award could be issued. This accomplishment is also uncontested.

Player, through Wyatt, however, specifically attacks the quality of the representation of Collins. Player believes that his affiliation with Collins resulted in the further audit that delayed receipt of Player's award. He questions how he came to be solicited to retain Collins. He also notes that he never spoke with Attorney Collins of the firm and complains that firm personnel stopped returning his calls. (SCM Stmt. at Ex. A, ¶¶ 9-11.) From his perspective, the firm did not provide advice, get him "out of audit," or do anything "other than string me along and waste my time." (*Id.*, ¶ 11.) He felt that Collins "was not truthful with [him], did not properly represent [him] and harmed [his] claim[.]" (*Id.*, ¶ 16.)

Collins, however, defends the quality of its representation of Player. Although it does not provide a copy of any submissions it made to the Claims Administrator, the selective correspondence with the Player that it presents reflects that a staffer told Player on December 7, 2020 via text message that his audit response had been submitted to the Claims Administrator's portal. Collins describes this effort as "saving [Player's] NFL Concussion Claim when it was left to die at the hands of [prior counsel.]" (Collins Resp. at 6.) With the benefit from Wyatt of copies of the actual response submitted to the Claims Administrator, however, Player has demonstrated that the audit inquiry sought only information about his work history and history of medical evaluations, and that the response that Collins submitted was nothing more than a reiteration of the information previously submitted by Shenaq in 2018. (SCM Resp. at Exs. D, E.) While it may have been a "quality" response in that it was apparently submitted by the deadline and consistent with a prior submission, it would not seem to have required significant effort. And while the

submission may have kept the claim "alive," nothing Collins did appeared to have *advanced* the client's claim through the audit process in any way.  Collins provides no documentation of any inquiries made of the Claims Administrator.  Rather, the text message chain between its staff and Player that it chose to append to its submissions shows periodic messages from the firm's NFL Coordinator communicating only that "[she did] not have an update" on the status of his claim. The only action she took on his behalf was to return to Player copies of his medical records.  She also asked if he had any questions.

Collins also asserts that it "did [its] very best to reduce the amount of the 3rd Party Lien, and we succeeded until [Player] relieved us as Counsel."  (Collins Resp. at 5.)  Collins appended correspondence referring to a meeting between its paralegal and Esquire Bank personnel in November 2020.  Collins also asserts that it responded to a "multitude" of phone calls and texts from Player about his financial condition and the importance of removing "any and all incidences on his credit report" as to Esquire Bank, and that Collins "worked with Esquire Bank tirelessly in the effort of making this happen for the benefit of [Player]."  (*Id.*)  *See also id.* at 6 (referring to "overly numerous calls and texts to and from" Player during the representation).[9]  Collins attached to its initial submission copies of partial email communications documenting these efforts from November 2020 to January 2021.

It is not clear from the Collins submission what was actually accomplished in this regard

---

[9]  Collins characterizes this work as "going above and beyond the representation contemplated by [the CFA]" between Player and Collins.  (Collins Resp. at 4.)  Yet, as shown in the zoom recording, Player expressed the importance of this issue in his intake interview, and he received assurances from the firm personnel that they would assist him with this as part of the representation.  This work was not "above and beyond" what Player sought from the representation but rather an important component of what he sought.

before its representation ended.  Esquire Bank assured Collins that Player was in good standing and provided clarification regarding Player's specific loan obligations.  Collins's assertion, however, that it "negotiated a $70,000+ reduction in the amount of this lien" is not reflected in any of the documentation provided by Collins regarding its communications with Esquire Bank. Moreover, Player has responded to Collins's arguments that it (Collins) accomplished a reduction in the amount owed by noting that "[t]hese types of negotiations are never conducted until an award is finalized, which occurred after [Collins] was replaced as counsel."  (SCM Resp. at 3.) Rather, Player asserts, it was Wyatt that conducted the negotiations to reduce the amount of the loan.  (*Id.*)[10]

The record leaves us with little evidence of anything "of quality" done by Collins besides obtaining for Player an update on his loan obligations and keeping his previously-filed claim nominally "alive" by submitting to the Claims Administrator the response to the Audit inquiry. This record stands in contrast to the work of the other interested law firms in this dispute.[11]

### 4.     The substantiality of the work

The more important question to consider in this multi-party lien dispute is how the different

---

[10]  Wyatt's submissions do not place a value on its work to this end nor has Wyatt appended any supporting documentation.

[11]  We must also note here that the record is devoid of evidence of any activity undertaken for the benefit of Player by any *attorneys* at Collins.  To be sure, no attorney signed the CFA with Player – on the copy of the CFA provided to the Claims Administrator by Collins, the name of Richard Collins appears as the party to bind the Collins firm but the signature line for an "Attorney" at the firm remains blank.  Player has also attested that he never had any contact during the period of representation with Richard Collins, the attorney at the Collins firm who has signed the pleadings and lien dispute submissions in this case.  The responsive memorandum submitted by Collins does not contest this averment by Player that he had no contact with Richard Collins during the period of his representation.

attorneys contributed to the work necessary to obtain the Monetary Award that Player received in this case.  We therefore lay out the efforts undertaken by the three firms in the various aspects of their representation to aid in our evaluation of this critical and final factor in the *McKenzie* analysis.[12]

   As we have described in prior opinions, we consider as many as seven major categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;
>
> (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class,
>
> (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award, which we now see may also encompass an audit for various reasons,
>
> (6) support of clients who were seeking loans and were exposed to predatory lending practices; and
>
> (7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories, and there may be other categories of tasks undertaken or services provided by IRPAs that would be relevant to this analysis.  Rather than address each category and break down the role (if any) of the three

---

[12] Ironically, the three firms here do not reflect the work that we typically value most significantly: the development of the medical record and submission of a properly-supported claim.

IRPAs on that subject, we will address the substantiality question more broadly as to each of the three firms.

### a.  The substantiality of Zimmerman's work

The substantiality of Zimmerman's work between 2012 and 2016 in securing the Monetary Award that Player ultimately received is necessarily reduced given that the work of Class Counsel and firms such as Zimmerman acting for the common benefit that clearly "reduced the amount of work required of" individually-retained counsel to achieve a recovery for retired NFL players for brain injuries.  (Doc. No. 9862 at 4).  The Court's establishment of a 22% presumptive fee cap for individual contingent fees also reflects an acknowledgement of the substantial benefit provided by Class Counsel.  This cap takes into account: (1) the value of the work provided by Class Counsel in their negotiation of a Settlement Agreement; (2) the benefits of Class Counsel's work as the legal team in filing pleadings, framing the Settlement Agreement, and handling the complex appellate process that followed; and (3) the efficiencies provided when the case was resolved without formal discovery, with limited motion practice, and with no bellwether trials.

Ultimately, the period of Zimmerman's representation of Player did not extend beyond the period that largely overlapped with the work of Class Counsel.  That does not mean it was insubstantial.  As we outlined above, Zimmerman ensured that Player was a party to the litigation and informed about the developments leading to the settlement.  Zimmerman obtained medical, head injury, and playing histories as to Player.  It also encouraged him to document his symptoms and provided him with a journal to use.  In addition, it retained a neurosurgeon to evaluate Player in July and August 2014 and review his medical history to recommend a plan for further medical

evaluation.  (Zimmerman Stmt. at 2.)  This work is also reflected in the costs Zimmerman incurred

for which it requests reimbursement, of which $541.67 was spent on expert evaluation.

The evidence of Zimmerman's work on behalf of Player in gathering medical records and

obtaining early guidance from an expert was not contradicted in any response filed by Collins or

Wyatt on behalf of Player.  We accept Zimmerman's representation that these communications

and arrangements were about Player's individual case and the medical documentation necessary

to support his future claim.  Zimmerman performed quality work in considering the information

that was available as the proposed settlement came to be announced and attempting to shore up

the medical evidence that would prove necessary for a meritorious claim.

Zimmerman's work largely related to factors (1) and (4) of the non-exhaustive list above.

**b.  The substantiality of Collins's work**

Collins's work on behalf of Player relates to factors (5)-(7) above, in that it worked with

him in the later stages of the claim process and sought to address his concerns about outstanding

loans collaterally related to the litigation.  Collins made a submission to the Claims Administrator

related to the ongoing audit such that there was "some" response to the outstanding request for

information.  This action does not seem to have progressed the claim out of audit but at best kept

it alive.  That is all. There is no evidence of (nor even any representation that there was) any

communications between Collins and the Claims Administrator about the status of the claim and

the course of the audit.

Collins *did* make contact with the third-party funder in an attempt to obtain clarity for

Player regarding the extent of his loan obligations.  Collins also represents that it obtained a verbal

commitment from Esquire Bank to accept a reduced payment in satisfaction of the loan, saving

Player approximately $70,000, although there is no written evidence of such a commitment. Moreover, Wyatt represents that it was *its* role to resolve the Esquire Bank loan once the Monetary Award was actually issued, which was during its period of representation.

We view Collins's work as keeping alive the Player's claim but doing little to advance the ball to bring the claim to fruition. The firm's role does not rate very well in terms of the substantiality of its contributions to the award that Player ultimately received and how much of it he may have retained given his third-party loans.

### c. The substantiality of Wyatt's work

Like the firms that preceded it, Wyatt also collected Player's medical records upon its retention. Unlike the previous firms, however, Wyatt recognized that a valid claim was pending but that there was work to be done regarding the lingering audit that arose from Player's prior representation by Howard and his evaluation by providers selected by Howard who had since been recognized to be unreliable. Wyatt alone advocated before the Claims Administrator to demonstrate the validity of Player's claim apart from any prior evaluations performed by suspect providers or the prior association with suspect counsel. The timeline tells the story: after Wyatt stepped in and took action, the long-stagnant case progressed quickly to claim approval based upon a condition dating to February 2017 and submitted as part of a claim made in June 2018, more than three years earlier.

### 5. <u>Apportionment</u>

As we synthesize this information to assess how to apportion fees for the representation provided to Player that yielded the positive outcome of a Monetary Award (and presumably some negotiation of the funder loan), we are cognizant that several groups of attorneys contributed to

21

the work necessary to obtain that Award: Zimmerman acting for Player individually, prior to the final approval of the settlement; Class Counsel and law firms that acted for the common benefit in negotiating and defending the Settlement Agreement; Howard and Shenaq, who registered Player, submitted the claim, and filed an appeal on his behalf; and Collins and Wyatt, both of which agreed to represent Player when the claim development process was completed but he was caught in the snare of an audit due to the earlier representation by Howard.

We first find that the substantiality of Zimmerman's work as an IRPA in Player securing the Monetary Award that Player received is necessarily reduced given that the work of Class Counsel, and the attorneys working with them for the common benefit during that same period, clearly "reduced the amount of work required of IRPAs."  (Doc. No. 9862 at 4).  Particularly when we account for the meaningful work of subsequent counsel, we are convinced that Zimmerman's hand in bringing about the award Player received does not warrant even the reduced fee it is seeking.

Wyatt is far more justified in the fee it seeks, in that it actually achieved a result for Player. And while we appreciate the position it advances on behalf of its client that Collins should not receive any portion of the fee, we are not bound to comply with that wish of Player.  For its part, Collins advances the simplistic view that it is due its full contracted 15% fee because it performed "extensive work on behalf of [Player]" and "preserve[d]" his claim "in responding to his final Audit."  However, it achieved less for Player than did any of the other firms who have represented him.  And the notion that it would have achieved a Monetary Award for Player had Wyatt not come in and taken over the case is unrealistic.

When we consider the contributions of each firm to the five categories of tasks described above, and valuing each task category based on its significance to this case, we find that the efforts of Wyatt were more substantial to the result in this case than that of either Zimmerman or Collins. As between Zimmerman and Collins, we value the risk that Zimmerman willingly shouldered when it agreed in 2012 to represent Player in his uphill battle. Accordingly, we settle upon what we consider to be fair resolution, apportioning the fee from the funds to be paid now and those to be set aside pursuant to the "holdback" order such that Wyatt receives 9% of Player's Monetary Award, Zimmerman receives 7%, Collins receives 1%, and the remaining 5% is refunded to Player.[13]

### COSTS

Wyatt agreed to waive any right to reimbursement for costs expended in its representation of Player. Zimmerman seeks to recover what it expended on the neurosurgeon evaluation and copying and postage over the three years of representation, when it provided communications to its client base about the concussion litigation and settlement. The CFA provides for recovery for these types of costs. We therefore recommend that Zimmerman be permitted to recover payment of $589.99.

Collins seeks reimbursement of $78.60 for costs. While its CFA provided for recovery of costs, the firm has not provided an accounting of what those costs were. Therefore, we cannot

---

[13] This reflects the joint request of Wyatt and Zimmerman that a portion of the fee be refunded to Player. It also reflects the reality that Howard and/or Shenaq obtained the qualifying diagnosis, submitted the claim, and successfully prosecuted an appeal. As noted above, however, those firms have not filed a lien on this award. Moreover, Howard was responsible for the conduct that raised the concerns of the Claims Administrator and required the lengthy audit. Player also blames Howard for excessive loans that he took out before Howard had even filed his MAF claim.

23

recommend that Collins receive reimbursement for them from Player's award.

## IV.    CONCLUSION

The evidence recounted here suggests to us that a total fee of 22% might be appropriate if all of the counsel to have represented Player were at the table seeking a portion.  We do not find it appropriate, however, for the lienholders or current counsel to profit from the absence of Howard and Shenaq, who (for all of Howard's faults) appear to be the attorneys who registered Player, secured a qualifying diagnosis for him from an approved MAF physician, filed the claim, and successfully prosecuted an appeal of the initial denial that Player received.  When we consider the value of the work of the other firms relative to the work of Howard and/or Shenaq, we ranked them from Wyatt to Zimmerman to Collins and allocated fees accordingly.  We find it appropriate for the remainder of funds set aside for counsel fee to be released to Player, who certainly endured many delays and uncertainties because of Howard's association with his file.

Our recommendation follows.

## RECOMMENDATION

**AND NOW**, this 4th day of August, 2022, it is respectfully **RECOMMENDED** that the

Claims Administrator be ordered to designate and release the funds withheld for attorney's fee and

costs as follows:

1.   Of the funds currently held by the Claims Administrator for payment of a
contingent fee pending resolution of this lien dispute, reflecting 17% of H.L.D's
Monetary Award:

   a.   Wyatt shall receive 9/22nds as attorney's fees;

   b.   Zimmerman shall receive 7/22nds as attorney's fees;

   c.   Collins shall receive 1/22nd as attorney's fees;

   d.   The balance of funds currently withheld by the Claims Administrator for
payment of a contingent fee pending resolution of this lien dispute shall be released
to H.L.D. (5/22nds);[14]

2.   Of the funds currently withheld by the Claims Administrator for reimbursement to
counsel for costs:

   a. Zimmerman shall receive $589.99 in costs; and

   b. The balance of funds currently withheld by the Claims Administrator for costs

---

[14]  We describe the apportionment of funds among the various constituencies using a fraction with
22 as the denominator, as 22% represents the maximum portion of Player's Monetary Award that
is allocated for counsel fee.  In effect, for example, an approved fee of 1/22[nd] of the available funds
for counsel fee would equate to 1% of Player's Monetary Award.

   Inasmuch as a 5% portion of Player's Monetary Award is set aside in a separate fund and
its distribution will be determined by Court Order at a future date, the actual distribution to counsel
and Player at this time reflects a smaller dollar value.

($78.60) shall be released to H.L.D.; and

3.      The 5% holdback funds shall be released by the Claims Administrator to Wyatt, Zimmerman, Collins, and H.L.D. in accordance with future orders of the Court and in the proportion allocated above for the 17% portion.

The Parties may file objections to this Report and Recommendation.  *See* Rule 25(d).

BY THE COURT:


/**s**/ David R. Strawbridge, USMJ_____
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE