**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | No. 14-cv-00029-AB |

**<u>NFL PARTIES' OPPOSITION TO MOTION FOR RELIEF</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ........................................................................................................... 4

    A.    The Settlement Agreement, Baseline Assessment Program, and Claims Process ................................................................................................................. 4

    B.    The Norming Agreement .............................................................................. 7

    C.    Modifications to the Settlement Agreement ............................................... 9

    D.    The Instant Motion ..................................................................................... 11

ARGUMENT ............................................................................................................... 12

    I.    The Claims Administrator Has the Clear Authority to Seek AAP Review of BAP Claims ..................................................................................................... 12

    A.    The Settlement Agreement Expressly Permits AAP Review of Any Claim ....... 12

    B.    Movants Misunderstand the Claims Process ........................................ 15

    C.    Movants' Claims Underscore the Necessity of AAP Review ............ 17

    II.    Movants Were Not Harmed by the Modifications to the Settlement Agreement 20

    A.    Movants Were Never Discriminated Against by the Settlement Program ......... 20

    B.    Movant Williams' Requested Relief Is Already Provided for by the Norming Agreement When Warranted ...................................................... 21

    C.    The Relief Requested for Movants Owens' and Brown's Situation Is Already Provided for in the Norming Agreement ........................................ 23

CONCLUSION ............................................................................................................ 25

The National Football League and NFL Properties LLC (the "NFL Parties") respectfully submit this memorandum of law in opposition to the motion of Settlement Class Members Troy Davis, Lynn James, Marvin Owens, Booker T. Brown and Newton Williams (together, "Movants") seeking relief pursuant to Article XXVII of the Settlement Agreement, ECF No. 11169 (the "Motion").

## PRELIMINARY STATEMENT

The Motion—a baseless attempt to reap unwarranted windfalls for certain former NFL players who indisputably do not qualify for Monetary Awards under the NFL Concussion Settlement Program—has no basis in the governing Settlement Agreement, fact, or law, and should be summarily denied.

*First*, nearly six years after the Settlement Agreement's Effective Date, and this Court's and the Third Circuit's searching review and approval of it, Movants now argue that the Claims Administrator cannot exercise its well-established authority to consult with the Settlement Program's neutral experts on technical medical issues for claims relying on evaluations conducted through the Baseline Assessment Program (the "BAP"). Movants' argument, however, directly conflicts with the clear terms of the Settlement Agreement, which establishes an Appeals Advisory Panel ("AAP") and expressly tasks it with providing advice "with respect to medical aspects of the Class Action Settlement," and grants the Claims Administrator "the discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package." Indeed, as Special Master Hoffman correctly held in rejecting Movants' *exact* argument in the context of another class member's claim appeal, "it simply cannot be the case that the Claims Administrator . . . does not have the authority to request assistance from the Settlement's

appointed expert medical reviewers," whose "very purpose is to provide advice regarding the 'medical aspects' of the Settlement" to help ensure that the Settlement Program pays Monetary Awards only for diagnostically accurate claims.  Movants Davis' and James' claims were anything but.  Although they initially received diagnoses from BAP providers, their claims were ultimately determined by the Program's neutral medical experts to fall far short of qualifying for a Monetary Award because their neuropsychological testing was invalid, and because they failed to meet the functional impairment requirements for their claimed diagnoses.  They cannot now avoid that proper determination by disputing the Claims Administrator's Settlement-granted authority to seek expert assistance in assessing *any* claim—whether based on evaluations conducted in the MAF program or through the BAP— to ensure that they are valid and meet the Settlement Agreement's requirements.

*Second*, Movants ask the Court to effectively amend the Settlement Agreement and write new terms into the later-enacted Norming Agreement by ordering that the age of certain Retired Players whose neuropsychologists applied full demographic normative corrections, including for race, should be indefinitely "tolled" as of the date those Players had their first neuropsychological evaluation.  This argument, however, is rooted in a profound misunderstanding of the Norming Agreement, and in a transparent desire to artificially inflate any future Monetary Awards Movants may ultimately qualify for, despite the fact that Movants failed to meet the criteria for any Monetary Award whether race norms or the race-neutral new assessment method under the Norming Agreement is used by their neuropsychologists.  As this Court is well aware, the Norming Agreement resolved pending challenges to the use of full demographic normative adjustments by independent neuropsychologists participating in the Settlement Program, and remedied any potential

impact of their use.  In fact, the Norming Agreement already, in effect, "tolls" the age of any Retired Player who would have received a Monetary Award but for the consideration of race. It correctly does not do so, however, for Claimants who, like Movant Williams, indisputably failed to meet the criteria for any Monetary Award regardless of the consideration of race, because he does not meet the Settlement's functional impairment requirements.  Movants do not ask to be placed in the position they otherwise would have been "but for" race considerations, as they proclaim, but instead seek a completely unjustifiable tolling windfall at the NFL Parties' expense.

*Finally*, Movants argue that there are Retired Players who were unable to attend expanded BAP evaluations under the Norming Agreement—such as Movants Owens and Brown, who passed away before they could attend their evaluations—and thus were improperly deprived of unspecified "benefits" to which they were purportedly "entitled."  This argument, too, is fatally flawed.  As this Court is aware, the Norming Agreement contemplated this precise situation, where a Retired Player was unable to attend an expanded BAP evaluation, and provided an express exception process to remedy it.  Neither Movant Owens nor Movant Brown (nor their Representative Claimants) have pursued this readily available exception.  And even if the Norming Agreement did not provide such an exception, the availability of expanded BAP examinations is an *additional* benefit provided to Class Members above and beyond those required by the Settlement Agreement—even if a Retired Player could not avail himself of those additional benefits, that would not be a deprivation of *any* right provided under the original Settlement.  Notably, both Movants Owens and Brown availed themselves of the free BAP evaluations provided for under the Settlement Agreement.

For these reasons, and those set forth below, the NFL Parties respectfully submit that Movants' Motion should be denied.

## BACKGROUND

### A. The Settlement Agreement, Baseline Assessment Program, and Claims Process

On April 22, 2015 (as amended on May 8, 2015), this Court, after significant briefing and a full fairness hearing, issued its final Order and Judgment approving the class action Settlement Agreement and certifying the Settlement Class. (Am. Final Order & J. ¶¶ 2–4, 7, ECF No. 6534.) Following an appeal by certain objectors, the Third Circuit affirmed the Court's Final Order and Judgment. *In re Nat'l Football League Players' Concussion Inj. Litig.*, 821 F.3d 410 (3d Cir. 2016). The Settlement Agreement became effective on January 7, 2017, and this Court retained "continuing and exclusive jurisdiction" over the Class Action Settlement Agreement's administration and enforcement. (Settlement Agreement § 27.1.)

The Settlement Agreement provides Monetary Awards for, among other diagnoses, Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, and provides Supplemental Benefits for diagnoses of Level 1 Neurocognitive Impairment. (*See* Settlement Agreement, Ex. 1 (the "Injury Definitions").) Qualifying Diagnoses of Level 1, 1.5, or 2 Neurocognitive Impairment generally require neuropsychological testing and other evidence establishing that a Retired Player is experiencing the degree of cognitive decline set forth in the Injury Definitions for each diagnosis. (*Id.*) The Injury Definitions and accompanying neuropsychological testing protocol set forth the specific neuropsychological testing battery and impairment criteria to be used in BAP evaluations, as well as instructions for evaluating validity to ensure that a former players' testing is a "reflection of his optimal level of neurocognitive functioning" in order to

4

receive a Qualifying Diagnosis.  (*See id.*, Ex. 2.)  The Injury Definitions also contain other requirements, including that a Retired Player have a certain level of functional impairment corresponding with his claimed Qualifying Diagnosis.  (*See id.*)

Pursuant to the Settlement Agreement, claimants can receive these Qualifying Diagnoses by being evaluated through the BAP or receiving an evaluation and diagnosis from a MAF physician.  The BAP allows eligible players to undergo evaluations from an approved board-certified neurologist and a board-certified neuropsychologist free of charge.  In the BAP, both the neurologist and neuropsychologist must agree on either a Qualifying Diagnosis or a determination of No Impairment.  If the providers do not agree on a diagnosis or lack thereof, the "BAP Administrator may in its discretion: (a) request that the Qualified BAP Providers confer with each other in an attempt to resolve the conflict; (b) request that a second BAP baseline assessment examination be conducted by different Qualified BAP Providers; or (c) refer the results of the BAP baseline assessment examination and all relevant medical records to a member of the Appeals Advisory Panel for review and decision."  (Settlement Agreement § 5.13.)

If the providers agree on, or a conflict is resolved in favor of, a diagnosis of Level 1 Neurocognitive Impairment, then the BAP Administrator makes Supplemental Benefits available to that Retired Player, which provides eligibility for benefits covering additional testing and treatment, up to a current limit of $35,000.  If the providers agree on, or a conflict is resolved in favor of, a diagnosis of either Level 1.5 or Level 2 Neurocognitive Impairment, the Retired NFL Player or Representative Claimant is informed that he or she is eligible to submit a claim for a Monetary Award with the Claims Administrator, and that claim will go through the claims process.

All Monetary Award claims—including those based on diagnoses made through the BAP—are reviewed by the Claims Administrator, who evaluates whether the rendered diagnoses in fact meet the criteria for a Monetary Award. (*See* Settlement Agreement Art. VIII.) The Settlement Agreement provides the Claims Administrator with wide latitude to investigate and ensure the sufficiency of Monetary Award claims, irrespective of whether those claims are based on BAP evaluations or evaluations with a MAF physician and approved neuropsychologist. (*See, e.g.*, *id.* § 8.6.) Specifically, the Settlement Agreement grants the Claims Administrator broad authority to "undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package or Derivative Claim Package documentation." (*Id.* § 8.6(b).)

In order to assist the Claims Administrator in ensuring that Monetary Award claims meet the Injury Definitions' criteria and are diagnostically accurate, the Settlement Agreement provides the Court and Special Masters, and at their direction the Claims Administrator, with neutral medical experts in the form of the AAP, which is comprised of board-certified neurologists tasked with "advis[ing] the Court or the Special Master with respect to medical aspects of the Class Action Settlement and to perform the other duties of the [AAP] set forth in th[e] Settlement Agreement." (*Id.* § 2.1(g); *see also, e.g.*, Settlement Program FAQ 138 ("What happens after I submit my Claim Package? The Claims Administrator will review your Claim Package to determine whether you have sent in everything required to make your claim complete. If you have, your claim will be reviewed on its merits either by the Claims Administrator or by an AAP doctor.").) The Settlement Program also has Appeals Advisory Panel Consultants ("AAPCs"), who are board-certified neuropsychologists tasked with "advis[ing] a member of the [AAP], the Court, or the Special

Master on the neuropsychological testing referenced in [the Settlement Agreement's Injury Definitions and neuropsychological testing protocol] as pertaining to the Qualifying Diagnoses of Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment, and Level 1 Neurocognitive Impairment if subject to review as set forth in Section 5.13." (Settlement Agreement § 2.1(h); *see also* Settlement Program FAQ 134 ("What is the AAPC and what does it do?  The Appeals Advisory Panel Consultants ['AAPC'] are board-certified neuropsychologists approved by the Court to give advice about neuropsychological testing and cognitive impairment to the Court, Special Masters, Claims Administrator, and/or AAP doctors.").)  The Claims Administrator has a long practice of consulting with AAP and AAPCs, consistent with its rights and obligations under the Settlement, in determining the sufficiency of Claim Packages submitted through both the BAP and MAF programs and to ensure that claims are diagnostically accurate.

### B.     The Norming Agreement

Consistent with long-standing neuropsychological practice and to facilitate accurate diagnoses, the Settlement Agreement permitted, but did not require, the independent clinicians who render Settlement Program diagnoses to consider a Retired Player's race in scoring his neuropsychological test results for Qualifying Diagnoses of Level 1, Level 1.5, and Level 2 Neurocognitive Impairment.  (*See* August 20, 2020 Special Masters' Decision at 11, https://www.nflconcussionsettlement.com/Docs/demographic_norms_sm.pdf.)

Specifically, the Settlement Agreement allowed the consideration of race during neuropsychological evaluations in two ways.  First, clinicians had the option of using demographic data to estimate a Retired Player's premorbid intellectual ability either alone ("demographics only") or in combination with the Test of Premorbid Functioning.  (*See* Settlement Agreement, Ex. 2 § 3.)  Second, when assessing a Retired Player's performance

on neuropsychological testing, clinicians were permitted (but not required) to use normative databases that aggregate neuropsychological test scores from people who represent the general population without the presence of neurocognitive problems, against which specific neuropsychological test scores obtained from a Retired Player are compared in order to help identify if the Retired Player's performances are similar to, or significantly different from, what is expected for a person of similar background characteristics, which could include a person's race.  (*See id.* § 4.)

      In August 2020, Settlement Class Members Najeh Davenport and Kevin Henry ("Intervenors") brought legal actions challenging the Settlement Program's practice with respect to the possible consideration of a Retired Player's race when assessing his neuropsychological test results for the purpose of rendering Qualifying Diagnoses of Level 1, Level 1.5, and Level 2 Neurocognitive Impairment.  (*See* Mot. for Relief, ECF No. 11169; Compl., *Henry et al.* v. *Nat'l Football League et al.*, 2:20-cv-04165 (E.D. Pa. Aug. 25, 2020), ECF No. 1.)  The Intervenors also challenged the use of the BAP Clinician's Interpretation Guide, adopted in 2017, which recommended the use of the so-called Heaton norms, including race norms, in administering neuropsychological tests.  (*Id.*)  The NFL Parties filed a motion to dismiss Intervenors' complaint on November 2, 2020 on the ground that the lawsuit constituted an improper collateral attack on the Class Action Settlement Agreement, which the Court granted on March 8, 2021.  (Order, *Henry et al.* v. *Nat'l Football League et al.*, 2:20-cv-04165 (E.D. Pa. Mar. 8, 2021), ECF No. 40.)  The Intervenors also filed: (1) a motion, pursuant to Article XXVII of the Class Action Settlement Agreement, seeking an interpretation of that Agreement which prohibited the use of race norms; and (2) an appeal from the Special Master's ruling with respect to the claim for benefits by Mr. Davenport.  (*See*

Mot. for Relief, ECF No. 11169.)  The Court denied the Article XXVII motion without prejudice on November 20, 2020.  (*See* Order, ECF No. 11237.)

        In its order dismissing Intervenors' class action complaint, the Court referred the Parties to mediation, supervised by Magistrate Judge David Strawbridge, to address the consideration of race in the Settlement Program (the "Mediation").  (Order at 1, *Henry et al.* v. *Nat'l Football League et al.*, 2:20-cv-04165 (E.D. Pa. Mar. 8, 2021), ECF No. 40.) Intervenors filed a motion to intervene and, on June 3, 2021, the District Court granted the motion to intervene in part.  (Explanation & Order at 2, ECF No. 11368.)

        As part of the Mediation, a group of the nation's leading neuropsychological experts retained by the NFL Parties and Class Counsel (the "Expert Panel") developed a new assessment method, which completely eliminates the use of race norms in the evaluation of Retired Players' estimated premorbid intellectual ability and neuropsychological test results, and thus, from the Settlement Program.  As a result of these efforts and based on the work of the Expert Panel, on October 20, 2021, the NFL Parties, Class Counsel, and Intervenors entered into an agreement (the "Norming Agreement," ECF No. 11502),[1] which among other things, eliminates the consideration of race from the Settlement Program.

### C.    Modifications to the Settlement Agreement

        On December 30, 2021, the NFL Parties and Class Counsel filed a motion (the "Modification Motion") to approve modifications to the Settlement Agreement in order to implement the Norming Agreement pursuant to Section 6.6 of the Settlement Agreement, which allows the NFL Parties and Class Counsel, with Court approval, to make "prospective

---

[1]    All capitalized terms not otherwise defined in this opposition shall have the meanings set forth in the Norming Agreement, including capitalized terms not defined in this opposition or in the Norming Agreement having the meaning ascribed to them in the Class Action Settlement Agreement.

modifications to the definitions of Qualifying Diagnoses and/or the protocols for making Qualifying Diagnoses." (*See* Modification Motion, ECF No. 11567; Settlement Agreement § 6.6(a).) Specifically, the parties' requested modifications prohibited any consideration of race in Settlement Program evaluations and provided additional benefits to eligible class members whose neuropsychological test results may have been adversely affected by the consideration of race. These additional benefits include: (i) automatically rescoring all BAP or MAF post-Effective Date neuropsychological testing where race was used and a Retired Player's medical records could have established a new or more severe Qualifying Diagnosis had his test scores been lower ("automatic retrospective rescoring"); (ii) granting eligible Retired Players who had Black Race Norms applied to their testing an additional free BAP exam regardless of whether they had a prior BAP exam or were initially eligible for one ("expanded BAP exams"); and (iii) allowing other eligible Retired Players who do not fall into the aforementioned categories but who had Black Race Norms applied to their testing performed through the MAF program, to have their testing rescored with the race-neutral new assessment method at their expense. (*See* Modification Motion, ECF No. 11567.)[2] If, upon automatic retrospective rescoring with the race-neutral new assessment method, it is determined that the Retired Player met all the requirements for a Monetary Award on the date of their prior testing, then the Retired Player's Monetary Award is calculated as of the earlier date when he underwent that prior testing—i.e., any Retired Player whose Monetary Award outcome was adversely impacted by the use of race norms had his age tolled as of the date of his evaluation that used race norming.

---

[2]    A Retired Player or Representative Claimant can only avail themselves of one of these benefits.

Following a period for class members to comment on the proposed modifications and for the parties to respond to those comments, on March 4, 2022, the Court granted the parties' motion to modify the Settlement Agreement to enact the Norming Agreement, effective immediately, with automatic rescoring and access to the expanded BAP examinations to be implemented on or around April 29, 2022.  (*See* Order, ECF No. 11648.) The Settlement Program's administrators dutifully complied with the Court's Order and have implemented the Modifications to the Settlement Agreement pursuant to the Norming Agreement.  Since that time, 646 claims have undergone automatic retrospective rescoring, which have resulted in more than 60 class members becoming eligible for a new or additional Monetary Award, subject to the NFL Parties' right to appeal.

### D.    The Instant Motion

On August 16, 2022, Movants filed the instant Motion, which, based on Movants' experience in the Settlement Program, argues that the Claims Administrator does not have the authority to seek AAP review or otherwise take any action to ensure the sufficiency of claims relying on BAP evaluations; that certain retired players who were race normed must have their age "tolled" from the time they were first tested to place them in the same position they would have otherwise been in had race norming never been used; and that there should be additional mediation to address Retired Players whose age cannot be tolled. (*See* Br. at 15.)  The Motion also requests that Movants' counsel be appointed as "Special Class Counsel" to oversee the requested relief, and that the Court "authoriz[e] an appropriate award of attorney's fees and expenses for these efforts."  (*Id.*)

For the reasons described in this opposition, the Motion has no merit.

## ARGUMENT

The Motion, seeking to prevent AAP and AAPC review of claims relying on BAP evaluations and enact needless amendments to the Norming Agreement that would result in unjustified windfalls to Movants, is baseless and should be denied in its entirety.

### I.      The Claims Administrator Has the Clear Authority to Seek AAP Review of BAP Claims

#### A.      The Settlement Agreement Expressly Permits AAP Review of Any Claim

Movants' argument that the Claims Administrator lacks the ability to use the AAP and AAPCs during the claims process to ensure that claims submitted based on BAP evaluations meet the criteria for Monetary Awards set forth in the Settlement's Injury Definitions has no basis in the Settlement Agreement. The Settlement Agreement expressly grants the Claims Administrator broad authority to ensure that Monetary Award claims meet the Settlement's criteria as set forth in the Injury Definitions, including by consulting the Program's neutral experts.

Diagnostic accuracy is the cornerstone of the Settlement and was critical to the NFL Parties' agreement to enter into an uncapped settlement.[3] The NFL Parties are committed to paying the valid claim of any class member who meets the Settlement's criteria for a Monetary Award over its 65-year term, but it is vital to ensure that Monetary Awards class members do receive are based on diagnostically accurate Qualifying Diagnoses, and meet the

---

[3]   *See In re: Nat'l Football League Players' Concussion Inj. Litig.*, 307 F.R.D. 351, 414 (E.D. Pa. 2015) ("Monetary Awards may amount to hundreds of thousands if not millions of dollars to eligible Class Members . . . . *The NFL Parties are entitled to reasonable procedures and documentation to ensure that large awards go to deserving claimants*." (emphasis added)); *id.* at 417 (noting the importance of "ensur[ing] that *only* Retired Players *actually affected by neurocognitive or neuromuscular impairment . . . receive Monetary Awards*" (emphasis added)); *id.* at 364 ("Crucially, this revised deal uncapped the fund to compensate Retired Players with Qualifying Diagnoses; the NFL Parties agreed to pay all valid claims over the duration of the settlement regardless of the total cost. The NFL Parties also agreed to narrow the scope of the Releases. In exchange for these concessions, the NFL Parties received heightened anti-fraud provisions to *ensure that funds were only disbursed to deserving claimants.*" (emphasis added)).

Settlement Agreement's criteria.    That is why the entire regime created by the Settlement Agreement is designed to rely on the AAP's and AAPCs' invaluable expertise from their professional stature and from their experience throughout the entire claims process to ensure that all Qualifying Diagnoses resulting in Monetary Awards are medically supported and diagnostically accurate.

Indeed, Section 8.6(b) of the Settlement Agreement expressly provides that "[t]he Claims Administrator will have the discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of ***any Claim Package*** or Derivative Claim Package documentation, including, without limitation, as set forth in Section 10.3," which concerns audits and the detection of fraud in the Program. (emphasis added).  Similarly, Section 9.1 of the Settlement Agreement provides that "[b]ased upon its review of the Claim Package, and the results of any investigations of the Settlement Class Member's claim, the Claims Administrator will determine whether a Settlement Class Member qualifies for a Monetary Award," and in order to make that determination, can evaluate supporting medical records.   Nothing in the Settlement Agreement limits these provisions to claims submitted through the MAF program, as opposed to those based on BAP evaluations.

Moreover, as explained above, the explicit purpose of the neutral expert AAP members and AAPCs is to advise the Claims Administrator with respect to "the medical aspects of the Class Action Settlement" and the Settlement's neuropsychological testing protocol, respectively.  (*See* Settlement Agreement §§ 2.1(g)–(h); *see also* Settlement Program FAQs 134, 138.)  Indeed, the parties to the Settlement Agreement contemplated the use of these neutral experts in recognition of the importance of ensuring only legitimate claims

13

receive Monetary Awards, and that the Claims Administrator, Special Masters, and Court lack expertise to evaluate the technical medical aspects of Claim Packages.

Movants contend that Sections 8.6(b) and 9.1 are inapplicable to the claims determination process because they "deal[] with audits and investigations of the player." (Br. at 8.) Movants are incorrect. Sections 8.6 and 9.1 of the Settlement Agreement are not located within the portion of the Settlement addressing audits and investigations. (*See* Settlement Agreement § 10.3.) Instead, they are contained in the articles governing the submission and review of all claim packages and the notices of claim determinations, payments, and appeals, respectively. (*See id.*, Arts. VIII–IX). Further, both provisions specify that they provide powers in addition to and separate from the Claims Administrator's powers in the realm of audits and investigations. (*Id.* § 8.3(b) ( ". . . ***including, without limitation***, as set forth in [the section of the Settlement addressing audits]" (emphasis added)); *id.* § 9.1 ("based upon its review of the Claim Package, ***and*** the results of any investigations . . ." (emphasis added).)

Indeed, Movants are not the first to mount this frivolous argument, which was squarely rejected by Special Master Hoffman. As he recently determined in the claim appeal context, "the Claims Administrator is responsible for processing and reviewing Claim Packages and determining whether Claimants are entitled to Monetary Awards," and "[h]aving entrusted the Claims Administrator with this central responsibility, the Parties to the Settlement incorporated language granting it broad authority to take the steps necessary to do its job." (Special Master's April 25, 2022 Decision at 8, https://www.nflconcussionsettlement.com/Docs/stroke_sm_2.pdf.) Indeed, "it simply cannot be the case that the Claims Administrator—tasked with reviewing the sufficiency of complex medical documentation and authorized to 'undertake or cause to be undertaken further

14

verification and investigation, including into the nature and sufficiency of any Claim Package'—does not have the authority to request assistance from the Settlement's appointed expert medical reviewers," whose "very purpose is to provide advice regarding the 'medical aspects' of the Settlement."  (*Id.*)  Accordingly, "[l]imiting the Claims Administrator's ability to ask for the AAP's assistance in making particular, nuanced, medical determinations would unquestionably run contrary to the goals and purpose of the Settlement."  (*Id.*)

Movants' attempts to distinguish this decision on the grounds that language in the decision suggests that the AAP "should defer to the articulated medical judgments of examining [providers]" and that the claim at issue in that decision involved a stroke offset (Br. at 6–7) are meritless.  The fact that the AAP, in its review, should ordinarily defer to the well-reasoned, articulated medical judgments of providers, only demonstrates that the AAP is permitted to review BAP claims under the Settlement.  Moreover, there is nothing in the Special Master's decision or its reasoning to suggest that it does not apply to all claims before the Claims Administrator or is otherwise limited to stroke offset determinations.

**B.  Movants Misunderstand the Claims Process**

Movants' argument that the only permissible AAP review of a BAP claim is in the case of BAP providers having conflicting diagnoses (Br. at 4) similarly suffers from a fatal misunderstanding of the claims process established by the Settlement.  As explained above, the BAP is simply the program through which Retired Players undergo a neurological and neuropsychological evaluation.  In that phase, if the BAP providers do not agree on a determination, Section 5.13 of the Settlement Agreement gives the BAP Administrator the option of resolving the conflict through AAP review.

Movants fail to understand, however, that a Qualifying Diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment through the BAP does not automatically qualify a

Retired Player for a Monetary Award. Once a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment is rendered in the BAP, the Retired Player—just like those who see a MAF physician and receive a Qualifying Diagnosis—*must* submit his Claim Package through the claims process, which is overseen by the Claims Administrator and is completely *separate and distinct* from the BAP. As discussed, once a former player submits a Claim Package to the Claims Administrator, the Claims Administrator has the explicit right to ensure that "***any Claim Package***" meets the Injury Definition's requirements including through AAP review of that claim, irrespective of whether the evaluations were performed pursuant to the BAP or MAF program.[4]

It is distinctly *not* the case that the "Settlement Agreement provides that the player must be paid" once a BAP diagnosis is rendered. Nor is it the case that "any action beyond processing" such a claim "stands in direct contradiction to the terms of the Agreement and the authority granted to the Claims Administrator." Indeed, Movants fail to cite *any relevant authority* at all for these far-fetched and self-serving proclamations. (Br. at 6, 8.) Nor could they, as the Settlement Agreement clearly grants the Claims Administrator the authority to ensure that *any* claim, including those based on BAP evaluations, meet the Settlement's criteria for a Qualifying Diagnosis. (*See supra* at 12–15.) Although Movants cite Section 9.8(a)(v) of the Settlement Agreement in purported support of their contentions, that provision stands for the unremarkable proposition that, as one would expect, AAP review of a diagnosis at the request of the BAP Administrator within the BAP is paid out of the BAP

---

[4]   Movants point to Special Master Hoffman's statement in a previous decision that the BAP Administrator sought AAP review where BAP providers did not agree on a diagnosis (Br. at 4–5), but this is completely irrelevant. Nobody disputes that the *BAP Administrator* has the ability pursuant to Section 5.13 to seek AAP review in that situation, and the decision has no bearing on the *Claim Administrator's* clear authority to seek AAP review of *any claim* in the claim determination process.

Fund, and AAP review of a submitted claim during the separate and requisite claims process overseen by the Claims Administrator is paid out of the Monetary Award Fund, which funds the claim process and all Monetary Awards (even those based on BAP evaluations).  Simply put, it has no relevance to the issue Movants raise.[5]

If the parties to the Settlement Agreement intended for only certain Claim Packages to be reviewable by the AAP to ensure they meet the Settlement's requirements, then that would be reflected in the Settlement Agreement.  But they did not.  The Settlement Agreement specifically provides the opposite to ensure diagnostic accuracy of claims, and Movants fail to point to any authority in the Settlement Agreement or otherwise that supports their implausible view of the scope of the Claim Administrator's authority in the claims process.

**C.    Movants' Claims Underscore the Necessity of AAP Review**

Although Movants proffer the claims of Movants Davis and James as examples of purportedly improper actions by the Claims Administrator, these claims merely emphasize why the Claims Administrator's ability to seek AAP review of any claim is a critical, bargained-for component of the Settlement Agreement.

Mr. James and Mr. Davis were both evaluated through the BAP by neurologist Dr. Bruce Rubin and neuropsychologist Dr. Charles Golden, who diagnosed them with Level 1.5 Neurocognitive Impairment and Level 2 Neurocognitive Impairment, respectively.

---

[5]    Movants cite a YouTube video, which baselessly accuses Claims Administrator Orran Brown of "preying on brain injured victims," for the proposition that the Claims Administrators are "fiduciaries to the claims process."  (Br. at 8.)  Not only have Movants utterly failed to demonstrate that the Claims Administrator has done anything other than faithfully fulfill its obligations under the Settlement Agreement, but the conspiratorial rhetoric contained in the video cited by Movants has absolutely no place in this Settlement Program.  Moreover, Movants' request that the Court take "punitive action" against the Special Masters and Claims Administrator (*id.* at 16) is patently meritless, based only on their disappointment that dutifully carrying out the terms of the Settlement Agreement does not result in a financial windfall for them.

Following that determination, Mr. Davis and Mr. James submitted a Claim Package to the Claims Administrator pursuant to the process described above.  Once in the claims process, the Claims Administrator exercised its clear authority to seek AAP review of any claim pursuant to Sections 8.6(b) and 9.1 of the Settlement Agreement, likely due to well-founded concerns with Dr. Golden's evaluations.  Based on that review, the Claims Administrator learned that (i) their neuropsychological testing was clearly invalid due to their failure of multiple performance validity measures and implication of several *Slick* criteria (*see* Settlement Agreement, Ex. 2 § 2), and (ii) they failed to meet the functional impairment requirements for their claimed Qualifying Diagnoses—each an independent basis for denial. The Claims Administrator thus denied both claims, which are now in the appeals process.[6]

Further underscoring the necessity of Claims Administrator and AAP review of BAP diagnoses, Dr. Golden, who was a BAP provider, is no longer even approved to conduct Settlement Program evaluations, and has been repeatedly criticized by the Program's neutral experts for misrepresenting validity testing results and ignoring clear rules and guidance from the Claims Administrator.  For instance, AAPCs have previously observed that "errors in interpretation of performance and validity tests [] are frequently seen in Dr. Golden's evaluations," and—in a decision reversing an award on the basis that Dr. Golden's validity determinations were both clearly erroneous and inadequately articulated—Special Master Hoffman noted that Dr. Golden's evaluations have on numerous occasions "not weathered scrutiny."   (April 18, 2022 Special Master's Decision at 4, 6, 7,

---

[6]   Movants' brief complains about the delay in processing these claims, but that delay was caused by their providers' deficient records requiring the Claims Administrator to send follow-up questions and requests. In any event, the Settlement provision Movants point to applies only to pre-Effective Date claims, and the 45-day period only begins to run when the AAP member receives the claim file.  (*See* Settlement Agreement § 6.4(b)(i).)

https://www.nflconcussionsettlement.com/Docs/validity_testing_6_sm.pdf.)[7]  Indeed, in Mr. Davis' and Mr. James' evaluations, which Movants contend somehow demonstrate why AAP review is improper, Dr. Golden misrepresented multiple performance validity results as passing when, in fact, they were clear failures.  Without the AAP and AAPCs, the Claims Administrator would have no way of accurately evaluating these technical medical determinations to ensure that they are reasonable and fulfill the Settlement Agreement's criteria for a Monetary Award and do not incorrectly diagnose Movants.

Movants also argue that because the NFL Parties have some degree of input into the approval of BAP providers, discretionary AAP review is unnecessary, but this is a non sequitur.  Putting aside that Movants greatly exaggerate the NFL Parties' degree of control over the selection of BAP providers, the process the Settlement establishes for selecting such providers is irrelevant to the fact that the Settlement explicitly confers to the Claims Administrator the authority to seek AAP review of any claim.  And Movants' claims demonstrate precisely why.

In sum, the NFL Parties are committed to paying the valid claim of any class member who meets the Settlement's criteria for a Monetary Award over its 65-year term.  It is vital, however, that the Claims Administrator has access to the Program's neutral experts to assist its evaluation of complex and technical medical issues in order to ensure that submitted claims meet the applicable criteria prior to payment, as is expressly contemplated by the Settlement Agreement.

---

[7]   Dr. Golden has also "repeatedly expressed his doubts to the Claims Administrator about the utility of the Settlement's mandated quantitative performance scores in the retired player population and his skepticism about the Program's review process."   (April 18, 2022 Special Master's Decision at 7, https://www.nflconcussionsettlement.com/Docs/validity_testing_6_sm.pdf.)

II.     **Movants Were Not Harmed by the Modifications to the Settlement Agreement**

Movants' brief also seeks changes to the Settlement Agreement and Norming Agreement designed not to rectify any supposed harm to the class, but instead to result in an unjustified windfall for Movants (and their counsel) individually.

A.     **Movants Were Never Discriminated Against by the Settlement Program**

As a preliminary matter, the Motion rests on the false premise that Movants and other class members are being discriminated against in "violation[] of their Civil and Due Process rights." (Br. at 12.) As the Court is well aware, demographically adjusted test scores which often take into account a person's age, level of education, gender, and race have long been used in clinical neuropsychology to avoid the misdiagnosis of Black test-takers, who were misdiagnosed with cognitive impairment at up to three times the rate of their White counterparts due to testing bias and social inequity. The use of demographic adjustments, including race, in the Settlement Program in connection with standard tests long used in the field was recommended by neuropsychological experts in pursuit of accurate diagnoses under the Settlement Agreement. Indeed, an analysis of over 700 claims demonstrated that the use of race norms did not have a differential impact on the impairment ratings assigned to Black and White former players in the Settlement Program (*see* Norming Agreement § 9.1(d)), and the Court correctly denied or dismissed each legal challenge to the discretionary use of race norming at the earliest possible juncture.

Nevertheless, recognizing the desire of many in medicine, including in the field of neuropsychology, to remove the consideration of race as a proxy to correct for test bias and social inequity, the parties to the Norming Agreement agreed to remove race as a consideration in Settlement Program evaluations and offer additional benefits to certain Settlement Class Members who were potentially impacted by such consideration, including the automatic

20

rescoring of certain Retired Players' testing using the diagnostically accurate race-neutral assessment method, and the opportunity for certain other potentially impacted Retired Players to receive an additional free evaluation using that new assessment method. Thus, Movants' contention that they were discriminated against in violation of their civil and due process rights is contrary to fact and entirely baseless. So, too, are Movants' arguments and requested relief, which are designed solely to obtain a windfall for them and their attorney.

**B.  Movant Williams' Requested Relief Is Already Provided for by the Norming Agreement When Warranted**

Movants contend that any future Qualifying Diagnosis received by Mr. Williams or similarly situated Retired Players should be awarded as of the date of any prior neuropsychological testing where race was considered in evaluating the Retired Player's neuropsychological test scores. But the Norming Agreement already provides this "age tolling" by backdating a Claimant's Qualifying Diagnosis to their previous evaluations when the Claimant would have received a diagnosis at that prior date but for the consideration of race.

To that end, a key benefit of the Norming Agreement was automatic retrospective rescoring, through which the Program's administrators reviewed every completed evaluation or claim to determine whether the class member's final diagnosis could have been adversely impacted by the use of race norming. If so, their claims were rescored under the race-neutral new assessment method and if they qualified for a Monetary Award, that award was backdated (or "tolled") to the date of their prior evaluations. In other words, any class member who could have theoretically received an award but for the use of race norming in the Settlement Program had their testing rescored and, if they qualified for such an award based on that prior testing after removing the consideration of race, their award is

calculated based on the age they were at their prior evaluation and incorporating the Program's annual inflation adjustments.[8]

Movant Williams here does not qualify for this "tolling" because he doesn't qualify for an award under *any* assessment method.  Movant Williams' testing was rescored pursuant to automatic retrospective rescoring under the Norming Agreement.  Through that process, it was determined that Movant Williams would not have qualified for a Monetary Award when he received his neuropsychological evaluations even if race had been eliminated from consideration, because he had *no* functional impairment in two of the three functional impairment categories, and had only slight impairment in the third.  (*See* Newton Williams, SPID 100016696, Rescored Neuropsychological Testing Results, Doc. ID 264572 at 1.)  Simply put, Movant Williams was not harmed in any way by his neuropsychologist's consideration of race in scoring his neuropsychological testing, because he failed to meet the entirely separate functional impairment criteria for a Monetary Award and, thus, has no compensable cognitive impairment.  Moreover, Movant Williams' contention that he was somehow denied four years of BAP benefits is nonsensical—he did not even complete his BAP evaluations until last year.  (*See id.* at 1.)

Indeed, in multiple evaluations, most recently in 2021, Movant Williams has never demonstrated more than slight functional impairment and, thus, was never eligible for any Monetary Award pursuant to the Settlement Agreement's clear requirements.  Moreover, Movants' pure conjecture that Mr. Williams *could* have received a Monetary Award *if* he had

---

[8]   Moreover, if a Retired Player receives a Qualifying Diagnosis through an expanded BAP exam, the Norming Agreement specifically provides that the diagnosis "may relate back to the date of an earlier exam that, upon application of the New Method, sufficiently demonstrates that the Retired Player previously met all of the criteria for the new diagnosis, notwithstanding any other timing rules in the Class Action Settlement Agreement."  (Norming Agreement § 2.6(e).)

been retested—despite all evidence to contrary—ignores the fact that Mr. Williams can get retested through the MAF program at any time, and submit a Claim Package based on that testing if he were to then meet the Settlement's criteria.

### C.     The Relief Requested for Movants Owens' and Brown's Situation Is Already Provided for in the Norming Agreement

Movants' brief next argues that Movants Owens and Brown, who were eligible for expanded BAP evaluations under the Norming Agreement but passed away prior to attending those evaluations, were deprived benefits.   But Movants' counsel and Representative Claimants have failed to avail themselves of the exceptions provided for in the Norming Agreement for their precise situation.

Both Movant Owens and Movant Brown previously underwent evaluations through the BAP and, in April 2022 were informed by the Claims Administrator that they were eligible for a free expanded BAP evaluation, a benefit of the Norming Agreement available to Retired Players whose previous claims did not meet the requirements for automatic retrospective rescoring.  (*See* Norming Agreement § 2.6.)  Although Movants claim that both Mr. Owens' and Mr. Brown's "results were rescored per modifications to the settlement" (Br. at 14), that is inaccurate.  Mr. Owens and Mr. Brown were eligible for an expanded BAP evaluation, rather than automatic retrospective rescoring, because they could not have met the requirements for a Qualifying Diagnosis based on their previous evaluations, irrespective of the use of race norming  (i.e., they failed to meet some other independent criteria, such as having valid testing or the functional impairment requirements for even Level 1 Neurocognitive Impairment).  Movants Owens and Brown both passed away several months after becoming eligible for expanded BAP examinations, and thus did not avail themselves of that option.

The parties to the Norming Agreement recognized the possibility that certain Retired Players who were eligible for an expanded BAP evaluation may have passed away or otherwise been unable to attend those evaluations.  Accordingly, Section 2.6(f) of the Norming Agreement provides that "[i]f a Retired Player cannot travel for a new BAP examination . . . subject to a 'good cause' standard, or if a Retired Player has died and cannot now be retested, a Special AAP Panel will determine if the Retired Player's rescored test results and Settlement Claim file meet the criteria for a new or more severe Qualifying Diagnosis."  (Norming Agreement § 2.6(f).)  Relief for Movant Owens' and Brown's situation is therefore already expressly provided for in the Norming Agreement where warranted—their counsel and Representative Claimants have simply not pursued it.

Moreover, even if the Settlement did not provide this clear exception for Movants Owens' and Brown's situation (and it does), there would be no "loss of benefits." Both Retired Players received a free BAP evaluation pursuant to the original Settlement Agreement, and those evaluations did not show any level of impairment that could have potentially entitled them to a Qualifying Diagnosis, even if their testing was rescored under a race-neutral assessment method.  The fact that the NFL Parties agreed to provide additional BAP evaluations to certain Retired Players in no way means that Retired Players who were ineligible or otherwise unable attend those evaluations "lost" benefits.   This is true for the Norming Agreement, just as it was true for Retired Players who were ineligible for, or unable to attend BAP evaluations pursuant to, the original Settlement Agreement.[9]

---

[9]   Movants also request that their attorney be appointed "Special Class Counsel to oversee the above-referenced relief and authorizing an appropriate award of attorney's fees and expenses for these efforts." (Br. at 15.)  As demonstrated in this opposition, however, the Motion is meritless and should be denied in its entirety, so there should be no relief for Movants' counsel to oversee.  Even if such relief was ordered, however, Movants do not offer any reason Class Counsel could not ensure its implementation.

24

## **CONCLUSION**

Accordingly, for the reasons stated herein, the NFL Parties respectfully request that the Court deny Movants' Motion.

Dated: September 29, 2022                    Respectfully submitted,

                                                    */s/ Brad S. Karp*
                                                    Brad S. Karp
                                                    Bruce Birenboim
                                                    Lynn B. Bayard
                                                    PAUL, WEISS, RIFKIND,
                                                    WHARTON &
                                                    GARRISON LLP
                                                    1285 Avenue of the Americas
                                                    New York, NY 10019-6064
                                                    Main: 212.373.3000
                                                    Fax: 212.757.3990
                                                    bkarp@paulweiss.com
                                                    bbirenboim@paulweiss.com
                                                    lbayard@paulweiss.com

                                                    *Attorneys for the National Football*
                                                    *League and NFL Properties LLC*

25

**CERTIFICATE OF SERVICE**

It is hereby certified that a true copy of the foregoing document was served electronically via the Court's electronic filing system on the 29th day of September, 2022, upon all counsel of record.

Dated: September 29, 2022          /s/ *Brad S. Karp*
                                       Brad S. Karp