**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB |
| | : | MDL No. 2323 |
| THIS DOCUMENT RELATES TO: | : : | Hon. Anita B. Brody |
| ALL ACTIONS | : : | |

## CLAIMS ADMINISTRATOR STATUS REPORT NO. 19

### I.      INTRODUCTION

1.      ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 19 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 18 filed on October 27, 2022 (Document 11882). Our earlier Status Reports are posted to the Settlement Website (under "Documents," click "Status Reports"). We do not repeat here what we covered in them. All numbers and other information in this Status Report No. 19 are as of January 9, 2023.[1] We will cover developments after that date in future reports.

### II.      NORMING AGREEMENT IMPLEMENTATION

2.      ***Current Status.*** On March 4, 2022, Judge Brody entered an Order approving certain modifications to the NFL Concussion Settlement Agreement Pursuant to Section 6.6

---

[1] All dates formatted as 1/9/23 in this Status Report mean January 9, 2023.

of the Class Action Settlement Agreement. These modifications, outlined in the Norming

Agreement, removed race norms and demographic estimates based on race from the NFL

Concussion Settlement Program. We have notified all affected Settlement Class Members

whether they qualified for Automatic Retrospective Rescoring and if so, the result of that

Rescoring and/or whether they qualified for an Expanded BAP exam. Table 1 summarizes

the outcome of our analysis of BAP evaluations and settlement claims:

| Table 1 | NORMING AGREEMENT ANALYSIS | |
|---|---|---|
| | **REVIEW OUTCOME** | **TOTAL** |
| **1.** | **Qualified for Automatic Retrospective Rescoring** | **646** |
| | (a)  BAP No Impairment to Level 1: Section 2.5(g)(i) | 246 |
| | (b)  BAP No Impairment or Level 1 to Level 1.5 or Level 2: Section 2.5(g)(ii) | 51 |
| | (c)  BAP diagnosis of No Impairment or Level 1 remains unchanged: Section 2.5(g)(iii) | 338 |
| | (d)  Level 1.5 or 2 Settlement Claim remains unchanged: Section 2.5(g)(iv) | 1 |
| | (e)  Level 1.5 or 2 Settlement Claim now qualifies for a Monetary Award (or an increased Monetary Award): Section 2.5(g)(v) | 10 |
| **2.** | **Qualified for an Expanded BAP exam** | **2,746[2]** |
| **3.** | **BAP evaluations to be processed under New Method that removes race from consideration** | **1,572** |
| **4.** | **Submitted Settlement Claims to be processed under New Method that removes race from consideration** | **51** |
| **5.** | **Not directly affected** | **11,122** |
| **6.** | **Excluded from eligibility for Automatic Retrospective Rescoring or Expanded BAP Exam** | **3** |
| **7.** | **Total Registered Settlement Class Members** | **16,140** |

---

[2] The number of Settlement Class Members who qualified for an Expanded BAP Exam has increased by 329 since the last report for two reasons: (1) The Special Masters determined that a group of additional Settlement Class Members qualified for Expanded BAP under Section 2.6(a) of the Norming Agreement based on their prior neuropsychological testing; and (2) additional Settlement Class Members have proven their eligibility for an Expanded BAP exam by submitting prior neuropsychological testing that meets the eligibility requirements in Section 2.6(a) of the Norming Agreement.  These 329 Settlement Class Members were previously reported in Row 5 of Table 1 as not directly affected by the Norming Agreement.

The 1,572 BAP evaluations (Row 3) include 691 cases where the Settlement Class Member is eligible for the BAP but has not yet attended a BAP appointment and 881 cases where the Settlement Class Member has attended one or both appointments but the results have not yet been finalized. The New Method will be applied to all BAP evaluations finalized for these 1,572 Settlement Class Members, and the BAP Administrator has begun notifying Settlement Class Members who have attended both appointments about those results. Similarly, we are processing the 51 Settlement Claims in Row 4 using the New Method and issuing Determination Notices incorporating those results. Finally, the 11,122 Settlement Class Members found to be not directly affected by the Norming Agreement (Row 5) could potentially be eligible for an Expanded BAP exam or to submit a New Settlement Claim under Section 2.7 of the Norming Agreement if they were examined by a Qualified MAF Physician but not diagnosed with a Qualifying Diagnosis in part because of the insufficiency of their valid neuropsychological test scores.

### III.    <u>MONETARY AWARD CLAIMS</u>

**3.**    *Total Claims Received.* Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted. We have received 71 new Monetary Award claims since Status Report No. 18 and have completed a review of all but seven claims. As of January 9, 2023, 3,044 unique Retired NFL Football Players and Representative Claimants (18.9% of the Retired NFL Football Players and Representative Claimants who received favorable registration determinations) submitted 3,510 Monetary Award Claim

Packages.[3]  Sixteen of the 3,510 claims[4] were denied as untimely.[5] We have received about five

new claims a week since Status Report No. 18 in October 2022. Of the 3,510 Monetary Award

claims submitted, 1,979 (56.4%) rest on pre-Effective Date diagnoses, while 1,256 (35.8%) are

for post-Effective Date diagnoses, of which 376 (29.9% of the 1,256) were made in the Baseline

Assessment Program ("BAP")[6] and 880 (70.1% of the 1,256) were made by Qualified MAF

Physicians.[7] The other 275 claims (7.8%) did not tell us what diagnosis date they assert. Table 2

compares these numbers to those in Status Report No. 18:

| Table 2 | QUALIFYING DIAGNOSIS DATES IN MONETARY AWARD CLAIMS | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** |
| 1. | Pre-Effective Date | 1,979 | 1,979 | +0 | 57.5% | 56.4% | -1.1% |
| 2. | Post-Effective Date | 1,179 | 1,256 | +77 | 34.3% | 35.8% | +1.5% |
| | *(a) BAP* | *361* | *376* | +15 | *10.5%* | *10.7%* | +0.2% |
| | *(b) MAF* | *818* | *880* | +62 | *23.8%* | *25.1%* | +1.3% |
| 3. | No Date Asserted | 281 | 275 | -6 | 8.2% | 7.8% | -0.4% |
| **4.** | **Totals** | **3,439** | **3,510** | **71** | | | |

---

[3] Section 3 of the Summary Report indicates that 3,571 Monetary Award Claim Packages have been submitted, which includes 61 Supplemental Monetary Award claims that we do not include in the rest of our numbers in this section of the Status Report. See section IV of the Status Report for details on the Supplemental Monetary Award claims.

[4] Of these Monetary Award claims, 625 (18%) have at least one associated Derivative Claimant who has registered and 2,885 (82%) have no registered Derivative Claimants. Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations (16,140) is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible).

[5] We reviewed 46 claims for potential untimeliness and denied 16 as untimely. We accepted 30 as timely, which includes two claims that showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

[6] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award.  The BAP Administrator's status reports explain more about BAP diagnoses.

[7] This includes claims submitted by the Settlement Class Members after the Effective Date, but the diagnoses were not rendered by MAF Physicians.  Given unique circumstances, the Parties allowed an AAP member or AAP Consultant to review the medical records to determine if there was a Qualifying Diagnosis.

Table 3 shows by diagnosis date how many claims we have for each type of Qualifying Diagnosis:

| Table 3 | MONETARY AWARD CLAIMS BY QUALIFYING DIAGNOSIS TYPE | | |
|---|---|---|---|
| | DIAGNOSIS | PRE-EFFECTIVE DATE | POST-EFFECTIVE DATE | |
| | | | MAF | BAP |
| 1. | Death with CTE | 125 | 0 | N/A |
| 2. | ALS | 51 | 11 | |
| 3. | Alzheimer's Disease | 425 | 167 | |
| 4. | Parkinson's Disease | 137 | 93 | |
| 5. | Level 2 | 505 | 232 | 118 |
| 6. | Level 1.5 | 736 | 376 | 251 |

We highlight the asserted Qualifying Diagnoses and diagnosis dates in Sections 4 and 5 of the Summary Report on the Settlement Website. We also show the current status of all Monetary Award claims based on the last notice or action taken in Section 8 of the Summary Report on the Settlement Website. There are 63 claims (2% of 3,571) in our review process after an initial Claim Package submission or a response to a notice requesting additional information and/or documents (see Row 1 in Section 8 of the Summary Report, which includes seven Supplemental claims).

###   4.   *Monetary Awards and Payments.*

(a) We show Monetary Awards and payments in Sections 7 and 11 of the Summary Report on the Settlement Website. As of January 9, 2023, we have issued 1,491 Notices of Monetary Award for claims totaling $1,062,728,218.[8] We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or

---

[8] The amount of these Notices of Monetary Award includes the 1% Derivative Claimant Award deductions allocated to eligible Derivative Claimants (see Paragraph 21 of this Status Report). Section 7 of the 1/9/23 Summary Report includes 37 Supplemental Monetary Award Claims in its total of 1,528 Claims with Monetary Award Notices in the amount of $1,079,858,112, which are not covered in our numbers in this section of the Status Report. See section IV of this Status Report for details on Supplemental Monetary Award claims.

holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit. Of the 1,491 claims with Notices of Monetary Award, we requested $1,040,914,454 from the NFL Parties for the 1,461 claims that have reached the point at which we can request funding. The NFL Parties have deposited funds for all 1,461 of those claims.[9] Of the 1,461  Monetary Award claims for which the NFL Parties have deposited funds, the Program paid 1,444  claims for a total of $966,971,790.[10] The remaining 17 funded claims were not yet ready for payment when we submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount. Of the 1,444 paid claims from Retired NFL Football Players and Representative Claimants, the Trustee sent $51,413,378 (5% of those Monetary Awards) to the Attorneys' Fees Qualified Settlement Fund, in accordance with the Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104). Finally, we are required to withhold money for unresolved Liens and for third-party funders.  Table 4 shows the distribution of the $966,971,790 paid by the Settlement Program and compares the totals to those reported in Status Report No. 18:

---

[9] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.
[10] Section 7 of the Summary Report includes $9,087,878 in Supplemental Monetary Award payments to 28 claimants in its total payments of $976,059,669 to 1,472 claims from Retired Players and Representative Claimants. We do not cover Supplemental Monetary Award claims in our numbers in this section of the Status Report. See Section IV of this Status Report for details on Supplemental Monetary Award claims.

| Table 4 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | **PAID TO** | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $890,419,125 | $930,984,431 | $40,565,306 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $3,967,502 | $4,054,420 | $86,918 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $13,377,135 | $13,530,472 | $153,337 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $17,421,230 | $18,402,468 | $981,238 |
| 5. | **Totals** | **$925,184,992** | **$966,971,790** | **$41,786,798** |

(b) Table 5 shows the changes in figures for payments and claims with Notices of

Monetary Award since Status Report No. 18:

| Table 5 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 18 | | | | | |
|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **AMOUNT** | | |
| | | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** |
| 1. | Notice of Monetary Award Issued | 1,441 | 1,491 | 50 | $1,019,509,086 | $1,062,728,218 | $43,219,132 |
| 2. | Paid | 1,383 | 1,444 | 61 | $925,184,992 | $966,971,790 | $41,786,798 |

(c) Table 6 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:[11]

| Table 6 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS[12] | | | | | |
|---|---|---|---|---|---|---|
| | DIAGNOSIS | CLAIMS SUBMITTED | NOTICE OF MONETARY AWARD | | PAID | |
| | | | HOW MANY | %[13] | HOW MANY | %[14] |
| 1. | Death with CTE | 125 | 80 | 64% | 80 | 64% |
| 2. | ALS | 62 | 45 | 73% | 45 | 73% |
| 3. | Alzheimer's Disease | 592 | 392 | 66% | 387 | 65% |
| 4. | Parkinson's Disease | 230 | 192 | 83% | 185 | 80% |
| 5. | Level 2 | 855 | 260 | 30% | 250 | 29% |
| 6. | Level 1.5 | 1,363 | 522 | 38% | 497 | 36% |

**5.     *Monetary Award Claims Reviewed by the AAP.***

(a) In addition to reviewing claims based on pre-Effective Date diagnoses, the Appeals Advisory Panel ("AAP") and Appeals Advisory Panel Leadership Council ("AAPLC") assist us with the medical aspects of claims review. Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel Consultants ("AAPC"), as highlighted in sub-paragraph (b) below. The AAP has completed reviews on 1,140 pre-Effective Date diagnosis Monetary Award claims, approving 563 (49%) of those claims (no change since Status Report No.18).[15] Under FAQ 151 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the

---

[11] Section 8 of the Summary Report on the Settlement Website identifies where claims that have not received a Notice of Monetary Award or been paid stand in the process.

[12] These do not include claims submitted where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.

[13] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that received a Notice of Monetary Award.

[14] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that were paid.

[15] Broken down by Qualifying Diagnosis, the AAP members approved 100% of Death with CTE claims, 91% of ALS claims, 75% of Alzheimer's claims, 87% of Parkinson's claims, 27% of Level 2 claims and 29% of Level 1.5

one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 140 claims. In accordance with Rules 23 and 27 of the Rules Governing Qualified MAF Physicians, the AAP and AAPLC have reviewed 360 out of the 880 total Monetary Award claims submitted for diagnoses made by Qualified MAF Physicians, approving 141 (39%) of those claims.[16] Section 2 of Exhibit A-2 to the Settlement Agreement states that a Player's failure on two or more effort tests may result in the Player's test results being subject to independent review. Under that provision, as well as Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award, the AAP and AAPLC have reviewed 64 claims out of the 376 total claims submitted based on Qualifying Diagnoses made through the BAP, approving 34 (53%) of those reviewed claims.

(b) We have assigned 756 claims (including pre- and post-Effective Date claims) to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing supporting an Alzheimer's Disease diagnosis. The AAPC have completed all of the reviews assigned to them and provided their assessments to the AAP.

6. ***Notices for Missing Materials.*** We have sent one or more notices requesting additional documents or information on 2,220 Monetary Award claims (one more since Status Report No. 18), as shown in Table 7:

---

claims. The number of claims approved or denied by the AAP may fluctuate depending on multiple factors including ongoing audit investigations, remands of AAP decisions, and re-review of determinations that have not yet been finalized to ensure compliance with current Settlement Program rules and guidelines.

[16] This figure includes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement as well as claims based on diagnoses made by Qualified MAF Physicians who have been terminated from participation in the Program under Rule 27 of the Rules Governing Qualified MAF Physicians.

| Table 7 | NOTICES FOR MISSING MATERIALS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[17] | TOTAL |
| 1. | Total Reviewed | 125 | 62 | 592 | 230 | 852 | 1,361 | 281 | 3,503 |
| 2. | Notice Issued | 48 | 29 | 322 | 106 | 569 | 910 | 236 | 2,220 |
| 3. | % Missing Materials | 38% | 47% | 54% | 46% | 67% | 67% | 84% | 63% |

So far, 88% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice. Settlement Class Members take an average of about 59 days to respond. We generally receive up to one response to these notices each week and review each reply to determine if it cures the problem. Of those who responded, 45% cured the problem. Section 6 of the Summary Report on the Settlement Website shows how many claims last received a notice requesting additional documents/information.

   7.   **Monetary Award Denials.**  There are 1,145 denials of Monetary Award claims for reasons other than an Audit (24 more since Status Report No. 18), as shown in Table 8.[18]

| Table 8 | MONETARY AWARD DENIALS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTALS |
| 1. | Total Reviewed | 125 | 62 | 592 | 230 | 852 | 1,361 | 281 | 3,503 |
| 2. | Denied | 42 | 3 | 84 | 12 | 268 | 484 | 252 | 1,145 |
| 3. | % Denied | 34% | 5% | 14% | 5% | 31% | 36% | 90% | 33% |

Sections 6 and 10 of the Summary Report on the Settlement Website show these denials and the reasons for them. Overall, the AAP has recommended denial of 659 claims for not having

---

[17] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed. We process and pay a person for only one Qualifying Diagnosis per claim submission.
[18] The 1,145 denials are the count of claims where the most recent determination notice is a denial notice. We discuss Audit denials in Paragraph 18 of this Status Report.

a valid Qualifying Diagnosis, which is 52% of the claims that currently have a denial notice. When we deny a claim based on the recommendation of an AAP member, we include in the notice comments from that AAP member explaining why. When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents. Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam. Settlement Class Members have appealed a total of 420 denial notices; twelve of the currently active denial notices are under appeal.

## IV.     SUPPLEMENTAL MONETARY AWARD CLAIMS

**8.     *Supplemental Monetary Award Claims Received.*** A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis. The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid. We have received claims from 58 Retired NFL Football Players and three Representative Claimants seeking Supplemental Monetary Awards:  40 for Qualifying Diagnoses of Alzheimer's Disease, 6 for Qualifying Diagnoses of Parkinson's Disease, and 15 for Qualifying Diagnosis of Level 2 Neurocognitive Impairment. This is 14 more Supplemental claims than we reported in Status Report No. 18.

9.      *Supplemental Monetary Award Reviews and Payments.* A Supplemental Monetary Award is the difference between the Monetary Award Grid value of the new Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis. We have issued 37 Notices of Supplemental Monetary Award to eligible Retired NFL Football Players and denied seven claims[19] for a Supplemental Monetary Award. The combined Monetary Award After Offset value of these 37 Supplemental Monetary Awards was $36,805,033 but after subtracting the prior Monetary Award payments, totaled $17,129,895 as set out below in Table 9 ($7,083,078 since Status Report No. 18):

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| 1. | Alzheimer's Disease | $187,217 | Level 1.5 | $93,904 | $93,313 |
| 2. | Alzheimer's Disease | $713,504 | Level 1.5 | $255,175 | $458,329 |
| 3. | Level 2 | $268,132 | Level 1.5 | $153,105 | $115,027 |
| 4. | Alzheimer's Disease | $316,188 | Level 1.5 | $99,620 | $216,568 |
| 5. | Alzheimer's Disease | $118,571 | Level 1.5 | $41,604 | $76,967 |
| 6. | Alzheimer's Disease | $404,326 | Level 2 | $253,783 | $150,543 |
| 7. | Level 2 | $78,737 | Level 1.5 | $55,125 | $23,612 |
| 8. | Alzheimer's Disease | $202,588 | Level 1.5 | $71,974 | $130,614 |
| 9 | Alzheimer's Disease | $119,170 | Level 1.5 | $42,870 | $76,300 |
| 10. | Alzheimer's Disease | $369,420 | Level 1.5 | $158,094 | $211,326 |
| 11. | Level 2 | $323,674 | Level 1.5 | $200,261 | $123,412 |

---

[19] In Status Report No.16, we reported that we denied five claims for a Supplemental Monetary Award but since that time one claim was appealed and remanded for further review.

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | |
|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| 12. | Alzheimer's Disease | $1,154,435 | Level 2 | $853,340 | $301,095 |
| 13. | Alzheimer's Disease | $513,562 | Level 1.5 | $179,936 | $333,626 |
| 14. | Alzheimer's Disease | $409,986 | Level 1.5 | $218,420 | $191,566 |
| 15. | Alzheimer's Disease | $882,550 | Level 2 | $667,538 | $215,012 |
| 16. | Alzheimer's Disease | $190,752 | Level 1.5 | $75,719 | $115,033 |
| 17. | Level 2 | $116,522 | Level 1.5 | $68,022 | $48,500 |
| 18. | Alzheimer's Disease | $1,024,966 | Level 1.5 | $387,302 | $637,664 |
| 19. | Alzheimer's Disease | $1,225,644 | Level 2 | $992,598 | $233,046 |
| 20. | Alzheimer's Disease | $1,154,435 | Level 1.5 | $494,045 | $660,390 |
| 21. | Parkinson's Disease | $2,049,932 | Level 1.5 | $722,870 | $1,337,062 |
| 22. | Alzheimer's Disease | $2,330,449 | Level 1.5 | $1,205,884 | $1,124,565 |
| 23. | Alzheimer's Disease | $513,562 | Level 1.5 | $197,618 | $315,944 |
| 24. | Parkinson's Disease | $1,835,768 | Level 1.5 | $787,371 | $1,048,397 |
| 25. | Alzheimer's Disease | $1,570,356 | Level 1.5 | $915,282 | $655,074 |
| 26. | Alzheimer's Disease | $55,294 | Level 1.5 | $26,973 | $28,321 |
| 27. | Parkinson's Disease | $2,731,535 | Level 1.5 | $1,596,023 | $1,135,512 |
| 28. | Alzheimer's Disease | $685,648 | Level 2 | $124,075 | $561,573 |
| 29. | Parkinson's Disease | $2,117,991 | Level 2 | $1,573,053 | $544,937 |
| 30. | Parkinson's Disease | $1,570,356 | Level 1.5 | $683,869 | $886,487 |
| 31. | Alzheimer's Disease | $123,859 | Level 2 | $113,502 | $10,357 |
| 32. | Level 2 | $1,557,086 | Level 1.5 | $1,095,564 | $461,522 |
| 33. | Level 2 | $2,506,671 | Level 1.5 | $1,560,140 | $946,531 |

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| 34. | Alzheimer's Disease | $364,942 | Level 1.5 | $131,627 | $233,315 |
| 35. | Level 2 | $3,317,653 | Level 1.5 | $1,596,023 | $1,721,630 |
| 36. | Parkinson's Disease | $787,390 | Level 1.5 | $324,000 | $463,390 |
| 37. | Level 2 | $2,912,162 | Level 1.5 | $1,658,827 | $1,253,335 |
| 38. | Totals | $36,805,033 | | $19,675,136 | $17,129,895 |

The Program has paid 25 Retired NFL Football Players and three Representative Claimants a total of $9,087,878 for their Supplemental Monetary Awards.

## V.   QUALIFIED MAF PHYSICIANS

**10.   *Maintaining the MAF Network.***

(a) Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website. There are a total of 68 Qualified MAF Physicians on the website now, representing 33 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside. Table 10 shows the changes in these numbers since Status Report No. 18:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | ASPECT | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE |
| 1. | Approved Physician – On Posted List | 72 | 68 | -4 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 33 | 33 | 0 |

We have removed four physicians from the website. Two withdrew stating that they did not have enough time and needed to focus on their practices, one physician retired and the other changed practices. Since the last status report, the Parties have approved seven new Qualified

MAF Physicians. They will be added to the Public Website after we confirm their participation and/or contract with them, and they complete orientation training.

(b) We continue to identify and contact potential new providers, collect applications, verify credentials and submit applicants to the Parties for approval, in conjunction with the BAP Administrator. We have a total of 963 additional physicians on our radar. Of those, we are engaged in initial and follow-up communications to determine interest with 135, and we have identified 828 as possibly having the appropriate qualifications, but we need to research them more fully before contacting them.

**11.** *150-Mile Rule.*

(a) Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired NFL Football Player be examined by a Qualified MAF Physician whose office is within 150 miles of his primary residence.[20] We can make exceptions to this 150-Mile Rule if the exception is requested prior to the appointment.

We have received 190 requests for exceptions to the 150-Mile Rule, of which we granted 164 (86.3%) and denied 26 (13.7%). There are currently no pending requests. Table 11 shows the changes since Status Report No. 18:

| Table 11 | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** |
| 1. | Granted | 141 | 164 | +23 | 84.4% | 86.3% | +1.9% |
| 2. | Denied | 26 | 26 | 0 | 15.6% | 13.7% | -1.9% |
| 3. | Pending | 0 | 0 | 0 | 0% | 0% | 0% |
| 4. | **Totals** | **167** | **190** | **+23** | | | |

---

[20] This requirement applies only to appointments made after April 11, 2019.  Appointments made on or before April 11, 2019, did not need to be rescheduled with a different Qualified MAF Physician.

(b) The 150-Mile Rule is a flexible rule with broad exceptions. Of the living Retired NFL Football Players registered in the Program, 85.6% have a Qualified MAF Physician within 150 miles of their primary residence. We work with those who do not to help them schedule appointments with physicians further away, when they tell us they are ready to be examined.

12.     *50-Mile Rule.*  Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office. Like the 150-Mile Rule, we have discretion to grant exceptions. We have received 35 requests for exceptions to the 50-Mile Rule, of which we granted 33 (94.3%) and denied two (5.7%). Table 12 shows how many exception requests we have received and our decisions on those requests (an increase of four since Status Report No. 18):

| Table 12 | | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | |
|---|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** |
| 1. | Granted | 29 | 33 | +4 | 93.5% | 94.3% | +0.8% |
| 2. | Denied | 2 | 2 | 0 | 6.5% | 5.7% | -0.8% |
| 3. | **Totals** | **31** | **35** | **+4** | | | |

Of the 68 Qualified MAF Physicians who are actively scheduling appointments, 61 (89.7%) have an approved neuropsychologist within 50 miles of their office, and we will grant exceptions on a case-by-case basis for the seven Qualified MAF Physicians who do not.

13.     *Deviation Explanations for Level 1.5 and Level 2 Diagnoses.* Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not

strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we determine more information is needed. We cannot process these claims further until we receive the required explanation. We report on these claims in Section 8 (Row 2) of the Summary Report on the Settlement Website. There is currently one claim based on a diagnosis of Level 2 Neurocognitive Impairment, that requires additional explanation from a Qualified MAF Physician and/or neuropsychologist, representing less than 1% of all Claim Packages submitted to the Program. Table 13 shows how many claims require additional explanation from the Qualified MAF Physician before we can issue award or denial notices:

| Table 13 | CLAIMS REQUIRING ADDITIONAL EXPLANATION FROM QUALIFIED MAF PHYSICIANS | | | | | |
|---|---|---|---|---|---|---|
| | DECISION | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE |
| 1. | Level 1.5 | 2 | 0 | -2 | 66.7% | 0 | -66.7% |
| 2. | Level 2 | 1 | 1 | 0 | 33.3% | 100% | +66.7% |
| 3. | Totals | 3 | 1 | -2 | | | |

**14.** *AAP Leadership Council.* Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network. We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses. In addition, the AAP Leadership Council assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the Settlement Agreement criteria. The AAP Leadership Council also facilitates discussions and solicits guidance from the MAF Steering Committee, a group of five Qualified MAF

Physicians, who render advice and assistance on providing peer-to-peer feedback to Qualified MAF Physicians and provide suggestions on how to improve the operations and performance of the network of Qualified MAF Physicians. Overall, our collaboration with the AAP Leadership Council has been successful, and the Qualified MAF Physicians have responded positively to receiving feedback from AAP members.

15. ***MAF Steering Committee.*** Five Qualified MAF Physicians serve on the MAF Steering Committee as authorized by Rule 24 of the Rules Governing Qualified MAF Physicians. The Committee members have participated in regular roundtable discussions with the AAP Leadership Council, assisted in developing training for the Qualified MAF Physicians to address most common issues, and provided other suggestions for improvement of the Qualified MAF Physicians network. Overall, the peer-to-peer communications regarding the operation and performance of the network of Qualified MAF Physicians has been positive.

## VI.   <u>AUDIT</u>

16. ***Closed Audits.*** We have concluded the Audit investigations of 1,288 Settlement Class Members with Monetary Award claims by denying a claim through Audit, by making no adverse finding and removing a claim from Audit, or because the Settlement Class Member withdrew his or her claim during our Audit. Table 14 summarizes the reasons for these closures and changes in the numbers since Status Report No. 18:

| Table 14 | CLOSED AUDITS | | |
|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** |
| 1. | Claim Denied in Audit | 372 | 372 | +0 |
| 2. | No Finding of Misrepresentation, Omission, or Concealment | 696 | 711 | +15 |
| 3. | Claim Withdrawn by Settlement Class Member | 205 | 205 | +0 |
| 4. | **Totals** | **1,273** | **1,288** | **+15** |

17. ***Reports of Adverse Finding in Audit.*** We have issued to the Parties 20 Reports of Adverse Finding in Audit (the same as we have reported since Status Report No. 11) affecting 566 Monetary Award claims, all 20 of which were then referred to the Special Masters. The 20 Audit Reports concern four neurologists, 12 neuropsychologists, three law firms, seven individual Settlement Class Members and one claims preparation company. Table 15 summarizes the Special Masters' and Court's decisions on these Audit reports:

| Table 15 | DECISIONS ON AUDIT REPORTS | |
|---|---|---|
| | **DECISION** | **AUDIT REPORTS** |
| 1. | Claims Denied in Audit | 12 |
| 2. | Claims Removed from Audit and Subjected to Specialized Review | 4 |
| 3. | Claims Removed from Audit and Returned to Normal Review | 3 |
| 4. | All Claims Withdrawn before Decision | 1 |
| 5. | **Total** | **20** |

18. ***Audit Proceeding Decisions.*** We have denied 372 claims after Audit based on decisions by the Court or Special Masters.[21] Sections 6 and 8 (Row 17) of the Summary

---

[21] Of the 372 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims).  Six individual Retired NFL Football Players' claims have been denied. The Special Masters directed us to deny 170 claims based on their findings related to the Special Investigator's investigation of a law firm. We denied the remaining claim for failing to cooperate with our requests for information during an Audit.

Report on the Settlement Website show these denials. A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors. We have received 115 new claims submitted by Settlement Class Members following an Audit Denial, of which 44 have been paid or are in the payment process.

19.     ***Ongoing Audit Investigations.*** We have other Audit investigations underway affecting ten Monetary Award claims (one less than the number we reported in Status Report No. 18). All ten are individual claims.

20.     ***Claims Investigated More than Once.*** Claims on which we have concluded an Audit may be the subject of another Audit if we later learn of information that requires further investigation. We notify Settlement Class Members when this happens. We have audited 94 Monetary Award claims more than one time (the same as we have reported since Status Report No. 14); the most times a Monetary Award claim has been audited is twice.

## VII.   DERIVATIVE CLAIMANTS

21.     ***Derivative Claims.*** We have received 614 Derivative Claim Packages (an increase of four since Status Report No. 18). Table 16 shows the status of these claims:

| Table 16 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | HOW MANY | % OF TOTAL |
| 1. | Paid Derivative Claimant Award ($1,006,289[22]) | 226 | 37% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($25,752) | 7 | 1% |
| 3. | Denied – Associated Retired NFL Football Player's Claim Denied | 48 | 8% |
| 4. | Denied – No Timely Claim for Associated Retired NFL Football Player | 42 | 7% |

---

[22] This includes payment for (a) Supplemental Derivative Claimant Awards and (b) additional Derivative Claimant Awards issued because the associated Retired NFL Football Player's Monetary Award, and resulting 1% deduction, increased after rescoring under the Norming Agreement.

| Table 16 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | HOW MANY | % OF TOTAL |
| 5. | Denied – No Timely or Proper Registration for Associated Retired NFL Football Player | 35 | 6% |
| 6. | Denied – Retired NFL Football Player's Claim Withdrawn During Statute of Limitations Proceeding | 16 | 3% |
| 7. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 8. | Denied – Deceased Derivative Claimant | 4 | <1% |
| 9. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 10. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 2% |
| 11. | Withdrawn | 8 | 1% |
| 12. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 199 | 32% |
| 13. | Total | 614 | |

We issued six Notices of Derivative Claimant Award since Status Report No. 18. Table 17 shows how many eligible Derivative Claimants received the entire 1% amount deducted from the associated Retired NFL Football Player's Monetary Award, and how many shared that 1% amount with other eligible Derivative Claimants:

| Table 17 | SHARED AWARD STATUS FOR ELIGIBLE DERIVATIVE CLAIMANTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE |
| 1. | Received Entire 1% Amount | 63 | 63 | 0 | 28% | 27% | -1% |
| 2. | Shared 1% Amount with Other Eligible Derivative Claimants[23] | 164 | 170 | +6 | 72% | 73% | +1% |
| 3. | Totals | 227 | 233 | +6 | | | |

The 233 Derivative Claimants who received Notices of Derivative Claimant Award are associated with 116 Retired NFL Football Players. We issued payment to three Derivative

---

[23] We have not received an Allocation Objection from any of the Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

Claimants since Status Report No. 18 and have paid 226 (97%) of the 233 Derivative
Claimants with Notices of Derivative Claimant Award; four of the eligible Derivative
Claimants who have not been paid are in the payment process, and the other three are not yet
ready for payment.

22.     *Additional Derivative Claimant Details.* We received challenges from 29
Retired NFL Football Players (or their Representative Claimants) to 41 Derivative Claimants
(no change since Status Report No. 8); 19 (46%) of those 41 challenged Derivative
Claimants are not eligible for a Derivative Claimant Award because they never submitted a
timely Derivative Claim Package. We have issued a Notice of Derivative Claim Package
Submission Deadline to 496 registered Derivative Claimants. Table 18 summarizes their
claim submission statuses and the changes since Status Report No. 18:

| Table 18 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE |
| 1. | Claim Submitted | 157 | 160 | +3 | 33% | 32% | -1% |
| 2. | No Claim Submitted | 324 | 335 | +11 | 67% | 68% | +1% |
| 3. | Within 30-Day Deadline | 2 | 1 | -1 | <1% | <1% | 0% |
| 4. | Totals | 483 | 496 | +13 | | | |

23.     *Supplemental Derivative Claimant Awards.* Section G of the Overview of
Derivative Claimant Process on the Settlement Website
(https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf)
explains how Supplemental Derivative Claimant Awards are handled. As discussed in
Paragraph 9 of this Status Report, we issued Notices of Supplemental Monetary Award to 37
Retired NFL Football Players (an increase of 10 since Status Report No. 18). Of those 37, 31
Retired NFL Football Players had no registered Derivative Claimants associated with them,

and four Retired NFL Football Players each had one registered Derivative Claimant, but those four Derivative Claimants did not submit Derivative Claim Packages to share 1% of the Retired NFL Football Players' earlier Monetary Awards and were not eligible for any portion of the Players' Supplemental Monetary Awards. The last two Players' Supplemental Monetary Award Notices had a 1% offset for potential Derivative Claimant Awards, which have been issued to the associated Derivative Claimants, as described in Table 19:

| Table 19 | SHARED SUPPLEMENTAL AWARD STATUS FOR ELIGIBLE DERIVATIVE CLAIMANTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE |
| 1. | Received Entire 1% Amount | 2 | 2 | 0 | 100% | 100% | 0% |
| 2. | Shared 1% Amount with Other Eligible Derivative Claimants | 0 | 0 | 0 | 0% | 0% | 0% |
| 3. | Totals | 2 | 2 | 0 | | | |

Both of the Derivative Claimants with Supplemental Derivative Claimant Awards have been paid.[24]

## VIII.   OTHER CLAIM PROCESSES

**24.   *Handling of Attempted Assignments of Claims.*** On September 27, 2019, the Court issued a Notice (Document 10858) directing us to streamline the process regarding attempted assignments by Settlement Class Members of claims to third-party lenders. At that time, we suspended the process for handling such assignment questions under the Rules Governing Assignment of Claims and worked with the Court and the Special Master to modify these Rules. On March 19, 2020, the Special Masters adopted the Rules Governing Payment of Claims Involving Third-Party Funders and the Rules Governing Third-Party

---

[24] See Row 1 of Table 16 in this Status Report.

Funding Resolution Protocol, which superseded the previous Rules (collectively, the "New Payment Rules"). Under the New Payment Rules Governing Payment of Claims Involving Third-Party Funders, all Settlement Class Members must complete and submit a Sworn Statement regarding the Status of Assignment of Monetary Claim ("SWS-5") to receive payment. There are two versions of the SWS-5, one for those identified as a borrower by a Third-Party Funder that is participating in the Rules Governing Third-Party Funding Resolution Protocol ("Resolution Protocol") (the SWS-5(A)) and another for those not so identified (the SWS-5(B)). As of January 9, 2023, 24 Third-Party Funder entities are participating in the Resolution Protocol. We have worked with those participating funders to resolve cash advances for 38 Settlement Class Members since the adoption of the New Payment Rules.

25.   ***Petitions for Deviation from the Attorneys' Fee Cap.***[25] We have received eight Petitions for Deviation, one of which was withdrawn.  The Court resolved three of the remaining seven Petitions for Deviation in conjunction with the Attorneys' Liens Dispute Process: two by final decision, and one upheld on appeal by the Third Circuit.  The other four Petitions are pending final resolution.

26.   ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a) Table 20 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 18:

---

[25] Judge Brody entered a Memorandum and Order in April of 2018 limiting attorneys' fees in the Program to 22% of each SCM's Monetary Award, plus reasonable costs (ECF Nos. 9862 and 9863). In the Memorandum, the Judge decided that attorneys should have the opportunity to petition the Court to go above and beyond the cap in exceptional circumstances, which is what the Petitions for Deviation process is meant to cover.

| Table 20 | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE |
| 1. | Attorneys' | 1,597[26] | 1,625[27] | +28 | 515 | 529 | +14 | 257 | 263 | +6 |
| 2. | Child Support | 352 | 353 | +1 | 53 | 53 | 0 | 22 | 22 | 0 |
| 3. | Judgment | 70 | 70 | 0 | 18 | 18 | 0 | 9 | 9 | 0 |
| 4. | Tax | 57 | 57 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| 5. | **Totals** | **2,076** | **2,105** | **+29** | **589** | **603** | **+14** | **288** | **294** | **+6** |

(b) Table 21 shows the status of Liens in the Attorneys' Liens dispute resolution process:

| Table 21 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[28] | | | |
|---|---|---|---|---|
| **PENDING** | **RESOLVED** | | **TOTAL** |
| | **BY AGREED WITHDRAWAL** | **BY COURT DETERMINATION** | |
| 45 | 151 | 22 | 218 |

(c) Table 22 breaks down the Non-Medical Lien holdbacks[29] by Lien type:

| Table 22 | NON-MEDICAL LIEN HOLDBACKS | | |
|---|---|---|---|
| | **LIEN TYPE** | **MONETARY AWARDS AFFECTED** | **MONETARY AWARD AMOUNTS** | **LIEN HOLDBACKS** |
| 1. | Attorneys' | 24 | $23,273,327.80 | $4,226,662.88 |
| 2. | Child Support | 5 | $4,440,056.53 | $489,291.01 |
| 3. | Judgment | 1 | $3,192,046 | $229,733.96 |
| 4. | Tax | 0 | N/A | N/A |
| 5. | **Totals** | **30** | **$30,905,430.33** | **$4,945,687.85** |

---

[26] These 1,597 Attorneys' Liens were asserted by 61 law firms.

[27] These 1,625 Attorneys' Liens were asserted by 62 law firms.

[28] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.

[29] The holdbacks are the amount of funds we are withholding pending resolution of a Dispute. As of 1/9/23, there are 45 disputed Attorneys' Liens currently pending resolution by Judge Strawbridge where the Settlement Class Member has or will receive payment of the rest of his Monetary Award. After the Court enters a final order (whether by Judge Strawbridge or Judge Brody's approval of his Report and Recommendation) resolving the Disputes and any appeal period passes, we disburse the held back funds on the next available monthly Disbursement.

(d) Table 23 summarizes the Non-Medical Lien payments from initial Monetary Awards[30] by Lien type:

| Table 23 | NON-MEDICAL LIEN PAYMENTS FROM INITIAL MONETARY AWARDS | | | |
|---|---|---|---|---|
| | **LIEN TYPE** | **MONETARY AWARDS AFFECTED** | **MONETARY AWARD AMOUNTS** | **LIEN PAYMENTS** |
| 1. | Attorneys' | 151 | $170,451,779.17 | $9,989,996.42 |
| 2. | Child Support | 16 | $13,305,054.74 | $737,344.67 |
| 3. | Judgment | 7 | $8,992,038.20 | $2,947,691.78 |
| 4. | Tax | 1 | $33,282.80 | $6,492.65 |
| 5. | **Totals** | **175** | **$192,782,154.91** | **$13,681,525.52** |

## IX.   COMMUNICATIONS CENTER FOR THE PROGRAM

27.   ***Our Contact Activity.*** Since our contact center opened on February 6, 2017, we have handled 96,051 total communications, including 58,315 calls made or received and 33,228 emails to us at our Claims Administrator email box. Since Status Report No. 18, we handled 1,363 such total communications. The most common topics of these communications have been General Settlement Information, Change in Lawyers, Payment, Claim Package Status – Retired Player, and Liens – Non-Medical.

28.   ***Law Firm Contacts.*** Our Law Firm Contacts are assigned to 573 different law firms or lawyers representing Settlement Class Members in the Program. This is the same number of law firms or lawyers that we reported in Status Report No. 18. The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 27 above.

---

[30] We also have issued $25,593.08 in Lien payments from Supplemental Monetary Awards.

29.    *Insights Newsletters.* Since Status Report No. 18, we issued one new edition of our quarterly "Insights" newsletter (Fourth Quarter 2022). We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail. We also post them to the Settlement Website at https://www.nflconcussionsettlement.com/Newsletters.aspx (under "Documents" click "Newsletters"). We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters by email to ClaimsAdministrator@NFLConcussionSettlement.com or through the online submission screen on the Newsletters page of the Settlement Website.

30.    *Program Doctors Newsletters.* In the fourth quarter of 2020, we issued our first newsletter to MAF Physicians as a tool to share relevant and valuable information. With the Second Quarter 2021 edition, we expanded our newsletter audience to include all Program doctors. We emailed the Fourth Quarter 2022 Program Doctors Newsletter to all Qualified MAF Physicians, Qualified BAP Providers and other approved evaluating Neuropsychologists on December 22, 2022. All Program Doctors also can access the newsletter on their Provider Portals. The newsletter provided information on requests from Players and/or Lawyers for specific medical assessments, who can perform MAF neuropsychological evaluations, what "Generally Consistent" means and Rule 20 of the Rules Governing MAF Physicians, Program Doctor appointment scheduling and training opportunities. We plan to continue to issue newsletters to Program Doctors on a quarterly basis.

31.    *Settlement Program Website.* We regularly update the Settlement Website to reflect progress and changes to the Program. Since Status Report No. 18 in October 2022, we posted a Report of the Special Masters (Document 11880, filed October 27, 2022), BAP

Administrator Status Report No. 16 (Document 11881, filed October 27, 2022), and Claims

Administrator Status Report No. 18 (Document 11882, filed October 27, 2022) to the Status

Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.

The Program's Home page has had 18,578 more unique visits since Status Report No. 18,

giving us 678,996 total unique visits, coming from 190 countries and all 50 of the United States.

The five most frequently visited pages since October, after Home and Login, were Physician

Search (1,137 unique views), Reports and Statistics (905 unique views), Published Special

Master Decisions – Monetary Award Claims (851 unique views), Frequently Asked Questions

(495 unique views), and Alerts (447 unique view).  Also since October, visitors conducted 4,129

searches on the website using 1,073 unique keywords and completed 1,627 unique downloads.

The top five downloaded documents were the Special Masters' March 8, 2022, and April 6,

2022, Notices regarding the Order approving implementation of the Norming Agreement and

timing of decisions by the Claims Administrator, accessed through the link on the Home page of

the public website and all Portals (390 clicks); the Settlement Agreement (344 clicks); the

Monetary Award Grid (127 clicks); Guide to Summary Report (80 clicks); and the Diagnosis and

Review Table (68 clicks).

## X.     SPECIAL MASTERS

**32.     *Our Work with the Special Masters*.** Since Status Report No. 18, we continue to

have regularly scheduled calls to discuss policy and operational issues, and have held 142 such

calls with the Special Masters to date. We have many other calls and exchange countless emails

with them to address issues as they arise. The Special Masters have the final say in how the

Settlement is implemented, subject only to the Court's oversight.

33.     *Program Rules.* There are 10 sets of Rules available on the Settlement Website (under "Documents," click "Governing Rules") and on the online portals of law firms, lawyers and *pro se* Settlement Class Members. We have not made changes to any posted Rules since Status Report No. 9 filed in July 2020.

34.     *Published Decisions.* Since Status Report No. 18, the Special Masters issued two new decisions they designated for publication. These decisions relate to how we analyze claims for Monetary Awards.

### Date of Diagnosis

November 1, 2022

The Special Master denied the appeal of a Retired NFL Football Player who disputed the date of Diagnosis that the Claims Administrator used in calculating his Level 2 Neurocognitive Impairment Monetary Award. The issue on appeal was whether, under FAQ 101, the underlying medical records provided reliable evidence from which the Diagnosing Physician could conclude that the Qualifying Diagnosis existed earlier than the date of his personal examination in 2021. FAQ 101 requires the Claims Administrator to strictly scrutinize in the claims review process Qualifying Diagnoses that predate a Diagnosing Physician's examination of a Player. The Special Master found that there was no clear and convincing evidence that the earlier Diagnosis date provided a medically sound and reliable basis to conclude that the Player suffered from Level 2 Neurocognitive Impairment prior to 2021.

### Validity Testing

November 23, 2022

The NFL Parties appealed the Claims Administrator's determination that a Retired NFL Football Player was entitled to a Level 1.5 Neurocognitive Impairment Monetary Award on the grounds of invalid neuropsychological testing. The NFL Parties argued that the Player's testing was not "a valid reflection of his optimal level of neurocognitive functioning" and thus could not support his Qualifying Diagnosis. At the Special Master's request, an AAP Consultant and AAP member reviewed the Claim and found that the testing was valid. The AAP Consultant determined that the standard that the NFL Parties applied of optimal performance differs from customary clinical practice and is "an unreasonable, even unattainable, standard." The Special Master denied the NFL Parties' appeal, finding that the Settlement does not require that the Player be functioning at the absolute peak of his capabilities for his testing to be valid.

We post all such rulings to the Settlement Website (under "Documents" select "Special Master" under "Published Decisions" and then click the Monetary Award Claims button). The Special Masters have so far issued 52 published Monetary Award appeal decisions and 11 Audit decisions (63 total such decisions).[31]

## XI.     FREQUENTLY ASKED QUESTIONS

**35.     *Frequently Asked Questions.*** We have not added any new FAQs since Status Report No. 16, but on November 11, 2022, we made substantive revisions to three existing FAQs to clarify that exceptions to the Settlement Agreement Section 8.2(a) Claim Package requirements need joint consent of the parties to the Settlement Agreement to be granted:

> (a) **FAQ 127:** What exceptions are allowed under Section 8.2(a) of the Settlement Agreement for living Retired NFL Football Players or Representative Claimants of legally incapacitated or incompetent Players?
> (b) **FAQ 128:** Are there other instances not listed in Section 8.2 of the Settlement Agreement where the medical records or Diagnosing Physician Certification Form requirement may be excused?
> (c) **FAQ 129:** What happens after the Claims Administrator grants an exception under Section 8.2(a) or the parties to the Settlement Agreement grant an exception for a situation not covered by Section 8.2(a)?

There are 395 FAQs in 18 categories. These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program. The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs. Note that when we add new FAQs, we place them within the existing set where it makes the most sense. This means that the numbering of FAQs within the set may change from time to time.

---

[31] On October 28, 2020, the Special Master issued contextually similar decisions on deviation from BAP Criteria for six claimants. One of the six decisions appears on the Settlement Website.

## XII.   REGISTRATION

**36.   *Registration Submissions.***

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover

Registration. Table 24 shows changes in the number of timely Registration submissions since

our Status Report No. 18:

| Table 24 | TIMELY REGISTRATION SUBMISSIONS | | | |
|---|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 10/10/22** | **AS OF 1/9/23** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,843 | 15,839 | -4 |
| 2. | Representative Claimants | 1,402 | 1,406 | +4 |
| 3. | Derivative Claimants | 3,325 | 3,325 | 0 |
| **4.** | **Totals** | **20,570** | **20,570** | **0** |

The number of Retired NFL Football Players (Row 1) went down by four from Status Report

No. 18 because they were replaced by Representative Claimants. Of the 20,570 to whom we

issued Registration notices, we were able to confirm that 19,409 of them are Settlement Class

Members under the Settlement Agreement, 12,838 of whom are Retired NFL Football

Players eligible to participate in the BAP. The other 1,161 persons are not Settlement Class

Members under the Settlement Agreement because of one or more of these reasons: (1) they

were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined

in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not

provide us with the information or support required by the Settlement Agreement to register,

after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a

Derivative Claimant but did not have a relationship with the Retired NFL Football Player by

which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals. We have made determinations on 320 such Registrations and found that 173 (54%) of them presented good reasons to be allowed to register after August 7, 2017. Table 25 shows the change in these numbers since Status Report No. 18:

| Table 25 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | |
|---|---|---|---|
| | STATUS | AS OF 10/10/22 | AS OF 1/9/23 | CHANGE |
| 1. | Accepted | 173 | 173 | 0 |
| 2. | Not Accepted | 144 | 147 | +3 |
| 3. | Totals | 317 | 320 | +3 |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge. The NFL Parties also may challenge our good cause exception decisions. We have received 379 challenges, which is one more than the number we have reported since Status Report No. 11. Table 26 explains these challenges and what happened to them:

| Table 26 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 245 | Settlement Class Member | 77 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 24 | Settlement Class Member | 5 | 19 |

| Table 26 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | Totals | 379 | | 150 | 229 |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters. Table 27 shows the appeals thus far and the Special Masters' rulings on them (no changes since Status Report No. 11):

| Table 27 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO APPEALED | DECISION UPHELD | DECISION OVERTURNED |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 6 | Settlement Class Member | 5 | 1 |
| 5. | Totals | 36 | | 33 | 3 |

37. ***Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.*** The Special Masters have approved 458 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants.  There have been two new Representative Claimant approvals and no new Derivative Claimant Representatives since Status Report No. 18.

## XIII.  <u>CONCLUSION</u>

38.    *General Status.* We have 243,400 document files (22,134 gigabytes, or 22.1 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 4,017 more than when we filed Status Report No. 18. We have issued 55,695 notices (273 more since Status Report No. 18) to 21,020 different persons since March 23, 2017.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By: *Roma Petkauskas*

Roma Petkauskas
Virginia State Bar No.: 71357
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
Telephone: (804) 521-7218
Facsimile: (804) 521-7299
Email: rpetkauskas@browngreer.com