**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB |
| | | MDL No. 2323 |
| | : | Hon. Anita B. Brody |
| THIS DOCUMENT RELATES TO: | : : | |
| ALL ACTIONS | : : | |

## CLAIMS ADMINISTRATOR STATUS REPORT NO. 20

### I.        INTRODUCTION

1.        ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 20 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 19 filed on February 3, 2023 (Document 11980). Our earlier Status Reports are posted to the Settlement Website (under "Useful Information," click "Status Reports").  We do not repeat here what we covered in them. All numbers and other information in this Status Report No. 20 are as of May 8, 2023.[1] We will cover developments after that date in future reports.

### II.      UPDATED SETTLEMENT PROGRAM WEBSITE AND WEEKLY REPORTS

2.        ***Updates.*** We have collaborated with the Special Masters, Class Counsel, and Counsel for the NFL Parties on an overall review of communication mechanisms and

---

[1] All dates formatted as 5/8/23 in this Status Report mean May 8, 2023.

reporting styles in the Settlement Administration. We worked together to design and implement new presentation approaches for the robust information available to Settlement Class Members and to the public about this important Settlement. As a result, we launched a re-designed Settlement Program Website and weekly posted reports on May 8, 2023.

In an effort to make the Settlement Website easier to use, we simplified the menu options, reorganized some of the pages, and added new functionality. We explain these changes in a May 8, 2023 Alert posted on the Settlement Website at

https://www.nflconcussionsettlement.com/Docs/website_changes_may_2023.pdf (under "Useful Information," click "Alerts"). We also reorganized the weekly Summary Report available on the Reports & Statistics page of the Settlement Website to provide a better user experience. All of the original information remains in these reports, but we updated the presentation of the data to: (a) lead with payment information in Section A; (b) separate the Supplemental Claim information from the initial Monetary Award Claims, and Supplemental Claim data will now be in a stand-alone Section C; and (c) move the Registration information to the end of the report as Section D because the Registration period ended on August 17, 2017.

### III.   NORMING AGREEMENT IMPLEMENTATION

3.      *Current Status.* On March 4, 2022, Judge Brody entered an Order approving certain modifications to the NFL Concussion Settlement Agreement Pursuant to Section 6.6 of the Class Action Settlement Agreement. These modifications, outlined in the Norming Agreement, removed race norms and demographic estimates based on race from the NFL Concussion Settlement Program. We have notified all affected Settlement Class Members whether they qualified for Automatic Retrospective Rescoring and if so, the result of that

Rescoring and/or whether they qualified for an Expanded BAP exam. Table 1 summarizes the outcome of our analysis of BAP evaluations and settlement claims:

| Table 1 | NORMING AGREEMENT ANALYSIS | |
|---|---|---|
| | **REVIEW OUTCOME** | **TOTAL** |
| **1.** | **Qualified for Automatic Retrospective Rescoring** | **647** |
| | (a) BAP No Impairment to Level 1: Section 2.5(g)(i) | 246 |
| | (b) BAP No Impairment or Level 1 to Level 1.5 or Level 2: Section 2.5(g)(ii) | 51 |
| | (c) BAP diagnosis of No Impairment or Level 1 remains unchanged: Section 2.5(g)(iii) | 338 |
| | (d) Level 1.5 or 2 Settlement Claim remains unchanged: Section 2.5(g)(iv) | 1 |
| | (e) Level 1.5 or 2 Settlement Claim now qualifies for a Monetary Award (or an increased Monetary Award): Section 2.5(g)(v) | 11 |
| **2.** | **Qualified for an Expanded BAP exam** | **2,749** |
| **3.** | **BAP evaluations to be processed under New Method that removes race from consideration** | **1,572** |
| **4.** | **Submitted Settlement Claims to be processed under New Method that removes race from consideration** | **50** |
| **5.** | **Not directly affected** | **11,119** |
| **6.** | **Excluded from eligibility for Automatic Retrospective Rescoring or Expanded BAP Exam** | **3** |
| **7.** | **Total Registered Settlement Class Members** | **16,140** |

The 1,572 BAP evaluations (Row 3) include 691 cases where the Settlement Class Member is eligible for the BAP but has not yet attended a BAP appointment and 881 cases where the Settlement Class Member has attended one or both appointments but the results have not yet been finalized. The New Method will be applied to all BAP evaluations finalized for these 1,572 Settlement Class Members, and the BAP Administrator has begun notifying Settlement Class Members who have attended both appointments about those results. Similarly, we are processing the 50 Settlement Claims in Row 4 using the New Method and issuing Determination Notices incorporating those results. Finally, the 11,119 Settlement Class Members found to be not directly affected by the Norming Agreement (Row 5) could potentially be eligible for an Expanded BAP exam or to submit a New

Settlement Claim under Section 2.7 of the Norming Agreement if they were examined by a Qualified MAF Physician but not diagnosed with a Qualifying Diagnosis in part because of the insufficiency of their valid neuropsychological test scores.

## IV.   MONETARY AWARD CLAIMS

4.    ***Total Claims Received.*** Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted.[2] We have received 72 new Monetary Award claims since Status Report No. 19 and have completed a review of all but nine claims. As of May 8, 2023, 3,077 unique Retired NFL Football Players and Representative Claimants (19.1% of the Retired NFL Football Players and Representative Claimants who received favorable registration determinations) submitted 3,582 Monetary Award Claim Packages. Fifteen of the 3,582 claims[3] were denied as untimely.[4] We have received about five new claims a week since Status Report No. 19 in January 2023. Of the 3,582 Monetary Award claims submitted, 1,979 (55.2%) rest on pre-Effective Date diagnoses, while 1,331 (37.2%) are for post-Effective Date diagnoses, of which 393 (29.5% of the 1,331) were made in the Baseline Assessment Program ("BAP")[5] and 938 (70.4% of the 1,331) were made by Qualified MAF

---

[2] These sections of the Summary Report previously included Supplemental Monetary Award claims in their counts. The updated Summary Report now separates the Supplemental claim information from the initial Monetary Award Claims. Supplemental Claim data now appears in a stand-alone Section C (sections 12-18) of the Summary Report.

[3] Of these Monetary Award claims, 629 (18%) have at least one associated Derivative Claimant who has registered and 2,953 (82%) have no registered Derivative Claimants. Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations (16,140) is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible).

[4] We reviewed 51 claims for potential untimeliness and denied 15 as untimely. We accepted 36 as timely, which includes two claims that showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

[5] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award. The BAP Administrator's status reports explain more about BAP diagnoses.

Physicians.[6] The other 272 claims (7.6%) did not tell us what diagnosis date they assert. Table 2

compares these numbers to those in Status Report No. 19:

| Table 2 | QUALIFYING DIAGNOSIS DATES IN MONETARY AWARD CLAIMS | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 1/9/23** | **AS OF 5/8/23** | **CHANGE** | **AS OF 1/9/23** | **AS OF 5/8/23** | **CHANGE** |
| 1. | Pre-Effective Date | 1,979 | 1,979 | 0 | 56.4% | 55.2% | -1.2% |
| 2. | Post-Effective Date | 1,256 | 1,331 | 75 | 35.8% | 37.2% | 1.4% |
| | (a) *BAP* | *376* | *393* | *17* | *10.7%* | *11.0%* | *0.3%* |
| | (b) *MAF* | *880* | *938* | *58* | *25.1%* | *26.2%* | *1.1%* |
| 3. | No Date Asserted | 275 | 272 | -3 | 7.8% | 7.6% | -0.2% |
| **4.** | **Totals** | **3,510** | **3,582** | **72** | | | |

Table 3 shows by diagnosis date how many claims we have for each type of Qualifying

Diagnosis:

| Table 3 | MONETARY AWARD CLAIMS BY QUALIFYING DIAGNOSIS TYPE | | |
|---|---|---|---|
| | **DIAGNOSIS** | **PRE-EFFECTIVE DATE** | **POST-EFFECTIVE DATE** | |
| | | | **MAF** | **BAP** |
| 1. | Death with CTE | 125 | 0 | N/A |
| 2. | ALS | 51 | 12 | |
| 3. | Alzheimer's Disease | 425 | 177 | |
| 4. | Parkinson's Disease | 137 | 108 | |
| 5. | Level 2 | 505 | 239 | 121 |
| 6. | Level 1.5 | 736 | 401 | 265 |

We highlight the asserted Qualifying Diagnoses in Section 4 of the Summary Report on the

Settlement Website. We also show the current status of all Monetary Award claims based on

final determination in Section 6 of the Summary Report on the Settlement Website. A "Review

in Progress" status means that the claims have not reached a final determination.  Section 7

---

[6] This includes claims submitted by the Settlement Class Members after the Effective Date, but the diagnoses were not rendered by MAF Physicians. Given unique circumstances, the Parties allowed an AAP member or AAP Consultant to review the medical records to determine if there was a Qualifying Diagnosis.

highlights the review status of claims that asserted Level 2.0 Neurocognitive Impairment Claims and Level 1.5 Neurocognitive Impairment Claims diagnosis.

**5.** ***Monetary Awards and Payments.***

(a) We show Monetary Awards and payments in Sections 1 and 2 of the Summary Report on the Settlement Website.[7] As of May 8, 2023, we have issued 1,548 Notices of Monetary Award for claims totaling $1,117,523,178.[8] We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit. Of the 1,548 claims with Notices of Monetary Award, we requested $1,113,359,309 from the NFL Parties for the 1,516 claims that have reached the point at which we can request funding. The NFL Parties have deposited funds for 1,500 of those claims.[9] Of the 1,500 Monetary Award claims for which the NFL Parties have deposited funds, the Program paid 1,483 claims for a total of $1,005,809,044. The remaining 33 funded claims were not yet ready for payment when we submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount. Of the 1,483 paid claims from Retired NFL Football Players and Representative Claimants, the Trustee sent $53,437,828 (5% of those Monetary Awards) to the Attorneys' Fees Qualified Settlement Fund, in

---

[7] Sections 7 and 11 of the Summary Report previously showed MAF and Supplemental Claim payments combined and this Status Report included details specific to Supplemental Claims.

[8] The amount of these Notices of Monetary Award includes the 1% Derivative Claimant Award deductions allocated to eligible Derivative Claimants (see Paragraph 22 of this Status Report).

[9] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.

accordance with the Court's June 27, 2018 Order Regarding the Common Benefit Fund

(Document 10104). Finally, we are required to withhold money for unresolved Liens and for

third-party funders.  Table 4 shows the distribution of the $1,005,809,044 paid by the

Settlement Program and compares the totals to those reported in Status Report No. 19:

| Table 4 | MONETARY AWARD PAYMENTS | | | |
|---------|-------------------------|---|---|---|
| | **PAID TO** | **AS OF 1/9/23** | **AS OF 5/8/23** | **CHANGE** |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $930,984,431 | $968,631,321 | $37,646,890 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $4,054,420 | $4,110,321 | $55,901 |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $13,530,472 | $14,003,022 | $472,550 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $18,402,468 | $19,064,380 | $661,912 |
| **5.** | **Totals** | **$966,971,790** | **$1,005,809,044** | **$38,837,253** |

(b) Table 5 shows the changes in figures for payments and claims with Notices of

Monetary Award since Status Report No. 19:

| Table 5 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 19 | | | | | |
|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **AMOUNT** | | |
| | | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE |
| 1. | Notice of Monetary Award Issued | 1,491 | 1,548 | 57 | $1,062,728,218 | $1,117,523,178 | $54,794,960 |
| 2. | Paid | 1,444 | 1,483 | 39 | $966,971,790 | $1,005,809,044 | $38,837,254 |

(c) Table 6 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:[10]

| Table 6 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS[11] | | | | | |
|---|---|---|---|---|---|---|
| | **DIAGNOSIS** | **CLAIMS SUBMITTED** | **NOTICE OF MONETARY AWARD** | | **PAID** | |
| | | | HOW MANY | %[12] | HOW MANY | %[13] |
| 1. | Death with CTE | 125 | 80 | 64% | 80 | 64% |
| 2. | ALS | 63 | 46 | 73% | 45 | 71% |
| 3. | Alzheimer's Disease | 602 | 398 | 66% | 389 | 65% |
| 4. | Parkinson's Disease | 245 | 201 | 82% | 193 | 79% |
| 5. | Level 2 | 865 | 271 | 31% | 259 | 30% |
| 6. | Level 1.5 | 1,402 | 552 | 39% | 517 | 37% |

**6.    *Monetary Award Claims Reviewed by the AAP.***

(a) In addition to reviewing claims based on pre-Effective Date diagnoses, the Appeals Advisory Panel ("AAP") and Appeals Advisory Panel Leadership Council ("AAPLC") assist us with the medical aspects of claims review. Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel

---

[10] Section 8 of the Summary Report on the Settlement Website identifies where claims that have not received a Notice of Monetary Award or been paid stand in the process.

[11] These do not include claims submitted where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.

[12] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that received a Notice of Monetary Award.

[13] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that were paid.

Consultants ("AAPC"), as highlighted in sub-paragraph (b) below. The AAP has completed reviews on 1,142 pre-Effective Date diagnosis Monetary Award claims[14], approving 565 (49%) of those claims.[15] Under FAQ 149 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 144 claims. In accordance with Rules 23 and 27 of the Rules Governing Qualified MAF Physicians, the AAP and AAPLC have reviewed 389 out of the 938 total Monetary Award claims submitted for diagnoses made by Qualified MAF Physicians, approving 160 (42%) of those claims.[16] Section 2 of Exhibit A-2 to the Settlement Agreement states that a Player's failure on two or more effort tests may result in the Player's test results being subject to independent review. Under that provision, as well as Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award, the AAP and AAPLC have reviewed 66 claims out of the 393 total claims submitted based on Qualifying Diagnoses made through the BAP, approving 34 (52%) of those reviewed claims.

(b) We have assigned 766 claims (including pre- and post-Effective Date claims) to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2

---

[14] The AAP has reviewed two more pre-Effective Date diagnosis Monetary Award claims since Status Report No. 19 because two claims were remanded to us following the Court's Order regarding the Objections of certain Settlement Class Members (Doc. No. 12001).

[15] Broken down by Qualifying Diagnosis, the AAP members approved 100% of Death with CTE claims, 91% of ALS claims, 75% of Alzheimer's claims, 87% of Parkinson's claims, 27% of Level 2 claims and 29% of Level 1.5 claims. The number of claims approved or denied by the AAP may fluctuate depending on multiple factors including ongoing audit investigations, remands of AAP decisions, and re-review of determinations that have not yet been finalized to ensure compliance with current Settlement Program rules and guidelines.

[16] This figure includes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement as well as claims based on diagnoses made by Qualified MAF Physicians who have been terminated from participation in the Program under Rule 27 of the Rules Governing Qualified MAF Physicians.

Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing

supporting an Alzheimer's Disease diagnosis. The AAPC have completed all of the reviews

assigned to them and provided their assessments to the AAP.

      **7.**    ***Notices for Missing Materials.***  We have sent one or more notices requesting

additional documents or information on 2,245 Monetary Award claims (25 more since Status

Report No. 19), as shown in Table 7:

| Table 7 | | NOTICES FOR MISSING MATERIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[17] | TOTAL |
| 1. | Total Reviewed | 125 | 63 | 601 | 244 | 864 | 1,396 | 280 | 3,573 |
| 2. | Notice Issued | 48 | 29 | 334 | 106 | 573 | 919 | 236 | 2,245 |
| 3. | % Missing Materials | 38% | 46% | 56% | 43% | 66% | 66% | 84% | 63% |

So far, 88% of the Settlement Class Members who received a notice requesting additional

documents have responded to the notice. Settlement Class Members take an average of about

59 days to respond. We generally receive up to one response to these notices each week and

review each reply to determine if it cures the problem. Of those who responded, 46% cured

the problem.

      **8.**    ***Monetary Award Denials.***  There are 1,156 denials of Monetary Award claims

for reasons other than an Audit (11 more since Status Report No. 19), as shown in Table 8.[18]

---

[17] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed. We process and pay a person for only one Qualifying Diagnosis per claim submission.

[18] The 1,156 denials are the count of claims where the most recent determination notice is a denial notice. We discuss Audit denials in Paragraph 18 of this Status Report.

| Table 8 | MONETARY AWARD DENIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTALS |
| 1. | Total Reviewed | 125 | 63 | 601 | 244 | 864 | 1,396 | 280 | 3,573 |
| 2. | Denied | 40 | 3 | 90 | 13 | 269 | 487 | 254 | 1,156 |
| 3. | % Denied | 32% | 5% | 15% | 5% | 31% | 35% | 91% | 32% |

Overall, the AAP has recommended denial of 666 claims for not having a valid Qualifying Diagnosis, which is 52% of the claims that currently have a denial notice. When we deny a claim based on the recommendation of an AAP member, we include in the notice comments from that AAP member explaining why. When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents. Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam. Settlement Class Members have appealed a total of 424 denial notices; four of the currently active denial notices are under appeal.

## V.     SUPPLEMENTAL MONETARY AWARD CLAIMS

**9.     *Supplemental Monetary Award Claims Received.*** A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis. The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid. Sections 12, 13 and

14 of the Summary Report on the Settlement Website show the total Supplemental Monetary Award claims submitted. We have received claims from 78 Retired NFL Football Players and six Representative Claimants seeking Supplemental Monetary Awards: 44 for Qualifying Diagnoses of Alzheimer's Disease, 11 for Qualifying Diagnoses of Parkinson's Disease, and 29 for Qualifying Diagnosis of Level 2 Neurocognitive Impairment. This is 23 more Supplemental claims than we reported in Status Report No. 19. Sections 15-18 of the Summary Report on the Settlement Website provide the status of Supplemental Monetary Award claims.

   **10.**   ***Supplemental Monetary Award Reviews and Payments.*** A Supplemental Monetary Award is the difference between the Monetary Award Grid value of the new Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis. We have issued 47 Notices of Supplemental Monetary Award to eligible Retired NFL Football Players and denied nine claims for a Supplemental Monetary Award. The combined Monetary Award After Offset value of these 47 Supplemental Monetary Awards was $55,576,314 but after subtracting the prior Monetary Award payments, totaled $27,371,623 as set out below in Table 9 (an increase of 10 claims totaling $10,241,729 since Status Report No. 19):

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | |
|---|---|---|---|---|
| | **SUPPLEMENTAL CLAIM** | | **PREVIOUSLY PAID CLAIM** | | **SUPPLEMENTAL MONETARY AWARD AMOUNT** |
| | **QUALIFYING DIAGNOSIS** | **AMOUNT** | **QUALIFYING DIAGNOSIS** | **AMOUNT** | **SUPPLEMENTAL MONETARY AWARD AMOUNT** |
| | **Total for Claims 1-37** | **$36,805,033** | | **$19,675,136** | **$17,129,895** |
| 38. | Alzheimer's Disease | $3,513,948 | Level 1.5 | $1,618,367 | $1,895,581 |
| 39. | Level 2.0 | $344,594 | Level 1.5 | $220,471 | $124,122 |
| 40. | Alzheimer's Disease | $1,813,651 | Level 1.5 | $798,395 | $1,015,256 |
| 41. | Level 2.0 | $1,303,561 | Level 1.5 | $696,863 | $606,698 |

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | |
|---|---|---|---|---|
| | **SUPPLEMENTAL CLAIM** | | **PREVIOUSLY PAID CLAIM** | | **SUPPLEMENTAL MONETARY AWARD AMOUNT** |
| | **QUALIFYING DIAGNOSIS** | **AMOUNT** | **QUALIFYING DIAGNOSIS** | **AMOUNT** | |
| 42. | Alzheimer's Disease | $3,967,360 | Level 1.5 | $1,500,000 | $2,467,360 |
| 43 | Level 2.0 | $1,020,179 | Level 1.5 | $497,648 | $522,530 |
| 44. | Level 2.0 | $992,973 | Level 1.5 | $558,609 | $434,364 |
| 45. | Alzheimer's Disease | $34,006 | Level 1.5 | $25,537 | $8,470 |
| 46. | Parkinson's Disease | $2,380,416 | Level 1.5 | $995,296 | $1,385,120 |
| 47. | Level 2.0 | $3,400,595 | Level 1.5 | $1,618,367 | $1,782,228 |
| | **Totals** | **$55,576,314** | | **$28,204,691** | **$27,371,623** |

The Program has paid 34 Retired NFL Football Players and five Representative Claimants a total of $16,302,586 for their Supplemental Monetary Awards. Section 2 of the Summary Report provides the payment details for Supplemental Monetary Awards by Qualifying Diagnosis.

## VI.    QUALIFIED MAF PHYSICIANS

**11.**    *Maintaining the MAF Network.* Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website. There are a total of 67 Qualified MAF Physicians on the website now, representing 32 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside. Table 10 shows the changes in these numbers since Status Report No. 19:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | **ASPECT** | **AS OF 1/9/23** | **AS OF 5/8/23** | **CHANGE** |
| 1. | Approved Physician – On Posted List | 68 | 67 | -1 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 33 | 32 | -1 |
| 3. | Approved Physician – Not yet Posted | 0 | 8 | +8 |

We had one Provider withdraw from the MAF Program, but he did not provide a reason for his resignation. We have since removed that physician from the posted list on the Settlement Website. Despite that loss, we have seen an uptick in interest from physicians and practices across the country. In the last month we have received four Provider Applications from physicians interested in becoming Qualified MAF Physicians and anticipate receiving several more in the next few weeks. Since the last status report, the Parties have approved eight new applicants. These newly approved Qualified MAF Physicians will be added to the Settlement Website after they contract with us and complete required Program orientation training.

  **12.**  ***150-Mile Rule.***

  (a)  Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired NFL Football Player be examined by a Qualified MAF Physician whose office is within 150 miles of his primary residence.[19] We can make exceptions to this 150-Mile Rule if the exception is requested prior to the appointment.

  We have received 222 requests for exceptions to the 150-Mile Rule, of which we granted 196 (88.3%) and denied 26 (11.7%). There are currently no pending requests. Table 11 shows the changes since Status Report No. 19:

| Table 11 | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 1/9/23** | **AS OF 5/8/23** | **CHANGE** | **AS OF 1/9/23** | **AS OF 5/8/23** | **CHANGE** |
| 1. | Granted | 164 | 196 | +32 | 86.3% | 88.3% | +2.0% |
| 2. | Denied | 26 | 26 | 0 | 13.7% | 11.7% | -2.0% |
| 3. | Pending | 0 | 0 | 0 | 0% | 0% | 0% |
| 4. | **Totals** | **190** | **222** | **+32** | | | |

---

[19] This requirement applies only to appointments made after April 11, 2019. Appointments made on or before April 11, 2019, did not need to be rescheduled with a different Qualified MAF Physician.

(b) The 150-Mile Rule is a flexible rule with broad exceptions. Of the living Retired NFL Football Players registered in the Program, 83.2% have a Qualified MAF Physician within 150 miles of their primary residence. We work with those who do not to help them schedule appointments with physicians further away, when they tell us they are ready to be examined.

13.    ***50-Mile Rule.***  Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office. Like the 150-Mile Rule, we have discretion to grant exceptions. We have received 40 requests for exceptions to the 50-Mile Rule, of which we granted 38 (95%) and denied two (5%). Table 12 shows how many exception requests we have received and our decisions on those requests (an increase of five since Status Report No. 19):

| Table 12 | | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | |
|---|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 1/9/23** | **AS OF 5/8/23** | **CHANGE** | **AS OF 1/9/23** | **AS OF 5/8/23** | **CHANGE** |
| 1. | Granted | 33 | 38 | +5 | 94.3% | 95.0% | +0.7% |
| 2. | Denied | 2 | 2 | 0 | 5.7% | 5.0% | -0.7% |
| 3. | **Totals** | **35** | **40** | **+5** | | | |

Of the 67 Qualified MAF Physicians who are actively scheduling appointments, 60 (89.5%) have an approved neuropsychologist within 50 miles of their office, and we will grant exceptions on a case-by-case basis for the seven Qualified MAF Physicians who do not.

14.    ***Deviation Explanations for Level 1.5 and Level 2 Diagnoses.*** Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not

strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we determine more information is needed. We cannot process these claims further until we receive the required explanation. There are currently 11 claims based on a diagnosis of either Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment, that require additional explanation from a Qualified MAF Physician and/or neuropsychologist, representing less than 5% of all MAF Level 1.5 and Level 2 Claim Packages submitted to the Program. Table 13 shows how many claims require additional explanation from the Qualified MAF Physician before we can issue award or denial notices:

| Table 13 | CLAIMS REQUIRING ADDITIONAL EXPLANATION FROM QUALIFIED MAF PHYSICIANS[20] | | | | | |
|---|---|---|---|---|---|---|
| | DIAGNOSIS TYPE | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE |
| 1. | Level 1.5 | 0 | 2 | +2 | 0 | 0.5% | +0.5% |
| 2. | Level 2 | 1 | 9 | +8 | 0.4% | 3.8% | +3.4% |
| 3. | Totals | 1 | 11 | +10 | | | |

**15.** ***AAP Leadership Council.*** Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network. We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses. In addition, the AAP Leadership Council assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the Settlement Agreement criteria. The AAP Leadership Council also facilitates discussions and

---

[20] In Table 13 we updated how we calculated the % of total to include all MAF Level 1.5 and 2 claims submitted since the start of the Settlement Program.

solicits guidance from the MAF Steering Committee, a group of five Qualified MAF Physicians, who render advice and assistance on providing peer-to-peer feedback to Qualified MAF Physicians and provide suggestions on how to improve the operations and performance of the network of Qualified MAF Physicians. Overall, our collaboration with the AAP Leadership Council has been successful, and the Qualified MAF Physicians have responded positively to receiving feedback from AAP members.

16.  ***MAF Steering Committee.*** Five Qualified MAF Physicians serve on the MAF Steering Committee as authorized by Rule 24 of the Rules Governing Qualified MAF Physicians. The Committee members have participated in regular roundtable discussions with the AAP Leadership Council, assisted in developing training for the Qualified MAF Physicians to address most common issues, and provided other suggestions for improvement of the Qualified MAF Physicians network. Overall, the peer-to-peer communications regarding the operation and performance of the network of Qualified MAF Physicians has been positive.

## VII.   AUDIT[21]

17.  ***Reports of Adverse Finding in Audit.*** We issued one new Report of Adverse Finding in Audit since Status Report No. 19, and the Special Masters have accepted the Audit Report for an Audit Proceeding. This Audit Report affects 12 Settlement Class Members and focuses on the actions of a law firm that allegedly (1) submitted unreliable medical tests and affidavits to the Program to support claims, (2) attempted to instruct Qualified MAF Physicians on the assigning of diagnoses, and (3) coached Settlement Class Members on how to perform in examinations.

---

[21] We rearranged the sections and tables within this Audit section and updated the text to explain a new Audit Report that the Audit Team began issuing on 2/15/23.

In total, we have issued to the Parties 21 Reports of Adverse Finding in Audit affecting 578 Monetary Award claims. All 21 Audit Reports were then referred to the Special Masters. The 21 Audit Reports concern four neurologists, 12 neuropsychologists, four law firms, seven individual Settlement Class Members and one claims preparation company. Table 14 summarizes the Special Masters' and Court's decisions on these Audit reports:

| Table 14 | DECISIONS ON AUDIT REPORTS | |
|---|---|---|
| | **DECISION** | **AUDIT REPORTS** |
| **1.** | Claims Denied in Audit | 12 |
| **2.** | Claims Removed from Audit and Subjected to Specialized Review | 4 |
| **3.** | Claims Removed from Audit and Returned to Normal Review | 3 |
| **4.** | All Claims Withdrawn before Decision | 1 |
| **5.** | Audit Proceeding Still in Progress | 1 |
| **6.** | **Total** | **21** |

18.    *Audit Proceeding Decisions.* We have denied 372 claims after Audit based on decisions by the Court or Special Masters.[22] Sections 6 and 9 of the Summary Report on the Settlement Website show these denials. A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors. There are 122 Settlement Class Members who submitted a new Monetary Award Claim following an Audit Denial, and 48 of them have been paid or are in the payment process.

---

[22] Of the 372 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims).  Six individual Retired NFL Football Players' claims have been denied. The Special Masters directed us to deny 170 claims based on their findings related to the Special Investigator's investigation of a law firm. We denied the remaining claim for failing to cooperate with our requests for information during an Audit.

19.    *Ongoing Audit Investigations.* We have other Audit investigations underway affecting 17 Monetary Award claims (seven more than the number we reported in Status Report No. 19). All 17 are individual claims.

20.    *Closed Audits.* We have concluded the Audit investigations of 1,297 Settlement Class Members with Monetary Award claims by denying a claim through Audit, by making no adverse finding and removing a claim from Audit, or because the Settlement Class Member withdrew his or her claim during our Audit. Table 15 summarizes the reasons for these closures and changes in the numbers since Status Report No. 19:

| Table 15 | CLOSED AUDITS | | | |
|---|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 1/9/23** | **AS OF 5/8/23** | **CHANGE** |
| 1. | Claim Denied in Audit | 372 | 372 | +0 |
| 2. | No Finding of Misrepresentation, Omission, or Concealment | 711 | 720 | +9 |
| 3. | Claim Withdrawn by Settlement Class Member | 205 | 205 | +0 |
| 4. | **Totals** | **1,288** | **1,297** | **+9** |

21.    *Claims Investigated More than Once.* Claims on which we have concluded an Audit may be the subject of another Audit if we later learn of information that requires further investigation. We notify Settlement Class Members when this happens. We have audited 94 Monetary Award claims more than one time (the same as we have reported since Status Report No. 14); the most times a Monetary Award claim has been audited is twice.

## VIII.   DERIVATIVE CLAIMANTS

22.    *Derivative Claims.* We have received 615 Derivative Claim Packages (an increase of one since Status Report No. 19). Table 16 shows the status of these claims:

| Table 16 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | STATUS | HOW MANY | % OF TOTAL |
| 1. | Paid Derivative Claimant Award ($1,016,519[23]) | 229 | 37% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($15,610) | 4 | 1% |
| 3. | Denied – Associated Retired NFL Football Player's Claim Denied | 48 | 8% |
| 4. | Denied – No Timely Claim for Associated Retired NFL Football Player | 42 | 7% |
| 5. | Denied – No Timely or Proper Registration for Associated Retired NFL Football Player | 35 | 6% |
| 6. | Denied – Retired NFL Football Player's Claim Withdrawn During Statute of Limitations Proceeding | 16 | 3% |
| 7. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 8. | Denied – Deceased Derivative Claimant | 4 | <1% |
| 9. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 10. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 2% |
| 11. | Withdrawn | 8 | 1% |
| 12. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 200 | 33% |
| 13. | Total | 615 | |

We did not issue any Notices of Derivative Claimant Award since Status Report No. 19.

Table 17 shows how many eligible Derivative Claimants received the entire 1% amount deducted from the associated Retired NFL Football Player's Monetary Award, and how many shared that 1% amount with other eligible Derivative Claimants:

[23] This includes payment for (a) Supplemental Derivative Claimant Awards and (b) additional Derivative Claimant Awards issued because the associated Retired NFL Football Player's Monetary Award, and resulting 1% deduction, increased after rescoring under the Norming Agreement.

| Table 17 | SHARED AWARD STATUS FOR ELIGIBLE DERIVATIVE CLAIMANTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE |
| 1. | Received Entire 1% Amount | 63 | 63 | 0 | 27% | 27% | 0% |
| 2. | Shared 1% Amount with Other Eligible Derivative Claimants[24] | 170 | 170 | 0 | 73% | 73% | 0% |
| 3. | Totals | 233 | 233 | 0 | | | |

The 233 Derivative Claimants who received Notices of Derivative Claimant Award are associated with 116 Retired NFL Football Players. We issued payment to three Derivative Claimants since Status Report No. 19 and have paid 229 (98%) of the 233 Derivative Claimants with Notices of Derivative Claimant Award; the four eligible Derivative Claimants who have not been paid are in the payment process.

23.     ***Additional Derivative Claimant Details.*** We received challenges from 29 Retired NFL Football Players (or their Representative Claimants) to 41 Derivative Claimants (no change since Status Report No. 8); 19 (46%) of those 41 challenged Derivative Claimants are not eligible for a Derivative Claimant Award because they never submitted a timely Derivative Claim Package. We have issued a Notice of Derivative Claim Package Submission Deadline to 498 registered Derivative Claimants. Table 18 summarizes their claim submission statuses and the changes since Status Report No. 19:

---

[24] We have not received an Allocation Objection from any of the Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

| Table 18 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE |
| 1. | Claim Submitted | 160 | 160 | 0 | 32% | 32% | 0% |
| 2. | No Claim Submitted | 335 | 338 | +3 | 68% | 68% | 0 |
| 3. | Within 30-Day Deadline | 1 | 0 | -1 | <1% | 0% | -<1% |
| 4. | **Totals** | **496** | **498** | **+2** | | | |

24.    ***Supplemental Derivative Claimant Awards.*** Section G of the Overview of Derivative Claimant Process on the Settlement Website (https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf) explains how Supplemental Derivative Claimant Awards are handled. As discussed in Paragraph 10 of this Status Report, we issued Notices of Supplemental Monetary Award to 47 Retired NFL Football Players (an increase of 10 since Status Report No. 19). Of those 47, 41 Retired NFL Football Players had no registered Derivative Claimants associated with them, and four Retired NFL Football Players each had one registered Derivative Claimant, but those four Derivative Claimants did not submit Derivative Claim Packages to share 1% of the Retired NFL Football Players' earlier Monetary Awards and were not eligible for any portion of the Players' Supplemental Monetary Awards. The last two Players' Supplemental Monetary Award Notices had a 1% offset for potential Derivative Claimant Awards, which have been issued to the associated Derivative Claimants, as described in Table 19:

| Table 19 | SHARED SUPPLEMENTAL AWARD STATUS FOR ELIGIBLE DERIVATIVE CLAIMANTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE |
| 1. | Received Entire 1% Amount | 2 | 2 | 0 | 100% | 100% | 0% |
| 2. | Shared 1% Amount with Other Eligible Derivative Claimants | 0 | 0 | 0 | 0% | 0% | 0% |
| 3. | Totals | 2 | 2 | 0 | | | |

Both of the Derivative Claimants with Supplemental Derivative Claimant Awards have been paid.[25]

## IX.   OTHER CLAIM PROCESSES

**25.**   ***Handling of Attempted Assignments of Claims.*** On September 27, 2019, the Court issued a Notice (Document 10858) directing us to streamline the process regarding attempted assignments by Settlement Class Members of claims to third-party lenders. At that time, we suspended the process for handling such assignment questions under the Rules Governing Assignment of Claims and worked with the Court and the Special Master to modify these Rules. On March 19, 2020, the Special Masters adopted the Rules Governing Payment of Claims Involving Third-Party Funders and the Rules Governing Third-Party Funding Resolution Protocol, which superseded the previous Rules (collectively, the "New Payment Rules"). Under the New Payment Rules Governing Payment of Claims Involving Third-Party Funders, all Settlement Class Members must complete and submit a Sworn Statement regarding the Status of Assignment of Monetary Claim ("SWS-5") to receive payment. There are two versions of the SWS-5, one for those identified as a borrower by a Third-Party Funder that is participating in the Rules Governing Third-Party Funding

---

[25] See Row 1 of Table 16 in this Status Report.

Resolution Protocol ("Resolution Protocol") (the SWS-5(A)) and another for those not so identified (the SWS-5(B)). As of May 8, 2023, 24 Third-Party Funder entities are participating in the Resolution Protocol. We have worked with those participating funders to resolve cash advances for 40 Settlement Class Members since the adoption of the New Payment Rules.

26.  ***Petitions for Deviation from the Attorneys' Fee Cap.***[26] We have received eight Petitions for Deviation, one of which was withdrawn. The Court resolved three of the remaining seven Petitions for Deviation in conjunction with the Attorneys' Liens Dispute Process: two by final decision, and one upheld on appeal by the Third Circuit.  The other four Petitions are pending final resolution.

27.  ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a) Table 20 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 19:

| Table 20 | | NON-MEDICAL LIENS SUMMARY | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **LIEN TYPE** | **LIENS ASSERTED** | | | **NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR** | | | **LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS** | | |
| | | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE |
| 1. | Attorneys' | 1,625[27] | 1,865[28] | +240 | 529 | 556 | +27 | 263 | 270 | +6 |
| 2. | Child Support | 353 | 353 | 0 | 53 | 55 | +2 | 22 | 22 | 0 |
| 3. | Judgment | 70 | 70 | 0 | 18 | 18 | 0 | 9 | 10 | +1 |
| 4. | Tax | 57 | 57 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| 5. | **Totals** | **2,105** | **2,345** | **+240** | **603** | **632** | **+29** | **294** | **301** | **+7** |

---

[26] Judge Brody entered a Memorandum and Order in April of 2018 limiting attorneys' fees in the Program to 22% of each SCM's Monetary Award, plus reasonable costs (ECF Nos. 9862 and 9863). In the Memorandum, the Judge decided that attorneys should have the opportunity to petition the Court to go above and beyond the cap in exceptional circumstances, which is what the Petitions for Deviation process is meant to cover.
[27] These 1,625 Attorneys' Liens were asserted by 62 law firms.
[28] These 1,865 Attorneys' Liens were asserted by 62 law firms.

(b) Table 21 shows the status of Liens in the Attorneys' Liens dispute resolution

process:

| Table 21 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[29] | | |
|---|---|---|---|
| PENDING | RESOLVED | | TOTAL |
| | BY AGREED WITHDRAWAL | BY COURT DETERMINATION | |
| 48 | 168 | 22 | 238 |

(c) Table 22 breaks down the Non-Medical Lien holdbacks[30] by Lien type:

| Table 22 | NON-MEDICAL LIEN HOLDBACKS | | |
|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN HOLDBACKS |
| 1. | Attorneys' | 16 | $17,877,985.19 | $3,204,436.54 |
| 2. | Child Support | 6 | $5,138,311.75 | $450,272.42 |
| 3. | Judgment | 2 | $3,890,301.22 | $231,233.96 |
| 4. | Tax | 0 | N/A | N/A |
| 5. | **Totals** | **24** | **$26,906,598.16** | **$3,885,942.92** |

(d) Table 23 summarizes the Non-Medical Lien payments from initial Monetary

Awards[31] by Lien type:

| Table 23 | NON-MEDICAL LIEN PAYMENTS FROM INITIAL MONETARY AWARDS | | |
|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN PAYMENTS |
| 1. | Attorneys' | 163 | $180,015,393.58 | $10,237,371.14 |
| 2. | Child Support | 17 | $12,381,484.76 | $811,466.41 |
| 3. | Judgment | 7 | $7,589,979.10 | $2,947,691.78 |
| 4. | Tax | 1 | $33,282.80 | $6,492.65 |
| 5. | **Totals** | **188** | **$200,020,140.24** | **$14,003,021.98** |

---

[29] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.
[30] The holdbacks are the amount of funds we are withholding pending resolution of a Dispute. As of 5/8/23, there are 55 disputed Attorneys' Liens currently pending resolution by Judge Strawbridge where the Settlement Class Member has or will receive payment of the rest of his Monetary Award. After the Court enters a final order (whether by Judge Strawbridge or Judge Brody's approval of his Report and Recommendation) resolving the Disputes and any appeal period passes, we disburse the held back funds on the next available monthly Disbursement.
[31] We also have issued $46,118.04 in Lien payments from Supplemental Monetary Awards and $1,442.10 from Derivative Claimant Awards.

## X.   COMMUNICATIONS CENTER FOR THE PROGRAM

28.    ***Our Contact Activity.*** Since our contact center opened on February 6, 2017, we have handled 98,438 total communications, including 59,224 calls made or received and 34,644 emails to us at our Claims Administrator email box. Since Status Report No. 19, we handled 2,389 such total communications. The most common topics of these communications have been General Settlement Information, Change in Lawyers, Payment, Baseline Assessment Program (BAP), and MAF Physicians.

29.    ***Law Firm Contacts.*** Our Law Firm Contacts are assigned to 577 different law firms or lawyers representing Settlement Class Members in the Program. This is four more law firms or lawyers than we reported in Status Report No. 19. The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 28 above.

30.    ***Insights Newsletters.*** Since Status Report No. 19, we issued one new edition of our quarterly "Insights" newsletter (First Quarter 2023). We send the newsletters to unrepresented Settlement Class Members and lawyers by email or mail. We also post them to the Settlement Website at https://www.nflconcussionsettlement.com/Newsletters.aspx (under "Useful Information" click "Newsletters"). We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters by email to ClaimsAdministrator@NFLConcussionSettlement.com or through the online submission screen on the Newsletters page of the Settlement Website.

31.    ***Program Doctors Newsletters.*** In the fourth quarter of 2020, we issued our first newsletter to MAF Physicians as a tool to share relevant and valuable information. With the Second Quarter 2021 edition, we expanded our newsletter audience to include all Program doctors. We emailed the First Quarter 2023 Program Doctors Newsletter to all

Qualified MAF Physicians, Qualified BAP Providers and other approved evaluating Neuropsychologists on March 31, 2023. All Program Doctors also can access the newsletter on their Provider Portals. The newsletter provided information on how to determine a Player's Reading Level under the New Method and how to access the Clinician's Interpretation Guide and other resources in the Portal, and it discussed the recent Provider Portal Survey and resulting feedback we have received. We plan to continue to issue newsletters to Program Doctors on a quarterly basis.

32.     ***Settlement Program Website.*** In addition to the more significant changes to the Settlement Website discussed in Section II of this Status Report, we regularly update the Settlement Website to reflect progress and changes to the Program. Since Status Report No. 19 in January 2023, we made these changes:

(1)  Posted a Report of the Special Masters (Document 11979, filed February 3, 2023), BAP Administrator Status Report No. 17 (Document 11981, filed February 3, 2023), and Claims Administrator Status Report No. 19 (Document 11980, filed February 3, 2023) to the Status Reports page at https://www.nflconcussionsettlement.com/Status_Reports.aspx.
(2)  Replaced the Monetary Award Grid on the Reference Guides page at https://www.nflconcussionsettlement.com/Reference_Guides.aspx. Under Section 6.9 of the Settlement Agreement, in January of each year the Special Masters may direct an inflation adjustment to the Monetary Award amounts, not to exceed 2.5%, based on consideration of the Consumer Price Index for Urban Consumers. The Special Masters approved a 2.5% upward adjustment for Monetary Awards issued on and after January 12, 2023.  All Monetary Award Determination Notices issued and all Monetary Awards paid on or after January 12, 2023, use the increased Monetary Award Grid values.

The Program's Home page has had 25,832 more unique visits since Status Report No. 19, giving us 704,828 total unique visits, coming from 190 countries and all 50 of the United States. The five most frequently visited pages since January, after Home and Login, were Physician Search (1,348 unique views), Published Special Master Decisions – Monetary Award Claims (1,282 unique views), Reports and Statistics (1,104 unique views), Frequently Asked Questions (637

unique views), and Alerts (628 unique views). Also since January, visitors conducted 6,187 searches on the website using 1,340 unique keywords and completed 2,361 unique downloads. The top five downloaded documents were the Special Masters' March 8, 2022, and April 6, 2022 Notices regarding the Order approving implementation of the Norming Agreement and timing of decisions by the Claims Administrator, accessed through the link on the Home page of the public website and all Portals (515 clicks); the Settlement Agreement (474 clicks); the Monetary Award Grid (226 clicks); Diagnosis and Review Table (94 clicks); and the Guide to Summary Report (82 clicks).

## XI.   SPECIAL MASTERS

**33.**   ***Our Work with the Special Masters.*** Since Status Report No. 19, we continue to have regularly scheduled calls to discuss policy and operational issues, and have held 147 such calls and/or meetings with the Special Masters to date. We have many other calls and exchange countless emails with them to address issues as they arise. The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

**34.**   ***Program Rules.*** There are 10 sets of Rules available on the Settlement Website (under "Governing Documents," click "Governing Rules") and on the online portals of law firms, lawyers and *pro se* Settlement Class Members. In late January 2023, we posted a revised set of the Rules Governing Appeals of Claim Determinations. The Special Masters amended NFL Appeal Rules 5(f) and 11(c) to set minimum 1-inch margins and minimum 12-point font size for appeal briefs. The Special Masters will reject submitted briefs that violate these requirements. The Parties also agreed to a modification of NFL Appeal Rule 14 concerning the Response of the Appellee and the standard of review that the Special Master will apply.

35.    *Published Decisions.* Since Status Report No. 19, the Special Masters issued

nine new decisions they designated for publication. These decisions relate to how we analyze

claims for Monetary Awards.

## AAP Review and Validity Testing

January 12, 2023

The Special Master denied the appeal of a Retired NFL Football Player's Level 2 Neurocognitive Impairment claim. The Player argued that the Claims Administrator improperly referred his claim to the AAP, which he asserted is only permissible when there are conflicting BAP diagnoses. The District Court previously considered the Player's argument and found that the Claims Administrator may request AAP review of a claim, regardless of whether there are conflicting diagnoses. The Special Master followed the Court's decision in concluding that the Claims Administrator did not err by asking for AAP input. The Player also argued that his testing was valid and that the AAP Member who reviewed his claim ignored the testing results and the BAP neuropsychologist's determination that he passed all *Slick* criteria. Flaws in the BAP neuropsychologist's review of the Player's claim illustrate why AAP review of BAP diagnoses is sometimes necessary to ensure diagnostic accuracy. The AAPC and an AAP Member both found that the Player's neurocognitive assessment failed the Settlement's validity criteria requirements, precluding him from meeting the Settlement criteria for Level 2 Neurocognitive Impairment.

## Validity Testing

January 12, 2023

The Special Master affirmed the Claims Administrator's denial of a Retired NFL Football Player's Level 1.5 Neurocognitive Impairment claim based on invalid validity testing and insufficient information regarding functional impairments. The AAP and AAPC worked carefully through the BAP neuropsychologist's analysis, which sought to explain away failure on two or more performance validity tests. The Settlement Agreement specifically indicates that such failures "may result in the Retired NFL Football Player's test results being subjected to independent review, or result in a need for supplemental testing of the Retired NFL Football Player." It was in service of that requirement that the AAP, AAPC, and the Claims Administrator assessed whether or not the Player's testing represented the optimal level of his neurocognitive functioning and they determined that it did not.

## Stroke Offset

January 20, 2023

The Special Master denied the appeal of a Representative Claimant who contended that the Claims Administrator incorrectly applied the stroke offset to a Retired NFL Football Player's Level 2 Neurocognitive Impairment claim. The Settlement provides that if a Retired NFL Football Player suffered a medically diagnosed stroke prior to a Qualifying Diagnosis, a 75% offset will be applied to his Monetary Award unless "the Settlement Class member demonstrates, by clear and convincing evidence, that the Qualifying Diagnosis was not causally related to the Stroke." The Representative Claimant argued that the Claims Administrator and AAP should have deferred to the primary care physician's judgment that the Player's stroke did not cause his neurocognitive impairment rather than that of the examining BAP neurologist and neuropsychologist who linked the stroke to his impairment. The Special Master has repeatedly emphasized the "fundamental presumption that the Claims Administrator – and by extension the AAP – should defer to the articulated medical judgments of examining clinicians and physicians." That deference applies to BAP providers who have expertise specific to the Settlement and the opportunity to apply that expertise in their examinations of the Player. The Special Master found that the Claims Administrator and AAP correctly and reasonably relied on the Player's BAP examinations to apply the stroke offset.

## Validity Testing

March 1, 2023

The Special Master affirmed the Claims Administrator's denial of a Retired NFL Football Player's Level 1.5 Neurocognitive Impairment claim based on invalid validity testing. The Special Master rejected the Player's argument that the neuropsychologist was entitled to deference because she provided a well-reasoned and medically sound justification for considering his neuropsychological testing valid, despite suboptimal performance validity test scores. The Special Master reiterated his previous holding that a clinician's conclusion that scores are not "suboptimal" is not entitled to deference when those scores indicate a "high likelihood of invalid performance" according to the Clinician's Interpretation Guide. All three AAP Consultants reviewed the neuropsychologist's analysis and confirmed that the Player did not meet the criteria for Level 1.5 or Level 2 Neurocognitive Impairment. The AAPC panel determined that the Player's "worse than chance" scores on performance validity measures suggested deliberate underperformance rather than cognitive difficulties.

## Neuropsychological Testing and Validity

March 17, 2023

The Retired NFL Football Player appealed the Claim Administrator's denial of his two claims for Level 2 Neurocognitive Impairment: a 2017 Pre-Effective Date Claim and a 2018 Post-Effective Date Claim. The 2017 Claim's denial results from failures of both validity and insufficient functional impairment; the 2018 Claim's denial focuses on functional impairment and the absence of neuropsychological testing without a reasonably articulated excuse. The Claims were based on two neurological assessments completed one month apart. In affirming the denial, the Special Master found that the Player's two examinations were conducted in ways so inconsistent with the Settlement's Injury definitions that they provided insufficient foundations for an award. One described invalid test scores; the other relied on those very exams to excuse a failure to administer additional testing.

## Validity Testing, External Evidence, and Functional Impairment

March 27, 2023

The NFL Parties and the Retired NFL Football Player appealed a Denial of a Level 2 Award. The appeals largely focus on the appropriateness of using evidence of function illustrated in the Player's social media that post-dates the Claim's submission in the Review process. That later-arriving evidence revealed a pattern of functional behavior inconsistent with the profound functional impairment the Player's diagnosis required.

Based on this external evidence, and the absence of any attempt to isolate the role of cognitive loss as opposed to other factors, the Special Master, granting the NFL Parties' appeal, concluded that the Player did not sufficiently demonstrate the requisite functional loss.

The Player's appeal raised multiple issues regarding Claims Administration, but centered on the argument that validity must be fixed at the time of the Diagnosis. The Special Master found that the Settlement Agreement did not adopt a "reasonable doubt" standard for a finding of invalidity. And, regarding later-created evidence, the Special Master concluded that a plain reading of the Settlement Agreement permitted its use. In considering the social media evidence, the Special Master determined that, though the Settlement's claims review process typically privileges evidence contemporaneous to the diagnosis, when later arriving information establishes a pattern of behavior inconsistent with the factual predicates of a diagnosis, the Claims Administrator has a duty to consider it. The Special Master concluded that due process applied to Claims Administration. But the External Evidence rules, adopted by the Claims Administrator in 2020, vindicate that interest, and no special rules for social media evidence are required. The Special Master denied the Player's appeal, finding that the later-arriving pieces of evidence established that the testing was invalid.

## Absence of Neuropsychological Testing

March 29, 2023

The Claims Administrator denied a Retired NFL Football Player's Level 2 Neurocognitive Impairment claim based on the absence of neuropsychological testing. This requirement can only be waived when the diagnosing physician can certify that it is medically unnecessary because the Player's dementia is so severe. The diagnosing physician's explanation did not link his doubts about the Player's inability to complete neuropsychological testing to the severity of his dementia, but instead cited the Player's psychiatric issues, anger, and agitation. The Special Master found that the Player's anger and agitation were not legitimate reasons to not attempt neuropsychological testing. The Special Master followed the AAPC's expert medical evaluation and the entire file in concluding that the Player's dementia was not so profound as to preclude neuropsychological testing, and determined that the Claims Administrator correctly decided that the diagnosing physician's conclusion was not reasonably determined. The Player ultimately completed neuropsychological testing after the Claims Administrator's denial and the neuropsychologist determined that the testing was invalid because the Player demonstrated inconsistent effort, not, as the Player argued, as support for the conclusion that the testing could not have been completed at all.

## Validity Testing

April 17, 2023

The Special Master affirmed the Claims Administrator's denial of a Retired NFL Football Player's Level 1.5 Neurocognitive Impairment claim based on invalid validity testing. The Settlement requires each neuropsychological examiner to complete the *Slick* criteria checklist to determine whether the Player's test data is a valid reflection of his optimal level of neurocognitive functioning. Seven of the nine *Slick* criteria were indicated for this Player, and therefore the examiner determined that no conclusion could be drawn about the Player's cognitive impairment level. Despite the invalid performance validity measures, the MAF Physician certified a Diagnosis of Level 1.5 Neurocognitive Impairment. The Special Master determined that the MAF Physician's reasoning for ignoring validity testing because it may not be as accurate when the level of cognitive impairment increases did not sufficiently address the discrepancies within the results.

## Absence of Neuropsychological Testing

April 22, 2023

The Claims Administrator denied a Retired NFL Football Player's Level 2 Neurocognitive Impairment claim on the grounds of missing valid neuropsychological test scores. The requirement for neuropsychological testing can be waived only for MAF diagnoses when the diagnosing physician can certify that it is medically unnecessary because the Player's dementia is so severe. The Claims Administrator has an obligation to determine if the certification was reasonably determined, *i.e.*, that it was reasonable to have concluded that the testing would not generate valid results. Invalid testing— whether indicating insufficient effort or malingering—does not demonstrate cognitive loss. Because the diagnosing physician offered neither an explanation of the Player's invalid testing nor an adequate rationale for setting aside the testing entirely, the Special Master concluded that the Claims Administrator correctly determined that the Player's claim must fail based on the absence of valid test scores to support it.

We post all such rulings to the Settlement Website, which can now be found by selecting "Governing Decisions" under "Governing Documents" found in the Green banner and then clicking the "Special Master" button if it is not already selected. The Special Masters have so far issued 61 published Monetary Award appeal decisions and 11 Audit decisions (72 total such decisions).[32]

---

[32] On October 28, 2020, the Special Master issued contextually similar decisions on deviation from BAP Criteria for six claimants. One of the six decisions appears on the Settlement Website.

## XII.   FREQUENTLY ASKED QUESTIONS

36.   ***Frequently Asked Questions.*** We have not added any new FAQs since Status Report No. 19, but we did remove four FAQs at the request of the NFL Parties and Class Counsel:

> (1) **FAQ 15** ("I opted out of the Settlement. May I revoke that Opt Out and get back into the Settlement Program?");
> (2) **FAQ 112** ("What must the medical records show for Level 1.5 and Level 2 Neurocognitive Impairment diagnoses for Retired NFL Football Players who died before January 7, 2017 (the Effective Date) and cannot participate in the BAP or be diagnosed by a Qualified MAF Physician?");
> (3) **FAQ 362** ("Who determines the appropriate model for predicting premorbid functioning?"); and
> (4) **FAQ 385** ("When will I be notified if my prior testing qualifies for Automatic Retrospective Rescoring?").

With the input from the NFL Parties and Class Counsel, we also made substantive revisions, as noted below, to 22 FAQs:

> (1) **FAQ 2** ("What are the benefits of the Settlement?"), to include the Expanded BAP Examination;
> (2) **FAQ 8** ("Does the Claims Administrator share the contents of my Claim Package with Class Counsel or the NFL Parties?"), to clarify that this is made available when the Claim Package is submitted and not only after a Settlement Class Member becomes eligible for an award;
> (3) **FAQ 14** ("If I opted out of the Settlement, can I still get benefits from the Settlement?"), to include language from FAQ 15 that was removed;
> (4) **FAQ 18** ("Are there any tools on the Settlement Website to help me understand the Settlement Agreement and how to make a claim?"), to update the description of the Neuropsychological Test Score Criteria document;
> (5) **FAQ 19** ("Where can I find the Special Master's or the Court's published decisions on appeals or statute of limitations matters?"), to include a reference to the Newsletters we issue;
> (6) **FAQ 25** ("If I receive benefits under an NFL disability plan (such as the 88 Plan), Social Security, or any other disability plan, do I automatically qualify for a Monetary Award in the Settlement Program?"), to note that Players will not lose benefits under an NFL disability plan if they receive a Monetary Award in the Settlement Program;
> (7) **FAQ 40** ("How does the Claims Administrator calculate a Retired NFL Football Player's Eligible Seasons?"), to note that if a Player believes he was deactivated on game day and that his number of Eligible Seasons is

not accurate that he may ask the Claims Administrator to look into the issue;

(8) **FAQ 51** ("Is there a deadline for taking the BAP exam?"), to add the March 4, 2024 deadline for requesting an Expanded BAP Examination;

(9) **FAQ 65** ("What happens after a BAP exam?"), to remove notes that the Claims Administrator will not receive records from the BAP exam;

(10) **FAQ 69** ("How long will I have to use my BAP Supplemental Benefits?"), to clarify that if a Player receives a Monetary Award while receiving BAP Supplemental Benefits, he will no longer receive BAP Supplemental Benefits;

(11) **FAQ 83** ("What kind of physicians are currently authorized to make a Qualifying Diagnosis?"), to simplify the answer and address only diagnoses made after January 7, 2017;

(12) **FAQ 111** ("How are diagnosing physicians to apply the Clinical Dementia Rating (CDR) scale to Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses?"), to remove a parenthetical about who evaluates the scores if testing was done in the BAP;

(13) **FAQ 128** ("Who reviews my claim for a Monetary Award?"), to clarify that an AAP doctor reviews all claims that rely on neuropsychological testing that was rescored under the Norming Agreement;

(14) **FAQ 130** ("What is the AAP and what does it do?"), to note that upon request, the AAP provides the Claims Administrator advice and assistance about medical issues that arise during the claim review process;

(15) **FAQ 144** ("I have provided my claim to the Claims Administrator and it is now complete enough to send to the AAP. What happens next?"), to clarify when the Claims Administrator assigns claims for review by an AAP doctor;

(16) **FAQ 154** ("If I received a Monetary Award for one Qualifying Diagnosis, can I later receive a Monetary Award for a different Qualifying Diagnosis? What is a Supplemental Monetary Award?"), to more clearly explain that if a Monetary Award for a different Qualifying Diagnosis is higher, a Player's Supplemental Monetary Award is the dollar amount of the new Monetary Award less the amount of the previously paid Monetary Award;

(17) **FAQ 188** ("What are Common Benefit Fees and how will Class Counsel be paid?"), to explain that the 5% holdback comes directly from the Monetary Award if the Settlement Class Member is not represented by counsel and from counsel's fee if represented;

(18) **FAQ 189** ("How will my individual lawyer be paid?"), to note that a lawyer's fee cannot exceed 22% of the Monetary Award unless there is an approved petition for deviation;

(19) **FAQ 190** ("Can I terminate my relationship with my individual lawyer?"), to make it clear that Players do have the right to terminate their relationship with their current lawyer;

(20) **FAQ 314** ("When will I receive payment for my Monetary Award or Derivative Claimant Award?"), to note that Class Counsel and the NFL

Parties have 30 days from the date of the Notice of Monetary Award Claim Determination to file an appeal;

(21) **FAQ 325** ("What is an audit?"), to add a fourth fact pattern for Mandatory Fact Pattern Audits; and

(22) **FAQ 328** ("I received a Notice of Audit of Claim after I received a Notice of Monetary Award Claim Determination or Notice of Denial of Monetary Award Claim. How does the audit affect my claim?"), to clarify that the appeal right is preserved for all parties, not just the Settlement Class Member.

There now are 391 FAQs in 18 categories. These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program. The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs. Note that when we add new FAQs, we place them within the existing set where it makes the most sense. This means that the numbering of FAQs within the set may change from time to time.

## XIII.   <u>REGISTRATION</u>

37.   *Registration Submissions.*[33]

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover Registrations. Table 24 shows changes in the number of timely Registration submissions since our Status Report No. 19:

| Table 24 | TIMELY REGISTRATION SUBMISSIONS | | | |
|---|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 1/9/23** | **AS OF 5/8/23** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,839 | 15,828 | -11 |
| 2. | Representative Claimants | 1,406 | 1,417 | +11 |
| 3. | Derivative Claimants | 3,325 | 3,326 | +1 |
| 4. | **Totals** | **20,570** | **20,571** | **+1** |

---

[33] Sections 1 of 2 of the Summary Report previously covered Registrations. Because the Registration period ended on August 17, 2017, we moved the Registration information to the end of the Summary Report at Section D.

The number of Retired NFL Football Players (Row 1) went down by eleven from Status Report No. 19 because they were replaced by Representative Claimants. Of the 20,571 to whom we issued Registration notices, we were able to confirm that 19,410 of them are Settlement Class Members under the Settlement Agreement, 12,838 of whom are Retired NFL Football Players eligible to participate in the BAP. The other 1,161 persons are not Settlement Class Members under the Settlement Agreement because of one or more of these reasons: (1) they were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not provide us with the information or support required by the Settlement Agreement to register, after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a Derivative Claimant but did not have a relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals. We have made determinations on 326 such Registrations and found that 173 (53%) of them presented good reasons to be allowed to register after August 7, 2017. Table 25 shows the change in these numbers since Status Report No. 19:

| Table 25 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | STATUS | AS OF 1/9/23 | AS OF 5/8/23 | CHANGE |
| 1. | Accepted | 173 | 173 | 0 |
| 2. | Not Accepted | 147 | 153 | +6 |
| 3. | **Totals** | **320** | **326** | **+6** |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge. The NFL Parties also may challenge our good cause exception decisions. We have received 380 challenges, which is one more than the number we have reported since Status Report No. 19. Table 26 explains these challenges and what happened to them:

| Table 26 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 245 | Settlement Class Member | 77 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 25 | Settlement Class Member | 5 | 20 |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | Totals | 380 | | 150 | 230 |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters. Table 27 shows the appeals thus far and the Special Masters' rulings on them:

| Table 27 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | **ISSUE** | **HOW MANY** | **WHO APPEALED** | **DECISION UPHELD** | **DECISION OVERTURNED** |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 7 | Settlement Class Member | 6 | 1 |
| 5. | **Totals** | **37** | | **34** | **3** |

38. ***Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.*** The Special Masters have approved 466 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants.  There have been eight new Representative Claimant approvals and no new Derivative Claimant Representatives since Status Report No. 19.

## XIV.   CONCLUSION

39. ***General Status.*** We have 249,994 document files (22,279 gigabytes, or 22.3 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 6,594 more than when we filed Status Report No. 19. We have issued 55,990 notices (295 more since Status Report No. 19) to 21,027 different persons since March 23, 2017.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By: *Roma Petkauskas*
   Roma Petkauskas
   Virginia State Bar No.: 71357
   BrownGreer PLC
   250 Rocketts Way
   Richmond, Virginia 23231
   Telephone: (804) 521-7218
   Facsimile: (804) 521-7299
   Email: rpetkauskas@browngreer.com