IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>         Plaintiffs,<br> v.<br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>         Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Smith & Stallworth, P.A.<br> v.<br>SPID 260001304 (J.W.)<br><br>Attorney Lien Dispute<br>(Lien Disp. No. 01780) | |

## MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE               June 16, 2023

### I. INTRODUCTION

Presently before the Court in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Smith & Stallworth, P.A. ("Stallworth") against the Award granted to its former client, Settlement Class Member ("SCM") SPID 260001304, J.W. ("Player"), in the litigation that became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.). By its lien, the firm sought payment of attorneys' fees of 22% of the Award issued to Player pursuant to the contingency fee agreement

("CFA") that he entered into with Stallworth on May 17, 2021.  Player, now represented by Langfitt PLLC ("Langfitt"), challenges the lien.

As we set out in a Report and Recommendation ("R&R") filed on January 7, 2019,[1] our evaluation of these positions involves a consideration of the CFA between Player and his former counsel and an assessment of the reasonableness of the requested fees in light of the five factors enumerated by the Third Circuit in *McKenzie*. *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*") and *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*").  This approach will require us to scrutinize the reasonableness of the CFA at the time of the signing of the contracts and then determine if the circumstances compel a different evaluation of the CFA at the time Stallworth, as lienholder, seeks to enforce it.  We will then examine the results obtained, the quality of the representation provided by Stallworth, and whether the efforts of Stallworth substantially contributed to the result.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F. 2d at 45 n.1.  This necessarily also involves a consideration of the role of Langfitt and other circumstances that led Player to achieve his award. We conclude that Stallworth's reasonable fee should be equal to that awarded to Langfitt but that the aggregate IRPA fee should be less than 22% of Player's Monetary Award.

## II.   FACTS AND PROCEDURAL HISTORY

At some point not documented in the record before us, Player retained the law firm of

---

[1] The District Court referred to us all "all petitions for individual attorneys' liens." (Doc. No. 7446).  On January 7, 2019, we issued an R&R pertaining to three separate cases.  (Doc. No. 10368).  In that R&R we set out the legal principles that would guide our analysis in these cases.  We have since issued opinions resolving similar disputes in which the parties consented for the magistrate judge to resolve the lien dispute.  *See, e.g.,* Doc. Nos. 10383 & 10514.

Gibbs & Parnell ("Gibbs") to represent him for a possible claim in this litigation. That firm, acting through Neurocognitive Football Lawyers, PLLC, registered him in the settlement program on February 10, 2017. Gibbs submitted a claim on Player's behalf on June 23, 2017, which was subsequently denied.

Thereafter, and while still represented by Gibbs, Player took the free BAP exam that is available to retired players under the Settlement Agreement. (SCM Stmt. of Disp. at 4.) His exam was conducted by neurologist Hera Stephens, M.D., with testing conducted by Heather Belanger, Ph.D., a neuropsychologist. The June 8, 2019 report provided by Dr. Stephens did not qualify Player for any other benefits of the Settlement Agreement, such as the non-monetary benefits associated with a diagnosis of Level 1.0 Neurocognitive Impairment nor the monetary award associated with a diagnosis of Level 1.5 Neurocognitive Impairment. (*Id.* at 2 (reflecting BAP finding of "No Impairment").) The record does not indicate when or why Player terminated his engagement of Gibbs.

On May 17, 2021, after an initial contact a few weeks earlier, Player entered into a retention and contingent fee agreement to have Stallworth represent him in connection with his NFL case. (CFA, appended to Notice of Lien.) Under the terms of the agreement, if recovery were made for these injuries, Stallworth was entitled to a fee in the amount of 22% of the net recovery. The agreement also provided that if Player discharged Stallworth "without cause," he agreed to pay Stallworth 22% of his future settlement award. (*Id.* at CFA p. 2.)

Stallworth gathered from Player details of his medical treatment and obtained pertinent medical records, through Player's Settlement Claims Portal and otherwise. This included statements submitted by third parties, worker's compensation records, the records of the prior claim and Special Master decision, a brief prepared by the NFL parties as to that prior claim,

3

information on the disqualification of a doctor who had previously examined Player, and MRI records. Stallworth requested records from a neuropsychologist with whom Player had been treating beginning in late 2020, Dr. Richard Hoffman. It also worked with the office of Dr. Ahmed Sadek, a then-MAF approved neurologist at the Orlando Epilepsy Center, to have Player seen for a new MAF examination. It even asked that Player be given priority ahead of other Stallworth clients who had appointments already scheduled there. (Lienholder Stmt. of Disp. at 8.) The firm also provided Dr. Sadek's office with Player's prior medical evaluations. Although the appointment was scheduled for October 15, 2021, the office delayed all of the appointments it had scheduled for Stallworth clients and at one point suggested that another doctor would perform the evaluations. Stallworth later learned that Dr. Sadek had been excluded from the Settlement Program following an audit, which would seem to account for the scheduling difficulties around this time.

As the scheduling of the MAF examination appeared to have been falling apart, Player looked for new counsel. He entered into a CFA with Langfitt on September 24, 2021 and gave notice to Stallworth on September 28, 2021 that he was terminating his engagement of the firm. Shortly thereafter, Stallworth gave notice to the Claims Administrator that it would assert a lien, and it filed its lien on the MDL docket in March 2022 seeking its fee from any Monetary Award that Player were to receive.

When Langfitt took over the representation, it too sought to schedule Player for an appointment with an MAF neurologist. Like Stallworth before it, Langfitt reviewed the past medical records, Player's medical history, and the neuropsychology examination report from the BAP provider who examined Player in June 2019. Player attended an MAF examination with Dr. Daniel Jacobs, for which Langfitt advanced the cost in November 2021.

Before Langfitt submitted any MAF claim based on its development of an updated examination, the Court approved modifications to the Settlement Program relating to the evaluation of the qualifying diagnoses of various levels of "Neurocognitive Impairments," which was the condition for which Player sought an award. As a result of that class-wide modification, which was approved on March 4, 2022, Player's 2019 neuropsychological testing through the BAP became eligible for re-calculation under new standards. Under those standards, Player was found to have a qualifying diagnosis of Level 1.5 Neurocognitive Impairment as of the June 6, 2019 examination date, and with the submission of a claim to the MAF, that finding resulted in the issuance of a Notice of Monetary Award Claim Determination on July 22, 2022. (SCM Stmt. of Disp. at 4 (recognizing that "[t]he award that Langfitt won [for Player] was based on overseeing in 2022 the rescoring process of [Player's] 2019 examinations").)

Leading up to the notice of the award, the Claims Administrator advised Langfitt of Stallworth's lien. The two firms engaged in some communications about resolving the lien but were unable to reach an agreement. On December 7, 2022, the Claims Administrator issued a Schedule of Document Submissions concerning the contested lien on the award. Stallworth and Langfitt submitted their respective Statements of Dispute to the Claims Administrator in accordance with the briefing schedule on January 9, 2023. They submitted response memoranda as well on January 27, 2023. Gibbs never filed a lien on the docket and has not been involved in this lien dispute.

In light of the unresolved lien based upon Stallworth's contingency fee agreement, the Claims Administrator withheld from Player's award funds for payment of attorneys fees in an amount equal to 22% of his Award. This figure represents the presumptive fee cap for individually-retained player's counsel in this litigation. Of that attorney fee withholding, a portion

reflecting 5% of Player's Award was separately deposited into the Attorneys' Fees Qualified Settlement Fund pursuant to the Court's June 27, 2018 Order Regarding Withholdings for Common Benefit Fund counsel. (Doc. No. 10104.) Those funds may be distributed at a later date upon further order(s) of Judge Brody. This leaves the Court to determine the appropriate distribution for the attorneys fees currently available for disbursement (representing 17% of Player's Award) and the allocation of those funds that are currently held in the Attorneys' Fees Qualified Settlement Fund (representing 5% of Player's Award), if those funds, or a portion thereof, are distributed by the Court at a future date.

Pursuant to Lien Rule 17, the Record of Dispute was transferred to the Court. Neither party requested that we hold an evidentiary hearing, nor do we find that one is necessary for our resolution of this dispute. The matter is ripe for review.

### III. DISCUSSION

Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts, but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts). The District Court's prior opinions in this class action settlement in no way relieved attorneys of this obligation. Indeed, the Court explained that all attorneys seeking fees – whether those fee requests are submitted through a Lien or otherwise – are obligated to ensure that their fees are "reasonable" under the standards set out in *McKenzie*. *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence). Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[]

6

in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney." *McKenzie I*, 758 F.2d at 101. Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement. *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based. We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

As we outline below, circumstances did not change significantly from the time of Player's initial contracting with Stallworth to the time that Stallworth sought to enforce its contract inasmuch as it was already clear that Player would proceed by way of a settlement claim and not a lawsuit against the NFL. What changed in that time, however, was some of the criteria for the evaluation of claims, which turned out to be more favorable to claimants such as Player. Based upon our evaluation of the remaining three prongs of the *McKenzie* test, however, we are satisfied that Stallworth provided quality representation and was working to achieve for Player the benefit that ultimately occurred on Langfitt's watch. We will therefore approve Stallworth's fee request in part, authorize the release of an equal portion of the remaining withheld fees to Langfitt as current counsel for Player, and return a portion of the withheld fees to Player in recognition of the

fact that neither party to this lien dispute played a substantial role in bringing about the current award.

    A.    **<u>The CFAs at the time of contracting and enforcement – impact of changed circumstances</u>**

As we assess the reasonableness of the contingent fee arrangement at the time of the contract's signing by Player, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary award and (2) the time-intensive nature of the litigation. We then compare the landscape at the time of contracting with the circumstances at the time the attorney-client relationship terminated.

    **1.  Gibbs/NCFL (unknown apart from 2017 and 2019)**

The record provided to us by the Claims Administrator indicates that Player was registered in the Settlement Program on February 10, 2017 and that an unsuccessful claim was made on behalf of Player by Gibbs through NCFL on June 23, 2017. The Statement of Dispute filed on behalf of Player by Langfitt indicates that Player was still represented by Gibbs when he was scheduled for a BAP examination and was seen in June 2019 by Dr. Stephens. *See* SCM Stmt. of Disp. at 4.

    **2.  Stallworth (May 2021 – September 2021)**

Stallworth first interacted with Player about representing him in late April 2021. The parties signed a CFA the next month. As we have noted in prior opinions, by this point, the Settlement Agreement had been in effect for some time. Firms entering into contingent fee agreements with retired players did not face the monumental challenges and risk of having to pursue the entire case themselves, and perhaps even through trial, as did those who represented players prior to the formation of the MDL. And once the Settlement Agreement was approved and

became effective, players' counsel did not face the legal challenges associated with establishing causation and overcoming preemption.

### 3. Langfitt (September 2021 – present)

At the time Langfitt contracted with Player in September 2021, the case was in the same posture as when Stallworth had begun its representation of Player. Player's BAP exam had already been undertaken and an earlier, unsuccessful MAF claim was already in Player's history.

What was changing around this time, however, was that challenges had been raised as to how neuropsychological evaluations were being used in the Settlement and whether the raw score norming conventions improperly impacted African-American claimants for Settlement benefits. By December 2021, the NFL and Class Counsel announced that they had reached an agreement to modify the evaluative procedures and diagnostic process for claimants seeking benefits for the various levels of "neurocognitive impairment." As noted above, the Court approved the parties' request to modify the Settlement Agreement in this manner by order entered on March 4, 2022. Accordingly, Langfitt and Player knew that the new standards could favorably affect a new claim for a Neurocognitive Impairment. And, as it turned out, the modification provided for automatic rescoring of earlier BAP exams in some cases – including Player's. Otherwise, there were no significant changes in the circumstances during the short period of time between when Langfitt agreed to represent Player and when it sought to enforce its contract and receive a fee upon the approval of Player's award.

### B. The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of the firms' efforts in bringing about the result. We observe that Player qualified for an award on July 22, 2022 based on a Level 1.5 Neurocognitive Impairment diagnosis dating

9

the evaluation conducted on June 8, 2019. (Notice of Monetary Award Claim Determination). That was during a period that predated both Stallworth and Langfitt's representation. There is no reason to believe there was an evidentiary basis for a successful claim for any of the qualifying diagnoses during the period of the Stallworth representation given the diagnostic standards in effect at that time and/or until Player underwent a new evaluation. And the Settlement Agreement modifications that led to the re-scoring and approval of Player's claim had not become effective until after Player terminated Stallworth's representation.

When Langfitt assumed the representation, it sent Player for further examinations in November 2021 and represents that it is actively working on submission of a claim for Level 2.0 Neurocognitive Impairment. Its submissions reflect that it also fronted the cost of a PET scan in March 2022 and for an evaluation needed for Player's "88 Plan" application in October 2022. (Langfitt Itemized Costs, Disp. Rec. Doc. 13.) But we are dealing now with the fee due to Langfitt for the award that has been recognized thus far: the Level 1.5 award. The work that Langfitt performed as to that Level 1.5 award was the submission of the claim form in May 2022 to "claim" the benefit of the re-scored 2019 testing that had been undertaken through the BAP.

Neither Stallworth nor Langfitt actually invested in an expert to provide an opinion as to Player's qualifying diagnosis of Level 1.5 Neurocognitive Impairment. For Stallworth, it was seeking to do so when it ran into scheduling difficulties and then lost the client. For Langfitt, while it did arrange for a new MAF examination, that was not the examination that led to the award that Player has received to date. Rather, the Level 1.5 award resulted from the BAP exam that was already on file and subject to re-scoring under the terms of the new "race norming" agreement. Regardless of his representational status, Player would have benefitted as he did from the testing re-scoring and needed only to submit an MAF claim, as he would have been instructed to do by

10

the Claims Administrator.  *See* NFL Concussion Settlement FAQ 381 (reflecting that the Claims Administrator notified players or their lawyers that, if the automatically rescored test results met the requirements for a Qualifying Diagnosis and the player had not previously submitted a settlement claim based on that testing, then the player "must file a Claim, which will receive a Monetary Award Claims Determination once submitted and determined to be complete").  This was the extent of the "shepherding" that Langfitt provided to Player as to the Level 1.5 award.

### C.  The quality of the work performed

Stallworth contends that it provided quality work when it represented Player by gathering and evaluating his medical records and claim history and by scheduling a MAF exam for him and even giving him priority in scheduling over other clients.  These are tasks that we value as particularly meaningful during this phase of Player's potential settlement claim.  Player simply did not give Stallworth additional time to carry out and realize any benefits from these efforts.  Langfitt has been engaging in similar efforts, now in the hopes of securing a higher qualifying diagnosis.  This takes time.

### D.  The substantiality of the work performed

We consider the more important question to be the role of each firm in the work necessary to obtain the Monetary Award that Player received in this case.  In this context, we look to the contributions of each firm, comparing the value each added in advancing legal theories and in the work they performed individually for the client, with the effect on the ultimate outcome of the client's award.  We evaluate the contributions in accordance with our prior decisions and the Circuit case law pertaining to individual attorneys' fees in the context of a class action settlement.  As we have described there, we look to as many as seven non-exclusive categories of work

undertaken by individually-retained players' attorneys ("IRPAs") who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this litigation would not be negatively impacted;
>
> (4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class;
>
> (5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award;
>
> (6) support of clients who were seeking loans and were exposed to predatory lending practices; and
>
> (7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories. We will, however, use these categories as checkpoints as we consider the substantiality of each party's efforts as an IRPA and the role each firm played in the eventual receipt of an award to Player.

Langfitt argues that Stallworth's work could not have had a "substantial" role in bringing about the Level 1.5 Award because nothing related to that finding occurred during the 5-month period of Stallworth's representation in 2021. Yet the Langfitt representation was in a similar posture but for the Race Norming changes going into effect, which resulted in Player being invited to submit a claim using his rescored 2019 BAP testing. Thus, we find that each firm performed quality work in considering the information that was available as of the time it was retained and in efforts to obtain a new evaluation. Stallworth's work largely related to factors (1) and (7) of the

non-exhaustive list above.² Langfitt's work, which was largely equivalent to that of Stallworth save for actual claim submission following the effectuation of the Race Norming changes, reflected factors (1) and (5) above, inasmuch as Langfitt was in a position to submit a claim following the automatic re-scoring of the prior BAP examination.

\* \* \*

### 3. Apportionment

As we synthesize this information to assess how to apportion fees for the representation provided to Player that yielded the positive outcome of a Monetary Award, we are cognizant that several groups of attorneys contributed to the work necessary to obtain that Award: Class Counsel and law firms that acted for the common benefit in negotiating and defending the Settlement Agreement as well as the re-negotiation in 2021 as to the criteria for the qualifying diagnoses of "Neurocognitive Impairment" at the various levels; Gibbs, which registered Player when registration opened in February 2017 and appears to have facilitated the BAP examination that was undertaken in June 2019; and Stallworth and Langfitt, both of which agreed to represent Player with the hope of developing a new claim to submit, recognizing that Player had already filed an unsuccessful claim and had already utilized what was, at the time, his one opportunity for a free BAP exam. We are also mindful that *McKenzie* gives us the latitude to consider whether payment of a fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I*, 758 F.2d at 101.

Stallworth's response memorandum suggests that its role in bringing about the eventual award warrants half of the fee payable to the dueling IRPAs here, while Langfitt contends that Stallworth should receive no portion of the fee. As between Stallworth and Langfitt, we lean closer

---

² The chronology of work performed by Stallworth reflects contacts with a third-party lender.

to Stallworth's position. Stallworth was taking all of the actions we would expect an IRPA to do in the circumstances at that time, and it did not do anything in its period of representation to hinder Player in any way. It presumably would have steered Player to the same result as did Langfitt given the BAP re-scoring had Player not switched lawyers when he did. At the same time, we recognize that Langfitt is presently engaging in ongoing work on behalf of Player, and that Player continues to put his trust in Langfitt. Langfitt has invested in a new MAF exam and PET scan, with apparent potential for a future incremental award for Player. Also, Langfitt engaged in the function of filing the MAF claim on May 10, 2022 that capitalized upon the rescored BAP, and Langfitt will bear responsibility for shepherding Player through any difficulties in connection with that award.

As both firms came to realize and acknowledge in the course of briefing this dispute and reviewing information as to the basis for the Level 1.5 award, however, nothing that either of them did in 2021 or 2022 resulted in the emergence of a Qualifying Diagnosis for Player retroactive to 2019. Rather, that diagnosis materialized from the automatic rescoring process of historical BAP exam data as a result of the Race Norming Agreement negotiated by Class Counsel with the NFL and approved by the Court as a modification of the original Settlement Agreement. Awarding a 22% fee to these firms in these circumstances approaches offending our sense of fundamental fairness and equity. *See McKenzie I*, 758 F.2d at 101. We find it only fair to the client that the portion of the IRPA fee that would be attributable to the work of Gibbs be recognized and allocated back to Player. We will direct that a 1/3rd portion of the withheld funds for IRPA fees be allocated for refund to Player.

As to the remainder of the funds set aside for IRPA fees, when we consider the contributions of both Stallworth and Langfitt to the five categories of tasks described above,

valuing each task category based on its significance to this case, we find that the efforts of Langfitt were not any more worthy of credit for achieving the result in this case thus far than those of Stallworth. We recognize that Langfitt continues to represent Player in ongoing work on a potential claim for Level 2.0 Neurocognitive Impairment, but the firm will have the opportunity to collect a contingent fee for that work if and when such a claim is approved. Accordingly, we settle upon what we consider to be a fair resolution, apportioning 1/3rd of IRPA funds to Langfitt and the remaining 1/3rd to Stallworth.

### E. Costs

Langfitt seeks reimbursement for the costs of medical examinations that it has been expending to have Player re-evaluated for a claim under the Settlement and in Player's attempt to secure benefits under the "88" disability plan. These costs are reimbursable to Langfitt under the terms of its CFA. We will award these costs to Langfitt.

An appropriate order follows.