**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE:  NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : : : : | No. 2:12-md-02323-AB |
| | | MDL No. 2323 |
| THIS DOCUMENT RELATES TO: | : : : | Hon. Anita B. Brody |
| ALL ACTIONS | : : | |

## CLAIMS ADMINISTRATOR STATUS REPORT NO. 21

### I.     INTRODUCTION

1.     ***The Purpose and Scope of this Status Report.***  BrownGreer PLC, the Court-appointed Claims Administrator of the Settlement Program established under the Class Action Settlement Agreement in this litigation, submits this Status Report No. 21 to apprise the Court on the implementation of its duties as the Claims Administrator and developments since Status Report No. 20 filed on June 6, 2023 (Document 12135). Our earlier Status Reports are posted to the Settlement Website (under "Useful Information," click "Status Reports").  We do not repeat here what we covered in them. All numbers and other information in this Status Report No. 21 are as of August 14, 2023.[1] We will cover developments after that date in future reports.

### II.     NORMING AGREEMENT IMPLEMENTATION

2.     ***Current Status.*** On March 4, 2022, Judge Brody entered an Order approving certain modifications to the NFL Concussion Settlement Agreement Pursuant to Section 6.6

---

[1] All dates formatted as 8/14/23 in this Status Report mean August 14, 2023.

of the Class Action Settlement Agreement. These modifications, outlined in the Norming

Agreement, removed race norms and demographic estimates based on race from the NFL

Concussion Settlement Program. We have notified all affected Settlement Class Members

whether they qualified for Automatic Retrospective Rescoring and if so, the result of that

Rescoring and/or whether they qualified for an Expanded BAP exam. Table 1 summarizes

the outcome of our analysis of BAP evaluations and settlement claims:

| Table 1 | NORMING AGREEMENT ANALYSIS | |
|---|---|---|
| | **REVIEW OUTCOME** | **TOTAL** |
| **1.** | **Qualified for Automatic Retrospective Rescoring** | **647** |
| | (a)  BAP No Impairment to Level 1: Section 2.5(g)(i) | 246 |
| | (b)  BAP No Impairment or Level 1 to Level 1.5 or Level 2: Section 2.5(g)(ii) | 51 |
| | (c)  BAP diagnosis of No Impairment or Level 1 remains unchanged: Section 2.5(g)(iii) | 338 |
| | (d)  Level 1.5 or 2 Settlement Claim remains unchanged: Section 2.5(g)(iv) | 1 |
| | (e)  Level 1.5 or 2 Settlement Claim now qualifies for a Monetary Award (or an increased Monetary Award): Section 2.5(g)(v) | 11 |
| **2.** | **Qualified for an Expanded BAP exam** | **2,749** |
| **3.** | **BAP evaluations to be processed under New Method that removes race from consideration** | **1,572** |
| **4.** | **Submitted Settlement Claims to be processed under New Method that removes race from consideration** | **50** |
| **5.** | **Not directly affected** | **11,119** |
| **6.** | **Excluded from eligibility for Automatic Retrospective Rescoring or Expanded BAP Exam** | **3** |
| **7.** | **Total Registered Settlement Class Members** | **16,140** |

The 1,572 BAP evaluations (Row 3) include 691 cases where the Settlement Class

Member is eligible for the BAP but had not yet attended a BAP appointment and 881 cases

where the Settlement Class Member had attended one or both appointments but the results

had not yet been finalized. The New Method will be applied to all BAP evaluations finalized

for these 1,572 Settlement Class Members, and the BAP Administrator has begun notifying

Settlement Class Members who have attended both appointments about those results.

Similarly, we are processing the 50 Settlement Claims in Row 4 using the New Method and issuing Determination Notices incorporating those results. Finally, the 11,119 Settlement Class Members found to be not directly affected by the Norming Agreement (Row 5) could potentially be eligible for an Expanded BAP exam or to submit a New Settlement Claim under Section 2.7 of the Norming Agreement if they were examined by a Qualified MAF Physician but not diagnosed with a Qualifying Diagnosis in part because of the insufficiency of their valid neuropsychological test scores.

### III.   MONETARY AWARD CLAIMS

**3.**    *Total Claims Received.* Sections 3, 4 and 5 of the Summary Report on the Settlement Website show the total Monetary Award claims submitted.[2] We have received 64 new Monetary Award claims since Status Report No. 20 and have completed a review of all but eight claims. As of August 14, 2023, 3,101 unique Retired NFL Football Players and Representative Claimants (19.2% of the Retired NFL Football Players and Representative Claimants who received favorable registration determinations) submitted 3,646 Monetary Award Claim Packages.  Fifteen of the 3,646 claims[3] were denied as untimely.[4] We have received about five new claims per week since Status Report No. 20 in May 2023. Of the 3,646 Monetary Award claims submitted, 1,979 (54.3%) rest on pre-Effective Date diagnoses, while 1,391 (38.2%) are for post-Effective Date diagnoses, of which 407 (29.3% of the 1,391) were made in the Baseline

---

[2] The Summary Report separates the Supplemental claim information from the initial Monetary Award Claims. Supplemental Claim data appears in a stand-alone Section C (sections 12-18) of the Summary Report.

[3] Of these Monetary Award, 636 claims (17%) have at least one associated Derivative Claimant who has registered and 3,010 (83%) have no registered Derivative Claimants. Note the total number of Retired NFL Football Players and Representative Claimants with favorable registration determinations (16,140) is shown in Section 2 of the Summary Report on the Settlement Website (BAP Eligible + Not BAP Eligible).

[4] We reviewed 54 claims for potential untimeliness and denied 15 as untimely. We accepted 39 as timely, which includes three claims that showed substantial hardship under Section 8.3(a)(i) of the Settlement Agreement.

Assessment Program ("BAP")[5] and 984 (70.7% of the 1,391) were made by Qualified MAF Physicians.[6] The other 276 claims (7.6%) did not tell us what diagnosis date they assert. Table 2 compares these numbers to those in Status Report No. 20:

| Table 2 | QUALIFYING DIAGNOSIS DATES IN MONETARY AWARD CLAIMS | | | | | |
|---|---|---|---|---|---|---|
| | **DATE** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE |
| 1. | Pre-Effective Date | 1,979 | 1,979 | 0 | 55.2% | 54.3% | -0.9% |
| 2. | Post-Effective Date | 1,331 | 1,391 | 60 | 37.2% | 38.2% | +1.0% |
| | (a) *BAP* | *393* | *407* | *14* | *11.0%* | *11.2%* | *+0.2%* |
| | (b) *MAF* | *938* | *984* | *46* | *26.2%* | *27.0%* | *+0.8%* |
| 3. | No Date Asserted | 272 | 276 | 4 | 7.6% | 7.6% | +0.0% |
| **4.** | **Totals** | **3,582** | 3,646 | 64 | | | |

Table 3 shows by diagnosis date how many claims we have for each type of Qualifying Diagnosis:

| Table 3 | MONETARY AWARD CLAIMS BY QUALIFYING DIAGNOSIS TYPE | | |
|---|---|---|---|
| | **DIAGNOSIS** | **PRE-EFFECTIVE DATE** | **POST-EFFECTIVE DATE** | |
| | | | MAF | BAP |
| 1. | Death with CTE | 125 | 0 | N/A |
| 2. | ALS | 51 | 12 | |
| 3. | Alzheimer's Disease | 425 | 186 | |
| 4. | Parkinson's Disease | 137 | 117 | |
| 5. | Level 2 | 505 | 247 | 127 |
| 6. | Level 1.5 | 736 | 421 | 273 |

We highlight the asserted Qualifying Diagnoses in Section 4 of the Summary Report on the Settlement Website. We also show the current status of all Monetary Award claims based on

[5] Although a Retired NFL Football Player may have received a Qualifying Diagnosis in the BAP, we do not report on it until he (or his Representative Claimant) submits a Claim Package seeking a Monetary Award. The BAP Administrator's status reports explain more about BAP diagnoses.
[6] This includes claims submitted by the Settlement Class Members after the Effective Date, but the diagnoses were not rendered by MAF Physicians. Given unique circumstances, the Parties allowed an AAP member or AAP Consultant to review the medical records to determine if there was a Qualifying Diagnosis.

final determination in Section 6 of the Summary Report on the Settlement Website. A "Review in Progress" status means that the claims have not reached a final determination. Section 7 highlights the review status of claims that asserted Qualifying Diagnoses of Level 2 Neurocognitive Impairment and Level 1.5 Neurocognitive Impairment.

    **4.**     *Monetary Awards and Payments.*

(a) We show Monetary Awards and payments in Sections 1 and 2 of the Summary Report on the Settlement Website. As of August 14, 2023, we have issued 1,589 Notices of Monetary Award for claims totaling $1,157,595,479.[7] We request funding from the NFL Parties by the 10th of each month (or the next business day if the 10th falls on a weekend or holiday) for claims that have received a Notice of Monetary Award for which the appeals process is complete (or the appeal deadline has passed with no appeal) and that are not in Audit. Of the 1,589 claims with Notices of Monetary Award, we requested $1,135,395,194 from the NFL Parties for the 1,563 claims that have reached the point at which we can request funding. The NFL Parties have deposited funds for 1,546 of those claims.[8] Of the 1,546 Monetary Award claims for which the NFL Parties have deposited funds, the Program paid 1,529 claims for a total of $1,039,590,355. The remaining 17 funded claims were not yet ready for payment when we submitted the most recent Disbursement Report; some have holds preventing payment, some do not have a submitted Payment Election Form or SWS-5, and some have holdbacks for potential Liens which, together with the 5% deduction for the Common Benefit Fund, exceeded the gross award amount. Of the 1,529 paid claims from Retired NFL Football Players and Representative Claimants, the Trustee sent $56,139,909

---

[7] The amount of these Notices of Monetary Award includes the 1% Derivative Claimant Award deductions allocated to eligible Derivative Claimants (see Paragraph 21 of this Status Report).
[8] The NFL Parties have 30 days from the date of the Funding Request to fund the amount requested.

(5% of those Monetary Awards) to the Attorneys' Fees Qualified Settlement Fund, in accordance with the Court's June 27, 2018 Order Regarding the Common Benefit Fund (Document 10104). Finally, we are required to withhold money for unresolved Liens and for third-party funders.  Table 4 shows the distribution of the $ paid by the Settlement Program and compares the totals to those reported in Status Report No. 20:

| Table 4 | MONETARY AWARD PAYMENTS | | | |
|---|---|---|---|---|
| | PAID TO | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE |
| 1. | **Settlement Class Members** (or their lawyers on their behalf, if represented) | $968,631,321 | $1,001,032,961 | +$32,401,640 |
| 2. | **Medical Lienholders** (on behalf of Settlement Class Members to the Lien Resolution Administrator to resolve medical Liens when a final Lien resolution amount is determined) | $4,110,321 | $4,055,932 | -$54,389[9] |
| 3. | **Non-Medical Lienholders** (on behalf of Settlement Class Members to lienholders to resolve non-medical Liens) | $14,003,022 | $15,054,710 | +$1,051,688 |
| 4. | **Third-Party Funders** (on behalf of Settlement Class Members to third-party funders who have accepted rescission of and/or terminated prohibited assignments that they had entered into with Settlement Class Members) | $19,064,380 | $19,446,752 | +$382,372 |
| 5. | **Totals** | **$1,005,809,044** | **$1,039,590,355** | **$33,781,311** |

(b) Table 5 shows the changes in figures for payments and claims with Notices of Monetary Award since Status Report No. 20:

---

[9] This amount is less than it was on 5/8/23 because the Lien Resolution Administrator returned a payment on 5/19/23.

| Table 5 | MONETARY AWARD CHANGES SINCE STATUS REPORT NO. 20 | | | | | |
|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | AMOUNT | | |
| | | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE |
| 1. | Notice of Monetary Award Issued | 1,548 | 1,589 | 41 | $1,117,523,178 | $1,157,595,479 | $40,072,301 |
| 2. | Paid | 1,483 | 1,529 | 46 | $1,005,809,044 | $1,039,590,355 | $33,781,311 |

(c) Table 6 shows how many claims for each type of Qualifying Diagnosis have received a Notice of Monetary Award and been paid:[10]

| Table 6 | MONETARY AWARDS AND PAYMENTS BY QUALIFYING DIAGNOSIS[11] | | | | | |
|---|---|---|---|---|---|---|
| | DIAGNOSIS | CLAIMS SUBMITTED | NOTICE OF MONETARY AWARD | | PAID | |
| | | | HOW MANY | %[12] | HOW MANY | %[13] |
| 1. | Death with CTE | 125 | 80 | 64% | 80 | 64% |
| 2. | ALS | 63 | 46 | 73% | 46 | 73% |
| 3. | Alzheimer's Disease | 611 | 399 | 65% | 393 | 64% |
| 4. | Parkinson's Disease | 254 | 209 | 82% | 202 | 80% |
| 5. | Level 2 | 879 | 277 | 32% | 265 | 30% |
| 6. | Level 1.5 | 1,430 | 578 | 40% | 543 | 38% |

**5.**      *Monetary Award Claims Reviewed by the AAP.*

(a) In addition to reviewing claims based on pre-Effective Date diagnoses, the Appeals Advisory Panel ("AAP") and Appeals Advisory Panel Leadership Council ("AAPLC") assist us with the medical aspects of claims review. Many of the claims being reviewed by the AAP are based on Level 1.5 or Level 2 Neurocognitive Impairment diagnoses for which the AAP members may request input from Appeals Advisory Panel

---

[10] Section 6 of the Summary Report on the Settlement Website identifies where claims that have not received a Notice of Monetary Award or been paid stand in the process.
[11] These do not include claims submitted where the Settlement Class Member asserted more than one Qualifying Diagnosis or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed.
[12] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that received a Notice of Monetary Award.
[13] This column shows the percentage of claims submitted with the Qualifying Diagnosis in each row that were paid.

Consultants ("AAPC"), as highlighted in sub-paragraph (b) below. The AAP has completed reviews on 1,142 pre-Effective Date diagnosis Monetary Award claims, approving 565 (49%) of those claims.[14] Under FAQ 149 ("Can I be found eligible for a Monetary Award based on a Qualifying Diagnosis that is different than the one I claimed?"), the AAP has found a lower level diagnosis (meaning a Qualifying Diagnosis that is less severe medically or with a lower Award amount under the Monetary Award Grid) on 146 claims. In accordance with Rules 23 and 27 of the Rules Governing Qualified MAF Physicians, the AAP and AAPLC have reviewed 418 out of the 984 total Monetary Award claims submitted for diagnoses made by Qualified MAF Physicians, approving 177 (42%) of those claims.[15] Section 2 of Exhibit A-2 to the Settlement Agreement states that a Player's failure on two or more effort tests may result in the Player's test results being subject to independent review. Under that provision, as well as Section 8.6(b) of the Settlement Agreement, which provides the Claims Administrator with the discretion to verify and investigate the sufficiency of a Claim Package to determine if it qualifies for a Monetary Award, the AAP and AAPLC have reviewed 68 claims out of the 407 total claims submitted based on Qualifying Diagnoses made through the BAP, approving 35 (51%) of those reviewed claims.

(b) We have assigned 775 claims (including pre- and post-Effective Date claims) to the AAPC based on requests by AAP members for their input on Level 1.5 and Level 2 Neurocognitive Impairment Qualifying Diagnoses or the neuropsychological testing

---

[14] Broken down by Qualifying Diagnosis, the AAP members approved 100% of Death with CTE claims, 91% of ALS claims, 75% of Alzheimer's claims, 87% of Parkinson's claims, 27% of Level 2 claims and 29% of Level 1.5 claims. The number of claims approved or denied by the AAP may fluctuate depending on multiple factors including ongoing audit investigations, remands of AAP decisions, and re-review of determinations that have not yet been finalized to ensure compliance with current Settlement Program rules and guidelines.

[15] This figure includes those claims reviewed by the AAP under Section 8.6(b) of the Settlement Agreement as well as claims based on diagnoses made by Qualified MAF Physicians who have been terminated from participation in the Program under Rule 27 of the Rules Governing Qualified MAF Physicians.

supporting an Alzheimer's Disease diagnosis. The AAPC have completed all of the reviews assigned to them and provided their assessments to the AAP.

6.      ***Notices for Missing Materials.***  We have sent one or more notices requesting additional documents or information on 2,258 Monetary Award claims (13 more since Status Report No. 20), as shown in Table 7:

| Table 7 | | NOTICES FOR MISSING MATERIALS | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN[16] | TOTAL |
| 1. | Total Reviewed | 125 | 63 | 611 | 254 | 876 | 1,427 | 282 | 3,638 |
| 2. | Notice Issued | 48 | 29 | 332 | 109 | 577 | 926 | 237 | 2,258 |
| 3. | % Missing Materials | 38% | 46% | 54% | 43% | 66% | 65% | 84% | 62% |

So far, 88% of the Settlement Class Members who received a notice requesting additional documents have responded to the notice. Settlement Class Members take an average of about 59 days to respond. We generally receive up to one response to these notices each week and review each reply to determine if it cures the problem. Of those who responded, 46% cured the problem.

7.      ***Monetary Award Denials.***  There are 1,157 denials of Monetary Award claims for reasons other than an Audit (one more since Status Report No. 20), as shown in Table 8.[17]

---

[16] These "Multiple/Unknown" claims are ones where the Settlement Class Member asserted more than one Qualifying Diagnosis, or the claim is so incomplete that we cannot tell what Qualifying Diagnosis is claimed. We process and pay a person for only one Qualifying Diagnosis per claim submission.

[17] The 1,157 denials are the count of claims where the most recent determination notice is a denial notice. Although there was a net gain of one denial since Status Report No. 20, we have issued denial notices on 11 claims since that time, but 10 claims received a subsequent notice changing that status, e.g., the denial was deactivated and the claim was closed and denied after audit. We discuss Audit denials in Paragraph 17 of this Status Report.

| Table 8 | MONETARY AWARD DENIALS | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CLAIMS | DEATH WITH CTE | ALS | ALZHEIMER'S DISEASE | PARKINSON'S DISEASE | LEVEL 2 | LEVEL 1.5 | MULTIPLE/ UNKNOWN | TOTALS |
| 1. | Total Reviewed | 125 | 63 | 611 | 254 | 876 | 1,427 | 282 | 3,638 |
| 2. | Denied | 42 | 3 | 85 | 13 | 271 | 489 | 254 | 1,157 |
| 3. | % Denied | 34% | 5% | 14% | 5% | 31% | 34% | 90% | 32% |

Overall, the AAP has recommended denial of 678 claims for not having a valid Qualifying Diagnosis, which is 52% of the claims that currently have a denial notice. When we deny a claim based on the recommendation of an AAP member, we include in the notice comments from that AAP member explaining why. When a claim is denied on other grounds, we typically call or email the Settlement Class Member (or his or her lawyer, if represented) to explain why the claim is being denied and discuss options for resubmitting the claim, appealing the denial, or withdrawing the claim until the claimant can obtain the missing mandatory information and/or documents. Our denial notices explain all appeal rights and that another claim may be submitted if circumstances change or if the claimant receives a new diagnosis from a Qualified MAF Physician or after a BAP exam. Settlement Class Members have appealed a total of 435 denial notices; seven of the currently active denial notices are under appeal.

## V.   SUPPLEMENTAL MONETARY AWARD CLAIMS

**8.   *Supplemental Monetary Award Claims Received.*** A Retired NFL Football Player (or Representative Claimant) who was paid a Monetary Award may be eligible for a Supplemental Monetary Award if the Retired NFL Football Player later is diagnosed while living with a different Qualifying Diagnosis. The new Qualifying Diagnosis must have occurred after the Qualifying Diagnosis for which the Award was paid and the amount payable for the new Qualifying Diagnosis must be more than the Monetary Award already paid. Sections 12, 13 and

14 of the Summary Report on the Settlement Website show the total Supplemental Monetary

Award claims submitted. We have received claims from 87 Retired NFL Football Players and six

Representative Claimants seeking Supplemental Monetary Awards:  46 for Qualifying Diagnoses

of Alzheimer's Disease, 14 for Qualifying Diagnoses of Parkinson's Disease, and 33 for

Qualifying Diagnosis of Level 2 Neurocognitive Impairment. This is nine more Supplemental

claims than we reported in Status Report No. 20. Sections 15-18 of the Summary Report on the

Settlement Website provide the status of Supplemental Monetary Award claims.

        **9.**    ***Supplemental Monetary Award Reviews and Payments.*** A Supplemental

Monetary Award is the difference between the Monetary Award Grid value of the new

Qualifying Diagnosis and the amount of the earlier Award for a different Qualifying Diagnosis.

We have issued 55 Notices of Supplemental Monetary Award to eligible Retired NFL Football

Players and denied nine claims for a Supplemental Monetary Award. The combined Monetary

Award After Offset value of these 55 Supplemental Monetary Awards was $63,297,706 but after

subtracting the prior Monetary Award payments, totaled $31,543,760 as set out below in Table 9

(an increase of eight claims totaling $4,172,137 since Status Report No. 20):

| Table 9 | | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| | **Total for Claims 1-47** | **$55,576,314** | | **$28,204,691** | **$27,371,623** |
| 48. | Level 2.0 | $1,190,208 | Level 1.5 | $696,863 | $493,345 |
| 49. | Alzheimer's Disease | $129,223 | Level 1.5 | $99,259 | $29,964 |
| 50. | Level 2.0 | $1,020,179 | Level 1.5 | $485,510 | $534,668 |
| 51. | Level 2.0 | $680,119 | Level 1.5 | $306,210 | $373,909 |

| Table 9 | SUPPLEMENTAL MONETARY AWARD CALCULATIONS | | | | |
|---|---|---|---|---|---|
| | SUPPLEMENTAL CLAIM | | PREVIOUSLY PAID CLAIM | | SUPPLEMENTAL MONETARY AWARD AMOUNT |
| | QUALIFYING DIAGNOSIS | AMOUNT | QUALIFYING DIAGNOSIS | AMOUNT | |
| 52. | Parkinson's Disease | $796,873 | Level 1.5 | $280,825 | $516,048 |
| 53 | Parkinson's Disease | $1,745,639 | Level 1.5 | $705,762 | $1,039,877 |
| 54. | Parkinson's Disease | $1,609,615 | Level 1.5 | $647,347 | $962,268 |
| 55. | Parkinson's Disease | $549,536 | Level 2.0 | $327,479 | $222,058 |
| | Totals | $63,297,706 | | $31,753,946 | $31,543,760 |

The Program has paid 40 Retired NFL Football Players and five Representative Claimants a total of $22,848,657 for their Supplemental Monetary Awards. Section 2 of the Summary Report provides the payment details for Supplemental Monetary Awards by Qualifying Diagnosis.

## VI.   QUALIFIED MAF PHYSICIANS

**10.**   *Maintaining the MAF Network.* Settlement Class Members and lawyers can locate Qualified MAF Physicians using the MAF Physician Locator Tool on the Settlement Website.  There are a total of 66 Qualified MAF Physicians on the website now, representing 32 of the 53 target cities closest to where the majority of living Retired NFL Football Players reside. Table 10 shows the changes in these numbers since Status Report No. 20:

| Table 10 | QUALIFIED MAF PHYSICIANS | | | |
|---|---|---|---|---|
| | ASPECT | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE |
| 1. | Approved Physician – On Posted List | 67 | 66 | -1 |
| 2. | Target Cities Represented by Approved Physicians on Posted List | 32 | 32 | 0 |
| 3. | Approved Physician – Not yet Posted | 8 | 16 | +8 |

Although we lost one Qualified MAF Physician last month due to faculty changes within their department, we continue to experience increased interest from providers and practices across the

country. Since Status Report No. 20, we have received four Provider Applications from physicians interested in becoming Qualified MAF Physicians and anticipate receiving up to 20 more in the next few weeks. Also since the last status report, the Parties have approved eight new applicants. These newly approved Qualified MAF Physicians will be added to the Settlement Website after they contract with us and complete required Program orientation training.

  **11.**  *150-Mile Rule.*

  (a)  Rule 9 of the Rules Governing Qualified MAF Physicians requires that a Retired NFL Football Player be examined by a Qualified MAF Physician whose office is within 150 miles of his primary residence.[18] We can make exceptions to this 150-Mile Rule if the exception is requested prior to the appointment.

  We have received 251 requests for exceptions to the 150-Mile Rule, of which we granted 222 (88.4%) and denied 28 (11.2%). There is currently one pending request. Table 11 shows the changes since Status Report No. 20:

| Table 11 | | REQUESTS FOR EXCEPTIONS TO 150-MILE RULE | | | | | |
|---|---|---|---|---|---|---|---|
| | **DECISION** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 5/8/23** | **AS OF 8/14/23** | **CHANGE** | **AS OF 5/8/23** | **AS OF 8/14/23** | **CHANGE** |
| 1. | Granted | 196 | 222 | +26 | 88.3% | 88.4% | +0.1% |
| 2. | Denied | 26 | 28 | +2 | 11.7% | 11.2% | -0.5% |
| 3. | Pending | 0 | 1 | +1 | 0% | 0.4% | +0.4% |
| 4. | **Totals** | **222** | **251** | **+29** | | | |

  (b) The 150-Mile Rule is a flexible rule with broad exceptions. Of the living Retired NFL Football Players registered in the Program, 83.2% have a Qualified MAF Physician within 150 miles of their primary residence. We work with those who do not to help them

---

[18] This requirement applies only to appointments made after April 11, 2019. Appointments made on or before April 11, 2019, did not need to be rescheduled with a different Qualified MAF Physician.

schedule appointments with physicians further away, when they tell us they are ready to be examined.

12.    *50-Mile Rule.*  Rule 10(b) of the Rules Governing Qualified MAF Physicians requires that, where neuropsychological testing is necessary as part of an MAF examination, the Qualified MAF Physician must refer a Retired NFL Football Player to a neuropsychologist who is located within 50 miles of the Qualified MAF Physician's office. Like the 150-Mile Rule, we have discretion to grant exceptions. We have received 43 requests for exceptions to the 50-Mile Rule, of which we granted 41 (95.3%) and denied two (4.7%). Table 12 shows how many exception requests we have received and our decisions on those requests (an increase of three since Status Report No. 20):

| Table 12 | REQUESTS FOR EXCEPTIONS TO 50-MILE RULE | | | | | |
|---|---|---|---|---|---|---|
| | DECISION | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE |
| 1. | Granted | 38 | 41 | +3 | 95.0% | 95.3% | +0.3% |
| 2. | Denied | 2 | 2 | 0 | 5.0% | 4.7% | -0.3% |
| 3. | Totals | 40 | 43 | +3 | | | |

Of the 66 Qualified MAF Physicians who are actively scheduling appointments, 57 (86.4%) have an approved neuropsychologist within 50 miles of their office, and we will grant exceptions on a case-by-case basis for the seven Qualified MAF Physicians who do not.

13.    *Deviation Explanations for Level 1.5 and Level 2 Diagnoses.* Under Rule 20 of the Rules Governing Qualified MAF Physicians, we request an explanation from a Qualified MAF Physician and/or neuropsychologist whenever the BAP criteria are not strictly followed on a diagnosis of Level 1.5 or Level 2 Neurocognitive Impairment and we determine more information is needed. We cannot process these claims further until we receive the required explanation. There are currently 16 claims based on a diagnosis of either

Level 1.5 Neurocognitive Impairment or Level 2 Neurocognitive Impairment that require additional explanation from a Qualified MAF Physician and/or neuropsychologist, representing less than 10% of all MAF Level 1.5 and Level 2 Claim Packages submitted to the Program. Table 13 shows how many claims require additional explanation from the Qualified MAF Physician before we can issue award or denial notices:

| Table 13 | CLAIMS REQUIRING ADDITIONAL EXPLANATION FROM QUALIFIED MAF PHYSICIANS[19] | | | | | |
|---|---|---|---|---|---|---|
| | DIAGNOSIS TYPE | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE |
| 1. | Level 1.5 | 2 | 7 | +5 | 0.5% | 1.7% | +1.2% |
| 2. | Level 2 | 9 | 9 | 0 | 3.8% | 3.6% | -0.2% |
| 3. | Totals | 11 | 16 | +5 | | | |

14.    ***AAP Leadership Council.***  Two AAP members serve as our AAP Leadership Council to provide advice and assistance on medical issues arising in our oversight of the Qualified MAF Physician Network. We enlist their help, as needed, to review specific claims or groups of claims to determine compliance by Qualified MAF Physicians with the Settlement Agreement, the Qualified MAF Physician Manual and any guidance materials or instructions we issued, and whether Claim Packages reflect and support the stated Qualifying Diagnoses. In addition, the AAP Leadership Council assists us by participating in our calls with Qualified MAF Physicians to offer medical guidance on making diagnoses under the Settlement Agreement criteria. The AAP Leadership Council also facilitates discussions and solicits guidance from the MAF Steering Committee, a group of five Qualified MAF Physicians, who render advice and assistance on providing peer-to-peer feedback to Qualified MAF Physicians and provide suggestions on how to improve the operations and

---

[19] In Table 13 we updated how we calculated the % of total to include all MAF Level 1.5 and 2 claims submitted since the start of the Settlement Program.

performance of the network of Qualified MAF Physicians. Overall, our collaboration with the AAP Leadership Council has been successful, and the Qualified MAF Physicians have responded positively to receiving feedback from AAP members.

15.     ***MAF Steering Committee.*** Five Qualified MAF Physicians serve on the MAF Steering Committee as authorized by Rule 24 of the Rules Governing Qualified MAF Physicians. The Committee members have participated in regular roundtable discussions with the AAP Leadership Council, assisted in developing training for the Qualified MAF Physicians to address most common issues, and provided other suggestions for improvement of the Qualified MAF Physicians network. Overall, the peer-to-peer communications regarding the operation and performance of the network of Qualified MAF Physicians has been positive.

## VII.   AUDIT

16.     ***Reports of Adverse Finding in Audit.*** The Special Masters issued their decision on one Report of Adverse Finding in Audit since Status Report No. 20. This Audit Report affected 23[20] Settlement Class Members and focused on the actions of a law firm that allegedly (1) submitted unreliable medical tests and affidavits to the Program to support claims, (2) attempted to instruct Qualified MAF Physicians on the assigning of diagnoses, and (3) coached Settlement Class Members on how to perform in examinations.  A Party to the Audit Proceeding has filed an Objection to the Special Masters' Decision.

In total, we have issued to the Parties 21 Reports of Adverse Finding in Audit affecting 589[21] Monetary Award claims. All 21 Audit Reports were then referred to the

---

[20]In Status Report No. 20, we reported that this Report of Adverse Finding in Audit affected 12 claims. After reviewing the full Record of the Audit Proceeding, the Special Masters issued a decision that affected an additional 11 claims, bringing the total to 23.

[21] In Status Report No. 20, we reported that all Reports of Adverse Finding in Audit affected 578 claims. This number increased by the 11 claims identified in Footnote 21 above.

Special Masters. The 21 Audit Reports concern four neurologists, 12 neuropsychologists, four law firms, seven individual Settlement Class Members and one claims preparation company. Table 14 summarizes the Special Masters' and/or Court's decisions on these Audit reports:

| Table 14 | DECISIONS ON AUDIT REPORTS | |
|---|---|---|
| | **DECISION** | **AUDIT REPORTS** |
| 1. | Claims Denied in Audit | 12 |
| 2. | Claims Removed from Audit and Subjected to Specialized Review | 4 |
| 3. | Claims Removed from Audit and Returned to Normal Review | 3 |
| 4. | All Claims Withdrawn before Decision | 1 |
| 5. | Audit Proceeding Still in Progress | 1 |
| 6. | **Total** | **21** |

17.      ***Audit Proceeding Decisions.*** We have denied 395 claims after Audit based on decisions by the Court or Special Masters.[22] Sections 6, 9, and 15 of the Summary Report on the Settlement Website show these denials. A Settlement Class Member whose claim is denied after Audit may submit a new claim if based on a Qualifying Diagnosis that does not rely on records or opinions from disqualified doctors. There are 129 Settlement Class Members who submitted a new Monetary Award Claim following an Audit Denial, and 50 of them have been paid or are in the payment process.

18.      ***Ongoing Audit Investigations.*** We have other Audit investigations underway affecting 14 Monetary Award claims (three less than the number we reported in Status Report No. 20). All 14 are individual claims.

---

[22] Of the 395 denials, 195 are associated with providers the Special Masters disqualified from participating in the Program: neurologist Dr. Ena Andrews (47 claims) and neuropsychologists Dr. Serina Hoover (139 claims), Dr. August Dolan-Henderson (four claims) and Dr. Darren Fuerst (five claims).  Six individual Retired NFL Football Players' claims have been denied. The Special Masters directed us to deny 170 claims based on their findings related to the Special Investigator's investigation of a law firm. The Special Masters directed us to deny 23 claims based on their findings related to the investigation of a second law firm. We denied the remaining claim for failing to cooperate with our requests for information during an Audit.

19.    *Closed Audits.* We have concluded the Audit investigations of 1,332 Settlement Class Members with Monetary Award claims by denying a claim through Audit, by making no adverse finding and removing a claim from Audit, or because the Settlement Class Member withdrew his or her claim during our Audit. Table 15 summarizes the reasons for these closures and changes in the numbers since Status Report No. 20:

| Table 15 | CLOSED AUDITS | | |
|---|---|---|---|
| | **REASON FOR CLOSURE** | **AS OF 5/8/23** | **AS OF 8/14/23** | **CHANGE** |
| 1. | Claim Denied in Audit | 372 | 395 | +23 |
| 2. | No Finding of Misrepresentation, Omission, or Concealment | 720 | 732 | +12 |
| 3. | Claim Withdrawn by Settlement Class Member | 205 | 205 | +0 |
| 4. | **Totals** | **1,297** | **1,332** | **+35** |

20.    *Claims Investigated More than Once.* Claims on which we have concluded an Audit may be the subject of another Audit if we later learn of information that requires further investigation. We notify Settlement Class Members when this happens. We have audited 100 Monetary Award claims more than one time (six more than we reported in Status Report No. 20); the most times a Monetary Award claim has been audited is twice.

## VIII.  **DERIVATIVE CLAIMANTS**

21.     ***Derivative Claims.*** We have received 615 Derivative Claim Packages (no change since Status Report No. 20). Table 16 shows the status of these claims:

| Table 16 | DERIVATIVE CLAIMS | | |
|---|---|---|---|
| | **STATUS** | **HOW MANY** | **% OF TOTAL** |
| 1. | Paid Derivative Claimant Award ($1,030,697[23]) | 232 | 38% |
| 2. | Derivative Claimant Award Notice Issued but Not Paid ($3,644.16) | 2 | <1% |
| 3. | Denied – Associated Retired NFL Football Player's Claim Denied | 48 | 8% |
| 4. | Denied – No Timely Claim for Associated Retired NFL Football Player | 42 | 7% |
| 5. | Denied – No Timely or Proper Registration for Associated Retired NFL Football Player | 35 | 6% |
| 6. | Denied – Retired NFL Football Player's Claim Withdrawn During Statute of Limitations Proceeding | 16 | 3% |
| 7. | Denied – Untimely Derivative Claim Package | 13 | 2% |
| 8. | Denied – Deceased Derivative Claimant | 4 | 1% |
| 9. | Denied – Derivative Claimant Not Registered | 1 | <1% |
| 10. | Successful Challenge to Derivative Claimant - Not Eligible | 15 | 2% |
| 11. | Withdrawn | 8 | 1% |
| 12. | Derivative Claim Package Receipt Notice Issued (no action required because the associated Retired NFL Football Player has not yet submitted a claim, or his claim status was not final) | 199 | 32% |
| 13. | **Total** | **615** | |

We issued one Notice of Derivative Claimant Award since Status Report No. 20. Table 17 shows how many eligible Derivative Claimants received the entire 1% amount deducted from the associated Retired NFL Football Player's Monetary Award, and how many shared that 1% amount with other eligible Derivative Claimants:

---

[23] This includes payment for (a) Supplemental Derivative Claimant Awards and (b) additional Derivative Claimant Awards issued because the associated Retired NFL Football Player's Monetary Award, and resulting 1% deduction, increased after rescoring under the Norming Agreement.

| Table 17 | SHARED AWARD STATUS FOR ELIGIBLE DERIVATIVE CLAIMANTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | **STATUS** | **HOW MANY** | | | **% OF TOTAL** | | |
| | | **AS OF 5/8/23** | **AS OF 8/14/23** | **CHANGE** | **AS OF 5/8/23** | **AS OF 8/14/23** | **CHANGE** |
| 1. | Received Entire 1% Amount | 63 | 64 | +1 | 27% | 27% | 0% |
| 2. | Shared 1% Amount with Other Eligible Derivative Claimants[24] | 170 | 170 | 0 | 73% | 73% | 0% |
| 3. | **Totals** | **233** | **234** | **+1** | | | |

The 234 Derivative Claimants who received Notices of Derivative Claimant Award are associated with 117 Retired NFL Football Players. We issued payment to three Derivative Claimants since Status Report No. 20 and have paid 232 (99%) of the 234 Derivative Claimants with Notices of Derivative Claimant Award; the two eligible Derivative Claimants who have not been paid are in the payment process.

22.    *Additional Derivative Claimant Details.* We received challenges from 29 Retired NFL Football Players (or their Representative Claimants) to 41 Derivative Claimants (no change since Status Report No. 8); 19 (46%) of those 41 challenged Derivative Claimants are not eligible for a Derivative Claimant Award because they never submitted a timely Derivative Claim Package. We have issued a Notice of Derivative Claim Package Submission Deadline to 510 registered Derivative Claimants. Table 18 summarizes their claim submission statuses and the changes since Status Report No. 20:

---

[24] We have not received an Allocation Objection from any of the Derivative Claimants who equally shared a 1% Derivative Claimant Award with other Derivative Claimants associated with the same Retired NFL Football Player.

| Table 18 | CLAIM STATUS FOR DERIVATIVE CLAIMANTS WITH DERIVATIVE CLAIM PACKAGE SUBMISSION DEADLINE NOTICE | | | | | |
|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE |
| 1. | Claim Submitted | 160 | 160 | 0 | 32% | 31% | -1% |
| 2. | No Claim Submitted | 338 | 344 | +6 | 68% | 68% | 0% |
| 3. | Within 30-Day Deadline | 0 | 6 | +6 | 0% | 1% | +1% |
| 4. | **Totals** | **498** | **510** | **+12** | | | |

23.     ***Supplemental Derivative Claimant Awards.*** Section G of the Overview of

Derivative Claimant Process on the Settlement Website

(https://www.nflconcussionsettlement.com/Docs/DerivativeClmtProcessOverview.pdf)

explains how Supplemental Derivative Claimant Awards are handled. As discussed in

Paragraph 9 of this Status Report, we issued Notices of Supplemental Monetary Award to 55

Retired NFL Football Players (an increase of eight since Status Report No. 20). Of those 55,

48 Retired NFL Football Players had no registered Derivative Claimants associated with

them, and four Retired NFL Football Players each had one registered Derivative Claimant,

but those four Derivative Claimants did not submit Derivative Claim Packages to share 1%

of the Retired NFL Football Players' earlier Monetary Awards and were not eligible for any

portion of the Players' Supplemental Monetary Awards. Two of the last three Players'

Supplemental Monetary Award Notices had a 1% offset for potential Derivative Claimant

Awards, which have been issued to the associated Derivative Claimants, as described in

Table 19:

| Table 19 | SHARED SUPPLEMENTAL AWARD STATUS FOR ELIGIBLE DERIVATIVE CLAIMANTS | | | | | | |
|---|---|---|---|---|---|---|---|
| | STATUS | HOW MANY | | | % OF TOTAL | | |
| | | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE | AS OF 5/8/23 | | CHANGE |
| 1. | Received Entire 1% Amount | 2 | 2 | 0 | 100% | 100% | 0% |
| 2. | Shared 1% Amount with Other Eligible Derivative Claimants | 0 | 0 | 0 | 0% | 0% | 0% |
| 3. | Totals | 2 | 2 | 0 | | | |

Both of the Derivative Claimants with Supplemental Derivative Claimant Awards have been paid.[25] The last Player's Supplemental Monetary Award Notice had a 1% offset for potential Derivative Claimant Awards, which will be issued to the associated Derivative Claimant if: (a) there is no appeal to his Supplemental Monetary Award, and (b) he does not successfully challenge the Derivative Claimant's right to share the 1%.

## IX.   OTHER CLAIM PROCESSES

**24.   *Handling of Attempted Assignments of Claims.*** On September 27, 2019, the Court issued a Notice (Document 10858) directing us to streamline the process regarding attempted assignments by Settlement Class Members of claims to third-party lenders. At that time, we suspended the process for handling such assignment questions under the Rules Governing Assignment of Claims and worked with the Court and the Special Master to modify these Rules. On March 19, 2020, the Special Masters adopted the Rules Governing Payment of Claims Involving Third-Party Funders and the Rules Governing Third-Party Funding Resolution Protocol, which superseded the previous Rules (collectively, the "New Payment Rules"). Under the New Payment Rules Governing Payment of Claims Involving Third-Party Funders, all Settlement Class Members must complete and submit a Sworn

---

[25] See Row 1 of Table 16 in this Status Report.

Statement regarding the Status of Assignment of Monetary Claim ("SWS-5") to receive payment. There are two versions of the SWS-5, one for those identified as a borrower by a Third-Party Funder that is participating in the Rules Governing Third-Party Funding Resolution Protocol ("Resolution Protocol") (the SWS-5(A)) and another for those not so identified (the SWS-5(B)). As of August 14, 2023, 24 Third-Party Funder entities are participating in the Resolution Protocol. We have worked with those participating funders to resolve cash advances for 44 Settlement Class Members since the adoption of the New Payment Rules.

25.     ***Petitions for Deviation from the Attorneys' Fee Cap.***[26] We have received eight Petitions for Deviation, one of which was withdrawn. The Court resolved three of the remaining seven Petitions for Deviation in conjunction with the Attorneys' Liens Dispute Process: two by final decision, and one upheld on appeal by the Third Circuit.  The other four Petitions are pending final resolution.

26.     ***Non-Medical Liens Process and Attorneys' Lien Disputes.***

(a) Table 20 summarizes Non-Medical Lien assertions, notices and disputes by Lien type and reflects changes to those numbers since Status Report No. 20:

---

[26] Judge Brody entered a Memorandum and Order in April of 2018 limiting attorneys' fees in the Program to 22% of each SCM's Monetary Award, plus reasonable costs (ECF Nos. 9862 and 9863). In the Memorandum, the Judge decided that attorneys should have the opportunity to petition the Court to go above and beyond the cap in exceptional circumstances, which is what the Petitions for Deviation process is meant to cover.

| Table 20 | NON-MEDICAL LIENS SUMMARY | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | LIEN TYPE | LIENS ASSERTED | | | NOTICES OF LIEN ISSUED BY CLAIMS ADMINISTRATOR | | | LIENS DISPUTED BY SETTLEMENT CLASS MEMBERS | | |
| | | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE |
| 1. | Attorneys' | 1,865[27] | 1,973[28] | +108 | 556 | 567 | +11 | 270 | 258 | -12 |
| 2. | Child Support | 353 | 355 | +2 | 55 | 57 | +2 | 22 | 18 | -4 |
| 3. | Judgment | 70 | 70 | 0 | 18 | 18 | 0 | 10 | 8 | -2 |
| 4. | Tax | 57 | 57 | 0 | 3 | 3 | 0 | 0 | 0 | 0 |
| 5. | Totals | 2,345 | 2,455 | +110 | 632 | 645 | +13 | 302 | 284 | -18 |

(b) Table 21 shows the status of Liens in the Attorneys' Liens dispute resolution

process:

| Table 21 | ATTORNEYS' LIENS IN DISPUTE RESOLUTION PROCESS[29] | | |
|---|---|---|---|
| PENDING | RESOLVED | | TOTAL |
| | BY AGREED WITHDRAWAL | BY COURT DETERMINATION | |
| 36 | 183 | 23 | 242 |

(c) Table 22 breaks down the Non-Medical Lien holdbacks[30] by Lien type:

| Table 22 | NON-MEDICAL LIEN HOLDBACKS | | |
|---|---|---|---|
| | LIEN TYPE | MONETARY AWARDS AFFECTED | MONETARY AWARD AMOUNTS | LIEN HOLDBACKS |
| 1. | Attorneys' | 24 | $24,639,384 | $4,467,342 |
| 2. | Child Support | 4 | $3,429,242 | $220,355 |
| 3. | Judgment | 2 | $1,778,930 | $844,426 |
| 4. | Tax | 0 | N/A | N/A |
| 5. | Totals | 30 | $29,847,556 | $5,532,123 |

---

[27] These 1,865 Attorneys' Liens were asserted by 62 law firms.
[28] These 1,973 Liens were asserted by 65 law firms.
[29] We refer Attorneys' Liens Disputes to the Court after we issue a Notice of Duty to Resolve Lien Dispute.
[30] The holdbacks are the amount of funds we are withholding pending resolution of a Dispute. As of 8/14/23, there are 36 disputed Attorneys' Liens currently pending resolution by Judge Strawbridge where the Settlement Class Member has or will receive payment of the rest of his Monetary Award. After the Court enters a final order (whether by Judge Strawbridge or Judge Brody's approval of his Report and Recommendation) resolving the Disputes and any appeal period passes, we disburse the held back funds on the next available monthly Disbursement.

(d) Table 23 summarizes the Non-Medical Lien payments from initial Monetary Awards[31] by Lien type:

| Table 23 | NON-MEDICAL LIEN PAYMENTS FROM INITIAL MONETARY AWARDS | | |
|---|---|---|---|
| | **LIEN TYPE** | **MONETARY AWARDS AFFECTED** | **MONETARY AWARD AMOUNTS** | **LIEN PAYMENTS** |
| 1. | Attorneys' | 177 | $196,381,056 | $10,995,541 |
| 2. | Child Support | 18 | $14,040,312 | $1,104,984 |
| 3. | Judgment | 7 | $7,589,979 | $2,947,692 |
| 4. | Tax | 1 | $33,283 | $6,493 |
| **5.** | **Totals** | **203** | **$218,044,630** | **$15,054,710** |

## X.     COMMUNICATIONS CENTER FOR THE PROGRAM

27.     *Our Contact Activity.* Since our contact center opened on February 6, 2017, we have handled 100,393 total communications, including 59,868 calls made or received and 35,913 emails to us at our Claims Administrator email box. Since Status Report No. 20, we handled 1,958 such total communications. The most common topics of these communications have been General Settlement Information, Change in Lawyers, Payment, Baseline Assessment Program (BAP), and MAF Physicians.

28.     *Law Firm Contacts.* Our Law Firm Contacts are assigned to 578 different law firms or lawyers representing Settlement Class Members in the Program. This is one more law firm or lawyers than we reported in Status Report No. 20. The calls and emails handled by the Law Firm Contacts are part of the total contact activity described in Paragraph 27 above.

29.     *Insights Newsletters.* Since Status Report No. 20, we issued one new edition of our quarterly "Insights" newsletter (Second Quarter 2023). We send the newsletters to

---

[31] We also have issued $46,118.04 in Lien payments from Supplemental Monetary Awards and $1,442.10 from Derivative Claimant Awards.

unrepresented Settlement Class Members and lawyers by email or mail. We also post them to the Settlement Website at https://www.nflconcussionsettlement.com/Newsletters.aspx (under "Useful Information" click "Newsletters"). We invite all lawyers and Settlement Class Members to send us suggested topics for our newsletters by email to ClaimsAdministrator@NFLConcussionSettlement.com or through the online submission screen on the Newsletters page of the Settlement Website.

30.    *Program Doctors Newsletters.* In the fourth quarter of 2020, we issued our first newsletter to MAF Physicians as a tool to share relevant and valuable information. With the Second Quarter 2021 edition, we expanded our newsletter audience to include all Program doctors. We emailed the Second Quarter 2023 Program Doctors Newsletter to all Qualified MAF Physicians, Qualified BAP Providers and other approved evaluating Neuropsychologists on July 13, 2023. All Program Doctors also can access the newsletter on their Provider Portals. The newsletter provided information on Provider Portal enhancements, communications with the Media, elements of Level 1, Level 1.5 and Level 2 Neurocognitive Impairment and Criterion iii (CDR® Scale), required information for CDR® evaluations, CDR® Ratings for Individual Domains, Gelb Criteria symptoms, and inclusion of PVT and SVT Scores. We continue to issue newsletters to Program Doctors on a quarterly basis.

31.    *Settlement Program Website.* We regularly update the Settlement Website to reflect progress and changes to the Program. Since Status Report No. 20 in May 2023, we made these changes:

> (1) Posted a Report of the Special Masters (Document 12133, filed June 6, 2023), BAP Administrator Status Report No. 18 (Document 12134, filed June 6, 2023), and Claims Administrator Status Report No. 20 (Document 12135,

filed June 6, 2023) to the Status Reports page at
https://www.nflconcussionsettlement.com/Status_Reports.aspx.

(2) Poster an Alert regarding recent Special Master and Court Decisions to the
Alerts page at https://www.nflconcussionsettlement.com/Alerts.aspx.

## XI.   SPECIAL MASTERS

**32.**   ***Our Work with the Special Masters.*** Since the Program's inception, we have had 147 regularly scheduled calls with the Special Masters to discuss policy and operational issues. Since Status Report No. 20, we have continued to participate in many other calls and exchange countless emails with the Special Masters to address issues as they arise. The Special Masters have the final say in how the Settlement is implemented, subject only to the Court's oversight.

**33.**   ***Program Rules.*** There are 10 sets of Rules available on the Settlement Website (under "Governing Documents," click "Governing Rules") and on the online portals of law firms, lawyers and pro se Settlement Class Members. We have not made changes to any posted Rules since Status Report No. 20 filed in June 2023.

**34.**   ***Published Decisions.*** Since Status Report No. 20, the Special Masters issued three new decisions they designated for publication. Two of these decisions relate to how we analyze claims for Monetary Awards.

## Validity Testing

July 14, 2023

The NFL Parties appealed the Claims Administrator's determination that a Retired NFL Football Player was entitled to a Level 1.5 Neurocognitive Impairment Monetary Award on the grounds of invalid neuropsychological testing. According to the Special Master, the NFL Parties must show by clear and convincing evidence that the Player's test data was not "a valid reflection of his optimal level of neurocognitive functioning," based on his performance on the nine *Slick* validity criteria. The NFL Parties asserted that he failed two *Slick* criteria (#1 and #7) and both the AAP Consultant and AAP Member who reviewed the claim agreed. The Special Master determined that no deference was due to the evaluating neuropsychologist because he provided no explanation or context with his *Slick* checklist. Thus, the AAP was to "thoroughly and independently" evaluate the file, however, the AAP panel members disagreed as to whether the failure of the two *Slick* criteria was sufficient to determine the evaluation invalid. The Special Master found that the disagreement itself indicated that the NFL Parties did not satisfy their burden of showing clear and convincing evidence that the Player is not entitled to an award, and denied the appeal.

## Validity and Historical Testing

August 6, 2023

The NFL Parties appealed the Claims Administrator's determination that a Retired NFL Football Player was entitled to a Level 1.5 Neurocognitive Impairment Monetary Award. The Player completed two sets of neuropsychological evaluations (2018 and 2019 testing) that the Claims Administrator rescored under the New Method. The revised scores from the 2018 testing reflected Level 1.5 Neurocognitive Impairment, however, the 2019 testing scores did not. The NFL Parties challenged the Player's Award on the grounds that: (1) the Retired NFL Football Player's 2018 neuropsychological testing was invalid; and (2) even if valid, the 2019 neuropsychological testing should invalidate it. At the Special Master's request, an AAP Consultant reviewed the Claim and determined that there was not adequate evidence to prove invalidity. The NFL Parties argued that the improvement between the two sets of testing was inconsistent with the presence of true organic impairment. The AAPC found, however, that there was no broad pattern of improvement or decline in the Player's testing from 2018 to 2019. Further, as explained in FAQ #109, the Settlement Program contemplates the use of neuropsychological testing completed more than a year before a Player's neurological evaluation if the Claims Administrator approves its use by the Qualified MAF Physician to measure impairment. The Claims Administrator's exercise of discretion under FAQ #109 was "not erroneous" because (1) the 2018 testing was performed while demographic corrections were permitted under the Settlement Agreement, and (2) this was the first and only use of the 2018 testing battery.

The third decision relates to Audit.

**Byron Cuthbert and Associates, LLC**

June 28, 2023

On June 28, 2023, pursuant to Rule 27 of the Rules Governing the Audit of Claims, the Special Masters issued a Decision on the Audit Proceeding regarding Byron Cuthbert and Associates, LLC.  This Decision is redacted to conceal the identities of certain parties. The Decision directs the Claims Administrator to suspend processing of Monetary Award claims submitted by Settlement Class Members both currently and formerly represented by Mr. Cuthbert, and to deny certain claims that exhibit issues central to the Audit, including those that rely on PET scans from Dr. Daryl Eber of 3T Radiology & Research. The Decision also directs the Claims Administrator, after certification to the Special Masters, to resume processing of claims that are entirely free of the issues discussed in the Audit.

We post all such rulings to the Settlement Website (under "Governing Documents" select "Governing Decisions" and then click the Monetary Award Claims button on the Special Master tab). The Special Masters have so far issued 63 published Monetary Award appeal decisions and 12 Audit decisions (75 total such decisions).[32]

## XII.   FREQUENTLY ASKED QUESTIONS

**35.**   *Frequently Asked Questions.* We have not added any new FAQs or made substantive revisions to existing FAQs since Status Report No. 20. There now are 391 FAQs in 18 categories. These FAQs contain links to other tools and resource guides posted on the Settlement Website to help Settlement Class Members and their lawyers navigate the Program. The banner at the top of the page contains a link to a printable PDF version of the full set of FAQs. Note that when we add new FAQs, we place them within the existing set where it makes the most sense. This means that the numbering of FAQs within the set may change from time to time.

---

[32] On October 28, 2020, the Special Master issued contextually similar decisions on deviation from BAP Criteria for six claimants.  One of the six decisions appears on the Settlement Website.

## XIII.   REGISTRATION

**36.**     *Registration Submissions.*

(a) Sections 1 and 2 of the Summary Report on the Settlement Website cover Registrations. Table 24 shows changes in the number of timely Registration submissions since our Status Report No. 20:

| Table 24 | TIMELY REGISTRATION SUBMISSIONS | | |
|---|---|---|---|
| | **TYPE OF SETTLEMENT CLASS MEMBER** | **AS OF 5/8/23** | **AS OF 8/14/23** | **CHANGE** |
| 1. | Retired NFL Football Players | 15,828 | 15,821 | -7 |
| 2. | Representative Claimants | 1,417 | 1,424 | +7 |
| 3. | Derivative Claimants | 3,326 | 3,328 | +2 |
| 4. | **Totals** | **20,571** | **20,573** | **+2** |

The number of Retired NFL Football Players (Row 1) went down by seven from Status Report No. 20 because they were replaced by Representative Claimants. Of the 20,573 to whom we issued Registration notices, we were able to confirm that 19,412 of them are Settlement Class Members under the Settlement Agreement, 12,838 of whom are Retired NFL Football Players eligible to participate in the BAP. The other 1,161 persons are not Settlement Class Members under the Settlement Agreement because of one or more of these reasons: (1) they were on an Active Roster as of July 7, 2014; (2) they did not play "NFL Football" as defined in the Settlement Agreement; (3) they opted out of the Settlement Program; (4) they did not provide us with the information or support required by the Settlement Agreement to register, after several notices from us and up to 150 days to turn it in; or (5) they tried to register as a Derivative Claimant but did not have a relationship with the Retired NFL Football Player by which they had a right under applicable state law to sue independently or derivatively.

(b) We are responsible for determining whether registrations submitted after August 7, 2017, meet one of the good cause exceptions specified in Section 4.2(c)(i) of the Settlement Agreement or can otherwise be accepted under the Rules Governing Registration Determinations and Appeals. We have made determinations on 332 such Registrations and found that 176 (53%) of them presented good reasons to be allowed to register after August 7, 2017. Table 25 shows the change in these numbers since Status Report No. 20:

| Table 25 | REGISTRATIONS SUBMITTED AFTER AUGUST 7, 2017 | | | |
|---|---|---|---|---|
| | STATUS | AS OF 5/8/23 | AS OF 8/14/23 | CHANGE |
| 1. | Accepted | 173 | 176 | +3 |
| 2. | Not Accepted | 153 | 156 | +3 |
| 3. | Totals | 326 | 332 | +6 |

(c) Settlement Class Members who disagree with our Registration determinations may object to them by sending us a challenge. The NFL Parties also may challenge our good cause exception decisions. We have received 381 challenges, which is one more than the number we have reported since Status Report No. 20. Table 26 explains these challenges and what happened to them:

| Table 26 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | |
|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 1. | Not a Retired NFL Football Player | 46 | Settlement Class Member | 23 | 23 |
| 2. | Not Eligible for the BAP | 245 | Settlement Class Member | 77 | 168 |
| 3. | Not Properly Registered | 53 | Settlement Class Member | 44 | 9 |
| 4. | Granted Good Cause Extension for Untimely Registration | 9 | NFL | 1 | 8 |
| 5. | Denied Good Cause Extension for Untimely Registration | 26 | Settlement Class Member | 5 | 21 |

| Table 26 | CHALLENGES OF OUR REGISTRATION DETERMINATIONS | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO CHALLENGED | CHALLENGE SUCCESSFUL | CHALLENGE NOT SUCCESSFUL |
| 6. | Not a Valid Derivative Claimant Relationship | 2 | Settlement Class Member | 0 | 2 |
| 7. | Totals | 381 | | 150 | 231 |

Those who are not successful in challenging Registration determinations to us may appeal our decision to the Special Masters. Table 27 shows the appeals thus far and the Special Masters' rulings on them:

| Table 27 | APPEALS OF OUR DECISIONS ON REGISTRATION CHALLENGES | | | | |
|---|---|---|---|---|---|
| | ISSUE | HOW MANY | WHO APPEALED | DECISION UPHELD | DECISION OVERTURNED |
| 1. | Not a Retired NFL Football Player | 3 | Settlement Class Member | 3 | 0 |
| 2. | Not Eligible for the BAP | 26 | Settlement Class Member | 24 | 2 |
| 3. | Not a Valid Derivative Claimant Relationship | 1 | Settlement Class Member | 1 | 0 |
| 4. | Denied Good Cause Extension for Untimely Registration | 8 | Settlement Class Member | 7 | 1 |
| 5. | Totals | 38 | | 35 | 3 |

37.     *Centralized Process for Appointment of Representative Claimants and Derivative Claimant Representatives.* The Special Masters have approved 471 petitions from persons to serve as the Representative Claimant of a deceased or legally incapacitated or incompetent Retired NFL Football Player and three petitions from Derivative Claimant Representatives to act on behalf of minor Derivative Claimants. There have been five new Representative Claimant approvals and no new Derivative Claimant Representatives since Status Report No. 20.

## XIV.   <u>CONCLUSION</u>

38.      ***General Status.*** We have 254,938 document files (22,353 gigabytes, or 22.3 terabytes of registration and claims data), including notices we have issued, stored on Settlement Class Members, which is 4,944 more than when we filed Status Report No. 20. We have issued 56,226 notices (236 more since Status Report No. 20) to 21,033 different persons since March 23, 2017.

Respectfully submitted,

**CLAIMS ADMINISTRATOR**

By: *Roma Petkauskas*

Roma Petkauskas
Virginia State Bar No.: 71357
BrownGreer PLC
250 Rocketts Way
Richmond, Virginia 23231
Telephone: (804) 521-7218
Facsimile: (804) 521-7299
Email: rpetkauskas@browngreer.com