### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,<br><br>Defendants. | |
| THIS DOCUMENT RELATES TO:<br><br>Pope McGlamry PC<br>v.<br>SPID 10001915 (R.B.)<br><br>Attorney Lien Dispute<br>(Lien Disp. No. 00289) | |

### MEMORANDUM OPINION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                    September 5, 2023

## I.      INTRODUCTION

Presently before the Court in the National Football League Player's Concussion Injury Litigation is the assertion of an Attorney Lien by Pope McGlamry PC against the Award subsequently granted to its former client, Settlement Class Member ("SCM") SPID 10001915, R.B. ("Player"), in the litigation that became this class action, *In re: National Football League Players' Concussion Injury Litigation*, No. 12-md-2323 (E.D. Pa.).  By its lien, the firm sought payment of attorneys' fees of 20% of the Award issued to Player pursuant to the contingency fee

agreement ("CFA") that he entered into with Pope McGlamry on December 29, 2011.  Player, now represented by Collins & Truett Attorneys, P.A., opposes the lien.

The District Court referred all Petitions for individual attorney's liens to this Magistrate Judge.  (Doc. No. 7446.)  Rules Governing Attorneys' Liens ("Rules") were adopted on March 6, 2018 and amended on October 3, 2018.  (Doc. Nos. 9760 and 10283.)  Pursuant to Rule 12, Pope McGlamry and Collins & Truett were advised of their right to consent to have the Magistrate Judge issue a final Order to resolve this dispute.  They have so consented.  (Doc. No. 11917.) Accordingly, the Order accompanying this Memorandum Opinion will serve as the final decision of the District Court concerning this attorney lien dispute.[1]

As we set out in a Report and Recommendation ("R&R") filed on January 7, 2019, our evaluation of these positions involves a consideration of the CFA between Player and his former counsel and an assessment of the reasonableness of the requested fees in light of the five factors enumerated by the Third Circuit in *McKenzie*.  *See* Doc. No. 10368 at 11-26 (discussing *McKenzie Constr., Inc. v. Maynard*, 758 F.2d 97, 100 (3d Cir. 1985) ("*McKenzie I*"); *McKenzie Constr., Inc. v. Maynard*, 823 F.2d 43, 45 (3d Cir. 1987) ("*McKenzie II*"); *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979)).  This approach will require us to scrutinize the reasonableness of the CFA at the time of the signing and then determine if the circumstances compel a different evaluation of the CFA at the time Pope McGlamry, as lienholder, seeks to enforce it.  We will then examine the results obtained, the quality of the representation provided by Pope McGlamry, and

---

[1]  This decision does not concern the propriety of the Monetary Award to the SCM, which has already been authorized.  Rather, it addresses only the allocation of the portion of the SCM's Monetary Award that was set aside by the Claims Administrator for fees and costs of the SCM's individually-retained counsel.  It is the SCM's discharge of an attorney he retained to represent him in this matter, and the filing of an attorney's lien by prior counsel, that has created the need for this judicial determination of the appropriate fee.

whether the efforts of Pope McGlamry substantially contributed to the result.  *See McKenzie I*, 750 F.2d at 101; *McKenzie II,* 823 F.2d at 45 n.1.

As we set forth below, we find that allocation to Pope McGlamry of a 10% fee is reasonable under the *McKenzie* standards and the circumstances of this case.  The remainder of the funds withheld for payment of the individually-retained plaintiff attorney ("IRPA") counsel fee (i.e., the balance of the 22% portion of Player's Monetary Award), may be returned to Player, subject to the court orders regarding the 5% holdback requirement.

## II.    FACTS AND PROCEDURAL HISTORY

To orient our narrative below, we provide a brief chronology in table form and then proceed with a more detailed account:

| Date | Significant event |
|------|-------------------|
| December 29, 2011 | Player retains Pope McGlamry |
| January 2012 | Pope McGlamry files complaint on Player's behalf in N.D. Ga. |
| July 2012 | Pope McGlamry files short-form complaint on Player's behalf in E.D. Pa. |
| March 14, 2014 | Attorney Carolyn McGlamry counsels Player regarding settlement and application to him; advises him against opting-out |
| April 22, 2015 | Judge Brody approves Settlement Agreement |
| April 18, 2016 | Third Circuit affirms approval of Settlement Agreement |
| July 27, 2016 | Player terminates Pope McGlamry |
| December 12, 2016 | U.S. Supreme Court denies certiorari |
| February 6, 2017 | Registration opens in settlement program |
| February 9, 2017 | Player is registered in the settlement program by Law Offices of A. Craig Eiland (per Settlement Claims Administrator) |

| March 23, 2017 | Claim submission opens in settlement program |
|---|---|
| *March 2017 to April 2022* | *Unknown representational status* |
| Possibly August 18, 2020 | Player undergoes BAP exam with Dr. Shukla (per Notice of Award) |
| March 4, 2022 | Court approval of "race-norming agreement," providing for re-scoring of prior BAP testing in certain circumstances |
| April 21, 2022 | Player retains Collins & Truett |
| May 25, 2022 | Collins & Truett submits claim on behalf of Player |
| September 6, 2022 | Player is approved for Monetary Award based on Dr. Shukla's diagnosis of Level 1.5 Neurocognitive Impairment as of August 18, 2020 |

\*     \*     \*

On December 29, 2011, Player signed an "NFL Fee Agreement" reflecting that he agreed to have Attorney Bruce Hagen and the Pope McGlamry firm represent him in connection with head injuries sustained during his seasons playing football in the NFL.  (Notice of Lien.)  Under the terms of the agreement, the lawyers would be entitled to a fee in the amount of 40% of the net recovery for Player's injuries.[2]

Pope McGlamry gathered from Player details of his medical treatment and obtained pertinent medical records to evaluate and substantiate a claim against the NFL.  *See, e.g.,* Lienholder Stmt. at Ex. C (detailing expenditures in 2012 for obtaining medical records).  Then, in early 2012, the firm filed suit on his behalf in a multi-plaintiff Master Long-form Complaint in the Northern District of Georgia, where the firm was based.  That suit was then transferred to the

---

[2]  Pope McGlamry later reduced this fee percentage.  However, in the early phases of this litigation, before matters were consolidated into the MDL, large contingency fees were to be expected and were the norm.  *See* Doc. No. 9526 at 25-26 (Expert Report of Prof. William B. Rubenstein).

MDL 2323 in February 2012.  In July 2012, Pope McGlamry filed a short-form complaint on Player's behalf pursuant to the Court's case management order.  The firm used various methods of communication to keep Player, and its client base at-large, apprised of the status of the litigation and the settlement proposals, as well as the legal challenges presented.  *See* Lienholder Stmt. at 12-13 & Ex. B (description of communications to firm's retired player client base).

Following the announcement by the parties in January 2014 of a proposed class action-style settlement, Attorney Caroline McGlamry of the Pope McGlamry firm reviewed Player's medical treatment and written responses to firm questionnaires regarding his condition.  She spoke with him by telephone for approximately one hour on March 14, 2014.  She reviewed past and pending worker's compensation claims and reviewed with him their impact on a potential claim against the NFL for head injuries.  She explained the firm's recommendation that Player not opt out of the proposed settlement program.  Player took that advice and did not opt out.  (Lienholder Stmt. at 6-7, 13.)  Once the litigation progressed to this settlement posture, the firm also unilaterally reduced its contingency fee for all of its NFL concussion litigation clients on March 10, 2016 to 20%.  (Lienholder Stmt. at 15 n.3.)[3]

Following the district court's approval of the Settlement Agreement, and as more law firms entered the market to guide SCMs through what had emerged as a settlement claim process, Pope McGlamry began to receive a number of notices that its clients were discharging them as counsel. Player transmitted such a letter on July 27, 2016, stating that he did want the firm "to pursue a claim with the NFL under the proposed concussion settlement on [his] behalf."  (Lienholder Stmt.

---

[3]  Player has not disputed the account of Pope McGlamry's activity except to assert that "Mr. McGlamry and his law firm did not respond to my many inquiries during that time seeking updates on my case" and describing the emails sent to the client base as not making any sense to him and not explained by firm personnel when he requested clarification.  (SCM Stmt. at App'x B.)

at Ex. G.)  His letter reflected that he "[did] not believe" his counsel had "done anything to pursue the claim at this point," adding that he thought he "would have been tested by now."  (*Id.*)  He indicated that he was going to obtain "a local lawyer" – presumably someone in the Houston area where he lived – "to get me tested."  (*Id*.)  Player's letter, addressed "Dear Attorney," was virtually identical to letters that Pope McGlamry received from other clients on that same date.  Pope McGlamry also learned that other firms received similar, if not identical, termination letters around this same time.  (Lienholder Stmt. at 8-10.)  Pope McGlamry did not learn which firm Player retained to represent him next (*id.* at 15 n.2), but to protect its interest, it filed an attorney lien on the MDL docket on December 21, 2016.  (Doc. No. 7050-1.)

Fast forward almost six years.  The Settlement Agreement withstood challenges on appeal and became effective in February 2017.  Player was registered in the settlement program that month but had not yet filed a claim.[4]  The original Settlement Agreement had been modified by agreement of the NFL and Class Counsel and approved by the Court on March 4, 2022.  The modification provided that new testing norms would be applied in the evaluation of particular neurocognitive impairments defined in the underlying Settlement Agreement.  For certain subsets of SCMs, earlier testing could be subject to re-calibration under the newly-adopted race-neutral norms for the benefit of the SCMs.  As it turned out, Player had been evaluated by a Qualified BAP Provider, Dr. Amitabh Shukla.  And while it is not clear whether Dr. Shukla found that Player met the criteria for a diagnosis of Level 1.5 Neurocognitive Impairment at the time of the

---

[4]  The record provided to us by the Claims Administrator indicates that Player was registered in the Settlement Program on February 9, 2017 by the Law Offices of A. Craig Eiland.  No other information on that firm's involvement in the representation of Player is apparent in the record. We are unaware of it having any sort of partnership with either Pope McGlamry or Collins & Truett.

evaluation as opposed to when the neurocognitive testing might have been re-examined using the new norms adopted in 2022, Dr. Shukla ultimately certified that Player met the criteria for the qualifying diagnosis of "Level 1.5 Neurocognitive Impairment" as of August 18, 2020.  (Notice of Award.)  With that diagnosis in hand, Player was in a position to submit a claim for a Monetary Award.

On April 21, 2022, Player retained Collins & Truett to represent him.  Collins & Truett did not refer Player for any testing or further evaluations.  *See* SCM Stmt., App'x A (time entries).  However, within approximately one month of its retention, Collins & Truett submitted a claim to the Monetary Award Fund program on May 25, 2022 on Player's behalf.  On September 6, 2022, Player was approved for a Monetary Award based upon the qualifying diagnosis of Level 1.5 Neurocognitive Impairment attributed to Dr. Shukla and dated as of August 18, 2020.

On August 29, 2022, while the claim was pending approval, the Claims Administrator provided notice to Collins & Truett of Pope McGlamry's attorney lien.  Pope McGlamry attorney Michael McGlamry also reached out to Collins & Truett on October 13, 2022 concerning the pending lien.  He addressed an e-mail to Attorney Richard "Dick" Collins, the only attorney he found listed on the firm's website, inviting discussion as to a resolution of the lien and providing Collins with Pope McGlamry's dates of representation of Player.  That e-mail went unanswered until December 5, 2022, when Attorney Collins responded, outlining his firm's view of the shortcomings of Pope McGlamry's representation of Player, characterizing Pope McGlamry's lien petition as "fraudulent" where the petition stated that Pope McGlamry was not terminated "for cause" or due to "any malfeasance or other improper action" by Pope McGlamry, and threatening Attorney McGlamry with a complaint to the Georgia bar and a motion for sanctions in the Eastern District of Pennsylvania.  Attorney Collins conveyed Player's offer of a certain sum to settle the

7

lien and his expectation that Pope McGlamry would convey to the Claims Administrator in the next 4 days that it was withdrawing its lien.  The communication made clear that this would be the extent of Collins & Truett's efforts to resolve the lien dispute.  (Lienholder Stmt. at Ex. D.)  Subsequent correspondence did not change either firm's position.  (*Id.* at 16 & Ex. D.)[5]  Accordingly, after the claim was approved and was approaching disbursement, the Claims Administrator issued a Schedule of Document Submissions calling for briefing on the conflicting claims for the IRPA fee and withheld from Player's award funds for payment of attorneys fees in an amount equal to 22% of his Award.

Pope McGlamry submitted its Lienholder Statement of Dispute ("Lienholder Stmt.") to the Claims Administrator on January 6, 2023 in accordance with the briefing schedule.  After initially making a non-conforming submission,[6] Collins & Truett submitted a Statement of Dispute ("SCM Stmt.") on behalf of Player on January 20, 2023.  Pope McGlamry filed a response to the Settlement Class Member memorandum on February 8, 2023 ("Lienholder Resp."), but Collins & Truett did not choose to do so on behalf of Player in response to Pope McGlamry's opening submission.

---

[5]  We described the communications between the two firms in significant detail in our Show Cause Order.  *See* Doc. No. 12158 at 4-16.  We do not repeat that material here but instead refer the reader to that document.

[6]  As we described in our prior Order, Player's initial submission as his Statement of Dispute was an email communication from Attorney Collins to the Claims Administrator outlining many of the complaints about Pope McGlamry that were ultimately repeated in the later submission on behalf of Player.  The email message stated that Player's response to Pope McGlamry's lien "is best declared in [his] complaint to the State Bar of Georgia," which was attached to the email message.  The transmission did not satisfy several subsections of Lien Rule 17 as to the requirements for a Statement of Dispute, specifically subsections (a)(2), (a)(7), and (b).  We gave leave to re-file a submission that complied with the Rules Governing Attorneys' Liens.  *See generally* Doc. No. 12158 at 5-6.

The Record of Dispute was transferred to the Court Pursuant to Lien Rule 1 on March 2, 2023.  Neither party requested that we hold an evidentiary hearing, nor do we find that one is necessary for our resolution of this dispute.  We did, however, issue an order for Collins & Truett to address in writing two particular questions that we viewed as bearing upon the issue of its entitlement to an award of attorney's fees in this matter (Doc. No. 12158), and it responded on July 28, 2023.  (Doc. No. 12193.)   The matter is now ripe for review.[7]

## III.    DISCUSSION

As we set out in our Show Cause memorandum, Third Circuit authority makes it clear that attorneys carry the burden of proof to demonstrate that a fee sought pursuant to a contract "is reasonable under the circumstances." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1111-12 (3d Cir. 1979) (discussing deference to fee contracts but cautioning that attorneys always bear the burden of demonstrating the reasonableness of their contracts).  The District Court's prior opinions in this class action settlement in no way relieved attorneys of this obligation.  Indeed, the Court explained that all attorneys seeking fees are obligated to ensure that their fees are "reasonable" under the standards set out in *McKenzie*.  *See* Doc. No. 9862 at 8-9 (noting the requirement and indicating the attorney's burden of showing reasonableness by a preponderance of the evidence).

---

[7]  Goldberg Persky & White recently filed an attorney lien on the MDL docket asserting a claim on Player's award on behalf of the creditors of the defunct firm, Howard & Associates.  *See* Doc. No. 12183 (filed July 27, 2023). It seeks only "reimbursement of all legitimate costs and expenses" during an alleged period of representation of Player by the Howard firm.

As Goldberg would have recognized, its lien was filed after the dispute record had been transmitted to this Court for disposition and briefing completed as to the Pope McGlamry lien. The Goldberg lien does not identify any expenses that Howard may have incurred for which it sought reimbursement, even though Goldberg was authorized by the Florida state courts more than a year ago to pursue liens on this basis and thus presumably has had access to the records of any such expenses.  Most significantly, however, the CFA appended to the lien filing was signed by only one party.  By its own terms, without both signatures it "is not valid."  *See id.* at Ex. A, p. 4. We therefore do not consider that lien here.

Even when the lienholder presents a presumptively valid fee contract, we are required to assess if the payment of the fee would "result[] in such an enrichment at the expense of the client that it offends a court's sense of fundamental fairness and equity." *McKenzie I,* 758 F.2d at 101.

It is also well established that District Courts have the responsibility to monitor CFAs based upon the court's "supervisory power over the members of its bar." *Dunn*, 602 F.2d at 1109. We consider this review, as does the Third Circuit, as "part and parcel of the process a federal court follows both in supervising members of its bar and in meeting the obligations imposed on it by Fed.R.Civ.P. 23(e)." *Id.* at 1110 n.8. The Court exercised this authority from the outset of this MDL, when counsel were advised that they were obligated to comport themselves "in accordance with the Pennsylvania Rules of Professional Conduct and the Rules of this Court." (Doc. No. 4, Case Management Order No. 1 (3/6/12), at 5.) The Preamble to the Pennsylvania Rules of Professional Conduct also sets the expectation that, while attorneys might encounter "conflict[s]" between their responsibilities to clients, to the legal system, and to their own interest in "earning a satisfactory living," they adhere to certain norms:

> Such issues must be resolved through the exercise of *sensitive professional and moral judgment* guided by the basic principles underlying the Rules. These principles include the lawyer's obligation zealously to protect and pursue a client's legitimate interests, within the bounds of the law, *while maintaining a professional, courteous and civil attitude toward all persons involved in the legal system*.

Pa. R.P.C., Preamble, ¶ 9 (emphasis added).

Our discussion below will first proceed with an analysis under *McKenzie*, as we have done in many prior decisions as to the lienholder's claim. We will, however, then provide an analysis of additional factors, not heretofore applied to our resolution of IRPA lien disputes in this MDL, focused on the question of the propriety of an allocation to Collins & Truett of a portion of the

available IRPA fee.  It was these factors that we identified in our earlier Rule to Show Cause, such that Collins & Truett would have notice and an opportunity to be heard before we made our final decision.  As our discussion below demonstrates, we have considered its response, even if we did not find it compelling.

A.     **The *McKenzie* analysis**

Pursuant to the *McKenzie* five-part reasonableness analysis, we evaluate the "performance of the attorney's contractual obligations [with consideration of] the circumstances surrounding the engagement of the attorney."  *McKenzie I*, 758 F.2d at 101.  Our inquiry begins "by scrutinizing the reasonableness of the contingent fee arrangement" at the time of the contract's signing and comparing it to the circumstances at the time of enforcement.  *McKenzie II*, 823 F.2d at 45 n.1. Recognizing that the District Court has already adjusted fee agreements through the Fee Cap to account for the changed circumstances that occurred over the course of this litigation, we must determine if there were other factors specific to this individual case that should be considered in our assessment of the reasonableness of the fee at the time of the enforcement of each contract upon which a lien is based.  We will then review: (1) the result in the case, (2) the quality of the work performed by counsel, and (3) the substantiality of that contribution to the overall result.

As we outline below, circumstances changed significantly from the time of Player's initial contracting with Pope McGlamry to the time it sought to enforce its contract.  Based upon our evaluation of the remaining three prongs of the *McKenzie* test, however, we are satisfied that Pope McGlamry provided quality representation and made a contribution to the ultimate Award received.  We will therefore approve Pope McGlamry's fee request in part.

1.     **The CFA at the time of contracting and enforcement – impact of changed circumstances**

As we assess the reasonableness of the contingent fee arrangement at the time of the

contract's signing by Player and Pope McGlamry, there are two primary factors that we must examine: (1) the legal challenges in the plaintiff's pursuit of a monetary recovery and (2) the time-intensive nature of the litigation.  We then compare the landscape at the time of contracting with the circumstances at the time the attorney-client relationship terminated.

Pope McGlamry agreed to represent Player in his dispute with the NFL in December 2011, after the first lawsuits brought by former players against the NFL had been proposed for consolidation for pretrial purposes.[8]  At this time, the case was advancing from what Professor Rubenstein[9] characterized as "Phase 1" to "Phase 2" of the litigation.  *See, e.g.,* Doc. No. 9526 at 24-25 (expert report opining that the litigation had "arguably" entered Phase 2 after the motion was filed on November 15, 2011 and that the case was "certainly" in Phase 2 after the Court's ruling on the motion on January 31, 2012).  The MDL was being created.

Once the individual cases were proposed for consolidation by the NFL's motion of November 15, 2011 and were, in fact, consolidated into an MDL at the end of January 2012, the risk relating to the *volume* of work to be undertaken by a law firm representing a retired player changed dramatically.  Once an MDL was formed, "lawyers contracting to represent clients were well aware that the costs of doing so had been greatly reduced: pre-trial proceedings would now be consolidated and undertaken once and the likelihood that any case would be remanded for trial declined significantly."  (Doc. No. 9526 at 26).  The formation of an MDL also resulted in the

---

[8]  The NFL moved for this consolidation on November 15, 2011, and its motion was granted on January 31, 2012.

[9]  The District Court appointed Professor William B. Rubenstein of Harvard Law School as an expert witness on attorneys' fees to aid the Court.  After considering the recommendations of Professor Rubenstein and the viewpoints of interested parties, the District Court adopted Professor Rubenstein's conclusions and presumptively capped IRPAs' fees at 22% plus reasonable costs. (Doc. No. 9862 at 2).

formation of various committees that took the lead in the primary work in the case.  *See* Case Management Order Number 5 (Doc. No. 3710 at 3) (detailing types of work shifted from individually-retained attorneys to Plaintiffs' Committees, which would be compensated through a common benefit fund).[10]  The risks as to the *legal* challenges faced by the plaintiffs at this phase in the litigation, however, remained substantial.  Plaintiffs faced stiff challenges including surmounting the issues of preemption and establishing causation.  This case remained a "high-risk, long-odds litigation."  (Doc. No. 9860 at 10).

Player remained in a contractual relationship with Pope McGlamry from December 2011 until July 27, 2016, some 4½ years.  During this time, substantial progress had been made in moving the cases forward, collectively and individually.  After Judge Brody ordered the parties to mediation, a term sheet was signed in August 2013.  The Court approved a settlement on April 22, 2015, and the United States Supreme Court would deny *certiorari* on December 12, 2016.  The risk inherent in the litigation was then decreased significantly, thanks to the efforts of Class Counsel and those other lawyers who served on various MDL committees and performed work for the common benefit.  This does not alter the fact, however, that Pope McGlamry undertook the representation of Player at a time of significant risk.

### 2.    The results obtained

We next look to the results obtained, the quality of the work performed and the substantiality of Pope McGlamry's efforts in bringing about the result.  We observe that Player qualified for an award based on a Level 1.5 Neurocognitive Impairment diagnosis made as of August 18, 2020.  (Notice of Monetary Award Claim Determination).  His qualifying diagnosis

---

[10]   We have laid out specifics of this benefit in our initial attorney lien dispute Report and Recommendation.  *See* Doc. No. 10368 at 13-18.

date was approximately four years after he terminated Pope McGlamry's representation. There is no reason to believe that there was an evidentiary basis for a successful claim for any of the qualifying diagnoses during the period of the Pope McGlamry representation. And, to be sure, the Settlement Agreement had not become effective until after Player terminated Pope McGlamry's representation.[11] However, Player was in a position to participate in the claim process in 2022 *in part because of* Pope McGlamry's earlier stewardship, insofar as it counseled him in the March 14, 2014 telephone conference against opting out of the Settlement.

> **3.   The quality of the work performed**

Pope McGlamry contends that it provided quality work when it represented Player by gathering his early medical records, filing suit to preserve his rights, regularly communicating with him about the status of the litigation and the settlement, and sharing informational seminars with Player as part of the firm's client base of former NFL players. It also points to the individualized attention from Attorney Caroline McGlamry in a telephone conference with Player on March 14, 2014. During that hour-long call, she reviewed with Player: the proposed settlement agreement and its application to him; the effect of his current treatment on a future claim; the impact of his ongoing and past worker's compensation and other disability claims on a future claim under the proposed settlement; and her evaluation of the risks and rewards to Player if he opted out of the

---

[11] We note that Player, through current counsel, appears to fault Pope McGlamry in that it "never even registered [Player] for the Settlement, nor sent [Player] for any MAF neuropsychiatric [sic] or neurological evaluations, or otherwise." (SCM Stmt. at App'x B.) Yet registration was not open at the time Player terminated Pope McGlamry, nor were providers yet designated under the MAF. *See* Settlement Agreement ¶ 6.5(a) (indicating that Claims Administrator would compile list of Qualified MAF Physicians within 90 days after the effective date of the Settlement). This criticism by Collins & Truett of Pope McGlamry, therefore, is completely misplaced and reflects poorly on the degree of care employed by Collins & Truett in this lien dispute and negotiation process.

14

proposed settlement.  These are all tasks that we value as particularly meaningful during this phase of Player's litigation and potential settlement claim.  We also note that this work included individual attention by an attorney, delivering legal advice tailored to Player's individual circumstances and at the apparently difficult stage where his condition was not yet likely to qualify him for any benefit in the concussion settlement.

We recognize that Player has attributed to Pope McGlamry a "lack of adequate representation prior to 2016" and asserted that Pope McGlamry "did not respond to [his] many inquiries during that time seeking updates on [his] case."  (SCM Stmt., App'x B at Grievance p. 1.)  In his recent bar grievance against Attorney McGlamy, Player describes Attorney McGlamry's alleged "malfeasance and improper action of not responding to [his] many inquiries during" the period of representation.  (*Id.*)  He provides no details or documentation of this alleged lack of responsiveness despite being given the opportunity to do so in the lien dispute briefing process under our Rules.  We view these assertions with some suspicion, as Pope McGlamry provided substantiation for its observation that Player's withdrawal was part of a wave of such changes in representation by SCMs as other firms offered more competitive fees.[12]  In addition, Pope McGlamry's Statement of Dispute undercuts Player's (or Collins & Truett's) assertions about a lack of individual attention to Player.  Again, Player had the opportunity to respond to Pope McGlamry's defense of its work in a response memorandum but has not done so, choosing instead to stand on his accusations against Pope McGlamry of making "fraudulent misrepresentations" in

---

[12]  Player may well be someone who was susceptible to the suggestion that he change law firms in pursuit of a lower fee, as this was something that Collins & Truett effectively promoted to him in its own CFA.  *See* SCM Stmt., App'x D at 2 (Collins & Truett NFL Retainer Agreement, noting as to contingent fee that "**Collins & Truett's charge is 15%, which is less than the standard NFL Concussion Settlement fee.**") (all emphases in original).  *See also* Doc. No. 12183 at Ex. A (suggesting Player sought to retain Howard & Associates in April 2016 at a 20% fee contingency).

its lien filing on the question of whether there existed "cause" for his termination of Pope McGlamry's representation.

As is demonstrated in our discussion below, we find that Pope McGlamry provided quality work on behalf of Player and in accordance with the demands of the litigation and anticipated settlement administration at the time of the representation.   We credit Pope McGlamry's submission that in the course of its representation of Player it obtained and reviewed records of Player's medical and playing history; gathered the information necessary to include Player in a multi-plaintiff complaint that it filed against the NFL in early 2012; kept Player abreast of developments in the litigation and eventual settlement discussions; and counseled Player as to whether to participate in the settlement and the criteria that would be necessary to obtain a qualifying diagnosis under the settlement.

### 4.      The substantiality of the work performed

We usually consider the more important question to be the role of the firms appearing before us in the work necessary to obtain the Monetary Award that Player received in this case.   In this context, we look to the contributions of the firm(s), comparing the value added in advancing legal theories and in the work performed individually for the client, with the effect on the ultimate outcome of the client's award.   As we have described in our prior decisions, we look to as many as seven non-exclusive categories of work undertaken by IRPAs who have supported their clients in this litigation:

> (1) review of medical records and necessary actions taken to ensure medical conditions were identified and diagnosed at the earliest possible date;
>
> (2) support of their individual clients to ensure their lawsuit would have evidentiary support should the matter proceed to trial;
>
> (3) review of other litigation that was related to ensure claims in this

litigation would not be negatively impacted;

(4) support of their individual clients in understanding the ongoing settlement negotiations and risks, and in ultimately making the determination of whether to opt out of the class;

(5) shepherding the individual client through a claims process from registration to receipt of a Monetary Award;

(6) support of clients who were seeking loans and were exposed to predatory lending practices; and

(7) providing necessary support in other personal matters collaterally related to this litigation.

In no way is it expected that an IRPA's work will cover each of these categories. We will, however, use these categories as checkpoints as we consider the substantiality of Pope McGlamry's efforts as an IRPA and the role Pope McGlamry played in the eventual receipt of an award to Player.

The substantiality of Pope McGlamry's work between late 2011 and mid-2016 in securing the Monetary Award that Player ultimately received is necessarily reduced given the work of firms acting for the common benefit that clearly "reduced the amount of work required of" individually-retained counsel to achieve a recovery for retired NFL players for brain injuries. (Doc. No. 9862 at 4).

Ultimately, the period of Pope McGlamry's representation of Player largely overlapped with the time of the most significant work of Class Counsel. That does not mean its work was insubstantial. As we outlined above, Pope McGlamry ensured that Player was a party to the litigation and was being informed about the developments leading to the settlement. Pope McGlamry obtained medical, head injury, and playing histories as to Player. It provided counsel on Player's individual case to support a future claim. Pope McGlamry performed quality work in

considering the information that was available as the proposed settlement came to be announced. Pope McGlamry's work largely related to factors (1) and (4) of the non-exhaustive list above.

As we synthesize this information to assess how to apportion fees for the representation provided to Player that yielded the positive outcome of a Monetary Award, we are cognizant that several groups of attorneys contributed to the work necessary to obtain that Award: Pope McGlamry acting for Player individually, prior to the final approval of the settlement; Class Counsel and law firms that acted for the common benefit in negotiating and defending the Settlement Agreement, as well as the further negotiation in 2021 as to the criteria for the qualifying diagnoses of "Neurocognitive Impairment" at the various levels; the firm (Law Offices of A. Craig Eiland) that registered Player when registration opened in February 2017 and which had an unknown role thereafter; and Collins & Truett, which agreed to represent Player and submit his claim after he had already undergone a BAP exam and as new scoring protocols were being adopted that were pertinent to claims, like his, of neurocognitive impairment.

Pope McGlamry's role in bringing about Player's eventual award warrants less than the 20% fee that it requested in its opening brief. However, we do not adopt the approach of Player and Collins & Truett, articulated in their Statement of Dispute, that in participating in this lien dispute process, "Mr. McGlamry has chosen to consume judicial resources to see how much money he can *take* from [Player's] settlement," nor do we approve of their characterization as to "the **menial** amount of work" done by Pope McGlamry. (SCM Stmt. at App'x B (all emphases in original).) Collins & Truett has failed to demonstrate that the lien filed by Pope McGlamry could or should be deemed "fraudulent." *See also id.* (characterizing Pope McGlamry's lien as

"fraudulent" and an "unfortunate deceit presented to" the Court).[13]   Nonetheless, because it was

terminated, Pope McGlamry was not in a position to register Player nor advise and accompany

him through testing and eventual claim submission.  Rather, it appears that Player's registration in

the Program and scheduling of a BAP exam, which led to Dr. Shukla's diagnosis of a qualifying

condition as of August 18, 2020, occurred during a time that he was represented by neither firm.

Collins & Truett then carried the case to a conclusion in 2022 when it filed Player's claim and saw

him past the appeal period and into what we presume has been a distribution of his award.

We would view the combined roles of these two firms as perhaps worthy of 15% of Player's

award.  When we consider the contributions of each firm to the categories of tasks described above,

valuing each task category based on its significance to this case, we find that the efforts of Collins

& Truett were no more substantial to the result in this case than those of Pope McGlamry.  As

between Pope McGlamry and Collins & Truett, we credit the risk that Pope McGlamry willingly

shouldered when it agreed to represent Player in late 2011 in what would be an uphill legal battle,

and we value the involvement and advice of *attorneys* based upon Player's individual needs that

Pope McGlamry provided in 2014 as compared to the functions of law firm support staff managing

an administrative process in 2022 with the critical diagnostic evidence already in hand.

### B.      Other considerations; exercise of the Court's supervisory power

But other factors have brought us to the conclusion that Collins & Truett should not share

in any part of the IRPA fee here.  These factors relate to: (1) violation of the Lien Rules, which

---

[13]   These accusations nominally arise from Pope McGlamry's statement in its lien filing that it was
not terminated by Player "for cause."  However, Player's subjective view in 2022 as to "cause" for
the termination in 2016 is not dispositive of the question before us. We also recognize that this
position is being advanced through Collins & Truett, which potentially stands to gain a larger share
of the available IRPA fee if we were to find some basis to preclude a recovery by Pope McGlamry.

relate to the integrity of the Settlement Program, and the related failure to take into account the good faith requirements the parties are expected to observe in the Court-supervised attorney lien resolution process; and (2) a violation of an Order of Judge Brody specific to Collins & Truett.

### 1.  Compliance with the attorney lien rules

Our July 7, 2023 Order directed to Collins & Truett touched briefly upon what we understood to be the involvement of each firm in Player's representation and how the two firms engaged in the attorney lien dispute process under the set of Rules approved by the Court in 2018. *See* Doc. No. 12158 at 3-7.  But it set forth in detail our concerns that the manner in which Collins & Truett conducted itself in this lien dispute process was detrimental to the integrity of the Attorney Lien Resolution process.  *See id.* at 7-11.  Inasmuch as we had not allocated disputed fees based upon one party's non-compliance with the attorney lien rules previously, we asked Collins & Truett to justify its fee request in light of its noncompliance with the Lien Rules and the expectation, set forth in one of the Court's early Orders concerning this MDL, that attorneys maintain a professional, courteous, and civil attitude toward all persons involved in the legal system. *See id.* at 15.[14]

The response filed by Collins & Truett on this topic on July 28, 2023 initially referred the Court to a six-page "Clarification Statement," "From the Desk of Dr. Nola Sharon Delaney, Sr. NFL Claims Specialist for Collins & Truett Attorneys, P.A."  *See* Doc. No. 12193 at 3.[15]  That statement responded to aspects of the chronology of Player's representation and claims status that we had set out in our Show Cause order.  *See* Doc. No. 12193-1 at 2-6.  The portion of the response

---

[14]  We do not otherwise recount that discussion again here and instead refer the reader to that document.

[15]  The various documentation provided by Collins & Truett includes references to Dr. Nola Sharon Delaney, Sharon Delaney, and Nola Delaney.  We presume that they refer to a single individual.

that was signed by Attorney Collins, however, addressed more directly the concern we expressed in our Order about how the firm comported itself, inasmuch as Attorney Collins acknowledged that he "may have been more assertive with Pope McGlamry than with any other Lienholder that he has encountered." Doc. No. 12193 at 3.  He sought to assure that his approach was "certainly not the norm for Collins & Truett in their history of confronting Attorney's Lien Disputes[.]" *Id.* He attributed "this assertiveness and expressions of disappointment in dealing with the Pope McGlamry law firm" to his firm's "attempt[] to strike a balance between our client[']s utter, and almost uncontrollable rage" concerning the lien petition that Pope McGlamry filed in 2016 and "the role of Counsel in typical Attorney's Lien Disputes." *Id.* [16] He explained that "the seemingly brazen Petition for Lien" filed by Pope McGlamry and the "collective dismay at this behavior" led him to "elect[] to take an assertive approach when confronting Pope in this Lien Dispute." *Id.* at 4.  Attorney Collins apologized to the Court and to Pope McGlamry "if they both feel as if he may

---

[16]  The response also reflected that Attorney Collins was himself "dismay[ed]" by the statement in the lien petition that Pope McGlamry had not been terminated with cause and that the termination was not due to any malfeasance or other improper action.  *See* Doc. No. 12193 at 3.  Attorney Collins's response seemed to fixate upon Player's termination letter to Pope McGlamry in 2016, which conveyed that Player did not believe the firm had "done anything to pursue [his] claim." *Id. See also id.* at 4 (continuing to argue that the lien petition was "a genuine and material misrepresentation of the facts" and "seemingly brazen").  As we have noted, at the time Player terminated Pope McGlamry, the proposed settlement was still being challenged on appeal, the claim program had not opened, and MAF physicians had not been designated.  Moreover, subsequent development of Player's claim through subsequent counsel did not substantiate a compensable claim until 2020.  Perhaps Player believed that counsel should have been doing more in 2016, but we cannot say that Pope McGlamry's termination in 2016 was somehow objectively warranted.

We would characterize the Pope McGlamry lien petition at worst as formulaic and comprised of largely stock language.  We also note, however, that the averments as to the circumstances of the termination of representation by Player are largely immaterial for purposes of disposition of the attorney lien given the subsequently-enacted Attorney Lien Rules and the resolution process those Rules established.  Player's personal assessment of Pope McGlamry's performance as his counsel is something that may be taken into consideration by us, but it is a subjective belief, not an objective fact.

have taken an assertive approach in this one instance," and took pains to note that "this is not the typical demeanor in which the Collins firm, et.al., conduct their affairs." *Id.* He saw fit to further explain that he was "assuredly taken aback at their (*sic*) client's rage over this situation, all while tempering his own interpretation of this occurrence." *Id.* (*sic*).

The response then addressed the subject of the Georgia Bar Complaint, suggesting that it was at the client's insistence that Collins & Truett conveyed that Player would file a bar complaint if Pope McGlamry continued to seek any payment "for their alleged work on his case." *Id.* The response refers repeatedly to the "disparity" between the language in Pope McGlamry's lien petition as to the circumstances of its termination and the assertions of Player in his withdrawal letter that he did not believe the firm had "done anything to pursue [his] claim." *Id.* at 4-5. Attorney Collins again provided an apology "if" his actions, "this one time," "may have edged toward non-compliance with the Lien Rules, or with the Pennsylvania Rules of Professional Conduct" – neither of which he otherwise acknowledged or discussed in the response. *Id.* at 5. He vowed that his firm would "be more mindful going forward" of these Rules. *Id.* "And, we seek mercy and understanding of the atypical circumstance that we were placed in in balancing the strong wishes of our client, our dismay at the situation, and our attempt at remaining civil with this Lienholder in the face of the facts presented." *Id.*

We are hard pressed to find any excuse for the behavior of Collins & Truett here. "Assertiveness" is hardly an accurate characterization for the firm's approach, and its apparent inability (or unwillingness) to recognize what was objectionable about its actions inspires little confidence that it knows how to avoid repeating them in the future. We have been involved in the resolution of many attorney lien disputes in this litigation over the last several years, both contested and upon presentation of a proposed resolution by the parties, and we saw nothing "atypical" about

22

the circumstances here.  If the client were "enraged" that some portion of the contingent fee that he agreed would be paid to his individually-retained counsel was being claimed by Pope McGlamry, we would expect that Collins & Truett would counsel him that there was a process established by the Court that provided for a review of such claims and an opportunity for Player to be heard.  No distribution of a fee was going to be authorized to Pope McGlamry based solely upon the assertions of the lien it filed in 2016.  Rather, a decision would be made upon the briefing that was established in the Rules that were subsequently enacted by the Court.[17]

Collins & Truett essentially seeks a free pass for what it suggests is not its usual conduct. Yet despite its conditional apology – it is sorry "if" it came close to crossing a line – its response fails to reflect that it understands where that line falls, that it recognizes what Attorney Lien Rules it violated, or that it has given any thought to what a "professional, courteous and civil attitude toward all persons involved in the legal system," *see* Pa. R.P.C., Preamble, ¶ 9, should look like in this context.  We are given no reason to believe that it understands how to comport itself in the very typical situation such as this one, where Collins & Truett acquired a client who had been previously represented at an earlier phase of litigation or claims administration.  These are not the circumstances that justify the "mercy" that Collins & Truett seeks from the Court.

### 2.  Compliance with the June 15, 2022 Settlement Implementation decision of Judge Brody

The second concern we had as to the propriety of apportioning any IRPA fee to Collins &

---

[17]  We also note that Collins & Truett apparently told Player that it was "compelled to honor his wishes as best as possible" when he allegedly suggested filing a bar complaint against Attorney McGlamry.  *See* Doc. No. 12193 at 4.  It was under no duty, however, to assist him in filing such a complaint, as it appears to have done through the firm's Senior NFL Claims Specialist, Dr. Nola Sharon Delaney.  *See* SCM Stmt. of Disp. at App'x B (reflecting that "Nola Delaney" could be contacted on Player's behalf regarding the grievance).  Rather, it was under a duty to counsel Player that his concerns about whether Pope McGlamry should receive a contingent fee from his award would be addressed in a court-sponsored process.

Truett in this lien dispute arose from its non-compliance with a specific order addressed to the firm by Judge Brody. The circumstances that led to Judge Brody's June 15, 2022 Order are described more fully in our Rule to Show Cause. *See* Doc. No. 12158. Briefly, her Order followed from an Audit Decision of the Special Masters from June 22, 2021 that disqualified particular employees of the former Howard & Associates law firm from further involvement in the Settlement Program. One such former employee, however, a paralegal with a J.D. degree, was then working at Collins & Truett in its NFL concussion practice, and he objected to the Special Masters' decision excluding him from working on behalf of Settlement Class Members. In the Determination opinion resolving his objection, Judge Brody lifted the disqualification of the paralegal after September 1, 2022. However, she specifically "cautioned" Attorney Richard Collins that the paralegal "works under his supervision and cannot engage in the unauthorized and independent practice of law." (Citing Fla. Bar Rule 4-5.3(a).) In furtherance of her supervisory responsibility as to the Settlement, including the propriety of fees charged by IRPAs as to these cognitively-compromised class members, she explicitly ordered that: "*In all pending and future lien proceedings, Collins & Truett must provide a complete accounting of tasks performed by all attorneys and staff.*" (Emphasis added.) That order was issued on June 15, 2022, prior to the date of the lien submissions by Collins & Truett in this case.

The initial submissions of Collins & Truett in this lien dispute were deficient in this respect. Its first submission "in lieu of" a Statement of Dispute was the bar complaint against Attorney McGlamry that attacked Pope McGlamry's representation and lien filing but did not provide any accounting of what tasks any Collins & Truett personnel performed that led to Player's award. When the firm was reminded by the Claims Administrator of the requirements of the Lien Rules about the content for a Statement of Dispute, it provided a chronology providing some information

about what the firm did on behalf of Player.  It identified tasks undertaken on particular dates but did not reflect who performed the functions.  *See* SCM Stmt. at App'x A.

After we filed our Rule to Show Cause, Collins & Truett submitted a revised chronology, adding an additional entry for one date and leaving off the entries previously listed that post-dated the receipt of the Notice of Monetary Award.  *See* Doc. No. 12193-2.  We acknowledge that Collins & Truett has now complied with the aspect of the Settlement Implementation Determination that contained an Order from Judge Brody directed to it.  While we are now satisfied that its earlier failure to comply with her Order should not preclude it from receiving an IRPA fee, we find that the firm's conduct as to this obligation contributes to our conclusion that "mercy" towards Collins & Truett is not warranted here.  Rather, the accounting that Collins & Truett provided only solidified our view that it lacked any justification for the tack it took in this lien dispute, and it suggests that the firm's work in this area is largely being undertaken by unsupervised non-attorney staff who are not familiar with the Rules of Professional Conduct and ethical rules.  And of course this was precisely the concern that caused Collins & Truett to come to Judge Brody's attention in the first place.

We note that the revised chronology submitted by Collins & Truett reflected that: all of the time entries previously set forth involved staff member Sharon Delaney; that only the newly-added entry, from April 20, 2022, reflected a task performed *solely* by Richard Collins ("draft, deliver, and discuss retainer agreement"); and that *three* entries involving Sharon Delaney also included participation by Richard Collins.[18]  *See* Doc. No. 12193-2.  The "Clarification Statement" of Dr.

_____

[18]  These were for the "initial meeting with [Player] in person" on April 19, 2022, to which was added "and by phone," presumably to reflect the method of Attorney Collins's participation from Florida in an otherwise in-person meeting in Texas; a "phone call with client" on May 16, 2022; and the entry of May 25, 2022 reflecting that Attorney Collins and Ms. Delaney "analyzed claim

Nola S. Delaney, Sr. NFL Claims Specialist, which Collins & Truett appended to its Show Cause

Response, also touched upon the matter of Judge Brody's directive:

> Speaking for myself, I sincerely apologize for not reminding Mr. Collins to include the names of the individuals that worked with [Player] and the NFL Claims Administrator during the drafting of the "Chronological List," and one of Mr. Collins' additional tasks on April 20, 2022.  Until further notice from the Court, I will ensure that all tasks, and the names of all attorneys and staff are incorporated into subsequent lists during my review of the chronology, and prior to submission to the NFL Claims Administrator while responding to future Attorney's Liens.

Doc. No. 12193-1 at 6.  The Response signed by Attorney Collins similarly stated that he and Ms.

Delaney would "collectively strive to do better" in adhering to Judge Brody's Order going forward.

Doc. No. 12193 at 2.  But before Attorney Collins offered this assurance, he provided a preculiar

lament on the burdens associated with this work and a passive-aggressive jab at Judge Brody's

Order, both of which are recounted here:

> Above and beyond the responsibilities of most, if not all other attorneys and law firms engaged in the process of resolving lien's (*sic*) for this NFL Concussion Settlement, the Undersigned's law firm, Counsel for SCM R.B., has been tasked with *an additional and onerous task* of providing "a complete accounting of tasks performed by all attorneys and staff in all pending and future lien proceedings," in perpetuity, as ordered by Honorable Judge Brody in a June 15, 2022 Settlement Implementation Determination. This Determination, *an effective sanction upon the Collins & Truett law firm, with no termination date*, is due to *alleged* past wrongdoing of an on-again-off-again part-time independent contractor, during his previous job as an intern at another law firm in 2017.

> The Undersigned acknowledges Judge Brody's June 15, 2022 Determination, and is committed to abiding by its provisions until potential further notice from the Court. However, admittedly, in the midst of being engaged in *the already arduous Lien Resolution process*, actively and properly addressing the ongoing and pressing needs of our many other NFL and personal injury

---

in portal – submitted claim." *See* Doc. No. 12193-2.

> clients, scheduling for MAF and BAP testing, and undertaking the
> very rigorous pace of a normal personal injury Plaintiff's law
> firm, all with a somewhat limited staff, the Undersigned had sincerely
> overlooked the mandated completion (*sic*) *this unique task handed
> down to him from Judge Brody*.

Doc. No. 12193 at 2 (emphasis added). As we indicated above, this approach does little to inspire

confidence in the firm's judgment nor does it incline us to show the "mercy" requested of the

Court.

The Response filed by Collins & Truett also reflects no appreciation of the concerns that

motivated the June 15, 2022 Determination in the first place and the need for attorney supervision

of non-attorney staff. Granted, those concerns derived from the employment of a former Howard

& Associates paralegal, and where the Court apparently wanted to ensure that he did not spread to

Collins & Truett any of the Howard firm's objectionable practices. Collins & Truett's submissions

in this lien dispute ultimately do not reflect that that gentleman was involved in the firm's

representation of Player, although he was copied on one email communication from Attorney

Collins to Pope McGlamry about the lien dispute. To be sure, the representation of Player seems

largely driven by Sharon Nola Delaney. But neither is she an attorney. And the Response signed

by Attorney Collins does not address the extent of his supervision of *her* work, which does not

even occur in the same state, much less in a shared office setting. Given that the Response

submitted by Attorney Collins reflects Ms. Delaney's significant involvement in the

representation, it would seem that the deficiencies we described above in terms of failure to adhere

to the Lien Rules might well reflect inadequate supervision by Attorney Collins of Ms. Delaney.[19]

---

[19] What is also noteworthy in the Response as to the question of compliance with Judge Brody's
Order is a minimization of the concern for the protection of SCMs who retain Collins & Truett
where the firm, with apparently only one licensed attorney, might unduly rely upon a staff member
who bore some taint from the operations of the Howard firm. For example, Attorney Collins refers

Collins & Truett's response to the Show Cause Order cured the prior noncompliance with Judge Brody's Order as it applies to this lien dispute. However, the response has only increased our concern that Attorney Collins may not be providing the required supervision of non-attorney staff.

**C.        Allocation**

We have no trouble allocating an IRPA fee to Pope McGlamry in recognition of the tasks that it performed successfully on behalf of Player between late 2011 and when it was terminated in July 2016. As a result of Pope McGlamry's guidance and counseling, Player did not opt out of the Settlement but remained in position to benefit from the free BAP exam in or around 2020 that ultimately qualified him for an award in 2022. We value that work at 10% of Player's Monetary Award.

As shown above, we conclude that awarding any portion of the balance of the available IRPA fee to Collins & Truett would effectively undermine the Attorney Lien Rules and offend the integrity of the Settlement Program. The tasks performed by Collins & Truett likely would have warranted a fee allocation in some proportion, inasmuch as it filed the claim form on behalf of Player in May 2022. But we cannot give the Court's imprimatur to the behavior of Collins & Truett through a fee award where it has failed to comply with so many of the Court-approved Lien and Professional Conduct rules that are designed to ensure an orderly resolution of these matters. *See supra* pages 20-23 (addressing compliance with attorney lien rules). We find it appropriate to

---

to "alleged past wrongdoing" of an individual during a previous position as an "intern" at Howard & Associates. *See* Doc. No. 12193 at 2. He also characterizes this individual's role at Collins & Truett as "an on-again-off-again part-time independent contractor." *Id.* Yet the Collins & Truett website features this individual as a "senior paralegal" and the only other member of "The Collins & Truett Team" aside from Attorney Collins himself. Concerns about his role in the operations of the firm as to class member clients are warranted.

exercise the court's "supervisory power over the members of its bar." *Dunn v. H.K. Porter Co., Inc.,* 602 F.2d 1105, 1109 (3d Cir. 1979). We will direct that the remaining portion of the available IRPA fee be refunded to Player.

**D.    <u>Costs</u>**

Pope McGlamry seeks $564.27 in costs, reflecting copying charges, the cost of retrieving medical records in 2012, and other administrative expenses such as court filing fees. Player did not dispute the legitimacy of these charges, and they are reimbursable to Pope McGlamry under the terms of its CFA. We will award these costs to Pope McGlamry.

An appropriate order follows.