### Special Masters' Rule 27 Decision on the Report of Adverse Finding Regarding Douglas Grossinger, Feder Law, Pro Athlete Law Firm, Syme Law, Reppert Oates & Vytell, and Associated Class Members

A strikingly similar pattern runs through ninety-eight Parkinson's Disease claims submitted or developed by five different law firms over the past few years:

- First, the Settlement Class Member (SCM) is evaluated by a private consultant or non-Program doctor, paid for and selected by the SCM's attorney under financial terms that are not disclosed to the Program. The non-Program doctor diagnoses the SCM with Parkinson's Disease, documents the SCM's purported symptoms, and usually issues a prescription, typically for levodopa, a powerful Parkinson's Disease medication that masks or suppresses those symptoms.
- Only then, armed with documentation of prior clinical findings and a levodopa prescription, does the SCM undergo an examination with one of the Settlement Program's Qualified Monetary Award Fund (MAF) Physicians.[1] By the time of the MAF examination, the SCM often presents with few, if any, observable symptoms. The MAF Physician, faced with a patient who looks well but arrives with outside records describing prior complaints and an active prescription that has apparently masked them, defers to the paperwork.
- Finally, with a Qualifying Diagnosis in hand, the SCM submits a Claim for benefits through the Settlement Program. The Program's reviewers see only the final Diagnosis—not the sequence that produced it.

These submissions share a common origin: an organized scheme, uncovered by the Claims Administrator's Audit, in which these law firms—and potentially others—circumvented the Settlement's anti-fraud safeguards and laundered questionable Parkinson's Disease diagnoses into payable claims.

The five law firms identified to date are Douglas Grossinger, Attorney at Law; Feder Law, LLC; Pro Athlete Law Firm, P.A.; Syme Law, PLLC; and Reppert Oates & Vytell, LLC (ROV).[2] Of the ninety-eight submitted claims, fifty-seven were approved and paid before the scheme was detected, four were denied or withdrawn, and thirty-seven are currently pending.[3] The fifty-seven approved Monetary Awards total over 95 million dollars, an amount the NFL Parties have funded

---

[1] MAF and BAP Physicians are contracted with the Program and are the only doctors permitted to render Qualifying Diagnoses. In return for this privilege, they agree, among other things, to comply with certain anti-influence rules, as well as to conform their diagnostic practices to the Settlement's published guidance.

[2] Prior to June 2025, the firm was named Reppert Kelly & Vytell. We will refer to it as ROV in the text.

[3] As noted in the Appendix, two of these ninety-eight claims were submitted by a non-subject firm, but because the non-Program diagnosis and/or Qualifying Diagnosis of Parkinson's Disease was rendered during representation by a subject firm, they are included in this Audit decision. These are SPID 100002017—an approved and paid Claim submitted by Byron Cuthbert and Associates, with prior representation by Feder Law—and SPID 100006536—a pending Claim which was submitted while the Player, who is now *pro se*, was represented by JR Wyatt Law, with prior representation by Pro Athlete Law Firm.

in full.[4] Attorneys at the five subject law firms together collected (or are due to collect) roughly 20 million dollars in attorney's fees from these Awards. And now, the Program has reason to doubt the diagnoses underlying all of them.

That uncertainty is itself alarming. Some of the Retired NFL Players subject to this Audit are almost certainly suffering from debilitating diseases. Others may not be, instead having been diagnosed not by treating physicians but by "forensic" doctors paid for by the Players' lawyers to render diagnoses. These lawyers' referral patterns, omission of material facts about the manufactured diagnoses, and lack of forthcoming response to scrutiny have made it impossible to tell good claims from bad. They have cast doubt on every Parkinson's Disease Claim going forward, and thus the Claims Administrator's ability to reliably pay only true Qualifying Diagnoses. Class Members who took potent medications—with significant side effects—to treat a disease they may not have are entitled to answers. So are the attorneys and medical professionals who witnessed this behavior and reported their concerns to the Program.

The Settlement Agreement creates powerful tools to prevent, investigate, and punish fraud. Section 10.3 of the Amended Class Action Settlement Agreement defines the Settlement's Audit mechanism, giving the Claims Administrator broad authority to conduct Audit investigations and make factual findings. Section 10.3(i) states that it is the Claims Administrator's role during an Audit to "determine[] [whether] there has been a misrepresentation, omission, or concealment of a material fact made in connection with the claim." This Audit proceeding is in some ways more extensive than any in the Program's history. But it operates under the same authority and the same rules as every Audit before it.

On December 12, 2025, after months of investigation, the Claims Administrator issued an exhaustively researched Audit Report, consisting of 81 pages and 70 pages of exhibits. It concluded:

> [A]t this time we have sufficient information to determine there is a reasonable basis to support a finding of misrepresentation, omission, or concealment of material fact in connection with [the Parkinson's Disease] Monetary Award Claims submitted. Under Audit Rule 12(c), a fact is material if it "did affect or has any potential to affect" a Monetary Award. The facts about how [Parkinson's Disease] diagnoses rendered outside the Program later proffered and relied upon by MAF Physicians came to be established are material because they affect or have the potential to affect determination of an Award for a [Parkinson's Disease Qualifying Diagnosis].

Audit Report at 80.

---

[4] The NFL Parties fund Awards once the Claims Administrator has approved a Qualifying Diagnosis and the appeals period has run. Of the 95 million dollars funded by the NFL Parties, over 87 million dollars has been paid to claimants, with the rest withheld due to holdbacks, pending liens, or this Audit.

Each subject law firm and each potentially affected Claimant had the chance to reply.[5] The responses submitted by the five subject firms were voluminous. Mr. Grossinger submitted 26 pages of briefing and 1,034 pages of exhibits. Feder Law submitted 8 pages of briefing. Pro Athlete Law Firm submitted 24 pages of briefing and 204 pages of exhibits. Syme Law submitted 4 pages of briefing and 58 pages of exhibits. ROV submitted 21 pages of briefing and 180 pages of exhibits, including extensive affidavits from its principals. The NFL Parties filed a relatively short 25-page rejoinder. And seven individual SCMs filed responses, while one law firm filed an omnibus response.[6] Having reviewed these materials with care, we now issue this decision under Audit Rule 27.

In doing so, our task is narrow. We must decide (1) whether the Claims Administrator had a "reasonable basis" for its determination,[7] and (2) if it did, what remedies are appropriate.[8]

We find that the Claims Administrator's determination had a reasonable basis, and deny thirty-seven pending Parkinson's Disease claims. The Audit establishes that each of the five subject law firms consistently prepared and submitted claims using a process designed to surreptitiously outsource clinical judgment to non-Program forensic diagnosticians. With the exception of ROV, these firms also regularly misrepresented the attorney of record in claim filings to hide suspicious patterns. These patterns have compromised their clients' claims, and we therefore require that Class Members start afresh.

That leaves the law firms. They followed a common process that subverted the Program's diagnostic system. When the Audit began to expose the arrangement, they notably refused to reasonably cooperate, obstructing the Claims Administrator's investigation of others who may

---

[5] Each individual Claimant, though they were not the direct subject of the Audit, might have their pending or future claims affected by it. On April 24, 2026, the Claims Administrator at our direction informed each of these ninety-eight claimants—with previously paid, pending, or denied/withdrawn Parkinson's Disease claims—about the Audit investigation. The Claims Administrator advised each Claimant that they could obtain a copy of the Audit Report from their attorney, or from the Claims Administrator if the Claimant is now represented *pro* se or by a new firm, as well as the briefing written by the attorney on record with the Program as having represented them at the time of their Claim's submission and the NFL Parties' response. Any responses were due by May 26, 2026.

[6] The notice providing for these responses stated that SCMs had the right to respond by May 26, 2026, through an "individual response to the Audit Report [made through] your law firm, if you are represented by a lawyer, or directly to the Claims Administrator by the deadline shown at the top of this Notice." On June 3, 2026, Locks Law Firm submitted an omnibus response on behalf of SPIDs 100000291, 100000701, 100001935, 100002632, 100003271, 100003382, 100004713, 100006626, 100007450, 100010106, 100010271, 100012594, 100012725, 100012925, 100014129, 100014820, 100014849, 100015742, 260000953, 950007919. It appears that Locks Law Firm misunderstood what the notice permitted and the import of its deadline, perhaps having been confused about the latter due to an extension it received from the Claims Administrator to respond to a different matter. To avoid any possible prejudice to the SCMs, we read and considered the omnibus response. Without citation to prior Audit decisions or the rulings of the District Court, it repeats arguments made by the subject firms and other individual SCMs—which we consider below—about the need for individualization, and the (asserted) requirement that the Claims Administrator prove that the claimants did *not* have Parkinson's Disease. Locks Law Firm also defends its practice of having both "referral counsel" and "co-counsel" relationships with the subject firms.

[7] Audit Rule 28.

[8] Audit Rule 31.

have been involved. Under Section 10.3(i) of the Settlement Agreement, we therefore disqualify Douglas Grossinger, Attorney at Law; Feder Law, LLC; Pro Athlete Law Firm, P.A.; Syme Law, PLLC; and Reppert Oates & Vytell, LLC from further participation in the Program. They will bear the costs of this Audit proceeding. Other financial consequences are described below.

### HOW THE SCHEME WORKED: RECRUIT, DIAGNOSE, DISGUISE

Last year, after receiving several credible tips, the Claims Administrator began a thorough Audit investigation. Despite its limited fact-gathering powers, the scheme's layered and confounding design, and the subject firms' failure to cooperate, the Claims Administrator was able to confirm its existence and basic contours. We outline those findings here. The facts we describe are derived from the Audit Report.

Mr. Douglas Grossinger, a Philadelphia-based attorney, created and orchestrated the scheme. Audit Report at 10-12. In addition to submitting fifteen Parkinson's Disease claims himself as attorney of record, Mr. Grossinger farmed cases out to Feder Law, Pro Athlete Law Firm, Syme Law, and others. *Id.* at 27-38. Using off-the-books "co-counsel" arrangements, these three firms submitted claims on Mr. Grossinger's behalf to hide their true origin. *Id.*

The final firm—ROV—was apparently not involved with Mr. Grossinger directly as co-counsel, but instead ran its own, highly analogous arrangement.[9] *Id.* at 79. ROV's practice may have been inspired by early communications between the firm's attorneys and Mr. Grossinger. *Id.* Most notably, Mr. Oates is a Retired NFL Player, and his career in the NFL would make him eligible to participate in the Settlement Program. *Id.* at 17-18.

The scheme, in essence, worked in three steps: (1) recruit Retired NFL Players as clients, (2) obtain Qualifying Diagnoses of Parkinson's Disease using non-Program medical records, and (3) in non-ROV cases, funnel the resulting claim submissions through seemingly independent law firms.

### 1. Recruit

The Audit Report charges that Mr. Grossinger (on behalf of his cover firms) and ROV targeted represented and unrepresented SCMs alike, promising them a lucrative Qualifying Diagnosis of Parkinson's Disease.

Mr. Grossinger's reputation for using these tactics was widely known. *Id.* at 10. An SCM interviewed by the Claims Administrator noted there was "one attorney that everyone talks about in connection with [Parkinson's Disease] claims—Doug Grossinger." *Id.* at Exhibit O (cleaned up). Mr. Grossinger's outreach was "aggressive" and Mr. Grossinger's clients regularly "boast about how many clients he has and his successes." *Id.* Two attorneys separately reported that Mr.

---

[9] For the sake of analytical and rhetorical simplicity, this decision often lumps together the stratagems used by both Mr. Grossinger (and his associates at Feder Law, Pro Athlete Law Firm, and Syme Law) and ROV. Where relevant, we detail the differences between the two.

Grossinger had promised Diagnoses to various SCMs they knew. *Id.* at 21, 26. The Audit Report describes one as concluding that "Mr. Grossinger has the ear of Retired Players because of his success in getting [Parkinson's Disease] diagnoses for his clients." *Id.* at 26.

ROV adopted a similar recruiting strategy, leveraging Mr. Oates' status as a former NFL Player and his connections to the NFL Alumni Association to win the trust of prospective clients. *Id.* at 72. According to informants the Audit Report credits, he cold-called Retired NFL Players, promising a Diagnosis of Parkinson's Disease if the Players switched their representation to ROV. *Id.* at 26. Mr. Oates also attended NFL Alumni events, where attendees reported that he is "in essence, promising them a [Qualifying Diagnosis of Parkinson's Disease] if they switch to ROV." *Id.* at 72. In his recruiting pitch, Mr. Oates "is known to tell the Retired Players that [ROV] 'can get you across the finish line' and will do so faster than their current attorney." *Id.* While ROV admits it engages in this sort of outreach, it characterizes the contact as "conversations" arising from word of mouth. *Id.* at 72-73.

According to attorneys whose clients were recruited by Mr. Grossinger and ROV, the recruitment pitch was targeted at Retired Players who were not obviously diseased. One attorney, whose client left for Mr. Grossinger (via Feder Law), believed that the former client "showed no indication" of Parkinson's Disease. *Id.* at 23. Another attorney, whose client also left for Mr. Grossinger (via Pro Athlete Law Firm), stated that he is "not yet convinced the client has Parkinson's disease." *Id.* at 24-25. And this attorney "expressed his belief" that a client who left for ROV "is not impaired based on his familiarity and knowledge of his medical status." *Id.* at 26. Moreover, the evidence suggests that at least some SCMs knew that Mr. Grossinger and ROV were recruiting them to submit claims for a disease they did not have. For example, one SCM remarked that he was "getting Parkinson's disease" through Mr. Grossinger, seemingly acknowledging the fact that he did not currently have the disease but would soon receive a diagnosis for it. *Id.*

Unsurprisingly, client switching leads to conflict, and accusations of "poaching" abound in the Program. The Special Masters oversee the resolution of such disputes in the Program's lien resolution process, after an SCM has been approved for a Monetary Award. That lien process is public, and necessarily reveals details about who did what work, with what costs, and to what end. Mr. Grossinger was aware that his aggressive recruiting tactics would inevitably lead to similar tensions with former attorneys. The Audit Report charges that on at least one occasion, to avoid a public lien dispute, Mr. Grossinger proposed off-the-books "pre-arranged lien resolution[s]" to smooth things over in advance with these attorneys. *Id.* at 25. The Audit Report illustrated that packaged resolution as follows.

Essentially, Mr. Grossinger proposed paying the terminated attorney $75,000 up-front, while the SCM would pay the attorney an additional $25,000 from his eventual Award. *Id.* The SCM—whose new official attorney of record was Pro Athlete Law Firm—planned to pay Mr. Grossinger a $150,000 "bonus" in addition to 10% of his Award, in accordance with a verbal retainer agreement.[10] *Id.*

The Claims Administrator concluded that this "pre-arranged lien resolution" was designed to "secure cooperation through a financial interest and avoid exposure of the arrangement." *Id.* In this case, the attorney declined Mr. Grossinger's proposal and reported it to the Claims Administrator, expressing that "[t]hese financial arrangements raise serious ethical concerns, particularly regarding how they were framed and the influence exerted." *Id.* This attorney noted that Mr. Grossinger had not provided the SCM with a written copy of any agreements and "all communication with Mr. Grossinger had occurred through phone or text . . . to avoid creating a discoverable paper trail." *Id.* at 24. Because these "pre-arranged lien resolutions" were apparently neither documented nor disclosed, it is impossible to determine at this time how widespread their use may have been, whether they routinely violated the Court's fee cap, or whether ROV used them as well.

## 2. Diagnose

The Audit Report reports that the next step was to obtain a Qualifying Diagnosis of Parkinson's Disease, certified by a Qualified MAF Physician, which could be used to assert a claim for a six or seven-figure Monetary Award. Parkinson's Disease can be a challenging diagnosis to make, often requiring observation over time to rule out alternatives which are non-compensable, such as Lewy Body Dementia, or Parkinsonian Progressive Supranuclear Palsy.

---

[10] Had these payments occurred, this SCM would have paid in attorney's fees: $175,000, plus 10% of his Award, plus any additional amount owed to his new attorney of record, Pro Athlete Law Firm. Depending on the size of the SCM's eventual Monetary Award, these payments could easily have violated the Court's 22% fee cap for IRPAs (21% with a 1% withholding for the Common Benefit Fund, previously the withholding was 5%). ECF No. 9862, Memorandum Accompanying Order Capping Fees to Individually Retained Plaintiffs' Attorneys (Apr. 5, 2018); ECF No. 9863, Order Capping Fees to Individually Retained Plaintiffs' Attorneys (Apr. 5, 2018).

The Audit Report alleges that Mr. Grossinger's solution—later adopted by ROV—was to create a seemingly legitimate medical history outside of the Program *before* any official MAF examination took place inside of the Program. By structuring their clients' evaluations in this way, Mr. Grossinger and ROV deliberately put MAF Physicians in a position where they had little choice but to defer to manufactured outside records. They also cherry-picked specific MAF Physicians who were apparently more willing to provide Qualifying Diagnoses.

### a.  Parkinson's Disease under the Settlement Agreement

The Settlement Agreement states: "[A] Qualifying Diagnosis of . . . Parkinson's Disease . . . shall be made only by Qualified MAF Physicians."[11] Qualified MAF Physicians are vetted and continually monitored by the Claims Administrator.[12] As an aspect of its uncapped, open-ended nature, the Settlement built in the idea that Program-monitored doctors must be doing the key diagnostic work.

MAF Physicians must be board-certified, have expertise in neurology, possess an unrestricted medical license, and have unrestricted hospital staff privileges.[13] In addition to these requirements, which ensure that MAF Physicians have the requisite medical training and skill to properly evaluate SCMs, the Rules Governing Qualified MAF Physicians set forth several additional prohibitions, aimed at preventing undue influence. These include not accepting gifts of any kind from an SCM or their attorney, not communicating exclusively with an SCM's lawyer, not entering into any financial arrangements that go beyond payment for the medical examination, not conducting MAF examinations at a non-standard location (like a hotel room), and not conducting MAF examinations for any SCM represented by a lawyer for whom the Qualified MAF Physician provides consulting or expert witness services.[14]

To make a Qualifying Diagnosis of Parkinson's Disease, MAF Physicians are instructed to follow the Gelb Criteria, which asks about four so-called "features" or symptoms: (1) resting tremor, (2) rigidity, (3) bradykinesia, and (4) asymmetric onset.[15] At least three out of four features must be present.[16] The Gelb Criteria also instructs neurologists to consider several exclusionary features and the patient's response to levodopa or a dopamine agonist.[17] Under the Program's current diagnostic guidelines, a claimant need not obtain a biomarker—like an alpha-synuclein seed amplification assay, a DaTscan, or a Syn-One Test—to obtain a Qualifying Diagnosis, although the presence of such objective markers can buttress a Claim.[18]

---

[11] Settlement Agreement, Section 6.3(b); *see also* Settlement Agreement, Exhibit A-1(4)(a) (defining Parkinson's Disease as "a diagnosis . . . made by a Qualified MAF Physician").

[12] Settlement Agreement, Section 6.5(b)-(c).

[13]  Network Provider Application at 4, NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=network_provider_application.pdf.

[14] Rules Governing Qualified MAF Physicians 13(a), 13(c), 13(e), 13(j), 13(k).

[15]  Special Master Ruling on Parkinson's Disease and Deference, at 10 (July 1, 2025), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=parkinsons_disease_deference_sm.pdf.

[16] *Id.*

[17] *Id.* at 10-11.

[18] *Id.* at 10 n.8.

During a MAF examination, the MAF Physician "should ordinarily directly observe" these parkinsonian symptoms.[19] One issue, though, is that medications such as levodopa tend to mask those observable signs—in fact, that symptomatic suppression is precisely why these drugs are prescribed to patients. But in the Settlement context, direct observation of parkinsonian symptoms is important. As we have previously written:

> Claimants do not have to stop their treatment by such powerful and beneficial medications to be diagnosed under the Settlement. The AAP emphasized that a trained neurologist should normally be able to discern the telltale parkinsonian signs even when the patient is medicated. That's particularly true when the neurologist follows best practices and personally observes a patient *over time*.[20]

In other words, a MAF Physician's ability to provide an accurate and reliable Diagnosis of Parkinson's Disease to an already-medicated SCM can hinge upon whether that MAF Physician has been given the opportunity to evaluate the SCM on multiple occasions. This is particularly true when claimants are in the early stages of Parkinson's Disease, where their symptoms are more subtle, and—not incidentally, from Individually-Retained Plaintiffs' Attorneys' (IRPAs) perspective—their payable Awards are higher. In such borderline cases, if the MAF Physician only evaluates the SCM once, after the SCM reports that he has begun taking levodopa, then the MAF Physician will be more likely to depend on potentially unreliable outside records. The Audit Report charges that the subject firms knowingly exploited this gap.

### b.  Initial Evaluation with a Non-Program Doctor

To start, rather than immediately sending SCMs to a MAF Physician for a formal MAF examination, Mr. Grossinger and ROV first sent their clients to private, non-Program doctors, where they established seemingly legitimate medical histories.[21]

---

[19] *Id.* at 10.

[20] *Id.* (emphasis in original).

[21] ROV went further. Even before sending its clients to a non-Program doctor, ROV sent them to an initial screening with a paid medical consultant. Audit Report at 68. During its July 9, 2025 interview with the Claims Administrator, ROV readily admitted to the practice: "According to ROV, these consultations are generally conducted via Zoom and paid for by the firm. ROV views the written assessments of these medical professionals as internal attorney work product and uses them to better judge whether the firm should 'invest' in sending a Player for treatment." *Id.* ROV again confirmed its use of these paid consultants in its written responses dated August 20, 2025 and September 26, 2025: "ROV referred some Former Players to medical professional to assist the attorney in assessing whether there was a potential claim; such assessments were typically informal, would constitute privileged and/or work product communications, and [there are] no records maintained for each potential client." *Id.* at Exhibit M, Exhibit N.

But ROV sought to downplay the frequency with which it used them. During the interview, "ROV also explained that they do not send Players for this type of consultation in every case and have used these screening consultations less frequently in their more recent claims." Audit Report at 68. And its written responses assert that "[t]his was not the standard process on all claims." *Id.* at Exhibit M, Exhibit N.

These assertions have been impossible to verify "because ROV does not typically disclose information about these medical professionals in Claim or Audit documentation." *Id.* at 68. ROV "omitted listing these medical professionals

These medical histories follow the same general structure. During an initial evaluation, the non-Program doctor physically examines the Player and describes various parkinsonian symptoms that were purportedly observed. After only a single examination, the non-Program doctor diagnoses the Player with Parkinson's Disease. Either then, or at a follow-up visit shortly thereafter, the non-Program doctor prescribes levodopa or a dopamine agonist, which the Player purportedly begins taking.[22] Some records also report subjective improvement in symptoms after the Player begins levodopa or a dopamine agonist.

Upon review of this pattern, the Appeals Advisory Panel (AAP) noticed several common deficiencies with these evaluations and the medical records they produced. Many of the medical reports were brief and templated. *Id.* at 47. In several instances, the non-Program doctor only barely described a neurological exam. *Id.* They often issued diagnoses without reviewing prior medical records detailing years of symptoms, some of which complicated or contradicted a finding of Parkinson's Disease. *Id.* at 47-48, 71. And the AAP was alarmed by the "uniform practice of prescribing carbidopa/levodopa to all patients with possible [Parkinson's Disease] after just an initial visit," which it asserted is "outside usual medical practice." *Id.* at 48.

Moreover, Mr. Grossinger and ROV repeatedly relied on the same non-Program doctors to perform these initial evaluations, raising red flags. These non-Program doctors were not vetted by the Program and thus were not subject to its strict requirements. Dr. Jeffrey Steinberg, one of the most frequently used non-Program doctors, who performed initial evaluations in eight Parkinson's Disease submissions, was neither board-certified nor known to be a movement disorders specialist. *Id.* at 46. And even if he were, Dr. Steinberg would have been ineligible for

---

on the Health Care Provider History forms [the Claims Administrator] asked [ROV] to complete" during the Audit investigation, and it does not regularly "shar[e] [the consultants'] medical reports with MAF Physicians." *Id.* Nor is there any indication that ROV ever disclosed the specifics of its financial relationship with these screening consultants to MAF Physicians or the Claims Administrator. We discuss the implications of that non-disclosure in more detail later in this decision.

In ROV's two written responses, it cited the unavailability of the information. It explained that "[m]aintaining such records would have been and is impossible . . . ROV does not have records as to how many total Former Players consulted with a medical professional prior to representation." *Id.* at Exhibit M, Exhibit N. But in its brief, ROV admitted that it *had* maintained and produced records from these consultants, but only those it deemed "relevant to claims actually submitted." ROV Brief at 12. Not incidentally, ROV points out that those "relevant" records only ever "bolstered the SCM's case." *Id.* ROV continues to assert that these records—and the circumstances that produced them, including payment terms with consultants—are privileged. *Id.* at 12-13.

While the use of screening doctors was primarily an ROV tactic, Mr. Grossinger also appears to have utilized them as a first step in at least some cases. Audit Report at 33, 34 n.58. These doctors typically expressly disclaimed that they were treating physicians, rather describing the purpose of the appointment as forensic or diagnostic.

This may well be an attempt for such physicians to escape fiduciary obligation. We relay this only descriptively. That some of these forensic doctors prescribed medicine does not appear consistent with the hope that they can avoid liability.

[22] This is a general pattern: each individual case file may contain variants.

consideration as a MAF Physician because of his past bankruptcy, federal tax liens, and civil judgments. *Id.*

The Claims Administrator's investigation also uncovered an apparent gift-in-kind from Mr. Grossinger to Dr. Steinberg: an invitation to attend Mr. Grossinger's extravagant Super Bowl party in New Orleans on February 7, 2025. *Id.* at 49-50.[23] While Mr. Grossinger disputes sending the invitation, Dr. Steinberg produced it specifically in response to a request for documents related to Mr. Grossinger. *Id.* The party invitation lists thirty-eight retired NFL Players who were expected to attend. *Id.* at 50-51. It is unclear if Dr. Steinberg accepted Mr. Grossinger's invitation, or whether any other non-Program doctors were similarly gifted an invite. *Id.* at 50.



The Claims Administrator concluded that "the invitation can reasonably be viewed as an attempt to sway Dr. Steinberg's professional judgment and/or create a sense of obligation to the firm(s)." *Id.* at 51. It also confirms the report from another attorney that Mr. Grossinger's relationship with non-Program doctors was "too clubby." *Id.* at 20. Mr. Grossinger's response confirms the basic details:

> Grossinger and friends held a party event in New Orleans along with other Philadelphia area friends including accountants, those in insurance etc. who were also fans of the Philadelphia Eagles. Some NFL players were invited, and as occurs

---

[23] As the Audit Report notes, the cropped text apparently reads "Eagles/NFL Players Private Dinner".

often for these Super Bowl events with many NFL players in town, many NFL players suggested to add their friends on the list, Grossinger and the other Philadelphia friends did not necessarily know many who were asked to be put on list, and many never attended. That the doctor received the party notice was not an intention for gift in kind.

Grossinger Brief at 24.

More broadly, it was reasonable to conclude that these non-Program doctors were improperly influenced by the prospect of receiving additional business from Mr. Grossinger and ROV. Both Mr. Grossinger and ROV sent some of their clients back for numerous follow-up visits, which were paid for in full by the attorneys. Audit Report at 56, 79. As the Claims Administrator found, this ongoing financial relationship turned these non-Program doctors into "lawyer-hired consultants and/or experts" who were "subject to incentive-caused bias based on the likelihood of further referrals and compensation from the law firms." *Id.* at 56. The lawyers, while admitting in their briefs that they paid these doctors what they deem to be reasonable amounts, have not disclosed the sums involved nor who ultimately paid these bills, the lawyers or the Players.[24]

At least some of these medical evaluations took place in a hotel suite. *Id.* at 21. This practice violates the Settlement's rules, which specifically prohibit examinations from taking place outside of medical settings (without express prior written permission of the Claims Administrator) and require automatic audits of any such claims.[25] Those prohibitions result from multiple prior Audits which disclosed similar practices of unreliable, compensated, diagnoses.[26]

The SCM who reported the hotel incident was—at the time—represented by Mr. Grossinger (via Pro Athlete Law Firm). *Id.* The Claims Administrator concluded that the SCM

---

[24] For example, Mr. Grossinger admits that he "did pay for some of Dr. Jeffrey Steinberg's treatment appointments for some of the co-counsel NFL patients as requested" but asserts—without any specificity—that "the total amount . . . was relatively deminimus [sic], reasonable for [sic] work undertaken." Grossinger Brief at 24. Feder Law likewise asserts that it has not "offered anything of value to any physician beyond appropriate payment for legitimate medical services," but offers no proof of those "appropriate" payments. Feder Brief at 4. Meanwhile, ROV argues that the burden is on the Claims Administrator to show "evidence that any of these doctors received anything other than their normal fees." ROV Brief at 12. Not only does ROV misunderstand the Audit's burden structure, it makes no effort to provide evidence supporting its claim of proper payments, despite the fact that such evidence is within ROV's exclusive control, and it has objected (on privilege grounds) to attempts to learn more about it. Because the subject firms had the opportunity to correct the record—by offering proof of appropriate payments, using records well within their possession—and have chosen not to, we agree that it was reasonable for the Audit Report to conclude that payments to non-Program doctors were different than those due in the ordinary course to treating physicians.

[25] Rules Governing Qualified MAF Physicians 13(j); Settlement Agreement, Section 10.3(d)(iii).

[26] Between late 2017 and early 2019, the Claims Administrator audited at least a dozen Program doctors, and the Special Masters ultimately disqualified four: Dr. Serina Hoover, Dr. August Dolan-Henderson, Dr. Ena Andrews, and Dr. Darren Fuerst. Shortly thereafter, the Court adopted the current version of the Rules Governing Qualified MAF Physicians. ECF No. 10527, Order in Aid of Implementation of the Settlement Agreement: Rules Governing Qualified MAF Physicians (Apr. 11, 2019), *aff'd by* In re Natl. Football League Players' Concussion Injury Litig., 962 F.3d 94 (3d Cir. 2020).

was "credible based on [his story's] specificity, coherence, and corroboration from independent sources." *Id.*

The SCM described being scheduled for an examination with Dr. Cherian Karunapuzha, a non-Program doctor, at the Hilton Dallas Lincoln Centre hotel in October 2024. *Id.* According to Mr. Grossinger or Pro Athlete Law Firm, Dr. Karunapuzha—who is based in Oklahoma City— was "coming to Texas to see patients." *Id.* While the SCM was ultimately unable to attend that appointment, Dr. Karunapuzha's October trip went ahead as planned. *Id.* at 21-22. The Claims Administrator obtained records from the Hilton Dallas Lincoln Centre confirming that Dr. Karunapuzha stayed one night, paid with a credit card in his own name, and reserved a large suite. *Id.*

Two months later, in December 2024, Dr. Karunapuzha was back in town, evaluating patients at the same hotel. *Id.* at 21. The SCM's rescheduled appointment took place then. *Id.* Arriving at the hotel, the SCM noticed "several other former NFL Players in the lobby also waiting to see Dr. Karunapuzha." *Id.* at 22. In the hotel room, Dr. Karunapuzha saw the SCM, informed him he had Parkinson's Disease, and referred him to another non-Program doctor, Dr. Avesh Verma, for a levodopa prescription. *Id.* Ten days later, on December 27, 2024, Dr. Verma confirmed the diagnosis and prescribed him levodopa, which the SCM began taking. *Id.*

During this time, the SCM reported that he "was experiencing terrible side effects from the levodopa." *Id.* He requested records from Dr. Karunapuzha, but was informed by OKC Medical that no such records existed. *Id.* In August 2025, the SCM confronted Dr. Verma about his side-effects and the lack of records, demanding to see Dr. Karunapuzha's medical report from December 2024 showing he had Parkinson's Disease. *Id.* But Dr. Verma confirmed that no report was ever created:

> According to Dr. Verma, there was no written report from Dr. Karunapuzha because [Dr. Karunapuzha] was not in Dallas that day to diagnose players. Instead, Dr. Verma proffered that Dr. Karunapuzha was only there as an unofficial representative of a support group and was hired by [Pro Athlete Law Firm] and Mr. Grossinger to travel around the country and consult for them. Dr. Verma continued this narrative, stating that after the client's hotel meeting with Dr. Karunapuzha in December, Dr. Karunapuzha had verbally informed him that the client had [Parkinson's Disease] and needed to be treated.

*Id.*

In response, the SCM called Dr. Verma "unethical" for confirming a diagnosis and prescribing him levodopa without a firm diagnosis from Dr. Karunapuzha. *Id.* At this point, Dr. Verma admitted it was possible the SCM did not have Parkinson's Disease. *Id.*

### c. MAF Examination with a Qualified MAF Physician

Now that their clients had seemingly legitimate medical histories showing symptoms of Parkinson's Disease and a levodopa or other prescription, Mr. Grossinger and ROV scheduled them for formal MAF examinations within the Program.

When SCMs presented for MAF examinations in front of Qualified MAF Physicians, many showed little to no observable symptoms of Parkinson's Disease. *Id.* at 27, 56-57, 69. For example, while reviewing a MAF examination that resulted in a Diagnosis of Parkinson's Disease, the AAP Member remarked that "the severity of all abnormalities is mild." *Id.* at 57. In a second case, the AAP Member likewise noted that "the exam findings in general are very modest." *Id.* And in a third, that "the MAF exam occurred after treatment where the Player had only minimal symptoms." *Id.*

Not being able to personally observe symptoms of Parkinson's Disease puts MAF Physicians in a difficult diagnostic position. On the one hand, if a patient shows no symptoms of Parkinson's Disease, then perhaps that patient does not have Parkinson's Disease. On the other hand, perhaps the patient does suffer from the early symptoms of Parkinson's Disease, but they are masked by medication.

So, MAF Physicians deferred to the prior medical history showing an active levodopa prescription and previously observed symptoms—often heavily. Sometimes, that deference was made explicit. Other times, it was implied by MAF Physicians backdating their Qualifying Diagnosis to the date of the non-Program doctor's initial diagnosis. The Claims Administrator found numerous examples of such backdating. *Id.* at 45-46, 48, 69.

Even the AAP reviewers were sometimes misled by these seemingly legitimate outside records. In the three cases previously cited where AAP Members noted minimal symptoms during the MAF examination, those same AAP Members ultimately approved the Diagnosis, relying on information from the Players' outside records. *Id.* at 57. In the first case, the AAP Member was willing to overlook only mild observable symptoms during the MAF examination because the outside records showed "consistency over multiple examinations." *Id.* In the second, because the "minimal findings on later examinations and by later providers are consistent with known capacity of suppression of Parkinson's disease signs by [levodopa] treatment." *Id.* And in the third, because "the mild symptomatology reported by two different neurologists is quite similar, supporting the diagnosis of [Parkinson's Disease] where a response to levodopa also is a component of this diagnosis by Gelb criteria." *Id.*

Layered on top of this dynamic was Mr. Grossinger and ROV's selection of MAF Physicians. Rather than sending their clients to the next-available, most-geographically convenient MAF Physician, regardless of who that MAF Physician might be, Mr. Grossinger and ROV typically limited their selection to specific MAF Physicians. As one MAF Physician explained, "in his experience, certain attorneys send Retired Players to him for MAF examination and when he informs them the patient does not have [Parkinson's Disease], the attorneys simply send their clients to a different MAF Physician looking elsewhere for the desired [Qualifying Diagnosis]." *Id.* at 54.

Topping the list of favorites was Dr. Daniel Jacobs, a former MAF Physician who provided Qualifying Diagnoses to twenty-nine of the ninety-eight SCMs whose claims are implicated in this Audit. *Id.* at 43.[27] Across the entire Program, Dr. Jacobs ranks first amongst MAF Physicians in diagnosing Parkinson's Disease, responsible for 16.4% of *all* submitted Parkinson's Disease claims. *Id.*

During his time as MAF Physician, Dr. Jacobs estimated that he provided a Qualifying Diagnosis to 80% of the Players he examined. *Id.* at 45. His office manager, Ms. Jaime Amaro, estimated it to be even higher—100%. *Id.*

SCMs flocked to Orlando, Florida to see Dr. Jacobs. While SCMs must ordinarily see a Qualified MAF Physician located within 150 miles of their primary residence, they can (through counsel) request an exception under certain circumstances.[28] ROV did so aggressively, requesting 150-mile exceptions in over half of its Parkinson's Disease submissions, all of which the Claims Administrator granted. *Id.* at 78. Six of these requests were to see Dr. Jacobs. *Id.* The Claims Administrator estimates that, on average, these six SCMs each traveled 1,345 miles for their examinations with Dr. Jacobs. *Id.*

In one such 150-mile exception request, ROV submitted a statement purportedly written by an SCM: "I have friends and family in the Orlando area and requested that my counsel schedule there as they had a convenient date and time that was convenient to my travel plans." *Id.* As detailed in the Audit Report, this was simply untrue. In reality, the SCM and his wife, who resided in Texas, were not happy about having to travel so far to see Dr. Jacobs:

> The SCM's wife reportedly complained to another Player's wife about needing to travel to Florida for the neurology examination with Dr. Jacobs because she had been inconvenienced, and it forced her to take time off from work. . . . When the SCM's wife questioned the need to travel to Florida, ROV reportedly claimed there were not many options and that they were only working with one MAF Physician (Dr. Jacobs) at that time.

*Id.* (cleaned up).

The Claims Administrator noted that while ROV's 150-mile exception requests cited urgency—arguing that Dr. Jacobs' office "is responsive with quick availability for scheduling"—this was "at odds with our findings that show most of the firm's clients begin treatment to develop their claims months or years in advance of scheduling an MAF examination." *Id.* It concluded,

---

[27] As the Claims Administrator notes, Dr. Jacobs' service as a MAF Physician was problematic: "His reports and findings frequently required clarifications, resulting in 267 follow up communications with him by the Claims Administrator about diagnoses and documentation for claims relying on his diagnoses over time, placing him within the top 5 Physicians for follow ups in the Program." Audit Report at 44. Dr. Jacobs was terminated in 2025.

[28] *Frequently Asked Questions: FAQ #88* (Is there any limit on which Qualified MAF Physician I may choose to examine me?), NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com.

therefore, that these requests served primarily to evade the Program's rules and secure access to ROV's "preferred MAF Physicians." *Id.* at 79.

### a. **Disguise**[29]

Having obtained a Qualifying Diagnosis of Parkinson's Disease, Mr. Grossinger knew that he could not submit all the claims himself. Such a high volume of identical Parkinson's Disease submissions from a single source would almost certainly attract Claims Administrator scrutiny.[30] Mr. Grossinger then established off-the-books co-counsel arrangements with Feder Law, Pro Athlete Law Firm, Syme Law, and others.[31] But Mr. Grossinger was the SCMs' real lawyer, retaining close—if not exclusive—control over each farmed-out Claim. To hide his involvement, Mr. Grossinger repeatedly insisted on not memorializing agreements or communications in writing.

### b. **Cover Firms**

The Claims Administrator's investigation confirmed that co-counsel agreements existed between Mr. Grossinger and (at least) three "cover" firms: Feder Law, Pro Athlete Law Firm, and Syme Law. *Id.* at 1. Feder Law has submitted twenty-one Parkinson's Disease claims, Pro Athlete Law Firm has submitted twenty-four, and Syme Law has submitted seven. *Id.* at 9, fig. 2.[32] All fifty-two of these claims were submitted in the past five years. *Id.* We address each firm individually.

#### (i) *Feder Law*

The Claims Administrator first noticed connections between Feder Law and Mr. Grossinger in 2021 involving Alzheimer's Disease submissions. *Id.* at 29. On one occasion, Feder Law submitted a document with metadata indicating the author was "Doug Grossinger" to the Claims Administrator. *Id.* Inquiring further, the Claims Administrator learned that in two Feder Law claims, it was Mr. Grossinger who had recommended the neurologist, scheduled the SCM's appointments, and paid for them. *Id.*

The Claims Administrator sent follow-up questions to Feder Law asking for an explanation of its relationship with Mr. Grossinger. Feder Law responded on June 8, 2021, stating: "Doug

---

[29] This is one way in which ROV's parallel scheme differed. Based on the Claims Administrator's investigation, there is no evidence that ROV funneled their Parkinson's Disease claims to any other firm.

[30] *See* Settlement Agreement, Section 10.4 ("The Claims Administrator . . . will also establish system-wide processes . . . and data analytics to spot 'red flags' of fraud, including . . . the number of claims from similar addresses or supported by the same physician or office of physicians [and] data metrics indicating patterns of fraudulent submissions.").

[31] Additional law firms may have been involved as cover firms in Mr. Grossinger's scheme. As we discuss below, the Audit process triggered by Mr. Grossinger will unspool further. We have asked that the Claims Administrator notify us if they later discover additional relationships so that we can consider them in due course.

[32] The Audit Report lists six claims but Syme Law submitted an additional claim—SPID 100009525—on December 8, 2025. Audit Report at 15.

Grossinger is co-counsel with me for retired NFL players with whom I am working. Our firms share attorney fees and the payment of expenses." *Id.* at Exhibit G.

In 2025, now investigating the Parkinson's Disease scheme, the Claims Administrator again asked Feder Law if it had a relationship or any arrangements with Mr. Grossinger. *Id.* Feder Law responded on November 20, 2025: "This is to confirm that the co-counsel relationship with Grossinger remains active for multiple cases currently on my portal, consistent with my prior response dated June 8, 2021." *Id.* Mr. Feder did not describe that relationship in further detail, leaving out the financial terms and how it complied with the Court's fee cap, and whether Mr. Grossinger made key decisions, fronted costs, or recruited clients.

### (ii) Pro Athlete Law Firm[33]

During the Audit investigation, several law firms independently came forward with information suggesting that Mr. Grossinger had a co-counsel agreement with Pro Athlete Law Firm. *Id.* at 32. The Claims Administrator concluded that these accounts were credible "given their consistency and corroboration through other evidence." *Id.*

One of those firms became aware of Pro Athlete Law Firm's connection to Mr. Grossinger because it later represented the SCM who was diagnosed by Dr. Karunapuzha in a hotel room. *Id.* at 32-33. While that SCM was officially represented by Pro Athlete Law Firm, Mr. Grossinger had been active in his case. *Id.* Dr. Verma told the SCM that Dr. Karunapuzha had been hired by Pro Athlete Law Firm and Mr. Grossinger "to travel around the country and consult for them." *Id.* at 33. In a subpoena response, Dr. Karunapuzha confirmed that he had been hired by Mr. Grossinger. *Id.* And the SCM showed the firm text messages he received from Pro Athlete Law Firm and "Doug" (presumably, Mr. Grossinger) about his Claim. *Id.* at 21.

Another firm learned of Mr. Grossinger's hidden involvement when one of its clients filed a Request for Change in Representation Status naming Pro Athlete Law Firm as the new attorney. *Id.* at 33. However, when the firm spoke to the client, he repeatedly referred to Mr. Grossinger as being that new attorney. *Id.* at 24. The client also confirmed that Mr. Grossinger, not Pro Athlete Law Firm, had emailed him the Request for Change in Representation Status form. *Id.* The firm provided the Claims Administrator with a screenshot of this email from Mr. Grossinger to the client. *Id.* at 24, Exhibit F.

---

[33] Pro Athlete Law Firm was the subject of a previous Audit for submitting unreliable third-party affidavits. Special Masters' Rule 27 Decision on the Report of Adverse Finding Regarding Pro Athlete Law Firm, P.A. (Nov. 1, 2024), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=pro_athlete_sm.pdf. On July 2, 2025, the Court ordered the Claims Administrator to continue carefully scrutinizing Pro Athlete Law Firm's submissions to ensure compliance with the rules, and to immediately report any violations to the Special Masters for referral to the Court. ECF No. 12473, Order Addressing Audit of Pro Athlete Law Firm, P.A. (July 2, 2025), at 4-5. On October 23, 2025, in light of new allegations of coaching and unreliable document submissions, among other concerns, the Claims Administrator issued a memorandum to the Special Masters. Audit Report at 14. Shortly thereafter, Pro Athlete Law Firm arranged to exit the Settlement Program. *Id.* The firm has informed the Claims Administrator that Shenaq PC will take over its dementia claims and Locks Law Firm will take over its Parkinson's Disease claims. *Id.*

And late last year, as Pro Athlete Law Firm contemplated winding down its participation in the Settlement Program, it sought to sell the future proceeds for its Parkinson's Disease claims to another law firm. *Id.* at 33. One firm that expressed interest in buying these claims was warned that it would need to seek Mr. Grossinger's approval to move forward. *Id.* According to that firm, Pro Athlete Law Firm clarified that its Parkinson's Disease claims were actually Mr. Grossinger's and "he is the attorney who handles them." *Id.*

Moreover, Pro Athlete Law Firm's Parkinson's Disease claims rely on the same few non-Program doctors, including Dr. Steinberg, Dr. Ramon Sanchez, and Dr. Stuart Isaacson. *Id.* at 32. As the Claims Administrator noted, there is significant overlap between these non-Program doctors and those used by the other law firms implicated in this Audit: "Dr. Jeffrey Steinberg also evaluated Players for Mr. Grossinger, ROV, Feder Law, and Syme Law. Likewise, Dr. Sanchez evaluated Players for Feder Law and Dr. Isaacson evaluated Players for Mr. Grossinger, Feder Law, and Syme Law." *Id.*

Pro Athlete Law Firm's briefing, submitted after the Claims Administrator issued its Audit Report, admits that the Claims Administrator correctly identified an (obscured) co-counsel arrangement: "[Pro Athlete Law Firm] worked in a co-counsel capacity with Mr. Grossinger to guide some Players through the [Parkinson's Disease] claims submission process." Pro Athlete Brief at 4. It lists eighteen Parkinson's Disease claims for which Mr. Grossinger served as co-counsel. *Id.* at 5-7.

*(iii) Syme Law*

On December 6, 2024, the Claims Administrator received an anonymous online tip alleging that Syme Law was "working with certain doctors and another attorney paying doctors excessive amounts to get reports written up correctly." Audit Report at 35. The tipster did not specify who that other attorney was. *Id.* At the time (and still today), *all* of Syme Law's claim submissions were for Parkinson's Disease. *Id.*

Then, in September 2025, Dr. Steinberg, responding to a subpoena request from the Claims Administrator, produced a copy of a $5,000 check payable from Syme Law to Dr. Steinberg. *Id.* at 36-37. The check included a handwritten note that states: "(Doug Gro – 9-16-24) Zelled Money 9/16/24." *Id.* at 37. The Claims Administrator concluded that this September 16, 2024 payment, which the note indicates was facilitated by Mr. Grossinger, related to ongoing work between Syme Law, Mr. Grossinger, and Dr. Steinberg. *Id.* It determined that the attorney referenced in the December 2024 tip—Syme Law's co-counsel—was likely Mr. Grossinger. *Id.*

The Audit Report also noted that Syme Law had used the same three MAF Physicians—Dr. Jacobs, Dr. Louis Pearlstein, and Dr. Andrew Sas—as several other firms acquiring Parkinson's Disease diagnoses—Mr. Grossinger, Pro Athlete Law Firm, and ROV. *Id.* at 35-36.

Syme Law's briefing, submitted after the Claims Administrator issued its Audit Report, admits that the Claims Administrator correctly identified an (obscured) co-counsel arrangement:

"I have worked as a co-counsel with attorney Douglas Grossinger for some of my NFL clients." Syme Brief at 2.

\*    \*    \*

The Claims Administrator noted that the full scope of Mr. Grossinger's network is as yet unknown, as there is substantial evidence that he sought to expand it.

Two law firms independently reported that Mr. Grossinger approached them several years ago about joining his Parkinson's Disease arrangement. Audit Report at 20, 23. According to one of these law firms, Mr. Grossinger claimed that he was a "difference maker" in the Parkinson's Disease realm and "can get people paid." *Id.* at 20. The firm understood Mr. Grossinger to be saying that he could consistently obtain Qualifying Diagnoses, but that "too many [Parkinson's Disease] diagnoses would raise red flags with the Claims Administrator, and [Mr. Grossinger] wanted to use other attorneys to 'run cover' for him." *Id.*

The second firm shared that understanding. *Id.* at 23. Mr. Grossinger told the firm about his Parkinson's Disease expertise and noted that co-counsel arrangements were "his preferred way to run his practice." *Id.* Because Mr. Grossinger did not lack "the knowledge to navigate Program requirements or the infrastructure to handle his caseload," the firm concluded that the real reason Mr. Grossinger sought a co-counsel agreement was to "effectively spread his clients' [Parkinson's Disease] claims among several different lawyers thus shielding him from scrutiny by the Claims Administrator." *Id.* Both law firms declined Mr. Grossinger's approach.

Additionally, from 2020 to 2022, Mr. Grossinger engaged in talks with ROV to develop a relationship. *Id.* at 64. ROV ultimately declined Mr. Grossinger's agreement in early 2022, citing several vague "philosophical differences."[34] But the Claims Administrator concluded that "at minimum [] Mr. Grossinger influenced or inspired [their] process based on [ROV]'s early connections to him coinciding with their entrance into the NFL Concussion Settlement." *Id.* at 65, 79. It also determined, contrary to ROV's representations that there was no relationship whatsoever, that ROV and Mr. Grossinger did work together. *Id.* at 65-66.

The other arrangements that did move forward—those with Feder Law, Pro Athlete Law Firm, and Syme Law—were co-counsel relationships in name only. Grossinger recruited the clients, communicated with them, scheduled the appointments, paid the doctors, and managed the Claim from start to finish. Feder Law, Pro Athlete Law Firm, and Syme Law were essentially confined to renting their names in communications with the Claims Administrator, and taking a share of the fee.[35]

---

[34] Among the "philosophical differences" ROV cited was the fact that Mr. Grossinger did not want the co-counsel arrangement memorialized. Audit Report at 65. ROV, by its own description, "wanted [the arrangement] to be in writing and fully disclosed to clients." *Id.*

[35] Some Players found this arrangement perplexing, confused as to why they were formally represented by one lawyer, while another lawyer—Mr. Grossinger—was doing all the work. One such Player, SPID 100013007, was formally represented by Feder Law for the duration of his (successful) Parkinson's Disease Claim. When initiating his representation with Feder Law, the Player submitted a Request for Change in Representation Status form. That

In fact, on at least one occasion, a Player believed that his lawyer was Mr. Grossinger when his official attorney of record was actually one of these cover firms. *Id.* at 24. While the Audit investigation did not reveal the fee split between Mr. Grossinger and his cover firms, given the relative responsibilities on each side, we can reasonably assume that Mr. Grossinger received a substantial portion of each approved Monetary Award.

The Program's rules provide that "[o]nly one lawyer [at a time] can represent each Settlement Class Member."[36] That follows Section 30.2(a) of the Settlement Agreement, requiring individual counsel to "provide notice of his or her representation to the Claims Administrator" within 30 days of being retained by an SCM. These policies make sense because they ensure that the Claims Administrator is able to monitor compliance with the Court's 21% cap on attorney's fees. Having one firm listed as the lawyer of record while another in fact runs the case violates these rules. And it makes monitoring compliance with the Court's fee order difficult—if not outright impossible.

### c. Other Tactics

In addition to using co-counsel arrangements to misrepresent the source of his Parkinson's Disease claims, Mr. Grossinger attempted to conceal his activities in other ways; ROV also engaged in tactics that omitted information provided to MAF physicians. These arrangements, the Claims Administrator concluded, are evidence that the participants knew their conduct was wrongful.

Mr. Grossinger in particular was known for repeatedly insisting that nothing be put in writing. Where possible, he avoided email communications, opting for text messages or phone calls instead. One SCM represented by Mr. Grossinger (via Pro Athlete Law Firm) reported not being able to find any emails from him in "the past year as all communication with Mr. Grossinger had occurred through phone or text." *Id.* at 24. Another SCM said he was warned "not to communicate through text messages with them, but through phone calls only." *Id.* at 21.

---

form named Feder Law—and *only* Feder Law—as the Player's "New Lawyer." Doc. 243532. All subsequent communications and filings, including the Player's Claim Form, exclusively listed Feder Law. Doc. 291633. When the Player decided to end his representation with Feder Law, and proceed *pro se*, he filed a new Request for Change in Representation Status form. Doc. 417754. This time, however, he listed both Feder Law and Mr. Grossinger as his "Prior Lawyer." *Id.* And in an accompanying letter addressed to Mr. Grossinger, the Player explicitly indicated that Mr. Grossinger was his actual lawyer. *Id.* In fact, the Player wrote that Fred Feder, of Feder Law, had done nothing to advance his case: "Fred whom I still don't know his role in my law suit as I have never felt he was involve in helping me from the beginning. Other than his name on the firm, you are using to represent player, I have no idea what he did to receive 22%." *Id.*

[36] Request for Change in Representation Status Form, NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=Request_for_Change_in_Representation_Status.pdf. The Claim Form imposes the same restriction: "If you are represented by *an* attorney, enter *the* attorney's information in this Section III." Claim Form for Retired NFL Football Players and Representative Claimants, NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=claim_form_for_retired_nfl_n_representative_claimants.pdf (emphasis added).

Meanwhile, on at least one occasion, ROV did not disclose medical documents that did not support a Player's Diagnosis of Parkinson's Disease. *Id.* at 76. While auditing an SCM's Claim, the Claims Administrator discovered records from an internal medicine doctor stating his views and those of Dr. William Bendure, a neurologist: "I do not suspect [Parkinson's Disease]. Neurologist Dr. William Bendure did not feel he had it either." *Id.* Dr. Bendure's report, in turn, stated: "The patient does not report any symptoms of bradykinesia, rigidity, postural instability, or any other features of Parkinsonism." *Id.* at 77. However, ROV had not provided these records to the Player's diagnosing physicians or to the Claims Administrator. *Id.* While unable to verify whether ROV omitted similar information in its other cases, the Claims Administrator concluded that it "causes us to question the completeness of the firm's audit responses and disclosures to MAF Physicians." *Id.*

\*　　\*　　\*

Collectively, the five law firms—Mr. Grossinger, Feder Law, Pro Athlete Law Firm, Syme Law, and ROV—submitted ninety-six Parkinson's Disease claims, and were involved in two additional claims submitted by non-subject firms.[37] Of these ninety-eight claims, fifty-seven were approved and paid before the Claims Administrator concluded its Audit investigation and issued its Report. *Id.* at 10. Those fifty-seven Monetary Awards resulted in over 95 million dollars in payable Awards.[38] Using the Court's 21% fee cap, the involved law firms earned roughly 20 million dollars in attorney's fees. And if—as we suspect—the scheme involved additional law firms and claims not yet implicated by the Audit investigation, then these payments, and fees, may end up being materially higher.

### AUDIT HISTORY

The Audit investigations of Mr. Grossinger (and his three cover firms) and ROV initially developed separately but merged as the similarities in approach became clear.

### 1.   <u>Mr. Grossinger (and Feder Law, Pro Athlete Law Firm, and Syme Law)</u>

Mr. Grossinger has been on the Claims Administrator's radar since at least 2018. Audit Report at 6. Between July 2018 and December 2020, the Claims Administrator received tips and other information alleging misconduct by Mr. Grossinger in his Alzheimer's Disease submissions. *Id.* at 6-7. After conducting an Audit investigation, which included inquiring into Feder Law's co-counsel arrangement with Mr. Grossinger, the Claims Administrator concluded that the "then-available evidence . . . did not support a clear finding of misrepresentation, but we were unable to definitively rule out misconduct." *Id.* at 7.

---

[37] These are SPID 100002017 and SPID 100006536.

[38] The Audit Report lists lower numbers—for the number of involved claims and the Award amounts—because additional claims were added to the Audit following the Report's release. We use the most recent figures available to us.

Roughly two years later, on March 12, 2022, the NFL Parties contacted the Claims Administrator to express concerns about three high-value Parkinson's Disease claims that Mr. Grossinger had recently submitted. *Id.* The NFL Parties were concerned that these claims, along with another claim submitted by Feder Law, relied mostly on subjective improvements reported by non-Program doctors. *Id.*

In September 2022, the NFL Parties again relayed strong concerns about a suspicious pattern of high-value Parkinson's Disease and Alzheimer's Disease claims submitted by Mr. Grossinger and Feder Law. *Id.* In response, the Claims Administrator reviewed eleven Parkinson's Disease claims and thirteen Alzheimer's Disease claims from the two firms. *Id.* at 8. An AAPLC Member concluded: "In general, while I agree that the concerns raised by the NFL Counsel are indeed reflected in the documentation, I would voice some caution with interpreting this to indicate a pattern of unreliable diagnoses for several reasons." *Id.*

Over the next few years, other firms—like Feder Law, Pro Athlete Law Firm and Syme Law—began submitting an increasing number of Parkinson's Disease claims. But Mr. Grossinger's own submissions plateaued. *Id.* at 8-9.

Then, in late 2024 and early 2025, the Claims Administrator received a series of new tips that prompted it to re-launch its investigation into Mr. Grossinger. *Id.* That new investigation formed the basis for this Audit.

In June 2025, the Claims Administrator learned from multiple third-parties of "an arrangement involving Mr. Grossinger and several other law firms representing SCMs." *Id.* at 18. This prompted an analysis of these firms' Parkinson's Disease submissions, which revealed several "red flags" including the same few MAF Physicians repeatedly deferring to non-Program doctors. *Id.* at 18-19.

That same month, the Claims Administrator interviewed Dr. Jacobs, a MAF Physician flagged in that analysis, and his office manager, Ms. Amaro. *Id.* at Exhibit I, Exhibit J. And in July 2025, the Claims Administrator interviewed three law firms who independently came forward with concerns they and their clients had about Mr. Grossinger's scheme. *Id.* at 20.

Based on those interviews, in August 2025, the Claims Administrator sent twelve Parkinson's Disease claims that relied on records from Dr. Steinberg to the AAP for review. *Id.* at 47. The AAP reviewer noted that "the individual reports did not rise to a level he would consider to be a 'red flag,'" but "outlined numerous criticisms of Dr. Steinberg," which we previously described. *Id.* The Claims Administrator also attempted to interview Dr. Steinberg about his relationship with Mr. Grossinger and the scheme. *Id.* at 49. Dr. Steinberg retained counsel and declined the Claims Administrator's request. *Id.*

So, in September 2025, the Claims Administrator issued a subpoena to Dr. Steinberg to obtain more information about his interactions with Mr. Grossinger and Pro Athlete Law Firm, as well as all "records reflecting any compensation earned in connection to such consultation or

examinations" of SCMs. *Id.* Timely responding on September 24, 2025, Dr. Steinberg—through counsel—objected to the Claims Administrator's requests:

[T]he Subpoena issued in the instant matter does not, as far as the undersigned can discern, comply with the requirements for "disclosures for judicial and administrative proceedings," set forth in 45 C.F.R. § 164.512(e). As such, Respondents are unable to produce Protected Health Information . . . without adherence to the procedure set forth in 45 C.F.R. § 164.512(e).

*Id.* at Exhibit K.

Notwithstanding these objections, Dr. Steinberg produced "copies of 14 checks from Mr. Grossinger and one check from Syme Law LLC together totaling $50,000, dated from 3/9/23 to 2/18/25. The checks range in amount from $1,500 to $7,500." *Id.* at 49, Exhibit L, Exhibit H. Given that Mr. Grossinger had himself submitted only *one* claim in which Dr. Steinberg appears, but nonetheless sent him *fourteen* checks, the Claims Administrator concluded that "Mr. Grossinger is paying [Dr. Steinberg] for examinations of Players represented by other attorneys or firms," confirming its suspicions regarding these co-counsel arrangements. *Id.* at 49.

Dr. Steinberg also produced an invitation to Mr. Grossinger's "private" Super Bowl party on February 7, 2025. *Id.* at 49-53. As previously discussed, the Claims Administrator concluded that this invitation served as an "apparent gift-in-kind." *Id.* at 51.

Around this same time, seeking to corroborate reports that non-Program doctors were examining SCMs in hotel rooms, the Claims Administrator subpoenaed the Hilton Dallas Lincoln Centre hotel, Dr. Karunapuzha, and Dr. Verma. *Id.* at 21-23. The hotel responded, providing evidence of Dr. Karunapuzha's visit, while the two non-Program doctors objected to the requests and provided only minimally informative responses. *Id.*

Dr. Karunapuzha confirmed that he was hired by Mr. Grossinger, but provided no other details and expressed his intention to assert attorney-client privilege as a third-party consultant of Mr. Grossinger. *Id.* at 22-23. Meanwhile, Dr. Verma's counsel submitted a letter alleging violations of Fed. R. Civ. P. 45 and repeating the same objection six times:

Dr. Verma objects to this Request for [information] . . . because it is overly broad, unduly burdensome, and not proportional to the needs of the case because it is not limited to the issues relevant to this case and further has the potential to implicate sensitive or confidential references to patient treatment. In addition, this Request imposes an undue burden and expense on a non-party . . . Subject to these objections and any assertions of privilege, Dr. Verma provides that he is the treating physician for two retired NFL football players that may be responsive to Request No. 2 and involved in the above-referenced litigation, and in that capacity possesses medical and billing records for those patients. Dr. Verma provides that he is willing to

produce those patients' medical records and billing records to the extent provided by law and subject to the patients' consent for the release of such records.

*Id.* at Exhibit E.

In October 2025, the Claims Administrator repeatedly attempted to contact Syme Law in light of the evidence it had gathered connecting the firm to Mr. Grossinger. *Id.* at 37. When the Claims Administrator finally spoke with Syme Law on October 22, 2025, the firm "acknowledged having little to no involvement with NFL Concussion Settlement cases." *Id.* When asked, then, if Syme Law had any co-counsel arrangements for those cases, Syme Law "asserted, without denying the premise, that this is 'privileged information.'" *Id.*

On November 18, 2025, the Claims Administrator sent written requests to three cover firms—Feder Law, Pro Athlete Law Firm, and Syme Law—asking whether the firm or anyone else at the firm "ha[s] any arrangement(s) (such as co-counsel, whether written or verbal) and/or other relationship with Mr. Grossinger in connection with the NFL Concussion Settlement." *Id.* at 30, 33, 37.

Feder Law responded on November 20, 2025, confirming that it did. *Id.* at 30.

Pro Athlete Law Firm responded on November 24, 2025, one day before the deadline, requesting an extension because its attorney "was unable to respond until after the holidays." *Id.* at 33. The Claims Administrator informed Pro Athlete Law Firm that it could not accommodate an extension. *Id.* Pro Athlete Law Firm then communicated its opinion (as related in the Audit Report) that it "was under no obligation to answer and questioned the Claims Administrator's audit authority." *Id.* At no point in these communications did Pro Athlete Law Firm deny having any arrangement or other relationship with Mr. Grossinger in connection with the Settlement. *Id.* at 34.

Syme Law responded at the deadline, stating: "I have communicated this request to counsel for Syme Law, and they will get back to me as to what information may be replied back. They are looking into privileges. I will follow up back when I receive guidance from the attorneys." *Id.* at 37. Neither Syme Law nor its counsel ever followed up. *Id.* At no point in these communications did Syme Law deny having any arrangement or other relationship with Mr. Grossinger in connection with the Settlement. *Id.*

The Claims Administrator also contacted Mr. Grossinger. *Id.* at 19-20. It requested that he "confirm whether he had any relationships with Feder Law, Pro Athlete, Syme Law, or ROV in the context of the NFL Concussion Settlement, and if so to explain the relationships or arrangements, describing their nature and purpose." *Id.*

On the deadline to respond, Mr. Grossinger explained that he was "on sabbatical from being able to spend active time on work for this case" due to an ongoing medical situation with a close family member. *Id.* He added that he "[had] communicated this request to the lawyers

representing this law firm and when they get back in the near term as to what can be responded [he] will reply on this." *Id.* Neither Mr. Grossinger nor his counsel ever followed up. *Id.* And despite being on a so-called "sabbatical" from Settlement work, Mr. Grossinger managed to find time to submit two new Parkinson's Disease claims, both certified by Dr. Jacobs and both submitted on December 3, 2025.[39] *Id.*

When the Claims Administrator issued its Audit Report on December 12, 2025, there were seven pending Parkinson's Disease claims in Audit: one from Mr. Grossinger, two from Feder Law, and four from Pro Athlete Law Firm. *Id.* at Exhibit A.

Since its initial Audit Report, the Claims Administrator has placed nine more claims in Audit—one from Mr. Grossinger, one from Syme Law, six from Pro Athlete Law Firm, and one represented at filing by JR Wyatt Law[40]—bringing the current total to sixteen.

## 2. Reppert Oates & Vytell (ROV)

Between August 2024 and February 2025, the Claims Administrator received five anonymous tips about ROV:

August 10, 2024, 8:04 PM
This is in reference to attorney Lisa Reppert who is with Reppert, Kelly and Vytell Law firm. I feel like Lisa Reppert must be looked into and investigated. For the past year she has been developing relationships with certain doctors and paying them substantially to get them to write up reports the way she wants them to be written out.

August 22, 2024, 7:25 PM
I am reporting on attorney Lisa Reppert. It is being said that she is paying her Doctors top dollar to get claims submitted a certain way. This has happened over the past year with her most recent claims that have been submitted.

September 8, 2024, 2:01 PM
I am reporting on attorney Lisa Reppert. It is being said that she is paying her Doctors top dollar to get claims submitted a certain way. This has happened over the past year with her most recent claims that have been submitted.

October 11, 2024, 2:09 PM
This letter is to report not only Fraud but misrepresentation of one of your Attorneys Lisa Reppert. She is paying off MAF doctors and Neuro doctors to get

---

[39] These are SPID 100010739 and SPID 100014169.

[40] This is SPID 100006536, whose original Diagnosis was made by Dr. Verma while the SCM was represented by Pro Athlete Law Firm. The SCM fired Pro Athlete Law Firm on June 11, 2025, and hired JR Wyatt Law. That firm filed the Claim, and it was denied in November 2025. JR Wyatt Law was then itself terminated by the SCM, and he both responded to this Audit and filed an Appeal *pro se;* the Appeal was remanded for re-review, where it remains pending.

the reports written out exactly how she is wanting them to. She along with her firm is doing this.

February 12, 2025, 4:12 PM
I feel like it is necessary to let you know that Lisa Reppert and the law firm that are working on the concussion case are going about things not legally. With the recent clients under audit should again be looked into more thoroughly. She found a way around the system to get guys approved with doctors that are past the 150 mile radius.

*Id.* at 58 tbl. 11 (cleaned up).

Given the similar language and shared IP addresses, the Claims Administrator concluded these tips were most likely authored "by the same party or parties." *Id.* at 58. It also noted that "[t]he tips used language specific to the Concussion Settlement and in one case even referenced non-public information regarding our ongoing audits of ROV's claims, indicative of the author's possible insider knowledge about the firm's activities." *Id.* Because of "the source's demonstrated familiarity, specificity, and coherence," the Claims Administrator determined that these tips were credible. *Id.*

As the Claims Administrator began reviewing ROV's claim submissions, which at the time were exclusively for Parkinson's Disease, it noticed concerning similarities to Mr. Grossinger's arrangement. *Id.* at 59.

So, in September 2024, the Claims Administrator contacted Dr. Jacobs—who had frequently appeared in both Mr. Grossinger and ROV's submissions—requesting that he provide all communications related to Player evaluations. *Id.* at 62. While the "resulting production included little substantive information," the Claims Administrator ultimately did interview Dr. Jacobs the following year, as it ramped up its parallel investigation into Mr. Grossinger's activities. *Id.*

In April 2025, the Claims Administrator organized interviews with two SCMs who were listed as former ROV clients.[41] *Id.*

Then, on July 9, 2025, the Claims Administrator conducted an in-person interview with ROV partners: Mr. Oates, Ms. Reppert, and Mr. Reppert. *Id.* That interview was recorded, with both sides retaining a copy. *Id.* The Claims Administrator noted:

During the three-and-a-half hour interview, the ROV partners in pertinent part denied ever promising a Player a diagnosis; denied ever questioning a diagnosis that

---

[41] Both SCMs were listed as currently being represented *pro se*. Audit Report at 62. However, part-way through one of the interviews, the SCM revealed that he was currently represented by Mr. Grossinger—information that was not registered with the Program. *Id.* at Exhibit Q. The Claims Administrator's investigator immediately terminated the interview and apologized for contacting the SCM since he was a represented party. *Id.*

a doctor has given; denied ever giving doctors specific instructions; denied ever drafting any report or addendum for a doctor; denied ever suggesting or implying that a doctor should change their report in any way; and denied ever offering any kind of payment, gift, or other incentive outside of or different than a doctor's usual payment arrangements.

*Id.*

On July 31, 2025, the Claims Administrator sent ROV twelve follow-up questions based on information collected during this interview. *Id.* Mr. Oates responded two weeks later. *Id.* Demanding a seven-day deadline for compliance, he insisted that the Claims Administrator "withdraw the follow-up questions" and "confirm that the Audit Claims will be released from Audit and processed in the due course pursuant to the Settlement Agreement." *Id.* Failing that, Mr. Oates advised that ROV would seek "judicial relief without further notice including, without limitation, an application to the Special Master and other legal remedies including: (i) a request to quash the improper Follow Up Questions; (ii) a request to remove the claims from audit, and (iii) a stay pending a determination on the foregoing." *Id.* at 62-63.

The next day, we (the Special Masters) responded to Mr. Oates, informing him of our view that the questions and audit process "did not exceed the scope of the Claims Administrator's authority pursuant to the Settlement Agreement and the enabling Audit Rules." *Id.* at 63. But we noted that if it wished to do so, ROV could submit formal briefing on the issue. *Id.*

One week later, on August 20, 2025, ROV submitted a response listing ten general objections to the Claims Administrator's follow-up questions, including privilege, lack of access to records, and undue burden. *Id.* at Exhibit M. It also included some substantive answers, which the Claims Administrator found to be unhelpful and riddled with "uninformative tautologies." *Id.* at 72.

For example, when asked how many of the Players who presented for a MAF examination received a Qualifying Diagnosis, ROV responded: "The number of Former Players who received a Qualifying Diagnosis from a MAF in the Program is reflected by the exact number of claims submitted by ROV with a Qualifying Diagnosis." *Id.* at Exhibit M. And when asked how many of the Qualifying Diagnoses received were for Parkinson's Disease, ROV responded: "The number of claims submitted by ROV for Parkinson's Disease with a Qualifying Diagnosis is the exact amount of claims submitted to the Claims Administrator with a Parkinson's Disease diagnosis." *Id.*

The Claims Administrator concluded that "ROV's assertions that it is unable to provide basic information about its clients (e.g., how many clients the firm referred for treatment) and the Claims the firm submitted" were not credible. *Id.* at 63.

Accordingly, on September 12, 2025, when serving ROV with its Notice of Audit Investigation, the Claims Administrator encouraged the firm to supplement its earlier response

with "a responsive, informative, and complete reply." *Id.* While ROV submitted a supplemental response on September 26, 2025, this new document "largely mirrored the firm's previously submitted responses and objections." *Id.*

In November 2025, the Claims Administrator shared the Claim Packages and medical records of five Parkinson's Disease claims with the AAP. *Id.* The AAP reviewer concluded that based on the individual medical records, it would only recommend approval of one of the five claims. *Id.* at 71. And considering the claims in aggregate, the reviewer concluded that "the background of the claims taken together is highly suspicious for misconduct." *Id.*

From November 2024 until issuing its Audit Report in December 2025, the Claims Administrator placed seventeen Parkinson's Disease claims submitted by ROV into Audit.[42] *Id.* at 59-61. Since issuing its Audit Report, the Claims Administrator has placed four more ROV Parkinson's Disease claims in Audit, bringing the total to twenty-one.

On December 24, 2025, roughly two weeks after the Claims Administrator issued its Audit Report, ROV sent a letter to the Claims Administrator accusing it of "defamation per se, willful misconduct, and unlawful false statements." ROV Exhibit 3. It wrote:

> The allegations asserted by [the Claims Administrator] are offensive in that they are objectively baseless and unsupported by any competent evidence obtained in [the Claims Administrator]'s purported investigation. The allegations in the Report appear to have been asserted for an improper purpose, including to harass and to coerce unfounded accusations intended to avoid its obligations under the NFL Concussion Settlement Agreement to act as a neutral agent and avoid paying legitimate claims to former NFL Players based on illegitimate reasons consistent with Fed. R. Civ. P. 11. What is even more troubling is that the truth was readily ascertainable by the so called "investigation," yet no facts were acknowledged in this very biased Report that lacks all levels of neutrality and exceeds the authority granted to [the Claims Administrator] under the Settlement Agreement.
>
> [ . . . ]

---

[42] The Claims Administrator also placed one Alzheimer's Disease Claim into Audit (SPID 100010899). Audit Report at 60 n.100, 75-76. It did so because the Player was formerly represented by Mr. Grossinger and had received a non-Program diagnosis of Alzheimer's Disease in a similar fashion to the Parkinson's Disease scheme, and there was evidence that Mr. Grossinger and ROV attorneys accompanied the Player to medical evaluations. *Id.* While we acknowledge that there may be serious issues with this Claim, those issues are not sufficiently related to the Parkinson's Disease arrangement to warrant its inclusion in this Audit decision. *See* Audit Rule 26 (granting the Special Masters the "discretion to consolidate," or not consolidate, several claims presenting similar issues). The Claims Administrator may resume processing this Claim, and if warranted under Section 10.3 of the Settlement Agreement, it may initiate a separate Audit proceeding. The Claims Administrator will inform the Player that under this Audit decision, ROV is disqualified from further participation in the Program. The SCM may proceed *pro se* or obtain representation from another law firm.

We demand that all evidence concerning this matter be preserved including the back-up and/or archiving of all electronic communications including, but not limited to, email and ESI/EDI data so as not to subject [the Claims Administrator] and its agents (including but not limited to its investigators) to liability arising from the improper destruction of evidence including, but not limited to, copies of all emails, interview notes, lists of people interviewed and dates, lists of all parties to whom the Report was disseminated, WhatsApp messages, text messages, recordings, photographs, letters, written complaints, and any other material which may potentially constitute evidence including, but not limited to, claims made by other lawyers and/or former players against [the Claims Administrator] and its agents for defamation and slander. This letter shall constitute formal notice of [the Claims Administrator] and its agents, including but not limited to HML's obligation to preserve evidence, and we request that [the Claims Administrator] place a "litigation hold" on all document destruction policies as of the date hereof and advise its agents associated with this investigation.

This letter is without prejudice to this firm and its individual members identified herein with respect to their individual and collective rights, claims, and defenses including their claims for punitive damages and counsel fees against the entity and individual(s) determined to have engaged in such violations of the Settlement Agreement and any applicable laws, rules and regulations and hereby reserves such claims.

*Id.*

On January 14, 2026, ROV again contacted the Claims Administrator, demanding to know the identity of the attorneys who prepared the Audit Report:

[The Claims Administrator]'s refusal to identify the attorneys responsible for investigating, drafting, reviewing, and approving those representations, while continuing to stand behind them, implicates the very category of conduct the Order excludes from immunity and frustrates meaningful review of whether the Report was prepared in good faith.

Accordingly, we renew our request that [the Claims Administrator] identify the specific attorneys responsible for the Audit Report so that the parties and, if necessary, the Court may evaluate the Report within the limits set by the June 14, 2017 Order. We note only that factual accusations advanced in this context are expected to rest on a good-faith evidentiary basis capable of substantiation. Thank you very much.

ROV Exhibit 21.

ROV filed its formal response brief on February 4, 2026.

## STANDARD OF REVIEW

The Settlement generally entrusts the Audit investigatory process to the Claims Administrator. Section 10.3 of the Agreement provides the main contractual source of that authority. It starts, in Section 10.3(b), by setting out the Claims Administrator's power to begin an Audit, and grants the Claims Administrator wide and sweeping authority to collect information in service of a particular goal: to prevent fraud.

> When auditing a Settlement Class Member's claim for a Monetary Award or Derivative Claimant Award, the Claims Administrator will review the records and information relating to that claim and determine whether the Claim Form or Derivative Claim Form misrepresents, omits, and/or conceals material facts that affect the claim.[43]

And once it has concluded its investigation, it is for the Claims Administrator to determine its import. As Section 10.3(i) explains (emphasis added):

> If, upon completion of an audit, *the Claims Administrator determines* that there has been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the Claims Administrator will notify the Settlement Class Member and will refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) *for review and findings*. The Special Master's review and findings shall take into account whether the misrepresentation, omission or concealment was intentional . . . .

Section 10.3(j) continues:[44]

> In addition, if the Claims Administrator *at any time makes a finding (based on its own detection processes or from information received from Co-Lead Class Counsel or Counsel for the NFL Parties) of fraud* by a Settlement Class Member submitting a claim for a Monetary Award or Derivative Claimant Award, and/or by the physician providing the Qualifying Diagnosis, including, without limitation, misrepresentations, omissions, or concealment of material facts relating to the claim, the Claims Administrator will notify the Settlement Class Member and will make a recommendation to Co-Lead Class Counsel and Counsel for the NFL Parties to refer the claim to the Special Master (or the Court after expiration of the term of the Special Master and any extension(s) thereof) *for review and findings that may include, without limitation, those set forth in Section 10.3(i).*

These provisions thus assign the Claims Administrator the lead role in Audits—gathering facts, investigating claims, and making the threshold findings that trigger Special Master review—

---

[43] Settlement Agreement, Section 10.3(g).
[44] Again, emphasis added.

while reflecting the anti-fraud framework the NFL Parties negotiated as a condition of funding the Monetary Award Fund.

The Audit's explicit textual charge was incorporated into our appointment order. After first explaining that we are authorized to take "all steps necessary to faithfully oversee the implementation and administration of the Settlement Agreement," the Court further explained that

> With respect to the auditing of Monetary Awards and Derivative Claimant Awards, the Master(s) will review any claims referred by the Claims Administrator and determine whether a misrepresentation, omission, or concealment of material fact was made in connection with the claim. The Master(s) will make findings and grant appropriate relief as authorized by § 10.3(i) of the Agreement. Pursuant to Fed. R. Civ. P. 53(f)(3)(B), the parties agree that the decision of the Master(s) findings will be final and binding. Pursuant to Fed. R. Civ. P. 53(f)(4), the Court will review de novo any objection to the Master(s)' conclusions of law. [45]

The Audit Rules implement the authority granted in Sections 5.7 and 10.3, and put it into the framework of the Federal Rules. They do not expand it. Under the Settlement's structure, the Claims Administrator owns the factual record: it investigates, gathers facts, and makes the threshold findings that trigger referral. By the time a claim reaches us, that work is done. The Audit Rules reflect this division: we ask not whether we would have reached the same conclusions, but whether the Claims Administrator's findings had a "reasonable basis."[46] If they did, we adopt them, and those factual determinations become final given the interaction between the Settlement and Federal Rule 53. The Special Masters' distinct task in Audit is really to determine what happens next—to set the remedy.

RESOLVING THIS AUDIT

1. **<u>Was There a Reasonable Basis?</u>**

Mr. Grossinger, Feder Law, Pro Athlete Law Firm, Syme Law, and ROV have the burden of establishing that there was no "reasonable basis" for the Claims Administrator to find that these firms' array of questionable practices—guaranteeing Qualifying Diagnoses to prospective clients, submitting unreliable non-Program medical records, deliberately waiting to schedule MAF examinations until after these records were obtained, abusing 150-mile-rule exceptions to see favored MAF Physicians, using non-disclosed co-counsel arrangements to hide suspicious patterns, and insisting that communications and agreements not be in writing—constitutes misrepresentation, omission, and concealment of material facts with respect to their Parkinson's Disease claims.[47]

---

[45] ECF No. 6871, Order Appointing Special Masters (July 13, 2016), at 5; ECF No. 11022, Order Appointing Special Master (Mar. 5, 2020), at 3.

[46] Audit Rule 28.

[47] *Id.*

30

We conclude that they have not met their burden. Very clearly, the Claims Administrator had a reasonable basis for its findings. That basis consisted of the medical files themselves, evidence produced via subpoena, and interviews with numerous Settlement participants, who provided credible and consistent accounts of these practices.

These pieces of evidence confirm that the subject firms repeatedly submitted Parkinson's Disease claims using a scheme that—at its core—perpetuated a fiction. On the surface, the submitted medical histories depict a natural and seemingly legitimate sequence of events leading to an eventual Qualifying Diagnosis of Parkinson's Disease. But in reality, these histories were repeatedly and carefully curated by lawyers, who provided undisclosed financial benefits to non-Program doctors, raising material doubts about those records' reliability.

That some number of Players' outside medical histories were obtained illegitimately— through an unreliable, obscured, and lawyer-driven scheme—is a fact. Here, that fact, in a significant number of cases, was misrepresented and concealed from MAF Physicians, AAP reviewers, and the Claims Administrator. If, due to that misrepresentation and concealment, MAF Physicians improperly deferred to outside medical records in making their Diagnoses, and Program reviewers did not adequately scrutinize those Diagnoses upon submission, that would be material under Audit Rule 12(c): "A fact is material if it did affect or has any potential to affect whether the Settlement Class Member qualifies for a Monetary Award."

This result is not at all undermined by assertions in briefs in this Audit proceeding that *some* SCMs very likely did have Parkinson's Disease.[48] It cannot be true, as Mr. Grossinger asserts, that "if these NFL clients actually have Parkinson's Disease, that is a broad defense of these Audit allegations." Grossinger Brief at 16 (cleaned up).[49]  Whether a Player is sick with a particular disease and whether a Player (independently or through his lawyer) made a material misrepresentation in the Claim process are two separate questions. Parkinson's Disease is a terrible, wasting illness, and the greatest tragedy of this Audit is that SCMs who are suffering from it will have to start afresh in the Program.  But that a client may be suffering is no license for his

---

[48] This was a common theme in the seven individual submissions we received. Several individual claimants make the additional argument that they should not be blamed for their previous attorney's misconduct, including SPID 260006224 (noting both that he had been diagnosed and treated for Parkinson's Disease prior to his representation by one of the named firms and that he has filed a new Claim), SPID 100006536 (noting that he was no longer represented by Pro Athlete Law Firm), and SPID 100008292 (noting that "I independently terminated my relationship with Douglas Grossinger after concerns arose regarding the administration and handling of claims matters."). The SCMs whose claims are denied in this Audit will have an opportunity to submit a fresh claim under the conditions laid out below, and we agree that the thrust of the Audit concerns attorney misconduct.

[49] This assumes the truth of the matter asserted. Mr. Grossinger's brief does attach selected medical records and asserts that they demonstrate that particular claimants do have Parkinson's Disease. But even were we disposed to ask for independent chart review of these new records, and even if the records covered all ninety-eight claims under review, they may be equally unreliable: the physicians making these records neither disclose their compensation nor are subject to examination about how they were produced.

attorney to misrepresent, omit, and conceal material facts. Were that the case, then the Audit process would cease to have any meaning.[50]

Nor must we call into question the Claims Administrator's factual findings because its investigation—at times—relied on anonymous sources and hearsay testimony, which the firms were not given an opportunity to challenge or cross-examine. These due process arguments misunderstand the nature of the Settlement Program, which is

> unlike either a criminal prosecution or an agency adjudication. In a contractually created system that depends upon physician certifications and documentary submissions, the Administrator lacks unlimited compulsory power to independently verify every representation. . . . The Parties voluntarily contracted into this Settlement's Audit mechanism and negotiated its standards, and Claimants choose to submit their documentation knowing the rules of the road.[51]

Those contractual rules of the road do not include, for example, the right to cross-examine witnesses,[52] the right to request additional documents and testimony,[53] or the right to exclude evidence under the Federal Rules.[54]

That is not to say the Settlement provides for no process. It does. Section 10.3 and the Audit Rules set forth specific steps and deadlines that the Claims Administrator must follow. But these specified, contractually-bargained-for protections should not be confused with a free-flowing right to the sorts of due process protections commonly found in other adversarial legal systems.[55]

---

[50] Mr. Grossinger also attacks the Gelb Criteria for being—in his view—outdated and out-of-step with modern medicine. As we affirmed last year, the Gelb Criteria remains the appropriate criteria for the Diagnosis of Parkinson's Disease under the Settlement Agreement. Special Master Ruling on Parkinson's Disease and Deference, at 9 (July 1, 2025), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=parkinsons_disease_deference_sm.pdf. Disagreement with that decision, however vehement it may be, is irrelevant to this Audit proceeding.

[51] Special Masters' Rule 27 Decision on the Report of Adverse Finding Regarding Dr. Lisa Cook and Associated Class Members (Apr. 2, 2026), at 8-9, https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=audit_drcook_sm.pdf.

[52] *See* Audit Rule 24 ("There will be no testimony, cross-examination or other evidentiary hearing on an Audit Proceeding.").

[53] *See* Audit Rule 23 ("No requests for production, interrogatories, requests for admission, depositions or other discovery is allowed by or on behalf of any Party to the Audit Proceeding.") ROV in particular presses this argument in its briefing and in its demand letters to the Claims Administrator.

[54] *See* Special Master Ruling on Validity Testing, External Evidence, and Functional Impairment, at 18 (Mar. 27, 2023), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=validity_evidence_impairment_sm.pdf ("Had the Settlement's drafters wished to adopt the Federal Rules of Evidence . . . or any other set of limiting proscriptions, they could have done so. Instead, they created a program that vests discretion in the Claims Administrator, overseen by the Special Masters and the Court. . . .").

[55] *Cf. id.* at 19 n.36 ("Though the Special Masters have built into the Appeals system some of the trappings of a judicial tribunal—notably, adversarial briefing and a 'common law' created by opinions—it is not one, and the Program's participants should not wish it to be otherwise.")

As we explained in the Claim Appeals context: "[T]he leading treatise on class action practice teaches [that] 'the scope of the settlement administrator's authority is limited by the terms of the settlement, and by an obligation to perform her duties in good faith.' The text shapes the contours of what administrative process claimants are due."[56] The same is true for Audits.[57]

While the firms' briefing attacks the anonymous sources—arguing that they have ulterior motives, are misinformed, or both—this credibility determination is precisely the one that the Settlement has placed exclusively in the hands of the Claims Administrator. Here, the Claims Administrator not only made such credibility determinations, it justified them. Throughout its Audit Report, the Claims Administrator cites specificity, consistency, and familiarity with non-public information as reasons why, on balance, the information provided by these informants is trustworthy. We need not re-visit these reasonable determinations *de novo*.

Nor must we make an individualized finding of wrongdoing for each particular claim.[58] We have rejected exactly this argument before:

> Audit Rule 26 expressly contemplates consolidation of multiple Audit Proceedings presenting common issues of law or fact and authorizes determinations that serve the efficient and equitable administration of the Settlement as a whole. Consolidation would be meaningless if the Special Masters were required to re-prove, claim by claim, a defect that arises from a common evidentiary source.[59]

And, even more importantly, the Court has previously adopted that very view. In a prior Audit involving the neuropsychological evaluations conducted by the Neuropsychiatric Institute ("NPI"), thirty-two Former Players whose claims relied on NPI testing objected to the Special Masters' denial of their claims without prejudice. The Court wrote:

> The Special Masters did not abuse their discretion in denying without prejudice all claims relying on NPI testing. Again, the Special Investigation revealed concerns about the reliability of the testing *procedures* employed by NPI: it is unclear whether neuropsychological evaluations were overseen by a qualified individual, whether that was clinical psychologist Dr. [A] or psychiatrist Dr. [B]. Furthermore, it is unclear what effect these procedural irregularities had on testing outcomes.

---

[56] *Id.* at 18 (quoting WILLIAM B. RUBENSTEIN, 4 NEWBERG ON CLASS ACTIONS § 12:20 (6th ed.)); *see also* Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291-2 (N.Y. 1995) (cautioning that while good faith is a "promise not to act arbitrarily or irrationally" in exercising contractual discretion, "no obligation can be implied that would be inconsistent with other terms of the contractual relationship") (citation omitted).

[57] In a non-precedential opinion filed last summer, the Third Circuit agreed with this approach. In re Natl. Football League Players Concussion Injury Litig., No. 24-1910, 2025 WL 1639402 (3d Cir. June 10, 2025). Addressing attorney Byron Cuthbert's argument that our Audit decision in his case "violated due process in a variety of ways," it held that "[t]here is no due process violation" because "Appellants obtained the process available to them under the settlement agreement, which they previously had the opportunity to challenge." *Id.* at *2.

[58] *Cf.* Feder Brief at 4 (asserting that there was no "claim-specific finding of material misrepresentation"); ROV Brief at 2 (asserting the need to identify a "specific claim" with a misrepresentation).

[59] Special Masters' Rule 27 Decision on the Report of Adverse Finding Regarding Dr. Lisa Cook and Associated Class Members, *supra* note 51, at 6-7.

Irregularities in NPI's testing *procedures*—unlike irregularities in scoring—would be difficult, if not impossible, to detect and remedy through individualized review of claims—even by experts like the AAPC, as the Former Players suggest. Thus, it was reasonable for the Special Masters to deny without prejudice all claims relying on NPI testing without allowing individualized review. Affected players are free to submit new claims based on procedurally sound diagnoses from the MAF or BAP programs. As such, the Special Masters did not abuse their discretion.[60]

Similarly here, the Audit Report established a pattern of Parkinson's Disease submissions whereby a group of law firms consistently structured their clients' evaluations so as to require reliance on unreliable outside medical records. It also showed—with the exception of ROV—that the subject firms repeatedly misrepresented or concealed the identity of the attorney (Mr. Grossinger) who ran the show.

The question is whether this pattern of submitting unreliable records and concealment is sufficient to justify the Claims Administrator's inferred conclusion that a material misrepresentation was made "in connection with" the entire set of pending Parkinson's Disease claims submitted by these firms. It is.

The Settlement Agreement "mandates broad processes—such as those mentioned in Section 10.4—to detect and prevent systemic fraud. That directive informs how Sections 10.3(i) and (j) operate when the Administrator develops evidence" of an improper scheme involving numerous claims and multiple law firms.[61] Once the Administrator has developed specific evidence confirming a law firm's connection to the scheme, and several of the law firm's submissions match the scheme's general pattern, "the Administrator is not required to treat [the law firm's remaining submissions] as presumptively reliable. To require that each be proven individually would invert the burden structure of Rule 28, which asks whether there is no reasonable basis to support the Administrator's finding. That is so because the pattern itself supplies the inference."[62]

We particularly reject ROV's emphatic claim that the Audit Report primarily concerns the other four firms and that it was an innocent bystander.[63] *See, e.g.*, ROV Brief at 2 ("The [Audit]

---

[60] ECF No. 11255, Settlement Implementation Determination Opinion (Dec. 17, 2020), at 7 (emphasis in original, breaks added, internal citations omitted).

[61] Special Masters' Rule 27 Decision on the Report of Adverse Finding Regarding Dr. Lisa Cook and Associated Class Members, *supra* note 51, at 7.

[62] *Id.*

[63] More broadly, it is telling that the involved law firms spend a significant portion of their briefing pointing fingers at one another, and at other firms not implicated in the Audit proceeding. As for the latter, both Mr. Grossinger and ROV repeatedly complain that they are being unfairly singled out by the Claims Administrator. Mr. Grossinger, for his part, bemoans the fact that "other law firms also have regularly co-counseled" and use "operating procedures . . . that are very similar to how [he] has operated," but they face "no audit disruption" and are not "subject to this same Audit scrutiny." Grossinger Brief at 11, 22. Meanwhile, ROV points out that while several other attorneys, including JR Wyatt and David Langfitt, also sent clients to Dr. Jacobs, "their claims are not subject to the audit nor are their claims being pulled back." ROV Brief at 14-15 (cleaned up).

Report fails to identify any misrepresentation, omission or concealment of material fact made in connection with [ROV's] Audit Claims.") (cleaned up). True, ROV did not submit claims on behalf of Mr. Grossinger. Nor does the Audit Report conclude that it used cover firms for its own claims.

But this does not exculpate the law firm or its principals, for the deceptive use of cover lawyers is merely one aspect of the broader scheme. We have already described ROV's practices around 150-mile-rule requests and deliberate omission of medical records suggesting the absence of impairment. And, like Mr. Grossinger and his three cover firms, but acting independently of them, ROV repeatedly misrepresented, omitted, and concealed material facts regarding how its clients' outside medical histories were obtained. We document several examples here, focusing in particular on ROV's failure to disclose payments it made to forensic doctors that repeatedly rendered outside diagnoses.

Consider Dr. Jonathan Fellus, who provided the initial diagnosis of Parkinson's Disease to four ROV clients who submitted a Claim: SPIDs 100004215, 100003877, 100014942, 100004734. In all four, the MAF Physician who certified the Qualifying Diagnosis of Parkinson's Disease relied on Dr. Fellus' initial diagnosis. And, in all four cases, ROV's representation began before the SCM was first diagnosed by Dr. Fellus. Given this sequence of events, and the absence of any evidence indicating a relationship between the SCMs and Dr. Fellus prior to ROV's representation, it was reasonable for the Claims Administrator to conclude that ROV was responsible for (and paid for) Dr. Fellus' involvement.

Indeed, in its supplemental responses provided as part of the Audit investigation, ROV vehemently defended Dr. Fellus, asserting that "[t]he implication that . . . Dr. Fellus . . . [is] not [a] credible doctor[] is incredulous." Audit Report at Exhibit N. ROV also wrote that when finding non-Program doctors for its clients, "it sought credible and compassionate care—not specific board certification." *Id.* In its briefing before us, it continues to assert that Dr. Fellus' diagnoses are pristine. ROV Brief at 3.

This is a rhetorical sideshow, but illustrative of the problems of outside diagnoses. It is true that Dr. Fellus is not board certified, and he has not been since 2014. Nor is Dr. Fellus a movement disorders specialist. We also note that, as of 2026, Dr. Fellus is not licensed to practice medicine at all. In 2014, the New Jersey Board of Medical Examiners revoked Dr. Fellus' license after he allegedly engaged in sexual conduct with a female patient inside the examination rooms at the

---

The firms also cast blame internally, with each firm simultaneously portraying itself as merely a victim of guilt by association. ROV argues that it is "unlike the other firms" because those "other firms [did not] cooperate" and their "numerous allegations of misconduct have nothing to do with ROV." *Id.* at 10, 15 (cleaned up). Feder Law attempts the same, asserting that the "key" Audit findings "concern other firms' clients and other counsel of record, not Feder clients or Feder files." Feder Brief at 6. Finally, Pro Athlete Law Firm minimizes its own involvement in the claims process, attributing the primary responsibility and fault to Mr. Grossinger. Pro Athlete Brief at 3-4, 18-20. Pro Athlete Law Firm asserts that it was "unaware" of, and did not "acquiesce in, Mr. Grossinger's allegedly improper conduct." *Id.* at 24 (cleaned up).

rehabilitation center where Dr. Fellus was treating the patient for a brain injury.[64] A jury awarded the female patient $3.2 million in connection with the incident.[65] In 2018, Dr. Fellus regained his license, under the condition that he always be accompanied by a chaperone when examining female patients.[66] Dr. Fellus allegedly did not comply, and in January 2026 the Board of Medical Examiners again suspended his license.[67] New Jersey now seeks to permanently revoke it.[68]

Dr. Fellus examined the four SCMs for Parkinson's Disease in 2024 and 2025, after regaining his license and before losing it again. It was more than reasonable to conclude that during these visits Dr. Fellus was acting as a paid forensic doctor, specifically hired by ROV to provide an initial diagnosis. As Dr. Fellus said on a podcast in 2022, "medical-legal" work was a "money train."[69] ROV never informed the Claims Administrator when submitting claims, or the MAF Physician evaluating the SCMs, that Dr. Fellus was its paid expert. Even today it is not clear how much ROV paid Dr. Fellus for these claims, or others not yet submitted.

ROV similarly did not disclose payment terms with at least five other doctors, each of whom provided initial diagnoses of Parkinson's Disease to ROV clients, and each of whom publicly advertises paid expert witness or paid consultant services.[70] It was reasonable for the Claims Administrator to conclude these seemingly neutral outside diagnoses were created through an undisclosed, compensated, forensic practice, and did not result from a course of ordinary neurological treatment. That omission was material.

Overall, because the subject firms have not shown that the Claims Administrator's findings lacked a reasonable basis, we adopt the factual conclusions in the Audit Report.

---

[64] Alex Wigglesworth, *AG: Neurologist Had Sex with Brain-Injured Patient*, PHILA. INQUIRER (June 13, 2014), https://www.inquirer.com/philly/news/new_jersey/AG_Neurologist_had_sex_with_brain-injured_patient.html.

[65] Karin Price Mueller, *N.J. Doc Needed a Chaperone to See Female Patients. His License is Suspended Again*, NJ.COM (Feb. 6, 2026), https://www.nj.com/morris/2026/02/nj-doc-needed-a-chaperone-to-see-female-patients-his-license-is-suspended-again.html.

[66] *Id.*

[67] In the Matter of the Suspension or Revocation of the License of Jonathan L. Fellus, M.D. License No. 25MA06616400 to Practice Medicine and Surgery in the State of New Jersey, Interim Consent Order, (N.J. State Bd. of Med. Exam'rs Jan. 14, 2026), https://www.njconsumeraffairs.gov/Actions/20260114_25MA06616400.pdf.

[68] *See* Division of Consumer Affairs Interim Consent Order Announcement (Feb. 6, 2026), https://www.njoag.gov/morris-county-neurologist-suspended-from-practice-amid-allegations-he-violated-and-evaded-prior-sexual-misconduct-order/.

[69] In that podcast interview, Dr. Fellus said that he had done (among other things) "medical-legal work, forensic work," often "testifying in court for lucrative work." THE JASON HENNESSEY PODCAST: *Dr. Jonathan Fellus* (August 3, 2022), https://www.jasonhennessey.com/podcast/dr-jonathan-fellus. Dr. Fellus emphasized that while he enjoyed helping patients, he was "getting rewarded for doing what [he] love[d]." *Id.*

[70] The forensic doctors were: Dr. Jay Lombard: SPIDs 100001072, 100008104, 100008923; Dr. Kirk Daffner: SPID 100000878; Dr. Steven Croft: SPID 100004455; Dr. Alan Shepard: SPIDs 100006341, 100013321; Dr. Eric Kramer: SPID 100010740.

Several SCMs were diagnosed by these doctors months before any official filing with the Claims Administrator disclosing that ROV was representing the SCM. These delays potentially violate Section 30.2(a) of the Settlement Agreement, which requires that all individual counsel "provide notice of his or her representation to the Claims Administrator" within 30 days of being retained by an SCM.

## 2. **What Remedies are Appropriate?**

The Settlement Agreement empowers the Special Masters to direct relief from a broad and non-exclusive menu of options:

> The Special Master's review and findings shall take into account whether the misrepresentation, omission or concealment was intentional, and may include the following relief, *without limitation*:
>
> > (a) denial of the claim in the event of fraud;
> >
> > (b) additional audits of claims from the same law firm or physician (if applicable), including those already paid;
> >
> > (c) referral of the attorney or physician (if applicable) to the appropriate disciplinary boards;
> >
> > (d) referral to federal authorities;
> >
> > (e) disqualification of the attorney, physician and/or Settlement Class Member from further participation in the Class Action Settlement; and/or
> >
> > (f) *if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member will be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.*[71]

The Claims Administrator recommends the denial of all pending Parkinson's Disease claims submitted by, or where the non-Program diagnosis and/or Qualifying Diagnosis was rendered while under representation by, Mr. Grossinger, Feder Law, Pro Athlete Law Firm, Syme Law, and ROV. Audit Report at 80. Meanwhile, the NFL Parties seek disqualification of these firms. NFL Parties Brief at 20-22. They also request the recoupment of funds from SCMs who have already had their Monetary Awards approved and paid. *Id.*

Given the scale of the substantial and intentional wrongdoing the Audit Report revealed, the subject firms' uncooperative responses to the Audit, the fact that Settlement Class Members may have been prescribed a powerful medication for a disease they did not have, and the possibility that similarly sophisticated fraudulent schemes may recur over the Program's remaining decades, we will deploy the full panoply of remedies available under Section 10.3(i).

First, and most obviously, there are thirty-seven Players whose Parkinson's Disease claims remain pending where the Audit established that their current or former attorneys participated in a deceptive scheme to leverage unreliable outside medical records to get Diagnoses inside of the Program. Because the Settlement cannot rely on the firms representing these Players, nor on

---

[71] Settlement Agreement, Section 10.3(i) (emphasis added, spacing added).

potentially unreliable evidence, we agree with the Claims Administrator that the denial of these thirty-seven claims is warranted under Section 10.3(i).

We specifically note that these thirty-seven Players may submit new claims based on new MAF exams.[72] So too may the four Players whose Parkinson's Disease claims were denied or withdrawn, and the fifty-seven Players who previously received Parkinson's Disease Awards facilitated by the subject firms (their new claims would be Supplemental claims for other Qualifying Diagnoses). However, for these ninety-eight Players—and all others who have submitted a Claim (for any Qualifying Diagnosis) through one of the five involved law firms—given that they have a history of submitting tainted claims, or working with firms who were willing to do so, we direct the Claims Administrator to establish special processes of heightened review for any future claims they submit.[73]

Second, we direct the Claims Administrator to refuse to accept any Claim going forward where a MAF Physician relied on the judgment of Drs. Steinberg, Pearlstein, Kramer, Karunapuzha, Verma, Sanchez, Fellus, or Isaacson. If any claims currently under review contain diagnoses relying in any way on any of these physicians, the Claims Administrator shall undertake reasonable efforts to permit the Claimant to cure that reliance through additional documentation. But it will deny those claims if it cannot determine that the Qualifying Diagnosis was entirely free of the scheme this Audit Report revealed.

Third, because the scheme at issue in this Audit touches so many Parkinson's Disease submissions, and drawing the line between implicated and non-implicated claims has become challenging, we have asked the Claims Administrator to develop and announce measures to ensure diagnostic reliability moving forward. It does so in response to the concerns raised in this Audit and under its authority under Section 8.6(b) of the Settlement Agreement.

As these measures are developed, it is important to balance the Program's anti-fraud rules with the day-to-day realities of practice. The Settlement does not contemplate the kind of forensic medicine the subject firms employed: indeed, it has carefully crafted requirements for its diagnosing practitioners. Avoiding those requirements by paying outside doctors to manufacture diagnoses which are then laundered inside the Program corrodes the Settlement's anti-influence rules, reduces confidence in payouts, and threatens to harm claimants through use of potent medicines that they do not need.

IRPAs, however, may reasonably argue that "screening" clients with doctors before investing in them is an ordinary part of practice, which suggests the complexity of an outright ban. It does make sense that an IRPA would send a Retired Player to be evaluated before spending more money on a full exam. Prohibiting that practice would dissuade legitimate claimants.

---

[72] We are aware of one pending Claim on behalf of a now-deceased SCM (SPID 100014000). As we describe below, the Claims Administrator may create a special process for review of that SCM's records.

[73] At the least, this will require mandatory AAP review of each Claim.

The Claims Administrator's measures will achieve that balance by requiring *disclosure* of details regarding medical records related to the submitted Qualifying Diagnosis, including those records relating to doctors' visits that did not lead to diagnoses. That disclosure will help to contextualize testing that resulted in a Qualifying Diagnosis, and it is necessary to have a complete and accurate diagnostic picture. Failing to fully disclose information (including payment information) regarding a screening visit, or any other visit, under such circumstances would amount to the omission of a material fact.[74] The Claims Administrator may also require heightened screening, including requiring positive biomarker tests, for certain Qualifying Diagnoses given the concerns discussed in this Audit Report.

That brings us to the conduct of Mr. Grossinger, Feder Law, Pro Athlete Law Firm, Syme Law and ROV. In choosing from Section 10.3(i)'s menu of remedies, we are instructed to consider whether the underlying conduct was intentional. Here, the facts overwhelmingly support the conclusion that it was: all five firms, in some way or another, took deliberate and repeated steps to circumvent the Settlement's anti-fraud safeguards.

An aggravating factor is the subject firms' failure to reasonably cooperate with this Audit.

As the Settlement Agreement makes clear, law firms and SCMs who find themselves in Audit proceedings are expected to provide extensive documentation at the Claims Administrator's request.[75] The penalty for non-compliance is strict:

> A Settlement Class Member who refuses to cooperate with an audit, including by unreasonably failing or refusing to provide the auditing party with all records and information sought within the time frame specified, will have the claim denied by the Claims Administrator, without right to an appeal.[76]

This makes sense, for the Settlement Program is a contractually-created entity, and its Administrator cannot independently force compliance with either its rules or its requests. Instead, the Program powerfully incentivizes that compliance by providing access to its lucrative uncapped Monetary Award Fund. In other words, no SCM or law firm is required to participate in the Settlement Program, but those who *choose* to participate must play by its rules or risk disqualification. Under Section 10.3(b)(ii), a law firm's obligation to cooperate is derivative of its client's obligation to cooperate, since the Monetary Award Fund is accessed by Class Members, not lawyers.

During the Audit investigation, the Claims Administrator requested that each law firm confirm any co-counsel agreements it had and provide information about its financial arrangements with non-Program doctors. These requests were simple and did not require sharing any privileged

---

[74] If counsel (as ROV apparently does) objects to this requirement on the ground that disclosure of screening-visit details alongside already submitted diagnostic materials compels production of attorney work product, they may brief that objection on appeal from a denial, with particular attention to Federal Rule of Evidence 502(a) and the "at issue" waiver doctrine, and the question will ultimately be subject to the Court's review.

[75] Settlement Agreement, Section 10.3(e)-(f).

[76] Settlement Agreement, Section 10.3(b)(ii).

information. And yet only one firm, Feder Law, provided a minimally informative response—confirming that it did have an active co-counsel relationship with Mr. Grossinger.

The remaining four firms—Mr. Grossinger, Pro Athlete Law Firm, Syme Law, and ROV—strenuously objected to the Claims Administrator's inquiries. Those that responded substantively (incorrectly) asserted, among other things, that the requests called for privileged information, imposed an undue burden, and asked for information not in the firm's possession, and that the Claims Administrator lacked audit authority. Three firms—Mr. Grossinger, Pro Athlete Law Firm, and Syme Law—provided no substantive response to the Claims Administrator's questions. ROV did provide substantive answers (notwithstanding its lengthy objections), but these answers were tautological and tendentious.

The Claims Administrator faced similar resistance from the non-Program doctors it contacted: Dr. Steinberg refused an interview with the Claims Administrator and provided a selected set of financial records, Dr. Karunapuzha provided a barely informative response and asserted attorney-client privilege as a third-party consultant to Mr. Grossinger, and Dr. Verma provided no response, objecting on a variety of grounds.

The Settlement requires more. Cooperation should be timely and responsive, not slow and designed to provide as little information as possible. Objections must be specific and well-cited, not frivolous and repetitive. To the extent a law firm (or doctor) asserts a privilege, it must do so on a communication by communication and document by document basis, and it should demonstrate that its client consented to the assertion.[77] This will allow the Special Masters to rule on its applicability, subject to the Court's oversight.

---

[77] The involved law firms (and non-Program doctors) repeatedly used attorney-client privilege as an excuse for why they could not cooperate with the Claims Administrator's requests. None of these assertions of privilege were supported by even a single legal citation, nor did any firm or doctor specifically explain which pieces of requested information were barred by privilege.

Vague, unsupported assertions of privilege do not suffice in ordinary legal proceedings, where the "party asserting a privilege bears the burden of proving the applicability of the privilege," Matter of Bevill, Bresler & Schulman Asset Mgt. Corp., 805 F.2d 120, 126 (3d Cir. 1986), let alone in the Settlement Program, where the Parties have agreed—contractually—to condition access to the Monetary Award Fund on full and timely cooperation with any Audit proceedings. Class Members, and by extension, their lawyers, can only be paid through the Program if they provide "*all* records and information sought *within the time frame specified*." Settlement Agreement, Section 10.3(b)(ii) (emphasis added). The Audit process would be irreparably damaged if SCMs and law firms could escape their obligation to cooperate simply by asserting privilege, without any accompanying proof or explanation.

Here, the repeated assertions of privilege were likely without merit, even if the crime-fraud exception to privilege is inapt. Information confirming the existence of an ongoing business relationship between two attorneys (or an attorney and a doctor) has absolutely no bearing on "communications between attorneys and clients" made "in confidence . . . for the purpose of obtaining or providing legal assistance for the client." In re Teleglobe Commun. Corp., 493 F.3d 345, 359 (3d Cir. 2007); *see also* In re Ford Motor Co., 110 F.3d 954, 965 (3d Cir. 1997) ("The communications must be for the purpose of obtaining legal advice."); Montgomery Cnty. v. MicroVote Corp., 175 F.3d 296, 304 (3d Cir. 1999) ("[A]ttorney-client privilege does not shield fee arrangements."). In other words, attorney-*client* communications about *legal* issues are protected, while attorney-*attorney* communications about *financial* dealings are not.

Here, it is easy to conclude that the subject firms each failed in their obligation to reasonably cooperate with this Audit. At the same time, they repeatedly submitted claims with material omissions: e.g., who was the real counsel-in-interest, were there other recent medical records indicating an absence of impairment, were the underlying medical records real or manufactured, were the outside neurologists independent professionals or captive diagnosis factories, did clients really need exceptions to the anti-fraud 150-mile rule for MAF diagnoses, or were the lawyers engaging in doctor shopping?

The subject firms' repeated omissions and misstatements in Claim submissions, and lack of reasonable cooperation in Audit, together justify the extraordinary relief under 10.3(i) of disqualifying these lawyers from further participation in the Program. We therefore bar each of the subject firms from submitting additional claims.

This exclusion comes with collateral consequences. To the extent that the Program holds legal fees on Claims on these lawyers' behalf, under 10.3(i)(f), we order those funds to be reverted to the Monetary Award Fund. The Claims Administrator will additionally refuse to recognize future equitable liens asserted by each of these firms. If any attorneys currently at the subject firms join a new practice, they may individually apply for reinstatement if they can certify, to the Claims Administrator's satisfaction, that they were not involved in the scheme that the Audit Report discloses.

The NFL Parties additionally request that the subject firms be forced to pay the costs they incurred in funding this Audit investigation.[78] Though not expressly granting us the power to order this compensatory remedy, the Settlement Agreement describes our remedial options post-Audit as "without limitation."[79] And, under the terms of our Appointment Order, we must "take all steps necessary to faithfully oversee the implementation and administration of the Settlement Agreement."[80] That Order, pursuant to Rule 53, invests us with the flexible and protean power of equity, fashioned as we think appropriate to maintain the Settlement's structure and vindicate the rights of the Class for decades to come.

---

Settlement participants should also remember that the "privilege belongs to the client." Klitzman, Klitzman and Gallagher v. Krut, 744 F.2d 955, 960 (3d Cir. 1984). Although an attorney may certainly "assert the privilege on his client's behalf," *id.*, an attorney may not—as we suspect may have occurred here—"assert [the privilege] on his own behalf" to advance his own interests. In re Avandia Mktg., Sales Practices and Products Liab. Litig., 415 F. Supp. 3d 498, 506 (E.D. Pa. 2019) (cleaned up).

If a law firm intends to assert privilege in response to a request from the Claims Administrator, it can only do so with the consent of its client: the Player himself. That decision is one for the Player to make, having been informed of his options, not one for the law firm to unilaterally assert in the interests of self-preservation.

[78] The NFL Parties expressly reserve their right to recoup underlying Award payments in separate proceedings. The Claims Administrator shall cooperate with the NFL Parties in providing needed evidence for any resulting claim.

[79] Settlement Agreement, Section 10.3(i).

[80] ECF No. 6871, Order Appointing Special Masters (July 13, 2016), at 3 (quoting Settlement Agreement, Section 10.1(a)(ii)).

In a related recent case, the Special Master in the 3M Earplugs MDL recommended that a law firm who submitted false claims be required to pay for the investigative expenses incurred by the settlement program.[81] The District Court adopted the Special Master's recommendation, ordering the firm to pay nearly $250,000 in investigative costs, and noted that "absent the measures taken here, other counsel in this Program and elsewhere, may go undeterred in the future. It is my hope that these measures will help to avoid a similar unfortunate situation from occurring in another settlement program."[82]

Sharing that aspiration, and as permitted under Section 10.3(i), we adopt the 3M Court's approach. We direct the Claims Administrator to prepare a report describing the costs and fees it expended preparing this Report to date. We will then order that each subject firm equally share the burden of making the NFL Parties whole for at least a small part of the harm detailed in this Report, through a payment to the Monetary Award Fund.

Consistent with the explanation above, we order the following remedies:

1. The Claims Administrator will deny the thirty-seven currently pending Parkinson's Disease claims that were submitted by, or where the non-Program diagnosis and/or Qualifying Diagnosis was rendered while under representation by, Mr. Grossinger, Feder Law, Pro Athlete Law Firm, Syme Law, or ROV. These claims are listed in Appendix A-1 below.

2. All ninety-eight SCMs who submitted a Parkinson's Disease Claim implicated in this Audit may seek a new evaluation from a Qualified MAF Physician.

   a. If the SCM is no longer alive and a Representative Claimant supports their Claim, the Claims Administrator will develop apt procedures to determine if a Qualifying Diagnosis can be supported without reliance on tainted records.
   b. The SCMs must provide any future MAF Physician with a synopsis of this Decision, which the Claims Administrator shall prepare. The MAF Physicians may see, but not rely upon, the ultimate medical judgments rendered along with any documentation or records associated with the Parkinson's Disease claims implicated in this Audit. These SCMs subject to this rule are listed in Appendices A-1, A-2, and A-3 below.

3. Any SCM who has previously submitted a Claim with Mr. Grossinger, Feder Law, Pro Athlete Law Firm, Syme Law, or ROV—regardless of the Qualifying Diagnosis, the result of the Claim, or the SCM's current representation—will have all pending and future claims

---

[81] Special Master Report and Recommendation at 35, In re 3M Combat Arms Earplugs Prods. Liab. Litig., No. 3:19MD2885 (N.D. Fla. Dec. 5, 2025). The Special Master ordered this repayment despite not finding that the law firm "intentionally committed fraud," but rather was only "consciously and recklessly indifferent." *Id.* at 2. In the current Audit, the underlying conduct was arguably more severe, given our finding of intentionality.

[82] In re 3M Combat Arms Earplug Prods. Liab. Litig., No. 3:19MD2885, 2026 WL 483602, at *2 (N.D. Fla. Feb. 20, 2026).

subject to a heightened review process, as established by the Claims Administrator and the AAP. These affected claimants are listed in Appendices below.

4. The Claims Administrator will deny any Claim going forward where a MAF Physician relied on the judgment of Drs. Steinberg, Pearlstein, Kramer, Karunapuzha, Verma, Sanchez, Fellus, or Isaacson. If any claims currently under review contain diagnoses relying on any of these physicians, the Claims Administrator shall undertake reasonable efforts to permit the Claimant to cure that reliance through additional documentation. But it will deny those claims if it cannot determine that the Qualifying Diagnosis was entirely free of the scheme this Audit Report revealed.

5. Once any appeal process terminates, Mr. Grossinger, Feder Law, Pro Athlete Law Firm, Syme Law, and ROV will be disqualified from further participation in the Program. Each firm will be prohibited from submitting further claims in the Settlement Program. The Claims Administrator will transfer any attorney fees belonging to those firms currently being held by the Program to the Monetary Award Fund,[83] and it will refuse to recognize future attorney liens asserted by any of these firms. During the pendency of any appeals process, the Claims Administrator shall not process claims or liens made by any of these firms.

6. Within a reasonable time, the Claims Administrator will prepare a report describing the costs and fees it expended preparing the Audit Report as of December 12, 2025, and submit that bill in equal shares to Mr. Grossinger, Feder Law, Pro Athlete Law Firm, Syme Law, and ROV.

7. Because the subject firms may no longer represent clients in this settlement, *any* IRPA that has an undisclosed co-counsel relationship for any pending or past Claim with those firms must disclose that relationship to the Claims Administrator within sixty days of today.[84]

   a. Pending claims where there is a co-counsel relationship with the subject IRPAs will be stayed pending the resolution of any appeal of this Decision unless the disclosing IRPA demonstrates that the co-counsel relationship has been terminated, and in that case can proceed under the heightened review process described in Paragraph 3 above.
   b. We have filed this decision with the Court on the MDL Docket, and instruct the Claims Administrator to make it available—without redactions—on its public website.[85]

---

[83] This would include funds subject to the remaining 1% holdback.

[84] Co-counsel relationships are different from mere referral relationships where there is a private contract to pay a referral fee, and only one firm is actively representing the SCM. In case of doubt, IRPAs should disclose ongoing relationships with the subject firms.

[85] Under Audit Rule 35, we designate this decision for publication on the Settlement's webpage alongside its filing on the MDL Docket, and we further conclude that it contains nothing we deem to be confidential Claim information under the Settlement Agreement.

8. The Claims Administrator will develop and soon announce additional measures to ensure the reliability of diagnoses. Additionally, Class Counsel and the Counsel for the NFL Parties will engage with the Special Masters and the Claims Administrator to revisit and consider any additional modifications to the diagnostic criteria for the Settlement's Qualifying Diagnoses.


_____
David A. Hoffman, Special Master

_____
Jo-Ann M. Verrier, Special Master


JUNE 8, 2026

**APPENDIX**

A-1:    Pending Parkinson's Disease Claims Subject to Denial Under This Decision

| SPID | Claim | Current Representation | Representation on Claim Form | Asserted Monetary Award[86] |
|---|---|---|---|---|
| 100008292 | 13014 | Pro se | Mr. Grossinger | $723,069.00 |
| 100010739 | 9368 | Mr. Grossinger | Mr. Grossinger | $866,690.00 |
| 100001722 | 8097 | Feder Law | Feder Law | $2,458,469.00 |
| 100010932 | 12942 | Feder Law | Feder Law | $2,563,447.80 |
| 100009525 | 12845 | Syme Law | Syme Law | $858,144.00 |
| 100004713 | 6471 | Locks Law Firm | Pro Athlete Law Firm | $2,319,311.00 |
| 100014849 | 8318 | Locks Law Firm | Pro Athlete Law Firm | $2,026,345.00 |
| 100007450 | 9748 | Locks Law Firm | Pro Athlete Law Firm | $1,541,323.60 |
| 100010106 | 11361 | Locks Law Firm | Pro Athlete Law Firm | $2,026,345.00 |
| 100003271 | 12651 | Locks Law Firm | Pro Athlete Law Firm | $2,736,786.00 |
| 100014820 | 12703 | Locks Law Firm | Pro Athlete Law Firm | $3,015,103.00 |
| 950007919 | 13214 | Locks Law Firm | Pro Athlete Law Firm | $2,736,786.00 |
| 100010271 | 13261 | Locks Law Firm | Pro Athlete Law Firm | $779,288.40 |
| 100012594 | 13288 | Locks Law Firm | Pro Athlete Law Firm | $3,015,103.00 |
| 100002632 | 13303 | Locks Law Firm | Pro Athlete Law Firm | $3,434,206.00 |
| 100008923 | 2736 | ROV | ROV | $1,220,690.00 |
| 100014942 | 5798 | ROV | ROV | $820,303.80 |
| 100002633 | 6030 | ROV | ROV | $1,155,992.70 |
| 100010746 | 8851 | ROV | ROV | $2,736,786.00 |
| 100001188 | 9006 | ROV | ROV | $1,044,910.00 |
| 100003617 | 9880 | ROV | ROV | $2,458,469.00 |
| 100003877 | 10623 | ROV | ROV | $1,220,690.00 |
| 100014000 | 11500 | ROV | ROV | $2,026,345.00 |
| 100006793 | 11897 | ROV | ROV | $1,220,690.00 |
| 100016911 | 12418 | ROV | ROV | $1,293,931.00 |
| 100004455 | 12824 | Athlaw | ROV | $1,220,690.00 |
| 100006341 | 12825 | ROV | ROV | $649,406.00 |
| 100015756 | 12858 | ROV | ROV | $1,367,173.00 |
| 950006652 | 12866 | ROV | ROV | $858,144.00 |
| 950014765 | 12892 | ROV | ROV | $1,879,862.00 |
| 100008981 | 12946 | ROV | ROV | $820,303.80 |
| 100001072 | 12949 | ROV | ROV | $858,144.00 |
| 100008104 | 13079 | ROV | ROV | $1,127,917.20 |

---

[86] The net Monetary Award that each claimant would receive had their Parkinson's Disease Claim been approved in 2026, after any offsets and prior award reductions.

| 100004734 | 13125 | ROV | ROV | $1,103,504.00 |
| 100014943 | 13245 | ROV | ROV | $1,513,655.00 |
| 100004215 | 13297 | ROV | ROV | $1,103,504.00 |
| 100006536 | 9643 | Pro se | JR Wyatt Law[87] | $1,367,173.00 |

*Total Asserted Monetary Awards:*    **$60,168,700.30**

A-2:    Previously Paid Parkinson's Disease Claims

| SPID | Claim | Current Representation | Representation on Claim Form | Monetary Award[88] |
|---|---|---|---|---|
| 100001008 | 1066 | Mr. Grossinger | Mr. Grossinger | $1,470,276.00 |
| 100002436 | 2988 | Mr. Grossinger | Mr. Grossinger | $408,484.00 |
| 100005113 | 11539 | Mr. Grossinger | Mr. Grossinger | $1,292,226.00 |
| 100008318 | 1390 | Mr. Grossinger | Mr. Grossinger | $1,473,591.00 |
| 100008730 | 9996 | Mr. Grossinger | Mr. Grossinger | $990,168.00 |
| 100009709 | 10035 | Mr. Grossinger | Mr. Grossinger | $776,967.84 |
| 100011240 | 7798 | Mr. Grossinger | Mr. Grossinger | $1,133,752.00 |
| 100013908 | 11264 | Mr. Grossinger | Mr. Grossinger | $1,293,885.00 |
| 100015134 | 10029 | Mr. Grossinger | Mr. Grossinger | $2,731,535.00 |
| 100017061 | 11504 | Mr. Grossinger | Mr. Grossinger | $3,870,596.00 |
| 100017209 | 12904 | Mr. Grossinger | Mr. Grossinger | $1,264,753.04 |
| 100000482 | 12646 | Feder Law | Feder Law | $1,225,652.00 |
| 100000784 | 10755 | Feder Law | Feder Law | $1,548,191.78 |
| 100000913 | 11615 | Feder Law | Feder Law | $1,203,800.38 |
| 100001100 | 12706 | Feder Law | Feder Law | $146,395.00 |
| 100002109 | 12626 | Feder Law | Feder Law | $475,204.00 |
| 100002489 | 9461 | Feder Law | Feder Law | $2,412,156.08 |
| 100002509 | 12604 | Feder Law | Feder Law | $1,359,387.70 |
| 100004590 | 6795 | Feder Law | Feder Law | $2,605,463.90 |
| 100008593 | 8297 | Feder Law | Feder Law | $3,870,596.00 |
| 100011393 | 11357 | ROV | Feder Law | $971,020.80 |
| 100011810 | 5968 | Feder Law | Feder Law | $1,076,589.00 |
| 100012872 | 7501 | Feder Law | Feder Law | $2,799,823.38 |
| 100013007 | 11579 | Pro se | Feder Law | $588,091.68 |
| 100013175 | 12062 | Feder Law | Feder Law | $1,405,282.00 |
| 100013651 | 8697 | Feder Law | Feder Law | $2,047,446.72 |

[87] SPID 100006536 received a non-Program diagnosis of Parkinson's Disease while represented by Pro Athlete Law Firm.

[88] The Monetary Award value after any applicable offsets. The amount paid to each Player is lower, due to common benefit fees, law firm fees and expenses, holdbacks, and pending liens. The total amount paid to Players is $87,714,085.32.

| 950000953 | 10374 | Feder Law | Feder Law | $2,353,322.10 |
|---|---|---|---|---|
| 950005755 | 12230 | Feder Law | Feder Law | $3,173,888.00 |
| 950008716 | 11130 | Feder Law | Feder Law | $458,321.76 |
| 100001962 | 10012 | Syme Law | Syme Law | $1,301,294.00 |
| 100002264 | 1909 | Syme Law | Syme Law | $1,171,164.60 |
| 100002546 | 12237 | Syme Law | Syme Law | $1,609,614.90 |
| 100007657 | 12820 | Syme Law | Syme Law | $1,262,371.55 |
| 100016009 | 12799 | Syme Law | Syme Law | $407,816.37 |
| 950008031 | 12613 | Syme Law | Syme Law | $3,300,871.97 |
| 100000291 | 12756 | Locks Law Firm | Pro Athlete Law Firm | $2,737,365.00 |
| 100000701 | 12699 | Locks Law Firm | Pro Athlete Law Firm | $2,068,128.00 |
| 100001935 | 4078 | Locks Law Firm | Pro Athlete Law Firm | $971,209.80 |
| 100003382 | 12852 | Locks Law Firm | Pro Athlete Law Firm | $1,521,991.24 |
| 100004292 | 12860 | Pro se | Pro Athlete Law Firm | $1,019,424.00 |
| 100006626 | 7353 | Locks Law Firm | Pro Athlete Law Firm | $3,776,191.00 |
| 100012725 | 12885 | Locks Law Firm | Pro Athlete Law Firm | $2,500,924.80 |
| 100012925 | 12769 | Locks Law Firm | Pro Athlete Law Firm | $2,066,269.68 |
| 100014129 | 11934 | Locks Law Firm | Pro Athlete Law Firm | $1,262,372.00 |
| 100015742 | 3119 | Locks Law Firm | Pro Athlete Law Firm | $3,659,889.60 |
| 260000470 | 7383 | Pro se | Pro Athlete Law Firm | $2,479,393.00 |
| 260000953 | 7761 | Locks Law Firm | Pro Athlete Law Firm | $2,119,832.00 |
| 900007110 | 8879 | Pro se | Pro Athlete Law Firm | $176,604.20 |
| 100000878 | 12379 | ROV | ROV | $1,337,567.00 |
| 100002388 | 3670 | ROV | ROV | $2,353,483.44 |
| 100003110 | 2719 | ROV | ROV | $2,604,912.00 |
| 100008676 | 11505 | ROV | ROV | $796,873.00 |
| 100010740 | 11487 | Pro se | ROV | $756,425.09 |
| 100012672 | 12320 | ROV | ROV | $1,269,555.00 |
| 100013321 | 12662 | ROV | ROV | $2,737,365.00 |
| 950006513 | 12218 | ROV | ROV | $659,034.92 |
| 100002017 | 12477 | Pro se | Byron Cuthbert and Associates[89] | $1,045,683.27 |

*Total Paid Monetary Awards:*    $95,400,492.59

A-3: Previously Denied or Withdrawn Parkinson's Disease Claims

| SPID | Claim | Current Representation | Representation on Claim Form | Status |
|---|---|---|---|---|
| 100006671 | 12570 | Mr. Grossinger | Mr. Grossinger | Denied |
| 100013620 | 12961 | Feder Law | Feder Law | Denied |

---

[89] SPID 100002017 received a Qualifying Diagnosis of Parkinson's Disease while represented by Feder Law.

| 100014169 | 13433 | JR Wyatt Law | Mr. Grossinger | Denied |
| 260006224 | 13305 | Shenaq PC | Pro Athlete Law Firm | Withdrawn |

A-4: Non-Parkinson's Disease Claims[90]

Non-Parkinson's Disease Claims Submitted by Mr. Grossinger

| SPID | Claim | Current Representation | Qualifying Diagnosis | Status |
|------|-------|----------------------|---------------------|--------|
| 100000883 | 5919 | Mr. Grossinger | Alzheimer's Disease | Paid |
| 100003312 | 9102 | Mr. Grossinger | Alzheimer's Disease | Paid |
| 100003713 | 11358 | Mr. Grossinger | Alzheimer's Disease | Paid |
| 100004202 | 8962 | Mr. Grossinger | Alzheimer's Disease | Paid |
| 100004593 | 9115 | Mr. Grossinger | Alzheimer's Disease | Paid |
| 100006864 | 4056 | Mr. Grossinger | Alzheimer's Disease | Paid |
| 100006918 | 1664 | Mr. Grossinger | Alzheimer's Disease | Paid |
| 100007543 | 8984 | Mr. Grossinger | Alzheimer's Disease | Paid |
| 100010088 | 9112 | Mr. Grossinger | Alzheimer's Disease | Paid |
| 950011631 | 10398 | Mr. Grossinger | Alzheimer's Disease | Paid |
| 100009339 | 5585 | Pro se | Alzheimer's Disease | Paid |

Non-Parkinson's Disease Claims Submitted by Feder Law

| SPID | Claim ID | Current Representation | Qualifying Diagnosis | Status |
|------|----------|----------------------|---------------------|--------|
| 100005368 | 11289 | Feder Law | Alzheimer's Disease | Paid |
| 950007036 | 3391 | Feder Law | Alzheimer's Disease | Paid |
| 950006318 | 11147 | ROV | Alzheimer's Disease | Paid |

Non-Parkinson's Disease Claims Submitted by Pro Athlete Law Firm

| SPID | Claim | Current Representation | Qualifying Diagnosis | Status |
|------|-------|----------------------|---------------------|--------|
| 100013575 | 6432 | Shenaq PC | *N/A* | Final Denial |
| 100007082 | 1004 | Shenaq PC | *N/A* | Withdrawn |
| 100001433 | 2430 | Pro se | ALS | Paid |
| 100004979 | 11115 | Pro se | ALS | Paid |
| 100014614 | 13022 | Pro Athlete Law Firm | Alzheimer's Disease | Paid |
| 950011537 | 10286 | Pro se | Alzheimer's Disease | Paid |
| 100014614 | 12897 | Pro Athlete Law Firm | Alzheimer's Disease | Withdrawn |
| 100014425 | 4179 | Shenaq PC | Level 1.5 | Denied After Audit |

---

[90] Syme Law has not submitted any non-Parkinson's Disease claims.

| 260001324 | 13049 | Shenaq PC | Level 1.5 | Denied After Audit |
|---|---|---|---|---|
| 100006850 | 7931 | Collins & Truett Attorneys, P.A. | Level 1.5 | Final Denial |
| 100015565 | 5534 | Pro se | Level 1.5 | Final Denial |
| 950011537 | 5546 | Pro se | Level 1.5 | Final Denial |
| 100003828 | 9200 | Shenaq PC | Level 1.5 | Final Denial |
| 100007990 | 12220 | Shenaq PC | Level 1.5 | Final Denial |
| 100012412 | 8948 | Shenaq PC | Level 1.5 | Final Denial |
| 100013167 | 11894 | Shenaq PC | Level 1.5 | Final Denial |
| 100014037 | 12347 | Shenaq PC | Level 1.5 | Final Denial |
| 950002705 | 5562 | Shenaq PC | Level 1.5 | Final Denial |
| 100016073 | 12410 | Song Whiddon | Level 1.5 | Final Denial |
| 900009282 | 6866 | Shenaq PC | Level 1.5 | In Audit Investigation |
| 100000083 | 13374 | Shenaq PC | Level 1.5 | Last Notice Was Award Notice |
| 100007602 | 4690 | Shenaq PC | Level 1.5 | Last Notice Was Award Notice |
| 100001865 | 7469 | Shenaq PC | Level 1.5 | On Appeal Now |
| 100009012 | 5516 | Locks Law Firm | Level 1.5 | Paid |
| 100000576 | 5498 | Pro se | Level 1.5 | Paid |
| 100004670 | 10634 | Pro se | Level 1.5 | Paid |
| 100004993 | 2270 | Pro se | Level 1.5 | Paid |
| 100010236 | 10764 | Pro se | Level 1.5 | Paid |
| 100015805 | 5535 | Pro se | Level 1.5 | Paid |
| 260001205 | 11124 | Pro se | Level 1.5 | Paid |
| 950000492 | 3209 | Pro se | Level 1.5 | Paid |
| 950002709 | 2639 | Pro se | Level 1.5 | Paid |
| 100000637 | 12549 | Shenaq PC | Level 1.5 | Paid |
| 100002370 | 8411 | Shenaq PC | Level 1.5 | Paid |
| 100005318 | 13220 | Shenaq PC | Level 1.5 | Paid |
| 100005599 | 11895 | Shenaq PC | Level 1.5 | Paid |
| 100010293 | 12322 | Shenaq PC | Level 1.5 | Paid |
| 100011889 | 8476 | Shenaq PC | Level 1.5 | Paid |
| 100013785 | 2747 | Shenaq PC | Level 1.5 | Paid |
| 100014859 | 5531 | Shenaq PC | Level 1.5 | Paid |
| 100016055 | 5536 | Shenaq PC | Level 1.5 | Paid |
| 950007536 | 5558 | Shenaq PC | Level 1.5 | Paid |
| 100005236 | 10031 | Song Whiddon | Level 1.5 | Paid |
| 100010024 | 12855 | Shenaq PC | Level 1.5 | Ready for Review by AAP |
| 100006800 | 12471 | JR Wyatt Law | Level 1.5 | Withdrawn |
| 100006800 | 12926 | JR Wyatt Law | Level 1.5 | Withdrawn |

| 100014614 | 12681 | Pro Athlete Law Firm | Level 1.5 | Withdrawn |
|---|---|---|---|---|
| 100007328 | 12676 | Pro se | Level 1.5 | Withdrawn |
| 100000637 | 7305 | Shenaq PC | Level 1.5 | Withdrawn |
| 100002188 | 2519 | Shenaq PC | Level 1.5 | Withdrawn |
| 100002708 | 11316 | Shenaq PC | Level 1.5 | Withdrawn |
| 100004159 | 12900 | Shenaq PC | Level 1.5 | Withdrawn |
| 100006807 | 12936 | Pro se | Level 2 | Denied After Audit |
| 100007328 | 5550 | Pro se | Level 2 | Denied After Audit |
| 100006622 | 3673 | X1Law, PA | Level 2 | Denied After Audit |
| 100002845 | 2114 | Pro se | Level 2 | Final Denial |
| 100009190 | 5952 | Pro se | Level 2 | Final Denial |
| 950000492 | 12429 | Pro se | Level 2 | Final Denial |
| 100011424 | 12476 | Shenaq PC | Level 2 | Final Denial |
| 110021509 | 10748 | Shenaq PC | Level 2 | Final Denial |
| 100011129 | 13094 | Shenaq PC | Level 2 | In Audit Investigation |
| 100011709 | 12856 | Shenaq PC | Level 2 | In Audit Investigation |
| 100016063 | 12939 | Shenaq PC | Level 2 | On Appeal Now |
| 100001986 | 5545 | Pro se | Level 2 | Paid |
| 100002700 | 5501 | Pro se | Level 2 | Paid |
| 100004269 | 1348 | Pro se | Level 2 | Paid |
| 100016980 | 10081 | Pro se | Level 2 | Paid |
| 950001309 | 9532 | Pro se | Level 2 | Paid |
| 950002655 | 5551 | Pro se | Level 2 | Paid |
| 950006601 | 12335 | Pro se | Level 2 | Paid |
| 950015915 | 7762 | Pro se | Level 2 | Paid |
| 100007835 | 1170 | Shenaq PC | Level 2 | Paid |
| 100007990 | 12913 | Shenaq PC | Level 2 | Paid |
| 100006807 | 12648 | Pro se | Level 2 | Withdrawn |
| 100016979 | 12708 | Pro se | Level 2 | Withdrawn |
| 100016979 | 1416 | Pro se | Level 2 | Withdrawn |
| 100004159 | 5504 | Shenaq PC | Level 2 | Withdrawn |
| 100005318 | 10189 | Shenaq PC | Level 2 | Withdrawn |
| 260001324 | 12878 | Shenaq PC | Level 2 | Withdrawn |

Non-Parkinson's Disease Claims Submitted by ROV

| SPID | Claim | Current Representation | Qualifying Diagnosis | Status |
|---|---|---|---|---|
| 100010899 | 12930 | ROV | Alzheimer's Disease | In Audit Investigation |

| 100007673 | 13507 | ROV | Alzheimer's Disease; Level 1.5; Level 2 | In Review Process at Claims Administrator |
|---|---|---|---|---|
| 260000628 | 13450 | ROV | Level 1.5 | Last Notice was for Incomplete Claim Package |
| 100005727 | 13247 | ROV | Level 1.5 | Paid |
| 100009492 | 13468 | ROV | Level 2 | On this Month's Payment List |