**IN THE UNITED STATES DISTRIC COURT FOR THE**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION** | **No. 2:12-md-02323-JDW**<br>**MDL No. 2323** |
| **Kevin Turner and Shawn Wooden, on behalf of themselves and others similarly situated,**<br>**Plaintiffs,**<br>**v.**<br>**National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.,**<br>**Defendants.** | |
| **This document relates to:**<br>**All Actions** | |

# OBJECTIONS OF REPPERT OATES & VYTELL, LLC TO SPECIAL MASTERS' RULE 27 DECISION DATED JUNE 8, 2026

John P. McShea
PA Attorney ID No. 34562
Conrad O. Kattner
PA Attorney ID No. 35468
**Eastburn and Gray, PC**
470 Norristown Road #302
Blue Bell, Pennsylvania 19422
(215) 345-7000

Counsel of Record for
Reppert Oates & Vytell, LLC

## TABLE OF CONTENTS


I. Background ..... 1

II. Reppert Oates & Vytell, LLC ..... 4

III. Standard of Review ..... 6

IV. ROV's Objections to Masters' Legal Conclusions ..... 7

A. The Decision Unlawfully Proscribes ROV's Protected Commercial Speech ..... 7

B. The Decision Errs in Retroactively Imposing Disclosure Requirements Absent from the Program Rules when the Claims were Submitted ..... 8

C. The Decision Errs in Making Conclusions about Claims of ROV Clients as to which the Claims Administrator Never Made Any Findings of Fact ..... 13

D. Imposing the Relief Ordered Against ROV is Unsupported Under the Audit Rules and Is Patently Excessive ..... 13

1. The Relief Ordered Against ROV is Unwarranted and Unprecedented ..... 13

2. The Court's Pro Athlete Law Firm Decision is the Law of the Case ..... 17

E. The Masters Erred By Imposing a Remedy that Improperly Denies ROV's Clients Their Choice of Counsel ..... 19

Reppert Oates & Vytell, LLC ("ROV"), pursuant to Fed. R. Civ. P. 35 (f) and Audit Rule ("AR" or "Rule") 34,[1] objects to the Special Masters' Rule 27 Decision ("Decision") dated June 8, 2026[2] on the following five grounds. ROV respectfully requests that the Court sustain its Objections and reverse the Decision as it concerns ROV. ROV also categorically denies and disputes the alleged "factual findings" in the Decision and the patently improper process adopted and employed by BrownGreer PLC, the Claims Administrator ("CA") to reach its flawed legal conclusions; however, ROV reserves these issues for resolution in a future appropriate application given the constraints of AR 33. The Masters failed to identify the conclusions of law in the Decision as required by AR 33 and, as such, the entire Decision is fairly subject to *de novo* review. ROV limits its arguments, however, to legal issues stemming from the Decision, and reserves for another occasion its challenges to the fundamentally flawed audit process.

## I. BACKGROUND

This matter arises from an Audit Report (the "Report") issued by the CA for the Settlement Agreement ("Agreement") reached in the NFL Players' Concussion Injury Class Action. The Agreement, effective January 2017, specifies that the CA, among other duties, is to process former NFL players' ("Settlement Class Members" or "SCMs") claims for compensation for certain concussion related injuries and determine whether the players' submissions ("Claim Packages") entitle them to compensation. Agreement §10.2 (b). The CA is empowered to audit Claim Packages. AR 7. If the CA determines that there has been a "misrepresentation, omission, or concealment of a material fact made in connection with the claim," the CA must notify the SCM

---

[1] *See Rules Governing the Audit of Claims* by the Claims Administrator of Claims for Monetary Awards in the NFL Concussion Settlement, effective March 18, 2020.

[2] *In Re: National Football League Players' Concussion Injury Litigation,* No. 2:12-md-02323-AB, No. 2:19-md-02323-AB, MDL No. 2323, 2026 WL 1698355 (E.D. Pa. June 8, 2026).

and may refer the claim to a Court-appointed Master "for review and findings," that "***shall*** take into account whether the misrepresentation, omission or concealment was intentional, and may include" six forms of relief. *Id.* § 10.3(i) (emphasis added). This Court retains "broad jurisdiction to administer the settlement and resolve issues relating to it," but that authority has limits. *National Football League Players' Concussion Injury Litigation*, 923 F.3d 96, 108, 111-12 (3d Cir. 2019)(vacating in part because "the District Court exceeded its authority").

The record in this matter, as it concerns ROV, is comprised of the CA's Report, ROV's Response (including sworn affidavits), the NFL Parties' Submission, and the Decision. The Report states that "the audit grew out of" allegations concerning an attorney unrelated to ROV and a series of tips received in 2024 and 2025 from anonymous third parties. The Decision states that 21 Parkinson's Disease Claims submitted by ROV were placed into Audit. (In fact, only 17 pending submitted Claims were addressed in the Report; apparently, the CA audited four, possibly five, additional unidentified Claims after issuing the Report that ROV was not apprised of and had no opportunity to address, nor was it provided the other parties' responses.)

The Decision – relying wholly upon unsustainable "evidence" in any court of law and without any finding of a material misrepresentation or omission in connection with any specific ROV claim – subjects all of the referenced law firms, including all of their pending and future Claims to broad, sweeping, and draconian relief. First, the Decision subjects these SCMs to a newly invented standard of "heightened scrutiny" not found anywhere in the Settlement Agreement or Program Rules and denies all of ROV's pending submitted claims.[3] Specifically, it

[3]All of ROV's 21 pending claims were denied despite receiving a qualifying diagnosis from no less than seven different MAF doctors; six of ROV's pending claims had a qualifying diagnosis from a MAF doctor who was retroactively disqualified. Dr. Jacobs had been in the Program since 2018 and examined over 300 former players while the Report noted that other firms, not related to the Audit, had used this doctor but their claims were not retroactively denied.

directs denial of future Claims where a CA-approved physician ("MAF" doctor) relied on any of eight particular physicians' records and requires current SCMs to establish that their diagnoses were entirely unrelated to the five law firms' alleged "scheme."[4] Second, upon the conclusion of ROV's appeal, ROV will be prohibited from further representing clients participating in the Settlement Program, including representing clients already in the Program. Third, the Decision directs that money being held as attorney's fees owed to ROV be transferred to the Monetary Award Fund – instead of to ROV - and directs the CA to refuse to recognize future ROV liens. Finally, the Decision remarkably requires ROV to pay an equal share of the Claims Administrator's undisclosed and non-public investigative expenses, regardless of their proportionate share of Claims or the alleged culpability of their conduct.

Further, in an apparent unprecedented directive, the Masters instructed the CA to make the Decision available on its public website before ROV could challenge the Decision,[5] an order having immediate repercussions to ROV, causing it to lose clients and suffer irreparable reputational harm. As for ROV's clients in the Program, the Decision effectively ordered them to find new counsel and start their claim process over, regardless of merit

The disqualification of ROV from further participation in this litigation, a sanction urged by the NFL Parties - *not* by the CA – is unprecedented, unsupported by the record, Program Rules, and contrary to this Court's decision in a case involving a law firm found to have engaged in far more egregious conduct than alleged against ROV.[6]

---

[4]Of the eight identified doctors (R. p.44), only one of ROV's clients saw Dr. Steinberg and that player died before attending a MAF exam. At the time of issuance of the Decision, two of ROV's submitted claims concerned players who saw Dr. Fellus.

[5]As discussed below, in another NFL concussion matter, the Masters stayed the publication of its Decision until *after* appeals were concluded.

[6] While the Rules ostensibly abridge certain rights of the SCMs, including allowing the CA to rely

## II. REPPERT OATES & VYTELL, LLC

The ROV firm, based in New Jersey and New York, was founded in 1994, and in its 32-year history has concentrated on complex commercial litigation matters, including employment, real estate, corporate, entertainment, and intellectual property matters. Well before ROV represented a single SCM, it had developed experience as advocates in diverse matters. A relative newcomer to the NFL Concussion litigation, having filed its first Claim in 2021, ROV's representation of former professional athletes grew because one of its founding members is a former football player who, himself, suffered serious football-related injuries, and one of its principal partners, Bart Oates, is an 11-year NFL veteran, who served as President of the NFL Players Alumni Association; he also suffers from Parkinson's Disease.[7] Naturally, ROV attracted former players as clients in this litigation. Before the Report and the Decision, ROV and its professional reputation had never been the subject of a disciplinary complaint. Even the CA and Masters recognize that ROV stands apart from the other four firms involved in this matter, finding, for example, that: ROV never disguised its role as counsel for former NFL players or used a "cover" firm;[8] never funneled its Parkinson's Disease claims to other firms;[9] never acted as co-

---

upon incompetent, unsupported evidence under federal rules (e.g., anonymous tips (four identical 38 word emails from the same IP), hearsay, innuendo, suspicion, and other similarly unreliable information lacking any semblance of evidentiary support) for its 'fact-finding' and purportedly bargaining away *clients'* fundamental due process rights in exchange for being able to participate in the Settlement Program, these Rules remain subject to judicial review in a separate proceeding to the extent they exceeded the scope of the Masters' authority and, importantly, are not appropriately applied to ROV – whose first claim was filed more than four years after the effective date of the Agreement. ROV did not waive *its due process rights* simply by representing SCMs.

[7] *See* Report at 17-18 (noting Mr. Oates' "large network of retired NFL players"). *See also*, ROV's Response to Report, at 3-4. Even so, the claims filed by ROV amount to less than 1% of claims filed with the CA. *Id.*

[8] Decision at 3, 4 ("With the exception of ROV, . .. ." ROV did not misrepresent attorneys of record).

[9] Report at 79 ("the ROV firm did not obscure its processes through intermediary firms . . . ."); Decision at 15, n. 20 ("there is no evidence that ROV funneled their Parkinson's Disease claims

counsel with the other firms subject to the CA's Report;[10] and never advertised, offered gifts, or hosted special events to attract clients.[11] Its clients grew based on many referrals from clients who appropriately felt properly represented, heard and seen by ROV, which dedicated substantial time to its clients. Likewise, ROV's clients' physician exams did not occur in inappropriate settings,[12] and ROV's clients have been examined by over 13 different MAF Physicians. ROV's clients whose Claims were audited had none of their Parkinson's Disease diagnoses proven incorrect. The Decision concedes that ROV's practice of having clients initially screened to determine if there was a valid basis to proceed further with claim process would "make sense," as ROV would decline – and did decline – cases without a sufficient medical basis.[13] Neither the CA nor the Masters found that ROV's conduct, that they believed to be contrary to the Settlement Program, was intentional. ROV cooperated with the CA's investigators, as evidenced by three of its partners agreeing to be tape recorded in a 3½ hour interview as part of an audit of ROV's clients' claims (the CA did not notify ROV that *it* was being audited until a week after ROV objected in writing to the Masters about the delay in processing the pending Audits for claims submitted close to two years earlier and its objections to the CA seeking ROV's attorney work product). Notably, the CA recommended that ROV be censured, *not* disqualified. Report at 80. In fact, the Report and Decision are the first suggestion that ROV acted contrary to the Rules of the Settlement Program.

All of ROV's clients whose qualifying diagnoses were rendered by a MAF exam outside the 150-mile radius received written approval from the CA, many related to the Program's lack of

---

to any other firm").

[10] Decision at 4.

[11] Decision at 5-6 (Super Bowl party) and 10 (referring to other party offering "apparent gift-in-kind"). ROV's perceived "recruitments" were without unfair inducements, but rather by fraternal familiarity. Report at 72-73.

[12] Decision at 11-12 (hotel rooms).

[13] Decision at 38 didn't understand cite, was it meant to say would not?

doctors in this radius.[14] The unsupported suggestion that ROV "shopped" clients to particular MAF doctors, disregards the fact that its clients' diagnoses were certified by CA-approved MAF physicians. Of the eight doctors deemed unreliable by the Decision, six were *not* used by ROV. One of the eight, Dr. Steinberg, treated one ROV client in 2022 and the Report notes the records were different in a good way. This player died before the scheduling of his MAF exam and these records were not obtained until well after his death and after ROV's retention by the Estate representative. *See* Report at 61, n. 101. Two other ROV clients were seen by Dr. Fellus, whom the Masters emphasize lost his license to practice medicine in 2026. However, Dr. Fellus has been and continues to be licensed in New York.[15] The Decision does not dispute that ROV's remaining clients were examined by undeniably qualified doctors, and each received Qualifying Disagnoses from CA-appointed MAF physicians.[16] The Decision found that, in one single instance, medical records of a SCM generated *before* ROV's involvement were omitted from that SCM's claim package, but the Masters did **not** find the omission intentional.[17]

In the context of the above facts, ROV objects to the Decision's legal conclusions.

## III. STANDARD OF REVIEW

"Pursuant to Fed. R. Civ. P. 53 (f)(4), the Court will review de novo any objection to the Master(s)' conclusions of law." ECF 6871 at 5; AR 34(d). The Court "may adopt or affirm, modify,

---

[14] Decision at 14; Report at 78-79.

[15] NY Physician Profile (Jonathan Fellus), at https://www.nydoctorprofile.com (accessed Sep. 4, 2026) (Neurology, NYS License Number: 313031, issued Sep. 14, 2021, last updated July 25, 2025).

[16] SCMs are not prohibited from seeing non-MAF physicians before seeing a MAF doctor. In fact, the Masters' decision dated July 1, 2025 recommends it for Parkinson's claims. *See* https://www.nflconcussionsettlement.com/PD-SpecialMasterDecisions-MonetaryAwardClaims.aspx (In Re Appeal of SPID #950003542, 2025-9)

[17] Section 10.3(i) of the Agreement states, in part, that "[t]he Special Masters' review and findings *shall* take into account whether [an] . . . omission . . . was intentional." (Emphasis added.)

wholly or partly reject or reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53 (f)(1). "The factual determinations of the Special Master are 'final and binding.' And the District's Court review is limited to questions of law." *NFL Players' Concussion Injury Litigation,* No. 19-2753, 2021 WL 5505402 (3d Cir. Nov. 24, 2021).

## IV. ROV'S OBJECTIONS TO MASTERS' LEGAL CONCLUSIONS

### A. The Decision Unlawfully Proscribes ROV's Protected Commercial Speech

The Decision concludes that ROV engaged in a "scheme" to "recruit retired NFL players as clients." Decision at 4. It characterizes Bart Oates' conversations with prospective clients at NFL Alumni Association meetings, golf outings, other NFL or NFLAP events, or other communications as unlawful because "ROV's practice ***may have been*** inspired by early communications between the firm's attorneys and Mr. Grossinger." Decision at 4-5 (emphasis added). But former players also reasonably may have been inspired to speak with Mr. Oates by virtue of him playing 11 years in the NFL; serving as NFL Players Alumni Association President; suffering from Parkinson's Disease due to concussions suffered as a player; and being a lawyer.

The Supreme Court has observed that a lawyer's communications with prospective clients for the lawyer's business or pecuniary interest are protected commercial speech that may not be prohibited by governmental action.[18] The Masters' Decision concluding that Mr. Oates' conversations with former players in furtherance of legal representation reflects a "scheme" is a gross legal overreach and its reliance on this finding is reversible error. ROV is uniquely positioned to attract and represent former NFL players, and barring the firm from speaking with prospective clients in this litigation is erroneous as a matter of law – it proscribes commercial speech and stifles

[18] *See Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) (advertising); *Shapero v. Kentucky Bar Ass'n*, 486 U.S. 466 (1988) (targeted direct mail letters with puffery).

ROV's ability to represent clients who seek compensation for serious football-related injuries, and prevents SCMs from counsel of their choice. There is no insinuation, let alone a finding, of duress, falsehood, threat, or conspiratorial agreement in any of ROV's alleged communications. Quite the contrary, as stated in sworn affidavits that appear to have been ignored by the Masters. The Court should reverse the Decision to the extent it is predicated on the legally flawed conclusion that Mr. Oates' (and by extension ROV's) legitimate communications with prospective clients is in furtherance of a fraudulent scheme.

### B. The Decision Errs in Retroactively Imposing Disclosure Requirements Absent from the Program Rules when the Claims were Submitted

The Decision, by concluding that ROV improperly failed to disclose certain information in Claim Packages, incorrectly presumes ROV had a duty to refrain from certain alleged conduct or make certain additional disclosures, at the time the Claims were submitted. The ***legal question*** for this Court – which the CA and Masters evidently overlook – is whether the existing Program Rules prohibited certain methods of developing or presenting SCM's Claims or required additional disclosures in the identified submitted Claims. There was no such obligation imposed under the Agreement or Program Rules when ROV submitted their clients' Claims and, therefore, this alleged failure to disclose cannot supply the legal predicate for sanctions.[19] Very simply, a material omission presupposes a duty to disclose; and no such duty existed at the time the Claims were submitted.

Federal fair notice principles require advance notice of Rule interpretations. Parties cannot be held liable when such interpretations are announced for the first time during a Claims audit.[20]

---

[19] *See* AR 31(h) (legal predicates for sanctions).

[20] *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 158–59 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's

Non-disclosure cannot become an actionable omission merely because, after the Claims submissions, the CA or Masters conclude that disclosure would have been useful. Had the Program sought to impose such requirements, the Agreement provides formal procedures for the CA to implement new rules to achieve the goals of the Agreement prospectively.[21] For obvious reasons, the audit process is clearly not the appropriate mechanism for developing or imposing new disclosure standards.

Neverthless, the Decision treats ROV's representation of former player clients through the claims process as an illicit "scheme" or "sequence,"[22] including lawyer referrals to physicians or advances of customary fees to non-Program providers (so-called "forensic" doctors),[23] allowing time for a treatment record to develop, despite Parkinson's being a disease needing diagnosis "over time,"[24] and not disclosing to MAF doctors, or in Claim Packages, collateral information, such as billing, referral sources, and payment sources,[25] ***none*** of which were then required by the Rules. When ROV submitted its clients' Claims, there was no Rule that set a time within which the player must submit to an MAF doctor exam. There was also no rule precluding counsel from referring a client to a physician for a preliminary evaluation, nor from advancing costs for the provider, an

---

interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding.")

[21] *See* Agreement as Amended, ECF 6481-1, at 59, 62, Feb. 3, 2015, at §10.3 (a) ("Co-Lead Class Counsel, Counsel for the NFL Parties, and the Claims Administrator will establish and implement procedures to detect and prevent fraudulent submissions …"); §10.4 ("The Claims Administrator, in consultation with Co-Lead Class Counsel and Counsel for the NFL Parties, will also establish system-wide processes to detect and prevent fraud, including …"). *Accord In re NFL Concussion Litigation,* 962 F.3d 94 (3d Cir. 2020) (reviewing revision of rules procedure).

[22] Decision at 3, 31, 35.

[23] Decision at 2 ("forensic" doctors paid for by the Players' lawyers," "lawyers referral"), *accord* 36 ("undisclosed, forensic, practice"), 38 ("does not contemplate the kind of forensic medicine the subject firms employed").

[24] Decision at 8.

[25] *See, e.g.,* Decision at 2, 7, 13, 31 ("undisclosed financial benefits to non-program doctors").

expense customarily deducted from an attorney's fee. In short, there is no Rule that precludes an attorney's referral of a client to a particular doctor in advance of a MAF examination. Nor is that practice different from how lawyers work with physicians in other injury litigations – it is not presumptively unethical; in fact, as the Masters conclude, there are occasions when it "makes sense." Decision at 38. To date, despite several requests, the CA refuses to issue "best practices" guidance to counsel regarding the preferred way to proceed.

Generally, lawyers may refer a client for treatment and advance costs for such providers. "The fact that an expert [or other] witness is to receive, or has received, … compensation … does not affect his competency as a witness, but it may have very slight bearing upon the question of his impartiality." Relationships of a physician to the party relying on him may be considered in weighing his testimony. *Smith v. Celotex Corp.*, 387 Pa. Super. 340, 349–50, 564 A.2d 209, 213–14 (1989). A provider's compensation does not disqualify his testimony, but may be the subject of cross-examination, within limits. *Mohn v. Hahnemann Med. Coll. & Hosp. of Philadelphia*, 357 Pa. Super. 173, 181, 515 A.2d 920, 925 (1986) (allowing examination of doctor's relation to retaining firm, and those closely related, but not for other services performed for other matters). Whether an attorney has referred a doctor to a client has been held to be within the scope of attorney-client privilege. *Worley v. YMCA, Inc.*, 228 So. 3d 18, 22, 25–26 (Fla. 2017), *superseded by* Fla. Stat. § 768.0427. Disclosure of a treating doctor's referral or payment sources also has been held to be irrelevant to medical evaluation, and may not be required absent a showing of cause. *Cooper v. Schoffstall*, 588 Pa. 505, 524–25, 905 A.2d 482, 494–95 (2006). Notably, this Settlement Program and its very detailed Rules lack any disclosure rules such as those under Fed. R. Civ. P.26 (2)(B) regarding expert disclosure requirements.

Although MAF physicians are required to provide certain qualifying information to the CA

(such as, Board-certification and litigation history),[26] there is no corresponding Rule that imposes such disclosure requirements on physicians to whom counsel refers a client. MAF doctors may also be forensic or expert witnesses, but they must disclose such information to the CA.[27] There is no requirement that attorneys disclose background information concerning physicians who examine a SCM when they submit a Claim Package, nor is there a prohibition on a doctor having a forensic background which is quite common for medical specialists.[28] In short, there is no Settlement Program requirement that the MAF doctor receive, review, or consider any billing, payment, referral source, or collateral litigation or forensic history for a treating physician or record for an exam. The Decision's conclusion that non-disclosure of such information caused the MAF doctor to "defer" is legally erroneous.[29]

To submit a Claim Package for a Qualifying Diagnosis to the CA[30] requires : (i) a claim form, (ii) a diagnosing physician certification, (iii) medical records reflecting the qualifying diagnosis, (iv) an authorization form, and (v) available records to show NFL employment.[31] The Rules do not require disclosure of more, and certainly not the information the Masters faulted ROV for not disclosing in their Claim Packages. Their legal conclusion to the contrary is meritless.

If the Claim is placed in Audit, additional automatic disclosures may be required, but the Rules do not require disclosure of the client's billing records, referral sources, payment sources,

---

[26] Rules 5, 6.
[27] *Id.*
[28] The Decision improperly criticized ROV's assertion of the work product and attorney client privilege for not providing names of all clients examined and not submitted, referred for any formal evaluations and/or declined by the firm based on initial consults. This information, including privileged medical information of current, former, or declined clients, is patently privileged and not subject to disclosure at the election of counsel, and other federal law, including HIPAA.
[29] Decision at 1, 13, 31.
[30] Agreement, ECF 6481-1, at 43-47, Article VIII, Submission and Review of Claim Packages.
[31] Agreement, § 8.2 (a), ECF 6481-1, at 43.

or a prior examining physician's litigation history, or other collateral information, as erroneously concluded by the Decision as reason to sanction ROV. During audit, the CA may "request," and the player and attorney "may be required to submit additional records, including medical records, and information as requested by the auditing party."[32] For "unreasonably" failing to provide the CA with all records and information sought, a Claim may be "denied."[33] The Decision here criticizes ROV for not providing items such as full financial information for five treating doctors, but also notes that "ROV did provide substantive answers (notwithstanding its lengthy objections), but these answers were tautological and tendentious."[34]

Under the pre-existing rules, referrals and fee amounts are ordinarily first disclosed only after an award is made, according to a form asking counsel to list costs for "providers."[35] The Program thus recognizes attorneys may advance fees for treating providers, contrary to the erroneous conclusions of the Decision. Not until July 2, 2026, well after the Audit and Decision, did the CA issue its "Measures to Ensure Diagnostic Reliability of the Program Claims" in which the CA, for the first time, required referral and payment information during ordinary claim processing. *See* https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=Measures.pdf ("Health Care Provider History Form" asking: "Who referred you to this Provider?" and "Did your Attorney pay for all or part of this Provider's services, either directly or indirectly?") No such disclosure measures existed in the program when ROV submitted its audited Claims.

In sum, the Decision retroactively imposes disclosure requirements that were non-existant when ROV submitted claims. The  lack of such claimed disclosures cannot be grounds for the

---

[32] Agreement, §10.3 (b) (i).
[33] *Id*. at §10.3 (b) (ii).
[34] Decision at 40.
[35] See NFL Statement of Attorney Fees and Costs at https://www.nflconcussionsettlement.com/.

conclusion that ROV engaged in misrepresentation, omission, or concealment.

### C. The Decision Errs in Making Conclusions about Claims of ROV Clients as to which the Claims Administrator Never Made Any Findings of Fact

The Report states that from November 2024 until its issuance in December 2025, the CA audited 17 Parkinson's Disease claims submitted by ROV. [36] However, the Decision discusses 21 ROV Claims. [37] The CA appears to have audited four additional claims that the Decision relied upon for its conclusions. Obviously, neither ROV nor these four other SCMs were afforded an opportunity to respond to whatever the CA found regarding these Claims, as permitted under Rule 20.[38] The Masters had no findings, at least that ROV had an opportunity to address, on which to base their conclusions that ROV engaged in a misrepresentation, omission or concealment regarding these four Claims. Accordingly, the Masters' conclusions of law, to the extent they are based on these four late-added Claims, are erroneous, especially as the Decision implies they were part of a "pattern" or "scheme" of "related" claims. Therefore, the Decision as to ROV should reversed.

### D. Imposing the Relief Ordered Against ROV is Unsupported Under the Audit Rules and Is Patently Excessive

#### *1. The Relief Ordered Against ROV is Unwarranted and Unprecedented*

Little more than a year ago, this Court ruled on objections to the Special Masters' decision to bar the Pro Athlete Law Firm, P.A., and its principal attorney, David I. Levine (together "PALF"), from further participation in the Settlement Program, a remedy advocated by the NFL

[36] Report at 60-61 (Table 12).
[37] Decision at 27, citing Audit Report at 59-61.
[38] Rule 20 ("Settlement Class Member(s) with a Claim identified in and/or related to the Audit Proceeding, and/or a Subject of Investigation, may submit to the Claims Administrator a memorandum of up to 25 pages addressing the matters raised in the notice, along with exhibits and any additional evidence … [for] the Special Master to consider").

Parties, as it has advocated in this case. *See* Settlement Implementation Determination, July 2, 2025 (ECF 12473) and Special Masters' Rule 27 Decision, Nov. 1, 2024 (ECF 12473-1). Despite admitting that its order of disqualification and reimbursement of the NFL Parties' costs was "unprecedented," and having concluded that PALF's conduct was "egregious," led to material misrepresentations in "at least 17 Claims," and evidenced "an intentional practice rather than an isolated error" by "inveterate and unrepentant offenders,"[39] the Masters further directed that the CA deny certain pending Monetary Award claims, and deny future claims that rely on affidavits gathered by PALF. (ECF 12473-1 at 9-10). Unlike in ROV's case, the Masters stayed the publication of their decision until any appellate rights were satisfied,[40] even though it was the second time that PALF had been found to have engaged in fraud by the CA. *Id*. at 1, n. 1 and 11.

PALF submitted forms containing information intended to support a client's claims for a monetary award, ostensibly containing sworn statements by third parties, yet the statements were not the affiant's own words, contrary to what counsel represented. Several affiants were unable to recall approving an affidavit submitted by PALF with the affiant's DocuSign signature. In short, PALF's practice of drafting statements for affiants using PALF's stock language and its "pervasive submission of unreliable statements" led the Masters to conclude that PALF's actions "reflected *intentional* conduct and threatened the integrity of the settlement program." (ECF 12473 at 3)(emphasis added.)

Although this Court agreed with the Masters' *factual* findings, the Court, per Judge Brody, declined to approve the Masters' *legal* remedy of barring PALF from further participating in the

---

[39] *See* Special Masters' Decision of 11/1/24 noting that PALF showed "disdain for the process." *Id.* at 10.

[40] Here, the Decision was punitive, as it instructed the CA to make the Decision available, without redaction, completely disregarding ROV's appeal rights. 2026 WL 1698355 at *36.

Settlement program. Instead, Judge Brody, who by then had the benefit of supervising this litigation for 13 years, ruled that PALF could continue to represent clients as long as they "adhere scrupulously to all Program rules governing claims submission and follow the requirements set forth by the Special Masters in their decision." *Id.* at 4. Significantly, the CA had investigated PALF for misconduct in a prior audit involving counsel "coaching" players how to behave during Settlement Program evaluations, including to "soil themselves" to demonstrate concussion-related incontinence, as well as "poaching" players from other law firms, and improperly accessing players' medical information. ECF 12473-1 at 1, n.1.

ROV has not been found to have engaged in conduct that comes close to PALF's intentional conduct in either their first or second audited actions. ROV's apparent inadvertent omission of a single client's past medical history, which was corrected contemporaneously after receiving the doctor's notes, which the SCM who is 71 year old SCM with early Alzheimers and Stage III Parkinsons forgot about, in one SCM claim package pales by comparison.[41]

ROV's alleged conduct is also distinguishable from that of another SCM attorney who "pressured physicians," to use unreliable PET scans, "attempted to influence" physicians to obtain particular diagnoses, improperly "drafted medical records" and third-party affidavits, and was "untruthful" to the CA, in a case in which the Settlement Masters' decision was affirmed by this Court and the Court of Appeals.[42] Neither the Report nor the Decision found that ROV attorneys engaged in any of this improper conduct, were untruthful to the CA, or deliberately sought to skirt the Rules. ROV may be zealous advocates, but they have not been untruthful.

The Decision identifies no conflict of interest nor any ethical breach by ROV. Federal

---

[41] As noted above, Section B, infra, this information was not required to be submitted.
[42] *In Re: National Football League Players Concussion Injury Litigation (Byron Cuthbert & Associates, LLC),* No. 24-1919, 2025 WL 1639402 at *1 (3d Cir. June 10, 2025).

courts generally reserve disqualification for situations involving conflicts of interest, misuse of confidential information, attorney-witness conflicts, or circumstances creating a demonstrated threat to the fairness of future proceedings. *See Wheat v. United States*, 486 U.S. 153, 160 (1988) (conflicts of interest); *Kevlik v. Goldstein*, 724 F.2d 844, 850-51 (1st Cir. 1984) (disqualification for use of former client's confidential communications for advantage of a third person in a criminal case). Without any findings of extreme misconduct, or CA recommendation, the Masters recommended, at the urging of the NFL Parties, the severe sanction of disqualification.[43] Courts have emphasized the disruptive and drastic effect of disqualification as a remedy of last resort. *See, e.g.*, *Freeman v. Chicago Musical Instrument Co*., 689 F.2d 715, 721 (7th Cir. 1982) ("because disqualification destroys a relationship by depriving a party of counsel of choice, it should be absolutely necessary before ordered"); *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979) ("disqualification has an immediate adverse effect on the client by separating him from counsel of his choice"); *United States v. Diozzi,* 807 F.2d 10, 12 (1st Cir. 1986) (courts should avoid unnecessarily restricting counsel-of-choice interests).

None of the extreme circumstances to justify disqualification of counsel for litigation conduct have been found here, nor attributed to ROV. *See Chambers v. NASCO, Inc*., 501 U.S. 32, 35, 44 (1991) (attorney not disqualified even though held in contempt three times, repeatedly warned, found in bad faith, and the court found "relentless, repeated, fraudulent and brazenly

---

[43] In the class action context, disqualification, even for conflicts of interest, must be "analyzed carefully," is "not automatic," and to disqualify counsel who have represented clients over the course of years deprives clients and the court of "those most familiar with its course and status" and such disqualifications "would substantially diminish the efficacy of class actions as a method of dispute resolution." *In re Agent Orange Prod. Liab. Litig*., 800 F.2d 14, 19 (2d Cir. 1986). Here, ROV has represented dozens of clients directly affected by the Masters' Decision for years, all of whom are now purportedly required to find new counsel unfamiliar with their Claims in this complex settlement process.

unethical efforts" throughout case); *In re PMD Enterprises, Inc.*, 215 F. Supp. 2d 519, 524 (D.N.J. 2002) (the court revoked the pro hac admission of attorney with documented history of misconduct, but not of the law firm). In sum, the legal remedies ordered by the Decision are unprecedented and unwarranted, and therefore should be reversed. [44]

#### *2. The Court's Pro Athlete Law Firm Decision is the Law of the Case*

As observed by this Court, "[u]nder the well established law of the case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.'" *Tellado v. IndyMac Mortg. Servs.*, No. 09-5022, 2010 WL 11710867 at *1 (E.D. Pa. Nov. 1, 2010)(quoting *Arizona v. California*, 460 U.S. 605, 618 (U.S. 1983). "There are limited exceptions to this rule," notably "reserved for instances 'where there has been an intervening change in the law, where new evidence has become available, or where reconsideration is necessary to prevent clear error or manifest injustice.'" *Id.,* citing *In re Engel*, 124 F.3d 567, 584 (3d Cir. 1997)(quoting *AL Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.*, 104 F.3d 601, 605 (3d Cir. 1997). "The law of the case doctrine provides that "once a court decides an issue, the same issue may not be relitigated in subsequent proceedings in the same case," and the exceptions to the law of the case doctrine are "narrow." *Schneyder v. Smith*, 709 F.Supp.2d 368, 383 (E.D. Pa. 2010 *aff'd*, 653 F.3d 313 (3d Cir. 2011).

The rationale underlying the law of the case doctrine is to ensure that rulings in a litigation be applied uniformly. Here, with ROV facing the same "unprecedented" remedies ordered by the Masters in the *Pro Athlete Law Firm* matter in this litigation, the Court should follow Judge Brody's ruling in July 2025 declining to approve the Decision's remedies of disqualification and financial penalties based on the law of the case doctrine. The findings of facts in both the PALF

---

[44] The ramifications of depriving choice of counsel is discussed further in Section E.

and instant matter are not sufficiently similar, and there has been no intervening change in the law since the PALF decision. In both matters, the Masters, at the urging of the NFL Parties, ordered SCM's counsel to order the "unprecedented" remedies of disqualification and related financial penalties. Just as this Court refused to approve those remedies in PALF, to be consistent the Court should decline to impose them now, especially in view of the extreme differences between the alleged misconduct of ROV and PALF.

Similarly, AR 34 provides that "published decisions of the Special Master *and the Court* will have *precedential value* in the Settlement Program on the issues and principles determined in the decision, which means they will serve as guidance for the consideration of the same or similar issues and principles in later Audit Proceedings." (Emphasis added.) If Rule 34 is to mean anything, it should be to establish that the Court's decision in the PALF matter "serve as guidance" here. In short, if the conduct in PALF did not warrant the Settlement Masters' relief in that case, it surely cannot here insofar as it concerns ROV. Notably, in the PALF matter the NFL Parties urged the Masters to disqualify PALF and order them to reimburse the costs the CA had borne, just as they have in this proceeding. But the Masters also noted in that case that the NFL Parties had not provided caselaw in support of their request.[45] The Court denied that requested relief. In this case, the NFL Parties again urge disqualification and extreme financial sanctions, despite the CA only recommending denial of pending Monetary Award Claims, and "censure" the subjects of the investigation. AR at 80-81.

In their zeal to sanction ROV, the NFL Parties cited *3M Combat Arms Earplug* in their response to the Report. *In re 3M Combat Arms Earplugs Prods. Liab. Litig.*, No. 3:19 MD 2885, ECF 4190 (N.D. Fla. Dec. 5, 2025) ("*3M*"). The Masters adopted *3M* as authority to augment the

---

[45] ECF 12473-1 at 9, n. 10.

CA's recommended relief and to order financial sanctions.[46] But the *3M* case is inapposite for the proposition the Masters conclude: the case involved hundreds of demonstrably fraudulent, undocumented claims, each employing a loophole developed by law firms, yet despite that egregious conduct, no lawyer disqualifications were imposed, and the costs assessed were tailored to each firm's case, not split equally. Similarly, this Court should sustain ROV's objections to the sanctions imposed by the Decision as it has damaged not only ROV but the SCMs for which the Agreement was intended to help.

**E. The Masters Erred By Imposing a Remedy that Improperly Denies ROV's Clients Their Choice of Counsel**

The Decision disqualifies ROV from representation of its current and potential future clients seeking to submit claims in this litigation. Decision at 42-3, 45-51. The Supreme Court recognizes the importance of a client's right to choose counsel. *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 440-441 (1985) (holding "an order disqualifying counsel may impose significant hardship on litigants," reflecting "concern about tactical use of disqualification motions to harass opposing counsel;" a concurring opinion stressed that "the tactical use of attorney-misconduct disqualification motions is a deeply disturbing phenomenon in modern civil litigation.") Additionally, if a court disqualifies a party's counsel on an adversary's motion "the court in essence permits the party's opponent to dictate his choice of counsel." *Id.* That is exactly the tactic and sanction the NFL Parties – not the CA – advocated here, and that the Masters adopted.

Former players came to ROV, and its client base expanded, because it was advocating for clients, assisting with obtaining benefits, devoting substantial time to each player who complained of prior counsels lack of communication and indifference to their medical issues. Diversity of

---

[46] *See,* Decision at 44, remedies 4, 5, and at 42, n. 81, *citing* 3*M*, *esp.* ECF 4190 (master decision).

representation is critical. These actions have repercussions that will impede other lawyers' involvement and willingness to represent players. It has led many doctors to decline getting involved as well and has resulted in an ongoing self-directed exodus by doctors leaving after being badgered for excessive interruptions in their practices from the Program.

Absent a compelling basis to disqualify ROV, and deprive ROV's clients of their choice of counsel, the Masters' Decision should be reversed.

Respectfully Submitted,

Date: September 11, 2026

By: /s/

John P. McShea
PA Attorney ID No. 34562
Conrad O. Kattner
PA Attorney ID No. 35468
**Eastburn and Gray, PC**
470 Norristown Road #302
Blue Bell, Pennsylvania 19422
(215) 345-7000

Counsel of Record for
Reppert Oates & Vytell, LLC

**CERTIFICATE OF SERVICE**

We certify that on September 11, 2026 undersigned counsel caused the foregoing to be electronically filed with the Clerk and service on counsel for all parties has been accomplished via CM/ECF.

Respectfully Submitted,

By: /s/

John P. McShea
PA Attorney ID No. 34562
Conrad O. Kattner
PA Attorney ID No. 35468
**Eastburn and Gray, PC**
470 Norristown Road #302
Blue Bell, Pennsylvania 19422
(215) 345-7000

Counsel of Record for
Reppert Oates & Vytell, LLC