# EXHIBIT 2

*Levine Decision*

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| THIS DOCUMENT RELATES TO:<br><br>Pro Athlete Law Firm, P.A. Audit | **Hon. Anita B. Brody** |

**<u>SETTLEMENT IMPLEMENTATION DETERMINATION</u>**

The Settlement Agreement authorizes the Claims Administrator to conduct audit investigations to detect and prevent fraud. Following one such investigation, the Claims Administrator determined that a law firm misrepresented material facts in connection with several claims it filed on behalf of class member clients. The Special Masters affirmed that finding and ordered several remedial measures. They directed the Claims Administrator to deny pending and future claims filed by the firm that reflected the problems identified in the audit and to give additional scrutiny to claims the firm had withdrawn and then re-filed. They also barred the firm and offending attorney from further participation in the settlement program. They stayed the publication and effect of their decision until any appellate rights were satisfied.

The firm, Pro Athlete Law Firm, P.A. ("PALF"), and its principal, David I. Levine, object to their disqualification. The NFL Parties and Class Counsel have been heard on PALF's objection.

* * *

This audit laid bare PALF's practices in obtaining a particular piece of evidence – Form SWS-3, "Third-Party Sworn Statement: Functional Impairment"[1] – in support of its clients' claims for a monetary award. PALF's methods yielded sworn statements that repeated idiosyncratic content across various claim files. The statements were not the affiants' "own words." In some cases, upon further inquiry by an investigator, the affiant later disavowed particular details included in his or her affidavit, indicating that the substance, not just the syntax, was the product of PALF's authorship. Several affiants could not recall approving an affidavit that was submitted by PALF with their DocuSign signature, suggesting that PALF's interview technique and transmittal communications failed to impress

[1] This form enables a lay witness – who cannot be a family member of the retired player – to corroborate the claimant's decline in function when no documentary evidence exists or is available. While the affiant is permitted to receive "help" in completing the substantive portion of the statement, the form purports to memorialize observations "in [the affiant's] own words" and based on the affiant's personal knowledge. The form asks the affiant to "explain how [the affiant is] aware of" the decline in function described. The affiant declares under penalty of perjury that the information provided is true to the best of his or her knowledge, information, and belief.

upon affiants the importance of their statement, that the information they provided had to be true and correct, and that a draft affidavit presented to them should be reviewed with care. The Claims Administrator's investigation also revealed that third-party statements submitted by PALF often relayed secondhand accounts without attribution, leaving the misimpression that the witness had personally observed what was recorded about the class member's condition.[2]

The Claims Administrator quite reasonably concluded that third-party affidavits with these characteristics were "unreliable." In affirming the Claims Administrator's findings, the Special Masters concluded that PALF's actions – its practice of drafting statements for affiants using PALF's own stock language and its pervasive submission of substantively unreliable statements – both reflected intentional conduct and threatened the integrity of the settlement program. I agree.

The Claims Administrator and the Special Masters must continue to protect this program from practices that risk veering into the realm of fraud. All counsel who represent class members in this settlement program must adhere to the instructions given by the Claims Administrator and follow both the letter and spirit of program rules. Those rules are designed to effectuate the terms of the settlement agreement. To the extent a claimant's lawyer chooses to provide assistance to an

---

[2] The audit findings are described in the Special Masters' decision, which I attach to this filing, redacted of identifying information of claimants and witnesses.

affiant completing a Form SWS-3 statement, that lawyer must convey the directive that the witness describe the claimant's functional decline in their own words and explain how the witness is aware of the decline. The attorney should impress upon the witness the need to avoid recounting information known only through the class member or a member of his family.

I have considered this audit report and the decision of the Special Masters, as well as the statements of PALF and the parties. I commend the Claims Administrator for its efforts to ferret out any possible fraud in the Program and the Special Masters for their wise oversight and keen analysis. But I will permit PALF and Mr. Levine to continue to participate in the Settlement Program at this time. They must adhere scrupulously to all Program rules governing claim submission and follow the requirements set forth by the Special Masters in their decision. Should PALF or Mr. Levine again violate the requirements of the Special Masters, they will face disqualification at that time.

**AND NOW**, this 2nd day of July, 2025, the Court denies the request of the Special Masters that the offending firm and attorney, Pro Athlete Law Firm and David I. Levine, Esquire, be barred from further participation in the Settlement Program. But the Claims Administrator is directed to continue to carefully scrutinize the claim application of any class member represented by Pro Athlete or Mr. Levine to assure complete compliance with the rules of the Court as to this

Settlement Program. The Claims Administrator is directed to immediately report any violation to the Special Masters, who will then refer the matter to the Court. The Court recognizes the violation but determines that it is in the best interest of the Program to allow the firm to continue to represent class members at this time.

s/ANITA B. BRODY, J.

ANITA B. BRODY, J.

Attachment: Special Masters' Rule 27 Decision on the report of Adverse Finding Regarding Pro Athlete Law Firm, P.A. (redacted)

**<u>SPECIAL MASTERS' RULE 27 DECISION ON THE REPORT OF ADVERSE FINDING REGARDING PRO ATHLETE LAW FIRM, P.A.</u>**

Two affidavits were allegedly written by different people for a Claim submitted by a single Representative Claimant, months apart. Their text was nearly identical. Pro Athlete Law Firm, P.A. represented that Claimant. Having its suspicions triggered, the Claims Administrator—with our consent—began a wide-ranging Audit investigation of Pro Athlete. It ultimately identified twenty affidavits, supporting the Claims of seventeen Settlement Class Members, that contained significant language overlaps. Of those seventeen Claims, seven have already been paid, resulting in millions of dollars in Awards (and, we have reason to believe, attorney's fees).

On April 11, 2024, the Claims Administrator issued an Audit Report (consisting of 25 pages and an additional 181 pages of exhibits). It found that Pro Athlete repeatedly submitted unreliable third-party affidavits that did not accurately represent each Settlement Class Member's condition. These inaccurate and unreliable affidavits, the Claims Administrator concluded, led to material misrepresentations in connection with the Claims.

Our task is to determine (1) whether there was a reasonable basis for the Claims Administrator's findings and (2) if there was, what remedy is appropriate. After having considered the record and the briefing by Pro Athlete and the NFL Parties, we now issue this Rule 27 Decision. We approve the Claims Administrator's findings, and, among other remedies detailed below, disqualify Pro Athlete from further participation in the Program.

**AUDIT HISTORY**

Pro Athlete's sole principal is David Levine. Doc. 350393 at 1. By April 11, 2024, Pro Athlete had represented 342 Class Members in the Settlement Program. Doc. 321156 at 2. This Audit concerns seventeen of those Class Members "whose Monetary Award claims are supported by 20 third-party affidavits that [the Claims Administrator has] determined to be unreliable." *Id.* at 3.[1]

As relevant here, the Claims Administrator noticed the first red flag in March 2023, when Pro Athlete submitted an affidavit with "numerous word-for-word language overlaps" with a prior affidavit submitted for the same Retired Player. *Id.* at 7. The Claims Administrator ultimately documented the following facts:

> [redacted] was a Retired NFL Football Player who died on 8/1/22. [redacted] had a neuropsychology evaluation through the BAP by [redacted] on 7/22/22.

[1] The Claims Administrator has investigated Pro Athlete for other allegations of misconduct in the past. Sources claimed that the firm coached players on how to behave during Settlement Program evaluations and in the NFL's disability program (including the claim that Players were coached to soil themselves), suggested that it poached players from other law firms, and asserted that it improperly accessed players' medical information. Doc. 321156 at 4–6. Ultimately the Claims Administrator did not substantiate these accusations, and it took no further Audit findings.

A BAP neurology evaluation had been scheduled with [redacted] for 10/26/22, but Mr. [redacted] died before the evaluation took place.

After the player's passing, his fiancée, [redacted], submitted a third-party affidavit on his behalf, dated 10/2/22. Since this original affidavit was completed by the player's fiancée, it could not be used to corroborate the player's functional impairment. Therefore, at our request, Pro Athlete provided a "new" affidavit completed by the player's friend, [redacted], dated 3/23/23. However, the two affidavits contain numerous word-for-word language overlaps, an issue noted by the Appeals Advisory Panel (AAP) during their review of [redacted] BAP results. Despite these documents allegedly being authored by two different individuals, [redacted], and executed roughly five months apart, the two affidavits share a substantial amount of identical language.

On 11/8/23, we reached out to Mr. Levine and pointed out the overlapping affidavits allegedly authored by [redacted]. We told Mr. Levine that while these statements acknowledge that they were prepared with assistance from his firm and reviewed by the affiants, this type of overlap is unacceptable and gives the impression that the information was not actually provided by the affiant named on the document. We referred Mr. Levine to Section III of the SWS-3 form, which states the affiant is instructed to provide a description of the Retired Player's functional impairments in his or her "own words." We asked Mr. Levine to consider this going forward and provide third-party sworn statements that contain unique language exactly as it was reported by the affiant, even if his firm is assisting in preparation of the documents. We concluded the email by telling Mr. Levine that in order for us to finalize Mr. [redacted] BAP results, he would need to submit to us a new third-party sworn statement that contains language directly from the affiant, in his or her own words.

Mr. Levine responded by email on 11/13/23:

> Please find attached the revised affidavit for the [redacted] claim. I told the affiant that you needed 'His own words' so he modified it accordingly. If he didn't change the verbage [*sic*] its [*sic*] because it was his verbage [*sic*] to begin with. The document is now 100% accurate and those are his words!!!

However, after reviewing Mr. Levine's response and the revised affidavit he sent us, we realized that many of the statements originally made by [redacted] in her 10/2/22 affidavit were still present in [redacted] "revised" affidavit. We therefore found it unacceptable for Mr. Levine to characterize this document as Mr. [redacted]'s own verbiage.

*Id.* at 7–8.

The overlapping phrases in the [redacted] and [redacted] affidavits are striking. *Compare*, *e.g.*, *id.* at Ex. 1 ("Prior to [redacted] untimely death his memory and functional abilities had substantially decreased over the last five years."), *with id.* at Ex. 2 ("Prior to [redacted] untimely death his memory and functional abilities had substantially decreased over the last five years."); *id.* at Ex. 1 ("[redacted] rarely ate regularly and had to be encouraged to eat. I would prepare his meals for him and served his meals to him."), *with id.* at Ex. 2 ("[redacted] rarely ate regularly and had to be encouraged to eat. His fiancée would prepare his meals for him and served his meals to him.").

The Claims Administrator again attempted to resolve its concerns with Mr. Levine directly by advising him that "he would need to submit [...] a unique affidavit from Mr. [redacted] or another affiant that is written by, or transcribed in the exact words of, the third party, and told him that this affidavit should not rely on language from previous versions." *Id.* at 8. Mr. Levine responded, on November 19, 2023:

> This is [redacted]'s words on this affidavit. Yes, some words are the same as the 1st one but there is only so many ways you can say the same thing. If someone doesn't like it, they can depose me or [redacted] to see if it's his words.

*Id.* at Ex. 3.

Mr. Levine attached a new version of Mr. [redacted]'s affidavit with wording "substantially different from the version dated four days earlier." *Id.* at 8.

Concerned about "the overlap among several affidavits submitted for Mr. [redacted]," the Claims Administrator "searched the Claim Packages of additional Pro Athlete Law Firm clients for documents that contained similar statements about the players' functionality and condition." *Id.* It found 20 affidavits, submitted on behalf of 17 Class Members, that fit the pattern. *Id.* In particular, the Claims Administrator determined that:

> 1. Each of the 20 affidavits includes substantial language overlaps also found in other affidavits. When questioned, seven affiants could not explain why their affidavits contain language that overlaps with other affidavits [...]
>
> 2. In three separate cases, Pro Athlete submitted to us affidavits that were allegedly provided by two different affiants, but contained numerous exact language overlaps. In all three cases, the affiants' names were different while much of the language in the affidavits remained the same [...]
>
> 3. In 13 of 20 cases, the affiant acknowledged that he or she did not have firsthand knowledge of one or more of the player's activities but learned it from the player or a member of the player's family [...]

4. 16 of the 20 affidavits include language discussing that the player allegedly has incontinence issues, something that we do not typically see as a reported symptom in the Program […]

5. In one case, the affiant did not actually report anything about the player's alleged incontinence issues to Pro Athlete, but noticed that incontinence wording had been added to the affidavit when it was returned by Pro Athlete for her review, and only then learned about the purported incontinence issues by "confirming" it with the player and his sister […]

6. 19 of the 20 affidavits state that the player allegedly has difficulty with missing buttons and/or belt loops, another issue that we do not typically see reported in the Program […]

7. Four affiants told us during the Audit investigation that they did not recall reviewing or signing an affidavit. This includes one affiant who said she had talked to the player's wife but had no idea it was for an affidavit, was not asked to write anything down, never saw a document, and never signed anything […]

8. During our interviews of the affiants, we revisited significant facts from the affidavits, and seven affiants provided information in the interviews that conflicted with what they reported in the affidavits […]

9. One affidavit contained multiple substantial misspellings of the affiant's last name, including a misspelling in the affiant's DocuSign signature, leading us to question how the affiant did not previously notice the misspellings if she had actually read and signed the affidavit […]

*Id.* at 3–4.

In its Audit Report, the Claims Administrator attached the concerning affidavits, documented its outreach to affiants, and highlighted particular examples of copied language:

**Example 4: Visiting with friends and family:**

1. **[redacted], affiant for [redacted] (SPID [redacted]):**
   He has stopped visiting with his friends like he use too. He also doesn't visit his family like he use too.

2. **[redacted], affiant for [redacted] (SPID [redacted]**
   He has stopped visiting with his friends like he use too. He also doesn't visit his family like he use too.

3. **[redacted], affiant for [redacted]:**

He has stopped visiting with his friends like he use too. He also doesn't visit his family like he use too.

4. [redacted]**, affiant for** [redacted]
He has stopped visiting with his friends like he use too. He also doesn't visit his family like he use too.

*Id.* at 10.

The Claims Administrator ultimately concluded:

We have found evidence that Pro Athlete submitted unreliable third-party affidavits that contain significant language overlaps between both affiants and Settlement Class Members that strongly suggest the language is not unique to each affiant or an accurate representation of each Settlement Class Member's condition. The evidence reasonably supports a finding of misrepresentation, omission, or concealment of a material fact in connection with the Monetary Award claims subject to the Audit. For this reason, we recommend that the Special Masters:

1. Deny any pending Monetary Award claim in which the Claim Package includes an affidavit that fits the pattern discussed in this Audit Report; and

2. Instruct David Levine and Pro Athlete Law Firm, P.A. to submit third-party affidavits from affiants who have personally witnessed the information to which they are attesting, and that contain unique language in the affiant's own verbiage.

*Id.* at 25.

Of the seventeen Claims implicated in the Audit Report, seven have already been paid,[2] three have been denied,[3] and three are on hold.[4] After the Audit Report's publication, Pro Athlete withdrew four pending Claims, and later resubmitted three with new supporting material.[5]

Pro Athlete withdrew two of these four Claims on July 24, 2024. Docs. 350042; 350068. The original Claim for Settlement Class Member [redacted] (SPID 100006800), asserted a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment. Doc. 284830. Its supporting affidavits were purportedly by [redacted] and [redacted]. Doc. 321156 at Ex. 13; Ex. 14. The Claims Administrator discovered issues with overlapping language, alleged incontinence, and

[2] Those are the Claims associated with SPIDs 100005599, 100010293, 100016980, 100013785, 100007835, 950006601, and 100009012.

[3] The Claims or Supplemental Claims, as applicable, associated with SPIDs 100012412, 100011424, and 950000492 have already been denied.

[4] The three Claims on hold are associated with SPIDs 100005318, 100007328, and 260001205.

[5] Pro Athlete withdrew the Claims associated with SPIDs 100002708, 100006800, 100006807, and 100014614 in July 2024, only to resubmit Claims for SPIDs 100006800, 100006807, and 100014614.

alleged belt loop and button issues with both affidavits. *Id.* at 12–14. There were additional irregularities with Ms. [redacted]'s affidavit:

> [The investigator] HML pointed out that we had identified [redacted] as "[redacted]" on the summary information we provided to HML about her affidavit. The name [redacted] also appears on the SWS-3 form as the third-party affiant and within the affidavit itself. The DocuSign signature also appears to be [redacted] The only place on the SWS-3 form where Ms. [redacted] name is correctly spelled is in her email address. When HML contacted Ms. [redacted] and mispronounced her name, she immediately corrected them. It is suspiciously odd that she would not have corrected the multiple misspellings within the SWS-3 had she read the entire document—not to mention misspelling her own last name via DocuSign.

*Id.* at 19.

On September 3, 2024, Pro Athlete submitted a "new" Claim for Mr. [redacted] again asserting a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment. Doc. 356068. The new Claim Package included a handwritten affidavit by [redacted] Doc. 356101.

Also on July 24, 2024, Pro Athlete withdrew a Claim for Settlement Class Member [redacted] (SPID 100002708). Doc. 350068. The Claim asserted a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment, Doc. 291101, and relied on an affidavit by [redacted] Doc. 321156 at Ex. 9. Mr. [redacted] affidavit contained issues with overlapping language and purported incontinence symptoms, and Mr. [redacted] "could not explain" why "certain language in his affidavit was remarkably similar to language that appeared in affidavits for other players." *Id.* at 16. Mr. [redacted] also claimed that "the information in his affidavit regarding the player's incontinence issues came from the player himself." *Id.* As of October 29, 2024, Pro Athlete has not resubmitted a Claim for Mr. [redacted]

Pro Athlete withdrew another two Claims on July 25, 2024. Docs. 350104; 350142. Just five days later, on July 30, 2024, Pro Athlete resubmitted a Claim for Settlement Class Member [redacted] (SPID 100014614). Doc. 350567. The original Claim asserted a Qualifying Diagnosis of Level 1.5 Neurocognitive Impairment dated January 30, 2023, while the resubmitted Claim asserted one of Alzheimer's Disease dated July 3, 2024. Docs. 296258; 350567. The affidavit submitted alongside the original Claim, by [redacted], Doc. 321156 at Ex. 17, had a number of problems including exact language overlaps, alleged incontinence issues, and alleged belt loop and button issues. *See id.* at 10, 12, 14. When the Audit investigator reached Mr. [redacted] by phone, he said "he has no idea whether Mr. [redacted] currently or previously has any involvement with another church in his community, though in his affidavit he stated 'He use to attend church on a regular basis, but now no longer attends.'" *Id.* at 21.

Pro Athlete also resubmitted the other Claim it withdrew on July 25, this one on September 7, 2024 for Settlement Class Member [redacted] (SPID 100006807). Doc. 356800. The

original and resubmitted Claim each asserted a Qualifying Diagnosis of Level 2.0 Neurocognitive Impairment dated October 2, 2023. Docs. 292141; 356800. The original Claim's supporting affidavit, by [redacted], contained issues with overlapping language, purported incontinence, and purported belt loop and button difficulties. Doc. 321156 at Ex. 10. Even more concerning, the Audit investigation revealed that the affidavit contained information Ms. [redacted] never knew about until it appeared in her affidavit:

> The information contained in Ms. [redacted] affidavit about Mr. Hicks soiling his pants came from his sister. Ms. [redacted] had no firsthand knowledge of this happening and did not document it; however, when the affidavit was returned for her review, she noticed the statement and questioned both Mr. [redacted] and his sister about it. It was at that time that Mr. [redacted] sister advised that it had occurred.

*Id.* at 17.

Ms. [redacted] also gave conflicting information in the investigation concerning the affidavit process and to what extent Mr. Levine had spoken with her about the interview request. *Id.* The new Claim, by contrast, included an affidavit by [redacted]. Doc. 356237. This affidavit did not include any claims about incontinence issues. *Id.*

As for the seven Claims that the NFL Parties have already paid, the Claims Administrator found material problems with the documentation supporting each. For example, affidavits for [redacted], [redacted], [redacted], and [redacted] all included the statement "He usually wears wrinkled clothes that is not always appropriate." Doc. 321156 at 11. Affidavits for [redacted] and [redacted] made identical claims that "He has stopped visiting with his friends like he use too. He also doesn't visit his family like he use too." *Id.* at 10. The affidavit for [redacted] also had issues with overlapping language relating to family members and conflicts with strangers. *Id.* at 9–10. Five of the paid Claims discussed in the Audit Report—for [redacted], [redacted], [redacted], [redacted], and [redacted]—were supported by affidavits alleging incontinence issues. *Id.* at 11–12. All but [redacted] Claim was supported by at least one affidavit alleging that each Retired Player struggles with missing buttons and belt loops when getting dressed. *Id.* at 13–14. Yet because they were approved before the Claims Administrator had observed this concerning pattern and initialized the Audit, the NFL Parties funded the payment of nearly nine million dollars to these Claimants.

The NFL Parties and Pro Athlete submitted briefing in response to the Audit Report. Docs. 332783; 350393; 350532; 352849; 352850; 353450; 357686.

## Resolving This Audit

According to the Rules Governing the Audit of Claims, we ask if the Claims Administrator had a "reasonable basis" to conclude that the problems with the overlapping affidavits—and Pro Athlete's insistence on continuing to submit affidavits with this issue after it was brought to its

attention—constitute a misrepresentation or omission of a material fact in connection with claims.[6] This deferential review of an extensive and careful investigatory system advances the Program's interest in deterring fraud and making its operations more efficient.

Very clearly, the Claims Administrator had a reasonable basis for its conclusion.

The instructions for third-party sworn statements are clear:

> **In your own words**, describe any behavior of the Retired NFL Football Player listed on the first page of this form that you believe demonstrates difficulties he has in his everyday functioning and how his functioning has declined from his previous usual level before you began noticing any impairment.[7]

The purpose of the "own words" requirement is to ensure the "[t]ruthfulness" of the statements in the affidavits so that "only those who are eligible for awards under the terms of the Settlement Agreement receive them."[8] It means what it says, literally: the affidavits must reflect the words and thoughts of those who purported to make sworn statements as to the truth of their contents.

The Audit reveals that the twenty affidavits here have problems both with the literal words used and the substance of what was communicated. The extensive language overlaps—including idiosyncratic grammar and spelling mistakes—make it obvious that the affidavits did not come from the affiants themselves. Pro Athlete implausibly argues that it has merely engaged in "an ordinary template common in legal practice." Doc. 350393 at 2 n.4. But the incredible prevalence of symptoms that the Claims Administrator rarely sees in the Program, the four affiants who "did not recall reviewing or signing an affidavit," and the affidavit purportedly signed with multiple spelling mistakes in the affiant's own name reveal otherwise. Doc. 321156 at 4.[9] We adopt the Claims Administrator's view that the affidavits repeatedly relate false facts.

Mr. Levine states that he "stands by the accuracy and truthfulness of all of the third-party affidavits submitted in connection with the claims handled by his law firm." Doc. 350393 at 1. But in withdrawing the Claims for Mr. [redacted] Mr. [redacted] Mr. [redacted] and Mr. [redacted] Mr. Levine does not even try to defend the accuracy of the documentary sources on which those Claims rely. The evidence overwhelmingly supports the inference that the sources misrepresented the facts, as these affidavits all had glaring issues with overlapping language, purported incontinence symptoms, and purported struggles with belt loops and buttons. Doc. 321156 at 11–14. An affiant for Mr. [redacted]

---

[6] *See* Rules Governing the Audit of Claims, at Rule 28 (Mar. 18, 2020), https://www.nflconcussionsettlement.com/Docs/NFL_Rules_Governing_the_Audit_of_Claims.pdf ("Standard of Proof Applicable to the Special Master.").

[7] *SWS-3, Third-Party Sworn Statement: Functional Impairment*, NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com/Docs/sworn_statement_functional_impairment_sws-3.pdf (emphasis added).

[8] *Id*.

[9] *See* Claims Administrator Audit Report, Doc. 321156, p. 11 ("...discussion of incontinence issues...is not something we typically see reported in...third-party affidavits.").

spelled her own name wrong in her signature and in numerous other places on the affidavit. *Id.* at Ex. 13. Mr. [redacted] affiant offered information in his investigation interview that directly conflicted with his affidavit. *Id.* at 21. And Mr. [redacted] affiant "did not actually report anything about the player's alleged incontinence issues to Pro Athlete, but noticed that incontinence wording had been added to the affidavit when it was returned by Pro Athlete for her review." *Id.* at 3. These are plainly misrepresentations of material facts. Withdrawing the Claims is not exculpatory: having submitted affidavits to the Program, Mr. Levine can be held accountable for their contents.

The second question is one of remedies. The Claims Administrator recommends that (at least) the pending Claims discussed in the Audit be denied; the NFL Parties seek disqualification of Pro Athlete and reimbursement of costs they have borne.[10] Docs. 321156; 332783.

The Settlement empowers the Special Masters to direct a relief from a broad menu of options:

> The Special Master's review and findings shall take into account whether the misrepresentation, omission or concealment was intentional, and may include the following relief, without limitation: (a) denial of the claim in the event of fraud; (b) additional audits of claims from the same law firm or physician (if applicable), including those already paid; (c) referral of the attorney or physician (if applicable) to the appropriate disciplinary boards; (d) referral to federal authorities; (e) disqualification of the attorney, physician and/or Settlement Class Member from further participation in the Class Action Settlement; and/or (f) if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member will be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.[11]

Pro Athlete's conduct here was egregious—it led to material misstatements in connection with at least seventeen Claims, raised the Program's administrative costs, and diverted the Claims Administrator's attention. The NFL Parties have already paid seven Monetary Awards that rested in part on misrepresentations. And, because of Pro Athlete's actions, it is likely that deserving Settlement Class Members will experience more delay and receive lower Monetary Awards as a result of an older age at Qualifying Diagnosis.

Because the Settlement Program cannot accept unreliable evidence, the affidavits described in this Audit cannot be used to support a claim. We therefore agree with the Claims Administrator that all of the pending Claims described in this Audit—along with any future claim that relies on a similarly unreliable affidavit—must be denied.

---

[10] The NFL Parties have not provided caselaw in support of their request for reimbursement. Since this request would be unprecedented in the Program, we hesitate to take it up without further briefing on our authority to order a fine or even disgorgement from a law firm in circumstances like these.

[11] Settlement Agreement, Section 10.3(i).

Clinicians who encounter former Pro Athlete-represented Retired Players in the future must either be fully screened from viewing the disqualified affidavits or, if they see a disqualified affidavit or a medical record that mentions the disqualified affidavit, they must make it clear to the Claims Administrator that they did not rely upon the unreliable affidavit evidence in rendering their medical opinions. In all cases, clinicians must entirely exclude the disqualified evidence from consideration.[12]

In considering Pro Athlete's continued participation in the Program, we cannot simply repeat the Claims Administrator's earlier instructions to the firm. Doc. 321156 at 25. The sheer volume of misrepresentations here (twenty affidavits, implicating seventeen Claims) illustrates that this was an intentional practice rather than an isolated error.

Pro Athlete's response to the Audit doubled down on its position. When given multiple chances to correct its behavior and bring its affidavits into compliance with the "own words" requirement, Pro Athlete responded with more problematic affidavits and disdain for the process. *See id.* at 8 ("'If someone doesn't like it, they can depose me or [redacted] to see if it's his words.'"). Mr. Levine and his Firm, in other words, are both inveterate and unrepentant offenders.

Astonishingly, Pro Athlete attempts to chalk this up to a misunderstanding about what it means for something to be in the affiant's "own words," claiming that the affidavits described in the Audit are merely "technically deficient." Doc. 350393 at 3. Attaching several new affidavits to its briefing, Pro Athlete further argues that now that it understands the "new" requirement of having affidavits "*literally*" in the affiant's "own words," everything is copacetic. *Id.* at 2, Ex. B. Without addressing whether these new affidavits in fact meet the Program's standards, we conclude that the twenty affidavits Pro Athlete already submitted are much more than technically deficient—they are substantively unreliable. Because of the Firm's practice of writing documents for affiants, the Claims Administrator repeatedly made awards relying on sworn documents that contained false statements about the scope of affiants' personal knowledge and Retired Players' functional impairment. This behavior corrupted the Claims process and caused serious harm to the Settlement's efficient and accurate administration.

Given the pervasive, inveterate, and material nature of the wrongdoing the Claims Administrator described, in addition to disqualifying the affidavits described in this Audit and denying claims that rely on them, we disqualify both Pro Athlete and Mr. Levine from further participation in the Program.

## CONCLUSION

Pro Athlete has not met its burden to prove that there was no reasonable basis to support the Claims Administrator's finding of "misrepresentation, omission, or concealment of a material fact in connection with the Monetary Award claims subject to the Audit." Doc. 321156 at 25. We adopt the factual findings of the Claims Administrator's thorough Audit Report and further find

[12] The Claims Administrator shall determine if this standard is met with respect to resubmitted Claims.

that the misrepresentations described therein were intentional. We therefore direct the following remedies:

1. The Claims Administrator will deny any pending Monetary Award claim in which the Claim Package includes an affidavit that fits the pattern discussed in the Audit Report;

2. Any future claims that rely on an affidavit gathered by Pro Athlete that fits the pattern discussed in the Audit Report will be denied, regardless of current representation;

3. Regarding claims submitted by Pro Athlete after withdrawing a claim for the same Settlement Class Member discussed in the Audit Report:

    a. The Claims Administrator shall review them with care to certify, before continuing to process each claim, that the claim is entirely free of the issues discussed in the Audit. We will consider that determination to be dispositive.

    b. If the Claims Administrator cannot determine that the pending claim is free of the issues discussed in the Audit, it shall notify the Special Masters, who will deny that claim without prejudice pursuant to this Order;

4. Pro Athlete and Mr. Levine are disqualified from further participation in the Program.

5. This Order is stayed, and shall not be made public until any appellate rights are satisfied; all potentially affected Claims shall be put on an Audit hold until that time. If the Claims Administrator can certify that other pending or filed Claims by Pro Athlete and/or Mr. Levine are free of the issues described herein, they may be processed in the ordinary course.

Dated November 1, 2024

David A. Hoffman, Special Master

Jo-Ann M. Verrier, Special Master