**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: NATIONAL FOOTBALL LEAGUE** | : | **No. 2:12-md-02323-JDW** |
| **PLAYERS' CONCUSSION INJURY** | : | |
| **LITIGATION** | : | **MDL No. 2323** |
| | : | **Hon. Joshua D. Wolson** |
| **v.** | : | |
| | : | |
| **In re Audit of the Law Office of** | : | |
| **Douglas R. Grossinger** | : | |

**MOTION TO VACATE THE CLAIMS ADMINISTRATOR'S DECEMBER 12, 2025 RULE 15 AUDIT REPORT, TO VACATE THE SPECIAL MASTERS' JUNE 8, 2026 RULE 27 DECISION, AND TO STAY AUDIT PROCEEDINGS PENDING RESOLUTION**

Douglas R. Grossinger and the Law Office of Douglas R. Grossinger (collectively, Grossinger"), by and through counsel, Bochetto & Lentz, P.C., respectfully move this Court for an Order vacating the Claims Administrator's Report of Adverse Finding dated December 12, 2025 and its referral to the Special Masters; vacating the Special Masters' Rule 27 Decision dated June 8, 2026; and staying all Audit proceedings as to Grossinger pending resolution of this Motion.

The grounds for this Motion are set forth in the accompanying Memorandum of Law and the Declaration of Douglas R. Grossinger, Esq., filed herewith.

**WHEREFORE**, Grossinger respectfully requests that the Court enter the accompanying proposed Order.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

Dated: September 11, 2026 By: *George Bochetto*

George Bochetto, Esquire
Kiersty DeGroote, Esquire
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
*Counsel for Douglas R. Grossinger and the Law Office of Douglas R. Grossinger*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION** | : | **No. 2:12-md-02323-JDW** |
| | : | **MDL No. 2323** |
| | : | **Hon. Joshua D. Wolson** |
| **v.** | : | |
| **In re Audit of the Law Office of Douglas R. Grossinger** | : | |

**MOTION TO VACATE THE CLAIMS ADMINISTRATOR'S**
**RULE 15 AUDIT REPORT AND THE SPECIAL MASTERS' RULE 27 DECISION, AND FOR A STAY OF AUDIT PROCEEDINGS**

Douglas R. Grossinger and the Law Office of Douglas R. Grossinger (collectively, "Grossinger") by and through counsel, Bochetto and Lentz P.C., respectfully move this Court, pursuant to Federal Rule of Civil Procedure 53(f) and Sections 10.1 and 10.2 of the Class Action Settlement Agreement (the "Settlement Agreement"), attached hereto as Exhibit "A," to vacate the Claims Administrator's "Rule 15 Audit Report of Adverse Finding," dated December 12, 2025 (the "Audit Report"), attached hereto as Exhibit "B," and the referral thereof to Special Masters David Hoffman and Jo-Anne Verrier, to vacate the Special Masters' Rule 27 Report and Decision, dated June 8, 2026 (the "Rule 27 Decision"), attached hereto as Exhibit "C," and to stay all Audit proceedings as to Grossinger pending resolution of this Motion.

# TABLE OF CONTENTS


**I. INTRODUCTION** .......... **4**

**II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND** .......... **8**

a. The Settlement Agreement and the Court's Continuing Supervisory Authority .......... 8

b. The Section 10.3(i) Threshold and the Audit Rules .......... 8

c. The Gelb Criteria Were Imposed Administratively, Not by Agreement of the Parties or Order of This Court .......... 9

d. The December 12, 2025 Audit Report .......... 12

e. The NFL's Submission and the June 8, 2026 Rule 27 Decision .......... 13

**III. LEGAL ARGUMENT** .......... **14**

a. This Court Has a Continuing Duty to Ensure the Fairness of the Settlement Agreement and the Procedures Adopted Under It, and That Duty Is Not Extinguished by the Passage of Time .......... 15

b. The Audit Must Be Vacated Because the Claims Administrator Never Made the Threshold Finding Section 10.3(i) and Audit Rule 12 Require .......... 16

c. Even If the Threshold Finding Had Been Made, the Audit Was Conducted in a Manner That Violates Grossinger's Right to Procedural Due Process .......... 17

i. This Court's Continuing Supervisory Role Renders the Audit Process Subject to the Due Process Clause .......... 18

ii. The Audit Provided None of the Constitutionally Required Protections .......... 19

iii. Grossinger Did Not—and Could Not—Knowingly Waive These Protections by the Operation of a Class Settlement to Which He Was Not a Party .......... 21

d. The Claims Administrator's Selective Grant of Pre-Referral Procedural Rights to Some Audit Subjects, but Not Grossinger, Is an Irrational and Unconstitutional Application of the Audit Rules .......... 22

e. Notice of a Recommended Censure Is Not Notice of Permanent Disqualification, and the Sanctions Actually Imposed Were Never Noticed at All .......... 23

f. The Diagnostic Standard Against Which Grossinger's Conduct Was Measured Has Never Been Subjected to Any Reliability Analysis .......... 26

g. The Rule 27 Decision Must Be Vacated Because It Asked a Single Officer to Adjudicate the Validity of His Own Prior Rulings .......... 29

h. The Treatment of Class Counsel as an Audit Subject Without the Procedural Safeguards Negotiated by Current Claimants Infringes Settlement Class Members' Right to Choose Their Own Counsel and Compounds the Constitutional Defects in the Audit .......... 30

**IV. ALL AUDIT PROCEEDINGS AS TO GROSSINGER SHOULD BE STAYED PENDING DISPOSITION OF THIS MOTION** ......31

**V. CONCLUSION** ......32

**EXHIBIT INDEX** ......33

**CERTIFICATE OF COMPLIANCE** ......34

## I. INTRODUCTION

Three weeks ago the largest study of its kind reported that at least one in four former NFL players who died between 2016 and 2021 had chronic traumatic encephalopathy at death—24.5 percent of the 878 players examined. John Branch, *Major Study Finds at Least 1 in 4 NFL Players Gets CTE*, N.Y. Times (Aug. 25, 2026), attached hereto as Exhibit "D." A study of nearly 20,000 professional players reports they are four times more likely than the general population to die of neurodegenerative disease—Parkinson's Disease among them—with the risk rising alongside years played. Andrew Thurston, *NFL Players Four Times More Likely to Die of Diseases Like ALS, Dementia, and Parkinson's, BU Study Finds*, Bos. Univ.: The Brink (July 8, 2026), attached hereto as Exhibit "E."

Such large scale devastation of these players' lives is unacceptable. At a minimum, these players deserve a full and fair opportunity to receive compensation for their injuries. That is precisely why the NFL Settlement was created. Yet players with Parkinson's Disease have categorically been denied relief pursuant to an outdated and incorrect standard (the "Gelb criteria") which modern medicine has rejected. Yet, for reasons unclear, the administrators of the Settlement Fund (who are legal, not medical professionals) continue to strictly enforce application of these outdated criterion. So much so, in fact, that they've now threated to entirely ban attorney Doug Grossinger from representing claimants. His purported crime? Bringing claims on behalf of players who were diagnosed with Parkinson's Disease under modern standards.

The Audit Report, and the Rule 27 Decision adopting it, violate both the Settlement Agreement and fundamental principles of due process. Moreover, the Report implicates this Court's continuing duty to ensure the Settlement Agreement it approved—over a decade ago—continues to operate fairly as applied to all class members and to the lawyers they have chosen to

represent them. The Claims Administrator has used its very limited audit authority to condemn Grossinger's law practice on grounds the Settlement Agreement does not reach and which Grossinger was never afforded an opportunity to challenge.

A plain reading of the Audit Report demonstrates the Claims Administrator never made the required threshold finding of "a misrepresentation, omission or concealment of a material fact made in connection with a Claim by the Settlement Class Member." Without such a finding, the Audit Report cannot proceed—there is no "jurisdiction" of the Special Master. See Settlement Agreement, Exhibit "A," § 10.3(i). Instead, the Audit simply criticizes the general business practices of Grossinger and four other law firms—without identifying a single specific misrepresentation, omission, or concealment in connection with any specific Settlement Class Member's claim. The audit began with one claim—SPID 100008292, placed in audit on October 6, 2025—and, on the Claims Administrator's own admission, that audit "remain[s] active, and processing is suspended." Audit Report, Ex. "B," at 19. The Claims Administrator never completed the audit of the single claim it selected, and never made a finding of misrepresentation, omission, or concealment which is **required** by the Settlement Agreement and the Rule 27 Decision to begin an audit. It nonetheless issued a 151-page report condemning Grossinger's entire practice. Nowhere in those 151 pages does the Audit Report identify a single Grossinger client whose claim was fraudulent, false, or unsupported by an actual diagnosis of Parkinson's Disease. To this day, there has been no finding that any of the claimants at issue do **not** have Parkinson's Disease. Declaration of Douglas R. Grossinger ("Grossinger Decl."), attached hereto as Exhibit "F," ¶¶ 6–7.

Even if the threshold finding of misrepresentation, omission, or concealment had been satisfied, which it has not, the Audit violates the most basic guarantees of procedural due process.

Due process requires, at a minimum, timely notice, an opportunity to present evidence, the right to confront and cross-examine adverse witnesses, and a neutral and disinterested adjudicator. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 267–71 (1970). Grossinger received none of these. In fact, he received no notice of the Audit until *after* the Claims Administrator had already prepared and referred its Audit Report and was given no pre-referral opportunity to confront accusers, to examine the evidence against him, or to put on competing evidence. Yet the Claims Administrator selectively granted those very protections to other audit subjects in earlier proceedings, an irrational and discriminatory application of process that is constitutionally indefensible.

The sanctions ultimately imposed were never noticed at all. The Audit Report recommended one sanction against Grossinger: censure. Audit Report, Ex. "B," at 81. He answered that recommendation on February 3, 2026 (the "February 3 Response"), attached hereto as Exhibit "G." The Rule 27 Decision then permanently disqualified him from the Program, forfeited his earned fees, refused to recognize his future liens, and apportioned the costs of the audit to him. No one ever warned Grossinger those sanctions were on the table. Grossinger Decl., Ex. "F," ¶¶ 5, 12–13.

These constitutional and contractual defects are fatal. As Professor Martin H. Redish—one of the most cited federal-courts scholars in the country and the author of *Due Process as American Democracy*—concludes in his accompanying Declaration, the Audit "provided to Grossinger literally none of the foundational requirements of the Due Process Clause." Decl. of Martin H. Redish ("Redish Decl."), attached hereto as Exhibit "H," ¶ 20.

The Audit's medical premise fares no better. Every inference the Audit draws about Grossinger's practice is irregular only when measured against a diagnostic standard the Settlement

Agreement does not contain: the criteria proposed in a 1999 journal article by Gelb, Oliver, and Gilman. Professor David L. Faigman, Chancellor and Dean of the University of California College of the Law, San Francisco, and managing author of the leading treatise on scientific evidence, reviewed the rulings that installed it. He concludes Special Master Hoffman "did not evaluate the scientific validity of the Gelb Criteria in any substantial fashion—or possibly in any fashion whatsoever." Decl. of David L. Faigman ("Faigman Decl."), attached hereto as Exhibit "I," ¶ 31. The standard by which Grossinger's professional judgment was measured has never been tested by anyone.

The consequences of that unexamined standard reach well beyond Grossinger. Since its adoption, the number of Parkinson's claims reaching this Program has drastically decreased. Retired players who have Parkinson's Disease are being excluded from the very Settlement this Court approved to compensate them.

The gravity of what has occurred here is reflected in leading experts whose reports accompany this submission, including Professor Martin H. Redish; Professor Sidney A. Shapiro, the Chair of Administrative Law at Wake Forest University and coauthor of one of the leading administrative law casebooks; Professor David L. Faigman; Mr. Ronald Goldstock, former Director of the New York State Organized Crime Task Force and Inspector General of the United States Department of Labor; Dr. John Duda, Professor of Neurology at the Perelman School of Medicine; and Dr. William Ondo, Director of the Movement Disorder Clinic at Houston Methodist Hospital.

For these reasons, and the reasons set forth more fully below, this Court should vacate the Audit Report and its referral, vacate the Rule 27 Decision, and stay all Audit proceedings as to Grossinger pending disposition of this Motion.

## II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### a. The Settlement Agreement and the Court's Continuing Supervisory Authority

On April 22, 2015, this Court granted final approval to the Class Action Settlement Agreement in *In re National Football League Players' Concussion Injury Litigation*, MDL No. 2323, 307 F.R.D. 351 (E.D. Pa. 2015), aff'd, 821 F.3d 410 (3d Cir. 2016). The Court did so only after holding a Rule 23(e) fairness hearing and concluding that the Settlement was "fair, reasonable, and adequate" to absent class members. Fed. R. Civ. P. 23(e)(2).

Section 10.1(a)(i) of the Settlement Agreement appoints two Special Masters who "shall serve pursuant to the terms of Federal Rule of Civil Procedure 53." Section 10.1(a)(iv) reserves to this Court the right, "at its sole discretion," to request from the Special Masters "any report or information [it] so desires." Section 10.1(d) authorizes the Court to remove the Special Masters "for good cause" at the Court's sole discretion. Section 10.2 confers the same plenary supervisory authority over the Claims Administrator. The Court adopted the terms of the Settlement Agreement—pursuant to its fairness determination—on February 13, 2015.

### b. The Section 10.3(i) Threshold and the Audit Rules

Section 10.3(i) of the Settlement Agreement permits a referral to the Special Master **only** after the Claims Administrator "determines that there has been a misrepresentation, omission or concealment of a material fact made in connection with the claim." (emphasis added). The Audit Rules promulgated under Settlement Agreement, Ex. "A," § 10.3(b) implement that requirement. See Relevant Audit Rules attached hereto as Exhibit "J." Audit Rule 12 permits the Claims Administrator to report a Claim and refer it only upon determining "there is a reasonable basis to support a finding" of that same material act "in connection with a Claim by the Settlement Class Member." *See also* Audit Rule 15 ("Report of Adverse Finding in Audit") (same).

Under the Audit Rules, the Audit Report's "adverse finding" incepts a chain of subsequent procedures. Yet these procedures shall **only** apply where the Claims Administrator has made a determination of misrepresentation, omission, or concealment in connection with a particular claim. Without that particular trigger—which is absent here—the Audit cannot proceed.

### c. The Gelb Criteria Were Imposed Administratively, Not by Agreement of the Parties or Order of This Court

The Settlement Agreement defines a Qualifying Diagnosis of Parkinson's Disease solely by reference to the ICD-9, the ICD-10, and the DSM-5. Settlement Agreement, Ex. "A," Ex. 1 ¶ 4(a). Importantly, Section 6.4(b) of the Settlement Agreement directs an Appeals Advisory Panel reviewer to consider "the year and state of medicine" in which a Qualifying Diagnosis was made. Indeed, the Third Circuit approved a settlement built to "keep pace with changing science regarding the existing Qualifying Diagnoses." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 433 (3d Cir. 2016). This Audit is in blatant violation of that principle.

The Gelb diagnostic criteria are not modern medicine. They are a product of a single article published in 1999 by Gelb, Oliver, and Gilman. Dr. Gelb wrote it, at a colleague's request, "while a very junior faculty member," and he "has never considered himself to be a movement disorder specialist." He "has not subsequently researched or published on the topic of Parkinson's disease," and he "was very surprised that his 1999 paper is being used by anyone for any purpose, including as the sole diagnostic criteria in a legal case." Memorandum of William G. Ondo, M.D., Feb. 2, 2026 ("Ondo Feb. Mem."), attached hereto as Exhibit "K," at 2. The criteria were superseded in 2015 by the Movement Disorder Society criteria, which have been validated at 89.3 to 92.5 percent diagnostic accuracy and which, with the 1988 United Kingdom Brain Bank criteria, govern more than ninety-five percent of registered Parkinson's trials today. Opinion of John Duda, M.D., June

11, 2026 ("Duda Op."), attached hereto as Exhibit "L," at 5–6; Declaration of William Ondo, M.D., Sept. 8, 2026 ("Ondo Decl."), attached hereto as Exhibit "M," at 2.

The Gelb criteria grade a Parkinson's diagnosis as possible, probable, or definite by counting four Group A features—bradykinesia, resting tremor, muscular rigidity, and asymmetric onset—against eight Group B features that point toward some other disease. A "probable" diagnosis requires three of the four Group A features, the complete absence of every Group B feature, at least three years of symptom duration, and a documented substantial and sustained response to levodopa or a dopamine agonist. A probable diagnosis becomes "definite" with pathologic confirmation.

The Gelb criteria are incorrect because they exclude patients who have the disease: a substantial share of pathologically confirmed patients never develop a resting tremor, and many present symmetrically, yet both features are counted toward the three of four that a "probable" diagnosis requires. Ondo Decl., Ex. "M," at 2–3. And the three-year duration and levodopa-response requirements mean no claimant qualifies until years after onset, which does not match modern clinical practice. Ondo Decl., Ex. "M," at 3.

In July 2023, the Claims Administrator issued the Second Quarter 2023 Program Doctors Newsletter, dated July 13, 2023, attached hereto as Exhibit "N," instructing Program physicians to state whether they had personally witnessed four features drawn from the Gelb criteria. The Newsletter named those features without introduction, without citation, and without any explanation of where they had come from or on whose authority they had been adopted.

Interestingly, just two months later on September 8, 2023, Special Master Hoffman held that pre-Settlement diagnostic recommendations for Alzheimer's Disease do not govern where the Settlement Agreement's Injury Definitions do not name them: "Those diagnostic

recommendations predate the establishment of the Settlement and could have been included in its Injury Definitions. Conspicuously, they were not." Special Master Ruling, Sept. 8, 2023, attached hereto as Exhibit "O," at 9. The Injury Definitions for Alzheimer's Disease and for Parkinson's Disease are identical in construction apart from the disease named.

In December 2023—five months after Program physicians had already been told to apply the Gelb features—the Appeals Advisory Panel was consulted and produced a memorandum endorsing them. That memorandum has never been produced. On January 16, 2024, Special Master Hoffman accepted that undisclosed memorandum in a single sentence: "I accept this statement of the appropriate way to make a Diagnosis of Parkinson's Disease today under the Settlement." Special Master Ruling, Jan. 16, 2024, attached hereto as Exhibit "P." With that sentence, a 1999 journal article became the governing diagnostic standard of this Settlement Program.

On July 1, 2025, the Special Master went further, requiring that three of the four Group A features under the Gelb criteria be present. Special Master Ruling, July 1, 2025, attached hereto as Exhibit "Q." Sixteen days later, on July 17, 2025, the Panel said to have recommended the criteria nineteen months earlier was reconstituted—seating, for the first time, a fellowship-trained movement disorders specialist.

In October 2025 the Claims Administrator issued a PD Diagnosis Checklist, attached hereto as Exhibit "R," tying the three-of-four requirement to the ICD and DSM classifications—which do not, of course, contain any such requirement. On December 12, 2025, the Claims Administrator measured Grossinger and four other firms against the standard it had assembled over the preceding two and a half years. And at paragraph 8 of the Rule 27 Decision, the Special Masters directed the Claims Administrator to develop the next set of requirements the same way.

Each step in that chain rests on the step before it, and the chain ends in a memorandum no one outside the Program has ever seen.

**d. <u>The December 12, 2025 Audit Report</u>**

On October 6, 2025, the Claims Administrator placed a single Grossinger Parkinson's Disease ("PD") claim (SPID 100008292) in audit. See Audit Report, Exhibit "B," at p. 19. On December 12, 2025—without notifying Grossinger he was under investigation for misconduct or giving him an opportunity to put on competing evidence, the Claims Administrator issued a 151-page "Audit Rule 15 Report of Adverse Finding" titled "Qualifying Diagnosis of Parkinson's Disease: Claims Patterns." The Claims Administrator expressly conceded that, as of issuance, the audit "remain active, and processing is suspended." See Audit Report, Ex. "B," at 19.

**The Audit Report does not identify a single specific misrepresentation, omission, or concealment of a material fact in connection with any specific Grossinger claim**. Instead, the Audit Report's findings are characterized in equivocal language: "*seemingly* designed to circumvent" anti-fraud safeguards (Audit Report, Ex. "B," at 2); "suggestive of efforts to conceal" and "give[s] the appearance of bad faith" (id. at 2–3); and "create significant uncertainty" (id.). The Claims Administrator's ultimate "Recommendation" is correspondingly vague: it asks the Special Master to deny pending PD claims, to modify the PD diagnostic criteria prospectively, and to "Censure the Subjects of Investigation regarding the questionable practices described in this Report." *Id.* at 81. **Nowhere does the Audit Report identify a specific Grossinger client whose claim was, in fact, fraudulent, false, or unsupported by an actual diagnosis of PD.**

Nor could it. Grossinger has worked alongside physicians of national standing in Parkinson's Disease since before this litigation began and has participated in the claims process for more than eight years. Grossinger Decl., Ex. "F," ¶¶ 21–22. In the time before this audit, every

single claimant represented by Grossinger had his claim approved, and none was appealed. Grossinger Decl., Ex. "F," ¶ 23.

The Audit Report relies in significant part on what it describes as anonymous "tips" received in mid-2025 from "attorneys from three different law firms" and from other unnamed sources. Audit Report, Ex. "B," at 19, 21. Notably, those tipsters are Grossinger's direct competitors. Grossinger was never told these tips had been received. He was not permitted to know the tipsters' identities, to see their submissions, or to test their reliability. He was not permitted to put on competing evidence at the audit stage at all. The first Grossinger learned he was the focus of a sanctions proceeding was when he received a Rule 19 notice *after* the Audit Report had been finalized and referred to the Special Master.

**e. <u>The NFL's Submission and the June 8, 2026 Rule 27 Decision</u>**

On March 20, 2026, the NFL filed a 22-page document styled a "Submission on the Claims Administrator's December 12, 2025 Audit Report" (the "NFL Submission"), attached hereto as Exhibit "S." NFL Submission, Ex. "S," at 1. The NFL's Submission asserts that "the scale of this fraud is rampant" and that the Claims Administrator's findings establish a "fraudulent scheme" that "has directly resulted in $94 million in payments for suspect diagnoses made by the NFL Parties." *Id.* at 2. On the basis of those characterizations—none of which appears as such in the Audit Report itself—the NFL demands a series of "severe remedies" well beyond what the Claims Administrator recommended: disqualification of the Subject Firms, referral to federal authorities and disciplinary boards, reimbursement of the $94 million in Monetary Awards already paid, and forfeiture of the Subject Firms' attorneys' fees to the Monetary Award Fund. *Id.* at 3.

On June 8, 2026, the Special Masters issued a Rule 27 Decision adopting the Audit Report. The Decision permanently disqualified Grossinger from every aspect of the Settlement Program,

denied thirty-seven claims, identified ninety-eight retired players, barred eight physicians from supporting future submissions, forfeited Grossinger's earned fees, refused to recognize his future liens, and apportioned audit costs to him. It disposed of Grossinger's challenge to the Gelb criteria in a single footnote, stating that disagreement with the Special Masters' prior rulings, "however vehement it may be, is irrelevant to this Audit proceeding." Rule 27 Decision, Ex. "C," at 32 n.50. Its final paragraph directed the Claims Administrator to develop further diagnostic requirements. *Id.* ¶ 8.

Notably, the Decision did not find any of the ninety-eight players lacks Parkinson's Disease. It conducted no medical review of their claim files and acknowledged some number of them may even have the disease. It discounted Grossinger's contrary medical evidence because the physicians were not subject to examination—though the Audit Rules provide for the examination of no one. A proceeding cannot forbid the testing of evidence and then treat the absence of testing as a reason to discard it.

## III. LEGAL ARGUMENT

### a. This Court Has a Continuing Duty to Ensure the Fairness of the Settlement Agreement and the Procedures Adopted Under It, and That Duty Is Not Extinguished by the Passage of Time

A class-action settlement is not an ordinary contract. It is the product of a court-supervised compromise in which absent class members have no individual voice, and is subject to Rule 23(e) requiring a bargain to be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval is not the end of the court's role—it is the beginning of an ongoing supervisory obligation. As the Third Circuit has held, where a district court "approve[s] a class action settlement, [it] retains broad authority and supervisory power over the administration of the agreement." *In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 235 (3d Cir. 2002).

That continuing supervisory authority is "an affirmative duty" imposed by Rule 23 to act as the "guardian of the rights of the absentees." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975); *accord Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 280 (7th Cir. 2002) ("The judiciary cannot abdicate its critical responsibility to police the implementation of any class action settlement").

The duty extends to the procedures adopted under the settlement and to the lawyers chosen by class members. Rule 23(d)(1) expressly authorizes the court to issue orders that "determine the course of proceedings," that "impose conditions on the representative parties or on intervenors," and that "deal with similar procedural matters." Fed. R. Civ. P. 23(d)(1)(A), (C), (E). And the supervisory authority the Third Circuit described in *Diet Drugs* runs to "the administration of the agreement." 282 F.3d at 235.

Rule 53(f)(3) and (4) require de novo review of a master's factual findings and legal conclusions, and Rule 53(f)(5) reserves review of procedural rulings for abuse of discretion. Rule 53(a)(2) separately subjects a master to the disqualification standard of 28 U.S.C. § 455. The Settlement Agreement expressly incorporates Rule 53, and §§ 10.1 and 10.2, set out above, vest this Court with plenary authority over both officers whose conduct is at issue here.

The consequences imposed on Grossinger—a return of funds in his possession, harm to his professional reputation, and interference with his right to pursue his chosen profession—trigger the liberty and property protections of the Due Process Clause. Redish Decl., Ex. "H," ¶ 18. Yet "it hardly seems fair to deny Grossinger, the chosen representative of numerous class members, the basic elements of his constitutional right to fair treatment," because doing so "indirectly undermines the rights of Grossinger's clients to be represented by their chosen attorney." *Id.* ¶ 22.

Accordingly, this Court has both the authority and the duty to vacate or stay the Audit as the procedures applied to Grossinger were unfair, exceeded the scope of the Settlement Agreement, and violated the Constitution.

**b. The Audit Must Be Vacated Because the Claims Administrator Never Made the Threshold Finding Section 10.3(i) and Audit Rule 12 Require**

Section 10.3(i) of the Settlement Agreement and Audit Rule 12 are the threshold which any audit of a Settlement claim **must** trigger before it may be referred to a Special Master for adjudication. Both provisions impose the same foundational finding: the Claims Administrator must have first "determine[d] that there has been a misrepresentation, omission or concealment of a material fact made in connection with the [or a] Claim" by a Settlement Class Member. Settlement Agreement, Ex. "A," § 10.3(i); Audit Rules, Ex. "J," Rule 12.

On the face of the Audit Report that threshold has not been satisfied. The Audit Report contains a single conclusory recital that the Claims Administrator has "sufficient information to determine there is a reasonable basis to support a finding of misrepresentation, omission, or concealment of material fact in connection with PD Monetary Award Claims submitted." Audit Report, Ex. "B," at 80. That recital is not tied to any particular Claim by any particular Settlement Class Member. It would certainly not pass muster by even the barest pleading standard, as it is a simple recitation of the standard.

In any event, the Claims Administrator admits its investigation "[is] not" complete: "We are unable, however, to complete our investigation of these firms and the arrangement uncovered." *Id.* at 2. And the Audit Report expressly concedes the audit "remain[s] active, and processing is suspended." *Id.* at 19.

A plain reading of the Audit Report confirms the Claims Administrator made no claim-specific determination of misrepresentation, omission, or concealment. Its findings are uniformly

hedged in the language of innuendo. Nor does it explain what the material fact was, what was said or omitted, by whom, when, or in what document. The resulting recommendation asks the Special Master to censure Grossinger for "questionable practices" writ large.

The unfairness is plain. Section 10.3 does not permit an audit without the appropriate trigger, which is missing here. Section 10.4 of the Settlement Agreement—the provision authorizing the Claims Administrator to detect "red flags" and "patterns" of fraud through data analytics—does not permit an audit. Section 8.6, which the Claims Administrator also invokes, addresses the resolution of individual claims and likewise does not authorize an audit unrelated to a specific finding of misrepresentation, omission, or concealment in connection with a Claim.

Because the Claims Administrator did not make a particularized § 10.3(i) finding tied to any specific Claim by any specific Settlement Class Member, the referral was *ultra vires* and the Audit Report falls outside the scope of the Settlement Agreement and the Audit Rules. The Audit Report should be vacated for that reason alone.

#### c. Even If the Threshold Finding Had Been Made, the Audit Was Conducted in a Manner That Violates Grossinger's Right to Procedural Due Process

Even if the Court were to conclude—contrary to the plain text of the Audit Report—that the Claims Administrator made the Section 10.3(i) finding, vacatur would still be required. The Audit deprived Grossinger of every basic guarantee of procedural due process, as set out below. As Professor Redish concludes, the Audit "provided to Grossinger literally none of the foundational requirements of the Due Process Clause." Redish Decl., Ex. "H," ¶ 20.

##### i. This Court's Continuing Supervisory Role Renders the Audit Process Subject to the Due Process Clause

The Claims Administrator and the Special Master are court-appointed agents administering a court-approved class settlement under this Court's continuing supervisory authority. Their

authority to act, the binding effect of their decisions, and the coercive sanctions they may recommend all flow from the Court's Rule 23(e) approval order and the Court's appointing orders under Rule 53. They wield, in short, the delegated coercive authority of the United States.

The Supreme Court has long held that when a private actor exercises powers "traditionally exclusively reserved to the State," or operates pursuant to a "sufficiently close nexus" with the government, the actor's conduct is properly attributed to the State for due-process purposes. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351–52 (1974); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 620–23 (1991). Court-appointed receivers, special masters, and monitors acting under judicial appointment are subject to constitutional constraint. *See, e.g., Cobell v. Norton*, 334 F.3d 1128, 1142–43 (D.C. Cir. 2003); *Shelley v. Kraemer,* 334 U.S. 1, 14–20 (1948).

That principle applies with particular force in the class-action context. The Court's judicial imprimatur is precisely the source of the Audit Report's coercive force. Where a court delegates adjudicatory power—here, the purported power to disqualify counsel, forfeit earned fees, and refer an attorney to federal prosecutors—the delegate's exercise of that power is subject to the same due-process constraints as the court's own.

#### ii. The Audit Provided None of the Constitutionally Required Protections

The Due Process Clause guarantees "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). At minimum, that means timely notice, an opportunity to present evidence, the right to confront and cross-examine adverse witnesses, and a neutral and disinterested adjudicator. *See Goldberg v. Kelly*, 397 U.S. 254, 267–71 (1970); *Greene v. McElroy*, 360 U.S. 474, 496–97 (1959); *Tumey v. Ohio*, 273 U.S. 510 (1927). Grossinger received none of these protections at the audit stage at which the Claims Administrator's findings were assembled.

The Settlement Agreement, the Audit Rules, and the Audit Report itself all describe the Claims Administrator's investigation as an audit. There was no notice that the audit had become an ad hominem sanctions proceeding against Grossinger personally—let alone that the NFL would seek disqualification, $94 million in restitution, and forfeiture of all earned fees.

Grossinger had no opportunity to put on competing evidence during the period when the Audit Report was being prepared. The Claims Administrator interviewed his accusers, collected medical and pharmacy records on his clients without his knowledge, and assembled a 151-page report, all without affording Grossinger the right to contest it. This is a blatant violation of due process. *See Jenkins v. McKeithen*, 395 U.S. 411, 428 (1969) (finding a statute that "drastically limit[s] the right of a person investigated to present evidence on his own behalf" violates procedural due process).

The Audit Report rests in significant part on "tips" from anonymous sources. See Audit Report, Ex. "B," at 19, 21–22. The Audit Rules expressly forbid any "discovery" and forbid "testimony, cross-examination or other evidentiary hearing." Audit Rules, Ex. "J," 23, 24. Yet "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg*, 397 U.S. at 269; *see also Greene*, 360 U.S. at 496–97.

None of Grossinger's accusers testified under oath. Indeed, they remain unknown to this day. The Audit Report instead summarizes and paraphrases unsworn statements made to the Claims Administrator. As Professor Redish observes, the result is "a hearsay plagued game of 'Telephone' in which what his unnamed accusers have said about him is merely recharacterized and summarized to him by the Claims Administrators in the Audit itself." Redish Decl., Ex. "H," ¶ 12.

The information known to be withheld from Grossinger is egregious. He received (i) no notice of a proceeding intended to consider the imposition of coercive sanctions upon him; (ii) no opportunity to present his own evidence before sanctions issued; (iii) no opportunity to confront, cross-examine, or even learn the names of his accusers; and (iv) no evidentiary hearing. Redish Decl., Ex. "H," ¶ 20.

These protections are the constitutional **floor** against deprivation of liberty, property, and reputation. The Audit threatened precisely those interests, and the Rule 27 Decision has since carried the threat out: it disqualified Grossinger from the Program, transferred his earned fees to the Monetary Award Fund, and refused to recognize his future liens. Redish Decl., Ex. "H," ¶ 18(a). The sanctions imposed and the referrals demanded implicate Grossinger's clients' right to choose their own counsel (*Wheat v. United States*, 486 U.S. 153, 159 (1988); *Powell v. Alabama*, 287 U.S. 45, 53 (1932)), Grossinger's right to pursue his chosen profession (*Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 238–39 (1957)), his property interest in earned attorneys' fees, and his protected interest in his good name and professional reputation under the stigma-plus doctrine (*Paul v. Davis*, 424 U.S. 693, 711–12 (1976)).

Professor Sidney A. Shapiro, the Frank U. Fletcher Chair in Administrative Law at Wake Forest University, reaches the same conclusion: the Special Master's acceptance of the fraud allegations will stigmatize Grossinger in a manner he cannot escape, damaging his ability to attract clients and exposing him to bar discipline. Decl. of Sidney A. Shapiro ("Shapiro Decl."), attached hereto as Exhibit "T," ¶ 18(e).

**iii. <u>Grossinger Did Not—and Could Not—Knowingly Waive These Protections by the Operation of a Class Settlement to Which He Was Not a Party</u>**

The NFL Parties have suggested—and may again suggest—that any due-process objection by Grossinger has been waived because the Settlement Agreement and the Audit Rules were approved more than a decade ago. This argument is without merit and raises an obvious issue—Grossinger was not involved in the negotiation of the Settlement Agreement at that time.

Waiver of a constitutional right requires "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 187 (1972); *Fuentes v. Shevin*, 407 U.S. 67, 94–96 (1972). Grossinger never signed the Settlement Agreement, never negotiated its audit provisions, and was not present at the 2014 fairness hearing. Even his current Settlement Class Member clients, all of whom retained him years after approval, did not assent to the Audit Rules. There is no "knowing" waiver. A waiver must also be voluntary, knowing, and intelligent, and must be established by clear and compelling evidence. *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1094 (3d Cir. 1988). It will not be implied from general contract language. Shapiro Decl., Ex. "T," ¶ 21(a)–(b).

A class settlement cannot waive the due-process rights of absent class members. Its claims-resolution provisions bind claimants only insofar as they comport with minimum constitutional requirements. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985). Professor Redish reaches the same conclusion. The Settlement Agreement may waive due process rights, but it does so "only for signatories to that agreement—meaning members of the class." Redish Decl., Ex. "H," ¶ 17. Grossinger is neither, and is therefore "in no way bound by such a waiver, to the extent one exists." *Id.* The Audit Rules accordingly cannot be read to permit such Draconian sanctions against a non-signatory with no notice, no opportunity to introduce competing evidence, and no chance to confront accusers.

**d. <u>The Claims Administrator's Selective Grant of Pre-Referral Procedural Rights to Some Audit Subjects, but Not Grossinger, Is an Irrational and Unconstitutional Application of the Audit Rules</u>**

In prior audit proceedings the Claims Administrator gave audit subjects pre-referral notice of the investigation against them and an opportunity to submit competing evidence. The Audit Report itself acknowledges that, in earlier investigations of other firms, the Claims Administrator engaged with subjects, conducted interviews, and accepted documentary submissions before issuing any Rule 15 report. See Audit Report, Exhibit "B," at, e.g., 16, 19, 20. The Claims Administrator did not afford Grossinger any of these rights or opportunities. No rational basis appears in the Audit Report or in the NFL's Submission for the Claims Administrator's differential treatment of Grossinger.

Mr. Ronald Goldstock—former Director of the New York State Organized Crime Task Force and Inspector General of the United States Department of Labor—addresses what audit practice requires. Expert Report of Ronald Goldstock, May 24, 2026 ("Goldstock Rep."), attached hereto as Exhibit "U"; Second Expert Report of Ronald Goldstock, Sept. 8, 2026 ("Goldstock Supp. Rep."), attached hereto as Exhibit "V." Furnishing a draft report to its subject for comment is his routine practice as an Independent Private-Sector Inspector General and while in practice at the Labor Department. Such measures let the issuer correct error before publication and lets the subject "potentially convince the issuer to delete or modify preliminary conclusions." Goldstock Rep., Ex. "U," at 3. He sees "no reason for not doing so in this case." Id.

That selective application of pre-referral procedural rights—granting them to some audit subjects while withholding them from Grossinger—is precisely the sort of irrational and discriminatory action that the equal protection component of the Due Process Clause forbids. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). As Professor Redish observes, "[i]f this factual assertion is accurate, then a serious question of equal protection

(guaranteed by the Due Process Clause of the Fifth Amendment; see *Bolling v. Sharpe*, 347 U.S. 497 (1954)) would most definitely arise in this case. The Claims Administrators would be obliged to provide a rational basis for drawing such a blatantly discriminatory distinction." Redish Decl., Ex. "H," ¶ 21.

**e. <u>Notice of a Recommended Censure Is Not Notice of Permanent Disqualification, and the Sanctions Actually Imposed Were Never Noticed at All</u>**

The Audit Report recommended one sanction against Grossinger: censure. Audit Report, Ex. "B," at 81. Grossinger filed his authorized response to that recommendation on February 3, 2026. February 3 Response, Ex. "G." He was never told any other sanction was under consideration. Grossinger Decl., Ex. "F," ¶¶ 5, 12–13. The Rule 27 Decision then imposed sanctions of an entirely different kind—permanent disqualification, forfeiture of all earned fees, refusal of future liens, restitution, and audit costs. That is a due process violation independent of every defect described above, complete on the face of four documents: the Audit Report, the February 3 response, the March 20 submission, and the Decision.

Audit Rule 17 gave Co-Lead Class Counsel and the NFL Parties twenty days after referral to file a ten-page Statement of Position, and expressly permitted that Statement to request further relief. A Rule 17 Statement is disclosed with the Rule 19 notice, which is what lets the audited firm answer it in its Rule 20 response. None was filed or served on Grossinger. Grossinger Decl., Ex. "F," ¶ 11. Audit Rule 21 permits a Reply Memorandum, bars evidence outside the Audit record, and does not authorize a request for further relief. Rule 22 permits additional memoranda only on the Special Masters' direction, and none issued.

The NFL Parties' March 20 submission ran over twenty pages, arrived after Grossinger's response, cited neither Rule 17 nor Rule 21, and demanded sanctions well beyond what the Claims

Administrator had recommended. It was, in effect, a motion for heightened sanctions against Grossinger. An application for an order must state the relief sought, Fed. R. Civ. P. 7(b)(1), and the Third Circuit looks to function rather than caption. *Turner v. Evers*, 726 F.2d 112, 114 (3d Cir. 1984). A paper seeking permanent disqualification, total fee forfeiture, refusal of future liens, and cost shifting functions as a motion for those remedies. This Court applied that principle in this very matter five weeks ago, construing a letter as a motion because it requested relief. ECF No. 12558 ¶ 3. Yet Grossinger was afforded no opportunity to respond to the NFL Parties' Motion for heightened sanctions, which was then adopted by the Special Masters' Report. This perversion of the process greatly prejudiced Grossinger. Mr. Goldstock agrees: the NFL's response sought "draconian remedies not asked for in the Audit's Recommendations section, but adopted without attribution or benefit of response in the Decision." Goldstock Supp. Rep., Ex. "V," at 1.

Due process requires notice and an opportunity to be heard before sanctions are issued against an attorney. *Martin v. Brown*, 63 F.3d 1252, 1262 (3d Cir. 1995). "[P]articularized notice" will usually require notice of "the precise sanctioning tool" the court intends to employ. *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1225 (3d Cir. 1995). A party is entitled to notice of the rule on which sanctions would rest, the reasons, and the form of the potential sanctions; without the third, the opportunity to be heard is meaningless. *Simmerman v. Corino*, 27 F.3d 58, 64 (3d Cir. 1994). A general reference to the remedies available does not supply notice that a particular remedy is being sought. *Gagliardi v. McWilliams*, 834 F.2d 81, 83 (3d Cir. 1987); *see Simmerman*, 27 F.3d at 64 ("the mere existence of the rule does not satisfy the requirement"). *Prosser v. Prosser* reiterated the requirement that a party facing sanctions is entitled to notice of the legal rule, the reasons, and the form of the potential sanctions, and observed that fundamental fairness and the established law of this Circuit require notice and an opportunity to

be heard before sanctions are imposed. 186 F.3d 403, 406 (3d Cir. 1999); *Jones v. Pittsburgh Nat'l Corp.,* 899 F.2d 1350, 1357 (3d Cir. 1990) (vacating sanctions where the notice given identified only Rule 11 and the district court sanctioned under 28 U.S.C. § 1927).

The Third Circuit has previously vacated suspensions imposed on three attorneys who, as is the case with Grossinger, had no opportunity to properly defend against the sanctions sought. *In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 379–80 (3d Cir. 1997). Monetary consequences carry the same requirement. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980).

The Audit Rules' general enumeration of available consequences does not satisfy this requirement. A catalog of available remedies is not considered notice that a particular remedy is being sought. *Gagliardi*, 834 F.2d at 83. The Audit Report asked the Special Masters to censure Grossinger and nothing else. Grossinger was entitled to notice that permanent disqualification, forfeiture of every fee he had earned, and restitution were the remedies actually under consideration. He was never given it.

Professor Redish identifies the first foundational element of due process as notice of a proceeding intended to consider the imposition of coercive sanctions—"in this case, disqualification from participation in the Program." Redish Decl., Ex. "H," ¶ 20(1). He describes its absence as "[e]ven more blatant a violation of Due Process," because "at the point at which [Grossinger] was permitted to make arguments to the Master no mention of disqualification as a possibility had been raised by the Audit." *Id.* ¶ 13. Professor Shapiro's opinion is to the same effect: Grossinger received notice of a proposed sanction of censure and challenged that action in his reply, but had no notice of the alternative sanctions adopted after that reply—permanent exclusion from the Program, forfeiture of all attorneys' fees, refusal of future liens, restitution, and apportionment of the Audit's costs. Shapiro Decl., Ex. "T," ¶ 19(b).

**f. <u>The Diagnostic Standard Against Which Grossinger's Conduct Was Measured Has Never Been Subjected to Any Reliability Analysis</u>**

The Audit's characterization of Grossinger's practice depends entirely on the Gelb criteria. As applied in this Program, a claimant whose physician did not witness at least three of the four Group A features does not have Parkinson's Disease, no matter how the physician actually diagnosed him and whatever the balance of the medical record shows. The Settlement Agreement contains no such requirements.

To be clear: the Gelb criteria are the wrong diagnostic criteria to apply in Parkinson's cases. See Ronald B. Postuma et al., *MDS Clinical Diagnostic Criteria for Parkinson's Disease*, 30 Movement Disorders 1591 (2015), attached hereto as Exhibit "W." So wrong, in fact, that the Claims Administrator's and Special Master's reliance upon Grossinger's clients' lack of a Gelb diagnosis as a reason for the Audit is reason enough to vacate the Audit. Grossinger could not rely upon an outdated standard rejected by modern medicine, even if that is what a tribunal erroneously encouraged—to do so would have prejudiced his clients and potentially resulted in malpractice.

As Mr. Goldstock—the former Inspector General of the United States Department of Labor—puts it, counsel who obtained accurate diagnoses for clients the Gelb criteria had failed to identify "should not be maligned or accused of improper behavior, if their purpose was to secure more accurate diagnoses than those available by inappropriate or outdated methods." Goldstock Rep., Ex. "U," at 5.

Professor Faigman—managing author of the leading treatise on scientific evidence—applies Federal Rule of Evidence 702 and *Daubert* "heuristically, as a measure of scientific merit," to conclude the Claims Administrator and Special Master Hoffman engaged in absolutely no reliable methodology before deciding to rely exclusively on outdated criteria—and have absolutely no medical basis to conclude Grossinger's non-Gelb claimants are somehow indicia of fraud.

Faigman Decl., Ex. "I," ¶ 17. The Special Masters' January 16, 2024 ruling uniformly adopting Gelb supplies nothing: no testing, no error rate, and no analysis of general acceptance. Professor Faigman concludes Special Master Hoffman "did not evaluate the scientific validity of the Gelb Criteria in any substantial fashion—or possibly in any fashion whatsoever." *Id.* ¶ 31.

Had that review occurred, the Gelb criteria would not have survived it. Dr. John Duda, Professor of Neurology at the Perelman School of Medicine, states the Gelb criteria "were never formally validated in autopsy confirmed cases to ascertain sensitivity and specificity," while the 2015 criteria have been validated at 89.3 to 92.5 percent diagnostic accuracy for probable disease. Duda Op., Ex. "L," at 5. The peer-reviewed literature has largely ignored the 1999 criteria: a 2018 review located eight published reports (of thousands) using this outdated standard. Ondo Decl., Ex. "M," at 2.

Tellingly, Dr. Gelb has since disclaimed the use of the very standard he developed and which has been adopted by the Claims Administrators and Special Masters. Dr. William Ondo, Director of the Movement Disorder Clinic at Houston Methodist Hospital, spoke with him: Dr. Gelb "has never considered himself to be a movement disorder specialist." He undertook the 1999 paper defining the Gelb standard "while a very junior faculty member" at a colleague's request, and "has not subsequently researched or published on the topic of Parkinson's disease." Ondo Feb. Mem., Ex. "K," at 2. Gelb "was very surprised that his 1999 paper is being used by anyone for any purpose, including as the sole diagnostic criteria in a legal case." *Id.*

Moreover, Dr. Ondo's assessment is that the Special Master "is not actually using the Gelb criteria correctly, selectively included and excluding features of the criteria," and that the count itself excludes many people who have the disease. Roughly one in four pathologically confirmed patients never develops rest tremor, and about one in five cases is completely symmetric. Ondo

Decl., Ex. "M," at 2–3. The Gelb criteria simply do not capture what modern science now knows about Parkinson's Disease. *Id.* at 3. This is even more true of the NFL claimant population.

To support their uniform adoption of the 1999 Gelb Criteria, the Special Masters cite their own July 1, 2025 ruling, which rests on the January 2024 ruling, which rests on an undisclosed memorandum. See Rule 27 Decision, Ex. "C," at 32 n.50. Professor Faigman's assessment (and really, common sense) is that a ruling resting on an unsound empirical proposition "is not cured by citing a previous ruling" that did the same. *Id.* ¶ 45.

In what appears to be a purposeful calculation, adoption of the Gelb criteria has severely limited claimants with Parkinson's disease from obtaining relief. Dr. Ondo reviewed the Claims Administrator's Status Reports, attached hereto as Exhibit "X": 74 PD claims were filed in 2025, but in the second quarter of 2026 there was only one. He attributes the collapse to criteria that have "markedly impeded access to diagnosis." Ondo Decl., Ex. "M," at 4.

To be clear, this Motion does not ask the Court to decide which diagnostic framework is medically correct. Grossinger asks only that a requirement which was never named in the Settlement Agreement, never agreed to by the parties, never approved by this Court, never tested for reliability, and which is clinically unreliable not be used as justification for his purported "professional misconduct."

**g. <u>The Rule 27 Decision Must Be Vacated Because It Asked a Single Officer to Adjudicate the Validity of His Own Prior Rulings</u>**

Special Master Hoffman occupied several roles in the same controversy. He adopted the 1999 criteria as the governing standard for a Qualifying Diagnosis of Parkinson's Disease on January 16, 2024. He then determined, on June 8, 2026, whether counsel and physicians acted improperly in conduct evaluated against that standard.

A special master appointed under Rule 53 is subject to the disqualification standards applicable to a judge, Fed. R. Civ. P. 53(a)(2), and § 455(a) requires disqualification whenever impartiality "might reasonably be questioned." The inquiry is objective **and actual bias need not be shown**. *Liteky v. United States*, 510 U.S. 540, 548 (1994); *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988); *see also In re Kensington Int'l Ltd.*, 368 F.3d 289, 303–09 (3d Cir. 2004). To be clear, Section 455(a) requires no allegation of bad faith, improper motive, or personal animus. It is clear the Special Masters here, having adopted the Gelb criteria in their own discretion without proper basis, cannot now adjudicate whether failing to adhere to their improper criteria is cause for professional misconduct.

Due process supplies the same principle. Prior significant involvement in adopting a critical finding may make later adjudication of that finding's validity an issue, because the later finding cannot possibly be a product of detached neutrality as required. *In re Murchison*, 349 U.S. 133, 136 (1955) ("no man can be a judge in his own case"); *Williams v. Pennsylvania*, 579 U.S. 1, 8–14 (2016) ("Under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case."). As Professor Redish states: "pre-adjudication personal involvement in or exposure to the facts of the case inevitably threatens the adjudicator's judgment of the evidence presented." Redish Decl., Ex. "H," ¶ 19(g). Mr. Goldstock, having reviewed the Decision itself, concludes the Special Master's "continued adherence to his own previous decisions adopting the 'Gelb' criteria shows him to be far from an unbiased arbitrator." Goldstock Supp. Rep., Ex. "V," at 2.

Vacatur is a narrow remedy. Grossinger asks only that a Decision entered in these circumstances not be permitted to stand.

**h. <u>The Treatment of Class Counsel as an Audit Subject Without the Procedural Safeguards Negotiated by Current Claimants Infringes Settlement Class Members' Right to Choose Their Own Counsel and Compounds the Constitutional Defects in the Audit</u>**

A separate constitutional and equitable problem warrants vacatur. The Audit Rules establish a procedural regime targeting not only the Settlement Class Members whose claims are placed in audit, but the lawyers who represent them. See Audit Rules, Ex. "J," 19, 20, 31. Yet none of the firms now subject to the Audit were a party to the negotiation of those Rules in 2014, and neither were the Settlement Class Members whom Grossinger now represents. The Audit Rules subject not only Settlement Class Members but the lawyers who represent them to a regime which none of them negotiated.

A Settlement Class Member's right to counsel of his choice is a substantial interest. *See, e.g., Wheat v. United States*, 486 U.S. 153, 159 (1988); *Powell v. Alabama*, 287 U.S. 45, 53 (1932). The Rule 27 Decision disqualified an entire firm from the Settlement—ending the relationship between ninety-eight retired players and their chosen counsel—on an audit conducted without notice, without an opportunity to be heard, without confrontation, and without a neutral adjudicator. That cannot be squared with this Court's Rule 23(e) duty—the continuing obligation, assumed when it approved this Settlement, to ensure that the bargain remains "fair, reasonable, and adequate" in its administration and not merely in its terms. Fed. R. Civ. P. 23(e)(2); *In re Diet Drugs*, 282 F.3d at 235.

## IV. <u>ALL AUDIT PROCEEDINGS AS TO GROSSINGER SHOULD BE STAYED</u>

The relevant audits "remain active." Audit Report, Ex. "B," at 19. Grossinger faces the continuation of proceedings whose governing standard is the subject of this Motion.

The harm is thus occurring now and is not repairable later. The Decision is public and unredacted. It disqualified Grossinger, forfeited fees for work already performed, refused future

liens, and apportioned costs, and impaired retired players have been separated from counsel of their choosing. A favorable ruling months from now does not restore a professional reputation or a client relationship that ended in the interim.

No other participant is burdened by preserving the position. The claims at issue are already denied or suspended, and have been for some time. Preserving them preserves them for whatever disposition this Court directs. It also preserves the claimants' right to their chosen counsel.

## V. CONCLUSION

For the foregoing reasons, Grossinger respectfully requests that this Court enter an Order: (1) vacating the Claims Administrator's December 12, 2025 Rule 15 Audit Report of Adverse Finding and its referral to the Special Masters; (2) vacating the Special Masters' June 8, 2026 Rule 27 Decision; (3) staying all Audit proceedings as to Grossinger pending resolution of this Motion; and (4) granting such further relief as the Court deems just and proper.

Dated: September 11, 2026

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

By: *George Bochetto*
George Bochetto, Esq.
Kiersty DeGroote, Esq.
*Attorneys for Douglas R. Grossinger and the Grossinger Law Firm*
(215) 735-3900
gbochetto@bochettoandlentz.com
kdegroote@bochettoandlentz.com

# EXHIBIT INDEX

| | |
|---|---|
| **Exhibit "A"** | Class Action Settlement Agreement |
| **Exhibit "B"** | Claims Administrator's Rule 15 Audit Report of Adverse Finding, dated December 12, 2025 |
| **Exhibit "C"** | Special Masters' Rule 27 Report and Decision, dated June 8, 2026 |
| **Exhibit "D"** | John Branch, Major Study Finds at Least 1 in 4 NFL Players Gets CTE, N.Y. Times (Aug. 25, 2026) |
| **Exhibit "E"** | Andrew Thurston, NFL Players Four Times More Likely to Die of Diseases Like ALS, Dementia, and Parkinson's, BU Study Finds, Bos. Univ.: The Brink (July 8, 2026) |
| **Exhibit "F"** | Declaration of Douglas R. Grossinger |
| **Exhibit "G"** | Response of the Law Office of Douglas R. Grossinger to the Audit Report, dated February 3, 2026 |
| **Exhibit "H"** | Declaration of Martin H. Redish |
| **Exhibit "I"** | Declaration of David L. Faigman |
| **Exhibit "J"** | Rules Governing the Audit of Claims (relevant excerpts) |
| **Exhibit "K"** | Memorandum of William G. Ondo, M.D., dated February 2, 2026 |
| **Exhibit "L"** | Opinion of John Duda, M.D., dated June 11, 2026 |
| **Exhibit "M"** | Declaration of William Ondo, M.D., dated September 8, 2026 |
| **Exhibit "N"** | Second Quarter 2023 Program Doctors Newsletter, dated July 13, 2023 |
| **Exhibit "O"** | Special Master Ruling, dated September 8, 2023 |
| **Exhibit "P"** | Special Master Ruling, dated January 16, 2024 |
| **Exhibit "Q"** | Special Master Ruling on Parkinson's Disease and Deference, dated July 1, 2025 |
| **Exhibit "R"** | Parkinson's Disease Diagnosis Checklist, issued October 2025 |
| **Exhibit "S"** | NFL Parties' Submission on the Claims Administrator's December 12, 2025 Audit Report, dated March 20, 2026 |
| **Exhibit "T"** | Declaration of Sidney A. Shapiro |
| **Exhibit "U"** | Expert Report of Ronald Goldstock, dated May 24, 2026 |
| **Exhibit "V"** | Second Expert Report of Ronald Goldstock, dated September 8, 2026 |
| **Exhibit "W"** | Ronald B. Postuma et al., MDS Clinical Diagnostic Criteria for Parkinson's Disease, 30 Movement Disorders 1591 (2015) |
| **Exhibit "X"** | Claims Administrator Status Reports reflecting Parkinson's Disease claim data |

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Motion to Vacate complies with the applicable 8,750 word limitation. Exclusive of the caption, the table of contents, the exhibit index, the signature block, and this certificate, the foregoing contains 8,732 words.

**BOCHETTO & LENTZ, P.C.**

By: *George Bochetto*
George Bochetto, Esq.
Kiersty DeGroote, Esq.
*Attorneys for Douglas R. Grossinger and the Grossinger Law Firm*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of September, 2026, a true and correct copy of the foregoing Motion to Vacate the Claims Administrator's Rule 15 Audit Report and the Special Masters' Rule 27 Decision, and for a Stay of Audit Proceedings, together with the exhibits thereto, and the proposed form of Order, was filed electronically with the Court and served upon all counsel of record by operation of the Court's CM/ECF system.

**BOCHETTO & LENTZ, P.C.**

By: *<u>/s/ George Bochetto</u>*
George Bochetto, Esquire
Kiersty DeGroote, Esquire
*Attorneys for Douglas R. Grossinger and the Law Office of Douglas R. Grossinger*