# Exhibit "B"

NFL CONCUSSION SETTLEMENT

IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION
No. 2:12-md-02323 (E.D. PENN.)

# CLAIMS ADMINISTRATOR'S RULE 15 AUDIT REPORT

## Qualifying Diagnosis of Parkinson's Disease: Claims Patterns

**December 12, 2025**

# TABLE OF CONTENTS

**PAGE**


**I. Introduction** ..... 1

**II. Scope of Audit** ..... 1

**III. Parkinson's Disease** ..... 2

**IV. Background: Early Audit Concerns Regarding Attorney Douglas Grossinger** ..... 4

**V. Subjects of Audit Investigation** ..... 10

A. Douglas R. Grossinger ..... 10

B. Feder Law LLC ..... 12

C. Pro Athlete Law Firm, P.A. ..... 13

D. Syme Law, PLLC ..... 15

E. Reppert Oates & Vytell, LLC ..... 16

1. Bart Oates ..... 17

2. Lisa Reppert ..... 18

3. J. Vincent Reppert ..... 18

**VI. Parkinson's Disease Claim Arrangement** ..... 18

A. Information Received from Law Firms in June 2025 ..... 20

1. Law Firm A ..... 20

2. Law Firm B ..... 23

3. Law Firm C ..... 24

B. Summary of the Arrangement ..... 26

C. Law Firms Connected to The Arrangement ..... 28

1. Feder Law LLC ..... 29

2. Pro Athlete Law Firm, P.A. ..... 32

(a)Trends and Attributes of Pro Athlete PD Claim Submissions ..... 32

(b)Pro Athlete's Confirmed Connections with Mr. Grossinger ..... 32

3. Syme Law, PLLC ..... 35

D. Mr. Grossinger's PD Claim Submissions as Counsel of Record ..... 37

E. Other Relevant Non-Subject Firms ..... 39

1. Song Whiddon, PLLC ..... 39

2. The Legal Collective ..... 41

F. Physicians Involved with The Arrangement ........ 43
1. Dr. Daniel H. Jacobs ........ 43
2. Non-Program Neurologist Dr. Jeffrey Steinberg ........ 46
(a)Preliminary Review by AAP Member ........ 47
(b)Outreach to Dr. Steinberg ........ 49
3. Other Repeat "Treating" Neurologists ........ 53
G. Findings ........ 55
**VII. 2024 and 2025 Online Tips Received Regarding ROV Firm** ........ 58
**VIII. Audit of ROV Claims** ........ 59
A. General Investigative Steps Taken ........ 61
B. RKV and/or ROV Involvement with Mr. Grossinger ........ 64
C. Process of Obtaining Diagnoses ........ 67
D. Solicitation of Retired Players ........ 72
E. Apparent Document Discrepancies ........ 73
F. Attorney Attendance at Non-Program Medical Examinations ........ 75
G. Omission of Records Not Supportive of Parkinson's Disease Diagnosis ........ 76
H. 150-Mile Rule Exception Requests ........ 78
I. Interviews of Pro Se Players who are Past Clients of ROV ........ 79
**IX. Conclusion & Recommendation** ........ 79
**X. Exhibit Index** ........ 82
A. Grossinger, Feder, and Pro Athlete Claims Placed in Audit ........ 83
B. Dr. Karunapuzha Hotel Invoice ........ 85
C. Dr. Karunapuzha Hotel Payment ........ 86
D. Summary of Dr. Karunapuzha Subpoena Response ........ 87
E. Dr. Verma Subpoena Response ........ 88
F. Mr. Grossinger Communications with Attorney C Client ........ 92
G. Feder Law LLC Co-Counsel Confirmation ........ 94
H. Syme Law, PLLC Payment to Dr. Steinberg ........ 97
I. Dr. Jacobs Interview Summary ........ 98
J. Jaime Amaro Interview Summary ........ 100

K. Dr. Steinberg Subpoena Response ........ 102
L. Check Payments Produced by Dr. Steinberg ........ 107
M.ROV Follow-up Responses ........ 119
N. ROV Follow-up Supplementary Responses ........ 131
O. Pro Se Player Interview Summary ........ 146
P. "Player 1" Interview Summary ........ 149
Q. "Player 2" Interview Summary ........ 151

# I. INTRODUCTION.

Pursuant to Sections 8.6, 10.3 and 10.4 of the Settlement Agreement and Rule 7(b) of the Rules Governing Audit of Claims, we audited claims submitted by the law firms of: (1) Douglas Grossinger (Mr. Grossinger), Attorney at Law; (2) Reppert Oates & Vytell, LLC (successor firm to Reppert Kelly & Vytell, LLC; hereinafter, "ROV"); (2) Feder Law LLC; (3) Pro Athlete Law Firm, P.A.; and (4) Syme Law, PLLC. This audit grew out of and was precipitated by earlier allegations and information we received regarding attorney Mr. Grossinger in 2018 – 2022, a series of six new tip submissions received in 2024 and 2025 from third parties alleging fraud by ROV and Syme Law, LLC, our own internal fraud detection and monitoring, and our concurrent observation of a consistent pattern of suspicious activity in the firms' Monetary Award Claim submissions for the Qualifying Diagnosis ("QD") of Parkinson's disease ("PD").

Our investigation of the tips uncovered separate but related concerns about an arrangement involving attorney Douglas Grossinger and several other law firms representing Settlement Class Members ("SCMs"), which include Feder Law LLC, Pro Athlete Law Firm, P.A.; and Syme Law, PLLC. Mr. Grossinger has reportedly developed a structured method of obtaining PD diagnoses outside of the Program through a network of doctors, with some working for him as "consultants," examining Players at a hotel, and coordinating with and referring them to other non-Program neurologists to establish records of treatment. As part of this outside care, Players normally purportedly begin immediate treatment with PD medication which supposedly causes them to show only minimal observable symptoms during Monetary Award Fund ("MAF") examinations, necessitating greater reliance of MAF Physicians on outside medical records. Further, instead of filing their claims himself, Mr. Grossinger reportedly coordinates and funnels his PD Monetary Award Claims through intermediary law firms using off-the-record co-counsel agreements to conceal the suspicious trends in his PD claim submissions and evade focused audit scrutiny. However, Mr. Grossinger continues to manage and maintain control over the PD claims. Retired NFL Football Players report that Mr. Grossinger solicits them to pursue PD claims with him and even promises or assures them PD QDs.

Our audit confirmed established connections between Mr. Grossinger and Feder Law LLC, Pro Athlete Law Firm, P.A., and Syme Law, PLLC in relation to PD claim submissions. While our investigative efforts also confirmed Mr. Grossinger's early connection to and solicitation of ROV for a proposed co-counsel partnership, we do not know the extent to which there are any additional as-yet-unknown relationships or partnerships between Mr. Grossinger and any other law firms or attorneys representing SCMs. After our Audit investigation, we have a reasonable basis to support a finding that:

1. SCMs understood attorneys, specifically and particularly Mr. Grossinger and Bart Oates (Mr. Oates) to be promising, guaranteeing, and/or assuring them Qualifying Diagnoses, either directly or in effect, even though the Players were not diagnosed with the QDs at the time. We learned this information from at least four separate sources. Given the specificity and consistency, we consider the reporting to be credible.

2. Attorneys engaged in practices seemingly designed to circumvent the Program's negotiated anti-fraud safeguards. These practices include, without limitation:

   (a) Use of off-the-record and/or verbal co-counsel arrangements to funnel Mr. Grossinger's PD claims through intermediary law firms to mask the attorney working on claims and obfuscate suspicious claim submission trends, suggestive of efforts to conceal improper activity and complicate investigation;

   (b) Reliance on networks of medical professionals outside of the Program (including examinations and/or consultations conducted in a hotel) to establish PD diagnoses, PD medication prescription (including prescriptions from a neurologist who uniformly and routinely prescribed PD medication to all patients with possible PD after just an initial visit or even telephone visit with no examination), and records of treatment to influence and support later Qualifying Diagnoses in the MAF, in effect outsourcing clinical judgment; and

   (c) Repeated attorney insistence that communications and agreements with Retired NFL Football Players and/or other law firms relating to these arrangements not be memorialized in writing, suggestive of their knowledge of impropriety and/or the appearance of impropriety.

3. Certain attorney conduct created conflicts of interest between attorneys and non-Program physicians and/or effectively circumvented Program anti-influence safeguards because of the attorneys' direct interests in the diagnoses and treatment rendered by the physicians. This conduct includes:

   (a) Evidence of at least one apparent gift-in-kind invitation by a law firm (Mr. Grossinger and/or Pro Athlete) to a non-Program neurologist to travel and attend a Super Bowl dinner event with dozens of Retired NFL Football Players when that law firm regularly used the neurologist to establish records of PD treatment and diagnosis of its clients to support their later Qualifying Diagnoses; and

   (b) Attorney Mr. Grossinger, Mr. Oates, and/or J. Vincent Reppert's attendance at Player medical examinations with non-Program physicians whose records the firms relied on to support and bolster later Qualifying Diagnoses.

4. ROV omitted disclosure to MAF Physicians and to us of medical records not supportive of a PD diagnosis and/or of examinations of Players conducted by consultant physicians and/or medical professionals hired by the firms to assist in developing payable PD claims. Such records are material because they affect and have the potential to affect the outcome of a Monetary Award Claim. Omissions to us are material because these records directly affect the outcome of this Audit.

Such practices conceived to circumvent the Program's anti-fraud safeguards seriously undermine the negotiated balance which enabled the Settlement Agreement and at minimum give the appearance of bad faith. Further, these practices create significant uncertainty regarding the integrity of involved firms' claim submissions. Most concerningly, the complex nature of these arrangements, seemingly designed to impede transparency and hinder scrutiny, also jeopardize potentially bona fide PD claim submissions entangled together among the firms' other more questionable submissions in the arrangement.

We prepared this Audit Rule 15 Report of Adverse Finding after determining that there is a reasonable basis to support a finding of misrepresentation, omission, or concealment of material fact and to present our findings to date. We are unable, however, to complete our investigation of these firms and the arrangement uncovered because, in growing number, subjects of the Audit and/or other involved third parties have either failed, objected, or refused to provide the Claims Administrator with necessary records and information.

We determined that issuance of this Audit Report was necessary under the circumstances to inform the Parties and Special Masters of the serious concerns uncovered which undermine the legitimacy and integrity of a growing number of PD Monetary Award Claim submissions and to seek direction as to next steps. Given the serious impact on Players' Monetary Award Claims and in the interest of avoiding further delay, we recommend that this matter is handled through a special expedited proceeding.

## II. SCOPE OF AUDIT.

In an Audit, we determine whether there is a reasonable basis to support a finding that a SCM or a third party misrepresented, omitted, or concealed a material fact in connection with a Monetary Award Claim Package. A material fact is a statement or an omission that did affect or has any potential to affect whether the SCM qualifies for a Monetary Award and/or the amount of such award in favor of the SCM under the provisions of the Settlement Agreement. A third party includes, without limitation, counsel for the SCM, law firm's staff, third-party consultants hired and/or engaged by attorneys and/or law firms, doctors providing Qualifying Diagnoses, clinicians and other medical professionals outside of the Program whose reporting was obtained and proffered to support a QD, and persons signing third-party sworn affidavits in support of a claim. We are not required to determine whether a misrepresentation, omission or concealment was made with intent, which instead shall be taken into account by the Special Masters in their review and findings.

## III. PARKINSON'S DISEASE.

The Settlement Agreement Injury Definitions effectively provide two pathways for a QD of PD. The Injury Definitions require fulfilling either: (1) a diagnosis of the specific condition of PD according to the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10); or (2) a diagnosis of Major Neurocognitive Disorder probably due to PD as defined in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5-TR).

The DSM-5-TR provides four specific diagnostic criteria for Major Neurocognitive Disorder probably due to PD. These are (1) evidence of neurocognitive disorder, (2) symptoms occur in the setting of established PD, (3) insidious onset with slow deterioration, and (4) the neurocognitive disorder is not attributable to another medical condition and is not better explained by another mental disorder. Notably, the DSM-5-TR's second criterion requirement of "established PD" means that the patient must have an existing diagnosis of PD.

Conversely, ICD-10 provides classifications for diseases but does not specify diagnostic criteria. The general U.S. standard for diagnosis of PD at the time of the Settlement Agreement negotiations was the "Gelb criteria."[1] These are utilized in the Settlement Agreement as they are inclusive (i.e., sensitive) and less likely to exclude atypical, but "true," cases than other subspecialty-oriented criterion sets.[2] In December 2023, the Claims Administrator enlisted a panel of Appeals Advisory Panel ("AAP") neurologists, asking them to describe their understanding of how to make a QD of PD under the Settlement. The members agreed in their conclusion that the appropriate criteria for the diagnosis of PD for use in the Settlement remain the Gelb criteria. The Special Master endorsed this conclusion in their 1/26/24 Decision. [3] In 2025, the Special Master asked the AAP for help in describing how they approach reviewing PD diagnoses using the Gelb criteria to provide more transparency and better explain the medicine for Individually-Retained Plaintiff's Attorneys ("IRPAs"). The Special Master outlined and endorsed the panel's guidance in his 7/1/25 Decision. [4] The Gelb criteria first ask about four "Group A" features: (1) Resting Tremor, (2) Rigidity, (3) Bradykinesia, and (4) Asymmetric Onset. At least three out of four features must be present. Regarding observation of these features, the AAP emphasized to the Special Master that, "Parkinson's Disease is an insidious illness whose diagnosis requires the eyes and mind of a trained neurologist, and accordingly, the diagnosing physician herself should ordinarily directly observe the Gelb Group A features on exam."[5]

After three of the four Gelb Group A criteria are met, that same guidance instructs neurologists to continue to the Group B "exclusionary" features and the Player's response to levodopa or a dopamine agonist. Deference is again given "to clinicians who have personally observed their patients over time and who have therefore been able to carefully consider both these exclusionary criteria and the appropriate course of medical treatment."[6] Physicians relying on external records after one-off visits, or who do not at least consider the utility of medication or the possibility of other confounds, may be unreliable sources for these consequential and delicate medical verdicts. The Special Masters noted the AAP has "expressed serious concerns

[1] Gelb DJ, Oliver E, Gilman S. *Diagnostic criteria for Parkinson's disease*. Arch Neurol 1999; 56(1)33-39.
[2] *E.g.*, Postuma RB *et al* Movement Disorders 2015; 30:1591-1601; In December 2023, the Special Masters convened a panel of AAP neurologists to help answer how physicians should make a diagnosis of PD under the Settlement which concluded that the Gelb Criteria are appropriate; Special Master Ruling on Parkinson's Disease Diagnosis Criteria, at 3 (Jan. 16, 2024), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=parkinsons_disease_diagnosis_criteria_sm.pdf.
[3] Special Master's Decision on Parkinson's Disease Diagnosis Criteria (January 16, 2024) *available at* https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=parkinsons_disease_diagnosis_criteria_sm.pdf.
[4] Special Masters' Decision on Parkinson's Disease and Deference (July 1, 2025) *available at* https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=parkinsons_disease_deference_sm.pdf.
[5] *Id.*
[6] *Id.*

about the quality and reliability of diagnoses in which MAF neurologists rely on other doctors' (often, non-MAF neurologists') observations" and that a "separate problem with such attempts at outsourcing clinical judgment is that reliance on non-MAF neurologists might permit evasion of the Program's anti-fraud and anti-influence rules."[7]

We note generally that diagnostic accuracy for PD is challenging, especially in non-specialized settings.[8] Historically, there has been a 20-25% misdiagnosis rate for PD among community neurologists, particularly in the early stages of the disease, where response to dopaminergic treatment is less defined and hallmarks of alternative diagnoses such as atypical parkinsonism may not have emerged.[9] A 2016 study found that diagnostic accuracy for the disease had not improved significantly in the preceding 25 years.[10]

While PD has been a QD eligible for Monetary Award since the inception of the NFL Concussion Settlement in 2017, data shows remarkable growth in the number of Claims submitted for this asserted QD over the last five years. Overall, the total number of MAF PD Claim submissions has grown more than fivefold, increasing approximately 447% from January 2020 to November 2025. Review shows this growth is not apportioned evenly, and that over a third (34%) in the last three years has been driven by Claim submissions originating from a small group of law firms and attorneys which includes ROV, Feder Law LLC, Pro Athlete Law Firm, P.A., Syme Law, PLLC, and Douglas Grossinger. Also warranting our attention, PD claims represent a significant percentage of each of these firm's overall claim submissions, in some cases exceeding 80%. These high proportions are at odds with the global data for all claims submitted in the Settlement that show PD claims representing only around 7% of overall submissions from January 2020 through September 2025. Similarly, these high proportions of PD submissions are not consistent with global Program data for Pre-Effective Date PD diagnoses which accounted for only 6.9% of all Pre-Effective Date diagnoses.

Figure 1 shows the trend in total PD claims submitted by all firms from 2019 to 2025.

---

[7] *Id.*

[8] Valtteri Räty, et al., *Stability and Accuracy of Diagnosis of Parkinson Disease Over 10 Years*, 104(9) NEUROLOGY (2025) *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC11970931/.

[9] Giovanni Rizzo, et al., *Accuracy of Clinical Diagnosis of Parkinson Disease: A Systematic Review and Meta-Analysis*, 86(6) NEUROLOGY 566 (2016) *available at* https://pubmed.ncbi.nlm.nih.gov/26764028/.

[10] *Id.*




*Figure 1*

## IV. BACKGROUND: EARLY AUDIT CONCERNS REGARDING ATTORNEY DOUGLAS GROSSINGER.

Beginning in July 2018 and continuing through December 2020, we received tips and other information from third parties alleging misconduct by attorney Mr. Grossinger in connection with his submission of Monetary Award Claims in the NFL Concussion Settlement.

In July 2018, we received a tip that Mr. Grossinger has two brothers[11] who are neurologists and that they had developed a test to diagnose Alzheimer's disease; that the neurologist brothers are essentially guaranteeing Alzheimer's diagnoses to Players who use the test; and that Mr. Grossinger has been traveling around to different law firms trying to get others on board with this scheme to submit Alzheimer's claims.

[11] Dr. Bruce H Grossinger (a/k/a: "Bruce the Sports Doc," "The Philly Sports Doc") is a neurologist and well-known public figure through his years covering Philadelphia teams on ESPN Radio and VoiceAmerica. He is board-certified in neurology and pain medicine and continues to be involved in sports media through a venture called Rover Sports. Dr. Steven Grossinger is a neurologist in Springfield, PA. He is board certified in neurology and pain management. In January 2017, Dr. Steven Grossinger, his brother Dr. Bruce Grossinger and their business partner Dr. Jason Brajer were barred from prescribing opioids and other medications for at least six months after improperly administering pain medication to a patient who later died of a heroin overdose. Each were found to have repeatedly violated Delaware's Uniform Controlled Substances Act.

On 12/17/20, we received an email from an attorney with a Connecticut law firm representing SCMs alerting us that Mr. Grossinger had approached one of the firm's clients (unnamed) to get him to switch representation to Mr. Grossinger, telling him that Mr. Grossinger "wants to go after the higher award [than] he already won." We followed up on 4/13/21 but the firm advised that the above was "all the information [the tipster] gave."

During that time, we reviewed Mr. Grossinger's submissions, audited one of his claims, and made numerous inquiries and requests to parties close to him to learn more information. Pursuant to Section 8.6, we sent questions to several Retired Players represented by Mr. Grossinger and his co-counsel, Fred Feder (Mr. Feder) to learn about their claim submissions. We sent questions to Mr. Feder about any arrangements or agreements he had with other attorneys. We questioned a non-Program neurologist that Mr. Grossinger frequently relied upon in his claim submissions. The then-available evidence gathered during this preliminary review did not support a clear finding of misrepresentation, but we were unable to definitively rule out misconduct.

Later, on 3/12/22, Counsel for the NFL Parties communicated their concerns to us that one attorney, Douglas Grossinger, had submitted three PD claims recently worth a total of nearly $8 million (overall, five PD claims worth a bit over $10 million). The NFL Parties also mentioned concerns with the PD claims of two Players, specifically that they both showed a pattern of symptom improvement with the use of the drug levodopa and the mostly subjective-reported improvements allowed the PD diagnosis to be confirmed. On 3/25/22, the NFL Parties further communicated to us their concerns over a high value PD claim submitted by Feder Law LLC. Mr. Grossinger had referred the Feder Law Player to the MAF physician, which was of concern to the NFL because of what it viewed as a suspicious pattern in claim submissions.

In September 2022, Counsel for the NFL Parties relayed their continued strong concerns regarding what they viewed as a suspicious pattern of high-value PD claim submissions by Mr. Grossinger and another firm, Feder Law LLC. The two firms' high proportion of PD and Alzheimer's disease claim submissions caused them to be clear outliers. Players saw the same non-Program doctors for diagnosis prior to MAF exams, reporting mild PD symptoms with later subjective improvements after treatment with common PD medication, levodopa.

In summary, the NFL Counsel's concerns were that: (1) Mr. Grossinger was submitting PD claims with high value, meaning the Players were relatively young when diagnosed which is atypical for such diagnosis; (2) two Players had seen the same non-Program neurologist through "self-referrals" (Dr. Daniel Kremens) prior to their MAF exams, whose reports the diagnosing MAF Physician then heavily relied on to support the QD; (3) both of Dr. Kremens' reports "generally follow" the same pattern – reporting of mild motor symptoms and various other PD symptoms, with improvement with levodopa; (4) their mostly subjective-reported improvements allowed the PD diagnosis to be confirmed; (5) according to an NFL medical expert, it was unusual that both Players reported hallucinations early in disease; [12] and (6) both Players (as well as a third Player), appeared to be relatively high-functioning.

[12] According to the NFL's medical expert, it is unusual for mild PD patients to report hallucinations as this symptom is usually seen as a later-stage complaint.

In response, and based on the earlier tips received, we again conducted a review of 11 PD claims[13] submitted by Mr. Grossinger and Feder Law LLC between 2019 and 2022 and 13 Alzheimer's disease claims[14] submitted by Mr. Grossinger and Feder Law with examination dates ranging from 2018 to 2021. We shared information for the 11 Grossinger/Feder Law PD claims and the NFL's concerns with a member of the Appeals Advisory Panel Leadership Council ("AAPLC") and asked for their assessment. The AAPLC members agreed in part with the NFL Counsel's concerns but overall concluded, "In general, while I agree that the concerns raised by the NFL Counsel are indeed reflected in the documentation, I would voice some caution with interpreting this to indicate a pattern of unreliable diagnoses for several reasons."[15]

We further reviewed the NFL's concerns through investigation of the relationship between Mr. Grossinger and two non-Program neurologists whose records supported his claims, Dr. David Weisman and Dr. Carl Sadowsky, sending questions to the former.[16] Dr. Weisman's answers, while generally not informative, did not raise immediate red flags at that time.[17] The Claims Administrator also requested review of a PET scan[18] for one involved Player[19] by a nuclear medicine/molecular imaging expert who opined that there was "no FDG [Fluorodeoxyglucose] pattern consistent with neurodegenerative disease," but that she needed additional data to complete the analysis.[20]

As time went on and as other firms began submitting an increasing number of PD claims, Mr. Grossinger did not follow this trend for his own clients of record; in fact, his number of yearly PD claim filings remained consistent or even decreased over the past five years. Figure 2 shows trends in the number of PD claim submissions by Mr. Grossinger and other subject firms over the five-year period of 2020 to (September) 2025.

---

[13] SPIDs 100001008, 100008730, 100013908, 100015134, 100017061, 100000913, 100004590, 100008593, 100011393, 950000953, and 950008716.

[14] SPIDs 100004202, 100007543, 100004593, 100006864, 100010088, 100006918, 950011631, 950006318, 100005368, 100009339, 100003312, 100003713, and 100000883.

[15] The AAPLC member noted that (1) treatment with dopaminergic medications is known to produce a dramatic response in patients with PD and is commonly accepted as part of the diagnostic workup for this condition; (2) most of the Players were treated with carbidopa/levodopa rather than other agents; (3) most of the Players had documentation of key Parkinsonian signs/symptoms that were directly observed by the Diagnosing Physicians during the examinations rather than relying on report from other physicians; and (4) when outside medical records were relied on they were from reputable sources.

[16] Eleven of the 13 Grossinger/Feder Players submitting Alzheimer's disease claims received their examinations from two neurologists: Dr. David Weisman and Dr. Carl Sadowsky.

[17] Dr. Weisman reported he had "no specific business relationship with Mr. Grossinger" and that Mr. Grossinger "requests that I see patients, I see them." Dr. Weisman stated his understanding was that attorneys, such as Mr. Grossinger, pay his practice similarly for medical treatment rendered by him or by other doctors. Dr. Weisman was not aware of any relationship or agreement with attorneys who represent the Retired Players.

[18] All 13 Grossinger/Feder Alzheimer's claims were supported by FTG PET scans. Seven scans were performed by Dr. Eric Baumel MD, six by Dr. Lee Adler MD, and two by Dr. Jesse Hochman MD.

[19] SPID 100000883.

[20] We contacted Mr. Grossinger for assistance in acquiring the needed Z-score data from his client's treating doctor, but never received the information requested. On 6/7/22, we placed the claim in Audit based on a possibly unsupported PET scan. During audit, we were unable to verify the reliability of the PET scan. We requested that the AAP review the claim based on the clinical criteria alone without consideration of the PET scan. The AAP determined the criteria were fulfilled.




*Figure 2*

During all this time, we continuously collaborated with AAP members to ensure that Qualified MAF Physicians followed criteria to assure consistency of PD diagnoses. As we reviewed PD claims, we noted recurring instances of the same non-Program doctors diagnosing Players with PD outside of the Program prior to MAF examination. We found that puzzling because the claims were filed by apparently unrelated firms across the country. Then, in late 2024 and throughout 2025 we received a series of tips that prompted us to re-launch our investigation and solidify our findings of the process orchestrated by Mr. Grossinger to obtain PD diagnoses and file Claims under the cover of various intermediary law firms. A similar approach for developing payable PD claims adopted by the firm of ROV also had connections with Mr. Grossinger.

Based on the findings of our current investigation as of December 2025, it is our belief that this early audit scrutiny of Mr. Grossinger's practices likely further motivated him to pursue alternative arrangements whereby he sought off-the-record relationships with intermediary law firms and attorneys to submit his PD or Alzheimer's Monetary Award Claims for the purpose of obfuscating any suspicious trends in his activities and evading Program anti-fraud safeguards.

This Audit Report details our findings to all these related processes. Because of the complexity of the various involved Parties, we will start by identifying subjects of this investigation.

## V. SUBJECTS OF AUDIT INVESTIGATION.

Five law firms are identified as Subjects of Investigation. Combined, these five law firms represent only around 3% of all Settlement Class Members,[21] but have submitted 29% of all PD claims in the Settlement since 2019, and over one third (34%) of all PD claims submitted over the last three years. These 93 PD claims submitted since 2019 asserted over $181,700,000 in compensation; 56 claims have been paid over $67,105,500. Based on this figure, total hypothetical maximum attorney's fees for the 93 PD claims (21% of each SCM's Award) would amount to over $14,092,100.[22]

### A. Douglas R. Grossinger.

Douglas Richard Grossinger, d.b.a. Douglas Grossinger, Attorney at Law, is an attorney based in the greater Philadelphia, PA area. Mr. Grossinger has been licensed to practice law in New York since 1989. For the past 41 years, Mr. Grossinger has carried out various production roles for national television productions of NFL Football and other sports and similar responsibilities with NBC Sports, ABC Sports, and ESPN networks.[23]

In conducting our Audit, we learned that Mr. Grossinger has an established reputation and association with PD Monetary Award claims among Retired NFL Football Players in the Program. A *pro* se Player we interviewed in October 2025 remarked that there was one attorney who everyone talks about in connection with PD claims – Douglas Grossinger.[24] According to the Player, Mr. Grossinger is known to be aggressive in his outreach to former Players, including contacting represented Players directly, and the Players boast about how many clients he has and his successes. Notable too, the Player informed us that in his opinion, most former Players were unaware that a QD for PD existed until about six months to one year ago. Consistent with this Player's remarks, an attorney we spoke with in July 2025[25] also noted how Mr. Grossinger has the ear of Players because of his success in getting PD diagnoses for his clients. The attorney shared how when he attended a conference with Players in Tampa earlier in 2025, one Player in attendance had remarked how he was "getting Parkinson's disease" through Mr. Grossinger.

Mr. Grossinger currently represents 38 SCMs and he submitted his first Claim in the NFL Concussion Settlement on 8/28/18. To date, he has submitted a total of 24 claims, 13 of which were for the QD of PD (54.2%), with the remaining 11 being for Alzheimer's disease, consistent

---

[21] Registered Retired Players and Representative Claimants.

[22] On 4/5/18, the Court ordered that if an attorney represents a SCM, the attorney's fees cannot be more than 22% of that SCM's Award. This 22% fee cap includes a 1% withholding for the Common Benefit Fund, which means the fee cap is effectively 21%.

[23] Douglas Grossinger, LINKEDIN, https://www.linkedin.com/in/douglas-grossinger-407106 (last visited June 17, 2025).

[24] Exhibit O.

[25] See Section VI.A.3 for further information shared by Attorney C.

with the 2018 tip we received. We observed a drastic shift in Mr. Grossinger's Claim submission activity in late 2021 from Alzheimer's disease to exclusively PD claim submissions. Of the 10 Claims he has submitted since December 2021, all (100%) are for the QD of PD.

Figure 3 shows total claims submitted by Douglas Grossinger as of October 2025 and breakdown by the QD:




*Figure 3*

Figure 4 shows Mr. Grossinger's claim submissions from 2018 to 2025 and his shift from Alzheimer's disease claims submissions to exclusively PD claim submissions:




*Figure 4*

Mr. Grossinger is a Subject of Investigation because we have a reasonable basis to believe that he orchestrated the robust but – purposefully – obscure process to obtain PD diagnoses and QDs for compensation in the Program that, at minimum, circumvents the Program's anti-fraud safe-guards.

### B. <u>Feder Law LLC</u>.

We confirmed through audit inquiries in 2021 that Mr. Grossinger has a co-counsel relationship with attorney Fred M. Feder of Feder Law LLC, another Pennsylvania-based law firm. Mr. Feder is the founder of Feder Law and has been licensed to practice law in Pennsylvania since 1977. When we asked about his relationship in 2021, Mr. Feder replied, "Doug[las] Grossinger is co-counsel with me for retired NFL Players with whom I am working. Our firms share attorney fees and the payment of expenses."[26]

Feder Law currently represents 37 SCMs. The firm has submitted a total of 24 Monetary Award Claims, 21[27] of which are for the QD of PD (87.5%), causing it to rank third highest among all firms for percentage of PD claims (as of September 2025). Feder Law submitted its

[26] Exhibit G.
[27] Similar to the composition of Mr. Grossinger's submissions, the three remaining Feder Law Monetary Award Claims are each for the QD of Alzheimer's disease.

first PD claim on 2/5/21. Figure 5 shows total claims submitted by Feder Law as of October 2025 and breakdown by the QD:




*Figure 5*

Feder Law is a Subject of Investigation because we have a reasonable basis to believe that the firm submitted claims to the Program based on diagnoses obtained through the process established by Mr. Grossinger.

### C. Pro Athlete Law Firm, P.A.

Pro Athlete Law Firm, P.A. ("Pro Athlete") is a law firm located in Fort Lauderdale, FL. The Registered Agent and Principal of Pro Athlete is David Levine (Mr. Levine), a Member in Good Standing of both the Florida Bar and California Bar. As of September 2025, Pro Athlete had submitted a total of 102 Monetary Award Claims, 24 of which were for the QD of PD (23.53%). While the firm has been submitting claims since 2017, consistent with the trend we observed, the firm submitted all 24 of these PD claims in the past four years beginning in August 2021. From January 2024 through September 2025, approximately 39% of the firm's submissions were for the QD of PD, causing it to be an outlier. As of September 2025, the firm represented 392 SCMs per data recorded in the NFL Portal.

Pro Athlete is the subject of a previous Audit Report. The Court, in rendering a Decision regarding Mr. Levine's objection to the Special Masters' Rule 27 Decision regarding this previous Audit of Pro Athlete, directed the Claims Administrator in a 7/2/25 Order to continue to carefully scrutinize the claim application of any SCM represented by Pro Athlete or Mr. Levine to assure complete compliance with the rules of the Court as to the Settlement Program and to immediately report any violation to the Special Masters, who will then refer the matter to the

Court. In compliance with this Order, on 10/23/25 we issued a memorandum to the Special Masters documenting new concerns (in addition to this matter) regarding Mr. Levine and Pro Athlete, among which were new allegations of coaching and preparation of unreliable documents, discrepancies in attorney representation documents, use of inpatient mental health facilities, and paying a SCM for referrals. The Court issued a 12/3/25 Order regarding Pro Athlete directing us to suspend the final disposition of pending claims submitted by the firm and payments due to the firm until we have resolved the pending investigation or determined a specific claim is free of misrepresentation or omission of material facts.

In late October 2025, Pro Athlete arranged to exit the NFL Concussion Settlement. We learned that Shenaq PC and Locks Law Firm would serve as successor counsel for the firm's Retired NFL Football Player clients. Shenaq PC took over representation for Pro Athlete's dementia claims and Locks Law Firm, its PD claims. This development is discussed in further detail in Section VI.C.2.

Figure 5 shows total claims submitted by Pro Athlete Law Firm for the period of January 2024 to September 2025 and breakdown by the QD:




*Figure 5*

Pro Athlete is a Subject of Investigation because we have a reasonable basis to believe that the firm submitted claims to the Program based on diagnoses obtained through the process established by Mr. Grossinger.

**D. Syme Law, PLLC.**

Syme Law, PLLC ("Syme Law") is a Bloomfield Hills, MI law firm which practices in the areas of personal injury and workers compensation. The firm's managing partner is Joshua S. Syme (Mr. Syme), an attorney licensed to practice law in Michigan since 2006.

Syme Law submitted its first Monetary Award Claim on 10/26/22 and its most recent submission occurred over one year ago on 5/20/24. The firm has submitted a total of six Claims, all of which assert the QD of PD (100%), causing it to be a significant outlier and rank first for percentage of PD claim submissions among all firms that have submitted more than one Claim as of September 2025. All six PD claims received Monetary Awards with the overall amount awarded after offset totaling over $5 million. Of the six SCMs who submitted PD claims, three reside in Michigan per Portal records, with the remaining three residing in Ohio, New York, and Florida. As of September 2025, the NFL Portal shows a total of 17 SCMs who list Syme Law as their attorney of record.

Figure 6 shows total claims submitted by Syme Law as of October 2025 and breakdown by the QD:




*Figure 6*

Syme Law is a Subject of Investigation, because we have a reasonable basis to believe that the firm submitted claims to the Program based on diagnoses obtained through the process established by Mr. Grossinger.

### E. **Reppert Oates & Vytell, LLC**.

Reppert Oates & Vytell (and predecessor firm, Reppert Kelly & Vytell, LLC) is a law firm based in Basking Ridge, NJ.[28] Prior to June 2025, the firm was comprised of four members: (1) J. Vincent Reppert; (2) Christopher P. Kelly; (3) Lisa J. Reppert; and (4) Nicholas A. Vytell. The firm added Retired NFL Football Player and licensed attorney Bart Oates as a named partner in January 2024, though he worked informally with the firm prior to this date. In or around June 2025, we learned that Reppert Kelly & Vytell, LLC ("RKV") had changed its name to Reppert Oates & Vytell, LLC ("ROV").

The law firm first obtained NFL Portal access on 8/26/21 and has registered attorneys J. Vincent Reppert, Lisa Reppert, and Bart Oates as users. ROV submitted its first Claim in the NFL Concussion Settlement on 11/2/21.[29] At the time we initiated our first audits of ROV's claim submissions in November 2024, the firm had submitted a total of 13 claims, all (100%) for the QD of PD, causing it to be a clear outlier among firms participating in the Settlement Program. As of October 2025, ROV has submitted a total of 31 Monetary Award Claims, 29 of which are for the QD of PD (93.5 %). In the firm's 8/20/25 responses (and 9/26/25 supplemental responses) to our follow-up questions, ROV reported that they currently represent approximately 75 SCMs, which is consistent with NFL Portal records.

When asked during an interview on 7/9/25 about the firm's high percentage of PD claim submissions, attorney Lisa Reppert explained that movement disorders [e.g., PD] had "become a sub-specialty."[30] While the firm had initially explored handling memory claims (i.e., Level 1.5 and Level 2 Neurocognitive Impairment) when they started in the Program, she concluded that "nobody is getting paid on them," referencing to a recent Washington Post article.[31] Lisa Reppert further expressed her perspective that many do not understand the high prevalence of PD among football Players and how prone they are to the disease. J. Vincent Reppert explained that memory issues are more subtle while movement issues are "easier" to understand. He stated however that, "we don't advertise: 'All we do is Parkinson's.'"[32] The ROV partners agreed they would not decline representation of a potential client who came to them presenting only memory issues.

Figure 7 shows total claims submitted by ROV as of October 2025 and breakdown by the QD:

---

[28] ROV's practice areas include NFL Concussion Settlement litigation, corporate law, employment law, entertainment law, intellectual property, and commercial real estate counseling and litigation.

[29] ROV submitted its first claim, SPID 100010740's Monetary Award Claim for the QD of PD, on 11/2/21.

[30] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).

[31] Seemingly, Ms. Reppert was referencing a Washington Post article published on 12/29/24. *See* Will Hobson, *Scouring social media, a firm fights NFL settlement payouts*, WASHINGTON POST (Dec. 29, 2024), https://www.washingtonpost.com/sports/2024/12/29/nfl-brain-injuries-players-compensation/

[32] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).




*Figure 7*

**a. <u>Bart Oates</u>.**

Bart Oates (Mr. Oates) (Settlement Program ID 100011393) is a Settlement Class Member and Retired NFL Football Player who during his athletic career in the 1980s and 1990s played for the Giants and 49ers. More recently, Mr. Oates served as President of the NFL Alumni Association from approximately 2017 – 2023 and prior to that as a Chapter President. Mr. Oates is also an attorney and has been licensed to practice law in New Jersey since 1990. J. Vincent Reppert, Lisa Reppert, and Mr. Oates are longtime acquaintances and all attended Seton Hall University Law School around the same timeframe.

Regarding his involvement and work with ROV, Mr. Oates told us during a 7/9/25 interview that prior to formally joining the firm, he would come to ROV attorneys Lisa and J. Vincent Reppert for informal advice and to refer or ask them to assist Retired Players who came to him in his capacity as NFL Alumni President. We observed at least one public source which listed Mr. Oates' role as attorney & counsel for Reppert Kelly & Vytell LLC beginning as early as 2018.[33] However, Mr. Oates reported to us that he joined ROV in January of 2024 after his tenure as President of the NFL Alumni Association concluded.[34]

---

[33] Bart Oates, ZOOMINFO, https://www.zoominfo.com/p/Bart-Oates/1838257043 (last visited Jan. 31, 2025).

[34] Because of Mr. Oates' status as a SCM, confusion arose when he contacted the Claims Administrator in June 2024 in his capacity as an attorney with RKV to inquire about registration of another SCM. In December 2024, Mr. Oates called again to discuss matters for other SCMs, and RKV clarified to us he was counsel when asked about the situation. At that time the firm explained, "Bart reached out in his capacity as legal counsel and as former President of the NFL Alumni Association. He is not calling as a former Player and/or client of our firm. He is [a] practicing lawyer and is now a member of our law firm."

Mr. Oates first registered in his capacity as a SCM with the NFL Concussion Settlement on 5/22/17.[35] Program records show Feder Law LLC (co-counsel of Mr. Grossinger) as Mr. Oates' attorney of record from around 4/1/21 to 2/13/24,[36] however, Mr. Oates later informed us in his response to audit questions in August 2025, that it was in fact Mr. Grossinger who represented him at this time.[37]

Mr. Oates himself received a QD of PD from MAF Physician Dr. Louis Pearlstein and submitted a claim on 7/12/21, which the Program later paid.[38] Consistent with the overall pattern of PD claim submissions we have observed, Mr. Oates received his initial PD diagnosis outside of the Program during his first visit with a neurologist, Dr. Fiona Gupta, on 1/14/21. Because of his own personal experience as a SCM and through his status as an attorney and former NFL Alumni President, Mr. Oates has unusual perspective and insight into obtaining a PD QD as well as connections to a large network of retired NFL players.

**b. <u>Lisa Reppert</u>.**

Lisa Reppert (Ms. Reppert) is an attorney licensed to practice law in New Jersey since 1989 and a partner at ROV. Ms. Reppert is married to fellow ROV partner, J. Vincent Reppert.

**c. <u>J. Vincent Reppert</u>.**

Julius Vincent Reppert (a/k/a J. Vincent Reppert) (Mr. Reppert) is an attorney licensed to practice law in New Jersey, New York, and the District of Columbia. Mr. Reppert is Lisa Reppert's husband and a founding member of ROV.

## VI. PARKINSON'S DISEASE CLAIM ARRANGEMENT.

In June 2025, we received information from multiple third parties regarding an arrangement involving Mr. Grossinger and several other law firms representing SCMs. Mr. Grossinger reportedly coordinated and funneled his PD Monetary Award Claim Packages through these intermediary firms to conceal suspicious trends in his submissions and evade scrutiny and anti-fraud safeguards. According to this new information, law firms alleged to be aiding and contributing to Mr. Grossinger's arrangements include Feder Law LLC and Pro Athlete Law Firm, P.A.

This new information aligned with our earlier 2022 audit concerns regarding Mr. Grossinger's claim submission practices outlined in Section IV which we revisited and incorporated into the current review. In addition, we reviewed data analytics for the subject firms' PD claim submissions. This review identified suspect "red flags" which included, without

---

[35] Document ID 44461.
[36] Mr. Oates notified us of his change in representation from Feder Law LLC to ROV on 2/13/24.
[37] Exhibit M.
[38] Net payment amount of $922,469.76 after offsets issued to Mr. Oates on 11/19/21.

limitation, claims supported by the same non-Program physicians and a pattern of unusually similar circumstances surrounding the underlying PD diagnoses obtained outside the Program prior to MAF examination.

We undertook numerous investigative steps to uncover specific details and develop a fuller understanding of the alleged arrangements, including the identification of any other involved parties. The following is a non-exhaustive list of steps we took in this investigation:

1) In July 2025, we interviewed attorneys with three law firms representing SCMs.

2) In August 2025 we attempted to interview one neurologist, Dr. Jeffrey Steinberg (Dr. Steinberg), to learn more about his examination of Retired Players in the NFL Concussion Settlement. Dr. Steinberg retained counsel and declined our request for an interview at the counsel's advice.

3) In September 2025, we issued multiple subpoenas (to the Hilton Dallas Lincoln Centre hotel, Dr. Steinberg, Dr. Cherian Karunapuzha, and Dr. Avesh Verma) to gather additional facts and to corroborate information provided by the three attorneys. Material produced by Dr. Steinberg confirmed Mr. Grossinger's relationship with an additional law firm, Syme Law. Subpoena responses and materials produced are incorporated to this Report.[39]

4) We audited seven pending PD Monetary Award Claims submitted by Mr. Grossinger, Feder Law, and Pro Athlete as they became eligible. Exhibit A summarizes details about these audited claims. In auditing each of these Claims, we: (1) requested that the Players complete and provide us a Health Care Provider History Form listing their providers for the past five years; (2) requested and obtained outside medical records from providers listed on the Players' forms as appropriate; and (3) requested each Player's pharmacy history for the past five years. As of the issuance of this report, Audits of these claims remain active, and processing is suspended. Subsequent action will be determined based on direction of the Special Master.

5) In November 2025, we conducted outreach to Feder Law, Pro Athlete, and Syme Law requesting that they confirm whether the firms (or anyone associated with the firms) had any relationships or co-counsel arrangements with Mr. Grossinger in connection with the NFL Concussion Settlement.[40] Feder Law confirmed an active co-counsel relationship with Mr. Grossinger. The deadline to timely respond having passed, neither Pro Athlete nor Syme law have provided informative answers. Each advised us that counsel for their respective firms would review the request, after which they would follow up. Neither firm denied arrangements or other relationships with Mr. Grossinger.

6) We also requested that Mr. Grossinger confirm whether he had any relationships with Feder Law, Pro Athlete, Syme Law, or ROV in the context of the NFL Concussion Settlement, and if so to explain the relationships or arrangements, describing their nature and

[39] Exhibits D, E, and K.

[40] Note that we addressed these same matters with ROV regarding any possible arrangement or relationships with Mr. Grossinger during our 7/9/25 interview with the firm. See Section VIII.B.

purpose. On the deadline for responding, Mr. Grossinger communicated to us that he is "on sabbatical from being able to spend active time on work for this case" due to an ongoing medical situation with a close family member.[41] Like Pro Athlete and Syme Law, Mr. Grossinger added that he "…[had] communicated this request to the lawyers representing this law firm and when they get back in the near term as to what can be responded [he] will reply on this." Mr. Grossinger did not deny relationships with the firms.

Our findings and information we collected are detailed in this Report.

### A. Information Received from Law Firms in June 2025.

In July 2025, we were contacted by and spoke with attorneys from three different law firms representing claimants in the Program regarding their concerns about PD claim submissions and their past discussions with Mr. Grossinger related to possible co-counsel arrangements. Each of these attorneys had on their own accord reached out to us and shared concerns about PD Claim submissions in the Program and/or Mr. Grossinger. Many concerns these firms expressed to us had originated from information reported to them by their current clients who Mr. Grossinger or other firms previously represented. At least one law firm expressed concern of retaliation by Mr. Grossinger and/or his associates. Consequently, we have elected not to identify the firms that have shared this information in this Report. Our Report correctly summarizes these interviews and the attorneys' identities are known to the Claims Administrator. Notes of the interviews are in our possession but are not included to preserve anonymity.

#### 1. Law Firm A.

In late summer 2020, Mr. Grossinger contacted Attorney A of Law Firm A to discuss a possible co-counsel arrangement. Mr. Grossinger claimed he was a "difference maker" in the PD realm and can get people paid. Even though Mr. Grossinger did not say it, Attorney A's takeaway was that Mr. Grossinger could get his clients a QD. Attorney A was left with the impression that Mr. Grossinger knew that too many PD diagnoses would raise red flags with the Claims Administrator, and he wanted to use other attorneys to "run cover" for him. Attorney A declined the arrangement.

Attorney A believed Mr. Grossinger tended to use the same doctors as treating neurologists outside of the Settlement, however, it seemed to Attorney A that his relationships with these doctors was "too clubby." One of those doctors reportedly evaluated a Player for PD in a hotel room.

---

[41] Mr. Grossinger first communicated his inability to spend time responding to NFL Concussion Settlement matters due to this ongoing medical situation in July 2025 in connection with a request for information on a pending PD claim. Mr. Grossinger requested a 45-day extension in that case and a second 45-day extension on 8/28/25. Mr. Grossinger requested a third 45-day extension in October 2025. To date, we have freely granted all such requests. Due to the significant length of the extensions and the adverse effect of the related delays on the processing of Players' claim submissions, we asked Mr. Grossinger in September 2025 if anyone was assisting him with his clients during his sabbatical but to date, he has not responded. At odds with these communications, Mr. Grossinger later submitted two additional PD Monetary Award Claims on 12/3/25.

Several Players who were previously represented by Mr. Grossinger switched to Attorney A. Some of those Players told Attorney A that Mr. Grossinger sent them to MAF Physician Dr. Suresh Kumar for the purpose of getting either a PD or an Alzheimer's diagnosis.

Other Players who later became clients of Attorney A reported that Mr. Grossinger had promised them a QD, but they later realized that promise was not going to be fulfilled and consequently, they decided to leave him. Attorney A believes that David and Justin Levine (of Pro Athlete Law Firm, P.A., the subject of a previous Audit Investigation and subsequent Special Master and Court Decisions) may have a co-counsel relationship with Mr. Grossinger and that he has approached other attorneys or firms to work with him.

Law Firm A contacted us again on 8/11/25 advising that one of its clients who had received a PD diagnosis outside of the Settlement Program was concerned about how the diagnosis came about and wanted to discuss the matter but remain anonymous. Law Firm A's client ("the client") is a former client of David Levine at Pro Athlete Law Firm, P.A. The client also had contact with Mr. Grossinger who he believed worked with Mr. Levine. The client expressed great distress about his health following his outside treatment for PD while represented by Pro Athlete. Per Law Firm A, the client possesses text messages he received from Mr. Levine and "Doug" (who is understood to be Mr. Grossinger) regarding his PD diagnosis and claim. The client also maintains that Mr. Levine had warned him not to communicate through text messages with them, but through phone calls only. Mr. Levine's and/or Mr. Grossinger's repeated insistence to clients that communications should not be memorialized and occur only via telephone are suggestive of their knowledge that their activities were improper or had the appearance of impropriety. We view the client's account as credible based on its specificity, coherence, and corroboration from independent sources.

At the direction of Mr. Levine and Mr. Grossinger, in late 2024 the client intended to travel to Oklahoma City, OK to be evaluated by non-Program neurologist Dr. Cherian Karunapuzha;[42] however, before making the trip, either Mr. Levine or Mr. Grossinger informed him that Dr. Karunapuzha would instead be coming to Texas to see patients. Consequently, on 10/16/24, the client was scheduled to be examined at the Hilton Dallas Lincoln Centre hotel by Dr. Karunapuzha. Due to personal circumstances, the client could not attend that appointment, so it was rescheduled for 12/17/24 at what he believed to be the same hotel when Dr. Karunapuzha was back in town. We corroborated Dr. Karunapuzha's presence at this Dallas hotel on 10/16/24 through records obtained via subpoena from Hilton in September 2025. Dr. Karunapuzha arrived the at Hilton Dallas Lincoln Centre at 7:33 pm on 10/15/24 and departed on 10/16/24 at 2:22

[42] Dr. Cherian Abraham Karunapuzha, MD is an American Board of Psychiatry and Neurology ("ABPN") certified neurologist and movement disorders specialist practicing at the Mercy Hospital Meinders Center for Movement Disorders in Oklahoma City, OK. Dr. Karunapuzha appears in numerous webinar and other online videos discussing PD and reportedly travels to other cities to speak on the topic. Dr. Karunapuzha co-authored an academic publication in 2021 with Dr. Fiona Gupta. Dr. Gupta was the evaluating neurologist for Mr. Oates on his PD claim with Feder Law in 2021, suggestive of a working relationship between the two doctors during the same timeframe as Mr. Oates' PD Claim.

pm.[43] He paid using a credit card in his own name.[44] Dr. Karunapuzha's room number indicates he reserved a large suite (approximately 729 sq. ft./67.7 sq. meters) which could provide ample space to see or examine players. In addition, this hotel has available meeting rooms, though it is unconfirmed whether Dr. Karunapuzha used such amenities during his stay.

When the client arrived at the hotel, he noticed several other former NFL Players in the lobby also waiting to see Dr. Karunapuzha. Dr. Karunapuzha saw the client, informed him he had PD, and referred him to Dr. Avesh Verma, a neurologist in Plano, TX to obtain a prescription for levodopa. The client's appointment with Dr. Verma occurred on 12/27/24. Dr. Verma conducted physical examinations, confirmed the diagnosis of PD, and prescribed him levodopa which he immediately started taking. The client had a follow-up appointment with Dr. Verma in February 2025. After the client changed representation to Law Firm A, he tried to obtain his medical records from Dr. Verma and Dr. Karunapuzha. However, when he submitted a formal records request and HIPAA form to Dr. Karunapuzha's office, he was informed from OKC Medical that no records existed.

By August 2025, the client reported he was experiencing terrible side effects from the levodopa. He visited Dr. Verma again on 8/6/25 for a medication check-up and advised of the concerning situation with his health. Dr. Verma claimed he told the client to stop taking the medication in May, which the client denies. The client became angry and asked Dr. Verma for Dr. Karunapuzha's report from 12/17/24 showing he had PD. According to Dr. Verma, there was no written report from Dr. Karunapuzha because he was not in Dallas that day to diagnose players. Instead, Dr. Verma proffered that Dr. Karunapuzha was only there as an unofficial representative of a support group and was hired by Mr. Levine and Mr. Grossinger to travel around the country and consult for them. Dr. Verma continued this narrative, stating that after the client's hotel meeting with Dr. Karunapuzha in December, Dr. Karunapuzha had verbally informed him that the client had PD and needed to be treated. Upon hearing this, the client called Dr. Verma "unethical" for dispensing medication without a firm diagnosis and questioned whether he even had PD. Dr. Verma reportedly responded that it was possible the client did not have PD.

The client mentioned he is aware of another Player in a similar situation, but Mr. Levine continues to represent him. Law Firm A advised that the client had shared with them past text message exchanges he had with Mr. Levine, one of which shows Mr. Levine directing the client to Mr. Grossinger to answer questions he had regarding his PD diagnosis.

We issued a subpoena to Dr. Karunapuzha in September 2025 to obtain records and communications relevant to his work for Mr. Grossinger and David Levine with Retired Players in the Settlement. Dr. Karunapuzha retained counsel who confirmed his work for Mr. Grossinger, further corroborating the client's account. Counsel proffered to us that Dr. Karunapuzha was not a retained expert who would testify in any legal proceedings but rather was a "consultant" hired by Mr. Grossinger.[45] Counsel advised that Dr. Karunapuzha had no dealing

[43] Exhibit B.
[44] Exhibit C.
[45] Exhibit D.

with David Levine and contended that he had no medical relationship with any former NFL players. Based on Dr. Karunapuzha's expressed intention to assert attorney-client privilege as a third-party consultant of Mr. Grossinger in response to our requests, and in the interest of avoiding a protracted and unproductive discovery dispute, we opted to withdraw the subpoena, having already established his working for Mr. Grossinger.

We also issued a subpoena to Dr. Verma in September 2025 to obtain records and communications relevant to his work for Mr. Grossinger and David Levine with Retired Players in the Settlement. Dr. Verma objected in large part to our requests and his response was minimally informative.[46] Dr. Verma did confirm that he is the treating physician for two retired NFL football Players that may be responsive to our request, and in that capacity possesses medical and billing records for those patients.

**2. <u>Law Firm B</u>.**

Mr. Grossinger reached out to Attorney B of Law Firm B two or three times several years ago regarding the Concussion Settlement. During the first conversation, Attorney B listened while Mr. Grossinger discussed his family connections to the medical community and his knowledge and understanding of the science surrounding PD. Like Attorney A's account, the second conversation primarily dealt with Mr. Grossinger's suggestion of him and Attorney B developing a co-counsel arrangement which Mr. Grossinger advised was his preferred way to run his practice.[47] Attorney B declined the offer. If a third conversation occurred between Mr. Grossinger and Attorney B, it was again about PD. They may have discussed the process Mr. Grossinger undertakes to develop PD cases.

Attorney B questioned to himself why Mr. Grossinger, with all his knowledge and expertise regarding PD, would "hide" behind his work and seek co-counsel relationships with other firms. Further, it did not appear to Attorney B that Mr. Grossinger lacked the knowledge to navigate Program requirements or the infrastructure to handle his caseload. Attorney B concluded that Mr. Grossinger sought this proposed arrangement with Law Firm B to effectively spread his clients' PD claims among several different lawyers thus shielding him from scrutiny by the Claims Administrator.

Per Attorney B, it is rumored that Mr. Grossinger has co-counsel or partnership arrangements with Mr. Levine from Pro Athlete Law Firm, Mr. Feder of Feder Law and Byron Cuthbert and Associates, LLC[48] (also the subject of a previous Audit Investigation and subsequent Special Master and Court Decisions). Within the past year, Law Firm B lost a client to Mr. Feder at Feder Law, who Attorney B believed showed no indication of PD. After

[46] Exhibit E.
[47] Consistent with this account, we reviewed a copy of a 2023 retainer agreement Mr. Grossinger entered into with a client of record wherein the client agreed to retain not only Mr. Grossinger but also "his associated law firms counsel as well as other co-counsel arrangements and assigns as may jointly be associated with such counsel (hereinafter referred to collectively as 'Representing Attorneys' or 'Law Firms')…"
[48] Investigation thus far has established no known connection between Mr. Grossinger and Byron Cuthbert and Associates, LLC. As of October 2025, this firm had only one pending PD claim which did not generally follow the typical claim submission pattern observed during this investigation.

changing representation, Attorney B learned that Mr. Feder was working on a PD claim for this client. Mr. Feder may have told Attorney B during the lien process that Mr. Grossinger was behind the PD claim. A similar situation happened with a client who left Law Firm B for Dallas, TX law firm Song Whiddon, PLLC (See Section VI.E.1 for further discussion of Song Whiddon, PLLC).

Attorney B also shared that one of his clients was recently approached by an unnamed third party who claimed he could get him a PD diagnosis for the NFL 88 Plan if he went to see non-Program neurologist, Dr. Jeffrey Steinberg, who we address in greater detail in Section VI.F.2. In return, the third party wanted 30% of the client's award as a referral fee. Attorney B also shared that another client who lives in South Florida related a conversation he had with Retired Player, SPID 950001529.[49] According to the client, SPID 950001529 told him he should consider changing his representation to attorney Bart Oates of ROV because he could get the client a PD diagnosis. SPID 950001529 noted how Mr. Oates was successful in obtaining that diagnosis for him.

### 3. Law Firm C.

On 6/4/25, we received an unsolicited and self-styled "whistleblower disclosure" from Attorney C at Law Firm C, alleging misconduct by Mr. Grossinger in relation to a PD Monetary Award Claim. Attorney C reported that the previous week he received a representation change notice listing attorney David Levine (Pro Athlete Law Firm, P.A.) as the new attorney for one of Law Firm C's clients.

During a call however, Attorney C learned that the client was under the misguided impression that Attorney C still represented him for his dementia claim while another attorney would handle a PD claim. Attorney C explained that the change in representation constituted full termination, not a partial shift. Despite the change in representation listing Pro Athlete as the new counsel of record, throughout the call, the client repeatedly referenced to "Doug" as the attorney handling the PD claim. When asked if he meant Douglas Grossinger, the client said yes. The client also confirmed that Mr. Grossinger, not Mr. Levine, had sent him the representation change form naming Mr. Levine as his new attorney. Like the client of Law Firm A discussed in Section VI.A.1, the client could not find emails from either attorney from the past year as all communication with Mr. Grossinger had occurred through phone or text. Attorney C concluded these methods seemed designed to avoid creating a discoverable paper trail, obscure firm relationships and solicitations, and subvert his own representation. From the available records that could be located, Attorney C shared with us a screenshot of an email sent from a "Douglas R. Grossinger, Esq." to the client with an attached Request for Change in Representation Status form with accompanying message stating, "See the Representation Form, please print it out soon and we can discuss you filling it in. We are proceeding closer to the claim filing. Lets [*sic*] talk soon ok."[50]

---

[49] SPID 950001529 submitted a Request for Change in Representation Status form dated 7/1/25, changing his attorney of record to ROV but has not yet submitted a claim. Document ID 400880.
[50] Exhibit F.

After discussing the situation with Attorney C, the client contacted Mr. Grossinger expressing his unease to him about the arrangement. According to the client, Mr. Grossinger proposed that he would pay Attorney C's firm $75,000 as part of what he termed a "pre-arranged lien resolution" apparently to secure cooperation through a financial interest and avoid exposure of the arrangement. The client also told Attorney C that after his talk with Mr. Grossinger, he had agreed (possibly under pressure or confusion) to pay an additional $25,000 from his own settlement to Attorney C's firm, which Attorney C declined. In reporting the activity, Attorney C expressed to us his view that, "[t]hese financial arrangements raise serious ethical concerns, particularly regarding how they were framed and the influence exerted."

In later communications, the client also expressed his plan to "bonus" Mr. Grossinger an additional $150,000 despite Attorney C's explanation that the client is not obligated to pay anything beyond any retainer agreement. The client insisted this was "the fair thing to do." When asked for a copy of Mr. Grossinger's retainer, the client said there was not one, only a verbal agreement at 10%. In sharing this information, Attorney C expressed his strong belief that Mr. Grossinger is funneling claims through various law firms to evade oversight. Attorney C also expressed that he is "not yet convinced the client has Parkinson's disease" based on his earlier representation and knowledge of the client's medical situation. The arrangement described by Attorney C's disclosure is depicted in Figure 6 below.




*Figure 6*

We followed up with Attorney C in July 2025 to learn of any additional information. Attorney C shared that Mr. Grossinger had contacted him earlier in 2018 or 2019 by phone and asked whether Attorney C was willing to submit Alzheimer's claims for him. Attorney C declined the arrangement. This reporting is consistent with the July 2018 tip discussed in Section VII.B and the trend noted in Mr. Grossinger's claim submissions which have shifted from being almost exclusively Alzheimer's disease QDs to exclusively PD since 2021. Attorney C

reportedly had no further contact with Mr. Grossinger since that time but has heard his name from former Players in connection with PD claims.

According to Attorney C, Mr. Grossinger has the ear of Retired Players because of his success in getting PD diagnoses for his clients. For example, when Attorney C was at a fundraiser in Tampa, FL in the Spring of 2025, there were many retired NFL Players in attendance. One of those Players informed Attorney C that he already had a Level 1.5 diagnosis and remarked that he was "getting Parkinson's disease" through Mr. Grossinger.

Attorney C contacted us in November 2025 to report he had received an unsolicited email from a neurologist named Dr. Sandeep Thakkar[51] relating to the above-referenced client in his "whistleblower disclosure." Dr. Thakkar's email stated, "i wanted to chat with you about to [*sic*] work more with you and also compensation for working with your clients." Attorney C expressed his belief that during the period of "joint representation," it seems that Dr. Thakkar may have evaluated the client for Mr. Grossinger and/or Mr. Levine. In December 2025, we learned during audit of one of Pro Athlete's PD claims that Dr. Thakkar had also treated another of the firm's clients for PD, further supporting this neurologist's suspected connection to Mr. Levine and/or Mr. Grossinger. Further, Dr. Thakkar's recent unsolicited outreach to Attorney C suggests his financial motivation for continued attorney referrals.

On 11/13/25 Attorney C also shared that another longtime client had recently changed representation to ROV. Attorney C expressed his belief that the client is not impaired based on his familiarity and knowledge of his medical status. Attorney C learned that Mr. Oates is reportedly cold-calling Retired Players to get them to switch their representation to ROV.

### B. <u>Summary of the Arrangement</u>.

In sum, information relayed to us by the three unrelated firms consistently supported that Mr. Grossinger has set up a mass-production process to obtain PD diagnoses and used other firms to file these claims with the Program. Here is the summary of this arrangement, based on the information we were able to uncover:

1. **Solicitation:** Mr. Grossinger and associated parties solicit Players (both represented and unrepresented), either directly or effectively promising or assuring them PD Qualifying Diagnoses. We learned of at least one instance in which Mr. Grossinger reportedly proposed paying off a Retired Player's current attorney through what he characterized as a "pre-arranged lien resolution." In this case, the SCM's counsel had learned of and questioned Mr. Grossinger's attempted solicitation of his client, believing that it undermined his representation (the solicited Player did not understand that his retainer of Mr. Grossinger would effectively terminate his existing representation by his current attorney). In response, Mr. Grossinger reportedly offered the attorney an apparently off-the-record $75,000 payment (characterized as a "pre-arranged lien"), seemingly to secure his cooperation through financial interest and avoid interference or exposure of his arrangements. The same

[51] Dr. Sandeep Thakkar is a board-certified neurologist and movement disorders specialist in Irvine, CA.

solicited SCM also reported that he planned to pay Mr. Grossinger a $150,000 "bonus" in addition to a verbal 10% retainer.

2. **"Treating" Neurologist Diagnoses:** Mr. Grossinger is further alleged to have questionable arrangements with a network of non-Program doctors he relies on to carry out a multi-step process to develop payable PD claims. This process involves obtaining a PD diagnosis from doctors outside the Program, under the guise of these being "treating" or evaluating neurologists. Our understanding of the role of these doctors has evolved through the course of our investigation. We started with looking at these outside records and diagnoses proffered from these providers to support Monetary Award Claims to be routine records of clinical treatment. As detailed below, the AAP members relied on these records to support QDs. Over time, however, our understanding of these records changed: findings show lawyer involvement (*i.e.,* selection of providers, referrals, compensation for ongoing care) that raise concerns over improper influence and their integrity or reliability. Of note, also, that while these Players were subject to multiple medical liens, when the medical information from insurers and government provided care (Medicare, Medicaid) was audited for treatment related to the PD QDs, there proved to be minimal expenses (on average treatment related care was $791). Throughout this Report, the terms "treating" or evaluating neurologist may appear interchangeably, and generally describe these often lawyer-selected providers who rendered SCMs' first diagnoses of PD outside of the Program, prior to a Qualifying Diagnosis established through the MAF. This process is also reported to utilize traveling doctors "consulting" for Mr. Grossinger and his associates, at least one of whom examined Players in a hotel. Upon receiving diagnoses, Players immediately purportedly start treatment with medication and report subjective symptom improvement from the medication.

3. **Qualified MAF Physician Evaluations:** Players present for MAF examinations with supposedly diminished observable symptoms. They possess outside medical records from non-Program evaluating neurologists to bolster that these are pre-existing diagnoses of PD. The same MAF physicians are used consistently, with Players at times traveling great distances to get Qualifying Diagnoses. At least one MAF physician diagnosed anywhere from 80-100% of Players he saw with a QD.

4. **Cover Firms:** Mr. Grossinger funnels these PD claims through several intermediary law firms to avoid raising suspicion and bringing scrutiny on his practices. At his request and insistence, Mr. Grossinger's communications with clients, retainer and other financial arrangements remain verbal and are not memorialized. We could not determine Mr. Grossinger's fee sharing and other financial arrangements with co-counsel firms submitting his PD claims. While the other firms are listed as attorney of record in the NFL Program's Portal, Mr. Grossinger maintains significant, if not sole, control and management of the claims. It must be noted that pursuant to Section 30.2(a) of the Settlement Agreement, counsel individually representing a SCM must provide notice of his or her representation to the Claims Administrator within 30 days of the retention if counsel is retained after the Agreement's Effective Date

(January 7, 2017). Inclusion of this provision speaks to the importance of transparency and the necessity of such information for effective administration of the Settlement. Mr. Grossinger's covert relationships undermine this Settlement Agreement provision.

As a result of either Mr. Grossinger's co-counsel arrangements, or his other outreach and solicitation of this approach for developing PD claims, several other law firms or attorneys representing SCMs, such as ROV, are now also engaged in a similar pattern of claim submissions for the QD of PD. These suspect submissions likewise involve establishing a record of initial diagnosis obtained from non-Program physicians and reporting of improvement from medication to support the diagnosis when presenting to MAF providers. Because they appear to have set up a separate, albeit similar process, to obtain PD diagnoses, our findings about ROV are discussed separately in Sections VII – VIII of this Report.

### C. Law Firms Connected to the Arrangement.

Review of the information shared by third parties documented in Section VI.A, subsequent investigative efforts, and analysis of claim submission data identified several law firms with established connections to Mr. Grossinger and/or the broader PD claim submission pattern. Relationships among connected firms are depicted in Figure 7 and summarized below, followed by summaries of involved Program and non-Program doctors.




*Figure 7*

1. **Feder Law LLC.**

87.5% (21 claims) of Feder Law's Monetary Award Claim submissions have been for the QD of PD. The firm has submitted all of these PD claims since February 2021. We first noted connections between Feder Law and Mr. Grossinger in May 2021 when we sent questions pursuant to Section 8.6 of the Settlement Agreement to a Retired Player represented by Feder Law to learn more about his claim for the QD of Alzheimer's disease. Mr. Feder submitted to us the Retired Player's responses on 5/13/21 in the form of a PDF document. Curiously, and without explanation, we observed that the document's metadata showed that a "Doug Grossinger" had authored the Retired Player's responses.

Likewise, the Retired Player's answers to our follow-up questions later that month informed us that Mr. Grossinger had recommended the Retired Player's "treating" neurologist (Dr. David Weisman) who had diagnosed and treated him for Alzheimer's disease, and that it was Mr. Grossinger who had scheduled, and paid for the Retired Player's appointment with this non Program doctor. In addition, responses to questions we sent pursuant to Section 8.6 of the Settlement Agreement to another Feder-represented Retired Player that month stated that it was in fact Mr. Grossinger who had recommended the two non-Program neurologists who diagnosed and treated the Player for Alzheimer's disease and that it was Mr. Grossinger who had scheduled and paid for the Player's appointments.

On 5/28/21, we sent follow up questions to Mr. Feder asking for explanation about his and Feder Law's relationship with Mr. Grossinger. Mr. Feder responded on 6/8/21 stating, "Doug Grossinger is co-counsel with me for retired NFL Players with whom I am working. Our firms share attorney fees and the payment of expenses."[52] We noted the information and continued processing the firm's claims.

As discussed in Section IV, in March 2022, Counsel for the NFL Parties communicated new concerns to us regarding Feder Law and Mr. Grossinger's relationship. A recent Award Notice for a PD claim of nearly $3.9 million listed the Retired Player (SPID 100008593) as being represented by Feder Law, however, medical records from the Retired Player's 12/13/21 MAF examination with Dr. Gilbert Ho noted it was Mr. Grossinger who had referred him to the doctor as the "Attorney for the player."[53] Further, review of Feder Law and Mr. Grossinger's Monetary Award Claim submissions together appeared to reinforce a suspicious pattern. Since 2021, the two firms had submitted eight PD claims worth a total of over $18 million. The two firms had submitted predominantly PD or Alzheimer's disease claims. Based in part on this suspicious pattern, we conducted the preliminary review of PD and Alzheimer's disease claims submitted by Mr. Grossinger and Feder Law LLC further described in Section IV.

Since March 2022, Feder Law has submitted an additional 17 Monetary Award Claims, all for the QD of PD. As of September 2025, 87.5% of all of Feder Law's claim submissions were for the QD of PD, causing the firm to rank third for in terms of percentage of PD submissions and be a clear outlier from the general population. Like other subject firms, Dr. Daniel Jacobs was Diagnosing Physician for seven of the PD claims. We further observed reliance of Feder Law on several of the same non-Program neurologists (Dr. Stuart Isaacson, Dr. Jeffrey Steinberg, Dr. Louis Pearlstein, Dr. Eric Kramer, and Dr. Mark Lew) for evaluating neurologist PD diagnoses which Mr. Grossinger also used for his own clients of record.

On 11/18/25, we sent a request to Feder Law asking whether Mr. Feder or anyone else at the firm have any arrangement(s) (such as co-counsel, whether written or verbal) and/or other relationship with Mr. Grossinger in connection with the NFL Concussion Settlement. On 11/20/25, Mr. Feder confirmed, stating, "This is to confirm that the co-counsel relationship with Grossinger remains active for multiple cases currently on my portal, consistent with my prior response dated June 8, 2021."

Table 1 summarizes Feder Law's 21 PD claim submissions, including "treating" neurologists, MAF Diagnosing Physicians, and status.

[52] Exhibit G.
[53] Document ID 241595 at 1.

| TABLE 1 | COMPLETE PD CLAIM SUBMISSIONS OF FEDER LAW LLC | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **No.** | **SPID** | **Claim Sub. Date** | **QD** | **Initial PD Diag. Date** | **MAF Exam Date** | **"Treating" Neurologist(s)** | **MAF Physician** | **Status** | **Amount Funded/Asserted** |
| 1. | 100011810 | 2/12/25 | PD | 1/26/23 | 11/20/24 | Dr. Rajesh Pawah | Dr. Larry C. Hollenbeck | Paid | $1,076,589 |
| 2. | 100013620 | 10/4/24 | PD | 7/19/23 | 5/13/24 | Dr. Nirav Pavasia; Dr. Leila Shirin | Dr. Suresh Kumar | Denied | $1,262,372.00[54] |
| 3. | 100010932 | 9/16/24 | PD | 12/12/23 | 7/3/24 | Dr. Carl Billian | Dr. Tamara Greene | In Audit | $2,500,924.80 |
| 4. | 100001722 | 7/26/24 | PD | 2/22/2023 | 10/3/23 | Dr. Louis Pearlstein; Dr. Lee Kubersky; Dr. Richard Bennett | Dr. Roger Behar | In Audit | $2,398,506 |
| 5. | 100000784 | 7/12/24 | PD | 11/1/2022 | 5/28/24 | Dr. Louis Pearlstein | Dr. Louis Pearlstein | Paid | $1,548,191.78 |
| 6. | 100001100 | 6/4/24 | PD | 2/21/2023 | 4/23/24 | Dr. Louis Pearlstein | Dr. Louis Pearlstein | Paid | $146,395 |
| 7. | 100013175 | 1/3/24 | PD | 6/29/22 | 12/18/23 | Dr. Fiona Gupta | Dr. Joseph Lubeck | Paid | $1,405,282 |
| 8. | 100000482 | 11/2/23 | PD | 2/7/23 | 10/26/23 | Dr. Stuart Isaacson | Dr. Daniel Jacobs | Paid | $1,225,652 |
| 9. | 100013007 | 10/27/23 | PD | 8/21/23 | 9/21/23 | Dr. Jeffrey Steinberg | Dr. Daniel Jacobs | Paid | $588,091.68 |
| 10. | 100013651 | 10/17/23 | PD | 10/31/22 | 10/4/23 | Dr. Eric Kramer | Dr. Daniel Jacobs | Paid | $2,047,446.72 |
| 11. | 100002109 | 10/13/23 | PD | 12/7/22 | 10/5/23 | Dr. Eric Kramer | Dr. Daniel Jacobs | Paid | $475,204 |
| 12. | 100002509 | 9/21/23 | PD | 12/27/22 | 9/18/23 | Dr. Stuart Isaacson | Dr. Daniel Jacobs | Paid | $1,359,387.70 |
| 13. | 950005755 | 10/31/22 | PD | 6/16/21 | 10/17/22 | Dr. Stuart Isaacson | Dr. Daniel Jacobs | Paid | $3,173,888 |
| 14. | 100002489 | 10/25/22 | PD | 10/29/21 | 10/6/22 | Dr. Stuart Isaacson | Dr. Daniel Jacobs | Paid | $2,412,156.08 |
| 15. | 100012872 | 10/24/22 | PD | 12/9/21 | 2/9/22 | Dr. Louis Pearlstein | Dr. Louis Pearlstein | Paid | $2,799,823.38 |
| 16. | 100000913 | 4/4/22 | PD | 11/16/21 | 2/21/22 | Dr. Stuart Isaacson; Dr. Carl Billian | Dr. Carl Billian | Paid | $1,203,800.38 |
| 17. | 100008593 | 2/1/22 | PD | 2/18/21 | 12/13/21 | Dr. Mark Lew | Dr. Gilbert Ho | Paid | $3,870,596 |
| 18. | 950000953 | 12/3/21 | PD | 3/20/21 | 11/4/21 | Dr. Ramon M. Sanchez | Dr. Carl Billian | Paid | $2,353,322.10 |
| 19. | 950008716 | 7/16/21 | PD | 10/23/20 | 7/7/21 | Dr. David A Jaeger | Dr. Arien Smith | Paid | $458,321.76 |

[54] Monetary Award Grid amount.

| TABLE 1 | COMPLETE PD CLAIM SUBMISSIONS OF FEDER LAW LLC | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 20. | 100011393 | 7/12/21 | PD | 1/14/21 | 5/14/21 | Dr. Fiona Gupta | Dr. Louis Pearlstein | Paid | $971,020.80 |
| 21. | 100004590 | 2/5/21 | PD | 12/12/20 | 12/29/20 | Dr. Ramon M. Sanchez | Dr. Jack E. Scariano Jr. | Paid | $2,605,463.90 |
| **22.** | **TOTAL** | | | | | | | **21 Claims** | **$35,882,435.08** |

### 2. Pro Athlete Law Firm, P.A.

#### (a) Trends and Attributes of Pro Athlete PD Claim Submissions.

Pro Athlete has submitted a total of 24 PD claims, all within the past four years. The firm submitted its first PD claim on 8/24/21. These claims show a pattern of reliance on certain non-Program neurologists to establish PD diagnoses and records of treatment prior to MAF examination. For example, four claims rely on non-Program evaluation records of Dr. Jeffrey Steinberg, three of Dr. Jeffrey Gelblum, three of Dr. Ramon M. Sanchez, two of Dr. Stuart Isaacson, two of Dr. Eric Kramer, and two of Dr. Johan Samanta. Of particular significance, we noted overlap in the use of these neurologists among other firms subject to this investigation. For instance, Dr. Jeffrey Steinberg also evaluated Players for Mr. Grossinger, ROV,[55] Feder Law, and Syme Law. Likewise, Dr. Sanchez evaluated Players for Feder Law and Dr. Isaacson evaluated Players for Mr. Grossinger, Feder Law, and Syme Law. Our findings regarding Dr. Jeffrey Steinberg are discussed in more detail in Section VI.F.2. Given the number of practicing neurologists in the United States,[56] we do not view the repeated appearance of PD evaluation records from these same non-Program neurologists in recent claims as coincidental. Pro Athlete's PD claims also frequently involve the same MAF Diagnosing Physicians. For example, seven claims relied on Dr. Daniel Jacobs and six on Dr. Tamara Greene.

#### (b) Pro Athlete's Confirmed Connections with Mr. Grossinger.

Information uncovered during our audit confirmed an established connection between Mr. Levine at Pro Athlete and Mr. Grossinger relating to the firm's submission of PD Monetary Award Claims. As documented in Section VI.A, Law Firms A, B, and C each separately relayed information and/or concerns to us regarding an alleged co-counsel partnership between Pro Athlete and Douglas Grossinger involving the submission of PD Claims. These accounts are considered credible given their consistency and corroboration through other evidence.

Both Attorney A and Attorney B separately informed us that Mr. Levine at Pro Athlete is believed to have a co-counsel relationship with Mr. Grossinger. Supportive of this reporting, Attorney A's client, whose account is detailed in Section VI.A.1, was himself a former client of

[55] ROV asserts that some of their clients had and/or went to their own independently selected doctors which included Dr. Jeffrey Steinberg

[56] The American Academy of Neurology reports a count of 14,252 member neurologists in the United States as of 2024. https://www.aan.com/siteassets/home-page/conferences-and-community/member-engagement/learn-about-aan-committees/strategic-planning-committee/25-member-demographics-report.pdf

Pro Athlete and had regular contact with Mr. Grossinger in relation to his PD claim, who he understood to be working with Mr. Levine. The client's non-Program neurologist, Dr. Verma, told him that Dr. Cherian Karunapuzha was hired by Mr. Levine and Mr. Grossinger to travel around the country and consult for them. We issued a subpoena to Dr. Cherian Karunapuzha in September 2025 to learn more about the alleged arrangement. Dr. Cherian Karunapuzha's counsel confirmed to us that Mr. Grossinger had hired his client as a consultant but advised that he had no dealings with Mr. Levine. Regarding allocation of duties between Pro Athlete and Mr. Grossinger, this finding further supports that Mr. Grossinger exercised a significant role in the handling and management of Pro Athlete's PD claims.

Consistent with the foregoing, Attorney C's "whistleblower disclosure" related to his receipt of a representation change notice listing Mr. Levine at Pro Athlete as the new attorney for one of his clients. Attorney's C's client, however, had communicated with Mr. Grossinger on the matter and understood Mr. Grossinger would represent him for his PD claim, despite Pro Athlete being his attorney of record. In substantiation of his account, the client produced communications he had received from Mr. Grossinger including the Request for Change in Representation Status form.

On 10/7/25, we notified Mr. Levine that, subject to Sections 8.6, 10.3, and 10.4 of the NFL Concussion Settlement Agreement, and Rule 7(b) of the Rules Governing the Audit of Claims, that Pro Athlete is the Subject of an Audit Investigation and any pending claims submitted by the firm would remain on hold. Later that month, we learned from another attorney representing SCMs that Mr. Levine had approached him after receiving this notice to discuss potentially having this attorney be successor counsel for his Retired NFL Football Player clients because Mr. Levine was contemplating winding down his practice in the NFL Concussion Settlement and selling this part of his business.

After consideration of the proposal, the attorney took up Mr. Levine on his offer. However, Mr. Levine informed the attorney that it was Mr. Grossinger who was deciding the firm's PD Monetary Award claims because they are in fact Mr. Grossinger's and he is the attorney who handles them. After apparently discussing the plan with Mr. Grossinger, Mr. Levine agreed to have the attorney take on only Pro Athlete's non-PD Monetary Award Claim clients. Mr. Grossinger reportedly directed that Locks Law Firm, a law firm in Philadelphia, be successor counsel for Pro Athlete's PD claims. On 10/29/25, Mr. Levine confirmed this arrangement in an email to the Claims Administrator, stating, "I am waiving the 7 day waiting period for the change in representation request from the 2 law firms of Gene Locks and Amir Shenaq. Thus, you can put all of these Players into the respective portals. There will be about 300 players."

On 11/18/25, we sent a request to Pro Athlete asking whether Mr. Levine or anyone else at the firm have any arrangement(s) (such as co-counsel, whether written or verbal) and/or other relationship with Mr. Grossinger in connection with the NFL Concussion Settlement. On 11/24/25, one day before the deadline to respond, Mr. Levine requested an extension as his attorney was unable to respond until after the holidays. We were unable to accommodate an extension. On the deadline for responding, Mr. Levine further communicated his opinion that he was under no obligation to answer and questioned the Claims Administrator's audit authority.

Mr. Levine did not deny having any arrangement or other relationship with Mr. Grossinger in connection to the Settlement.

Table 2 summarizes Pro Athlete's 24 PD claim submissions, including non-Program neurologists, MAF Diagnosing Physicians, and status.

| TABLE 2 | COMPLETE PD CLAIM SUBMISSIONS OF PRO ATHLETE LAW FIRM, P.A. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **SPID** | **Claim Sub. Date** | **QD** | **Initial PD Diag. Date** | **MAF Exam Date** | **"Treating" Neurologist** | **MAF Physician** | **Status** | **Amount Funded/ Asserted** |
| 1. | 260006224 | 7/29/25 | PD | 10/29/20 | 2/6/25 | Dr. Nnambi Dike | Dr. Aanchal Teneja | In Review | $4,168,208 |
| 2. | 100002632[57] | 7/26/25 | PD | 8/16/24 | 8/16/24 | Dr. Jeffrey Gelblum | Dr. Daniel Jacobs | In Review | $3,350,445 |
| 3. | 100012594 | 7/20/25 | PD | 7/17/24 | 6/23/25 | Dr. Jeffrey Gelblum; Dr. George Scott | Dr. Daniel Jacobs | In Audit | $2,941,564 |
| 4. | 100004713 | 6/11/25 | PD | 5/1/24 | 4/21/25 | Dr. Eric Kramer | Dr. Daniel Jacobs | In Audit | $2,262,742 |
| 5. | 100010271[58] | 6/3/25 | PD | 3/20/21 | 5/29/25 | Dr. Ramon M. Sanchez; Dr. Stuart Isaacson | Dr. Tamara Greene | In Review | $760,281.30 |
| 6. | 100010106 | 6/3/25 | PD | 9/30/24 | 4/30/25 | Dr. Jeffrey Steinberg; Dr. Eric Kramer | Dr. Daniel Jacobs | In Audit | $1,976,922 |
| 7. | 950007919 | 4/7/25 | PD | 9/12/24 | 9/12/24 | Dr. Jeffrey Gelblum | Dr. Daniel Jacobs | In Review | $2,670,035 |
| 8. | 100014129 | 2/13/25 | PD | 8/23/24 | 6/7/24 | Dr. Ramsey A. Falconer | Dr. Roger Behar | Paid | $1,262,372 |
| 9. | 100014849 | 10/18/24 | PD | 3/17/23 | 9/27/24 | Dr. Johan Samanta; Dr. Paarth Shah | Dr. Gilbert Ho | In Audit | $1,976,922 |
| 10. | 260000953 | 8/20/24 | PD | 11/1/23 | 8/19/24 | Dr. Salima Brillman | Dr. Gilbert Ho | Paid | $2,119,832 |
| 11. | 100012725 | 7/13/24 | PD | 8/22/23 | 6/28/24 | Dr. Amy Brown | Dr. Andrew Sas | Paid | $2,500,924.80 |
| 12. | 100004292 | 6/18/24 | PD | 10/10/23 | 5/22/24 | Dr. Stuart Isaacson | Dr. Daniel Jacobs | Paid | $1,019,424 |
| 13. | 100003382 | 6/11/24 | PD | 7/5/22 | 5/15/24 | Dr. Adam J. Schneider | Dr. Roger Behar | Paid | $1,521,991.24 |
| 14. | 100012925 | 3/25/24 | PD | 9/7/22 | 3/5/24 | Dr. Ramon M. Sanchez | Dr. Tamara Greene | Paid | $2,066,269.68 |

[57] Dr. Gelblum's records indicate the Retired Player had already been diagnosed with PD by an unnamed physician, but no additional records are available for review.
[58] Dr. Sanchez's notes state, "[The Retired Player] was seen and evaluated by a well-known Neurologist, who specializes in Movement Disorders/Parkinson Disease Dr. Jacob Isaacson, who told [the Retired Player] he was developing Parkinson's Disease in the early stages. I was not given any Medical Records to review on [the] patient..."

| TABLE 2 | COMPLETE PD CLAIM SUBMISSIONS OF PRO ATHLETE LAW FIRM, P.A. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 15. | 100000291 | 3/6/24 | PD | 12/22/22 | 2/1/24 | Dr. Carl Billian | Dr. Tamara Greene | Paid | $2,737,365 |
| 16. | 100014820 | 1/3/24 | PD | 11/26/22 | 1/2/24 | Dr. Jeffrey Steinberg | Dr. Tamara Greene | In Review | $3,350,445 |
| 17. | 100000701 | 12/27/23 | PD | 7/16/21 | 9/29/23 | Dr. Johan Samanta | Dr. Gilbert Ho | Paid | $2,068,128 |
| 18. | 100007450 | 11/17/23 | PD | 1/13/23 | 11/15/23 | Dr. Jeffrey Steinberg | Dr. Tamara Greene | In Review | $1,667,283.20 |
| 19. | 100003271 | 11/9/23 | PD | 10/27/22 | 10/19/23 | Dr. Jeffrey Steinberg | Dr. Daniel Jacobs | In Review | $2,670,035 |
| 20. | 100015742 | 8/26/23 | PD | 1/18/23 | 7/25/23 | Dr. Ramon M. Sanchez | Dr. Carl Billian | Paid | $3,659,889.60 |
| 21. | 100001935 | 6/22/23 | PD | 8/29/22 | 6/13/23 | Dr. Steven Croft | Dr. Mike Yuan | Paid | $971,209.80 |
| 22. | 900007110 | 12/15/22 | PD | 11/29/22 | 11/29/22 | Dr. Lee[59] | Dr. Mike Yuan | Paid | $176,604.20 |
| 23. | 260000470 | 1/8/22 | PD | 12/22/21 | 12/22/21 | N/A | Dr. Julie Schwartzbard | Paid | $2,479,393 |
| 24. | 100006626 | 8/24/21 | PD | 9/2/20 | 8/3/21 | Dr. Stuart Isaacson | Dr. Tamara Greene | Paid | $3,776,191 |
| **25.** | **TOTAL** | | | | | | | **24 Claims** | **$54,154,477** |

**3. Syme Law, PLLC.**

On 12/6/24, we received an online tip submission alleging attorney Joshua Syme of Syme Law was "working with certain doctors and another attorney paying doctors excessive amounts to get reports written up correctly."[60] The tipster did not share their name or contact information. The firm has submitted a total of six Claims, all of which assert the QD of PD (100%), causing the firm to be a significant outlier and rank first for percentage of PD claim submissions among all firms that have submitted more than one Claim as of September 2025.

Of the six submitted PD claims, data shows Syme Law's heavy reliance on MAF Physician Dr. Aaron Ellenbogen (three Claims), and initial diagnoses rendered by non-Program neurologists at a practice called Neurology Consultants of Southfield (Southfield, MI) which include Dr. Lawrence Eilender (three Claims) and Dr. Anthony Emmer (one Claim). All six Players received their first diagnosis of PD from their evaluating neurologist six to 20 months before presenting for MAF examination. Other MAF Physicians who rendered QDs for the six SCMs include Dr. Daniel Jacobs, Dr. Louis Pearlstein, and Dr. Andrew Sas. These three MAF Physicians also certified PD diagnoses for ROV (Dr. Daniel Jacobs, Dr. Louis Pearlstein, & Dr. Andrew Sas), Pro Athlete (Dr. Daniel Jacobs and Dr. Andrew Sas) Douglas Grossinger (Dr.

[59] Dr. Yuan's notes state, "[The Retired Player] was put on Levodopa in 2021 per Dr. Lee." Records of Dr. Lee are not available for review.

[60] This 12/6/24 tip submission originated from the same IP Address (24.73.114.147) as the 2/12/25 tip submission we received regarding Ms. Reppert and ROV discussed in Section VII, suggestive of authorship by the same party(ies).

Daniel Jacobs and Dr. Pearlstein), and The Legal Collective (Dr. Daniel Jacobs). Table 3 summarizes information about Syme Law's six claim submissions and the trends we observed.

| **TABLE 3** | **COMPLETE CLAIM SUBMISSIONS OF SYME LAW, PLLC** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **No.** | **SPID** | **Claim Sub. Date** | **QD** | **Initial PD Diag. Date** | **MAF Exam Date** | **"Treating" Neurologist** | **MAF Physician** | **Status** | **Amount Funded/ Asserted** |
| 1. | 100001962 | 5/20/24 | PD | 4/25/22 | 12/1/23 | Dr. Lawrence Eilender (Neurology Consultants of Southfield) | Dr. Aaron Ellenbogen | Paid | $1,301,294 |
| 2. | 100007657 | 5/10/24 | PD | 5/16/22 | 1/22/24 | Dr. Lawrence Eilender (Neurology Consultants of Southfield) | Dr. Aaron Ellenbogen | Paid | $1,262,371.55 |
| 3. | 100016009 | 4/16/24 | PD | 7/25/22 | 12/1/23 | Dr. Anthony Emmer (Neurology Consultants of Southfield) | Dr. Aaron Ellenbogen | Paid | $407,816.37 |
| 4. | 100002264 | 12/13/23 | PD | 10/25/22 | 11/17/23 | Dr. Lawrence Eilender (Neurology Consultants of Southfield) | Dr. Andrew Sas | Paid | $1,171,164.60 |
| 5. | 950008031 | 10/19/23 | PD | 4/26/22 | 6/19/23 | Dr. Adam Schneider | Dr. Louis S. Pearlstein | Paid | $3,300,871.97 |
| 6. | 100002546 | 10/26/22 | PD | 4/1/22 | 10/7/22 | Dr. Jeffrey Steinberg | Dr. Daniel H. Jacobs | Paid | $1,609,614.90 |
| **7.** | **TOTAL** | | | | | | | **6 Claims** | **$9,053,133.39** |

Consistent with our observations of Mr. Grossinger's general PD claim submission pattern, Players represented by Syme Law first see a non-Program neurologist who diagnoses them with PD and prescribes PD medication, all usually during their first visit. Thereafter, the Players present for four to 14 follow-up visits with their non-Program neurologists before an MAF examination is scheduled. MAF examinations are most often performed while the Players are under treatment by levodopa, significantly limiting observable signs of PD. The records of non Program provider examination and diagnosis are presented to the MAF Physician and incorporated into the MAF Report to support the QD of PD, again, raising the concern of outsourced clinical judgment.

Payment records Dr. Jeffrey Steinberg produced to us in response to a subpoena in September 2025 (see Section VI.F.2(b)) confirmed Syme Law's connection and coordination with Mr. Grossinger with respect to examinations of Players he conducted. When asked to provide records reflecting all compensation earned by Dr. Jeffrey Steinberg (or his practice) in

connection with consultation or examination of Retired NFL Football Players referred to him by Mr. Grossinger or Pro Athlete, Dr. Jeffrey Steinberg produced in pertinent part an undated check in the amount of $5,000 payable from Syme Law, PLLC's operating account to "Dr. Jeff Steinberg."[61] The check includes an accompanying handwritten note stating, "(Doug Gro – 9-16-24) Zelled[62] Money 9/16/24…" Claim records show Dr. Jeffrey Steinberg diagnosed one Syme Law client, 100002546, with PD on 4/1/22. This SCM provided records of treatment with Dr. Jeffrey Steinberg spanning four visits from April 2022 – September 2022, well before this 9/16/24 payment facilitated through Mr. Grossinger. This is indicative that Syme Law may continue to work with Mr. Grossinger and Dr. Jeffrey Steinberg on claims not yet submitted. The weight of the evidence further suggests that the unnamed attorney alleged to be working with Joshua Syme referenced in the 12/6/24 online tip we received is likely Mr. Grossinger.

In October 2025, we made repeated efforts to contact Syme Law LLC via telephone to discuss the firm's participation in the Concussion Settlement. Mr. Syme returned the investigator's calls on 10/21/25 and scheduled a call to discuss for the following day. Mr. Syme acknowledged having little to no involvement with NFL Concussion Settlement cases. When asked whether he had any co-counsel arrangements for his PD claim submissions, Mr. Syme asserted, without denying the premise, that this is "privileged information," in effect confirming that to be the case. Mr. Syme ended the call prematurely due to outside circumstances.

On 11/18/25, we sent Mr. Syme a written request asking him to confirm if he or anyone else at Syme Law had arrangement(s) (such as co-counsel, whether written or verbal) and/or other relationship with Mr. Grossinger in connection with the NFL Concussion Settlement. On the deadline (11/26/25), Mr. Syme provided a non-informative response, stating in pertinent part, "…I have communicated this request to counsel for Syme Law, and they will get back to me as to what information may be replied back. They are looking into privileges. I will follow up back when I receive guidance from the attorneys." At the time of issuance of this Report, Mr. Syme has provided no further update. Mr. Syme did not deny having any arrangement or other relationship with Mr. Grossinger in connection to the Settlement.

### D. Mr. Grossinger's PD Claim Submissions as Counsel of Record.

Table 4 summarizes all PD claim submissions for which Mr. Grossinger was counsel of record, including "treating" neurologists, MAF Diagnosing Physicians, and status. Consistent with our understanding of the arrangement, this claims information shows repeated reliance on certain evaluating neurologists for initial PD diagnosis outside the Program. For instance, Dr. Johan Samanta treated at least three Retired Players represented by Mr. Grossinger, Dr. Dainel E. Kremens two, and Dr. Steven Gollomp two. The presence of several other evaluating neurologists (Dr. Jeffrey Steinberg, Dr. Stuart Isaacson, Dr. Louis Pearlstein, Dr. Steven Croft, Dr. Mark Lew, and Dr. Eric Kramer) is also conspicuous as we observed that outside PD diagnoses from these same doctors also supported numerous claim submissions of subject firms Feder Law, Pro Athlete, Syme Law, and ROV.

---

[61] Exhibit H.
[62] Circumstances (*i.e.*, recipient, amount, purpose) regarding this apparent peer-to-peer funds transfer remain undetermined.

| TABLE 4 | COMPLETE PD CLAIM SUBMISSIONS OF DOUGLAS GROSSINGER | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **No.** | **SPID** | **Claim Sub. Date** | **QD** | **Initial PD Diag. Date** | **MAF Exam Date** | **"Treating" Neurologist** | **MAF Physician** | **Status** | **Award Amount Funded/ Asserted** |
| 1. | 100006671 | 2/18/25 | PD | 6/28/21 | 8/19/22 | Dr. Johan Samanta; Paarth Shah; Maria Christina Ospina | Dr. George Hishaw | In Review | $1,333,827 |
| 2. | 100008292 | 1/25/25 | PD | 6/28/23 | 11/12/24 | Dr. Jeffrey Steinberg; Dr. Reed Stone | Dr. Daniel Jacobs | In Audit | $1,834,012 |
| 3. | 100011240 | 1/16/25 | PD | 10/24/23 | 8/19/24 | Dr. Stuart Isaacson; Dr. Kelly Mills | Dr. Roger Behar | Paid | $1,133,752 |
| 4. | 100017209 | 8/5/24 | PD | 2/24/23 | 2/24/23 | Dr. Johan Samanta; Dr. Paarth Shah; Dr. Javier Cardenas | Dr. George Hishaw | Paid | $1,264,753.04 |
| 5. | 100002436 | 11/15/23 | PD | 9/1/22 | 8/28/23 | Dr. Louis Pearlstein | Dr. Louis Pearlstein | Paid | $408,484 |
| 6. | 100009709 | 8/10/23 | PD | 9/6/22 | 5/5/23 | Dr. Kelly Ann Ramirez; Dr. Mark Fishel | Dr. Mark Fishel | Paid | $776,967.84 |
| 7. | 100008318 | 7/12/22 | PD | 10/8/21 | 4/28/22 | Dr. Johan Samanta | Dr. Louis Pearlstein | Paid | $1,473,591 |
| 8. | 100005113[63] | 6/30/22 | PD | 12/31/20 | 6/20/22 | Dr. Steven Croft/Dr. Igor Cherches | Dr. Daniel Jacobs | Paid | $1,292,226 |
| 9. | 100017061 | 1/31/22 | PD | 6/1/21 | 12/16/21 | Dr. Mark Lew | Dr. Gilbert Ho | Paid | $3,870,596 |
| 10. | 100013908 | 12/23/21 | PD | 3/8/21 | 12/20/21 | Dr. Eric Kramer; Dr. Daniel E. Kremens | Dr. Daniel Jacobs | Paid | $1,293,885 |
| 11. | 100015134 | 11/1/21 | PD | 12/22/20 | 9/15/21 | Dr. Daniel E. Kremens | Dr. Louis Pearlstein | Paid | $2,731,535 |
| 12. | 100001008 | 3/12/19 | PD | 3/14/17 | 3/14/17 | Dr. Steven Gollomp; Dr. Neal Hermanowicz | Dr. Louis Pearlstein | Paid | $1,470,276 |
| 13. | 100008730 | 3/5/2019 | PD | 10/4/18 | 12/7/18 | Dr. Steven Gollomp | Dr. Louis Pearlstein | Paid | $990,168 |
| **14.** | **TOTAL** | | | | | | | **13 Claims** | **$19,874,073** |

[63] Records on file reference that a Dr. Igor Cherches diagnosed the Retired Player in 2019. No records from Dr. Cherches were available for review in the Claim Package. Physical Therapy notes state, "P[atient] was diagnosed with pre-Parkinson's in 2015, diagnosed officially in 2019." Again, no such records are included in the Claim Package.

### E. Other Relevant Non-Subject Firms.

Our Audit identified two additional law firms (Song Whiddon, PLLC and The Legal Collective) with PD claim submissions or other suspicious attributes common to the subject firms in the arrangement. Accordingly, we consider findings about these firms to be relevant to the Audit. Investigation to date however has found no established connections to Mr. Grossinger or the other subject firms. The investigation has not ruled out the existence of further connections among these firms and Mr. Grossinger's arrangement, but at this time we do not consider them to be Subjects of Investigation. Information about these firms is summarized below.

#### 1. Song Whiddon, PLLC.

Song Whiddon, PLLC ("Song Whiddon") is a Dallas, TX-based full-service law firm. As of November 2025, the firm had submitted a total of 30 Monetary Award Claims, seven of which are for the QD of PD (23.3%). As we observed with Pro Athlete and ROV, all of Song Whiddon's PD claim submissions began in 2021 and have continued into the present. Year to date (since January 2025), Song Whiddon's percentage of PD submissions has increased significantly to around 35.7%. The firm currently represents 147 SCMs as recorded with the Settlement.

In October 2024, Attorney D of Law Firm D contacted us, requesting that we open an audit investigation of Song Whiddon based on concerning circumstances surrounding the change in representation of the firm's past client, SPID 100001739. After learning of this client's recent change in representation to Song Whiddon in October 2024, the firm attempted to contact him to learn more. The Player remarked that he was going to "get a Parkinson's diagnosis." This information was concerning to Attorney D because of his familiarity with the Player's health situation as his attorney in the Settlement. Per Attorney D, the Player had been seeing a personal neurologist "for years," who had never confirmed that the Player had PD. SPID 100001739 reported he had been contacted by Retired NFL Football Player [redacted] (NFL Alumni Chapter President for [redacted]) to "hook him up with the Song law firm in Texas." This reporting about recruitment of clients is consistent with information shared with us by a Qualified MAF Physician during a routine feedback call in September 2025. In sharing concerns about potential doctor shopping, the MAF Physician informed us that there are several prominent Players (unnamed) working as agents or liaisons between attorneys and players, particularly "big" attorneys with many SCMs moving across state lines to undergo MAF examinations.

We interviewed Mr. [redacted] on 7/7/25 to learn more about his apparent recruitment of clients for Song Whiddon. Regarding SPID 100001739, Mr. [redacted] contends that he heard the Player was trying to get in touch with him because of marital issues about a year or two ago, so he contacted him. During their conversation, SPID 100001739 reportedly asked Mr. [redacted] about Song Whiddon. While Mr. [redacted] told him the firm represented many Players who live in the Dallas area, he denied that he ever told the Player that he could get a QD for PD if he signed with that firm.

Our investigative efforts thus far have established no firm connection between Song Whiddon and Mr. Grossinger or the other subject firms. However, we observed numerous incidental connections between Mr. [redacted] and Mr. Oates of ROV: Both either currently serve or recently served as Chapter presidents for the NFL Alumni Association; both are "friends" on Facebook; both played together on the NY Giants in [redacted]; and both are also recently (as of 2024) involved in a venture called Player Networking Event (PNE). Mr. [redacted] received his own PD QD on 2/11/21 while represented by the Tailim Song Law Firm (predecessor firm to Song Whiddon, PLLC) several months before Mr. Oates received his PD QD in August of that year while represented by Mr. Grossinger and Feder Law.

During our 7/7/25 interview, Mr. [redacted] confirmed that he and Mr. Oates were past NFL teammates and continue to occasionally keep in touch with their last contact being one month earlier. On several occasions, Mr. [redacted] has spoken with Mr. Oates' brother, Brad Oates (Brad), who lives in Dallas regarding ideas Brad has to assist players. Mr. [redacted] reported that he does not know Mr. Grossinger and that Mr. Oates never mentioned Mr. Grossinger to him. Mr. Oates, Ms. Reppert, and Mr. Reppert reported to us during our 7/9/25 interview at ROV that they are not familiar with the law firm Song Whiddon.

Of separate concern, on 6/9/25, a newly qualified MAF neurologist[64] located in Dallas, TX communicated concerns to us about a law firm (later determined to be Song Whiddon) that was threatening to sue her because she had uploaded her 5/14/25 MAF Provider Report "without permission" that showed her conclusion that the Player did not have a QD for PD.[65] We observed removal of the MAF Provider Report from the Portal on 6/9/25. On 8/22/25, Song Whiddon uploaded a second MAF Provider Report dated 7/16/25, only 63 days after the first report, this time completed by a different MAF Physician, which now included a QD for PD, suggestive of potential doctor shopping.[66]

Table 5 summarizes information about Song Whiddon's seven PD claim submissions, including "treating" neurologists and MAF Diagnosing Physicians used.

| TABLE 5 | | COMPLETE PD CLAIM SUBMISSIONS OF SONG WHIDDON, PLLC | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **No.** | **SPID** | **Claim Sub. Date** | **QD** | **MAF Exam Date** | **"Treating" Neurologist** | **MAF Physician** | **Status** | **Funded/Asserted** |
| 1. | 100014606 | 11/20/25 | PD | 9/17/25 | Dr. Nnamdi Dike | Dr. Aimee C. Garza | In Review | $2,941,564 |

[64] The same newly qualified MAF neurologist also contacted us earlier in May 2025 to report that an unnamed attorney told her that other MAF Physicians rely solely on records provided from other doctors in making a QD. She stated the attorney advised they would find another MAF Physician when she informed them she could not rely solely on other doctors' records to render a QD.
[65] We determined the Player to be SPID 100002053, who Song Whiddon currently represents. Mr. Grossinger currently represents this SCM's brother, SPID 950014420.
[66] Document ID 404267.

| TABLE 5 | COMPLETE PD CLAIM SUBMISSIONS OF SONG WHIDDON, PLLC | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2. | 100000616 | 11/20/25 | PD | 9/25/25 | Dr. Adam DiDio | Dr. Daniel Jacobs | In Review | $837,214 |
| 3. | 100002053 | 11/20/25 | PD | 7/16/25 | Dr. Avesh Verma | Dr. Aimee C. Garza | In Audit | $3,350,445 |
| 4. | 100001739 | 5/6/25 | PD | 2/4/25 | Dr. Andrew Scott Gorman | Dr. Andrew Scott Gorman | Denied | $1,262,372[67] |
| 5. | 100011262 | 2/26/25 | PD | 10/23/24 | Dr. Jeri Williams | Dr. Michele Tagliati | In Review | $1,076,589 |
| 6. | 100012706 | 8/19/21 | PD | 5/13/21 | Dr. Nirav Pavasia | Dr. Suresh Kumar | Paid | $118,330.10 |
| 7. | 100016573 | 5/5/21 | PD | 2/11/20 | Dr. Nirav Pavasia | Dr. Suresh Kumar | Paid | $966,704.80 |
| **8.** | **TOTAL** | | | | | | **7 Claims** | **$10,553,219** |

**2. <u>The Legal Collective</u>.**

In August 2025, The Legal Collective, an entity new to the NFL Concussion Settlement, filed its first three Monetary Award Claims, all for the QD of PD (100%). Consistent with trends for the subject law firms, all Legal Collective PD claims relied on outside diagnoses rendered by Dr. Jeffrey Steinberg and used MAF Physician Dr. Jacobs as the Diagnosing Physician.[68] Despite these similarities, our investigative efforts to this point have not established any firm connection between The Legal Collective and Mr. Grossinger or the other subject firms.

On 8/28/25, we spoke informally to this entity's principal, Dwight Sean Jones (a/k/a Sean Jones and Dwight Andre Sean O'Neil Jones, hereinafter, Mr. Jones), to learn more about his background and participation in the Settlement Program. Public records show Mr. Jones has a history of financial misconduct and though he references FINRA licensure on The Legal Collective website, he has been barred from acting as an investment advisor or associating with firms that provide investment advice to the public.[69] This stems in part from charges the SEC brought against him in 2007.[70]

[67] Monetary Award Grid amount.
[68] During our 6/9/25 interview of Dr. Jacobs' office manager, Jaime Amaro, she remarked that in addition to ROV, The Legal Collective is another firm sending many Players to see Dr. Jacobs for MAF evaluations.
[69] Dwight A.S.O. Jones, Broker Check, FINRA, *available at* https://brokercheck.finra.org/individual/summary/1830351 (last visited Aug. 15, 2025).
[70] Press Release, Securities and Exchange Commission, SEC Charges Former NFL Player for Violations of Investment Adviser Regulations (Sep. 24, 2007) *available at* https://www.sec.gov/news/press/2007/2007-196.htm.

Mr. Jones confirmed that The Legal Collective is a law firm and advised that he is an attorney and member of the District of Columbia Bar. Mr. Jones later shared with us a photograph of his District of Columba Bar card showing he first became a member on 1/29/24.[71] Mr. Jones explained that he became involved with the Settlement because "too many attorneys have been taking advantage of the players," at one point mentioning, "We're not the David Levines of the world." Mr. Jones later clarified that while he has heard client complaints, he does not know Mr. Levine. Mr. Jones reported that The Legal Collective does not have any partnerships with other law firms. Mr. Jones estimated his firm had about nine additional clients with Monetary Award Claims that he has not submitted yet.

During the call, we noted to Mr. Jones how all of The Legal Collective's claims had relied on diagnoses from the same non-Program doctor (without naming Dr. Jeffrey Steinberg specifically) and asked for context on how he learned about and selected doctors for his clients. Mr. Jones remarked that "it's no different than how the [National Football] [L]eague finds doctors... the League has a habit of sending Players to doctors who they know are going to deny claims…It's just by chance. It's no different than how the League [chooses doctors]." In making these remarks, Mr. Jones' strongly implied that he selects doctors who he understands will provide a favorable diagnosis for his clients, suggestive that Dr. Jeffrey Steinberg may be known to readily provide PD diagnoses.

Table 6 summarizes information about The Legal Collective's three total claim submissions to date (all of which are for the QD of PD), including "treating" neurologists and MAF Diagnosing Physicians used.

| **TABLE 6** | | **COMPLETE CLAIM SUBMISSIONS OF THE LEGAL COLLECTIVE** | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **No.** | **SPID** | **Claim Sub. Date** | **QD** | **MAF Exam Date** | **"Treating" Neurologist** | **MAF Physician** | **Status** | **Funded/ Asserted** |
| 1. | 100000355 | 8/19/25 | PD | 7/21/25 | Dr. Jeffrey Steinberg / Dr. Eric Kramer | Dr. Daniel Jacobs | Denied | $1,976,922 |
| 2. | 100007965 | 8/22/25 | PD | 2/27/25 | Dr. Jeffrey Steinberg | Dr. Daniel Jacobs | In Review | $2,119,832 |

[71] District of Columbia Bar ID 90002322. We observed that Mr. Jones listed his brother, attorney Rhoan C. Jones's, Centreville, VA residence as his address of record in the Bar's membership directory. Per public records, Mr. Jones resides in Texas. Mr. Jones later confirmed he uses a suite at his brother's Virginia residence as office space.

| TABLE 6 | COMPLETE CLAIM SUBMISSIONS OF THE LEGAL COLLECTIVE | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 3. | 100010446 | 8/21/25 | PD | 3/13/25 | Dr. Jeffrey Steinberg / Dr. Eric Kramer | Dr. Daniel Jacobs | In Audit | $1,976,922 |
| **4.** | **TOTAL** | | | | | | **3 Claims** | **$6,073,676** |

### F. Physicians Involved with The Arrangement.

#### 1. Dr. Daniel H. Jacobs.

Dr. Daniel H. Jacobs (Dr. Jacobs) is a neurologist and a now former MAF Qualified Physician in Orlando, FL. Dr. Jacobs was a Qualified MAF Physician since 4/25/18; he did not participate in the BAP Program. In reviewing claims data, we observed that Dr. Jacobs stands apart from other peer MAF Physicians in terms of his certification of a high number of PD QDs. Dr. Jacobs ranks first among all MAF Physicians for percentage of PD QDs certified, with his PD claims accounting for 16.4% of all claims submitted. Of the 95 total claims in which Dr. Jacobs was Diagnosing Physician during his participation in the Settlement as of October 2025, 49 (51.58%) were for the QD of PD. Of the 93 total PD claims submitted by the subject firms of Mr. Grossinger, Pro Athlete, Feder Law, Syme Law, and ROV as of October 2025, Dr. Jacobs was Diagnosing Physician for 26 (27.9%). Table 7 shows all Claims submitted based on diagnoses from Dr. Jacobs and their current status:

| TABLE 7 | | PD PATTERN CLAIMS BASED ON DIAGNOSES FROM DR. JACOBS | | |
|---|---|---|---|---|
| **No.** | **SPID** | **Representation** | **Status** | **Amount Funded/ Asserted** |
| 1. | 100000482 | Feder Law LLC | Paid | $1,225,652 |
| 2. | 100002109 | Feder Law LLC | Paid | $475,204 |
| 3. | 100002388 | Reppert Oates & Vytell, LLC | Paid | $2,353,483.44 |
| 4. | 100002489 | Feder Law LLC | Paid | $2,412,156.08 |
| 5. | 100002509 | Feder Law LLC | Paid | $1,359,387.70 |
| 6. | 100002546 | Syme Law, PLLC | Paid | $1,609,614.90 |
| 7. | 100002632 | Pro Athlete Law Firm, P.A. | In Review | $3,350,445 |
| 8. | 100003271 | Pro Athlete Law Firm, P.A. | In Review | $2,670,035 |
| 9. | 100004292 | Pro Athlete Law Firm, P.A. | Paid | $1,019,424 |
| 10. | 100004455 | Reppert Oates & Vytell, LLC | In Audit | $1,190,917 |
| 11. | 100004713 | Pro Athlete Law Firm, P.A. | In Audit | $2,262,742 |
| 12. | 100005113 | Douglas Grossinger, Attorney at Law | Paid | $1,292,226 |
| 13. | 100006341 | Reppert Oates & Vytell, LLC | In Audit | $633,567 |
| 14. | 100006793 | Reppert Oates & Vytell, LLC | In Audit | $1,190,917 |

| TABLE 7 | | PD PATTERN CLAIMS BASED ON DIAGNOSES FROM DR. JACOBS | | |
|---|---|---|---|---|
| 15. | 100008292 | Douglas Grossinger, Attorney at Law | In Audit | $1,834,012 |
| 16. | 100010106 | Pro Athlete Law Firm, P.A. | In Audit | $1,976,922 |
| 17. | 100010740 | Reppert Oates & Vytell, LLC | Paid | $756,425.09 |
| 18. | 100012594 | Pro Athlete Law Firm, P.A. | In Audit | $2,941,564 |
| 19. | 100013007 | Feder Law LLC | Paid | $588,091.68 |
| 20. | 100013651 | Feder Law LLC | Paid | $2,047,446.72 |
| 21. | 100013908 | Douglas Grossinger, Attorney at Law | Paid | $1,293,885 |
| 22. | 100015756 | Reppert Oates & Vytell, LLC | Audit | $1,333,827 |
| 23. | 950005755 | Feder Law LLC | Paid | $3,173,888 |
| 24. | 950006652 | Reppert Oates & Vytell, LLC | In Audit | $837,214 |
| 25. | 950007919 | Pro Athlete Law Firm, P.A. | In Review | $2,670,035 |
| 26. | 950014765 | Reppert Oates & Vytell, LLC | In Audit | $1,834,012 |
| **27.** | **TOTAL** | | **26 Claims** | **$44,333,094** |

Table 8 shows a breakdown of Dr. Jacobs' involvement as Diagnosing Physician for PD claim submissions by the subject firms.

| TABLE 8 | SUBJECT FIRM PD SUBMISSIONS AND DR. JACOBS | | |
|---|---|---|---|
| **No.** | **Attorney/Firm** | **Number of PD Claims in which Dr. Jacobs is Diagnosing Physician** | **Percentage of Firm's Total PD Submissions** |
| 1. | Douglas Grossinger, Attorney at Law | 3 | 23% |
| 2. | Feder Law LLC | 7 | 33% |
| 3. | Pro Athlete Law Firm, P.A. | 7 | 29% |
| 4. | Reppert Oates & Vytell, LLC | 8 | 28% |
| 5. | Syme Law, PLLC | 1 | 17% |

Through his tenure as an MAF Physician, Dr. Jacobs' performance has been called into question several times. His reports and findings frequently required clarifications, resulting in 267 follow up communications with him by the Claims Administrator about diagnoses and documentation for claims relying on his diagnoses over time, placing him within the top 5 Physicians for follow ups in the Program. Likewise, after observing incomplete reasoning and documentation in Dr. Jacobs reports, the Special Masters noted in a 9/27/25 Decision that, "The

Claims Administrator should consider asking Dr. Jacobs whether he can conform his reports to the Program's rules going forward and, if not, whether to part ways."[72]

On 6/3/25, we interviewed Dr. Jacobs in person at his office in Orlando, FL and his practice administrator, Jaime Amaro (Ms. Amaro), via telephone, to better understand his diagnostic process, particularly concerning PD, and to address the perceived increase in Parkinson's diagnoses among Players he has evaluated.[73] In the interview we gathered the following details.

Dr. Jacobs considers himself a behavioral neurologist, focusing on the cognitive aspects of neurological diseases. He is not a movement disorders specialist. Since becoming a MAF physician, Dr. Jacobs believes he has examined 40-45 former NFL Players and estimated providing a QD to about 80% of them. When interviewed separately on 6/9/25, Ms. Amaro reported that, since she has been involved with the Settlement in August 2023, she believes that every Player Dr. Jacobs has seen received a QD and that he evaluates around 25-50 former Players per year. Dr. Jacobs acknowledged that more recently he has seen an increase in Players coming in who already have a prior PD diagnosis. Those Players typically have medical records they send to Ms. Amaro in advance, but Dr. Jacobs reviews those records for the first time when present with the player.

Of the approximately 15-18 Players that Dr. Jacobs has diagnosed with PD, all but two or three had already received that diagnosis prior to coming in to be evaluated. Dr. Jacobs reported that he confirmed the pre-existing diagnoses for those SCMs, signing and submitting to the Claims Administrator MAF Diagnosing Physician Certification forms. This is consistent with backdated dates of QD we observed on a number of these forms. This explanation also offers insight into Dr. Jacobs' diagnostic decisions and raises concern over possible improper deference to non-Program physicians.

Per Dr. Jacobs, when a Player comes to see him with a prior diagnosis of PD, he confirms the diagnosis through his own examination, looking for key symptoms like bradykinesia, cogwheel rigidity, and resting tremor. He also considers the Player's response to carbidopa/levodopa. Concerningly, though, Dr. Jacobs reported that while he is aware of the Gelb criteria, he does not routinely use them calling them a "late 90's thing" that he was not trained on. Instead, when diagnosing Parkinson's, Dr. Jacobs reported he relies on his "books" and looks for several of the cardinal Parkinson's criteria and also considers sleep dysfunction, such as REM Sleep Behavior Disorder, as supporting evidence. He denied feeling pressured by any law firms, or any Players to provide specific diagnoses and maintained that his findings are based on his own clinical judgment.

Dr. Jacobs also stated he has never been asked to change the wording in any of his reports nor been given guidance about how to write them. Dr. Jacobs was never offered, nor has he received anything of value other than his standard exam fee for conducting his evaluations. Likewise, no lawyer or Player has ever asked Ms. Amaro to change or modify language in a

[72] Special Master's Decision on Appeal of Settlement Class Member Regarding Denial of Monetary Award Claim (September 27, 2025).

[73] Exhibits I and J.

report nor have they ever asked to speak with Dr. Jacobs about his reports. Ms. Amaro has never been offered anything of value by any former Player or law firm personnel.

Given various concerns (some of which are addressed in this Audit Report), on 11/6/25 we issued notice of Dr. Jacobs' termination from participation as a Qualified MAF Physician, effective 12/8/25.

**2. Non-Program Neurologist Dr. Jeffrey Steinberg.**

Dr. Jeffrey Steinberg (Dr. Steinberg) is a neurologist associated with First Choice Neurology in Plantation, FL. He is not and has never been a Qualified MAF Physician or a BAP Provider. Despite representations on his website, he is not board-certified by the American Board of Psychiatry and Neurology ("ABPN").[74] Public records show Dr. Steinberg has a past bankruptcy and federal tax liens as well as civil judgments in which he is listed as a debtor. Consequently, Dr. Steinberg would be ineligible for consideration to serve as a Qualified MAF Physician. He is also not known to be a movement disorders specialist.[75] Yet, this outside doctor is associated with eight PD claims submitted by subject firms and attorneys which include Douglas Grossinger, Feder Law, Pro Athlete, ROV,[76] Syme Law, PLLC, Song Whiddon, and a firm new to the Program called "The Legal Collective" discussed further in Section VI.E.2. Dr. Steinberg's repeated appearances in the PD claim submissions of subject firms are summarized in Table 10 in Section VI.F.3. As noted in Section VI.A.2, a client of Law Firm B also reported being approached by an unnamed third party who promised him a PD diagnosis in exchange for a share of his award if he went to see Dr. Steinberg.

As of August 2025, law firms representing SCMs had submitted outside records of diagnoses rendered by Dr. Steinberg for at least 12 Monetary Award Claims to support PD Qualifying Diagnoses. On average, Players travelled over 500 miles to see Dr. Steinberg.[77] MAF Physicians, mostly Dr. Jacobs, appear to defer to Dr. Steinberg's prior diagnoses and in six cases, the MAF Physician even backdated the date of their diagnosis to Dr. Steinberg's initial examination date, raising concern for outsourced clinical judgment. Also of note, seven of the 12 Players diagnosed by Dr. Steinberg later received their QD from the same MAF Physician, Dr. Jacobs.

[74] Dr. Steinberg's Neurology certification expired on 12/31/19.

[75] Jeffrey Steinberg, MD, *Business Directory*, FIRST CHOICE NEUROLOGY, https://www.fcneurology.net/business-directory/816/jeffrey-steinberg-md/ (last visited Aug. 12, 2025) (listing Dr. Steinberg's specialties as Alzheimer's Disease, Pain Management, Sleep Disorders, Headaches/Migraines, and Electromyography); Headache and Pain Center of South Florida, *Meet the Doctor*, DRJEFFREYSTEINBERG.COM, https://drjeffsteinberg.com/meet-the-doctor/ (last visited 10/31/24) (stating Dr. Steinberg "has extensive expertise in the medical-legal arena, from forensic work to auto and work-related injuries.").

[76] ROV asserts that some of their clients had and/or went to their own independently selected doctors which included Dr. Steinberg and ROV did not research whether he was Board Certified.

[77] Using Players' addresses in the Portal to calculate distances, we observed they traveled an average of approximately 511 miles for their examinations with Dr. Steinberg. Several Players traveled over 400 miles, and another traveled over 1,400 miles. We note, however, that Dr. Steinberg's reports list alternate addresses for several players, which indicate shorter distances.

At the time of their examination, Florida law firm, Podhurst Orseck PA, represented three Players diagnosed by Dr. Steinberg, and two of those Players are now represented by Pro Athlete. We observed connections between these two firms. Justin Levine, who along with his father, David Levine, is a Managing Partner of Pro Athlete Disability Claims, noted in a social media profile that he previously worked for Podhurst Orseck from 2015-2017. We are also aware of a co-counsel relationship between David Levine and Podhurst Orseck in at least one unrelated claim.[78] When asked how they had learned of Dr. Steinberg, several Retired Players informed us that they heard about him through other players.

The weight of the evidence suggests Retired Players who Dr. Steinberg diagnosed with PD did not consistently continue their treatment or other medical care with him after receiving a QD in the Settlement. We observed that when the Players submitted their claims, they did not provide any medical records from Dr. Steinberg that post-dated their MAF examinations where they received QDs. Because it was presented to us that Dr. Steinberg was a treating doctor, we asked for records to show the Retired Players' continuing medical care. It was not until we asked several Players for additional medical records from Dr. Steinberg that we first received any reports that post-dated their MAF examinations. We observed that many such records documented appointments conducted via telehealth. In at least one instance, a Retired Player did not see Dr. Steinberg for any follow-up appointments until a date after we had questioned him.[79] These findings, together with the other unusual circumstances uncovered, are suggestive that Players had either not continued ongoing PD treatment with Dr. Steinberg or only continued follow-up care minimally or inconsistently until asked about the situation during audit.

**(a) Preliminary Review by AAP Member.**

In August 2025, we shared 12 claims[80] with PD diagnoses supported by records from Dr. Steinberg with a member of the AAP and asked for his preliminary assessment and whether the records presented any concerns or "red flags." The AAP member outlined numerous criticisms of Dr. Steinberg, even though he noted that the individual reports did not rise to a level he would consider to be a "red flag." These criticisms include: (1) Dr. Steinberg's overly brief evaluations and documentation as well as many instances of what would be considered substandard medical record keeping such as the use of copy and paste documentation and overuse of templates; (2) There are many instances where Dr. Steinberg did not perform an adequate neurological exam to make the diagnosis of PD, particularly with regard to bradykinesia; and (3) An unusual and concerning aspect of Dr. Steinberg's evaluations and initial diagnoses of PD is that all are done

[78] SPID 100003567.
[79] On 8/15/24 we asked SPID 100014820, represented by Pro Athlete, for any additional records of follow-up care with his evaluating neurologist Dr. Steinberg after his 1/3/24 MAF examination and QD. The Retired Player reported he had to cancel a planned appointment with Dr. Steinberg in 2024. The Retired Player later produced records of an appointment he had with Dr. Steinberg on 10/28/24, which occurred over ten months after his MAF examination and over two months after we requested records of his follow-up care, suggestive that he had not continued PD treatment or follow up care with Dr. Steinberg until after receiving our inquiry.
[80] The AAP member reviewed PD claims submitted by 100013007, 100002546, 100003271, 100007450, 100014820, 100008292, 100012387, 100007965, 100010446, 100014000, 100010106, and 100001961. These SCMs are represented by Douglas Grossinger, Feder Law LLC, Pro Athlete Law Firm, PA, Reppert Oates & Vytell LLC, Syme Law, PLLC, The Legal Collective, and JR Wyatt Law.

without review of prior medical records even with histories of years of symptoms. Dr. Steinberg's uniform practice of prescribing carbidopa/levodopa to all patients with possible PD after just an initial visit (or even a telephone visit with no examination) is also outside usual medical practice. Notably, Dr. Steinberg's PD diagnoses are not based on Gelb criteria, however, as a non-Program physician he is not obligated to do so.

Of special interest, in the case of SPID100007965, represented by The Legal Collective, Dr. Steinberg conducted an initial telephone call visit with the player, and in spite of no examination and an assessment that gave only a non-specific diagnosis of tremor and gait abnormalities, placed the Player on both carbidopa/levodopa and clonazepam. The AAP member noted that this practice by Dr. Steinberg has little medical justification in this case and is well outside usual clinical practice. Dr. Steinberg later diagnosed this Player with PD after conducting a follow-up telemedicine visit, again having never fully examined him.

In another observation, the AAP member noted the apparent evolution in Dr. Steinberg's documentation over time, potentially suggestive of feedback or coaching from counsel that led to his current uniform style of documentation. For example, the AAP member found the level of documentation for SCM 100014000 (represented by ROV[81]) to be of better quality than all of the later-diagnosed claims. Documentation from this Player's initial evaluation in 2022 by Dr. Steinberg significantly predates documentation from the other Players' later claims. It is distinct with more detailed and different verbiage and, notably, is the only case where tremor is not a presenting symptom. This is the only claim that includes historical information that might undermine a diagnosis of PD. Dr. Steinberg's assessment in this case also reflects a degree of uncertainty of diagnosis and treatment more commonly seen in medical documentation but not seen in his reports for the other later claims. Evidence both supporting the diagnosis as well as alternative diagnoses are considered. This observation and the available information are suggestive that counsel may have potentially expressed dissatisfaction with documentation such as this that undercut or expressed uncertainty regarding the claimed PD diagnosis, leading to the later uniformly supportive documentation characteristic of Dr. Steinberg's more recent diagnoses, though definitive conclusions cannot be drawn.

Review of these cases also showed the frequent involvement of another non-Program neurologist, Dr. Eric Kramer, currently practicing in Atlantis, FL.[82] Dr. Kramer's frequent participation in the claims together with Dr. Steinberg is unexplained, but with the large number of neurologists in the southern Florida area, the AAP member noted it is unlikely that his repeated involvement is coincidental. We observed records or references to Dr. Kramer's treatment on claims submitted by Mr. Grossinger, Feder Law, Pro Athlete, and ROV.[83]

The AAP member assessed that while there was no evidence of undue influence of MAF Physicians, it appears Dr. Jacobs may have been overly deferential to Dr. Steinberg and on one occasion even referred to his own MAF evaluation as confirmatory of Dr. Steinberg's assessment

[81] ROV asserts that some of their clients had and/or went to their own independently selected doctors which included Dr. Steinberg.
[82] See Section IV.F.3 for additional discussion of Dr. Kramer.
[83] SPIDs 100013908, 100002109, 100013651, 100004713, 100010106, and 100010740.

of a Player represented by The Legal Collective.[84] We also observed evidence of Dr. Jacobs' deference to Dr. Steinberg in this claim and another for the same firm. On the two Diagnosing Physician Certification Forms Dr. Jacobs signed certifying QDs of PD for these Players' respective claims, Dr. Jacobs backdated the diagnoses and added notations beside his selection of PD as the QD, stating "by Dr. Steinberg" and "per records [of Dr. Steinberg]."[85]

Regarding the regular long-distance travel for examinations, the AAP member expressed that it would be difficult to justify any patient travelling a long distance to see Dr. Steinberg on the basis of his purported expertise in PD other than possible easy and quick accessibility compared to a bona fide movement disorder specialist that may be closer to a Retired Player's home. Likewise, extensive travel to be evaluated by Dr. Jacobs, who may be overly deferential to Dr. Steinberg's assessments, would also need to be clearly justified.

**(b) Outreach to Dr. Steinberg.**

In August 2025, we attempted to arrange an interview with Dr. Steinberg to learn more about his examination of Retired Players in the NFL Concussion Settlement. Dr. Steinberg retained counsel and declined the request at the counsel's advice. In September 2025, we issued a subpoena to Dr. Steinberg to obtain more information about any interactions he had with Mr. Grossinger and David Levine (or any other attorneys or staff at Pro Athlete) related to consultation or examination of Retired NFL Football Players, including records reflecting any compensation earned in connection to such consultation or examinations. Dr. Steinberg timely responded on 9/24/25.[86] Dr. Steinberg (through his counsel) largely objected to our requests on the basis that he is unable to produce Protected Health Information without assurance of compliance with the applicable regulations governing disclosure of such information.

Notwithstanding his objections, Dr. Steinberg included in his production to us copies of 14 checks[87] from Mr. Grossinger and one check from Syme Law LLC[88] together totaling $50,000, dated from 3/9/23 to 2/18/25. The checks range in amount from $1,500 to $7,500. We noted that of the 24 total claims Mr. Grossinger has submitted as attorney of record, Dr. Steinberg appears as an evaluating neurologist for only one player. Information on the 14 check payments issued by Mr. Grossinger does not reveal the names of the respective Players treated by Dr. Steinberg or their attorneys of record with the Settlement. This evidence of Dr. Steinberg's frequent compensation from Mr. Grossinger (far in excess of his own client's recorded usage of his services), however, is indicative that Mr. Grossinger is paying him for examinations of Players represented by other attorneys or firms, supportive of the allegations regarding his arrangements.

Also included in Dr. Steinberg's production (responsive as a document he received from a third party relating to Douglas R. Grossinger, David Levine, Justin Levine, and/or Pro Athlete

[84] SPID 100010446.
[85] Document IDs 381080 at 3 and 384074 at 3.
[86] Exhibit K.
[87] Exhibit L.
[88] Exhibit H.

Law Firm[89]) was an invitation to an "Eagles/NFL Players Private Dinner" held on 2/7/25 at Landry's Seafood House in New Orleans, LA. The document does not show the sender but lists the names of 38 invited retired NFL Players as "attending NFL players." We noted that this dinner occurred on the Friday before Super Bowl LIX, also held in New Orleans that Sunday. Most, if not all, invitees (Dr. Steinberg included) would have had to travel from out of state to the dinner. It remains undetermined whether Dr. Steinberg accepted this invitation and whether Mr. Grossinger and/or associated parties ever extended such invitations to other non-Program providers treating his clients. Figure 8 shows a copy of the 2/7/25 invitation as produced (with partially cropped text[90]) by Dr. Steinberg:




*Figure 8*

We confirmed that this event did in fact take place through our observation of a social media post published by one of the "attending NFL players."[91] The 2/8/25 post includes a photograph of the Player with other event attendees standing in what appears to be the interior of Landry's Seafood House restaurant. The accompanying caption reads, "Off The Field Wife Fashion Show was a hit and dinner at Landry's was good." The post lists the location as New Orleans, LA.

---

[89] We asked Dr. Steinberg to produce any documents he or any person associated with his medical practice received from a third party relating to Douglas R. Grossinger, David Levine, Justin Levine, and/or Pro Athlete Law Firm. Dr. Steinberg produced this invitation document as responsive to our request.

[90] The partially cropped text appears to read, "EAGLES/NFL PLAYERS PRIVATE DINNER."

[91] Michael Bankston (bigbank90), INSTAGRAM (Feb. 8, 2025), https://www.instagram.com/bigbank90/p/DFzNutIMhFf/.

Of the 38 retired NFL Players listed as attending the dinner, 16 had received a QD of PD in the Concussion Settlement and 12 of those 16 Players had received a Monetary Award for their QD. The total amount awarded as of November 2025 for these 12 PD claims is $8,204,935.72. The four PD claims submitted but not yet paid assert an additional $9,088,282.00 in award funds. The majority of remaining Player invitees have not yet submitted a Claim. This stark apportionment is unexpected since PD represents only around 7% of overall Claim Submissions in the Settlement[92] and is therefore unlikely to be the result of accidental coincidence. Also suspect, representation of these dinner invitees includes Mr. Grossinger, Feder Law, Pro Athlete, Syme Law, and Song Whiddon all of which have relied on Dr. Steinberg for outside PD diagnosis of their clients and proffered his treatment records to bolster PD Monetary Award Claims.

Mr. Grossinger's and/or Pro Athlete's apparent gift-in-kind invitation to Dr. Steinberg to attend this pre-Super Bowl dinner with the group of 38 retired NFL Players (six of whom are Hall of Famers) raises serious ethical concerns because of their direct financial interest in his medical assessment and treatment of their clients in the Concussion Settlement. In this context, the invitation can reasonably be viewed as an attempt to sway Dr. Steinberg's professional judgment and/or create a sense of obligation to the firm(s).

It was for the reason of potential to compromise the doctor's professional judgement that the Program doctors are prohibited from accepting anything of value from lawyers. Rule 13(a) of the Rules Governing Qualified MAF Physicians states that a Qualified MAF Physician specifically cannot "Accept from a Settlement Class Member or his or her lawyer, law firm or any other person or entity any payment (except for the provision of services rendered), gifts, trips, dinners, entertainment, or anything else of value that could be perceived as a conflict of interest."

Similarly, program doctors are cautioned from being "influenced in his or her methodology for performing MAF examinations or rendering diagnoses" and as a result are permitted to communicate with the MAFs only "with regard to administrative items such as scheduling or medical record requests."[93]

As a result, this activity is consistent with the commentary shared by Attorney A (documented in Section VI.A.1), who opined that while Mr. Grossinger has many relationships with doctors he uses for treatment outside the Settlement, his relationships with them seemed to him to be "too clubby."

Table 9 summarizes the "attending NFL players" listed on the invitation to the 2/7/25 Super Bowl dinner, including their representation, asserted QDs, claim status, and payment amounts.

---

[92] PD claims represented around 7% of overall submissions from January 2020 through September 2025.
[93] *See* Rules 13(b) and (c) of the Rules Governing Qualified MAF Physicians.

| TABLE 9 | | 2/7/25 SUPER BOWL DINNER "ATTENDING NFL PLAYERS" | | | |
|---|---|---|---|---|---|
| **No.** | **SPID** | **Representation** | **Claim Status** | **QD** | **Award Amount Funded/Asserted** |
| 1. | 100010740 | *Pro Se* (ROV at time of claim submission) | Paid | PD | $756,425.09 |
| 2. | 100002436 | Douglas Grossinger | Paid | PD | $408,484.00 |
| 3. | 950001081 | Langfitt PLLC (formerly, Gene Locks) | Paid | PD | $2,403,031.50 |
| 4. | 100015134 | Douglas Grossinger | Paid | PD | $2,731,535.00 |
| 5. | 100008318 | Douglas Grossinger | Paid | PD | $1,473,591.00 |
| 6. | 100012437 | Gene Locks | Paid | PD | $968,930.10 |
| 7. | 100001722 | Feder Law LLC | Claim in Audit | PD | $2,398,506.00 |
| 8. | 100002053 | Song Whiddon, PLLC | Claim in Review | PD | $3,350,445.00 |
| 9. | 100002509 | Feder Law LLC | Paid | PD | $1,359,387.70 |
| 10. | 100004713 | Pro Athlete Law Firm, P.A. | Claim in Audit | PD | $2,262,742.00 |
| 11. | 100003264 | Corboy & Demetrio | Claim in Review | PD | $1,076,589.00 |
| 12. | 100014129 | Pro Athlete Law Firm, P.A. | Paid | PD | $1,262,372.00 |
| 13. | 100000701 | Pro Athlete Law Firm, P.A. | Paid | PD | $2,068,128.00 |
| 14. | 100013007 | Feder Law LLC | Paid | PD | $588,091.68 |
| 15. | 100016009 | Syme Law, PLLC | Paid | PD | $407,816.37 |
| 16. | 950010444 | JR Wyatt Law | Paid | PD | $1,301,294.00 |
| 17. | 100012634 | *Pro Se* | Paid (Claim submitted 12/11/20) | Level 1.5 | N/A |
| 18. | 100006864 | Douglas Grossinger | Paid | Alzheimer's Disease | N/A |
| 19. | 100015501 | Feder Law LLC | Registered/No Claim | N/A | N/A |
| 20. | 100005169 | Gene Locks | Registered/No Claim | N/A | N/A |
| 21. | 100010641 | Feder Law LLC | Registered/No Claim | N/A | N/A |
| 22. | 100002898 | Berkowitz and Hanna LLC | Registered/No Claim | N/A | N/A |
| 23. | 900008566 | *Pro Se* | Registered/No Claim | N/A | N/A |
| 24. | 100013411 | Feder Law LLC | Registered/No Claim | N/A | N/A |
| 25. | 100003729 | Pro Athlete Law Firm, P.A. | Registered/No Claim | N/A | N/A |
| 26. | 100012604 | Berkowitz and Hanna LLC | Registered/No Claim | N/A | N/A |
| 27. | 100016988 | X1Law, PA (formerly, Podhurst & Orseck) | Registered/No Claim | N/A | N/A |
| 28. | 950008515 | Corboy & Demetrio | Registered/No Claim | N/A | N/A |
| 29. | 100012779 | *Pro Se* | Registered/No Claim | N/A | N/A |

| TABLE 9 | | | 2/7/25 SUPER BOWL DINNER "ATTENDING NFL PLAYERS" | | |
|---|---|---|---|---|---|
| 30. | 100006542 | The Lorentz Law Firm, P.A. | Claim Closed After Special Master / Court Decision on Audit Findings | N/A | N/A |
| 31. | 100007428 | *Pro Se* (formerly, Caroline Davis) | Registered/No Claim | N/A | N/A |
| 32. | 100002629 | X1Law, PA | Claim Closed After Special Master / Court Decision on Audit Findings | N/A | N/A |
| 33. | 100015941 | *Pro Se* (formerly, The Rabaa Law Firm, PLLC) | Registered/No Claim | N/A | N/A |
| 34. | 100001716 | JR Wyatt Law (formerly, Podhurst and Orseck PA) | Registered/No Claim | N/A | N/A |
| 35. | 100005197 | Shenaq PC | Registered/No Claim | N/A | N/A |
| 36. | 100004089 | Sacco & Fillas LLP | Registered/No Claim | N/A | N/A |
| 37. | 100008032 | Locks Law Firm | Registered/No Claim | N/A | N/A |
| 38. | N/A | N/A | Not Registered | N/A | N/A |

### 3. <u>Other Repeat "Treating" Neurologists</u>.

In addition to Dr. Steinberg, we noted the repeated usage of PD diagnosis and treatment records from a number of other non-Program neurologists. Subject firms proffered records from these doctors to support their PD claim submissions.

Table 10 summarizes the subject firms' repeated usage of diagnosis and treatment records from the same non-Program neurologists on PD claims submitted over the life of the Program. This table lists only the neurologists whose records we observed on five or more claims combined submitted by the subject firms. Notably, the doctors are located in different geographic areas, seemingly to serve significant Player populations:

| TABLE 10 | | PD CLAIMS SUBMITTED BY SUBJECT FIRMS | | | | | |
|---|---|---|---|---|---|---|---|
| **No.** | **"Treating" Neurologist** | **Douglas Grossinger** | **Feder Law** | **Pro Athlete** | **ROV** | **Syme Law** | **Total** |
| 1. | Dr. Stuart Isaacson (Boca Raton, FL) | 1 | 5 | 3 | 0 | 1 | 10 |
| 2. | Dr. Jeffrey Steinberg | 1 | 1 | 4 | 1 | 1 | 8 |

*This Report reflects information available to the Claims Administrator as of December 1, 2025.*

| TABLE 10 | | PD CLAIMS SUBMITTED BY SUBJECT FIRMS | | | | | |
|---|---|---|---|---|---|---|---|
| No. | "Treating" Neurologist | Douglas Grossinger | Feder Law | Pro Athlete | ROV | Syme Law | Total |
| | (Plantation, FL) | | | | | | |
| 3. | Dr. Louis Pearlstein (Bensalem, PA) | 1 | 4 | 0 | 1 | 0 | 6 |
| 4. | Dr. Eric Kramer (Atlantis, FL) | 1 | 2 | 2 | 1 | 0 | 6 |
| 5. | Dr. Johan Samanta (Phoenix, AZ) | 3 | 0 | 2 | 1 | 0 | 6 |
| 6. | Dr. Ramon M. Sanchez (Atlanta, GA) | 0 | 2 | 3 | 0 | 0 | 5 |

Below are additional details about these doctors (Dr. Steinberg was discussed in Section VI.F.2 of the Report):

**(1) Dr. Stuart Isaacson, M.D.:** Dr. Isaacson is a board-certified neurologist and movement disorders specialist in Boca Raton, FL. Dr. Isaacson is Director of the Parkinson's Disease and Movement Disorders Center of Boca Raton, a nationally recognized center for PD evaluation, care, and clinical research. He is also the Medical Director of the Parkinson's Research and Education Foundation. Dr. Isaacson provides pharmaceutical and legal consulting through his Florida entity, SHI Consulting LLC.[94] During a routine feedback call in September 2025, an MAF Physician communicated concerns to us regarding non-Program PD diagnoses and potential doctor shopping, reporting that there was an attorney who had hired "Isaac Stuart" to diagnose and complete full Unified Parkinson's Disease Rating Scale ("UPDRS") ratings of clients before their MAF examinations with these records around the timeframe of 2019 or 2020, but according to the MAF Physician, "none of them had PD" based on his assessment and observations. The MAF Physician had noted that in his experience, certain attorneys send Retired Players to him for MAF examination and when he informs them the patient does not have PD, the attorneys simply send their clients to a different MAF Physician looking elsewhere for the desired QD. Based on Dr. Isaacson's public notoriety as a PD expert, our observation of his outside records on file for 10 PD claims (complete with UPDRS ratings) submitted by the subject firms consistent with the MAF Physician's description, and our determination that there is no board-certified or other neurologist named "Dr. Isaac Stuart" who we were able to identify, we assess that the MAF Physician appears to have misstated the non-Program doctor's name and interpret his concerns to in fact pertain to Dr. Isaacson.

[94] Stuart Isaacson, MD, LINKEDIN, https://www.linkedin.com/in/stuart-isaacson-md-b373b67/ (last visited October 31, 2025).

**(2) Louis Pearlstein, D.O.:** Dr. Pearlstein is a board-certified neurologist in Bensalem, PA associated with Neurologic and Headache Associates, P.C. While Dr. Pearlstein served as an evaluating neurologist for six PD claim submissions, he has also been MAF Approved since 5/22/17.

PD QDs predominate Dr. Pearlstein's activity as an MAF Physician. As of November 2025, Dr. Pearlstein has certified QDs for 21 Retired Players through his tenure. Payment was issued for 18 of those claims. The remaining were either denied or withdrawn. 12 of the 21 (57.1%) claims were for the QD of PD and six (28.6%) for the QD of Alzheimer's disease. Of special interest, we noted that to date, the only firms that have submitted Monetary Award Claims which relied on Dr. Pearlstein as Diagnosing Physician are Douglas Grossinger, Feder Law, Pro Athlete, Syme Law, ROV, and Zimmerman Reed, five of which are subjects of this investigation.

Rule 13(k) of the Rules Governing Qualified MAF Physicians prohibits an MAF Physician from "Conduct[ing] an MAF Examination or render[ing] any diagnosis on a Retired NFL Football Player represented by a lawyer or law firm for whom or for which the Qualified MAF Physician provides services as a consulting or testifying expert witness." Given the covert relationships in the arrangement we discuss in this Report, the Claims Administrator is still in the process of determining whether Dr. Pearlstein's conduct violated this aspect of the Rules, and we will take appropriate measures regarding Dr. Pearlstein's status after such inquiry is concluded.

**(3) Dr. Eric Kramer, M.D.:** Dr. Kramer is a board-certified neurologist in Atlantis, FL associated with a practice called Medical Specialists of the Palm Beaches, Inc. Dr. Kramer is originally from Philadelphia and previously practiced out of the Camden, NJ area. As noted in Section VI.F.2(a), Dr. Kramer is frequently, and for unexplained reasons, associated with claim submissions supported by Dr. Steinberg's PD diagnoses. Any connection or relationship between the two Florida neurologists remains undetermined.

**(4) Dr. Johan Samanta, M.D.:** Dr. Samanta was a board-certified neurologist and movement disorders specialist in Phoenix, AZ associated with a practice called Movement Disorder Specialists. Dr. Samanta died unexpectedly on 9/17/23. Three claims supported by Dr. Samata's PD diagnoses show subsequent treatment records from Gilbert, AZ board-certified neurologist and movement disorders specialist, Dr. Paarth Shah, M.D.

**(5) Dr. Ramon M. Sanchez, M.D.:** Dr. Sanchez is a board-certified neurologist in Atlanta, GA associated with a practice called Peachtree Neurology Associates, P.C. Dr. Sanchez specializes in headaches and pain management.

**G. <u>Findings</u>.**

Under Section 10.3(b) of the Settlement Agreement the Claims Administrator is tasked in pertinent part with implementing procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the MAF. In furtherance of that obligation, pursuant to Section 10.4, the Claims Administrator must also establish system-wide processes to detect and prevent fraud, including data analytics to spot "red flags" of fraud, which include, without

limitation, alteration of documents, questionable signatures, duplicative documents submitted on claims, the number of claims supported by the same physician, data metrics indicating patterns of fraudulent submissions, and such other attributes of claim submissions that create a reasonable suspicion of fraud.

On their face, especially when relationships and connections are obscured as they were in this set up, these diagnoses appear appropriate: multiple apparently reputable evaluating neurologists seemingly make diagnoses of PD and prescribe treatment; Qualified MAF Physicians evaluate the Players and provide Qualifying Diagnoses, relying in part on these evaluating neurologists' diagnoses, observations, and other records of treatment.; These Players are represented by different, seemingly unconnected law firms.

It is only when the layers are peeled back, and the true picture of the process emerges that these diagnoses lose any semblance of proper clinical value and violate a number of Program's rules and anti-fraud safeguards:

Attorneys solicit Retired Players (both unrepresented and represented), in effect assuring or promising a PD QD. Notably, numerous involved Retired Players are first diagnosed with PD while under the representation of the subject firms.

Firms are confirmed to hire and use "screening" medical professionals as consultants to informally diagnose PD and refer the SCMs to evaluating neurologists for formal treatment in numerous cases. At least some of these screening evaluations and diagnoses occur in hotel rooms, not a "standard treatment or diagnosis setting."[95]

Attorneys are confirmed in numerous instances to pay not only for their clients' first PD diagnosis but for their continuing treatment as well. Under such arrangements, the evaluating "treating" neurologists are, in effect, lawyer-hired consultants and/or experts. As such, the treating doctors are compensated by lawyers who have no prohibitions in dictating the doctor's methodologies, reports and findings. These doctors are subject to incentive-caused bias based on the likelihood of further referrals and compensation from the law firms. Consistent with this concern, we observed many repeated instances of these same doctors diagnosing PD to the subject firms' clients, the cumulative effect of which cannot be viewed as coincidental.

Then, when Qualified MAF Physicians evaluate these Players, they are influenced by the weight of this information supporting the diagnosis. This is especially true because MAF examinations are most often performed while the Players are under treatment by levodopa, the effect of which significantly limits observable signs of PD and necessitates reliance on the other doctor's records and observations. At least one MAF Physician attained an 80-100% diagnosis rate; it also appears firms routinely "shopped" for and chose the MAF Physicians who made PD QDs.

---

[95] Section 10.3(d) of the Settlement Agreement mandates audit of any Claim Packages that reflect a Qualifying Diagnoses made through a medical examination conducted in a location other than a standard treatment or diagnosis setting (e.g., hotel rooms).

The totality of the records, including the records from evaluating doctors, also have a great effect on AAP members who review the file to approve the Qualifying Diagnoses. For example:

1) In the case of SPID 100000784, the AAP reviewer noted "although the severity of all abnormalities is mild, their degree of consistency over multiple examinations supports their validity;"

2) In the case of SPID 100001722, the AAP reviewer stated "although the exam findings in general are very modest, they are consistent between examiners and that the initial exam by Dr Pearlstein remains the only examination prior to treatment with levodopa. The minimal findings on later examinations and by later providers are consistent with known capacity of suppression of Parkinson's disease signs by this treatment;"

3) In the case of SPID 100002264, the AAP reviewer concluded "unfortunately, the MAF exam occurred after treatment where the Player had only minimal symptoms. In spite of this situation, the mild symptomatology reported by two different neurologists is quite similar, supporting the diagnosis of PD where a response to levodopa also is a component of this diagnosis by Gelb criteria."

And finally, because a single firm or attorney submitting a significant number of highly similar payable PD Monetary Award Claims sharing common suspicious attributes (e.g., reliance on the same non-Program doctors, use of the same diagnosing physicians, consistent symptom reporting, reported subjective improvement from medication treatment) would trigger enhanced scrutiny and review by the Claims Administrator, it follows that spreading similar PD claim submissions among multiple, apparently unrelated, law firms and attorneys would serve to obscure suspicious trends or patterns and inhibit fraud detection and monitoring. Mr. Grossinger's arrangements are designed to circumvent the Settlement Agreement's anti-fraud safeguards. Further, the covert "off the books" nature of this design suggests Mr. Grossinger's knowledge of its impropriety and/or the appearance of its impropriety.

Such an arrangement designed to obtain diagnoses disguised as clinical diagnoses from treating doctors and obscured relationships by the firms involved in the process evade provisions for fraud detection and prevention seriously undermines the substantive foundation of the Settlement Agreement given its uncapped compensation fund. Recognizing the vital importance of such anti-fraud provisions, the Court has emphasized that, "[s]afeguarding the integrity of this claims process is crucial to implementing the Settlement honorably."[96] The process designed and implemented by the subjects of the investigation stripped away these safeguards, compromising integrity of the claims process. It is a direct attack on the Settlement's honor.

The writers of this Report cannot but also observe that at the heart of it, the process exploits the Players, who are diagnosed with a life altering disease and are prescribed treatment in a substandard setting by medical professionals that are paid by and influenced by lawyers.

[96] *In re NFL Players' Concussion Inj. Litig.*, Order at 2 (Dec. 18, 2020), https://www.nflconcussionsettlement.com/Docs/npi_court_decision.pdf.

## VII. 2024 AND 2025 ONLINE TIPS RECEIVED REGARDING ROV FIRM.

Beginning in August 2024 and continuing through February 2025, we received five anonymous tip submissions regarding ROV. The five tips used similar language and originated from three IP addresses, suggestive of authorship by the same party or parties. The tips used language specific to the Concussion Settlement and in one case even referenced non-public information regarding our ongoing audits of ROV's claims, indicative of the author's possible insider knowledge about the firm's activities. We regarded the tips as credible due to the source's demonstrated familiarity, specificity, and coherence. These tips are outlined below in Table 11.

| **TABLE 11** | | **ONLINE TIPS RECEIVED** | |
|---|---|---|---|
| **No.** | **Date** | **IP Address** | **Tip Submitted Through Website** |
| **1.** | 8/10/24, 8:04 PM | 24.73.114.149 | "This is in reference to attorney Lisa Reppert who is with Reppert, Kelly and Vytell Law firm. I feel like Lisa Reppert must be looked into and investigated. For the past year she has been developing relationships with certain doctors and paying them substantially to get them to write up reports the way she wants them to be written out." |
| **2.** | 8/22/24, 7:25 PM | 24.73.114.149 | "I am reporting on attorney Lisa Reppert. It is being said that she is paying her Doctors top dollar to get claims submitted a certain way. This has happened over the past year with her most recent claims that have been submitted." |
| **3.** | 9/8/24, 2:01 PM | 24.73.114.149 | "I am reporting on attorney Lisa Reppert. It is being said that she is paying her Doctors top dollar to get claims submitted a certain way. This has happened over the past year with her most recent claims that have been submitted." |
| **4.** | 10/11/24, 2:09 PM | 107.77.215.215 | "Thai [*sic*] letter is to report not only Fraud but misrepresentation of one of your Attorneys Lisa Reppert. She is paying off MAF doctors and Neuro doctors to get the [*sic*] their reports written out exactly how she is wanting them too. She along with her firm is doing this" |
| **5.** | 2/12/25, 4:12 PM | 24.73.114.147 | "I feel like it is necessary to let you know that Lisa Reppert and the law firm that are working on the concussion case are going about things not legally. With the recent clients under audit should again be looked into more thoroughly. She found a way around the system to get guys approved with doctors that are past the 150 mile radius." |

During the same timeframe, we observed that as of early February 2025 (when we received the most recent tip) all 17 (100%)[97] claims submitted by ROV since the firm submitted its first claim in 2021 had been for the QD of PD. As of June 2025, the percentage of overall PD Claims submitted by ROV ranked second[98] among all firms that have submitted more than one Claim in the NFL Concussion Settlement, making it a clear outlier.

We noted a consistent pattern of activity and other attributes in the firm's submissions which further raised suspicion. The pattern shows similarity to Mr. Grossinger's methods of establishing payable PD diagnoses. In numerous instances, ROV's clients first undergo a "consultation" with a screening medical professional paid for by the firm. The Players are then referred to another non-Program neurologist and immediately receive a formal PD diagnosis and begin treatment with PD medication before scheduling their MAF exam. The firm submits these outside records to the MAF neurologist. Players present to Program physicians with mild or modest observable symptoms, reportedly on account of their ongoing treatment. Accordingly, MAF doctors rely on outside treatment records to support the QD, in effect outsourcing clinical judgment. The firm often relies on the same outside neurologists for treatment with Players traveling or using telemedicine for appointments. We noted inconsistencies however in which medical records the firm selects to include with its Claim Packages.[99] Data also showed the firm's PD Qualifying Diagnoses are often repeatedly supported by the same Qualified MAF Physicians. For example, seven recent SCMs traveling from around the country had each relied on MAF Physician Dr. Daniel Jacobs in Orlando, FL as Diagnosing Physician for their PD claims.

Of special interest, we noted a salient connection between Mr. Grossinger's PD claim submission arrangement and ROV's entrance into the Settlement Program in or around 2021. ROV attorney and Retired NFL Football Player Bart Oates had received his own Monetary Award for a PD QD in August 2021 while represented by attorney of record Fred Feder (Mr. Feder) at Feder Law LLC, co-counsel to Mr. Grossinger. ROV's participation and representation of SCM's in the Settlement began during this same timeframe in 2021.

## VIII. <u>AUDIT OF ROV CLAIMS</u>.

From 11/8/24 to 12/2/25, we placed the following 18 ROV claims in Audit based on the above tips we had received and our own internal fraud prevention and monitoring. As of the issuance of this report, Audits of these claims remain active, and processing is suspended. Subsequent action will be determined based on direction of the Special Master in this matter. Table 12 summarizes information about the audited PD claims, including the Diagnosing Physicians and "treating" neurologists used.

[97] Number reflects SCMs listing RKV as representation at the time of Claim submission.
[98] The first ranking being for Syme Law, PLLC, another firm mentioned in one of the tips we received in December 2024 and discussed further in Section VI.C.3.
[99] *E.g.*, As discussed in further detail in Section VIII.G, in auditing the PD claim of SPID 950006652, we observed ROV's omission of neurological treatment records that undermined a diagnosis of PD.

| TABLE 12 | | ROV CLAIMS IN AUDIT | | | | | |
|---|---|---|---|---|---|---|---|
| **No.** | **SPID** | **Notice of Audit** | **Date of PD or AD QD** | **MAF Physician** | **"Treating" Neurologist** | **QD Type** | **Award Asserted** |
| 1. | 100015756 | 11/8/2024 | 6/10/2024 | Dr. Daniel Jacobs | Dr. Angela Traylor | PD | $1,333,827 |
| 2. | 100004455 | 11/12/2024 | 4/12/2024 | Dr. Daniel Jacobs | Dr. Steven Croft | PD | $1,190,917 |
| 3. | 950014765 | 11/21/2024 | 7/15/2024 | Dr. Daniel Jacobs | Dr. Pierre V. Pavot | PD | $1,834,012 |
| 4. | 950006652 | 11/21/2024 | 6/20/2024 | Dr. Daniel Jacobs | Dr. Ashwin Malhotra | PD | $837,214 |
| 5. | 100006341 | 11/21/2024 | 4/8/2024 | Dr. Daniel Jacobs | Dr. Alan Shepard | PD | $633,567 |
| 6. | 100016911 | 3/4/2025 | 12/11/2024 | Dr. Michael Scott Jaffee | Dr. Lauren Faye Fanty | PD | $1,262,372 |
| 7. | 100010899[100] | 7/9/2025 | 8/11/2020 | Dr. Ashwin Malhotra | Dr. David C. Weisman | Alzheimer's disease | $1,274,281.00 |
| 8. | 100001072 | 8/5/2025 | 5/4/2023 | Dr. Michael Scott Jaffee | Dr. Jay Lombard | PD | $837,214 |
| 9. | 100002633 | 10/3/2025 | 9/9/2023 | Dr. Michael Scott Jaffee | Dr. Shital Shah | PD | $1,127,797.80 |
| 10. | 100004734 | 10/3/2025 | 5/30/2024 | Dr. Ashwin Malhotra | Dr. Jonathan Fellus | PD | $1,076,589 |
| 11. | 100008104 | 10/3/2025 | 10/13/2023 | Dr. Ashwin Malhotra | Dr. Ashwin Malhotra | PD | $1,100,407.20 |

[100] SPID 100010899's Alzheimer's disease claim is one of only two non-PD claims submitted by ROV. A Request for Change in Representation Status form dated 6/16/22 and uploaded on 4/11/23 (Document ID 280452) lists the Players' prior attorney as Douglas Grossinger and RKV as the new firm. At odds with this first submission, a second form dated 4/12/23 uploaded the next day lists no prior representation (Document ID 281000). Non-Program neurologist Dr. David Weisman first diagnosed SPID 100010899 with Alzheimer's disease on 8/11/20, likely when Mr. Grossinger represented him. Several other Alzheimer's Claims submitted by Mr. Grossinger also rely on diagnoses rendered by Dr. Weisman.

| TABLE 12 | | ROV CLAIMS IN AUDIT | | | | | |
|---|---|---|---|---|---|---|---|
| **No.** | **SPID** | **Notice of Audit** | **Date of PD or AD QD** | **MAF Physician** | **"Treating" Neurologist** | **QD Type** | **Award Asserted** |
| 12. | 100008923 | 10/3/2025 | 9/26/2024 | Dr. Ashwin Malhotra | Dr. Ashwin Malhotra | PD | $1,190,917 |
| 13. | 100010746 | 10/3/2025 | 9/12/2023 | Dr. Ashwin Malhotra | Dr. Ashwin Malhotra | PD | $2,670,035 |
| 14. | 100014943 | 10/3/2025 | 10/19/2024 | Dr. Ashwin Malhotra | Dr. Pierre Pavot | PD | $1,476,737 |
| 15. | 100004215 | 11/4/2025 | 6/27/2025 | Dr. Roger Behar | Dr. Jonathan Fellus | PD | $1,076,589 |
| 16. | 100006793 | 11/17/25 | 4/28/25 | Dr. Daniel Jacobs | Dr. Arif Dalvi | PD | $1,190,917.00 |
| 17. | 100014000 | 11/17/25 | 3/3/22 | N/A[101] | Dr. Jeffrey Steinberg | PD | $1,976,922.00 |
| 18. | 100003617 | 12/2/25 | 8/13/25 | Dr. Tamara Greene | Dr. Tamara Greene | PD | $2,398,506.00 |
| **19.** | **TOTAL** | | | | | **18 Claims** | **$24,488,821** |

### A. **General Investigative Steps Taken**.

In auditing each of these Claims, we: (1) requested that the Players complete and provide us a Health Care Provider History Form listing their providers for the past five years; (2) requested and obtained outside medical records from providers listed on the Players' forms as appropriate; and (3) requested each Player's pharmacy history for the past five years.

[101] The Player died unexpectedly on 6/22/22, three months after starting treatment with Dr. Steinberg. The Player was in the process of scheduling MAF examination with Dr. Julie Schwartzbard at the time of his death, but never underwent MAF examination. Although ROV submitted the claim more than two years after the date of the QD, we used our discretion to accept substantial hardship. On 6/12/25, the Parties approved an exception to the Diagnosing Physician Certification requirement and the requirement that a Post-Effective Date diagnosis be made by a Qualified MAF Physician.

We also sent Players (through their counsel) audit questions as warranted to: (1) gather information about the timelines of their PD symptoms; (2) ask whether they were ever promised a diagnosis; (3) whether they underwent an initial screening; (4) how they learned of their treating neurologist; (5) whether anyone coached them; (6) whether they have continued taking PD mediations as prescribed; (7) whether they sought PD treatment with any other providers; and (8) how they learned of their MAF Physician. We sent follow-up questions as warranted. In pertinent part, the audited Players denied that anyone had promised them diagnoses, coached them or provided instructions on how to respond to questions during examination. The audited Players reported that they had continued to take PD medications as prescribed and follow-up care as advised.

Based on his frequent role as Diagnosing Physician for ROV's PD claims, on 9/4/24 and 9/27/24, we sent outreach to Dr. Jacobs requesting that he provide us any communications he had with Ms. Reppert, or any other attorneys or staff at ROV, relating to Player evaluations. The resulting production included little substantive information. As discussed in Section VI.F.1, on 6/3/25, we interviewed Dr. Jacobs at his office in Orlando, FL and his practice administrator, Jaime Amaro (Ms. Amaro), via telephone. Information obtained is incorporated into our findings for this Report.

In April 2025, we identified and interviewed past clients of ROV who Settlement records now show as *pro se* regarding their past experiences with the firm. We interviewed SPID 100010740 (Player 1) and his spouse on 4/3/25 and SPID 100008902 (Player 2) on 4/11/25. Information obtained is incorporated into our findings for this Report.

On 7/9/25 we conducted an interview of ROV partners, Mr. Oates, Ms. Reppert, and Mr. Reppert, at ROV's office in Basking Ridge, NJ to learn more about their firm's participation in the NFL Concussion Settlement and to address issues identified during the ongoing audits. ROV consented to audio recording of the interview and created their own recording as well. Topics included but were not limited to: (1) How Mr. Oates came to be involved with ROV; (2) trends in diagnoses in the firm's claim submissions; (3) doctors and clinical examinations conducted outside the Program; (4) the firm's selection of MAF Physicians and 150-mile rule exception requests; (5) specific Monetary Award Claims including those of SPIDs 100016911, 950006652, and 100015756; and (6) ROV's interactions with Mr. Grossinger and/or other law firms representing SCMs. Information obtained is incorporated into our findings for this Report.

During the three-and-a-half hour interview, the ROV partners in pertinent part denied ever promising a Player a diagnosis; denied ever questioning a diagnosis that a doctor has given; denied ever giving doctors specific instructions; denied ever drafting any report or addendum for a doctor; denied ever suggesting or implying that a doctor should change their report in any way; and denied ever offering any kind of payment, gift, or other incentive outside of or different than a doctor's usual payment arrangements.

On 7/31/25, we sent ROV 12 follow-up questions addressing information the firm had provided during this 7/9/25 interview. In response, on 8/12/25 we received a letter from Mr. Oates wherein he issued a 7-day deadline demanding that we: (1) "withdraw the follow-up questions"; and (2) "confirm that the Audit Claims will be released from Audit and processed in the due course pursuant to the Settlement Agreement." Mr. Oates advised that if we did not yield

to these demands, ROV intended to seek "judicial relief without further notice including, without limitation, an application to the Special Master and other legal remedies including: (i) a request to quash the improper Follow Up Questions; (ii) a request to remove the claims from audit, and (iii) a stay pending a determination on the foregoing." Given the tone and urgency expressed, we forwarded the letter to the Special Masters. On 8/13/25, the Special Masters responded to Mr. Oates' letter offering him a provisional reaction that the questions and audit process did not exceed the scope of the Claims Administrator's authority pursuant to the Settlement Agreement and the enabling Audit Rules. Additionally, the Special Masters proposed a briefing schedule allowing Mr. Oates to submit a formal brief explaining why the referenced Audits should be curtailed, if he wished to do so.

On 8/20/25, Mr. Oates submitted to the Special Masters a cover letter and ROV's responses to the follow-up questions in the form of a 12-page document listing 10 general objections and further repetitive objections for his answers to each individual question.[102] In general, the substantive portions of Mr. Oates' answers were not informative. We found ROV's assertions that it is unable to provide basic information about its clients (e.g., how many clients the firm referred for treatment) and the Claims the firm submitted to lack credibility. ROV's assertions that maintaining relevant claim and treatment records would be impossible are likewise not credible. It is unclear from ROV's response what, if any, due diligence the firm conducted in furnishing us requested information, such as requested correspondence and timelines of communication with Mr. Grossinger.

On 9/12/25, pursuant to Sections 8.6, 10.3, and 10.4 of the NFL Concussion Settlement, and Rule 7(b) of the Rule Governing the Audit of Claims, we served Notice to ROV that the firm was the subject of an Audit Investigation. We also encouraged the firm to revisit its 8/20/25 submission to our follow-up questions and to submit a responsive, informative, and complete reply. On 9/26/25, we received supplemental responses from ROV in the form of a revised 15-page document with amended versions of the firm's earlier answers submitted on 8/20/25.[103] These responses largely mirrored the firm's previously submitted responses and objections. Additions included biographical information about evaluating neurologists and further details about the firm's early interactions with Mr. Grossinger. We incorporated new information, to the extent provided, into our findings.

In November 2025, we shared the PD Claim Packages and available medical records for five of the first ROV claims placed into audit with a member of the AAP and asked for his input on the medical aspects of the claims. The AAP member concluded that the circumstances surrounding the submissions were suspicious of misconduct and that he would recommend approval of only one of the claims reviewed based on the faults he observed in the respective records. His assessment and recommendation are incorporated and discussed further in Section VII.C.

---

[102] Exhibit M; To the extent that ROV contends the follow-up questions are untruthful or inaccurate regarding their statements during the 7/9/25 interview, we are able to corroborate as needed. However, this information is readily available in the recording of the 7/9/25 interview. As previously noted, ROV created and possesses their own recording of the 7/9/25 interview.
[103] Exhibit N.

**B. <u>RKV and/or ROV Involvement with Mr. Grossinger</u>.**

In or around the timeframe of 2020 to 2022, RKV explored a potential working relationship between their firm and attorney Douglas Grossinger in representing SCMs in the NFL Concussion Settlement. We first learned of this proposed arrangement from Mr. Oates during the 7/9/25 interview with the firm. ROV maintains that although they had conversations with Mr. Grossinger, no agreement was ever reached due to their reservations about him and "philosophical differences." ROV provided relevant information on this topic incrementally and only after sustained inquiry, hindering our timely investigation. The below summary is pieced together and based on the information provided by Mr. Oates and the other ROV partners during the 7/9/25 interview, the firm's initial responses and supplemental responses to our follow-up questions, as well as claim documentation on file.

Mr. Oates informed us that an individual "through NFL Alumni" whose name he could not recall first introduced him to Mr. Grossinger.[104] At that time, Mr. Oates was working in his leadership role with the NFL Alumni Association and had not yet formally joined RKV. Mr. Grossinger represented to Mr. Oates that he was doing a lot of work in the Concussion Settlement and Mr. Oates understood him to be working as a solo practitioner. Mr. Oates told Mr. Grossinger he knew two attorneys in private practice, Mr. and Ms. Reppert, who could help him.

During the same period, Mr. Grossinger represented Mr. Oates as his attorney in submitting a Monetary Award Claim for the QD of PD in the Concussion Settlement. The date Mr. Oates first retained Mr. Grossinger as his attorney is undetermined. However, he received his initial PD diagnosis on 1/14/21.[105] He notified us of his representation by another firm, Feder Law LLC (Mr. Grossinger's co-counsel) on 4/1/21.[106] We did not learn of Mr. Grossinger's concurrent representation of Mr. Oates until receiving his first responses to our follow-up questions in August 2025.[107] Mr. Oates conspicuously omitted sharing this information about his relationship during the extensive discussion of Mr. Grossinger at our 7/9/25 interview with the firm.

Mr. Oates introduced Mr. Grossinger to Mr. Reppert at RKV in late 2020 for consideration of a co-counsel relationship.[108] Discussions between Mr. Grossinger and RKV reportedly did not take place until later in 2021 after Mr. Oates had submitted his own PD claim with Mr. Grossinger and Feder Law, however.[109] ROV contends it did not keep records of specific dates of the conversations that took place. Per Mr. Reppert, Mr. Grossinger did not share any of his past audit issues with RKV during their discussions.

---

[104] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).
[105] Document ID 236835 at 1.
[106] Document ID 234450.
[107] Exhibit M at 10.
[108] Exhibit N at 11.
[109] *Id.*

ROV asserts that it viewed the firm's proposed arrangement with Mr. Grossinger as more of a partnership. The ROV partners did not perceive the proposed arrangement as a way for Mr. Grossinger to "hide" behind their firm as they wanted it to be in writing and fully disclosed to clients.[110] Ms. Reppert and Mr. Reppert recalled that Mr. Grossinger did not want the arrangement memorialized, and this area of disagreement was one "philosophical difference" they had with him.[111] According to Mr. Oates, in the earlier part of 2022 ROV concluded that the proposed co-counsel arrangement with Mr. Grossinger would not move forward.[112] Mr. Oates' recounted during our 7/9/25 interview:

> We weren't comfortable with it…as the conversation and Vince [Reppert] and Lisa [Reppert] started to weigh in – and mostly Vince [Reppert] because he and Vince [Reppert] were having most of the conversations, you know Vince [Reppert] was not comfortable at all. It didn't go forward. It kind of died. Doug [Grossinger] wanted to continue, to do something, but Vince [Reppert] just–[113]

As noted, Mr. Oates, Ms. Reppert, and Mr. Reppert cited "philosophical differences" as the reason their firm decided not to carry out any arrangement and to end communications with Mr. Grossinger. When asked through repeated requests to elaborate and explain these differences that had affected their decision, ROV's disclosure of information was protracted and fragmented, with certain information withheld initially only to be disclosed later. ROV told us there were differences with respect to communications with Players (i.e., how often to provide status updates and to timely respond to all players) and that ROV had its own respective policies and procedures, which apparently did not align with Mr. Grossinger's unspecified practices.[114] ROV stated that with Mr. Grossinger's "limited communications" there was not the same level of transparency they expected. In addition, ROV states it discovered that a number of Players "who had interactions [with Mr. Grossinger] often did not feel respected or felt they were talked down to and/or were not heard and/or treated unprofessionally."[115] In their response, ROV also affirmed, without further context, that it "strive[s] to represent all Former Players equally regardless of their age," apparently implying that Mr. Grossinger may not do so.[116]

While ROV maintains that their interactions with Mr. Grossinger were limited to briefly meeting him and exploratory conversations, certain information uncovered suggests the relationship may have progressed further. ROV contends that Mr. Grossinger referred no claims to their firm and that they elected not to represent any Players represented by Mr. Grossinger,

---

[110] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).
[111] *Id.*
[112] Exhibit N at 15.
[113] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).
[114] Exhibit M at 8.
[115] Exhibit N at 11.
[116] *Id.*

with the exception of SPID 100010899, a longtime friend of Mr. Reppert who felt more comfortable with ROV.[117] However, in discussing apparent discrepancies[118] on claim documentation for ROV's former client, SPID 100008902, Ms. Reppert explained there had been cases ROV "might work with Doug [Grossinger] on, and that was probably one of them."[119] Further, ROV informed us for the first time in their 9/26/25 supplemental responses that the firm "may have been on joint calls with Players [and Mr. Grossinger] in 2021, but did not maintain any records."[120] We are unable to verify the accuracy of this information and timeline as ROV did not make clear what, if any, due diligence the firm performed to provide their response.

ROV asserts it is not aware of any co-counsel partnership, fee sharing or other arrangement between Mr. Grossinger and any other law firms or attorneys aside from Feder Law LLC. While Mr. Oates confirmed his earlier representation by Mr. Grossinger, he reported that he is not privy to the fee sharing arrangement terms between Mr. Grossinger and Feder Law LLC.

In ROV's 9/26/25 supplemental responses to our follow-up audit questions, Mr. Oates asserted that "[n]o agreement was ever reached verbal, or written, with Mr. Grossinger and ROV had no fee sharing arrangement with Mr. Grossinger and ended all communications with Mr. Grossinger," and that, "[t]here was never any fee sharing between Mr. Grossinger and this law firm."[121] As of September 2025, ROV maintains that the firm has not communicated with Mr. Grossinger "for approximately three plus years."[122] Again, we are unable to verify this information because the firm made no indication what, if any, due diligence it performed to ascertain these dates.

A timeline of ROV's interaction and involvement with Mr. Grossinger is summarized in Table 13.

| **TABLE 13** | **TIMELINE OF INVOLVEMENT** | |
|---|---|---|
| **No.** | **Date** | **Event** |
| 1. | Late 2020 | Mr. Oates introduces Mr. Grossinger to Mr. Reppert. |
| 2. | January 14, 2021 | Mr. Oates receives his initial PD diagnosis outside of the Program. |

[117] *Id.* at 12.
[118] As discussed in further detail in Section VII.E, we observed that a signed NFL Concussion Settlement Change in Representation Status Form dated 8/10/21 listing RKV as the Player's new attorney had been uploaded to his file in 2021, in contradiction with this Player's understanding that he had never been represented by RKV.
[119] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).
[120] Exhibit N at 12.
[121] *Id.* at 15.
[122] *Id.* at 12.

| TABLE 13 | TIMELINE OF INVOLVEMENT | |
|---|---|---|
| **No.** | **Date** | **Event** |
| 3. | April 1, 2021 | Mr. Oates submits a Request for Change in Representation Status Form listing Feder Law LLC as his attorney of record. Mr. Oates understands he is represented by Mr. Grossinger who may use co-counsel arrangements. |
| 4. | May 14, 2021 | Mr. Oates undergoes MAF examination with Dr. Pearlstein and receives a PD QD. |
| 5. | July 21, 2021 | Mr. Oates submits his PD claim while represented by Mr. Grossinger/Feder Law. |
| 6. | After July 2021 | Discussions of ROV exploring a relationship with Mr. Grossinger did not take place till after submission of Mr. Oates' claim in July 2021. |
| 7. | August 26, 2021 | RKV obtains NFL Portal access for first time. Mr. Reppert emails Claims Administrator with 11 Request for Change in Representation Status Forms for the firm's first clients in the Settlement. |
| 8. | August 27, 2021 | Mr. Oates receives Notice of Monetary Award Claim Determination that he was entitled to a Monetary Award in the net amount of $922,469.76 for the QD of PD.[123] |
| 9. | 2021 (dates unspecified) | ROV participates in joint phone calls with Mr. Grossinger and SCMs. |
| 10. | Early 2022 | ROV concludes the proposed co-counsel arrangement with Mr. Grossinger will not move forward. No agreement was ever reached and there was never any fee sharing, per Mr. Oates. |

### C. <u>Process of Obtaining PD Diagnoses</u>.

We observed that the majority of ROV's PD Monetary Award Claims follow an apparent multi-step process to establish and document a PD diagnosis outside the Program before presenting for Program evaluation, the unusual consistency and cumulative effect of which cast doubts on the results achieved. During the 7/9/25 interview with Mr. Oates, Ms. Reppert, and Mr. Reppert, we were able to discuss our observations about this apparent process and learn more about the firm's approach. While ROV offered explanation and background, the firm

[123] Document ID 237967.

denied there was a set process for its submissions. Information we observed and learned about ROVõs typical PD Claim submission practices is summarized below:

1. **Screening Medical Professional/Consultant:** ROV has the Player see an independent medical professional for initial screening and/or consultation for whether it would be beneficial to send that Player to see another neurologist for treatment. According to ROV, these consultations are generally conducted via Zoom and paid for by the firm. ROV views the written assessments of these medical professionals as internal attorney work product and uses them to better judge whether the firm should ñinvestò in sending a Player for treatment.[124] ROV has omitted listing these medical professionals on the Health Care Provider History forms we asked them to complete during Audit or sharing their medical reports with MAF Physicians. ROV also explained that they do not send Players for this type of consultation in every case and have used these screening consultations less frequently in their more recent claims.[125] We are unable to confirm these assertions because ROV does not typically disclose information about these medical professionals in Claim or Audit documentation. For screening consultations, ROV reports that the firm uses medical professionals they have worked with before and trust.[126]

2. **ñTreatingò Neurologist:** Next, Players present to a neurologist for formal PD diagnosis and treatment with common PD medication (levodopa). Treating doctors most often diagnose Players with PD and prescribe levodopa during their first appointment. The Players typically continue treatment with this neurologist from a period lasting from several months up to two years or more according to Ms. Reppert.[127] Follow-up visits are conducted via telemedicine or in-person. The neurologists also often refer the Players to several physical therapy sessions. ROV is confirmed to pay evaluating neurologists for ongoing treatment of clients.[128] ROV explained to us that, in part, the purpose of sending Players for outside treatment before MAF examination was to ñfurther substantiate the claimò and ñbetter situate their case.ò[129] ROV also emphasized to us their view of the importance of demonstrating improvement from treatment with medication. When asked whether ROV screens the ñtreatingò neurologists and reviews their backgrounds, Ms. Reppert replied in the affirmative, stating that the firm wants to make sure that they are

---

[124] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).
[125] *Id.*
[126] *Id.*
[127] *Id.* When asked at the 7/9/25 interview how long Players are seeing treating neurologists before going to an MAF examination, and whether a Player might only see a treating neurologist for one visit, Ms. Reppert answered, ñNo, typically, personally I feel that minimum, through this I have some Players that have treated for close to two years and maybe over that actually.ò
[128] *E.g.*, Document ID 382388 at 2. When asked who paid for his neurological evaluations, the SCM responded, ñMy lawyer paid because I do not have enough money.ò
[129] *Id.*

board-certified.[130] ROV prefers "treating" neurologists located near where the SCMs reside, but this is not always possible. ROV explained that in selecting "treating" neurologists, the firm primarily makes unsolicited outreach to doctors requesting availability, but it is most helpful if the firm knows somebody who can make an introduction and explain what they are doing so that they might get "preferred access" and easier scheduling.[131] ROV told us they do not typically communicate the findings or diagnoses of the firm's screening medical professionals to the "treating" neurologists. However, the firm also informed us that occasionally a screening medical professional might make phone calls to neurologists they know to get the Player scheduled sooner and might relay information about their assessment of the client in that regard.[132]

3. **MAF Examination:** Finally, ROV schedules the Players for MAF examination. ROV sends records from the Players' evaluating neurologist to the MAF Physician in advance of the appointment. MAF Physicians have in at least 10 instances backdated the date of QD to the date of the outside treating doctor's diagnosis, again raising concern over undue deference and effective outsourcing of clinical judgment. Adding to that concern, a significant limitation in documenting signs of PD is that the majority of Player evaluations, including the MAF examinations, are performed while the patient is under treatment by levodopa and exhibits only mild symptoms. We also observed in at least one instance, ROV omitted sharing unsupportive medical records that showed assessment from another neurologist that an SCM did not have PD.[133] This causes us to question the completeness of records ROV selectively disclosed to the MAF Physicians and to us during Audit of Claims.

When asked on 7/9/25 whether anyone had ever suggested that this was the "right" way to go about submitting claims, Mr. Reppert replied that he did not know, but that smart lawyers will make sure they have sufficient evidence to support the claim.[134] Mr. Oates later clarified to us in his 8/20/25 response (and 9/26/25 supplemental response) that no one had suggested, demonstrated or provided to ROV any process on how to treat players.[135] Considering the highly consistent PD diagnoses we observed, we also asked the ROV partners about how the firm decides whether to take on Players as clients. Mr. Oates explained:

---

[130] *Id.* When asked at the 7/9/25 interview whether ROV screens treating doctors, Ms. Reppert answered, "Yeah, we want to make sure that they're board certified. Absolutely. Make sure they're a neurologist, preferably in the area that you're looking into (i.e., not headaches, sleep disorders). Sometimes you don't have a choice in some states. Sometimes it takes so long that a Player is willing to come to the tri-state area."

[131] *Id.*

[132] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).

[133] In auditing the PD claim of SPID 950006652, we observed ROV's omission of neurological treatment records close in time that undermined a diagnosis of PD or supported alternative diagnoses. ROV maintains the firm had no knowledge of their client's treatment by this neurologist. See Section VIII.G for further discussion.

[134] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).

[135] Exhibits N and M.

> There are some initial questions on the PD side. Do you have symptoms? Without coaching them, we want to know whether they have the symptoms. If they don't have them, they won't qualify. If there are some symptoms, then we have a diagnosing doctor. If the diagnosis comes back that there is something here, some PD or some memory issues, then we can go through the process of bringing them in, educating them, what's the process, and then really understanding whether they are going to qualify – way before we send them to the MAF.[136]

Regarding the prevalence of the firm's PD claim submissions in comparison to other possible diagnoses and whether ROV determines if a Retired Player will qualify before taking them on as a client, Mr. Oates explained, "I do things a little bit different. I ask them up front – are there symptoms?"[137] He added, "When I talk to people, I ask about movement issues because that's what I went through. I understand that."[138] When asked whether Retired Players come to ROV who have already been diagnosed with PD, Mr. Oates explained, "I don't ask if they have seen a doctor before. I'm simply saying, here's the Program. Do you have any of those symptoms, and if they say, 'No, I don't,' I say, 'That's good.'"[139]

Though appearing facially proper, the almost unwavering consistency of outcomes favorable to Award payment for PD QDs under this process contribute to concerns about the integrity of diagnoses reached. Among other issues, we observed that at least three doctors ROV used for treatment or screening (and who either initially diagnosed the firm's clients or were otherwise involved in their initial diagnosis) are not board-certified by the ABPN in neurology or another neuro-specialty, and that at least two others are not neurologists, neurosurgeons, or other neuro-specialist physicians.[140] When asked about this issue, in their 9/26/25 supplemental response, ROV provided biographical information outlining the medical professionals' respective qualifications and experience, asserting that "to the extent that ROV referred doctors, it sought credible and compassionate care – not specific board certification."[141]

Attorney A (discussed further in Section IV.A.1) reported concerns to us regarding the circumstances surrounding a current client's initial PD diagnosis under ROV. A Player currently under representation by Attorney A, and who requested through his counsel to remain anonymous to us in sharing this information, came to the firm from ROV and was previously evaluated by Dr. Suresh Kumar who also serves as an MAF Physician. According to the Player's wife, Dr. Kumar diagnosed her husband with PD, but when she later tried to obtain his medical records from Dr. Kumar's office, she was unsuccessful despite multiple attempts. Attorney A,

---

[136] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).
[137] *Id.*
[138] *Id.*
[139] *Id.*
[140] (1) Dr. Jay Lombard, DO; (2) Dr. Jeffrey Steinberg, MD; (3) Dr. Jonathan Fellus, MD; (4) Dr. Khalid Rayaz, MD; and (5) Dr. Kristen E. Cardamone, DO.
[141] Exhibit N at 8.

after becoming the Retired Player's counsel, also contacted Dr. Kumar's office and emailed a HIPAA form but also received nothing in response.

An AAP member who reviewed five of ROV's audited PD claims in November 2025 found that the background of the claims taken together is highly suspicious for misconduct. Each of the five individual cases reviewed presents a logical progression of complaints and findings. In general, the treating and diagnosing physicians appear to neglect complicating and contradictory factors in the Players' stories and emphasize those in support of PD diagnoses. The AAP member expressed suspicion that this is reflective of confirmation bias or more concerningly an incentive-caused bias based on likelihood of further referrals from the firm. Based on these concerns, the AAP member advised he would not recommend backdating to symptom onset in any of the cases. The AAP member further called into question ROV's reliance on consultant, Dr. Kristen Cardamone, a physical medicine and rehabilitation specialist, for initial PD diagnostic assessment in one of the claims. Based on her reported training and practice, she has no clear qualifications to provide expert opinion on primary neurodegenerative diseases such as PD. The AAP member advised that he would likely only approve one of the five cases (SPID 950014765). Based on these faults, four of the five claims would have been supported only if affording reasonable deference to the MAF Physician, Dr. Jacobs. Dr. Jacobs' reporting, however, is not afforded deference due to his termination as an MAF Physician in November 2025.

Regarding the apparent consistency of outcomes, when asked how many total Players a screening doctor had recommended that they seek treatment or other care with a neurologist, ROV responded that "there are no records maintained for each potential client" and "maintaining such records would have been and is impossible in view of the multiple conversations by the individual attorneys and individual attorneys did not know when or if another ROV attorney spoke with a Former Player during business hours, the evening, or on the weekends."[142] ROV further explained that the firm referred some Players to medical professionals to assist the attorney in assessing whether there was a potential claim; such assessments were typically informal, would constitute privileged and/or work product communications, and no records are maintained for each potential client. ROV added that this was not the standard process on all claims and if a Player did not demonstrate or present with such conditions, ROV did not move forward with processing that particular claim. Again, we are unable to verify the accuracy of these assertions as ROV does not typically provide information from or about screening medical professionals working for the firm during the Claim submission process and it produced no specific information in response to our Audit question directed at this issue.

When asked how many Players who saw a treating neurologist had received a PD diagnosis and how many did not, Mr. Oates responded that, "any Player that [ROV] currently represents with a diagnosis of Parkinson's Disease received such diagnosis from the neurologist with whom that particular Former Player was treating," and "[t]he number of Players [ROV] presently represents with a Parkinson's Disease diagnosis received such diagnosis from a treating neurologist."[143] Likewise, when asked how many Players who presented for MAF examination

[142] Exhibit N at 3 – 4.
[143] Exhibit M.

had received a QD, and of those, how many were for PD, Mr. Oates again responded for ROV using uninformative tautologies stating that "[t]he number of Former Players who received a Qualifying Diagnosis from a MAF in the Program is reflected by the exact number of claims submitted by ROV with a Qualifying Diagnosis" and that the "[t]he number of claims submitted by ROV for Parkinson's Disease with a Qualifying Diagnosis is the exact amount of claims submitted to the Claims Administrator with a Parkinson's Disease diagnosis."[144]

**D. <u>Solicitation of Retired Players</u>.**

We learned during our Audit that ROV is known to solicit Retired Players (both represented and not represented) to pursue PD Monetary Award Claims in the Concussion Settlement. Retired Players also reportedly understood Mr. Oates to in effect be promising, guaranteeing, or assuring them a QD. As noted in Section V.E.1, Mr. Oates is uniquely positioned to leverage personal networks within the NFL community through his status as a Retired Player, his past leadership roles in the NFL Alumni Association, and his status as an attorney representing SCMs in the Settlement.

During our 4/3/25 interview, Player 1[145] informed us he was aware that Mr. Oates had joined Ms. Reppert's firm and is "recruiting" for them.[146] At NFL Alumni events, other Retired Players have told him that Mr. Oates is, in essence, promising them a QD if they switch to ROV. In his recruiting pitch, Mr. Oates is known to tell the Retired Players that RKV "can get you across the finish line" and will do so faster than their current attorney. Player 1 also felt that Mr. Reppert used his history as a football Player to show he is "part of the fraternity" and build credibility and trust with the Retired Players in making ROV's pitch.[147] During our 7/9/25 interview, Mr. Oates confirmed that ROV attorneys have attended events such as alumni meetings and functions where they engage with Retired Players.[148] Mr. Oates characterized these interactions more as "conversations" where he tells the Retired Players about ROV and what they are doing.[149] Per Mr. Oates, when Retired Players express interest, he tells them, "Let's see if you go through the basic diagnosis and see if you qualify, we start the process."

Attorney B, who is discussed further in Section VI.A.2, also reported concerns to us about a client who lives in South Florida who had shared details of a conversation he had with another Retired Player, SPID 950001529[150] about changing his representation to ROV to obtain a PD diagnosis. According to the client, SPID 950001529 told him he should consider changing

---

[144] *Id.*

[145] Player 1 told us he selected RKV after Retired Players whose names he could not recall recommended Ms. Reppert and her firm.

[146] Exhibit P.

[147] Per his firm biography, Mr. Reppert received an athletic football scholarship from Syracuse University and was invited by the New England Patriots as a free agent. He played football at the professional level in the Canadian Football League.

[148] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).

[149] *Id.*

[150] SPID 950001529 submitted a Request for Change in Representation Status form dated 7/1/25, changing his attorney of record to ROV but has not yet submitted a claim. Document ID 400880.

his representation to Mr. Oates because he could get the client a PD diagnosis. In doing so, SPID 950001529 cited how Mr. Oates had been successful in obtaining that diagnosis for him.

Separately, on 11/13/25 Attorney C, who is referenced further in Section VI.A.3, reported concerns to us regarding circumstances surrounding the change in representation of one of his longtime clients to ROV. Attorney C expressed his belief that the client is not impaired based on his familiarity in representing him in the Settlement and his knowledge of his medical status. In investigating the situation, Attorney C learned that Mr. Oates is reportedly cold-calling Retired Players to get them to switch their representation to ROV and continues to do so.

During our 7/9/25 interview, when asked how the firm reaches out to Retired Players, the ROV partners explained that Players themselves will reach out to ROV, that Mr. Oates has many connections, that Mr. Reppert also played football in college, and that current clients of ROV talk to their friends.[151] The ROV partners initially denied reaching out to Players who are currently represented or cold-calling Retired Players, but later clarified that contact occurs through word of mouth and through what the firm again termed as, "conversations."[152]

Regarding outreach and/or solicitation of represented SCMs, ROV cited to Retired Players' incapacity due to neurological impairment, explaining that many do not know they are represented or even remember talking to their current attorney.[153] Likewise, Ms. Reppert explained that most of ROV's Request for Change in Representation Status Forms do not list the Retired Players' prior attorneys because ROV does not know about their representation status unless the Retired Players themselves inform ROV.[154]

### E. <u>Apparent Document Discrepancies</u>.

Retired Player confusion regarding representation status was reflected in our interaction with another past ROV client, SPID 100008902 (Player 2). On 4/11/25, we spoke Player 2, who Portal records reflected as *pro se*, regarding his former representation[155] by Ms. Reppert and her firm, RKV.[156] During a period when he was unrepresented three or four years ago, Player 2 reported that he had received a call from Ms. Reppert regarding working with her firm. They had a conversation, but Ms. Reppert never called Player 2 back and his understanding was that he was never represented by RKV. He does not know how Ms. Reppert obtained his telephone number.

Following our interview, we observed that a signed NFL Concussion Settlement Change in Representation Status Form dated 8/10/21 listing RKV as Player 2's new attorney had been

---

[151] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).
[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] Settlement records indicate ROV represented the Player from around August 2021 to August 2023.
[156] Exhibit Q.

uploaded to his file on 8/26/21,[157] in contradiction with this Player's understanding that he had never been represented by RKV. Concerningly, the signature and other handwriting on the form show significant unexplained inconsistencies with an undisputed signature found on Player 2's 6/12/17 registration documentation[158] and multiple other public examples of the Player's signature observed online. In researching the source of this Change in Representation Status Form, we found that Mr. Reppert had emailed the Claims Administrator on 8/26/21 with PDF copies of signed Change in Representation Status Forms for 11 separate players, including Player 2 attached.[159] This is also the same date Mr. Reppert and RKV first registered to use the NFL Portal as a firm, and these are among the first Players to be represented by RKV in the Settlement. The Form for another Player attached to Mr. Reppert's email, SPID 100014000, also shows highly similar handwriting to Player 2's form as well as a questionable signature when compared to public examples observed online.[160] Because of Player 2's now-reported representation by Mr. Grossinger, we have not yet been able to follow-up with him or confirm information about who may have signed the form.[161]

We shared Player 2's form and the concerns about the signature with ROV during the interview on 7/9/25. The ROV partners denied they or any other staff at the firm had signed this form or any other documents on behalf of clients. In discussing the issue, Ms. Reppert explained that Players' wives sometimes complete documents on their behalf but clarified she did not know who had signed and completed the form. Following the interview, Ms. Reppert shared with us a signed fax cover sheet dated 1/19/22 sent from Player 2 to Ms. Reppert showing he had further interaction with the firm regarding representation in the Settlement Agreement.[162] The fax cover sheet is on letterhead for Player 2's employer with his name and contact information. The handwriting and signature show similarity to the undisputed signature found on Player 2's 6/12/17 registration documentation, suggestive that he signed the document. However, the fax coversheet handwriting and signature show the same inconsistencies we observed with the handwriting and signature on the Change in Representation Status Form in question dated 8/10/21. These unexplained discrepancies coupled with Player 2's apparent uncertainty or lack of awareness regarding his representation status present concerns about the circumstances surrounding his change in representation to ROV in August 2021.

When asked during the 7/9/25 interview if it was possible Mr. Grossinger had any involvement, Ms. Reppert replied, "I know in the beginning, like you said, there were some cases that we might work with Doug[las] [Grossinger] on, and that probably was one of them, and

[157] Document ID 237922.
[158] Document ID 308914.
[159] On 7/28/23, Mr. Reppert emailed the Claims Administrator again requesting to withdraw his firm's representation of SPID 100008902 stating they had been unable to communicate with him.
[160] Document ID 237921.
[161] Later during the interview, Player 2 informed us that about a year and half ago through recommendations received from unnamed former players, he had agreed to have Douglas Grossinger represent him in the Settlement. Upon learning this information, we advised Player 2 that Mr. Grossinger's representation of him was not registered with the Settlement and promptly terminated the interview. SPID 100008902 later submitted to us a Request for Change in Representation Status form dated 4/22/25 showing his new counsel as "The Law Firm of Douglas Grossinger." Document ID 389003.
[162] The handwritten note on the 1/19/22 cover sheet reads in pertinent part, "Thank you. Look forward to getting together. Move this long overdue claim along. I have my old report. You should see it."

what ended up happening is that we didn't work together." This information strongly suggests Mr. Grossinger's early involvement with ROV extended beyond mere hypothetical discussion of a partnership and involved coordination or other efforts on certain claims at odds with the firm's earlier characterization of their interactions.

### F. <u>Attorney Attendance at Non-Program Medical Examinations</u>.

We learned during our audit of SPID 100010899's claim for Alzheimer's disease submitted by ROV, that for reasons initially unexplained, Mr. Grossinger and Mr. Reppert had accompanied the Player to separate medical evaluations. The Player was first represented by Mr. Grossinger[163] and notified us of his change in representation to ROV on 4/11/23 (with a Request for Change in Representation Status Form dated 6/16/22).[164] Non-Program evaluating neurologist, Dr. David Weisman's notes from his 4/12/23 (one day after the notice of change in representation to ROV) evaluation state, "[The Player is] [h]ere with a friend from college. From his perspective he has known him for years, since 1982. He is also his lawyer and friend."[165] When asked during audit who this attorney who accompanied him was, the Player responded, "It could have been either Bart Oates or Vince [Reppert]. I'm not sure which!"[166] The Player clarified in later follow-up responses that he believed it was Mr. Reppert who attended his appointment with him "because I needed a ride."[167] The Player maintained that Mr. Reppert did not speak with his doctor about his treatment or diagnosis.

The Player also informed us that Mr. Grossinger had accompanied him to his first neurological evaluation with another unnamed doctor.[168] When asked why, the Player offered a similar explanation, stating, "I don't remember why, maybe I needed a ride."[169] The Player also maintained that Mr. Grossinger had not spoken with his doctor about treatment or diagnosis, however.

When asked for clarification on SPID 100010899's response, Mr. Reppert confirmed he drove the player, who he has known for years, to the appointment and then back home. Mr. Reppert explained that the Player had called him for a ride because "he had mixed up the dates and had no way to attend the appointment."[170] To Mr. Reppert's recollection, the Player had forgotten his phone and possibly his wallet, so "for emotional support [I] walked him back to the exam room, when the doctor entered the room, I said hello and walked out to the reception area."[171] Mr. Reppert maintained he had no conversations with Dr. Weisman regarding the Player's treatment or condition and there was no other contact with Dr. Weisman before, during,

---

[163] The Player told us during audit that it was Mr. Oates who had first introduced him to Mr. Grossinger. Document ID 407801 at 2.
[164] Document ID 280452. ROV contends that Mr. Grossinger referred no claims to their firm and that they elected not to represent any Players represented by Mr. Grossinger, with the exception of SPID 100010899, a longtime friend of Mr. Reppert who felt more comfortable with ROV.
[165] Document ID 317028 at 29.
[166] Document ID 407801 at 2-3.
[167] Document ID 410718 at 1.
[168] *Id.* at 2.
[169] *Id.* at 1.
[170] Document ID 413026 at 2.
[171] *Id.*

or after the appointment (apart from routine administrative correspondence handled by his secretary). Mr. Reppert denied that he (or any other attorneys or staff at ROV) had ever attended any other medical examinations or appointments with this Player or any other Retired NFL Football Players represented by the firm in the NFL Concussion Settlement. We regard the circumstances and proffered explanations as highly unusual, particularly in consideration of the tip submissions we received regarding the firm's alleged improper relationships with doctors.

The attorneys' attendance at the Player's non-Program medical evaluations, while not prohibited, is at minimum questionable and creates the appearance of improper influence or other impropriety. The attorneys had a direct financial interest in the doctors' evaluations and diagnosis of their client and later proffered his diagnosis and treatment records to support the QD upon MAF examination. Understandably, attorney practices such as this involving the Program's own doctors are prohibited under Rule 13 of the Rules Governing Qualified MAF Physicians in the interest of avoiding improper influence and maintaining the integrity of the Program. When, such as in this case, attorneys attend or participate in their clients' non-Program medical evaluations, particularly when they plan to use the records from those outside evaluations to establish and support a later QD, they are in effect circumventing this important safeguard against improper influence or the appearance of improper influence. The total number of non-Program medical evaluations Mr. Grossinger, ROV attorneys, or attorneys with the other law firms subject to audit attended with Players remains undetermined.

### G. **Omission of Records Not Supportive of Parkinson's Disease Diagnosis.**

In auditing the PD claim of SPID 950006652, we observed ROV's omission of neurological treatment records close in time that undermined a diagnosis of PD or supported alternative diagnoses. Evaluating neurologist Dr. Ashwin Malhotra[172] first diagnosed SPID 950006652 with PD on 12/9/23. The Player's later MAF examination with Dr. Daniel Jacobs occurred on 6/20/24. The Player resides in Oklahoma, over 1,400 miles away from Dr. Malhotra, who practices in New York. Regarding this circumstance, ROV explained that the Player is thankful for the care he receives with Dr. Malhotra and has declined offers from the firm to find a doctor closer to his home in Oklahoma.[173] Similarly, the Player traveled approximately 1,300 miles to see Dr. Jacobs for MAF examination in Florida.

In auditing this Player's claim, we obtained records from his internal medicine doctor, Dr. Thomas Merrill, which included references to the Player's recent assessment by a neurologist in Oklahoma City, Dr. William Bendure. Dr. Merrill's records discuss how the Player had been seeing Dr. Bendure for concerns about possible PD close in time to his treatment and PD diagnosis by Dr. Malhotra. In pertinent part, on 11/2/23 Dr. Merrill reported, "I do not suspect PD. Neurologist Dr. William Bendure did not feel he had it either."[174] Accordingly, we obtained records from Dr. Bendure which included reports for visits on 8/23/22 and 2/20/23 where Dr.

---

[172] Dr. Malhotra later became a Qualified MAF Physician on 10/23/24.
[173] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).
[174] Document ID 410999 at 10 – 11.

Bendure assessed the Player did not have PD, noting that, "The patient does not report any symptoms of bradykinesia, rigidity, postural instability, or any other features of Parkinsonism."[175]

Concerningly, the Player (through his counsel) omitted Dr. Bendure from his 11/22/24 Healthcare Provider History Form submitted to us during audit and did not share Dr. Bendure's records with Dr. Malhotra or Dr. Jacobs prior to their assessments. When asked (through his counsel) earlier during audit if the Player had sought treatment for PD with any other providers, he again made no disclosure of his recent treatment with Dr. Bendure, qualifying only that, "Since being diagnosed, I have not seen any other neurologists recently other than those affiliated with Dr. Malhotra's office."[176] In his response to another question about when he first experienced PD symptoms and sought medical advice, the Player alluded only to dissatisfaction with unspecified care he received in Oklahoma ("I did not feel anyone was listening to me and was not happy with the care in Oklahoma because I did not receive any.")[177] Based on the above information uncovered, these answers appear calculated to prevent disclosure of the unsupportive medical records while still facially answering the questions. This causes us to question the completeness of the firm's audit responses and disclosures to MAF Physicians.

When asked about Dr. Bendure's omitted records during our interview on 7/9/25, ROV maintained that the firm had no knowledge of the doctor.[178] After the interview, ROV shared Dr. Bendure's records with evaluating neurologist, Dr. Malhotra, and independently obtained a 9/3/25 addendum report. Dr. Malhotra maintained in his addendum that his diagnostic impression that the Player has PD was unchanged. He reasoned that the lack of tremor reported in Dr. Bendure's records is consistent with the Player's intermittent symptom pattern at that stage of the disease evolution.[179]

We included this Claim Package and the available medical records among four others for review by a member of the AAP in November 2025. The AAP member did not recommend approval. Treating physician Dr. Malhotra provided diagnoses of both Alzheimer's and PD which would be a notably unusual co-occurrence in a 68-year-old. This not only violates the principles of parsimony in medical diagnosis which would logically assign the combination of symptoms to repetitive head injury, but also reflects a lack of knowledge/understanding of the diagnostic criteria for Alzheimer's disease. The AAP member further found Dr. Malhotra's addendum report supporting backdating of diagnosis to be "speculative and specious." Also problematic, Dr. Jacobs' MAF exam provided better support for non-PD causes of many of the symptoms. Selective or biased interpretation of preceding history and concomitant health concerns facilitated diagnosing PD when other factors may appear to be more likely.

---

[175] Document ID 400118 at 4.
[176] Document ID 382388 at 3.
[177] *Id.* at 1.
[178] Interview by Investigator with Lisa Reppert, Member, Reppert Oates & Vytell LLC, J. Vincent Reppert, Member, Reppert Oates & Vytell LLC, and Bart Oates, Member, Reppert Oates & Vytell LLC, in Basking Ridge, NJ (July 9, 2025).
[179] Document ID 405576.

### H. 150-Mile Rule Exception Requests.

As of October 2025, 16 (55%) of ROV's PD claim submissions included 150-mile Rule Exception Requests, six of which were to see Dr. Jacobs in Orlando, FL for MAF examination. All requests have so far been granted. The requests list general reasons such as inability to schedule sooner appointments with closer MAF Providers, the convenience of the Orlando, FL airport, the ease of scheduling an appointment with Dr. Jacobs, and having friends and family in the area. Using these six SCMs' addresses listed in the NFL Portal to calculate approximate distances travelled to see Dr. Jacobs, we observed that they travelled an average of 1,345 miles for their examinations. The overall group of 16 SCMs who requested exceptions travelled on average 1,046 miles, with the furthest distance travelled being approximately 2,900 miles.

When discussed during the 7/9/25 interview, Ms. Reppert attributed this trend to what she perceives as the low number of available MAF Physicians and significant difficulty in scheduling MAF appointments.[180] Ms. Reppert explained that ROV needed to schedule the soonest available MAF examinations and that other MAF Providers nearer to the Players were unresponsive or could not schedule appointments sooner than several months out. Ms. Reppert added that Dr. Jacobs' office, unlike other MAF Physicians, is responsive with quick availability for scheduling. This rationale of urgency is at odds with our findings that show most of the firm's clients begin treatment to develop their claims months or years in advance of scheduling an MAF examination.

The explanation proffered on one exception request was also at odds with information shared with us by past ROV client, Player 1 on 4/3/25. Player 1 informed us he had introduced another Retired Player, SPID 100004455[181] to Ms. Reppert during the time she represented him. SPID 100004455 and his wife live in Texas and are friends with Player 1 and his wife. SPID 100004455's wife reportedly complained to Player 1's wife about needing to travel to Florida for the neurology examination with Dr. Jacobs because she had been inconvenienced, and it forced her to take time off from work. At variance with that account, the 1/30/24 Request for Exception to 150-Mile Rule ROV submitted notes an inability to schedule with an MAF Physician closer to the Player for several months and states in pertinent part, "I have friends and family in the Orlando area and requested that my counsel schedule there as they had a convenient date and time that was convenient to my travel plans."[182] When SPID 100004455's wife questioned the need to travel to Florida, Ms. Reppert reportedly claimed there were not many options and that she was only working with one MAF Physician (Dr. Jacobs) at that time.

Dr. Jacobs reported during our 6/3/25 interview that he became aware of the 150-mile rule (requiring waivers for Players outside this radius) within the past year from Ms. Amaro.[183] He admitted to having seen Players from other states and has asked some of them "how they got his name" but did not get a clear answer. Per Dr. Jacobs, no one has ever complained to him

---

[180] Ms. Reppert also explained to us that during a conference call, Class Counsel had advised attorneys representing SCMs to obtain exception requests to get Players to doctors more quickly and that requests are freely approved.
[181] Incidentally, the PD claim for this Player is currently in Audit in connection with this investigation.
[182] Document ID 300706 at 2.
[183] Exhibit I.

about having to travel a long distance to see him. Dr. Jacobs denied any explicit or implicit suggestions from Players or law firms, including ROV, that they were coming to be evaluated by him because they expected to receive a QD. According to Ms. Amaro, other law firms in addition to ROV that send many Players to be evaluated by Dr. Jacobs include J.R. Wyatt, David Langfitt, and The Legal Collective.[184]

Dr. Jacobs acknowledged that all eight Players (100%) he has evaluated from ROV, including the six who requested exceptions, came to him with a pre-existing PD diagnosis but stated that, in his opinion, there was no question those Players had the disease. Dr. Jacobs denied having direct interactions with anyone from the ROV firm, stating that all those contacts were handled by Ms. Amaro who schedules MAF examinations for him.

### I. **Findings Regarding ROV Audit**.

Unlike Mr. Grossinger and associated firms, the ROV firm did not obscure its processes through intermediary front firms for claim submissions. Perhaps this was one philosophical difference the ROV partners had with Mr. Grossinger. Nevertheless, ROV set up a similarly faulted process to consistently develop and obtain PD QDs and seek payments. We assess at minimum that Mr. Grossinger influenced or inspired this process based on the firm's early connections to him coinciding with their entrance into the NFL Concussion Settlement.

The evaluating neurologists, we found, are effectively a network of consultants and/or experts paid by ROV who rendered PD diagnoses and follow-up treatment without the safeguards of the Settlement Program. ROV's repeated reliance on the same paid neurologists for diagnosis and treatment of the firm's clients raise concerns for incentive-caused bias based on the likelihood of further referrals and compensation. As an AAP member noted, the cases reviewed individually present a logical progression of complaints and findings. However, the claims taken together in context are highly suspicious for misconduct.

Furthermore, ROV's practice of direct solicitation of Players, effective promising or assurance of PD QDs, omission of relevant records that do not support the claimed diagnosis, the manufactured urgency to obtain 150-mile exceptions to see preferred MAF Physicians, and attendance at an evaluation with the Player, all compromise the integrity and honor of the Program, and cause harm to the SCMs.

## IX. **CONCLUSION & RECOMMENDATION**.

As documented herein, our investigation of Douglas Grossinger, Feder Law, Pro Athlete, Syme Law, and ROV has uncovered an expanding, sometimes deliberately convoluted, network of relationships implicating multiple parties and activities, which taken together, call into question the integrity and legitimacy of a significant number of PD Monetary Award Claims. Firms employ processes apparently conceived to take advantage of the Program's diagnostic criteria for the QD of PD to develop consistent payable claims. Off-the-record arrangements are

---

[184] Exhibit J.

in place to funnel such claims through intermediary firms to mask the attorney working on them and to disguise suspicious trends.

In the past year, nearly every element of the Program – players, attorneys, and medical professionals – have come forward to express their serious concerns about these ongoing PD submission arrangements. The Settlement Agreement relies ultimately on the good faith and judgment of professionals, particularly of doctors and attorneys. Our collective findings thus far, however, cause us to question the process employed to obtain these PD diagnoses and the overall reliability of the respective Monetary Award Claims. Our investigation to date has substantiated that these arrangements are taking place. Firms' arrangements to pay certain MAF Physicians for outside PD diagnoses and continued treatment of clients has in effect rendered them paid consultants, tainting reliability of their judgment. Most concerningly, the suspect nature of these broad arrangements devised to develop payable PD Monetary Award Claims through a consistent process of diagnosis and treatment outside the Program, circumvent the Program's anti-fraud safeguards, and complicate investigation endanger potentially legitimate PD claims comingled together among the more questionable submissions.

Our efforts to obtain information necessary to further our investigation and address these concerns have grown increasingly challenged and mired in objections which do not serve the interests of Players caught in this arrangement who may have this disease. Nonetheless, at this time we have sufficient information to determine there is a reasonable basis to support a finding of misrepresentation, omission, or concealment of material fact in connection with PD Monetary Award Claims submitted. Under Audit Rule 12(c), a fact is material if it "did affect or has any potential to affect" a Monetary Award. The facts about how PD diagnoses rendered outside the Program later proffered and relied upon by MAF Physicians came to be established are material because they affect or have the potential to affect determination of an Award for a PD QD.

These findings raise serious concerns and call into question the integrity of PD Monetary Award Claims submitted in the Settlement Program. We recommend referring this Report of Adverse Finding in Audit to the Special Masters, and that the Special Masters:

1. Deny any pending Monetary Award Claims for the QD of PD submitted by the subject firms but allow SCMs to refile based on new evaluations from a Qualified MAF Physician or BAP Provider.

2. Direct Class Counsel and the Counsel for the NFL Parties to engage with the Special Masters and the Claims Administrator to revisit and consider current criteria and possible prospective modifications to the diagnostic criteria for the QD of PD set forth in Exhibit 1 of the Settlement Agreement, to include:

    a. Enhanced training for the Qualified MAF Physicians that can make PD QDs, including provision for multiple evaluations if needed to confirm PD; and

    b. Reduced reliance on, and increased scrutiny of, non-Program provider records.

3. Censure the Subjects of Investigation regarding the questionable practices described in this Report, such as direct solicitation of Players, promising of QDs, use of intermediary law firms to obscure relationships and submissions trends, omission of medical records that do not support claimed diagnoses, attorney insistence that communications and agreements with lawyers and other firms not be memorialized in writing, circumvention of Program anti-influence safeguards, etc.

| X. EXHIBIT INDEX. | |
|---|---|
| **Exhibit** | **Title** |
| **A** | **Grossinger, Feder, and Pro Athlete Claims Placed in Audit** |
| **B** | **Dr. Karunapuzha Hotel Invoice** |
| **C** | **Dr. Karunapuzha Hotel Payment** |
| **D** | **Summary of Dr. Karunapuzha Subpoena Response** |
| **E** | **Dr. Verma Subpoena Response** |
| **F** | **Mr. Grossinger Communications with Attorney C Client** |
| **G** | **Feder Law LLC Co-Counsel Confirmation** |
| **H** | **Syme Law, PLLC Payment to Dr. Steinberg** |
| **I** | **Dr. Jacobs Interview Summary** |
| **J** | **Jaime Amaro Interview Summary** |
| **K** | **Dr. Steinberg Subpoena Response** |
| **L** | **Check Payments Produced by Dr. Steinberg** |
| **M** | **ROV Follow-up Responses** |
| **N** | **ROV Follow-up Supplementary Responses** |
| **O** | **Pro Se Player Interview Summary** |
| **P** | **"Player 1" Interview Summary** |
| **Q** | **"Player 2" Interview Summary** |

## Douglas Grossinger, Feder Law LLC, and Pro Athlete Law Firm, P.A. Claims Placed In Audit

In furtherance of our investigation of the patterns, we placed the following pending claim submissions from subject firms in Audit as they became eligible based on the information we had received from third parties referenced in Section VI.A and our own internal fraud prevention and monitoring. Claim information is summarized in Tables 14-16. See Section VIII for information about ROV claims placed in Audit.

| TABLE 14 | | PRO ATHLETE CLAIMS IN AUDIT[1] | | | | | |
|---|---|---|---|---|---|---|---|
| **No.** | **SPID** | **Notice of Audit** | **Date of Parkinson's QD** | **MAF Physician** | **"Treating" Neurologist(s)** | **QD Type** | **Award Asserted** |
| 1. | 100004713 | 11/4/25 | 4/21/25 | Dr. Daniel Jacobs | Dr. Eric Kramer | Parkinson's disease | $2,262,742.00 |
| 2. | 100010106 | 10/6/25 | 9/30/24 | Dr. Daniel Jacobs | Dr. Jeffrey Steinberg / Dr. Eric Kramer | Parkinson's disease | $1,976,922.00 |
| 3. | 100012594 | 10/6/25 | 7/17/24 | Dr. Daniel Jacobs | Dr. Jeffrey Gelblum / Dr. George Scott | Parkinson's disease | $2,941,564.00 |
| 4. | 100014849 | 4/2/25 | 9/27/24 | Dr. Gilbert Ho | Dr. Johan Samanta / Dr. Shah Paarth | Parkinson's disease | $1,976,922.00 |
| **5.** | | | **TOTAL** | | | **4 Claims** | **$9,158,150** |

| TABLE 15 | | FEDER LAW LLC CLAIMS IN AUDIT | | | | | |
|---|---|---|---|---|---|---|---|
| **No.** | **SPID** | **Notice of Audit** | **Date of Parkinson's QD** | **MAF Physician** | **"Treating" Neurologist(s)** | **QD Type** | **Award Asserted** |
| 1. | 100001722 | 12/3/24 | 10/3/23 | Dr. Roger Behar | Dr. Louis Pearlstein / Dr. Lee Kubersky / Dr. Richard Bennett | Parkinson's disease | $2,398,506.00 |
| 2. | 100010932 | 2/4/25 | 7/3/24 | Dr. Tamara S. Greene | Dr. Carl Billian | Parkinson's disease | $2,500,924.80 |
| **3.** | | | **TOTAL** | | | **2 Claims** | **$4,899,430.80** |

[1] From 10/29/25 to 11/3/25, we received notices that each of the four Pro Athlete players had changed their representation to Locks Law Firm, consistent with Mr. Levine's arrangement to sell off his Concussion Settlement business.

| TABLE 16 | | DOUGLAS GROSSINGER CLAIM IN AUDIT | | | | | |
|---|---|---|---|---|---|---|---|
| **No.** | **SPID** | **Notice of Audit** | **Date of Parkinson's QD** | **MAF Physician** | **"Treating" Neurologist(s)** | **QD Type** | **Award Asserted** |
| 1. | 100008292 | 10/6/25 | 11/12/24 | Dr. Daniel Jacobs | Dr. Jeffrey Steinberg / Dr. Reed Stone | Parkinson's disease | $1,834,012 |
| **2.** | **TOTAL** | | | | | **1 Claim** | **$1,834,012** |

Hilton

HILTON DALLAS LINCOLN CENTRE
5410 LBJ FREEWAY
DALLAS, TX 75240
United States of America
TELEPHONE 972-934-8400 • FAX 972 934-5105
Reservations
www.hilton.com or 1 800 HILTONS

KARUNAPUZHA, CHERIAN ABRAHAM

501 NW 155TH CIR

EDMOND OK 73013
UNITED STATES OF AMERICA

Room No: 1807/K1SCS
Arrival Date: 10/15/2024 7:33:00 PM
Departure Date: 10/16/2024 2:22:00 PM
Adult/Child: 1/0
Cashier ID: ABHI
Room Rate: 491.96
AL:
HH # [redacted] SILVER
VAT #
Folio No/Che 1592582 A

Confirmation Number: 3149324455

HILTON DALLAS LINCOLN CENTRE 9/8/2025 7:34:00 PM

| DATE | REF NO | DESCRIPTION | CHARGES |
|---|---|---|---|
| 10/15/2024 | 11287395 | VALET - OVERNIGHT | $36.00 |
| 10/15/2024 | 11287395 | SALES TAX-PARKING | $2.97 |
| 10/15/2024 | 11287396 | GUEST ROOM | $491.96 |
| 10/15/2024 | 11287396 | TOURISM PID REIMBURSEMENT FEE | $9.84 |
| 10/15/2024 | 11287396 | STATE TAX | $30.11 |
| 10/15/2024 | 11287396 | CITY TAX | $45.17 |
| 10/16/2024 | 11288540 | VS [redacted] | ($616.05) |
| | | **BALANCE** | $0.00 |

CREDIT CARD DETAIL

| | | | |
|---|---|---|---|
| APPR CODE | 09237D | MERCHANT ID | 8032912647 |
| CARD NUMBER | VS [redacted] | EXP DATE | [redacted] |
| TRANSACTION ID | 11288540 | TRANS TYPE | Sale |

**Exhibit C: Dr. Karunapuzha Hotel Payment**



# Exhibit D: Summary of Dr. Karunapuzha Subpoena Response

[redacted]

On October 3, 2025, investigator [redacted] from [redacted], contacted attorney John Thompson from the Oklahoma City law firm of Crowe & Dunlevy at (405) 235-7774 pursuant to a message he left at BrownGreer for attorney [redacted]. Mr. Thompson sought to discuss what he believed was an improperly issued subpoena to his client, Dr. Cherian Karunapuzha, under Rule 45 of the Federal Rules of Civil Procedure. Mr. Thompson explained that his client was not a retained expert who would testify in any legal proceeding but rather was a consultant hired by attorney Doug Grossinger. Mr. Thompson noted that his client had no dealings with the other attorney mentioned in the subpoena, David Levine. He went on to confirm that Dr. Karunapuzha had no medical relationship with any former NFL players.

After discussing the situation with [redacted], she decided to withdraw the subpoena issued to Dr. Karunapuzha. Mr. Thompson was notified orally and via email of this decision.

HUSCH BLACKWELL

Brian G. Flood
Partner
111 Congress Avenue
Suite 1400
Austin, TX 78701
Direct: 512.370.3443
Fax: 512.479.1101
brian.flood@huschblackwell.com

Jennifer Cavner
Senior Counsel
111 Congress Avenue
Suite 1400
Austin, TX 78701
Direct: 512.370.3325
Fax: 512.479.1101
jennifer.cavner@huschblackwell.com

October 3, 2025

*VIA Secure Transfer to:*
[redacted]@browngreer.com)
Brown Greer
250 Rocketts Way
Richmond, VA 23231

[redacted]
Claims Administrator (ClaimsAdministrator@NFLConcussionSettlement.com)

Re: *Kevin Turner and Shawn Wooden, et al v. National Football League and NFL Properties, LLC, Successor-In-Interest to NFL Properties, Inc*. Civil Action 14-cv-00029-AB; in the United States District Court for the Eastern District of Pennsylvania; Subpoena to Produce Documents.

Dear Counsel:

I write on behalf of Dr. Avesh Verma ("Dr. Verma") in response to the Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (the "Subpoena") issued by the "Special Masters in re: NFL Players' Concussion Injury Litigation" and transmitted by email on September 9, 2025, to Dr. Verma in connection with the above-referenced matter. This letter serves as Dr. Verma's timely served objections and responses to the Subpoena, in accordance with Brian Flood's September 19, 2025 agreement with [redacted].

At the outset, the Subpoena was not properly issued and served in accordance with Federal Rule of Civil Procedure 45(a) and (b). Also, to the extent the Subpoena requests production to the "NFL Concussion Settlement Claims Administrator, PO Box 25369, Richmond, VA 23260," it exceeds the permissible limits of Rule 45(c). Additionally, Dr. Verma is not a party to the underlying litigation. The document requests do not comply with Rule 45's requirement to take reasonable steps to avoid imposing undue burden and expense on non-parties. *See* Fed. R. Civ. P. 45(d)(1). Many of your requests impose an unnecessary and undue burden on Dr. Verma, a non-party, and are therefore improper. Further, by providing these objections and responses, Dr. Verma does not concede that he is the appropriate party for these requests and reserves all rights. Upon review of the Subpoena, we have identified several

concerns regarding the scope and nature of the requests. Accordingly, Dr. Verma asserts the following objections and provides the following responses:

1. All correspondence you or any person associated with your medical practice had with Douglas R Grossinger, David Levine and/or any other attorneys or staff at Pro Athlete Law Firm, relating to the scheduling, evaluation, consultation, examination or treatment of Retired NFL Football Players. This includes but is not limited to all emails, text messages, encrypted messages (e.g., Signal, Telegram, WhatsApp, etc.) and/or written agreements or arrangements. If any oral communications took place with Douglas R. Grossinger, David Levine and/or with other attorneys or staff at Pro Athlete Law Firm, provide a written description and the approximate date of those communications.

Dr. Verma objects to this Request for "All correspondence . . . with Douglas R Grossinger, David Levine and/or any other attorneys or staff at Pro Athlete Law Firm, relating to . . . Retired NFL Football Players. This includes . . . a written description and the approximate date of those communications," because it is overly broad, unduly burdensome, and not proportional to the needs of the case because it is not limited to the issues relevant to this case and further has the potential to implicate sensitive or confidential references to patient treatment. In addition, this Request imposes an undue burden and expense on a non-party. Dr. Verma also objects that this Request is improper because it asks Dr. Verma to create documents and provide information, exceeding the scope of a document request pursuant to Federal Rule of Civil Procedure 45. Subject to these objections and any assertions of privilege, Dr. Verma provides that he is the treating physician for two retired NFL football players that may be responsive to Request No. 2 and involved in the above-referenced litigation, and in that capacity possesses medical and billing records for those patients. Dr. Verma provides that he is willing to produce those patients' medical records and billing records to the extent provided by law and subject to the patients' consent for the release of such records.

2. The names and contact information of all Retired NFL Football Players currently or previously represented by Douglas R. Grossinger, David Levine and/or any other attorney at Pro Athlete Law Finn, for whom you conducted any consultation(s), medical evaluation(s) and/or examinations.

Dr. Verma objects to this Request for information regarding "all Retired NFL Football Players currently or previously represented by Douglas R. Grossinger, David Levine and/or any other attorney at Pro Athlete Law Finn . . ." because it is overly broad, unduly burdensome, and not proportional to the needs of the case because it is not limited to the issues relevant to this case and further has the potential to implicate sensitive or confidential references to patient treatment. In addition, this Request imposes an undue burden and expense on a non-party. Dr. Verma also objects that this Request is improper because it asks Dr. Verma to create documents and provide information, exceeding the scope of a document request pursuant to Federal Rule of Civil Procedure 45. Subject to these objections, Dr. Verma provides that he is the treating physician for two retired NFL football players that may be responsive to Request No. 2 and involved in the above-referenced litigation, and in that capacity possesses medical and billing records for those patients. Dr. Verma provides that he is willing to produce those patients' medical records and billing records to the extent provided by law and subject to the patients' consent for the release of such records.

3. All correspondence you or any person associated with your medical practice had with Dr.

Cherian Karunapuzha related to any Retired NFL Football Player currently or previously represented by Douglas R. Grossinger, David Levine and/or any other attorneys at Pro Athlete Law Firm, including but not limited to emails, text messages, encrypted messages (e.g., Signal, Telegram, WhatsApp, etc.), agreements, arrangements, letters, notes, memos and/or other documents as well as descriptions and approximate dates of any verbal communications, arrangements and/or agreements.

Dr. Verma objects to this Request for information regarding "All correspondence . . . with Dr. Cherian Karunapuzha related to any Retired NFL Football Player . . . as well as descriptions and approximate dates of any verbal communications, arrangements and/or agreements," because it is overly broad, unduly burdensome, and not proportional to the needs of the case because it is not limited to the issues relevant to this case and further has the potential to implicate sensitive or confidential references to patient treatment. In addition, this Request imposes an undue burden and expense on a non-party. Dr. Verma also objects that this Request is improper because it asks Dr. Verma to create documents and provide information, exceeding the scope of a document request pursuant to Federal Rule of Civil Procedure 45. Subject to these objections and any assertions of privilege, Dr. Verma provides that he is the treating physician for two retired NFL football players that may be responsive to Request No. 2 and involved in the above-referenced litigation, and in that capacity possesses medical and billing records for those patients. Dr. Verma provides that he is willing to produce those patients' medical records and billing records to the extent provided by law and subject to the patients' consent for the release of such records.

4. All documents and records reflecting compensation expected and/or earned by you or your medical practice in connection with Retired NFL Football Players you consulted with, examined, evaluated and/or treated who were referred to you or your practice by Dr. Cherian Karunapuzha and/or who were or are represented by Douglas R. Grossinger, David Levine, or any other attorneys at Pro Athlete Law Firm. This includes but is not limited to retainer agreements, contracts, invoices, bank statements, check copies, ACH deposits, wire transfers, credit card receipts, Zelle transactions, Apple Pay, and third-party payment transactions (e.g. Venmo, PayPal, Stripe. CashApp, Square, etc.).

Dr. Verma objects to this Request for information regarding "All documents and records reflecting compensation expected and/or earned by you or your medical practice in connection with Retired NFL Football Players you consulted with, examined, evaluated and/or treated . . ." because it is overly broad, unduly burdensome, and not proportional to the needs of the case because it is not limited to the issues relevant to this case and further has the potential to implicate sensitive or confidential references to patient treatment. In addition, this Request imposes an undue burden and expense on a non-party. Subject to these objections and any assertions of privilege, Dr. Verma provides that he is the treating physician for two retired NFL football players that may be responsive to Request No. 2 and involved in the above-referenced litigation, and in that capacity possesses medical and billing records for those patients. Dr. Verma provides that he is willing to produce those patients' medical records and billing records to the extent provided by law and subject to the patients' consent for the release of such records.

5. Any other documents EXCLUDING MEDICAL RECORDS OR OTHER PROTECTED HEALTH INFORMATION received from or sent to Dr. Cherian Karunapuzha, Douglas R. Grossinger, David Levine and/or other attorneys or staff at Pro Athlete Law Firm.

Dr. Verma objects to this Request for information regarding "Any other documents

EXCLUDING MEDICAL RECORDS OR OTHER PROTECTED HEALTH INFORMATION received from or sent to Dr. Cherian Karunapuzha, Douglas R. Grossinger, David Levine and/or other attorneys or staff at Pro Athlete Law Firm," because it is overly broad, unduly burdensome, and not proportional to the needs of the case because it is not limited to the issues relevant to this case and further has the potential to implicate sensitive or confidential references to patient treatment. In addition, this Request imposes an undue burden and expense on a non-party. Subject to these objections and any assertions of privilege, Dr. Verma provides that he is the treating physician for two retired NFL football players that may be responsive to Request No. 2 and involved in the above-referenced litigation, and in that capacity possesses medical and billing records for those patients. Dr. Verma provides that he is willing to produce those patients' medical records and billing records to the extent provided by law and subject to the patients' consent for the release of such records.

6. Any documents received by you or any person associated with your medical practice from a third party relating to Douglas R. Grossinger, David Levine and/or Pro Athlete Law Firm.

Dr. Verma objects to this Request for information regarding "Any documents received by you or any person associated with your medical practice from a third party relating to Douglas R. Grossinger, David Levine and/or Pro Athlete Law Firm," because it is overly broad, unduly burdensome, and not proportional to the needs of the case because it is not limited to the issues relevant to this case and further has the potential to implicate sensitive or confidential references to patient treatment. In addition, this Request imposes an undue burden and expense on a non-party. Subject to these objections and any assertions of privilege, Dr. Verma provides that he is the treating physician for two retired NFL football players that may be responsive to Request No. 2 and involved in the above-referenced litigation, and in that capacity possesses medical and billing records for those patients. Dr. Verma provides that he is willing to produce those patients' medical records and billing records to the extent provided by law and subject to the patients' consent for the release of such records.

We are willing to meet and confer in good faith to address the scope and burden issues asserted in Dr. Verma's objections and any necessary next steps. Please contact me with any questions or concerns regarding these objections and responses.

Sincerely,

Jennifer Cavner

Jennifer Cavner

**Exhibit F: Mr. Grossinger Communications with Attorney C Client**

11:35 Roses 5G 81

[redacted]

See the Representation Form, please print it out soon and we can discuss you filling it in. We are proceeding closer to the claim filing.

Lets talk soon ok.

Regards,

Doug

-------------------------------------------

Douglas R. Grossinger, Esq.
Attorneys at Law
200 Monument Road, Suite 11
Bala Cynwyd, PA 19004
Tel: (610) 304-2012
Fax: (215) 689-3182
E-mail: dgrossinger@NFLConcussionsLawyers.com

NFL CONCUSSION SETTLEMENT

REQUEST FOR CHANGE IN REPRESENTATION STATUS

Reply


11:35
Roses
5G
81
200 Monument Road, Suite 11
Bala Cynwyd, PA 19004
Tel: (610) 304-2012
Fax: (215) 689-3182
E-mail: dgrossinger@
NFLConcussionsLawyers.com
NFL CONCUSSION SETTLEMENT
REQUEST FOR CHANGE IN REPRESENTATION STATUS
I. SETTLEMENT CLASS MEMBER INFORMATION
Settlement Program ID:
Name:
II. CHANGE FROM ONE LAWYER TO ANOTHER LAWYER
Change in...n Form.pdf
Thank you, will do.
Thanks, I will.
Thanks, I'll take a look.
Reply
99+

## Exhibit G: Feder Law LLC Co-Counsel Confirmation

**From:** Fred M. Feder
**To:** [redacted]
**Cc:** Fred M. Feder
**Subject:** RE: NFL Concussion Settlement Program - Feder Law LLC: Co-Counsel Inquiry
**Date:** Thursday, November 20, 2025 11:52:39 AM
**Attachments:** image006.png
Fred M. Feder, Esquire Response to Questions.pdf

---

Good morning [redacted],

This is to confirm that the co-counsel relationship with Grossinger remains active for multiple cases currently on my portal, consistent with my prior response dated June 8, 2021. A copy of that prior response provided to [redacted] is attached hereto for reference.

Fred
Feder Law

---

**From:** [redacted]
**Sent:** Tuesday, November 18, 2025 8:31 PM
**To:** Fred M. Feder <fmfeder@federlaw.net>
**Subject:** NFL Concussion Settlement Program - Feder Law LLC: Co-Counsel Inquiry

Good afternoon Fred,

Pursuant to Sections 8.6 and 10.3 of the NFL Concussion Settlement Agreement, please answer the following question by **11/25/25**.
Do you or anyone else at Feder Law LLC have arrangement(s) (such as co-counsel, whether written or verbal) and/or other relationship with attorney Douglas R. Grossinger in connection with the NFL Concussion Settlement?
Best Regards,
[redacted]
**BROWNGREER PLC**
250 Rocketts Way
Richmond, Virginia 23231
Telephone: [redacted]
Facsimile: (804) 521-7299
www.browngreer.com

*This electronic mail is intended to be received and read only by certain individuals. It may contain information that is privileged or protected from disclosure by law. If it has been misdirected, or if you suspect you received this in error, please notify me by replying and then delete this message and your reply. These restrictions apply to any attachment to this email.*

1. What is your relationship with Doug Grossinger? Do you have any arrangements or agreements, written or verbal, related to representation of Settlement Class Members in the NFL Concussion Settlement Program?

   **Doug Grossinger is co-counsel with me for retired NFL players with whom I am working. Our firms share attorney fees and the payment of expenses.**

2. Do you share any co-counsel arrangements or agreements, written or verbal, with any lawyers or law firms related to the NFL Concussion Settlement Program? If so, provide the name(s) of those individuals or firms and describe the nature of your arrangements.

   **None other than Doug Grossinger identified in 1. above.**

3. Did anyone help you to answer these questions? If so, who? How did they help?

   **No.**

**Date: June 8, 2021**

/s/ Fred M. Feder

**Fred M. Feder**

**Exhibit H: Syme Law, PLLC Payment to Dr. Steinberg**

SYME LAW, PLLC
Operating Account
41000 Woodward Ave., STE 350E
Bloomfield Hills, MI 48304-5130

JPMorgan Chase Bank
9-32/720

1036

PAY TO THE ORDER OF Dr. Jeff Steinberg $ 5,000

Five Thousand + 00/100 DOLLARS

Photo Safe Deposit®

Details on Back

MEMO

AUTHORIZED SIGNATURE

⑈001036⑈ ⑆072000326⑆ [redacted]7516⑈

SYME LAW, PLLC Operating Account 1036

(Doug - 9-16-24)
Cro

Zelled 9/16/24
Money
By [signature]

[redacted]

On June 3, 2025, MAF physician Dr. Daniel Jacobs was interviewed by investigators [redacted] and [redacted] from [redacted], at his office located at 3849 Oakwater Circle in Orlando, Florida. Also present during the interview was Dr. Jacobs' assistant office manager Debbie Astore. The purpose of the interview was to understand Dr. Jacobs' diagnostic process, particularly concerning Parkinson's disease, and to address a perceived increase in Parkinson's diagnoses among players he has evaluated, especially those referred by the law firm, Reppert, Kelly and Vytell (RKV). Dr. Jacobs consented to have the interview audio recorded and thereafter provided the following information:

Dr. Jacobs graduated from medical school at University of Kansas in 1985 and finished his fellowship and other training in neurology in 1994. He considers himself a behavioral neurologist which focuses on the cognitive aspects of neurological diseases. Over the years, Dr. Jacobs has published many articles related to his medical specialty.

Dr. Jacobs got involved with the NFL Concussion Settlement as a MAF physician about 5-6 years ago after receiving a solicitation in the mail. He is the only doctor in his practice participating in the program. After being approved as a MAF physician, Dr. Jacobs received some documentation from BrownGreer spelling out the guidelines he was expected to follow when conducting his exams and the criteria required to find a player had diagnosis of a Level 1.5 or Level 2 Neurocognitive Impairment (NCI), noting that neither of those were clinical diagnoses. There was also mention of other Qualifying Diagnoses such as ALS, Parkinson's Disease and Alzheimer's in the documentation he received, but those conditions are clinical diagnoses and were familiar to Dr. Jacobs because of his training. Dr. Jacobs no longer refers to those documents previously received from BrownGreer, stating that he "hopes he's internalized them by now" and also believes he knows what BrownGreer wants after being "queried" many times by them about his submissions.

Jaime Amaro (Ms. Amaro), who is Dr. Jacobs' office manager, schedules the appointments for the MAF exams after being contacted by someone from the law firm representing the former player or whoever calls/emails the office. The appointments are almost always scheduled to start at 4 p.m., so Dr. Jacobs can spend at least 1 ½ hours with them. Initially, Dr. Jacobs based his fee for MAF evaluations on Medicare rates, charging around $300 per exam, admitting he low-balled the amount because he thought the work was interesting. However, about a year or so ago, he raised his fee to $4000 per evaluation, considering it more akin to an Independent Medical Examination (IME) due to the extensive work involved. This fee covers records review, player examination, completion of required forms, report writing, and potentially a second visit if additional testing like a neuropsychological assessment is needed. Dr. Jacobs believes his fee is paid for by the law firm representing the player.

Dr. Jacobs' standard evaluation includes a thorough neurological exam, a detailed history of the player's football career (years played, positions, concussions), and input from an informant, typically a spouse, which he relies on for getting a true sense of the player's functionality. He tailors the neurological exam based on suspected conditions, which includes conducting a cognitive exam focusing on higher functions (e.g. language, level of attention, orientation, memory, frontal lobe function, drawing), evaluating the 12 cranial nerves, observing

and testing motor skills (tone, tremor, strength), reviewing sensory functions, coordination, reflexes, and gait. Dr. Jacobs also asks questions about the player's sleep habits and pays attention to their voice. He uses the "Dementia Rating Scale" as requested by BrownGreer. Dr. Jacobs types his own notes while evaluating the player and completes all the required paperwork, only relying on Ms. Amaro to upload the documents to the Portal. Dr. Jacobs is the only person who evaluates the player.

Since becoming a MAF physician, Dr. Jacobs believes he has examined 40-45 former NFL players and estimated providing a Qualifying Diagnosis to about 80% of them. He recalled giving one player an ALS diagnosis and confirming an Alzheimer's diagnosis in another after his evaluation. For years, Dr. Jacobs saw many players he diagnosed with Level 1.5 or Level 2 NCI and acknowledged that more recently he's seen an uptick in players coming in who already have a prior Parkinson's diagnosis. Those players typically have some medical records they bring in with them or send to Ms. Amaro in advance, but Dr. Jacobs reviews those records for the first time with the player after they tell him "what's going on."

When a player comes to see Dr. Jacobs with a prior diagnosis of Parkinson's, he confirms the diagnosis through his own examination, looking for key symptoms like bradykinesia, cogwheel rigidity, and resting tremor. He also considers the player's response to Sinemet (carbidopa-levodopa), a common Parkinson's medication. Dr. Jacobs advised there is not much he can do to ensure the player is actually taking the Sinemet as prescribed. Sometimes, Dr. Jacobs, through Ms. Amaro, advises players to come off their medication a day or two before the evaluation, so he can observe them in an unmedicated state. While Dr. Jacobs is aware of the GELB criteria, he does not routinely use it calling it a "late 90's thing" that he wasn't trained on. Instead, when diagnosing Parkinson's, Dr. Jacobs relies on his "books" and looks for several of the cardinal Parkinson's criteria and also considers sleep dysfunction, such as REM Sleep Behavior Disorder, as supporting evidence. Of the approximately 15-18 players that Dr. Jacobs has diagnosed with Parkinson's, all but 2 or 3 had already received that diagnosis prior to coming in to be evaluated. Dr. Jacobs confirmed the pre-existing diagnosis for those individuals. All players with pre-existing Parkinson's diagnoses seemed to be under the continuing care of the original diagnosing physician. Dr. Jacobs noted that Parkinson's Disease can "co-occur" with cognitive symptoms.

After being informed about the high percentage of Parkinson's diagnoses among players referred by the RKV firm, Dr. Jacobs acknowledged that all eight players he's evaluated from that firm had a pre-existing Parkinson's diagnosis and stated that, in his opinion, there was no question those players had the disease. He denied feeling pressured by any law firms, including RKV, or any players to provide specific diagnoses and maintained that his findings are based on his clinical judgment. Dr. Jacobs also stated that he has never been asked to change the wording in any of his reports nor been given guidance about how to write them.

Dr. Jacobs became aware of the 150-mile rule (requiring waivers for players outside this radius) within the past year from Ms. Amaro. He admitted to having seen players from other states and has asked some of them "how they got his name" but didn't really get an answer. No one has ever complained to him about having to travel a long distance to see him. Recently, Dr. Jacobs instructed his staff to decline players from outside Florida, particularly those associated with the RKV firm, due to "bad vibes" stemming from this current inquiry by BrownGreer. Dr. Jacobs denied any explicit or implicit suggestions from players or law firms, including RKV, that they were coming to be evaluated by him because they expected to receive a Qualifying Diagnosis. He denied having direct interactions with anyone from the RKV firm, stating that all those contacts were handled by Ms. Amaro. Dr. Jacobs was never offered nor has he received anything of value other than his standard exam fee for conducting his evaluations.

**Exhibit J. Jaime Amaro Interview Summary**

[redacted]

On June 9, 2025, Jaime Amaro (Ms. Amaro), office manager for Dr. Daniel Jacobs (Neurological Services of Orlando, P.A.), telephone number [redacted] was interviewed by investigators [redacted] and [redacted] from [redacted], regarding her role and responsibilities within her office related to the NFL Concussion Settlement. After being advised of the identities of the investigators and nature of the interview, Ms. Amaro provided the following information:

Ms. Amaro has been handling the administrative aspects of the NFL Concussion Settlement for Dr. Jacobs since August 2023. Prior to that, Susie Mullins was responsible for those tasks from the time Dr. Jacobs became a qualified MAF Physician approximately six years ago. Ms. Amaro schedules the appointments for the players, sends invoices for the exam fee and fields all the phone calls and emails from the former players or their legal representative. Except for attorney Lisa Reppert, Ms. Amaro advised that all other calls or emails from law offices to schedule exams or ask questions are from paralegals. When the law firm calls to book an appointment, Ms. Amaro requests a follow-up email from them with the player's information and any relevant medical records. Once she receives the paperwork, Ms. Amaro books the appointment and sends an invoice for payment. At no time has Ms. Amaro been informed by the paralegal or lawyer booking the appointment that the former player had a prior diagnosis from another neurologist. If medical records are sent in advance, Ms. Amaro puts them in a file without looking at them and they remain there until the appointment date.

Payment is due at the time of the appointment in the amount of $4000. All their fees were raised in the last year and the MAF exam fee was increased from $3500. Typically, the law firm pays the fee on behalf of the former player.

On the day of the appointment, Ms. Amaro makes sure the former player is present in the waiting room and then provides a packet with the medical records to Dr. Jacobs. She noted that this is the first time he sees the player's medical information. Dr. Jacobs conducts the evaluations of the former players alone. Afterwards, Dr. Jacobs returns the packet with the medical records to Ms. Amaro along with the completed CDR worksheet and assessment, his provider report and the Diagnosing Physician Certification Form. She prints Dr. Jacobs' electronic notes which were written during the exam and adds them to the file. Ms. Amaro then uploads all the documents to the NFL Concussion Settlement Portal. None of the information is provided directly to the former player or the law firm. No lawyer or player has ever asked Ms. Amaro to change or modify language in a report nor have they ever asked to speak with Dr. Jacobs about his reports. Ms. Amaro has never been offered anything of value including cash, gifts, trips, dinner, or tickets to a sporting event or concert by any former player or law firm personnel.

Since Ms. Amaro has been involved with the Concussion Settlement, she believes that every player Dr. Jacobs has seen received a Qualifying Diagnosis, including Levels 1.5 and 2.0, Alzheimer's, Parkinson's and ALS. She estimated that Dr. Jacobs evaluates 25-50 former players per year.

Ms. Amaro's first interaction with attorney Lisa Reppert (Ms. Reppert), a lawyer from Reppert, Kelly and Vytell (RKV), occurred in February 2024 when she asked for an appointment for [redacted]. As previously mentioned, Ms. Reppert is the only lawyer that Ms. Amaro deals with directly, all the other firms use paralegals. Dr. Jacobs has evaluated 7 players

represented by RKV including [redacted] who was initially pro-se but later switched to Ms. Reppert. Additionally, RKV is the only firm who sends former players to be seen by Dr. Jacobs from "far away." In October 2024 after a routine audit from BrownGreer, Dr. Jacobs decided to only evaluate players who live within the 150-mile radius of his practice. Ms. Amaro recalled getting some brief training from BrownGreer about the Concussion Settlement shortly after taking over from Susie Mullins. As part of that training, the 150-mile waiver was mentioned, but Ms. Amaro believed that the lawyers needed to concern themselves with that rule as opposed to Dr. Jacobs. After Ms. Amaro notified Ms. Reppert of Dr. Jacobs' decision to no longer see former players who lived more than 150 miles from the office, Ms. Reppert responded via email on November 25, 2024, complaining that the number of MAF Physicians nationwide has dwindled to 50 and claimed that many of those aren't scheduling appointments. She also stated that Orlando is a "main hub" for many players and allows for an easy "in and out." Ms. Amaro agreed to forward that email to the investigators.

The last player that Dr. Jacobs saw from RKV was [redacted] (Mr. [redacted]) who was given a diagnosis of Parkinson's in April 2025. Mr. [redacted] lives in Florida.

In addition to RKV, other law firms send a lot of players to be evaluated by Dr. Jacobs including J.R. Wyatt, David Langfitt and the Legal Collective.

**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Kevin Turner and Shawn Wooden, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 2:14-cv-00029-AB |

**RESONSE AND OBJECTIONS TO SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**
**BY DR. JEFFREY STEINBERG AND FIRST CHOICE NEUROLOGY**

Dear Counsel,

This office represents Dr. Jeffrey Steinberg and First Choice Neurology (collectively, the "Respondents") in the above-captioned matter. We write in response to the subpoena received on September 11, 2025,[1] pursuant to Rule 45 of the Federal Rules of Civil Procedure. Please find our formal responses below:

**SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS "ATTACHMENT A"**

**For the period January 1, 2020 to the present, please provide the following:**

1) All correspondence you or any person associated with your medical practice had with Douglas R. Grossinger, David Levine, Justin Levine and/or any other attorneys or staff at Pro Athlete Law Firm, relating to the scheduling, evaluation, consultation, examination or treatment of Retired NFL Football Players. This includes but is not limited to all emails, text messages, encrypted messages (e.g., Signal, Telegram, WhatsApp, etc.) and/or written agreements or arrangements. If any oral communications took place with Douglas R. Grossinger, David Levine, Justin Levine and/or with other attorneys or staff at Pro Athlete Law Firm, provide a written description and the approximate date of those communications.

[1] The undersigned received a written approval for additional time for Respondents to respond to the instant Subpoena, where responses are now due on or before September 24, 2025.

**Response:** Objection; the Subpoena issued in the instant matter does not, as far as the undersigned can discern, comply with the requirements for "disclosures for judicial and administrative proceedings," set forth in 45 C.F.R. § 164.512(e). As such, Respondents are unable to produce Protected Health Information (which, as defined by 45 C.F.R. § 160.103, includes individually identifiable health such as the identity(ies) of any patients of the Respondents), as the Respondents have not: a) received a Court Order permitting the transmission of Protected Health Information ("PHI"); b) received satisfactory assurance from the party issuing the instant subpoena that the parties impacted by the release of PHI have received notice of this request for their PHI and/or provided their consent; c) that, if provided, any PHI transmitted by the Respondents is subject to a qualified protective order; or, d) that the party seeking release of PHI has otherwise complied with the procedures set forth for such a disclosure(s). *See*, 45 C.F.R. § 164.512(e) for details related to the methods of compliance. This request specifically asks for the disclosure of PHI and cannot be responded to without adherence to the procedure set forth in 45 C.F.R. § 164.512(e). *See, e.g.*, Woods Servs., Inc. v. Disability Advocs., Inc., No. CV 18-296, 2018 WL 4932706, at *2 (E.D. Pa. Oct. 11, 2018) (where a party sought disclosure of PHI, the court noted that "the Health Insurance Portability and Accountability Act ('HIPAA') allow a party to produce confidential information '[i]n response to a subpoena, discovery request, or other lawful process' provided that 'reasonable efforts have been made by such party to secure a qualified protective order.'").

2) The names and contact information of all Retired NFL Football Players currently or previously represented by Douglas R. Grossinger, David Levine, Justin Levine and/or any other attorney at Pro Athlete Law Firm, for whom you conducted any consultation(s), medical evaluation(s) and/or examination(s).

**Response:** Objection; the Subpoena issued in the instant matter does not, as far as the undersigned can discern, comply with the requirements for "disclosures for judicial and administrative proceedings," set forth in 45 C.F.R. § 164.512(e). As such, Respondents are unable to produce Protected Health Information (which, as defined by 45 C.F.R. § 160.103, includes individually identifiable health such as the identity(ies) of any patients of the Respondents), as the Respondents have not: a) received a Court Order permitting the transmission of Protected Health Information ("PHI"); b) received satisfactory assurance from the party issuing the instant subpoena that the parties impacted by the release of PHI have received notice of this request for their PHI and/or provided their consent; c) that, if provided, any PHI transmitted by the Respondents is subject to a qualified protective order; or, d) that the party seeking release of PHI has otherwise complied with the procedures set forth for such a disclosure(s). *See*, 45 C.F.R. § 164.512(e) for details related to the methods of compliance. This request specifically asks for the disclosure of PHI and cannot be responded to without adherence to the procedure set forth in 45 C.F.R. § 164.512(e). *See, e.g.*, Woods Servs., Inc. v. Disability Advocs., Inc., No. CV 18-296, 2018 WL 4932706, at *2 (E.D. Pa. Oct. 11, 2018) (where a party sought disclosure of PHI, the court noted that "the Health Insurance Portability and Accountability Act ('HIPAA') allow a party to produce confidential information

'[i]n response to a subpoena, discovery request, or other lawful process' provided that 'reasonable efforts have been made by such party to secure a qualified protective order.'").

3) All correspondence you or any person associated with your medical practice had with Dr. Cherian Karunapuzha related to any Retired NFL Football Player currently or previously represented by Douglas R. Grossinger, David Levine, Justin Levine and/or any other attorneys at Pro Athlete Law Firm, including but not limited to emails, text messages, encrypted messages (e.g., Signal, Telegram, WhatsApp, etc.), agreements, arrangements, letters, notes, memos and/or other documents as well as descriptions and approximate dates of any verbal communications, arrangements and/or agreements.

**Response:** The Respondents have no such correspondence in their possession.

4) All documents and records reflecting compensation expected and/or earned by you or your medical practice in connection with Retired NFL Football Players you consulted with, examined, evaluated and/or treated who were referred to you or your practice by Dr. Cherian Karunapuzha and/or who were or are represented by Douglas R. Grossinger, David Levine, Justin Levine or any other attorneys at Pro Athlete Law Firm. This includes but is not limited to retainer agreements, contracts, invoices, bank statements, check copies, ACH deposits, wire transfers, credit card receipts, Zelle transactions, Apple Pay, and third-party payment transactions (e.g. Venmo, PayPal, Stripe, CashApp, Square, etc.).

**Response:** Objection; the Subpoena issued in the instant matter does not, as far as the undersigned can discern, comply with the requirements for "disclosures for judicial and administrative proceedings," set forth in 45 C.F.R. § 164.512(e). As such, Respondents are unable to produce Protected Health Information (which, as defined by 45 C.F.R. § 160.103, includes individually identifiable health such as the identity(ies) of any patients of the Respondents), as the Respondents have not: a) received a Court Order permitting the transmission of Protected Health Information ("PHI"); b) received satisfactory assurance from the party issuing the instant subpoena that the parties impacted by the release of PHI have received notice of this request for their PHI and/or provided their consent; c) that, if provided, any PHI transmitted by the Respondents is subject to a qualified protective order; or, d) that the party seeking release of PHI has otherwise complied with the procedures set forth for such a disclosure(s). *See*, 45 C.F.R. § 164.512(e) for details related to the methods of compliance. *See*, *e.g.*, Woods Servs., Inc. v. Disability Advocs., Inc., No. CV 18-296, 2018 WL 4932706, at *2 (E.D. Pa. Oct. 11, 2018) (where a party sought disclosure of PHI, the court noted that "the Health Insurance Portability and Accountability Act ('HIPAA') allow a party to produce confidential information '[i]n response to a subpoena, discovery request, or other lawful process' provided that 'reasonable efforts have been made by such party to secure a qualified protective order.'").

Notwithstanding the above Objection: the Respondents are not familiar with Dr. Cherian Karunapuzha and have no such correspondence in their possession. Additionally, and notwithstanding the above Objection, Respondents have treated patients referred by Douglas R. Grossinger; Respondents are attaching responsive documents that do not contain PHI in response to this Request.

5) Any other documents EXCLUDING MEDICAL RECORDS OR OTHER PROTECTED HEALTH INFORMATION received from or sent to Dr. Cherian Karunapuzha, Douglas R. Grossinger, David Levine, Justin Levine and/or other attorneys or staff at Pro Athlete Law Firm.

**Response:** To the best of Respondents' knowledge, there are no documents responsive to this Request in their possession.

6) Any documents received by you or any person associated with your medical practice from a third party relating to Douglas R. Grossinger, David Levine, Justin Levine and/or Pro Athlete Law Firm.

**Response:** See attached. The respondents are continuing to look for any additional records responsive to this request and will supplement this response in the event that additional records are found.

Dated this 24th day of September, 2025.

**LUBELL | ROSEN, LLC**
*Attorneys for Dr. Jeffrey Steinberg and First Choice Neurology*
200 S. Andrews Ave.
Suite 900
Ft. Lauderdale, FL 33301
Phone: (954) 880-9500
JMB@LubellRosen.com
Jaeden@LubellRosen.com

By: /s/ Josh M. Bloom
Fla. Bar No.: 88559

**Certificate of Service**

This certifies that on September 24, 2025, a copy of this Response, and its attachments, was served, via email and US-Mail, upon: counsel for the Special Masters in re: NFL Players' Concussion Injury Litigation, [redacted] (250 Rocketts Way, Richmond, VA, 23231; email: [redacted]@browngreer.com) and [redacted] (via email only: [redacted]).

*Josh M. Bloom*
Josh M. Bloom, Esq.

**Exhibit L: Check Payments Produced by Dr. Steinberg**

DOUGLAS GROSSINGER DBA
DOUGLAS R GROSSINGER ESQ ATTORNEY
1305 WRENFIELD WAY
VILLANOVA, PA 19085-2061

391
3-5/310
645

Date 4/25/23

Pay to the Order of Dr. Jeff Steinberg $ 1,500.00/xx

One thousand five hundred and no/xx Dollars

PNCBANK
PNC Bank, N.A. 020

For

⑆031000053⑆ [redacted]7383⑈ 0391

DOUGLAS GROSSINGER DBA
DOUGLAS R GROSSINGER ESQ ATTORNEY
1305 WRENFIELD WAY
VILLANOVA, PA 19085-2061

392
3-5/310
645

Date 4/25/23

Pay to the Order of Dr. Jeff Steinberg $ 1,500.00/xx

One thousand five hundred and no/xx Dollars

PNCBANK
PNC Bank, N.A. 020

For

⑆031000053⑆ [redacted]7383⑈ 0392

$ 48,500

FORM 103541-0912

02000445

3-5/3

PNC BANK
PNC Bank, National Association
Philadelphia, PA

CASHIER'S CHECK

No. 5100987

DATE MARCH 09, 2023

PAY TO THE ORDER OF DR. JEFFREY STEINBERG

$ 2,500.00

TWO THOUSAND FIVE HUNDRED AND 00 / 100************************** DOLLARS

DOUGLAS GROSSINGER

REMITTER

MIX Paper from responsible sources FSC® C101537

PNC Bank, National Association

Sydney Jones

OFFICIAL SIGNATURE

⑈5100987⑈ ⑆031000053⑆ [redacted] 1542⑈

FORM 103541-1122

02009640

**CASHIER'S CHECK**

PNCBANK
PNC Bank, National Association
Philadelphia, PA

No. 5148928

3-5/31

DATE MAY 11, 2023

PAY TO THE ORDER OF DR. JEFFREY STEINBERG $ 2,500.00

TWO THOUSAND FIVE HUNDRED AND 00 / 100******************** DOLLARS

Security features included. Details on back.

DOUGLAS R GROSSINGER ESQ
REMITTER

MIX
Paper from responsible sources
FSC® C101537

PNC Bank, National Association
OFFICIAL SIGNATURE

⑈5148928⑈ ⑆031000053⑆ [redacted]54 2⑈

FORM103541-0912

02000645

**PNC BANK**

PNC Bank, National Association
Philadelphia, PA

CASHIER'S CHECK

No. 5088193

3-5/3

DATE MAY 08, 2023

PAY TO THE ORDER OF DR. JEFFREY STEINBERG $ 2,500.00

TWO THOUSAND FIVE HUNDRED AND 00 / 100*********************** DOLLARS

DOUGLAS R GROSSINGER ESQ
REMITTER

PNC Bank, National Association

MIX Paper from responsible sources FSC® C101537

Telemedicine Patients

OFFICIAL SIGNATURE

⑈5088193⑈ ⑆031000053⑆ [redacted]1542⑈

**DOUGLAS GROSSINGER DBA**
**DOUGLAS R GROSSINGER ESQ ATTORNEY**
1305 WRENFIELD WAY
VILLANOVA, PA 19085-2061

450
3-5/310
845

Date 6/14/23

Pay to the Order of Dr. Jeffrey Steinberg $ 4,000.00/xx

Four thousand and 00/xx Dollars

Photo Safe Deposit® Details on back

**PNCBANK**
PNC Bank, N.A. 020

For

⑆031000053⑆ [redacted] 7383⑈ 0450

Harland Clarke

**DOUGLAS GROSSINGER ESQ.**
200 MONUMENT RD STE 11
BALA CYNWYD, PA 19004-1726

169
3-50/310 9202

October 1, 2023
Date

Pay to the Order of Dr. Jeffrey Steinberg $ 2,500.00/xx

two thousand five hundred and no/100 Dollars

Photo Safe Deposit® Details on back.

Wells Fargo Bank, N.A.
Pennsylvania
wellsfargo.com

For

MP

⑆031000503⑆ [redacted] 8033⑈ 00169

FORM103541-0912

02000645

3-5/310

PNC BANK
PNC Bank, National Association
Philadelphia, PA

CASHIER'S CHECK

No. 5014126

DATE OCTOBER 16, 2023

PAY TO THE ORDER OF DR. JEFFREY STEINBERG $ 2,000.00

TWO THOUSAND AND 00 / 100************************************ DOLLARS

Security features included. Details on back.

DOUGLAS R GROSSINGER ESQ
REMITTER

PNC Bank, National Association

OFFICIAL SIGNATURE MP

MIX Paper from responsible sources FSC® C101537

⑈5014126⑈ ⑆031000053⑆ [redacted] 1542⑈

DOUGLAS GROSSINGER DBA
DOUGLAS R GROSSINGER ESQ ATTORNEY
200 MOMUMENT ROAD SUITE 11
BALA CYNWYD, PA 19004

741
3-5/310
645

3/15/24 Date

Pay to the Order of Dr. Jeffrey Steinberg $ 7500.00

seven thousand five hundred and no/100 Dollars

PNCBANK
PNC Bank, N.A. 020

For

⑆031000053⑆ [redacted] 7383⑈ 0741

DOUGLAS GROSSINGER DBA
DOUGLAS R GROSSINGER ESQ ATTORNEY
1305 WRENFIELD WAY
VILLANOVA, PA 19085-2061

818
3-5/310
645

Date 5/13/24

Pay to the Order of Dr. Jeff Steinberg $ 2,500.00/xx

two thousand five hundred 00/xx Dollars

PNCBANK
PNC Bank, N.A. 020

For

⑆031000053⑆ [redacted] 7383⑈ 0818

Harland Clarke

DOUGLAS GROSSINGER DBA
DOUGLAS R GROSSINGER ESQ ATTORNEY
1305 WRENFIELD WAY
VILLANOVA, PA 19085-2061

1105
3-5/310
645

Pay to the Order of: Dr. Jeffrey Steinberg c/o Pharmaclaw LLC

Date: 2/1/24

$ 5,000.00

Dollars

PNCBANK
PNC Bank N.A. 020

For

⑆031000053⑆ [redacted]7383⑈ 1105

1151
3-5/310
645

DOUGLAS GROSSINGER DBA
DOUGLAS R GROSSINGER ESQ ATTORNEY
1305 WRENFIELD WAY
VILLANOVA, PA 19085-2061

12/5/24 Date

Pay to the Order of Dr. Jeff Steinberg $3,000.00

three thousand and no/100 Dollars

PNCBANK
PNC Bank, N.A. 020

For

⑆031000053⑆ [redacted] 7383⑈ 1151

Harland Clarke

**DOUGLAS R GROSSINGER ESQ**
200 MONUMENT ROAD SUITE 11
BALA CYNWYD, PA 19004

3-7380/2360

date 3/28/

Pay to the order of DG- Jeff Stephens $ 5,000.00

Five thousand and 00/100 dollars

**FIRSTRUST BANK**
800.220.BANK / firstrust.com

for

⑆236073801⑆ [redacted] 6225⑈ 1034

3-7380/2360

**DOUGLAS R GROSSINGER ESQ**
200 MONUMENT ROAD SUITE 11
BALA CYNWYD, PA 19004

date February

Pay to the order of DG Jeff Stephens $ 3,000.00

Three thousand dollars and 00/100 dollars

**FIRSTRUST BANK**
800.220.BANK / firstrust.com

for

⑆236073801⑆ [redacted] 6225⑈ 1035

**REPPERT OATES & VYTELL, LLC'S RESPONSES**
**TO FOLLOW-UP QUESTIONS**

TO: [redacted]
BrownGreer PLC
250 Rocketts Way
Richmond, VA 23231
[redacted]@browngreer.com

Pursuant to BrownGreer's ("BG") Email Dated July 30, 2025 Containing Follow-Up Questions ("Questions") [1], Reppert Oates & Vytell, LLC ("ROV"), hereby responds and objects as follows:

**GENERAL OBJECTIONS**

1. ROV objects to the Questions as they impose a duty greater than required by (i) the Concussion Litigation Settlement Agreement Dated June 25, 2014 ("Agreement"); (ii) Rule 10 of the Rules Governing the Audit of Claims ("Rule 10"); and (iii) Rule 45 of the Federal Rules of Civil Procedure ("Rule 45 Fed. R. Civ. P."), to the extent that the Questions are beyond the scope of the Agreement, Rule 10, and Rule 45 and seek information having nothing to do with the claims in audit.

2. ROV objects to the Questions as overbroad.

3. ROV objects to the Questions as some Questions seek information and records that ROV was under no obligation to maintain, would have been administratively impossible to maintain in view of the separate conversations each attorney had with Former Players at all times of the day and night, weekends, and, accordingly, such information is unknowable.

[1] These questions were in relation to the Audit of Settlement Class Members, [redacted] and [redacted] (the "Audit Claims").

4. ROV submits that to the extent the Questions seek information that is unknowable and ROV has no records. All Responses to the Questions are to the best of ROV's and its individual attorneys' recollection.

5. ROV objects to the Questions as imposing on ROV duties beyond those required by the Agreement, Rule 10, and Rule 45 of the Fed. R. Civ. P. and are unduly burdensome.

6. ROV objects to the Questions to the extent that BG seeks information subject to a claim of privilege, including, without limitation, attorney-client privilege and/or work product doctrine.

7. ROV objects to the Questions to the extent that BG seeks information already in the possession, custody, or control of BG, equally accessible to BG, and/or available to BG in the public domain.

8. ROV objects to the Questions to the extent that BG seeks information not in ROV's possession, custody or control.

9. By identifying any information in response to any Question, ROV does not stipulate, and expressly reserves all objections, including, without limitation, to the authenticity, relevance, privilege, materiality, and admissibility of any such information, document(s) or thing(s). Any inadvertent production or disclosure of privileged material or information shall not be deemed a waiver of any such privilege and same shall be subject to claw back.

10. In providing the following responses to the Questions, ROV has undertaken a reasonable effort to provide the information requested, to the extent the requested information is not subject to objection. The following Responses are based upon such information as is reasonably available to ROV at this time. ROV reserves the right to supplement its responses and/or assert additional objections to the Questions as appropriate.

**RESPONSE to QUESTION 1**

ROV objects to this Question as beyond the scope of the Agreement, Rule 10, Rule 45 Fed. R. Civ. P., unduly broad, vague, irrelevant, burdensome and that it seeks information already in BG's possession. Notwithstanding and without waiving said objections, ROV responds as follows:

ROV currently represents approximately 75 Settlement Class Members (hereafter referred to as "Settlement Class Members" or "Former Players" or "SCM"). Please note, however, this figure fluctuates and is indicative of the Settlement Class Members that ROV currently represents. Typically ROV receives unsolicited calls from many players, sometimes multiple players in a single day, seeking potential representation. Again, no records of potential clients are maintained unless the player elects to retain our office; not all former players who contact ROV become clients. This was and is a fluid process where Lisa, Vince, or Bart may speak with a player and then when there was no follow-up, there would be no record of these conversations.

(a) This Question includes an inaccurate statement of what was stated during ROV's meeting with [redacted] on July 9, 2025. That is, ROV did not state that it sent all Settlement Class Members to screening doctors for initial consultation and sought confirmation on whether it would be beneficial to send that player to see another neurologist for treatment or other care. The term "screening doctor" is also confusing and ambiguous. For the sake of clarification, ROV referred some Former Players to medical professional to assist the attorney in assessing whether there was a potential claim; such assessments were typically informal, would constitute privileged and/or work product communications, and

no records maintained for each potential client. This was not the standard process on all claims. Maintaining such records would have been and is impossible in view of the multiple conversations by the individual attorneys and individual attorneys did not know when or if another ROV attorney spoke with a Former Player during business hours, the evening, or on the weekends. ROV communicated and - - communicates - - with Former Players 24/7. To the best of our recollection, many of the Former Players were already seeing doctors when they sought representation from ROV. If a Former Player did not demonstrate or present with such conditions in accordance with the Agreement, ROV did not move forward with processing that particular claim. ROV does not have records as to how many total Former Players consulted with a medical professional prior to representation. .

(b) As provided in (a), ROV did not maintain this information and Former Players often had seen their own doctors before contacting ROV. ROV does not possess information as to how many total Former Players where a physician concluded that no further treatment or follow-up was needed at that time. Notwithstanding, ROV followed the directives of the medical professionals. That is, to the extent any medical professional concluded that a Former Player did not present symptoms covered under the Agreement, then ROV would decline representation and/or advise the Former Player that there was nothing further to do at this point in time.

(c) This Question is not accurate and misstates what was stated during ROV's meeting with [redacted]. ROV did not state that Former Players see a treating

neurologist for a period lasting up to two years before their eventual Program evaluation (MAF or BAP). ROV states that any player that it currently represents with a diagnosis of Parkinson's Disease received such diagnosis from the neurologist with whom that particular Former Player was treating. The number of players it presently represents with a Parkinson's Disease diagnosis received such diagnosis from a treating neurologist. In addition, any Former Player that did not receive such diagnosis, ROV does not represent nor did it ever represent. The number of Former Players that received a diagnosis other than Parkinson's Disease would be the number of ROV Settlement Class Members who present a claim other than Parkinson's Disease. ROV does not maintain lists or specific statistics of this information; however, all medical information submitted on behalf of Former Players was accurate and complete to the best of ROV's knowledge. Moreover, some Former Players presented overlapping medical issues, had their own doctors, relationships with Former Players were ended and there was no reason to keep or maintain such records as there were many Former Players with whom ROV spoke and ROV never recorded this information as ROV had no reason to do so and did not.

(d) The number of Former Players who received a Qualifying Diagnosis from a MAF in the Program is reflected by the exact number of claims submitted by ROV with a Qualifying Diagnosis. ROV has not submitted any claims unless the Former Player received a Qualifying Diagnosis from a MAF and/or BAP exam. The number of claims submitted by ROV for Parkinson's Disease with a Qualifying Diagnosis is the exact amount of claims submitted to the Claims Administrator with a Parkinson's Disease diagnosis and as provided in Question 1.

Presently, the majority of claims submitted by ROV are for PD. Out of the 22 submitted claims, two are 1.5 and one is for ALZ and the remainder is PD. Many of the PD claims have overlapping memory impairment as well. It should also be noted that most players are no longer entitled to any type of BAP testing and this firm does not randomly incur the cost of neuropsych testing.

**RESPONSE to QUESTION 2**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

ROV objects to this Question as it inaccurately states and/or summarizes what was said during what is referred to as the "discussion" between ROV and [redacted] on July 9, 2025. At no time, did anyone from ROV state that the only medical professionals used by ROV are board-certified. Moreover, BG states in this Question the Settlement Program's requirements for its own doctors, which has nothing to do with ROV's claims in audit. In addition, there is no question contained in the first paragraph of Question 2 other than a mischaracterization of what was discussed during the meeting between ROV and [redacted] and, accordingly, the very reason why ROV requested multiple times, a copy of the transcription of the meeting so as to corroborate the facts that BG is incorporating into the Questions or a section of text taken out of context. BG advised ROV that BG did not have a transcription of the meeting ROV permitted [redacted] to record.

With respect to the second paragraph of Question 2, BG again mischaracterizes and misstates what was discussed during the meeting. At no time did ROV state that "its" physicians

were, or had to be, board-certified. Accordingly, BG's affirmative statement that some of ROV's doctors, physicians, neurologists were not board-certified is accurate. There was never any such statement that they were board-certified and the doctors that BG lists in (a) through (e) may not be board-certified. ROV has no reason to believe that BG is inaccurate. Therefore, and for the foregoing reasons, ROV objects to the last sentence of the second paragraph alleging that ROV's statements during the July 9, 2025 meeting "are consistent with your statements regarding board-certification during the interview". There could be no inconsistent statements when there was no statement made with respect to the board-certification of any doctors ROV Former Players treated, not only the five doctors BG lists in Question 2.

In addition, some Former Players had and/or went to their own independently selected doctors which included Dr. Jeffrey Steinberg and Dr. Khalid Rayaz. ROV did not conduct research whether any doctor was Board Certified. ROV located medical professionals by contacting Universities, references from other doctors, and in view of ROV's 32 years of practice, reached out to other doctors for referrals.

**RESPONSE to QUESTION 3**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

Question 3 mischaracterizes and misinterprets what was discussed at the meeting and is incorrect. ROV did not receive advice from any attorney regarding its process on how Former Players sought treatment or how or why medical professionals prescribed medications to Former Players to address their condition that they presented to such medical professional. No one

suggested, demonstrated or provided to ROV any process on how to treat Former Players. ROV utilizes the Settlement Agreement for guidelines on the submission of a claim.

**RESPONSE to QUESTION 4**

ROV objects to this request as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., in the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

(a) There were personality differences and differences with respect to communications with Former Players. That is, how often to provide status updates to Former Players and to respond to Former Players. ROV has been in practice for 32 years and had its own policies and procedures; in view of ROV's successful practice for over three decades, it continued to practice law at a very high level.

(b) Mr. Oates made the introduction to Vince in or about late 2020. The discussions of working together occurred in or about a few months later. ROV did not keep records of the specific dates of conversations that took place; however, to the best of our recollection ROV has not communicated with Mr. Grossinger for approximately three plus years;.

(c) Yes. Mr. Oates joined the firm in January of 2024. Mr. Reppert does not recall the exact dates of the conversations he had with Mr. Grossinger and believes there may have been conversations prior to and subsequent to the date Mr. Oates submitted his claim.

**RESPONSE to QUESTION 5**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

No claims were referred by Mr. Grossinger as ROV elected not to represent any Former Players represented by Mr. Grossinger except [redacted] who Vince had been a teammate with, and friend of [redacted] for many years. ROV never had any relationship with Mr. Grossinger, financial or otherwise. For the sake of clarification, RKV/ROV accepted Former Players who may have been introduced as knowing Mr. Grossinger.

(a) We don't recall how Mr. [redacted] was retained. He may have been introduced through Mr. Oates and/or Mr. Grossinger or another of our Eagles players. ROV was unable to maintain communication with him and removed him from the portal in May of 2023.

**RESPONSE to QUESTION 6**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

ROV is not aware of any co-counsel partnership, fee sharing or other arrangement between Mr. Grossinger and any other law firms or attorneys. Based on documents in the portal, Mr. Oates signed a Request for Change in Representation to Feder Law LLC on April 1, 2021.

**RESPONSE to QUESTION 7**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

See RESPONSE to QUESTION 6.

**RESPONSE to QUESTION 8**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

Mr. Grossinger represented in his Retainer Agreement with Mr. Oates that he (Doug Grossinger) would be working with co-counsel at his discretion. ROV's predecessor firm had no involvement with the submission and/or processing of the Oates' claim.

**RESPONSE to QUESTION 9**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

Please see RESPONSE to QUESTION 4.

**RESPONSE to QUESTION 10**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

Please see RESPONSE to QUESTION 4.

**RESPONSE to QUESTION 11**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

ROV is not aware of any non-privileged responsive documents in its custody, possession or control and refers BG to the conversations identified with Mr. Grossinger referred to herein. ROV affirmatively states that while there were conversations with Mr. Grossinger, Mr. Grossinger initially represented Mr. Oates, and that no agreement was ever reached verbal, or written, with Mr. Grossinger and ROV had no financial dealings with Mr. Grossinger and ended all communications with Mr. Grossinger.

**RESPONSE to QUESTION 12**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P. and the General Objections. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

ROV did not receive any assistance in preparing answers to the Questions.

N:\NFL Concussion Claims\Correspondence\LR RL 8-20-25 Response to Follow-Up Questions.docx

**Exhibit N: ROV Follow-up Supplementary Responses**

**REPPERT OATES & VYTELL, LLC'S SUPPLEMENTAL RESPONSES**
**TO FOLLOW-UP QUESTIONS**

TO: [redacted]
BrownGreer PLC
250 Rocketts Way
Richmond, VA 23231
[redacted]@browngreer.com

Pursuant to BrownGreer's ("BG") Email Dated July 30, 2025 Containing Follow-Up Questions (the "Questions") [1] and email dated September 12, 2025 requesting supplemental responses, Reppert Oates & Vytell, LLC ("ROV"), hereby provides Supplemental Objections and Responses to the Questions as follows:

**GENERAL OBJECTIONS**

1. ROV objects to the Questions as they impose a duty greater than required by (i) the Concussion Litigation Settlement Agreement Dated June 25, 2014 ("Agreement"); (ii) Rules 10, 12 and 15 of the Rules Governing the Audit of Claims ("Rules 10, 12 and 15"); and (iii) Rule 45 of the Federal Rules of Civil Procedure ("Rule 45 Fed. R. Civ. P."), to the extent that the Questions are beyond the scope of the Agreement, Rule 10, and Rule 45 and seek information having nothing to do with the claims in audit.

2. ROV objects to the Questions as overbroad.

3. ROV objects to the Questions as some Questions seek information and records that ROV was under no obligation to maintain, would have been administratively impossible to maintain in view of the separate conversations each attorney had with Former Players at all times of the day and night, weekends, and, accordingly, such information is unknowable.

---

[1] These questions were an offshoot of a meeting requested with Reppert Oates Vytell LLC in relation to the Audit of Settlement Class Members, [redacted] and [redacted] (the 2024 "Audit Claims").

4. ROV submits that to the extent the Questions seek information that is unknowable and ROV has no records. All Responses to the Questions are to the best of ROV's and its individual attorneys' recollection.

5. ROV objects to the Questions as imposing on ROV duties beyond those required by the Agreement, Rule 10, 12 and 15 and Rule 45 of the Fed. R. Civ. P. and are unduly burdensome.

6. ROV objects to the Questions to the extent that BG seeks information subject to a claim of privilege, including, without limitation, attorney-client privilege and/or work product doctrine.

7. ROV objects to the Questions to the extent that BG seeks information already in the possession, custody, or control of BG, equally accessible to BG, and/or available to BG in the public domain.

8. ROV objects to the Questions to the extent that BG seeks information not in ROV's possession, custody or control.

9. By identifying any information in response to any Question, ROV does not stipulate, and expressly reserves all objections, including, without limitation, to the authenticity, relevance, privilege, materiality, and admissibility of any such information, document(s) or thing(s). Any inadvertent production or disclosure of privileged material or information shall not be deemed a waiver of any such privilege and same shall be subject to claw back.

10. In providing the following responses to the Questions, ROV has undertaken a reasonable effort to provide the information requested, to the extent the requested information is not subject to objection. The following Responses are based upon such information as is

reasonably available to ROV at this time. ROV reserves the right to supplement its responses and/or assert additional objections to the Questions as appropriate.

**RESPONSE to QUESTION 1**

ROV objects to this Question as beyond the scope of the Agreement, Rule 10, Rule 45 Fed. R. Civ. P., unduly broad, vague, irrelevant, burdensome and that it seeks information already in BG's possession. Notwithstanding and without waiving said objections, ROV responds as follows:

ROV currently represents approximately 75 Settlement Class Members (hereafter referred to as "Settlement Class Members" or "Former Players" or "SCM"). Please note, however, this figure fluctuates and is indicative of the Settlement Class Members that ROV currently represents. Typically, ROV receives unsolicited calls from many players, sometimes multiple players in a single day, seeking potential representation. Again, no records of potential clients are maintained unless the player elects to retain our office; not all former players who contact ROV become clients. This was and is a fluid process where Lisa, Vince, or Bart may speak with a player and then when there was no follow-up, there would be no record of these conversations.

(a) This Question includes an inaccurate statement of what was stated during ROV's meeting with [redacted] on July 9, 2025. That is, ROV did not state that it sent all Settlement Class Members to "screening doctors" for initial consultation and sought confirmation on whether it would be beneficial to send that player to see another neurologist for treatment or other care. The term "screening doctor" is also confusing and ambiguous. For the sake of clarification, ROV referred some Former Players to medical professional to assist the attorney

in assessing whether there was a potential claim; such assessments were typically informal, would constitute privileged and/or work product communications, and there are no records maintained for each potential client. This was not the standard process on all claims. Maintaining such records would have been and is impossible in view of the multiple conversations by the individual attorneys and individual attorneys did not know when or if another ROV attorney spoke with a Former Player during business hours, the evening, or on the weekends. ROV communicated and - - communicates - - with Former Players 24/7. To the best of our recollection, many of the Former Players were already seeing doctors when they sought representation from ROV. If a Former Player did not demonstrate or present with such conditions in accordance with the Agreement, ROV will not move forward with processing the claim. ROV does not have records as to how many total Former Players consulted with a medical professional prior to representation. Each client is unique. Statistics are not kept as not every player was recommended for further neurological evaluation. Accordingly, ROV did not proceed.

(b) As provided in (a), ROV did not maintain this information and Former Players often had seen their own doctors before contacting ROV. ROV does not possess information as to how many total Former Players where a physician concluded that no further treatment or follow-up was needed at that time. Notwithstanding, ROV followed the directives of the medical professionals. That is, to the extent any medical professional concluded that a Former Player did not present symptoms covered under the Agreement, then ROV would decline

representation and/or advise the Former Player that there was nothing further to do at this point in time.

(c) This Question is not accurate and misstates what was stated during ROV's meeting with [redacted]. ROV did not state that Former Players see a treating neurologist for a period lasting up to two years before their eventual Program evaluation (MAF or BAP). ROV stated that any player that it currently represents with a diagnosis of Parkinson's Disease received such diagnosis from the neurologist with whom that particular Former Player was treating. The number of players it presently represents with a Parkinson's Disease diagnosis received such diagnosis from a treating neurologist. In addition, any Former Player that did not receive such diagnosis, ROV does not represent nor did it ever represent. The number of Former Players that received a diagnosis other than Parkinson's Disease would be the number of ROV Settlement Class Members who present a claim other than Parkinson's Disease. ROV does not maintain lists or specific statistics of this information; however, all medical information submitted on behalf of Former Players was accurate and complete to the best of ROV's knowledge. Moreover, some Former Players presented overlapping medical issues, had their own doctors, relationships with Former Players were ended and there was no reason to keep or maintain such records as there were many Former Players with whom ROV spoke and ROV never recorded this information as ROV had no reason to do so and did not. During the meeting, ROV noted only that it did not believe it made sense to send a former player to a MAF doctor if they were not exhibiting or complaining of any symptoms. Rather, it was noted

that ROV focused on pursuing claims where a player exhibited a more extensive history of complaints including, in many instances, prior treatment with a neurologist.

**(d)** The number of Former Players who received a Qualifying Diagnosis from a MAF in the Program is reflected by the exact number of claims submitted by ROV with a Qualifying Diagnosis. ROV has not submitted any claims unless the Former Player received a Qualifying Diagnosis from a MAF and/or BAP exam. The number of claims submitted by ROV for Parkinson's Disease with a Qualifying Diagnosis is the exact amount of claims submitted to the Claims Administrator with a Parkinson's Disease diagnosis and as provided in Question 1. Presently, the majority of claims submitted by ROV are for PD. Out of the 22 submitted claims, two are 1.5 and one is for ALZ and the remainder is PD. Many of the PD claims have overlapping memory impairment as well. It should also be noted that most players are no longer entitled to any type of BAP testing and this firm does not randomly incur the cost of neuropsych testing. ROV was not representing Former Players until the latter part of 2021. Over the last few years, the practice has grown to over 75 based on referrals. Given the small number (compared to the entire class under the Agreement), most Former Players represented by ROV completed BAP testing prior to be being represented by ROV. Many already processed impairment claims in the past with prior counsel. Again, this information would be reflected in the BG portal. A claim would not be submitted unless it was a bona fide claim. There were undoubtedly Former Players who attended BAP exams in the past prior to this firm's involvement where impairment was or was not identified.

**RESPONSE to QUESTION 2**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

ROV objects to this Question as it inaccurately states and/or summarizes what was said during what is referred to as the "discussion" between ROV and [redacted] on July 9, 2025. At no time, did anyone from ROV state that the only medical professionals used by ROV are board-certified. Moreover, BG states in this Question the Settlement Program's requirements for its own doctors, which has nothing to do with ROV's claims in audit. In addition, there is no question contained in the first paragraph of Question 2 other than a mischaracterization of what was discussed during the meeting between ROV and [redacted] and, accordingly, the very reason why ROV requested multiple times, a copy of the transcription of the meeting so as to corroborate the facts that BG is incorporating into the Questions or a section of text taken out of context. BG advised ROV that BG did not have a transcription of the meeting ROV permitted [redacted] to record.

With respect to the second paragraph of Question 2, BG again mischaracterizes and misstates what was discussed during the meeting. At no time did ROV state that "its" physicians were, or had to be, board-certified. Accordingly, BG's affirmative statement that some of ROV's doctors, physicians, neurologists were not board-certified is accurate. There was never any such statement that they were board-certified and the doctors that BG lists in (a) through (e) may not be board-certified. ROV has no reason to believe that BG is inaccurate. Therefore, and for the foregoing reasons, ROV objects to the last sentence of the second paragraph alleging that ROV's

statements during the July 9, 2025 meeting "are consistent with your statements regarding board-certification during the interview". There could be no inconsistent statements when there was no statement made with respect to the board-certification of any doctors ROV Former Players treated, not only the five doctors BG lists in Question 2.

In addition, some Former Players had and/or went to their own independently selected doctors which included Dr. Jeffrey Steinberg and Dr. Khalid Rayaz. ROV did not conduct research on whether any doctor was Board Certified. ROV located medical professionals by contacting Universities, references from other doctors, and in view of ROV's 32 years of practice, reached out to other doctors for referrals.

To the extent that ROV referred doctors, it sought credible and compassionate care – not specific board certification. Before founding Advanced NeuroCare in 2012 for the mid-Atlantic region of the United States, Dr. Fellus served as Director of Brain Injury Services at the renowned Kessler Institute for Rehabilitation which was number two in the country for brain injury, where he led the largest brain injury inpatient program in the U.S., and later as Director of Rehabilitation at Meadowlands Hospital Medical Center, where he developed one of the first outpatient neuromodulation centers. He has a subspeciality in brain rehabilitation which very few neurologists hold.

He has held leadership roles in both clinical and humanitarian settings, including nine years as Chief Medical Officer and Scientific Advisor to the International Brain Research Foundation, and as co-founder of the Moulay Ali Institute for Rehabilitation. He has collaborated with organizations such as the Center for Neurologic Studies, Neurella Labs, Neufidelity, and the Kurzweil Accelerating Intelligence Network. His research contributions include serving as principal investigator and co-investigator in NIH and DOD funded clinical trials and authoring

numerous peer-reviewed publications and book chapters on topics such as pseudobulbar affect, disorders of consciousness, and post-TBI neuropsychiatric syndromes.

Dr. Fellus has appeared as a medical expert in national media outlets including CBS, ABC, Fox 5, NPR, and the New York Times, and is a sought-after speaker at neurology and rehabilitation conferences worldwide.

He earned his B.A. in Neurobiology, cum laude, from Rutgers University and his M.D. from Rutgers Robert Wood Johnson Medical School, where he was a Robert Wood Johnson Research Scholar and graduation speaker. He completed his Neurology residency at Pennsylvania Hospital (serving as Chief Resident), followed by a fellowship in Neurorehabilitation at the University of Maryland's Kernan Rehabilitation Hospital.

Dr. Lombard served as chief of Neurology at Bronx Lebanon Hospital between 2007-2011. He was also the head of the stroke division at the medical center, and has previously held academic medical appointments at New York Presbyterian Hospital and Albert Einstein College of Medicine.

Dr. Lombard served as chief of Neurology at Westchester Square Medical Center from 1995-2000, and at the Brain Behavior Center in Rockland County, NY, from 2000-2007, where he specialized in patients with intractable neurological and psychiatric disorders. He has been honored as one of the top Neurologists in NY.

Dr. Lombard has written extensively on neuroscientific topics, including several peer-reviewed papers and medical textbooks, among them the *New England Journal of Medicine*, *Medical Hypothesis*, *Clinics of North America*, Journal of Managed Care and *Expert Opinion*. Dr. Lombard is extremely sought after and known for getting to the bottom of underlying conditions that are difficult to diagnose and assisting the patient with improvement.

The implication that either Dr. Fellus or Dr. Lombard are not credible doctors is incredulous.

Dr. Cardamone is not a treating doctor. Dr. Cardamone is an Interventional Physiatrist who is Fellowship trained in Orthopedic Spine and Sports Rehabilitation Medicine. She graduated with Distinction and earned a BA in Biology with Specialization in Neuroscience from Boston University. She completed her Residency and Fellowship training in Manhattan's top hospitals including New York-Presbyterian, Memorial Sloan Kettering Cancer Center, Hospital for Special Surgery, Sinai-Beth Israel Spine Institute in Union Square. Dr. Cardamone has received NJ Top Doc award every year since 2015. She combines her traditional physiatry skillset with a unique, integrative approach to musculoskeletal sports and spine pain conditions through a variety of innovative, non-surgical options uniquely tailored to each patient's functional goals.

**RESPONSE to QUESTION 3**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

Question 3 mischaracterizes and misinterprets what was discussed at the meeting and is incorrect. ROV did not receive advice from any attorney regarding its process on how Former Players sought treatment or how or why medical professionals prescribed medications to Former Players to address their condition that they presented to such medical professional. No one suggested, demonstrated or provided to ROV any process on how to treat Former Players. ROV

utilizes the Settlement Agreement and the documentation on the website for guidelines and best practices on the submission of a claim.

**RESPONSE to QUESTION 4**

ROV objects to this request as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., in the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

(a) There were philosophical differences and differences with respect to communications with Former Players. That is, how often to provide status updates to Former Players and to respond to Former Players. ROV has been in practice for 32 years and had its own policies and procedures; in view of ROV's successful practice for over three decades, it continued to practice law at a very high level. We strive to represent all Former Players equally regardless of their age and provide all clients with timely responses. With the limited communications, we found there was not the same level of transparency, follow through and later discovered that a number of Former Players who had interactions often did not feel respected or felt they were talked down to and/or were not heard and/or treated unprofessionally. In view of these philosophical differences, ROV ended communications with Grossinger Law.

(b) Mr. Oates may have suggested that Mr. Grossinger should get to know Mr. Reppert in or about late 2020. Discussions of the law firm exploring a relationship with Grossinger did not take place till after submission of Mr. Oates' claim. ROV did not keep records of the specific dates of conversations that took

place; however, to the best of our recollection ROV has not communicated with Mr. Grossinger for approximately three plus years.

(c) Yes. Mr. Oates joined the firm in January of 2024. Mr. Reppert does not recall the exact dates of the conversations he had with Mr. Grossinger and believes there may have been conversations prior to and subsequent to the date Mr. Oates submitted his claim but it was not until after the submission of Mr. Oates' claim that the parties agreed to explore working together.

**RESPONSE to QUESTION 5**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

No claims were referred by Mr. Grossinger as ROV elected not to represent any Former Players represented by Mr. Grossinger except [redacted] who Vince had been a teammate with, and friend of [redacted] for many years. ROV never had any relationship with Mr. Grossinger, financial or otherwise. For the sake of clarification, RKV/ROV accepted Former Players who may have been introduced as knowing Mr. Grossinger.

(a) We don't recall how Mr. [redacted] was retained. He may have been introduced through Mr. Oates and/or Mr. Grossinger or another of our Eagles players. ROV was unable to maintain communication with him and removed him from the portal in May of 2023. Upon information and belief, ROV may have been on joint calls with players in 2021, but did not maintain any records.

**RESPONSE to QUESTION 6**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

ROV is not aware of any co-counsel partnership, fee sharing or other arrangement between Mr. Grossinger and any other law firms or attorneys aside from Feder Law LLC. Based on documents in the portal, Mr. Oates signed a Request for Change in Representation to Feder Law LLC on April 1, 2021. Mr. Oates understood that he was represented by Mr. Grossinger as well but is not privy as to the fee sharing arrangement terms between Mr. Grossinger and Feder Law LLC.

**RESPONSE to QUESTION 7**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

See RESPONSE to QUESTION 6.

**RESPONSE to QUESTION 8**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and

burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

Mr. Grossinger represented in his Retainer Agreement with Mr. Oates that he (Doug Grossinger) would be working with co-counsel at his discretion. ROV's predecessor firm had no involvement with the submission and/or processing of the Oates' claim. Mr. Oates understood Mr. Grossinger to be his attorney.

**RESPONSE to QUESTION 9**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, 12 and 15 and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

Please see RESPONSE to QUESTION 4.

**RESPONSE to QUESTION 10**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, 12 and 15 and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

Please see RESPONSE to QUESTION 4.

**RESPONSE to QUESTION 11**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, 12 and 15 and Rule 45 Fed. R. Civ. P., the General Objections and that the Question is irrelevant

and burdensome. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

ROV is not aware of any non-privileged responsive documents in its custody, possession or control and refers BG to the conversations identified with Mr. Grossinger referred to herein. ROV affirmatively states that while there were conversations with Mr. Grossinger, Mr. Grossinger initially represented Mr. Oates. No agreement was ever reached verbal, or written, with Mr. Grossinger and ROV had no fee sharing arrangement with Mr. Grossinger and ended all communications with Mr. Grossinger. There was never any fee sharing between Mr. Grossinger and this law firm. It became apparent in the earlier part of 2022 that the relationship would not move forward. There are no known communications with Mr. Grossinger regarding the Audit Claims.

**RESPONSE to QUESTION 12**

ROV objects to this Question as being outside the scope of the Agreement, Rule 10, 12 and 15 and Rule 45 Fed. R. Civ. P. and the General Objections. Notwithstanding and without waiving said objections and General Objections, ROV responds as follows:

ROV did not receive any assistance in preparing answers to the Questions.

Dated: September 26, 2025

[redacted]

On October 7, 2025, Settlement Class Member (SCM) [redacted] (Mr. [redacted]) (SPID 100003384) was interviewed by investigators [redacted] and [redacted] from [redacted], regarding how he learned of and selected non-Program neurologist Dr. Jeffrey Steinberg (Dr. Steinberg) to evaluate and treat him for his neurological symptoms and how he chose Dr. Daniel Jacobs (Dr. Jacobs) as his Qualified MAF Physician in connection with his claims. After being advised of the identities of the investigators and nature of the interview, Mr. [redacted] provided the following information:

Prior to starting the interview, Mr. [redacted] confirmed to investigators that he was not represented by counsel and was proceeding with his claims *pro se*.

When Mr. [redacted] initially became a SCM, he was represented by Smith & Stallworth (S&S), switching to Byron Cuthbert (Mr. Cuthbert) after questions arose about S&S's handling of SCM's claims which were placed into audit. Mr. [redacted] left Mr. Cuthbert in July 2022 after getting a sense that Mr. Cuthbert was headed down the same path as S&S[1] with the final straw being informed by Mr. Cuthbert that his neurology appointment with Dr. Kester Nedd in Miami was canceled and rescheduled for months later. It was around this time that Mr. [redacted] and his wife began to scour the Concussion website, reading everything they could about the claims process and following all the cases and Special Masters' decisions that were posted there. They continue to refer to the Concussion website regularly. Based on what Mr. [redacted] and his wife initially read, they believed they could advocate for themselves as well as any attorney and file the necessary paperwork with the claims administrator, so they decided to move forward *pro se*.

Once that decision was made, Mr. [redacted] looked through the MAF list and started calling neurologists in his general area. Mr. [redacted] lives in Fort Pierce, Florida but noted that there are not many medical specialists in his area and none affiliated with the MAF program. The closest ones he found were in Broward County which is about a two-hour drive from him, but there were no appointments readily available. Consequently, Mr. [redacted] looked in the Orlando area which is about 10 miles outside the 150-mile radius dictated by the claims administrator and found Dr. Jacobs. When he called the office, Mr. [redacted] was able to get an appointment within 6 weeks, so he requested and received a waiver from the claims administrator to attend the appointment. Since his initial visit in the fall of 2022, Mr. [redacted] has been evaluated 3-4 additional times by Dr. Jacobs. Dr. Jacobs initially diagnosed Mr. [redacted] in 2022 with a Level 2 NCI which was reduced to a Level 1.5 NCI by the claims administrator. Mr. [redacted] successfully appealed the decision to downgrade his diagnosis and is waiting for that claim to be completed. Once that is done, Mr. [redacted] intends to file an additional claim for a Parkinson's disease (PD) diagnosis that he received earlier this year from Dr. Jacobs. Mr. [redacted] has paid $2500 out-of-pocket for each dementia exam and "a little more" for the PD exams.

Mr. [redacted] receives a lot of his medical care through the Cleveland Clinic which has doctors all over the country. In April 2024, Mr. [redacted] sought a treating neurologist for his

---

[1] Mr. [redacted] became nervous about Mr. Cuthbert's representation of him after learning that he sent about 90 players, including Mr. [redacted], to the same doctor to get a brain scan. He also had an issue with Mr. Cuthbert's refusal to engage with him, noting that apart from one phone call, Mr. Cuthbert only communicated by text.

dementia and PD symptoms which included tremors and twitching both during the day and while sleeping. He also developed mild sleep apnea. Like with Dr. Jacobs, Mr. [redacted] started looking for a doctor close to home and then expanded his search when those few specialists in the area didn't have any available appointments for 2 or 3 months or didn't treat sleep disorders. He found Dr. Steinberg either through a Google search or his insurance carrier's in-network directory, noting that his listed specialties included sleep medicine. Additionally, Dr. Steinberg's office was in Plantation which is an area that Mr. [redacted] frequents because his kids live there as well as one of his good friends. For these reasons, Mr. [redacted] contacted Dr. Steinberg's office and made an appointment for April 23, 2024. Since then, he has continued to see Dr. Steinberg at regular intervals, about once every 4-6 weeks on average. Mr. [redacted]'s last appointment was a few months ago because he's been in and out of the hospital several times recently for another medical issue. The appointments with Dr. Steinberg, which are covered by Mr. [redacted]'s insurance, typically last 1 hour to 1 hour and 15 minutes. Dr. Steinberg spends about half of every appointment testing Mr. [redacted]'s reflexes and balance, observing his writing ability and watching him walk. During the other half of the appointment, they discuss his symptoms, medication and treatment plan.

Presently, Dr. Steinberg is treating Mr. [redacted] for his PD-related symptoms including a resting tremor which seems to be getting worse, balance issues and sleep apnea. For the last year, Mr. [redacted] has routinely taken carbidopa levodopa prescribed by Dr. Steinberg for the tremors. Initially, he was only taking one pill a day when he woke up at 5 or 6 a.m. but complained to Dr. Steinberg that it was wearing off in the afternoon, so he added a second dose. Mr. [redacted] believed the note from his February 4, 2025 visit with Dr. Steinberg read to him by investigator [redacted] related to this. In addition to the carbidopa levodopa, Mr. [redacted] has also been taking ropinirole for the last four or five months which helps him sleep. He also attributed better sleep to his significant weight loss of about 50 pounds.

At the time of his first appointment with Dr. Steinberg in April 2024, Mr. [redacted] believed that only he and one other SCM were patients of Dr. Steinberg. He now knows that many SCMs go to him. Mr. [redacted] stated that players talk to one another all the time and discuss their experiences with doctors and lawyers which is why they often move from one to another with regularity.

In Mr. [redacted]'s opinion, both Dr. Steinberg and Dr. Jacobs are good doctors, and he would happily pay out-of-pocket to see either one. Mr. [redacted] described both doctors as having different roles in his medical care. He considers Dr. Steinberg's role as that of his treating neurologist while Dr. Jacobs helps him navigate living with dementia and PD which is his "new reality." Mr. [redacted] noted that it was Dr. Jacobs who helped him recognize his PD symptoms for what they were.

Although it took Mr. [redacted] a long time to fully comprehend how the claims process works, he now understands it and believes other players could do this themselves without an attorney but are too lazy to put in the time and effort. Neither Mr. [redacted] nor his wife received any assistance filing his claim for PD from an attorney or law firm. However, Dr. Jacobs's office did help them with the medical records and test results.

Mr. [redacted] has never been promised or guaranteed a qualifying diagnosis (QD) nor has one been predicted by anyone throughout the entire time he been a SCM. He specifically noted that his answer included the time he was represented by S&S and Mr. Cuthbert.

Mr. [redacted] was aware of other former players who received a QD of PD but stated there weren't many and he wasn't interested in "naming names." The only person he alluded to was a former teammate who is 70 years old. In Mr. [redacted]'s opinion, most former players were unaware that a QD for PD existed until about six months or a year ago. He noted there was one attorney that everyone talks about in connection with PD claims- Doug Grossinger. Mr. Grossinger is aggressive in his outreach to former players, and they boast about how many clients he has and his successes. Mr. [redacted] has never spoken to Mr. Grossinger and would avoid that type of attorney. Mr. [redacted] has not heard the names David Levine or Bart Oates/Reppert Oates & Vytell associated with PD claims.

[redacted]

On April 3, 2025, former NFL player [redacted] ([redacted]) (SPID 100010740) and his wife, [redacted] ([redacted]), were contacted at [redacted] by investigators [redacted] and [redacted] from [redacted], regarding the [redacted]'s experience with attorney Lisa Reppert and her firm, Reppert, Kelly and Vytell LLC, who represented [redacted] in connection with the NFL Concussion Settlement (Settlement) from September 2021 to January 2023. Investigator [redacted] spoke with [redacted] again on April 15, 2025, to clarify a few things previously discussed. After being advised of the identities of the investigators and nature of the interview, [redacted] and [redacted] provided the following information:

When [redacted] first became a Settlement Class Member (SCM), he was represented by Tom Parnell (Parnell) and then switched to David Langfitt (Langfitt) after [redacted]'s claim that was submitted by Parnell wasn't moving. During the time [redacted] was with Parnell and Langfitt, [redacted] stated he obtained all the testing required by the Settlement and received a Qualifying Diagnosis; however, Langfitt wanted to delay the resubmission of [redacted]'s claim to BrownGreer because the race-norming issue was taking hold, and he believed there may be a benefit to waiting until it was resolved. [redacted] did not want to wait because [redacted] was suffering and she needed the money for his care, so they decided to switch attorneys again. This time they went with Lisa Reppert (Reppert) and her firm, Reppert, Kelly and Vytell LLC (RKV), after she was recommended by other players whose names [redacted] cannot recall. [redacted] believed that [redacted] was one of RKV's first NFL clients.

Almost from the outset, neither [redacted] nor [redacted] liked Reppert. It seemed to [redacted] as if Reppert didn't know what she was doing as she often provided them with incorrect or misleading information. [redacted] believed she knew more about the Settlement than Reppert. In [redacted]'s opinion, it was like Reppert was simply telling them what they wanted to hear. [redacted] stated that Reppert had a "nasty attitude" and described her as unprofessional. He added that Reppert always acted like she was the smartest person in the room.

According to [redacted], [redacted] claim was almost finished when Reppert took over [redacted]'s representation. [redacted] said had she known how to file [redacted]'s claim she would have done it herself instead of using an attorney.

When asked about the doctors who treated and evaluated [redacted], [redacted] advised that both Dr. Eric Kramer and Dr. Daniel Jacobs were located reasonably close to where they lived. She wasn't sure but thought other former players may have suggested [redacted] make an appointment with Dr. Kramer who was not affiliated with the Settlement. [redacted] noted that [redacted] is still a patient of Dr. Kramer's today. Despite [redacted]'s previous belief that all of [redacted]'s testing was completed by the time they switched representation to Reppert, the investigator informed her that [redacted] was evaluated by Dr. Jacobs in October 2021 when he was signed up as a client of RKV. According to [redacted], at the time of [redacted]'s visit with Dr. Jacobs, Reppert did not know any MAF doctors. [redacted] believed there were two MAF neurologists in Florida who were within 150 miles of Sarasota where they then lived, and it was she, not Reppert, who selected Dr. Jacobs because his office was easier for [redacted] to get to. [redacted] advised that she and [redacted] paid Dr. Jacobs about $2500 out-of-pocket for his exam because it wasn't covered by insurance.

[redacted] had no first-hand knowledge of Reppert paying Dr. Jacobs or any other doctor to obtain a Qualifying Diagnosis or to write SCMs' neurologist reports in a certain way. However,

during a subsequent call with Reppert after [redacted]'s Common Benefit Funds were released, Reppert falsely claimed that [redacted] and [redacted] agreed to a change in her contingent legal fee from 17% to 22%, meaning Reppert would keep the 5% holdback, and told [redacted] that she had already spent [redacted]'s money because she had to pay two doctors $8000 each. Reppert told [redacted] she would "try to make it up to her some other way," but [redacted] pushed back telling Reppert that she wanted what was owed to them. As "proof" about the supposed agreed upon change in her fee, Reppert provided an email where [redacted] and [redacted] allegedly agreed to the higher fee along with an amended Interim Closing Statement reflecting the change which did not contain [redacted]'s signature. [redacted] provided the investigators with the initial Interim Closing Statement that contained original signatures and other relevant documents including the aforementioned email, amended Interim Closing Statement, Retainer Agreement and Judge Strawbridge's Explanation and Order related to the Attorney's Liens in [redacted]'s case where the Judge noted the fee discrepancy in Footnote 2. [redacted] and [redacted] ultimately prevailed in their dispute with RKV and received the monies they were due.

[redacted] introduced two former players, [redacted] ([redacted]) and [redacted] ([redacted]), to Reppert during the time she represented him. [redacted] and his wife [redacted] live in San Antonio, TX and are friends with the [redacted]. [redacted] and [redacted] coached together at the Rams. [redacted] and [redacted] keep in touch and often talk about Reppert. [redacted] underwent his neuropsychological testing in Houston, TX, but [redacted] scheduled him for his neurology appointment in Florida with Dr. Daniel Jacobs. When [redacted] questioned the need to travel to Florida for the exam, Reppert claimed that there weren't many options and stated she was only working with one MAF doctor (Jacobs) at the time. [redacted] told [redacted] about this conversation when she was complaining because she was forced to take time off from work and was generally inconvenienced by the long distance they had to travel. The [redacted] have also been asking questions of Reppert about the status of [redacted]'s claim, and [redacted] believes that Reppert is not being truthful with them.

[redacted] hasn't had any contact with [redacted] in over a year, so he doesn't know anything about his experience with Reppert and RKV.

[redacted] knows Bart Oates (Oates) but doesn't consider him a friend. He was aware that Oates joined Reppert's firm and is "recruiting" for them. At NFL Alumni events, some of the guys have told [redacted] that Oates is, in essence, promising them a Qualifying Diagnosis if they switch to RKV. In his recruiting pitch, Oates is known to tell the SCM that RKV "can get you across the finish line" and will do so faster than their current attorney.

Vince Reppert (Vince) is Reppert's husband and a partner in the firm. Vince has told [redacted] and other SCMs that he formerly played in the NFL, but [redacted] doesn't know if that's true. He believes that [redacted] may be lying in order to act like he is "part of the fraternity" and develop a common bond with those SCMs they are recruiting.

Neither [redacted] nor [redacted] have ever heard of Joshua Syme.

[redacted]

On April 11, 2025, former NFL player [redacted] (Mr. [redacted]) (SPID 100008902) was contacted at [redacted] by investigators [redacted] and [redacted] from [redacted], regarding Lisa Reppert, Esq. and the law firm, Reppert Kelly & Vytell (RKV). After being advised of the identities of the interviewers and purpose of the call, Mr. [redacted] provided the following information:

Mr. [redacted] was initially represented by Hausfeld LLP's (Hausfeld) Washington D.C. office beginning in approximately 2017 or 2018. Hausfeld arranged for Mr. [redacted] to undergo his BAP testing in Maryland. After the testing, he waited for 6 months but never received a diagnosis or any of the testing results. Mr. [redacted] called and emailed the firm every few weeks but never received any answers. During the roughly two years he was represented by Hausfeld, Mr. [redacted] never spoke to a lawyer only a paralegal. In late 2018 or 2019, he sent an email to the paralegal advising him that he no longer wanted to be represented by the firm. Hausfeld never billed Mr. [redacted] for the testing.

After leaving Hausfeld, Mr. [redacted] was unrepresented for a while and during that time he received a call from Lisa Reppert (Ms. Reppert) from RKV regarding working with her firm. Mr. [redacted] estimated he received the call from her 3 or 4 years ago. They had a conversation, but Ms. Reppert never called Mr. [redacted] back and he was never represented by RKV. He does not know how Ms. Reppert got his telephone number.

Mr. [redacted] knows Bart Oates (Mr. Oates) as they played football in the same era. Mr. [redacted] recognizes Mr. Oates as the former President of the NFL Alumni Association. Mr. [redacted] has no recollection of having a conversation with Mr. Oates about Ms. Reppert, nor was he aware that Mr. Oates is affiliated with RKV.

About a year and half ago through recommendations received from some former players, Mr. [redacted] agreed to have Doug Grossinger, Esq. (Mr. Grossinger) from Philadelphia represent him in Settlement. Upon learning this information, Investigator [redacted] advised Mr. [redacted] that Mr. Grossinger's representation of him was not registered with the Settlement, apologized for contacting him since he is a represented party and promptly terminated the interview.