# Exhibit "G"

Law Office of Douglas Grossinger Response to Audit

This response to the Audit was prepared by attorney Douglas Grossinger, Esq., with consultation by the law firm's long time counsel attorney William Stassen, Esq. of Fox Rothschild. Herein, "Grossinger" shall refer to the Law Firm of Douglas Grossinger and attorney Douglas Grossinger collectively.

**Overview of Response**

Douglas Grossinger, Esq. appreciates the time focused on ensuring that proper execution is undertaken by law firms and doctors in this NFL case, and shares the view that work of attorneys and doctors should be undertaken ethically and driving towards truthful and accurate diagnoses. Grossinger further appreciate the time and review consideration of the Special Masters here, I am more familiar with Special Master Hoffman from his various rulings over the years, although we have not yet communicated or interacted, Grossinger is aware many attorneys in this case who have expressed appreciation at Special Master Hoffman's work product.

Please see throughout this Response that Douglas Grossinger and the Grossinger law firm are deeply focused on ethical reasonable work execution, which this NFL case requires for integrity. The Grossinger firm very much wants to, and is in favor of well thought out refined new processes and appropriate remedial measures which can going forward bring transparency, and ethical working involvement for the law firm's upcoming work involvement…with such appropriate remedial measures also applying to and creating reasonable and transparent working executions for all law firms in this case. We all have an interest in truthful, accurate medical diagnoses for these men and for appropriate awards under the Settlement where warranted.

With that said, it is important that this response be serious, and identify what is occurring here from this Audit report. Grossinger wants to emphasize that in responding to the allegations, there is no intention to be intensely vociferous, and the points here underline the importance to Grossinger and colleagues of these matters being correct and reasonable. This Audit against the Grossinger law firm is viewed by many as an attempt to weaken the successful work of Grossinger, and colleagues in this NFL case who have been involved in undertaking work which has focused on real, accurate and modern medical principles, including the development of truthful and correct diagnoses, which are associated with follow-up medical treatment. The allegations are largely a daisy chain of weak innuendo and linked assertions without truthful basis-which are not backed up by any accurate medical diagnosis seeking to show that the NFL clients **do not actually have Parkinson's Disease**. Nowhere in the lengthy, apparently years long Audit is there any discussion of actual medical principles, again nor does that Audit state at any point, "these retired NFL players DO NOT have Parkinson's Disease." This is because these NFL clients for whom claims were filed in fact actually do have Parkinson's Disease, as diagnosed by and treated with modern medical principles of movement disorders, often by thought leader level national/world Parkinson's Disease authorities. It is an indication of the "avoid specific medical principles" strategy of the innuendo laden audit- that there is NEVER reference to any well established Parkinson's Disease principles, tests, or established modern movement disorders doctrine.

This NFL case, including the imposition of the Gelb criteria, has become very well known and studied, investigated by many different groups and constituencies, including among top thought leaders

in the Parkinson's Disease movement disorders field. The same way that law firms that focus on cases involving a highly specialized domain, medical or otherwise, undertake and work actively in that specialized area of the law, the Grossinger law firm also interacts with high level industry leading medical experts. This is critical for the law firm to stay up to date with a developing area of medicine. Grossinger has sourced, researched and been referred over the years to have dialogue and learn from many of the leading figures in the Parkinson's area. The Audit (with appropriate redactions for client confidentiality)…has been requested by and reviewed by a large number of persons, groups including Parkinson's organizations, corporate entities in various disciplines who have substantial interest in these areas to ensure that NFL players, and their attorneys working diligently and properly for them, and certain media entities have requested information about the Audit as part of their current work investigations involving this case. They bring different perspectives but uniformly see the ramifications of the attempt to weaken strongly expertised attorneys and also physicians which could result in prejudicial harm to the law firms representing retired NFL players.

We understand that there are a number of ongoing external investigations and reviews, analysis by third parties regarding NFL case matters, diagnoses, some of which we are aware of, some not, we will need to supplement this in near term with such findings which we may learn.

**See Attachments to Response**

Close review should be undertaken of the many Attachments to this Response, which include the very comprehensive and accurate medical treating records, many from national/world authorities in Alzheimer's and Parkinson's- for many of the prior filed and approved Grossinger involved claims, and for the currently pending Parkinson's claims. Review shows conclusively the long term in the regular course treatment of NFL clients, which support these accurate diagnoses.

**Grossinger's Work with other Law Firms was Appropriate and Reasonable, and Not At All Purposely Designed as Implied as an Improper "Arrangement." It was Very Well Known to Many.**

The allegations in the Audit seek to portray a picture of a covert "arrangement" by Grossinger with other law firms where in fact there was actually straight forward co-counsel working relationships with other law firms. Grossinger has a small firm, with little bandwidth and co-counseled in this NFL cases similar to other cases, to share work tasks, and to interact on complex medical-legal issues in this case was beneficial to both involved firms. It worked well for other firms to handle claims filing, and processing and paperwork, and Grossinger mainly focused on working with certain NFL clients and developing accurate diagnoses, and ongoing treatment, As stated herein, Grossinger chose to work for a range of strong and ethical reasons with several law firms: 1) Grossinger co-counseled with attorney Levine, as he had much long term expertise in NFL matters, had a large volume of clients, was in Florida where many NFL players reside, and he operated very seriously and ethically. 2) Grossinger also worked over the years with the Locks Law firm, not a subject of the Audit, they are a large extremely credible firm, who were previously Class Counsel, and Grossinger learns much about the workings of the case from very experienced attorneys and paralegals such as at Locks, and they have appreciated his expertise in medical issues. 3) Grossinger has worked with Feder Law, fully disclosed, as the two Philadelphia area firms have been able to jointly undertake work in easing the work burden, Attorney Feder is very ethical and has more years of litigation expertise than Grossinger which has been beneficial in the ongoing interaction. 4) Grossinger has also worked with the Corboy & Demetrio law

firm, not part of the Audit, one of the leading plaintiff firms in the US, which provided expertise and bandwidth, that firm is well experienced in these cases being lead counsel in the NHL case, and the Riddell case. 5) In addition, Grossinger has co-counseled with the Joshua Syme law firm in Detroit and Florida, which provided on the ground relationships with NFL players where the firm operates, he is a sophisticated attorney who interacts well with retired NFL players, and undertook claims processing bandwidth.

Overall, Grossinger and attorneys who interact with him were aware that competitor law firms who did not have such extensive expertise in PD would often seek to criticize Grossinger's work, as the unattributed and baseless tips in the Audit portray. These same law firms were effusive in praise though when Grossinger appropriately had a Parkinson's award for a prior client of theirs, and they received substantial attorney lien funds. Grossinger has sought to maintain good relationships with other firms, and it is well understood over time that competitor firms have tried to weaken the Grossinger firm, and others with whom he co-counsels.

**The Audit involves Parkinson's and Therefore the 1999 Gelb Criteria is relevant, as it Compares to Modern Parkinson's Movement Disorders Doctrine and Diagnosis Principles**

While the Grossinger law firm respects Special Master Hoffman and his decisions, the movement disorders field has moved beyond the 1999 Gelb criteria. High level thought leader Parkinson's movement disorders specialists, and general neurologists have not used the Gelb criteria for Parkinson's diagnoses.

Although not the primary focus of this Audit Response, the 2015 Movement Disorders Society Clinical Diagnostic Criteria for Parkinson's Disease ("MDS criteria") created by thought leadership in the movement disorders field, and more recent MDS revisions, are in fact the universally accepted diagnosis criteria for Parkinson's Disease and movement disorders for both movement disorders specialists, and general neurologists in the US and internationally from 2015 through to the present, and ongoing into the future. Many of the renowned physicians making diagnoses and treating NFL players in these relevant recent years for the Grossinger involved clients were involved in creating the 2015 MDS criteria, and certainly have followed the current MDS guidelines.

We understand that by the middle of 2024 and ongoing to the present, the imposition of the 1999 Gelb criteria for Parkinson's diagnoses in this case from the January 2024 ruling, and its ramifications as it has been used and extrapolated in this case has become increasingly well-known and controversial among many of the thought leaders in the Parkinson's Disease movement disorders field, and among other very interested constituencies...including particularly retired NFL players and their concerned relationships, and media entities. Parkinson's Disease thought leaders among high level physicians have known about traumatically induced Parkinson's Disease, which was commonly known as dementia pugilistica from early boxers, and an ever increasing number of Parkinson's Disease experts are aware of and have focused attention on American football players, with their view that such football players including particularly retired NFL players who happen to be the class of this NFL case are the penultimate demographic group, who likely had more sub-concussive blows than anyone else in the history of the human race. Many of the leading PD specialists in the movement disorders field are by now well aware that a not insignificant number of Retired NFL players have Parkinson's Disease caused by thousands and thousands of sub-concussive blows impacting the brain, combined with volumes of actual concussions in addition.

Many of the attorneys representing NFL players, and increasing numbers of the NFL players class members are aware that many news media organizations and investigative journalists and others have over time since the imposition of the 1999 Gelb Criteria been contacted by Parkinson's Disease leaders in the field, and well known NFL players concerned that accurate modern Parkinson's medical diagnoses are not being used. They have expressed their great concern that the NFL players who do actually have Parkinson's Disease are prejudiced and harmed, by the outdated strict 1999 Gelb guidelines. It is not surprising that given the stakes and the perceived harm to the many accurately diagnosed NFL players through modern movement disorders principles by high level, expertised medical clinicians that the many interested constituencies and entities are actively engaged. This includes we have heard increasing investigative involvement by media entities nationally, and in the Philadelphia region where much activity has been occurring, where these interested observers are documenting the successive developments as they proceed ongoing - including how these assaults such as the Audit on lawyers and their NFL players' rights to accurate Parkinson's diagnoses and payments are evolving.

At various points in this Response, there will be narrative comments and opinions from thought leader Parkinson's Disease movement disorders specialists, who have reviewed the Audit and are providing certain expert comments and responses to specific points in the Audit. Many leading Parkinson's Disease experts in the field who have reviewed and are aware of the Audit's allegations largely grounded in process based innuendo and false allegations over real medically proven and universally accepted modern well-grounded movement disorders diagnoses and treatment are outraged by this Audit. Many have expressed concern, rightfully so, that this Parkinson's Audit is an attempted indictment of **them and their field as a whole,** the thought leadership in the movement disorders field, and shockingly specifically focusing on many PD thought leaders who Grossinger has interacted with who have diagnosed and treated NFL players, and claims were made in this case.

Further, the process of this Audit has shown lack of due process to the Grossinger law firm, and the other law firms which collaborated as co-counsel with Grossinger. This investigation evidently was undertaken over a period of years, but as opposed to other Audits of law firms including Byron Cuthbert law firm, the Reppert law firm, and the prior audit of Pro Athlete Law, where those attorneys were given the opportunity to engage in dialogue…and in the cases of Cuthbert and Reppert law firms, there were face to face meetings leading up to the Audits. Those attorneys and law firms had the opportunity to engage in dialogue during the investigations, to provide their views of the allegations in such dialogue and to correct the record and provide their sides of the investigative points, the Reppert points are set forth here. Here Grossinger law firm was given no such opportunity to correct the record and head off many of these baseless, false allegations. If such dialogue had occurred, many of the false points in the Audit could have been eliminated before the Audit report. Further, it is the view of many constituencies that it is patently unfair, and severe lack of due process that the other side had literally years to plan this Audit, which involves over five years of activities in this NFL case…and the Grossinger firm and the other law firms had only weeks over the holidays with only two week additional extension to expedite preparing these responses.

It is the views of the Grossinger law firm, and those from the constituencies with whom Grossinger has dialogue now and over time over the years including national and world authority thought leader Parkinsons movement disorders specialists, who are aware of and focused on the Audit allegations which they feel indicts their field and them- that there was no up front dialogue or

opportunity for correcting the untruthful allegations, false innuendos, through dialogue with Grossinger before the Audit- for the same reason why all of the Grossinger associated claims in this NFL case for Parkinson's Disease and Alzheimer's Disease which have been decided over the past 8+ years of the case were approved, with no denials.

The Claims Administrator and other side with whom they collaborate has over the years of Grossinger claims – in the claims process avoided head to head focused medical dialogue with many of the high level national, world authorities treating physicians because they have known that their medical reports were in fact grounded in accurate, modern movement disorders medical principles.

The Audit instead focuses on making false process allegations wholly avoiding and unrelated to the modern, real movement disorders field medical principles of the diagnoses or medical treatment – contending NFL players clients should not be paid for Parkinson's claims because Grossinger does not text message enough, or he had a Super Bowl party, or falsely stating from unattributed non identified competitor lawyers that he is "chummy" with doctors. (There was only one recent claim denial ever in this NFL case, one week ago for Grossinger client Dale Hellestrae, where the Claims Administrator correctly objected to the time frame of the earlier diagnosis, not objecting substantively based on the medical basis.)

**The Audit Skews and Attempts to Weaponize Real Accurate Medical Diagnoses Combined with Long Term Treatment -which are the Only Standards of Actual Diagnoses and Care in the Real Modern Medical Area of Parkinson's Disease**

A major **prejudicial allegation construct used repeatedly in the Audit** involves the repeated use of spurious false innuendos- alleging wrongdoing when the real truth is that the activities described are in fact the opposite, are standard and well established medical diagnoses and long term treatment practices. The well-known and absolutely established diagnosis and care practices in this field among movement disorders neurologists and general neurologists regarding Parkinson's Disease is that the complete and accurate diagnosis, and proving of the diagnosis of Parkinson's Disease is developed not only on the first medical appointment, but rather over time as the clinician physician observes the patient through multiple appointments. In the real world in traditional well established medical practice procedures, a neurologist first examines the patient, takes the history and undertakes various tests if they suspect the patient may have Parkinson's Disease. Often the clinician who feels that the patient may have Parkinson's Disease will prescribe at that first appointment, or another of the follow-up appointments a dopamine medication such as carbidopa levodopa or other dopamine medications. In the Parkinson's Disease field, the response to dopamine medications that may be initially prescribed, is strongly indicative of an accurate positive PD diagnosis.

**Background of Douglas Grossinger and Grossinger Law Firm Focused on Thought Leader Level Complex, Real Medical Conditions and Diagnoses**

Attorney Douglas Grossinger has a background which is very relevant to and supportive of his work throughout this NFL case in working at a high level of understanding and execution in the complex areas of the medical disciplines of Alzheimer's Disease and Parkinson's Disease. Grossinger's law practice over the years, including before and during this NFL case has focused on working primarily with national and world authorities in complex medical areas. Grossinger also has spent over 35 years working in various business areas involving professional sports, particularly NFL football. In 2009,

when the head injury advocacy and crisis commenced regarding football concussions, CTE and head blows, Grossinger founded the National Sports Concussion Program with his close colleague Sandy Grossman, one of the most well known luminary television sports directors for CBS and Fox. (See Attachment to this Response, a March 2011 Conference before this NFL case, one of the early national conferences in sports head injuries, developed by the National Sports Concussion Program headed by Grossinger as Executive Director.) Throughout all of this time through to the present Grossinger specifically sourced and researched who the leading figures have been in the medical disciplines relevant to repeated sub-concussive football head injuries, and over time has known, learned from, and interacted with many of these national and world authority medical thought leaders. Law firms develop areas of expertise, Grossinger's deep domain specific knowledge and his law firm's work and execution from the beginning of this NFL case and earlier has been focused on having the NFL clients provided very high level medical diagnoses and treatment in the fields of dementia Alzheimer's Disease, and Parkinson's movement disorders - that has been grounded in and at the accurate modern thought leader level of current medical care.

To immediately dispel one of the many inappropriately alleged innuendo laden claims in the Audit, throughout his work in this NFL case, with his grounding and focus on interacting with thought leaders in Alzheimer's Disease and Parkinson's which are "real medical disciplines," Grossinger specifically avoided from Day 1 in this NFL case working in the areas of the 1.5 dementia and 2.0 dementia, as they were both "made up" for this NFL case and are not real medicine. (Throughout this Response, the term "real medicine" will refer to actual modern medical disciplines grounded in real medical principles concerning which specialists including Alzheimer's dementia specialists and Parkinson's movement specialists work, research, develop literature, and undertake modern diagnoses based upon well-established current modern medical principles.) Many other plaintiff lawyers in this NFL case have derisively called this NFL case, "Operation Avoid the Neuropsych," as all of the plaintiff lawyers are well aware of how the neuropsychology testing in the real world has been altered in this case in the Settlement Agreement in many areas to make it extremely difficult for NFL players to receive a 1.5 or 2.0 diagnosis. The stripping away in the Settlement of some of the traditional CDR domains, and increase in gotcha validity measures in the neuropsych battery created for this case for these impaired men is frequently cited by other plaintiff lawyers, and expert reviewers and commentators.

There are no references in medical treatises or experts regarding "1.5 dementia" or "2.0 dementia." While dementia and Alzheimer's Disease are real disciplines, Grossinger made the decision years ago, prior to 2017 when the Settlement terms were set and the definitions of the "not real 1.5 and 2.0 dementias" became known-to focus solely on the actual real defined medical conditions in this Settlement, ie. Alzheimer's Disease and Parkinson's Disease. If as significantly identified herein as a major prejudice to Grossinger, and law firm co-counsel colleagues, in not having the opportunity prior to issuance of this Parkinson's Audit Report to have dialogue with the Claims Administrator and others as other law firms were give the opportunity for dialogue meetings for other audits-the insinuation laden allegation of the high percentage of Parkinson's claims for Grossinger and some of the other law firms could have been appropriately and innocuously explained away, at least as relates to Grossinger. Alzheimer's and Parkinson's are real, with real actual medically based and substantiated diagnoses, with supporting literature and experts in the field - 1.5 and 2.0 dementia are not real, Grossinger never worked in those areas. Accordingly, this confirms Grossinger's claims in this case are in the areas where clients have had accurate diagnoses in the fields of Alzheimer's and Parkinson's, and follow-up long term treatment, with such records used for MAF exams and in the claims process.

The same answer and Grossinger's decision to only work in areas of real medicine-which are medically grounded, with literature, acknowledged thought leaders, evolution of well-known and acknowledged medical principles leading to current modern diagnoses - applies to the BAP testing program. Grossinger has not been involved with the BAP for these same important and well-reasoned rationales.

**Grossinger's Work and Execution in the NFL Case has Focused on High Level Expert Physicians Developing Accurate Diagnoses, and Undertaking Long Term Medical Treatment- Which is the Universally Recognized Processes for Parkinson's Disease Patients.**

The Grossinger law firm recently engaged one of the foremost leading world authorities in Parkinson's Disease, and Movement Disorders – Dr. William Ondo, Director of the Movement Disorder Clinic, Methodist Neurological Institute, and Professor at Weill Cornell, to provide expert opinions on many of the relevant issues in this Audit. He provided in this report (here and Attachment), and will ongoing through further expert involvement in this NFL case as the Grossinger firm and other law firms will request-- strong expertised support endorsing the Grossinger activities over the years and positions in this Audit -- and of the need for utilizing high level expertised neurologists to accurately diagnose PD utilizing modern criteria, and provide as appropriate long term treatment, which the Grossinger law firm undertook over time working in this Parkinson's area for this NFL case. He set forth at the granular level how real Parkinson's Disease medical diagnoses, and treatment are undertaken now.

---

Methodist Neurological Institute

William G. Ondo, M.D.

Director Movement Disorder Clinic, Methodist Neurological Institute

Prof. Neurology, Weill Cornell Medical School
Adjunct Prof of Neurology Texas A&M

6560 Fannin St., #802

Houston, Texas 77030

Feb 2, 2026

Memorandum on the Diagnosis of Parkinson's disease

I, William Ondo, MD, am the Director of the Movement Disorder Clinic at the Houston Methodist Hospital, and a Professor of Neurology at Weill Cornell Medical School and Adj Prof. at Texas A&M Medical School. My medical degree was awarded by the Medical College of Virginia (Richmond, Virginia), I completed an internship at the University of North Carolina Hospital (Chapel Hill, North Carolina) and a neurology residency at Duke University (Durham, North Carolina). I subsequently undertook a Movement Disorders fellowship with Dr. Joe Jankovic and joined the Baylor College of Medicine faculty for 19 years becoming a Full Professor, then later was a Professor at the University of Texas Medical Science Center-Houston for 5 years, prior to taking my current position in 2015. In addition to maintaining a busy clinical practice for the past 30 years, I have authored more than 350 original articles, review articles, and book chapters, and have edited three books on

Movement Disorders. I estimate that I have seen more than 4,500 individual patients with Parkinson's disease and consider myself an expert on its diagnosis and management. Recently, I was asked to opine on the proper diagnosis of PD.

The Gelb *et al*. paper published in 1999 was a "white paper", positing diagnostic criteria for definite, probable, and possible Parkinson's disease. It was not based on any novel or original data, but was rather a summary of older studies. In it, they proposed criteria, based on their opinion, on what would constitute the most accurate diagnostic criteria for Parkinson's disease. This was not the first proposed criteria for PD and there have been others published since. The UK Brain Bank criteria, first published in 1988 provided much of the data for the Gelb paper and was in fact based on pathologic confirmed data. The Movement Disorder Society criteria published in 2015 is now widely accepted, and other criteria exist. Both the UK Brain Bank and MDS criteria have also evolved over time, incorporating the latest information, and are the usual diagnostic criteria employed for research studies in Parkinson's disease.

Recent reviews have suggested that the Gelb criteria is not particularly predictive of the clinical diagnosis of Parkinson's disease. The criteria are criticized for their rigidity, with absolute exclusionary criteria that are in fact sometimes seen in patients that have pathologically confirmed idiopathic Parkinson's disease. In contrast, UK Brain bank criteria balances "red flags" against diagnosis versus additional supportive criteria. The other major criticism is the complete reliance on motor features, which we now realize constitute only part of the overall clinical phenotype of Parkinson's disease. Non-motor features such as REM Behavioral Disorder (acting out dreams), decreased olfaction (loss of sense of smell) and autonomic symptoms such as constipation, all strongly correlate with a pathological (definitive) diagnosis of Parkinson's.

I recently spoke to Dr. Gelb, a very respected neurologist at the University of Michigan. He has never considered himself to be a movement disorder specialist and only undertook the 1999 paper, while a very junior faculty member, at the bequest of Dr. Sid Gilman. Dr Gelb has not subsequently researched or published on the topic of Parkinson's disease. He was very surprised that his 1999 paper is being used by anyone for any purpose, including as the sole diagnostic criteria in a legal case. He feels the work was a fair summary of our knowledge of Parkinson diagnosis in 1999, but readily agrees that our knowledge has progressed greatly since then, and that more modern methods are, and should be, used to make this diagnosis currently.

Although the ideal diagnostic criteria for Parkinson's disease are continually evolving and formal criteria exist, diagnosis in the real-world setting has always been a clinical diagnosis, based on history and examination findings. There are several principles of clinical diagnosis, which are fairly self-evident, regarding the accuracy of diagnosis of Parkinson's disease, and for many other medical conditions. First, using the current most modern information for diagnosis is clearly superior to older criteria formed with a less complete data set. Second, clinical diagnosis that rely predominantly on examination and history findings, rather than objective findings such as blood tests, are best

determined by specialists in that field. In the case of Parkinson's disease, a movement disorder specialist would be most able to accurately diagnose, compared to a general neurologist, who would be better able to accurately diagnose compared to a non-neurologist. Movement Disorders is a specific specialty that requires extra fellowship training after a general neurology training. Third, any diagnosis that requires examination is best done in person, rather than by review of medical records, which can never capture the full nuanced clinical picture as accurately. Fourth, one of the keystones of Parkinson's disease diagnosis is evaluating patients over time, to see how they evolve, and especially to see how they respond to interventions proven to help with Parkinson's disease. Time and disease evolution are key components recommended by all modern diagnostic principles for Parkinson's disease, and are arguably the best predictor of an accurate diagnosis compared to "gold standard" autopsy findings. Clinical response to L-dopa is another very strong predictor for Parkinson's disease.

Formal diagnostic criteria for Parkinson's disease also represent a general population rather than a specific population. National Football League players do not represent a cross section of America. They have a distinct set of relatively more common medical issues, including much higher rates of dementia, balance and gait difficulties, both from neurologic and orthopedic etiologies, sleep apnea etc.

Therefore, co-morbidity symptoms that are listed as "exclusionary" in the Gelb criteria are common in the NFL population. That said, it is also strongly argued that early onset idiopathic dementia, that is truly part a Lewy body pathology (Parkinson's disease and Dementia with Lewy bodies) is no different than Parkinson's disease with the subsequent development of dementia, and that this distinction is arbitrary and should be eliminated.

In summary, I do not feel that a strict use of criteria proposed in 1999 should be used to diagnose Parkinson's disease.

References:

Calne D *et al.* Ann Neurol 1992
Gelb D *et al*. Arch Neurol 1999
Gibb and Lees A. J Neurol Neurosurg Psych 1988
Kulisevsky J *et al.* Mov Disord Clin Pract *2024*
Marsili L *et al*. Front Neurol 2018
Postuma RB *et al*. Mov Disord 2015
Weintraub D. Mov Disord 2023

Sincerely,

William Ondo, MD
Director of Movement Disorders – Methodist Neurological Institute Professor of Neurology – Weill Cornell Medical School

It is extremely important to focus throughout this Audit analysis and this Response-that there is in the weak, Audit allegations **no attempted factual or any at all "medically based counterpoints"** to the voluminous, well documented national/ world authority thought leader level medical work primarily undertaken by Grossinger, and the co-counsel law firms with whom he associated These law firms: 1) interacted with physicians… many being extremely credible luminary national and world authorities well recognized in the movement disorders field; and 2) who undertook the only type of diagnoses and treatment clinical processes well recognized and practiced in the real world movement disorders and neurology medical field, ie. first initial diagnosis, followed by medication prescribed when modern Parkinson's symptoms and significantly followed by successive additional medical appointments critical in the clinicians ongoing diagnosis analysis and Parkinson's Disease determination.

Dr. Ondo spoke to Dr. Douglas Gelb who is still in Ann Arbor at the University of Michigan, and obtained important responses. Dr. Gelb and his 1999 criteria are partly involved in this Audit, as the Audit references the Gelb criteria on page 4 as the standard to be used for Parkinson's diagnoses currently in this NFL case. We need not get into a deep medical discussion here of the accuracy or universal use in the US and internationally by both movement disorders specialists and general neurologists of the 2015 MDS criteria (and revisions to it). In the Grossinger firm interacting with many thought leader level medical authorities in the PD field over recent years and intensely now—concerning which the Claims Administrator, AAP and others managing this case are well aware—Dr. Stuart Isaacson, Dr. Salima Brillman, Dr. Ramon Gil, Dr. Sachin Kapur, Dr. Ramsay Falconer, Dr. Fiona Gupta, Dr. Peter LeWitt, Dr. Daniel Kremins, Dr. Stephen Gollomp, Dr. Jill Farmer, Dr. Mark Lew, the late Dr. Johan Semanta and others- these leading PD authorities all focused their diagnoses and treatment using current PD principles as set forth in the MDS criteria.

There will be further activity we understand upcoming in this NFL case by many constituencies interested in proper modern accurate diagnoses for NFL football player class members including the Grossinger firm, where we expect further involvement with Dr. Gelb, and many leading figures in the PD field. Many of them have noted to us that when Dr. Gelb wrote his treatise now in the Sixth Edition, Introduction to Clinical Neurology - Douglas J. Gelb - Oxford University Press , in none of the six editions does Dr. Gelb mention the 1999 Gelb and Gilman article which he co-wrote as a young general neurologist.

It is extremely important to focus, as we have repeatedly referenced in this response that: the Audit is devoid of any specific mention of medical areas, or any citing of NFL clients of the Grossinger firm or some of its co-counsel- where it is alleged that these men do not, or did not have PD. They do, as proven very comprehensively in these exhaustively documented medical claims that were filed previously, and many pending now which have been delayed and held up because of this Audit. The Audit is very conspicuously silent on the medicine. (Other than mentioning the 1999 Gelb criteria on page 4.)

To be very clear- the following is a message from many of the leading national/world authorities luminary figures who are beyond reproach, leading the Parkinson's Disease field for decades, including developing the 2015 universally agreed as standard MDS criteria (and revisions): many have become aware of this Audit.

These leading authorities are very aware of developments in this NFL case, the diagnoses activities and diagnosis mandates in the last 2 years… and view this Audit as:

*Impugning them, their integrity and essentially tarring them, along with the Grossinger law firm concerning which many are aware has utilized thought leader level real, modern principles in the diagnoses and treatment of the NFL players. They do wish to engage coming up with those who manage this NFL case to have accuracy prevail going forward, we have heard that some of them have engaged with media in addition.*

Another major point these leading authorities in the PD field have wanted for the Special Masters to focus on is:

*The Grossinger law firm, and other involved law firms have engaged in comprehensive real, modern Movement Disorders medical practices through the respected doctors, and comprehensive long term treatment after accurate diagnosis which would be respected in any quarters as would be review by actual high level PD authorities and university academics using modern medicine principles (ie. the MDS criteria). Significantly- whereas the 1999 Gelb criteria is currently for now mandated as the standard diagnosis required by the Claims Administrator and those who manage the NFL case, (based upon the contention of some AAP doctors in late 2023)—IT IS NOT PUT FORTH OR PROPOSED OR STATED OR CONTENDED BY THOSE WHO MANAGE THE NFL CASE…(OR CONTENDED AT ALL IN THIS AUDIT) -- AS A DIAGNOSIS CRITERIA THAT ANY NEUROLOGISTS IN THE UNITED STATES NOW USE FOR DIAGNOSING PARKINSON'S DISEASE. THE GROSSINGER FIRM, BACKED BY THE WORK OF LEADING AUTHORITIES OVER MANY MANY YEARS –ON THE OTHER HAND…**DOES UTILIZE HIGH LEVEL DOCTORS WHO NOW TODAY, AND IN ALL GROSSINGER CLAIMS-USE MODERN MEDICAL CRITERIA.***

The Grossinger firm is happy to and relieved to be able to for the first time factually set forth the very appropriate, reasonable and ethical reasons why Grossinger has co-counseled with other law firms, from the early beginning of the claims process to the present... for many of the same reasons that other law firms are co-counseling in this case, and commonly in other litigations. Early in the claims process in 2018, as noted below, Grossinger transparently disclosed to Brown Greer, that it was co-counsel for NFL clients and jointly on the Grossinger law firm portal with well-established Philadelphia law firm Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck. (See attachment 35).

A primary reason why Grossinger was co-counsel with other law firms is that over the years, and prior to this NFL case, the small one man solo Grossinger law firm has had co-counsel arrangements to get benefits of joint working, and infrastructure execution from such other co-counsel law firms. The Grossinger firm is lean, just Douglas Grossinger with no secretary or paralegal, and a key reason for co-counsel was having other law firms assist in much of the work in this particularly complex NFL case, very document heavy at times, and in the claims process.

Regarding the Grossinger law firm choosing to work with other law firms as co-counsel, these co-counsel relationships were absolutely appropriate and allowed under the Settlement, we understand other law firms also have regularly co-counseled in this NFL case, with no audit disruption. There was not an organized plan or attempt to hide the co-counsel working relationships- and indeed throughout this case our Grossinger law firm's work with other law firms was well known, and openly discussed to those with whom we interacted as clients, and others, and those who inquired. Grossinger and all other

IRPAs with whom he works have been fully aware from those who talk to the Claims Administrator often…that the Claims Administrator has known for a long time that Grossinger co-counsels, it is not a secret.

There are many reasons why the Grossinger firm worked with and co-counseled with other law firms, all of which are reasonable, ethical and commonly undertaken in litigations such as this. Indeed Grossinger and other attorneys with whom he interacts have been aware that other law firms also co-counsel in this NFL case, likely for the same efficiency, and co-counsel appropriate group think medical-legal involvement which drives many of the very common co-counsel arrangements in lawsuits, particularly large, geographically expansive lawsuits such as this national NFL case.

This Audit makes it seem like it was a "secret" that Grossinger worked with other law firms as co-counsel- whereas the truth is in fact that it was well known to many, and very openly discussed. When Grossinger, or the other co-counsel would talk to the NFL clients with whom we co-counseled or people around them, or who they knew we were entirely open that we worked together.

To be clear, many law firms in this NFL case view other law firms in this case as competitors. Grossinger firm does not feel that way, and is very integrative and open to sharing thoughts, insights with other unrelated firms. Grossinger firm, and some of the law firms with whom it co-counsels have been very aware that certain other attorneys and law firms…which do not spend the time, nor necessarily have the same level of movement disorders Parkinson's domain knowledge—have been making unfounded-false allegations against the Grossinger firm, and some of its co-counsel firms. It is extremely unfair, and lacking due process…for the repeated unattributed "anonymous" purported "tips" referenced in the Audit as truthful gospel.

Such anonymous allegations which are replete through the Audit not only do not give Grossinger an appropriate opportunity to correct the record, or afford due process. We are aware of many law firms and NFL players in this competitive case who have admitted to others who we know… that they were attempting to weaken various law firms, including Grossinger by making unfounded "tips." Such "tips" on page 8 at top, "in response based on earlier <u>tips received</u>, we again conducted a review of 11 PD claims …" Also on page 9 in first paragraph, "Then in late 2024 and throughout 2025 we received a series of tips that prompted us to relaunch our investigation and solidify our findings of the process orchestrated by Mr. Grossinger…" Again, what were the purported "tips," and who made them?

Further, as noted below, Grossinger selected several law firms to co-counsel with, with one of many valid and appropriate reasons- because of their on the ground geographic locations, which facilitated working easier with NFL clients with whom those firms had NFL clients in their geographic areas. Grossinger worked with David Levine, Pro Athlete Law in part because he had many NFL clients, and contacts in South Florida. Similarly, Grossinger worked with Joshua Syme as he had NFL clients and relationships in the Detroit area. Fred Feder has had relationships with clients, and contacts in the Philadelphia region which supplemented Grossinger's.

This topic involving Grossinger's work with other law firms—is a primary area where Grossinger was prejudiced by the Claims Administrator NOT ASKING, nor having communication with the Grossinger firm similar to the extensive dialogue, discussions, and meeting which Brown Greer undertook with other law firms prior to issuance of audit reports, including the Cuthbert law firm and the Reppert law firm which both had opportunities for face to face meetings for the law firms in that more

informal pre-Audit setting to set the records straight factually, respond, and provide pertinent information requested by the Claims Administrator.

Many of our relationships and contacts in various constituencies including our counsel Fox Rothschild, lawyers in this case, lawyers outside this case, NFL players, doctors, and media entities who have inquired about this NFL case and are aware of this chilling Audit have strongly expressed the views:

WHY DIDN'T THE GROSSINGER LAW FIRM GET THE OPPORTUNITY TO BE ASKED, SO IT COULD ANSWER THE SIMPLE QUESTION DURING THIS AUDIT PREPARATION, INVESTIGATION OR PREVIOUSLY:

"WHAT LAW FIRMS ARE THE GROSSINGER LAW FIRM WORKING WITH, AND CO-COUNSEL IN THIS NFL CASE?"

The Reppert law firm was given the opportunity in the broad communication dialogue, including face to face, prior to this Audit…and they were asked that specific line of inquiry questions as this Audit summarizes.

Only recently, shortly before the issuance of this Audit report, and at a time when Grossinger was aware from dialogue with other attorneys that the Audit report was imminent, Grossinger at the last moment was asked whether he had relationships with other law firms, and Grossinger's counsel was reviewing matters including that request when this Audit was issued, so it was not responded to.

This is an unfair, ultimately executing as bad faith "gotcha," where if we had been asked—we would have very openly responded truthfully and fully, but we never had that opportunity during this Audit investigation, or before.

The May 28, 2021 Request to Feder Law Firm Regarding Working with Grossinger

On May 28, 2021 the Claims Administrator made a request to attorney Fred Feder of Feder Law, which Feder discussed and informed Grossinger, and both of course supported Feder's openly, transparently responding on June 8, 2021, "Doug Grossinger is co-counsel with me for retired NFL players with whom I am working. Our firms share attorneys fees and payment of expenses."

The November 18, 2025 Request to Feder Law regarding Working with Grossinger

Further, recently when Feder Law was asked again on November 18, 2025, concerning which Grossinger was aware and also wanting continuing transparency, Feder responded on November 20, 2025, "This is to confirm that the co-counsel relationship with Grossinger remains active for multiple cases currently on my portal, consistent with my prior response dated June 8, 2021."

There are several entirely appropriate reasons why Grossinger law firm worked and co-counseled with other firms, and it did not involve the false nefarious allegations set forth in the Audit.

Very significantly—Grossinger VERY OPENLY DISCLOSED to Brown Greer early in the claims handling phase that the Grossinger law firm would be working with co-counsel in this NFL case. Early in the claims handling, Grossinger decided to co-counsel with large well respected Philadelphia law firm Eisenberg, Rothweiler. (See Attachment 35).

**Attorneys and NFL Players are Forced to Use the Same MAF Doctors at Volume Because there are So Few of the Dwindling MAF Doctors Left**

It is well known among IRPA attorneys in this NFL case that the Claims Administrator has kept the number of MAF physicians purposely at an artificially low, and dwindling number. Many IRPAs who are close to and talk often to insiders at the Claims Administrator and others managing this case over the years have told Grossinger and other attorneys in this case consistently, that

*"A key strategy of the Claims Administrator is to make it harder for NFL players to get qualifying diagnoses and to be paid, has been through keeping the MAF doctors to a very low level. IRPAs and NFL players particularly in states like Florida which have a very high volume of retired NFL football players, and 3 NFL teams where the players often retire near their NFL team- are geographies where IRPAs are forced to send volume MAFs to the same doctor often, such as neurologist Dr. Daniel Jacobs."*

*"Then (as is being used as an allegation sword in this Audit), there are allegations made that IRPAs Use THE SAME MAFs too often…whereas the real truth is that are forced to do so by the plan of those managing this NFL case."*

This is not Grossinger's statement, this is the statements know for years in this case of other IRPAs.

The proof of this is in the numbers:

| | |
|---|---|
| The August 31, 2017 MAF List had: | 94 Doctors Practices and 154 Doctors |
| The current January 30, 2026 MAF List has only: | 46 Doctors Practices and 56 Doctors |

(See Attachments 30 and 31)

For years, IRPAs have known this, and media journalists have asked about this. One of the main themes and allegations in this Audit centers on the Claims Administrator contention- which is dubious and factually skewed to their position that: ONLY "PROGRAM DOCTORS" have reliability, are honest and "independent," whereas the truth is the opposite. The major reality is as is commonly discussed among IRPAs and other constituencies focusing now o this case- "THE FEW PROGRAM DOCTORS LEFT ARE "CONTROLLED" BY THE OTHER SIDE, THE CLAIMS ADMINISTRATOR, AAP AND OTHERS.

MAF doctors are selected by those managing the case…and they are controlled in not being able to practice standard medicine as they and other doctors undertake daily, with well established real world diagnoses- whether in Alzheimer's, Parkinson's, and also their involvement with the not real 1.5s and 2.0s. It is very well known among IRPAs, NFL players who are knowledgeable and the outside viewers of this case--see from the continual AAP questions asked, the FAQs, and the mandated directives required of these controlled "Program" doctors regarding only NFL Case specific, diagnoses forced upon them by those managing the case.

**A Major Theme Allegation in the Audit is that Grossinger and Other Co-Counsel Work with Doctors Outside of the only 46 "Program Doctors" to Diagnose and Treat NFL Clients- and that This is Nefarious**

The truth is the opposite, this Audit essentially lays insinuations of fraud and bad acts for the doctors Grossinger uses undertaking what every doctor practice in the US always undertakes, traditional modern expertised medicine. In the July 1, 2025 Parkinson's ruling, a major controversial red flag of falseness immediately recognized by IRPAs in the case and national authority medical experts and clinicians who became aware of it, and has taken on a life of its own among many constituencies now in its stark "every doctor in the US is bad, wrong, can't be trusted, only our 46 doctors can be trusted"-is the underlying the contentions and strategy used by those managing the NFL case, annd used as a sword against Grossinger in this Audit that:

**THE APPROXIMATE 18,000 NEUROLOGISTS AND 750 MOVEMENT SPECIALISTS IN THE UNITED STATES CANNOT BE TRUSTED, CANNOT MAKE ACCURATE DIAGNOSES, AND THERE SHOULD BE FRAUD SCRUTINY ON THEIR MEDICAL OPINIONS**

**And**

**THE ONLY DOCTORS WHOSE OPINIONS ARE REAL, UNTAINTED, NOT FRAUD AND NOT TO BE QUESTIONIONED- ARE ONLY THE SELF SELECTED AND CONTROLLED BY THE NFL CASE 46 REMAINING "PROGRAM" DOCTORS**

The footnote comment has been intensely scrutinized by many constituencies, third parties- since the July 1, 2025 ruling that out in the open states this skewed false theme rationale stated the AAP "has expressed serious concerns about the quality and reliability of diagnoses in which MAF neurologists rely on other doctors' (often non-MAF neurologists') observations" and that a "separate problem with such attempts at outsourcing clinical judgment is that reliance on non-MAF neurologists might permit evasion of the Program's anti-fraud and influence rules."

Many of the thought leaders in the movement disorders authorities community in the States have been well aware of and focused on Parkinson's Disease traumatically caused occurring they feel with volume in this demographic of men with large volume sub-concussive blows. We understand that there are at least two studies involving these leading clinicians regarding PD and football players, and analysis of cardiac issues in football players who have PD. This PD among NFL players has been we understand the subject of meetings, and off site assembling of PD thought leaders at the 2024 MDS conference in Philadelphia, and recent 2025 MDS conference in Hawaii, with further dialogue on this subject planned for next MDS in South Korea later this year. There are many constituencies which have been interfacing with the leadership of the PD field, including well known sophisticated retired NFL players, and we understand media some of which have contacted IRPAs including Grossinger for comments on matters involving this case.

**The Audit Purposely and Conspicuously AVOIDS Specific Medical Allegations, Does not Allege or use any Medical Authority other than Baseless Non-Related to Medical Allegations, and DOES NOT Allege that these NFL Player Clients DO NOT HAVE PARKINSONS DISEASE, because they Actually Do**

The Claims Administrator and others have evidently been investigating the Grossinger firm for years, and again never contacted Grossinger like all others had dialogue…for Grossinger to factually explain and professionally set the record factually straight here. Most of these allegations in this Audit can be quickly dispelled as false, as noted below, ie the false contentions about text messaging, Grossinger having a common practice of going to doctors appointments with NFL players, doctors often seeing NFL players in hotels for triage which is not true, the false allegations regarding Grossinger's brothers and tie in to NFL player clients of Grossinger, Grossinger not sending supplemental medical records of treatment after claim filing, Grossinger withholding adverse records as Reppert law firm may have undertaken, etc. etc.

**What the Audit calls a "Pattern" is actually traditional, generally accepted practices of diagnoses, and follow-up treatment. The Minimal Attempted Oblique Reference to Medical Diagnoses, and Treatment in Audit are False, and Unsupported. <u>If these NFL clients actually have Parkinson's Disease, that is a broad defense of these Audit allegations.</u> The accurate truth of these diagnoses, is paramount to the unfounded allegations about process, and ultimately unrelated to diagnosis areas.**

As stated herein, the work of the Grossinger firm with high level diagnosing doctors is standard in medical care for Parkinson's Disease diagnosis/treatment. As is well established in the field, and confirmed in the expert report of leading authority Dr. William Ondo- what is called a troublesome "pattern" in the Audit- is in fact standard medical practices used for Parkinson's diagnosis and treatment.

Medical Diagnoses and Treatment – <u>as Attachments</u> to this Grossinger Response- review of the actual medical diagnoses, and ongoing treatment records for Grossinger involved Parkinson's Disease and Alzheimer's Disease is critically important in proving the very accurate and appropriateness of medical diagnoses and follow-up treatment of these clients over the years. The page limit requirement of this response does not allow for a full analysis of many of the Grossinger involved medical records—see the Medical Files Attachments, from prior approved claims, and current filed claims.

It would require far more than 25 pages, likely 100s of pages to fully reply and substantiate the correctness and accuracy of the medical work undertake over time—and therefore close review and analysis of the level of comprehensive accurate diagnoses and treatment undertaken by Grossinger and co-counsel in the Attachments hereto is critically important.

The process which Grossinger undertook for NFL clients involved initial triage of symptoms, primarily through close telephone, or at times in person meeting dialogue by Grossinger and the client. If the symptoms seemed to potentially involve well known Parkinson's symptoms of expressed bradykinesia, balance and gait issues, tremors, and punching and kicking in sleep, Grossinger would proceed to have the NFL player seen for an initial evaluation. Grossinger is not a doctor, although has over the years learned and developed expertise and information from high level PD authorities which, as other lawyers undertake in medical-legal matters, Grossinger appropriately proceeded to have exams if the symptoms seemed acute.

It is important to note that many of the NFL players who Grossinger initially interacted with did not have substantial symptoms, and Grossinger did not have them see doctors. This is standard triage in medical-legal cases.

These records of the NFL clients with Parkinson's Disease and Alzheimer's are standard medical treating records in the real world, by very credible physicians. Sigificantly- THE AUDIT SEEKS TO ALLEGE BAD ACTS, AND A "PATTERN" WHERE IN FACT GROSSINGER HAVING NFL PLAYERS EXAMINED, WHERE IF THEY DO RECEIVE A POSITIVE PARKINSON'S DIAGNOSIS, AND PROCEEDING WITH ONGOING MEDICAL TREATMENT- ARE STANDARD MEDICAL PRACTICES IN THE MOVEMENT DISORDERS FIELD

Among the allegations, here are three NFL players having real, verified PD examples which illuminate how world authority doctors made their traditional regular course of business diagnoses of PD, whereas the Audit attempts to reference what would be "medical diagnoses criticisms" fail. Page 7 of the Audit sets forth the NFL Parties "concerns" in March 2022 and in September 2022 that Grossinger had submitted on his portal, and as co-counsel with Feder several Parkinson's claims. The Audit makes it seem that just the fact that there were "concerns" makes it a fact that there was wrongdoing by the doctors, and Grossinger…ultimately intimating that these men did not actually have Parkinson's Disease.

The actual facts show the veracity and world authority high level substantiated diagnoses and treatment:

1) World authority movement disorders authority Dr. Mark Lew, the Chief at USC was the diagnosing and ongoing treating doctor for two of these men, Eric King which had Grossinger and Feder as co-counsel; and 2) George Wrighster who was a Grossinger client. There is no allegation that luminary figure Dr. Lew falsified or did not accurately undertake medical work for King and Wrighster, similar to all of his other patients. Just the "concerns," does not drive an actual finding of wrong doing by Dr. Lew or Grossinger. Rather it is the opposite, Grossinger had these men seen by a high level world authority, which is absolutely appropriate.

2) Another strong example of how the Audit fails factually when attempting to wade into "real medicine areas" …and mere allegations and thousands of mile record reviews do not stand up to actual national/ world authority level diagnoses, and ongoing, long term treatment which is standard in such a medical practice- involves the record review criticism of leading PD authority Dr. Daniel Kremins, Co-Director of PD at Thomas Jefferson in Philadelphia.

   It is a false straw man concept used throughout the Audit that only the only 46 controlled remaining "Program" doctors, only a few of which are PD specialists, in the United States can make valid accurate diagnoses of Parkinson's, from a short one time MAF appointment. (The 1999 Gelb is not the point here, but also is the driving diagnosis that the Audit would seek from 2024-2026). Page 7 of the Audit states that two players saw "non-Program" neurologist Dr. Daniel Kremins, and that national/world authority Dr. Kremins' reports "generally follow" the same pattern. As it turns out- yes not only is it a pattern for these NFL patients…but this is the SAME symptoms and diagnosis for a great many of Dr. Kremins, and other PD specialists' patients. Yes they have symptoms, often subjective, but a highly trained PD specialist undertakes objective testing in addition, often UPDRS testing…which is replete throughout many of the Grossinger involved medical files. And yes, then movement disorders doctors are supposed to per their field guidelines prescribe initial

dopamine medications if symptoms and suggested PD is the diagnosis early on, and yes if there is a positive dopamine or levodopa response that absolutely is indicative of PD.

3) Overall, whereas it is termed a "Program" and intimated as bad acts, improper…the long term work of Grossinger as set forth in the many NFL player file Attachments hereto—show standard and proper accurate diagnoses, followed by treatment. That is how the PD field operates in the real world.

It is a major focus of many constituencies now viewing this NFL case for involvement that those managing the decisions in this NFL case stand by the not real in medicine assertion that: "Only the self selected 46 "Program" doctors are not fraudulent, only a few of whom are movement doctors…and the medical rules needed – are the 1999 Gelb, now 27 years later. Leading authorities in PD and other constituencies see the flaws there, and this Audit is a continuation of attempts to drive those false medical principles to apply, prejudicing the NFL players in this NFL case.

4) Grossinger's work in the Alzheimer's area, more active in earlier years of the Settlement claims also followed the same very accurate and appropriate, high level authorities driven and involved accurate diagnoses, and ongoing care. It is absolutely appropriate that Grossinger referred NFL patients multiple times to may of the same treating doctors, who are preeminent national/world authorities. In the Alzheimer's area, Grossinger had multiple patients see leading national/ world Alzheimer's authorities Dr. Carl Sadowsky, and Dr. David Weisman who brought great seriousness, diligence and expertise to the NFL patients and treatment, similar to their other patients. Also they utilized well accepted radiology testing including objective FDG PET Scans, and Amyloid scans in supporting their diagnoses.

Overall- the constant attacking and impugning the 18,000 neurologists/750 national movement doctors, as worse than and can't be trusted like the 46 controlled "Program" doctors- is absolutely false and skewed and self serving, and an improper baseless theme prejudicing the NFL players, attorneys such as Grossinger and a major unfounded allegation theme in the Audit. The truth is these well credentialed doctors which Grossinger used, many luminary thought leaders in PD performing traditional medical care including modern diagnoses, undertook modern diagnoses, appropriate treatment on the NFL players-similar to their medical practice work daily with non-NFLers.

There is not enough pages in the 25 page allowance to go through each unattributed purported "tip" from the competitor law firms, such as that Grossinger was "chummy," but Grossinger firm has been told frequently that competitors viewed it as having much domain expertise and having focused a great amount of time in the Parkinson's medical area when the firms had not. There is for example a reference to Attorney C, the recitation regarding such is not correct, regarding NFL player Matthew Hatchett it was a one-off situation not replicated among other NFL players with whom Grossinger associated, when Mr. Hatchett stated after seeing a doctor that he wanted to work with his prior lawyer Attorney C., Grossinger essentially stated that Hatchett should determine if any legal fee payment should go to Grossinger, and Grossinger indicated that no legal fee was the best course, which is what

occurred, it was not so involved as stated in Audit. Attorney C is evidently a competitor and Grossinger does not know him but for one or two talks over 5 years ago, and that attorney is not aware at all of how Grossinger worked, for him to make false accusations as stated. Key in the recitation is that the Minneapolis attorney who apparently worked with Mr. Hatchett who is in California, Mr. Hatchett was diagnosed with a movement disorder by a high level movement specialist in the Los Angeles area, there was no factual basis for the attorney to state and impugn Grossinger, including he never got Mr. Hatchette properly diagnosed for PD over ll of the prior years, his self serving statement bears no relevancy factually that he was “not convinced that the client has Parkinson’s Disease.”

**The accuracy of the prior Grossinger involved Parkinson’s and Alzheimer’s claims diagnoses- that were previously decided in the extremely rigorous Claims Administrator and AAP reviews- is proven by the fact THAT ALL PRIOR GROSSINGER CLAIMS DECIDED IN THIS CASE WERE APPROVED, WITH NO DENIALS.**

Whether with the earlier Alzheimer’s claims, which often used well respected national/world authorities care…or in the recent years of Parkinson’s files…it is illustrative and important that the Claims Administrator and AAP rarely if ever chose to go head-to head with aggressive questioning in the claims process when they knew that leading national/world authorities were the diagnosing, treating doctors. As discussed, Grossinger did appropriately have leading national/world authorities such as Dr. Stuart Isaacson, Dr. Salima Brillman, Dr. Ramon Gil, Dr. Sachin Kapur, Dr. Ramsay Falconer, Dr. Fiona Gupta, Dr. Peter LeWitt, Dr. Daniel Kremins, Dr. Stephen Gollomp, Dr. Jill Farmer, Dr. Mark Lew, and others involved in diagnosing and treating a volume of NFL patients, to provide their authoritative and accurate diagnoses, treatments. It is unclear why in the last two years the Claims Administrator, AAP did not actively criticize or go head-to head with many of the leading national/world authorities in questioning diagnoses, and PD treatment because of their concerns about how the 1999 Gelb would be viewed and would be responded to if Gelb was proactively used.

Criticisms of this Audit by various constituencies, including many national/world authorities in PD focused also substantially on the entire lack in the Audit of medical grounding, medical specificity, high level PD diagnoses and treatment concepts and objective Parkinson’s testing execution commonly used in the field—namely the Unified Parkinson’s Disease Rating Scale (**UPDRS**), or the off-on dopamine testing. Very significantly, the movement disorders specialists seeing NFL players after their diagnosis often employed their standard objective UPDRS testing, this is viewed by them as a “silver bullet” of proof of diagnosis in their profession, these Experts commented how the UPDRS testing for many of these NFL players, when undertaken in successive appointments- is a gold standard accurate proof of Parkinson’s Disease diagnosis, if the scoring objectively tracks the known course of PD and the specifics of the patient, and their dopamine regimen.

These constituencies including high level experts also commented on the Audit focusing on supposed text messages or not, hotels or not, and non-sequiturs as respects real medical diagnoses—and there is no reference at all to the off-on dopamine testing which many of the movement specialist use in their practice, and employed with many of the NFL patients. Again, in the Parkinson’s field, **use of off-on testing**, with patients coming to an appointment such as many NFL patients were directed here, after being off medication for a period- and an Off-UPDRS is scored/ then taking their medication in the offices, followed by an On-UPDRS objectively and accurately proves the Parkinson’s Disease diagnosis

objectively. These NFL patients do actually have Parkinson's Disease which is a substantial defense to these Audit allegations.

**A Major Execution and Additional Proof of the Accuracy and Truth of the Parkinson's Disease Diagnoses, with Currently Filed Claims where Grossinger has been Involved- ALMOST ALL OF THE NFL CLIENTS WITH PENDING PARKINSON'S CLAIMS HAVE ALSO BEEN SEEN BY NATIONAL/WORLD AUTHORITY MOVEMENT SPECIALISTS – TO AGAIN CONFIRM THE PARKINSON'S DIAGNOSIS.**

Again, the further additional confirmation and truth of the Parkinson's diagnosis at all of the appointments with new additional movement disorders specialists as set forth in the Attachments hereto and noted below, is substantial proof of the strength and accuracy of the medical work, and diagnoses of these men with currently filed claims where the NFL clients and the IRPAs are waiting for claims determinations.

As noted here, Grossinger has worked with the Locks Law firm for many years on Parkinson's claims, and Doug Grossinger and his firm continues to interact closely as co-counsel with the Locks firm regarding the many NFL player clients who David Levine recently transferred to Locks to be lead counsel, and on their portal. See Attachments, almost all of these NFL clients have again been diagnosed in confirming PD, and are continuing treatment with very high level authority movement specialists. Some of these men have traveled to see these national/world authority experts figures for their high level PD expertise consultation:

**A. Additional Confirmed Parkinson's Diagnosis/Treatment of Locks Law Clients Filed Claims:**

1) **Marshall Faulk, Mr. Faulk has had his diagnosis confirmed, and continues treatment with movement specialist Dr. Sandeep Thakkar. Dr. Thakkar is a national investigator in Amneal's Crexont phase IV trial.**
2) **Kevin McLeod, Mr. McLeod had his diagnosis confirmed and is continuing to be seen by movement specialist Dr. Ramsay Falconer, Chief at Inova. He too is a Crexont Phase IV investigator.**
3) **Patrick Surtain, Mr. Surtain was again confirmed diagnosed by national/world authority PD figure Dr. Ramon Gil.**
4) **Christopher Redman, Mr. Redman has been confirmed to have PD, and is treating with PD authority Dr. Sachin Kapur of Northwestern.**
5) **Sedrick Irvin, Mr. Irvin has been seeing Dr. Ramon Gil, who has confirmed his PD diagnosis, and has changed his medication to the newer long acting Crexont as part of the evolution of the medical condition.**
6) **Eric Swann, Mr. Swann has again been diagnosed with PD by well known PD specialist Dr. Eric Farbman, and continues treating with him.**
7) **Joseph Salave'a, Mr. Salave'a has been confirmed to have PD again, by Dr. Eric Farbman, and is treating with him.**

> **The other Locks Law clients from the Levine firm originally are also being seen for additional high level movement specialist, and such records will be uploaded and supplement the claims files.**

Further, one of the prior Levine clients which Locks Law is managing who has been treated extensively is having their MAF exam scheduled in California soon. That patient was entered into the phase IV Amneal Crexont trial, and the specific strict requirements of patients for the trial is that they have definitive Parkinson's Disease, with at least 2 hours of definable 'Off" and other medical requirements. That man has Parkinson's Disease, like these other NFL clients have also been proven to have.

**B. Additional Confirmed Parkinson's Diagnosis/Treatment of Feder Law Clients**

**There are two current filed claims on the Feder Law portal, concerning which Grossinger has also had involvement. Both NFL players have further confirmed diagnoses by leading national authority movement specialists.**

1) **Barrett Brooks, Mr. Brooks has been treating with authority movement specialist Dr. Lee Kubersky of Thomas Jefferson for 22 months, with 155 pages of treating records.** As Grossinger has commonly undertaken throughout this NFL case for our common co-counsel clients, Mr. Feder has continually sent ongoing post-claim filing medical records to the Claims Administrator. The Audit references that some firms, possibly the Reppert firm or others not associated with Grossinger have not sent post claim filing treatment records, the opposite is true for the Grossinger involved NFL players where ongoing treatment records are sent. With almost all claims having post claim HIPAA forms, and Claims administrator requests for additional treatment records, this is expected and followed through on.
   **Mr. Brooks has additionally been confirmed diagnosed with Parkinson's by leading PD authority Dr. Stephen Gollomp, who has switched his medication to the newer Crexont.**

2) **Christian Morton, Mr. Morton has also been again confirmed to have PD by Inova Chief Dr. Ramsay Falconer.**

**C. Long term Parkinson's Diagnosis/Treatment of Joshua Syme Law Client Marty Lyons, with claim filed**

**We understand that Attorney Joshua Syme has a small volume of NFL clients, and there is one recently filed claim, for Marty Lyons. Mr. Lyons has been diagnosed and has been treating with neurologists Dr. Adam Schneider <u>for 37 months, prior to the claim being filed.</u>**

<u>D.</u> It is Significantly Relevant Proving Parkinson's Diagnosis and Confirmatory of Parkinson's that the Grossinger Clients Undertake Long Term Ongoing Care, as is Standard in real World Movement Disorders Field

As strongly set forth in this response, the Grossinger work over time, and execution in having NFL players see high level doctors, who in the regular course of business make diagnoses similar to their

other patients…then if diagnosed with PD continue ongoing treatment care, again like their regular patients- this is not "A Program." This is how movement disorders treatment is always undertaken in the real world.

Then yes, if there was an initial diagnosis, whether for Parkinson's or Alzheimer's, and these men treat for an extended period- then yes they are sent for an MAF exam. And yes, the MAF physician should review the ongoing treatment records, and the diagnosis critically.

In the real world, and certainly at the high level of national/world authority experts which the Grossinger firm seeks to use for these NFL clients, it is absolutely appropriate that these men have had long term treatment, which real PD patients always have.

**Other Law Firms Not Under Audit Operate Similiarly Operate - Diagnosis/Treating/MAF**

**Also-significantly, the Audit seemingly seeks to blame Grossinger for all or a substantial portion of the manner in which other attorneys in the NFL case also undertake work in the PD area- whereas in fact:**

1) The statistics provided and review of the weekly reports on the NFL case web site show that- the Grossinger involved Parkinson's claims over the last 3 years with the several law firms as co-counsel Levine/ now Locks, Syme, Feder only comprise approximately 30 % of the Parkinson's claims. There are 70% of claims from other law firms.
2) Are the 70 % from other law firms other than Reppert subject to this same Audit scrutiny who have by far the majority of claims?
3) We are well aware and have specifically heard very precise NFL case operating procedures for Parkinson's claims- from the other major law firms… that are very similar to how Grossinger has operated—i) first have an accurate PD diagnosis if appropriate, emphasis on accurate, ii) then treat for a substantial period of time. Grossinger likely has clients treat longer than other law firms to accurately substantiate the condition, iii) the have the NFL player see an MAF doctor.
4) Grossinger and other attorneys with whom he works has been told very specifically by other IRPAs that when they have spoken to other leading law firms which have hundreds of NFL players that:

   "They have well over 50 NFL players diagnosed with Parkinson's and more being diagnosed ongoing, and after a period of treatment by doctors who they know well, then the NFL players see MAF doctors with extensive medical documentation of PD."

5) We assume that this Audit is not suggesting that a new "NFL case" style of diagnosing process be undertaken, that NFL players cannot got to high level treating doctors and treat over time, then go to MAF doctors with extensive medical records.

**Many of the Allegations in the Audit are False, or Misrepresent the Truth and Can Be Corrected as Below. If Grossinger had been given the opportunity for dialogue prior to the Audit, they would have been corrected, and likely not in the Audit.**

1) Grossinger has not utilized the practice commonly of having NFL players triaged first in hotels. It was a rare one-off type occurrence with a non-testifying litigation expert for the Grossinger firm, who did not treat NFL players in his office, Dr. Cherian Karunapuzha who indicated that he had other Parkinson's pharmaceutical work in Dallas and suggested to see some NFL players on two trips as a triage. He saw a small finite number of men, and indicated to Grossinger which men he felt did not have PD, and which may, and recommended they should be examined by a neurologist. Grossinger's NFL players see doctors in doctors offices.

2) The facts regarding the substantial material in the Audit relating the Reppert firm and Grossinger's possible involvement with that firm are in truth minimal. Grossinger was introduced to that firm by Mr. Oates, and over a period of time the two law firms considered collaborating as co-counsel, and it was mutual that it was not the right fit, from the Grossinger standpoint. Grossinger views those attorneys as very proficient, those attorneys were sophisticated and stated how they wanted to work with NFL players, and there was no working relationship that evolved.

3) Much is made about Grossinger not memorializing matters in writing, that is not correct, all matters required by Grossinger's counsel including ethics counsel were appropriately memorialized.

In fact Grossinger text messages very often with NFL player clients, regarding a broad range of matters. Text messaging is the primary communication medium of most of these NFL players.

There have been a finite number of instances where Grossinger knew that retired NFL players were working with others and trying to "pump him" for information, and in at least two such specific instances Grossinger declined to text message. One involved NFL player James Hasty concerning whom Grossinger knew was working with others, on December 20, 2024 when Mr. Hasty attempted to elicit information Grossinger text messaged back, "I will call you, we do not text message substantive matters." Further Dallas based NFL player Correll Buckhalter was working with others and often tried to elicit information in writing from Grossinger, on August 27, 2025, Mr. Grossinger replied, "I don't ever talk about those other matters," when Mr. Buckhalter was seeking information to be provided to others.

Last, it is true that Grossinger similar to other lawyers who he knows in this NFL case, and medical-legal lawyers outside of this case, will often speak by phone regarding important complex matters, including medical matters rather than simplistically text messaging complex medical matters.

4) Grossinger does not as a practice accompany NFL clients to doctors offices, they go on their own. The one example referenced appears to be a time when an NFL player needed a ride or could not find the doctor's office it was not clear. Grossinger that one time met him near the doctors office and led him to the waiting room, and then Grossinger left. Grossinger did not talk to the doctor at that appointment.

5) There is an attempt to weaken Grossinger's credibility by referencing his two brothers who are both neurologists and pain doctors, the information in Audit is not true. Grossinger purposely has not involved either brother in the treating medical work involving claims, as they are his brothers and he views that as improper. They know nothing about Alzheimer's or Parkinson's, and practice more in other areas of neurology along with their primary pain medicine work. Grossinger has no idea what the purported reference to an Alzheimer's test is on page 6, there was no such undertaking, Grossinger worked with high level Alzheimer's doctors such as Dr. Weisman and Dr. Sadowsky in that field.

6) The reference to a purported gift in kind is not accurate, Grossinger and friends held a party event in New Orleans along with other Philadelphia area friends including accountants, those in insurance etc. who were also fans of the Philadelphia Eagles. Some NFL players were invited, and as occurs often for these Super Bowl events with many NFL players in town, many NFL players suggested to add their friends on the list, Grossinger and the other Philadelphia friends did not necessarily know many who were asked to be put on list, and many never attended. That the doctor received the party notice was not an intention for gift in kind.

7) The financial payments between Grossinger and the various physicians practices was appropriate, and standard for how those physicians worked. Grossinger did pay for some of Dr. Jeffrey Steinberg's treatment appointments for some of the co-counsel NFL patients as requested, the total amount as Dr. Steinberg provided records was relatively deminimus, reasonable for work undertaken. The various physicians practices determined their standard fees for physician work.

8) It is true that the Grossinger firm and other firms have had multiple NFL players see some neurologists, this is very common in large national medical cases of this type, and specifically in these extremely complex medical areas – experts advise this- having experience seeing and treating other NFL players is appropriate and beneficial in the accurate understanding of the medical conditions and complex diagnoses of these men.

9) There has not been guaranteeing of diagnoses by Grossinger, before diagnosis, it simply not true and indeed would be nonsensical given the long term care needed by doctors. A doctor was needed to accurately diagnose, then undertake long term treatment if a diagnosis, that can not be known up front. NFL players were consistently told that the doctor determines the diagnosis, often over time, which is unknown prior to doctor determination.

10) Grossinger did not engage in broad solicitation as is referenced. Grossinger undertook ethical and appropriate dialogue with NFL players, and the great majority of clients were developed from the NFL players coming to Grossinger or one of his co-counsel, generally the facts were that "they had not heard from their prior lawyer in years, and were not working actively with them, ad they chose to contact Grossinger who had a good reputation as knowledgable." Grossinger did travel, and did not only work in his office as many other lawyers do in this NFL case, so being out and traveling did provide Grossinger in person exposure to various NFL players.

11) The reference to NFL players traveling hundreds of miles for MAF examinations did not apply to Grossinger's clients, it may have for the Reppert firm but Grossinger is not aware of how that law firm worked. For NFL players in the State of Florida where Grossinger had a volume of NFL co-counsel clients, including with Mr. Levine, the NFL players provided their addresses in Florida, and 150 mile exceptions were occasionally requested but there absolutely was not a volume traveling hundreds of miles. As stated in this response, there are very few MAF doctors, necessitating travel and 150 mile exceptions at times.

**Conclusion**

Grossinger is appreciative of the need for solid ethical actions to be undertaken by law firms in this case, and as set forth herein, the allegations against Grossinger are significantly incorrect, and attribute a

purposeful plan to evade rules in this NFL case which has not been actually the intention. Grossinger has worked with high level doctors to seek accurate diagnoses. With that said, Grossinger respects the Claims Administrator and its duties (despite the defenses needed to be set forth here), and Grossinger generally feels that the Claims Administrator's Requested Remedies on Pages 80 and 81 are generally reasonable, and Grossinger supports them as important for continued ethical correctness of all law firms in this case.

The #1 Claims Administrator remedy of denying filed PD claims, and requiring refiling with new MAF reports is reasonable, designed to drive to correct diagnoses…and has been ruled to be used as the ordered result of other audits in this case. For #2, it is appropriate for involved law firms and others in this NFL case to confer regarding developing enhanced and refined processes, however the B. proposed remedy requires deeply focused attention to the traditional practice of movement disorders, where non MAF doctors are credible, and provide strong accurate movement disorders consultation to NFL players. Regarding Censure, Grossinger and counsel, and others with whom Grossinger interacts realize that after the years of intensive investigation here, the Claims Administrator recommends Censure, rather than much more onerous remedies which have never been ruled and required in this NFL case for law firms being stopped from further involvement in this case. Grossinger associates with a number of very well respected law firms, including the large and long term practices at Locks and Corboy & Demetrio, and as was recommended for Cuthbert, it may be reasonable for certain law firms working together to have the lead counsel role and responsibilities by such larger established firms. Grossinger will not comment on the Censure areas, and understand the terms of any Censure as are suggested would be decided pursuant to the Claims Administrator's management of this case. Again, Grossinger is very supportive of new and refined rules and processes if well thought out and reasonable.

Further although attorney Douglas Grossinger has not interacted with Class Counsel Chris Seeger and Mike Rosenberg of the Seeger Weiss firm, Grossinger is appreciative of their continued strong work managing this NFL case on behalf of the NFL players, and ensuring the smooth working of the case. The attorneys with whom Grossinger interacts have consistently given positive comments towards the critical work that the Seeger Weiss firm plays, and Grossinger and other attorneys with whom Grossinger interacts are expecting for the Seeger Weiss attorneys to have an important role going forward regarding Parkinson's Disease, such as they smoothly resolved the race norming and other matters.

Grossinger and its counsel Fox Rothschild, and its co-counsel in this case are aware of the remedies and resulting actions for involved law firms from all other Audits in this NFL case. After years of investigating, there is no specific allegation of fraud , no proof of or specific allegation of malicious intent, and the identified Audit areas are primarily process focused. Very significantly, in other serious Audits and investigations including of Byron Cuthbert, and the Tampa law firms, there were far more serious proven allegations by the Claims Administrator and investigators which are absolutely not alleged, or present here. (see Cuthbert and Tampa Law Firms Audit, Investigations as Attachments 28 29) Such proven allegations involved significant tampering with doctors reports, and doctors and worse. None of that, nothing like that is alleged here. Further, the fact is that the great majority of diagnoses from Grossinger's work involved national and world authorities practicing as they do for all patients.

Thank you for your review and consideration.