# Exhibit "I"

# DECLARATION OF DAVID L. FAIGMAN IN SUPPORT OF DOUGLAS GROSSINGER, ESQ., MOTION TO VACATE AUDIT REPORT, AND VACATE RULE 27 RULING

I, David L. Faigman, declare as follows:

## I. RELEVANT EDUCATION AND EXPERIENCE

1. Declarant is the Chancellor & Dean, William B. Lockhart Professor of Law, and John F. Digardi Distinguished Professor of Law at University of California College of the Law, San Francisco (formerly UC Hastings Law). Declarant also holds a position as Professor in the School of Medicine (Dept. of Psychiatry), University of California, San Francisco.

2. Declarant received his BA in Psychology and History from the State University of New York at Oswego, his MA in Psychology from the University of Virginia, and his JD from the University of Virginia, School of Law.

3. Declarant has extensive training and experience in research design, scientific methods and statistics and has taught classes for lawyers and judges on these subjects.

4. For well-over thirty years in the profession, Declarant has dedicated his scholarship and teaching to the use of scientific research in legal decision making. He has written over seventy articles, published in the leading law reviews, including the Chicago, Virginia, Pennsylvania, Texas, and Northwestern law reviews, and peer-reviewed science journals, including Science, Sociological Methods and Research, Nature Reviews Neuroscience, Law & Human Behavior, and Current Biology. He has written three books on subjects related to the law's use of scientific research. In addition to courtroom use of applied science, these books have considered the use of science by administrative agencies, legislatures, and in constitutional cases. In addition, Declarant is the managing author/editor of the leading treatise on scientific evidence, *Modern Scientific Evidence: The Law and Science of Expert Testimony*, which has been cited widely by state and federal courts, including several times by the United States Supreme Court. Declarant's articles similarly have been cited numerous times by federal and state courts, including state supreme courts.

5. Declarant is one of the leading scholars in the United States on the subject of the use of scientific research in the law. He was recently identified as the most-cited evidence scholar in the nation. He has written and taught extensively in the area of scientific evidence and issues surrounding proper scientific methodology and statistical analysis for scientific evidence offered in applied settings.

6. Declarant served on the National Research Council's Committee examining the scientific validity of polygraphs,[1] which principally considered the use of polygraph tests at the nation's nuclear labs for national security purposes. Declarant was a Senior Advisor for the President's Council of Advisors on Science and Technology's (PCAST) Report on forensic science.[2]

---

[1] THE POLYGRAPH AND LIE DETECTION (National Research Council (NAS) 2003).

[2] President's Council of Advisors on Science and Technology, Report to the President, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016).

Additionally, he was a member of the MacArthur Foundation's two Networks (Phase I and Phase II) on Law and Neuroscience.

7. Declarant regularly presents on the subject of applied science to both federal and state judges. He has participated in programs organized by the Federal Judicial Center and judicial education conferences in numerous states, including California, Texas, Tennessee, Illinois, Pennsylvania, North Dakota, Virginia, and Florida. In addition, over the last twenty years, Declarant has presented lectures to judges regarding the scientific literatures relevant to their work at the National Judicial College in Reno, Nevada.

8. In his presentations and lectures to federal and state judges, Declarant focuses on the statistical and methodological bases for proffered scientific evidence. In particular, under virtually all evidence codes, federal or state, judges have gatekeeping responsibilities to ensure that expert opinion is based on good grounds.

## II. Referral

9. Declarant was asked by Douglas Grossinger, Esq. to opine on the proper manner by which to evaluate the scientific validity of the diagnostic criteria used to assess Parkinson's Disease (PD) under the Settlement Agreement.

10. Specifically, I was asked to review the record in this matter and opine on the appropriateness of Professor Hoffman's decision dated January 16, 2024, and employed in other rulings, to adopt diagnostic criteria associated with an article written by Douglas J. Gelb and colleagues and published in 1999.[3]

11. I have reviewed the Court's August 3, 2026 Order, ECF No. 12558. I understand the Court held that the Special Masters' historical factual findings are final under the Settlement Agreement and that objections to the Rule 27 decision are limited to legal issues. I offer no opinion disputing any historical factual finding concerning the conduct of any attorney, claimant, physician or firm. The opinions expressed herein do not depend on discovery, an evidentiary hearing, or any material outside the published rulings and the documents identified in this Declaration.

## III. Posited Diagnostic Criteria for Assessing a Qualifying Diagnosis

12. In his January 16, ruling, Hoffman noted that, "[a]s is often the case, the ICD-9/10 itself does not well-define the precise contours of a Diagnosis, leaving much to clinical practice." In order to answer the question of how best to make a Qualifying Diagnosis of Parkinson's Disease, Hoffman asked an Appeals Advisory Panel of neurologists for their opinions. That panel met in December 2023 and offered the following guidance:

> All members agreed that the appropriate criteria for the diagnosis of Parkinson's disease for use in the Settlement remain the Gelb criteria. These criteria published in 1999 were the most widely used criteria in the United States at the time of the Settlement. Later criteria such as those of the Movement Disorder Society published in 2015 are designed to be used by movement disorder specialists rather than the neurologists who participate as MAF

[3] Douglas J. Gelb, Eugene Oliver, & Sid Gilman, *Diagnostic Criteria for Parkinson's Disease*, 56(1) Arch. Neurol. 33-39 (1999).

> physicians, who are not required to have this specialty expertise. All members agreed that disease biomarkers such as the DaT scan should not be used to reverse the diagnosis of the examining MAF physician following Settlement criteria.[4]

13. To this recommendation, Hoffman simply asserted: "I accept this statement of the appropriate way to make a Diagnosis of Parkinson's Disease today under the Settlement."[5]

14. The opinion does not list the membership of the Panel, provide any analysis regarding what went into the Panel's recommendation, or otherwise explain the basis for this ruling. Nonetheless, the Gelb Criteria have become the operating standard.[6]

15. The essential question presented, therefore, is whether the Gelb Criteria have a sufficient scientific basis to be used as the decision criteria for making a Parkinson's diagnosis.

16. Fortunately, as the next section describes, federal courts have a well-defined process for evaluating the foundation of scientific claims; unfortunately, it appears that none of this process was employed in the present case.

17. In the next section, I employ Federal Rule of Evidence 702 and *Daubert* heuristically, as a measure of scientific merit. I do not mean to suggest that Rule 702 literally governs the consultation of the Appeals Advisory Panel or the conclusions reached by Professor Hoffman. Nonetheless, Rule 702 and the *Daubert* line of cases supply a well-developed framework by which federal courts evaluate whether a scientific proposition rests on a sound empirical foundation. I use those principles as benchmarks for assessing the methodology (or lack thereof) in the adoption of the Gelb Criteria.

---

[4] Order of Special Master Hoffman, In Re: National Football League Players' Concussion Injury Litigation, No. 2:12-md-02323-JDW, MDL No. 2323 (January 16, 2024).

[5] *Id* at 3.

[6] Of some importance to note, the Gelb criteria are a foundational component of The Claims Administrator's Rule 15 Audit Report. It provides as follows:

> The Settlement Agreement Injury Definitions effectively provide two pathways for a QD of PD. The Injury Definitions require fulfilling either: (1) a diagnosis of the specific condition of PD according to the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10); or (2) a diagnosis of Major Neurocognitive Disorder probably due to PD as defined in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5-TR).
>
> The DSM-5-TR provides four specific diagnostic criteria for Major Neurocognitive Disorder probably due to PD. These are (1) evidence of neurocognitive disorder, (2) symptoms occur in the setting of established PD, (3) insidious onset with slow deterioration, and (4) the neurocognitive disorder is not attributable to another medical condition and is not better explained by another mental disorder. Notably, the DSM-5-TR's second criterion requirement of "established PD" means that the patient must have an existing diagnosis of PD.

The Audit Report goes on to state that although the ICD-10 provides "classifications for diseases," it does not "specify diagnostic criteria." According to the Audit Report, "The general standard for diagnosis of PD at the time of the Settlement Agreement negotiations was the 'Gelb Criteria.'" Audit Report Claims Administrator's Rule 15 Audit Report, Qualifying Diagnosis of Parkinson's Disease: Claims Patterns, NFL Concussion Settlement, In re: National Football League Players' Concussion Injury Litigation, No. 2:12-md-02323 (E.D. Penn) (December 12, 2025) (hereinafter Audit Report).

## IV. Evaluating the Evidentiary Reliability and Scientific Validity of Scientific Claims

18. It is well-settled law that a settlement agreement that covers future claimants must contemplate changing science and medicine such that future claimants are ensured that the medical and scientific standards governing their eligibility for compensation remain current.[7] This determination ought to be conducted pursuant to conventional standards for evaluating scientific evidence.[8]

19. Federal courts employ Federal Rule of Evidence 702 to proffered expert testimony in both civil and criminal cases. The current rule, amended in 2023, is regularly informed by three United States Supreme Court decisions from the 1990s: *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[9] *General Electric Co. v. Joiner*,[10] and *Kumho Tire v. Carmichael*.[11] This section discusses the requirements of Rule 702 and considers generally how the holdings in *Daubert* and its progeny influence federal courts' application of Rule 702.

20. Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[12]

---

[7] *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) (Court agreed with lower court that exposure-only plaintiffs would rationally want "'causation provisions that can keep pace with changing science and medicine, rather than freezing in place the science of 1993.'") (citation omitted). *See also In re Nat'l Football League Players Concussion Inj. Litig*., 821 F.3d 410, 433 (3d Cir. 2016), as amended (May 2, 2016) ("This allows the settlement to keep pace with changing science regarding the existing Qualifying Diagnoses."). *See generally Georgine v. Amchem Products, Inc*., 83 F.3d 610, 630-631 (3d Cir. 1996); In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation, 575 Fed.Appx. 69 (2014).

[8] *See In re Silica Products Liability Litigation*, 398 F. Supp. 2d 563 (S.D. Tex. 2005) (employing *Daubert* analysis to determine whether diagnostic criteria reflected current science); *In re Zantac (Ranitidine) Prods. Liab. Litig., No. 20-MD-2924*, 2023 WL 4765409, at *5 (S.D. Fla. July 26, 2023) (noting connection between medical monitoring claims and *Daubert* analysis).

[9] 509 U.S. 579 (1993).

[10] 522 U.S. 136 (1997).

[11] 526 U.S. 137 (1999).

[12] Fed. R. Evid. 702.

21. Although Rule 702 sets forth the criteria proffered expert testimony must meet to be admitted in court, trial courts continue to rely on the *Daubert* trilogy and, in particular, the factors set forth in *Daubert*, for evaluating the foundation of proffered scientific evidence. In *Daubert*, the Court identified five factors important in assessing the "evidentiary reliability" and "scientific validity" of scientific evidence. These are:

1. Testability and whether the basis for the expert testimony has been adequately tested;
2. Peer Review and Publication;
3. Error Rate;
4. Appropriate Standards; and
5. General Acceptance

The *Daubert* factors are primarily relevant to Rules 702(b) and 702(c), as described below. In addition to the requirements of 702(b) and 702(c), other considerations should be taken into account, including in particular Rule 702(d). Finally, the additional two legs of the *Daubert* trilogy bring further issues into consideration.

The remainder of this section provides a brief overview of the *Daubert* factors.

22. **Testability (and having been adequately tested)**. This is a straightforward question of whether the testimony offered in court, or to be relied on by a factfinder, has undergone adequate testing sufficient to support the opinion of the expert. For example, research on the effectiveness of a vaccine that only studied men between the ages of 21 and 50 will likely be found insufficient to apply to women, children, or older adults. In short, an opinion that is based on no empirical testing or inadequate testing cannot meet the standards of Rules 702(b) and (c). This criterion is related to the discussion below regarding "fit."

23. **Peer Review and Publication**. The *Daubert* Court cited this factor as a proxy of good scientific research. Specifically, it should be expected that opinions offered in court will be based on a sound and robust scholarly literature. Peer review is a mainstay of the scientific process and scientific evidence offered in court should be expected to have been published in mainstream scientific outlets. It should be noted, additionally, that peer review need not be limited to the process of publication. Much peer review occurs after publication and that work can and should be taken into account when assessing the foundational validity of views offered in court. This factor also is primarily relevant to courts in answering the questions raised by Rules 702(b) and (c).

24. **Error Rate**. In science, of course, error is an essential component of any analysis. The Supreme Court identified this factor as essential, but did not opine whether any particular error rate associated with proffered expert testimony was required. In general, what error rate might be acceptable should depend on the costs of making a mistake and so must take into account the legal context involved. Unfortunately, this is an under-theorized area, and it is difficult to identify general rules or propositions regarding how much error is too much. Suffice it to say that courts typically contemplate this issue, sometimes finding error rates to be low enough to support admissibility or too high and require exclusion. Without question, however, error rates are an important consideration for courts when assessing the criteria set forth in Rules 702(b) and (c).

25. **Appropriate Standards**. This factor applies beyond 702(b) and (c) and contemplates the inquiry set forth in 702(d). Specifically, the question is whether the test or procedure on which the expert's opinion depends contains adequate standards to ensure that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." For example, in a medical causation case, an expert might claim to have done a differential diagnosis to determine what illness the plaintiff is suffering from. The first question presented is whether there are appropriate standards applicable to the method employed—i.e., differential diagnosis of the condition in question—and second, assuming such standards exist, whether they were applied reliably in the case at hand.

26. **General Acceptance**. This factor asks whether the method or test employed by the expert to reach an opinion is generally accepted among the relevant population of experts in the field. This can be a slippery factor, since the respective court must define the relevant population to consider. It should be clear that you cannot simply ask true believers whether they generally accept the methods and tests that they use every day. After all, presumably astrologers accept the validity of their methods and tests. So, the "relevant" population considered will often extend beyond just the group that use the methods or tests in question.

27. **A Matter of Fit**. An important additional consideration identified by the *Daubert* Court involves what it described as a matter of "fit." This is essentially a relevance inquiry or a component of Rule 702's "helpfulness" requirement. Specifically, the Court explained that the rule's "'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." In its opinion, the Court used a fanciful example, but one that well illustrates the point that underlying the admissibility determination lies the policy judgment of how demanding courts should be regarding the amount of research that is necessary before testimony is allowed. "The study of the phases of the moon," the Court suggested,

> [M]ay provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

28. Hence, a court's reliance on a test or method that is inappropriate for the legal standard applicable in the case would fail this fit criterion.[13] For instance, a court's use of diagnostic criteria

[13] Ultimately, the question whether a research program generalizes to a legal issue in dispute is a scientific question. For instance, the question whether animal studies provide a valid basis for opining about humans, or studies on college sophomores generalize to real jurors, must be decided based on scientific principles of extrapolation. In some cases, it will be appropriate and in others it will not. But the judgment is for courts to make pursuant to their gatekeeping responsibilities. *Compare Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 29 Media L. Rep. (BNA) 2505, 57 Fed. R. Evid. Serv. 347, 51 Fed. R. Serv. 3d 235 (9th Cir. 2001) (The majority found the animal studies to fit the issue of the product's safety and disagreed that the "species gap" necessarily rendered such work irrelevant.) *with Johnson v. Arkema, Inc*., 685 F.3d 452, 466, Prod. Liab. Rep. (CCH) P 18872 (5th Cir. 2012) ("The district court determined that the rat study was irrelevant and unreliable because [the expert] admitted that 'there is no correlation between the durations of exposure' experienced by the rats, on the one hand, and [plaintiff], on the other. Based on [this Circuit's] requirement that animal studies be 'carefully qualified in order to have explanatory potential

for Parkinson's disease that was proposed in a White Paper and which was not intended to be used "for any purpose, including as the sole diagnostic criteria in a legal case"[14] would, alone, run afoul of the Supreme Court's and Rule 702's fit requirement.

### V. APPLYING RULE 702 AND *DAUBERT*

29. The essential question presented is whether diagnostic criteria that were articulated more than 25 years ago as merely a "proposal," and one that expressly needed "to be validated in future clinicopathologic studies," meets the expectations of Rule 702.[15] Specifically, since the Gelb diagnostic criteria were intended as a hypothesis—one constructed in light of the existing knowledge at the time but yet to be empirically tested in 1999—the pivotal question presented is whether subsequent work validated those criteria. If the answer to this question is no, then a court's reliance on a mere hypothesis under even a relaxed Rule 702 and *Daubert* analysis would be manifest error.

30. I should emphasize, however, that I am not a subject matter expert on the qualifying criteria necessary to make a proper diagnosis of Parkinson's Disease. Therefore, I offer no opinion on the substantive accuracy of the opinions of Dr. John Duda and Dr. William Ondo, both of whom find that the Gelb Criteria were not state of the art at the time of the Settlement Agreement, were not state of the art when adopted by Hoffman at the recommendation of the AAP Neurologists in 2024, and are not the state of the art today.

31. From an evidentiary point of view, the question is not whether the arguments of Drs. Duda and Ondo are correct, but whether Hoffman properly evaluated the diagnostic criteria he adopted under conventional standards of proof. A review of the record indicates that he did not evaluate the scientific validity of the Gelb Criteria in any substantial fashion—or possibly in any fashion whatsoever.

32. Rule 702(b) requires that "the testimony is based on sufficient facts or data," and Rule 702(c) requires that "the testimony is the product of reliable principles and methods." Since Hoffman conducted no evaluation of these requirements, this Declaration could end here. The January 16, 2024 opinion is devoid of any analysis explaining, much less substantiating, the decision to adopt the Gelb criteria. Nonetheless, the remainder of this section considers how the Gelb Criteria might succeed or fail under Rule 702, *Daubert*, and its progeny.

33. Employing *Daubert's* factors to assess the requirements of Rules 702(b) and (c) makes clear that the Gelb Criteria are unlikely to pass muster. As Drs. Duda and Ondo explain, the Gelb criteria themselves were based on existing research and have received little substantive testing over the ensuing quarter of a century. For example, Dr. Duda stated: "In fact the Gelb criteria were

---

for human beings,' we conclude that the district court did not abuse its discretion in discounting this rat study.") (citation omitted).

[14] William G. Ondo, M.D., Memorandum on the Diagnosis of Parkinson's Disease, Feb. 2, 2026, at p. 2 (describing a conversation with Dr. Gelb regarding the import and intent of his 1999 paper) (hereinafter Ondo Opinion Feb2026).

[15] Gelb, *supra* note 3, at 38.

never formally validated in autopsy confirmed cases to ascertain sensitivity and specificity," when other diagnostic frameworks had been so tested.[16]

34. Although the original Gelb study was published in a peer reviewed journal, the peer review literature since that time has largely ignored those criteria.[17]

35. The error rate factor cannot be resolved from the materials I reviewed. Neither the January 16 ruling nor the posited recommendation identifies an error rate for the Gelb Criteria. Moreover, no comparisons were made regarding error rates for alternative diagnostic frameworks. Dr. Ondo noted, for example, that "recent reviews have suggested that the Gelb Criteria is not particularly predictive of the clinical diagnosis of Parkinson's disease. (Marsili et al., 2018)."[18]

36. The Gelb Criteria are defined by certain features, including resting tremor, rigidity, Bradykinesia, and asymmetric onset. If validated, these features might meet the *Daubert* factor regarding standards that can be reliably applied. However, according to Dr. Ondo, these features are not valid diagnostic indicators. He explains as follows:

> The Gelb et al. paper "Gelb Criteria" published in 1999 was a "white paper", positing diagnostic criteria for definite, probable, and possible Parkinson's disease. It was not based on any novel or original data, but was rather a summary of older studies. The Gelb Criteria lists 4 core features required for the diagnosis of PD (resting tremor, bradykinesia, rigidity, and asymmetric onset). However, two of these features are frequently absent in PD patients. First, approximately 25% of patients with pathologically confirmed PD never have rest tremor. (Helmich et al., 2012; Hirsch et al., 1992). In fact, patients without tremor have a worse prognosis. (Aleksovski et al., 2018) Rest tremor can also be seen only at certain stages of the disease, classically being absent in the very early and late stages, while present during the middle stages of PD progression. Second, PD is often completely symmetric or minimally asymmetric. Complete symmetry occurs in about 20% of PD cases, while 40% of patients demonstrate only mild to moderate asymmetry, whereas 40% have markedly asymmetric features. (Fox et al., 2025; Gómez-Esteban et al., 2010; Jost et al., 2026) Postural Instability Gait Disorder (PIGD) phenotype is the most common presentation of symmetric PD and confers a worse prognosis compared to tremor dominant PD. Furthermore, asymmetric presentations often evolve into more symmetric features over time. (Marinus & van Hilten, 2015) Therefore, requiring 3 of 4 Gelb criteria, 2 of

[16] *See* John Duda, M.D., Opinion on the Diagnosis of Parkinson's Disease in the National Football League Player's Concussion Injury Litigation, June 11, 2026, at 4 (hereinafter Duda Opinion).

[17] *See* William Ondo, M.D., Expert Report in Support of Douglas Grossinger Esq.: 1999 Gelb Criteria vs. 2015 Movement Disorders Society Criteria for the Diagnosis of Parkinson's Disease, August 15, 2026, at 2 ("One review article from 2018 reported that only 8 published reports on PD employed the Gelb Criteria, out of many thousands during that time frame." (citing L. Marsili, G. Rizzo, & C. Colosimo, Diagnostic Criteria for Parkinson's Disease: From James Parkinson to the Concept of Prodromal Disease, 9(March), 313069 (2018)) (hereinafter cited as Ondo Opinion Aug2026).

[18] Ondo Opinion (August 15, 2026), *supra* note 17, at 3.

which are commonly not seen in pathologically confirmed PD, is an incorrect diagnostic burden and would eliminate many people with actual PD.[19]

37. The Gelb Criteria appear to entirely fail the *Daubert* Court's demand that the research basis for scientific evidence "fit" the use to which it is to be put. The Claims Administrator's use of diagnostic criteria for Parkinson's disease that was proposed in a White Paper, and which was not intended to be used "for any purpose, including as the sole diagnostic criteria in a legal case,"[20] would run afoul of the fit requirement. Simply put, a mere hypothesis set forth in a research paper is not suitable, and does not fit, its application as diagnostic criteria for a qualifying diagnosis.

38. The final *Daubert* factor asks whether the proffered test is generally accepted in the relevant community. Indeed, it appears that this was the only factor cited by Hoffman and the AAP neurologists, in their statement that the GelbCcriteria "were the most widely used criteria in the United States at the time of the settlement." At least according to Drs. Ondo and Duda, this claim is incorrect. Dr. Duda, for instance, stated: "I have expertise in this matter and it is my view, and I strongly believe most movement disorder neurologists would agree with me, that the 1999 Gelb criteria was not the most widely used criteria in 2014."[21]

39. Rule 702(d) requires that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." As both Drs. Ondo and Duda opine, Hoffman's statement that 3 of the 4 features must be present is an unreliable application of the Gelb Criteria—even assuming the Gelb Criteria are valid, which neither doctor accepts.[22]

40. Two final considerations are worth noting, both from *Daubert's* progeny. In *Joiner*, the Court cautioned that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Here, Hoffman asked a panel of AAP Neurologists how to make a Qualifying Diagnosis of Parkinson's Disease under the Settlement and they responded that the Gelb Criteria should be used, since they "were the most widely used criteria in the United States at the time of the settlement." Hoffman stated: "I accept this statement of the appropriate way to make the Diagnosis of Parkinson's Disease today under the Settlement." The Panel's conclusion, and Hoffman's acceptance of it, is paradigmatic *ipse dixit*.

41. In *Kumho Tire*, the Court emphasized that the admissibility determination must "make certain that an expert, whether basing testimony upon professional studies or personal experience,

---

[19] *Id*. at 2-3.

[20] Ondo Opinion Feb2026, supra note 14, at 2 (describing a conversation with Dr. Gelb regarding the import and intent of his 1999 paper).

[21] Duda Opinion, *supra* note 16, at 2.

[22] Dr. Ondo states: "Although I strongly disagree with the use of the Gelb criteria entirely, and am certain that other leading Parkinson's expert would concur, the Special Master is not actually using the Gelb criteria correctly, selectively included and excluding features of the criteria." Ondo Opinion, supra note 17, at 3-4. Dr. Duda commented: "This requirement for 3 Gelb criteria for a diagnosis of Parkinson's disease runs counter to how the diagnosis is made in common practice and is incongruent with the state-of-the-art criteria outlined in 2015." Duda Opinion, supra note 17, at 3.

employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[23] Drs. Ondo and Duda both point out that the Gelb criteria do not reflect the level of diagnostic rigor that is practiced in this field.[24]

### VI. Rule 27 Decision

42. In the June 8, 2026 Rule 27 Decision, the Gelb Criteria reemerge in footnote 50 of that decision. There the Special Masters state as follows:

> Mr. Grossinger also attacks the Gelb Criteria for being—in his view—outdated and out-of-step with modern medicine. As we affirmed last year, the Gelb Criteria remains the appropriate criteria for the Diagnosis of Parkinson's Disease under the Settlement Agreement. Special Master Ruling on Parkinson's Disease and Deference, at 9 (July 1, 2025). Disagreement with that decision, however vehement it may be, is irrelevant to this Audit proceeding.[25]

43. As discussed above, the assertion that "the Gelb Criteria remains the appropriate criteria," without more, is little more than *ipse dixit*. Essentially, the Rule 27 decision rests wholly on a citation to the Special Master's own ruling of July 1, 2025, which relied on the *ipse dixit* of the unidentified AAP neurologists.

44. *Ipse dixit* atop *ipse dixit* is a most unusual, and obviously inappropriate, basis for asserting the soundness of a scientific standard.

45. A scientific proposition does not gain validity through repetition. And a legal ruling that rests on an unsound empirical proposition is not cured by citing a previous ruling that similarly rested on an unsound empirical proposition.

### VII. Conclusions

46. Embedded as a requirement in the Claims Administrator's Program Doctors Newsletter, and uncritically adopted in the January 16, 2024 ruling, the 1999 Gelb Criteria sprang into being as the standard for diagnosing Parkinson's Disease. The January 16 ruling was based ostensibly on the conclusory recommendation of a panel of AAP neurologists, to which Hoffman acceded without explanation. The Panel's reasoning was not provided and appears not to be publicly available. Indeed, the statement that the Gelb Criteria would "remain" the guiding standard appears

---

[23] *Kumho Tire*, 526 U.S. at 152.

[24] For example, Dr. Ondo observes as follows:

> One barometer to assess opinion regarding the preferred diagnostic criteria for PD would be identifying which are used for clinical trials of PD. A brief review on ClinicalTrials.gov, which lists all public clinical trials involving PD, revealed that more than 95% of trials specify either UK Brain bank or MDS criteria, or list these criteria verbatim. In the approximately 100 PD clinical trials in which I have participated since 1996, I can't recall any study that employed any other diagnostic criteria.

Ondo Opinion, *supra* note 16, at 2.

[25] Rule 27 Decision, June 8, 2026, p.32, n.50. I offer no opinion concerning the Audit's historical factual findings. My opinion is confined to the scientific proposition used as a diagnostic benchmark: specifically, footnote 50 does not supply the reliability analysis absent from the January 16, 2024 ruling.

to be an affirmative misstatement, since those criteria were not part of the Settlement Agreement and were employed only after the 2024 ruling. This ruling is manifestly erroneous for an assortment of reasons.

47. The Gelb standard was not subjected, at least in the disclosed ruling, to any reliability assessment as would have been reflected in the sort of analysis inherent in Rule 702 and *Daubert* and its progeny.

48. It appears that if the Gelb standard had undergone that review, it would have failed it. The Gelb Criteria are a product of a hypothesis published in a White Paper that has not been adequately tested since it was first promulgated in 1999. Although published in a peer reviewed journal, the Gelb Criteria have not been the subject of substantial published treatment. Moreover, the Gelb Criteria have unknown, but seemingly problematic, error rates and are not generally accepted in the relevant field.

49. Finally, uncritical adoption of the unexplained AAP Neurologist recommendation to adopt the Gelb Criteria is the worst form of *ipse dixit*. Repetition of that ipse dixit in the Rule 27 Ruling does not cure it.

50. In sum, the Gelb standard should have been assessed under some process for evaluating the soundness of a scientific standard, such as the criteria offered by Rule 702 and *Daubert* and its progeny. It was not. For this reason alone, it was error. A further review of the Gelb Criteria under the criteria of Rule 702 indicate that even if that review had taken place, the Gelb Criteria would have been found to lack scientific validity.

I solemnly affirm under the penalties of perjury that the contents of this document are true to the best of my knowledge, information, and belief. Signed September 10, 2026:

______________________________________

David L. Faigman

**August 2026**

# DAVID L. FAIGMAN

**University of California**
**College of the Law, San Francisco**
**200 McAllister Street**
**San Francisco, CA 94102**
**(415) 565-4739**
**faigmand@uclawsf.edu**

## EMPLOYMENT

**Regular**

| | |
|---|---|
| 2017-present | Chancellor & Dean, University of California College of the Law, San Francisco (formerly UC Hastings Law) |
| 2016 | Acting Chancellor & Dean, University of California College of the Law, San Francisco (formerly UC Hastings Law) |
| 2007-present | John F. Digardi Distinguished Professor of Law, University of California College of the Law, San Francisco (formerly UC Hastings Law) |
| 2009-present | Professor, Department of Psychiatry, School of Medicine, University of California, San Francisco |
| 2014-2020 | Co-Founder, JuriLytics, LLC |

*******

| | |
|---|---|
| 2009-2015 | Founding Director, UCSF/UCLawSF Consortium on Law, Science & Health Policy |
| 2006-2007 | Distinguished Professor of Law, University of California College of the Law, San Francisco (formerly UC Hastings Law) |
| 1993-2006 | Professor of Law, University of California College of the Law, San Francisco (formerly UC Hastings Law) |
| 1997-1998 | Harry H. and Lillian H. Hastings Research Chair, University of California College of the Law, San Francisco (formerly UC Hastings Law) (One-year appointment) |
| 1990-1993 | Associate Professor of Law, University of California College of the Law, San Francisco (formerly UC Hastings Law) |

| | |
|---|---|
| 1987-1990 | Assistant Professor of Law, University of California College of the Law, San Francisco (formerly UC Hastings Law) |
| 1986-1987 | Judicial Clerkship with The Honorable Thomas M. Reavley of the United States Court of Appeals for the Fifth Circuit, Austin, Texas |

**Visiting**

| | |
|---|---|
| 2000 (May) | Universita Piemonte Orientale Amedeo Avogadro, Allassandria, Italy |
| 1998 (May) | Universita Degli Studi di Trento, Trento, Italy |
| 1995 (April-June) | Universite D'Aix-Marseille, Aix-en-Provence, France |
| 1995 (January-March) | Universita Degli Studi di Trento, Trento, Italy |

## EDUCATION

| | |
|---|---|
| 1986 | J.D., University of Virginia, School of Law.<br>Member of the Editorial Board, VIRGINIA LAW REVIEW.<br>Member, Order of the Coif. |
| 1983 | M.A., University of Virginia (Psychology) (Degree awarded May 1984). |
| 1979 | B.A., State University of New York, College at Oswego.<br>Majors: Psychology and History. |

## PUBLICATIONS

**General Non-Fiction Books**

| | |
|---|---|
| 2008 | CONSTITUTIONAL FICTIONS: A UNIFIED THEORY OF CONSTITUTIONAL FACTS (Oxford Univ. Press 2008). |
| 2004 | LABORATORY OF JUSTICE: THE SUPREME COURT'S 200-YEAR STRUGGLE TO INTEGRATE SCIENCE AND THE LAW (Henry Holt & Co. (Times Books), 2004 (Paperback, 2005 (Owl Books)). |

1999 LEGAL ALCHEMY: THE USE AND MISUSE OF SCIENCE IN THE LAW (W.H. Freeman & Co., 1999 (Paperback, 2000)).

**Treatises, Course Books & Manuals**

2026 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Erin Murphy, Michael Saks, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2025-2026 Edition) (Volumes 1-5) (in press).

2025 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Erin Murphy, Michael Saks, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2024-2025 Edition) (Volumes 1-5) (in press).

2024 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Erin Murphy, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2023-2024 Edition) (Volumes 1-5).

2023 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Jennifer Mnookin, Erin Murphy, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2022-2023 Edition) (Volumes 1-5).

2022 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Jennifer Mnookin, Erin Murphy, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2021-2022 Edition) (Volumes 1-5).

2021 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Jennifer Mnookin, Erin Murphy, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2020-2021 Edition) (Volumes 1-5).

2020 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Jennifer Mnookin, Erin Murphy, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2019-2020 Edition) (Volumes 1-5).

2019 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Jennifer Mnookin, Erin Murphy, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2018-2019 Edition) (Volumes 1-5).

| | |
|---|---|
| 2018 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Jennifer Mnookin, Erin Murphy, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2018-2019 Edition) (Volumes 1-5). |
| 2017 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Jennifer Mnookin, Erin Murphy, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2017-2018 Edition) (Volumes 1-5). |
| 2016 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Jennifer Mnookin, Erin Murphy, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2016-2017 Edition) (Volumes 1-5). |
| 2015 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Edward Cheng, Jennifer Mnookin, Erin Murphy, Joseph Sanders and Christopher Slobogin) (West/Thomson Publishing Co., 2015-2016 Edition) (Volumes 1-5). |
| 2014 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Jeremy Blumenthal, Edward Cheng, Jennifer Mnookin, Erin Murphy and Joseph Sanders) (West/Thomson Publishing Co., 2014-2015 Edition) (Volumes 1-5). |
| 2013 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Jeremy Blumenthal, Edward Cheng, Jennifer Mnookin, Erin Murphy and Joseph Sanders) (West/Thomson Publishing Co., 2013-2014 Edition) (Volumes 1-5). |
| 2012 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Jeremy Blumenthal, Edward Cheng, Jennifer Mnookin, Erin Murphy and Joseph Sanders) (West/Thomson Publishing Co., 2012-2013 Edition) (Volumes 1-5). |
| 2011 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Jeremy Blumenthal, Edward Cheng, Jennifer Mnookin, Erin Murphy and Joseph Sanders) (West/Thomson Publishing Co., 2011-2012 Edition) (Volumes 1-5). |
| 2010 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Michael J. Saks, Joseph Sanders and Edward K. Cheng) (West/Thomson Publishing Co., 2010-2011 Edition) (Volumes 1-5). |
| 2009 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Michael J. Saks, Joseph Sanders and Edward K. Cheng) (West/Thomson Publishing Co., 2009-2010 Edition) (Volumes 1-5). |

| | |
|---|---|
| 2008 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with Michael J. Saks, Joseph Sanders and Edward K. Cheng) (West/Thomson Publishing Co., 2008-2009 Edition) (Volumes 1-5). |
| 2007 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with David H. Kaye, Michael J. Saks, Joseph Sanders and Edward K. Cheng) (West/Thomson Publishing Co., 2007-2008 Edition) (Volumes 1-4). |
| 2006 | MODERN SCIENTIFIC EVIDENCE: STANDARDS, STATISTICS AND RESEARCH ISSUES (Student Edition); MODERN SCIENTIFIC EVIDENCE: FORENSICS (with David H. Kaye, Michael J. Saks, Joseph Sanders, and Edward Cheng) (West/Thomson Publishing Co. 2006) (Volumes 1-4). |
| 2006 | ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (with Michael J. Saks, David H. Kaye and Joseph Sanders) (West/Thomson Publishing Co., 2006) (Volumes 1-4). |
| 2005 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with David H. Kaye, Michael J. Saks, and Joseph Sanders) (West/Thomson Publishing Co., 2005-2006 Edition) (Volumes 1-4). |
| 2004 | ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (with Michael J. Saks, David H. Kaye and Joseph Sanders) (West Publishing Co., 2004). |
| 2003 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with David H. Kaye, Michael J. Saks, Joseph Sanders, eds., Supplement 2003, West Publishing Co.) (Volumes 1-4). |
| 2002 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with David H. Kaye, Michael J. Saks and Joseph Sanders, eds., 2d ed., 2002, West Publishing Co.) (Volumes 1-4). |
| 2000 | MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with David H. Kaye, Michael J. Saks, Joseph Sanders, eds., Supplement 2000, West Publishing Co.). |

1999 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with David H. Kaye, Michael J. Saks, Joseph Sanders, eds., West Publishing Co.) (Volume III).

1999 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with David H. Kaye, Michael J. Saks, Joseph Sanders, eds., Supplement 1999, West Publishing Co.).

1997 MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (with David H. Kaye, Michael J. Saks, Joseph Sanders, eds., 1997, West Publishing Co.) (Volumes I & II).

**In Preparation**

NINO & CLARENCE'S EXCELLENT ADVENTURE: THE TALE OF TWO SUPREME COURT JUSTICES AND THEIR JOURNEY THROUGH TIME TO DISCOVER THE ORIGINAL MEANING OF ORIGINAL INTENT

*Using Scientific Data to Make Individual Decisions in the Law (G2i)* (with multiple coauthors).

**Articles, Essays, Comments & Book Reviews**

2026 *A Set of One*, 77 UC LAW JOURNAL 17 (2026) (Special Issue in honor of Richard Marcus).

2026 *Lost in Translation: How Inconclusive Results Exposed the Limits of Forensic Firearm Identification and Confounded the Courts*, 65 JURIMETRICS J. ___ (2026, in press) (with Nicholas Scurich).

2025 *Behavioral Research in the Shadow of Plea Bargaining*, 38(3) JOURNAL OF BEHAVIORAL DECISION MAKING (2025), https://doi.org/10.1002/bdm.70031.

2025 *Overcoming Judicial Innumeracy: A Proposal to Bring the Venerable Process of Peer Review to the Enduring Problem of Courts' Scientific Illiteracy*, 26 COLUMBIA SCI. & TECH. L. REV. 76 (2025).

2025 *The Ineffectiveness of the "Consistent with" Judicial Limitation on Forensic Firearms Testimony*, 49(4) LAW & HUMAN BEHAVIOR 387-397 (2025) (with Nicholas Scurich and Brandon L. Garrett) https://doi.org/10.1037/lhb0000615.

2025 *Contemporary Challenges to Firearms & Toolmarks Based on Science*, in MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY, Chap. 34, Part III (2024-2025 edition) (with Nicholas Scurich).

| | |
|---|---|
| 2024 | *The Law Must Respond when Science Changes*, SCIENTIFIC AMERICAN, Nov. 4, 2024, https://www.scientificamerican.com/article/the-law-must-respond-when-science-changes/ (with Jeff Kukucka) (Ethics/Opinions). |
| 2024 | *Shaken Baby Syndrome Has Been Discredited. Why is Robert Roberson Still on Death Row?* SCIENTIFIC AMERICAN, October 26, 2024, https://www.scientificamerican.com/article/shaken-baby-syndrome-has-been-discredited-why-is-robert-roberson-still-on/ (with Jeff Kukucka) (Ethics/Opinions). |
| 2024 | *Putting the Bar Exam to the Test: An Examination of the Predictive Validity of Bar Exam Outcomes on Lawyering Effectiveness*, 2024 JOURNAL OF LAW AND EMPIRICAL ANALYSIS 1-13 (2024) (with Jason Scott, Stephen Goggin, Rick Trachok, Jenny Kwon, Sara Gordon, Dean Gould, Fletcher Higel, and Leah Chan Grinvald) DOI: 10.1177/2755323X241296683. |
| 2023 | *Scientific Guidelines for Evaluating the Validity of Forensic Feature-Comparison Methods*, 120 PROC. NATL. ACAD. SCI. e2301843120 (2023) (with Nicholas Scurich and Thomas D. Albright); https://doi.org/10.1073/pnas.2301843120. |
| 2022 | *The Field of Firearms Forensics Is Flawed*, SCIENTIFIC AMERICAN, May 25, 2022 (with Nicholas Scurich and Thomas D. Albright) (Ethics/Opinions). |
| 2022 | *The Use of Battered Woman Syndrome in U.S. Criminal Courts*, 50 J. AMER. ACAD. PSYCHIATRY LAW 1 (2022) (with Jessica R. Holliday, Dale E. McNiel, Nathaniel P. Morris, and Renee L. Binder). |
| 2022 | *Using Burdens of Proof to Allocate the Risk of Error in Juvenile Sentencing*, 63 WM. MARY L. REV. 1289 (2022) (with Kelsey Geiser) (Symposium Issue). |
| 2021 | *Differential Etiology: Inferring Specific Causation in the Law from Group Data in Science*, 63 ARIZONA L. REV. 851 (2021) (with Joseph Sanders, Peter B. Imrey & Philip Dawid). |
| 2021 | *Fact-Finding in Constitutional Cases*, *in* A DIALOGUE BETWEEN LAW AND HISTORY (Baosheng Zhang, Thomas Man, Jing Lin, eds.) (Springer 2021). |
| 2019 | *Psychological Assessments in Legal Contexts: Are Courts Keeping "Junk Science" Out of the Courtroom?* 20(3) PSYCHOLOGICAL SCIENCE IN THE PUBLIC INTEREST 135 (2019) (with Tess M.S. Neal, Christopher Slobogin, Michael J. Saks & Kurt F. Geisinger). |
| 2019 | *A Man for All Seasons: A Remembrance of Geoffrey C. Hazard*, 70 HASTINGS L. J. 949 (2019). |

2018 *Intellectual Disability, the Death Penalty, and Jurors*, 58 JURIMETRICS J. 437 (2018) (with Emily V. Shaw & Nicholas Scurich).

2018 *The Curious Case of* Wendell v. GlaxoSmithKline, Inc., 48 SETON HALL L. REV. 607 (2018) (with Jennifer Mnookin).

2016 *Scientific Gatekeeping: Using the Structure of Scientific Research to Distinguish Between Admissibility and Weight in Expert Testimony*, 110 NW. U. L. REV. 859 (2016) (with Christopher Slobogin and John Monahan).

2015 *Where Law and Science (and Religion) Meet*, 93 U. TEX. L. REV. 1659 (2015).

2015 *Organized Common Sense: Judge Jack Weinstein's Uncommonly Sensible Approach to Expert Evidence*, 64 DEPAUL L. REV. 421 (2015) (with Claire Lesikar) (invited paper for the Clifford Symposium in honor of Judge Jack Weinstein).

2015 *Toward a Jurisprudence of Psychiatric Evidence: Examining the Challenges of Reasoning from Group Data in Psychiatry to Individual Decisions in the Law*, 69 U. MIAMI L. REV. 685 (2015) (with Carl Erik Fisher & Paul Appelbaum).

2014 *Group to Individual (G2i) Inference in Scientific Expert Testimony*, 81 U. CHI. L. REV. 417 (2014) (with John Monahan & Christopher Slobogin).

2014 *Promises, Promises for Neuroscience and Law*, 24 CURRENT BIOLOGY 861 (2014) (with Joshua W. Buckholtz).

2014 *Fitting Science into Legal Contexts: Assessing Effects of Causes or Causes of Effects?* 43 SOCIOLOGICAL METHODS & RESEARCH 359 (2014) (with Philip Dawid & Stephen Fienberg). With additional commentary in:

*Authors' Response to Comments on Fitting Science into Legal Contexts: Assessing Effects of Causes or Causes of Effects?*, 43 SOCIOLOGICAL METHODS & RESEARCH 416 (with Philip Dawid & Stephen Fienberg);

*On the Causes of Effects: Response to Pearl*, 44 SOCIOLOGICAL METHODS & RESEARCH 165 (2015) (with Philip Dawid & Stephen Fienberg).

2014 *"My Older Clients Fall Through Every Crack": Geriatrics Knowledge Among Legal Professionals*, 62 JOURNAL OF THE AMERICAN GERIATRICS SOCIETY 734 (2014) (with Tacara Soones, Cyrus Ahalt, Sarah Garrigues & Brie A. Williams).

| | |
|---|---|
| 2013 | *Neuroscientists in Court*, 14 NATURE REVIEWS NEUROSCIENCE 730 (2013) (with Owen Jones, Anthony Wagner & Marcus Raichle). |
| 2013 | *Wading Into the* Daubert *Tide*: Sargon Enterprises, Inc. v. University of Southern California, 64 HASTINGS L. REV. 1665 (2013) (with Edward Imwinkelried). |
| 2013 | *The* Daubert *Revolution and the Birth of Modernity*, 46 UC DAVIS L. REV. 101 (2013). |
| 2012 | *Implicit Bias in the Courtroom*, 59 UCLA L. REV.1124 (2012) (with Jerry Kang, et. al). |
| 2010 | *Evidentiary Incommensurability: A Preliminary Exploration of the Problem of Reasoning from General Scientific Data to Individualized Legal Decision Making*. 75 BROOKLYN L. REV. 1115 (2010) (Festschrift for Professor Margaret Berger). |
| 2009 | *Defining Empirical Frames of Reference in Constitutional Cases: Unraveling the As-Applied versus Facial Distinction in Constitutional Law*, 36 HASTINGS CONST. L. Q. 631 (2009). |
| 2009 | *Standards of Legal Admissibility and Their Implications for Psychological Science*, *in* PSYCHOLOGICAL SCIENCE IN THE COURTROOM: CONTROVERSIES AND CONSENSUS (Jennifer Skeem, Kevin Douglas & Scott Lillienfeld, eds. 2009) (with John Monahan). |
| 2009 | *Evidence Code Section 802: The Neglected Key to Rationalizing the California Law of Expert Testimony*, 42 LOYOLA L. REV. 427 (2009) (with Edward Imwinkelried). |
| 2008 | *A Matter of Fit: The Law of Discrimination and the Science of Implicit Bias*, 59 HASTINGS L.J. 1380 (2008) (with Nilanjana Dasgupta and Cecilia L. Ridgeway). |
| 2008 | *Failed Forensics: How Forensic Science Lost Its Way and How It Might Yet Find It*, 4 ANNUAL REVIEW OF LAW AND SOCIAL SCIENCE 149 (2008) (with Michael J. Saks). |
| 2008 | *Scientific Realism in Constitutional Fact-Finding*, 73 BROOKLYN L. REV. 1067 (Symposium) (2008). |
| 2008 | *Anecdotal Forensics, Phrenology, and Other Abject Lessons from the History of Science*, 59 HASTINGS L.J. 979 (2008). |
| 2008 | Three entries in THE ENCYCLOPEDIA OF PSYCHOLOGY AND LAW: (1) Expert Testimony, (2) Expert Testimony, Qualifications of, (3) Expert Testimony, Forms of (Brian Cutler, ed. 2008 (Sage Publications)). |

| | |
|---|---|
| 2008 | *Admissibility Regimes: The Opinion Rule and Other Oddities and Exceptions to Scientific Evidence, the Scientific Revolution, and Common Sense*, 36 SOUTHWESTERN L. REV. 699 (Symposium) (2008). |
| 2007 | *Fact-Finding in Constitutional Cases*, *in* HOW LAW KNOWS (Stanford University Press, ed., Austin Sarat et al. 2007) (Amherst College Speaker Series). |
| 2007 | *The Limits of Science in the Courtroom*, *in* BEYOND COMMON SENSE: PSYCHOLOGICAL SCIENCE IN THE COURTROOM (Eugene Borgida & Susan T. Fiske, eds. 2007 (Blackwell Publishers)). |
| 2006 | *Judges as Amateur Scientists*, 86 BOSTON U. L. REV. 1207 (2006). |
| 2006 | *Amicus Brief of Constitutional Law Professors David L. Faigman and Ashutosh A. Bhagwat, et al. in the Case of* Gonzales v. Carhart, 34 HASTINGS CONST. L. Q. 69 (2006) (with Ashutosh A. Bhagwat & Kathryn M. Davis). |
| 2005 | *Expert Evidence After* Daubert, 1 ANNUAL REV. LAW & SOC. SCI.105 (2005) (with Michael Saks). |
| 2004 | *Psychological Evidence at the Dawn of the Law=s Scientific Age*, 56 ANNUAL REV. PSYCHOL. 631 (2004) (with John Monahan). |
| 2003 | *Expert Evidence: The Rules and Rationality the Law Applies (or Should Apply) to Social Science Expertise*, in HANDBOOK OF PSYCHOLOGY IN LEGAL CONTEXTS (John Wiley & Sons Inc., David Carson & Ray Bull, eds., 2003). |
| 2003 | *The Limits of the Polygraph*, 20 ISSUES IN SCIENCE & TECHNOLOGY 40 (Fall 2003) (with Stephen E. Fienberg & Paul C. Stern). |
| 2003 | *Making Moral Judgments Through Behavioral Science: The Substantial Lack of Volitional Control Requirement in Civil Commitments*, 2 LAW, PROBABILITY AND RISK 309 (2003). |
| 2003 | *Expert Evidence in Flatland: The Geometry of a World Without Scientific Culture*, 34 SETON HALL L. REV. 255 (2003). |
| 2002 | *Is Science Different for Lawyers?,* 297 SCIENCE 339 (2002). |
| 2001 | *The Tipping Point in the Law's Use of Science: The Epidemic of Scientific Sophistication that Began with DNA Profiling and Toxic Torts*, 67 BROOKLYN L. REV. 111 (2001). |
| 2001 | *Embracing the Darkness:* Logerquist v. McVey *and the Doctrine of Ignorance of Science is an Excuse,* 33 ARIZONA ST. L. REV. 87 (2001). |

2000 *The Law's Scientific Revolution: Reflections and Ruminations on the Law's Use of Experts in Year Seven of the Revolution*, 57 WASH. & LEE UNIV. L. REV. 661 (2000).

2000 *How Good is Good Enough? Expert Evidence Under* Daubert *and* Kumho Tire, 50 CASE W.L. REV. 645 (2000) (with David H. Kaye, Michael J. Saks, and Joseph Sanders).

1998 *Looking for Policy in All the Wrong Places: A Comment on the Strategies of the Race and Gender Crowd Toward Evidence Law*, 28 SOUTHWESTERN L. REVIEW 289 (1998).

1998 *Truth with a Small t*, 49 HASTINGS LAW JOURNAL 1185 (1998).

1998 *Should Forensic Science be Scientific?* in POLICE, TECHNIQUÉS MODERNES D'ENQUÊTE OU DE SURVEILLANCE ET DROIT DE LA PREUVE, Faculte de droit, Université de Sherbrooke, Quebec (Canada) (28 et 29 mai 1998).

1997 *The Battered Woman Syndrome in the Age of Science*, 39 ARIZONA L. REV. 67 (1997) (with Amy J. Wright).

1997 *Appellate Review of Scientific Evidence Under* Daubert *and* Joiner, 48 HASTINGS L.J. 969 (1997).

1996 *And the Republic for Which it Stands: Guaranteeing a Republican Form of Government in the Individual States*, 23 HASTINGS CONST. L. Q. 1057 (1996) (with Catherine A. Rogers).

1996 *The Syndromic Lawyer Syndrome: A Psychological Theory of Evidentiary Munificence*, 67 COLORADO L. REV. 817 (1996).

1996 *Making the Law Safe for Science: A Proposed Rule for the Admission of Expert Testimony*, 35 WASHBURN L. REV. 401 (1996).

1995 *The Evidentiary Status of Social Science Under* Daubert*: Is it Scientific, Technical, or Other Knowledge?,* 1 PSYCHOLOGY, PUBLIC POLICY AND LAW 960 (1995), *revised and reprinted in* 1999 WILEY EXPERT WITNESS UPDATE: NEW DEVELOPMENTS IN PERSONAL INJURY LITIGATION (Eric Pierson, ed., Aspen, 1999).

1995 *Mapping the Labyrinth of Scientific Evidence*, 46 HASTINGS L.J. 555 (1995).

1994 *Modeling Constitutionality Transactionally*, 45 HASTINGS L.J. 753 (1994).

| | |
|---|---|
| 1994 | *Check Your Crystal Ball at the Courthouse Door, Please: Exploring the Past, Understanding the Present and Worrying About the Future of Scientific Evidence*, 15 CARDOZO L. REV. 1799 (1994) (with Elise Porter & Michael J. Saks). |
| 1994 | *Madisonian Balancing: A Theory of Constitutional Adjudication*, 88 NORTHWESTERN U.L. REV. 641 (1994). |
| 1993 | *Constitutional Adventures in Wonderland: Exploring the Debate Between Rules and Standards Through the Looking Glass of the First Amendment*, 44 HASTINGS L.J. 829 (1993). |
| 1992 | *Reconciling Individual Rights and Government Interests: Madisonian Principles Versus Supreme Court Practice*, 78 VA. L. REV. 1521 (1992). |
| 1992-2025 | *A Flow Chart of the Federal Rules of Evidence*, *in* FEDERAL RULES OF EVIDENCE FOR UNITED STATES COURTS AND MAGISTRATES (West Academic, 1992-2024). |
| 1992 | *Like Socrates, But Hold the Hemlock: Teaching Law*, *in* FULL DISCLOSURE: DO YOU *REALLY* WANT TO BE A LAWYER (compiled by Susan J. Bell, Peterson's Guides 2d Ed. 1992). |
| 1992 | *Struggling to Stop the Flood of Unreliable Expert Testimony*, 76 MINN. L. REVIEW 877 (1992). |
| 1991 | *Normative Constitutional Fact-Finding: Exploring the Empirical Component of Constitutional Interpretation*, 139 U. PA. L. REV. 541 (1991). |
| 1990 | *By What Authority: Reflections on the Constitutionality and Wisdom of the Flag Protection Act of 1989*, 17 HASTINGS CON. L. Q. 353 (1990); *reprinted in* THE FLAG AND THE CONSTITUTION, VOL. II, FLAG BURNING AND THE LAW (Michael Kent Curtis ed. 1993). |
| 1989 | *To Have and Have Not: Assessing the Value of Social Science to the Law as Science and Policy*, 38 EMORY L.J. 1005 (1989). |
| 1988 | *Bayes' Theorem in the Trial Process: Instructing Jurors on the Value of Statistical Evidence*, 12 LAW & HUMAN BEHAV. 1 (1988) (with A.J. Baglioni, Jr.). |
| 1987 | *Discerning Justice When Battered Women Kill* [Book Review], 39 HASTINGS L.J. 207 (1987). |

| | |
|---|---|
| 1986 | Note, *The Battered Woman Syndrome and Self-Defense: A Legal and Empirical Dissent*, 72 VA.L.REV. 619 (1986); *reprinted in* REPRESENTING ... BATTERED WOMEN WHO KILL (S.L. Johann & F. Osanka eds. 1989). |

**Government Reports/Books**

| | |
|---|---|
| 2018 | *Translating Scientific Concepts into Legal Constructions (and Vice Versa)*, in *Neuroforensics: Exploring the Legal Implications of Emerging Neurotechnologies: Proceedings of a Workshop*, National Academies of Science, National Academies Press; PDF available at http://nap.edu/25150 |
| 2002 | *The Polygraph and Lie Detection* (Final Report of the Committee to Review the Scientific Evidence on the Polygraph, National Academies of Science/National Research Council) (National Academy Press). |

## PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 2022-2023 | Member, Nevada Bar Commission |
| 2017-2020 | Member, ABA National Commission on the Future of Legal Education. |
| 2015-2016 | Senior Advisor, President's Council of Advisors on Science and Technology (PCAST), Office of Science and Technology Policy, Executive Office of the President, for its Report, "Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods." |
| 2011-2016 | Member, MacArthur Foundation Law and Neuroscience Network (Phase II) |
| 2011-2016 | Principal Investigator, MacArthur Foundation G2i Committee (a Subcommittee of the MacArthur Foundation Law and Neuroscience Network) |
| 2010-present | Advisory Council (Law), Institute for Linguistic Evidence |
| 2006-present | Member, American Law Institute |
| 2005-present | Member, National Commission on Forensic Science and Public Policy, American Judicature Society |

| | |
|---|---|
| 2002-present | Outside Reviewer, JUDICATURE |
| 2002-present | Outside Reviewer, JURIMETRICS |
| 2002-present | Member, Editorial Advisory Board, ENCYCLOPEDIA OF FORENSIC AND LEGAL MEDICINE, Academic Press, London. |
| 2008-2011 | Member, MacArthur Foundation Law and Neuroscience Project (Phase I) |
| 2001-2002 | Committee Member, National Academy of Sciences/National Research Council, Committee to Review the Scientific Evidence on the Polygraph. |
| 2001-2004 | Member, Editorial Review Board, JOURNAL OF LEGAL EDUCATION. |
| 2000-2006 | Member, Editorial Review Board, PSYCHOLOGY, PUBLIC POLICY AND THE LAW. |
| 2000-present | Outside Reviewer, National Science Foundation, Wash. D.C. |
| 2000 | Guest Editor, AMERICAN PSYCHOLOGIST. |
| 1998-99 | Chair, Section on Law and Social Science, American Association of Law Schools. |
| 1996 | Contributing Editor, CRIMINAL LAW BULLETIN. |
| 1995-present | Member, Editorial Review Board, LAW AND HUMAN BEHAVIOR. |
| 1995-96 | Chair, Section on Law and Mental Disability, American Association of Law Schools. |
| 1989-90 | Member, Multistate Bar Essay Exam Committee, National Conference of Bar Examiners. |
| 1982-83 | Chair, Committee on Student Involvement, Division of Law and Psychology of the American Psychological Association: The Committee was formed in August 1982 to facilitate student participation in the Division of Law and Psychology. |

## MEMBERSHIPS, BOARD OF DIRECTORS

| | |
|---|---|
| 2018-2020 | Member, Board of Directors, Lowboknow, LLC |

| | |
|---|---|
| 2013-2018 | Member, Board of Directors, Institute for Responsible Nutrition (IRN) |
| 2013-present | Chair, Board of Directors, Lawyers for America (LfA) |

## OTHER ASSOCIATED ACTIVITY

| | |
|---|---|
| 2014-2018 | The Exploratorium, San Francisco; Host, "In the Balance: Bringing Science to Justice" – a bimonthly program on subjects at the intersection of law and science. |

## BAR MEMBERSHIP

| | |
|---|---|
| 1992-present | Member, California Bar |

## MISCELLANEOUS AWARDS AND HONORS

| | |
|---|---|
| 2015 | Innovator of the Year Award, awarded by *The Recorder*, for co-founding JuriLytics, LLC., a company formed to bring expert academic peer review to expert testimony (with Dr. Amit Lakhani). |
| 2014 | Innovator of the Year Award, awarded by *The Recorder*, for formulating and developing the idea for Lawyers for America (with Prof. Marsha Cohen). |
| 2009 | Visiting Consortium Professor of Law, University of Minnesota Consortium on Law and Values in Health, Environment and Life Sciences. |
| 2008 | Elected Honorary Distinguished Member - American Psychology-Law Society (AP-LS). |
| 1991 | Awarded Honorable Mention (2d Place) in The Annual AALS Call for Scholarly Papers. |

| | |
|---|---|
| 1986 | Received the Roger and Madeline Traynor Prize, awarded to acknowledge the best written work by a graduating student, University of Virginia, School of Law. |
| 1979 | Awarded the William G. McGarvey Award presented to the Outstanding Senior in the Department of Psychology, State University of N.Y., College at Oswego. |
| 1978 | Member of the National Honor Societies in Psychology (Psi Chi) and History (Phi Alpha Theta). |

## PAPERS AND PRESENTATIONS

| | |
|---|---|
| 2026 | Invited Lecturer in "Law and Neuroscience," Harvard Law School, February, 2026. |
| 2025 | Invited Lecturer in "Law and Neuroscience," Harvard Law School, February, 2025. |
| 2025 | Invited Presentation, "Managing Scientific Evidence in the Age of Climate Change," for the Judicial Council of California, March, 2025, San Francisco. |
| 2024 | Symposium presentation of paper, "Overcoming Judicial Innumeracy," for the Columbia University Science and Technology Law Review, New York, NY, November 2024. |
| 2024 | Invited Lecture, "Managing the G2i "Problem" at the Intersection of Law and Science," Reichman University, Herzliya, Israel, February 2024. |
| 2024 | Invited Lecture, "The Rules of Evidence/Science as Applied to Firearms Identification Expert Testimony," Hebrew University of Jerusalem, Jerusalem, Israel, February 2024. |
| 2023 | Keynote, United Nations General Assembly Science Summit: Advances in Neuroscience-Inspired Law: Regulating the Future, New York, NY, Sept. 19, 2023. |
| 2023 | Invited Lecturer in "Law and Neuroscience," Harvard Law School, February, 2023. |
| 2023 | Invited Lecture, "The Tribulations of Forensic 'Science,'" Santa Clara University School of Law, Innocence Project: |
| 2022 | Visiting Lecturer in Forensic Science, University of Colorado Law School, October, 2022 |
| 2022 | Invited speaker at Monterey Capital Case Defense Seminar, on Toolmarks & Firearms Identification, February, 2022. |
| 2021 | Visiting Lecturer in "Law & Neuroscience, Harvard Law School, February, 2021 |
| 2019 | Presented at, and participated in, day-long conference sponsored by the American Association for the Advancement of Science (AAAS) at the National Judicial College in Reno, NV, on integrating science into legal decision making, with special emphasis on issues arising with algorithms and addiction. November 22, 2019. |
| 2019 | Presented "Fact-Finding in Constitutional Decision-Making," at a conference held at Peking University School of Transnational Law, Shenzhen, China, November 16-17, 2019. |
| 2018 | Presentations to State and Federal judges, National Judicial College, on "The Intersection of Law and Science," "Forensic Science," and "Medical Causation," Reno, Nevada, August 20, 2018. |
| 2018 | Keynote, Developing a Framework for the Use of Scientific Evidence in the Law, European Association of Psychology & Law, Turku, Finland, June 26, 2018. |
| 2018 | Developing a Framework for Use of Scientific Evidence: The Abiding Challenge of Translating Scientific Concepts into Legal Constructions (and Vice Versa), Forensic Science Conference, University of Virginia, Charlottesville, VA, March 26, 2018. |
| 2018 | Developing a Framework for Use of Evidence From Emerging Neurotechnologies – A Way Forward, National Academies of Science Workshop: Neuroforensics: Exploring the Legal Implications of Emerging Neurotechnologies, Washington, DC, March 6, 2018. |

2018 Evaluating Scientific Evidence and Considering When – If Ever – Judges Can Ethically Get It For Themselves, Program sponsored by the Texas Court of Criminal Appeals, Austin, Texas, February 2018.

2018 *Daubert* After 25 Years: A Prospective Look at the Next Great Challenges in Expert Reliability, American Association of Law Schools Annual Meeting, January, 2018.

2016 Presented lectures to state judges on various areas of scientific evidence (forensics, behavioral science, medical causation, and predictions of violence) for a program sponsored by the National Judicial College, Clearwater, Florida, September, 2016.

2016 Presented "Managing Scientific Evidence in the Age of Science," to a group of Illinois Judges, sponsored by the Illinois Judicial Education Administration, Chicago, IL, April, 2016.

2016 Presented "Operationalizing Law/Operationalizing Science: The Abiding Challenge of Translating Scientific Concepts into Legal Constructions (and Vice Versa) to the National Academies of Science, Committee on Science, Technology and Law, Newport Beach, CA, March, 2016.

2016 Presented "Operationalizing Neuroscience," at the "Law and Neuroscience" Symposium at Fordham University School of Law, February, 2016.

2016 Presented "Changes in Evidence Science or, Bringing Scientific Sensibilities to Scientific Evidence," to a group of Louisiana State judges, sponsored by the Louisiana Judicial College and the Louisiana Association for Justice, New Orleans, LA, February, 2016.

2016 Invited panelist, Georgetown University School of Law, program on "Rational Basis Review," February, 2016.

2016 Presented "Managing Scientific Evidence in the Age of Science," to a group of Illinois Judges, sponsored by the Illinois Judicial Education Administration, Chicago, IL, February, 2016.

2015 Presented paper entitled "Disinterested Science and Interested Scientists: Some Thoughts on the Perils and Pitfalls at the Intersection of Science and Policy," at the inaugural UC Consortium on Social Science and Law Conference, Irvine, CA., Oct. 2015.

2015 Presentation on Neuroscience and the Law at the ABA/NJC Conclave for state and federal judges on contemporary issues and findings in neuroscience and law, Chicago, IL, Oct. 2015.

2015 Taught in Master of Judicial Studies Program, 1 week, on topics in Science and Law for the University of Reno, Nevada, July, 2015.

2015 Presented "Judges as Amateur Scientists? Using Scientists to Measure the Science in Scientific Evidence," at the 2015 Advanced Judicial Academy for Illinois State judges, University of Illinois College of Law, June, 2015.

2015 Presentation on "The Role of the Courts in Improving Forensic Science," in a program for State and Federal Judges organized by the ABA, April, 2015, Chicago, IL.

2015 Presentation entitled "'Forensic "Science': How to Determine When it Is Scientific and When it is Not, " at the 2015 Criminal Justice Conference, organized by the Texas Court of Criminal Appeals, February, 2015,Austin, TX.

2015 Two presentations at the CACJ & CPDA 2015 Capital Case Defense Seminar, entitled "*Daubert*, *Frye* & *Sargon*," and "Statistics for Lawyers: Intellectual Disability as a Case-in-Point," Monterey, CA, February, 2015.

2015 "Where Law and Science (and Religion) Meet," Keynote Presentation at a Symposium on Science and Law at the University of Texas, Austin, TX, Jan., 2015.

2014 Two presentations, organized by the National Judicial College, to the California Personnel Board, entitled "Opinion Testimony: Experts," and "Medical Evidence: The Challenge of Determining Causation Through Toxicology, Epidemiology and Misc. Other Scientific Methods," Sacramento, CA, Dec. 2014.

2014 Presentation entitled "The Challenge of Scientific Expert Testimony in the 21st Century: Neuroscience as a Case-in-Point," at a conference sponsored by the Universita Cattolica, Milan, Italy, Oct. 2014.

2014 Presented lecture on expert testimony and medical causation, to the New Mexico Judicial Conclave (all NM state court judges), Albuquerque, NM, June, 2014.

2014 Presentation on "Why Avoiding *Daubert* at the Trial Level Creates Problems at the Appellate Level" at the 2014 Criminal Justice Conference for Texas State Judges, organized by the Texas Court of Criminal Appeals, Dallas, May, 2014.

2014 Presented lectures on "Forensic Identification 'Science,'" "Predictions of Violence in Civil Commitment and SVP Cases," and "Medical Causation," for a judicial education program at the National Judicial College, Reno, NV, May 2014.

| | |
|---|---|
| 2014 | Presented paper "Organized Common Sense: Judge Jack Weinstein's Uncommonly Sensible Approach to Expert Evidence," at the Clifford Symposium, in honor of Judge Jack Weinstein, at DePaul University, Chicago, April, 2014. |
| 2014 | Presentation on "The Challenge of Reasoning from Group Data in Science to Individual Decision Making in the Law (G2i)," at Faculty Workshop, University of San Diego Law School, San Diego, April, 2014. |
| 2013 | Presented 'work in progress' on "The Challenge of Reasoning from Group Data in Science to Individual Decision Making in the Law (G2i)," at The Mind Research Network, University of New Mexico, Albuquerque, November, 2013. |
| 2013 | Invited lecture on "Reasoning from Group Data to Individual Decision Making," at Harvard University School of Law, October, 2013. |
| 2013 | Presentation on "Current Trends in Admissibility of Expert Testimony," at the 2014 Criminal Justice Conference for Texas State Judges, organized by the Texas Court of Criminal Appeals, Dallas, May, 2013. |
| 2013 | Presentation on "Reasoning from Group Data in Science to Individual Decision Making in the Law," at an ABA Conference on Law and Neuroscience, organized by the MacArthur Foundation, Chicago, April, 2013. |
| 2013 | Presented paper on reasoning from group data in law to individual decision making in the law at the University of Oregon, School of Law, April, 2013. |
| 2013 | Presentation on Standards of Admissibility for Expert Evidence at a CLE organized by the New Mexico State Bar, Albuquerque, NM, March, 2013. |
| 2013 | Presentation on standards of admissibility and the problem of reasoning from group data in science to individual decision making in the law to a group of federal judges at a conference on Law, Neuroscience and Criminal Justice at Stanford University School of Law, organized by the Federal Judicial Center and the MacArthur Foundation, March, 2013. |
| 2012 | Invited Commentator, Empirical Legal Studies Conference, Stanford University, School of Law, November, 2012. |
| 2012 | Invited Lecturer, The Current State of Art (and Science) of Forensic Science, ASTAR conference for state judges, Albuquerque, NM, September, 2012. |
| 2012 | Keynote Speaker, "ACA's Supreme Court Decision: What's Next?" sponsored by The Greenlining Institute; at CA State Association of Counties (CSAC) conference center in Sacramento, July, 2012. |
| 2012 | Presenter, San Francisco PD Office: 2012 San Francisco Justice Summit, at the Koret Auditorium at the Main Library in San Francisco=s Civic Center, May, 2012. |
| 2012 | Presentation on Forensic Science: The State of the Art and Future Directions,@ California Judges Association (Mid-year meeting), Palm Springs, CA, April, 2012. |
| 2011 | Presented lectures on Forensic Science and the Law and Science of Predicting Violence to a program on Handling Capital Cases, organized and sponsored by the National Judicial College, held in Phoenix, AZ, September, 2011. |
| 2011 | Presentations on Scientific Evidence, at the National Judicial College, August, 2011. |
| 2011 | Participated in a meeting of legal scholars, forensic scientists, lawyers and judges to discuss ways to begin reforming the field of forensic identification science, held at the offices of the MacArthur Foundation, Chicago, IL, March, 2011. |
| 2011 | Presentation on Implicit Bias in the Courtroom: State of the Field and Institutional Responses So Far, at the UCLA Conference on Implicit Bias, Los Angeles, CA, March, 2011. |
| 2011 | Presentation on "Science in the Supreme Court: The Constitutional Significance of >Real Differences' Between Men and Women," at the "Frontiers in Women's Health" Conference, February, 2011. |
| 2011 | Participated in Federalist Society debate regarding the constitutionality of the Affordable Care Act, February, 2011, at UC Hastings. |
| 2011 | Participated in a meeting of legal scholars and scientists to discuss proposals to be submitted to the MacArthur Foundation for Phase II of the Law & Neuroscience Project, Vanderbilt University, Nashville, TN, February, 2011. |
| 2010 | Participated in a two-day charrette for the San Francisco Exploratorium, with the purpose of identifying new exhibits to be developed when the museum moves to its new location on Fisherman=s Wharf, February, 2010. |

| | |
|---|---|
| 2010 | Participated on three person inspection team (with Sandra Johnson & George Annas) to review the University of Minnesota=s Consortium on Law and Values in Health, Environment & the Life Sciences, March, 2010. |
| 2010 | Presented Lecture on Medical Causation for the National Judicial College, with simultaneous Webinar, in San Diego, CA, April, 2010. |
| 2010 | Presentation on Forensic Identification Evidence for the Texas Criminal Defense Lawyers Association, San Antonio, TX, June, 2010. |
| 2010 | Presentation on The Science? of Forensic Science, at a conference of forensic examiners organized by the National Institute of Justice (US Dept. of Justice), in Clearwater Beach Florida, August, 2010. |
| 2010 | Organized, and participated in, a meeting of legal scholars, neuroscientists and statisticians to discuss the challenge of reasoning from group data in science to individual decision making in the law, sponsored by the MacArthur Foundation, September, 2010. |
| 2010 | Participated in a meeting of legal scholars and scientists to consider the dangers associated with cognitive biases in forensic identifications, sponsored by the National Science Foundation and held at Northwestern University Law School, September, 2010. |
| 2009 | Presented lectures at the National Judicial College, Reno, NV, on 1. Systemic Similarities and Differences Between Law and Science, 2. Predictions of Violence in Civil Commitment Hearings Involving >Sexually Violent Predators,= 3. Causation in Medical Evidence, and 4. The Current State of the >Art= of Forensic Identification >Science,=@ July, 2009. |
| 2009 | Presented talk on Scientific Evidence: Theory and Practice, for the California Bar=s program on Forensic Science, May, 2009. |
| 2009 | Presented talk on Current Developments in the Law of Expert Evidence: *Daubert* and Beyond, for a program sponsored by the Texas Court of Criminal Appeals and the University of Texas Law School, May, 2009. |
| 2009 | Visiting Consortium Professor of Law, University of Minnesota Consortium on Law and Values in Health, Environment and Life Sciences. Presented public lecture to the university community, entitled Science in the Supreme Court: Hypotheses & Hypocrisy in Constitutional Decision Making, April, 2009. |
| 2009 | Commentator at Stanford University School of Law Conference on Law and Neuroscience, February, 2009. |
| 2009 | Presented the paper Defining Empirical Frames of Reference in Constitutional Cases: Unraveling the As-Applied versus Facial Distinction in Constitutional Law at the Hastings Constitutional Law Symposium, February, 2009. |
| 2008 | Presentation on Standards of Admissibility, MacArthur Foundation=s Network on Law and Neuroscience, St. Louis, October, 2008. |
| 2008 | Morning presentation (3 hrs.) on Admissibility of Expert Evidence in Federal Courts, for a program sponsored by the United States District Court, Puerto, Rico, August, 2008. |
| 2008 | Discussion leader in the session Nuts and Bolts for New Law Teachers, at the Conference on Evidence, AALS, June, 2008. |
| 2008 | Panelist discussing Soft Science and Non-Science: Controlling Expertise in the Courtroom, at the Conference on Evidence, AALS, June, 2008. |
| 2008 | Presented lecture on Scientific Evidence, at the Louisiana Defense Lawyers Association Conference, New Orleans, April, 2008. |
| 2008 | Presented the paper Anecdotal Forensics, Phrenology and Other Abject Lessons from the History of Science, at the Faces of Forensics Conference, Hastings Law Journal, March, 2008. |
| 2008 | Presented the paper A Matter of Fit: The Law of Discrimination and the Science of Implicit Bias, at a conference organized by the Hastings Law Journal, February, 2008. |
| 2007 | Lectured on the subjects of the Battered Woman Syndrome and Predictions of Violence, National Judicial College, Reno, Nevada. |
| 2007 | Public Lecture, Adjudicating Faith: The Law=s Obligation to Reconcile Religion and Science Through the Prism of the First Amendment, for the 2006-2007 Collin College Distinguished Speaker Series, Dallas, Texas. |
| 2007 | Presented paper Scientific Realism in Constitutional Law, at the Brooklyn Law Reviews symposium on Truth, Brooklyn Law School. |

| | |
|---|---|
| 2007 | Presented paper Admissibility Regimes at the Southwestern University Law Review=s symposium, Rules of Evidence: FRE v. CEC, Los Angeles, CA. |
| 2006 | Presentation on Our Empirical Constitution, at the University of Illinois School of Law (faculty lunchtime talk), Champaign, Illinois. |
| 2006 | Lectured on the subjects of the Battered Woman Syndrome and Predictions of Violence, National Judicial College, Reno, Nevada. |
| 2006 | Panelist and presenter on the Panel Social Science and Judging at symposium on AJudging in the Twenty-First Century, at Boston University School of Law, Boston, MA. |
| 2006 | Attended First Annual Retreat for the American Judicature Society Commission on Forensic Science and Public Policy and gave presentation on Good Science, Bad Science, and No Science, to Commissioners, Greensboro, NC. |
| 2006 | Lectured on Challenges to Forensic Science, at the National College of District Attorney=s Annual Conference, San Francisco, CA. |
| 2006 | Presentation on Judicial Responses to the Use of fMRI as a Lie Detector, at a day-long symposium on Neuroscience and the Law at Stanford University School of Law. |
| 2006 | Presented AA Unified Theory of Constitutional Facts, at Stanford University School of Law. |
| 2006 | Presentation on the Daubert Trilogy, at the Annual Conference of the American College of Legal Medicine, Las Vegas, Nevada. |
| 2005 | Panelist (3 Panels) at the National Academies of Science Sackler Colloquium on Forensic Science, Washington, DC. |
| 2005 | Presentation on Psychology and the Law, Predictions of Violence and the Scientific Method, to the state-wide California Judicial Conference, San Diego, California. |
| 2005 | Lectured on the subjects of the Battered Woman Syndrome and Predictions of Violence, National Judicial College, Reno, Nevada. |
| 2005 | Week-long course on Science and the Law, Master of Judicial Studies Program, University of Nevada, Reno. |
| 2005 | Presented article AA Unified Theory of Constitutional Facts, Constitutional Law Speaker Series, University of Texas, School of Law. |
| 2005 | Presentation to faculty, AA Unified Theory of Constitutional Facts, Washington & Lee University, School of Law. |
| 2005 | Presented work-in-progress, Constitutional Facts: The Essential Function of Fact-Finding in Establishing Constitutional Standards, at the Center for the Study of Law and Society, University of California, Boalt Hall School of Law. |
| 2004 | Presented lecture on The Supreme Court=s Struggle to Integrate Science and the Law, Oregon State University, Corvallis, Oregon. |
| 2004 | Presentation to faculty, A Unified Theory of Constitutional Facts, Arizona State University, College of Law, Tempe, Arizona. |
| 2004 | Presented Symposium paper, Constitutional Facts: The Essential Function of Fact-Finding in Setting Constitutional Norms, Amherst College, Amherst, Massachusetts. |
| 2004 | Presenter on Evaluating National Security Surveillance Tools@ at the International Biometric Society Conference, Pittsburgh, PA. |
| 2004 | Presenter on Science Policy and the Judiciary, for the Board on Behavioral, Cognitive, and Sensory Sciences, National Academies of Science, Washington, D.C. |
| 2004 | Presented Annual Review of Federal and State Cases on Scientific Evidence, for conference organized by the American Law Institute/American Bar Association, New Orleans, LA. |
| 2004 | Panelist on Science Program for The Ninth Circuit Judicial Conference, Monterey, CA. |
| 2004 | Lectured on Selected Topics in Science and the Law, National Judicial College, Reno, NV. |
| 2003 | Commentator for papers presented at Conference on Forensic Science, Univ. of CA, Irvine. |
| 2003 | Presented lectures on psychological syndromes and predictions of violence to judges at the National Judicial College, Reno, Nevada. |

| | |
|---|---|
| 2003 | Presented paper Making Moral Judgments Through Behavioral Science: The >Substantial Lack of Volitional Control= Requirement in Civil Commitments at a conference at Cardozo Law School. |
| 2003 | Presented paper Legal Perspectives on Sexually Violent Predators, at the California Psychological Association, San Jose, CA. |
| 2003 | Presented Annual Review of Federal and State Cases on Scientific Evidence, for conference organized by the American Law Institute/American Bar Association, San Francisco, CA. |
| 2003 | Presented paper Expert Evidence in Flatland: The Geometry of a World Without Scientific Culture, at a conference at Seton Hall Law School, Newark, N.J. |
| 2002 | Presented keynote address to a group of Canadian judges, organized by Canada=s National Judicial Institute, at a conference in Nova Scotia. |
| 2002 | Presented the Annual Report on Science and the Law for the National Conference on Science and the Law, sponsored by the National Institute of Justice, Miami, Fl. |
| 2002 | Presented Annual Review of Federal and State Cases on Scientific Evidence, for conference organized by the American Law Institute/American Bar Association, Bermuda. |
| 2002 | Presented lecture on Daubert and Its Progeny to a group of judges at a conference organized by the Private Adjudication Center at Duke University. The conference was held in Miami. |
| 2002 | Presented Current Trends in Expert Testimony, for California Judges in Pasadena. |
| 2002 | Presented Medical Expert Testimony, for California Appellate Judges in Pasadena. |
| 2002 | Lectured on Selected Topics in Science and the Law, National Judicial College, Reno. |
| 2002 | Week-long course on Scientific Evidence, in the Masters of Judicial Studies Program, Univ. of Nevada-Reno. |
| 2001 | Presented lecture on Appellate Review of Expert Testimony: The Appellate Judge as Gatekeeper, for the ABA Appellate Judges Conference, Boston, MA. |
| 2001 | Presented the Annual Report on Science and the Law for the National Conference on Science and the Law, sponsored by the National Institute of Justice, Miami, FL. |
| 2001 | Presented a series of lectures on admissibility standards, psychological syndromes and statistics to Wisconsin state court judges, Madison, WI. |
| 2001 | Presented lectures on psychological syndromes and predictions of violence to judges at the National Judicial College, Reno, NV. |
| 2001 | Presented the paper The Tipping Point in the Law=s Use of Science: The Epidemic of Scientific Sophistication that Began with DNA Profiling and Toxic Torts for a symposium at the Brooklyn Law School. |
| 2001 | Presented overview of recent case law for ABA section meeting on Tort and Insurance law in San Francisco. |
| 2001 | Keynote address for Mealey's Publications, conference on scientific evidence, Boston, MA. |
| 2001 | Presented lecture on Current Trends in Forensic Science, for the Northern District of CAs annual judges conference, at Chaminade. |
| 2001 | Presented lecture on Expert Testimony Trends in Federal Practice for a conference organized and sponsored by ALI-ABA in San Francisco. |
| 2001 | Lecture on Current Trends in Scientific Evidence for a group of state and federal judges at Duke University. |
| 2001 | Presented two lectures on issues concerning the integration of science into the law for the Illinois Judicial Conference, at the University of Illinois. |
| 2001 | Presented two lectures on syndrome research and general issues concerning science in the law at a Florida judges= conference in Naples, Florida. |
| 2000 | Congressional Briefing, Standards of Admissibility for Scientific Evidence, Washington, D.C., sponsored by the American Chemical Society. |
| 2000 | Presented paper on Current Trends in Expert Testimony at Seton Hall University Law School, Newark, New Jersey. |
| 2000 | Presented lecture on Integrating Scientific Research into Legal Decision Making for the Annual Education Meeting of the Florida Conference of District Court of Appeal Judges, St. Augustine, Florida. |

| | |
|---|---|
| 2000 | Invited Speaker for Congressional Informational Meeting sponsored by the American Chemical Society, Washington, D.C. |
| 2000 | Panelist on a panel on science in the law at the Ninth Circuit Judicial Conference, Sun Valley, Idaho. |
| 2000 | Co-organized and presenter, program on understanding critical scientific thinking, at the American Bar Association=s annual conference, held in New York. |
| 2000 | Taught at a week-long program on Scientific Evidence and Expert Testimony, at the National Judicial College. |
| 2000 | Participated in a panel session on Criminal Law and the Gene Revolution at the Law and Biology Conference, organized by the Gruter Institute, held at Squaw Valley, CA. |
| 2000 | Lecture on The *Daubert* Trilogy to a group of state and federal judges at Duke University. |
| 2000 | Presentation to Florida State Judges on scientific evidence and the *Frye* Test after *Daubert* in Orlando, Fla. |
| 2000 | Moderator of panel When the Rubber Meets the Road: Kumho Tire Past Daubert C Will the Gatekeeper Accept the World Wide Web? Section of litigation, American Bar Association meeting, Seattle, Washington. |
| 2000 | Presented paper at conference on Kumho Tire and Expert Testimony at Washington and Lee University, School of Law, Lexington, Virginia. |
| 2000 | Invited Presidential Address, American Psychology-Law Society, New Orleans, Louisiana. |
| 2000 | Guest, Beyond Computers, National Public Radio, hosted by Maureen Taylor. |
| 2000 | Guest, Forum, KQED, hosted by Michael Krasny. |
| 1999 | Guest, Science Fridays, Talk of the Nation, National Public Radio, hosted by Ira Flatow. |
| 1999 | Guest, Tech-Nation, National Public Radio, hosted by Moira Gunn. |
| 1999 | Presented talk based on Legal Alchemy: The Use and Misuse of Science in the Law at the Yale Law School. |
| 1999 | Presented faculty talk based on Legal Alchemy at the University of Connecticut, School of Law. |
| 1999 | University talk at Arizona State University, based on Legal Alchemy.@ |
| 1999 | Presented faculty talk based on Legal Alchemy at Arizona State University. |
| 1999 | Lecture on science in the law in the Sociology Dept., Wellesley, College. |
| 1999 | Presented lecture on Standards of Admissibility of Scientific Evidence for Florida Appellate Judges. |
| 1999 | Moderator of panel on Expert Testimony at APA-ABA joint conference, Washington, D.C. |
| 1999 | Participated in invited conference on The State of the Field@ of law and psychology at Simon Frazier University, Vancouver, B.C. |
| 1999 | Presented paper on Genetics and Criminal Law at the Gruter Institute's Annual Conference, Squaw Valley, California. |
| 1999 | Organized and presented lectures for a week-long program on law and science for judges at the National Judicial College, Reno, Nevada. |
| 1999 | Participated in AFred Friendly Seminar for the California Judges Education and Research Program in San Diego, with Charles Nesson moderating. |
| 1999 | Organized and participated on a panel for the Law and Social Sciences division of AALS in New Orleans on Using Science in the Legislative Process and Before Administrative Agencies. |
| 1998 | Presented lecture, Social Science in the Courtroom, at the National Judicial College=s week-long program, Science in the Courts, Reno, Nevada, Nov. 19, 1998. |
| 1998 | Presented the paper, Should Forensic Science be Scientific? at the Conference, Police, Techniques Modernes Denquête ou de Surveillance et Droit de la Preuve, Université de Sherbrooke, Quebec. |
| 1998 | Commentator on the panel, ARace, Gender and Evidentiary Policy, at the AALS Annual Conference in San Francisco. |
| 1997 | Presented the paper, Are the Social Sciences and Forensic Sciences Science? at the ABA Annual Conference in San Francisco. |

| | |
|---|---|
| 1997 | Presented the paper, Expert Testimony Under the Federal Rules of Evidence, at a conference of state and federal judges, Duke University (sponsored by the Private Adjudication Center). |
| 1997 | Presented a lecture on standards of admissibility for scientific expert testimony at a Bench and Bar Conference, Seattle, Washington. |
| 1997 | Presented Colloquium, What Every Psychologist Should Know About the Law of Expert Testimony, at the University of California, San Diego (Psychology Department). |
| 1996 | Presented Colloquium, Scientists, Sorcerers & Charlatans, at Washington & Lee University, School of Law. |
| 1996 | Presented talk, Scientists, Sorcerers & Charlatans, as part of the Villanova Law School's Annual Lecture Series. |
| 1996 | Presented the paper, The Admissibility of Expert Testimony in the United States, at the European Conference of Psychology and Law, in Siena, Italy, August 1996. |
| 1996 | Presented a Seminar on The Standards of Appellate Review of Expert Testimony, at the ABA's Appellate Judges Conference, in Portland, Oregon, August 1996. |
| 1996 | Presented the paper, Expert Testimony Under the Federal Rules of Evidence, at a conference of state and federal judges, Duke University (sponsored by the Private Adjudication Center). |
| 1996 | Presented the paper, The Admissibility of Scientific Expert Testimony, for the Texas Judicial Center, Dallas, Texas (for a conference of 350 Texas state judges). |
| 1996 | Presented the paper, Making the Law Safe for Science..., at The Washburn Law Journal Symposium, Tort Reform? Impact of 'loser pays' and 'honesty in evidence,' March, 1996. |
| 1996 | Presented the paper, The Syndromic Lawyer Syndrome..., at The University of Colorado Law Review Symposium, AO.J. Simpson and the Criminal Justice System on Trial, February, 1996. |
| 1995 | Participant in round table discussion of the role of court-appointed experts in the American trial process at Duke University (sponsored by the Private Adjudication Center). |
| 1995 | Presented the paper, The Primary System in the United States, Universita Degli Studi di Trento, Trento, Italy. |
| 1995 | Participant in round table discussion of Religious Freedom in France, at Universite D'Aix-Marseille, Aix-en-Provence, France. |
| 1995 | Presented a paper on United States Immigration Policy: California's Proposition 187, at Goethe University, Frankfurt Am-Main, Germany. |
| 1995 | Presented the paper, The Admissibility of Scientific Evidence after *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, at a conference of state and federal judges, Duke University (sponsored by the Private Adjudication Center). |
| 1994 | Participated on a panel discussing evidentiary standards for admitting expert testimony at a conference of federal judges in New Orleans (sponsored by the Federal Judicial Center). |
| 1994 | Presented the paper, The Admissibility of Scientific Evidence after *Daubert v. Merrell Dow Pharmaceuticals*, at a conference of state and federal judges, Duke University (Sponsored by the Private Adjudication Center). |
| 1994 | Presented the paper, AModeling Constitutionality Transactionally, at the HASTINGS LAW JOURNAL Symposium "When is a Line as Long as a Rock is Heavy: Reconciling Public Values and Individual Rights in Constitutional Adjudication," San Francisco, CA. |
| 1994 | Presenter on the panel, Social Science and Mental Health Evidence After *Daubert v. Merrell Dow*, at the Annual Meeting of the American Association of Law Schools, Orlando, Florida. |
| 1994 | Commentator on the panel, Expert Testimony in the Wake of *Daubert*, at the Annual Meeting of the American Association of Law Schools, Orlando, Florida. |
| 1993 | Presented the paper, Check Your Crystal Ball at the Courthouse Door, at a Symposium on Scientific Evidence at Cardoza Law School, New York, N.Y. |
| 1993 | Presented the paper, Life After *Frye*: The Admissibility of Scientific Evidence Under *Daubert v. Merrell Dow Pharmaceuticals*, at the annual convention of the American Psychology Association, Toronto, Canada. |

| | |
|---|---|
| 1993 | Moderator for panel on The Changing Face of Constitutional Interpretation: The Supreme Court and the New First Amendment, for a symposium sponsored by the HASTINGS LAW JOURNAL, San Francisco, California. |
| 1992 | Drafted the Brief for a Group of American Law Professors as *Amicus Curiae* in Support of Neither Party submitted in *Daubert v. Merrell Dow Pharmaceuticals*, No. 92-102, to the Supreme Court of the United States. |
| 1991 | Presented the paper, Struggling to Stop the Flood of Expert Testimony: A Response to Professor Carlson, at the Conference on Hearsay Reform at the University of Minnesota. |
| 1991 | Presented the paper, Normative Constitutional Fact-Finding, at the AALS Annual Convention, Washington D.C. |
| 1991 | Moderator for panel on The Right to Die for a symposium sponsored by the HASTINGS LAW JOURNAL, San Francisco, California. |
| 1983 | Presented the paper, Setting the Odds on Justice: Statistics and Probabilities in the Trial Process, at the annual convention of the American Psychological Association, Anaheim, California. |
| 1983 | Organized and chaired the symposium on Psychology and Law Training Models at the annual convention of the American Psychological Association, Anaheim, California. |