# Exhibit "Q"

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | : | No. 2:12-MD-02323-AB<br>MDL No. 2323<br>**HON. ANITA B. BRODY** |
| THIS DOCUMENT RELATES TO: APPEAL OF SETTLEMENT CLASS MEMBER [redacted] REGARDING DENIAL OF MONETARY AWARD | : | |

[redacted], a Retired NFL Football Player and Class Member under the Amended Class Action Settlement Agreement, filed a Claim for benefits based on a Qualifying Diagnosis of Parkinson's Disease. The Claims Administrator, rejecting Mr. [redacted]'s Claim, concluded that his medical records did not adequately support the Diagnosis.

As Mr. [redacted] has not shown by clear and convincing evidence that the Claims Administrator's determination was in error, I deny his Appeal. In doing so, I describe how the AAP generally advises the Claims Administrator in its review of Qualifying Diagnoses of Parkinson's Disease.

## CLAIM HISTORY

Mr. [redacted] submitted this Claim—his first—on January 11, 2024. Doc. 298912. Qualified MAF Physician Dr. [redacted] certified the Diagnosis of Parkinson's Disease, dated to January 6, 2023. Doc. 298809.

Mr. [redacted]'s visit to [redacted] in January 2023 was not his first neurological evaluation. On August 2, 2017, Dr. [redacted] initially diagnosed Mr. [redacted] with Level 1 Neurocognitive Impairment through the BAP. Doc. 285048 at 8-9. However, on September 6, 2017, after Qualified BAP Neuropsychologist Dr. [redacted] determined that Mr. [redacted]'s scores were invalid, Dr. [redacted] revised his original diagnosis to indicate no impairment under any injury definition. *Id.* at 10.

The following year, on September 12, 2018, Dr. [redacted] examined Mr. [redacted] in connection with worker's compensation litigation. Doc. 285043 at 14. Dr. [redacted] found that Mr. [redacted] had sustained head trauma with posttraumatic head syndrome, posttraumatic headaches,

and disorder of sleep and arousal. *Id.* at 18. He made no mention of Parkinson's Disease. *Id.* On February 18, 2019, Mr. [redacted] completed neuropsychological testing with Dr. [redacted], who made no diagnosis. Doc. 285045 at 41-42.

Mr. [redacted] visited [redacted] on three occasions: January 6, 2023, March 14, 2023, and October 11, 2023. Doc. 298781 at 25-26. Though he dated Mr. [redacted]'s Qualifying Diagnosis of Parkinson's Disease to his initial consultation on January 6, 2023, Dr. [redacted] only reached that conclusion after his assessment in October.[1] *Id.* at 1.

Dr. [redacted] ultimately diagnosed Mr. [redacted] with Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the DSM-5. *Id.* at 5. In doing so, Dr. [redacted] determined that Mr. [redacted] had "established Parkinson's Disease" based upon his previous neurological evaluations between 2017 and 2019, his three visits to [redacted] in 2023, his results on the Clinical Dementia Rating (CDR) scale, and his third-party sworn statements. *Id.* at 9-10. His contemporaneous justification follows:

> Mr. [redacted]'s symptoms do occur in the setting of established Parkinson's Disease. His cognitive testing performance showed impairments in visual spatial processing, object recognition, visual processing speed, and working memory–all of which are consistent with synucleinopathy. And this condition is represented by Parkinson's Disease.
>
> His MRI results also point to a Parkinson's diagnosis as indicated by the relatively preserved Medial Temporal Lobe volume, relatively greater Parietal Atrophy, relatively greater Occipital atrophy, and relatively greater Frontal atrophy. Atrophy in these regions of the brain are seen in patients with a Parkinson's diagnosis. These imaging results have been further corroborated by the SPECT Report which also shows damage to the frontal, temporal, and parietal lobes. His CSF biomarker levels are also consistent with this diagnosis. In addition, for having Stage 4 mild dementia, the severity of his CSF levels would account for a disorder of alpha synuclein. Parkinson's Diagnosis is the most likely diagnosis.
>
> Mr. [redacted] also has REM Sleep Behavior Disorder and Pseudobulbar Affect which are both present in Parkinson's Disease patients. He has exhibited a positive response to sinemet treatment, which is indicative of this diagnosis. He also is being prescribed carbidopa-levodopa, which is another Parkinson's medication.
>
> Additionally, Parkinson's symptoms have been noted since his 09/12/2018 evaluation. His injuries have caused him discomfort that has prevented him from

[1] Dr. [redacted] did not date this critical report, in which he offered and explained his Diagnosis of Parkinson's Disease. Doc. 298781. From the record, it appears that Dr. [redacted] wrote this report sometime between Mr. [redacted]'s October 11, 2023 assessment and the Diagnosing Physician Certification Form's submission on January 10, 2024. Doc. 298809. Dr. [redacted]'s practice of not dating key medical documents has added unnecessary confusion to the resolution of Mr. [redacted]'s Claim.

> walking more than a quarter mile. He also has had difficulties with climbing stairs, sitting, standing, walking, reaching for things, pushing/pulling activities, gripping/grasping/holding/manipulating objects with his hands, repetitive motions, forceful motions, kneeling, bending, and squatting. He has issues with stiffness which has hindered his ability to dress himself. He especially struggles to put on shoes and socks. Mr. [redacted]'s struggles to maintain his physical appearance as a result of his physical injuries are documented in statements provided by [redacted] and [redacted].
>
> His physical ailments make participating in "any kind of physical activity…very difficult." Additionally, when walking, he shuffles his feet and sometimes loses his balance. Increasingly, his legs have become almost paralyzed and experience stiffness and spasms. According to an affidavit provided by [redacted], Mr. [redacted] will sometimes have a "mask life" face without movement. He is progressively having tremors.
>
> Mr. [redacted] has experienced and is also experiencing a decline in cognitive abilities as a result of his Parkinson's diagnosis.

*Id.* (breaks added).

The Claims Administrator requested a review by the Appeals Advisory Panel Leadership Council (AAPLC) of Dr. [redacted]'s Qualifying Diagnosis. Doc. 300613. On March 20, 2024, the AAPLC solicited clarification from Dr. [redacted] about his conclusion that Mr. [redacted] had "established Parkinson's Disease." It wrote:

> Dr. [redacted]'s history from his 10/11/23 assessment provides a detailed description and impact of cognitive the player's difficulties. Although there are comments regarding physical difficulties in several activities, no symptoms specific to Parkinson's disease (PD) are noted. An addended version of this report edited and highlighted refers to an "established diagnosis of PD" and that Parkinson's symptoms had been noted since 2018 (pages 9-10 of doc. #298915).
>
> The clinical evidence supporting this addended statement is predominantly historical with multiple comments regarding the Player's difficulties in a wide range of physical activities as well as tremors. The specificity of these symptoms is highly uncertain given the player's several other listed diagnoses that can impact mobility (cervical and lumbar spinal stenosis, cerebral amyloid angiopathy, chronic pain).
>
> Some comments in this addendum do not reflect an adequate level of knowledge of PD. It is stated that the player had a "positive response to sinemet treatment … and is also prescribed carbidopa-levodopa, which is another Parkinson's medication" where in fact Sinemet is only the old brand name of carbidopa/levodopa – the same medication - and the most widely used PD medication for the last 50 years.

> The comment that the CSF abnormalities for tau and amyloid are best accounted for by a disorder of alpha synuclein are without clinical foundation. Although laboratory studies (including the FDA approve DaT scan which was not performed) can be used to support a diagnosis of PD, this qualifying diagnosis requires clinical evidence from a medical history and physical exam to determine fulfillment of Gelb criteria. This 28 page addended report does not appear to include a complete neurological exam including a Motor component that is the standard basis for evaluation and diagnosis of objective signs (rather than symptoms) of PD. Notes from Dr. [redacted]'s Nurse Practitioner [redacted]'s assessment of the player on 1/6/23 and 3/14/2023 also do not include a neurological exam.
>
> Dr. [redacted] appears to be the only physician to make a diagnosis of PD in the player, proposing "to exclude Parkinson's disease by doing a 3-5 day a trial of sinemet" (page 54 of the same document). In the documentation included there are records of Neurological examinations by Dr. [redacted] in 8/17 and Dr. [redacted] in 9/18 with few comments regarding any PD related signs including slow arising related to back pain ([redacted]) and questionably increased tone in the right arm and slow rapid alternating movements ([redacted]), which are far from diagnostic of PD.

Doc. 317662 (paragraph breaks added).

Dr. [redacted] responded to the AAPLC's feedback on April 30, 2024, noting that Mr. [redacted] was scheduling another exam "in order to obtain the necessary neurological exam and additional information." Doc. 325225.

That follow-up exam took place on May 20, 2024. Doc. 330073 at 1. Dr. [redacted] performed the requested comprehensive neurological exam, including a motor component, noting that Mr. [redacted] was "wheelchair bound" but "can walk with walker, which is better since spinal stenosis surgery." *Id.* at 5 (cleaned up).

However, Dr. [redacted] failed to address the AAPLC's concerns regarding fulfillment of the Gelb Criteria. *Id.* Instead, he again referred to Mr. [redacted]'s response to treatment: "[Mr. [redacted]] had a positive response to Sinemet, which means you have Parkinson's Disease." *Id.* at 1 (cleaned up).

Upon review, the AAP concluded, as summarized by the Claims Administrator in the Notice of Denial, that Mr. [redacted]'s Qualifying Diagnosis of Parkinson's Disease was not sufficiently supported:

> The Settlement Agreement defines the Qualifying Diagnosis of Parkinson's Disease to be made "as defined by" ICD-9 or ICD-10. However, the ICD system provides classifications rather than diagnostic criteria. The Settlement Agreement's definition also includes the diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease, as defined in the DSM-5. A

diagnosis of Major Neurocognitive Disorder probably due to Parkinson's disease cannot be made in the absence of a prior diagnosis of Parkinson's Disease.

The general US standard for a diagnosis of Parkinson's Disease at the time of the Settlement Agreement negotiations was the "Gelb Criteria" (Gelb DJ et al. Arch Neurol 1999; 56:33-9). These are based on identifying four primary clinical features by history and examination. These are resting tremor, rigidity, bradykinesia and asymmetric onset. Three features must be present to establish a diagnosis of probable Parkinson's Disease. Additional clinical findings can further support the diagnosis including, but not limited to, hypomimia, shuffling gait, reduced stride length, postural instability, and response to dopaminergic pharmacotherapies. As a neurodegenerative disease, insidious onset and progressive worsening of the clinical features are typical.

After reviewing the file, the AAP determined none of the Gelb Criteria were fulfilled and noted that Dr. [redacted]'s report did not include a neurological exam. The Claims Administrator contacted Dr. [redacted] to address these issues, and Dr. [redacted] submitted a report detailing a comprehensive neurological exam dated 5/20/2024. The Player has clearly severe impairment in mobility. He is described as wheelchair bound but able to walk with a walker. He is described as having severe pain in his neck and shoulders but better after recent surgery. He has some degree of weakness, rated as four out of five in all of his limbs. Although a history of drooling is described with hypersalivation on exam, there is no evidence on exam to support any of the Gelb Criteria for a Qualifying Diagnosis of Parkinson's Disease.

Specifically, there is no mention of tremor and no mention of abnormal muscle tone other than a painful spastic neck to support a finding of rigidity. Range of motion of the legs is described as limited by pain and weakness, not cardinal features of Parkinson's Disease. There are no comments regarding speed of any specific movements to support a finding of bradykinesia. The Player appears limited by pain and weakness in a symmetric fashion, in contrast to the usual asymmetric onset of Parkinson's Disease. Although the 5/20/2024 follow-up note corrects some of the previous deficiencies regarding documentation of a motor exam, it supports the alternative of the Player's known diagnosis of cervical spinal stenosis as a cause of the Player's limitations in mobility rather than a Qualifying Diagnosis of Parkinson′s Disease. It is possible that some signs of Parkinson′s Disease have been suppressed by the use of Parkinson′s Disease medications, such as carbidopa/levodopa and ropinirole, but complete suppression of signs of Parkinson′s Disease with therapy is very unusual.

In conclusion the available medical records including the 5/20/2024 report do not support any of the Gelb Criteria or the Qualifying Diagnosis of Parkinson's Disease.

Doc. 349660.

Relying on the AAP's findings, the Claims Administrator denied Mr. [redacted]'s Claim on July 23, 2024. *Id.* Mr. [redacted] timely appealed the Claims Administrator's decision on August 18, 2024. Doc. 353748.

His Appeal introduced new documentation from the NFL Players Association (NFLPA) regarding Mr. [redacted]'s application for 88 Plan Benefits for a diagnosis of Parkinson's Disease. Doc. 353747. Those records included Mr. [redacted]'s 88 Plan Benefits Application, signed by Dr. [redacted] on January 26, 2024, and an Initial Decision by the 88 Committee on April 19, 2024, indicating that Mr. [redacted] was entitled to benefits. *Id.* at 2, 8.

Additionally, a new, undated, letter written by Dr. [redacted]—seemingly responding to the AAP's findings in response to a query from Mr. [redacted]'s lawyer—was uploaded to the Claims Portal on August 23, 2024. Doc. 355096 at 1. Dr. [redacted] now purported to address some of the Gelb Criteria features, writing that Mr. [redacted] "exhibited bilateral rigidity in upper arms, general musculoskeletal bradykinesia, masked faces, and psychomotor slowing." *Id.* With respect to Parkinson's Disease medication, Dr. [redacted] explained:

> The results of the exam met criteria for both Alzheimer's Disease and Lewy Body Disease, so a five day trial of Sinemet was conducted to exclude PD. The 10/23/2023 notes, which are attached to this addendum, indicate an improvement in PD symptoms. The positive response to the Sinemet trial confirms a disorder of presynaptic impairment in dopamine release, which is consistent with a PD diagnosis.

*Id.*

Dr. [redacted] also contested the AAP's assertions regarding the clinical foundation and relevance of CSF abnormalities to a Qualifying Diagnosis of Parkinson's Disease under the Settlement:

> Moreover, with regards to Mr. [redacted]'s CSF abnormalities in relation to an alpha synuclein disorder, several studies have shown a link between decreased CSF ABeta-42 levels in PD patients and cognitive dysfunction. Additionally, CSF t-tau and p-tau levels have been reported to be elevated in PD patients with cognitive impairment. The corroborating paper can be found at DOI: 10.1080/14737159.2017.1341312 and is attached to this addendum. The findings in Mr. [redacted] of elevated p-tau levels and abnormal ABeta-42 levels are therefore consistent with reports of patients with PD and cognitive impairment.
>
> In sum, the CSF findings, the results of the neurological exam, and the positive response to Sinemet are clinically relevant to Mr. [redacted]'s PD diagnosis.

*Id.*

I remanded Mr. [redacted]'s Claim for re-review on October 4, 2024. Doc. 361099.

Upon review, the AAP concluded that "the current medical records including the recent documentation still do not support any of the Gelb criteria or the Qualifying Diagnosis of Parkinson's Disease according to the Settlement's Injury Definitions." Doc. 372358. The AAP first addressed the two new pieces of evidence:

> Doc ID 353747 is a determination from the NFL Players Association Plan 88 stating that the Player is eligible for benefits under the plan for Parkinson's disease. This appears to be based on Dr. [redacted]'s diagnosis.
>
> Doc ID 355096 is an undated letter from Dr. [redacted] stating that he examined the Player on 5/20/2024 where he exhibited bilateral rigidity of the arms, general bradykinesia, masked face and psychomotor slowing. He refers to a more comprehensive summary of findings attached to an addendum. Although it is not clear what specific documentation is referred to as "a more comprehensive summary of findings" the document also includes exam notes from the 5/20/2024 visit that were reviewed previously (with the same typographical error where the date of evaluation is given as [redacted], the patient's date of birth). The exam notes, as discussed earlier, describe weakness of both arms and legs with the right leg limited by pain as well deep tendon reflexes are described as decreased in both arms and legs with a possible Babinski sign on the right. Hypersalivation is also noted.

*Id.* (citing Doc. 355096).

Evaluating this new evidence alongside the previous medical records, the AAP outlined its determinations for each of the Gelb Criteria features:

> 1. Resting Tremor: There are no comments with regard to tremor of any form, so that this Gelb criterion remains unfulfilled.
>
> 2. Rigidity: In contrast to the letter provided by Dr. [redacted], which mentions bilateral rigidity of the arms, there is no comment regarding muscle tone in the exam notes. The exam notes do indicate that the Player has significant pain in his shoulders, which interferes with movement, and that the range of motion of the right leg is limited by pain and weakness. As noted earlier, these limitations appear to be more consistent with the Player's known diagnosis of degenerative arthritis, including cervical stenosis, than with a Qualifying Diagnosis of Parkinson's Disease. Because of the reasons given above, the current documentation continues to be insufficient to support the fulfillment of the Gelb criterion of rigidity.
>
> 3. Bradykinesia: There are no exam note findings that support the presence of bradykinesia referred to in the summary. Specifically, there is no comment

> regarding any tasks that were assessed that are typically used to assess slowing of movement, such as opening and closing the hands, tapping the fingers or tapping the feet. The current medical records, including the new documentation, still do not adequately document the presence of bradykinesia on exam to consider this Gelb criterion to be fulfilled.
>
> 4. Asymmetric Onset: There are no comments with regard to asymmetry of onset, so that this Gelb criterion also remains unfulfilled.

*Id.*

The AAP rejected the significance of Mr. [redacted]'s reported positive response to Parkinson's Disease medication:

> Dr. [redacted]'s letter refers to 10/23/2023 notes that document an improvement in PD symptoms with a five day trial treatment with carbidopa/levodopa. The provided 10/23/2023 note reflects a conversation between the "chronic care manager" whose training and supervision is unstated and the Player's POA who reports that the Player improved with levodopa. This level of documentation without a neurological exam is not adequate to support an objective response to levodopa by Gelb criteria (improvement in abnormal exam findings) and does not affect the prior determination.

*Id.* (citing Doc. 355096).

Finally, the AAP dismissed Dr. [redacted]'s discussion of CSF abnormalities, concluding that they "do not factor into the Gelb settlement criteria for the Qualifying Diagnosis of Parkinson's Disease." *Id.*

Relying on the AAP's findings, the Claims Administrator again denied Mr. [redacted]'s Claim on January 3, 2025. *Id.* Mr. [redacted] timely appealed. Doc. 376085.

## Resolving This Appeal

On appeal, I must determine if Mr. [redacted] has identified clear and convincing evidence that the Claims Administrator was wrong to deny that he was entitled to relief under the relevant Injury Definition. That is: is it "highly probable or reasonably certain that there was an error" in the denial.[2] That determination is ultimately a factual one: did the medical records Mr. [redacted] appended to his Claim so obviously meet the requirements for a Qualifying Diagnosis of Parkinsons' Disease that it was "reasonably certain" that any contrary conclusion must be a mistake.

---

[2] Special Master Ruling on Slick Criteria and Validity Testing, at 10 (Oct. 21, 2020), https://www.nflconcussionsettlement.com/Docs/slick_validity_testing_sm.pdf (quoting In re Fosamax Alendronate Sodium Prods. Liab. Litig., 852 F.3d 268, 285–86 (3d Cir. 2017))

The Settlement's relevant Injury Definition states that a Diagnosis of Parkinson's Disease requires:

> For living Retired NFL Football Players, a diagnosis while living of the specific disease of Parkinson's Disease as defined by the World Health Organization's International Classification of Diseases, 9th Edition (ICD-9), the World Health Organization's International Classification of Diseases, 10th Edition (ICD-10), or a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as defined in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), made by a Qualified MAF Physician or a board-certified or otherwise qualified neurologist, neurosurgeon, or other neuro-specialist physician, as set forth and provided in Sections 6.3(b)-(d) of the Settlement Agreement. [3]

This Definition thus seemingly presents two distinct pathways for a Diagnosis of Parkinson's Disease: receive a diagnosis of Parkinson's Disease as set out by the ICD-9/10, or receive a diagnosis of Major Neurocognitive Disorder probably due to Parkinson's Disease as described by the DSM-5.[4]

However, the ICD-9/10 "does not well-define the precise contours of a Diagnosis"[5] and "provides classifications rather than diagnostic criteria." Doc. 349660. By contrast, the DSM-5 does provide specific diagnostic criteria for Major Neurocognitive Disorder probably due to Parkinson's Disease. Doc. 298781 at 5-11. These are (1) evidence of neurocognitive disorder, (2) symptoms occur in the setting of established Parkinson's Disease, (3) insidious onset with slow deterioration, and (4) the neurocognitive disorder is not attributable to another medical condition and is not better explained by another mental disorder. *Id.* Thus, the DSM-5's second criterion requirement of "established Parkinson's Disease" means that the patient must have an *existing* diagnosis of Parkinson's Disease. Doc. 349660.

How, then, should physicians make a Diagnosis of Parkinson's Disease under the Settlement? In December 2023, I first convened a panel of AAP neurologists to help me answer that question.[6] These neutral advisors concluded (and I accepted) that the Gelb Criteria is "the appropriate way to make a Diagnosis of Parkinson's Disease today under the Settlement."[7] But it's evident that more transparency is necessary to help explain the medicine for IRPAs and

---

[3] Settlement Agreement, Exhibit A-1 (4)(a).

[4] The DSM-5-TR is now the operative version under the Settlement, though its text here is identical in relevant part, and for simplicity's sake I refer to the DSM-5 above. *See* Special Master Ruling on Alzheimer's Disease Diagnostic Criteria, at 11-16 (Mar. 10, 2025), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=alz_diagnosis_criteria_sm.pdf (concluding that the DSM-5-TR was incorporated into the Settlement and is the operative text for all references to the DSM-5).

[5] Special Master Ruling on Parkinson's Disease Diagnosis Criteria, at 3 (Jan. 16, 2024), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=parkinsons_disease_diagnosis_criteria_sm.pdf.

[6] *Id.*

[7] *Id.*

Claimants who face claim denials. To that end, in this Appeal I asked the AAP for help in describing how they approach reviewing Parkinson's Diagnoses using the Gelb Criteria.[8]

To start, the Gelb Criteria first asks about four "Group A" features: (1) Resting Tremor, (2) Rigidity, (3) Bradykinesia, and (4) Asymmetric Onset. *Id.* At least three out of four features must be present.

The AAP emphasized that Parkinson's Disease is an insidious illness whose diagnosis requires the eyes and mind of a trained neurologist. For that reason, the group advised that the diagnosing physician herself should ordinarily directly observe the Gelb Group A features on exam. Conversely the AAP expressed serious concerns about the quality and reliability of diagnoses in which MAF neurologists rely on other doctors' (often, non-MAF neurologists') observations.[9]

To see why this is problematic in part, consider that patients on a medication like Sinemet often have some of their symptoms masked. But Claimants do not have to stop their treatment by such powerful and beneficial medications to be diagnosed under the Settlement. The AAP emphasized that a trained neurologist should normally be able to discern the telltale parkinsonian signs even when the patient is medicated. That's particularly true when the neurologist follows best practices and personally observes a patient *over time*. According to the AAP, this sort of subtle judgment call about the effects of medication and its relationship to a diagnosis is one that a neurologist doing good medicine would not ordinarily outsource.

Or to put it differently and in the context of the system of layered deference which guides this Program, it is easy for the AAP to defer to a neurologist who carefully relays her observations from the patient's physical exam in her notes, and who has had multiple visits; it is hard if not impossible to defer and approve a Diagnosis when that same neurologist simply relays the views of others, who may or may not be trained, and may or may not be talking about those diagnostic signs the Gelb criteria make stigmatic.

After three of the four Gelb Group A criteria are met, that same guidance instructs neurologists to continue to the Group B "exclusionary" features and the player's response to levodopa or a dopamine agonist.[10] *Id.* The AAP has probed these additional requirements in its

---

[8] This was a conversation by zoom with the AAP, but I sent the panel a draft of this Opinion to make sure that I had accurately captured the gist of their views. The AAP also agrees that biomarkers of Parkinson's Disease, though increasingly common in practice, are not dispositive for a Qualifying Diagnosis under the Settlement Agreement. However, they may be a piece of information in the total mix that helps the AAP to review a Qualifying Diagnosis. *Cf.* Special Master Ruling on Alzheimer's Disease Diagnostic Criteria, at 6 (Mar. 15, 2024), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=alz_diagnosis_sm_2.pdf ("That is, although biomarker testing should not (today) be the only factor weighing against or for a Diagnosis, it can be a factor: Diagnosing physicians and the Settlement's medical experts may consider the absence of biomarkers signifying Alzheimer's alongside other contravening evidence.")

[9] A separate problem with such attempts at outsourcing clinical judgment is that that reliance on non-MAF neurologists might permit evasion of the Program's anti-fraud and anti-influence rules.

[10] The article which first established the so-called "Gelb Criteria" specifies three independent requirements for a probable diagnosis of Parkinson's Disease: (1) 3+ Group A features, (2) no exclusionary Group B features, and (3)

review processes, asking clinicians to explain potential unusual symptoms and confounding physical causes outside of head trauma itself—like Mr. [redacted]'s cervical spinal stenosis. It has also asked whether Claimants have had a substantial and sustained response to levodopa or a dopamine agonist, or, if they have not begun that course of treatment, sought a reasonable clinical explanation of why it was counter-indicated.

Here, too, the AAP appropriately defers more to clinicians who have personally observed their patients over time and who have therefore been able to carefully consider both these exclusionary criteria and the appropriate course of medical treatment. That's because, when mild or incompletely expressed, Parkinson's is a diagnosis that physicians typically arrive at after excluding other possibilities through repeated observations followed by differential judgment. It's obvious that physicians relying on external records after one-off visits, or who do not at least consider the utility of medication or the possibility of other confounds, may be unreliable sources for these consequential and delicate medical verdicts.

Both Class Counsel and the NFL Parties have endorsed the AAP's use of the Gelb criteria, though they may disagree as to the appropriate weight given to any particular factor and how the AAP strikes the balance between type one and type two errors. But as the Special Masters have repeatedly emphasized, the Settlement works best when the Claims Administrator and its advisory experts are able to defer to treating physicians' reasoned diagnostic practices, which in turn requires those physicians to create contemporaneous records which fully and adequately capture the factual bases for their diagnoses.

The denied Qualifying Diagnosis which resulted in this Appeal demonstrates the wisdom of the AAP's approach to this set of problems and the importance of focusing on those medical records created in the ordinary course. Essentially, as the AAP has advised, Dr. [redacted]'s contemporaneous notes do not follow the Gelb criteria in making a Parkinson's Diagnosis. They do not record those symptoms reported by a patient and signs evident on exam that sufficiently justify a Diagnosis. Dr. [redacted]'s later attempts to backfill his notes are plainly insufficient, as I will now explain.

Mr. [redacted] acknowledges that he has not demonstrated Asymmetric Onset. Doc. 376083 at 6. He argues that he has fulfilled each the remaining three Gelb A features: Resting Tremor, Bradykinesia, and Rigidity. *Id.* at 5-6. To succeed on Appeal, Mr. [redacted] must start by showing by

---

substantial and sustained response to Parkinson's Disease medication. Douglas J. Gelb, Eugene Oliver & Sid Gilman, *Diagnostic Criteria for Parkinson Disease*, 56 ARCH NEUROL 33, 37 tbl.2 (1999). As Exhibit E to the Claimant's brief notes, the Group B features "suggestive of alternative diagnoses" are "features unusual early in the clinical course:

- Prominent postural instability in the first 3 years after symptom onset
- Freezing phenomena in the first 3 years
- Hallucinations unrelated to medications in the first 3 years
- Dementia preceding motor symptoms or in the first year
- Supranuclear gaze palsy (other than restriction of upward gaze) or slowing of vertical saccades
- Severe symptomatic dysautonomia unrelated to medications
- Documentation of a condition known to produce parkinsonism and plausibly connected to the patient's symptoms (such as suitably located focal brain lesions or neuroleptic use within the past 6 months)."

clear and convincing evidence that the Claims Administrator erred in its determination as to each remaining feature. (And, then, that the AAP was incorrect in its approach to the remaining Gelb requirements.)

Mr. [redacted]'s briefing refers to a variety of medical evidence, submitted at different times and for distinct purposes. Dr. [redacted] examined him on four occasions: three times in 2023 (leading to the initial Claim) and again on May 20, 2024 (in response to the AAPLC's questions).

The notes of that May 20, 2024 exam have been uploaded to the Claim Portal three times. The first was on May 23, 2024, shortly after the exam took place. Doc. 330073 at 5-7. On August 23, 2024, the notes were uploaded again, this time as an attachment to Dr. [redacted]'s undated letter. Doc. 355096 at 2-4. The first and second versions of the notes are identical. *Compare* Doc. 330073 at 5-7, *with* Doc. 355096 at 2-4. This original version contains the following substantive sections: History of Present Illness, Exam, Right Upper Extremity, Left Upper Extremity, Right Lower Extremity, Left Lower Extremity, and Cranial Nerve Assessment. *Id.*

And then, on January 30, 2025, over eight months after the exam took place (and over two years after the initial date of Diagnosis), Mr. [redacted] uploaded the notes again, as Exhibit G to his Appeal. Docs. 376084; 376083 at 177-180. This new version contains the same sections and information as the original version, but with two key differences. *Compare* Doc. 330073 at 5-7, *and* Doc. 355096 at 2-4, *with* Doc. 376084. First, in the middle of the Exam section, Dr. [redacted] added the following Gelb-specific language: "bradykinesia, masked facies, psychomotor slowing observed." Doc. 376084 at 1. Second, at the end of the notes, Dr. [redacted] added a brand-new Assessment section, where he states:

> Has symptoms and signs of Parkinson's Disease -- rigidity, masked faces, bradykinesia, psychomotor slowing -- with positive response to Sinemet. Other parkinsonian conditions do not typically respond to Sinemet. Has other neurological signs with reduced reflexes and pain consistent with spinal stenosis of the lumbar and cervical regions.
>
> Diagnosis is consistent with Parkinson's Disease plus spinal stenosis from sports related injuries.

*Id.* at 2-3.

Dr. [redacted] did not date these additions and Mr. [redacted] offers no explanation for their sudden appearance on Appeal, only suggesting that the notes are "new evidence to consider." Doc. 376083 at 6. The additions mirror the language that Dr. [redacted] previously used in his undated letter: "[Mr. [redacted]] exhibited bilateral rigidity in upper arms, general musculoskeletal bradykinesia, masked faces, and psychomotor slowing." Doc. 355096 at 1. That is, the *information* that Dr. [redacted] added to the notes was already available for the Claims Administrator to consider, by way of his previous undated letter, though now it was refashioned as if it had been contemporaneously recorded in May 2024.

Neither the recently revised exam notes nor the undated letter, created and submitted during the pendency of Mr. [redacted]'s various appeals, are medical records produced contemporaneously to an exam. This materially erodes their utility, as "the Agreement's system of review turns on deference to contemporaneously created and articulated medical judgments."[11] Instead, these new and amended documents represent "late-arriving reasoning," which "cannot substitute for the actual reasons" Dr. [redacted] outlined at the time of his Diagnosis.[12] Simply put, "no deference is due to clinician's letters produced on Appeal."[13]

The problem of what to do about back-filled medical records is particularly acute when the contemporaneous notes are devoid of the very pieces of factual information which are necessary to support a Diagnosis. While such pieces of medical advocacy may occasionally explain pieces of reasoning in helpful ways, they are no substitute for missing, documented, observation.[14] On remand, while the AAP and the Claims Administrator certainly referenced Dr. [redacted]'s undated letter, they put much more weight on Dr. [redacted]'s contemporaneous medical records. Doc. 372358.

Mr. [redacted] argues that information in these contemporaneous medical records alone demonstrates fulfillment of the necessary Gelb Criteria features. Doc. 376083 at 5-6. I do not agree, and will address each feature in turn.

**1. <u>Resting Tremor</u>**

In its Notice of Denial, the Claims Administrator—relying on the AAP's findings—concluded that "[t]here are no comments with regard to tremor of any form, so that this Gelb criterion remains unfulfilled." Doc. 372358. Mr. [redacted] argues that this statement is wrong. Doc. 376083 at 5. In fact, as he points out, Mr. [redacted]'s medical record does reference tremors, most notably in the Diagnosis, where Dr. [redacted] states three times that Mr. [redacted] is "progressively having tremors." Doc. 298781 at 10, 11, 25.

And yet, none of these references to "tremor" in the notes rely on Dr. [redacted]'s own observations. *Id.* Rather, all three are verbatim recitations of [redacted]'s third-party sworn statement, where she reports that Mr. [redacted] "is progressively having tremors and humming all the time." Doc. 298735 at 3.

---

[11] Special Master Ruling on Post-Diagnosis Evidence, at 5 (June 8, 2020), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=post_diagnosis_evidence_sm.pdf.

[12] Special Master Ruling on Neuropsychological Testing and Validity, at 8-9 (Mar. 17, 2023), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=np_testing_and_validity_sm_2.pdf.

[13] *Id.* at 9 n.1.

[14] This idea is illustrated in a previous Parkinson's Disease decision. Special Master Ruling on Parkinson's Disease Diagnosis Criteria, at 2-3 (Jan. 16, 2024), https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=parkinsons_disease_diagnosis_criteria_sm.pdf. There the diagnosing clinician explained in a later addendum why certain Gelb Criteria features were met. *Id.* However, unlike here, where Dr. [redacted]'s contemporaneous notes make no mention of any Gelb Criteria features, in that Claim the diagnosing clinician's contemporaneous notes specifically mentioned "bradykinesia of right hand." *Id.*

There are two problems here.

First, as AAP pointed out, "[t]he clinical evidence supporting this addended statement is predominantly historical" and "[t]he specificity of these symptoms is highly uncertain given the player's several other listed diagnoses that can impact mobility." Doc. 317662. Or to put it more plainly: Dr. [redacted] did not personally observe or describe tremors but merely reproduced the views of a lay informant. As I explained above, having the neurologist observe and contextualize the relevant symptom directly is crucial under the Gelb criteria.

The point is emphasized here because Dr. [redacted]'s third-party report does not show that Mr. [redacted] suffers *resting* tremors, as opposed to those that accompany movement. It is resting tremors which are a stigmatic movement associated with this disease. The AAP thus requested that Dr. [redacted] conduct a physical exam, so that "objective signs" of Parkinson's Disease could be observed. *Id.* Despite this input, none of Dr. [redacted]'s contemporaneous notes from the May 20, 2024 exam (nor any of his new and amended documents, for that matter) mention that he directly observed tremors, let alone resting tremors. Doc. 330073 at 5-7.

**2. <u>Rigidity</u>**

The Notice of Denial again focuses on problems in Dr. [redacted]'s contemporaneous notes:

> In contrast to the letter provided by Dr. [redacted], which mentions bilateral rigidity of the arms, there is no comment regarding muscle tone in the exam notes. The exam notes do indicate that the Player has significant pain in his shoulders, which interferes with movement, and that the range of motion of the right leg is limited by pain and weakness. As noted earlier, these limitations appear to be more consistent with the Player's known diagnosis of degenerative arthritis, including cervical stenosis, than with a Qualifying Diagnosis of Parkinson's Disease. Because of the reasons given above, the current documentation continues to be insufficient to support the fulfillment of the Gelb criterion of rigidity.

Doc. 372358.

The Claims Administrator was quite correct to question Dr. [redacted]'s assertion of rigidity in his undated letter, because that assertion was not supported by his contemporaneous exam notes. *Id.* On appeal, Mr. [redacted] points to Dr. [redacted]'s amended exam notes that mention rigidity. Docs. 376084 at 2; 376083 at 6. This amended document is no more contemporaneous than Dr. [redacted]'s undated letter. Worse, Dr. [redacted] offered no explanation for how or why this observation became part of the file so late in the day.

The only contemporaneous evidence that Mr. [redacted] cites in favor of rigidity is the "stiffness" in his legs, which makes movement difficult, including walking and getting dressed. Doc. 376083 at 6, 38-39. As the Claims Administrator determined, however, without exam findings

of Mr. [redacted]'s muscle tone, these symptoms cannot be attributed to Parkinson's Disease, as they are nonspecific. Doc. 372358.

### 3. <u>Bradykinesia</u>

The Notice of Denial states:

> There are no exam note findings that support the presence of bradykinesia referred to in the summary. Specifically, there is no comment regarding any tasks that were assessed that are typically used to assess slowing of movement, such as opening and closing the hands, tapping the fingers or tapping the feet. The current medical records, including the new documentation, still do not adequately document the presence of bradykinesia on exam to consider this Gelb criterion to be fulfilled.

*Id.*

Once again, Dr. [redacted]'s undated letter and modified exam notes do not fill gaps in the contemporaneous records. The only contemporaneous evidence that Mr. [redacted] cites in favor of bradykinesia is a [redacted] document from January 6, 2023, in which he self-reported "[s]lowing of [m]ovement." Doc. 376083 at 6 (citing Doc. 298808 at 5). However, as the Claims Administrator (aided by the AAP) concluded, there are specific diagnostic tasks on clinical exam which can be used to assess potential bradykinesia. Doc. 372358. Dr. [redacted] did not conduct any of these tests during his May 20, 2024 exam to evaluate Mr. [redacted]'s self-reported symptoms. Doc. 330073 at 5-7. Thus, the Claims Administrator was left with nothing substantive to defer to.

Considering these deficiencies in Dr. [redacted]'s notes, it is not highly probable or reasonably certain that the contemporaneous medical records support the presence of *any* of the Gelb Group A criteria.

## CONCLUSION

I find as a matter of fact that Mr. [redacted] has not sufficiently shown that he has fulfilled the requirements for a Qualifying Diagnosis of Parkinson's Disease under the Settlement. I therefore deny his Appeal.

Date: July 1, 2025

David A. Hoffman, Special Master