# Exhibit "S"

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br><br>MDL No. 2323<br><br>Special Master Jo-Ann Verrier<br>Special Master David Hoffman |
| Kevin Turner and Shawn Wooden, *on behalf of themselves and others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>National Football League and NFL Properties LLC, successor-in-interest to NFL Properties, Inc.,<br>Defendants. | Civ. Action No.: 14-cv-00029-JDW |
| THIS DOCUMENT RELATES TO:<br>All Actions | |

**THE NFL PARTIES' SUBMISSION ON THE CLAIMS ADMINISTRATOR'S DECEMBER 12, 2025 AUDIT REPORT**

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... 2

I. BACKGROUND .......... 3

A. The Settlement's Audit Provisions .......... 3

B. The Claims Administrator's Audit Investigation of the Subject Firms .......... 5

C. The Fraudulent Scheme .......... 7

D. The Claims Administrator's Conclusions .......... 9

II. RESPONSES TO THE SUBJECT FIRMS' SUBMISSIONS .......... 11

A. Grossinger .......... 12

B. Feder Law .......... 13

C. Pro Athlete .......... 14

D. Syme Law .......... 15

E. ROV .......... 15

III. SEVERE REMEDIES ARE APPROPRIATE AND WARRANTED .......... 18

IV. CONCLUSION .......... 22

The Special Masters have accepted the referral of a December 12, 2025 Rule 15 Audit Report concerning claims patterns in the Qualifying Diagnosis of Parkinson's Disease (the "Audit Report"). The Audit Report, which is over 80 single-spaced pages in length, is the result of an extensive, multi-year investigation into Parkinson's Disease claim submissions by five law firms: Douglas Grossinger ("Grossinger"); Feder Law LLC ("Feder"); Pro Athlete Law Firm, P.A. ("Pro Athlete"); Syme Law, PLLC ("Syme"); and Reppert Oates & Vytell, LLC ("ROV") (collectively, the "Subject Firms").

The Audit Report details an elaborate and coordinated years'-long arrangement among the Subject Firms intentionally designed to circumvent the Settlement Program's anti-fraud safeguards, manufacture Parkinson's Disease diagnoses outside the Program, and funnel these claims through intermediary law firms in an effort to evade the Programs' fraud-detection measures. As the Claims Administrator found, the Subject Firms' extensive efforts to evade provisions for fraud detection and prevention "seriously undermines the substantive foundation of the Settlement Agreement given its uncapped compensation fund" and represent a "***direct attack on the Settlement's honor***." (Audit Report at 57.)

Indeed, the scale of this fraud is rampant. The Subject Firms represent only 3% of all Settlement Class Members, yet have submitted a staggering **29%** of all Parkinson's claims since 2019, and **over one-third** (34%) of all Parkinson's claims submitted over the last three years. (Audit Report at 10.) And the Subject Firms have continued to submit Parkinson's claims even after the issuance of the Audit Report. As of February 12, 2026, the Subject Firms have submitted Parkinson's claims worth a total of $158 million. Of that total, $64 million is pending, meaning that the Subject Firms' fraudulent scheme has ***directly resulted in $94 million in***

***payments for suspect diagnoses made by the NFL Parties.***[1] And, as the Claims Administrator observed, "at the heart of it, the [Subject Firms'] process exploits the Players, who are diagnosed with a life altering disease and are prescribed treatment in a substandard setting by medical professionals that are paid by and influenced by lawyers." (*Id.* at 57.)

The Subject Firms' burden in these proceedings is heavy: each must establish that there is "*no reasonable basis* to support a finding that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim by the Settlement Class Member." (Audit Rule 28 (emphasis added).) In light of the thoroughness of the Claims Administrator's investigation and its stunning findings, no Subject Firm can meet that high bar. Indeed, each of their submissions—which primarily misunderstand the Settlement's audit provisions, deny wrongdoing, and point the finger at other Subject Firms—falls far short.

Following an audit referral, the Special Masters are charged with evaluating intent and fashioning appropriate remedies to ensure that fraudulent behavior is appropriately sanctioned and deterred. The Claims Administrator recommended that the Special Masters deny all pending Parkinson's claims submitted by the Subject Firms, direct the parties to the Settlement to work with the Claims Administrator and Special Masters to improve the Settlement's Parkinson's criteria and procedures, and censure the Subject Law Firms.

The unpaid claims implicated by the Audit Report must be denied and it is beyond question that the Settlement's Parkinson's diagnostic criteria and procedures need to be updated including in light of the Claims Administrator's findings. The NFL Parties respectfully submit, however, that additional remedies are necessary in order to sufficiently serve the purposes of the

[1] These figures differ from those in the Audit Report because they have been updated and represent amounts funded by the NFL Parties, as opposed to the net payment amounts received by Class Members, which can be affected by lien holdbacks.

Settlement's audit provisions, which are not only to detect fraudulent claims, but also to deter future fraudulent actors and ensure that the NFL Parties' have received the benefit of their bargain to compensate accurate diagnoses, not fraud. Given the magnitude of the fraudulent scheme detailed by the Audit Report, the staggering impact of that scheme, and that the lengths the Subject Firms took to evade detection, which factors indisputably support intent and knowledge of wrongdoing, the remedies must be correspondingly severe. Accordingly, the NFL Parties respectfully request that the Special Masters order additional remedies, including (i) disqualification of the Subject Firms and referral to federal authorities and disciplinary boards, and (ii) reimbursement of the NFL Parties and/or Monetary Award Fund by the Subject Firms for costs that their scheme caused them to bear, including the $94 million in Monetary Awards that would have been denied as part of this audit had they not already been paid. In addition, the Subject Firms should be required to forfeit their attorneys' fees to the Monetary Award Fund, as expressly permitted by Section 10.3(i)(f) of the Settlement Agreement. These remedies are necessary protect the integrity of the Settlement Program, compensate the NFL Parties for the Subject Firms' fraud, and deter future misconduct.

For these reasons and those set forth below, the NFL Parties respectfully request that the Special Masters impose the NFL Parties' requested remedies.

# I. BACKGROUND

## A. The Settlement's Audit Provisions

As the Court has held, the administration of the Settlement requires "diagnostic accuracy," which is "expressly provided for by the terms of the Settlement Agreement." (ECF No. 11931 at 6.) Accordingly, to ensure that diagnostic accuracy and that only legitimate claims are paid, the Settlement Agreement provides for a robust audit system to prevent the submission

and payment of claims that, among other things, rely on fraudulent records. Specifically, the Settlement Agreement requires Class Counsel, Counsel for the NFL Parties, and the Claims Administrator to "establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Monetary Award Fund." (Settlement Agreement § 10.3(b); *see also id.* § 10.4).) Moreover, the Settlement Agreement provides that "[t]he Claims Administrator will have the discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package or Derivative Claim Package documentation, including, without limitation, as set forth in [the audit provisions of] Section 10.3." (*Id.* § 8.6(b).)

Indeed, the purpose of the Settlement's audit provisions is not only to detect fraud, but to deter future fraud as well. These provisions and their implementation are critical to maintaining the integrity of the Settlement Program. They are also essential to ensuring that the NFL Parties receive the benefit of their bargain; namely, that there is robust fraud detection and prevention in order to prevent payment of fraudulent claims, and that the NFL Parties are only required to pay awards resulting from legitimate and accurate diagnoses. (*See* ECF No. 11931 at 6.)

During the audit of a claim or group of claims, the Claims Administrator may conduct an investigation. If based on its investigation the Claims Administrator determines that there is a reasonable basis to support a finding that there has been a misrepresentation, omission, or concealment of a material fact made in connection with the claim or claims, the Claims Administrator notifies the affected Class Member or Class Members and refers the claim or claims to the Special Master. (Settlement Agreement § 10.3(i).) Following briefing, the Special Masters then determine whether the target(s) of the audit investigation "have established that

there is no reasonable basis to support a finding that there has been a misrepresentation, omission or concealment of material fact made in connection with a Claim" and issue a written decision which may "direct such relief as deemed appropriate." (Rules 27, 28, 31.)

When determining such relief, the Special Masters' "review and findings shall take into account whether the misrepresentation, omission or concealment was intentional," and the Special Masters may order a wide degree of remedies including, without limitation, (i) denial of the Claim or Claims, (ii) additional audits of Claims, (iii) referral of an attorney or physician to disciplinary boards, (iv) referral to federal authorities, and (v) disqualification of an attorney, physician, or Class Member from further participation in the Settlement Program. *Id.* Notably, the Settlement Agreement specifies that "if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member will be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund." (*Id.* § 10.3(i)(f).)

**B. The Claims Administrator's Audit Investigation of the Subject Firms**

The Claims Administrator's exhaustive investigation of the Subject Firms[2] grew out of tips it received as early as 2018. Between 2018 and 2020 the Claims Administrator received tips that Grossinger was engaging in wrongdoing with respect to claims for Alzheimer's disease and may have implied that he could obtain a higher value Qualifying Diagnosis when attempting to recruit a represented former player. (Audit Report at 7.) At that time, the evidence "did not support a clear finding of misrepresentation, but [the Claims Administrator] was unable to definitively rule out misconduct." (*Id.*)

[2] The Subject Firms are detailed by the Claims Administrator in the Audit Report. (*See* Audit Report at 10–18.)

Then, in 2022, Counsel for the NFL Parties several times expressed to the Claims Administrator their "continued strong concerns" about Grossinger and Feder Law, including that "Players saw the same non-Program doctors for diagnosis prior to MAF exams, reporting mild [Parkinson's] symptoms with later subjective improvements after treatment with common [Parkinson's] medication, levodopa." (*See id.*) This led the Claims Administrator to investigate these concerns in collaboration with the Program's neutral experts and by questioning certain non-Program neurologists.[3]

The Claims Administrator continued to work with the Program's neutral experts to ensure the consistency of Parkinson's diagnoses, while noticing a pattern of the same non-Program doctors diagnosing players with Parkinson's outside of the Program for apparently unrelated law firms across the country. As certain other firms began to submit an increasing number of Parkinson's claims, the Claims Administrator received a series of tips since later 2024, which prompted it to re-launch its investigation.

Ultimately, the Claims Administrator's robust investigation included numerous steps in order to "uncover specific details and develop a fuller understanding" of the Subject Firms' fraudulent scheme, including: (i) interviewing Program attorneys; (ii) attempting to interview Dr. Jeffey Steinberg, a non-Program neurologist involved in the fraudulent scheme; (iii) issuing multiple subpoenas, including to non-Program doctors and a hotel; (iv) auditing certain pending claims submitted by certain of the Subject Firms; (v) contacting the non-Grossinger Subject Firms about their relationship with Grossinger; and (vi) contacting Grossinger about his relationship with the other Subject Firms. (Audit Report at 19–20.)

[3] It is the Claims Administrator's belief that that "this early audit scrutiny of Mr. Grossinger's practices likely further motivated him to pursue alternative arrangements whereby he sought off-the-record relationships with intermediary law firms and attorneys to submit his [Parkinson's] or Alzheimer's Monetary Award Claims for the purpose of obfuscating any suspicious trends in his activities and evading Program anti-fraud safeguards." (Audit Report at 9.)

### C. The Fraudulent Scheme

This investigation uncovered a sophisticated arrangement among the Subject Firms that represents a direct and chilling attack on the integrity of the Settlement Program. Specifically, the Subject Firms' fraudulent arrangement operates through a "mass production process" designed to manufacture Parkinson's claims while evading the Program's fraud detection and prevention procedures. (*See* Audit Report at 26.)

*First*, "Grossinger and associated attorneys solicit former players (both represented and unrepresented), either directly or effectively promising or assuring them [Parkinson's Disease] Qualifying Diagnoses." (*Id.*) In at least one case, but likely more, Grossinger offered a former player's existing attorney an off-the-record $75,000 payment in order to "secure his cooperation through financial interest and avoid interference or exposure of his arrangements." (*Id.*) The same former player reported that he planned to pay Grossinger a $150,000 bonus in addition to a retainer. (*Id.* at 26–27.)

*Second*, Grossinger uses questionable arrangements with a network of non-Program doctors "he relies on to carry out a multi-step process to develop payable [Parkinson's] claims." (*Id.* at 27.) The Claims Administrator's "findings show lawyer involvement (*i.e.,* selection of providers, referrals, compensation for ongoing care) that raise concerns over improper influence and their integrity or reliability." (*Id.*) In essence, the Subject Firms "hire and use 'screening' medical professionals as consultants to informally diagnose [Parkinson's] and refer the [former players] to evaluating neurologists for formal treatment." (*Id.* at 56.) Notably, "at least some of these screening evaluations and diagnoses occurred in hotel rooms, not in 'standard treatment or diagnosis settings.'" (*Id.*; *see also* Settlement Agreement § 10.3(d).) And, under these arrangements, the evaluating neurologists are "in effect, ***lawyer-hired consultants and/or***

***experts***," meaning that the neurologists are "compensated by lawyers who have no prohibitions in dictating the doctor's methodologies, reports and findings." (*Id.* at 26 (emphasis added).) Further, "[t]hese doctors are subject to incentive-caused bias based on the likelihood of further referrals and compensation from the law firms" and the Claims Administrator "observed many repeated instances of these same doctors diagnosing [Parkinson's] to the subject firms' clients, the cumulative effect of which cannot be viewed as coincidental." (*Id.*)

*Third*, the former players are then evaluated by Qualified MAF Physicians, who are influenced by the non-Program neurologist's reports, especially because the MAF evaluations "are most often performed while the Players are under treatment by levodopa, the effect of which significantly limits observable signs of [Parkinson's] and necessitates reliance on the other doctor's records and observations." (*Id.* at 56.) Further, the Subject Firms routinely "shopped" for MAF Physicians most likely to provide a Parkinson's diagnosis, with one now-terminated MAF Physician granting such diagnoses in 80% to 100% of such cases. (*Id.*)

*Fourth*, claims are funneled through intermediary law firms (Subject Firms Syme Law, Pro Athlete, and Feder Law) using "off-the-record" co-counsel arrangements in violation of the Settlement Agreement and specifically designed to "obscure suspicious trends or patterns and inhibit fraud detection and monitoring." (*Id.*) In fact, Grossinger insisted that his "communications with clients, retainer and other financial arrangements remain verbal and are not memorialized" and while other firms are listed as attorneys of record, Grossinger "maintains significant, if not sole control and management of the claims," in violation of the Settlement Agreement. (*Id.* at 27.) The lengths to which Grossinger went to obscure these relationships demonstrate the Subject Firms' knowledge of the impropriety of these arrangements and their intent to defraud the Settlement Program.

Unlike Grossinger and associated firms, the ROV firm did not obscure its processes through intermediary front firms for claim submissions. The Claims Administrator, however, found that "ROV set up a similarly faulted process to consistently develop and obtain [Parkinson's diagnoses]," and that Grossinger "influenced or inspired this process." (Audit Report at 79.) Indeed, like Grossinger, the neurologists ROV uses "are effectively a network of consultants and/or experts paid by ROV who rendered [Parkinson's] diagnoses and follow-up treatment without the safeguards of the Settlement Program" and "ROV's repeated reliance on the same paid neurologists for diagnosis and treatment of the firm's clients raise concerns for incentive-caused bias based on the likelihood of further referrals and compensation." (*Id.*) Furthermore, "ROV's practice of direct solicitation of Players, effective promising or assurance of [Parkinson's] diagnoses, omission of relevant records that do not support the claimed diagnosis, the manufactured urgency to obtain 150-mile exceptions to see preferred MAF Physicians, and attendance at an evaluation with the Player, all compromise the integrity and honor of the Program, and cause harm to the [class]." (*Id.*)

**D. The Claims Administrator's Conclusions**

Ultimately, the Claims Administrator concluded that its investigation of all Subject Firms "uncovered ***an expanding, sometimes deliberately convoluted, network of relationships implicating multiple parties and activities, which taken together, call into question the integrity and legitimacy of a significant number of [Parkinson's] Monetary Award Claims.***" (*Id.* at 79 (emphasis added).) Specifically, the Subject Firms "employ processes apparently conceived to take advantage of the Program's diagnostic criteria for [Parkinson's] to develop consistent payable claims" including through "[o]ff-the-record arrangements," which are "in place to funnel such claims through intermediary firms to mask the attorney working on them

and to disguise suspicious trends." (*Id.*)

Indeed, over the past several years, "nearly every element of the Program – players, attorneys, and medical professionals – have come forward to express their serious concerns about these ongoing [Parkinson's] submission arrangements." (*Id.*) Such concern is warranted. The Settlement Program relies on the good faith and judgment of professionals, and particularly of doctors and attorneys. But the Claims Administrator's collective findings have caused it to "question the process employed to obtain these [Parkinson's] diagnoses and the overall reliability of the respective Monetary Award Claims." (*Id.*) Instead of doctors exercising their good faith judgments, as the Program relies upon, the Subject Firms fraudulent scheme has rendered certain doctors "paid consultants [for the Subject Firms], tainting reliability of their judgment." (*Id.*)

This arrangement, which was "designed to obtain diagnoses disguised as clinical diagnoses from treating doctors and obscured relationships by the firms involved in the process [and] evade provisions for fraud detection and prevention[,] ***seriously undermines the substantive foundation of the Settlement Agreement given its uncapped compensation fund.*** (*Id.* at 80 (emphasis added).) Simply put, "the process designed and implemented by the subjects of the investigation stripped away these safeguards, compromising integrity of the claims process." (*Id.*) As the Claims Administrator found, the Subject Firms' misconduct constitutes "***a direct attack on the Settlement's honor.***" (*Id.* (emphasis added).)

Thus, the Claims Administrator determined that there is a reasonable basis to support a finding of misrepresentation, omission, or concealment of material fact in connection with Parkinson's claims submitted by the Subject Firms, and that the facts about how Parkinson's "diagnoses rendered outside of the Program later proffered and relied upon by MAF Physicians

came to be established are material because they affect or have the potential to affect determination of an Award for a [Parkinson's diagnosis]." (Audit Report at 78.)

Indeed, the impact of the Subject Firms' misconduct has been catastrophic. Not only has it directly resulted in $94 million in award payments made by the NFL Parties, but the Settlement Program (including the Claims Administrator, neutral experts, and the Special Masters) are likely to spend years attempting to untangle tainted records and diagnoses from potentially legitimate ones to the detriment of the class. And, as the Claims Administrator observed "at the heart of it, the [Subject Firms'] process exploits the Players, who are diagnosed with a life altering disease and are prescribed treatment in a substandard setting by medical professionals that are paid by and influenced by lawyers." (*Id.* at 57.)

Accordingly, based on its audit findings, the Claims Administrator recommended that the Special Masters: (i) deny any pending Parkinson's claim submitted by the Subject Firms, allowing the affected class members to file new claims based on new evaluations from Program clinicians; (ii) direct Class Counsel and Counsel for the NFL Parties to engage with the Special Masters and Claims Administrator to revisit and consider the current Parkinson's Settlement criteria and prospective modifications to it[4]; and (iii) censure the Subject Firms regarding the practices detailed in the Audit Report. (Audit Report at 80–81.)

## II. RESPONSES TO THE SUBJECT FIRMS' SUBMISSIONS

In these proceedings, the Subject Firms shoulder the heavy burden to establish that there was "*no reasonable basis* to support a finding that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim by the Settlement Class

[4] Specifically, these modifications would include, without limitation, (i) enhanced training for Qualified MAF Physicians, including providing for multiple evaluations if needed to confirm Parkinson's; and (ii) reduced reliance on, and increased scrutiny of, non-Program provider records.

Member." (Audit Rule 28 (emphasis added).) Given the detailed findings in the Audit Report, and the Claims Administrator's investigation that led to them, no Subject Firm comes close to meeting that high bar. While the Claims Administrator's investigation and findings stand fully on their own, the NFL Parties nevertheless briefly address each of the Subject Law Firms' responses.

**A. Grossinger**

Although Grossinger does not contest that the Special Masters should implement the vast majority of the Claims Administrator's proposed remedies, his primary response to the Audit Report is to assert that at least some of his clients "actually do have Parkinson's disease." (Grossinger Resp. at 1, 25.) This argument, however, fundamentally misunderstands the purpose of the Settlement's audit provisions, and the findings in the Audit Report. An adverse audit report and the Special Masters' issuance of remedies does not depend on showing that any individual retired player does or does not have Parkinson's (or any other Qualifying Diagnosis). Instead, the audit process is concerned with whether there has been misrepresentation, omission, or concealment of material facts in connection with claims. Here, the manner in which players received these diagnoses renders all such records and diagnoses unreliable and unable to support a Qualifying Diagnosis. Indeed, Grossinger response agrees that the denial without prejudice of all affected claims is "reasonable." (*Id.* at 25.)

Moreover, Grossinger's other scattershot arguments are baseless. For example, despite his claim that he was never asked about his co-counsel relationship, the Claims Administrator did, in fact, ask him about that topic in November 2025, and he failed to respond substantively. Likewise, contrary to Grossinger's contention that these relationships were "standard," multiple law firms independently reported to the Claims Administrator that Grossinger specifically

insisted that arrangements not be memorialized in writing and that communications occur only over the phone to avoid creating a paper trail and in order to obscure those relationships, also evidencing his clear intent to commit fraud. Finally, Grossinger's reliance on the purported qualifications of his network of physicians is unavailing. The issue is not necessarily the qualifications of the neurologists (though some are not even movement disorder specialists), it is that lawyer-selected, lawyer-compensated physicians are offering falsified records to influence MAF Physicians, which effectively outsources the MAF Physician's clinical judgment all while taking intentional steps to evade the Program's anti-influence and anti-fraud safeguards that apply to MAF Physicians.

**B. Feder Law**

Feder Law's primary response is that it "categorically denies any allegation that it engaged in fraud," that "pattern evidence is non-probative of misconduct," and that there was no "claim-specific finding of material misrepresentation." These arguments, too, misunderstand the Settlement's audit provisions and related rules. Regardless of whether Feder Law disclosed his co-counsel relationship with Grossinger, it does not absolve Feder Law of its participation in a scheme designed to manufacture Parkinson's diagnoses and circumvent the anti-fraud safeguards by obscuring the attorney actually controlling the claims. Further, while the Audit Report is not based exclusively or even primarily on pattern evidence, it is relevant that Feder Law submitted 87.5% of all its claims for Parkinson's, ranking it third among all firms for percentage of Parkinson's submissions and making it "a clear outlier from the general population." Likewise, Feder Law's argument that many of its Parkinson's claims were paid does not prove anything, other than the extensive measures the Subject Firms took to conceal their scheme were successful for several years. Finally, Feder Law misunderstands the Audit

standards by arguing that the Claims Administrator failed to show that Feder Law submitted knowingly false information and lacks the purportedly necessary "claim by claim" proof of fraud. The Special Masters can impose remedies, including the denial of all affected claims, without a finding of intent, and no claim-by-claim proof is required under the Audit Rules. (*See* Audit Rule 15.)

**C. Pro Athlete**

Pro Athlete's response attempts to distance itself from the fraudulent arrangement by claiming that it did not engage in misconduct, irrespective of his affiliation with Grossinger. Contrary to that claim, however, the Audit Report contains specific findings with respect to Pro Athlete beyond a simple "affiliation" with Grossinger. For example, in addition to Parkinson's claims submitted by Pro Athlete showing a pattern of reliance on the same non-Program neurologists as the other firms, the Claims Administrator "confirmed an established connection" between Pro Athlete and Grossinger, including based on independent reports from three separate law firms, which the Claims Administrator "considered credible given their consistency and corroboration through other evidence." (Audit Report at 32.) Indeed, the Claims Administrator uncovered that Grossinger was directing certain class members purportedly represented by Pro Athlete, including based on David Levine's own statement when winding down his Settlement practice that Grossinger controlled his Parkinson's claims "because they are in fact Mr. Grossinger's and he is the attorney who handles them." (*Id.* at 33.) This is in stark contrast to Pro Athlete's current statements that it worked in a standard "co-counsel" relationship with Grossinger. In fact, Pro Athlete "submitted claims to the Program based on diagnoses obtained through the process established by Mr. Grossinger" and was party to the off-the-record arrangements with Grossinger which were designed to obscure the fraudulent scheme.

**D. Syme Law**

Syme Law submitted an email primarily asserting that the Audit Report does not allege fraud, intentional misconduct, bad faith, or any knowing violation on Syme Law's part. (Syme Resp. at 1–2.) That is not correct. The Claims Administrator received a tip alleging that Syme Law was "working with certain doctors and another attorney paying doctors excessive amounts to get reports written up correctly," which is consistent with a non-Program neurologist producing in response to a subpoena a check from Syme Law with a handwritten note stating "Doug Gro – 9-16-24) Zelled Money 9/16/24…" (Audit Report at 35–37.) In fact, each and every claim Syme has submitted in the Program has been for a Qualifying Diagnosis of Parkinson's and has followed the pattern detailed by the Audit Report. In any event, even if there were not specific fraud allegations against Syme Law (and there are), that would not preclude adverse audit findings and the imposition of remedies, as the inquiry is whether there is "a reasonable basis to support a finding of misrepresentation, omission, or concealment of material fact" made in connection with a claim.

**E. ROV**

Finally, ROV's response misunderstands the Settlement's audit provisions while attacking the Claims Administrator and its years-long audit investigation. Simply put, these baseless arguments and allegations are a transparent attempt to distract from ROV's own fraudulent conduct.

*First*, ROV contends that the Claims Administrator is required to, but did not, identify any "specific claim" containing a misrepresentation. The Settlement's audit provisions, however, allow for an adverse audit report resulting from a group of claims that, as here, share a common pattern or characteristics. (*See* Audit Rule 15 ("An Audit Report may concern one

Claim or a group of Claims with a shared source or other common characteristics.”).) Indeed, potentially fraudulent patterns often will not reveal themselves outside of the context of other claims submitted by a particular firm or clinician, as was the case here. (*See* Audit Report at 56 (“On their face, especially when relationships and connections are obscured as they were in this set up, these diagnoses appear appropriate . . . . It is only when the layers are peeled back, and the true picture of the process emerges that these diagnoses lose any semblance of proper clinical value and violate a number of Program’s rules and anti-fraud safeguards.”).) In any event, the Claims Administrator uncovered that “in at least one instance, ROV omitted sharing unsupportive medical records that showed assessment from another neurologist that an SCM did not have [Parkinson’s],” which constitutes an omission of material fact. (*Id.* at 69.)

*Second*, ROV likewise misunderstands the Settlement’s Audit provisions by claiming that they improperly shift the burden to ROV to disprove findings. Not so. The Audit provisions include the flexible standard of “a reasonable basis to support a finding that there has been a misrepresentation, omission or concealment of a material fact” specifically in order to allow the Claims Administrator to issue adverse audit reports based on its findings even where, as here, the subjects of the audit investigation predictably continue to deny wrongdoing in the face of the mountain of evidence the Claims Administrator’s investigation compiled. The Claims Administrator had ample evidence to issue its Rule 15 Audit Report and the Special Masters accepted its referral. Thus, at this point the heavy burden *is* on ROV to demonstrate that “there *is no reasonable basis* to support a finding that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim.” (Audit Rule 28.) ROV cannot do so in the face of the undeniable evidence presented in the Audit Report.

*Third*, ROV criticizes the use of anonymous tips, but overstates their impact.

Anonymous tips are a key tool for uncovering potential misconduct in the Settlement Program, and their use has been blessed by the Special Masters and the Court. ROV also vastly overstates their import here: the information received from the tips was corroborated by ample independent evidence, as the Audit Report is not simply the result of anonymous tips, but instead the culmination of an exhaustive multi-year investigation.

*Fourth*, ROV attempts to nitpick individual findings by the Claims Administrator, but most of this boils down to ROV denying the Claims Administrator's evidence-supported findings. These self-serving denials fall far short of meeting ROV's heavy burden to establish that there *is no reasonable basis* to support a finding that there has been a misrepresentation, omission or concealment of a material fact.

Indeed, the evidence uncovered by the Claims Administrator demonstrates that ROV engaged in a wide array of misconduct, including using "effectively a network of consultants and/or experts paid by ROV who rendered [Parkinson's] diagnoses and follow-up treatment without the safeguards of the Settlement Program," and that "ROV's repeated reliance on the same paid neurologists for diagnosis and treatment of the firm's clients raise concerns for incentive-caused bias based on the likelihood of further referrals and compensation." (*Id.*) Moreover, ROV's "practice of direct solicitation of Players, effective promising or assurance of [Parkinson's] diagnoses, omission of relevant records that do not support the claimed diagnosis, the manufactured urgency to obtain 150-mile exceptions to see preferred MAF Physicians, and attendance at an evaluation with the Player, all compromise the integrity and honor of the Program, and cause harm to the [class]." (*Id.*) Nothing contained in ROV's response could or does effectively counter these findings, or the evidence upon which they rely.

## III. SEVERE REMEDIES ARE APPROPRIATE AND WARRANTED

As explained above, following an audit referral by the Claims Administrator, the Special Masters are charged with evaluating intent and fashioning appropriate remedies to ensure that fraudulent behavior is appropriately sanctioned and deterred. The Special Masters have broad authority when determining remedies, which can include, without limitation, claim denials, additional investigation, referral to appropriate disciplinary boards, referral to federal authorities, and disqualification from further participation in the Program. (*See* Settlement Agreement § 10.3(i).) Notably, the Settlement Agreement specifies that "if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member will be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund." (*Id.* § 10.3(i)(f).)

The Claims Administrator recommended that the Special Masters (i) deny any pending Parkinson's claim submitted by the Subject Firms; (ii) direct Class Counsel and Counsel for the NFL Parties to engage with the Special Masters and Claims Administrator to revisit the Settlement's Parkinson's criteria, as described above; and (iii) censure the Subject Firms regarding the practices uncovered by the audit investigation. (Audit Report at 80–81.)

There is no doubt that the unpaid claims implicated in the Audit Report should be denied, and that it is imperative that the parties work with the Claims Administrator and Special Masters to update the Settlement's Parkinson's Disease criteria and procedures, including in light of the Audit Report's findings and the NFL Parties urge the Special Masters to proceed with these remedies. But the NFL Parties respectfully submit that these proposed remedies are insufficient. The purpose of the Settlement's audit provisions are not only to detect fraudulent claims, but also to deter future fraudulent actors, and the remedies issued following an adverse Audit Report must

be of sufficient magnitude to accomplish this purpose. Absent the imposition of sufficient remedies, the message sent is that a lawyer or other Program participant can attempt to commit fraud on the Program, and even if ***nearly $100 million dollars*** in potentially fraudulent claims are paid, the only repercussion will be that any remaining fraudulent claims will be denied without prejudice and the wrongdoers will be asked to begin following the Program's rules.[5]

The misconduct uncovered in the Audit Report is among the most serious ever documented in the Settlement Program. The Subject Firms devised "a direct attack on the Settlement's honor" that "stripped away" the Program's robust anti-fraud safeguards. (*See* Audit Report at 57.) Indeed, the scheme perpetrated by the Subject Firms was "designed to obtain diagnoses disguised as clinical diagnoses from treating doctors and obscured relationships by the firms involved in the process evade provisions for fraud detection and prevention," which "seriously undermines the substantive foundation of the Settlement Agreement given its uncapped compensation fund." (*Id.*) The lengths that the subject firms went in order to obscure their scheme and arrangements suggest that this misconduct was done intentionally and with full knowledge of its impropriety. Indeed, it surely is no accident that the Subject Firms targeted obtaining awards based on one of the most valuable Qualifying Diagnoses in the Settlement Program. Further, the Subject Firms' arrangement "exploits the Players, who are diagnosed with a life altering disease and are prescribed treatment in a substandard setting by medical professionals that are paid by and influenced by lawyers." (*Id.*) Such misconduct should not be allowed to stand, and the remedies must be sufficient to prevent the Subject Firms and deter others from engaging in similar behavior in the future.

[5] These incentives are particularly concerning in this Program because often fraudulent schemes, cannot be detected until a pattern has been established, meaning that the NFL Parties can be required to pay awards based on claims that are only later revealed to be fraudulent, as occurred here.

As explained above, the NFL Parties agreed in the Settlement Agreement to pay awards only for legitimate and diagnostically accurate diagnoses. That is the benefit of the NFL Parties' bargain under the Settlement Agreement to which they are entitled. Accordingly, including in order to ensure that the NFL Parties' pay only legitimate and diagnostically accurate awards now and in the future, and consistent with the purposes of the Settlement Agreement's audit provisions, the Special Masters should order the following remedies:

- The Subject Firms and their principals should be permanently banned from further participation of any kind in the Program (including any role in preparing or submitting claims to it) and the Subject Firms and their principals should be referred to the federal authorities and the appropriate disciplinary boards, which should be provided a copy of the Audit Report and the Special Masters' Decision.
- As the Claims Administrator recommended, all pending Parkinson's claims submitted by the Subject Firms should be denied given that the records in support of those claims, and the processes by which they were generated, are unreliable.
- As the Claims Administrator also recommended, the Special Masters should direct Class Counsel and Counsel for the NFL Parties to engage with the Special Masters and Claims Administrator to revisit and consider the current Parkinson's criteria and prospective modifications to it, including (i) enhanced training for Qualified MAF Physicians, including providing for multiple evaluations if needed to confirm Parkinson's, and (ii) reduced reliance on, and increased scrutiny of, non-Program provider records.
- The Special Masters should direct Class Counsel and Counsel for the NFL Parties

to engage with the Special Masters and Claims Administrator to consider whether any changes to Program Rules are necessary in order to aid future detection and prevention of the use of intermediary firms or other means to circumvent the Program's fraud detection measures.

- Any claims by Settlement Class Members who were at any time represented by the Subject Firms should be audited and reviewed by the Program's neutral experts, whether those claims are currently pending or submitted in the future.
- Finally, the NFL Parties have borne significant costs due to the conduct detailed in the Audit Report, including by paying (through the MAF Fund) for the Claims Administrator's extensive investigation and reports, as well as by paying ***nearly $100 million*** in awards to claimants whose claims would have been denied as a result of the Audit Report, had they not already been paid. The Special Masters should order the Subject Firms to reimburse the NFL Parties or the Monetary Award Fund, as aggrieved parties, for the entirety of these costs, pursuant to their broad powers under Section 10.3(i) of the Settlement Agreement. The Special Masters should also order that all attorneys' fees paid to the Subject Firms be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund, which is a remedy expressly contemplated by Section 10.3(i)(f) of the Settlement Agreement.

Courts have required funds to be returned in similar contexts. Indeed, it is well-established that an individual who receives a judgment or award through fraud—including through a contingency on such a judgment or award—is bound to make restitution, and the obligation to provide restitution does not depend upon

a finding of wrongdoing by the party from whom restitution is sought. *Deepwater Horizon*, No. MDL 2179, 2014 WL 12788985, at *9 (E.D. La. Apr. 29, 2014) (noting that any "party-in-interest" can be required to provide restitution, even in the absence of fraud on that party's behalf and ordering restitution by a claimant, attorneys, and claim preparers); *see also* The Restatement (Third) of Restitution and Unjust Enrichment § 18; *Deepwater Horizon*, 2015 WL 12724047, at *3 (E.D. La. Feb. 26, 2015) (disgorging legal fees resulting from claims deemed fraudulent); *Deepwater Horizon*, 2015 WL 3891840, at *4 (E.D. La. June 23, 2015) (ordering restitution against a claimant, lawyers, and a third-party funding company). The Special Masters should order such restitution here under their broad powers to order remedies pursuant to Section 10.3(i) of the Settlement Agreement.[6]

## IV. CONCLUSION

The NFL Parties respectfully request that the Special Masters order the remedies requested herein.

[6] The NFL Parties expressly reserve, and do not waive, any and all rights including without limitation their right to separately seek restitution from the Court or to pursue recovery based on unjust enrichment against any beneficiary of the Subject Firms' fraudulent scheme.

Dated: March 20, 2026

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

*/s/ Brad S. Karp*

Brad S. Karp
Lynn B. Bayard
Tyler B. Myers
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: bkarp@paulweiss.com

*Attorneys for the National Football League and NFL Properties LLC*