# Exhibit "U"

RONALD GOLDSTOCK
16 North Chatsworth Ave, Suite 75
Larchmont, New York 10538

EXPERT REPORT OF RONALD GOLDSTOCK

I served for thirteen years as Director of the New York State Organized Crime Task Force and for ten years and the New York State Commissioner of the Waterfront Commission of New York Harbor. I currently provide Independent Private-Sector Inspector General ("IPSIG") and investigative consulting services to corporate and individual clients and serve as a referee for the NYS Commission on Judicial Conduct overseeing the questioning of judges.

During my tenure as head of the Organized Crime Task Force, it became a model agency for the control of organized and white-collar crime, playing critical roles in the *Cosa Nostra* Commission, Lucchese and Gambino Family prosecutions, Cali Cartel drug and money laundering cases, and producing highly acclaimed analytic reports on corruption and racketeering in the construction and carting industries.

As Director of the Task Force, I instituted the use of the IPSIG program, which I had previously developed, and which has now become a significant factor in advancing corporate integrity and controlling corrupt behavior. The program is not only widely used in New York, but in other States and in several other countries including the U,K. and The Netherlands.

My IPSIG team is composed of attorneys, investigators, accountants and analysts and has conducted or overseen myriad investigations, financial audits, and operational audits. For example, our monitorship of a roofers local in the construction industry removed mob influence, instituted democratic practices and fair elections, more than doubled the membership, tripled the general fund and ancillary assets, and brought the pension and annuity funds to actuarially stable levels. As will be noted later, one requirement of our monitorships is to issue regular reports of our findings.

I am a graduate of Cornell University and Harvard Law School, served as Inspector General of the U.S. Department of Labor (where I oversaw numerous audits and investigations), and Chief of the Rackets Bureau in the New York County District Attorney's office. In 1995, I was employed as a Managing Director of Kroll Associates overseeing monitoring assignments. I was on the faculties of the Cornell, Columbia and New York University Law Schools, and, with Professor G. Robert Blakey, ran the Cornell Institute on Organized Crime. The Institute conducted scholarly research in the areas of organized crime, labor racketeering, and official corruption, and each year brought prosecutors and investigators (local, state, and federal) from around the country to be trained by us in the investigation and prosecution of those areas of criminal activity.

I am a Past Chair of the American Bar Association (ABA) Criminal Justice Section (CJS), the ABA Criminal Justice Standards Committee, and Chair of its Task Force on Monitoring Standards and the "Investigative Role of the Prosecutor" as well as Past Co-chair of the CJS Special ABA Ethics 2000 Committee. I, for many years, served as

Financial Officer of the CJS. I am a Director of the New York Convention ("Javits") Center Operating Corporation, and chair its Governance Committee and its Audit Committee and am a member of its Finance Committee.. I also served as a member of the Advisory Board of Project Rise of the International Brotherhood of Teamsters.

I have lectured, consulted, written, and testified as an expert witness on subjects related to organized and white-collar crime, investigative planning, corruption, labor racketeering, and corporate integrity. In 1992, I was appointed by the Secretary of State for Northern Ireland to serve as his advisor on matters relating to international organized crime and remained in that capacity through 1994. As part of that assignment, I was asked to consult with the Police Service of Northern Ireland on the investigation of organized crime and corrupt activities.

In connection with this matter, I was asked to review the audit report issued by the Claims Administrator and other materials provided to me and to report as to any observations and conclusions that I could draw from them.

I was provided with the audit report (Report), draft expert affidavits, a number of Special Master (SM) opinions, and several articles concerning Parkinson Disease (PD) and the settlement agreement,

I begin with my analysis of the "audit" Report issued by the Claim's Administrator (CA) on December 12, 2025. As a preliminary matter, I put the term "audit" in quotation marks, because the Report reads much more like an investigative expose rather than a typical audit. [Without seeking to impugn the professionalism of any investigator working on the matter, indeed, I do not know who the individuals were, I note that in general, investigators tend to seek to find evidence of wrongdoing rather than innocent explanations for suspicious conduct. That is why investigators point to their investigative successes rather than a finding of a lack of wrongdoing in promotional material.] It is difficult to assess the findings and conclusions in the Report without access to the work papers, backgrounds of the person(s) who drafted the report and/or edited it, and to what extent there was input from any of the parties of interest. My understanding is that the subject parties will refute the specific allegations of misconduct but I, in my capacity of reviewer, have no basis upon which to do so, nor is it a part of the mandate I accepted.

I note, however, that in issuing audits or reports which I am tasked to do in my role as IPSIG, either to the Court, the prosecutor, administrative agency, or other independent party, I routinely (unless there is a compelling reason, such as an ongoing investigation, not to do so), provide a draft to the subject party for comment. That was also the practice when I was Inspector General of the US Labor Department and professional auditors whom I hire to review the Javits Center operations invariably provide draft reports to management for comment. There are at least two benefits in doing so. In the first instance, any mistake that is made can be identified and corrected before the final report

is issued -- clearly a benefit to the issuer. Secondly, as a matter of fairness, it gives the adverse party a chance to respond, potentially convince the issuer to delete or modify preliminary conclusions and recommendations, and to have part or all of the response included either in the report or audit, or as an appendix thereto. This is particularly important if the report is to be made available to third parties. I see no reason for not doing so in this case, and I suggest that inquiry should be made as why such a procedure was not utilized.

The audit report on page 80 contains recommendations, one of which, I believe, relates precisely to the adversarial posture of the parties as it pertains to the "consistent process of diagnosis and treatment [of PD] outside the Program." It is as follows:

> We recommend …that the Special Masters: … [d]irect Class Counsel and the Counsel for the NFL Parties to engage with the Special Masters and the Claims Administrator to revisit and consider current criteria and possible prospective modifications to the diagnostic criteria for the QD of PD set forth in Exhibit 1 of the Settlement Agreement.

While there is no obvious basis in the Report for this Recommendation, it clearly results from the decision made by the Special Master (SM) to adopt the Gelb criteria, a standard which, according to the documents I reviewed, was flawed at the inception as a basis for determining whether or not a person actually has PD. The SM notes that he adopted the recommendation of "neutral advisors," but that adoption appears to have been a foregone conclusion, given that the CA's 2023 second quarter newsletter had already advised MAF doctors how to document use of the "Gelb criteria."

In an opinion dated January 16, 2024, the SM wrote:

> The Program's neutral advisers began with a general, clarifying, statement:
>
> All members agreed that the appropriate criteria for the diagnosis of Parkinson's disease for use in the Settlement remain the Gelb criteria. These criteria published in 1999 were the most widely used criteria in the United States at the time of the Settlement. Later criteria such as those of the Movement Disorder Society published in 2015 *are designed to be used by movement disorder specialists rather than the neurologists who participate as MAF physicians, who are not required to have this specialty expertise*. All members agreed that disease biomarkers such as the DaT scan should not be used to reverse the diagnosis of the examining MAF physician following Settlement criteria. [Emphasis added]
>
> I accept this statement of the appropriate way to make a Diagnosis of Parkinson's Disease today under the Settlement.

The reason for the adoption of that criteria was further clarified by the SM in his opinion dated July 1, 2025:

> The general US standard for a diagnosis of Parkinson's Disease *at the time of the Settlement Agreement negotiations* was the "Gelb Criteria" [Emphasis added.]

My understanding, after having reviewed the expert reports of doctors totally familiar with PD medicine, is that this an untrue statement regarding the practice of diagnostic physicians who practiced in this area in 2014 and thereafter. Indeed, the explicit statement that the test was adopted for use by less skilled diagnosticians rather than by specialists in the area is disconcerting. But the further reasoning behind the decision to use the Gelb criteria -- that the "general US standard for a diagnosis of Parkinson's Disease *at the time of the Settlement Agreement negotiations*" is not only a non-sequitur but, I believe, to be the basis for the conduct to which the CA objects. [emphasis again added]

First, as to the non-sequitur: The SM's subtext is that decisions to award compensation, whether or not the claimant actually has PD is not the point; what is relevant is the presence or absence of a combination of Gelb factors because, he claims (apparently incorrectly), they were in general use at the time of the negotiated settlement. But even if they had been in "general use" at that time, the SM's reasoning is clearly indefensible. Suppose, for example, that subsequent to, or even just a day after, his decision to utilize the Gelb criteria, it was discovered that a test or a different series of factors could determine with near perfect accuracy whether someone, in fact, had PD. In that case, following the logic of the opinion, the SM would presumably deem that irrelevant because such an approach was unknown at the time of the settlement. That seems absurd.

It is not clear to me why the SM chose to issue such a decision which set in stone (potentially flawed) criteria that could obviously be improved upon, but, whether planned or not, that decision would severely limit the number of PD cases that would be eligible for compensation. As I have noted, it is also problematic that the criteria were chosen because they were simpler to apply by non-experts. I assume that those who drafted the Report recognized this and thus included a recommendation to modify the diagnostic procedures from the antiquated 1999 Gelb criteria to current 2026 standards designed to actually determine whether an individual has PD.

The second point addresses the issue of the attorneys' conduct insofar as utilizing the diagnostic skills of outside practitioners (i.e. other than the MAF panel). My opinion, based on having spent a large part of my professional life studying business and government conduct, is that unreasonable rules that artificially limit the ability of a practitioner to do what that practitioner rightfully must do, cause, and result in, behavior that appears suspicious but, in fact, is otherwise appropriate. Thus, I believe that the attorneys' conduct objected to in the CA's Report should be viewed in the light of the

attorneys having clients with PD, undiagnosed by the Gelb criteria, "obtaining PD diagnoses [by expert physicians] outside the Program." Such attorneys should not be maligned or accused of improper behavior, if their purpose was to secure more accurate diagnoses than those available by inappropriate or outdated methods.

I was asked to address the issue of whether the SM should have the authority to rule on the recommendations in the Report and on certain remedies sought by the NFL attorneys. I think it clear that given my analysis, the SM not only has a conflict of interest, but, given the expert reports and documents I reviewed, it was his inexplicable determination to use the Gelb standards, based upon flawed reasoning, that has created the controversy that now exists. As a proponent of using only MAF doctors and finding fault with the use of recognized experts to diagnose and treat patients, he could hardly be an objective arbiter. Indeed, in a real sense he has staked his reputation, at least, in this matter, on the adoption and use of Gelb standards and cannot be expected to find that, in retrospect, he was wrong in having done so. It would best for him to recuse himself as to this issue and to ask the Court to appoint a neutral party to determine the validity of the AC's findings. If he does not recuse himself, it is my opinion that the Court should act to remove him from the decision-making process. I further note that with the understanding that the SM's decision is non-reviewable, there is an even greater reason to ensure that such a decision-maker is not conflicted and is completely objective.

Given disagreements as to the appropriate process in the diagnoses of PD with the result being, in part, the disqualification of deserving claimants and the attempt to remove attorneys who seek to utilize more appropriate criteria, a recommendation to determine whether or not there were defects in the system that was developed to compensate former players seems to be appropriate. The Court thus has the opportunity to arrange for full or in camera discovery for the purpose of determining whether such defects exist and, if so, whether they were instituted for the benefit of parties other than the PD-affected players.

I am, of course, available to respond to any questions.

Respectfully submitted.

Ronald Goldstock