**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION | No. 2:12-md-02323-AB<br>MDL No. 2323 |
| Kevin Turner and Shawn Wooden on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br>vs.<br><br>National Football League and NFL Properties, LLC, successor-in-interest to NFL Properties, Inc.<br><br>Defendants. | |
| THIS DOCUMENT RELATES TO:<br>David I. Levine and Pro Athlete Law. Firm, P.A. | |

**PRO ATHLETE LAW FIRM, P.A.'S AMENDED OBJECTION TO THE SPECIAL MASTER'S RULING BARRING FUTURE PARTICIPATION IN THE PROGRAM**

Pro Athlete Law Firm, P.A.
David Levine
1804 Intracoastal Drive
Fort Lauderdale, FL 33305
AgentDL@bellsouth.net
(954)914-5293
Counsel for Pro Athlete Law Firm, P.A.

Dated September 15, 2026

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 1

A. Pro Athlete Submits Claims on the Player's Behalf .......... 1

B. Audit process and the rights of the attorney's who have allegedly conducted Improper processing of PD claims .......... 1

C. The Audit Report .......... 2

D. The Special Master's Decision .......... 3

III. ARGUMENT .......... 5

A. The Special Master Lacked a Reasonable Basis to Conclude that Pro Athlete Misrepresented Any Fact .......... 5

1. There were no misrepresentation of Facts .......... 5

B. The Special Master abused his discretion when disqualifying Pro Athlete .......... 6

C. Pro Athlete fully cooperated with the Audit .......... 8

IV. CONCLUSION .......... 10

## TABLE OF AUTHORITIES

**Cases**

*Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 570 (3d Cir. 1985) (en banc)........4

*Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1225 (3d Cir. 1995)..........................................................................................10

*In re Kiesewetter*,

391 B.R. 740 (Bankr. W.D. Pa. 2008) ..........................................................8

*Mendez v. Holder*,

566 F.3d 316 (2d Cir.2009. ............................................................................5, 6, 10

*TD Bank N.A. v. Hill*,

928 F.3d 259 (3d Cir. 2019)............................................................................ ..6, 7, 8

United States v. Brodie,

403 F.3d 123, 134 (3d Cir. 2005) (citation modified)........................................ .4

Wexner v. First Manhattan Co., ............................................................... 4, 5

902 F.2d 169, 172 (2d Cir. 1990)

**Other Authorities**

Parkinson's Foundation Website

www.parkinson.org ..........................................................................8

Rule 28 of the Rules Governing the Audit of Claims ....................................5

Rule 33 of the Rules Governing the Audit of Claims ................................ .5

Rule 35 of the Rules Governing the Audit of Claims ................................ ....6

# I. INTRODUCTION

David I. Levine is an attorney and Pro Athlete's ("PA") sole principal. Since 1988, Mr. Levine has represented over 6,000 professional athletes as an NFL agent and in post-retirement benefit matters. Ex 1. PA's Response to Audit Report ("Response"). PA objects to the Special Master's ("SM") Rule 27 decision ("Decision") disqualifying PA from the Program and accessing costs of the investigation to PA. As the Court is aware, "guilt must remain personal and individual" United States v. Brodie, 403 F.3d 123,134 (3d Cir. 2005) Thus, there will be multiple topics that PA need not respond to if the SMs did not specifically address PA. Thus, the mere fact that PA had a co-counsel agreement with Grossinger, is not only permitted, but it does not make PA liable for any of the SMs claims against Grossinger directly and individually or any lack of cooperation by the other law firms or medical doctors under subpoena, as mentioned in the SMs Ruling.

# II. BACKGROUND

## A. Pro Athlete Submits Claims on the Player's Behalf

PA has represented more than 500 Settlement Class Members who have registered with the Settlement Program." Ex. 2. ("Levine Statement"). PA has pursued Monetary Award Claims on behalf of more than 100 Players (*Less than 5% of the Players represented by PA made claims for PD*). *Id.* In early 2026, because of the constant harassment and auditing of almost 100% of PA's claims by the Claims Administrator ("CA"), PA referred their entire head concussion practice to two law firms. Levine Statement.

The Audit proceedings are all stacked in the favor of the CA and the NFL. Even with this one sided Audit proceeding, the CA did not have any reasonable basis to find that PA made any misrepresentation, omission and concealment of material facts with respect to their PD claims.

***C.* The Audit Report**

The CA took issue with the process that PA used in getting their clients qualifying diagnosis ("QD") for PD as stated in a December 15, 2025 Audit Report ("Report"). However, there is no evidence (not even an inference) that this was the case with any PA client. The exact opposite applies, as the only evidence is that the MAF's who evaluated PA clients found the symptoms of PD observable at the time of their MAF evaluations. Report at 44-46 and 99. Also, the alleged scheme completely overlooks the fact that (1) prescribing PD medications early in a treatment relationship is the standard of care; (2) observations of the effects of the PD medication on Players' symptoms is a standard diagnostic tool and (3) MAF doctors must, and do, diagnose players with PD based on their own observations." Ex. 1 ("Response") at p. 8. Furthermore, the only evidence is that PA clients were told not to take their medication on the day of their appointment with the MAF physician. Response at 11-12. Lastly, the SM previously held: " Claimants do not have to stop their treatment by such powerful and beneficial medications to be diagnosed under the Settlement. The AAP emphasized that a trained neurologist should normally be able to discern the telltale Parkinson's signs even when the patient is medicated." Decision at 38. On one hand the SM states this process of sending Players to a treating doctor for screening is improper and then on the other hand they state: "IRPAs, however, may reasonably argue that "screening" clients with doctors before investing in them is an ordinary part of practice, which suggests the complexity of an outright ban. It does make sense that an IRPA would send a retired

Player to be evaluated before spending more money on a full exam. Prohibiting that practice would dissuade legitimate claimants." Decision at 38. All of the above contradicts the CA's theory.

Lastly, the only evidence is that all of the PA clients who filed PD claims actually have PD (confirmed by 14 different treating doctors and 10 MAF neurologist). Response at 5-7. Ironically, the only evidence that was derived from a former PA client was that: when the treating doctor (Dr. Verma) stated to Player that he does NOT have PD, Levine refused to continue a PD claim because he didn't have PD. Response at 21-23. This evidence showed that PA didn't file fraudulent claims and that the treating doctors were not giving QD of PD unless they actually had the disease. This was the only evidence provided by the audit report versus PA for wrongdoing with treating and/or MAF doctors.

Please note the CA didn't ask for PA to be disqualified from the case. The Special Masters concluded that remedies first requested in the NFL Parties' March 20, 2026 submission could be imposed on a firm whose notice described a recommended censure. That is a conclusion of law. The Report recommended censure and PA responded to that recommendation. The March 20 submission, filed afterward, demanded something categorically different: permanent exclusion from the Program, forfeiture of fees already earned, refusal of future liens, restitution, and a share of the Audit's costs. The Rules provide for such a request and provide for it early. Audit Rule 17 permits a Statement of Position within twenty days of the referral, and Rule 19 requires that it be served on the firm with the referral notice so the firm's response can respond to it. Nothing was served on PA. Rule 22 then bars any further memoranda absent the Special Master's permission, and none was given. Between March 20 and June 8 there was no process available to

PA to respond to the NFL's new ask of sanctions and the Decision imposed upon PA based on the NFL's ask. Censure and exclusion are not degrees of one thing. The first comments on a lawyer's work; the second ends existing representations, takes fees already earned and reaches clients never before the tribunal. See Report at 37. Also, sanctioning an attorney implicates due process whatever the source of the power. *Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 570 (3d Cir. 1985) (en banc).

**D. The Special Master's Decision**

The SM adopted the Audit Report's findings in a June 8, 2026 decision. *Decision* at 42. However, there was no reasonable basis to support the CA to find that PA made any misrepresentation, omission, and concealment of material facts with respect to their PD claims. The allegations against the Law Firm's collectively are irrelevant as only the allegations against PA are relevant. When making this determination, PA asks that the Court to remain mindful that a conspiracy, as described in the Report, "cannot be proven by piling inference upon inference." United States v. Brodie, 403 F.3d 123, 134 (3d Cir. 2005) (citation modified). And to the extent the SM finds the Report's other targets have engaged in any wrongdoing, that itself is irrelevant to PA's alleged culpability, for "guilt must remain personal and individual." Id. Thus, the allegations against the other four firms are not relevant to the culpability of PA. Based upon the Audit finding, the SM imposed a litany of penalties and "disqualified PA from further participation in the Program." Decision at 42-44.

**III. ARGUMENT**

**A. The SM Lacked a Reasonable Basis to Conclude that PA Misrepresented Any Fact**

Under Rule 28 of the Rules Governing the Audit of Claims, the SM may *only* penalize PA if there is a "reasonable basis to support a finding that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim." R. 28. The SM erred in concluding there is a reasonable basis to support such a finding. Rule 33 empowers this Court to review *de novo* the conclusions of law reached by the Special Master in concluding there is a reasonable basis to support such a finding."R. 33. Further, the CA's accusations cannot survive if they are based only "on speculation and conclusory allegations." Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990). With those axiomatic legal principles in mind, PA addresses the substance of the issues raised in the Report.

**1. There Was No Misrepresentation of Fact**

The SM adopted "the CA's view that PA misrepresented material facts. However, the SM totally overlooked and mischaracterized the facts of the Audit. Thus, like *Mendez v. Holder*, 566 F.3d 316, 323 (2d Cir. 2009) (where facts "have been totally overlooked and others have been seriously mischaracterized, we conclude that an error of law has occurred").

**B. The Special Master Abused His Discretion When Disqualifying Pro Athlete**

As this Court has explained, "a Court may only set aside the SM's ordered relief if the SM abused their discretion." ECF 11255, at 6. A SM "abuses [his] discretion if [his] decision rests on an incorrect legal standard, a clearly erroneous factual finding, or a misapplication of the law to the facts." *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019).

The SM abused his discretion in three ways here.

**1. *First*, the SM applied the incorrect legal standard.**

Under Rule 35, "published decisions of the Special Master and the Court will have precedential value in the Settlement Program on the issues and principles determined in the decision, which means they will serve as guidance for the consideration of the same or similar issues … in later … Proceedings." The SM issued a published ruling addressing similar issues to those giving rise to this objection in *Cuthbert.* There, the NFL "asked that Mr. Cuthbert be barred from the Program," because the Audit Report concluded that Mr. Cuthbert violated many of the Settlement rules, including "he was not truthful in responding to the investigative process." Cuthbert at 3. This is an attorney being **UNCOOPERATIVE**. The SM made clear that "Mr. Cuthbert's wrongful conduct – and his unrepentant behavior when confronted with the problems he caused – was persistent." *Id.* at 5. But the SM concluded that disqualification was unwarranted because "Mr. Cuthbert's conduct, although wrongful, **was not provably malicious**." (Emphasis added) *Id.* at 6. Here, however, the SM ***never*** considered whether PA's conduct was "provably malicious." The SM's failure to discuss, let alone apply, the legal standard set forth in the governing *Cuthbert* decision is itself an abuse of discretion requiring reversal. *See TD Bank N.A.*, 928 F.3d at 270; *cf. Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017) Thus, disqualifying PA for only a fraction of *alleged* conduct of Cuthbert, for which Cuthbert was not disqualified, is legal error.

**2. *Second*, the SM misapplied the law to the facts.**

In Cuthbert, "Mr. Cuthbert engaged in far worse misbehavior than even the unproven allegations against PA and even taking into account this additional misconduct, the SM found Cuthbert's expulsion from the Program unwarranted. Unlike PA whose conduct only involved the

"process in which PD claims were made (even though this "process" is recognized as the proper way to diagnose PD). See Parkinson's Foundation Website

3. Third, the SM clearly made erroneous factual findings. The SM held that PA acted with intent, stating: "Repeatedly submitted claims with material omissions" The alleged omissions were in part: "1. "Were there other recent medical records indicating an absence of impairment?" **Response**: all treatment or evaluations records for PD diagnosis were provided with the original claim packages. There is no evidence whatsoever that Pro Athlete withheld medical records that would have showed a Player didn't't have PD. The only evidence is when a former Pro Athlete client was told by a treating doctor that he didn't have PD, Levine told him he would not be able to pursue a claim on his behalf. Player in turn terminated Pro Athlete and hired JR Wyatt. 2. "Were the underlying records real or manufactured?" **Response:** Of the 24 PD claims Pro Athlete filed, there were 16 different treating doctors were used (One player was diagnosed by an MAF as having PD even without any treatment or diagnosis prior to the MAF exam). Additionally, 10 different MAF doctors were used for the 24 PD claims. (All local with the two exceptions where there were no MAF doctors in Arizona were available.) 3. "Were the outside neurologist independent professionals or captive diagnosis factories?" **Response:** Pro Athlete never used a specific treating doctor more than three times (All treating doctors were local to the Player unlike some of the allegations against the other firms). Thus, all 16 treating doctors were licensed neurologist and independent professionals. See #2 above for stats. 4. "Did clients really need exceptions to the anti-fraud 150 mile rule for MAF diagnosis's or were lawyers engaging in doctor shopping." **Response:** Pro Athlete (unlike the other firms) only used the exception to the 150 mile rule twice (2 out of 24 claims) for two clients who lived in Arizona where there were no

MAF doctors available within the 150 miles. The other 22 MAF exams were all local for the players (Within 150 miles of their home). Response at 3-7 and 19-21.

Rather, the question is whether Pro Athlete *intentionally* misrepresented or omitted some facts. Section 10.3(h)(i); *cf. In re Kiesewetter*, 391 B.R. 740, 749 (Bankr. W.D. Pa. 2008) (fraudulent intent is the "intent to defraud, to deceive, acting in bad faith"). The SM's failure to answer that question was error. *See TD Bank N.A.*, 928 F.3d at 270. And that error was compounded by the absence of *any* evidence that PA's conduct was intentional, let alone provably malicious. The SM faulted "provable maliciousness" required to disqualify Cuthbert. Cuthbert. At 6. To the contrary, PA simply followed the medically accepted process (does the person have PD symptoms; if so, go to a neurologist; if the neurologist confirms the presence of the symptoms of PD they will prescribe the person Levodopa to see if the person has a robust response from the meds, if so, then the PD diagnosis is confirmed) to determine if someone had PD. Response at 8. See also Parkinson's Foundation Website.

**C. Pro Athlete fully cooperated with the Audit**

Lastly, the SM erred by finding that PA did not cooperate with the audit investigation. The SM believes that PA's failure to reasonably cooperate with the Audit was an aggravating factor in his decision. Decision at 39. However, the only facts in the record are the following:1. From 2023-2025 the CA submitted hundreds of audit questions and request for documents to PA and every single question was answered with no objections and PA produced thousands of records in a timely manner. Unlike some of the other firms, PA provided complete medical records (all treating or evaluation medical records) with the Player's Claim package. (There is no allegation or evidence that PA did not provide all records). The only other allegation by the CA

or the SM of a lack of cooperation of PA was that they didn't like the response to a single question that was emailed to PA. On a Monday the CA asked PA if it had a Co-Counsel Agreement with Doug Grossinger and gave them until Friday to respond. Ex 4 ("Email re: Co-counsel"). Since it was around the Thanksgiving holiday, PA's attorney was unavailable, so PA asked for a seven day extension in which to respond. The Claims Administrator unreasonably denied that request. Id. Thus, to timely respond (as PA always did), PA stated: "Pursuant to sections 8.6 and 10.3 of the Settlement Agreement, I see no obligation on my part to answer the below question. Please direct me to the part that obligates me to respond to that question. Thank you." Id. The CA responded with: "I have received your email and will follow up after I receive additional clarification on your inquiry." Id. This was the only response by the CA prior to the Audit Report being issued. To date, the CA has never responded to PA's question which confirms there was no requirement to disclose co-counsel relationships. Thus, PA cannot be accused of non-disclosure of a fact that was not required to be disclosed. Additionally, unlike the other firms, PA NEVER claimed any privilege whatsoever to avoid answering audit questions. Lastly, PA can't be responsible or blamed for the lack of cooperation by the other firms or medical doctors under subpoena.

Thus, the facts clearly show that PA not only cooperated with the audit but that it also went beyond reasonable cooperation by volunteering to answer questions of the CA under oath and offered for his clients to be questioned under oath. Levine's request was initially denied but the CA later interviewed five former PA clients (After the Audit Report was issued) and the SM found no wrongdoing whatsoever (Interestedly this is NOT mentioned in the Special Master's Order even though it was in the Audit Report). Ex. 3 **(Email Chain Re: Volunteering).**

This shows that the SM has totally overlooked and seriously mischaracterized the facts with regard to PA's cooperation with the Audit. *Mendez v. Holder*, 566 F.3d 316, 323 (2d Cir. 2009) (where facts "have been totally overlooked and others have been seriously mischaracterized, we conclude that an error of law has occurred"). Additionally, in the SM's Audit ruling in Collins & Truett, P.A., the SM Censured the firm for failing to cooperate with the Audit. In Collins, the SM censured the firm for its failure to cooperate with the Audit including:" their practices in responding to this Audit, which included obstruction, dilatory tactics, and provision of information which any reasonable investigation would have shown to be untrue". Collins decision. Here, PA clearly cooperated with the Audit and was still banned from the Program. This again is an error of law in not following the precedent in Collins.

**IV. CONCLUSION**

For all of the reasons set forth herein, PA requests that this Court reverse the SM's decision and vacate said Order. Additionally, PA request an oral argument before said Court to be further heard on the matter, especially in light of the limited pages (10 double spaced) that PA had to respond (Object) to the one hundred and fifty-eight page Audit Report and the SM's fifty-one page Order. PA also reserves the right to respond to the lack of due process in the assessment of cost of the investigation and the NFL's request for dismissal from the program because it was never addressed in PA's response to the Audit Report because it was not recommended by the CA in their report. Particularized notice ordinarily requires notice of the precise sanctioning tool the tribunal intends to use, *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1225 (3d Cir. 1995).

Dated: September 15th, 2026

Respectfully submitted,

Pro Athlete Law Firm, P.A.

By: ______________________________

David Levine

1804 Intracoastal Drive

Fort Lauderdale, FL 33305

AgentDL@bellsouth.net

*Counsel for Pro Athlete Law Firm, P.A.*

**CERTIFICATE OF SERVICE**

I, , certify that on September 15th, 2026, I caused the foregoing document to be served on the Claims Administrator and counsel for the NFL Parties via email.

Dated: September 15, 2026

David Levine,

Attorney for Pro Athlete Law Firm, P.A.