# Exhibit# 1
# Pro Athlete's Response to the Claims Administrator's December 15, 2025 Audit Report

**In the United States District Court**
**For the Eastern District of Pennsylvania**

| | | |
|---|---|---|
| **IN RE: NATIONAL FOOTBALL LEAGUE PLAYERS' CONCUSSION INJURY LITIGATION** | § § § § § | **No. 2:12-md-02323-AB<br>MDL No. 2323** |

**Pro Athlete Law Firm, P.A. and David Levine's Response to the Claims Administrator's December 15, 2025 Audit Report**

## I. Introduction

Relying mostly on inferences and suspicion rather than facts, the December 15, 2025 Audit Report paints a picture of a conspiracy of lawyers, treating physicians, and Monetary Award Fund ("MAF") doctors designed to submit unreliable Parkinson's Disease ("PD") claims that the Claims Administrator labels "The Arrangement." Audit Report, at 26. The Claims Administrator asserts that, under the "Arrangement," Doug Grossinger and "associated parties" solicited retired NFL Football Players ("Players") by "either directly or effectively promising or assuring them PD Qualifying Diagnoses." *Id.* The Report states that Mr. Grossinger is "alleged" by unidentified whistleblowers to have arrangements with a network of doctors he relies on to carry out "a multi-step process to develop payable PD claims." *Id.* at 27. Those "treating" or "evaluating" neurologists, as they are called in the Report, examine the Players and, if a Player is diagnosed with symptoms of PD, the neurologists "purportedly" start treatment of the Player's symptoms with medication. *Id.* The Report asserts that MAF doctors then rely upon unreliable records of those treating or evaluating doctors to support their Qualifying Diagnoses.

However, although the Audit Report produces some smoke regarding its claims against the several individuals and firms on which it has focused, there is no valid issue raised with respect to Pro Athlete Law Firm, P.A. ("PALF") and its principal, David Levine.

The Report does not identify the total number of Players seen by the evaluating neurologists or how many may have been initially diagnosed with PD symptoms. The report also states that Players "at times" travel great distances to get MAF Qualifying Diagnoses. *Id.* Again, the Report does not provide the total number of Players any MAF physician has seen or how many of that number have been diagnosed by the MAF physician with a Qualifying Diagnosis.

The Report singles out former MAF qualified physician Dr. Daniel H. Jacobs as a participant in the "Arrangement." It states that Dr. Jacobs was the MAF diagnosing physician for 26 of93 total PD claims submitted by the firms subject to the Report. *Id.* at 43. As noted, however, the Report does not discuss the total number of Players he examined and how many of the potential PD diagnoses were rejected by him.

The Report also identifies Dr. Jeffrey Steinberg, a Florida neurologist, as a participant in the "Arrangement." The Report states that Dr. Steinberg, a so-called "treating neurologist," was associated with eight PD claims submitted by the several firms subject to the Report. *Id.* at 46. The Claims Administrator states that "on average, Players travelled over 500 miles to see Dr. Steinberg." *Id.* But Dr. Steinberg is a treating physician, not an MAF and, as is shown below, the MAFs who made Qualifying Diagnoses of PD did not have to rely on his Player examinations or records to make their diagnoses.

The Claims Administrator states that Mr. Grossinger funnels the MAF doctors' PD Qualifying Diagnoses claims through "several intermediary law firms to avoid raising suspicion and bring scrutiny on his practices," while maintaining control and management of the claims. *Id.* at 27. It does not, however, identify the large number of participating law firms that have worked with him, focusing instead on only three of those firms: (1) Feder Law, LLC; (2) Syme Law, PLLC;

and (3) PALF. David Levine, a member in good standing of the Florida and California Bar Associations, is the principal of PALF.

Despite the Report's focus on Mr. Levine, when the information set forth in the Report concerning him is separated from the aggregate claims, it does not show that Mr. Levine engaged in any misconduct or ran afoul of the NFL Settlement Agreement program's anti-fraud safeguards in connection with the submission of his client Players' PD claims. As Mr. Levine explains here, the Report faults the method by which Mr. Levine's clients received PD treatment, but the Claims Administrator's concession in the Audit Report along with prevailing scientific literature show that Mr. Levine's clients and the doctors followed the standard of care for their PD treatment and diagnosis. Similarly, Mr. Levine will show that there is no questionable frequency of examinations or connection between or among Mr. Levine, his clients, the physicians that initially treated them or the MAF doctors who evaluated them for Qualifying Diagnoses. The Report also suggests that Mr. Levine's conduct was suspect because he had a co-counsel relationship with Mr. Grossinger, but there is no basis for this alleged "guilt by association." Last, the only direct allegations against Mr. Levine, those involving a disgruntled former client for whom Mr. Levine *did not pursue a PD claim*, are not credible and actually show that Mr. Levine followed the Settlement Agreement when he submitted his clients' PD claims.

## II. Material Facts

Mr. Levine, the sole principal of Pro Athlete Law Firm, P.A., has a long history of successfully representing Players in the NFL Concussion Settlement claims process. Ex. A (Declaration of David Levine, "Deel."), ¶ 1. Since 2010, he has represented over 500 Player clients and submitted approximately 100 claims under the NFL settlement claims process. *Id.* at ¶2. About 60 to 70 of the claims have been approved. *Id.* Twenty-five percent of his claim submissions

involve PD diagnoses, and fewer than five-percent of his clients have filed PD claims. *Id.* at ¶ 3. In fact, Mr. Levine's focus only shifted to PD in late 2021 when an MAF physician, Dr. Julie Schwartzbard, surprisingly diagnosed his client, Zack Crockett, with PD, even though Mr. Crocket was evaluated for dementia. *Id.* at ¶ 4. From that point on, Mr. Levine asked his clients if they experienced symptoms commonly associated with PD, such as balance issues and hand tremors. *Id.* Some of those clients had such symptoms, so Mr. Levine took steps to make sure the Players had the opportunity to receive treatment and potentially obtain an award.

As part of Mr. Levine's law practice, he worked in a co-counsel capacity with Mr. Grossinger to guide some[1] Players through the PD claims submission process. *Id.* at ¶ 5. Mr. Grossinger is based in Philadelphia, and sought Mr. Levine's assistance with representing Players living in Florida because of Mr. Levine's practice there and history of success in the NFL Settlement claim submission process. *Id.* Under this arrangement, Mr. Grossinger helped Players find neurologists to examine them and, consistent with accepted PD diagnosis protocols, if a Player appeared to have strong signs of PD after obtaining treatment, Mr. Levine would assist the Players through the MAF evaluation and claim submission process. *Id.* In most cases, Mr. Levine did not interact with the treating physicians—that was Mr. Grossinger's responsibility. *Id.* The Report recognizes that Mr. Grossinger (not Mr. Levine) paid the treating physicians. *See* Audit Report, at 49 (describing Mr. Grossinger's payments to Dr. Steinberg). In this way, Mr. Levine assisted 24 Players.

---

[1] In cases where a Player was already seeing a treating physician, Mr. Grossinger and Mr. Levine would not jointly represent that Player through the claim submission process. Deel. at ¶ 5.

The following table (including relevant[2] information) illustrates the process by which those Players eventually submitted PD claims:

**Paid Claims**

| Player | Treating Physician | MAF Physician | Representation |
|---|---|---|---|
| Goltz (TX) | Dr. Lee (TX) | Dr. Juan (TX) | Mr. Levine |
| Brown (TX) | Dr. Croft (TX) | Dr. Juan (TX) | Mr. Levine/ Mr. Grossinger |
| Cross (NJ) | Dr. Schneider (NJ) | Dr. Behar (PA) | Mr. Levine/ Mr. Grossinger |
| Smith (VA) | Dr. Falconer (VA) | Dr. Behar (PA) | Mr. Levine/ Mr. Grossinger |
| Anderson (GA) | Dr. Billian (GA) | Dr. Green (GA) | Mr. Levine/ Mr. Grossinger |
| Robertson (GA) | Dr. Sanchez (GA) | Dr. Greene (GA) | Mr. Levine/ Mr. Grossinger |
| Neal (CA) | Dr. Brillman (CA) | Dr. Ho (CA) | Mr. Levine/ Mr. Grossinger |
| Bankston (AZ) | Dr. Samanta (AZ) | Dr. Ho (CA) | Mr. Levine/ Mr. Grossinger |
| Reynolds (OH) | Dr. Brown (OH) | Dr. Sas (OH) | Mr. Levine |

[2] The following tables include the residence of each Player and the location of the treating physician and MAF physician that treated or otherwise evaluated any given Player. Mr. Levine notes that the tables include only those physicians that treated his Player clients before they submitted their PD claims. Deel. at ¶ 6. Any additional treating physicians listed in the Report were necessarily involved in a Player's treatment after claim submission. *Id.*

| | | | |
|---|---|---|---|
| | | | |
| Duper (FL) | Dr. Isaacson (FL) | Dr. Jacobs (FL) | Mr. Levine/<br>Mr. Grossinger |
| Veal (GA) | Dr. Sanchez (GA) | Dr. Billian (GA) | Mr. Levine/<br>Mr. Grossinger |
| Crockett (FL) | **none** | Dr. Schwartzbard (FL) | Mr. Levine |
| Hayward (FL) | Shands Hospital Network (FL) | Dr. Jacobs (FL) | Mr. Levine |

**<u>Pending Claims</u>**

| **Player** | **Treating Physician** | **MAF Physician** | **Representation** |
|---|---|---|---|
| Irvin (North FL) | Dr. Steinberg (FL) | Dr. Greene (GA) | Mr. Levine/<br>Mr. Grossinger |
| Surtain (North FL) | Dr. Steinberg (FL) | Dr. Green (GA) | Mr. Levine/<br>Mr. Grossinger |
| McLeod (GA) | Dr. Sanchez (GA) | Dr. Greene (GA) | Mr. Levine/<br>Mr. Grossinger |
| Cowart (FL) | Dr. Steinberg (FL) | Dr. Jacobs (FL) | Mr. Levine/<br>Mr. Grossinger |
| Chambers (FL) | Dr. Gelblum (FL) | Dr. Jacobs (FL) | Mr. Levine/<br>Mr. Grossinger |
| Faulk (FL) | Dr. Steinberg (FL)/<br>Dr. Kramer (FL) | Dr. Jacobs (FL) | Mr. Levine/<br>Mr. Grossinger |

| | | | |
|---|---|---|---|
| Redman (FL) | Dr. Gelblum (FL) | Dr. Jacobs (FL) | Mr. Levine/ Mr. Grossinger |
| Salavea (FL) | Dr. Gelblum (FL) | Dr. Jacobs (FL) | Mr. Levine/ Mr. Grossinger |
| Swann (AZ) | Dr. Samanta (AZ) | Dr. Ho (CA) | Mr. Levine/ Mr. Grossinger |
| Haggans (TX) | Dr. Dike (TX) | Dr. Teneja (TX) | Mr. Levine |
| McDuffie (FL) | Dr. Steinberg (FL) | Dr. Jacobs (FL) | Mr. Levine (for claim)/ previously Mr. Sean Jones[3] |

Mr. Levine's claim submissions show that his clients were evaluated by an array of treating physicians and subsequent referrals to MAF doctors completely complied with the Program's geographic limitations in selecting MAF physicians.[4] And as discussed further below Mr. Levine did not engage in the misconduct outlined in the Report.

## III. Standard of Review

The Special Masters must determine if Mr. Levine has "established that there is no reasonable basis to support" the allegations against him as set forth in Report. Audit Rules 20, 28. When making this determination, Mr. Levine asks that the Special Masters remain mindful that a conspiracy, as described in the Report, "cannot be proven by piling inference upon inference."

[3] Sean Jones of Legal Collective represented O.J. McDuffee through the MAF evaluation phase, but Mr. McDuffee hired Mr. Levine to submit his claim. Decl. at ¶ 9.

[4] Two of Mr. Levine's Player clients, Marshall Faulk and Chris Redman have residences in Florida as well as another state. Decl. at ¶ 10.

*United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005) (citation modified). And to the extent the Special Masters find the Report's other targets have engaged in any wrongdoing, that itself is irrelevant to Mr. Levine's alleged culpability, for "guilt must remain personal and individual." *Id.* (quotation omitted). Further, the Claims Administrator's accusations cannot survive if they are based only "on speculation and conclusory allegations." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). With those axiomatic legal principles in mind, Mr. Levine addresses the substance of the issues raised in the Report.

## IV. Argument

### A. The PD treatment and diagnostic practices described in the Audit Report are proper.

As stated in the Report, Players often receive PD care from treating physicians before an MAF physician evaluates the Player for PD. As part of the Players' initial treatment, their physicians will often prescribe PD medication, like Levodopa, that alleviates their PD symptoms. The NFL seems to believe that when treating physicians prescribe Levodopa, the true purpose is not to ease Players' PD symptoms but instead to create circumstances in which MAF physicians must rely on the treating physicians' records of the Players' examinations when examining Players for PD, since the medications alleviate PD symptoms. In turn, the NFL suggests that those treating physicians are corrupt, and so this lawyer-driven system results in MAF neurologists relying on fraudulent medical records that show a Player has PD when in truth, he does not. This alleged scheme completely overlooks the fact that (1) prescribing PD medication early in a treatment relationship is the standard of care; (2) observation of the effects of PD medication on Players' symptoms is a standard diagnostic tool, and (3) MAF doctors must, and do, diagnose Players with PD based on their own observations.

**TheLevodopa test is an accepted tool to diagnose PD**

There is no shortage of peer-reviewed medical literature showing that "[a] positive levodopa test helps to confirm the diagnosis of Parkinson's disease." *See* Ex. B-1, *The levodopa test in Parkinson's disease*; *see also* Ex. B-2, *Is levodopa response a valid indicator of Parkinson disease?* ("A clear and dramatic beneficial response to dopaminergic therapy is considered to be a supportive criterion for the clinical diagnosis of PD."). This is why a patient's "neurologist may recommend a trial of carbidopa-levodopa" to help diagnose PD. Ex. B-3, Parkinson's disease diagnosis, Penn Medicine. In fact, the use of Levodopa to diagnose PD is so prevalent that even the Appeals Advisory Panel Leadership Council members cautioned against accepting the NFL's position. As the Claims Administrator notes in the Report, "treatment with dopaminergic drugs is known to produce a dramatic response in patients with PD and is commonly accepted as part of the diagnostic workup for this condition." Audit Report, at 8 n.15 (emphasis added). Put another way, there is absolutely nothing wrong with a treating physician's decision to prescribe Levodopa to a Player prior to an MAF evaluation. In actuality, such a practice promotes the efficacy of the Program.

The Claims Administrator recognizes "that diagnostic accuracy for PD is challenging," *id.* at 5, so the use of treating physicians to assess whether a Player has PD ensures that only Players who are confident that they suffer from PD will pursue a settlement award. Without this process, attorneys would send Players to MAF physicians for diagnoses in droves, and needlessly clog the MAF physician's calendar.[5] Some MAF physicians would inevitably diagnose some Players with PD. But other Players who may initiate the claims process will not have PD. For those latter

[5] An attorney is by no means qualified to opine, at even a threshold level, as to whether a Player might have PD and should therefore seek an MAF evaluation. *See* Audit Report, at 4 (PD "diagnosis requires the eyes and mind of a trained neurologist").

Players, an intermediary treating physician will easily dispel the possibility of an MAF PD diagnosis and save the Players' and MAF physicians' time and expense spent pursuing an MAF evaluation. Indeed, as discussed below, this is precisely what happened with Mr. James Hasty. Just as important to the efficiencies, the Claims Administrator has not indicated that there is a better path for Players to take regarding possible PD treatment or how to obtain a PD diagnosis.

Mr. Levine has established that the utilization of Levodopa-prescribing treating physicians benefits the Program and constitutes the standard of care. Undeterred by the appropriateness of this practice, the NFL takes the position that "immediate treatment with PD medication . . . causes [Players] to show only minimal observable symptoms during [MAF] examinations, necessitating greater reliance of MAF Physicians on outside medical records." *Id.* at 1. But this view is incorrect as it fails to account for how Levodopa works in practice, rather than on paper.

One of the reasons that Levodopa is such an effective diagnostic tool is that its results can be seen "within about 30-60 min[utes]." Ex. B-4, Pharmacokinetics and tolerability of inhaled levodopa from a new dry-powder inhaler in patients with Parkinson's disease; Ex. B-5, Motor Complications of Dopaminergic Medications in Parkinson's Disease ("Oral levodopa formulations usually take at least 20 to 30 minutes to take effect"); Ex. B-6, Carbidopa/Levodopa: Answers to Frequently Asked Questions, American Parkinson Disease Association (explaining that Levodopa "takes 30 minutes to one hour for a dose to start working"). Furthermore, the effects of Levodopa (*i.e.*, alleviating PD symptoms) last for only about 2-6 hours. Ex. B-7, Duration of benefit per Dose: Carbidopa-Levodopa immediate release vs. extended release capsules (Rytary®) (explaining that the effects of immediate release Levodopa last for about 2.5 hours whereas the extended-release formulation last for about 3.5 hours); Ex. B-8, How long does it take carbidopa levodopa to work?, Medically reviewed by Sally Chao, MD ("The effects of extended-release

carbidopa/levodopa should last between 4 to 6 hours. The effects of immediate-release carbidopa/levodopa last for approximately 2 to 3 hours less time — about 2 to 3 hours in total."). Because Levodopa works so quickly and the duration of its effectiveness is relatively short, MAF physicians can and do ask a Player to arrive at an early morning appointment while off Levodopa and then ask the Player to come back later in the day while on Levodopa. In such cases, the MAF physician is able to observe directly, without reference to a treating physician's notes, whether a Levodopa response suggests that a Player has PD. In this regard, several of Mr. Levine's clients with pending PD claims deliberately refrained from taking Levodopa prior to their MAF evaluation so the MAF physician would have the benefit of evaluating them without a need to rely on prior treating physicians' records.[6] In particular,

- Chris Chambers did not take Levodopa the day of his MAF evaluation. *See* Ex. C-1;
- An MAF physician evaluated Mario Haggan twice, first while on Levodopa and four days later while Haggan was off his medication. *See* Ex. C-2;
- Sedric Irvin stopped taking Levodopa two weeks before his MAF evaluation. *See* Ex. C-3;
- Joe Salavea did not take Levodopa the weekend before his Monday morning appointment with an MAF physician. *See* Ex. C-4;
- Patrick Surtain was off Levodopa for 1.5 weeks prior to his MAF evaluation. *See* Ex. C-5;
- Samuel Cowart attended his MAF evaluation while off Levodopa. *See* Ex. C-6; and

[6] This practice is conspicuously absent from the Report.

- Chris Redman did not take Levodopa for three days prior to his MAF evaluation. *See* Ex. C-7.

All of these examples show that Mr. Levine's clients were properly evaluated by MAF physicians while off their medication, so the MAF physicians were fully able to observe whether the Player had "(1) Resting Tremor, (2) Rigidity, (3) Bradykinesia, and (4) Asymmetric Onset," *i.e.*, the first stage of the Gelb criteria used by MAF physicians to diagnose Players with PD. Audit Report, at 4. And because the Players were off their medications, the MAF physicians were also able to assess any relevant response to Levodopa. *Id.*; *see also* Exs. C-1 to C-7. Thus, inasmuch as Mr. Levine and his clients are concerned, there was no deceit or wrongdoing in connection with the Players' treatment leading up to their MAF evaluations, or the MAF evaluations themselves.

The diagnostic and MAF evaluation process followed by Mr. Levine's clients, the treating physicians, and the MAF doctors was entirely appropriate. With no flaws in the process, the Claims Administrator next attempts to focus on physician misconduct. The problem for the NFL and the Claims Administrator, however, is that the allegations lodged against the physicians that have treated or evaluated Mr. Levine's clients—Dr. Jacobs, Dr. Steinberg, and Dr. Isaacson—are either unfounded, or unrelated to Mr. Levine and his clients, or both.

**Dr. Daniel Jacobs was an approved MAF doctor who properly evaluated some of Mr. Levine's Florida-resident Players.**

During the relevant time, Dr. Jacobs was an approved MAF physician. The NFL pressured the Claims Administrator to terminate Dr. Jacobs from the Program because he diagnosed too many Players with PD. Audit Report, at 46. While the Claims Administrator's issues with Dr. Jacobs are less than clear in the Report, the Claims Administrator does shed light on Dr. Jacobs's diagnostic process by including a summary of interviews with Dr. Jacobs and his office manager, Ms. Jaime Amaro. *Id.* at 44–46.

Despite the Claims Administrator's assertion that Dr. Jacobs might give "improper deference" to non-Program physicians, his interview tells a different story. *Id.* at 45. Dr. Jacobs explained that "he confirms the diagnosis through his own examination, looking for key symptoms like bradykinesia, cogwheel rigidity, and resting tremor." *Id.* at 99. Dr. Jacobs also stated that he "considers the player's response to [Levodopa]" and, as confirmed by the medical records of Mr. Levine's clients, often "advises players to come off their medication a day or two before the evaluation, so he can observe them in an unmedicated state." *Id.* Dr. Jacobs "denied feeling pressured by any law firms . . . or any [P]layers to provide specific diagnoses and maintained that his findings are based on his clinical judgment." *Id.* Nor was Dr. Jacobs offered anything "other than his standard exam fee for conducting his evaluations." *Id.* Ms. Amaro confirmed Dr. Jacobs's answers, stating that Players and law firms never offered her anything of value, nor have they requested "to change or modify language in a report." *Id.* at 100.

The interview summaries undercut the Claims Administrator's criticism of Mr. Levine for sending his clients to Dr. Jacobs, especially since the Claims Administrator does not challenge the veracity of either interviewee's answers. To the extent that Dr. Jacobs evaluated Players who had a previous PD diagnosis, he ***did not*** rubberstamp the treating physician's records and observations. Rather, "Dr. Jacobs confirmed [any] pre-existing [PD] diagnosis" independently and through his own examination. *Id.* at 99.

**Dr. Jeffrey Steinberg is a qualified neurologist who initially evaluated a small number of Mr. Levine's clients for PD symptoms and treatment.**

Dr. Jeffrey Steinberg is a treating physician who evaluated four of Mr. Levine's 500 Player clients. Decl. at ¶ 11. The Report seems to attack Dr. Steinberg's ability and credibility so as to make attorneys appear improperly motivated to send their clients to be treated by him. Audit

Report, at 46–51.[7] The Report notes that Dr. Steinberg has previously declared bankruptcy. *Id.* at 46. But the truth is that there is no evidence suggesting that Dr. Steinberg engaged in any claims-related misconduct whatsoever.

Similarly, the Claims Administrator implies misconduct by Mr. Levine because some of his clients allegedly did not continue treatment with Dr. Steinberg after obtaining PD diagnoses from MAFs. *Id.* at 47. Yet, neither Mr. Levine nor Dr. Steinberg have any obligation or ability to dictate whether a Player continues with PD treatment with him. . It certainly is not the lawyer's role to be involved in a Player's post-diagnosis medical treatment. These tangential facts do not provide any basis to conclude that Mr. Levine had engaged in any wrongdoing in connection with his clients' claims.[8]

Indeed, the Claims Administrator submitted ***twelve claims*** to an Appeals Advisory Panel ("AAP") Member for a determination of whether Dr. Steinberg's treatment raised any "red flags." *Id.* at 47. Tellingly, the AAP Member found "that the individual reports ***did not*** rise to a level he would consider to be a 'red flag.'" *Id.* (emphasis added). At most, the AAP Member suggested a few examples cited in the Report to imply some sort of problem with Dr. Steinberg's practice. For instance, the Claims Administrator says it is notable that Dr. Steinberg does not use the "Gelb criteria" to diagnose PD, but then concedes that, as a non-Program physician, Dr. Steinberg is not required to do so. *Id.* at 48. The AAP Member also speculated that Dr. Steinberg may have been coached because his initial evaluation of a Player in 2022 was more detailed than later evaluations

---

[7] The Report describes a connection among Mr. Levine, the law firm Podhurt Orseck PA, Mr. Levine's son (Justin Levine, former law clerk at Podhurst), and Dr. Steinberg, but fails to tie any misconduct to this alleged connection. Audit Report, at 47.

[8] Although not related to PD diagnoses or claims submission, the Claims Administrator notes that Dr. Steinberg represents himself as a board-certified neurologist even though his certifications expired in 2019. Audit Report, at 46. To the extent this is true, it does not suggest that Dr. Steinberg is not qualified to provide treatment, or that Mr. Levine had knowledge of the lapsed certification. But it does show that a reputed neurologist treated Mr. Levine's clients.

of other Players. *Id.* But there is a simple explanation for this discrepancy. As the AAP Member concedes, that was the only case where tremors, an essential PD symptom, were not present. *Id.* So of course Dr. Steinberg would need to provide a thorough report regarding PD where a common PD symptom is absent. Moreover, Dr. Tamara Greene—an MAF physician based out of Georgia that is not alleged to have engaged in any misconduct whatsoever—discussed Dr. Steinberg's treatment records in a way that shows he is sufficiently thorough and offers excellent care:

> In reviewing Dr. Steinberg's notes from his physical exam on 11/26/2022, there was note made of a resting tremor in both extremities, worse on the left and decreased arm swing. Mr. Surtain was started on carbidopa-levodopa 25-100mg BID and clonazepam 0.5mg qhs at this visit. During the follow-up visit on 02/08/2023, there was noted improvement in voice, mobility, insomnia, and tremor. Per the Gelb criteria, Mr. Surtain met criteria for possible diagnosis of Parkinson's disease during the follow-up visit on 02/08/2023. Specifically, he exhibited at least 2 of the 4 features in Group A with at least 1 of these tremor or bradykinesia (resting tremor and asymmetric onset), symptoms had been present for less than 3 years (Mr. Surtain noted onset of symptoms 2-3 years prior), and a substantial and sustained response to levodopa or a dopamine agonist had been documented. Additionally, on a follow-up exam on 11/17/2023, Mr. Surtain's exam was notable for cogwheel rigidity in the bilateral upper extremities, which was not noted in previous exams. This is consistent with the progressive nature of neurodegenerative disorders. Additionally, per the Gelb criteria, Mr. Surtain may have met criteria for probable diagnosis of Parkinson's disease during the follow-up visit on 11/17/2023. However, tremor and bradykinesia were not mentioned on the date of this evaluation.

Ex. D; *see also* Ex. E (Dr. Steinberg's treatment records of Samuel Cowart). Notwithstanding the foregoing, as discussed above, the MAF physicians did not have to rely on Dr. Steinberg's treatment records to evaluate any given Player for PD. Most importantly, to the extent the MAF physicians reviewed those records, it should be noted that the AAP Member concluded that ***"there was no evidence" that Dr. Steinberg "undu[ly] influence[d] [any] MAF Physicians."*** Audit Report, at 48 (emphasis added). Thus, Dr. Steinberg's provision of PD care to Mr. Levine's clients does not suggest that Mr. Levine engaged in misconduct.

**Dr. Stuart Isaacson evaluated only one of Mr. Levine's Player clients for PD.**

Last, the Report takes aim at Dr. Isaacson but does so with problematically circumstantial and, with regard to Mr. Levine, irrelevant evidence. Audit Report, at 54. Specifically, in 2025 an anonymous MAF physician reported that a Dr. Isaac Stuart (who the Report suggests is Dr. Isaacson) provided high PD ratings to Players who, in that physician's view, did not actually have PD. *Id.* The MAF physician also indicated that when he informs Players that they do not have PD, their attorneys send them to a different MAF physician. But this unsubstantiated tip lacks credibility for four reasons. First, the Claims Administrator speculates that the neurologist described by the MAF physician and identified as Dr. Isaac Stuart is Dr. Stuart Isaacson, but has not provided anything other than the similarity of the transposed names to allow one to conclude that the two doctors are indeed one and the same. Second, the Report does not state that the anonymous MAF physician provided a factual basis to support his statement that attorneys will send Players to a second MAF physician if the first Program physician does not provide a PD diagnosis. Third, that a Player's attorney encourages a second MAF doctor's opinion hardly supports allegations of fraudulent conduct, especially when the Report does not describe any review of the medical records associated with the anonymous MAF physician's tip. And last, with respect to Mr. Levine's association with Dr. Isaacson, it bears note that the allegedly overstated ratings described by the MAF physician were from 2019 and 2020, before Mr. Levine submitted any PD claims for his clients. The temporal disconnect nullifies any relevance of the suspected role of Dr. Isaacson in facilitating questionable PD diagnoses to Mr. Levine's clients' claim submissions.

In light of the foregoing, there is no reasonable basis for the Special Masters to find wrongdoing associated with the targeted PD diagnosis process, or the identified doctors that treated

and/or evaluated Mr. Levine's clients for PD. Mr. Levine has not attempted to submit any misleading or fraudulent PD claim and his affiliation with Mr. Grossinger and three physicians that are the subject of the Report does not lead to such a conclusion.

### B. Mr. Levine's co-counsel relationship with Mr. Grossinger has no nefarious undertones.

The Report suggests that Mr. Levine should have affirmatively disclosed his joint representation of his Player clients with Mr. Grossinger. Audit Report, at 33. However, there is no requirement in the Settlement Agreement for an attorney of record to disclose a co-counsel arrangement and the Claims Administrator does not point to such an affirmative obligation. Nor is it relevant that the co-counsel relationship was not reduced to writing, which is why the Claims Administrator points to no legal or ethical obligation for such relationships to be so consummated.[9] At any rate, and contrary to the Claims Administrator's suggestion, Mr. Levine was not hiding the ball. On November 18, 2025, the Claims Administrator contacted Mr. Levine and demanded that he describe his co-counsel arrangements within a week, *i.e.*, right before Thanksgiving and during a busy travel week. *Id.* Mr. Levine asked for more time to respond because his attorney was unavailable due to the holiday. *Id.* The Claims Administrator refused to agree to an extension, so Mr. Levine informed the Claims Administrator (correctly) that he was under no obligation to respond. *Id.* Had the Claims Administrator exercised patience and permitted Mr. Levine a bit of extra time to respond, the co-counsel allegations would be a non-issue.

Regardless, the Report overstates Mr. Levine's connection to Mr. Grossinger's alleged misconduct. To begin, the Claims Administrator suggests that Mr. Levine engaged in foul play by submitting claims after his clients followed the PD diagnosis and treatment process allegedly

---

[9] Moreover, all of Mr. Levine's clients have written representation forms and retainer agreements. Decl. at ¶ 3.

established by Mr. Grossinger. *Id.* at 14. Yet, as Mr. Levine already has explained above, that process embraces the well-recognized standard of care.

Next, the Claims Administrator suggests that because the clients of several law firms and attorneys affiliated with Mr. Grossinger, including Mr. Levine, were seen by the same treating physicians, that those physicians must be corrupt and incentivized to provide fraudulent PD diagnoses. *Id.* at 32. But the Claims Administrator provides no reasonable basis to show that Mr. Levine continued to utilize certain treating physicians for his clients while knowing that those physicians were enlisted by other attorneys or firms associated with Mr. Grossinger. To the contrary, and by way of example, once Mr. Levine learned that Mr. Grossinger worked with other law firms whose clients also were seen by Dr. Steinberg, he asked Mr. Grossinger to send his clients to new treating physicians to ensure that the reliability of his clients' claims could not be questioned. Decl. at ¶ 8. This is why Dr. Kramer and Dr. Steinberg both treated Marshall Faulk. Audit Report, at 48.

The Claims Administrator also contends that Mr. Grossinger or Mr. Levine invited Dr. Steinberg to a Super Bowl dinner event with dozens of Players. Audit Report, at 51–53. Mr. Levine ***did not send any invitation to Dr. Steinberg, nor was he in New Orleans at the time of the dinner or the Super Bowl game***. *See* Decl. at ¶ 11. Even if Mr. Grossinger issued the invitation, there is no basis to impute Mr. Grossinger's dinner invitation to Mr. Levine.

Similarly, the Claims Administrator notes that Dr. Sandeep Thakkar, who treated one of Mr. Levine's clients for PD, is financially motivated to work with attorneys to provide PD treatment to Players. Audit Report, at 26. But Mr. Levine has never interacted with Dr. Thakkar. As discussed above, Mr. Grossinger handled the Players' initial treatment and Mr. Levine rarely,

if ever, interacted with the treating physicians since that was Mr. Grossinger's responsibility. Deel. at ¶ 5.

Last, the Report asserts that Mr. Grossinger enlisted Dr. Cherian Karunapuzha to evaluate Players in hotel rooms, and in turn, imputes this conduct to Mr. Levine. Audit Report, at 21, 27. This allegation, like the others, is either unsupported or refuted in the Report itself. The Report states that Dr. Karunapuzha expressly stated that he "had no dealings with . . . [Mr.] Levine." Audit Report, at 87. Moreover, the Claims Administrator suggests that Dr. Karunapuzha's use of a hotel room to evaluate players violates Section 10.3(d) of the Settlement Agreement, *id.* at 56 n.95, but that section applies to MAF Qualifying Diagnoses, not treating physician evaluations, *see* Settlement Agreement, § 10.3(d). It is irrelevant that a non-Program physician screens Players for PD in a hotel room or a doctor's office. *See generally id.* at § 6.

In light of the foregoing, the Special Masters should conclude that the Claims Administrator's attempt to prove improper conduct by Mr. Levine by virtue of his association with Mr. Grossinger is not supported by the facts.

**C. The Audit Report fails to establish any reasonable basis to conclude that Mr. Levine engaged in any misconduct.**

The Report assembles a scattershot of allegations against a variety of actors in unrelated contexts to suggest a widespread attorney-physician driven scheme to procure fraudulent PD diagnoses for Players. But the Report does not connect Mr. Levine to the suspected improper conduct postulated by the Claims Administrator. The Report fails to connect Mr. Levine to the array of parties and their speculative misconduct simply because there is no valid basis to sweep Mr. Levine into a basket of allegations that have nothing to do with him.

Start with the idea that some attorneys allegedly solicit Players with the promise of a PD diagnosis and an accompanying payout. *See* Audit Report, at 1. The Claims Administrator links

this practice to Mr. Grossinger and Bart Oates ("Oates"), not Mr. Levine. *Id.* Similarly, the Claims Administrator believes that Mr. Grossinger, Oates, and J. Vincent Reppert attend Players' medical examinations, but no such allegation is made against Mr. Levine. *Id.* Likewise, the Claims Administrator notes that a law firm omitted a Player's medical records that do not support a PD diagnosis from a PD claim submission, but it does not contend that Mr. Levine ever has omitted relevant medical records. *Id.* at 76. And though Mr. Grossinger's relationship with certain physicians is described as "too clubby," the Claims Administrator does not indicate that Mr. Levine maintains such a relationship with physicians. *Id.* at 51.

Otherwise, the Claims Administrator explains some Players travelled well over 1,000 miles to see Dr. Jacobs for an MAF evaluation and over 500 miles to see Dr. Steinberg for treatment, which, due to the long distances, suggests improper motivation. Audit Report, at 46, 76. But Mr. Levine's clients did not go to such lengths to see either physician, for as described in the tables *supra* at 5–7, they lived near both doctors. *See* Decl. at ¶ 6.[10] Ironically, if Mr. Levine wished to send the eight Players who saw Dr. Jacobs to a to a different MAF doctor, he would have to request an exception to the 150-mile rule. *See* Ex. G. It is absurd to suggest that Mr. Levine improperly shopped for an MAF physician by following the Program rules, rather than invoking an exception.

So, if Mr. Levine did not (1) promise PD diagnoses; (2) attend Players' medical appointments; (3) omit important medical information when submitting PD claims; (4) become "too clubby" with neurologists; or (5) send his clients vast distances to see various physicians, he

[10] Although Dr. Schwartzbard, an MAF physician, was also located in Florida, her availability was drastically limited during the operative timeframe. Deel. at ¶ 7. And even if Dr. Schwartzbard was available, Mr. Levine's Player clients were free to seek an MAF evaluation from ***any*** Program-approved neurologist within 150 miles of their residence, and that is precisely what they did. *Id.* at ¶ 6. The only exceptions are Michael Bankston and Eric Swann, both of whom received exemptions to see MAF physicians outside of their 150 miles radius because there were no such physicians in either Player's vicinity. *Id.*

should not be found to have participated in any wrongdoing simply because his firm is included in the Report.

Just as striking as the omission of Mr. Levine from those allegations is the Claims Administrator's allusion to alleged misconduct by Mr. Levine that is unrelated to and outside to the scope of the Report.

The Claims Administrator states that it "issued a memorandum to the Special Masters documenting new concerns (in addition to this matter) regarding Mr. Levine and Pro Athlete, among which were new allegations of coaching and preparation of unreliable documents, discrepancies in attorney representation documents, use of inpatient mental health facilities, and paying a SCM for referrals." Audit Report, at 14. These unsubstantiated allegations are irrelevant to the Report, and Mr. Levine cannot respond to them without understanding the factual or legal basis for the Claims Administrator's secret memorandum. Mr. Levine denies any alleged wrongdoing, and notes those unsettled allegations in the Report do not bear upon the credibility of his submission of PD claims for his clients. To that end, Mr. Levine offered to be interviewed by both the Claims Administrator as well as its private investigator, but both declined his invitation.

The only allegations of purported misconduct by Mr. Levine in submitting PD claims wholly depend on a disgruntled former client, James Hasty, who was angry that he did not obtain a PD diagnosis and that Mr. Levine refused to fabricate a PD diagnosis to help him obtain an award. Decl. at ¶ 12. Mr. Hasty's claims (which are adopted in toto by the Claims Administrator, Audit Report, at 21–23) as to Mr. Levine's supposed misconduct fall into two categories.

First, Mr. Hasty informed the Claims Administrator that Mr. Levine did not want to discuss matters over text and preferred to talk over the phone. This is partially truthful, but contrary to the Claims Administrator's illogical leap, does not suggest impropriety. Mr. Levine's practice is to

discuss life-changing illnesses like PD with his clients over the phone rather than text because verbal communication allows for a clearer understanding of the client's challenges and concerns. Deel. at ¶ 13. This practice reflects proffessionalism and tact, not some amorphous brand of misconduct.

Second, Mr. Hasty frames his treatment as some sort of crooked arrangement. Was Mr. Hasty screened by Dr. Karunapuzha in a hotel? Mr. Levine believes so, but there is nothing improper about Mr. Levine's client being screened for PD by a certified neurologist that specializes in PD. *See* Audit Report, at 21 n.42.[11] Did Dr. Karunapuzha inform Mr. Grossinger that Mr. Hasty had symptoms of dementia? Mr. Levine again believes this is true, but screening clients for cognizable claims, whether in the NFL settlement process or in personal injury cases, is common, efficient, and hardly questionable. Was Mr. Grossinger or Dr. Karunapuzha responsible for referring Mr. Hasty to Dr. Avesh Verma, who in turn prescribed Levodopa to Mr. Hasty? Once more, Mr. Levine thinks the answer is likely yes. But as discussed, when a physician suspects that an individual has PD, prescribing Levodopa early on in the treatment relationship is routine and assists with diagnosis. Thus, from Dr. Karunapuzha screening Mr. Hasty for PD to Dr. Verma prescribing Levodopa to Mr. Hasty, no physician or lawyer engaged in any form of misconduct.

Importantly, Mr. Hasty's failure to describe the basis for his separation from Mr. Levine undermines both his insinuations and his credibility. Mr. Hasty admitted to the Claims Administrator that he changed law firms, but absent from the Report is any description of the timing of, and reason for this change. As to the former, Mr. Hasty fired Mr. Levine and moved to

[11] Relatedly, the Claims Administrator, in nebulous phrasing, alluded to some sort of impropriety because Mr. Hasty requested his medical records from Dr. Karunapuzha but "he was informed from OKC Medical that no records existed." Audit Report, at 22. The Claims Administrator, however, indicates that Dr. Karunapuzha practices at Mercy Hospital, so it is unclear how it is relevant that OKC Medical had no records. *Id.* at 21 n.42. Moreover, per Mr. Hasty's own claims, Dr. Karunapuzha merely referred Mr. Hasty to another neurologist and did not prescribe medication or otherwise provide any treatment. Therefore, it is unclear as to how those records, if they exist, would be relevant.

a new law firm in June 2025, *see* Ex. F, because he was upset that Mr. Levine would not guarantee him a PD diagnosis, Deel. at ¶ 12. Specifically, Mr. Hasty saw Dr. Verma in May 2025, and Dr. Verma told Mr. Hasty to stop taking Levodopa because he does not have PD. *Id.* The temporal proximity between Dr. Verma informing Mr. Hasty that he does not have PD and Mr. Hasty firing Mr. Levine to find a law firm to help him obtain a PD diagnosis (*i.e.*, one month) eviscerates Mr. Hasty's position that Dr. Verma never told him to stop taking PD medication. Audit Report, at 22. The reason why Mr. Hasty returned to Dr. Verma in August 2025 after acquiring new counsel, even though Dr. Verma said he did not have PD, is a mystery. But it does show that Mr. Hasty himself., along with his new counsel, seemingly held Dr. Verma in high enough regard to continue the doctor-patient relationship after the May 2025 appointment.

At bottom, the Report's recitation of. Mr. Hasty's allegations does not suggest that Mr. Levine engaged in any wrongdoing. Rather, they show that Mr. Levine would not entertain a Player's request to fabricate a PD diagnosis. Deel. at ¶ 12. Mr. Hasty's allegations also show that he obtained proper treatment while represented by Mr. Levine, and that Mr. Levine exercises professionalism when discussing medical diagnoses with his clients. And finally, Mr. Hasty's allegations show something broader, to which Mr. Levine has sworn in a declaration: "Mr. Levine direct[ed] [Mr. Hasty] to [Mr. Grossinger] to answer questions he had regarding his PD diagnosis," Audit Report, at 22, because Mr. Grossinger, as Mr. Levine's co-counsel, handled their clients' PD treatment, *see* Decl. at ¶ 5.

## V. <u>Conclusion</u>

For the foregoing reasons, there is no reasonable basis for the Special Masters to conclude that Mr. Levine engaged in any wrongdoing in connection with his clients' PD claims submissions. There is no basis to conclude that Mr. Levine encouraged any misconduct by the treating

physicians and MAF doctors who are the subject of the Audit Report and, in fact, no support for that Report's conjecture that there was in fact any such misconduct. At most, Mr. Levine's co-counsel, Mr. Grossinger, is alleged to have engaged in misconduct of which Mr. Levine was unaware. And the Claims Administrator has provided no basis for the Special Masters to conclude that Mr. Levine had knowledge of, or otherwise acquiesced in, Mr. Grossinger's allegedly improper conduct. Mr. Levine is not, and cannot be, culpable of any alleged misconduct by mere association.

DATED: February 3, 2026

Respectfully submitted,

HICKS THOMAS LLP
A REGISTERED LIMITED LIABILITY PARTNERSHIP

By: */s/ Robin L. Harrison*
Robin L. Harrison
State Bar No. 09120700
rharrison@hicks-thomas.com
Kai Mindick
State Bar No. 24133963
kmindick@hicks-thomas.com
700 Louisiana, Suite 2300
Houston, Texas 77002
Tel: 713.547.9100
Fax: 713.547-9150

**Attorneys for David Levine and Pro Athlete Law Firm, P.A.**