# Exhibit #5
# Special Masters' Rule 27 Decision on the Report of Adverse Finding Re: Cuthbert

**SPECIAL MASTERS' RULE 27 DECISION ON THE REPORT OF ADVERSE FINDING REGARDING BYRON CUTHBERT AND ASSOCIATES, LLC**

## Introduction

On April 13, 2021, Dr. [redacted], a MAF neurologist, called the Program to report that Attorney Byron Cuthbert had been calling him daily to "twist [his] arm." Doc. 277525, at 21. Mr. Cuthbert, said the Program's doctor, was "breaking the law": his communications felt like "mafia letters." *Id.* Dr. [redacted] revealed that Mr. Cuthbert was telling him "what to do with a claim, including instructions to backdate a diagnosis to a particular date." *Id.*

Dr. [redacted]'s allegations formed part of a thick file of complaints about Mr. Cuthbert's practice habits regarding this Settlement that ultimately generated today's Opinion. Under Section 10.3 of the Settlement Agreement and Rule 7(b) of the Rules Governing Audit of Claims, the Claims Administrator audited Byron Cuthbert and Associates, LLC. After conducting interviews with nineteen individuals, it issued a 225-page Rule 15 Audit Report that found that Mr. Cuthbert "displayed a pattern of questionable behavior" including persisting in using PET scans he knew were unreliable, pressuring doctors to change and backdate diagnoses, drafting a medical record under a doctor's name, and preparing third-party affidavits with specific language not unique to Players. Doc. 277525, at 49. The Claims Administrator found that these were material misrepresentations, made for the purpose of securing awards. *Id.* at 48. Finally, the Claims Administrator identified some evidence that Mr. Cuthbert coached Players on how to behave during medical evaluations. *Id.* at 49.

Pursuant to Rule 16(a), the Claims Administrator referred its Audit Report to us, but did not make a specific remedial recommendation. By contrast the NFL Parties, submitting a Rule 17 Statement of Position, asked that Mr. Cuthbert be barred from the Program, among other remedies. Doc. 279582. Mr. Cuthbert submitted a responsive memorandum under Audit Rule 20, Doc. 282199, and the NFL Parties then submitted a reply memorandum under Rule 21. Doc. 283621. Class Counsel did not participate.

Ultimately, we are charged under Rule 28 with determining whether Mr. Cuthbert has "established that there is no reasonable basis" to support the Audit Report's finding "that there has been a misrepresentation, omission or concealment of a material fact made in connection with a Claim by the Settlement Class Member." We have reviewed the full record of the Audit Proceeding, considered the responsive memoranda, and now issue this Decision regarding Byron Cuthbert and Associates.

## Factual and Procedural Background

As of February 15, 2023, the date of the Rule 15 Audit Report, Byron Cuthbert and Associates represented "223 registered Settlement Class Members in the Settlement Program, 83 of whom have filed 114 Monetary Award claims." Doc. 277525, at 1. Twenty-four of these claims

have been paid. *Id.* at 2. A total of twelve claims of Players currently represented by Byron Cuthbert and Associates are implicated in this Audit.[1]

Beginning in January of 2019 and continuing through March of 2022, the Claims Administrator received five tips from five separate sources implicating Mr. Cuthbert in unethical conduct relating to the Settlement Program. *Id.* at 3–6. Three of these were from different lawyers who represent Players in the Program. Those lawyers shared concerns that Mr. Cuthbert had purported to guarantee to prospective clients that he could win them a Monetary Award using (what the informants thought were unreliable) Amyloid PET scans to secure Alzheimer's Disease diagnoses. *Id.* at 3–4.

Another tip came from an individual who raised concerns that a Player represented by Mr. Cuthbert was receiving a Monetary Award despite being able to participate in rodeos.[2] The Claims Administrator, investigating, found that the Player in question had not yet filed a Claim. But its suspicions grew that Mr. Cuthbert was representing to Players that he could guarantee an Award. *Id.* at 4–5.

Finally, the Claims Administrator spoke thirteen times with a woman "who has wished to remain anonymous due to concerns for her safety." *Id.* at 5. She alleged that one of the Players Mr. Cuthbert represents "filed a claim but had faked his symptoms and had submitted an affidavit to support his claim which contained false information." *Id.* Again, as of today, this Player has not yet filed a claim.

The Claims Administrator investigated these issues extensively, over years. *Id.* at 2. On March 8, 2022, it interviewed Mr. Cuthbert. It concluded that Mr. Cuthbert dissembled during that conversation.[3]

In September 2022, the Claims Administrator shared its preliminary findings with Mr. Cuthbert "in an effort to address these concerns." *Id.* It sought, ultimately, to pair Mr. Cuthbert with an attorney mentor experienced with the ins and outs of the Settlement, in the hopes of correcting what it saw as Mr. Cuthbert's wrongful behavior going forward. *Id.* at 42.

Mr. Cuthbert largely rejected this approach. He sought second opinions for the questionable PET scans from another doctor, and consulted with a different attorney from those offered as mentors by the Claims Administrator. *Id.* The doctor who purported to verify the

---

[1] These are [redacted] (SPID 100000793), [redacted] (SPID 1000 04597), [redacted] (SPID 100005198), [redacted] (SPID 100005756), [redacted] (SPID 100005916), [redacted] (100006836), [redacted] (SPID 100007913), [redacted] (SPID 100002921), [redacted] (SPID 100004410), [redacted] (SPID 100007249), [redacted] (SPID 100011956), and [redacted] (SPID 260001260).

[2] This Player was [redacted] (SPID 100011429).

[3] For example, when asked if he had ever drafted an addendum for a doctor, Mr. Cuthbert replied, "'no, never.'" Doc. 277525, at 67. This is simply not true: Mr. Cuthbert sent Dr. [redacted] a draft addendum report under Dr. [redacted]'s name and specifically asked Dr. [redacted]'s office to "'[r]eview, edit and sign off the addendum to his notes then send back to me so I can file fir his appeal.'" *Id.* at 23. The original draft as it was sent to Dr. [redacted]'soffice shows that Mr. Cuthbert was the last user to modifiy the document. *Id.*

unreliable PET scan findings incorrectly applied the relevant scoring system, rendering the second opinions of the unreliable PET scans themselves unreliable. *Id.* at 46.

Given Mr. Cuthbert's refusal to work with the Claims Administrator to resolve its concerns, it renewed the audit investigation. On February 15, 2023, the Claims Administrator issued a Rule 15 Audit Report. That Report in relevant part concludes that Mr. Cuthbert:

- submitted to the Program and pressured physicians to rely upon Amyloid PET scans that he knew were unreliable;
- attempted to influence and change Qualified MAF Physicians' diagnoses in order to secure Alzheimer's diagnoses in contravention of FAQ 94's guidelines for appropriate communications with Qualified MAF Physicians;
- submitted inaccurate costs in relation to lien disputes;
- drafted medical records for at least one Diagnosing Physician to be used in support of an Appeal;
- drafted affidavits for third parties asserting specific information that was not unique to the Settlement Class Member;
- may have coached Settlement Class Members on how to behave during medical examinations to obtain given diagnoses;
- was not truthful when questioned about the above;
- did not accept the opportunity to resolve these concerns and instead doubled down on his position.

*Id.* at 2–3.

The Claims Administrator found that Mr. Cuthbert using the unreliable Amyloid PET scans, attempting to have Diagnosing Physicians change their diagnoses, drafting of medical records and third-party affidavits, and (if true) coaching of Players were material misrepresentations and omissions related to Claim filings. *Id.* at 48–49.

**Discussion**

Mr. Cuthbert's burden in this Audit is to show "that there is no reasonable basis" for the Claims Administrator's factual findings about his misrepresentations and omissions. This he has plainly failed to do. His briefing was tendentious when it was not evasive:[4] he in no way satisfied

---

[4] Mr. Cuthbert responds to the Claims Administrator's finding that he pressured doctors into changing their diagnoses by insisting, "Questioning an expert is not 'pressure', regardless of how a medical expert's fragile ego may react to having their finding questioned." Doc. 282199, at 7. This is simply not responsive to the Claims Administrator's concerns. Mr. Cuthbert insists that the third-party affidavits he provided were nothing more than an attorney's "routine" provision of an "outline of topics that need to be covered" in the form of a "template." Doc. 282199, at 8. But "template" mischaracterizes the documents Mr. Cuthbert provided to third-party affiants. The Rule 15 Audit Report documents multiple examples of affidavits purportedly authored by different individuals, about different individuals with identical language. Doc. 277525, at 25-26. An affidavit "template" provided by Mr. Cuthbert to one of the third-party affiants—containing some of the identical language that raised red flags in the first place—reveals

the "no reasonable basis" burden he faces in this Audit. We have considered the record and adopt the factual findings of the Claims Administrator. Mr. Cuthbert knowingly used unreliable Amyloid PET scans, attempted to have Diagnosing Physicians change their diagnoses, and drafted both medical records and third-party affidavits. These were material omissions or misrepresentations connected to Claim submissions. We also conclude that Mr. Cuthbert was not truthful in responding to the investigatory process, making it more difficult for the Claims Administrator to carry out its duties.

However, like the Claims Administrator, we are not sure that Mr. Cuthbert coached Players. Despite the Appeals Advisory Panel Leadership Counsel (AAPLC)'s opinion that similarities in how Players acted at medical evaluations strongly indicated that they had been coached, the Claims Administrator was ultimately "unable to confirm that Mr. Cuthbert has in fact coached any of his clients on what to say or how to act during an exam for the Program." *Id.* at 34. Needless to say, coaching Players on what they should say and how they should act during medical evaluations violates the honesty and openness required of Players in their interactions with doctors in the Program.[5]

## Conclusion

The Claims Administrator ended its thorough report with the following trenchant summary:

> Through his interactions with the Program, Mr. Cuthbert has displayed a pattern of questionable behavior that has placed an unnecessary burden on Qualified MAF Physicians, Program experts, and the Claims Administrator. The evidence we have obtained shows that Mr. Cuthbert orchestrated a process designed to manipulate the judgment of Diagnosing Physicians by attempting to influence their decisions and professional judgment, based largely on PET scan reports that we have determined are unreliable.
>
> Mr. Cuthbert knew these reports to be unreliable yet continued to present them as the "ticket" to a Qualifying Diagnosis of Alzheimer's Disease, even when his clients had already received a Qualifying Diagnosis of Neurocognitive Impairment. Further, Mr. Cuthbert questioned medical professionals and pressured Program doctors to change their diagnoses, drafted a medical record under a doctor's name, prepared third-party affidavits that included specific language that was not actually unique to the Players, and, based on expert AAPLC opinion, possibly coached his clients on how to perform during their exams.

---

that Mr. Cuthbert provided full, substantive, and conclusory wording around symptoms and experiences meant to be individualized and specific to each Player, with fill-in-the-blank spaces for each Player's name. *Id.* at 28.

[5] FAQ 94 emphasizes that Players must "talk openly and honestly with the Qualified MAF Physician" and "provide complete and truthful answers to the doctor's questions." *Frequently Asked Questions: FAQ #94* (regarding communications with MAF Physicians), NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com. Players cannot be open, honest, complete, and truthful if they have been coached in advance about what to say and how to say it.

*Id.* at 49.

With respect to next steps, we consider the Claims Administrator's factual findings in light of remedial action we might take. In the event of a "misrepresentation, omission, or concealment of a material fact made in connection with the claim," Settlement Section 10.3(i) allows us to, "without limitation," direct the following as possible remedies:

> (a) denial of the claim in the event of fraud; (b) additional audits of claims from the same law firm or physician (if applicable), including those already paid; (c) referral of the attorney or physician (if applicable) to the appropriate disciplinary boards; (d) referral to federal authorities; (e) disqualification of the attorney, physician and/or Settlement Class Member from further participation in the Class Action Settlement; and/or (f) if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member will be forfeited and paid to the Settlement Trust for transfer by the Trustee into the Monetary Award Fund.

Settlement Agreement, Section 10.3 (i).

In short, our remedial options are broad. And Mr. Cuthbert's wrongful conduct—and his unrepentant behavior when confronted with the problems he caused—was persistent.

Attorneys may legitimately communicate with Qualified MAF Physicians about administrative and scheduling matters, even up to "correcting factual things the records may have wrong."[6] But FAQ 94 expressly prohibits attorneys from attempting "to instruct or influence how the doctor performs the examination and makes a diagnosis," and from asking "the doctor to change a diagnosis in any way." *Id.* Mr. Cuthbert's communications with MAF Physicians Dr. [redacted], Dr. [redacted], and Dr. [redacted] ran afoul of this standard. Doc. 277525, at 16–22. Emailing and calling doctors on a daily basis, asking for in person meetings, requesting doctors to backdate or change diagnoses, pre-writing medical records, and questioning a doctor's methodology are illustrative of conduct that crosses the line.

Just as communications between attorneys and physicians in the Program must adhere to high standards of propriety, diagnoses must adhere to the criteria laid out in Exhibit A-1 of the Settlement. FAQ 116 is explicit that "a positive amyloid PET scan does not establish a diagnosis of Alzheimer's Disease or any other cognitive disorder."[7] Rather, it is one tool among many used by clinicians in diagnosing Alzheimer's Disease. Mr. Cuthbert's representations to potential clients,

---

[6] *Frequently Asked Questions: FAQ #94* (regarding communications with MAF Physicians), NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com.

[7] *Frequently Asked Questions: FAQ #116* (regarding use of biomarker tests in diagnosing Alzheimer's Disease), NFL CONCUSSION SETTLEMENT, https://www.nflconcussionsettlement.com.

therefore, to the effect that a positive PET scan was all that was needed for a Qualifying Diagnosis under the Settlement Program were improper.[8] Mr. Cuthbert additionally erred in relying on PET scans from Dr. Eber's office well after being alerted that these scans were unreliable.[9] This conduct evidenced a sustained attempt to secure Claim Awards using medical records that Mr. Cuthbert knew, or should have known, were defective.

It is also clear from the Audit Report that Mr. Cuthbert pushed doctors harder than the Settlement allows. The pressure he exerted on them to modify diagnoses was inappropriate. The PET scans he relied on were unreliable, a fact of which he was on notice. And his drafting of medical records and third-party affidavits crossed the line between an ordinary template common in legal practice and putting words in the mouths of people who needed to use their own independent judgment.

The Claims Administrator is correct in concluding that Mr. Cuthbert's overreliance on unreliable PET scans as proof of Alzheimer's Disease "certainly had the potential to affect, and did affect, his clients' Qualifying Diagnoses." Doc. 277525, at 48. So, too, were Mr. Cuthbert's efforts to pressure Diagnosing Physicians to change or backdate diagnoses and his drafting of medical records and third-party affidavits. *Id.* The integrity of the Settlement depends on reliable, accurate diagnoses, and Mr. Cuthbert's conduct had a material impact on the reliability and accuracy of his clients' diagnoses. His conduct throughout the Audit investigation then made things worse, attenuating the process of getting to the bottom of what happened and running up costs. That the Claims Administrator did not find that Mr. Cuthbert filed a Claim knowing it rested on falsified documentation (rather than a mix of unreliable and pre-drafted records) does not clear Mr. Cuthbert from wrongdoing.

Under Section 10.3 (i)(e) and (f), we have the power to bar Mr. Cuthbert and his law firm entirely from further participation in the Settlement Program. His conduct led to multiple material misstatements in Claims submitted on behalf of Settlement Class Members. It has diverted the attention of the Claims Administrator, raised the administrative cost of this Program, and ultimately harmed his clients. However, we do not exercise this power today because we conclude that Mr. Cuthbert's conduct, though wrongful, was not provably malicious. Instead, we issue the following remedies:[10]

---

[8] For example, one Player told the Claims Administrator that Mr. Cuthbert advocated for avoiding the "'regular way' of going through the MAF or BAP process" in favor of "undergoing a PET scan, which 'looked at your brain.'" Doc. 277525, at 6.

[9] In total, Mr. Cuthbert sent 99 clients to Dr. Eber for PET scans. Doc. 277525, at 8. On April 19, 2021, an MAF Physician's assistant directly communicated with Mr. Cuthbert that the Physician recommended getting re-reads of several Dr. Eber PET scans. *Id.* at 12. At this point, Mr. Cuthbert was "on notice about possible unreliability of Dr. Eber's findings." *Id.* Yet Mr. Cuthbert continued to send clients to Dr. Eber. When confronted by the Claims Administrator, instead of seeking accurate scans from a reliable source, Mr. Cuthbert sought a second opinion on the Dr. Eber scans from another physician who used unreliable criteria. *Id.* at 16.

[10] These remedies shall apply to all Monetary Award claims that exhibit the issues discussed in the Audit, regardless of current representation.

1. Under Section 10.3 (i)(a), the twelve Claims directly implicated in this Audit are now denied. We emphasize that Mr. Cuthbert, not his clients, is at fault. But the issues described in this Audit are intractable, ranging from unreliable PET scans to undue pressure on doctors. The task of separating out the genuine from the tainted in the medical evidence behind each Qualifying Diagnosis would be difficult, time-consuming, and in our experience unlikely to lead to successful submissions based on the existing medical records. We thus deny the Claims now to expedite the process of Claimants obtaining new medical records unsullied by the issues described in this Audit.
2. Under Section 10.3 (i)(b), we direct the Claims Administrator to first suspend the processing of all Claims currently or formerly represented by Mr. Cuthbert, whether on review or on appeal, and review them with care as follows:
    - Any additional Claims supported by a PET scan from Dr. Eber's office should be Denied.
    - Further the Claims Administrator shall certify, before continuing to process each Claim, and before permitting the continued processing of any Appeal, that the Claim is entirely free of the issues discussed in the Audit. We will consider that determination to be dispositive.
    - If the Claims Administrator cannot determine that the pending Claim or Appeal is free of the issues raised by this Audit, they shall notify the Special Masters, who will deny that Claim without prejudice pursuant to this Order.
3. These remedies result from Mr. Cuthbert's actions, and the burdens of delay and expense caused by his conduct. We condemn Mr. Cuthbert's conduct as described in this Decision and the underlying Audit Report. We hereby censure him. The Claims Administrator shall make a copy of this Opinion available on the NFL Concussion Settlement Website, redacting all names but those of Mr. Cuthbert and Dr. Eber.

David A. Hoffman

Jo-Ann M. Verrier

Dated June 28, 2023